1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3

     IN RE BROILER CHICKEN ANTITRUST     )  Docket No. 16 C 8637
4    LITIGATION                          )
                                         )  Chicago, Illinois
5    This Document Relates To:           )  October 21, 2016
     All Actions                         )  9:37 a.m.
6

7              TRANSCRIPT OF PROCEEDINGS - Status
           BEFORE THE HONORABLE THOMAS M. DURKIN
8

9    APPEARANCES:

10

     For Plaintiffs      HART McLAUGHLIN & ELDRIDGE LLC by
11   Maplevale Farms     MR. STEVEN A. HART
     and John Gross      121 W. Wacker Drive, Suite 1050
12   and Company:        Chicago, IL 60601

13   *(Direct purchaser plaintiffs interim liaison class counsel)*

14

                         LOCKRIDGE GRINDAL NAUEN PLLP by
15                       MR. W. JOSEPH BRUCKNER
                         MR. BRIAN D. CLARK
16                       100 Washington Avenue South, Suite 2200
                         Minneapolis, MN 55401
17
     *(Direct purchaser plaintiffs interim co-lead class counsel)*
18

19                       PEARSON SIMON & WARSHAW LLP by
                         MR. BRUCE L. SIMON
20                       44 Montgomery Street, Suite 2420
                         San Francisco, CA 94104
21
     *(Direct purchaser plaintiffs interim co-lead class counsel)*
22

23

24

25

APPEARANCES (Cont'd.):

For Plaintiffs Fargo     WEXLER | WALLACE LLP by
Stopping Center,         MR. THOMAS A. DOYLE
Sargent's Restaurant     55 W. Monroe Street
and Don Chavas           Suite 3300
Mexican Restaurant:      Chicago, IL 60603

*(Indirect purchaser plaintiffs interim liaison class counsel)*

For Plaintiffs          GUSTAFSON GLUEK PLLC by
Fargo Stopping          MR. DANIEL E. GUSTAFSON
Center and              MR. JOSHUA R. RISSMAN
Sargent's               Canadian Pacific Plaza
Restaurant:             120 S. 6th Street, Suite 2600
                        Minneapolis, MN 55402

*(Indirect purchaser plaintiffs interim co-lead class counsel)*

                        COTCHETT PITRE & McCARTHY LLP by
                        MR. STEVEN N. WILLIAMS
                        840 Malcolm Road, Suite 200
                        Burlingame, CA 94010

*(Indirect purchaser plaintiffs interim co-lead class counsel)*

For Defendants          NOVACK AND MACEY LLP by
Koch Foods, JCG         MR. STEPHEN NOVACK
Foods and Koch          MR. STEPHEN J. SIEGEL
Meats:                  100 N. Riverside Plaza, Suite 1500
                        Chicago, IL 60606

For the Tyson           WHITE & CASE LLP by
Defendants:             MR. PETER J. CARNEY
                        701 13th Street, NW
                        Washington, DC 20005

                        WHITE & CASE LLP by
                        MR. DAVID H. SUGGS
                        1155 Avenue of the Americas
                        New York, NY 10036

```
1    APPEARANCES (Cont'd.):

2

3    For Defendant          SIMPSON THACHER & BARTLETT LLP by
     Pilgrim's Pride:       MR. KEVIN J. ARQUIT (via telephone)
                            MS. ANDREA B. LEVINE (via telephone)
4                           425 Lexington Avenue
                            New York, NY 10017
5

6    For Defendant          FALKENBERG FIEWEGER & IVES LLP by
     Perdue Farms:          MS. KIRSTIN B. IVES
7                           30 N. LaSalle Street, Suite 4020
                            Chicago, IL 60602
8

9                           VENABLE LLP by
                            MS. LISA JOSE FALES
10                          MS. DANIELLE R. FOLEY
                            575 7th Street, NW
11                          Washington, DC 20004

12
     For the Sanderson      KIRKLAND & ELLIS LLP by
13   Farms Defendants:      MR. DANIEL E. LAYTIN
                            MS. CHRISTA C. COTTRELL
14                          MR. MARTIN L. ROTH
                            300 N. LaSalle Street
15                          Chicago, IL 60654

16
     For Defendant          PROSKAUER ROSE LLP by
17   Wayne Farms:           MR. CHRISTOPHER E. ONDECK
                            MR. ADRIAN FONTECILLA
18                          1001 Pennsylvania Avenue, NW
                            Suite 600 South
19                          Washington, DC 20004

20
                            PROSKAUER ROSE LLP by
21                          MR. MARC E. ROSENTHAL
                            70 W. Madison Street, Suite 3800
22                          Chicago, IL 60602

23
     For the Mountaire      ROSE LAW FIRM by
24   Farms Defendants:      MS. AMY LEE STEWART
                            120 E. 4th Street
25                          Little Rock, AR 72201
```

```
1    APPEARANCES (Cont'd.):

2

3    For Defendant            SKADDEN ARPS SLATE MEAGHER & FLOM by
     Peco Foods:              MR. BORIS BERSHTEYN
                              4 Times Square
4                             New York, NY 10036

5

6    For Defendant            VEDDER PRICE PC by
     House of                 MR. GREGORY G. WROBEL
     Raeford Farms:           222 N. LaSalle Street, Suite 2600
7                             Chicago, IL 60601

8

9    For Defendant            SHOOK HARDY & BACON LLP by
     Simmons Foods:           MS. LYNN H. MURRAY
                              111 S. Wacker Drive, Suite 5100
10                            Chicago, IL 60606

11

12   For Defendant            ALSTON & BIRD LLP by
     Fieldale Farms:          MS. VALARIE C. WILLIAMS
                              1201 W. Peachtree Street
13                            Atlanta, GA 30309

14

15   For the George's         RILEY SAFER HOLMES & CANCILA LLP by
     Defendants:              MS. SONDRA A. HEMERYCK
                              70 W. Madison Street, Suite 2900
16                            Chicago, IL 60602

17

                              THE LAW GROUP OF NORTHWEST ARKANSAS LLP by
18                            MS. KRISTY E. BOEHLER (via telephone)
                              1830 Shelby Lane
19                            Fayetteville, AR 72704

20

21   For the                  KUTAK ROCK LLP by
     O.K. Defendants:         MR. JOHN P. PASSARELLI
                              1650 Farnam Street
22                            Omaha, NE 68102

23

                              KUTAK ROCK LLP by
24                            MR. J.R. CARROLL
                              234 E. Millsap Road, Suite 200
25                            Fayetteville, AR 72703-4099
```

1    APPEARANCES (Cont'd.):

2
                         KUTAK ROCK LLP by
3                        MS. KIMBERLY M. HARE
                         One S. Wacker Drive, Suite 2050
4                        Chicago, IL 60606-4615

5
     Also Present:       MR. BRIAN AN, Citadel (via telephone)
6

7    Court Reporter:     LAURA R. RENKE, CSR, RDR, CRR
                         Official Court Reporter
8                        219 S. Dearborn Street, Room 1432
                         Chicago, IL 60604
9                        312.435.6053
                         laura_renke@ilnd.uscourts.gov
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (In open court.)

2          THE CLERK:  Okay.  Is everybody else here on the

3      Maplevale Farms case?  Looks like it.

4          Okay.  I've got to dial in some attorneys.

5      (Clerk places telephone call.)

6          THE CLERK:  Good morning.  This is Sandy with Judge

7      Durkin.  Sorry for the delay.  But this is Case No. 16 C 8637,

8      Maplevale Farms v. Koch Foods.

9          THE COURT:  All right.  This is Judge Durkin.  A

10     couple -- we have a number of attorneys in court.  Some of them

11     are up before the bench; some are in the back of the courtroom.

12     There is a sign-in sheet for anyone who wants to have a

13     record -- the record reflect their presence here.  And that

14     will be present on the docket sheet -- or on the transcript.

15     Your presence will be noted.

16         Let's have the attorneys on the phone identify

17     themselves, please.

18         MR. ARQUIT:  Kevin Arquit from Simpson, Thacher &

19     Bartlett for Pilgrim's Pride.

20         THE CLERK:  Can you speak a little louder, please.

21         MR. ARQUIT:  Yes.  Kevin Arquit from Simpson,

22     Thacher & Bartlett for Pilgrim's Pride.

23         MS. BOEHLER:  Kristy Boehler with The Law Group of

24     Northwest Arkansas for George's, Incorporated, and George's

25     Farms, Incorporated.

1    THE COURT:  There are others on the phone.  So anybody

2  else?

3    MS. LEVINE:  ... with Simpson Thacher on behalf of

4  Pilgrim's Pride.

5    THE COURT:  Name again, please.

6    MS. LEVINE:  Andrea Levine.

7    THE COURT:  All right.  Anyone else on the phone?

8    (No response.)

9    THE COURT:  All right.  Now let's have the attorneys

10  present before the Court identify themselves, please, starting

11  first with plaintiffs.

12    MR. SIMON:  Thank you, your Honor.  Bruce Simon,

13  Pearson, Simon & Warshaw, co-lead counsel for the direct

14  purchasers in this matter.

15    MR. HART:  Good morning, your Honor.  Steven Hart,

16  Hart, McLaughlin & Eldridge in Chicago, on behalf of the direct

17  purchasers, liaison counsel.

18    THE COURT:  Okay.

19    MR. DOYLE:  Good morning, your Honor.  Thomas Doyle,

20  liaison counsel for the indirect purchasers.  With me in court

21  this morning are the two co-leads for the indirect purchasers,

22  Dan Gustafson and Steven Williams.

23    MR. GUSTAFSON:  Good morning, your Honor.

24    MR. WILLIAMS:  Good morning, your Honor.

25    THE COURT:  Good morning.

1          MR. BRUCKNER:  Good morning, your Honor.  Joseph

2    Bruckner from the Minneapolis firm Lockridge Grindal, here for

3    the direct purchaser plaintiffs.

4          THE COURT:  All right.

5          MR. CARNEY:  Good morning, your Honor.  Peter Carney

6    from White & Case for defendant Tyson.

7          MR. SUGGS:  David Suggs from White & Case, also for

8    Tyson.

9          MR. ROTH:  Martin Roth, Kirkland & Ellis, for the

10   Sanderson Farms defendants.

11         THE COURT:  Okay.  Well, thank you all.  And thank you

12   for both coming in today and then also filing the -- both a

13   status report and a proposed order relating to the cases.  I'd

14   like to go through those.

15         I have a few issues I need to put on the record

16   relating to potential conflicts.  I don't think it affects my

17   ability to stay on the case, but I need to put them on the

18   record.

19         THE CLERK:  Someone maybe joined.

20         THE COURT:  Did someone else join the phone call --

21   phone line that did not identify themselves?

