IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


IN RE BROILER CHICKEN ANTITRUST       )   Docket No. 16 C 8637
LITIGATION                             )
                                       )   Chicago, Illinois
This Document Relates To:              )   December 9, 2016
All Actions                            )   9:25 a.m.


TRANSCRIPT OF PROCEEDINGS - Status
BEFORE THE HONORABLE THOMAS M. DURKIN
AND THE HONORABLE JEFFREY T. GILBERT


APPEARANCES:


For Plaintiffs         HART McLAUGHLIN & ELDRIDGE LLC by
Maplevale Farms        MR. STEVEN A. HART
and John Gross         MR. KYLE POZAN
and Company:           121 W. Wacker Drive, Suite 1050
                       Chicago, IL 60601

*(Direct purchaser plaintiffs interim liaison class counsel)*


                       LOCKRIDGE GRINDAL NAUEN PLLP by
                       MR. W. JOSEPH BRUCKNER
                       MR. BRIAN D. CLARK
                       100 Washington Avenue South, Suite 2200
                       Minneapolis, MN 55401

*(Direct purchaser plaintiffs interim co-lead class counsel)*


                       PEARSON SIMON & WARSHAW LLP by
                       MR. BRUCE L. SIMON
                       44 Montgomery Street, Suite 2420
                       San Francisco, CA 94104

*(Direct purchaser plaintiffs interim co-lead class counsel)*

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Plaintiffs Fargo Stopping Center, Sargent's Restaurant and Don Chavas Mexican Restaurant: | WEXLER \| WALLACE LLP by MR. KENNETH A. WEXLER MR. THOMAS A. DOYLE 55 W. Monroe Street Suite 3300 Chicago, IL 60603 |

*(Indirect purchaser plaintiffs interim liaison class counsel)*

| | |
|---|---|
| For Plaintiffs Fargo Stopping Center and Sargent's Restaurant: | GUSTAFSON GLUEK PLLC by MR. DANIEL E. GUSTAFSON Canadian Pacific Plaza 120 S. 6th Street, Suite 2600 Minneapolis, MN 55402 |

*(Indirect purchaser plaintiffs interim co-lead class counsel)*

| | |
|---|---|
| For Plaintiffs Drucker, Harwayne-Gidansky, Majernik, Nelson and Veaner: | WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP by MR. THEODORE B. BELL 70 W. Madison Street, Suite 1400 Chicago, IL 60602 |

| | |
|---|---|
| For Plaintiffs Percy, Lathen, Dimas, Monahan, Coe, Patterson, Tierney, Cheslow and Wilbur: | HAGENS BERMAN SOBOL SHAPIRO LLP by MS. JEANNIE Y. EVANS MS. ELIZABETH A. FEGAN 455 N. Cityfront Plaza Drive NBC Tower, Suite 2410 Chicago, IL 60611 |

| | |
|---|---|
| For Defendants Koch Foods, JCG Foods and Koch Meats: | NOVACK AND MACEY LLP by MR. STEPHEN J. SIEGEL MR. CHRISTOPHER S. MOORE 100 N. Riverside Plaza, Suite 1500 Chicago, IL 60606 |

| | |
|---|---|
| For the Tyson Defendants: | WHITE & CASE LLP by MR. PETER J. CARNEY 701 13th Street, NW Washington, DC 20005 |

1    APPEARANCES (Cont'd.):

2

3                              WHITE & CASE LLP by
                             MR. DAVID H. SUGGS
                             1155 Avenue of the Americas
4                            New York, NY 10036

5

6                              McGUIRE WOODS LLP by
                             MS. CHRISTINA M. EGAN
                             77 W. Wacker Drive, Suite 4100
7                            Chicago, IL 60601

8
     For Defendant           SIMPSON THACHER & BARTLETT LLP by
9    Pilgrim's Pride:        MS. ANDREA B. LEVINE (via telephone)
                             425 Lexington Avenue
10                           New York, NY 10017

11
                             EIMER STAHL LLP by
12                           MR. MICHAEL L. McCLUGGAGE
                             224 S. Michigan Avenue, Suite 1100
13                           Chicago, IL 60606-1229

14
     For Defendant           VENABLE LLP by
15   Perdue Farms:           MS. LISA JOSE FALES
                             575 7th Street, NW
16                           Washington, DC 20004

17
     For the Sanderson       KIRKLAND & ELLIS LLP by
18   Farms Defendants:       MR. MARTIN L. ROTH
                             MS. STACY L. PEPPER
19                           300 N. LaSalle Street
                             Chicago, IL 60654
20

21   For Defendant           PROSKAUER ROSE LLP by
     Wayne Farms:            MR. CHRISTOPHER E. ONDECK
22                           MR. ADRIAN FONTECILLA
                             1001 Pennsylvania Avenue, NW
23                           Suite 600 South
                             Washington, DC 20004
24

25

APPEARANCES (Cont'd.):

For the Mountaire        ROSE LAW FIRM by
Farms Defendants:        MS. AMY LEE STEWART (via telephone)
                         MR. JACOB WHITE (via telephone)
                         120 E. 4th Street
                         Little Rock, AR 72201

For Defendant            SKADDEN ARPS SLATE MEAGHER & FLOM by
Peco Foods:              MR. PATRICK J. FITZGERALD
                         155 N. Wacker Drive, Suite 2700
                         Chicago, IL 60606

For Defendant            MAYER BROWN LLP by
Foster Farms:            MR. CARMINE R. ZARLENGA
                         MR. ORAL D. POTTINGER
                         1999 K Street NW
                         Washington, DC 20006

For Defendant            VEDDER PRICE PC by
House of                 MR. GREGORY G. WROBEL
Raeford Farms:           222 N. LaSalle Street, Suite 2600
                         Chicago, IL 60601

For Defendant            SHOOK HARDY & BACON LLP by
Simmons Foods:           MS. LYNN H. MURRAY
                         111 S. Wacker Drive, Suite 5100
                         Chicago, IL 60606

For Defendant            ALSTON & BIRD LLP by
Fieldale Farms:          MR. B. PARKER MILLER
                         MS. VALARIE C. WILLIAMS (via telephone)
                         1201 W. Peachtree Street
                         Atlanta, GA 30309

For the George's         THE LAW GROUP OF NORTHWEST ARKANSAS LLP by
Defendants:              MR. GARY V. WEEKS (via telephone)
                         1830 Shelby Lane
                         Fayetteville, AR 72704

1   APPEARANCES (Cont'd.):

2

3                           STINSON LEONARD STREET LLP by
                            MR. WILLIAM L. GREENE
                            150 S. Fifth Street, Suite 2300
4                           Minneapolis, MN 55402

5
     For the               KUTAK ROCK LLP by
6    O.K. Defendants:      MR. JAMES M. SULENTIC (via telephone)
                           1650 Farnam Street
7                          Omaha, NE 68102

8
                           KUTAK ROCK LLP by
9                          MS. KIMBERLY M. HARE
                           One S. Wacker Drive, Suite 2050
10                         Chicago, IL 60606-4615

11
     Court Reporter:       LAURA R. RENKE, CSR, RDR, CRR
12                         Official Court Reporter
                           219 S. Dearborn Street, Room 1432
13                         Chicago, IL 60604
                           312.435.6053
14                         laura_renke@ilnd.uscourts.gov

15

16

17

18

19

20

21

22

23

24

25

1       (In open court.)

2           THE CLERK:  Folks, we'll get started probably about

3   9:35, 9:40.

4           JUDGE DURKIN:  Yeah, about that much.

5           THE CLERK:  Yeah.

6           JUDGE DURKIN:  And if there's people that you need to

7   communicate with that are expecting a conference call --

8           THE CLERK:  There are.

9           JUDGE DURKIN:  -- just send an e-mail and tell them we

10  may start a few minutes late.  All right.

11          THE CLERK:  All rise.

12      (Recess at 9:26 a.m., until 9:40 a.m.)

13          THE CLERK:  All rise.

14          Be seated, please.

15          16 C 8637, Maplevale Farms v. Koch Foods.

16          JUDGE DURKIN:  All right.  Let's have -- I don't want

17  everyone to identify themselves for the record, but let's have

18  lead counsel who are going to be speaking today identify

19  themselves.

20          For the record, this is Judge Gilbert, the magistrate

21  judge who is assigned to the case.  He is going to be -- as I

22  said earlier would likely be the case, that I was going to get

23  Judge Gilbert involved in monitoring discovery in the case, and

24  that will be the case.  There will be an appointment of Judge

25  Gilbert, an order entering that today.  And he's going to

1  participate in today's hearing.  So --

2          JUDGE GILBERT:  Good morning, everybody.

3          Does this work?

4          THE CLERK:  Yes, it's on.

5          JUDGE GILBERT:  Maybe.  Okay.  Great.

6          Good morning, everybody.  Nice to see some familiar

7  faces, and looking forward to getting to know the unfamiliar

8  faces.

9          MR. HART:  Good morning, your Honor.  Steven Hart,

10  liaison counsel for direct purchaser plaintiffs.

11          MR. SIMON:  Bruce Simon, lead counsel for the direct

12  purchaser plaintiffs.

13          MR. BRUCKNER:  Good morning, your Honor.  Joe

14  Bruckner, co-lead counsel for the direct purchaser plaintiffs.

15          MR. GUSTAFSON:  Good morning, your Honor.  Dan

16  Gustafson, lead counsel for the indirect purchaser plaintiffs.

17          MR. WEXLER:  And good morning, your Honor.  Ken

18  Wexler, liaison counsel for the indirect purchaser plaintiffs.

19          JUDGE DURKIN:  All right.

20          MR. CLARK:  Your Honor, Brian Clark for direct

21  purchaser plaintiffs as well.

22          JUDGE DURKIN:  Okay.

23          MR. CARNEY:  Your Honor, Peter Carney for Tyson Foods,

24  liaison defense counsel.

25          MR. SUGGS:  David Suggs from White & Case, also for

1  Tyson.

2  JUDGE DURKIN:  All right.

3  MR. ROTH:  Good morning, your Honor.  Martin Roth for

4  the Sanderson Farms defendants.

5  MS. PEPPER:  Stacy Pepper, also for the Sanderson

6  Farms defendants.

7  MR. POTTINGER:  Oral Pottinger on behalf of Foster

8  Farms, LLC.

9  JUDGE DURKIN:  All right.  And, Mr. Pottinger, you're

10  with Mayer Brown?

11  MR. POTTINGER:  That's correct.

12  JUDGE DURKIN:  All right.  I made a disclosure last

13  time that I am now hearing Mayer Brown cases, that after being

14  separated for nearly four years in January, I've decided to do

15  it.

16  Mr. Pottinger and I are not familiar with each other.

17  I've never met him.  In fact, I think he joined the firm after

18  I left.  But I'm not familiar with any of the Mayer Brown

19  attorneys who have filed appearances on the case.  So I'm

20  not -- unless parties object otherwise, and you're free to.

21  But I'm not independently recusing myself because of Mayer

22  Brown's involvement in the case.

23  Okay.  Is there anyone here from the Berman firm or

24  Cohen Milstein?

25  MS. FEGAN:  Yes, your Honor.  Elizabeth Fegan and

1  Jeannie Evans from Hagens Berman.

2  JUDGE DURKIN:  Okay.  Because I am going to take up

3  that motion today that you have filed.

4  MS. FEGAN:  Thank you, your Honor.

5  JUDGE DURKIN:  All right.  I had a couple preliminary

6  questions I want to get out of the way.  And then I want to

7  take up, before we get into the discovery disputes, which Judge

8  Gilbert is going to take the lead on -- I wanted to get into

9  the motion that was made by the Hagens Berman firm to appoint

10  them as attorneys for the end-user consumers.

11  So, first, are there -- does anyone know, have more

12  cases been filed since our last status?

13  MR. HART:  No other cases that we're aware of have

14  been filed.

15  JUDGE DURKIN:  In Northern District or anywhere else?

16  MR. HART:  That is correct, your Honor.

17  JUDGE DURKIN:  All right.  Well, maybe we're done with

18  that.

19  Okay.  I did review the -- there were *in camera*

20  submissions made to me by lead counsel for the direct

21  purchasers and lead counsel for the indirect purchasers.  Might

22  have been liaison counsel who actually submitted it.

23  And they -- the procedures that are set forth about

24  billing and staffing certainly appeared, at least on their

25  face, as being -- nothing was obviously problematic to me.

1        I am not -- there's no presumption that I'm going to

2   approve your bills and fees based on that.  But I think the

3   point of your submission of that was to give me some early

4   warning if I saw something that I thought is just beyond the

5   pale, and why incur those expenses if I know already I would

6   deny them if we get to that point in the case.  It would be to

7   save trouble for all of you.

8        Nothing I saw was problematic.

9        I do need to see the bills in practice as they come

10  in.  And obviously, at some point, if we get that far,

11  defendants will be objecting to a number of the things.  And

12  nothing about my review and saying anything today is meant to

13  pass any kind of judicial imprimatur on the propriety of them.

14       I would like to get the bills, whether they are

15  year-end -- what is the status?  Have you collected billing

16  time and bills so far?

17       MR. BRUCKNER:  We have, your Honor.  We collect them

18  on a monthly basis.  Typically it's we tell counsel to get us

19  their bills on the 20th of the month following, you know, the

20  end of that month.  We're happy to submit them to your Honor as

21  often or frequently as you want: every quarter; we can do it

22  every year.  Whatever your Honor's preference is.

23       JUDGE DURKIN:  Well, let's start -- okay.  All right,

24  Mr. Bruckner.  Why don't we do it where you submit them to me.

25  You can do it in early January, but for the calendar year 2016.

1        MR. BRUCKNER:  Got it.

2        JUDGE DURKIN:  And then we'll do it every quarter.

3   Likely I'll reduce the frequency of it, but I'd like to at

4   least see what they look like and know what I may have to be

5   reviewing in a year or two.

6        MR. BRUCKNER:  Very good.

7        JUDGE DURKIN:  You won't see them.

8        MR. CARNEY:  That's fine with us, your Honor.

9        JUDGE DURKIN:  So they will be submitted *in camera*.

10  I'd like them done simultaneously, both direct and indirect.

11  Do it on the same day.  But you don't have to do it on

12  December 31st.  You know, get them to me in the -- sometime in

13  the first couple weeks of January.

14       MR. BRUCKNER:  Will do.

15       JUDGE DURKIN:  And then generally two weeks after the

16  end of the quarter.

17       MR. BRUCKNER:  Very good.

18       JUDGE DURKIN:  Which -- does that give you enough time

19  to gather them for a quarter?

20       MR. BRUCKNER:  Yes, your Honor.  It will actually be

21  at least 20 days after the end of the quarter, then another two

22  weeks on top of that, I think we can get them to you.

23       JUDGE DURKIN:  All right.  So --

24       MR. BRUCKNER:  Counsel don't report to us until

25  20 days after the end of the month, so --

1            JUDGE DURKIN:  Oh, I see.  Well, let's do 2016 then.

2            MR. BRUCKNER:  Okay.

3            JUDGE DURKIN:  You need -- they need to report it

4   within 20 days of the --

5            MR. BRUCKNER:  Right, by January 20th.

6            JUDGE DURKIN:  And then you need a couple weeks after

7   that to --

8            MR. BRUCKNER:  A week.

9            JUDGE DURKIN:  All right.  So --

10           MR. GUSTAFSON:  I think maybe February 1st would be a

11  good day.

12           MR. BRUCKNER:  Yeah.

13           JUDGE DURKIN:  That'll work.  Okay.

14           MR. BRUCKNER:  We can certainly get them to you by

15  then.

16           MR. HART:  Your Honor, with respect to how you would

17  like to receive them.

18           JUDGE DURKIN:  Yes.

19           MR. HART:  We can do them electronically on a flash

20  drive; we can do them paper; whatever the Court's --

21           JUDGE DURKIN:  Why don't we try paper first, and then

22  if it looks like it's going to be unworkable, I'll have you

23  submit it electronically.

24           MR. BRUCKNER:  Got it.

25           JUDGE DURKIN:  But -- and if it's going to be anything

1  more than 3 or 4 inches thick when you submit it to me in paper

2  form, contact my courtroom deputy, and we'll tell you just to

3  do it electronically likely, but -- all right.

4          MR. BRUCKNER:  Yeah.

5          JUDGE DURKIN:  Anything else on that issue?

6          MR. BRUCKNER:  No, your Honor.

7          MR. GUSTAFSON:  None.

8          JUDGE DURKIN:  Okay.  All right.  There was a

9  second -- there were two second amended complaints filed, one

10  for the direct, one for the indirect.  Remind me.  Did I

11  authorize or allow you to file a second amended complaint,

12  or -- I may have.

13          MR. HART:  You did, your Honor.

14          We actually negotiated that with defense counsel.  We

15  submitted a stipulated and agreed order.  That order was

16  approved by the Court.  And we filed that, the amended --

17  second amended complaint, on November 23rd.

18          JUDGE DURKIN:  How did they change the allegations

19  from the first amended -- from the first consolidated complaint

20  you filed?

21          MR. HART:  Essentially it's paragraphs 89 through 115

22  of our second consolidated amended complaint, your Honor.

23  There was, in our continuing effort to negotiate -- excuse

24  me -- to investigate our allegations, it became public that the

25  information that was supplied by the defendants to the

department, Georgia Department of Agriculture, was suspected to be false and misleading.

Subsequent to our first consolidated complaint, the Georgia index has now been suspended.

And the allegations that are contained in paragraphs 89 through 115 of the second amended complaint address that circumstance.

JUDGE DURKIN: All right.

And also I should -- that reminds me, the beep. Who is on the line?

JUDGE GILBERT: On the phone.

JUDGE DURKIN: On the phone line.

MS. LEVINE: This is Andrea Levine from Simpson, Thacher & Bartlett on behalf of Pilgrim's Pride Corporation.

JUDGE DURKIN: All right.

MS. WILLIAMS: Valarie Williams with Alston & Bird on behalf of Fieldale Farms.

JUDGE DURKIN: Okay.

MR. SULENTIC: Jim Sulentic from Kutak Rock on behalf of O.K. Foods.

JUDGE DURKIN: All right. Anyone else?

MR. WEEKS: Yes, Gary Weeks with the Law Group of Northwest Arkansas on behalf of George's.

JUDGE DURKIN: Anyone else?

MS. STEWART: Yes, Amy Stewart and Jacob White on --

1     from the Rose Law Firm on behalf of Mountaire.

2          JUDGE DURKIN:  All right.  If I don't hear from anyone

3     else, I'm going to assume we have everyone on the phone that is

4     going to be on.

5          (No response.)

6          JUDGE DURKIN:  And do we have any brokerage houses or

7     investment advisers or anyone else on?  Citadel is not present

8     for this one?  Apparently not.  Okay.

9          MR. HART:  Your Honor, there's one more thing I would

10    like to mention about our second --

11         JUDGE DURKIN:  Yes.

12         MR. HART:  -- consolidated complaint.  There were some

13    unnamed co-conspirators that were also added that are chicken

14    consolidators that we did not name as defendants in the

15    complaint but we believe are co-conspirators.

16         JUDGE DURKIN:  All right.  Mr. Doyle, were you going

17    to say something on this?

18         MR. DOYLE:  I was.  The similar allegations in our

19    second amended complaint regarding the Georgia Dock are

20    paragraphs 109 to 127.

