**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **IN RE BROILER CHICKEN ANTITRUST LITIGATION** | No. 1:16-cv-08637 |
| **THIS DOCUMENT RELATES TO:**<br><br>**DIRECT PURCHASER PLAINTIFF ACTION** | **Honorable Thomas M. Durkin** |

**MEMORANDUM OF LAW IN SUPPORT OF ALL DEFENDANTS' JOINT MOTION
TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' SECOND AMENDED AND
<u>CONSOLIDATED CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    A.    Plaintiffs' Conspiracy Theory. ............................................................................. 2

    B.    Relevant Context for Plaintiffs' Claims. ............................................................. 4

LEGAL STANDARD ..................................................................................................... 10

ARGUMENT .................................................................................................................. 13

I.    Plaintiffs Fail to Adequately Allege a Conspiracy ........................................... 14

    A.    Plaintiffs Fail to Sufficiently Allege Parallel Conduct. ................................... 15

        1.    Plaintiffs' Own Allegations Illustrate the Lack of Parallel Conduct. ........ 15

        2.    The Complaint Also Concedes Many Defendants Acted Contrary to the Alleged Conspiracy. ............................................................................. 19

    B.    In Those Limited Instances Where a Defendant Allegedly Reduced Output, There Were Obvious Unilateral, Non-Conspiratorial Reasons for Doing So ........ 20

        1.    Chicken Feed Costs Spiked in Both 2008 and 2011 ................................. 21

        2.    The Great Recession Created Havoc for Broiler Producers. .................... 22

        3.    Because of the Combination of Steep Cost Increases and the Great Recession, Production Cuts Were in Individual Defendants' Independent Interests. ............................................................................. 23

    C.    The Complaint Alleges No Substantive Facts About the Claimed Conspiracy's Formation and Operation and No Conspiratorial Communications. ............................................................................................... 24

II.    The Complaint's Allegations Make a Conspiracy Implausible. ....................... 25

    A.    The Premise of the Alleged Conspiracy Is Flawed:  the Complaint Reveals Defendants *Increased* Broiler Production During the Class Period. .................... 26

    B.    The Structure of the Industry Renders a Conspiracy Highly Implausible. ............ 26

i

C.      The Claimed Conspiracy Is Also Implausible Because it Lacks an Enforcement Mechanism. ....................................................................27

D.      Plaintiffs Fail to Allege Plausible Plus Factors....................................29

     1.     Plaintiffs Fail to Plausibly Allege That Defendants "Signaled" One Another Through Public Statements........................................29

     2.     Agri Stats Does Not Suffice to Make a Conspiracy Plausible...................32

     3.     Plaintiffs' Georgia Dock Allegations Only Underscore the Implausibility of Their Claim. ..................................................35

     4.     Opportunities to Collude Do Not Plausibly Suggest Conspiracy. .............37

     5.     "Industry Characteristics" Make a Conspiracy Implausible.....................37

     6.     Plaintiffs' Allegations Regarding Contract Changes and Inter-Defendant Purchases – Each Relating to Only a Few Firms – Cannot Support the Inference of a Conspiracy........................................38

III.     **Plaintiffs Have Not Stated a Claim Under the Rule of Reason**...................................**40**

IV.     **Plaintiffs' Claim Is Barred by the Statute of Limitations.** ...........................................**41**

A.      By Their Own Allegations, Plaintiffs Should Have Discovered Their Alleged Injury More Than Four Years Ago. ........................................................42

B.      Plaintiffs Have Not Pled Fraudulent Concealment. ................................................45

C.      There Are No "New" Alleged Facts That Excuse Plaintiffs' Untimeliness. .........48

**CONCLUSION** ..............................................................................................................**49**

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adams v. City of Indianapolis*,
  742 F.3d 720 (7th Cir. 2014) ..................................................................................4

*Adams v. Pilgrim's Pride Corp.*,
  No. 2:09-CV-397, 2011 WL 5330301 (E.D. Tex. Sept. 30, 2011), *rev'd sub
  nom. In re Pilgrim's Pride Corp.*, 728 F.3d 457 (5th Cir. 2013)...............................44

*Agnew v. NCAA*,
  683 F.3d 328 (7th Cir. 2012) ..........................................................................10, 40

*Amerigas Propane, L.P. v. BP Am., Inc.*,
  691 F. Supp. 2d 844 (N.D. Ill. 2010) ....................................................................46

*Anderson v. Simon*,
  217 F.3d 472 (7th Cir. 2000) .................................................................................5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................................12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................... passim

*Burch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011).............................................................................18, 40

*Cada v. Baxter Healthcare Corp.*,
  920 F.2d 446 (7th Cir. 1990) ...........................................................................44, 46

*Campos v. BP Prods. N. Am., Inc.*,
  No. 13 CV 8376, 2014 U.S. Dist. LEXIS 159242 (N.D. Ill. 2014) ...................18, 24

*Contractor Utility Sales Co. v. Certain-Teed Products Corp.*,
  638 F.2d 1061 (7th Cir. 1981) ..............................................................................10

*Eddins v. Redstone*,
  134 Cal. App. 4th 290 (Cal. Ct. App. 2005) ..........................................................28

*Energy Conversion Devices Liquidation Trust v. Trina Solar Ltd.*,
  833 F.3d 680 (6th Cir. 2016) ................................................................................49

Americas 92415189

*Flying J, Inc. v. Van Hollen*,
621 F.3d 658 (7th Cir. 2010) ...................................................................11

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.*,
128 F.3d 1074 (7th Cir. 1997) ...................................................................5

*Geo. Knight & Co. v. Watson Wyatt & Co.*,
170 F.3d 210 (1st Cir. 1999)....................................................................45

*Gulliver's Periodicals, Ltd. v. Charles Levy Circulating Co.*,
562 F. Supp. 539 (N.D. Ill. 1981) ...........................................................33

*Gupta v. St. Margaret Mercy Healthcare Ctrs., Inc.*,
No. 2:95 CV 310, 1998 WL 34360626 (N.D. Ind. Apr. 22, 1998).........19

*Hammer v. Residential Credit Sols., Inc.*,
No. 13 C 6397, 2014 WL 4477948 (N.D. Ill. Sept. 11, 2014)...........46, 47

*Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.*,
408 F. Supp. 1251 (S.D.N.Y. 1976).........................................................19

*Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*,
231 F. Supp. 2d 1253 (N.D. Ga. 2002), *aff'd sub nom. Williamson Oil Co. v.
Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) ...............................38

*In re Aftermarket Filters Antitrust Litig.*,
No. 08 C 4883, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009)...................44

*In re Aluminum Phosphade Antitrust Litig.*,
905 F. Supp. 1457 (D. Kan. 1995)...........................................................46

*In re Animation Workers Antitrust Litig.*,
87 F. Supp. 3d 1195 (N.D. Cal. 2015) .....................................................47

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999)...............................................................10, 18

*In re Baby Food Antitrust Litig.*,
1997 U.S. Dist. LEXIS 24488 (D.N.J. July 25, 1997)............................25

*In re Beef Indus. Antitrust Litig.*,
713 F. Supp. 971 (N.D. Tex. 1988), *aff'd*, 907 F.2d 510 (5th Cir. 1990)...............39

*In re Beef Indus. Antitrust Litig.*,
907 F.2d 510 (5th Cir. 1990) .......................................................11, 15, 19

*In re Brand Name Prescription Drugs Antitrust Litig.*,
288 F.3d 1028 (7th Cir. 2002) .................................................................33

iv

*In re Chocolate Confectionary Antitrust Litig.,*
  801 F.3d 383 (3d Cir. 2015).................................................................21

*In re Chocolate Confectionary Antitrust Litig.,*
  999 F. Supp. 2d 777 (M.D. Pa. 2014) ....................................................38

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.,*
  906 F.2d 432 (9th Cir. 1990) ...........................................................27, 29

*In re Copper Antitrust Litig.,*
  436 F.3d 782 (7th Cir. 2006) ...............................................................44

*In re Elevator Antitrust Litig.,*
  502 F.3d 47 (2d Cir. 2007)......................................................12, 20, 38

*In re Evanston Nw. Healthcare Corp. Antitrust Litig.,*
  No. 07 C 04446, 2016 WL 4720014 (N.D. Ill. Sept. 9, 2016)................42

*In re High Fructose Corn Syrup Antitrust Litig.,*
  295 F.3d 651 (7th Cir. 2002) ..........................................................10, 14

*In re Ins. Brokerage Antitrust Litig.,*
  618 F.3d 300 (3d Cir. 2010)...........................................................10, 23

*In re Late Fee & Over-Limit Litig.,*
  528 F. Supp. 2d 953 (N.D. Cal. 2007) ...............................................24, 38

*In re LTL Shipping Servs. Antitrust Litig.,*
  No. 1:08-MD-01895, 2009 U.S. Dist. LEXIS 14276 (N.D. Ga. Jan. 28, 2009)...............21, 33

*In re Milk Prod. Antitrust Litig.,*
  84 F. Supp. 2d 1016 (D. Minn. 1997), *aff'd,* 195 F.3d 430 (8th Cir. 1999) ..........................47

*In re Musical Instruments & Equip. Antitrust Litig.,*
  798 F.3d 1186 (9th Cir. 2015) ....................................................20, 24, 37

*In re Niaspan Antitrust Litig.,*
  42 F. Supp. 3d 735 (E.D. Pa. 2014) ......................................................47

*In re Pilgrim's Pride Corp.,*
  728 F. 3d 457 (5th Cir. 2013) ...........................................................9, 23

*In re Plasma-Derivative Protein Therapies Antitrust Litig.,*
  764 F. Supp. 2d 991 (N.D. Ill. 2011) ....................................21, 22, 27, 30

*In re Pool Prods. Distribution Mkt. Antitrust Litig.,*
  158 F. Supp. 3d 544 (E.D. La. 2016)..............................................21, 25

Americas 92415189

*In re Potash Antitrust Litig.*,
954 F. Supp. 1334 (D. Minn. 1997), *rev'd in part on other grounds*, 176 F.3d 1055 (8th Cir. 1999)........................................................................................27, 39

*In re Processed Egg Prods. Antitrust Litig.*,
MDL No. 2002, 2011 WL 5980001 (E.D. Pa. Nov. 30, 2011)..............................................45

*In re Ready-Mixed Concrete Price Fixing Litig.*,
2006 WL 2849711 (S.D. Ind. Sept. 29, 2006) ........................................................44

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ...........................................................12, 16, 19, 22

*In re Text Messaging Antitrust Litig.*,
782 F.3d 867 (7th Cir. 2015) ...................................................................10, 27

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) ...........................................................................37

*Indianapolis Airport Auth. v. Am. Airlines, Inc.*,
733 F.2d 1262 (7th Cir. 1984) .........................................................................5

*Int'l Equip. Trading, Ltd., v. AB Sciex LLC*,
No. 13 C 1129, 2013 U.S. Dist. LEXIS 123109 (N.D. Ill. Aug. 29, 2013) ...........................41

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
626 F.3d 1327 (11th Cir. 2010) ....................................................................12

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ....................................................................12

*Kleen Prods. LLC v. Packaging Corp. of Am.*,
775 F. Supp. 2d 1071 (N.D. Ill. 2011) ..............................................................23

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997).....................................................................................41, 45

*Kolon Indus. v. E.I. du Pont de Nemours & Co.*,
No. 3:11cv622, 2012 U.S. Dist. LEXIS 48722 (E.D. Va. Apr. 5, 2012)...............................22

*Lamers Dairy Inc. v. U.S. Dep't of Agr.*,
379 F.3d 466 (7th Cir. 2004) .........................................................................5

*Mahoney v. Beacon City Sch. Dist.*,
988 F. Supp. 395 (S.D.N.Y. 1997).....................................................................46

*Maple Flooring Mfrs. Ass'n v. United States*,
268 U.S. 563 (1925).................................................................................22, 32, 33

vi

*Massey v. Merrill Lynch & Co.*,
   464 F.3d 642 (7th Cir. 2006) ........................................................................42

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)....................................................................................49

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)........................................................................24

*Missouri Pet Breeders Ass'n v. Cty. of Cook*,
   106 F. Supp. 3d 908 (N.D. Ill. 2015) ............................................................5

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984)..............................................................................10, 13

*Moore v. Boating Indus. Ass'n*,
   819 F.2d 693 (7th Cir. 1987) ......................................................................37

*Newman v. Vill. of Hinsdale*,
   592 F. Supp. 1307 (N.D. Ill. 1984) ...............................................................5

*Nitz v. Birkette*,
   No. 11-c-44, 2011 U.S. Dist. LEXIS 25960 (N.D. Ill. Mar. 11, 2011) ..................11

*Paddock Publ'ns, Inc. v. Chicago Tribune Co.*,
   103 F.3d 42 (7th Cir. 1996) ........................................................................26

*Parker v. Brown*,
   317 U.S. 341 (1943).....................................................................................5

*Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*,
   998 F.2d 1224 (3d Cir. 1993)......................................................................28

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
   828 F.2d 211 (4th Cir. 1987) ......................................................................47

*Prosterman v. Am. Airlines*,
   No. 16-cv-2017, 2016 U.S. Dist. LEXIS 170125 (N.D. Cal. Dec. 8, 2016)............33

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
   381 F.3d 717 (7th Cir. 2004) ................................................................40, 41

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
   971 F.2d 37 (7th Cir. 1992) ........................................................................29

*Robert L. Kroenlein Trust ex rel. Alden v. Kirchhefer*,
   764 F.3d 1268 (10th Cir. 2014) ..................................................................44

vii

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
   661 F. Supp. 2d 218 (E.D.N.Y. 2009) ...............................................................................18

*Ryan v. Mary Immaculate Queen Ctr.*,
   188 F.3d 857 (7th Cir. 1999) ...........................................................................................24

*Sanjuan v. Am. Bd. of Psychiatry & Neurology*,
   40 F.3d 247 (7th Cir. 1994) .............................................................................................40

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
   547 F.3d 406 (2d Cir. 2008)..............................................................................................49

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   782 F. Supp. 2d 1059 (E.D. Cal. 2011)............................................................................24

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   803 F.3d 1084 (9th Cir. 2015) .........................................................................................21

*Std. Iron Works v. Arcelormittal*,
   639 F. Supp. 2d 877 (N.D. Ill. 2009) ....................................................................22, 27, 30

*Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*,
   903 F.2d 988 (4th Cir. 1990) ...........................................................................................34

*Superior Offshore Int'l, Inc. v. Bristow Group*,
   738 F. Supp. 2d 505 (D. Del. 2010)..................................................................................33

*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*,
   850 F. Supp. 470 (E.D. Va. 1994) ....................................................................................33

*U.S. S.E.C. v. Fisher*,
   No. 07 C 4483, 2008 WL 2062699 (N.D. Ill. May 13, 2008) ...........................................42, 48

*United States v. Gen. Motors Corp.*,
   No. 38219, 1974 U.S. Dist. LEXIS 6569 (E.D. Mich. Sept. 26, 1974) ....................................22

