1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3

4    IN RE BROILER CHICKEN ANTITRUST        )   Docket No. 16 C 8637
     LITIGATION                             )
5                                           )   Chicago, Illinois
     This Document Relates to:             )   February 24, 2017
6    All Actions                            )   10:09 a.m.

7

         TRANSCRIPT OF PROCEEDINGS - Telephonic Status
8          BEFORE THE HONORABLE JEFFREY T. GILBERT

9

     APPEARANCES:
10

     For Plaintiffs        HART McLAUGHLIN & ELDRIDGE LLC, by:
11   Maplevale Farms       MR. STEVEN A. HART
     and John Gross        MR. KYLE POZAN
12   and Company:          121 W. Wacker Drive, Suite 1050
                           Chicago, IL  60601
13

14   *(Direct purchaser plaintiffs interim liaison class counsel)*

15
                           LOCKRIDGE GRINDAL NAUEN PLLP, by:
16                         W. JOSEPH BRUCKNER
                           MR. BRIAN D. CLARK
17                         100 Washington Avenue South, Suite 2220
                           Minneapolis, MN  55401
18
     *(Direct purchaser plaintiffs interim co-lead class counsel)*
19

20                         PEARSON SIMON & WARSHAW LLP, by:
                           MR. BRUCE L. SIMON
21                         MR. AARON M. SHEANIN
                           MR. NEIL J. SWARTZBERG
22                         44 Montgomery Street, Suite 2420
                           San Francisco, CA  94104
23
     *(Direct purchaser plaintiffs interim co-lead class counsel)*
24

25

```
1   APPEARANCES (Cont'd.):

2   For Plaintiffs         WEXLER | WALLACE LLP, by:
    Fargo Stopping         MR. THOMAS A. DOYLE
3   Center, Sargent's      55 W. Monroe Street
    Restaurant and         Suite 3300
4   Don Chavas Mexican     Chicago, IL  60603
    Restaurant:

5
    (Indirect purchaser plaintiffs interim liaison class counsel)
6

7   For Plaintiffs         GUSTAFSON GLUEK PLLC, by:
    Fargo Stopping         MR. DANIEL E. HEDLUND
8   Center and             MS. MICHELLE J. LOOBY
    Sargent's              MR. JOSHUA J. RISSMAN
9   Restaurant:            Canadian Pacific Plaza
                           120 S. 6th Street, Suite 2600
10                         Minneapolis, MN  55402

11  (Indirect purchaser plaintiffs interim co-lead class counsel)

12
    For Plaintiffs         HAGENS BERMAN SOBOL SHAPIRO LLP, by:
13  Percy, Lathen,         MS. JEANNIE Y. EVANS
    Dimas, Monahan,        MS. ELIZABETH A. FEGAN
14  Coe, Patterson,        455 N. Cityfront Plaza Drive
    Tierney, Cheslow       NBC Tower, Suite 2410
15  and Wilbur:            Chicago, IL  60611

16  For Plaintiffs         COHEN MILSTEIN SELLERS & TOLL PLLC, by:
    Newman, Stangeland,    MR. BRENT W. JOHNSON
17  Gardner, Weidner,      1100 New York Avenue NW
    Pauk, Gilbert and      Suite 500 West Tower
18  Weidner:               Washington, DC  20005

19  For Defendants         NOVACK AND MACEY LLP, by:
    Koch Foods, JCG        MR. CHRISTOPHER S. MOORE
20  Foods and Koch         100 N. Riverside Plaza, Suite 1500
    Meats:                 Chicago, IL  60606
21
    For the Tyson          WHITE & CASE LLP, by:
22  Defendants:            MR. DAVID H. SUGGS
                           1155 Avenue of the Americas
23                         New York, NY  10036

24  For Defendant          WEIL, GOTSHAL & MANGES LLP, by:
    Pilgrim's Pride:       MS. CARRIE MAHAN
25                         1300 Eye Street N.W., Suite 900
                           Washington, DC 20005
```

```
 1   APPEARANCES: (Cont'd.):

 2                          EIMER STAHL LLP, by:
                            MR. MICHAEL L. McCLUGGAGE
 3                          224 S. Michigan Avenue, Suite 1100
                            Chicago, IL  60606-1229
 4
     For Defendant          VENABLE LLP, by:
 5   Perdue Farms:          MS. LISA JOSE FALES
                            MR. ROBERT P. DAVIS
 6                          575 7th Street, NW
                            Washington, DC  20004
 7
     For the Sanderson      KIRKLAND & ELLIS LLP, by:
 8   Farms Defendants:      MR. MARTIN L. ROTH
                            MS. STACY L. PEPPER
 9                          MR. DANIEL LAYTIN
                            300 N. LaSalle Street
10                          Chicago, IL  60654

11   For Defendant          PROSKAUER ROSE LLP, by:
     Wayne Farms:           MR. CHRISTOPHER E. ONDECK
12                          MR. ADRIAN FONTECILLA
                            MR. STEPHEN R. CHUK
13                          1001 Pennsylvania Avenue, NW
                            Suite 600 South
14                          Washington, DC  20004

15   For the Mountaire      ROSE LAW FIRM, by:
     Farms Defendants:      MS. AMY LEE STEWART
16                          MR. JACOB WHITE
                            120 E. 4th Street
17                          Little Rock, AR  72201

18   For Defendant          SKADDEN ARPS SLATE MEAGHER & FLOM, by:
     Peco Foods, Inc.:      MR. PATRICK J. FITZGERALD
19                          155 N. Wacker Drive, Suite 2700
                            Chicago, IL  60606
20
                            SKADDEN ARPS SLATE MEAGHER & FLOM, by:
21                          MR. SAM AULD
                            4 Times Square, 40th Floor
22                          New York, NY 10036

23
     For Defendant          MAYER BROWN LLP, by:
24   Foster Farms:          MR. CARMINE R. ZARLENGA
                            MR. ORAL D. POTTINGER
25                          1999 K Street NW
                            Washington, DC  20006
```

APPEARANCES (Cont'd.):

For Defendant         VEDDER PRICE PC, by:
House of              MR. GREGORY G. WROBEL
Raeford Farms:        222 N. LaSalle Street, Suite 2600
                      Chicago, IL  60601


For Defendant         SHOOK HARDY & BACON LLP, by:
Simmons Foods:        MS. LYNN H. MURRAY
                      111 S. Wacker Drive, Suite 5100
                      Chicago, IL  60606


                      CONNER & WINTERS, P.L.L.C., by:
                      MR. JOHN R. ELROD
                      100 West Center Street, Suite 200
                      Fayetteville, AK 72701

For Defendant         ALSTON & BIRD LLP, by:
Fieldale Farms:       MR. B. PARKER MILLER
                      1201 W. Peachtree Street
                      Atlanta, GA  30309


                      MANDELL MENKES LLC, by:
                      MR. BRENDAN J. HEALEY
                      One North Franklin, Suite 3600
                      Chicago, IL 60606

For the George's      STINSON LEONARD STREET LLP, by:
Defendants:           MR. WILLIAM L. GREENE
                      150 South Fifth Street, Suite 2300
                      Minneapolis, MN 55402


                      RILEY SAFER HOLMES & CANCILA LLP, by:
                      MS. SONDRA HEMERYCK
                      70 West Madison Street, Suite 2900
                      Chicago, IL 60602

For the               KUTAK ROCK LLP, by:
O.K. Defendants:      MR. JAMES M. SULENTIC
                      MR. JOHN P. PASSARELLI
                      150 S. Fifth Street, Suite 2300
                      Minneapolis, MN  55402

                      KUTAK ROCK LLP, by:
                      MR. J.R. CARROLL
                      234 East Millsap Road, Suite 200
                      Fayetteville, AR 72703

1  Court Reporter:          KELLY M. FITZGERALD, CSR, RMR, CRR
                            Official Court Reporter
2                           United States District Court
                            219 South Dearborn Street, Room 1420
3                           Chicago, Illinois  60604
                            Telephone:  (312) 818-6626
4                           kelly_fitzgerald@ilnd.uscourts.gov

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings heard in open court:)

2            THE CLERK:  16 CV 8637, Maplevale Farms v. Koch

3    Foods, Inc., et al., for a status hearing.

4            THE COURT:  Okay.  Good morning, everybody.  This is

5    Judge Gilbert.  I think at last count, we had something like

6    41 participants on this call.

