**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION<br><br>This Document Relates To: ALL CASES | No. 1:16-cv-08637 |

## ALL PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' SECOND AMENDED AND CONSOLIDATED COMPLAINT AND SUPPORTING BRIEFS BY INDIVIDUAL DEFENDANTS

# TABLE OF CONTENTS

I.      Introduction ................................................................................................................. 1

II.     Defendants' Burden to Prevail on a Motion to Dismiss is Significant ............................. 3

III.    Plaintiffs Adequately Plead Facts and Circumstances Establishing a Plausible
        Broiler Antitrust Conspiracy Under *Twombly* ................................................................ 4

IV.     Defendants' Attacks Under *Twombly* Run Afoul of the Law and Ignore the
        Detailed Factual Allegations of the Complaints .............................................................. 16

        A.      The Alleged Horizontal Price-Fixing Conspiracy Constitutes a *Per Se*
                Violation of the Sherman Act That is Not Subject to Rule of Reason
                Analysis ................................................................................................................ 16

        B.      Defendants' Motion to Dismiss Improperly Relies Upon External
                Evidence ............................................................................................................... 18

                1.      Defendants' Citation to Documents Outside of Plaintiffs'
                        Complaints Violates the Incorporation by Reference Doctrine ................ 19

                2.      Defendants' Citation to Documents Outside of Plaintiffs'
                        Complaints Violates the Judicial Notice Doctrine ................................... 20

        C.      Plaintiffs Adequately Plead Parallel Conduct to Support the Broiler
                Conspiracy ............................................................................................................ 22

                1.      Plaintiffs Adequately Allege Coordinated Efforts to Reduce
                        Supply in Furtherance of the Conspiracy ................................................ 23

                2.      Defendants Do Not Dispute That Plaintiffs Adequately Plead
                        Parallel Manipulation of the Georgia Dock Price Index ........................... 25

        D.      Defendants' "Alternative Explanations" for Their Alleged Conspiratorial
                Acts Do Not Undermine the Plausibility of the Complaints ................................... 26

        E.      Defendants' Claimed Production Increases Improperly Rely Upon
                External Evidence and Fail to Establish Implausibility ......................................... 29

        F.      Defendants Do Not—and at this Stage May Not—Explain Away the
                Detailed Allegations Regarding the Manipulation of the Georgia Dock
                Price Index ............................................................................................................ 32

        G.      "Plus Factors" Support the Existence of a Plausible Conspiracy .......................... 34

| | 1. | Plaintiffs Allege that Agri Stats was an Enforcement Mechanism for the Conspiracy | 34 |

1. Plaintiffs Allege that Agri Stats was an Enforcement Mechanism for the Conspiracy ..................................................................................... 34

2. Broiler Market Concentrations and Industry Characteristics Support the Plausibility of the Conspiracy ................................................. 36

3. Defendants' Exploitation of Opportunities to Collude Supports the Plausibility of the Conspiracy .................................................... 37

4. Defendants' Public Statements and Calls to Action Support the Plausibility of the Conspiracy .................................................... 38

5. The Shift to Short-Term Contracts and Purchases from Competitors Support the Plausibility of the Conspiracy ........................... 39

V. Plaintiffs' Claims Are Timely ...................................................................... 40

    A. Dismissal Under Rule 12 Based on a Statute of Limitations Affirmative Defense is Strongly Disfavored ............................................................. 41

    B. Plaintiffs' Claims are Timely Under the Continuing Violation Doctrine, Discovery Rule, and Equitable Tolling Due to Fraudulent Concealment ............ 43

        1. Plaintiffs Allege a Continuing Violation ................................................. 43

        2. The Statute of Limitations Has Only Recently Accrued Under the Discovery Rule ....................................................................................... 45

        3. Plaintiffs' Claims are Tolled Due to Fraudulent Concealment ................. 48

VI. The Arguments In Defendants' Individual Briefs Do Not Warrant Dismissal ................. 51

    A. Plaintiffs Adequately Plead that Each of the Defendants Joined and Participated in the Conspiracy ............................................................. 51

        1. Perdue .................................................................................................. 54

        2. George's ............................................................................................... 59

        3. Foster Farms ........................................................................................ 61

        4. Koch Foods .......................................................................................... 66

        5. Mountaire, O.K. Foods, Simmons, and House of Raeford ...................... 70

            (a) Mountaire ................................................................................. 70

            (b) O.K. Foods ................................................................................ 72

    (c)  Simmons ........................................................................73

    (d)  House of Raeford ..........................................................75

   6.  Sanderson ................................................................................77

   7.  Wayne Farms ...........................................................................81

   8.  Peco ..........................................................................................83

 B.  Fieldale Farms' Attempt to Remove Anti-Biotic Free Chicken From the Conspiracy is Without Merit ....................................................................85

 C.  Pilgrim's Bankruptcy Does Not Shield It From Liability....................................91

VII. Conclusion ............................................................................................96

**Page(s)**

**CASES**

*Adams v. City of Indianapolis*,
  742 F.3d 720 (7th Cir. 2014) ...............................................................20

*Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*,
  129 F. Supp. 3d 614 (N.D. Ill. 2015) ...................................................44

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012).................................................3, 27, 63

*Arizona. v. Maricopa County Med. Soc'y*,
  457 U.S. 332 (1982).............................................................17, 27

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................3

*Atkins v. Hasan*,
  No. 15 CV 203, 2015 WL 3862724 (N.D. Ill. June 22, 2015) ..............52, 59, 61, 70

*Avnet, Inc. v. Motio, Inc.*,
  No. 12 C 2100, 2015 WL 5307515 (N.D. Ill. Sept. 9, 2015)...................87

*Bailey Lumber & Supply Co. v. Georgia-Pac. Corp.*,
  No 1:08-CV-1394, 2009 WL 2872307 (S.D. Miss. Aug. 10, 2009)....................86

*Bank of America, N.A. v. Knight*,
  725 F.3d 815 (7th Cir. 2013) ...........................................................52, 55

*Bell Atlantic Co. v. Twombly*,
  550 U.S. 544 (2007)........................................................... passim

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
  620 F.2d 1360 (9th Cir. 1980) ...........................................................39, 51

*Bloyer v. St. Clair Cty. Illinois*,
  179 F. Supp. 3d 843 (S.D. Ill. 2016)...............................................86, 87

*Bonte v. U.S. Bank, N.A.*,
  624 F.3d 461 (7th Cir. 2010) ...........................................................4, 32, 95

*Brooks v. Ross*,
  578 F.3d 574 (7th Cir. 2009) ...........................................................52, 53, 61, 70

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2012)............................................................25, 59

*Cactus Corner, LLC v. U.S. Dep't of Agric.,*
   346 F. Supp. 2d 1075 (E.D. Cal. 2004), *aff'd*, 450 F.3d 428 (9th Cir. 2006) .........................22

*Cada v. Baxter Healthcare Corp.,*
   920 F.2d 446 (7th Cir. 1990) .........................................................................................43, 48

*Campos v. BP Prods. North Am., Inc.,*
   No. 13 CV 8376, 2014 WL 5858625 (N.D. Ill. Nov. 12, 2014) .........................................25

*City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.,*
   11 C 8332, 2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ......................................................22

*Copperweld Corp. v. Indep. Tube Corp.,*
   467 U.S. 752 (1984) ............................................................................................................16

*Doss v. Clearwater Title Co.,*
   551 F.3d 634 (7th Cir. 2008) .............................................................................................21

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,*
   637 F.3d 435 (4th Cir. 2011) .............................................................................................87

*Edwards v. Arthur Andersen LLP,*
   44 Cal.4th 937 (2008) ........................................................................................................65

*Erickson v. Pardus,*
   551 U.S. 89 (2007)..............................................................................................................51

*Erie County, Ohio v. Morton Salt, Inc.,*
   702 F.3d 860 (6th Cir. 2012) ..................................................................................27, 63, 71

*Evergreen Partnering Group, Inc. v. Pactiv Corp.,*
   720 F.3d 33 (1st Cir. 2013) ..............................................................................................4, 27

*Fenerjian v. Nongshim Co., Ltd.,*
   72 F. Supp. 3d 1058 (N.D. Cal. 2014) ...............................................................................57

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.,*
   85 F. Supp. 3d 1007 (E.D. Wis. 2015)...................................................................... passim

*Gen. Elec. Capital Corp., v. Lease Resolution Corp.,*
   128 F.3d 1074 (7th Cir. 1997) ...........................................................................................21

*Geo. Knight & Co. v. Watson Wyatt & Co.,*
   170 F.3d 210 (1st Cir. 1999)...............................................................................................43

*Gerritsen v. Warner Bros. Entm't Inc.,*
   112 F. Supp. 3d 1011 (C.D. Cal. 2015) ..............................................................................22

*Giger v. Ahman*,
　09 C 4060, 2013 WL 6730108 (N.D. Ill. Dec., 20, 2013) ................................................42, 47

*Goldman v. Belden*,
　754 F.2d 1059 (2d Cir. 1985).............................................................................................20

*Gupta v. v. St. Margaret Mercy Healthcare Centers, Inc.*,
　2:95 CV 310, 1998 WL 34360626 (N.D. Ind. Apr. 22, 1998)..............................................25

*Haley Paint Co. v. E.I. Dupont De Nemours & Co.*,
　804 F. Supp. 2d 419 (D. Md. 2011).....................................................................................37

*Hammer v. Residential Credit Sols., Inc.*,
　No. 13 C 6397, 2014 WL 4477948 (N.D. Ill. Sept. 11, 2014)..............................................50

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
　392 U.S. 481 (1968)..............................................................................................................44

*Hardy v. Johns-Manville Sales Corp.*,
　681 F.2d 334 (5th Cir. 1982) ...............................................................................................21

*Havoco of Am., Ltd. v. Shell Oil Co.*,
　626 F.2d 549 (7th Cir. 1980) ...............................................................................................91

*Hill v. Trustees of Ind. Univ.*,
　537 F.2d 248 (7th Cir. 1976) ...............................................................................................18

*Illinois Corp. Travel, Inc. v. Am. Airlines, Inc.*,
　806 F.2d 722 (7th Cir. 1986)................................................................................................71

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
　No. 06-MDL-1775, 2010 WL 10947344 ........................................................................44, 47

*In re Cardizem CD Antitrust Litig.*,
　332 F.3d 896 (6th Cir. 2003) ..........................................................................................17, 28

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
　738 F. Supp. 2d 1011 (N.D. Cal. 2010) ...............................................................................51

*In re Chicken Antitrust Litig.*,
　560 F. Supp. 963 (N.D. Ga. 1980) .......................................................................................31

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
　906 F.2d 432 (9th Cir. 1990) ..........................................................................................38, 39

*In re Copper Antitrust Litig.*,
　436 F.3d 782 (7th Cir. 2006) ..................................................................................... passim

*In re Credit Default Swaps Antitrust Litig.*,
No. 13-MD-2476, 2014 WL 4379112 (S.D.N.Y. Sep. 4, 2014)............................28, 31, 53, 54

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
767 F. Supp. 2d 880 (N.D. Ill. 2011) ........................................................................27, 42, 51

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
733 F. Supp. 2d 1348 (N.D. Ga. 2010) ..................................................................................38

*In re Domestic Airline Antitrust Litig.*,
No. MC 15-1404 (CKK), 2016 WL 6426366, ___ F. Supp. 3d ___ (D.D.C. Oct. 28,
2016) ..................................................................................................................................... passim

*In re Evanston Nw. Healthcare Corp. Antitrust Litig.*,
No. 07 C 04446, 2016 WL 4720014 (N.D. Ill. Sept. 9, 2016).............................44, 45, 46, 47

*In re Flash Memory Antitrust Litig.*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009) ..........................................................................36, 37

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004).............................................................................62, 66, 77, 78

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
No. 13 CIV. 7789, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016).........................................89

*In re Fresh & Process Potatoes Antitrust Litig.*,
834 F. Supp. 2d 1141 (D. Idaho 2011) .................................................................................24

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) .................................................................................30, 40, 58

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (6th Cir. 2010) .................................................................................................63

*In re Linerboard Antitrust Litig.*,
497 F. Supp. 2d 666 (E.D. Pa. 2007) .....................................................................................30

*In re Nat'l Ass'n of Music Merchants, Musical Instruments & Equip. Antitrust Litig.*,
No. 09CV2002, 2011 WL 3702453 (S.D. Cal. Aug. 22, 2011)..............................................90

*In re Packaged Seafood Prod. Antitrust Litig.*,
No. 15-MD-2670 JLS (MDD), 2017 WL 35571 (S.D. Cal. Jan. 3, 2017) .............................89

*In re Pilgrim Pride Corp.*,
728 F.3d 457 (5th Cir. 2013) .................................................................................................28

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
764 F. Supp. 2d. 991 (N.D. Ill. 2011) ................................................................................ passim

*In re Pool Prods. Distrib. Market Antitrust Litig.*,
  988 F. Supp. 2d 696 (E.D. La. 2013) .........................................................34, 67, 68

*In re Potash Antitrust Litig.*,
  667 F. Supp. 2d 907 (N.D. Ill. 2009), *aff'd sub nom. Minn-Chem, Inc. v. Agrium, Inc.*,
  683 F.3d 845 (7th Cir. 2012) ...................................................................24, 32, 33

*In re Processed Egg Prods. Antitrust Litig.*,
  821 F. Supp. 2d 709 (E.D. Pa. 2011) ........................................................... passim

*In re Ready Mixed Concrete Antitrust Litig.*,
  261 F.R.D. 154 (S.D. Ind. 2009)........................................................................31

*In re Ready Mixed Concrete Antitrust Litig.*,
  No. 1:05-CV-00979-SEB-VS, 2006 WL 2849711 (S.D. Ind. Sept. 29, 2006).......................46

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  No. 07-md-01819 CW, 2010 WL 5138859 (N.D. Cal. Dec. 10, 2010)................68, 69, 80, 84

*In re Sulfuric Acid Antitrust Litig.*,
  703 F.3d 1004 (7th Cir. 2012) ...........................................................................42

*In re Sulfuric Acid Antitrust Litig.*,
  743 F. Supp. 2d 827 (N.D. Ill. 2010) ........................................................... passim

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ....................................................................... passim

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal 2008) ............................................................51, 55, 59, 67

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009) ............................................................................64

*In re Westinghouse Sec. Litig.*,
  No. CIV. A. 91-354, 1998 WL 119554 (W.D. Pa. Mar. 12, 1998) .......................................85

*In re Wirebound Boxes Antitrust Litig.*,
  128 F.R.D. 262 (D. Minn. 1989)........................................................................50

*In re WorldCom, Inc.*,
  546 F.3d 211 (2d Cir. 2008)..............................................................................91

*Jamsports & Entm't, LLC v. Paradama Prods., Inc.*,
  No. 02 C 2298, 2003 WL 1873563 (N.D. Ill. Apr. 15, 2003)..........................................86, 87

*Kleen Prods., LLC v. Packaging Corp. of Amer.*,
  775 F. Supp. 2d 1071 (N.D. Ill. 2011) ........................................................... passim

*Kleen Products LLC v. International Paper Co.*,
    831 F.3d 919 (7th Cir. 2016) ....................................................................91, 93, 95

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)........................................................................................44

*Lamers Dairy Inc. v. U.S. Dep't of Agr.*,
    379 F.3d 466 (7th Cir. 2004) ..........................................................................22

*Leegin Creative Leather Prods, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)........................................................................................17

*Loeb Indus. Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002), *cert. denied sub nom. Credit Lyonnais Rouse, Ltd. v.
    Ocean View Capital, Inc.*, 539 U.S. 903 (2003) ...............................................88

*Lynch v. Ackley*,
    No. 3:12CV537 MPS, 2013 WL 6732540 (D. Conn. Dec. 19, 2013) ....................85

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
    62 F.3d 967 (7th Cir. 1995) ............................................................................87

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010)........................................................................................41

*Metz v. Joe Rizza Imports, Inc.*,
    700 F. Supp. 2d 983 (N.D. Ill. 2010) ...............................................................19

*Missouri Pet Breeders Ass'n v. Cty. of Cook*,
    106 F. Supp. 3d 908, 918 (N.D. Ill. 2015) ...................................................22, 89

*Monsanto Co. v. Spray-Rite Service Corp.*,
    465 U.S. 752 (1984)...................................................................................23, 52

*Muggill v. Reuben H. Donnelley Corp.*,
    62 Cal.2d 239 (1965) ......................................................................................65

*N. Texas Specialty Physicians v. F.T.C.*,
    528 F.3d 346 (5th Cir. 2008) ......................................................................17, 27

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) .........................................................................87

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*,
    669 F.2d 490 (7th Cir. 1982) ..........................................................................43

*Omnicare, Inc. v. UnitedHealth Group, Inc.*,
    629 F.3d 697 (7th Cir. 2011) ..........................................................................23

*OverEnd Techs., LLC v. Invista S.A.R.L.*,
431 F. Supp. 2d 925 (E.D. Wis. 2006)................................................................87

*Palmer v. BRG of Georgia, Inc.*,
498 U.S. 46 (1990)..............................................................................................17

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
281 F.3d 629 (7th Cir. 2002) .............................................................................90

*Parker v. Brown*,
317 U.S. 341 (1943)............................................................................................22

*PharMerica Chicago, Inc. v. Meisels*,
772 F. Supp. 2d 938 (N.D. Ill. 2011) .................................................................30

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
971 F.2d 37 (7th Cir. 1992) ...............................................................................39

*Retirement Grp. v. Galante*,
176 Cal. App. 4th 1226 (2009) ..........................................................................65

*Richards v. Mitcheff*,
696 F.3d 635 (7th Cir. 2012) .............................................................................42

*Robert L. Kroenlein Trust ex rel. Alden v. Kirchhefer*,
764 F.3d 1268 (10th Cir. 2014) .........................................................................43

*Rosenblum v. Travelbyus.com*,
299 F.3d 657 (7th Cir. 2002) .............................................................................18

*RxUSA Wholesale, Inc. v. Alcon Laboratories, Inc.*,
661 F. Supp. 2d 218 (E.D.N.Y. 2009) ...............................................................25

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ("*SD3*") ...................................................4, 24, 25

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008)...............................................................................21

*Standard Iron Works v. ArcelorMittal*,
639 F. Supp. 2d 877 (N.D. Ill. 2009) ......................................................... passim

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010)..........................................................................25, 52

*Superior Beverage Co. v. Owens-Illinois, Inc.*,
No. 83 C 0512, 1988 WL 99216 (N.D. Ill. Sept. 22, 1988)...............................48

*Swanson v. Citibank, N.A.*,
    614 F.3d 400 (7th Cir. 2010) ............................................27

*Thompson v. Impaxx, Inc.*,
    113 Cal. App. 4th 1425 (2003) .........................................65

*Thompson v. Paul*,
    657 F. Supp. 2d 1113 (D. Ariz. 2009) ...............................85

*Tierney v. Vahle*,
    304 F.3d 734 (7th Cir. 2002) ............................................19

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)........................................37, 87

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ...........................................64

*United Nat'l Records, Inc. v. MCA, Inc.*,
    609 F. Supp. 33 (N.D. Ill. 1984) ......................................47

*United States ex rel. Bogina v. Medline Indus., Inc.*,
    No. 11 C 05373, 2015 WL 1396190 (N.D. Ill. Mar. 24, 2015), *aff'd sub nom. U.S. ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365 (7th Cir. 2016).........................................21

*United States for the Use & Benefit of Denning Inc. v. Titan Mech., LLC*,
    No. 15-CV-11370, 2016 WL 3551678 (N.D. Ill. June 29, 2016).........................................19

*United States v. Container Corp. of Am.*,
    393 U.S. 333 .................................................................21

*United States v. Jones*,
    29 F.3d 1549 (11th Cir. 1994) ..........................................21

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus.*,
    648 F.3d 452 (6th Cir. 2011) ...........................................27

*Weit v. Cont'l Ill. Nat'l Bank & Tr. Co.*,
    641 F.2d 457 (7th Cir. 1981) ...........................................65

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*,
    536 F.3d 663 (7th Cir. 2008) ...........................................48

*Wojcik v. InterArch, Inc.*,
    13-cv-1332, 2013 WL 5904996 (N.D. Ill. Nov. 4, 2013) ......................................19

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971).......................................................43

**STATUTES**

Fed. R. Civ. P. 9(b) ..........................................................................................................48

Fed. R. Civ. P. 8(a) ..........................................................................................................51

Fed. R. Civ. P. 12(b)(6)............................................................................................ passim

Fed. R. Civ. P. 12(f)..........................................................................................................85

Fed. R. Evid. 201(b)...................................................................................................21, 22

Webb Pomerene Act of 1918, 15 U.S.C. § 61-66.........................................................80

**OTHER AUTHORITIES**

Alexander Geist & Korbinian von Blanckenburg, *Cartel Detection – Is Market Share
    Volatility a Significant Indicator?* ............................................................................69

NASS, Chickens, Young, Slaughter, FI, Certified, Chilled & Frozen – Production,
    Measured in LB, available at https://quickstats.nass.usda.gov/results/C33961EC-
    6D46-31DE-8CCB-89780E3D1620 ..............................................................30, 31

Robert C. Marshall & Leslie M. Marx, *The Economics of Collusion: Cartels and Bidding
    Rings* (2012) at 122 ...................................................................................................69

The Direct Purchaser Plaintiffs ("DPP"), Commercial and Institutional Indirect Purchaser Plaintiffs ("C&I"), and End User Consumer Plaintiffs ("EU") (collectively "Plaintiffs") submit this joint opposition to Defendants' Joint Motion to Dismiss the Direct Purchaser Plaintiffs' Second Amended and Consolidated Class Action Complaint ("MTD") (Dkts. 279-280), and the briefs filed by individual Defendants in support thereof (Dkts. 274-278, 281-291, 294-298).[1]

## I.      Introduction

Plaintiffs allege that Defendants,[2] the nation's largest Broiler chicken producers, conspired to fix, raise, maintain, and stabilize the price of Broiler chicken products in the United States.  Since at least 2008, Defendants have fixed Broiler prices by implementing a series of coordinated long-term and short-term output restrictions, and manipulating the price of Broilers reported on the industry-controlled Georgia Dock price index.  Far from merely asserting bare allegations, Plaintiffs support their case with thorough Complaints[3] that set forth the specific

---

[1] Defendants' arguments for dismissal in the Motion to Dismiss apply equally to the DPP, C&I and EU Plaintiffs.  (Dkt. 293 at 1 n.1.)  Although these individual briefs were styled as separate individual motions to dismiss, the Court struck the separate motions and interpreted the arguments contained therein as supporting Defendants' Joint Motion to Dismiss.  (Dkt. 300.)

[2] The term "Defendants" refers collectively to Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC, and Koch Meat Co., Inc. (collectively, "Koch Foods"); Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc. (collectively, "Tyson"); Pilgrim's Pride Corporation ("Pilgrim's"); Perdue Farms, Inc. and Perdue Foods LLC (collectively, "Perdue"); Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division), and Sanderson Farms, Inc. (Processing Division) (collectively, "Sanderson"); Wayne Farms, LLC ("Wayne"); Mountaire Farms, Inc., Mountaire Farms, LLC, and Mountaire Farms of Delaware, Inc. (collectively, "Mountaire"); Peco Foods, Inc. ("Peco"); Foster Farms, LLC ("Foster Farms"); House of Raeford Farms, Inc. ("HRF"); Simmons Foods, Inc. ("Simmons"); Fieldale Farms Corporation ("Fieldale Farms"); George's, Inc. and George's Farms, Inc. ("George's"); and O.K. Foods, Inc., O.K. Farms, Inc. and O.K. Industries, Inc. ("O.K. Foods").

[3] The term "Complaints" refers collectively to the operative complaints filed by Direct Purchaser Plaintiffs (Dkt. 212), End User Consumer Plaintiffs (Dkt. 255), Commercial and Institutional Indirect Purchaser Plaintiffs (Dkt. 253).

acts, persons, mechanisms and workings of the conspiracy. These allegations—which must be taken as true and viewed in the light most favorable to the Plaintiffs—provide sufficient context to establish a plausible conspiracy.

Instead of responding to these meticulous factual allegations as the law requires, Defendants misconstrue and attempt to recast the conspiracy. Defendants ignore allegations, view allegations in isolation, and read allegations in the light most favorable to themselves. In addition, Defendants often seek to bring in impermissible extrinsic evidence, improperly relying upon external articles, reports, and statistics. Because this tactic violates the fundamental principle that motions to dismiss must be decided on the four corners of the complaint, the Court should deny Defendants' improper request for judicial notice of these documents and reject arguments that rely upon such evidence.

Defendants' attempt to shift the plausibility standard by positing possible alternative explanations for Defendants' collusive conduct is similarly improper. Contrary to Defendants' assertion, *Bell Atlantic Co. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*"), does not impose a probability standard. A possible or even plausible alternative explanation for the conduct alleged does not render a conspiracy implausible. When the detailed allegations of the Complaints are viewed according to these principles, it is clear that the alleged conspiracy is plausible.

Next, Defendants' statute of limitations defense ignores Plaintiffs' itemized allegations that Defendants took great pains to keep the conspiracy secret. Before Plaintiffs filed their Complaints, facts that would cause a reasonable person to suspect the existence of a conspiracy were not available to the market. As shown in their Motion to Dismiss, to this day Defendants seek to cover up the conspiracy and provide pretextual explanations for their misconduct. The Complaints establish that Plaintiffs' claims are timely, because the statute of limitations: (1) was

started anew by each act in furtherance of the conspiracy under the continuing violation doctrine, (2) was not triggered due to the discovery rule, and (3) was equitably tolled due to Defendants' fraudulent concealment of the conspiracy.

Finally, the individual briefs filed by certain Defendants also lack merit because, among other reasons, Plaintiffs sufficiently allege that each Defendant joined and committed acts in furtherance of the conspiracy. That each Defendant did not participate in every conspiratorial act does not merit dismissal of the Complaint as to any individual Defendant.

As detailed herein, Defendants' Motion to Dismiss should be denied in its entirety.

