```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3

 4   IN RE BROILER CHICKEN ANTITRUST      )  Docket No. 16 C 8637
     LITIGATION                          )
 5                                       )  Chicago, Illinois
     This Document Relates to:           )  April 21, 2017
 6   All Actions                         )  9:30 a.m.

 7
                   TRANSCRIPT OF PROCEEDINGS - Status
 8          BEFORE THE HONORABLE JEFFREY T. GILBERT

 9
     APPEARANCES:
10
     For Plaintiffs        HART McLAUGHLIN & ELDRIDGE LLC, by:
11   Maplevale Farms       MR. STEVEN A. HART
     and John Gross        MR. KYLE POZAN
12   and Company:          121 W. Wacker Drive, Suite 1050
                           Chicago, IL  60601
13

14   (Direct purchaser plaintiffs interim liaison class counsel)

15
                           LOCKRIDGE GRINDAL NAUEN PLLP, by:
16                         MR. W. JOSEPH BRUCKNER
                           MR. BRIAN D. CLARK
17                         100 Washington Avenue South, Suite 2220
                           Minneapolis, MN  55401
18
     (Direct purchaser plaintiffs interim co-lead class counsel)
19

20                         PEARSON SIMON & WARSHAW LLP, by:
                           MR. BRUCE L. SIMON
21                         MR. AARON M. SHEANIN
                           44 Montgomery Street, Suite 2420
22                         San Francisco, CA  94104

23   (Direct purchaser plaintiffs interim co-lead class counsel)

24

25
```

```
 1   APPEARANCES (Continued):

 2   For Plaintiffs          WEXLER | WALLACE LLP, by:
     Fargo Stopping          MR. THOMAS A. DOYLE
 3   Center, Sargent's       55 W. Monroe Street
     Restaurant and          Suite 3300
 4   Don Chavas Mexican      Chicago, IL  60603
     Restaurant:
 5
     (Indirect purchaser plaintiffs interim liaison class counsel)
 6

 7   For Plaintiffs          GUSTAFSON GLUEK PLLC, by:
     Fargo Stopping          MS. MICHELLE J. LOOBY
 8   Center and              MR. JOSHUA J. RISSMAN
     Sargent's               Canadian Pacific Plaza
 9   Restaurant:             120 S. 6th Street, Suite 2600
                             Minneapolis, MN  55402
10
                             COTCHETT, PITRE & McCARTHY, by:
11                           MR. STEVEN N. WILLIAMS
                             840 Malcolm Road, Suite 200
12                           Burlingame, CA  94010

13                           NASTLAW LLC, by:
                             MS. ERIN C. BURNS (by phone)
14                           1101 Market Street, Suite 2801
                             Philadelphia, PA  19107
15
     (Indirect purchaser plaintiffs interim co-lead class counsel)
16

17   For Plaintiffs          HAGENS BERMAN SOBOL SHAPIRO LLP, by:
     Percy, Lathen,          MS. JEANNIE Y. EVANS
18   Dimas, Monahan,         MS. ELIZABETH A. FEGAN
     Coe, Patterson,         455 N. Cityfront Plaza Drive
19   Tierney, Cheslow        NBC Tower, Suite 2410
     and Wilbur:             Chicago, IL  60611
20
     For Plaintiffs          COHEN MILSTEIN SELLERS & TOLL PLLC, by:
21   Newman, Stangeland,     MR. BRENT W. JOHNSON
     Gardner, Weidner,       MR. DANIEL H. SILVERMAN
22   Pauk, Gilbert and       1100 New York Avenue NW
     Weidner:                Suite 500 West Tower
23                           Washington, DC  20005

24   For Defendants          NOVACK AND MACEY LLP, by:
     Koch Foods, JCG         MR. CHRISTOPHER S. MOORE
25   Foods and Koch          100 N. Riverside Plaza, Suite 1500
     Meats:                  Chicago, IL  60606
```

APPEARANCES:   (Continued)

For the Tyson              WHITE & CASE LLP, by:
Defendants:                MR. DAVID H. SUGGS
                           MR. ROBERT A. MILNE
                           1155 Avenue of the Americas
                           New York, NY  10036

For Defendant             WEIL, GOTSHAL & MANGES LLP, by:
Pilgrim's Pride:          MS. CARRIE MAHAN (by phone)
                          1300 Eye Street N.W., Suite 900
                          Washington, DC 20005

                          EIMER STAHL LLP, by:
                          MR. MICHAEL L. McCLUGGAGE
                          224 S. Michigan Avenue, Suite 1100
                          Chicago, IL  60606-1229

For Defendant             VENABLE LLP, by:
Perdue Farms:             MR. LEONARD L. GORDON
                          1270 Avenue of the Americas
                          24th Floor
                          New York, NY  10020

For the Sanderson         KIRKLAND & ELLIS LLP, by:
Farms Defendants:         MR. MARTIN L. ROTH
                          MS. STACY L. PEPPER
                          MS. CHRISTA C. COTTRELL
                          300 N. LaSalle Street
                          Chicago, IL  60654

For Defendant             PROSKAUER ROSE LLP, by:
Wayne Farms:              MR. CHRISTOPHER E. ONDECK
                          MR. ADRIAN FONTECILLA
                          1001 Pennsylvania Avenue, NW
                          Suite 600 South
                          Washington, DC  20004

For the Mountaire         ROSE LAW FIRM, by:
Farms Defendants:         MS. AMY LEE STEWART
                          120 E. 4th Street
                          Little Rock, AR  72201

For Defendant             SKADDEN ARPS SLATE MEAGHER & FLOM, by:
Peco Foods, Inc.:         MR. PATRICK J. FITZGERALD
                          MS. LARA A. FLATH
                          155 N. Wacker Drive, Suite 2700
                          Chicago, IL  60606

```
 1  APPEARANCES:   (Continued)

 2  For Defendant          SKADDEN ARPS SLATE MEAGHER & FLOM, by:
    Peco Foods, Inc:       MR. SAM AULD (by phone)
 3                         MR. BORIS BERSHTEYN (by phone)
                           4 Times Square, 40th Floor
 4                         New York, NY 10036

 5
    For Defendant          MAYER BROWN LLP, by:
 6  Foster Farms:          MR. ORAL D. POTTINGER
                           1999 K Street NW
 7                         Washington, DC  20006

 8  For Defendant          VEDDER PRICE PC, by:
    House of               MR. GREGORY G. WROBEL
 9  Raeford Farms:         222 N. LaSalle Street, Suite 2600
                           Chicago, IL  60601
10
    For Defendant          SHOOK HARDY & BACON LLP, by:
11  Simmons Foods:         MS. LYNN H. MURRAY
                           111 S. Wacker Drive, Suite 5100
12                         Chicago, IL  60606

13  For Defendant          ALSTON & BIRD LLP, by:
    Fieldale Farms:        MR. B. PARKER MILLER
14                         MS. VALARIE C. WILLIAMS
                           1201 W. Peachtree Street
15                         Atlanta, GA  30309

16  For the George's       STINSON LEONARD STREET LLP, by:
    Defendants:            MR. WILLIAM L. GREENE
17                         150 South Fifth Street, Suite 2300
                           Minneapolis, MN 55402
18
                           RILEY SAFER HOLMES & CANCILA LLP, by:
19                         MS. SONDRA HEMERYCK
                           70 West Madison Street, Suite 2900
20                         Chicago, IL 60602

21  For the                KUTAK ROCK LLP, by:
    O.K. Defendants:       MR. JAMES M. SULENTIC (by phone)
22                         150 S. Fifth Street, Suite 2300
                           Minneapolis, MN  55402
23
                           KUTAK ROCK LLP, by:
24                         MR. J.R. CARROLL (by phone)
                           234 East Millsap Road, Suite 200
25                         Fayetteville, AR 72703
```

APPEARANCES:   (Continued)

For the                    KUTAK ROCK LLP, by:
O.K. Defendants:           MS. ROBIN E. STEWART
                           Two Pershing Square
                           2300 Main Street, Suite 800
                           Kansas City, MO  64108

Court Reporter:            KELLY M. FITZGERALD, CSR, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           219 South Dearborn Street, Room 1420
                           Chicago, Illinois  60604
                           Telephone:  (312) 818-6626
                           kelly_fitzgerald@ilnd.uscourts.gov

(Proceedings heard in open court:)

THE COURT:  Good morning, everybody.

MULTIPLE COUNSEL:  Good morning, Your Honor.

THE COURT:  I am glad you're taking advantage of the jury box.  I was going to suggest that.  We will swear you soon.

Okay.  Brenda, you want to call the case?

THE CLERK:  16 CV 8637, Maplevale Farms Incorporated v. Koch Foods Incorporated, et al.

THE COURT:  All right.  Good morning, everybody.  We have a full courtroom, and I understand we have some people on the phone as well.  I'm going to get the appearances of the people who want to state their appearances, and I'll get those on the phone who also want to state their appearances for the record.  But I'm going to ask you as well to do what we did last time, which is for you to send to Brenda who you are and -- your name, your firm and who you represent.  But I would like you to do it today because last time Kelly told us that she got requests pretty quickly for transcripts.  And so if you can send them in today they will be incorporated into the transcript rather than having to wait for that stuff.

Okay.  Let me get a piece of paper and try and do my score card here as you guys state your appearances.

Okay.  In the courtroom, who wants to start on the plaintiffs' side?

1          MR. BRUCKNER:  Good morning, Your Honor.  Joseph
2   Bruckner for the direct purchaser plaintiffs.
3          THE COURT:  Okay.
4          MR. WILLIAMS:  Good morning, Your Honor.  Steve
5   Williams for the commercial industrial plaintiffs.
6          THE COURT:  So that would be the indirect people?
7          MR. WILLIAMS:  Yes, Your Honor.
8          THE COURT:  I mean, I know you're calling yourself
9   that to distinguish yourselves from other indirect purchasers,
10  right?
11         MR. WILLIAMS:  Correct.
12         THE COURT:  Okay.
13         MR. SHEANIN:  Good morning, Your Honor.  Aaron
14  Sheanin from Pearson, Simon & Warshaw for the direct purchaser
15  plaintiffs.
16         MR. CLARK:  Brian Clark from Lockridge Grindal Nauen
17  for direct plaintiffs as well.
18         THE COURT:  Okay.
19         MR. SIMON:  Good morning, Your Honor.  Bruce Simon,
20  Pearson, Simon & Warshaw, on behalf of direct purchasers.
21         MR. HART:  Good morning, Your Honor.  Steven Hart,
22  Hart, McLaughlin & Eldridge, for direct purchaser plaintiffs.
23         THE COURT:  Okay.
24         MS. FEGAN:  Good morning, Your Honor.  Elizabeth
25  Fegan for end users.

1          MR. JOHNSON:  Good morning, Your Honor.  This is

2   Brent Johnson from Cohen Milstein with my colleague Dan

3   Silverman for the end users.

4          THE COURT:  What was your last name?

5          MR. JOHNSON:  Johnson.

6          THE COURT:  Johnson?

7          MR. JOHNSON:  Yes.

8          THE COURT:  That's easy.

9          Did you want to say something too?

10         MR. SILVERMAN:  Judge, again, my name is Daniel

11  Silverman from Cohen Milstein.

12         THE COURT:  Daniel?

13         MR. SILVERMAN:  Silverman.

14         THE COURT:  From Cohen Milstein?

15         MR. SILVERMAN:  Yes, sir.

16         THE COURT:  Okay.  Anybody on the phone for the

17  plaintiffs?

18         Okay.  I think that's all the plaintiffs, right, all

19  the plaintiffs who want to say something?

20         Okay.  Let's start with the defendants then.

21         MS. PEPPER:  Good morning, Your Honor.  Stacy Pepper

22  from Kirkland & Ellis on behalf of the Sanderson Farms

23  defendants.

24         MR. SUGGS:  Good morning, Your Honor.  David Suggs

25  from White & Case on behalf of the Tyson defendants.  I'm also

1    here with my colleague Robert Milne.

2              MR. MILNE:  Good morning, Your Honor.

3              THE COURT:  And could you give me your last name

4    again?

5              MR. MILNE:  Yeah.  My last name is Milne, and that's

6    spelled M-i-l-n-e.

7              THE COURT:  Okay.

8              MR. FONTECILLA:  Good morning, Your Honor.  Adrian

9    Fontecilla with Proskauer Rose on behalf of the defendant

10   Wayne Farms.  I'm also here with Chris Ondeck.

11             THE COURT:  Spell your last name for me.

12             MR. FONTECILLA:  Sure.  It's F-o-n-t-e-c-i-l-l-a.

13             THE COURT:  And for?

14             MR. FONTECILLA:  Wayne Farms.  Thank you, Your Honor.

15             MS. COTTRELL:  Good morning.  Christa Cottrell, and

16   with me is Martin Roth.  We're both with Kirkland for

17   Sanderson Farms.

18             MR. POTTINGER:  Good morning, Your Honor.  Oral

19   Pottinger with Mayer Brown on behalf of Foster Farms, LLC.

20             THE COURT:  On behalf of?

21             MR. POTTINGER:  Foster Farms, LLC.

22             THE COURT:  Who else wants to weigh in?  Okay.  Good.

23             Anybody else on the phone want to weigh in?

24             MR. SULENTIC:  Good morning, Your Honor.  This is

25   Jim Sulentic from Kutak Rock for defendant O.K. Foods.

1          THE COURT:  Okay.  O.K. Foods.

2          Anybody else?

3          MS. MAHAN:  Good morning, Your Honor.  It's

4     Carrie Mahan from Weil Gotshal on behalf of Pilgrim's Pride.

5          THE COURT:  On behalf of Pilgrim's?

6          MS. MAHAN:  Pilgrim's Pride.

7          THE COURT:  Pilgrim's Pride.  And could you spell

8     your last name?

9          MS. MAHAN:  Sure.  M-a-h-a-n.

10          THE COURT:  Okay.  Thank you.  Anybody else?

11          Okay.  And those of you on the phone, remember to

12     send either right now or today to Brenda who you are, who you

13     represent, so that you're reflected as having been

14     participating in the conference.

15          All right.  Welcome, everybody.  Sorry to do this on

16     a Friday.  I used to hate to travel on Fridays, but those are

17     days both for myself and Judge Durkin where we end up having

18     open times that aren't -- so now I understand more why judges

19     used to do that to me all the time, but you'll get out of here

20     in plenty of time to make flights to the various places that

21     you want to go back to.

22          I want to talk about -- some threshold issues.  I

23     want to talk about our agenda for this morning, and then I

24     want to get this on the road in that regard.

25          Threshold issue.  I know that this is a status

1  hearing.  The only motion that's really ripe is the end-user

2  plaintiffs' motion to compel, which hopefully you got my draft

3  ruling on yesterday evening, and we could talk about that.

4         So I'm very sensitive to the procedural posture here.

5  You know, your joint status report identifies a number of

6  issues, some agreed and some disputed.  I'm sensitive to

7  resolving issues before they're fully presented either in

8  writing or orally.  So there's a balance.  I mean, you gave me

9  a very long status report.  And in that status report, you

10 described a lot of the issues, and you gave me some substance

11 there.  So it's really tempting to somebody with a type A

12 personality to just rule, rule, rule on a bunch of stuff.  On

13 the other hand, I understand there's some things that people

14 have said -- you know, for example, defendants have said we

15 want to file motions to quash subpoenas if they're served and

16 that kind of stuff.

17        So I'm sensitive to the procedural posture, which is

18 I know -- I know a lot.  I may know enough to be dangerous in

19 some respects.  And I want to have a balance between cutting

20 through, separating the wheat from the chaff, being able to

21 move things forward but at the same time not depriving people

22 of the ability to fully educate me to the extent I need to be

23 fully educated.  So I know that that's a balance.  It's a

24 balance for the Court.  It's also a balance for counsel.  So I

25 just want you to know that I appreciate that issue.

1       Second, I also appreciate a lot the effort that went

2   into your negotiations since the last time we were here and

3   the agreements that you were able to reach, which are

4   substantial, and also the effort that went into outlining

5   where you are in that joint status report.  Really helpful to

6   me and, you know, although there are a bunch of issues that

7   you haven't agreed on, there's also a bunch that you have.

8   And, you know, I don't want to miss the forest for the trees

9   on that by not recognizing the fact that there are things that

10  have been agreed to.

11      I'm going to try to address and have some dialogue

12  with you about as many of the matters discussed in the joint

13  status report as possible.  I already know I'm going to have

14  to set a date to delve more deeply into issues that we're not

15  going to be able to deal with here, and I've got some proposed

16  dates.

17      Actually, I left them on your desk.  Could you get me

18  that yellow pad?

19      So, you know, that's a given.

20      Let me outline my agenda here and then see if there

21  are more agenda items that we need to deal with.

22      I would like to address briefly because I don't want

23  to hijack the entire hearing over this, but end-user

24  plaintiffs' document requests to defendants and the subpoenas

25  to customers that I addressed in the draft ruling yesterday.

1    Why did I send it to you as a draft ruling rather than just

2    ruling and sending it out and we're done?  I want to know if I

3    got things wrong factually or in terms of how I understood or

4    characterized your arguments, and I want to hear from you on

5    that today.  I mean, the thrust of my thinking on that is

6    encompassed in that order.  And I'm going to enter an order,

7    but I'm interested in hearing from you on that and, you know,

8    if you change my mind, you change my mind.  But, I mean,

9    that -- I had made up -- I had gone a long way toward reading

10   the two briefs, and kind of my thinking before I got the reply

11   brief, let me address that real quickly.  Filed without leave,

12   right?  I don't think I gave leave.  I think I did not set a

13   briefing schedule that included a reply brief.

14          So how do you handle that in the future?  As soon as

15   you know you want to file a reply, let Brenda know, okay, even

16   by e-mail.  File a motion quickly for leave to file a reply

17   because, you know, I was  -- my thinking was coalescing before

18   I got that, and I was thinking of sending out a ruling to all

19   of you before I got that.  I read it even though it wasn't

20   filed with leave, at least I don't think it was filed with

21   leave.

