# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION*<br><br>This Document Relates To: All Actions | Case No. 1:16-cv-08637<br><br>**JOINT STATUS REPORT AND LETTER BRIEF FOR JUNE 16, 2017 STATUS CONFERENCE AND PURSUANT TO ECF NO. 388.** |

517215.7

<u>**JOINT STATUS REPORT AND LETTER BRIEF**</u>
<u>**FOR JUNE 16, 2017 STATUS CONFERENCE**</u>
<u>**AND PURSUANT TO ECF NO. 388**</u>

Pursuant to the Court's Order on April 27, 2017 (ECF No. 388), the parties submit this joint status report and letter brief regarding document sources, Rule 34 objections, and documents relating to the Florida Attorney General's antitrust investigation. The next status conference in this matter is scheduled for 10:15 a.m. on June 16, 2017.

This letter brief addresses the following three issues:

I. **Document Sources**

II. **Rule 34 Objections and Responses**

III. **Florida Attorney General Civil Investigative Demands**

<u>**Plaintiffs' Preliminary Statement**</u>

With all but three Defendants, Plaintiffs were able to reach an agreement relating to document sources. For the three Defendants for which an agreement was not reached—Tyson, Pilgrim's, and Foster Farms—further information is provided below. With respect to Direct Purchaser Plaintiffs' ("DPPs") document custodians, Defendants simply are wrong on the relevance of the additional custodians they seek. As noted below, DPPs have designated as a document custodian every employee known to have a role in purchasing Broilers. Indeed, Ferraro has designated 14 document custodians, which is more than many Defendants. The issue boils down to a long line of Supreme Court and other cases finding that efforts like Defendants' here to seek downstream information from direct purchaser plaintiffs is not only irrelevant, but it has the effect of chilling private enforcement of the Sherman Act. Moreover, the issues Defendants' have decided to brief below relate primarily to search methodology and Rule 34 objections, neither of which is actually at issue or properly before the Court at this time.

2

The deadline to submit a letter brief concerning the parties' Rule 34 objections is today, June 14, 2017. *See* Order, ECF No. 388 (Apr. 27, 2017). After a time-consuming analysis of the fourteen Defendants' RFP responses, Plaintiffs determined there are certain high-level deficiencies common to all or most Defendants' Rule 34 objections and responses that must be resolved, therefore Plaintiffs identified those issues in a letter dated June 6, 2017. Defendants requested more time to discuss these high-level issues and Plaintiffs have agreed to an extension. However, Plaintiffs do not wish to delay resolution of these threshold issues indefinitely, so have proposed a 7-10 day deadline by which the issues in the letter will be resolved or submitted via a letter brief to the Court. Plaintiffs agree that individual discussions with each Defendant regarding Rule 34 objections and responses make sense to conduct simultaneously with discussions about search methodology, so have agreed a later date may be set for resolution or briefing of such issues.

Finally, Plaintiffs have renewed their request for documents produced by six Defendants (Tyson, Pilgrim's, Sanderson, Koch, Wayne Farms, and Fieldale) in response to the Antitrust Civil Investigative Demand ("CID") by the Office of the Florida Attorney General. For the reasons set forth below, Plaintiffs believe that new information and detail concerning the CIDs, as well as the passage of time and service of Rule 34 objections and responses, warrant production of this information within 14 days of the June 16 status conference.

### Defendants' Preliminary Statement

In the nine months since these cases were filed, the Parties have successfully negotiated in good faith on a wide range of discovery-related issues, including a confidentiality order, an ESI protocol, and several rounds of discovery disclosures. Most recently, the Parties have been negotiating the list of custodians from which the Parties will collect documents in the event

discovery proceeds in these cases. These various discussions have been productive, with many Defendants coming to agreement with Plaintiffs on their custodians, and the Parties have significantly narrowed areas of dispute.

Thus, it is clear that Defendants have been working diligently with Plaintiffs to move these cases forward even while Defendants' motions to dismiss are pending – motions which could eliminate entirely the need for discovery or at least significantly narrow its scope. Defendants also have agreed to extremely broad discovery (subject to the Court's rulings on their motions and certain objections). For example, Defendants have collectively offered to produce documents from over 210 custodians.

Plaintiffs, however, continue to push for additional custodians and documents, all the while attempting to make discovery more and more one-sided in their favor. For example, Plaintiffs are insisting that Tyson and Pilgrim's Pride designate as custodians certain low-level employees – in addition to the dozens of custodians those companies have offered already – based solely on speculation about what documents those employees may have. But when it comes to their own custodians, the Direct Purchaser Plaintiffs have refused to produce documents from almost anyone except employees with responsibility for purchasing broilers, even though many other employees may have relevant information, particularly those who sell broilers and participate in trade associations. Commercial and Institutional Indirect Purchaser Plaintiffs similarly refuse, now representing that none of the CIIPPs sells broilers.

Plaintiffs also are insisting that the Parties negotiate over a small, arbitrary subset of issues related to their Rule 34 requests for production, and they want to do so in just nine days. Plaintiffs have offered no compelling reason why these issues should be discussed separate and apart from all other issues related to the Rule 34 requests or without discussing each Defendant's

individual responses with that Defendant, and their expressed urgency is surprising given that they raised the issues for the first time just a week ago.

Finally, Plaintiffs are reviving a dispute that was resolved by this Court less than two months ago, demanding that Defendants produce documents produced to the Florida Attorney General outside of the context of responding to Rule 34 requests in this case. They base this demand on purportedly "new" information, but there is nothing material about this claimed new information, and certainly nothing that warrants raising this issue for a second time before document discovery has even begun.

## I.  DOCUMENT SOURCES

The parties have largely reached agreement on document sources. Plaintiffs reached agreement on the document sources to be searched by Defendant Sanderson Farms, Mountaire, Perdue, Koch Foods, Wayne Farms, Peco, Fieldale, George's, House of Raeford, Simmons, and OK Farms. For those Defendants that Plaintiffs did not reach agreement with (Tyson, Pilgrim's, and Foster Farms), further information is provided below in the parties' separate statements.

Defendants also request DPPs add additional custodians whose responsibilities relate exclusively to downstream sales of Broiler chickens, which is addressed in the parties' separate statements below.

### A.  **Foster Farms**:

**Plaintiffs' position:**  As explained further in Plaintiffs' May 31, 2017, Motion to Compel the Deposition of Defendant Foster Farms, LLC (ECF No. 406), Defendant Foster Farms refused to discuss or negotiate regarding the document custodians proposed by Plaintiffs. Therefore, upon resolution of Plaintiffs' motion, and an opportunity to obtain the information concerning document custodians that Defendant Foster Farms' conduct has deprived Plaintiffs from

obtaining, Plaintiffs and Foster Farms will either agree upon a set of document custodians or file a joint letter brief outlining areas of disagreement.

**Foster Farms, LLC's position:**

Foster Farms, LLC continues to be willing to discuss or negotiate document custodians with respect to Foster Farms, LLC. The Court has issued a briefing schedule whereby Foster Farms, LLC's response to Plaintiffs' May 31, 2017, Motion to Compel the Deposition of Defendant Foster Farms, LLC (ECF No. 406) is due on Thursday, June 15, 2017 and Plaintiffs' reply is due on Thursday, June 22, 2017. The position of Foster Farms, LLC will be set forth in that response.

**B. Tyson Foods:**

Plaintiffs and Defendant Tyson were unable to fully agree upon a set of document custodians. The parties' dispute whether the following list of complex-level managers should be included as document custodians for Tyson and whether Tyson's current President & CEO should be designated as a document custodian. A list of the custodians Plaintiffs and Tyson have agreed upon and that Plaintiffs have agreed to withdraw based on the parties' discussions is attached as Exhibit A.

| Name | Title |
|------|-------|
| Whittington, David | Complex Manager (Corydon, IN) |
| Edwards, Jonathan | Complex Manager (Monroe, NC) |
| Ensley, Mike | Live Production Manager (Dawsonville, GA) |
| Glass, Charles | Live Production Manager (Monroe, NC) |
| Varner, Stan | Live Production Manager (Carthage, MS) |
| McCue, Tom | Live Production Manager (Shelbyville, TN) |
| Harshman, Dale | Hatchery Manager (Shelbyville, TN) |
| Person #1 | Hatchery Manager (TBD based on meet and confer) |
| Person #2 | Hatchery Manager (TBD based on meet and confer) |
| Person #3 | Hatchery Manager (TBD based on meet and confer) |

**Plaintiffs' Position**:

1.     **Tom Hayes, Tyson Food, Inc.'s President & CEO**

Plaintiffs propose including Tom Hayes—the President & CEO of the largest company in this price-fixing case concerning Broiler sales of over $200 billion—as a custodian for the limited time period of June 13, 2016 to September 2, 2016.  Mr. Hayes served as President of Tyson Foods, Inc. since June 13, 2016, and became CEO of Tyson as of December 31, 2016.  Plaintiffs have limited their request for Mr. Hayes' documents to a narrow three month period at this time and see no reason in an antitrust case why the leader of the largest alleged conspirator is not an appropriate document custodian.  Even though Defendants argue below that he was in a poultry-related position for a short amount of time, during that time period the USDA and Georgia Department of Agriculture were conducting an inquiry into the Georgia Dock price survey.  Plaintiffs' Second Amended and Consolidated Class Action Complaint (ECF No. 212) ("SCAC" or "Complaint"), ¶ 104.  Further, it is reasonable to believe that in conjunction with his appointment to a senior leadership position at Tyson that Mr. Hayes would have received briefings and memoranda concerning many of the allegations concerning production and pricing discussed in Plaintiffs' complaint.

2.     **Complex-Level Managers**

**BACKGROUND**

A central element of Plaintiffs' antitrust claims in this case is their allegation that Defendants coordinated and conspired to reduce the supply of Broilers in order to obtain supracompetitive prices.  These supply cuts and restrictions were implemented at Defendants' "complexes" by the complex level managers.  Rather than seeking to designate all such

managers as custodians, Plaintiffs have requested a sampling of ten[1] complex-level managers out of the hundreds of such Tyson employees.  There are three different complex-level manager positions that Plaintiffs' request: complex manager, live production manager, and hatchery production manager.  Tyson has dozens of broiler "complexes," each of which includes at least a slaughter facility, a feed mill facility, a hatchery facility, and dozens of farms where chickens are raised for slaughter by contract farmers.  An explanation of the difference between each type of complex-manager is provided below.

As the name suggests, the complex manager is the Tyson executive who oversees the entire complex.  The duties of a complex manager are far from low-level, as exemplified by one of Plaintiffs' proposed Tyson complex manager document custodians, David Whittington.  Mr. Whittington's resume indicates he was responsible for over 550 employees at Tyson's Corydon, Indiana broiler complex, including overseeing a 65 member management team.[2]  He was also responsible for a $98 million annual budget for the complex and was in charge of all operations and support functions for the Corydon complex.[3]

Hatchery managers oversee the raising of Broiler breeder stock, which are the "parent" stock that lay the eggs that are raised into chickens for slaughter.  Plaintiffs' Complaint alleges that unprecedented changes were made to Broiler breeder stock levels during the class period, including slaughtering such chickens early.  *See, e.g.*, SCAC, ¶ 142.  Hatchery Managers were

---

[1] Vernon Owenby, discussed below, is an agreed upon custodian for Tyson.  He oversees a group of complexes in North Georgia, but Plaintiffs do not understand that his position is equivalent to complex managers Plaintiffs have proposed.

[2] Mr. Whittington left Tyson shortly after this lawsuit was filed and subsequently obtained employment with Defendant Perdue.  A copy of his resume from October 2016 appears to be available here: https://www.slideshare.net/slideshow/embed_code/key/ewtvyOiwIXDgFy.

[3] A fourth category of relevant complex-level manger is a plant manager.  Plaintiffs and Tyson agreed to add Vernon Owenby as a document custodian, who current oversees a group of complexes in North Georgia.  However, as noted in the complaint, Mr. Owenby previously was a plant manager for Tyson and served on the Georgia Dock Advisory Board.  SCAC, ¶ 105.

the employees who directly oversaw the implementation of these unprecedented changes, and Plaintiffs have ample reason to believe that hatchery managers have unique communications, such as communications questioning the change from historic practice and providing commentary concerning the difficulties associated with hitting lowered Broiler breeder stock supply level goals. Unfortunately, Tyson never produced the names of any hatchery managers and was unwilling to meet and confer in any way concerning the identities of hatchery managers, so Plaintiffs were only able to identify the name of one specific hatchery manager.

Finally, the live production manager at each complex supervises Tyson's relationship with its contract farmers and coordinates the aspects of the supply chain involved with moving chickens from hatcheries to contract farms, and finally to the slaughter house. As part of this role, Plaintiffs' understanding and investigation suggest these Live Production Managers have to answer questions raised by contract farmers and contract farmers' creditors concerning changes in Broiler production levels, such as the number of days contract farmers have to wait between flocks before receiving a new flock. SCAC, ¶¶ 140-41, 231.

Much of what Tyson (and for that matter, Pilgrim's) argue about complex-level managers is that such individuals are not production or pricing decision makers. But Plaintiffs emphasized time and again during the parties' meet and confer discussions that complex-level managers' involvement in *implementing* decisions regarding production and pricing is crucial to establishing the allegations in Plaintiffs' complaint. Whether or not complex-managers are decision makers—an issue that discovery will answer—is beside the point because Tyson (and Pilgrim's) cannot deny that a complex-level managers are critical to the implementation of desired production levels, and therefore, they have information relevant to this lawsuit. In other words, while it is disputable whether Tyson is correct below when it says complex-level

managers are involved in the "how" or "why" of Tyson's output decisions, such managers certainly have information critical to establishing the "what," "when," "who," and "where" of the day-to-day operation of the alleged conspiracy. In a conspiracy to reduce the supply of Broiler chicken by "destroying Broiler breeder flocks responsible for supplying the eggs Defendants raise into Broilers" (ECF No. 212, ¶ 6), the employees who actually destroyed the flocks clearly possess relevant information.

## ARGUMENT

Federal Rule of Civil Procedure ("Rule") 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ." Plaintiffs analyze below the relevance and proportionality of adding a sampling of Tyson's complex-level manager.

