1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3

4    IN RE BROILER CHICKEN        )   Docket No. 16 C 8637
     ANTITRUST LITIGATION        )
5                                )   Chicago, Illinois
     This Document Relates to:   )   June 16, 2017
6    All Actions                 )   10:57 a.m.

7
              TRANSCRIPT OF PROCEEDINGS - Status
8
         BEFORE THE HONORABLE JEFFREY T. GILBERT
9

10   APPEARANCES:

11   For Plaintiffs         HART McLAUGHLIN & ELDRIDGE LLC
     Maplevale Farms        BY:   MR. STEVEN A. HART
12   and John Gross               MR. KYLE POZAN
     and Company:           121 West Wacker Drive, Suite 1050
13                          Chicago, Illinois  60601

14   (Direct purchaser plaintiffs interim liaison class counsel)

15

16                          LOCKRIDGE GRINDAL NAUEN PLLP
                            BY:   MR. BRIAN D. CLARK
17                          100 Washington Avenue South
                            Suite 2220
18                          Minneapolis, Minnesota  55401

19   (Direct purchaser plaintiffs interim co-lead class counsel)

20

21                          PEARSON SIMON & WARSHAW LLP
                            BY:   MR. BOBBY POUYA
22                                MR. MICHAEL H. PEARSON
                            15165 Ventura Boulevard, Suite 400
23                          Sherman Oaks, California  91403

24   (Direct purchaser plaintiffs interim co-lead class counsel)

25

1    APPEARANCES (Continued):

2    For Plaintiffs          WEXLER WALLACE LLP
     Fargo Stopping          BY:  MR. THOMAS A. DOYLE
3    Center, Sargent's       55 West Monroe Street, Suite 3300
     Restaurant and          Chicago, Illinois  60603
4    Don Chavas Mexican
     Restaurant:

5
        (Indirect purchaser plaintiffs interim liaison class counsel)
6

7    For Plaintiffs          COTCHETT, PITRE & McCARTHY
     Fargo Stopping          BY:  MR. MARK F. RAM
8    Center and              840 Malcolm Road, Suite 200
     Sargent's               Burlingame, California  94010
9    Restaurant:

10      (Indirect purchaser plaintiffs interim co-lead class counsel)

11
     For Plaintiffs          HAGENS BERMAN SOBOL SHAPIRO LLP
12   Percy, Lathen,          BY:  MS. JEANNIE Y. EVANS
     Dimas, Monahan,              MS. ELIZABETH A. FEGAN
13   Coe, Patterson,         455 North Cityfront Plaza Drive
     Tierney, Cheslow        NBC Tower, Suite 2410
14   and Wilbur:             Chicago, Illinois  60611

15
     For Plaintiffs          COHEN MILSTEIN SELLERS & TOLL PLLC
16   Newman, Stangeland,     BY:  MR. BRENT W. JOHNSON
     Gardner, Weidner,            MR. DANIEL H. SILVERMAN
17   Pauk, Gilbert and       1100 New York Avenue NW
     Weidner:                Suite 500 West Tower
18                           Washington, D.C.  20005

19
     For Defendants          NOVACK AND MACEY LLP
20   Koch Foods, JCG         BY:  MR. STEPHEN J. SIEGEL
     Foods and Koch          100 North Riverside Plaza, Suite 1500
21   Meats:                  Chicago, Illinois  60606

22

23

24

25

APPEARANCES:   (Continued)

| | |
|---|---|
| For the Tyson<br>Defendants: | WHITE & CASE LLP<br>BY:  MR. DAVID H. SUGGS<br>1221 Avenue of the Americas<br>New York, New York  10036 |
| For Defendant<br>Pilgrim's Pride: | WEIL, GOTSHAL & MANGES LLP<br>BY:  MR. DANIEL E. ANTALICS<br>     MS. CARRIE MAHAN (by phone)<br>1300 Eye Street N.W., Suite 900<br>Washington, D.C.  20005 |
| For Defendant<br>Perdue Farms: | VENABLE LLP<br>BY:  MR. LEONARD L. GORDON<br>1270 Avenue of the Americas<br>24th Floor<br>New York, New York  10020 |
| | VENABLE LLP<br>BY:  MR. ROBERT P. DAVIS (by phone)<br>600 Massachusetts Avenue, NW<br>Washington D.C.  20001 |
| For the Sanderson<br>Farms Defendants: | KIRKLAND & ELLIS LLP<br>BY:  MS. STACY L. PEPPER<br>     MS. CHRISTA C. COTTRELL<br>300 North LaSalle Street<br>Chicago, Illinois  60654 |
| For Defendant<br>Wayne Farms: | PROSKAUER ROSE LLP<br>BY:  MR. ADRIAN FONTECILLA<br>1001 Pennsylvania Avenue, NW<br>Suite 600 South<br>Washington, D.C.  20004 |
| For the Mountaire<br>Farms Defendants: | ROSE LAW FIRM<br>BY:  MS. AMY LEE STEWART<br>120 East 4th Street<br>Little Rock, Arkansas  72201 |
| For Defendant<br>Peco Foods, Inc.: | SKADDEN ARPS SLATE MEAGHER & FLOM<br>BY:  MS. LARA A. FLATH<br>155 North Wacker Drive, Suite 2700<br>Chicago, Illinois  60606 |

```
 1    APPEARANCES:   (Continued)

 2    For Defendant              MAYER BROWN LLP
      Foster Farms:              BY:   MR. ORAL D. POTTINGER
 3                               1999 K Street NW
                                 Washington, D.C.   20006
 4

 5    For Defendant              VEDDER PRICE PC
      House of                   BY:   MR. GREGORY G. WROBEL
 6    Raeford Farms:             222 North LaSalle Street, Suite 2600
                                 Chicago, Illinois  60601
 7

 8    For Defendant              SHOOK HARDY & BACON LLP
      Simmons Foods:             BY:   MS. LYNN H. MURRAY
 9                               111 South Wacker Drive, Suite 5100
                                 Chicago, Illinois  60606
10

11    For Defendant              ALSTON & BIRD LLP
      Fieldale Farms:            BY:   MR. JAMES B. CASH, JR.
12                               1201 West Peachtree Street
                                 Atlanta, Georgia  30309
13

14    For the George's           STINSON LEONARD STREET LLP
      Defendants:                BY:   MR. WILLIAM L. GREENE
15                               150 South Fifth Street, Suite 2300
                                 Minneapolis, Minnesota  55402
16

17    For the                    KUTAK ROCK LLP
      O.K. Defendants:           BY:   MS. ROBIN E. STEWART
18                               Two Pershing Square
                                 2300 Main Street, Suite 800
19                               Kansas City, Missouri  64108

20

21

22

23    Official Court Reporter:   NANCY L. BISTANY, CSR, RPR, FCRR
                                 219 South Dearborn Street, Room 1706
24                               Chicago, Illinois 60604
                                 (312) 435-7626
25                               nancy_bistany@ilnd.uscourts.gov
```

(Proceedings heard in open court:)

THE CLERK:   16 CV 8637, Maplevale Farms, Inc., versus Koch Foods, et al.; status hearing.

THE COURT:   Okay.  I guess it's billed as a status hearing, but really the intent, per my last order, was to deal with the ESI issues, which I'd like to do.

I see that you worked out an agenda with Joe, which is fine.  That agenda is fine with me, with a little bit of a couple of modifications.

Are there people who are going to be the main players on this?  I assume it's the people who are sitting at the tables.  And the folks in the jury box and in the seats are watching and have a lesser role, right?

And I know you've already signed in, so Nancy has that.  Would you do me a favor, the folks sitting at the tables, though, so that I -- I know some of you but not all of you immediately -- so could you give me your names so that I'll have them.

MR. POUYA:   Bobby Pouya, Pearson Simon & Warshaw, for direct purchaser plaintiffs.

THE COURT:   And you're Bobby --

MR. POUYA:   Pouya, P-o-u-y-a.

THE COURT:   Okay.

MR. DOYLE:   Good morning, Judge.

I'm Thomas Doyle from Wexler Wallace, liaison counsel

for commercial and institutional plaintiffs.

THE COURT:   What are commercial institution --
indirect purchasers?

MR. DOYLE:  Yes, not the consumers.

THE COURT:   Right.

MR. RAM:   Good morning, Your Honor.

Mark Ram of Cotchett, Pitre & McCarthy, also for the
commercial and institutional indirect purchaser plaintiffs, for
lack of a better phrase these days.

THE COURT:   Okay.  Graham, did you say, or Ram?

MR. RAM:   Ram, R-a-m, like the animal.

THE COURT:   Got it.

MR. CLARK:   Your Honor, Brian Clark, Lockridge
Grindal Nauen, for direct purchaser plaintiffs.

MR. HART:   Good morning, Your Honor.

Steve Hart, Hart McLaughlin & Eldridge in Chicago,
for -- liaison counsel, direct purchaser plaintiffs.

MS. FEGAN:   Good morning, Your Honor.

Elizabeth Fegan for the end-user consumers.

MR. SUGGS:   Good morning, Your Honor.

David Suggs from White & Case for Tyson Foods.

MS. COTTRELL:   Good morning, Your Honor.   Glad to
hear you're feeling well.

Christa Cottrell, Kirkland & Ellis, Sanderson Farms.

MS. PEPPER:   Good morning, Your Honor.

1          Stacy Pepper, Kirkland & Ellis, for the Sanderson

2     Farms defendants.

3          MR. FONTECILLA:  Good morning, Your Honor.

4          Adrian Fontecilla with Proskauer Rose on behalf of

5     Wayne Farms.

6          THE COURT:  Give me the last name one more time.  I

7     know you were here last time.

8          (Laughter.)

9          THE COURT:  Give me it -- I had trouble with it last

10    time.  I'm going to get this by the end of the case.  Give me

11    it again.

12         MR. FONTECILLA:  The easiest way to remember it is

13    it's like "Fontasia."

14         THE COURT:  Fontecilla?

15         MR. FONTECILLA:  Like "Fontasia," yep.

16         THE COURT:  Fontecilla.  And you are for?

17         MR. FONTECILLA:  Defendant Wayne Farms, Your Honor.

18         MR. POTTINGER:  Good morning, Your Honor.

19         Oral Pottinger from Mayer Brown for Foster Farms LLC.

20         MR. ANTALICS:  Good morning, Your Honor.

21         Daniel Antalics with Weil Gotshal, for defendant

22    Pilgrim's Pride.

23         THE COURT:  And, Mr. Pottinger, you're here for?

24    Your client is?

25         MR. POTTINGER:  Oh, Foster Farms LLC.

1           THE COURT:  Foster Farms.  Got it.  Okay.

2           That's kind of the main players on this particular --

3   these particular issues.  Great.  Thank you so much.

4           Okay.  I'm fine with the agenda of looking at the ESI

5   things.  I know you would like to get some resolution on those

6   things so you can move forward.  I'm good with that to the

7   extent we can get resolution as much as possible.  And I've

8   looked at all that.

9           And I envision this as a bit of a back-and-forth on

10  this so that I can understand the issues fully and give you my

11  views on it.  And if I have to rule, I would rule, but -- and a

12  word about the 60-page -- 52-page, quote/unquote, letter

13  brief -- that's kind of like an oxymoron, I guess -- that was

14  filed at 10:12 p.m. on June 14th.

15          I have not had a chance to digest that whole thing,

16  particularly with respect to the custodians' issues.  I did

17  look at the Rule 34 issue and the Florida AG issue.

18          I think you're right that we should address the ESI

19  things first, because those have been percolating the longest.

20  And I'm thinking we probably would have time to circle back to

21  that and talk about how to deal with those issues.  At the very

22  least, I'd like to deal with the Rule 34 issue, because that's

23  a time-sensitive time kind of thing as well.

24          I think in the future, we have to get straight what a

25  letter brief is and when it gets filed in advance of the

1    hearing, because it's just -- I -- it's not fair to me to lay

2    52 pages on me and expect me to read it really essentially

3    overnight when I got other things going on.  And I know -- and

4    I'm not criticizing you for it.  I -- whenever I read the stuff

5    that you file, including, you know, I've been over and over the

6    joint report you filed in April, it's helpful to me.  But I

7    just need to give myself enough time to look at it, so that

8    when you come in from out of town it's fair both to you and to

9    me to kind of deal with those issues.

10            And I -- I talked to Judge Durkin about it, too.  He

11   had his own medical issue.  He had his knee replaced, so he's

12   still laid up on that.

13            I had two questions before we got to the ESI stuff.

14   If somebody would tell me, how did you -- the two disputes that

15   were percolating and that I'm very pleased that you resolved,

16   but I just would like to know for my own purposes how you

17   resolved the document preservation subpoenas to the telephone

18   carriers and what about other third parties with document

19   preservation issues.  And how did you resolve the end-user

20   plaintiffs' requests for information necessary to serve the

21   subpoenas on the defendants' customers, and then the obtaining

22   of that information or preserving of that information itself?

23            Mr. Fontecilla, you're trying to get up there.  And

24   you were front and center on this before.

25            MR. FONTECILLA:  That's correct, Your Honor.  And I

1  commend you for getting my name perfectly right.

2      The -- we resolved that the -- the end-user

3  plaintiffs and the defendants met and conferred several times,

4  and ultimately we agreed to the March 22nd proposal that was in

5  our letter that we discussed at the last hearing.  And we have

6  turned over an aggregated list to the end-users of the top

7  customers for the defendants.

8      THE COURT:  And then are subpoenas then going to go

9  out to these -- or document preservation letters going to go

10  out to these and/or subpoenas?  What are the plaintiffs going

11  to do?

12      MR. FONTECILLA:  I'll let Ms. Fegan answer that.

13      THE COURT:  Ms. Fegan.

14      MS. FEGAN:  Your Honor, we received the list this

15  week.  We do intend to proceed along the lines in the letter

16  and serve document preservation letters.  And there is a -- I

17  guess a function within that that if it turns out that those

18  letters aren't going to be sufficient that we will confer and

19  figure out whether additional subpoena steps are necessary.

20      THE COURT:  Great.  Okay.  Congratulations --

21      MR. FEGAN:  Thank you.

22      THE COURT:  -- on reaching that.

23      And I think Nancy said -- our court reporter said

24  that until she maybe -- until she gets to know each person,

25  give your -- I'm calling on you now, but give your name if

1    you're not otherwise identified for the record so that she

2    attributes the pearls that you say to the right person.

3            And then the document preservation letters to

4    telephone carriers?  Ms. Pepper or Mr. Clark, somebody, go

5    ahead.

6            MR. CLARK:  Sure.  Your Honor, Brian Clark for

7    directs.

8            On the document preservation subpoenas to phone

9    carriers, we're still discussing with defendants.  I think

10   right now we've received the correspondence the defendants have

11   had with the phone carriers about preservation.  We've

12   discussed that as we -- as part of the discussions about

13   document sources.

14           I think the next step is now that we've identified

15   for most defendants, and even for Tyson and Pilgrim's, most of

16   the universe of document custodians, the next step is:  Okay,

17   what are their phone numbers?  Is what's been done cover them

18   or not?  And that last step still needs to be discussed.

19           THE COURT:  Okay.  Thanks.

20           Okay.  So let's delve into these fascinating ESI

21   Protocol issues.  So how do you want to tee this stuff up?  Do

22   you want to --

23           MR. GORDON:  Your Honor, I'm getting an email from

24   some of our colleagues that I don't think the conference call

25   was activated.

1        THE COURT:  Oh, my Lord.  Okay.  It wasn't, so

2   thanks.

3        MR. GORDON:  Sorry.

4        THE COURT:  We need to connect to the courtroom sound

5   system, I imagine, to our court number.  So let me tell you

6   the --

7        THE COURT REPORTER:  Do you want this off the record,

8   Judge?

9        THE COURT:  Yes.

10        THE CLERK:  Okay.  We'll pause the --

11   (Brief pause.)

12        THE COURT:  Thank you.

13        MR. GORDON:  Sure.

14        THE COURT:  Thanks for letting us know.  Completely

15   forgot about that.

16   (Discussion off the record.)

17        THE COURT:  Sorry about that.  Thank you for

18   notifying somebody in the room that you weren't hearing it.  We

19   forgot to connect you.  We cannot hear you.  Hello, anybody

20   there?

21   (Discussion off the record.)

22        THE COURT:  Okay.  Let's continue.  This is one of

23   the problems when you decide to join a hearing by telephone.

24        What do you want me to do?  Do you want me to walk

25   through the language on Exhibit C?  Do you want me to start

1   with -- do you want me to walk through the issues as they line
2   up in the parties' joint status letter and deal with them that
3   way?  Do you have a particular -- I know you said Exhibit A.
4   I'm not sure what the --
5             MR. CLARK:  Your Honor, on Exhibit C at the
6   suggestion -- the suggestion from plaintiffs would be if we
7   kind of walk through Exhibit C, and if you just -- I think it
8   would actually help kind of the parties reach a pretty quick
9   agreement on some of these if the Court would kind of indicate
10  your thoughts on them.
11            THE COURT:  Yeah.
12            MR. CLARK:  And I think that would move things along.
13            THE COURT:  Are you okay with that, Ms. Pepper?
14            MS. PEPPER:  We are, with the caveat that if it takes
15  longer, there are issues in Exhibit C that are of more
16  importance that -- for the Court to weigh in on, and we may ask
17  the Court's leave to reprioritize, depending on how quickly
18  things move.
19            THE COURT:  I'm totally fine with that.
20            And so -- and so when you -- but when I start with
21  Exhibit C, I don't talk about structured data at all.  And I
22  don't know if that's an issue or not.  That's in -- that was in
23  your scheduling part of this thing.  So you want to bring it up
24  as part of these issues if it's related to it?
25            MR. CLARK:  That's fine, Your Honor, if it comes up.

1        THE COURT:  Okay.  Okay.  So let's just start.  Okay.

2    (Discussion off the record.)

3        THE COURT:  Okay.  I mean, I read what you have to

4    say about this.  I'm not sure about what the issue is.  I don't

5    see that there's a subject matter waiver risk here.  I thought

6    the language was pretty similar.

7        Please, somebody from one side or the other, maybe

8    plaintiffs, focus me on what's the disconnect on this language

9    here.  I thought -- I could live with either of the languages.

10   I didn't see there was a big difference.

11       MR. CLARK:  Yeah, I think that's probably -- probably

12   true, as we've now had a chance to kind of look at this for the

13   last month or two months.

14       I think the concern that was driving this is making

15   sure that we'd have a cooperative and transparent discussion

16   about search.  And our concern was what -- what it is that

17   defendants believe is actually appropriate to withhold under

18   their work product, attorney-client privilege doctrines that

19   would impede a cooperative discussion.

20       And I think, you know, if Your Honor sees them the

21   same either way, perhaps we'll deal with those issues as they

22   come up.

23       THE COURT:  Okay.  And let me -- I'm going to respond

24   to that comment in a minute with kind of a global comment that

25   probably will help us shape some of the other discussions we

1     have. But we have -- our tech guy, Mike Gombosi, came in, so

2     right now I think we're connected, Mike -- you could go off the

3     record on this.

4         (Discussion off the record.)

5         THE COURT: Mike, I think it only was fixed because

6     you came in.

7         (Laughter.)

8         THE COURT: Okay. So -- okay. Let me address what

9     Mr. Clark said with a little bit more of a longer answer, and

10     then let's get back to this particular issue. Okay?

11         In general, my approach to a lot of this stuff -- and

12     I think you guys are really good at it -- is, A, disclosure,

13     talking to each other about what the issue is; B, trying to

14     resolve it; C, if you resolve some of it but not all of it,

15     teeing it up for me, and I resolve it. Okay?

16         So I have that approach with respect to a lot of the

17     things in here. I don't want to open the floodgates that

18     I'm -- I mean, that I'm -- you know, the default is always

19     let's ask Gilbert, because I don't want that to be it, and I

20     don't think that will be it. And if it becomes too unwieldy,

21     then I obviously can stop it. But, you know, you could use a

22     hands-on person for a lot of this, but I don't want to take

23     control of it, because I like -- to the extent you guys can

24     control your litigation, I want you to do it. But if there's a

25     decision to be made, then hopefully I can make it.

1       So, for example -- so let me get back to your

2  comment.  I'm not even sure -- having heard what you said, I'm

3  not sure what the fear is.  I don't think participating in this

4  by itself is a waiver.  I don't think anybody is waiving

5  anything.

6       I saw the talk about work product.  The defendants

7  say nothing will be interpreted to require the disclosure of

8  information protected by the attorney-client privilege, the

9  work product doctrine, or any other applicable privilege.

10      Are you worried that that language will impede your

11 ability to discuss with the defendants things like search terms

12 and other things?

13      MR. CLARK:  Yeah, I think in some of our discussions,

14 some statements have been made during meet-and-confers that

15 some defense counsel might view hit count reports as work

16 product.

17      THE COURT:  Okay.  And I don't.  Okay.  I mean,

18 jumping ahead to that, I'd like to hear why the defendants --

19 the defendants are fine with disclosing search terms but not

20 hit counts.  To me, that's part of the disclosed -- I mean, I

21 think it's very relevant to the plaintiffs and to the

22 defendants when you propose a search term, if you run it on a

23 big database and it hits a thousand times versus one time.

24 That gives any -- and I don't see how that's work product.  I

25 think that is -- and I don't see how it's discovery on

1   discovery, as the defendants said in their briefs.

2   I'm happy to listen to that, but generally, I don't

3   think the ESI Protocol should be viewed as implicitly or

4   explicitly waiving what I would consider to be work product --

5   attorney work product or any other applicable privilege.

6   And I think the -- you know, the plaintiffs -- I

7   guess the difference is the plaintiffs say you're not waiving

8   an objection to the production of particular ESI.

9               MS. PEPPER:  Your Honor?

10              THE COURT:  Yeah, go ahead, Ms. Pepper.

11              MS. PEPPER:  So we would like -- we would like to be

12  heard on search terms eventually, but let's just talk about the

13  second introductory paragraph.

14              THE COURT:  Right.

15              MS. PEPPER:  What we understood the major difference

16  to be between the parties' positions was that defendants are

17  reserving their right, if something is determined to be

18  protected by privilege, to not disclose that.

19              We understood plaintiffs to be taking the position

20  that there is nothing about a party's search process that could

21  conceivably be protected as privileged.

22              If -- and we can't agree to that.  I don't see how we

23  could.  So to the extent they view the -- I actually don't see

24  anything objectionable about the language that they proposed

25  unless they expect it to be construed to mean that there is

1   nothing about the defendants' approach to their review --

2   search and review for responsive documents that could be

3   protected by a privilege.  And we can't agree to that.

4           THE COURT:  Okay.  I don't blame you.  I don't know

5   how you can agree to that.  Let me look at the language again

6   with that gloss on it.

7           (Brief pause.)

8           THE COURT:  I mean, why wouldn't -- let me just throw

9   this out there, okay?

10          Why wouldn't it be okay to go with the plaintiffs'

11  language and then add at the end of that "for the avoidance of

12  doubt, a party's" --

13          MS. PEPPER:  Your Honor --

14          THE COURT:  -- "a party's compliance with the ESI

15  Protocol will not be required" -- "will not be interpreted to

16  require the disclosure of information protected by the

17  attorney-client privilege, the work product doctrine, or any

18  other applicable privilege in and of itself"?

19          MR. CLARK:  We're fine with that, Your Honor.  Brian

20  Clark for directs.

21          THE COURT:  You okay with that for the defendants?

22          MS. PEPPER:  Yes.

23          THE COURT:  Yeah, I just think -- I mean, I agree

24  with everything that both of you are saying.  It shouldn't

25  be -- fine.  Let's move on to the second point.

1        PowerPoints.  Did defendants say on PowerPoints that

2    it would be -- at page 34 of the joint April -- April

3    submission:  "Defendants cannot easily brand these natives with

4    a Bates number or with confidentiality designations, if at

5    all."

6        So I'm not exactly sure what that means.  We can't

7    easily do it, or we can't do it at all.

8        I don't -- I don't like generally -- just I will say

9    this so you're getting some front-loaded stuff.  I don't like

10    generally a lot of the defendants' suggestions which -- that

11    are:  We're going to do it this way, but either on an ad hoc

12    basis or, you know, the plaintiffs can then request more stuff.

13        Because what I've seen happen is the default is,

14    fine, we're not going to provide it, and then the other side

15    will ask for everything again, you know, and then we just have

16    to deal with that issue again.

17        So -- and this is -- has the same flavor.  But I know

18    there's a technical aspect to this, and I also don't know how

19    big the issue is.  So, I mean, is it -- is it that it's -- and

20    for their part, the plaintiffs say something a little bit

21    different, which I kind of understand, which is that -- hold

22    on.

23        I thought you said something like you're proposing an

24    exemplar Bates stamp, which I'm thinking you mean like a

25    separate page or something like that.

1          MR. CLARK:  Just really tech -- on the technical

2     piece, the way natives are produced and we've agreed to produce

3     Excel natives as a Bates numbered placeholder, you put your

4     confidentiality designation on there, and then the native file

5     is associated with that.

6          I think the concern is by defendants whether or not

7     those natives can be Bates numbered.  That's just -- that's

8     just an issue with native productions.

9          And our proposal is to do that -- PowerPoints the

10    same as one would do Excels.  Or in other cases, you would even

11    do email production natively, which we're not -- haven't talked

12    about here because it was just too big of a divide to cross.

13          THE COURT:  But I don't understand your exemplar

14    thing.  In other words, there -- because you can't Bates

15    stamp -- and I get that you can't Bates stamp the native file

16    the same way that you can do a TIFF or, you know, or a PDF or

17    something like that -- you're proposing that PowerPoints or any

18    other things that you can't deal with that way be produced how?

19    Without a Bates stamp number at all, but there would be a cover

20    thing produced that would say, Bates number or Bates range and

21    say confidential or not?

22          MR. CLARK:  If you -- yeah, if you would imagine

23    preparing for a deposition and you would see the first piece of

24    paper would be the Bates numbered placeholder; it would have

25    the Bates number; it would have the confidentiality

designation.  Then there's a native file produced, and the file
name is generally the Bates number of that document.  And you
would print that native document and staple the placeholder to
the native document, and you'd show that to the witness.

THE COURT:  So if you're doing an electronic search,
like, on relativity or something like that, and it hits on the
PowerPoint, you will somehow be told that the Bates number of
that document is X associated with it?  If it's confidential,
you will also be told that in the same retrieval?

MR. CLARK:  Yes.

THE COURT:  Okay.  Defendants, Ms. Pepper.

So that was Mr. Clark.  Are you getting the cast of
characters here?

THE COURT REPORTER:  Well, those two I know.

THE COURT:  Who's the guy sitting in the first row
over here?

(Laughter.)

MS. PEPPER:  So --

THE COURT:  It's cumbersome.  It's cumbersome.

MS. PEPPER:  Well, so as Your Honor saw from Exhibit
B, the parties have a default agreement that most documents
that are produced are going to be produced as TIFFs.  That --
I'm a bit handicapped in terms of my full understanding of this
as well, but let's just say a TIFF is like a PowerPoint.  It's
not manipulable.  It's the -- it's the way the document is

1  produced, and it's branded.

2          When you --

3          THE COURT:  With a Bates number?

4          MS. PEPPER:  With a Bates number and with a

5  confidentiality designation as appropriate.

6          THE COURT:  Right.

7          MS. PEPPER:  When you produce something in native,

8  you are giving the file itself to the other party.  That means,

9  number one, that, as Mr. Clark explained, you don't brand the

10  document; you don't brand it.  You get a slip sheet as a

11  placeholder where the Bates number and whatever other

12  information the parties agree to is put on basically a cover

13  sheet.

14          So point number one that defendants were making was,

15  yes, you can't actually brand the document.  But the larger

16  point that we're concerned about and why we would prefer more

17  things be treated as TIFFs than fewer, to the extent

18  appropriate, is that when you hand over a native file, you hand

19  over control of the file.  So those documents are more easily

20  susceptible to manipulation.  Those documents are more easily

21  susceptible to untracked circulation to inappropriate parties.

22          And it can make it harder for defendants to know,

23  when a document is used in a deposition, is it the document we

24  sent?  And so we understand, for example -- and you saw that

25  the parties agreed -- that Excel spreadsheets are going to be

1    produced as a default in native.  Those documents do not lend

2    themselves easily to being TIFFed, so we understand why the

3    parties should agree that those should be produced in native.

4            It's not true of PowerPoints.  PowerPoints can be

5    easily produced in TIFF, which is the parties' agreed default.

6    And if there is a problem or plaintiffs think they need more

7    information about a particular PowerPoint, they can seek to

8    have -- I understand that the Court doesn't like this as the

9    general operative rule, but what we're actually asking for is

10   that more things than fewer be treated in accordance with the

11   parties' default.

