Law Offices

# Pearson, Simon & Warshaw, LLP

15165 VENTURA BOULEVARD, SUITE 400

SHERMAN OAKS, CALIFORNIA 91403

(818) 788-8300

FAX (818) 788-8104

WWW.PSWLAW.COM

SAN FRANCISCO OFFICE
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104
(415) 433-9000
FAX (415) 433-9008

WRITER'S DIRECT CONTACT
(818) 205-2818
BPOUYA@PSWLAW.COM

October 16, 2017

**VIA ECF**

Hon. Magistrate Judge Jeffrey T. Gilbert
Everett McKinley Dirksen
United States Courthouse
219 South Dearborn Street
Chambers 1336
Chicago, IL 60604

Re:     *In re Broiler Chicken Antitrust Litigation, No. 1:16-cv-08637 (N.D. Ill).*

Dear Judge Gilbert:

In accordance with the Court's October 2, 2017 Order (Dkt. 492), Direct Purchaser Plaintiffs, Commercial and Institutional Indirect Purchaser Plaintiffs, and End User Consumer Plaintiffs (collectively, "Plaintiffs") present this letter regarding certain disputes relating to Defendants' Responses to All Plaintiffs' First Set of Requests for Production of Documents ("RFPDs" or "Requests").[1]  This letter follows extensive meet and confer efforts with Defendants between June 6, 2017 and the present including global discussions regarding certain overarching issues affecting Defendants' responses, and individual discussions regarding issues specific to each Defendant's responses.

Plaintiffs' goal throughout this process was to obtain only discovery that we believe is essential to the litigation.  Accordingly, Plaintiffs have significantly narrowed our Requests to minimize any burden of production on Defendants.  Plaintiffs have further agreed to continue conferring with Defendants regarding a number of disputes as the parties develop appropriate search terms and commence the process of searching for and producing documents.  These compromises, as well as the parties' other agreements regarding document custodians, non-

---

[1]  Plaintiffs' Requests are attached hereto as Exhibit A.  Due to their voluminous nature Defendants' objections and responses to the Requests are not attached.  However, Plaintiffs are willing and able to file them upon request.

custodial sources, and search protocols, have served to strike the balance between Plaintiffs' right to conduct discovery and any burden on Defendants of responding to Plaintiffs' discovery.

This letter brief presents certain areas in which the parties have not reached agreement and therefore are appropriate for Court resolution (without waiving our right to raise other issues with the Court as it becomes necessary).[2] Plaintiffs' primary focus and intent at this stage in the discovery process is focused on two overarching goals. First, obtaining an agreement from Defendants that they will search for discoverable documents sought by Plaintiffs. Second, ensuring that once a search is conducted, Defendants will produce (i.e., not withhold) discoverable documents. Accordingly, most of the disputes set forth in this letter brief arise from what Plaintiffs contend are improper limitations regarding the scope of Defendants' search for documents (e.g., searches relating to subsidiaries, improper time limitations, Georgia Department of Agriculture documents) or Defendants' unwillingness to produce responsive documents (e.g., documents outside of search terms, unredacted phone records).

Plaintiffs believe that their positions are reasonable, consistent with the law, and proportional to the needs of the case. Plaintiffs respectfully request that the Court overrule certain objections and order Defendants to search for and produce documents for the reasons set forth in this letter.

## I.      Issues Arising From Global Meet and Confer Efforts

The parties' global meet and confer discussions included multiple telephone conferences and the exchange of multiple meet and confer letters between June 6, 2017, and October 11, 2017. Although the parties resolved a number of issues, disputes remain including the issues listed below. Although these issues were met and conferred upon globally, Plaintiffs have been able to resolve them with certain individual Defendants, as noted below.

### A.      Defendants' Assertion of Improper General Objections

In responding to Plaintiffs' Requests, almost all of the Defendants have asserted "general objections" that were incorporated by reference into each response to individual requests.[3] The

---

[2]  Pursuant to the Court's October 2, 2017 Order this brief is limited to the presentation of issues that are ripe for resolution at this point in the case. Plaintiffs understand that some of the parties' disputes are appropriate to be resolved later in the discovery process or through further meet and confer efforts. Thus, Plaintiffs reserve the right to present additional disputes that are pending further meet and confer efforts.

[3]  Defendants Pilgrim's Pride and Mountaire did not assert general objections in their responses.

assertion of such boilerplate general objections violates Rule 34(b)(2)(B) which requires that, "[f]or each item or category, the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." In interpreting this standard, courts have held that the requirement to substantiate objections "cannot be met by a reflexive invocation of the same baseless, often abused litany that the requested discovery is vague, ambiguous, overly broad, unduly burdensome or that it is 'neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.'" *Burkybile v. Mitshubishi Motors Corp.*, 2006 WL 2325506, at *6 (N.D. Ill. Aug. 2, 2006) (citing *Swift v. First USA Bank*, 1999 WL 1212561 (N.D. Ill. Dec. 15, 1999). ); *see also United Auto. Ins. v. Veluchamy*, 2010 WL 749980, at *5 (N.D. Ill. March 4, 2010) (citing cases). "Because of their lack of specificity, general objections do not accomplish anything useful. They serve merely to add unnecessarily to the cost of litigation." *Flava Works, Inc. v. Gunter*, 2013 WL 5770558, * 1 (N.D. Ill. Oct. 24, 2013) (ordering defendant to produce any documents withheld solely on the basis of general objections). Moreover, "general objections on the ground of attorney-client privilege, which appear in both of [a party's] discovery responses, are ineffective…. As courts have repeatedly pointed out, blanket objections are patently improper." *See Ritacca v. Abbott Labs.*, 203 F.R.D. 332, 336 n.4 (N.D. Ill. 2001).

The assertion of such improper and unjustified general objections supports a finding of waiver. Nevertheless, Plaintiffs sought to reach a practical compromise with Defendants by seeking agreement that their blanket general objections would not serve as a basis to withhold the production of documents in response to individual requests. After months of meet and confer efforts, Defendants rejected this proposal on a global basis. Unable to reach resolution of this issue globally, Plaintiffs negotiated with individual Defendants which resulted in an agreement with all Defendants except for Perdue, regarding the withholding of documents on the basis of general objections. The refusal of Defendants to withdraw or otherwise limit the application of their general objection is improper and without justification. The Court should overrule the general objections asserted by Defendants.

### B.     Defendants' Refusal to Disclose the Identities of Their Subsidiaries and Affiliates

It is well settled that a party responding to discovery has an obligation to produce documents that are in its possession, custody, or control. Whether documents are in a party's control under Rule 34 is broadly construed. *See Costa v. Kerzner Intern. Resorts, Inc.*, 277 F.R.D. 468, 470-71 (S.D. Fla. 2011).

> 'Control,' therefore, does not require that a party have legal ownership or actual physical possession of the documents at issue; indeed, documents have been considered to be under a party's control (for discovery purposes) when that party

has the 'right, authority, or practical ability to obtain the materials sought on demand.'[4]

Thus, the scope of discovery in this case is not limited to the named Defendants, but also includes their subsidiaries and related entities which are involved in the production, processing, sale, and distribution of Broilers.

Consistent with these principles, Plaintiffs' RFPDs define "You," "Your," and "Defendant" to include the responding party's "predecessors, wholly-owned or controlled subsidiaries or affiliates, successors, parents, other subsidiaries, departments, divisions, joint ventures, other affiliates and any organization or entity that the responding Defendant manages or controls…"

Defendants objected to these terms and attempted to limit the scope of discovery to the named Defendants in the litigation. After months of meeting and conferring, Defendants finally agreed to redefine the terms "You," "Your" and "Defendant" to include: "A named Defendant in *In re Broiler Chicken Antitrust Litigation* and, as agreed by the Parties or ordered by the Court, related entities directly involved in the production, processing, distribution, sale, pricing, or marketing of Broilers."

However, Defendants have refused Plaintiffs' request that they identify such related entities, or otherwise propose a workable mechanism for reaching an agreement of the parties regarding the appropriate entities at issue. While Defendants may attempt to paint this dispute as academic, the lack of transparency regarding Defendants subsidiaries and related entities has already necessitated the Court's order compelling the deposition of Defendant Foster Farms, LLC regarding its organizational structure and the identity of related entities. (*See* Dkt. 449.) More recently, Plaintiffs' independently learned of more than twenty (20) potentially related entities to Defendant Koch Foods Incorporated ("Koch"). In response to Plaintiffs' inquiry regarding these entities, Koch refused to disclose whether any of these entities were proper parties. Koch has further refused to toll the statute of limitations with respect to any of these recently discovered entities.

Given Defendants' superior knowledge of their complex corporate structure, it is appropriate for them to identify any entities that fall within the scope of their own proposed definition. In addition to allowing Plaintiffs to understand the relevant entities at issue, such a disclosure is necessary to allow the parties to negotiate search terms for documents relating to competitors.

---

[4] *Id.*

Plaintiffs' proposal is reasonable and imposes an extremely minimal burden on Defendants.  For example, on October 12, 2017 Defendant Pilgrims produced amended responses, which listed its related entities that fall within the definition of the term "You."  There is no reason why other Defendants cannot do the same. Defendants' attempt to place the burden on Plaintiffs to untangle their corporate organizations piecemeal, places Plaintiffs at a significant disadvantage.

### C. Defendants' Unwillingness to Produce Responsive Documents They Become Aware of Through Searching and Culling Documents

In this case, Plaintiffs have agreed upon numerous limitations regarding custodians, non-custodial sources, search terms, and search protocols to minimize any burden on Defendants. While Plaintiffs understand the utility of negotiating such limits on searching and culling documents, they have sought to ensure that such agreements will not be exploited as a sword to withhold highly relevant, responsive discoverable evidence.  This problem is not hypothetical, but borne out by Plaintiffs' counsels' collective experience in numerous antitrust cases since the advent of electronic searching.

As courts in this District have recognized, "Defendants cannot avoid their obligation to produce relevant and responsive documents that they know to exist, simply because [Plaintiffs] did not guess the right electronic search terms or custodians of records." *Championsworld LLC v. U.S. Soccer Federation, Inc.*, 2011 WL 3734167 (N.D. Ill. Jul. 14, 2011) (citing *IWOI, LLC v. Monaco Coach Corp.*, 2011 WL 2038714, at *4 (N.D. Ill. May 24, 2011) ("The burden is not on the plaintiff to figure out what relevant information might be stored on defendants' computers.").

