October 30, 2017

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
T +1 212 819 8200

whitecase.com

BY HAND AND ECF

The Honorable Jeffrey T. Gilbert
United States District Court
Northern District of Illinois
Everett McKinley Dirksen United States Courthouse
219 South Dearborn Street
Chicago, IL 60604

*In re Broiler Chicken Antitrust Litigation*, No. 1:16-cv-08637 (N.D. Ill.)

Dear Magistrate Judge Gilbert:

We write on behalf of all Defendants in response to Plaintiffs' letter dated October 16, 2017 (ECF No. 508).

As Plaintiffs acknowledge in their letter, Defendants have engaged in "extensive meet and confer efforts" with Plaintiffs about their Rule 34 requests, and the parties have reached agreement on numerous issues. Although those discussions are ongoing, during the most recent Court conference Plaintiffs proposed that the parties inform the Court of the "concrete disputes" that have arisen to date. 10/2/17 Hr'g Tr., Ex. A, at 29:9-14. In response, the Court instructed the parties to submit letters identifying "concrete issues or disputes that can be presented to the Court now either for resolution or for focused discussion that could enhance the prospect that those issues or disputes can be resolved without extensive motion practice and, preferably, before Defendants' motions to dismiss are decided." ECF No. 492, at 2.

Plaintiffs have now filed their letter, asking the Court to intervene in the parties' negotiations and resolve fourteen purported disputes. But many of those claimed disputes are not "concrete." Indeed, they are almost entirely unripe, mischaracterized, or simply non-existent.[1] For example, in several instances Defendants learned only upon receiving Plaintiffs' letter that Plaintiffs believe the parties are at impasse. In addition, Plaintiffs' characterization of the alleged disputes (and Defendants' supposed obstinacy) is often contrary not only to Defendants' understanding, but also to the facts contained in Plaintiffs' own letter.

In Defendants' view, none of the matters in Plaintiffs' letter requires the Court's immediate attention, and most (if not all) would have benefitted from further discussions among the parties. In rushing to raise these issues now, Plaintiffs apparently failed to realize that the parties are not,

---

[1] The Indirect Purchaser Plaintiffs ("IPPs") declined to raise any IPP-specific disputes with the Court at this time so that they can continue negotiations with Defendants. ECF No. 507.

in fact, at odds in some cases, and they likewise may have missed opportunities for compromise. Their haste also may be the reason that Plaintiffs make several obvious misstatements about Defendants' positions, which is reminiscent of the many misrepresentations in Plaintiffs' recent brief regarding third-party subpoenas. *See* ECF No. 517. In either case, the consequence is that Plaintiffs risk needlessly burdening the Court, the parties, and, in some cases, third parties.[2]

Defendants below provide detailed responses to Plaintiffs' claims, and Defendants stand ready to provide the Court with any additional information that would help the Court resolve these matters now if it is inclined to do so. However, Defendants believe that it would be more efficient for the Court to address the matters discussed in Plaintiffs' letter after the parties have finished meeting and conferring and they have more information about what issues are relevant and within the scope of discovery. Defendants also see advantages to addressing issues regarding Rule 34 requests all at once rather than piecemeal. In the meantime, Defendants will continue working with Plaintiffs to advance discovery where the parties can do so efficiently, as they have been doing throughout this litigation.

## I. "Global" Issues

### A. General Objections

It is not clear why Plaintiffs have asked the Court to "overrule the general objections asserted by Defendants." Plaintiffs admit that no dispute exists with any Defendant except Perdue, and they do not bother to describe the alleged dispute with Perdue. *See* ECF No. 508, at 3 (Plaintiffs have "an agreement [as to general objections] with all Defendants except for Perdue."). Indeed, Perdue does not know what Plaintiffs believe the dispute to be, because Perdue previously advised Plaintiffs that "Perdue does not anticipate withholding documents or data responsive to [Plaintiffs'] Requests pursuant to [general] objections unless that information is privileged." 9/29/17 Davis Letter to Pearson, Ex. B, at 2. Thus, there is no "concrete" issue for the Court to consider.

Even if that were not so, the procedural posture here distinguishes this litigation from the cases Plaintiffs cite. Because Defendants' Rule 12 motions are still pending, Defendants cannot yet know what documents will be relevant (if any), or even whose files will be relevant, let alone the burden of producing those documents. Thus, it is reasonable for Defendants to object generally to all of Plaintiffs' Rule 34 requests – on the ground that the scope of discovery is unresolved – and to reserve their right to amend their responses when the Court rules on Defendants' motions.[3] Indeed, Plaintiffs have left Defendants with no alternative but to object, because they

---

[2] Defendants recognize that a party that faces a dismissal motion, and whose case is entirely circumstantial, is highly incentivized to obtain discovery to try to bolster its claims should it need to file an amended complaint. That is particularly so where the opposing parties bear the lion's share of the discovery costs. But, of course, no plaintiff gains a *right* to obtain discovery simply by filing a complaint.

[3] It is also notable that Plaintiffs themselves included a category of overarching objections in their own objections and responses. *See, e.g.*, Direct Purchaser Plaintiff ("DPP") Barters International LLC's Responses and Objections to Defendants' First Request of Documents to [DPPs] (including "Scope Limitations"), Ex. C; Commercial and Institutional Purchaser Plaintiffs' Objections and Responses to

have refused to respond to Defendants' repeated requests to confirm they will not seek discovery related to any dismissed claims. *See* 9/15/17 Suggs Letter to Clark, Ex. F, at 1.

Similarly, it makes sense for Defendants to object generally to producing privileged documents, because Plaintiffs have claimed that if a party does not object to a document request on privilege grounds, the party waives the right to withhold privileged documents in response to the request. *See id.* But Defendants cannot at this stage know which requests call for privileged documents. Plaintiffs are essentially insisting that Defendants include a rote recitation of a privilege objection in response to each document request, but such formalism is unnecessary.[4]

Defendants believe their other general objections are likewise justified. Indeed, Plaintiffs have not presented to the Court a single example of a general objection raised by a specific Defendant that they believe is inappropriate. Nor have they described why they believe any specific general objection, as applied to any particular offer of production, prevents Plaintiffs from adequately understanding the documents that will and will not be produced in response to a specific request. In any event, as Plaintiffs' letter demonstrates, Defendants have addressed Plaintiffs' concerns about these objections in their individual negotiations. But for unclear reasons, Plaintiffs have asked the Court to wade into this non-existent dispute. The Court should decline to do so.

