UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION*<br><br>This Document Relates To: All Actions | Case No. 1:16-cv-08637<br><br>Magistrate Judge Jeffrey T. Gilbert |

## ORDER

This matter is before the Court on Defendants' Motion to Stay Production Obligations Imposed by Plaintiffs' Subpoenas Served on Third Parties [499]. In their Motion, Defendants ask that the Court stay the production obligations imposed by nine document production subpoenas that Plaintiffs recently served on third parties.[1] Defendants contend this relief is justified because Plaintiffs did not seek leave before serving the subpoenas and because there is no need to require third parties to produce documents at this time. In response, Plaintiffs argue that they were not required to seek leave before serving the subpoenas and that they served the subpoenas to prevent the prejudicial destruction of relevant information. For the reasons stated below, Defendants' Motion [499] is granted in part and denied in part.

I.

On October 3, 2017, Plaintiffs informed Defendants that they planned to serve nine document production subpoenas on third parties and gave Defendants copies of the subpoenas they intended to serve. [501-3 at 5–6].[2] Defendants objected, and the parties met and conferred in an attempt to resolve the dispute. [499 at 2; 510 at 4]. The parties were unsuccessful, and Plaintiffs served the subpoenas on October 10, 2017. [499 at 1–3; 510 at 2, 4].

The nine subpoenas can be broken into three categories. The first is a single subpoena served on Pilgrim Enterprises, Inc. ("PEI"), which commands the production of documents related to the founder of Defendant Pilgrim's Pride, Corp. ("Pilgrim's Pride"). [501-1 at 29–33]. Next, Plaintiffs served five subpoenas, one each, on five different phone carriers: AT&T Corp. ("AT&T"); CenturyLink Communications LLC ("CenturyLink"); Comcast Corp. ("Comcast"); Verizon; and Windstream Services, LLC ("Windstream"). *Id.* at 2–28. Finally, Plaintiffs served three subpoenas (again, one each) on Claxton Poultry Company, Inc. ("Claxton"); Harrison Poultry, Inc. ("Harrison"); and Mar-Jac Poultry, Inc. ("Mar-Jac"). [501-1 at 34–45]. Plaintiffs

---

[1] Defendants also ask that the Court preclude Plaintiffs from serving any additional third-party production subpoenas for an unspecified period of time (presumably until a ruling on the motions to dismiss). [499 at 3]. Defendants, however, do not make any arguments in support of this ambitious request for relief.

[2] Although the Court cites sealed documents in this Order, the Order does not reveal any confidential information contained in those documents.

allege in their operative complaints that these three companies participated in the alleged conspiracy as "Producer Co-Conspirators" (which is the term the Court will use in this Order to refer collectively to Claxton, Harrison, and Mar-Jac).[3] [212, ¶ 71; 253, ¶ 76; 255, ¶ 99].

Three days after Plaintiffs served these nine third-party document production subpoenas, Defendants filed the Motion now before the Court. [499]. The Court then set a briefing schedule and ordered Plaintiffs to inform the subpoena recipients that they need not respond to their respective subpoenas until the Court rules on Defendants' Motion. [505].[4] The following day, Plaintiffs filed a combined Motion to Expedite the Briefing Schedule and response brief in opposition to Defendants' Motion. [510]. The Court modified the previously-entered briefing schedule, effectively granting in part and denying in part Plaintiffs' Motion to Expedite. [513; 515]. Consistent with the new schedule, Defendants filed a reply brief. [519]. Defendants' Motion is ripe for resolution.

II.

Defendants argue the production obligations imposed by the nine subpoenas served on October 10, 2017, should be stayed because Plaintiffs did not follow the proper procedure when serving them. According to Defendants, during a status hearing held on April 21, 2017, the Court ordered Plaintiffs to seek leave before serving any third-party production subpoena to which Defendants objected. Plaintiffs concede they did not seek leave in this instance. Plaintiffs contend, however, that the Court did not actually impose the procedural requirement Defendants claim it did.

