UNITED STATES DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | No. 16 C 8637[1]<br><br>Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Defendants are industrial producers of chicken meat. Plaintiffs are three putative classes of businesses and individuals who purchased chicken from Defendants, either directly or indirectly, for resale, business, or personal use, between 2008 and 2016. Plaintiffs allege that during that time period Defendants conspired to fix chicken prices higher than the market would naturally support, in violation of the Sherman Act § 1 and state law. Defendants have moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* R. 279; R. 292.[2] For the following reasons, the motions are denied to the extent that Plaintiffs' Sherman Act claims survive, at least one state law claim survives in every jurisdiction except for Arkansas, and none of the defendants are dismissed from the case entirely. The motion addressing Plaintiffs' state law claims, R. 292, is granted in part in that all claims under Wisconsin law are dismissed.

---

[1] And related cases: Nos. 16 C 9421; 16 C 8931; 16 C 8851; 16 C 9007; 16 C 9490; 16 C 8737; 16 C 7176; 16 C 9589; 16 C 9684; 16 C 8874; 16 C 9912; 16 C 9900.

[2] The motions were supported by a number of briefs, some filed by Defendants jointly, others individually. Plaintiffs opposed the motions with two briefs: one filed by the "Direct Plaintiffs," and the other filed by the "Indirect Plaintiffs."

**Legal Standard**

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g.,* *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

**Background**

**I.     The Chicken Industry**

"Broilers" are "chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or

frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards." R. 212 ¶ 79. Broilers constitute approximately 98% of all chicken meat sold in the United States. *Id.* ¶ 2.

Defendants are industrial Broiler producers. As of 2015, Defendants controlled 88.8% of Broiler production in the United States. *Id.* ¶ 286. Defendants own or tightly control all aspects of producing Broilers, including laying eggs; hatching chicks; raising chicks; slaughtering chickens; and processing and distributing the meat. *See id.* ¶¶ 270-74. The technology and process of industrial scale Broiler production is well known among Defendants, and all defendants use the same types of equipment and processes. *Id.* ¶ 330. Entry into the market would cost in excess of $100 million, *see id.* ¶¶ 319-22, and "no company has created a new poultry company from scratch in decades." *Id.* at ¶ 323. Defendants Tyson and Pilgrim's Pride maintain the largest market shares, approximately 22% and 17% respectively, while the other defendants maintain market shares no greater than 8-9%, with several below 5%. *See id.* ¶ 286 (including the following chart).



Defendants' businesses also have relatively similar cost structures. *Id.* ¶ 330. The primary costs of production are labor and feed for the chickens. *Id.* ¶¶ 327-38. Labor costs have declined significantly over the past two decades, while labor productivity has substantially increased. *Id.* ¶ 328. Defendants feed their chickens corn and soybean meal, and purchase these ingredients on the open market. *Id.* ¶¶ 327, 330. "Feed prices have varied widely from 2007-2016, reaching 71% of the cost of producing Broilers in 2012, but falling to only about 50% by 2014." *Id.* ¶ 327. "Since January 1, 2008, corn prices have declined roughly 21% and soybean prices have declined 13%." *Id.* ¶ 329.

Defendants purchase their breeder flocks (the chickens that lay the eggs Defendants raise into Broilers) from three "global genetics conglomerates" that account for 98% of Broilers raised in the United States, and 80% of Broilers raised globally. *Id.* ¶¶ 6, 275. These three genetic companies own a "biological lock" on their unique Broiler lines, meaning they tightly control the purebred genetic strain they develop. *Id.* ¶ 274. These genetic strains have special hybrid characteristics, such as a tendency to product a large chicken breast. *Id.*

Because all aspects of Defendants' methods of production are nearly identical, Broilers are substantially uniform across all Defendants' brands. *See id.* ¶ 80. For this reason, Broilers are considered a commodity product. *See id.* ¶¶ 80-81. Commodity industries are particularly susceptible to agreements that violate antitrust laws. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 658 (7th Cir. 2002) ("[When] the product is uniform (a 'commodity') . . . competition

would be expected to prevent any one seller from raising his price to any of this customers above cost.").

## II.   Agri Stats

Plaintiffs allege that Defendants communicated their conspiracy to restrain production and inflate prices in part through an entity called Agri Stats. Agri Stats is a subsidiary of Eli Lilly & Co. that produces subscription reports about the Broiler industry. *Id.* ¶¶ 67, 118. Agri Stats collects data directly from Defendants' Broiler production facilities. *Id.* ¶ 129. Only Broiler producers that supply data to Agri Stats are permitted to receive the Agri Stats reports. *Id.* ¶ 128.

Agri Stats reports provide information about where Broiler producers buy their breeder stock and feed, the size of production facilities, and actual production numbers. *Id.* ¶ 130. The reports also provide detailed information regarding production capacity, including numbers of eggs, the size of breeder flocks, and other inventory numbers, as well as financial information about each company. *Id.* ¶¶ 130, 135C. Although the reports do not identify the Broiler producers by name, the reports are so detailed that a reasonably informed producer can discern the other producers' identities, and it is common knowledge among producers that this is possible. *Id.* ¶ 124. This ability to identify each other by the information in the reports is enhanced by tours Defendants' executives take of each other's production facilities, *see id.* ¶ 313, and by the relatively frequent movement of employees and executives among the Defendant companies, without the protection of noncompete clauses. *Id.* ¶ 314.

Defendants have publicly stated that Agri Stats reports provide them knowledge of their competitors' production plans, and that they rely on this information to plan their own production. *See id.* ¶ 131A (defendant Sanderson Farms reported that "every year we review our operations and every facet within [Agri Stats] . . . we set operational goals every year . . . and [we] try to improve our operations within this benchmarking service we call [Agri Stats]"); *id.* ¶ 131B (Sanderson Farms CEO was quoted as saying, "my judgment is that based on what I see in Agr[i] [S]tats nobody is planning on, pullet placements say no ramp up and what I've gleaned from Agr[i] [S]tats, people are not planning on ramping up. I see a lot of information from Agr[i] [S]tats that tells me that nobody is going to ramp up.");[3] *id.* ¶ 131E (Tyson stated in an investor presentation, "It's very profitable right now. And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack. We can tell that through Agri Stats.").[4] Plaintiffs allege that a Broiler industry expert has said that the extent of information shared by Broiler producers through Agri Stats is "unusual" and "a significant antitrust issue." *Id.* ¶ 133.

---

[3] A "pullet" is "a young hen; specifically . . . a chicken less than a year old." *See* Merriam-Webster Dictionary, www.merriam-webster.com (last visited Nov. 20, 2017).

[4] The Court assumes the term "tray pack" refers to the common method of packaging chicken meat for retail sale on a form tray covered in plastic wrap. *See* "Tyson Foods to invest $110 million in Georgia plant," Food Business News, Jan. 27, 2015 (http://www.foodbusinessnews.net/articles/news_home/Business_News/2015/01/Tyson_Foods_to_invest_110_mill.aspx?ID={915D3A88-684F-4AFC-A100-499311AD6F31}) (last visited Nov. 20, 2017) ("The . . . plant . . . will convert to supply fresh tray-pack chicken to meet the needs of regional retail customers.").

Beyond the contact necessary to collect data, Agri Stats employees also interact regularly with Broiler producer executives and employees at trade association meetings. *Id.* ¶ 127. Agri Stats also offers to meet with Broiler producer executives on a quarterly basis to make detailed presentations about company and industry data, including whether the industry is over- or undersupplying the market. *Id.* ¶ 127. Plaintiffs allege that Agri Stats breaches the anonymity of the reports at these meetings by matching the data to particular companies. *Id.*

## III.  Defendants' Production & Pricing

### A.  The Years 2008-2010

Plaintiffs allege that prior to 2008, there was a "historic pattern of annual increases in Broiler production," of about 3%. *Id.* ¶ 335. Industry publications noted that 2008 was the "first time in decades [that] total broiler production . . . remained virtually unchanged from the year before." *Id.*

These production cuts began in 2007 when defendants Tyson, Pilgrim's, Foster Farms, Peco Foods, and Perdue cut back their Broiler production. *Id.* ¶ 143. Plaintiffs allege that these production cuts did not result in a "meaningful" price increase, so Tyson and Pilgrim's—the industry's two largest producers—realized that production cuts by the industry as a whole were necessary. *Id.* ¶ 144.

Plaintiffs allege that Defendants' executives and employees attended the International Poultry Expo in Atlanta from January 23-25, 2008. *Id.* ¶ 145. After that meeting, executives from Tyson, Pilgrim's, and Sanderson made statements that their companies would raise prices or cut production in response to market

prices that were below the cost of production. *Id.* ¶¶ 5, 146-48, 150, 154. Pilgrim's CFO stated that "the rest of the market is going to have to pick-up a fair share." *Id.* ¶ 147. And Sanderson's CEO stated that he expected the industry to make production cuts. *Id.* ¶ 148. Five more defendants—Fieldale Farms,[5] Simmons, Wayne Farms, O.K. Foods, and Koch Foods (plus non-defendant producer, Cagle)— followed suit with their own production cuts in April 2008. *See id.* ¶ 151. Additionally, Sanderson's CEO stated at a conference presentation, "I know some companies have cut back and have not announced." *Id.* ¶ 151E.

On May 21, 2008, the Wall Street Journal noted the production cuts, and reported that prices had started to increase. *Id.* ¶ 157. The paper also noted that "it is unusual for egg sets to decline at this time of year," because demand is usually highest in August when chickens hatched in May would be mature. *Id.*[6] Nevertheless, despite these production and capacity cuts, Tyson's CEO questioned whether they would result in the sought after price increase. *Id.* ¶ 155 (stating that "we're going to be up a little but probably not a significant amount, not as much as we might have once anticipated"). Pilgrim's CEO also called for additional production cuts, *id.* ¶ 156, because "there is still too much breast meat available to drive market pricing significantly higher." *Id.* ¶ 160.

Plaintiffs allege that the industry responded to these calls for additional cuts. On June 19, 2008, Peco's CEO said, "the poultry industry is entering a second phase

---

[5] The Court has preliminarily approved a settlement between Fieldale Farms and the Direct Plaintiffs. R. 462.

[6] The term "egg sets" means the "number of eggs placed in incubators." R. 212 ¶ 140B.

of production cutbacks . . . . We are hearing talk that this was not nearly enough, so liquidation is in round two." *Id.* ¶ 161. And the next day, an Agri Stats non-public communication stated, "Those who have announced cutbacks indicated they will continue until margins normalize. At this time we expect to see the declines continue until at least late 2009, and cuts could be deeper than now projected." *Id.* ¶ 162. Indeed, seven defendants announced additional production cuts or facility closures through the end of 2008. *Id.* ¶¶ 163, 165-71, 176-77, 180. And in September 2008, an industry publication reported that "*most* U.S. broiler integrators had announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent." *Id.* ¶ 173 (emphasis added). Then in February 2009, Pilgrim's announced additional facility closures and production cuts. *Id.* ¶ 187. The production cuts of 2007-09 had the effect of increasing Broiler prices "through mid to late 2008, staying at or near all-time highs until late 2009." *Id.* ¶ 192.

### B. The Years 2010-2014

By late 2010, the economy as a whole had begun to improve, and some producers began to increase production to meet that demand, resulting in falling prices. *Id.* ¶ 193. After the International Poultry Expo held January 24-26, 2011, *id.* ¶ 196, Defendants again began to take action to restrict production. Seven defendants and two other producers cut production, closed facilities, or delayed planned construction of new facilities. *Id.* ¶¶ 196, 198-201, 203-05, 210, 212-13, 215, 217-18, 220, 222-23, 231. These actions continued into 2012. *Id.* ¶¶ 232, 238. By

April 27, 2012, Pilgrim's CEO stated on an earnings call that "the die is cast for 2012," and "we're comfortable that the industry is going to remain constrained." *Id.* ¶ 229. Prices began to increase in September 2012, and continued to increase through 2014. *Id.* ¶¶ 239, 243.

C.    **Summary of Plaintiffs' Theory Regarding Production & Pricing**

Plaintiffs allege that in a commodity market like the Broiler market, "[n]ormal supply and demand would suggest that in the wake of massive supply cuts by [some producers], other Broiler producers would jump into the massive gap," and increase production to meet demand, yet, "just the opposite occurred" in 2008. *Id.* ¶ 151. Plaintiffs also argue that "the commodity nature of Broilers does not allow one producer to successfully raise market prices in the absence of widespread reductions in supply relative to the then-current demand." *Id.* ¶ 146. So, Plaintiffs contend, public statements of intent to cut production, and the discipline of Defendants to resist filling the supply gap after production cuts by large producers, do "not make sense absent an intention (or knowledge) . . . that [competitors] would coordinate a reduction in supply across the Broiler industry." *Id.* ¶ 146. One producer of a commodity cannot, absent coordination, simply cut production, fail to meet demand, and expect to maintain market share. Thus, Plaintiffs contend that the many public statements Defendants' executives made regarding production cuts during the relevant time period is an indication that an agreement among Defendants to cut production was already in place or in the works.

In addition to these suspicious public communications, Plaintiffs contend they have plausibly alleged private communications among Defendants indicating a conspiracy to cut production with the intent to inflate prices. Plaintiffs' primary argument in that regard is that "[t]here is no plausible, non-conspiratorial justification for Defendants to use Agri Stats to secretly share highly confidential and proprietary information about their pricing, capacity, production, and costs at the level of detail at which they do. In a competitive market, such proprietary, competitively sensitive information would be a closely guarded secret. Economic theory suggests that the routine exchange among competitors of such sensitive internal company information reduces the intensity of competition." *Id.* ¶ 134. "Moreover," Plaintiffs continue, "the nature of Broiler breeder flocks is that they predict future Broiler supply, so by sharing such information in a way that permits company-by-company identification, Defendants are in fact sharing future anticipated production information with one another, which clearly suggest high antitrust concern." *Id.* ¶ 135C. Additionally, Plaintiffs cite Sanderson's CEO's statement on May 28, 2008—"I know some companies have cut back and have not announced"—as an indication that he had private communications with his competitors regarding their intention to cut production. *Id.* ¶ 151E.

## IV.    Factors Enabling Defendants to Sustain Production Cuts

Plaintiffs allege that a number of additional factors demonstrate that Defendants' production cuts from 2008-2014 were not merely independent reactions to economic conditions, but are indicative of a conspiracy. These factors include: (1)

a shift away from fixed price to variable price contracts; (2) slaughter or export of breeder flocks; (3) use of inter-company sale agreements; and (4) an increase in exports. Plaintiffs allege these factors enabled Defendants to sustain their production cuts despite the economic incentives to increase supply of a commodity product like Broilers.

First, beginning in 2008, Defendants moved away from fixed price contracts to contracts that permitted prices to fluctuate with the market. *Id.* ¶ 348. According to Plaintiffs, fixed price contracts prevented Defendants from being able to realize market price increases resulting planned production cuts. *Id.* ¶ 349. Starting in January 2008, around the same time Defendants began production cuts, defendants Koch Foods, Pilgrim's, Perdue, Sanderson, and Tyson, publicly announced an effort to use contracts that permitted variable pricing. *Id.* ¶ 350-54. Pilgrim's CFO explained on an earnings call on January 29, 2008, that in the current "situation" in which there is a "need to drive commodity prices up," having fewer fixed price contracts "is going to give us the opportunity for more immediate benefit." *Id.* ¶ 352. This shift was noted by an industry analyst in December 2013, who stated that "with volume growth generally limited, companies are developing more sophisticated strategies to generate profits . . . . Contracts are now being negotiated all year long and employ a variety of pricing methodologies." *Id.* ¶ 355.