22      (No response.)

23         THE COURT:  Okay.  And everyone can have a seat if

24   they want.  No need to stay up here.  We'll call you up when we

25   need to address certain things, but I have a few things I need

1   to talk about first.

2   Let's see.  In going through the list of attorneys on

3   the case, I see that there's a Marc Rosenthal from Proskauer

4   who is on the case.  I used to be at Mayer Brown from 1993 to

5   2013, for 20 years, when I left the U.S. Attorney's Office.

6   And Mr. Rosenthal was a partner at Mayer Brown for part of

7   that.  We're not personal friends, but he is at least a name I

8   recognize from the long list of attorneys on the cases.

9   It's not a basis for me to recuse myself, but I put it

10  on as a matter of disclosure.  If there's any basis -- if

11  people think that's -- that or anything else I'm going to

12  disclose is a basis for disqualification, you're free to file a

13  motion.

14  Secondly, Steve Berman is on the case.  I think I

15  disclosed I had cases against Mr. Berman when I was at Mayer

16  Brown.  But I -- it came to my attention from talking to one of

17  my brothers -- I have seven younger brothers, many of whom are

18  lawyers.  It turns out one of my brothers, Terry, has referred

19  clients to Mr. Berman -- not in this case, but in other

20  cases -- and may actually have a case pending somewhere where

21  he has referred a client to Mr. Berman.  And so my brother, I

22  suppose, is potentially someone who could receive a recovery in

23  a case where he has made a referral to Mr. Berman of a client.

24  Again, it's not this case, and it's not any case I've

25  ever had with Mr. Berman.  I don't think it's a basis for me to

1    recuse myself, but I want to put that on the record.

2         Mayer Brown, my firm.  They are not -- they don't have

3    an appearance in this case, but someone from Mayer Brown called

4    my court reporter looking for a transcript and indicated they

5    may get in the case.  I'm not exactly sure for who.  And I'm

6    not sure -- is anyone aware of them filing an appearance in

7    this case yet?  I have not seen it.

8         MULTIPLE COUNSEL:  No, your Honor.

9         THE COURT:  Okay.  I have in the past recused myself

10   from all Mayer Brown cases.  I left the firm in early January

11   of 2013, so it's been over three and a half years since I've

12   been at Mayer Brown.

13        I had a small -- literally small -- like $600 holdback

14   from Mayer Brown that they kept relating to a tax issue -- not

15   mine, but the firm's -- off in another country.  They have

16   since paid that to me.  I have signed a formal separation

17   agreement with the firm, and I have informed them that I'm no

18   longer automatically recusing myself from Mayer Brown cases.

19        Three and a half years is plenty, in my mind.  Every

20   judge -- some judges wait longer; some judges wait shorter

21   time.  I've checked with the Administrative Office and the

22   Ethics Office of the judiciary, and it's up to me.

23        I don't feel that if Mayer Brown entered this case or,

24   frankly, any other case I would feel it necessary to recuse

25   myself unless there were certain attorneys from Mayer Brown who

1   I'm personal friends with.  I can say with pretty good

2   certainty I don't think I'm friends with any antitrust lawyers

3   from Mayer Brown.

4        (Laughter.)

5             THE COURT:  Not that they wouldn't be friendly, but I

6   primarily practiced criminal law, obviously, as a prosecutor

7   and also at Mayer Brown, so I didn't get involved in those kind

8   of cases.

9             So if certain attorneys were to enter this case, I

10  would have a problem, and I'd feel it necessary to either --

11  they'd have to get new lawyers, or I'd have to get off the

12  case.  I don't think any of the antitrust lawyers at Mayer

13  Brown would fit that bill, but if they happen to get in the

14  case -- I am no longer automatically recusing myself from Mayer

15  Brown cases.

16            And it's not just this case, but from any other case.

17  I've been thinking about whether or not to remain on cases if

18  they ever get assigned to me from Mayer Brown, and I've reached

19  the conclusion there's no reason for me not to, absent, as I

20  said, particular people who I'm personal friends with, but more

21  than a professional friendship.

22            Similarly, in Mayer Brown, there is a malpractice case

23  filed against Mayer Brown relating to a client engagement I was

24  involved in with other lawyers.  I may be a potential witness

25  in that case.  I don't know.  May be a deponent, at least, in

1  that case.  But that's another tie-in with Mayer Brown I have.

2  I don't believe that any of those disclosures, in my

3  mind, at least, form the basis for me to recuse myself.  And,

4  again, Mayer Brown hasn't even appeared on this case; they may

5  not.  But if they do, it will not be an automatic recusal by

6  me, but I certainly would entertain any motions either side

7  makes relating to my being disqualified from the case by virtue

8  of Mayer Brown being on it.

9  But I will not independently on my own recuse myself

10  and have the case transferred to another judge.  But I'll

11  listen with an open mind to anything anybody raises -- anybody

12  raises.

13  Okay.  Anything else anyone wants to raise on recusal

14  or conflict issues that I may not have raised already?

15  (No response.)

16  THE COURT:  I see no hands.  Okay.

17  All right.  The magistrate judge on this case is Judge

18  Gilbert.  He's out of the office until -- I think his first day

19  back in court is November 14th.  I'm going to enter certain

20  discovery orders today and case management orders, but I am

21  strongly considering, because with Judge Gilbert's expertise in

22  ESI and in the management of large cases, I may very well refer

23  overall discovery supervision to him on this case.  I have a

24  number of trials coming up, particularly the first two quarters

25  of next year, that are going to make my time a little bit

1   difficult, and I don't want any scheduling problems of my own

2   to interfere with the parties moving forward.

3           We'll see.  It may very well be Judge Gilbert and I

4   conduct statuses where we're both on the bench.  It may be that

5   certain matters get referred to him for supervision, in

6   particular, ESI issues because he has an expertise in that and

7   I don't.

8           But I will -- when Judge Gilbert is back in the

9   office, I'll talk to him about that.  But that is a distinct

10  possibility.  And it's actually a great benefit to all of you

11  because he's very good at this stuff.

12          Okay.  The --

13          Did someone else join the call?

14     (No response.)

15          THE COURT:  Who is it that just added themselves to

16  the call?

17          MR. AN:  I'm sorry.  This is Brian from Citadel.

18          THE COURT:  Brian.  What's your last name?

19          MR. AN:  An, A-N.

20          THE COURT:  And where are you from, what firm, and who

21  do you represent?

22          MR. AN:  I'm from Citadel.

23          THE COURT:  Citadel?

24          MR. AN:  Yes.

25          THE COURT:  Is that a law firm?

1           MR. AN:  No, this is an investment firm.  I received

2   this dial-in from an outside colleague.  I'm not sure if --

3           THE COURT:  All right.  Well, I'm not going to kick

4   you off the call.  But if people want to observe the court

5   proceedings, they're open proceedings.  And that is your right

6   to come to court and sit in the courtroom and hear everything

7   that happens.  It's your right to order a transcript and read

8   what happens.

9           But I want this call actually for -- call line for

10   attorneys on the case.  This is not an investor call where

11   anyone can join.

12           MR. AN:  Okay.  Understood.  I appreciate it.

13           THE COURT:  All right.

14           MR. AN:  Thanks for the clarification.

15           THE COURT:  You can stay on the call today, but not in

16   the future.

17           Is there anyone else on this call who is not a lawyer

18   and a lawyer representing a party in this case?

19     (No response.)

20           THE COURT:  All right.  I hear no answer, so I'm

21   assuming no one else on this call is anyone other than a lawyer

22   who is representing a party on this case.  Okay.

23           Mr. An, are you here for the poultry -- the broiler

24   antitrust case, or are you calling in on a different case?

25           MR. AN:  No, I'm here for the poultry case.

1          THE COURT:  All right.

2          Okay.  We have an agenda, which I appreciate the

3     parties having prepared.  There's an agreed-upon proposed case

4     management order which the parties also prepared, and I

5     appreciate that.

6          First question is whether or not we need a

7     preservation order in this case.  And I'll let plaintiffs'

8     counsel address that.  Let me tell you, having read it -- and I

9     appreciate -- I like the way you've done it where you put each

10    side's party -- each party's position and then the response.

11         I also have a question for defendants.  Is -- do you

12    have committees just as the plaintiffs do?  I know there's --

13    White & Case has come on as basically liaison counsel for the

14    defendants.  But is everyone else coming on, you know, for each

15    defendant?

16         MR. CARNEY:  We're going to try, your Honor, to

17    streamline and have a spokesperson on a given issue.  So my

18    colleague David Suggs will address this issue, and others may

19    take others.  And we'll divide it up kind of that way.  If

20    some -- if a defendant has a separate position that has to come

21    up, they may need to do that, but we'll try and be streamlined

22    that way.

23         THE COURT:  Great.

24         And are all defendants represented?  Has everyone been

25    served who is a defendant in the case?

1     MR. SIMON:  Everybody's been served, your Honor.  Not

2     every defendant has appeared.  And in the case management

3     order, as you noticed, we gave them until November 30th, I

4     believe, to make their appearances.

5     MR. CARNEY:  I think that's right.

6     THE COURT:  All right.  Well, we're going to proceed

7     without them.  If they have an objection -- I'll put on the

8     record if there's any party that does not yet have counsel who

9     has objections to any of the rulings made today or up to the

10    time they appear in the case, they're free to ask me to

11    reconsider.  I don't think anything we're going to do is going

12    to be objected to by anyone because it's -- or if it -- if

13    there is an objection, it's likely they're -- whatever they

14    have to say would be raised by other parties.

15          But anyone who is not in the case is free, of course,

16    to come in and ask me to reconsider based on a new position or

17    a new perspective.

18    MR. SIMON:  With respect to the defendants, there is a

19    provision in the proposed case management order that says those

20    that haven't appeared are -- want to take the benefit of it and

21    will abide by it.  So I don't think we'll have that problem

22    with defendants.

23    THE COURT:  Okay.

24    MR. CARNEY:  That's right, your Honor.

25    THE COURT:  All right.  Good.  Well, you're ahead of

1    me, so that's good.

2           All right.  So on the preservation order, what's

3    the -- my reading of it is what does a preservation order do

4    that isn't already covered by the defendants' obligation to

5    preserve information, provided they're told what it is they

6    need to preserve?  But what good does an order do if they are

7    under fairly draconian sanctions if they fail to follow the

8    ordinary Rules of Civil Procedure to preserve relevant

9    evidence?

10          MR. SIMON:  Well, first of all, your Honor, we all

11   consulted amongst the plaintiffs' counsel.  And we've been

12   cooperating, coordinating before and since we've been

13   appointed.  So they have elected me to speak to you.  So for

14   efficiency purposes --

15          THE COURT:  Great.  And, then again, I think for my

16   court reporter's perspective, state your name at the beginning

17   of every -- until we get used to all the faces.