21         JUDGE DURKIN:  Okay.

22         And from the defendants' point of view, do these new

23    allegations and the filing of the second amended complaint

24    affect in any way the briefing schedule we have set on the

25    motion to dismiss?

1    MR. CARNEY:  We discussed that and had negotiated a

2  schedule, which I believe was part of the order that we're

3  submitting.  It was submitted and approved, and it set the date

4  for the motion to dismiss at January 27.

5    JUDGE DURKIN:  Okay.

6    MR. CARNEY:  So we've got that calendared and going,

7  your Honor.

8    JUDGE DURKIN: All right.  Okay.  That's fine.  And we

9  will -- and we'll go ahead with that schedule.

10    You said I approved that?

11    MR. CARNEY:  I believe so, your Honor, yes.

12    MR. HART:  You did.  It moved the dates, your Honor.

13    JUDGE DURKIN:  Yeah, can you print it up?

14    I looked over a lot of papers yesterday, and I just

15  didn't look at that order.

16    MR. CARNEY:  It kept the schedule we had, basically,

17  but shifted it based on a number of days to give us time to

18  address this.

19    JUDGE DURKIN:  Sure.

20    JUDGE GILBERT:  When does it end up -- when do the

21  motions to dismiss, at least on your --

22    JUDGE DURKIN:  Use this.

23    JUDGE GILBERT:  When do the motions to dismiss on your

24  current schedule -- when do they end up getting fully briefed?

25    THE CLERK:  April 12th.

1      MR. CARNEY:  I believe early April, your Honor.

2      JUDGE DURKIN:  Okay.  All right.

3      Okay.  Well, I want to -- before we get into the

4  substantive discovery issues, I wanted to get a little better

5  feel for the industry -- thank you.

6      THE CLERK:  Mm-hmm.

7      JUDGE DURKIN:  All right.  Yes, I remember it like

8  it's yesterday.  November 23rd I entered this order.  So okay.

9      The motion to reconsider that was filed, before I rule

10  on it, I want to get a little better feel for the broiler

11  industry, which will inform my decision on what to do.

12      We have chicken producers, obviously, on the defense

13  side.

14      MR. CARNEY:  Yes, we do, your Honor.

15      JUDGE DURKIN:  They are farms and, you know, people

16  who subcontract with farms, and they ultimately are the

17  producers that sell the broilers, obviously.  Correct?

18      MR. CARNEY:  That's correct.  Yes, your Honor.

19      JUDGE DURKIN:  All right.  You sell to what have been

20  called direct purchasers -- these are wholesalers -- but also

21  food stores.  Isn't that correct?

22      MR. CARNEY:  There are a range of direct producers,

23  your Honor.  And I think when we get down the road, we'll see

24  there are a number of channels.  And it will vary by defendant.

25  Some of the defendants sell to a range of purchasers; some of

1   them are large grocery chains, it's been alleged.  Some may be

2   kind of fast-food stores -- right? -- like your KFCs, your

3   McDonald's.  Could also be somebody like a Walmart or somebody

4   of that scale as well.

5           So a number of channels.  Yes, your Honor.

6           JUDGE DURKIN:  All right.  So some of the people you

7   sell to then sell it directly to consumers.

8           MR. CARNEY:  There will be some.  That's right, your

9   Honor, yes.

10          JUDGE DURKIN:  And there are others that are -- that

11  then resell it.  So you sell to wholesalers, who then resell it

12  to either restaurants or other butcher shops or supermarkets.

13          MR. CARNEY:  That's right, your Honor.  And the idea,

14  though, that all of these are just broilers that are sold very

15  much simplifies things.  These broiler chickens are often sold

16  in, you know, tray packs that you get in the grocery store.

17  They may be sold to McDonald where they're, you know, made into

18  nuggets and value added and sold in that way.

19          They could be sold as rotisserie chickens, basically,

20  smaller birds.  And you'll find that there's a range of kind of

21  the birds that are involved in this case.  So it's going to be

22  interesting where you get to kind of product market and all

23  these parts, and there would be a wide range of members of

24  purchasers, yes.

25          JUDGE DURKIN:  All right.  Because I think I had an

1    oversimplified view of -- I know I did -- of the -- of the

2    channels, the structure and supply chain.

3         I -- and I'm sure it was contained in the complaint

4    and it just -- I overlooked it.  But I didn't realize that

5    there were direct purchasers that then sell directly themselves

6    to consumers.  I guess it should have been obvious to me that a

7    place like Sam's Club or Jewel or some of the larger food

8    chains will buy directly from a chicken producer and then sell

9    to a consumer.

10        MR. CARNEY:  Yeah, and I think we'll find that there

11   will be -- you know, that there will be that direct sale, and

12   then there will also be various intermediaries in the indirect

13   chain basically.  There may be a couple of steps.  And, again,

14   it may vary among the defendants who their customers are and

15   how that's done.

16        JUDGE DURKIN:  All right.  And this may be more

17   addressed then to the defendants.  But there are -- the broad

18   category of direct versus indirect is direct buys it right from

19   the producer; indirect buys it from someone who bought it

20   directly.

21        MR. SIMON:  That's correct, your Honor.  And so the

22   representative plaintiffs would have invoices that they bought

23   directly from one of the defendants.

24        And it's very common in antitrust cases that you have

25   this division.  There's a Supreme Court case, as we talked

1    about last time --

2            JUDGE DURKIN:  Right.

3            MR. SIMON:  -- *Illinois Brick*, which recognizes the

4    direct purchasers, even though they may resell, still are the

5    ones that bring the direct claims; and then you have indirect

6    purchasers, who raise different claims but also are entitled to

7    recover.

8            So until the Supreme Court tells us differently, there

9    is that dividing line as a policy matter.

10           JUDGE DURKIN:  All right.  And the restaurants who

11   are -- I suppose some restaurants buy directly from producers.

12   Are there restaurants?

13           MR. SIMON:  There's some very large ones that would --

14   and, you know, as mentioned by Mr. Carney, if you get a

15   fast-food chain or a big restaurant chain, they could lot-buy

16   through distributors as well.

17           JUDGE DURKIN:  All right.  And the -- you've excluded

18   from your class definition people who buy chicken in

19   restaurants.  Is that correct?

20           MR. SIMON:  From our class definition, that would not

21   be included within ours because --

22           JUDGE DURKIN:  Right.

23           MR. SIMON:  -- we're --

24           JUDGE DURKIN:  You're --

25           MR. SIMON:  You're going to have --

1          JUDGE DURKIN:  -- the direct.

2          MR. SIMON:  -- the restaurant who bought directly.

3     But that would be a question for Mr. Gustafson on the --

4          JUDGE DURKIN:  Sure.

5          MR. SIMON:  -- indirect side.

6          MR. GUSTAFSON:  Yes, your Honor.  Dan Gustafson.

7          We have excluded anyone who bought chicken that has

8     been repurposed into a meal or another product.  So Chicken

9     McNuggets or, you know, if you had chicken chow mein or

10    something like that in a restaurant, those categories of

11    chicken purchases are excluded.

12         JUDGE DURKIN:  And the reason being -- I think I know

13    the reason, but why don't you tell me.

14         MR. GUSTAFSON:  The reason being is that the ability

15    to calculate the damages for something that's incorporated into

16    a larger product is difficult at best.

17         JUDGE DURKIN:  Right.  Okay.  That makes sense.

18         But there are end-user consumers who purchase from the

19    direct purchasers, and there are end-user consumers who

20    purchase from the indirect purchasers.  Is that correct?

21         MR. GUSTAFSON:  That's correct.

22         JUDGE DURKIN:  Okay.  Okay.  All right.  That's

23    helpful for me to understand the industry.

24         Now, why don't the attorneys from the Berman firm come

25    up.

1          MR. GUSTAFSON:  Would you like me to stay, your Honor?

2          JUDGE DURKIN:  Why don't you stay.  Defense counsel

3     doesn't need to.  But why don't you -- and, again, for the

4     record, why don't you identify yourselves.

5          MS. FEGAN:  Your Honor, Elizabeth Fegan from Hagens

6     Berman.

7          JUDGE DURKIN:  Okay.

8          MS. EVANS:  And Jeannie Evans from Hagens Berman.

9          JUDGE DURKIN:  All right.  You have filed a motion to

10    reconsider -- well, in effect, a motion to reconsider my

11    original order, which said that we should wait until a conflict

12    becomes apparent between the indirect purchasers and the

13    end-user consumers.

14         Frankly, the conflict, if it exists, also exists

15    between the direct purchasers and the end-user consumers

16    because it hadn't -- as I said, it wasn't something I focused

17    on, the fact that there are large food chains -- well, large

18    supermarkets that buy directly from the chicken producers, and

19    people obviously go in individually and buy from the food --

20    from those supermarkets.

21         So is it your intent to try and come in and represent

22    all end users, whether they are -- they buy from the direct

23    purchasers or the indirect purchasers?

24         MS. FEGAN:  That's correct, your Honor.  And that is

25    typical and why you already have two lead counsel orders,

1  because there's already a conflict between direct purchasers

2  and indirect purchasers.  And what we're really pointing out is

3  that there's now also two cogs in the distribution chain, so to

4  speak, kind of lumped together in this indirect purchaser group

5  that has the same type of conflict that would exist with the

6  direct purchasers and requires separate representation.

7          JUDGE DURKIN:  All right.  And I read your motion, and

8  I read the response.  Is there anything you want to add to your

9  motion?

10          MS. FEGAN:  No, your Honor.

11          JUDGE DURKIN:  All right.  Anything you want to add to

12  the response or anything that Ms. Fegan said today?

13          MR. GUSTAFSON:  Well, your Honor, the only thing that

14  I wanted to add was two quick points.  They don't even

15  recognize the distinction between what you've just described as

16  the consumers who buy from direct purchasers like Costco and

17  those who buy through indirect purchasers.  Their complaint

18  only represents those who buy from indirect purchasers.

19          But -- but it doesn't really matter for the purposes

20  of this motion.  Purpose of this motion, nothing has changed.

21  There is no conflict, despite Ms. Robinson's affidavit, which I

22  would suggest is -- is essentially based on the assumptions

23  that Mr. Berman put in his memo.

24          But -- but the point here is that we don't deny that

25  there may be a day when a conflict might arise.  But it's not

now, and it's not going to be for some time.  And let me give

you just one example.

They suggest that during discovery, we need to have

different counsel because we have different interests in the

outcome of the economic analysis with respect to pass-on.

While it may be true that we'd have different

interests if this were a settlement, for the purposes of

litigation, we have the same interests, that is, proving the

correct amount of pass-on from an expert who will use some sort

of economic analysis or econometric model.

What we want is an expert who will be *Daubert*-proof,

who will be credible, who will be -- who will find the correct

answer as to what the pass-on is at the various levels of the

distribution channel.

No one would suggest that the consumers would put

forth an expert who couldn't be defended just so he could say

that a hundred percent was passed through, nor would anyone

suggest that an expert who couldn't be defended would be --

would be put forward so she could say that none was passed

through.

We all have the same interests.  We have the same

interests on liability.  We have the same interests on making

sure that we separate defendants from as much money as

possible.

The conflict only arises when you have to allocate

1  between those two classes, whether as the result of a

2  litigation trial or as the result of a settlement.

3          And until that point, the Court was correct its first

4  time when it said this will be more efficient for the class.

5  This will be more economical for the class.

6          And just one more reminder, your Honor.  We already

7  have consumer counsel.  We already advised you in our first

8  motion that there are people who have filed these consumer

9  cases who are there standing ready and able to protect the

10  interests of those consumers if those consumers' interests

11  diverge from those of the other indirect purchasers.

12          To add another layer of counsel at this point does

13  nothing but complicate and make more expensive for all of the

14  class members.

15          Thank you.

16          JUDGE DURKIN:  All right.  Anything else?

17          MS. FEGAN:  Your Honor, just two quick points.  First,

18  with respect to experts.  An expert's analysis is only as good

19  as the data that they're given.  And the data here that we're

20  talking about is data that the consumer class will have to go

21  get from the reseller group.  And to say that one counsel could

22  both defend and prosecute those depositions and go after the

23  discovery that's needed is difficult at best.

24          Second, your Honor, it does not make it more expensive

25  to have separate representation for the consumers.  At the end

1  of the day, there's a certain amount of damages that defendants

2  are going to be liable for.  This Court may or may not award a

3  fee -- a percentage award fee that might be 25 percent.  It's

4  only a matter of how much they've put in versus how much we've

5  put in.  The cost to the class does not go up.

6        The fact of the matter is that the consumers are

7  entitled to separate representation to make sure that they do

8  get and prosecute to the amount of overcharge that they've

9  borne.

10       JUDGE DURKIN:  I think last time we were here, the

11  parties, both plaintiffs and defendants, were against the idea

12  of bifurcating discovery.  Isn't that correct?

13       MR. GUSTAFSON:  That's right, your Honor, because

14  it's -- the fights over what's merits and what's, you know, not

15  merits becomes bigger than just doing the discovery in the

16  instance.  It just doesn't work.

17       JUDGE DURKIN:  That was my impression too.  And,

18  frankly, that militates in favor of separate counsel.

19       Are the indirect purchasers going to claim any prices

20  for the broilers -- that there is any increase in price for

21  broilers that are passed on through -- a hundred percent to the

22  end users?

23       MR. GUSTAFSON:  We --

24       JUDGE DURKIN:  Or are you going to claim that some of

25  it was retained by your clients?

1    MR. GUSTAFSON:  The answer, Judge, is an empirical

2  one.  Until you have the economist do the analysis, you can't

3  answer that question.  The --

4    JUDGE DURKIN:  But we know.  I mean -- well, go ahead.

5  I -- sorry to interrupt.  Go ahead.

6    MR. GUSTAFSON:  Well, the point I was going to make

7  was that it depends primarily on the competitiveness of the

8  industry.  The more competitive the industry, the more likely

9  that there was pass-through.

10    But it's not a question -- it's not a fight about --

11  it's not a tug-of-war here like it would be in a settlement

12  where you'd be trying to allocate more to your client and more

13  to your client.

14    Here the answer is what it is.  You look at the

15  economics of the industry, and you get an answer with respect

16  to pass-on.  It's -- I think it's just wrong to say that

17  counsel will try to get the wrong answer to benefit their

18  client.  Counsel will try to get the correct answer so they can

19  defend those expert opinions, whatever the outcome is.

20    So if it turns out that the economists do the

21  econometric analysis and a hundred percent of the case --

22  hundred percent of the pass-through is -- is -- goes to the

23  consumers, I would expect that good counsel would -- would say

24  to their intermediate clients, "You don't have a claim here,

25  and you should dismiss your claim."

1        So -- so --

2            JUDGE DURKIN:  Well --

3            MR. GUSTAFSON:  But it's -- the discovery is not a

4    tug-of-war between the two classes because in order to do the

5    econometric analysis, you need the data.

6            JUDGE DURKIN:  I understand you need the data.  But

7    experts -- without being jaundiced, experts will -- are

8    retained -- you know, they all come in under oath and provide

9    expert reports to the best of their ability.  But I've seen

10   experts with diametrically opposed opinions on the same set of

11   facts.

12           MR. GUSTAFSON:  Of course.

13           JUDGE DURKIN:  And that's why we have trials and why

14   we have hearings.

15           MR. GUSTAFSON:  Well, your Honor, if I could add one

16   more thing.

17           JUDGE DURKIN:  Sure.

18           MR. GUSTAFSON:  If you're inclined to appoint separate

19   counsel to represent these consumers, I suggest that you should

20   appoint the Wolf Haldenstein firm, Fred Isquith, who has been

21   cooperative with us and working with us, as opposed to

22   constantly causing problems by -- by fighting against us.

23           We asked Mr. Berman and Mr. -- the fellow from Cohen

24   Milstein --

25           MS. FEGAN:  Kit Pierson.

1     MR. GUSTAFSON:  -- Kit Pierson, to join us, and they

2  declined.  Instead, they said, "We're not going to participate

3  with you in prosecuting the case," both before and after they

4  filed their motion.

5     So if you think that independent counsel is required,

6  I would suggest that you appoint Mr. Isquith, who has been

7  cooperative and been working with us on all of these ESI

8  protocols and all the rest of it that we've been working with

9  the direct counsel on because efficiency for the class is

10  important here, and you can protect this potential conflict if

11  you think one exists with a group of lawyers who are dedicated

12  to working together.

13     MS. FEGAN:  If I may respond on that very --

14     JUDGE DURKIN:  I assumed --

15     MS. FEGAN:  -- quickly, your Honor.

16     JUDGE DURKIN:  -- you'd want to.

17     MS. FEGAN:  Thank you.

18     To say that we wouldn't work with them is a fairly big

19  over-characterization.  We suggested we would work with them,

20  but just not under their direction.

21     In fact, prior to the time that the Court originally

22  appointed lead counsel, I was working hand in hand with

23  Mr. Clark, who is here in the courtroom, having phone calls

24  with folks from my office and lead counsel's office -- or

25  direct purchasers' counsel's office to talk to defendants about

1    preservation issues, working with them to revise those

2    stipulations.

3              So this idea that we weren't able to work together is

4    only to the effect that we wouldn't work under the direction of

5    Mr. Gustafson.

6              JUDGE DURKIN:  All right.  Well, let's not go there

7    yet.

8              But how large will each class be?  Do you have any

9    idea?  I'm assuming the consumer class, the end user, is

10   anybody in the country who eats chicken.

11             MS. FEGAN:  That's correct.

12             JUDGE DURKIN:  Am I mischaracterizing what that class

13   is?

14             MR. GUSTAFSON:  Well, who eats chicken on an unchanged

15   form.  It's going --

16             JUDGE DURKIN:  Right, doesn't go --

17             MR. GUSTAFSON:  -- to be --

18             JUDGE DURKIN:  -- to the restaurant --

19             MR. GUSTAFSON:  -- a large --

20             JUDGE DURKIN:  -- and eats it --

21             MR. GUSTAFSON:  It's going to be --

22             JUDGE DURKIN:  -- but buys it at a supermarket or --

23   or -- yeah, buys it at a supermarket --

24             MR. GUSTAFSON:  Right.

25             JUDGE DURKIN:  -- and takes it home and eats it.

1  That's the consumer end-user class, correct?

2        MR. GUSTAFSON:  I think that's a fair

3  characterization, yes.

4        JUDGE DURKIN:  All right.  How big is the -- are the

5  direct purchasers?  You -- I'm sure every direct purchaser was

6  not a named plaintiff, but do you have an estimate of how many

7  entities are direct purchasers?

8        MR. SIMON:  Yeah.  It's smaller, your Honor.  It's --

9  I don't have an exact number, but it's probably in the tens of

10  thousands as opposed to the millions.

11        JUDGE DURKIN:  Okay.  And how about indirect

12  purchasers?  That would be restaurants and --

13        MR. GUSTAFSON:  Yeah.  Again, it's hard to predict the

14  number, but I think it's in the hundreds of thousands, not the

15  tens of thousands.

16        JUDGE DURKIN:  Okay.

17        MR. GUSTAFSON:  Ultimately the quantity of chicken is

18  going to be very similar in all of the -- all of the classes.

19  So -- so that same sort of commerce pass through the system.

20        JUDGE DURKIN:  Okay.

21        MR. GUSTAFSON:  It just got diluted as to the number

22  of people who touched it by the time you get done.

23        JUDGE DURKIN:  All right.  How do you think discovery

24  is going to play out regarding pass-through?  I am concerned

25  that the -- the head of marketing of Jewel is going to get

1    deposed for -- in the initial stages and may have to be deposed

2    a second time when we deal with pass-through.