*United States v. Inc. Vill. of Island Park*,
   791 F. Supp. 354 (E.D.N.Y. 1992) ...................................................................................45

*United States v. United Bhd. of Carpenters and Joiners of Am.*,
   457 F.2d 210 (7th Cir. 1972) .............................................................................................5

*United States v. United States Gypsum Co.*,
   438 U.S. 422 (1978)........................................................................................................32

*Waldner v. N. Am. Truck & Trailer, Inc.*,
   277 F.R.D. 401 (D.S.D. 2011) ......................................................................................45, 48

Americas 92415189

*Williamson Oil Co v. Philip Morris USA*,
346 F.3d 1287 (11th Cir. 2003) .........................................................................17, 23

*Willow Creek Fuels, Inc. v. Farm & Home Oil Co.*,
No. 08-5417, 2009 U.S. Dist. LEXIS 85400 (E.D. Pa. Sept. 18, 2009) ..................................15

*Zoslaw v. MCA Distrib. Corp.*,
693 F.2d 870 (9th Cir. 1982) .................................................................................18

## STATUTES AND RULES

17 C.F.R. § 229.303(a)(3)(ii) (2017) ...........................................................................30

15 U.S.C. § 15(b) ................................................................................................41

Fed. R. Evid. 201(c)(2) ...........................................................................................5

## MISCELLANEOUS

Earl W. Kinter et al., 2 Federal Antitrust Law § 11.4 (Matthew Bender 2015) ............................34

Edward J. Green et al., *Tacit Collusion in Oligopoly, in* 2 The Oxford Handbook
of International Antitrust Economics at 486 (Roger D. Blair & D. Daniel
Sokol eds., 2015)................................................................................................25

Gregory J. Werden, *Economic Evidence on the Existence of Collusion:*
*Reconciling Antitrust Law with Oligopoly Theory*, 71 Antitrust L.J. 719, 780
(2004)...........................................................................................................24

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2010).......................................25

Richard A. Posner, *Antitrust Law* (2d ed. 2001).............................................................24

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines*
(Aug. 19, 2010)...............................................................................................26, 27

ix

## INTRODUCTION

The direct purchaser plaintiffs ("Plaintiffs" or "DPPs") contend that Defendants – 14 corporate families that produce and sell "broiler" chickens – conspired for over eight years to *reduce production* of broilers (and thereby raise prices). As shown below, their complaint (the "Complaint" or "SCAC") fails for a number of reasons, but three bear particular emphasis:

*First*, the Complaint is missing an indispensable element of a circumstantial conspiracy claim: allegations of parallel conduct. Before subjecting Defendants and the court system to the massive burdens of antitrust litigation, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007), DPPs must allege facts demonstrating that Defendants acted in parallel – for example, by announcing highly similar output cuts on the same day or in close proximity. Such parallel conduct is essential to adequately allege that Defendants acted pursuant to an *agreement*, rather than independently. DPPs' conspiracy claim thus fails at the outset.

*Second*, DPPs' conspiracy claim is facially implausible, most significantly because broiler production *grew* during the very period when DPPs claim that it was being cut. Both the Complaint itself and the materials cited therein reflect this increased output. DPPs, however, choose to bury the relevant allegations and ignore blatant contradictions in their sources. In particular, the same government data on which the Complaint relies show that broiler output *increased by over 8%* at the time Defendants were allegedly conspiring to lower output – despite rapidly increasing input costs and a historic recession. DPPs' allegations are thus implausible on a fundamental level, and the Complaint should be dismissed for this reason alone. *See Twombly*, 550 U.S. at 557 (holding plausibility is threshold requirement for pleadings).

*Third*, DPPs' claim is barred by the four-year statute of limitations. The Complaint is almost exclusively based on allegations of *public* conduct that occurred *five or more years ago*.

1

The statute of limitation is just four years. While DPPs assert the conclusion that the claimed conspiracy was fraudulently concealed, the public conduct alleged in the Complaint itself nullifies that argument.

For these reasons and the others discussed below, the Complaint should be dismissed against all Defendants with prejudice.[1]

## BACKGROUND

### A. Plaintiffs' Conspiracy Theory.

**Broiler production and sales in a sprawling industry**. DPPs posit a conspiracy involving *17 participating producers* – 14 Defendant corporate families and three claimed co-conspirators – in an industry with *at least 35 producers* and perhaps more than 120 production complexes.[2] SCAC[3] ¶¶29-70, 122, 284. The Complaint alleges that 12 of 14 Defendants have a market share of 8% or less, with *30-odd* companies having a collective share of around 60%. *Id.* ¶¶284, 286. Defendants themselves differ in myriad ways, ranging from small, privately held entities to publicly traded, Fortune 500 companies, and they are geographically dispersed. *See, e.g.*, *id.* ¶¶29, 34, 49, 54, 324.

**A vague and disjointed conspiracy**. The Complaint asserts that, beginning "[a]t least as early as" 2008 and continuing for nearly a decade (the "Class Period"), Defendants conspired to raise prices for broilers. *Id.* ¶1. The Complaint's "principal" contention is that Defendants reduced output as a means to reduce supply and thereby increase broiler prices. *Id.* (conspiracy "principal[ly]" implemented by reducing output); *see also id.* ¶5 (price increases required "supply [to] be cut"), ¶6 (alleging "substantial cuts"), ¶140 ("mechanisms to reduce the supply").

---

[1] Thirteen Defendants have also filed separate briefs identifying additional bases for dismissal.

[2] A production complex consists of several different facilities, namely a feed mill, hatchery, and processing plant. SCAC ¶322.

[3] Direct Purchaser Plaintiffs' Second Consolidated and Amended Class Action Complaint, Dkt. No. 212.

Americas 92415189

DPPs characterize a wide variety of conduct as "output reductions," including reducing egg sets, destroying eggs, slaughtering broilers early, exporting broilers, and reducing breeder flocks.[4]  *Id.* ¶¶140, 189.  The Complaint also claims that supposed output cuts included laying off employees, canceling contracts, closing plants, and forgoing expansion plans, *see, e.g.*, *id.* ¶¶165, 168, 201, 217, but it does not allege what impact, if any, such actions had on output.  Nor does the Complaint allege any coordination of such activities, but rather a range of different actions at different times by different firms over multiple years.  *See infra* §I.A.

DPPs similarly allege little regarding when and how the conspiracy was formed or how it operated.  For example, the Complaint is silent about how the alleged conspirators *agreed* which companies would reduce production, when they would do so, by what amounts, and by what means.  DPPs identify no meeting at which the claimed conspiracy was hatched or phone calls during which Defendants discussed production or prices.  Rather, they catalogue various industry events and assert "upon information and belief" that Defendants conspired at those events.  *Id.* ¶300.  DPPs also imply that all Defendants supposedly coordinated their productions levels for eight years through code phrases contained in ordinary press releases, announcements, and public statements made by only some Defendants.  *See, e.g.*, *id.* ¶6.

The Complaint also includes a hodgepodge of other allegations.  For example, DPPs, assert that a research firm called Agri Stats is somehow an "an agent and/or co-conspirator," *id.* ¶67, even though the company's website (quoted in the Complaint at ¶119) shows that Agri Stats has been providing its services to the broiler industry for decades (and provides similar services

---

[4] DPPs base most of their output-related allegations on public statements and announcements by some Defendants.

to other industries).[5] *See* Agri Stats, Inc., *Company History*, available at http://www.agristats.com/history (last visited Jan. 26, 2017); Agri Stats, Inc., *Partnership and Services*, available at http://www.agristats.com/partnership (last visited Jan. 26, 2017).[6]

In the most recent amended Complaint, DPPs added another allegation, relating to a price survey by the Georgia Department of Agriculture ("GDA") known as the Georgia Dock price. *See, e.g.*, *id.* ¶¶97-115. DPPs assert that, sometime around 2015, seven Defendants – but *not* all 14 – began manipulating Georgia Dock prices. *Id.* ¶¶100, 102, 113. DPPs do not explain how or why this subset of Defendants decided to expand (or replace) the alleged output-reducing conspiracy with an agreement to manipulate Georgia Dock prices. In addition, DPPs allege no facts explaining when or how these companies *agreed* what prices to submit to GDA each week.

### B. Relevant Context for Plaintiffs' Claims.

**Broiler production _increased_ during the claimed conspiracy**. Although the central premise of the claimed conspiracy is reduced output, production actually increased, both at various points during the alleged conspiracy and over the Class Period as a whole, as the Complaint and its source materials show. For example, the Complaint reveals that Defendants increased broiler production in 2010, resulting in "depress[ed] prices." *Id.* ¶193. Elsewhere the Complaint (including materials that DPPs cite but simply ignore) demonstrates that output grew throughout the Class Period:

---

[5] The Complaint also asserts that, sometime in the Class Period, a few Defendants shifted from fixed-price contracts to variable-priced contracts, *id.* ¶¶348-55, and also that a small number of Defendants purchased from competitors in furtherance of the claimed cartel, *id.* ¶¶337-47. But in no case does the Complaint allege facts connecting this conduct to any *agreement* among 17 companies, or offer an explanation for how these disparate actions tie to the overarching conspiracy alleged.

[6] Courts may take judicial notice of the full contents of materials cited in a complaint. *See, e.g.*, *Twombly*, 550 U.S. at 568 n.13 (holding court "was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn"); *Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014) (holding court could consider materials cited in complaint, and plaintiffs' argument to the contrary was "frivolous").

4

- "[D]uring late 2009 . . . producers started increasing production," *id.* ¶193;

- "[T]he broiler industry [in 2011] is currently at record high weekly slaughter volumes," *id.* ¶196;

- In 2014 and 2015, Sanderson increased production by 12.6%, Peco by 10.2%, Perdue by 9.3%, Keystone by 6.1%, Mountaire by 5.4%, Wayne Farms by 5%, House of Raeford by 4.1%, and Pilgrim's by 2.4%. WATT PoultryUSA, Top 10 Chicken Producers Grow in New Directions (Mar. 7, 2016) (quoted at SCAC ¶262).

The production increases conceded in the Complaint are confirmed, and amplified, by data from the same government sources relied on by DPPs, which show broiler production *grew 8.5%* during the Class Period.  *See* U.S. Dep't of Ag. ("USDA") Econ. Research Servs., *Broilers: Supply and Disappearance (Million Pounds) and Per Capita Disappearance (Pounds)*, at Column E, available at  https://www.ers.usda.gov/webdocs/DataFiles/Livestock__Meat_ Domestic_Data__17992/WASDE_BroilerFull.xls?v=42731 (last visited Jan. 26, 2017); *see also* chart below and at Appx. A.[7]

---

[7] A court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment.  *See Anderson v. Simon*, 217 F.3d 472, 475 (7th Cir. 2000); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997).  The court "*must* take judicial notice if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(c)(2) (emphasis added).  Courts routinely take notice of statistics compiled by the USDA.  *See, e.g., Parker v. Brown*, 317 U.S. 341, 363, 363 n.9 (1943) (data in USDA publications); *Lamers Dairy Inc. v. U.S. Dep't of Agr.*, 379 F.3d 466, 471 (7th Cir. 2004) (USDA regulations); *Missouri Pet Breeders Ass'n v. Cty. of Cook*, 106 F. Supp. 3d 908, 918 (N.D. Ill. 2015) (noticing USDA publication in dismissing complaint).  Courts also take judicial notice of other government data.  *See Indianapolis Airport Auth. v. Am. Airlines, Inc.*, 733 F.2d 1262, 1266-67 (7th Cir. 1984) (data from U.S. Dept. of Transportation); *United States v. United Bhd. of Carpenters and Joiners of Am.*, 457 F.2d 210, 214 n.7 (7th Cir. 1972) (statistics from U.S. Bureau of Census); *Newman v. Vill. of Hinsdale*, 592 F. Supp. 1307, 1309 n.8 (N.D. Ill. 1984) (data from Nat'l Oceanic and Atmospheric Admin.).

Americas 92415189



As is evident from the above chart, during the seven years from 2008 to 2015, annual broiler production declined only once by a non-negligible amount, from 2008 to 2009, in the midst of a devastating recession and at a time of high feed costs (and when production of other proteins also fell). After 2009, broiler production rebounded completely, erasing in one year the declines from 2009. Broiler output then stayed above 2008 levels for the rest of the alleged conspiracy period.[8]

Notably, the USDA wholesale broiler composite, a price index published weekly by the federal government, *id.* ¶92, shows that broiler prices during the Class Period were often *lower* than when the conspiracy allegedly began. *See* USDA Econ. Research Servs., *Meat Price Spreads*, at Worksheet "composite," Column B, available at http://www.ers.usda.gov/ webdocs/datafiles/meat_price_spreads__17995//history.xls (last visited Jan. 26, 2017). Indeed,

---

[8] The increase in broiler output coincided with a significant increase in the size of broilers at slaughter. The average live weight of slaughtered young chickens increased from 5.51 pounds in 2007 to 6.12 pounds in 2015. USDA, *Poultry Slaughter 2008 Annual Summary*, at 1 (February 2009), available at http://usda.mannlib.cornell.edu/usda/nass/PoulSlauSu//2000s/2008/PoulSlauSu-02-28-2008.pdf; USDA, *Poultry Slaughter 2015 Summary*, at 5 (February 2016), available at http://usda.mannlib. cornell.edu/usda/current/PoulSlauSu/PoulSlauSu-02-25-2016.pdf. As live weight increased, producers could maintain their production levels while raising fewer birds. Plaintiffs' focus on head counts of breeder hens, ¶¶140A, 191, 242, ignores the historical growth in broiler weight.

6

the prices fell more than 12% overall between January 2008 ($.7296/pound) and December 2015 ($.6416/pound). *See id.*

The increases in broiler production stand in sharp contrast to the output of other proteins such as beef and turkey (in its reports, the USDA often combines broiler data with data on other proteins). *See, e.g.*, USDA Econ. Research Servs., *Retail Prices for Beef, Pork, and Poultry Cuts, Eggs, and Dairy Prods.*, available at https://www.ers.usda.gov/webdocs/DataFiles/Meat_Price_Spreads__17995/cuts.xls?v=42754 (last visited Jan. 26, 2017)l. According to the USDA, annual beef output grew only once after 2008, and in 2015 was still about 11% below 2008 levels. *See* USDA Econ. Research Servs., *Beef: Supply and Disappearance (Carcass Weight, Million Pounds) and Per Capita Disappearance (Pounds)*, at Column E, available at https://www.ers.usda.gov/webdocs/DataFiles/Livestock__Meat_Domestic_Data__17992/WASDE_BeefFull.xls?v=42731 (last visited Jan. 26, 2017); Appx. A. Turkey output dropped nearly 9% between 2008 and 2015. *See* USDA Econ. Research Servs., *Turkeys: Supply and Disappearance (Million Pounds) and Per Capita Disappearance (Pounds)*, at Column E, available at https://www.ers.usda.gov/webdocs/DataFiles/Livestock__Meat_Domestic_Data__17992/WASDE_TurkeyFull.xls?v=42731 (last visited Jan. 26, 2017); Appx. A.