7            I want you to know I have a court reporter here, and

8    she's taking down what's being said in the courtroom and also

9    what's on the phone.

10            I would like to proceed this way.  I would like

11    everyone who is on the phone to send their names to liaison

12    counsel and then have liaison counsel organize those and send

13    them to Brenda so that she can make sure the court reporter

14    has them and therefore can then record everybody's appearances

15    on this call who want to have their appearances recorded.

16            I will get appearances orally now for the people on

17    the phone who will be speaking.  My guess is mostly liaison

18    counsel for my benefit.  And then before you speak on the --

19    during the hearing, I'm going to ask you, if you can remember

20    to do so, to state your name again so that our court reporter

21    can match your name with what you're saying.  And then anybody

22    else who is on the phone who doesn't intend to speak right now

23    but does later, please state your name and who you represent

24    if you're going to say something during the call, okay.

25            So why don't we get first the appearances of the

people who anticipate speaking today. And so you know what I
intend to cover today, and you'll know then, therefore,
whether you'll want to speak, there are certain, you know,
threshold issues that need to be discussed in the case in
terms of whether -- plaintiffs' view of whether discovery or
some portions of discovery-related tasks should proceed or
not. I'm prepared to address those things and then some
specifics along those lines, but I'm going to want to set
another in-person conference to delve into this stuff in a lot
more detail. But I hope to deal with some shape-of-the-table
issues today and then get together with you again in person
once everybody knows the shape of that table.

So let's get appearances first.

MR. SIMON: Your Honor, this is Bruce Simon, Pearson,
Simon & Warshaw, on behalf of the direct purchasers. And
primarily our liaison counsel, Steve Hart, will be talking
about schedule. And Brian Clark will be talking about some of
the scope of discovery issues if we get there. Mr. Bruckner
and myself may chime in if you get to some issues that involve
that.

THE COURT: Okay.

Next on the plaintiff side?

MR. HEDLUND: Good morning, Your Honor. Dan Hedlund,
one of the co-lead counsel for the commercial and
institutional plaintiffs. And Tom Doyle, liaison counsel for

1    us, is also on.  We may chime in, although I think we'll see

2    how it goes in terms of what the directs have to say.

3         MS. FEGAN:  Good morning, Your Honor.  This is

4    Elizabeth Fegan from Hagens Berman for the indirect purchaser

5    end-user plaintiffs.  And I would just chime in if we get to

6    our particular issue on preservation.

7         THE COURT:  Okay.  Yeah, I'm intending to deal with

8    that, or at least address it.

9         MS. FEGAN:  Thank you.

10        THE COURT:  And so we've got the three liaisons for

11   the three plaintiff groups.  Anybody else on the plaintiff

12   side want to chime in right this minute?

13        Okay.  Let's go to the defense side.

14        MR. SUGGS:  Your Honor, this is David Suggs from

15   White & Case on behalf of Tyson, and I'll be coordinating on

16   behalf of the defendants today.  The defendants today, we have

17   people who are prepared to present on specific topics, but

18   what specifically those topics are will determine who speaks.

19   So I don't know if it's worthwhile.  Counsel for Sanderson in

20   some fashion may be talking, counsel for Pilgrim's Pride,

21   counsel for Gulch Farms, counsel for Wayne Farms, but I don't

22   know if we need all the names right now.  It just depends on

23   how the schedule plays out, or how the agenda plays out.

24        THE COURT:  Okay.  I mean, I'm fine with that,

25   provided that everybody goes with the flow of the program,

1 which is if you do speak, state your name first and who you

2 represent so Kelly can get that down and so that I know too,

3 okay.

4 And then --

5 MR. SUGGS: Yes, Judge.

6 THE COURT: -- I do want everybody else who hasn't

7 identified themselves, I would like to have a record of who is

8 participating in the hearing. So I would like you to, you

9 know, within, you know, by early next week, get your names to

10 the liaison counsel, and then I would say just to pick a date

11 by next, you know, Thursday.

12 Take a note of that, okay.

13 By next Thursday, I would like liaison counsel to

14 send to Brenda everybody who is on the call so that we can get

15 that to -- or maybe even next Wednesday. Yeah, because if

16 anybody wants a transcript, then we'll have you in the record,

17 okay.

18 All right. No. 1, Judge Durkin sends his regrets

19 because of the trial that he is involved in. He had intended,

20 as you know, to have this as an in-person hearing with both of

21 us, but events conspired against us. But we have spoken at

22 length about the case and about where we would like to move

23 with this, so -- and part of what I'm going to be doing today

24 is to articulate where we come out on that.

25 I was very new to this case at the last status

hearing in December.  In fact, the referral order was entered
on December 9, 2016, which was the date of the hearing.  So I
really needed to get up to speed, and I have now been able to
do that to a large extent.  I also had just returned from knee
replacement surgery then, and I was getting caught up on a
whole lot of things.  I know at that time, and I saw in
your -- what you filed in preparation or in anticipation of
this hearing, plaintiffs were saying, you know, they were
anticipating meeting with Judge Gilbert about the ESI issues
and all the other issues that were in your December 7th
filings, and I know you anticipated that meeting taking place
a lot sooner than today.  And it just -- it has taken me a
long time just to get to the place where I feel like I am
ready to engage with you on everything that you've engaged --
everything you've written.  It hasn't slowed down the motions
to dismiss, and I'm sure, you know, you're all on that.

I've read everything the parties have filed, and I
know that there are some threshold issues that need to be
dealt with on the issue of what discovery-related tasks, if
any, will proceed while the motion to dismiss -- motions to
dismiss are pending.  That was, you know, a clear divide with
all of you, and I'm prepared to address those issues this
morning.

And then once I do that, I'm going to want to meet
again with you about a schedule that's consistent with the

direction that I'm going to set today.  And I'm going to

propose late March.  I looked at my calendar.  March -- we

could talk about this later or even after the call, but I'm

going to propose a meeting on March 27th or 29th, which would

be in-person, and hopefully Judge Durkin could join us.  But

if not, we can continue to move forward on the issues that I

need to do that, to deal with.

So rather than fly people in from around the country

for this kind of a shape-of-the-table session, if you will, we

thought, both Judge Durkin and I thought it made sense to do

this by telephone.  With the number of people involved, I know

that's not ideal either, and I recognize that, but hopefully

it will work.  And, you know, when I was doing these kind of

cases in private practice before coming here, I used to hate

to go to out-of-town hearings on Fridays and hope the airlines

cooperated so I could get home at a reasonable time that

evening.  I don't know if you follow the weather in Chicago,

but we've had terrible rainstorms.  I don't know what planes

were cancelled or not, but it might have been a propitious

decision to have this by phone.  But if you would rather have

flown into Chicago last night for this hearing, you could

blame us for changing your travel plans here.

Let me -- I'm going to -- I want to address several

of these big points up front, whether to wait until the

motions to dismiss are decided before doing much of anything

1  on the discovery front.

2      Judge Durkin and I have talked about this length, and

3  we don't agree completely with defendants' view of the world

4  on this.  We do not want to have to start from a standing stop

5  if the motions to dismiss are denied in whole or in part.  We

6  think that there are discovery-related tasks that can and

7  should proceed while the motions to dismiss are being briefed

8  and under advisement.  Identifying those tasks is the chore,

9  but just as a -- you know, at the fork in the road, we think

10 we need to go forward with some things while the motions to

11 dismiss are being briefed.