## II.     <u>Defendants' Burden to Prevail on a Motion to Dismiss is Significant</u>

A motion to dismiss must be denied if the complaint alleges "enough facts to state a claim [for] relief that is plausible on its face." *Twombly*, 550 U.S. at 570. As the Supreme Court held in *Twombly*, pleading antitrust violations with sufficient plausibility "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. "[A] well-pleaded complaint may proceed if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Id.* At the pleading stage the Court should not weigh competing theories and dismiss an antitrust complaint by choosing "among plausible alternatives." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012) ("*Anderson News*") (internal quotation omitted).

Absent direct evidence of a conspiratorial agreement, a plausible antitrust conspiracy may be pled using circumstantial evidence that provides "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556); *In re Text Messaging*

*Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("*Text Messaging*"). When analyzing an alleged conspiracy, the court must "accept all facts in the complaint as true, view them in the light most favorable to the [plaintiffs], and draw all reasonable inferences in their favor." *See Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 463 (7th Cir. 2010) ("*Bonte*"). The allegations must be analyzed as a whole and in their entirety, rather than viewed in isolation. *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 894 (N.D. Ill. 2009) ("*Standard Iron Works*") ("'The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts.'") (quoting *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962) ("*Cont'l Ore*")).

On a Rule 12(b)(6) motion, the Court should not determine whether the allegations "show an agreement," but rather "whether the allegations 'plausibly suggest[ed]' such an agreement." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 426 (4th Cir. 2015) ("*SD3*"). Courts should "not decide whether the circumstantial evidence … is sufficient to compel an inference of conspiracy; the case is just at the complaint stage and the test for whether to dismiss a case at that stage turns on the complaint's 'plausibility.'" *Text Messaging*, 630 F.3d at 629. Moreover, "[i]t is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences, since those questions are properly left to the factfinder." *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) ("*Evergreen*").

## III.   Plaintiffs Adequately Plead Facts and Circumstances Establishing a Plausible Broiler Antitrust Conspiracy Under *Twombly*

Contrary to Defendants' contention, Plaintiffs present much more than "a bare allegation of conspiracy." (MTD p. 24.) Moreover, the fact that Plaintiffs' claims may be based on circumstantial allegations instead of direct evidence is not dispositive. As the case law firmly establishes and Defendants concede, plaintiffs can (and almost always do) allege antitrust

conspiracies without "the smoking gun in a price-fixing case: direct evidence, which would usually take the form of an admission by an employee of one of the conspirators[.]" *Text Messaging*, 630 F.3d at 628 ("Direct evidence of conspiracy is not a sine qua non, however. Circumstantial evidence can establish an antitrust conspiracy.") (citing *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984) ("*Monsanto*"); *Miles Distributors, Inc. Specialty Construction Brands, Inc.*, 476 F.3d 442, 449 (7th Cir. 2007); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661-62 (7th Cir. 2002) ("*High Fructose*")).

Plaintiffs' Complaints meticulously detail how Defendants adopted and implemented their price-fixing conspiracy. Rather than assert "bare allegations" of parallel conduct, the Complaints set forth specifics regarding Defendants' collusion to control the supply and manipulate the prices of Broilers. The Complaints identify the conspiratorial acts Defendants committed, the individuals who committed these acts, when these acts were committed, and how they were implemented. These allegations provide sufficient facts to plausibly suggest the existence of the alleged conspiracy.

## Summary of Plaintiffs' Conspiracy Allegations

**The Hallmarks of the Alleged Conspiracy:** Defendants are the leading manufacturers in the multi-billion dollar United States Broiler[4] market, which comprises chickens raised for consumption and sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts. (DPP ¶¶ 79-82; EU ¶¶ 107-10; C&I ¶¶ 84-87.)[5] The Broiler industry has significant

---

[4] The term "Broiler" refers to chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards. (DPP ¶ 79; EU ¶ 107; C&I ¶ 84.)

[5] In citations, the terms DPP, EU, and C&I refer respectively to the operative complaints (footnote continued)

market concentration with a few producers controlling the vast majority of the market; Defendants collectively control 88.8% of U.S. Broiler production. (DPP ¶¶ 284-86; EU ¶¶ 312-14; C&I ¶¶ 289-91.) Moreover, Defendants are vertically integrated, meaning they control all aspects of Broiler production, including breeding, hatching, processing, and selling.

Prior to the start of the conspiracy in 2008, the U.S. Broiler market was "marked by boom or bust cycles," where periods of rising prices compelled suppliers to increase production, followed by periods of oversupply and decreasing prices. (DPP ¶¶ 3, 265; EU ¶¶ 3, 293; C&I ¶¶ 3, 270.) Defendants acting independently lacked sufficient market power to alter this cycle. For example, in 2007, the two largest broiler producers, Tyson and Pilgrim's, who together controlled 40% of the Broiler market, introduced short term-production cuts, but they could not prevent oversupply and overproduction due to inadequate competitor support. (DPP ¶¶ 4, 143-144; EU ¶¶ 171-72; C&I ¶¶ 4, 148-49.) The nature of the Broiler industry and each producer's inability to stabilize Broiler prices independently motivated them to act collectively.

Starting in 2008, Defendants conspired to fix Broiler prices. Defendants' conspiracy primarily relied on two methods—long-term and short-term supply restrictions, and manipulation of the Georgia Dock pricing index. In addition, throughout the Class Period all Defendants participated in Agri Stats, a data-sharing service which regularly compiles reports including critical information pertaining to the price, production, cost, and supply of Broilers at a level of detail that, according to a Broiler industry expert who testified in a contract-farmer case, presents "'a significant antitrust issue.'" (DPP ¶¶ 116-17, 133; EU ¶¶ 144-45, 158, 161; C&I ¶¶ 121-22, 135.) Agri Stats purports to disseminate this data to its subscribers on an anonymized

---

of the Direct Purchaser Plaintiffs (Dkt. 212), End User Consumer Plaintiffs (Dkt. 255), Commercial and Institutional Indirect Purchaser Plaintiffs (Dkt. 253).

basis, but in fact producers can and do reverse engineer these reports to discern their competitors' business operations. (DPP ¶¶ 123-24; EU ¶¶ 152; C&I ¶¶ 152.) Thus, Agri Stats provides a mechanism for all Defendants to share their own production data, monitor their co-conspirators, and enforce compliance with the conspiracy.

**Conspiratorial Production Cuts in 2008 through Early 2009:** Starting in January 2008 Tyson and Pilgrim's recruited other competitors to cut production across the industry. Defendants adopted the euphemism "capacity discipline" or "discipline" in calling for competitors to collectively limit Broiler production, enabling them to raise prices to supra-competitive levels. Plaintiffs allege, "exercising capacity discipline will only benefit a Broiler company if it knows or is reasonably sure that its competitors will do likewise. Absent such assurance, it would be against each Broiler company's independent self-interest to cut production." (DPP ¶ 139; EU ¶ 167; C&I ¶ 144.) Defendants understood that widespread industry participation was the key to using "capacity discipline" to drive profits. (DPP ¶¶ 138-139, 144, 170; EU ¶¶ 166-67, 172; C&I ¶¶ 143-44, 152, 157, 161, 199.)

Defendants had the opportunity to conspire at the International Poultry Expo ("IPE") conference in Atlanta, Georgia on January 23-25, 2008. (DPP ¶ 145; EU ¶ 173; C&I ¶ 150.) Days later, on January 28-29, 2008, high ranking executives from Tyson and Pilgrim's exhorted their competitors to raise prices and cut production. (DPP ¶¶ 146-147; EU ¶¶ 174-75; C&I ¶¶ 151-52.) On January 31, 2008, the CEO of Sanderson Farms indicated that "reductions in production" were "probable" between February and April 2008. (DPP ¶ 148; EU ¶ 176; C&I ¶ 153.) On March 4, 2008, senior executives from Pilgrim's, Tyson, and Fieldale Farms met at an Executive Committee Meeting for the National Chicken Council's Board of Directors. (DPP ¶ 149; EU ¶ 177; C&I ¶ 154.) On March 12, 2008, Pilgrim's led a production cut, closing several

Broiler production facilities. (DPP ¶ 150; EU ¶ 178; C&I ¶ 155.) Instead of filling the supply gap, on April 3-11, 2008 Defendants Fieldale Farms, Simmons, Cagle's Inc., Wayne, O.K. Foods, and Koch Foods also announced production cuts of 2-8%. (DPP ¶ 151; EU ¶ 179; C&I ¶ 156.) According to Sanderson CEO Joe Sanderson, more Defendants made *unannounced* production cuts in April and May 2008. (*Id.*) In April 2008, Pilgrim's announced a 5% reduction in egg sets and that it was considering closing a production plant. (DPP ¶¶ 152-54; EU ¶¶ 180-82; C&I ¶¶ 158-59.) On May 15, 2008, Pilgrim's CEO Clint Rivers called on the "industry to trim total production by 3-4%." (DPP ¶ 156; EU ¶ 184; C&I ¶ 161.)

Industry-wide reductions continued throughout 2008. CEO Joe Sanderson said that his company would cut production 4-5% after Labor Day 2008. (DPP ¶ 158; EU ¶ 186; C&I ¶ 163.) In June 2008, the CEO of Pilgrim's exhorted producers to continue their production cuts. (DPP ¶ 160; EU ¶ 188; C&I ¶ 165.) On June 19, 2008, Peco CEO Mark Hickman said on a conference call with competitors that "the poultry industry is entering a second phase of production cutbacks. … 'We are hearing talk that this was not nearly enough, so liquidation is in round two.'" (DPP ¶ 161; EU ¶ 189; C&I ¶ 166.) Three days later Wayne announced a 6% production cut. (DPP ¶ 163; EU ¶ 191; C&I ¶ 168.) In July and August 2008, further supply reductions were announced by Foster Farms (cancelling a broiler processing plant); Tyson (cancelling a processing contract); O.K. Foods (7.5% reduction in egg sets); Pilgrim's (closing a processing plant); and HRF (5% production cut). (DPP ¶¶ 165-70; EU ¶¶ 193-98; C&I ¶¶ 170-71, 173-75.) Defendants' production cuts continued in the fall of 2008 through early 2009, including Wayne (plant closures), Pilgrim's (processing plant reduction), and Tyson (processing plant reduction; 5% production cut). (DPP ¶¶ 176-180, 187; EU ¶¶ 204-08, 215; C&I ¶¶ 181-86.) At least eleven producers reported production cuts in 2008 including Tyson, Pilgrim's, Perdue, Simmons,

HRF, Cagle's, George's, O.K. Foods, Coleman Natural Foods, Harrison Poultry, and GNP

Company, resulting in 6% less production than 2007. (DPP ¶¶ 183, 188; EU ¶¶ 211, 216; C&I

¶¶ 188, 193.) As Pilgrim's CEO Clint Rivers admitted at a conference with the CEOs of Tyson,

Perdue, and Sanderson Farms, the intent of these production cuts was to push through an

industry-wide price increase. (DPP ¶ 174; EU ¶ 202; C&I ¶ 179.)

Defendants also engaged in unprecedented destruction of Broiler breeder flocks in 2008,

which had a significant long-term impact on Broiler production. (DPP ¶¶ 189-91; EU ¶¶ 217-19;

C&I ¶¶ 194-96.) Because Broiler breeder flocks are created by a limited pool of grandparent

Broilers, this remarkable measure cannot be explained by a response to short-term economic

pressures. (DPP ¶ 190; EU ¶ 218; C&I ¶ 195.) As a result, there was a significant and

immediate plunge in Broiler hatchery supply flocks which caused constrictions down the supply

chain for more than a year. (DPP ¶¶ 140-42, 191; EU ¶¶ 168-70, 219; C&I ¶¶ 196-98.)

**Unprecedented Coordinated Production Cuts Led to Supra-Competitive Prices and**

**Profits in 2009 and 2010:** As an intended result of Defendants' supply restraints, Broiler prices

rose in late 2008 and 2009 to near all-time highs, despite weak demand during the Great

Recession. (DPP ¶ 192; EU ¶ 220; C&I ¶ 197.) While many businesses struggled to stay afloat

in such a challenging economy, Defendants reaped the benefits of their conspiracy, enjoying

strong profits that exceeded Wall Street predictions. (*Id.*) In response to rising prices in late

2009 and 2010 (and the recovery of breeder flocks that had been systematically destroyed by

Defendants), producers began to increase production. (DPP ¶ 193; EU ¶ 221; C&I ¶ 198.)

**Second Wave of Unprecedented Production Cuts in 2011 and 2012:** By late 2010

supply caught up to, and eventually exceeded, the increased demand. Prior to the conspiracy,

such oversupply would have resulted in an extended price reduction. (*Id.*) But this time

Defendants sounded the call for industry wide "discipline," and implemented a new wave of production cuts to maintain supra-competitive prices. (DPP ¶¶ 194, 196-97; EU ¶¶ 222, 224-25; C&I ¶¶ 199, 201-02.) In early 2011, these efforts were led by Tyson, which implemented a "buy vs. grow strategy," whereby Tyson would purchase Broilers from competitors and reduce its own production, even though it would have been cheaper to Tyson to produce its own Broilers. (DPP ¶ 195; EU ¶ 223; C&I ¶ 200.) Tyson's strategy is indicative of a market susceptible to collusion.

Between February 16 and March 15, 2011, supply restrictions were reported by Cagle's (20% production reduction), Sanderson (processing plant reduction), HRF (10% reduction in egg sets), and Simmons (work force reduction). (DPP ¶¶ 198-201; EU ¶¶ 226-29; C&I ¶¶ 203-06.) In April 2011, Mountaire Farms announced it was abandoning planned production increases and cutting capacity in order to decrease supply and obtain "higher prices." (DPP ¶ 203; EU ¶ 231; C&I ¶ 208.) Fieldale Farms and Mar-Jac also reduced production. (DPP ¶¶ 204-05; EU ¶¶ 232-33; C&I ¶¶ 209-10.) In May 2011, Sanderson CEO Joe Sanderson attended a conference with competitors and one week later pronounced that, based on "the rule and the law of the jungle," "my judgment is that there will be some others that are going to have to make some adjustments. … I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats." (DPP ¶¶ 207, 209; EU ¶¶ 235, 237; C&I ¶¶ 212, 214.) In June and July 2011, production constraints were announced by Tyson (destroying eggs), Cagle's (employee layoffs), Simmons (employee layoffs), and Pilgrim's (employee layoffs). (DPP ¶¶ 212-18; EU ¶¶ 240-46; C&I ¶¶ 217-18, 220, 222.) In August 2011, Cagle's announced a 20% production decrease in its Pine Mountain, Georgia plant. (DPP ¶ 220; EU ¶ 248; C&I ¶ 225.) Defendants' production decreases continued into fall 2011, in what Joe Sanderson reported as a 4% "industry" decrease which Sanderson was "going to be a part of." (DPP ¶¶ 221-23; EU ¶¶ 249-51; C&I ¶¶ 226-28.) In

early 2012, Sanderson cut its production 4% as promised, which Tyson matched. (DPP ¶¶ 227-31; EU ¶¶ 249-51; C&I ¶¶ 232, 236.) Tyson also informed stockholders that "the industry as a whole has reduced production pounds by 4% to 6% year-over-year" due in part to implementation of its buy vs. grow strategy. (DPP ¶ 231; EU ¶ 259; C&I ¶ 236.)

As in 2008 and 2009, these production decreases were not limited to short-term restraints that could be justified as reactions to short-term market forces. In 2011 and 2012, Defendants cemented and ensured the long-term impact of their conspiracy by destroying and eliminating breeder flocks to "levels not seen for almost two decades." (DPP ¶ 242; EU ¶ 270; C&I ¶ 247.) According to Koch Foods CEO Joseph Grendys, the goal of these production cuts was to "get price increases of 10 to 15 percent across all product lines." (DPP ¶ 237; EU ¶ 265; C&I ¶ 242.) He went on to state, "'[t]he industry needs to be smart' and focus on pricing to ensure it remains profitable. … Even if it does become unprofitable in the fourth quarter, the industry may resume making money after the first quarter of 2013." (*Id.*)

**Coordinated Production Cuts Led to Supra-Competitive Prices and Profits From 2013 through 2015:** Defendants' new coordinated production decreases had their intended effect as prices stabilized and began to increase in September 2012. (DPP ¶ 239; EU ¶ 267; C&I ¶ 244.) From late 2012 through 2014, Defendants reaped significant profits by reducing market supply and making long-term production cuts. (DPP ¶¶ 243, 252; EU ¶¶ 267, 280; C&I ¶¶ 248, 257.) To maintain these record profits and prevent another boom-and-bust cycle, Defendants stressed the need to limit breeder flock growth and maintain capacity to control long-term Broiler supply. (DPP ¶¶ 246-52; EU ¶¶ 274-80; C&I ¶¶ 251-53, 255, 258.) This continuation of capacity discipline strategies included Tyson's buy vs. grow program and exporting hatchery eggs and Broilers outside of the United States at a price less than the cost of production. (*Id.*)

These strategies allowed Defendants to maintain Broiler prices at supra-competitive levels even when they were faced with unfavorable and unexpected negative market pressures—such as export limitations related to Avian Flu. (DPP ¶¶ 255-60; EU ¶¶ 283-88; C&I ¶¶ 260-66.) As a result, Defendants achieved record profits in 2014 and 2015. (DPP ¶¶ 261-64, 268; EU ¶¶ 289-92, 296; C&I ¶¶ 267-73, 339.)

**Defendants Manipulated the Georgia Dock Price Index Since at Least 2015:** In addition to coordinating supply control measures, certain Defendants manipulated the Georgia Dock price index in furtherance of their price-fixing conspiracy. (DPP ¶ 258; EU ¶ 286; C&I ¶ 263.) Broiler prices in the United States are reported on three main price indexes: Urner Barry (a commodity price reporting service), Georgia Dock (compiled by the Georgia Department of Agriculture ("GDA")), and USDA Composite (compiled by the United States Department of Agriculture ("USDA")). (DPP ¶ 91; EU ¶ 119; C&I ¶ 96.) Spot market prices for Broilers are based on the index prices. (DPP ¶ 94; EU ¶ 122; C&I ¶ 99.) Unlike Urner Barry and the USDA composite, which verify prices with information from purchasers and producers, the Georgia Dock price index relied exclusively on unverified information from the Broiler producers themselves (*i.e.*, Defendants). (DPP ¶¶ 92, 97-98; EU ¶¶ 120, 125-26; C&I ¶¶ 97, 102-03.)

The Georgia Dock survey methodology and pricing model, which were not publicly disclosed until November 2016, made it especially susceptible to Defendants' collusive manipulation. (DPP ¶¶ 97-101; EU ¶¶ 125-29; C&I ¶¶ 102-06, 110.) The Georgia Dock price index relied on a weekly survey, whereby a GDA employee would call producers each Wednesday and ask the price at which they offered generic 2.5-to-3 pound whole Broilers that week. (*Id.*) The GDA made no independent verification of the producers' self-reported prices. Based on this single whole Broiler price, the Georgia Dock price index used a formula to

calculate prices for different Broiler cuts and parts of those whole birds. This pricing methodology was determined by the Georgia Dock Advisory Committee, which was controlled by senior executives from Fieldale Farms, Pilgrim's, Wayne, Koch, Tyson, Mar-Jac, Harrison Poultry, and Claxton Poultry. (DPP ¶ 105; EU ¶ 133; C&I ¶ 110.) As reported by the GDA's Director of Regulatory Compliance & Budget, the Georgia Dock price index was determined "based off of contracts that have been determined at the private level and reported without regulatory oversight." (DPP ¶ 110; EU ¶ 138; C&I ¶ 115.)

Although not known publicly until November 2016, the Georgia Dock pricing index raised anticompetitive concerns within regulatory agencies. In a September 2016 memorandum, Arty Schronce, the GDA employee who collected prices from Broiler producers, wrote that the Georgia Dock price index was "a flawed product that is a liability to the Georgia Department of Agriculture," and he had "come to question the validity of some of the information provided." (DPP ¶ 99; EU ¶ 127; C&I ¶ 104.) Mr. Schronce further wrote, "I have questions about the 'Advisory Board' [controlled by Defendants and other producers] and its role over an office of a state regulatory agency that is supposed to be independent. I was told I could not make any changes without clearing them with the Advisory Board." (DPP ¶ 105; EU ¶ 133; C&I ¶ 110.)

Defendants took advantage of these conditions and colluded to increase prices reported in the Georgia Dock price index, as can be seen in the growing divergence between Georgia Dock prices on the one hand, and Urner Barry and USDA Composite prices on the other, since at least January 2015. (DPP ¶ 102; EU ¶¶ 130; C&I ¶ 107.) That divergence cannot be explained by one or two outlier companies independently reporting high Broiler prices, due to the so-called "One Cent Rule." (DPP ¶ 103; EU ¶ 131; C&I ¶ 108.) The "One Cent Rule," which was developed "to shield [] one company having the ability to greatly influence the price up or down," provides

that the Georgia Dock price index would exclude any quote that is more than one cent above or below the initial average price calculated based on all responses. (DPP ¶¶ 100, 103; EU ¶¶ 128, 131; C&I ¶¶ 105, 108.) This "control measure" was well known to Defendants vis-à-vis their control of the Advisory Board, and demonstrates that the artificial increases of the Georgia Dock price index were the result of Defendants acting in concert rather than independently. (*Id.*)

The susceptibility of the Georgia Dock price index to price collusion, as well as these artificially high prices, raised such "serious concerns" with the USDA that it began investigating the index in late 2015 and 2016. (DPP ¶ 106; EU ¶ 134; C&I ¶ 111.) The USDA demanded that the GDA cease price reporting from Defendants without purchaser verification.[6] (DPP ¶¶ 107-08; EU ¶¶ 135-36; C&I ¶¶ 112-13.) The USDA's decision to stop reporting Georgia Dock prices was the result of Defendants' continued refusal to allow independent verification procedures. (DPP ¶¶ 114-15; EU ¶¶ 142-43; C&I ¶¶ 119-20.)

**The Structure of the Broiler Market Provided Defendants With the Opportunity to Conspire and Made the Market Susceptible to Collusion:** The Complaints allege that numerous conditions within the Broiler industry make it susceptible to collusion.

The Broiler industry is highly concentrated with the 10 largest suppliers controlling 80% of the market and Defendants collectively controlling almost 90% of U.S. Broiler production. (DPP ¶¶ 109, 284-89; EU ¶¶ 137, 312-17; C&I ¶¶ 114, 289-94.) Moreover, the Broiler industry has high barriers to entry and significant capital requirements, which make it unlikely that new

---

[6] After Plaintiffs filed the Complaints in November 2016, the USDA stopped including the Georgia Dock price index in its weekly Broiler Market News Report. *See* Michael Pellman Rowland, *Are You Being Overcharged At The Grocery Store?*, FORBES, Nov. 21, 2016 (https://www.forbes.com/sites/michaelpellmanrowland/2016/11/21/are-chicken-prices-being-manipulated/#716ea6066dfd).

entrants would be able to enter the market to compete with Defendants and take advantage of supra-competitive prices and margins. (DPP ¶¶ 319-25; EU ¶¶ 347-53; C&I ¶¶ 324-30.)

Defendants are vertically-integrated producers who own or control almost all aspects Broiler production, including breeding, hatching, rearing, feeding processing and selling. (DPP ¶¶ 270-78; EU ¶¶ 298-306; C&I ¶¶ 275-83.) Defendants have similar cost structures, which leads to similar economic pressures, and allows them to exchange information that facilitated the conspiracy. (DPP ¶¶ 326-33; EU ¶¶ 354-61; C&I ¶¶ 331-38.) As discussed above, Agri Stats is the primary vehicle Defendants use to share material, non-public information about price, production, supply, and demand. (DPP ¶¶ 116-135; EU ¶¶ 144-63; C&I ¶¶ 121-40.)

The Broiler market is characterized by inelastic supply, meaning that a higher price would not result in a significant reduction in demand for or sales of Broilers. (DPP ¶¶ 279-81; EU ¶¶ 307-09; C&I ¶¶ 284-86.) Because there are no significant substitutes for Broilers, higher prices would not cause Broilers to be replaced by alternative meat protein sources such as beef, pork or turkey. (DPP ¶¶ 282-83; EU ¶¶ 310-11; C&I ¶¶ 287-88.)

Defendants had numerous opportunities to conspire, as their high-level executives attended and participated in industry trade association meetings. (DPP ¶¶ 297-318; EU ¶¶ 325-46; C&I ¶¶ 302-33.) Defendants exploited these meetings to further their collusive aims.

Finally, the government has historically investigated the Broiler industry for collusion, including but not limited to violations of the Sherman Act for price fixing, DOJ actions to stop the acquisitions of processing plants, and the aforementioned USDA investigations into the operations of the Georgia Dock price index. (DPP ¶¶ 290-96; EU ¶¶ 325-46; C&I ¶¶ 295-301.)[7]

---

[7] Public disclosures concerning the Georgia Dock price index and collusion in the Broiler industry are ongoing with the revelation of new investigations by the Antitrust Division (footnote continued)

**The Broiler Conspiracy Resulted in Supra-Competitive Broiler Prices:** The conspiracy enabled Defendants to charge supra-competitive prices which led to record profits. Industry analysts took note. In the face of the Great Recession, "The profit margins of the nation's biggest meat packers rose dramatically between 2008 and 2010 (the most recent year for which good data is available), even as the national economy cratered." (DPP ¶ 334; EU ¶ 362; C&I ¶ 339.) Despite a recovering economy in 2011 and 2012, unprecedented reductions in Broiler supply continued, strongly indicating coordinated efforts to reduce supply in the name of "capacity discipline." (DPP ¶ 336; EU ¶ 364; C&I ¶ 341.) As the GDA's Alec Asbridge said, "[t]he combination of vertical integration, limited competition and lowered production periods has led to steady prices that have shown to be fairly resistant to changing market conditions. These factors alone illicit [sic] anti-trust review." (DPP ¶ 109; EU ¶ 137; C&I ¶ 114.)

## IV. Defendants' Attacks Under *Twombly* Run Afoul of the Law and Ignore the Detailed Factual Allegations of the Complaints

### A. The Alleged Horizontal Price-Fixing Conspiracy Constitutes a *Per Se* Violation of the Sherman Act That is Not Subject to Rule of Reason Analysis

"Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). "Other combinations, such as mergers, joint ventures, and various vertical agreements, hold the promise of increasing a firm's efficiency and enabling it to compete more effectively." *Id.* Courts use a "rule of reason" analysis to evaluate those combinations, inquiring into market power and market structure to assess the effect of the combination on competition. *Id.* Defendants suggest that

_____

of the Florida Attorney General's Office in November 2016 (DPP ¶ 374; EU ¶ 408; C&I ¶ 385) and the U.S. Securities and Exchange Commission ("SEC") in February 2017, after Plaintiffs filed the Complaints.