22          Ms. Fegan, did you think you had leave to file it?

23          MS. FEGAN:  You're correct, Your Honor.  I did not

24   seek leave.  I should have.

25          THE COURT:  Okay.  So I read it.  And you'll see in

the draft order, I've incorporated some of the time. And, you
know, it was helpful to me. I have to say, you know, it
didn't carry the day, but it was helpful to me in moderating
some of the views I had before I read it. But in the future,
I would like that kind of thing to be -- I would like to know
that.

Anyway, I want to address that first, not for a long
time, maybe not more than 15 minutes, but I would like to get
end-user plaintiffs' views on that, tell me where I'm wrong.
And as you saw, you know, my end -- my bottom line is I'm
denying it. I'm thinking of denying it without prejudice, but
to me that doesn't close the door. I just tried to set the
table a little bit differently.

And I'm going through my agenda first so don't rush
up here, okay. That's only one.

All right. Then I want to address these other
third-party subpoenas and production requests to defendants to
see how we're going to go on those; are we going to brief
them, are we going to argue them? As I said, I understand
defendants said in the joint status, I want to move to quash
some of the stuff. It might be helpful to you to hear what
I'm thinking about some of these things, just preliminarily
based on the joint status report.

And then I have -- I have divided the disputes in
the -- outlined in the status report into non ESI disputes,

scheduling issues, other things, and ESI-related disputes,
okay.  I'm prepared more to talk about the ESI -- the non ESI
disputes than the ESI stuff.  I think that the ESI stuff is
the thing that I think we need to set a meeting -- and I've
got some dates for you -- where we will sit down.  And I won't
be up here.  I'll be down there.  And we'll sit around the
table and see what we can resolve and what we can't.

There's privilege issues, you know, that I want to
address too, and those may be more susceptible to a meeting as
well.

I know -- my last agenda item was what else?  I mean,
big picture, I want to address the draft opinion that I sent
out.  I want to get the -- get some -- hear from you and get
some thoughts on these other third-party document populations
you're looking at and the documents that you're looking, the
plaintiffs primarily are looking at from the defendants.

My goal at the end of this is, one, I want to get an
order entered, and I don't know whether we're going to call it
interim scheduling order No. 1 or case management order No. 1.
I'm leaning toward interim scheduling order No. 1 because it
always used to scare me when we got to CMO No. 355 or
something like that and I didn't know what the heck they were;
and, 2, potentially either now or very soon an interim ESI
protocol.  You've done so much work on that, and you've got so
many agreements in there that I think the perfect is the enemy

1  of good on that.  I would like to get something put on paper

2  and signed.  And if there are areas that are still being

3  discussed, I would put in there, in brackets or bold, subject

4  to further discussion, or something like that.  I mean, but I

5  don't want to lose the momentum that you've got in terms of

6  actually getting some stuff done.  And the interim scheduling

7  order I'm talking about takes you through the agreement you

8  had, through class certification and document production and

9  all the rest.  Let's get that on paper so that at least we

10  have that.  Can it be changed in the future?  Yes.  But is it

11  good to get your agreements memorialized?  Yes.

12          So that's my big picture, okay.

13          The third -- the end user stuff, other subpoena

14  issues, non ESI disputes, ESI disputes/privilege issues and

15  then getting a date on the calendar where you come back and we

16  make some -- hopefully make some progress on the disputed

17  areas on ESI and privilege that you have.  I just don't think

18  that's productive.  My view of how to deal with that stuff is,

19  one, to get into it in more detail myself; two, to sit down at

20  a conference cable -- I have a good conference room at the end

21  of this hallway -- and go through this stuff with you to see

22  if we can push forward to some compromises, and the stuff we

23  can't compromise on, then determine how we're going to deal

24  with that, okay.

25          Okay.  Big-picture items I'm missing here?  Okay.

1  Great.

2       All right.  Now, Ms. Fegan, tell me how I'm wrong.

3       MS. FEGAN:  Thank you, Your Honor.  I don't think

4  necessarily you are wrong.

5       There's two pieces I would like to focus on.  And I

6  appreciated that with this order we were able to hone in on

7  where I think some of the issues are between us.

8       First, I would like to focus on the unique data

9  maintained by the customers of the defendants, and then I

10  would like to focus on the fact that we have no interest in

11  sending thousands, much less hundreds, of subpoenas, and I

12  think there's a way to shortcut that.

13       First, with respect to the unique data maintained by

14  the customers, the customers maintain the data that reflects

15  the amount of the price that they paid to the defendants that

16  was passed through to the next level of the distribution

17  chain.  So the customers resold the broilers that they bought

18  from the defendants to another set of customers, and that

19  ultimately is what's important to us.  Sure, we can get the

20  original price by which the defendant sold the broilers to the

21  customer, but the defendants don't have the next level down.

22  And so that's part of what we're trying to accomplish here, is

23  tracking through the price and the overcharge through the

24  distribution change.

25       THE COURT:  So what you -- I think I understand that,

and I think I may have said it in the draft. My understanding

is, you know, defendants will always have the price at which

they sold and the components of that price. And then they're

selling to a direct purchaser, okay, and that direct purchaser

may sell to -- well, defendants are selling to a lot of

people. All of whom who buy from the defendants are going to

be called direct purchasers.

MS. FEGAN: Correct.

THE COURT: Some of those direct purchasers sold

directly to your putative class members. If a large, large,

large retailer bought direct, like Jewel, for example --

MS. FEGAN: Exactly.

THE COURT: -- they may have sold to an end user. So

you want the price at which Jewel sold to those end users?

MS. FEGAN: Correct.

THE COURT: Okay. Some of the sales would have gone

from the direct purchaser to someone else, call them an

indirect purchaser, or what they're calling themselves now,

the commercial something -- the Commercial IIPP I think is

what it is. I'm trying to think of how to easily refer to

those people. And those people then resold to someone else.

That could have been Jewel. That could have been, you know,

D&D. It could have been somebody else. It could have been

resold. Eventually it gets sold to your customer, right?

MS. FEGAN: That's correct.

1          THE COURT:  You're looking to serve subpoenas only on

2     directs essentially, correct?

3          MS. FEGAN:  That's right.

4          THE COURT:  Okay.  So you will get the price at which

5     the direct sold to either an end user or an indirect?

6          MS. FEGAN:  That's correct.

7          THE COURT:  You will not get from your subpoenas the

8     price at which the indirect then sold it, continued down to

9     the distribution chain because those aren't the people you're

10    looking to serve subpoenas on right now, right?

11         MS. FEGAN:  That's correct.

12         THE COURT:  So that data, assuming every one of those

13    people destroy it, which I said in my order I don't think is

14    going to happen, that data is not encompassed by subpoenas.

15    The only data is the price at which the direct sold to the

16    next level in the chain.  And then the reason you want IRI and

17    Nielson data is to somehow triangulate eventually it went down

18    to the retail level.  And I'm familiar with IRI and Nielsen

19    from another life, so I understand how they obtain, harvest

20    and do lots of stuff with point of sale information in an

21    amazingly scary way --

22         MS. FEGAN:  Yes.

23         THE COURT:  -- that they can actually know what

24    somebody walking down aisle 5 at Safeway is going to purchase

25    or they can try and alter that purchaser's psychology.

1          MS. FEGAN:  Exactly.

2          THE COURT:  Yeah, it's scary stuff.  And I say

3  "scary" only -- it's very sophisticated stuff.  Okay.

4          So I just want to make sure I got it.

5          MS. FEGAN:  That's correct.  So you have encapsulated

6  the unique set of data that only the customers would hold.

7          Where we got caught up, and I think we understand

8  that we lost you with the idea that we were trying to

9  understand during the course of the meet-and-confers

10  what percentage of sales the top 25 customers would account

11  for.  Defendants did offer us ten customer names if we would

12  only agree to send preservation letters, but at no time during

13  the meet-and-confer process would they tell us what

14  the percentage of sales, what that meant.

15          We're willing to live with that vacuum at this point

16  because more important to us is getting preservation subpoenas

17  out there.  We would be willing to live with, for example, the

18  top ten customers for each defendant for the top 25 selling

19  products.  That way we believe that we would more likely than

20  not encompass the important products that would be the

21  majority of sales and the important customers.

22          We ultimately think, Your Honor, that many of these

23  customers are going to overlap.  So even getting ten customer

24  names by defendant doesn't equate to an even number of

25  subpoenas because a lot of this will overlap, and we'll be

able to simplify with one subpoena per customer that covers
the defendants.

So that would be our proposal for today. Like I
said, we are not interested and have never been interested in
sending out thousands of subpoenas. We were just trying to
understand through this process for the customers that we were
asking for what percentage of sales that that would cover. At
this point more important is the preservation of data than an
understanding of that number.

THE COURT: But to me -- I hear you, and I think
that's productive and that moves the ball forward a little
bit, and I'll hear from the defendants or who wants to speak
for the defendants. And I do think that's progress, and I'm
not trying to minimize that.

Part of what I'm hung up on though --

MS. FEGAN: Mm-hmm.

THE COURT: -- and you may not be able to answer the
question, is -- so that's -- we have 14 defendants, right?

MS. FEGAN: I believe so.

THE COURT: So that's 140 subpoenas, right? Unless
they overlap. Okay.

MS. FEGAN: And I --

THE COURT: Has everybody -- did I put into this
draft -- excuse me. I need to consult.

MS. FEGAN: It's okay.

1      (Off the record.)

2           THE COURT:  Something hit the cutting room floor,

3      okay, but one of the thoughts I had when I was going down this

4      path was in response to the defendants' concern about

5      confidentiality and all the rest was a way -- if, as and when

6      we got to this point -- this is more to you but also to the

7      defendants -- was to get each defendant to give a list of

8      how -- whatever we're looking at, that they could send it to

9      me.

10          MS. FEGAN:  Mm-hmm.

11          THE COURT:  I could aggregate that list by

12     alphabetical -- alphabetically, and those would be the people

13     who got subpoenas.  The subpoena -- or document preservation

14     letters, and those people would be told to preserve data

15     relating to all 14 defendants, some of whom may not have dealt

16     with them.  But that takes away the you shouldn't know, you

17     know, what percentage I'm selling to Bob, Joe, and Harriet.

18     So, I mean, that was a proposal that I had if we ended up

19     going down that route.

20          But I still have a problem with -- I mean, this seems

21     to be somewhat, from the end-user plaintiffs' point of view,

22     throwing darts at the wall.  We'll take ten, and we'll take

23     the top 25 products.  What I don't know and what you may not

24     know yet is -- and we still want ten years' of data, okay,

25     which is less for ten people than it is for 70 percent, which

might include thousands or something like that. And the top

25 products is not Tyson's one thousandth product or SKUs or

something like that. I get it. So we're starting to narrow

down.

I still don't know, though -- and maybe I won't and

maybe I can't and maybe I have to leave that alone. But I

don't know -- I don't know, for example, on the 25 products

whether there's some products that the defendants sell that

are bellwethers for other products. So when the defendants

set their price, for example -- and you may not know this

either but they could tell us, you know, we look at X. You

know, we look at a broiler. We look at a half pound. We look

at a quarter pound. And then we say, and then this one has to

be two cents more than that. This has to be two cents away

from that. So we may not need 25 products. We may need a

bellwether product or two bellwether products or five. And I

don't know whether we need ten customers each year or we need

the top ten customers during the last four years or during the

last ten years. That cuts down on stuff too. And when you

say top ten customers from each defendant, if you're looking

for the top ten customers over ten years, that multiplies

pretty quickly if some customer was not in that mix.

MS. FEGAN: All good points, Your Honor. And a lot

of those questions I don't have answers to. It was the type

of information we were seeking during the meet-and-confer so

1  that we could have an informed conversation with the Court.

2  That's information in the defendants' control.

3       That being said, our proposal is for the top ten

4  customers blanket for the entire time, not ten by ten by ten

5  by ten.  And we think that will capture, for example, the

6  Wal-Marts of the world or, you know, the larger distributors

7  that probably have existed throughout the entire period.  So

8  it's just a pure ten by defendant.

9       THE COURT:  Okay.  And we may not be able to work

10  this out now.  Okay.  So other than that, it sounds like in

11  terms of correcting where I was, my factual assumptions were

12  kind of okay.  My understanding of your arguments being made

13  were kind of okay.  It was really the result I reached and

14  then this is an attempt to scale back -- this is in response

15  to my "this is a huge amount of stuff to do right now," and

16  this is an attempt to address that?

17       MS. FEGAN:  It is.  And it's also in part to address

18  the fact that we didn't have this information from the

19  defendants until they filed their opposition briefs.  So,

20  frankly, we weren't able to have an informed conversation with

21  them in order to scale back.  But it has never been our intent

22  to send out hundreds of subpoenas.

23       THE COURT:  Okay.  And let me address that one point

24  because I read it in your joint status report.  And as you

25  know before looking at my background before coming here --

because everybody looks at the judge's background -- I have
participated in a lot of these cases when I was a lawyer.  And
I'm not crazy about and I never was crazy about and it's
really hard for lawyers to get the judge to understand who is
nailing who or who is not being cooperative.  So I read the
stuff in here.  And I'm going to address the one-day notice on
the subpoena to this person who is under seal when I get to
that point because I don't think that was fair, and I don't
think that's enough time.  And one of the things I want to
have in an order that we end up entering is an agreed amount
of time for notice to third -- that somebody is going to send
out to third-party subpoenas to give somebody a reasonable
enough time to respond to it.

        But I hear what you've said about the defendants in
effect quote-unquote -- and you're not using this word, and it
may be too strong a word -- sandbagging you before this in the
meet-and-confers.  I know what these meet-and-confers are
like.  They are multiparty telephone calls sometimes followed
up with letters.  And sometimes it's just hard to get what
somebody is saying.  But if I get the impression in this case
as we live this together for a while that either one or the
other side or somebody on one side or the other side is not
playing nicely in the sandbox, I've got remedies for that,
okay.  But it takes me a while.  It takes the judge a while to
figure that out.  I don't like the sniping.  This is not --

1  I'm not calling this sniping, and it was legitimate fodder to
2  say look, we didn't know until we got your response which is
3  why you wanted to file your reply, because that was the first
4  time you were able to join issues on that.  The defendants
5  might tell me we told her that, you know, in a conversation on
6  February 12, 2017.  Who knows.  So I'll listen to that.  But
7  at the bench at some point, it sounds like (descriptive
8  sounds).
9        MS. FEGAN:  Understood.
10        THE COURT:  How you're going to transcribe that,
11  Kelly, I don't know.
12        So I just want you to know, I picked it up.  I get it
13  on both sides.  And all of you are very experienced, good
14  lawyers.  Some of you I know or I was in cases with before.
15  So, you know, I'm expecting nothing but the highest level of
16  professional courtesy, and I'm sure I'm going to get it.
17  Okay.  I get what you're saying.
18        Does somebody from -- I don't know if we're going to
19  resolve this right now.  It would be great if I could just --
20  you know, if we could.  We may not.  Does somebody from the
21  defendants want off the cuff to respond to this at all or are
22  we -- is it going to require some further talk?
23        MR. FONTECILLA:  Very briefly, Your Honor, just a
24  couple of comments.
25        THE COURT:  Okay.  And I'm okay, everybody at least

1    who has access to a microphone, either you come up here to the

2    podium as you're doing, or make sure you just get the

3    microphone on this desk.  This whole courtroom, including the

4    jury box, by the way, is wired for sound.  And it's really --

5    it's good quality, so whenever you want to do that.  And, of

6    course, we got the court reporter too.

7            THE COURT REPORTER:  Could you please state your name

8    again?

9            MR. FONTECILLA:  Sure.  Adrian Fontecilla.

10           THE COURT:  And you represent Wayne Farms?

11           MR. FONTECILLA:  That's correct, Your Honor.

12           I think Your Honor's analysis in the tentative ruling

13   had it correct.  I just want to address a couple of points in

14   your discussion with Ms. Fegan.

15           THE COURT:  Mm-hmm.

16           MR. FONTECILLA:  We didn't address the

17   meet-and-confer issue.  We agree with you that the defendants

18   take their meet-and-confer obligations and their

19   professionalism very seriously.  We didn't address that in our

20   brief.  We didn't think it was necessary.  I will -- I think

21   it's -- suffice it to say we disclosed our burdens and our

22   objections and concerns to the plaintiffs during the

23   meet-and-confer process and then articulated them in very

24   detailed fashion in the letter that we sent on March 22nd,

25   which is attached to their motion.

1      Now, what's striking is that that letter and the
2  offer presented was rejected within hours.  No effort was made
3  by the indirect or the end-user plaintiffs to address all the
4  burdens and objections we had either through an additional
5  meet-and-confer call, in their brief or in another letter.  So
6  they declared impasse and we agreed because the only objection
7  they had was that they weren't able to serve the subpoenas.
8  They made no effort to really address each of the objections
9  and concerns that Your Honor identified in the tentative
10  ruling, which there are a lot of them.

11      And I don't think that the proposal that's been
12  presented here today really addresses them either.  The
13  numbers that I just did really quickly I don't fully
14  understand the proposal in terms of how many products, but
15  back-of-the-envelope math, I think it comes out to something
16  like potentially 3500 products or customers on --

17      THE COURT:  How do you get that math?

18      MR. FONTECILLA:  So --

19      THE COURT:  And incidentally, Mr. Fontecilla, I'm
20  past the meet-and-confer burden process.  I betcha that if I
21  was really to dig down to that, which I'm not, there's truth
22  on both sides.  Okay.  That's usually how it shakes out, okay.
23  You let them know what your burden was, but they didn't
24  understand it completely.  They figured, well, there's a
25  burden.  We're never going to agree to this.  We've got to tee

it up.  We got this hearing coming up.  So I'm past that.  I'm
more into substance right now.  And I don't know that we're
going to resolve this because I think what I'm going to have
to say is talk about this -- better in person than not, but I
understand the logistical problems with talking about this in
person -- and see whether we can narrow the issues for me to
decide on this.