### 1.    _Information from Tyson's complex managers is highly relevant._

Due to the special interest that society has in prosecuting actions that violate antitrust laws, "[i]n antitrust cases, courts generally take an expansive view of relevance and permit broad discovery." *Kleen Prods. LLC v. Packaging Corp. of Am.*, No. 10 C 5711, 2012 WL 4498465 at *13 (N.D. Ill. Sept. 28, 2012) (citing *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 WL 7200711, at *3 (E.D. Pa. Oct. 29, 2004)); *see also U.S. v. Int'l Bus. Machs. Corp.*, 66 F.R.D. 186, 189 (S.D.N.Y. 1974) (observing that "discovery in antitrust litigation is most broadly permitted and the 'burden or cost of providing the information sought is less weighty a consideration than in other cases.'") (citations omitted). This broad discovery is permitted "because direct evidence of an anticompetitive conspiracy is often difficult to obtain, and the existence of a conspiracy frequently can be established only through circumstantial evidence, such as business documents and other records." *Kleen*, 2012 WL 4498465, at *13

(citing *In re Auto. Refinishing*, 2004 WL 7200711, at *3).[4]  As a result, a court will weigh the utility against the cost of discovery, but "[**t]he party opposing a motion to compel carries a 'heavy' burden of persuasion**" and must, at a minimum, specify the nature and extent of that burden.  *Kleen*, 2012 WL 4498465, at *9, 13 (emphasis added) (citing *U.S. v. AT & T Inc.*, No. 11-1560, 2011 WL 5347178, at *5 (D.D.C. Nov. 6, 2011)).

In particular, the issues here are extremely similar to *Kleen Products*, in which Magistrate Judge Nan Nolan ordered antitrust defendant International Paper, who had previously agreed to search 75 custodians' documents, to collect and search the documents of eight additional lower-level executives.  *Kleen*, 2012 WL 4498465, at *12.  As is the case here with Tyson, *Kleen Products* involved the largest defendant (International Paper) who refused to add lower level employees as document custodians.  *Id*.  The court held that it was appropriate to require a sampling of lower-level employees, stating that "in an antitrust case such as this, Plaintiffs are at least entitled to a sample of lower-level and plant-level employees to determine if they possess significant and nonduplicative information."  *Id.* at *15.  The court explained that "even if the conspiracy is among higher-level executives, lower-level employees may *possess* important, relevant information." *Id.* (emphasis in original).

---

[4] Numerous courts have held that the standard governing discovery in antitrust cases is lenient. *See Eisai Inc. v. Sanofi-Aventis U.S., LLC*, No. CIV.A. 08-4168, 2012 WL 628320, at *2 (D.N.J. Feb. 27, 2012) (quoting *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 217-18 (D. Del. 1985) ("where allegations of conspiracy or monopolization are involved, . . . broad discovery may be needed to uncover evidence of invidious design, pattern or intent."); *Callahan v. A.E.V. Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996) ("Discovery in an antitrust case is necessarily broad because allegations involve improper business conduct. Such conduct is generally covert and must be gleaned from records, conduct, and business relationships.") (citations omitted); *Am. Health Sys., Inc. v. Liberty Health Sys.*, Civ. A. No. 90-3112, 1991 WL 30726, at *2 (E.D. Pa. Mar. 5, 1991) ("Where there is doubt over relevance [in antitrust cases], the rule indicates that the court should be permissive."); *Tele-Radio Sys., Ltd. v. De Forest Elecs., Inc.*, 92 F.R.D. 371, 375 (D.N.J. 1981) ("The party resisting discovery has the burden of clarifying and explaining its objections and to provide support therefor.").

Here, Plaintiffs have already alleged information that lower-level employees would have and demonstrated the types of documents sought from these employees. Plaintiffs' Complaint includes many instances where mid-level employees (e.g., sales, international/export, and supply and demand) and complex-level employees (e.g., complex managers, live operations managers, and hatchery managers) would be critical to Plaintiffs' case. Complex-level managers would likely have documents showing Defendants "relying upon one another's production to meet customer needs, and exporting excess Broiler breeder flocks to Mexico, even when doing so was against their independent economic interest." SCAC ¶ 6; *see also* ¶ 88. Additionally, complex level managers who reported prices to Georgia Department of Agriculture also contributed to the conspiracy. *See id.*, ¶¶ 9, 97-115. It is unlikely that a high-level executive was the sole participant in this conduct, and various documents show that mid-level executives and assistants were involved in these communications. *See, e.g.*, ¶ 105 (the Georgia Dock Advisory Committee recently included a range of positions, from CEOs to lower-level executives such as vice presidents of sales or operations, as well as plant managers).

Complex-level managers would have executed other actions in the conspiracy, such as the "destruction of the Broiler breeder flock," "production cuts," and "destroying eggs." SCAC, ¶ 6 (similar allegations at *id.*, ¶¶ 239, 248, 261). Information specific to individual complexes is highly relevant. Plaintiffs allege that Defendants shared, through Agri Stats, information on "the specific type or size of a Broiler house, breed of chick, average bird size, and production levels," as well as "reports for each major area of operations including, but not limited to, its breeding, hatching, hauling, feeding, processing, selling, and administration, which are regularly shared with area managers specifically dealing with those categories of information in their daily business." *Id.*, ¶¶ 124-25. Additional complex-level actions include historically unusual actions

such as reducing the size of Broiler breeder flocks by prematurely killing Broiler breeders and reducing purchases of Breeder pullets from genetics companies, SCAC ¶ 140(A); destroying eggs, as well as breaking them at hatcheries prior to setting them in incubators or even while in incubators, or simply destroying newly hatched chicks at hatcheries, *id.*, ¶¶ 140(B)-(E); reducing the number of healthy chicks delivered to contract farmers and manipulating the genetics of chicks provided, *id.*, ¶ 140(F); slaughtering birds before they reach full maturity, *id.*, ¶ 140(H); and slowing down or temporarily or permanently closing Broiler processing plants, *id.*, ¶ 140(I). *See also id.*, ¶ 191 (Broiler hatchery supply flock cuts were unprecedented).

Finally, employees at all levels of Defendants' companies participated in trade associations and other events where they met with competitors, and records and notes from those meetings are a critical portion of Plaintiffs' case. *See* SCAC, ¶ 202 (the Georgia Poultry Federation elected the Harrison Poultry Director of Live Operations and a Mar-Jac Plant Manager to its board of directors in 2011).

Thus, providing only high-level executives is not sufficient. As *Kleen* and other courts in this circuit have recognized, especially in antitrust cases, discovery from custodians must include a fair sampling of mid-level and low-level employees in order for Plaintiffs to have adequate visibility into the operation and implementation of the alleged conspiracy. Plaintiffs have reached agreements with the other Defendants in this case to include complex-level managers as document custodians, and Plaintiffs seek the same from Tyson—the largest Defendant in the case.

2. *A sampling of complex-level managers is proportionate to the needs of this case.*

In evaluating proportionality, courts consider the following factors provided in Rule 26(b)(1): "(1) the importance of the issues at stake in the action, (2) the amount in controversy,

(3) the parties' relative access to relevant information, (4) the parties' resources, (5) the importance of the discovery in resolving the issues, and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit." *Soricelli v. GEICO Indem. Co.*, No. 8:16-cv-1535-T-30TBM, 2017 WL 275967, at *1 (M.D. Fla. Jan. 20, 2017) (citing FRCP 26(b)(1)). These factors, both individually and in combination, support Plaintiffs' position that the scope of relevant custodians must include a sampling of complex-level managers. Plaintiffs analyze each of the proportionality factors from Rule 26(b)(1) below.

<u>Importance of the issues at stake</u>: The Sherman Act is intended to protect the overriding public policy interest all Americans have in free competition and open markets. *U.S. v. Topco Assocs.*, 405 U.S. 596, 610 (1972) ("Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms."). The conduct alleged in Plaintiffs' complaint describes a nine-year long effort to distort the free market for Broiler chickens in the United States. The market for Broiler chicken sales in the United States during the class period is over $200 billion, affecting nearly every American. Tyson has more than a 20% share of those sales.[5] As noted above, "because direct evidence of an anticompetitive conspiracy is often difficult to obtain, and the existence of a conspiracy frequently can be established only through circumstantial evidence," discovery of information from mid- and lower-level executives who assisted in implementing an antitrust conspiracy are crucial if the antitrust laws are to fulfill their purpose. *See Kleen*, 2012 WL 4498465, at *13.

---

[5] Watt Poultry USA, March 2017. Available at www.WattAgNet.com.

Amount in controversy:  The amount at stake in this litigation is exceptional—even with a relatively modest overcharge of 5% on the over $200 billion in sales of Broiler chickens during the class period, damages would be over $10 billion before trebling.  Prior to accounting for its joint and several liability for co-conspirators conduct, Tyson's share of any damages would be over 20%.  Therefore, the amount in controversy in this matter strongly suggests that including a sampling of complex-level managers is appropriate and proportionate to the needs of the case.

Parties' relative access to relevant information:  In antitrust cases, relevant evidence is "largely in the hands of the alleged conspirators."  *Hosp. Bldg. Co. v. Trusteess. of Rex Hosp.*, 425 U.S. 738, 746 (1976) (citations omitted).  The illegal conduct at the core of an antitrust conspiracy is typically concealed, and thus Tyson has the information necessary to prove the core allegations in Plaintiffs' complaint.

Parties' resources:  Tyson has over 113,000 employees and engaged in tens of billions of dollars of Broiler chicken sales during the class period.  Tyson's profits during the class period were in the billions of dollars.  *See, e.g.*, ¶ 334 (noting 2013 profits were $778 million for Tyson's protein businesses).  Consequently, there is no question that Tyson has the financial resources to collect, search, and produce documents for ten additional complex-level document custodians.

Importance of the discovery in resolving the issues:  Numerous cases have shown that evidence from mid-level and lower-level employees such as complex managers has been considered by courts at various stages in antitrust cases, including at class certification and summary judgment. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002) (reversing the district court's grant of summary judgment and noting "[o]ne of [defendant] Staley's HFCS plant managers was heard to say: 'We have an understanding within

the industry not to undercut each other's prices.'"); *Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*, 530 F.3d 204, 208-09, 211 (3d Cir. 2008) (reversing the district court's grant of judgment as a matter of law; the court considered notes taken by Mack's consultant at a sales meeting); *In Re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1143-44 (N.D. Cal. 2009) (denying defendants' motion to dismiss and finding that defendants' communications, including internal emails sent by defendant's V.P. of Marketing, were "sufficient to suggest that Defendants routinely exchanged highly sensitive competitive information, including pricing and production data, to facilitate and monitor their alleged price fixing conspiracy."). One reason for this is more senior executives are often careful about what information they put in writing, while lower level executives implementing the conspiracy may be less cautious about what documents they create or retain. As the above authority demonstrates, these types of documents can be crucial to establishing the existence of a conspiracy.

_Whether the burden or expense of the proposed discovery outweighs its likely benefit_: Weighed against the benefit of obtaining information from complex-level managers (discussed above), the potential burden of producing the requested sample of 10 complex-level managers is reasonable and proportionate. In particular, a balancing of the burden is already part of Plaintiffs' request: rather than requesting every complex manager, live production manager, and hatchery manager from every Tyson complex (a number well over 100), Plaintiffs have requested a sample of 10 such managers.

Tyson's primary argument during the parties' meet and confer was that lower level executives would only have information duplicative of their superiors. However, given the parties' agreement to use de-duplication to remove duplicates during process (¶ IV(E), ECF Dkt. No. 349-2), this argument doesn't hold water. Moreover, Tyson has yet to review the documents

and cannot say with any certainty that lower-level employee's documents are entirely duplicative of their superiors' documents. This is one of the reasons why a sampling of complex manager level documents is required—to provide objective data on the actual overlap of purportedly duplicative information, rather than both parties simply asserting (without objective data) the supremacy of their conclusion about the potential level of duplication of complex-level managers' documents with more senior executives.

This evening Tyson provided Plaintiffs with an affidavit to support the notion that adding ten custodians would cost $1.6 million. Tyson's estimate of $1.6 million in costs associated with the review of documents for 10 custodians—of which $1.4 million is attributable to attorneys' fees—is based on numerous generic assumptions and guesswork that is not directly applicable to these custodians or the facts of this particular case. For instance, if Tyson is right that information from complex-managers is almost entirely duplicative of more senior executives, then it would largely be de-duplicated out and there would be little associated review costs.

## CONCLUSION

Plaintiffs respectfully request that the Court order Tyson to include the sampling of ten complex-level managers Plaintiffs propose above, and meet and confer to cooperatively determine the appropriate hatchery managers who should be designated as document custodians.

**Tyson's Position**:

Tyson has engaged in a robust meet and confer with the Plaintiffs regarding document custodians, even though the scope of discovery remains unclear while Defendants' motions to dismiss are pending. Tyson initially proposed fifteen custodians focused on the witnesses who might have documents relevant to the gravamen of Plaintiffs' Complaints — an alleged

conspiracy to reduce production. Plaintiffs' counter-proposal added more than 66 custodians from across Tyson, which would bring Tyson's total to more than 80 custodians.

In order to reach a compromise, Tyson has agreed to double its custodians to 30 – 30% more than any other Defendant has agreed to.[6] The final 30 agreed-upon custodians include:

- The former CEO of Tyson (from late 2009 through the end of the relevant period);

- The current CFO of Tyson (who held the position for nearly the entire relevant period);

- The current COO of Tyson (who was President of Tyson's Poultry business during a portion of the relevant period);

- Three former senior executives of Tyson (including the former COO who retired in 2014 and two former poultry executives);

- Eight additional executives identified by Tyson as having responsibility for "determining or approving a Defendant's own Broiler pricing, hatchery supply flock, slaughter, inventory, export, or production levels." Order Regarding Disclosure of Information dated December 21, 2016 (Dkt No. 264) at 4;

- Tyson's current Vice President of Live Operations;

- Tyson's current and former Vice Presidents for Investor Relations;

- The complex manager of Tyson's Cummings, Georgia production complex.

Yet, the parties have two outstanding disputes after their negotiations.

First, Plaintiffs seek to obtain documents from Tyson's current CEO Tom Hayes,[7] who only became CEO on December 31, 2016 – after the end of the relevant period in this matter. Mr. Hayes, who did not even join Tyson until October 2014, is unlikely to have unique, relevant information to this case that justifies the cost and burden of embroiling him in civil discovery.