12           THE COURT:  Got it.  Okay.  I understand that.

13           And in addition, not only to the extent of

14   manipulation, but sometimes when you produce it natively, you

15   can get behind the data that's there and get some other

16   information that maybe is not apparent from the face of the

17   document.

18           So the plaintiffs -- but the reason the plaintiffs

19   want these PowerPoints natively is because sometimes they're in

20   color, and if they're not produced natively, you don't get the

21   color?

22           MR. CLARK:  Yeah, and a lot of the cases like this

23   involved in a supplier restriction in particular --

24           THE COURT REPORTER:  Can you speak up, please?

25           MR. CLARK:  Of course, I can.

1   THE COURT:  Or use the mic.  There's two mics at

2   every table.

3       MR. CLARK:  Sure.  Yeah, a lot of -- there's going to

4   be a lot of charts comparing different entities, production

5   levels, pricing.  A lot of those are color coded, and you

6   cannot understand them without the color.

7       THE COURT:  Okay.

8       MR. CLARK:  But, you know, honestly, Your Honor, on

9   this one, we're happy to abide with whatever -- whichever way

10  you're leaning.

11      THE COURT:  Yeah.

12      MR. CLARK:  We can work with it.

13      THE COURT:  I would lean toward producing these

14  TIFFs, and then for this particular population, you request

15  what you want.  Because I think the interests on not -- not

16  allowing -- preserving the integrity of the document and not

17  allowing getting behind these particular documents outweigh

18  stuff that could be in color.

19      And to me, that's just going to be one of the prices

20  to pay for going through these things.  And there will be --

21  you know, I used to hate this.  I used to -- I mean, I used to

22  do it in the trenches, and then I did it where I wasn't in the

23  trenches.  I liked it a lot better when I wasn't in the

24  trenches.

25      But you're going to have to go through these,

1    identify ones, and ask if they're in color, and then -- but
2    this is one that I think the defendants' proposal to do a
3    subsequent request works.   Okay.
4         MR. CLARK:  And, Your Honor, the only thing we'd want
5    to clarify -- and I think it's covered by the agreed ESI
6    Protocol -- is that if there's speaker notes, that those are
7    going to be branded onto the image, the TIFF itself.   And I
8    think we're in agreement that's how it would be done, but we
9    wouldn't want to lose speaker notes for these documents,
10   because they're important.
11        THE COURT:  Well, that's a separate document, right?
12   Wouldn't that be produced as a document, or are they part of
13   the PowerPoint?
14        MR. CLARK:  What we have typically seen is the slide
15   would appear on the top half and the speaker notes on the
16   bottom of each image.
17        THE COURT:  Oh, okay.
18        MS. PEPPER:  We will make sure --
19        THE COURT:  Yeah, you got to produce that stuff.
20        MR. PEPPER:  Yeah.
21        THE COURT:  Okay.  Would you do me a favor and either
22   move the podium or put the microphone down so that I can see
23   people, and they're not split by that?
24        (Brief pause.)
25        THE COURT:  Okay.  Purportedly nonresponsive

attachments. I think you guys have narrowed the issues somewhat. My -- my feeling is that I would resolve this -- I mean, I don't know what it means, for example, that the documents pertain almost entirely to nonbroiler products.

Plaintiffs have made a good case for -- with respect to certain defendant groups, subsidiaries or affiliated entities which may or may not be defendants but still being relevant here.

I don't like the proposal that the default that the attachment doesn't get produced because it doesn't hit on an agreed search term, that to me could very easily result in the nonproduction of stuff that could be relevant because your search terms at the beginning are not that good.

The way I would address this is beginning to identify and continuing to identify, after you look at documents, categories of documents that fit within the nonresponsive category. There were some -- you know, I don't like "almost entirely to nonbroiler products." But I think if they don't pertain to a particular product, that is, that may not be in the case, then I can see how that would be nonresponsive.

If it -- if you -- if there is an entity of Wayne Farms that isn't like the Tyson-affiliated entities that the plaintiffs were talking about, that could be nonresponsive.

I just think transparency here is the key. In other words, if there are agreed top -- agreed subject matters,

1    including agreed products or product groups, that are outside

2    the scope of the case, either now or after a motion to dismiss

3    decision, then I would rather have you agree to those

4    categories rather than what is proposed by the defendants.

5              Yes.

6              MR. SUGGS:  Your Honor, David Suggs from White &

7    Case.

8              THE COURT:  Yeah.

9              MR. SUGGS:  So just to be clear, I mean, the

10   documents that we're talking about withholding are

11   nonresponsive.  That's been -- that's a determination that's

12   made.  So it's not -- we're not talking about documents that

13   contain some responsive material but only a little.

14             We're talking about documents that are entirely

15   nonresponsive.  And the difficulty with identifying in advance

16   what categories can be withheld as nonresponsive if it's only

17   some and then applying that in the review process this is

18   nonresponsive, but it has to be produced; whereas, this is

19   nonresponsive, but it doesn't have to be produced, is difficult

20   and will add burden.  I mean, what we're --

21             THE COURT:  Wait.  Can I just interrupt you for a

22   second?

23             I thought we're talking about attachments to

24   documents or documents that -- something that's in the same

25   document family.  So the default probably for discovery would

1    be, if a document contains Exhibits A, B, and C and it's

2    determined to be a document and there's -- you know, the first

3    part of the document is responsive, but there's something in

4    Exhibit A, B, or C that's not responsive, the default would be

5    you produce it, because it's an integral document.

6         I can understand that there's a -- if there's a

7    volume of stuff that is part of a response -- I thought that's

8    what we're talking about.  We're not talking about a

9    free-standing document that is nonresponsive at all.

10        I thought we're talking about document -- some type

11   of a document or integrally related document where there is

12   something responsive and nonresponsive.  Am I wrong?

13        MR. SUGGS:  No, Your Honor, I think you're right.

14   For Tyson, my client, let's say the CEO, who is the custodian,

15   receives an email, and it has attached to it ten presentations,

16   and only one of those presentations is really related to

17   broilers.  Maybe some of the others say, we also have a broiler

18   business, so they're not entirely related to the other

19   businesses, but they're predominantly related to the other

20   businesses, which are nonresponsive.  It adds a lot of time and

21   burden to have to produce all those nonresponsive attachments.

22        I mean, the bulk of a production is going to come

23   from the attachments, not the emails.  And if some of those

24   nonresponsive attachments, let's say, contain privileged

25   material, then we're going to have to go back and

1    unnecessarily -- I mean, we're going to go back and redact

2    these documents that aren't even responsive.  That's going to

3    take a lot of time.  It's going to add a lot of pages that have

4    to be reviewed by the plaintiffs.

5            And so we think that it's much more efficient and

6    saves costs to be able to just withhold these documents from

7    production in the first instance.  I mean, they're

8    nonresponsive.  Plaintiffs' only claim to them is that they are

9    attached to another document; but otherwise, they have no claim

10   to them.

11           THE COURT:  The -- I hear you, but I don't -- I mean,

12   I'm having -- my default still would be agree to -- let me put

13   it another way.

14           I don't necessarily disagree with defendants'

15   approach on this, but I agree with the language that you're

16   using -- I disagree with the language you're using.  I don't

17   know what "almost entirely relates to nonbroiler products"

18   means, because -- I'm going to say this totally facetiously,

19   all right?

20           But, you know, there's an email, and there's a bunch

21   of attachments, and there's an attachment that relates to a

22   whole bunch of other stuff.  And there's a line in that

23   attachment that says, "And we're really -- you know, we're

24   dealing with this" -- I don't know; how outrageous can I make

25   it -- "you know, this relates to all other stuff, not the stuff

1    we're fixing prices on." Okay? I'm just -- none of the

2    defendants are really smiling, but I don't -- but in other

3    words, is that almost entirely -- is that almost entirely

4    nonresponsive because there's just one line out of fifty --

5              MR. SUGGS: Well, no, Your Honor, just to be clear --

6              THE COURT: -- that would --

7              MR. SUGGS: -- we're not talking about almost

8    entirely nonresponsive. We're talking about almost entirely

9    not related to the relevant business.

10             A document might reference the relevant business and

11   still not be responsive.

12             THE COURT: Yes, correct. And you said -- you're

13   right, "almost entirely to nonbroiler products."

14             But I guess you could drive a truck through "almost

15   entirely." I mean, I would -- I don't mind --

16             MR. SUGGS: But that's part of the difficulty with

17   having these -- I mean, if we only -- if we limit it to only

18   those documents that make no mention of broilers, then it could

19   include a lot of things that just make a very short passing

20   reference to broilers, which doesn't need to be produced.

21             THE COURT: Why not? Why doesn't it need to be --

22             MR. SUGGS: Because it's not responsive. I mean,

23   we're talking about documents that are not responsive.

24             THE COURT: But if it makes a passing reference to

25   broilers, why isn't it responsive?

1          MR. SUGGS:  Not every reference to chicken makes the

2     document responsive.  Let's say --

3          THE COURT:  Well, but what if it makes a passing

4     reference to something that is relevant?

5          MR. SUGGS:  Well, then it's responsive, and then it

6     gets produced.

7          What we're talking about is documents that have been

8     determined to be nonresponsive.  Those don't get produced.  And

9     it would be really simpler just to say, if it has been

10     determined to be nonresponsive -- and as part of discovery,

11     it's inherent that you have to trust the attorneys to make that

12     determination -- then no response -- no nonresponsive

13     attachments should be produced.

14          That's a much cleaner, simpler way to do it, and it

15     saves the effort that you see here of trying to figure out in

16     advance, which we can't know, what categories of documents

17     should be withheld, and then in the review process say, this

18     document falls into the withhold category, and this document

19     doesn't.  That makes it much more complicated.

20          So we really would prefer not having to produce any

21     nonresponsive attachments.  And, again, you just have to --

22     part of the process requires you trust the other party to make

23     that determination.  And if you think that they're not doing it

24     fairly, then you can come back and say, "This email makes a

25     reference to an attachment.  That sounds responsive.  We want

1    you to look at it."

2          The plaintiffs are not precluded or prejudiced from

3    later coming back and saying, "Please produce these

4    attachments". But it would save a lot of time and costs to not

5    have to do that in the first instance.

6          THE COURT: Plaintiffs?

7          MR. CLARK: Yeah, go ahead.

8          MR. HART: A couple thoughts there, Your Honor. I

9    think --

10          THE COURT REPORTER: Your name?

11          MR. HART: Steven Hart of Hart McLaughlin & Eldridge.

12          The nomenclature that they're using is intentionally

13    vague, and I think Your Honor has pointed that out.

14          But second of all, they would have to review the

15    document to determine whether it was responsive or not

16    responsive. There's no additional burden upon the defendants

17    to produce the document or tell us that it's completely

18    nonresponsive. But you can't be a little bit pregnant, and if

19    there's information in there that touches upon the issues in

20    our case, respectfully, we think we're entitled to it.

21          MR. SUGGS: Your Honor, no one is saying they're not

22    entitled to information that is responsive to what they've

23    requested. But it's not clear to us why they're insisting on

24    seeing documents that they have not requested. I mean, this is

25    something nonresponsive to their requests.

1           THE COURT:  You know, you're both right, obviously.

2      I think, Mr. Suggs, you're -- I mean, I'm focused on your

3      carve-outs here.  Okay?

4           MR. SUGGS:  Well, Your Honor, like I said, we can --

5      we can revisit the carve-outs.  What -- these carve-outs,

6      again, are only for documents that have already been determined

7      nonresponsive.  The carve-outs are not going to exclude from

8      production something that is responsive.

9           THE COURT:  Okay.  Your carve-outs do, with all due

10     respect, though, to that.  When I read it, I think they do,

11     because I'm looking at the language in Exhibit C, and it says,

12     "The parties need not produce attachments that are

13     nonresponsive because" -- so that's our limiter, right?  The

14     word "because" is a limiter -- "because they pertain almost

15     entirely to nonbroiler products."

16          MR. SUGGS:  I --

17          THE COURT:  Now, if it said "entirely to nonbroiler

18     products," I might have a different view of it.

19          But when it says, "almost entirely," I'm not sure

20     what "almost" means.

21          MR. SUGGS:  Okay.

22          THE COURT:  Is it less than 50 percent?  Is it 25

23     percent?  Is it 10 percent?  Does it depend on the qualitative

24     subjective assessment of whether it is nonbroiler or not?

25          The next thing is:  Or to a business unit,

1    subsidiary, or division that is affiliated with the producing
2    party but not a party to this litigation.  Plaintiffs raise a
3    good point with respect to, I think, your client with respect
4    to a couple of entities that are not parties.  But Cobb
5    Vantress was used by Tyson to effectuate aspects of the
6    conspiracy they allege.

7              So if there's a document that relates to Cobb
8    Vantress and it's not a party to the litigation and you
9    withhold it, I'm not sure it's entirely nonresponsive or even
10   nonresponsive a little bit.

11             I don't know -- I don't know what the plaintiffs feel
12   about this -- you know, an attachment that doesn't hit on a
13   search term.  You know, I could go either way on that,
14   depending upon how your search -- how good your search terms
15   are.  But, I mean, your carve-outs as -- the defendants'
16   carve-outs as proposed to me could very well include responsive
17   documents.  If all we were talking about is not producing
18   nonresponsive documents that are attached to a parent, I could
19   understand the point.

20             MR. SUGGS:  Your Honor, this, I agree, is not worded
21   well.  And so I guess we would make -- we would change
22   "because" to "and."  But it is simpler, and we would actually
23   prefer just saying "not responsive to a Rule 34 request," not
24   getting into different categories.  Just saying if it's not
25   responsive to a Rule 34 request, it shouldn't be produced.

1        And that's much simpler and avoids the problem that
2    you just identified.
3        MR. CLARK:  Your Honor, if I could, Brian Clark for
4    plaintiffs.
5        I think -- you know, one of the ways forward on this,
6    I mean, our proposal, I mean, we really mean it.  We have had
7    some really constructive conversations on custodians with
8    defendants.  We're building relationships, building trusts that
9    we're each going to do what we say we'll do.  I think a way
10   forward is our proposal and then having a conversation with
11   Mr. Suggs about Tyson's documents.
12       You know, with respect to the carve-out for other
13   business units, in the -- in the context of a compromise on
14   Tyson custodians, we have a Tyson custodian who works for Cobb.
15   So this -- I mean, this provision would exclude all those
16   documents.  Why did we negotiate that?
17       But I don't think that's what they mean.  So I think
18   it would be more helpful to talk with counsel and have those
19   one-on-one conversations, talk specifics, and have that
20   agreement and talk about, you know, whether on the placeholder
21   it says, "This is an environmental document.  This is a
22   beef-only document."
23       That might be enough to move this forward.  And
24   that's our proposal, is to stick to kind of the language in --
25   which in some ways we're punting it down the road, but we're

1   also going to let ourselves talk about it in the specific

2   context, not in the abstract where none of us know what

3   "entirely" or "almost entirely" mean.

4           MR. SUGGS:  And, Your Honor, again, we're willing to

5   drop those carve-outs and just say, "any document not

6   responsive to a Rule 34 request," to make it cleaner.

7           I mean, what -- we're happy to talk with plaintiffs,

8   but what they're proposing makes things really complicated if

9   we have to say, "This is nonresponsive because it relates to an

10  environmental issue, but this is nonresponsive because it

11  relates to some other issue," and in the process of reviewing

12  it distinguish between different types of nonresponsive

13  documents and say, "We only withhold some of them," that makes

14  it a lot more difficult.

15          So if you just trust the process and say, if it's

16  determined to be nonresponsive to a Rule 34 request, then it

17  doesn't have to be produced.  And that, in turn, saves us from

18  having to redact nonresponsive documents.  It reduces the size

19  of the production significantly.  It saves plaintiffs from

20  having to review these nonresponsive documents.  And then they

21  can come back and if they think something was wrongly withheld,

22  ask for it at that time, that's a much cleaner, better

23  solution, in our opinion.

24          THE COURT:  Well, I hear you.  I'm not sure it covers

25  the field.

1      For example, defendants are agreeing that a

2 nonresponsive parent document is going to be produced if it

3 contains a responsive attachment that's not withheld as

4 privileged.  So that undercuts what you're saying.

5      You're agreeing to produce certain nonresponsive

6 documents; i.e., nonresponsive parent documents, if they

7 contain a responsive attachment.  So that's an exception to not

8 producing responsive -- nonresponsive stuff.

9      MR. SUGGS:  That's correct.  And that's because the

10 parent is often needed to understand the attachments, because

11 you need to know, for example, who the attachment was sent to.

12 But the same isn't true for all the nonresponsive attachments

13 on an email.

14      And so just because we're willing to agree to that

15 carve-out doesn't decrease the savings that we would -- that

16 would result from the proposal.

17      MS. PEPPER:  Excuse me, Your Honor.  Just to be

18 clear --

19      THE COURT REPORTER:  I'm sorry?

20      THE COURT:  Ms. Pepper.

21      THE COURT REPORTER:  I can't see you.  Sorry.

22      MS. PEPPER:  Hello.  I wasn't sure if there -- maybe

23 I missed -- there might have been a misunderstanding.  I just

24 want to be clear.

25      Defendants have already agreed that if the parent is

1    nonresponsive, it goes.  It will be produced.  So all that

2    Mr. Suggs is talking about is in the context where a parent may

3    be responsive or a family member may be responsive but a

4    different attachment is determined to be nonresponsive.

5            So what he's proposing does not subsume within it the

6    agreement we already made that a nonresponsive parent document

7    will be produced if any of its children are responsive.

8            And I can tell by your face that that didn't actually

9    help clarify it but --

10           THE COURT:  No, I'm close -- I think I understood

11   that.  I think -- I think I understood that.

12           The issue is -- no, maybe I don't understand it.

13           MR. SUGGS:  So any email will be produced if any

14   aspect of the email, either the email itself or the attachments

15   or --

16           THE COURT:  Or even a single attachment?

17           MR. SUGGS:  Right.

18           THE COURT:  Is responsive?

19           MR. SUGGS:  Right.

20           THE COURT:  Okay.

21           MR. SUGGS:  And we can do that and still withhold

22   nonresponsive attachments and save a lot of time and money.

23           THE COURT:  Okay.  But we're only talking -- so then

24   the -- that's how I started this.

25           What we're really talking about is documents that

1     defendants would say are nonresponsive -- attachments that
2     defendants would say are nonresponsive, right?
3                 MR. SUGGS:  Right.
4                 THE COURT:  Okay.  And the -- I don't necessarily --
5     I mean, I agree that nonresponsive documents don't get
6     produced.  That's just a truism.
7                 The problem arises for the plaintiffs when the
8     defendants start defining what they mean by nonresponsive
9     documents.
10                MR. SUGGS:  And we --
11                THE COURT:  And my suggestion on that is more -- more
12    talking because, you know, maybe the plaintiffs need to tell
13    you what they would consider to be responsive, okay; i.e., any
14    attachment that refers to broiler products at all, any
15    attachments that refers to these particular affiliates or
16    subsidiaries.
17                You may argue about whether or not it's responsive or
18    not, but at least now you have an argument about a specific
19    subject.
20                MR. SUGGS:  Well, you're exactly right, Your Honor.
21    And -- and the parties will, of course, have to engage in
22    negotiations about what is and is not responsive to their
23    requests.
24                And if we -- once we come to an agreement on that, if
25    we've already decided that anything that is deemed

1  nonresponsive as part of those conversations can be withheld,

2  then that's -- that's a perfectly adequate solution.  I mean,

3  if we just say, anything deemed nonresponsive per the parties'

4  agreement or the Court's order if the parties can't agree, then

5  that's fine with defendants.  And is that acceptable to you?

6  THE COURT:  Well, I would start the language in this

7  particular paragraph of your ESI Protocol, I think, with the

8  first line in Exhibit C under the defendants' proposed

9  provision, which says:  The parties agree that nonresponsive

10  parent documents must be produced if they contain a responsive

11  attachment and are not withheld as privileged.  Okay?  Then --

12  MR. SUGGS:  And you could just scratch most of this

13  and just say, "The parties need not produce attachments that

14  are nonresponsive," period.

15  THE COURT:  You could say that, too.  But then you

16  have to say the parties will meet and confer in good faith and,

17  you know, put together -- or meet and confer in good faith

18  about the -- I don't want to say protocol -- but about their --

19  MR. SUGGS:  How about what --

20  THE COURT:  I'm sorry.

21  -- about -- about what they view as responsive or

22  nonresponsive.  You know, because if it relates to Tyson,

23  whatever that entity is, plaintiffs say it's responsive.

24  Now, you may argue about it.  That's something that I

25  would then have to decide if you can't agree.  But, you know,

1  plaintiffs might say, "If it relates to broiler products, I

2  want it even though it's kind of -- it's totally off point.

3  I'd rather get it and throw it out than not get it at all."

4          Now, you could talk about whether it hits on agreed

5  search terms or not.  That's not a bad way to do it, you know,

6  but, I mean, if it -- if it does hit on agreed search terms,

7  then you might decide that it should be deemed responsive no

8  matter what.

9          So I'm fine with solving the problem this way.

10 The -- you know, it's a huge case, and I understand the burden.

11 But I also take with a grain of salt, Mr. Suggs, the issue of

12 burden, because as Mr. Clark said, in order to determine

13 whether the document is responsive or not, you guys -- your

14 guys have to go through it.  Now, whether it gets coded,

15 whether it gets TIFFed, whether it gets produced, that's a

16 different subject.  But you're looking at the stuff to make

17 that initial call anyway.

18         So I'm not sure, you know, if the default was if a

19 parent or an attachment is associated with a responsive

20 document, it gets produced.  I don't know whether it, I

21 guess -- I guess privilege review comes in there.

22         MR. SUGGS:  Right, and also just the processing.  So

23 if you're talking about potentially hundreds and thousands of

24 nonresponsive documents that have to be processed, that also

25 adds cost and time.

1          THE COURT:  Okay.  Well, I guess the way I would do

2     this now -- I don't know if this is resolving it, Mr. Clark --

3     but I would start with what the defendants have as their first

4     sentence.

5          MR. SUGGS:  I think the way Your Honor described it

6     earlier where it says:  Parties need not produce attachments

7     that are nonresponsive, and the parties will meet and confer

8     about what is responsive to Rule 34 requests, is a perfectly

9     good solution.

10          THE COURT:  Yeah, but I suppose you could also play

11    it the other way, and I'm not sure I want to play it the other

12    way, which is:  The parties are obligated to produce

13    nonresponsive attachments unless they're on that other list,

14    right?  But that's -- that's -- you know, that's too much

15    mental gymnastics.

16          MR. SUGGS:  I think -- I mean, the parties are going

17    to have to meet and confer about what is responsive anyway.

18          THE COURT:  Yeah.

19          MR. SUGGS:  And then we'll essentially just be

20    treating all documents the same in terms of the responsiveness

21    determination.

22          THE COURT:  Yeah.  Can you live with that, Mr. Clark,

23    or no?

24          MR. CLARK:  I think the key for us is we agree,

25    there's -- some meet-and-confers could really narrow this and

1    not take up the Court's time with this.  But I think for us the

2    key is that we're going to have an identification of some way,

3    if it's just a word, of the category that says, this is beef,

4    this is environmental, this is HR.  That would, I think,

5    resolve 95 percent of the issues.

6            If it's an HR or beef issue, you will not hear a word

7    from us.  But we need to know the easiest way.  As the coders

8    for defendants will go through, they'll tag them as a

9    particular category that we've talked about, and hopefully

10   we'll never have to come to you with issues.

11           THE COURT:  Yeah, I mean, I'm fine with dealing with

12   it that way.  I just think you're in the dark a little bit

13   about what some of the documents look like.

14           MR. CLARK:  Yeah.

15           THE COURT:  And that's going to -- you're going to

16   have to get some documents --

17           MR. CLARK:  Yeah.

18           THE COURT:  -- and see what they say, but --

19           MR. SUGGS:  That's also the same for every document

20   that's not produced.  I mean, they have to trust us --

21           THE COURT:  Right.

22           MR. SUGGS:  -- to make a determination of what's

23   responsive or not.

24           THE COURT:  Right.  But I think trust and verify is a

25   good way to approach -- approach that, and I just think if they

1    have stuff that they know that could be on the line but they
2    would argue is responsive, you guys ought to -- you got to talk
3    about it, so that you don't go through a whole bunch of review
4    and then have to come back and produce the stuff that relates
5    to X or Y entity because it's -- you know, becomes responsive
6    later on.
7              MR. SUGGS:  Right, but it will be determined to be
8    responsive based on the parties' negotiations.
9              If we're carving out separate categories of
10   nonresponsive documents that can be withheld or can't be
11   withheld, that's too burdensome and, frankly, probably not
12   worth it unless the categories can be clearly defined in
13   advance, which is very difficult to do.
14             So your initial suggestion that the parties just
15   withhold them if they're responsive to Rule 34 requests to me
16   is far superior.
17             THE COURT:  If they're nonresponsive.  Yeah, I'm okay
18   with that, but I do want you to talk about these other
19   categories --
20             MR. SUGGS:  Absolutely.
21             THE COURT:  -- because I don't want there to be --
22             MR. SUGGS:  Absolutely.
23             THE COURT:  -- you know, your view of nonresponsive
24   and theirs may be different.
25             MR. SUGGS:  That will --

1          THE COURT:   And that's always addressed in a case.

2          MR. SUGGS:   That will definitely happen.

3          THE COURT:   Mr. Pouya, did you -- you're wanting to

4    say something?

5          MR. POUYA:   Yes, Your Honor.  Thank you.  I'm going

6    to come up to the podium.  I don't want to stand up over there.

7          THE COURT:   Yes.

8          MR. POUYA:   I just don't want to get lost in the

9    trees and stop seeing the forest.  We talked -- in the

10   beginning you talked about the default.  The default told us to

11   produce the attachments when you have a responsive parent, and

12   the reason for that is to provide that context and not have

13   some of the issues that we're talking about right now, which is

14   then we have to get into a separate discussion of whether it's

15   responsive or not.  What's in the attachment?  Give us a

16   category.  Review the document and see if it's responsive, and

17   it isn't, and then come back to you later with 10,000 documents

18   that we say have attachments which we believe may be responsive

19   to something.

20         We want to avoid that, and that's why we're

21   advocating for the default rule.

22         THE COURT:   The default rule being?

23         MR. POUYA:   The default rule, if the parent contains

24   relevant information that's responsive, it should be produced

25   as a family group.  It's less burdensome on the review end.

1      THE COURT:   Wait.  They've agreed to that.

2      MR. POUYA:   Okay.

3      THE COURT:   Am I missing this?  Haven't the

4  defendants agreed to that?

5      It says:   The parties agree that nonresponsive parent

6  documents must be produced if they contain a responsive

7  attachment and are not withheld as privileged.

8      MR. SUGGS:   No, Your Honor.  What Mr. --

9      THE COURT:   Is he saying the opposite?

10     MR. SUGGS:   What Mr. Pouya is doing is trying to go

11 back to a different discussion and now say that we have to

12 produce any attachment regardless of responsiveness, which

13 seems to be just ignoring all that we've just discussed here.

14     THE COURT:   What you're saying is, if the parent is

15 responsive, then any document that's attached to it also has to

16 be produced, right?

17     MR. POUYA:   That's the default.

18     MR. SUGGS:   And, Your Honor, we have had similar

19 arrangements in other cases where nonresponsive attachments are

20 withheld.  It's perfectly workable.  It's not distorting what's

21 in the production or the meaning of the document.

22     They can always come back and ask, if they think the

23 document is wrongly withheld, that it be produced.  But I don't

24 want to underestimate the savings of not having to go back and

25 redact a bunch of nonresponsive attachments and process

1    hundreds and thousands of pages of documents that the

2    plaintiffs would have no claim to see except for the fact that

3    it's attached to an email.

4         THE COURT:  Okay.  I don't want to -- I don't want to

5    spend the whole afternoon on this.  We're not even at the

6    afternoon, but we're close.  I --

7         MR. FONTECILLA:  And, Your Honor, Mr. Fontecilla for

8    Wayne Farms.

9         I just want to add one thing.  One of the questions

10   you had was about the verify aspect of it.  And to the extent

11   that things can be verified, the parent email, when it gets

12   TIFFed, has the file names of the attachments on it.  So even

13   if a nonresponsive attachment would be missing, the way this

14   works practically in ESI discovery is the parent gets produced

15   with its Bates stamp, the subject line of the email -- it looks

16   like an email you look -- that looks -- you know, it looks like

17   a deposition exhibit, and it lists the file names of all the

18   attachments.

19        So it provides some, you know, basis for verification

20   by the plaintiffs.

21        THE COURT:  So the real dispute is responsive parent,

22   bunch of attachments.  Do nonresponsive attachments have to be

23   produced, or do they only have to be produced if they relate to

24   certain categories of things, or can they only be withheld if

25   they relate to certain categories of things, right?