Accordingly, Plaintiffs have asked Defendants to agree and commit that they will not withhold relevant and responsive documents that they know exist, simply because they do not hit on search terms and protocols.  In order to address Defendants' concerns that such a discovery commitment may too broad and capture routine sales and marketing information, Plaintiffs specifically defined this obligation to include:

> Documents relating to the existence of a conspiracy or agreement with competitors to "coordinat[e] their output and limit[] production" of Broilers and "manipulate[] and artificially inflate[]" the Georgia Dock price," or fix, raise, stabilize, or artificially inflate the price of Broilers in the United States.

Documents that fall within this category of information go directly to the heart of the conspiracy Plaintiffs allege.  It is essential for Defendants to produce such documents that they are aware of, even if they do not hit on a negotiated search terms and search protocols.  To be clear, Plaintiffs' request does not impose any additional obligation upon Defendants to perform

searches beyond those agreed upon by the parties or ordered by the Court. Nor, does this request place an additional obligation on Defendants to produce discoverable documents—such as market reports and routine business records—which do not independently support the existence of a conspiracy.

After months of meeting and conferring, Defendants stated on August 22 that they would produce "direct evidence of the alleged conspiracy among Defendants to 'coordinat[e] their output and limit[] production' of Broilers and 'manipulate[] and artificially inflate[]" the Georgia Dock price.'" But Defendants' agreement to only produce *direct* evidence is insufficient because it is well established that non-direct circumstantial evidence is often relied upon to prove the existence of a conspiracy. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("Direct evidence of conspiracy is not a sine qua non, however. Circumstantial evidence can establish an antitrust conspiracy.") (citing *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661-62 (7th Cir. 2002)). Moreover, while Plaintiffs' complaints assert extensive allegations regarding manipulation of the Georgia Dock price index and Broiler supply restrictions, the scope of the price fixing conspiracy alleged is not so limited. The Court should order Defendants to comply with their discovery obligations and produce documents relating the existence of the conspiracy as requested by Plaintiffs.[5]

### D. Improper Limitations on Time as to Particular Requests for Production

Plaintiffs' Requests are generally subject to a default time period from January 1, 2007 through September 2, 2016. The vast majority of Plaintiffs' Requests are limited to this default time period. However, Plaintiffs have sought limited exceptions to this general rule with respect to certain requests. Despite extensive meet and confer efforts, Defendants have not agreed to Plaintiffs' proposals.

---

[5] Despite the parties' inability to reach a global agreement regarding this issue, Defendants Peco and Foster Farms have agreed that "if [Defendant] becomes aware of responsive documents that are not picked up by agreed-upon or court-ordered search methodologies, it will produce those documents as a part of its duty to supplement under Fed. R. Civ. P. 26(e)(1)(A). However, this agreement does not impose any additional obligation upon [Defendant] to perform searches beyond those agreed upon by the parties or ordered by the Court." Plaintiffs would have no objection to an order requiring other Defendants to comply with this agreement.

### 1.     Request 21: Documents Relating to the Georgia Dock Price Index

RFPD 21 seeks documents relating to the "Georgia Department of Agriculture and Broilers, Broiler supplies, or Broiler pricing, including the Georgia Dock Advisory Committee, information collection, verification, auditing, and reporting methodologies or procedures, inaccuracies, errors, or vulnerabilities to manipulation of the Georgia Dock price index…and documents relating to the proposed Georgia Premium Poultry Price Index [GPPPI]." As this Court has already recognized in ordering the production of the Florida Attorney General productions, the Georgia Dock price index and investigations relating thereto figure prominently in Plaintiffs' complaints and are the proper subject of discovery. (*See* Dkt. 489.)

While Defendants have not yet produced documents responsive to RFPD 21, Plaintiffs have obtained certain documents relating to the Georgia Department of Agriculture investigation regarding the Georgia Dock price index. These records demonstrate that the Georgia Department of Agriculture's investigation into the Georgia Dock and efforts to replace it with the GPPPI go at least through February 28, 2017. (*See, e.g.*, Exhibit B, GDA0000000347 (Georgia Dept. of Agriculture email indicating efforts to publish the GPPPI were ending "Due to a lack of available data" and lack of participation from producers.)) Accordingly Plaintiffs requested that the relevant period of production for RFPD 21 go through February 28, 2017. Plaintiffs have been clear that such discovery would be limited to custodial and non-custodial sources likely to possess information relating to RFPD 21.

Defendants rejected this proposal and instead seek to limit the production of responsive documents through December 31, 2016. Defendants' limitations are without justification. Their assertion that the GPPPI is not relevant to the litigation is unfounded. In truth, the dismantling of the Georgia Dock price index and related unsuccessful efforts to adopt the GPPPI (in order to alleviate regulatory and anti-competitive concerns) are central to this litigation. Plaintiffs should be permitted to seek discovery relating to the limited evidence sought by RFPD 21 through at least February 28, 2017.

### 2.     Requests 48-53: Structured/Transactional data and the Proper Scope of the Pre-Class Period

RFPDs 48 through 53 seek structured transactional data[6] relating to the production, capacity, processing, sale, and distribution of Broilers. In antitrust actions such as this one, transactional data is essential for Plaintiffs and their experts to examine the impact of the

---

[6] "Structured transactional data," refers to a company's databases containing purchase history information concerning its customers, such as the date of purchase, price paid, amount, and delivery location.

conspiracy, and the damages suffered by Plaintiffs and the class members as a result. One frequently utilized aspect of such economic analysis is to compare prices in the conspiracy period (i.e., class period) with prices in a period of comparable length outside the conspiracy period (typically a pre-class period where, it is presumed, the same anticompetitive factors were not present, at least to the same extent as in the conspiracy period). *See, e.g., Pressure Sensitive Labelstock*, MDL No. 1556, 2007 WL 4150666, at *20 (M.D. Pa. Nov. 19, 2007). This analysis typically cannot be performed by Plaintiffs and their experts without Defendants' own transactional data prior to the alleged conspiracy.

While the parties agree that some structured transactional data outside the conspiracy period is discoverable, we disagree on the length of that pre-conspiracy period. Plaintiffs allege a nine-year-long conspiracy, so are requesting structured data from January 1, 2002, six years prior to the class period, as a potential benchmark for the econometric analysis that will be conducted by Plaintiffs' experts. *See, e.g., Kleen Prods. v. Packaging Corp. of Am.*, No.1:10-cv-05711, 2013 WL 120240, at *9 (N.D. Ill. Jan. 9, 2013) (granting plaintiffs' request for five years of pre-class period transactional data; "[t]he larger window of economic data (as opposed to conduct documents) is warranted in order to provide an accurate economic picture."); *New Park Entm't LLC v. Elec. Factory Concerts, Inc.*, No. Civ. A. 98-775, 2000 WL 62315 at *2-3 (E.D. Pa. Jan. 13, 2000) (allowing discovery for seven years prior to start of alleged conspiracy because "discovery in antitrust litigation is most broadly permitted and the burden or cost of providing the information sought is less weighty a consideration than in other cases") (citation omitted).

Defendants have refused to produce structured data prior to January 1, 2004. Yet, at the same time they have refused to stipulate that their own proposed pre-class period of 2004 to 2008 will be deemed as adequate for expert analysis at class certification. They ought not to be allowed to have it both ways. Moreover, Defendants have not articulated any specific facts to establish that the production of pre-2004 data is unduly burdensome, or provided any case law to support their time period limitations. The Court should grant Plaintiffs' request for transactional data dating back to January 1, 2002, in response to RFPDs 48-53.

### 3. Requests 34-37: Documents Produced to Government Authorities and Concealment of Antitrust Violations

In antitrust actions, evidence of previous anticompetitive conduct in the same or related products or markets is relevant for purposes of proving a conspiracy. *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1148-49 (N.D. Cal. 2009); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (recognizing that allegations relating to existence of a conspiracy in the DRAM industry "support an inference of a conspiracy in the SRAM industry."); *New Park Entm't v. Elec. Factory Concerts, Inc.*, 2000 WL

62315, *7 (E.D. Pa. Jan. 13, 2000). Prior acts are also relevant for showing absence of mistake, making previous similar schemes relevant to explain aspects of collusive activities. *See U.S. v. Andreas*, 216 F.3d 645, 664-65 (7th Cir. 2000) ("This court finds that information regarding other claims or lawsuits involving antitrust issues, if any, are relevant to the antitrust action before this court.").

Consistent with this authority, RFPDs 34 through 37 seek the production of information relating to prior antitrust and anticompetitive investigations. In an effort to limit the burden regarding these requests, Plaintiffs have offered significant compromises by: (1) limiting the pre-conspiracy period to January 1, 2000 to the present on all of these RFPDs; (2) offering additional clarifications regarding the scope of RFPDs 34 and 35; and (3) limiting the documents sought by RFPD 37 to a copy of a single document: the consent decree and/or agreement with the U.S. Department of Justice in a prior antitrust case, *United States v. Nat'l Broiler Marketing Assoc., et al.* (N.D. Ga.).

Locating documents relating to the existence of government investigations of anticompetitive behavior should not be difficult. And Plaintiffs would of course work with Defendants regarding the mechanisms for conducting such a search. Nevertheless, Defendants have rejected Plaintiffs' proposals outright and refused to produce any documents relating or evidencing anticompetitive investigations into the Broiler industry prior to January 1, 2007. Defendants' wholesale refusal to search for such documents is inconsistent with their discovery obligations. The Court should order that Defendants search for and produce documents in response to RFPDs 34 through 37 dating back to January 1, 2000.

## E. Failure to Adequately State Which Documents Are Being Produced or Withheld as Required by Rule 34

Effective December 1, 2015, Rule 34(b)(2)(C) was amended to require that: "An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest." Advisory Committee Notes to Rule 34 regarding the 2015 Amendment elaborate that: "This amendment should end the confusion that frequently arises when a producing party states several objections and still produces information, leaving the requesting party uncertain whether any relevant and responsive information has been withheld on the basis of the objections."