## B. The Definition of "Defendant"

Defendants also disagree that a meaningful dispute exists over the definition of "Defendant." Instead, it appears Plaintiffs raise this issue to obtain what amounts to a response to an interrogatory that has not been served.

In Defendants' view, defining "Defendant" to mean a named Defendant should not be controversial. In any event, to avoid a dispute, Defendants proposed a broader definition months ago. Perhaps more importantly for Plaintiffs' purposes, Defendants have agreed to expansive discovery from non-Defendant affiliates notwithstanding the meaning of "Defendant." That makes it especially mystifying that Plaintiffs claim Defendants are trying "to limit the scope of discovery to the named Defendants." ECF No. 508, at 4. Indeed, Defendants' recent letter to Plaintiffs refutes this very claim:

> It is important to note that Defendants have not limited the scope of discovery to the named Defendants. For example, Defendants' custodians were identified based on their roles and responsibilities, not whether they are technically employed by a specific entity. Those custodians include employees who are

---

Defendants' First Set of Requests for Production (including "General Responses" and "General Objections"), Ex. D; End User Consumer Purchaser Plaintiffs' Objections and Responses to Defendants' First Request for Production of Documents (including "General Objections"), Ex. E.

[4] Plaintiffs' citation to *Ritacca v. Abbott Labs.*, 203 F.R.D. 332, 336 n.4 (N.D. Ill. 2001), is far off point. In that case, the defendant withheld specific documents from production, misrepresented that they were duplicates of documents already produced, and only belatedly claimed they were privileged. Defendants here are simply alerting Plaintiffs to the fact that Defendants are not waiving their intention and right to withhold privileged documents they later identify.

AMERICAS 93600837

> responsible for producing, processing, distributing, selling, pricing, or marketing Broilers in the United States for their respective corporate families, not just for the named Defendants. And Defendants are not withholding from production Broiler-related documents in their custodians' files based on formalistic divisions between entities.

10/11/17 Suggs Letter to Clark, Ex. G, at 1.

In addition, Plaintiffs' description of Defendants' definition is misleading because it omits a critical compromise, namely the proposal that "a Defendant responding to the Rule 34 requests will treat short-hand references to other named Defendants (*e.g.*, 'Tyson') as included within this definition." *See id.* In other words, a producing Defendant will not withhold a document that discusses another Defendant simply because it does not specifically identify a named Defendant entity.

Thus, Defendants have proposed a definition well beyond the ordinary meaning of "Defendant," and Plaintiffs have no basis to assert that the definition will deny them reasonable discovery. Further reflecting that Plaintiffs' position has little to do with the proper scope of discovery, Plaintiffs do not even ask this Court to adopt a particular definition of "Defendant" for purposes of their Rule 34 requests. Instead, Plaintiffs seek an order requiring Defendants to immediately "disclos[e]" their corporate structures.

What Plaintiffs are demanding is essentially a response to an interrogatory. Not only is such an interrogatory not contemplated by the Court's discovery order, ECF No. 388, it is also unnecessary. Defendants already are addressing this issue under the existing framework (contrary to Plaintiffs' claim that Defendants have "refused" to do so). *See* 10/11/17 Suggs Letter to Clark, Ex. G, at 1-2 (explaining that Defendants will respond to Plaintiffs' Rule 34 requests about corporate structures on the schedule ordered by the Court). That discovery is in addition to the disclosures Defendants already have produced to Plaintiffs, including organizational charts and employee directories, which identify employees with responsibilities for relevant business functions that are not limited to named Defendants.

Plaintiffs argue that they need the requested disclosures now in order to develop search terms, but the parties are not even at a point where they can negotiate comprehensive search terms. Nor do Plaintiffs provide any reason to believe that a search for short-hand references for Defendants (*e.g.*, "Tyson") would be inadequate, or why the parties could not timely update their search terms if they later learn of relevant entities not captured by other terms.[5]

Nevertheless, if the Court believes it needs to decide this issue now, the Court should order the parties to adopt Defendants' definition of the term "Defendant" and deny Plaintiffs' attempt to

---

[5] Notably, every named Defendant that is a part of a corporate family shares a name with another named Defendant. For example the names of all Perdue Defendants include the word "Perdue," and the names of all Mountaire Defendants include the word "Mountaire."

turn this dispute into an interrogatory to which Defendants must respond before the Court rules on Defendants' motions to dismiss.[6]

### C. Plaintiffs' Vague Proposal that Defendants Produce Documents Outside the Parties' Agreed-upon Parameters

The parties have spent months negotiating the scope of discovery in these cases, reaching agreements regarding discovery disclosures, custodians, non-custodial data sources, time frames, and requests for production, among other things. Defendants entered into those agreements with the understanding that they would define the scope of discovery and serve as a check on the burdens of unlimited discovery, and Plaintiffs have repeatedly used those agreed-upon limitations as a sword to argue that they therefore do not need to limit the scope of their Rule 34 requests. Plaintiffs' proposal would negate those agreements and impose on Defendants new and potentially limitless obligations to produce documents in addition to the enormous quantity of documents the Defendants will be producing pursuant to the search protocols agreed upon by the parties. The only asserted "need" for their request is Plaintiffs' concern about the theoretical possibility that a "smoking gun" document would not be captured by the agreed-upon search protocols. Although Defendants believe they have no obligation to rewrite the parties' agreed-upon limitations on the scope of discovery, they have tried to address Plaintiffs' concern by offering to give Plaintiffs a supplementary category of documents that is clearly defined:

> If a Defendant, in the course of collecting, processing, reviewing, and producing its documents to respond to the RFPs now under discussion, identifies documents that are direct evidence among Defendants of the alleged conspiracy among Defendants to "coordinat[e] their output and limit[] production" of broilers and "manipulate[] and artificially inflate[]" the Georgia Dock price, *see* ECF No. 212 ¶ 1, the Defendant will produce such documents even if the documents are not within the search protocols adopted to respond to the RFPs.