During the April 21 status hearing, the Court addressed one third-party document production subpoena that Plaintiffs already had served and two that Plaintiffs wanted to serve. [384 at 50–68]. The Court denied Defendants' oral motion to quash the already-served subpoena. *Id.* at 61. The Court also denied Defendants' oral motion to prevent Plaintiffs from serving a subpoena on the Georgia Department of Agriculture ("GDA") and recognized Defendants could move to quash the subpoena, if they wanted to do so, after Plaintiffs gave them notice and a copy of it before service, as required by Rule 45(a)(4) of the Federal Rules of Civil Procedure. *Id.* at 65–66. Similarly, the Court said it was not convinced by Defendants' argument that the Court should prevent service of any subpoena on Agri Stats, Inc., and recognized that the issue potentially could be revisited after Plaintiffs gave notice and a copy of the subpoena to Defendants in compliance with Rule 45. *Id.* at 67–68.[5] The Court did not order Plaintiffs to seek leave before serving a subpoena on GDA or Agri Stats, Inc.

The Court's rulings and comments on third-party subpoenas during the hearing largely were confined to the three specific subpoenas mentioned above. *See id.* at 64 (emphasizing that the Court was focused on the three subpoenas then before it). The Court addressed only one

---

[3] Additional corporate entities related to Claxton and Mar-Jac are encompassed within the complaints' definition of the term "Producer Co-Conspirators."

[4] All the subpoenas commanded production on or before November 7, 2017, with three commanding production as early as October 17, 2017. [501-1 at 2, 7, 12, 19, 24, 29, 34, 38, 42].

[5] Apparently, Plaintiffs served a subpoena on Agri Stats in July 2017, and neither Defendants nor Agri Stats, Inc. moved to quash it. *See* [499 at 3 n.3].

2

matter related to third-party production subpoenas to be served in the future: the length of the notice period that the parties would be required to provide under Rule 45(a)(4). *Id.* at 25, 54–55, 116–17. The parties eventually agreed to a notice period of four business days, and this agreement is memorialized in Interim Scheduling Order on Agreed Dates No. 1. [388]. During the April 21 hearing, no party asked the Court whether leave must be obtained before serving third-party production subpoenas and the Court did not address the issue.

In their Motion, Defendants also set forth three reasons why, in their view, it makes sense to require leave before serving third-party production subpoenas. The Court understands Defendants essentially to be arguing that, if the Court has not imposed this requirement already, it should do so now. Defendants note the Court's ruling on the pending motions to dismiss could impact the scope of discovery in this case if a Defendant or a claim is dismissed, a particular product is excluded from the definition of "Broilers," or the relevant time period at issue is shortened. *See generally* [489]. Defendants emphasize the special weight that is given to burdens on non-parties. *See Papst Licensing GmbH & Co. KG v. Apple, Inc.*, 2017 WL 1233047, at *3 (N.D. Ill. Apr. 4, 2017); *Tresona Multimedia, LLC v. Legg*, 2015 WL 4911093, at *2 (N.D. Ill. Aug. 17, 2015). Defendants' last point is that requiring leave will help to "avoid a satellite cottage industry" for motions to quash. *See* [384 at 48]. In light of these factors, Defendants say that requiring Plaintiffs to seek leave before service will ensure a third party is not unjustifiably burdened by a document production subpoena. Plaintiffs do not respond to this argument.

Upon reflection, the Court finds Defendants' proposal to be reasonable and practical at this point in the litigation before the District Judge has ruled on Defendants' motions to dismiss. To ensure that no party attempts to fling open the floodgates of third-party discovery before a ruling on the motions to dismiss, the Court now orders that, until Defendants' fully-briefed motions to dismiss are decided, the parties must obtain leave from the Court before serving on a third-party a document production subpoena to which another party objects. After a ruling on the motions to dismiss, the default procedures embodied in Rule 45(a)(4) of the Federal Rules of Civil Procedure and the Interim Scheduling Order on Agreed Dates No. 1 [388] will apply. But Plaintiffs' failure to comply with a process that was not in place when they served the nine third-party subpoenas on October 10, 2017, does not justify staying the production obligations imposed by those subpoenas. The Court thus will not grant Defendants' Motion on the basis that Plaintiffs did not obtain leave before serving the challenged subpoenas.