Second, one of the primary forms of production cuts during the relevant time period was to slaughter or export breeder flocks. *Id.* ¶¶ 189, 250. Historically, when Broiler producers wanted to cut production, they simply destroyed excess eggs or

Broilers in order not to have them available on the market. *Id.* ¶ 191. Breeder flocks are not usually destroyed because such a strategy hampers a producer's ability to meet increased demand. Yet, during the time period at issue in this case, total breeder flock numbers went from a high of approximately 59 million in 2008, to a low of about 49 million in 2013. *See id.* ¶¶ 191, 242 (including the following chart).



Source: National Agricultural Statistical Service, U.S.D.A., https://quickstats.nass.usda.gov/

At a conference in January 2012, an Agri Stats Vice-President noted the importance of reducing Broiler breeder flocks, because a failure to do so "could blow apart any recover[y] in the short term by filing up incubators again." *Id.* ¶ 225. He also noted that Agri Stats data showed that the industry was in fact slaughtering breeder flocks, demonstrating an intent to manage production carefully. *Id.* Another industry analyst also noted the significant decrease in breeder flocks, stating on May 6, 2014 that historically, "it has been very easy to increase the chicken supply

because . . . . [i]t only takes four to eight weeks to grow a chicken." *Id.* ¶ 249. But in recent years, the analyst continued, producers "cut production capacity throughout the supply chain when grain prices were very high," so "they cannot materially increase supply" for 18 months. *Id.* Plaintiffs allege that Defendants' decisions to slaughter or export breeder flocks were unusual, and allowed the production cuts they implemented between 2008 and 2014 to have a longer lasting effect on the market.

Third, early in 2011, Tyson began to satisfy a portion of its customers' demand by buying and reselling Broilers or Broiler parts from its competitors—a strategy Tyson dubbed "Buy vs. Grow." *Id.* ¶ 195. According to this strategy, Tyson bought up excess production from its competitors in order to avoid the price depression that would occur if those Broilers had been sold on the open market. This strategy had a two-fold effect on Broiler supply: (1) allowing Tyson to cut its own production without losing customers; and (2) creating a mechanism for Tyson to communicate production cut levels to its competitors, *id.*, i.e., "don't produce more Broilers than Tyson is willing to buy." Plaintiffs allege that Tyson engaged in this strategy even though it would have cost less to supply its customers with its own Broilers, because the strategy kept overall supply low and prices high. *Id.*

Lastly, Defendants increased Broiler exports. In 2006, Broiler exports constituted only 14.8% of U.S. Broiler production. *Id.* ¶ 87. This number increased to 16.5% by 2007, and was never lower than 18.5% through 2014. *Id.* Increasing exports enabled Defendants to continue to sell Broilers without affecting the price

in the United States. *Id.* ¶ 88. Plaintiffs also allege that this increase in exports was undertaken specifically to lift prices in the United States, because otherwise it would have been more profitable to sell the eggs and Broilers in the United States. *Id.* ¶ 251.

## V.     Georgia Dock Price Index 2014-2016

In addition to alleging that Defendants conspired to artificially inflate prices by suppressing production, Plaintiffs allege that some Defendants sought to directly inflate prices by tampering with one of the primary Broiler price indexes. Broiler prices are reported primarily by three entities: Urner Barry (a subscription commodity price reporting service); the Georgia Department of Agriculture (known as Georgia Dock); and the U.S. Department of Agriculture ("USDA"). *Id.* ¶ 91. Urner Barry and the USDA prices are doubly verified through telephonic and written surveys of virtually all Broiler producers. *Id.* ¶ 92. Georgia Dock also collects its pricing data by communications with producers, but unlike the USDA and Urner Barry prices, Georgia Dock does not verify the prices collected from producers against invoices or purchaser reports. *Id.* ¶ 98. When asked for an explanation of this lack of a verification process, Georgia Dock responded that it trusts the producers to provide truthful information. *Id.* The sincerity of this response, however, is undermined by that fact that seven Defendants exercise direct control over the Georgia Dock price index through participation in the Georgia Dock Advisory Committee, the existence of which was kept secret until 2016. *Id.* ¶ 105. Additionally, several Georgia Dock employees have expressed concern about

Georgia Dock's methods. *Id.* ¶ 99. In early 2016, the USDA initiated an investigation into Georgia Dock, and concluded that it could no longer accept Broiler producers' price reports at face value. *Id.* ¶ 107.

After generally mirroring each other from 2007 through 2013, by the end of the 2014, the USDA and Urner Barry prices had begun a significant decline while the Georgia Dock stayed level. *Id.* ¶ 89 (and the following chart).



Plaintiffs allege that this deviation is due to Defendants' manipulation of prices reported to Georgia Dock. *Id.* ¶¶ 110, 113. By allegedly reporting false inflated prices to Georgia Dock, Defendants benefited from the use of artificially inflated Georgia Dock prices in the spot market and prospective contracts. *See id.* ¶ 103.

## VI.    Plaintiffs and their Claims

Plaintiffs are divided into three putative classes based on their position in the supply and demand chain, and each class has filed its own complaint: (1) direct purchasers (e.g., wholesalers and retailers), R. 212; (2) commercial and institutional indirect purchasers who resell chicken (e.g., retailers and restaurants), R. 253; and (3) indirect purchasers who cook or eat the chicken (e.g., restaurants and individuals), R. 255. Obviously, there is some overlap of the classes, particularly of the two classes of indirect purchasers, and that is reflected in the bulk of allegations concerning the conspiracy, which are nearly identical across the three complaints.

## Analysis

All Defendants argue that Plaintiffs have failed to plausibly allege a conspiracy. The first part of this opinion addresses that argument. Since federal law prohibits indirect purchasers from pursuing damages under the Sherman Act, the Indirect Plaintiffs also make claims under state law antitrust, consumer protection, and unjust enrichment laws. The second part of this opinion addresses Defendants' arguments against these claims. As mentioned, the Sherman Act claims survive, as does at least one state law claim in every jurisdiction included in the complaint, except for Wisconsin.

## I.    Conspiracy

To begin, the Court provides the following brief summary preview of its reasoning regarding Plaintiffs' conspiracy claim, which is explained in greater detail below. First, the Court finds that Plaintiffs have plausibly alleged parallel conduct.

The Court rejects Defendants' contention that the alleged conduct is too varied in its timing and methods.

The Court also finds that the alleged factual circumstances plausibly demonstrate that the parallel conduct was a product of a conspiracy. The Court finds plausible Plaintiffs' allegations that Defendants conduct was unusual in comparison to the industry's history of regular production increases, and rejects Defendants' argument that the conspiracy as alleged would not be in the interests of all conspirators. Nothing about Plaintiffs' allegations indicates that the increase in the market price was insufficient to cover the various potential losses of market shares Defendants highlight. The Court also finds that the alleged conspiracy strategy—to take actions to restrain production, and then allow production to increase again to reap the benefits of the resulting price increase—is not implausible despite the large number of producers in the industry and the lack of an enforcement mechanism allegation.

Further, although Plaintiffs have not alleged details about the formation, operation, and communications constituting the conspiracy, the facts included in the complaint are sufficient to plausibly infer formation and communication. Defendants' criticize the lack of details, but when a conspiracy is secret such details will not be available without discovery, and thus cannot be required at the pleading stage. Defendants' public statements of intent to cut production are indicative of an agreement considering the commodity nature of Broilers. Moreover, the extent of information sharing through Agri Stats is unusual, and plausibly amounts to a

method of communication. This is all in the context of regular opportunities to collude at trade association meetings, plant tours, and the large number of other note opportunities that company executives had to interact.

Additionally, Defendants' business strategies during the relevant time period are indicative of a conspiracy. Defendants: engaged in intra-competitor sales to manage production numbers; increased exports to reduce product in the U.S. market; switched from fixed price to variable price contracts to take advantage of price increases; and decreased the number of breeder flocks by unprecedented numbers. All of these are strategies that make sense in the context of a price-fixing conspiracy, which is plausibly alleged.

Although Defendants raise plausible alternative innocent explanations for their conduct, it is improper at this stage of the proceedings to weigh alternatives and which is more plausible. To the extent an innocent alternative explanation can serve to show that a conspiracy claim is not plausible in and of itself, the Court does not view the allegations in that way. There is simply too much unusual market movement, unusual public statements, unusual information sharing through Agri Stats, and a coincidence of business strategies that make dismissal of Plaintiffs' claims at this point in the case inappropriate.

For these reasons, as discussed in greater detail below, Defendants' motions to dismiss Plaintiffs' conspiracy claims are denied.

*       *       *       *

Defendants argue Plaintiffs have failed to sufficiently allege a conspiracy in order to state a claim under Section 1 of the Sherman Act. The Sherman Act "does not prohibit all unreasonable restraints of trade," but only those "effected by a contract, combination, or conspiracy." *Twombly*, 550 U.S. at 553 (citing 15 U.S.C. § 1). As the Seventh Circuit explained, the Sherman Act "does not require sellers to compete; it just forbids their agreeing or conspiring not to compete." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010). The "crucial question," then, is "whether the challenged anticompetitive conduct stems from independent decisions or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553. In other words, only agreements not to compete are prohibited by the law.

To allege an unlawful agreement, a plaintiff must allege facts from which the Court can plausibly infer that the defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Omnicare, Inc. v. UniteHealth Group, Inc.*, 629 F.3d 697, 706 (7th Cir. 2011). "That is, the circumstances of the case must reveal a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *Id.* At least "[t]wo separate economic decisionmakers must be joined, depriving the marketplace of independent centers of decisionmaking and therefore of a diversity of entrepreneurial interests." *Id.*; *see also* William H. Page, "Tacit Agreement Under Section 1 of the Sherman Act," 81 ANTITRUST L.J. 593, 608 (2017) (hereinafter "Page") (an agreement "involve[s] a conscious choice by participating rivals to communicate intentions by means that lack [economic] efficiency justifications").

"Direct evidence of conspiracy," however, "is not a sine qua non." *Text Messaging*, 630 F.3d at 629. "Circumstantial evidence can establish an antitrust conspiracy." *Id.*

"Parallel behavior" by putative competitors (i.e., competitors following the same course of conduct) can be circumstantial evidence of an agreement not to compete. *See Twombly*, 550 U.S. at 553. However, without more, allegations of parallel conduct are "merely consistent with," but do not "plausibly suggest" the existence of an agreement. *Id.* at 557. For instance, the Seventh Circuit has noted that a price fixing claim based on the parallel behavior of "thousands of children who set up lemonade stands all over the country on hot summer days . . . would be laughed out of court." *Text Messaging*, 630 F.3d at 628. Of course that example at the extreme far end of the factual spectrum permits no inference of collusion. But the Supreme Court has held that even "conscious parallelism,"—i.e., "a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions"—"is not in itself unlawful." *Id.* at 553-54.

For example, in *White v. R.M. Packer Co.*, gas stations on Martha's Vineyard were alleged to have fixed gasoline prices. *See* 635 F.3d 571 (1st Cir. 2011). The gas station owners argued that "because of their isolated location, relatively small numbers, and transparent pricing, they could engage in cooperative pricing without any secret meetings or any explicit agreements that would violate the nation's antitrust laws." Page at 594. The gas stations "admitted that they communicated indirectly by posting their prices and were able to engage in cooperative pricing by

rationally predicting what rivals would do in response." *Id.* at 625. This type of parallel conduct is considered mere "interdependence" that is "insufficient to raise the necessary inference of agreement," *id.* at 626-27, because, although it is "consistent with conspiracy, [it is] just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554. Instead, "allegations of parallel conduct . . . must be placed in a context that raises a suggestion of a preceding agreement." *Id.* at 557. Absent additional "factual enhancement" or a "circumstance pointing toward a meeting of the minds," an allegation of parallel conduct "stops short of the line between possibility and plausibility." *Id.* As the Seventh Circuit explained, "a complaint that merely alleges parallel behavior alleges facts that are equally consistent with an inference that the defendants are conspiring and an inference that the conditions of their market have enabled them to avoid competing without having to agree not to compete." *Text Messaging*, 630 F.3d at 627.

In *Twombly*, the Supreme Court indicated the kinds of additional factual circumstances that would push an allegation of parallel conduct into the realm of a plausible conspiracy. *Id.* at 556 n.4; *see also Text Messaging*, 630 F.3d at 628 (describing additional factual circumstances as "'parallel plus' behavior"). The Court cited antitrust scholars' description of such conduct, including "behavior that would probably not result from chance, coincidence, independent response to common stimuli, or mere interdependence unaided by an advance understanding among the parties," *Twombly*, 550 U.S. at 556 n.4 (citing 6 Areeda & Hovenkamp ¶ 1425, at

167-85); and "conduct that indicated the sort of restricted freedom of action and sense of obligation that one generally associates with agreement," *id.* (citing Blechman, Conscious Parallelism, Signaling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws, 24 N.Y.L. S. L.Rev. 881, 899 (1979)). The Court also noted that the parties in *Twombly* agreed that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason," would state a claim under the Sherman Act § 1. 550 U.S. at 556 n.4. Following this guidance, the Seventh Circuit affirmed a district court's denial of a motion to dismiss a Sherman Act § 1 claim, where the plaintiffs had alleged the following: (a) four competitors controlling 90 percent of the market; (b) the defendants' memberships in a trade association where they exchanged price information; (c) defendants' memberships in a "leadership council" within the trade association whose stated purpose was "to urge its members to substitute 'co-opetition' for competition"; the defendants increased their prices in the face of steeply falling costs; the defendants changed their pricing structures "all at once." *See Text Messaging*, 630 F.3d at 628.

In order to address Defendants' argument that Plaintiffs have failed to plausibly allege a conspiratorial agreement, the Court must address whether Plaintiffs have sufficiently alleged (A) parallel conduct, and (B) additional factual circumstances indicating an agreement, including (1) an underlying premise that accounts for production numbers and the means of alleged production rate decreases, (2) other "plus factors," and (3) alternative, non-conspiratorial

explanations for Defendants' conduct. After addressing these arguments regarding Plaintiffs' allegations of the conspiracy itself, the Court will address (C) arguments made by individual defendants regarding their particular circumstances, (D) the statute of limitations, and (E) Plaintiffs' allegations regarding Georgia Dock.

A.    **Parallel Conduct**

Defendants first argue that Plaintiffs have failed to make a threshold showing of parallel conduct necessary to state a conspiracy claim under the Sherman Act. Defendants contend that Plaintiffs have alleged only that some defendants decreased production, at various points over many years, in varying amounts, and by various methods, and that this kind of varied action cannot be described as parallel. *See* R. 280 at 15-19. The Court disagrees.