18          MR. SIMON:  Bruce Simon.

19          So our perspective is exactly what you said, your

20   Honor.  We need more specificity with respect to certain items

21   as we put in.

22          We understand the general obligation.  I'm not going

23   to stand here and say that anybody's purposely destroying

24   documents or anything like that.  But we do know from our

25   antitrust cases in particular that documents, especially

1    electronic-type documents, can be deleted.

2         We know that, you know, e-mail servers overwrite after
3    certain periods of time.

4         We know that, as particular cell phones, there are
5    issues if they're still being used by executives at the
6    company.  We know that the cell phone carriers overwrite their
7    records as well.

8         So we think with specific, you know, items that we've
9    listed, it would not hurt to have them laid out so there's no,
10   you know, argument later on whether they should have been kept
11   or not.

12        The issue in these cases, without trying to overburden
13   the defendants -- which obviously is a consideration, but we
14   don't think it is in this situation -- is to make sure that we
15   don't lose anything in the interim.

16        And although we respect that defense counsel will
17   undertake their obligations completely, we have had other
18   antitrust cases.  I personally have had other antitrust cases
19   where the general order has been put out.  Defense counsel has
20   instructed their clients not to destroy anything or --
21   inadvertently or otherwise, and we've had evidence that has
22   disappeared, one particular case, a laptop computer that found
23   its way back to Asia from the United States with the witness.
24   I'm not suggesting anything here that -- like that.

25             THE COURT:  How would an order have prevented that,

1  though?  How would an order, which is really no different in my

2  mind than your telling them what you need preserved.  They're

3  either agreeing to preserve it or coming back to me to decide

4  whether it's overbroad for preservation purposes.  There's not

5  a huge expense with preservation.  There's a lot of expense

6  with production.

7        And I know there is expense relating to preservation

8  too, but that's minor compared to the production expense.

9        But if the laptop went to Asia, weren't the sanctions

10  similar to whether you had a preservation order in or not?

11        MR. SIMON:  Well, yes.  But the point is that if we're

12  specific about -- and I'm not -- don't want to make the laptop

13  the --

14        THE COURT:  No, I know.

15        MR. SIMON:  -- the example.  But we're more concerned

16  about inadvertent and automatic deletion of documents.  And,

17  you know, there's some issues about what they control and what

18  they don't control.  We haven't had a concrete position from

19  defendants about whether they say they control the cell phones,

20  for example, for executives.

21        The reason this is important as in a case like this,

22  we think that there's going to be a lot of discussions and

23  communications when we get to the point of asking for all that

24  between executives about the subject matter of the complaint.

25  We already see in the complaint that there are public

1  statements about discipline and other things.

2       So the cell phone records and the technology,

3  unfortunately, that we've now come to in this day and age,

4  compared to what it was when we all started practicing, is such

5  that I think best practices would be to have some specificity

6  with respect to what items specifically need to be preserved on

7  top of the general obligations.

8       We're generally in agreement about, you know,

9  beginning and cutoff date.  We're in agreement about the

10 parameters of it.  It's just that we believe that, to be belt-

11 and-suspenders in this particular situation, it's better to

12 have an order.

13      The only other thing I would say, your Honor, is that,

14 you know, we did have an order in *Potash*.  I know that that's a

15 different case, but -- and it was on top of the general

16 instruction by Judge Castillo saying, "You preserve

17 everything."

18      And I want to make sure we're going to hit the ground

19 running.  And one of the purposes of the preservation order is

20 so we don't come in to Magistrate Judge Gilbert or yourself and

21 say, "Hey, we thought this stuff was being kept, but now it's

22 not."  We're, you know, past the motions to dismiss, and now we

23 have to have an argument which could take two to three months

24 about whether they should have preserved it or not.

25      So we're trying to be belt-and-suspenders is what

1  we're trying to do.

2      THE COURT:  All right.  And what's defendants'

3  response?

4      Mr. Simon, you can stay up there.  When we have

5  arguments, both of you can stay up here because I may have

6  questions back and forth.

7      MR. SIMON:  Thank you, your Honor.

8      THE COURT:  Go ahead.

9      MR. SUGGS:  David Suggs from White & Case on behalf of

10  Tyson Foods, but in this case on behalf of all defendants.

11      I think your Honor's questions were very good.  The

12  points that plaintiffs have made don't warrant a preservation

13  order in this case.  Defendants are preserving their documents

14  and data.  We have issued litigation holds.  We are speaking

15  with our IT staff and our business people, identifying

16  potentially relevant information and preserving that

17  information.

18      And the things that plaintiffs have focused on we're

19  working with them on.  We are copying -- forensically copying

20  certain mobile devices for executives that they have

21  identified.

22      So they say that this is needed because there might be

23  some destruction, but that's the case in any litigation.

24      THE COURT:  I guess, Mr. Suggs -- and I read your

25  proposal, and I'm familiar with the Sedona Conference's

1  statement that these are not necessarily required.  Where are

2  you prejudiced?  What is the prejudice with an order being

3  entered?

4         What I'm concerned about is you have some informal

5  discussions, apparently.  They said, "We want you to preserve

6  certain things."  You say you will.

7         We have a potentially unmanageable number of

8  defendants -- not defense companies, but talking about a number

9  of individuals within the companies.  And I think -- I

10 recognize Mr. Simon's concern about there being questions later

11 about whether something was covered or not.

12        And one way to get it covered is they issue a request

13 for production.  You say, "We'll preserve everything you ask

14 for, but -- we're not saying we're going to produce all of it,

15 but we'll preserve it," because you may have legitimate

16 objections to the scope of their written discovery.

17        The big question I have is where there's going to be

18 any prejudice -- and if you have co-counsel or a colleague who

19 wants to join you or you want to talk to her for a minute,

20 that's fine.

21        MR. SUGGS:  Sure.

22        THE COURT:  But what's the prejudice with a

23 preservation order being put in?  The sanctions are the same.

24 There would at least appear to be a little more concrete

25 certainty as to what it is that you are all agreeing should be

1  preserved.

2        MR. SUGGS:  Well, one point, your Honor, is, if you've

3  seen their draft preservation order, it's 17 pages.  It goes

4  into great detail about different things that aren't

5  necessarily the case for each party.  So it's going to require

6  a lot of negotiation.

7        And right now we don't think that's the best use of

8  the parties' resources.  We have agreed to work on a number of

9  other things that will move the case forward: protective

10  orders, ESI protocols.  We're having Rule 26 conferences,

11  Rule 16 conferences.  And, of course, we're briefing a motion

12  to dismiss.

13        To spend a lot of time on this when there are already

14  measures in place that serve the purpose that plaintiffs are

15  concerned about, we think --

16        THE COURT:  Well, I haven't seen -- oh, go ahead.  And

17  please identify yourself.

18        MS. COTTRELL:  Christa Cottrell with Sanderson Farms.

19  Good morning.

20        I think that maybe a simple way of describing the

21  problem is the one-size-fits-all problem because when we get

22  into that level of specificity, it's going to impact each of us

23  differently.

24        So here's one example from the preservation order that

25  they sent us.  They say hard drives of defendants' employees

1  who depart the company will be kept, will not be repurposed or

2  reformatted, until we meet and confer on the issue.

3           For some defendants, that may be fine.  They may have

4  tons of hard drives.  They may be able to wait months and talk

5  with plaintiffs.  For others, that could present a business

6  problem.  That's one example, but it translates across the

7  preservation order.

8           And this is why the Sedona Conference says this should

9  be something that each defendant determines what makes the most

10 sense for them to do in light of their business practices, how

11 they delete data.  Right?  For some of us, we may want to

12 preserve by pulling the media off and sitting it with a vendor,

13 and that's fine.  For others, we may want to hold the hard

14 drives in a room as they suggest.

15          But when they get into our business and try to do a

16 one-size-fits-all across all 14, we have a problem.

17          THE COURT:  All right.  Well, and I recognize that.

18 And maybe -- I think we're going to end up with a bigger

19 problem later when something has -- is not around and then I

20 have to referee a fight between the two of you about whether

21 you asked for it and whether you agreed to preserve it.  And

22 then we're going to get into letters; we're going to get into

23 e-mails.  And I don't want to do that.

24          What I mean is letters and e-mails between the two of

25 you, not letters and e-mails that are being preserved.

1          I don't think anyone is intentionally out --

2   preservation is easy, other than the problem you raise.  But

3   the overall idea of preservation is obviously everyone agrees

4   to.

5          There may be many reasons why what they ask you to

6   preserve and you agree to preserve doesn't get turned over in

7   the end, because of a variety of objections you may raise that

8   may be meritorious.  But we need to find something -- some

9   common ground where everyone agrees on what's being preserved.

10          If it means -- how many defendants are there, 17?

11          MR. SUGGS:  14.

12          THE COURT:  14?

13          MR. SUGGS:  14 --

14          MR. SIMON:  Families.

15          MR. SUGGS:  Some of them are families, right.

16          THE COURT:  Okay.  If the problem is that there's a

17   proposal on a protective order -- on a preservation order

18   that's too broad or doesn't apply to your company, that seems

19   like wordsmithing to change it.

20          MS. COTTRELL:  That is just one provision.  I think

21   what your Honor raised in the beginning is the most important

22   point.  We know what they want us to preserve.  We are well

23   aware.  And we are also well aware of the sanctions and the

24   repercussions if we don't preserve relevant material.

25          And so we think the best course -- so, for example, on

1  Sanderson Farms, we know what they want us to preserve. We've

2  drafted a letter that we're going to send to them this week

3  that talks about what steps we've taken, what we've done in

4  terms of preservation to give them comfort that we're complying

5  with our obligations.

6       I think you're right. To the extent that there's

7  something where there's a disagreement, that is something that

8  probably needs to happen early. But we don't think an order is

9  the way of dealing with it. We think communication between the

10 parties and continuing to meet and confer is the best route.

11      THE COURT: All right.

12      MR. SUGGS: And we are, as your Honor knows, meeting

13 and conferring. I mean, the issue that they have been focused

14 on is an issue that we have already addressed with them.

15      THE COURT: Okay. Well, I -- I'm happy to let you

16 continue to meet and confer. You'll hear that a lot in this

17 case. But you can continue to meet and confer. Are you doing

18 it on an individual basis? Are you -- is each defendant

19 telling the plaintiff what it is they're preserving? And are

20 you trying to reach an agreement to that?

21      MR. SIMON: We've done both. We started the process

22 by sending letters asking for preservation of certain things,

23 and we've had had meet-and-confers with individual defendants,

24 some of which have agreed to what we asked for and others which

25 we haven't completed.