3         If -- if pass-through is something that's going to

4    come up in the deposition of the CFO of Jewel or the CFO of

5    Sam's Clubs, the CFO of any of the other chains that are direct

6    purchasers that then sell to end users, are you going to -- are

7    you going to ask questions about pass-through in that?

8         MS. FEGAN:  We do, your Honor.  And that typically

9    comes up in the first -- in the only deposition we would take

10   of that person.  We would typically subpoena in advance the

11   data that we would need to understand the prices at which they

12   purchased the chicken, either directly or indirectly, and then

13   the prices at which they sold the chicken, as well as some

14   other cost factors.

15        But we do that prior to the time that oral discovery

16   begins.  And when that person's deposed, they're deposed once,

17   either -- and both on liability issues, as well as pass-through

18   or antitrust impact issues.

19        MR. GUSTAFSON:  That's --

20        JUDGE DURKIN:  Go ahead.

21        MR. GUSTAFSON:  Frankly, your Honor, the idea that

22   they would depose all of the intermediate sellers of chicken is

23   ridiculous.  There's tens or hundreds of thousands of people.

24   The information is in the data that will be collected

25   electronically that the experts will analyze.

1    There is -- this is not a situation where we're

2 talking about three or four purchasers who will say, "Yes, we

3 added 10 percent to the price before we sold it."

4    This is -- this is a complex economic analysis, which

5 will not be dependent on the discovery of -- not -- at least

6 not on the depositions.

7    JUDGE DURKIN:  All right.  Mr. Simon, were you going

8 to say something?

9    MR. SIMON:  I was just going to try to add my

10 experience, not that I am taking sides here.

11    But the typical way this happens -- and just for the

12 record, because we may get to this point -- is that the

13 evidence on this issue doesn't only come from the defendants.

14 Sometimes when our class representatives, who are direct

15 purchasers, are asked to produce discovery, the defendants will

16 ask them to produce pass-through discovery.

17    And there's law on this, and I won't pre-argue it, but

18 we're going to have a fight about that because pass-through has

19 no relevance to the direct purchasers under *Illinois Brick*.

20 So -- and there's issues about using it offensively versus

21 defensively, and we can brief all that when we get to the

22 appropriate time.

23    But that's one way it comes up.

24    The other way it comes up is that typically one

25 subpoena is done to how many ever people that are, you know,

1    potentially our class members to get their data to try to

2    figure out what the pass-through is.

3         It's usually done -- there's no separate subpoenas.  I

4    don't think any Court I know of would agree that you should

5    have multiple subpoenas for different people.  It's one

6    subpoena.

7         And we're -- by the way, if that gets to be too

8    oppressive and they're actually subpoenaing, you know, a large

9    majority of our class members, which I know in working on cases

10   with Mr. Gustafson and also with Mr. Berman's office, you know,

11   we have these discussions because it's our class members that

12   they potentially are subpoenaing, and we want to keep that from

13   having an effect on our case.

14        So there are issues that do come up.  But typically

15   it's all done on a coordinated fashion.  And I haven't seen

16   where, you know, you have separate interests going out for

17   different things from the subpoenaed parties.  So typically the

18   discovery can be done in a unified way.

19        JUDGE DURKIN:  All right.  Well, defendants are going

20   to take depositions and get documents from the -- from the

21   direct purchasers, obviously.  And I just -- if Tyson or Perdue

22   raises -- not to pick on them, but those are the two names that

23   come to mind.  You know, if they raise prices of broilers on

24   Jewel, someone needs to ask Jewel if they simply lower their

25   margins on the sale of broilers and absorb the price increases

1  a hundred percent themselves or if they act like any rational

2  business and pass all or part of it on to their end user.

3  And I expect the answer will be different for every

4  entity that buy and sells broilers and will be different for

5  that entity itself depending on the time of year it is, where

6  the geographic market is, their own business models. Broilers

7  may be the loss leader for a store to get people in to buy

8  other higher-margin products.

9  Maybe it's not going to be 10,000 depositions. Of

10  course it can't be. It's going to be through expert testimony.

11  But these are all factors, I would think, that go into the

12  pricing issues.

13  Who is going to explore those situations? Their own

14  lawyers? I'm not -- I don't see how someone who is going to

15  retain experts to focus on that issue can necessarily -- I know

16  experts will all come in and say they just look at the facts

17  and they're rendering an opinion, no matter who is asking them

18  to render it. But I'm -- I'd be pretty naive to think that

19  that is the way it always works.

20  MR. GUSTAFSON: Your Honor, I wasn't -- I didn't mean

21  to convey that. What I meant to convey was it's all the same

22  data. It's not -- it's not a question of fighting over whether

23  we should produce the data or not. Everybody needs the same

24  data. And we already have consumer counsel in this case who

25  have agreed to represent the consumers.

1      What you have here is two people who we offered to
2  have them come into the case.  We offered to have their
3  plaintiffs be involved in the case.  They declined.
4      JUDGE DURKIN:  Well, I'll get to that issue in a
5  minute.
6      MR. GUSTAFSON:  Okay.
7      JUDGE DURKIN:  That's a separate issue.  The first
8  issue is whether I appoint separate counsel.
9      MR. GUSTAFSON:  Yeah.  So if you're inclined to do
10  that, we have people available for that.
11      JUDGE DURKIN:  Well, I am inclined to do it.  The -- I
12  don't want to wait two to three years to have the issue of
13  allocation come up and then find out that a number of people
14  that have been deposed or the fact that new experts have to be
15  retained to examine an issue is put off to the end of the case.
16      No one's going to get deposed twice unless there's
17  good reason to do it.  I don't think the kinds of questions
18  that would normally be asked on behalf of the end-user
19  consumers would be the same questions that would be asked by
20  the people that sell to them.
21      And I expect no one's going to say it's a hundred
22  percent pass-through; no one's going to say it's a zero percent
23  pass-through.  It's probably going to be somewhere in between,
24  and it's going to be different for any number of indirect and
25  direct purchasers as to the amount of -- if there is an

increase in price that was unlawful, the amount that they

retain and eat themselves versus put -- pass on to an end user.

So I don't believe you share the same interests, the

indirect purchasers and the end-user purchasers necessarily

have the same interests, at least as to the damage portion.

And what probably is pushing me over the edge is that

the damage portion of the case is part of something that's

going to have to be proven up to get past summary judgment.

That's going to be an issue that deals with class

certification.  And it's a -- so I think it's something that's

going to be critical to the case well before we get to a point

where you either settle or, if there's a verdict in the

plaintiffs' favor, there's going to be a pool that then has to

be allocated.

I don't think it's practical to put off that discovery

when it is likely hand in hand with the discovery that's going

to take place earlier.  I just don't think the efficiencies in

that regard make sense.

I have a motion to reconsider in front of me, or it's

a motion which is styled based on the fact that there was an

amended complaint filed.  I -- the amended complaint doesn't

change anything.  I just changed my mind.

I will for the one time in my life quote Justice

Frankfurter:  "Wisdom too often never comes, and so one ought

not to reject it merely because it comes late."

1          Now, I'm not so self-important that I think anything

2     I'm saying has wisdom.  But you will find out over the next

3     couple of years if I'm convinced I'm wrong on something, I

4     really am not embarrassed to change my mind.  And I am changing

5     my mind on this one.  I do believe that it's in the best

6     interests of what are potentially millions and millions of

7     people who are the end-user consumers to have their own set of

8     lawyers.

9          I -- had I had more experience and thought this

10    through more fully at the time, I would have made that decision

11    originally.  I didn't, so I'm changing my mind for reasons I've

12    just given.  I believe there is a conflict, and it has -- and

13    the best way to resolve it is up front.

14         The -- I am persuaded that the conflict is real, but I

15    also think that much of what -- just as the direct and indirect

16    lead counsel are going to cooperate, because the key issue in

17    this case for it to go forward is, did the people on the right

18    side of the room, who represent -- the clients that are

19    represented by the attorneys on my right, did they conspire to

20    fix prices?

21         If they didn't, then this case is going nowhere.  And

22    that is a common question that all lead counsel have in the

23    case.

24         I really don't think that the -- there need be three

25    sets of attorneys at every deposition just because they're a

1  lead counsel in the case when the issue that is causing the

2  conflict is not something that is relevant to that deposition.

3  So I'm putting everyone on notice.  I haven't decided who is

4  going to be that lead counsel yet, but I'm putting everyone on

5  notice, and I'm advising the defense attorneys specifically.

6       If you see people at these depositions, which is where

7  a lot of the expense comes in, or enormous duplication of

8  efforts by the defense, bring it to my attention and make note

9  of it because someday you're going to be objecting to these

10  fees.  And I -- there's no reason to have three sets of lawyers

11  at something where the reason for their being in the case, that

12  third set, has nothing to do with that deposition.

13       It doesn't mean you don't go to those depositions.

14  You may have to coordinate with other -- with the other two

15  sets of lawyers.

16       And it doesn't mean that three sets of lawyers can't

17  be at a deposition always, but there are going to be obvious

18  duplications -- and I'm going to spot them, quite frankly --

19  asking inane questions just to be on the record as if you're

20  asking questions -- I'm not calling that -- saying anyone would

21  do that, but just to be there and to cover yourself for fees by

22  asking a few questions is not going to cut it.

23       I rejected the idea of a separate set of lead counsel

24  because of the cost considerations.  I'm still very concerned

25  about that.  I'm more concerned about the conflict and the

1  duplication of effort that would have to take place if the

2  plaintiffs prevail when there is an allocation of funds.  And I

3  think that's better handled up front with appropriate questions

4  of witnesses and appropriate document requests while the case

5  is ongoing.

6      If that affects any of the schedules we have set, we

7  need to talk about it today.  I don't know why it would.

8  Defendants, doesn't change your motions to dismiss in the

9  least.  Unless the -- there's going to be another amended

10  complaint raised for the indirect -- or the end-user consumers,

11  I frankly don't think it is necessary at this point.

12      But if it is, it can be another "me too" complaint

13  that just notes that plaintiffs' counsel is representing the

14  end users.  It's not going to change the underlying allegations

15  of the complaint that are substantive and that are likely the

16  subject of the motion to dismiss.

17      But I really don't want to delay -- this is my fault.

18  I should have made this ruling a month ago.  And I don't want

19  to delay things any longer because of that.  So that's going to

20  happen.  And we can talk in a minute about how that affects

21  your schedules, and then we can get into the discovery

22  disputes.

23      Now the issue is Berman and the --

24      MR. GUSTAFSON:  Kit Pierson.

25      JUDGE DURKIN:  -- Kit Pierson from Cohen Milstein or

1  Wolf Haldenstein.  I haven't focused on that.  I was really

2  focused on the issue of whether to get new counsel in.  I am --

3  why don't you tell me on each side -- I don't think anybody is

4  here from Wolf, but --

5              MS. FEGAN:  There is, your Honor.

6              JUDGE DURKIN:  Or are they?

7              MR. GUSTAFSON:  Yeah, Theo Bell is here.

8              JUDGE DURKIN:  Oh, good.  Very good.  Why don't we

9  hash that out right now because whether I rule today or not, we

10 ought to at least air the issue.

11             MR. GUSTAFSON:  Would you like --

12             MR. BELL:  Good morning, your Honor.  Theodore Bell

13 from Wolf Haldenstein.

14             JUDGE DURKIN:  All right.  Good morning.  Good

15 morning, Mr. Bell.

16             MR. GUSTAFSON:  Would you like me to start?

17             JUDGE DURKIN:  You may.

18             MR. GUSTAFSON:  Your Honor, you indicated in your

19 initial order that one of your concerns was efficiency, that

20 counsel could work together.

21      The truth is in this matter, we -- we reached out to

22 the Berman firm and to Cohen Milstein and tried to get them to

23 work with us.  They declined.

24      After you ruled initially, we offered them a spot with

25 their plaintiffs.  They could represent consumers if a conflict

1   arose.  They declined.  They brought this other motion.

2   They -- they want to do their own case separately.

3           It's clear from their papers to me and from their

4   conduct thus far that they want -- they want to run their own

5   case without interference from indirect purchasers.

6           As you noticed -- as you already noted, most of the

7   questions with respect to liability and the like are not

8   different for the indirect purchasers.  There is this pass-on

9   issue that will come up, and there are some questions that will

10  be different for that.

11          On the contrary, Wolf Haldenstein, Mr. Bell and

12  Mr. Isquith, his partner, have cooperated from the beginning

13  with us.  We asked them to be cooperative; they have.  They

14  supported our -- our initial motion.  They support this -- they

15  support us now as leaders.

16          We have discussed scheduling with them, as we do with

17  the directs.  Most of the scheduling discussions have been in

18  coordination with the direct purchasers.  It's all worked very

19  well.

20          I would suggest to you that if you now interject

21  Mr. Berman and Mr. Pierson, you will find animosity to be a

22  problem more so than if Haldenstein firm is engaged.

23          We are happy, of course, to work with whoever you

24  appoint, and -- but we think that conduct -- that past conduct

25  is the best indicator of future performance.  And their past

1  conduct indicates they're not very interested in playing

2  together with us.

3            JUDGE DURKIN:  All right.  I'll hear from Mr. Bell.

4            MR. BELL:  Your Honor, I pretty much agree with --

5            JUDGE DURKIN:  I assumed you would.

6            MR. BELL:  -- Mr. Gustafson, and I know in our -- in

7  the initial papers -- we didn't file a separate set of papers

8  for leadership because we were supporting Mr. Gustafson.  I

9  believe our résumé was attached.  Our firm résumé was attached.

10  I believe the initial papers indicated that -- or in the

11  affidavit that Mr. Isquith would have been appropriate to even

12  lead this case, you know, but we were supporting Mr. Gustafson.

13            So I would propose that if the Court's interested in,

14  we could file something quickly as -- you know, for the

15  leadership position, you know, within a week or so so the Court

16  at least has that information in front of it to make the

17  decision.

18            JUDGE DURKIN:  All right.

19            And on behalf of the Berman firm.

20            MS. FEGAN:  Your Honor, the only animosity here

21  appears to be coming from Mr. Gustafson.  We worked with the

22  direct purchasers prior to the lead counsel appointment, in

23  working jointly with them and working out orders and working

24  out stipulations, in speaking with defendants.  We have no

25  issue and animosity.  We have no issue in not working together.

1    We have an issue in protecting the consumers.  That's been our

2    goal from the start.  That's what we've done in taking the

3    leadership role in doing that.

4         And while I work well with Haldenstein and have no --

5    nothing bad to say about them at all -- we're on a current case

6    together -- the fact of the matter is they chose not to raise

7    the conflict, and we did.  And I think, for that reason alone,

8    in addition to the fact that Hagens Berman is a leader in the

9    antitrust area, that it's appropriate to appoint our team.

10        MS. EVANS:  And, your Honor, I'd just like to add a

11   couple things on that.  I just want to point out that our firm

12   works hand in hand with Wexler Wallace firm and Gustafson firm

13   on several matters.  We get along just great.

14        We also -- I just also want to point out that just as

15   the direct purchaser counsel don't get to pick the indirect

16   purchaser counsel, so I don't think the reseller counsel should

17   pick the consumer counsel because the whole point in having

18   separate counsel is there will be points where they have

19   divergent interests, and they need to be independent.  You

20   don't just pick a counsel that you know is going to defer to

21   you.

22        MR. BELL:  And, your Honor, I just wanted to add that

23   Wolf Haldenstein does represent the majority of the end-user

24   consumers that are in the current complaint.  So ...

25        JUDGE DURKIN:  Well, that's a matter of paper.

1   There's millions of end-user consumers.  So I understand that,

2   though.

3           MR. BELL:  But as far as our loyalties go, your Honor.

4           JUDGE DURKIN:  Okay.  All right.  Well, what are the

5   respective positions, if you have one at this point, on

6   whether -- because you didn't know I was going to rule this way

7   today -- but on the need for a separate complaint for the

8   end-user consumers?

9           MS. FEGAN:  Your Honor, I don't think we would change

10  anything with respect to liability.  The only -- the only two

11  issues would be the definition of the class and paragraph 382,

12  which is the allegation with respect to pass-through.

13          I think that can be done very quickly in a two-page

14  almost addition or a separation.  I don't think it affects the

15  motion to dismiss briefing or the current proposed -- or the

16  current schedule.

17          JUDGE DURKIN:  Anyone else have anything to say on

18  that?

19          MR. GUSTAFSON:  No, your Honor.

20          JUDGE DURKIN:  Go ahead.  All right.  Mr. Simon -- or,

21  Mr. Bell, do you have anything on that?

22          MR. BELL:  I don't think there's anything more that

23  would need to be changed, your Honor, here.

24          JUDGE DURKIN:  Yeah, I -- go ahead, Mr. Simon.

25          MR. SIMON:  Well, I -- being on the direct purchaser

1  side, having worked with Mr. Gustafson and Mr. Williams from

2  the beginning of the case, knowing what work went into it, I

3  just would like to be a proponent of the fact that the

4  complaint is our absolute best efforts at this point.

5  It's a good complaint.  You acknowledge how long it

6  is.  And I would not want to see anything that would upset the

7  schedule at this point.  We've worked very hard.  I've worked

8  personally with Mr. Carney.  And most of those things that we

9  fought about we were able to work out.

10  And, you know, we'll do whatever the Court deems and

11  work with whomever the Court appoints.  I just -- the more

12  voices you get, it's -- the harder it is to work things out.

13  JUDGE DURKIN:  Well, the schedule is not going to

14  change.  And, Mr. Carney, I think if an amended complaint is

15  filed, if it's as limited as whichever firm is appointed as is

16  suggested, changing the class definition and having a position

17  on pass-through -- I don't know what your motions to dismiss

18  look like, but you ought to be able to change course on

19  something so minor.

20  MR. CARNEY:  If it is that minor, yes, your Honor, I

21  think that -- and it was done quickly, like next week, and it's

22  two pages, I think that would work.  And we do want to keep all

23  these cases on the same schedule and keep it organized that

24  way.

25  JUDGE DURKIN:  Oh, absolutely.

1    MR. CARNEY:  And I don't think we have a sort of dog

2  in the hunt as to which plaintiffs' counsel comes in and does

3  that.  I think to keep having, you know, one voice or have a

4  good liaison and it works smoothly -- it has done so so far --

5  I think that would be in the defendants' interests and would --

6    JUDGE DURKIN:  All right.  Well, I -- if -- I've

7  worked -- I've worked against both the Wolf Haldenstein firm

8  and the Berman firm when I was in private practice, so I'm -- I

9  think one of the cases I read -- I'm in equipoise on that.

10  I -- you know, you're both competent firms and fully capable of

11  representing the -- the consumer class.

12    I'm not going to rule at this moment.

13    The -- I'll give you -- I didn't focus on the

14  competition, and I -- I will give you all till next Tuesday.

15  Today is Friday.  It shouldn't take long because you do these

16  for many other cases.

17    You can file simultaneous briefs next Tuesday as to

18  why you are better suited to represent the end-user consumers.

19  And whoever -- I will rule on Wednesday.  And no later than

20  Friday of next week, an amended complaint needs to be filed on

21  behalf of those end-user consumers.  Is there any -- going to

22  be any problem with that schedule?