**Record-high chicken feed costs**. The alleged Class Period coincides with a period of soaring prices for corn and soybeans, the main ingredients in chicken feed. SCAC ¶327; *see also*

7

Americas 92415189

*id.* ¶151B ("spiraling costs of corn and soymeal."); ¶163 ("[s]oaring feed ingredient costs"); ¶166 ("record high prices for corn and soybean meal"). Chicken feed is the "single largest cost component of producing Broilers," accounting for 50-71% of production costs. *Id.* ¶327. According to government statistics from the same sources relied on by DPPs, the price of both corn and soybeans skyrocketed to historic levels in 2008, the very year that the Complaint contends Defendants began conspiring to cut production. *See* chart below; Appx. A.



Specifically, in June 2008 corn prices reached a record of $5.47/bushel, 55% higher than prices had been the prior year ($3.53) and more than 150% greater than prices two years earlier ($2.14).[9] National Agricultural Statistics Service ("NASS"), *Corn, Grain – Price Received, Measured in $/BU*, at Column "Value," available at https://quickstats.nass.usda.gov/results/9E19043B-BA0D-37BA-91CA-C39D468295A0 (last visited Jan. 26, 2017) ("Corn Price Data"). Similarly, in July 2008, the price of soybeans topped previous highs, hitting $13.30/bushel – more than double the price just two years before ($5.61 in July 2006). NASS, *Soybeans – Price Received*, Measured in $/BU, at Column "Value," available at https://quickstats.nass.usda.gov/

---

[9] DPPs cite NASS data in the Complaint. SCAC ¶¶191, 242.

results/4245848F-7C39-3C12-BAC6-C968996AF5C5 (last visited Jan. 26, 2017) ("Soybeans Price Data").

A few years later, in 2011, prices of corn and soybeans spiked even higher than in 2008, with corn hitting $6.88/bushel in August 2011 and soybeans reaching $13.40/bushel that same month. *See* Corn Price Data; Soybeans Price Data.

Ignoring this public data, DPPs allege that feed costs declined during the Class Period by pointing only to prices at the start and end of the Class Period. SCAC ¶7. They fail to note that feed costs radically increased at the same time that Defendants allegedly cut production. DPPs also ignore that, even in late 2016, grain prices remained *higher* than at any point before 2007. *See* Corn Price Data; Soybeans Price Data.

**The Great Recession**. At the same time that chicken feed prices were reaching then-record heights in 2008, the U.S. economy was entering the "worst recession in generations." SCAC ¶192. Production fell nationwide and millions of people lost their jobs. *See, e.g.*, U.S. Dept. of Commerce, Bureau of Economic Analysis, *How did Recent GDP Revisions Change the Picture of the 2007-2009 Recession and the Recovery?* (Aug. 5, 2011), available at https://www.bea.gov/faq/index.cfm?faq_id=1004 ("from 2007:Q4 to 2009:Q2, real GDP decreased at an average annual rate of 3.5 percent"). The impact of the recession on the broiler industry was significant, and many broiler producers struggled just to stay afloat, experiencing deep losses and in some cases entering bankruptcy proceedings or even failing completely. SCAC ¶¶39A, 278, 286, 323; *see also, e.g.*, *id.* ¶187 (Feb. 2009: "weak consumer demand resulting from a national recession"), ¶210 (June 2011: "reduced demand"), ¶218 (Aug. 2011: "until demand improves"). Indeed, the Fifth Circuit recognized the "severe economic difficulties" facing broiler producers in 2008. *See In re Pilgrim's Pride Corp.*, 728 F. 3d 457,

9

463 (5th Cir. 2013) (holding Pilgrim Pride's production cuts were "legitimate response of a rational market participant to changes in a dynamic market").

## LEGAL STANDARD

DPPs allege that 14 Defendants violated Section 1 of the Sherman Act by "conspir[ing] and combin[ing]" to fix the price of Broilers.  SCAC ¶¶1, 401.  DPPs cannot advance this claim unless they adequately plead three elements: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012).

**The hallmark of a conspiracy claim is an agreement**.  To satisfy the conspiracy element of their claim, DPPs must allege an *agreement* to restrain trade, the "fundamental prerequisite" of a Section 1 claim.  *Contractor Utility Sales Co. v. Certain-Teed Products Corp.*, 638 F.2d 1061, 1074 (7th Cir. 1981).  An agreement requires DPPs to allege that Defendants reached a "meeting of minds" or a "conscious commitment to a common scheme."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010); *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984) (agreement requires "a conscious commitment to a common scheme designed to achieve an unlawful objective").  Implicit agreements are not enough; DPPs must allege that each Defendant "explicitly agreed" on the alleged course of conduct.  *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 872 (7th Cir. 2015).

**Alleging an agreement requires either (a) direct evidence or (b) parallel conduct *and* plus factors**.  The most basic way for a plaintiff to plausibly allege an agreement is with facts directly reflecting a conspiracy, *i.e.*, direct evidence is "tantamount to an acknowledgment of guilt."  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999) (direct evidence "requires no

10

inferences to establish the proposition or conclusion being asserted"). Without direct evidence, DPPs still may allege an agreement by alleging circumstantial facts, but only where such allegations lead to a *plausible* inference of an agreement. *See Twombly*, 550 U.S. at 564-66.

DPPs allege no direct evidence of conspiracy and instead rely exclusively on circumstantial allegations. The *Twombly* Court specifically addressed the standard for pleading an agreement in a Section 1 case based on circumstantial allegations. The Court made clear that DPPs must allege something beyond conduct that is "merely consistent with" agreement. *Twombly*, 550 U.S. at 557. Also insufficient is "a conclusory allegation of agreement at some unidentified point," *id*., or the recitation of buzzwords such as "conspiracy" or "scheme." *See, e.g.*, *Nitz v. Birkette*, No. 11-c-44, 2011 U.S. Dist. LEXIS 25960, at *6 (N.D. Ill. Mar. 11, 2011) (citing *Twombly*, 550 U.S. at 544, 554-55) (holding plaintiff's "buzzwords" inadequate because "he provides no facts whatsoever that might support an inference of a conspiracy").

A threshold step in alleging an agreement in a circumstantial case is alleging "parallel conduct," *i.e.*, that each Defendant cut output at approximately the same time. *See In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 514 (5th Cir. 1990) (plaintiffs asserting circumstantial claims "must first demonstrate that the defendants' actions were parallel"). But alleging parallel conduct alone is insufficient to state a Section 1 claim. *See Twombly*, 550 U.S. at 560 (requiring "something more than merely parallel behavior"); *see also Flying J, Inc. v. Van Hollen*, 621 F.3d 658, 665 (7th Cir. 2010) ("Without more, parallel conduct does not suggest conspiracy . . . .") (quoting *Twombly*, 550 U.S. at 556-57). While such conduct is "consistent with conspiracy," it is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 553-54.

Thus, even if DPPs could allege parallel conduct, in order to make their claim *plausible*,

they would still need to identify "further circumstance pointing towards a meeting of the minds." *Id.* at 557; *see also id.* at 570 (plaintiff must allege "enough facts to state a claim to relief that is plausible on its face"). Claims that are merely "conceivable" must be dismissed. *Id.* at 570. Similarly, if the alleged facts suggest only the "possibility of misconduct," a complaint does not state a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

"Further circumstances" that may permit a plausible inference of agreement are often called "plus factors." There is no definitive list of plus factors. One example of "parallel plus" behavior is the rare case – identified by the Supreme Court in a footnote – where parallel conduct is so anomalous that it could not be an independent response to common economic conditions. *See Twombly*, 550 U.S. at 556 n.4; *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) ("That is the kind of 'parallel plus' behavior alleged in this case").

**A conspiracy's plausibility depends on context**. In determining whether the Complaint alleges a conspiracy that is plausible rather than just conceivable, the Court should consider context and "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. For example, in a complaint based on circumstantial allegations, where there is an "obvious alternative explanation" for a defendant's allegedly parallel actions, courts should not infer a conspiracy. *Twombly*, 550 U.S. at 567. Similarly, allegations "that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008); *see also Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1343 (11th Cir. 2010) (affirming dismissal of price-fixing claim as implausible by weighing inference of conspiracy against defendant's self-interest); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (affirming dismissal of complaint where alleged conspiratorial conduct was equally consistent with independent

12

business judgment).

**Plausibility is essential to protect defendants and the court system**.  The plausibility threshold is especially important in antitrust cases because of the risk of inferring "false positives" from ambiguous business conduct.  *See Twombly*, 550 U.S. at 554; *see also Monsanto*, 465 U.S. at 764 (inferring agreement from ambiguous evidence risks "creat[ing] an irrational dislocation in the market").  The dangers of such false positives are particularly acute in the antitrust context because of the substantial burdens imposed by antitrust cases on both litigants and courts.  As the Supreme Court warned in *Twombly*, in which the plaintiff alleged an antitrust conspiracy, "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Twombly*, 550 U.S. at 558 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  The *Twombly* Court further stressed that it is no answer to clarify ambiguous allegations at a later stage of the litigation:  "groundless" claims will not simply be "weeded out early in the discovery process" because the mere "threat of discovery expense will push cost-conscious defendants to settle even anemic cases" before summary judgment.  *Id.* at 559.

## ARGUMENT

The Complaint does not adequately allege a conspiracy for three primary reasons.

*First*, the Complaint does not allege facts showing that Defendants acted in parallel to reduce output or to raise prices for broilers.  While the Complaint alleges that some (but not all) Defendants reduced output occasionally, the alleged conduct is widely divergent and not parallel. In fact, the Complaint reveals that Defendants often acted inconsistently with the claimed conspiracy, and when some reduced output, there were obvious alternative explanations for

13

doing so.

*Second*, the Complaint does not allege facts that make a conspiracy plausible. Indeed, the allegations in the Complaint demonstrate the *implausibility* of the alleged conspiracy. Foremost, both the Complaint and data relied on by DPPs show that U.S. production of broilers *increased overall* during the Class Period, totally at odds with the claimed conspiracy. Additionally, the Complaint reveals that the broiler industry is unconcentrated. Forming and operating a conspiracy involving 17 firms over nearly a decade would require complex negotiations not alleged here, and any such conspiracy would be vulnerable to being undercut by the nearly 20 other non-participating producers (which further diminishes the chance that a conspiracy would even form in the first place). The alleged conspiracy also would require an elaborate enforcement mechanism, and DPPs plead nothing plausible in that regard. Although DPPs purport to allege "plus factors," their claimed plus factors fall woefully short of making a conspiracy plausible.

*Third*, DPPs' claim is time barred. They base their claim on public statements made more than six years ago despite a four year limitations period under the Sherman Act.

## I.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE A CONSPIRACY

The Complaint must be dismissed because it does not allege adequate facts supporting the claim that any Defendant *agreed* with any other Defendant to reduce output. As an initial matter, DPPs' case is entirely circumstantial; they do not even attempt to allege facts directly establishing a conspiracy. *High Fructose Corn Syrup*, 295 F.3d at 662. And the Complaint's circumstantial allegations do not come close to pleading an agreement. Indeed, DPPs allege very few facts at all about the claimed agreement, such as how and when it formed. Most significantly, the Complaint fails to allege parallel conduct, which is essential to stating a claim

14

for conspiracy (but still insufficient on its own to survive a motion to dismiss).

### A. Plaintiffs Fail to Sufficiently Allege Parallel Conduct.

Because DPPs rest their claim entirely on circumstantial allegations, they cannot survive a motion to dismiss unless they allege facts showing that Defendants reduced production in a parallel manner that suggests a conspiracy. *See Beef Indus.*, 907 F.2d at 514 (disregarding allegations beef producers exchanged pricing information because plaintiffs "must first demonstrate that the defendants' actions were parallel"); *Willow Creek Fuels, Inc. v. Farm & Home Oil Co.*, No. 08-5417, 2009 U.S. Dist. LEXIS 85400, at *12 (E.D. Pa. Sept. 18, 2009) (dismissing antitrust conspiracy claim where plaintiff did "not even allege parallel conduct"). However, the Complaint itself demonstrates there was nothing parallel about Defendants' alleged actions.

### 1. Plaintiffs' Own Allegations Illustrate the Lack of Parallel Conduct.

Although DPPs contend that Defendants "coordinat[ed] their output," SCAC ¶1, the Complaint does not actually allege that all Defendants reduced output, and where it does allege production-related actions, they are not parallel, but vary significantly in their timing, amounts, and methods.

**Timing**. The output reductions alleged in the Complaint are spread across a lengthy period and do not reflect actions by all, or even most, producers in close proximity to one another. The timing of production decreases is particularly significant in the broiler industry because demand is seasonal. *See id.* ¶157 (discussing the "high-demand summer grilling season"). Thus, lowering supply during the summer when sales are higher is very different than making reductions later in the year, when fewer consumers buy chicken.

Between 2012 and 2016 combined (*i.e.*, the four-year claim period under the statute of

limitations), the Complaint alleges that a total of only *three* claimed conspirators decreased their output.[10] *Id.* ¶¶227, 231, 232; *see also* Appx. B (chart of alleged production decisions). In other words, over a period of five years – more than half of the alleged Class Period – DPPs *do not identify a single production cut* by *eleven* Defendants (or any of the three alleged co-conspirator producers). For 2009-10, DPPs allege (at most) that just *four* companies lowered production.[11] *Id.* ¶¶184-87, 383E.

Although DPPs allege more output reductions in 2008 and 2011, those cuts still were not parallel in their timing because they occurred sporadically throughout the year. *See* Appx. B. For example, for 2011 DPPs assert that, of the 17 claimed conspirators, one reduced production at one plant in February, SCAC ¶200, another in June, *id.* ¶212, a third made its "normal fall production cut" in November, *id.* ¶218, and two made reductions at an unknown time (one of which was "unspecified"), *id.* ¶¶204-05. Also in 2011, five other companies allegedly laid off employees, closed plants, or canceled expansion plans over the course of the year (as explained below, such alleged production decisions are entirely different than alleged explicit production cuts).[12] *Id.* ¶¶199, 201, 203, 215, 217, 222. Additionally, some Defendants allegedly decreased production just once in some periods, while others did so multiple times. *Compare id.* ¶170, *with* ¶¶150D, 163. In other words, DPPs fail to allege Defendants' output cuts took place "at the very same time." *Text Messaging*, 630 F.3d at 628 (quoting *Twombly*, 550 U.S. at 557 n.4).

**Amounts**. In many cases the Complaint does not even allege the amount of a claimed production cut. *See, e.g.*, ¶¶185, 212. For the 20 instances where DPPs do allege a particular

---

[10] Some allegations fail to specify when during the year a producer reduced output. *Id.* ¶188. Other allegations merely reference announcements of planned cuts but do not follow through with allegations confirming the timing at which the cuts actually occurred. *Id.* ¶151.

[11] As discussed further below, not all of the alleged output cuts were actually cuts.