12     I want to emphasize -- and I'll say it again -- I

13 want to emphasize that that does not mean that Judge Durkin

14 thinks that the motions to dismiss raise only trivial issues.

15 He does not.  And I know the defendants quoted at length the

16 prior hearing saying you've raised, you know, serious issues

17 that need to be decided and therefore nothing should happen on

18 a discovery front or a discovery-related front until those are

19 decided.

20     He understands that defendants have raised issues

21 that are nontrivial, and if defendants succeed on those

22 arguments or some of them, that could end or change the shape

23 of the case.  So, you know, I'm communicating that from him,

24 but I -- you know, he is -- he is of that view.

25     By the same token though, plaintiffs all are

represented by experienced and competent lawyers, and they may
well have some important things to say in response to what
defendants have said.  Or it's possible plaintiffs may choose,
for example, to amend their complaints before responding to
some of defendants' arguments, and that would kick this can
down the road even further potentially.

By the way, and I don't want to put you on the spot
here.  If you're not ready to respond to that, don't.  Have
the plaintiffs thought about that, whether or not we're going
to stick to this briefing schedule or if there will be any
amendments?

MR. SIMON:  Your Honor, this is Bruce Simon on behalf
of the directs.  We plan to stick with the schedule and file
an opposition.

THE COURT:  Is that the same for the other plaintiff
groups?

MS. FEGAN:  Yes, Your Honor.

MR. HEDLUND:  Yes, Your Honor.  Yes.

THE COURT REPORTER:  I'm sorry.  Who was that
speaking?

THE COURT:  So who was -- after Bruce Simon, I think
that was Elizabeth Fegan who represents the end-user
plaintiffs.

And then the third person was?

MR. HEDLUND:  Sorry, Your Honor.  Dan Hedlund for the

1  commercial and institutional indirect purchasers.

2        THE COURT:  Okay.  But we don't think we should wait

3  to begin doing some things that are done in -- in cases

4  generally while these motions are under advisement even with

5  the seriousness of the issues that are raised.  You know,

6  statistically in this district, I would say that only about

7  10 percent of our civil cases are completely disposed of on

8  what we call dispositive motions, motions to dismiss or

9  summary judgment, and 90 percent are not.  That's not to say

10  that this case fits within the statistics, but our culture in

11  this district because of that, as plaintiffs noted in their

12  filing last October, is not to stay discovery during the

13  pendency of dispositive motions.  And, you know, the federal

14  judicial center keeps statistics on cases terminated, for

15  example, by summary judgment, and their latest statistics show

16  that only 5 percent of the cases are totally completely

17  disposed of on summary judgment.  So even if good arguments

18  are being raised and they could change certain shape of the

19  case, the odds, at least early in the case like this, are, you

20  know, against the case completely being terminated.  And I

21  will say, those are odds.  That's not -- I'm not speaking for

22  Judge Durkin or myself on what would happen with these motions

23  at all.  You could very well be within the 10 percent or

24  5 percent of the cases that end at this stage.  But I'm just

25  saying statistically, that's what it is.

1    So if we can do some things during this period of
2  time before the motions are decided that would, if the case
3  still survives in whole or in part afterwards, move it forward
4  and prevent us from -- or avoid starting from a standing stop,
5  which is difficult to do, we would like to do that.  And I
6  think those things include serving initial disclosures,
7  serving written discovery -- and I'm going to talk about all
8  of these things -- negotiating search terms and an ESI
9  protocol so that we don't delay the case by just having to do
10  those things afterwards.  I'm not going to order production of
11  documents or responses to written discovery now, you know, but
12  I want to -- I'm going to want to work through those
13  objections to written discovery so that doesn't delay us later
14  and so that we could move toward actual production of
15  documents and things like that if the case merits that after
16  the motions are decided.

17    I want to address defendants' argument that
18  plaintiffs agree to a discovery stay in this case in the
19  status report that was filed back in October.  I don't read it
20  that way.  I read that status report, which predated my
21  involvement in the case.  Plaintiffs said they would agree to
22  a stay until the earlier of April 1, 2017 or a ruling on the
23  motions to dismiss, and that was filed in October of 2016,
24  October 20th.

25    So we're approaching April 1.  The motions to dismiss

won't be fully briefed on the current schedule until
April 12th.  And even if Judge Durkin is a superman, which he
very well might be, my best guess is that he's not going to
rule in April.  And there's nothing that I've seen that the
defendant -- and for that matter, the order that we entered
regarding disclosure of information that I signed on
December 21st also doesn't say, the way I read it, that
nothing else is going to happen.  So I think we're -- I'm
writing on a clean slate here as to what's going to -- what
should occur, and I think some things should occur that will
make the case, you know, consistent with Rule 1 of the Federal
Rules of Civil Procedure which requires the Court and the
parties to do things that would enhance the speedy, economical
and efficient disposition of the case.  I think there are
certain things we can do even while the motions are pending
that would serve that goal.

Judge Durkin also agrees that it's important to set a
trial date in this case, and he intends to do so later this
year.  But, you know, let's talk about timing on this.  You
know, big picture again, I, having read these proposed
schedules and Judge Durkin having read them, don't really
agree with either side's posture in this.  I mean, plaintiffs
are on jet skis, and a lot of the things that they're
proposing in terms of scheduling are unrealistic.  And I think
plaintiffs' schedule I think gave Judge Durkin a month

1  between, like, October and November of 2019 to rule on summary

2  judgment motions at that point with a trial date in November

3  of 2019, and that's not realistic.  And defendants' schedule

4  had us with a trial in November of 20 -- of 2022, I think, and

5  my best guess is that's going to be way too long too.  So,

6  you know, you've both staked out positions on either end of

7  this, and I think part of my job is to move us to a place of

8  compromise or mutual dissatisfaction.

9       I look at it a little bit like a settlement

10  conference.  You know, plaintiffs have made their demand.

11  Defendants have put their offer on the table, and we have

12  to -- you know, I'm going to have to move this to a place

13  where it works.  I understand that if we can't get agreement,

14  then I make the decision.  So it's different than a settlement

15  conference because, you know, I rule on what I think is right,

16  and that's fine.  But I think if I set some sidelines and goal

17  posts here, we may be able to make some progress once you see

18  the direction we're going.

19       You know, plaintiffs cite the *Potash* case in their

20  submissions, and, you know, urge Judge Durkin to do what

21  Judge Castillo did, set a trial date.  You know, what you guys

22  don't say is that *Potash*, the transfer order in the *Potash*

23  case -- or *Potash*, however you pronounce it -- came in on

24  December 2, 2008.  The motions to dismiss in that case,

25  according to the docket, were filed in June of '09, and they

were fully briefed in August '09. Judge Castillo entered a memorandum opinion denying in part and granting in part the motions to dismiss in November of '09.

The case then went up to the Seventh Circuit, and the Seventh Circuit ruled in July of 2012. And it was only after that process that Judge Castillo set a trial date in -- I think in December of 2012.

So I think we've got to be realistic about, you know, when to set a trial date, what information we have to set a trial date. Yes, it was an early case management order, but a lot of stuff was under the bridge in *Potash* before that happened. So he agrees that we need to set a trial date. Once we have a better sense of some of the things that we're going to discuss today and when we meet in person, he will set a firm trial date. And once we're informed by those discussions, he's going to do everything he can to stick to that trial date. But as I said, likely it's not going to be in November of 2019, and I don't think it's going to be in 2022 either. We need to embark on a process that will result in a schedule that I hope will include, if possible, up to and including trial, and I'm committed to working with you to do that.

There are a couple of other preparatory issues I guess that I want to address before we talk about some specifics and the next date to get together.