Plaintiffs allege a "rule of reason" case.  (MTD p. 40.)  They are wrong.

Plaintiffs clearly allege "[a] horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price [which] is, and ought to be, *per se* unlawful."  *See Leegin Creative Leather Prods, Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007); *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 869 (N.D. Ill. 2010) ("*Sulfuric Acid*") ("Conspiring to reduce industry output as a means of stabilizing or raising prices is … *per se* illegal."); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 48 (1990) ("Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity … is illegal *per se*.") (quotations omitted).

*Per se* violations of the Sherman Act are presumed to be unlawful, "regardless of the motives driving an unlawful conspiracy."  *Sulfuric Acid*, 743 F. Supp. 2d at 871.  "The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some."  *Arizona. v. Maricopa County Med. Soc'y*, 457 U.S. 332, 351 (1982) ("*Maricopa Cty.*").  In this horizontal price-fixing conspiracy, the only thing that Plaintiffs need to allege to sustain their Sherman Act claims is that Defendants acted collectively in raising, fixing, or stabilizing the price of Broilers.  *Id.*; *N. Texas Specialty Physicians v. F.T.C.*, 528 F.3d 346, 360 (5th Cir. 2008) ("*Specialty Physicians*") ("Procompetitive justifications will not be considered if a practice, such as price-fixing, is a *per se* violation."); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 906 (6th Cir. 2003) ("*Cardizem CD*") (holding that where a *per se* approach applies, "no consideration is given to the intent behind the restraint, to any claimed pro-competitive justifications, or to the restraint's actual

effect on competition").  Plaintiffs satisfy this standard.[8]

**B.      Defendants' Motion to Dismiss Improperly Relies Upon External Evidence**

In reviewing a motion to dismiss under Rule 12(b)(6), the Court's inquiry must generally be limited to the allegations within the four corners of the Complaints, and all of Plaintiffs' allegations must be accepted as true.  *Hill v. Trustees of Ind. Univ.,* 537 F.2d 248, 251 (7th Cir. 1976); *Rosenblum v. Travelbyus.com*, 299 F.3d 657, 661 (7th Cir. 2002).  Defendants violate these fundamental principles by repeatedly relying upon affirmative evidence outside the four corners of the Complaints and asking the Court to make factual determinations.  The extrinsic materials include:  newspaper articles, industry reports, the Agri Stats website, and data compilations from federal government agencies such as the USDA and the National Agricultural Statistics Service ("NASS").  As the court recognized in *In re Domestic Airline Antitrust Litig.*, No. MC 15-1404 (CKK), 2016 WL 6426366 at *15, ___ F. Supp. 3d ___ (D.D.C. Oct. 28, 2016) ("*Domestic Airline*"), Defendants' attempted reliance upon external evidence is improper:

> In essence, Defendants ask the Court to consider all the facts in the Complaint and the underlying documents provided as exhibits to their briefing and make factual determinations after weighing and considering the facts relied upon by each party. This is a proper inquiry to conduct when addressing a motion for summary judgment, rather than a motion to dismiss when the Court is tasked with accepting all factual allegations in the Complaint as true.

*Id.* at *15.  Moreover, as explained below, Defendants' reliance on this evidence cannot be saved by the limited exceptions for incorporation by reference or judicial notice.

---

[8] If the Court concludes that Plaintiffs' claims are subject to a rule of reason analysis, Plaintiffs reserve their rights to amend their claims, as necessary, to satisfy the appropriate standards.

1. **Defendants' Citation to Documents Outside of Plaintiffs' Complaints Violates the Incorporation by Reference Doctrine**

The incorporation by reference doctrine provides a "narrow exception" that allows courts to rely upon a document cited in a complaint only if "it was a concededly authentic document central to the plaintiff's claim." *See Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002). The typical application of this limited exception is the incorporation of the contract at issue in a breach of contract claim. *Id.* However, incorporation by reference "is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment…." *Id.* (citing *Levenstein v. Salafsky,* 164 F.3d 345, 347 (7th Cir. 1998)). "Both reference and centrality are required to allow consideration of documents attached to a motion to dismiss. Without both elements satisfied, additional documents cannot be considered for purposes of a Rule 12(b)(6) motion." *United States for the Use & Benefit of Denning Inc. v. Titan Mech., LLC*, No. 15-CV-11370, 2016 WL 3551678, at *2 (N.D. Ill. June 29, 2016). *See also Metz v. Joe Rizza Imports, Inc.*, 700 F. Supp. 2d 983, 988 (N.D. Ill. 2010) (excluding documents on a motion to dismiss that were not central to plaintiff's claims: "Unlike situations, for example, involving the breach of a contract, Plaintiffs' underlying substantive claims are not contingent upon the interpretation of a document."). Courts refuse to apply the doctrine when defendants attempt to rely on documents that are not central to the causes of action and to which plaintiffs make a mere "passing reference." *See, e.g.*, *Wojcik v. InterArch, Inc.*, 13-cv-1332, 2013 WL 5904996 at *6 (N.D. Ill. Nov. 4, 2013); *Domestic Airline*, 2016 WL 6426366 at *14.

This is exactly what Defendants attempt to do, improperly resting their Motion upon external documents that receive a mere passing reference in Plaintiffs' Complaints. (*See, e.g., MTD p. 19 (article published on ThePoultrySite.com); MTD p. 20, Dkt. 277-2 (articles published on WattAgNet.com ); Dkt. 277-3 (article published on Barrons.com); Dkt. 277-4 (transcript from*

the BMO Capital Markets and Agriculture Conference); Dkt. 281-1 (article in the Poultry Processing Economic Review); Dkts. 281-2 & 281-4 (transcripts of earnings calls by Pilgrim's, Tyson Foods, and Sanderson filed with the SEC); Dkts. 283-1 & 283-2 (articles published by the Continental Grain Company); Dkt. 283-3 (Wayne's press release); Dkts. 295-2, 298-2 (article published in the Chattanooga Times Free Press)). These documents should not be incorporated by reference. *See Domestic Airline*, 2016 WL 6426336 at *14 (refusing to incorporate by reference articles, industry reports, transcripts from earning calls, and SEC filings cited within the complaint); *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985) ("*Goldman*") ("[L]imited quotation does not constitute incorporation by reference.").

Defendants fail to mention (let alone satisfy) the incorporation by reference doctrine. Rather they state in a conclusory footnote that the Court can "take judicial notice of the full contents of materials cited in the complaint." (MTD p. 4 n. 6.) However, the Seventh Circuit case they cite, *Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014), is inapposite. There, the Seventh Circuit acknowledged that the plaintiffs' EEOC charges filed in their employment discrimination matter were deemed incorporated by reference, because they were referred to in the complaint and central to the plaintiffs' claim. *Id.* at 729. That is not the case here. Moreover, *Twombly* does not support the broad and untethered application of the incorporation by reference (or judicial notice) doctrines asserted by Defendants. *In re Processed Egg Prods. Antitrust Litig.,* 821 F. Supp. 2d 709, 740 n. 31 (E.D. Pa. 2011) ("*Processed Egg*") (rejecting defendants' claim that *Twombly* broadened the incorporation by reference doctrine).

### 2. Defendants' Citation to Documents Outside of Plaintiffs' Complaints Violates the Judicial Notice Doctrine

Judicial notice is another narrow exception, but it cannot be used to summarily adjudicate facts in Defendants' favor. "[C]ourts should strictly adhere to the criteria by the Federal Rules of

Evidence before taking judicial notice of pertinent facts." *Doss v. Clearwater Title Co.*, 551 F.3d 634, 640 (7th Cir. 2008). Courts may judicially notice a fact only if it is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction, or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *Gen. Elec. Capital Corp., v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997). Stated differently, "judicial notice applies to self-evident truths that no reasonable person could question, truisms that approach platitudes or banalities." *Hardy v. Johns-Manville Sales Corp.,* 681 F.2d 334, 347 (5th Cir. 1982).

Especially on a motion to dismiss, when a document is given judicial notice, it cannot be used to establish the truth of the matters asserted therein. *United States ex rel. Bogina v. Medline Indus., Inc.,* No. 11 C 05373, 2015 WL 1396190 at *3 (N.D. Ill. Mar. 24, 2015), *aff'd sub nom. U.S. ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365 (7th Cir. 2016); *Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 424 (2d Cir. 2008) (prohibiting the district court from taking judicial notice of regulatory filings for truth of the matter asserted). This is because the effect of judicially noticing a fact is to preclude the opposing party from introducing contrary evidence and essentially directing a verdict against him as to the fact noticed. *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citing 21 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5104 at 485 (1977 & Supp. 1994)).

Here, Defendants are not seeking judicial notice to establish the existence or publication of documents. Rather, they are improperly attempting to "present new factual allegations to counter the factual allegations underlying Plaintiffs' claim as set forth in the Complaint." *Domestic Airline*, 2016 WL 6426366 at *15. *Id.* (denying defendants' request to take judicial notice of the truth of the matter asserted in articles, industry reports, SEC filings, and a DOJ

press release, that were cited or relied upon in the complaint); *City of Sterling Heights Gen.*

*Employees' Ret. Sys. v. Hospira, Inc.*, 11 C 8332, 2013 WL 566805 *12 (N.D. Ill. Feb. 13, 2013)

(refusing to grant defendant's request for judicial notice of SEC documents for the truth of the

matter asserted); *Cactus Corner, LLC v. U.S. Dep't of Agric.,* 346 F. Supp. 2d 1075 (E.D. Cal.

2004), *aff'd*, 450 F.3d 428 (9th Cir. 2006) (refusing to take judicial notice of the accuracy and

validity of information contained USDA reports in support of the USDA's motion for summary

judgment); *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1029 (C.D. Cal. 2015)

(holding information appearing on third-party websites is not a proper subject of judicial notice

because it is not capable of accurate and ready determination).

Defendants' request for judicial notice should be denied for the additional, and

independently sufficient reason that "other than asserting that the Court should take notice of

these facts, Defendants do not set forth how each document at issue satisfies the requirements of

Federal Rule of Evidence 201." *Domestic Airline*, 2016 WL 6426366 at *15.[9] Therefore, the

Court should deny Defendants' request for judicial notice, and disregard the information

contained in Defendants' extrinsic evidence and their arguments based thereupon.

### C. Plaintiffs Adequately Plead Parallel Conduct to Support the Broiler Conspiracy

Even in the absence of a "smoking gun," an antitrust conspiracy can be properly pled

---

[9] Although Defendants claim in a conclusory footnote that the Court can use judicial notice to rely upon USDA data and statistics, the cases Defendants cite are distinguishable in that none involve a motion to dismiss where the court accepted the truth of the USDA data and statistics. The issue of judicial notice of USDA data in *Parker v. Brown*, 317 U.S. 341, 363 n.9 (1943), did not arise in the context of a motion to dismiss, but instead on appeal following a trial by a district court of three judges. Similarly, the court in *Lamers Dairy Inc. v. U.S. Dep't of Agr.*, 379 F.3d 466, 471 (7th Cir. 2004), relied on a USDA report in an appeal from an entry of summary judgment. And the court in *Missouri Pet Breeders Ass'n v. Cty. of Cook*, 106 F. Supp. 3d 908, 918 (N.D. Ill. 2015), took judicial notice for the limited purpose of recognizing that the USDA has encouraged local governments to enact laws related to animal protection.

when plaintiffs allege parallel conduct supported by "an industry structure that facilitates collusion," which establish the plausibility of the conspiracy. *Text Messaging*, 630 F.3d at 628.[10] Here, Plaintiffs adequately plead facts showing that Defendants coordinated their efforts in furtherance of a conspiracy which included, among other things: (1) coordinated efforts to reduce and stabilize Broiler supply; and (2) manipulating the Georgia Dock price index.

### 1. Plaintiffs Adequately Allege Coordinated Efforts to Reduce Supply in Furtherance of the Conspiracy

Defendants contend that their alleged supply restraints do not constitute "parallel conduct" because they did not occur simultaneously, in the same amounts, using identical methods. But this misrepresents the legal standard for pleading parallel conduct and ignores Plaintiffs' allegations. Courts in this District recognize that coordinated supply reductions in furtherance of an antitrust conspiracy may arise from "parallel conduct that is sequential rather than simultaneous." *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011) ("*Plasma-Derivative*"). Parallel conduct can exist even where the defendants' supply restrictions take place "gradually" because "*Twombly* does not require that a complaint include allegations of such an unnatural coincidence in the management of competitors' businesses." *Id.*; *see also Kleen Prods., LLC v. Packaging Corp. of Amer.*, 775 F. Supp. 2d 1071, 1077 (N.D. Ill. 2011) ("*Kleen Prods. I*") ("[W]hile there may be some variation

---

[10] Although Defendants cite *Monsanto*, 465 U.S. at 768, for the proposition that Plaintiffs must show Defendants had a "conscious commitment to a common scheme" in order to state a claim (MTD p. 10), that case establishes an evidentiary standard, not a pleading standard. As the Seventh Circuit explained: "To show concerted action, antitrust plaintiffs *must produce evidence* that would allow a jury to infer that the alleged conspirators 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (summary judgment case; citing *Monsanto*, 465 U.S. at 764) (emphasis added). Such evidence would "tend[] to exclude the possibility that [defendants] were acting independently." *Monsanto*, 465 U.S. at 764 (citation and quotation omitted). The Seventh Circuit has not applied *Monsanto* in the context of a motion to dismiss.

in the amount and timing of reductions, that variation is not substantial enough to overcome the otherwise strong suggestion of conscious parallelism."). Moreover, Defendants' use of multiple methods to reduce supply is not only plausible, but "not surprising [because] [c]ommercially sophisticated parties like the defendants could well understand the red flags that would be raised" by simultaneous and identical conspiratorial acts. *SD3*, 801 F.3d at 427-28.

Defendants often employ various available supply-control measures to further their price-fixing conspiracy. *See In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 934 (N.D. Ill. 2009) ("*Potash*") (defendants used multiple supply restraints including shutting down mines, export cuts, and output cuts), *aff'd sub. nom. Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012); *Processed Egg*, 821 F. Supp. 2d at 714-15 (antitrust conspiracy used a series of egg supply reduction events including flock reductions, hatch reductions, cage species density guidelines, and exporting eggs); *Plasma-Derivative*, 764 F. Supp. 2d. at 996 (conspiracy employed "a series of production cuts, strategic acquisitions, and plant closures"); *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1159 (D. Idaho 2011) ("*Potatoes*") (defendants conspired to stabilize potato prices using acreage reduction rules, payments not to plant potatoes, shutting down packing plants, and offloading surplus potatoes).

In this case, Plaintiffs allege that Defendants reduced Broiler supply in furtherance of the conspiracy in several ways including: (1) reducing breeder flocks by killing Broiler breeders and limiting purchases of breeder pullets; (2) destroying or diverting the number of eggs sold in incubators at hatcheries; (3) destroying and reducing the size and quality of chickens that were delivered to farmers; (4) slowing down, closing or limiting the production of Broiler processing plants; and (5) exporting Broilers outside of the United States. *See* Section III, *supra*. That Defendants exploited their vertical integration to adopt a multifaceted price-fixing conspiracy is

not surprising. While Defendants' supply-control measures were not simultaneous, they were employed around the same time in a manner that supports the plausible inference of parallel conduct. *See Plasma-Derivative*, 764 F. Supp. 2d at 1000.

Defendants' challenge to Plaintiffs' allegations of coordinated supply-control measures ignores the standard for alleging parallel conduct and is not supported by their own cases. For example, Defendants' assertion that *Text Messaging* requires that parallel conduct occur "at the very same time" lacks merit because nothing establishes that requirement. 630 F.3d at 627-29. Defendants' other authorities are off point, because they involve either non-antitrust cases or antitrust cases subject to a rule of reason analysis.[11] Defendants' reliance on summary judgment decisions also fails, because "courts must be careful not to import the summary-judgment standard into the motion-to-dismiss stage." *SD3*, 801 F.3d at 425; *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) ("The 'plausibly suggesting' threshold for a conspiracy complaint remains considerably less than the 'tends to rule out the possibility' standard for summary judgment."). Therefore, Plaintiffs' allegations of coordinated supply reduction efforts satisfy the requirements for pleading parallel conduct.

### 2. Defendants Do Not Dispute That Plaintiffs Adequately Plead Parallel Manipulation of the Georgia Dock Price Index

The Georgia Dock is one of the primary pricing indexes for reporting and determining the prices of Broilers in the United States. (DPP ¶¶ 91-95, 97; EU ¶¶ 119-23; C&I ¶¶ 96-100, 102.)

---

[11] *See Campos v. BP Prods. North Am., Inc.*, No. 13 CV 8376, 2014 WL 5858625 *1 (N.D. Ill. Nov. 12, 2014) (non-antitrust case in which plaintiffs alleged a civil conspiracy arising from pollution caused by crude-oil refining byproducts); *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2012) (plaintiff did not sufficiently allege a group boycott under the rule of reason analysis); *RxUSA Wholesale, Inc. v. Alcon Laboratories, Inc.*, 661 F. Supp. 2d 218, 231 (E.D.N.Y. 2009) (alleged parallel conduct was "questionable" in a group boycott case); *Gupta v. v. St. Margaret Mercy Healthcare Centers, Inc.*, 2:95 CV 310, 1998 WL 34360626 (N.D. Ind. Apr. 22, 1998) (boilerplate recitation of conspiracy allegations was insufficient).

The GDA compiles the Georgia Dock price index by calling each participating Broiler producer on "Wednesday every week to report the price offered to companies in which they have contracts in place with." (DPP ¶¶ 97-98; EU ¶¶ 125-26; C&I ¶¶ 102-03.) To manipulate the Georgia Dock price index, Defendants submitted artificially high, coordinated Broiler prices—at the same time—every Wednesday in response to the GDA survey. (DPP ¶¶ 99-105; EU ¶¶ 127-33; C&I ¶¶ 104-110.) Defendants cannot—and do not—dispute the existence of coordinated manipulation of the Georgia Dock price index. These allegations alone satisfy *Twombly*. *See Kleen Prods. I*, 775 F. Supp. 2d at 1078 ("Even without any parallel capacity reductions, consistent parallel price increases are enough to make a threshold showing of conscious parallelism.").

Defendants erroneously argue that Plaintiffs' allegations about the manipulation of the Georgia Dock price index are implausible because it could not have been enforced against participants who submitted low prices. No enforcement was necessary, however, because any price more than one cent lower than the prices of other producers was thrown out. (DPP ¶ 103; EU ¶ 131; C&I ¶¶ 105, 108.). Moreover, Defendants' manipulation did not require enforcement because participants had no incentive to "cheat" by submitting lower prices. Artificially inflating the index benefited all producers, and no participant could have increased its own market share by submitting lower prices.

### D. Defendants' "Alternative Explanations" for Their Alleged Conspiratorial Acts Do Not Undermine the Plausibility of the Complaints

Defendants' positing of "alternative explanations" for their unprecedented coordinated conduct is not relevant. (MTD pp. 20-24.) Plaintiffs need only show that the conspiracy alleged is plausible, not that it is more probable than potential alternative explanations.

Plausibility "does not impose a probability requirement at the pleading stage; it simply

calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. "The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Anderson News*, 680 F.3d at 189. "Often, defendants' conduct has several plausible explanations. Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleading stage." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus.*, 648 F.3d 452, 458 (6th Cir. 2011) ("*Watson Carpet*"). "If a plaintiff were required to allege facts excluding the possibility of lawful conduct, almost no private plaintiff's complaint could state a Section One claim." *See Erie County, Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012) ("*Erie County*"). Moreover, in analyzing plausibility, "it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). "It follows that the inference of an agreement need not be more reasonable than the inference of independent parallel conduct." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 899 (N.D. Ill. 2011) ("*Dairy Farmers I*"). "Requiring such heightened pleading requirements at the earliest stages of litigation would frustrate the purpose of antitrust legislation and the policies informing it." *Evergreen*, 720 F.3d at 47.

Plaintiffs allege a plausible conspiracy by pleading specific details regarding Defendants' adoption, implementation, and workings of a conspiracy to fix Broiler prices. Because the conspiracy is a *per se* antitrust violation, it does not matter that Defendants claim they acted in response to economic pressures such as the Great Recession or a period of rising input costs. *See Maricopa Cty.*, 457 U.S. at 351; *Specialty Physicians*, 528 F.3d at 360; *Cardizem CD*, 332 F.3d

at 906.  As the court recognized in *Sulfuric Acid*, when analyzing a price fixing conspiracy, "an unforgiving market offers no excuse for violating antitrust laws."  743 F. Supp. 2d at 870.  When considering supply restraints, "[t]here is no requirement under the antitrust laws that plaintiffs prove only the most profitable capacity be eliminated."  *Id.* at 869-70.  Therefore, it is plausible that "producers could have colluded to reduce output and stabilize acid prices precisely to salvage profit—indeed, stay in business—in a dire economic climate" such as the Great Recession or rising feed prices.  *Id.*; *see also Kleen Prods. I*, 775 F. Supp. 2d at 1079-80 (Defendants' "contentions may be plausible—but that does not negate the plausibility of Plaintiffs' competing version.").[12]

Moreover, Defendants' "alternative explanations" argument fails because the Great Recession and purportedly rising feed prices do not explain away their conspiratorial acts or pricing behavior.  *See In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476, 2014 WL 4379112, at *11 (S.D.N.Y. Sep. 4, 2014) ("*Credit Default Swaps*") (denying defendants' motion to dismiss because, "[t]he financial crisis hardly explains the alleged secret meetings and coordinated actions" in furtherance of the conspiracy).  Neither the Great Recession nor rising feed costs explain Defendants' manipulation of the Georgia Dock price index and its divergence from the USDA and Urner Barry indexes.  All three of these indexes were subject to the same input cost and price pressures.  But unlike the others, the Georgia Dock price index was susceptible to collusion because Defendants controlled it, and it lacked purchaser verification.

---

[12]  *Per se* claims under the Sherman Act such as are alleged here are distinguishable from claims under the Packers and Stockyards Act ("PSA"), which subjects allegations of unilateral price manipulation by poultry manufacturers to a rule of reason analysis.  *See In re Pilgrim Pride Corp.*, 728 F.3d 457, 462 (5th Cir. 2013).  Thus, the Fifth Circuit's holding that Pilgrim's did not violate the PSA by engaging in "unilateral conduct" in order to "independently control its own output" has no bearing on the plausibility of this industry-wide antitrust conspiracy.  *Id.*

(DPP ¶¶ 91-92, 97-98; EU ¶¶ 119-20, 125-26; C&I ¶¶ 97, 102-05, 110.)

The Great Recession also does not explain how Defendants obtained record high prices in 2008 and 2009 in the midst of "weak demand." (DPP ¶¶ 192, 334; EU ¶¶ 220, 362; C&I ¶¶ 197, 339.) Nor does the Great Recession explain why Defendants cut breeder flocks and reduced supply to unprecedented levels in 2011 and 2012, when the U.S. economy was no longer in recession and consumer demand was increasing. (DPP ¶¶ 195-242; EU ¶¶ 223-70; C&I ¶¶ 200-47.) *See Kleen Prods. I*, 775 F. Supp. 2d at 1079 (finding a plausible conspiracy where plaintiffs alleged "capacity reductions, at least in large part, took place when the industry foresaw rising demand"). Similarly, the impact of rising feed prices does not explain why Defendants were able to generate increased profits in 2013. Nor does it explain how Broiler prices increased from 2014 through 2016 despite significant decreases in corn and soybean costs. (DPP ¶¶ 89-90; EU ¶¶ 117-18; C&I ¶¶ 94-95.)

During the conspiracy, Broiler prices repeatedly resisted negative market forces that impacted supply and demand in a manner that baffled industry commentators and defied expert predictions. (DPP ¶¶ 259-61 (Broiler producers do not see reduced prices and oversupply despite Avian Flu export restrictions); DPP ¶¶ 264-69 (continued Broiler profits and limited supply run counter to decades-long boom and bust cycles anticipated by industry experts and commentators); DPP ¶¶ 334-36 (Broiler prices rise despite decreased demand during the Great Recession); EU ¶¶ 287-88, 292-97, 362-64; C&I ¶¶ 266-74, 339-40.) These conspiracy allegations strongly support the plausibility of the conspiracy and cannot be explained away by independent non-conspiratorial market forces.

### E. Defendants' Claimed Production Increases Improperly Rely Upon External Evidence and Fail to Establish Implausibility

There is no merit to Defendants' contention that the alleged conspiracy is implausible

because they increased production "almost every year" during the Class Period. As stated in Section IV(B) *supra*, this argument improperly ventures outside the four corners of the Complaints, and relies upon external USDA data for the purported truth of the matter asserted. Even if the Court were to consider these extraneous materials, Defendants' argument fails because supply increases still would not make the conspiracy implausible. A close examination of Defendants' own statistics reveals significant unprecedented reduction in supply in 2008, supply remaining flat from 2010 through 2012 despite increasing demand, and only modest supply increases from 2013 through 2015. (MTD Appx. A (Dkt. 280-1).) The lack of consistent production increases supports Plaintiffs' allegations that Defendants implemented production control measures in 2008 and 2011, with pervasive and lasting effect on supply and prices.