         But go ahead.  How did you come up with 3500?

         MR. FONTECILLA:  Sure.

         So the way I understand the proposal today, which I
think part of the issue, taking a step back, is that
understanding these proposals and going back to each of the 14
defendants to figure out how many customers and how many
products, which requires a lot of time.

         THE COURT:  Mm-hmm.

         MR. FONTECILLA:  The time and money that we were
going to invest as defendants and that we got all of our
clients individually to agree to do as part of the proposal
during the meet-and-confer process, which took a lot of effort
to put together and was very detailed and reflected a lot of
consensus internally among the defendants and their clients
that they had to obtain, then the amount of time and effort
that we were going to do that has been overshadowed by an
exponential magnitude by the amount of time and money that the
end users have now forced us to undertake in collecting the

affidavits and conducting a preliminary investigation.  The
information we collect in the affidavits took a lot of time
just to put together, and even so, a lot more would be
required to understand how many products and customers are
implicated by this new proposal.  We would have to go back and
do that all over again.

So the numbers I came up with based on the proposal
are that the top ten customers by 14 defendants for top 25
selling products, that could be as many as 14 defendants times
products, you know, ten each, possibly, for each product.  And
the 14 defendants times 25 products times ten customers for
each is 3500 subpoenas.

THE COURT:  14 defendants times what?

MR. FONTECILLA:  14 defendants times 25 products
times ten customers.  Now, of course we recognize that there
may be overlap.  But this is just -- this is the range we're
looking at.  And to understand that for each defendant just
requires a lot of time and effort, not just by outside
counsel, but deferring people whose jobs are required day to
day to run the databases and the sales and run these
businesses.

THE COURT:  Mr. Fontecilla, I've got to -- can we
just put this in perspective for a second?

MR. FONTECILLA:  Sure.

THE COURT:  We're in an interim phase here, right?

1    Motions to dismiss are pending.  They will be decided.  Unless

2    the motions to dismiss are 100 percent successful, there will

3    still be a case after those motions to dismiss are decided.

4    The scope of that case may be different as to product, as to

5    time period, as to defendant.  But the defendants who are

6    still in the case at that time are going to have to deal with

7    some issue like this at that time.  We are going to have to at

8    some point -- I mean, there is no question in my mind that at

9    some point plaintiffs -- whether they're end-user plaintiffs

10   or indirects or somebody else -- are going to need information

11   at a customer level basis.  You agree to that?

12       MR. FONTECILLA:  I agree to that, Your Honor, if the

13   case proceeds and the motions to dismiss are denied in part.

14       THE COURT:  Okay.  Well, statistically in the

15   Northern District of Illinois -- and you could look it up on

16   the Federal Judicial Center site -- the percentage of cases in

17   the Northern District of Illinois as opposed to the Southern

18   District of New York or some other place that are completely

19   resolved on a dispositive motion -- motion to dismiss or

20   motion for summary judgment -- is 9 percent, a little over

21   9 percent.  So over 90 percent then of the cases are not fully

22   resolved on a motion to dismiss or for summary judgment.

23       Now, your case may be in the 9 percent range.  I read

24   your motions to dismiss.  I get it.  But when the defendants

25   tell me either collectively or individually that this is a

tremendous burden, what I have to do is figure out -- I
understand that.  But I have to figure out, you know, when the
benefit outweighs the burden, and that's all I'm trying to do
here.  And I understand that before we know whether plaintiffs
can go back ten years or not, for example, there's an
increased burden.  But my best guess is that, you know, for a
defendant to say to me this is really burdensome, I get it
it's early, and I'm going to push back on the defense notion
that we shouldn't be doing a whole lot here.  But at some
point, my guess is we're going to have to get down to this, as
they say in Oklahoma, this lick-log.  Okay.  At some point
we're going to put the pedal to the metal on this.  And my
feeling is if this could be done reasonably early rather than
late, everybody benefits from it in terms of getting the case
to trial earlier rather than later.

          So I don't know whether it makes sense to have 3500
products.  I don't know particularly how much of that burden
is in our computer age today, okay, because some people who
receive these subpoenas, even if it asks for a thousand
products, let's say, and I don't know if they will or won't,
they could push a button on a computer and spit that data out
so they have to have, you know, Sylvia in the file room figure
it out, and those people may have a bigger burden.  And I'm
running too much on this, so I have to stop.

          All I want to say is at some point plaintiffs are

going to be able to obtain some data, some subset of this

data. And so the question is, what's the best way to do it

and not to always say no?

MR. FONTECILLA: So we share the Court's interest and

I think all the parties' interest in moving this case along as

swiftly as possible so that when we press go or the green

light is given, if it is given, that we can move expeditiously

to do that. All we're saying is there's a lot of things

happening right now and a lot of work being done, as you can

see from all the substantial agreements we've reached with the

plaintiffs.

Our proposal is simply to delay this conversation

until such time that the motions to dismiss are ruled on and

we have a firm understanding of the information that

Your Honor described in the tentative ruling as necessary:

What products, what years, how many customers, which

defendants, in what states, with what claims. There are so

many things that need to be answered and that I think our

motions to dismiss raise substantial arguments. Of course the

plaintiffs disagree about the merits of those, but that's to

be decided at a later time. And what we're mindful of is

wastefulness, potential mootness, not just of the issues but

of the burden and costs imposed not only on defendants but

also absent class members as well as the Court. As Your Honor

raised in the tentative ruling, anyone who has practiced with

third-party subpoenas knows that the chances of this many

subpoenas resulting in a substantial amount of disputes and

potential motion practice is significant and real, and we're

mindful of that.  There are a lot of things we're trying to

work on, including the internal investigation that each

defendant is conducting to understand the number of customers

and the number of products that we might be able to pull.

Now, one of the issues we have is this general notion

that the plaintiffs and Your Honor alluded to that in our

technological age, it might be as simple as a point and click.

What we've done is we've done an investigation working with

our IT folks, our in-house counsel and the business folks, and

we've determined and shown in the affidavits that it's not

that simple in this industry and at least for these clients.

And so all we're asking is that we be allowed to conduct our

internal investigation, focus on the other discovery and the

other issues to move this case along and postpone this until

such time that the subpoenas and the document requests can be

tailored narrowly and accurately to the case that will

proceed, if it does, into discovery.

THE COURT:  Okay.  And are you speaking on behalf of

all defendants on this or just on behalf of Wayne Farms?

MR. FONTECILLA:  I'm speaking on behalf of all

defendants, Your Honor.

THE COURT:  Okay.  Statute of limitations for

1  antitrust actions?

2       MR. FONTECILLA:  Four years under the Sherman Act,

3  different for each of the state law claims.

4       THE COURT:  How many products are being accused in

5  plaintiff's complaint as it currently stands as having been

6  affected by an alleged conspiracy to inflate price?

7       MR. FONTECILLA:  Undefinable, ambiguous, but a

8  somewhat indeterminate amount that would require a lot of

9  work.  That's part of the issues that have been teed up in the

10  motions to dismiss, for example, about antibiotic-free

11  chicken, what's excluded and what's included within the

12  definition of broilers.  The allegations made in the complaint

13  don't reflect a firm understanding of exactly how many

14  products would be involved by which defendants.  Each

15  defendant is very different.  Some sell more fresh.  Some sell

16  more further processed product.  They all differ.  Some

17  defendants, such as Fieldale, sell -- and they can speak for

18  themselves, but it's antibiotic-free chicken.  And my

19  understanding and the arguments made are that it's excluded,

20  or that Fieldale and the defendants have argued for the

21  exclusion of that within the definition of the products and

22  the class definition.  So a lot of these issues are going to

23  be addressed and have been fully briefed in the motions to

24  dismiss.

25       What we're asking for is what Your Honor said in the

tentative ruling, which is there's a lot of information that we need in order for us to do the data pull and for us to work with our clients and for the third parties to understand exactly what they should be preserving.  All of that won't be determinable until a ruling on the motion to dismiss.

And, by the way, our other point -- and I think it was made very well in the tentative rulings -- there's no prejudice that's been shown here by having to wait for a ruling.  If, in fact, they succeed in the motions to dismiss being denied in part or in whole like the 91 percent of cases in this district, then they will be able to work with us to issue subpoenas and promptly get the information.  We can I think agree as defendants to, in the meantime, work on collecting this information exactly about how many products and how many customers and work with the plaintiffs in the meantime to narrow the scope of the data requests.  What we ask is that we not be put through the steps, potentially wasteful and potentially moot, of having to start collecting, pulling, analyzing, reviewing, harvesting and producing the data and the customer list.  This is going to raise a lot of questions and disputes such as the ones that we've talked about today and that are in the tentative ruling between the plaintiffs and the defendants themselves.  When we produce a list, it's going to raise questions, well, which products did you include and how did you do this.  It's just going to lead

1   to more -- more expense and more time spent -- I think better

2   spent on the other issues and allow the defendants the

3   flexibility to undertake their own investigation, to collect

4   this data so if at such time that it becomes appropriate in

5   the motions to dismiss -- if they are denied in part or in

6   whole -- then we can promptly agree to produce that

7   information and negotiate with the plaintiffs about a proper

8   scope of it.  What we're asking for is a postponement of this.

9          THE COURT:  No, I get it.  I get it.  I hear it loud

10  and clear.  As I read the motions to dismiss -- and I'm not an

11  expert on the motions to dismiss.  That's going to be

12  Judge Durkin.  I agree that there are certain types of

13  products, like antibiotic-free chicken or whatever, that have

14  been highlighted as either in or out of the case.

15         My read of the motion to dismiss though is it's

16  pretty vague on other stuff, you know.  There's not a listing

17  of a thousand products and this one is or this one isn't in

18  the case.  So I'm not sure, other than at the fringes, whether

19  a motion to dismiss decision is going to be very helpful to

20  the parties on what products necessarily are in or outside the

21  case.

22         MR. FONTECILLA:  I agree, but it will do a lot to set

23  the perimeter fence of where we should be having the

24  productive negotiations with the end users.  For example, this

25  is couched as a request for production.  Our belief is that

1  it's more like a substantial interrogatory.  And like with any

2  interrogatory in discovery, it requires a lot of individual

3  defendant and plaintiff discussion based on what has been

4  determined to be potentially relevant, and that perimeter

5  fence is critical, crucial, in order for those discussions to

6  be productive.  Otherwise I think we're just going to be

7  spinning our wheels, and we're going to end up with more

8  disputes like this.

9        THE COURT:  Okay.  Isn't the perimeter fence though,

10  at least as the motion to dismiss tees it up, primarily based

11  on time period and whether a defendant is in and out?  But I

12  don't see -- how is the motion to dismiss going to give us a

13  whole plot of guidance on product?

14        MR. FONTECILLA:  I think it's more than that, yes,

15  the statute of limitations, a very significant and real issue

16  that could, you know, cut this request down by more than half.

17  And I think the products are certainly an issue.  The

18  defendants that will remain in the case is a huge issue.  For

19  some of the smaller, privately-owned defendants, this is a

20  very real and significant issue, customer list being

21  trademarked and confidential, having to produce this data and

22  pull it with a small amount -- relatively small amount of

23  staff already available.  This is a significant burden.  And I

24  know we've talked about the burden issues and we've moved past

25  that, but it goes back to the weighing of this.  The

1   plaintiffs just haven't made an effort to craft a proposal

2   that addresses seriously the concerns and the burdens that we

3   have even after we presented them with the affidavits.  I

4   mean, leaving aside that this information was provided to them

5   during the meet-and-confer process.  We built it out with

6   affidavits and have established burden.  Now we've shifted the

7   ball back into their court to show us, well, show us the need

8   for this information and the risk, if any, or a substantial

9   spoliation or potential prejudice that would outweigh this

10  burden, but they haven't done that.  They even filed a reply

11  brief.  And in that reply brief, what's stark about it is it

12  doesn't address the objections and the burdens that we've

13  demonstrated in the affidavit.

14          So what we ask is that we just postpone this

15  discussion so that it could be meaningful and productive at a

16  later time.

17          THE COURT:  Okay.  I mean, I suppose the motions to

18  dismiss also could eliminate certain states; as you say, could

19  eliminate certain defendants.  The fact that we have small

20  defendants could cut both ways, right?  If it's going to take

21  them a year and a half after the motions to dismiss are

22  decided to get this information together, maybe they should

23  start trying earlier rather than later.  That was more of a

24  facetious point.  That was a rhetorical point.  It doesn't

25  require a response.

1      MR. FONTECILLA:  No, but I think it's a good thing to

2  address because we're going to talk about it later with the

3  other issues.  What's important here is that the parties have

4  agreed to deadlines for the production of documents.  We're

5  going to abide by that deadline.  Each defendant may move at a

6  different pace, but we've come up with a firm deadline by

7  which documents and data will have to be produced at some

8  point.

9      THE COURT:  Right.  And if you do abide by that

10  deadline, you will be the first multidistrict litigation that

11  has even done so that is not pending in Marshall, Texas.

12      MR. FONTECILLA:  And I have a case pending there, and

13  I understand that very well.  But I think what the parties

14  could agree to do is to move expeditiously right now, and we

15  have agreed to do that with a substantial number of issues.

16  And what we could agree to do is add this issue that the

17  defendants will work with their clients to understand products

18  and customers by state that are potentially relevant.  And we

19  could work on that pending a motion to dismiss so that this is

20  at the top of the list among the issues that we'll discuss

21  when we talk about individual requests for productions,

22  objections that each defendant may have and a potential

23  resolution to that.

24      I think this is, as Your Honor said in the tentative

25  ruling, a bit premature and potentially overkill.  And we just

1   want to make sure that we don't waste the resources of the

2   defendants that could be better spent focusing on the

3   discovery that we've already agreed to start moving forward to

4   so that when and if the green light is given, we will move

5   quickly to make sure that the discovery proceeds apace and

6   that we try as best as possible to abide by those deadlines.

7         THE COURT:  I hear you.  The defendants though who

8   you are speaking on behalf of at one point proposed to the

9   plaintiffs to serve either document preservation letters or

10  subpoenas on ten customers per defendant, right?

11        MR. FONTECILLA:  That's -- that's a very important

12  point, but I think what's more important is the specific

13  conditions of that proposal which I worked to coalesce among

14  14 different defendants.

15        THE COURT:  Mm-hmm.

16        MR. FONTECILLA:  That each condition addresses

17  serious concerns and objections.  That's in the March 22nd

18  letter that we sent to the end users, the one that was

19  rejected within hours without any addressing of those

20  conditions or issues or counterproposal to the offer.

21        Now, this is -- for them to now force us to spend

22  money objecting to a motion, coming and arguing before the

23  court, filing all these affidavits and then saying, oh, okay,

24  we'll accept your proposal that we've rejected previously,

25  that's not how litigation and the local rules of meeting and

conferring in good faith are designed to allow the parties to
resolve this. The money and resources that we -- like I
mentioned earlier, we had agreed to invest in to undertake the
data pull and the production that was conceived of in that
offer has been expended already and by an order of magnitude
has been overshadowed.

So I don't think it's appropriate for the plaintiffs
now to say we would like to go back to that offer now that we
rejected it and file this motion and force the defendants to
oppose it.

THE COURT: Okay. Thanks. We're going to move -- I
appreciate that, Mr. Fontecilla. I appreciate your -- I'm
listening. You know, I'm just looking at that March 22nd
letter again. Hold on.

How are you going to -- so everybody was so concerned
about their customer name, so you proposed a single aggregated
list of customer names. How are you going to do that by
preserving people's confidentiality?

MR. FONTECILLA: One single -- the idea, which I have
to confer with the other defendants -- but the original idea
was potentially for one individual outside counsel --
potentially me -- would receive, you know, on an outside
counsel only basis and under strict confidentiality, a list of
customers. And then I would myself undertake the
de-duplication and ordering of such a list.

1    THE COURT:  And everybody was okay with that?

2    MR. FONTECILLA:  My understanding is that everyone

3  would be okay with that as set forth in the order as long as

4  the other conditions are met.  Some of them are very

5  significant, which are the defendants want to be able to make

6  a determination based on their ordinary course of business in

7  terms of listing and identifying top customers.  The word "top

8  customer" in and of itself could be interpreted in many ways,

9  which is one of the objections we had and was going to lead to

10  additional disputes.  Once we turn over a list, then the

11  plaintiffs will receive it and say, well, for each defendant,

12  what is really meant by a top customer and for what products?

13  And so we wanted some flexibility on our end to be able to

14  make a determination of what a top ten customer is, you know,

15  de-duplicate them, produce that list, and then they could

16  proceed with preservation letters.

17    THE COURT:  What does it mean that the end users

18  would limit the scope of the letters to existing transactional

19  data but not seek data beyond September 2, 2016?  So that was

20  the filing date of the complaint, right?

21    MR. FONTECILLA:  That's correct.

22    THE COURT:  Okay.

23    MR. FONTECILLA:  And that's the preservation cutoff

24  date that we have in the case.

25    THE COURT:  Okay.  So it would be going back.  How

1   many years -- you don't really address how many years in the

2   information would be subject to that.

3           MR. FONTECILLA:  That goes to the flexibility that

4   defendants were hoping to have to make sure that it's done

5   expeditiously, as expeditiously as possible, as efficiently as

6   possible.  Each defendant could make a determination.  Some

7   defendants may have the top ten, you know, handy for the last

8   year, and that may be the quickest way to do it.  Other

9   defendants may have somewhere handy top ten for two to three

10  years.  And so we wanted the flexibility to be able to

11  determine, you know, what's reasonably available.  Top ten

12  customers for one year, top ten customers for the last two or

13  three years, some defendant may have, you know, one of those.

14  Another defendant may have another.  But we just want the

15  flexibility to be able to go and undertake that without

16  micromanaging and compliance issues of an ambiguous request or

17  an ambiguous specification.