Second, Plaintiffs seek to conduct a "sampling" of as many as ten of Tyson's "complex-level" employees. Tyson's position is not only that these individuals are "duplicative," but that

---

[6] A full list of the custodians offered by Tyson is attached as Exhibit A.

[7] Plaintiffs also seek to include Mr. Hayes' executive assistance, Karen Nagy, as a custodian. Pursuant to the Parties' agreement, Tyson will only agree to provide Ms. Nagy as a custodian for the same time period Mr. Hayes is to be a custodian.

the potential relevance of any information they might possess is substantially outweighed by the burden on Tyson of conducting this discovery given what has already been agreed to. Tyson has agreed to the inclusion of one complex manager as a custodian, but Plaintiffs' request for a further "sampling" amounts to an unwarranted fishing expedition that cannot be justified given the expected cost of more than $1.6 million to process and review these additional custodians. *See* Declaration of Bryan Burns (Ex. B) ¶ 4.

Plaintiffs' insistence upon these custodians ignores the December 1, 2015 amendments to the Federal Rules of Civil Procedure which "subtly narrowed the concept of relevance for purposes of discovery" by "delet[ing] from Rule 26 a party's ability, for good cause, to obtain discovery of any information relevant to the subject matter of the case, and the notion that information is discoverable, even if not directly relevant, if it is reasonably calculated to lead to the discovery of admissible evidence." *Yee v. Cliff Veissman, Inc.*, No. 14-CV-01531, 2016 WL 950948, at *1 (N.D. Ill. March 7, 2016) (Gilbert, M.J.). Rather, "a party seeking discovery of relevant, non-privileged information must show, before anything else, that the discovery sought is proportional to the needs of the case." *Gilead Scies. Inc. v. Merck & Co.,* Case No. 5:13-cv-04057-BLF, 2016 WL 146574 at *1 (N.D. Cal. Jan. 13, 2016). Plaintiffs cannot do so for either disputed case.

### Tyson CEO Tom Hayes

Mr. Hayes' relation to the conspiracy alleged in these cases is tenuous at best. Mr. Hayes did not join Tyson until 2014 – well after the production cuts in 2008-09 and 2011-12 that are the focus of Plaintiffs' claims. *See* DPP SCAC, ¶ 142. Even after he began work at Tyson, Mr. Hayes had no direct involvement in broiler supply decisions until June 2016 – three months before the end of the relevant period.

While Mr. Hayes is now CEO, that does not make him an appropriate custodian. As noted, he did not become CEO until after the relevant period. Additionally, Tyson has already offered as a custodian Donnie Smith, who was Tyson's CEO for nearly the entire relevant time period, including the time for which Plaintiffs are seeking Mr. Hayes as a custodian. Tyson has also offered as custodians other high level executives of the Company – including the current CFO and COO. Further, the Complaints do not even mention Mr. Hayes.

Plaintiffs have provided no basis for Mr. Hayes' relevance other than speculation that he "must have" knowledge of the alleged conspiracy by virtue of his position. In essence, Plaintiffs seek to conduct a fishing expedition through Mr. Hayes' files. *Willnerd v. Sybase, Inc.*, No. 1:09-cv-500-BLW, 2010 U.S. Dist. LEXIS 121658, at *7-9 (D. Idaho Nov. 16, 2010) (plaintiff failed to "sufficiently link" proposed document custodians to allegations in complaint, and thus "a search of the employees' emails would amount to the proverbial fishing expedition — an exploration of a sea of information with scarcely more than a hope that it will yield evidence to support a plausible claim."). But particularly given his current position as CEO, such a fishing expedition creates "a tremendous potential for abuse or harassment" and should be rejected. *Cf. Apple Inc. v. Samsung Electronics Co., Ltd*, 282 F.R.D. 259, 263 (N.D. Cal. 2012).

## Complex Level Custodians

Plaintiffs propose the addition of ten additional custodians at the complex level, including two complex managers, four live production managers, and four hatchery managers. These individuals, if Plaintiffs' request is granted, would be a random draw from dozens of individuals with these positions within Tyson. Within Tyson, the role of complex manager is a supervisory role at each of Tyson's 30-plus production facilities, with the live production manager and hatchery manager reporting up through the complex manager. But, as Tyson has explained to Plaintiffs in the course of the meet and confer, at Tyson these lower-level operations staff are not

involved in the "how" or "why" of Tyson's output decisions. Indeed, they are three to four levels down in the operations hierarchy.

**Plaintiffs Offer Nothing But Speculation to Justify The Additional Ten Custodians**

Despite being so informed, Plaintiffs now attempt to tie these individuals to the allegations in their Complaint. Despite their assertions in this submission that the Complaints contain "many instances" connecting complex-level operations staff to the alleged conspiracy, they pointedly do not cite any with respect to Tyson (with the exception of the one complex manager that Tyson has agreed to offer as a custodian). Although Plaintiffs' assert that complex-level managers "likely have documents" regarding topics like "exporting Broiler breeder flocks to Mexico," they have no basis for that guess. Further, the only named individuals from Tyson in the Complaints are very senior executives (save one individual who Tyson has agreed to add as a custodian based on unrelated Georgia Dock allegations). This is consistent with Plaintiffs' opposition to Defendants' motions to dismiss, in which Plaintiffs focused on the conduct of "senior executives." *See, e.g.*, Pltf's Opp. to Motion to Dismiss DPP Complaint (Dkt. No. 343) at 7, 38 ("high ranking" and "senior" executives of Tyson involved in trade association meetings); *id.* at 53 (trade associations gave "senior executives the opportunity to meet and communicate with each other frequently to facilitate their conspiracy"). Indeed, if the claimed conspiracy were so pervasive that it involved low-level operations employees at 14 different companies — at least hundreds of individuals — Plaintiffs' Complaints presumably would have consisted of more than circumstantial allegations of production cuts.

Finally, there is no reason to believe that Tyson employees might have complained about output cuts, because, as Plaintiffs have conceded, USDA data show that production *increased* during the period of the alleged conspiracy. Pltf's Opp. to Motion to Dismiss DPP Complaint (Dkt. No. 343) at 30.

Given that Tyson has already offered 30 custodians, Plaintiffs should not be able to obtain additional Tyson custodians – particularly individuals who lack authority to determine supply – without showing that the requested individuals are the "exclusive holders of responsive documents." *In re Mortgate*, No. 09-CV-02137 (LTS)(SN), 2013 U.S. Dist. LEXIS 129989 at *10 (S.D.N.Y. Sep. 11, 2013); *Thermal Design, Inc. v. Guardian Bldg. Prods.*, No. 08-C-828, 2011 U.S. Dist. LEXIS 50108, at *5 (E.D. Wis. Apr. 20, 2011) ("Courts should not countenance fishing expeditions simply because the party resisting discovery can afford to comply"). In short, "Plaintiffs do not need, and are not entitled under the rules of proportionality, to every single document" relevant to their allegations. *In re Mortgate*, 2013 U.S. Dist. LEXIS 129989 at *11.

Even the cases relied on by Plaintiffs support Tyson's position that they need more than guesswork to add low-level custodians. In *Kleen Products*, the plaintiffs were able to justify a search of lower-level employees based on "an unusually large" number of emails they had obtained in discovery. *Kleen Prods. LLC v. Packaging Corp. of Am.*, No. 10 C 5711, 2012 U.S. Dist. LEXIS 139632, *44 (N.D. Ill. Sep. 28, 2012). Plaintiffs cite three other decisions to establish the "importance" of these custodians, but none of those cases addresses the discovery issues now before the Court. Rather, they are decisions on substantive motions that happen to mention the unremarkable proposition that evidence of conspiracy often comes from an alleged conspirator's employees – without a specific reference to whether they are lower-level employees or not. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002) (listing amongst several instances of defendant's communications, a quote from defendant's plant manager without detailing his authority within the company); *Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*, 530 F.3d 204, 211 (3d Cir. 2008) (considering evidence from

defendant's employee who attended a sales meeting, without discussing his role or responsibilities within the company, or the context of the sales meeting); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1143-44 (N.D. Cal. 2009) (noting internal email from Vice President of Marketing without describing his authority within the company or explaining the relevance of mid- to lower-level employees).

**The Burden of Producing Ten Additional Custodians at This Stage Outweighs Any Benefit**

In applying Rule 26, "the Court balances [the requesting party's] interest in the documents requested, against the not-inconsequential burden of searching for and producing documents." *Willnerd*, 2010 U.S. Dist. LEXIS 121658, at *9. Here, the burden of searching for and producing documents from the proposed additional custodians would be substantial. As the Court is aware, for each custodian, Tyson will need to collect the relevant ESI, process that data into a reviewable form, run searches to identify documents to be reviewed, conduct an attorney review of those documents, and then process and produce the documents.

Plaintiffs are seeking discovery going back to January 1, 2007 (and in many cases longer) for the vast majority of their 88 total document requests.[8] Tyson estimates that for each custodian added for the nearly ten year relevant period, Tyson will be forced to review approximately 85,000 additional documents. Burns Decl. (Ex. B) ¶ 5. In all, Tyson expects that the addition of each custodian in this case will cost Tyson as much as $161,000 — a total of more than $1.6 million for all ten complex-level custodians. *Id.* ¶ 4.[9]

---

[8] In some instances, Plaintiffs document requests seek documents even further back in time to as much as 15 years ago. *See* All Plaintiffs' Requests for Production of Documents to All Defendants (Feb. 28, 2017), Req. No. 34 (requesting documents back to 2000), No. 49 (requesting documents back to 2002), Ex. C.

[9] Tyson's estimated discovery costs are proportional to the costs for processing and review considered by other courts in considering whether to add additional custodians in a complex litigation. See, e.g., *In re Disposable Contact Lens Antitrust Litig.*, 2015 U.S. Dist. LEXIS 178026 (M.D. Fla., Nov. 1, 2016) (considering costs of approximately $83,000 per custodian to produce documents for alleged three year

Plaintiffs' speculation about what they might find in the files of these additional custodians does not outweigh the estimated $1.6 million in costs that Tyson would incur to allow Plaintiffs' to satisfy their curiosity. *United States ex rel. McBride v. Halliburton Co.,* 272 F.R.D. 235, 241 (D.D.C. 2011) ("without any showing of the significance" of requested searches of dozens of additional custodians, balancing "cost against [the searches'] utility" led court to reject additional custodians). This case is thus markedly different than *Kleen Products*, for instance, where the responding party failed to "articulate and provide evidence of its burden." *Kleen Prods. LLC*, 2012 U.S. Dist. Lexis 139632 at *48.

Finally, after reviewing documents produced by Tyson, if Plaintiffs have non-speculative bases to believe that additional custodians are appropriate, Plaintiffs can request further custodians at that time. But the expense of adding Plaintiffs' proposed junior-level custodians is not proportional to the needs of the case now.

### C.  Pilgrim's Pride

As was the case with Tyson, Plaintiffs and Pilgrim's have agreed upon a set of document custodians, except with respect to a sampling of complex-level managers. Plaintiffs propose the individuals who held the following positions at Pilgrim's during the class period be added as document custodians. Plaintiffs have listed the names of who they believe are the current complex manager for each complex.

| Name | Title |
|------|-------|
| Ricky Walker | Complex Manager (Athens, GA) |
| Ken Long | Complex Manager (Canton, GA) |
| Randy Long | Complex Manager (Ellijay, GA) |
| James Bradford | Complex Manager (Chattanooga, TN) |
| Lance Lacefield | Complex Manager (Mt. Pleasant, TX) |

antitrust conspiracy); *Oracle Corp. v. SAP AG*, 2008 U.S. Dist. LEXIS 88319 (N.D. Cal., Jul. 3, 2008) (considering costs of approximately $100,000 per custodian to produce documents involving alleged six year period of copyright infringement).

| Kevin Holt | Breeder Production Supervisor (Natchitoches, LA complex) |
| Robert Williams | Live Operations Manager (Sanford, NC complex) |

**Plaintiffs' Position:**

## BACKGROUND

Plaintiffs' rationale for selecting the individual positions from the seven complexes listed above includes the fact that they constitute a geographically diverse sample of Pilgrim's 24 complexes and operations.  Further, Pilgrim's complex managers (like other Defendants' complex managers) served on trade association boards of directors, such as Pilgrim's complex manager James Bradford, who serves with other Defendants' complex-level managers on the Board of Directors for the Tennessee Poultry Association.[10]  Similarly, Lance Lacefiled contributes to, and appears to be involved with, the National Chicken Council and its Political Action Committee.[11]  Finally, some of the complexes Plaintiffs' selected are complexes with relevant events cited in Plaintiffs' complaint or are located in proximity to complexes that Pilgrim's closed during the class period, such as Pilgrim's Chattanooga complex that experienced layoffs in 2012.  SCAC, ¶ 232.

Pilgrim's made the offer yesterday to extend the time period of documents collected for two current custodians to include their time as complex managers.  While Pilgrim's offer is appreciated, it is far from sufficient, as one of those individuals served in the complex manager for six months or less, and the other has an uncertain time period.

## ARGUMENT

Rather than repeat the general justifications for including complex-level managers noted above regarding Tyson (all of which apply equally to Pilgrim's), Plaintiffs incorporate the

---

[10] http://www.tnpoultry.org/news/Newsletters/Fall2016TPANewsletter.pdf

[11] https://www.opensecrets.org/pacs/pacgave2.php?sort=A&cmte=C00034272&cycle=2016&Page=2 (noting $935 contribution by Mr. Lacefield to the National Chicken Council's PAC in May 2015).

arguments made above regarding the relevance of information from lower level custodians.  *See supra*, § I(B).