1      MR. CLARK:  Yes.

2      THE COURT:  That's really the dispute?

3      MR. SUGGS:  That is right.

4      THE COURT:  Okay.  I guess I want to think about that

5  for more than just this few seconds.  I didn't -- I didn't boil

6  it down to that.

7      It's the mirror image of nonresponsive parent but

8  responsive attachment.  Except a parent is one document, and

9  attachments could be more.  But who the heck knows.

10     MR. FONTECILLA:  Yeah.  If it's helpful, Your Honor,

11  I could give an example.

12     So an email gets sent.  I send a colleague an email,

13  and I say, here are all the reports I need you to review, you

14  know, because I'm leaving on vacation.  And only one of them is

15  actually responsive to a Rule 34 request, but the other fifty

16  attachments that I'm giving to my associate to review while I'm

17  on vacation, because that's what I do, is -- have to do with

18  environmental issues, have to do with, you know, whatever

19  nonresponsive stuff is agreed upon by the parties.

20     So it would -- that's what's trying to be excluded.

21     THE COURT:  Yeah.  And in the olden days where you

22  used to go to a warehouse and review documents in boxes, you

23  had the same problem.  You had a presentation with Exhibits A

24  through F, and either you got there and the presentation and

25  all the exhibits was produced because the presentation was

1    responsive, and you looked through A through F, and you said
2    this is garbage, but usually when you showed up and only A, B,
3    and C were produced and D through F, or whatever, were not,
4    there was a follow-up discussion of:  Why did you withhold
5    them?  Because they're not responsive.  Well, let me see them
6    anyway.  So you end up with a fight about that, too.
7              So I can see plaintiffs' point, too, about the
8    default.  I can see the expense on the defendants.  It's
9    somewhat -- the expense of not producing responsive stuff is
10   discounted by the fact that you need to look at it anyway.
11             MR. SUGGS:  It is.  But, Your Honor, I mean, the box
12   example --
13             THE COURT REPORTER:  I'm sorry.
14             THE COURT:  Suggs.
15             MR. SUGGS:  Sorry.
16             THE COURT REPORTER:  I can't hear him.
17             MR. SUGGS:  We're talking about 14 defendants who are
18   going to have a lot of documents to produce.  So this will
19   significantly reduce the volume of documents that are produced
20   and the time required to do it.
21             I mean, yes, they'll still need to be reviewed, but
22   they won't have to be redacted, and they won't have to be
23   reviewed by the plaintiffs, which is a significant savings for
24   them.  And so I'm a little unclear why they want to see these
25   documents that are deemed nonresponsive.

1          I mean, for Tyson, again, we have -- the CEO is the
2     custodian.  He's going to be receiving documents about their
3     beef business, about their pork business, about Hillshire
4     Farms, about Sara Lee.  And we don't think it's in anyone's
5     interest to produce all those documents in this litigation.
6     And once the parties determine what is or is not responsive,
7     we'll just make the determinations about whether to withhold
8     the documents based on that agreement.
9          THE COURT:  Yeah, I hear you.  Okay.  I don't think I
10    understood this in the fine detail when I was reading this
11    stuff like I understand it now.  I get it.  It brings back bad
12    memories.
13         (Laughter.)
14         THE COURT:  But now I have to decide.  I get it.  I
15    get it.  There's no perfect here, but maybe there's good.
16    Okay.  I need to think about that a little bit more.
17         The next one is not easy either.  This is the
18    pre-culling TAR, but I'm not sure it's as hard -- I mean, I
19    guess there was some weasel words in this one, too.  And I'm
20    not really -- I mean, first of all, the literature that I've
21    been able to see does, as plaintiffs say, criticize doing a
22    keyword search and then TARing that as opposed to TARing
23    everything.
24         Now, you know, I don't know if it's related or not to
25    the issue that we just talked about, the larger the database,

1  you know, with nonresponsive documents.

2          But defendants have on page 33 of the April filing

3  something that I wasn't really sure -- you said:  In particular

4  for unusually high volume data sets, a defendant should have

5  the option to limit a data set through the application of

6  keywords and conduct the review of the remaining data using

7  TAR.

8          And I wondered whether that really is what we're

9  talking about.  I mean, in the abstract, this is one thing.

10  You can make a call in the abstract.  But I don't know if

11  there's any data set, for example, the plaintiffs would say,

12  I'm okay with doing that.

13          So Ms. Pepper is standing, but that was really a

14  question for the plaintiffs.

15          MS. PEPPER:  Oh.

16          MR. CLARK:  Not, as we sit here today, can we think

17  of a way in which that would work.

18          The problem is, we're going to spend all this time

19  negotiating keywords, and it's going to cut stuff down, and

20  we're going through the whole game of guessing which words

21  occur in documents that, frankly, neither one of the attorneys

22  discussing it know all the words that people in the data set

23  used.  And then it's going to be applied a second time with

24  TAR, and frankly, it decreases the recall so much it's hard to

25  understand why it wouldn't just be -- since to run the search

1   terms, you have to process a lot of the data anyways -- you

2   have to make -- you have to have the searchable text -- why you

3   wouldn't just dump it into TAR and use the savings there.  That

4   way you're going to still review a very small amount of the

5   text, and as a benefit here, it can find some of the kind of

6   coded words and not have to guess at every word used by --

7               THE COURT:  Yeah.  Ms. Pepper, you wanted to say

8   something?

9               MS. PEPPER:  Yes.  I'd actually like to take a step

10  back just for a minute to I think -- there are a few things

11  we're talking about here, and I want to make sure on this

12  particular issue we're all clear about what it is we're talking

13  about.

14              THE COURT:  The only thing I'm talking about is

15  pre-culling.

16              MS. PEPPER:  Yes, and I -- and that's why I think

17  that -- indulge me for one minute.

18              THE COURT:  Okay.

19              MS. PEPPER:  There are a few different ways that a

20  producing party may identify responsive documents for

21  production.  One is apply keywords, have an associate like me

22  review them, make a determination, send them out the door.

23              The other is TAR, right?  You take the whole universe

24  of documents that have been collected from custodians.  You

25  allow TAR to operate.  You send those documents out the door.

1        But there is a -- this was the point, I think, Your

2   Honor was referring to on the page 31.  The bigger the volume

3   of documents, you may want to make a decision about how best to

4   get to the universe of responsive documents that go out the

5   door.  And one way to do that, that some defendants may wish to

6   apply when we actually know the full volume that we're dealing

7   with, would be to first apply keywords and then apply -- to get

8   to the universe of documents that are subject to review for

9   responsiveness and then apply TAR.

10       And as I understand it, the only difference that

11  we're talking about between plaintiffs and defendants is who is

12  making the responsiveness call, because they do not object to

13  the application of search terms.  What they object to is, is it

14  me or is it predictive coding or computer-assisted review that

15  is then looking at the universe of documents pulled with search

16  terms to make the responsiveness call?

17       THE COURT:  I don't -- I -- I'm surprised that I

18  actually understand most of what you just said.

19       But I don't know that that's -- I mean, the way I

20  understand it is that on any database, the science says that if

21  you first apply keywords to that database and then on a subset

22  of that database that you have identified as, quote/unquote,

23  responsive, you apply a technology-assisted review product to

24  that in order to determine what you're going to produce, that

25  process constricts the -- what ends up getting produced to the

1 reviewing party or to the requesting party more than if you did

2 your computer-assisted review process on the entire database.

3     MS. PEPPER:  So I think Your Honor is correct in that

4 there are different ways to get at increasingly fine calls of

5 responsiveness.  Without knowing what Your Honor has read, I'm

6 not in a position to dispute it.

7     I think there is evidence that my eyes are actually

8 less reliable than the computer that has been taught to

9 identify responsiveness.  But I think this is where it is

10 important to actually look beyond what the science says in a

11 perfect world and actually look at the cases that were

12 presented to Your Honor.

13     THE COURT:  I read those.  And I also read Sedona

14 stuff.

15     MS. PEPPER:  And I think it's really interesting that

16 the case cited by plaintiffs, the *Rio Tinto* case, the holding

17 in that case by Judge Peck was actually that, sure, in a

18 perfect world, we would boil the ocean.  We'd look at every

19 single document.  We would look at it several times, and we

20 would decide, you know, is it perfect?  Is it going out the

21 door?  But the standard is not perfection.  It can't be when

22 considerations of reasonableness and proportionality are taken

23 into account.

24     And every other case that at least was before the

25 Court in terms of briefing holds the same.  *Da Silva Moore* said

1    that TAR, in conjunction with search terms, can be applied to

2    improve richness of review.

3           And let's just -- I actually like it when we give

4    real-world examples.  In the *Biomet* case, they applied search

5    terms first before applying TAR, and they were able to reduce

6    19.5 million documents that could have potentially been subject

7    to review and coding, and everything we've just talked about,

8    down to a set of 2.5 million documents.  And that still cost

9    the producing party $3.25 million.

10          So as Your Honor pointed out at the beginning, it's

11   fine in the abstract to talk about what we would do if cost was

12   not an option and, you know, if we were going to hold everybody

13   to a standard of scientific perfection.  But fundamentally,

14   when you are dealing with a universe of extremely large

15   populations of documents, there has to be a way for a producing

16   party to both reap the benefits of arguably more precise

17   computer-assisted review without having to apply that to every

18   document in its files.

19          THE COURT:  What about these -- some of these other

20   kind of related issues?  For example, disclosure?  Is

21   defendants' proposals that any one -- that all the 14

22   defendants could do this in a different way; that they could --

23   they could decide -- they've got 14 different systems, assuming

24   they're all still in the case at the end or when we start doing

25   this stuff or even 12 or 10, and they could all do it different

1    ways, and they don't necessarily need to disclose to the

2    plaintiffs who is doing what?

3              MS. PEPPER:  Oh, so the latter part is not right.

4              THE COURT:  Okay.

5              MS. PEPPER:  So the first part of Your Honor's

6    sentence is our position that people could do it different

7    ways.  That is totally accurate insofar that some defendants

8    may choose to apply search terms and not use TAR at all.  Some

9    defendants may choose to use TAR and determine that the

10   universe they're looking at, it doesn't make sense to first

11   apply search terms.  Some defendants -- and this is, you know,

12   the discrete issue, could they do both -- are asking when we

13   know the volume of documents, could we first pre-cull with

14   search terms before applying TAR?

15             So the first part of your question is, could we do it

16   differently?  Yes.  To what I think you're asking now, which is

17   if for those who choose to use TAR in some capacity, could they

18   use it differently?  The answer to that is yes, but to an

19   extent.  Every producing party will have to secure a vendor or

20   has already secured a vendor.  Those who are using TAR have

21   secured vendors who have TAR capabilities.  Those TAR

22   capabilities have their own nuances.  They're not all

23   necessarily the same, because the parties have not all procured

24   the same vendor.

25             But to the last part of your question, are we

1    suggesting we don't have to tell them what we're doing?  No,
2    no, not at all.  In fact, I think our -- we can turn to that
3    part of the proposal.

4            THE COURT:  Yeah, I'm on page 3 of Exhibit C.  It
5    says -- the part that I'm looking at -- and maybe this is a
6    nuance -- a party may use technology-assisted review to sort
7    documents for linear review without disclosure of that use.

8            MS. PEPPER:  If Your Honor wants to strike the part
9    about "without disclosure of that use," that's fine.  It's
10   inconsistent with V(D)(2)(c) where we say:  A producing party
11   shall describe to the requesting party the name of the TAR
12   software and vendor being used --

13           THE COURT:  Right.

14           MS. PEPPER:  -- the document types included and/or
15   excluded from the TAR process and the applicable review metrics
16   applied, which may, but not necessarily, include recall,
17   precision, richness, blah, blah, blah, blah.

18           THE COURT:  Yeah, I see it all.

19           MS. PEPPER:  So -- so if you're concerned, delete it.
20   A party may use technology-assisted review or other
21   technology-based analytics, which we can get to when Your Honor
22   is ready, period.  If a party elects to use TAR or cull -- to
23   cull or otherwise limit the volume of unstructured ESI, subject
24   to linear review, the parameters set forth in Section V(D)(2)
25   shall apply.

1       THE COURT:   What is linear review?  Is that just
2  review by people?
3       MS. PEPPER:   It's just -- it's the -- linear review
4  is review, like, the straightforward review, but I think
5  where -- someone will correct me if I'm speaking out of turn --
6  where it becomes nonlinear is, you know, certain documents get
7  withheld for a privilege review, which is another part we'll
8  have to talk about.
9       THE COURT:   Well, both sides seem to agree with this,
10  so I don't -- didn't necessarily want to wade into it, because
11  without disclosure of that use is in both sides.  So I don't
12  want to make a mountain out of a molehill here, but I wasn't
13  sure why anybody would agree that the other side can use TAR to
14  sort documents without telling the other side that's what
15  they're doing.
16       Mr. Clark, you were okay with that?
17       MR. CLARK:   So the issue -- so when you're talking
18  about just using TAR to say review this document first and
19  review document number one million last, that's just
20  prioritization.   They all still get reviewed.
21       What we're -- kind of the fight about is on when TAR
22  is being used to cull the universe a human ever looks at and
23  makes decisions on what's in or out, that's what we're really
24  kind of focused on.
25       And just, if I could say broadly, what matters to

plaintiffs about TAR is that we know what products are being used. On some of these just basics of which product, kind of what's the general work flow are important questions for us. And then really at the end of the day, what matters on this is there's validation done of the TAR process; that where no human but some kind of black box algorithm said these documents are out, and these ones are in. And that validation is looking at that set of documents that got excluded, and there's going to be some that are responsive in that bucket, and we know that. It's not perfect. But we want to know what that recall number was that tells you how many responsive documents are in, what was excluded.

        And that's -- I mean, setting all this language aside that's in front of you, at the end of the day we care about that validation the most. And frankly, in a conspiracy case, our preference is for defendants to use TAR. We just want to know what documents go in that bucket, and we don't want them pre-culled. And then we also want to know kind of more broadly that then it worked.

        THE COURT: And so where are the defendants on that continuum there? Do you want to talk for a second there?

        MS. PEPPER: Give me one minute.

        THE COURT: Yes, you got people talking behind you.

    (Brief pause.)

        MS. PEPPER: So --

1      THE COURT:  Or should I give you guys a chance to
2  talk about this together?  Because I thought that that was -- I
3  mean, I wasn't understanding plaintiffs' position like that.  I
4  don't know how you feel about validation.
5      I think that if somebody is using technology-assisted
6  review in the course of their document production process, it
7  should be disclosed to the other side.  I think I had a problem
8  with "or other advanced technology-based analytics" because it
9  was part of a sentence that said, "without disclosure of that
10  use."
11      If somebody says, "I don't want to use TAR.  I want
12  to use Fred, because Fred is new, and that's a technology-based
13  analytic algorithm," I don't have a problem with it, provided
14  that it's disclosed to the other side, and the other side has a
15  chance to say, "No, Fred has been found to be -- in seven
16  cases, you know, it drops relevant stuff even though it's
17  millions of dollars cheaper, and before you use that, I want to
18  be able to prove that to the Court."
19      So I'd like each party to disclose to the other what
20  they're reviewing -- what they're using.
21      I'd like to delve into the validation point that
22  Mr. Clark made, because that may be a way of dealing with some
23  of these problems.  And if you can't deal with it right now but
24  you'd rather talk about it, that's fine.
25      And finally -- and I know -- I got three people at

1    the defendants' table standing, so I know you want to say

2    something -- I didn't -- I'm going to have to go back and read

3    the cases, because I'm afraid I did not read the case law in

4    the way you were telling me you read it.

5         I know that in the *Rio Tinto* case, I guess it is,

6    Judge Peck made the statements about, you know, perfect being

7    the enemy of the good.  But I thought that that case had

8    proceeded in a particular way on the facts where stuff had

9    happened already, and he was trying to say, okay, I can live

10   with this.

11        He's got other cases that I did read in which he said

12   pretty clearly that the pre-culling of a database with search

13   terms and then TARing that database is not the preferred way of

14   going.  And I've read some other materials, which I can't put

15   my finger on right now, that also said the same thing.

16        If the validation process is something that is a

17   failsafe on that -- and Mr. Hart is shaking his head, so I

18   don't need to go there maybe -- but, I mean, I guess I'd have

19   to go back and read those a little bit more, because my -- I

20   will tell you coming out here, my leaning was -- my leaning was

21   not to pre-cull with search -- with keyword search terms.  Part

22   of that leaning, though, was because I have no quantification

23   by the defendants as to the increased burden of this.

24        You know, I understand that TAR is an expensive

25   process.  Searching with keywords is an expensive process.  I

1    don't really know what the difference is in dollars, and I

2    don't know that the defendants know it either yet.  If we're

3    talking about a hundred million dollars to two million dollars,

4    that's one thing.  If we're talking about two million dollars

5    to ten million, that's really significant, too, but I'd have to

6    delve into that a little bit more.  I just don't know what the

7    increased burden is.

8              The literature seems to say -- the cases seem to say,

9    though -- and, frankly, common sense tells me that an

10   artificial intelligence product like technology-assisted review

11   learns better on a big database.  And, I mean, that's what they

12   tell you when you go to these programs.  And when you

13   circumscribe the database, then you are in some ways limiting

14   the utility of your technology-assisted review process.

15             And I'm afraid that when you pre-cull and for just

16   documents that hit the search terms and then TAR that, you've

17   left out something that TAR might pick up because it's smarter

18   than the associate looking at the documents.  And that to me is

19   a problem.  And if it's a problem, I need you to quantify what

20   the extent of the burden is.  And that's what I started out

21   with, what defendants really were talking about in terms of

22   databases.

23             You know, if you're going to do that for all your

24   emails, I got a problem with it.  If you're going to do it for

25   all -- you know, everything you get from your production

facilities, maybe I have a problem with it.  But if you're

doing it with a huge database of stuff where the utility --

where the chance of finding anything responsive is low and the

cost of doing it with TAR on the whole thing is high, I might

look at it differently.

So I'm glad I was able to get that out, because that

was behind some of the things I was saying.  And I'll stop.

MS. PEPPER:  No.  So that's helpful.  And my

colleagues are -- I want to make sure that they have an

opportunity to be heard as well.

But Your Honor has highlighted several sub-issues

with the whole approach to TAR, and I just want to touch on

them briefly, because I hope it will be clarifying.

THE COURT:  Okay.

MS. PEPPER:  So, first of all, the point Your Honor

made about other advanced technology-based analytics, I

understand the concern about, without disclosure of use, just

delete it.  If a party uses TAR, we will disclose the vendor.

We will disclose the program.  No one is trying to hide the

ball about how we are approaching this review.

MR. FONTECILLA:  Can I just jump in here, Ms. Pepper?

THE COURT:  Fontecilla.

MR. FONTECILLA:  Yeah, Adrian Fontecilla for Wayne

Farms.

That provision, just so -- because I think there's a

1    fundamental misunderstanding about what the separate provision
2    in V(D)(1) is about.  That's about sorting.  It's not about
3    coding for responsiveness.  It's about if -- if for Wayne Farms
4    I determine that I want to start -- I want to use the
5    technology-assisted review as part of my investigation to dive
6    into documents related to a particular custodian that may have
7    a certain search term in it, I can apply TAR to sort that to
8    the beginning of my review and use TAR for an internal
9    investigative work product purpose.  I don't need to disclose
10   that I used TAR for that purpose to the plaintiffs.
11              Now, V(D)(2), which is in the next line, talks about
12   using TAR to code for responsiveness and nonresponsiveness, in
13   which case disclosure is made and certain metrics that we have
14   laid out are disclosed to the other side.
15              But I don't want to delete the first sentence because
16   it raises potential work product issues.  We want the
17   flexibility to use the TAR technology we've paid for for
18   internal investigative work product purposes without having to
19   tell the plaintiffs that we're using it for that purpose as
20   well.
21              THE COURT:  I mean, I don't disagree with that.
22              MR. FONTECILLA:  Right.  That's why it says the word
23   "sort" in that sentence.  It's completely separate from V(D)(2)
24   where it's for coding purposes.
25              MR. CLARK:  Nor do -- this is Brian Clark for

plaintiffs.

Nor do we disagree.  I think the reason that the issue carries over is that's where -- the first sentence is where TAR is defined.  And TAR is defined as TAR, and then this other advanced technology-based analytics, which nobody seems to know what it is.

When you use "TAR" down below where it's not sorting, where it is culling, that's where the problem comes in.

THE COURT:  Okay.  So I agree with that, too.

So you don't need to delete "without disclosure of the use" if it's internal work product and you're doing it that way.  Just like you don't have to disclose to the other side:  We had Mike do it, because Mike's really smart, and he does this all the time.

But if you're going to define TAR to include other advanced technology-based analytics and use that term for the use of TAR to produce out, then I don't like that, because there has to be transparency there.

MS. PEPPER:  So let -- let -- I will answer that, but my colleagues may have something to add before we get to that.

THE COURT:  Okay.  Go ahead.

MS. ROBIN STEWART:  Thank you, Your Honor.  It's Robin Stewart with the law firm of Kutak Rock.  We represent O.K. Foods defendants.

And exactly what Adrian said.  I mean, when we -- the

nondisclosure part of it was for a linear review.  And I know

Ms. Pepper was starting to define what that was.  That's when

you're reviewing every single document.  You're not using any

type of technology to kick out certain documents that don't

need to be reviewed.  It could be clustering them together.  It

could be prioritizing them, that sort of thing.

THE COURT:  I'm fine with that.

MS. ROBIN STEWART:  And the TAR, technology-assisted

review, means a lot of different things.

I think what we're talking about in the next section

is commonly referred to as predictive coding.  The new buzz

term right now is continuous active learning or CAL.  That is

where you're using technology, and in my opinion -- and I think

most of the scientific research supports this -- is it actually

enhances the review.  Even Mr. Clark had stated that he would

prefer that the parties use CAL or TAR predictive coding,

choose your term, and I agree.  You know, I agree that that is

a better way to review documents.

However, the issues that we have right now -- and

some of this is just premature -- is there could still be

millions and millions of documents.  We just don't know.

You know, if it's a fairly small set -- there are

smaller defendants.  Just because they're a small defendant --

O.K. Foods is not the largest defendant, but we may have tons

of data.  Because we don't have document retention policies, we

1    keep everything; and, you know, whereas, a larger defendant,

2    like Tyson, may have smaller document sets because they might

3    have a really restrictive data retention policy.

4              We just don't know the volume.  If something is a

5    relatively small volume, it's probably a lot easier just to

6    agree on search terms and review it that way and not use

7    predicative coding or continuous active learning.  However, if

8    we've got terabytes of data, putting it through -- I'm sorry --

9    putting it through predictive coding still would mean -- you

10   know, let's just say we've got -- you know, we have over ten

11   million documents in our data site.  Even using predicative

12   coding, we're still reviewing, you know, between a million and

13   a million-and-a-half documents.

14             There's still a significant review that goes into

15   using that type of technology.  You have to train it.  You have

16   to test it.  You have to -- you have to provide -- I agree, you

17   have to verify it, and in the recall, you're still -- there's

18   still a lot of -- a lot of documents to get through.

19             So the circumstance in which we would advocate to use

20   some search terms, agreed upon and negotiated with opposing

21   counsel, would be to narrow the terabytes of data that may,

22   could easily -- you know, it was reasonably anticipated some

23   defendants will have super large volumes of data to get still a

24   large subset that the predictive coding technology will be

25   applied to, however, not quite as large -- you know, if we're

1  dealing with, say, 15 terabytes, maybe we just use it across

2  one terabyte.

3          One more point of clarification, just so the record

4  is clear, the term "databases" has been used a lot.  Typically

5  databases are handled totally differently.

6          You know, email, for example, is not a database.  You

7  know, databases have a bunch of fields that are populated, and

8  data is kind of existing floating around in space.  And you

9  come up with a report that you would generate, that type of

10  thing.

11          We're talking about user files, such as, you know,

12  emails and Word docs, things that might be on a hard drive or

13  on a network shared server somewhere, that type of thing,

14  not -- you know, it might be a little too technical, but not a

15  database, per se.

16          MR. FONTECILLA:  And if I could just add one thing

17  before Ms. Pepper dives into the substance.

18          The -- it's important to understand how this works

19  practically for a party in litigation dealing with this volume

20  of documents.

21          Every vendor and every outside law firm has entered

22  into a different contract for different rates with a particular

23  vendor.  And the way the vendor is charged for this kind of

24  thing, it's very different.  It's -- there's a whole range of

25  different fee structures and fees.  And typically, what happens

1    is the amount of data that has to be put through TAR is charged

2    for.  So if you're not culling with search terms, the -- you're

3    paying for a lot more either per gigabyte or per document to

4    put it through the system first, which can be enormous amounts

5    of cost.  Some vendors charge for actually processing as well

6    as for hosting.

7         So once a document -- each document that has to be

8    processed to be made technically viable and ready for the

9    system to use is charged, and then once it gets put on the

10   database, it's charged per gigabyte per -- you know, per month

11   that that document has to exist and be tested and exist live

12   rather than be culled out.

13        So there are enormous costs just from the vendors'

14   side before you even get to the review side that Ms. Stewart

15   talked about.  So I just wanted to make that clear.

16        THE COURT:  Okay.

17        MR. POTTINGER:  And, Your Honor, Oral Pottinger from

18   Foster Farms.

19        Just one thing about the technology.  The technology

20   has evolved, and it's continuing to evolve.  A lot of the

21   algorithms that were -- in terms of those earlier cases that

22   we're talking about is not the preferred method in terms of the

23   pre-cull, and then TAR were -- was a different algorithm

24   altogether.

25        And now, as we've stated, continuous active learning

1  is another algorithm.  And then probably next year there will
2  be tweaks to technology that the same limitations that were in
3  the previous algorithm are no longer there.

4          And so one of the things we have to keep in mind as
5  we're having the discussion is that the technology has changed.
6  The technology has gotten more precise.  At one point, it
7  wasn't a preferred method to have -- we were supposed to have
8  all your custodians collected at once and then apply TAR.  But
9  now, because of the continuous active learning, you can have
10 subset custodians and then add custodians later on, and it
11 doesn't affect the results.

12          And so I just wanted to raise that point as well.

13          THE COURT:  Okay.  I was afraid of that, actually.
14 That was the thought that I had.  A couple of thoughts on this.

15          One, I realize I used -- I'm using terms that are
16 technical terms, like "database," and I get it.  I understand
17 that.  I'm not as well versed in that, but I appreciate the
18 correction.

19          Two, when you say, Ms. Stewart, that if we have 10
20 million terabytes of information, it's going to be really
21 expensive to look at it, and so to reduce the cost, we should
22 do the keywords first and then do the TAR on top of it.

23          It doesn't answer the question that I have, which is:
24 Have we diluted the producible product after that in a way that
25 is prejudicial to the requesting party?  Okay?

1        And I may need an expert to tell me this.  All right.
2   I may need somebody who is up on the current data and not from
3   2013 or 2009 to help me decide this.  Because I understand the
4   cost issue, but if there really is 10 million terabytes of
5   data, which there may or may not be, and it's possible that all
6   that stuff is responsive, it may not be a good response to say,
7   the best way to do this to save costs is the keywords and then
8   TAR, unless I'm convinced that that's not diluting it too much.
9   All right.
10       And, you know, Mr. Pottinger's point is well taken.
11  Maybe today there's a different answer to that question.
12  Again, the way I read these cases and at least what -- on the
13  Sedona stuff, which I'm a member of, is -- is there was a
14  caution sign on that.
15       One thing that is completely missing here from this
16  discussion is what Mr. Fontecilla was talking about in terms of
17  the vendor charges.  Right?  We're putting the cart before the
18  horse a little bit.  I know there is a difference in how much a
19  vendor will charge depending upon how much data that vendor
20  needs to process and how quickly the vendor needs to do it.
21  And I know that there's a charge for hosting.
22       But I don't know, for example -- and maybe this is
23  different for different defendants.  I mean, O.K. Foods, Wayne
24  Farms, somebody else, the difference may not be great, and it
25  may not be unduly burdensome.  I don't know.  And certainly

1   burden factors into this whole discussion.

2           And I'm tempted, after I think about it for maybe a

3   few more terabytes of seconds -- I don't know -- or bytes, to

4   ask each side -- and I think it's probably just each side, even

5   though there's a lot of plaintiffs and a lot of defendants --

6   to propose to me two experts who aren't conflicted, because you

7   haven't hired them, that I would consider to come in for a

8   hearing to be a court expert under whatever federal rule you

9   could do that, maybe 706, but -- no, that's testimony.  But I

10  can appoint a master, I can appoint an expert that you guys

11  would pay for to give me state-of-the-art information rather

12  than advocacy information, because I don't know that I'm expert

13  enough to make it.