Defendants violate this provision throughout their Responses. The most frequent such violation arises where Defendants assert numerous objections, and limit their responses to Plaintiffs' document requests using the phrase "related to a claim or defense" or "relevant to a claim or defense." For example Defendant Tyson qualified almost every one of its responses with the statement that it will produce documents to the extent they "are relevant to the parties' claims or defenses and proportional to the needs of the case."

The problem with such a qualification is that Plaintiffs do not know how Defendants define the claims and defenses in this case, and this qualification does not allow Plaintiffs to determine what, if anything, Defendants are withholding in response to a request. Moreover, the assertion of such a subjective limitation on production merely invites a dispute regarding the parties' interpretation of the general scope of the lawsuit, rather than a focus on Plaintiffs' specific discovery requests. Indeed, Plaintiffs would not have requested any of the categories of information sought in any request if they did not believe it was relevant to the claims and defenses.

The parties' discussions and efforts through the meet and confer process have demonstrated that these concern are not merely academic. For example, through the meet and confer process Plaintiffs learned that Defendant Perdue intended to rely on "relevant to the claims" language as a basis to withhold the production of documents evidencing a conspiracy to fix the price of Broilers that was not specifically alleged in Plaintiffs' Complaints. (*See* Section II.F, *infra* (describing dispute with Perdue).) Other Defendants have attempted to rely on "relevant to the claims or defenses" language as grounds to withhold communications with competitors in response to RFPD 1, and information relating to competitor contacts in response to RFPD 2, and their attendance at trade association meetings in response to RFPD 2 and 3. (*See e.g.*, Section II.B, *infra*).

Defendants' "relevant to the claims or defenses" responses are ambiguous and violate Rule 34(b)(2)(C), leaving Plaintiffs unable to determine what documents Defendants will produce or will withhold. Plaintiffs thus request an order from the Court that the limitation of production to documents "relevant to the claims defenses" or similar qualifying language be stricken, and Defendants be ordered to specifically state the documents (or categories of documents) they are producing in accordance with Rule 34.

## II.    Issues Arising From Individual Defendant Meet and Confer Efforts

In addition to meeting and conferring with Defendants collectively regarding certain overarching "global" issues, Plaintiffs undertook separate meet and confer efforts with each of the Defendants regarding issues applicable to their individual discovery responses. These efforts involved both telephonic and written communications. While these efforts resulted in compromises and resolution with some Defendants on a number of issues, Plaintiffs have reached an impasse with certain Defendants on a the issues described below.

### A.    Request 2(e): Refusal to Produce Unredacted Phone Numbers—Defendants Peco, Perdue and George's

RFPD 2(e) seeks the production of telephone records and logs from Defendants' identified custodians. The relevance of these records is significant and undisputed as phone logs

and other phone records provide evidence of communications between Defendants. *In re Domestic Drywall Antitrust Litig.*, -- F. Supp. 3d --, 2016 WL 684035, at *51-52 (E.D. Pa. Feb. 18, 2016) (citing phone record evidence and denying motions for summary judgment); *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 594-96 (N.D. Ill. 2015) (citing phone record evidence as support for granting class certification) (*appeal pending*). While all Defendants have agreed to produce some phone records, Defendants Peco, Perdue, and George's have indicated their intent to apply redactions to certain unidentified phone numbers. Plaintiffs' concern regarding such redactions is obvious; since the production of a redacted phone records leaves Plaintiffs unable to determine if the redacted portions of the records contain relevant calls. Redacting phone numbers is likely to result in significant delay to their production. Moreover, production of redacted phone records will require costly and time consuming meet and confer efforts regarding the basis for such redactions. These efforts will require that Defendants provide a factual basis for the redaction of every phone number redacted from the phone records, which is an incredible burden compared to producing the records and allowing Plaintiffs to process and analyze the records as they are already doing with certain phone records in this case. Further, such redactions make Plaintiffs' processing and analysis of the phone records themselves difficult and expensive given that they change the formatting and structure of the data. Thus, any redactions of phone records would be extremely prejudicial to Plaintiffs with little or no redeeming benefit.

There is ample authority establishing that phone numbers contained in phone records do not raise significant confidentiality or privacy concerns and should not be redacted. *See, e.g., Corsair Special Situations Fund, L.P. v. Engineered Framing Sys., Inc.*, No. 09-1201-PWG, 2011 WL 3651821, at *2 (D. Md. Aug. 17, 2011) (denying motion to quash subpoena to phone carrier and explaining that because "[a]n individual does not have a legitimate expectation of privacy in the telephone numbers that are dialed on his or her telephone," the defendant "has no standing to challenge the subpoena insofar as it pertains to her 'incoming and outgoing call records' or the numbers associated with her 'incoming and outgoing text messages.'") (citing cases); *Courtright v. Madigan*, No. 09-cv-208-JPG, 2009 WL 3713654, at *2 (S.D. Ill. Nov. 4, 2009) ("[a] person has no reasonable expectation of privacy in information exposed to third parties, like a telephone company or a bank."); *see also State v. Griffin*, 834 N.W.2d 688, 697 (Minn. 2013) (finding under the Fourth Amendment that the defendant could not show that "he had an expectation of privacy in the cell phone records.").

The Protective Order in this case provides all the requisite protection that Defendants need to allow for the production of phone records without redactions. (Dkt. No. 202.) Plaintiffs have already agreed that any phone records in this case may be designated as Confidential under the Protective Order, and thus will not be disclosed. The Court should order that these Defendants produce their phone records without redactions as other Defendants have already committed.

**B.**   **Request 3: Production of Documents Relating to Attendance at Trade Association and Industry Meetings—Defendant Tyson**

RFPD 3 seeks Documents relating to Trade Associations, Industry Meetings, Investor Conferences, such as memberships and attendance lists, correspondence, and presentations. As set forth in Plaintiffs' Complaints, attendance and participation at industry and trade meetings are relevant in antitrust conspiracies because they provide co-conspirators with opportunities to meet and collude. (*See, e.g.*, DPP Compl. (Dkt. 212) ¶¶ 297-318.); *Kleen Prods. I*, 775 F. Supp. 2d at 1080 ("[B]elonging to a trade association or attending industry events and exchanging price information … 'facilitates price fixing.'") (quoting *Text Messaging*, 630 F.3d at 628); *Standard Iron Works*, 639 F. Supp. 2d at 897 ("Given the proximity of Defendants' trade meeting statements to private trade association meetings involving the same high-level executives, there is reason to infer that opportunity for private communications reinforced the industry strategy to squeeze supply.").

Through the global meet and confer process Plaintiffs agreed to narrow RFPD 3 by revising the defined terms Trade Association, Industry Meetings, and Investor Conferences. With these refinements, most Defendants have agreed to search for and produce documents in response to RFPD 3 without limitation. Defendant Tyson, however, has sought to further limit its production of documents responsive to RFPD 3 based on the documents' "relevan[ce] to the claims and defenses." Besides the general impropriety of such a vague limitation (as set forth in Section I.E, *supra*), this attempt to place a subject matter limitation on meetings between Defendants is without merit. Even if an industry meeting is not directly related to the claims in this case, the attendance and participation at such a meeting provides Defendants with opportunities to meet and engage in inter-defendant communications which are discoverable. Industry meeting documents do not raise significant privacy or confidentiality concerns. Moreover, providing a complete production will be less burdensome and costly for Tyson, because it will not have to perform a time-intensive review for the "responsiveness" of such documents. The Court should order Tyson to join the other Defendants in providing complete productions regarding industry meetings.

**C.**   **Request 5: Communications Regarding Sales Trades and Exchanges With Competitors—Defendant Simmons**

In an antitrust conspiracy, communications within and amongst competitors are highly relevant and essential pieces of information that should be discoverable and produced with little controversy or resistance. In addition, Plaintiffs' complaints contain specific allegations regarding the utilization of trades and exchanges amongst competitors as a mechanism to restrict and control the supply of Broilers in the United States. *See, e.g.*, DPP Compl. ¶¶ 195, 231, 255; (the buy vs. grow program); and DPP Compl ¶¶ 251, 255, 260 (foreign exports). Consistent with this authority, RPPD 5 seeks the production of "Structured Data, Documents, and

Communications regarding the terms of all purchases, sales, trades, exchanges, or swaps of Broilers between You and any other Broiler Producer, including any contracts, joint ventures, and/or other agreements, whether formal or informal."

All Defendants except Simmons have agreed to produce communications relating to the terms of such competitor transactions, and with good reason, as such transactions typically are facilitated by email exchanges and internal communications concerning the terms, price, and volume a company is willing to provide its competitor. Therefore, Simmons' refusal is without justification because such communications between Broiler producers provide key insight into that basis and reasons for competitor transactions. The Court should order Simmons to produce communications and other documents related to competitor transactions in response to RFPD 5.

### D. Request 13: Documents Relating to Bids for the Sale of Broilers—Defendants House of Raeford and Mountaire

RFPD 13 seeks the production of documents relating to the "bids for the sale of Broilers (e.g., a request for bid or online auction), including documents concerning whether or not to bid and the availability of Broilers from other Broiler Producers to fulfill a bid." While most Defendants have agreed to produce documents in response to RFPD 13, Mountaire and House of Raeford have refused to do so. These, Defendants' claim that bidding information is not discoverable, is belied by the fact that Plaintiffs have alleged an antitrust conspiracy to fix the price of Broilers in the United States. Documents and communications regarding actual and contemplated bids to sell Broilers are relevant to the existence and economic impact of such a conspiracy. Moreover, the presence of bidding and auctions for the sale of Broilers (and the ability of multiple Defendants to fulfill such bids) supports Plaintiffs position that Broilers are commodity products that are susceptible to collusion. *See, e.g.*, *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 48 (1990) ("Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity … is illegal *per se*.").

### E. Requests 19-21: Documents Relating to the Georgia Dock Pricing Index and the Georgia Department of Agriculture—Defendants Peco, Mountaire, and House of Raeford

As this Court recently recognized in ordering the production of documents produced to the Florida Attorney General, Defendants' use and manipulation of the Georgia Dock price index and any related government investigations are the proper subject of discovery in this litigation. (*See* Dkt. 489; *see also* DPP Compl. ¶¶ 91-105, 290-96.) Plaintiffs' RFPDs 19 through 21 seek discoverable documents and communications involving the Broiler industry with the Georgia Department of Agriculture, including documents relating to the Georgia Dock price index.