---

[6] The October 16 letter alleges that "recently, Plaintiffs' independently learned of more than twenty (20) potentially related entities to Defendant Koch Foods Incorporated ('Koch')." ECF No. 508, at 4. This is not so. Eleven months ago, on December 2, 2016, Koch produced as its very first document in this case (Bates No. KOCH 0000000001, Ex. H), a corporate organizational chart dated July 10, 2015 that disclosed that the four named "Koch" Defendants had at least 17 affiliated entities that were not named as defendants. Plaintiffs further contend that, "Koch refused to disclose whether any of these entities were proper parties." ECF No. 508, at 4. In fact, however, in response to Plaintiffs' request 54, Koch has agreed to "produce non-privileged responsive documents, if any, sufficient to show any of [Koch's] direct or indirect subsidiaries that had a role in the production, processing, distribution, marketing, pricing or sale of Broilers in the U.S." 08/29/17 Koch Letter to Clark, Ex. I, at 6. Moreover, Plaintiffs wrote to Koch recently concerning request 54, seeking Koch's "written affirmation on behalf of your client that you will preserve, collect and produce relevant information from the following [23] entities to the extent they related to Koch, and to the extent that they played a role in the production, processing, distribution, marketing, pricing or sale of Broilers." 10/5/17 Pozan Letter to Novack, Ex. J. In response, Koch agreed. 10/13/17 Siegel Letter to Pozan, Ex. K.

AMERICAS 93600837

Plaintiffs' response is to accuse Defendants of being "unwilling" to produce documents – a strange claim given that their own letter acknowledges Defendants' production offer. Plaintiffs demand instead that Defendants agree to a proposal that is so nebulous that Defendants could never know what they are required to produce, and thus whether they are in compliance. Although Defendants have asked Plaintiffs for clarification numerous times – in letters and on conference calls – Plaintiffs have provided almost no additional information. Thus, Defendants are left with Plaintiffs' demand that they produce documents that Defendants "know exist,"

> *relating to* the existence of a conspiracy or agreement with competitors to "coordinat[e] their output and limit[] production" of Broilers and "manipulate[] and artificially inflate[]" the Georgia Dock price," or fix, raise, stabilize, or artificially inflate the price of Broilers in the United States.

ECF No. 508, at 5. A major source of uncertainty in this proposal is Plaintiffs' vague demand for documents "relating to the existence of a conspiracy." That language is far too imprecise to provide any meaningful guidance as to what Defendants are required to produce. Defendants asked Plaintiffs several times for an explanation, but Plaintiffs' only attempt to clarify was to say that it includes "circumstantial evidence" of a conspiracy, but not "market reports."

That is hardly any clarification at all. An obligation to produce anything Plaintiffs may deem "circumstantial evidence" of a purported anticompetitive agreement is virtually boundless. Circumstantial evidence necessarily depends on chains of inferences and potentially includes almost anything relating to Defendants' Broiler businesses. To understand just how broad Plaintiffs' conception of "circumstantial evidence" might be, one need look no further than Plaintiffs' 80-plus Rule 34 requests. Each of those requests is purportedly "related to" Plaintiffs' allegations, which are entirely circumstantial. Defendants are not going to commit to an agreement that requires them to supplement an already massive document production based on a guess as to what Plaintiffs believe is circumstantial evidence of a conspiracy.

Plaintiffs' exclusion of "market reports" does not improve their offer. That term sheds no additional light on the meaning of their proposal, and it does not materially narrow its scope. Even if the phrase "market reports" had an obvious meaning (and it does not), Plaintiffs cannot define a broad universe of documents by identifying just one thing that it is not. Their exclusion of "routine business records," which they raise for the first time in their letter to the Court, only further underscores the vagueness of Plaintiffs' proposal. That phrase – equally opaque – still does not tell Defendants what Plaintiffs *include* in the category of documents "relating to the existence of a conspiracy."

Another flaw in Plaintiffs' proposal is their demand that Defendants produce "documents that they know exist." It is impossible to determine what a corporation "knows"; in theory, a corporation knows every document in its files. Plaintiffs appear to seek the production of potentially any document regardless of custodian, location, or time frame. Defendants are not going to assume a responsibility to review every document in their possession, interview every employee, or require every single person at the company to notify litigation counsel of potentially responsive documents. Such an obligation is unprecedented and extraordinarily

burdensome and disruptive. It also raises significant privilege and work product concerns, which could potentially result in the unnecessary expansion of a Defendant's privilege log. Indeed, the purpose of search protocols – and the various agreements the parties spent months negotiating – is to relieve parties of the obligation to engage in such an open-ended investigation that is in no way proportionate to the needs of the case.

The cases cited by Plaintiffs do not support imposing on Defendants a new, far-reaching obligation to produce documents. In *IWOI*, the plaintiff asked the defendants to produce specific emails that were referenced elsewhere in their production and appeared to be missing, and the defendants "made no effort" to search for them. *IWOI, LLC v. Monaco Coach Corp.*, 2011 U.S. Dist. LEXIS 55333, *12-13 (N.D. Ill. May 24, 2011). Similarly, in *Championsworld* the defendants refused to produce specific documents that the plaintiff requested on a topic that the defendants themselves put at issue and tried to use to their advantage – documents which contradicted their expert's testimony. *Championsworld LLC v. v. U.S. Soccer Federation, Inc.*, 2011 WL 3734167, *5-7 (N.D. Ill. Jul. 14, 2011). Certainly neither case involved a demand for a nearly limitless number of documents (on top of a huge volume of documents already requested).

Defendants' offer to supplement their production with documents, uncaptured by existing search protocols, that contain direct evidence of conspiracy is far clearer than Plaintiffs' proposal, because direct evidence requires no inferences, and thus there is no guesswork to determine if a document is responsive. Defendants' proposal also is anchored directly to Plaintiffs' express allegations, unlike Plaintiffs' request for documents "related" to some generalized conspiracy – unsupported by facts alleged in their complaints – to "fix, raise, stabilize, or artificially inflate" prices. Additionally, Defendants' proposal is much less burdensome, because it does not impose a broad duty to search for and produce documents from across Defendants' businesses.

Finally, Defendants ask that the Court place a reciprocal obligation on Plaintiffs, namely:

> If a Plaintiff, in the course of collecting, processing, reviewing, and producing its documents to respond to the RFPs now under discussion, identifies documents that are explicit evidence that there was no conspiracy among Defendants to "coordinat[e] their output and limit[] production" of broilers and/or "manipulate[] and artificially inflate[]" the Georgia Dock price, or that a particular Defendant did not participate in any such conspiracy, the Plaintiff will produce such documents even if the documents are not within the search protocols adopted to respond to the RFPs.