III.

Defendants argue the Court should grant their Motion because there is no need to require the subpoena recipients to produce documents at this time. According to Defendants, the recipients already are preserving relevant information. Defendants say that, to the extent Plaintiffs have specific problems with a given third party's preservation efforts, those issues can be remedied informally through the cooperation of the parties and the third party, without serving document production subpoenas. Plaintiffs, on the other hand, argue that highly relevant information in the possession, custody, or control of the recipients is being, or is at risk of being, destroyed. Plaintiffs claim the prejudice that could result from this risk can be sufficiently mitigated only through immediate document production. Plaintiffs also maintain that Defendants should not be permitted to interfere in Plaintiffs' efforts to obtain documents from third parties.

3

The Court recently described at some length the approach it has taken to discovery-related matters during this period of time while Defendants' motions to dismiss have been pending in an Order issued on September 28, 2017. [489]. To date, the Court "has neither stayed discovery completely nor allowed full discovery to proceed." *Id.* at 7. Of particular relevance to Defendants' Motion, the Court already has declined to prohibit the service of all third-party document production subpoenas, but has not yet unleashed full third-party document discovery. *See* [384 at 50–68]. The Court has and "will continue to apply [a] benefit-burden balancing approach" when determining whether a given discovery-related task should be completed "unless [that approach] proves to be unworkable." [489 at 7].

A.

Plaintiffs served one subpoena on PEI. [501-1 at 29–33]. PEI is a sole proprietorship that Lonnie "Bo" Pilgrim ("Mr. Pilgrim") owned until his death in July 2017. [519-3, ¶ 3].[6] Mr. Pilgrim founded Pilgrim's Pride and served on its Board of Directors throughout the class period in this case until March 13, 2012. *Id.* ¶ 5. In the subpoena served on PEI, Plaintiffs command the production of: (1) Mr. Pilgrim's communications with any employee of a Broiler Producer concerning cuts to Broiler production or increases to Broiler prices; (2) Mr. Pilgrim's calendars; (3) Mr. Pilgrim's contact information concerning any employee or director of a Broiler Producer; and (4) records reflecting Mr. Pilgrim's attendance at Broiler industry trade association events. [501-1 at 32–33]. For each request, the relevant time period is January 1, 2007 through September 2, 2016. *Id.* at 32.

Defendants argue that requiring PEI to produce documents at this time would burden Defendants because they would have to review all of the subpoenaed documents before they are produced. Among Mr. Pilgrim's documents are materials that he received in connection with his position as a Director of Pilgrim's Pride. [517 at 11; 519-3, ¶ 14]. Some of these documents may belong to Pilgrim's Pride. [517 at 11]. Moreover, Defendants and Michael Rochelle ("Mr. Rochelle"), who is an attorney for Mr. Pilgrim and PEI, say that Mr. Pilgrim's estate owes a fiduciary duty to maintain the confidentiality of documents Mr. Pilgrim received in his capacity as a Director and that the estate is prohibited from disclosing confidential documents to Plaintiffs without the consent of Pilgrim's Pride. [517 at 11; 519-3, ¶ 14]. Plaintiffs do not contend otherwise. To protect its privileged or confidential information, Pilgrim's Pride wants to review the subpoenaed documents, identify any protected information in them, withhold or redact that information, and prepare a privilege log. [517 at 11]. PEI has agreed to let Pilgrim's Pride do so before any documents are produced to Plaintiffs. [519-3, ¶ 14]. Plaintiffs contend the burden on Defendants could be limited through a Quick-Peek agreement. But Defendants and PEI object to allowing Plaintiffs to review Mr. Pilgrim's documents before Defendants conduct their privilege review. [517 at 11; 519-3, ¶ 14]. Further, even under Plaintiffs' proposal, Defendants still would have to incur the burden of conducting a privilege review before PEI actually produced documents to Plaintiffs. Therefore, requiring PEI to produce the requested documents at this time would impose a meaningful burden on Pilgrim's Pride.