Defendants contend that their alleged conduct was not parallel because it took place "across a lengthy period." R. 280 at 15. As Defendants point out, Plaintiffs do not allege that Defendants took action "all at once," as was alleged in *Text Messaging*, 630 F.3d at 628. But such an allegation is not required for the Court to plausibly infer parallel conduct. The Seventh Circuit highlighted the "all at once" nature of the alleged conduct in *Text Messaging*, not to explain why the plaintiffs in that case had sufficiently alleged parallel conduct, but in holding that the allegations plausibly alleged an agreement. The court noted that the "all at once" allegation was "the kind of 'parallel *plus*' behavior" that "would support a plausible inference of conspiracy." *Id.* (emphasis added). The court never said that "all at once" behavior was necessary to allege parallel conduct in the first place.

Indeed, the Supreme Court has long held that simultaneous action is a not a requirement to demonstrate parallel conduct. *See Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939) ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."); *accord United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 673 (1965). Other courts have reaffirmed this principle more recently. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 429 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015), *cert. denied*, 136 S. Ct. 2485 (2016) ("parallel conduct need not be exactly simultaneous and identical in order to give rise to an inference of agreement"); *Kleen Prod., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077, nn. 5, 9 (N.D. Ill. 2011) ("capacity reductions need not be simultaneous to demonstrate conscious parallelism," rather, allegation of sequential conduct "is common" in such cases); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011) ("The supply cutbacks in this case are alleged to have occurred more gradually and thus could have resulted from one firm observing its competitor's decisions and then independently deciding to follow along. . . . But interdependence can be inferred from parallel conduct that is sequential rather than simultaneous."). And while *Twombly* changed the law with respect to the weight of parallel conduct in the pleading equation, it said nothing about what is necessary to allege parallel conduct in the first place.

Notably, courts have found allegations of defendants joining or effectuating a conspiracy over periods of time comparable to or longer than the periods Plaintiffs

allege here to sufficiently allege parallel conduct. *See Kleen*, 775 F. Supp. 2d at 1077-78 (finding sufficient allegations of parallel conduct where defendants increased prices over the course of five years); *Plasma-Derivative*, 764 F. Supp. 2d at 996 (finding sufficient allegations of parallel conduct where the defendants made "production cuts, strategic acquisitions, and plant closures" over the course of two years); *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 440 (S.D.N.Y. 2014), *aff'd sub nom. Ross v. Citigroup, Inc.*, 630 Fed. App'x 79 (2d Cir. 2015), *as corrected* (Nov. 24, 2015) (defendant credit card companies adopted arbitration clauses over a two year period). Here, Plaintiffs allege two periods of production cuts of approximately one-two years each, in 2008-09 and 2011-12. These allegations are sufficient to allege conduct that took place at the same time.

Defendants also argue that Plaintiffs' allegations do not demonstrate parallel conduct because the alleged production cuts are too varied in methods and amounts. But courts in this district have not required such uniformity to allege parallel conduct. *See Plasma-Derivative*, 764 F. Supp. 2d at 996 ("Plaintiffs point to a series of production cuts, strategic acquisitions, and plant closures by CSL and Baxter leading to reduced supply."); *Kleen*, 775 F. Supp. 2d at 1077, n.8 ("Variations in the size of capacity reductions do not disprove the existence of a conspiracy[.]"). Neither have courts in other districts. *See In re Interest Rate Swaps Antitrust Litig.*, 2017 WL 3209233, at *33 (S.D.N.Y. July 28, 2017) ("Unanimity of action . . . is not required."); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 69 (D.D.C. 2016) ("Plaintiffs do not need to demonstrate that Defendants cut or limited

capacity in exactly the same way in order to adequately allege parallel conduct."); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010) ("[I]t is well settled . . . that the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period."); *City of Moundridge v. Exxon Mobil Corp.*, 2009 WL 5385975, at *5 (D.D.C. Sept. 30, 2009) ("Price-fixing can occur even though the price increases are not identical in absolute or relative terms."). It is more than plausible that conspirators would leave the precise means of cutting production up to each conspirator, where multiple options would accomplish the intended goal. Permitting flexibility, where possible, in the means of effectuating price increases, would enable a greater number of producers to participate in the conspiracy, and might help to conceal the collusive nature of their conduct. *See SD3*, 801 F.3d at 428 ("[I]f the defendants employed different courses of action, then their conspiracy might better avoid detection.").

Defendants also argue that Plaintiffs have not alleged that all Defendants "reduced" production, but rather that some Defendants only canceled planned production increases. *See* R. 280 at 17-18. This argument might carry weight if Plaintiffs had alleged that Defendants conspired to decrease overall production in absolute numbers. Plaintiffs, however, base their claims on allegations that overall production increases were not in line with what had been the Broiler industry's historic annual 3% production increase. Such a conspiracy leaves room for some participants to merely cancel production increases, as opposed to actually decreasing production. *See SD3*, 801 F.3d at 428-29 ("But the dissent would require

more, even at this early stage of the proceedings; it would find 'parallel conduct' only when defendants move in relative lockstep, achieving their common anticompetitive ends (exclusion) only by substantially identical means. So far as we can tell, this standard finds no support in any existing authority.").

Despite Defendants' attempts to highlight the aspects of their alleged conduct that are not absolutely uniform, Plaintiffs have alleged that all of the defendants engaged in production cuts at the same time. Thus, the Court finds that Plaintiffs have sufficiently alleged Defendants' conduct was parallel.

## B.    Additional Factual Circumstances

Beyond questioning Plaintiffs' allegations of parallel conduct, Defendants also contend that the alleged factual circumstances surrounding the parallel conduct do not permit an inference that the parallel conduct was a product of a conspiratorial agreement. Plaintiffs' claims are primarily premised on the allegation that the Broiler industry and market is such that no one producer can cut production and successfully affect the market price. Additionally, the commodity nature of Broilers, the high cost of entry into the market, and the uniformity of production cost structures, means that any production cut by one producer should be immediately filled by the rest. According to Plaintiffs, in a market with such characteristics, when the industry as a whole slows production to a historically unprecedented rate, with at least some conspirators using the historically unprecedented method of slaughtering or exporting breeder flocks, such that prices experience an unusual increase, "chance, coincidence, or independent responses to

common stimuli, or mere interdependence unaided by an advance understanding among the parties," are not plausible explanations. *See Twombly*, 550 U.S. at 557 n.4. Rather, such "historically unprecedented changes," *id.*, suggest a conspiratorial agreement, not mere parallel conduct.

In opposition to Plaintiffs' conspiracy claims, Defendants both: (1) point to factual circumstances alleged in the complaint—i.e., production statistics, the extent and means of production cuts, and the number of producers in the industry—which they contend undermine Plaintiffs' primary premise of unprecedented market movement and industry action; and (2) contend that Plaintiffs' additional allegations (often referred to by courts as "plus factors") in support of their claim that a conspiratorial agreement existed are lacking. Lastly, Defendants argue (3) that alternative explanations for their conduct exist, demonstrating that Plaintiffs' claims are not plausible.

### 1. Underlying Premise

In attacking the underlying premise of Plaintiffs' conspiracy claim, Defendants first argue (a) that Plaintiffs' allegations mischaracterize the Broiler market during the relevant time period. Defendants then also argue (b) that no rational producer would subscribe to the agreement Plaintiffs allege, and (c) that the large number of producers in the industry makes conspiracy impractical and thus implausible.

### a.    Production Statistics

Defendants contend that, "[a]lthough the central premise of the claimed conspiracy is reduced output, production actually increased." R. 280 at 4. This argument fails to undermine Plaintiffs' conspiracy claim for a number of reasons. First, it is based on an incorrect characterization of Plaintiffs' claims. Plaintiffs' theory of the case is not that production decreased in absolute numbers, but that there was a decrease relative to the historic annual rate of production increase. *See* R. 212 ¶ 335. Additionally, the Seventh Circuit has noted that this is not an uncommon characteristic of price fixing conspiracies involving production restrictions, which can still require the ability to manage excess capacity. *See High Fructose Corn Syrup*, 295 F.3d at 657 ("The defendants continued to add to their capacity during the period of the alleged conspiracy. This behavior does not disprove the existence of the conspiracy, as the defendants argue. Maintenance of excess capacity discourages new entry, which supracompetitive prices would otherwise attract, and also shores up a cartel by increasing the risk that its collapse will lead to a devastating price war ending in the bankruptcy of some or all of the former cartelists.").

Second, Defendants' argument is based on the following data from the U.S. Department of Agriculture, showing an increase in production, which were not included in the complaint:



R. 280 at 6. Although Plaintiffs cite some data from the Department of Agriculture in their complaint, this is not license for the Court to consider all data from the Department of Agriculture as incorporated into the complaint on this motion.

Regardless of whether the data is incorporated into the complaint, the parties argue over whether the Court can take judicial notice of this data. The Court can certainly take judicial notice of the fact that the Department of Agriculture has *stated* these production numbers. But the Court declines to take judicial notice of the ultimate truth of these production numbers. Statistics such as these (i.e., statistics about a nationwide industry) are inherently a product of various calculation and collection methods, which can be reasonably questioned. Both sides have already produced a number of statistical charts to the Court, each claiming their accuracy. Both sides should also have the opportunity to argue to the Court why these statistics may not be what they seem, which necessarily cannot take place at the pleading stage.

Moreover, even taking judicial notice of the fact that the Department of Agriculture says that this is the history of Broiler production over the relevant time period, the production increases do not undermine Plaintiffs' claims, at least at the pleading stage. The graph notes a significant production decrease in 2008-09. It also shows a decrease in 2011-12. These are the two periods during which Plaintiffs allege agreed upon production cuts. And "to the extent that capacity increases took place after Defendants were able to effectuate their intended price increases, no further action by the conspirators is required to effect the objectives of the conspiracy because each sale at the fixed price continues to benefit the conspirators." *Kleen*, 775 F. Supp. 2d at 1077, n. 10 (quoting *Morton's Market, Inc. v. Gustafson's Dairy, Inc.,* 198 F.3d 823, 838 (11th Cir. 1999)). Further, the graph shows that Broiler production was approximately 36,500 in 2008 and approximately 38,000 in 2014, for a total increase of 1,500, and an average annual increase of 0.5%. This is well below the alleged historic annual 3% increase, as can be seen from the same Department of Agriculture data going back to the year 2000, which Plaintiffs included in their brief:



Source: U.S. Department of Agriculture, National Agricultural Statistics Service. Trend line (black) based on 2000-2007 production.

R. 343 at 31. Thus, drawing reasonable inferences in favor of Plaintiffs, the data from the Department of Agriculture can be interpreted as consistent with Plaintiffs' claims that Defendants conspired to slow the increase of Broiler production.

### b. Extent and Means of Production Cuts

In addition to arguing that industry-wide production did not decrease, Defendants argue that "[i]t is implausible that a producer would agree to give up 8% of its sales while its rivals give up only 2%." R. 280 at 17 (also noting that Plaintiffs allege a range of percentage reductions of between 1.25% and 10%). Certainly, at some point the difference in production cut or market share reductions would be so great that agreement becomes implausible. For instance, Defendants cite an Eleventh Circuit decision affirming dismissal of conspiracy claims involving two defendants whose market shares increased 20% and 50% respectively, while two other defendants' market shares declined 25% and 19% respectively. *See*

*Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1321 (11th Cir. 2003).[7] Plaintiffs do not allege anywhere near such divergent shifts in production or market share among Defendants in this case. Furthermore, Defendants make no argument as to why the production cut percentage spread alleged here makes agreement implausible. Certainly, companies with a larger market share have more room to cut. And if the resulting price increase is large enough, convincing smaller companies to cut production, even in small amounts, could still benefit the bottom line of the larger companies, despite a potentially greater loss of market share. *See, e.g.*, *United States v. Foley*, 598 F.2d 1323, 1333-34 (4th Cir. 1979) (some defendants did not act to implement the commission-fixing agreement until months after it formed, while at least one defendant implemented the new commissions before the conspiracy formed; still other defendants only partially joined, taking higher commissions when available but otherwise pursuing lower ones).

Defendants also question why a "company would agree to close a plant in exchange for a competitor merely reducing its egg sets," since, "[w]hile egg sets can be adjusted, closing a plant may be irreversible," and creates business issues beyond production (i.e., labor, public relations, accounting, taxes). R. 280 at 17. But as noted above, Plaintiffs do not allege that Defendants conspired to reduce production absolutely, but instead to reduce the rate of production increase. Similar to Defendants' concern with the spread of alleged production cut percentages, it is plausible that it was beneficial to some producers to achieve production cuts by

_____

[7] This was a summary judgment decision, so the Court considers the percentages at issue in that case merely as an example.

whatever means they could get agreement, in the hopes that the price increase would be substantial enough.

Similarly, while Defendants argue that only *some* of them are alleged to have destroyed or exported Broiler flocks, this argument improperly focuses on the particular public announcements Plaintiffs identify in their complaint. These announcements can be sufficient to demonstrate a plausible agreement without each announcement embodying the entire agreement. Moreover, to flesh out their allegations on this point, Plaintiffs have cited industry reports to support their allegation that *all* Defendants destroyed Broiler flocks. It is not surprising that not all defendants announced these tactics, making them available to Plaintiffs to include in their complaint.[8]

### c.    Number of Producers

Defendants also point to the fact that the "industry includes about 35 producers, only 17 of which are alleged . . . to be conspirators," as indicating that conspiracy is not plausible. R. 280 at 26. But 100% industry participation is not necessary to plausibly allege a conspiracy. Additionally, the 17 Defendants are alleged to control 88.8% of the market. It cannot be credibly disputed that 88.8% of the market acting in concert is sufficient to control it.

Defendants contend, however, that with as many as 18 competitors in the market not bound by the conspiracy, Plaintiffs' failure to allege that these

---

[8] Defendants' additional argument that "the complaint also concedes many defendants acted contrary to the alleged conspiracy" is based on material that is outside the complaint, or arguments that test the truth of Plaintiffs' allegations. *See* R. 280 at 19-20. These are arguments for summary judgment.

competitors did not have the ability to expand their production to make up for Defendants' production cuts in the market, makes the conspiracy implausible. *See id.* at 27. This argument, however, ignores the rest of Plaintiffs' factual allegations (both already discussed and discussed below) indicating the existence of a conspiracy. Considering Plaintiffs' allegations as a whole (as the Court must), it is reasonable to infer that the other 18 non-defendant producers did not have the ability to fulfill the demand Defendants were leaving on the table. There is nothing about Plaintiffs' allegations compelling the Court to infer otherwise.

Defendants also argue that a conspiracy of 17 is implausible because it would be too unwieldy. In particular, Defendants criticize Plaintiffs for failing to allege an "enforcement mechanism." R. 280 at 27-29. In support of this argument, Defendants cite a Third Circuit decision holding that, "Game theory teaches us that a cartel cannot survive absent some enforcement mechanism because otherwise the incentives to cheat are too great." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1233 (3d Cir. 1993) (citing Richard A. Posner, Economic Analysis of Law 265-66 (3d ed. 1986)). But *Petruzzi's* was decided in the context of a summary judgment motion, and Defendants have cited no authority that an "enforcement mechanism" must be alleged in order to state a claim. The only case in this district the Court has found discussing the relevance of an enforcement mechanism was also in the context of summary judgment. *See Kleen*, 2017 WL 3310975, at *23. And even there, the court explained that the lack of evidence of an enforcement mechanism made "the inference *tend*[] toward no

agreement." *Id*. (emphasis added). The Court did not hold that the lack of enforcement mechanism was dispositive of the claims.