1    Then we had a more general discussion to put together

2    the status report and the order where we talked more broadly.

3    And I would say that we're not trying to do one-size-fits-all,

4    I mean, but we do need some uniformity too because otherwise,

5    you know, with 14 defendants, the negotiations can go on

6    forever, and I'm sure you've seen that, your Honor.

7    THE COURT:  Well, what I don't want to have happen is

8    what I just described.  I don't want to have to deal later with

9    a misunderstanding where we have to dig into e-mails and

10   letters and possibly even testimony about what people agreed to

11   preserve and what they didn't.

12   If you get 14 different letters from 14 different

13   defendants where plaintiffs agree that what the obligations --

14   what defendants have agreed to preserve is what plaintiffs

15   agree to, that would be fine.  We wouldn't need a preservation

16   order.  If you get ten of them and you have disagreements on

17   the four, I can deal with that pretty easily.

18   And I would suggest you continue to meet and confer on

19   that.  We're going to set some deadlines on things to come back

20   on.  This would be one of them.

21   But if -- I'll propose this, and tell me where it's

22   wrong.  And I take no offense at people telling me, "That won't

23   work for this reason."  I really don't.

24   Continue to meet and confer, but in the end, if you

25   get 14 different agreements that may be adaptable or may be

1    necessary because of peculiar or individual retention policies

2    or organization of each defendant, that's a legitimate concern

3    and a legitimate reason for you to negotiate with each one of

4    them.

5            But you don't have to negotiate very hard.  I don't

6    think preservation is that hard.  And if you get -- if you,

7    Mr. Simon, run into loggerheads where a company is just saying,

8    "We can't do that," and they don't give you a reason you find

9    satisfactory, then come back and I'll rule one way or the

10   other.  It won't be nearly as satisfying to anybody as if it

11   was by agreement because someone's going to not get what they

12   want.

13           But I think you've raised a legitimate point about

14   each one of these 14 companies having different systems and

15   different ways that they can best preserve information, and I

16   think, Mr. Simon, you've raised legitimate reasons why -- and I

17   think I've raised reasons why I don't want to go back to this a

18   year from now and say, "Why wasn't this agreed to?"

19           MR. SIMON:  We're happy to go back to the drawing

20   board and try to do something, I think a combination, a hybrid

21   of something general that, you know, gives us guidelines.  And

22   if there's specific exceptions, perhaps those could be

23   delineated.

24           But I do want to say, having gone through this and

25   being the guy that likes to stand up in front of the jury and

1    try the cases, I hate to see cases spin out of control on

2    issues which are so -- should be so easy, like preservation.

3            THE COURT:  Well, this is not going to take long.

4            MR. SIMON:  Right.  We agree.

5            THE COURT:  You're either going to agree, or you're

6    going to come back and I'm going to rule from the bench.  So

7    it's that simple.  And I'm not going to let that be an

8    impediment because, as I said, preservation is easy.

9    Production is a lot more difficult.

10           MR. SIMON:  Right.

11           MR. SUGGS:  And, your Honor, we do want to make a

12   couple additional points.  One is we want to make sure that

13   this is reciprocal, that the plaintiffs are also understanding

14   their obligations in preserving their documents and data,

15   because some of their conduct is going to be relevant in this

16   case.

17           THE COURT:  Well, I don't think there's any reason you

18   can't have a similar letter agreement with the plaintiffs.

19   Document discovery is reciprocal.  Obviously, you have more

20   records than they do and -- at least relevant records,

21   presumably.

22           But if there's documents you think they ought to

23   preserve, you ought to be addressing it -- you don't have to do

24   it to individual plaintiffs, but you've got a set of lawyers

25   who speak on behalf of the plaintiffs, and you ought to address

1 it with them.

2 And similarly, if you can't reach agreement, you're

3 going to come to me on where the area of disagreement is, and

4 I'm going to rule from the bench on what that disagreement is.

5 MR. SUGGS: The last point is that one thing that's

6 very important to the defendants is that we get a cutoff date

7 for our preservation obligations.

8 THE COURT: Yeah, and I thought Mr. Simon said you'd

9 reached agreement on that. But is that premature?

10 MR. SUGGS: We made a proposal on Monday of

11 September 2nd, 2016. We are waiting for a response.

12 MR. SIMON: We're okay with that, your Honor. So we

13 can take that off the table right now.

14 THE COURT: Okay. That should be in every letter.

15 And I hope what you end up having are letters, which

16 plaintiff says, "Defendant agrees to the following" --

17 "preserve the following records for the following period of

18 time." List it out with enough specificity and individuality

19 that makes sense for the individual defendants, and then it's

20 signed by the defense counsel, and they agree, something along

21 those lines.

22 It's a letter -- it's not a -- in some ways, I

23 suppose, it's an individual preservation order. But it's

24 something where we have some way to go back later and make sure

25 there weren't mistakes.

1    MS. COTTRELL:  Your Honor, the only caveat I would ask

2    for is that we do keep it fairly general, I think, in terms of

3    the scope, you know, the relevant subject matters, the cutoff

4    date.  That is going to apply across the board and I think will

5    give us the clarity that you're referring to.

6        But when we get into specific steps, am I going to put

7    a hard drive off to the side?  Am I going to forensically

8    bit-by-bit certain types of data?  I think that that should be

9    left to each defendant's discretion for what makes the most

10   sense for them from a business perspective.

11       THE COURT:  Well, yeah.  But tell plaintiffs what

12   you're doing.  If they think there is going to be information

13   lost because of the way you say you're going to do it, then you

14   need to make that clear in the letter that it's not going to

15   happen, that's all.  I'm not going to micromanage it, but I

16   hope you can all agree upon this; and, if not, just bring it to

17   me and I'll decide.

18       So we won't have a formal preservation order, but what

19   I anticipate is agreements with each of the defendants and with

20   the plaintiffs as to the -- and these may be cookie-cutter

21   preservation or -- you know, letters that talk about the

22   retention of the same type of records for everybody.  But if

23   there's individual reasons that a company has that necessitate

24   different language, then you ought to put different language in

25   for your client and work with plaintiff on it.  And if there's

1   ambiguity still, come back and I'll rule.

2           MR. SIMON:  And we do have one, at least,

3   non-appearing, I guess, defendant, Foster Farms being one of

4   them.

5           THE COURT:  That may be the one Mayer Brown is coming

6   in on.  I think that's what my court reporter -- when the

7   person called looking for a transcript.  So that may be the

8   party that's going to retain Mayer Brown.  But I don't know

9   that.

10          MR. SIMON:  Yeah.  So in any case, we want to make

11  sure whatever we do applies, you know, so that we don't start

12  from scratch again.

13          THE COURT:  Well, that and if Foster Farms is unaware

14  of a preservation order or any type of document retention

15  obligation, is anyone on the defense side aware of who Foster

16  Farms is going to get as a lawyer?

17      (No response.)

18          MS. COTTRELL:  I don't think this is going to be an

19  issue.

20          THE COURT:  All right.

21          MS. COTTRELL:  I think that we'll be okay.

22          THE COURT:  Yeah, contact someone who -- either at

23  Foster Farms, a general counsel or a -- an attorney you think

24  is going to get on the case.  But they need to get on the stick

25  right away and know that there's a clock that has been set

1   today on a time period and that if there's automatic --

2   auto-destruction or auto-delete policies going on, they need to

3   stop immediately.

4           They probably should anyway.  They were served.  So

5   they're, I'm assuming, a big enough company to have an inside

6   counsel or someone who consults with outside counsel.

7           But please informally on your defense side communicate

8   so that no one thinks they didn't have to do something just

9   because they haven't appeared in a case yet.

10          MS. COTTRELL:  Will do.

11          THE COURT:  I don't think anybody's going to do that,

12  but let's make sure it doesn't happen.  Thank you.

13          MR. SUGGS:  Thank you, your Honor.

14          THE COURT:  Okay.  And, again, we'll set a time on all

15  these things toward the end of this -- this status.

16          All right.  On the partial stay of discovery, I note

17  that defendants are -- I don't know who is speaking on the

18  defendants' behalf on this one.

19          MR. ROTH:  Martin Roth for Sanderson Farms, your

20  Honor.

21          THE COURT:  Okay.  I noted in your position paper at 9

22  that "Defendants have approached Plaintiffs about narrowing

23  their requested disclosures in exchange for their agreement to

24  stay all discovery through the Court's decision on the motions

25  to dismiss.  Parties are currently conferring and exploring

whether such an accord can be reached for readily accessible information."

Where do you stand on that?

MR. ROTH:  So, your Honor, we had a very productive meet-and-confer call with Mr. Simon and the plaintiffs' group just yesterday.  We got their proposal only on Monday.  So we have a number of categories that I think, if we continue discussions, hopefully we can come to ground on.  But given the court date and everyone traveling, we just haven't gotten there yet.

THE COURT:  Okay.

Mr. Simon?

MR. SIMON:  I agree that's the status.  We had very productive discussions.  We made a submission we believe that's relatively modest given other antitrust cases.  We don't think there's any automatic stay, and I think we should continue those discussions.  But, obviously, we oppose a complete stay.

THE COURT:  All right.  Well, some of the things you asked for are low-cost, low-effort: org charts, phone directories, document retention policies.  Some of these are just very low-sweat efforts that the defendants need to go through to get.

MR. ROTH:  We agree, your Honor.  And those are precisely the ones we're looking at.

One thing I should note on org charts.  I understand

1   for some of the defendants -- and, of course, we have 14

2   here -- these are living documents.  There may be many

3   iterations.  They may not be maintained in the fashion

4   plaintiffs have requested them.

5          For example, we don't have an org chart of all the

6   people who go to industry meetings.  You'd have to look at

7   different org charts.  So but point taken, and those are

8   exactly the types of requests that we're looking into

9   providing.

10         THE COURT:  All right.  Yeah, document requests don't

11  require you to re-create a document.  But, on the other hand,

12  if it solves the issue of having a 30(b)(6) witness get up and

13  talk about all that, you may want to create a document strictly

14  for purposes of the litigation, making sure that it's not a --

15  you know, that it's not something that was prepared otherwise.

16  But it may save you a 30(b)(6) witness or a more expansive

17  document request.  That's just common sense.

18         MR. ROTH:  Yeah.

19         THE COURT:  Well, I'll let you continue to work on

20  that.  All I can tell you is if you don't agree to give them

21  something, you're going to end up giving them more -- you'll

22  have to give them more than what you probably want to.  And if

23  you're not reasonable about your requests, you're going to get

24  nothing.  So that's the only admonition I can give both.