23    MS. FEGAN:  No, your Honor, that works.

24    MR. BELL:  We'll make it work, your Honor.

25    JUDGE DURKIN:  Okay.  So Tuesday for your respective

1  positions.  The brief themself -- brief itself should be ten

2  pages or less.  I have the earlier submissions.  You don't need

3  to attach all the résumés and firm descriptions and things like

4  that.  I've seen those.

5      But ten pages or less, simultaneous.  Do it by the

6  close of business Tuesday.  I'll rule on Wednesday.  It will be

7  a very short order because I've already put on the record that

8  I believe both firms are competent to handle this

9  representation.  And then I will rule on the issue of an

10 amended complaint -- or I'll expect an amended complaint to be

11 filed by Friday.

12      Judge Gilbert, do you want to add something?

13      JUDGE GILBERT:  Can I -- yeah.

14      JUDGE DURKIN:  Go ahead.

15      JUDGE GILBERT:  Can I just -- if you wouldn't mind on

16 this.  You referenced, I thought, paragraph 382 of the indirect

17 purchasers' complaint.  Is that what you're saying needs to

18 be --

19      MS. FEGAN:  Correct.

20      JUDGE GILBERT:  -- tweaked?  So I have that up in

21 front of me, in front of Judge Durkin.  How does it need to be

22 tweaked?  Because I'm not -- it's not immediately apparent to

23 as to why --

24      MS. FEGAN:  And do you have the second -- is it the

25 second amended complaint that you have up?  Because it would be

1  353 in the initial consolidated complaint.

2       JUDGE GILBERT:  I believe what I have is -- I have

3  what was filed.  I have Docket Entry 213 filed on

4  November 23rd, 2016.  Right?  That's what I'm looking at, which

5  is the most recent amended complaint.

6       MS. FEGAN:  If -- so the pieces that we were concerned

7  about is where it says, "It is well" --

8       MS. EVANS:  I think, if he has 217 --

9       JUDGE DURKIN:  We have --

10       JUDGE GILBERT:  I've got 213.

11       JUDGE DURKIN:  -- Document 213 is the indirect

12  purchaser plaintiffs' second amended consolidated class action

13  complaint.  And what paragraphs, other than class definition?

14       JUDGE GILBERT:  I was looking at 382.

15       MS. FEGAN:  382, where it talks about then "in a

16  multi-level chain of distribution, such as exists here, an

17  overcharge will be felt throughout the distribution chain."

18       Then there's another quote where it says, "In most

19  cases resellers will" -- well, we put in "resellers" -- "will

20  absorb part of these increased costs themselves and pass part

21  along," and they're talking about to the consumers.  And so --

22       JUDGE GILBERT:  Where is that quote, "In most cases"?

23  Where is that?  Is that in the same paragraph?  Because I'm

24  not --

25       MS. FEGAN:  I'm sorry.  So starting at 382.

1          JUDGE GILBERT:  Yeah.

2          MS. FEGAN:  And then the quote that goes on to the

3     following page, on page 120.

4          JUDGE DURKIN:  Right.

5          MS. FEGAN:  And it says, "In most cases they," and

6     they're talking about resellers.  It's about the middle of that

7     quote there.

8          JUDGE GILBERT:  What paragraph?

9          JUDGE DURKIN:  No, it's in the middle --

10         MS. FEGAN:  382.

11         JUDGE DURKIN:  -- of this quote.

12         MS. FEGAN:  But the top of --

13         JUDGE GILBERT:  Oh, okay.

14         MS. FEGAN:  -- the next page.

15         JUDGE GILBERT:  The electronic copy is different.

16         MS. FEGAN:  Oh, I'm sorry.

17         JUDGE GILBERT:  Okay.  I'm sorry.  So we're looking at

18    the quote.  Got it.  Okay.

19         MS. FEGAN:  And in the middle of that block quote, it

20    says, "In most cases they will absorb part of these increased

21    costs themselves and pass part along to cookware wholesalers."

22    And it kind of goes through the distribution chain of each part

23    and --

24         JUDGE GILBERT:  But that's a quote from a -- a source,

25    the federal antitrust policy, right?

1          MS. FEGAN:  Correct, your Honor.

2          JUDGE GILBERT:  Okay.

3          MS. FEGAN:  But what we would be focused on here is

4    the facts in this case.  And I don't think that this would be

5    a -- a long amendment at all, but just making clear the

6    position that the consumers would take.

7          JUDGE GILBERT:  I'm just -- I'm not trying to mess

8    with this, and I'm the new kid on the block here.  I was just

9    wondering whether now is a time to amend the complaint because

10   382 currently, as I read it, says that the overcharge is going

11   to be felt throughout the distribution chain -- right? --

12   which --

13         MS. FEGAN:  Which --

14         JUDGE GILBERT:  -- in the end goes to your end-user

15   clients, right?

16         MS. FEGAN:  Well, I think that there's a nuance in

17   that sentence, your Honor.  We don't think that they ultimately

18   are felt through the distribution chain because they're passed

19   through, and we believe a hundred percent, or sometimes even

20   more, to the consumer end users.

21         And so our nuance would be with the word "felt," your

22   Honor.

23         JUDGE GILBERT:  Right.  But then is there -- are the

24   other people within this indirect purchaser group represented

25   by Mr. Gustafson going to arm-wrestle with you about this

1  wording in this --

2          MS. FEGAN:  Oh, I'm sorry.

3          JUDGE GILBERT:  -- complaint?

4          MS. FEGAN:  My amendment -- or our amendment on behalf

5  of the end users would be specifically with respect to the end

6  users.  I don't think the resellers --

7          JUDGE DURKIN:  Right.

8          MS. FEGAN:  I wouldn't be --

9          JUDGE DURKIN:  We will --

10          MS. FEGAN:  -- trying to amend what the resellers have

11  stated.

12          JUDGE DURKIN:  We will then have three operative

13  consolidated complaints: one for direct, one for indirect

14  excluding end-user consumers, and then one for end-user

15  consumers.

16          MS. FEGAN:  That's correct.

17          JUDGE DURKIN:  Okay.

18          MR. BELL:  At this point I don't know if anything

19  specific to that effect can be alleged at this point, you know,

20  because that's something that will be developed later in the

21  case, other than a general statement about pass-through and who

22  it goes to.

23          JUDGE DURKIN:  Yeah, it -- if there's -- whoever I

24  appoint, if they choose to file an amended complaint, they have

25  leave to, with the modest changes the Berman firm is

1   suggesting, or you may choose not to.

2       Either way, there's no reason the schedule can't

3   remain the same --

4       MS. FEGAN:  Correct.

5       JUDGE DURKIN:  -- which is my primary concern, because

6   complaints get amended all the time.  But I think, so there's

7   no moving target, defendants need to know what the final

8   complaints are.

9       And, if nothing else, even if that one paragraph is

10  not changed, there will have to be an amendment to allege the

11  class to be the end-user consumers.  There will be a third

12  complaint, one way or the other, just a matter of whether

13  another paragraph gets changed beyond the class definition.

14      MR. BELL:  And, your Honor, if we change -- if we have

15  a change of counsel here, there may be a change of the

16  plaintiffs because these are all under state law, the indirect

17  consumer cases, and there may be additional states that will

18  need to be pled in the -- from what's in the current complaint.

19      MR. GUSTAFSON:  Your Honor, if I might, there is going

20  to need to be a new complaint on behalf of my clients because

21  currently our complaint includes consumer plaintiffs.

22      JUDGE DURKIN:  Right.

23      MR. GUSTAFSON:  So they would have to be taken off our

24  complaint.  I don't think that paragraph 382 needs to be

25  changed because that's just a general statement about antitrust

1    policy.  And no one has the facts now to say there was

2    pass-through a hundred percent, 90 percent, or 50 percent.

3    That's a discovery issue that will be answered empirically.

4         But as Mr. Bell correctly points out, we're going to

5    have to drop some plaintiffs and drop some lawyers who are

6    currently on the second amended complaint on behalf of indirect

7    purchasers if -- once you appoint separate counsel, we're going

8    to separately have two separate cases.

9         JUDGE DURKIN:  All right.  Well, any amended

10   complaints that are filed, it will be by a week from today

11   after my ruling on Wednesday.  And make sure you send a redline

12   copy to defendants so they know what the changes are.

13        MR. GUSTAFSON:  Understood.

14        JUDGE DURKIN:  That's all.  You don't have to file a

15   redline copy.  Send them a courtesy copy redlined.

16        MR. GUSTAFSON:  Yes.

17        JUDGE DURKIN:  And we'll go that way.

18        MR. GUSTAFSON:  Thank you.

19        JUDGE DURKIN:  All right.  Were you going to add

20   something, Mr. Simon?

21        MR. SIMON:  I was just going to be careful for the

22   record, your Honor.  We're not amending our complaint.  The

23   issues don't affect us.

24        JUDGE DURKIN:  Right.

25        MR. SIMON:  It's a whole different issue.  And so --

1          JUDGE DURKIN:  Okay.

2          MR. SIMON:  -- we're standing on the complaint we

3   filed.

4          JUDGE DURKIN:  All right.

5          And, Mr. Carney, you're still satisfied this isn't

6   going to affect your ability to prepare motions to dismiss on

7   the schedule we have set?

8          MR. CARNEY:  I certainly hope not, your Honor.  It

9   sounds like it's limited.  It got a little bit more

10  interesting.  We're hearing there might be new plaintiffs and

11  counsel swapping out.  So we'd like to keep the schedule, and

12  we'll look at it as soon as we get it --

13         JUDGE DURKIN:  All right.

14         MR. CARNEY:  -- with that goal.

15         JUDGE DURKIN:  If it changes, you can raise it and

16  we'll -- we don't have to convene a giant meeting, but we can

17  do a phone conference, if need be, to adjust the schedule.  But

18  there's a fair amount of time.  I'm sure you're not starting on

19  these right now.

20         MR. CARNEY:  Our goal is to work with that schedule,

21  your Honor --

22         JUDGE DURKIN:  Okay.

23         MR. CARNEY:  -- yes.

24         JUDGE DURKIN:  Very good.

25         Okay.  That's the schedule on how I'm going to rule on

1    this issue of who the third set of lawyers will be.

2          I -- whoever it is, whether it's Wolf Haldenstein or

3    the Berman firm, I expect that the work that's been done on the

4    discovery issues is not going to be redone.

5          I've looked at it.  The parties have all -- that have

6    been taking the lead role have done it responsibly, have raised

7    credible issues.  The conflict that I've identified doesn't

8    have anything to do with the ESI issues, the production issues,

9    anything like that.

10         So I -- I don't expect there to be any -- other than a

11   suggestion, if need be, that if taken is -- is fine.  We don't

12   need to redo what's been done.

13         MS. FEGAN:  I agree, your Honor.

14         JUDGE DURKIN:  Okay.  And that will be the same --

15   Mr. Bell, you agree with that too?

16         MR. BELL:  I think that's right, your Honor.

17         JUDGE DURKIN:  Okay.  Very good.

18         And I will note too -- I'm going to do this every

19   time.  Christina Egan is an attorney representing who?

20         MS. EGAN:  Representing Tyson, your Honor.

21         JUDGE DURKIN:  Okay.  I'm not sure I put on the record

22   before I know Ms. Egan.  She was in the U.S. Attorney's Office

23   with me and -- or, actually, she was at Mayer Brown with me.

24   And then I had -- and we're friends, but not social friends.

25   But we are acquainted, the same way I am with Mr. Fitzgerald.

1    And this will probably happen every time a new face arrives --

2    comes into court that I recognize.

3            So I wanted to put that on the record.  It's not a

4    basis for me to recuse myself, but it's on the record now.

5            Okay.  Thank you.

6            MS. FEGAN:  Thank you, your Honor.

7            MR. GUSTAFSON:  Thank you, your Honor.

8            JUDGE DURKIN:  All right.  Let's now --

9            JUDGE GILBERT:  I'm one of the --

10           JUDGE DURKIN:  Go ahead, Jeff.

11           JUDGE GILBERT:  I'm one of the few judges in the

12   Northern District of Illinois who did not practice at all at

13   Mayer Brown, so I don't have that same issue.

14   (Laughter.)

15           JUDGE DURKIN:  Or the U.S. Attorney's Office.

16           Okay.  Let's now go to the -- I have a couple

17   preliminary issues, other issues I wanted to raise with you

18   briefly, and then we'll get to the discovery.

19           I think I was overly optimistic when I asked you to

20   send me your status report with any attachments the day before

21   the hearing.  It's going to have to be sooner than that.  So I

22   think -- I think I'm going to ask for them the Monday -- if --

23   well, four days in advance of a hearing.

24           JUDGE GILBERT:  Five.

25           JUDGE DURKIN:  Five?  Five days it is.

1            JUDGE GILBERT:  If they're going to keep doing this.

2            JUDGE DURKIN:  Yeah.  We need it five days in advance

3    because the issues you raise are not simple ones, and I need

4    more than overnight -- or I received, I think from Kirkland, a

5    revised Exhibit No. 2.  I appreciate that, and we've seen it.

6    But I just need more time, as does Judge Gilbert, and so

7    we'll -- make these submissions five days in advance of any

8    statuses we have.

9            I would like to get -- if you have any filings that

10   are more than ten pages long, I need hard copies delivered to

11   chambers.  And you should deliver copy to me and copy to Judge

12   Gilbert.  The -- there's just too much paper to -- and you've

13   got the resources to produce those more than we do.  So if it's

14   anything over ten pages long, produce a copy to us, hard copy.

15           And I raised last time the issue of whether we could

16   dismiss the other cases that have been filed that are not under

17   this number without prejudice.  Mr. Simon, I think you raised

18   the issue of -- you had raised the issue of that caused

19   problems in the case.  I didn't ask you to explain, but -- it's

20   more a matter of housekeeping.

21           But is there a reason to keep -- to not dismiss all

22   the other cases -- all cases other than what will be three

23   consolidated complaints, dismiss the other underlying

24   complaints without prejudice?

25           MR. SIMON:  Well, the answer is, your Honor, it's a

little complicated. I see no reason procedurally not to make it as easy as possible for the Court, so that's the first and primary goal.

Substantively, a dismissal, even without prejudice, you know, may be used by other parties potentially -- I know defendants won't do it, but, you know, to try to say there's been some disposition in those cases.

But I think we can cover all that since the Court is trying to do something administratively and procedurally effectively. So I think we can work that out.

But perhaps we could prepare some sort of stipulation that we know has language in it that protects that dismissal from being used down the line for any purpose --

JUDGE DURKIN: Sure.

MR. SIMON: -- by absent class member or potentially objector or something like that.

JUDGE DURKIN: Yeah, if you can prepare that with the agreement of the other lead counsel and with the defendants, I'll enter it.

MR. SIMON: Okay.

JUDGE DURKIN: And I'll remember it too this time. So, yeah, if you can do that, I'd appreciate it. If you can't, so be it. It will just be some extra cases on the docket. But I think administratively, I want to make it as easy as I can for the Clerk's Office.

1          And with the third amended complaint, you need to use

2    the same -- whether -- whichever firm it is -- use the same

3    marking protocol on the -- on the header.  That document will

4    relate to end-user consumers, so make sure it's on the cover

5    sheet for any filings that go specifically to that issue.

6          So okay.  Those are the easy administrative things I

7    had to raise.  I'm going to let Judge Gilbert now ask some

8    questions and deal with the discovery issues you have.

9          First, is there anything else non-discovery-related

10   that you want to raise right now?

11         MR. SIMON:  Yeah, I can take another easy matter off

12   your plate.  Mr. Carney and I have discussed the Rule 26(f)

13   conference and the Rule 16 conference to follow.  It was two

14   weeks apart in our original conceived schedule.  And we've

15   picked dates, and I've cleared it now with Hagens Berman, Cohen

16   Milstein, Wolf Haldenstein.  The whole group agrees that we can

17   do it on the 8th and -- for the Rule 26(a) conference.  And if

18   the Court is available on the 22nd of February --

19         MR. CARNEY:  Your Honor --

20         MR. SIMON:  -- for the Rule 16 conference, which may

21   involve Magistrate Judge Gilbert as well.

22         JUDGE DURKIN:  It will involve him.

23         MR. SIMON:  Okay.

24         JUDGE DURKIN:  I'll be on trial, and it's going to be

25   Judge Gilbert that is going to supervise that conference.

1          MR. SIMON:  Okay.

2          JUDGE GILBERT:  And your Rule 26(f) conference is

3     January 8th or February --

4          MR. SIMON:  No, no.  February 8th.

5          MR. CARNEY:  February.

6          MR. SIMON:  And there's been, Judge Gilbert, quite a

7     bit of work leading up to that, which I won't bore the record

8     with.  So we've made a lot of headway.

9          JUDGE GILBERT:  Okay.  And this is emanating from an

10    order entered when?  Or did Judge Durkin just encourage you to

11    set dates for that?

12         MR. SIMON:  No, we had dates in an order.  And we kept

13    the spacing the same, even though the dates moved a little bit

14    on the order in November, which Judge Durkin did sign off on.

15         MR. CARNEY:  So the motion to dismiss briefing moved

16    back several weeks.  This is moving back less than that,

17    actually.

18         MR. SIMON:  Right.

19         MR. CARNEY:  We're keeping it on the 8th and the 22nd.

20         JUDGE DURKIN:  All right.

21         JUDGE GILBERT:  Okay.  I've got to see whether or not

22    I'm available on the 22nd.

23         MR. SIMON:  We'll, of course, accommodate your

24    schedule.

25         JUDGE GILBERT:  Yeah, let me just look.

1          JUDGE DURKIN:  You're talking about the conference

2     being the 22nd or the 8th of February?

3          MR. SIMON:  The 8th is going to be the 26(f) only

4     amongst the parties --

5          JUDGE DURKIN:  Right.

6          MR. SIMON:  -- and counsel.

7          JUDGE DURKIN:  Right.

8          MR. SIMON:  And the actual discovery conference with

9     the Court on the 22nd of February.

10         JUDGE GILBERT:  Yeah, I can't do the 22nd of February.

11         MR. SIMON:  Okay.

12         JUDGE GILBERT:  I could do the 24th, which is that

13    Friday, I think.

14         MR. SIMON:  Is that okay with everybody?

15         It looks like it's okay on the plaintiffs' side, your

16    Honor.

17         MR. CARNEY:  We'll make that work.

18         JUDGE GILBERT:  I mean, if that's a problem, let me

19    know.  But we'll -- we'll use that as a working assumption

20    right now.

21         MR. SIMON:  Do you have a preference as to time?

22         JUDGE GILBERT:  I would do it in the morning.

23         MR. SIMON:  Okay.

24         MR. CARNEY:  Thank you, your Honor.

25         JUDGE DURKIN:  All right.  You'll get an order from

1  Judge Gilbert with the time for that once he clears out

2  whatever else he has that day.  I'm on trial that week.  I know

3  I am.

4          And what I expect is going to happen is we will have

5  our -- perhaps on that day, we'll have an initial status

6  conference in this courtroom where you can report anything that

7  needs to be reported to me.  Judge Gilbert may be up here for

8  that.  And then you'll go down to his courtroom and conduct

9  your Rule 16 conference and any other discovery issues you want

10  to discuss with him.

11          MR. SIMON:  That's fine.

12          JUDGE DURKIN:  But I think in the future, we will

13  likely have our meetings where we both are up here together or

14  one of us will be, and then you'll meet separately with Judge

15  Gilbert after that to deal with discovery issues that he's

16  going to have sole responsibility for.