[12] And some of the alleged plant closures concern "further processing facilities" that are not even the subject of the alleged conspiracy. SCAC ¶169 n.7

Americas 92415189

percentage reduction, they allege *11 different amounts between 1.25% and 10%.* The most common percentage decrease alleged in the Complaint is 5%, which occurs just four times. Sometimes DPPs do not even specify the amount of an alleged cut, and they instead provide a range, such as "2-8%." *See, e.g.*, *id.* ¶151D. But the difference between 2% and 8% is substantial. It is implausible that a producer would agree to give up 8% of its sales while its rivals give up only 2%. *See, e.g.*, *Williamson Oil Co v. Philip Morris USA*, 346 F.3d 1287, 1321 (11th Cir. 2003) (alleged conspiracy that reduced some defendants' market shares significantly more than others' shares "makes little sense").

**Methods**. The alleged production decisions also took disparate forms, including reducing egg sets, reducing capacity, canceling deboning contracts, and announcing layoffs.[13] *See* SCAC ¶¶158, 166, 168, 172. For instance, throughout the year 2008 DPPs claim some Defendants prospectively announced production cuts (implemented by different methods), *e.g.*, *id.* ¶151, they claim that others abandoned plans to expand by building new facilities, *e.g.*, *id.* ¶¶165, 176, and still others announced layoffs, *e.g.*, *id.* ¶172. These decisions are far from parallel. For example, what company would agree to close a plant in exchange for a competitor merely reducing its egg sets? While egg sets can be adjusted, closing a plant may be irreversible and would likely have far-reaching consequences that go beyond production levels, such as employee lawsuits, public relations issues, accounting and tax ramifications, and more.

Moreover, some actions that DPPs attempt to portray as production cuts are not reductions at all. For example, the Complaint alleges that Foster Farms elected not to build a new plant in 2008. *Id.* ¶165. But the alleged decision to defer or cancel new construction can

---

[13] Although Plaintiffs make the conclusory assertion that the alleged conspirators made "unprecedented" cuts to breeder flocks, SCAC ¶191, they do not allege *facts* showing that even one producer did so, let alone that all 17 did so at approximately the same time.

17

hardly be called an output "reduction."  Similarly, DPPs claim that Mountaire Farms abandoned a *capacity increase* in April 2011, *id.* ¶203, but that says nothing about how much Mountaire was producing.  Additionally, employee layoffs, plant closures and the like do not necessarily result in an overall decrease in production.[14]

In short, because the alleged production decisions differ in their timing, amounts, and methods, they are not parallel, and they do not plausibly suggest that they were made by *agreement.  See, e.g.*, *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2011) (holding plaintiffs had not alleged parallel conduct when defendants acted differently and "at different time periods"); *In re Baby Food Antitrust Litig.*, 166 F.3d at 128-32 (affirming summary judgment for defendants because plaintiffs were "unable to show that defendants' prices moved in a parallel fashion"); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 884 (9th Cir. 1982) (holding conduct not parallel because there was "considerable variation" in defendants' practices); *Campos v. BP Prods. N. Am., Inc.*, No. 13 CV 8376, 2014 U.S. Dist. LEXIS 159242, at *29 (N.D. Ill. 2014) (Shah, J.) (dismissing civil conspiracy claims as "particularly insufficient" because defendants acted in "non-overlapping time periods"); *RxUSA Wholesale, Inc. v. Alcon*

---

[14] For example, DPPs cite an article stating that Tyson planned to "increase efficiencies" by closing a plant in Buena Vista, Georgia and eliminating a shift at a facility in Dawson, Georgia.  *Id.* ¶256.  The same article, however, states that Tyson was *expanding* a plant in nearby Vienna, Georgia, adding more than 700 jobs.  David Allison ed., *Tyson Foods to Close Georgia Chicken Plant, Cut 190 Jobs*, Atlanta Bus. Chronicle (May 4, 2015), available at http://www.bizjournals.com/atlanta/news/2015/05/04/tyson-foods-to-close-georgia-chicken-plant.html.  Moving production from one location to another has no impact on overall output.  DPPs cite a 2011 press release stating Simmons was laying off 180 workers, *id.* ¶201, but the same release shows a year-over-year employment *increase* of 300 workers company-wide. *See* Serenah McKay, *Simmons Foods to Cut 180 Jobs As Grain Prices Rise*, Ark. Bus. (Mar. 16, 2011), available at http://www.arkansasbusiness.com/article/34877/simmons-foods-to-cut-180-jobs-as-grain-prices-rise.  And the Complaint alleges that Pilgrim's announced a layoff of 190 employees in Chattanooga, Tennessee in 2012, *id.* ¶232, but the source article states expressly that Pilgrim's output would *not* decline and also notes that the industry overall was adding production in the region.  *See* Carey O'Neil, *Pilgrim's Pride Announces 105 More Layoffs in Chattanooga*, Times Free Press (June 6, 2012), available at http://www.timesfreepress.com/news/business/aroundregion/story/2012/jun/06/66c1pilgrimsprideannounces105morelayoffs/79655/.

Americas 92415189

*Labs., Inc.*, 661 F. Supp. 2d 218, 231 (E.D.N.Y. 2009) (dismissing refusal-to-deal complaint where some defendants did not provide any response to plaintiffs' proposal while those that did gave different reasons for their decisions to decline plaintiffs' proposal); *Gupta v. St. Margaret Mercy Healthcare Ctrs., Inc.*, No. 2:95 CV 310, 1998 WL 34360626, at *13 (N.D. Ind. Apr. 22, 1998) (holding "there [wa]s no way to conclude that a conspiracy existed" when plaintiffs failed to "allege facts" to show how defendants "acted together"); *Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.*, 408 F. Supp. 1251, 1277 (S.D.N.Y. 1976) ("[M]ore than a general similarity of action is required for a finding of consciously parallel behavior.").

The failure to allege parallel conduct dooms DPPs' claims, *see, e.g.*, *Beef Indus.*, 907 F.2d at 514, and distinguishes this case from others in which plaintiffs plausibly alleged parallel action. *See, e.g.*, *Text Messaging*, 630 F.3d at 628 (plaintiffs alleged "*all at once* the defendants changed their pricing structures, which were heterogeneous and complex, to a *uniform* pricing structure, and then *simultaneously* jacked up their prices by a third") (emphasis added).

### 2. The Complaint Also Concedes Many Defendants Acted Contrary to the Alleged Conspiracy.

The lack of parallel conduct is underscored by the many instances, recited in the Complaint, in which Defendants allegedly acted directly contrary to the claimed conspiracy. For example, the Complaint admits that Defendants "oversuppl[ied]" in 2009 and 2010. SCAC ¶193. The Complaint also reveals that individual Defendants increased their output at various times during – and sometimes throughout – the alleged conspiracy period:

- **Tyson**, the largest producer in the U.S., increased its production 6% in November 2008, just as the alleged conspiracy was beginning. *Id.* ¶179. The next year Tyson stated that it was "aggressively trying to grow our business." *See Tyson's Poultry Goes Back to Basics*, The Poultry Site (Feb. 18, 2009), available at http://www.thepoultrysite.com/poultrynews/17161/tysons-poultry-goes-back-to-basics/ (cited at SCAC ¶183).

19

- **Sanderson Farms** utilized a "build and grow" strategy and invested over $100 million during the alleged supply-reduction conspiracy to build and open a new production plant in 2010 (one of three new production facilities Sanderson opened during the alleged class period), SCAC ¶¶286, 322, causing its growth to far outpace demand, *id.* ¶281, and resulting in a significant increase to its market share, *id.* ¶286.

- **Koch** doubled its market share, including purchasing a bankrupt chicken producer and buying a broiler processing plant. *Id.* ¶286.

- **Peco** significantly expanded its market share and grew supply by as much as 10.2% per year, without ever allegedly reducing it during the Class Period. *Id.* ¶286; Gary Thornton, *Top 10 US chicken producers grow in new directions*, WATT PoultryUSA (Mar. 7, 2016), available at http://www.wattagnet.com/articles/25893-top---us-chicken-producers-grow-in-new-direction (cited at SCAC ¶262).

The Complaint makes no attempt to reconcile the growth of these Defendants with DPPs' overall claim of a conspiracy to cut output.

**B.     In Those Limited Instances Where a Defendant Allegedly Reduced Output, There Were Obvious Unilateral, Non-Conspiratorial Reasons for Doing So.**

No doubt DPPs will point to allegations that some Defendants decreased output at some point.  As explained above, that does not establish parallel conduct as a matter of law.  In any event, DPPs' allegations cannot suggest a conspiracy because there are "obvious alternative explanation[s]" for why some individual Defendants would elect to lower output.  *Twombly*, 550 U.S. at 567.  Specifically, the vast majority of the alleged output cuts occurred at a time of (1) record-high feed costs and (2) a devastating economic crisis.  *See supra* Background §B.  DPPs allege no facts plausibly suggesting that production decisions made in this context were conspiratorial, as opposed to independently rational responses to a volatile market, and thus they have not stated a conspiracy claim.  *See, e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (affirming complaint's dismissal where "manufacturers' similar response to . . . market pressure is a hallmark of independent parallel conduct – not collusion"); *Elevator Antitrust Litig.*, 502 F.3d at 51 (affirming dismissal because parallel actions could have resulted from "common perceptions of the market" (quoting *Twombly*, 550 U.S. at

20

554)); *accord In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 997 (N.D. Ill. 2011) ("Firms within a single industry often act in similar ways even though no coordination has taken place.").

### 1. Chicken Feed Costs Spiked in Both 2008 and 2011.

As explained above, chicken feed, which is mostly corn and soybeans, accounts for 50-71% of the production costs for broilers. *See supra* Background §B. When the price of both corn and soybeans hit record highs in 2008 and again in 2011, *id.*, the resulting increase in the cost of chicken feed created a substantial incentive for producers, acting independently, to reduce their output, particularly in a weak economy. For example, DPPs allege that "the commodity nature of broilers" prevents producers from passing on the "historic" rise in feed costs to consumers. SCAC ¶146. Thus, soaring input costs by themselves explain instances when some Defendants allegedly reduced their production. *See, e.g.*, *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 158 F. Supp. 3d 544, 567 (E.D. La. 2016) ("a 'rise in raw material costs' [i]s an 'independent explanation' for a price increase" (quoting 6 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶1434, at 269 (3d ed. 2010)); *In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895, 2009 U.S. Dist. LEXIS 14276, at *65 (N.D. Ga. Jan. 28, 2009) (dismissing allegations that trucking companies conspired to increase fuel surcharges because rising fuel prices made it "highly plausible that each carrier faced a similar profit shortfall"); *see also In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 399-400 (3d Cir. 2015) (holding evidence that "price increases were taken in anticipation of rising costs" does not create plausible inference of conspiracy); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1092 (9th Cir. 2015) ("[T]he cost of [tin inputs] only dropped in 2009 after having jumped, sharply, in 2008. . . . [Defendant] may have raised tin prices in 2009 to make up for losses

Americas 92415189

caused by skyrocketing material costs a year earlier – or as a hedge against future price increases in the market for component parts."); *cf. Text Messaging*, 630 F.3d at 628 (denying motion to dismiss where prices allegedly increased despite steeply falling costs).

### 2. The Great Recession Created Havoc for Broiler Producers.

The problems created for broiler producers by high feed costs were exacerbated by what DPPs concede was the "worst recession in generations." *See supra* Background §B. During an economic panic, when many producers were in financial straits and the Complaint states that there was an "oversupply" of broilers, *id.* ¶143, there is nothing unusual about individual firms electing to lower output to match the lower demand that each faced (particularly where, as here, they did not do so in lockstep). *See, e.g.*, *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 583-84 (1925) ("General knowledge that there is an accumulation of surplus of any market commodity would undoubtedly tend to diminish production . . . . The manufacturer is free to produce, but prudence and business foresight based on that knowledge influence free choice in favor of more limited production."); *see also Kolon Indus. v. E.I. du Pont de Nemours & Co.*, No. 3:11cv622, 2012 U.S. Dist. LEXIS 48722, at *41 n.12 (E.D. Va. Apr. 5, 2012) (declining to hold defendant's production cuts suggested anticompetitive market power where "the United States was facing an economic crisis in 2009"); *United States v. Gen. Motors Corp.*, No. 38219, 1974 U.S. Dist. LEXIS 6569, at *56-57 (E.D. Mich. Sept. 26, 1974) (holding decisions to eliminate certain sales programs was "reasonable" because "[t]he declining economy in 1969 and 1970 produced an urgent cost-reduction climate throughout the economy").[15]

---

[15] The severe economic downturn, including falling demand for broilers, distinguishes the allegations here from other cases that DPPs may argue are analogous, such as *Standard Iron Works*, *Plasma-Derivatives*, and *Kleen Products*. In those cases, defendants were alleged to reduce supply despite high and increasing demand. *See Std. Iron Works v. Arcelormittal*, 639 F. Supp. 2d 877, 893 (N.D. Ill. 2009) (demand "far exceeded domestic supply"); *Plasma-Derivative*, 764 F. Supp. 2d at 996 (defendants cut supply "even as

22

### 3. Because of the Combination of Steep Cost Increases and the Great Recession, Production Cuts Were in Individual Defendants' Independent Interests.

Individually, either the impact of the financial crisis or the rising cost of feed provides an obvious, non-conspiratorial reason for a company to reduce production. Together, they make clear the rationality of any Defendant's unilateral decision to cut output during these times. *See Brokerage Ins.*, 618 F.3d at 326 ("a claim of conspiracy predicated on parallel conduct should be dismissed if common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for defendants' common behavior") (internal quotation marks omitted); *Williamson Oil*, 346 F.3d at 1310 ("[W]e must exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest we be too quick to second-guess well-intentioned business judgments."). Further, the Complaint alleges no facts plausibly suggesting that it was against the independent interest of Defendants to decrease supply in such market conditions.

Tellingly, the Fifth Circuit recently addressed this very same issue, considering whether it was in Pilgrim's Pride's independent interest to reduce its chicken output in 2008 and 2009. *In re Pilgrim's Pride Corp.*, 728 F.3d 457 (5th Cir. 2013). The court expressly held that cutting production was unilaterally rational:

> [Pilgrim's Pride] was producing more chicken than the market appeared to need, and was thereby driving the market price of chicken down at great cost to itself. Recognizing the damage inflicted by its own excess production, [Pilgrim's] *wisely decided to stop flooding the market with unprofitable chicken*.

*Id.* at 462 (emphasis added). For the same reasons, DPPs cannot plausibly contend that any Defendant's output cuts at these times were contrary to its independent interest or suggestive of a

---

demand was increasing"); *Kleen Prods. LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1076 (N.D. Ill. 2011) ("reductions coincided . . . [with] high demand").

Americas 92415189

conspiracy.

### C.    The Complaint Alleges No Substantive Facts About the Claimed Conspiracy's Formation and Operation and No Conspiratorial Communications.