1       One is Tyson's desire to file a summary judgment

2  motion before class certification briefing.  That's going to

3  be an issue -- that will be an issue ultimately for

4  Judge Durkin.  My guess is Tyson will have to file a motion

5  for leave to do that explaining why it makes sense and it's

6  going to save time probably after a decision on the motions to

7  dismiss if that -- if that issue is still ripe.  But I think

8  Tyson has an uphill battle to get leave to do that.  In the

9  case Tyson cites, *Mervyn v. Nelson Westerberg*, which is a

10 Northern District of Illinois case, is readily distinguishable

11 from this case, as you have to know.  And it acknowledges that

12 the preferred course in any case is to address class

13 certification issues first.  In that case, the Court noted

14 that the named plaintiff was an inadequate class

15 representative for a flawed claim, and it didn't want to waste

16 time on class certification.  So that, to me, is an exception

17 and proves a little bit of the rule.

18      But, again, the schedule that I would like to work

19 with the parties on is not going to build in pre class

20 certification summary judgment briefing.  I think everybody

21 has to see how the motions to dismiss come out first and then

22 act accordingly.  And, you know, if there's a preemption of

23 that, fine, but I think the odds of that happening are not

24 great if the case is still moving forward.

25      And, Ms. Fegan, you referenced your request to pursue

third-party preservation of data.  I want to address this as
we get to the end of this conference, not now so as not to
focus on one particular plaintiff group early.  But I did note
that one of the issues that you and the defendants in the
status report and in the Rule 16 report discuss the back and
forth that you've been going through, and the defendants' end
position was, you know, since they wanted an assurance that if
they provided the information you're looking for, then there
would be no further discovery-related efforts.  And that's a
direction that we're not going to go here, so that may require
additional discussion between the groups here.  I think if
this issue needs to be decided, I'll probably need a separate
motion on it.  You know, you've highlighted the issue for me
in your filings, but I'm going to have to get a better sense
of what you're looking for and, you know, whether it's the top
25 customers or other people and how -- you know, so there's a
lot of stuff that I'm going to need.  I want to address this
at the end.

          And then as an overall issue, the last overall issue
are the ESI issues.  That's something -- that's something
particularly that is not suited for discussing in this format.
We have to be sitting around the same table and do that.

          Let me talk about a couple of big picture issues.
And I know defendants requested leave to provide more
authority and argument if the Court was considering departing

from their protocol.  And since we are considering that, I don't know what else you would want to submit or whether you would want to come in and discuss it.  But, you know, big, big picture items on that, I think plaintiff's protocol is probably too detailed, but there are some good things in there.  And just because the provision wasn't utilized in another case doesn't mean it's not a good idea here and shouldn't be used here, but I would need a lot more information in order to make that judgment that I have in just your brief submissions.

And I am going to tell you that I am not going to spend my life or career micromanaging ESI issues and disputes in this case.  And so if with my help we can't agree on most of this stuff and I'm going to need to weigh in substantively to resolve disputes, I'm going to appoint a court's expert to assist me at your alls' expense or a special master if it becomes that.  The costs will be allocated among the parties because I think to the extent I need expertise, I'm going to need an independent court expert on that.

I do think that the process of doing the things in plaintiff's protocol, some of those things need to start sooner rather than later.  Plaintiffs' proposed structure, I view it as a tradeoff in exchange for foregoing document production and more comprehensive discovery while the motions to dismiss are pending.  I think a structure to that

1    negotiation process can help to prevent or preempt foot

2    dragging that inevitably can happen where there are no

3    deadlines and no structure.

4            I view the defendants' suggestion, for example, that

5    they start negotiations about document sources and search

6    processes, start 30 days after the motion to dismiss order is

7    entered as not the direction I want to go because, as I said,

8    that starts from a standing stop.  But similarly -- so I would

9    like to begin that process now.  I don't know what the

10   schedule for getting it done will be.  That's something --

11   that's one of the reasons I want to meet with you about the

12   stuff that you've got here.  And if you think that my or our

13   deciding that we're going to move forward with some of this

14   stuff requires you to get back together and talk about what a

15   schedule could look like if we're going to start now as

16   opposed to 30 days after the motion to dismiss order, that's a

17   good thing, and I'm happy to accommodate that.  But I do think

18   that identifying certain of the issues that plaintiffs have in

19   their protocol, document sources, talking about keywords,

20   talking about how this is going to happen, prioritizing

21   certain databases for production relatively soon after motions

22   to dismiss are decided and then rolling forward with others, I

23   think those are things that productively we can discuss

24   beginning now and save time later, again, if the motions to

25   dismiss leave all or part -- significant parts of the case in

1  place.

2          I have views that are not engraved in stone on some

3  of these things, and, again, I would like to talk to you about

4  them in person.  But, for example, the dispute about whether

5  the defendants' suggestion that they do technology-assisted

6  review on top of or after keyword searches, this is an issue

7  that's gotten a lot of attention recently, both in literature

8  and in cases.  And I think the best practice seems to me

9  generally not to accept that because it tends to lessen the

10  recall documents that are coming in or the productive

11  documents.  There may be -- again, and you can talk about that

12  and we can talk about that -- certain databases where that

13  makes sense to do for certain reasons.  You know, there's

14  no -- there may not be any one-size-fits-all answer for that.

15  But generally what I've seen is that doing keyword searches

16  and then doing technology-assisted review, or TAR, over that

17  process is disfavored.  Now, again, you may be able to

18  convince me that there's a reason to do it.  You may be able

19  to convince each other that there's certain databases to do

20  it.  But if we're going to have a knockdown, drag-out fight on

21  that, then I'm going to need a court's expert I think to help

22  me make that kind of decisions.  I think your other -- and

23  these are just -- these are preliminary thoughts on these

24  kinds of things that we're going to talk about in person.

25          I agree with defendants' position on the privilege

1  logs, for example. I think there have to be categories of

2  communications that the parties on both sides agree don't have

3  to be logged with litigation counsel or in-house counsel after

4  a certain date, for example. I mean, I cannot believe that

5  we're going to need to have a log of all of that kind of

6  stuff, and I'm happy to meet with you to kind of try and

7  broker a compromise. And, again, if not, I'm happy to decide

8  the issue if it gets presented to me. But, you know, that's

9  an issue I think that makes sense to proceed the way the

10 defendants are proposing.

11      I think there's potentially a middle ground on your

12 dispute with respect to whether nonresponsive attachments to

13 e-mails and documents get produced. I think I lean toward the

14 position that attachments should be produced even if not

15 responsive because the fine combing, I guess I would say,

16 process of determining whether all or part of the document is

17 responsive is time consuming and potentially fraught with

18 problems. And my experience is that at the front end of

19 document production process sometimes it's difficult to know

20 whether something is responsive or not. And then we get into

21 problems at the end where something wasn't produced because

22 the producing party thought it was not responsive, but it was.

23      But I also agree with the concept that there can be

24 certain guideposts. I mean, Tyson's, for example, there's a

25 reference to unrelated businesses. I mean, if there are

things that relate to stuff that is completely unrelated to this litigation and we can describe what that is with sufficient certainty that everyone knows that stuff does not need to get produced and clog up the process, I'm all for it. And there are -- you can negotiate protections on documents that are produced that are not relevant to a claim or defense. So, you know, I think although there's a sentiment that, you know, producing or culling the nonresponsive -- so-called, I would say, nonresponsive documents early on in the process is going to, in the end, be beneficial. I think, you know, there's a powerful counterargument to that, that it slows everything down. And I think there are ways to deal with that.

I like to have an ESI liaison structure. I don't think it's a bad idea to require some parameters on responding to requests, and having been involved in this process a lot myself, it wouldn't be a bad idea. And I'm talking about as a lawyer. It wouldn't be a bad idea to put some guidelines in there as to, you know, how long you can sit on something, but, again, I don't know that micromanaging it too much is a good idea. And, you know, I don't know that getting either side in the other side's business too much is good either. But I think in general, there's a way to structure a liaison -- an ESI liaison relationship so that it works well with the personnel that you put in place.

1          I know I've been talking for a lot, but I think that

2    was my intent here with this phone call because, again, the

3    interactive process is not as great on the phone.  Let me tell

4    you what I was going to go to next.