Moreover, by focusing only on total Broiler supply during the Class Period, Defendants ignore the change in the rate of production increases prior to and during the conspiracy. *See High Fructose*, 295 F.3d at 660 (determining conspiratorial impact based on analysis of periods before and after the conspiracy); *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 683-84 (E.D. Pa. 2007) (approving expert damages calculation by analyzing pricing behavior before, during, and after conspiracy). Stated differently, the data show that Broiler production growth slowed substantially during the Class Period, which supports the existence of a conspiracy. As shown in the USDA data in Figure 1 below, Broiler production grew by 21% before the conspiracy from 2000 to 2008.[13] NASS, Chickens, Young, Slaughter, FI, Certified, Chilled & Frozen – Production, Measured in LB, available

at https://quickstats.nass.usda.gov/results/C33961EC-6D46-31DE-8CCB-89780E3D1620 (last

---

[13] To the extent that Defendants rely upon external sources in support of their Motion to Dismiss—which they should not—Plaintiffs may rely on those same sources in opposition to the Motion. *PharMerica Chicago, Inc. v. Meisels*, 772 F. Supp. 2d 938, 948 (N.D. Ill. 2011).

visited Feb. 3, 2017). Production then slowed significantly, gaining only 8.5% from 2008 through 2015. *Id.* The significant decrease in the pace, timing, and manner of Broiler production during the conspiracy supports plausibility, even if Defendants were motivated by economic conditions. *See Sulfuric Acid*, 743 F. Supp. 2d at 870 ("[A]n unforgiving market offers no excuse for violating antitrust laws."); *Credit Default Swaps*, 2014 WL 4379112, at *11.

**Figure 1. Production of Young Chickens (lbs.) with Pre-Conspiracy Trend**



Moreover, Defendants ignore other variables such as demand and price for Broilers in order to isolate the impact of the alleged conspiracy. Such evidence must be developed by experts after discovery. *See, e.g., In re Chicken Antitrust Litig.*, 560 F. Supp. 963, 993 (N.D. Ga. 1980) (utilizing "multi-variable regression analysis to attempt to isolate the impact of the [National Broiler Marketing Association's] activities from the other variables influencing the market price."); *In re Ready Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 164-65 (S.D. Ind. 2009) ("*Concrete II*") (analyzing plaintiffs' expert's multi-factor regression model in support of class certification). Defendants' incomplete analysis underlines the impropriety of their attempt to summarily adjudicate disputed facts and evidence on a motion to dismiss.

Defendants' claim that the conspiracy is implausible because Broiler supply did not decline as much as beef and turkey violates the permissible scope of judicial notice. Moreover, the Complaints allege that alternative protein sources such as pork, beef, and turkey are different products with different market drivers than Broilers. (DPP ¶¶ 282-83; EU ¶¶ 310-11; C&I ¶¶ 287-88.) The court must "accept all facts in the complaint as true, view them in the light most favorable to the [plaintiffs], and draw all reasonable inferences in their favor." *Bonte*, 624 F.3d at 463. Thus, the beef and turkey markets are irrelevant to the Broiler conspiracy.

F. **Defendants Do Not—and at this Stage May Not—Explain Away the Detailed Allegations Regarding the Manipulation of the Georgia Dock Price Index**

While Defendants bury their criticisms of the Georgia Dock allegations on page 35 of their Motion and attempt to minimize its import by erroneously referring to it as merely a "plus factor," their manipulation of the Georgia Dock price index was part and parcel of their conspiracy, and had the purpose and effect of artificially raising Broiler prices. As courts recognize, antitrust conspiracies can rely upon various methods such as a combination of price manipulation and supply restrictions. *See Kleen Prods. I*, 775 F. Supp. 2d at 1077-78 (plausible conspiracy included both parallel capacity reductions and price increases); *Processed Egg*, 821 F. Supp. 2d at 714-15; *Potash*, 667 F. Supp. 2d at 934.

Defendants' claim that Plaintiffs provided "no meaningful details" about how they manipulated the Georgia Dock is also without merit. The Complaints allege that Defendants controlled the Georgia Dock Advisory Committee, which was responsible for determining the methodology for reporting the Georgia Dock pricing index. (DPP ¶¶ 97-110; EU ¶¶ 125-38; C&I ¶¶ 102-20.) A GDA employee was told that he "could not make any changes without clearing them with the Advisory Board." (DPP ¶ 105; EU ¶ 133; C&I ¶ 110.) Defendants exploited their control to adopt and implement a pricing mechanism that was susceptible to

collusion, the "One Cent Rule." (*Id.*) The divergence between the Georgia Dock index price and other indexes shows that Defendants' manipulation was successful. (DPP ¶¶ 102-03; EU ¶¶ 130-31; C&I ¶¶ 107-08.) These factors led to the USDA to stop relying on the Georgia Dock price index.[14] (DPP ¶¶ 107-09, 112-15; EU ¶¶ 135-37; C&I ¶¶ 111-13, 120.) Individuals within the GDA also expressed alarm regarding the legality and propriety of the Georgia Dock price index. (DPP ¶ 99; EU ¶ 127; C&I ¶ 104 (Georgia Dock is "a flawed product that is a liability to the Georgia Department of Agriculture"); DPP ¶ 105; EU ¶ 133; C&I ¶ 110 ("I have questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent."); DPP ¶ 110; EU ¶ 138; C&I ¶ 111 (noting that the "weighted average price per pound on broilers [for the Georgia Dock price was] based off of contracts that have been determined at the private level and reported without regulatory oversight").)

None of Defendants' pretextual justifications regarding the Georgia Dock price index overcome the sufficiency of Plaintiffs' allegations. Although only seven producers manipulated the Georgia Dock price index—the other Defendants were not part of the index—all Defendants benefited from the manipulation, because the Georgia Dock price index was used as the baseline from which purchasers negotiated Broiler prices nationwide, and all Defendants participated in at least one of the many aspects of the conspiracy.[15] Put differently, the Georgia Dock manipulation scheme was in furtherance of the conspiracy, and the actions of the seven

---

[14] In December 2016, after Plaintiffs filed the Complaints, the GDA indefinitely suspended the Georgia Dock price index. *See* Erica Shaffer, *Georgia Dock pricing indefinitely suspended*, FOOD BUSINESS NEWS, Dec. 22, 2016 (http://www.foodbusinessnews.net/articles/news_home/Business_News/2016/12/Georgia_Dock_pricing_indefinit.aspx?ID=%7B969D4784-318A-444E-89C7-8D96AA3D7F59%7D&cck=1).

[15] Among other things, Defendants that did not participate in the Georgia Dock price index could have benefited from the price manipulation through the extensive inter-Defendant trading of Broilers, the extent to which is a matter for discovery.

Defendants benefited all conspirators.  Moreover, Defendants' claim that the divergence of the

Georgia Dock price index from the USDA and Urner Berry indexes in 2015 and 2016 can be

explained by different sampling methodologies is not only improper at the pleading stage, but

also unconvincing, because there are no allegations suggesting that those sampling

methodologies changed at any time during the Class Period.

G.    **"Plus Factors" Support the Existence of a Plausible Conspiracy**

Defendants' attempt to minimize Plaintiffs' well-pleaded allegations of "plus factors"

fails.  While there is no finite list of plus factors, courts and commentators have identified:

> (1) actions that would be against the defendants' self-interest if the defendants
> were acting independently, but consistent with their self-interest if they were
> acting in concert; (2) a motive to conspire; (3) an opportunity to conspire; (4)
> market concentration and structure conducive to collusion; (5) pretextual
> explanations for anticompetitive conduct; (6) sharing of price information; (7)
> signaling; and (8) involvement in other conspiracies.

*In re Pool Prods. Distrib. Market Antitrust Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013)

("*Pool Prods.*").  Here, several plus factors support the conspiracy's plausibility.

1.    **Plaintiffs Allege that Agri Stats was an Enforcement Mechanism for the Conspiracy**

Defendants fail to cite a single Rule 12 decision requiring Plaintiffs to allege an

enforcement mechanism to plead an antitrust conspiracy.  Their argument, based on two non-

controlling summary judgment decisions, should be rejected.  (MTD pp. 27-28 (citing *Petruzzi's*

*IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1233 (3d Cir. 1993);

*Edding v. Redstone*, 134 Cal.App.4th 290, 313 (2005)).)

In any event, Plaintiffs allege that Defendants facilitated, monitored and enforced the

conspiracy, including by exploiting detailed industry data obtained from Agri Stats.  (DPP ¶¶

116-135; EU ¶¶ 144-63; C&I ¶¶ 121-40.)  Specifically, Plaintiffs allege that Agri Stats produces

the most comprehensive data report available, which includes "sufficient detail for an informed subscriber [i.e. Defendants] to determine with reasonable accuracy producer-specific production, cost, and general efficiency data." (DPP ¶ 116; EU ¶ 144; C&I ¶ 121.) Unlike publicly available sources such as the USDA index, Agri Stats provided Defendants with enough information to monitor and enforce their supply restraints. (DPP ¶¶ 117-32; EU ¶¶ 145-60; C&I ¶¶ 121-37.) As observed by industry commentators, "the sharing of information through Agri Stats by Broiler producers regarding pay for contract-farmers creates 'a potential vehicle for collusion' and presents a 'classical antitrust concern.'" (DPP ¶ 133; EU ¶ 161; C&I ¶ 138.) Moreover, Agri Stats allowed Defendants to share information in a manner that violates FTC and DOJ guidelines for collaboration amongst competitors.[16] (DPP ¶ 135; EU ¶ 163; C&I ¶ 140.)

Defendants' attacks on the Agri Stats allegations erroneously treat Agri Stats as if it were the conspiracy rather than a conduit for the conspiracy. Contrary to Defendants' contention, the detailed, non-public information obtained via Agri Stats served as an enforcement mechanism and enabled Defendants to conceal their collusion without fear of detection. (DPP ¶¶ 116-135; EU ¶¶ 144-63; C&I ¶¶ 121-40.) In other words, the use of Agri Stats—by all Defendants — supports the inference of conspiracy, because it constitutes "a practice, not illegal in itself, that facilitates price fixing that would be difficult for the authorities to detect." *Text Messaging*, 630 F.3d at 628; *see also Domestic Airline*, 2016 WL 6426366 at*8 (defendants' ability to monitor other airlines' fare structure and pricing supported the plausibility of the alleged conspiracy).

---

[16] In 2004, after a $1.3 billion jury verdict against Tyson for conspiring to manipulate pay for cattle farmers, Tyson withdrew from Agri Stats on increased fears of antitrust liability. (DPP ¶ 121; EU ¶ 149; C&I ¶ 126.) Tyson resumed its participation in Agri Stats in January 2008 around the start of the Class Period. (*Id.*)

## 2. Broiler Market Concentrations and Industry Characteristics Support the Plausibility of the Conspiracy

Plaintiffs allege numerous industry characteristics which allowed Defendants to implement their conspiracy, including high market concentration. Plaintiffs allege that the Broiler industry was characterized by: (1) vertical integration; (2) inelastic supply and demand; (3) a lack of significant substitutes; (4) high barriers to entry; (5) similar cost structures; and (6) the commodity nature of Broiler products. *See* Section III, *supra*. Viewed collectively, these industry characteristics support the plausibility of the Broiler conspiracy, irrespective of market concentration. *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1144 (N.D. Cal. 2009) (*"Flash"*); *Kleen Prods. I*, 775 F. Supp. 2d at 1081.

Defendants ignore these well pleaded allegations and assert that the conspiracy is "implausible" because the Broiler industry is not sufficiently concentrated according to the Herfindahl-Hirschman Index ("HHI"). Defendants' argument fails for several reasons. First, Defendants' HHI calculation impermissibly relies upon facts and evidence regarding HHI concentrations that do not appear within the four corners of the Complaints. (MTD Appendix C (Dkt 280-3).) Second, as evidenced by the DOJ guidelines referenced in Defendants' Motion, HHI is a measure of market concentration that is typically used for analyzing horizontal mergers rather than the plausibility of a conspiracy. *See* U.S. Dept. of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines, p. 1 (Aug. 19, 2010) (These guidelines "may [ ] assist the courts in developing an appropriate framework for interpreting and applying the antitrust laws in the horizontal merger context."). Unlike a merger, antitrust conspiracies often include more than two competitors that combine to control a market because they could not do so independently or via a lawful merger. *See Kleen Prods. I*, 775 F. Supp. 2d at 1081 (inability of one firm to control the market supports the inference of a conspiracy). Accordingly, courts regularly find the

existence of concentrated industries that are susceptible to price collusion, without referring to HHI. *See, e.g., Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 804 F. Supp. 2d 419, 426 (D. Md. 2011) (finding high market concentration where defendants controlled 70% of the market); *Flash*, 643 F. Supp. 2d at 1144-45; *Domestic Airline*, 2016 WL 6426366, at *8. In this case, Defendants' market power supports the inference of conspiracy, because they collectively control 90% of the Broiler market, with the top 10 producers controlling almost 80%. (DPP ¶¶ 2, 109, 286; EU ¶¶ 2, 137, 314; C&I ¶¶ 2, 114, 291.)

### 3. Defendants' Exploitation of Opportunities to Collude Supports the Plausibility of the Conspiracy

Defendants' assertion that opportunities to collude do not support an inference of conspiracy fails as a matter of law. "[B]elonging to a trade association or attending industry events and exchanging price information … 'facilitates price fixing.'" *Kleen Prods. I*, 775 F. Supp. 2d at 1080 (quoting *Text Messaging*, 630 F.3d at 628); *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001) ("*Todd*") ("[T]he frequency of the meetings is itself problematic for the same reason that the exchange of current price data is suspect: It tends to facilitate the policing of price conspiracies."). Accordingly, attendance at trade association meetings and other opportunities to collude support the inference of a conspiracy when they are connected to alleged conspiratorial acts. *See Text Messaging*, 630 F.3d at 628; *Kleen Prods. I*, 775 F. Supp. 2d at 1080; *Standard Iron Works*, 639 F. Supp. 2d at 893; *Flash*, 643 F. Supp. 2d at 1148.

The Complaints meet this standard. Plaintiffs identify specific trade associations and meetings that facilitated the conspiracy, the people who attended those meetings, the relationship between these meetings and alleged conspiratorial acts, and the manner in which Defendants exploited these opportunities to conspire. (DPP ¶¶ 105-09 (Defendants used their roles on the Georgia Dock Advisory Committee to facilitate the conspiracy); ¶¶ 145-48 (Defendants

37

announced intentions to raise prices and issued calls to coordinate production cuts days after attending IPE conference); ¶¶ 149-51 (Defendants announced plant closure and production cuts weeks after attending Executive Committee meeting of National Chicken Counsel's Board of Directors); ¶ 174 (Defendants' senior executives discussed their desire to push through industry-wide price increases at a National Chicken Council meeting); ¶ 194 (Defendants' senior executives attended meetings of National Chicken Counsel and IPE to discuss production discipline); EU ¶¶ 133-37, 173-79, 202, 222; C&I ¶¶ 110-14, 150-56, 179, 199). These allegations tying Defendants' conspiratorial acts to attendance at industry events render the conspiracy plausible.

4. **Defendants' Public Statements and Calls to Action Support the Plausibility of the Conspiracy**

The Complaints also set forth detailed statements by Defendants and their executives calling for industry-wide supply restraints and "capacity discipline." Such specific statements constitute a plus factor which supports the inference of a plausible conspiracy. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010) ("[C]ollusive communications can be based upon circumstantial evidence and can occur in speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways."); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir. 1990) ("*Petroleum*") ("[T]he form of the exchange—whether through a trade association, through private exchange ... or through public announcements of price changes—should not be determinative of its legality."); *Standard Iron Works*, 639 F. Supp. 2d at 893-94 (conspiracy was supported by defendants' executives' statements "calling for industry-wide production restraint" or otherwise "suggest[ing] collective action and agreement").

Defendants' attempts to explain away these allegations suffer from many of the defects prevalent throughout their Motion. First, Defendants attempt to establish the truth of matters asserted in documents outside of the Complaints (*e.g.,* SEC filings) in violation of Rule 12. (MTD p. 31; Section IV(B), *supra*.) Second, although not all public statements support an inference of conspiracy, the specific statements alleged in the Complaints do.[17] Finally, Defendants' attack on a few cherry-picked statements in the Complaints fails to provide any explanation for the dozens of other public statements that support the inference of a conspiracy. When viewed collectively and through the proper lens of a motion to dismiss, Defendants' public statements support the plausibility of the Broiler conspiracy.

**5.      The Shift to Short-Term Contracts and Purchases from Competitors Support the Plausibility of the Conspiracy**

Finally, Plaintiffs' allegations that certain Defendants moved to short-term, spot-market contracts and that they used intra-Defendant sales to reduce supply further support the inference of a conspiracy. Contrary to Defendants' assertion, Plaintiffs need not allege that each Defendant engaged in these activities for them to be in furtherance of the conspiracy. *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) ("*Beltz*"). Moreover, moving customers from long-term, fixed-price contracts to short-term agreements

---

[17]   The cases cited by Defendants do not support a blanket rule that public statements render a conspiracy implausible. In *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 52 (7th Cir. 1992), the court found that the defendants' advance announcement of price increases was not sufficient to lead to an inference of price fixing because their customers required advance notice for construction projects. In *Petroleum*, public announcements of price increases were sufficient to support  an inference of conspiracy because they were not needed for "consumers to get the information they need" or any other legitimate purpose. 906 F.2d at 448 n.14; *see also Standard Iron Works.*, 639 F. Supp. 2d at 893-94 (holding that public statements suggesting collective action support the inference of a plausible conspiracy). Here, as in *Petroleum,* Defendants do not claim that their public statements were necessary to inform their customers, and their assertion that they were required to make these statements because some Defendants are public companies is unsupported.

supports plausibility, because it enabled Defendants to implement conspiratorial price increases. *See High Fructose*, 295 F.3d at 659. Defendants' attempt to assert "independent reasons" for the shift to short-term contracts improperly relies upon extrinsic documents. In addition, the mere assertion of alternative explanations for conspiratorial acts in a legal brief does not make Plaintiffs' theory implausible. *See* Sections IV(D), (F), *supra*.

As for the inter-Defendant Broiler purchases, while they are not improper in and of themselves, purchases that were not in Defendants' independent self-interest support the inference of a conspiracy. *See High Fructose*, 295 F.3d at 659 ("A seller who experiences a surge in demand, but meets the surge by buying what it needs from another seller rather than by expanding its own production, protects the other firm's market share and so preserves peace among the cartelists."). Plaintiffs allege the same cartel practices here, and in this case, it was more expensive for Defendants to purchase Broilers from competitors than produce them independently. (DPP ¶ 195; EU ¶¶ 223; C&I ¶¶ 200.) Accordingly, the inter-Defendant purchases further support the inference of conspiracy.

## V.     Plaintiffs' Claims Are Timely

Defendants' statute of limitations argument suffers from the same shortcomings that plague their arguments about Plaintiffs' conspiracy allegations. Defendants ignore allegations, view others in isolation, read allegations in the light most favorable to themselves, and prematurely seek to resolve factual disputes. They also try to recast the conspiracy alleged into one that they believe better serves an affirmative defense based on a four-year limitations period.

Defendants characterize the conspiracy allegations as "base[d] … on public statements made more than six years ago" (MTD p. 14), but ignore that Plaintiffs actually allege a single conspiracy spanning from at least 2008 through at least 2016 with acts in furtherance continuing

40

throughout that time frame. While some of Defendants' production restraints were public more than four years ago (DPP ¶¶ 145-241; EU ¶¶ 173-269; C&I ¶¶ 150-246), Defendants improperly minimize Plaintiffs' allegations of at least five additional years of alleged misconduct including the manipulation of the Georgia Dock price index, misuse of Agri Stats, and production restraints by, among other things, depressing the size of U.S. hatchery flocks under the pretext of exporting such flocks to deal with the outbreak of the Avian Flu in Mexico. (DPP ¶¶ 97-135, 242-69; EU ¶¶ 125-63, 270-97; C&I ¶¶ 102-40, 247-74.) Under the continuing violation doctrine alone, Plaintiffs' allegations related to post-2011 events are sufficient to defeat dismissal.

Defendants also ignore that key information disclosing the conspiracy was not made public until 2014 or later, with a series of revelations starting with the publication of *The Meat Racket* (DPP ¶ 372; EU ¶ 406; C&I ¶ 383), and culminating with media reports in 2016 about possible manipulation of the Georgia Dock price index (DPP ¶ 374; EU ¶ 408; C&I ¶ 385). In addition, Plaintiffs sufficiently allege that Defendants hid their misconduct, including through affirmative misrepresentations that the Renewable Fuels mandate and higher feed costs caused Broiler price increases (DPP ¶ 383; EU ¶¶ 417; C&I ¶¶ 392-98), which prevented Plaintiffs from discovering the existence of the conspiracy. Defendants seek to ignore the significance of these allegations relating to later events, including their impact on key statute of limitations issues— such as discovery and fraudulent concealment.

**A.      Dismissal Under Rule 12 Based on a Statute of Limitations Affirmative Defense is Strongly Disfavored**

Even "storm warnings" are not enough to trigger the running of a statute of limitations. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) ("*Merck*") (affirming reversal of district court's dismissal based on statute of limitations affirmative defense). "[T]he 'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations

period…. [T]he limitations period … begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first." *Giger v. Ahman*, 09 C 4060, 2013 WL 6730108 at *3 (N.D. Ill. Dec., 20, 2013) (Durkin, J.) ("*Giger*") (quoting *Merck*, 559 U.S. at 653).

The Seventh Circuit strongly disfavors dismissal on a motion to dismiss: "Judges should respect the norm that complaints need not anticipate or meet potential affirmative defenses." *Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012). "A complaint that invokes a recognized legal theory (as this one does) and contains plausible allegations on the material issues (as this one does) cannot be dismissed under Rule 12." *Id.* "Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 9 CR 3690, 2013 WL 212908, at *8 (N.D. Ill. Jan. 18, 2013) ("*Dairy Farmers II*") (denying a motion to dismiss price-fixing claims as time-barred) (quoting *Xechem, Inc. v. Bristol–Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004), and *Richards*, 696 F.3d at 637-38; *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, 85 F. Supp. 3d 1007, 1009-10 (E.D. Wis. 2015) ("*Fond Du Lac*") (denying motion to dismiss price-fixing claim as time-barred) (quoting *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004)).

Here, when Plaintiffs' allegations are viewed in their totality, the facts available in 2012 would not have "prompted a reasonably diligent plaintiff to begin investigating" and "have discovered the facts constituting the violation"—an industry-wide conspiracy to fix Broiler prices. *See id.*; *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1014 (7th Cir. 2012) (denying defendants' request to have the statute of limitations apply on a factual record that was fully-developed); *Giger*, 2013 WL 6730108, *3 (denying motion for summary judgment based on

statute of limitations affirmative defense). Plaintiffs' claims are timely.

Defendants' most pertinent authorities are not antitrust cases and did not resolve the limitations issue on a motion to dismiss. Instead, those cases disposed of the limitations issue only after discovery was conducted and there was a finding of undisputed facts supporting summary judgment. *See, e.g.*, *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990) ("*Cada*") (age discrimination suit based on firing of employee; affirmed grant of summary judgment); *Robert L. Kroenlein Trust ex rel. Alden v. Kirchhefer*, 764 F.3d 1268 (10th Cir. 2014) (RICO suit based on theft of merchandise; affirmed grant of summary judgment); *Geo. Knight & Co. v. Watson Wyatt & Co.*, 170 F.3d 210 (1st Cir. 1999) (professional negligence suit based on improper provision of actuarial services; affirmed grant of summary judgment). On this basis alone, this Court should reject Defendants' statute of limitations argument. *See Dairy Farmers II*, 2013 WL 212908, at *8.

**B.      Plaintiffs' Claims are Timely Under the Continuing Violation Doctrine, Discovery Rule, and Equitable Tolling Due to Fraudulent Concealment**

The statute of limitations typically begins to run when a "defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). However, various, often inter-related rules modify the date of accrual or toll the running of the statute of limitations. *See In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006) ("*Copper*"). Here, three such rules—the continuing violation doctrine, the discovery rule, and equitable tolling due to fraudulent concealment—each render Plaintiffs' claims timely.

**1.      Plaintiffs Allege a Continuing Violation**

"In the context of a continuing scheme to violate the antitrust laws, a cause of action accrues to the plaintiff each time the defendant engages in antitrust conduct that harms the plaintiff." *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 669 F.2d 490, 494 (7th Cir. 1982); *see*

43

*also Copper*, 436 F.3d 782. The continuing violation doctrine postpones the accrual date where the "defendant inflicts continuing and accumulating harm." *In re Evanston Nw. Healthcare Corp. Antitrust Litig.,* No. 07 C 04446, 2016 WL 4720014, at *7 (N.D. Ill. Sept. 9, 2016) ("*Evanston*") (citing *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001)); *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n. 15 (1968).[18] If defendants committed overt acts in furtherance of their wrongdoing, notably those with the purpose of "fine tun[ing] their cartel agreement[]" during the statutory period, their prior and new actions may be considered a single, continuing violation for which suit may be brought. *Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 129 F. Supp. 3d 614, 633 (N.D. Ill. 2015).[19]

"[T]he Seventh Circuit has held that the 'right question' is not whether the plaintiff has alleged 'facts that tend to defeat affirmative defenses,' but 'whether it is possible to imagine proof of the critical facts consistent with the allegations in the complaint' that would fall within the period of limitations." *Id.* at 633 (quoting *U.S. Gypsum Co. v. Ind. Gas Co., Inc.,* 350 F.3d

---

[18] *See also Evanston*, 2016 WL 4720014, at *10 ("In continuing violations cases, "the complaint is timely when it is filed within [the limitations period, measured from] the last asserted occurrence of that practice."; "[I]f a continuing violation extends into the statutory period, the victim is entitled to complain about the whole violation, no matter how long ago it began ....") (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982) and *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1984)); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MDL-1775, 2010 WL 10947344, at *18 (E.D.N.Y. Sept. 22, 2010) ("*Air Cargo I*") ("That all of the particular allegations against the [] defendants occurred prior to the limitations period is a point that has some superficial appeal and perhaps may have an impact on the recoverable damages, but it offers little reason to find that the claim against them is barred by the statute of limitations.").

[19] Defendants cite *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ("*Klehr*"), where the Supreme Court recognized that "[a]ntitrust law provides that, in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Id.* at 189 (citation omitted).