18          THE COURT:  But you were okay with whoever the

19  customers ended up to be identified -- whatever customers

20  ended up being identified you were okay with a document

21  preservation letter going to those customers and asking those

22  people to preserve whatever data they might have going back as

23  far as ten years?

24          MR. FONTECILLA:  It's not what we wanted.  This issue

25  was --

1          THE COURT:  But you were willing to compromise on it.

2          MR. FONTECILLA:  We were willing to compromise at the

3    time.

4          THE COURT:  I love it.  I know the discussion that

5    was had among the defendants -- and I'm sure it was a good --

6    and then somebody says at the end, and it counts as one

7    interrogatory.  That's a point that we're going to go to the

8    mat on.

9          Okay.  You can smile, Mr. Fontecilla.  It's okay.

10         MR. FONTECILLA:  Thank you.

11         THE COURT:  It was a joke.  I take all this

12   seriously, but I also think it's okay if we don't take

13   everything too seriously.

14         Look, I'm going to hear really, really briefly from

15   Ms. Fegan.  You know, re-reading where you were on March 22nd

16   and having heard from me on my -- on where I'm going on this,

17   that might provide both parties some place to begin talking

18   about this, right, Ms. Fegan, and to talk about -- I mean, you

19   had, you know -- you address a lot of the concerns that I

20   have, including trying to use a bellwether product.  And but

21   I'm not going to micromanage it.  I think I'll hear briefly

22   from Ms. Fegan just because it's always fair to let the other

23   person speak a little bit, but I think what I want to do is

24   set a date by which you're going to talk about this again.

25   You know, I mean, the plaintiffs just got this yesterday.  I

don't know if they have experts.  They probably do.  If not,

they should.  And it might be interesting to find out what is

the statistically significant group of information or swath of

information and a time period.  I looked at the graphs in the

complaints, and I know, I see where the dips go, at least the

alleged dips in supply and things like that, and they go back

a long way, so four years, you know, is a tough statute for

you.  I understand why you're arguing for tolling because you

want to go back farther than that, and whether or not you've

pled enough to do that, I don't know.  And I agree the time

period is important.  But, here, you could look again at this

March 22nd thing.  Talk hard.  Then I would say, you know, by

this date, and then for plaintiffs to be able to potentially

renew their motion and you respond to it, or you do it in a

joint thing and I'll revisit it again.  This deserves -- we

have to stop on this now because -- but this deserves more

time than I could give you right this minute.  But this has

been very helpful in understanding, giving me -- peeling back

the curtain and seeing what the views are.

MR. FONTECILLA:  Thank you, Your Honor.  I appreciate

your time.

Just one non-substantive point.  It's "font-SIEGE-a,"

like "font-SEE-a."

THE COURT:  So give it to me again.

MR. FONTECILLA:  Like "font-SIEGE-a."

1          THE COURT:  "Font-SIEGE-a"?

2          MR. FONTECILLA:  Yeah.  Or "font-SEE-a" is an easier

3    way.

4          THE COURT:  Okay.  Keep reminding me.  Okay.

5    "Font-SIEGE-a."  Thank you.

6          MR. FONTECILLA:  All right.  Thank you, Your Honor.

7          THE COURT:  Ms. Fegan, you want a couple of minutes

8    of time?  But I think -- you know, as I said, I think we

9    got --

10          MS. FEGAN:  Just a few seconds, Your Honor.

11          THE COURT:  Yeah.

12          MS. FEGAN:  I think where the rubber meets the road

13   with the March 22nd letter was we were open to it except for

14   the fact that they would not agree to the use of a

15   preservation subpoena.  I think the case law just comes down

16   to the fact that a letter does not require the -- where these

17   are not parties anticipated to be parties to the litigation,

18   that there is not a requirement that they cease destruction of

19   data or the natural overturn of data.  And that's really all

20   it was, Your Honor, and that's why we rejected it because we

21   could not agree to preservation letters alone based on the

22   case law.

23          THE COURT:  Yeah, okay.  And I get that.  And that

24   may be a call I have to make one way or the other.  I

25   understand why you don't want to do it.  I toyed with the idea

of just kind of envisioning the motion for a rule to show

cause why customers should not be held in contempt for

violating the subpoena. I'm not sure that the plaintiffs are

going down that road, but I understand that. Certainly it

gets somebody's attention more, I think sophisticated parties

to get a document preservation letter are going to say what

are we supposed to do with this, and I don't know that a lot

of lawyers are just going to say, well, you could just destroy

it out; you could just throw it out, you know. But I hear

you. That might be a call I have to make. But I think in

terms of scope -- my main issues here are scope.

        MS. FEGAN: Yes.

        THE COURT: And I am involved in other large

litigations where third-party subpoenas go out at various

different stages, and I get motions to quash and then I have

to figure out, well, what am I going to do with this, right.

And so I'm trying to avoid a satellite cottage industry and

motions to quash by people who are buying chickens. So the

narrower, the more precise, the more limited. And

Mr. Fontecilla has a point with respect that we shouldn't

miss, which is you make a common sense point, there's stuff

out there that's going to be destroyed. But the more

sophisticated point is will it -- how will it affect your

ability to prove up your case I'm still a little bit weaker

on.

1       MS. FEGAN:  And, Your Honor, on that point, I could

2  address it very, very quickly.

3       IRI has instituted a policy of destroying data on a

4  four-year basis, so we've already lost a year of data since

5  the case started.  And I know this from first-hand

6  conversations with in-house counsel from the recent case I've

7  been involved in with a consumer product being sold at retail.

8  Each of the retailers has a different policy, but they've

9  taken the position now that they will not maintain that, you

10  know, what Joe Smith bought on a particular day past

11  approximately three to four years because frankly they don't

12  want to have to share it with people like us.  That being

13  said, it's important that we get that because we've learned

14  that being able to make direct distributions to customers,

15  being able to allocate damages and ultimately being able to

16  show the price that individuals paid in a particular region or

17  particular store is appropriate to the issues of pass-through

18  and damages.

19       THE COURT:  But if it's -- but on that point though,

20  if it's essentially foreseeable that the only data that's out

21  there is four-year data or five-year data at the most, then

22  one can question whether a subpoena should, say, go back ten

23  years just for those people who might have it.  It could say

24  if you have more data than five years, give us a call.  A

25  document preservation subpoena could do that too.  But I --

1  you know, just as a practical matter, knowing about the

2  business world a little bit, I would bet that not very many

3  people have ten-year data except Bob and Shirley who sell

4  chickens out of their garage, you know.

5         MS. FEGAN:  I think you're probably correct,

6  Your Honor, but a subpoena and a document request, the

7  recipient of that can only preserve what they have.

8         THE COURT:  Okay.  Can we quickly -- or do you want a

9  chance to confer about this afterwards and send Brenda dates?

10  I want a date by which you're going to meet and confer and try

11  and resolve things in light of my order or at least narrow the

12  disputes.  Then I want a date by which plaintiff is going to

13  renew your motion and a date by which defendants are going to

14  respond.  And I'll give you a reply date too.

15         MS. FEGAN:  Thank you, Your Honor.

16         THE COURT:  So do you want to do that immediately, or

17  you want to do it after the hearing?  I'm fine with after the

18  hearing with an e-mail to Brenda.

19         MS. FEGAN:  Right after the hearing, Your Honor, that

20  would be great.  Thank you.

21         THE COURT:  Good.  Okay.

22         Okay.  All right.  Thank you for -- everybody else

23  for indulging that, although it's probably relevant and

24  interesting to a larger percentage of people too.

25         Okay.  I want to move on to the other third-party

subpoenas and production requests to the defendants and see if
there's anything I can deal with here or we're going to need
to get motions on that too.

I divide these into two categories, you know,
really -- real third-party information.  So what we're talking
about that is the witness whose name cannot be stated, the
Georgia Department of Agriculture, Agri Stats.  And then what
I look at as more in the nature of a Rule 34 request --
because that's the way it is kind of framed up -- you know,
plaintiffs want defendants to produce -- or Tyson to produce
what it produced to the SEC, but that's already in document
request 35(a) maybe or something, don't hold me to that, and
the Florida attorney general's investigative -- or what they
turned over to the Florida attorney general.  So those are
really requests for production from defendants.  They don't
really require a third party necessarily, and you've got a
schedule on that.  And then there's the telephone carriers,
which is kind of a hybrid because there's certain documents
the defendants already have, and then there's other documents
that the plaintiffs want to subpoena.

Let me say preliminarily, defendants' argument that
flows throughout and Mr. "Font-GEE-a"?

MR. FONTECILLA:  "SIEGE-a."

THE COURT:  "SIEGE-a."

MR. FONTECILLA:  "SIEGE-a."

1       THE COURT:  "Font-SIEGE-a."  Gotta get that down.

2           Articulated the point for the defendants which is we

3   shouldn't be producing documents before -- nobody should be

4   producing documents, third parties or defendants should not be

5   producing documents before the motion to dismiss ruling, that

6   defendants, collectively that overreads my comments the last

7   time, okay.  Judge Rowland has a wonderful opinion -- or not

8   wonderful, but she's got a really good opinion in *New England*

9   *Carpenters Fund v. Abbott Labs*, which is 2013 WL 690613,

10  Northern District, February 20, 2013 in which she summarizes

11  law in the Seventh Circuit, which, you know, can be different

12  than in other circuits, which is we're not culturally a

13  circuit -- and I think I said this when we were together in

14  February.  We're not culturally a circuit where everything

15  stops until a motion to dismiss is decided.  We're an

16  individualized circumstances circuit, and we've got more of a

17  hand on let's see what we can do on motions to dismiss that

18  are pending rather than full stop.  It's not a PSLRA kind of

19  mindset, okay.  And I recognize that that makes it more

20  difficult for me to make some of these calls, but I don't

21  subscribe to the notion, as you heard in my colloquy with

22  Mr. Fontecilla and as you'll hear throughout this next section

23  here that nothing should be produced.  I'm really a balancing

24  benefit burden kind of guy on this.  And if it becomes too

25  time consuming for me, I'll go one way or the other, but, you

1  know, I would prefer to be able to do it that way.

2       So my guidepost on all of this is burden and benefit.

3  So, for example, with respect to the witness who plaintiffs

4  contend was overheard saying certain things, the burden there

5  I think is minimal.  Defendants' argument there seems to be we

6  shouldn't be doing discovery on the merits at all until we

7  know what the merits are.  And the assumption within there or

8  unstated is plaintiffs shouldn't be able to do discovery while

9  the motions to dismiss are pending to discover facts that they

10 might put in an amended complaint or be able to use to respond

11 to -- you know, I mean, I think plaintiffs were right in what

12 they said.  I would be very surprised if claims are dismissed

13 with prejudice at this particular point in time.  It just --

14 again, that's not necessarily the way it always works.  So if

15 the only objection there is going to be no document discovery

16 should proceed until the motions to dismiss are going to be

17 decided, then it's not as persuasive to me.

18      On the other end of that, Agri Stats which is also a

19 subpoena, you know, again, defendants would be arguing

20 Agri Stats' position potentially.  I don't know what

21 Agri Stats' position is.  But a case that had a ten-year time

22 frame pulls a lot different data from Agri Stats than a case

23 that has a four-year time frame.  And when you balance benefit

24 or burden there, you know, I don't know how that comes out or

25 whether the subpoena would be limited to a four-year time

frame unless and until the case is expanded.

I look at the SEC subpoena with respect to Tyson. I can't remember who Tyson is here?

(Show of hands.)

THE COURT: I look at that a bit differently. I'm just giving you, like, 30,000 feet, just -- I mean, my feet are not stuck in stone on this, okay. But, you know, just commonsensically, an SEC subpoena brings in a whole lot more than the Florida Attorney General or Georgia Dock investigation based on the stuff that's, you know, much more germane to the complaint. An SEC subpoena, which I'm more personally familiar with based on my practice, you know, pulls in a lot of stuff about stock price and disclosures and public disclosures and stuff. And I understand some of that could be relevant, but a lot of it doesn't -- it's not -- we're going to put that on the scale against somebody who says I overheard a conversation, that's a much different benefit and burden analysis. I'll stop there because I don't understand fully the dispute about the telephone carriers.

So, you know, with this background -- and this is the place where I do want to say to everybody that I want to include in the order of agreed stuff on the schedule how many days' notice you're going to give to each other as the case proceeds when you want to serve a third-party subpoena, and one day is not going to cut it, okay. And based on what I

1    could see in the joint status report, I think it was on
2    March 30th, plaintiffs said we're going to serve this and then
3    we didn't hear anything, and on March 31st, we served it.  And
4    there was no objection to the notice until the joint status
5    report brief.  That's fine, and I get that, but that's not an
6    excuse.  And I don't think that's enough notice for somebody
7    in a case like this to be able to get -- confer with whoever
8    they have to confer with and get back with a response, so I
9    want more time than that.  You know, if you need a kickout on
10   that because somebody is leaving the country, then file a
11   motion, or do what you got to do and then deal with the
12   consequences, you know, but emergencies are emergencies.  But
13   in the ordinary course, I don't want that to happen.  And
14   maybe there was a reason here for a quick subpoena based upon
15   what plaintiffs knew.  I don't know that.  But in general, I
16   want more time.

17          So the only subpoena here that has been served is
18   that one and then these other ones are ones that want to be
19   served.  And I said in my order, it was not clear to me that
20   plaintiffs wanted to serve Nielsen or IRI with subpoenas.  I
21   guess I would like clarity on that, but if document -- but if
22   their data is being destroyed, at least a document
23   preservation subpoena should be hit on those people.  And I
24   don't have a problem with that because the burden is not
25   great.

1       MS. FEGAN:  We would like to do that, Your Honor.

2       THE COURT:  Okay.

3       So who is going to speak for the defendants on this

4  particular issue?  Do you want to file a motion to quash the

5  one that's already been served so that nothing is produced by

6  May 5th?  Do you want to brief whether or not subpoenas should

7  be served on these other entities?  My preference on the

8  request for production of the Florida Attorney General

9  materials and the SEC materials, as much as I understand

10  plaintiff's desire to get that stuff quick that seems to be

11  encompassed within the Rule 34 request and can be handled

12  within the Rule 34 process.

13       And, anyway, who is speaking for the defendants on

14  that?

15       MR. FONTECILLA:  I think both of us, Stacy Pepper and

16  I, Your Honor.

17       THE COURT:  Okay.

18       MR. FONTECILLA:  So, Your Honor, I think the

19  important thing to note about -- again, Adrian Fontecilla for

20  Wayne Farms.

21       I think the important thing to note about the

22  subpoena that went out to the individual is that this

23  individual and the allegations that were informally included

24  in the joint letter status are not in the complaint.  And so

25  they haven't even been pled with Rule 11 specificity in a

1   pleading.  They're not even within the allegations in the

2   complaint.  They're just being added now, and we think that is

3   procedurally improper.

4          THE COURT:  Wait.  Can I interrupt you on that?

5          But the substance of what the person is said to

6   overheard being said is relevant to the allegations that

7   currently are in the complaint, correct, in that it goes to

8   broadly -- let me find it in here, but I think it goes broadly

9   to some of the allegations that are in the complaint, right?

10  The theory of the case.

11         MR. FONTECILLA:  Only theoretically and

12  hypothetically first assuming that there is merit to these,

13  which our investigation to date suggests that there is not,

14  and we look to briefing or explaining to the Court if it's

15  added to an amended complaint why these allegations are not

16  even plausible.  But even then it's only potentially relevant

17  to a single opportunity to conspire apparently between one or

18  two defendants at most.

19         So this is very limited, and our suggestion would be

20  that the subpoena and compliance with it be held in abeyance

21  with the other subpoenas until such time as the motions to

22  dismiss are ruled on, which, as Your Honor has already pointed

23  out, is the request that resonates throughout the joint letter

24  brief from defendants' positions.

25         THE COURT:  Okay.  So let me -- first of all, do you

1    want me to make this decision now, or are you going to want to

2    brief this?

3              MR. FONTECILLA:  I think it's been fully briefed by

4    the parties.

5              THE COURT:  This particular issue?

6              MR. FONTECILLA:  This particular issue as to the

7    subpoena.

8              THE COURT:  So what you're telling me -- okay.  I got

9    to -- I don't want to overspeak here or misspeak.

10             MR. FONTECILLA:  Your Honor, we could also brief it

11   if you would like a more fulsome explanation of the case.

12             THE COURT:  No, I would love to deal with it right

13   now if I can.

14             MR. SUGGS:  Your Honor, I believe it's on page 40, if

15   you're looking for it in the --

16             THE COURT:  Got it.  Yep.  And I'm looking at the

17   unredacted one.  So the only thing that has been redacted is

18   the witness' name and who he or she works for, correct?

19             MR. FONTECILLA:  I believe that's correct.  I'm also

20   looking at an unredacted version here, Your Honor.

21             MR. CLARK:  That's correct, Your Honor.

22             THE COURT REPORTER:  I'm sorry.  Who was that?

23             THE COURT:  Who was that?

24             MR. CLARK:  Fair enough.  Brian Clark for direct

25   plaintiffs.

1          That's correct, Your Honor.

2          THE COURT:  So this person is alleged to have

3    witnessed conversations concerning the scope -- this is all

4    unredacted, correct, Mr. Clark?

5          MR. CLARK:  There are some redactions.

6          THE COURT:  All right.  Let me go to the --

7          MR. SUGGS:  The name of the individual is -- here, I

8    believe my copy is redacted.

9          THE COURT:  I have an unredacted copy on my couch,

10   but that's -- okay.  I'll get this really quick.

11         MR. SUGGS:  Here.

12         THE COURT:  You got the redacted copy?  Terrific.

13   Thank you very much.  Great.

14         So this person has witnessed conversations concerning

15   the scope of defendants' agreement to illegally restrict

16   broiler chicken supplies in the United States.