With respect to application of Rule 26(b)(1)'s proportionality factors to Pilgrim's, the analysis for Pilgrim's is very similar to the analysis concerning Tyson above.  Briefly, each of the six proportionality factors in Rule 26(b)(1) warrant a sampling of complex-level managers, (1) the issues in this antitrust case are of significant public importance; (2) given Pilgrim's more than 17% market share, its potential damages with even a modest 5% overcharge would be well over one billion dollars prior to trebling; (3) as with Tyson, Pilgrim's has exclusive access to the information requested; (4) Pilgrim's has over 40,000 employees and engaged in tens of billions of dollars in sales during the class period and has the resources necessary to collect, search, and produce documents for the sample of seven complex-level managers[12]; (5) as noted above regarding Tyson, information from lower level custodians is often crucial to prove an antitrust conspiracy where evidence of an agreement is proven through circumstantial evidence; and (6) Plaintiffs' proposal to sample 7 complex-level managers, rather than designate the hundred or more such managers, adequately balances the burden of the requested discovery against the benefit identified above.

## CONCLUSION

For the reasons identified above, Plaintiffs respectfully request that the Court order Pilgrim's to collect and search documents from the sample of 7 complex-manager positions identified by Plaintiffs.

---

[12] http://www.pilgrims.com/our-company/about-us.aspx

**Pilgrim's Position**:

Pilgrim's and Plaintiffs have worked assiduously and cooperatively to resolve all but one remaining dispute related to Pilgrim's' document custodians in the event discovery proceeds in this matter. The sole dispute that remains is the size of the "sample" Plaintiffs seek of lower-level, complex employees. While Pilgrim's believes that no complex level employees should be custodians, it has offered in the spirit of cooperation to include complex managers from two complexes as custodians. This proposal minimizes the burden on Pilgrim's of adding what it views to be only marginally relevant custodians but allows Plaintiffs to see the types of documents Pilgrim's' complex managers maintain and is consistent with (or larger than) the sample size agreed to with nearly all other Defendants.

Pilgrim's did not include complex-level employees as custodians in its disclosures. Plaintiffs responded to Pilgrim's' initial list by requesting more than 80 additional employees, as well as a "sample" of 19 complex-level employees. Upon receipt of Plaintiffs' request, Pilgrim's' counsel immediately began interviews of the requested and other employees as to Pilgrim's business, and how decisions as to production levels and pricing – the heart of Plaintiffs' allegations – occur in practice. Counsel for Pilgrim's presented the findings of these interviews to Plaintiffs, informing them that decisions surrounding production and price are made at the corporate level in Pilgrim's headquarters in Greeley, Colorado. Accordingly, Pilgrim's did not believe complex employees were appropriate custodians.

In response, Plaintiffs offered their justification for inclusion of at least a sample of complex employees: that their allegations "directly involve" the mid- and low-level positions and that "lower level employees may discuss execution of policies amongst themselves and with third parties other than their superiors."

In an attempt to resolve this final impasse without having to involve the Court, Pilgrim's offered to collect and produce a sample of documents from two of its current 21 custodians – Jason McGuire and David Thompson – from when they were formerly complex managers.[13] This solution would offer an appropriate sample of the types of documents Plaintiffs seek, while minimizing the burden on Pilgrim's and avoiding collection of documents in multiple remote facilities. While Plaintiffs have agreed to accept similar proposals from other Defendants, they have refused Pilgrim's. They continue to insist on a "sample" of custodians from more than 25% of Pilgrim's' complexes – which would be a 30% increase in the size of Pilgrim's' custodian list. This insistence – based purely on speculation – is vastly disproportionate to the needs of the case and would unnecessarily increase the burden on Pilgrim's, including requiring the collection of documents at seven additional facilities across the country.

1. *Any responsive information from Pilgrim's' complex managers is likely to be duplicative or irrelevant*

Plaintiffs' theoretical speculation of the types of emails complex level employees *may have had* does not justify adding these custodians. Plaintiffs asserted during meet and confers that they must insist on production from complex-level employees. Their rationale was that even if the complex-level employees only implement production decisions, decisions by Pilgrim's corporate office to reduce production levels in support of the alleged conspiracy to reduce supply would result in emails between complex-level employees in disagreement about these alleged decisions and "complaining horizontally" about changes in production levels (and that they might "take pride" in their production levels because they "want to produce eggs"). Plaintiffs have zero support for their assumptions and speculation and this mere speculation is insufficient

---

[13] Pilgrim's also has agreed to produce the files of predecessors and certain assistants. Pilgrim's expects its total number of custodians to increase significantly based on the large number of relevant predecessors and turnover at the company.

to justify the added cost of including them in discovery.  *Hespe v. City of Chicago*, 2016 U.S. Dist. LEXIS 173357 (N.D. Ill. Dec. 15, 2016) (at *9-*15) (under proportionality standard of Rule 26, "mere suspicion or speculation that an opposing party may be withholding discoverable information" not sufficient to compel discovery); *Garcia v. Tyson Foods, Inc.,* 2010 U.S. Dist. LEXIS 135678, 2010 WL 5392660, at *14 (D. Kan. Dec. 21, 2010) ("Plaintiffs must present something more than mere speculation that responsive e-mails *might* exist in order for this Court to compel the searches and productions requested") (emphasis in original).

Pilgrim's' complex employees have nothing to do with the topics most important to Plaintiffs' case.  They have no involvement in decision making on production levels, pricing, or overall company strategy.  Complex-level employees predominantly deal with operational issues, such as staffing complexes with thousands of hourly staff (who have had 80+% annual turnover during the past decade), complying with myriad OSHA, USDA and other regulations, and determining how best to manage the various portions of the complex to meet the production levels mandated by corporate employees in Colorado.  Complex level employees <u>implement</u> the production and sales decisions made by the custodians from whom the Plaintiffs will be receiving documents.  They do not make – or have any significant input into – those decisions themselves.  As such, they are highly unlikely to contain responsive, non-duplicative documents relevant to Plaintiffs' claims.  That Plaintiffs allege they "executed" the decisions of their superiors does not make them relevant.

Nor are they responsible for reporting to the Georgia Department of Agriculture or analyzing or distributing data obtained from Agri Stats.  Pilgrim's has offered as a custodian the employee at Pilgrim's who manages the analysis of Agri Stats data for the various business units. It also has agreed to produce data from Pilgrim's' SAP system, which is transmitted to Agri

Stats. Pilgrim's has further offered <u>all</u> employees responsible for reporting to the "Georgia Dock." Complex managers do not have responsibilities in these areas.

Plaintiffs also asserted during meet and confers that they were interested in adding custodians who may have participated in trade association meetings. Yet Pilgrim's' custodian list already includes numerous employees at different levels of the company who have attended regional, national, and international trade association events. These individuals include high-level executives such as President and CEO Bill Lovette and Executive Vice President Jayson Penn, as well as employees lower down the chain, such as Randy Stroud, Vice President of Live Technical Services. Several of Pilgrim's' other proposed custodians, which go three to four levels down from the senior executives, have attended trade association meetings, and Plaintiffs will receive their documents.

2. *Plaintiffs' proposal is much more than a "sampling" and is disproportionate to the needs of the case*

Plaintiffs also have noted that Pilgrim's is one of the larger Defendants in the case. While it is true that globally Pilgrim's has many thousands of employees, they are spread out internationally, and even in the U.S. businesses relevant to this case, the vast majority of Pilgrim's' employees are hourly employees manning manufacturing on an hourly basis. They would have nothing to do with any of the allegations in the complaint. Pilgrim's also has undergone tremendous change in the past ten years, including a bankruptcy, acquisition, and relocation of its corporate headquarters across the country. These changes have resulted in a major consolidation of its responsibilities with its corporate executives in Colorado.

Plaintiffs also have stated that there are "hundreds" of complex-level employees relevant to the case, and that their "sample" of seven complex-level employees is designed to cover those

employees. Yet only 24 complexes, each with its own complex manager, are likely to be relevant to this case. (Several rendering, organic, and other facilities are well outside Plaintiffs' complaint.) Seven employees would constitute a "sample" of nearly 30% of the 24 relevant complex managers. Plaintiffs' number is clearly inflated by including even lower level employees than complex managers, such as hatchery managers. Their "sample" is not a sample, and Pilgrim's' proposal of two individuals should be sufficient. There also is no particular relevance to the specific individuals Plaintiffs identified: none of their requested custodians work at the few Pilgrim's facilities Plaintiffs referenced in their Complaint.[14]

Pilgrim's also disagrees that mid- and lower-level employees' documents, from any part of the company, are necessarily relevant. In antitrust cases, even where employees without decision-making authority have engaged in low-level "chatter" about pricing or market conditions, courts have found those communications to not be probative of conspiracy where they had no impact on company decisions. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125-26 (3d Cir.1999); *City of Moundridge v. Exxon Mobil Corp.*, 2009 WL 5385975, at *9 (D.D.C. Sept. 30, 2009).

### 3. *Plaintiffs' authority for collecting larger "samples" of employees is distinguishable*

Plaintiffs rely on the *Kleen Products* case to support their argument that a large sample of complex-level employees is warranted in this case. *See Kleen Prods. LLC v. Packaging Corp. of Am.*, 2012 WL 4498465 at *13 (N.D. Ill. Sept. 28, 2012). That case is distinguishable. There, the court ordered expanding the custodian list only after significant discovery had occurred, and in response to a fully briefed motion to compel filed by the Plaintiffs after document collection

---

[14] To the contrary, Pilgrim's has agreed to include as custodians every employee identified in Plaintiffs' complaint with the exception of one former employee Plaintiffs are no longer seeking.

and production (as well as a series of court-supervised meet and confers). Prior productions in that case were specifically identified as supporting Plaintiffs' argument that specific additional employees were likely to have relevant, non-duplicative emails. The procedural posture of this case is different, as the court has not yet ruled on the motions to dismiss and discovery has not commenced. Plaintiffs' insistence that these individual might have unique, relevant files is based on their own speculation; if they later determine their speculation was justified, at that point in time they could re-raise the issue with Pilgrim's.

Furthermore, Pilgrim's has explained why it would be burdensome to add these seven individuals. They are spread around the country at seven different locations, and it would be very costly for attorneys, paralegals, and e-discovery professionals to visit each of those locations to interview custodians and collect documents.[15] It is simply disproportionate to the needs of the case.

Finally, Pilgrim's has not opposed Plaintiffs' requests for lower-level employees across the board. Rather, Pilgrim's has agreed to include employees four or five levels down from the "C-Suite" executives who actively manage the company. The agreed upon custodian list includes the highest ranking executives, the senior head of sales and operations, general managers of each the company's five relevant business units, the heads of both sales and operations for each business units, and a number of lower-level employees within those business units that have specific responsibilities requested by Plaintiffs. For example, Plaintiffs requested that Pilgrim's add employees who have responsibility for buying and selling poultry with other

---

[15] Given that negotiations over custodians have been progressing to date, Pilgrim's has not had sufficient time to interview employees and collect an affidavit describing the estimated cost for collecting documents from an additional seven locations. Common sense dictates that adding collections in seven disparate geographies, many in rural areas, necessarily will add significant expense.

integrated producers. Those are sales employees (not complex managers), and although they are fairly are low-level, Pilgrim's agreed to add them. Other examples included a request to add lower-level employees responsible for communicating with Agri Stats, communicating with the Georgia Department of Agriculture regarding the "Georgia Dock", and investor relations. The rationale was that Plaintiffs were able to point to specific allegations in the complaint regarding those responsibilities. Plaintiffs have not provided – and indeed cannot provide at this stage of the case – any justifiable rationale for increasing the number of Pilgrim's custodians in this case.

### D.  Direct Purchaser Plaintiffs' Document Custodians

**DPPs' Position:**

1. *Direct Purchaser Plaintiffs have already designated an adequate number of custodians, including every known individual who had any role in the purchase of Broiler chickens.*

Each DPP designated *every* known individual who had a role in purchasing Broiler chickens. Indeed, one named DPP (Ferraro Foods) has already agreed to designate more document custodians than many Defendants (14) and two others (DPPs Joe Christiana and Barters International) have agreed to collect the entire known universe of existing documents for purposes of funning searches. Nevertheless, Defendants seek to press further into the files of the victims of their alleged conspiracy by seeking the addition of an unidentified number of document custodians whose responsibilities relate exclusively to "downstream" sales of Broiler chickens by DPPs to their customers.

2. *Numerous Courts have found requests for downstream discovery in antitrust cases inappropriate, even where all that was sought from direct purchasers was transactional data.*

A request for downstream data from direct purchaser plaintiffs is "one routinely made by defendants in antitrust actions [and] an argument routinely rejected by various federal courts."

*In re Polyester Staple Antitrust Litig.*, MDL No. 3:03CV1516, slip op. at 5 (W.D.N.C. Feb. 5, 2004). Courts in the Seventh Circuit and across the country have routinely rejected requests by defendants in antitrust conspiracy cases to compel discovery of downstream sales information from direct purchaser plaintiffs, finding such discovery irrelevant to any legitimate claim or defense. *See, e.g.*, *In re Plastics Additives Antitrust Litig.*, No. 03-2038, 2004 WL 2743591, at *15-16 (E.D. Pa. Nov. 29, 2004) (finding defendants' request for "downstream" discovery irrelevant to any merits or class certification issue before the court). Despite Defendants' efforts to conjure up various rationales for their request, they cite no authority that warrants this Court's deviation from the majority rule prohibiting downstream discovery.

As established by extensive Supreme Court and other precedent, discovery of downstream data in price-fixing cases is almost always denied, not only because it is irrelevant to any legitimate claim or defense, but because courts recognize that victims of price-fixing schemes must be willing to come forward to prosecute such cases. If the law entitled Defendants to the irrelevant downstream discovery they seek, it could chill such vital private enforcement of the Sherman Act. Fortunately, a long line of cases roundly rejects such discovery, including the Supreme Court's decisions in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). *See e.g.*, *In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 301 (D.D.C. 2000) (noting that "no court has ever allowed production of individualized downstream data" in an antitrust case and refusing to grant defendants' motion to compel documents that relate to plaintiffs' use, manufacture, sale, marketing, distribution, or supply of vitamin products); *In re Auto Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2006 WL 1479819, at *7-8 (E.D. Pa. May 26, 2006) (declining to "depart from the long-held practice of proscribing discovery of downstream data" in a price-fixing case); *In re Plastics Additives*

*Antitrust Litig.*, No. 03-2038, 2004 WL 2743591, at *16 (E.D. Pa. Nov. 29, 2004) ("[C]ourts have refused to require production of downstream data in antitrust price-fixing cases"); *In re Air Cargo Shipping Servs. Antitrust Litig.*, MDL No. 1775, 2010 WL 4916723, at *2-4 (E.D.N.Y. Nov. 24, 2010) (denying motion to compel discovery of downstream information); *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 433-36 (N.D. Cal. 2008) (denying motion to compel discovery of downstream information); *In re Aspartame Antitrust Litig.*, No. 2:06-cv-1732, 2008 WL 2275528, at *4 (E.D. Pa. April 8, 2008) (granting motion for protective order regarding downstream discovery); *In re K-Dur Antitrust Litig.*, No. 01-1652, 2007 WL 5302308, at *10-15 (D.N.J Jan. 2, 2007) (concluding that downstream discovery was "irrelevant as a matter of law"); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 226 F.R.D. 492, 497-98 (M.D. Pa. 2005) (noting that courts "generally proscribe downstream discovery" in price-fixing cases). Moreover, it is well settled that antitrust defendants cannot avoid liability for damages on the grounds that direct purchaser plaintiffs were able to pass on any additional costs. *See Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481, 489 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745-46 (1977).