14          I don't want to make a bad decision.  I don't want to

15  make a stupid decision.  I don't want to make a rash decision.

16  I want to make the best decision I can make knowing that

17  there's no perfect decision here.

18          MS. PEPPER:  Your Honor, I think what you've proposed

19  makes a lot of sense.  I actually think we can take a step even

20  farther back than that and suggest that the hearing that you're

21  proposing may be appropriate at the time that the producing

22  parties know if this will even be an issue.

23          So as Ms. Stewart pointed out, we don't have any idea

24  yet what the volume is that we're talking about.  If we don't

25  need to have this discussion or that hearing, we shouldn't do

1       it.  Right?  That's the most efficient outcome.

2           The reason that this is at issue is for purposes of

3       today, the Court wants to get to ground on an ESI Protocol, and

4       the provision that this all started with was plaintiffs'

5       proposed V(A)(2)(b), which says:  A producing party may under

6       no circumstances pre-cull the documents that's subject to TAR

7       process with keyword search terms.

8           If it doesn't have to be in there today, we could --

9       you know, nothing prevents this Court from re-issuing, you

10      know, amending as necessary.  But we don't -- it doesn't make

11      sense to us to restrict parties until we know what we're

12      talking about.

13          THE COURT:  Yeah, that's not a -- I hear you.  I got

14      to think -- I get that.

15          And if we wanted to at least get an ESI Protocol

16      together, we could say the parties and the Court will continue

17      to discuss those issues, too, you know, the pre-culling issue

18      and the use of TAR and keywords just as a placeholder.

19          Because I -- increasingly, I'm feeling that on this

20      particular issue, I may need -- we may need up-to-date -- more

21      up-to-date guidance than we have, and it's not just advocacy.

22      And we don't have -- we don't have a key component of this

23      other than a general sense of expense.  We really don't know

24      what we're actually talking about.

25          MR. CLARK:  Your Honor --

1          THE COURT:   Yeah.

2          MR. CLARK:   -- if I could offer a couple thoughts.

3          THE COURT:   Yes.

4          MR. CLARK:   I think -- yeah, this conversation is

5    very -- incredibly helpful, I think.  And I think the missing

6    piece of information that is kind of even stepping up to a

7    higher level is, what are we going to do the next month or two?

8               And one of those pieces, if we do want to have a

9    fact-based conversation about TAR or keywords and these kind of

10   things, is loading and processing the data.  So I think that's

11   kind of the elephant in the room that nobody's mentioned yet.

12   And it kind of ties into the question of the timing of the

13   order on the motion to dismiss, which you may or may not have

14   information on but --

15         THE COURT:   I don't.

16         MR. CLARK:   Fair enough.

17              So I think that's kind of the decision that drives

18   how we move that conversation forward.  That decision being,

19   should we load and process the data now so we continue to have

20   the conversation now that, for the most part, we've agreed what

21   document sources are in and which are out for now?

22         THE COURT:   But you have some disputes on custodians,

23   right?

24         MR. CLARK:   Yeah, I'd say it's relatively -- it's

25   actually, setting aside one high-level person for three months

at Tyson, it's an issue of how big of a sample, if any, for complex level managers, for Tyson and Pilgrim's. It's ten for Tyson; seven for Pilgrim's.

That's a pretty small additional set. For the most part, with 11 of the defendants that we have an agreement, we have letters confirming it with those 11. And we have agreement with Tyson and Pilgrim's on the vast majority of custodians. The question is: Okay, do we load this data now so can we say is it ten million documents or two, and what are your cost structures for search engine?

THE COURT: Yeah, and I have precious little information on that in your briefs, I think.

I know that there's been attention in the case and is, and there probably will be for some time until you get a ruling. The defendants' position is, we would like to do as little as possible before the motions to dismiss are decided. Plaintiffs' position is we'd like to do as much as possible before the motions to dismiss are decided. I do view myself as the fulcrum on that, you know, and I understand that.

But if it's necessary for me to take a step back and understand the technology better and the proposals that are being made, that also is going to affect the timing of that decision.

And when you say, you know, do I have a sense of the timing? The only sense I have is yours. You don't have a

1   decision yet.

2         (Laughter.)

3               THE COURT:   But that's not unusual either.

4               MR. CLARK:   No, no.

5               THE COURT:   You know, and, you know, I will -- okay.

6   I keep saying the perfect is the enemy of the good, depending

7   upon how much we can get done.

8               I'm finding this helpful.  I mean, you know, it's not

9   just an exercise, though.  I mean, we can make certain

10  decisions.  Right now I'm holding in abeyance this responsive-

11  nonresponsive attachment thing or document thing.  And I want

12  to think about this TAR issue.

13              I'd like to address some of these other things,

14  because I -- and Ms. Pepper also said there's some priority

15  issues.  I also -- I don't know how long you are -- how long

16  you have.  I have -- I think I have a 2:30 criminal hearing,

17  and I'm not sure how long that will go.  And also people may

18  want to eat before you faint, but we have a good place in the

19  building to do that.

20              There are a couple of other issues that actually may

21  affect cost, too, kind of big-picture issues.  There are some

22  of these next things, which is privilege.  Okay?  So I just got

23  to throw some stuff out there on that.  And it affects the

24  culling and all the rest.

25              In a big document case like this, I am more persuaded

1    about -- with defendants' position on a 502(d) clawback order.
2    I -- you know, the way I read 502(b) and (c), I don't read them
3    necessarily the way plaintiffs do it.  I think 502(d) says you
4    could do this or you could do (b).

5         I don't think -- I don't think you must do it the way
6    plaintiffs are proposing.  I understand why you're proposing it
7    that way.  My fear is that that's going to slow a lot of stuff
8    down.  I think you can address the issue that you have with,
9    well, what if there's a clawback right when you need it, a
10   little bit a different way.

11        I'm not requiring this, but, for example, you could
12   have a limit on the period of time before a deposition, 30, 60
13   days, where somebody could claw back a document where that
14   deponent is a recipient or author of a document.  So that would
15   force the defending party to run a search on the database to
16   see whether or not there's a problem lurking in the house, and
17   it can be determined earlier rather than later.

18        So if I were going to write the ticket here -- and
19   I'm happy to listen to this -- I would write this as a much
20   broader 502(d) regime here, where on balance, I think it will
21   speed the production of stuff, noncontroversial stuff.
22   Privilege review takes a tremendously long time.

23        I'm always uncomfortable when I have to make a
24   decision as to what inadvertent disclosure really means and
25   what it was and what happened and what inadvertence is.  Does

1    it have to be "I forgot" or does it have to be "a lower-level

2    person did it"?  I mean, I -- you know, so I think 502(d) kind

3    of, you know, gives you the clawback thing.

4        I disagree, though, with defendants on the scope of

5    the review of a document that a producing party produces.  I --

6    I think you have to be able to use the contents of the document

7    in the process of deciding whether the document is privileged

8    or not.  And if that's -- I understood the defendants to be

9    proposing that neither party can use the contents of the

10   document.

11       I mean, the hypothetical is party X produces a

12   document, claws it back.  There's a challenge because the other

13   party says, "No, I don't think it's privileged."  I have a

14   hearing.  I get the document *in camera*.

15       There's no way that I can make a decision one way or

16   the other as to whether a document is privileged without

17   hearing from the people about the contents of that document.  I

18   do that all the time.  Maybe that -- the contents don't get

19   spread of record.  Maybe it's confidential.  Maybe the record

20   is sealed.  But I need to be able to engage with the parties

21   about what the document says, the circumstances under which it

22   was written, why it's privileged or why it's not, to make a

23   decision as to whether or not the document is going to be

24   clawed back as privileged and, you know, improvidently

25   produced, or it's going to stay in the case.

1          So I didn't -- if the defendants were proposing that

2     the plaintiffs can't point to a document and say, "Look, when

3     Mr. X says this, that's business advice; that's not legal

4     advice, and that's not privileged," I disagree with that.

5          MR. CLARK:  Your Honor, just on behalf of the

6     plaintiffs, Brian Clark.

7          I think that proposal is fine, and we'll live with it

8     and live with your decision on that.

9          THE COURT:  Are the defendants -- is there some

10    nuance that I'm missing on the confidentiality issue -- on the

11    privilege issue in the hypothetical that I described?

12         MR. FONTECILLA:  Yeah.  Your Honor, Adrian Fontecilla

13    for Wayne Farms.

14         I'll just give you an example.  If I inadvertently on

15    behalf of my client produce a document that I didn't realize

16    contained work product, a litigation strategy document, and I

17    produced it, and then I tried to claw -- and then I sent them a

18    notice, and I asked them to claw it back.  Typically under the

19    rule, a privilege log is required.

20         To make a claim of privilege on a document, there are

21    certain requirements.  You've got to disclose to whom it was

22    sent, who the attorney was, what -- you know, what the general

23    subject matter of the document is.  That's typically done

24    through a privilege log, and disputes are resolved by looking

25    at the privilege log and the required -- the required

1    information that's disclosed pursuant to the rule.

2         The difference is here that plaintiffs want to

3    challenge the claim using the substance of the document, which

4    raises a lot of concern when you're talking about the example I

5    gave, which is a very sensitive work product litigation

6    strategy document that we would rather the plaintiffs' counsel

7    didn't have and exchange and circulate amongst themselves and

8    pour over while they're having the privilege dispute.

9         We are happy to submit those kind of documents *in*

10   *camera* review, which is, as Your Honor mentioned, how it's

11   typically done, so that we avoid this work product and

12   privilege concern for very sensitive documents.  And after all,

13   it's how the rule envisions it.  You produce -- when you

14   produce a document inadvertently and you try to claw it back

15   and assert a claim of privilege, there's a provision that we

16   propose where immediately you provide in your privilege log the

17   required information under the rules.  And then they can look

18   at that and say, "Listen, there's not an attorney on this" or

19   "We didn't know that this person was an attorney.  Can you

20   explain -- you know, we thought it was a business person.  Can

21   you explain why you think that they're operating as an attorney

22   in this situation?"

23        And those are the kind of conversations that should

24   be had.  And Your Honor's entitled to look at the document *in*

25   *camera*.  We just don't want plaintiffs' counsel to be pouring

1    over our privileged documents while we're having a dispute.

2            THE COURT:  Yeah, I understand.  But the bell has

3    been rung.  You know, in scenario one, all you have is the

4    privilege log, and then a party challenges the privileged

5    nature of a document or the attorney work product nature of it

6    based upon the disclosure.  And if the judge can't make the

7    decision on the privilege log itself, they ask for the document

8    *in camera*.  The only one who has seen the document is the

9    producing party at that point.  The other side hasn't seen it,

10   and the judge has to make a call on that.  I get that.

11           But in the scenario we're talking about, the bell has

12   been rung.  The document has been produced.  I'm sure

13   plaintiffs and defendants are going to take steps to attempt to

14   minimize those circumstances.  Even if you're producing

15   documents after an electronic review, you're going to search

16   for attorneys' names.  You're going to, you know, search for

17   the word "attorney."  You're going to search for lots of stuff

18   in order to try to avoid it.  But mistakes can and will happen,

19   and then the document is produced.

20           So the bell has been rung.  The other side should

21   have to sequester that document.  You know, I don't know what

22   you mean by "pouring over it" or not, you know, but it could

23   say the document is either returned to the other side pending a

24   decision or sequestered.  It cannot be used for any purpose

25   other than the resolution of the dispute with the Court.  But

1    when I deal with these things under those circumstances -- and
2    I get what you're saying -- but when I deal with them from --
3    at this side of the bench, what happens is I have the document.
4    The other side has already seen the document.  They can't use
5    it for any other purpose aside from the -- and the documents,
6    if they're in any brief or something, it's sealed.

7          But I'm going to make a better decision on that, one
8    way or the other, both if I allow you to tell me why your
9    document really is work product by using the contents of the
10   document, and allow the other side to tell me why it's not.
11   And there might be things in there that I don't know that you
12   guys know from the case that really is better addressed in the
13   adversarial process rather than the Star Chamber process.

14         So I do understand that in the normal course, all the
15   other side has is a privilege log, and the only people who see
16   the contents are the judge and the producing party in those
17   circumstances where the judge has the document produced *in*
18   *camera*.  But where the bell's already been rung, I think --
19   again, the perfect being the enemy of the good -- the document
20   should be sequestered.  It can't be used.  You know, if it's on
21   the eve of a deposition or if it's on the eve of a filing or
22   something, it can't be used until the judge makes a
23   determination, and both sides have the opportunity to tell me
24   why the information they all have now, which is the document,
25   or how that information affects my decision.

1          On a scale of one to ten, I'm pretty high on -- I'm

2    pretty close to a ten on this in terms of thinking that that's

3    the way I need to go on it.  I understand your concern with it,

4    but if that means that everybody's going to take a little bit

5    more care so that the clawbacks are rare, fine.  I still think

6    the benefit of doing the clawback -- you know, if I have a --

7    if I have a clawback order under 502(d), I could sit on the

8    parties a little bit more to produce the documents more

9    quickly.

10         And I know when I was producing -- again, I shouldn't

11   talk about my experience.  That's -- that's before I got here.

12   But I believe when a party is producing documents, if there's

13   going to be a pretty high burden, if they're caught with an

14   inadvertently produced document, they're going to take a lot

15   more time to look at that production.  It will also cost a lot

16   more.  So, you know, I'm just -- kind of that's where I come

17   out on it.

18         MS. PEPPER:  We appreciate that, Your Honor.  We're

19   interested in the 502(d) order.  We think that's for the best,

20   and we --

21         THE COURT:  I mean, there's a little bit in here for

22   everybody.  I didn't intend it that way.  But, you know,

23   defendants were proponents of the 502 order, and plaintiffs

24   were arguing against a rule that says you can't use the

25   document.  When I do this in my current job, that's really the

best way to do it, I think.

So the other -- the privilege -- the other privilege issues here, are you in agreement as to the time period during which documents are going to be produced?

MS. PEPPER:  Well, it depends on what Your Honor --

THE COURT:  Well, nobody is producing after September 2nd, 2016, correct?  That was the filing date of the document -- filing date of the lawsuit?

MS. PEPPER:  You're talking about documents that will be logged and what will be produced.  Okay.

THE COURT:  I'm talking about both.

MS. PEPPER:  Oh, we've agreed that September 2nd, 2016, is the processing deadline, with the exception of a very narrow subset of other documents that may relate to the Georgia Dock.

THE COURT:  And by processing -- okay.  I see that. But as with respect to the processing deadline, you mean documents produced in October or November -- created in October or November of 2016 are deemed nonresponsive for purposes of producing documents in response to Rule 34 request or -- right?

MR. CLARK:  Yes.

MS. PEPPER:  Correct.

THE COURT:  Except for Georgia Dock or other things? Okay.  And logging is different?

MR. CLARK:  I'm sorry.  I apologize for jumping in,

1    Your Honor, but the one exception that we need to talk about in

2    the Rule 34 context is transactional data.  And that goes

3    beyond those periods.

4           We haven't agreed what, if any, where that goes

5    beyond the periods, but we've reserved our rights in that area.

6           THE COURT:  Okay.  And I'll tip my hand on the Rule

7    34 thing, which we'll get to at the end.  I didn't like

8    plaintiffs' two-step approach.  Again, I haven't delved into

9    that enough.  I just read it yesterday.  But I didn't like

10   high-level stuff and other stuff.  And we're going to have time

11   to do this, I think.

12          So -- okay.  And then in terms of logging, I

13   misspoke.  But in terms of privilege log, you are -- well, I

14   don't know what the agreement is here.  Let's delve into that a

15   little bit.  Or should we take a quick break on this?  Nah.

16          When are your planes?

17          MR. CLARK:  I'm 7:30, Your Honor.

18          THE COURT:  People have mid-afternoon planes?  Okay.

19          When do I have this hearing?

20          THE CLERK:  2:30.

21          THE COURT:  2:30?  I just want to see what it is.

22      (Brief pause.)

23          THE COURT:  I want to talk about in-house counsel,

24   out-house counsel.

25      (Discussion off the record.)

1          THE COURT:  Okay.  Here's my proposal.  That we take

2     a quick 10-minute break here.  We come back at 1:00.  We go to

3     2:00, at least, or we can go to 2:30, but maybe we can get --

4     maybe, well, something to eat between then.  I don't know.

5          Here's my problem.  I don't know how long this

6     hearing is going to go.  If it's going to go for an hour, I

7     don't know if you want to cool your heels.  If it's going to be

8     ten minutes, it's better.  And I don't -- and I can try -- I

9     mean, ask one of my law clerks to see if they could push it

10    back a little bit, because that would be the best thing, and

11    then we could finish.  So that's what I want to use this break

12    for.  So let's take ten minutes here.  Okay?

13         MR. CLARK:  I'll just say for plaintiffs, we're happy

14    to stick around even if it's an hour.

15         THE COURT:  Okay.  But it's also Friday afternoon,

16    and there's people from out of town, including you.  And I used

17    to hate that.  Okay.

18      (Recess.)

19         THE COURT:  Please be seated.

20         All right.  We're working on figuring out the

21    privilege thing.  I'm going to allow time for you to get

22    something to eat at some point.  It's important for those with

23    low -- low blood sugar.

24         Okay.  Can we go back on privileged stuff?  Before I

25    tear into this, maybe you should set these issues up for me.  I

1  mean, I don't -- because aside from the clawback, tell me --

2  articulate the issues that are the key ones that I need to

3  decide right now.

4        MR. CLARK:  And, Your Honor, that's on page 4, the

5  Section VI you're referring to, is what you'd like to walk

6  through?

7        THE COURT:  Okay.  I've outlined it a little bit

8  differently, though.  All right.

9        MR. CLARK:  I'm happy to go through it any way you'd

10 want.

11       THE COURT:  Well, the reason that this is not as

12 helpful to me is that proposals are vastly different in terms

13 of how they're laid out.  So I don't know whether -- you know,

14 it says information generated before January 1, 2007, and after

15 September 2nd, 2016, don't have to be logged.

16       Plaintiffs say information entered after September

17 2nd, 2016, doesn't have to be logged.  I don't know if you've

18 got an agreement on a start date or not.

19       MR. CLARK:  I think on the paragraph B, if you --

20 those should -- they're covering -- intended to cover the same

21 subjects.

22       I think we do have an agreement on not logging after

23 September 2nd.  The before January 1st, 2007, I don't think

24 that's a problem in the abstract.  I don't know that there's

25 going to be a lot of emails prior to January 1st, 2007, that

1    could really even be at issue.  There's a pretty limited

2    category of information.  Like a prior DOJ investigation or

3    something back to 2000 is something we requested.

4            I don't know that -- if there's going to be a lot of

5    privileged information relating to that or not.  I think we

6    could probably agree on that just to move things along.

7            THE COURT:  Okay.  What you could do is a default

8    1107, I guess.  I mean, when did you -- you got a statute of

9    limitations.  You got to go -- you have to agree to a start

10   date so that they don't have to go back to the beginning of

11   time.

12           MR. CLARK:  Yeah, and the January 1st, 2007, is the

13   kind of discovery cutoff date in general as far as as far back

14   we go except for limited exceptions.

15           THE COURT:  And defendants are all right with that or

16   don't object to that?

17           MS. PEPPER:  To January 7th?

18           THE COURT:  Yeah.

19           MS. PEPPER:  No, we do not.

20        (Discussion off the record.)

21           MS. PEPPER:  Right, assuming -- right.

22        (Discussion off the record.)

23           MS. PEPPER:  Excuse me, Your Honor.  One thing that I

24   assumed Your Honor meant, but I want to clarify.  We're

25   operating under the assumption as we negotiate this that

1    nothing has changed by virtue of the motion to dismiss ruling.

2          So if for reason the time period is affected by the

3    motion to dismiss, January 1st, 2007, may no longer be

4    appropriate.  For purposes of these discussions, we're assuming

5    arguendo nothing changes by virtue of the district court's

6    ruling.

7          THE COURT:  Understood.  And of course.  Okay.

8          Can we go off the record just for scheduling for a

9    second?

10         (Discussion off the record.)

11         THE COURT:  Okay.  Let's go back to this.

12         MR. CLARK:  So, Your Honor, on the provisions on the

13   cutoff dates for logging, I think we're fine with their

14   provision on that.  The -- I think the main provision in

15   dispute is their (B)(2) that appears towards the upper

16   right-hand corner at page 5 in Exhibit C.

17         And we laid out our position, and you're probably

18   familiar with it.  Our view is with in-house counsel, there's a

19   higher burden to establish those people are acting as

20   attorneys, not as business people.  Therefore, at least as a

21   matter of logging, setting aside the substantive log -- or the

22   law, we don't think that can be categorically excluded from the

23   log.

24         THE COURT:  And who is going to speak -- I mean,

25   defendants have a burden here, it seems to me.  Okay?  I mean,

1    I have seen enough communications between in-house counsel

2    and -- I mean, if I were to say where most of the privileged

3    disputes arise since I've been here, that's where they arise.

4         And so I am sensitive and receptive to plaintiffs'

5    point.  I don't want to create undue burden, but on the other

6    hand, a blanket in-house counsel, even if it's after

7    commencement of the action -- well, you're not doing it -- I

8    had a question about that little phrase there, too.

9         Go ahead.  Ms. Pepper is getting up.  Go ahead.

10        MS. PEPPER:  Okay.  Well, so for purposes of Section

11   VI, defendants -- defendants think there's two broad issues

12   here.  What do we have to log, and how do we have to log it?

13        So we understand plaintiffs' concern that if no

14   communications with, for example, a general counsel are logged,

15   that might create a problem.  So -- so we are prepared to log

16   communications with a general counsel if the Court thinks

17   that's appropriate.

18        We don't agree that in-house counsel who handle

19   litigation matters necessarily need to be logged, and we don't

20   understand -- we don't think that active litigation needs to be

21   logged.  And we don't -- so, you know, we've made proposals in

22   terms of what needs to be logged in an attempt to diminish the

23   burden on producing parties.

24        I'm sure, as the Court is aware, you know, the Sedona

25   Conference commentary on the protection of privileged ESI calls

1    this the most burdensome and time-consuming task that a

2    producing party has to undertake.

3              What we're also keenly interested in the Court's view

4    on is how we have to log it, because, you know, the more we

5    have to log, counsel's in favor then of what defendants are

6    proposing in terms of a metadata log or a categorical privilege

7    log, which would then be an appropriate counterbalance to try

8    and -- if we have to log it, the format in which it has to be

9    logged is, we think, the proper way to mitigate against the

10   additional burden that will be imposed on us.

11             We're happy to discuss the details of that, but

12   that's sort of the high level of where we're coming from.

13             THE COURT:  Okay.  And my reaction to that is that

14   litigation -- counsel responsible for the litigation matters is

15   too broad.  I've seen too many non-privileged emails copied to

16   a lawyer in-house who may have responsibility for litigation

17   matters just to shield it.

18             I'm more receptive -- I'd be interested in what the

19   plaintiffs have to say to the Sedona Conference's own

20   phraseology, which is, you know, outside litigation counsel or

21   in-house counsel responsible for this litigation.  If you get

22   to this litigation, I'm a little bit more inclined on that to

23   say that doesn't necessarily have to be logged.  So I'll look

24   for Mr. Hart and Mr. Clark on that.

25             In terms of the metadata, the metadata I find is

1    useless.  It's -- you guys have the same two-step there, which

2    is, we'll log the metadata, but if they want more, then we'll

3    ask for it.  And what's going to happen is they're going to ask

4    for it all.

5           So I think I understand that privilege logs are

6    tough, but I don't think a metadata log tells the other side

7    much of anything.  That's the embedded information in the

8    document, and it tells you the date it was created sometimes;

9    sometimes not.  It doesn't always give you all -- I mean, it

10   just doesn't always give you all the information you need to

11   challenge privilege.

12          First let me ask the plaintiffs whether they could

13   live with -- I mean, to me what makes sense is in-house counsel

14   responsible for litigation.  If they're communicating a lot

15   about this litigation, that's one thing.  But if they're just

16   one of fifteen in-house counsel and they happen to be copied on

17   an email, I don't think that's enough.

18          MR. CLARK:  On this litigation, it was filed

19   September 2nd, 2016, and we've agreed in this document and in

20   court today, there's no logging of information after September

21   2nd.

22          THE COURT:  Okay.  So it doesn't matter.

23          MR. CLARK:  Yeah, I think, yes, but it's already

24   covered.

25          THE COURT:  Okay.  Well, then it begs the question,

1    right?

2         I would not exclude from logging work product, as it

3    says here, created by the producing party's general counsel,

4    in-house counsel, I mean, outside trial counsel.  But the case

5    was filed on September 2nd.  So you're saying that's moot,

6    right?

7         MR. CLARK:  Yeah.

8         MS. PEPPER:  Your Honor, there's --

9         THE COURT:  I could see -- I could see an exception

10   to this.  I could see in-house counsel responsible for

11   litigation if it's other litigation.  You know, the closer that

12   the lawyer gets to being actually litigating something; i.e.,

13   in anticipation of litigation, in the course of litigation --

14        MR. CLARK:  Right.

15        THE COURT:   -- I think the utility of logging that is

16   slim.

17        MR. CLARK:  And we --

18        THE COURT:  But if it's just a lawyer who happens to

19   be in-house counsel and gets copied on stuff, I've seen too

20   many occasions on both sides -- I mean, you guys are -- you

21   know, you're representing commercial entities, too.  I just --

22   that's subject to abuse.

23        So I would say in-house -- it doesn't hurt to say

24   counsel responsible for the litigation, because you're not

25   logging after September 2nd, or the litigation or the lawsuit

1  involved in the communication.

2  You want to push back on me on the mega-data thing --

3  the metadata thing?

4  MS. PEPPER:  Yes, Your Honor.  I think it's -- I

5  think this is important.

6  THE COURT:  Yes.

7  MS. PEPPER:  So, for example, the metadata log has

8  been in the Blue Cross/Blue Shield antitrust litigation to

9  great success.  There have been some tens of thousands of

10  privilege log entries, and I think under 50 issues based on the

11  metadata log.

12  And maybe we need to talk about more what goes into a

13  metadata privilege log.  But, you know, for example, with

14  emails, you can get who it was to, who it was from, who it was

15  copied on, the date it was sent.  You get the subject line

16  unless the subject itself is subject to privilege.  I mean, you

17  get quite a bit of information there.

18  THE COURT:  But you get no -- do you get all cc's or

19  just the -- I'm getting heads going yes.  You get all cc's?

20  MS. PEPPER:  Yeah, I think you get all cc's and --

21  THE COURT:  You don't get a description of what the

22  subject matter of the document is, right?

23  MS. COTTRELL:  Hi, Your Honor.  As someone who worked

24  on one of these metadata logs -- Christa Cottrell -- you get a

25  lot.  And we could even submit for you, if it would be helpful,

1  an example of a page or two of one of these metadata logs.  But

2  you can get the title of the document, the subject matter of

3  the email.  I mean, you get a ton of information.  And we'll

4  agree with them on the metadata fields that they get.

5          It's pretty close, actually, to a real log.  It just

6  removes all of that work, which is -- I think everyone in this

7  room knows is immense when it goes into a privilege log.  I

8  mean, someone entering in the author, the subject matter, all

9  that takes so much time, and it's probably one of the most

10 costly things we do.  And the metadata really removes that.

11         And Stacy -- Ms. Pepper and I used it in the Blue

12 Cross/Blue Shield litigation to great success.

13         THE COURT:  Well, it's -- I mean, I guess every case

14 is different.

15         My thought was that if you produce that, there would

16 be a lot of requests for more information.

17         Mr. Clark's nodding yes.  Now, I don't know why --

18 did Blue Cross settle?

19         MS. COTTRELL:  No, it's still pending.  In fact,

20 discovery closes in two months.  So we've had a long time, and

21 the log has worked well.  There's a -- like I said, if it would

22 be helpful for us to bring a copy, you know, a -- and we could

23 redact whatever needs to --

24         THE COURT:  I've seen them; but, I mean, you could

25 give me something that you've used.

1          I mean, my problem with this is that I don't know

2   that it avoids the problem.  What would happen under the

3   defendants' proposal if you produced the metadata log and --

4   and the plaintiffs then made a request for further information?

5   What happens then?

6          MS. COTTRELL:  We would log it.

7          THE COURT:  What?

8          MS. COTTRELL:  We would log it.  So then we would

9   just be back in the same spot that plaintiffs are advocating

10  now.

11         I mean, at that point if they said, "There are ten

12  entries, and we can't figure out what you're talking about.

13  You know, the email subject line is just not giving us enough,"

14  we would say, "Okay, we'll log those," which is just, again,

15  putting us back where we are right now but saving us all that

16  time and expense, because I think that these logs are pretty

17  descriptive.