While most Defendants have agreed to produce Georgia Department of Agriculture and Georgia Dock documents, Defendants Peco, Mountaire, and House of Raeford have refused to do so.

The claim by these Defendants that they are excused from producing such relevant documents because they did not directly participate in the Georgia Dock pricing survey is without merit. RFPDs 19 through 21 are not limited to documents related to the Georgia Dock price index, but rather seek relevant documents to the Broiler industry exchanged with the Georgia Department of Agriculture. Moreover, the mere fact that a Defendant did not directly participate in the Georgia Dock pricing survey does not mean that these Defendants did not benefit from manipulation of the Georgia Dock, or have any documents relating thereto. While no party can produce documents that do not exist, each party has an obligation to perform a reasonable search for discoverable evidence. This is exactly what Plaintiffs are requesting from Defendants Peco, Mountaire, and House of Raeford.

## F.     Request 29: Defendant Perdue's Refusal to Produce Documents Demonstrating the Existence of a Conspiracy

RFPD 29 goes to the heart of the allegations in this antitrust conspiracy by seeking:

All Documents that directly or indirectly relate, in whole or in part, alone or when viewed with other Documents any combination, conspiracy, agreement or understanding, explicit, implied or tacit, to fix prices, reduce output, limit production, limit capacity, limit supplies, limit inventories, or allocate customers, product lines or territories for Broilers sold in the U.S.

All Defendants except Perdue have recognized the discoverability of the information sought by this request and agreed to search for and produce such documents. Perdue has refused to do so by limiting its offer of production to this highly relevant request to documents "relevant to the claims and defenses." During the parties' meet and confer discussions, Perdue explained that the limitation on "relevant to the claims and defenses" meant that it would only produce documents evidencing a conspiracy to fix the price of Broilers if the conspiratorial acts were explicitly alleged in Plaintiffs' complaints. Perdue's position and unwillingness to provide a complete production in response to RFPD 29 is inconsistent with its discovery obligations and exemplifies the problem with allowing an interested party to subjectively limit its production using terms such as "relevant to the claims and defenses." (*See* Section I.E, *supra*). Plaintiffs' claims are that Defendants violated state and federal antitrust laws by fixing the prices of Broilers in the United States. Plaintiffs' ability to conduct discovery relating to this price-fixing conspiracy must be consistent with their claims, and not limited to only specific facts alleged in the Complaint filed prior to the start of discovery. Otherwise, there would be no point to conducting discovery in the first place.

In meeting and conferring regarding this request, Perdue has attempted to characterize Plaintiffs' efforts to obtain a fulsome production of documents in response to RFPD 29 as a "fishing expedition." As evidenced by the fact that all other Defendants have agreed to full production of responsive documents, the production of conspiracy evidence in an antitrust conspiracy is the opposite of a fishing expedition. To be clear, Plaintiffs are already restricting the search for and production of documents responsive to RFPD 29 via search protocols, custodians, and non-custodial sources. However, what they are not willing to do is allow Perdue to withhold evidence of the existence of a Broiler antitrust conspiracy. The Court should strike Perdue's "relevant to the claims and defenses" limitation and order Perdue to provide a complete production in response to RFPD 29.

G.      **Plaintiffs Have Not Been Able to Brief Issues Presented by Wayne Farms Responses, Due to a Lack of Timely Responses**

As set forth above Plaintiffs have engaged in extensive meet and confer efforts and resolved a number of disputes relating to their request with Defendants. However, the meet and confer process is a two way street. Thus, when Defendants do not timely respond and engage in meet and confer efforts it is difficult to resolve discovery disputes without undue delay and prejudice. Unfortunately, this has been Plaintiffs' experience with Defendant, Wayne Farms.

While Wayne Farms' lack of responsiveness has been an issue throughout the litigation it has impacted Plaintiffs ability to complete the meet and confer process and brief pending disputes relating to Plaintiffs' Requests. Specifically, Plaintiffs sent their most recent meet and confer letter regarding Wayne Farms' responses on September 12, 2017. Plaintiffs followed up regarding the status of this letter on September 26 and again October 10. Despite representing to Plaintiffs that Wayne Farms was working "diligently" on a response, Plaintiffs did not receive a response until after business hours on Friday, October 13. (*See* Exhibit C, Emails exchanged between Plaintiffs and Wayne Farms regarding Plaintiffs' Requests.) Wayne Farms delayed response indicated there are a number of remaining disputes between the parties. However, Plaintiffs were unable to resolve or include these disputes in this brief due Wayne Farms' untimely response.

Wayne Farms' failure to timely respond to meet and confer communications is prejudicing Plaintiffs' ability to efficiently adjudicate this case and represent the interests of class members. Plaintiffs reserve all rights with respect to Defendant Wayne Farms, including seeking appropriate relief from the Court should further prejudice result for its delays and lack of responsiveness in the meet and confer process.

Thank you for your attention to these matters. Please advise if the Court needs more information.

Very truly yours,

PEARSON, SIMON & WARSHAW, LLP     HAGENS BERMAN SOBOL SHAPIRO LLP

*/s/ Bobby Pouya*                 */s/ Elizabeth A. Fagen*

BOBBY POUYA                       ELIZABETH A. FAGEN
*Co-Lead Counsel for Direct Purchaser*   *Lead Counsel for End User and Consumer Plaintiffs*
*Plaintiffs*


GUSTAFSON GLUEK PLLC

*/s/ Daniel C. Hedlund*

DANIEL C. HEDLUND
*Lead Counsel for Commercial and*
*Institutional Indirect Purchaser Plaintiffs*

cc:     All Counsel and Parties via ECF

874830.2

# EXHIBIT A

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION*<br><br>This Document Relates To: All Actions | Case No. 1:16-cv-08637<br><br>**ALL PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO ALL DEFENDANTS** |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs hereby request that each Defendant produce the documents and things herein requested within 30 days of the date of service at the offices of Hart McLaughlin & Eldridge, 121 West Wacker Drive, Suite 1050, Chicago, IL 60601, or such other time and place as may be agreed upon by counsel. Pursuant to F.R.C.P. 34(b), unless otherwise specified, all documents must be organized and labeled to correspond to the categories in the associated document request. Corrections and supplemental answers and production of documents are required as provided for in the Federal Rules of Civil Procedure.

## <u>DEFINITIONS</u>

The following definitions shall apply to these document requests:

1.      "And" and "or" are to be read interchangeably so as to give the broadest possible meaning to a particular request in which either or both is used.

2.      "Broiler" or "Broilers" have the same meaning as the definition in ¶ 79 of Direct Purchaser Plaintiffs' Second Consolidated and Amended Complaint (ECF No. 212).

3.      "Broiler Breeder Facility" means the breeder farms where Broiler parent stock which produce fertilized eggs is raised and grandparent stock is received from a Primary Breeder Company.

4.      "Broiler Hatchery Facility" means the location where fertilized eggs are received from a Broiler Breeder Facility and incubated into day-old chicks that are delivered to grow-out farms to be raised into meat for slaughter.

5.      "Broiler Processing Facility" means the location where a Broiler is slaughtered.

6.     "Broiler Further Processing Facility" means the location where slaughtered broilers are cut, deboned, cooked, marinated, or included in a value-added product by a Broiler Producer.

7.     "Broiler Producer" means Defendants and any non-Defendant entity included in WattPoultryUSA's Annual Top Broiler Company survey published each spring (see, e.g., March 2016 Issue of WattPoultryUSA, available at http://www.wattpoultryusa-digital.com/201603#&pageSet=0&contentItem=0).

8.     "Broiler Supply Factors" refers to any data, calculation, or other information relating to those factors cited in ¶ 140 of Direct Purchaser Plaintiffs' Second Consolidated and Amended Complaint (ECF No. 212) and any similar data You maintain from which Your own or Broiler industry supply information can be assessed or determined.

9.     "Communication" or "Communicated" means, without limitation, any exchange of thoughts, messages, or information, as by speech, signals, writing, or behavior, including but not limited to, any advice, advisement, announcement, articulation, assertion, contact, conversation, written or electronic correspondence, declaration, discussion, dissemination, elucidation, expression, interchange, memoranda, notes, publication, reception, revelation, talk, transfer, transmission, or utterance.  The phrase "communication between" is defined to include instances where one party addresses the other party but the other party does not necessarily respond.

10.     "Competitive Conditions," in addition to its ordinary meaning and usage, includes actual or forecasted, projected or estimated conditions or trends relating to pricing, Broiler Supply Factors, number of spent Broiler breeder hens slaughtered, Broilers available for purchase by customers, production (including output, capacity, capacity utilization, operating

rates, facility closures, rationalization, supply or capacity discipline, production or downtime and/or production scheduling), inventories, demand, sales, profitability or margins, market share (including mergers, acquisitions, joint ventures, divestitures, sales or transfers of assets, spin-offs or any other form of change of ownership or control or consolidation), competitors, fixed or variable costs, imports or exports in the market for Broilers.

11. "Complaint" means Direct Purchaser Plaintiffs' Second Consolidated and Amended Complaint (ECF No. 212), Commercial and Institutional Indirect Purchaser Plaintiffs' Third Consolidated Amended Complaint (ECF No. 253), and End-User Consumer Plaintiffs' Consolidated Amended Class Action Complaint (ECF No. 255).

12. "Corporate Communications" means without limitation communications by the responding parties' corporate officers or employees responsible in whole or in part for its external communications or messaging (*i.e.*, to media, financial community, customer base, government, industry bodies and institutes and general public), including, but not limited to, public relations, investor or creditor relations, government relations, or similar functions or activities.

13. "Creditor Conference" means any meeting or event organized or hosted by a company that provides credit or loan financing for Broiler companies or partners, coordinates, or associates with Broiler companies to provide credit or loans to Broiler companies' contract farmers, such as Rabobank, CoBank, John Hancock, Bank of America, Bank of the West, Wells Fargo, and Farm Credit (including AgGeorgia Farm Credit, Ag Heritage Farm Credit Services, AgSouth Farm Credit, and Ag First Farm Credit Bank).