### D. Plaintiffs' Demands for Discovery Beyond the Almost Ten Years (And Sometimes More) to Which Defendants Have Already Agreed

Defendants have agreed to a default discovery time period of nearly a decade (January 1, 2007 to September 2, 2016) for all of Plaintiffs' nearly 90 document requests. In an effort to

AMERICAS 93600837

compromise, Defendants also have agreed to an even broader discovery time period for several of Plaintiffs' Rule 34 requests.[7] Yet Plaintiffs continue to ask for more.

### 1. Request 21 – Georgia Dock Documents

Request 21 asks for a wide range of documents primarily related to the Georgia Dock price survey. Because the Georgia Dock ceased to exist in mid-December 2016, Defendants have offered a time period for this request through December 31, 2016.

Plaintiffs argue that Defendants should produce documents through the end of February 2017 – almost six months after Plaintiffs filed their complaints. They claim such an expansion is justified because request 21 asks for documents relating to the Georgia Premium Poultry Price Index ("GPPPI"). But their *complaints* never mention the GPPPI – which is different from the Georgia Dock survey – let alone allege a plausible conspiracy relating to GPPPI. Plaintiffs cannot make discovery about the GPPPI relevant and proportional to the needs of the case simply by asking for documents about it.[8] *See* Fed. R. Civ. P. 26(b)(1). The Court should reject Plaintiffs' request for documents long past the date of the complaints on a topic not alleged to be part of the conspiracy.

### 2. Requests 48-53 – Structured Data

Defendants have agreed to lengthen the relevant time period for producing structured data to *fourteen years*, from January 1, 2004 to December 31, 2017 – including four years before the start of the claimed conspiracy and almost a year and a half after. This proposal is reasonable and proportional to the needs of the case. Indeed, fourteen years of data is greater than what the defendants produced in both cases Plaintiffs cite, *Kleen Products* and *New Park Entertainment*. And it includes nearly 5.5 years outside of the alleged conspiracy period, which Plaintiffs can use "as a potential benchmark for the econometric analysis" they expect their economists to perform.[9] Numerous complex antitrust cases have involved shorter benchmark periods. *See, e.g.*, *In re Domestic Drywall Antitrust Litig.*, No. 13-MD-2437, 2017 U.S. Dist. LEXIS 134802, at *75 (E.D. Pa. Aug. 23, 2017) (two-year benchmark); *Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, No. 09-cv-0852, 2016 U.S. Dist. LEXIS 82434, at *35 (E.D. Wis. June 24, 2016) (under 2.5 years); *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171, 190 (E.D. Pa.

---

[7] Defendants' proposals assume the requested materials are reasonably accessible and their production would not be unduly burdensome.

[8] The lack of proportionality is compounded by the fact that some Defendants already have made productions to the Florida Attorney General's Civil Investigative Demand, and those Defendants would have to re-collect documents to accommodate Plaintiffs' February 2017 date.

[9] Plaintiffs' suggestion that Defendants should stipulate to the adequacy of their economists' econometric techniques, without knowing anything about that analysis, is unreasonable. In addition, Defendants note that, while they do not object to producing certain data, "[r]egression models and statistical tests . . . cannot be used conclusively to prove the existence of collusion." ABA Section of Antitrust Law, Proof of Conspiracy under Federal Antitrust Laws 225 (2010); *see also* Hays Gorey, Jr. & Henry A. Einhorn, *The Use and Misuse of Economic Evidence in Horizontal Price-Fixing Cases*, 12 J. Contemp. L. 1, 28 n.111 (1986) ("[N]o statistical or economic study can establish that there was a conspiracy.").

2015) (four years); *In re Steel Antitrust Litig.*, No. 08-cv-5214, 2015 U.S. Dist. LEXIS 119652, at *30 (N.D. Ill. Sept. 9, 2015) (five years).

Plaintiffs identify no reason that fourteen years of data is insufficient; they simply insist on more before they or their experts have even looked at Defendants' data. And they have made no effort to compromise, refusing to modify their demands even as Defendants first offered to expand the default period to 2006 and then lengthened their offer further to 2004. Plaintiffs' suggestion that there is no burden on Defendants is wrong. As Defendants have explained, they are still investigating their databases, and thus it is too early to detail all the burdens of producing the requested data. But Defendants know that Plaintiffs have served six different Rule 34 requests asking for a wide range of structured data, and those requests implicate multiple databases for the majority of the 14 Defendants, including legacy systems. Collecting, processing, and producing data from those many sources already will require significant work. Adding another two years of data will materially increase the burden still, and older data and documents present unique burdens because they are more likely to be archived or maintained in a manner that requires additional investigation and investment to locate and produce. Given this, Plaintiffs must show more than just a mere desire for additional data to justify their demands.

### 3. Requests 34-37 – Government Investigation Documents

Plaintiffs' letter greatly understates the scope of what they are seeking with these requests. While Plaintiffs depict the requests as looking for "evidence of previous anticompetitive conduct," their actual requests are far broader than Plaintiffs portray them. Request 35 alone asks for "all Documents relating to *any possible or alleged violations of federal, state, or international antitrust laws*, competition laws, anti-monopoly laws, anti-cartel laws, anti-dumping laws, unfair competition laws, anti-bribery laws and *any similar laws, rules or regulations*." ECF No. 508, Ex. A, at 19 (emphasis added). Request 34 calls for "all Documents relating to competition in the Broiler industry" produced to any government agency, specifically including the U.S. Department of Agriculture and the U.S. Securities & Exchange Commission, among others.

Given the breadth of these requests, Plaintiffs cannot credibly assert that locating responsive documents "should not be difficult."[10] And the decisions they cite do not support their vast requests. Those cases focused on discrete, highly similar conduct, such as guilty pleas in other pertinent price-fixing conspiracies (conduct that a plaintiff likely could establish without even requesting documents). *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002) (defendant "conceded to have fixed prices on related products"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (discussing "guilty pleas entered by various Defendants in the DRAM litigation").

By contrast, Plaintiffs' requests are a fishing expedition to seek evidence unrelated to the conspiracies they allege in their complaints. *See, e.g.*, *Bredemus v. Int'l Paper Co.*, 252 F.R.D. 529, 533-34 (D. Minn. 2008) (refusing to compel discovery of unrelated incidents and explaining

---

[10] To be clear, Defendants are not suggesting that documents responsive to these requests exist.

parties may not "roam in the shadow zones of relevancy to explore matter which does not presently appear germane on the theory that it might conceivably become so"); *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1305 (N.D. Ga. 2002) ("[I]llegal behavior elsewhere in time or place does not generally allow the inference of an immediate conspiracy"); *In re Travel Agent Comm'n Antitrust Litig.*, No. 1:03-cv-30000, 2007 U.S. Dist. LEXIS 79918, at *37-38 (N.D. Ohio Oct. 29, 2007) (holding allegations of other price-fixing conspiracies were irrelevant and explaining "investigations by the U.S. Department of Justice and other legal action taken against the airline industry relating to various forms of alleged anticompetitive conduct is not only completely immaterial to Plaintiff's claim, but is also arguably prejudicial" (internal quotation marks omitted)).