Plaintiffs assert that, in spite of any burden, Defendants cannot interfere with Plaintiffs' ongoing, productive discussions with PEI. Essentially, this argument relies on the premise that

---

[6] PEI's predominate business is banking. [519 at 9; 519-3, ¶ 4].

4

PEI would produce the subpoenaed documents voluntarily if it were not for Defendants' meddling. This premise is unsound. PEI says it does not want to incur the costs of producing documents if it is not required to do so and document production has not begun in this case.[7] [519-3, ¶¶ 16, 24]. Mr. Rochelle has told Plaintiffs that PEI prefers to wait for this Court's ruling on Defendants' Motion before filing its own motions in the Eastern District of Texas. *See id.* ¶ 19. The Court understands that to mean PEI will file a motion to quash Plaintiffs' subpoena if Defendants' Motion is denied. Therefore, Defendants are not preventing PEI from producing documents that PEI otherwise would want to turn over to Plaintiffs at this time.

Plaintiffs also contend any burdens imposed by the subpoena are justified because there is a risk that they will be unable to obtain relevant information if production is delayed. To be clear, Plaintiffs do not contend there is any risk that the documents requested by the subpoena they served on PEI actually will be destroyed. Plaintiffs instead say they are worried about losing access to the documents if Mr. Rochelle stops representing PEI. As of now, though, Mr. Rochelle has no concern that he will not be representing PEI in the future. [519-3, ¶ 22]. Moreover, Plaintiffs do not explain how the cessation of one particular attorney's representation would affect PEI's obligations to preserve documents or limit their ability to serve a subpoena requiring the production of those documents at an appropriate time. Plaintiffs also express concern that they will lose the ability to confront witnesses to a single conversation during which Plaintiffs claim Mr. Pilgrim made a statement concerning the scope of the alleged conspiracy. Plaintiffs provide no basis, other than speculation, for believing a witness to the conversation who could be identified in Mr. Pilgrim's documents will become unavailable in the near future. Moreover, Plaintiffs' proffered reason is significantly undercut by the fact that they neither asked Mr. Rochelle about the conversation nor limited their subpoena to documents related to it.

The record now before the Court provides no indication that PEI is falling short in its preservation efforts. Ever since Plaintiffs first contacted Mr. Rochelle in December 2016, Mr. Pilgrim, his estate, and PEI have worked diligently to preserve Mr. Pilgrim's documents. After receiving a preservation letter from Plaintiffs, Mr. Rochelle and PEI took steps to identify, collect, and store all files belonging to Mr. Pilgrim. *Id.* ¶ 8. They organized the entire contents of Mr. Pilgrim's office and stored them at PEI's headquarters. *Id.* Early in 2017, Mr. Rochelle and PEI forensically imaged the computers of Mr. Pilgrim's secretary and several other PEI employees whose offices were close to Mr. Pilgrim's office.[8] *Id.* ¶¶ 10, 11. The imaged hard drives are being stored at PEI's headquarters too. [499 at 8]. According to Mr. Rochelle, all of these documents will remain sequestered at PEI's headquarters until the Court orders document production to begin in this case, and he does not believe there is any risk of destruction. [519-3, ¶ 21]. Plaintiffs have not expressed to Mr. Rochelle any concerns about PEI's preservation efforts or identified any preservation task which Mr. Rochelle has refused to complete. *See id.*

---

[7] On September 12, 2017, Mr. Rochelle gave Plaintiffs permission to review the requested documents in preparation for production. [519-3, ¶ 15]. Mr. Rochelle says, though, that he only agreed to do so based on a misimpression that document discovery had begun in this case. *Id.* ¶¶ 15, 16. PEI no longer wants to voluntarily allow Plaintiffs to review the subpoenaed documents at this time. *Id.* ¶ 16.