Furthermore, the logic supporting the need for an enforcement mechanism assumes that all producers must hold the line on the conspiracy at all times. This makes sense in a case like *Petruzzi's*, which concerned a cartel that "allocated customers" in a particular industry. 998 F.2d at 1228. The entire point of the conspiracy was the maintenance of individual monopolies for each defendant over their customer bases. Any deviation would destroy the point of the conspiracy, so logically the conspirators needed a mechanism to enforce continuity of the agreement. Here by contrast, Plaintiffs have alleged a conspiracy to cut production during certain limited periods of time in order to increase prices. It is plausible that the conspiracy would contemplate that after cutting production and successfully inflating prices, Defendants would be permitted to again increase production to take advantage of those price increases. No enforcement mechanism akin to that in *Petruzzi's* is necessarily required under Plaintiffs' theory of the case.

### 2. Plus Factors

In addition to questioning the underlying premise of the complaint, Defendants contend that the particular factual plus factors Plaintiffs identify to support the plausibility of their claims are lacking. All of the plus factors Plaintiffs say contribute to the plausibility of their claims—including (a) forms of communication, such as industry or trade association meetings, and public statements by executives, (b) Agri Stats, and (c) the shift to short-term contracts

and purchases from competitors—must be viewed in light of the underlying premise of Plaintiffs' claims, i.e., that between 2008 and 2014, the Broiler market experienced unprecedented movement, and the Broiler producers took unprecedented action. *See Kleen*, 775 F. Supp. 2d at 1078 (the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole" (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699 (1962)); *Domestic Airline Travel.*, 221 F. Supp. 3d at 59 ("[a]ctions that might seem otherwise neutral in isolation can take on a different shape when considered in conjunction with other surrounding circumstances" (quoting *SD3, LLC*, 801 F.3d at 425)). Defendants, however, argue against Plaintiffs' claim by isolating each factor, and finding instances when courts have questioned their weight in determining the plausibility of conspiracy allegations. The Court rejects this method of analysis and these arguments.

### a.     Communications

Defendants' primary attack on Plaintiffs' plus factor allegations is that they "allege no facts regarding when, where, or by what means Defendants purportedly colluded." R. 280 at 24. Specifically, Defendants contend that Plaintiffs' reliance on (i) "opportunities" to collude at industry and trade association meetings, and (ii) public statements by Defendants' executives, are insufficient to establish that Defendants reached a "meeting of the minds."

But as discussed, Plaintiffs' reliance on industry meetings and public statements must be evaluated in the context of all their allegations. Plaintiffs allege

that by 2007 there was a consensus in the Broiler industry that prices were too low because they were near or below the cost of production. That year, several of the larger producers unsuccessfully attempted to increase prices through unilateral production cuts. In January 2008, immediately after an industry convention, the large producers made public statements calling for industry-wide production cuts. "Defendants' discussion of the need for capacity discipline within the industry as a whole is notable because it involves more than a mere announcement of [each individual] [d]efendant's own planned course of conduct." *Domestic Airline Travel*, 221 F. Supp. 3d at 62-63. And sure enough, soon thereafter, a number of other producers publicly announced that they would cut production. In an industry where history has shown unilateral production cuts to be ineffective at moving prices, the announcement of production cuts soon after demands by other producers for such cuts is indicative of agreement. *See id.* at 63 ("Defendants' statements concerning the focus on exercising capacity discipline . . . were a deviation from past business practices," thus indicating collusion.).

Further, in an industry in which unilateral production cuts expose a company to loss of market share, a publicly announced production cut makes it more likely that the producer has an agreement from other producers to either cut production as well, or at least to forebear from assuming the vacated market share. Such conduct without an agreement makes little economic sense. *See Plasma-Derivative*, 764 F. Supp. 2d at 1002 ("The risk involved in leading a supply reduction suggests that purely interdependent supply decisions are unlikely." (quoting *In re*

*Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 463 (9th Cir. 1990)); *see also Brown v. Pro Football, Inc.*, 518 U.S. 231, 241 (1996) ("uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable, or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision"); *White*, 635 F.3d at 576-77 ("tacit agreement" is "facilitated by a stable market environment, fungible products, and a small number of variables upon which the firms seeking to coordinate their pricing may focus. . . . Such coordination is also easier to maintain when these fungible goods 'are repeatedly sold in market transactions that are immediately known in every detail by customers and rivals.'" (quoting 6 Areeda & Hovenkamp, *Antitrust Law* ¶ 1430b, at 225 (3d ed. 2010)). Plaintiffs allege, moreover, that Defendants knew that they were all in agreement because Agri Stats reports and briefings served as a mechanism to monitor each other's production cuts. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 906-07 (6th Cir. 2009) (an industry information clearing house could be a tool for a price fixing conspiracy if it "could provide defendants with [the pertinent] information *before* defendants implemented their rate reductions").

A similar scenario of industry meetings, followed by public statements and production cuts also took place in 2011, this time involving unprecedented slaughter or export of breeder flocks. Plaintiffs argue that Defendants would not take such drastic and unusual action unless they knew that the industry as a whole had agreed to reduce production.

Defendants point out that "where a public announcement has a non-conspiratorial purpose, courts do not hesitate to reject the argument that such statements support a conspiracy claim." R. 280 at 29. But this argument almost amounts to the tautology that if public statements do not plausibly suggest a conspiracy they cannot support a conspiracy claim. This principle (to the extent it can be described as such) does not exclude the possibility that public statements *can* contribute to the plausibility of a conspiracy under the right circumstances.

**(i) Public Statements.** The primary case Defendants cite to support their argument that public statements can never contribute to the plausibility of a conspiracy claim is to the contrary. In *Petroleum Products*, the Ninth Circuit noted that "the form of the [communication]—whether through a trade association, through private exchange . . ., or through public announcements of price changes—should *not* be determinative of its legality." *Petroleum Products*, 906 F.2d at 447 (citing R. Posner, Antitrust Law: An Economic Perspective 146 (1976)). Rather, "[t]he fact that it is feasible for the [defendants] to communicate the necessary price information through press releases does not 'immunize the exchange of price information from legal sanction [where] the conditions of the market suggest that the exchange promotes collusive rather than competitive pricing.'" *Petroleum Prods.*, 906 F.2d at 447 (citing Posner at 147). It is true that the Ninth Circuit expressed concern with a court potentially finding that communications that are otherwise beneficial to consumers (such as communication of *retail* prices) to be an aspect of a conspiracy. *See Petroleum Prods.*, 906 F.2d at

448 n.14 ("permitting an inference of conspiracy from such evidence would make it more difficult for retail consumers to get the information they need to make efficient market decisions"). But Defendants do not argue that such a threat exists here with respect to announcements of Broiler production numbers. And the Court does not perceive one.

Defendants also argue that the public statements on which Plaintiffs rely "had purposes wholly apart from conspiracy," such as responses to questions from shareholders and the press. R. 280 at 30. But this argument merely notes the circumstances in which the statements were made. It is certainly possible for a statement to have multiple purposes or meanings directed at different audiences. For purposes of evaluating Plaintiffs' conspiracy claims, what is important to the Court's analysis is not so much the immediate context in which the statements were made, but the larger context of the market and industry actions. Although Defendants cite a court in this district finding that "[i]t difficult to imagine how these generic [public] statements render the conspiracy allegation more plausible," that court nevertheless went on to deny a motion to dismiss based on the totality of the allegations. *See Plasma-Derivative*, 764 F. Supp. 2d at 1001. As discussed, the Court considers the public statements at issue in this case with the same broad perspective and in the context of Plaintiffs' overall theory of the case.

**(ii) Opportunities to Collude.** Similar to their criticism of Plaintiffs' reliance on public statements, Defendants argue that "opportunities" to collude at industry and trade association meetings do not make a conspiracy

plausible. But just as a speaker can intend statements to convey different meanings to difference audiences, meetings can serve different purposes depending on a participant's interests. As the Seventh Circuit has held, such meetings can "facilitate price fixing." *Text Messaging*, 630 F.3d at 628. The context within which those meetings take place is key to determining the significance of the occurrence of those meetings to the plausibility of a conspiracy claim. Here, where Plaintiffs' have alleged suspicious timing of important industry conferences in January 2008 and 2011, followed by unusual producer actions and market movements, those meetings plausibly help to fill-out the picture of Defendants' alleged conspiratorial agreement.

### b. Agri Stats

Defendants also argue that the existence of Agri Stats does not plausibly suggest the existence of a conspiracy because "Agri Stats was in business long before the alleged conspiracy period," and courts "routinely reject efforts to depict long-standing practices as reflective of a more recent conspiracy." R. 280 at 33. This is true with respect to practices that constitute the mechanism of effectuating price fixes. *See*, *e.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d 1028, 1033-34 (7th Cir. 2002) (defendants alleged to have conspired to fix prices through charge back agreements that were in place prior to the alleged commencement of the conspiracy). But here Agri Stats is not the mechanism Defendants are alleged to have used to effectuate the price increases—that would be the means of their

production cuts. Rather, Plaintiffs allege Defendants used Agri Stats as a means of communication and monitoring.

Defendants question whether the role Agri Stats allegedly played in the conspiracy is plausible considering Plaintiffs do not allege that Agri Stats was a co-conspirator and that Agri Stats is a subsidiary of a publicly owned company, and its existence is no secret. *See* R. 280 at 34. Plaintiffs clearly allege, however, that the information provided by Agri Stats simply facilitated the conspiracy. It was a tool Defendants used to help implement their conspiracy. Agri Stats does not have to be a co-conspirator or a secret to play this alleged role, possibility unwittingly.

### c.    Short-Term Contracts & Inter-Competitor Sales

According to Plaintiffs, two additional circumstances indicate that a collusive agreement existed. First, beginning in 2008, Defendants allegedly shifted to short-term contracts with variable pricing. This shift indicates that Defendants anticipated higher prices and wanted to have the flexibility to take advantage of that market. Second, Tyson began buying Broiler products from its competitors in order to satisfy its own customers, even though this practice allegedly cost more than producing and selling its own Broilers. This practice plausibly indicates that Tyson knew that the other producers from which it was buying would not simply consider Tyson's orders as additional demand on top of their current demand, and increase production to meet that increased demand. *See* R. 212 ¶ 246 (Plaintiffs allege that "Tyson's continued use of Buy vs. Grow . . . allows Tyson and other Defendants to reduce production on a month-to-month basis and have opportunities

to learn more information about one another's production and pricing."). Fieldale Farms also subscribed to this strategy. *Id.* ¶ 342. It is plausible that Tyson and Fieldale only makes purchases from their competitors because Defendants had agreed to restrict their production accordingly.

Defendants argue that the shift in contract form and sales among competitors do not plausibly suggest a conspiracy because only a few of the defendants participated and there are plausible alternative explanations for these business strategies. With respect to the first argument, Plaintiffs do not allege that these strategies were necessary to effectuate the conspiracy. Rather, Plaintiffs argue that these strategies are the kind of strategies a producer might undertake if they knew an agreement to restrict production was in place. The fact that businesses sometimes follow these strategies without the assurance of a price fixing conspiracy does not change the fact that these strategies are far less risky when taken in the context of such an agreement. Thus, these practices serve to bolster the plausibility of a conspiratorial agreement.

As for alternative explanations for these strategies, the Court will address that argument with respect to Plaintiffs' claims more broadly.

### 3.    Alternative Explanations

Defendants contend that *Twombly* requires this Court to reject Plaintiffs' conspiracy claims if "there are 'obvious alternative explanations' for why some individual Defendants would elect to lower output." R. 280 at 20 (quoting 550 U.S. at 567); *see also* R. 370 at 7 ("a plaintiff must demonstrate that alleged parallel

behavior would probably not result from . . . independent responses to common stimuli"). But *Twombly* does not stand for the proposition that the mere existence of an alternative explanation for Defendants' conduct serves to destroy the plausibility of Plaintiffs' conspiracy claims. Rather, *Twombly's* point with respect to alternative explanations was that they nearly always exist for parallel conduct, such that an allegation of parallel conduct alone cannot plausibly allege a conspiracy. The Supreme Court's reference to "obvious alternative explanations" was made in the context of explaining why "the plaintiff's assert[ion] that the . . . parallel conduct was 'strongly suggestive of conspiracy," was not true. *Twombly*, 550 U.S. at 567; *see also id.* at 564-65 ("the complaint leaves no doubt that plaintiffs rest their [conspiracy] claim on descriptions of parallel conduct and not any independent allegation of actual agreement . . . . The nub of the complaint, then, is the . . . parallel behavior . . . and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience."). Hence the Court's requirement of additional factual circumstances—such as "unprecedented changes" in the market or competitors' conduct—to push allegations of parallel conduct into the conspiratorial realm.

Contrary to Defendants' argument, the Supreme Court did not intend for courts to weigh the plausibility of a plaintiff's conspiracy claims against the plausibility of the defendants' alternative explanation for their conduct. That would be equivalent to "impos[ing] a probability requirement at the pleading stage," which *Twombly* expressly does not do. 550 U.S. at 556; *see also Swanson v. Citibank, N.A.*,

614 F.3d 400, 404 (7th Cir. 2010) ("'Plausibility' in [the legal pleading] context does not imply that the district court should decide whose version to believe, or which version is more likely than not. . . . [I]t is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences."); *Plasma-Derivative*, 764 F. Supp. 2d at 1002 ("Defendants make a somewhat convincing case that all of plaintiffs' allegations can be explained as behavior perfectly in line with the firms' independent self-interest. . . . But despite any doubts about plaintiffs' case, the defendants propose a standard for reviewing the complaint which does not comport with *Twombly* or Rule 8. It is not necessary that the factual allegations tend to exclude the alternative explanation offered by defendants. That is the standard appropriate for a summary judgment motion.").[9]

Although Plaintiffs are not required to show that their conspiracy claims are more plausible than Defendants' alternative explanation, alternative explanations can serve to demonstrate that Plaintiffs' conspiracy claims are not plausible. *See*

---

[9] Defendants implicitly argue that *Twombly* imports a probability requirement into the plausibility standard in applying the standard to alternative explanations to conspiracy claims, when the Supreme Court suggested that "parallel conduct allegations that would state a § 1 claim," include "'parallel behavior that would *probably* not result from chance.'" 550 U.S. at 557 n.4 (quoting 6 Areeda & Hovenkam ¶ 1425, at 167-68) (emphasis added). But noting that conduct that "would probably not result from change" is an example of a plausible conspiracy allegation does not mean that all plausible claims must meet a standard of probability. Furthermore, this quote from *Twombly* is in turn a quote from the Areed & Hovenkamp treatise, which was published prior to *Twombly* instituting its fine distinction between the terms "probable" and "plausible." Considering the Court's clear insistence that it has not "impos[ed] a probability requirement at the pleading stage," 550 U.S. at 556, this Court disagrees with the weight Defendants give to *Twombly's* quote of the word "probable."

*Plasma-Derivative*, 764 F. Supp. 2d at 1002 (conspiracy claims must be "plausible in light of the competing explanations"). But this analysis is no different than for any other plus factor.