25         I can, and I recognize the cases they've noted, about

1　holding off on discovery while a motion to dismiss is pending.

2　But I don't think that's a good -- limited discovery makes

3　sense because it's going to, frankly, make discovery disputes

4　and any Rule 26 conferences and a Rule 16 scheduling make a lot

5　more sense if you have some idea of how many people are out

6　there that you think you need to depose, what kind of volume of

7　documents are out there, what the protocols you're going to

8　arrive at for electronic searching are.  It all makes sense to

9　allow some limited discovery up front.

10　　　　If you ask for too much, you won't get much.  And if

11　you offer too little, you'll end up giving more than you have

12　to.  So I'd advise you all to continue talking.  You said you

13　had a productive meeting, so that sounds good to me.  And that

14　will be on our agenda for the next meeting on where you are at

15　on an agreement as to limited discovery while the motions to

16　dismiss are pending.

17　　　　MR. ROTH:  Thank you, your Honor.

18　　　　THE COURT:  I take it all defendants except Foster

19　Farms -- but I'm sure they'll join in with whatever everyone

20　else is doing.  Are all defendants filing motions to dismiss?

21　　　　MR. ROTH:  I believe so, your Honor, although some are

22　not here.  But I believe that's going to be the case.

23　　　　THE COURT:  Okay.  All right.

24　　　　Let's go next to the electronically stored information

25　protocol.  What -- where do you stand on that?  There was at

1     least some attempt to get some agreement on that. But where do

2     you stand right now?

3           MR. CARNEY: We've agreed to a date to do it --

4           THE COURT: And give your name again, please.

5           MR. CARNEY: Yeah, we've agreed to a date to do any

6     ESI protocol, and --

7           MR. SIMON: Carney.

8           MR. CARNEY: Sorry, your Honor. Peter Carney from

9     White & Case --

10           THE COURT: Thank you.

11           MR. CARNEY: -- for the defendants on this.

12           We've agreed to a date to do the ESI protocol and for,

13     you know, a process sort of similar to this, to submitting --

14     if there's anything we can't resolve, to submitting a joint

15     brief that's, you know, brief to your Honor on that.

16           And from the defendants' perspective, we think that's

17     enough right now. We think it's kind of getting ahead of

18     things to start saying what should or should not be in the ESI

19     protocol. There's a lot of things that go into an ESI

20     protocol, and, you know, it's all a give-and-take, I think, in

21     terms of how it works.

22           THE COURT: All right. Mr. Simon?

23           MR. SIMON: We do -- we have agreed on a procedure,

24     and we do want a drop-dead date so that -- and I believe the

25     date that we have is December 7th in the proposed CMO, and that

1    is adequate in our mind.

2          You know, a lot of these things are interrelated, so

3    when you do the ESI protocol, you're also thinking about what's

4    being preserved, and you're also thinking about what document

5    requests you're going to be making.  And we do, I think, also

6    have in the CMO agreement upon the fact that we'll serve a set

7    of first requests for productions on November 14th.

8          MR. CARNEY:  Informally serve, right?

9          MR. SIMON:  Well, we didn't talk about that, but we'll

10   do it --

11         MR. CARNEY:  Oh.

12         MR. SIMON:  -- whatever way we work out.  But we were

13   going to give it to them so that they know what we're asking

14   for, and then actual responses and production of documents

15   would be 45 days after whatever limited stay would be lifted.

16   So we have talked about some things in that regard, and I think

17   we can sort this one out.

18         I will say, not being the ESI guru but knowing a

19   little bit about Sedona and what goes on there and in other

20   places, but, nonetheless, a lot of this is going to have to do

21   with custodians and search terms.  And we get to the point of

22   discovery, making sure that those things actually work.  You

23   know how you do test runs and make sure that it's picking up

24   the right documents and that sort of thing.

25         So the more we can do on the front end on these

custodians and search terms, which is part of the ESI protocol,
again, the more we can hit the ground running after the motion
to dismiss and not have any hopefully intense fights about the
searches.

MR. CARNEY:  Yeah.  Your Honor, the defendants have
agreed to talk -- to have those ESI discussions.  We would
contemplate there would be discussions about custodians.
They're proposing dates to start identifying custodians, I
think, before the lift of the stay.

There is a fair bit of work that goes into identifying
custodians, who has what.  You -- under Sedona Conference, you
often talk to those people, figure it out.  So there is a work;
there is a burden.  We're interested in going forward.

Plaintiffs' position was clear that this is sort of an
informal service of the document requests.  Defendants don't
object to that because that's just providing insight to us on
what the scope of the things that the plaintiffs want.  What we
do object to is sort of a hard deadline for responding to
those, you know, before we kind of know where things are going.

But we don't object to that exchange, and I think
defendants would do the same and serve on the plaintiffs.  We
expect this to be a bilateral discussion.  We expect the
plaintiffs to similarly, you know, identify things to us.

MR. SIMON:  I'm okay, your Honor, if there's objection
to setting a deadline for the responses a certain number of

1   days after you rule since we'll have another status, I'm sure,

2   before then, putting that off to the next status and see where

3   we stand.

4          We just want to make sure that we have framed the

5   issues as best we can.  And we did a lot of work up front when

6   we sent the letters out on preservation, and part of our orders

7   that we've submitted to defendants include the executives we

8   think need to preserve.  So we've given them a real head start.

9   We don't know everything because obviously we're not at the

10  companies.

11         But a lot of work has gone into this already, and we

12  want to capitalize on that work with the defendants.

13         THE COURT:  All right.  So what's the bottom line on

14  it?  If you're agreeing to hold off on a firm date for this, at

15  least until we have our next status, are you going to continue

16  to try and discuss some type of protocol?

17         MR. SIMON:  Yeah.  We have the December 7th date built

18  into the CMO agreed upon where we're either going to work out

19  an ESI protocol or brief it.  And I think we just hold firm to

20  that date and work on it as hard as we can between now and

21  then.  We think custodians should be part of that discussion,

22  certainly part of the Rule 26 discussion and disclosures that

23  may be made thereafter.  We haven't reached total agreement on

24  that, but we'll continue to talk about that, and search terms.

25         THE COURT:  Okay.  Well, that's fine.  And I think the

1  proposal you have in the draft order about five-page letters

2  setting forth -- joint letters setting forth your positions is

3  just -- makes a lot more sense than briefs.  These are

4  practical issues that don't involve a lot of law, just

5  something not amenable to briefs.

6           And what you propose by way of how you would present a

7  disagreement is just fine.  We'll get to that when we go

8  through the order.

9           MR. SIMON:  That's fine.

10          THE COURT:  All right.  What's next?

11          MR. SIMON:  I think you hit the main things on the

12  agenda that we don't have agreements on.

13          Then how we're going to handle it, I think we're

14  looking for deadlines, obviously.  I think we covered

15  everything -- we're probably at the point where we can go

16  through the case management order and get your ideas about

17  dates and what you want to do on that.

18          THE COURT:  All right.  Well, let's talk --

19          MR. SIMON:  And then we haven't talked about your

20  indication in your order about bifurcation, which we can either

21  put off to a different time, but we've -- in our first meet-

22  and-confer phone call, we expressed our view to counsel that we

23  think in these cases it doesn't work.  They said they were

24  going to think about it and get back to us.

25          And happy to explain that now or do it at a time where

1  you think, you know, you have your arms around it a little bit

2  better in terms of what we're doing.

3          THE COURT:  Well, I'm happy to -- how about a

4  minute -- 60 seconds or two minutes on why you think

5  bifurcation makes no sense.

6          I will tell you, I'm not an antitrust expert.  I told

7  you that already.  I haven't -- I know less -- the only person

8  that knows as little about antitrust law as me is probably Pat

9  Fitzgerald, who is one of the lawyers.  He's not here, so I

10 don't want to take a shot at him, but I think he'd agree.

11         So this is an educational process for me.  And I'm

12 happy to take guidance from all of you who do this kind of work

13 more -- with a lot more experience than I have in this area,

14 and I'll take guidance and I'll take what each side says and

15 use my best judgment.

16         But why would -- you know, the damages appear, at

17 least on their face, to be -- well, the underlying issue, if

18 you get past the motion to dismiss, is did these companies

19 conspire to fix prices.  And if they did, if there's a finding

20 they did, at some point damage discovery may be more relevant.

21         It may as a practical matter be something where it's

22 going to be doing it all at once -- the incremental cost of

23 doing it all at once is less than doing it twice.  I don't

24 know.  But why don't you just briefly tell me --

25         MR. SIMON:  Sure.

1          THE COURT:  -- why you think bifurcation is not a good

2     idea.  I expect -- I had expected you'd think that.

3          And you on the defense side, whether, sir, it's you or

4     someone else, can tell me the defense view on that.  I won't

5     decide this today.

6          MR. SIMON:  Right.

7          THE COURT:  I just need some perspective.

8          MR. SIMON:  You know, we may actually agree on this --

9     I don't know because we've had some discussions that indicate

10    we might agree on it -- that we shouldn't.

11         You know, I'm going to reveal my age, but doing it for

12    36 years, I can't really even think of a case where we have

13    bifurcated in an antitrust case.  And let me explain the

14    reasons why.  It creates inefficiencies and duplication of

15    effort.  In an antitrust case, your Honor, one of the elements

16    of the merits claim is antitrust impact, or sometimes called

17    antitrust injury, which is closely related to damages.  And you

18    get into liability facts that relate to both of those things.

19         One example I would give you on impact -- we're just

20    going through it in another case where we have class cert

21    coming up in about a month -- is that if it turns out we get

22    discovery and defendants are communicating amongst themselves

23    that the discipline they talked about and pulling back on

24    production worked and prices went up, their discussions, which

25    are liability facts, about the fact that they were able to keep

1  the price up also go to damages and impact.

2         So they're interrelated.  If you get a witness who

3  knows about that -- the author, recipient, or otherwise of the

4  document -- if you bifurcate, you're going to end up

5  potentially deposing that witness twice.  And I know every time

6  we get to the discovery plan in cases like this, the number one

7  thing I hear from defense side is "We don't want our witnesses

8  deposed twice."  So there's an inefficiency there.

9         We also have the class cert element here.  We have to

10 have class certification.  And the timing of that will be

11 determined.  But class certification in this new day and age

12 requires expert reports.  Expert reports actually go through,

13 to a certain extent, because it's somewhat merits-based, the

14 liability facts, it goes through impact, and it goes through

15 damages.

16        And to get class cert -- if we didn't do damages and

17 impact on class certification, you'd see an opposition saying

18 that they haven't met their burden to prove to you that it's

19 superior as a class action and we have predominant issues.