17          MR. SIMON:  And then you have twice the capacity to

18  remember things.

19          JUDGE DURKIN:  I do.  And you have another person you

20  can appeal to now.  If I rule on discovery, you can't take an

21  appeal.  If he rules on discovery, you can appeal it.  But --

22          JUDGE GILBERT:  But you're not encouraged to do so.

23          JUDGE DURKIN:  No, nor are you going to get -- nor are

24  you going to have any luck with that.

25          So okay.

1          JUDGE GILBERT:  Did you have anything else, Mr. Simon,

2     on --

3          MR. SIMON:  No, that was one housekeeping matter that

4     I wanted to take off your plate.

5          JUDGE DURKIN:  Okay.

6          JUDGE GILBERT:  Well, that -- this kind of leads into

7     what I was going to inquire about, and then this is because I'm

8     just really just getting up to speed here.

9          If you want to sit down, Mr. Carney, you can.

10          MR. CARNEY:  Thank you.

11          JUDGE GILBERT:  Because I'm really just learning this

12     case right now.

13          But I saw a reference in your status report to the

14     service of written discovery, so I'm assuming interrogatories

15     and document requests.  I wanted a little bit more information

16     about it.  It looked to me like responses, at least in your

17     current schedule, were due on November 15th, and that -- and

18     that's, I take it, how you've dealt with these dates that

19     you're suggesting now.  Right?

20          MR. CLARK:  Your Honor, yeah.  Just for background,

21     directs and indirects served their initial requests for

22     production, not interrogatories.

23          My name is Brian Clark.  I represent the directs.

24          JUDGE GILBERT:  Mm-hmm.

25          MR. CLARK:  We served those on November 15th, really

1   to give a basis for discussion about the ESI issues.  We're

2   talking a day and identification of custodians and search

3   terms.  We found it's really helpful and transparent for us to

4   give those now.

5              JUDGE GILBERT:  Mm-hmm.

6              MR. CLARK:  And what we propose in our ESI protocol is

7   the written answers to those are not due until 45 days after

8   the Court's ruling on the motions to dismiss.

9              But we're giving it to be transparent and cooperative

10  and to facilitate the conversation that we propose having over

11  the next five or six months during pendency of the motions to

12  dismiss.

13             JUDGE GILBERT:  So although you -- sir, do you want to

14  identify yourself for the record?

15             MR. ROTH:  Yes, your Honor.  Martin Roth on behalf of

16  Sanderson Farms.

17             We understood those to be draft discovery requests

18  that had no response due yet.  We also did agree that once --

19  if we get past a motion to dismiss, once discovery starts in

20  full force, that those would be formally re-served.  And then

21  we would have them due as Mr. Clark identifies, sometime after

22  the motion to dismiss is decided.

23             JUDGE GILBERT:  Okay.  So although you've -- what I'm

24  understanding is although you've served them, it's for

25  informational purposes at this point and to help everybody

1   start working this through, but no responses are going to be

2   due until the motions to dismiss are decided.

3           MR. CLARK:  That's correct.  The only thing I'd add, I

4   mean, the word "draft" implies we have some plan to change

5   something.  We don't --

6           JUDGE GILBERT:  Yeah, they are --

7           MR. CLARK:  -- because we don't have any plan to

8   change anything.  We -- they're very thoughtful.  We can

9   provide a copy in connection with the next status.  But

10  they're -- I'm sure counsel for defendants would agree they're

11  detailed.  And we did that intentionally so the parties have a

12  foundation to talk about these issues over next few months.

13          JUDGE GILBERT:  And then did defendants also serve on

14  the plaintiffs their intended discovery?

15          MR. ROTH:  We have not yet, your Honor.  We have a

16  draft in process as well.  And we intend to serve that on them

17  sometime in short order, but we have not done that to date.

18          JUDGE GILBERT:  Okay.  And is there -- has there been

19  any thought given on the end-user side as to what -- I mean,

20  did you participate -- did the end-user plaintiffs -- I'll ask

21  Mr. Clark.  Did you --

22          MR. CLARK:  I'll actually say I'm aware that there is

23  a -- we actually propose a deadline of today -- it would need

24  to be a couple days out -- to have some additional specific

25  requests covering end users.  And that was contemplated by the

1    Gustafson firm and indirects now.  But certainly, I think, if

2    those could get out in the next probably -- you know, a few

3    days after the Court's ruling on the end users, it would make

4    sense.

5            There's a couple additional requests they might want

6    to include.  But wherever there was overlap, the intention with

7    what we served on November 15th was to really identify the vast

8    majority of issues that are common to both groups, and even

9    though there might be a small subset of -- a separate request

10   from an indirect or end-user group.

11           JUDGE GILBERT:  So can we say that within a week after

12   your ruling on the issue of who would be end-user counsel,

13   unless that is going to --

14           MR. CLARK:  It sounds --

15           JUDGE GILBERT:  It looks like that -- will that butt

16   right up on the holidays?  I don't know what the --

17           MS. FEGAN:  That's fine, your Honor.  I think that

18   would be right before the holidays.

19           JUDGE GILBERT:  If it's before, then that's good.

20   Okay.

21           MS. FEGAN:  That's right.

22           MR. CLARK:  And do we -- I don't know what date we

23   want to have when you're planning to serve plaintiffs.  But it

24   would be helpful for us too to get the requests defendants want

25   to serve.  There might be a couple issues Mr. Simon hinted at

1   with what we call downstream data that we might want to raise

2   with the Court at some point.

3           MR. ROTH:  We can probably do that next week as well,

4   your Honor.

5           JUDGE GILBERT:  So should I say by next Friday?

6           MR. ROTH:  Sure.

7           JUDGE GILBERT:  Are you taking notes on this?

8           MR. ROTH:  And just to be clear for the record, I

9   mean, we don't want our silence on these drafts to indicate

10  that we think the breadth or scope is at all appropriate.

11  So ...

12          JUDGE GILBERT:  Yeah.  No, you're not conceding

13  anything.  But I think what plaintiffs are saying is they put

14  in collectively a lot of time in deciding what they would want

15  to serve on you, when they were appropriate to serve.  They've

16  served them on you kind of in the spirit of the new amended

17  rule, so you know what's coming even before it came.

18          But what -- if they succeed at all, in whole or in

19  part, on the motion to dismiss ruling, the defendants should

20  consider these to be what they want served, and it will start

21  the clock ticking on those.

22          MR. ROTH:  Yeah, we --

23          JUDGE GILBERT:  And, you know, P.S., from my point of

24  view, it won't be really -- you won't get a total receptive ear

25  if you come in and say, "Well, Judge, we just saw these.  You

1    know, the motion to dismiss was just ruled on on July 30 -- you

2    know, July 30th, and we just saw these. And we need now a

3    million years to respond."

4            At least you've seen them, you've thought about them,

5    and you can -- you know, I mean, I understand you don't know --

6    you're confident in your motion to dismiss, but it's not going

7    to be new news; it's going to be existing news.

8            MR. ROTH: We understand that, and we wouldn't make

9    that argument.

10           JUDGE GILBERT: Okay.

11           JUDGE DURKIN: And it also informs your preservation

12   obligation, which I think is the other reason they issued them

13   to you.

14           MR. ROTH: Right.

15           JUDGE DURKIN: Okay.

16           JUDGE GILBERT: Right. Okay. Good. That's helpful

17   because I didn't know what the -- what had come in. It looks

18   like I have to study the docket a little bit more than I did in

19   the last --

20           MR. CLARK: There's a few things there.

21           JUDGE GILBERT: -- couple of days. Yeah.

22           Okay. Thanks.

23           All right. So -- and now I have a couple of other

24   questions.

25           Is the issue -- so I've looked at your status report,

1    and I'd like to deal with whatever I can today.  And whatever I

2    can't deal with today, we'll deal with at a subsequent time.

3            On your first issue, is the issue the identification

4    of recipients of the hold letters, or is it the language in the

5    hold letters?

6            MR. CLARK:  There's kind of -- the issues I and II on

7    the agenda, in plaintiffs' opinion, interrelate.

8            JUDGE GILBERT:  Well, wait.

9            MR. CLARK:  Yeah.

10           JUDGE GILBERT:  Let me be a little more careful.

11           MR. CLARK:  Sure.

12           JUDGE GILBERT:  You want -- as I understand it,

13   plaintiffs want to know the identity of all the people to whom

14   defendants have sent hold letters, right?

15           MR. CLARK:  I think ultimately, your Honor, what -- or

16   what we really want to do is know who is having documents

17   preserved and move forward with identifying those people and

18   then identifying how we're going to search their documents.

19           We don't -- defendants have expressed some -- some

20   reservations about sharing recipients' litigation hold letters.

21   We don't want to put form over substance.  If they don't want

22   to do it in that way, fine.

23           What plaintiffs propose then is moving forward with

24   identifying custodians so we don't have a squabble about

25   litigation hold recipients, but we do the practical thing of

1  identifying where are the documents and, therefore, are they

2  being preserved by identifying those ones.

3          You know, oftentimes litigation hold is extremely

4  broad.  We think it's proportional and in everyone's interests

5  to move forward with really identifying the people that matter.

6  And we think that's especially important in light of kind of

7  advances in technology with cell phones.

8          That data is very much subject to deletion, so if

9  there's a mistake, inadvertently or otherwise, of identifying

10 somebody who did have a cell phone that's relevant as a

11 custodian, we don't want to do that in eight months; we want to

12 do it now.

13         And we don't particularly think it's -- it's wise if,

14 you know, there's 500 people that received a litigation hold

15 letter for us just to blanket-request defendants preserve all

16 those phones.  That's expensive.  We want to get down to the

17 specific individuals and make determinations on, you know, who

18 has a phone that's relevant, who has a -- some other type of

19 data that's relevant, rather than talk in the abstract and wait

20 six or seven months when we can't do anything about it.

21         JUDGE GILBERT:  Mm-hmm.  You have not yet seen

22 whatever litigation hold letter defendants are sending to their

23 people.

24         MR. CLARK:  No, we have not.

25         JUDGE GILBERT:  You're not asking for that

1    necessarily.

2         MR. CLARK:  We're not asking -- we don't -- you know,

3    oftentimes there's, you know, as you are probably aware, big

4    battles over those.  Really our focus here is a practical one,

5    on identifying the people who have the documents and making

6    sure those are preserved.

7         JUDGE GILBERT:  And do you think that's appropriate as

8    part of the ESI protocol discussions or as part of the

9    discussions you're having on the 8th and then --

10         MR. CLARK:  We do.  I think the ESI protocol, in our

11    view, has three purposes.

12         One is the technical issues, you know, TIFF images and

13    all those kind of things your Honor is familiar with.  Secondly

14    is identifying what is the set of documents we're all going to

15    be dealing with here.  And then third is how are we going to

16    search them.

17         And what we've proposed is to do that transparently,

18    collaboratively, and, in our view, efficiently while the

19    parties are briefing motions to dismiss, advancing the ball on

20    that.

21         So then on the day a motion to dismiss order comes

22    out, we would be prepared to hit the ground running rather than

23    add months and months of these same tasks, which are, frankly,

24    in our view, not very burdensome, to simply identify search

25    terms and identify custodians.  We want to be ready to hit the

1    ground running so we really are not, you know, sitting there

2    waiting to do things we could have done over the intervening

3    time period.

4          JUDGE GILBERT:  Yeah, I understand.  And what I'm

5    prepared to do this morning in the little time we have left is

6    to try and weigh in to the extent I can on your issues I and

7    II, which I think are a little bit more manageable and subject

8    to calling balls and strikes, if you will, just somebody needs

9    to make a call on some of that stuff once I understand it.

10          On the ESI protocol, I am not prepared to weigh in

11   substantively on that yet.  I mean, I want to talk about a way

12   that we will do that.  I want to talk about who on the counsel

13   side are the people who we're going to meet with.  We may have

14   phone calls; we may have meetings.  But I'm not prepared to do

15   it because I have -- I have not yet fully digested not only the

16   areas that you have in dispute, but the different, you know,

17   forms that you've submitted as to what you're thinking about,

18   and I want to go through that in a second.

19          And let's go back.  I just really want to go back up

20   to the -- I mean, if I can cut to the chase and see how this

21   affects where we are.  And let's -- I gather the folks in front

22   of me now are the people who are in the -- in the trenches on

23   these discovery issues.  Right?

24          MR. CLARK:  Yes, your Honor.

25          MR. ROTH:  Yes.

1          JUDGE GILBERT:  So Mr. Clark.  And you're a direct

2    purchaser plaintiff person?

3          MR. CLARK:  Correct.  And I'm -- today I'm speaking on

4    behalf of indirects as well.

5          JUDGE GILBERT:  Okay.

6          MR. ROTH:  And Martin Roth on behalf of Sanderson

7    Farms.  My colleague Stacy Pepper has been taking more of the

8    lead on the ESI and preservation side.

9          MR. POTTINGER:  And Oral Pottinger for Foster Farms,

10   LLC, more so working with the ESI protocol.  So if you're not

11   going to address those issues substantively today --

12         JUDGE GILBERT:  I am.  I am.

13         MR. POTTINGER:  Okay.

14         JUDGE GILBERT:  I mean, I'll nip around the edges of

15   those a little bit.

16         MR. POTTINGER:  Understood.

17         JUDGE GILBERT:  But I'm glad -- I'm glad that you

18   have -- I mean, one of my questions was who is it who's on your

19   side -- hopefully not everybody -- who needs to talk about

20   those ESI issues.

21         I mean, let me just -- I mean, here's my -- my feeling

22   on some of these issues at the beginning.

23         I would not order right now that the defendants tell

24   you who they have sent all their litigation hold letters to.  I

25   just don't think that that's -- that's fraught with problems.

1    You haven't given -- you know, I know about the *Potash* case.  I

2    can't remember whether I was in that case when I was a

3    practitioner or not, but -- you can check.

4         But, I mean, I -- you haven't given me a reason to say

5    this is an important thing to do.  I mean, it doesn't sound

6    like you're pushing that real hard.

7         MR. CLARK:  No.

8         JUDGE GILBERT:  Okay.

9         MR. CLARK:  We wanted to flag it, frankly, for that

10   category of information really.  You know, knowing whose

11   documents are being preserved is important.  We think the way

12   to accomplish that goal is not squabble about litigation hold

13   recipients but deal now with identifying custodians.

14        JUDGE GILBERT:  Okay.  And then for the same -- it

15   sounds like the gravamen of the issue is not really the

16   language in their hold letters, which you haven't seen and you

17   haven't seen theirs.  I mean, everybody has to send a hold

18   letter that works.  I mean, there are consequences for not

19   doing this down the line that everybody knows about in the

20   amended Rules of Civil Procedure.  Hopefully you don't get

21   there.

22        But, you know, if we get to a point where I think it's

23   necessary to get behind that curtain, I can easily do that.

24   But I have no reason to do that now.  Okay?

25        The -- and so that I think is your issue number I.

1 Right?  Is there anything else on issue number I?  Because it

2 then bleeds into issue number II.

3 MR. CLARK:  No, your Honor.

4 JUDGE GILBERT:  Yeah.

5 And for you too, right, no?  The issue number I in

6 your status report is what I'm talking about.

7 MR. ROTH:  Yeah, nothing further.

8 The only thing I'd add is, you know, we have per the

9 Court's direction -- every defendant has sent letters

10 indicating what we're doing to preserve documents.  We've had

11 follow-up conversations.  We've sent follow-up letters.  So

12 just want the record to be clear we're being very diligent

13 about that.

14 JUDGE DURKIN:  Yeah, and I think last time there was

15 contemplated -- because I believe the words were "one size does

16 not fit all" as to the defendants.  Have -- has each defendant

17 communicated with the representative from the plaintiffs'

18 counsel to say what it is they are going to be retaining?

19 MR. ROTH:  So certainly Sanderson has.  To my

20 knowledge, others have as well.  I'm sure --

21 JUDGE DURKIN:  Well --

22 MR. ROTH:  -- they'll tell you if someone hasn't.

23 MR. CLARK:  You'll probably speak to it, but we have

24 received a letter from each defendant.  There's one defendant

25 we have to talk a little bit more about the broad issues rather

1  than a specific group of senior executives.

2          But I think the reason we included this item on

3  preservation letters in the status agenda is because the

4  purpose of those is to make sure we don't get down the road

5  six, twelve months and figure out, oh, shoot.  There was that

6  person, and, yeah, his job title on the org chart said this,

7  but, in fact, he's the guy who sent data to the Georgia Dock.

8  And we, of course, would want that data.

9          The reason we included this here and the reason we did

10  that was to not have that problem.  The letters are broad and

11  vague, all parties' letters.  We're not identifying

12  preservation custodians or litigation hold recipients.  So they

13  haven't solved that underlying problem.

14          JUDGE DURKIN:  All right.

15          JUDGE GILBERT:  Okay.

16          JUDGE DURKIN:  But you've had communications with

17  every defendant.

18          MR. CLARK:  Absolutely, yeah.  Absolutely.

19          JUDGE DURKIN:  Okay.

20          JUDGE GILBERT:  You're not getting stonewalled.

21          MR. CLARK:  No.  We've talked, and we've had

22  productive follow-up telephone conversations as well.

23          JUDGE GILBERT:  Okay.  Good.

24          Okay.  And so then to me on the -- on the section of

25  your status report labeled Disclosures of Information, to me

the issue is mostly timing because the question is whether you

get this information by January 31st when you're getting all

these -- your first wave of 26(a)-like disclosures or whether

it's part of the discovery process after the motion to dismiss

where you have agreed to 45 days or whether it's more in

connection with the ESI protocols when you're identifying where

you're going to get -- to get information. Am I -- am I

oversimplifying it too much, or is that essentially what we're

talking about?

MR. CLARK: No, that's right. And, actually, with the

amended -- corrected Exhibit 2, it appears we're in agreement,

at least, on the list issue for (1) through (3) because that's

included in defendants' proposal.

JUDGE GILBERT: Mm-hmm.

MR. CLARK: But what's -- I guess what's at issue is

whether a list of the individuals in (4) through (7), page 5 of

our --

JUDGE GILBERT: Right.

MR. CLARK: -- brief, whether those also get produced.

And we think it's -- you know, frankly, the practical

reality is here I would -- I would be shocked if defendants

don't have something akin to this list because we've told them

these are employees we want. We gave them almost a month ago

our discovery requests, calling for information from people

like this.

1          And, you know, we're not trying to hold their feet to

2     the fire.  If there's some -- you know, we want to be

3     reasonable.  If there's some difficulty on finding the person

4     from 2008 who fulfilled that role, fine.  But we really want to

5     get a better sense of this, especially with one of the key

6     allegations being the submission of data to Agri Stats,

7     submission of data to Georgia Dock.

8          That's a key issue in the case, and that doesn't show

9     up on an org chart.  Certainly you can see there's a business

10    analyst.  Maybe it's that person.  Maybe it's a complex

11    manager.  We don't know, and defendants do.  And we're certain

12    they have already asked these questions themselves in

13    connection with fulfilling their preservation obligations.

14          JUDGE GILBERT:  Okay.  Two things.  One, help me

15    understand what the amended Exhibit 2 did and didn't do.  I see

16    what you're saying is that there's agreement in (a)(i)(1), (2),

17    (3).  I thought there was agreement before.