DPPs allege no facts regarding when, where, or by what means Defendants purportedly colluded, *supra* Background §A, and thus they advance nothing more than a "bare allegation of conspiracy" that must be dismissed. *Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 860 (7th Cir. 1999) (dismissing conspiracy claims that failed to identify "when an agreement between . . . defendants was formed, what its terms were . . . or what [defendant]'s role was") (Posner, C.J.).[16]

DPPs also fail to allege a single conspiratorial communication (instead relying exclusively on putative signaling), even though communications would be critical to the operation of a conspiracy involving 17 companies and lasting over eight years. *See* Richard A. Posner, *Antitrust Law* 66 (2d ed. 2001) ("[L]aunching a cartel may require elaborate negotiations among the parties . . . .  The costs of negotiation rise rapidly with the number of parties to the negotiation . . . .  It is unlikely that a large number of firms could accomplish the complex and delicate task of effectively coordinating their pricing without generating abundant evidence of conspiracy.").[17]

---

[16] *See also, e.g.*, *Musical Instruments*, 798 F.3d at 1190 (affirming dismissal of complaint where "plaintiffs failed to identify in their complaint 'who is alleged to have conspired with whom, what exactly they agreed to, and how the alleged conspiracy was organized and carried out'" (citation omitted)); *Campos*, 2014 U.S. Dist. LEXIS 159242, at *29 (dismissing civil conspiracy claim where "plaintiffs say nothing about when the agreement took place, what form it was in, or which defendants participated"); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1075 (E.D. Cal. 2011) (dismissing claim where plaintiff alleged no details of agreement); *In re Late Fee & Over-Limit Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) (dismissing claim that "provides no details as to when, where, or by whom this alleged agreement was reached").

[17] *See also Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 139-40 (2d Cir. 2013) (affirming dismissal of complaint alleging only scattered interfirm communications); Gregory J. Werden, *Economic Evidence on the Existence of Collusion: Reconciling Antitrust Law with Oligopoly Theory*, 71

24

DPPs' inability to allege conspiratorial communications or facts relating to the formation and execution of the conspiracy is fatal to their claim (and underscores their broader failure to adequately allege facts suggesting an agreement).

## II.     THE COMPLAINT'S ALLEGATIONS MAKE A CONSPIRACY IMPLAUSIBLE.

Having failed to allege parallel conduct, DPPs' so-called plus factors are irrelevant, because such "plus factors are only supplemental to a threshold showing of parallel behavior." *Resco Prods. v. Bosai Minerals Grp. Co.*, 158 F. Supp. 3d 406, 423 (W.D. Pa. 2016); *see also In re Baby Food Antitrust Litig.*, 1997 U.S. Dist. LEXIS 24488, at *28 (D.N.J. July 25, 1997) ("The very notion of 'plus' factors is that they are 'plus,' or in addition to, evidence of parallel pricing."); 6 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶1433e (3d ed. 2010) (plus factors are "a prerequisite to finding that parallel action amounts to a conspiracy"). Yet the additional facts alleged in the Complaint are nevertheless critical here, because they make DPPs' alleged conspiracy *less plausible*, not more so, and indeed provide an independent basis for dismissing the Complaint. In particular, the Complaint shows that (a) broiler production increased rather than decreased during the alleged conspiracy, (b) the broiler industry is too diffuse for a nationwide conspiracy, and (c) there is no plausible way for cartel members to enforce compliance with any conspiracy. Moreover, DPPs have not alleged any other facts that might "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

---

Antitrust L.J. 719, 780 (2004) ("an agreement should not be inferred absent some evidence of communications of some kind among the defendants through which an agreement could have been negotiated."); Edward J. Green et al., *Tacit Collusion in Oligopoly, in* 2 The Oxford Handbook of International Antitrust Economics at 486 (Roger D. Blair & D. Daniel Sokol eds., 2015) ("[B]ecause most market environments are sufficiently complex that there are numerous possible ways to collude, none of which will work unless it is adopted by all of the significant market participants, . . . it is difficult, and probably rare, for successful collusion to obtain in the absence of explicit communication.").

25

**A.      The Premise of the Alleged Conspiracy Is Flawed:  the Complaint Reveals Defendants *Increased* Broiler Production During the Class Period.**

The crux of the Complaint is that Defendants conspired to fix prices by reducing broiler production.  But this core contention is eviscerated by the Complaint itself and the data it relies upon.  In fact, broiler production increased almost every year during the Class Period, and it increased 8.5% overall during that time, even as production of other proteins declined.  *See supra* Background §B.  That broiler production increased at precisely the time DPPs allege a conspiracy to lower output highlights the implausibility of the claimed conspiracy.

**B.      The Structure of the Industry Renders a Conspiracy Highly Implausible.**

The broiler industry includes about 35 producers, only 17 of which are alleged in the Complaint to be conspirators.  *See supra* Background §A.  According to the Herfindahl-Hirschman Index ("HHI"), such an industry is unconcentrated.[18]  Specifically, based on the market shares alleged in the Complaint for 2011, the HHI of the broiler industry is 1014, which qualifies as "unconcentrated" under standards published by United States antitrust authorities.[19]  *See* Merger Guidelines at 19 (industries with an HHI under 1500 are "unconcentrated").

As numerous authorities have recognized, a conspiracy to cut production is not plausible in such an unconcentrated industry.[20]  *See Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103

---

[18] HHI is "a commonly accepted measure of market concentration" used by many economists.  U.S. Dep't of Justice, *Herfindahl-Hirschman Index*, available at https://www.justice.gov/atr/herfindahl-hirschman-index; *see also* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* 18 (Aug. 19, 2010) ("Merger Guidelines").

[19] Appendix C shows how the HHI was calculated based on the Complaints' allegations.  This Complaint-based HHI is very similar to the HHI reported in a 2010 study cited in the Complaint (SCAC ¶¶93, 116), which determined the HHI for ready-to-cook chicken production in the U.S. is 979.  Thomas E. Elam, *Competition in the U.S. Chicken Sector* 3 (FarmEcon LLC 2010).  For the broiler industry to be "highly concentrated," its HHI would need to more than double to 2,500.  Merger Guidelines at 19.

[20] Other aspects of the broiler industry compound the difficulties of conspiring to cut production.  For example, Defendants' different sizes, varying production capabilities, and dispersed locations all would make it harder for them to align production to prevent one company from sacrificing more in sales than

26

F.3d 42, 45 (7th Cir. 1996) (affirming dismissal of complaint against newspapers and news syndication services where news sources "are unconcentrated and therefore do not facilitate tacit collusion in the more concentrated [readers'] market"); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 443 (9th Cir. 1990) ("[I]n highly unconcentrated markets, a claim that price increases were the result of sequential interdependent price increases is often likely to prove implausible."); Merger Guidelines 25 (2010) ("unconcentrated markets are unlikely to be vulnerable to coordinated conduct").[21]

Another obstacle to DPPs' alleged conspiracy is that more than a dozen broiler producers are not alleged to be conspirators. *See* SCAC ¶284. These non-conspirator producers could effectively make any conspiracy unworkable if they were to increase their output to take advantage of cuts made by Defendants. Thus, it would make little sense for Defendant producers to conspire to lower their own production unless the non-conspirators were "unable to expand output sufficiently to drive the price back down to the competitive level." *See Text Messaging*, 782 F.3d at 871. But DPPs do not allege the non-conspirator producers lacked excess capacity.

### C. The Claimed Conspiracy Is Also Implausible Because it Lacks an Enforcement Mechanism.

Further rendering the alleged conspiracy implausible is the fact that DPPs do not allege an enforcement method. There can be no cartel (and certainly not an eight-year cartel with 17 members) without an enforcement method to deter participants from cheating on the conspiracy.

---

others. Further complicating matters, broiler demand fluctuates depending on the time of year, so the producers would have to adjust their production plans seasonally. *See* SCAC ¶¶141, 157.

[21] The number of competitors and unconcentrated nature of the broiler industry distinguish this case from cases involving concentrated industries where courts denied motions to dismiss. *See In re Text Messaging*, 782 F.3d at 870 (four companies had 90% share); *Std. Iron Works*, 639 F. Supp. 2d at 881 (eight manufacturers controlled 80-85% of production); *Plasma-Derivative*, 764 F. Supp. 2d at 994 (two of five companies made 60% of sales); *Kleen Prods.*, No. 1:10-cv-5711, Pl.'s Opp. to Mot. to Dismiss, ECF 175 at 6 (N.D. Ill. Mar. 3, 2011) (eight producers sold 83% of product); *Potash*, 667 F. Supp. 2d at 915 (six firms had 71% share).

Americas 92415189

*See, e.g.*, *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1233 (3d Cir. 1993) ("a cartel cannot survive absent some enforcement mechanism"); *Eddins v. Redstone*, 134 Cal. App. 4th 290, 314 (Cal. Ct. App. 2005) (affirming summary judgment under California antitrust law where "no evidence indicates [defendant] 'enforced' the alleged agreement . . . and indeed no evidence showed any mechanism by which [defendant] *could* enforce such an agreement") (emphasis in original) (citing *Petruzzi's*, 998 F.2d at 1233). Notably, DPPs do not allege a single instance when Defendants enforced the claimed cartel, despite conceding that multiple Defendants increased production contrary to the claimed conspiracy. *Supra* §I.A.2. The failure to allege a plausible enforcement method – or enforcement efforts – underscores the implausibility of the Complaint.

The closest DPPs come to alleging an enforcement mechanism is to claim that Tyson has "leverage over other Defendants to mandate compliance," because its subsidiary Cobb-Vantress, which sells breeder stock for broilers, can withhold breeder hens from non-complying companies or provide them with "inferior" or "sick" breeder hens. *See* SCAC ¶¶275-76. These allegations fall short of establishing a plausible enforcement mechanism for a host of reasons, and even provide reasons why producers would choose *not* to conspire: (1) DPPs allege that Defendants buy breeder stock from two other companies with a combined market share of about 50% that are not part of the alleged conspiracy, *id.* ¶275, which neutralizes Tyson's claimed "leverage"; (2) DPPs do not allege that all Defendants purchase breeding stock from Cobb-Vantress, which would be necessary for Tyson to have "leverage" over them, and no company would agree to participate in a conspiracy in which it could be punished but others could not; (3) it is implausible that each participant in an unlawful conspiracy would consent to giving all enforcement power to a single competitor; (4) it is even less plausible that Perdue would give up

28

its own "leverage" by selling its existing genetics business in the middle of the alleged conspiracy, *id.* ¶250; and (5) it strains credulity to claim that Tyson would risk the long-term business prospects of Cobb-Vantress by "manipulat[ing]" its products to make them inferior and driving its customers to financial ruin, *see id.* ¶278.

> ### D. Plaintiffs Fail to Allege Plausible Plus Factors.

Given the absence of parallel conduct and the many allegations in the Complaint demonstrating the implausibility of the alleged conspiracy, plus factors cannot save DPPs' claim. Nevertheless, the Complaint asserts five categories of "plus factors," which it describes as (1) "information sharing through Agri Stats," (2) "opportunities to collude," (3) "a coordinated change from contracts with fixed Broiler prices to Broiler prices that float," (4) "inter-Defendant trades and purchases," and (5) "multiple industry characteristics which facilitate collusion." *Id.* ¶10. DPPs also attempt to insinuate a conspiracy by citing alleged public comments by a handful of Defendants (*i.e.*, claimed "signaling"). For example, they contend that Defendants "confirmed" their commitment to the alleged agreement through public statements about "discipline." *Id.* ¶139. None of these allegations, individually or collectively, states a Section 1 conspiracy claim.

> ### 1. Plaintiffs Fail to Plausibly Allege That Defendants "Signaled" One Another Through Public Statements.

DPPs allege that some Defendants made public statements that DPPs contend are somehow suggestive of a conspiracy. However, where a public announcement has a non-conspiratorial purpose, courts do not hesitate to reject the argument that such statements support a conspiracy claim. *See, e.g., Petroleum Prods.*, 906 F.2d at 447-48 & 448 n.14 (distinguishing between public comments with no purpose but facilitating conspiracy and those with a legitimate purpose such as allowing "consumers to get the information they need"); *Reserve Supply Corp.*

Americas 92415189

*v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 52 (7th Cir. 1992) ("the industry practice of maintaining price lists and announcing price increases in advance does not necessarily lead to an inference of price fixing" because of benefit to public).

Here, the Complaint admits that many of the alleged statements had purposes wholly apart from conspiracy, such as to "lobby the federal government to limit the ethanol subsidy" or "in response" to questions from shareholders. SCAC ¶¶161, 167. Moreover, most of the statements were made by publicly traded companies that are required by law to provide information to investors.[22] *See, e.g.*, 17 C.F.R. § 229.303(a)(3)(ii) (2017) (public company must describe factors it "reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income"). Instead of suggesting a conspiracy, these statements to investors are unremarkable, compulsory disclosures about the state of the company and the industry more generally. *See Plasma-Derivative*, 764 F. Supp. 2d at 1001 ("[M]any of the public statements . . . are very general statements to investors or regulators about the trajectory of the plasma therapies industry. . . . It is difficult to imagine how these generic statements render the conspiracy allegation more plausible."); *Std. Iron Works*, 639 F. Supp. 2d at 894 ("Public statements about output reduction, in the form of press releases or SEC filings, are fundamentally distinct from statements made at trade meetings directly to competing executives").

For example, DPPs allege that a statement during a 2008 Tyson earnings call that it had "no choice [but] to raise prices substantially" shows that Tyson knew other producers would reduce output. SCAC ¶146. The statement, of course, suggests no such knowledge. As an initial matter, the statement says nothing about other producers or production levels. Moreover, Tyson had just disclosed that its annual chicken feed costs likely would be *more than $200*

---

[22] Tyson Foods, Pilgrim's Pride, and Sanderson Farms are all publicly traded.

*million* higher than the company had anticipated just a few months before, and at the same time it disclosed that chicken prices were not rising as fast as prices for "other food staples." *See* Transcript of Q1 2008 earnings call by Tyson Foods, Inc. (Jan. 28, 2008) (quoted at SCAC ¶146). In such circumstances, the need for a price increase is obvious, and the statement is exactly what one would expect Tyson to tell its investors.

Similarly, although DPPs allege that Sanderson Farms signaled the market to reduce supply on January 31, 2008 when speculating "we could see some reductions in production" in the February through April 2008 time frame, SCAC ¶148, an earnings call transcript from the next month (quoted in the same paragraph of the Complaint) reveals that Sanderson publicly announced an increase in its own production due to the opening of its new Waco facility during that same timeframe.[23] The Complaint also alleges a "signal" by Sanderson Farms on an August 26, 2008 earnings call when discussing potential industry production cuts, *id.* ¶171, despite Sanderson announcing on the very same call that it had processed 22.5% more pounds of chicken in the most recent quarter.[24]

DPPs also claim that Defendants used the word "discipline" in public statements to "signal" each other. *Id.* ¶¶139, 269, 380. DPPs allege, however, just a handful of such statements over nine years, and two of those statements are by third parties. *Id.* ¶¶194, 221. The others are backward-looking statements made by the same person. *See, e.g.*, *id.* ¶¶243, 336. The use of the word "discipline" by a single employee of one Defendant does not plausibly suggest that 14 "Defendants repeatedly confirmed" their commitment to an agreement. *Id.* ¶139.