5          Hold on for a second.

6      (Off the record.)

7          THE COURT:  I wanted to talk about initial

8    disclosures and getting you then to a process or a schedule

9    for that.  Written discovery, again, broad over-points and

10   then getting you to discuss it and the other -- kind of the

11   other weigh stations on the way to a schedule and then seeing

12   whether we can get together and meet about these things in

13   person and potentially getting you to file something after

14   you've had a chance to meet and confer about this stuff.

15         Maybe I should just go through that now and then I

16   will pause and get your reactions to this.  As I said, I

17   think -- and Judge Durkin agrees -- that we should go forward

18   with initial disclosures.  I think plaintiffs' proposal that

19   this be done 14 days from today, I don't think it's realistic.

20   Defendants' proposal that it be delayed until 21 days after a

21   decision on the motions to dismiss we don't think is

22   reasonable given our decision that we should begin to move

23   forward with non-document discovery process -- processes and

24   so that we don't start from a full stop if the motions to

25   dismiss are denied in whole or in part.

1      There's no reason to exempt this case completely from

2    Rule 26 of the Federal Rules of Civil Procedure.  The process

3    of putting together the abbreviated disclosures that you

4    exchanged on January 31st, which was in the agreed order that

5    we entered in December, was a beginning.  And my guess is that

6    you can build on that to get to realistic initial disclosures.

7      Now, they are initial disclosures.  They could be

8    supplemented under Rule 26(e) as necessary.  But the process

9    can start now in a meaningful way in good faith to allow both

10    sides to get a better realistic look, for example, of what

11    kind of deposition structure is going to be needed.  I'm not

12    prepared in an initial case management order to say now how

13    many depositions the other side is going to take.  I think you

14    need more information for that.  I don't know how you came up

15    with the numbers in your proposals.  Again, they seem to be at

16    opposite ends of the spectrum.

17      Defendants say that plaintiffs' numbers would yield

18    300 depositions.  That seems to me to be an incredibly high

19    number in a case with 14 defendants and not, you know, 50

20    defendants.  The proportionality guidelines that have become

21    express in the federal rules I take seriously and expect you

22    guys to take seriously too, but I think initial disclosures

23    can help us go forward on what some type of a structure would

24    look like, and I would like those to occur.  Now, I would like

25    you to meet as to when, right?  I mean, I'm saying no to 14

1  days from today, and it's going to happen before motions to

2  dismiss.  I could impose a date unilaterally for initial

3  disclosures by fiat, or I could have you discuss that now

4  given the direction we're talking about.  And of the two, I'd

5  prefer at least going first with the latter approach.  If you

6  can't come to an agreement or it's one that I don't agree with

7  and you give me your best proposal, I could decide it.  But I

8  don't see any reason to kind of throw a dart at the board now

9  and set that date by fiat just because I can.

10            With respect to written discovery, the way I would

11  like to proceed is I know plaintiff said they served written

12  discovery informally.  Can you tell me, somebody on the

13  plaintiffs' side, when did you do that and how many -- these I

14  think were just requests for production.  When were those

15  served --

16            MR. CLARK:  Your Honor, this is --

17            THE COURT:  -- or at least -- go ahead.

18            MR. CLARK:  Your Honor, this is Brian Clark for

19  directs.

20            We served requests for production under Rule 34 on

21  November 15th of last year.

22            THE COURT:  And what -- how many did you serve?

23            MR. CLARK:  I don't have the exact number.  I believe

24  it was about 60, plus or minus five.

25            THE COURT:  And were the indirects served as well?

1          MS. FEGAN:  Your Honor, this is Elizabeth Fegan for

2    the end-users.

3          We did not because we were not appointed at that

4    time, and we were focusing on the preservation efforts as data

5    as a non-duplicative request that we would need, to what the

6    direct purchasers are.

7          THE COURT:  What about Mr. Hedlund?

8          MR. HEDLUND:  Your Honor, we of course joined in the

9    discovery served by the direct purchaser because obviously

10   there's a lot of overlap.  But like Ms. Fegan, we haven't

11   served separate requests at this time.

12         THE COURT:  Did you formally --

13         UNIDENTIFIED SPEAKER:  Your Honor, this is --

14         THE COURT:  Did -- let me just ask this -- sorry.

15   That's why this is not the best.  I understand.

16         Mr. Hedlund, did you formally join saying we served

17   these too, or did you just work with them on it and say it

18   looks good to me?

19         MR. HEDLUND:  I can't recall exactly what we did.

20   But I guess barring any issues related to, I mean, if there's

21   numbering issues that we're going to be faced with on their

22   requests, it may have been to the extent there would be some

23   that we wouldn't join in, I would want an opportunity to be

24   able to go through and, you know, carve those out and say

25   maybe direct purchaser plaintiffs only.  But certainly there

1  are things directed at conspiracy issues, and, you know, of

2  the sort that are going to be common across all plaintiffs.

3  We would certainly join in those.

4        MR. SUGGS:  Your Honor, this is David Suggs of

5  White & Case.

6        I think just for your informational purposes,

7  according to my records, the direct served requests for

8  production on November 15th, and the commercial indirect

9  served some on December 19th.  And I believe the total number

10 was 67.

11       THE COURT:  And who was that who was just speaking?

12 You were cut off at the beginning.

13       MR. SUGGS:  David Suggs for White & Case on behalf of

14 Tyson.

15       THE COURT:  Great.  Thank you.

16       And did the defendants serve on any of the plaintiff

17 groups?  I recognize that the end users weren't a formal group

18 at that time.  So did you serve on the directs or at that

19 point the indirects any document requests or any other

20 discovery of your own on any formal basis before discovery

21 began?

22       MR. SUGGS:  Yes, Your Honor.  We have also served our

23 own requests on the plaintiffs.

24       THE COURT:  And when did you do that?

25       MR. SUGGS:  I can get that date for you in just a

second. I think it was in December.

MR. HEDLUND: Your Honor, this is Dan Hedlund.

I just want to say, I'm sorry, I stand corrected. Mr. Suggs is corrected. We did serve some additional requests.

MR. SUGGS: So the defendant served requests on January 6th.

THE COURT: And you served those on the directs and indirects at that point?

MR. SUGGS: That's correct, Your Honor.

THE COURT: And by that time, I think the end users were there too. Did you serve end users too?

MR. SUGGS: I believe they applied to all -- there may have been some specific to end users, but I believe there were requests that applied to all plaintiffs.

THE COURT: Okay.

MR. SIMON: Your Honor?

THE COURT: Yeah.

MR. SIMON: This is Bruce Simon on behalf of the directs.

But I just wanted to say, amongst a lot of the provisions we didn't agree upon, one of the things we did agree upon in our joint Rule 26(f) report was a prediction that we would try to be coordinated and non-duplicative in our discovery attempts. And even though procedurally, as

1    Ms. Fegan said, they weren't appointed at that point, we fully

2    intended to try to work in a coordinated fashion and will

3    continue to do that.

4         So I think probably what Mr. Hedlund and the

5    commercial indirect plaintiffs served are probably

6    supplemental to ours, and Ms. Fegan may have some in addition

7    that directly relate to them.  But we certainly tried to cover

8    the landscape to the best of our ability on, you know, broad

9    issues that cut across all the plaintiffs.

10        THE COURT:  Okay.  So, again, big picture here, what

11   Judge Durkin and I would like to see, whether it's these

12   informal requests that then get deemed your formal requests,

13   but big picture, we would like to see each side serve on the

14   other requests for production.  And then we would like to be

15   able to work through objections to those things in the

16   ordinary course now, not wait until a decision on a motion to

17   dismiss, so that you could do your meet-and-confer process as

18   to what is or is not burdensome and relevant.  I understand

19   that relevance could change if the motion to dismiss is denied

20   in part and granted in part, but that would be an easy fix.