623, 628 (7th Cir. 2003)).  Therefore, Plaintiffs properly plead a continuing price-fixing

conspiracy, including allegations of disguised meetings within four years of the filing of the first

complaint to "fine tune their cartel agreement."  (DPP ¶¶ 240 (2012), ¶¶ 132(C), 245 (2013), ¶

250 (2013-14), ¶ 251 (2013-16); EU ¶¶ 268, 160(C), 273, 278-79; C&I ¶¶ 137, 245, 250, 255-56,

347.)  Plaintiffs' well-pled allegations invoke the continuing violation doctrine and are sufficient

to toll the statute of limitations at least until 2016.  (DPP ¶¶ 1, 9, 89, 97, 99, 104-15, 250-52, 256,

258, 260, 262, 264-67, 269, 306, 315, 373-75, 380; EU ¶¶ 1, 9, 117, 125, 127, 133-34, 278-80,

284, 286, 288, 290, 292-95, 297, 334, 343, 407-09, 414; C&I ¶¶ 1, 9, 102-20, 255-57, 261-65,

269-72, 274, 311, 320, 347-50, 384-86, 391.)

> **2.**     **The Statute of Limitations Has Only Recently Accrued Under the Discovery Rule**

Under the discovery rule, the statute of limitations does not accrue until the plaintiff

discovers or should have discovered that "he has been injured and who caused the injury."

*Evanston*, 2016 WL 4720014 at *7 (quoting *Barry Aviation Inc. v. Land O'Lakes Mun. Airport

Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004)).  In determining whether the discovery rule applies,

courts do not provide defendants with the benefit of hindsight; instead, they examine whether the

facts and information available to the plaintiffs at the time "amount[] to indisputable evidence of

inquiry notice" that a defendant has done something illegal.  *Copper*, 436 F.3d at 790 (reversing

grant of summary judgment based on statute of limitations); *Sulfuric Acid.*, 743 F. Supp. 2d at

856 (denying summary judgment:  "In short, generalized reports in trade publications do not

constitute indisputable evidence of inquiry notice that Defendants engaged in illegal practices.").

Here, Plaintiffs could not have discovered the detailed and intricate price-fixing scheme

until shortly before they filed suit.  (DPP ¶ 370; EU ¶ 404; C&I ¶ 381.)  Antitrust cases in the

Seventh Circuit consistently hold that the statute of limitations does not accrue despite the

presence of facts far more probative of possible antitrust violations than those Defendants cite here. *See Copper*, 436 F.3d at 789-90; *Sulfuric Acid*, 743 F. Supp. 2d at 855-56; *Evanston*, 2016 WL 4720014 at *7; *Fond Du Lac*, 85 F. Supp. 3d at 1012.

In *Copper*, for example, the Seventh Circuit reversed summary judgment based on accrual of the statute of limitations on antitrust claims against J.P. Morgan. The court held that the district court erroneously ruled that the statute of limitations began to run when a newspaper reported that J.P. Morgan was under federal investigation for financing Sumitomo's fraudulent transactions in the copper market. 436 F.3d at 786. These facts did not trigger discovery accrual because J.P. Morgan had not been charged with violating any law, and it was not yet clear that J.P. Morgan was complicit in Sumitomo's anticompetitive activity. *Id*. at 789.

In *Sulfuric Acid*, the defendants argued that the plaintiffs' claim was untimely because the mechanisms that they allegedly used to accomplish their conspiracy "had all received publicity in various trade publications." 743 F. Supp. 2d at 855. Guided by the analysis in *Copper*, the court found that although the public reports revealed "commercial interaction and collaboration between the parties," nonetheless, "even if Plaintiffs had harbored suspicions early on, it remains unclear whether a reasonable investigation would have revealed incriminating evidence sufficient to support an antitrust claim against Defendants." *Id*. at 855-56. Here also, Defendants fail to explain how any earlier investigation would have revealed evidence sufficient to support an antitrust claim against them.

Plaintiffs had no reason to suspect that Defendants had violated the law or that they had been injured based on public information including Defendants' statements. Even reports of government investigations of defendants do not necessarily trigger the statute of limitations. *See Copper*, 436 F.3d at 789-790; *In re Ready Mixed Concrete Antitrust Litig.*, No. 1:05-CV-00979-

SEB-VS, 2006 WL 2849711, at *2 (S.D. Ind. Sept. 29, 2006) ("*Concrete I*") (discovery rule postponed accrual until "Department of Justice announced the guilty plea entered by Irving Materials, Inc."); *Fond Du Lac*, 85 F. Supp. 3d at 1012.[20]  It is often only in hindsight and with new information that plaintiffs recognize the significance of public information such as parallel production cuts, calls for industry restraint, and use of industry data services.  *Fond Du Lac*, 85 F. Supp. 3d at 1012 ("[T]hat defendants allegedly lied about the reason for the price increases if anything, supports plaintiff's assertion that it had no reason to know about defendants' conduct and thus no reason to investigate."); *Evanston*, 2016 WL 4720014 at *7 (price increase immediately after merger did not put plaintiffs on notice of antitrust claim); *United Nat'l Records, Inc. v. MCA, Inc.*, 609 F. Supp.  33, 37 (N.D. Ill. 1984) ("[M]ere knowledge that defendants were raising prices … does not mean the plaintiffs knew or should have known defendants were allegedly agreeing to fix prices."); *Air Cargo I*, 2010 WL 10947344 at *18.  This is particularly true in a complicated and highly-sophisticated industry, such as the Broiler market.  Therefore, Plaintiffs' allegations, including many based on public information, do not show that they could have discovered Defendants' conspiracy earlier.[21]

---

[20] Defendants' argument that a civil complaint filed against Pilgrim's in 2009 put Plaintiffs on constructive notice of their claims in this case ignores the facts, context, and result of that action.  First, it was an action brought by contract growers in Fort Worth Texas alleging violations of the PSA, not an antitrust case by Broiler purchasers.  Second, the action mentioned unilateral facility closures by Pilgrim's, but never alleged a conspiracy to fix prices between Pilgrim's and any other Defendant.  Third, because the court in that case "ultimately found for Defendants" in 2011 (MTD 44, n.45), Plaintiffs could not have been on constructive notice that their antitrust claims had merit.

[21] In *Giger*, 2013 WL 6730108, this Court denied summary judgment where a discrepancy between the defendant's written representations in deal documents and its oral representations and subsequent written assurances created a material dispute whether the discovery rule had been met so as to trigger the running of the limitations period.  2013 WL 6730108 at *3.  Here, at the pleading stage, the discovery rule cannot be applied as a matter of (footnote continued)

Accordingly, Plaintiffs' allegations satisfy application of the discovery rule.

### 3. Plaintiffs' Claims are Tolled Due to Fraudulent Concealment

Fraudulent concealment is a type of equitable tolling that "stop[s] the statute of limitations from running even if the accrual date has passed." *Cada*, 920 F.2d at 450. The doctrine "'presupposes that the plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts by the defendant— above and beyond the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time.'" *Copper*, 436 F.3d at 790 (quoting *Cada*, 920 F.2d at 451). For a plaintiff to benefit from tolling for fraudulent concealment, he must show "that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Copper*, 436 F.3d at 791 (quoting *Klehr*, 521 U.S. at 194-95).

Fraudulent concealment must be alleged with particularity. *See* Fed. R. Civ. P. 9(b); *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008); *Fond Du Lac* , 85 F. Supp. 3d at 1012. Nevertheless, Seventh Circuit courts recognize that "[i]n an action for conspiracy under the antitrust statute, however, a wrong is often self-concealing by its very nature." *Superior Beverage Co. v. Owens-Illinois, Inc.*, No. 83 C 0512, 1988 WL 99216, at *2 (N.D. Ill. Sept. 22, 1988) (citing *Baker v. F&F Inv.*, 420 F.2d 1191, 1199 (7th Cir. 1970)). Fraudulent concealment can be established when defendants provide false explanations for price increases or otherwise "throw[] up a smokescreen." *Fond Du Lac*, 85 F. Supp. 3d at 1012; *see also Sulfuric Acid*, 743 F. Supp. 2d at 854.

In *Fond Du Lac*, the court held that the antitrust plaintiffs sufficiently alleged "fraudulent

---

law to bar Plaintiffs' claims, particularly where the Complaints contain detailed allegations as to why Plaintiffs could not discover their claims earlier.

conduct with particularity, alleging the who (defendants), the what (falsely attributing the cause of price increases to other causes and agreeing among themselves to keep their price-fixing secret), the when (as early as January 2003 continuing to the present, but alleging at least one specific meeting in March 2008), the where (in Taipei), and the how (via secret meetings and other methods of communication)."  85 F. Supp. 3d at 1012.  The court also rejected the defendants' argument that the plaintiffs did not allege "reasonable diligence" with particularity because defendants misrepresented the reasons for price increases.  *Id.*

Here, Plaintiffs sufficiently plead fraudulent concealment by alleging that Defendants and their co-conspirators (*who*) conspired and coordinated to fix, raise, maintain, and stabilize the price of Broilers (*what*) beginning at least as early as January 2008 (*when*) at seemingly innocuous industry meetings, teleconferences, and through non-public, third-party co-conspirators such as Agri Stats and the use of the Georgia Dock price survey and Advisory Committee (*where*) in order to maintain price stability and increase profitability (*why*) by exchanging detailed, competitively sensitive, and closely-guarded non-public information to coordinate the output and limit production of Broilers (*how*).

Moreover, Plaintiffs allege that Defendants' pretextual explanations deferred any suspicion of wrongdoing each time they announced the closing of facilities (DPP ¶¶ 150, 217; EU ¶¶ 178, 245; C&I ¶¶ 155, 222); higher prices (DPP ¶¶ 382-83(B), 385, 387; EU ¶¶ 416-17(B), 419, 421; C&I ¶¶ 394, 396-98); production cuts and supply shortage prices (DPP ¶¶ 383-87(B); EU ¶¶ 417-21(B); C&I ¶¶ 394, 396, 398); the buy vs. grow program (DPP ¶¶ 195, 231, 255; EU ¶¶ 223, 269, 283; C&I ¶¶ 200, 236, 239); and foreign exports (DPP ¶¶ 251, 255, 260; EU ¶¶ 279, 283, 288; C&I ¶¶ 255, 260, 265.).  Plaintiffs also allege that Defendants concealed their collusion by using innocuous terms and secret terminology in their statements.  (DPP ¶¶

49

138-39, 194, 221, 243-44, 247, 250, 264, 269, 336, 380; EU ¶¶ 166-67, 222, 249, 271-72, 275, 278, 292, 297, 364, 414; C&I ¶¶ 143-44, 199, 226, 248-49, 252-53, 255, 269, 274, 341, 391.) Further, Plaintiffs allege "secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings at trade association meetings (and elsewhere)." (DPP ¶ 379; EU ¶ 413; C&I ¶ 390; *see also* DPP ¶¶ 149, 164, 167, 182, 235, 379; EU ¶¶ 177, 192, 195, 210, 263, 413; C&I ¶¶ 154, 169, 172, 187, 390.)

Courts recognize that such conduct, especially in the antitrust context, satisfies fraudulent concealment. *See Copper*, 736 F.3d at 791 ("publicly offered innocent alternative explanations to explain away events related to the price-fixing conspiracy, knowing that they were misleading"); *Sulfuric Acid*, 743 F. Supp. 2d at 855 ("alternative, and allegedly false, explanations for Defendants' decisions to shut down facilities or raise prices"); *Fond Du Lac*, 85 F. Supp. 3d at 1012 (agreeing to keep the price-fixing secret); *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 262, 266 (D. Minn. 1989) (defendants met secretly regarding the conspiracy while falsely representing that the meetings were legitimate trade association meetings).[22]

Plaintiffs satisfy the particularity requirements of equitable tolling due to fraudulent concealment and, therefore, have presented timely claims.

---

[22] This Court's decision in *Hammer v. Residential Credit Sols., Inc.*, No. 13 C 6397, 2014 WL 4477948, at *12 (N.D. Ill. Sept. 11, 2014), cited by Defendants (MTD p. 46), is distinguishable. There, this Court concluded that the plaintiff's fraudulent concealment allegations failed to toll the limitations period on her Fair Debt Collection Practices Act claim, because the plaintiff (i) did not allege when she discovered defendant's misconduct, and (ii) made only conclusory allegations that the defendant had provided "conflicting information," and "misrepresented the status of [plaintiff's] own loan, or [defendant's] willingness to honor the contractual terms or Judge Gibson's orders." *Id.* at *12. Here, Plaintiffs not only allege the recent revelations that brought Defendants' conspiracy to light, but also include detailed allegations about how Defendants concealed their scheme, including with pretextual explanations for price increases, that "went 'above and beyond'" the wrongdoing upon which [their] claim is founded[.]" *Id.* (quoting *Hentosh v. Herman M. Finch Univ. of Health Sci../The Chi. Med. Sch.*, 167 F.3d 1170, 1174 (7th Cir. 1999)).

## VI. The Arguments In Defendants' Individual Briefs Do Not Warrant Dismissal

Defendants' individual briefs do nothing to support their requests for dismissal. Defendants challenge the sufficiency of the allegations concerning their participation in the conspiracy, by improperly minimizing, isolating, and ignoring Plaintiffs' specific allegations which should be viewed as a whole and in context. *See Dairy Farmers I*, 767 F. Supp. 2d at 898 (denying defendants' motion to dismiss because "the individual defendants minimize the allegations against them in the complaint, completely omitting certain paragraphs from a list of quoted paragraphs that they suggest is exhaustive"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) ("[T]he 'character and effect of a conspiracy are not to be judged by dismembering it and viewing it in separate parts, but only by looking at it as a whole.'") (quoting *Cont'l Ore*, 370 U.S. at 699).

### A. Plaintiffs Adequately Plead that Each of the Defendants Joined and Participated in the Conspiracy

Rule 8(a) applies to allegations regarding participation in a conspiracy. To satisfy Rule 8(a), "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation marks omitted; elision original). While a "complaint need not contain[] detailed 'defendant by defendant' allegations," it must "allege that each individual defendant joined the conspiracy and played some role in it … ." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal 2008) ("*TFT-LCD*") (internal quotation marks omitted). "Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz*, 620 F.2d at 1367. "Although every conspirator is responsible for others' acts within the scope of the agreement, it remains essential to show that a

particular defendant joined the conspiracy and knew of its scope." *Bank of America, N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("*Knight*").[23]

A plaintiff may "adequately plead[] personal involvement … [where] he specifies that he is directing his allegation at all of the defendants." *Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009) ("*Brooks*"); *see also Atkins v. Hasan*, No. 15 CV 203, 2015 WL 3862724, at *3 (N.D. Ill. June 22, 2015) ("*Atkins*") ("It is true that, in certain cases, referring simply to 'the defendants' without further specification may adequately plead personal involvement."). Thus, nothing requires that each allegation pertaining to all Defendants list each individual Defendant by name.

Plaintiffs satisfy the requirement of pleading each Defendant's individual involvement in the conspiracy through numerous allegations that pertain to all Defendants. In particular, Plaintiffs' allegations concerning Defendants' conspiracy include the following:

- Defendants "coordinat[ed] their output and limit[ed] production with the intent and expected result of increasing prices of Broilers in the United States." (DPP ¶ 1; EU ¶ 1; C&I ¶ 1.)

- "Defendants exchanged detailed, competitively sensitive, and closely-guarded non-public information about prices, capacity, sales volume, and demand, including through third party co-conspirator Agri Stats." (DPP ¶ 1; EU ¶ 1; C&I ¶ 1; *see also* DPP ¶¶ 117, 124-27, 331; EU ¶¶ 145, 152-55, 359; C&I ¶¶ 122, 129-32, 336.)

- Defendants reduced the boom-and-bust cycle of the Broiler industry and propped up Broiler prices by coordinating supply restrictions. (DPP ¶ 3; EU ¶ 3; C&I ¶ 3.)

- "Defendants adopted the euphemism 'capacity discipline' or simply 'discipline' to refer to their agreement to limit Broiler production. The key to 'production discipline' and 'capacity discipline' is widespread participation by the industry." (DPP ¶ 138; EU ¶¶ 166; C&I ¶ 143.)

---

[23] Plaintiffs need not present evidence of Defendants' "conscious commitment to a common scheme" at the pleading stage that would tend to exclude the possibility that they acted independently. *See Monsanto*, 465 U.S. at 768 (post-trial review); *Starr*, 592 F.3d at 321.

- "Defendants repeatedly confirmed to each other that they remained committed to this agreement by publicly (and privately) discussing their plans to continue exercising 'capacity discipline,' so long as others did the same." (DPP ¶ 139; EU ¶ 167; C&I ¶ 144; *see also* DPP ¶¶ 243, 380; EU ¶¶ 271, 414; C&I ¶¶ 248, 391.)

- Defendants took unprecedented steps to reduce Broiler breeder flocks in 2008 and early 2009. (DPP ¶ 191; EU ¶ 219; C&I ¶ 196.)

- Defendants announced a new round of production cuts in the first half of 2011 which helped to stabilize prices that had fallen after supply began to increase in 2010. (DPP ¶ 193; EU ¶ 221; C&I ¶ 198.)

- By September 2012, Defendants' destruction of Broiler breeder flocks prevented them from increasing Broiler supplies in the short or medium term. (DPP ¶ 239; EU ¶ 267; C&I ¶ 244.)

- Defendants are members of numerous Broiler-related trade associations, giving their senior executives the opportunity to meet and communicate with each other frequently to facilitate their conspiracy at those associations' regular events. (DPP ¶ 297; EU ¶ 325; C&I ¶ 302.)

Each of these allegations pertains to all Defendants and therefore "adequately pleads personal involvement" of each of them. *Brooks*, 578 F.3d at 582. These allegations satisfy *Twombly*, because they describe unlawful conduct by all Defendants, not merely in a formulaic recitation of the cause of action, but in sufficient detail to put all Defendants on notice of how they violated the antitrust laws. *Id.; see also Credit Default Swaps*, 2014 WL 4379112, at *10 (rejecting the argument that "references to 'Dealer-Defendants' as a group are insufficiently particular to render the allegations plausible" where complaint alleged "that 'senior-level employees of *each* [Dealer-Defendant] participated'" in conspiratorial conduct and included lists of Dealer-Defendant representatives who were alleged to be present at different meetings).

Moreover, as set forth below, Plaintiffs adequately allege specific conduct by each individual Defendant showing it joined and committed acts in furtherance of the conspiracy.

1. **Perdue**

Perdue ignores critical allegations implicating it in the conspiracy and attempts to compartmentalize the allegations it does acknowledge. Plaintiffs specifically allege that Perdue was one of the Defendants that participated in the Georgia Dock price index manipulation scheme, which could have been effective only through coordinated efforts of all participants. (DPP ¶¶ 100, 103, 109, 115; EU ¶¶ 128, 131, 137, 143; C&I ¶¶ 105, 108, 114, 120.) Perdue ignores these allegations entirely, which alone are sufficient to demonstrate that Perdue joined the conspiracy and played a role in it.

Moreover, Plaintiffs allege as to Perdue:

- Following the clear messages by Tyson and Pilgrim's in early 2008 that all producers needed to reduce production to allow prices to stabilize, Perdue was among 11 other companies that reported reductions in weekly ready-to-cook production in 2008. (DPP ¶¶ 146-47, 188; EU ¶¶ 174-75, 216; C&I ¶¶ 151-52, 193.)

- Beginning in early 2008, Perdue, along with co-conspirators Koch Foods, Pilgrim's, Sanderson, and Tyson, announced a coordinated effort to reduce annual fixed-price contracts, enabling them to drive prices higher. (DPP ¶¶ 348-50; EU ¶¶ 376-78; C&I ¶¶ 353-55.) In July 2008, Perdue spokesperson Julie DeYoung acknowledged its plans "to raise prices and shorted its contracts" to an industry publication. (DPP ¶ 353; EU ¶ 381; C&I ¶ 355.)

- At the National Chicken Council's October 2011 meeting, Perdue senior executive Clint Rivers participated in a panel with executives of Koch Foods and two other producers, at which they admitted that "[d]iscipline on the supply side as one suggestion" to increase Broiler prices, and "[g]etting better prices from retailers was another." (DPP ¶¶ 221, 380; EU ¶¶ 249, 414; C&I ¶¶ 226, 391.)

- In 2009, Clint Rivers joined Perdue as Senior VP of Operations and Supply Chain Management and later became Perdue's President of Foodservice and Supply Chain. (DPP ¶¶ 221, 314; EU ¶¶ 249, 342; C&I ¶¶ 226, 391.) Mr. Rivers, who had been a vocal proponent of industry-wide production restrictions and price increases when he had been the President and CEO of Pilgrim's until December 2008, pushed for more of the same when he moved to Perdue. (DPP ¶¶ 149-50, 156, 160, 174, 221, 380; EU ¶¶ 177-78, 184, 188, 202, 249, 414; C&I ¶¶ 154-55, 161, 165, 179, 226, 391.) He later joined Wayne Farms as COO. (DPP ¶ 314; EU ¶ 342; C&I ¶ 319.) These moves between Perdue and other Defendants

occurred without non-compete limitations or confidentiality agreements to protect the transfer of proprietary business knowledge. (*Id.*)

- During the Class Period, Perdue's CEO and other senior executives participated in multiple industry panels with other Defendants' executives, affording them the opportunity to collude and at times explicitly pushing for industry-wide price increases. (DPP ¶ 174 (October 3, 2008 panel at National Chicken Council's Annual Meeting), ¶ 216 (July 12, 2011 panel at Food Media Seminar), ¶ 221 (October 5-7, 2011 panel regarding the "new paradigm" in the Broiler industry at the National Chicken Council's 57th Annual Conference), ¶ 333 (April 19-21, 2013 and April 19-21, 2015 Chicken Media Summits); EU ¶¶ 202, 244, 249, 361; C&I ¶¶ 179, 221, 226, 338.)

- Perdue had the opportunity to collude with other Defendants through its membership and participation in major industry trade associations, including the National Chicken Council, Georgia Poultry Federation, and North Carolina Poultry Federation. Perdue's senior executives met with their counterparts informally at and around regular trade association meetings to discussion pricing and production and to ensure that competitors remained committed to the conspiracy. (DPP ¶¶ 297-300, 303-04; EU ¶¶ 325-28, 331-32; C&I ¶¶ 302-50, 308-09.)

- In April 2013, Chairman of the Board Jim Perdue and top management from other Defendants toured Sanderson's production facilities, and in April 2015 Perdue opened its facilities to senior executives from other Defendants. These tours afforded the opportunity for Perdue to collude, and demonstrate that Perdue does not closely guard its proprietary methods of production from its competitors. (DPP ¶ 333; EU ¶ 361; C&I ¶ 338.)

- In 2014, Perdue, the last remaining Broiler integrator in the U.S. other than Tyson to have its own genetics research company, sold that company to Tyson, enabling Tyson to manipulate the supply of grandparent and great-grandparent Broiler stock. As a result, Tyson provided healthier and high quality breeder pullets to co-conspirators, but inferior stock to smaller, non-Defendant companies which were then forced out of business. (DPP ¶¶ 277-78; EU ¶¶ 305-06; C&I ¶¶ 282-83.)

These allegations more than plausibly suggest that Perdue joined the conspiracy and knew of its scope. *Knight*, 725 F.3d at 818. An agreement can be inferred from the allegations that Tyson and Pilgrim's issued an invitation to their competitors to limit production and increase prices in order to impose market-wide "discipline," and Perdue responded by cutting its production, reducing annual fixed-price contracts, and increasing prices. *See TFT-LCD,* 586 F.

Supp. 2d at 1116 ("Courts have held that a conspiracy to fix prices can be inferred from an invitation followed by responsive assurances and conduct."); *Standard Iron Works*, 639 F. Supp. 2d at 901 (denying a motion to dismiss where an individual defendant, along with others, "is alleged to have attended the relevant trade meetings, curtailed production in 2005, 2006, and 2007, and made statements suggesting its participation in the conspiracy").

Perdue challenges Plaintiffs' allegation that it was among 11 other companies that reported reductions in weekly ready-to-cook production in 2008 by assuming facts that have not been pleaded in the Complaints, specifically that those cuts could have been *de minimis* or come at different times of the year. (Dkt. 288 at p. 3.) Perdue ignores that this allegation follows a dozen pages describing the steady drum beat of calls for production restraints as well as actual production cuts by Defendants at meaningful levels between 2% and 8% throughout 2008. (DPP at pp. 46-59, ¶¶ 151, 158, 166, 173, 180; EU at pp. 52-65, ¶¶ 179, 186, 194, 201, 208; C&I at pp. 48-60, ¶¶ 156, 163, 171, 178, 185.) Perdue also asserts as an alternative explanation that the output reduction was its unilateral response to higher feed prices, rather than an agreement. (Dkt. 288 at 3.) But again this fails to acknowledge that such cuts were made industry-wide in response to an invitation by the two largest producers, Tyson and Pilgrim's, to reduce production. *See* Section III, *supra*.

Perdue argues that the allegation regarding its spokesperson stating that Perdue was seeking to raise prices in 2008 is not the same as an allegation that it actually participated in the conspiracy. (Dkt. 288 at 4.) This allegation should not be considered in isolation. Plaintiffs allege that Perdue and its competitors cut production and sought to reduce fixed-price contracts to take advantage of higher spot-market prices during the same general timeframe as Perdue publicly assured its competitors that it wanted to raise prices. (DPP ¶¶ 188, 350; EU ¶¶ 216,

378; C&I ¶¶ 193, 355.)  These allegations show Perdue's plausible participation in the conspiracy.[24]

Perdue's attack on the allegation that Defendants used the term "discipline" to describe their agreement to restrict production is an unwarranted invitation for the Court to ignore the well-pleaded allegations of the Complaints.  (Dkt. 288 at 6.)  Plaintiffs not only allege that Defendants adopted the euphemism "capacity discipline" to refer to their supply restrictions, but also that each Defendant would participate only with knowledge that its co-conspirators would do the same.  (DPP ¶¶ 138-39; EU ¶¶ 166-67; C&I ¶¶ 143-44.)  These facts are deemed true on a motion to dismiss.  Moreover, the term "discipline" has been used to describe industry-wide supply restraints in other antitrust litigation.  *Standard Iron Works*, 639 F. Supp. 2d at 895 (denying motions to dismiss where the "types of statements alleged include Defendants' repeated reference to collective industry action and specifically to industry 'discipline' in connection with production cuts"); *Domestic Airline*, 2016 WL 6426366, at *12-13 ("the Court notes that Plaintiffs provided several examples of Defendants' own executives using the term 'capacity discipline' and a discussion of the term as used in the complaint filed by the Department of Justice").  Plaintiffs' allegations that Perdue cut production in response to calls for discipline are sufficient.  (DPP ¶ 188; EU ¶¶ 216; C&I ¶¶ 193.)