17         MR. SUGGS:  And, Your Honor, one concern --

18         THE COURT:  How is that not relevant?

19         MR. SUGGS:  Well, one concern we have with this is

20   that's a very vague allegation, and we're concerned about

21   third parties being burdened based on such a slim read when

22   our investigation, our own due diligence suggests there's

23   nothing to it.  And we can explain that in more detail in

24   briefing, but we just don't want this to serve as an adequate

25   foundation for burdening a third party with a subpoena when

1   motions to dismiss are pending which might make that moot.

2           THE COURT:  Yeah.

3           That's Mr. Suggs, right?

4           MR. SUGGS:  Yes, Your Honor.

5           THE COURT:  Okay.  For?

6           MR. SUGGS:  White & Case for Tyson.

7           THE COURT:  Okay.  So you recognize -- you recognize

8   in making that argument that Rule 485 -- that under -- with a

9   Rule 485 (sic) subpoena, the defendants' ability to make the

10  burden argument for the third party is somewhat limited,

11  right?

12          MR. SUGGS:  Yes, Your Honor.

13          THE COURT:  And that an argument that says we don't

14  think what this person is going to say is true goes to the

15  weight of his testimony potentially, his or her testimony, not

16  whether or not it's discoverable, right?

17          MR. SUGGS:  Well, first on the burden issue, it's not

18  just about the third party because for any subpoena, we're

19  going to want to talk to the subpoenaed party and discuss

20  whether there's anything further that we want to do, so there

21  is burden on us.  But, yes, and we are -- we're just concerned

22  that this vague allegation, which seems in our -- based on our

23  investigation to be unsubstantiated would be the basis for

24  going out and subpoenaing parties.

25          THE COURT:  Okay.

1    (Off the record.)

2         THE COURT:  And the reason plaintiffs want this

3    information is fully set forth at pages 40 and 41 of the joint

4    submission, right?

5         MR. CLARK:  That's right, Your Honor.  If I could

6    just add, we have had an opportunity to talk to outside

7    counsel for this individual.

8         THE COURT:  Have or have not?

9         MR. CLARK:  Have had an opportunity.  They have

10   conducted a search.  We instructed them not to give us any

11   information until this hearing occurred so that defendants

12   could be heard on their concerns.  The outside attorney is

13   waiting to hear from us on the outcome of today, and they have

14   not raised any burden arguments with us.

15        THE COURT:  Okay.  So I'm going to -- procedurally

16   what I should say is that really this is -- did you want to

17   say something, Ms. Pepper?

18        MS. PEPPER:  I will if we get to the government

19   subpoenas and to the phone carrier subpoenas.

20        THE COURT:  Okay.  Good.

21        On this, I mean, cutting to the chase, I guess what I

22   would say is I would characterize this as defendants' oral

23   motion to quash the subpoena that was served on this person

24   and this business, and the subpoena is returnable May 5th.

25   Based on the arguments that the defendants have articulated

here with respect to relevance, burden and we don't know where
this is going kind of thing, I would deny the motion to quash
on that basis.  That doesn't mean that if defendants talk to
the employer or do their own investigation and there's either,
you know, attorney -- I don't know what information that would
be in there that you guys would have a more particularized
protective order request on so I'm not ruling on anything
that's not in front of me.  What I'm ruling on is I have a
subpoena that's been served on a third party.  Plaintiffs have
made more than a *prima facie* showing that the person and/or
the entity for whom he works may have relevant information
within the time period.  And although the exact statements
that they say were made by the witness are not alleged in the
complaint, that doesn't mean that the subject matter of the
witness' knowledge or the company's knowledge or the documents
that the witness or the company has are not discoverable
within the meaning of the Federal Rules of Civil Procedure.
And I don't think the burden either on the defendants from
having to look at documents, talk to the witness, talk to
counsel and deal with this are sufficient on the
proportionality scale to say that the subpoena should not be
served and responded to on May 5th absent some other reason
that comes up.  So I would deny the oral motion to quash,
allow that to go forward and deal with anything else that you
bring to my attention in the future.

1      MR. SUGGS:  Thank you, Your Honor.

2      THE COURT:  Okay.  Then there's Georgia Department of

3 Agriculture.  This is the Georgia Dock investigation, right?

4      MR. CLARK:  It's the Georgia Department of

5 Agriculture, and it's documents they have.

6      THE COURT:  But did they investigate the Georgia Dock

7 allegations or no?

8      MR. CLARK:  They looked into them.  There's documents

9 about both before and after an investigation was opened by the

10 USDA.

11     THE COURT:  Okay.  And the defendants would be moving

12 to quash that too, right?

13     MR. FONTECILLA:  That's correct, Your Honor, on some

14 of the same bases, which is a burden on the defendants of

15 having to work with the other party, having to review the

16 documents and having to undertake that review while there are

17 a lot of other things that we're trying to move forward on in

18 terms of discovery.

19     We also think that to the extent that a preservation

20 subpoena is what's being discussed, these documents I think to

21 the extent that they are exchanges and communications

22 allegedly between the defendants submitting information

23 supposedly to the Georgia Dock and only a limited number of

24 defendants, by the way, that that information would be

25 preserved by the defendants.  And so it's not necessary to

1  start sending third-party subpoenas to anyone that might have

2  overlapping information that's already been preserved by the

3  defendants.  Like Mr. Suggs mentioned, we're primarily

4  concerned with the burden and the distraction of resources on

5  our end as well as this setting a precedent for any time any

6  third party is identified in an ongoing investigation by

7  either party that they be subject to a third-party subpoena

8  for the production of documents and that this lead to

9  potential motion practice before the Court, burdening the

10  Court and the defendants with having to respond to those

11  motions by third parties, as well as working with them and

12  then reviewing any documents that are actually produced.

13       THE COURT:  Well, I'm approaching these based upon

14  the representation expressed in the joint status report by

15  plaintiffs that they are planning to serve a limited number of

16  third-party subpoenas.  And my understanding, unless I'm

17  disabused of that notion, is that the limited number is what

18  I'm dealing with right now.  So if this expands -- if giving

19  somebody a finger and they take the whole hand kind of

20  approach here applies, I would -- I always reserve the right

21  to see whether or not the floodgates have opened and it's

22  inappropriate.  But right now I'm dealing with a limited

23  number of subpoenas that appear to be seeking information that

24  is relevant to the allegations in the complaint, whether they

25  are only applied to certain defendants, because I understand I

think it's only seven defendants that were involved in the
Georgia Dock price issues or whatever happened there, but
that's half of the defendants in the case.  And those
allegations are in the complaint, and I'm interpreting this --
again, I weigh benefit and burden.  The benefit of the
documents is probably great, burden on both the defendants.
And unless and until I hear from the Georgia Department of
Agriculture on this, you know, I can't tell, but that doesn't
appear to be great.  The documents appear to be discoverable
in this case because they're relevant.  I don't subscribe to
the notion that we ought to wait until a ruling on the motion
to dismiss in order to get -- to allow either party or any
party to get -- to obtain discreet document populations that
are relevant to the issues here absent some, you know, other
privacy issues and some things which could be in play with
respect to other people.

So I would deny the oral motion to quash the Georgia
Department of Agriculture.  One, it's a discreet investigation
for I think a nine-month period or something like that, and it
doesn't seem to me to be overly burdensome.

MR. FONTECILLA:  So, Your Honor, I would just add --
completely understood --

THE COURT:  And it's also not a motion to quash right
now.  It's really a motion to prevent plaintiffs from serving
the subpoena.

1    MR. FONTECILLA:  And we agree with your comments that

2    the discovery sought from these third parties should be

3    discreet and limited to a specific time period and limited to

4    very specific particular categories of documents.  We would

5    just ask that any order on this motion also include that

6    condition as well.

7    THE COURT:  Well, what I'm going to do is I'm going

8    to say defendants' motion to prevent plaintiffs from serving a

9    subpoena on the department -- Georgia Department of

10   Agriculture, the oral motion is denied, okay.  Plaintiffs

11   still have to give you a copy of the subpoena before they

12   serve it.  You'll have an opportunity to weigh in on it.  If

13   you're going to move to quash it because it's overbroad at

14   that point, I've got to look at that because I don't know what

15   the subpoena is asking for.  There's only one subpoena that's

16   been served so far.  And although I don't know what is

17   requested there, the description of it is -- seems to be

18   discreet with respect to what somebody overheard in

19   conversations.  So, you know, I'm -- I don't have the same

20   problem there.

21   I would have, Mr. Clark, a problem of breadth, scope,

22   whatever, depending on what you guys serve.  And if you can't

23   work it out, then I may have to deal with it before you

24   actually get to serve it.

25   MR. CLARK:  I understand.

1          THE COURT:  But I'm okay with you going forward with

2     that process.

3          Agri Stats I look at a little bit differently though.

4     And so I guess on that, to cut to the chase, I can't really

5     decide that.  I think I need you to give these guys what you

6     want because it could be -- I mean, this was an organization

7     that was obtaining information for almost the entire time, if

8     not the entire time of the alleged conspiracy.  And if time

9     period is an issue on the motions to dismiss, which it is, I

10    might look at this one a little bit differently.  This could

11    be, you know -- I mean, theoretically, depending upon what

12    you're looking for at this stage as opposed to the next stage,

13    you could be asking them just to give you the keys to their

14    entire office and just, you know, have at it, and I'm not sure

15    that's something that I'm prepared to do right now.  Limited

16    time, limited data, I don't know, and it may not be worth it.

17    But I think you've got to -- I'm not prepared to accept

18    defendants' argument on a full stop you're not entitled to any

19    of this stuff.

20         So I think you've got to take the next step and show

21    the defendants what you want, talk about it with them, and

22    then I'll be able to rule on that in the context of having a

23    real subpoena with real requests.  And, you know,

24    potentially at that point I might have somebody -- well, I

25    won't have Agri Stats here, but I'll look at it on that basis

because that could be a different kettle of chicken.

I think as I've said, I prefer -- unless plaintiffs are going to push me hard on this -- to deal with the Florida Attorney General production and the SEC production the way you've already teed it up, which is in the context of a request for production of documents. You've already got a schedule for them responding, you replying. I mean, you know, I understand why you want those documents early, but I don't have a good excuse as to why they should be required to produce those to you early as opposed to something else.

MR. BRUCKNER: Your Honor, Joe Bruckner for the plaintiffs.

We appreciate Your Honor's guidance on this. Frankly we think that there is absolutely no burden to the defendants to send us a copy at the same time that they send a copy to the requesting entity. I don't think there's any question about the relevance and responsiveness of those documents. I understand Your Honor's concern especially in the case of the SEC. It may be broader. They may be asking for more. But the defendants themselves have told -- or Tyson in that example -- has told us it's based on the allegations in our complaint. To the extent that it is more broad, it's simply a matter of not being relevant. It's probably public information anyway. We don't know because we haven't seen the subpoena, but it's probably the only issue would be relevance

or not.  Frankly it comes down to we just think there is no
burden for them to commit to producing them in the ordinary
course.  You know, maybe that's right after the motions to
dismiss are decided, assuming that the ruling goes our way,
but it could be six, eight months down the road from now.  And
we just don't see any point in waiting.

THE COURT:  Yeah, I think I disagree.  I mean, I'm
going to have to look at this in the context of your disputes
on the Rule 34 request.  I think there is a burden on Tyson
because I don't believe they can just -- that they can just
turn over and say, here's what we gave to the SEC.  I just --
I mean, I haven't heard from Tyson.  Do you represent Tyson?
Who -- oh, Mr. Suggs?

MR. SUGGS:  Yes, Your Honor.

THE COURT:  Yeah.  But I don't need a lot on this.

MR. SUGGS:  Well, just to confirm your instincts,
White & Case who is representing Tyson in this matter is not
representing Tyson in that other matter.  It is a distinct
investigation.

THE COURT:  Yeah.  I mean, there is a serious
question in my mind -- first of all, I haven't seen what the
SEC's request was, okay, but I have seen SEC requests in other
contexts.  They are -- shall we say they're not the most
focused things that companies get.  So I don't know what
they've asked for.  I don't know what the company produced.

1  My best guess is anybody who would have to produce this stuff
2  would have to go through it for responsiveness for sure, maybe
3  privilege.  And I think a lot of the material right now, and
4  particularly if it's based on the allegations in the complaint
5  which could get cut back, when I do my benefit burden analysis
6  and proportionality -- and maybe I'm giving you a preview of
7  what I'm going to look at when I get the Rule 34 requests --
8  do I think at some point plaintiffs would be entitled to some
9  portion of Tyson's production to the SEC?  I betcha yes.  I
10 betcha you're right.  Is it fair right now to require them to
11 go through all that?  I would have to think about that when
12 you present it to me in the Rule 34 request.  But I look at
13 this as a Rule 34 request because otherwise why don't you just
14 give me -- am I right that it's 35(a) or something like this?
15 Is that the request?
16          MR. CLARK:  That's correct, Your Honor.
17          MR. BRUCKNER:  I believe that's right.
18          THE COURT:  Okay.  You know, why don't you now pick
19 out document request 65, document request 75, document request
20 21 and say for this stuff, it's really easy too.  All they
21 have to do is go to Bob, and Bob can give them the stuff out
22 of his desk drawer.  Again, that's the slope that I'm trying
23 to avoid right now.
24          And the Florida Attorney General, well, I understand
25 that that could be more focused.  I don't know enough about

1  that investigation to say for sure.  But it's teed up as part

2  of your Rule 34 request, and so I'm looking at that in that

3  part of the case as opposed to gathering documents from third

4  parties who could destroy them or whatever.  And, you know,

5  it's different in that respect.  So I guess I'm not going

6  to -- my formal quote-unquote ruling is that I would not deal

7  with those two, the Florida attorney general and the SEC in

8  this context because I don't think they're the same character.

9           So briefly what I would like to talk about is the

10 telephone carrier thing.  So, Ms. Pepper, I don't know that I

11 completely understand, and then whoever from the plaintiff --

12 Mr. Clark, are you dealing with that?

13          MR. CLARK:  Yes, Your Honor.

14          THE COURT:  I'm understanding -- what I understand so

15 far is that the plaintiffs, Mr. Clark -- the defendants have

16 obtained certain records for certain people from the telephone

17 companies already.  I don't know who or going back for how

18 much a period of time, but my guess would be if they obtained

19 records, all they would be is the lists that you get from the

20 telephone company, date, time of call, where it was placed

21 from or received from, telephone number, duration.  And then

22 originally the defendant said we'll give you that information,

23 but now they say they won't give it to you, or they want to go

24 through and redact some of it.  That was at least what I was

25 getting.  Ms. Pepper is shaking her head so maybe I'm wrong.

1    And then there's a sense that the plaintiffs either

2  want -- whatever the defendants have, they want it.  If they

3  can't get it from the defendants, they want to know who the

4  defendants dealt with so that they could serve their own

5  subpoenas.  And they want maybe new subpoenas for certain

6  employees' cell phone data.

7        MR. CLARK:  Yeah.  Just to set it up in the context a

8  little, in the fall, plaintiffs identified I think somewhere

9  between two and six key executives of each of the 14 defendant

10  families.  Most defendants agreed to use the feature of AT&T

11  and Verizon and other carriers to download what we understand

12  usually to be about 18 months of phone records for free from

13  the sites.  We understand most, I don't think all, defendants

14  did that.  We're asking for the copies of those to be

15  disclosed on May 5th with the 26(a) disclosures.  We, in turn,

16  are disclosing what we've obtained from the Georgia Department

17  of Agriculture on May 5th and from the USDA with FOIA

18  requests.  So we view them in that way, that it's something

19  that with very little burden a party can provide to one

20  another.

21        And then with respect to why we need to go to the

22  carriers, obviously we're interested in more than 18 months of

23  phone records.  More than 18 months of phone records are not

24  available through the free download feature.  And our

25  experience is at the phone carriers, the left hand often

1   doesn't know what the right hand is doing, and it's important

2   to get in there and identify specific phone numbers and obtain

3   those records as quickly as possible.

4         Defendants did provide preservation letters at our

5   request to their telephone carriers.  We think, like I said,

6   there's an issue with the left hand knowing what the right

7   hand is doing at those companies, and we would like to move

8   forward with those.  We think there isn't a burden on

9   defendants of doing so, and we would limit ourselves to this

10   category we called identified senior executives, about two to

11   six executives per defendant family.  And the reason we're

12   asking for a copy of the letter to the carrier is to know

13   which carrier to subpoena.  And the reason we're asking for

14   what they've already downloaded is it will allow us to exclude

15   those from what we subpoena.

16         THE COURT:  So on this, why wouldn't it be sufficient

17   for you to get copies of the document preservation letters

18   that the defendants sent to the carriers, understand what

19   period of time records are being preserved for?  If it's not a

20   sufficient number of -- sufficient period of time, send your

21   own preservation letter to those carriers and then wait to see

22   where we are after the motions to dismiss are decided?

23         MR. CLARK:  I think, Judge, because it is, in our

24   experience, a very iterative process to make sure you're not

25   subpoenaing too broad of a number of executives' phone

1   numbers.  So we would start with a small initial group.  It

2   could take the carriers many months to respond.  You look at

3   those records.  You analyze those records to determine if

4   there's phone numbers you didn't include initially and work

5   that way.  That process takes time, and so that's why we would

6   like to start that process now.

7             THE COURT:  I'm not sure why the phone records that

8   the defendants have would necessarily be 26(a)(1) material

9   because I'm not sure that they can tell you now they're going

10  to rely on that information to support a claim or defense.

11            MR. CLARK:  And that's fine.  If the Court wasn't

12  inclined to treat them like that, like we're going to

13  voluntarily treat the phone records and the FOIA requests on

14  May 5th, that's fine.

15            THE COURT:  Yeah.  I could understand why you're

16  identifying those.

17            MR. CLARK:  Yeah, fair enough.

18            THE COURT:  Ms. Pepper.

19            MS. PEPPER:  A couple of things.

20            If the Court will indulge me, I want to take a step

21  back to talk about a theme that I've heard the Court mention a

22  few times because I think it's important when we're talking

23  about the phone records in particular.