Courts in this District recognize the "long-held precedent of proscribing downstream discovery in antitrust litigation." *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, Nos. 09-C-7666, 11-C-1468, 2012 WL 1533221, at *3 (N.D. Ill. April 27, 2012). In such cases, plaintiffs' downstream data is "irrelevant to the question whether those buyers actually paid higher prices as a result of the alleged conspiracy . . . ." *In re Folding Carton Antitrust Litig.*, MDL No. 250, 1978 U.S. Dist. LEXIS 20409, at *5 (N.D. Ill. May 5, 1978). As such, DPPs should not be ordered to designate as document custodians individuals who have responsibilities exclusively for downstream sales of Broilers.

3.    *Defendants cannot repackage downstream discovery as something relevant to a DPP case.*

Despite Defendants' efforts to conjure up various rationales for their request for downstream discovery, they have cited nothing to warrant this Court's deviation from the majority rule prohibiting such discovery. An explanation concerning the irrelevance of each of Defendants' proffered rationales for downstream discovery—which have been proffered and rejected in other cases—is provided below.

a.    *Downstream Discovery of Named Representatives for the proposed DPP class is not permissible merely because there happen to be indirect purchaser actions.*

Courts generally refuse to require named representatives for a direct purchaser class to produce downstream discovery simply because a companion indirect case exists. *See In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 301 (D.D.C. 2000) ("[T]he proposition that there are indirect purchasers in this case who may assert claims for damages other than direct overcharges is not sufficient to carry defendants' burden of showing that this information ought to be produced by the direct purchasers."); *In re Aspartame Antitrust Litig.*, 2008 WL 2275528, at *6 (E.D. Pa. Apr. 8, 2008) (denying downstream discovery against direct purchaser class representative who were potential members of the indirect purchaser class); *In re Plasma-Derivative Protein Therapies antitrust Litig.*, 2012 WL 1533221 at *2 (noting that "Defendants seek to blur the line between the two groups in an effort to solicit downstream information from both. Otherwise, Defendants would generally be prohibited from downstream discovery in a direct purchaser action, yet are able to demand such discovery from an indirect purchaser."). Additionally, the downstream transactional data from a few direct purchaser plaintiffs is unlikely to provide any meaningful discovery in a corresponding indirect purchaser case. *See Aspartame*, 2008 WL 2275528, at *4 ("in light of the considerable size of the aspartame market the Court

does not find [Direct Purchaser] Plaintiffs' potential resales sufficiently significant to justify the burden on the Plaintiffs for providing individualized downstream discovery"). This is particularly true where the direct purchaser plaintiffs are not large retailers that control a significant portion of the indirect purchaser market, as is the case here. Furthermore, Defendants' statement below that "the IPP plaintiffs have already conceded this discovery is relevant, despite DPPs' attempt to block it" is factually inaccurate. Commercial & Institutional Indirect Purchaser Plaintiffs have repeatedly informed Defendants of their position that downstream discovery is irrelevant.

Therefore, DPPs should not be ordered to designate as document custodians individual who have exclusive responsibility for downstream sales of Broilers.

### b. *Downstream discovery from DPPs is not relevant to class certification.*

Defendants essentially argue that this Court should allow discovery of downstream data because it might be "relevant" to class certification, despite the fact that there is no pass-on defense to liability or damages in a direct purchaser antitrust case. But not all potential factual differences among class members are relevant for class certification purposes. Relevance refers only to those factual differences that could have legal significance. The common issues be resolved, if any, are not in the downstream market, but in the direct-purchaser market where [Direct Purchaser] Plaintiffs allege that they were overcharged." *In re Photochromic Lens Antitrust Litig.*, 279 F.R.D. 620, 624-25 (M.D. Fla. 2012).

Defendants rely primarily on reasoning that originated with the Eleventh Circuit's decision in *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1191-92 (11th Cir. 2003), which held that downstream discovery was relevant to typicality, commonality, and superiority under Rule 23 in a "pay-for-delay" class action because some class members

benefitted from the delayed introduction of generic drugs complained of in the lawsuit.  Notably, "[t]he *Valley Drug* decision has not been widely embraced.  Most courts which have considered the specific issue of down-stream discovery as it relates to class certification in antitrust litigation in the pharmaceutical industry have rejected it."  *In re Skelaxin (Metaxalone) Antitrust Litig.*, 292 F.R.D. 544, 553 (E.D. Tenn. 2010) (citing authority); *see also In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 2012 WL 1533221 at * 2-3.

Courts refusing to apply the reasoning of *Valley Drug* and its progeny have done so based on two primary reasons.  First, a number of courts have explicitly rejected the Eleventh Circuit's decision because "requiring plaintiffs to show that no class member benefited from the challenged conduct in the form of greater profits is contrary to the Supreme Court's decision in *Hanover Shoe*" that the alleged overcharge (rather than lost profits) is the measure of damages in Sherman Act lawsuits.  *In re K-Dur Antitrust Litigation*, 686 F.3d 197, 223 (3d Cir. 2013).  "The same logic applies equally, if not more strongly, in the class certification setting because under defendants' proposed approach, plaintiffs would not only have to assess their own lost profits but also those of potential class members."  *Id.*; *see also Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 434 (N.D. Cal. 2008) ("*Valley Drug* conflicts with the Supreme Court's decisions in *Hanover Shoe* and *Illinois Brick*…."); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 292 F.R.D. at 554 (refusing to apply *Valley Drug* to permit downstream discovery in a pay for delay antitrust action because "damages in this type of anti-trust litigation are not measured by lost profits; they are measured purely by overcharges, and this fact renders any *past* economic conflict of interest among plaintiffs in this litigation moot as a matter of law."); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 103 (E.D.N.Y. 2012) ("[T]he *Valley Drug* Court failed to recognize that *Hanover*

*Shoe's* holding eradicates any possibility that a named plaintiff's downstream sales could create a conflict of interest with other class members.").

Second, courts have distinguished *Valley Drug* based on the specific facts of that case. *Id.* at 104 ("the *Valley Drug* decision is distinguishable from this case because it was limited to the particular characteristics of the pharmaceutical industry. Specifically, the *Valley Drug* Court relied on an assumption that the demand for pharmaceuticals is less elastic than the demand for most consumer goods."); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 4916723 at *3 ("The decision in *Valley Drug*, which was not a price-fixing case, is not particularly helpful to the defendants" in a price-fixing antitrust conspiracy); *In re Photochromic Lens Antitrust Litigation*, 279 F.R.D. at 623-24 (distinguishing *Valley Drug* because "Defendants have not identified any direct purchasers that benefitted from Defendants' conduct or provided any information regarding the extent of the alleged benefit. And Defendants do not identify any factors specific to the nature of the product or industry that support the existence of a conflict of interest.").

In *Plasma Derivative*, the Northern District of Illinois followed the majority of Courts in rejecting downstream discovery in direct purchaser class action. *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 2012 WL 1533221, at *2-3 (stating there is "a plethora of case law in which courts analyzing facts similar to those herein did not permit discovery into downstream data and financial information.") (citations omitted). In the present case, Plaintiffs' allege a somewhat prototypical horizontal conspiracy by producers of Broilers to fix, raise and stabilize prices of a commodity product. Thus, it is unlikely that Defendants will be able to make a "demonstration that the markets at issue here share any of the unique market characteristics the court in *Valley Drug* found significant to its decision." *See In re Air Cargo*

*Shipping Servs. Antitrust Litig.*, 2010 WL 4916723 at\* 3; *In re Photochromic Lens Antitrust Litig.*, 279 F.R.D. at 623-24 (noting that generic pass-through argument such as the presence of cost-plus sales is not sufficient to demonstrate a conflict of interest under *Valley Drug*).

<u>c.</u>  <u>*Downstream discovery for the purpose of understanding market conditions is routinely rejected.*</u>

Finally, Defendants assert that downstream data is relevant to various market conditions such as substitutability and fungibility.  These arguments are routinely rejected by courts relying on *Hanover Shoe*.  In *In re Aspartame Antitrust Litig.*, No. 06-1732, 2008 WL 2275528 (E.D. Pa. Apr. 8, 2008), the court rejected defendants' product differentiation rationale for downstream discovery.  Defendants sought to establish the fungibility and substitutability of aspartame, as well as plaintiffs' buyer power — all variations of Defendants' arguments in this case. *See id*. at \*4-6.  The court found defendants' buying power argument to be without merit, as defendants' "suggest[ion] that a conspiracy was not as successful as it might otherwise have been because of the plaintiffs' countervailing economic power [was] absurd."  *Id*. at \*5 (quoting *Vitamins*, 198 F.R.D. at 301).

Similarly, in *Automotive Refinishing Paint*, the court rejected defendants' downstream data request regarding "market conditions" and the "competitive landscape" in order to show that the competitiveness of the industry made price-fixing implausible. 2006 WL 1479819, at \*7-8. The court noted that "Plaintiffs' activities are almost wholly irrelevant in proving or disproving the underlying charge. This claim must be substantiated by evidence of Defendants' activities, not Plaintiffs'." *Id*. at \*8. Thus, Defendants' claim that downstream data is relevant to analyzing the market conditions of the Broiler industry is without merit.

4. *Defendants' request for downstream discovery through the designation of so-called trade association document custodians is similarly improper.*

DPPs agreed to designate as document custodians individuals who were involved with trade associations relating to Broilers or other protein products. Some of these designated custodians may or may not have communicated with other distributors or attended annual meetings of trade groups, such as the UniPro buying group in which Defendants have previously expressed an interest. However, the parties have yet to even have an initial meet and confer on search methodology or DPPs' objections to Defendants' Rule 34 Requests for Production, which is the appropriate forum for having such a discussion. Regarding the current issue of designating document custodians, Defendants ask that DPPs go far beyond the realm of individuals with potentially relevant information and designate as custodians individuals who were involved in unidentified non-protein industry trade associations—indeed, during the parties' May 12 meet and confer, counsel for Tyson stated that a DPP employee's involvement in a local Rotary Club would warrant designation of that individual as a document custodian. In addition to clearly being overbroad, such a position is at best inconsistent in light of Defendants' proposal to withhold as "irrelevant" all documents relating to non-Broilers, including Tyson's sale of beef or pork. *See* ECF No. 349 at pp. 34-35 (proposing to permit the parties to withhold email attachments that "pertain almost entirely to non-broiler products").

Defendants' proffered rationale for designating additional document custodians who attended *any* type of community group or trade association meeting—that it might somehow enable Defendants' to show that attendance at broiler-related trade association events is innocent—does not justify the unnecessary cost and burden that would be imposed on DPPs in order for Defendants to assert what amounts to a throw-away argument on an irrelevant question. As DPPs advised Defendants, a simple interrogatory or deposition questions would allow

Defendants to pursue this "defense" without the burden and expense of designating numerous irrelevant DPP employees as document custodians. The question to be answered in discovery is whether Defendants' employees used trade association events as opportunities to facilitate an antitrust conspiracy, not whether DPPs' employees attended different, irrelevant, and unrelated community events or trade associations.

Given the irrelevance of Defendants' argument that attendance at community events or trade associations, the intent of Defendants' request for document custodians who attended trade association events appears to be to obtain downstream information relating to DPPs' downstream sales employees. As noted above, such downstream data is not only irrelevant, but is impermissible because it has a chilling effect on direct purchaser plaintiffs' willingness to step forward and challenge conduct that violates the Sherman Act. *See In re Vitamins Antitrust Litig.*, 198 F.R.D. at 298-301.

None of the cases cited by Defendants support the proposition that an individual's participation in community organizations or trade associations unrelated to Broilers warrants inclusion of that individual as a document custodian (and Plaintiffs are unable to find any case law supporting such a proposition). To be clear, Plaintiffs do not dispute that Defendants are entitled to documents and information concerning DPPs' participation in any *relevant* trade association—and Plaintiffs have expressly offered to produce such documents for the designated custodians, to the extent they exist—but there is simply no basis for including as a document custodian any individual who may have participated in some entirely irrelevant group or organization.

The Court should decline Defendants' request to force DPPs to designate as document custodians individuals who were involved with irrelevant, non-protein industry trade associations.

**Defendants' Position:**

The Parties also have reached agreement on the custodians for all Commercial and Institutional Indirect Purchaser Plaintiffs as well as all Direct Purchaser Plaintiffs ("DPPs"), subject to disputes about two categories of custodians. First, DPPs take the position that the only relevant custodians are individuals with responsibility for purchasing broilers, but Defendants believe employees with other broiler-related responsibilities (*e.g.*, sales of broilers) are relevant. Second, DPPs are refusing to designate as custodians individuals who participate in trade associations, even for limited purposes. Those categories are discussed in more detail below.