18         And in my experience, it has been the case that they

19  do come back, but they don't come back on 20,000 entries.  They

20  come back on a select number of those entries, which really

21  minimizes our burden.

22         MR. CLARK:  Your Honor, if I could speak to this.

23         I have received those.  And I sus -- perhaps maybe in

24  the Blue Cross case, which I'm not involved in, it's in the eye

25  of the beholder.  We don't have plaintiffs here talking about

1    their experience with it.

2            I've received them in other cases.  I find them

3    useless, and I find them useless because, for instance, author

4    field often only shows up if it's a Word document, Excel as

5    User 1, something.  It tells me nothing about who created it.

6    Was it the attorney?  Was it someone else?  And that's

7    something on the face of the document of the reviewer who's

8    looking at it and can easily indicate that in a normal

9    privilege log.

10            I also find they're incredibly confusing with respect

11    to email chains, because different, you know, parts of the

12    chain go out different ways.  You don't know, you know, at the

13    end who actually was involved with it.  Is there a chain

14    between two employees discussing it that is not privileged?

15            And they really end up -- you don't really have a

16    good sense of the privilege being asserted.  And they tend to

17    increase by a factor of two, three, fourfold how many entries

18    end up on the privilege log, because the attorneys, in our

19    experience, that are doing those aren't as critically thinking

20    about the information they're withholding.  And when that

21    actually happens, that process of thinking is this actually

22    privileged, the universe narrows substantially.

23            So we think that one of the reasons there's a burden

24    on the party asserting privilege is because you actually have

25    to think through it and think can I -- is this really

1    privileged, rather than just these 30,000 documents have an

2    attorney; we're going to put them on this log, and, you know,

3    it takes an hour, we're good, as opposed to spending some time

4    to meet your burden of withholding documents from production.

5         THE COURT:  I mean, you can address the first thing.

6    But I have some experience with these.  I'd be interested in

7    seeing what your Blue Cross logs look like with everything

8    redacted.  However, my experience has been more like

9    Mr. Clark's in that you get computer-generated user names,

10   so -- but you could easily address that by saying you can't do

11   that.  In other words, somebody -- some real person has to look

12   for that or you got to do a search on it and --

13        MS. COTTRELL:  Yes, Your Honor, and that's exactly

14   what we did.  I mean, we don't just have the computer spit it

15   out; here you go.

16        You know, we actually go through the metadata log,

17   make sure it is complete in providing, you know, information.

18   But that is really, really helpful for us to have those

19   pre-populated fields and to use that metadata log with a review

20   by everyone, you know, on our side of the V, a review by us in

21   the first instance.

22        And we could talk with plaintiffs about if there's

23   mandatory fields that need to be ensured that they are

24   populated.  We could probably work with the plaintiffs on some

25   sort of compromise there.

1          But like I said, it's a huge cost savings for our

2    clients, given -- given the issues privilege presents.

3          THE COURT:  Is there any creative way -- and what

4    you're proposing is that would be your privilege log, period?

5          MS. COTTRELL:  So what I would propose is that we

6    would do a metadata log.  We could work with plaintiffs if

7    there's some fields they want to guarantee are populated.

8          And if plaintiffs then come back to us and want to

9    challenge entries, we could then supplement with a more

10   traditional log or even more than a more traditional log, and

11   then, of course, address any privilege issues with the Court.

12         THE COURT:  But there would be no -- there would

13   be -- in your view of the world, there would be no traditional

14   privilege log produced in the first instance by any producing

15   party.  And there would be this log, and then the receiving

16   party would have to either raise an issue.  You've got to meet

17   and confer.  You'd have to talk about it.  You'd have to

18   provide additional information.

19         Hold on for a second.

20      (Discussion off the record.)

21         THE COURT:  Back on the record.

22         MS. COTTRELL:  But, Your Honor, I think this is

23   something we probably could work out with the plaintiffs.

24         THE COURT:  I'm not sure you could work it out -- the

25   flat thing.  But, I mean, I'm wondering whether there's some

1   creative ways that deal with this.

2          Things that are going through my mind is time period.

3   In other words, is there more -- is there one -- is there any

4   time period in the case or time periods in the case where there

5   would likely to be more activity that you would be more

6   interested in?  I suppose you could do that, too, when you got

7   your log.

8          The one thing I was going to ask the plaintiffs

9   before we kind of make an up or down on this is, isn't there a

10  correlation between how quickly you're going to get the

11  documents produced?  And, I mean, let's say I go with your

12  proposal of 45 days -- 45 days after substantial completion of

13  documents or something.  Or let's say I don't.  Let's say that

14  you get a rolling metadata log, so that you don't have to wait

15  until the end.

16         But aren't you going to get stuff quicker that way?

17  And is there a -- is there a -- is there a benefit to that?

18         MR. CLARK:  Yeah, process-wise, our understanding is

19  generally there's going to be an electronic screen on their

20  end, and we'll get rolling productions of documents that didn't

21  hit on any privileged-related term.  Those are set aside.

22         And then at some point whether we do a priority

23  custodian date for a log or after substantial completion,

24  whatever Your Honor thinks on that, we're fine living with.

25         At some point we're going to get this log.  And in

1    our mind, unless it has a field that describes the privilege

2    being asserted and the attorney involved, it's really not

3    telling us that much.  And we think -- you know, we're familiar

4    with the "From" and the "To" and the "cc" fields pulled out of

5    the email.  I mean, those are fine to a certain extent.

6         Your problem is then, okay, the attorney's copied

7    here.  Why are you asserting a privilege?  And if the

8    description says, "legal advice" or "follow-up regarding legal

9    advice from attorney A," we understand what's going on.  We can

10   set that aside and narrow the universe.

11        If all we have are 2,000 entries copying an attorney,

12   our letter is:  "Okay.  These 2,000 entries, please see

13   attachment A, involve attorney A being copied.  We have no idea

14   why you're asserting privilege.  Please log it."

15        MS. COTTRELL:  Not what we're proposing.  So, again,

16   the metadata log would have a number of fields.

17        What I'm suggesting maybe that the parties work on

18   would be a number of fields that if they are not there, then we

19   manually populate.  So the concern that it's just going to say

20   author Bob and have no other information would be solved,

21   because we would have agreed that there at least has to be an

22   email subject line or a document description.  And if those

23   aren't there, we manually log, you know, in a more traditional

24   sense.

25        I think we can come to an agreement that if these

1    aren't to be populated and there are holes on critical fields,

2    then we default to a more traditional log.

3    THE COURT:  Ah, ah, ah.  So what you want to do is

4    pre-populate.  To save the time of the data entry "To," "From,"

5    "cc," "Date," that will all be pre-populated.  But you're not

6    opposed to, even at the outset, producing on your metadata log

7    not only the re: line but a brief description?

8    MS. COTTRELL:  So I would say, let us look at the

9    metadata fields.  And let's say there's an email, and that

10   email has the individual; it has the re: line.  It has an

11   attachment.  We have the attachment document title.  All that's

12   there.  Then we would shoot that out the door as the metadata

13   log.

14   But let's say that there's a document, and it just

15   says, "Authored by X," and it has no other metadata

16   information.  Perhaps it's a hard copy.  For some reason, it's

17   missing the rest of the metadata.  In that instance, we would

18   work with plaintiffs on the critical fields that they feel that

19   they need information on, and we would pre-populate.

20   That's what I'm proposing, that we sort of work

21   together on what they really feel they need, along with the

22   metadata logs, and figure out some sort of compromise here that

23   eases our burden but gets them what they need.

24   THE COURT:  They want a document description at some

25   point, right?

1          MS. PEPPER:   But, Your Honor, at some point

2     reliance -- I mean, that's Ms. Cottrell's point.  Like,

3     sometimes the subject line is the description.  Right?

4     Sometimes the subject line says, "This is a document about

5     blah" --

6          THE COURT:   Right.

7          MS. PEPPER:   -- and it's pretty clear from the face

8     of the document, without defendants having to manually populate

9     anything, that a privilege would apply.  And sometimes it's

10    not.  And therefore, we would have to add a supplemental

11    description for those documents.

12         THE COURT:   Right.  I mean, I recognize -- and you

13    see these all the time.  But, you know, if it's Bob to attorney

14    re: softball practice, it's not going to be privileged.

15         In your regime, however, that's going to appear on

16    your privilege log, because attorney is recipient, right?

17         MS. COTTRELL:   Well, it would be nonresponsive.  So

18    it would be in his --

19         THE COURT:   Ah.

20         MS. COTTRELL:   It would over here with Mr. Suggs and

21    the nonresponsive file.

22         MR. CLARK:   Unless attorney A worked --

23         MR. SUGGS:   But, Your Honor, that is an interesting

24    point, because there are going to be a lot of documents that

25    they're privileged, but plaintiffs aren't even going to be

interested in them.  And they can tell that based on --

THE COURT:  Yeah.

MR. SUGGS:  -- recipients or the subject line.  And so even if they question whether it's actually privileged, they know it's not something they don't actually care about.

THE COURT:  Yeah, and I -- I mean, I guess I suppose this is not a -- this is not a black-or-white issue.  To some extent, it's a timing issue, right?  Because you're not -- plaintiffs aren't -- or defendants going the other way, because you could do the same thing for your commercial clients, right?  I mean, this is not just a defendant provision.  This is a privilege log for each side.

MR. CLARK:  It applies to both sides, and that's why we're willing to do it.  You're right.  We're going to have some privileged documents, and we, frankly, would like to just follow the procedures the Court has kind of as a -- you know, the basics of the privilege log.

THE COURT:  I recognize that.  And my gut -- I mean, I told you, I'm not -- my gut was going that way, too.

In a single-plaintiff employment case with 400 documents -- you know, I mean, I have a lot of cases where somebody comes in and says, "Judge, they produced 800 documents to me.  I mean, I need time to review them."  You know, and the privilege log in that case is pursuant to my order.

When you're talking about the volume here, you're

1  talking about a little bit different scale.  And there's a

2  real -- there's a real weighing difference between getting the

3  documents produced quickly enough -- and you're not foreclosed

4  if you want to turn around and say, "I want privilege logs for

5  all of it," you know, they may come in to say, "Look, Judge,

6  for some of these, you can see on the re: line, it's really not

7  even -- I mean, why do we have to do a complete privilege log

8  for this?"  And I might agree with that.

9       I mean, I could -- you know, I could calibrate this a

10  little bit if we're going to -- I mean, I'm not thrilled with

11  -- I'm not thrilled with the metadata log.  I got to tell you.

12  But if -- if you're doing that and it's computer generated and

13  I'm requiring that to be produced, for example, with what

14  you're saying, the priority custodian documents, within 45 days

15  of that, and then within 45 days of additional substantial

16  productions of documents -- I don't know what substantial

17  means -- but so that you're not waiting until the end of the

18  case and it's not delaying stuff too much, and an additional

19  remedy is for them to not have to populate each and every field

20  but to populate a description field for certain of these

21  things.

22       And you're going to be reviewing documents.  You're

23  going to see, once you get those documents, what they look

24  like, what the flow is within the company.  And if it looks

25  like something's -- some games are being played, you can raise

1  it, and you're not precluded at all from getting a real

2  privilege log.  I don't know.  Much -- much as -- much as my

3  experience with metadata logs has not been great, with some of

4  those additional tweaks, I wonder whether you'll get the

5  documents more quickly.

6          And, you know, as officers of the court, they're

7  representing that they've done this in the Blue Cross case.

8  And that's shocking to me, but it is -- if it's true, which

9  I'm going to take as true --

10          MS. COTTRELL:  Yeah.  And like I said, Your Honor, we

11  took our obligation seriously.  And so we did the metadata log.

12  We went through every entry.  It's not just metadata, pump it

13  out, don't ever look back.  Oh, there's a bunch of holes.  You

14  guys have to deal with it, plaintiffs.

15          THE COURT:  Okay.

16          MS. COTTRELL:  We went through every single entry to

17  make sure we were giving them enough information.  We did do

18  that.  It's just --

19          THE COURT:  So you did a manual review of the

20  metadata and added the information that was missing?

21          MS. COTTRELL:  Yes.

22          THE COURT:  I don't know.  That's -- I'd go with

23  that.

24          MS. COTTRELL:  Great.

25      (Laughter.)

1                MR. HART:  Well, a couple of points, Your Honor.

2                THE COURT:  Yeah.  I mean, well, yeah, maybe I

3       shouldn't have pulled the trigger too quickly.

4                Mr. Hart?

5                MR. HART:  Just a couple of points.  I don't want to

6       overcomplicate this issue, certainly.

7                THE COURT:  I'm happy to put bells and whistles on

8       it.

9                MR. HART:  Yeah.

10               THE COURT:  But, I mean, I -- I know how long it

11      takes to do a privilege log, and it's going to slow stuff down.

12      And there's a balance.

13               MR. HART:  So we're talking about a shortcut here,

14      clearly.  I mean, let's call it what it is and --

15               THE COURT:  But it's not -- it's not a -- it's not a

16      final shortcut.  It's an interim shortcut.  And if it doesn't

17      work, you have the right to get the stuff.

18               MR. HART:  I appreciate that.  And that's what I want

19      to make certain.

20               So with respect to the shortcut, if we can agree on

21      additional mandatory fields, I think we could probably agree to

22      the shortcut.  And if we find the shortcut to be inadequate

23      even with the additional fields, it should be the defendants'

24      burden, if we toss it back to them, to create a traditional log

25      on it.

1    THE COURT:  They have -- I mean, that's what they're

2    proposing.

3        MR. HART:  Is that the proposal?

4        THE COURT:  I mean, it may come back to me at some

5    point, but that's what they're proposing.

6        What they're betting is that there will be enough

7    substantive documents to keep everybody busy, that it doesn't

8    look like people are playing games on it because at least we're

9    figuring this out.  I mean, if you see -- I mean, you could

10   tell something from this if they actually populate the fields.

11       If every time Bob sends an email, he copies a lawyer

12   on it and the re: line is "Things you should know," okay, then

13   you're going to ask for those documents, you know.

14       But if -- in other words, I guess what I'm thinking

15   is, why should I force them to deliver to you a Cadillac if

16   they can deliver to you a Chevy, and most of what you need is

17   going to be in the Chevy, but you could still ask for the

18   Cadillac for certain trips?  I mean, just --

19       MR. HART:  I think that's right, Your Honor.  And we

20   can agree on --

21       THE COURT:  And in terms of agreeing on the fields, I

22   don't know if you -- I don't know if you can micromanage this,

23   but I don't mind putting in the protocol that if you ask for a

24   document description field, you get that.

25       MR. HART:  Okay.

1    THE COURT:   But the representation is this is not a

2    computer-generated that, you know, vomit out of stuff, but it

3    has some real information in each and every field.   And then

4    the -- and then you could ask for a document description field.

5    But the default also is if you want the document, they have to

6    give you a log with -- although, frankly, the log is going to

7    have exactly what the metadata has on it, plus document

8    description.

9            MR. HART:   Description.

10           THE COURT:   Okay.   But if it's fulsome enough

11   document description, that will save time.   That really will.

12           MR. HART:   I agree.   And we're interested in saving

13   time as well, Your Honor.

14           THE COURT:   The cases that I've had this happen in --

15   I would do it that way.   I just -- at least, I mean, you could

16   always come back and say, "Hey, this ain't working."   But I

17   just -- I would do it.

18           MS. PEPPER:   Your Honor --

19           MR. CLARK:   Can we just maybe have a -- so it sounds

20   like we're going to get some kind of exemplar of this and talk

21   about some mandatory fields.   Can we just put a -- tie a date

22   around that for meeting and conferring and talking about it?

23           It sounds -- if this is the direction the Court wants

24   to go, we'll talk to them, and we'll try to figure something

25   out -- it sounds like we probably can -- but then have a date

1　we come back.

2　　　　　THE COURT:　Well, give me a proposal as to -- well,

3　you're going to have to meet and confer maybe about some stuff.

4　　　　　I actually have another proposal for you on the

5　responsiveness thing, too.　Is there anything else?　Remind me

6　about dates, because there's other dates I want to do, too.

7　　　　　Other issues on the privilege log thing?

8　　　　　MS. PEPPER:　Just one thing before Your Honor moves

9　off it.　And maybe you weren't being -- I couldn't tell if you

10　were actually proposing this or brainstorming with the parties.

11　　　　　But 45 days is quite a tight turnaround time for a --

12　you know, as Ms. Cottrell said, we take our privilege review

13　seriously.　We are not going to play games with the plaintiffs.

14　But to do it properly is going to take more than five weeks,

15　particularly -- I mean, as the Court's aware, right, my client,

16　for example, just agreed to give them 23 custodians.　I presume

17　they want us to actually do the responsiveness review and keep

18　those documents moving out the door.

19　　　　　Mr. Clark is right that at some point we have to go

20　back and make a determination about whether or not documents

21　that hit for privilege terms are properly withheld as

22　privileged or not.　If we have to do that faster, it will slow

23　down, you know, as you move to other custodians, the ability to

24　which responsive -- clean responsive documents go out the door.

25　　　　　I don't know if the Court was actually proposing a

deadline today, but our position is 45 days --

THE COURT:  If I were going to -- I was trying to give plaintiffs something and you guys something.

If I were going to propose a deadline, what I wrote down was 53 days.  Why?  Because that's halfway between 45 and 60, rounding up.  I have never been in a case where the privilege logs actually came when they were supposed to.  All right?  I have never been in a case where one party or the other didn't ask for more time.  And first they -- what normally happens is:  Okay, how much time?  Another two weeks.  Fine.  We still need another two weeks.  Fine.  No, I'm not going to agree to another two weeks.  We got to go to the judge.  All right?

So there has to be a -- there has to be a default date.  Sometimes you could do it in 45 days; sometimes you can't.  I would split the difference at 53, or given that the defendants got what they wanted on the metadata, I would say 45.  I don't care.  If you want me to make the decision, my decision is 53, and that gives you 8 more days.

MS. PEPPER:  Take it.

MR. CLARK:  Same.  Thanks, Your Honor.

THE COURT:  Fine, 53.  And then somebody who takes this ESI Protocol on another case and looks at it and says, "How the hell did they come up with that?"

(Laughter.)

1          THE COURT:   What I do -- I'm still where I was on the

2     having to log but in a metadata way.  And I think you said

3     there was a push/pull on that, the lawyers.  I mean, I just

4     don't like excluding in-house counsel or general counsel, but

5     if it's on a metadata log, at least it's a little bit more

6     doable, and then you can then supplement it.

7          And I think that's a decent compromise.  So it's a

8     more fulsome -- it's a more inclusive log in terms of lawyers

9     but less information at least at the outset.

10          MR. CLARK:   So just to be clear then, Your Honor --

11     Brian Clark for directs -- on the exclusions, then, that

12     defendants proposed on page 5, we'd cut out the in-house

13     counsel and then go on this kind of hybrid metadata log?

14          THE COURT:   Yeah.

15          MR. CLARK:   Okay.

16          THE COURT:   Exclusions in the second column there?

17     Yeah.

18          MR. CLARK:   Okay.

19          MS. PEPPER:   Your Honor --

20          THE COURT:   Are you okay with communications

21     exclusively between a producing party and its general counsel

22     or in-house counsel responsible, or same thing, paragraph 3?

23          MR. CLARK:   I think that's the same thing.  What we

24     were comfortable with --

25          THE COURT:   Yeah.

1      MR. CLARK:  -- we proposed on pages 4 and 5.

2      THE COURT:  Yeah.

3      MR. CLARK:  That would be, let's see, (B)(1), (2),

4  and (3), which we think addressed the outside counsel and

5  active litigation in another case --

6      THE COURT:  Yeah.

7      MR. CLARK:  -- without dealing -- you know, bringing

8  in the in-house counsel people.

9      THE COURT:  Yeah.  I still think -- I'm there, too.

10 I was just fishing for a concession there.  But, in fact, if I

11 can't get it, I would say general counsel, even if it's

12 exclusively, needs to be logged.  It has the same problem for

13 in-house counsel.

14     MS. PEPPER:  Your Honor, are we -- so outside counsel

15 does not have to be logged, correct?

16     THE COURT:  Do you feel less strongly about that,

17 Mr. Clark, or the same?

18     MR. CLARK:  In (B)(2), that's our proposal to kind of

19 try to reach a compromise in this as far as --

20     THE COURT:  Oh, you had outside counsel in there?

21     MR. CLARK:  We did.

22     THE COURT:  That's fine.

23     MR. CLARK:  In connection with specific action --

24     THE COURT:  Yeah, yeah, yeah.  Okay.

25     So, Ms. Pepper, outside counsel is excluded but not

1    in-house counsel.

2              MS. PEPPER:  Okay.

3              THE COURT:  And then we've dealt with the metadata.

4              MR. CLARK:  Your Honor, one of the other large

5    issues, I actually think we're basically in agreement.

6    Defendant or Stacy -- Ms. Pepper will correct if I'm wrong, but

7    the documents redacted for privilege, we essentially adopted

8    their language on this that they don't initially have to log

9    those.  However, we had the language that was in red, the

10   line-by-line redactions.  And I think on page 36 of defendants'

11   joint letter brief on April 5th, defendants said they don't

12   object to that language.  That might be one where we can just

13   check the box and say it's our provision there.

14             THE COURT:  Defendants?

15             MS. PEPPER:  We do not disagree that we will

16   undertake a line-by-line review of our documents to make

17   privilege determinations.

18             THE COURT:  Okay.  That was my gut, too.  So you're

19   not giving up anything.  That's where I was going.

20             Is there also -- do we need to discuss this issue of

21   a rebroadcast of -- I did not agree to a blanket -- I thought

22   somebody -- I thought the defendants were proposing that if

23   something is initially privileged but then is rebroadcast to

24   the world, it still retains its privilege?

25             MS. PEPPER:  Well, that's not quite right.

1          THE COURT:  Yeah, where is it -- tell me where it is.

2          MR. CLARK:  That language appears on page 7 in the

3     right-hand column under "Nonwaiver" towards the bottom of that

4     big paragraph.  "Nonwaiver," Your Honor.

5          THE COURT:  And I guess I would say on that, I agree

6     that redistribution internally doesn't automatically destroy a

7     privilege, but it could, depending upon who it goes to and the

8     purpose for it.

9          MS. PEPPER:  Your Honor, is there any reason that we

10     can't address this if a recirculation issue arises?

11          THE COURT:  Maybe not.

12          MR. CLARK:  Your Honor, I think -- I think that it

13     would show up on a log, and then we'd deal with the issue.  So

14     I don't think that --

15          THE COURT:  Okay.  So you don't need -- so you don't

16     need the language that you get a safe haven -- defendants don't

17     necessarily need a safe haven.  They take the position -- they

18     can take the position that the -- they can take the position

19     that the redistribution retains the privilege, and then they

20     log it, and then you could question it.

21          MR. CLARK:  If the facts --

22          THE COURT:  I mean, why not take the language out and

23     just deal with it when it happens?

24          MR. CLARK:  Agreed.

25          MS. PEPPER:  That's fine.

1          THE COURT:  Okay.

2          MR. CLARK:  And the same -- the last sentence is a

3     similar issue on an affidavit.  I don't know if you're

4     referencing that, too.

5          THE COURT:  Where?

6          MR. CLARK:  "The parties agree that no affidavit or

7     other evidence is required," would you lump that in the same

8     bucket?

9          MR. FONTECILLA:  I'm sorry, Mr. Clark.  Can you

10    repeat that a little louder?

11         MR. CLARK:  Sure.

12         THE COURT REPORTER:  I'm sorry.  Who said that?

13         MR. FONTECILLA:  I did.

14         THE COURT:  Fontecilla.

15         MR. CLARK:  Page -- same paragraph we were looking

16    at:  "The parties agree that no affidavit or other evidence is

17    required to prove that the privilege extends to internally

18    distributed communications."  I think we cross that bridge when

19    we come to it if this issue arises on rebroadcasting.

20         So it's the last sentence at "(D) Nonwaiver" under

21    defendants' section on page 7.

22         THE COURT:  Oh, I crossed it out.

23         MR. CLARK:  Okay.  Great.

24         THE COURT:  So let's -- let's do this.  I'm going to

25    break for, why don't we call it, a half an hour.  Go down to

the second floor.  You should not be competing with anybody to
get anything to eat at 1:45.  And let's come back at 2:15.
Okay?  See you.

(Recess.)

THE COURT:  Okay.  I was going to suggest to you
before you left that you let the folks at the tables get the
stuff to eat first.  Hopefully you did that.  I don't know
but -- okay.

Here's my agenda for the next hour or so that we're
going to be together.  I want to make sure I'm covering things
you guys want to cover.  I want to add anything you want me to
cover.

I want to finish this discussion of privilege.  To me
that finishes Exhibit C, I think.

I want to correct the record about something.  So I
realized over lunch, I was wrong.  I referred to a Magistrate
Judge Peck case where he disapproved of keyword and then TAR.
It wasn't Peck.  It was some other magistrate judge.  I can't
remember who it was.  I couldn't find the case, but I have -- I
have that.  But anyway, I want to correct what I said.

I do think that I want you to -- I would like from
each side proposals with respect to ESI experts.  I guess I
would suggest two from each side who, A, are not conflicted
within your group, and then I would ask you how you want to do
it with the other group.  So to me, the plaintiffs and

1   defendants would get together, propose to the other side people

2   who they know are not conflicted because they haven't hired

3   them in this case.

4           I wonder whether the parties are adverse to telling

5   the other one on a global basis when they get -- when the

6   defendants get plaintiffs' and they propose Sharon and Floyd,

7   whether the defendants say -- are okay to say to plaintiffs,

8   and vice versa, can't use Floyd because one of us is using him.

9   You won't know which one of the fourteen defendants is using

10  him or which one of the main plaintiffs is, so that I get four

11  people from both sides, unless you want to just give me two

12  people through this process, you know.

13          But the question is, are you feeling like you're

14  being -- your work product or your consulting experts are being

15  outed a little bit if either side or the other side knows that

16  one of the myriad people on the other side is hiding something?

17          You know what I'm trying to say?

18          MS. COTTRELL:  Your Honor, I actually think the

19  experts are under an obligation to tell us.  I don't think that

20  that would be an issue, because I think, like, for example, if

21  they called Floyd and Floyd was working with one of us, Floyd

22  would have to say, "I'm conflicted out of that" --

23          THE COURT:  No, no.  I'm talking -- what I'm talking

24  about is -- and I'm still doing the agenda, but this is -- what

25  I'm saying I think I'd like an expert, primarily on the TAR

1  stuff but not exclusively. I think ESI issues are going to
2  arise in this case.
3          MS. COTTRELL: Keep coming up.
4          THE COURT: There's enough dollars in the case that
5  if it goes past the motion to dismiss stage, this could be
6  money well spent.
7          So I want the people -- rather than me trying to go
8  out there and getting everybody telling me I'm conflicted, I
9  want to get names from you and either -- you know, I was
10 thinking two names, but I probably could get one name each from
11 defendants' group and one name from the plaintiffs' group who I
12 would interview. But plaintiffs' group would get together and
13 say, "We propose to you guys these several people."
14         You call them back and say, "You can't use Floyd
15 because one of us is using him." Is that okay with you?
16         MS. COTTRELL: I think that is okay. I also think
17 Floyd has an obligation to even tell them that before they even
18 call me.
19         THE COURT: Yeah, but they may not call Floyd. They
20 may just -- by reputation, they may say, "You know, Floyd's
21 pretty good."
22         But all the better, you're right. If they call Floyd
23 and say, "Would you be interested in it," I didn't think of
24 that. That's a very -- that's probably a better way to do it.
25 Floyd would have to say, too. That's right. Okay.

1    MS. COTTRELL:  I am speaking, I think, for us.  I
2    don't think we see an issue with that.
3         THE COURT:  Plaintiffs?
4         MR. CLARK:  That's fine.  And I guess the idea being,
5    don't call him and tell him why you're right about everything.
6    We'd call them and make sure they're available.
7         THE COURT:  Right.
8         MR. HART:  You're looking for two independents?
9         THE COURT:  Two people you guys haven't hired but who
10   you think would be good people for me to consider for this job.
11   And because you guys have hired a bunch of people and because
12   I've been out of this business for a while -- I actually have
13   an idea myself, but we'll see if anybody comes up with that
14   idea.  I don't know if that person would still be available.
15        Anyway, I'd like to do that.  I'd like to set a date
16   for that to happen.
17        I have a proposal on the nonresponsive\responsive
18   issue that I'd like to float by you.  I'd like to address the
19   Florida AG issue a bit.
20        I want to address the new custodian issue that -- and
21   a time frame for resolving it that you put in your 52-page most
22   recent filing.
23        I know you want to talk about load and process ESI,
24   the samples of structured data, a time frame for negotiating
25   search terms, I think are all things that have been on the

1    table and a new date -- and then another date to come here to

2    deal with anything that we need to deal with on any issues that

3    aren't resolved today.  There will be issues that aren't

4    resolved today.  That was my agenda.