14. "Creditor Representative" means a Person who is an employee for an entity that provides financing for Broiler Producers companies or partners, coordinates, or associates with

Broiler Producers to provide loans to Broiler Producers' contract farmers who raise chicks into Broiler Chickens to slaughter on Your behalf, such as Persons who work for entities that hold Creditor Conferences.

15.     "Defendant" means any company, organization, entity or person presently or subsequently named as a Defendant in this litigation including its predecessors, wholly-owned or controlled subsidiaries or affiliates, successors, parents, other subsidiaries, departments, divisions, joint ventures, other affiliates and any organization or entity managed or controlled by a named Defendant, including those merged with or acquired, together with all present and former directors, officers, employees, agents, attorneys, representatives or any persons acting or purporting to act on behalf of a Defendant.

16.     "Document" shall have the same meaning as used in Rule 34 of the Minnesota Rules of Civil Procedure, and shall be construed in its broadest sense to include, without limitation, the final form and all drafts and revisions of any paper or other substance or thing, original or reproduced, and all copies thereof that are different in any way from the original, on which any words, letters, numbers, symbols, pictures, graphics, or any other form of information is written, typed, printed, inscribed, or otherwise visibly shown, and also every other form of stored or recorded information, whether on film, tape, disks, cards, computer memories, or any other medium and/or device whereby stored information can, by any means whatsoever, be printed or otherwise recovered, generated or displayed in the form of visible, audible, or otherwise perceptible words, letters, numbers, symbols, pictures, or graphics.  To illustrate (and not to limit) the breadth of this definition, "document" in this sense papers or objects bearing handwritten notes, material written in Braille, contracts, letters, bills, telegrams, notes, e-mail, voice mail, books, desk calendars, memoranda, envelopes, drafts or partial copies of anything,

signs, photographic negatives and prints, video and audio recordings of all kinds and the contents of storage media used in data-processing systems. Each and every draft of a document is a separate document for purposes of these document requests.

17. "Document Custodian" refers to Your employees and/or representatives who the parties agree, or the Court orders, must have Documents in Your, the employee's, and/or Representative's possession, custody, or control collected and produced in this matter.

18. "Electronically stored information" or "ESI" means and refers to computer generated information or data of any kind, stored in or on any storage media located on computers, file servers, disks, the cloud, tape, or other real or virtualized devices or media. Non limiting examples of ESI include:

- Digital communications (e.g., e-mail, phone calls and logs of phone calls, voice mail, text messaging, instant messaging, and ephemeral messaging (SnapChat, Confide, Signal, etc.));
- E-Mail Server Stores (e.g., Lotus Domino .NSF or Microsoft Exchange .EDB);
- Word processed documents (e.g., MS Word or WordPerfect files and drafts);
- Spreadsheets and tables (e.g., Excel or Lotus 123 worksheets);
- Accounting Application Data (e.g., QuickBooks, Money, Peachtree data);
- Image and Facsimile Files (e.g., .PDF, .TIFF, .JPG, .GIF images);
- Sound Recordings (e.g., .WAV and .MP3 files);
- Video and Animation (e.g., .AVI and .MOV files);
- Unstructured Data;
- Structured Databases (e.g., Access, Oracle, SQL Server data, SAP);
- Contact and Relationship Management Data (e.g., Outlook, ACT!);
- Calendar and Diary Application Data (e.g., Outlook PST, blog entries);
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint, Corel Presentations);
- Network Access and Server Activity Logs;
- Project Management Application Data;

- Backup and Archival Files (e.g., Veritas, Zip, .GHO, iTunes archives of iPhone content); and
- Cloud based or other virtualized ESI, including application, infrastructure and data.

19.   "Employee" means, without limitation, any Person that You employ or employed during the Relevant Time Period.

20.   "Including" is used to emphasize certain types of Documents requested and should not be construed as limiting the request in any way.  Including therefore means "including, but not limited to," or "including without limitation."

21.   "Industry Analyst" means a Person or entity who analyzes Competitive Conditions in the Broiler industry for the purpose or with the effect of advising on investment in or providing financing to Broiler Producers, such as Persons who work for entities who host Industry Conferences.

22.   "Industry Conference" means any meeting, webinar, telephone conference, or event involving one or more Broiler Producers organized or hosted by an entity that either invests its own money or advises others who have an ownership interest in any Broiler Producer, such as Stephens, Inc., D.A. Davidson & Co., Goldman Sachs, BMO Capital Markets, JP Morgan, Merrill Lynch, Bank of America, Deutsche Bank, or similar companies including but not limited to the Goldman Sachs Global Staples Forum, Bank of America Merrill Lynch Global Agriculture Conference, BMO Capital Markets Annual Ag & Protein Conference, BMO Capital Markets Conference, BMO Farm to Market Conference, and JP Morgan Basic Materials Conference.

23.   "Industry Meeting" means, without limitation, any meeting, directly or indirectly relating to the market for Broilers, Overseas Distribution Services, Inc., conferences hosted by Urner Barry, Agri Stats, any joint venture, entity, affiliation, or association created under the

Export Trading Company Act (15 U.S.C. §§ 4001-21), Trade Association (or other industry or similar organizations) or other entities or persons, whether formal, informal or *ad hoc*, involving two or more producers of Broilers and includes any formal or informal committee or other sub-unit.

24. "Management" shall be construed broadly and means without limitation, Employees or other Persons with executive, management, supervisory or policy-setting responsibilities, both individually and collectively, and, depending upon context, includes their administrative assistants, secretaries, or other support staff.

25. "Meeting" means, without limitation, any assembly, convocation, encounter, communication or contemporaneous presence (whether in person or via any electronic, computer-assisted, digital, analog, video, or telephonic method of communication) of two or more persons for any purpose, whether planned or arranged, scheduled or not.

26. "Named Plaintiffs" means those individuals or entities listed as plaintiffs in the Complaint, and any entities subsequently added as named plaintiffs in this matter.

27. "Person" means, without limitation, any individual, corporation, partnership or any variation thereof (e.g., limited partnership, limited liability partnership), limited liability company, proprietorship, joint venture, association, group or other form of legal entity or business existing under the laws of the United States, any state or any foreign country.

28. "Planning Staff" shall be construed broadly and means without limitation, Employees or other Persons with strategic planning, informational or analysis responsibilities both individually and collectively, and, depending upon context, includes their administrative assistants, secretaries or other support staff.

29.     "Policy" or "procedure" means any rule, practice or course of conduct, guidelines or business methods or traditions whether formal or informal, written or unwritten, recorded or unrecorded, which was recognized or followed, explicitly or implicitly, by You.

30.     "Primary Breeder Company" or "Primary Breeder Companies" means those entities that develop and reproduce strains of Broiler chicken for Broiler Producers, including Tyson's Cobb-Vantress (including its purchase of Perdue Farms' genetics division), Hubbard, and Aviagen.

31.     "Relating to," "referring to," "regarding," "with respect to" or "concerning" mean without limitation the following concepts: concerning, constituting, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part, directly or indirectly. Documents are considered relating to the subject matter whether they are viewed alone or in combination with other Documents.

32.     "Representative" shall mean any and all agents, employees, servants, independent contractors, consultants, officers, directors, associates, or other persons acting or purporting to act on Your behalf or on behalf of the person in question.

33.     "Sales Personnel" shall be construed broadly and means, without limitation, any Employees or other Persons that had responsibility, directly or indirectly, relating to sales to customers of Broilers sold in the U.S. (including any role or responsibility for selling, determining or establishing pricing, effectuating, or establishing terms and conditions of sales or purchases).

34.     "Structured Data" or "Structured Database" refers to any data that resides in a fixed field within a record or file, such as data stored in Oracle, SQL, or files that are in Columns/Rows or a fixed field with a predefined format.

35.     "Studies" or "analyses" include all reports, memoranda, statistical compilations, reviews, audits and other types of written, printed, or electronic submissions of information.

36.     "Trade Association" means any group, committee, subcommittee, or association, formal or informal, relating to the market for Broilers including, but not limited to, the National Chicken Council, United States Poultry & Egg Export Council ("USAPEEC"), U.S. Poultry & Egg Association ("U.S. Poultry"), Georgia Poultry Federation, North Carolina Poultry Federation, The Poultry Federation (including any predecessor organizations), Mississippi Poultry Association, Inc., Alabama Poultry & Egg Association, Louisiana Poultry Federation, International Poultry Expo ("IPE"), International Producers and Processors Expo ("IPPE"), International Poultry Council ("IPC"), American Meat Institute, US Meat Export Federation, and includes any formal or informal committee or other sub-unit.

37.     "United States" or "U.S." means each of the 50 states, the District of Columbia, and the commonwealths, territories, and possessions of the United States.

38.     "Unstructured Data" is data that does not conform to a specific, pre-defined data model, it may be human generated and in various formats that fit into structured database tables and columns. Common examples include, but not are limited to, word processing documents, Emails, blogs, social media extracts, tweets, picture captions, GPS data, and others of similar variable formats.

39.     "You," "Your" or "Your company" mean the responding Defendant, including its predecessors, wholly-owned or controlled subsidiaries or affiliates, successors, parents, other

subsidiaries, departments, divisions, joint ventures, other affiliates and any organization or entity that the responding Defendant manages or controls, including those merged with or acquired, together with all present and former directors, officers, employees, agents, attorneys, representatives or any persons acting or purporting to act on their behalf.

## SPECIFIC DOCUMENT REQUESTS

The "Relevant Time Period" for these requests is January 1, 2007 through and including September 2, 2016, unless otherwise noted.