Setting aside the dubious relevance of these requests, Plaintiffs have established no need to force Defendants to search for materials going back eight years *before* the alleged conspiracy. The default time period is sufficient. Beyond that, if Plaintiffs have specific investigations or litigations in which they are interested, Defendants will meet and confer with them about those.[11]

### E. Defendants Have Adequately Disclosed What They Will Produce Based on the Information Available

This is another example of Plaintiffs asking the Court to intervene and order broad relief – applicable to all Defendants and all Rule 34 requests – instead of focusing on specific, concrete disagreements. In fact, Plaintiffs' own letter highlights what a non-issue this "dispute" appears to be. For example, Plaintiffs complain generally about "almost every one of [Tyson's] responses" because those responses include the phrase "relevant to the parties' claims or defenses." Setting aside that this language is drawn directly from Rule 26(b)(1) – which defines the scope of discovery as what is "relevant to any party's claim or defense and proportional to the needs of the case" – Tyson's responses were served months ago. Since then, Tyson and Plaintiffs have conferred at least six times to discuss Tyson's responses, and they have significantly eliminated or narrowed their differences. Indeed, Plaintiffs' letter identifies just one request where they claim a dispute exists with Tyson (and that dispute came as a surprise to Tyson, as discussed further below). Likewise, Plaintiffs refer to an individual dispute with Perdue, but that dispute also is limited to a single request. Thus, Plaintiffs have failed to articulate a ripe dispute across all Defendants that requires this Court's resolution, and they certainly have not presented any basis for the broad relief they request.

Additionally, Plaintiffs again overlook the stage of this litigation. Until the Court rules on what claims and defenses are relevant (if any), Defendants cannot know definitively how burdensome it will be to produce the requested documents, making it impossible to state exactly what is

---

[11] Plaintiffs complain that Defendants have refused to produce materials relating to *United States v. National Broiler Marketing Ass'n*. Conspicuously, Plaintiffs did not disclose the date of that litigation, which was filed over 40 years ago and thus has no plausible relevance to the alleged conspiracy in this case. *See United States v. Nat'l Broiler Mktg. Ass'n*, Civil Action No. 18173, 1975 U.S. Dist. LEXIS 16437 (N.D. Ga. Aug. 26, 1975). Defendants do not agree to produce any documents relating to a case of that vintage.

reasonable to withhold or produce.  Nevertheless, Defendants have endeavored to respond to Plaintiffs' document requests as best they can, and they have been negotiating with Plaintiffs in good faith.[12]  Plaintiffs' demand for further precision at this point is unreasonable.

## II.  Individual-Defendant Issues

### A.  Request 2(e) as to Defendants George's, Peco, and Perdue (seeking phone records for each custodian)[13]

Plaintiffs state that "Defendants Peco, Perdue, and George's have indicated their intent to apply redactions to certain unidentified phone numbers" within their custodians' phone records, and argue that "[t]he Court should order that these Defendants produce their phone records without redactions."  ECF No. 508, at 11.  Plaintiffs claim to be raising this issue now, before any such hypothetical redacting has occurred, to avoid "significant delay" that might result from "costly and time consuming meet and confer efforts regarding the basis for such redactions."  *Id*.  Plaintiffs also speculate that any such hypothetical redactions will "make Plaintiffs' processing and analysis of the phone records themselves difficult and expensive given that they change the formatting and structure of the data."  *Id*.  Plaintiffs have not offered any basis for this Court's intervention at this point in time, and their premature request should be denied.

To begin, this issue is not sufficiently ripe or concrete for Court resolution at this juncture.  None of the three Defendants identified by Plaintiffs has, in fact, expressed an "intent to apply redactions" to their phone records.  Instead, these Defendants have all informed Plaintiffs that they have not yet determined whether they will seek to redact phone records, or the nature or extent of any proposed redactions, and have suggested that the parties meet and confer if and when a Defendant elects to apply any such redactions.  In other words, at present, these Defendants have simply reserved their rights and have declined to unequivocally agree now, before any loading or review of phone records has commenced, that there is no conceivable circumstance in which any redaction of phone records might be appropriate.[14]

This Court has previously told the parties that it will not address the issue of redaction of irrelevant personal information, including from phone records, "in the abstract" and is "not going to say from a blanket provision you can't redact anything."  6/16/17 Tr., Ex. L, at 134:13-15; *see also id*. at 131:4-6 ("I agree with you that I'm not going to make a blanket rule that nobody can redact anything.").  Unless and until a Defendant notifies Plaintiffs that it actually intends to redact or withhold particular phone records, any Court intervention would necessarily be "abstract" and potentially unnecessary.  Plaintiffs' assertion that any future meet and confer on this issue will be "costly and time consuming" is purely conjectural, as is Plaintiffs' concern

---

[12]  The Court's order states only that the parties must "object" to Rule 34 requests, not that they must respond, *see* ECF No. 388, but Defendants nevertheless responded to move the case forward.

[13]  Defendants have paraphrased Plaintiffs' requests for informational purposes only.

[14]  Likewise, Plaintiffs' suggestion that all other Defendants have "committed" to "produce their phone records without redactions" is inaccurate.  ECF No. 508, at 11.  Other Defendants have similarly reserved their rights on this question.

AMERICAS 93600837

about the "formatting and structure" of any redacted phone data. Defendants, as the producing parties, have every incentive to address this issue in the most efficient way possible, should it arise in the future.