[8] Mr. Pilgrim did not use a computer regularly and relied on his secretary to print hard copies of emails and documents for him. [519-3, ¶ 10].

Rather, Plaintiffs have characterized Mr. Rochelle as cooperatively working with them to ensure relevant information is preserved.[9] [510 at 3, 15–16; 510-1, ¶ 13].

For these reasons, Defendants' Motion is granted with respect to the subpoenas served on PEI.[10] The production obligations imposed by the subpoena are stayed until the Court has ruled on Defendants' pending motions to dismiss. After a decision on the motions to dismiss, Plaintiffs should notify Defendants and PEI if they still want PEI to comply with the subpoena. If Plaintiffs do so, this Order will not preclude Defendants or PEI from arguing that PEI should not be required to produce any of the subpoenaed documents at that time for reasons other than those addressed in this Order.

B.

Plaintiffs served one subpoena each on five phone carriers: AT&T; CenturyLink; Comcast; Verizon; and Windstream. From each phone carrier, the subpoenas command the production of: (1) records of "talk" and/or "call details," including the number a call is received from or made to, whether the call is incoming or outgoing, the date and time of the call, the length of the call, and any calls to check voicemail; (2) a text message report, including the incoming and outgoing phone numbers, the date and time the message was sent and received, and the number of messages sent (but not any text message content); and (3) subscriber information.[11] [501-1 at 5–6, 10–11, 15–16, 22–23, 27–28]. Each subpoena identifies specific phone numbers for which this information should be provided. In total, the subpoenas seek information related to 29 phone numbers. *Id.* at 6, 11, 16, 23, 28. The breakdown by phone carrier is as follows: 16 for AT&T; 8 for Verizon; 3 for Windstream; 1 for CenturyLink; and 1 for Comcast. All of the subpoenaed phone numbers were used by Mr. Pilgrim, members of the Georgia Dock Advisory Committee, or the Georgia Department of Agriculture.

Defendants do not argue that requiring the five phone carriers to comply with Plaintiffs' subpoenas at this time will impose a burden on Defendants or that they will be prejudiced by harmful disclosures of their private information. Plaintiffs have agreed to designate all the phone records as Confidential under the Protective Order entered in this case. [510 at 13]. Plaintiffs also say the phone carriers are unlikely to move to quash the subpoenas challenged in Defendants' Motion. As Plaintiffs point out, three of them already have produced records to Plaintiffs, and all five will be paid the fees they charge for producing records in response to a subpoena. *Id.* Defendants do not claim there is any reason to believe the phone carriers will object to responding to Plaintiffs' subpoenas before a decision on Defendants' motions to dismiss.

---

[9] When, in September 2017, Plaintiffs asked Mr. Rochelle to provide Mr. Pilgrim's phone numbers so they could send preservation letters to the relevant phone carriers, Mr. Rochelle gave them Mr. Pilgrim's home, cellular, and PEI phone numbers within 3 weeks of receiving the request. [510-1, ¶ 13; 519-3, ¶ 12].

[10] In light of the analysis in this Order, the Court need not reach the parties' arguments concerning any burden imposed on PEI.

[11] Each subpoena also commands the production of a notarized Declaration of Custodian of Records or Business Records Affidavit. [501-1 at 6, 11, 16, 23, 28].

Defendants offer only one reason why the Court should stay the phone carriers' production obligations. According to Defendants, there is no risk that the phone carriers will destroy discoverable information. Defendants say the parties can employ methods short of document production—such as informal cooperation and preservation letters or subpoenas—to ensure appropriate preservation efforts are made.