In this case, Defendants "alternative explanation" does not fatally undermine the alleged motivation for their conspiracy, and in fact could be understood to bolster it. Defendants contend that to the extent Plaintiffs have sufficiently alleged unusual production cuts, the cuts were a product of high feed costs and the Great Recession. It is logical that high costs combined with weak demand would lead at least some producers to cut production on the basis that such a shrunken profit margin was insufficient to support their past production levels. As Defendants point out, the Fifth Circuit drew this conclusion with respect to one of the defendants in this case. *See In re Pilgrim's Pride Corp.*, 728 F.3d 457, 462-63 (5th Cir. 2013). That case, however, involved consideration of whether Pilgrim's actions had an anticompetitive effect sufficient to demonstrate violation of the Packers and Stockyards Act, 7 U.S.C. §§ 181 et seq. *Id.* A conspiracy claim was not at issue. *Id.* at 459. But as Plaintiffs point out, producers facing such economic conditions have an even greater incentive to conspire to fix prices. *See In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 870 (N.D. Ill. 2010) ("producers could have colluded to reduce output and stabilize acid prices precisely to salvage profit—indeed, stay in business—in a dire economic climate"). The circumstances underlying Defendants' alternative innocent explanation also serve to make a price fixing conspiracy more likely.

Both Plaintiffs' allegation of a conspiracy, and Defendants' innocent explanations, could be described as plausible. By asking the Court to choose its innocent explanations over Plaintiffs' claims, Defendants are asking the Court to undertake a weighing of evidence that is not appropriate at the pleading stage, and must be rejected. Thus, Defendants' alternative explanations do not undermine the plausibility of Plaintiffs' conspiracy claims.

*　　*　　*　　*

For the foregoing reasons, the Court finds that Plaintiffs have plausibly alleged the existence of a conspiratorial agreement. The Court now turns to (C) arguments made by individual defendants regarding their particular circumstances, (D) the statute of limitations, and (E) Plaintiffs' allegations regarding Georgia Dock.

## C.    Arguments Particular to Individual Defendants

### 1.    Participation

A number of defendants argue that Plaintiffs have insufficiently pled their participation in the conspiracy.[10] "Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz Travel Serv., Inc. v. Int'l Air Trans. Ass'n*, 620 F.2d 1360, 1367 (7th Cir. 1980). "Although every conspirator is responsible for others' acts within the scope of the agreement, it remains essential to show that a particular defendant joined the

---

[10] The defendants who make this argument are the following: Mountaire, R. 275; Sanderson, R. 277; Wayne Farms, R. 283; George's, R. 285; Perdue, R. 288; Foster Farms, R. 289; Koch, R. 291; and Peco, R. 297.

conspiracy and knew of its scope." *Bank of America, N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).

These defendants each separately attack Plaintiffs' allegations of their participation in the conspiracy using many of the same arguments Defendants raised collectively. The Court has already found that Plaintiffs have plausibly alleged parallel conduct; that production increases are plausibly compatible with the conspiracy to slow the rate of production increases and inflate prices; and that Broiler industry characteristics, opportunities to collude at industry conferences and trade associations meetings, public statements urging production cuts, the existence and characteristics of Agri Stats, and the shift to variable price contracts and export increases, serve as a plausible factual basis to infer the existence of a conspiratorial agreement.

What is left is the question of whether Plaintiffs have sufficiently alleged each individual defendant's participation in this alleged agreement. Plaintiffs have alleged that each defendant that has raised this argument either cut production or took action to restrain production at some point during the relevant time period. *See* R. 212 ¶ 143 (Perdue cut production in 2007); ¶¶ 350, 353 (Perdue announced efforts to reduce fixed price contracts); ¶ 188 (George's cut production in 2008); ¶ 143 (Foster Farms cut production in 2007); ¶165 (Foster Farms canceled plant construction in 2008); ¶ 151D (Koch Foods cut production in 2008); ¶ 203 (Mountaire abandoned a capacity increase in 2011); ¶ 151D (O.K. Foods cut production in 2008); ¶ 166 (O.K. Foods reduced egg sets in 2008); ¶ 188 (O.K. Foods

reduced production in 2008); ¶ 383C (O.K. Foods cut production in 2008); ¶ 151C (Simmons cut production in 2008); ¶ 188 (Simmons cut production in 2008); ¶¶ 201, 215 (Simmons laid off employees in 2011); ¶ 254 (Simmons closed a plant in 2014); ¶ 383 (Simmons downsized a plant in 2011); ¶¶ 170, 188 (House of Raeford cut production in 2008); ¶ 200 (House of Raeford reduced egg sets in 2011); ¶ 383F (House of Raeford cut production in 2011); ¶ 158 (Sanderson made unusual announcements); ¶ 176 (Sanderson cut production in 2008); ¶ 185 (Sanderson cut production in 2008-09); ¶ 199 (Sanderson delayed a plant construction in 2011); ¶¶ 218, 223, 227 (Sanderson cut production in 2011-12); ¶ 238 (Sanderson made an additional 2012 production cut); ¶ 151D, 163 (Wayne Farms cut production in 2008); ¶ 177 (Wayne Farms closed a plant in 2008); ¶ 222 (Wayne Farms closed a plant in 2011); ¶ 143 (Peco cut production in 2007); ¶ 309 (Peco engaged in exports in 2011). Plaintiffs also make numerous allegations that executives from these companies participated in industry conferences and trade associations meetings. And Plaintiffs allege that they all subscribe to Agri Stats. Although each defendant argues that these allegations are insufficient to allege their participation in the agreement, none of the defendants cite any case law authority supporting the contention that allegations of participation of this magnitude are insufficient.

A price fixing conspiracy would be expected to leave little publicly available evidence of its existence. Price fixing conspiracies are therefore often inferred from context. *See Plasma-Derivative*, 764 F. Supp. 2d at 1003 n.10 ("[T]he Supreme Court has also recognized that Congress drafted the antitrust laws with the express

purpose of encouraging private enforcement. If private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available information." (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979))). Any direct evidence of the agreement will only be uncovered through discovery. Allegations that each defendant participated in the parallel conduct, participated in the meetings that provided the opportunity to collude, participated in Agri Stats, and participated in variable contracts or exports, are sufficient to allege participation in the agreement. Furthermore, most of Defendants' arguments boil down to the contention that Plaintiffs' allegations are wrong: they did not agree; they did not cut production; they actually increased market share. But all of these are arguments that should be tested by discovery; and they are not arguments that Plaintiffs have failed to allege participation.

### 2. Anti-Biotic Free

Another one of Defendants, Fieldale Farms, argues that the claims against it should be dismissed because it only produces anti-biotic free chicken meat. Fieldale contends that anti-biotic free chicken meat "has different growing costs, production methods, pricing, demand, and other market characteristics than conventional chicken." R. 281 at 1. For these reasons, Fieldale argues that its production of anti-biotic free chicken meat undermines Plaintiffs' theory of the case to the extent it is dependent on Broilers' commodity nature.

The Court agrees that Plaintiffs' theory of the case is strongly dependent upon the allegation that the Broiler market functions as a commodity market. But whether or not the inclusion of anti-biotic free chicken meat undermines this commodity nature, or whether it functions as a separate and unrelated market, is a question of fact. Fieldale primarily cites the Focus Management Report on the poultry industry because Plaintiffs cite it in the complaint (although they don't attach it) to support their allegation of the commodity nature of the Broiler industry. The Focus Management Report groups anti-biotic free chicken meat with organic and free range chicken meat, which Plaintiffs excluded from their definition of "Broilers." On this basis, Fieldale argues that Plaintiffs cannot reasonably include anti-biotic free chicken in their definition of Broilers. But this is a superficial argument. The Focus Management Report is a basis for Plaintiffs to plausibly allege that the Broiler market functions as a commodity market. It would also serve as a plausible basis for Fieldale to allege that anti-biotic chicken meat undermines that commodity nature. But by itself, without further factual development and explanation, the Court cannot, and at the pleading stage must not, decide who is right. Of course, Plaintiffs chose to carve out organic, free range, halal, and kosher chicken from their definition of "Broilers." And Fieldale's argument that anti-biotic free chicken meat is analogous to these excluded categories has facial appeal based on a trip to the grocery store. But that is not a basis for dismissing a claim that requires analysis of complex economic theories and

data. The Court suspects that Fieldale's argument might have merit, but the pleading stage is not the place to make that call.

### 3.    Pilgrim's Bankruptcy

Pilgrim's was in bankruptcy proceedings until it was discharged on December 28, 2008. Pilgrim's argues that to the extent it was part of a conspiratorial price fixing agreement during its bankruptcy proceedings, any claim based on that conduct has been discharged. *See* R. 295. Plaintiffs, however, argue that Pilgrim's reentered the conspiracy after its discharge, and that it can be jointly and severally liable for the entire conspiracy on that basis.

Pilgrim's argues that Plaintiffs have failed to plausibly allege that it reentered the conspiracy after its bankruptcy discharge. The Court disagrees. Plaintiffs allege that Pilgrims announced production cuts in February 2009, R. 212 ¶ 184; announced the closure of three processing plants in February 2009, *id.* ¶ 187; attended various industry meetings and trade association meetings through the remainder of the relevant time period, *id.* ¶¶ 207, 214; joined the shift to variable price contracts, *id.* ¶ 208; closed a plant in July 2011, *id.* ¶ 217; made statements indicative of knowledge of an agreement, *id.* ¶ 229; and closed another plant in June 2012, *id.* ¶ 232. For reasons explained generally in addressing Defendants' argument against Plaintiffs' conspiracy allegations, these allegations are sufficient to allege that Pilgrim's rejoined the conspiracy after its discharge.

Pilgrim's also argues that even if it is found to have rejoined the conspiracy, the Bankruptcy Code prohibits it from being liable for damages incurred before its

bankruptcy discharge date. The Seventh Circuit recently issued a holding diametrically opposed to Pilgrim's contention:

> We noted earlier that defendant RockTenn is in a different position from the other defendants, because it filed for bankruptcy and received a discharge on June 30, 2010, approximately four months before the end of the class period. The district court refused to dismiss RockTenn on that basis because it found evidence that RockTenn re-joined the conspiracy after the discharge. (For example, on the very evening of the day when the discharge order was entered, RockTenn's president sent an email stating "I assume we are announcing tomorrow," after three other defendants announced a simultaneous price increase.) The court also found that RockTenn might be jointly and severally liable for actions undertaken by its co-conspirators before the discharge, based on its post-discharge participation. *See Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980) ("[A] co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators.").

> The district court's reasoning was sound. RockTenn is free to argue at trial that it did not re-join the conspiracy. There is no conflict with bankruptcy law, however, if it did so, because in that case its liability would be predicated on post-discharge conduct. To the extent that these nuances need to be brought to the jury's attention, we are confident that the district court can do so through proper instructions.

*Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 930 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 1582 (2017).

Pilgrim's criticizes this holding for failing to address the language of the Bankruptcy Code providing for exceptions to discharge. R. 295 at 7 (citing 11 U.S.C. § 1141(d)(2), § 523(a)). But the logic here is not that Pilgrim's conduct would be an

exception to its discharge, but that it would be a liability it incurred after its discharge. Pilgrim's argues that this liability should not be measured by conduct that occurred prior to its discharge, but it has cited no authority for this position, and the Seventh Circuit has held otherwise. This Court will follow the Seventh Circuit's holding in *Kleen*, such that Pilgrim's can be jointly and severally liable for the entire conspiracy.

### D. Statute of Limitations

Defendants argue that Plaintiffs' Sherman Act claims are untimely. Under the Sherman Act, a plaintiff must bring a lawsuit "within four years after the cause of action accrued." 15 U.S.C. § 15b. "Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). A court may only dismiss a claim as untimely under Rule 12(b)(6) if "it is clear from the face of the . . . complaint that it is hopelessly time-barred." *Id.* at 675; *see also Grzanecki v. Bravo Cucina Italiana*, 408 Fed. App'x. 993, 996 (7th Cir. 2011) (A court may dismiss the complaint if the plaintiff "mak[es] allegations that conclusively establish the action's untimeliness."); *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)."). The "right question" is not whether the plaintiff has alleged "facts that tend to defeat

affirmative defenses," but "whether it is possible to imagine proof of the critical facts consistent with the allegations in the complaint" that would fall within the period of limitations. *U.S. Gypsum Co. v. Ind. Gas Co., Inc.*, 350 F.3d 623, 628 (7th Cir. 2003).

Defendants argue that Plaintiffs' Sherman Act claims should be dismissed as untimely because they allege production cuts that "occurred between five and eight years ago," in 2008 and 2011. R. 280 at 41. This case was filed on September 2, 2016. That means that the statutory period stretches back at least as far as September 2, 2012. It is "possible to imagine" overt acts in furtherance of the conspiracy taking place on or after September 2, 2012. Plaintiffs' allegations permit such an inference. *See*, *e.g.*, R. 212 ¶ 218 (Sanderson's 2011 production cut remains in place beyond January 2012); ¶ 255 ("The early slaughter of breeder flocks in 2011 through mid-2012 meant that Defendants subsequently were unable to increase production for at least eighteen months . . . ."); ¶ 229 (Pilgrim's CEP reported that "the die is cast for 2012" and "we're comfortable that the industry is going to remain constrained"); ¶ 231 (Tyson's announce production decrease in May 2012); ¶ 234 (Pilgrim's laid off 190 employees); ¶ 236 (Tyson's CEO states in August 2012 that the "vast majority of our contracts . . . allow for conversations about adjusting prices to move . . . and we will continue to push for even more of these types of contracts"); ¶ 237 (Koch Foods CEO states "the industry will be forced to get price increases of 10 to 15 percent" for 2013); ¶ 238 (Sanderson announces production cut on August 28, 2012); ¶ 240 (Defendants' senior executives attend the National Chicken Council

annual meeting); ¶ 243 (Pilgrim's CEO stated on May 3, 2013 that "supply continues to be disciplined and constrained"); ¶ 246 (Tyson's CEO reported that through its "buy versus grow strategy we continue to keep our supply short of demand."). These actions are alleged to be part of the production cut that began in 2011. Thus, there is no basis to dismiss Plaintiffs' allegations regarding the 2011 production at the pleading stage.

### 1.     Continuing Violation

The question Defendants raise, however, is whether Plaintiffs have sufficiently alleged that the 2011 production cut is part of a continuing conspiracy with the 2008 production cut, such that claims based on the 2008 production cuts are timely. "In the context of a continuing scheme to violate the antitrust laws, a cause of action accrues to the plaintiff each time the defendant engages in antitrust conduct that harms the plaintiff." *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 669 F.2d 490, 494 (7th Cir. 1982). For purposes of identifying a continuing violation in the context of a price-fixing conspiracy claim, antitrust conduct includes meeting "to fine-tune [a] cartel agreement," *Midwestern Machinery Co., Inc. v. Nw. Airlines, Inc.*, 392 F.3d 265, 269 (8th Cir. 2004), and "each sale to the plaintiff" at an artificially inflated price. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997).

Defendants argue that Plaintiffs' allegation of "over-supply" in 2010 conclusively demonstrate that the 2008 conspiracy had ended, and had to be restarted in 2011, such that a continuing conspiracy from 2008 through 2012 is not plausible. *See* R. 370 at 24-25. Defendants point out that the Supreme Court has

held that "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." *U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 464 (1978). It may be that Defendants will be able to prove that the 2008 conspiracy had ended by 2010, and that a new conspiracy began 2011. But it is also plausible that a conspiracy would contemplate allowing the conspirators to increase production at a certain point to take advantage of the inflated price the conspiracy achieved through production cuts. And Plaintiffs allege that the inflated prices continued from 2008 onward. The fact that Defendants are alleged to have taken unprecedented actions in order to cut production twice within a four year period, plausibly indicates that the conspiracy was continuing through 2012, and the momentary production increase was an agreed pause in the production cuts to take full advantage of higher prices. For these reasons, the Court finds that Plaintiffs' Sherman Act claims are not untimely on the face of the complaint.