20        And the last thing, which is my experience -- and I

21 don't know what counsel's experience is -- it just precipitates

22 more fights because we get into a deposition or a dispute, and

23 is this a damages question, or is this a liability question?

24 Is this an impact question?

25        And we end up -- you know, I've had this happen, not

on bifurcation, but on other issues, where we're having to call

from the deposition to either the magistrate judge or somebody

and say, "Hey, we have this fight." We've been over in, you

know, Taiwan taking depositions, and we've had to do that with

the time delay and everything else.

So from my perspective and I think the plaintiffs'

perspective, speaking on all their behalves, it actually

creates inefficiencies as opposed to helping the case.

THE COURT: Okay. And, Mr. Carney, are you addressing

this, or is --

MR. CARNEY: Yeah, I am, your Honor.

I think there's large agreement on the defense side

that that's probably the case, that we wouldn't be pushing for

bifurcation --

THE COURT: All right.

MR. CARNEY: -- of damages and liability. I think the

points on class are well-taken. The law has changed over the

last ten years. There's a lot more scrutiny about using

experts and kind of looking into the class allegations, and I

think defendants will need and want to do that, and there is

that overlap.

And then we have had cases -- I leave the door open on

this. We have had cases where defendants have asked for and

the Court has granted a focus on was there an agreement. You

can't have an antitrust case here without an agreement. And is

1  there some subset of evidence that can be looked at to

2  establish whether there was an agreement or not such that you

3  don't have to get down the road to everything else.

4  I don't think we're into this case enough yet to know

5  if that's something defense would ask for, but we've seen that

6  done in other cases.

7  THE COURT:  All right.  Well, that's very helpful from

8  both sides.  I one hundred percent agree taking depositions of

9  someone twice is a waste of time and shouldn't happen.  And it

10  may, instead of bifurcation, be something where you stage your

11  discovery to try and get to critical issues that may be case-

12  dispositive early or, if not case-dispositive, settlement-

13  dispositive.

14  There may be a way to stage some of your discovery

15  where what's important to informing people about whether they

16  want to settle the case, whether it's an early motion for

17  summary judgment on a particular issue if something like that

18  comes up -- and I'm -- I have no insight in the case.  I'm just

19  throwing these out -- but some type of staging of discovery

20  that may take place where you all believe, or one party

21  believes, with this issue decided or this issue -- with all

22  documents and depositions done on a particular issue, there may

23  be a basis to go to the Court for some type of partial relief

24  or a settlement conference, any of those things.

25  And maybe that -- I hear what you're saying on

1    bifurcation.  I'm glad I asked you.  And I would just want to

2    make sure the parties intelligently decide if they can stage

3    particular discovery, rather than being bifurcated, to get to

4    the bottom of particular issues that may be either case-

5    dispositive or settlement-worthy, you do that.

6         Okay.  I don't mind taking calls on discovery in the

7    middle of depositions.  I really don't.  And, you know, if

8    Judge Gilbert is on the case, which I think he will be, you can

9    get either one of us.  But that's -- I'm not at all adverse if

10   I'm not on the bench in a trial taking a call or at least

11   putting it off till when we're on a break or later.

12        MR. SIMON:  Well, the good news is that -- and

13   Mr. Carney's firm and my firm, we're opposing each other in an

14   antitrust trial, one of the few ones that has taken place

15   recently back in San Francisco.  And I don't think we had an

16   occasion where we had to do that vis-à-vis our witnesses.

17        So I think we'll be okay.  We had some other issues,

18   and it's a bit problematic when you're sitting in Taiwan and

19   translator is giving instructions to a witness apparently

20   because the answer is "yes," and there's a lot of communication

21   going on.  But --

22        THE COURT:  Okay.

23        MR. SIMON:  -- that's not going to happen here, I

24   suspect.

25        THE COURT:  No.  I'm --

1          MR. CARNEY:  No translations; no Asian defendants

2    here.

3          THE COURT:  And, Mr. Carney, you remind me with

4    White & Case.  One of my law clerks used to work at White &

5    Case years ago.  He was -- his name is Peter Wilhelm.  And he's

6    not assigned to this case.  I have clerks assigned to each case

7    based on the last number of the case.  He's not the clerk

8    working on this case.  He'll stay away from any work on the

9    case.  But he was an associate at the firm probably at least

10   five or more years ago.  He -- after that time he clerked for a

11   magistrate judge, and he's been clerking for me for two or

12   three years.  So I just noticed.

13         MR. CARNEY:  Yes, your Honor, he was.  I don't know

14   him personally.  And I heard good things about his work, but I

15   don't know him personally.

16         THE COURT:  Well, that's good to know.  But I will

17   make sure he has no involvement in this case at all.

18         MR. CARNEY:  Thank you, your Honor.

19         THE COURT:  Okay.  And also on the phone number, as

20   these numbers keep coming in, we're going to do something in

21   the future where perhaps what we'll do is my courtroom deputy

22   will circulate a call-in number, different than today's if we

23   can do it, but circulate a number to lead counsel from each

24   side, and you can circulate it among yourselves.  Putting it on

25   a public docket is going to encourage phone calls from people

joining in who are not attorneys on the case, and I don't think that's right because it's not meant to be for that purpose.

So we're going to figure out some way where any number we use is going to be simply distributed to lead counsel or liaison counsel, and then you get it out to all your various colleagues so that call-ins are not something that anyone can call in on.

MR. SIMON:  That's fine, your Honor.

MR. CARNEY:  Thank you, your Honor.

THE COURT:  Okay.  All right.

Next then should we go to the -- go to the proposed order?

MR. SIMON:  Sure.

MR. CARNEY:  Yes, your Honor.

THE COURT:  Okay.  What is the intent of the parties? If -- I understand you're going to file consolidated complaints for both direct and indirect plaintiffs, correct?

MR. SIMON:  Right, separate for each.

THE COURT:  So we'll have two operative complaints.

MR. SIMON:  Correct.

THE COURT:  What is the intent of keeping the other cases active?  Or is there any reason not to dismiss the other cases?

MR. SIMON:  Well, what typically happens is that we pool -- and we think all the plaintiffs that we currently have,

1  maybe even in addition to a couple more, may be in the

2  consolidated amended complaint that effectively supersedes the

3  other ones.

4        If it's an administrative question, you know, could

5  those cases be deemed, you know, administratively closed in

6  lieu of the master case, you know, that's something that could

7  happen.

8        But dismissal has implications, you know, that we

9  would rather not have.  We would just rather have the

10 consolidated amended complaint be the superseding pleading.

11 And if a plaintiff doesn't appear in there, then, you know, in

12 effect, that plaintiff is not going to be class

13 representative -- presented at class certification.

14       THE COURT:  All right.  So you'd prefer not to have

15 the underlying actions dismissed?

16       MR. SIMON:  Prefer not to, your Honor.

17       THE COURT:  All right.  I'm indifferent.  I don't know

18 if the defendants care.

19       MR. CARNEY:  I think this is the way it's usually

20 done, your Honor.

21       THE COURT:  All right.

22       MR. CARNEY:  So I don't think we have an objection.

23       THE COURT:  So we'll keep those open.  But what we

24 can't have is anything other than one filing number.

25       MR. SIMON:  Right.

1      MR. CARNEY:  I think we're all agreed on that, your

2   Honor.

3      THE COURT:  Going forward.

4      MR. SIMON:  And we have that in the order, and we have

5   a master filing number.

6      And the only wrinkle is sometimes maybe there might be

7   a filing in the indirect case that doesn't apply to the direct

8   case or vice versa.  And we'll indicate "relates to all cases"

9   if it's all cases, and we will jointly try to do as much as we

10  can together because we've been working together well.  And if

11  it relates to only one action, we'll note that, and then it

12  will say which action.

13     THE COURT:  Yeah, either direct or indirect.

14     MR. SIMON:  Indirect or direct.

15     THE COURT:  Or if it relates to a particular

16  previously filed complaint.  And if for some reason there's

17  something that relates only to that complaint, you can put that

18  number in on the part that says the document relates to.

19     MR. SIMON:  Right.

20     THE COURT:  Okay.  That means then every filing will

21  be under this number, 16 CV 8637, with anything that relates to

22  a particular -- and if this is blank, it will relate to

23  everything.

24     MR. SIMON:  Right.

25     THE COURT:  You don't even have to put in "all."  Just

1    you can leave it blank, as far as I'm concerned.

2            Yeah, I take that back.  Put in "all actions."  Then

3    there's no -- there will be no question someone forgot to put

4    something in.

5            MR. SIMON:  And it's kind of the code we all

6    understand between each other that --

7            THE COURT:  That's fine.

8            MR. SIMON:  -- you don't have to respond multiple

9    times.

10           THE COURT:  All right.  So your proposal on the

11   caption, 5 and 6, is fine.  We won't dismiss the other cases at

12   this point.

13           What is your prediction on more cases being filed

14   either in this district or other districts?

15           MR. SIMON:  Well, you asked me that last time, and so

16   far it hasn't.  So I don't think there will be -- personally,

17   without giving a hundred percent guarantee -- cases filed

18   outside the district.  We have been contacted by a couple of

19   attorneys who say they have plaintiffs who would like to join

20   in the direct purchaser action.  So far, you know, we've

21   communicated with them, and everybody still supports what we're

22   doing here.

23           And I don't anticipate anybody's going to upset the

24   applecart at this point, your Honor.

25           THE COURT:  Okay.  Well, there's a mechanism here -- I

1    think one of your colleagues wants to talk to you.

2         (Counsel conferring.)

3         MR. SIMON:  Oh, okay.

4         THE COURT:  Go ahead.

5         MR. SIMON:  Mr. Gustafson just advised me there will

6    be more indirect filings, but they'll be in this court, and

7    they also will not upset the applecart of what we have here.

8         THE COURT:  All right.  So they will be filed in the

9    Northern District.  We will -- let us know when they come in.

10   File your motion for relatedness in front of me.  It will be

11   granted, and they'll be joined in the case.

12        MR. SIMON:  Fine, your Honor.

13        THE COURT:  So I think -- let's start at the beginning

14   then.  I think all the issues 1 through 4 are just fine.  Any

15   additional comment on those?

16        MR. SIMON:  No, your Honor.

17        MR. CARNEY:  No, your Honor.

18        THE COURT:  Okay.  5 and 6 we've just spoken about,

19   and that's -- that's fine.

20        We'll -- in essence, we'll have two operative

21   complaints under this number.  The Clerk's Office wondered why

22   we could have two complaints, whether we needed two separate

23   numbers; we don't.  We're going to have two complaints under

24   this number.  Otherwise, it will be chaos.