18          MR. ROTH:  There was.  To be honest, your Honor,

19    there -- we literally fixed three typos.  It was not our

20    intent --

21          JUDGE GILBERT:  Oh, okay.

22          MR. ROTH:  -- to change anything substantive.  So

23    there's nothing -- we took out a stray word, and we corrected a

24    couple numbers that should have been different.  That was all

25    that was done.

1      MR. CLARK:  I think (1) through (3) are actually

2  identical in both Exhibits 1 and 2, which Exhibit 1 being

3  plaintiffs' order, proposed order, defendants' being Exhibit 2.

4  The only difference -- and we both include this language about

5  "may create a list" if you don't have an org chart.

6      JUDGE GILBERT:  Mm-hmm.

7      MR. CLARK:  The really -- the difference at this point

8  is whether (4) through (7) from our Exhibit 1 should also be

9  part of that.

10      JUDGE GILBERT:  Right.  That's what I understood.

11      MR. CLARK:  Okay.

12      JUDGE GILBERT:  And I looked this morning at

13  Exhibit 2, and I just -- I thought it was exactly the same.  I

14  must have missed the typos.

15      I mean, unless defendants are -- you think they're

16  lying, they say that we would have to go through and do a lot

17  more information -- lot more work than we've already done,

18  interviewing employees and things like that, to -- to get

19  answers to these questions.

20      And, you know, you've now, just now, focused on a

21  couple of things -- all right? -- which is a little different

22  than -- my reaction to these is that some of this was very

23  general, and I didn't know how I would respond to them if I had

24  those.  How am I supposed to -- if I don't have a list of these

25  people -- and they might cross departments -- this seemed to me

1  more like interrogatory-like discovery, deposition discovery,

2  stuff that's coming up.  So I didn't know whether you were

3  anticipating doing some of that during the motion to dismiss

4  period or otherwise.

5      So, for example, in (4), you talk about people

6  responsible for "market intelligence," "competitor analysis,"

7  "analysis of reporting."  Those are your words.

8      MR. CLARK:  Correct.

9      JUDGE GILBERT:  You know, I don't know if they have a

10  vice president in charge of market intelligence, but they may

11  not, and they probably don't.  So that may cross over different

12  things.

13      That may be a little bit different, however, than the

14  person who is responsible for sending data to Agri Stats,

15  Express Markets, Georgia Dock.  That's a little bit more

16  specific.  And that was one of the things you just mentioned.

17      MR. CLARK:  Yeah.

18      JUDGE GILBERT:  And, you know, similarly, if you -- if

19  you were focused on certain things here -- you know, who

20  attended trade association events -- you maybe have a list of

21  trade association events during your relevant time period.

22      You could agree on that.  Maybe you can get -- in

23  other words, I'm trying to be a little bit more practical here

24  rather than broad.  I understand why you want that stuff.  I

25  think a lot of it is a little -- is more part of discovery.

1    But, I mean, for example, either Mr. Roth or Ms. Pepper.

2         If (4) was people who sent or received data to

3    Agri Stats, is that a much smaller group of people?

4         MR. ROTH:  It's not, your Honor.  And just to give

5    your Honor some context, Agri Stats, which is the data exchange

6    that forms a big portion of plaintiffs' complaint, issues

7    dozens of different reports.  Some deal with very simple things

8    like corporate finance and corporate structure; others deal

9    with broiler production and broiler supply; others deal with

10   pricing; others deal with hen production.

11        And so literally since these are chicken

12   broiler-producing companies, for the most part, or they have a

13   division that does that, there could be any number of employees

14   throughout every aspect of the company that receive or send

15   data to these reports.  Using Sanderson as an example, you

16   know, I know there are numbers of individuals in production and

17   in processing that put information into a system that goes to

18   Agri Stats.

19        So doing this for a nine-year period for a company

20   that produces chicken broilers is very difficult, a lot harder

21   than it sounds.  It's not as simple as, you know, one Agri Stat

22   report; tell us who got that report.  If that were the request,

23   depending on which report it was, we might be able to think

24   about it.

25        But for us to try to tell them over a nine-year period

1  every person who sent or received data from Agri Stats is a

2  huge undertaking.

3          JUDGE GILBERT:  But they may not want that.  And for

4  you to tell me that it involves numbers of people doesn't

5  advance my ball because if it involves five or ten as numbers,

6  those are numbers.  Right?  But, I mean, or it involves 20.

7          But they probably don't know -- want to know about

8  reports about financial structure or stuff like that at this

9  time.  What they probably want to know is broiler production,

10  pricing.  There's probably three types of things they want to

11  know.

12          So if they boiled this down to a person at your

13  company who during -- person or persons -- during this

14  nine-year period who were responsible for -- and I know you're

15  just one company -- but who were responsible for sending or

16  receiving a report from Agri Stats regarding pricing, regarding

17  broiler production, regarding hen something, just the little

18  things that you just said, that may be numbers of people, but

19  it's a little bit more specific.  Right?

20          MR. ROTH:  It's definitely more specific.  I think at

21  our company it would still be -- and when I said numbers, I

22  mean more like dozens or hundreds -- right? -- because these

23  are large departments.  We have many different plants who

24  process chickens all over the country.  We have lots of

25  different farmers all over the country.

1    So even if that were narrower, I think it would still

2 be burdensome and more interrogatory-like.  But certainly we

3 can consider a narrower version and try to see if that's

4 something we can digest.  As worded now, it's just so broad

5 that I know there's no way we can do this, particularly where

6 it refers to "other industry data sources" at the end.  I don't

7 even know what that means.

8    MR. CLARK:  Judge --

9    JUDGE GILBERT:  No, but you've got to cross out the

10 general stuff.  I mean, I'm not trying to --

11    MR. CLARK:  Yeah, we're happy to do that, your Honor.

12    The one point I was going to add, I mean, you know,

13 counsel said, you know, he knows, you know, whatever.  We

14 don't -- we'd like to know that type of information.  Maybe

15 it's all hatchery managers submit hatchery data.  If that's the

16 case, you know, we do have org charts for many of these

17 defendants.  That would kind of answer that question.

18    We don't need them to create a list of the, you know,

19 50 hatchery managers.  If there's a specific person with a job

20 title we know about, that answers the question.

21    JUDGE GILBERT:  So let me just push this a little bit

22 farther.  The -- is your issue now you want to make sure that

23 those people are -- those people's data is being preserved, or

24 is it that you want to identify those people so that you can

25 put it -- them on a list of deponents?

1    Is it that you need the identity or just the numbers

2  so when you do your 26(f) plan, you can figure out how much

3  time it's going to take to have discovery?  Is it you want to

4  make sure that those people are included in a list of

5  custodians who are going to be searched, and they may not --

6  you may not have to have them identified by name but category?

7    I mean, I'm just -- because --

8    MR. CLARK:  Yeah.

9    JUDGE GILBERT:  -- if it's you want to know their

10  names in order to put them on a deposition list, my response to

11  that is maybe not now.  Okay?

12    MR. CLARK:  No, I agree.  Yeah.

13    JUDGE GILBERT:  If you want to make sure that the

14  data -- that these people are getting a hold letter, I get

15  that, and that's appropriate for this stage of the litigation.

16    If it's you want to know how many people you're

17  talking about as part of a Rule 26(f) plan, I get that too.

18  But I don't know that you need number -- I don't know that you

19  need identities as opposed to numbers.

20    And if we're talking about this because you want to

21  make sure that when we do go through an ESI protocol you want

22  those people's data to be captured, some of that is going to be

23  rolled into when we're talking about the ESI protocol.

24    So I'm just kind of wondering where your head is at on

25  this.

1    MR. CLARK:  Multiple parts of that.  So the -- on the

2    26(f), yeah, it is helpful to know.  If we know that, you know,

3    each defendant has, you know, between two and maybe

4    30 hatcheries, we're probably not going to ask for every single

5    hatchery manager, but we'd like to probably have a sampling of

6    a few of those.

7         And another instance is on -- you know, as we do talk

8    about custodians, we do want to know their identities and be

9    able to kind of identify those and move forward with that

10   process we've laid out in the ESI protocol.

11        MR. HART:  The key here, your Honor, I think primarily

12   is that we don't want to have disputes down the road.  We don't

13   want to wait six months to know what we're going to argue about

14   without any burden to the defendants, or not much at all.

15        So this is really not a discovery tactic.  We're not

16   trying to get information from them, or data.  What we're

17   trying to do is identify people, make sure that that stuff is

18   being preserved, have some type of transparency and cooperation

19   between the parties.

20        JUDGE GILBERT:  Mm-hmm.

21        MR. HART:  And then so we don't have fights down the

22   road with "Did you preserve this guy's or this woman's

23   information?"

24        "No, we didn't.  We didn't feel it was appropriate."

25        "Well, we do."

1      JUDGE GILBERT:  Okay.

2      MR. HART:  So really it's a disclosure issue with

3 respect to ESI, not a discovery issue, and it's a disclosure

4 issue which would be compatible and consistent with their

5 obligations under 26(a)(1).  That's really what we're

6 addressing here, not discovery.

7      We don't want discovery from them now.  We understand

8 that we have a right to pursue it if we wanted to push that

9 issue, but we have agreed to acquiesce to those discovery

10 issues and say, "Okay.  Let's not put the cart before the

11 horse."  There's been no ruling on the motion to dismiss.

12      But we don't want to lose six months and have -- under

13 what we believe is a likely scenario, that our complaint, which

14 is well researched, survives.  We don't want to be in the

15 position where we are now six months from now.

16      JUDGE GILBERT:  Right.  But you're -- 26(a)(1)

17 requires the defendant to disclose -- to identify by name

18 and -- and address or telephone number, whatever, people who

19 they are going to call to support their claims or defenses.

20 Okay?  So where are we on the 26(a) disclosures?  When are

21 those going to be happening?

22      JUDGE DURKIN:  Before we get to that, so I can remain

23 relevant, Laura, do you want a break for about ten minutes?

24 We've been going since 8:45 on other cases.

25      In fact, I want a break.  So we're going to break for

1    ten minutes.  We're going to finish this this morning or early

2    afternoon.

3            JUDGE GILBERT:  Yeah, we will.

4            JUDGE DURKIN:  This is not going to run all day.

5    We'll finish it hopefully by noon or 12:30.  But let's break

6    for ten minutes, and we'll come back at that time.

7            JUDGE GILBERT:  I don't intend to go past noon, I

8    hope.

9            JUDGE DURKIN:  Okay.  Great.  Thank you.

10           THE CLERK:  All rise.

11      (Recess at 11:11 a.m., until 11:21 a.m.)

12           THE CLERK:  All rise.

13           Be seated, please.

14           JUDGE DURKIN:  All right.  And if anyone has to

15   leave -- I understood there's some people that had to leave

16   for -- to catch flights -- that's fine.  I'm sure someone's

17   going to order a transcript of this.  You're free to leave, and

18   no prejudice attaches to it.

19           JUDGE GILBERT:  As all of you know, it's really nice

20   to be leaving Friday afternoon out of O'Hare Airport with snow

21   coming.

22           MR. SIMON:  Thank you, your Honor.

23           JUDGE GILBERT:  Used to be one of my favorite things

24   to do.

25           You were going to say something?

1    MR. CLARK:  Your Honor, yeah.  I was just going to say

2  we had some -- among plaintiffs some discussion during the

3  break about the disclosures.  I think if we wanted, if you had

4  a few minutes just to go over, I think we could probably on the

5  record just boil this down right now and then submit a proposed

6  order afterwards.

7    And then with respect to the ESI protocol, we

8  understand you've had less than 24 hours to look at lengthy

9  documents.  If it made sense for a smaller group of those

10  dealing with the ESI protocol to come back, say, a week from

11  today, I think that would be helpful, as long as -- there's two

12  items we thought we could really use guidance on I think have

13  been the main sticking points.

14    JUDGE GILBERT:  Hold your --

15    MR. CLARK:  Sure.

16    JUDGE GILBERT:  Let's talk about that.  I will try and

17  do that.  I don't know if I could do it in a week, but I could

18  talk about making sticking --

19    MR. CLARK:  Understood.

20    JUDGE GILBERT:  -- points, if I can.  You were reading

21  my mind, though, on this.  You said you had conversation with

22  plaintiffs.  Did you also talk to defense counsel?

23    MR. CLARK:  We didn't have a chance to talk.

24    JUDGE GILBERT:  I mean, what I was going to suggest on

25  this is that I do think -- to the extent, as I'm now

1    understanding this, the plaintiffs' concern at this point with

2    the stipulated orders (1) and (2) that you're trying to get out

3    is to make sure, as Mr. Hart said, that we don't have fights

4    about this later.  And I complete -- I think that's laudable,

5    and I don't think the defendants are saying not.  It's just a

6    question of how you do it and what you disclose.

7         And to me, some -- there is data in at least (4), (6),

8    and (7) that is very important -- that's going to -- people

9    involved in this stuff at various levels are going to be people

10   who everybody is going to be interested in.

11        And I think if we could fine-tune some of this stuff,

12   and identify them -- I know the defendants don't want to

13   identify them, but eventually they're going to be identified.

14   Okay?  And they're probably going to be identified sooner

15   rather than later as part of the ESI protocol because their

16   names are going to have to be searched.

17        So, you know, at some point you're going to be -- have

18   to be searching for this kind of information.  I mean, if you

19   have somebody who is communicating price in an antitrust

20   price-fixing case -- it's a price-fixing case, right?

21        JUDGE DURKIN:  It is.

22        JUDGE GILBERT:  Okay.  See, I'm getting it.  I'm

23   getting it.

24   (Laughter.)

25        JUDGE GILBERT:  That stuff is going to be relevant at

1    some point.  So -- and I know you -- that's a timing issue.

2    But to me, I'm not -- for the -- for -- if we could focus on

3    putting more clarity on what information we're asking for, it

4    will help the defendants identify the people.  And as long

5    as -- and I think it would be -- it would be helpful.

6         And I'm happy -- I don't even know if we need Judge

7    Durkin here to do it.  I can come down there and sit with you

8    for a couple of minutes, and we can talk about this.  But

9    talking about it -- and what you're proposing is talking about

10   it amongst yourselves and giving it to them.  I'd kind of give

11   you some of my thoughts before we do that.  Then we could see

12   what the defendants want to do too.

13        MR. ROTH:  That's fine, your Honor.  But just to bring

14   it back a little bit.  I mean, to be clear, what we're doing

15   now is we've already given them organizational charts, lots of

16   information on December 2nd, and we've already committed for

17   the same nine-year period to give them organizational charts of

18   our officers and the board members, which reflect names and

19   heads of departments, to give them phone directories, to tell

20   them our e-mail system.

21        So to the extent this is a preservation issue, I think

22   we've actually done a lot and agreed to do a lot more.  I'm not

23   suggesting that we're not willing to at least listen to

24   reasonable requests.  Of course, if the Court wants us to do

25   that, we're happy to do that.

1          But, you know, this is a line-drawing exercise the way

2     we view it.  And I think we're doing a lot of work a lot more

3     than Rule 26(a) would require already voluntarily.  And if we

4     have to do a little bit more, I guess we will.  But I would

5     just point out that, you know, we've put in the joint status

6     report at page 6 all of the things we've already agreed to

7     provide, which is taking a substantial amount of work.

8          JUDGE GILBERT:  Yeah, that's copied verbatim from the

9     proposed orders at (1) and (2).

10          MR. ROTH:  Correct.

11          JUDGE GILBERT:  Yeah, I understand that.  And I'm

12     just -- I think one of the things I'm thinking about is just

13     putting the line a little bit lower as opposed to -- I mean,

14     you know, members of the board of directors, I'm glad you're

15     going to do that.  They can get that from your -- if any of

16     the -- if your companies are public, you can get it from public

17     filings, right?

18          MR. CLARK:  Yeah.

19          JUDGE GILBERT:  If they're not, they can get it from

20     the Secretary of State.  I mean, so it's not a big lift.  All

21     right?  And similarly, you know, executives with the titles

22     here, good.  I get that.  All they want to -- I think it is not

23     inappropriate for them to try and make sure with you that

24     people who are dealing with some of the issues here are also on

25     your radar screen.  And if they already are, fine.  If they're

1    not, I think there's at least reasonable cause to believe they

2    should be.

3         And so if there's a way to fine-tune this a little bit

4    so it doesn't -- you know, words such as, like, "market

5    intelligence" are not meaningful in this context.  "Competitor

6    analysis" is not meaningful in this -- you know, "analysis of

7    pricing" is not, but maybe determination is more relevant, and

8    maybe people who send or receive information is a little bit

9    more focused.  And to the extent that that would be helpful, I

10   think we ought to at least try and do that.  All right?

11        I'm not -- and the process that I'm talking about is

12   having to talk to them.  You get me something next week and

13   we'll finalize it, and it will be in your order for producing

14   on January 31st.  That's all.  I mean, I'm talking about

15   getting in under the hood a little bit more.

16             MR. CLARK:  Happy to do so, your Honor.

17             MR. ROTH:  Yeah, and we're happy to confer as well.

18             JUDGE GILBERT:  Okay.  And so if we spend five minutes

19   about it at the end, that would be fine.  And but that's as far

20   as I would go in number II.  Okay?

21             MR. CLARK:  Okay.

22             JUDGE GILBERT:  Okay.  Tell me what are the key issues

23   that you're feeling the need for help on on the ESI thing --

24             MR. CLARK:  I think the --

25             JUDGE GILBERT:  -- because I'm not -- I don't know how

1  much I can even --

2       MR. CLARK:  They're overarching issues.  I think the

3  Court might have a view one way or the other, and I think they

4  would inform the parties if we do come back here with a smaller

5  group to talk about the ESI protocol.

6       Our (1), the concept of having deadlines on doing

7  things.  Plaintiffs believe that promotes efficiency and

8  advances the ball on the litigation to have deadlines.  I mean,

9  we're attorneys.  That's what -- that's what makes us do

10 things.  And not only during the negotiations on the parameters

11 for discovery, of search terms and custodians, but deadlines

12 for substantial completion of production of documents once we

13 get into discovery.

14      And then, secondly, the other issue that I think has

15 really put the parties at issue is are we going to do anything

16 to set the parameters for discovery during the pendency of the

17 briefing on the motions to dismiss.  And plaintiffs' view is,

18 obviously, we should.  We should set the universe of documents

19 that will be considered relevant and subject to some type of

20 search.

21      And then, secondly, with respect to a small group of

22 two to five key custodians that we identified in letters back

23 in September and October to defendants, have that data, load it

24 into a document review search software, and test the search

25 process, be that keywords or TAR, actually make sure we have a

1    process in place so when we get to the point of the motions to

2    dismiss being resolved, we can hit the ground running rather

3    than add all that time on afterwards.

4         MS. PEPPER:  I think that's an oversimplification of

5    what those two points actually entail.  Stacy Pepper for

6    Sanderson Farms.

7         So let's start with the concept of deadlines.  Your

8    Honors will see that even though defendants do not believe that

9    the discovery deadlines that plaintiffs have advanced are

10   contemplated by an ESI protocol, in the interest of compromise,

11   we have actually suggested discovery deadlines in our Section V

12   at Exhibit 4.

13        So if the question is can we agree to certain

14   deadlines in terms of identifying custodians, in terms of

15   identifying centralized document sources, in terms of the

16   meet-and-confer process that will necessarily accompany those

17   discussions once the claims and the parties who are advancing

18   in this litigation are determined by the Court after the motion

19   to dismiss, those have been addressed in plaintiffs' proposed

20   protocol -- I'm sorry -- defendants' proposed protocol as well.