Furthermore, many of the statements recited in the Complaint are flatly inconsistent with

---

[23] Transcript of Q1 2008 earnings call by Sanderson Farms, Inc., Exhibit to 2008 SEC 8-K (Feb. 26, 2008) (quoted at SCAC ¶148).

[24] Transcript of Q3 2008 earnings call by Sanderson Fars, Inc., Exhibit to 2008 SEC 8-K (Aug. 26, 2008) (quoted at SCAC ¶171).

Americas 92415189

the alleged conspiracy. For example, DPPs allege that, in November 2008, Tyson stated it "would not be making additional production cuts," *id.* ¶178, and a month later Tyson refused to disclose its production levels on an earnings call, *id.* ¶180. Similarly, DPPs allege that Tyson told investors in February 2009 that it did not intend to reduce production. *Id.* ¶184. Although DPPs attempt to spin such statements as "posturing," a company's announcement that it will not cut its production is obviously in conflict with an alleged conspiracy to reduce supply that is "signaled" through public encouragement of production cuts. In addition, other statements alleged in the Complaint show that, instead of knowing their competitors' production plans, Defendants were *uncertain* about future broiler output. *See, e.g.*, *id.* ¶171 ("we kind of thought we were going to see reductions in July . . . and that really did not materialize"), *id.* ¶244 ("Do I know what's going to happen in June or July or August of this year with respect to breeder placements, I don't know that"). These statements only render more implausible DPPs' conspiracy theory because, if there were a preceding agreement among Defendants, they would not resort to (wrong) speculation about broiler production.

### 2. Agri Stats Does Not Suffice to Make a Conspiracy Plausible.

DPPs claim that Defendants' use of benchmarking services from third-party Agri Stats is a "plus factor" and Agri Stats is somehow central to the claimed conspiracy.[25] *Id.* ¶¶8, 10 (Agri Stats "effectuate[d]" the conspiracy). But these allegations do not withstand scrutiny.

*First*, competitors may lawfully share information with each other, even production and pricing information, which can facilitate efficient forecasting and planning. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) (information sharing can "increase economic efficiency and render markets more, rather than less, competitive"); *Maple Flooring*,

---

[25] Agri Stats is a subsidiary of Eli Lily & Co. that produces reports on the broiler industry and sells them to broiler producers. *Id.* ¶¶ 67, 116.

32

268 U.S. at 582-85 (endorsing dissemination of information "with respect to the production and distribution, cost and prices in actual sales, of market commodities"); *Gulliver's Periodicals, Ltd. v. Charles Levy Circulating Co.*, 562 F. Supp. 539, 542 (N.D. Ill. 1981) (holding "mere exchange of information" does not show conspiracy).[26]

Thus, the mere use of a third-party benchmarking service does not render a conspiracy plausible. DPPs' claims to the contrary risk chilling permissible conduct. *See Maple Flooring*, 268 U.S. at 583-84 ("It was not the purpose or the intent of the Sherman Anti-Trust Law to inhibit the intelligent conduct of business operations.").

*Second*, DPPs suggest that the mere existence of Agri Stats indicates collusion, SCAC ¶134, but there is nothing new about Agri Stats's reporting. Agri Stats was in business long before the alleged conspiracy period, and it provides services to the turkey and swine industries in addition to the broiler industry. *Supra* at Background §A. DPPs do not attempt to explain how a long-running service used by broiler, turkey, and swine producers suddenly became central to a broiler conspiracy in 2008. Courts routinely reject efforts to depict long-standing practices as reflective of a more recent conspiracy. *See, e.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d 1028, 1033-34 (7th Cir. 2002) (rejecting argument defendants conspired "because . . . the chargeback system was adopted before the alleged collusion of the manufacturers began and because the system is supported by commercial reasons independent of any desire to . . . to facilitate collusive pricing"); *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 850 F. Supp. 470, 480 (E.D. Va. 1994) (dismissing Sherman Act claim because contracts at

---

[26] *See also, e.g.*, *Prosterman v. Am. Airlines*, No. 16-cv-2017, 2016 U.S. Dist. LEXIS 170125, at *5 (N.D. Cal. Dec. 8, 2016) (ECF 107) (dismissing price-fixing claim where defendants allegedly sent fare data to third party, which distributed the data to defendants); *Superior Offshore Int'l, Inc. v. Bristow Group*, 738 F. Supp. 2d 505, 513 (D. Del. 2010) (dismissing complaint despite allegations defendants exchanged information about capacity and costs); *LTL Shipping*, 2009 WL 323219, at *12-13 (dismissing complaint alleging defendants shared price data on their websites).

Americas 92415189

issue were used before alleged conspiracy); Earl W. Kinter et al., 2 Federal Antitrust Law § 11.4 (Matthew Bender 2015) ("[T]hat a practice began before the alleged conspiracy began tends to show that there is an independent justification for the practice.").

Additionally, Agri Stats is just one of many entities – including federal and state governments and third parties – that collect and distribute information about the broiler industry. *See, e.g.*, SCAC ¶¶91-92.  For example, a USDA service (NASS) publishes reams of data about different agricultural products, including dozens of categories of data for "Chickens" alone.  *See, e.g.*, NASS, Quick Stats, available at https://quickstats.nass.usda.gov/.  NASS notes that "[h]igh-quality statistical information is essential to those involved in agriculture."  NASS, Fact Finders for Agriculture 7 (2016), available at https://www.nass.usda.gov/About_NASS/pdf/NASSFactFinders_April_2016_FINAL.pdf (last visited Jan. 25, 2017).

*Third*, DPPs offer no reason to believe Agri Stats is an "agent and/or co-conspirator of Defendants."  SCAC ¶67.  The Complaint does not allege that Agri Stats benefits from reduced output or increased broiler prices, or that it earns money from broiler sales.  Nor is there any contention that Defendants would stop buying Agri Stats reports, which they obtained for many years before the Class Period, but for the alleged conspiracy.  *See Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 994-95 (4th Cir. 1990) (affirming dismissal of case alleging schools conspired with photographers because "appellants ha[d] articulated no motive the schools might have to engage in such a conspiracy").

*Fourth*, although DPPs claim that Agri Stats is some sort of secret, the Complaint itself reveals that Defendants have publicly disclosed their use of Agri Stats numerous times.  *See* SCAC ¶¶119, 123, 131, 132, 209, 336.  That multiple Defendants would speak so candidly about the program undermines DPPs' claims that Defendants were trying to keep it secret and,

34

moreover, that Agri Stats was the linchpin of a conspiracy.

### 3. Plaintiffs' Georgia Dock Allegations Only Underscore the Implausibility of Their Claim.

In the most recent amended complaint, DPPs depart from their claim about a conspiracy to reduce production to assert that "certain Defendants" also conspired to inflate a pricing survey conducted by the Georgia Department of Agriculture, known as the "Georgia Dock" price. SCAC ¶97-115. DPPs fail to allege any connection between their Georgia Dock theory and their theory that Defendants conspired to reduce output, and the combination of the two theories makes neither any more plausible.[27] The disconnect between DPPs' Georgia Dock allegations and their other allegations is substantial. For example, DPPs allege that only seven of 14 Defendants report prices to the GDA. *Id.* ¶100. DPPs also claim that Defendants began conspiring to reduce output in 2008, but they allege the Georgia Dock price did not begin to depart from other price surveys until "around January 2015" – seven years later. *Id.* ¶102.

DPPs' Georgia Dock theory also suffers from many of the same flaws as their output-based allegations. For example, the Complaint provides no meaningful details of the alleged agreement, let alone allegations of how seven Defendants coordinated prices that they submit individually on a weekly basis. DPPs also do not identify any inter-firm communications relating to Georgia Dock prices, even though an attempt to "manipulate" those prices each week would have required frequent and detailed discussions. *See id.* ¶100.

In addition, the Complaint itself reveals the implausibility of any Georgia Dock conspiracy by showing that it cannot be enforced. According to DPPs, if a producer reports a price to the GDA that is "more than one cent above or below" the prices reported by other

---

[27] Defendants are addressing the claim as alleged, but reserve the right to argue that the alleged conspiracy related to the Georgia Dock allegations is entirely separate from the earlier output reduction conspiracy or conspiracies alleged elsewhere in the Complaint.

Americas 92415189

producers, that price is excluded from the final calculation of the Georgia Dock price. *Id.* ¶100. The Complaint alleges that one company "deliberately submit[s] a low [Georgia Dock price] that they know will be kicked out" of the Georgia Dock calculation. *Id.* ¶104. However, DPPs do not allege that other Defendants were even aware of the low bids, let alone that they punished the company that submitted the low bids. Having effectively conceded that the alleged manipulation scheme is not and cannot be enforced, the conspiracy claim is implausible. *See supra* §II.C.

Rather than allege actual conspiratorial conduct, DPPs effectively ask the Court to infer that Defendants are conspiring because the Georgia Department of Agriculture survey prices differ from prices reported by other services, namely Urner Barry and USDA. SCAC ¶103. But the fact that different pricing services, surveying different producers in different geographies, report different prices does not suggest a conspiracy. For example, the Georgia Dock price survey is based only on prices reported by broiler producers in Georgia, the survey is weighted depending on each company's sales in Georgia, and the survey is focused on 2.5-to-3 pound broilers.[28] *Id.* ¶¶100-01. None of the other services are alleged to be limited in this way. In addition, the Complaint shows that there have been other times when Georgia Dock prices diverged from prices reported by other services. For example, the spread between the Georgia Dock price and the USDA price was much wider in 2009 than 2007, and in 2013 the Urner Berry and USDA prices increased much more rapidly than the Georgia Dock price. *Id.* ¶89. In the face of such obvious non-conspiratorial explanations, DPPs' conclusory allegations are patently insufficient to state a claim.[29]

---

[28] As noted above, the average weight of broilers at slaughter has been increasing and far exceeds 2.5-3 pounds. *Supra* Background §B n.8.

[29] Additionally, the chart in the Complaint does not make an apples-to-apples comparison between the price reporting services. The values reported for Urner Barry and USDA are 6-month moving averages, but the value reported for Georgia Dock does not appear to be. SCAC ¶89.

Americas 92415189

### 4. Opportunities to Collude Do Not Plausibly Suggest Conspiracy.

DPPs also claim that Defendants are members of trade associations and have other "opportunities" to conspire, *id.* ¶¶297-318, but the Complaint alleges nothing approaching conspiratorial conduct during any of these "opportunities," and it is axiomatic that trade association activities are "not condemned or even discouraged by the antitrust laws." *Moore v. Boating Indus. Ass'n.*, 819 F.2d 693, 712 (7th Cir. 1987). Indeed, trade associations "often serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services." *Musical Instruments*, 798 F.3d at 1196 (9th Cir. 2015) (citing *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999)). Accordingly, virtually all courts have rejected as insufficient allegations of "opportunities" like those in the Complaint. *See, e.g.*, *Twombly*, 550 U.S. at 567 n.12; *Musical Instruments*, 798 F.3d at 1196 (affirming dismissal of complaint and stating "mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement"); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910-11 (6th Cir. 2009) (affirming dismissal of price-fixing claims despite allegations of parallel conduct and attendance at trade meetings).

### 5. "Industry Characteristics" Make a Conspiracy Implausible

Although DPPs contend that certain "industry characteristics" in this case are plus factors, as noted above, the most notable characteristic of the broiler industry is the sheer number of competitors, which makes a conspiracy implausible. *See supra* §II.B. The other factors alleged by DPPs do not make their conspiracy theory plausible, either. For example, allegations regarding government investigations in other decades or other countries are irrelevant, not least because Defendants are not alleged to operate production facilities in those countries. *See, e.g.*,

Americas 92415189

*In re Elevator Antitrust Litig.*, 502 F.3d at 52 (dismissing complaint and rejecting as inadequate "[a]llegations of anticompetitive wrongdoing in Europe"); *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1305 (N.D. Ga. 2002) (holding "nature of the market" not a plus factor where plaintiffs alleged "history of collusion"), *aff'd sub nom. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003); *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 798 (M.D. Pa. 2014) (noting that anticompetitive conduct "elsewhere in time or place does not generally allow the inference of an immediate conspiracy" (quoting 6 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶1421a, at 160 (3d ed. 2010) (internal quotation marks omitted)).  Allegations of similar cost structures also do not make the alleged conspiracy plausible.  *See Late Fee & Over-Limit*, 528 F. Supp. 2d at 964 (holding such allegations not "sufficient to infer a conspiratorial agreement").  Instead, they demonstrate why Defendants might unilaterally react similarly to the higher input prices and lower poultry demand identified by the Complaint.

> **6.  Plaintiffs' Allegations Regarding Contract Changes and Inter-Defendant Purchases – Each Relating to Only a Few Firms – Cannot Support the Inference of a Conspiracy.**

DPPs also claim "plus factors" based on alleged conduct by just a small number of the 14 Defendants.  These allegations cannot salvage DPPs' claim.

*First*, DPPs assert broadly that Defendants moved from fixed-price contracts to contracts that "float with the Broiler spot market."  SCAC ¶10.  But the Complaint identifies only Tyson and Pilgrim's Pride as having shifted from fixed-price to spot contracts.  *Id.* ¶¶208, 236.  DPPs' other allegations about contract changes are limited to two other companies and involve only shortening contracts, not reducing fixed-price contracts.  *Id.* ¶¶352-53.  In any event, such changes do not suggest a conspiracy because there are independent reasons for certain

Defendants to unilaterally revise their contracts: volatile chicken feed prices and the Great Recession. *See, e.g.*, Transcript of Q1 2008 earnings call by Tyson Foods, Inc. (Jan. 28, 2008) (quoted at SCAC ¶146) ("customers realize that we are experiencing this higher grain price" and Tyson was doing "whatever we have to do to go back and talk to our customers about these additional costs, which were unanticipated").[30] Additionally, there is no allegation that customers opposed such changes, and, in fact, the Complaint indicates Defendants and customers (DPPs here) were "partnering" in making changes to fixed-price contracts. SCAC ¶355.

*Second*, the Complaint alleges some Defendants purchased broilers from other producers and that doing so was against their unilateral interests. But DPPs only specifically allege that two of the 14 Defendants bought from competitors, Tyson and Fieldale Farms. SCAC ¶¶341-42. Conduct by two Defendants hardly makes plausible an industry-wide conspiracy.

Moreover, courts have rejected the argument that buying from competitors plausibly suggests a conspiracy. *See, e.g., In re Potash Antitrust Litig.*, 954 F. Supp. 1334, 1367-68 (D. Minn. 1997), *rev'd in part on other grounds*, 176 F.3d 1055 (8th Cir. 1999) (refusing to infer conspiracy where defendant supplied potash to competitor and plaintiffs argued sales made "no economic sense"); *In re Beef Indus. Antitrust Litig.*, 713 F. Supp. 971, 976 (N.D. Tex. 1988), *aff'd*, 907 F.2d 510 (5th Cir. 1990) (granting summary judgment because defendants' inter-firm sales were rational to "keep[] certain facilities operating at profitable levels" and maintain "an adequate supply").