21   But what we would like is for that process to go forward.  I

22   don't know when -- it was unclear to me in the proposals that

23   you all made when, from the plaintiff's point of view, if

24   written discovery was going to be served before motions to

25   dismiss, when it would be at least responded to in writing,

not produced, not documents produced.  You know, we would
change the existing Rule 34 regimen as amended for that.  But
I would like not to have to go through a process of months of
meeting and conferring and then motions to compel after
motions to dismiss are decided if the case remains.  And I
think the burden on the parties of actually looking at the
requests to produce and dealing with objections and having me
weigh in on whether they are meritorious or not could allow us
then to begin document production in -- more quickly after
motions to dismiss are decided.  And, again, I'd want kind of
a schedule on that and whether these existing document
requests are your first wave or not.

I would also big picture have a second wave of
document requests, and it would be well before the completion
of fact discovery is to happen.  As often occurs, after you
get responses or after you even begin to take some
depositions, it becomes clear that there may be other document
populations that you want.  But I don't want to wait as long
as either party is wanting to wait into fact discovery before
those are served because the process of doing that and then
objections and all the rest are going to eat up a lot of time
and push discovery out.  I would rather have a date, again,
earlier in the process than not for any second wave of
requests for production and then have -- and try to get
documents out of the way early, early.  That's not to say that

documents that are mentioned or identified in a deposition or
otherwise discovered later can't be requested, but I don't
want that -- I would like to get the major requests out in two
waves much earlier than either of you guys.  I mean, I
don't -- for example, plaintiffs' statement that they would
like to serve another document request up to 60 days before
the close of fact discovery I think is a recipe for disaster
because, again, not if it's a document identified in a
deposition, but I think we can start having problems with
that.  I can be convinced otherwise.  I mean, you know,
documents can be produced after the close of discovery.  But
if we can get them done during the discovery period and during
the deposition period, I would rather do that.

Now, neither Judge Durkin or I are real big fans of
interrogatories.  Interrogatories can be useful for who, what,
when, where, why, how.  I mean, maybe that's too broad.  I
don't really mean what and how.  To identify people, dates,
places, things; once you start getting into interrogatories
that are more detailed than that and ask for more narrative
answers, I don't think they're helpful because the responses
are written by the lawyers, and they're designed not to
necessarily be that responsive -- but don't quote me on that I
guess, but I've seen that happen I suppose with less competent
and experienced counsel than we have in this case.  But
nevertheless, identifying people and places and dates that

meetings occurred, for example, interrogatories could be useful for that purpose.

My default would be to keep interrogatories at least initially to the 25 authorized by the rule. I mean, plaintiffs I think had proposed 30 and 15, 30 jointly, 15 on individual defendants. I think on principle I might cut that down to 25/10. Defendants were talking jointly up to 25 on each of the named plaintiffs. I think all of that is reasonable.

I can see the benefit of serving interrogatories along with requests for production and going through the objection process so that we don't have to do that at the end of the -- at the end -- not at the end but after motions to dismiss are decided. I would be willing to hear why that doesn't make sense, but my gut is to at least begin that process. Again, I'm not talking about answering them, but I'm talking about getting the field of play set so that we then could expect answers to document requests and interrogatories soon after -- sooner after motions to dismiss are decided than under what the defendants' schedule would provide.

I think a schedule that we ultimately enter should have a date for completion of all fact discovery. I don't know how to set that date immediately right now when I don't know how many depositions are going to be taken. I thought, again, the parties doing proposals probably were, you know,

1    aggressive or regressive, depending upon where you're doing

2    this.  For example, you know, I think that it's probably

3    unrealistic for plaintiffs to say that five months after the

4    motion to dismiss is ruled upon you're going to -- everybody

5    is going to complete or substantially complete document

6    production.  That's too soon even, you know, if we get

7    agreement on the written discovery that's going to be

8    answered.

9         Defendants had, you know, eight months after the

10   earlier of an agreement on, you know, the process or four

11   months after the Court's decision on the motions to dismiss.

12   But I think, you know, the defendants' process in general was

13   pushed farther back than I think it needs to be, but I think

14   it's going to require more than five months.

15        Under plaintiffs' proposal, the way I read it, they

16   would complete fact discovery seven months after substantial

17   completion of document production.  I think that's aggressive,

18   but I don't know what the right date is.  I will work with you

19   to get to that date.  But I think the plaintiffs' schedule is

20   too aggressive on that.  Defendants' schedule may be more

21   realistic on that.

22        Again, big picture items, I hope some of these are

23   helpful to you and kind of cutting to something that we could

24   end up entering.

25        I do not agree with plaintiffs' proposed presumption

1   that documents produced from an opponents' files automatically

2   are authentic business records.  I think there are a lot of

3   problems with that.

4         I like defendants' position that stipulations as to

5   evidentiary issues, which I take as stipulations within --

6   under the Federal Rules of Evidence as to certain things will

7   not be unreasonably withheld.

8         I do think that the schedule that we ultimately enter

9   should go through class certification, including a schedule

10  for briefing and disclosure of experts.  I have some ideas on

11  that, but I've been speaking too long, so I don't know that I

12  need to do that.  I think plaintiffs' proposal that they would

13  file within 60 days after the close of fact discovery is

14  reasonable, and then we have to build in the expert schedule.

15        I noted that the defendants wanted plaintiffs to file

16  motions for class certification within 30 days of the close of

17  fact discovery, but they gave themselves 60 days to file

18  motions for summary judgment after the completion of merits

19  expert discovery.  So, you know, I don't know that it's fair

20  to squeeze the plaintiffs in a way that they don't want to

21  squeeze themselves, but 30 to 60 days after a line gets drawn

22  to file motions and then brief them is reasonable.

23        And, again, as I noted at the outset, when I look at

24  the schedules that you've proposed up to getting to a trial

25  date, the way I read the schedule, with plaintiffs' schedule

1  would have summary judgment motions filed mid-August of 2019

2  and then briefed in 30-day increments.  So that means they

3  would be fully briefed in October of 2019, and your trial is

4  supposed to start on November 2, 2019.  I just don't think

5  that works.  Again, even if Judge Durkin is superman, to

6  decide summary judgments a month after they're fully briefed,

7  I don't think so.

8        So, again, big picture is I want to -- we both want a

9  schedule.  I'm going to work with you to get a schedule.

10  These are some thoughts on what a schedule would include.  I

11  would like to meet with you to go through this.  And then my

12  thought would be that if you think it would be productive for

13  liaison counsel to meet again in light of kind of some of the

14  guidelines that I have set out to maybe try again to do a

15  proposed schedule, see how much you can agree to and how much

16  is not agreed to, then we'd get together in person to talk

17  about that as well as some of these ESI issues and try to push

18  that process forward either on March 27th or the 29th I think

19  in my mind is workable and the way I would like to proceed.

20  But I'm interested in hearing what you have to say about that.

21        And, Ms. Fegan, I can get back at the end of that to

22  your discovery issue with defendants.

23        MS. FEGAN:  Thank you, Your Honor.

24        THE COURT:  So --

25        MR. SIMON:  Your Honor, this is Bruce -- I'm sorry.

1           THE COURT:  No, go ahead.

2           MR. SIMON:  I was going to say, this is Bruce Simon

3    on behalf of the direct purchasers.

4           I think, first of all, on behalf of everybody, thank

5    you for the level of preparation you obviously put into this

6    and for giving us your suggestions.  My experience in these

7    cases is that when we get this level of thoughtfulness to what

8    the Court wants to do, it helps the parties immensely despite,

9    you know, there being differences as to where we should go.

10   And I think that what you proposed just at the end there so we

11   can absorb what you're saying and have another discussion with

12   that in mind and then be able to come that week that you

13   proposed, either the 27th or the 29th, with some concrete

14   things in mind that we should have a chance to do that before

15   we show up and see you again.