Perdue is incorrect in asserting that the allegations concerning Clint Rivers—a senior executive who moved from Pilgrim's to Perdue to Wayne Farms during the Class Period without any non-compete restrictions—fail to support the company's plausible participation in the

---

[24] *Fenerjian v. Nongshim Co., Ltd.*, 72 F. Supp. 3d 1058 (N.D. Cal. 2014), upon which Perdue relies, is distinguishable.  There, the court held that allegations that a Korean defendant conspired to fix prices in Korea were insufficient to plausibly support its participation in a conspiracy to fix prices in the United States.  *Id.* at 1076.  Here, Plaintiffs allege that Perdue participated in a conspiracy to restrict output and fix prices in the same market as its competitors.

conspiracy. (Dkt. 288 at 7-8.) Perdue's argument that the hiring of Mr. Rivers was not tied in any way to its decisions to restrict production ignores that he was a vocal proponent of industry production restrictions and price increases during his tenure at Pilgrim's, and that he pushed to continue those practices later at Perdue. (DPP ¶¶ 149-50, 156, 160, 174, 221, 380; EU ¶¶ 177-78, 184, 188, 202, 229, 414; C&I ¶¶ 154-55, 161, 165, 179, 226, 391.)

Perdue cannot and does not dispute that allegations of its participation in industry trade group meetings, panels, and competitor plant tours provided opportunities to conspire were followed by production restraints. (DPP ¶ 300; EU ¶ 328; C&I ¶ 305.) Perdue's contention that such conduct is insufficient to demonstrate its plausible participation in the conspiracy is incorrect. (Dkt. 288 at 5, 8.) *Standard Iron Works*, 639 F. Supp. 2d at 897 ("Given the proximity of Defendants' trade meeting statements to private trade association meetings involving the same high-level executives, there is reason to infer that opportunity for private communications reinforced the industry strategy to squeeze supply."). Moreover, "Defendants cannot rely on the public or semi-public nature of trade meetings to immunize their statements from antitrust scrutiny." *Id*. (citing Richard A. Posner, Antitrust Law (2d ed. 2001) ("[T]hat the exchange is 'laundered' through a trade association should be no defense … .")).

In addition, Perdue's criticism of Plaintiffs' customer contract allegations lacks merit. Purdue suggests that Plaintiffs only allege it was seeking to shorten its customer contracts, not that it actually did shorten them or did so as part of the conspiracy. (Dkt. 288 at 8.) This reads the Complaints in too limited a fashion and ignores that several of its competitors moved away from fixed-price customer contracts during the same general timeframe as Perdue (DPP ¶¶ 348-55; EU ¶¶ 376-83; C&I ¶¶ 353-60), while Defendants were calling to impose discipline and actually implementing production cuts. *See High Fructose*, 295 F.3d at 659.

Defendants' Motion to Dismiss as to Perdue should be denied.

## 2. George's

There is no merit to George's argument that the Complaints fail to show its plausible participation in the conspiracy. Plaintiffs' allegations concerning supply restrictions, price hikes, and enforcement implicate all Defendants, including George's, as discussed above. *See Atkins*, 2015 WL 3862724, at *3 ("noting such that collective pleading is permissible where it is clear that the plaintiff is directing the allegations 'at all of the defendants'") (quoting *Brooks*, 578 F.3d at 582)). Plaintiffs also allege that George's was one of 11 companies that reported reductions in weekly ready-to-cook production in 2008, which followed clear statements by Tyson and Pilgrim's earlier that year that all producers needed to restrict their production to stabilize prices. (DPP ¶¶ 146-47, 188; EU ¶¶ 174-75, 216; C&I ¶¶ 151-52, 193.) Such allegations are sufficient. *See TFT-LCD*, 586 F. Supp. 2d at 1116; *Standard Iron Works*, 639 F. Supp. 2d at 895.

George's citation to *Burch v. Milberg Factors, Inc.*, 622 F.3d 212, 228 (3d Cir. 2011), for the proposition that the Court cannot infer parallel conduct or an agreement from Plaintiffs' allegations is unavailing. (Dkt. 285 at 7.) In *Burch*, the Third Circuit affirmed dismissal of price-fixing and group boycott claims for failure to demonstrate parallel behavior, because the complaint alleged that different defendants were taking inconsistent actions with respect to the plaintiff during the same time frame. 622 F.3d at 228. *Burch* simply does not fit the facts of this case, where the allegation that George's and its co-conspirators all slashed production in 2008 follows a dozen pages detailing Defendants' repeated calls for production restraints and actual production cuts throughout that year. (DPP at pp. 46-59, ¶¶ 151, 158, 166, 173, 180; EU at pp. 52-65, ¶¶ 179, 186, 194, 201, 208; C&I at pp. 48-60, ¶¶ 156, 163, 171, 178, 185.)

George's claim that its production statistics could not be discerned from the Agri Stats reports because it is a privately-held company and the data could be matched only for public companies (Dkt. 285 at 6-7) impermissibly contradicts Plaintiffs' well-pleaded allegations. The Complaints allege that "Agri Stats reports are so detailed that a reasonably informed producer can discern the identity of competitors' individual Broiler complexes, and it is common knowledge among producers that other can do so." (DPP ¶ 124; EU ¶ 152; C&I ¶ 129.) Plaintiffs allege that: (1) industry insiders can reverse engineer the Agri Stats reports to identify each Defendant's individual facilities; (2) summaries of targeted Agri Stats reports are regularly provided to Defendants' senior executives; (3) Defendants' top executives receive Agri Stats' "Bottom Line Report," which contains critical, confidential operating information; (4) Defendants' top executives know their competitors well enough to identify those companies from recurring, unique data points in the Bottom Line Reports; and (5) Agri Stats employees confirm data for particular companies with Defendants at quarterly meetings and regular industry trade association meetings. (DPP ¶¶ 124-27; EU ¶¶ 152-55; C&I ¶¶ 119-32.) Each of these allegations pertains to all Defendants including George's. Accordingly, George's assertion that Agri Stats data can be reverse engineered only for publicly-held Broiler producers is not a reasonable inference that can be drawn from Plaintiffs' well-pleaded allegations.

George's attack on the allegations concerning prior government investigations into the Broiler industry also fails. As an example, the Complaints identify an action by the DOJ to stop the acquisition by George's of a processing plant from Tyson. (DPP ¶ 294; EU ¶ 322; C&I ¶ 299.) George's argues that its settlement with the DOJ required it to make capital improvements to the facility that would increase its capacity. (*Id.*; Dkt. 285 at 6-7.) Nonetheless, at this stage of the litigation, George's cannot dispute Plaintiffs' allegations that it neither expanded its

overall output nor increased market share.  (DPP ¶ 286; EU ¶ 314; C&I ¶ 291.)  The settlement with the DOJ does not exculpate George's from the conspiracy.

Defendants' Motion to Dismiss should be denied as to George's.

### 3.    Foster Farms

Plaintiffs adequately plead Foster Farms' individual involvement in the conspiracy through the detailed allegations of unlawful conduct directed at all of the Defendants in the Complaints.  *See Brooks*, 578 F.3d at 582; *Atkins*, 2015 WL 3862724, at *3.  In addition, Plaintiffs allege Foster Farms' specific participation in the industry-stabilization scheme.  In 2007, Tyson and Pilgrim's, the two leading players in the Broiler industry, cut their production in an attempt to increase prices.  (DPP ¶¶ 4, 143; EU ¶¶ 4, 171; C&I ¶¶ 4, 148.)  Foster Farms, Peco, and Perdue joined in reducing production, but those actions were not enough to stem the tide of falling prices.  (*Id.*)  As a result, beginning in early 2008, Tyson and Pilgrim's issued calls to their competitors to increase prices and cut production across the board.  (DPP ¶¶ 146-47; EU ¶¶ 174-75; C&I ¶¶ 151-52.)  Their co-conspirators followed suit, leveling off supply and increasing prices throughout 2008 and into early 2009.  (DPP ¶¶ 148-88; EU ¶¶ 176-216; C&I ¶¶ 153-93.)  In April 2008, Foster Farms announced that it would build a new Broiler plant in northeastern Colorado which would employ about 1,000 people.  (DPP ¶ 165; EU ¶ 193; C&I ¶ 170.)  Consistent with the industry-wide production restraints, the company abandoned those plans on July 2, 2008, within 10 days of Wayne's announcement that it would cut production by 6% and just 5 days before O.K. Foods announced a 7.5% reduction in egg sets.  (DPP ¶¶ 163, 165-66; EU ¶¶ 191, 193-94; C&I ¶¶ 168, 170-71.)  Foster Farms again delayed expansion plans in 2010.  (DPP ¶ 383; EU ¶ 417; C&I ¶ 394.)  These acts were in furtherance of the conspiracy.

There is no merit to Foster Farms' claim that the Complaints are deficient because they allege only that the company maintained its production at then-current levels, not that it made specific production cuts. (Dkt. 289 at 3-4.) In so arguing, Foster Farms ignores Plaintiffs' allegations that it cut production of ready-to-cook Broilers by 4.8% in 2007, following the lead of Tyson and Pilgrim's. (DPP ¶ 143; EU ¶ 171; C&I ¶ 148.) Having already substantially reduced its own production, Foster Farms' decision to drop expansion plans adhered to the goals of the conspiracy—namely, to fix, raise, maintain, or stabilize the price of Broilers. Moreover, Foster Farms' market share remained relatively constant throughout the entire Class Period (DPP ¶ 286; EU ¶ 314; C&I ¶ 291), suggesting that the company did not merely maintain its production levels, but cut them, while its competitors reduced their own.

Foster Farms' reliance on *Twombly* for the proposition that "sitting tight" does not plausibly support an antitrust violation is unavailing. (Dkt. 289 at 4.) *Twombly* involved an alleged agreement among recently-deregulated regional telephone companies (ILECs) to inhibit upstart competitors (CLECs) from competing with each other in areas where the ILECs had enjoyed preexisting regional monopolies. The Supreme Court found that "a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing," and that other economic allegations bolstered this conclusion. *Twombly*, 550 U.S. at 566. Unlike *Twombly*, the Broiler industry is not characterized by preexisting natural monopolies and a lack of competition between major firms. Instead, the Court can reasonably infer that Foster Farms was acting contrary to its own self-interest when it refused to expand market share while its competitors were reducing supply. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3d Cir. 2004) ("*Flat Glass*") (evidence that defendant acted contrary to its self-interest is plus factor).

Foster Farms applies the wrong standard when claiming that other events, such as the Great Recession or rising feed costs, provide "a ***more*** plausible explanation" for its refusal to increase production. (Dkt. 289 at 5 (emphasis in original).) "A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." *Anderson News*, 680 F.3d at 185. In any event, these arguments merely parrot Defendants' joint brief. As explained in brief, the assertion of a pretextual alternative, such as rising input costs or the Great Recession, does not support dismissal.

Foster Farms also misconstrues the unique facts of *Twombly* to suggest that rising feed costs are a "natural explanation" for its collusive conduct. (Dkt. 289 at 6.) The *Twombly* Court used that phrase to describe noncompetition between pre-existing regional monopolies, which was a structural element of the recently-deregulated telecommunications market. It simply does not apply here, where Defendants' behavior substantially departed from decades of prior conduct when they reduced production and raised prices during times of both rising and falling input costs in an otherwise competitive market. Nor are Plaintiffs required to plead facts excluding the possibility that input costs affected Broiler pricing.[25] *See, e.g., Erie County*, 702 F.3d at 869 ("If a Plaintiff were required to allege facts excluding the possibility of lawful conduct, almost no

---

[25] Similarly, higher input costs are not the type of "obvious alternative explanation" to a horizontal conspiracy that the Sixth Circuit found in *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (6th Cir. 2010). (Dkt. 289 at 6.) There, the court found it could not plausibly infer a horizontal agreement among insurers and insurance brokers to allocate customers based on "the mere fact that each insurer entered into a similar contingent commission agreement with the broker." *Id.* at 327. In light of the structure of the insurance market with vertical relationships between individual brokers and insurers, "the obvious explanation for each insurer's decision to enter into a contingent commission agreement with a broker that was consolidating its pool of insurers was that each insurer independently calculated that it would be more profitable to be within the pool than without." *Id.* at 327-28. These facts are distinct from the Broiler market.

private plaintiff's complaint could state a Section One claim."); *Plasma-Derivative*, 764 F. Supp. 2d at 1002 ("It is not necessary that the factual allegations tend to exclude the alternative explanation offered by defendants. That is the standard appropriate for a summary judgment motion.").

Plaintiffs' allegations far exceed those in the other cases Defendants cite. *See, e.g.*, *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (affirming dismissal where complaint merely alleged, "'since September, 2004, the Defendants and co-conspirators have … defamed and libeled the Total Benefits Strategy to third parties,' 'coerced and threatened certain insurance agents by threatening to blacklist them and cancel their contracts,' and 'organized a boycott of Plaintiffs,'" without describing "when Defendants joined the Anthem conspiracy, where or how this was accomplished, and by whom or for what purpose"); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (affirming dismissal where the complaint did not mention two defendants or describe how they were involved in the alleged conspiracy, and only provided sparse allegations of parallel behavior by two others).

Contrary to Foster Farms' contention, Plaintiffs' allegations that the company had numerous opportunities to collude support the plausibility of their claims. For example, Plaintiffs allege not only that Foster Farms was a member of the Poultry Federation, but that its senior executives met frequently with competitors at regular Poultry Federation meetings and Board of Directors meetings. (DPP ¶ 305; EU ¶ 333; C&I ¶ 310.) *See Plasma-Derivative*, 764 F. Supp. 2d at 1002 (finding sufficient plaintiffs' allegations that defendants met during and after industry meetings to discuss price and supply and to monitor their ongoing agreement over production restrictions); *Standard Iron Works*, 639 F. Supp. 2d at 897 (inferring that defendants'

opportunity for private communications at trade meetings "reinforced the industry strategy to squeeze supply").

Plaintiffs further allege that Foster Farms "permit[ted] employees to regularly move between companies without non-compete limitations or confidentiality agreements that would protect a company's (seemingly) proprietary business knowledge and customer base." (DPP ¶ 314; EU ¶ 342; C&I ¶ 319.) Specifically, Dr. Don Jackson became the CEO of Pilgrim's in December 2008, immediately after leaving his position as President of Foster Farms' Poultry Division. (*Id.*) Foster Farms' contention that California law prohibits the company from imposing a non-compete agreement is wrong. (Dkt. 289 at 7, citing Cal. Bus. & Prof. Code § 16600; *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 945-47 (2008).) California courts have long-recognized that State's broad statutory prohibition on non-competition agreement has an exception where "they are necessary to protect the employer's trade secrets." *Muggill v. Reuben H. Donnelley Corp.*, 62 Cal.2d 239, 242 (1965); *see also Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1430 (2003). The case Foster Farms cites specifically declined to address the trade secret exception, *Edwards*, 44 Cal.4th at 946 n.4, and subsequent cases hold that a former employee may be prohibited "from using trade secret information to identify existing customers, to facilitate the solicitation of such customers, or to otherwise unfairly compete with the former employer[.]" *Retirement Grp. v. Galante*, 176 Cal. App. 4th 1226, 1238 (2009). Foster Farms cannot dispute that the move of its own President to become the CEO of one of its largest competitors, and a leader of the conspiracy, exposed its proprietary business knowledge and provided a substantial opportunity for collusion.[26]

---

[26] Foster Farms' reliance on *Weit v. Cont'l Ill. Nat'l Bank & Tr. Co.*, 641 F.2d 457, 462 (7th Cir. 1981), is unavailing, because that case was decided on summary judgment "after eight (footnote continued)

Defendants' Motion to Dismiss should be denied as to Foster Farms.

### 4. Koch Foods

Like Perdue, Koch Foods simply ignores Plaintiffs' allegations concerning its substantial role in manipulating the Georgia Dock price index. Not only did it submit prices to the Georgia Dock, but Dale Tolbert, Koch Foods' VP of Sales, was one of eight members of the Georgia Dock Advisory Committee, a secret body of senior poultry industry executives that facilitated Defendants' control over the index and precluded GDA personnel from making changes to the index independently. (DPP ¶¶ 105, 110; EU ¶¶ 133, 138; C&I ¶¶ 110, 115.) The Georgia Dock allegations are enough, by themselves, to render Plaintiffs' claim against Koch Foods plausible.

Koch Foods also fails in attempting to brush aside the other allegations against it. For example, Plaintiffs allege that Koch Foods announced a production cut between 2% and 8% in early April 2008. (DPP ¶ 151; EU ¶ 179; C&I ¶ 156.) Koch Foods challenges this allegation as falling short of stating that Koch Foods actually did reduce its output (Dkt. 291 at 6), but that ignores the context in which the allegation was made. Plaintiffs allege in the Complaints that on March 12, 2008, Pilgrim's, the second largest producer by market share, announced a massive closure of seven Broiler facilities, claiming it was "absolutely necessary to help bring supply and demand into better balance" for the industry. (DPP ¶ 150; EU ¶ 178; C&I ¶ 155.) A few weeks later, six smaller producers including Koch Foods and co-conspirators Fieldale Farms, Simmons, Cagle's, Wayne, and O.K. Foods each announced production cuts. (DPP ¶ 151; EU ¶ 179; C&I ¶ 155.) These restraints are contrary to the economic self-interest of Koch Foods and its co-

---

years of discovery … [which] failed to produce any significant probative evidence to support the complaint." *Id.* at 458.

conspirators, which would have been expected to maintain or expand their production to gain market share in the absence of a cartel.  *See Flat Glass*, 385 F.3d at 360-61.

The same inference can be applied to Plaintiffs' allegations that Koch Foods, Perdue, Pilgrim's, Sanderson, and Tyson announced a coordinated plan to reduce their annual fixed-price contracts beginning around January 2008.  (DPP ¶¶ 348-50; EU ¶¶ 376-78; C&I ¶¶ 353-55.) This coordinated effort is alleged to have occurred at the same time that Tyson and Pilgrim's called for industry-wide supply reductions, and that Defendants, including Koch Foods, announced they were cutting production.  (DPP ¶¶ 146-51; EU ¶ 174; C&I ¶¶ 151-56.)  The reasonable inference is that Koch Foods responded to its competitors' invitation to limit production and increase prices by, among other things, reducing its annual fixed-price contracts in accordance with its public announcement.  *See TFT-LCD*, 586 F. Supp. 2d at 1116.

In addition, Plaintiffs allege that Koch Foods publicly reassured the other producers that it was committed to the conspiracy.  For instance, in October 2011, Mark Kaminsky, the company's COO and CFO, participated in a panel at the National Chicken Council's 57th Annual Conference with senior executives of Purdue and other Broiler producers, in which he stated that "[d]iscipline on the supply side was one suggestion" to respond to the "new paradigm" in the Broiler industry, and that "[g]etting better prices from retailers was another." (DPP ¶¶ 221, 380; EU ¶¶ 249, 414; C&I ¶¶ 226, 391.)  Also, in an August 2012 interview with Bloomberg News, Koch Foods CEO Joseph Grendys stated that "the industry will be forced to get price increases of 10 to 15 percent across all product lines," and announced that the company would re-implement quarterly price adjustments in its contracts for the first time since 2008. (DPP ¶ 237; EU ¶ 265; C&I ¶ 242.)  While trying to write these allegations off as mere "bland economic truisms" (Dkt. 291 at 7), Koch Foods fails to acknowledge that these public

pronouncements signaled its pricing and production intentions to other members of the cartel. *See, e.g.*, *Pool Prods.*, 988 F. Supp. 2d at 711 (identifying signaling as a plus factor).

Koch Foods' criticism of Plaintiffs' "buy vs. grow" allegations also lacks merit. (DPP ¶¶ 337-47; EU ¶¶ 365-75; C&I ¶¶ 342-52.) Plaintiffs allege that Koch Foods, Tyson, Fieldale Farms, and other Defendants joined together to ensure that some companies deliberately under-produced Broilers on the assumption that they would satisfy their requirements by buying Broilers from other Defendants. (DPP ¶¶ 337-38; EU ¶¶ 365-66; C&I ¶¶ 342-43.) This agreement allowed Defendants to absorb excess supply that would have otherwise depressed market prices, maintain market share despite restricting their own production, and engage in pricing discussions between the competitors' CEOs and other executives. (DPP ¶ 338; EU ¶ 366; C&I ¶ 343.) These allegations, taken in the context of the Complaints as a whole, plausibly show Koch Foods participated in the conspiracy.

Finally, this Court should reject Koch Foods' argument that it could not have plausibly "conspired to reduce the supply" of Broilers (Dkt. 291 at 1), because it increased its market share during the Class Period with the acquisitions of a plant from Tyson and a second plant during Cagle's bankruptcy (*Id.* at 2-7). Contrary to Koch Foods' contention, Plaintiffs allege a price-fixing conspiracy; supply reduction by itself was not the object of the conspiracy. Plaintiffs allege that Defendants took acts in furtherance of the conspiracy which included exchanging detailed, competitively-sensitive information about pricing, capacity, sales volumes, and demand through Agri Stats, and manipulating the Georgia Dock pricing index, in addition to imposing supply restrictions. (*Id.*) Thus, Koch Foods' increase in its market share relative to the other Defendants does not render its participation in the cartel implausible where. *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-01819 CW, 2010 WL 5138859 at *3-4

(N.D. Cal. Dec. 10, 2010) ("*SRAM*") (denying summary judgment despite defendant's having "grown from the ninth-largest to the second-largest in the SRAM market in terms of market share" over the class period, purchased two of its competitors, and acquired the business of a third competitor that had exited the market).

Koch Foods is also wrong to assert that its increase in market share at two particular points in time is inconsistent with its participation in an eight-year conspiracy. The chart that Koch Foods cites shows that it increased its market share only from 2008 to early 2009 and again from mid-2011 to mid-2012. (Dkt. 291 at 3, citing DPP ¶ 286; EU ¶ 314; C&I ¶ 291.) That same chart shows Koch Foods' market share to be flat (or slightly declining) throughout the remainder of the Class Period (*id.*), from which the Court can reasonably infer that Koch Foods limited its production and maintained the stability of overall market output, consistent with its co-conspirators. To the extent that these discrete increases in market share may be indicative of competition, "[t]he continuation of some competition is not fatal" to a Section 1 Sherman Act case. *United States v. Container Corp. of Am., 393 U.S. 333, 337 (1969)*; *see also SRAM*, 2010 WL 5138859 at *9.[27]

Defendants' Motion to Dismiss should be denied as to Koch Foods.

---

[27] Economic analysis recognizes that "in some cases the cartel agrees to an allowable range for market shares or a path of changing market shares over time." Robert C. Marshall & Leslie M. Marx, *The Economics of Collusion: Cartels and Bidding Rings* (2012) at 122 n.41; Alexander Geist & Korbinian von Blanckenburg, *Cartel Detection – Is Market Share Volatility a Significant Indicator?*, Intereconomics Review of European Economic Policy (Vol. 46, July/Aug. 2011, No. 4) at 221 (finding "no support for the hypothesis that market shares in a cartel are more stable than under collusion," and noting that the distributions of market share changes were significantly different in 3 of 10 cartels analyzed).

## 5. **Mountaire, O.K. Foods, Simmons, and House of Raeford**

Defendants Mountaire, O.K. Foods, Simmons, and HRF filed a joint brief in support of the Motion to Dismiss. (Dkt. 275) As discussed herein, Plaintiffs' allegations demonstrate that each of these Defendants plausibly joined the conspiracy and knew of its scope.

### (a) **Mountaire**

There is no merit to Mountaire's assertion that the allegations against it are insufficient. Plaintiffs adequately plead Mountaire's involvement in the conspiracy through the detailed allegations of unlawful conduct directed at all of the Defendants. *See Brooks*, 578 F.3d at 582; *Atkins*, 2015 WL 3862724, at *3. Moreover, Plaintiffs allege that Tyson and Pilgrim's attempted to prop up Broiler prices in 2007 before the start of the Class Period, by reducing their Broiler production through short-term measures. (DPP ¶ 143; EU ¶ 171; C&I ¶ 148.) Although three Defendants followed their lead, Mountaire, Sanderson, and HRF did not. (*Id.*) The failure by Mountaire, Sanderson, and HRF to reduce their production rendered the unilateral, parallel production restrictions by Pilgrim's, Tyson, and others ineffective, and made Tyson and Pilgrim's realize that such measures would never be enough to raise prices. (DPP ¶¶ 143-44; EU ¶¶ 172; C&I ¶¶ 148-49.) In other words, the events of 2007 demonstrated that industry-wide concerted action—in particular, an agreement among all Defendants, including Mountaire and others, to implement long-term supply cuts—would be needed to raise Broiler prices. (*Id.*) Mountaire and the other Defendant participated in such industry-wide concerted action. On April 15, 2011, Mountaire announced it was abandoning a 3-5% capacity increase. (DPP ¶ 203; EU ¶ 231; C&I ¶ 208.) As Mountaire President Paul Downes explained, "The only way to higher prices is less supply. The only way to less supply is chicken companies will shut down or

cut back." (*Id.*)  These allegations are sufficient to show that Mountaire plausibly joined the conspiracy and knew of its scope.

Mountaire incorrectly contends that it cannot have participated in the conspiracy because its market share increased between 2011 and 2014.  (Dkt. 275 at 4.)  Mountaire's argument confuses market share—a proportion of a market held by a single participant relative to other participants—with overall output.  (*Id.*)  Plaintiffs allege that Mountaire did decrease its capacity (DPP ¶ 203; EU ¶ 231; C&I ¶ 208), and that it did so during a period of industry consolidation (DPP ¶¶ 284-89; EU ¶¶ 312-17; C&I ¶¶ 289-94).  Accordingly, Mountaire's defense that it could not have participated in a production-restriction conspiracy should be rejected.[28]

Mountaire's contention that it abandoned a planned capacity increase due to the increased cost of corn (Dkt. 275 at 4-5), is an improper attempt to contradict the well-pleaded allegations of the Complaints.  Plaintiffs allege that Mountaire's supply restriction was part of collective action within the industry to raise prices by decreasing Broiler production.  (DPP ¶ 203; EU ¶ 231; C&I ¶ 208.)  *Twombly* does not require Plaintiffs to plead facts excluding the possibility that input costs affected Broiler pricing.  *See, e.g.*, *Erie County*, 702 F.3d at 869; *Kleen Prods. I*, 775 F. Supp. 2d at 1079-80.[29]

Plaintiffs also allege that Mountaire participated in numerous channels for sharing sensitive, non-public information with competitors, effectively monitoring and enforcing all

---

[28]  Mountaire's request that the Court take judicial notice of truth of certain USDA data is improper (Dkt. 275 at 4-5) for the reasons discussed in Section IV(B)(2), *supra*.  At most, the Court may take judicial notice of the fact that USDA published such data but not its truth.