24            THE COURT:  I'm -- okay.  Go ahead.

25            MS. PEPPER:  It's not defendants' position that we

should not be doing work during the pendency of the motion to
dismiss.  It's quite the opposite.  The Court rightly pointed
out how much work the parties undertook since our last status
hearing to reach agreement on I would say between 80 percent
of the issues between us, and there's more work that's
following.  For example, next Friday, we're exchanging our
initial custodian lists.  Plaintiffs will also be exchanging a
list of potential custodians.  As the Court saw from the
schedule, we have agreed that by June 14th, any outstanding
issues across those custodian lists will be raised for the
Court.  On May 19th -- well, on May 5th, I should say, we're
exchanging our Rule 26(a)(1) disclosures.  And on May 19th,
we're exchanging our objections to Rule 34 requests.  That's a
lot of work.  And it's important work because while plaintiffs
are telling you that they just want to subpoena phone records
for people, we don't have a list of custodians yet.  So just
to blanket phone carriers with subpoenas for people who may
not even be custodians certainly cannot be construed as
reasonable or proportionate to the needs of the case.

          THE COURT:  Time for a second.  What you're asking
for I guess is once you get the names of the custodians in
this next production, those are people you want to subpoena
the phone records for?

          MR. CLARK:  There is a list of executives known to
the defendants.  It's generally the CEOs, some of the next

1   level people right below them.  It's between -- I think it's

2   between roughly two and six executives in each defendant

3   family.  Those are the ones where we would like to target

4   their office phone numbers and their cell phone numbers that

5   have been disclosed and provided already to plaintiffs.

6             THE COURT:  Okay.

7             Go on, Ms. Pepper.

8             MS. PEPPER:  So the other thing I want to talk about

9   is I think that -- as I understood plaintiffs' concern and the

10  reason that they need these subpoenas -- so, first of all,

11  No. 1, again, preservation letters have issued to these phone

12  carriers.  They have been instructed to preserve phone

13  records.  We are happy to tell plaintiffs when -- we, each

14  individual defendant, asks their phone carrier to preserve for

15  and what they were requested to preserve.  It's not the case

16  that preservation letters have not issued to those third

17  parties.  Those records should be being preserved.

18            Secondly, as to the issue of, you know, the

19  executives that they have identified, Mr. Clark is correct.

20  The defendants agreed last fall to image or otherwise preserve

21  the records for those custodians, potential custodians I

22  should say.  We have not yet agreed that those people are

23  custodians.

24            So as I understood the issue -- and he'll correct me

25  if I'm wrong -- there's a concern that at some point if we

eventually identify those individuals as custodians, there's a
potential risk that the cellular phones in particular will not
be deemed to be within the possession, custody or control of
the producing party.  We agreed to provide plaintiffs as soon
as reasonably practicable after custodians are identified and
those interviews with those custodians commence that we would
disclose whether or not we had a reasonable good-faith basis
to conclude that those phones were not in our possession,
custody or control.  We've agreed to do that.

I am not clear from plaintiffs' submission on what
basis they now have the right to start subpoenaing documents
and/or collecting phone records when we don't have a custodian
list.  And just to assert that somebody is an executive at our
company is not a sufficient basis to conclude they'll be a
custodian.

Also -- well, you know what, I will stop if the
Court --

THE COURT:  Yeah.  Mr. Clark, I agree with this.  I
just -- again, I'm trying to make these calls as we're going
down.  To me, I understand that it's a little different when a
party to a litigation sends a document preservation letter to
the telephone company as opposed to in the other side of my
docket when the U.S. Attorney does that.  But I'm not
understanding why it wouldn't be sufficient here for you to
get from the defendants the document preservation letters that

1   were already sent, who is covered by those, what the period of

2   time is that's covered, either send your own preservation

3   letter or a "me too" or something, or send a letter that asks

4   for a longer period of time if that's what you're asking for,

5   although they don't keep records for that long.  I know.  And

6   then include -- you know, if you have an objection to this let

7   me know so that if somebody says, it's not a subpoena, I don't

8   have to keep it, then we can say, well, maybe they ought to

9   get a subpoena.

10          But, I mean, again, in terms of balance here and not

11  having satellite motion practice and then with respect to the

12  next group of custodians doing the same thing, along the

13  schedule that you guys have already agreed to, this is not --

14  and I understand that telephone records often are helpful in

15  cases such as this.  I think the amount of help they can give

16  is potentially overblown because -- I mean, look it.  You

17  could forensically go through there and say, you know, Norman

18  was in Charlotte, North Carolina on this day and so was blah,

19  blah, blah, but, I mean, that's not really what you're talking

20  about in your complaint.  Your complaint talks about a --

21  structured communications through different entities, whether

22  it's a Georgia Dock or Agri Stats or the meetings that you've

23  identified.  So you know dates of meetings and, you know, so

24  you could find out if people were there.  And if the records

25  are preserved for whatever period of time they have them, I'm

1  not sure this is a now thing versus later, and it's

2  potential -- it's a larger -- again, it's a little bit

3  different than saying I want the Georgia Dock's documents now

4  or Mr. or Mrs. Confidential witness.

5       I mean, I just -- you know, unless you can -- I can

6  understand -- what I'm hearing from -- again, big picture,

7  plaintiffs would like to get as much as they can as soon as

8  they can while the motions to dismiss are pending so that

9  notwithstanding the time period, product mix, defendants,

10  states, may be cut down.  I understand that.  I appreciate it.

11  It's fine.  It's the way this process works.  The defendants

12  would like to produce to you as little about anything that

13  they -- now until they understand the time period, who is in

14  or out of the case, what states are in, what the product mix

15  is.  And in a perfect world, that's what they would want.  And

16  I'm pushing on both sides, and I'm trying to, you know, be the

17  traffic cop in the middle figuring out where exactly that's

18  going to -- where to draw the line.

19       MR. CLARK:  Yeah.  Two things, if I could,

20  Your Honor.

21       One, that would be helpful if we had a copy of the

22  letters and knew was it just a letter saying, hey, there is

23  this lawsuit, preserve our company's records, or did it

24  identify the phone numbers to preserve them for?  Because our

25  experience with these carriers are they need very specific

information to act.  They're very large.  AT&T and Verizon are very large.  AT&T in particular has swallowed up dozens of other entities.  If the phone number is not identified specifically, we would like to follow up.  And if we could get those within the next seven days, those letters, so we know what's been done and then we could further meet and confer and determine if the Court is inclined prior to the motion to dismiss order not to serve the subpoenas, we can at least make sure the preservation is covered.

And then, secondly, if we could just kind of have an understanding on that, you know, if the motion to dismiss goes our way, once that order is in place and we give whatever amount of days' notice, five days' notice prior to serving the subpoenas, whatever the Court orders, we could move forward on those.  We do think it's important.

THE COURT:  Yeah.  So I saw Ms. Pepper looking over to her colleagues when I mentioned copies of the letters.

Problem with that?

MS. PEPPER:  Yes, because I want to -- so I don't want to snatch defeat from the jaws of victory on this.  I just want to raise one issue.  I'm sure the Court is aware. We have sent preservation letters to the third-party phone carriers.  I can represent to the Court that at least some of the defendants, if not all, have had subsequent conversations with those carriers when requests issued as to what

1    specifically we were supposed to preserve.

2          My concern about -- Mr. Clark has raised an issue

3    which is why I'm concerned about producing the letters instead

4    of representing as officers of the Court that we've done it.

5    A list of who we asked to preserve phone numbers for is not

6    the same thing as a concession that those individuals are

7    relevant or responsive or properly identified as custodians in

8    this case.  I am concerned that if we just provide letters,

9    we're going to hear what we just heard, which is, well, your

10   preservation letter is not good enough, and all of those

11   individuals on your list are potential fodder for custodians

12   when we already have an issue as to who may be properly

13   identified and the right number that is reasonable and

14   proportionate in this case.

15         So it seems to me like -- I'm not sure on what basis

16   sometimes AT&T doesn't know what it's doing is the proper

17   justification for asking us to turn over the letters we've

18   sent to those third parties and to disclose the conversations

19   we've had with them.  As the Court has rightly pointed out,

20   plaintiffs are perfectly capable of sending their own

21   preservation letters to those third parties and identifying

22   for them the people that, based on our December 2nd and

23   January 31st disclosures, the phone numbers they may be

24   interested in.  I'm not sure that it's incumbent on defendants

25   to do plaintiffs' work for them, or, alternatively, to make

1    available to plaintiffs people who we identified for purposes
2    of preservation, which is not the same thing as identifying
3    custodians or Rule 26(a)(1) witnesses.

4              THE COURT:  Okay.  I appreciate your concern.  I can
5    alleviate one aspect of the concern by actually having a
6    separate order on this that you guys might draft, which would
7    say, among other things, that the Court's order that
8    defendants provide this information to plaintiffs is in no way
9    a concession or a stipulation or an admission that any of the
10   people for whom any defendant asked the phone carrier to
11   preserve records for has relevant information, is a custodian
12   of relevant information, however you want to do it so that
13   you're not prejudiced in that respect.  That I can do.

14             I don't see work product.  Once defendants send a
15   letter to a phone carrier that says please preserve for these
16   people, I don't think it's privileged.  I don't think it's
17   work product.  You're not claiming it is.  I think in the
18   context of a case like this where, to the extent I can reduce
19   burden, I would like to.  I just think it would be consistent
20   with Rule 1 of the Federal Rules of Civil Procedure, which say
21   that the Court -- and it's been amended now as of December 1,
22   2015, to say the Court and the parties are to construe the
23   rules and administer and employ them to secure the just,
24   speedy and inexpensive determination of every action or
25   proceeding.

So in that vein, I really don't see -- I could understand the reluctance, but I would like to sign an order that says the defendants will provide to the plaintiffs the document preservation subpoenas they have issued to these phone carriers and bring plaintiffs up to date with this saving clause in there that nobody is prejudiced either way and that plaintiffs can't use that information in that way later in the case if somehow this case gets reassigned to someone else and that the defendants and plaintiffs' counsel work cooperatively toward the end of doing what they can to ensure that the carriers preserve this information. To me that would be a way to go about this.

If that's not going to work, then I think I would move on to other things right now --

MS. PEPPER: Okay.

THE COURT: -- and have you brief it or something. But my sense is there's relevant information out there. You've started the process. It's legitimate for you guys to start the process because you know who the people are. They're outside the tent trying to feel to see what's in the tent. They have legitimate concern about time period. And, you know, if as this process goes on, and as you make your additional disclosures they identify somebody who is not on the list, I would expect them to say to you, we would like this information to be preserved too; will you send a letter?

1  And if you won't, then they could send a letter.  But I

2  just -- I think the idea here would be to preserve this

3  information for the time that it becomes relevant.

4          MS. PEPPER:  So two points.

5          No. 1, I would like the opportunity -- I'm empowered

6  to a point to speak for the defendants.  I would like the

7  opportunity to confer with them before we make a final

8  decision on this.

9          THE COURT:  Okay.

10         MS. PEPPER:  Second point, if, in fact, an order like

11  the one the Court just described issues, we would like that to

12  be reciprocal because we understand that plaintiffs have also

13  issued preservation letters to third-party phone carriers, and

14  we think that defendants are entitled to see those to the

15  extent that we're showing them ours.

16         THE COURT:  Very reasonable.

17         MR. CLARK:  I don't believe we actually have any of

18  those, Your Honor, any such letters exist.

19         THE COURT:  Okay.  Well, I mean, you could talk to

20  each other about this.

21         MR. CLARK:  Sure.

22         THE COURT:  But if either of you are sending out

23  letters to anybody, the same rationale applies, right?  I

24  mean, everybody should know what you're trying to preserve and

25  that there's no privilege there?  I'm happy to give you -- for

1  you to propose a schedule to Brenda as the people on the end

2  users are doing this after, a date by which you'll meet and

3  confer on this and a date by which you'll inform the Court

4  whether you've agreed and submit a proposed order or submit a

5  proposed order redlined to show who wants what, but I would

6  like to push it ahead on that basis.

7          MS. PEPPER:  Okay.

8          MR. CLARK:  Understood.

9          THE COURT:  And I -- okay.  We're still in -- we're

10 going to take a break right away because we've been going for

11 too long, and I had intended to be done by noon.  We might

12 not.

13         The only issues after this that I want to talk about

14 are the ESI-related things and privilege issues.  But I can

15 tell you, cutting to the chase on that, I need to set a date

16 for us to get back together.  I might want to understand this

17 a little bit more, but I will tell you that every time I read

18 that, my eyes glaze over.  And, you know, my big picture on

19 that is that I should sit down with you and see whether or not

20 I could help you to a point of mutual unhappiness but not so

21 unhappy that you want to push the pedal to the metal on it.

22 But if I can't, I'm going to appoint a court's expert, and you

23 guys are going to pay for it because this is complicated stuff

24 and some of which, with respect to structured databases and

25 all the rest, I don't know that I want to have an evidentiary

1   hearing and hear your ESI expert and their ESI expert talk

2   about.

3        MS. PEPPER:  I'll speak for defendants and say we

4   100 percent think that with the Court's guidance and a

5   sit-down, we can get where we need to go.

6        THE COURT:  Yeah.  I mean, I understood -- I'm being

7   facetious when I say my eyes glazed over.  I dealt with some

8   of this stuff.  I always had somebody really good next to me

9   though.  And I have Joe here, so maybe the two of us could

10  help, but I do think that nine-tenths of this we could work

11  through.  And it might be that for the one-tenth of it I don't

12  need a court's expert, but, again, I'm not going to spend my

13  life becoming the ESI mogul.  I rebuffed requests to be on the

14  Seventh Circuit's pilot project here and, you know, because I

15  had been in private practice, but I'm content to do it in my

16  own cases.

17       But continuing on the non ESI dispute, I want an

18  order -- I want this interim scheduling order, No. 1, on the

19  non ESI issues which will include your schedule through --

20  well, maybe we should talk about this when we come back --

21  through class cert and all that.  All the agreed dates I want

22  in an order.  I will tell you that I don't know that I'm -- I

23  think when we talk about ESI, I might talk about this

24  presumptive number of custodians.  I'm not sure I can -- I'm

25  not sure I agree that there should be a presumptive number or

1  a non presumptive number.  I  mean, when I looked at your

2  interim disclosures that you did back in December or January,

3  there's more than ten people on that list.  So, you know, and

4  I'm not going to -- today I'm not going to say how many people

5  could be deposed from every defendant or every plaintiff.  I

6  just don't know.  I mean, it's going to depend a little bit

7  more on additional information.  So I'm not going to put --

8  those were a couple of things that were non ESI disputes, but

9  I want you guys to give me an interim scheduling order that

10  includes all those dates.  And let's take a break, and we'll

11  come back on that.  And we won't be here for that much longer.

12          MS. PEPPER:  Okay.

13          THE COURT:  I hope.

14          THE CLERK:  Court stands in recess.

15          THE COURT:  Do like ten minutes, by the time

16  everybody does what they need to do.

17    (Recess.)

18          THE COURT:  Got most people, or maybe some people

19  decided to leave, which is good too.

20          Okay.  Let me just circle back for a second.  So when

21  I talked to -- when I said I want you to submit to me a

22  scheduling order on the dates that are agreed, and I would say

23  within seven days so that you could circulate a draft, the

24  dates that I'm talking about appear at various different

25  points in your submission, and definitely we've referenced

1    some of them here.

2          But it's the April 28, 2017 date to exchange

3    custodian lists, supplement your list of noncustodial sources.

4    I may not have everything that's going to happen that day.

5          It's the May 5th date with respect to additional

6    custodians and 26(a) disclosures.

7          It's the May 19th date for objections to the initial

8    Rule 34 requests and a meet-and-confer about custodians and

9    noncustodial document sources.

10         It's the June 14th date about submitting -- I guess

11   you're taking me up on what you called a joint letter brief in

12   your filing.  I think what I like to call it is a joint motion

13   to resolve discovery disputes or something because it really

14   is a motion.  But it's a joint one, and I'm fine with the

15   format that you're talking about.  And, P.S., because I'm

16   going to suggest to you dates to get back together in June

17   that might conflict with that June 14th date.  So if that has

18   to be changed by the time we set that meeting, we can do that.

19         And then the other dates, you have 240 days after

20   ruling on the motion to dismiss, complete substantial

21   production of documents.  And I guess the defendants want me

22   to put in there final date, no extensions, which I won't do.

23         Then you've got 120 days after substantial completion

24   of document production.  I'm not sure what "substantial

25   completion" means, so, you know, I think maybe you ought to

1  tie those dates together. I know what you mean by that, not

2  little tagalong things, but I think there has to be a firm

3  date on the calendar for amending complaints so that you don't

4  play with that because if you -- you know, and, again, I want

5  these in an interim scheduling order. I know these dates

6  could slip, all right. I mean, I know everybody feels like

7  once we get a decision on the motions to dismiss, we're off

8  and running to the races. Everybody is going to know exactly

9  unless plaintiffs are given leave to amend and unless there's

10  still some slippage, so, you know, we got to deal with

11  reality.

12        And then 330 days after completion of -- and, again,

13  it's a substantial completion -- complete fact discovery, at

14  some point these are going to have to be real dates, okay.

15        And then you've got a class cert schedule 30 days

16  after fact discovery closed, motions for class cert and expert

17  reports. And then 20 -- 42 days, plaintiffs make experts

18  available, 75 days, all these dates; dates for expert reports;

19  dates for defendants to respond to class cert; additional

20  expert reports, all these dates, I just want to get them down,

21  get them in order. If they're going to move, they're going to

22  move. I know that there's an implicit assumption here -- I

23  think it was from the defendants -- that every motion will be

24  decided within three and a half months of being fully briefed,

25  and, therefore, that's why you've proposed these dates. From

1  your mouth to God's ears, that will happen.