## I. DPPs Should Not Be Permitted to Avoid Preserving and Producing Relevant Information Such as Downstream Discovery.

DPPs refuse to produce any information related to their sales of broilers to their customers (*i.e.*, "downstream" sales to putative members of the IPP classes).[16] More specifically, DPPs have refused to: (1) preserve any files or ESI related to downstream sales; (2) add custodians whose responsibilities involve downstream sales; (3) search non-custodial document sources that relate to downstream sales; and (4) produce documents related to downstream sales. DPPs' refusal to preserve or produce downstream data is based solely on a

---

[16] CIIPPs also object to, and refuse to provide, downstream discovery, but they now represent that none of the CIIPPs sell broilers. *See* Ex. G, 6/13/17 Ram Letter to Suggs. This representation is curious, since a major basis for the appointment of counsel for End User Consumer Plaintiffs in this case was the apparent conflict of interest between resellers and end-users. *See, e.g.*, Dkt. No. 218 at 4 ("Three cases were filed on behalf of indirect purchaser resellers, such as small grocery stores and restaurants, which purchase the broilers from distributors and resell them ('Resellers').")); *see also id.* at 8 ("Consumers will want to maximize their damages by proving that nearly 100% of the overcharges were passed through to them. Resellers will want to show that they absorbed most of the overcharges and passed through very little.").

relevance argument: DPPs' position is that the limitation on "pass-on" defenses to Sherman Act claims prohibits Defendants, as a matter of law, from seeking or obtaining any downstream information.

By making this argument, DPPs ignore both the case law and the facts. Courts routinely permit downstream discovery in antitrust cases where that discovery is relevant. And downstream discovery is particularly relevant in cases where, such as here, claims have been brought by indirect (*i.e.* downstream) purchasers as well as direct purchasers. In fact, the IPP plaintiffs have already conceded this discovery is relevant, despite DPPs' attempt to block it.[17] And numerous courts (including this one) have found downstream discovery relevant to other issues beyond the "pass-on" defense in federal antitrust suits. For these reasons and those explained below, Defendants respectfully request this Court to order DPPs to withdraw their objection to preserving and producing relevant documents concerning downstream sales of broilers and other information related to broilers besides just purchases.[18] In the event the Court desires further briefing or argument on this issue, Defendants are prepared to file a motion to compel.

A. <u>Downstream Discovery is Highly Relevant, and DPPs' Failure to Provide it Will Prejudice Defendants and the Other Putative Classes.</u>

Downstream discovery is relevant to the claims and defenses of the DPP and IPP cases, and it is proportional to the needs of these cases. Indeed, DPPs' ability to withhold downstream discovery would deprive Defendants and the IPPs of evidence that is relevant to numerous

---

[17] Additionally, downstream discovery from the named representatives of the putative DPP class may help avoid the need for IPPs to pursue third-party discovery from absent class members, to whom the named DPPs have an obligation under Rule 23.

[18] The Court's ruling on this issue will benefit the Parties' ongoing meet and confer discussions regarding DPPs' objections to Defendants' requests for production, which include the same objection regarding downstream discovery.

issues, including class certification, market definition, and issues arising under pending state law claims that allow a pass-on defense.

*First*, Plaintiffs' sales information is relevant to the IPPs' claims under state laws, many of which allow a pass-through defense. DPPs do not dispute that "a pass-on defense, while not allowed under federal antitrust law, is permitted under the state laws… in the indirect purchaser action[s]." *See In re Plasma-Derivative Protein Therapies Antitrust Litig.,* No. 09 C 7666, 2012 WL 1533221, at *3 (N.D. Ill. Apr. 27, 2012). And DPPs also do not dispute that their downstream documents and data contain information relevant to the issue of which indirect purchaser plaintiffs, if any, paid the alleged overcharge. *See In re Cathode Ray Tube (CRT) Antitrust Litigation*, 301 F.R.D. 449, 452-53 (N.D. Cal. 2014) (denying direct purchaser plaintiff's objection and allowing downstream discovery related to direct purchaser's pricing as being "directly relevant to the question of how, and in what amount, any potential overcharges were passed through to *other plaintiffs*") (emphasis added); *In re Aftermarket Filters*, No. 08 C 4883, 2010 U.S. Dist. LEXIS 105108, at *13-14 (N.D. Ill. Oct. 1, 2010) (allowing discovery from direct purchasers related to "prices charged to the indirect purchasers"); *In re Polyester Staple Antitrust Litig.*, No. 2:03CV1516, 2005 WL 6457181, at *4 (W.D.N.C. May 9, 2005) (compelling direct purchaser plaintiffs to produce discovery as relevant to the indirect purchaser claims). Consequently, downstream discovery will be highly relevant to the claims and defenses in the indirect purchaser cases. Fed. R. Civ. P. 26. Such discovery will also be relevant to class certification in those cases, particularly with respect to whether IPPs can meet their Rule 23 burden to show that, at trial, individualized proof would not overwhelm common proof on disputed elements of impact and pass-on of damages.

The IPPs have agreed that this type of discovery is relevant. As this Court is well-aware, the End-User Consumer Plaintiffs filed a motion petitioning the Court to allow them to subpoena hundreds of putative DPP class members for the purpose of obtaining downstream data from them. *See* Dkt. No. 355, at 1-2, 6, 9, ("[T]he EUPs will require transactional data from Defendants' direct customers, including distributors and retailers. This data will be used to analyze the extent to which the overcharges are passed through the chain of distribution."). In fact, the Parties and the Court spent months briefing and discussing the EUPs desire to send preservation subpoenas to Defendants' customers precisely to obtain such discovery. The EUPs have also served their own set of document requests on DPPs seeking various categories of downstream documents and data.[19]

***Second***, courts have repeatedly recognized that downstream information (and other non-purchasing documents) is relevant to the class certification inquiry in a DPP case under the federal antitrust laws, including issues of commonality, typicality, and adequacy. *See, e.g.*, *In re Plastics Additives*, No. 07-0086, 2010 WL 3431837, at *12 (E.D. Pa. Aug. 31, 2010) (holding evidence "class members were able to obtain lower prices from Defendants" because they had option "to buy from non-Defendant[s]" is relevant and weighs against finding class-wide impact); *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 267-68 (D. Mass. 2008) ("[T]his Court permitted downstream discovery to determine whether a fundamental conflict exists between distributor class members and end user class members."); *In re Urethane*

---

[19] The papers submitted by the IPPs in connection with their motions for lead counsel also acknowledge the relevance of downstream evidence. *See, e.g.*, Dkt. No. 116-3 (describing class certification analysis related to "the products, distribution channels, final uses, and the distribution ("pass-on") of the alleged overcharges between intermediate and end-buyer groups, as well as their various characteristics and their relative percentages of DRAM commerce"); Dkt. No. 117 at 15 (describing expert opinions using downstream data); Dkt. No. 117-3 at 10 (Defendants' expert analysis of downstream data); Dkt. No. 121 at 3 (predicting that "reseller and consumer witnesses [will be] deposed on the subject of pass through (an issue central to each class's impact and damages claim)" and that "expert reports reflecting pass-through analysis and class certification motions" will be filed).

*Antitrust Litig.*, 237 F.R.D. 454, 464 (D. Kan. 2006) (granting defendants discovery relating to plaintiffs' "policies regarding sales and purchasing decisions" because such discovery "bears on whether Plaintiffs' claims are typical of those of the class they seek to represent, whether common issues predominate in this action, and whether Plaintiffs will be adequate representatives"); *In re Pressure Sensitive Labelstock*, 226 F.R.D. 492, 495 (M.D. Pa. 2005) ("[U]se of non-manufacturer sellers' prices by class members may bear on the questions of class-wide impact.").

DPPs' downstream documents could include information regarding changes in demand and pricing for broilers, or admissions about the characteristics and complications of the alleged market—information that is central to whether a DPP class should be certified, and if so, what its definition should be. *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153 (3d Cir. 2002) (granting class certification after considering various "industry characteristics," including market power). For instance, if the facts are such that the impact and damages of the alleged anti-competitive activities on the putative class must be determined for each class member separately, then these individual determinations will be found to overwhelm any common issues. *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68-69 (4th Cir. 1977). DPPs "should not be allowed to hide behind the possibility of a pass-on defense as a reason to be totally unresponsive to" Defendants' discovery requests seeking otherwise responsive documents that relate to downstream information. *See In re Plasma-Derivative*, 2012 WL 1533221, at *3.

***Third***, downstream information (and other non-purchasing information) is relevant to market definition issues, such as substitutability and interchangeability. For example, DPPs' downstream information – including documents in the custodial files of its sales executives or sales managers – likely will include information about customer preferences and sales trends

relevant to support or undermine any alleged market definition presented by IPPs' and DPPs' class certification and merits experts. In fact, Plaintiffs expressly allege that broilers do not face competition from substitutes such as other meat products. *See, e.g.*, Dkt. No. 212 ¶¶ 282-283; Dkt. No. 253 ¶¶ 287-288; Dkt. No. 255 ¶¶ 310-311. Defendants are entitled to discovery relevant to these allegations, in particular from information in Plaintiffs' own files about downstream sales and promotional programs that may directly contradict these allegations.

Such documents could also include information about other sales-based reasons for a particular class member's decision to purchase, not purchase, switch to, or pay more for certain broilers, or to purchase or not purchase from a defendant or non-defendant. Such documents in the possession of DPPs' sales-oriented custodians are relevant and necessary to attack DPPs' claim that the alleged conspiracy had a class-wide impact and to establish individual issues regarding their purchasing and pricing that undermine any Rule 23 motion for class certification. *See Windham*, 565 F.2d at 62-65 (affirming denial of class certification in an antitrust action where the relevant product came in a variety of grades and was non-fungible).

In sum, there are numerous factual issues in these cases to which downstream discovery is relevant, and the potential unavailability of the "pass-on" defense in the DPP case does not render all downstream discovery off limits.

### B.  DPPs' Position is Unsupported by the Applicable Case Law.

Given the many issues identified above to which downstream discovery is relevant in antitrust cases, it is unsurprising that the precedent DPPs cite fails to support their position. Indeed, contrary to DPPs' position, there is no legal precedent holding that downstream data is wholesale irrelevant. As one court correctly summarized, "neither *Hanover Shoe* nor *Illinois Brick* holds that downstream data is irrelevant or non-discoverable. . . . Nor can it be said that

any of the courts interpreting *Hanover Shoe* hold downstream data irrelevant as a general rule." *In re Urethane Antitrust Litig.*, 237 F.R.D. 454, 462-63 (D. Kan. 2006). The very cases relied on by DPPs contradict and undermine their position that downstream discovery is never appropriate in a federal antitrust case "as a matter of law." *See, e.g., Meijer Inc. Abbott Labs.*, 251 F.R.D. 431, 433-36 (N.D. Cal. 2008) (acknowledging that courts may order downstream discovery if the documents are relevant to class certification); *In re Aspartame Antitrust Litig.*, No. 2:06-CV-1732-LDD, 2008 U.S. Dist. LEXIS 121490, at *12-13 (E.D. Pa. Apr. 8, 2008) (acknowledging that "downstream discovery is not prohibited in a federal price-fixing class action"); *In re Plastics Additives Antitrust Litig.*, No. 03-2038, 2004 U.S. Dist. LEXIS 23989, at *52 (E.D. Pa. Nov. 29, 2004) (refusing to "per se preclude defendants at this time from requesting downstream data through discovery"). Indeed, in *In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 299 (D.D.C. 2000), the court disallowed downstream discovery because it found that the burden and expense of the discovery outweighed its likely benefit—a position neither taken nor established by DPPs here. *Id.*; *see also CRT*, 301 F.R.D. at 455 (approving downstream discovery pursuant to a balancing test).

Unlike the cases cited by DPPs, Defendants here have demonstrated that downstream discovery is relevant to various market definition and class certification issues. DPPs have also not presented any legal authority that would allow them to withhold or deny custodians or discovery that relate in part to downstream sales, but also partially relate to purchasing and other relevant topics. Moreover, critically, this litigation involves two putative classes of indirect purchasers that have asserted claims under state laws that recognize a pass-through defense, and both the IPPs and Judge Durkin have acknowledged that pass-through issues will be relevant in this case. *See supra*; 12/9/16 Hr'g Tr. at 36; Dkt. No. 144 at 4. And, because discovery is

proceeding jointly in the direct and indirect cases consolidated in the *In re: Broiler Chicken Antitrust Litigation* case, it is inefficient to deny Defendants the downstream discovery to which they are entitled.

*     *     *

Downstream discovery should be allowed in this case because it is highly relevant to class certification and the merits of the claims in this litigation.  *See* Fed. R. Civ. P. 1, 23, 26.  DPPs' refusal to produce such discovery is unjustified and unsupported, and DPPs' continued refusal to preserve or produce this information will potentially prejudice both Defendants and IPPs.  For the foregoing reasons, the Court should order the DPP class representatives to withdraw their objection regarding downstream information and to add custodians that possess downstream documents.

## II.  DPPs Should Not Be Permitted to Avoid Producing Documents Relating to Their Participation in Trade Associations.

In their complaint, Plaintiffs rely exclusively on circumstantial evidence to attempt to allege a conspiracy.  Among other things, they allege that Defendants had "opportunities" to conspire because they are members of trade associations.

A number of courts have held that, where plaintiffs are asking the factfinder to infer a conspiracy based on conduct such as participation in trade associations, defendants can obtain discovery showing that the plaintiffs themselves engaged in similar conduct, which suggests that the conduct is not conspiratorial.  *See, e.g.*, *In re Domestic Drywall Antitrust Litig.*, MDL No. 13-2437, 2016 U.S. Dist. LEXIS 109695, at *14-15 (E.D. Pa. Aug. 18, 2016) (requiring plaintiffs to "produce all requested trade-association related documents" and to identify the "relevant trade-association and identify which meetings were attended"); *In re Cathode Ray Tube Antitrust*

*Litig.*, MDL No. 1917, 2015 U.S. Dist. LEXIS 185963, at *87 (N.D. Cal. Jan. 16, 2015) ("[C]ompetitive intelligence information is relevant to rebut allegations that competitor contacts and price monitoring are indicative of a conspiracy."); *Gen. Commc'ns Eng'g, Inc. v. Motorola Commc'ns & Elecs., Inc.*, 421 F. Supp. 274, 289 (N.D. Cal. 1976) (holding that "practice common in the industry and utilized by both plaintiff and defendant" is not a *per se* violation of the Sherman Act) (citing *Whitten v. Paddock Pool Builders*, 508 F.2d 547 (1st Cir. 1974)); *In re Urethane Antitrust Litig.*, No. 04-MD-1616-JWL, 2011 U.S. Dist. LEXIS 37093, at *43-44 (D. Kan. Apr. 5, 2011) ("Plaintiffs concede that they intend to use such evidence regarding defendants' activities as evidence supporting the existence of a conspiracy; thus defendants would be entitled to rebut that evidence by showing that because plaintiffs engaged in the same conduct, that evidence does not necessarily indicate or support the existence of a conspiracy among defendants."); *In re Urethane Antitrust Litig.*, No. 04-MD-1616-JWL, 2010 U.S. Dist. LEXIS 134110, at *42-43 (D. Kan. Dec. 17, 2010) (holding defendants are entitled to information that might refute plaintiffs' assertion that attendance at trade association meetings is evidence of collusion, "such as possible statements by plaintiffs that such conduct is consistent with legal business behavior").