5             What do you have, plaintiffs?

6             MR. CLARK:  The only things left on Exhibit C besides

7    the one you just said were the relevancy redactions, logging of

8    the email chains, and then just kind of time frame for

9    challenging privilege.  There are three provisions we can just

10   point you to and hopefully be a quick decision now.

11            THE COURT:  Okay.  Relevancy redactions.  Next.

12            MR. CLARK:  Logging of email chains.

13            THE COURT:  Logging of email chains.

14            MR. CLARK:  And then just some type of parameters for

15   challenging a privilege claim.

16            THE COURT:  For challenging a privilege claim?

17            MR. CLARK:  Correct.

18            THE COURT:  Defendants?

19            MS. PEPPER:  Your Honor, we're operating under the

20   assumption that the ESI expert you propose is going to cover

21   both the search terms and TAR issues.  Is that right?

22            THE COURT:  I think so.  It depends on what you mean

23   by search terms.

24            I mean, I would like -- my goal was to be able to get

25   an ESI Protocol at least entered.  I'm okay if we get to an ESI

1    Protocol today -- which we may not -- if we get to it, it would
2    say on the issue of TAR and pre-culling, this issue is being --
3    is being discussed by the Court and the parties, and the
4    protocol will be amended later when this is dealt with.  I
5    don't know if there's any other issues that we should do on
6    that.
7              So when you say, will you deal with the issue of
8    search terms, what do you mean?  Disclosing search terms and
9    hits?
10             MS. PEPPER:  Yes.
11             THE COURT:  Well, you guys are agreeing to disclose
12   search terms but not hits, right?
13             MS. PEPPER:  Correct.
14             THE COURT:  We could maybe address that here and if I
15   need to deal with it back there, okay.
16             What other issues from the defendants?
17             MS. PEPPER:  I don't think we -- if we're discussing
18   V(D)(1) and V(D)(2) and V(D)(2)(d) with the ESI expert, then
19   the only other one -- and it's quite minor -- would be the
20   Other Sources provision, V(G)(1)(b) on 4.
21             THE COURT REPORTER:  I'm sorry, V(G)(1)(b)?
22             MS. PEPPER:  V --
23             THE COURT:  V as in Victor.
24             MS. PEPPER:  Victor Gary --
25             THE COURT REPORTER:  V(G)(1)(b)?

1          MS. PEPPER:  Yeah, (1)(b), Other Sources.

2          THE COURT:  Okay.  Randomly, when do you think you

3    can confer enough and get to me your proposed ESI expert

4    people?  Two weeks, three weeks, one week?

5          MR. CLARK:  I think one.

6          THE COURT:  Two weeks?  Two weeks, going once?

7          MR. CLARK:  One week would work for us.

8          THE COURT:  I think one week is slim.

9          MR. CLARK:  Okay.  We'll do two then.

10         MS. PEPPER:  Your Honor, the 4th of July weekend is

11   coming up.  So three would be ideal, but, you know, if --

12         MR. CLARK:  To budget --

13         THE COURT:  Two weeks -- two weeks gets you to June

14   30th.

15         MS. PEPPER:  Okay.

16         THE COURT:  So let's shoot for June 30th, so nobody

17   has to worry about this over the 4th of July.

18              Here's my imperfect solution on nonresponsive parent

19   and nonresponsive attachments.  And if it meets with terrible

20   opposition, I -- we can say we're going to do it at another

21   point.  But I would adopt the defendants' first line:  "The

22   parties agree that nonresponsive parent documents must be

23   produced if they contain a responsive attachment and are not

24   withheld as privileged."

25              I would say:  Nonresponsive attachments to responsive

1  parent documents need not be produced but -- and I'm not sure

2  if it's a "but" or a period there -- the parties will meet and

3  confer regarding a nonexhaustive list of criteria to be

4  considered in determining whether a document is responsive

5  within the meaning of Rule 26(b) for purposes of this case.

6  So why am I suggesting that? I'm saying that --

7  (b)(1), I guess I would say.

8  I think there's a default that nonresponsive

9  documents are -- obviously don't need to be produced. I can

10  see a difference between a responsive parent and nonresponsive

11  attachments. I don't want, however, in a complicated case like

12  this to leave that decision completely to 26 different people,

13  or however many people are doing it.

14  And I think that the plaintiffs had some good reasons

15  why defendants' proposal that they thought at first blush

16  included things that weren't responsive really would be

17  responsive.

18  You always have a problem in cases whether the other

19  side is truly producing responsive documents or not, but

20  that -- that just is it. And in a case like this with so many

21  parties, I'm fearful of just dumping a whole bunch of stuff.

22  So my compromise on that for myself was that if the

23  parties met and said, for example, these chicken types are off

24  limits, but these other ones might -- defendants might say

25  they're not responsive, but we got to talk about it before you

1     can exclude all these, or these companies are off the list.

2         Now, if you think I'm overcomplicating that, I can go

3     back to the drawing board. Plaintiffs?

4         MR. CLARK: Your Honor, Brian Clark for directs.

5         I think as long as it's specific and also specific --

6     each defendant is very different. So a lot of the examples

7     here were Tyson, and Tyson is unique. There's only maybe one

8     other defendant that does things -- or maybe couple other that

9     do things other than chicken.

10         So I would hope that we don't -- as long as we're

11     specific and, perhaps, even to defendant I think it would be

12     useful if we create a general exception that's so broad that a

13     purely chicken company can start excluding things that nobody

14     understood, I think it would be -- lead to a lot of problems.

15         THE COURT: I am intending for it to be specific to

16     defendant.

17         MR. CLARK: Okay.

18         THE COURT: You happen to have a lot of defendants.

19         MR. CLARK: Sure.

20         THE COURT: Whether they're still here after the

21     motion to dismiss, I don't know. But I don't think talking

22     about it now is a huge expense.

23         And the devil will be in the details. It's not going

24     to be perfect. The bottom line is, they don't have to produce

25     responsive stuff and neither -- nonresponsive stuff and neither

do you.  I'm trying to put a cabin around that a little bit.

I'm also trying to guard against garbage being produced and having to be housed on servers.  And if I multiply that 14 times or 7 times or 10 times, it's a lot of garbage.

And so responsiveness means something.  So by definition, you're not going to get -- you're not excluding stuff that is responsive, but this is a little bit of a way to cabin what is responsive.

Defendants, any global reaction?  Mr. Suggs.

MR. SUGGS:  Your Honor, that sounds like a workable solution.  I mean, we're certainly happy with the idea that we don't have to produce every nonresponsive attachment.  And we're going to have to engage with the plaintiffs anyway to talk about what is or what is not responsive.

And so we'll have those conversations, and I think we can hopefully come to an agreement that -- about what is or is not responsive, and those documents won't be produced.

THE COURT:  This is always subject to reconsideration.  You can put it this way in the protocol, but if it doesn't work or somebody's ox is being gored terribly, I can revisit it.  But I just think it's a way to proceed.

Let's stick with agenda -- the Exhibit C agenda.  If we don't get to some of this other stuff, we don't get to it.

Relevancy redactions, logging of email chains, parameters of challenging a privilege claim, disclosure of

hits, and Other Sources protocol.

Relevancy redactions, I thought we dealt with that before but maybe not.

MR. CLARK: I think you've spoken to it, like, in your preference on relevancy redactions. Plaintiffs' proposal is on page 7 of Exhibit C. It's paragraph F. And defendants' proposal is kind of the mirror image on page 8 on relevancy redactions in paragraph F as well. Mirror image, meaning the opposite result.

THE COURT: So I looked at both of these. And the devil is in the detail here.

You know, pers -- you know, personal irrelevant employee information by definition is irrelevant. It could be confidential. I mean, I am -- if somebody proposed redacting identifying information, home addresses, health information -- I mean, I don't know -- that kind of stuff shouldn't be produced.

Line by line, I am not a fan of line-by-line redactions of documents for relevancy. I don't know if anybody is proposing that, but I would not be okay with that. I mean, if there's relevant and irrelevant portions of a letter, the letter gets produced. Now, if it's privileged, it doesn't get produced.

If you could agree on certain criteria here, such as personal employee information, home addresses, I mean, that

1    stuff should get redacted.  I almost -- I don't know that you
2    need a global provision on this, right?  I mean, if you get
3    documents that say redacted, redacted, redacted, I would say --
4    I could see, even though it's burdensome, saying you need to
5    get a log of these redactions and tell them what they are.

6          Now, you could agree to some global thing that says
7    personal identifying information gets redacted and that you
8    don't have to log it.  But is anybody proposing line-by-line
9    relevance redactions?  It's not relevant because it relates to
10   the ballgame?

11         MR. FONTECILLA:  Your Honor, I have one example that
12   I'll bring up.  Adrian Fontecilla for Wayne Farms.

13         The example that -- that comes to mind for my client
14   is, they've asked for us to produce phone logs, you know, of a
15   series of phone calls to phone numbers made for a particular
16   custodian.  That could reveal a phone number for a particular
17   doctor.  That might reveal that a custodian might have a
18   certain illness or something like that.

19         So there are certain line-by-line redactions that may
20   be appropriate, and we just want to make sure that we protect,
21   you know, information that's not relevant to the case but that
22   is of highly confidential, personal -- and personal capacity
23   and a sensitive nature.

24         THE COURT:  Okay.  But that's pretty specific, right?
25   Mr. Clark doesn't want that.

1          MR. CLARK:  Yeah, I don't really know what that would

2     reveal, and we have a protective order.  And in that

3     situation -- I don't know -- that's extremely theoretical, but

4     let's say that were the case.  That's why we have a protective

5     order, and the chances of that even being discovered are

6     extremely minimal.

7          These records are processed into a database, and

8     relevant numbers that we know are identified with calls between

9     people we care about.  That is beyond theoretical.  That just

10    wouldn't happen.

11         THE COURT:  Yeah.  I mean, the normal way that this

12    is dealt with -- I mean, I have this all the time in police

13    cases.  And it depends on how much work you guys want to put

14    into this, right?  It's a confidential document.  It can't be

15    in any record.

16         If you want to redact -- if you want to redact on

17    that, you know, stuff that is irrelevant because it relates to

18    health or family members or stuff like that --

19         MR. CLARK:  Your Honor --

20         THE COURT:  -- I mean, health is different than

21    family members, frankly.  I mean, what's the proposal -- I

22    don't get the proposal.

23         MS. PEPPER:  Your Honor, I think this is where it's

24    important to just look at what the two parties are proposing.

25         THE COURT:  Okay.

1          MS. PEPPER:  When you look at plaintiffs' proposal,

2     it's to avoid unnecessary delays and expenses associated with

3     the review and production of information in this litigation.

4     They will not make any redactions based upon the purported

5     relevancy of a document.

6          I mean, this is the theme that we've been talking

7     about now for several hearings, right?  There is a difference

8     between unduly restricting a party's ability to make decisions

9     as needed.  We don't know yet what will be needed, although

10    Mr. Fontecilla has given one example.

11         Our proposal on relevancy redactions preserves

12    flexibility for the parties.  If it turns out that a party

13    abuses that flexibility, I am quite sure that plaintiffs will

14    bring that to the Court's attention.

15         THE COURT:  Do you --

16         MS. PEPPER:  But there's no reason to presuppose that

17    that's what's going to happen.  And all defendants are

18    proposing is that there not be themes within the ESI Protocol

19    that says at this junction we cannot.

20         THE COURT:  Do you oppose logging redactions based on

21    relevance?  Telling -- in other words, if you redact stuff

22    based on relevance, telling them why it was redacted?

23         MS. PEPPER:  Well, I'm not quite sure --

24         THE COURT:  At least in a general summary way?  Here

25    are the telephone records.  We've redacted telephone numbers

1    for doctors, family members, credit card companies. I mean, I

2    don't know.

3        I mean, if you're going to redact stuff, I mean,

4    that's going to happen any -- I would say, I agree with you

5    that I'm not going to make a blanket rule that nobody can

6    redact anything. That -- I don't like that blanket rule.

7        I don't generally like -- I mean, the defendants

8    proposed a possibility of collection of personal, irrelevant,

9    employee information. I'm not sure what that is. But

10   generally, I don't allow redactions for relevance. Irrelevant

11   stuff gets produced unless there's a reason not to. It's

12   highly sensitive. It's medical information. It's personal

13   information. In cop cases, their personal phone numbers -- not

14   their personal phone numbers -- calls to family members are

15   redacted. But I don't want anybody going overboard.

16       So I guess what I would say is, I would reject the

17   plaintiffs' you can't make any relevance rejection --

18   redactions. I would say if a party redacts information or a

19   party may redact information that is highly personal, health --

20   relates to health or -- I don't know -- a couple other

21   categories there -- and shall log the redactions in a -- in a

22   way that informs the receiving party of the reason for the

23   redactions.

24       MR. CLARK: Your Honor, if I could, I don't think we

25   have a problem with, you know, a home address, a health

1    information.

2           But with the example -- and this has come up more

3    than once in our meet-and-confers -- the example of a phone

4    record, you're talking about a list of phone numbers and

5    redacted -- number one, that actually disrupts our ability to

6    process those, having a redaction in the middle of it, kind of

7    we're not able to process them in the same way.

8           And a phone number itself is not private health

9    information, the kind of -- the hypothetical that was given.

10   You're right, if somebody says, "You know, I have a health

11   condition.  I have brain cancer," that can be redacted, and we

12   can agree on a way to do that.  But just a list of phone

13   numbers without even identifying who the people are, I just

14   can't foresee how a relevancy -- I mean, the phone record is

15   relevant.

16          And the issue would be they would be -- we would

17   serve a subpoena.  And what they're really proposing is then

18   all those records would go from the carriers to them first.  A

19   few weeks or months later, we get a bunch of redacted phone

20   records that we can't actually process.

21          THE COURT:  Would you agree that phone records could

22   be produced as a confidential document?

23          MR. CLARK:  Absolutely.  We already have.

24          THE COURT:  Would you agree that no party who

25   receives phone records can't call any number in the phone

1    record without the approval of the other party?

2            MR. CLARK:  Absolutely.

3            THE COURT:  Okay.  So why doesn't that meet the --

4    any legitimate objection that the producing party could have?

5    Phone number's there.  Nobody could call it.  Nobody could --

6    without the permission of the other side, and it's a

7    confidential document.

8            MR. FONTECILLA:  Sure.  Your Honor, Adrian Fontecilla

9    for Wayne Farms.

10           It is just merely one example, but I think

11   Ms. Pepper, you know, articulated it better, that it's just a

12   little too soon to know until we see what's in the documents

13   and until we can work with our clients to understand and

14   interview to ask these specific personal questions.  Is there

15   anything in your documents that you think might reveal?  They

16   may not even know probably, in essence, until we look at it,

17   and then we say:  This is something that we may want to talk to

18   the plaintiffs about about redacting, in which case, you're

19   right.  We would log it and make a good-faith effort to provide

20   a general description of why it was redacted for what reason.

21           MS. PEPPER:  Could I add one thing to that as well?

22           THE COURT:  Yes.

23           MS. PEPPER:  I don't want to belabor the point too

24   much more than we have.

25           Phone records in particular, I don't think it's as

1    simple as that.  We don't know -- I mean, we know for the most

2    part who the custodians in the case will be.  We have to

3    identify whether or not it's a company-issued phone versus a

4    bring-your-own device versus whether plaintiffs are going to

5    attempt to go after totally personal phones or personal home

6    phones.

7            I mean, they -- they've raised a lot of issues with

8    respect to phones.  I'm not sure that we can just perfunctorily

9    say that any phone number that appears on any phone record for

10   someone we've identified as a custodian in this case is

11   information to which they're entitled.  I don't know.  So --

12           THE COURT:  I don't know the answer to that either,

13   and I can't -- I can't address it in the abstract.

14           I can say that I'm not going to say from a blanket

15   provision you can't redact anything.  I don't think I'm going

16   to say -- you could reserve the right to redact or not.  It

17   doesn't have to be in the ESI Protocol.  Okay?

18           When I look at our model confidentiality order, it

19   says things are produced as confidential, so they can't be used

20   outside the litigation.  And it talks about information

21   prohibited from disclosure by statute, trade secrets, personal

22   identity information, medical information concerning any

23   individual, personal or employment records, et cetera.  Okay?

24   But importantly, it doesn't say you could redact it.  It just

25   says you produce it, and it's confidential.

1          So I don't think this is susceptible to a

2    one-size-fits-all ruling from the bench today.  I would say

3    that if -- and I guess for that reason, I wouldn't put in "a

4    party may redact" or "may redact."

5          I would say if a party redacts anything, whether it's

6    privileged or anything, you got to produce a log.  I will also

7    say that if this gets abused on either side, I'll stop it, and

8    I'll put a very short time frame on producing this stuff back.

9    Okay?  So, you know, it's not like you have to do a search.

10    It's just stuff that has to be erased, but I'm hoping that we

11    don't get there.

12          But I think a confidentiality order is the way to go

13    on stuff and identifying things as confidential.  I'm not

14    asking you to overdesignate.  But I think if it's confidential,

15    it's confidential, and it can't be used for -- outside the

16    case.

17          If an employee says, "I don't want anybody to see

18    where I live," the first -- I mean, the first line is they

19    can't use it outside of the case.  If they want to redact it,

20    tell them you're redacting it.  But, you know, I'm not going to

21    give anybody blanket one way or the other.  But it probably

22    should say that if there are redactions for any reason, a log

23    has to be produced.  And not a metadata log.  Other than the

24    metadata log for these other documents, you got to tell them

25    why it was done, and you have to then decide whether or not you

1    want to undergo the burden of doing that or just produce the

2    document under a confidentiality order. Okay?

3              MS. PEPPER: Understood.

4              THE COURT: Logging of email chains.

5              MR. CLARK: So, Your Honor, this is for -- Brian

6    Clark for directs.

7              On page 6, we have a provision towards the upper

8    left-hand corner, email chains. Defendants on the right-hand

9    column have a paragraph 4, email chains.

10             And the issue might actually -- I think is largely

11    answered by the Court's -- or kind of rough agreement order we

12    have on a metadata log for privilege log. However, we just

13    want to make sure, because we're going to the metadata log, one

14    of the issues that happens -- and the Court's probably aware --

15    is if there's a chain of ten emails, there might be portions of

16    that that have a branch that get sent off to someone else. And

17    that might destroy the privilege because it's two nonemployees.

18             We just want to make sure, given it's metadata --

19    given that it's a metadata log, that we get all -- all

20    different year duplicates of that log so we see who were the

21    actual participants in each part of that chain as opposed to

22    just the most inclusive version of it.

23             And so our provision, as it's written, might change a

24    little, given it's a metadata log now, but we think it's

25    important that we're getting all the mirror duplicates so we

1    know where there's a branch.

2           THE COURT:  I think you have to fine tune this.  I

3    mean, a lot of the redactions are going to be in this context

4    of email.  Right?

5           MR. CLARK:  Right.

6           THE COURT:  And so I think you got to fine tune this

7    knowing that you're getting a metadata log.  And I would urge

8    the defendants to be somewhat more flexible on it just because

9    I -- these are maddening.  And they're maddening anyway, and

10   they're maddening if they can't -- if they can't identify them.

11   And because there's a fallback of they could ask for all of it

12   anyway to be logged, then everybody has an interest in trying

13   to give them the information at the first cut that at least is

14   understandable so that they can get it.

15          I don't know how to fine tune it from the bench

16   but --

17          MR. CLARK:  I think that might be enough for us to

18   work out.

19          THE COURT:  Yeah, I think you got to fine tune it.  I

20   agree with that.

21          Parameters for challenging a privilege claim.

22          MR. CLARK:  Page 7, paragraph E on the left-hand

23   side, Your Honor, our "Challenges to Privilege Claims" are what

24   plaintiffs propose.

25          And then paragraph E at the very bottom on page 7 for

defendants, "Challenges to Privilege Claims," I think it's just
giving some type of structure to this. And I think we had a
day proposal in there. If the Court thinks that's too short of
a period, 14 days, we can extend it. But we wanted to have
some kind of protocol for what do we do if we don't agree.

THE COURT: I'm okay with you -- I'm okay with the
default of 14 days. If you give them something that has 3,000
questions on it, they're not going to be able to do it in 14
days.

You know, rather than "must," you can say "must use
every effort to respond within 14 days." I mean, nobody -- I'm
not going to cut anybody's head off on this. But I agree that
there has to be some type -- otherwise it gets pushed to the
bottom of the pile, and we don't want that.

And, again, I'm going to be -- you know, if I'm going
to be -- you know what, Nancy, your battery on your iPad is
failing, but I'm not looking at the realtime anyway, because
I'm in the moment anyway, so whatever happens.

THE COURT REPORTER: Okay. I forgot the charger at
the break.

THE COURT: That's okay. I'm fine with it.

I'm going to be very cognizant of the fact that I'm
attempting to get this stuff produced sooner rather than later
with less information, and so I think just a push to get these
issues resolved sooner rather than later is going to be part of

1    the whole protocol.  It's part of the whole package.

2             Defendants have anything to say about that?

3             MS. PEPPER:  If you introduce the language that we'll

4    use every effort, it sounds like the Court is quite cognizant

5    of the fact that our ability to do so will depend on how many

6    challenges we get, so --

7             MR. CLARK:  We're also fine with that language, Your

8    Honor.  The plaintiffs are.

9             THE COURT:  Are you okay with that or can I --

10   because you could do it one way or the other.

11            MR. CLARK:  That's fine.

12            THE COURT:  I could say "must," and then I'm going to

13   give you free relief from it.  Or I'm going to say, "must use

14   every effort," and then you got to do it.

15            MR. CLARK:  That's fine.

16            THE COURT:  I'm going to say, "shall endeavor to

17   respond."

18            MR. CLARK:  Okay.  Thank you, Your Honor.

19            THE COURT:  Disclosure of hits, you know, this may be

20   something that I got to defer to the ESI person, but my gut --

21   I mean, tell me why you are -- you don't object to disclosing

22   search terms but do object to disclosing hits.

23            I would think that they're two parts of the same

24   peapod.

25            MS. PEPPER:  Not quite, Your Honor.  So I just want

1  to be clear about what defendants' position is, and then I

2  think that will help clarify where we think an appropriate line

3  is drawn.

4       THE COURT:  Okay.

5       MS. PEPPER:  For those who do, in fact, use search

6  terms, we think it is appropriate to share with the plaintiffs

7  the search term used, the strings used, et cetera.

8       We think it's appropriate for plaintiffs to

9  counter-propose terms, which we would accept or deny with

10 justification.  The problem is once you start -- and, perhaps,

11 the justification for their proposed search terms may include

12 hit count reports.  But when you start suggesting that we have

13 to reflexively produce hit count reports for every term, all

14 that's going to do is invite discovery disputes before this

15 Court, because if you actually look at the case that they

16 propose to the Court, the *National* case -- I mean, Judge

17 Scheindlin in that case said to suggest that one term may be

18 more or less likely, based on the number of hits, to produce

19 responsive information or a term would be better as to go where

20 angels fear to tread, it's just inviting a huge number of

21 fights over what's the right number and when does it stop in

22 terms of inviting further terms from a requesting party.

23      The cases suggest that once we've agreed on terms and

24 plaintiffs have counter-proposed terms and have perceived an

25 explanation as to why those terms were accepted or not,

1    reflexive hit count reports are only proper under *Freedman* if

2    there's been some showing that the productions they're

3    receiving are inadequate, or under a second case that

4    defendants bring to the Court's attention, that there's been

5    some indicia of unreliability.

6              THE COURT:  Time out.  I thought what we were talking

7    about -- I read those cases, but I thought here what we were

8    talking about was a desire to disclose hit counts as you're

9    negotiating what the search terms are supposed to be, not after

10   you guys are doing this in the course of all your discovery.

11             MR. CLARK:  That's right.

12             THE COURT:  I thought it was you were going to meet

13   and confer about what search terms each side agrees the other

14   side should run, and then you're going to run terms -- then

15   you're going to run tests.

16             And then you're going to come back to the other side

17   and say, "We don't think we ought to run apple.  We think we

18   ought to run pear."  And as a part of that, I was thinking you

19   should say, "And because we ran apple and it hit four times,

20   but pear hit 75 times."

21             MS. PEPPER:  That's why we suggest that for the

22   plaintiffs' side, it may be appropriate that where we reject a

23   term, we let them know what the term -- what the hit count was

24   for their term.

25             But this proposal that for every term, including the

1   ones that we run internally, that we would have to produce hit

2   count reports, I think that's going to -- it's going to

3   protract the negotiations about what terms are proper or not

4   proper for a long time.

5        THE COURT:  Okay.  Mr. Clark, you got to tell me a

6   little bit more about what the plaintiffs are proposing.

7        MR. CLARK:  Yeah, I'm not sure how we could have a

8   really informed negotiation if we don't know how many documents

9   are being hit by the proposed terms.

10       And then if we -- when we -- our proposal is 7 to 14

11  days after the initial search terms are disclosed for both

12  sides, the other party -- the requesting party comes back with

13  some additional proposals.

14       I don't know how you'd move that conversation forward

15  and have a good-faith meet-and-confer if you don't know that:

16  "Oh, my gosh, I proposed this word, but it hit on 30 percent of

17  the documents."  I don't know how you do that.  Or "I propose

18  this word, which is critical, and it hit on 10 documents.  That

19  has to be wrong.  What's going on?"

20       THE COURT:  What I was hoping would happen and what I

21  think would happen is the plaintiffs collectively would come up

22  with search terms you want to be part of the agreed-upon

23  protocol.  Defendants would do that, too.

24       Defendants are going to run plaintiffs' words on seed

25  database.  Plaintiffs are going to do the same thing.

1    You're going to meet with your litigation

2  consultants, your electronic consultants, and they're going to

3  say it -- "The word 'pear' is not a really good 'pear.'  The

4  word 'parry,' though, or 'pares' or 'paring' is a better word.

5  And in order to see whether it's a better word, we ran it, and

6  it hit a lot more than just 'pears.'  What 'pears' gets you is

7  X, and that's an irrelevant thing, so you've got a control on

8  that."

9    Then you're going to get back together and meet, and

10  you're going to say, "We think it should be 'paring,' and the

11  reason is is because of what I just said."

12    I don't think I would require work product disclosure

13  of:  The defendants ran some words themselves; they're not

14  proposing them to you.  It hasn't hit the meet-and-confer.  But

15  as part of the discussion as to what the agreed-upon search

16  terms should be, rather than just throwing words at each other,

17  I was hoping that the discussion would include these words and

18  why.  And "why" might -- might include either side ran those

19  through your database, and they were more effective words.

20  "Plaintiff, you should want those words."  Or you could hide

21  it.  You could say, "Fine.  You want 'paring,' and we'll run it

22  that way, although we know that there's another word that you

23  should be using, but we're not going to give it to you."

24    I'm not saying give them that word.  I'm just saying

25  if you're opposing or opposing a word, part of the discussion

1  should be how many it hit.

2  MS. PEPPER:  Your Honor, I actually think, based on

3  what you just said, we might act -- we might be in agreement.

4  I just want to make sure that I was clear.  I think, perhaps, I

5  wasn't.

6  If we accept a term that plaintiffs send us, there

7  should be no reason to give them a hit count report.  The only

8  issue should be if we reject a term and we reject it with

9  explanation, the explanation may be the number of hits that

10  that term generated.

11  THE COURT:  I may not mind that, because presumably

12  plaintiffs suggested a word because they did their own analysis

13  on that word in a seed database.  So I'm cognizant to the work

14  product nature of this.  I'm focused on the communication

15  between the parties.  And the rejection of a term, I think, has

16  to come with why, and hit count should be part of that

17  discussion.

18  Conversely, if the plaintiffs want to say, "We ran

19  that term in our database, and it hit thousands of times; why

20  is it not hitting in your yours," that could be a legitimate

21  discussion.  You might not say it hit seven times, but you

22  could say, "Look, it's not coming up in ours."  That's a

23  legitimate discussion to have.

24  I just don't think hit count by itself is work

25  product.  I could see in certain circumstances where it is

1    where you haven't -- where you're not communicating about it,

2    but where you're communicating about trying to come up with an

3    agreed-upon search terms, we're not -- you know, we're not --

4    and I don't know how to put it in writing, but I would -- I

5    would say, you know, a legitimate inquiry within that context

6    is hit counts for words that you're rejecting from our -- from

7    us, let's say.

8              And I don't know, plaintiffs, if you need them to

9    tell them -- how many times your proposals hit, because before

10   you proposed it to them, you ran it on your own database,

11   right?