**REQUEST NO. 1:** All Communications and Documents reflecting Communications between You and any other Defendant.

**REQUEST NO. 2:** For each Document Custodian, all:

a) electronic and hard copy diaries, calendars, appointment books, notebooks, to-do lists, Day Timers, day planners or appointment notes;

b) contact information maintained in Microsoft Outlook, similar programs, Rolodex cards, or any other format, for any Person who is or was: (i) an owner, employee, consultant, officer, board member, Representative, or agent of a Broiler Producer or Agri Stats; (ii) a Creditor Representative or Industry Analyst; (iii) employee of a Trade Association; or (iv) employee of any entity that falls within the definition of Industry Meeting.

c) trip and travel logs, records, expenses, and other supporting Documents;

d) expense and entertainment reports, including supporting Documents;

e) bills, statements, records, and supporting Documents concerning local, long distance, and cellular telephone calls by such employees, including calls made using telephones not paid for by You (such as home office, fax, and personal telephone numbers, personal cellphones, and temporary pay-as-you go cellphones) if such telephones were used for business purposes;

f) Documents relating to membership in any Trade Association or industry group or attendance at any Industry Meeting, Creditor Conference, or Industry Conference;

g) a copy of the Person's most recently created resume or curriculum vitae (CV);

h) personnel file, including any discipline or performance evaluations, and any terms of employment (such as confidentiality or non-compete agreements);

i)        copies of any transcripts or recordings of prior testimony relating to Competitive Conditions in the market for Broilers, such as testimony at a deposition, trial, or public hearing;

j)        Documents sufficient to show the Document Custodian's complete contact information, including all phone numbers, social media user names or "handles," and email addresses used by such persons for any business purposes, even if only sparingly; and

k)        Any severance agreements in connection with the Document Custodian ceasing employment or changing employment status with You (without time limitation).

**REQUEST NO. 3:**    All Documents relating to any Trade Associations, Industry Meetings, Investor Conferences, or Creditor Conferences, including membership lists, announcements, dates and locations for meetings, presentations (including speaker notes, where applicable), agendas, minutes, notes, attendance lists, expense reports, handouts, reports, statistical bulletins, and correspondence.

**REQUEST NO. 4:**    All Documents relating to Communications with investors, Industry Analysts, and/or Creditor Representatives regarding Competitive Conditions in the Broiler industry.

**REQUEST NO. 5:**    All Structured Data, Documents, and Communications regarding the terms of all purchases, sales, trades, exchanges, or swaps of Broilers between You and any other Broiler Producer, including any contracts, joint ventures, and/or other agreements, whether formal or informal.

**REQUEST NO. 6:**    Documents relating to budgets, projections, estimates, or related studies, presentations, or reports regarding Broilers regularly prepared or received by Your current or former directors, officers, Management, or Planning Staff on a regular basis (weekly, monthly, quarterly, or annually) regarding the following topics:

a.        cost and/or cost accounting reports (including, production, sale and distribution);

b.        audited or unaudited financial statements (including all appendices);

c.   cost and supply of raw material and/or inputs, including any back-integration of raw materials, swaps or sales of raw materials with other Broiler producers, or hedging of purchased raw materials and/or inputs for Broilers;

d.   distribution channels for Broilers;

e.   export markets for Broilers including a breakdown of country of destination and product form;

f.   Broiler product information regarding the types and product forms of Broilers sold by You;

g.   forecasted, projected, estimated, planned, or actual demand for Broilers;

h.   demand changes or demand fluctuations for Broilers sold in the U.S.; and

i.   profits, revenues, and loss information on Broilers produced or sold in U.S. identified on a (i) consolidated basis; (ii) product line or product category basis; and/or (iii) facility-by-facility basis, (including, but not limited to, gross profits, operating profits, net profits, cash flow reports, and EBITDA).

**REQUEST NO. 7:**   All Documents that compare or contrast Broilers sold by You in the U.S. with Broilers sold by any other Broiler Producer (including product characteristics, product forms, packaging, specifications, quality, prices, availability, delivery schedules, etc.), any product crosswalks, or any other comparison showing how Broilers sold by You compare to other Broiler Producers.

**REQUEST NO. 8:**   Document sufficient to show industrywide standards of products and definitions/descriptions of standards for Broilers.

**REQUEST NO. 9:**   Documents sufficient to show actual or potential substitutes for Broilers analyzed by You during the Class Period (including the effect of such substitutes' prices upon Broiler pricing, purchase terms, or profits).

**REQUEST NO. 10:**   Documents sufficient to show Your ability to identify or trace in the supply chain each Broiler You slaughter in the event of a food safety recall, including Your ability to track or identify chicken meat incorporated into value-added Broiler products.

**REQUEST NO. 11:**    All Documents utilized or generally referred to by Your Management or Sales Personnel for quoting, changing, or setting the prices or the terms and conditions for sale of Broilers, including Documents relating to pricing guidelines, pricing methods, pricing formulas, procedures or authorization procedures for Sales Personnel to quote a price, price changes, price lists, pricing policies, pricing guidelines, pricing methods, violations of pricing policies and Documents providing guidance to Sales Personnel about implementation of  price changes.

**REQUEST NO. 12:**    All Documents relating to or communicating Broiler price announcements, price changes, explanations of the reasons for price changes, price lists, pricing policies, pricing guidelines, pricing methods, pricing formulas, procedures or authorization procedures for Sales Personnel to quote a price, analysis of market prices, monitoring of competitor pricing, price changes of Broilers produced or sold in the U.S. (including price announcements or explanations of the reasons for price changes), price increase and surcharge announcements, and any other Communications concerning Broiler price increases or the imposition of surcharges.

**REQUEST NO. 13:**    All Documents relating to any contemplated, proposed, or actual bids for the sale of Broilers (e.g., a request for bid or online auction), including Documents concerning whether or not to bid and the availability of Broilers from other Broiler Producers to fulfill a bid.

**REQUEST NO. 14:**    All Documents relating to the forecasted, projected, estimated, or actual effects of the relationship of changes of Broiler price, supply, and/or demand, including any estimates of the elasticity of supply or demand, or price sensitivity of Broilers.

**REQUEST NO. 15:** Documents sufficient to identify Your cost accounting policies and procedures for Broilers and accounting policies and procedures for intra-company transfer pricing and transactions between Broiler Producers for Broilers.

**REQUEST NO. 16:** Documents sufficient to describe in detail Your policies and procedures concerning imposition of surcharges and customer rebates, credits, discounts and any other special price arrangements.

**REQUEST NO. 17:** All Documents or Communications with or about Primary Breeding Companies relating to Broiler Supply Factors, including any complaints by You or any Broiler Producer about the receipt of inferior or sick Broiler breeder stock (e.g., grandparent stock from a Primary Breeder Company), any analysis of the effect of Broiler breeder stock levels on the supply or price of Broilers (including both grandparent and great-grandparent Broiler breeders from Primary Breeding Companies), and any condition with respect to Your receipt of Broiler breeder stock from a Primary Breeding Company being contingent on You lowering or agreeing not to increase Your production and/or supply of Broilers.

**REQUEST NO. 18:** All Structured Data and supporting Documents provided to or received from Agri Stats, Inc. or any of its affiliates (including Express Markets, Inc.), including flock and/or complex level data for both Broiler breeders and Broilers and any data compilations concerning Agri Stats You maintained, such as any data reformatted, reprocessed, or otherwise used in analyzing Agri Stats data.

**REQUEST NO. 19:** All Communications to and from, and all Documents relating to, the Georgia Department of Agriculture (including the Georgia Dock Broiler price index), United States Department of Agriculture and its subdivisions, IRi, Nielsen, Urner Barry, Agri Stats, or

Express Markets, Inc. regarding Broiler Supply Factors, Broiler supplies, Broiler exports, or Broiler pricing.

**REQUEST NO. 20:** To the extent not produced in response to other Requests, all Documents and Communications regarding the Broiler market collected, disseminated, purchased or received from, reported to, and/or published by the Georgia Department of Agriculture (including the Georgia Dock Broiler price index), United States Department of Agriculture and its subdivisions, IRi, Nielsen, Urner Barry, Agri Stats, Express Markets, Inc..

**REQUEST NO. 21:** From January 1, 2007, through the present, all Documents relating to the Georgia Department of Agriculture and Broilers, Broiler supplies, or Broiler pricing, including the Georgia Dock Advisory Committee, information collection, verification, auditing, and reporting methodologies or procedures, inaccuracies, errors, or vulnerabilities to manipulation of the Georgia Dock price index, any agreement with other Defendants or co-conspirators concerning reporting of information for the Georgia Dock, any responses or Communications relating to any investigation (whether formal or informal) concerning the accuracy of information reported to the Georgia Department of Agriculture (including the United States Department of Agriculture's investigation disclosed publicly in early November 2016), and documents relating to the proposed Georgia Premium Poultry Price Index.

**REQUEST NO. 22:** All Documents or Communications relating to or exchanged with Agri Stats or its affiliates (including Express Markets, Inc.), including any consideration of the risks and/or benefits of providing information to or receiving information from Agri Stats, the anonymity of individual Broiler producer data received from Agri Stats, any reverse-engineering processes employed by You to de-anonymize Agri Stats data, any contracts or agreements with

Agri Stats, any presentations, reports, or meeting minutes received from or provided to Agri Stats, and all copies of Agri-Stat's Bottom-Line Report.

**REQUEST NO. 23:**     All Documents relating to Competitive Conditions in the market for Broilers, including reports, presentations, industry publications, business plans, studies, analyses, or other Documents concerning forecasted, projected, estimated, planned or actual: (i) market shares, (ii) consolidation, mergers, acquisitions, or joint ventures, (iii) production or processing capacity, capacity reduction, capacity utilization, or operating rates (iv) fixed or variable costs, (v) pricing, (vi) inventories (vii) entry or exit conditions (viii) inventories, (ix) supplies/supply trends, (x) data, publications, or other sources used in the regular course of business by You to monitor Broiler demand in the United States, (xi) substitute products, (xii) exports, (xiii) raw materials, (xiv) Broiler Supply Factors, or (xv) other industry statistics.

**REQUEST NO. 24:**     All Documents concerning Broiler supply rationalization, industry leadership, industry discipline, production discipline, supply discipline, capacity discipline, or other so-called disciplined approaches or practices relating to the Broiler industry.

**REQUEST NO. 25:**     All Documents and Communications relating to any memoranda, studies, reports, analyses, or presentations analyzing Competitive Conditions in the Broiler industry prepared by a consulting firm, including Bain & Company, McKinsey & Company, Deloitte & Touche, The Hudson River Group, and Charles River Associates.