Importantly, each Defendant's reservation of rights to this end is expressly protected by the parties' agreed ESI Protocol and consistent with this Court's prior guidance. *See* ECF No. 459. The ESI Protocol specifically contemplates that irrelevant personal and/or sensitive information may be appropriately redacted from produced documents, including phone-related records. *See id.* ¶ VI.F. ("A Party may redact irrelevant information that is highly sensitive, medical, or personal information (e.g., health information or Social Security Numbers)."); *id.* ¶ V.G.1.c. ("For mobile devices that are owned by the Document Custodian and used for personal purposes, if the device is in the possession, custody, or control of a producing Party, a producing Party is entitled to redact or withhold information from the contacts file that does not relate to the Document Custodian's work—including, but not limited to, the name and contact information for any family or friends not involved in the Broiler industry."). The parties' agreements on these provisions followed this Court's express guidance that irrelevant information that is "highly sensitive," "medical information," or "personal information" may be appropriate for redacting; this Court even noted that "calls to family members" are commonly redacted in some cases. 6/16/17 Tr., Ex. L, at 131:10-15. Plaintiffs ignore these facts, which various Defendants have repeatedly made clear to Plaintiffs during the meet and confer process. Particularly given that Plaintiffs have claimed an entitlement to records from phones used for both business and personal purposes, it is entirely reasonable and consistent with the parties' agreements for Defendants to preserve some flexibility to later determine that certain irrelevant information contained in those records may be appropriate for redaction.

This Court should decline Plaintiffs' invitation to wade into what is, at present, a purely theoretical dispute. If and when a concrete disagreement arises concerning redaction of phone records, the parties can present it to the Court at the appropriate time.

**B. Request 3 as to Defendant Tyson (seeking all documents relating to trade association and other meetings)**

Plaintiffs gave Tyson no indication they intended to raise this purported dispute with the Court. Although Tyson met and conferred with Plaintiffs many times, the parties only discussed this request in the first meeting, and Plaintiffs never stated that the parties were at an impasse. In fact, in their only correspondence on the subject, Plaintiffs made no demand for all documents:

> Tyson explained that the specific items Plaintiffs note, for the most part, do not seem obviously objectionable. Specifically, it is not Tyson's position that documents relating to Trade Associations are not relevant, but it is possible that certain subcommittees are irrelevant. Plaintiffs agreed that certain subcommittees themselves may not be relevant, but their members are relevant because these Trade Associations are an opportunity for relevant contacts. Tyson is also concerned that our request of "all documents" is overbroad. However, Tyson is not withholding any documents based on this objection at this time.

AMERICAS 93600837

07/28/17 Pozan Letter to Tyson Counsel, Ex. M, at 3.[15]   Thus, Tyson does not view this "dispute" as ripe.

That said, Tyson does not agree that Plaintiffs are entitled to every document related to every trade association meeting that Tyson attended over nearly ten years.[16]   Plaintiffs contend that "attendance and participation at such a meeting provides Defendants with opportunities to meet and engage in inter-defendant communications which are discoverable."  But such opportunities to conspire are of little significance, because trade association activities are "not condemned or even discouraged by the antitrust laws."  *Moore v. Boating Indus. Ass'n*, 819 F.2d 693, 712 (7th Cir. 1987) (citation omitted).  The minimal relevance of opportunities to conspire does not justify a request for "all documents" (in fact, Plaintiffs likely need only one document to establish that an opportunity existed).  If a document does not relate to the subject matter of the alleged conspiracy, but instead reflects the legitimate activities of a trade association – and there likely will be thousands of such documents – it is not relevant to Plaintiffs' claims, and Tyson should not have to produce it.  Nevertheless, had Plaintiffs properly met and conferred with Tyson on this request as they should have, Tyson would have attempted to compromise: it remains willing to consider producing certain additional sets of trade association documents.

### C.  Request 5 as to Defendant Simmons (seeking all documents and data relating to sales and purchases with other producers)

No dispute exists between Simmons and Plaintiffs.  Simmons and Plaintiffs reached agreement on request 5, and this request does not require the Court's consideration.  *See* 10/29/17 Lienhardt email to Novion, Ex. N.

### D.  Request 13 as to Defendants Mountaire and House of Raeford (seeking all documents relating to bids for the sale of Broilers)

Plaintiffs' October 16, 2017 letter alleges that Defendants House of Raeford Farms ("HRF") and Mountaire have "refused" to produce documents in response to request 13.  ECF No. 508, at 13. This contention surprised Defendants, given that both HRF and Mountaire did offer and continue to offer to produce documents in response to request 13.

Request 13 seeks "All Documents relating to any . . . bids for the sale of Broilers . . . ."  During the meet and confers, Plaintiffs asserted that request 13 is designed to elicit documents showing that the Defendants were engaged in "bid-rigging."  Request 13 makes no reference to bid-rigging, and the Direct Purchaser Plaintiffs' Second Amended Complaint, ECF No. 212, makes no bid-rigging allegations against HRF or Mountaire (or any other Defendant).  Mountaire and HRF each objected to Plaintiffs' interpretation of request 13 on the grounds that document discovery focused on bid-rigging is not relevant, and is unduly burdensome and not proportional to the needs of the case, given the lack of bid-rigging allegations against Mountaire and HRF (or

---

[15] Tyson does not adopt Plaintiffs' characterization of the parties' negotiations.

[16] Tyson doubts the accuracy of Plaintiffs' claim that "most Defendants" have agreed to search for all trade association documents "without limitation," but Tyson is not bound by their positions in any event.

AMERICAS 93600837

any other Defendant). In the spirit of compromise, both Mountaire and HRF have agreed to produce certain documents in response to request 13:

- In its original response to request 13 Mountaire offered to search agreed custodial and non-custodial sources for documents sufficient to show Mountaire's spot market purchases of Broilers, in spite of its objection that bid-rigging is not a claim or defense in this action, and discovery directed toward it would be irrelevant. Plaintiffs claim that request 13 seeks relevant information because "the presence of bidding and auctions for the sale of Broilers (and the ability of multiple Defendants to fulfill such bids) supports Plaintiffs position that Broilers are commodity products that are susceptible to collusion." ECF 508, at 13. Setting aside whether Plaintiffs' contention is correct, Plaintiffs do not explain in their October 16 letter to the Court how Mountaire's offer is insufficient. The documents, if any, that Mountaire offered would provide what Plaintiffs claim to seek. Nevertheless, Mountaire will offer to make a reasonable effort to search agreed custodial sources for documents that show Mountaire's bids to purchase Broilers between January 1, 2007 and September 2, 2016, cognizant of Plaintiffs' interest in supposed "bid rigging" documents to the extent any exist. Mountaire will make a reasonable effort to search agreed non-custodial sources for Documents sufficient to show the same. Mountaire submits that in light of the offered production and Plaintiffs' stated rationale for request 13, there is no ripe dispute for the Court to resolve at this juncture.