Defendants' argument rests on the unstated assumption that, unless there is a risk of destruction of discoverable information, no third-party document production should be conducted at this time. The Court does not agree with this blanket statement, and it is inconsistent with the Court's approach to the discovery that will occur before the motions to dismiss are decided. Ensuring that discoverable information in the possession of third parties is preserved is one benefit that could justify completing a given discovery-related task, but it is not the only potential benefit. During the April 21, 2017 status hearing, the Court denied Defendants' motion to quash a third-party document production subpoena and Defendants' motion to prevent service of two other third-party document production subpoenas even though Plaintiffs did not argue any of the subpoenas was necessary to ensure the preservation of discoverable information. The parties' filings in connection with the Motion now before the Court also indicate that Plaintiffs have served additional document production subpoenas on third parties, including phone carriers, and that neither Defendants nor the recipients objected to them. The Court thus does not agree with the proposition that the risk of the destruction of discoverable information is the *sine qua non* of third-party document discovery during this phase of the case.

Plaintiffs contend that requiring compliance with the subpoenas at this time would in fact prevent the destruction of at least some discoverable information. To some extent, Plaintiffs oversell this argument. Among other things, Plaintiffs do not complain about the preservation of phone records by three subpoenaed phone carriers and the subpoenas Plaintiffs have served would not fully mitigate all the supposed destruction risk about which they complain. It seems, though, that at least some phone carriers already have destroyed records pursuant to automatic rolling record deletion policies that could have been preserved if adequate steps had been taken earlier. For instance, one defendant did not identify phone numbers it had with Windstream and so no records were preserved until Plaintiffs sent a subpoena to Windstream. [510 at 9; 510-1, ¶ 9; 519 at 7, 7 n.5]. Also, although multiple Defendants have phone numbers through CenturyLink, no Defendant told Plaintiffs until August 2017 that the phone carrier would not preserve records unless certain fees were paid (which it seems no defendant has paid). [510 at 10–12; 510-1, ¶ 10; 519 at 7]. Perhaps more importantly, Plaintiffs say, and Defendants do not dispute, that reviewing phone records can and already has revealed additional, relevant phone numbers that Defendants have not yet specifically identified. *See* [510-1, ¶12]. In light of the evidence cited by Plaintiffs regarding communication by telephone among the members of the Georgia Dock Advisory Committee, there is a benefit to ensuring all relevant phone numbers are identified in time to preserve discoverable records.

For these reasons, Defendants' Motion is denied with respect to the subpoenas served on AT&T, Verizon, Windstream, CenturyLink, and Comcast. To give these phone carriers sufficient time to move to quash Plaintiffs' subpoena, if they want to do so, the production obligations imposed by the subpoenas (but not, of course, the preservation obligations) are

7

stayed until December 8, 2017. The Court has allowed these non-parties a little more time in light of the upcoming Thanksgiving holiday.

C.

Plaintiffs served one subpoena each on three so-called Producer Co-Conspirators: Claxton, Harrison, and Mar-Jac. Apparently, the Office of the Florida Attorney General ("Florida AG") served each of the Producer Co-Conspirators with an Antitrust Civil Investigative Demand ("CID") on February 21, 2017. *See* [501-1 at 37, 41, 45]. Plaintiffs represent that these CIDs are identical to the ones served on six Defendants that the Court discussed in the Order concerning Production of the Florida Attorney General Documents [489]. [510 at 12–13]. The subpoenas that Plaintiffs have served seek production of a copy of all the documents each Producer Co-Conspirator produced in response to the CIDs from the Florida AG. [501-1 at 37, 41, 45]. At least two of the Producer Co-Conspirators—Harrison and Mar-Jac—have objected to producing documents at this time and may move to quash Plaintiffs' subpoenas if the Court were to deny Defendants' Motion. [517-3 at 2; 517-4]. It is unclear whether Claxton objects and would file a motion to quash if the Court were to deny Defendants' Motion.