### 2.    Discovery Rule

To the extent Plaintiffs have insufficiently alleged a continuing violation, they have sufficiently alleged that the discovery rule saves the timeliness of their earliest claims. The discovery rule "postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured." *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006). Under this rule, "accrual occurs when the plaintiff discovers that he has been

*injured* and who has *caused* the injury." *Id.* (emphasis in original). The Seventh Circuit has held that this rule applies in the antitrust context. *Id.*

Defendants contend that Plaintiffs could have discovered the facts underlying their claims because many of the statements Plaintiffs rely on to support their claims were made publicly. It may be true that it was *possible* for Plaintiffs to have discovered these statements on the dates they were made. The Court, however, is unwilling to hold that Plaintiffs should be charged with a level of diligence requiring them to follow Defendants' executives' public statements such that they were immediately aware of these statements.

Further, even if some Plaintiffs can properly be held to such a level of diligence, there is a question of fact as to what conclusion Plaintiffs could draw from those statements alone. On their face, the statements merely discuss market and industry conditions and do not directly mention collusive behavior. *See Sulfuric Acid*, 743 F. Supp. 2d at 855-56 ("the publications cited by Defendants fail to make any mention of collusive behavior that could potentially give rise to liability under the Sherman Act. The reports merely expound upon common knowledge: namely, that mass quantities of nondiscretionary acid were entering the American market, leading to the displacement of virgin acid, the voluntary shutdown of plants, and the forging of business deals . . . . This precludes the entry of summary judgment on the issue of timeliness."); *In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1100 (S.D. Cal. 2017) ("In the present case, the most a reasonable . . . . Plaintiff could have known prior to the investigation announcement was that

prices for tuna were going up and can size was shrinking. These facts alone would almost certainly be insufficient to put Plaintiffs on notice that they should investigate the possibility of a tuna cartel.").

This is not a simple case of obvious injury with obvious defendants. Rather, many dots need to be connected in context to draw a picture of conspiracy. *See Sulfuric Acid*, 743 F. Supp. 2d at 856 ("[E]ven if Plaintiffs had harbored suspicions early on, it remains unclear whether a reasonable investigation would have revealed incriminating evidence sufficient to support an antitrust claim against Defendants."). And Defendants do not convincingly argue that any one piece of Plaintiffs' allegations would have sufficiently alerted them to a potential conspiracy. *See Packaged Seafood*, 242 F. Supp. 3d at 1099 ("Simply put, there is no reason a particular piece of information should have a fixed amount of relevance regardless of the context in which it is viewed. For example, a lone puzzle piece may, in isolation, give no further indication as to the larger picture into which it fits, and yet at the same time be an integral component of the final product once all corresponding pieces are assembled.").

Contrary to Defendants' argument, it is plausible that, as Plaintiffs contend, a reasonable person would not have been able to connect those dots until public reports and government investigations into collusive conduct by producers in the Broiler industry began to appear. *See* R. 212 ¶¶ 372-73; R. 253 ¶¶ 383-84; R. 255 ¶¶ 406-07. In particular, Plaintiffs cite a "widely circulated" book titled *The Meat Racket*, published on February 18, 2014, in which the author suggested "that

conditions in the Broiler industry had become susceptible to collusion." R. 212 ¶ 372. And on January 18, 2016, the Wall Street Journal published an article the "raised the possibility of collusion by Defendants to artificially raise, fix, or maintain Broiler prices." R. 212 ¶ 372. At some point between February 18, 2014 and January 18, 2016, Plaintiffs discovered the facts enabling them to bring these claims. It is not possible on these allegations for the Court to determine precisely when Plaintiffs' claim accrued under the discovery rule. To the extent such a determination is necessary, it must await further factual discovery. But in any case, since the entire time period falls within the four-year statute of limitations for Plaintiffs' federal claims, it is unnecessary to identify the date when Plaintiffs should have discovered their injuries with any further specificity. Suffice to say that prior to February 18, 2014, the complaints do not contain factual information indicating that any plaintiff had or should have discovered a totality of evidence sufficient to have enabled them to state a claim in compliance with Rule 11.

### E.    Georgia Dock

Plaintiffs argue that their allegations that some Defendants manipulated the Georgia Dock price index serve to demonstrate an additional means by which Defendants effectuated their conspiracy to fix prices in the Broiler market. Defendants argue that only seven of them are alleged to have participated in a conspiracy to manipulate the Georgia Dock price index, so Plaintiffs' Georgia Dock allegations cannot be a part of the same conspiracy as the conspiracy to cut production among all defendants.

It is unnecessary for the Court to address whether the Georgia Dock allegations constitute a separate conspiracy at this point in the proceedings. Regardless of whether Plaintiffs have sufficiently alleged a continuing price fixing conspiracy from the production cuts in 2008 and 2011 through the alleged Georgia Dock price fixing, they have at least plausibly alleged a separate conspiracy involving Georgia Dock price fixing among some of the defendants. The defendants alleged to have been involved do not meaningfully challenge this claim. Either way, Plaintiffs have stated a claim with respect to the Georgia Dock that will proceed to discovery. Whether Georgia Dock should be considered a separate conspiracy, or a continuation of the production cut conspiracy, can await summary judgment or a pretrial motion in limine.

## II.     Arguments against the Indirect Plaintiffs

Having addressed Plaintiffs' conspiracy allegations necessary to state a claim for violation of the Sherman Act, the Court now turns to arguments Defendants make particular to the Indirect Plaintiffs. The Court addresses: (A) Article III standing; (B) antitrust standing, for both Indirect Plaintiffs' Sherman Act and state antitrust claims; (C) other issues with Plaintiffs' state antitrust claims; (D) Plaintiffs' state consumer protection and unjust enrichment claims; and (E) the statutes of limitations.

### A.     Article III Standing

Defendants argue that the Indirect Plaintiffs do not have standing to assert claims under laws for states in which they do not allege any of the named plaintiffs

purchased chicken. Standing under Article III of the U.S. Constitution requires an injury in fact that is fairly traceable to the alleged conduct of the defendant, and likely to be redressed by a favorable judicial decision. *See Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540 (2016). Defendants argue that because the Indirect Plaintiffs have not established that the named plaintiffs have a connection with all of the jurisdictions for which Plaintiffs make claims, they have failed to allege injury in fact as to those claims.

The problem with this argument is that "Article III's injury in fact requirement 'has nothing to do with the text of the statute relied upon.'" *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 722 (N.D. Ill. 2016) (quoting *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 97 (1998)). Here, Plaintiffs plausibly allege an injury in fact by alleging that they paid inflated prices, which can be fairly traced to Defendants' price-fixing scheme, and which can be redressed by a favorable judicial decision. For the time being—meaning at the pleading stage and prior to analysis of the class allegations under Rule 23—this analysis suffices to establish the named plaintiffs' standing to assert the claims of class members in other states. *See Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) (Only "once a class is properly certified" should "standing requirements . . . be assessed with reference to the class as a whole" as opposed to "the individual named plaintiffs."); *Lewis v. Casey*, 518 U.S. 343, 395-96 (1996) (Whether the named plaintiffs "may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the

prerequisites of Rule 23 governing class actions."); *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008) ("We . . . conclude that [the plaintiff] did have standing to pursue his lawsuit. Whether he is entitled to relief on any or all of those claims and whether he may serve as an adequate class representative for others asserting such claims are separate questions . . . ."); *Supreme Auto Trans. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1038 (N.D. Ill. 2017) ("For now, whether named plaintiffs can bring claims under the laws of other states and whether plaintiffs are adequate class representatives do not pose Article III barriers to subject-matter jurisdiction.).

Defendants rely on a number of decisions to the contrary from courts in this district. *See, e.g.*, *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 2012 WL 39766 (N.D. Ill. Jan. 9, 2012); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013). With regard to *Plasma-Derivative* and *Dairy Farmers* in particular, however, the courts did not address the reasoning from *Lewis* and *Payton* the Court relies on here. Those courts focused on the principle that "named plaintiffs who represent a class must allege and show that they have personally been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Plasma-Derivative*, 2012 WL 39766, at *6 (quoting *Lewis*, 518 U.S. at 357); *see also Dairy Farmers*, 2013 WL 4506000, at *8 ("[I]t bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action." (quoting *Payton*, 308 F.3d at 682)). But *Plasma-Derivative* and *Dairy Farmers* failed to account for the

fact that in *Payton* the named plaintiffs—like the named plaintiffs here—*were* able to establish their own standing apart from that of the class. 308 F.3d at 682 ("This is not a case where the named plaintiff is trying to piggy-back on the injuries of the unnamed class members."). As the Supreme Court put it in *Lewis*, "the standing issue focuses on whether the plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court." 518 U.S. at 395. For these reasons, the Court finds the holdings of *Plasma-Derivative* and *Dairy Farmers* unpersuasive on this issue. The Indirect Plaintiffs have plausibly alleged Article III standing for all their claims.

**B.    Antitrust Standing**

The term "antirust standing" refers to "doctrines that have arisen to clarify the circumstances under which a particular person may recover from an antitrust violator." *Loeb Indust., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir. 2012). The two most prominent doctrines were set forth by the Supreme Court in the cases *Illinois Brick Co. v. Illinois*, which held that indirect purchasers are prohibited from seeking damages under federal antitrust law, and *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, which imposed a version of proximate causation on antitrust claims. Defendants make arguments based on both of these doctrines. The Court addresses each in turn.

**1.    *Illinois Brick* Arguments**

In *Illinois Brick*, the Supreme Court held that permitting indirect purchasers to sue for damages from over-charges "passed on" to them by middlemen "would

transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge." 431 U.S. 720, 737 (1977).[11] Such a "dimension of complexity" would "seriously undermine [the] effectiveness" of lawsuits against price-fixing conspiracies. *Id.* Further, the Court reasoned, "the legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws under § 4, is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it." *Id.* at 746. The Court "question[ed] the extent to which . . . . attempting to allocate damages among all those within the defendant's chain of distribution . . . . would make individual victims whole for actual injuries suffered rather than simply depleting the overall recovery in litigation." *Id.* at 746-47.

Although most state courts generally interpret their states' antitrust laws in accordance with federal case law, in *California v. ARC America Corp.*, 490 U.S. 93 (1989), the Supreme Court held that state legislatures could pass laws "repealing" *Illinois Brick*, and state courts could reject the Illinois Brick reasoning as applied to state antitrust laws (known as "repealers"), thus providing for damages to indirect purchasers under state antitrust law. Defendants argue that Rhode Island only

---

[11] Damages for conspiracies in violation of the Sherman Act § 1 are available through the Clayton Act § 4, which provides: "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or have an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained." 15 U.S.C. § 15(a).

passed such a statute on July 15, 2013, and that West Virginia has not done so, such that Plaintiffs' claims under those statutes should be dismissed.

**Rhode Island's** Supreme Court has held that new statutes "are presumed to apply prospectively." *Hydro-Mfg., Inc. v. Kayser-Roth Corp.*, 640 A.2d 950, 954 (R.I. 1994). Moreover, Rhode Island's repealer statute provides that it should "take effect on passage." R.I.P.L. 13-274.

Plaintiffs argue that the Rhode Island Supreme Court has also held that "remedial and procedural statutes, which do not impair or increase substantive rights but rather prescribe methods for enforcing such rights, may be construed to operate retroactively." *Pion v. Bess Eaton Donuts Flour Co., Inc.*, 637 A.2d 367, 371 (R.I. 1994). But the Rhode Island Supreme Court has also held that this principle holds for procedural statutes only "absent a legislative intent to the contrary." *Wayland Health Ctr. v. Lowe*, 475 A.2d 1037, 1041 (R.I. 1984). Here, the statute provides that it takes effect on passage, and the Rhode Island Supreme Court has held that nearly identical language indicates that the legislature did not intend retroactive application. *See Kaveny v. Cumberland Zoning Bd. of Review*, 875 A.2d 1, 4 (R.I. 2005) ("this act shall take effect upon passage" implied only prospective application). And in any event, a statute providing damages to indirect purchasers is substantive, not procedural. *See United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1088 (N.D. Cal. 2014) ("Rhode Island statute conveyed

substantive rights; allowing indirect purchasers to sue on claims they had no standing to before.").

Plaintiffs cite an unpublished order from a court in the District of Massachusetts as supporting retroactive application of Rhode Island's repealer statute. But contrary to Plaintiffs' representation, that order does not address this issue. And Plaintiffs have cited no courts that have applied Rhode Island's repealer retroactively. Most have not. *See In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 252-53 (D. Conn. 2015); *In re Opana ER Antritrust Litig.*, 162 F. Supp. 3d at 723-24; *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2015 WL 5458570, at *15 (D. Mass. Sept. 16, 2015); *In re Cast Iron Soil Pipe And Fittings Antitrust Litig.*, 2015 WL 5166014, at *22 (E.D. Tenn. June 24, 2015). This Court will follow suit. Plaintiffs' Rhode Island claims are only cognizable to the extent they accrued after July 15, 2013.

**West Virginia** has not directly passed a "repealer" statute. But the West Virginia Attorney General issued a legislative rule providing that "any person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act may bring an action for damages." W. Va. Code St. R. § 142-9-2. The West Virginia legislature then approved that rule as part of omnibus legislation. S. 243, Reg. Sess., at 2013 (W. Va. 1990). The West Virginia Supreme Court has held that "[o]nce a disputed regulation is legislatively approved, it has the force of a statute itself. . . . Being an act of the West Virginia Legislature, it is entitled to more than mere deference; it is entitled to controlling weight." *W. Va. Health Care*

*Cost Review Auth. v. Boone Mem. Hosp.*, 472 S.E.2d 411, 421 (W.Va. 1996). Thus, West Virginia permits indirect purchasers to seek damages. A number of federal courts have also found this to be the case. *See In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 408 (D. Mass. 2013); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 582 n.10 (M.D. Pa. 2009) ("Although West Virginia looks to federal law when interpreting the WVAA, the prohibition against indirect purchaser recovery announced in *Illinois Brick* does not apply to claims under the WVAA." (citing *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1154 (N.D. Cal. 2007) ("[T]he West Virginia Attorney General has promulgated a legislative rule expressly *permitting* antitrust suits brought by indirect purchasers. The Attorney General's ability to promulgate such a rule is contemplated by the state's antitrust statute itself[.]")); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 175 (D. Me. 2004) ("Cases from other states are divided on whether state antitrust law is governed by *Illinois Brick* limitations where the state statute is silent. But allowing such recovery is certainly a 'permissible construction.' It is neither arbitrary nor capricious, and is therefore entitled to deference. Accordingly, I conclude that West Virginia permits antitrust recovery by indirect purchasers."). Thus, based on this authority, the Court will not dismiss Indirect Plaintiffs' antitrust claim under West Virginia law based on *Illinois Brick*.