25        MR. SIMON:  Right.

1          THE COURT:  So we'll keep it this way, and the way of

2     delineating them is the way you suggest.  So 5 and 6 are fine.

3          7 we just talked about, and 7 is fine.

4          What do you mean by 8?  Now, you may have copied this

5     language from an MDL --

6          MR. SIMON:  Yeah.

7          THE COURT:  -- the MDL practice.

8          MR. SIMON:  That's possible.  I think that really is

9     intended to mean that there still would be a file open on the

10    other cases, but we'd certainly -- and with ECF, I think this

11    is kind of maybe even unnecessary.  But I guess there's some

12    technicality, which I'm not remembering why that -- those files

13    need to remain open.

14         But, Joe, do you --

15         MR. BRUCKNER:  I think it --

16         THE COURT:  And your name, please.

17         MR. BRUCKNER:  I'm sorry.  Joe Bruckner, your Honor.

18         THE COURT:  Sure.

19         MR. BRUCKNER:  Co-lead for the direct.

20         I think it anticipates a separate file or some sort of

21    separate organization for the direct purchaser cases on the one

22    hand and for the indirect purchaser cases on the other, rather

23    than the individual file matters.  But, frankly, from my

24    perspective, we'd defer to the Court and the Clerk's Office.

25    We were --

1          THE COURT:  Yeah, I don't think the clerks will be
2     able to -- sorry to interrupt you.  I don't think the clerks
3     are going to be able to differentiate within the --
4          MR. SIMON:  Right.
5          THE COURT:  -- lead number.  So we're going to keep
6     everything -- we'll have a massive docket on the lead number
7     case.  And the individual filings will either say "all actions"
8     or "indirect" or "direct" if they apply to one or the other.  I
9     hope there's -- I anticipate there will be very little
10    delineation, at least early in the case.
11         But if -- and if this turns out to be unworkable or
12    creates a docket that no one can comprehensively review, we'll
13    look for ways to make it easier.  But I think this seems like a
14    fine way to do it.
15         And I don't think the clerk's going to maintain a
16    separate file for each consolidated action.
17         MR. SIMON:  I think you can take it out, and I think
18    we'll work within the ECF and the rules of the Court, and I
19    think we'll be fine --
20         THE COURT:  Okay.
21         MR. SIMON:  -- if that's okay with --
22         MR. CARNEY:  Yeah, we're fine with that for defendants
23    if that's administratively easier for the Court.
24         THE COURT:  I think it is.  At this stage we'll know
25    pretty quick if it isn't, and then we'll try plan B.

1          All right.  9 is fine.

2          10 and 11 are just fine.

3          12, the majority of these are just fine.  I do have a

4     question, g.

5          MR. SIMON:  Yes.

6          THE COURT:  What do you -- what are you proposing on

7     that?  Because I did want to raise the issue of how -- I know

8     in one of the proposals to be co-lead counsel or co -- or

9     liaison counsel, there were references to cost containment

10    issues: how many people at a dep, how many people at a status

11    conference, how many, you know, travel, what you're charging,

12    where you stay, a lot of minutiae.

13         The truth is I care about that only because I'm going

14    to someday, if you're successful, going to have to review a fee

15    petition and going to wish I took steps today or in the near

16    future to put in guidelines that I don't have to then be in the

17    unhappy circumstance of telling you you're not going to get

18    paid for something when I could have told you up front you

19    weren't going to get paid, and you adapt your procedures

20    accordingly.

21         So how -- what is done in other cases on this up

22    front?

23         MR. SIMON:  It's all over the board, frankly, your

24    Honor.  Some judges say just what you said:  "If you put it in

25    and I don't like it, you're not going to get paid for it at the

1    end of the case, and don't bother me with it in the meantime."

2          We have experienced counsel who have been lead counsel

3    in many cases.  We have a system in place amongst the

4    plaintiffs that if we ask anybody to work on the case, we give

5    them guidelines.  We put certain limitations on what can be

6    charged for certain things, like document review.

7          We are used to looking at the time records and

8    ferreting out things where people are just reviewing the ECFs

9    and haven't been assigned something, a case.

10          So it's largely left to the wide discretion of lead

11   counsel.  And the only reason I put this in is because some

12   courts do want to see it on some sort of basis, like I have --

13   we have one court that we submit it on a quarterly basis.  It's

14   a summary, just as how much time and how much cost.  It's

15   *in camera*.  Obviously, there's work product and privilege

16   issues there.  But, frankly, we started doing that, and, you

17   know, the Court really hasn't even asked us much about it.

18          So I think really it depends on what you want to do.

19   I'd recommend that you rely on us as lead counsel to make sure

20   we do things efficiently -- if we don't, you'll penalize for

21   us -- and that if you want to look at it at some point, you

22   just let us know, and we'll be happy to submit it *in camera*.

23          THE COURT:  Well, do you have a written protocol that

24   you are distributing among counsel as --

25          MR. SIMON:  Yes, yes.

1          THE COURT:  Why don't you give me that *in camera*.  If

2    I look at the written protocol, I can tell you if there's

3    something that I find problematic.

4          MR. SIMON:  Sure.

5          THE COURT:  Is there an objection from defendants with

6    my discussion, even in a phone call -- I can either do it on

7    the record and seal it, or I can just do an off-the-record

8    phone call with plaintiffs' counsel where I discuss their

9    protocol for how they're going to go about monitoring and

10   setting guidelines for co-counsel as to expenses.

11         You know, what will be best is I'll do it on the

12   record, but I'm going to seal it.  Let's do everything on the

13   record.  But any objection to my doing it that way if I review

14   that and have some questions?

15         MR. CARNEY:  I don't think so, your Honor, on behalf

16   of defendants, no.

17         THE COURT:  All right.  We'll do it that way.  Why

18   don't you -- when you get it finalized, if it's not finalized

19   yet, when you have something like that, you can file it

20   *in camera*.  You don't need to file it under ECF.  You can just

21   have it delivered to chambers, *in camera*.  I'll look at it, and

22   if I have questions, I'll contact counsel.  My court

23   reporter -- or my courtroom deputy will contact lead counsel or

24   liaison counsel to arrange a phone call with a limited number

25   of people just to answer questions.

1       MR. SIMON:  That's fine, your Honor.  And just so you

2   know what will be coming, we do have it done.  We haven't sent

3   it out yet.  We wanted to have the hearing today.  But it's a

4   letter to all the counsel on the case emphasizing efficiency,

5   non-duplication of effort, certain limits on hourly rates with

6   respect to certain things like documents.

7       And then we have a -- from our experience in other

8   cases have a format for reporting to us as lead counsel, and we

9   keep track of it, and they report to us usually on a quarterly

10  basis, and we keep running track of it.  So --

11      THE COURT:  That's fine.  It doesn't sound all that

12  elaborate, but if it's detailed where I can at least look at it

13  and make sure there's nothing that --

14      MR. SIMON:  That's fine.

15      THE COURT:  -- gives me any pause, we're all going to

16  save ourselves a lot of trouble potentially years from now.

17      MR. SIMON:  Right.

18      THE COURT:  And I would like to at least initially get

19  your time and cost records so I can see what kind of detail

20  you're providing me.  And if it's in a format that I think is

21  going to be very unworkable for me years later -- I know a fee

22  petition is going to be much more detailed than anything you

23  provide me.

24      MR. SIMON:  How about if we send you -- it won't be

25  filled in yet -- what we've provided to other courts in terms

of the summary we provide. We have an example of that from

another case, so you can just see what you would be getting.

THE COURT: Sure. Why don't you put that in along

with your protocol when you send it over, and then I can look

at both and see if that makes sense.

MR. SIMON: That's fine, your Honor.

THE COURT: And then I would, though, like to at

least, as you propose here, provide quarterly -- provide

these -- this information on a quarterly basis to me *in camera*.

If I decide I don't -- it's just make-work and I'm happy with

the way you're reporting it, I may lengthen the time where I

get it. But I think if I don't do this early, there's going to

be a lot of disappointment later. And perhaps not, but why

risk that.

MR. SIMON: We're happy to do all that, your Honor.

THE COURT: Okay. So g. is fine, with that

understanding.

On monitoring activities of co-counsel, I did have a

question on cases like this. When you take a deposition of the

CEO of one of the defendants, do -- even though these cases

have been consolidated, do all plaintiffs' lawyers have a right

to go to these depositions? Do you agree informally that

that's a waste of time and money?

MR. SIMON: We agree that it will be one lead person

taking the deposition. We'll agree between the directs and

1    indirects to allocate work.  Maybe they'll take one; we'll take

2    one.  If there's some follow-up questions, like if the directs

3    take it, the indirects might do, you know, a half hour or

4    something like that on issues specific to them.

5         But we totally try to coordinate that and allocate it.

6    Only if we delegate to somebody who is on -- let's say we --

7    for example, somebody is very familiar with a particular

8    defendant.  We may delegate to somebody, non-lead counsel, to

9    take that deposition.  In that situation, maybe one of the lead

10   counsel attorneys will sit there as a second chair.

11        But we're not going to have three or four people from,

12   you know, each side at each deposition.

13        THE COURT:  All right.  Yeah.  Otherwise, what's the

14   point of appointing lead counsel?

15        MR. SIMON:  Exactly.

16        THE COURT:  We're supposed to -- that's -- I have

17   always understood that's to avoid having multiple plaintiffs'

18   counsel go and take a dep where only one or two people have

19   speaking roles.

20        MR. SIMON:  Right.

21        THE COURT:  Defendants have clients that are going to

22   be monitoring your costs, so it's going to be efficient based

23   on --

24        MR. CARNEY:  They do, your Honor.  That's right.

25        THE COURT:  I remember that.

1       MR. SIMON:  Do you want them to submit their time and

2  cost records?

3    (Laughter.)

4       THE COURT:  No, no.  It may --

5       MR. SIMON:  Because I'd like to see the comparison in

6  one of these cases.

7       THE COURT:  Well, unlike other fee petitions I see on

8  civil rights cases where the defense counsel is often a

9  government -- an assistant attorney general or a corporation

10  counsel, I -- at least here, I have comparative fees where your

11  hourly rates are -- you're going to start comparing them with

12  what defense counsel gets paid, and it's a good indicator of

13  what reasonable -- what reasonable fees are if you have clients

14  that pay.

15       That's a little different -- difficult for plaintiffs

16  sometimes because of the nature of the practice.  But we have a

17  little more -- few more guidelines here than I would where --

18  in city cases where I just have corporation counsels who don't

19  have hourly rates.

20       All right.  I think the rest of the subparagraphs of

21  12 are fine.

22       I take it these are all agreed to by defense unless

23  there's an exception noted.

24       MR. CARNEY:  Yes.  Yes, your Honor.  That's right,

25  yeah.