21        JUDGE GILBERT:  That's Exhibit 4, Section V.

22        MS. PEPPER:  Section V.

23        JUDGE GILBERT:  But all of those deadlines key off of

24   a decision on the motion to dismiss?

25        MS. PEPPER:  They do, your Honor.  And --

1    JUDGE GILBERT: And plaintiffs' deadlines are earlier

2  deadlines because they want to hit the ground running when, as

3  they would put it, they resoundingly defeat the motions to

4  dismiss.

5    MS. PEPPER: As they would put it, correct.

6    JUDGE GILBERT: Yes.

7    MS. PEPPER: If the Court --

8    JUDGE GILBERT: I don't know the answer to my question

9  yet. I mean, I -- and I'm sorry for interrupting you. I hate

10  to do that, but it's helpful to hear my thinking.

11    I agree with the first thing you said. It's an

12  oversimplification to say what is my view on deadlines and

13  setting parameters for discovery during the motion to dismiss

14  briefing period. Generally I think deadlines are good when

15  you're dealing with lawyers, but the devil is going to be in

16  the details on them and what are we setting the deadline for

17  and what has to be done during that period of time.

18    I think we should be addressing these issues to the

19  extent we can during the motion to dismiss briefing period.

20  But then again, it's a question of how deep we get into that.

21  You know, in plaintiffs' world, if we got deep enough so that

22  ten days after the motions to dismiss were denied -- and

23  resoundingly, as I said, in your view of the universe -- the

24  defendants hit a button and you got an electronic production of

25  everything they're producing, you would love that.

1    I'm not sure that that's -- you know, Rule 1 says the

2    Court and the parties should make sure to use the rules for the

3    just, speedy, and inexpensive resolution of disputes.  And

4    often there's an interplay between speedy and inexpensive.

5    Okay?  And this case is going to be expensive any way you do

6    it.  And I think both of you are trying to comply with that

7    requirement but in different ways in representing your clients.

8         So, you know, I like deadlines generally, and I think

9    we ought to be looking at discovery issues during the pendency

10   of the motion to dismiss.  I'm not prepared to tell you that I

11   think your deadlines are right or her deadlines are right.

12        MS. PEPPER:  So that brings us to the second point

13   that plaintiffs raised.  And I don't -- it sounds like we might

14   be in agreement here.  But I think it's important to keep in

15   mind it's not -- it's not -- the deadlines matter not just in

16   terms of do we have them, but what are the producing parties

17   expected to do by then.

18        And this is something that as your Honors are working

19   through the parties' submission, you'll see what's in the

20   five-page letter is not the universe, exhaustive list, of

21   problems that defendants have with plaintiffs' proposed

22   protocol.  We were mindful of the Court's instruction to keep

23   those submissions ultimately to five pages apiece.

24        We think, as is laid out in the letter report, that

25   plaintiffs have offered this Court no basis to conclude that

1  this case is that different from the other complex antitrust

2  litigations that defendants have flagged at Exhibit 5, the ESI

3  protocols for which almost universally do not contain either

4  the breadth or the restrictive nature of requirements that

5  plaintiffs seek to impose on producing parties.

6         And for good reason, because while everybody

7  understands that this Court expects discovery to move apace,

8  the idea that less flexibility on a producing party at the

9  outset avoids motion practice later on and encourages

10  efficiency is -- we would say the opposite is true.  More

11  flexibility to allow a producing party to respond to the facts

12  on the ground as they unfold is precisely what facilitates

13  efficient discovery that's both reasonable and proportionate to

14  the needs of the actual case.

15         That's not what plaintiffs' protocol advances.  They

16  have offered this Court no precedent to support a number of the

17  restrictions that they would impose.  And so to the extent

18  we're actually talking about are deadlines reasonable, not as

19  tethered to the protocol that plaintiffs have advanced.

20         JUDGE GILBERT:  And the points you're making are

21  focused on the ESI protocol now, right?  Not necessarily on

22  Exhibits 1 and 2, but it's really -- you're really addressing

23  the deadlines and the --

24         MS. PEPPER:  Correct.  We are talking about the

25  deadlines on -- that the Court will find in Exhibit 3 and the

1  counter deadlines proposed in Exhibit 4 --

2  JUDGE GILBERT:  Right.

3  MS. PEPPER:  -- coupled with the actual obligations

4  that are attendant to those deadlines.

5  JUDGE GILBERT:  Let me --

6  MR. POTTINGER:  And, your Honor, I just might want to

7  add to that.  During the pendency of the motions to dismiss, as

8  Mr. Clark just articulated, they want us to take certain

9  custodians that they've identified, load those custodians, you

10  know, validate certain search terms.  That incurs costs on the

11  defendants.  That incurs processing costs, hosting costs,

12  analytic costs.

13  And, quite frankly, there may be some defendants that

14  are dismissed as part of the motion to dismiss briefing.  So

15  he's encouraging those defendants to incur those costs.  It

16  could be very possible that some of the claims might be

17  dismissed or narrowed or tailored, and so there might be

18  certain parameters that adjust in terms of the searching of

19  those particular custodians.  So --

20  JUDGE DURKIN:  Well, that's covered too, though.  If

21  certain defendants are dismissed or all are dismissed and it's

22  found that the complaint was frivolous or brought in bad faith,

23  you can recover your -- you can seek to recover your costs.

24  That's the price of operating in the United States.

25  You get sued, and you often have to incur costs.  And your

1  clients may think it's unfair, but that's what the court system

2  is sometimes.  There's costs attendant to it.

3  And if something is brought in bad faith, then you ask

4  to have those costs recouped.  And if it's just a good-faith,

5  honest difference of opinion, your clients will be happy

6  they're out of the case, even if it incurred costs relating

7  to --

8  MR. CLARK:  Understood, your Honor.

9  JUDGE DURKIN:  -- holding on to electronic discovery

10  longer than they should have in the first place.  But there's

11  remedies for all of that.

12  JUDGE GILBERT:  Can I make sure that I understand

13  everything?  And so plaintiffs' proposed protocol is Exhibit 3,

14  correct?

15  MS. PEPPER:  Correct.

16  JUDGE GILBERT:  Defendants' is Exhibit 4.

17  Exhibit 5, as I can understand this, this is a

18  plaintiffs' exhibit?

19  MS. PEPPER:  No.

20  MR. CLARK:  It is not.

21  JUDGE GILBERT:  This is yours.

22  MS. PEPPER:  Defendants will take responsibility for

23  Exhibits 4 through 7.

24  JUDGE GILBERT:  Okay.  So give me -- so this is an

25  attempt to show what?  It's attempt to show --

1          MR. POTTINGER:  It's an attempt to compare different

2    ESI protocols.  One, that have taken place in other antitrusts,

3    similar antitrust litigation.

4          JUDGE GILBERT:  Mm-hmm.

5          MR. POTTINGER:  Also to -- there's also two cases in

6    there from Judge Durkin that he's decided in terms of ESI

7    protocol, and to compare the provisions that the plaintiffs

8    have put into their ESI protocol versus whether those

9    provisions even exist in similar ESI protocols.

10          JUDGE GILBERT:  And a check mark means what?  If

11    there's a check mark --

12          MR. POTTINGER:  If it's green check mark, it means --

13          JUDGE GILBERT:  I don't have color.

14          MR. POTTINGER:  Okay.  I'm sorry.

15          JUDGE GILBERT:  That maybe could help.

16          MR. POTTINGER:  The check mark means that it's

17    present.

18          JUDGE GILBERT:  Okay.

19          MR. POTTINGER:  An X means that it's not present.

20          JUDGE DURKIN:  All right.

21          MR. CLARK:  And, your Honor, it might be useful -- and

22    perhaps in connection when we come back as you're available.

23    Plaintiffs would be happy to go through each one of these

24    categories and tell you about motions we have briefed for

25    months at a time on each of these issues because of the failure

1    in these other cases, which some of which we're in, to address

2    the issue, like cell phones.  If we don't address cell phones

3    in an ESI protocol, it comes back later on.  You're just

4    pushing the motion practice off.

5              JUDGE GILBERT:  Okay.  I don't know that I want to

6    know about that stuff.

7              MR. CLARK:  I won't do it right now.

8              JUDGE GILBERT:  But okay.  So I -- is there a color

9    version of this?

10              MR. POTTINGER:  May I approach?

11              JUDGE GILBERT:  Yeah.  Yes.

12         (Document tendered to Judge Gilbert.)

13              THE CLERK:  Thank you.

14              JUDGE GILBERT:  Got it.  Helpful.  Okay.

15              And then the -- and then --

16              MS. PEPPER:  Exhibit 6.  Is that what --

17              JUDGE GILBERT:  I'm not to 6 yet.

18              MS. PEPPER:  Oh.

19              JUDGE GILBERT:  I'm still on 237-5.

20              MS. PEPPER:  Oh.

21              JUDGE GILBERT:  So I've got the checklist, and then

22    the other stuff is a -- just goes through and gives you that

23    information.  And the checklist summarizes everything that you

24    have in that spreadsheet that has --

25              MR. POTTINGER:  Yeah, the spreadsheet is just the

1    detail.

2         JUDGE GILBERT:  Yeah, and that -- the one that has

3    type that is, like, O-point type, right?  Okay.

4         And then 6A through I are yours.

5         MS. PEPPER:  They are.  And they are the actual ESI

6    protocols for Exhibit 5.

7         MR. POTTINGER:  Correct.

8         MS. PEPPER:  Including one that the Court will see

9    defendants' proposed protocol at Exhibit 4 is modeled off of.

10        JUDGE GILBERT:  Okay.  And then the ones at 7?

11        MS. PEPPER:  That's the correspondence between the

12   parties as they sought to negotiate the protocols, to flag

13   areas of difference and make clear that defendants worked in

14   good faith to accommodate a number of plaintiffs' requests,

15   even to the extent they were not contemplated by the ESI

16   protocols that the Court will see at Exhibits 5 and 6.

17        JUDGE GILBERT:  Okay.  Thanks.

18        I can't answer your two issues.

19        MR. CLARK:  Okay.  Understood.

20        JUDGE GILBERT:  And I can't give you guidance on them

21   right now.  I'm not -- I'm not in the case enough.

22        One of the things that came to mind, though, as I was

23   looking at what you have -- and I'd be interested, at least, in

24   your preliminary thought on this -- is that there are cases in

25   the multi-district panel -- the litigation manual encourages

1  this in certain cases where the Court, if it feels it's

2  necessary, to appoint its own expert, its own -- not really a

3  master or something, but somebody with expertise in ESI issues,

4  and the parties then split the cost of that in some way.

5         Because I don't -- I have enough -- I haven't -- I

6  mean, I've dealt with these issues when I was in private

7  practice; and in the six and a half, almost seven years I've

8  been here, I've been dealing with them.

9         But sometimes you guys all have your own liaison --

10 litigation consultants and all that, and sometimes it can be

11 helpful for the Court to have its own.  Do you have any view on

12 that?  You would support it?  You wouldn't support it?  You

13 want to think about it?  You have an initial reaction one way

14 or the other?

15         MR. CLARK:  Want to think about it.

16         JUDGE DURKIN:  Or you can avoid it by agreeing.

17    (Laughter.)

18         JUDGE DURKIN:  But that may not be the simplest

19 answer.

20         MR. SIMON:  Your Honor, the only thing I would say is

21 that having done this for over 30 years and been involved in

22 cases as complex, if not more complex, than this, I can't

23 remember one of the cases I've been in where we've had to have

24 that.  And the thing I would just say is it does add a level of

25 complication, you know, that person's expertise and -- there's

1   issues involving it.

2        I think we can sort these things out with your Honor.

3   If there's one particular point which just boggles everybody's

4   minds, then we can think about it.

5        But, you know, we're already talking about expanding

6   the voices in this case.  Adding an expert to whisper in your

7   ear when some of these things -- you know, your gut is probably

8   just as good as hearing the technical aspects of it.  I think

9   it would complicate matters, just my personal opinion.

10       JUDGE GILBERT:  Do you have a view different than

11  that, Mr. Clark?

12       MR. CLARK:  No, that's --

13       JUDGE GILBERT:  No.

14       Do you have a view different than that, Ms. Pepper?

15       MS. PEPPER:  I don't have a view different than that,

16  and I won't speak on behalf of all defendants on that point

17  now.  But we'll be prepared to talk about it more the next time

18  we meet.

19       JUDGE GILBERT:  Well, think about it -- okay? --

20  because I would like not to get there too.  All right?  And my

21  experience in 29 years of litigation before I got here was

22  similar to Mr. Simon's.  All right?

23       I don't want this case to get to the point where I

24  would need that.  It's certainly something I can order if I

25  need it, if I feel I need it.  But if what we're looking for is

1  boiling down issues for me to decide that I can decide with

2  your help and minimizing those issues, then we won't need that.

3  Right?  And it would be a little bit more streamlined and less

4  expensive.

5      If we do need it, though, it's something that I would

6  consider because if I'm going to referee very technical things

7  that I don't have all the expertise on and I don't feel I can

8  trust one or the other's litigation consultant or ESI

9  consultant, then that's something that I might consider.  Okay?

10 So it's -- it's there.  Okay?

11     I'm happy to talk to you off record about what we can

12 do to fine-tune some of this stuff.  I don't have -- I'm going

13 to -- so in terms of who do I contact about ESI stuff, it's --

14 on the plaintiff side, it's you?

15     MR. CLARK:  Correct.

16     JUDGE GILBERT:  And on the defendants' side, it's

17 Roth, Pepper, and Popple?

18     MR. POTTINGER:  Pottinger.

19     JUDGE GILBERT:  Pottinger.

20     MR. POTTINGER:  Yeah.

21     MS. PEPPER:  I think you might also want to contact

22 David Suggs.

23     JUDGE GILBERT:  And who does he represent?

24     MS. PEPPER:  Tyson.

25     JUDGE GILBERT:  And if I wanted to schedule a

1   conference call with these people, is there one person -- I'd

2   call Clark on the plaintiffs' side, and is there one person on

3   the defendants' side I can -- who could be the point person to

4   then get everybody else in line?

5           MS. PEPPER:  David Suggs.

6           JUDGE GILBERT:  Okay.  Is he here?

7           MS. PEPPER:  Yes.

8           MR. SUGGS:  (Indicating.)

9           JUDGE GILBERT:  Okay.

10          JUDGE DURKIN:  And, Mr. Pottinger, while you're up

11  front, I see that people from Mayer Brown are Carmine Zarlenga,

12  William Stallings, and yourself, Mr. Pottinger.  I know none of

13  you.  I'm not sure when you joined the firm, but I had no

14  dealings with you, at least while I was there, when I left.

15          If you involve anyone else on the case who has

16  joined -- who was with the firm before I left Mayer Brown, you

17  should make a disclosure of that.

18          MR. POTTINGER:  Sure.

19          JUDGE DURKIN:  There are certain people -- I mentioned

20  this last time.  I don't think you were in the case yet.  But I

21  did mention there's some people in Chicago, if they join the

22  case, I have to get off the case.

23          MR. POTTINGER:  Understood.

24          JUDGE DURKIN:  And you ought to know that up front so

25  you can make your decision.  It won't be that easy to recuse

1  me, but there are certain people that I am close to personally

2  that I just won't hear a case if they're going to be involved.

3      So if anyone else is involved who has joined the firm

4  after I left, which was January of 2013, then you can make a

5  disclosure of that, and I'll act appropriately.

6      MR. POTTINGER:  Understood.

7      JUDGE DURKIN:  All right.  Thank you.

8      MR. POTTINGER:  Thank you, your Honor.

9      JUDGE GILBERT:  I'm not prepared to give you another

10  date right now.

11      What I would like to do is -- you know what?  And we

12  can do this on the record too, just, and then we'll get it

13  done.  Here.  Maybe what we ought to do is we can talk about

14  this a little bit.  You'll send a revised proposal to them.

15      MR. CLARK:  Absolutely.

16      JUDGE GILBERT:  Copy me on it.  You guys will react to

17  it next week sometime.  That's not Christmas yet, right?

18      MR. POTTINGER:  No.

19      JUDGE GILBERT:  And then we can see whether we can

20  get -- I'm not -- and let me just say I'm not -- I'm not a

21  hundred percent sure that I want you -- that I'm going to order

22  you to include these, but that's partly dependent upon how this

23  little exercise goes.

24      MR. POTTINGER:  Understood.

25      JUDGE GILBERT:  Okay?  Because I think you're too

1  broad.  So in (4), (a)(i)(4) --

2          MS. PEPPER:  I'm sorry, your Honor.  Are you at

3  Exhibit 3?

4          JUDGE DURKIN:  Oh, use your mic.

5          JUDGE GILBERT:  Okay.  Sorry.  Sorry, sorry.

6      I am in -- yes.

7          No.  I'm in -- I'm sorry.  I'm in 1 and 2.

8          MR. ROTH:  Right.

9          JUDGE GILBERT:  I've switched back to that.

10         MS. PEPPER:  Got it.

11         JUDGE GILBERT:  It doesn't matter which one.  I'm

12 looking at (4), (5), (6), and (7).  Okay?  To me, if the

13 plaintiffs want to make progress with this -- at this level of

14 detail to make sure that they get -- they're sure that these

15 custodians are being preserved and they may or may not get the

16 names, at least at this stage, I think terms like "market

17 intelligence," "competitor analysis," "analysis of," or "other

18 industry data sources" are unhelpful because they're not

19 specific enough for the defendants to really put pen to paper

20 or to be able to locate specific people.

21         I think people who are responsible for, reporting to,

22 or receiving data from Agri Stats -- and I'm sorry.  I don't

23 know enough about these other, but these are people who are in

24 your complaints -- relating to particular subjects I think is a

25 much more manageable category.

1          And maybe you know the particular categories; maybe

2     the plaintiffs do.  But things like pricing or -- you know, I

3     mean, Mr. Roth, I know you're going to tell me that there's

4     numbers of people in this category, and it may be.  But I guess

5     I'd postpone till the next round to see whether or not the

6     numbers are so unmanageable that you shouldn't have to do this.

7          This is also separate and apart from the fact that you

8     were probably doing this already trying to capture this data.

9     The only purpose of this is to make sure that everybody is on

10    the same wavelength, that these people are getting captured.

11         MR. ROTH:  Understood.  And the only other thing I'd

12    flag for the Court is we have a little bit of a safeguard in

13    here because there are 14 different companies.

14         JUDGE GILBERT:  Mm-hmm.

15         MR. ROTH:  And so whereas my client may have numbers

16    that seem more manageable, others may have much larger numbers.

17    And so we can take the Court's guidance and speak amongst

18    ourselves.  It may be that for some defendants, they're able to

19    make some disclosure for a certain time period, and for others,

20    it may be unmanageable.

21         JUDGE GILBERT:  Well, and I'm not -- I'm less

22    concerned about names.  But I would say that if there's a large

23    company and it has a number of people who are reporting price

24    information or production information to a centralized source

25    that the plaintiffs say is being used to fix prices, those

1    people -- those people should have litigation holds.

2              MR. ROTH:  Yeah.

3              JUDGE GILBERT:  I mean, I don't know care how many

4    those are.  And it's -- I know we have some big companies and

5    small companies.  But I see no reason why a case involving, you

6    know, allegations of conspiring to fix prices where the people

7    who are actually sending information in to this source

8    shouldn't be somehow held ...

9              MR. ROTH:  I agree with you.  And I think that

10   defendants have taken it upon themselves to do that.  I guess

11   the question becomes whether we then have to provide a list of

12   who these people are.