Allegations about such purchases are particularly insufficient to make a conspiracy

---

[30] *See also* Transcript of Q1 2008 earnings call by Tyson Foods, Inc. (Jan. 28, 2008) ("[G]iven the volatility . . . in these markets, it only makes sense, I think for us and ultimately for our customers . . . [to have a] shorter timeframe nature in terms of a fixed price."); Tyson Foods at Stephens Spring Investment Conference Tr. (June 2, 2009) (quoted at SCAC ¶351) ("if corn prices and feed costs do go up then [with shorter fixed-price contracts] we are going to be able to more quickly get on top of that new cost structure with our pricing. We think that is going to help us weather the storm better going into the future.").

Americas 92415189

plausible here, because there are ample independent business reasons for a producer to buy from a rival. Because consumers often buy only certain chicken parts (*e.g.*, breasts but not thighs), a company that grows a whole bird may be left unable to sell some parts. With high feed costs and a business model focused on value-added products, Tyson "prefer[red] to buy commodity pieces in the secondary market" instead of growing whole birds and being stuck with unsold parts. SCAC ¶234.[31]

Also, the timing of the inter-defendant sales does not support DPPs' conspiracy theory. DPPs concede Tyson did not begin its "Buy vs. Grow" program until 2011, *id.* ¶341, three years after the start of the alleged conspiracy period, *id.* ¶¶155, 192. Fieldale Farms did not buy from other producers until even later, in 2012. *Id.* ¶342.

## III. PLAINTIFFS HAVE NOT STATED A CLAIM UNDER THE RULE OF REASON

DPPs expressly allege that Defendants committed a "per se" violation of the Sherman Act. *Id.* ¶399. However, certain allegations suggest they may also seek to assert a rule of reason claim.[32] If so, that claim fails, because, among other things, the Complaint does not allege that Defendants have "substantial market power."[33] *Sanjuan v. Am. Bd. of Psychiatry & Neurology*, 40 F.3d 247, 251 (7th Cir. 1994). In particular, DPPs have not alleged "a precise market definition," *Agnew*, 683 F.3d at 337, which consists of a geographic market and a product market. *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004). As to the product market, DPPs do not allege "all interchangeable substitute products," or explain

---

[31] *See also* Transcript of Q3 2012 earnings call by Tyson Foods, Inc. (Aug. 6, 2012) (quoted at SCAC ¶236) ("[O]ur buy-versus-grow strategy is giving us a cost advantage because . . . we're able to buy the parts we need at generally below our costs and convert those into value-added items.").

[32] A rule of reason claim is very different from a *per se* claim. *Per se* illegality is limited to exceptional circumstances where the conduct "'on its face, has no purpose except stifling competition.'" *Burtch*, 662 F.3d at 221(quoting *Eichorn v. AT&T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001)).

[33] Defendants do not concede DPPs have otherwise adequately pleaded a rule of reason claim, but focus on these dispositive issues for present purposes.

Americas 92415189

"why a market should be limited in a particular way." *Int'l Equip. Trading, Ltd., v. AB Sciex LLC*, No. 13 C 1129, 2013 U.S. Dist. LEXIS 123109, at *10 (N.D. Ill. Aug. 29, 2013). With respect to the geographic market, the Complaint alleges no facts regarding the areas in which Defendants operate or to which a purchaser can turn for alternative supply. *See Republic Tobacco Co.*, 381 F.3d at 738.

## IV. PLAINTIFFS' CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS.

In addition to the arguments set forth above, the complaint must be dismissed for another, independent reason: it is time-barred. DPPs allege a single Sherman Act claim, asserting that Defendants "coordinat[ed] their output and limit[ed] production" to increase "prices of Broilers in the United States." SCAC ¶1. The challenged supply cuts, however, occurred between *five* and *eight* years ago: DPPs allege "substantial and unprecedented cuts . . . in *2008* and *2011*." *Id.* ¶142 (emphasis added). The statute of limitations for DPPs' claim is four years. 15 U.S.C. § 15(b). Thus, their claim must be dismissed unless DPPs can sufficiently allege that they could not have discovered the claimed offense within the limitations period exercising "reasonable diligence." *See, e.g.*, *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 194-95 (1997) (plaintiff must show "he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense.'" (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶338, at 145 (rev. ed. 1995)).[34]

DPPs cannot satisfy this burden, because their claim is based primarily on contemporaneous public statements and conduct, in other words, information that was widely available as many as *eight* years ago (and *five* years at minimum). *See infra* §III.A. DPPs

---

[34] The complaint should be dismissed because the statute of limitations expired long before plaintiffs' September 2016 filing date. However, because the complaint does not provide any valid basis for recovering damages from before the four year limitations period, the Court should, at a minimum, simplify the issues by clarifying now that the Sherman Act damages period will be limited to the four years before filing.

41

attempt to justify their delay by (i) claiming fraudulent concealment and (ii) citing a handful of allegedly "new" facts.  *See infra* §§III.B., C.  For the reasons discussed below, however, DPPs' excuses do not hold up, and their time-barred claim should be dismissed.

**A.    By Their Own Allegations, Plaintiffs Should Have Discovered Their Alleged Injury More Than Four Years Ago.**

DPPs rely primarily on public statements, data, and information from 2008-2011 to support their claim.  In fact, DPPs cite to more than **90** public statements and **25** public articles, and include over **50** allegations based on publicly available data.  As addressed below, DPPs' heavy reliance on old public information is fatal to their claim.  *See In re Evanston Nw. Healthcare Corp. Antitrust Litig.*, No. 07 C 04446, 2016 WL 4720014, at \*9 (N.D. Ill. Sept. 9, 2016) ("[T]he discovery rule asks when the Class knew (or had reason to know) that [Defendant] had unlawfully increased its *prices*." (emphasis in original)); *U.S. S.E.C. v. Fisher*, No. 07 C 4483, 2008 WL 2062699, at \*5 (N.D. Ill. May 13, 2008) (holding that government's claim accrued when defendant issued public statements related to the allegations at issue); *see also Massey v. Merrill Lynch & Co.*, 464 F.3d 642, 650 (7th Cir. 2006) (under Rule 12(b)(6), a plaintiff who pleads facts that defeat its claims has "[pled] itself out of court.").

The bulk of DPPs' claim is based on the following allegations: (i) supply cuts in 2008 and 2011, *see, e.g.*, SCAC ¶¶6, 136-241; (ii) increased prices for Broilers since 2008, *see, e.g.*, *id.* ¶¶7, 89-90; (iii) Defendants' alleged "signals" through public statements, *see, e.g.*, *id.* ¶¶146-47, 194; (iv) Defendants' use of Agri Stats, *see, e.g.*, *id.* ¶¶116-35; (v) Defendants' participation in trade meetings, *see, e.g.*, *id.* ¶¶297-312; and (vi) Broiler industry structure, *see, e.g.*, *id.* ¶¶270-333.  However, Plaintiffs own allegations demonstrate that they could have learned of each category of evidence through the exercise of reasonable diligence.  In fact, DPPs rely on widely available public information to support each allegation:

42

- **Supply Cuts.** DPPs cite repeatedly to widely available public announcements in 2008 and 2011 about production cuts and plant closures. *See, e.g.*, *id.* ¶150 ("On March 12, 2008, Pilgrim's announced a massive closure of its Broiler processing plants."); *id.* ¶¶151, 217, 218.

- **Price Increases.** DPPs admit that price information was reported *daily* by Urner Barry and the GDA and *weekly* by the USDA. They go on to point out that information published by the USDA is "publicly available for free." *See, e.g.*, *id.* ¶92.

- **Signaling.** Although DPPs call it signaling, they have actually alleged that Defendants made easily understood public statements. DPPs did not need to decode the meaning of Defendants alleged communications, as the import of these statements was clear when made. *See, e.g.*, *id.* ¶ 138 (alleging that Defendants used the term "discipline" to reference limiting production, consistent with the plain meaning of the term). These signals, DPPs assert, involved "clear messages" and "calls to action." *See, e.g.*, *id.* ¶¶146-47 (discussing "clear message[s]" and "call[s] to action" communicated by Tyson and Pilgrim's Pride in their respective January 28 and 29, 2008 earnings calls). DPPs cannot have it both ways: if, as they claim, these statements were obvious indicators of misconduct, they triggered DPPs' duty to inquire as far back as 2008.

- **Agri Stats.** DPPs rely on public statements regarding the use of Agri Stats — many from *eight* years ago. *See, e.g.*, *id.* ¶123 ("[I]n May 2008 Sanderson Farms CEO Joe Sanderson claimed '[w]e use Agri Stats . . . . . Almost everyone in our industry does as well.'").

- **Trade Associations.** Defendants' participation in trade conferences and meetings was public when it occurred, many years ago. *See, e.g.*, *id.* ¶194 ("[A]t the National Chicken Council's October 2009 Annual Conference, one industry analyst wrote that participants had emphasized continued 'production discipline.'").

- **Industry Structure.** The nature of the Broiler industry's structure has been known for decades. DPPs cite no new information that was not otherwise available in 2008 or contemporaneously as plants were closed. *See, e.g.*, *id.* ¶¶279-80; *see also id.* ¶173 ("By September 2008, Broiler industry publication Watts PoultryUSA reported that '[m]ost U.S. broiler integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'").

Further, DPPs *concede* they relied on this very public information to bring their claim. In DPPs' Motion for Appointment as Lead Counsel, they detail the investigation that led them to file their Complaint. The information they reviewed tracks the public materials cited in their

43

Complaint, including: (i) USDA price and supply information, available at USDA.gov; (ii) SEC filings, available on EDGAR; (iii) investor conference call transcripts, available from the respective websites of Defendants; and (iv) documents from past litigation involving Defendants, available at PACER.gov. *See* Dkt. 44 at p. 7; Dkt. 44-1 at p. 3. Critically, DPPs cite no sources of information that they could not have reasonably discovered until the past four years.[35] Plaintiffs' failure to plead any new facts leading to the discovery of supply reductions dating back to 2008 and 2011 distinguishes DPPs' complaint from those that have survived dismissal. *See e.g., In re Copper Antitrust Litig.*, 436 F.3d 782, 790 (7th Cir. 2006) (finding that plaintiffs were put on inquiry notice of their claim during the limitations period when a related lawsuit alleging the same conduct by the same defendant was unsealed); *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2009 WL 3754041, at *4 (N.D. Ill. Nov. 5, 2009) (denying dismissal because plaintiffs based almost their entire complaint on FBI testimony that was released two years prior to filing); *In re Ready-Mixed Concrete Price Fixing Litig.*, 2006 WL 2849711, at *2-3 (S.D. Ind. Sept. 29, 2006). Indeed, as discussed, DPPs here effectively admit that the underlying facts supporting their claim were as easily discoverable in 2008 and 2011 as they were in September 2016.

Put simply, DPPs could have discovered their claim through the exercise of reasonable diligence more than four years ago. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990); *Robert L. Kroenlein Trust ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1280 (10th Cir.

---

[35] In addition, an antitrust complaint – citing some of the *exact* same closures at issue here – was filed *more than seven years ago* alleging that Pilgrim's Pride cut capacity in order to increase prices. *See, e.g., Adams v. Pilgrim's Pride*, 2:09-v-00397-RSP, Dkt 58 ¶19. The Court ultimately found for Defendants. *Adams v. Pilgrim's Pride Corp.*, No. 2:09-CV-397, 2011 WL 5330301, at *10 (E.D. Tex. Sept. 30, 2011), *rev'd sub nom. In re Pilgrim's Pride Corp.*, 728 F.3d 457 (5th Cir. 2013). As of the filing of that suit in 2009, there was plainly enough information to put DPPs on constructive notice of their claim here. *See In re Copper Antitrust Litig.*, 436 F.3d at 792 (finding plaintiffs were put on inquiry notice of their claims when complaint alleging similar allegations was unsealed).

Americas 92415189

2014) (affirming summary judgment after finding that "if the [plaintiffs] had been reasonably diligent, they would have discovered their injury [within the limitations period]"); *Geo. Knight & Co. v. Watson Wyatt & Co.*, 170 F.3d 210, 215 (1st Cir. 1999) (affirming summary judgment after finding that plaintiff's "failure to make further inquiry to resolve the inconsistency precludes a finding that it exercised reasonable diligence"). Because DPPs' own Complaint establishes their claim is time-barred, dismissal is appropriate. *Waldner v. N. Am. Truck & Trailer, Inc.*, 277 F.R.D. 401, 408 (D.S.D. 2011) (dismissing RICO claim in part because plaintiff had sufficient information to discover his injury more than four years before filing suit).

### B. Plaintiffs Have Not Pled Fraudulent Concealment.

Recognizing their statute of limitations obstacle, DPPs attempt to defend their delay by alleging fraudulent concealment. DPPs' conclusory allegations fail for two independent reasons:

*First*, DPPs are precluded from claiming fraudulent concealment because they cannot plausibly allege "reasonable diligence." *Klehr*, 521 U.S. at 194-95 (explaining "reasonable diligence" is required to invoke the doctrine of fraudulent concealment); *In re Processed Egg Prods. Antitrust Litig.*, MDL No. 2002, 2011 WL 5980001, at *15 (E.D. Pa. Nov. 30, 2011) (rejecting fraudulent concealment argument because plaintiffs had not pled reasonable diligence). Thus, the statute of limitations is "not tolled by fraudulent concealment once the plaintiff knows of the operative facts that form the basis of his claim such that he could discover his cause of action through the exercise of diligence." *United States v. Inc. Vill. of Island Park*, 791 F. Supp. 354, 370 (E.D.N.Y. 1992) (citing *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975)). As described in detail above, DPPs had more than sufficient information to discover their cause of action more than four years ago. Accordingly, Plaintiffs' fraudulent concealment allegations cannot save their claim for this reason alone.

*Second*, the Complaint's assertions of fraudulent concealment fail because they are simply recycled versions of DPPs' conspiracy allegations. To properly plead fraudulent concealment, DPPs must allege facts that "denote[] efforts by the [Defendants] — *above and beyond* the wrongdoing upon which [their] claim is founded — to prevent [DPPs] from suing in time." *Cada*, 920 F.2d at 451 (emphasis added); *see also Hammer v. Residential Credit Sols., Inc.*, No. 13 C 6397, 2014 WL 4477948, at *12 (N.D. Ill. Sept. 11, 2014) (dismissing fraudulent concealment claim because plaintiff failed "to allege how [defendant's] fraudulent concealment goes 'above and beyond' the wrongdoing upon which her claim is founded.") (Durkin, J.). That is, fraudulent concealment does not toll a statute of limitations where the conduct is "an integral part of th[e] scheme, which could not have been executed without it." *See Amerigas Propane, L.P. v. BP Am., Inc.*, 691 F. Supp. 2d 844, 859-60 (N.D. Ill. 2010). But the alleged conduct on which DPPs rely to claim fraudulent concealment – meetings, information exchanges, and alleged signals, SCAC ¶379 – is precisely the same conduct they rely on to support their claim of an antitrust violation. *See, e.g.*, *id.* ¶¶116, 269, 297. For example, DPPs allege that Defendants concealed a conspiracy by communicating sensitive data to one another through a "secret" system, *see id.* ¶379, but this is just a rehash of their allegations regarding Agri Stats. *See, e.g.*, *id.* ¶116.