16          The only other thing I would say is -- and I know

17   that you don't want to do this by fiat and we probably should

18   discuss it.  It probably makes sense, just so that everything

19   is on the table on the 27th or the 29th, to perhaps have

20   initial disclosures before then and serve the discovery that

21   you want to start on before then.  I think on behalf of the

22   direct purchasers at least we can do that, but I recognize

23   other people have certain obligations, including the

24   defendants, and they may have a different view on that.  But

25   at least we would have, you know, some additional data points

1  for our discussion on the 27th.

2          THE COURT:  I --

3          MR. SUGGS:  Your Honor, this is David Suggs for

4  Tyson.

5          And speaking for defendants, we agree with Mr. Simon

6  that this has been very helpful.  We very much appreciate your

7  guidance.

8          THE COURT:  Mr. Suggs?  Mr. Suggs?  I'm sorry.  I

9  don't know if you're on a cell phone or not, but I was not

10 hearing what you started to say.

11         MR. SUGGS:  Oh, I'm sorry.  I'm not on a cell phone,

12 but maybe this -- I'm sorry.  I don't have a handset I can

13 pick up.  But can you hear me now okay?

14         THE COURT:  Yes, that's much better.

15         Kelly, can you hear better?

16         THE COURT REPORTER:  Yes.

17         THE COURT:  Okay.  Go ahead.  Sorry.

18         MR. SUGGS:  Yes.

19         So I just want to say that we agree with Mr. Simon

20 that your guidance has been very helpful and much appreciated.

21 And we also agree that it would be useful for the parties to

22 get together and discuss a schedule and the other issues that

23 you just addressed prior to any additional conference.

24         As for the date of disclosures and discovery, it may

25 be something we can agree to plaintiffs with, so we would just

include that in our discussions.

THE COURT:  Yeah.  Mr. Simon, I appreciate your
desire to get it moving forward, but my concept was that one
of the things that the two sides would talk about was an
acceptable date for initial disclosures knowing that it wasn't
going to be 14 days from today and knowing it wasn't going to
start after motions to dismiss.  I don't -- I don't think our
discussion when we get together is going to be materially
advanced by having initial disclosures or not.  To me what
that will advance and when we get the document requests on
file, what that's going to advance is moving forward with a --
you know, a comprehensive discovery schedule and how many
depositions are really going to be needed and what it's going
to look like.

So I'm not -- I won't insist on the initial
disclosures getting served before we meet.  I would be
satisfied either with an agreement as to when that would
happen or revised proposal from the two sides that then I can
decide when it will happen.

Again, I appreciate -- I have litigated these, so,
you know, part of this comes from some experience here.  Not
only on the bench in managing some MDL cases, which has been
fun and interesting, but also having represented parties on
both sides of the versus in these cases.  So I completely
appreciate the desire of plaintiffs to get concrete dates on

the record that we then move to and eventually move this case

either to settlement or a disposition on the merits.  And I

appreciate the defendants' desire not to do that precipitously

or to do it too quickly and to be able to have enough time to

confer with their clients and make sure that that schedule

works for them.

And I think you both have accurately gauged or both

sides have accurately gauged that my way of doing this is to

be a little bit more hands on.  And not that I want you coming

in every other Thursday with all the disputes that you can't

resolve as a default to me.  I don't.  And as I said, with

respect to the electronic material particularly, if you can't

get these things decided yourselves then I'm going to have to

bring in some extra help, and there's going to be a cost to

that.  And I don't think that will unduly delay the process.

But my experience in big cases like this, with good

lawyers on both sides, all of whom have their own interests in

doing things economically and not wasting time, is that when

you see the shape of the table and the goal posts that most of

these issues you can resolve yourselves because the costs and

delay of not doing that is not productive.

I see a lot of judges writing on ESI issues, TAR or

not TAR, hit counts or how much is shared.  I have not, in the

years that I've been on the bench, written about that because

I have been able to work things out with the parties.  And if

I can't work it out, then it's a short order, not a law review article necessarily.  And I think, again, if I need to have an expert, that will help me.  So I would say I don't think I'd want initial disclosures before we meet, but I would like proposals as to where those fit into the schedule before we meet, and then if I have to make the call, I would like to do it.

I would like you to talk -- so I'm looking at -- I would have the whole day on March 27th.  And on March 29th, I teach in the afternoon, so I would turn into a pumpkin at 3:30.  But I would have the whole day after that.  And maybe you guys can compare your schedules and let Brenda know which of those dates works best for you and then we can set it for then.  And what I would anticipate is a couple of weeks before that getting from you some revised proposals on things that you've met and conferred about that we've discussed here today and even a proposed agenda for the meeting.  Again, my agenda would be to tackle some of -- you know, discuss with you in more detail than we can do now some of the ESI protocol issues in your I think it's Exhibits 3 or 4 maybe to the filing in December and come up with a process and strategy for dealing with that stuff to move it forward, as well as ending up with an order as to when initial disclosures come, when written discovery comes, when objections come and then a meet-and-confer process after that and involving me and how we

1   would tee that up for review, but that's kind of my big

2   picture thought.  So if you are all in agreement with that,

3   you can confer and get back to Brenda that week and then I'll

4   enter an order setting the date.

5          MR. SIMON:  Thank you, Your Honor.

6          THE COURT:  Who was that?

7          MR. SIMON:  Your Honor, it was Bruce Simon.  I'm

8   sorry.

9          THE COURT:  Okay.  And unless somebody on the

10   plaintiff's side disagrees, I'll hear from Mr. Suggs, if

11   that's agreeable for him?

12          MR. SUGGS:  Yes, Your Honor.  Sounds good to me.

13          THE COURT:  Okay.  I'm going to go look at my notes

14   and go back to this end-user thing.  Oh, there were a couple

15   of other issues.

16          Global status hearings were requested in several of

17   the filings.  Judge Durkin intends to set a global status

18   hearing after the motions to dismiss are fully briefed.  He

19   also intends -- I mean, the concept is I'm going to meet with

20   you more often, but he intends to come to as many of those

21   meetings as he can in whole or in part so that he is

22   participating in this as well.

23          Plaintiffs' requested biweekly telephone conferences

24   with me.  I don't know about that.  I'm just -- I assume --

25   you said "biweekly."  I assume that meant bimonthly and not

1  twice a week, right?

2      MR. CLARK:  Your Honor, yes.  This is Brian Clark for

3  plaintiff.  The idea was every other week.

4      THE COURT:  Because biweekly, you know, I'll do

5  motion call on Tuesday and Thursday, but I'm not going to meet

6  with you guys every week.  The short answer to that -- the

7  short answer to that is we can decide on the best schedule for

8  this at a future date.  Some of it depends upon what's

9  happening in the case, so I think it's premature to set a

10  regular time.  But I am going to be involved and will be

11  involved.  And however often we need to meet, we will meet.

12  However often we need to talk on the phone, we'll talk on the

13  phone.  But I think we need to move that process forward.

14      Let me go back to the EUP, end-user plaintiffs, issue

15  here.

16      Ms. Fegan, do you think, or Mr. Suggs, do you think

17  given what we've said here, you could further talk about

18  amongst you as to what you want to do makes sense, or should I

19  set a schedule for motion practice on that?

20      MS. FEGAN:  Your Honor, this is Elizabeth Fegan.

21      I'm happy to confer further with Mr. Suggs and

22  defense counsel if they prefer.  Otherwise we can be prepared

23  to file a motion on it within seven days so that we can

24  address it at the next conference.

25      MR. SUGGS:  Your Honor, this is David Suggs.

1      We don't want to put the Court through any

2  unnecessary motion practice, so it probably is worthwhile just

3  to confer with the plaintiffs to see if there's any movement

4  on the positions.

5      THE COURT:  Okay.  And then, I mean, I like that

6  proposal.  And then once you have -- once you -- I do take

7  seriously our Local Rule 37.2 that disputes only should be

8  brought to the Court when they need to be resolved by the

9  Court.  So you all should know that -- and that's whether it's

10  our local rule or it's the federal rules, you know, there's

11  clearly a preference for that.  So I take that seriously.