[29]  Mountaire's authorities are inapposite, because neither was decided on a motion to dismiss.  (Dkt. 275 at 5, citing *In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999) (summary judgment motion); *Illinois Corp. Travel, Inc. v. Am. Airlines, Inc.*, 806 F.2d 722 (7th Cir. 1986) (pre-*Twombly* preliminary injunction motion).)

Defendants' compliance with the conspiracy, including through Agri Stats.[30]  Defendants'

sharing proprietary and confidential information about pricing, capacity, production, and costs at

the level of detail provided by Agri Stats plausibly supports their participation in the alleged

conspiracy.  (DPP ¶ 134; EU ¶ 162; C&I ¶ 139.)

Mountaire also attended numerous in-person industry meetings that provided

opportunities to collude, such as the National Chicken Council, the United States Poultry & Egg

Export Council ("USAPEEC"), the U.S. Poultry & Egg Association, the North Carolina Poultry

Federation, the IPE, and the International Producers and Processors Expo ("IPPE").  (DPP ¶¶

299, 301-02, 304, 306; EU ¶¶ 327, 329-30, 332, 334; C&I ¶¶ 304-07, 309, 311.)  These meetings

supplemented the weekly exchanges of competitive information facilitated by Agri Stats.

The allegations as to Mountaire are more than sufficient, and Defendants' Motion to

Dismiss should be denied.

### (b)  O.K. Foods

Plaintiffs' allegations that O.K. Foods slashed production in coordination with other

Defendants provide a sufficient basis from which the Court can infer O.K. Foods plausibly

joined and took acts in furtherance of the conspiracy.  O.K. Foods was among the producers that

cut production by 2-8% following Pilgrim's March 2008 call for the industry to reduce

oversupply.  (DPP ¶¶ 150; EU ¶¶ 178; C&I ¶¶ 155-56.)  Defendants continued to announce a

---

[30] The secrecy with which Defendants and Agri Stats guard both the list of Agri Stats participants and the content of the weekly reports independently supports a claim of fraudulent concealment by Mountaire and every other Agri Stats participant—including O.K. Foods, Simmons, and HRF, who join Mountaire in this argument in their jointly-filed supplemental brief (Dkt. 275), and Wayne, which separately raises an identical argument (Dkt. 283 at 8)—even beyond any other actions taken to fraudulently conceal the conspiracy.  Defendants' weekly monitoring, via Agri Stats, of their co-conspirators' compliance with the conspiracy further constitutes a continuing violation.

series of production cuts through spring of 2008 (DPP ¶¶ 151(E), 152-60; EU ¶¶ 179(E), 180-88; C&I ¶¶ 156-64), and on June 19, 2008, the Chairman of the National Chicken Council and CEO of Peco told participants on a media conference call that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year." (DPP ¶ 161; EU ¶ 189; C&I ¶ 166.) Less than three weeks later, on July 7, 2008, O.K. Foods announced another production cut, this time that it would reduce egg sets by 7.5%. (DPP ¶ 166; EU ¶ 194; C&I ¶ 171.) Reducing egg sets is one way for Broiler producers to manipulate supply. (DPP ¶ 140(B); EU ¶ 168(B); C&I ¶ 145(B).)

While O.K. Foods claims that its production restraints were a reaction to the effect of ethanol policies on feed the prices for corn and soy bean meal (DPP ¶¶ 166, 240; EU ¶¶ 194, 268; C&I ¶¶ 171, 245), that explanation is pretextual, and ethanol's effect on feed prices is wildly overplayed.[31] (DPP ¶¶ 383-86; EU ¶¶ 417-20; C&I ¶¶ 394, 396-98.) As Plaintiffs plausibly allege, O.K. Foods' production cuts were the result of a conspiracy that it helped to enforce through weekly informational exchanges accomplished via Agri Stats and through other face-to-face meetings at industry events. (DPP ¶¶ 117, 299-305; EU ¶¶ 145, 327-33; C&I ¶¶ 122, 302-07, 310-11.) Even if rising input costs were a plausible explanation for O.K. Foods' coordinated production cuts, that would not render implausible the inference of conspiracy.

Accordingly, Defendants' Motion to Dismiss should be denied as to O.K. Foods.

### (c)    Simmons

Simmons acknowledges, as it must, that Plaintiffs allege the company participated in the earliest rounds of production cuts in 2008 after Pilgrim's specifically called for the industry to

---

[31] As with Mountaire, O.K. Foods' request that the Court consider USDA data from outside the Complaints is improper. (Dkt. 275 at 7.)

reduce oversupply. (DPP ¶ 151; EU ¶ 179; C&I ¶ 156.) On April 9, 2008, it announced a 6% production cut throughout its processing plants (DPP ¶ 151(B); EU ¶ 179(B); C&I ¶ 156(B)), making it one of 11 companies to depart significantly from past industry practices by reducing production that year (DPP ¶ 188; EU ¶ 216; C&I ¶ 193). In February 2009, CEO Todd Simmons noted that the company had "made adjustments in bird weights"—*i.e.*, slaughtered Broilers early, at a smaller size—which is one method Broiler producers use to manipulate supply. (DPP ¶¶ 186, 140(A); EU ¶¶ 214, 168(A); C&I ¶¶ 191, 145(A).) And during the 2011 round of industry-wide production cuts, Simmons implemented two sets of layoffs at its Siloam Springs processing plant, eliminating over 400 workers and thereby imposing longer-term production limitations. (DPP ¶¶ 201, 215; EU ¶¶ 229, 233; C&I ¶¶ 206, 220.) In October 2014, Simmons announced that it would close its spent hen processing plant in Jay, Oklahoma, which processed Broiler breeders that reached the end of their productive lives on behalf of other Defendants. (DPP ¶ 254; EU ¶ 282; C&I ¶ 259.) The Jay facility had afforded Simmons the opportunity to monitor changes in other Defendants' Broiler breeder supplies, and its closure indicated that Defendants' push to cut Broiler breeder capacity industry-wide had succeeded. (*Id.*) All of this conduct was in furtherance of the conspiracy.

Like its co-conspirators, Simmons also exchanged material, non-public information on pricing and production with its competitors through Agri Stats throughout the Class Period. (DPP ¶ 117; EU ¶¶ 145; C&I ¶ 122.) It also participated in multiple industry groups, including the National Chicken Council, USAPEEC, U.S. Poultry, and the Poultry Federation (DPP ¶¶ 299, 301-02, 305; EU ¶¶ 327, 329-30, 333; C&I ¶¶ 304-07, 310), and attended regular events hosted by those groups as well as attending the IPE and later the IPPE (DPP ¶ 306; EU ¶ 334; C&I ¶ 311). Agri Stats and the various industry meetings provided Simmons ample opportunity

to exchange information and monitor competitors' compliance with the conspiracy. It is perhaps not surprising, then, that at one National Chicken Council meeting in October 2013, CEO Todd Simmons sat on a panel with the CEOs of GNP and Tyson; industry press reported that the panelists were "chipper about the prospects for their industry in the next few years." (DPP ¶ 245; EU ¶ 273; C&I ¶ 250.)

Like other Defendants, Simmons' attempt to propose alternative explanations for its conduct alleged in the Complaints does nothing to undermine the plausibility of Plaintiffs' allegations. Simmons blames its production cuts in 2008 and layoffs in 2011 on high grain prices resulting from ethanol subsidies. (Dkt. 275 at 9-10.) As discussed above, however, those excuses are pretextual (DPP ¶¶ 383-86; EU ¶¶ 417-20; C&I ¶¶ 394-97), and came amidst public calls by Defendants and Agri Stats for industry-wide production cuts. (DPP ¶¶ 196-98, 209-10, 218; EU ¶¶ 224-26, 237-38, 246; C&I ¶¶ 201-03, 214-15, 223). Simmons begrudgingly acknowledges that its layoffs may be "germane to the alleged conspiracy and suggestive of production cuts, … [but] would not be good evidence of it." (Dkt. 275 at 10.) That is not the standard on a motion to dismiss. *See Standard Iron Works*, 639 F. Supp. 2d at 902 ("While individual Defendants may be able to suggest business justifications for some of the mill shutdowns … , the fact that multiple instances of parallel conduct are alleged makes it far less likely that a business justification exists for all of the acts taken in total.") (internal quotation marks omitted).

Defendants' Motion to Dismiss should be denied as to Simmons.

### (d) House of Raeford

Plaintiffs' allegations concerning HRF are more than sufficient. HRF, like Mountaire, did not participate in the pre-conspiracy production cuts in 2007; however, like Mountaire, its

non-participation and over-production doomed the price-protection efforts by Tyson and Pilgrim's and made clear that industry-wide cooperation would be needed to increase Broiler prices. (DPP ¶¶ 143-44; EU ¶¶ 171-72; C&I ¶¶ 148-49.) In fact, from 2001 through 2007, HRF had pursued a strategy of aggressive production growth, doubling its Broiler production during that time. (DPP ¶ 170; EU ¶ 198; C&I ¶ 175.) But HRF reversed course in August 2008 when, after months of production cuts by some of its largest competitors, it announced it would begin reducing its own Broiler production by 5%. (DPP ¶¶ 170, 188; EU ¶¶ 198, 216; C&I ¶¶ 175, 193.)

When other Broiler producers kicked off a second round of industry-wide production cuts in 2011, HRF once again participated. In March 2011, HRF announced that it was reducing egg sets by 10% to increase prices. (DPP ¶ 200; EU ¶ 228; C&I ¶ 205.) Although it blamed ethanol subsidies for its production cut (*id.*), that was mere pretext, as discussed above (DPP ¶¶ 383-86; EU ¶¶ 417-20; C&I ¶¶ 394, 396-98). Like the other Defendants, HRF exchanged material, non-public information with its co-conspirators through Agri Stats, which allowed all Defendants to monitor compliance with the conspiracy. (DPP ¶ 117; EU ¶ 145; C&I ¶ 122.) It also participated in multiple industry groups, including the National Chicken Council, USAPEEC, U.S. Poultry, the Georgia Poultry Federation, the North Carolina Poultry Federation, and the Poultry Federation (DPP ¶¶ 299, 301-05; EU ¶¶ 327, 329-33; C&I ¶¶ 304-10), and attended regular events hosted by those groups as well as attending the IPE and later the IPPE (DPP ¶ 306; EU ¶ 334; C&I ¶ 301).

HRF's attempts to contest Plaintiffs' well-pleaded allegations are meritless. For all the reasons described above, HRF's effort to blame its production restraints on high input costs does not undermine the plausibility of Plaintiffs' allegations. (Dkt. 275 at 11-12.) While contending

that HRF's August 2008 production cut does not evidence parallel behavior, because it occurred several months after some other Defendants announced their own supply restraints (*Id.* at 11-12), HRF ignores the numerous allegations of production cuts, layoffs, and industry calls for more of the same by its co-conspirators throughout the year.  (DPP ¶¶ 146-88; EU ¶¶ 174-216; C&I ¶¶ 151-93.)  As alleged in the Complaints, HRF's announcements of a 5% reduction occurred during the same month that Pilgrim's furthered its own production restraints with the announced closure of two facilities, and Sanderson demanded further industry-wide cuts.  (DPP ¶¶ 169-71; EU ¶¶ 197-99; C&I ¶¶ 174-76.)  Such allegations of "parallel conduct that is sequential rather than simultaneous" can give rise to an inference of conspiracy.  *See Plasma-Derivative*, 764 F. Supp. 2d. at 1000.

Finally, there is no merit to HRF's argument that its low market share undermines the plausibility of its participation in the conspiracy.  (Dkt. 275 at 12.)  As a small producer, HRF had every incentive to expand its own production and increase market share when its larger competitors slashed their own production.  That it chose not to expand supply, contrary to its own self-interest, is indicative of conspiratorial activity.  *See Flat Glass*, 385 F.3d at 360-61.

Defendants' Motion to Dismiss should be denied as to House of Raeford.

### 6. <u>Sanderson</u>

Sanderson's individual arguments focus exclusively on issues related to its own production levels and market share.  It all but ignores Plaintiffs' allegations of its manipulation of the Georgia Dock price index.  (DPP ¶¶ 97, 100, 102-03, 110, 113; EU ¶¶ 125, 128, 130-21, 138, 141; C&I ¶¶ 120-05, 107, 110, 115-18.)  Sanderson similarly ignores Plaintiffs' allegations that it participates in Agri Stats through which it exchanges material, non-public information about pricing, sales, and production with other Defendants without any plausible, non-

conspiratorial justification for doing so.  (DPP ¶¶ 116, 123, 130, 134; EU ¶¶ 144, 151, 158, 162; C&I ¶¶ 121-40.)  Given the nature of the information shared through Agri Stats, the way the Georgia Dock index is calculated, the susceptibility of that index to manipulation by participants, and the deviation of that index from indexes that, unlike Georgia Dock, are based on verified sales, Plaintiffs are entitled to the reasonable inference that Sanderson conspired to inflate prices.

Sanderson also participated in coordinated production cuts.  On a January 31, 2008 earnings call, Sanderson's CEO stated that "we could see some reductions in production," that a production cut was "probable," with production cuts to follow in February through April "if it's bad and ugly and deep."  (DPP ¶ 148; EU ¶ 176; C&I ¶ 153.)  In addition to the numerous production cuts announced by Defendants in March and April 2008, Sanderson's CEO indicated that he was aware that some competitors had cut their production but had not announced that fact publicly.  (DPP ¶ 151(E); EU ¶ 179(E); C&I ¶ 156(E).)  Plaintiffs are entitled to the reasonable inference that Sanderson made unannounced production cuts during this time period as well as throughout the remainder of 2008.

Sanderson engaged in anticompetitive conduct in 2008 and 2009.  Among other things, Sanderson:  joined Koch Foods, Pilgrim's, Perdue, and Tyson in January 2008 in reducing annual fixed-price contracts so they could more quickly reap the benefit of higher prices caused by their coordinated production restraints (DPP ¶¶ 350, 354; EU ¶¶ 378, 382; C&I ¶¶ 355, 359); acknowledged in May 2008 that it regularly makes unannounced reductions in its egg sets from Thanksgiving through mid-February and would cut production by 4% to 5% after Labor Day (DPP ¶ 158; EU ¶ 186; C&I ¶ 163); called for further industry-wide reductions in August 2008 (DPP ¶ 171; EU ¶ 199; C&I ¶ 176); implemented its previously announced "fall cuts" a month early and delayed its planned opening of a new deboning facility (DPP ¶ 176; EU ¶ 204; C&I ¶

181); and confirmed supply cuts in February 2009 by processing smaller Broilers and running its plants at lower capacity utilization rates (DPP ¶ 185; EU ¶ 213; C&I ¶ 190).  Sanderson acknowledged to investors that these cuts were intended to drive Broiler prices higher (*id.*), which indeed they did (DPP ¶ 192; EU ¶ 220; C&I ¶ 197).

Sanderson took advantage of these higher prices by increasing its production with the opening of a North Carolina processing plant, which began operating in January 2011.  (DPP ¶ 131(C); EU ¶ 159(C); C&I ¶ 137(C); *see also* Dkt. 277-1 at p. 13.[32])  Production increases by Sanderson and others again resulted in over-supply that caused Broiler prices to fall.  (DPP ¶ 193; EU ¶ 221; C&I ¶ 198.)  To counter price declines, Sanderson and the other Defendants implemented another round of production restraints in 2011.  (DPP ¶¶ 193, 197, 199; EU ¶¶ 221, 225, 227; C&I ¶¶ 198, 202, 204.)  Sanderson announced in late February 2011 that it would delay the development and construction of a second North Carolina Broiler complex (DPP ¶ 199; EU ¶ 227; C&I ¶ 204); reaffirmed in May 2011 the need to "reduce production and get prices up" industry-wide (DPP ¶ 209; EU ¶ 237; C&I ¶ 214); announced to investors in August 2011 the extension of its 4% fall production cut and encouraged further industry-wide restraints (DPP ¶ 218; EU ¶ 246; C&I ¶ 223); and reaffirmed its commitment to participating in a projected 4% industry-wide reduction (DPP ¶ 223; EU ¶ 231; C&I ¶ 228).  Like in 2008, this second round of production cuts had its intended effect, causing Broiler price increases in 2012.  (DPP ¶ 239; EU ¶ 267; C&I ¶ 244.)

---

[32]  Sanderson attaches as Exhibit A to its supplemental brief a copy of its 8-K dated May 24, 2011, which contains a transcript of the earnings call described in the Complaints.  (DPP ¶ 131(C); EU ¶ 159(C); C&I ¶ 136(C).)  Transcripts of the earnings call are available from multiple sources, and Plaintiffs relied on one of those other sources, not the 8-K, in their Complaints.  Consequently, to the extent that Sanderson might attempt to direct to Court to any portion of the 8-K apart from the earnings call transcript, those other portions are not embraced by the Complaint and are not subject to judicial notice to prove the fact of the matter asserted.

Sanderson also participated in multiple industry groups that provided additional meetings replete with opportunities to conspire: the National Chicken Council, USAPEEC, U.S. Poultry, the Georgia Poultry Federation, the North Carolina Poultry Federation, and the International Poultry Council. (DPP ¶¶ 299, 301-04, 307; EU ¶¶ 327, 329-32, 335; C&I ¶¶ 304-09, 312.) In addition, Sanderson attended the IPE and later the IPPE (DPP ¶ 306; EU ¶ 334; C&I ¶ 311), and participated in Overseas Distribution Solutions ("ODS"), a Webb Pomerene organization which, although by statute was not supposed to have any impact on the U.S. domestic market, could not, as a practical matter, have conducted its business without providing a vehicle for members to affect domestic Broiler prices. (DPP ¶¶ 308-10; EU ¶¶ 336-38; C&I ¶¶ 313-15.) *See* Webb Pomerene Act of 1918, 15 U.S.C. § 61-66. Sanderson also invited competitors to tour its grow house and processing plant in connection with an April 2013 "Chicken Media Summit." (DPP ¶ 333; EU ¶ 361; C&I ¶ 338.)

Sanderson cannot dispute any of these well-pleaded allegations and makes no effort to do so. Sanderson's argument that it could not have conspired because its production "zigged" as other Defendants "zagged" (Dkt. 277 at p. 1) ignores allegations that it manipulated the Georgia Dock price index, exchanged information through Agri Stats to police the conspiracy, and participated in both the 2008 and 2011 production cuts. Sanderson also ignores that any increased production during the Class Period[33] occurred outside of those agreed-upon restrictions and at the same time that other industry participants also increased production, after the rounds of production cuts had their intended effect of increasing Broiler prices.

---

[33] Sanderson contends that it opened seven new production facilities since 1992. (Dkt. 277 at p. 3 n. 3.) But it is irrelevant to Plaintiffs' conspiracy allegations that, beginning 16 years before the start of the Class Period, Sanderson opened new production facilities. As late as 2007, overproduction by Sanderson and others was precisely the reason that earlier attempts by competitors to raise prices through production cuts failed. (DPP ¶ 143; EU ¶ 171; C&I ¶ 148.)

Sanderson's assertion that it could not have conspired because it increased its market share over the course of the Class Period is also unpersuasive. Like Mountaire, Sanderson confuses market share with production. *See SRAM*, 2010 WL 138859 at *3-4 (denying motion for summary judgment where defendant had grown from the ninth largest competitor to the second largest competitor in terms of market share during the class period, having swallowed up the business of three other competitors).

Defendants' Motion to Dismiss should be denied as to Sanderson.

### 7. <u>Wayne Farms</u>

Wayne's supplemental brief ignores Plaintiffs' allegations that it participated in the conspiracy to inflate Broiler prices in multiple ways. First, Wayne, along with several co-conspirators, artificially inflated the Georgia Dock price index by collectively submitting high and nearly identical Broiler prices. (DPP ¶¶ 103, 110, 266; EU ¶¶ 131, 138, 294; C&I ¶¶ 102-15, 271.) One of Wayne's executives, Steve Clever, served on the Georgia Dock Advisory Committee, which was convened to facilitate participants' control of the Georgia Dock price index. (DPP ¶ 105; EU ¶ 133; C&I ¶ 110.)[34]

Moreover, Wayne participated in the earliest rounds of production cuts in 2008 after Pilgrim's announced its own supply restraints and called for the industry to follow suit. (DPP ¶¶ 150-51; EU ¶¶ 178-79; C&I ¶¶ 155-56.) Two months later, on June 23, 2008, Wayne announced another 6% cut, days after Agri Stats' subsidiary, EMI, issued a report indicating the need for deep production cuts into 2009 and the Chairman of the National Chicken Counsel and CEO of Peco announced that the industry was entering a second phase of cuts. (DPP ¶¶ 161-63; EU ¶¶

---

[34] Given its service on the George Dock Advisory Committee, the fact that Wayne ignores the implications of the Georgia Dock price index manipulation in its discussion of the statute of limitations is telling. (Dkt. 283 at p. 8.)

189-91; C&I ¶¶ 166-68.)  Wayne announced yet a third production cut in October 2008, closing a Georgia plant and laying off more than 600 employees just over a week after the National Chicken Council meeting where Pilgrim's CEO spoke on a panel about the need to implement an industry-wide price increase.  (DPP ¶¶ 174, 177; EU ¶¶ 202, 205; C&I ¶¶ 179, 182.)

Wayne also participated in the 2011 production cuts, when it announced its closure of a Decatur, Alabama plant and layoff of 360 employees.  (DPP ¶ 222; EU ¶ 250; C&I ¶ 227.) While Wayne claims that it cut production due to high input costs and the Great Recession (Dkt. 283 at pp. 5-6), those contentions fare no better for Wayne than they do for any other Defendant. *See* Section IV(D), *supra*.

Wayne does not dispute it that participated in Agri Stats, exchanging material, non-public pricing, production, and other information with ostensible competitors.  (DPP ¶ 117; EU ¶ 145; C&I ¶ 122.)  Wayne's participation in the National Chicken Council, USAPEEC, U.S. Poultry, the Georgia Poultry Federation, the North Carolina Poultry Federation, the Poultry Federation, and ODS (a Webb Pomerene organization), the IPE, and the IPPE also provided opportunities for collusion.  (DPP ¶¶ 299, 301-06, 308-10; EU ¶¶ 327, 329-34, 336-38; C&I ¶¶ 304-11, 313-15.)

At least one high-level executive—Clint Rivers, who had exhorted other industry participants to make production cuts and increase prices—had moved between Pilgrim's, Perdue, and Wayne without being bound by non-compete or confidentiality agreements that would have prevented information sharing among competitors.  (DPP ¶¶ 156, 160, 174, 314; EU ¶¶ 184, 188, 202, 342; C&I ¶¶ 161, 165, 179, 319.)  It is reasonable for the Court to infer that Mr. Rivers continued to play a role in the conspiracy during his tenure at Wayne.

Defendants' Motion to Dismiss should be denied as to Wayne.

8.     **Peco**

Peco's supplemental arguments in support of dismissal lack merit.  In 2007, Peco and two other producers followed the lead of Pilgrim's and Tyson in reducing their Broiler production.  (DPP ¶ 143; EU ¶ 171; C&I ¶ 148.)  Moreover, Peco participates in Agri Stats, which would have enabled it to share with competitors information about any changes in its own production, while shielding that information from public view.  (DPP ¶ 117; EU ¶ 145; C&I ¶ 122.)

Peco and its executives also facilitated and acted in furtherance of the conspiracy through their participation in industry organizations.  In June 2008, Mark Hickman, who was Peco's CEO and Chairman of the National Chicken Council, told participants in a media conference call that "the poultry industry is entering a second phase of production cutbacks, following a 1 to 2 percent cutback in production earlier this year," and that because the first round of cutbacks was not sufficient, "liquidation"—reductions that would impose long-term rather than short-term restraints—would occur in round two.  (DPP ¶ 161; EU ¶ 189; C&I ¶ 166.)  Hickman's statement echoed calls to action made by other Defendants' CEOs and from EMI in the weeks immediately preceding and following.  (DPP ¶¶ 160, 162-66; EU ¶¶ 188, 190-94; C&I ¶¶ 165, 167-71.)

In addition to having served as the Chairman of the National Chicken Council, Peco's CEO appeared in 2011 on a panel with executives from Tyson, Sanderson, and Perdue in the midst of Defendants' conspiratorial price increases.  (DPP ¶¶ 161, 216; EU ¶¶ 189, 244; C&I ¶¶ 166, 221.)  The company is also a member of the USAPEEC, U.S. Poultry, the Poultry Federation, and ODS (a Webb Pomerene organization).  (DPP ¶¶ 299, 301-02, 304-05, 308-10; EU ¶¶ 327, 329-30, 332-33, 336-38; C&I ¶¶ 304-10, 313-15.)  Peco attended the IPE and later the IPPE.  (DPP ¶ 306; EU ¶ 334; C&I ¶ 311.)  Peco's participation in these organizations afforded it the opportunity to meet with its competitors to coordinate pricing and production.

Peco improperly invites the Court to consider materials outside the Complaints and to reject reasonable inferences that could be drawn in Plaintiffs' favor. *See* Sections IV(B) and II, respectively, *supra*. Peco argues that it could not have participated in the conspiracy because it increased its production in 2009 and in 2015. (Dkt. 297 at p. 4.) But the Complaints allege that, as prices rose during late 2009 and 2010, Broiler producers across the board increased their production to capitalize on the higher prices generated by their 2008 production cuts. (DPP ¶ 193; EU ¶ 321; C&I ¶ 198.) Peco's increased production in 2009 is consistent with Plaintiffs' allegations. Any increased production by Peco in 2015 does not absolve it from the consequences of its earlier conduct over an eight-year conspiracy. *See SRAM*, 2010 WL 5138859, at *9 (denying motion for summary judgment: "That Cypress may have cheated on the alleged conspiracy, angering other competitors, still leaves open the possibility that it would have sold SRAM at even lower prices absent critical knowledge about competitors' pricing and production.").