2        You've got merits experts discovery dates.  And then

3  you've got summary judgment dates.  I think you could put

4  those in there.  I understand that Tyson and maybe more

5  defendants would like the opportunity to file summary judgment

6  before class cert happens and maybe even before fact discovery

7  is done.  I'm not weighing into that right now because that's

8  going to be somewhat of a joint decision between me and

9  Judge Durkin.  But, you know, I saw Tyson's separate filing

10  and I know that this remains an issue.  I'm not going to say

11  one way or the other right now, and I don't think Judge Durkin

12  is prepared to say right now whether he would entertain that

13  or not.  Just so you know, his general practice in these

14  things is to have parties in, and I don't know that he would

15  change it here.  When somebody wants to file a motion for

16  summary judgment, we come in and talk about it as to whether

17  this is going to be -- whether the other side is going to say,

18  what are you going to do about this fact dispute?  You know,

19  so he's, somebody mentioned an iterative process.  He has an

20  iterative process in that kind of thing.

21        And I'm not prepared to set a trial date right now.

22        MR. SUGGS:  Your Honor, sorry.  David Suggs again for

23  Tyson.

24        I'm not going to get into the substance of this, but

25  if possible, we would like the order to include some

1  recognition of our position.

2          THE COURT:  Put it in there.

3          MR. SUGGS:  Okay.  Thanks.

4          THE COURT:  I mean, I think I heard not only is it

5  Tyson's position, but I thought in the defendants' submission

6  there was people saying there might be other people who are in

7  the same boat or something like that.

8          MR. SUGGS:  You're correct, Your Honor.  We are

9  hoping to find a way to do what Judge Durkin asked us to do,

10 which is to get to the dispositive issues most efficiently.

11         THE COURT:  Yeah.  And when we get down to managing

12 discovery in a much more hands-on basis, I will take into

13 consideration thoughts about, well, which deposition should go

14 first or not and which -- you know, whether there's select

15 requests to admission -- requests for admission that would

16 move the process along.  I'm not blind to that.  I think

17 though, Mr. Suggs, in all fairness, and I don't mind you

18 continuing to raise it, and I don't mind other defendants

19 continuing to raise it because you know the case right now

20 better than the judicial officers know it.  But you're going

21 to have to make a very good case for an all or some summary

22 judgment motion so that the case doesn't stop in its tracks,

23 and it doesn't prevent us from moving it forward.

24         MR. SUGGS:  We understand, Your Honor.  And just

25 there is a distinction here between the sequencing of class

1  cert and summary judgment and then the possibility of an early

2  summary judgment motion.  So Tyson's position is that for some

3  of the same reasons you saw today with the end-user plaintiff

4  motion, all the different classes, class cert can be very

5  expensive trying to determine passthrough, et cetera.  So our

6  position is we're confident that the discovery will show that

7  the Tyson and the other defendants haven't done anything

8  wrong.  We would like to avoid the expensive class cert by

9  going to summary judgment first.

10         THE COURT:  Right.  And you would be the first

11 defendant in a major class action to want to do that.

12         MR. SUGGS:  Well, actually --

13         THE COURT:  That's innovating.

14         MR. SUGGS:  In the drywall case, we got our client

15 out of the matter on summary judgment before class cert.  So

16 that's part of the impetus behind this.

17         THE COURT:  Right.  Congratulations.  I mean, I read

18 all the cases on that.  I'm not familiar with a lot of them.

19 And this is going to be a just depends kind of -- I can't see

20 Mr. --

21         MR. BRUCKNER:  Bruckner.

22         THE COURT:  You're blocking Suggs even though both of

23 you are tall.

24         I think this is going to be an individualized

25 determination.  There's no one size fits all on this.  You

1 know, I understand you were able to do that in that case. I

2 don't know what the metrics were in that case that allowed --

3 that had all the stars aligned to be able to allow that to

4 happen. And I would just have to look at it and probably in

5 the end, Judge Durkin is going to have to look at it and see

6 whether those stars align here. Look, the Court has an

7 interest in not wasting time on things that don't have to be

8 wasted either, and I think plaintiffs also have an interest in

9 that. So there will be a lot of voices heard on that, but it

10 is -- and, you know, full stop.

11         MR. SUGGS: Sure. Thank you, Your Honor.

12         MR. BRUCKNER: Your Honor, if I may, Joe Bruckner for

13 the plaintiffs.

14         I stood up for a much more ministerial matter, and

15 that is in the scheduling order that we are going to submit to

16 Your Honor, are you contemplating actual dates as opposed to

17 time periods?

18         THE COURT: No, you could put time periods.

19         MR. BRUCKNER: Okay.

20         THE COURT: But I was just -- I didn't know what --

21 fair enough. And so maybe we don't have to change the

22 substantial completion because as we go down the road, we're

23 going to actually put dates in there. So I get that. That's

24 fine.

25         MR. BRUCKNER: Okay.

1        THE COURT:  I'm fine with that.  No, I was

2   anticipating time frames just to hold people and myself to

3   time frames and see where we're going.  I'm just saying

4   eventually I want a date by which a motion to amend the

5   complaint has to be filed, so that if it's filed the next day,

6   nobody argues, well, it wasn't substantially complete until a

7   week after.

8        MR. BRUCKNER:  Right.  We agree.  Thank you.

9        THE COURT:  Okay.

10       You also had suggested interim document production

11  deadlines.  And in their schedule, you know, plaintiffs have

12  very granular dates with respect to particular document

13  populations.  I don't mind the schedule talking about 45-day

14  rolling productions, but I'm not prepared right now to -- and

15  these are at page 5 of Exhibit C.  I don't think I'm prepared

16  right now --

17       MS. PEPPER:  No, it's Exhibit A.

18       THE COURT:  It's A.  I'm sorry.  A.  I got a

19  notebook.  I'm not prepared right now to talk about those

20  document populations.  I'll have a better idea of that when we

21  get together in that meeting in June, and maybe I will be able

22  to do that.  But, again, I'm looking at this as we're

23  beginning to outline the shape of the playing field that you

24  will be playing on if the motions to dismiss are not

25  completely one way or the other -- well, one way.  And so I

think beginning to outline that is good.  But I would be
shocked if every single date that we set is absolutely going
to be engraved in stone.  Because, again, it's not shocking if
you're in a court where you're going to try the case on, you
know, November 15, 2018 whether you're ready or not, but I
don't get the impression from Judge Durkin that that's the way
he would like to run the case.  He does want to set a trial
date eventually, but he's not going to do that I think until
after he sees at least where the motions to dismiss are and
what is going to be expected after that.

MS. PEPPER:  Would it be all right with the Court if
the interim scheduling order does not include 40 -- currently
include the 45-day rolling productions?  And here's why I say
that.  No. 1, it's not agreed yet between the parties, so if
the interim scheduling order is to reflect agreed dates,
defendants don't agree to that.  And the reason the defendants
don't -- I want to be very clear.  I understand plaintiffs'
concern with the -- or at least the impetus behind interim
production deadlines to be a worry that defendants are going
to sandbag them at the end of the production period and be
like, here you go, here's everything.  And I understand that
concern which is why defendants made very clear to plaintiffs
and will now make clear on the record that we do not disagree
to interim rolling productions and are very happy to meet and
confer with them once we identify the custodians and the

1  document populations and the order in which we're going to

2  agree to certain productions to discuss interim production

3  deadlines that are tethered to reality and that make sense.  I

4  don't think that just a reflexive 45 days for rolling

5  productions makes sense at this point.  So if we can get a

6  pass, we would like to leave that out of the order for now.

7          THE COURT:  Okay.  Thank you for that clarification,

8  and you are correct that I want this to reflect agreed dates,

9  not disagreed dates, so that's why it's not going to include

10  the deposition limits either because the defendants have

11  proposed a certain number of depositions per party, and I'm

12  not prepared, for the reasons I said earlier this morning, to

13  do that, so it doesn't have to include that either.  It

14  doesn't have to include this.  I will tell you that, once we

15  get -- just so everyone knows, once we get down to actually

16  producing documents and having a schedule, I do want to have

17  dates for that because notwithstanding the best intentions of

18  anybody, I want everybody to have guideposts on this.  And I

19  don't want, you know -- and I don't want it to -- and we might

20  even be talking about document populations at that point

21  because despite everybody's best intention, unless we have

22  dates to shoot at, I'm concerned about it.  You know, things

23  happen.  And if somebody is not -- at least speaking for

24  myself, if I'm not required to do something by a particular

25  date, I might go to the Cubs game, you know.  And so I just

1  want to have a good balance between flexibility but also

2  target dates that we're hitting, and if we're not hitting, I'm

3  going to want to know why.

4        MS. PEPPER:  Understood.

5        THE COURT:  Okay.  Good.  Thanks.

6        Okay.  So that's the scheduling thing.

7        Okay.  Briefly -- and, finally, although these are --

8  so you've got -- the plaintiffs have proposed

9  aspirationally -- and maybe even more than that -- dates for

10 structured data, samples for the structured database, loading

11 and processing ESI, TAR disclosures.  These are dates in May,

12 June, July and August of 2017.  I'm not prepared to do that

13 right now.  I'm sorry.

14        MS. PEPPER:  I'm a defendant, so I'm thrilled to hear

15 that.

16        THE COURT:  I know.  I wasn't talking to you.  I

17 don't know why you're still standing there, that's fine.  You

18 can stand wherever you want, but I was talking broadly to the

19 group, okay.

20        MS. PEPPER:  Gotcha.

21        THE COURT:  I mean, I would love to be able to do

22 that.  I don't -- I've read it three or four times.  I'm not

23 even sure right now as I sit what structured data is.  But,

24 anyway, in this scheduling order, I'm not prepared to put

25 these dates.  I know plaintiffs wanted those dates.  It's not

going to happen by May 12th.  It's not going to happen by

June 14th.  I intend to talk about this when we get together

when we talk about ESI.  I'll have a better sense of this, and

if I think putting dates in here makes sense, I'll require it

to be done.  But right now I don't have enough information to

say that this should be included there.  And I guess for the

same reason Ms. Pepper says it's not agreed, I don't want it

in this interim scheduling order reflecting how much agreement

you do have.  And I recognize it's easy to agree when class

cert is going to be filed a certain number of days because,

what the heck, you just put it on there, but I like the fact

that we have it.  It's guidance, and it is helpful.

          Let me talk about this.  Let me give you some

dates that -- you can sit down again if you want, or do you

want to stay up there?

          MS. PEPPER:  I want to stand up if there's a

chance that we can talk about -- I heard you mention

presumptive number of custodians, and I'm not sure when, if at

all --

          THE COURT:  I'm not prepared -- well -- oh, see, to

me, I don't know how I can determine that it should be ten.  I

planned -- I thought that the better place to talk about that

was when we got together.  I'm talking about reserving a whole

day for this mind-numbing ESI discussion.  Does the

presumptive number of custodians though relate to what you're

going to be disclosing coming up?

MS. PEPPER:  So I think ultimately it will.  But I think that the Court's instinct is right, that this can wait until June because what's going to happen is we'll exchange our lists.  We'll discuss those lists.  And we'll raise with the Court, I guess, any issues with those lists, including numbers, if we can't reach resolution before June.

THE COURT:  I mean, my gut is the ten is too low, and, you know, it depends on the company.  I don't know how big Wayne Farms is, but Tyson is a huge company.  And when I looked at the -- when I went back and I looked at the order regarding disclosure of information that was the first one we did after I got in the case on December 21st and I looked at who you have in your organizational charts and who you kind of have targeted, I mean, that's not ten people.

MS. PEPPER:  Let me say two things, and I will sit down.

So, No. 1, I just want to start ten -- ten is a proposal.

THE COURT:  Mm-hmm.

MS. PEPPER:  Our proposal was ten.  Their proposal is zero.

THE COURT:  Well, why shouldn't it be whoever has relevant -- whoever has the information that we really should be harvesting?

1          MS. PEPPER:  That's exactly right, Your Honor.  It

2     should be a number -- in the *Hyles v. New York* case,

3     Judge Peck talked about this very issue in terms of the

4     staging of custodian numbers.  I know that is not analogous in

5     terms of being an antitrust case, but the point that the Court

6     made is once there is a list of people proposed who, on an

7     individualized party basis, the party represents has relevant,

8     unique and proportionate information responsive to what

9     ultimately becomes a Rule 34 request and the other needs of

10     the case, then if another party can show that that is not

11     actually a sufficient number and they need more people to

12     cover responsive, unique and proportionate information in a

13     case, then that's how that should proceed.

14          But this is now my second point.  If the Court will

15     recall, the December 2nd and January 31st disclosures that

16     defendants made -- or I should say the parties made but I'll

17     speak for defendants -- that wasn't a list of proposed

18     custodians.  That was a list of people responsive to inquiries

19     that plaintiffs made, that we -- I think -- I believe that the

20     parties indicated in those submissions that we were not

21     conceding that the people on that list were all presumptive

22     custodians.  Those lists are not a magic number tethered to

23     what we're doing on the 28th and May 5th.

24          So the only thing I guess I'll say is that while I

25     appreciate that ten might not be the right number, infinity

isn't either. And it really matters in terms of what we then

have to do over the next few months in terms of who do we have

to go interview from, who do we have to collect from, what's

the population of documents we are collecting because that

informs what search protocol or TAR protocol we seek to use.

I don't -- we don't -- if it's not ten, that's fine. But the

number should be, as the Court pointed out, the population of

individuals who can provide responsive, proportionate and

unique information in this case as determined by an individual

defendant basis.

THE COURT: And is this where you're referencing

Judge Peck's order? I can't find -- that was really in the

502 --

MS. PEPPER: No, Judge Peck's order is a 502(d)

order, but he was the judge in *Hyles v. New York*, which is

another authority I'm pointing to the Court's attention just

in terms of phasing of custodians. They're not a

boil-the-ocean-at-the-outset approach, but a number proposed

by individual parties who are best positioned to determine how

to identify and produce responsive documents is what makes

sense, and that is not everybody on an org chart.

THE COURT: Okay. I want two things. I want to make

sure that my punting the number of custodians is not hanging

you up -- and I want to hear from plaintiffs on this too --

hanging you up on what you're going to do doing over the next

few months because, if it is, then I need to make a call.

Two -- so whoever is going to talk about this from the plaintiffs. Mr. Clark, if that's you, come on up.

Two, I don't think I've read this case. We can find it. If -- I don't know how now I would be able to say how many custodians either a plaintiff or a defendant should identify. That's going to -- the process to determine that should be the interviewing of the client. Smaller clients, it's easier; bigger clients, it's harder, but that's why you guys are doing what you're doing. So you're going to go in. You're going to interview the clients. You're going to figure out who these people are. If what you're suggesting is I need to put some number on it and then the burden is on the other side to be able to say that that's not enough people, if that's what Judge Peck says in *Hyles*, I don't like that because I don't know how the other side is going to have enough information to do that.

Now, I understand that as discovery goes forward, somebody who is not an identified custodian from whom you're harvesting ESI or other documents could have appeared someplace, and Mr. Clark could look at that and say, well, dang, we need this guy's documents. Perfectly appropriate that they have that discussion, and if I have to resolve it, I do. But most of the time people resolve it themselves.

So I guess what I would like is I guess I would like

1    a better proposal than just -- ten doesn't seem right to me.

2    It just doesn't seem right.  It might be right for, you know,

3    Wayne Farms, and, you know, whoever some other people are.

4    And I'm sure it's not right for Perdue or Tyson or Sanderson.

5              MS. PEPPER:  I don't want -- I feel like -- I think I

6    have inadvertently steered us off in the wrong direction.

7              THE COURT:  Okay.

8              MS. PEPPER:  I don't think we need a number today.

9              THE COURT:  Okay.

10             MS. PEPPER:  I think that over the course of the

11   next --

12             THE COURT:  Couple of months?

13             MS. PEPPER:  Before we see the Court next, these

14   exchanges are going to happen.  So we'll leave it.  If it

15   turns out that it's an issue and what we get at the end of

16   that exchange is an unreasonable number, we'll raise it.

17             THE COURT:  Okay.  Because I looked at the ESI

18   protocol, which I think is, what, Exhibit B?

19             MS. PEPPER:  The agreed portions are B.

20             THE COURT:  Yeah, and it doesn't say at all -- this

21   part doesn't appear in there, right?

22             MS. PEPPER:  No, because this isn't a protocol part.

23             THE COURT:  Okay.

24             Go ahead, Mr. Clark.

25             MR. CLARK:  No, Your Honor, I think -- I don't want

1    to expand too much more than what we said in the joint letter

2    submission.  We think it has to be based on the facts.  I

3    mean, we've never been in a case where a defendant doesn't

4    look at their company and the scope of the company and make a

5    proposal.  We'll respond seven days later.  We're ready to do

6    it.  We'll engage.  I'll see where we get.  But just saying

7    ten I think would -- we would probably end up back here too

8    quickly, and we wouldn't be able to have that conversation.

9         THE COURT:  It sounds like we all agree.  I think we

10   all agree on this.  Okay.  Good.  So it wouldn't be in the

11   agreed order.  It wouldn't be in this interim scheduling

12   order, and neither would the number of depositions or that

13   kind of stuff.  Okay.

14        All right.  So I want to briefly -- because there's a

15   limit to how long people should have to sit, including this

16   people -- so I'm just going into the ESI-related disputes

17   really quickly.

18        One, I understand -- and the defendants said it in

19   the joint report -- that the decisions that are made here cost

20   millions of dollars.  I get that.  I understand that.  And my

21   guess is no matter what decisions are made, this is going to

22   be an extremely expensive part of the case.  The question is

23   not making it overly expensive for the clients.  And I

24   understand that too.  And in a case like this where the -- you

25   know, the plaintiffs share that concern too.  You know, it's

1  probably within this -- within a certain spectrum and then

2  there's differences of opinion between the parties that go

3  beyond that spectrum that either push the costs up or push it

4  down.  So I understand that.  And I don't say -- I mean, I

5  keep that in mind.  And I'm not somebody who is completely

6  ignorant of that, and it's not that far -- it's not that long

7  ago even though it's becoming even longer that I had to deal

8  with these issues too, so I get that.