Consistent with this precedent, Defendants have asked DPPs to designate as custodians employees who participated in trade associations.[20]  DPPs have rejected that request on the ground that participation in trade associations is only relevant if the association is "protein-

---

[20] Contrary to DPPs' representations, Defendants never asked DPPs to designate custodians who were members of a Rotary Club or similar organization.  Nor have Defendants requested that DPPs produce documents relating to such groups.

related."[21]  But membership in, for example, a restaurant industry trade group is just as relevant for Defendants' purposes as membership in a protein-related trade association.

Although DPPs suggest that adding the requested custodians would be burdensome, they have not even attempted to explain what that burden would be – even though elsewhere in their submission they claim that the party opposing discovery must "at a minimum, specify the nature and extent of that burden." *See supra* § Tyson Food Custodians.  Furthermore, Defendants have offered to minimize any burden by limiting discovery from such custodians to only those Requests seeking materials related to communications with competitors and participation in trade associations (assuming that the custodian is not likely to possess other relevant information).[22] *See* Ex. E, 6/13/17 Suggs Letter to Clark.  Plaintiffs ignore that offer in their submission.

DPPs also have argued that Defendants should limit their discovery on these issues to interrogatories or depositions, but DPPs cannot dictate to Defendants the form of discovery of relevant information, and documents can shed much more light on the scope and nature of DPPs' conduct than can other forms of discovery.

Defendants ask the Court to order DPPs to designate as custodians current and former employees who participated in trade associations, to the extent there are any such employees.[23]

## II.    RULE 34 OBJECTIONS AND RESPONSES

The parties address their positions on Rule 34 Objections and responses below.

---

[21] DPPs state they will produce trade association documents from their designated custodians, but it is not clear that those individuals – who are limited to employees with responsibility for purchasing broilers – even include individuals who attended trade associations.

[22] This disproves DPPs' claim that Defendants are seeking discovery from these custodians to obtain downstream sales information.

[23] Defendants reserve their right to seek similar discovery from CIIPPs if they learn that CIIPPs also participated in trade associations.

**Plaintiffs' Position:**

Plaintiffs' and Defendants' responses and objections to their respective Rule 34 Requests for Production of Documents were due on May 19, 2017. On June 6, 2017, Plaintiffs sent a meet and confer letter to Defendants addressing certain threshold issues effecting Defendants' responses—e.g. assertion of general objections, objections to defined terms, and failure to provide responses that complied with the 2015 Rule 34 Amendments. Defendants' June 9, 2017 response did not provide an agreement on any of these issues, but indicated Defendants were willing to meet and confer further. Given the close proximity of these discussions to the filing of this brief, the parties agreed it was appropriate to engage in further meet and confer discussions before presenting these issues to the Court. However, the parties do not agree on the timing of such a proposed continuance.

Plaintiffs' position is that the Court should set a deadline of June 23, 2017 for the parties to meet and confer on the high-level issues identified in Plaintiffs' June 6, 2017, letter, and (if necessary) brief the issues. This initial deadline would be without prejudice to the parties ability to confer upon and resolve other issues relating to Plaintiffs and Defendants' Rule 34 responses at a future date to be agreed upon by the parties or ordered by the Court. Plaintiffs believe that this deadline is important to ensure the meet and confer process continues to proceed expeditiously.

**Defendants' Position:**

Although the parties have exchanged objections and responses to Rule 34 requests for production of documents ("Requests"), the Parties have not even begun to meet and confer regarding those Requests, despite today being the deadline for briefing any disputes about the Requests. This delay is partly due to simultaneous (and productive) negotiations related to

custodians. But it is also a product of the massive number of Requests served in the case, especially the broad Requests served by Plaintiffs. Altogether, Plaintiffs served on Defendants approximately 80 Requests, many with various subparts and requesting "all documents related to" myriad vaguely defined categories of documents that touch on almost every aspect of Defendants' businesses.

As required, each Defendant individually objected and responded to all of the Plaintiffs' Requests on May 19, 2017. Plaintiffs did not raise a single issue about those objections and responses until just last week on June 6, 2017. Even then, Plaintiffs only summarized at a general level a discrete set of issues, many of which applied to only some (unidentified) Defendants and/or were too vague for Defendants to understand. Plaintiffs' letter also contemplated that they may raise additional issues in the future about each Defendant's individual objections and responses.

After raising this subset of non-individualized issues, Plaintiffs propose bifurcating negotiations regarding objections to the Requests, first addressing the generic issues summarized in Plaintiffs' June 6 letter and later moving on to others. Despite punting additional issues for a later date, Plaintiffs propose the Parties negotiate and brief the generic issues they raised *within nine days*, with other issues to be separately raised and briefed at a later date. This bifurcation proposal – necessitated by Plaintiffs' own delay – is inefficient and overly-complicates the issues to be decided by the Court.

Even if it made sense to bifurcate these negotiations (and, as discussed below, it does not), nine days is patently unreasonable, not least because the Parties are currently busy drafting this joint submission and preparing for this Friday's status conference related to the ESI protocol. Furthermore, as the Parties' experience shows, productive negotiations take time in a complex

case such as this. The Parties have to understand their respective positions, consult with their clients, identify areas of potential compromise, consult with their clients again, and so on.[24] For example, the Parties have spent over six weeks negotiating custodians, and the Parties worked on the ESI protocol for even longer.

More importantly, it makes little sense for the Court and the Parties to address issues about the Requests on a piecemeal basis. Under Plaintiffs' proposal, the Parties will delay negotiations about some issues that could be helpful or even necessary for understanding and resolving the issues Plaintiffs have raised in their letter, including each Defendant's responses to specific Requests. Further, it is inefficient and unproductive to decouple "generic" issues, which may or may not apply to all Defendants, from individual negotiations about each Defendant's specific objections. Rather, discussions on each Defendant's objections should proceed on an individualized basis as the Parties' negotiations over document custodians have successfully occurred. Plaintiffs' generic and expedited approach limits the ability of the Parties to compromise on the various issues, which is critical to negotiations, and removes Defendants' objections from the context of the actual objections that each individual Defendant actually made. Indeed, Plaintiffs' proposal does not even allow sufficient time for compromises to be reached or particularized differences in approach among Defendants to be explored. In sum, Plaintiffs have different issues with different Defendants, and those differences cannot be adequately addressed through a single global negotiation in the next nine days. Finally, Plaintiffs' proposal ignores that Defendants served their own Requests on Plaintiffs, and there is

---

[24] Recognizing that Plaintiffs are seeking vast swathes of discovery encompassing all aspects of the businesses of more than a dozen Defendants for a time period of nearly a decade, Defendants anticipated that the process would take considerable time. Thus, Defendants originally proposed a schedule that provided more time for the negotiations and discussions. However, in a compromise with Plaintiffs, Defendants ultimately agreed to a more compressed schedule, which has proved impossible to meet.

no reason to address Defendants' objections and responses on one track and Plaintiffs' objections and responses on another.

For these reasons, Defendants ask the Court to deny Plaintiffs' request for separate deadlines for negotiating different (and not-yet-defined) aspects of Defendants' objections and responses. Instead, the Parties should meet and confer regarding an appropriate deadline for comprehensive negotiations of the issues related to the Requests that can be identified at this stage of discovery.

## III. FLORIDA ATTORNEY GENERAL CIVIL INVESTIGATIVE DEMANDS.

Plaintiffs have renewed their request for documents produced by six Defendants (Tyson, Pilgrim's, Sanderson, Koch, Wayne Farms, and Fieldale) in response to the Antitrust Civil Investigative Demand ("CID") by the Office of the Florida Attorney General. Defendants decline to produce such documents at this time. The parties outline their positions below.

### Plaintiffs' Position:

During the April 21, 2017 Status Conference, the Court did not order that certain defendants produce documents responsive to the Antitrust Civil Investigative Demand ("CID") served by the Florida Attorney General's Office ("Florida AG") based on two concerns: 1) the Court did not know enough about the scope of the Florida Attorney General investigation; and 2) the Court wanted to address the issue in the context of Defendants' responses to Plaintiffs' Rule 34 requests for production of documents. (Transcript of April 21, 2017 Status Conference, at p. 70-71 ("the Florida Attorney General, well, I understand that that could be more focused. I don't know enough about that investigation to say for sure. But it's teed up as part of your Rule 34 request…") The events and discovery that have taken place since the April 21 Status Conference

have addressed both of these concerns and justify an order requiring Defendants to produce these relevant and readily available documents now.

On May 17, 2017 Plaintiffs' obtained copies of the Florida AG CIDs served on Defendants Fieldale Farms Corp., Koch Foods, Wayne Farms, Sanderson Farms, Tyson Foods and Pilgrim's Pride ("CID Defendants"), in response to their open records request. (*See, e.g.*, Florida AG CID to Wayne Farms (Ex. D), Bates numbered FLA-AG0000000031-40 (each of the CIDs served on the defendants contain nearly identical requests.) Service of the CID was accepted on behalf of the six relevant Defendants by an attorney representing that Defendant in this litigation. *See, e.g.*, *id.* (CID accepted by attorney Christopher Ondeck, on behalf of Wayne Farms.); *see infra* (signature block for Mr. Ondeck). These CIDs confirm that the scope of the Florida AG investigation directly tracks the scope of Plaintiffs' claims in this lawsuit. For instance, the CIDs request "All Documents Relating to any internal investigations conducted by Your Company of potential anticompetitive conduct within the Broiler industry." (*Id.* at Request 1.) The CIDs seek documents and communications relating to Georgia Dock Index price submissions and calculations; Broiler price, supply, and production; Broiler production cuts; and the reduction in or liquidation of Broiler breeder flocks. (*Id.*, Requests 2-10) They further seek contractual and transactional information regarding the sales of Broilers. (*Id.*, Requests 11-14) Each of these issues fall within the scope of Plaintiffs' claims in this lawsuit. Thus, there should not be any concern by the Court that ordering the production of documents produced in response to the Florida AG CID would be overbroad or require an additional layer of review before they are produced.

Plaintiffs have also received Defendants' responses and objections to Plaintiffs' Rule 34 Requests for Production of Documents ("RFPs"). (*See* All Plaintiffs' First Set of Requests for

Production of Documents to all Defendants, Ex. C.)  Significantly, all of the CID Defendants except Wayne Farms[25] have agreed to produce documents in response to RFP 35(a) which seeks: "Documents relating to any possible or alleged violations of federal, state, or international antitrust laws …including: a. any inquiry, investigation, administrative, criminal or civil litigation or similar actions (regardless of characterizations such as non-adjudicative, cooperating, preliminary, informal, formal, incomplete, open, closed or final) by... any state law enforcement agency."  (*See id*., pp. 19-20.)  The CID Defendants have agreed to produce documents relating to submissions to the Georgia Dock broiler price index in response to RFPs 19-22.  (*See id.*, pp. 15-16.).  The CID Defendants have also agreed to produce transactional and contractual information relating to Defendants' sales of Broilers in the United States in response to RFP 40-41 and 48.  (*See id.*, pp. 21, 23.).  Thus, there is no legitimate dispute that the documents produced in response to the Florida AG CID documents fall within the scope of discovery and should be produced.

Given the centrality of the Florida CID documents to the litigation, Defendants cannot establish that these documents are not responsive to Plaintiffs' Rule 34 request or otherwise not discoverable.  Moreover, any claim Defendants claim that these documents should not be produced until after the Court rules on Defendants' Motion to Dismiss, lacks merit because any legitimate grounds for such delay—i.e. burden, costs and expense—do not apply to readily available documents that have already been produced to the Florida AG .  As this Court has previously ruled in requiring the parties to provide Rule 26 disclosures, waiting for the Motions to Dismiss to produce minimally burdensome and available discovery will only impede the progress of the other phases of the litigation.  Production of the Florida AG CID documents now

---

[25] Wayne Farms' isolation on this issue demonstrates the impropriety of its position.

is important because it will facilitate a better understanding of the facts supporting the allegations in Plaintiffs' complaints, permit more informed negotiation of document sources and search methodology, and constitute a limited burden to Defendants. These documents will also be relevant to the drafting of any amended complaint in the event that Defendants' motion to dismiss is granted. Therefore, Plaintiffs respectfully request that the Court order CID Defendants to produce the documents responsive to the Florida AG CID within 14 days of the June 16 status conference. *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 899-900 (N.D. Cal. Feb. 14, 2008) (explaining how the Court required production of documents produced to the DOJ well before adjudicating defendants' motions to dismiss); *In re Platinum & Palladium Commodities Litig.*, No. 10-cv-3617, Dkt. 59, at 2-3 (S.D.N.Y. Nov. 30, 2010) (compelling defendants to produce 250,000 pages of documents already produced to government authorities before the decision on the motion to dismiss); *In re Photochromatic Lens Antitrust Litig.*, No. 10-md-2173 (M.D. Fla. Nov. 5, 2010) (Ex. H) ("despite the absence of any agreement among the parties on a case management schedule, Defendants voluntarily produced the FTC Material to Plaintiffs").

**Defendants' Position:**

On April 21, 2017, the Court ruled that it was premature for Plaintiffs to demand productions made by Defendants to the Florida Attorney General (or other government entities) and any such productions should be made "in the context of a [Rule 34] request for a production of documents." 4/21/17 Hr'g Tr. at 68:1-9; 70:23-71:7. Despite the Court's ruling, Plaintiffs

again demand that certain Defendants provide to them any documents produced in response to the Florida Attorney General's Civil Investigative Demands ("CID(s)").[26] *See* Ex. F.