12             MR. CLARK:  Well, database of what, though?  The

13   point is they have the set of documents, and we don't.  So it's

14   a different -- each data set's different.  Maybe there's

15   somebody with a unique name at one company and not unique.  So

16   there's a lot of individual issues, and so that's why for each

17   defendant, since we don't know what's behind kind of the

18   curtain, this is a way to have more of a transparent

19   discussion.

20             THE COURT:  Yeah.  I guess another way to have more

21   of a transparent discussion, defendants, if you don't want to

22   tell them -- if they give you words to run on your database,

23   you don't want to tell them the hit count, then you got to give

24   them sample databases to run the words through.

25             MR. FONTECILLA:  Your Honor, if I may make a comment

or suggestion.  It's Adrian Fontecilla for Wayne Farms.

In my experience, what has been most effective, and I think it's what we've been talking about here, is providing a justification -- and what we're limiting this to is terms proposed by the requesting party that are rejected in the initial meet-and-confer, and the requesting party wants more information about why the term "broiler" is rejected.

Well, in that -- in that scenario, the responding party will provide a justification and an explanation that may -- may involve providing some metrics and some hit counts.

But what defendants have a problem with is incentivizing the plaintiffs to throw thousands of words at us because they know they're immediately going to get a hit count report for certain -- and they can ask for certain custodians, and that can lead -- that troubles us.

But what's more effective, in my experience, is providing an explanation about the sampling.  They provide a -- and I think you alluded to this -- where we go in, we test the term.  We say "paring" actually resulted in things of this nature.

One example is street roads and names that may result in lots of hits where the word might actually be in the complaint, but it also shows up in tons of random Excel data that isn't even relevant.

So in those circumstances, explaining to them the

1    types of documents that their hit count is --

2        (Brief interruption.)

3           THE COURT:  Sorry.

4           MR. FONTECILLA:  Explaining to them in providing

5    examples of the sampling that's been done is more effective.

6    And we just -- we just want to be mindful of having an

7    automatic requirement imposed on us at the outset of providing

8    hit count reports, which ultimately the number may not be as

9    useful as explaining why it returns a disproportionate amount

10   of irrelevant information.

11          THE COURT:  Now, you know what, I had a brain moment

12   there.  I forgot in this context that the plaintiffs don't have

13   the documents.  Okay?  So they're totally beholding on you to

14   run their proposed search terms in your database.

15          Right, Mr. Clark?

16          MR. CLARK:  Yes.

17          THE COURT:  Yeah.  And, therefore, I mean, you

18   can't -- it's an interesting -- it's an interesting thing, and

19   I don't, you know --

20          MS. COTTRELL:  Your Honor --

21          THE COURT:  I understand your position.  And if

22   everybody was dealing with a full deck and information that

23   was -- if plaintiffs had a sufficient amount of information to

24   intelligently propose search terms and determine whether those

25   were effective search terms on data that they had, I agree with

1   you a hundred percent, because everybody's -- everybody's

2   dealing with a full deck.

3          Where plaintiffs don't have the data and they're

4   asking you to run it and they got to do it blind and you don't

5   tell them how many times it hit, that's a different -- that's a

6   different scenario.

7          Now, this also -- you know, this deals with a whole

8   other issue, right?  It opens a huge can of worms.  The can of

9   worms it opens is, should you produce documents to them that

10  they could use to develop a search protocol and then talk to

11  you intelligently about it?  And I know you don't want to do

12  that.  Okay?  And -- but I don't know how they will

13  intelligently -- and I have to think about this.

14         I mean, I don't know how they're going to

15  intelligently propose search words to you because they're just

16  shooting in the dark without seeing actual documents.

17         Yes, Mr. Suggs.

18         MR. SUGGS:  Well, we want to be clear here that the

19  search term number, the hits by itself, that doesn't really

20  tell you anything.  So just --

21         THE COURT:  Sure, it does.

22         MR. SUGGS:  Well, not really.  It doesn't tell you

23  whether the -- whether the documents are likely to be

24  responsive or -- so I've never worked on a litigation where I

25  had to produce hit count reports, but we have successfully

negotiated search terms without them.

What Mr. Fontecilla was describing as a more accurate description of the problem rather than just some abstract number is more useful.

THE COURT:  And were the other -- okay.

MR. SUGGS:  I mean, they were cases like this, antitrust alleged price-fixing cases with large document collections.

You don't need to know how many times the word "price" hits to know whether it's relevant or --

THE COURT:  Well, that's -- you're right.  "Price" is going to be a word no matter what.

MR. FONTECILLA:  And I'll just add, Your Honor, you mentioned that the parties -- the opposing party is not playing with a full deck.  That's the nature of litigation.  That's why the rules are in place.  That's how this works.  It's representations by outside counsel saying, "We tested your terms, and we in good faith worked to sample them, and we came up with a conclusion that your terms are unduly burdensome, and here's why, one, two, three.  They were terms" --

THE COURT:  Here's why, meaning one, two, three?

MR. FONTECILLA:  Here -- number one, they've returned a disproportionate amount of the relevant information that are not responsive to your requests.  Here are some examples.

And this happens in every case.  And the parties

1  continue to move forward, and litigation in the federal

2  district courts continues to function properly without hit

3  count reports in every case.

4          And so in a case with volumes of this magnitude and

5  where there will be a lot of search terms and a lot of search

6  term negotiations, it's just more effective, in my opinion and

7  in my experience, to actually provide substantive explanations

8  rather than just reflexively have to turn over a number that

9  doesn't actually represent anything without the explanation.

10         And we may for some terms where we are at loggerheads

11  ultimately say, "Listen, we're going to give you the hit count

12  report for the hit count for this particular term, but we think

13  that providing the hit count report at the outset will deflect

14  attention and distract us from the actual substantive results

15  of the sampling."

16         And nothing prevents the plaintiffs from coming to

17  the fore or asking us for a hit count for a particular

18  document.  And I believe in some circumstances some defendants

19  may agree to that.  And if they really think that they can't

20  resolve the dispute without us providing a simple number, we

21  can certainly bring it to the Court's attention.  But give us a

22  shot at using the process that's been used for cases in

23  litigation -- antitrust litigation for many, many years, and

24  it's working.

25         MR. HART:  We would say the same thing, Your Honor.

1    Give us a shot.  There's -- they have articulated no basis to
2    withhold hit counts.  They haven't said it's burdensome to
3    them, because it's not.  They haven't said that their ECI [sic]
4    expert says that it's not useful, because it is.
5         We've always said that more information is better, so
6    the parties can articulate and have an iterative exchange on
7    what strings to produce and not produce.  In our experience,
8    hit counts are essential, and it doesn't disclose any
9    information that they don't want us to have.  At least, they
10   haven't articulated what that is.
11        What is the harm other than it will distract us in
12   some meaningful way?
13        THE COURT:  No, I mean -- and it's not privileged,
14   and it's not work product.
15        MR. SUGGS:  There is a concern that it's going to
16   result in a lot of disputes over:  Why are there not more
17   documents produced with this term because the initial hit count
18   report had 10,000 hits, and you've only produced 500 documents
19   with that term?  I mean --
20        THE COURT:  That's a good discussion to have, in my
21   view.  Okay?  I mean, it's -- I don't think it's a bad
22   discussion to have.  There may be a reason for it.  It might be
23   that just is, or it may be there's a problem with the way it's
24   being run.
25        MR. SUGGS:  Well, if you step back, let's be clear,

1    there are going to be very broad search terms applied in this

2    case.  There are going to be a lot of them.  It's going to

3    produce a lot of documents.

4            So if we're going to have a bunch of disputes about

5    all these search terms because they don't like the numbers

6    of -- they don't like the number of hits compared to how many

7    documents we produced or they just think that hit count doesn't

8    match what their expectations are, that's going to produce a

9    lot of disputes.

10           MS. COTTRELL:  Your Honor --

11           THE COURT:  It may or may not.  You know what, I --

12   where it's almost 3:10, and as I said, there's a certain point

13   at which these hearings become less productive.  People get

14   tired.  We're dealing with a lot of stuff.

15           My -- my reaction to this is whether this has to be

16   dealt with in the ESI Protocol or whether it's something that

17   is best left to the parties discussing it.  I know that the

18   defendants' view is that the plaintiffs want to front load a

19   lot of fine tuning and big brother-ish stuff into the protocol

20   to pre -- and the plaintiffs want to do that to prevent

21   problems that they know could happen later.  Okay?  So there's

22   a give and a take here.

23           I have to say that I recognize, Mr. Fontecilla, with

24   what you're saying.  That's part of the, you know, hearing

25   going on too much.  Yes, this happens in every piece of

litigation.

This happens to be a little bit more complex piece of litigation. But hit counts are not privileged. I don't think -- if they ask you to run a search term and it hits on a certain number, the number that it hits on I don't think is work product under any definition. It's not privileged. It's not particularly confidential. It could be useful information in a particular situation. And as all the defense counsel have said, or maybe it was just Mr. Fontecilla because he was focused on it, we might decide to give it to them as part of a negotiating process.

I've certainly been involved in those kinds of discussions where that is a topic of discussion. The reason you don't want it is this. Or tell us what the hits were before we're willing to withdraw it.

So does it have to be in the protocol, or does it have to be silent and they asked you for it, and then you don't provide it, and they file a motion in front of me saying, "We're trying to come up with legitimate search terms, and we're being hampered in that process"?

And maybe somebody would be reluctant to do that because that sounds like "Na, na, na, na, na, na, na," you know, like small ball. But I don't know.

MS. COTTRELL: Your Honor, to avoid "na, na, na, na, na" --

1    THE COURT:  Yeah.

2    MS. COTTRELL:  -- Christa Cottrell.  So it sounds

3    like we're already contemplating having an expert come in to

4    talk about TAR and search terms.  And we've put a lot of focus

5    today on, you know, do we have to disclose hit count reports?

6    And it is our position that they're not that useful.  I mean,

7    if I tell you there were 20,000 hits on the word, you know -- I

8    don't know -- "court," that could be relevant if they were all

9    responsible -- responsive, but it could mean nothing, right, if

10   none of them were responsive.  So the hit count alone is not

11   really what they're after.

12       THE COURT:  Well, it's not -- it's not outcome

13   determinative, but it's part of the discussion.  Okay?  And

14   they're trying to front load into the ESI Protocol that you

15   must discuss that.  And you're pushing back on the "must," but

16   you're not necessarily saying that in particular circumstances

17   you wouldn't.

18       MS. COTTRELL:  That's exactly right, Your Honor.

19       THE COURT:  You know, and I -- and I get that.  And,

20   you know, after doing this for several hours, I don't know

21   whether I'm -- whether I am willing to just have the sword fall

22   one way or the other.

23       I don't -- maybe it's not an appropriate topic for

24   the ESI Protocol as a "must," but darn it, I think it is an

25   appropriate discussion point when you're trying to agree on

1    search terms.  It can be part of the discussion.  It doesn't

2    need to be an outcome determinative part of the discussion.  It

3    doesn't have to be the most valuable piece of information.  But

4    it's a legitimate question for somebody to ask, and it's not

5    privileged information for the other side not to say.

6            And if I were sitting there with you in that

7    discussion, I would say answer the question.  Should it be in

8    the protocol because of that?  I don't know.

9            MS. COTTRELL:  And I think our position is just, this

10   is an issue when there are terms we reject, not terms that we

11   accept.  It's for the rejected terms, and it is one potential

12   metric that could be at use, but there are other metrics as

13   well and information and data that we could share to also give

14   the plaintiffs comfort that the term is not -- not a useful

15   one.

16           MR. CLARK:  I don't think it's only fair to say

17   reject.  Also accept.  Again, if there is -- apparently the

18   word's spelled differently and we hit once on a term that's

19   key, that's pretty relevant information.

20           It's both accept and reject to have a useful

21   conversation, Your Honor.

22           THE COURT:  Yeah, but it's up to you not to spell the

23   words wrong, too.

24           MR. CLARK:  I wasn't saying we would spell them

25   wrong.

1        THE COURT:   Okay.   In the database?

2        MR. CLARK:   In the database.   Yeah, in the data set

3   being searched.

4        MS. PEPPER:   Your Honor, can I just make one

5   practical point?

6        THE COURT:   Yeah.

7        MS. PEPPER:   I'm sure plaintiffs will correct me if

8   I'm mistaken.

9        So in the ESI Protocol, what I believe we're talking

10   is Section V(C)(1), Search Term Disclosures.

11        THE COURT:   What page?

12        MS. PEPPER:   On page 3 of Exhibit C.

13        And if you'll look at what we were talking about --

14   so "Plaintiffs proposed inserting the following in the

15   bracketed section.   'The parties will make the disclosures of

16   search term information in accordance with the accompanying

17   case scheduling order.'"

18        And defendants just said, we object to the inclusion

19   of this in the ESI Protocol.

20        So if we wanted to adopt the Court's, I think, second

21   proposal, which is this doesn't really belong in the ESI

22   Protocol, we understand your guidance.   We understand that

23   there will most likely be guidance of an expert.   Why don't we

24   just cut V(C)(1), because it shouldn't be tethered to a --

25   frankly, a case scheduling order that is no longer live anyway

1    because we've already entered the interim scheduling order.

2    We'll take it out.  We understand the Court's guidance, and

3    we'll see if the parties can continue to have the productive

4    conversations that I think we've had to date on the issues

5    we've had to conquer together.

6            MR. CLARK:  I guess the only caveat there is that

7    begs the question, are we going to kind of move forward with

8    search term discussions right now?  And if so, we have to talk

9    about kind of deadlines for loading and processing data --

10           MS. PEPPER:  Well, I don't -- I actually don't

11   think those are the same --

12           THE COURT REPORTER:  I'm sorry, counsel.  One at a

13   time, please.

14           Mr. Clark, I didn't get all of what you said.

15           MR. CLARK:  Understood.

16           I was just saying, Your Honor, that taking that out

17   of the schedule or the -- obviously, the dates would change,

18   but we need to kind of decide moving forward what we're going

19   to be doing with respect to search methodology in the next

20   month or two and whether data needs to be loaded to facilitate

21   that discussion.

22           MR. HART:  Furthermore, Your Honor, they haven't

23   articulated a reason not to give it to us, as you've pointed

24   out several times.  But if for some reason it becomes a

25   roadblock down the road, can't they bring that issue to the

1  Court and say, "Judge, we told you this was going to happen,
2  and this is what happened"?

3          It seems to me that including it as a requirement is
4  a far more productive thing than excluding it.

5          THE COURT:  Okay.  Let me take two minutes before we
6  go into the home stretch here.  Okay?  I'll tell you where I
7  come out on that after I get off the bench and walk around and
8  come back.  All right?  And we'll go into the home stretch
9  here.

10          I want to address what you're going to be doing in
11  the next month.  I want to address this loading and processing
12  of ESI.  However, I'll tell you right now, I don't know that I
13  have enough information on that.  There's just -- there's not a
14  whole lot in what you guys have given me, and that may be
15  another hearing.

16          I know the plaintiffs want to move forward with this,
17  but the defendants' position on that is nothing should happen
18  before the motions to dismiss are decided.  And I don't
19  under -- there's no burden information there.  Plaintiffs are
20  saying, let's just do it.  There's obviously common sense if we
21  burden there.

22          But just give me -- give me five.  Okay?
23      (Recess.)
24          THE COURT:  Okay.  Hit terms, I would take it out of
25  the protocol.  I would build into whatever schedule we're going

1    to continue to work on, periodic meetings, including when you

2    guys are negotiating about search terms and hit terms.  And if

3    this becomes a real problem, I'll give you a better -- I'll

4    give you a more definitive ruling.

5           You've heard what my thoughts are on it.  I don't

6    know that I have to micromanage it in the ESI Protocol, even

7    though we're micromanaging a lot in the ESI Protocol.  But if

8    it is -- if I'm convinced that not knowing how -- for at least

9    certain search terms what the hits are is hampering a

10   productive discussion, I'm going to require that it be

11   disclosed, because I don't think it's privileged or anything

12   else.

13          And I intend to at least have phone calls with you or

14   something else to find out how it's going.  So I don't -- I

15   don't -- I don't think the fate of the free world is going to

16   depend on this, but if -- I will tell you that if it's

17   hampering discussions, I'm going to say disclose it.

18          Florida Attorney General -- this is a request that

19   somebody is leaving to get a plane.  I think -- I think I got

20   to rule in writing on this, because I think either one side or

21   the other might want to appeal it.  If you appeal it, I should

22   be in writing.

23          I don't want to talk off the cuff, particularly after

24   being on the bench for four or five hours, on this particular

25   issue.  If I change my mind, I will do it, but I'll do it at

1    another hearing.

2          I want to know whether Wayne Farms, for example,
3    wants the opportunity to brief it or anybody wants the
4    opportunity to brief it more than what you've done in the joint
5    submission that you gave me yesterday, because I would set
6    dates for you to do that.

7          And then I have some just -- I have some just general
8    questions about the status hearings.

9          MR. FONTECILLA:  Adrian Fontecilla for Wayne Farms.

10          Our position is is that we want to negotiate the
11    RFPs.  There are about 80 of them.  All in total, they probably
12    will get all the documents that were -- or most all that
13    were -- that were -- if they have been at all, for us we
14    haven't produced any documents in response to CID.

15          So they -- this is a conversation that is best had in
16    the context of Rule 34 meet-and-confers, because while the
17    initial objection that they, you know, cited a very short
18    sentence from, it actually provides a lot of explanation about
19    the problem with the wording in a -- what is a whole-page RFP
20    when you look at it.

21          And so we have a lot of explanations and objections
22    that we would like to talk to them about and sort out.  We
23    think the issue is premature even for briefing at this stage.
24    And, yes, we would like briefing if we're ultimately not able
25    to resolve this RFP issue.  But it is what it is, an RFP issue

1    that should be talked about in the context of all the RFPs,

2    because there are a lot of them and they do overlap, and there

3    are objections that apply to all of those.

4        The plaintiffs have not even attempted to talk to us

5    yet about this particular RFP or any of them, actually.

6        THE COURT:  Well, the reason I mention Wayne Farms is

7    my understanding is that they alone among defendants are --

8    have objected, actually, to producing these documents.

9        The other documents have -- the other defendants, as

10   I understood it in that brief two-paragraph thing at the end,

11   was that the other defendants said they'll produce them but

12   when they produce their other responsive documents.

13       True, false?

14       MR. FONTECILLA:  A slight mischaracterization,

15   because we have agreed and offered to produce large and

16   voluminous categories of documents in response to all of

17   their -- lots of RFPs.

18       And so I think what we wanted to do is we wanted to

19   talk to them about the interplay and the intersection between

20   that one particular subsection that asks for a mirror image

21   production of anything we produce to any government agency

22   about anything automatically gets produced to them.

23       And there's a lot of ambiguity and vagueness in the

24   terms that they used, and we also wanted to talk to them about

25   the principle of that request.  And so what we said is:  We'll

1   agree to meet and confer with you, but as of now, the way it's
2   phrased, based on this broad request, we can't agree to just
3   say, yes, we'll produce responsive documents to this or we'll
4   agree to your request.  But what we did do is offer very
5   specific objections and offers of production of different
6   categories of documents, all of which are not -- excluded from
7   their very short section mischaracterizing our position.
8           THE COURT:  Ms. Pepper, you rose.  And then I'll hear
9   from plaintiffs' counsel.
10          MS. PEPPER:  I'm rising in defense of another
11  defendant.
12          So to answer your question, are there other
13  defendants besides Wayne Farms who will brief this?  Yes,
14  that's correct.  I'm know at least Fieldale strongly thinks
15  that antibiotic-free chicken is not properly relevant to this
16  case.  I don't know and won't speak for them to the extent that
17  that's been an issue in their CID discussions, but to the --
18  plaintiffs make a representation in the agreed short filing
19  that we reflexively now think that anything produced in
20  response to a CID is relevant and responsive to this case.
21  That's not correct.
22          THE COURT:  Okay.  Sir.
23          MR. POUYA:  Yes, Your Honor.  Bobby Pouya for the
24  direct purchaser plaintiffs.
25          This is a concrete, discrete issue.  There isn't or

1    should not be a fight as to whether the documents in response

2    to the Florida AG antitrust civil investigative division

3    subpoenas are responsive to the Rule 34 request, and there

4    shouldn't be a drawn-out process by which we talk about all the

5    other Rule 34 issues that holds up the production of these

6    documents which are narrower than our requests and can be

7    determined based upon their face to be responsive.

8            They talk about antitrust violations by the

9    defendants.  They talk about specifically the Georgia Dock

10   issues, which are central to our case.  There shouldn't be any

11   dispute as to whether these -- this set of documents is

12   responsive.  There also shouldn't be a dispute on burden, which

13   is holding up the rest of the -- the discussions.

14           They're responsible for producing it to the Florida

15   AG.  All we're asking is produce it to us as well.  It's a

16   simple, discrete issue.  We want it resolved now rather than

17   sometime in the future.  It's not complicated.  It probably

18   doesn't require briefing.

19           THE COURT:  Okay.  Let's talk about burden first.

20   Thanks.

21           I don't know who is going to address this from the

22   defendants.  Did all 14 defendants produce documents to the

23   Florida AG or only certain ones?

24           MS. PEPPER:  Some defendants have not produced any

25   documents to the Florida AG.

1    THE COURT:  Is it public who has or who hasn't?

2    MS. PEPPER:  No.

3    THE COURT:  For those defendants who have produced

4  documents to the Florida AG, was it done electronically or in

5  hard copy?

6    MS. PEPPER:  I can't speak for all defendants.

7    MR. CASH:  Your Honor, James Cash for Fieldale Farms.

8  I don't have a microphone.

9    THE COURT:  James Cash.  There is a microphone, so

10 that --

11   MR. CASH:  Sure.  Can you hear me now?  Thanks.

12   So I'm here for Fieldale Farms.  We have received a

13 CID, and that's been indicated in the papers that are before

14 you.  I did want to address one point that Ms. Pepper touched

15 on.

16   We have a motion to dismiss based on antibiotic-free

17 chicken.  We are one of the smaller producers in this

18 litigation, and we primarily deal in antibiotic-free chicken.

19 And based on the motion to dismiss, we don't feel like we're a

20 proper party in this case.

21   But with respect to counsel -- I'm sorry, I missed

22 your name.

23   MR. POUYA:  Pouya.

24   MR. CASH:  -- his comments about what has been

25 produced to the Florida AG, we are going to be -- we will

produce documents based on antibiotic-free chicken to the
Florida AG just based on the specifications in their CID, but
until the motion to dismiss is decided, that -- that issue
about whether or not documents pertaining to antibiotic-free
chicken should be in this case, that really hasn't been
addressed by this Court.  So until that gets decided by the
motion to dismiss, a request just to turn over everything that
we are turning over to the -- in response to the CID, it seems
premature.

I agree to the other points about the Rule 34
process, that this seems to -- we seem to be jumping ahead for
no real reason, but I wanted to get that on the record that
there is a -- at least in our case, the motion to dismiss that
is going to indicate what types of documents that we think
should be ultimately produced to plaintiffs in this class.

THE COURT:  Okay.  I asked a second ago which
defendants had produced, and I see the plaintiffs did say
they're filing -- that they got Freedom of Information Act
requests for something else, and they know that Fieldale --
Fieldale Farms, Koch or Koch Foods, Wayne Farms, Sanderson
Farms, Tyson Foods, and Pilgrim's Pride all at least received
requests for information from the Florida AG.

How many of those have produced or not, I don't know,
but I -- I see that it's not all 14.  It's a smaller group, and
I -- and I note your concern with antibiotic-free chicken.

1          MR. CASH:  Okay.  Thank you.

2          THE COURT:  Is there any defendant -- I mean, one of

3    the -- I mean, I got to determine big picture -- and, again,

4    I'm reluctant to do this in a flyby right now.  I really am.

5    But I -- you guys give me a lot of good information, and I

6    value the back-and-forth in the end.  As you've seen before, I

7    know I have to decide some stuff, and I will, but I'd like to

8    get information.

9          I do not buy the argument completely that because a

10   motion to dismiss is pending, no documents shall be produced.

11   I haven't through the whole case.  It will be a lot easier to

12   say that.  I just haven't said that yet.

13         I balance.  If balancing becomes too hard, then I'll

14   go one way or the other.  But at this point, I think

15   calibrating it is better.

16         So the question is, are there documents relevant?

17   Are they responsive?  What's the burden in producing them?  Am

18   I going down a slippery slope, because the next one is the

19   government investigation and the next government investigation

20   and the next government investigation?

21         So when I asked whether any of the defendants

22   produced these documents electronically or in hard copy, you

23   know, if it's in hard copy or electronically, what's the

24   volume?  That goes to burden.  Do you have to burn a disk, or

25   do you have to produce 75 boxes of documents?  Or do you make

1    75 boxes of documents available for inspection, and plaintiffs

2    bear the cost of copying them?  That goes to -- that goes to

3    burden.

4         In terms of the relevance of the documents, I get the

5    antibiotic-free chicken issue.  There may be other like issues,

6    but to me, based upon reading quickly the request for

7    production of documents and the Florida request of what they

8    are looking for, there's a pretty darn close Venn diagram

9    overlap between what Florida is looking for and what the

10   plaintiffs will be looking for in this case if discovery was

11   allowed to go forward.

12        Another question I ask myself on this is whether

13   production of that group or some subgroup of those documents

14   would actually help plaintiffs frame discovery requests, narrow

15   discovery requests, come up with legitimate search terms, and

16   move the whole scope of discovery forward, assuming discovery

17   is going to go forward; and what the prejudice is to the

18   defendants if they succeed on the motion to dismiss having

19   produced this, you know, micro-category, even though it may not

20   be so micro, but this micro-category of documents?

21        I freely recognize that the defendants would say

22   terribly prejudicial because the plaintiffs' complaints have

23   not been ruled to be viable; we don't know that we have a case

24   going forward.  And to the extent these documents help them

25   make their case better, that shouldn't be the -- that shouldn't

be the proper scope or the proper reason for discovery.

On the other hand, there's no rule in the federal rules -- you can, you know, scour the whole thing to see whether or not discovery is always stayed while motions to dismiss are pending.  You know, it depends.  I guess it's always discretionary with the Court.

So I don't know which way that goes, but those are some of the things that I would think about when I'm looking at these requests.

I also don't want to make a habit -- I mean, for important issues, particularly ones that are going to be -- Mr. Pouya, move to one side or the other, please.  Pick one.

MR. POUYA:  Sorry.

THE COURT:  In ruling on these joint letter briefs, these really are -- the best purpose of these briefs are to give me a sense of what's going on, not to be the definitive brief on a particular subject, or else it would be 70 pages rather than 52 pages.  So I'm sensitive to that, too.  And because it just came in the other day, I'm not prepared to rule on this at all.

I almost think if we were going to brief it, I'd get a response from the defendants and then a reply from the plaintiffs, because I think the plaintiffs did a better job of at least throwing the issue out there than defendants did in arguing burden and the other things that I'm talking about.

1    But those are some of the things that I'm thinking

2 about at least.

3    Mr. Suggs and Ms. Pepper are standing.  Do you want

4 to say something else, or should I set a schedule?

5    MR. SUGGS:  I do think it's worth briefing, Your

6 Honor.  One thing I'm still not clear on is what's the

7 prejudice to plaintiffs to wait until after the rule -- the

8 motion has been ruled on and when we know with more certainty

9 what issues are remaining in the case.

10    And we could produce these on a more expedited

11 schedule once discovery begins, but I don't understand why they

12 need them now.  They say they might need them to draft an

13 amended complaint.  As Your Honor alluded to, we don't see that

14 as a valid reason for producing them now.

15    THE COURT:  Mr. Pouya, do you want to take a stab at

16 that before you go to get your plane?

17    MR. POUYA:  Two answers.  Discovery has begun.

18    THE COURT:  Pull --

19    MR. POUYA:  Discovery has begun.  Production hasn't

20 begun.  And the Court has declined to issue a stay.  The

21 Court's correct that will inform the issues.  It will help move

22 things forward.

23    And I still haven't heard a burden argument.  I don't

24 think there's a very good one, because they're producing these

25 documents already to the Florida AG.  We're just asking the

1    defendants to produce them to us.

2           So balancing, which is what the Court indicated it

3    wants to do, we believe the balance is in plaintiffs' favor on

4    this issue.

5           THE COURT:  I mean, part of what I hear plaintiffs

6    saying is, in effect, that these are -- this is a little bit

7    seed documents.  In other words, I don't know if it was in the

8    letter brief that you guys filed or it was what I interpreted

9    from the letter brief was it's a -- it's a look at this stuff

10   in what they would characterize as a nonburdensome way early,

11   before total production has begun, that could be helpful in

12   calibrating the discussions that are going to be coming up

13   about search terms and which custodians.