**REQUEST NO. 26:**     Documents sufficient to identify any tentative, proposed or consummated sale, acquisition, merger, joint venture, divestiture, transfer of assets, spin-off, or any other form of change of ownership or control or business combination concerning any Broilers-related business, production facilities, product lines, or other assets (including both businesses or assets owned or controlled by You and those owned or controlled by other

Persons), and any minutes, notes, reports, studies, analysis, presentations, expert or market participant comments, analysis or other information submitted to or received from any governmental agency.

**REQUEST NO. 27:**   All Documents and Communications relating to the immediately prior Request that reflect the disclosure of any non-public information to another Broiler Producer concerning Broiler Supply Factors, Broiler pricing, or any future Broiler supply plans, including documents made available to You or by You through an electronic "data room" associated with a proposed transaction.

**REQUEST NO. 28:**   All Documents relating to public announcements, press releases, or Corporate Communications by You concerning Competitive Conditions for Broilers.

**REQUEST NO. 29:**   All Documents that directly or indirectly relate, in whole or in part, alone or when viewed with other Documents any combination, conspiracy, agreement or understanding, explicit, implied or tacit, to fix prices, reduce output, limit production, limit capacity, limit supplies, limit inventories, or allocate customers, product lines or territories for Broilers sold in the U.S.

**REQUEST NO. 30:**   All Documents relating to compliance policies whether implemented, adopted, used or considered concerning federal, state, or international antitrust laws, competition laws, anti-monopoly laws, anti-cartel laws, unfair competition laws, anti-bribery laws and any similar laws or regulations, or contacts and/or Communications with Your competitors (including current and former versions of compliance policies and procedures, presentations, seminars, programs, memos, Corporate Communications, statements signed by Your employees with responsibility for Broilers that acknowledge receipt of or compliance with such policies arising from or relating to any prior legal proceedings), and all Documents relating to any

inquiries or investigations concerning compliance with such policies including those listed in the prior Request.

**REQUEST NO. 31:**　　All Documents relating to any joint defense, contribution, indemnity or judgment sharing agreement relating to any investigation, civil or criminal litigation involving the production, sale, resale or marketing of Broilers.

**REQUEST NO. 32:**　　All Documents relating to the Named Plaintiffs in this action.

**REQUEST NO. 33:**　　From September 2, 2016, through the present, all Documents relating to any changes made to the conditions, terms of sale, contracts, rebates, discounts, and/or special pricing for the sale of Broilers to any Named Plaintiff.

**REQUEST NO. 34:**　　From January 1, 2000 through the present, all Documents relating to competition in the Broiler industry produced to the Department of Justice, Federal Trade Commission, U.S. Department of Agriculture, Georgia Department of Agriculture, U.S. Securities & Exchange Commission, states' attorneys general, or other government agencies or regulators voluntarily or pursuant to any civil investigative demand, grand jury subpoena, or other investigative request.

**REQUEST NO. 35:**　　For the period January 1, 2000, through the present, all Documents relating to any possible or alleged violations of federal, state, or international antitrust laws, competition laws, anti-monopoly laws, anti-cartel laws, anti-dumping laws, unfair competition laws, anti-bribery laws and any similar laws, rules or regulations by You, any other Defendant or any other Broiler-related business or person (including any current or former officers, directors, Employees or other persons) including:

>    a.　　any inquiry, investigation, administrative, criminal or civil litigation or similar actions (regardless of characterizations such as non-adjudicative, cooperating, preliminary, informal, formal, incomplete, open, closed or final) by any government entity, legislative body or representative or instrumentality thereof

(*i.e.*, the United States Department of Justice, the Federal Bureau of Investigation, the Federal Trade Commission, the International Trade Commission, any state law enforcement agency, any grand jury, any committee of the United States Congress, any agency of a state or other political subdivision, and any domestic or international government body) (including all Documents received from or provided to such governmental entities or used during or regarding discussions or negotiations with them);

b.  any internal inquiry or investigation (regardless of characterizations such as non-adjudicative, cooperating, preliminary, informal, formal, incomplete, open, closed or final) and further including any violation of internal antitrust or competition law policies or practices; and

c.  any private actions or civil litigation (including arbitrations, mediations or negotiations and further including any violation of internal antitrust or competition law policies or practices) in which You have been a party, witness, participant, or subject.

**REQUEST NO. 36:**   Without time limitation, all Documents relating to actions to conceal or avoid detection of any potential violations of federal, state, or international antitrust laws, competition laws, anti-monopoly laws, anti-cartel laws, unfair competition laws, anti-bribery laws and any similar laws, rules or regulations (including the use of code words or otherwise masking the identity of any Person or entity, meeting in locations or communicating at times or via methods with the intent to avoid detection by any Person or entity, using non-traceable prepaid calling cards or cellphones, non-contract or disposable cell phones, placing calls from public phones, and destroying, secreting, altering or forging Documents).

**REQUEST NO. 37:**   Without time limitation, Documents sufficient to show the terms and conditions of any preliminary or permanent injunction, consent decree, plea agreement, sentencing agreement, settlement agreement or stipulation of settlement in a class action or private action, judgment or similar orders or agreements relating to alleged violations of federal, state, or international antitrust laws, competition laws, anti-monopoly laws, anti-cartel laws, unfair competition laws, anti-bribery laws and any similar laws, rules or regulations entered

against You or any other Defendant, including *In re Chicken Antitrust Litigation*, Civ. No. C74-2454A (N.D. Ga.).

**REQUEST NO. 38:**    All Documents relating to complaints received from any Broiler customer regarding prices, pricing, or terms or conditions of sale or the refusal or failure to supply Broilers and any responses thereto, and all Documents reflecting any policy of Your company concerning the handling of such complaints.

**REQUEST NO. 39:**    All Documents that support or disprove any affirmative defense alleged by any Defendant in this action, including the statute of limitations, doctrines of estoppel and laches, or release of any claims.

**REQUEST NO. 40:**    Documents sufficient to show all forms of contracts and invoices, and any summaries of the terms (including duration, price protection, terms for price modification, surcharges, discounts, or rebates) for the sale of Broilers in the U.S. to Your customers.

**REQUEST NO. 41:**    Your Structured Data sufficient to summarize the pricing provisions of Your customers' Broiler contracts or purchases, including any changes to those provisions over time and the Broiler price index to which such prices are tied.

**REQUEST NO. 42:**    All Documents relating to any decision to change the pricing terms for Your customers' contracts for Broilers, including any analyses regarding changes from fixed-price to adjustable price provisions.

**REQUEST NO. 43:**    Documents sufficient to identify and describe Your computer hardware and systems (including email systems), software, ESI, Structured Databases, storage, backup and archiving systems and Communications systems and devices used in connection with Documents called for by production of the Requests for Production herein, including data maps,

explanations of information contained in each system or database, and document retention policies.

**REQUEST NO. 44:** All Documents necessary to understand the operation of any of the computer hardware and systems, software, Structured Databases, ESI, database, storage, backup and archiving systems and Communications systems and devices information requested herein (including, but not limited to, Documents describing or defining the fields contained in any such database file naming conventions and standards); user manuals; Help features or documentation; password, encryption, and other security protocols; diskette, CD, DVD, and other removable media labeling standards; email storage conventions, *e.g.*, limitations on mailbox sizes/storage locations; schedule and logs for storage; software and hardware upgrades (including patches) for the relevant time period (including who and what organization conducted such upgrades); and Backup tape rotation.

**REQUEST NO. 45:** Documents sufficient to identify or describe the outputs of Your Structured Databases, ESI, information systems, databases and Communications systems used by You to record, store, communicate, compute, analyze, organize, or retrieve information relating to Documents and Structured Data You produce in this matter (including all mainframe systems, legacy systems, archives, computers, networks, telephones, handheld devices, smart phones, storage or archiving systems, and word processing, electronic mail, personal information managers, calendar, or spreadsheet programs).

**REQUEST NO. 46:** All Documents related to the claims and allegations in the Complaint.

**REQUEST NO. 47:** All Documents referenced or relied upon in responding to any Interrogatory served by any party in this Action.

**REQUEST NO. 48:** For the time period from January 1, 2002 through December 31, 2017, Structured Data sufficient to show, for each U.S. Broiler sale, the categories of information listed below, and Documents sufficient to understand all data fields, codes, or other fields on the invoice. Plaintiffs request this information in the most disaggregated form (meaning at the transactional level, not aggregated by month or quarter) in which it is kept, and Defendants should produce the data in a comma-delimited text file (*e.g.*, a file with a file extension of .csv or .txt). If You maintain separate or distinct sets of such data for internal purposes, Agri Stats reporting purposes, or any other purpose, Plaintiffs' request is for each separate set of data for the categories of information listed below.

     a.     the terms of each sale;

     b.     the invoice number;

     c.     the purchase order number;

     d.     the location from which the Broilers were shipped;

     e.     the customer's name, phone number(s), address(es), email address(es), including the identity of the customer that was billed and the location to which the Broilers were shipped;

     f.     the date You shipped the Broilers, the date You billed for the Broilers, and the date the customer took delivery;

     g.     the grade, cut, product form, and/or type of Broiler, including any product numbers, unique purchaser-specific identifier, and product descriptions sold for each transaction;

     h.     the quantity (and units of measure) for each sale;

     i.     all pricing information concerning the sale, including shipping, tax, or similar charges, and the gross and net unit price for each item in the sale;

     j.     the currency in which the sale was billed and paid;

     k.     any discounts, rebates, credits, freight allowances, returns, free goods, and/or services or any other pricing adjustment for each sale, with sufficient information to attribute these adjustments to individual sales;

l.    if a resale, the Supplier of each Broiler sold in connection with each sale;

m.    the price You paid Your Supplier for each type of Broiler sold in connection with each sale, including gross and net aggregate and per-unit prices;

n.    any fixed or variable costs or costs of goods sold concerning the sale (including freight charge and transportation cost, sales and distribution cost, raw materials, intermediates, marketing or sales cost, and any other cost attributed or allocated to the sale);

o.    for any sale or purchase from another Broiler producer, Electronic Data Interchange fields for which the user can freely enter text, such as "comments" or similar fields;

p.    any Structured Database field summarizing terms of sale or agreements or contracts for customers;

q.    any other data available in Your database Concerning the purchase, sale or distribution of the Broilers for each sale.