- HRF's original Response to request 13 stated that it would search stated sources and produce Documents sufficient to show HRF's bids for the sale of Broilers and any purchase of Broilers to fulfill a bid between January 1, 2007 and September 2, 2016. On October 20, 2017, HRF submitted a further Response to Plaintiffs' counsel on open matters that were the subject of continuing meet and confer communications at the time Plaintiffs submitted ECF No. 508 to the Court. The Response addresses open matters with request 13. Specifically, HRF proposed to search custodial sources for Documents that show HRF formal bids, cognizant of Plaintiffs' interest in supposed "bid rigging" documents to the extent they exist, and search non-custodial sources for Documents sufficient to show HRF formal bids for the sale of Broilers and any purchase of Broilers to fulfill a bid. HRF also advised in the Response that it will further meet and confer on open matters with this RFP as warranted. Given its offers of production, and continuing meet and confer communications, HRF submits that this dispute is not ripe for the Court's consideration.

E. **Request 19- 21 as to Defendants Peco, Mountaire, and House of Raeford (seeking all documents relating to various topics such as the Georgia Dock)**

Plaintiffs' letter alleges that Defendants Peco, Mountaire, and House of Raeford have "refused" to produce Georgia Department of Agriculture and Georgia Dock documents in response to requests 19 through 21. ECF No. 508, at 13-14. Defendants do not understand why Plaintiffs believe this to be the case given the parties' negotiations during the meet and confers and Defendants' most recent offers of production and compromise.

AMERICAS 93600837

As Plaintiffs correctly acknowledge, Peco, Mountaire, and House of Raeford did not participate in the Georgia Dock pricing survey. In addition, Plaintiffs have disclaimed any connection between these Defendants and the Georgia Department of Agriculture or the Georgia Dock. *See* ECF No. 349-2, at 12 ("[t]he Plaintiffs and the Defendants specified in Direct Purchaser Plaintiffs' Second Amended Complaint (ECF Dkt. 212), ¶ 100 agree to meet and confer on a processing end date for discoverable information responsive to . . . Request No. 21, subject to Defendants' objections to that Request."). Given the lack of allegations against them, Peco, Mountaire, and House of Raeford each originally objected to requests 19 through 21 on the grounds that they are irrelevant, unduly burdensome, and not proportional to the needs of the case, and stated they would not produce documents in response.

During the parties' meet and confers, however, Peco, Mountaire, and House of Raeford each ultimately agreed to produce documents in response to these requests. Specifically:

- On August 23, 2017, Peco confirmed in writing that, although it would not agree to otherwise expand its search for responsive documents, Peco will not withhold any non-privileged document that is otherwise reviewed relating to Peco's potential "awareness or understanding of manipulation or irregularities in the Georgia Dock Broiler price index" as clarified in Plaintiffs' letter (should any exist). On September 29, 2017, Peco reiterated (again, in writing) that it would not withhold documents as described above *and* informed Plaintiffs that in the interest of compromise, Peco was also willing to meet and confer as part of search term negotiations regarding potential, targeted search terms specific and proportional to the allegations against Peco. Peco submits that in light of this offer of production and offer to consider specific, targeted search terms, there is no ripe dispute for the Court to resolve at this juncture.

- On October 7, 2017, Mountaire confirmed in writing that, although it will not agree to expand its search for responsive documents, Mountaire will not withhold any "responsive, relevant, non-privileged document that is otherwise reviewed showing Mountaire's 'awareness or understanding of manipulation or irregularities in the Georgia Dock Broiler price index'" per Plaintiffs' clarification during the meet and confer. Given that Mountaire has offered to produce documents in response to requests 19 through 21, this dispute is not ripe for the Court's consideration.

- On October 20, 2017, House of Raeford submitted a further response to Plaintiffs on open matters that were the subject of continuing meet and confer communications at the time Plaintiffs submitted ECF No. 508 to the Court. This Response addressed requests 19 through 21. Specifically, House of Raeford agreed to include the Georgia Department of Agriculture in response to requests 19 and 20, and to search custodial sources for Documents that discuss House of Raeford's use of the Georgia Dock price index for pricing of Broilers or perceived inaccuracies in the Georgia Dock price index in response to request 21. House of Raeford also advised Plaintiffs that it will further meet and confer on open matters with these requests as warranted. Given its offers of production, and continuing meet and confer communications, House of Raeford submits that this dispute is not ripe for the Court's consideration.

### F. Request 29 as to Defendant Perdue (seeking all documents relating to any Broiler pricing or output conspiracy)

Request 29 seeks the following:

> All Documents that directly or indirectly relate, in whole or in part, alone or when viewed with other Documents any combination, conspiracy, agreement or understanding, explicit, implied or tacit, to fix prices, reduce output, limit production, limit capacity, limit supplies, limit inventories, or allocate customers, product lines or territories for Broilers sold in the U.S.

As Perdue has noted consistently during the meet and confer process on this request, it is vague and appears to call for documents that are not relevant to the allegations in the Complaint. Perdue has attempted to salvage the request rather than simply objecting to it by committing to search for any documents regarding any conspiracies where those documents are relevant to the claims or defenses in the case. Plaintiffs have responded by consistently misconstruing Perdue's offer, making incomprehensible and unrealistic demands and then unilaterally declaring an impasse without ever explaining their own demands.[17]

In their letter to the Court the Plaintiffs once again misconstrue Perdue's position to make it look less reasonable and also unique.[18] Plaintiffs claim that Perdue's position is that "the limitation on 'relevant to the claims and defenses' meant that it would only produce documents evidencing a conspiracy to fix the price of Broilers if the conspiratorial acts were explicitly alleged in Plaintiffs' complaints." But Perdue has reiterated during the meet and confer process that it is willing to produce documents that relate to any conspiracy where that document is relevant to the claims or defenses in this action. *See* 8/25/17 Davis Letter to Pearson, Ex. Q, at 9 ("Perdue would produce, by way of example only, non-privileged documents that relate to the alleged conspiracy and also some other, unrelated conspiracy (if such documents existed). However,

---

[17] Plaintiffs have asserted that "any conspiratorial actions on Perdue's behalf are relevant and responsive to this request (whether they were specifically pled in the Complaints *or merely implied*)." 9/12/17 Pearson Letter to Davis, Ex. O, at 6 (emphasis added). Perdue was still seeking clarification on what Plaintiffs meant by conspiratorial actions by Perdue that were "merely implied" by the Complaints when Plaintiffs declared an impasse without further explanation.