The parties dispute whether Defendants even have standing to challenge the subpoenas served on the Producer Co-Conspirators. Plaintiffs contend only the Producer Co-Conspirators (that is, the subpoena recipients) can move to quash the subpoenas. *See Piercy v. Wilhelmi*, 2016 WL 9176539, at *2, *2 n.2 (S.D. Ill. June 17, 2016); *Parker v. Four Seasons Hotels, Ltd.*, 291 F.R.D. 181, 187 (N.D. Ill. 2013). Defendants respond by claiming their Motion is proper because, among other things, the subpoenas implicate their interest in the administration of this litigation. *See Phipps v. Adams*, 2012 WL 3074047, at *3 (S.D. Ill. July 30, 2012); *c.f. Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 307 (S.D. Ind. 2016). The case law cited by the parties addressing motions to quash third-party subpoenas under Rule 45 of the Federal Rules of Civil Procedure may be at least somewhat off the mark because Defendants have filed a motion to stay. Regardless, for the reasons explained below, the parties' "standing" dispute is not determinative of the issue now before the Court.

Defendants again do not argue that any burden will be imposed on them if the Court does not stay the production obligations imposed on the Producer Co-Conspirators. *See* [489 at 5–9]. Defendants say their Motion should be granted for three other reasons. The Court does not find any to be persuasive.

Defendants first say there is no risk that the Producer Co-Conspirators will fail to preserve the subpoenaed documents. Plaintiffs do not contend otherwise. As discussed above, the destruction of relevant information, however, is not an indispensable prerequisite to any third-party document production. Defendants next note the Court's Order concerning Production of the Florida Attorney General Documents [489] does not apply to the Producer Co-Conspirators. Defendants are right in the technical sense that the Order was limited to whether six Defendants should produce documents they provided (or will provide) to the Florida AG in response to a CID. That does not necessarily mean the analysis in the Order is entirely irrelevant to the issue of whether the Producer Co-Conspirators should produce documents that they have provided (or will provide) to the Florida AG in response to identical CIDs. More importantly, the fact that the Court has not yet ruled on whether the Producer Co-Conspirators should produce

such documents sheds no light on whether they now should be required to do so. Finally, Defendants note the Court's prior Order required the six Defendants to produce documents provided to the Florida AG in response to only seven documents requests in the CIDS while Plaintiffs are seeking all of the documents provided to the Florida AG by the Producer Co-Conspirators. Even if Plaintiffs' subpoenas to the Producer Co-Conspirators were overbroad (which, to be clear, the Court is not now deciding), that does not justify Defendants' broad request to stay compliance with the subpoenas in their entirety.

If any Producer Co-Conspirator objects to producing some or all of the subpoenaed documents at this time, the validity of its objection should be decided on the merits with the benefit of an adequately developed record and the participation of the objecting Producer Co-Conspirator. The Court already has found that certain requests in the CIDs served on at least six Defendants—and, apparently, the Producer Co-Conspirators—seek documents that go to "the core of Plaintiffs' allegations in this case." [489 at 14]; *see also id.* at 8–9. Of course, the benefits to be gained from the production of the Producer Co-Conspirators' documents may be different. The Producer Co-Conspirators also may assert different objections to production. Such arguments against production, though, should be raised by the Producer Co-Conspirators through appropriate motion practice.

For these reasons, Defendants' Motion is denied with respect to the subpoenas served on the Producer Co-Conspirators. To give the Producer Co-Conspirators sufficient time to move to quash Plaintiffs' subpoenas, if they want to do so, the production obligations imposed by the subpoenas are stayed until December 8, 2017. The Court, again, has allowed these non-parties a little more time in light of the upcoming Thanksgiving holiday.

IV.

For the reasons stated above, Defendants' Motion to Stay Production Obligations Imposed by Plaintiffs' Subpoenas Served on Third Parties [499] is granted in part and denied in part.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: November 13, 2017