### 2. *AGC* Arguments

Six years after *Illinois Brick*, the Supreme Court again addressed the scope of the Clayton Act's damages provision in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"). Unlike *Illinois Brick*, which only had implications for plaintiffs who made *purchases* in the defendants' product distribution chain, *AGC* applies to all potential antitrust plaintiffs whether they are related to the defendants as purchasers or not. In *AGC*, the Supreme Court held that a literal application of the Clayton Act damages provision to "*any* person" who suffers an antitrust injury does not reflect Congress's intent. Instead, only persons whose antitrust injury has been "proximately caused" by the defendants can receive damages. *See AGC*, 459 U.S. at 535; *Loeb*, 306 F.3d at 481. Whether a defendant has proximately caused a plaintiff to suffer an antitrust injury such that the plaintiff is a "proper plaintiff" under federal antitrust law, requires courts to consider a number of factors including: (1) the "causal connection between [the] antitrust violation and [the] harm"; (2) the presence of "improper motive"; (3) "the nature of the plaintiff's alleged injury" and whether it was one Congress sought to redress; (4) "the directness or indirectness of the asserted injury"; (5) how speculative or identifiable the damages are; and (6) "the risk of duplicative recoveries . . . or the danger of complex apportionment of damages." *AGC*, 459 U.S. at 537-38, 540-42, 544. These principles have implications for the Indirect Plaintiffs' claims under both the Sherman Act and state antitrust statutes.

### a. *AGC's* Application to Indirect Plaintiffs' Claim for an Injunction Under the Sherman Act

The Indirect Plaintiffs do not seek damages for their Sherman Act claim, but only injunctive relief under § 16 of the Clayton Act. Claims for such relief even by indirect purchasers are not precluded by *Illinois Brick. See U.S. Gypsum*, 350 F.3d at 627 ("the direct-purchaser doctrine does not foreclose equitable relief"). For this reason, "[s]tanding analysis under § 16 [the injunction provision] will not always be identical to standing analysis under [the damages provision] of § 4." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986). For instance, the factors *AGC* identified that relate to damages are not relevant to standing to seek injunctive relief. *See id.* ("because standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16."). On this basis, the *AGC* factors can be separated into those that concern damages (speculative, duplicative, apportionment), and those that concern causation, directness, or a plaintiff's relationship to the defendants.

Applying the *relevant AGC* factors—i.e., those factors that do not concern damages—it is clear that the Indirect Plaintiffs have standing to seek an *injunction* under the Sherman Act.[12] Defendants argue that the Indirect Plaintiffs are not "proper plaintiffs" by *AGC's* terms because their "alleged injury is indirect by definition," R. 293 at 12, such that there are "more immediate victims of an

---

[12] As an initial matter, Defendants do not argue that Plaintiffs have failed to sufficiently allege an antitrust injury.

antitrust violation in a better position to maintain a treble damages action." *Id.* at 13 (quoting *Loeb*, 306 F.3d 469). *AGC's* focus on "directness," however, was made in the context of analyzing the claim for damages by a plaintiff who was not in the defendants' chain of distribution. Instead, the plaintiff in that case was a union who alleged injury arising from the defendants' conspiracy to direct business to non-union companies. Unlike the "vaguely defined links" in *AGC*, the Indirect Plaintiffs can fairly easily trace their purchases from Defendants through wholesalers and retailers to consumers. Defendants argue to the contrary that the Indirect Plaintiffs "do not identify even a single Defendant from which they indirectly purchased broiler products." R. 293 at 14. But Plaintiffs allege that Defendants occupy 88% of the Broiler market. This is sufficient to plausibly allege directness and causation. Moreover, since the Indirect Plaintiffs do not seek damages for their Sherman Act claim, it is inconsequential that there are more "immediate victims" of the scheme. When damages are at issue, the most direct victims are the proper plaintiffs for the reasons stated in *Illinois Brick*. When damages are not at issue, as long as the plaintiffs' alleged injury is not "remote" like the union's injury in *AGC*, but is directly attributable to the conspiracy, the injury satisfies *AGC*.

Defendants' argument entirely ignores *AGC's* reasoning that "consumer[s] [and] competitor[s] in the market in which trade was restrained," generally have antitrust standing. 459 U.S. at 539. The "Sherman Act was enacted to assure customers the benefits of price competition, and . . . the central interest in protecting the economic freedom of participants in the relevant market." *Id.* at 538.

In *AGC*, the Supreme Court highlighted the factual circumstances of its earlier case, *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982). In that case, the plaintiff alleged that insurance companies and an association of psychiatrists had conspired to restrain the market for psychologists. The plaintiff was a consumer of "psychotherapy" and so was sufficiently connected to the restrained market, even though she never purchased "psychotherapy" from any of the defendants. Here, the Indirect Plaintiffs actually purchased Broilers that they have plausibly alleged were produced by Defendants.

Defendants contend that despite the fact that the Indirect Plaintiffs are "consumers," and thus favored plaintiffs under the Sherman Act, *AGC* stands for the proposition that if there exists a less "remote party . . . whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," claims by more remote parties—like indirect purchasers—should not be permitted to proceed. R. 293 at 13. The Supreme Court, however, has also held that this factor is not relevant to claims for injunctive relief. *See Cargill*, 479 U.S. at 111 n.6 ("In order to protect against multiple lawsuits and duplicative recoveries, courts should examine other factors in addition to antitrust injury, such as the potential for duplicative recovery, the complexity of apportioning damages, and *the existence of other parties that have been more directly harmed*, to determine whether a party is a proper plaintiff under § 4. Conversely, under § 16, the only remedy available is equitable in nature . . . .") (emphasis added). When only injunctive relief is sought, the fact that Indirect Plaintiffs occupy a position further down the distribution

chain does not raise the concern at issue in *AGC* when damages are sought. Thus, Indirect Plaintiffs have sufficiently pled standing to seek an injunction under the Sherman Act.

### b.   *AGC's* **Application to State Antitrust Law**

Unlike their Sherman Act claim, the Indirect Plaintiffs' claims under state law antitrust statutes seek damages. Defendants argue that the *AGC* factors serve as a basis to dismiss these claims. In deciding whether to apply *AGC* to state-law antitrust claims, the Court will look to whether the relevant state high court or state legislature has spoken on the issue. *See ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). "In the absence of guiding decisions by the state's highest court," the Court will "consult and follow the decisions of intermediate appellate courts unless there is a convincing reason to predict the state's highest court would disagree." *Id.*

Looming over this analysis are the *Illinois Brick* repealers. Although *Illinois Brick* and *AGC* are "analytically distinct doctrines,"[13]—*Illinois Brick* addressing the breadth of the Congressional intent behind the Clayton Act's damages provision, and *AGC* applying the doctrine of proximate cause in the antitrust context—in states that have repealed *Illinois Brick*, courts must decide whether the repeal serves to undermine *AGC's* proximate cause reasoning where it borrows from *Illinois Brick's* concern with the unwieldy nature of indirect purchaser damages

---

[13] *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 828 (7th Cir. 1999).

suits.[14] Of the states at issue in this case, only five have expressly addressed the issue. All have held that, considering *AGC's* express borrowing of reasoning from *Illinois Brick*, *Illinois Brick* repealers work to save indirect purchaser damages suits, even from application of the *AGC* factors. *See Lorix v. Crompton Corp.*, 736 N.W.2d 619, 628 (Minn. 2007) (The "*AGC* factor [regarding] complexity of apportionment and risk of duplicative recoveries[,] was at the heart of *Illinois Brick's* bar to indirect purchaser suits. *Illinois Brick* explained that an indirect purchaser suit is, by nature, complicated and uncertain: '[t]he demonstration of how much of the overcharge was passed on by the first purchaser must be repeated at each point at which the price-fixed goods changed hands before they reached the plaintiff.' By expressly permitting indirect purchaser suits, our legislature has rejected the notion that Minnesota courts are not to be burdened with the complex apportionment inherent in those suits."); *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 196-97 (Iowa 2007) ("The plaintiffs bringing suit in [Iowa's *Illinois Brick* repealer case] were indirect purchasers of [a product]. The plaintiffs in the present action are not in a comparable position because they did not purchase, directly or indirectly, the product that is the subject of anticompetitive activity by Visa and MasterCard-debit processing services. It is clear from the petition that the plaintiffs are nonpurchasers; they simply bought merchandise from businesses that used the defendants' debit processing services."); *Kanne v. VISA U.S.A., Inc.*, 723 N.W.2d

---

[14] The Supreme Court has acknowledged this borrowing. *See AGC*, 459 U.S. at 545 ("The [*Illinois Brick*] concerns should guide us in determining [who] is a proper plaintiff.").

293, 301 (Neb. 2006) ("Moreover, appellants are not indirect purchasers permitted to sue under [the reasoning of Nebraska's *Illinois Brick* repealer case]. The plaintiffs in [the *Illinois Brick* repealer case] had a direct relationship with [the producer-defendant] because they were end-user licensees of [of the product], but each had purchased . . . indirectly through an intermediary. Here, appellants did not purchase the debit card services, either directly or indirectly; rather, they claim to have paid higher prices for goods resulting from the merchants' purchase of Visa's and MasterCards debit card services."); *Nass-Romero v. Visa U.S.A. Inc.*, 279 P.3d 772, 780 (N.M. Ct. App. 2012) ("[A]s stated above, we reject Plaintiff's claim that she is an indirect purchaser in the distribution scheme at hand; rather, her claim is distinct from and derivative of a distribution network for debit card services that involves Defendants, their member banks, and merchants."); *Ho v. Visa U.S.A. Inc.*, 2004 WL 1118534, at *2-3 (N.Y. Sup. Ct. Apr. 21, 2004), *aff'd*, 16 A.D.3d 256 (N.Y. App. Div. 2005) ("Here, the plaintiffs' claims, as general consumers at stores which accept Visa and MasterCard, are clearly derivative of the stores' claims against those companies, and their alleged injuries are indirect. They have had no direct dealings with either of the defendants; they do not claim to use defendants' credit or debit card services in any way. Rather, they claim that stores where they shop raise their prices on all products in order to absorb the extra fees charged by Visa and MasterCard, and that they pay higher prices as a result. Thus, plaintiffs' claims are far more indirect than those in cases challenging the tobacco industry, on which plaintiffs rely, where the plaintiffs are cigarette smokers who actually

purchased the defendants' product, though not directly from defendants.).[15]

Defendants have not identified authority from any of the states at issue in this case

supporting dismissal of claims made by plaintiffs down a distribution chain.[16] The

Court finds that any state with an *Illinois Brick* repealer would reject application of

*AGC* to this case for the reasons expressed by the courts cited above.[17]

### C.    Other State Antitrust Law Issues

In addition to raising issues of antitrust standing, Defendants argue that

Plaintiffs have failed to state claims under the antitrust statutes of several states,

which the Court addresses in turn.

### 1.    District of Columbia and Wisconsin

Defendants argue that the antitrust laws of the District of Columbia and

Wisconsin both require a "substantial effect" on *intra*state commerce, and do not

apply to conspiracies that are essentially *inter*state in nature. *See* R. 293 at 17.

---

[15] Additionally, although the California Supreme Court has not expressly addressed *AGC*, it has held that California's antitrust statute is "broader in range and deeper in reach that then Sherman Act," *In re Cipro Cases I & II*, 348 P.3d 845, 872 (Cal. 2015), and that "[i]nterpretations of federal antitrust law are at most instructive, not conclusive, when construing [California's antitrust statute]." *Aryeh v. Canon Bus. Sols., Inc.*, 292 P.3d 871, 877 (Cal. 2013). On the basis of this authority, the Court will not impose *AGC's* requirements on California antitrust law.

[16] The Seventh Circuit, of course, did not have an *Illinois Brick* repealer to contend with when it applied federal law in *Loeb* and stated that "apportion[ing] damages along a chain of distribution [is] forbidden by *AGC*." 306 F.3d at 494.

[17] This reasoning also suffices to reject Defendants' argument that "harmonization" statutes passed by some states are a basis to apply the *AGC* factors to those states' antitrust laws. "Harmonization" statutes are laws that require a state's courts to interpret the state's antitrust statutes in harmony with federal law. But Iowa, Nebraska, New Mexico, and New York applied *AGC* in accord with their states' harmonization statutes. This did not prevent the courts in those states from recognizing that *Illinois Brick* repealers work to save the claims of true indirect *purchasers*, like the Indirect Plaintiffs in this case.

Plaintiffs, however, allege that a business and two individual residents of Wisconsin, R. 253 ¶ 25; R. 255 ¶¶ 55-56, and an individual resident of the District of Columbia, R. 255 ¶ 54, purchased Broilers in those jurisdictions. In light of the obvious fact that Broilers are purchased in substantial numbers throughout the United States, these allegations plausibly establish "substantial" *intra*state effects in the District of Columbia and Wisconsin.

### 2. Arkansas Law

"Plaintiffs concede that they cannot bring their price-fixing claim under the Arkansas Unfair Practices Act, Ark. Code Ann. §§ 4-75-201, 4-75-301," R. 345 at 14 n.5, so that claim is dismissed.

### 3. Arizona and Rhode Island Law

Defendants argue that Plaintiffs' claims under the Arizona and Rhode Island antitrust statutes should be dismissed because Plaintiffs failed to file notice of suit with the states' attorneys general. Plaintiffs represent that they have now filed such notices. Defendants do not cite any authority that late notice requires dismissal, so the Court will not dismiss Plaintiffs' Arizona and Rhode Island antitrust claims on this basis.

### 4. Illinois Law

All indirect purchaser class actions under Illinois's antitrust statute must be brought by the Illinois Attorney General. *See* 740 ILCS 10/7(2). On this basis, Defendants argue that Plaintiffs' claim under Illinois's antitrust statute must be dismissed. *See* R. 293 at 20.

In *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Company*, the Supreme Court held that a New York statute prohibiting class actions "in suits seeking penalties or statutory minimum damages," did not serve to bar a class action under New York law in federal court because it is a procedural not a substantive rule. 559 U.S. 393 (2010). A majority of the Court held that New York's class action bar conflicted with Federal Rule of Civil Procedure 23. A plurality held that because Rule 23 "neither change[s] plaintiffs' separate entitlements to relief nor abridge[s] defendants' rights; [but] alter[s] only how the claims are processed," it was proper to apply Rule 23 and permit the class action to proceed despite New York's bar. *Id.* at 408; *see also id.* at 407 ("What matters is what the rule itself regulates: If it governs only the manner and the means by which the litigants' rights are enforced, it is valid; if it alters the rules of decision by which [the] court will adjudicate [those] rights, it is not."). Justice Stevens concurred in the judgment, but reasoned the proper analysis examined not whether Rule 23 is procedural, but whether New York's class action bar was procedural such that it should not be applied by federal courts, or whether it was "so bound up with," or "sufficiently intertwined with," a substantive state-law right or remedy "that it defined the scope of that substantive right or remedy" with effect in federal court. *Id.* at 420, 429. Justice Stevens concluded that the New York statute constituted a "classic[] procedural calibration of making it easier to litigate claims in New York courts . . . only when it is necessary to do so, and not making it too easy when the class tool is not required." *Id.* at 435. Despite this difference in reasoning, at bottom, both the

plurality and concurrence were primarily focused on the fact that both Rule 23 and the New York statute governed when a class action was permissible, and this was a procedural, not substantive conflict.