1          THE COURT:  Okay.  All right.

2          And if -- on this cost issue and fee issue, if there

3     are some things that defense counsel have seen -- because if

4     there is an award at some point, it's -- the money's coming

5     from your side.  So if there is a -- some practice that you

6     believe to be a best practice in this area, raise it with

7     plaintiffs' counsel or raise it with the Court if you think

8     there's going to be a disagreement down the road.

9          MR. CARNEY:  We can do that, your Honor.

10         THE COURT:  Okay.  It's in your best interests,

11    obviously, if the case reaches that stage.  Good.  Okay.

12         13 is fine.

13         And 14 is fine, and you indicated that you're working

14    with other defense counsel to try and set up some organization

15    where you're going to divide up tasks.

16         MR. CARNEY:  That's right, just like we're doing

17    today, your Honor, so you don't hear 14 views, yes.

18         THE COURT:  Sure.

19         15 is just fine.  And when we get to expert reports,

20    we can talk about it.  But I prefer if the parties do -- drafts

21    of expert reports are basically off limits to either side.  It

22    works to both parties' advantage, and it's a waste of -- it's

23    an enormous waste of time and energy.  If the parties want to

24    do something different on it, that's fine.  But generally

25    drafts of expert reports, if they're off limits to each side,

1  you both save yourself a lot of --

2     MR. CARNEY:  We've often entered stipulations on

3  expert disclosures and all of that, so I think --

4     THE COURT:  Great.

5     MR. SIMON:  Right.

6     MR. CARNEY:  -- that shouldn't be a problem.

7     MR. SIMON:  And that's usually part of it, so --

8     THE COURT:  Okay.  Very good.

9     But same thing here on privileges.  This is just fine

10  as you have it proposed.

11     I think 60 days is fine for the regular status

12  reports.  I may ask for a little sooner report -- it can be in

13  writing -- on your efforts to resolve some of the issues we

14  talked about today.  I don't want to wait 60 days for that.

15  But I think for a meeting like this, every 60 days is fine.

16     And, again, you can participate by phone to listen in.

17  But, frankly, if you're listening and not talking, reading a

18  transcript is just as good.  But I'll leave it to the --

19  certainly on defense side, you can -- you've got clients that

20  are going to decide whether that's a good way to pay you.

21     On the plaintiffs' side, if you're just attending and

22  listening and there's no good reason for it, then either lead

23  counsel is going to have to talk about whether that's going to

24  be compensable later, or I'll have to review it later.

25     But there shouldn't be a lot of travel if you don't

1    have a major speaking role or you're not -- on the plaintiffs'

2    side, at least.  If you don't have a major speaking role -- you

3    know, walking two blocks from an office in the Loop is fine,

4    but traveling from around the country just to be here present

5    to me seems unnecessary.  But if there's a good reason for it,

6    I'll hear it.

7    Okay.  All right.  October 28th for you to file your

8    amended complaints.  Do it under the main case number.

9    MR. SIMON:  Yes, your Honor.

10    THE COURT:  That's fine.

11    18 is fine.  We've talked about that.

12    Do any defendants expect to answer, or is everyone

13    filing a motion to dismiss, as far as you know?

14    MR. CARNEY:  I would -- I haven't polled each one

15    about that, but I would expect motions to dismiss.  We haven't

16    yet seen the amended complaint, but we're --

17    THE COURT:  You have a --

18    MR. CARNEY:  -- pretty much --

19    THE COURT:  -- pretty good idea --

20    MR. CARNEY:  -- of that mind --

21    THE COURT:  -- of what --

22    MR. CARNEY:  -- I think.

23    THE COURT:  -- it's going to say.

24    MR. CARNEY:  Yeah, we do, yeah.

25    THE COURT:  All right.  Well, you have a date if it's

1    an answer and a date if it's going to be a motion to dismiss.

2    How do you propose -- and we can talk about this on our next

3    status if you want.  But you're likely starting your motions to

4    dismiss already if you haven't.  If you haven't done it

5    already, you're going to be starting it soon.

6         How do you propose the briefing on that to be?  I

7    would prefer, unless there are individual issues, consolidated

8    briefs, similarly for the plaintiff.

9         MR. SIMON:  Right.

10        THE COURT:  I'll give you more than 15 pages, but I

11   don't want to get 14 briefs of 15 pages each raising the same

12   issues, no more -- and then I'd have to give the plaintiffs,

13   you know, 90 pages or something to respond.

14        MR. CARNEY:  Yeah.  Yeah, your Honor.  This comes in

15   all these big antitrust cases.  I think we obviously are

16   mindful that there's a lot of paper that comes to the Court.  I

17   think you'd often see, you know, a brief on each of the

18   complaints, an indirect and the direct, because there are

19   separate issues.  They overlap.  And if we can cross-refer to

20   things in the indirect brief, we'll do that to tighten it up.

21        There may be some defendants that have additional

22   issues, are just differently positioned, whatever that may be,

23   and we'll strive to be efficient about how that's presented as

24   well.  I don't think we've got to the point of should they have

25   a separate side brief or should it be, you know, a subpart.  I

1  think it will depend on what we see in the complaints --

2          THE COURT:  Let's put that --

3          MR. CARNEY:  -- as we go.

4          THE COURT:  -- on the agenda for our next status

5  because that will be a lot closer.  You'll have seen the

6  consolidated complaints.

7          MR. CARNEY:  Yeah.

8          THE COURT:  Foster Farms or anyone else who is not in

9  with counsel will be in presumably by then, and you can decide

10 how you best want to approach this on your motions.

11         MR. CARNEY:  That would be great because we'll have a

12 chance to look at it, think about it, and we want to know ahead

13 as well as to what we're -- what space and what format --

14         THE COURT:  Right.

15         MR. CARNEY:  -- the Court wants --

16         THE COURT:  And talk to --

17         MR. CARNEY:  -- exactly.

18         THE COURT:  -- plaintiffs' counsel about what you're

19 proposing, and then you should talk among yourselves about how

20 you want to respond in a joint or separate fashion, and then

21 we'll work on it that way.

22         MR. CARNEY:  Yes, your Honor.

23         THE COURT:  Okay.  But I think the timing that you

24 proposed jointly is fine for either an answer or motion to

25 dismiss and then a response and then a reply.

1        No. 20, I think you wanted to talk more about these

2    dates, or are these dates acceptable --

3        MR. SIMON:  Yes.

4        THE COURT:  -- by defense --

5        MR. CARNEY:  The dates are good.  We're fine with the

6    dates, your Honor, yes.

7        THE COURT:  Okay.  20 will be fine.

8        21, 22, and 23 are just fine too.

9        I think the only then portion of this that we have --

10   we've deleted No. 8.  And I think everything else is fine as

11   proposed, unless I've missed something.

12       MR. SIMON:  No, I think that's right, your Honor.

13       THE COURT:  All right.  So if you can resubmit it with

14   that one omission and renumbering it, that's fine.  And I'll

15   enter that order.

16       Now, we do have a couple deliverables that we talked

17   about on the preservation issue.  How do you want to do that?

18   I think -- I don't want to wait 60 days for that because that's

19   a long time to go without an agreement for preservation.

20       MR. CARNEY:  Yeah.  No, I think the defendants will

21   need some time to confer with their clients and then confer

22   with the plaintiffs on that.

23       30 days.  Would that be fair for a status conference

24   on it?

25       THE COURT:  How does that sound to plaintiffs?

1      MR. SIMON:  I think that's okay with us.

2      We do have the December 7th date agreed upon on the

3 ESI protocol.  Might we make that the same date to come to

4 agreement on the other issues and come in for status after

5 that?

6      THE COURT:  Yeah.  Why don't you --

7      Well, 60 days takes us out to where, Sandy, if we have

8 a status?

9      THE CLERK:  That would be the -- let me see -- 21st.

10 That would be the 21st of December.

11      THE COURT:  All right.  Let's move that up.  Our first

12 status will be a little shorter than 60 days.  Let's move it up

13 to shortly after that December 7th date where you're going to

14 be giving me five-page letters of your areas of disagreement,

15 and I'm going to rule on them.

16      Why don't we set it for --

17      THE CLERK:  The 9th, a Friday?

18      THE COURT:  Yeah.  How is -- I start a trial on the

19 12th.  How is the 9th?  Fridays are often a little better than

20 others.

21      MR. CARNEY:  We'll make that work for defendants, your

22 Honor.

23      THE COURT:  Yeah.  And if you can then get all your --

24 if there are any disagreements -- let me make sure plaintiffs'

25 counsel is on board with that too.

1      MR. SIMON:  I think we're okay with that, your Honor.

2      THE COURT:  All right.  December 9th.  We'll do it at

3  9:30 again.  And that will be our next status.  We'll stretch

4  it out a little further after that, but for this first one,

5  we'll do it a little shorter than 60 days.

6      I should have in my hands by the 7th your -- any areas

7  you disagree upon about scope of any of the issues we spoke

8  about earlier, and I'll give you rulings on the 9th so that we

9  can go forward with that.

10      Okay.  Let me just look at my notes and see if there's

11  anything else I wanted to raise.

12      Okay.  I don't have anything else in my notes.  First

13  from the plaintiffs, anything else we have failed to address

14  today that we had on the agenda or you think needs to be

15  addressed?

16      MR. SIMON:  I think we covered it, your Honor.  If we

17  didn't, we'll figure it out by the next status.

18      THE COURT:  Sure.

19      And defense?

20      MR. CARNEY:  Nothing, your Honor.  Thank you for your

21  time in sorting through all of this.

22      THE COURT:  And I would appreciate an agenda as was

23  prepared today for our next meeting so that we can work off the

24  agenda.  But I think that's --

25      MR. CARNEY:  We'll work together to do that.

1          THE COURT:  -- helpful.

2          MR. CARNEY:  Yes, your Honor.

3          THE COURT:  Very good.

4          MR. SIMON:  Yes, your Honor.

5          THE COURT:  Your counsel -- your co-counsel I think

6     may have something he wants to raise.  So go ahead.

7        (Counsel conferring.)

8          MR. CARNEY:  We're all set, your Honor.  Thank you.

9          THE COURT:  Great.  Thank you all.

10          MULTIPLE COUNSEL:  Thank you, your Honor.

11          THE COURT:  Okay.  Thank you.

12        (Concluded at 10:58 a.m.)

13                    C E R T I F I C A T E

14        I certify that the foregoing is a correct transcript of the

15     record of proceedings in the above-entitled matter.

16

17     */s/ LAURA R. RENKE*                        *October 24, 2016*
       LAURA R. RENKE, CSR, RDR, CRR
18     Official Court Reporter

19

20

21

22

23

24

25