13             One thing I heard your Honor say that might make more

14   sense is we could give more generic descriptions of the

15   departments that are involved for a certain time period.  That

16   might be more manageable, to generally tell them, you know,

17   "Our production plants report data to a system that goes to

18   Agri Stats," without naming the individual custodians.

19             If the goal was preservation, that could obviously

20   lead to a conversation about preservation, and it might be

21   something that's easier for us to do and more relevant to their

22   preservation goals at this stage.

23             JUDGE GILBERT:  Right now, I think the plaintiffs and

24   I are focused -- I'm not meaning to align them, but I'm more

25   focused on preservation so that everybody is on the same page.

1 That seems to be what Exhibits 1 and 2 are designed to do. I'm

2 less concerned about identification.

3 At the time that we start talking about when certain

4 things happen with respect to data pulls and data searches,

5 identification is going to be unavoidable and important

6 because, you know, to save a lot of time and expense on both

7 sides -- and I think the defendants wouldn't mind this

8 either -- I don't know that the plaintiffs should have to

9 figure out with a lot of investigative skill who the people are

10 who are doing certain things.

11 Because you're going to pay for it if you lose the

12 case, and, you know, it's just not efficient. Again, Rule 1.

13 So at some point, whether it's by January 31st or another

14 point, we're going to identify these people.

15 I'm less concerned about them being identified than I

16 am with what Mr. Hart said and what Mr. Clark has echoed, which

17 is this -- let's make sure this stuff is getting pulled and

18 kept now so that six months or a year from now, two years from

19 now, you're not standing here saying, "Oh, your Honor, we

20 didn't know they wanted that stuff."

21 MR. ROTH: Right.

22 JUDGE GILBERT: And now we're in a world of hurt that

23 nobody wants to be in. Okay?

24 MR. ROTH: We're in alignment with that.

25 JUDGE GILBERT: That's where I'm trying to get to.

1     "Communicating with," (5), I think is way too broad.

2   I can't figure out a way, unless you guys can figure out a way,

3   to narrow that, "communicating with other defendants" or "other

4   broiler suppliers."

5     MR. CLARK:  I have some thoughts.  I could share them

6   now or share them in this draft that we e-mail out, which we're

7   happy to do.

8     JUDGE GILBERT:  Put it in the draft.

9     MR. CLARK:  Will do.

10     JUDGE GILBERT:  I think it is important people who are

11   attending trade associations with respect to certain things.  I

12   don't know -- I don't know exports.  I don't know how that

13   involves here.  But pricing, I mean, you know, in other cases

14   that I am aware of, trade associations are places where

15   plaintiffs often can mine stuff, you know, and can be

16   problematic or not, depending upon how careful the defendants

17   are in that regard.

18     And, again, I'm not making any conclusions as to what

19   was going on in the case.  I'm just saying preserve the data

20   where some of it may -- where people may want to look for this

21   stuff.  It may be everybody is, you know, pure as driven snow

22   here, which is fine too.

23     I -- and on (7), I don't know -- I don't know what

24   "analysis of pricing" means.  That's a meaningless term to me

25   in this context because a salesman is analyzing pricing all the

1   time too, but I'm not sure -- but deciding on a price or a

2   supply level?  I don't know.  And, again, I don't know how many

3   of those people are, and that could be fraught with difficulty.

4   All right?

5           But I just think the more you can do to specify and

6   limit so that it's understandable and everybody knows what

7   you're looking for.  If you want -- if we got to that point to

8   add those to (a)(i) of the order, that would be what I would

9   try and do.

10          MR. CLARK:  We'll endeavor to do that and e-mail that

11  out as soon as we can.

12          JUDGE GILBERT:  Okay.  Well, let's put deadlines on

13  it.  Okay?

14          MR. CLARK:  Absolutely.  We can do as early as Monday.

15  If you need sooner, well, we'll do it sooner.

16          JUDGE GILBERT:  No, I don't want it -- you don't have

17  to -- I'm not trying to -- I don't want to set -- I would like

18  to avoid setting unreasonable deadlines.

19          Let's do this.  I'd like to set a conference call

20  after this is done.  Right?  You can get something out quickly,

21  but then they're going to have to talk.

22          MR. CLARK:  Right.  Yeah, I was just speaking to what

23  we're getting out.  I can't hold them to it.

24          JUDGE GILBERT:  Yeah.  So times I would be available

25  for a conference call with you all are --

1      MR. POTTINGER:  Your Honor, is this related to the

2  disclosures, or does this also include the ESI protocol?

3      JUDGE GILBERT:  This is not ESI protocol.

4      MR. POTTINGER:  Okay.

5      JUDGE GILBERT:  I need some time with that.

6      MR. POTTINGER:  Right.

7      JUDGE GILBERT:  I mean, I'm not prepared to jump on

8  that right now.

9      MR. POTTINGER:  Understood.

10      JUDGE GILBERT:  I'm going to have to read it, and

11  then, reaching out to Mr. Suggs and Mr. Clark, schedule another

12  conference call to talk about that, and/or a meeting.  I'm

13  sorry.  I just have not been able to delve into it or digest

14  what you're giving me.  I understand the issues better now, but

15  I need to dive into it.

16      I'm just trying to get something in writing that

17  you're going to do by January 31st or whatever date you're

18  going to get it done.  Okay?  I'm just looking for times that I

19  actually could talk.

20      Okay.  So if we could shoot for a conference call on

21  this subject next Thursday afternoon, the twenty -- I'm sorry.

22  That's not --

23      MR. CLARK:  That would be the 15th, your Honor.

24      JUDGE GILBERT:  It's the 22nd.  I'm giving you time

25  next week to deal with this.  I could do the 22nd in the

1   afternoon.  I could do -- does that work for you guys, first of

2   all?

3           MR. ROTH:  Thursday the 22nd would work, yeah.

4           JUDGE GILBERT:  And you?

5           MR. CLARK:  That would be fine.

6           JUDGE GILBERT:  Okay.  So I would say 2:00 p.m.

7   Chicago time.  Okay?  So let's back into that date now.  You'll

8   get your stuff out Monday or Tuesday, right?

9           MR. CLARK:  Yes, we'll have it out by Monday.

10          JUDGE GILBERT:  Okay.  And then you guys will respond

11  to it by?

12          MR. ROTH:  Thursday or Friday, and then --

13          JUDGE GILBERT:  Okay.  Then continue to talk about it

14  a little bit.

15          MR. ROTH:  Right.

16          JUDGE GILBERT:  So I'll say by Friday the 16th.  So

17  you guys are the 12th; you guys are the 16th.  You're going to

18  continue to talk, and we're going to talk on the 22nd at 2:00

19  in an attempt to see whether or not this is workable or not

20  and, if it is workable, whether we have some agreement on this

21  and, if it's not workable, then, you know, I wouldn't order it.

22          And then you'll have your orders, 1 and 2.  You know,

23  you'll have some semblance of the order that gets entered.

24  I'll sign it, and we'll move on.

25          I have to look at the ESI stuff, and I'll have to then

1   contact you as to when I want to get back together on that. I

2   know it delays where you want, but it was too much. This could

3   choke a horse, and I'm not a horse. So I was not able to get

4   through everything on that.

5           MR. POTTINGER: Your Honor, I have some additional

6   color copies and a legal size, at least for the spreadsheet, in

7   terms of detail.

8           JUDGE GILBERT: I'd love it. I'd love it.

9           MR. POTTINGER: Okay.

10          JUDGE GILBERT: And, you know, we're going to work

11  toward these dates that you were talking about, obviously.

12          When you say you're meeting on the 28th with respect

13  to your 26(f) report, what was the work product that eventually

14  is going to come out of that, a plan? I mean, I haven't looked

15  at the docket. Was there an order that you filed, a Rule 26(f)

16  plan?

17          MR. CLARK: We -- I think -- we have not exchanged

18  that, you know, our 26(f) draft report. Typically then we'd

19  have a discussion, how many depositions per party --

20          JUDGE GILBERT: Mm-hmm.

21          MR. CLARK: -- number of interrogatories. We haven't

22  done that yet.

23          JUDGE GILBERT: Mm-hmm.

24          MR. CLARK: We're working on a draft. I want to share

25  that sooner rather than later with defendants because we want

1   to have that conversation soon.

2            JUDGE GILBERT:  But was it your intent that sometime

3   after 2/8, February 8th, when you're meeting about this, there

4   will be a plan filed?

5            MR. CLARK:  Yes.  I think the dead --

6            JUDGE GILBERT:  Is there a date set?

7            MR. CLARK:  I believe -- my understanding was that

8   date -- I believe it might have been the 8th would be the

9   deadline to file that report, have our 26(f) meeting --

10            JUDGE GILBERT:  Okay.

11            MR. CLARK:  -- and file that report by that deadline.

12            MR. ROTH:  Yeah, I don't know that -- I think the

13   local rules probably have a deadline.  I mean, it may be

14   helpful to have the report be due a day or two after just so

15   that we can iron out any differences and submit an order that

16   is agreed where it's agreed and competing where it's competing.

17            JUDGE GILBERT:  Right.

18            MR. CLARK:  That's fine.

19            JUDGE GILBERT:  Okay.  Propose a date.  The 10th is

20   Friday.  The 13th is that Monday.

21            MR. CLARK:  13th?

22            MR. ROTH:  Yeah, 13th is good.

23            MR. CLARK:  That will work.

24            JUDGE GILBERT:  Okay.  So you want to meet by the 8th,

25   exchange drafts before then, and file something by the 13th.

1          MR. ROTH:  That works, your Honor.

2          JUDGE GILBERT:  Okay.  And then is there already an

3     agenda for the Rule 16 conference, or that's something that

4     you're putting together?

5          MR. CLARK:  We're putting that together.  We haven't

6     talked about it.

7          JUDGE GILBERT:  Okay.  And then we're going to have

8     that on the 24th as Judge -- well, he's available early in the

9     morning.

10         JUDGE DURKIN:  Yeah.  I think the way we're going to

11    do this going forward is submit your status report, you know,

12    the -- what did we say, five days in advance?  Four days?  Five

13    days?  Whatever we agreed to.

14         And we'll either hold it -- if there are a number of

15    issues that I'm going to have to address and I don't have this

16    courtroom being used for a trial, we'll do it here.  If not,

17    we'll -- I'll go down to Judge Gilbert's courtroom.  We'll all

18    meet down there.  I may sit in for the first part of the

19    status.

20         Especially if I have a trial, we may do the initial

21    part at 8:45, sit in for the first part of the status and then

22    leave and attend to my trial while Judge Gilbert deals with the

23    remaining issues that deal with discovery matters.

24         But I think I'll attend the one on the -- what did we

25    say, 24th?

1          JUDGE GILBERT:  24th, right.

2          JUDGE DURKIN:  Yeah.  I'll attend it, but it may very

3   well be down in Judge Gilbert's chambers.  You'll get some kind

4   of notice of that, depending on what your agenda is.

5          JUDGE GILBERT:  And your intent is to come up with a

6   proposed agenda for a Rule 16 conference, hitting the Rule 16

7   topics, right?

8          MR. CLARK:  Yes.

9          MR. ROTH:  Yes.

10         MR. CLARK:  That's what we've typically done the last

11  couple times, and it seems to make things a little -- flow

12  smoothly.

13         JUDGE GILBERT:  Okay.  So you consider this thing, the

14  thing that you filed, ECF No. 237, your agenda for today.

15         MR. CLARK:  That is what we considered it, yeah.  I

16  don't know if the intention was to -- if the Court in the

17  future wants voluminous exhibits or not.  Guidance on that

18  would be helpful.

19         JUDGE GILBERT:  You can do whatever you want.  I don't

20  want to control it.  That's fine.

21         I wouldn't mind double-spacing, between you and me.

22         MR. CLARK:  Understood.

23         JUDGE GILBERT:  But, you know, that's just me.

24         But let's set a date for you to file that.  If we're

25  going to meet on the 24th, I mean, can we have it by the 17th,

1  which is a week before?

2          MR. CLARK:  Yes.

3          MR. ROTH:  Sure.

4          JUDGE GILBERT:  Is that okay with defense?

5          MR. ROTH:  Yes.

6          JUDGE DURKIN:  Okay.

7          JUDGE GILBERT:  Okay.  I think what I'm going to do is

8  attempt to look at the rough transcript and come up with, at

9  least on the discovery issues, an order setting some of the --

10 saying some of the things that we did here.

11         JUDGE DURKIN:  All right.  Yeah, I don't think --

12 other than a stipulation regarding other cases, if you're going

13 to reach one about dismissal of the other cases, which you're

14 going to work on some stipulated language and submit a proposed

15 order, if you can reach agreement, I don't think we need a --

16 do we need an -- I don't think we need an order that you need

17 to prepare today because I simply have some dates that are set

18 forth.

19         You're going to -- the Berman and Wolf firms are going

20 to submit proposals by Tuesday.  I'm going to rule on which

21 firm is going to be representing the end users on Wednesday.

22 And any amended complaints that are going to be filed by --

23 looks like by the indirect plaintiffs and then the end-user

24 plaintiffs, which are limited, are going to be filed by Friday,

25 with redline copies being sent to the defendants so they can

1    identify the -- easily the changes.

2           Shouldn't affect the briefing schedule we have on the

3    motion to dismiss, which is already set.

4           At the time you come back on the 24th, I'll have

5    already seen the original defendants' motions to dismiss, the

6    first round of them.  I should tell you if -- you know, there

7    is limited discovery going on, but I don't know what your

8    motion to dismiss is going to raise.

9           If it's a motion to dismiss saying they failed to

10   address certain things with particularity and it's something

11   easily remedied by an amended complaint, I may change my mind

12   about -- or I'll speak to Judge Gilbert about the advisability

13   of whether it ought to remain limited discovery or not.

14          If this is inevitably going to be an answered

15   complaint, then we're just wasting time.  If these are, as

16   promised, substantive, game-changing motions that are -- can't

17   be cured with an amendment -- I may agree or disagree, but one

18   way or the other, it's either out or in, and just in in a

19   different form -- we may have to revisit -- I'm going to talk

20   to Judge Gilbert about whether there's a need to revisit the

21   acceleration of discovery so we're not wasting time while

22   you're waiting for me to decide -- decide the motion.

23          I'll give it as much precedence as I can over other

24   motions, but you have to know that there are many other fully

25   briefed motions older than yours.  But I don't want to delay a

1    case of this size unnecessarily, and we'll try and get to it as

2    quickly as possible.  But I may have some comments about the

3    motions themselves when we meet on the 24th because I'm holding

4    off on ordering full-blown discovery because of the expense of

5    it if certain defendants are out or all defendants are out.

6         If it's just we're delaying the inevitable and it's

7    just going to be an amended complaint given what you're going

8    to file in your motion, then there's really no point in doing

9    this piecemeal discovery.  We might as well get going.

10        So that's what I do in every case.  I look at the

11   motions to dismiss when they come in.  And if they are game

12   changers, then it's not fair to defendants to make them incur

13   the cost of discovery when it's likely to be dismissed or has

14   at least a good-faith chance of being dismissed.

15        If it's just an amendment that will cure it because

16   it's a problem under *Iqbal* or *Twombly*, which you can get around

17   by amending, that's a little different issue.

18        So just a general attitude toward these things, but

19   you might as well know it because that's what I do on all the

20   cases.

21        JUDGE GILBERT:  And, obviously, Judge Durkin's views

22   calibrate my views on stuff as the magistrate judge trying to,

23   you know, supervise and help you move through the discovery

24   process too.

25        You should expect to hear from me as soon as I can

1   digest this.  I can't give you a date or a time.  I know that

2   this time of the year, sometimes it's hard, but I'm going to do

3   it as soon as I can.  My intention is to get you at least first

4   on a phone call to talk a little bit and probably set a meeting

5   of the folks that are focused on the ESI protocol stuff.

6       I will have views on it once I've digested it.  It's

7   not -- you know, Mr. Simon, I get it.  You know, I mean, there

8   are some things that are gut; there are some things not.  But I

9   wanted to put that out there so everybody knows that there's

10  another way too.  There's a third way too.  And it may not be

11  the best way, but sometimes if it needs to be that way, it

12  needs to be that way.  Okay?

13      JUDGE DURKIN:  And last but not least, if the --

14  whoever I appoint as lead counsel for the end users, I'm going

15  to expect full cooperation between that set of -- that law

16  firm, whether it's the Berman firm or the Wolf firm, with the

17  other lead attorneys.

18      If I hear from Judge Gilbert or I observe a lack of

19  cooperation that's causing unnecessary expense or delay, I

20  won't hesitate to substitute and switch the lead counsel I

21  appoint.  There's no reason you -- you all do this for a

22  living, and you're all in cases together.  You have been for

23  years.  So there's no reason that the firms can't cooperate in

24  an efficient way, and I'll expect it, and I'm sure you will.

25  But I'll substitute if -- attorneys if I have to if there is no

cooperation or if it becomes a problem.

Okay. What have I left out? Is there --

Well, first, Judge Gilbert, anything else from your end?

JUDGE GILBERT: I don't think so.

JUDGE DURKIN: Anything else that the parties need to raise that we haven't covered in the three and a half hours we've been here?

MR. ROTH: No, your Honor.

MR. CLARK: I don't think so, your Honor.

MR. CARNEY: We're all set for defendants.

MR. CLARK: Appreciate the time.

JUDGE DURKIN: Okay.

JUDGE GILBERT: I should say, before I react really quickly, are you okay with everything on my end at this point? Do you understand where I'm coming from?

MR. CLARK: Yes.

MR. ROTH: Yes, your Honor.

MR. POTTINGER: I think we do, your Honor.

JUDGE GILBERT: All right. Then I don't have anything else either. Thank you.

JUDGE DURKIN: Okay. Great.

Now, I'm still wondering. We have a lot of attorneys here, and I'm -- what is the -- and I also -- I know we have some limits on all the numbers of attorneys at depositions and

1   at -- and you're going to try and triage some of these things

2   and schedule them out where you're going to act efficiently.

3   And I have no problem with people walking downtown

4   here.  But are -- out-of-town attorneys should consider whether

5   it's really necessary to come here just to hear something they

6   can read in a transcript or listen to on a phone call.  It's

7   everyone's own call.  They have clients to represent, and I'm

8   fine.  Many of these may be attorneys for defendants.

9   But keep that in mind on the plaintiffs' side going

10  forward, that every transcript is being ordered, I assume --

11  well, in fact, I know it has been.  And I'm perfectly happy to

12  have people participate by phone, as is Judge Gilbert.  So

13  we'll go from there.

14  Anything else we need to discuss?

15  MR. SIMON:  No, your Honor.  Thank you very much for

16  your time and case management and thinking about these things

17  so carefully, both of your Honors.  And best of the holidays to

18  you and your staff.

19  JUDGE DURKIN:  Thank you very much.  You're in good

20  hands with Judge Gilbert.  And we'll see you in February,

21  unless there's something that needs to come up before then.

22  Thank you.

23  MULTIPLE COUNSEL:  Thank you, your Honor.

24  (Concluded at 12:06 p.m.)

25

1                    C E R T I F I C A T E

2        I certify that the foregoing is a correct transcript of the

3    record of proceedings in the above-entitled matter.

4

5    /s/ LAURA R. RENKE                        December 13, 2016
     LAURA R. RENKE, CSR, RDR, CRR
6    Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25