Although DPPs repeatedly assert that Defendants acted in "secret" in describing their recycled allegations, a conclusory label does not make it so. *In re Aluminum Phosphade Antitrust Litig.*, 905 F. Supp. 1457, 1470 (D. Kan. 1995) (rejecting fraudulent concealment claim because plaintiffs failed to cite specific actions by defendants to keep meetings secret); *Mahoney v. Beacon City Sch. Dist.*, 988 F. Supp. 395, 400 (S.D.N.Y. 1997) ("The evidence submitted by plaintiff to support a fraudulent concealment claim must not be conclusory . . . ." (citing *Pinaud*

46

*v. Cnty of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995))). Indeed, courts have held that fraudulent concealment must be pled with particularity. *See, e.g.*, *Residential Credit Sols., Inc.*, 2014 WL 4477948, at *12; *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1217 (N.D. Cal. 2015); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 747 (E.D. Pa. 2014). Plaintiffs have insufficiently pled fraudulent concealment consistent with Rule 8, much less to Rule 9(b)'s high standard. Moreover, Plaintiffs' allegations belie any secrecy. For example, Plaintiffs reference a statement made by Pilgrim's Pride at a 2008 industry conference, expressing a desire for industry-wide cuts. *See* SCAC ¶156. This statement, far from being euphemistic, was clear when made. Further, while Plaintiffs assert Defendants used "code words . . . in their public statements" when discussing fraudulent concealment, *see id.* ¶380, they *concede* Defendants' signals were "clear" when discussing the alleged conspiracy, *see id.* ¶¶146-47 (discussing "clear message[s]" and "call[s] to action" communicated by Tyson and Pilgrim's Pride in their respective January 28 and 29, 2008 earnings calls).

Finally, DPPs cannot establish fraudulent concealment by alleging that Defendants attributed high Broiler prices to higher feed prices "rather than disclosing the existence of an agreement to illegally restrain the supply of Broilers." *See id.* ¶¶381-84. Courts routinely reject such arguments. *See, e.g., Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218–19 (4th Cir. 1987) (defendants' statement blaming price changes on market forces rather than conspiracy was insufficient to show fraudulent concealment; ruling differently "would effectively nullify the statute of limitation"); *In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1023 (D. Minn. 1997), *aff'd*, 195 F.3d 430 (8th Cir. 1999) ("[T]he mere allegation that Defendants mailed letters to customers attributing price increases to market factors does not lead to the conclusion that Defendants affirmatively concealed a conspiracy . . . .").

47

At bottom, DPPs' fraudulent concealment allegations cannot save their time-barred claim. DPPs' own Complaint establishes that, through reasonable diligence, they could have discovered their Sherman Act claim years ago. In any event, their fraudulent concealment allegations are merely regurgitations of their underlying claim. This fails as a matter of law.

### C. There Are No "New" Alleged Facts That Excuse Plaintiffs' Untimeliness.

In a final effort to avoid the statute of limitations, DPPs blame their late filing on more "recent" events. *See* SCAC ¶¶370-77. These allegations cannot excuse DPPs' delay.

DPPs cannot save their time-barred claim by pointing to a 2014 book, the *Meat Racket*, and a handful of recent newspaper articles concerning the Georgia Dock price. *Id.* ¶¶372-74. DPPs purport to bring one Sherman Act claim, alleging that Defendants "coordinat[ed] their output and limit[ed] production." *Id.* ¶1. That there are new sources of information supposedly supporting DPPs' claim is irrelevant to whether DPPs knew or reasonably should have known the facts supporting their allegations years ago. These "new" details do not relate to DPPs' ability to *discover* the alleged conspiracy through the exercise of reasonable diligence. *See, e.g.*, *Waldner*, 277 F.R.D. at 408 ("The statute of limitations clock begins when Waldner should have discovered the initial injury and does not 'reset' every time Waldner discovers a new act that is part of the conspiracy."); *see also Fisher*, 2008 WL 2062699, at *6 (applying an accrual date more than four years before suit was filed despite the emergence of later relevant facts because "the court envisioned additional investigation *after* the limitations clock starts").

DPPs also cite five foreign investigations as evidence that "collusion is evidently rampant in [the] Broiler industry." SCAC ¶373. This allegation, too, says nothing to support DPPs' argument that they could not discover the alleged conspiracy within the limitations period. In any event, an allegation of misconduct in one country is not suggestive of misconduct elsewhere.

48

*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 593 (1986); *Energy Conversion Devices Liquidation Trust v. Trina Solar Ltd.*, 833 F.3d 680, 690 (6th Cir. 2016). And because *not a single one* of the investigations involved *any* named Defendant, they add nothing.  *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) ("For inquiry notice to exist, the triggering information must 'relate [ ] directly to the misrepresentations and omissions the [DPPs] later allege in their action against the defendants.'" (quoting *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 193 (2d Cir. 2003))).

In sum, the Complaint establishes that the basis for DPPs' complaint was public years before the statutory period.  They cannot save their time-barred claim through either their fraudulent concealment allegation or allegations of supposedly "new" conduct.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Complaint should be dismissed in its entirety with prejudice.

Americas 92415189

Dated: January 27, 2017

WHITE & CASE LLP

By: /s/ *Robert A. Milne*
Robert A. Milne
David H. Suggs
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
rmilne@whitecase.com
dsuggs@whitecase.com

J. Mark Gidley
Peter J. Carney
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355
mgidley@whitecase.com
pcarney@whitecase.com

*Attorneys for Defendants Tyson Foods, Inc.,*
*Tyson Chicken, Inc., Tyson Breeders, Inc.,*
*Tyson Poultry, Inc.*

NOVACK AND MACEY LLP

By: /s/ *Stephen Novack*
Stephen Novack
Stephen J. Siegel
Christopher S. Moore
100 North Riverside Plaza
Chicago, IL 60606
Telephone: (312) 419-6900
snovack@novackmacey.com
ssiegel@novackmacey.com
cmoore@novackmacey.com

*Attorneys for Defendants Koch Foods*
*Incorporated, JCG Foods of Alabama LLC,*
*JCG Foods of Georgia LLC and Koch Meat*
*Co., Inc.*

Respectfully submitted,

WEIL, GOTSHAL & MANGES LLP

By: /s/ *Kevin J. Arquit*
Kevin J. Arquit
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-0950
Facsimile: (212) 310-8007
kevin.arquit@weil.com

BAILEY BRAUER PLLC

Clayton E. Bailey
8350 N. Central Expressway, Ste. 935
Dallas, TX 75206
Telephone: (214) 360-7433
Facsimile: (214) 360-7424
cbailey@baileybrauer.com

EIMER STAHL LLP

Michael L. McCluggage
224 South Michigan Avenue, Ste. 1100
Chicago, IL 60604
Telephone: (312) 660-7665
mmccluggage@eimerstahl.com

*Attorneys for Defendant Pilgrim's*
*Pride Corporation*

50

VENABLE LLP

By: /s/ *J. Douglas Baldridge*
J. Douglas Baldridge (#437678)
Lisa Jose Fales (admitted *pro hac vice*)
Danielle Foley (admitted *pro hac vice*)
Robert Davis (admitted *pro hac vice*)
575 7th Street, NW
Washington, DC 20004
jdbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
rpdavis@venable.com

FALKENBERG FIEWEGER & IVES LLP

Kirstin B. Ives
30 N. LaSalle St., Suite 4020
Chicago, IL 60602
kbi@ffilaw.com

*Attorneys for Defendants Perdue Farms, Inc.
and Perdue Foods LLC*

KIRKLAND & ELLIS LLP

By: /s/ *Daniel E. Laytin*
Daniel E. Laytin, P.C.
Christa C. Cottrell
Martin L. Roth
Stacy Pepper
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
dlaytin@kirkland.com
ccottrell@kirkland.com
martin.roth@kirkland.com
stacy.pepper@kirkland.com

*Attorneys for Defendants Sanderson Farms,
Inc., Sanderson Farms, Inc. (Processing
Division), Sanderson Farms, Inc. (Production
Division) & Sanderson Farms, Inc. (Foods
Division)*

PROSKAUER ROSE LLP

By: /s/ *Christopher E. Ondeck*
Christopher E. Ondeck
Adrian Fontecilla
Stephen R. Chuk
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004
Telephone: (202) 416-6800
Facsimile: (202) 416-6899
condeck@proskauer.com
afontecilla@proskauer.com
schuk@proskauer.com

*Attorneys for Wayne Farms LLC*

SIDLEY AUSTIN LLP

By: /s/ *John W. Treece*
John W. Treece, Bar No. 3122889
1 S. Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
jtreece@sidley.com

ROSE LAW FIRM

Amy Lee Stewart (admitted *pro hac vice*)
Jacob Dylan White (admitted *pro hac vice*)
20 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 377-0334
Facsimile: (501) 375-1309
astewart@roselawfirm.com
jwhite@roselawfirm.com

*Attorneys for Defendants Mountaire Farms,
LLC and Mountaire Farms of Delaware, Inc.*

51

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

By: /s/ *Patrick Fitzgerald*
Patrick Fitzgerald (#6307561)
155 N. Wacker Drive
Chicago, IL 10036
Telephone: (312) 407-0700
Facsimile: (312) 407-0411
patrick.fitzgerald@skadden.com

Boris Bershteyn
Sam Auld
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
boris.bershteyn@skadden.com
sam.auld@skadden.com

*Attorneys for Defendant Peco Foods, Inc.*


VEDDER PRICE P.C.

By: /s/ *Gregory G. Wrobel*
Gregory G. Wrobel (#3122900)
222 N. LaSalle Street
Chicago, IL 60601
Telephone: (312) 609-7722
Facsimile: (312) 609-5005
gwrobel@vedderprice.com

JORDAN PRICE WALL GRAY JONES &
CARLTON, PLLC

Henry W. Jones, Jr.
1951 Clark Avenue
Raleigh, NC 27605
Telephone: (919) 828-2501
Facsimile: (919) 834-8447
hjones@jordanprice.com

*Attorneys for Defendant House of Raeford
Farms, Inc.*

SHOOK HARDY & BACON LLP

By: /s/ *Lynn H. Murray*
Lynn H. Murray
Andrew M. Meerkins
111 S. Wacker Dr.
Ste. 5100
Chicago IL 60606
Telephone: (312) 704-7700
lhmurray@shb.com
ameerkins@shb.com

*Attorneys for Defendant Simmons Foods, Inc.*

RILEY SAFER HOLMES & CANCILA LLP

By: /s/ *Sondra A. Hemeryck*
Sondra A. Hemeryck
70 West Madison Street, Suite 2900
Chicago, IL 60602
Telephone: (312) 471-8700
shemeryck@rshc-law.com

STINSON LEONARD STREET LLP

William L. Greene
Ruth S. Shnider
150 South Fifth Street, Suite 2300
Minneapolis, MN 55402
Telephone: (612) 335-1500
william.greene@stinson.com
ruth.shnider@stinson.com

THE LAW GROUP OF NORTHWEST
ARKANSAS LLP

Gary V. Weeks
K.C. Dupps Tucker
Kristy E. Boehler
1830 Shelby Lane
Fayetteville, AR 72704
Telephone: (479) 316-3760
gary.weeks@lawgroupnwa.com
kc.tucker@lawgroupnwa.com
kristy.boehler@lawgroupnwa.com

*Attorneys for Defendants George's, Inc.*
*and George's Farms, Inc.*

MANDELL MENKES LLC

By: /s/ *Brendan J. Healey*
Brendan J. Healey
One North Franklin, Suite 3600
Chicago, IL 60606
Telephone: (312) 251-1006
Facsimile: (312) 759-2189
bhealey@mandellmenkes.com

ALSTON & BIRD LLP

B. Parker Miller
Valarie C. Williams
Max Marks
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
parker.miller@alston.com
valarie.williams@alston.com
nowell.berreth@alston.com
max.marks@alston.com

SMITH, GILLIAM, WILLIAMS & MILES
PA

R. Brent Hatcher, Jr.
301 Green Street NW, Suite 200
Gainesville, GA 30501
Telephone: (770) 536-3381
Facsimile: (770) 535-9902
bhatcher@sgwmfirm.com
cfranklin@sgwmfirm.com

*Attorneys for Fieldale Farms Corporation*

Americas 92415189

KUTAK ROCK LLP

By: /s/ *John P. Passarelli*
John P. Passarelli
James M. Sulentic
1650 Farnam Street
Omaha, NE 68102
Telephone: (402) 346-6000
Facsimile: (402) 346-1148
john.passarelli@kutakrock.com
james.sulentic@kutakrock.com

J.R. Carroll
Scott Jackson
234 East Millsap Road
Suite 200
Fayetteville, AR 72703-4099
Telephone: (479) 973-4200
Facsimile: (479) 973-0007
jr.caroll@kutakrock.com
scott.jackson@kuakrock.com

Kimberly M. Hare (#6323326)
One South Wacker Drive
Suite 2050
Chicago, IL 60606-4614
Telephone: (312) 602-4100
Facsimile: (312) 602-4101
kimberly.hare@kutakrock.com

*Attorneys for Defendants O.K. Foods, Inc.,*
*O.K. Farms, Inc., and O.K. Industries, Inc.*

MAYER BROWN LLP

By: /s/ *Carmine R. Zarlenga*
Carmine R. Zarlenga, #90784529
William H. Stallings
Oral D. Pottinger
1999 K Street N.W.
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
czarlenga@mayerbrown.com
wstallings@mayerbrown.com
opottinger@mayerbrown.com

*Attorneys for Defendant Foster Farms, LLC*

54

## <u>CERTIFICATE OF SERVICE</u>

I, David H. Suggs, hereby certify that a true and correct copy of the foregoing All Defendants' Joint Motion to Dismiss the Direct Purchaser Plaintiffs' Second Amended and Consolidated Class Action Complaint and the Memorandum of Law in Support of All Defendants' Joint Motion to Dismiss the Direct Purchaser Plaintiffs' Second Amended and Consolidated Class Action Complaint, including appendices, were electronically filed with the Clerk of the Court using the CM/ECF system on January 27, 2017, which constitutes service on counsel of record who are registered electronic filing users.

/s/ David H. Suggs
**David H. Suggs**
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

*Counsel for Defendants Tyson Foods, Inc.,*
*Tyson Chicken, Inc., Tyson Breeders, Inc.,*
*Tyson Poultry, Inc.,*

Dated: January 27, 2017