12  I'll resolve disputes that need to be resolved, and I hope

13  we'll resolve them quickly.  But if this one needs a little

14  bit more time, I'm fine with that.

15      It seemed to me -- if I understand this right, could

16  I maybe have two minutes on this just so that I actually

17  understand it?  You want, Ms. Fegan, the defendants to

18  identify, you know, up to their 20 -- let's say their 25 top

19  customers so that you then can serve those people with

20  document preservation subpoenas?  Is that what we are talking

21  about?

22      MS. FEGAN:  That's exactly right, Your Honor.  We

23  have -- under the case law we've researched, sending customers

24  letters or direct purchasers letters asking them to preserve

25  data wouldn't actually put any onus on them because they're

not parties to the case.  They're potential -- you know,
they're not going to be sued.  And so all we want to do is
make sure that whatever transactional data currently exists is
just preserved.  And so we would serve document subpoenas
identifying the transactional data and contact them to just
ask that the data be preserved until discovery proceeds in
this case.

THE COURT:  And by "transactional data," you mean
price, right, the price at which the product was bought and
sold, correct?

MS. FEGAN:  That's exactly right.

THE COURT:  And the reason that the direct or
indirect purchasers don't have that information is they have
their own information, but they don't know what the top 25 of
each defendant might be, right?

MS. FEGAN:  That's my understanding, yes, correct.
At this point there's no customer list that they have.  We
could certainly all guess, and I could certainly ask for leave
to serve subpoenas on a wide range of people that, based on my
research, looks like they bought or sold chickens.  But rather
than kind of blanket the universe, we thought it made sense to
just do targeted preservation subpoenas that will cover the
majority of the market based on the information in the
defendants' possession.

THE COURT:  And so when the defendants propose to you

1   that you give them a list of these entities in advance, your

2   response is well, I don't really know, I could guess, but you

3   have that information from your company?

4           MS. FEGAN:  That's exactly right.

5           MR. ROSS:  Your Honor, this is Martin Ross on behalf

6   of Sanderson.

7           Just to clarify something that might not have been

8   clear in our papers, I think we're actually talking about two

9   different things.

10          So on the one hand, Ms. Fegan and her clients have

11  said they want to subpoena third-party data organizations such

12  as Nielsen and IRI which aren't customers directly but they

13  keep statistics on retail.  That was what we asked for a list

14  of because we as defendants don't know the third-party data

15  organizations that they're thinking of.  And we've already

16  told the end-user consumer plaintiffs that we're happy to

17  allow those subpoenas to go out.

18          What we have objected to is providing lists of our

19  top 25 customers at this point given that we frankly don't

20  want our customers and businesses to be disrupted by

21  subpoenas.

22          That said, having heard the Court's guidance on this

23  issue, we are happy to talk about it further with them.

24          THE COURT:  Okay.  So I'm looking at page 25 of the

25  joint status report which was docket entry 316.  And, you

know, I see where it says defendants' position is that
plaintiffs gave you a list of these entities in advance, and
we're talking about IRI and Nielsen. I get that, and I think
plaintiffs could do that, for example. I mean, maybe I'm
weighing into this too much, but you know who -- the
third-party entities you want to do. They obviously don't
know your top 25, and at first blush, a desire to preserve
data, you know, is a reasonable request. I understand why you
wouldn't want your customers to be subpoenaed, and then I
would have to balance the pluses and minuses with that or
whether there's any other way to do it. I think Ms. Fegan
probably is right, that a letter may not do it, though I don't
know.

And then, you know, the third point was confirming
that they wouldn't issue any further discovery requests to you
or otherwise pursue discovery in exchange for this. And I
have addressed that.

So I think it would be great for you guys to talk a
little bit more and then resolve it. I don't know if it would
work in this case, but my guess is it would. I've had
success, just to let you know, in the run-of-the-mill case
with what I call a joint motion to resolve a discovery
dispute. Sometimes it saves time, but that is -- it
doesn't -- neither party waives the ability to go for fees if
you want fees. But it would be a joint motion that says,

here's the dispute:  Here's the plaintiff's position on it,

cites case.  Here's the defendants' position on it, cite

cases.  I find when we do that the parties tend to be speaking

to each other rather than past each other as in traditional

motion to compel practice.

So, you know, sometimes in traditional motion to

compel practice, the moving party says, you know, they haven't

responded to interrogatories 5, 6 and 7 and this is why we

need the information.  And the responding party says, the

moving party's whole theory of the case is wrong, and they're

barking up the wrong tree, and, you know, so they -- it's hard

to figure out what the issue is.  So sometimes, particularly

for an issue like this which is very narrow, if the parties

spend a little bit more time up front and put in one document

what their positions are, No. 1, sometimes once everybody sees

it in print, we can get rid of two of the issues and then the

third one gets presented to me.  But at least I find, when we

do it that way, the issue gets presented I think a little bit

more quickly and then I can rule on it more quickly.  And it

takes a little bit more time of the parties up front, but it

presents the issue in a way that at least lends to a quicker

decision.

So I'll think about whether I'm going to require it

in this case.  Everybody in this case certainly is capable of

doing that.  But I just suggest it to you, if this one comes

to me, it strikes me as something that is easily put into that kind of format. And if you could work it out, then we don't need it. And if you want to tee it up before we got together in March, that would be fine too.

So I would suggest if we were going to get together then and it worked for everybody's schedules, I would be looking at, you know, some type of a filing by you of an agenda and proposed schedules in -- I'm in the wrong month. You know, sometime early the week of the 13th, for example, so that I have time to look at it before you guys came in.

I want to take a brief break here and review my notes to see if I've covered what I wanted to cover with you all, and, more importantly, ask my law clerk whether I did so, okay. So hold on for one -- just hold on for one second.

Brenda, if you wouldn't mind muting us.

And then you guys can gather your thoughts too and then we'll end.

(Off the record.)

THE COURT: Okay. I don't really have anything further. Do you all have anything further you would like to discuss? And if not, then I would ask you to get back to Brenda through liaison counsel after you talk about your schedules about the 27th or 29th, and we'll go from there.

MR. SIMON: Nothing further on behalf of the direct purchasers.

1           This is Bruce Simon speaking.

2           MR. HEDLUND:  Dan Hedlund on behalf of the --

3           MR. HART: Judge, this is Steve Hart, direct

4    purchasers liaison.  I just want to remind everybody from the

5    plaintiff's side to send me their contact information so we

6    have it and can submit it to the Court.

7           THE COURT:  I think that was Mr. Hedlund, right?

8           MR. HEDLUND:  I -- go ahead.

9           MR. HART:  Steven Hart, Hart, McLaughlin & Eldridge,

10   liaison counsel for direct purchaser plaintiffs.

11          MR. HEDLUND:  Judge, this is Dan Hedlund.

12          I did start to just join Mr. Simon in saying that for

13   the commercial and institutional indirect purchaser plaintiffs

14   that we have nothing further.

15          THE COURT:  Okay.

16          Ms. Fegan, same?

17          MS. FEGAN:  Nothing further, correct.  Thank you.

18          THE COURT:  And Mr. Suggs?

19          MR. SUGGS:  Your Honor, we're fine.

20          Thank you again for your guidance.  You've been very

21   helpful.

22          THE COURT:  Terrific.  Well, have a great weekend.

23   Thanks for your patience.  And I'm looking outside, and for

24   those of you who are not in Chicago, I think you're lucky.

25   Okay.

1          MR. SUGGS:  Thank you, Your Honor.

2          THE COURT:  Okay.

3          MS. FEGAN:  Thank you.

4          (Which were all the proceedings heard.)

5

6                          CERTIFICATE

7     I certify that the foregoing is a correct transcript from

8  the record of proceedings in the above-entitled matter.

9  */s/Kelly M. Fitzgerald*              *March 2, 2017*

10 _____        _____

   Kelly M. Fitzgerald                    Date
11 Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25