Peco's assertion that it could not have participated in the conspiracy because it built new construction facilities during the Class Period is based on two sources not embraced by the Complaint and which therefore cannot properly be considered on a motion to dismiss. *See* Section IV(B), *supra*. Peco is incorrect when it asserts that those sources were quoted in the Complaint. (Dkt. 297 at pp. 4-5, citing BB&T Cap. Mkts., Protein/Broilers: Cause for a Little Optimism (Nov. 4, 2015) and Sanderson Farms, Inc., Quarterly Report (Form 8-K) at p. 48 (May 26, 2016)). Moreover, its purchase of a production plant from a bankrupt competitor in early 2011 is far from exculpatory. *See SRAM*, 2010 WL 138859, at *3-4 (denying company's motion for summary judgment despite its having dramatically increased its market share during course of price-fixing conspiracy). That fact has no bearing on whether any resulting gain in Peco's

market share also corresponded with an overall increase in Broiler production by the industry. In any event, Peco's purchase came at the tail end of industry-wide production growth that occurred in response to the higher prices generated by the 2008 production cuts, which is consistent with Plaintiffs' allegations. (DPP ¶ 193; EU ¶ 321; C&I ¶ 198.)

Defendants' Motion to Dismiss should be denied as to Peco.

B.      **Fieldale Farms' Attempt to Remove Anti-Biotic Free Chicken From the Conspiracy is Without Merit**

Fieldale Farms argues that it did not participate in the conspiracy because it produced anti-biotic free ("ABF") Broilers. Fieldale's argument is procedurally defective and substantively unpersuasive. First, Fieldale Farms' argument is procedurally defective because it does not seek dismissal of an entire cause of action in the Complaints. Fieldale Farms concedes that even if the Court were to consider its argument and exclude ABF Broilers from the instant litigation, the allegations would stand as to its non-ABF Broiler production. (Dkt. 281 at p. 1 n.1.) Thus, the motion should be denied. *Lynch v. Ackley*, No. 3:12CV537 MPS, 2013 WL 6732540, at *2 (D. Conn. Dec. 19, 2013) ("Rule 12(b)(6) is the appropriate procedural mechanism by which to dismiss 'an entire claim or complaint.'"); *In re Westinghouse Sec. Litig.*, No. CIV. A. 91-354, 1998 WL 119554, at *2 (W.D. Pa. Mar. 12, 1998) (denying motion to dismiss only portions of a claim); *Thompson v. Paul*, 657 F. Supp. 2d 1113, 1129-30 (D. Ariz. 2009) (a challenge to certain allegations, rather than to an entire claim, must be brought under Rule 12(f), not Rule 12(b)(6)).

*Processed Egg* is on-point. There, the court denied the defendants' Rule 12(b)(6) motion which had sought to limit the plaintiffs' claims only to a conspiracy to restrict output of shell eggs, while dismissing claims regarding egg products:

Fundamentally … this Motion is not directed to the SAC, and as such does not implicate Rule 12(b)(6) issues. Defendants seek to circumscribe and delineate pre-trial issues, yet they are not using an appropriate vehicle to achieve their goal. Defendants have filed a motion that specifically requires an inquiry focused on whether the complaint states a claim. It simply is not the best use of Rule 12(b) motion procedure to chisel issues for trial. That function is to be better "discharged by the responsive pleading, pretrial discovery, the pretrial conference, and other case management procedures."

2011 WL 4945864 at *5 (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356) (internal citation omitted). Similarly, Fieldale Farms' argument does not implicate Rule 12(b)(6) issues, because it fails to focus on whether the Complaints state a claim but instead seeks to delineate pre-trial issues regarding the scope and effect of the conspiracy.[35]

Second, as reflected in Section IV(B), *supra*, Fieldale Farms' argument is based solely on extraneous material that should not be considered on a motion to dismiss. Even if the Court were to consider those documents, they are not relevant—let alone central—to determining whether Defendants engaged in the anticompetitive acts alleged in the Complaints. The 2012 Focus Management Report ("FMG Report") and earnings calls do *not* say, or in any way show, that ABF Broilers are not a commodity. Plaintiffs anticipate that the evidence will show that ABF Broilers, like other Broilers, are subject to commodity pricing that is not tailored to each individual purchaser.

Third, Fieldale Farms' argument that Plaintiffs allege an overly-broad relevant product market is misplaced, because allegations of a relevant market are not required for *per se* antitrust law violations. Even in rule of reason cases where a relevant market is an element of the claim,

---

[35] The only case on which Fieldale Farms relies, *Bailey Lumber & Supply Co. v. Georgia-Pac. Corp.*, No 1:08-CV-1394, 2009 WL 2872307 (S.D. Miss. Aug. 10, 2009), was soundly distinguished in *Processed Egg*, 2011 WL 4945864 at *7 n.7 (rejecting *Bailey* because it was based on a relevant market analysis and relied on factors outside the complaint).

plaintiffs must only "allege a cognizable market on which Defendants' actions could have had anticompetitive effects." *Bloyer v. St. Clair Cty. Illinois*, 179 F. Supp. 3d 843, 848-49 (S.D. Ill. 2016) ("*Bloyer*") (citing *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 976 (7th Cir. 1995) ("*MCM Partners*")).  An alleged product market may only be rejected on a motion to dismiss if "it is inconceivable that Plaintiffs could prove a set of facts supporting the market definition alleged."  *Id.*  As explained in *Jamsports & Entm't, LLC. v. Paradama Prods., Inc.*, No. 02 C 2298, 2003 WL 1873563 (N.D. Ill. Apr. 15, 2003) ("*JamSports*"), "at the pleading stage, we need only find it conceivable that JamSports could prove a set of facts supporting the relevant market definitions that it has alleged."  *Id.* at *6.  An antitrust complaint "need not explain why the market alleged is the relevant market."  *OverEnd Techs., LLC v. Invista S.A.R.L.*, 431 F. Supp. 2d 925, 929-30 (E.D. Wis. 2006) ("*OverEnd*") (The "court may not look behind OverEnd's allegations to speculate on the plausibility of its market definition.").

*Bloyer*, *JamSports* and *OverEnd Techs* all applied the Seventh Circuit's decision in *MCM Partners*.  In *MCM Partners*, the plaintiffs alleged a relevant market consisting of "the rental of forklifts, material handling and personnel moving equipment to the convention and trade show industry in Chicago, Illinois."  62 F.3d at 975.  The district court dismissed, ruling that this relevant market was too narrow because the complaint did not include facts establishing that the market for MCM's equipment was limited to exhibition contractors.  *Id.* at 975-76.  The Seventh Circuit reversed, finding that it was erroneous for the district court to dismiss on this basis because "it is not inconceivable to us that MCM could prove a set of facts supporting the relevant market definition alleged in its complaint."  *Id.* at 976;[36] *see also Avnet, Inc. v. Motio,*

---

[36] Post-*Twombly* district court decisions have consistently applied *MCM Partners* in denying motions to dismiss antitrust claims based on relevant market allegations.  Moreover, (footnote continued)

*Inc.*, No. 12 C 2100, 2015 WL 5307515, at *4 (N.D. Ill. Sept. 9, 2015) (denying motion to dismiss antitrust counterclaim asserting that alleged relevant market was too narrow: "Motio's market definition may be too narrow, or it may not be, but this determination is inappropriate at this stage of the litigation.").

Moreover, Plaintiffs may recover damages as to both ABF Broilers and non-ABF Broilers, even if the conspiracy had been limited solely to the reductions in the supply of non-ABF Broilers, so long as the conspiracy affected the price of both. *See Loeb Indus. Inc. v. Sumitomo Corp.*, 306 F.3d 469, 495 (7th Cir. 2002), *cert. denied sub nom. Credit Lyonnais Rouse, Ltd. v. Ocean View Capital, Inc.*, 539 U.S. 903 (2003). In *Loeb*, the Seventh Circuit reversed dismissal of a claim alleging overcharges for copper rods in a case alleging a price-fixing conspiracy based on supply reduction of copper cathode. 306 F.3d at 495. Similarly, in *Processed Egg*, where the plaintiffs alleged a single conspiracy to restrict output which affected both shell eggs and egg products, the court denied the defendants' motion to dismiss egg products from the suit based on an argument that egg products were not part of the same product market as shell eggs. 2011 WL 4945864 at *5. As the *Processed Egg* court concluded, "Plaintiffs have the right to control their own complaints, and they are free to allege whatever products they can ultimately prove have been the subject of a[n antitrust] conspiracy." *Id*. at *6. Here, as in *Processed Egg*, Plaintiffs allege a single conspiracy, and nothing in the Complaints

---

*MCM Partners* is consistent with decisions by other circuit courts. *See, e.g.*, *Todd*, 275 F.3d at 199-200 ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc*., 637 F.3d 435, 442 (4th Cir. 2011) (determining the relevant market "is a fact-intensive exercise centered on the commercial realities of the market and competition"); *Newcal Indus., Inc. v. Ikon Office Sol*., 513 F.3d 1038, 1045 (9th Cir. 2008) (Market allegations do not need to be pled with specificity and survive dismissal "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect.").

support Fieldale Farms' argument that ABF Broilers constitute a separate, discrete product market that must be excluded.

Fourth, Fieldale Farms erroneously asks the Court to determine the scope of the conspiracy, which is a factual issue that cannot be resolved on a motion to dismiss. *See Kleen Prods. I*, 775 F. Supp. 2d at 1082 (denying motion to dismiss that sought to limit an antitrust action to containerboard, although it alleged that the conspiracy also included corrugated products: "Defendants identify nothing in the Complaint that even hints that the relevant price increases, supply reductions and other contextual factors were limited to containerboard and not to corrugated products. Hence all of the preceding discussion and its plausibility analysis apply with equal force to corrugated boxes."). Here, as in *Kleen Products I*, Fieldale Farms points to nothing in the Complaints that even hints that Defendants' supply reductions and overcharges did not include ABF Broilers.[37]

"'The question in this case is not whether any conspiracy existed, only how far it reached. That question is ultimately one of fact, and cannot be resolved in the present procedural posture, where the Court tests only the sufficiency of the pleadings.'" *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789, 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) (quoting *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420-YGR, 2014 WL 309192, at *2 (N.D. Cal. Jan. 21, 2014); *see also In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051,

---

[37] Fieldale Farms premises its argument on the fact that the 2012 FMG Report—mentioned only once in the Complaints (DPP ¶ 80; EU ¶ 108; C&I ¶ 85)—discusses ABF Broilers on the same page as it discusses organic chickens, which Plaintiffs excluded from their definition of Broilers (DPP ¶ 79; EU ¶ 107; C&I ¶ 84). However, the Pilgrim's 4th Quarter 2013 Earnings Call, which Fieldale Farms also cites, indicates that ABF Broilers are only modestly more expensive than other Broilers and describes ABF chicken as a "category" of the overall Broiler marketplace: "But, again the consumer has clearly spoken and voted with their wallets, and as such, in order to remain relevant to the marketplace, we're going to grow in that category." (Dkt. 281-2 at p. 9.)

1063 (N.D. Cal. 2015) ("[T]here simply is no requirement that an antitrust plaintiff draw the boundaries of the alleged conspiracy (or conspiracies) in a complaint with the precision of a diamond cutter."); *Air Cargo Shipping Services Antitrust Litig.*, No. 06-MD-1175, 2014 WL 7882100, *38 (E.D.N.Y. Oct. 15, 2014) ("*Air Cargo II*") ("[T]he mere fact that the defendants have a different case theory should not deprive the plaintiffs of the opportunity to prove theirs.").

Fieldale Farms finds no support in the case law it cites. In *In re Packaged Seafood Prod. Antitrust Litig.*, No. 15-MD-2670 JLS (MDD), 2017 WL 35571 (S.D. Cal. Jan. 3, 2017), the plaintiffs alleged a conspiracy to fix the price of all packaged seafood. The defendants sought to dismiss all claims except for those regarding tuna because the plaintiffs' allegations did not mention non-tuna varieties of packaged seafood. Plaintiffs' claims here are not analogous. Plaintiffs are not alleging a broad multi-species "bird" market based on allegations about chickens. Instead, the Complaints identify a plausible single-species market of Broilers.

*In re Nat'l Ass'n of Music Merchants, Musical Instruments & Equip. Antitrust Litig.*, No. 09CV2002, 2011 WL 3702453, at *1 (S.D. Cal. Aug. 22, 2011) ("*Musical Instruments*"), is also inapposite. *Musical Instruments* concerned a conspiracy in which minimum prices were set for fretted instruments and guitar amplifiers. *Id.* at *2. This claim was found to be too broad because fretted musical instruments, including electric guitars, banjos, and mandolins, were not reasonably interchangeable. *Id.* at *4. Nonetheless, the court acknowledged that relevant product market allegations are a factual matter that typically cannot be adjudicated at the pleading stage. *Id.* ("The degree to which high-end instruments and low-end instruments are in the same market is a factual matter which is not ripe for decision at this point[.]"). Here, in stark contrast to *Musical Instruments*, Plaintiffs are not alleging a single conspiracy to fix the prices of disparate products, such as turkeys, hams, and beef. Fieldale Farms does not, and cannot, deny

that consumers choose between ABF Broilers and non-ABF Broilers and that the two are reasonably interchangeable.

Accordingly, Defendants' Motion to Dismiss should be denied as to Fieldale Farms.

### C.    Pilgrim's Bankruptcy Does Not Shield It From Liability

Pilgrim's would like the Court to believe that Plaintiffs seek to impose some newfangled theory of liability on a recently bankrupt antitrust conspirator, but Pilgrim's liability and the extent of its damages will be determined from a basic application of antitrust law.  Antitrust co-conspirators are jointly and severally liable "for *all damages* caused by the [entire] conspiracy." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002) (emphasis added). And in general, "a co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators." *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980).

Bankruptcy does not provide an exception from that rule, as the Seventh Circuit recognized in *Kleen Products LLC v. International Paper Co.*, 831 F.3d 919 (7th Cir. 2016) ("*Kleen Prods. II*").  In that case, the Seventh Circuit held that where a defendant re-joins an antitrust conspiracy after its discharge from bankruptcy, "there is no conflict with bankruptcy law" to hold a defendant jointly and severally liable for the pre-discharge actions by its co-conspirators.  *Id.* at 930.

Although Pilgrim's participated in the Broiler conspiracy from the beginning, its liability stems not from its pre-discharge conduct, but from its repeated reaffirmation of its participation in the conspiracy after its December 28, 2009 discharge from bankruptcy.  Pilgrim's "certainly would have had knowledge of what ha[d] gone on before [re-joining the conspiracy] and

91

presumably would have had the intent to pursue the same objectives." *Kleen Prods.*, 306 F.R.D. 585, 608 (N.D. Ill. 2015) ("*Kleen Prods. III*"); *cf. Kleen Prods. II*, 831 F.3d at 930 (describing the district court's reasoning as "sound"). Thus, by continuing in the collusive scheme after discharge, Pilgrim's is jointly and severally liable for damages caused throughout the duration of the conspiracy.[38]

Following discharge, Pilgrim's continued to use Agri Stats to share sensitive competitive information with the other Defendants—information for which there is no plausible, non-conspiratorial justification to exchange. In fact, as recently as February 2015—more than five years after Pilgrim's discharge from bankruptcy—Pilgrim's admitted to investors that it uses Agri Stats to monitor the industry's "discipline." (DPP ¶ 336; EU ¶ 374; C&I ¶ 341.)

In addition, Pilgrim's participated in industry-wide production cuts after its bankruptcy discharge. Defendants' production cuts in 2008 had been remarkably effective in raising prices. (DPP ¶ 193; EU ¶ 221; C&I ¶ 391.) Pilgrim's would have been well aware of that fact, having been a major proponent of the industry-wide cuts in 2008 and undertaken multiple significant cuts itself. (DPP ¶¶ 147, 150, 152-54, 156, 160, 169, 172, 174-75, 187; EU ¶¶ 175, 178, 180-82, 184, 188, 197, 200, 202-03, 215; C&I ¶¶ 152, 155, 157-59, 165, 174, 177, 179-80, 192.)

Pilgrim's joined a further round of production cuts beginning in 2011. (DPP ¶ 193; EU ¶ 221; C&I ¶ 198.) Defendants' senior executives attended the IPE in Atlanta, Georgia in January 2011, during which presenters at a market intelligence panel suggested that "[t]he market is

---

[38] Pilgrim's argues that it cannot be jointly liable for its co-conspirators' pre-discharge conduct because Plaintiffs did not file proofs of claims in Pilgrim's bankruptcy, citing *In re WorldCom, Inc.*, 546 F.3d 211, 220 (2d Cir. 2008). *WorldCom*, however, involved continuing trespass, not joint-and-several liability for an antitrust conspiracy. No proofs of claim were filed by plaintiffs in *Kleen Products III* and none were needed, because the antitrust defendant that had filed bankruptcy was jointly liable for its co-conspirators' pre-discharge conduct as the result of its own post-discharge participation in the conspiracy. 306 F.R.D. at 609.

calling for around a 5% reduction in chicken production."  (DPP ¶ 196; EU ¶ 224; C&I ¶ 201.)

In the following months, multiple Defendants announced consistent production restraints.  (DPP

¶¶ 197-205; EU ¶¶ 225-31; C&I ¶¶ 202-10.)  In May 2011, Pilgrim's President and CEO Bill

Lovett presented at the BMP Farm to Market Conference, discussed Pilgrim's shift away from

fixed-rate contracts to market-based pricing, and noted Pilgrim's "new focus on matching

production to forecasted demand, including by adjusting head and bird weights at selected plants

to better balance supply and customer demand."  (DPP ¶¶ 208, 352; EU ¶¶ 236, 380; C&I ¶¶

213, 357.)  And through 2011 and 2012, Pilgrim's implemented a number of plant closures and

layoffs that constrained capacity.  (DPP ¶¶ 217, 232; EU ¶¶ 245, 260; C&I ¶¶ 222, 237.)

     Pilgrim's also made statements indicating that it made additional production cuts that

were not publicly announced.  In January 2012, Agri Stats Vice President Donohue appeared at

USPOULTRY's Hatchery-Breeder Clinic and noted that Agri Stats data indicated the industry

was managing its production carefully by slaughtering its breeder flocks 5 to 6 weeks early,

thereby constraining production for at least 18 months.  (DPP ¶ 225; EU ¶ 253; C&I ¶ 230.)  The

early slaughter of breeder flocks began in 2011 and lasted through mid-2012.  (*Id.*)  In an April

2012 earnings call, Lovett stated that "the die is cast for 2012" and that "we're comfortable that

the industry is going to remain constrained."  (DPP ¶ 229; EU ¶ 257; C&I ¶ 234.)  Plaintiffs are

entitled to the reasonable inference that Pilgrim's participated in these industry-wide capacity

restrictions.

     By September 2012, the second round of industry-wide production cuts had begun to

drive Broiler prices higher.  (DPP ¶ 239; EU ¶ 267; C&I ¶ 244.)  In October 2012, the National

Chicken Council held an annual meeting, attended by Defendants' senior executives, that

discussed "[w]hat did the broiler industry learn from 2011 and how will the industry apply those

lessons in 2012 and 2013?"  (DPP ¶ 240; EU ¶ 268; C&I ¶ 245.)  The higher prices and industry-wide capacity controls continued throughout 2013 and 2014.  (DPP ¶ 243; EU ¶ 271; C&I ¶ 248.)  In May 2013, Pilgrim's President and CEO praised that "disciplined and constrained" supply, and stated, "I believe the industry has learned over the past three to five years that chicken is going to be driven by the supply and demand of chicken and not necessarily what corn or soybean meal costs.  I think I'm confident to say we've, we figured that out and we're doing a good job of balancing supply and demand."  (*Id.*)  He then reaffirmed the importance of continuing the restrain the industry's breeder flocks, as he did on a subsequent earnings call in February 2014.  (DPP ¶¶ 243, 247; EU ¶¶ 271, 275; C&I ¶¶ 248, 252.)  Indeed, by March 2014, industry-wide reductions in Broiler breeder flocks made it impossible to "meaningfully change" Broiler production until the second half of 2015 at the soonest.  (DPP ¶ 248; EU ¶ 276; C&I ¶ 253.)  Pilgrim's February and April 2016 earnings call reflected that industry-wide production "discipline" continued.  (DPP ¶¶ 264, 269; EU ¶¶ 292, 297; C&I ¶¶ 269, 274.)

In other post-discharge conduct, Pilgrim's, in coordination with other Defendants, used the pretext of Avian Flu in Mexico to continue to export hatchery flock Broilers from 2013 to 2016, further suppressing domestic production levels.  (DPP ¶¶ 250-52, 260; EU ¶¶ 278-80, 288; C&I ¶¶ 255-57.)  By late 2015, a Boiler industry analyst noted that chicken supplies had not increased as expected following the Avian Flu because Defendants had begun breaking rather than setting eggs.  Defendants coordinated that breaking of eggs during 2015 by exchanging information through Agri Stats.  (DPP ¶ 261; EU ¶ 289; C&I ¶ 266.)

Also, beginning at least in January 2015, Pilgrim's—in cooperation with Defendants Tyson, Fieldale Farms, Perdue, Sanderson, Koch Foods, and Wayne, and several producer co-conspirators—intentionally provided misleading pricing information to the Georgia Dock on a

weekly basis, for the purpose of artificially inflating the index price. (DPP ¶¶ 97-98, 102-03; EU ¶¶ 125-26, 130-31; C&I ¶¶ 102-08.) The manipulation of the Georgia Dock price index is an overt, post-discharge act in furtherance of the conspiracy, which alone is sufficient to sustain the Complaints against Pilgrim's. It is telling that Pilgrim's brief fails to refer to these allegations whatsoever.

Pilgrim's attempts to distinguish *Kleen Products III* based on the evidence in that case showing specific communications discussing the conspiracy, but its argument misses two important points. First, Pilgrim's ignores the post-discharge allegations about its coordinated production cuts, participation in Agri Stats, and manipulation of the Georgia Dock price index. Second, Pilgrim's fails to inform the Court that this issue did not arise in *Kleen Products III* until class certification, once substantial discovery had been completed. *See Kleen Prods. III*, 831 F.3d at 921. Plaintiffs are not required to produce such evidence on a Rule 12(b)(6) motion.

Pilgrim's tries to limit its exposure under the Seventh Circuit's *Kleen Products III* decision by arguing that even if it could be liable for is co-conspirators' pre-discharge conduct, the conspiracy that Pilgrim's joined did not date from January 2008, because the second round of production cuts in 2011 actually constituted a separate conspiracy. (Dkt. 295 at pp. 8-9.) But that argument elides the standard that governs this Rule 12(b)(6) motion, in which the Court must accept as true Plaintiffs' well-pleaded facts and make all reasonable inferences in Plaintiffs' favor. *Bonte*, 624 F.3d at 463. Plaintiffs have alleged a single conspiracy beginning in 2008 and continuing until the present. Defendants used multiple strategies to inflate Broiler prices, and used particular strategies at different times. But throughout the Class Period, Defendants maintained a single objective and used the Agri Stats platform to exchange data that allowed them to monitor compliance with the conspiracy.

Defendants' Motion to Dismiss should be denied as to Pilgrim's.

**VII.** **Conclusion**

For these reasons, the Court should deny Defendants' Joint Motion to Dismiss the Direct Purchaser Plaintiffs' Second Amended and Consolidated Class Action Complaint in its entirety as to all Defendants.

Dated:  March 15, 2017

Respectfully submitted,

/s/ *Steven A. Hart*
Steven A. Hart (#6211008)
Brian Eldridge (#6281336)
Kyle Pozan (#6306761)
HART MCLAUGHLIN & ELDRIDGE, LLC
121 West Wacker Drive, Suite 1050
Chicago, IL 60601
Telephone: (312) 955-0545
Facsimile: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com
kpozan@hmelegal.com

*Direct Purchaser Plaintiffs Interim Liaison Class Counsel*

W. Joseph Bruckner
Heidi M. Silton
Elizabeth R. Odette
Brian D. Clark
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:  (612) 339-6900
Facsimile:  (612) 339-0981
wjbruckner@locklaw.com
hmsilton@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com

Bruce L. Simon
Aaron M. Sheanin
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com
asheanin@pswlaw.com

*Direct Purchaser Plaintiffs Interim Co-Lead Class Counsel*

/s/ Steven N. Williams
Steven N. Williams
Mark F. Ram
Joyce M. Chang
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
swilliams@cpmlegal.com
mram@cpmlegal.com
jchang@cpmlegal.com

Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Joshua R. Rissman
Brittany N. Resch
GUSTAFSON GLUEK PLLC
120 South Sixth Street #2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
bresch@gustafsongluek.com

*Interim Co-Class Counsel on Behalf of Commercial & Institutional Indirect Purchasers*

Kenneth A. Wexler
Edward A. Wallace
Thomas A. Doyle
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
kaw@wexlerwallace.com
eaw@wexlerwallace.com
tad@wexlerwallace.com

*Interim Liaison Counsel on Behalf of
Commercial & Institution Indirect Purchaser
Plaintiff*

/s/ *Steve W. Berman*
Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, Washington  98101
(206) 623-7292
steve@hbsslaw.com

Elizabeth A. Fegan
Jeannie Y. Evans
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive
Suite 2410
Chicago, IL 60611
(708) 628-4949
beth@hbsslaw.com
jeannie@hbsslaw.com

*End-User Consumer Plaintiffs Interim Lead
Counsel*

Kit A. Pierson
Brent W. Johnson
COHEN MILSTEIN SELLERS & TOLL,
PLLC
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
(202) 408-4600
kpierson@cohenmilstein.com
bjohnson@cohenmilstein.com

Daniel H. Silverman
COHEN MILSTEIN SELLERS & TOLL,
PLLC
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
(312) 357-0370
dsilverman@cohenmilstein.com

*Additional Counsel for End-User Consumer Plaintiffs*

872728.6