9         The big issue here and one that I really want to talk

10  about with you together, this divide on loading and processing

11  ESI, I mean, tell me if I'm getting this right because my

12  sense from reading all this is the real divide here is the

13  loading and processing and harvesting of ESI and reviewing it

14  before we got the motions to dismiss.  People are making

15  progress on the parameters of an ESI protocol, which is good,

16  but the defendants are pushing back hard on until we know time

17  frame, products.  And "products" I say advisedly because,

18  again, as I read your motion to dismiss, aside from a few

19  things that were said -- and the only one that really comes to

20  mind is this antibiotic-free chicken or something -- I mean, I

21  don't know that anybody is making huge pushes on products.

22  But states are in issue, certainly, whether there's a prior

23  right of action or not.  Statute of limitations are in issue.

24  How far you go back on an equitable tolling is an issue.  I

25  get that.  And that will affect loading and processing.

1      I mean, one of the thoughts I had when I was reading

2  all this was four years is not in dispute, okay.  I mean, the

3  directs have a four-year statute of limitations.  You guys

4  also -- every -- all the -- the antitrust claims are on at

5  least a four-year.  The states are plus or minus that.  And,

6  you know, I don't know what unjust enrichment is under

7  Tennessee law or something.

8      But, I mean, and so I don't know whether you've

9  talked about or that it makes sense, because it really may

10 not, to talk about four years as a beginning and then

11 seeing -- you know, I understand where that can screw up,

12 okay.  I mean, I understand you go to a custodian and you get

13 four years, but you don't get the other stuff, but you

14 preserved it.  Then you got to go reload.  I understand the

15 problem with that.  So that's probably not doable, right?  I'm

16 seeing both sides shake your heads no.  It's not doable,

17 right?

18     Mr. Clark, you want -- you know what?  So you don't

19 have to keep jumping up, do you want use the microphones at

20 your tables.

21     MR. CLARK:  I'll just say, Your Honor, there's a

22 couple of ways around that.  If the ultimate goal is to be

23 able to make some progress on developing a search so we're not

24 starting from --

25     THE COURT:  Hold on for a second.

1    So if you don't want anybody to hear, don't you have

2 a green button that you could push down?

3    MS. PEPPER:  Oh, sorry.

4    THE COURT:  Does that turn it off?

5    MS. PEPPER:  No, but it's okay.

6    THE CLERK:  She has to hold it.

7    THE COURT:  You have to hold it.  If you hold the

8 green, does the green light go off?  Because when you hit this

9 (indicating), everybody hears it.

10    Go ahead, Mr. Clark.

11    MR. CLARK:  If the ultimate goal is during -- while

12 we're waiting for an order on the motion to dismiss to make

13 some progress on the search, there's a couple of approaches

14 we'd propose.  One of them would be load, like we talked about

15 earlier, this smaller group of custodians.  We identified two

16 to five last fall, and we've talked about with defendants

17 already, just their data could be loaded, and we could avoid

18 the issue of time period with that.  If the Court thought --

19    THE COURT:  How do you avoid -- sorry for

20 interrupting, Kelly -- but how do you avoid the issue of time

21 period?  You still go back ten years.

22    MR. CLARK:  Correct.  You would still -- you would

23 avoid loading all of the custodians' data over the entire time

24 period.  If the concern is, you know, it's expensive, what if

25 it's only four years, which obviously we address in our

1    opposition brief.  But loading the smaller subset would reduce

2    some of those costs, and we're willing to test search terms in

3    there.  We proposed that back in October and November.  And I

4    think we referenced that in our letter brief today and kind of

5    fell out of favor and defendants didn't agree to that.  But

6    it's still on the table, and we're willing to talk about it.

7              MS. PEPPER:  A couple of things.

8              The Court rightly points out that defendants have

9    motions to dismiss pending, both group and individual briefs

10   that go to the core of these allegations.  I don't think that

11   the only issue in those briefs is statute of limitations and

12   product.  The issue in those briefs is defendants that remain

13   in the case as well.

14             THE COURT:  And I didn't -- wait.  Just so you know,

15   I mean, I'm not giving them short shrift.  It is defendants

16   who are in the case, and it's whether the case proceeds at all

17   and whether the claims make any sense on a pleading standard.

18   I get it.  So there's a lot of issues.

19             MS. PEPPER:  But the reason I say that at the high

20   level is I hear the Court asking if we could compromise on

21   four years.  And the point is if a defendant is not going to

22   remain in the case, the defendant should not have to incur the

23   costs to collect, load and process documents period.  I saw in

24   plaintiffs' *Seroquel* case -- it's the first time I ever

25   learned this -- but a terabyte of information equates to 500

billion pages of plain text.  That's one terabyte.  So to say
that we're going to limit this to four years, I understand the
instinct to compromise, but defendants' position on this is --
goes to the heart of what's reasonable and proportional.  And
I know that the Court will eventually tire of hearing me say
that, but the Sedona Conference commentary on proportionality
and electronic discovery tells us that proportionality is, in
fact, determined by the actual claims and defenses that remain
in the case.  I imagine that also subsumes statute of
limitations, and it certainly must subsume defendants.

        So I understand the Court's instinct, and I
appreciate the urge to compromise.  I don't think the proposal
of four years will work.

        I also want to flag one more time that we are filing
our -- or serving our objections to Rule 34 requests on
May 19th.  Those matter too because what we have to go collect
even for those four years are determined by those objections
in the meet-and-confer process on those.  So...

        THE COURT:  Okay.  Both good points.  Good to
reiterate them.  I understand them.  I underlined in the
submission one of the times that I -- yeah, you quoted the
Sedona Conference on proportionality that proper application
requires them to focus on the actual claims and defenses in
the case.  And that's true, and those are being -- those are
being challenged here.  And I get it, and I will continue to

1   try -- you know, this is -- I mean, I'm guided by a couple of
2   principles on this.  I didn't want there to be a standing stop
3   until the motions to dismiss are decided.  We're past that.
4   There is no standing stop.  I understand that.  I wanted to
5   balance the benefits and burdens of overall discovery
6   management early in the case versus waiting.  We're doing
7   that.  I wanted to relate it all to how a motion to dismiss
8   decision will affect the benefit and burden, and we're doing
9   that on a microlevel.  And this is art, not science, you know,
10  and so I understand all that.  And as I get to know this a
11  little bit more or as I continue to learn more, you know, I'm
12  going to have to adjust my thinking, and I get it.  And I
13  understand, you know, plaintiffs are thrilled with the
14  discovery or the prediscovery or whatever they're getting so
15  far, and there are cases that you don't get it like this.
16          On the other hand, defendants raise very solid,
17  important points about how far we should go on that, and I'm
18  concerned about it.  You know, I have a concern about it.  And
19  as you see, what I'm trying to do -- and you may object to my
20  decisions on stuff, which is fine, and, you know, and if you
21  do object, you got another avenue in terms of Judge Durkin,
22  but I'm trying to make those calls the best I can.  And I'm
23  listening.  I am listening.  And I still feel there's some
24  stuff we can do.  Obviously when we get a decision on the
25  motion to dismiss, there will be more stuff we can do to the

extent we get some clear guidance.  To the extent we don't, we
have to continue to visit these issues.  And somebody asked
early on for, you know, periodic case management conferences
which I'm -- once we're off and running I'm prepared to do,
and we've been doing it now.  And that gets to this other
issue, which we should stop.

So the privilege issues, I had prepared to go into
them and give you some impressions.  I'm not going to do it.
It's just too much.  I think privilege and ESI issues we need
to talk -- they're related to some extent in terms of
procedural things, and we ought to talk about them when we
meet.

This is what I thought -- first of all, before I give
you...

(Off the record.)

THE COURT:  And I think you guys should confer
amongst each other like you did the last time and then let
Brenda know I'm hoping by, like, next Tuesday.

MR. CLARK:  Your Honor, if we might, it actually took
probably a fair amount, a couple of dozen hours to figure out
the timing.  If we could, while we're all here, set some dates
I think it would be real helpful.

THE COURT:  All right.  A couple of dozen hours, wow.

MR. CLARK:  You would be surprised.

THE COURT:  I am surprised.

1    MS. PEPPER:  So are we, actually.

2    THE COURT:  I was trying to make it easier, but if

3 I'm not making it easier, then that's fine.

4    Okay.  So let me look at what I wrote down here.  So

5 I know you've got a filing due on June 14th.  And if that has

6 to be adjusted, as I said before, we could do that.  I'm

7 looking -- and I'm sorry.  A lot of these dates are Mondays

8 and Fridays, but it's because the middle days of the week get

9 really congested.

10    I was looking at June 12th.

11    I would have to move a pretrial conference on June

12 14th, which I would love to do.  And then I have a -- but I

13 have a judge meeting in the -- over the lunch hour.  But

14 June 14th is a possibility, and that's not a Monday or Friday.

15    June 16th is a possibility.

16    June 23rd is a possibility.

17    I was going to suggest June 19th, but that's the

18 Monday after Father's Day, and I'm hesitant to have people

19 have to travel if you're coming in from out of town on that

20 day.

21    Do any of those dates work for the people who have to

22 be here?  I think really the people that have to be here are,

23 you know, primarily the people who were -- you know, I mean, I

24 don't want to exclude anybody, but, you know, the people who

25 have been jumping up on these issues are Clark, Pepper -- I

1   don't want to say whoever has to be here, but do any of these

2   dates work for the people who have to be here?

3           MR. CLARK:  The 12th, 14th or 16th work for the

4   plaintiffs.

5           MR. SHEANIN:  The 14th and 16th would be better, but

6   we could do the 12th.

7           THE COURT REPORTER:  I'm sorry.  Who was that?

8           MR. SHEANIN:  Aaron Sheanin for the direct

9   purchasers.

10          MS. PEPPER:  Did we hear right, that the 23rd doesn't

11  work for them?

12          MR. SHEANIN:  Yes, we'd prefer not to do the 23rd.

13          MS. PEPPER:  I think the 16th would be fine for us.

14  So 16th?

15          THE COURT:  Boy, that cut 12 hours off, or dozens of

16  hours off?

17          MR. CLARK:  Big cost savings.

18          THE COURT:  I thought it would be a free-for-all.

19  Okay.  Fine.  And I would say 9:30.  I mean, let's try and get

20  as much done as we could possibly do.

21          MS. PEPPER:  Will plaintiffs bring snacks?

22          THE COURT:  I have Snickers, but that's for, like,

23  3:00 in the afternoon.

24          Okay.  And, again, so let's be clear about what my

25  agenda would be.  Where's my chart?

1      I made a chart of every single disputed issue here.

2  I'm really looking at all the stuff you have outlined in your

3  section in the joint report on ESI protocol and also the stuff

4  that's on Exhibit C; is that right?  Yeah.  I mean, some of

5  this is easy, PowerPoints, native format, not native format,

6  okay.  I mean, I understand that there's a cost to it, but it

7  almost could be a coin flip.  And I don't mean that.  That's

8  facetious at the end of a long hearing.  Forget about it.  I

9  don't view that as -- I mean, I know there's a cost to it, but

10  I just -- you want me to tell you which way I was leaning on

11  these?  No, I don't think so.  I mean, I'm looking at things

12  as, you know, in the trees as the disclosure of privileged

13  information pursuant to the ESI protocol and whether it does

14  or doesn't require it, the PowerPoints, the nonresponsive

15  attachments.  And on that I understood -- I'm understanding

16  that issue better from the defendants' proposal, and I think

17  the defendants have bent on that proposal more than they had

18  at the prior hearing, so that's something I really want to

19  push on.

20      I will tell you I still am where I was on the double

21  culling on the TAR datasets.  I wasn't -- I wasn't completely

22  convinced by the other technology-assisted stuff.  The nature

23  of the technology-assisted system is very important.  So I

24  don't know.  I think the more either party can specify the

25  nature of the technology they're going to use, the better off

1  you are on being able to have transparency in the process.

2  You know, your hit counts, your not hit counts, cell phones

3  and then all the stuff about the privilege and redactions and

4  those kind of stuff.  And the 502 clawback, I have views on

5  that.  So I really think we'll make progress, and hopefully it

6  won't take all day.  But you should plan on being here into

7  the afternoon and, you know, breaking for lunch or quick -- or

8  even go down to 2 and bringing it up.  Because I just think if

9  we could knock some of this out, we're better off.

10         If we do it on the 16th, do you want to adjust the

11 date for your filing on the 14th or not?

12         MR. CLARK:  Would the Court be inclined to hear any

13 aspects of that dispute on the 16th?

14         THE COURT:  I don't think so, unless it really

15 relates -- I mean, my goal would be to get -- after that

16 meeting to be able to have you sign and file we could call it,

17 you know, an ESI protocol even if we had to keep certain

18 things in there that said, you know, subject to further

19 discussion.  I just think that would be helpful as we move on.

20         MR. CLARK:  I would probably just keep the date.  I

21 mean, we've agreed to the June 14th --

22         THE COURT:  Okay.  If it becomes a problem, let me

23 know.  And I can adjust it.  It's only a date.

24         Okay.  I don't think -- I don't want to keep you here

25 any longer than this.  Is there anything that I haven't

1    addressed that is front and center on anybody's mind?

2         MR. CLARK:  Just one thing I wanted to -- you

3    suggested we should grant some kind of time frame for giving

4    notice of a subpoena --

5         THE COURT:  Let's talk about it.  You want to talk

6    about it?

7         MR. CLARK:  I think we've agreed on four business

8    days, but we can just confirm that for you.

9         THE COURT:  Good?

10         MS. PEPPER:  I think -- can we -- we'll confirm with

11    them.  We think that's right.  I would -- this is another area

12    in which I have limited empowerment to speak for the 14.

13         THE COURT:  Okay.  I'm fine with that amount of time,

14    but I would hear another proposal too.  I guess -- because

15    the -- well, right now, it's not crucial right now because

16    nobody is out there throwing other subpoenas out there, right?

17         MR. CLARK:  I mean, for instance, on the Georgia

18    Department of Ag subpoena, we can give four business days'

19    notice.  We can talk about it and address it that way if that

20    works and talk about it on a broader date if we need to later.

21         MS. COTTRELL:  Hi, Your Honor.  Christa Cottrell with

22    Sanderson Farms.

23         I just want to clarify that that notice is not just,

24    hey, we're going to send the subpoena, but it's actually a

25    copy --

1          THE COURT:  Yes.

2          MS. COTTRELL:  -- of the document requests

3    themselves.

4          THE COURT:  Yes.

5          MR. CLARK:  That's our understanding.  Really what

6    we're talking about is the attachment A, the schedule that

7    lays out what you want.

8          THE COURT:  That's what I'm talking about too.  I'm

9    just trying to put a -- so you want time to confer on it.

10   That's fine.  Could you just -- so that we could get it in a

11   court order, so that everybody has it as a court order, confer

12   about it.  And when you give me the schedule of other stuff,

13   give me a schedule for submitting to me the parties' either

14   agreed position or respective positions on this, or get it to

15   Brenda, and I'll incorporate that in a scheduling order then.

16   And I'll be expecting it by then.

17         MS. PEPPER:  Yes.

18         MS. FEGAN:  Your Honor, if we could also include the

19   end user, I think we are supposed to confer and set a

20   schedule.

21         THE COURT:  Right.  You were going to tell Brenda.

22         MS. FEGAN:  So if we could include that on the same

23   timeline.

24         THE COURT:  Can we do that all by Tuesday, so you

25   have a business day after this?

1          MS. FEGAN:  That's fine.

2          THE COURT:  So I think what we're getting is the end

3  user issue.  You're supposed to be giving me this interim

4  scheduling order.  Is Tuesday okay with that too?

5          MR. CLARK:  That's fine.

6          THE COURT:  There's the issue of days' notice.

7          Was there anything else that I was expecting from

8  them, Brenda, based on your notes?

9          MR. CLARK:  There might be one other date to advise

10  the Court if we can kind of work out a time frame on the

11  letters to the phone carriers the defendants have sent out.

12          THE COURT:  Correct.  So do you want -- do you want

13  to send me -- do you want to e-mail to Brenda your proposals

14  on that by Tuesday, or do you want by Wednesday?

15          MR. CLARK:  Tuesday --

16          MS. PEPPER:  I'll pick Wednesday.

17          THE COURT:  Typical.

18          MR. SUGGS:  Your Honor, coordinating among 14 parties

19  is difficult.

20          MS. PEPPER:  Can I ask a point of clarification?  Is

21  the Court expecting the proposed interim scheduling order by

22  this date?

23          THE COURT:  I am.

24          MS. PEPPER:  Okay.

25          THE COURT:  I could say Wednesday just because today

1   is a travel day.  I mean, I'm not wedded to either day.  I
2   just think it's funny.  It's classic.  But it's only one day.
3          MR. CLARK:  Wednesday will work.
4          THE COURT:  Yeah, I know.
5          Okay.  Anything else?
6          Okay.  Good.  Have good flights back, those of you
7   who are traveling.  Have a good weekend.  See you in a couple
8   of months.
9          Hold on.  Hold on.
10    (Off the record.)
11         THE COURT:  So as I continue to look at what you've
12  already submitted to me, I reserve the right to ask you -- and
13  either I'll maybe have a phone conference or I might just send
14  something out.  If I want additional information before the
15  June meeting that would help me understand stuff a little bit
16  better, I'll ask you for it, but I'm not asking for anything
17  more than what you've already submitted to date on that.  If,
18  for some reason, you resolve something before then, you could
19  tell me so that I won't spend any time on it.  But if I need
20  more information, I'll let you know, but I'm not expecting any
21  more information.
22         Okay.  Thanks a lot.
23         MULTIPLE COUNSEL:  Thank you, Your Honor.
24         THE CLERK:  Court is adjourned.
25    (Which were all the proceedings heard.)

1

2                          CERTIFICATE

3       I certify that the foregoing is a correct transcript from

4   the record of proceedings in the above-entitled matter.

5   /s/Kelly M. Fitzgerald                April 24, 2017

6   _____     _____
    Kelly M. Fitzgerald                       Date
7   Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25