Nothing has changed since the Court's ruling. At the time of the ruling, Sanderson Farms had already disclosed – months prior – that it had received a CID. In fact, Plaintiffs concede they were aware of that disclosure, *see id.* at 1. To be sure, Plaintiffs emphasize that other Defendants have now received a CID. *See id.* But they do not explain why that matters. Nor could they: Plaintiffs do not have a greater claim to obtain government productions just because several more Defendants might produce such documents. Similarly, that Plaintiffs have now obtained copies of the CIDs makes no difference either. *See id.* at 2. Nor can Plaintiffs claim that, at the time of the Court's ruling, they did not know the subject matter of the Florida Attorney General's CIDs. Indeed, in their previous filing, they even characterized the Florida Attorney General's investigation as "concerning Defendants' conduct alleged in Plaintiffs' complaints." Dkt. No. 349 at 8.

Plaintiffs now argue that receiving government productions would "facilitate a better understanding of the facts supporting the allegations in Plaintiffs' complaints."[27] Ex. F, at 2. However, the same can be said of any pre-dismissal discovery and cannot justify "unlock[ing] the doors of discovery" while Defendants' motions to dismiss are pending. *See Ashcroft v. Iqbal*,

---

[26] The relevant Defendants are Tyson Foods, Pilgrim's Pride, Sanderson Farms, Wayne Farms, Fieldale Farms, and Koch Foods. Plaintiffs also demand that these Defendants supplement their Rule 26(a)(1) disclosures pursuant to Rule 26(a)(1)(A)(ii) and provide copies of the documents produced to the Florida Attorney General in response to the CIDs. *See* Ex. F, 6/2/17 B. Clark Letter to Defendants, at 2. Nothing in Rule 26(a)(1)(A)(ii) requires Defendants to do so. That rule requires only that a party disclose "a description by category" of documents the party "may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(ii). Defendants have complied with their obligations under the rule.

[27] Contrary to Plaintiffs' assertion as to Wayne Farms, its objections to RFP No. 35 are not unreasonable or improper. Although omitted by Plaintiffs, Wayne Farms detailed the numerous problems with, and objections to, RFP No. 35. And, it offered to individually meet and confer with Plaintiffs about them. Yet Plaintiffs have made no such request of Wayne Farms, instead choosing to raise an issue with the company's specific objections to RFP No. 35 for the first time in their proposed submission on June 14.

556 U.S. 662, 678-79 (2009). Moreover, that Plaintiffs need the discovery to "better understand[]" the facts supporting *their* allegations suggests that they have not meaningfully investigated, and do not have a factual basis for, their Complaints' allegations.

In addition, Plaintiffs' assertion that any productions to the Florida Attorney General fall within the scope of discovery is presumptuous to say the least, because the Court has not ruled on Defendants' motions to dismiss.[28]   Any further discovery should await resolution of what, if any, remains of Plaintiffs' allegations after the Rule 12 motions are decided. Accordingly, Plaintiffs lack any reasonable basis to demand document productions from Defendants outside of a Rule 34 request for production, on an expedited basis (and prior to the Court's ruling on Defendants' Rule 12 motions), and despite the Court's ruling to the contrary.

---

[28] It bears noting that a "decision by the Florida Attorney General to investigate . . . does not make the conspiracy alleged in this case more plausible because the outcome of the investigation cannot be predicted." *In re Florida Cement & Concrete Antitrust Litig*., 746 F. Supp. 2d 1291, 1316 (S.D. Fla. 2010).

**Date: June 14, 2017**

s/ Steven A. Hart
Steven A. Hart (#6211008)
Brian Eldridge (#6281336)
Kyle Pozan (#6306761)
Benjamin Shrader (#6304003)
HART MCLAUGHLIN & ELDRIDGE, LLC
121 West Wacker Drive, Suite 1050
Chicago, IL 60601
T: (312) 955-0545
shart@hmelegal.com
beldridge@hmelegal.com
kpozan@hmelegal.com
bshrader@hmelegal.com

*Direct Purchaser Plaintiffs Interim Liaison
Class Counsel*

W. Joseph Bruckner
Heidi M. Silton
Elizabeth R. Odette
Brian D. Clark
Simeon A. Morbey
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
wjbruckner@locklaw.com
hmsilton@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com

Bruce L. Simon
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
T: (415) 433-9000
bsimon@pswlaw.com
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

s/ Thomas A. Doyle
Kenneth A. Wexler
Edward A. Wallace
Thomas A. Doyle
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
T: (312) 346-2222
kaw@wexlerwallace.com
eaw@wexlerwallace.com
tad@wexlerwallace.com

*Commercial and Institutional Indirect
Purchaser Plaintiffs Liaison Counsel*

Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Joshua R. Rissman
Brittany N. Resch
GUSTAFSON GLUEK PLLC
220 South Sixth Street, #2600
Minneapolis, MN 55402
T: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
bresch@gustafsongluek.com

Steven N. Williams
Mark F. Ram
Joyce M. Chang
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
T: (650) 697-6000
swilliams@cpmlegal.com
mram@cpmlegal.com
jchang@cpmlegal.com

*Commercial and Institutional Indirect
Purchaser Plaintiffs Interim Co-Lead Counsel*

Clifford H. Pearson
Daniel L. Warshaw
Bobby Pouya
Michael H. Pearson
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
T: (818) 788-8300
cpearson@pswlaw.com
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

*Direct Purchaser Plaintiffs Interim Co-Lead
Class Counsel*


/s/ *Steve W. Berman*
Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, Washington 98101
T: (206) 623-7292
steve@hbsslaw.com

Elizabeth A. Fegan
Jeannie Y. Evans
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive
Suite 2410
Chicago, IL 60611
T: (708) 628-4949
beth@hbsslaw.com
jeannie@hbsslaw.com

*End User and Consumer Plaintiffs Interim
Lead Counsel*

WHITE & CASE LLP

By: /s/ *Robert A. Milne*
Robert A. Milne
David H. Suggs
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
rmilne@whitecase.com
dsuggs@whitecase.com

J. Mark Gidley
Peter J. Carney
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355
mgidley@whitecase.com
pcarney@whitecase.com

*Attorneys for Defendants Tyson Foods, Inc.,*
*Tyson Chicken, Inc., Tyson Breeders, Inc.,*
*Tyson Poultry, Inc.*

NOVACK AND MACEY LLP

By: /s/ *Stephen Novack*
Stephen Novack
Stephen J. Siegel
Christopher S. Moore
100 North Riverside Plaza
Chicago, IL 60606
Telephone: (312) 419-6900
snovack@novackmacey.com
ssiegel@novackmacey.com
cmoore@novackmacey.com

*Attorneys for Defendants Koch Foods*
*Incorporated, JCG Foods of Alabama LLC,*
*JCG Foods of Georgia LLC and Koch Meat*
*Co., Inc.*

WEIL, GOTSHAL & MANGES LLP

By: /s/ *Kevin J. Arquit*
Kevin J. Arquit
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-0950
Facsimile: (212) 310-8007
kevin.arquit@weil.com

Carrie C. Mahan
1300 Eye Street NW
Washington, DC 20016
Telephone: (202) 682-7231
Facsimile: (202) 857-0940
Carrie.mahan@weil.com
BAILEY BRAUER PLLC

Clayton E. Bailey
8350 N. Central Expressway, Ste. 935
Dallas, TX 75206
Telephone: (214) 360-7433
Facsimile: (214) 360-7424
cbailey@baileybrauer.com

EIMER STAHL LLP

Michael L. McCluggage
224 South Michigan Avenue, Ste. 1100
Chicago, IL 60604
Telephone: (312) 660-7665
mmccluggage@eimerstahl.com

*Attorneys for Defendant Pilgrim's*
*Pride Corporation*

VENABLE LLP

By: /s/ *J. Douglas Baldridge*

J. Douglas Baldridge (#437678)
Lisa Jose Fales (admitted *pro hac vice*)
Danielle Foley (admitted *pro hac vice*)
Robert Davis (admitted *pro hac vice*)
575 7th Street, NW
Washington, DC 20004
jdbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
rpdavis@venable.com

FALKENBERG FIEWEGER & IVES LLP

Kirstin B. Ives
30 N. LaSalle St., Suite 4020
Chicago, IL 60602
kbi@ffilaw.com

*Attorneys for Defendants Perdue Farms, Inc.*
*and Perdue Foods LLC*

KIRKLAND & ELLIS LLP

By: /s/ *Daniel E. Laytin*

Daniel E. Laytin, P.C.
Christa C. Cottrell
Martin L. Roth
Stacy Pepper
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
dlaytin@kirkland.com
ccottrell@kirkland.com
martin.roth@kirkland.com
stacy.pepper@kirkland.com

*Attorneys for Defendants Sanderson Farms,*
*Inc., Sanderson Farms, Inc. (Processing*
*Division), Sanderson Farms, Inc. (Production*
*Division) & Sanderson Farms, Inc. (Foods*
*Division)*

PROSKAUER ROSE LLP

By: /s/ *Christopher E. Ondeck*

Christopher E. Ondeck
Adrian Fontecilla
Stephen R. Chuk
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004
Telephone: (202) 416-6800
Facsimile: (202) 416-6899
condeck@proskauer.com
afontecilla@proskauer.com
schuk@proskauer.com

*Attorneys for Wayne Farms LLC*

SIDLEY AUSTIN LLP

By: /s/ *John W. Treece*

John W. Treece, Bar No. 3122889
1 S. Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
jtreece@sidley.com

ROSE LAW FIRM

Amy Lee Stewart (admitted *pro hac vice*)
Jacob Dylan White (admitted *pro hac vice*)
20 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 377-0334
Facsimile: (501) 375-1309
astewart@roselawfirm.com
jwhite@roselawfirm.com

*Attorneys for Defendants Mountaire Farms,*
*LLC and Mountaire Farms of Delaware, Inc.*

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

By:  /s/ *Patrick Fitzgerald*
Patrick Fitzgerald (#6307561)
155 N. Wacker Drive
Chicago, IL 10036
Telephone: (312) 407-0700
Facsimile: (312) 407-0411
patrick.fitzgerald@skadden.com

Boris Bershteyn
Sam Auld
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
boris.bershteyn@skadden.com
sam.auld@skadden.com

*Attorneys for Defendant Peco Foods, Inc.*


VEDDER PRICE P.C.

By:  /s/ *Gregory G. Wrobel*
Gregory G. Wrobel (#3122900)
222 N. LaSalle Street
Chicago, IL 60601
Telephone: (312) 609-7722
Facsimile: (312) 609-5005
gwrobel@vedderprice.com

JORDAN PRICE WALL GRAY JONES &
CARLTON, PLLC

Henry W. Jones, Jr.
1951 Clark Avenue
Raleigh, NC 27605
Telephone: (919) 828-2501
Facsimile: (919) 834-8447
hjones@jordanprice.com

*Attorneys for Defendant House of Raeford
Farms, Inc.*

SHOOK HARDY & BACON LLP

By:  /s/ *Lynn H. Murray*
Lynn H. Murray
Andrew M. Meerkins
111 S. Wacker Dr.
Ste. 5100
Chicago IL 60606
Telephone: (312) 704-7700
lhmurray@shb.com
ameerkins@shb.com

*Attorneys for Defendant Simmons Foods, Inc.*

RILEY SAFER HOLMES & CANCILA LLP

By: /s/ *Sondra A. Hemeryck*
Sondra A. Hemeryck
70 West Madison Street, Suite 2900
Chicago, IL 60602
Telephone: (312) 471-8700
shemeryck@rshc-law.com

STINSON LEONARD STREET LLP

William L. Greene
Ruth S. Shnider
150 South Fifth Street, Suite 2300
Minneapolis, MN 55402
Telephone: (612) 335-1500
william.greene@stinson.com
ruth.shnider@stinson.com

THE LAW GROUP OF NORTHWEST
ARKANSAS LLP

Gary V. Weeks
K.C. Dupps Tucker
Kristy E. Boehler
1830 Shelby Lane
Fayetteville, AR 72704
Telephone: (479) 316-3760
gary.weeks@lawgroupnwa.com
kc.tucker@lawgroupnwa.com
kristy.boehler@lawgroupnwa.com

*Attorneys for Defendants George's, Inc.*
*and George's Farms, Inc.*

MANDELL MENKES LLC

By: /s/ *Brendan J. Healey*
Brendan J. Healey
One North Franklin, Suite 3600
Chicago, IL 60606
Telephone: (312) 251-1006
Facsimile: (312) 759-2189
bhealey@mandellmenkes.com

ALSTON & BIRD LLP

B. Parker Miller
Valarie C. Williams
Max Marks
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
parker.miller@alston.com
valarie.williams@alston.com
nowell.berreth@alston.com
max.marks@alston.com

SMITH, GILLIAM, WILLIAMS & MILES
PA

R. Brent Hatcher, Jr.
301 Green Street NW, Suite 200
Gainesville, GA 30501
Telephone: (770) 536-3381
Facsimile: (770) 535-9902
bhatcher@sgwmfirm.com
cfranklin@sgwmfirm.com

*Attorneys for Fieldale Farms Corporation*

KUTAK ROCK LLP

By: /s/ *John P. Passarelli*
John P. Passarelli
James M. Sulentic
1650 Farnam Street
Omaha, NE  68102
Telephone: (402) 346-6000
Facsimile: (402) 346-1148
john.passarelli@kutakrock.com
james.sulentic@kutakrock.com

J.R. Carroll
Scott Jackson
234 East Millsap Road
Suite 200
Fayetteville, AR  72703-4099
Telephone: (479) 973-4200
Facsimile: (479) 973-0007
jr.caroll@kutakrock.com
scott.jackson@kuakrock.com

Kimberly M. Hare (#6323326)
One South Wacker Drive
Suite 2050
Chicago, IL  60606-4614
Telephone: (312) 602-4100
Facsimile: (312) 602-4101
kimberly.hare@kutakrock.com

*Attorneys for Defendants O.K. Foods, Inc.,*
*O.K. Farms, Inc., and O.K. Industries, Inc.*

MAYER BROWN LLP

By: /s/ *Carmine R. Zarlenga*
Carmine R. Zarlenga, #90784529
William H. Stallings
Oral D. Pottinger
1999 K Street N.W.
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
czarlenga@mayerbrown.com
wstallings@mayerbrown.com
opottinger@mayerbrown.com

*Attorneys for Defendant Foster Farms, LLC*