14          For example, there's a big dispute, I know -- or I

15   don't know if it's big or little but -- Mr. Pouya, you got to

16   pick a spot, because you're too close, and I can't see

17   Ms. Pepper.  Sorry.  The -- she's going to come up here, which

18   will save the problem.  That's good.

19          You know, there's a dispute going on about whether

20   complex level custodians should be identified or not.

21   Defendants say they shouldn't.  Plaintiffs want it to be -- it

22   might be that these documents could shed light on a rationale

23   one way or the other as to whether complex level people should

24   or shouldn't be identified as custodians.

25          If their documents are in the productions, that

1    augers toward one way.  If they're not, it augers towards
2    another way.  So, you know, I could see an argument that if the
3    burden is not great, then I got to look at the prejudice going
4    both ways.  Okay?

5            And I say that not legally.  I say that almost kind
6    of commonsensically, because I haven't thought to myself
7    definitively whose burden this motion is and whose prejudice is
8    relevant or not.  Is it the prejudice to the defendants for
9    producing it, or is it the prejudice to the plaintiffs for not
10   getting it?  Do plaintiffs have to meet a burden to get this?
11   Or because discovery isn't stayed, is it the defendants that
12   have the burden of showing it shouldn't be produced?

13           MS. PEPPER:  So, Your Honor, you're thinking about
14   all of the rights things and so --

15           THE COURT:  Well, thanks.

16       (Laughter.)

17           MS. PEPPER:  Let's brief it.  But I just want to make
18   one point here, and this is -- and this is really the
19   fundamental problem.

20           Since these complaints were filed, we've represented
21   to both Judge Durkin and to you our position.  We filed
22   substantive -- what the Court has recognized as substantive
23   motions to dismiss that impact the claims, defenses, and time
24   periods in this case and the defendants.

25           And to date -- Mr. Pouya is correct -- we have not

1    begun document production, but that's -- but there's a good

2    reason for that.  And I take issue with the argument that he

3    hasn't heard a burden argument.  We've made burden arguments

4    all along.  We have explained to the Court that every time that

5    we are engaging in discovery that a defendant who gets

6    dismissed from this case should not have had to incur, that's a

7    real burden with real costs for that defendant.

8            So every time we take it piecemeal -- well, couldn't

9    you just do this, couldn't you just do that, couldn't you just

10   negotiate custodians, couldn't you just serve and negotiate

11   objections to RFPs, couldn't you just revisit each of these

12   issues -- in aggregate, that is hours of time and costs

13   incurred for defendants in this case.

14           THE COURT:  Yes.

15           MS. PEPPER:  So to hear now the argument that, well,

16   they could just produce it, I mean, that's not -- there's a

17   number of things that a defendant could just do before a motion

18   to dismiss issues.

19           I understand that there's no basis to say that

20   discovery should be stayed in its full -- or the Court has

21   determined there's no basis to say that discovery should be

22   stayed in full until a ruling on a motion to dismiss issues.

23           But that's not what has happened here.  And in the

24   months since we've started to meet in February, when we talked

25   about making sure by the time we have a motion to dismiss we're

1  not starting from a standing stop, we've negotiated -- because

2  many of us spent hours negotiating custodians with plaintiffs,

3  quite generously, by the way.

4        We have spent hours negotiating over 80 -- or

5  objecting and responding to over 80 RFPs from them.  We've

6  taken time to serve our own and are beginning the process to

7  negotiate those with them.  There's a lot to do.

8        So to suggest that they're just entitled to documents

9  until at some point the validity of their claims are sustained,

10 I just want to make sure the Court -- I don't think it's right

11 to say there's no burden argument here.  In the aggregate,

12 there's been tremendous burden on defendants.  And at some

13 point, defendants are entitled to have a ruling on whether

14 those claims are valid before more advances.

15       THE COURT:  Yeah, and I'm sure you're going to get

16 the ruling.

17       And I fully appreciate the burden.  Burden is not

18 only cost of doing X, Y, or Z task, but the lawyer time

19 involved in doing what we've been doing and in defending your

20 clients.  And I can multiply that by 14, and I know already

21 it's millions and millions of dollars.  It doesn't escape me.

22       There's a benefit -- there's a burden analysis, and

23 there's a benefit argument, and then there's the balancing of

24 these things.

25       And one thing I don't know yet and I'm hoping will be

1    addressed, in addition to the points you just made, in the

2    brief, is what would it cost for a defendant or defendants to

3    produce the document or reproduce the documents that have

4    already been produced in document populations to the Florida

5    Attorney General?  Because that's another aspect of the burden

6    analysis, and I would like to know that.

7            I don't disagree with anything you've said about how

8    the Court should be thinking about burdens.  The fact remains

9    that there is right now a federal case, a multidistrict case

10   here.  I do appreciate the fact that everybody is doing things.

11   And I would say, I'm glad we've done all the things that have

12   been done now, because they don't have to be done later.  Okay?

13           And it would have taken the months that we've taken

14   here to do it later.  And when I think about the costs that the

15   defendants have incurred to do this, the benefit that I think

16   even after today's hearing we've gotten, I go -- I am okay with

17   that balance on the benefit scale, even though it cost the

18   defendants and plaintiffs money to do it, because the amount

19   that -- if the case continues, the amount that will be spent in

20   the future is -- dwarfs this kind of stuff.

21           And if the defendants are successful on their motions

22   to dismiss, in whole or in part, they will be, and that's just

23   part of the cost of the litigation.  And what I'm trying to do

24   is calibrate it in a way so that it's not terribly unfair

25   either way.  So I get it.

1          I do want to know, though -- I do want to hear from

2    the defendants on this, because I can see benefits, too, that

3    the defendant -- plaintiffs have laid out in their filing of a

4    seed group of documents like this.  And there's actually --

5    weirdly, there's precedent in this district for plaintiffs who

6    have had their case dismissed and judges allowing them to get

7    discovery to actually see if they can amend the complaint.  I'm

8    not saying that's good or bad.  That just exists.  Okay?  And

9    it's got to be very fact intensive in terms of a particular

10   case.

11         And I'm not saying that's the rule, and I'm not

12   saying that's the rule going the other way.  But I don't know

13   when those motions are going to be decided.

14         And I would be interested from the plaintiffs' point

15   of view on, as Ms. Pepper said, how you're prejudiced if you

16   can't get these documents now, what the burden is, and what

17   benefit they would serve, and whether this is a slippery slope

18   going down a whole bunch of stuff.  Because if it is, I ain't

19   going there.  You know, it's not a -- it's not a backdoor to

20   anything, but it's just a discrete issue.

21         And that's why I think I ought to write something on

22   it, because I think it's important for me to -- often when

23   you're writing something, you think about everything, and you

24   see how it looks in print.  And if one side -- this smells to

25   me like an issue that if one side or the other is not happy

1    with it, they could decide to take it up to Judge Durkin.

2          We don't get appealed a lot, but, you know, I can --

3    I'm not -- I'm not -- and I'm not encouraging anybody to do it,

4    but I'm saying it's better to do that in writing than a long

5    transcript.

6          So when can you respond?  Do you want to talk to your

7    colleagues?

8                MS. PEPPER:   Yeah.

9                THE COURT:   Okay.

10       (Brief pause.)

11               THE COURT:   Mr. Pouya, why don't -- once you give me

12   a reply date, you could go to your plane.  I would excuse you.

13               Where are you going to?

14               MR. POUYA:   Los Angeles, but I think I'm going to

15   miss it already.

16               THE COURT:   Oh, I'm sorry.

17               MR. POUYA:   That's okay.

18               THE COURT:   Oh, no.  What does that mean?  Is there

19   another one tonight?

20               MR. POUYA:   Yeah, there is.

21               THE COURT:   I'm sorry.

22               MR. POUYA:   No, it's okay.

23               THE COURT:   No, I'm really sorry.

24               MR. POUYA:   That's okay.

25               THE COURT:   I've been in those shoes, and I feel

terrible that I've made you walk in them.

MR. POUYA:  It comes -- it comes with the process, but I appreciate -- I appreciate the thoughts.  Thank you.

MS. PEPPER:  If Your Honor is receptive to it, given that we'll also be working on the ESI expert, could we have July 7th as the date for our response?

THE COURT:  And if they reply July 7th -- I mean, I'm -- just FYI, next week is my last day in the office for about ten days.

MS. PEPPER:  Oh.

THE COURT:  So, you know, July 7th is when I'm coming back, so that's fine.

MR. POUYA:  We can do it a week -- we can do our reply a week after that.

THE COURT:  Okay.  7/14.  Okay.  If you want to go, you want to stay, I really feel lousy about that.  I used to hate that.

MR. POUYA:  No, Your Honor.  Thank you.  I'll give it a shot, and then we'll see if I get on or get on the next one.

THE COURT:  Are you going to Midway or O'Hare?

MR. POUYA:  O'Hare.

THE COURT:  You can take the Blue Line.

MR. POUYA:  That's what we're planning on doing.

THE COURT:  Okay.  I'm really sorry.  I mean, most of my practice was out of town, so I was in courts all over the

country all the time.  I get it.  I'm really sorry.

MR. POUYA:  No, Your Honor, we appreciate the time.

THE COURT:  Let me just tell you this.  I don't want
to do this to anybody again, and I don't know who else I've
done this to in here, but I would be very receptive to people
telling me:  "I have a plane on a Friday afternoon, and, you
know, I want to get home to my family."  And I would
accommodate that.  So don't -- I mean, I'm serious about that.
Don't take that lightly.  You work very hard.  You know, you
shouldn't have some judge on a Friday afternoon go 15 minutes
too long and make you lose a plane.  So please let me know if
that happens.

If you've got to get on a plane, you can go.

MR. FONTECILLA:  Your Honor, I -- it's my mother's
birthday, and she has a dinner tonight, and I do have time.

The one issue, if we could accelerate it, if you're
even going to address it, is the downstream data issue, which
I'm prepared to address.  But I understand Your Honor --

THE COURT:  When do you have to walk out of the
courthouse?

MR. FONTECILLA:  4:10.

THE COURT:  What's the downstream data issue?

MR. FONTECILLA:  It's a very comp -- it's briefed
extensively in the papers -- in the papers that were submitted
Wednesday night.

1     THE COURT:  Is it called the downstream?

2        (Discussion off the record.)

3     THE COURT:  I'm not going to deal with that.  That's

4  in your new brief.

5     MR. FONTECILLA:  That's correct.

6     THE COURT:  We call it the direct purchaser custodian

7  issue.

8     MR. FONTECILLA:  That's correct, Your Honor.

9     THE COURT:  Okay.  I'm not going to deal with it

10  today.

11     MR. FONTECILLA:  Got it.

12     THE COURT:  I'm going to have to set another time.

13  The 50 pages that everybody took up on all of these issues,

14  that's briefed well in here.  So is everybody willing to stand

15  on their briefs on those issues here in the -- in the joint

16  report and letter brief for June 16th status on that issue and

17  on the other issues in the first 51 -- before the AG and the

18  rule?

19     MR. FONTECILLA:  Subject to oral argument, if Your

20  Honor needs it?

21     THE COURT:  Yes.

22     MR. FONTECILLA:  Then yes.

23     THE COURT:  Subject to oral argument.

24     MR. DOYLE:  Your Honor, Thomas Doyle for the

25  commercial indirect purchasers.

1       We'd like a chance to -- we're mentioned in a

2  footnote in there and had not anticipated that we would be.

3  We'd like a chance within seven days to file a very short

4  paper --

5       THE COURT:  Fine.

6       MR. DOYLE:  -- on it.  Thank you.

7       MR. FONTECILLA:  And may we get a reply, Your Honor,

8  very brief, if needed?

9       THE COURT:  Okay.  The indirect purchaser plaintiffs,

10  6/23 and 6/30 for a reply.

11       And if somebody else -- I mean, I'm going to be out

12  of town on the 30th, so I'm not going to rule on this on the

13  30th.  So if somebody else feels the need to throw something

14  over the transom once you see this stuff, I'm okay with that,

15  too, by, I would say, July 7th or whatever -- or even the

16  following week, consistent with that other schedule.

17       MR. CLARK:  And, Your Honor, that -- if, for

18  instance, the direct purchasers saw an issue we needed to kind

19  of speak to on the downstream matter, it would be okay to --

20       THE COURT REPORTER:  I'm sorry.  You're going to --

21       THE COURT:  I didn't even hear you.

22       MR. CLARK:  This is Brian Clark for direct

23  purchasers.

24       If there were an issue we wanted to address on July

25  7th or 14th, we could file our brief without seeking leave for

1 | doing so?

2 | THE COURT: Yeah. Let me just look here. Because

3 | you're going to want to reply to what the defendants say,

4 | right?

5 | MR. CLARK: Yes.

6 | THE COURT: Yeah, but that's over the 4th of July

7 | holiday. So I would say the 11th.

8 | MR. CLARK: That's fine, Your Honor.

9 | MR. FONTECILLA: Your Honor, just to be clear, the

10 | reply that I asked for was only to address the issue in the

11 | commercial additional -- the commercial indirect plaintiffs.

12 | THE COURT: I know. So --

13 | MR. FONTECILLA: I just don't see a need for the

14 | directs to file anything additional. I think it's fully

15 | briefed, very extensively, in fact. We just don't know what

16 | the commercial plaintiffs plan on --

17 | THE COURT: Do this. I'll put this in my order.

18 | Write this down.

19 | If the direct purchasers feel a need to file anything

20 | after they see the reply filed on June 30th with respect to the

21 | indirect -- the reply to the indirect purchasers' brief, you

22 | should confer with defendants' counsel and propose a briefing

23 | schedule that works for both sides. And then let Brenda know,

24 | so at least I know what's getting filed.

25 | You may decide you don't need to file anything. And

1    if you do need to file something, talk to them about it.  Okay?

2            MR. CLARK:  Thank you, Your Honor.  Brian Clark for

3    directs.

4            THE COURT:  I wasn't anticipating that long, but

5    that's fine.

6            And so you should feel free, without raising your

7    hand, if you need to get on the plane or anybody else does,

8    you're free to leave.  Okay?

9            MR. FONTECILLA:  Thank you, Your Honor.

10            THE COURT:  I'm not prepared to address the other new

11    custodians issues.

12            There was one issue, the "Other Source" -- the "Other

13    Sources" protocol, I mean, I could -- that was the only

14    other -- I'm prepared to address that.  Hold on.

15        (Brief interruption.)

16            THE COURT:  My big picture look at that was that

17    if -- this primarily related to cell phone logs, and I thought

18    that plaintiffs were saying there's information in other

19    sources that is not in what the defendants planned to produce

20    from the carriers.

21            If that's true, you got to produce it.  If it's not

22    true, then I'd be open to a suggestion that you don't.  But I'm

23    not -- unless there's a tremendous burden, I'm usually not

24    receptive to they can get it someplace else, because sometimes

25    there's a value from getting it from the defendant or something

1  like that.

2          So the way I understood the argument was defendants

3  were saying, "You can get most of this stuff from this other

4  place."

5          And plaintiffs were saying, "Yeah, but there may be

6  things that we can't get from the other place that we can only

7  get from this place."

8          And if that's true, then they're right.

9          MR. FONTECILLA:  Your Honor, Adrian Fontecilla

10  for Wayne Farms.

11          THE COURT:  Yes, but it's 3:56.  So just be aware of

12  that.

13          MR. FONTECILLA:  But it's worth it for my client.

14          THE COURT:  But I'm speaking for your mother.

15      (Laughter.)

16          MR. FONTECILLA:  And I'll let her know you did that,

17  sir.

18          Your Honor, some of these -- some of the data from

19  third parties comes at a cost.  Could we ask that there be cost

20  sharing for any costs incurred in obtaining the information

21  from the third parties that the plaintiffs seek?

22          THE COURT:  Well, first ask them.

23          MR. CLARK:  I'm not even sure of the nature of that

24  request, and we haven't talked about it.

25          MR. FONTECILLA:  Sure.  To the -- to the extent

1    you're ordering us to obtain information from the third parties

2    and the third parties incur -- you know, that incurs a cost,

3    are you willing to --

4         THE COURT:  Well, the plaintiffs can subpoena it,

5    too, right?

6         MR. CLARK:  And, actually, we are planning to

7    subpoena phone records, if that's what we're discussing.  So

8    I'm not sure the nature of the question.

9         THE COURT:  I mean, if you subpoena it, you know, the

10   defendant has to -- the third party has to produce it unless

11   it's too much, and then we got Rule 45, and there could be cost

12   sharing.

13        All I -- I was not addressing that.  I'm addressing

14   what I thought was the central point, which is that defendants

15   have some information in their possession, custody, and

16   control.  They are saying, we don't need to produce this

17   information because the phone companies are producing it.

18        Plaintiffs are saying, there is some information that

19   is in the defendants' custody, control that I can't get that

20   they are not getting or that we can't get from the third-party

21   carriers.

22        If that -- and Brian -- Mr. Clark is shaking his

23   head.  If that is the case, that's a winning argument.  And

24   then if you want to raise with respect to producing the

25   defendants' information that it's burdensome and outsized and

1    disproportional and there should be cost sharing, first talk to
2    them about it.

3          What I would suggest is first drill down to what
4    information the plaintiffs think is in defendants' possession
5    that they can't get from the phone carriers, see if you
6    disagree about that or agree about it.  But if you have it and
7    it's not coming from a third party, I think you have to produce
8    it.

9          You want to raise the cost sharing on that between
10   you and the plaintiffs, you could do that.  If the plaintiffs
11   are subpoenaing a third party and the other party raises a cost
12   issue, that's fine.  If you do it, that's fine.  If I have to
13   ultimately decide it, I will.

14         But I just don't think it was enough of an objection
15   to say, we're getting most of it from a third party, so we
16   shouldn't have to produce stuff that could be duplicative in
17   response to their point, which was it's not all duplicative,
18   and there's some stuff that we need from them that we're not
19   getting from the third party.

20         I actually think that made sense, at least to me.

21         MS. PEPPER:  I think if what Your Honor is saying is
22   you're inclined to adopt their protocol and we'll raise issues
23   as they unfold, that's fine, we will raise issues as they
24   unfold.

25         THE COURT:  If that's the way it plays out -- is that

1   the way it plays out in the protocol?  Yes.

2           MS. PEPPER:  Okay.

3           THE COURT:  Okay.  I don't understand enough -- I

4   mean, big picture on load and process ESI, the plaintiffs want

5   defendants to do that for certain document populations on a

6   certain schedule before the motions to dismiss are decided and

7   begin the iterative process of discussing search terms and

8   running search terms to determine what the search terms are

9   going to be, so that when and if -- or if full-blown discovery

10  is unleashed, that process has already occurred, right?

11          MR. CLARK:  Right.  And to be clear, Your Honor, with

12  respect to the six recipients of the Florida AG CIDs, I mean,

13  I -- we have not had this statement disputed, that clearly they

14  have already load and process data, those six defendants,

15  because how else would they respond to the CIDs?

16          They can correct me if I'm wrong, but I think that's

17  a pretty safe assumption.

18          THE COURT:  It depends on how large the document

19  population was and whether they did it electronically.

20          MR. FONTECILLA:  And it assumes that anyone has

21  responded to the CID.  The only representations made in

22  plaintiffs' papers are that CIDs were actually received.

23          THE COURT:  Okay.  And I'm hoping that somebody on

24  the defense side will address this.

25          And the defendants say, we're willing to talk about

1   stuff, not come to any definitive agreements, and not load or
2   process anything until we know which defendants are in the case
3   and what claims are in the case?

4           MS. PEPPER:  Well, and also let's take -- can we take
5   a step back?

6           RFPs have been served.  Objections and responses have
7   been served.  The meet-and-confers over what is properly
8   responsive have not begun.

9           THE COURT:  Right.

10          MS. PEPPER:  And so it's not just that we do not want
11  to incur the cost to collect, load, and process ESI until the
12  motions to dismiss have issued.  We don't want to do that until
13  we have also discussed what is -- what should be collected and
14  what should be loaded and processed.

15          THE COURT:  Yeah.  And we're on the same page on that
16  a little bit.  Because one alternative to the load and process
17  and then talk is continue down the road -- that's why I said I
18  don't want piecemeal Rule 34 discussions -- continue down the
19  road with that parallel to the motion to dismiss discussions,
20  decide objections there, and then there may be -- it may -- I
21  may be able to order or you may be able to agree to the
22  production of certain document populations, which necessarily
23  include the other stuff.

24          You know, and, I mean, you could do it that way, too.
25  You don't have to do it in the ESI context.  You can do it in

1  the moving forward with discovery context.

2       MS. PEPPER:  I think that's right, Your Honor.  I

3  mean, so as I understand what we've accomplished over the

4  course of several hours today, we have what we need to more or

5  less put together the ESI Protocol.

6       And then what I heard plaintiffs say and I understand

7  the Court's concern to be is, so what are we going to do in the

8  next 60 to 90 days?  I think we have plenty to do in the next

9  60 to 90 days in terms of actually now meeting and conferring

10  over both plaintiffs' RFPs to all defendants and defendants'

11  RFPs to plaintiffs.

12       We have ESI experts that we should start getting

13  ready for the Court or proposing to the Court.  We actually --

14  you know, it would be great if we all agreed on the objections

15  and responses to the RFPs through the meet-and-confer process.

16  I suspect those issues are going to have to be briefed.

17       The Court has now issued briefing or ordered briefing

18  both on the downstream discovery issue for CII PPs and the

19  Florida Attorney General.

20       I mean, I think we have quite a lot of work to do in

21  the next 60 to 90 days.  So why don't we do that?  And then we

22  can come back to the Court and see where we are.

23       THE COURT:  Maybe.  I mean, I do -- I agree we have a

24  lot to do.

25       What I have to decide in my own mind and I don't want

1    to do it -- when you say several hours, that's a total -- if
2    you're -- you're totally underestimating how long we've been
3    together --
4         (Laughter.)
5         THE COURT:  -- based on my clock, even with my
6    being -- starting late.  I want to get people out of here to
7    get planes, because there could be shy people.
8         I need to take a step back for a second, because the
9    reason I laid out those two alternatives is I got to -- I have
10   to take a breath and see whether the best way to get about this
11   is loading and processing certain document populations or
12   moving forward with that Rule 34 process and discovery and
13   continue negotiation, to the extent they can, about search
14   terms, whether it is or not aided by a production of a certain
15   subset of documents, including the Florida stuff.
16        MS. PEPPER:  May I say one thing --
17        THE COURT:  I think there's another step here.  And,
18   you know, I'm not -- I'm not as worried about micromanaging
19   what happens in the next 60 days for you guys, because I
20   imagine you've got other things you've got to do, too, and this
21   isn't the only case.
22        So I'm just -- I need to take a breath and not do
23   this.  And I want to set a date for us to come back.  And I
24   know everybody in the room and on the phone, to the extent we
25   have anybody still left on the phone, likes me to set the date

1   in open court.  I'm not prepared to do it right this second

2   because I want to look at where the briefing schedules are,

3   what issues are being briefed.

4         And I do think we have made some progress here, not

5   insignificant progress.  And I'd like you to finish the ESI

6   Protocol and submit it so that I can sign it so at least we

7   have that.  If it has to be amended, so it's the first amended

8   ESI Protocol and the second amended ESI Protocol, I'm okay with

9   that.  But I'd like the first one.

10        I just think we're moving -- we're making some

11  progress.  You know, it's -- it may not be as much as

12  plaintiffs would like, but it's a lot more than a lot of cases

13  where you get a stay, and you don't do anything for years.  So

14  I get that.

15        And it's probably more than the defendants want to

16  do, but I actually think it's going to pay dividends at the end

17  if we have -- if we still have a case.  If we don't, you're

18  going to have a victory dinner, you know.  And so -- and I

19  don't think the victory dinner will be less just because your

20  clients had to pay for the ESI Protocol.

21        I'm just not sure what I want to order you to do

22  during this period of time at 4:00 in the afternoon after being

23  here for six hours.

24              MR. CLARK:  Can I make a 30-second proposal --

25              THE COURT:  Yes.

1    MR. CLARK:  -- just a couple of things?

2    THE COURT:  Yes, please.

3    MR. CLARK:  One, on the ESI Protocol, I think it

4    would be reasonable to get it in by a week from Monday, June

5    26th.  I think you've given us a lot of guidance.  That would

6    give us all of next week to talk about that.

7    THE COURT:  I would say the middle of that week, just

8    to give you more time.

9    MR. CLARK:  June 28th?

10    THE COURT:  Yeah.

11    MR. CLARK:  And then secondly, on Rule 34, it seems

12    like regardless of where things shake out on the search

13    discussions and loading, everybody's agreed we're to talk about

14    Rule 34 and not do it piecemeal.

15    THE COURT:  Yes.

16    MR. CLARK:  If we could commit to getting letters out

17    to defendants for all of the plaintiffs' RFPs and then the

18    defendants' objections within 14 days, and then if we allowed

19    our -- we gave our deadline 45 days out from now, that would

20    give us 30 days to meet and confer about those letters and have

21    these, frankly, pretty cooperative and frank discussions among

22    -- one on one with the defendants.

23    And we know we made a lot of progress on custodians

24    that way.  I think that framework with a deadline would let us

25    get things done in the next 45 days.

1    THE COURT:   The 45 days would be for somebody to file
2    something?
3    MR. CLARK:   Yeah.   If we did not reach agreement or
4    at least agree to defer particular issues on Rule 34, we would
5    file -- I suppose it would be a motion to compel or whatever
6    the Court said was appropriate format.
7    THE COURT:   I would want to have you in -- before I
8    get a huge motion to compel, I'd like you to come in to talk.
9    And I can set that 30 to 40 days after those letters go out
10   after you've had a chance to talk.   I want to know if the big
11   objections are:   "We've moved to dismiss this category of
12   claims; we're not going to produce these documents," that's a
13   different objection than "We shouldn't produce meetings or --
14   about X broiler chickens."
15   And I view those a little bit differently.   I don't
16   know that I want to be briefing a motion to compel on a time
17   period that Judge Durkin is going to have to decide.   So I'd
18   rather have these segmented a little bit.
19   MR. CLARK:   I think that makes sense.   The only thing
20   I would suggest is if we just -- it was very productive for the
21   custodian discussions to have a deadline by which we met and
22   conferred.   I mean, granted, we -- we're all procrastinators,
23   so we did it in the last week possible.   It was fine.   We got
24   it in.   If we could just put, you know, within, you know, 21
25   days, or whatever, of the letters, meet and confer --

1    THE COURT:  I'd say 30 days of the letters --

2    MR. CLARK:  Sure.

3    THE COURT:  -- you should have met and conferred.

4 Then I'll probably set a status.  And that helps me with -- I

5 also have four trials coming up, and so that's -- that affects

6 when I can have you come in.

7    Okay.  I'm glad I set some dates.  I just -- is there

8 a group -- what did you say last time?  If I want to have a

9 telephone conference with people about scheduling stuff, who do

10 I call on each side or who should Brenda call or contact?  Does

11 she know this already?  Has she -- who has she been -- has she

12 been contacting anybody?  Is there a liaison for one of you?

13    MR. HART:  Yes.  I think under the Court's order,

14 there -- the Court has appointed liaison counsel to wrangle our

15 constituents for any --

16    THE COURT:  Okay.  So we should use those from that

17 last management order.

18    MR. HART:  Yes, Your Honor.

19    THE COURT:  Okay.  Is there anything else of pressing

20 concern you want me -- Mr. Fontecilla, it is 4:09.

21    MR. FONTECILLA:  I was going to let you finish, Your

22 Honor.

23    THE COURT:  Is there anything else of a pressing

24 concern we need to deal with now, or should we call this a day,

25 say we did some good stuff, and move on?

1          MR. CLARK:  Call it a day.

2          THE COURT:  Okay.  Hearing no objections, have great

3     weekends.

4       (Chorus of "Thank you, Your Honor.")

5          THE COURT:  And I hope those of you who are catching

6     flights, make them.  It looks like the weather turned, and it

7     doesn't look bad.

8          Happy birthday to your mother.

9       (Laughter.)

10         THE COURT:  And I'll see you next when I see you.

11    Thank you.

12      (Proceedings concluded.)

1          C E R T I F I C A T E

2

3

4              I, Nancy L. Bistany, do hereby certify that the

5     foregoing is a complete, true, and accurate transcript of the

6     proceedings had in the above-entitled case before the HONORABLE

7     JEFFREY T. GILBERT, one of the Judges of said Court, at

8     Chicago, Illinois, on June 16, 2017.

9

10

11    /s/ Nancy L. Bistany, CSR, RPR, FCRR        June 23, 2017

12        Official Court Reporter                 Date
          United States District Court
13        Northern District of Illinois
          Eastern Division

14

15

16

17

18

19

20

21

22

23

24

25