**REQUEST NO. 49:**    For the period January 1, 2002 through December 31, 2017, Documents sufficient to show Your production processes, including each class, type, cut, grade, or category of Broilers that You manufactured, marketed, sold or distributed in the U.S. (including raw material inputs).

**REQUEST NO. 50:**    Documents sufficient to describe in detail the Broiler products You sold, marketed, or distributed from January 1, 2002 through December 31, 2017, including any variations relating to brand name, its physical properties and characteristics, packaging, product form, cut, further processing, grade, specialty products and any other factors influencing price.

**REQUEST NO. 51:**    For the period January 1, 2002 through December 31, 2017, Documents sufficient to identify all of Your Broiler Hatchery Facilities, Broiler Breeder Facilities, Broiler Processing Facilities, and Broiler Further Processing Facilities.

**REQUEST NO. 52:**     From January 1, 2002 through December 31, 2017, Your Structured Data relating to Broiler Supply Factors in the most disaggregated form in which You maintain such data.

**REQUEST NO. 53:**     From January 1, 2002 through December 31, 2017, Structured Data and Documents sufficient to show the following information by product form/type/grade/cut Your monthly, quarterly, and annual:

a.     Processing, production, capacity, and capacity utilization by facility;

b.     Broiler export shipments (including destination country);

c.     Exports of Broiler breeder hens, Broiler breeder chicks, or Broiler breeder eggs, including destination country and the name, address, and terms under which the eggs were transferred and/or sold to the foreign entity;

d.     Any data You maintain regarding Broiler imports into the U.S. (including country of origin);

e.     Inventories (frozen, fresh, and value-added);

f.     Demand for Broilers;

g.     Total cost and total variable cost, as well as disaggregated costs (e.g., fuel). To the extent not provided in the cost data, data and/or Documents sufficient to show the relative proportion of cost associated with each component of variable cost and each component of total cost throughout the Relevant Time Period; and

h.     United States sales of Broilers, including sales either shipped or billed.

**REQUEST NO. 54:**     Documents sufficient to show Your corporate organizational structure throughout the Relevant Time Period, including, but not limited to, departments, divisions, parents, subsidiaries, joint ventures, affiliates, units or other subdivisions that had any role during any in the production, processing, distribution, marketing, pricing or sale of Broilers.

**REQUEST NO. 55:**     All Documents concerning the costs of and potential obstacles to entering the Broiler market, including, but not limited to, capital costs, environmental

regulations, production costs, marketing costs and difficulties, contractual supply relationships, market conditions, brand loyalty or differentiation, start-up costs, and any other difficulties or obstacles to entry into the market for producing and selling broilers.

**REQUEST NO. 56:**    All Documents concerning the identity of any actual or potential entrant(s) into the Broiler market and any barriers, obstacles or difficulties facing the actual or potential entrant(s).

**REQUEST NO. 57:**    Documents sufficient to identify the Management and Sales Personnel having non-clerical responsibilities or duties with respect to any of the following:

      a.      the production or processing of Broilers;

      b.      the marketing or promotion of Broilers;

      c.      the pricing of Broilers;

      d.      the sale or distribution of Broilers;

      e.      antitrust compliance;

      f.      the maintenance of any electronic database(s), including archives of emails or other electronic documents relating to Broilers.

**REQUEST NO. 58:**    Documents sufficient to show any insurance policies, indemnification agreements, judgment sharing agreements or hold harmless agreements that may provide coverage to You or any other defendant named in this action for any of the claims or causes of action asserted in this action, or that may provide reimbursement for payments made or costs incurred in defense of this action.

**Date: February 28, 2017**

/s/ *Steven A. Hart*
Steven A. Hart (#6211008)
Brian Eldridge (#6281336)
Kyle Pozan (#6306761)
Benjamin Shrader (#6304003)
HART MCLAUGHLIN & ELDRIDGE,
LLC
121 West Wacker Drive, Suite 1050
Chicago, IL 60601
Telephone: (312) 955-0545
Facsimile: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com
kpozan@hmelegal.com
bshrader@hmelegal.com
*Direct Purchaser Plaintiffs Interim Liaison
Class Counsel*

W. Joseph Bruckner
Heidi M. Silton
Elizabeth R. Odette
Brian D. Clark
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
hmsilton@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com

Bruce L. Simon
Aaron M. Sheanin
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com
asheanin@pswlaw.com
*Direct Purchaser Plaintiffs Interim Co-Lead
Class Counsel*

/s/ Thomas A. Doyle
Kenneth A. Wexler
Edward A. Wallace
Thomas A. Doyle
WEXLER WALLACE LLP
55 W.Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
kaw@wexlerwallace.com
eaw@wexlerwallace.com
tad@wexlerwallace.com
*Commercial and Institutional Indirect
Purchaser Plaintiffs Liaison Counsel*

Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Joshua R. Rissman
Brittany N. Resch
GUSTAFSON GLUEK PLLC
220 South Sixth Street, #2600
Minneapolis, MN 55402
Telephone: (612)333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
bresch@gustafsongluek.com

Steven N. Williams
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
swilliams@cpmlegal.com
*Commercial and Institutional Indirect
Purchaser Plaintiffs Interim Co-Lead
Counsel*

*/s/ Steve W. Berman*
Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO
LLP
1918 8th Avenue, Suite 3300
Seattle, Washington  98101
(206) 623-7292
steve@hbsslaw.com

Elizabeth A. Fegan
Jeannie Y. Evans
HAGENS BERMAN SOBOL SHAPIRO
LLP
455 N. Cityfront Plaza Drive
Suite 2410
Chicago, IL 60611
(708) 628-4949
beth@hbsslaw.com
jeannie@hbsslaw.com
*End User and Consumer Plaintiffs Interim
Lead Counsel*

# EXHIBIT B

| **From:** | GPPPI |
| --- | --- |
| **To:** | "Erina de Valk" |
| **Subject:** | RE: Georgia Dock Poultry Prices |
| **Date:** | Tuesday, February 28, 2017 7:03:00 AM |

Erina,

Due to a lack of available data, the Georgia Department of Agriculture will cease its efforts to publish the Georgia Premium Poultry Price Index.

— —
Alec Asbridge | Director, Business Operations
Georgia Department of Agriculture | Office of the COO
19 Martin Luther King, Jr. Drive, SW, Atlanta, Georgia 30334-4201
404-656-3600 (O) | 404-556-2218 (M) | 404-651-8206 (F)
alec.asbridge@agr.georgia.gov | agr.georgia.gov

**From:** Erina de Valk [mailto:███████████]
**Sent:** Friday, February 24, 2017 3:26 PM
**To:** GPPPI
**Subject:** Georgia Dock Poultry Prices

When will they be published and what is the website?

# EXHIBIT C

**Pouya, Bobby**

| | |
|---|---|
| **From:** | Fontecilla, Adrian <afontecilla@proskauer.com> |
| **Sent:** | Tuesday, October 10, 2017 5:21 PM |
| **To:** | Shana Scarlett; Cadio Zirpoli |
| **Cc:** | Clark, Brian D.; Mark Ram <MRam@cpmlegal.com> (MRam@cpmlegal.com); Sarah Van Culin; Josh J. Rissman (jrissman@gustafsongluek.com); Chuk, Stephen R. |
| **Subject:** | RE: Chickens - Wayne Farms follow up |

Shana and Cadio,

Preparing our response letter has taken longer than expected.  You will be receiving it by Thursday if not tomorrow.  We are working to get it out to you as quickly as possible.

Best,

Adrian

Adrian Fontecilla
202.416.5863

afontecilla@proskauer.com <mailto:afontecilla@proskauer.com>

From: Shana Scarlett [mailto:shanas@hbsslaw.com]
Sent: Tuesday, October 10, 2017 8:18 PM
To: Fontecilla, Adrian; Cadio Zirpoli
Cc: Clark, Brian D. (bdclark@locklaw.com); Mark Ram <MRam@cpmlegal.com> (MRam@cpmlegal.com); Sarah Van Culin; Josh J. Rissman (jrissman@gustafsongluek.com); Chuk, Stephen R.
Subject: RE: Chickens - Wayne Farms follow up

Adrian –

I don't recall seeing a letter in response from Wayne Farms. Did I miss the letter (if so, could you re-send) or will you be sending it shortly?

Shana Scarlett | Hagens Berman Sobol Shapiro LLP | Direct: (510) 725-3032

From: Fontecilla, Adrian [mailto:afontecilla@proskauer.com]
Sent: Monday, September 25, 2017 5:36 PM
To: Cadio Zirpoli
Cc: Shana Scarlett; Clark, Brian D. (bdclark@locklaw.com); Mark Ram <MRam@cpmlegal.com> (MRam@cpmlegal.com);
Sarah Van Culin; Josh J. Rissman (jrissman@gustafsongluek.com); Chuk, Stephen R.
Subject: Re: Chickens - Wayne Farms follow up

Cadio, We are diligently working with our client and preparing our letter response to both letters. We plan to respond next week.

Best,

Adrian

Adrian Fontecilla
Proskauer
1001 Pennsylvania Avenue, NW

Suite 600 South

Washington, DC 20004-2533

office 202.416.5863
cell 917.254.3932

<mailto:afontecilla@proskauer.com> afontecilla@proskauer.com

On Sep 26, 2017, at 5:36 AM, Cadio Zirpoli <cadio@saveri.com <mailto:cadio@saveri.com> > wrote:

Adrian:

We have not yet received any response from Wayne Farms to my letter of September 12, 2017. I've attached the letter again here for reference. Please advise when Plaintiffs can expect a response.

Thanks,

Cadio

Cadio Zirpoli

SAVERI & SAVERI, INC.

706 Sansome Street

San Francisco CA 94111

Telephone 415.217.6810

Facsimile 415.217.6813

cadio@saveri.com <mailto:cadio@saveri.com>

<2017-09-12 Zirpoli letter to Fontecilla re Rule 34 meet and confer.pdf>

*****************************************************************************************************************************************************************************

This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure.
If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them.
Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.
*****************************************************************************************************************************************************************************