[18] Plaintiffs claim that "[a]ll Defendants except Perdue have . . . agreed to search for and produce such documents," but, in fact, a number of Defendants have limited their offer just as Perdue has done, and apparently Plaintiffs accepted it. *See, e.g.,* 5/19/17 Sanderson Farms' Objections and Responses to All Plaintiffs' First Set of Requests for Production of Documents to All Defendants, Ex. P, at 39 ("Subject to and without waiving these and its general objections, Sanderson Farms will make a reasonable effort to search agreed or court-ordered custodial and non-custodial sources for Documents *relevant to the claims and allegations in the Complaint* and will produce responsive Documents that are not otherwise privileged. However Sanderson Farms is not aware of any such Documents.") (emphasis added)).

Perdue maintains that documents that relate solely to other conspiracies (if any exist) that have no connection to Plaintiffs alleged conspiracy are not relevant to this litigation.").[19]

Plaintiffs' attempt to manufacture a dispute by mischaracterizing Perdue's position and that of other Defendants should be rejected.

### G. Negotiations with Defendant Wayne Farms

Plaintiffs are attempting to manufacture a discovery dispute as to Wayne Farms where none exists. Wayne Farms disagrees with Plaintiffs' assertions that Wayne Farms did not respond in a timely manner to its October 13 letter. Instead, the record shows that Wayne Farms has actively engaged in an ongoing and time-intensive meet and confer process with Plaintiffs over the last few months. It has diligently evaluated Plaintiffs' positions and made meaningful offers of compromise, and it has been extraordinarily forthcoming and transparent in responding to Plaintiffs' requests for information about the company's documents and custodians.

As a result of these efforts, Wayne Farms and Plaintiffs appear to have reached agreement or are very close to reaching agreement on at least 26 of Plaintiffs' requests for production. Wayne Farms remains hopeful that the parties will be able to resolve all their remaining disputes, and will in good faith endeavor to do so. For that reason, Wayne Farms does not believe there is a "concrete issue[] or dispute[]" that the Court needs to address here. *See* ECF No. 492, ¶ 3. To clarify the record, the below timeline summarizes the parties' meet and confer discussions and Wayne Farms' timely and meaningful participation in those ongoing efforts:

(1) Wayne Farms served responses to All Plaintiffs' RFPs in which it made significant offers of production and explained in detail how plaintiffs should narrow certain RFPs to minimize the burden on Wayne Farms. Plaintiffs' June 30 letter in response rejected every one of Wayne Farms' offers and made *zero* counter-offers of compromise.

(2) On July 17, Wayne Farms was the first defendant to meet and confer with Plaintiffs.

(3) Plaintiffs refused to meet and confer with Wayne Farms between July 18 and July 31, and demanded that the parties meet before that time period. Wayne Farms accommodated Plaintiffs' schedule and front-loaded the meet and confer process. The parties spoke for *over four hours* by telephone on July 17, ending their meet and confer late in the evening. Wayne Farms promptly followed-up with *a 10-page letter* on July 19.

---

[19] Perdue previously told Plaintiffs that their characterization of Perdue's position – which they repeat in their letter to the Court – misstates Perdue's position. 8/25/17 Davis Letter to Pearson, Ex. Q, at 9 ("Plaintiffs' letter mischaracterizes Perdue's position when you state that Perdue would withhold 'any Documents evidencing or relating to a conspiracy that is not specifically alleged in the Complaint.' As Perdue explained during the meet and confer, Perdue's position is that not every document relating to any conspiracy involving the Defendants in this litigation is necessarily relevant to the conspiracy actually pled in Plaintiffs' complaints.").

AMERICAS 93600837

(4) On July 31, the parties set-up their next call.  The parties spoke on August 2 and again on August 7.  At the conclusion of the August 7 call, Plaintiffs stated that they would send a letter to Wayne Farms.  Plaintiffs did not send that letter until September 12—***over a month later***.[20]

Wayne Farms' October 13 response to that letter was not untimely.  By September 12, the parties were engaged in "global discussions regarding certain overarching issues affecting Defendants' responses."  ECF No. 508, at 1.  Many of those global issues overlapped—and were intertwined with—the individual issues presented in Plaintiffs' discussions with Wayne Farms.  In fact, Plaintiffs' September 12 letter to Wayne Farms stated for the first time that, even where Wayne Farms thought the parties had previously reached agreement on specific RFPs, Plaintiffs were expressly conditioning any agreements "subject to the issues being discussed at the global level."

In order to benefit from the clarity that global resolution would provide its discussions with Plaintiffs and to avoid unnecessary disputes with Plaintiffs about overlapping issues, Wayne Farms focused on trying to resolve overlapping issues through the global discussions.  The parties exchanged letters on those global issues on September 15, October 4, October 11, and had various teleconferences throughout that time.  Meanwhile, Wayne Farms diligently pursued its internal investigation in order to carefully craft meaningful counter-offers that it ultimately sent to plaintiffs on October 13.  Plaintiffs responded on October 27 and agreed with many of those offers.

For the same reasons, Wayne Farms disagrees with IPPs' assertion that they have made "very little progress" with Wayne Farms.  ECF No. 507, at 1, 5.  Through the parties' meet and confer process about IPPs' 21 separate requests, IPPs withdrew one and confirmed that another did not apply to Wayne Farms.  As to the remaining 19, the parties have significantly narrowed their disputes and Wayne Farms believes the parties are close to reaching agreement on all of them.  In its October 13 letter, Wayne Farms extended significant offers of compromise as to the remaining requests, but IPPs have not yet responded (17 days later).

In short, Wayne Farms has engaged and will continue to engage in timely and efficient meet and confer discussions with Plaintiffs, and Wayne Farms does not believe there is a concrete discovery dispute before the Court.

*          *          *

In sum, Defendants believe the best course is for the Court to defer addressing these matters until a later date (assuming they even remain unresolved at that time).  However, Defendants will provide the Court with whatever further information it needs to resolve them now if the Court chooses to do so.

---

[20] During that period, Wayne Farms met and conferred with EUPs about their separate set of document requests.

WHITE & CASE

Respectfully submitted,

/s/ David H. Suggs

**David H. Suggs**

**T** +1 212 819 2686
**E** dsuggs@whitecase.com

Attachments

cc:     Plaintiffs' Interim Lead and Liaison Counsel

AMERICAS 93600837