The Court finds that Shady Grove's reasoning with respect to New York's class action ban is equally applicable to Illinois's requirement that class actions be brought by the Attorney General. It is true that the Seventh Circuit has noted that Illinois's decision to repeal *Illinois Brick* and allow indirect purchaser lawsuits "reflects different judgments about the feasibility of trying such claims and the potential danger of duplicative recoveries." *Ill., ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1480 (7th Cir.1991). And some district courts have identified this statement as an indication that the Seventh Circuit considers decisions about the "feasibility" of indirect purchaser suits to be a substantive, not procedural, issue. *See In re Opana ER Antritrust Litig.*, 162 F. Supp. 3d at 723 (citing *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670, 677 (E.D. Pa. 2010)). Moreover, the *Illinois Brick* issue—whether indirect purchasers can bring suit at all, even individually—is certainly substantive in that it affects the "rights and remedies" of indirect purchasers. But whether such plaintiffs may bring a class action does not affect their substantive rights. The availability of the class action procedure does not change the substantive rights or remedies available to them under Illinois law. *See In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *21 (N.D. Cal. Oct. 2, 2014); *In re Aggrenox Antitrust Litig.*, 2016 WL

4204478, at *6 (D. Conn. Aug. 9, 2016). Therefore, the Court will not dismiss Plaintiffs' Illinois antitrust claim on the basis of the Illinois's class action bar.

### D.    Consumer Protection Statutes & Unjust Enrichment

The Court has held that of Plaintiffs' state law antitrust claims, only the claims under the laws of Arkansas and Rhode Island (before July 15, 2013) have failed to state a claim. The Court will not address Defendants' arguments with respect to the consumer protection statutes and unjust enrichment laws of the states for which antitrust claims are proceeding, because the fact that the antitrust claims are going forward in those jurisdictions is sufficient for the parties to proceed with discovery relevant to those jurisdictions. The Court will address Defendants' arguments regarding the consumer protection laws in Arkansas and Rhode Island, as well as states for which Plaintiffs do not bring an antitrust claim: Florida, Hawaii, Montana, South Carolina, and Vermont. This analysis will include consideration of Defendants' argument that in three states (Florida, Missouri, South Carolina) that have not passed repealer statutes and thus follow *Illinois Brick's* ban on indirect purchasers seeking damages, this principle also prevents indirect purchasers from seeking damages for antitrust injuries under those states' consumer protection statutes. To the extent the Court finds that Plaintiffs' claim under a certain state's antitrust law must be dismissed, the Court will address any claim for unjust enrichment under that state's laws.

### 1. Arkansas

Arkansas's consumer protection statute, the Arkansas Deceptive Trade Practices Act ("ADTPA") specifically enumerates the conduct it prohibits, but also includes a catch-all provisions for "any other unconscionable, false, or deceptive act." Ark. Code § 4-88-107(10). The Eighth Circuit (of which Arkansas is a part) has held that this catch-all must be interpreted in light of the enumerated conduct, such that it only serves to prohibit other instances of "false representation, fraud, or the improper use of economic leverage." *Univ. Coops., Inc. v. AAC Flying Servs., Inc.*, 710 F.3d 790, 795-96 (8th Cir. 2013). Considering the Eighth Circuit's further explanation that "improper use of economic leverage" is tied to the term "unconscionable," which is an act that "affronts the sense of justice, decency, or reasonableness," district courts have found that the ADTPA does not prohibit price fixing conspiracies. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *35 (N.D. Ill. June 29, 2015); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029-30 (N.D. Ill. 2007); *see also In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1166-67 (N.D. Cal. 2015) (citing cases). Although some district courts have permitted price fixing claims to go forward under the ADTPA, those courts did not consider the Eighth Circuit's interpretation of the ADTPA in *Universal Cooperatives*, so the Court finds them unpersuasive. For these reasons, the Court grants Defendants' motion to dismiss Plaintiffs' ADTPA claim.

Plaintiffs do not bring an unjust enrichment claim under Arkansas law. *See* R. 253 ¶ 727; R. 255 ¶ 830. Thus, all of Plaintiffs' claims under Arkansas law have been dismissed.

### 2. Florida

Defendants also argue that Plaintiffs' claim under the Florida consumer protection statute (the Florida Unfair and Deceptive Trade Practices Act ("FDUTPA")) should be dismissed because it fails to comply with the heightened pleading standard of Rule 9(b). Plaintiffs argue that the FDUTPA provides for causes of action for both "deceptive acts" and "unfair practices," and that the heightened pleading standard for fraud claims is applicable only to claims for "deceptive acts" and not "unfair practices." They argue further that the price fixing scheme is an "unfair practice" to which the heightened pleading standard does not apply. The parties cite cases both applying and declining to apply Rule 9(b) to the FDUTPA. The courts that decline to apply Rule 9(b) to the FDUTPA have not done so on the reasoning Plaintiffs propose. But the Seventh Circuit has endorsed that reasoning with respect to the Illinois consumer protection statute. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008) ("Because neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b)."). In the absence of definitive Florida law on this issue, this Court will take its cue from the Seventh Circuit, and deny

Defendants' motion to dismiss Plaintiffs' FDUTPA claim for failure to comply with Rule 9(b).

In accord with *Illinois Brick*, Florida law prohibits claims for damages by indirect purchasers under its antitrust statute. *See Mack v. Britol-Myers Squibb Co.*, 673 So.2d 100, 102 (Fla. Dist. Ct. App. 1st Dist. 1996). Defendants argue that this principle also serves to bar the Indirect Plaintiffs' claim under the FDUTPA as an improper "attempt to circumvent" the bar on indirect purchaser antitrust claims by "dressing [them] up . . . as consumer protection claims." R. 293 at 9. But the Florida appellate court held that the FDUTPA "reveals no intention by the legislature to limit suits for price-fixing to direct purchasers only." *Mack*, 673 So.2d at 105. Although federal courts applying Florida law have dismissed FDUTPA claims on the basis of a failure to state a claim under Florida's antitrust statute, those cases addressed the substantive elements of the antitrust claim, not the category of plaintiffs who were permitted to bring a claim at all. And a number of other courts have permitted such claims to proceed. *See In re Florida Microsoft Antitrust Litig.*, 2002 WL 31423620, at *2 (Fla. Cir. Ct. Aug. 26, 2002) ("Indirect purchasers of a monopolist's or price fixer's products, such as Plaintiffs here, may bring suit under the Florida DTPA."); *In re Opana Er Antritrust Litig.*, 2016 WL 4245516, at *2 (N.D. Ill. Aug. 11, 2016) ("The [FDUTPA] allows indirect purchasers to recover damages for 'unfair methods of competition' — including violations of the antitrust laws."); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 699 n.23 (E.D. Pa. 2014) ("Although Florida's

antitrust law does not permit antitrust claims by indirect purchasers and has adopted *Illinois Brick,* Florida courts have held that the Florida Deceptive and Unfair Trade Practices Act does not have this same restriction. Therefore, I decline to dismiss the claims for monopolization and attempted monopolization brought under the FDUTPA on *Illinois Brick* grounds."); *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 569 (E.D. La. 2013) ("The Court agrees . . . that indirect plaintiffs are not barred from bringing suit by the standing rule of *Illinois Brick.*"); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 665 (E.D. Mich. 2011) ("indirect purchasers may sue under the FDUTPA"). On this authority, the Court finds that *Illinois Brick* is not a sufficient basis to dismiss Plaintiffs' FDUTPA claim.

Just as federal antitrust law requires inquiry into proximate cause under *AGC* even if a claim survives *Illinois Brick*, Defendants argue that Plaintiffs' alleged injuries are too "remote" from Defendants' alleged actions to establish standing under the FDUTPA. *See* R. 293 at 30-31. But as with states that have passed *Illinois Brick* repealer statutes, *Mack's* permission for indirect purchasers to pursue FDUTPA claims take the teeth out of *AGC* for the reasons already discussed in applying *AGC* to state antitrust statutes in states with *Illinois Brick* repealer statutes. At least one federal court has alluded to the inapplicability of *AGC*-type factors with respect to the FDUTPA because "[u]nlike in the federal and state antitrust analyses . . . , no standing issue prevents the Court from reaching an analysis of the merits of this claim, because 'any person affected by a violation of

this part' may bring a claim alleging a violation of FDUTPA." *JAWHBS, LLC v. Arevalo*, 2017 WL 1345141, at *7 (S.D. Fla. Apr. 12, 2017). Thus, the Court also denies Defendants' motion to dismiss Plaintiffs' FDUTPA claim for remoteness.

### 3. Hawaii

Defendants argue that Plaintiffs' claim under Hawaii's consumer protection statute does not satisfy Rule 9(b). Similar to Florida, Defendants cite no case requiring that a claim under this statute based on price fixing comply with Rule 9(b). Plaintiffs on the other hand, cite two cases in which the courts permitted indirect purchasers to pursue such claims. *See Cast Iron Soil Pipe*, 2015 WL 5166014, at *30 ("Thus, based on Hawaii's unfair competition statute, the Indirect Purchasers will only be able to bring their claim based on grounds of unfair methods of competition."); *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *26 (D.N.J. Oct. 20, 2011) ("Additionally, at this time, [the indirect purchasers'] claims may move forward to the extent they are premised on allegations of Defendants' engaging in unfair competition, as there is no indication that Rule 9(b) applies to such allegations."). On the basis of this authority, Defendants' motion to dismiss Plaintiffs' Hawaii consumer protection claim is denied.

### 4. Montana

Like the states already discussed, Montana's consumer protection act prohibits "unfair" as well as "deceptive" actions. Defendants cite no authority to

support their argument that a claim brought under the "unfair" prong must satisfy Rule 9(b). The Court will not dismiss this claim on that basis.

Montana prohibits class actions under its consumer protection law. For this reason, Defendants argue that Plaintiffs should be prevented from bringing their Montana consumer protection claim. *See* R. 293 at 36-37. The Court rejects this argument for the reasons stated with respect to the indirect purchaser class action bar under Illinois's antitrust statute.

### 5.    Missouri

Defendants contend that Missouri has not passed an *Illinois Brick* repealer statute, and argue on that basis that Indirect Plaintiffs' claim under the Missouri consumer protection statute must be dismissed. But as Plaintiffs point out, the Missouri Supreme Court has held that the "statute's broad language of 'any person who has suffered an ascertainable loss' contemplates that other parties, besides the direct purchasers or contracting party . . . are included among those eligible to receive restitution." *Gibbons v. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007). Federal district courts have interpreted *Gibbons* to allow indirect purchaser claims under Missouri's consumer protection statute despite *Illinois Brick*. *See In re Opana ER Antitrust Litig.*, 2016 WL 4245516, at *4 (N.D. Ill. Aug. 11, 2016); *In re Pool Prods. Dist. Market Antitrust Litig.*, 946 F. Supp. 2d 554, 570-71 (E.D. La. 2013). On

this authority, the Court finds that Plaintiffs' Missouri consumer protection act claim is not barred by *Illinois Brick*.[18]

### 6.    South Carolina

Defendants argue *Illinois Brick* serves to undermine the Indirect Plaintiffs' claim under South Carolina's consumer protection statute, because South Carolina has not passed an *Illinois Brick* repealer. Plaintiffs, however, cite several cases permitting such claims to proceed to discovery. *See Cast Iron*, 2015 WL 5166014, at *32; *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, 2015 WL 4755335, at *21 (N.D. Cal. Aug. 11, 2015); *Lithium Ion Batteries*, 2014 WL 4955377, at *21. By contrast, Defendants cite only one case dismissing such a claim, and that case failed to consider the authority to the contrary. The Court will follow the majority of courts on this issue, and allow the claim to proceed.

South Carolina prohibits class actions under its consumer protection law. For this reason, Defendants argue that Plaintiffs should be prevented from bringing their South Carolina consumer protection claim. *See* R. 293 at 36-37. The Court rejects this argument for the reasons stated with respect to Illinois's antitrust statute.[19]

---

[18] Defendants cite no authority that Rule 9(b) applies to Missouri's consumer protection statute, so the Court will not address Defendants' broad-brush claim that all consumer protection statutes must comply with Rule 9(b) as it applies to Missouri.

[19] Defendants cite no authority that Rule 9(b) applies to South Carolina's consumer protection statute, so the Court will not address Defendants' broad-brush claim that all consumer protection statutes must comply with Rule 9(b) as it applies to South Carolina.

### 7. Vermont

The only argument Defendants make with respect to Plaintiffs' claim under Vermont's consumer protection statute is that is fails to satisfy Rule 9(b). But as with several other states' laws analyzed in this opinion, Defendants fail to cite any authority in support of their argument. The Court rejects it for this reason.

### E. Statutes of Limitation

With respect to states that apply at least a four year statute of limitations to either their antitrust or consumer protection statutes, the Court rejects Defendants' argument that those claims are untimely for the same reasons stated with respect to Plaintiffs' federal claims. The same is true for states that apply a three-year statute of limitations in conjunction with the discovery rule. Based on this reasoning, Plaintiffs' pleadings are sufficient to plausibly allege the timeliness of all their state law antitrust claims.

Three states apply statutes of limitations of two years or less to their consumer protection act statutes. Two of those states, Utah and Oregon, have antitrust statutes that will otherwise proceed to discovery. Thus, the Court will not address the statute of limitations with respect to those states' consumer protection statutes at this time.

The statute of limitations for Montana's consumer protection statute is two years, and Montana follows the discovery rule. The Court's application of the discovery rule with respect to Plaintiffs' federal claims focused on February 18, 2014, the date a "widely read" book suggesting that the Broiler industry could be

subject to collusion was published, and January 18, 2016, when a Wall Street Journal article discussed evidence of collusion in the Broiler industry. The statutory period for Montana consumer protection act ends squarely between these two dates. In other words, if the Court finds that Plaintiffs' claims accrued as early at February 18, 2014 when the book was published, Plaintiffs' Montana consumer protection act claim is untimely. But as discussed with respect to Plaintiffs' federal claims, Plaintiffs' complaint does not plead itself out of court with respect to the discovery rule. It is possible to imagine that Plaintiffs' claims accrued after September 2, 2014, such that they are timely. Defendants' motion to dismiss the Indirect Plaintiffs' claim under the Montana consumer protection statute is denied.

## Conclusion

For the foregoing reasons, Defendants' motions to dismiss, R. 279; R. 292 are denied except that Plaintiffs' claims under the laws of Wisconsin are dismissed, such that Defendants' motion to dismiss the Indirect Plaintiffs' claim is granted in part. The Court has not addressed all of Defendants' arguments seeking dismissal of Plaintiffs' state law claims. But the Court's opinion explains that at least one claim in each jurisdiction will proceed to discovery, with the exception of Wisconsin. Any state law claim the Court has addressed and dismissed, is dismissed without prejudice.

To the extent Plaintiffs believe they can cure the deficiencies the Court has described with respect to their claims under Wisconsin law, Plaintiffs may file a joint motion for leave to amend by December 20, 2017, supported by a brief of no

more than five pages explaining how the amendments would cure Plaintiffs' allegations. The proposed amended paragraphs of the complaints (not the entire complaints) should also be attached as an exhibit. No defendant should file a responding brief unless the Court so orders.

To the extent it is necessary in order to streamline a trial or assess damages for the Court to address the additional state law claims not addressed in this opinion, or to reconsider dismissal of state law claims under the laws of jurisdictions for which other claims are proceeding, the Court will address those issues when appropriate. For now, however, the parties know which jurisdictions remain in play and which are out. That is a sufficient basis to conduct discovery.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: November 20, 2017