# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION*<br><br>This Document Relates To:<br><br>Commercial and Institutional Indirect Purchaser Plaintiff Actions | Case No. 1:16-cv-08637 |

**DEFENDANT PILGRIM'S PRIDE CORPORATION'S ANSWER AND DEFENSES TO THE COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS' THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Defendant Pilgrim's Pride Corporation ("Pilgrim's") submits its answer and affirmative defenses to the Third Amended Consolidated Class Action Complaint ("Complaint") of the Commercial and Institutional Indirect Purchaser Plaintiffs ("Plaintiffs"), filed on December 16, 2016, as follows:

## I. *NATURE OF ACTION*

*1. Plaintiffs are informed and believe, and thereon allege, that in order to maintain price stability and increase profitability, beginning at least as early as January 1, 2008, Defendants and their co-conspirators conspired and combined to fix, raise, maintain, and stabilize the price of Broilers. The principal (but not exclusive) method by which Defendants implemented and executed their conspiracy was by coordinating their output and limiting production with the intent and expected result of increasing prices of Broilers in the United States. In furtherance of their conspiracy, Defendants exchanged detailed, competitively sensitive, and closely-guarded non-public information about prices, capacity, sales volume, and demand, including through third party co-conspirator Agri Stats. Plaintiffs are further informed and believe that Defendants fraudulently concealed their anticompetitive conduct from Plaintiffs and the Classes for the states set forth below in furtherance of the conspiracy, and as a result there may be other methods by which Defendants carried out their conspiracy which presently are not known to Plaintiffs. For instance, it was not publicly known until November 2016 that certain Defendants and their co-conspirators apparently manipulated and artificially inflated a widely used Broiler price index, the Georgia Dock. These allegations are based on information and belief and the investigation of counsel, except for those allegations about Plaintiffs, which are based on personal knowledge.*

**Answer to Paragraph 1** : Denied.

*2. Broilers constitute approximately 98% of all chicken meat sold in the United States. Defendants are the leading suppliers of Broilers in an industry with over $30 billion in annual wholesale revenue. The Broiler industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants collectively control approximately 90% of the wholesale Broiler market. Since the 1950s, the production of Broilers has become highly industrialized and commoditized.*

**Answer to Paragraph 2**: Pilgrim's admits it produces and sells poultry products that may fit within Plaintiffs' litigation definition of "Broilers." Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties and therefore denies them. Pilgrim's denies all remaining allegations in Paragraph 2.

*3.      Historically, the Broiler industry was marked by boom and bust cycles where, in response to rising prices, producers increased production, which caused an oversupply and resulting decrease in pricing.  However, that market pattern changed markedly in 2008.  By their wrongful conduct as alleged in this complaint, Defendants not only materially reduced or eliminated the historical boom and bust cycle of the Broiler industry, they propped up Broiler prices during periods of rapidly falling input costs by, among other means, coordinating supply restrictions and manipulating one or more Broiler price indices.*

**Answer to Paragraph 3**: Pilgrim's admits that poultry production and pricing levels may vary with time and at times may appear cyclical in nature.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties and therefore denies them.  Pilgrim's denies all remaining allegations in Paragraph 3.

*4.      In 2007, Pilgrim's and Tyson attempted to cut their production levels enough to cause industry prices to rise.  However, despite Pilgrim's and Tyson's combined 40% market share, their production cuts in 2007 were not enough to increase prices through supply cuts because other Broiler companies increased their production.*

**Answer to Paragraph 4**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants and therefore denies them.  Pilgrim's denies all remaining allegations in Paragraph 4.

*5.      As a result, in January 2008 Pilgrim's and Tyson changed tactics and concluded that only through broader cooperation among major producers in the Broiler industry could supply be cut enough to force prices to increase.  In January 2008, both Pilgrim's and Tyson made clear to the Broiler industry that neither Pilgrim's nor Tyson would continue to cut production while their competitors used the opportunity to take away Pilgrim's and Tyson's market share.  A few days after attending an industry event in late January 2008, Tyson's CEO announced Tyson would be raising prices because "we have no choice [but] to raise prices substantially."  A day later, a Pilgrim's executive announced publicly that Pilgrim's would be cutting its production and "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."*

**Answer to Paragraph 5**: Pilgrim's denies the allegations in the first two sentences of Paragraph 5.  Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – unidentified documents in the third and fourth sentences of Paragraph 5, which speak for themselves.  Pilgrim's lacks knowledge or information sufficient to form a belief as to

the truth of any remaining allegations in the third sentence and therefore denies them. Pilgrim's

denies all remaining allegations of the fourth sentence in Paragraph 5.

> 6. Subsequently, as described in detail below, the other Defendants and Producer Co-Conspirators followed Pilgrim's and Tyson's call to arms and made substantial cuts to their own production. However, unlike Pilgrim's and Tyson's prior production cuts, in 2008 the Defendants did not rely solely on the ordinary mechanisms available to temporarily reduce production, which would have permitted production to be quickly ramped up if prices rose. Instead, Defendants and their Producer Co-Conspirators cut their ability to ramp up production for 18 months or more by destroying Broiler breeder hens in their Broiler breeder flocks responsible for supplying the eggs Defendants raise into Broilers. This destruction of the Broiler breeder flock was unparalleled and the consequences continue to reverberate in the Broiler industry to present day. Further, when some Defendants in 2010 became "undisciplined" and began gradually increasing their production, Defendants made a second wave of coordinated production cuts in 2011 and 2012, which included further substantial destruction of industry Broiler breeder flocks. Defendants continued to limit the United States Broiler supply in subsequent years by destroying eggs, relying upon one another's production to meet customer needs, and exporting excess Broiler breeder flocks to Mexico, even when doing so was against their independent economic interest.

**Answer to Paragraph 6**: Pilgrim's denies all allegations in Paragraph 6 related to Pilgrim's and

lacks knowledge or information sufficient to form a belief as to the truth of any allegations related

to other Defendants or third parties and therefore denies them.

> 7. The consequence of Defendants' cuts in 2008 and 2011-2012 has been a nearly 50% increase in Broiler wholesale prices by one measure since 2008, despite input costs (primarily corn and soybeans) falling roughly 20% to 23% over the same time period. The rise in Broiler prices relative to input costs has led to record profits for Defendants.

**Answer to Paragraph 7**: Pilgrim's lacks knowledge or information sufficient to form a belief as

to the truth of any allegations related to other Defendants and therefore denies them. Pilgrim's

denies all remaining allegations in Paragraph 7.

> 8. To effectuate their conspiracy, Defendants turned to a modernized version of an antitrust conspiracy in the Broiler industry during the 1970s. During the 1970s, major Broiler producers held a weekly conference call to discuss production levels and prices for Broilers. After the Department of Justice and civil antitrust plaintiffs sued, that practice was stopped. However, by January 2008, modern technology provided a way for Defendants to share detailed production and pricing information without industry-wide conference calls. Producers now electronically transfer vast amounts of production data

*to Agri Stats which, while supposedly anonymous, in fact provide Defendants with sufficient detail to determine with reasonable accuracy producer-level data on production, cost, and general efficiencies. This permits the Defendants to share, on a weekly and/or monthly basis, their confidential production and pricing information, including forward-looking production information, which is easily forecasted on Broiler breeder flock data that is reported and shared.*

**Answer to Paragraph 8**: Pilgrim's admits it has contracted with Agri Stats during the Plaintiffs' Class Period, pursuant to which Pilgrim's provides Agri Stats with certain data on a confidential basis and receives various benchmarking reports from Agri Stats. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies all remaining allegations in Paragraph 8.

9.      *From late 2014 into 2016, Broiler input costs fell significantly. Economic theory predicts that in a competitive market, all else being equal, Broiler prices similarly would fall. However, prices remained artificially inflated due to Defendants' and their Broiler Co-Conspirators' agreement to artificially restrict production and their manipulation of the Georgia Dock Broiler price index, published by the Georgia Department of Agriculture ("GDA"). The facts surrounding this episode were unknown to Plaintiffs and the public until November 2016, when it became public that the United States Department of Agriculture ("USDA") had requested in July 2016 that the GDA investigate and verify the accuracy of the Broiler prices provided to the GDA by several Defendants and their Producer Co-Conspirators. When the GDA declined to do so, citing the industry's and its own lack of interest in verifying prices, USDA began publishing its own Broiler price statistic, which confirmed that the Georgia Dock price was inflated over already supracompetitive prices.*

**Answer to Paragraph 9**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first two sentences in Paragraph 9, and therefore denies them. Pilgrim's denies the allegations of the third sentence of Paragraph 9. Pilgrim's admits that on approximately August 5, 2016, the USDA discontinued a portion of a Market News Report based on the Georgia Dock poultry reports and that in October 2016, the USDA's Agricultural Marketing Service (AMS), through its Livestock, Poultry, and Grain Market News (LPGMN) expanded its National Whole Broiler/Fryer report to include additional data. Pilgrim's lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 9, and therefore denies them.

> 10.     There are numerous "plus factors" in the Broiler industry during the Class Period including, but not limited to, the following: (a) extensive information sharing through Agri Stats, (b) numerous opportunities to collude in a variety of forums, (c) a coordinated change from contracts with fixed Broiler prices to Broiler prices that float with the Broiler spot market, (d) inter-Defendant trades and purchases that often are against independent self-interest, and (e) multiple industry characteristics which facilitate collusion, such as high vertical integration, high barriers to entry, high Broiler industry consolidation and concentration, inelastic supply and demand, a lack of significant substitutes for Broilers, and a history of government investigations and collusive conduct.

**Answer to Paragraph 10**: Paragraph 10 consists of Plaintiffs' legal conclusions, to which no response is required.  To the extent a response is required, Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.  Pilgrim's denies any remaining allegations in Paragraph 10.

> 11.     Defendants' restriction of Broiler supply had the intended purpose and effect of increasing Broiler prices to Plaintiffs and the Classes.  First, as Defendants themselves acknowledge, supply and demand in the Broiler industry are inelastic.  Therefore, a coordinated decrease in supply as alleged herein necessarily will result in an increase in prices.  As one industry consultant noted, "[b]ecause of the inelastic nature of the supply and demand [of Broilers,] a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

**Answer to Paragraph 11**: Pilgrim's denies the allegations of the first sentence of Paragraph 11. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences of Paragraph 11 and therefore denies them.  Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document in the fourth sentence of Paragraph 11, which speaks for itself.  To the extent a response is required, Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegation.  Pilgrim's also lacks knowledge or information sufficient to form

a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 11.

>    12. *Second, as acknowledged by industry experts and Defendants themselves, pricing in virtually all Broiler sales is tied to spot market prices, which are publicly known and available through industry price indices. An expert economist has testified that "internal [Defendant] documents show that virtually all chicken products, even if they're not sold spot, are tied to the spot prices. . . ."*

**Answer to Paragraph 12**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – unidentified documents in Paragraph 12, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 12.

>    13. *Therefore, Defendants knew and intended that their coordinated limitation and reduction in Broiler supply would artificially increase all Broiler prices—for spot market and contract sales—above the level they would have been absent the conduct alleged herein.*

**Answer to Paragraph 13**: Denied.

>    14. *As a result of Defendants' unlawful conduct, Plaintiffs and the Classes paid artificially inflated prices for Broilers during the Class Period. Such prices exceeded the amount they would have paid if the price for Broilers had been determined by a competitive market. Thus, Plaintiffs and Class members were injured by Defendants' conduct.*

**Answer to Paragraph 14**: Denied.

## II.    *JURISDICTION AND VENUE*

>    15. *Plaintiffs bring this state law class action on behalf of all the Classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct in restricting the supply of Broilers and increasing the price of Broilers. Plaintiffs seek damages in excess of $5,000,000. Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.*

**Answer to Paragraph 15**: Pilgrim's admits that Plaintiffs purport to bring this state law class action on behalf of all Classes to recover alleged actual and/or compensatory damages, alleged double and treble damages as permitted, pre and post-judgment interest, costs, and attorneys' fees for the alleged injury caused by Defendants' alleged conduct. Pilgrim's further admits that Plaintiffs purport to bring their case under Section 16 of the Clayton Act, 15 U.S.C. § 1 to secure injunctive relief against Defendants for alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. Pilgrim's denies any remaining allegations of Paragraph 15.

> 16. Plaintiffs also assert claims for actual and exemplary damages and injunctive relief pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violation of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state laws. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from some defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

**Answer to Paragraph 16**: Pilgrim's admits that Plaintiffs purport to assert claims for actual and exemplary damages and injunctive relief pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages, and secure relief against Defendants for alleged violation of those state laws. Pilgrim's admits that Plaintiffs purport to seek attorneys' fees, costs, and other expenses under federal and state law. Pilgrim's admits that this Court has subject matter jurisdiction. Pilgrim's denies any remaining allegations of Paragraph 16.

> 17. Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

**Answer to Paragraph 17**: Paragraph 17 contains legal conclusions about venue to which no response is required. To the extent a response is required, Pilgrim's admits that it has transacted business in this district at certain points in time, but denies all remaining allegations in Paragraph 17. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants, and therefore denies them.

> 18. This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of Broilers throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

**Answer to Paragraph 18**: Paragraph 18 contains a legal conclusion about personal jurisdiction to which no response is required. To the extent a response is required, Pilgrim's admits that it is amenable to service of process in this district and has transacted business in the United States and this district at certain points in time. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants, and therefore denies them. Pilgrim's denies all remaining allegations in Paragraph 18.

> 19. The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

**Answer to Paragraph 19**: Paragraph 19 states a legal conclusion to which no response is required. To the extent a response is required, Pilgrim's admits that it conducts business in the United States and sells various products in interstate commerce, but denies all remaining allegations in Paragraph 19 related to Pilgrim's. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

### III.  PARTIES

**A.  Plaintiffs**

20.  Plaintiff Sargent's Restaurant and Lounge is a South Dakota sole proprietorship located in Winner, South Dakota.  During the Class Period, Sargent's Restaurant and Lounge purchased Broilers indirectly from one or more Defendants in South Dakota and suffered antitrust injury as a result.

**Answer to Paragraph 20**: Pilgrim's denies knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 20 and therefore denies them.

21.  Plaintiff Fargo Stopping Center, LLC is a North Dakota limited liability corporation located in Fargo, North Dakota.  During the Class Period, Fargo Stopping Center, LLC purchased Broilers indirectly from one or more of the Defendants in North Dakota and suffered antitrust injury as a result.

**Answer to Paragraph 21**: Pilgrim's denies knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 21 and therefore denies them.

22.  Plaintiff OneHarvest Corporation is a Georgia Nonprofit Corporation located in Hoschton, Georgia.  During the Class Period, OneHarvest Corporation purchased Broilers indirectly from one or more of the Defendants in Arkansas, and suffered antitrust injury as a result.

**Answer to Paragraph 22**: Pilgrim's denies knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 22 and therefore denies them.

23.  Plaintiff Wildwood Tavern LLC is an Illinois limited liability company located in Niles, Illinois.  During the Class Period, Plaintiff Wildwood Tavern LLC purchased Broilers indirectly from one or more Defendants in Illinois, and suffered antitrust injury as a result.

**Answer to Paragraph 23**: Pilgrim's denies knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 23 and therefore denies them.

24.  Plaintiff Don Chavas Mexican Restaurant, Inc. is a Michigan corporation located in Waterford, Michigan.  During the Class Period, Plaintiff Don Chavas Mexican Restaurant, Inc. purchased Broilers indirectly from one or more Defendants in Michigan and suffered antitrust injury as a result.

**Answer to Paragraph 24**: Pilgrim's denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 and therefore denies them.

> 25.    Plaintiff Bodega Brew Pub, Inc. is a Wisconsin corporation located in LaCrosse, Wisconsin.  During the Class Period, Plaintiff Bodega Brew Pub, Inc. purchased Broilers indirectly from one or more Defendants in Wisconsin and suffered antitrust injury as a result.

**Answer to Paragraph 25**: Pilgrim's denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 and therefore denies them.

> 26.    Plaintiff Sullott Corporation is a New York corporation located in Ocean Beach, New York.  During the Class Period, Sullott Corporation purchased Broilers indirectly from one or more of the Defendants in New York, and suffered antitrust injury as a result.

**Answer to Paragraph 26**: Pilgrim's denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 and therefore denies them.

> 27.    Plaintiff Chicken Joe's, LLC is Connecticut domestic limited liability company doing business in New York and Connecticut.  During the Class Period, Chicken Joe's, LLC purchased Broilers indirectly from one or more of the Defendants in New York, and suffered antitrust injury as a result.

**Answer to Paragraph 27**: Pilgrim's denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 and therefore denies them.

> 28.    Plaintiff Eat This, Inc. is a California corporation located in Los Angeles, California.  During the Class Period, Eat This, Inc. purchased Broilers indirectly from one or more Defendants in California, and suffered antitrust injury as a result.

**Answer to Paragraph 28**: Pilgrim's denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 and therefore denies them.

> 29.    Plaintiff Alpine Special Treatment Center, Inc. is a California corporation located in Alpine, California.  During the Class Period, Alpine Special Treatment Center, Inc. purchased Broilers indirectly from one or more Defendants in California, and suffered antitrust injury as a result.

**Answer to Paragraph 29**: Pilgrim's denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 and therefore denies them.

*30.    Plaintiff Tennis Bums, LLC, dba Alabama Joe's, is a Florida corporation located in Lake Worth, Florida.  During the Class Period, Tennis Bums, LLC purchased Broilers indirectly from one or more Defendants in Florida, and suffered antitrust injury as a result.*

**Answer to Paragraph 30**: Pilgrim's denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 and therefore denies them.

*31.    Plaintiff Alabama Joe's 2, Inc., dba Alabama Joe's, is a Florida corporation located in Boyton, Florida.  During the Class Period, Alabama Joe's 2, Inc. purchased Broilers indirectly from one or more Defendants in Florida, and suffered antitrust injury as a result.*

**Answer to Paragraph 31**: Pilgrim's denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31 and therefore denies them.

*32.    Plaintiff Tani Sushi Bistro, LLC is a Missouri Limited Liability Company.  During the Class Period, Tani Sushi Bistro, LLC purchased Broilers indirectly from one or more Defendants in the State of Missouri, and suffered antitrust injury as a result.*

**Answer to Paragraph 32**: Pilgrim's denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 and therefore denies them.

*33.    Plaintiff France 44 Foods, Inc. is a corporation located in Minneapolis, Minnesota.  During the Class Period, France 44 Foods, Inc. purchased Broilers indirectly from one or more of the Defendants in Minnesota, and suffered antitrust injury as a result.*

**Answer to Paragraph 33**: Pilgrim's denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 and therefore denies them.

**B.    *Defendants***

**1.    *Koch Foods Defendants***

*34.    Koch Foods, Inc. is a privately held Illinois corporation with its corporate headquarters in Park Ridge, Illinois.  It has its sales office in Flowood, Mississippi and its export office in Chattanooga, Tennessee.  During the Class Period, Koch Foods, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 34**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 34 and therefore denies them.

*35.    JCG Foods of Alabama, LLC is an Alabama corporation with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, JCG Foods of Alabama, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 35**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 35 and therefore denies them.

*36.    JCG Foods of Georgia, LLC is a Georgia corporation with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, JCG Foods of Georgia, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 36**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 36 and therefore denies them.

*37.    Koch Meat Co., Inc. is an Illinois corporation with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Meat Co., Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 37**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 37 and therefore denies them.

*38.    Defendants Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC, and Koch Meat Co, Inc. are collectively referred to as "Koch Foods."*

**Answer to Paragraph 38**: Pilgrim's admits that Plaintiffs intend to refer to Defendants Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC, and Koch Meat Co., Inc. collectively as "Koch Foods" throughout their Complaint.

*2.    **Tyson Defendants***

*39.    Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas.  During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 39**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 39 and therefore denies them.

40. *Tyson Chicken, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Chicken, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 40**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 40 and therefore denies them.

41. *Tyson Breeders, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Breeders, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 41**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 41 and therefore denies them.

42. *Tyson Poultry, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Poultry, Inc. During the Class Period, Tyson Poultry, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 42**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 42 and therefore denies them.

43. *Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc. are collectively referred to as "Tyson."*

**Answer to Paragraph 43**: Pilgrim's admits that Plaintiffs intend to refer to Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc. collectively as "Tyson" throughout their Complaint.

### 3. *Pilgrim's Pride Corporation*

44. *Pilgrim's Pride Corporation is a Delaware corporation headquartered in Greeley, Colorado (hereinafter "Pilgrim's"). JBS USA Holdings, Inc. holds a 75.3% controlling interest in Pilgrim's. JBS USA Holdings and Pilgrim's are subsidiaries of JBS SA, a Brazilian corporation headquartered in Sao Paulo, Brazil. During the Class Period,*

*Pilgrim's sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

A. *Around December 1, 2008, Pilgrim's filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Texas. Effective December 28, 2009, Pilgrim's was discharged from bankruptcy under a plan of reorganization that paid all creditors in full largely due to rising Broiler prices leading to increased profits at Pilgrim's. Pilgrim's participated in the conspiracy alleged herein throughout the Class Period through the actions of many of Pilgrim's most senior executives, including former CEO Dr. Don Jackson and current President & CEO Bill Lovette, and others with responsibility for Broilers.*

B. *After its discharge from bankruptcy, Pilgrim's reaffirmed its participation in the conspiracy, in part by calls-to-arms and pledges by and between Defendants that were followed by actions that resulted in further idling of production capacity, reduced production, and price increases. Other specific post-discharge actions taken by Pilgrim's in furtherance of the conspiracy are alleged (see below) and are consistent with the actions taken by all of the Defendants and Pilgrim's throughout the Class Period.*

C. *Regardless of whether Pilgrim's participated in the conspiracy throughout the Class Period or joined or reaffirmed membership in the conspiracy immediately after its discharge from bankruptcy, this Complaint seeks to recover damages from Pilgrim's only for Pilgrim's post-discharge conduct, and in no way seeks to violate any Orders of the above-referenced Bankruptcy Court. However, by operation of law, the damages arising from Pilgrim's post-discharge conduct include damages incurred by Plaintiffs and the Classes throughout the Class Period. This Complaint also seeks to recover damages from the other Defendants for Pilgrim's pre-discharge conspiratorial conduct. Therefore, Plaintiffs plead only a single Class Period as to all Defendants, but damages as to Pilgrim's are governed by the principles of joint and several liability as noted above.*

**Answer to Paragraph 44**: Pilgrim's admits the allegations of the first sentence of Paragraph 44.

Pilgrim's admits JBS SA is a Brazilian corporation headquartered in Sao Paulo, Brazil and that

JBS USA Food Company Holdings is a wholly-owned subsidiary of JBS SA, which today

indirectly owns approximately 78.5% of the common stock of Pilgrim's. Pilgrim's admits that it

sold poultry products that may fall within Plaintiffs' litigation definition of Broilers in interstate

commerce in the United States during the Plaintiffs' litigation Class Period. Pilgrim's denies any

remaining allegations of Paragraph 44. As to the allegations in Paragraph 44A, Pilgrim's admits

14

it is one of several Debtors that filed for Chapter 11 bankruptcy protection on December 1, 2008, in the U. S. Bankruptcy Court for the Northern District of Texas, which on December 10, 2009, approved an amended plan of reorganization, discharging Pilgrim's and other Debtors from bankruptcy effective December 28, 2009. Pilgrim's admits that as part of that plan of reorganization its creditors were repaid in full. Pilgrim's denies all remaining allegations of Paragraph 44A. Pilgrim's denies all allegations in Paragraph 44B. Paragraph 44C contains legal conclusions and Plaintiffs' interpretation of bankruptcy and antitrust law, to which no response is required. To the extent a response is required, Pilgrim's denies the allegations of Paragraph 44C.

### 4. *Perdue Defendants*

45. *Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland. During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 45**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 45 and therefore denies them.

46. *Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 46**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 46 and therefore denies them.

47. *Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to as "Perdue."*

**Answer to Paragraph 47**: Pilgrim's admits that Plaintiffs intend to refer to Defendants Perdue Farms, Inc. and Perdue Foods LLC collectively as "Perdue" throughout their Complaint.

### 5.    *Sanderson Farms Defendants*

48.    *Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi.  During the Class Period, Sanderson Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 48**: Pilgrim's lacks knowledge or information sufficient to form a belief as

to the truth of the allegations of Paragraph 48 and therefore denies them.

49.    *Sanderson Farms, Inc. (Foods Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly-owned subsidiary of Sanderson Farms, Inc.  During the Class Period, Sanderson Farms, Inc. (Foods Division) sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 49**: Pilgrim's lacks knowledge or information sufficient to form a belief as

to the truth of the allegations of Paragraph 49 and therefore denies them.

50.    *Sanderson Farms, Inc. (Production Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly-owned subsidiary of Sanderson Farms, Inc.  During the Class Period, Sanderson Farms, Inc. (Production Division) sold or supplied for sale Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 50**: Pilgrim's lacks knowledge or information sufficient to form a belief as

to the truth of the allegations of Paragraph 50 and therefore denies them.

51.    *Sanderson Farms, Inc. (Processing Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly-owned subsidiary of Sanderson Farms, Inc.  During the Class Period, Sanderson Farms, Inc. (Processing Division) sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 51**: Pilgrim's lacks knowledge or information sufficient to form a belief as

to the truth of the allegations of Paragraph 51 and therefore denies them.

52.    *Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division), and Sanderson Farms, Inc. (Processing Division) are collectively referred to as "Sanderson Farms."*

16

**Answer to Paragraph 52**: Pilgrim's admits that Plaintiffs intend to refer to Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division), and Sanderson Farms, Inc. (Processing Division) collectively as "Sanderson Farms" throughout their Complaint.

### 6. *Wayne Farms, LLC*

53. *Wayne Farms, LLC is a Delaware corporation headquartered in Oakwood, Georgia. It is an operating affiliate of its parent company, Continental Grain Company, a privately held company in Arlon, Belgium. During the Class Period, Wayne Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 53**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 53 and therefore denies them.

### 7. *Mountaire Farms Defendants*

54. *Mountaire Farms, Inc. is a privately held Delaware corporation with its headquarters in Millsboro, Delaware. During the Class Period, Mountaire Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 54**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 54 and therefore denies them.

55. *Mountaire Farms, LLC is a privately held Arkansas corporation located in Little Rock, Arkansas, and is a wholly-owned subsidiary of Mountaire Farms, Inc. During the Class Period, Mountaire Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 55**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 55 and therefore denies them.

56. *Mountaire Farms of Delaware, Inc. is a privately held Delaware corporation located in Millsboro, Delaware, and is a wholly-owned subsidiary of Mountaire Farms, Inc. During the Class Period, Mountaire Farms of Delaware, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce,*

*directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 56**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 56 and therefore denies them.

57. *Defendants Mountaire Farms, Inc., Mountaire Farms, LLC, and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire."*

**Answer to Paragraph 57**: Pilgrim's admits that Plaintiffs intend to refer to Defendants Mountaire Farms, Inc., Mountaire Farms, LLC, and Mountaire Farms of Delaware, Inc. collectively as "Mountaire" throughout their Complaint.

### 8. *Peco Foods*

58. *Peco Foods, Inc. is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama. During the Class Period, Peco Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 58**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 58 and therefore denies them.

### 9. *Foster Farms*

59. *Foster Farms, LLC is a privately held California corporation headquartered in Modesto, California. During the Class Period, Foster Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 59**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 59 and therefore denies them.

59(A). *Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms, LLC. During the Class Period, Foster Poultry Farms and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of Broilers, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States. Defendants Foster Farms, LLC and Foster Poultry Farms are collectively referred to as "Foster Farms."*

18

**Answer to Paragraph 59(A)**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 59(A) and therefore denies them.

### 10. *House of Raeford Farms*

60. *House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. During the Class Period, House of Raeford operated in part through a division referred to as "Columbia Farms," which is a group of Broiler facilities and operations originally named Columbia Farms, Inc. and Columbia Farms of Georgia, Inc. when purchased by House of Raeford in 1998. During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 60**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 60 and therefore denies them.

### 11. *Simmons Foods*

61. *Simmons Foods, Inc. is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas. During the Class Period, Simmons Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 61**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 61 and therefore denies them.

61(A). *Simmons Prepared Foods, Inc. Is a privately held Arkansas company headquartered in Siloam Springs, Arkansas. Simmons Prepared Foods, Inc. is a wholly-owned subsidiary of Simmons Foods, Inc. During the Class Period, Simmons Foods, Inc. exclusively sold the chicken it produced to Simmons Prepared Foods, Inc., which in turn resold the chicken in various forms to its customers. Simmons Prepared Foods, Inc. and/or its predecessors wholly-owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of Broilers, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States. Defendants Simmons Foods, Inc. and Simmons Prepared Foods, Inc. are collectively referred to as "Simmons" or "Simmons Foods."*

**Answer to Paragraph 61(A)**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 61(A) and therefore denies them.

19

### 12. Fieldale Farms

*62.    Fieldale Farms Corporation is a privately held Georgia corporation headquartered in Baldwin, Georgia.  During the Class Period, Fieldale Farms Corporation and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 62**: Pilgrim's lacks knowledge or information sufficient to form a belief as

to the truth of the allegations of Paragraph 62 and therefore denies them.

### 13. George's Defendants

*63.    George's, Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.  During the Class Period, George's, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 63**: Pilgrim's lacks knowledge or information sufficient to form a belief as

to the truth of the allegations of Paragraph 63 and therefore denies them.

*64.    George's Farms, Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas, and is a wholly-owned subsidiary of George's Inc.  During the Class Period, George's Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold and/or supplied Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 64**: Pilgrim's lacks knowledge or information sufficient to form a belief as

to the truth of the allegations of Paragraph 64 and therefore denies them.

*65.    Defendants George's, Inc. and George's Farms, Inc. are collectively referred to as "George's."*

**Answer to Paragraph 65**: Pilgrim's admits that Plaintiffs intend to refer to Defendants George's,

Inc. and George's Farms, Inc. collectively as "George's" throughout their Complaint.

### 14. O.K. Foods Defendants

*66.    Defendant O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.  O.K. Foods, Inc. is a subsidiary of Industrias Bachoco S.A., a Brazilian corporation headquartered in Sao Paulo, Brazil.  During the Class Period, O.K. Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold*

*Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 66**: Pilgrim's lacks knowledge or information sufficient to form a belief as

to the truth of the allegations of Paragraph 66 and therefore denies them.

67.    *O.K. Farms, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas, and is a wholly-owned subsidiary of O.K. Foods, Inc. During the Class Period, O.K. Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 67**: Pilgrim's lacks knowledge or information sufficient to form a belief as

to the truth of the allegations of Paragraph 67 and therefore denies them.

68.    *O.K. Industries, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas, and is a wholly-owned subsidiary of O.K. Foods, Inc. During the Class Period, O.K. Industries, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**Answer to Paragraph 68**: Pilgrim's lacks knowledge or information sufficient to form a belief as

to the truth of the allegations of Paragraph 68 and therefore denies them.

69.    *Defendants O.K. Foods, Inc., O.K. Farms, Inc., and O.K. Industries, Inc. are collectively referred to as "O.K. Foods."*

**Answer to Paragraph 69**: Pilgrim's admits that Plaintiffs intend to refer to Defendants O.K.

Foods, Inc., O.K. Farms, Inc., and O.K. Industries, Inc. collectively as "O.K. Foods" throughout

their Complaint.

70.    *"Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including Broilers companies that merged with or were acquired by the named Defendants and each named Defendant's wholly-owned or controlled subsidiaries or affiliates that sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the Class Period.*

**Answer to Paragraph 70**: Pilgrim's admits that Paragraph 70 describes Plaintiffs' purported definition of the terms "Defendant" or "Defendants," but denies this is appropriate or consistent with the ordinary definition of the terms.

>   71.   To the extent that subsidiaries and divisions within each Defendant's corporate family sold or distributed Broilers to direct purchasers, these subsidiaries played a material role in the conspiracy alleged in this Complaint because Defendants wished to ensure that the prices paid for such Broilers would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein.   Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing and collecting monies from Plaintiffs and the members of the Classes for Broilers was known to and approved by their respective corporate parent named as a Defendant in this Complaint.

**Answer to Paragraph 71**: Pilgrim's denies all allegations of Paragraph 71 related to Pilgrim's. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants, and therefore denies them.

### IV.    AGENTS AND CO-CONSPIRATORS

>   72.   Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co.  Eli Lilly & Co. is an Indiana corporation located in Indianapolis, Indiana.  Throughout the Class Period, Agri Stats acted as an agent and/or co-conspirator of Defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among Defendants and their co-conspirators.

**Answer to Paragraph 72**: Pilgrim's denies the allegations of the second sentence of Paragraph 95 to the extent directed at Pilgrim's.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of Paragraph 95 and therefore denies them.

>   73.   Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia.  Claxton Poultry Farms, Inc. and Norman W. Fries, Inc. are collectively referred to as "Claxton Poultry."  Throughout the Class Period, Claxton Poultry acted as a co-conspirator of Defendants by participating in the conspiracy alleged herein.

**Answer to Paragraph 73**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of Paragraph 73 and therefore denies them. Pilgrim's admits Plaintiffs intend to refer to Claxton Poultry Farms, Inc. and Norman W. Fries, Inc. collectively as "Claxton Poultry" throughout their Complaint. Pilgrim's denies the allegations of the third sentence of Paragraph 73 to the extent directed at Pilgrim's and lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

> 74. Harrison Poultry, Inc. is a Georgia corporation located in Bethlehem, Georgia. Throughout the Class Period, Harrison Poultry, Inc. acted as a co-conspirator of Defendants by participating in the conspiracy alleged herein.

**Answer to Paragraph 74**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of Paragraph 74 and therefore denies them. Pilgrim's denies the allegations of the second sentence of Paragraph 74 to the extent directed at Pilgrim's and lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

> 75. Mar-Jac Poultry, Inc. is a Delaware corporation located in Gainesville, Georgia. Mar-Jac Poultry MS, LLC is a Mississippi limited liability corporation located in Gainesville, Georgia. Mar-Jac Poultry AL, LLC is an Alabama limited liability corporation located in Gainesville, Georgia. Mar-Jac AL/MS, Inc. is a Delaware corporation located in Gainesville, Georgia. Mar-Jac Poultry, LLC is a Delaware corporation located in Gainesville, Georgia. Mar-Jac Holdings, LLC is a Delaware corporation located in Gainesville, Georgia and is the parent company of Mar-Jac Poultry, Inc., Mar Jac Poultry MS LLC, Mar-Jac AL, LLC, Mar-Jac AL/MS, LLC, and Mar-Jac Poultry, LLC. Co-Conspirators Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, Mar-Jac Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-Jac Poultry, LLC and Mar-Jac Holdings, LLC are collectively referred to as "Mar-Jac Poultry." Throughout the Class Period, Mar-Jac Poultry acted as a co-conspirator of Defendants by participating in the conspiracy alleged herein.

**Answer to Paragraph 75**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first four sentences of Paragraph 75 and therefore denies them.

Pilgrim's admits Plaintiffs intend to refer to a number of different entities collectively as "Mar Jac Poultry" throughout their Complaint. Pilgrim's denies the allegations of the last sentence of Paragraph 75 to the extent directed at Pilgrim's and lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

> 76. When appropriate in the context, Mar-Jac Poultry, Harrison Poultry, and Claxton Poultry are referred to collectively in this Complaint as the "Producer Co-Conspirators."

**Answer to Paragraph 76**: Pilgrim's admits that Plaintiffs intend to describe in Paragraph 76 what they mean when they use the phrase "Producer Co-Conspirator" in a certain context Plaintiffs believe (but do not identify) as appropriate, but denies that it is either appropriate or clear.

> 77. Various other persons, firms and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

**Answer to Paragraph 77**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of Paragraph 77 and therefore denies them. The last sentence of Paragraph 77 is Plaintiffs' legal conclusion to which no response is required. To the extent a response is required, Pilgrim's denies the last sentence of Paragraph 77.

> 78. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

**Answer to Paragraph 78**: Pilgrim's admits Paragraph 78 describes the Plaintiffs' purported drafting techniques and what they intend the reader to assume or conclude when they use certain phrases, but denies such techniques are clear or appropriate.

> 79. Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

24

**Answer to Paragraph 79**: Denied.

80.     *Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.*

**Answer to Paragraph 80**: Paragraph 80 states a legal conclusion to which no response is required.

To the extent a response is required, Pilgrim's denies the allegations of Paragraph 80.

## V.     TRADE AND COMMERCE

81.     *During the Class Period, each Defendant, directly or through its subsidiaries or other affiliates, sold Broilers in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.*

**Answer to Paragraph 81**: Pilgrim's admits that it has sold poultry products that may fall within

Plaintiffs' litigation definition of "Broilers" in the United States and has transacted business in this

district at certain points in time, but denies all remaining allegations in Paragraph 81.  Pilgrim's

lacks knowledge or information sufficient to form a belief as to the truth of any allegations related

to other Defendants, and therefore denies them.

82.     *During the Class Period, Defendants collectively controlled a majority of the market for Broilers in the United States.*

**Answer to Paragraph 82**: Denied.

83.     *Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.*

**Answer to Paragraph 83**: Denied.

## VI.     FACTUAL ALLEGATIONS

A.     *Background on Broilers.*

1.     *"Broilers."*

84.     *As used in this Complaint, "Broilers" are chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a*

25

*value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards.*

**Answer to Paragraph 84**: Pilgrim's admits Paragraph 84 purports to present the litigation definition Plaintiffs have created for the term "Broilers" but denies that it is a clear definition or one used by Pilgrim's in the ordinary course of business.

2.      ***Broilers Are A Commodity.***

*85.      According to a 2012 report by Focus Management Group, Broilers "are a commodity product with little or no product differentiation based on the processors."*

**Answer to Paragraph 85**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. To the extent a response is required, Pilgrim's denies the allegations in Paragraph 85.

*86.      Defendants acknowledge that Broilers are a commodity.  For instance, Pilgrim's CEO commented in February 2014 that "I would add too, our business...the [Broiler] chicken business per se is a commodity business."*

**Answer to Paragraph 86**: Pilgrim's denies the allegations of the first sentence of Paragraph 86 to the extent directed at Pilgrim's.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.  Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document in the second sentence of Paragraph 86, which speaks for itself.  To the extent a response is required, Pilgrim's denies the remaining allegations in Paragraph 86.

3.      ***The United States Broiler Market Is A National Market Worth Tens Of Billions Of Dollars Annually.***

*87.      According to the U.S. Poultry & Egg Association, the value of wholesale U.S. Broilers produced in 2014 was $32.7 billion, up 6 percent from 2013.  The market value varied between $21.8 and $30.7 billion from 2008-2013.*

**Answer to Paragraph 87**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

> 88.    There is a single national market for Broilers in the United States.  Prices for Broilers sold in the United States are quoted in whole bird or disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

**Answer to Paragraph 88**: Pilgrim's denies the allegations of the first sentence of Paragraph 88. Pilgrim's admits it has on occasion quoted prices for certain poultry products that may fall within the Plaintiffs' litigation definition of "Broilers" on terms consistent with the second sentence of Paragraph 88.  Pilgrim's admits that quoted prices for some Broilers products sold in the United States may depend on whether a bird is sold whole or in parts.  Pilgrim's denies the existence of publicly "quoted" prices for the majority of products encompassed within the Complaint's definition of Broilers. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 88.

> 89.    About 50-70% of Broilers are sold under contract with a customer, about 10-20% are sold on the spot market, and roughly 17-20% are exported.

**Answer to Paragraph 89**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

> 90.    According to expert testimony in July 2011 in Adams v. Pilgrim's Pride,[1] spot market Broilers are "anything left over [that is] sold fresh" within 3 days.  Broiler industry executives sometimes refer to the Broiler spot market as the "sell it or smell it market," meaning that if the Broiler isn't sold within 3 days, then it will rot.  According to Janette Barnard, founder of a spot market trading platform called The Poultry Exchange, "there are no secrets in the spot market, very few anyway.  As soon as a sales manager picks up the phone and calls a customer or trader, the word is out and other people will soon know that X company has one load available."

---

[1] No. 2:09-cv-00397 (N.D. Tex.).

**Answer to Paragraph 90**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – unidentified testimony purportedly given in a litigation in 2011 in the first sentence of Paragraph 90, which speaks for itself. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document in the third and fourth sentences of Paragraph 90, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 90.

> 91. *Exports of Broilers from the United States account for approximately 45% of all United States meat exports. Broilers produced in the U.S. are exported to well over 100 different countries, with the major export markets including Mexico, Canada, Hong Kong, and China. Some of the exports from the United States include products less desirable to United States consumers, such as chicken feet or dark meat, but exports also increasingly include white meats and other products widely consumed in the United States.*

**Answer to Paragraph 91**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of Paragraph 91 and therefore denies them. Pilgrim's admits certain poultry products that may fall within Plaintiffs' definition of "Broilers" are exported, that some exports go to Mexico, Canada, Hong Kong and China, and that certain poultry products are less desirable to U.S. consumers than they may be to consumers in other countries, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 86 and therefore denies them.

> 92. *Exports of Broilers from the United States have increased since 2007 both in quantity and value. Before the Class Period, in 2006 exports constituted only 14.8% of U.S. exports and increased to 16.5% by 2007. But between 2008-2014 export levels were never lower than 18.5% of U.S. production levels, dropping down to 16% in 2015 due to export bans by countries due to Avian Flu concerns.*

**Answer to Paragraph 92**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

*93. While this complaint does not seek damages for Broilers sold into export commerce, Broilers exported from the United States decrease available supply and increase Broiler prices in the United States. Therefore, exports by Defendants were an important mechanism used by Defendants to effect their United States-based Broiler market conspiracy.*

**Answer to Paragraph 93**: Denied.

### *4.   Broiler Prices Have Risen Steadily Since 2008.*

*94. Broiler prices were significantly elevated during the Class Period due to Defendants' conduct. This is contrary to pricing patterns prior to the Class Period, and contrary to what would be expected in a competitive market. For instance, during much of the Great Recession, Broiler prices steadily rose despite flat or declining input costs. Similarly, Broiler prices during the 2015 through 2016 time period remained artificially inflated and failed to account for the historic drop in corn and soybean prices, which constitute 50 – 70% of Broiler input costs (see below, ¶ 339).*



**Answer to Paragraph 94**: Pilgrim's denies the allegations of the first two sentences of Paragraph 94. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of all remaining allegations and therefore denies them.

*95.    As of November 2013, a Bloomberg News compilation of industry analyst forecasts predicted Broiler prices would drop 7.1% in 2014 due to a 50% fall in corn prices, but instead, Broiler prices increased 9.2%.  Since January 1, 2008, by one measure Broiler prices have been at or near all-time highs roughly half of the time, even though the 2008-2009 period was during the Great Recession.*

**Answer to Paragraph 95**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – unidentified documents in Paragraph 95, which speak for themselves.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

> **5.    *Overview of the Georgia Dock, USDA Composite, Urner Barry, and EMI Broiler price indices.***

*96.    Broiler prices are reported primarily by three entities:  Urner Barry (a commodity price reporting service), the Georgia Department of Agriculture (aka "Georgia Dock,"), and the USDA.  Additionally, as discussed below, Agri Stats collects detailed pricing information through its subsidiary Express Markets, Inc. ("EMI").*

**Answer to Paragraph 96**: Pilgrim's admits that Urner Barry, the Georgia Department of Agriculture and the USDA have publicly reported pricing information for certain poultry products that may fall within Plaintiffs' litigation definition of "Broilers" during the Plaintiffs' Class Period.  Pilgrim's further admits that EMI collects and reports pricing information for certain poultry products that may fall within Plaintiffs' litigation definition of "Broilers."  Pilgrim's denies any remaining allegations in Paragraph 96.

*97.    Urner Barry collects and publishes daily price information for Broilers, while for the USDA's Composite index, USDA collects and publishes on Broiler price information on a weekly basis.  USDA's Composite price index is publicly available for free.  Urner Barry's Broiler price information is subscription-based, so all Broiler producers and many Broiler purchasers subscribe for a fee.  The USDA and Urner Barry's Broiler price indices are based upon a system of double verification, which includes telephonic and written surveys of all or nearly all Broiler producers, but also verification of reported prices from Broiler purchasers such as brokers, and customers.  The Georgia Dock price survey methodology, which contrasts materially with those of the USDA and Urner Barry, is discussed below in Section VI(B).*

**Answer to Paragraph 97**: Pilgrim's admits that Urner Barry collects and publishes pricing data on various poultry products, some of which may fall within Plaintiffs' litigation definition of "Broilers," which can be daily. Pilgrim's admits that the USDA collects and publishes pricing data on various poultry products, some of which may fall within Plaintiffs' litigation definition of "Broilers" and some of which is weekly in nature. Pilgrim's admits it does not pay a fee to view the USDA pricing reports, but does pay a fee for data from Urner Barry. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations directed at Pilgrim's and therefore denies them. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

> 98. The most detailed price report is not publicly available and is produced by Agri Stats and its subsidiary, Express Markets, Inc. According to a May 2010 FarmEcon study, EMI's pricing report[2] includes "pricing data on whole birds and chicken parts that is considerably more detailed than the USDA," Urner Barry, or Georgia Dock reports, as it is based on actual sales invoices from Broiler companies.

**Answer to Paragraph 98**: Pilgrim's admits that pricing reports from Agri Stats and EMI are not publicly available, but lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of Paragraph 98 and therefore denies them. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document in the second sentence of Paragraph 98, which speaks for itself. With respect to the allegations of footnote 2 embedded in Paragraph 98, Pilgrim's lacks knowledge or

---

[2] Agri Stats subsidiary EMI was formed around 2000 to compete with the price reporting service of Urner Barry. Unlike Agri Stats reports for Defendants, EMI releases daily pricing data to both Defendants and potential purchasers of Broilers, though the reporting service costs thousands of dollars and is not publicly available. EMI reports capture all transactions by Broiler producers, who automatically transmit invoice information electronically from each transaction to EMI. The reports include all sales volume information from the previous day, including the size of containers, type of cut, whether the product was chilled with ice or $CO_2$, the price, and numerous other pieces of information.

information sufficient to form a belief as to the truth of the allegations of the first sentence;

Pilgrim's admits it pays for reports from Agri Stats and EMI and that such reports are not publicly

available, but lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of the remaining sentences of footnote 2.

> 99.     Published prices for Broilers from Urner Barry, Georgia Dock, and USDA relate
> to the spot market for Broilers.  However, prices for Broilers, whether sold under contract
> or on the spot market, generally move with spot market prices as reported by Georgia Dock
> or Urner Barry.

**Answer to Paragraph 99**: Denied.

> 100.     Statements by Broiler company executives and industry experts confirm that Broiler
> sales, whether by contract or on the spot market, are tied to spot market pricing.  For
> instance, Sanderson Farms CEO Joe Sanderson explained in a May 2008 speech that
> Sanderson Farms' contract sales to retail customers have prices tied to the Georgia Dock
> price survey and Sanderson Farms' contract sales to food distributors are "based on
> formulas tied to the Urner Barry."  Similarly, expert economist Dr. Colin A. Carter from
> the University of California (Davis) testified that "internal Pilgrim's documents show that
> virtually all chicken products, even if they're not sold spot, are tied to the spot prices. . . .
> 83 percent of Pilgrim's chicken sales are reflecting the spot price within a given year.  So
> there's only about 16 percent of their sales that are not tied to the spot market over a
> relatively short period of time."  Further, because half of "fixed contracts" actually had
> terms tied to Broiler spot market prices, Dr. Carter concluded that 92% of Pilgrim's
> Broiler sales were tied to Broiler spot market prices such as Georgia Dock.

**Answer to Paragraph 100**: Pilgrim's lacks knowledge or information sufficient to form a belief

as to the truth of the allegations of the first sentence of Paragraph 100 and therefore denies them.

Pilgrim's admits Plaintiffs appear to be selectively quoting from – and attempting to characterize

– one or more unidentified documents in the remaining sentences of Paragraph 100, which speak

for themselves.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth

of any remaining allegations in Paragraph 100 and therefore denies them.

> 101.     As a consequence of the inelasticity of supply and demand in the Broiler industry
> (discussed below) and the availability of the spot market price indices (discussed above),
> public price increase announcements by Defendants were unnecessary.  Defendants knew
> and intended that a decrease in supply pursuant to their agreement would increase Broiler
> spot market prices, and therefore that all Broiler prices would increase.

**Answer to Paragraph 101**: Pilgrim's denies the allegations of the first sentence of Paragraph 101. Pilgrim's denies the allegations of the second sentence of Paragraph 101 to the extent directed at Pilgrim's and lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties and therefore denies them.

B.     *The Georgia Dock Price Index Is Highly Susceptible To Collusion.  In Fact, Certain Defendants And Producer Co-Conspirators Apparently Have Manipulated It To Further Their Conspiracy.*

> 102.     *The Georgia Dock price is compiled on a weekly basis by the GDA.  For decades, it has been used by producers and others as a benchmark to set Broiler prices.  Until very recently, little if any information was publicly available regarding how the GDA compiles the Georgia Dock price.  In fact, Defendants and their Producer Co-Conspirators intentionally disseminated misinformation that the Georgia Dock price is derived through a complex algorithm and is an accurate and reliable measure of actual Broiler transaction prices.  Public revelations in early November 2016, however, indicate for the first time that the Georgia Dock price index not only may be unreliable, but that its survey methodology makes it susceptible to manipulation by Broiler producers.*

**Answer to Paragraph 102**: Pilgrim's admits that the GDA compiles and disseminates poultry market and statistical information at least weekly, some of which encompass poultry products that fall within Plaintiffs' litigation definition of "Broilers."  Pilgrim's further admits that at various points in the Plaintiffs' litigation Class Period a small percentage of its sales included terms related to the Georgia Dock price, which Pilgrim's defines as the Georgia f.o.b. dock quoted price on broilers and fryers based on full truck load lots of ice pack USDA grade "A" sized 2½ to 3 pound birds published on Wednesdays by the GDA.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations in the first three sentences of Paragraph 102, and therefore denies them.  Pilgrim's denies the allegations directed at Pilgrim's in the fourth and fifth sentences of Paragraph 102, and lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies any remaining allegations of Paragraph 102.

*103. To compile the Georgia Dock price index, according to an internal GDA document provided recently to the New York Times through an open records request, "each participating [Broiler producer] company is called [by the GDA] on Wednesday every week to report the price offered to companies in which they have contracts in place with." A single price is given by each Broiler producer company and it is accepted without any verification of actual invoices, double-verification with purchasers, or any other form of auditing to verify accuracy. Remarkably, in response to a recent press inquiry, the GDA justified its failure to audit any self-reported data from Defendants and their Producer Co-Conspirators by stating, "We don't see any reason they would submit information that wasn't truthful."*

**Answer to Paragraph 103**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more unidentified documents in Paragraph 103, which speak for themselves. Pilgrim's admits it provided requested information related to supply and demand of various poultry products, including some that may fall within Plaintiffs' litigation definition of "Broilers," but denies all remaining allegations directed at Pilgrim's in Paragraph 103. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

*104. Despite the GDA's public statements about confidence in the Georgia Dock price index, the GDA employee who collected prices each week from Broiler companies, Arty Schronce, was deeply concerned. In a September 2016 internal GDA memorandum (hereinafter, "September 2016 Schronce Memorandum") disclosed publicly for the first time on November 17, 2016, in a Washington Post article, Mr. Schronce wrote that he "continue[d] to have concerns about" the Georgia Dock, had "voiced concerns in the past," and that he thought the Georgia Dock price index was "a flawed product that is a liability to the Georgia Department of Agriculture." Mr. Schronce also noted, "I was told that poultry companies know what they are doing and all I need to do is to gather and consolidate the info I am provided. However, I have come to question the validity of some of the information provided." Mr. Schronce also reported that the Broiler companies reporting prices to him gave "lackadaisical and rude responses to my requests for information," such as responding "just keep em' the same" when asked for a company's updated Broiler price.*

**Answer to Paragraph 104**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of Paragraph 104. Pilgrim's admits Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more documents

in the remaining sentences of Paragraph 104, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

> 105. The Broiler companies that participated in the Georgia Dock price survey during the relevant time period all own at least one Broiler processing facility located within the State of Georgia. They included Defendants Pilgrim's, Tyson, Fieldale Farms, Perdue, Sanderson Farms, Koch Foods, and Wayne Farms, and Producer Co-Conspirators Claxton Poultry, Mar-Jac Poultry, and Harrison Poultry. According to the GDA, each weekly price report from these Broiler producers is weighted to account for the particular company's market share of Broilers processed in Georgia (referred to by GDA as that company's "voice"). A preliminary calculation is made based on the single price quotation from each company, then "[a]ny company that provides a whole bird quote that is more than one cent above or below the initial dock price calculation will not be included in the calculation for the whole bird dock price that week. Its voice is taken out of the formula and the dock price is recalculated without it" (hereinafter, the "One Cent Rule"). According to internal GDA documents, the One Cent Rule is meant "to shield [] one company having the ability to greatly influence the price up or down."

**Answer to Paragraph 105**: Pilgrim's admits it owned facilities in the State of Georgia during the Plaintiffs' litigation Class Period, but lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first two sentences with respect to other Defendants or third parties and therefore denies them. Pilgrim's admits Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more unidentified documents in the remaining sentences of Paragraph 105, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of any remaining allegations of Paragraph 105 and therefore denies them.

> 106. The price quoted by each company to the GDA is based on 2.5-to-3 pound whole Broilers, but only a handful of companies who report to GDA actually process 2.5-to-3 pound birds in Georgia, so internal GDA documents state that Broiler companies "are supposed to adjust their whole bird quote as if they are producing that sized bird." Once the final Georgia Dock whole bird price is calculated, then the GDA uses a formula to calculate prices for different Broiler cuts and parts of those whole birds, but that calculation is based entirely on the single original price that each Broiler company provided to the GDA each Wednesday.

**Answer to Paragraph 106**: Pilgrim's admits that the GDA requested information related to supply and demand of 2.5 to 3 pound whole birds, as well as individual poultry parts from such birds (including, for instance, wings, line run tenders, drumsticks, etc.) at least once a week, that Pilgrim's provided such information at least once a week, and that more than one of its facilities in the state of Georgia produced products from 2.5 to 3 pound whole birds, as well as individual poultry parts from such birds, and that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more unidentified documents in the remaining sentences of Paragraph 106, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 106 and therefore denies them.

> *107.    Historically, the Georgia Dock price was roughly comparable to the prices reflected by the Urner Barry, EMI, and USDA Composite indices.  However, beginning around January 2015, the Georgia Dock price began to depart significantly from the pricing reflected by the EMI, Urner Barry, and USDA Composite indices (see above, ¶ 101).[3]*

**Answer to Paragraph 107**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of these allegations and therefore denies them.  In response to the footnote in Paragraph 107, Pilgrim's admits the footnote purports to set forth Plaintiffs' allegations and case theories regarding other pricing indices, but denies all such allegations.  In response to the cross-reference to Paragraph 101 of the Plaintiffs' Complaint, Pilgrim's cross-refers to its answer to Paragraph 101 above.

> *108.    The significant difference between the Georgia Dock price index and other Broiler price indices in recent years cannot be explained by only one or two outlier companies reporting artificially high Broiler prices to the GDA, as the One Cent Rule requires that outlier prices deviating by more than one cent from the initial dock price be excluded from the final Georgia Dock price.  Instead, the deviation of the Georgia Dock price index from*

---

[3] To be clear, Plaintiffs allege that prices reported in the EMI, Urner Barry, and USDA Composite price indices during the Class Period were also supracompetitive and artificially inflated by the conduct of Defendants and their Producer Co-Conspirators, as alleged in this Complaint.

*other indices – indices that are themselves based on verified sales by Defendants – can only be attributed to all or nearly all participating Broiler producers collectively submitting artificially high and identical or very nearly identical Broiler prices to the GDA.*

**Answer to Paragraph 108**: Pilgrim's denies all allegations in Paragraph 108 related to Pilgrim's, and lacks knowledge or information sufficient to form a belief as to the truth of allegations related to third parties and therefore denies them.

*109.    The September 2016 Schronce Memorandum confirms the significance of the One Cent Rule.  Mr. Schronce's memorandum noted that after a January 2016 article about the Georgia Dock price index in the Wall Street Journal (see below, ¶ 278), one "company appears to basically not take part in the Whole Bird Dock Price process.  They seem to deliberately submit a low bid that they know will be kicked out.  However, they can claim that they are submitting something lower.  In essence, they can take advantage of a high whole bird price while maintaining that they want it to be lower."*

**Answer to Paragraph 109**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – certain documents in Paragraph 109, which speak for themselves.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations of Paragraph 109 and therefore denies them.   In response to the cross-reference to Paragraph 278 of the Plaintiffs' Complaint, Pilgrim's cross-refers to its answer to Paragraph 278 below.

*110.    To facilitate their control of the Georgia Dock price, Defendants convinced the GDA to convene a "Georgia Dock Advisory Committee" composed of senior executives from eight Defendants and Producer Co-Conspirators to advise the GDA on the Georgia Dock price.  The Georgia Dock Advisory Committee recently included Gus Arrendale (CEO, Fieldale Farms), Mike Welch (CEO & President, Harrison Poultry), Jerry Lane (Former CEO, Claxton Poultry), Jayson Penn (EVP Sales & Operations, Pilgrim's), Pete Martin (VP of Operations, Mar-Jac), Vernon Owenby (Plant Manager (Cumming, GA), Tyson), Steve Clever (VP of Fresh Sales, Wayne Farms), and Dale Tolbert (VP of Sales, Koch Foods).  Prior to November 10, 2016, the existence and conduct of this secret Georgia Dock Advisory Committee was not known to Plaintiffs.  In his September 2016 Schronce Memorandum, Mr. Schronce wrote, "I have questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent.  I was told I could not make any changes without clearing them with the Advisory Board."*

**Answer to Paragraph 110**: With respect to the first two sentences of Paragraph 110, Pilgrim's admits that at various points in the Plaintiffs' litigation Class Period, at the request of the GDA, it had an employee representative on the Georgia Dock Advisory Committee, but denies it "controls" the GDA's Georgia Dock Price, denies that it "convinced the GDA" to convene the Georgia Dock Advisory Committee, denies that that Committee was "a secret," and denies any remaining allegations directed at Pilgrim's and lacks knowledge or information sufficient to form a belief as to the truth of allegations related to other Defendants or third parties and therefore denies them. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of allegations in the third sentence related to what Plaintiffs "knew" and therefore denies them. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document in the fourth and fifth sentences of Paragraph 110, which speaks for itself. Pilgrim's denies any remaining allegations in this Paragraph.

> *111.    USDA publishes a weekly report on poultry production and prices called the Broiler Market News Report ("USDA BMNR"), which until very recently included a reprint of the GDA's separately compiled Georgia Dock price. According to the November 17, 2016 Washington Post article, the GDA stated that "a review process began in December 2015 after 'serious concerns' emerged" with the Georgia Dock price. Sometime in the first half of 2016, the USDA began investigating how the Georgia Dock price survey was conducted.*

**Answer to Paragraph 111**: Pilgrim's admits the USDA published the Broiler Market News Report and that this report previously included information from the GDA. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a news report in the second sentence of Paragraph 111, which is a document that speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 111 and therefore denies them.

> *112.    On July 19-20, 2016, high level USDA officials met with GDA representatives in Atlanta, Georgia to discuss the Georgia Dock price. The USDA officials shared their*

*conclusion that GDA could no longer simply accept Broiler prices from Defendants and their Producer Co-Conspirators without verification, and instead would have to verify invoice-level data to confirm reported prices. On July 20-21, 2016, USDA officials requested that the GDA provide the USDA with data from Broiler producers to "test and review" the Georgia Dock price for accuracy.*

**Answer to Paragraph 112**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 112 and therefore denies them.

*113. On July 22, 2016 USDA's weekly BMNR publication noted that beginning on August 5, 2016, GDA "will be issuing a new weekly market report for negotiated Georgia broiler/fryer whole birds and bird parts, which will replace the current [Georgia Dock price]." The GDA did not comply with USDA's August 5 deadline, however, and in the August 5 USDA BMNR all price information from the GDA and Georgia Dock was removed and only a hyperlink to the GDA's website was included.*

**Answer to Paragraph 113**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document in the first sentence of Paragraph 113, which speaks for itself. Pilgrim's admits that on approximately August 5, 2016, the USDA discontinued publishing the AMS Market News report based on the Georgia Dock report, but lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations of Paragraph 113 and therefore denies them. Pilgrim's denies any remaining allegations in this Paragraph.

*114. During the weeks after the July 19-20 meeting with the USDA, the GDA coordinated closely with Defendants, their Producer Co-Conspirators, and the Georgia Poultry Federation—the Broiler industry's representative—to determine how to deal with the USDA's inquiry into the Georgia Dock price. Within the GDA, high level officials began to raise antitrust concerns regarding the Georgia Dock. For instance, a July 27, 2016, report from GDA Director of Regulatory Compliance & Budget Alec Asbridge to GDA Commissioner Gary Black concluded that "[t]he top 10 poultry producing companies now control over 80% of the industry output. The combination of vertical integration, limited competition and lowered production periods has led to steady prices that have shown to be fairly resistant to changing market conditions. **These factors alone illicit [sic] anti-trust review**." (emphasis added).*

**Answer to Paragraph 114**: Pilgrim's denies the allegations of the first sentence of Paragraph 114 related to Pilgrim's, and lacks knowledge or information sufficient to form a belief as to the truth of allegations related to third parties and therefore denies them. Pilgrim's lacks knowledge or

information sufficient to form a belief as to the truth of allegations in the second sentence of Paragraph 114 and therefore denies them. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document in the remaining sentences of Paragraph 114, which speaks for itself. Pilgrim's denies any remaining allegations in this Paragraph.

> 115. GDA Director Asbridge's July 27, 2016, report also noted that over time, the GDA became a vehicle for Defendants and their Producer Co-Conspirators to "report[] a weighted average price per pound on broilers [Georgia Dock price] based off of contracts that have been determined at the private level and **reported without regulatory oversight**. The **formulas to calculate weighted average prices have been determined on the private level** and have not been standardized since the inception of the [GDA Poultry Market News division] in 1968, which there is no written record of." (emphasis added). In other words, it was Defendants and their Producer Co-Conspirators themselves who wrote the rules and formulas that make up the Georgia Dock price, not the GDA.

**Answer to Paragraph 115**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document in the first two sentences of Paragraph 115, which speaks for itself. Pilgrim's denies the allegations of the last sentence of Paragraph 115 related to Pilgrim's, and lacks knowledge or information sufficient to form a belief as to the truth of allegations related to third parties and therefore denies them. Pilgrim's denies any remaining allegations in this Paragraph.

> 116. Director Asbridge's July 27, 2016, report also concluded that "[t]he extent of the use of the [Georgia Dock price] in contract negotiations is presently unknown but inquiries made by media and other governmental entities indicate that **it is utilized on a more regular basis than previously expected**." (emphasis added). In short, the GDA had been publishing the Georgia Dock price for decades, but until the last few months, apparently did not know the scope of reliance on the Georgia Dock price. Notably, a revised and highly sanitized version of the July 27, 2016 report from Director Asbridge to GDA Commissioner Black was circulated internally at GDA on August 5, 2016. The sanitized August 5 report removed references to the existence of factors in the Broiler industry eliciting "antitrust review" and to the fact that the Georgia Dock price was reported for decades by GDA "without regulatory oversight."

**Answer to Paragraph 116**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document in the first sentence of Paragraph 116, which speaks for itself. Pilgrim's admits the GDA had been publishing the Georgia Dock price since at least the start of Plaintiffs' litigation Class Period, but lacks knowledge or information sufficient to form a belief as to the truth of allegations related to what the GDA "knew" or the remaining allegations in the second and third sentences of Paragraph 116 and therefore denies them. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document in the last sentence of Paragraph 116, which speaks for itself. Pilgrim's denies any remaining allegations in this Paragraph.

> 117. On August 12, 2016, GDA Director Asbridge provided Georgia Poultry Federation President Mike Giles with the sanitized version of the report and asked Giles to review it before the GDA sent it to the USDA, "to ensure what I presented is accurate and best represents industry's concern with only reporting a spot price." As noted elsewhere in this Complaint, the Georgia Poultry Federation represents the poultry industry in Georgia, and most Defendants and all of their Producer Co-Conspirators are members.[4] Remarkably, the GDA also noted in a separate email the same day to Giles and the Georgia Poultry Federation that "[t]he GDA is in agreement with the poultry industry that there is no desire to review invoices for verification of data reported," even though the information and means to do so are readily at hand—Defendants and their co-conspirators already report such invoice information to Agri Stats on a daily basis. According to a subsequent email dated August 24, 2016, Georgia Poultry Federation President Giles called GDA Director Asbridge back and gave "his and industry's sign off on the dock price summary report. We can move forward with sending to USDA." GDA Director Asbridge also proposed another meeting between GDA and the Georgia Poultry Federation to discuss recommendations about verifying Georgia Dock data.

**Answer to Paragraph 117**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more unidentified documents or communications in the first sentence of Paragraph 117, which speak for themselves. Pilgrim's admits the Georgia Poultry Federation is an industry organization that represents the poultry industry in Georgia and that

---

[4] See ¶ 315 below.

Pilgrim's has been a member of the Georgia Poultry Federation throughout the Plaintiffs' litigation Class Period, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of the second sentence of Paragraph 117 and therefore denies them. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more unidentified documents or communications in the third sentence of Paragraph 117, which speak for themselves. Pilgrim's denies the remaining allegations of the third sentence of Paragraph 117 with respect to Pilgrim's and lacks knowledge or information sufficient to form a belief as to the truth of remaining allegations with respect to anyone else and therefore denies them. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more unidentified documents or communications in the fourth and fifth sentences of Paragraph 117, which speak for themselves. Pilgrim's denies any remaining allegations in this Paragraph. In response to the footnote embedded in Paragraph 117, which contains a reference to Paragraph 315 of Plaintiffs' Complaint, Pilgrim's refers to its response to Paragraph 315 below.

> 118. On October 6, 2016, a USDA press release noted the expansion of its National Whole Broiler/Fryer report, which included new weekly price information regarding 2.5-to-3 pound Broilers that replaced the same weight Broiler previously reported by the Georgia Dock price. Importantly, the new USDA price roughly matched the Urner Barry price, suggesting that the Georgia Dock price continues to be subject to manipulation by Defendants and their Producer Co-Conspirators and does not reflect actual market prices.

**Answer to Paragraph 118**: Pilgrim's admits that Plaintiffs appear to be appear to be describing – and attempting to characterize – a press release, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies any remaining allegations in this Paragraph.

119.    In an email dated October 7, 2016, a GDA official reported to the USDA that it had not determined how to proceed with new verification procedures for the Georgia Dock price, as it was "cultivating multiple opinions on usefulness as well as playing with various algorithms."

**Answer to Paragraph 119**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an email, which speaks for itself.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

120.    On November 3, 2016, the New York Times published the first account of the USDA's inquiry into the Georgia Dock, based on information received via Freedom of Information Act and open records requests for internal USDA and GDA documents. Subsequently, a November 8, 2016, article by the Washington Post provided additional detail on the inquiry, including a comment from the USDA that "they discontinued publishing the Georgia Dock price 'when data from the source report could not be independently verified.'" In the Washington Post article, Sanderson Farms CFO Mike Cockrell was quoted as saying "the Georgia Dock has come to be a trusted reflection of the supply and demand for retail stores."  In a press release cited in a Bloomberg News article on November 17, 2016, Tyson stated that "[w]hen the Georgia Department of Agriculture asks us for pricing data, we provide accurate information based on actual and recent transactions." Sanderson Farms' and Tyson's continued defense of the Georgia Dock price index as one that customers should trust shows that Defendants continue their efforts to conceal the conspiracy alleged in this Complaint.

**Answer to Paragraph 120**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a series of news reports and press releases, which speak for themselves.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.  Pilgrim's denies any remaining allegations in this Paragraph.

C.    **Defendants Relied Upon Co-Conspirator Agri Stats To Facilitate Communications Among Defendants And To Provide Data And Analysis Critical To The Monitoring And Enforcement Of Defendants' Conspiracy.**

121.    According to a May 2010 study prepared for the National Chicken Council ("NCC"), Agri Stats, Inc. is a private company that generates Broiler industry data "considerably more detailed than [] USDA reports," including data on weighted average price, top third average, bottom third average, and volume traded on a daily, weekly, and monthly basis, and supply, sales volume by detailed product type and form, export, and

*pricing information for whole and cut-up Broilers.[5] The USDA and various other entities publish aggregated weekly, monthly, and annual supply and pricing information concerning the Broiler industry. But only Agri Stats provides Defendants and other producers information with sufficient detail for an informed subscriber to determine with reasonable accuracy producer-specific production, cost, and general efficiency data. Agri Stats also collects from and reports back to Defendants detailed statistics on almost every conceivable operating metric within the industry.*

**Answer to Paragraph 121**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document in the first sentence of Paragraph 121, which speaks for itself. With respect to the footnote embedded at the end of the first sentence of Paragraph 121, Pilgrim's admits that Agri Stats reports are not publicly available, admits that Plaintiffs admit that their allegations related to Agri Stats and its reports are based on only their "information and belief," and refers to Pilgrim's answers to Paragraphs 142 and 144 in response to Plaintiffs' cross-reference to those Paragraphs. Pilgrim's admits the USDA publishes aggregated data related to the poultry industry, and those reports are documents that speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the second sentence of Paragraph 121. Pilgrim's denies the remaining allegations of Paragraph 121 to the extent directed at Pilgrim's, but lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

> *122.    Defendants and Co-Conspirator Mar-Jac Poultry participate in Agri Stats and provide and receive the detailed information described in this Complaint. However, because many Broiler companies have kept their participation in Agri Stats completely secret, certain other named and unnamed co-conspirators may also participate in Agri Stats.*

**Answer to Paragraph 122**: Pilgrim's admits it purchases data from Agri Stats, but denies all other allegations in Paragraph 122 related to Pilgrim's. Pilgrim's lacks knowledge or information

---

[5] *Because Agri Stats reports are not publicly available, see, e.g., ¶¶ 142, 144, Plaintiffs' allegations regarding Agri Stats and its reports are upon information and belief, except as to the public statements alleged herein.*

sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies all remaining allegations in Paragraph 122.

> 123. *Agri Stats has profited from collecting and reporting Defendants' confidential business information, including by charging substantial fees of hundreds of thousands of dollars annually to each Defendant. Around March 2014, Agri Stats was acquired by the Eli Lilly company, which has allowed Eli Lilly to sell drugs and vaccines to Broiler producers based on the information Eli Lilly obtains through Agri Stats about producers' operations.*

**Answer to Paragraph 123**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123, and therefore denies them.

> 124. *According to former Pilgrim's CEO Don Jackson, Agri Stats is "basically a [] third party accounting firm that companies [use] in their process." Agri Stats claims its mission is to "[i]mprove the bottom line profitability for our participants by providing accurate and timely comparative data while preserving confidentiality of individual companies." Agri Stats describes itself as a "benchmarking" service, which it says "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance."*

**Answer to Paragraph 124**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 124, and therefore denies them.

> 125. *According to an expert witness for Pilgrim's in contract-farmer litigation against Pilgrim's, "[p]robably no one in the industry would know better than [Agri Stats economist] Mike Donahue [as to whether Broiler production increased in 2008] because EMI is the same company as AgriStats, which is the company that gathers operating statistics from virtually every company in the chicken industry. And they know definitively how many breeders are out there, how many pullets are out there, how many broilers are produced every week, and head count and pounds, everything else. They have massive amounts of statistics. And that's why they're so effective at reporting all of this [production information]."*

**Answer to Paragraph 125**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document or other source in Paragraph 125, which speaks for itself. Pilgrim's denies any remaining allegations in Paragraph 125.

126.    Upon information and belief, in the wake of a $1.3 billion jury verdict in 2004 against Tyson for a conspiracy to manipulate pay to cattle farmers, increased fears of antitrust liability led Tyson to withdraw from Agri Stats.  However, in or around January 2008, Tyson resumed its participation in Agri Stats.

**Answer to Paragraph 126**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 126, and therefore denies them.

127.    Upon information and belief, certain Agri Stats reports list complex-level data for roughly 120 Broiler complexes and identify each complex with unique numbers, including identifying the sub-region of the data for each Broiler complex.

**Answer to Paragraph 127**: Pilgrim's admits that certain Agri Stats reports include complex-level data on an anonymized basis, that complexes are assigned unique identifying numbers, of which a subscriber can see only its own numbers, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 127 and therefore denies them.

128.    Agri Stats purports to maintain the confidentiality and anonymity of individual companies' data by providing each company a report identifying only that company's specific Broiler complexes by name, but not identifying by name other Broiler producers' complexes described in the report.  For instance, in May 2008 Sanderson Farms CEO Joe Sanderson claimed "[w]e use Agri Stats, which some of you are probably familiar with.  Agri Stats is a benchmarking service that we submit data to.  Almost everyone in our industry does as well.  And we get the data back.  It's anonymous – the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over the industry."

**Answer to Paragraph 128**: Pilgrim's admits that Agri Stats agreed to maintain the confidentiality and anonymity of individual company data in its reports.  Pilgrim's further admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document, which speaks for itself.  Pilgrim's lacks knowledge or information sufficient to form a belief as to any remaining allegations in Paragraph 128 and therefore denies them.

129.    However, upon information and belief, Agri Stats reports are so detailed that a reasonably informed producer can discern the identity of competitors' individual Broiler complexes, and it is common knowledge among producers that others can do so.  For example, the specific type or size of a Broiler house, breed of chick, average bird size, and production levels listed in Agri Stats data for complexes allows an industry insider to

*identify each Defendant's individual Broiler complexes. Some Defendants refer to the task of determining the identity of individual competitor's data as "reverse engineering."*

**Answer to Paragraph 129**: Pilgrim's denies the allegations in Paragraph 129 to the extent related to Pilgrim's. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

*130.    Each Defendant receives numerous types of Agri Stats reports, including separate targeted reports for each major area of operations including, but not limited to, its breeding, hatching, hauling, feeding, processing, selling, and administration, which are regularly shared with area managers specifically dealing with those categories of information in their daily business. Summaries of these separate Agri Stats reports are regularly provided to Defendants' senior executives. Within each report, unique information referring to supposedly "anonymous" data permits Defendants to identify their competitors' information contained within each category of report.*

**Answer to Paragraph 130**: Pilgrim's admits that it has received reports from Agri Stats that contain benchmarking information relevant to different areas of its business, that Pilgrim's has used this information for lawful and procompetitive benchmarking purposes, and that certain business people receive certain Agri Stats reports and summaries thereof. Pilgrim's denies the allegations of the last sentence of Paragraph 130 with respect to Pilgrims, but lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 130.

*131.    While some of Defendants' managers received the targeted reports for the specific aspects of Broiler operations for which they have responsibility, only the CEO, CFO, and a few other top executives at Defendants are given access to Agri Stats' monthly "Bottom Line Report" that is geared to top level executives at each company. The contents of the Bottom Line report are a closely guarded secret by company executives. The report contains one row for each Broiler company reporting to Agri Stats, then has columns for certain categories of information, such as operating profit dollars, profit percentage, corporate SG&A (aka overhead), interest expense, and other key operational information. While each company receives a report that only identifies by name that particular company's "row" in the Bottom Line Report, top executives at each company know their competitors well enough to pick out recurring unique data points for other companies such that they are often able to identify competitors on the Bottom Line Report. Furthermore,*

*Tyson, Pilgrim, and Sanderson are public companies which report some aggregated data publicly, which top executives from other companies then can match up against the far more detailed information in the Bottom Line Report to help identify specific data from these companies. In other instances, a company's interest expense data in Agri Stats can be matched up against information already known about each Defendant's debt level.*

**Answer to Paragraph 131**: Pilgrim's admits that it receives various reports from Agri Stats, including the Bottom Line report, that contain anonymized benchmarking information relevant to different areas of the business, that Pilgrim's independently determines which employees within its business receives which reports at any given time, and that these reports are confidential. Pilgrim's admits that Plaintiffs appear to be describing – and attempting to characterize – the contents of the Bottom Line report, which is a document that speaks for itself. Pilgrim's denies the allegations in the fourth sentence of Paragraph 131. Pilgrim's admits the allegations in the fifth sentence of Paragraph 131 to the extent that it is a publicly traded company, but denies the remaining allegations in that sentence. Pilgrim's denies the allegations in the last sentence of Paragraph 131. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of allegations related to other Defendants or third parties and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 131.

*132. Even if a producer is unable to individually identify a specific competitor's data from the Bottom Line Report, Agri Stats' employees are able to confirm for Defendants the data for a particular company at quarterly meetings with each company or at the numerous trade association meetings where Agri Stats executives present on a regular basis. For instance, Agri Stats provided a service to Defendants whereby each quarter Agri Stats would meet each Defendant's executives and make a detailed presentation about company and industry data. At these presentations, Agri Stats would lead detailed discussions about industry profitability and the key factors that contribute thereto, including items such as size and average age of Broiler breeder flock, average hatchability of eggs, mortality rates, average bird rate, feed cost, and other performance factors based on data Defendants provided. At these presentations Agri Stats would also lead discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and top and bottom third of the industry. Agri Stats would also tell company executives how much the industry was over- or undersupplying the market, indicate its estimate of demand, and share other information based on the data Defendants provided. At such meetings, Agri Stats would often be asked to confirm the identity of a particular*

48

> *competitor in an Agri Stats report, which it could do more subtly during the Q&A portion of the meeting. Further, since Agri Stats travelled between each Defendant regularly and discussed each Defendant's non-public, proprietary data, Agri Stats was in a unique position to share information among Defendants.*

**Answer to Paragraph 132**: Pilgrim's denies the allegations in the first sentence with respect to Pilgrim's but lacks knowledge or information sufficient to form a belief as to the truth of these allegations as to other Defendants or third parties and therefore denies them. Pilgrim's admits Agri Stats has made presentations to Pilgrim's, but denies Plaintiffs' characterizations of these meetings. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 132.

> *133. Agri Stats reports are as yet not publicly available because Defendants and Agri Stats permit only participating Broiler producers to receive the reports. Accordingly, there is little publicly available information about even the categories of information contained in the lengthy weekly and monthly reports each Broiler producer receives. For instance, in response to a request for production of Agri Stats reports by the State of Oklahoma in litigation involving environmental issues, George's Inc. responded that Agri Stats "information is proprietary, privileged and is also confidential business/financial information not subject to disclosure." Nevertheless, despite the tight control over Agri Stats data, the National Chicken Council has ready access to it and relies on Agri Stats data summaries for its studies and publications.*

**Answer to Paragraph 133**: Pilgrim's admits that it receives Agri Stats reports on a confidential basis and that Agri Stats has agreed to protect Pilgrim's confidential data in a number of ways including aggregation and anonymization. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants or third parties in the remaining sentences and therefore denies them.

> *134. Upon information and belief, Agri Stats' survey methodology involves direct electronic data submissions on a daily, weekly, and monthly basis of financial, production, capacity, cost, and numerous other categories of information by each Broiler producer. At each of Defendants' Broiler complexes, an employee is responsible for submitting its data to Agri Stats. Agri Stats relies upon a detailed audit process to verify the accuracy of data from each complex, sometimes directly contacting Defendants to verify data.*

49

**Answer to Paragraph 134**: Pilgrim's admits that certain employees submit data to Agri Stats and that such submissions are often made electronically. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 134.

135. *While Agri Stats reports are a closely guarded secret by Defendants and their Produce Co-Conspirators, based on a handful of public comments by Defendants' senior executives and other information, and after an extensive investigation, Plaintiffs believe and allege that Agri Stats reports include at a minimum the following categories of information:*

A. *Name of genetics company used for primary breeder stock;*

B. *Hatchery capacity, costs, and age of Broiler breeder flocks;*

C. *Feed Manufacturing, Delivery and Formulation data, including corn and soybean meal costs;*

D. *Growout information for Broiler "flocks" provided to contract farmers, including the number of Broilers placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (aka, "down time"), feed conversion rate (pounds of feed per pound of Broiler), average daily weight gain by chicks, live pounds produced per square foot of grower house, grower compensation, including average grower payment in cents per pound and cents per square foot, breed composition of flock (breed or cross-breed of flocks), detailed information on numerous mechanical aspects of Broiler housing, and numerous other detailed cost, mortality, and operational information about disease, transportation, labor, and other grow out related information;*

E. *Slaughter, processing, and further processing information, including pay for processing plant workers, total production volume, market age of Broilers at slaughter, weight of Broilers at slaughter, birds per man hour, processing line speeds, and labor hours per pound;*

F. *Inventory levels of Broilers;*

G. *Sales data for finished product form and type, such as type of cut (whole bird, cut-up, deboned), various packaging forms (such as bulk, tray pack, etc.), and data segmented into various categories (such as exports, retail, foodservice, etc.); and*

H. *Financial information, such as monthly operating profit per live pound, sales per live pound, and cost per live pound.*

**Answer to Paragraph 135**: Pilgrim's admits that Plaintiffs appear to be characterizing unidentified documents in Paragraph 135, which speak for themselves. To the extent Plaintiffs allege the contents of the Agri Stats reports, Pilgrim's refers to the contents of the Agri Stats reports, which are documents that speak for themselves, and denies any characterization thereof. To the extent a response is required, Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations, including allegations related to other Defendants or third parties, and therefore denies them.

136. *Defendants rarely mention their "proprietary, privileged, and confidential" exchange of information with one another through Agri Stats. However, on a very small number of occasions, Broiler producers (primarily Sanderson Farms) have referenced Agri Stats information on earnings calls or in public statements. For instance:*

A. *Sanderson Farms reported in May 2008 that "every year we review our operations and every facet within Agristats... we set operational goals every year . . . and [we] try to improve our operations within this benchmarking service we call Agristats."*

B. *Sanderson Farms CEO Joe Sanderson commented on a December 2009 earnings call that "my judgment is that based on what I see in Agr[i] stats nobody is planning on, pullet placements say no ramp up and what I've gleaned from Agr[i] stats, people are not planning on ramping up. I see a lot of information from Agr[i] stats that tells me that nobody is going to ramp up."*

C. *Sanderson Farms CEO Joe Sanderson commented in a May 2011 earnings call that "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats." Asked later on the call by an analyst why he had said on the call and a few months earlier that he "feel[s] confident that we are going to see cutbacks" based on Agri Stats data, Sanderson indicated "industry participants expected that [the market would improve in June and July] and I think they wanted to carry their production into June and July and see if the market would reward them for that it appears right now. . . . And then once you get past July 4 . . . I think then you will start seeing reduced egg sets. . . . Typically in my experience the first cut is not enough and you go back and look at 2008, I think the industry started cutting back maybe in June and that cut back was not enough and then they made another cut in the late fall and I believe the industry became profitable in January."*

    D.   *At a May 19, 2010 BMO Conference, Tyson compared its operating profit per live pound statistic from Agri Stats against what it said were the total of 121 plants in the Agri Stats survey.*

    E.   *Tyson Foods noted in a December 2014 investor presentation that "[t]he point being is that when you talk about the chicken cycle, most people will look at the cyclicality. It's very profitable right now. And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack. We can tell that through Agri Stats. Now at the same time, when there is more poultry available and the industry may not be as profitable, we would not expect to be anywhere close to what the bottom of that cycle would be."*

**<u>Answer to Paragraph 136</u>**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – unidentified documents in Paragraph 136, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies all remaining allegations in Paragraph 136.

    137.   *Similar to Defendants, Agri Stats on occasion refers to the secret exchange of information it facilitates among Defendants. In many instances, Agri Stats has played the role of industry cheerleader rather than industry benchmarking service, with Agri Stats suggesting specifically how much Broiler production should be cut based on Agri Stats data.*

    A.   *In July 2012 trial testimony in a contract-farmer lawsuit against Pilgrim's, testimony revealed that a November 2008 Agri Stats report "made statements to the effect that it thought the industry was 5-percent oversupplied . . . relative . . . to demand."*

    B.   *Agri Stats holds regular "poultry outlook conferences" for meat industry executives. For instance, Agri Stats hosted an April 23, 2015, conference in Atlanta, Georgia for which an agenda indicated a presentation by Agri Stats Vice President Sue Trudell would be provided concerning the "broiler market situation and outlook" and an analysis of feed and macroeconomic factors. Such presentations are restricted from circulation outside the invited participants to EMI's poultry outlook conference and are not publicly available.*

C. *Defendant Sanderson Farms invites Agri Stats employees to present about the industry to Sanderson's own investors, such as an October 18, 2013, presentation by Agri Stats Vice President Sue Trudell.*

D. *In January 2009 Agri Stats Vice President Mike Donohue commented that "We [i.e., Broiler producers] are an industry that is in demand . . . . We have a product that people want and continue to consume." (emphasis added).*

E. *Agri Stats subsidiary EMI also holds regular invitation-only "Analytics Web Conference" calls.*

F. *Agri Stats Vice President Donohue also frequently appears at industry events, such as the Spring 2011 IPE conference. Donohue provided comments as part of an annual "market intelligence" forum about various industry performance metrics. Additionally, Donohue's co-panelist, Broiler industry insider Paul Aho, explicitly suggested "[t]he market is calling for around a 5% reduction in chicken production" in order for producers to achieve higher prices in 2011.*

G. *Donohue also authors articles for the Agri Stats publication EMI Vital Signs. For instance, the sole "sample" publication available on EMI's website is a May 2013 article in EMI Vital Signs by Donohue, which analyzes whether Broiler producers could continue to achieve high profit levels. Donohue carefully analyzed Agri Stats data concerning pricing, inventory, and production levels, ultimately concluding "[w]hen supply and demand factors are in good shape the industry can get a good return on investment and for the short and medium term it appears that there is certainly room for optimism in these factors."*

H. *Donohue helps forecast supply and demand for the Broiler industry by using Agri Stats data on breeder placements and inventory. For instance, at the US Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, Donohue noted that chicken breast prices were at a particularly high level and "[i]t's not just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012," he said. "I hope this carries over into the latter half of 2012 based on some of the production forecasts that can be made based on breeder placements and inventories." Donohue also noted a concern that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recover[y] in the short term by filing up incubators again," but noted that Agri Stats data indicates the industry is slaughtering breeder flocks at 59 to 60 weeks (instead of the typical 65 weeks), which suggested to him the industry was managing its production carefully.*

53

**Answer to Paragraph 137**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – unidentified documents in Paragraph 137, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies all remaining allegations in Paragraph 137.

> 138. One Broiler industry expert testified in a contract-farmer case that the sharing of information through Agri Stats by Broiler producers regarding pay for contract-farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern." This conclusion is important because besides Defendants, their agents, and their co-conspirators, only expert witnesses and court-approved advisors in a handful of prior litigation have even seen an actual Agri Stats reports, but such individuals are expressly prohibited from publicly releasing or discussing such reports by the terms of protective orders Defendants and their Producer Co-Conspirators require before producing Agri Stats reports in discovery. The same expert also remarked that Agri Stats was unusual even among other price surveys, noting "[t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue. Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive. As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry. An intensive inquiry is needed."

**Answer to Paragraph 138**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – unidentified documents or testimony in the first, third, fourth, and fifth sentences of Paragraph 138, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 138.

> 139. There is no plausible, non-conspiratorial justification for Defendants to use Agri Stats to secretly share highly confidential and proprietary information about their pricing, capacity, production, and costs at the level of detail at which they do. In a competitive market, such proprietary, competitively sensitive information would be a closely guarded secret. Economic theory suggests that the routine exchange among competitors of such sensitive internal company information reduces the intensity of competition.

**Answer to Paragraph 139**: Denied.

140. *The FTC's and DOJ's 2000 Guidelines For Collaborations Among Competitors ("FTC/DOJ Guidelines"), and presentations by FTC attorneys, suggest that Agri Stats is far outside the scope of permissible information sharing among competitors. For example:*

A. *The FTC/DOJ Guidelines note the high risk of antitrust issues for information sharing programs in industries with a history of collusion.*

B. *The more competitively sensitive the information being shared, the higher the antitrust concern for such information sharing. Upon information and belief, the weekly and monthly Agri Stats reports include dozens of categories of detailed information that in a competitive industry would be considered trade secrets. Therefore, the competitive sensitivity of Agri Stats reports suggests a particularly high level of antitrust concern.*

C. *The older or more historical the information being shared, the less concern the FTC and DOJ have with information collaborations. However, Agri Stats reports are issued weekly and/or monthly, and its EMI reports are issued daily, so as to provide nearly current production, sales, and other data to Defendants. Moreover, the nature of Broiler breeder flocks is that they predict future Broiler supply, so by sharing such information in a way that permits company-by-company identification, Defendants are in fact sharing future anticipated production information with one another, which clearly suggests high antitrust concern under the FTC/DOJ Guidelines.*

D. *The FTC/DOJ Guidelines also provide a "safety zone" (i.e., presumptively permissible) for collaborations among competitors that account for no more than 20 percent of each relevant market in which competition may be affected, but Defendants and their Producer Co-Conspirators account for approximately 90-95% of Broiler production.*

**Answer to Paragraph 140**: Pilgrim's admits that Paragraph 140 contains Plaintiffs' legal conclusions, to which no response is required. To the extent Plaintiffs are selectively quoting from – and attempting to characterize – FTC/DOJ Guidelines, that is a document that speaks for itself. Pilgrim's denies the allegations related to that document, as well as the allegations in the second and third sentences of subparagraph B and the third sentence of subparagraph C. Pilgrim's admits that certain Agri Stats and EMI reports are issued on a regular basis; Pilgrim's otherwise denies the allegations in the second sentence of subparagraph C. Pilgrim's lacks knowledge or

55

information sufficient to form a belief as to the truth of the allegations related to other Defendants

or third parties. Pilgrim's denies all remaining allegations in Paragraph 140.

**D.** ***Defendants Coordinated Production Cuts To Stabilize And Then Increase The Price Of Broilers From 2008-2012, Then Continued Depressing Broiler Supply To Maintain Artificially High Prices.***

*141. As alleged in this Complaint, Defendants engaged in a conspiracy to fix, raise, stabilize, and maintain the price of Broilers throughout the Class Period. Defendants' acts, practices, and course of conduct in furtherance of their conspiracy evolved over time and included but were not limited to the following: engaging in continuous communications on confidential and proprietary business matters to eliminate price competition; allocating market shares; restricting supply of Broilers; using input costs and other events as a pretext for industry-wide production cuts; manipulating one or more publicly reported Broiler price indices; and concocting mechanisms to nullify competitive sales processes to their customers. Examples of Defendants' conduct are described in detail below.*

**Answer to Paragraph 141**: Denied.

*142. In 2008, Pilgrim's retained consultant Bain & Company to analyze its business operations. Bain outlined a strategy for Pilgrim's to help reshape the dynamic of the Broiler industry. The Bain plan suggested that Pilgrim's management needed to take action to reduce supply in the Broiler industry, similar to other industries which in the then-recent past had been able to restrict production and increase prices.*

**Answer to Paragraph 142**: Pilgrim's admits Bain & Company was engaged in mid-September 2008 to assist Pilgrim's in analyzing its operations and finances, and that Bain's retention was subsequently terminated in mid-November 2008 after Bain's proposals were made to Pilgrim's executives. To the extent Plaintiffs describe the contents of documents related to Bain's proposals, these are documents that speak for themselves and Pilgrim's denies Plaintiffs' characterizations thereof. Pilgrim's denies all remaining allegations in Paragraph 142.

*143. Defendants adopted the euphemism "capacity discipline" or simply "discipline" to refer to their agreement to limit Broiler production. The key to "production discipline" and "capacity discipline" is widespread participation by the industry. Broiler companies will not reap outsized profits if only one or a few Broiler companies exercise discipline by cutting production. Put differently, if a single Broiler company reduces Broiler capacity, there is no guarantee that competitors will do the same, and therefore the company acting alone has simply ceded market share to its competitors. However, if other Broiler companies similarly exercise discipline and reduce capacity and production, Broiler*

56

*purchasers will be faced with resulting higher prices, which they will have no choice but to pay. The alternative – to not purchase Broilers – is not an option for most of Defendants' customers.*

**Answer to Paragraph 143**: Denied.

144. *Thus, exercising capacity discipline will only benefit a Broiler company if it knows or is reasonably sure that its competitors will do likewise. Absent such assurance, it would be against each Broiler company's independent self-interest to cut capacity and production. In Defendants' case, their shared commitment to capacity discipline was made feasible and rational by their knowledge that each had agreed to engage in the same capacity limitations. As explained in this complaint, Defendants repeatedly confirmed to each other that they remained committed to this agreement by publicly (and privately) discussing their plans to continue exercising "capacity discipline," so long as others did the same.*

**Answer to Paragraph 144**: Denied.

145. *Broiler producers have several mechanisms to reduce the supply of Broilers. Given Broiler producers' vertical integration and control of breeder farms, hatcheries, growout farms, and slaughter houses, they have several methods to manipulate supply, including the following:*

    A. *Reduce the size of Broiler breeder flocks through two measures: (1) retire and kill off Broiler breeders at an earlier age than would normally be the optimum age for doing so and/or (2) reducing purchases of Breeder pullets from genetics companies that supply them. Such reductions in Broiler breeder flock purchases by Broiler companies effectively forces genetics companies to in turn reduce their own stocks of parent and grandparent Broiler breeders (the one from which broiler company pullets are supplied). Such reductions by the genetics companies extend into a period of years the time it takes to materially increase the supplies of Broilers.*

    B. *Reduce "egg sets" or "egg placements" (i.e., number of eggs placed in incubators) by destroying such eggs and selling them to a rendering plant, which causes a reduction in production within roughly 7 weeks, but this does not reduce the size of Broiler breeder flock itself and does not prevent a producer from being able to ramp up production in the short or medium term should it subsequently decide it wants to quickly ramp up production;*

    C. *"Break eggs" at hatcheries by destroying the eggs prior to setting them in incubators;*

    D. *Pull (i.e., destroy) eggs already set in incubators sometime before the 21 days necessary for eggs to hatch;*

E. Destroy newly hatched chicks at hatcheries before delivery to farmers for grow-out;

F. Reduce the number or health of chicks delivered to contract farmers for grow-out, including by manipulation of the genetics of chicks or providing an inferior type of Broiler to farmers for grow-out of Broilers into mature Broilers;

G. Extend the period of time between pickup of mature Broilers for slaughter and delivery of new chicks to contract-farmers for grow-out (a/k/a, "days between flocks");

H. Reduce the size of birds at slaughter, including by slaughtering birds before they reach full maturity or weight;

I. Slow down, temporarily close, or permanently close Broiler processing plants; and

J. Export hatching eggs and/or day-old chicks outside the United States.

**Answer to Paragraph 145**: Pilgrim's admits it has several means to adjust its production of poultry products when it determines that doing so is in its independent interest, including reducing or increasing the size of breeder flocks and reducing or increasing egg sets or egg placements. Pilgrim's lacks information or knowledge sufficient to form a belief as to the truth of allegations related to other Defendants or third parties in Paragraph 145 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 145.

146. Historically, when Broiler producers "cut production," they did so through short-term cuts that targeted the end of the supply chain, such as slaughtering Broilers early, destroying eggs before incubation, killing newly hatched chicks before delivery to contract farmers, and/or increasing the days between flocks delivered to contract farmers. Broiler companies historically did not cut their Broiler breeder flocks (except for normal seasonal variations), however, because doing so would leave a producer unable to ramp up production in the short or medium term should market conditions improve.

**Answer to Paragraph 146**: Pilgrim's lacks information or knowledge sufficient to form a belief as to the truth of allegations related to other Defendants or third parties in Paragraph 146 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 146.

*147. With respect to the type of production cuts used by Broiler producers, the period from 2008 through the present is characterized by both traditional production cuts (short-term in nature), as well as by unprecedented reductions in Broiler breeder flocks by Broiler producers. As discussed below, Broiler producers made substantial and unprecedented cuts to Broiler breeder flocks in 2008 and 2011 that prevented them from being able to meaningfully increase supply for years to follow.*

**Answer to Paragraph 147**: Pilgrim's lacks information or knowledge sufficient to form a belief as to the truth of allegations related to other Defendants or third parties in Paragraph 147 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 147.

### 2. *Pre-Class Period Events.*

*148. In 2007, the two largest Broiler producers, Pilgrim's and Tyson, reduced their production of Broilers, but only a few other Broiler producers followed their lead, namely Foster Farms (4.8% reduction in Ready-to-Cook ("RTC") pounds), Peco Foods (5.4% reduction in RTC pounds), and Perdue (unspecified cuts). However, cuts by only five industry participants were not enough to affect industry supply sufficient to increase prices meaningfully. Industry publications noted that oversupply of Broilers was due to overproduction by Sanderson Farms, Mountaire Farms, and House of Raeford Farms. Due to the resulting oversupply of Broilers, prices fell in late 2007 and into early 2008. In addition, production cuts in 2007 followed the typical pattern of focusing on short-term reductions in production, such as slaughtering Broilers early, but not on longer-term cuts to Broiler breeder flocks.*

**Answer to Paragraph 148**: Pilgrim's lacks information or knowledge sufficient to form a belief as to the truth of allegations related to other Defendants or third parties in Paragraph 148 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 148.

*149. The failure of the 2007 shorter-term production cuts to raise prices made Tyson and Pilgrim's realize that their unilateral supply cuts would never be enough to raise industry prices without a broader industry supply cut by most of their competitors, and further, that cuts that did not reduce Broiler breeder flocks left the industry vulnerable to near-term increases in supply. Tyson and Pilgrim's realized that by making cuts that were not followed by their smaller competitors, they were essentially giving away market share to those competitors.*

**Answer to Paragraph 149**: Pilgrim's lacks information or knowledge sufficient to form a belief as to the truth of allegations related to other Defendants or third parties in Paragraph 149 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 149.

### 3. *2008-2009 Production Cuts.*

*150.     On January 23-25, 2008, Defendants attended the IPE conference in Atlanta, Georgia.  According to the IPE, attendees representing over 99.4% of the production of the major Broiler companies participated in the IPE.  Numerous employees from Defendants attended the conference, including Defendants' senior executives.*

**Answer to Paragraph 150**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

*151.     On a January 28, 2008, earnings call, Tyson CEO Dick Bond declared bluntly "we have no choice [but] to raise prices substantially."  However, the commodity nature of Broilers does not allow one producer to successfully raise market prices in the absence of widespread reductions in supply relative to the then-current demand, so Bond's comment does not make sense absent an intention (or knowledge) on his part that Defendants would coordinate a reduction in supply across the Broiler industry.  After learning in 2007 that its production cuts alone could not force up industry prices, Tyson also sent a clear message to its co-Defendants and co-conspirators: we are not making production cuts until you do.*

**Answer to Paragraph 151**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document in the first sentence of Paragraph 151, which speaks for itself.  Pilgrim's denies the allegations of the second sentence of Paragraph 151. Pilgrim's denies the allegations in the last sentence of Paragraph 151 to the extent related to Pilgrim's, and lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 151.

*152.     In response, Pilgrim's issued a call to action for its competitors to reduce their production of Broilers to allow prices to recover.  On a January 29, 2008, earnings call, Pilgrim's CFO Rick Cogdill said the industry was oversupplying Broilers and it was hurting market prices.  Cogdill explained that his company had done its part in 2007 by reducing production 5%, so "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."  During the call, Cogdill went on to explain that Pilgrim's alone could not reduce supply enough to help market prices recover and its past efforts to reduce supply had merely led to smaller players increasing their market share at Pilgrim's expense.  Cogdill went even further in describing specifically how he thought the industry needed to coordinate production cuts in order to drive up market pricing, including making the following statements urging Pilgrim's competitors to do their part in reducing Broiler industry supplies:*

A. "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs. We were the leader in cutting production last year to help drive that. . . . [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price."

B. When asked by an analyst "do you have an estimate internally of what the state of oversupply in the industry might be? What you would hope to see cut from others that would make you feel like the industry was more rational?" Pilgrim's CFO Cogdill replied "It's really hard to say that the faster we get to production adjustment the quicker the recovery could happen . . . . And if the industry doesn't react soon enough it will have to react stronger in the end."

C. "[W]e have walked away from sales in certain cases, where the pricing just did not make any sense. So we are trying to hold the line. We are losing at times the competitive bids . . . . So we are trying to take a leadership position from a pricing perspective."

D. JP Morgan analyst Pablo Zuanic asked "[D]o you and Tyson have the evidence that your production call backs lead to significant price improvements last year[?]....Clearly, there are more producers who are not following you. On my mask [sic], according to USDA, the industry was up 5% in the December quarter....So, it means that the rest of the industry was up about 9% in the December quarter. So there is evidence that rest of the industry is not following you. You guys are the leaders. You know that this worked last year.... Is it just that last year we did it for the industry, and they didn't follow and now it's their turn?" In response, CFO Cogdill noted, "I think you kind of hit on it there. . . . It's not like we had 5% of surplus capacity that we could just reduce our operations and not feel that . . . I mean we cannot be the ones that are out there continually reducing production, and let the other producers capitalize on that. I mean if it's 5% last year, 5% this year, 5% next year, you can see that that's a spiral to the demise of our company, which we are not willing to accept."

**Answer to Paragraph 152**: Pilgrim's denies the allegations of the first sentence of Paragraph 152.

Pilgrim's admits it held an earnings call on January 29, 2008, on which then-Chief Financial

Officer Rick Cogdill participated, and that Plaintiffs appear to be selectively quoting from – and

attempting to characterize – portions of a transcript from that call. The transcript is a document,

which speaks for itself. Pilgrim's denies any remaining allegations of Paragraph 152, including

Plaintiffs' characterizations of the transcript.

153.    On a January 31, 2008, earnings call, Sanderson Farms CEO Joe Sanderson explained that he anticipated the industry would cut production.  Asked about Broiler industry cuts by an analyst, Sanderson replied "we could see some reductions in production."  Asked to expand on his comments by another analyst, CEO Sanderson said he thought a production cut was "probable" and "if it's bad and ugly and deep in February, March and April, you'll see the production cuts take place during that period of time.  There's still 25% of the industry still making money but I would expect to see those reductions come over the next 90 to 120 days."  Upon information and belief, CEO Sanderson's basis for the statement that "25% of the industry [was] still making money" was through the secret sharing of information by Defendants through Agri Stats.

**Answer to Paragraph 153**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 153.

154.    Around March 4, 2008, senior executives from Defendants met at an Executive Committee meeting of the National Chicken Council's Board of Directors including Pilgrim's CEO Clint Rivers, Tyson Senior VP Donnie Smith, and Fieldale Farms President Thomas Hensley.

**Answer to Paragraph 154**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them.

155.    Only a month and a half after installing its new CEO, Pilgrim's again led the charge to cut overall industry supplies, but this time it backed up its rhetoric with production cuts.  On March 12, 2008, Pilgrim's announced a massive closure of its Broiler processing plants.  Just five days after taking over the position of Pilgrim's CEO, Clint Rivers, publicly announced the closure of seven Broiler facilities in order to reduce industry oversupply, stating "we believe [these] actions . . . are absolutely necessary to help bring supply and demand into better balance . . . . That portion of the demand for our products that exists solely at pricing levels below the cost of production is no longer a demand that this industry can continue to supply." (emphasis added).

**Answer to Paragraph 155**: Pilgrim's admits that its Board of Directors elected J. Clinton Rivers to the position of President and Chief Executive Officer on March 5, 2008.  Pilgrim's further admits that on March 12, 2008, it issued a press release announcing the closure of one poultry processing plant and six distribution centers, which included statements from Mr. Rivers.

Pilgrim's admits that Plaintiffs are selectively quoting from – and attempting to characterize – this press release, which speaks for itself. Pilgrim's denies Plaintiffs' characterization of the press release and any remaining allegations in Paragraph 155.

156. *Normal supply and demand would suggest that in the wake of massive supply cuts by Pilgrim's, other Broiler producers would jump into the massive gap in supply that Pilgrim's closures left. However, just the opposite occurred. Following Pilgrim's announcement, a series of production cuts were publicly announced by other Defendants between April 3 and April 11, 2008.*

> A. *On April 3, 2008, Fieldale Farms announced a 5% production cut. In connection with the cut, Executive Vice President Thomas Hensley commented that Fieldale has had trouble passing on cost increases to both foodservice and retail customers. "Every time we try [to increase prices], one of our competitors comes in with a price lower than our previous price," Hensley said. Fieldale, which has been absorbing feed-cost increases, hopes its move will help ease continuing price pressure. "We can't sell [some of] the chickens at a price higher than the cost," Hensley said. "We're hoping this cut puts supply and demand back into better balance."*

> B. *On April 9, 2008, Simmons Foods announced a 6% reduction in production throughout its processing plants. Simmons Prepared Foods President David Jackson said in a press release that "[r]ecent U.S. chicken market price levels have not allowed processors to recover the spiraling costs of corn and soy meal. . . . This increased cost burden has yet to be reflected in domestic poultry prices." BMO Capital Markets analyst Kenneth Zaslow welcomed Simmons' production cut, saying in a note to investors that production cuts across smaller companies in the Broiler industry would be positive for Broiler prices. On April 9, 2008, BMO Capital Markets analyst Kenneth Zaslow welcomed Simmons' production cut, saying in a note to investors that production cuts across smaller companies in the Broiler industry would be positive for Broiler prices.*

> C. *On April 10, 2008, Cagle's Inc. announced a 4% reduction in processing of Broilers. According to a press release from Cagle's President and CEO, Doug Cagle, "[c]urrent chicken prices have failed to reflect the tremendous increase in the cost of feed. Ingredient prices, mostly corn and soybean meal, have increased over 80 percent in the last two years raising the cost to produce chicken by more than $.17 a pound. These are unprecedented times and given current USDA forecasts it appears that high feed costs are here for the foreseeable future. The cut back in production will not effect [sic] our customers*

> *with existing commitments but will reduce product being sold through less profitable commodity outlets."*

> D. *Between April 3-11, 2008, Wayne Farms, O.K. Foods, and Koch Foods each announced 2-8% reductions in production.*

> E. *A number of other Broiler companies cut their production between April 1, 2008 and May 28, 2008, but did not publicly announce those cuts. Instead, these Broiler companies communicated such cuts to their Producer Co-Conspirators through Agri Stats and/or other means of communication. For instance, at his BMO Capital Markets Conference presentation on May 28, 2008, Sanderson Farms CEO Joe Sanderson stated that "we have seen for the last 6 or 7 weeks . . . some companies in our industry announce cutbacks. There have been I think six companies have announced cutbacks. I know some companies have cut back and have not announced." Such knowledge of non-public production cuts by competitors is highly suggestive of secret communication among Broiler companies.*

**Answer to Paragraph 156**: Pilgrim's denies the allegations of the first sentence of Paragraph 156 with respect to itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of Paragraph 156 with respect to other Defendants or third parties and therefore denies them. Pilgrim's admits that Plaintiffs are selectively quoting from – and attempting to characterize – one or more documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the remaining allegations in Paragraph 156 and therefore denies them.

> 157. *After witnessing a steady stream of its competitors close production capacity between April 3 and 11, Pilgrim's saw that other industry participants were contributing to reducing industry supply. Pilgrim's decided it could now take further steps to reduce industry supply.*

**Answer to Paragraph 157**: Denied.

> 158. *On April 11, 2008, Pilgrim's suggested it might close its large El Dorado, Arkansas processing plant, which employed 1,620 workers.*

**Answer to Paragraph 158**: Pilgrim's admits that Plaintiffs are selectively quoting from – and attempting to characterize – an unidentified document, which speaks for itself. Pilgrim's lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 158 and therefore denies them.

> 159.    On April 14, 2008, Pilgrim's announced a further production cut of 5% of egg sets.

**Answer to Paragraph 159**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 159 and therefore denies them.

> 160.    On April 29, 2008, Tyson CEO Dick Bond described the change in the industry in response to an analyst question, noting "[y]ou are right. I think the industry has changed. Diane, I don't think the industry will be up that much anymore, we have seen some sizable declines here lately in egg sets and placements. So, we're going to be up a little bit but probably not a significant amount, not as much as we might have once anticipated."

**Answer to Paragraph 160**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 160.

> 161.    Despite the large number of coordinated production cuts announced by producers in April 2008, Pilgrim's concluded these cuts were not sufficient. Therefore, Pilgrim's CEO Clint Rivers encouraged further action by the industry at a May 15, 2008, speech at the BMO Capital Markets Third Annual Ag & Protein Conference, which was attended by Sanderson Farms CEO Joe Sanderson and CFO Mike Cockrell, Tyson CEO Richard Bond, and Pilgrim's CFO Richard Cogdill. CEO Rivers announced that he hoped to see the Broiler industry continue to cut production to help the industry return to profitability, stating that "he would like the industry to trim total production by 3%-4%, calling it a prudent move in light of recent price volatility in the grain markets." He also noted that "[t]he cuts need to be fairly deep."

**Answer to Paragraph 161**: Pilgrim's denies the allegations of the first sentence of Paragraph 161. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the second, third, and fourth sentences, and therefore denies them. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document in the third and fourth sentences, which speaks for itself. Pilgrim's lacks

knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

> 162.    A May 21, 2008, Wall Street Journal article noted that conditions in the industry were starting to change. "Three things are making analysts more optimistic: Companies are cutting production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines." The article also noted "[i]t is unusual for egg sets to decline at this time of year." The reason such a reduction was unusual in May is that egg sets result in Broilers that are ready for market approximately 10 weeks later, which in this case would have been first week of August, and is still the peak of the high-demand summer grilling season.

**Answer to Paragraph 162**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document, which speaks for itself.  Pilgrim's denies any remaining allegations in Paragraph 162.

> 163.    During an earnings call on May 22, 2008, Sanderson Farms CEO Joe Sanderson was asked if he thought industry cuts were sufficient to keep the industry profitable in the fall. In response, Sanderson noted, "[w]e don't know yet. We will make a cut as we always do after Labor Day. We will make a 4-5% cut following Labor Day as we always do going into Thanksgiving, Christmas, and January we reduce our egg sets and around Thanksgiving, Christmas, New Years and Martin Luther King. That is a period of slow demand for us, and we don't announce that, but we always do it. It is just a period when we take downdays and we will do that. But if we think more is needed, we will evaluate that sometime in August, and if need be will do it. We cut back in 2006, we cut back in '97-98. I don't know if we announced it or not, but we will do what we need to do." Sanderson provided no explanation why it was choosing to publicly disclose its "regular" production cut if it had never done so in the past.

**Answer to Paragraph 163**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an earnings call transcript, which is a document that speaks for itself.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 163.

> 164.    Six days later, on May 28, 2008, CEO Sanderson attended the BMO Capital Markets Conference Presentation.  One or more of Sanderson Farms' competitors attended the same conference.  Sanderson explained to the attendees that the company

*tracks egg set data closely and it had observed many companies cutting production "for the last 6 or 7 weeks."*

**Answer to Paragraph 164**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 164 and therefore denies them.

> 165.    *In early June 2008, Pilgrim's CEO Clint Rivers continued to keep up the drumbeat for further production cuts, noting in a June 4, 2008, presentation that "[o]ur supply in chicken, we are oversupply . . . we need to see some balance in the supply. . . . Simply put, at this time there is still too much breast meat available to drive market pricing significantly higher."*

**Answer to Paragraph 165**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document, which speaks for itself. Pilgrim's denies Plaintiffs' characterization of the document and any remaining allegations in Paragraph 165.

> 166.    *Other CEOs picked up on Pilgrim's call for further action. A few weeks later on June 19, 2008, Broiler industry executives participated in a media conference call intended to lobby the federal government to limit the ethanol subsidy. According to one report, Mark Hickman, Chairman of the National Chicken Council and CEO of Peco Foods, told participants that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year. 'We are hearing talk that this was not nearly enough, so liquidation is in round two.'" Upon information and belief, "liquidation" is a reference to the need for Defendants' decision to reduce Broiler breeder flocks to affect longer-term supply restraint in the industry, rather than mere short-term production cuts like breaking eggs or slaughtering Broilers earlier to reduce weight.*

**Answer to Paragraph 166**: Pilgrim's denies any allegations directed at Pilgrim's. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

> 167.    *As noted above, Agri Stats' subsidiary EMI issues regular reports to its clients, which are not publicly available. However, EMI's website currently has available a "sample" report available from June 20, 2008. The sample report notes that "[b]eginning in April [2008], the weekly hatchery data started to show declines in egg sets and chick*

*placements relative to year-earlier, which confirms the announced intentions to reduce Broiler production and will result in slaughter falling below year-ago by mid June." The same report also notes that "[i]t is unclear how long the slaughter declines will continue, and if other companies will choose to cut production as well making them deeper than initially thought. Those who have announced cutbacks indicate they will continue until margins normalize. At this time we expect to see the declines continue until at least late 2009, and cuts could be deeper than now projected."*

**Answer to Paragraph 167**: Pilgrim's admits it purchases reports from Agri Stats/EMI and that these reports cost money and are not publicly available. Pilgrim's further admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a sample report they claim was available on EMI's website when Plaintiffs' filed their Complaint, which is a document that speaks for itself. Pilgrim's denies Plaintiffs' characterization of the document and lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 167, and therefore denies them.

*168.    Three days later, on June 23, 2008, Wayne Farms announced an additional 6% production cut. Wayne Farms President & CEO Elton Maddox said in a statement that "[s]oaring feed ingredient costs aggravated by the government's food for fuel mandate has created the need for us to rationalize our business." Like many other executives, Maddox cited ethanol subsidies as the reason for the production cuts. Wayne Farms' announcement came only three days after Agri Stats suggested further cuts were needed and four days after Peco Foods CEO Hickman suggested further cuts were needed.*

**Answer to Paragraph 168**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

*169.    On June 23-25, 2008, USPOULTRY held its annual Financial Management Seminar. Defendants' senior executives attended the seminar.*

**Answer to Paragraph 169**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any these allegations, and therefore denies them.

*170.    On July 2, 2008, Foster Farms announced it was abandoning plans to build a new Broiler plant in northeastern Colorado that it had previously announced in April 2008*

68

*would employ about 1,000 people. In a statement, Foster Farms CEO Don Jackson noted "[i]n these difficult conditions with costs escalating primarily due to grain and fuel prices and chicken prices lagging it does not make economic sense to go forward with expansion at this time."*

**Answer to Paragraph 170**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

*171. On July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets, citing "record high prices for corn and soybean meal, which it attributes to the U.S. government's mandated ethanol policies along with recent flooding in the Midwest 'Corn Belt' region."*

**Answer to Paragraph 171**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

*172. On July 20-22, 2008, the National Chicken Council held a three-day "Chicken Marketing Seminar" attended by Defendants' senior executives. The event was billed as a marketing seminar that "includes social networking events and recreational opportunities, including a golf tournament."*

**Answer to Paragraph 172**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any of these allegations, and therefore denies them.

*173. On July 31, 2008, Tyson cancelled a contract with Petit Jean Poultry for the processing of Broilers at Petit's Buffalo, Missouri plant. Tyson subsequently told the City of Buffalo that no amount of incentives could convince it to renew its contract with Petit.*

**Answer to Paragraph 173**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any of these allegations, and therefore denies them.

*174. On August 11, 2008, Pilgrim's announced the closure of its Clinton, Arkansas, processing plant and a further processing facility in Bossier City, Louisiana.[6] Pilgrim's*

---

[6] *"Further processing plants" are facilities that process whole or cut-up Broilers into products for end users, such as chicken nuggets. Notably, further processing plants alone are not a bottleneck for the supply of Broilers and were*

*press release noted the closures "are part of the company's ongoing effort to operate more efficiently and return to profitability amid high feed costs and an oversupply of chicken on the market." The closure of the Clinton processing plant represented an additional 1.25% incremental increase of the company's previously announced production cuts. Pilgrim's stated that it would keep both plants idled until "industry margins can be sustained at more normalized levels of profitability." Pilgrim's also noted that "[w]ith Labor Day approaching and no indication that the actions taken to date by Pilgrim's Pride or other industry members are having a positive effect on selling prices for our products, it is now clear that more significant decisive action is necessary."*

**Answer to Paragraph 174**: Pilgrim's admits that on August 11, 2008, it issued a press release announcing that it would idle a processing plant in Clinton, Arkansas, and a further processing plant in Bossier City, Louisiana, and that Plaintiffs appear to be selectively quoting from – and attempting to characterize – that press release, which is a document that speaks for itself. Pilgrim's denies Plaintiffs' characterization of the press release, and any remaining allegations in Paragraph 174 and its embedded footnote.

*175.    In August 2008, House of Raeford announced that it would begin reducing its Broiler production by 5%. The company said in a statement that "[t]he current obstacles that face our industry require that supply be brought in line with demand." The announcement was remarkable for House of Raeford, which had pursued a strategy of aggressive production growth that resulted in the company doubling its Broiler production from 2001 to 2007.*

**Answer to Paragraph 175**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

*176.    On an August 26, 2008, earnings call, Sanderson Farms CEO Joe Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand." When asked later whether the industry had already made enough production cuts, he noted "we kind of thought we were going to see*

---

*not the focus of Defendants' coordination to reduce and restrict Broiler supplies as alleged herein. During the Class Period, some Defendants have increased the amount of further processing they perform internally in order to capture profits that had previously been earned by third party further processors who purchased unprocessed Broilers from Defendants. A few further processing plant closures are noted in this Complaint where they were closed in conjunction with processing plants.*

*reductions in July . . . [based on] 213/214 [million] eggs sets back in April and that really did not materialize. When you look at USDA slaughter numbers in July, they were 100% and 101% and now we're looking at egg sets of 206 and 207 million that are going to show up sometime in October or November. We'll see when we get there. Those are barely impressive cuts. My suspicion is, as I've told you in May, the industry typically make the cut [sic] and it's tentative. We'll have to see if it works. . . . I'm very skeptical that those cuts are going to be enough to return us margins to cover these grain costs."*

**Answer to Paragraph 176**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

    177.   *On September 23, 2008, Pilgrim's announced the layoff of 100 employees at its El Dorado, Arkansas processing plant.*

**Answer to Paragraph 177**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 177, and therefore denies them.

    178.   *By September 2008, Broiler industry publication Watts PoultryUSA reported that "[m]ost U.S. broiler integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'"*

**Answer to Paragraph 178**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any allegations related to other Defendants or third parties, and therefore denies them.

    179.   *On October 3, 2008, Defendants' senior executives attended the National Chicken Council's Annual Meeting. Agri Stats CEO Bill Snyder moderated a CEO panel that included Pilgrim's, Tyson's, Perdue's, and Sanderson Farms' CEOs. Explaining Pilgrim's desire to push through an industry-wide price increase, Pilgrim's CEO Clint Rivers told panel members and the audience "[w]e need to get those [input] costs pushed through, but we've yet to see that happen."*

**Answer to Paragraph 179**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first and second sentences of Paragraph 179 and therefore denies them. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document in the second sentence of Paragraph 179, which is a document that speaks for itself. Pilgrim's denies Plaintiffs' characterization of the document.

> 180. On October 10, 2008, Pilgrim's gave an interview to the Associated Press regarding a USDA report of falling egg sets in the Broiler industry. Spokesman Gary Rhodes noted that "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

**Answer to Paragraph 180**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first and second sentences of Paragraph 180. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a news article in the second sentence of Paragraph 180, which is a document that speaks for itself. Pilgrim's denies Plaintiffs' characterization of the article.

> 181. During Fall 2008, Sanderson Farms also implemented its previously announced "fall cuts" a month early and delayed the opening of a new deboning facility.

**Answer to Paragraph 181**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 181 and therefore denies them.

> 182. On October 18, 2008, Wayne Farms President & CEO Elton Maddox released a statement announcing the closure of the company's College Park, Georgia plant, resulting in the layoff of over 600 employees. Maddox cited "changing market conditions" and a need to "maximize efficiencies" as justification for the plant closure.

**Answer to Paragraph 182**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and therefore denies them.

183.    On a November 10, 2008, Tyson earnings call, CEO Dick Bond claimed that Tyson would not be making additional production cuts because it had already done its part to reduce industry supply with prior production cuts in 2007 and earlier.  However, D.A. Davidson & Co. analyst Tim Ramey asked "Dick, a year ago you talked about price encourage [sic] then I was out with Donnie Smith four five months ago, you guys talked about well we're not going to be the one to cut."  Tyson didn't respond directly, but cited Tyson's attention to "supply and demand."

**Answer to Paragraph 183**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an earnings call transcript, which speaks for itself.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

184.    On November 12, 2008, industry analyst Ken Zaslow noted that "many companies, such as Pilgrim's, have pledged to cut production, but Tyson increased its volume about 6 percent in the quarter . . . . The industry has cut about 10 to 12 percent of its production."

**Answer to Paragraph 184**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

185.    Despite claims to the contrary on its November 2008 earnings call, Tyson substantially reduced production in December 2008.  First, on December 18, 2008, Tyson announced the canceling of a deboning contract with Petit Jean Poultry at Petit's Little Rock, Arkansas processing plant that resulted in the layoff of 700 employees by Petit. Second, by December 23, 2008, it was reported that Tyson had cut its production by 5%. Asked by a reporter about the cuts, Tyson spokesman Gary Mickelson stated that "[w]hile we would rather not share details of our current poultry production levels, we can tell you we continue to closely evaluate market conditions in an effort to match customer demand with our supply."  Tyson also noted that it had reduced production "in recent years through the closing or sale of poultry plants and by running the company's remaining operations at reduced capacity utilization."

**Answer to Paragraph 185**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more unidentified documents, which speak for themselves.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

*186.    On a January 26, 2009, Tyson earnings call, an analyst asked why Tyson cut production in December 2008 after claiming it would not do so in its November 2008 earnings call.  Tyson's Senior VP Donnie Smith replied that Tyson's inventory growth had triggered it to cut production in December 2008.*

**Answer to Paragraph 186**: Pilgrim's lacks knowledge or information sufficient to form a belief

as to the truth of the allegations and therefore denies them.

*187.    On January 28-30, 2009, Defendants' senior executives attended the 2009 International Poultry Expo in Atlanta, Georgia.*

**Answer to Paragraph 187**: Pilgrim's lacks knowledge or information sufficient to form a belief

as to the truth of the allegations and therefore denies them.

*188.    In a February 18, 2009, interview, Tyson Senior Group Vice President Donnie Smith noted that "[a]cross our industry, we're down about six percent versus where we were a year ago.  We're seeing an impact from that on market prices . . . the industry fundamentals are improving."*

**Answer to Paragraph 188**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from

– and attempting to characterize – a news article, which speaks for itself.  Pilgrim's lacks

knowledge or information sufficient to form a belief as to the truth of the allegations and therefore

denies them.

*189.    In late February 2009, a report noted that Pilgrim's had cut another 9-10% of its production.  According to the same report, Tyson told the audience at a February 2009 investors' conference that it did not intend to reduce its production further because "[u]sing WATT PoultryUSA data on ready-to-cook (RTC) pounds, our numbers have declined 5-7% from 2000 to 2008 on RTC pounds while at the same time the industry has grown 31%.  Over time, we have done plenty of cutting back."  In other words, Tyson felt it had already taken its fair share of needed production cuts, so competitors needed to take further actions.  However, as indicated below, Tyson's statements about not reducing production appear to be posturing, because generally Tyson did reduce its production during the 2008-2015 time period in line with other producers, apparently hoping the threat of it not reducing production would lead other producers to reduce production first.*

**Answer to Paragraph 189**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from

– and attempting to characterize – one or more unidentified documents, which speaks for

themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 190. By February 25, 2009, Sanderson Farms told The Morning News that it had made cuts to its supply of Broilers by processing smaller Broilers and running its plants at lower capacity utilization rates. Sanderson also told a group of investors around this time that "[b]ecause we don't expect much help from the demand side, chicken market improvement will have to come from supply cuts."

**Answer to Paragraph 190**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a news article, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 191. Similarly, Simmons Foods CEO Todd Simmons noted in a February 25, 2009, interview that "[w]e are seeing lower demand in the food-service customer base. We have made adjustments in bird weights to ensure our production meets with our customer's needs."

**Answer to Paragraph 191**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a news article, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 192. Seeing further cuts from smaller producers in the industry led Pilgrim's to announce historically large cuts to its production on February 27, 2009. In a press release announcing the closure of three processing plants located in Douglas, Georgia, El Dorado, Arkansas, and Farmerville, Louisiana, Pilgrim's indicated the plants were "underperforming" and said the closures would "improve the company's product mix by reducing commodity production and to significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession." Pilgrim's indicated that the idling of these three plants would reduce production 9-10% in total pounds of Broilers produced by the company.

**Answer to Paragraph 192**: Pilgrim's admits that on February 27, 2009, it was in Chapter 11 bankruptcy and operating its business under the supervision of the U.S. Bankruptcy Court and the bankruptcy laws and that it issued a press release announcing it intended to idle three chicken

processing plants by mid-May 2009 as part of organizational restructuring. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – this press release, which speaks for itself. Pilgrim's denies Plaintiffs' characterization of the press release and any remaining allegations in Paragraph 192.

> 193. Overall, "[a]t least 11 companies reported reductions in weekly ready-to-cook production in 2008," including Tyson, Pilgrim's, Perdue, Simmons, House of Raeford, Cagle's, George's, O.K. Foods, Coleman Natural Foods, Harrison Poultry, and GNP Company. Other companies reduced their planned production levels and/or delayed the planned opening of new Broiler complexes.

**Answer to Paragraph 193**: Pilgrim's admits it idled or closed a number of facilities in 2008 to stem massive financial losses in a failed attempt to avoid filing for bankruptcy, which ultimately occurred in December 2008. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document in the first sentence of Paragraph 193, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of Plaintiffs' allegations regarding other Defendants or third parties and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 193.

### 4. Defendants' 2008 To Early 2009 Broiler Production Cuts Included Unprecedented Reductions To Broiler Breeder Flocks.

> 194. As noted above, 2008 ended a decades-long trend of additional Broiler production, and surprised industry observers. However, what makes the production cuts in 2008 even more remarkable is that Broiler producers did not merely make an unprecedented reduction in the pounds of Broilers they produced – they also went further up their supply chains than ever before to restrict their ability to ramp up production for years into the future. This production restriction was accomplished by reducing Broiler breeder flocks and thereby forcing genetics companies to reduce supplies of grandparent stocks.

**Answer to Paragraph 194**: Denied.

> 195. Broiler breeder flocks on average are kept in active "lay" for 65 weeks, so over its lifespan a breeder hen produces an average of 140 eggs per year that are incubated at Broiler producer-owned hatcheries. Because Broiler breeder flocks are created from a limited pool of grandparent Broilers from the three Broiler genetics companies (Tyson's Cobb-Vantress, Aviagen, and Hubbard), it takes substantial time to re-populate a Broiler breeder flock that has been reduced through early slaughter. By reporting the size of each

*Defendant's supply flocks through Agri Stats, Defendants could closely monitor one another's supply flock reductions and deal with a co-conspirator who was ramping up production in conflict with Defendants' conspiracy.*

**Answer to Paragraph 195**: Pilgrim's admits that breeder hens produce eggs that may be incubated at producer-owned hatcheries, and that Aviagen, Cobb-Vantress, and Hubbard are poultry genetics companies. Pilgrim's denies the remaining allegations in Paragraph 195.

*196.    Defendants' reduction in Broiler breeder flocks during 2008 and the first two months of 2009 was unprecedented. While previous downturns had led some producers to use short-term methods to reduce overall pounds of Broilers slaughtered, in 2008 Defendants took their reductions to the next level by substantially reducing their Broiler breeder flocks (aka, "Broiler Hatchery Supply Flock"), as shown below.*



**Answer to Paragraph 196**: Pilgrim's admits Plaintiffs appear to be characterizing and purporting to chart selected statistics from the National Agricultural Statistical Service of the USDA, which

are source documents that speak for themselves. Pilgrim's denies Plaintiffs characterization of the statistics and any remaining allegations in Paragraph 196.

### 5. The Cuts in 2008 and 2009 Led To Record Broiler Prices For Much Of 2009 And Early 2010.

197. *The effect of the supply cuts on Broiler pricing in 2008 and the first two months of 2009 was clear – during the worst recession in generations, Broiler prices rose through mid to late 2008, staying at or near all-time highs until late 2009. For instance, by May 28, 2009, Sanderson Farms reported strong profits that were twice the predictions of Wall Street analysts, which according to one industry publication was "aided by production cuts and lower feed costs that offset still-weak demand." Similarly, at a May 14, 2009, BMO Capital Markets conference, interim Tyson CEO Leland Tollett noted that "poultry market fundamentals had improved. Pullet placements, an[] indication of future Broiler supplies, have been down the past five months compared to the same period last year. Egg sets continue to run six percent or more below year ago levels and cold storage inventories of poultry have declined about 20 percent since peaking in November 2008."*

**Answer to Paragraph 197**: Pilgrim's admits that there was a recession in 2007-2008 and that it filed for Chapter 11 bankruptcy at the end of 2008 and remained under the supervision of the U.S. Bankruptcy Court until approval of its Amended Plan of Reorganization and discharge from bankruptcy in late 2009. Pilgrim's admits Plaintiffs are selectively quoting from – and attempting to characterize – unidentified documents in the remaining sentences of Paragraph 197, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of Plaintiffs' allegations regarding other Defendants or third parties and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 197.

198. *However, as prices continued to rise during late 2009 and early 2010, producers started increasing production in response to the higher prices, as they had done in previous decades. The rising production by producers in early 2010 led to a reported oversupply of Broilers that began to depress prices by late 2010. However, Defendants had learned the value of coordinated supply reductions in 2008, so were quick to react with a new round of publicly announced production cuts in the first half of 2011, which quickly helped prices recover.*

**Answer to Paragraph 198**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first two sentences of Paragraph 198 and therefore denies them. Pilgrim's denies the allegations of the last sentence of Paragraph 198.

>    199.    During 2009 and 2010, Defendants' senior executives continued to meet with one another at trade association meetings and industry events, such as the National Chicken Council and the International Poultry Expo.  For instance, at the National Chicken Council's October 2009 Annual Conference, one industry analyst wrote that participants had emphasized continued "production discipline."  As used by Defendants, "capacity discipline" is a euphemism for limiting Broiler supplies.  Defendants' conspiratorial efforts to artificially limit Broiler supplies enabled Defendants to raise prices of Broilers to supracompetitive levels.

**Answer to Paragraph 199**: Pilgrim's admits that its senior executives have attended trade association meetings and industry events in the ordinary course of business, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of the first sentence of Paragraph 199 and therefore denies them.  Pilgrim's admits Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document in the second sentence of Paragraph 199, which speaks for itself.  Pilgrim's denies any remaining allegations in Paragraph 199.

>    **6.    Defendants Reacted With Unprecedented Speed To Overproduction In 2011, Which Led To A Second Wave Of Unprecedented Production Cuts.**

>    200.    Around early 2011, Tyson was one of the first Defendants to see the coming overproduction of Broilers.  In addition to limiting its own production, Tyson embarked on a new strategy to soak up excess supply produced by its competitors.  Tyson called the strategy "Buy vs. Grow."  As described further in Section VI(G) of this Complaint, Tyson's Buy vs. Grow strategy allowed Tyson to buy up excess production from its competitors and avoid the depression of prices that would occur had the excess production been sold on the open market.  In return, Tyson could communicate the volumes of Broilers it would be willing to purchase from competitors in the current and future months, thus suggesting to each competitor the amount of production it should cut that would not be purchased by Tyson.  As one investment analyst described it, Tyson's program "involves maintaining or even reducing [Tyson's] own chicken production levels, with buying more chicken on the open market from their rival chicken producers, in an effort to keep the chicken market from being over supplied."  Even though it would have been cheaper (with respect to the cost of pounds purchased) for Tyson to grow its own Broilers instead of buying them from

*a competitor, Tyson engaged in its Buy vs. Grow program because it allowed Tyson to better control supply and production in the Broiler industry and reap the benefit of higher market prices on all of the rest of its Broiler pounds sold.*

**Answer to Paragraph 200**: Pilgrim's admits Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more unidentified documents in Paragraph 200, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 200 and therefore denies them.

*201.   On January 24-26, 2011, Defendants' senior executives attended the International Poultry Expo in Atlanta, Georgia, including Tyson CEO Donnie Smith. The IPE featured an annual market intelligence panel with Mike Donohue from Agri Stats and industry-insider Paul Aho. According to one report, Donohue noted that "'2008 was the worst year financially for the (U.S.) broiler industry that most people have ever seen' . . . The industry's response in 2008 was a 5 to 6% reduction in pounds produced. He said that the broiler industry is currently at record high weekly slaughter volumes." Aho noted "[t]his could be a very difficult year with cutbacks, rationalization, and consolidation . . . . The market is calling for around a 5% reduction in chicken production."*

**Answer to Paragraph 201**: Pilgrim's admits Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more unidentified documents in Paragraph 201, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 201 and therefore denies them.

*202.   On a February 4, 2011, Tyson earnings call, COO James Lochner noted that "until industry supply more closely aligns with demand" Tyson's Broiler business would "be challenged." Tyson CFO Dennis Leatherby also referred to a supply-demand imbalance in the chicken industry.*

**Answer to Paragraph 202**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

*203.   On a February 16, 2011, Cagle's earnings call, Cagle's reportedly said it had begun a 20% reduction in production at a deboning operation in an effort to balance supply and demand. Cagle's told one publication that it was "optimistic that the industry will*

*exhibit the production restraint necessary to support higher pricing for Cagle's products allowing for return to profitable margins."*

**Answer to Paragraph 203**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

*204.    On or around February 25, 2011, Sanderson Farms CEO Joe Sanderson announced on an earnings call that Sanderson would be delaying the development and construction of a second North Carolina Broiler complex.*

**Answer to Paragraph 204**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

*205.    On March 7, 2011, House of Raeford announced a 10% reduction in egg sets that began in early February. CEO Bob Johnson noted in an accompanying press release that "we decided that acting now was a responsible action for our company in light of continuing unstable economic conditions. . . . Hopefully the chicken prices will begin to increase later this year. In addition, if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."*

**Answer to Paragraph 205**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

*206.    On March 15, 2011, Simmons announced it was laying off 180 workers at its Siloam Springs, Arkansas processing plant "[d]ue to economics specific to our industry, resulting from high grain prices predominantly caused by corn being used in ethanol, we have decided to realign some of our production resulting in the elimination of 180 positions as of April 15."*

**Answer to Paragraph 206**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

207. On April 13-15, 2011, the Georgia Poultry Federation held its annual meeting at the Brasstown Valley Resort in Georgia. Defendants' senior executives attended the meeting. Among other positions that Defendants' and their Producer Co-Conspirators' employees were elected to at the meeting, Donnie Wilburn (Director Live Operations, Harrison Poultry) was elected Vice Chairman of the Board of Directors and Phillip Turner (Plant Manager, Mar-Jac) was elected to the Board of Directors.

**Answer to Paragraph 207**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

208. On April 15, 2011, Mountaire Farms announced it was abandoning a 3-5% capacity increase. Mountaire President Paul Downes explained Mountaire's justification for the cut to anticipated capacity in starkly simple terms: "The only way to higher prices is less supply. The only way to less supply is chicken companies will shut down or cut back. That's not good for poultry growers or the economy. But I think that's what we're going to see." In other words, Mountaire had learned from the industry's coordinated action in 2008 to reduce supply and realized that the oversupply and decreasing prices in early 2011 could only be addressed through collective action by the Broiler industry to restrain production.

**Answer to Paragraph 208**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

209. During 2011, Fieldale Farms reduced its production by an unspecified amount.

**Answer to Paragraph 209**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

210. During 2011, Mar-Jac reduced its production 10% and reported that other Broiler Producers were doing so as well.

**Answer to Paragraph 210**: Pilgrim's lacks knowledge or information sufficient to form a belief

as to the truth of the allegations and therefore denies them.

> 211.    On May 1-3, 2011, Defendants' senior executives, including Tyson CEO Donnie
> Smith, attended Urner Barry's Annual Executive Conference and Marketing Seminar,
> which includes an annual golf outing at a local country club.

**Answer to Paragraph 211**: Pilgrim's lacks knowledge or information sufficient to form a belief

as to the truth of the allegations, and therefore denies them.

> 212.    On May 17-18, 2011, senior executives from Sanderson Farms, Pilgrim's, and
> Tyson attended the BMO Farm to Market Conference.  Attending were Sanderson Farms
> CEO & Chairman Joe Sanderson, Sanderson President & COO Lampkin Butts, Pilgrim's
> President & CEO Bill Lovette, Tyson CEO Donnie Smith, and Tyson Senior Group VP of
> Fresh Meats Noel White.

**Answer to Paragraph 212**: Pilgrim's lacks knowledge or information sufficient to form a belief

as to the truth of the allegations, and therefore denies them.

> 213.    Pilgrim's President & CEO Bill Lovette presented at the May 17, 2011, BMO Farm
> to Market Conference.  Lovette's presentation noted Pilgrim's shift away from fixed-rate
> contracts to market-based pricing.  Pilgrim's also noted its new focus on matching
> production to forecasted demand, including by adjusting head and bird weights at selected
> plants to better balance supply and customer demand.

**Answer to Paragraph 213**: Pilgrim's lacks knowledge or information sufficient to form a belief

as to the truth of the allegations and therefore denies them.

> 214.    On a May 24, 2011, earnings call, Sanderson Farms CEO Joe Sanderson stated
> "the deal is that the industry — forget Sanderson — the industry cannot sustain losses like
> they are sustaining for a long period of time.  They will — they can't do it and you have
> been observing this for years and years and the industry has been losing money since
> Novemberish and balance sheets deteriorate and losses have to stop.  The only way to stop
> losses with $7 corn is to reduce production and get prices up.  That is the rule and the law
> of the jungle."  Sanderson continued, "my judgment is that there will be some others that
> are going to have to make some adjustments that I believe cuts will be forthcoming in our
> industry based on the losses we see in Agri Stats."

**Answer to Paragraph 214**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from

– and attempting to characterize – a document, which speaks for itself.  Pilgrim's lacks knowledge

or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> *215.    On June 6, 2011, Cagle's announced on an earnings call that "[t]he industry must lower supply in order to offset reduced demand and to support higher market prices. Cagle's continues to process at 80 per cent of capacity at its Pine Mountain Valley deboning facility and does not contemplate any increase in the foreseeable future."*

**Answer to Paragraph 215**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> *216.    On June 7-10, 2011, the USAPEEC held its annual meeting at The Greenbrier America's Resort in West Virginia.  Defendants' senior executives attended.*

**Answer to Paragraph 216**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

> *217.    On approximately June 20, 2011, Tyson begin pulling eggs from its incubators to reduce Broiler volumes.*

**Answer to Paragraph 217**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> *218.    On June 21, 2011, Cagle's announced it was laying off 300 employees at its Pine Mountain Valley, Georgia plant to reduce Broiler volumes.*

**Answer to Paragraph 218**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> *219.    On June 27-29, 2011, the US Poultry & Egg Association held a Financial Management Seminar at the Ritz Carlton in Amelia Island, Florida.  Among other presentations, Pilgrim's President & CEO Bill Lovette presented to a group of 150 attendees that included senior executives from Defendants.*

**Answer to Paragraph 219**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

*220. On June 27, 2011, Simmons announced it was laying off 223 employees by August at its Siloam Springs, Arkansas plant to "shift production to better address soaring corn prices." In its press release, Simmons blamed U.S. Ethanol policies for reducing its production.*

**Answer to Paragraph 220**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

*221. On July 12, 2011, Tyson CEO Donnie Smith, Tyson executive Bernard Leonard (Chairman of the NCC at the time), Sanderson Farms COO Lampkin Butts, Peco Foods CEO Mark Hickman, and Perdue CEO Jim Perdue participated in a panel together at the 2011 Food Media Seminar.*

**Answer to Paragraph 221**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

*222. On July 29, 2011, Pilgrim's announced the closure of its Dallas, Texas processing plant and the layoff of 1,000 employees. Pilgrim's President & CEO Bill Lovette explained that "[w]hile the decision to close a plant and eliminate jobs is always painful, we must make better use of our assets given the challenges facing our industry from record-high feed costs and an oversupply of chicken . . . . A key component of that effort is improving our capacity utilization through production consolidation and other operational changes. By closing the Dallas facility, we can consolidate that production volume at three other plants and help those sites run closer to full capacity."*

**Answer to Paragraph 222**: Pilgrim's admits that on July 29, 2011, it issued a press release announcing the closure of a further-processing plant (which did not slaughter birds) in Dallas, Texas within 60 days as part of its continuing effort to reduce costs and operate more efficiently, and that this press release included statements from Mr. Lovette. Pilgrim's further admits that Plaintiffs' selectively quote from – and attempt to characterize – the press release, which is a document that speaks for itself. Pilgrim's denies any remaining allegations in this Paragraph.

*223. On an August 1, 2011, earnings call, Sanderson Farms' CEO reportedly said that Sanderson Farms' normal fall production cut of 4% beginning in November would remain in place beyond January of 2012 [and . . .] until demand improves. Sanderson also stated "we aren't going to set any more eggs until we pick up a big account or we can't supply*

*our customers' needs. We think demand improvement will require unemployment to drop . . . . It wouldn't surprise me if the industry makes further, deeper reductions in egg sets in October or November," he said. "Nobody knows what cuts might be needed until we get to October," "but I think that the cutbacks may need to be more than the 6% in head that the industry already has in place."*

**Answer to Paragraph 223**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

*224. On an August 8, 2011, Tyson earnings call, CEO Donnie Smith said that "[d]omestic availability must be in balance with demand before industry economics can improve. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter. . . . Our goal is to match supply to demand. And following over-production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market."*

**Answer to Paragraph 224**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

*225. On August 18, 2011, Cagle's announced it was reducing 20% of its production at its large Pine Mountain Valley, Georgia plant.*

**Answer to Paragraph 225**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

*226. From October 5-7, 2011, Defendants' senior executives attended the National Chicken Council's 57th Annual Conference. As part of the conference, senior executives from Perdue and Koch Foods participated in a panel regarding the "new paradigm" in the Broiler industry. Panel members Clint Rivers (Perdue, President of Foodservice and Supply Chain), Bill Anderson (Senior Vice President, Keystone Foods), Mike Helgeson (CEO, GNP), and Mark Kaminsky (Koch Foods COO & CFO) said "the industry is accustomed to cycles, but not one quite like the latest, and companies are going to need to adjust. Discipline on the supply side was one suggestion. Getting better prices from retailers was another."*

**Answer to Paragraph 226**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 227. On November 17, 2011, Wayne Farms issued a press release announcing the closure of its Decatur, Alabama plant and layoffs of 360 employees.

**Answer to Paragraph 227**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 228. On November 21, 2011, earnings call, Sanderson Farms CEO Joe Sanderson responded to a question about a production decrease that "when we talk about the 4% number, that is what we project the industry to be. Obviously, we're going to be a part of that."

**Answer to Paragraph 228**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 229. On December 6-8, 2011, the USAPEEC held its annual Council members only winter meeting. Defendants' senior executives attended the meeting.

**Answer to Paragraph 229**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 230. At USPOULTRY's Hatchery-Breeder Clinic in January 2012, Agri Stats Vice President Donohue noted the importance of reducing Broiler breeder flocks, noting that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recover[y] in the short term by filing up incubators again," but noted that Agri Stats data indicates the industry is slaughtering breeder flocks at 59 to 60 weeks (instead of the typical 65 weeks), which suggested to him the industry was managing its production carefully. The early slaughter of breeder flocks in 2011 through mid-2012 meant that Defendants subsequently were unable to increase production for at least eighteen months, as they would have been able to do had they not made cuts so high in the supply chain.

**Answer to Paragraph 230**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 231. *Defendants' senior executives attended the January 25-26, 2012, International Poultry and Processing Expo in Atlanta, Georgia. The National Chicken Council held its Board of Directors meeting in conjunction with the meeting.*

**Answer to Paragraph 231**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 232. *In early 2012, Sanderson Farms cut its production 4%.*

**Answer to Paragraph 232**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 233. *On March 20-21, 2012, the National Chicken Council Board of Directors met in Washington D.C. Defendants' senior executives attended the meeting.*

**Answer to Paragraph 233**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 234. *On an April 27, 2012, earnings call, Pilgrim's President & CEO Bill Lovette reported that "the die is cast for 2012," and that "we're comfortable that the industry is going to remain constrained."*

**Answer to Paragraph 234**: Pilgrim's admits it held an earnings call on April 27, 2012, in which President and Chief Executive Officer William W. Lovette participated, and that Plaintiffs appear to be selectively quoting from – and attempting to characterize – portions of a transcript from that call. The transcript is a document, which speaks for itself. Pilgrim's denies any remaining allegations of Paragraph 229, including Plaintiffs' characterizations of the transcript.

> 235. *On April 29-May 1, 2012, Urner Barry held its Annual Executive Conference and Marketing Seminar. Defendants' senior executives attended the conference.*

**Answer to Paragraph 235**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 236.    On May 7, 2012, Tyson held an earnings call and announced it had decreased its production by 4% through longer days between flocks for its growers and by increasing its Buy vs. Grow program.  Tyson noted on its earnings call that "the industry as a whole has reduced production pounds by 4% to 6% year-over-year.  To help keep our production balanced, we bought chicken on the open market rather than growing all the birds we needed.  We won't grow a bird solely for the part in the highest demand because we have to sell the entire bird.  Grow versus buy is a strategy we look at continually based on input costs, revenue demand forecast and the needs of our customers."  Tyson CEO Donnie Smith also noted on the earning call that "we began to cut back last year" with respect to egg sets and placements.

**Answer to Paragraph 236**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 237.    On June 6, 2012, Pilgrim's announced the layoff of 190 employees at its Chattanooga, Tennessee deboning plant.  The company noted that "[w]hile the decision to reduce the workforce in Chattanooga was not made lightly, we are confident that these actions will improve the efficiency of our plant, maintain our mutually profitable relationship with growers, and strengthen our ability to produce quality poultry products in Tennessee, . . . [but] [t]he Chattanooga operation remains a vital part of our ongoing strategy."

**Answer to Paragraph 237**: Pilgrim's admits that Plaintiffs' appear to be selectively quoting from – and attempting to characterize – an unidentified document, which is a document that speaks for itself.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 237 and therefore denies them.

> 238.    On June 21, 2012, the National Chicken Council Board of Directors held its summer meeting at the Ritz-Carlton Highlands in Lake Tahoe, California.  Defendants' senior executives attended the meeting.

**Answer to Paragraph 238**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

239. *In a July 9, 2012, article, Tyson CEO Donnie Smith was quoted as saying "the company will not over produce chicken at these expensive grain levels, preferring to buy commodity pieces in the secondary market to fill orders where necessary."*

**Answer to Paragraph 239**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

240. *On July 15, 2012, Defendants' senior executives attended a meeting of the National Chicken Council's Marketing Committee at the Stone Mountain Lodge in Stowe, Vermont.*

**Answer to Paragraph 240**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

241. *On an August 6, 2012, earnings call, Tyson CEO Donnie Smith stated that "[o]ver the past couple of years we have substantially reduced a number of fixed price contracts we have with customers and currently have less than 15% of our Poultry volume [on] annual fixed price contracts. The vast majority of our contracts are tied to specific markets or allow for conversations about adjusting prices to move – prices to offset higher input and we will continue to push for even more of these types of contracts. I believe supply will begin to rationalize as well, making it easier for us to have those pricing conversations."*

**Answer to Paragraph 241**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

242. *On August 23, 2012, Koch Foods CEO Joseph Grendys gave an interview with Bloomberg News. He stated that "[c]osts have gone up so much due to the drought that the industry will be forced to get price increases of 10 to 15 percent across all product lines" for 2013 over this year. He went on to note that "'[t]he industry needs to be smart' and focus on pricing to ensure it remains profitable . . . . Even if it does become unprofitable in the fourth quarter, the industry may resume making money after the first quarter of 2013." The article also mentioned Koch was going to use quarterly adjustments for price in its contracts for the first time since 2008.*

**Answer to Paragraph 242**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 243. On August 28, 2012, Sanderson Farms announced a further 2% production cut that it blamed on corn and soybean prices.

**Answer to Paragraph 243**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore denies them.

> 244. By September 2012, the effect of Defendants' earlier production cuts starting in 2011 had begun to lead to increased Broiler prices. Most important to the record profits that were to come, Defendants had not just cut the number of pounds of Broilers slaughtered, but Defendants destroyed a significant proportion of their Broiler breeder flocks. As noted previously, doing so meant that Defendants could not increase Broiler supplies in the short or medium term, even if they wanted to.

**Answer to Paragraph 244**: Pilgrim's denies the allegations of Paragraph 244 with respect to itself and lacks knowledge or information sufficient to form a belief as to the truth of the allegations as to any other Defendant or third party and therefore denies them.

> 245. On October 10-11, 2012, the National Chicken Council held its annual meeting at The Mandarin Hotel in Washington, D.C. Defendants' senior executives attended the meeting. The meeting featured an "Industry Outlook Panel" that included speakers Thomas Hensley (President, Fieldale Farms) and Paul Fox (CEO, O.K. Foods) and discussed the question of "[w]hat did the broiler industry learn from 2011 and how will the industry apply those lessons in 2012 and 2013?" O.K. Foods CEO Paul Fox's comments during the panel continued to point to the ethanol mandate as a pretext for higher Broiler prices, stating "[i]n 2006, the ethanol mandate began to really take a bite against the protein complex, and since that time on a cumulative basis, we've seen about $31 billion in new costs that have come in to the chicken business,".

**Answer to Paragraph 245**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

246. *The actions alleged above, taken collectively and not in isolation, demonstrate a level of coordination and "discipline" not seen in this industry prior to the Class Period alleged herein.*

**Answer to Paragraph 246**: Denied.

7. *Defendants' 2011-2012 Production Cuts Lowered Broiler Breeder Flocks To Unprecedented Levels, Which Led To Record Profits For The 2013 2014 Time Period.*

247. *Defendants' cuts to the Broiler breeder flocks in 2011-2012 sent flock levels down to levels not seen for almost two decades, as shown by the graph below.*



**Answer to Paragraph 247**: Pilgrim's admits Plaintiffs appear to be characterizing and purporting to chart selected statistics from the National Agricultural Statistical Service of the USDA, which are source documents that speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 247 and therefore denies them.

*248.    For much of the remainder of 2012 through 2014, Defendants reaped the benefits of coordinated supply restraints in the form of rising prices and record profits. During this period Defendants' executives repeatedly made statements congratulating industry players on the "discipline" they had shown by keeping supply restrained. For instance, on a May 3, 2013, earnings call, Pilgrim's President & CEO Bill Lovette stated that "[w]ell, obviously, revenue is going to be a function of price, in part, and in this case a big part; and obviously, price is going to strengthen as supply continues to be disciplined and constrained . . . . So I think the industry is doing an admirable job in being disciplined on the supply side and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying." Lovette also commented that "I believe the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken and not necessarily what corn or soybean meal costs. I think I'm confident to say we've, we figured that out and we're doing a good job of balancing supply and demand."*

**Answer to Paragraph 248**: Pilgrim's denies the allegations of the first two sentences of Paragraph 248 to the extent directed at Pilgrim's, and lacks knowledge or information sufficient to form a belief as to the truth of the allegations with respect to any other Defendants or third parties and therefore denies them. Pilgrim's admits it held an earnings call on May 3, 2013, in which Mr. Lovette participated, and that Plaintiffs appear to be selectively quoting from – and attempting to characterize – portions of a transcript from that call in the subsequent sentence of Paragraph 248. The transcript is a document, which speaks for itself. Pilgrim's denies any remaining allegations of Paragraph 248, including Plaintiffs' characterizations of the transcript.

*249.    On the May 3, 2013, earnings call, Pilgrim's President & CEO Lovette also discussed the importance of continued restraint of the industry's breeder supply flock, noting "[w]ell, I only know what we've seen happen in the past. Now, certainly, this summer if the industry chooses to grow the breeder supply significantly, that's definitely going to impact 2014. What I'm saying is, so far, we've seen no indication that the industry plans to grow the breeder supply and as a matter of fact, it's actually shrunk. So that's the source of my comments. Do I know what's going to happen in June or July or August of this year with respect to breeder placements, I don't know that. I would tell you that based on the last three to five years, though, again, I'll reiterate that I think the industry has learned that the economics of our business is tied very closely to the supply of chickens and we've done a good job so far of maintaining discipline such that even paying nearly $8.50 for corn, we've been able to be profitable as an industry."*

**Answer to Paragraph 249**: Pilgrim's admits it held an earnings call on May 3, 2013, in which Mr. Lovette participated, and that Plaintiffs appear to be selectively quoting from – and attempting to characterize – portions of a transcript from that call in the subsequent sentence of Paragraph 249. The transcript is a document, which speaks for itself. Pilgrim's denies any remaining allegations of Paragraph 249, including Plaintiffs' characterizations of the transcript.

> 250. On October 4, 2013, CEOs and other senior executives of Defendants' companies met at the annual NCC meeting in Washington D.C. The meeting featured a panel with GNP CEO Mike Helgeson, Tyson CEO Donnie King, and Simmons Foods CEO Todd Simmons. According to one publication's account of the panel, the CEOs were "chipper about the prospects for their industry in the next few years."

**Answer to Paragraph 250**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 251. On a January 31, 2014, earnings call, Tyson CEO Donnie Smith reported that through Tyson's "buy versus growth strategy we continue to keep our supply short of demand . . . ." Tyson's continued use of Buy vs. Grow, including through the present, allows Tyson and other Defendants to reduce production on a month-to-month basis and have opportunities to learn more information about one another's production and pricing.

**Answer to Paragraph 251**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 252. On a February 21, 2014, earnings call, Pilgrim's President & CEO Bill Lovette reflected on what had led to record earnings for Pilgrim's. He noted that "I think the one thing that creates...has created that stability is the discipline of the industry to not allow profitability in the past to drive supplies in the future. I think we all have an understanding that our industry is mature, especially in the U.S. Consumption of total meat in the last five years has not grown and our growth in the future is going to come from markets outside the U.S. And so, we have a different model today than we had 15...10 or 15 years ago in that consumption in this country is not growing as robustly as it used to. And I think that

*discipline really, Ken, is the one ingredient that has made for more stable earnings that we have seen. We have certainly seen a lot of volatility in feed ingredient costs, even as recent as this past year. And I don't know what...I mean you can make a solid argument for corn and soybean meal being much cheaper in 2014 and '15, given the rebuilding of world inventories of corn and growing inventories of soybeans. But we just don't know what the next weather event in either, South America, North America or even Eastern Europe may present in terms of the supplies of those feed ingredients."*

**Answer to Paragraph 252**: Pilgrim's admits it held an earnings call on February 21, 2014, in which Mr. Lovette participated, and that Plaintiffs appear to be selectively quoting from – and attempting to characterize – the transcript from this call, which is a document that speaks for itself. Pilgrim's denies Plaintiffs' characterization of the transcript and any remaining allegations of Paragraph 275.

> *253. On March 12, 2014, Tyson CEO Donnie Smith attended an industry conference and told the attendees that "[a] 'meaningful change' in bird production won't occur until the second half of 2015." Smith's confidence about broiler production was possible because of the radical reductions in Broiler breeder flocks Defendants had made during 2011 and early 2012, which Smith knew made it impossible for Defendants to "meaningful[ly] change" Broiler production.*

**Answer to Paragraph 253**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> *254. Industry analysts noted the change in the nature of Defendants' production cuts. On May 6, 2014, a Stephens, Inc. analyst said in an interview that historically "it has been very easy to increase the chicken supply because the cycle is so short. It only takes four to eight weeks to grow a chicken, but U.S. chicken producers are having a hard time increasing the chicken supply by much. They cut production capacity throughout the supply chain when grain prices were very high. Because of this, they cannot materially increase supply for 2014. We likely won't see a material increase in production until the second-half of 2015."*

**Answer to Paragraph 254**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge

or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 255. *During 2013 and into 2014, Defendants continued to find ways to actively depress the size of Broiler hatchery flocks, such as using the pretext of avian flu in Mexico to justify exporting hatchery flock Broilers to Mexico to repopulate flocks rather than use such Broilers to increase domestic production levels. Indeed, Defendants continued their program of exporting Broiler hens and eggs to Mexico in 2015, with Tyson explicitly noting in a May 4, 2015, earnings call that it was sending 3% of its eggs to Mexico to "fill incubators." Similarly, during a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted his "confidence that we're going to do the right thing with respect to maintaining [] discipline. We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million hatching eggs or so outside of the country. The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made. And so again that gives us confidence that we're going to continue to be disciplined as an industry."*

**Answer to Paragraph 255**: Pilgrim's denies the allegations the first two sentences of Paragraph 255 with respect to itself and lacks knowledge of information sufficient to form a belief of the allegations as to any other Defendant or third party. Pilgrim's admits it held an earnings call on July 28, 2016, in which Mr. Lovette participated, and that Plaintiffs' appear to be selectively quoting from – and attempting to characterize – a transcript of that call, which is a document that speaks for itself. Pilgrim's denies Plaintiffs' characterization of the transcript and any remaining allegations in Paragraph 255.

> 256. *Defendants' coordinated exportation of Broiler hatching eggs from the U.S. from 2013 through the present is an active effort to artificially reduce the supply of Broilers in the U.S. below what it would be absent Defendants' active and continued participation in an illegal antitrust conspiracy. Upon information and belief, Tyson and other Defendants exported hatching eggs to Mexico and other foreign countries from 2013-2016 to artificially reduce the supply of Broilers in the U.S. and increase the price of Broilers in the U.S. The value Tyson and others received for exporting hatchery eggs to Mexico would have been far exceeded by the price Tyson would have received for hatching those same eggs in the U.S. and selling the resulting Broiler meat in the U.S. market. Therefore, but for Defendants' agreement and conspiracy as alleged in this Complaint, it would have been against Tyson's independent economic self-interest to export hatching eggs to Mexico and to forgo higher hatching egg prices in the United States. But Defendants' new-found discipline ameliorated any remaining risk and resulted in higher U.S. broiler prices.*

**Answer to Paragraph 256**: Denied.

> 257. According to an October 1, 2014, CoBank analysis of the Broiler industry, the strategy of Defendants to target Broiler breeder flocks paid dividends during 2013 and 2014. According to the report, "[b]roiler product demand should remain robust through the rest of this year and well into 2015, bolstered by a gradually improving domestic economy, continued strength in export demand, and the towering prices of beef and pork. Broiler production, however, has been slow to respond, with integrators having had problems expanding the number of chicks placed for growout. Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015. Producers have been somewhat constrained in their attempts to expand the nation's chicken flock by the limited supply of broiler hatching eggs. When the broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been rebuilt to prior levels. Following seven months of [Year-over-Year ("YoY")] declines, the number of chicks placed for growout finally posted a modest 1 percent YoY gain in August. However, it will take another 6-9 months for integrators to rebuild the supply of broiler hatching eggs in preparation for expanding the overall flock, so significant growth in broiler production will not materialize until late-2015 or early-2016."

**Answer to Paragraph 257**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified report prepared by a third party, which is a document that speaks for itself. Pilgrim's denies the allegations of Paragraph 257 with respect to itself and lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations and therefore denies them.

> 258. On October 10, 2014, NCC President Mike Brown wrote an op-ed in The National Provisioner. The title of Brown's article, "Biofuel policy holds back production ramp-up," continued to blame the Broiler industry's boogey man of the Renewable Fuel Standard (aka the ethanol mandate) instead of Broiler producers' collusive agreement to not increase production in line with demand. Brown wrote, "current favorable market conditions would normally stimulate production to be somewhat higher, that is, a percentage more aligned with the long-run annual average of 4 percent. So why are chicken producers not stepping up production to better match the long-term average of 4 percent? We would if we could, but we can't. We would like to produce more pounds of chicken, but unfortunately we are not there yet. The primary reason for the industry's inability to increase production can be attributed to problems caused by a failed policy" of the Renewable Energy Standard. Brown also went on to blame fertility issues in the breeder stock and a propane shortage that made it difficult to heat chicken houses as other reasons the industry could not increase production.

**Answer to Paragraph 258**: : Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

259.     *On October 29, 2014, Simmons Foods announced the closure of its Jay, Oklahoma spent hen processing plant. Spent hens are Broiler breeders that have reached the end of their productive life cycle. The Simmons facility processed spent hens on behalf of many Defendants, providing Simmons with opportunities to monitor changes in other Defendants Broiler breeder supplies. The closure of Simmons' Jay, Oklahoma facility is indicative of the reduced Broiler breeder capacity resulting from Defendants' initiatives to cut Broiler breeder capacity across the industry.*

**Answer to Paragraph 259**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 259, and therefore denies them.

### 8. *Avian Flu Disrupted The Export Relief Valve During 2015, But Prices And Profitability Remained Relatively Stable Into 2016.*

260.     *Signs in late 2014 began to point towards the possibility of rising production levels. A few Defendants announced production cuts, but due to the substantial reductions in Broiler breeder flocks Defendants had already taken, Defendants' production was already constrained. Defendants undertook various affirmative acts in furtherance of the conspiracy, including exporting of hatching eggs outside the U.S., inter-Defendant purchases in furtherance of Defendants' conspiracy such as Tyson's Buy vs. Grow program, breaking eggs rather than setting eggs, dumping of excess Broiler supply in foreign markets, closing Broiler production facilities, and manipulating at least one Broiler price index.*

**Answer to Paragraph 260**: Pilgrim's denies the allegations of Paragraph 260 with respect to itself and lacks knowledge or information sufficient to form a belief as to the truth of the allegations with respect to any other Defendant or third party and therefore denies them.

261.     *For example, Tyson announced on May 4, 2015, the closure of its Buena Vista, Georgia, Broiler plant as part of an ongoing effort to "increase efficiencies." Tyson also announced it was eliminating one shift at its Dawson, Georgia plant. Tyson announced in May 2015 that it planned to reduce its production after July 2015 and keep production flat through 2016 by increasing its Buy vs. Grow purchases.*

**Answer to Paragraph 261**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 262. In addition to the continuation of Defendants' illegal supply restriction that artificially increased the price of all Broilers, around January 2015 the Georgia Dock price index began to deviate significantly from other price indices (see ¶¶ 109-127).

**Answer to Paragraph 262**: Pilgrim's denies the existence of and its participation in any illegal supply restriction and that any prices were "artificially inflated." Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations related to comparisons of price indices and therefore denies them. In response to Plaintiffs' reference to paragraphs 109 through 127, Pilgrim's references its corresponding responses above. Pilgrim's denies any remaining allegations in this Paragraph.

> 263. As alleged above, due to the GDA's One Cent Rule, it was not possible for only one or two Broiler companies to report a significantly higher Broiler price to the Georgia Dock without being disregarded as outliers by the GDA. Accordingly, on information and belief, Plaintiffs allege that Defendants and their Producer Co-Conspirators began collectively reporting prices to the GDA that not only were identical or nearly identical, but also were significantly above the actual market rate. As a result, Georgia Dock prices continued to rise and later stabilize during 2015-2016 at near historic highs. As described further in this Complaint, it was not until a series of articles was published between November 3, 2016 and November 17, 2016 that information was publicly available to show Defendants and the Producer Co-Conspirators may have fixed the Georgia Dock price.

**Answer to Paragraph 263**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 263 and therefore denies them. Pilgrim's denies the allegations of the second sentence of Paragraph 263. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 263 and therefore denies them. Pilgrim's denies that it in any way "fixed" the Georgia Dock price and lacks knowledge or information sufficient to form a belief as to the

truth of the remaining allegations of the fourth sentence of Paragraph 263 and therefore denies them. Pilgrim's denies any remaining allegations in this Paragraph.

> 264. During 2015, despite the devastation Avian Flu caused to the turkey and table egg industries, the Broiler industry was largely unaffected by the disease, with the primary effect being temporary bans on exports from some specific states or of all Broiler exports from the U.S. to various countries, such as China, Korea, and a number of other nations.

**Answer to Paragraph 264**: Pilgrim's admits that poultry industries have been affected by Avian Flu at certain points in time, but denies any characterization of such effects contained in Paragraph 264. Pilgrim's lacks knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 264 and therefore denies them.

> 265. Avian Flu-related export limitations during 2015 caused frozen Broiler inventories to build up in the U.S., threatening the stability of Broiler prices Defendants had worked so hard to increase since 2008. In response, Defendants worked in concert to coordinate the dumping of excess inventories of Broilers in foreign markets to avoid deterioration of the artificially high prices in the U.S. resulting from Defendants' conspiracy. For instance, in early October 2015, Vietnam launched an inquiry into dumping by U.S. Broiler producers after Vietnamese Broiler producers determined that dumping of frozen chicken by U.S. producers had cost it over $120 million in the last 16 months. A report by Vietnam's Southeast Livestock Association concluded that U.S. Broiler companies were selling chicken thighs in Vietnam for 29% of the price of a similar product sold in the U.S. market (e.g., at a Walmart), excluding the additional cost of frozen shipping rates, import duties and other fees associated with U.S. producers selling chicken thighs in the Vietnamese market. By late May 2016, Sanderson Farms CEO Joe Sanderson reported on an earnings call that all but one of the Avian Flu export bans had been lifted.

**Answer to Paragraph 265**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth the allegations of Paragraph 265 and therefore denies them. Pilgrim's admits that Plaintiffs appear to be describing – and attempting to characterize – one or more unidentified documents. Pilgrim's denies all allegations inconsistent with the information expressly set forth in the unidentified documents. Pilgrim's denies all remaining allegations in Paragraph 265.

> 266. In late 2015, Broiler industry analyst Heather Jones noted that chicken supplies had not increased as expected from the Avian Flu due to the fact Defendants had started breaking eggs rather than setting eggs. Defendants coordinated the breaking of eggs with

*one another during 2015, in part, by the exchange of production information through Agri Stats.*

**Answer to Paragraph 266**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 266 and therefore denies them. Pilgrim's denies the allegations of the second sentence of Paragraph 266.

> 267. *Watts PoultryUSA's March 2016 issue noted that Tyson Foods achieved "record earnings and sales in fiscal year 2015 . . . posting $40.6 billion in sales, including ringing up higher chicken sales. Yet, Tyson lowered chicken production in 2015. What's at work here? This paradoxical performance, in part, reflects the fact that Tyson, along with other top U.S. broiler companies, is redefining its business model to achieve profitable growth." In fact, the explanation for Tyson's "paradoxical" 2015 performance—including increasing its Broiler profits but lowering its Broiler production—was the result of the illegal conspiracy alleged in this Complaint.*

**Answer to Paragraph 267**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 268. *Prices during the first half of 2015 remained relatively flat, which led NCC President Mike Brown to write another op-ed in The Wall Street Journal on May 15, 2015, to try to explain why Broiler prices remained so high. Like his previous op-ed, he again blamed the Broiler industry's typical boogeyman – the Renewable Fuel Standard – for increased Broiler prices.*

**Answer to Paragraph 268**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 269. *During 2016, Broiler prices have declined slightly, but significantly less so than input costs. Defendants have maintained artificially high Broiler prices and high profitability during 2016 by exercising "discipline" on their Broiler supply and manipulating at least one Broiler price index. For instance, during an April 2016 earnings call, an analyst noted that Pilgrim's CEO Bill Lovette "mentioned that you think the industry domestically has been much more disciplined than they have been in the past, I'm wondering if you could just elaborate a little bit more on what sort of drives that view and*

*then maybe what gives you confidence that this discipline will hold." Lovette responded, "[w]hat drives the view is the actual numbers that we see, ready to cook pounds are up about 3.1% year to date. If you look at placements year to date, they're up 1%, egg sets up 0.7%, hatchery utilization actually declined in Q1 to 91%. So in the phase of coming off two of the most profitable years in the industry, we're not seeing, not realizing large amount of production increases." Tellingly, Pilgrim's CFO Fabio Sandri added immediately after Lovette's comments that "what drove that I believe it is that industry is more geared towards profitability rather than just market share or field growth." Put another way, Defendants are no longer competing with one another to gain market share by growing their companies as one would expect in a competitive market, but instead Defendants are working collectively to increase profitability by being "disciplined" in terms of supply growth.*

**Answer to Paragraph 269**: Pilgrim's denies the allegations of the first sentence of Paragraph 269 with respect to itself but lacks knowledge or information sufficient to form a belief as to the truth of the allegations with respect to any other Defendant or third party and therefore denies them. Pilgrim's admits it held an earnings call on April 28, 2016, that Mr. Lovette and Mr. Sandri participated, and that Plaintiffs appear to be selectively quoting from – and attempting to characterize – the transcript from that call, which is a document that speaks for itself. Pilgrim's denies Plaintiffs' characterization of the transcript and any other allegations in the second through sixth sentences of Paragraph 269. Pilgrims' denies the allegations of the last sentence of Paragraph 269.

*270. Other CEOs have also been forced recently to try to explain the marked shift in the Broiler industry's profitability in recent years, after the decades'-long pattern of boom and bust regarding Broiler pricing and profitability. During a February 2016 Sanderson Farms earnings call, BMO Capital Markets analyst Ken Zaslow noted the Broiler industry's history of volatility in pricing and profitability for chicken companies and questioned if there was "any changing of the industry dynamic" that had occurred. Sanderson Farms CEO Joe Sanderson replied "we might be at a capacity wall, you know? . . . Since back in 2007 . . . there are three or four plants shuttered . . . It does feel different."*

**Answer to Paragraph 270**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge

or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 271. A January 18, 2016, article in The Wall Street Journal questioned whether Defendants, including Tyson, Sanderson Farms, Pilgrim's, and Wayne Farms, have intentionally manipulated the pricing data they report to the Georgia Department of Agriculture. As discussed above, in early November 2016 evidence became public suggesting that the Defendants and Producer Co-Conspirators may be fixing the Georgia Dock price.

**Answer to Paragraph 271**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 272. During 2016, Defendants' profitability has also been aided, in part, by the fact that input costs have decreased substantially, though Broiler prices have not experienced a similar decline. During a Broiler industry conference in February 2016, industry analyst Dr. Paul Aho reported that overall profitability has remained steady or increased, as input costs have drastically decreased. Aho noted that during 2016 there have been "broad-based declines in key commodities, especially feed grains and energy." In fact, in May 2016 Tyson posted record quarterly growth, with profit margins for Broilers rising to between 9 and 11 percent.

**Answer to Paragraph 272**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 273. Not only are the harmony among Defendants and resulting high profit margins achieved by Tyson and other Defendants in recent years remarkable, so is their fairly recent ability to accurately predict their profit margins into the future. For instance, before 2008, Tyson had profit margins in the 5-6% range and would not predict future profit margins, but after 2008, Tyson would routinely predict record margins of 13% or more with surprising accuracy.

**Answer to Paragraph 273**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

*274.    Defendants have also kept up the use of signals to one another to perpetuate their conspiracy during 2016 by using the code word "discipline" to note their continued adherence to Defendants' conspiracy.  For instance, during a February 2016 earnings call, Pilgrim's CEO Bill Lovette noted that "[t]he industry continues to be disciplined in terms of U.S. supply.  Although monthly pullet data tend to be volatile and have occasionally been at the high end of our expectations, we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits [sic] and chick placements as a positive.  We believe that at least part of the reason is because chicken producers are being disciplined and are much quicker to react than in the past and in adjusting supply growth to the actual market conditions."  Similarly, in a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted that "I think what we've seen with egg sets is absolutely a testament to the discipline of our industry that we've seen the last really two to three years."*

**Answer to Paragraph 274**: Pilgrim's denies the allegations of the first sentence of Paragraph 274.

Pilgrim's admits it held earnings calls on February 11 and July 28, 2016, in which Mr. Lovette

participated, and that Plaintiffs appear to be selectively quoting from – and attempting to

characterize – transcripts of those calls, which are documents that speaks for themselves.

Pilgrim's denies Plaintiffs' characterizations of those transcripts and any remaining allegations in

Paragraph 274.

### E.    *The Structure And Characteristics Of The Broiler Market, Together With Other Factors, Render The Conspiracy Economically Plausible.*

#### 1.    *The Broiler Industry Is Highly Vertically Integrated.*

*275.    The Broiler industry is almost entirely vertically integrated, with Broiler-processing firms owning or tightly controlling almost all aspects of production, processing, and marketing.  In the Broiler industry, "vertical integration" means the Broiler company owns or controls each aspect of breeding, hatching, rearing, feeding, basic processing, and selling of Broilers.  Many integrated Broiler companies also own further processing plants.[7]*

**Answer to Paragraph 275**: Pilgrim's admits it owns and manages facilities at multiple stages of

the distribution chain, including production, processing and marketing, as well as further

processing, for certain poultry products. Pilgrim's lacks knowledge or information sufficient to

form a belief as to the truth of allegations with respect to any other producer and therefore denies

---

[7] *See fn. 5 above.*

them and any other remaining allegations in Paragraph 275. With respect to the cross reference to the embedded footnote within the footnote embedded in Paragraph 275, Pilgrim's refers back to its response to the footnote above.

> 276. *Because Broiler producers have determined over time that the economics of growing chicks into full size Broilers are unfavorable, the Broiler industry has developed a system of production-contract farming. The integrated producers provide the feed and chicks to farmers (which remain under ownership of the integrated producer); the contract farmer then has roughly 6-7 weeks to grow the chicks into full size Broilers. During this "grow out" period, the integrated producer's employees frequently monitor the Broilers. Once fully grown, Broilers are picked up by the integrated producer and brought to an integrator-owned processing plant (aka, slaughterhouse). Some of the Broilers are sold without any further processing, while other Broilers are further processed by integrated companies into value-added specialty products (e.g., chicken nuggets, etc.).*

**Answer to Paragraph 276**: Pilgrim's admits it has employed both production-contract farmers as well as internal facilities at various points in time. Pilgrim's admits that the remaining sentences accurately describes the general terms of contract farming and further processing of some poultry products that may fall within Plaintiffs' litigation definition of "Broilers," but denies that contract farmers always have roughly 6-7 weeks.

> 277. *The graphic below indicates the key stages of Broiler production that vertically integrated Broiler companies control, which are all those points in the production process which provide integrated Broiler companies complete control over supply and allow them to capture the greatest profit margin:*



**Answer to Paragraph 277**: Pilgrim's admits that the diagram contained within Paragraph 277 is a general description of the various phases of a fully vertically integrated U.S. broiler production business. The remaining allegations of Paragraph 277 consist of Plaintiffs' characterizations of the nature and goals of vertical integration. To the extent a response to such characterizations is required, Pilgrim's denies those remaining allegations.

> 278. *According to a paper prepared in connection with the USDA and DOJ's failed effort to increase competition in the Broiler industry in 2010, "[c]ontrol over the number of birds delivered to the processing plants allows processors to match more closely inputs to plant capacities and lower per-unit processing costs, as well as to better meet consumer requirements." In connection with the same effort by the USDA and DOJ, a former expert witness for Defendant Tyson, Michael Dicks, wrote, "[i]n the poultry industry vertical coordination allows integrators to manage excess capacity to manage price. Integrators can minimize the effect on producers by increasing the time between collection and delivery of birds or reducing the number of flocks per year rather than terminating grower contracts in much the same way the USDA requires all commodity program recipients to adhere to acreage reduction program guidelines and grower associations require members to cut back marketable output."*

106

**Answer to Paragraph 278**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 279.    Modern Broiler producers rely on a handful of unique Broiler breed lines to mass produce essentially identical chickens with desirable genetic traits. Genetics companies, which develop strains of grandparent and great-grandparent breeding stock, sell to integrated Broiler producers' breeders that have special hybrid characteristics, such as a tendency to produce a large chicken breast. Genetics companies create a "biological lock" on their unique Broiler lines by tightly controlling the purebred genetic strain that they develop. After an integrated producer purchases young breeder hens (aka "breeder pullets") from a primary breeder, the integrated producer raises the birds to be breeders that lay eggs to be taken to incubators at an integrator-owned hatchery. The chicks from Broiler company hatcheries are then sent out to the integrated producer's contract-farmers to raise into adult Broilers.

**Answer to Paragraph 279**: Pilgrim's admits that it purchases pullets from certain poultry breeding companies; that these pullets, as a general matter, are raised by contract-farmers until they are ready to breed and lay eggs; and that once these eggs are hatched, the chicks from its hatcheries are generally sent to its contract-farmers to be raised according to its specifications. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations with respect to any other producer or third party and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 279.

> 280.    At present, no Broiler company except Tyson owns the genetics or produces the grandparent or great-grandparent strain for the Broilers it raises and slaughters. Nearly all U.S. producers now rely on 3 global genetics conglomerates: Cobb-Vantress (owned by Tyson), Hubbard, and Aviagen. These three companies supply the breeder stock, and therefore ultimately the Broilers, that account for 98% of Broilers raised in the U.S. and 80% of Broilers raised globally. While there were 26 Broiler genetics companies world-wide in 1981, acquisitions by the three remaining companies have essentially eliminated any other meaningful competitors in the U.S. Tyson's Cobb-Vantress subsidiary has approximately 50% market share.

**Answer to Paragraph 280**: Pilgrim's admits it does not own the genetics or produce the grand parent or great grandparent strain for the Broilers it raises and slaughters, but lacks knowledge of information sufficient to form a belief as to the truth of the allegations of the first sentence of Paragraph 280 with respect to any other producer and therefore denies them. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 280 and therefore denies them.

> 281.    Since a supply of primary breeders is essential to each Broiler producer's business, Tyson's ownership and control of subsidiary Cobb-Vantress provides it with exceptional leverage over other Defendants to mandate compliance with Defendants' illegal agreement. Tyson can offer other Defendants the carrot of access to Cobb-Vantress' unique Broiler genetic lines, with desirable qualities like high conversion rates of feed into meat. However, Tyson can also use Cobb-Vantress as a stick against any competitor who Tyson and/or its co-conspirators believe is overproducing Broilers by providing such competitors inferior, sick, or an insufficient number of breeder pullets, or withholding breeder pullets altogether that the competitor needs to operate a profitable business.

**Answer to Paragraph 281**: Pilgrim's denies the allegations of Paragraph 281 with respect to itself, but Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations with respect to any other producer or third party and therefore denies them.

> 282.    Perdue was the last Broiler integrator in the U.S. to maintain its own genetics research company besides Tyson, but Perdue sold its genetics company to Tyson in 2014. In announcing the sale, Perdue issued a press release that stated "there are no longer significant advantages to having our own breed . . . it is important that we have the flexibility to select the breeder combination that works best for each specific customer requirement." The press release went on to note that "[w]ith the outstanding exception of the Cobb-Vantress enterprise owned by Tyson Foods, no producer has managed to effectively compete using an in-company breeding program against a multinational primary breeder. To be cost effective a genetics program based on index selection incorporating the measurement of significant traits and applying sophisticated molecular markers and field testing requires a magnitude of scale exceeding the capacity of individual producers."

**Answer to Paragraph 282**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge

or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 283.    Upon information and belief, Defendant Tyson, through its Cobb-Vantress subsidiary, intentionally manipulates the supply of grandparent and great-grandparent Broiler stock (from which it supplies integrators with Breeder pullets) including, but not limited to, only providing healthy and high quality breeder pullets to certain of its co-conspirators, but providing inferior and sick quality breeder pullets to other smaller non-Defendant Broiler producers.  This practice contributed significantly to the bankruptcy or failure of a number of smaller Broiler companies in the 2010 time period.

**Answer to Paragraph 283**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 283 and therefore denies them.

> **2.    The Market For Broilers Is Characterized By Inelastic Supply And Demand.**

> 284.    According to a May 2010 paper written by Broiler industry consultant Michael Dicks, "[b]ecause of the inelastic nature of the supply and demand [of Broilers,] a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."  A study by consultant The Hudson River Group for Pilgrim's in 2008 found that a one percent decrease in the supply of Broilers leads to a 0.8% increase in the price of Broilers.  In other words, demand for Broilers is inelastic, so a decrease in supply will increase prices.

**Answer to Paragraph 284**: Pilgrim's admits Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more unidentified documents, which speak for themselves.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 284 and therefore denies them.

> 285.    Defendants acknowledge that supply and demand in the Broiler industry is inelastic.  For instance, in his May 2010 paper, Broiler industry consultant Michael Dicks wrote that "[a]ttempting to maintain supply levels would reduce price to levels unsustainable even in the short run.  Because of the inelastic nature of the supply and demand a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

**Answer to Paragraph 285**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself.  Pilgrim's lacks knowledge

or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 286. Broiler producers have asserted in public statements that changes in wholesale Broiler prices have been due to changes in "supply and demand." However, demand for Broilers has been flat since 2008, while at the same time wholesale Broiler prices have risen roughly 50%. Therefore, it is the reduction in the supply of Broilers that has led to Broiler price increases.

**Answer to Paragraph 286**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

### 3. There Are No Significant Substitutes For Broilers.

> 287. Pork and beef are the most likely alternative sources of protein to Broilers, but pork and beef are not economic substitutes for Broilers. Numerous studies have found that the cross elasticity of demand between Broilers, beef, and pork is either negative or statistically insignificant, meaning that pork and beef are complements to Broilers, but not substitutes.

**Answer to Paragraph 287**: Pilgrim's admits that pork and beef are sources of protein, and that Plaintiffs' appear to be referring to and characterizing various unidentified studies or reports, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 287 and therefore denies them.

> 288. The historically high spread between the price of pork and beef versus Broilers since 2008 has also reduced any possibility of substitution of Broilers with pork or beef.

**Answer to Paragraph 288**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

### 4. The Broiler Industry Has Experienced High Consolidation And Is Highly Concentrated.

> 289. According to a November 2013 USDA report, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing. According to the

*National Chicken Council, 55 federally inspected Broiler companies operated in 1995, compared with 41 companies in 2010." By 2014, there were only 35 such companies.*

**Answer to Paragraph 289**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 290. *In fact, the trend towards consolidation among all segments of the Broiler industry goes back decades, as shown below. This consolidation has largely squeezed out the large number of smaller Broiler companies that used to represent a significant portion of Broiler industry production.*



**Answer to Paragraph 290**: Pilgrim's admits Plaintiffs appear to be characterizing and purporting to chart selected statistics from WATT Poultry data in the chart in Paragraph 290, which data speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of remaining allegations in Paragraph 290 and therefore denies them.

> 291. *As of 2015, Defendants controlled 88.8% of Broiler production in the United States. Since the start of the Class Period, there has been surprising stability in market share for*

*each Defendant, as shown by the graph below. The two exceptions are Pilgrim's loss of market share due to its large plant closures during bankruptcy in 2008-2009 and Koch Foods' increase in market share due to the purchase of a plant from Tyson and purchase of bankrupt Cagle's, Inc.*



**Answer to Paragraph 291**: Pilgrim's admits Plaintiffs appear to be characterizing and purporting to chart selected statistics in the chart in Paragraph 291, which data speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of remaining allegations in Paragraph 291 and therefore denies them.

> *292. In addition to formal consolidation among Defendants, increased antitrust scrutiny of acquisitions in the Broiler industry by the U.S. Department of Justice has led Broiler companies to increasingly rely on de facto consolidation whereby Defendants acquire nearly complete control over seemingly independent smaller Broiler companies. Defendants' de facto consolidation creates "zombie" Broiler companies that on paper are separate and independent entities, but are in fact completely controlled by Defendants through co-packing contracts. For instance, Tyson Foods has co-packing arrangements with a number of smaller Broiler producers in which Tyson purchases either (1) the company's entire production of Broilers (including dark meat) or (2) all of the company's white meat (i.e., chicken breast and wings) and encourages the company to export the less valuable dark meat to remove that supply from the United States market.*

**Answer to Paragraph 292**: Pilgrim's admits that it uses co-packing agreements with other companies for the production or processing of certain poultry products when it is in Pilgrim's

unilateral business interests to do so, but denies Plaintiffs' characterization of these agreements and any remaining allegations in Paragraph 292 with respect to Pilgrim's and lacks knowledge or information sufficient to form a belief as to the truth of allegations related to other producers or third parties and therefore denies them.

> 293.    Upon information and belief, Defendants' co-packing contracts with smaller producers are typically 2-5 years in length.  Even where the co-packing arrangement is only 10-20% of a smaller producer's overall supply, Defendants are in a position to pressure smaller producers to limit their production.  Co-packing contracts give Defendants unprecedented control over supposedly independent producers, including control over the breed of bird grown, what feed can be used, how many birds can be grown, and numerous other aspects of raising Broilers.  With respect to processing, Defendants not only require exacting specifications for co-packing partners, but also put Defendants' own employees in the processing plants of their co-packers and supervise every significant detail of the slaughter and packing process.

**Answer to Paragraph 293**: Pilgrim's admits that it uses co-packing agreements with other companies for the processing of certain poultry products when it is in Pilgrim's unilateral business interest to do so, but denies Plaintiffs' characterization of these agreements and any remaining allegations in Paragraph 293 with respect to Pilgrim's and lacks knowledge or information sufficient to form a belief as to the truth of allegations related to other producers or third parties and therefore denies them.

> 294.    Upon information and belief, the purpose and/or effect of Defendants' co-packing arrangements is it avoids scrutiny from antitrust regulators that would come with formal merger arrangements, including possible discovery of Defendants' anti-competitive agreement to reduce the supply of Broilers in the U.S.

**Answer to Paragraph 294**: Paragraph 294 contains Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Pilgrim's denies the allegations of Paragraph 294.

> **5.    The Broiler Industry Has A History Of Government Investigations And Collusive Actions.**
>
> 295.    In response to a Federal Trade Commission investigation in 1919 which found oligopoly domination and anti-competitive monopolistic behavior in the meat-packing

*industry, Congress passed the Packers and Stockyards Act ("PSA"). See 7 U.S.C. §
193(a), § 209. Congress amended the law to include the poultry industry in 1935.*

**Answer to Paragraph 295**: Paragraph 295 contains Plaintiffs' legal conclusions as to the basis

for a federal statute, to which no response is required. The legislative history of the statute speaks

for itself. To the extent a response is required, Pilgrim's lacks knowledge or information sufficient

to form a belief as to the truth of the allegations and therefore denies them.

> *296.     In 1922, the Supreme Court upheld the constitutionality of the PSA in Stafford v.
> Wallace, finding that "the object of the PSA was to secure the flow of livestock from the
> farms and ranges to the slaughtering center and into meat products unburdened by
> collusion that unduly lowered the prices to the shipper and unduly increased the price to
> the consumer."*

**Answer to Paragraph 296**: Paragraph 296 contains Plaintiffs' legal conclusions as to a Supreme

Court case that Plaintiffs' selectively quote and characterize, to which no response is required.

The case speaks for itself. To the extent a response is required, Pilgrim's denies Plaintiffs'

allegations in Paragraph 296.

> *297.     In April 1973, the United States Department of Justice filed a civil antitrust action
> against the National Broiler Marketing Association ("NBMA") alleging the NBMA and its
> members conspired to fix Broiler prices and restrict Broiler production in violation of
> Section 1 of the Sherman Act. The DOJ sought to enjoin the NBMA and its dozens of
> members from continuing a conference call program where members (and even some non-
> members) coordinated the pricing and production of Broilers. In response, numerous
> private civil antitrust actions were filed against the NBMA and 42 individual defendants in
> the In re Chicken Antitrust Litigation case. The NBMA and Broiler producers eventually
> settled the case, resulting in a settlement of roughly $30 million.*

**Answer to Paragraph 297**: Pilgrim's admits that in Paragraph 297 Plaintiffs seek to paraphrase

and characterize various court filings, which speak for themselves. Pilgrim's lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 297 and

therefore denies them.

> *298.     Beginning in 2010, the USDA undertook a series of public workshops to explore
> competition issues in the upstream, contract-farmer Broiler market.. A workshop held in
> Normal, Alabama, on May 21, 2010, focused on corporate concentration and lack of
> competition in the Broiler industry. The workshops led to the proposal of new rules aimed*

*at encouraging competition in the meat industry, but extreme political pressure from Defendants and their allies eventually watered down the rule and led to the resignation of the official charged with imposing tougher regulations.*

**Answer to Paragraph 298**: Pilgrim's admits that USDA held public workshops to discuss competition and regulatory issues in the agriculture industry, including one related to the poultry industry in Normal, Alabama in May 21, 2010. The remaining allegations of Paragraph 321 consist of conclusory statements and Plaintiffs' characterization of the workshops and ensuing administrative actions, as to which Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore Pilgrim's denies them.

> *299. In 2011, George's Inc. acquired the Harrisonburg, Virginia processing plant from Tyson Foods. The DOJ brought an action to stop the acquisition (United States v. George's, Inc.),[8] which alleged the purchase would impermissibly reduce the available options for contract farmers to sell their grower services. The DOJ eventually settled with George's in June 2011 after obtaining an agreement to require George's to make capital improvements to the facility that would increase its capacity and permit contract farmers to sell more grower services to the processing plant.*

**Answer to Paragraph 299**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 299 and therefore denies them.

> *300. According to a June 2014 USDA Report, "the [Broiler] industry faces a range of public policy issues, [including] competition . . . . [c]oncerns[, including] the exercise of market power by Broiler integrators have prompted merger litigation, USDA regulatory initiatives, congressional proposals, and investigations by Federal agencies."*

**Answer to Paragraph 300**: Pilgrim's admits Plaintiffs appear to be selectively quoting from – and attempting to characterize – a June 2014 USDA report, which speaks for itself. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 300 and therefore denies them.

> *301. Numerous cases in recent years have documented the lack of competition in the contract-farmer Broiler market, which while upstream in the supply chain from the Plaintiffs' and the direct purchaser market, suggest an absence of true competition and instead suggest a practice of coordination and collusion among Defendants. In cases such*

---

[8] *United States v. George's Foods, LLC et al.*, No. 5:11-cv-00043 (W.D. Va.).

*as Adams v. Pilgrim's Pride, No. 2:090-cv-00397 (E.D. Tex.), Been v. O.K. Industries, No. 08-7078 (E.D. Okla.), and Wheeler v. Pilgrim's Pride Corp., No. 5:06-cv-00004 (E.D. Tex.), contract-farmers have alleged violations of the Packers and Stockyards Act by integrated Broiler producers.*

**Answer to Paragraph 301**: Pilgrim's denies the allegations of the first sentence of Paragraph 301. Pilgrim's admits certain of its growers have filed unsuccessful lawsuits against it alleging violations of the Packers and Stockyards Act, including in *Adams v. Pilgrim's Pride*, No. 2:090-cv-00397 (E.D. Tex.), which was dismissed on summary judgment after the Fifth Circuit held that, "PPC's conduct was merely the legitimate response of a rational market participant to changes in a dynamic market." *Adams v. Pilgrim's Pride Corp.*, 182 F. Supp. 3d 679, 681 (citing *Agerton v. Pilgrim's Pride Corp.*, 728 F.3d 457, 462-63 (5th Cir. 2013)). Pilgrim's denies any remaining allegations of Paragraph 301.

###### 6. *Defendants Had Numerous Opportunities To Collude.*

###### a. *Trade Associations.*

*302. Defendants are members of several Broiler-related trade associations and other forums, which they used to facilitate their conspiratorial conduct. Integrated Broiler producers have numerous regular events through which they can communicate in person with one another. Regular and frequent attendance by Defendants' CEOs and top level executives at trade association meetings is the norm rather than the exception.*

**Answer to Paragraph 302**: Pilgrim's admits it is a member of poultry related trade associations for legitimate pro-competitive reasons, but denies the remaining allegations of the first sentence of Paragraph 302. Pilgrim's admits that its employees, including its CEO and executives, attend certain meetings of certain trade associations when it is in its unilateral self-interest to do so, but denies all remaining allegation of Paragraph 302.

*303. According to its website, "[t]he National Chicken Council represents integrated chicken producer-processors, the companies that produce, process and market chickens. [The 40] member companies of NCC account for approximately 95 percent of the chicken sold in the United States." The CEOs of the top integrated Broiler producers are routinely on the board of directors and meet at least quarterly with one another through the NCC.*

**Answer to Paragraph 303**: Pilgrim's admits Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more unidentified documents from the NCC, which speak for themselves. Pilgrim's admits that it is a member of the NCC and at certain times, its CEO has been a member of the board of directors, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 303 and therefore denies them.

> 304. The NCC has three annual board meetings attended by Defendants' and their Producer Co-Conspirators' senior executives, including most or all Defendants' CEOs and other top executives. CEOs generally always attend the following three NCC meetings each year, in addition to special committee meetings or other special NCC events: (a) the January meeting of the NCC held along with the International Poultry Expo, (b) the mid-year Board of Directors meeting, and (c) the NCC Annual Meeting in October. Generally, CEOs arrive the night before an NCC meeting and socialize with their colleagues, then have small private dinners with one or more of their competitors' CEOs or top executives. The next day, the formal NCC meetings are held and executives from Agri Stats and other allied industry organizations make presentations at the meeting. A formal lunch is held during the meeting and provides CEOs and top executives and opportunity to talk casually with their competitors. Following the meeting, Defendants' and their Producer Co-Conspirators' CEOs and top level executives often meet, socialize and golf, hunt, or fish together.

**Answer to Paragraph 304**: Pilgrim's admits that it has been a member of the National Chicken Council during the Plaintiffs' litigation Class Period, and that its employees have attended NCC meetings at various points in time. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 304 and therefore denies them.

> 305. Upon information and belief, CEOs and top level executives from Defendants and their Producer Co-Conspirators discuss topics with one another relating to pricing, production, and other non-public, proprietary information outside of NCC's formal meetings at the informal settings surrounding NCC meetings described above. These regular, informal, and in-person opportunities to discuss pricing and production in the Broiler industry gives CEOs and top level executives comfort that their competitors remain committed to a plan to artificially restrict Broiler production.

**Answer to Paragraph 305**: Pilgrim's denies the allegations of Paragraph 305 with respect to itself and lacks knowledge or information sufficient to form a belief as to the truth of the allegations with respect to any other Defendant or third parties and therefore denies them.

117

*306. The United States Poultry & Egg Export Council ("USAPEEC") has its home office in Stone Mountain, Georgia. Defendants are all members of USAPEEC. USAPEEC has a network of international offices and consultants in key export markets. The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world. The group has evolved into an association that is an advocate for the industry on trade policy issues. USAPEEC has about 200 member companies and organizations. USAPEEC holds Board of Directors meetings quarterly and includes executives from all or nearly all Defendants and co-their conspirators.*

**Answer to Paragraph 306**: Pilgrim's admits that it has been a member of the USAPEEC during the Plaintiffs' litigation Class Period, and that its employees have attended USAPEEC meetings at various points in time. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 306 and therefore denies them.

*307. The U.S. Poultry & Egg Association ("U.S. Poultry") describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and processors of Broilers, turkeys, ducks, eggs and breeding stock, as well as allied companies. Defendants and their Producer Co-Conspirators are all members of U.S. Poultry. U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall.*

**Answer to Paragraph 307**: Pilgrim's admits that it has been a member of U.S. Poultry during the Plaintiffs' litigation Class Period, and that its employees have attended U.S. Poultry meetings at various points in time. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 307 and therefore denies them.

*308. The Georgia Poultry Federation "is a non-profit trade association which represents the poultry industry in Georgia, the nation's leading broiler producing state. The Federation was founded in 1951, and since that time has represented the interests of the entire poultry industry at the state and federal level on legislative and regulatory matters." The Georgia Poultry Federation's mission is "[t]o protect and improve the competitive position of the poultry industry in Georgia, the nation's leading poultry producing state." The Georgia Poultry Federation has regular meetings each April, August, and September which typically are attended by Defendants' senior executives. Defendants House of Raeford, Perdue, Fieldale Farms, Wayne Farms, Tyson, Sanderson Farms, and Pilgrim's, and Producer Co-Conspirators Mar-Jac Poultry, Harrison Poultry, and Claxton Poultry are members of the Georgia Poultry Federation.*

**Answer to Paragraph 308**: Pilgrim's admits that it has been a member of the Georgia Poultry Federation during the Plaintiffs' litigation Class Period, and that its employees have attended

118

Georgia Poultry Federation meetings at various points in time. Pilgrim's further admits that Plaintiffs' appear to be selectively quoting from – and attempting to characterize – unidentified documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 308 and therefore denies them.

> 309.    The North Carolina Poultry Federation "has been the voice of the North Carolina poultry industry since 1968." The mission of the North Carolina Poultry Federation "is to create a favorable climate for business success for everyone involved in the poultry industry in North Carolina." The North Carolina Poultry Federation holds regular meetings each year, including annual meetings and Board of Directors meetings which typically are attended by Defendants' senior executives. Defendants Tyson Foods, Perdue, Mountaire Farms; House of Raeford; Wayne Farms, Sanderson Farms, and Pilgrim's are each members of the North Carolina Poultry Federation.

**Answer to Paragraph 309**: Pilgrim's admits that it has been a member of the North Carolina Poultry Federation during the Plaintiffs' litigation Class Period, and that its employees have attended North Carolina Poultry Federation meetings at various points in time. Pilgrim's further admits that Plaintiffs' appear to be selectively quoting from – and attempting to characterize – unidentified documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 309 and therefore denies them.

> 310.    The Poultry Federation was established in 1954 as a non-profit trade organization to represent the poultry and egg industries in Arkansas, Missouri, and Oklahoma. In 1998, the Arkansas, Missouri, and Oklahoma organizations were consolidated and became The Poultry Federation. The Poultry Federation claims to promote all poultry interests relating to production, distribution, merchandising, and consumption of poultry, and poultry products. It disseminates information relating to the various phases of the Broiler industry to improve and expand markets, to increase efficiency in production and marketing, and to encourage and support research in production and marketing of poultry. The Poultry Federation holds regular meetings each year, including Board of Directors meetings with Defendants' senior executives identified below. Defendants Foster Farms, O.K. Industries, Inc., Pilgrim's, Simmons Foods, Peco Foods, Tyson Foods, George's, Inc., and Wayne Farms are each members of the Poultry Federation.

**Answer to Paragraph 310**: Pilgrim's admits that it has been a member of the Poultry Federation during the Plaintiffs' litigation Class Period, and that its employees have attended Poultry Federation meetings at various points in time. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 310 and therefore denies them.

> 311. The International Poultry Expo ("IPE") was held annually from 2008-2012. The IPE billed itself as "the networking hub of the world for the poultry industry." The IPE was held annually in late January in Atlanta, Georgia. Defendants' and the Producer Co-Conspirators' senior executives, and numerous mid-level executives and other employees, attended the IPE each year. The International Producers and Processors Expo ("IPPE") is the world's largest annual poultry, meat, and feed industry event. IPPE held its first event in January 2013 and combined three previously separate expos – the IPE, the International Feed Expo, and the International Meat Expo. According to the IPPE's website, a wide range of international decision-makers attend this annual event to network and become informed on the latest technological developments and issues facing the industry. The 2015 IPPE featured more than 7,245 international visitors from over 103 countries, including attendees from Chile, France, Singapore, and Australia. IPPE indicates that Defendants and co-conspirators each sent their "Top Management" to the 2014 IPPE in January 2014. The most popular panel each year is the "market intelligence" forum, which features an Agri Stats executive speaking regarding the Broiler industry. Similarly, Defendants' and the Producer Co-Conspirators' senior executives attended IPPE in 2015 and 2016.

**Answer to Paragraph 311**: Pilgrim's admits that its employees attended IPE and IPPE meetings at various points in time. Pilgrim's further admits that Plaintiffs' appear to be selectively quoting from – and attempting to characterize – unidentified documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 311 and therefore denies them.

> 312. The International Poultry Council ("IPC") was formed in 2005 and is composed of national trade associations from 23 countries, as well as 40 individual companies that are "Associate" members. The IPC website bills the organization as the "voice of the global poultry industry" and its mission is to "strengthen communication between the industries of different countries." The NCC, USAPEEC, and USPOULTRY are members of the IPC on behalf of United States poultry producers, along with individual company members of the IPC, including Tyson, Cobb-Vantress (a Tyson subsidiary), Sanderson Farms, and JBS S.A. (Pilgrim's parent company). Additionally, the Chilean poultry trade

*association ("APA") and the Australian Chicken Meat Federation ("ACMF") are also members of the IPC.*

**Answer to Paragraph 312**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 312 and therefore denies them.

*b.* ***Overseas Distribution Solutions.***

*313.    Overseas Distribution Solutions ("ODS") is a Webb Pomerene[9] organization founded by a group of Defendants in 1999. A Webb Pomerene organization is an association of exporters that is exempt from certain provisions of the Sherman Antitrust Act while engaging in conduct to promote United States trade abroad. A Webb Pomerene organization may not engage in importation or sales within the United States, however, and its members may undertake what would otherwise be considered actionable collusive conduct only to export similar products.*

**Answer to Paragraph 313**: The allegations of Paragraph 313 contain legal conclusions to which no response is required. To the extent a response is required, Pilgrim's admits that it was a member of Overseas Distribution Solutions, including from 2000-2004. Pilgrim's further admits that Overseas Distribution Solutions was registered as a Webb Pomerene organization. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of allegations related to other producers or third parties and therefore denies them. Pilgrim's denies any remaining allegations in Paragraph 313.

*314.    ODS continued to operate at least through 2011. ODS membership by Defendants has included Defendants Wayne Farms, Peco Foods, Sanderson Farms, Pilgrim's, and Tyson, as well as Cagle's. The principal office for ODS was located for much of the Class Period in the same town as Sanderson Farms' headquarters – Laurel, Mississippi.*

**Answer to Paragraph 314**: Pilgrim's admits that it was a member of Overseas Distribution Solutions, including from 2000-2004. Pilgrim's admits that Overseas Distribution Solutions was headquartered in Laurel, Mississippi. Pilgrim's lacks knowledge or information sufficient to form

---

[9] Webb Pomerene Act of 1918, 15 U.S.C. §§ 61-66.

a belief as to the truth of allegations related to other producers or third parties and therefore denies

them.  Pilgrim's denies any remaining allegations in Paragraph 314.

> 315.    While originally a member of ODS around the time it was founded, Tyson withdrew
> from ODS some time prior to the start of the Class Period.  However, Tyson re-joined ODS
> in 2010, but then inexplicably withdrew within a few months.  Within a few years of Tyson's
> sudden departure, ODS disbanded and stopped filing for Webb Pomerene status.

**Answer to Paragraph 315**: Pilgrim's lacks knowledge or information sufficient to form a belief

as to the truth of allegations related to other producers or third parties and therefore denies them.

Pilgrim's denies any remaining allegations in Paragraph 315.

> 316.    While ODS had a mandate under the Webb Pomerene Act to have no impact on the
> U.S. domestic market, Broiler industry executives recognize it is inevitable that exports
> will impact U.S. domestic Broiler prices.  For instance, former Pilgrim's CEO Dr. Don
> Jackson has noted that "the broiler market is global in nature.  Obviously, the U.S.
> business generally has more volume obviously going into the domestic market, but both the
> domestic and export makes up the market.  And at times, the export market can be very
> impactful favorably or unfavorably to the U.S. market."  Therefore, according to the
> testimony of one of Defendants' own CEOs, it was impossible for ODS to comply with the
> Webb Pomerene requirement that ODS not impact domestic prices for U.S. Broilers.

**Answer to Paragraph 316**: The allegations in the first and last sentences of Paragraph 316 contain

legal conclusions to which no response is required.  To the extent a response is required, Pilgrim's

denies the allegations in those sentences.  Pilgrim's admits that Plaintiffs appear to be selectively

quoting from – and attempting to characterize – one or more documents, which speak for

themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of

allegations related to other producers or third parties and therefore denies them.  Pilgrim's denies

any remaining allegations in Paragraph 316.

### c.    Investor Conferences.

> 317.    Defendants' CEOs and senior executives participate in numerous investor
> conferences organized by Wall Street analysts, providing further opportunities to meet and
> communicate with one another.  Such conferences are held on an annual and/or ad hoc
> basis including, but not limited to, the Goldman Sachs Global Staples Forum (held every
> May), Bank of America Merrill Lynch Global Agriculture Conference (held every

*February), BMO Capital Markets Annual Ag & Protein Conference (held every May),
BMO Capital Markets Conference (held every May), BMO Farm to Market Conference
(held every May), Urner Barry Annual Executive Conference and Marketing Seminar (held
every April or May), and JP Morgan Basic Materials Conference (held every June).*

**Answer to Paragraph 317**: Pilgrim's lacks knowledge or information sufficient to form a belief

as to the truth of the allegations and therefore denies them.

### d.  *Competitor Plant Tours.*

*318.    Defendants also permitted one another to tour each other's Broiler plants, which
revealed confidential business methods employed by a company.  While such tours were
often framed as "best practices" information exchanges, they permitted the opportunity to
conspire among senior executives.*

**Answer to Paragraph 318**: Pilgrim's denies it has revealed confidential business models to any

competing producer or received confidential business methods about any competing producers,

and that it conspired with anyone.  Pilgrim's lacks knowledge or information sufficient to form a

belief as to the truth of any remaining allegations in Paragraph 318 and therefore denies them.

*319.    Defendants also permit employees to regularly move between companies without
non-compete limitations or confidentiality agreements that would protect a company's
(seemingly) proprietary business knowledge and customer base.  For example, Dr. Don
Jackson was President of Foster Farms' Poultry Division until December 2008, but then
immediately took a position as CEO of Pilgrim's.  Similarly, Clint Rivers, Pilgrim's former
President and CEO until December 2008, left the company and became Senior VP of
Operations and Supply Chain Management for Perdue in 2009.  Rivers then moved to
Wayne Farms in 2012, where he became Chief Operating Officer.  Greg Tatum served as
CFO for Claxton Poultry, before moving to Pilgrim's in 2009 to serve as Senior VP of
Business Development.  Numerous other high level and well as lower level executives move
freely between Broiler companies with little or no provision by Defendants to protect their
confidential information.*

**Answer to Paragraph 319**: Pilgrim's admits that the majority of its employees are at-will

employees with no written employment agreement; that it has termination or separation

agreements with certain employees, which may contain confidentiality or non-compete provisions,

upon departure from the company, but not with others; and that incoming employees are asked

whether they have relevant separation or termination agreements with any poultry company for

whom they previously worked when they begin employment at Pilgrim's. Pilgrim's further admits that Dr. Don Jackson was CEO of Pilgrim's from January 2009 through January 2, 2011; that J. Clinton Rivers was CEO of Pilgrim's from March 5, 2008 to January 2009; and that Greg Tatum was an employee of Pilgrim's from February 9, 2009 to June 28, 2014. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of remaining allegations and therefore denies them. Pilgrim's denies any remaining allegations of Paragraph 319.

### e. *Merger, Acquisition, and Capital Financing Discussions.*

320. *Senior executives from Defendants had numerous opportunities to directly communicate with one another regarding various mergers and acquisitions between 2008 and 2016. These merger and acquisition discussions include both completed agreements, such as those described in Section VI(E)(4) of this Complaint, as well as proposed transactions that were never completed. In connection with mergers and acquisition discussions, due diligence materials regarding confidential business information were shared between Defendants.*

**Answer to Paragraph 320**: Pilgrim's denies the allegations of Paragraph 320 with respect to itself and lacks knowledge or information sufficient to form a belief as to the truth of the allegations with respect to any other Defendant or third party and therefore denies them. In response to the cross reference to Section VI (E) (4) embedded in Paragraph 320, Pilgrim's refers to its answer to that section.

321. *In addition, Defendants all rely on debt financing and merger and acquisition services from the same small group of financial institutions. In the course of providing such services, financial institutions obtain unusually detailed access to Defendants' non-public operational information, including production and pricing information, which provides another opportunity for Defendants to share confidential business information.*

**Answer to Paragraph 321**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

322. *Complete information regarding the full scope of merger, acquisition, and capital financing discussions, communications, and due diligence information exchanged presently is known only to Defendants and their agents.*

**Answer to Paragraph 322**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

### f.     Other Business Dealings.

323.    *Defendants also engaged in various business dealings with one another, including purchasing feed from one another and forming joint ventures for various purposes, such as construction and operation of rendering plants.*

**Answer to Paragraph 323**: Pilgrim's admits it has entered into arms-length business relationships with other poultry companies in the ordinary course of its business when it is in Pilgrim's unilateral independent self-interest to do so.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations with respect to any other Defendant or third party and therefore denies them.

### 7.     There Are High Barriers To Entry In The Broiler Market.

324.    *The existence of high barriers to entry is one factor which makes markets susceptible to collusion.  A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help facilitate the formation and maintenance of a cartel.*

**Answer to Paragraph 324**: Paragraph 324 contains Plaintiffs' legal conclusions to which no response is required.   To the extent a response is required, Pilgrim's denies the remaining allegations in Paragraph 324.

325.    *During the Class Period and continuing today, substantial barriers impede entry into the Broiler market.  A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, construction of processing plants, feed mills, hatcheries, equipment, energy, transportation distribution infrastructure (aka, "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, long-standing customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.*

**Answer to Paragraph 325**: Pilgrim's lacks information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 325 and therefore denies them.

> 326. Defendants themselves acknowledge the substantial costs of entering the market and view it as important that new entrants not be able to purchase closed facilities. For example, when the State of Louisiana pressured Pilgrim's to sell its closed Farmerville Broiler complex, Pilgrim's executives expressed concern about any state assistance to the buyer to purchase the Farmerville Broiler complex because such assistance could substantially reduce the buyer's cost basis therein, which could then permit the buyer to flood the market with low-cost Broilers.

**Answer to Paragraph 326**: Pilgrim's denies the allegations of the first sentence of Paragraph 349 with respect to itself and lacks knowledge or information sufficient to form a belief as to the truth of the allegations with respect to any other Defendant. Pilgrim's lacks information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 349 and therefore denies them.

> 327. The price of construction of a new integrated Broiler processing complex (hatchery, feed mill, and processing plant) able to compete on price with current integrated producers is relatively high. Even for a current market participant, such as the third-largest producer (Sanderson Farms), construction of a new Broiler complex (i.e., feed mill, hatchery, and processing plant) in 2010 was estimated to cost $100-$125 million. However, these costs fail to account for other hurdles to new market participants, discussed above.

**Answer to Paragraph 327**: Pilgrim's lacks information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 327 and therefore denies them.

> 328. The barriers to entry in the Broiler industry have proved insurmountable for potential new market entrants. No company has created a new poultry company from scratch in decades. Further, when one foreign meat company (a Ukrainian company, Omtron) tried to enter the U.S. market in February 2011 by buying a portion of the assets of bankrupt Broiler producer Townsend's, Omtron invested $35 million to improve the facility's processing operations, but went bankrupt only five months after making the purchase.

**Answer to Paragraph 328**: Pilgrim's denies the allegations of the first two sentences in Paragraph 328. Pilgrim's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the third sentence in Paragraph 328 and therefore denies them.

329.    A number of large foreign meat conglomerates have acquired U.S. Broiler producers in the past decade, including Brazil's JBS S.A. (Pilgrim's), Mexico's Industrias Bachoco (O.K. Foods), Belgian company Continental Grain Company (Wayne Farms), and Marfig Alimentos S.A. (Keystone Foods).  However, each of these foreign meat conglomerates were already large players in the global meat industry and simply continued operating their pre-existing U.S. Broiler company as a subsidiary.  Ownership of U.S. Broiler subsidiaries by such large, well-financed conglomerates deter entry by smaller, non-globalized companies that might want to enter the U.S. Broiler production business.

**Answer to Paragraph 329**: Pilgrim's admits JBS S.A. acquired a majority interest in Pilgrim's in December 2009 as part of Pilgrim's restructuring in bankruptcy, but denies all remaining allegations in the first two sentences of Paragraph 329 with respect to itself and lacks knowledge or information sufficient to form a belief as to the truth of the allegations with respect to any other Defendant or third party and therefore denies them.  Pilgrim's denies the allegations of the last sentence of Paragraph 329.

330.    A further barrier to new entrants is the unwillingness of large vertically integrated producers to sell an idled Broiler complex, which also keeps open the threat that an integrated producer will restart a closed Broiler complex.  Pilgrim's has been explicit about this threat to new market entrants.  For instance, in a February 2014 earnings call, Pilgrim's was asked whether it had any plans to sell "a couple of idled U.S. facilities . . . to use that as a source of capital," to which Pilgrim's CFO Fabio Sandri replied "[n]o. We are thinking those are held defensive, so we don't plan to sell them in this short-term or in the near future."  Such a threat of restarting idled facilities, rather than selling those facilities, represents a substantial barrier to entry for new market participants because an existing Broiler producer can merely restart a closed mill to drive down prices and run a new entrant out of business.

**Answer to Paragraph 330**: Pilgrim's denies the allegations of the first sentence of Paragraph 330. Pilgrim's admits it held an earnings call on February 20, 2014 in which Mr. Sandri participated. Pilgrim's further admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a transcript of that call in the remaining sentences of Paragraph 330, which is a document that speaks for itself.  Pilgrim's denies the remaining allegations of Paragraph 330.

**8.** **Defendants Have Similar Cost Structures And Work Collaboratively To Share Cost Information.**

*331.    Another factor antitrust law and economics have identified as making markets susceptible to price-fixing is similar cost structures. The majority of production costs for Broiler producers are variable. All other factors being equal, when variable costs are a high percentage of production costs, there is less incentive for a producer to operate its facilities at full capacity, and this may allow a cartel to boost prices artificially with greater success than when fixed costs are the largest component of production costs.*

**Answer to Paragraph 331**: Paragraph 331 contains Plaintiffs' legal conclusions and characterizations of antitrust law, to which no response is required. To the extent a response is required, Pilgrim's denies these allegations.

*332.    The single largest cost component of producing Broilers is feed, which primarily consists of soybean meal and corn. Broiler feed prices have varied widely from 2007-2016, reaching 71% of the cost of growing Broilers in 2012, but falling to only about 50% by 2014.*

**Answer to Paragraph 332**: Pilgrim's admits feed is a component of its cost to produce poultry products, that both soybean meal and corn are feed sources, and that feed costs have varied over time, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore denies them.

*333.    Input costs other than feed include processing plant labor costs (~15%), materials (~11%), and capital equipment (~2.5%). Labor costs have declined significantly over the past two decades for Defendants, while at the same time labor productivity has substantially increased.*

**Answer to Paragraph 333**: Pilgrim's admits that processing plant labor costs, materials and capital equipment are also costs to produce poultry products and that these costs have varied over time, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore denies them.

*334.    Broiler feed costs have been decreasing sharply since record highs in 2012. For instance, prices for soybean meal were down 10% in 2014. Since January 1, 2008, corn prices have declined roughly 21% and soybean prices have declined 13%. During the same period, Broiler prices increased roughly 50%.*

**Answer to Paragraph 334**: Pilgrim's admits feed costs change over time, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore denies them.

> 335. *Defendants and their Producer Co-Conspirators have relatively similar cost structures. The technology and process of industrial scale growing and processing Broilers is well known and Defendants and their Producer Co-Conspirators employ the same types of equipment and processes in the production process. Defendants also have only three companies from which they can obtain breeder stock from which to raise Broilers, so there are very limited options with respect to purchasing the most cost efficient Broiler genetic lines. Similarly, Defendants all purchase corn and soybeans on the open market, so they have limited ability to obtain substantially different pricing on these key variable cost inputs for their Broilers.*

**Answer to Paragraph 335**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 335 and therefore denies them.

> 336. *Defendants use Agri Stats to share extraordinarily detailed cost information (as discussed below), so they are able to constantly realign their cost structures with one another. Agri Stats permits each Defendant to have extremely unusual knowledge of competitor costs and to make adjustments to standardize each company's cost structure across all Agri Stats participants.*

**Answer to Paragraph 336**: Pilgrim's admits that it has received anonymized reports from Agri Stats, and that Pilgrim's has used this information for lawful, non-conspiratorial purposes. Pilgrim's denies the remaining allegations in Paragraph 336.

> 337. *Defendants engage in a program of "feedmill cross-testing" in which some Defendants exchange feed and chicks with one another for the purported purpose of determining which Defendants' feed and/or chicks have superior qualities. Defendants claim this strategy helps them maximize efficiency. However, it is not economically rational in a truly competitive market for a producer to provide its proprietary feed mixes and/or chicks to its competitor, thereby giving away any competitive cost advantage over its competitors.*

**Answer to Paragraph 337**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 337 and therefore denies them.

> 338. *Another sign that Defendants do not view production costs as secret is the fact that it is not unusual for Defendants to permit competitor's CEOs access to each other's production complexes. In a competitive industry, production methods should be closely*

129

*guarded to protect proprietary methods of production that save a company money and give it a competitive advantage over its competitors. However, this is not the case in the Broiler industry. For example, from April 19-21, 2013, Pilgrim's President & CEO Bill Lovette, Perdue Chairman of the Board Jim Perdue, and Sanderson Farms President & COO Lampkin Butts attended a three day long "Chicken Media Summit" in North Carolina that included visits by attendees to a Sanderson Farms growhouse and processing plant. Similarly, from April 19-21, 2015, another Chicken Media Summit was sponsored by the NCC and USAPEEC and included tours of Perdue's operations and panel discussions with Defendants' senior executives.*

**Answer to Paragraph 338**: Pilgrim's denies the allegations of the first three sentences of Paragraph 338. Pilgrim's admits Mr. Lovette attended one day of the three day "Chicken Media Summit" in April 2013 but denies he toured the Sanderson Farms facility and denies he attended the 2015 Chicken Media Summit. Pilgrim's lacks knowledge or information sufficient to form a belief as to the remaining allegations of the fourth sentence of Paragraph 338.

## F.  *Since 2008 Defendants' Collusion Has Led to Unprecedented Capacity Reductions, Artificially High Prices, and Record Profits.*

*339.  As described above, Broiler prices have been artificially inflated since 2008, despite a historic trend of boom and bust pricing cycles for Broilers as producers oversupply the market in response to price increases leading to low single-digit profit margins in the Broiler industry. As one industry observer noted, "[t]he profit margins of the nation's biggest meat packers rose dramatically between 2008 and 2010 (the most recent year for which good data is available), even as the national economy cratered. Tyson Foods, the nation's biggest meat company, reported record profits of $778 million last year [i.e., 2013] as the company hiked prices for beef, pork, and chicken."*

**Answer to Paragraph 339**: Pilgrim's denies the allegations of the first sentence of Paragraph 339. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document in the remaining sentences of Paragraph 339, which speaks for itself. Pilgrim's denies Plaintiffs' characterization of the documents and any remaining allegations in Paragraph 339.

*340.  The historic pattern of annual increases in Broiler production was so entrenched over decades of experience by the 2000s that one widely repeated quip in the industry was that there were now only three things certain in life: "Death, taxes and 3% more broilers." A leading industry publication noted in early 2009 that "[b]roiler production in the U.S. used to be just like government spending, it never went down and cutbacks only resulted in*

*slowing the rate of growth, but not anymore" because "[f]or the first time in decades, total broiler production in 2008 remained virtually unchanged from the year before. WATT PoultryUSA 2008 rankings data show the industry's total weekly ready-to-cook (RTC) production at 724.05 million pounds, just slightly more than the 723.71 million RTC pounds per week reported at the end of 2007."*

**Answer to Paragraph 340**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more unidentified documents in Paragraph 340, which speak for themselves. Pilgrim's denies Plaintiffs' characterization of the documents and any remaining allegations in Paragraph 340.

*341. During a February 12, 2015, earnings call, Pilgrim's President & CEO Bill Lovette summed up the restriction of supply which Defendants had implemented since 2008: "I looked at some numbers supplied by Agri Stats earlier in the week and found some interesting facts. If you go back to 2008, the industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies."*

**Answer to Paragraph 341**: Pilgrim's admits it held an earnings call on February 12, 2015, in which Mr. Lovette participated, and that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a transcript of that call. The transcript is a document that speaks for itself. Pilgrim's denies Plaintiffs' characterization of the transcript and any remaining allegations in Paragraph 341.

**G.    Defendants Reduced Their Own Production And Used Direct Purchases of Broilers To Reduce Industry Supply.**

*342. Economic theory and good business strategy suggests that relying upon one's competitors to meet a company's own commitments to its customers is not rational, as the competitor can decide to cut out the middleman and sell directly to the end customer. Nevertheless, Tyson, Fieldale Farms, Koch Foods, and other Defendants have created a system of inter-dependence whereby some Broiler companies purposely under-produce Broilers on the assumption their competitors will sell them what they need.*

**Answer to Paragraph 342**: Denied.

> 343. *Defendants use direct purchases of Broilers from one another and from smaller Broiler producers to meet each company's own sales needs. This permits Defendants to soak up excess supply that could depress prices in the market and also facilitates the opportunity to expressly discuss prices with competitors. Such purchases also permit companies to maintain their market share despite reducing their own production. Additionally, in many instances large inter-Defendant purchases are negotiated by CEOs or other senior level executives of Defendants, providing an additional opportunity for such individuals to conspire.*

**Answer to Paragraph 343**: Pilgrim's admits that at times when it is in its unilateral best interest

to do so it may buy or sell certain poultry products that may fall within Plaintiffs' litigation

definition of "Broilers" to or from other producers. Pilgrim's denies all remaining allegations in

Paragraph 343.

> 344. *Further, Defendants' participation in Agri Stats gives them visibility into each other's profitability, operating margins, and supply that no ordinary customer could hope to achieve.*

**Answer to Paragraph 344**: Denied.

> 345. *In 2011, as noted above in Section VI(D)(5), Tyson began using what was described as a "very unique strategy," called "Buy vs. Grow." Tyson's strategy essentially treats the industry supply as though it were for a single unified company, rather than competing businesses that would rather sell self-produced product to a customer than a competitor.*

**Answer to Paragraph 345**: Pilgrim's lacks knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 345 and therefore denies them.

> 346. *What makes Tyson's program exceptionally "unique" is that only a few years before adopting a "Buy vs. Grow" strategy, Tyson declared such a strategy to be "stupid" because it would be subsidizing a competitor's growth. Tyson's Executive Vice President & CFO, Wade Miquelon explained on an April 29, 2008, earnings call that "I think what we said along is we're going to match our supply and demand. We're not going to cut beyond that and then go out and buy open market meat to subsidize other people's growth." Therefore, Tyson's change in view towards open market purchases suggests it had confidence by 2011 that its competitors would maintain their production levels and not grow.*

**Answer to Paragraph 346**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from

– and attempting to characterize – one or more documents, which speak for themselves. Pilgrim's

lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 347. In a November 5, 2012, interview, Fieldale Farms President Thomas Hensley noted his company was also pursuing a strategy to buy up excess supply from its competitors, stating that "[i]f you don't have a home for your chickens on Monday morning, you shouldn't have those chickens. Now we know where all our chickens are going. So we are buying chickens in that lower price area instead of selling them. So, no expansion for us."

**Answer to Paragraph 347**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 348. By the end of 2014, Tyson reported it was buying over 4 million pounds of Broilers on the open market each week. Four million pounds of Broilers per week is more than any of the 24th-30th largest Broiler companies produce on a weekly basis, so the amount of Tyson's purchases was quite significant in terms of volume.

**Answer to Paragraph 348**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 349. During the first part of 2015, Tyson increased its Buy vs. Grow purchases by 50%, expanding Tyson's purchases from competitors to unprecedented levels.

**Answer to Paragraph 349**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 350. Tyson announced plans in May 2015 to increase its Buy vs. Grow strategy to 10 percent of its sales in the second half of 2015 and 2016. Ten percent of Tyson's 2014 pounds RTC is 17.6 million pounds per week, a volume that by itself would dwarf the entire average weekly production of any of the 15th-30th largest Broiler producers. Notably, Tyson also announced in May 2015 that it planned to reduce its production after July 2015 and keep production flat through 2016 by increasing its Buy vs. Grow purchases.

**Answer to Paragraph 350**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

351. Upon information and belief, Defendants made use of Broiler purchases from and purchase contracts between one another and smaller Broiler producers to reduce their own production while soaking up excess supply from competitors.

**Answer to Paragraph 351**: Denied.

352. Defendants' use of direct purchases from one another and from smaller Broiler producers provided Defendants an uninterrupted flow of supply and pricing information and opportunities to communicate directly with one another.

**Answer to Paragraph 352**: Denied.

**H.** **Defendants Made A Coordinated Move Away From Fixed-Price Contracts To Contracts That Changed Prices Quarterly Or Followed Broiler Price Indexes.**

353. A coordinated move away from fixed price contracts to contracts that permit prices to fluctuate with an indexed public market price helps facilitate an antitrust conspiracy. See In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 659 (7th Cir. 2002). This is precisely what occurred in the Broiler market during the Class Period.

**Answer to Paragraph 353**: The first sentence of Paragraph 353 contains a legal conclusion and Plaintiffs' characterization of a Seventh Circuit case and antitrust law, to which no response is required. To the extent a response is required, Pilgrim's denies the remaining allegations in Paragraph 353.

354. For several years prior to the Class Period, many vertically integrated Broiler producers offered some customers long-term fixed-price contracts of a year or more. This guaranteed customers a fixed price, but also prevented Broiler producers from being able to realize market price increases that would naturally result from their planned supply cuts.

**Answer to Paragraph 354**: Pilgrim's admits it has used long-term, fixed-price contracts for certain poultry products that may fall within Plaintiffs' litigation definition of "Broilers" when it was in its independent unilateral self-interest to do so, but denies all remaining allegations in Paragraph 354.

355. Starting around January 2008, senior executives from Koch Foods, Pilgrim's, Perdue, Sanderson Farms, and Tyson Foods publicly announced an effort to reduce annual fixed-price contracts. This change coincided with Defendants' efforts to reduce Broiler industry supplies so as to drive Broiler market prices higher.

**Answer to Paragraph 355**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 355 and therefore denies them. Pilgrim's denies the allegations in the second sentence of Paragraph 355.

> 356. On January 28, 2008, Tyson CEO Dick Bond announced on an earnings call that Tyson was looking at shortening its fixed price contracts, and by June 2009 Tyson reported it had "dramatically" shortened the amount of fixed-price contracts over 90 days.

**Answer to Paragraph 356**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 357. On January 29, 2008, Pilgrim's CFO Rick Cogdill reported on an earnings call that Pilgrim's had started moving away from fixed-price contracts, but Pilgrim's moves were being held back by legacy fixed-price contracts entered into by Gold Kist prior to its acquisition by Pilgrim's in late 2006. Cogdill also noted that "in a situation like where we are now where we need to drive commodity prices up, that [i.e., having less fixed price contracts] is going to give us the opportunity for more immediate benefit to our P&L than what we would have had say, historically three year[s] ago, when a higher percentage was fixed price." Pilgrim's later reported that by March 2012 it had reduced its exposure to fixed price contracts, with most contracts now market-based or including a reset provision linked to the underlying commodity. By 2014, Pilgrim's reported that less than 5% of all its contracts were 12-month fixed price contracts.

**Answer to Paragraph 357**: Pilgrim's admits it held an earnings call on January 29, 2008, in which then-CFO Rick Cogdill participated, and that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a transcript from that call, as well as one or more additional unidentified documents. These documents speak for themselves. Pilgrim's denies any remaining allegations in Paragraph 357.

> 358. On July 28, 2008, Perdue spokesperson Julie DeYoung told an industry publication that Perdue was looking to shorten its contract terms, stating, "the company is also seeking to raise prices and shorten its contracts."

**Answer to Paragraph 358**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

135

359.    Sanderson Farms' CEO Joe Sanderson noted in a July 31, 2008, earnings call that *the industry may move towards "shorter term agreements."*

**Answer to Paragraph 359**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

360.    *Industry observers noted the trend of Broiler producers moving away from fixed-price contracts.  For instance, a December 2013 report by Stephens, Inc. analyst Farha Aslam noted that "[w]ith volume growth generally limited, companies are developing more sophisticated strategies to generate profits . . . . 'Rather than annual fixed price contract[s] that are negotiated every fall, companies are partnering with customers and creating contracts that can be multi-year in duration.  Contracts are now being negotiated all year long and employ a wide variety of pricing methodologies.'" This confirms that even contracts which are long-term in duration are not "fixed" so as to prevent price increases when coordinated supply reductions drive up Broiler market price indices.*

**Answer to Paragraph 360**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more documents, which speak for themselves.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

## VII.    CLASS ACTION ALLEGATIONS

361.    *Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking injunctive relief pursuant to federal law, and damages pursuant to various state antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states listed below on behalf of the members of the following classes:*

    A.  **_Nationwide Injunctive Relief class_**:    *All entities who indirectly purchased Broilers from Defendants or co-conspirators in the United States during the Class Period for use or resale in their business or organization.*

    B.  **_Arizona class_**:  *All entities who indirectly purchased Broilers from Defendants or co-conspirators in Arizona during the Class Period for use or resale in their business or organization.*

    C.  **_Arkansas class_**:  *All entities who indirectly purchased Broilers from Defendants or co-conspirators in Arkansas during the Class Period for use or resale in their business or organization.*

D. **_California class_**:  All entities who indirectly purchased Broilers from Defendants or co-conspirators in California during the Class Period for use or resale in their business or organization.

E. **_District of Columbia class_**:  All entities who indirectly purchased Broilers from Defendants or co-conspirators in the District of Columbia during the Class Period for use or resale in their business or organization.

F. **_Florida class_**:  All entities who indirectly purchased Broilers from Defendants or co-conspirators in Florida during the Class Period for use or resale in their business or organization.

G. **_Hawaii class_**:  All entities who indirectly purchased Broilers from Defendants or co-conspirators in Hawaii during the Class Period for use or resale in their business or organization.

H. **_Illinois class_**:  All entities who indirectly purchased Broilers from Defendants or co-conspirators in Illinois during the Class Period for use or resale in their business or organization.

I. **_Iowa class_**:  All entities who indirectly purchased Broilers from Defendants or co-conspirators in Iowa during the Class Period for use or resale in their business or organization.

J. **_Kansas class_**:  All entities who indirectly purchased Broilers from Defendants or co-conspirators in Kansas during the Class Period for use or resale in their business or organization.

K. **_Maine class_**:  All entities who indirectly purchased Broilers from Defendants or co-conspirators in Maine during the Class Period for use or resale in their business or organization.

L. **_Massachusetts class_**:  All entities who indirectly purchased Broilers from Defendants or co-conspirators in Massachusetts during the Class Period for use or resale in their business or organization.

M. **_Michigan class_**:  All entities who indirectly purchased Broilers from Defendants or co-conspirators in Michigan during the Class Period for use or resale in their business or organization.

N. **_Minnesota class_**:  All entities who indirectly purchased Broilers from Defendants or co-conspirators in Minnesota during the Class Period for use or resale in their business or organization.

O. **_Mississippi class_**:  All entities who indirectly purchased Broilers from Defendants or co-conspirators in Mississippi during the Class Period for use or resale in their business or organization.

137

P. **_Missouri class_**:  *All entities who indirectly purchased Broilers from Defendants or co-conspirators in Missouri during the Class Period for use or resale in their business or organization.*

Q. **_Montana class_**:  *All entities who indirectly purchased Broilers from Defendants or co-conspirators in Montana during the Class Period for use or resale in their business or organization.*

R. **_Nebraska class_**:  *All entities who indirectly purchased Broilers from Defendants or co-conspirators in Nebraska during the Class Period for use or resale in their business or organization.*

S. **_Nevada class_**:  *All entities who indirectly purchased Broilers from Defendants or co-conspirators in Nevada during the Class Period for use or resale in their business or organization.*

T. **_New Hampshire class_**:  *All entities who indirectly purchased Broilers from Defendants or co-conspirators in New Hampshire during the Class Period for use or resale in their business or organization.*

U. **_New Mexico class_**:  *All entities who indirectly purchased Broilers from Defendants or co-conspirators in New Mexico during the Class Period for use or resale in their business or organization.*

V. **_New York class_**:  *All entities who indirectly purchased Broilers from Defendants or co-conspirators in New York during the Class Period for use or resale in their business or organization.*

W. **_North Carolina class_**:  *All entities who indirectly purchased Broilers from Defendants or co-conspirators in North Carolina during the Class Period for use or resale in their business or organization.*

X. **_North Dakota class_**:  *All entities who indirectly purchased Broilers from Defendants or co-conspirators in North Dakota during the Class Period for use or resale in their business or organization.*

Y. **_Oregon class_**:  *All entities who indirectly purchased Broilers from Defendants or co-conspirators in Oregon during the Class Period for use or resale in their business or organization.*

Z. **_Rhode Island class_**:  *All entities who indirectly purchased Broilers from Defendants or co-conspirators in Rhode Island during the Class Period for use or resale in their business or organization..*

AA. **_South Carolina class_**:  *All entities who indirectly purchased Broilers from Defendants or co-conspirators in South Carolina during the Class Period for use or resale in their business or organization.*

BB. **_South Dakota class_**: *All entities who indirectly purchased Broilers from Defendants or co-conspirators in South Dakota during the Class Period for use or resale in their business or organization.*

CC. **_Tennessee class_**: *All entities who indirectly purchased Broilers from Defendants or co-conspirators in Tennessee during the Class Period for use or resale in their business or organization.*

DD. **_Utah class_**: *All entities who indirectly purchased Broilers from Defendants or co-conspirators in Utah during the Class Period for use or resale in their business or organization.*

EE. **_Vermont class_**: *All entities who indirectly purchased Broilers from Defendants or co-conspirators in Vermont during the Class Period for use or resale in their business or organization.*

FF. **_West Virginia_**: *All entities who indirectly purchased Broilers from Defendants or co-conspirators in West Virginia during the Class Period for use or resale in their business or organization.*

GG. **_Wisconsin class_**: *All entities who indirectly purchased Broilers from Defendants or co-conspirators in Wisconsin during the Class Period for use or resale in their business or organization.*

**Answer to Paragraph 361**: Pilgrim's admits that Plaintiffs purport to bring this action on behalf of the Classes described in Paragraph 361, but denies that any class may be certified in this action, denies that Plaintiffs are entitled to any relief, and denies any remaining allegations of Paragraph 361.

362. *The State Classes are collectively referred to as the "Classes" unless otherwise indicated. Specifically excluded from these Classes are natural persons who purchased Broilers for their own use and not for resale (End-Purchaser Consumers); the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from these Classes are any federal, state governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action. Further excluded from the Classes and National Injunctive Relief Class are purchases of value added products containing Broilers, that are not manufactured, supplied or processed by Defendants, or otherwise not under the control of Defendants.*

**Answer to Paragraph 362**: Pilgrim's admits that Plaintiffs purport to exclude the entities described in paragraph 362 from their purported classes, but denies that any class may be certified

139

in this action, denies that Plaintiffs are entitled to any relief, and denies any remaining allegations of Paragraph 362.

*363.  Class Identity:  The above-defined Classes are readily identifiable and is one for which records should exist.*

**Answer to Paragraph 363**: Paragraph 363 contains Plaintiffs' legal conclusions, to which no responses is denied. To the extent a response is required, Pilgrim's denies the allegations.

*364.  Numerosity:  Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of Defendants and their Producer Co-Conspirators.  Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.*

**Answer to Paragraph 364**: Paragraph 364 contains Plaintiffs' legal conclusions, to which no responses is denied. To the extent a response is required, Pilgrim's denies the allegations.

*365.  Typicality:  Plaintiff's claims are typical of the claims of the members of the Classes because Plaintiffs purchased Broilers indirectly from one or more of the Defendants or their Producer Co-Conspirators, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Classes and the relief sought is common to the Classes.*

**Answer to Paragraph 365**: Paragraph 365 contains Plaintiffs' legal conclusions, to which no responses is denied. To the extent a response is required, Pilgrim's denies the allegations.

*366.  Common Questions Predominate:  There are questions of law and fact common to the Classes, including, but not limited to:*

> *A.  Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of Broilers sold in interstate commerce in the United States;*
> *B.  The identity of the participants of the alleged conspiracy;*
> *C.  The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;*
> *D.  Whether the alleged conspiracy violated the antitrust and consumer protection laws of the various states;*

> E. Whether the conduct of Defendants and their co-conspirators, as
> alleged in this Complaint, caused injury to the business or property of
> the Plaintiffs and the other members of the Classes;
>
> F. The effect of Defendants' alleged conspiracy on the prices of Broilers
> sold in the United States during the Class Period;
>
> G. Whether Plaintiffs and other members of the Classes are entitled to,
> among other things, injunctive relief and if so, the nature and extent of
> such injunctive relief; and
>
> H. The appropriate class-wide measure of damages.
>
> These and other questions of law or fact, which are common to the members of the
> Classes, predominate over any questions affecting only individual members of the
> Classes.

**Answer to Paragraph 366**: Paragraph 366 contains Plaintiffs' legal conclusions, to which no

responses is denied. To the extent a response is required, Pilgrim's denies the allegations.

> 367. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Classes
> in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other
> members of the Classes who indirectly purchased Broilers from Defendants and Plaintiffs
> have retained counsel competent and experienced in the prosecution of class actions and
> antitrust litigation to represent themselves and the Classes.

**Answer to Paragraph 367**: Paragraph 367 contains Plaintiffs' legal conclusions, to which no

responses is denied. To the extent a response is required, Pilgrim's denies the allegations.

> 368. Superiority: A class action is superior to other available methods for the fair and
> efficient adjudication of this controversy since individual joinder of all damaged members
> of the Classes is impractical. Prosecution as a class action will eliminate the possibility
> of duplicative litigation. The relatively small damages suffered by individual members of
> the Classes compared to the expense and burden of individual prosecution of the claims
> asserted in this litigation means that, absent a class action, it would not be feasible for
> members of the Classes to seek redress for the violations of law herein alleged. Further,
> individual litigation presents the potential for inconsistent or contradictory judgments and
> would greatly magnify the delay and expense to all parties and to the court system.
> Therefore, a class action presents far fewer case management difficulties and will provide
> the benefits of unitary adjudication, economy of scale and comprehensive supervision by a
> single court.

**Answer to Paragraph 368**: Paragraph 368 contains Plaintiffs' legal conclusions, to which no

responses is denied. To the extent a response is required, Pilgrim's denies the allegations.

369. *The prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.*

**Answer to Paragraph 369**: Paragraph 369 contains Plaintiffs' legal conclusions, to which no responses is denied. To the extent a response is required, Pilgrim's denies the allegations.

370. *Plaintiffs bring the Classes on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that, as residents of various states, indirectly purchased one or more Broilers that a defendant or co-conspirator produced during the respective Class Periods.*

**Answer to Paragraph 370**: Paragraph 370 contains Plaintiffs' legal conclusions, to which no responses is denied. To the extent a response is required, Pilgrim's denies the allegations.

371. *Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.*

**Answer to Paragraph 371**: Paragraph 371 contains Plaintiffs' legal conclusions, to which no responses is denied. To the extent a response is required, Pilgrim's denies the allegations.

## VIII. *ANTITRUST INJURY*

372. *Defendants' anticompetitive conduct had the following effects, among others:*

    A. *Price competition has been restrained or eliminated with respect to Broilers;*

    B. *The prices of Broilers have been fixed, raised, stabilized, or maintained at artificially inflated levels;*

    C. *Indirect purchasers of Broilers have been deprived of free and open competition; and*

    D. *Indirect purchasers of Broilers, including Plaintiffs, paid artificially inflated prices;*

**Answer to Paragraph 372**: Denied.

373. *Once the Defendants' chickens reach maturity, they are processed. Per the USDA, "processing is the term used by the poultry industry to describe the conversion of live poultry into raw poultry products fit for human consumption." Sometimes, the chicken is then sent for further processing, which, per the U.S. Poultry & Egg Assoc., is where "[t]he*

142

*whole carcass or cut-up and deboned pieces are further processed for added value."  The Broilers are then sold through various distribution channels.  See below chart.*



*See the National Chicken Counsel website, Industry Issues, Vertical Integration, http://www.nationalchickencouncil.org/industry-issues/vertical-integration/ (last visited 10/25/2016)*

**Answer to Paragraph 373**: Pilgrim's admits that some of its chickens are processed when they reach maturity and that some poultry products are then further processed.  Pilgrim's admits its sells a number of processed and further processed poultry products that may fall within Plaintiffs' litigation definition of "Broiler."  Pilgrim's admits Plaintiffs' are selectively quoting and attempting to characterize unidentified documents, which speak for themselves.  Pilgrims lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 373 and therefore denies them.

> 374.     The Broilers that Plaintiffs and Class Members purchased were in substantially the same form as when they were initially sold by Defendants.  As a result, the Broilers follow a traceable physical chain from Defendants to the Plaintiffs and class members, and the overcharges on Broilers can be traced from Defendants to Plaintiffs and class members.

**Answer to Paragraph 374**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

> 375.     It is well recognized that in a multi-level chain of distribution, such as exists here, an overcharge will be felt throughout the distribution chain.  As Professor Herbert Hovenkamp, a noted antitrust scholar has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 564:
>
> > A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below.  For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum.  In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers.  The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers.  Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.
> >
> > Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.
>
> Similarly, Professor Jeffrey K. McKie-Mason, the Arthur W. Burks Professor of Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan, has stated, it is "well known in economic theory and practice, [that] at least some of the overcharge will be passed on by distributors to end consumers."

**Answer to Paragraph 375**: Paragraph 375 contains legal conclusions, characterizations of Plaintiffs' allegations, and/or argument to which no response is required.  To the extent a response is required, Pilgrim's denies all allegations, arguments, and conclusions in Paragraph 375. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more documents, which speak for themselves. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations and therefore denies them.

*376.    Consequently, while the direct purchasers were the first to pay supra-competitive prices, some or all of the overcharge was passed along the distribution chain and absorbed by Plaintiffs and Class Members when they purchased from stores, brokers or distributors.*

**Answer to Paragraph 376**: Denied.

*377.    Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution.  Thus, the economic harm to Plaintiffs and the class members can be quantified.*

**Answer to Paragraph 377**: Paragraph 377 contains Plaintiffs legal conclusions to which no response is required.  To the extent a response is required, Pilgrim's denies the allegations.

*378.    The purpose of the conspiratorial conduct of the Defendants and their con-conspirators was to raise, fix, or maintain the price of Broilers and, as a direct and foreseeable result.  Plaintiffs and the Classes paid supracompetitive prices for Broilers during the Class Period.*

**Answer to Paragraph 378**: Denied.

*379.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury to their businesses or property, having paid higher prices for Broilers than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages.*

**Answer to Paragraph 379**: Denied.

*380.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.*

**Answer to Paragraph 380**: Denied.

## IX.    *THE STATUTES OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS*

### A.    *Plaintiffs Did Not and Could Not Have Discovered Defendants' Anticompetitive Conduct*

*381.    Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief.  Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint.  Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for Broilers.*

145

**Answer to Paragraph 381**: Denied.

> 382. The Adams v. Pilgrim's Pride case was originally filed as an adversarial bankruptcy proceeding against Pilgrim's in 2009, but was stayed pending resolution of Pilgrim's bankruptcy. The bankruptcy court subsequently allowed the Adams case to proceed. The Amended Complaint in the Adams case was filed on December 7, 2009, and like the original complaint, disclosed nothing about a horizontal conspiracy among Broiler producers to fix the price of Broilers.

**Answer to Paragraph 382**: Pilgrim's admits the *Adams v. Pilgrim's Pride* case was originally filed as an adversarial bankruptcy proceeding. Pilgrim's admits that an Amended Complaint in the Adams case was filed on December 7, 2009, that Plaintiffs are attempting to characterize the Complaint and Amended Complaint, both of which speak for themselves, and to the extent Plaintiffs allege anything inconsistent with the complaints Pilgrim's denies those allegations. Pilgrim's further admits that the Adams cases were decided in Pilgrim's favor and all claims were dismissed with prejudice. Pilgrim's denies any remaining allegations of Paragraph 382.

> 383. On February 18, 2014, "investigative reporter Christopher Leonard [published The Meat Racket,] the first-ever account of how a handful of companies have seized the nation's meat supply." The book was credited with being the first to explain how the meat industry had changed over the past forty years into an "oligarchy controlling much of the food we eat." While The Meat Racket did not conclude that Broiler producers were engaged in a horizontal conspiracy, it did suggest for the first time in a widely circulated book that conditions in the Broiler industry had become susceptible to collusion.

**Answer to Paragraph 383**: Pilgrim's admits Christopher Leonard published a book called The Meat Racket in 2014, which speaks for itself, but denies Plaintiffs' characterizations of the book or its contents. Pilgrim's denies any remaining allegations in Paragraph 383.

> 384. In addition, five recent investigations by foreign governments into price-fixing conspiracies in Broiler markets suggest that such price-fixing was possibly taking place in the United States. French, Chilean, Singaporean, Australian, and Indonesian price-fixing investigations in the past two years (described in sub-paragraphs A-E) have indicated that collusion is evidently rampant in Broiler industry. In particular, the large fine levied by France's competition authority against 21 separate companies and 2 other organizations suggests that even in a Broiler industry with almost two dozen participants, a price-fixing conspiracy is plausible even in the modern, industrialized reality of Broiler production.

146

A. *Chile: In a September 25, 2014, decision, Chile's Tribunal de Defensa de la Libre Competencia (Court for the Defense of Free Competition) concluded that three Chilean Broiler producers had colluded to limit the production of Broiler meat offered to the domestic market and allocated market shares of production and marketing of Broiler. The Court found that "the summoned poultry companies, by demand projections developed in conjunction with the APA[, a Chilean Broiler trade association], pursued the range in which Broiler prices should fluctuate through coordinated definition of a certain level of production." Based on the projected future demand for broilers, each conspirator would be allocated a production quota. The collusion was established through emails and other documents seized by the competition authority. The Court imposed fines equivalent to roughly $85 million and disbanded a Broiler trade association used by the defendants to facilitate their conspiracy.*

B. *Australia: On February 2, 2015, The Australian newspaper disclosed that the Australian Competition & Consumer Commission had initiated an investigation into price-fixing in the Australian broiler industry. The investigation is ongoing.*

C. *Singapore: On March 7, 2015, a local newspaper reported for the first time that the Competition Commission of Singapore (CCS) was investigating price-fixing among live chicken slaughtering and fresh chicken distribution by Malaysian based broiler producers and the Poultry Merchants' Association. On March 8, 2016, the Competition Commission of Singapore charged thirteen fresh chicken companies that make up ninety percent of the market in Singapore with engaging in anti-competitive discussions from 2007 through 2014. The matter is ongoing.*

D. *France: On May 6, 2015, France's competition authority, l'Autorité de la Concurrence announced that after an investigation into the entire French Broiler industry, it had decided to impose approximately $17.18 million in fines on 21 companies and 2 organizations for price fixing. The French competition authority concluded that between 2000-2007, French Broiler producers held a large number of meetings to discuss the prices to charge their customers, as well as other business details, all for the purpose of gaining a stronger position in price negotiations with France's larger supermarket chains. One of the French broiler company conspirators, Doux, collaborated with Pilgrim's parent company, JBS, S.A., in the Brazilian broiler market.*

E. *Indonesia: On February 3, 2016, Indonesia's Business Competition Supervisory Commission (KPPU) announced that it had compiled enough evidence of price-fixing in the poultry industry to summon 12*

*companies who constitute 90 percent of Indonesia's poultry production. The investigation is ongoing.*

**Answer to Paragraph 384**: Pilgrim's denies the allegations of the first three sentences of Paragraph 384. Pilgrim's admits Plaintiffs appear to be selectively quoting from and characterizing a series of unidentified documents, which speak for themselves. Pilgrim's denies Plaintiffs' characterizations and lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 384 and therefore denies them.

*385. The Wall Street Journal article on January 18, 2016 regarding possible manipulation by Defendants of the Georgia Dock Broiler price index raised the possibility of collusion by Defendants to artificially raise, fix or maintain Broiler prices. Subsequently, the series of articles published between November 3 and 17, 2016, detailed for the first time that the USDA had discontinued its reliance on the Georgia Dock price because its prices could not be verified. In an April 2016 letter to the Securities and Exchange Commission and the November 8, 2016, Washington Post article, Defendant Sanderson Farms continued to represent that the Georgia Dock price was "reliable," in order to induce purchasers of Broilers to believe the price was not subject to illegal manipulation by Defendants and their Producer Co-Conspirators. Further, not until November 10, 2016, was it disclosed publicly that Defendants and the Producer Co-Conspirators had formed a secret Georgia Dock Advisory Committee that facilitated opportunities for executives to meet and also discuss their scheme to fix the Georgia Dock price. The existence of this Committee was not known to the Plaintiffs, nor would they have been able to learn of how they conducted themselves in their secret meetings. Finally, not until November 17, 2016, was it publicly disclosed that the Florida Attorney General's Office was investigating the accuracy of the Georgia Dock price index.*

**Answer to Paragraph 385**: Pilgrim's admits that Plaintiffs appear to be attempting to characterize one or more news report and communications in the first three sentences of Paragraph 385, which are documents that speak for themselves. Pilgrim's denies the allegations of the fourth sentence of Paragraph 385. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the fifth sentence of Paragraph 385, including what Plaintiffs "knew" or should have known, and therefore denies them. Pilgrim's denies Plaintiffs' characterization of any investigation by the Florida Attorney General's Office and lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations of the last sentence of

Paragraph 385. Pilgrim's denies any remaining allegations in this Paragraph.

> 386. One way to assess whether the public was aware of facts suggesting an antitrust
> conspiracy among Defendants is to analyze the reaction of the market to the filing of the
> first complaint. In a reaction widely seen as driven exclusively by the filing of the
> Maplevale Farms complaint, on October 7, 2016, Defendant Tyson Food, Inc.'s stock price
> dropped as much as 11.5%, while Defendants Sanderson Farms and Pilgrim's Pride
> dropped 6.9% and 6.1% respectively. Similarly, the November 3, 2016, the New York
> Times article, published online that evening, revealed for the first time the USDA's inquiry
> regarding the Georgia Dock price index and raised the possibility that the index had been
> manipulated by Broiler companies. The next business day, the stock prices of Defendants
> Tyson Food, Inc., Sanderson Farms, and Pilgrim's Pride dropped 4%, 7%, and 8%,
> respectively, which media reports blamed on fallout from the disclosure of the USDA
> inquiry regarding the Georgia Dock price in the New York Times article.

**Answer to Paragraph 386**: Pilgrim's denies the allegations of the first sentence of Paragraph 386.

Pilgrim's admits that its stock price on the New York Stock Exchange opened at $20.79 on October

7, 2016 and closed at $20.16, but denies the Plaintiffs' characterization of the basis for or

perception of any changes in the stock price and lacks knowledge or information sufficient to form

a belief as to the truth of the allegations related to other Defendants in the second sentence and

therefore denies them. In the third sentence, Pilgrim's admits the Plaintiffs appear to be attempting

to characterize a news report, which is a document that speaks for itself. Pilgrim's admits that its

stock price on the New York Stock Exchange opened at $21.01 and closed at $19.31 on November

4, 2016, but denies the Plaintiffs' characterization of the basis for or perception of any changes in

the stock price and lacks knowledge or information sufficient to form a belief as to the truth of the

allegations related to other Defendants in the last sentence and therefore denies them. Pilgrim's

admits Plaintiffs appear to be attempting to characterize a news report in the last sentence, which

is a document that speaks for itself. Pilgrim's denies any remaining allegations in this Paragraph.

> 387. Defendants' anticompetitive conspiracy, by its very nature, was self-concealing.
> Broilers are not exempt from antitrust regulation, and thus, before these recent events
> Plaintiffs reasonably considered it to be a competitive industry. Accordingly, a reasonable

*person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Broiler prices before these recent events.*

**Answer to Paragraph 387**: Denied.

*388. Plaintiffs exercised reasonable diligence. Plaintiffs and the members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and all of their co-conspirators to conceal their combination.*

**Answer to Paragraph 388**: Denied.

**B.    *Defendants Actively Concealed The Conspiracy***

*389. Throughout the Class Period set forth in this Complaint, Defendants and their Co-Conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the Class members.*

**Answer to Paragraph 389**: Denied.

*390. The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).*

**Answer to Paragraph 390**: Denied.

*391. Defendants used code words including "discipline" and "capacity discipline" in their public statements to conceal their conspiracy and signal one other in furtherance of their conspiracy to restrain production while shielding their conspiracy from detection or suspicion. As alleged above, specific examples of the use of such coded language abound during the Class Period, including (1) the National Chicken Council's Annual Conference in October 2011 where a report noted that panel members Clint Rivers of Perdue Farms, Bill Anderson of Keystone Foods, Mike Helgeson of GNP, and Mark Kaminsky of Koch Foods noted that "[d]iscipline on the supply side was one suggestion" to increase Broiler prices, (2) on a May 3, 2013, earnings call, Pilgrim's President & CEO Bill Lovette stated that "price is going to strengthen as supply continues to be disciplined and constrained....and "we've done a good job so far of maintaining discipline," and (3) on a July 2016 earnings call Pilgrim's CEO Bill Lovette noted that "I think what we've seen with egg sets is absolutely a testament to the discipline of our industry that we've seen the last really two to three years."*

**Answer to Paragraph 391**: Denied.

392.    As alleged above, in 2008, after years of boom and bust cycles of production leading to the regular rise and fall of prices, the price of Broilers began an unprecedentedly steady increase that continues through the filing of this Complaint. Defendants affirmatively and falsely attributed the price increase to increases in the price of inputs, among other reasons. These were pretexts used to cover up the conspiracy. In fact, these price increases were the result of collusive conduct among Defendants, which was undisclosed at the time.

**Answer to Paragraph 392**: Denied.

393.    During the relevant period, Defendants affirmatively made numerous misleading public statements falsely portraying the market for Broilers as a competitive one. For example, Defendants provided testimony at workshops held by the U.S. Department of Justice and USDA suggesting the Broiler industry was competitive and not subject to anti-competitive practices and agreements. This included testimony at a May 21, 2010 workshop of a National Chicken Council-commissioned study by Dr. Thomas Elam, which stated that "the chicken industry is competitive and thriving," and has "[i]ntense competition" that promotes "product innovation and lower prices for consumers."

**Answer to Paragraph 393**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – testimony in Paragraph 393, which speaks for itself. Pilgrim's denies all remaining allegations in Paragraph 393.

394.    Defendants also repeatedly blamed the Renewable Fuels mandate for increased Broiler prices, both through the NCC, other trade groups, and through press releases, speeches, and other public statements by Defendants' employees, rather than disclosing the existence of an agreement to illegally restrain the supply of Broilers. Some instances of these pretextual explanations by Defendants and their agents include:

> A.    On a January 29, 2008 earnings call, Pilgrim's Interim CEO Clint Rivers claimed that "the U.S. government continues its misguided policy of subsidizing ethanol production at the expense of affordable food, and a lower corn yield expectation by USDA will contribute to decrease corn suppliers next year."

> B.    On June 23, 2008, Wayne Farms President & CEO Elton Maddox said in a statement that "the government's food fuel mandate has created the need for us to rationalize our business."

> C.    On July 7, 2008, O.K. Foods announced production cuts due to "record high prices for corn and soybean meal, which it attributed to the U.S. government's mandated ethanol policies."

D. On June 24, 2009, Harrison Poultry President & CEO Mike Welch and Claxton Poultry President Jerry Lane met in Washington DC and encouraged elected officials to end the "mistake" of the ethanol subsidy.

E. In 2010, Foster Farms delayed an expansion due, allegedly, to corn prices. Ira Brill, Foster Farm's Director of Market Services, blamed the ethanol mandate for the delay, stating that it "places enormous pressure on our input costs, and for that reason we can't go forward with our expansion plans."

F. On March 7, 2011, House of Raeford announced production cuts due to increased prices. It stated that "if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."

G. On March 15, 2011, Simmons announced downsizing at a plant due to economics "resulting from high grain prices predominantly caused by corn being used in ethanol." Simmons cited ethanol policies again on June 27, 2011, when it laid off another 223 employees.

H. In an April 13, 2011, hearing before a congressional subcommittee, Michael Welch (President and CEO of Harrison Poultry) stated that production of broilers was threatened by the diversion of corn to fuel production. Welch claimed that shifting corn back to feed would "allow consumers of poultry products to continue to enjoy an ongoing, adequate supply of animal protein at reasonable prices." Welch repeated similar claims in 2012 as well, citing increased corn costs resulting in "tens of billions of dollars in increased costs for livestock and poultry producers and food manufacturers."

I. On October 10, 2014, National Chicken Council President Mike Brown wrote an op-ed citing the Renewable Energy Standard as the primary reason for the poultry industry's inability to increase production. Brown cited the Renewable Fuel Standard again in a May 15, 2015 op-ed in the Wall Street Journal.

J. On October 10, 2014, National Chicken Council President Mike Brown wrote an op-ed citing the Renewable Energy Standard as the primary reason for the poultry industry's inability to increase production. Brown cited the Renewable Fuel Standard again in a May 15, 2015 op-ed in the Wall Street Journal.

**Answer to Paragraph 394**: Pilgrim's admits it held an earnings call on January 29, 2008, in which then-CEO Clint Rivers participated, and that Plaintiffs appear to selectively quote – and attempt

152

to characterize – the transcript of this call.  The transcript is a document that speaks for itself. Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – one or more documents throughout Paragraph 394 and its subparts (B)-(J), which speak for themselves.  Pilgrim's denies Plaintiffs' characterizations and all remaining allegations in Paragraph 394.

> 395.    To explain the shortage of Broilers since 2012, Defendants have provided a variety of pretextual explanations, including the following:  (a) a breeding issue with Broilers during 2014, (b) a Russian ban of U.S. Broiler imports starting in 2014, and (c) a 2013 shortage in supply due in part due to an Avian Flu outbreak in Mexico that caused a surge in demand for hens to repopulate farms in Mexico (see, e.g., ¶ 262 above) However, these explanations were pretextual and Defendants sought to hide their conspiracy from discovery by blaming Broiler price increases on these factors rather than Defendants' own collusive conduct.

**Answer to Paragraph 395**: Denied.

> 396.    Throughout the Class Period Defendants repeatedly cited increasing input costs as a pretext for their collusion to restrain supply and increase prices.  For instance, Defendants repeatedly claimed that input cost increases during 2008 justified Broiler price increases.  However, while corn was $5/bushel in 2005-2006 and increased to $9 by May or June 2008, it quickly fell back to below $5/bushel by fall 2008.  In fact, prior to 2008 there is a statistical correlation between Broiler prices and corn prices, but during the Class Period there has been no statistical correlation between Broiler and corn prices.  In other words, despite Defendants' pretextual explanations to the contrary, Defendants were not determining the price of Broilers based on the input price for corn.

**Answer to Paragraph 396**: Denied.

> 397.    Another example of the pretextual nature of cost justifications for Broiler price increases is a November 2012 interview, in which Fieldale Farm President Thomas Hensley was asked whether he thought the recently concluded NCC Annual Conference focused too much time on the Renewable Fuel Standard because eliminating the ethanol subsidy would not "move the needle on corn supply and prices that much" and whether there was "any danger the industry has focused too much on this as a magic bullet?" Hensley responded, "I think that's accurate.  The best-case scenario is that corn would go down $1.25 per bushel and some people say it will only go down 50 cents."

**Answer to Paragraph 397**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a document in Paragraph 397, which speaks for itself.  Pilgrim's

lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 397 and therefore denies them.

> 398. *The National Chicken Council has served as the mouthpiece for Defendants publicized pretextual excuses for rising Broiler prices. Among other actions, the following indicate an intent to deceive purchasers of Broilers into believing that input costs, rather than a collusive agreement among Defendants to reduce supply, was the cause of rising Broiler prices:*

>> A. *Through the National Chicken Council, Defendants ensured that the pretext for their production cuts and price increases, the ethanol mandate, continued to be blamed for increased chicken prices rather than Defendants' secret conspiracy. A May 19, 2010, report by FarmEcon LLC was commissioned by the NCC and concluded "[o]n the national scale, it is the overall conclusion of this study that the chicken industry is a competitive and thriving sector." The NCC trumpeted the findings through a press release on its website with the headline "Competition in Broiler Sector Benefits Chicken Farmers, Companies, and Consumers, Study Finds."*

>> B. *As noted above, Brown's October 10, 2014, and May 15, 2015, op-eds in national newspapers attempted to explain away why "current favorable market conditions that would normally stimulate production to be somewhat higher" were not doing so. These op-eds were intended to convince purchasers of Broilers that input costs, rather than a secret conspiracy, were to blame for increasing Broiler prices.*

**Answer to Paragraph 398**: Pilgrim's admits that Plaintiffs appear to be selectively quoting from – and attempting to characterize – a series of unidentified documents in Paragraph 398 and its sub-parts, which speak for themselves. Pilgrim's denies any remaining allegations in Paragraph 398 and therefore denies them.

> 399. *By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.*

**Answer to Paragraph 399**: Denied.

## X.  VIOLATION OF THE SHERMAN ACT

### FIRST CLAIM FOR RELIEF
#### Violation of Section 1 of the Sherman Act
#### 15 U.S.C. § 1
#### (On Behalf of Nationwide Class for Injunctive and Equitable Relief)

*400.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 400**: Paragraph 400 contains no factual allegations to which a response is required.  To the extent a response is required, Pilgrim's denies the allegations.  Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

*401.   Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2008, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, stabilize, and peg prices for Broilers in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).*

**Answer to Paragraph 401**: Denied.

*402.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:*

> *A.  Fixing, raising, stabilizing, and pegging the price of Broilers; and*

> *B.  Allocating among themselves and collusively reducing the production of Broilers.*

**Answer to Paragraph 402**: Denied.

*403.   The combination and conspiracy alleged herein has had the following effects, among others:*

> *A.  Price competition in the sale of Broilers has been restrained, suppressed, and/or eliminated in the United States;*

> *B.  Prices for Broilers sold by Defendants and all of their Produce Co-Conspirators have been fixed, raised, maintained and stabilized at*

*artificially high, non-competitive levels throughout the United States; and*

C. *Those who purchased Broilers indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.*

**Answer to Paragraph 403**: Denied.

404. *Plaintiffs and members of the Classes have been injured and will continue to be injured in their businesses and property by paying more for Broilers purchased indirectly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy, as a result of higher prices paid for Broilers by the direct purchasers.*

**Answer to Paragraph 404**: Denied.

405. *Plaintiffs and members of the Classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.*

**Answer to Paragraph 405**: Denied.

## XI. *VIOLATIONS OF STATE ANTITRUST LAWS*

406. *Plaintiffs incorporate by reference the allegations in the preceding paragraphs.*

**Answer to Paragraph 406**: Paragraph 406 contains no allegations to which a response is required. To the extent a response is required, Pilgrim's denies the allegations. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

407. *The following Second through Twenty-Sixth Claims for Relief are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of the indicated class.*

**Answer to Paragraph 407**: Paragraph 407 contains no factual allegations to which a response is required. To the extent a response is required, Pilgrim's denies the allegations.

### *SECOND CLAIM FOR RELIEF*
***Violation of Arizona's Uniform State Antitrust Act,***

*Ariz. Rev. Stat. § 44-1401, et seq*
*(On Behalf of the Arizona Class)*

408.    *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 408**: Paragraph 408 contains no factual allegations to which a response is required.  To the extent a response is required, Pilgrim's denies the allegations.  Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

409.    *By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. § 44-1401, et seq.*

**Answer to Paragraph 409**: Denied.

410.    *Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Broilers market, a substantial part of which occurred within Arizona.*

**Answer to Paragraph 410**: Denied.

411.    *Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Broiler market.*

**Answer to Paragraph 411**: Denied.

412.    *Defendants' violations of Arizona law were flagrant.*

**Answer to Paragraph 412**: Denied.

413.    *Defendants' unlawful conduct substantially affected Arizona's trade and commerce.*

**Answer to Paragraph 413**: Denied.

414.    *As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and members of the Arizona Class have been injured in their business or property and are threatened with further injury.*

**Answer to Paragraph 414**: Denied.

157

415. *By reason of the foregoing, Plaintiffs and members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, et seq.*

**Answer to Paragraph 415**: Denied.

### THIRD CLAIM FOR RELIEF
**Violation of the Arkansas Unfair Practices Act,**
**Ark. Code Ann. § 4-75-201, et seq. and § 4-75-301, et seq.**
**(On Behalf of the Arkansas Class)**

416. *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 416**: Paragraph 416 contains no factual allegations to which a response is required. To the extent a response is required, Pilgrim's denies the allegations. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

417. *By reason of the conduct alleged herein, Defendants have violated Ark. Code Ann. § 4-75-201, et seq. and § 4-75-301, et seq.*

**Answer to Paragraph 417**: Pilgrim's denies that Plaintiffs are entitled to any relief under the Arkansas Unfair Practices Act, as the Court dismissed Plaintiffs' claims under this statute in its November 20, 2017 Order. Pilgrim's denies the allegations in Paragraph 417.

418. *Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Broilers market, a substantial part of which occurred within Arkansas.*

**Answer to Paragraph 418**: Denied.

419. *Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Arkansas, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Broilers market.*

**Answer to Paragraph 419**: Denied.

420. *Defendants' violations of Arkansas law were flagrant.*

**Answer to Paragraph 420**: Pilgrim's denies that Plaintiffs are entitled to any relief under the Arkansas Unfair Practices Act, as the Court dismissed Plaintiffs' claims under this statute in its November 20, 2017 Order. Pilgrim's denies the allegations in Paragraph 420.

421. *Defendants' unlawful conduct substantially affected Arkansas's trade and commerce.*

**Answer to Paragraph 421**: Denied.

422. *Defendants' unlawful conduct caused injury, and as a result, Plaintiffs and the members of the Arkansas Class have been damaged in their business or property and are threatened with further damages.*

**Answer to Paragraph 422**: Pilgrim's denies that Plaintiffs are entitled to any relief pursuant to claims under the Arkansas Unfair Practices Act, as the Court dismissed these claims in its November 20, 2017 Order. Pilgrim's denies the allegations in Paragraph 422.

423. *By reason of the foregoing, Plaintiffs and members of the Arkansas Class are entitled to seek all forms of relief, including treble damages, reasonable attorney's fees and costs, and injunctive relief available under Ark. Code Ann. § 4-75-211.*

**Answer to Paragraph 423**: Pilgrim's denies that Plaintiffs are entitled to any relief pursuant to claims under the Arkansas Unfair Practices Act, as the Court dismissed these claims in its November 20, 2017 Order. Pilgrim's denies the allegations in Paragraph 423.

### FOURTH CLAIM FOR RELIEF
#### Violation of California's Cartwright Act,
#### Cal. Bus. & Prof. Code § 16700, et seq.
#### (On Behalf of the California Class)

424. *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 424**: Paragraph 424 contains no factual allegations to which a response is required. To the extent a response is required, Pilgrim's denies the allegations. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

159

*425.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.*

**Answer to Paragraph 425**: Paragraph 425 contains Plaintiffs' legal conclusions regarding California law, to which no response is required.  To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

*426.    California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.*

**Answer to Paragraph 426**: Paragraph 426 contains Plaintiffs' legal conclusions regarding California law, to which no response is required.  To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

*427.    Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).*

**Answer to Paragraph 427**: Paragraph 427 contains Plaintiffs' legal conclusions as to standing under California law, to which no response is required.  To the extent a response is required, Pilgrim's denies the allegations of Paragraph 427.

*428.    A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. Id. at § 16726.*

**Answer to Paragraph 428**: Paragraph 428 contains Plaintiffs' legal conclusions as to California law, to which no response is required.  To the extent a response is required, Pilgrim's admits

160

Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

> 429. *Plaintiffs purchased Broilers within the State of California during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 429**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 429 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 429.

> 430. *Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, et seq.*

**Answer to Paragraph 430**: Denied.

> 431. *Plaintiffs and members of the Class were injured in their business or property, with respect to purchases of Broilers in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.*

**Answer to Paragraph 431**: Denied.

### FIFTH CLAIM FOR RELIEF
**Violation of the District of Columbia Antitrust Act,
D.C. Code § 28-4501, et seq.
(On Behalf of the District of Columbia Class)**

> 432. *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 432**: Paragraph 432 contains no factual allegations to which a response is required. To the extent a response is required, Pilgrim's denies the allegations. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

> 433. *The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."*

**Answer to Paragraph 433**: Paragraph 433 contains Plaintiffs' legal conclusions regarding the law of the District of Columbia, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

> 434. Plaintiffs purchased Broilers within the District of Columbia during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.

**Answer to Paragraph 434**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 434 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 434.

> 435. Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "any indirect purchaser in the chain of manufacture, production or distribution of goods...shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

**Answer to Paragraph 435**: Paragraph 435 contains Plaintiffs' legal conclusions regarding standing under the law of the District of Columbia, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

> 436. Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the market for Broilers within the District of Columbia, in violation of D.C. Code § 28-4501, et seq.

**Answer to Paragraph 436**: Denied.

> 437. Plaintiffs and members of the Class were injured with respect to purchases of Broilers in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

**Answer to Paragraph 437**: Denied.

### SIXTH CLAIM FOR RELIEF
### Violation of the Illinois Antitrust Act,
### 740 Ill. Comp. Stat. Ann. 10/3(1), et seq.
### (On Behalf of the Illinois Class)

438.    *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 438**: Paragraph 438 contains no factual allegations to which a response is required.   To the extent a response is required, Pilgrim's denies the allegations.   Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

439.    *The Illinois Antitrust Act, 740 ILCS 10/1, et seq., aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 ILCS 10/2.*

**Answer to Paragraph 439**: Paragraph 439 contains Plaintiffs' legal conclusions regarding Illinois law, to which no response is required.   To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

440.    *Plaintiffs purchased Broilers within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 440**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 440 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 440.

441.    *Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint.  740 ILCS 10/7(2).*

**Answer to Paragraph 441**: Paragraph 441 contains Plaintiffs' legal conclusions regarding standing under Illinois law, to which no response is required. To the extent a response is required, Pilgrim's denies the allegations of Paragraph 441.

> 442. Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for Broilers sold, and/or for allocating customers or markets for Broilers within the intrastate commerce of Illinois.

**Answer to Paragraph 442**: Denied.

> 443. Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for Broilers in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, et seq.

**Answer to Paragraph 443**: Denied.

> 444. Plaintiffs and members of the Class were injured with respect to purchases of Broilers in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

**Answer to Paragraph 444**: Denied.

### SEVENTH CLAIM FOR RELIEF
**Violation of the Iowa Competition Law**
**Iowa Code § 553.1, et seq.**
**(On Behalf of the Iowa Class)**

> 445. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 445**: Paragraph 445 contains no factual allegations to which a response is required. To the extent a response is required, Pilgrim's denies the allegations. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

> 446. The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

**Answer to Paragraph 446**: Paragraph 446 contains Plaintiffs' legal conclusions regarding Iowa law, to which no response is required. To the extent a response is required, Pilgrim's admits

Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

> 447.    *Plaintiffs purchased Broilers within the State of Iowa during the Class Period.  But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 447**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 447 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 447.

> 448.    *Defendants contracted, combined or conspired to restrain or monopolize trade in the market for Broilers, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for Broilers, in violation of Iowa Code § 553.1, et seq.*

**Answer to Paragraph 448**: Denied.

> 449.    *Plaintiffs and members of the Iowa Class were injured with respect to purchases of Broilers in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.*

**Answer to Paragraph 449**: Denied.

### EIGHTH CLAIM FOR RELIEF
**Violation of the Kansas Restraint of Trade Act**
**Kan. Stat. Ann. § 50-101, et seq.**
**(On Behalf of the Kansas Class)**

> 450.    *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 450**: Paragraph 450 contains no factual allegations to which a response is required.  To the extent a response is required, Pilgrim's denies the allegations.  Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

> 451.    *The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state."  Kan. Stat. Ann. § 50-112.*

**Answer to Paragraph 451**: Paragraph 451 contains Plaintiffs' legal conclusions regarding Kansas law, to which no response is required.  To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

452.    *Plaintiffs purchased Broilers within the State of Kansas during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 452**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 452 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 452.

453.    *Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  Kan. Stat. Ann § 50-161(b).*

**Answer to Paragraph 453**: Paragraph 453 contains Plaintiffs' legal conclusions regarding standing under Kansas law, to which no response is required.  To the extent a response is required, Pilgrim's denies the allegations of Paragraph 453.

454.    *Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of Broilers, increasing the price of Broilers, preventing competition in the sale of Broilers, or binding themselves not to sell Broilers, in a manner that established the price of Broilers and precluded free and unrestricted competition among themselves in the sale of Broilers, in violation of Kan. Stat. Ann. § 50-101, et seq.*

**Answer to Paragraph 454**: Denied.

455.    *Plaintiffs and members of the Class were injured with respect to purchases of Broilers in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.*

**Answer to Paragraph 455**: Denied.

### NINTH CLAIM FOR RELIEF
**Violation of the Maine's Antitrust Statute**

*Me. Rev. Stat. Ann. Tit. 10 § 1101, et seq.*
*(On Behalf of the Maine Class)*

456.    *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 456**: Paragraph 456 contains no factual allegations to which a response is required.  To the extent a response is required, Pilgrim's denies the allegations.  Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

457.    *Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine.  Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade.  Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.*

**Answer to Paragraph 457**: Paragraph 457 contains Plaintiffs' legal conclusions regarding Maine law, to which no response is required.  To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

458.    *Plaintiffs purchased Broilers within the State of Maine during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 458**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 458 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 458.

459.    *Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  Me. Rev. Stat. Ann. Tit. 10, § 1104(1).*

**Answer to Paragraph 459**: Paragraph 459 contains Plaintiffs' legal conclusions regarding standing under Maine law, to which no response is required.  To the extent a response is required, Pilgrim's denies the allegations of Paragraph 459.

*460.    Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of Broilers within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, et seq.*

**Answer to Paragraph 460**: Denied.

*461.    Plaintiffs and members of the Class were injured with respect to purchases of Broilers in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.*

**Answer to Paragraph 461**: Denied.

### TENTH CLAIM FOR RELIEF
**Violation of the Michigan Antitrust Reform Act**
**Mich. Comp. Laws § 445.771, et seq.**
**(On Behalf of the Michigan Class)**

*462.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 462**: Paragraph 486 contains no factual allegations to which a response is required.  To the extent a response is required, Pilgrim's denies the allegations.  Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

*463.    The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce...to prohibit monopolies and attempts to monopolize trade or commerce...[and] to provide remedies, fines, and penalties for violations of this act."  Mich. Act 274 of 1984.*

**Answer to Paragraph 463**: Paragraph 463 contains Plaintiffs' legal conclusions regarding Michigan law, to which no response is required.  To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

*464.    Plaintiffs purchased Broilers within the State of Michigan during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broiler would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 464**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 464 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 464.

> 465.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  Mich. Comp. Laws. § 452.778(2).

**Answer to Paragraph 465**: Paragraph 465 contains Plaintiffs' legal conclusions regarding standing under Michigan law, to which no response is required.  To the extent a response is required, Pilgrim's denies the allegations of Paragraph 465.

> 466.    Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in the market for Broilers, in violation of Mich. Comp. Laws § 445.772, et seq.

**Answer to Paragraph 466**: Denied.

> 467.    Plaintiffs and members of the Class were injured with respect to purchases of Broilers in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

**Answer to Paragraph 467**: Denied.

### ELEVENTH CLAIM FOR RELIEF
**Violation of the Minnesota Antitrust Law,
Minn. Stat. § 325D.49, et seq.
(On Behalf of the Minnesota Class)**

> 468.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 468**: Paragraph 468 contains no factual allegations to which a response is required.  To the extent a response is required, Pilgrim's denies the allegations.  Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

> 469.    The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any

*establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.*

**Answer to Paragraph 469**: Paragraph 469 contains Plaintiffs' legal conclusions regarding Minnesota law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

*470. Plaintiffs purchased Broilers within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 470**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 470 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 470.

*471. Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.*

**Answer to Paragraph 471**: Paragraph 471 contains Plaintiffs' legal conclusions regarding standing under Michigan law, to which no response is required. To the extent a response is required, Pilgrim's denies the allegations of Paragraph 471.

*472. Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for Broilers within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for Broilers within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for Broilers within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, et seq.*

**Answer to Paragraph 472**: Denied.

*473. Plaintiffs and members of the Class were injured with respect to purchases of Broilers in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.*

**Answer to Paragraph 473**: Denied.

### TWELVTH CLAIM FOR RELIEF
#### *Violation of the Mississippi Antitrust Statute,*
#### *Miss. Code Ann. § 74-21-1, et seq.*
#### *(On Behalf of the Mississippi Class)*

474. *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 474**: Paragraph 474 contains no factual allegations to which a response is required. To the extent a response is required, Pilgrim's denies the allegations. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

475. *Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.*

**Answer to Paragraph 475**: Paragraph 475 contains Plaintiffs' legal conclusions regarding Mississippi law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

476. *Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.*

**Answer to Paragraph 476**: Paragraph 476 contains Plaintiffs' legal conclusions regarding Mississippi law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language

171

of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

> 477. *Plaintiffs purchased Broilers within the State of Mississippi during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 477**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 477 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 477.

> 478. *Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.*

**Answer to Paragraph 478**: Paragraph 478 contains Plaintiffs' legal conclusions under Mississippi law, to which no response is required. To the extent a response is required, Pilgrim's denies the allegations of Paragraph 478.

> 479. *Defendants combined, contracted, understood and agreed in the market for Broilers, in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of Broilers and hindering competition in the sale of Broilers, in violation of Miss. Code Ann. § 75-21-1(a), et seq.*

**Answer to Paragraph 479**: Denied.

> 480. *Defendants monopolized or attempted to monopolize the production, control or sale of Broilers, in violation of Miss. Code Ann. § 75-21-3, et seq.*

**Answer to Paragraph 480**: Denied.

> 481. *Defendants' Broilers are sold indirectly via distributors throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.*

**Answer to Paragraph 481**: Pilgrim's admits it sells to direct purchasers in the state of Mississippi, and some direct purchasers may be distributors, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 481 and therefore denies them. Pilgrim's denies the allegations of the second sentence of Paragraph 481.

482. *Plaintiffs and members of the Class were injured with respect to purchases of Broilers in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.*

**Answer to Paragraph 482**: Denied.

### *THIRTEENTH CLAIM FOR RELIEF*
### *Violation of the Nebraska Junkin Act,*
### *Neb. Rev. Stat. § 59-801, et seq.*
### *(On Behalf of the Nebraska Class)*

483. *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 483**: Paragraph 483 contains no factual allegations to which a response is required. To the extent a response is required, Pilgrim's denies the allegations. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

484. *Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.*

**Answer to Paragraph 484**: Paragraph 478 contains Plaintiffs' legal conclusions under Nebraska law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

485. *Plaintiffs purchased Broilers within the State of Nebraska during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 485**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 485 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 485.

486. *Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.*

**Answer to Paragraph 486**: Paragraph 486 contains Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Pilgrim's denies the allegations of Paragraph 486.

> 487.    Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the market for Broilers within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, et seq.

**Answer to Paragraph 487**: Denied.

> 488.    Plaintiffs and members of the Class were injured with respect to purchases of Broilers in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**Answer to Paragraph 488**: Denied.

### FOURTEENTH CLAIM FOR RELIEF
**Violation of the Nevada Unfair Trade Practices Act,**
**Nev. Rev. Stat. § 598A.010, et seq.**
**(On Behalf of the Nevada Class)**

> 489.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 489**: Paragraph 489 contains no factual allegations to which a response is required. To the extent a response is required, Pilgrim's denies the allegations. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

> 490.    The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities...is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

**Answer to Paragraph 490**: Paragraph 490 contains Plaintiffs' legal conclusions under Nevada law, to which no response is required. To the extent a response is required, Pilgrim's admits

Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

> 491.    The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices.  Nev. Rev. Stat. Ann. § 598A.030(2).  Such acts include, inter alia, price fixing, division of markets, allocation of customers, and monopolization of trade.  Nev. Rev. Stat. Ann. § 598A.060.

**Answer to Paragraph 491**: Paragraph 491 contains Plaintiffs' legal conclusions under Nevada law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

> 492.    Plaintiffs purchased Broilers within the State of Nevada during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.

**Answer to Paragraph 492**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 492 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 492.

> 493.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint.  Nev. Rev. Stat. Ann. §598A.210(2).

**Answer to Paragraph 493**: Paragraph 493 contains Plaintiffs' legal conclusions as to standing under Nevada law, to which no response is required.  To the extent a response is required, Pilgrim's denies the allegations of Paragraph 493.

> 494.    Defendants fixed prices by agreeing to establish prices for Broilers in Nevada, divided Nevada markets, allocated Nevada customers, and monopolized or attempted monopolize trade or commerce of Broilers within the intrastate commerce of Nevada, constituting a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, et seq.

**Answer to Paragraph 494**: Denied.

> 495.    Plaintiffs and members of the Class were injured with respect to purchases of Broilers in Nevada in that at least thousands of sales of Defendants' Broilers took place in

175

*Nevada, purchased by Nevada purchasers at supra-competitive prices caused by Defendants' conduct.*

**Answer to Paragraph 495**: Denied.

496.     *Accordingly, Plaintiffs and members of the Nevada Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.*

**Answer to Paragraph 496**: Denied.

497.     *In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by Plaintiffs.*

**Answer to Paragraph 497**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 497 and therefore denies them.

### *FIFTEENTH CLAIM FOR RELIEF*
*Violation of New Hampshire's Antitrust Statute,*
*N.H. Rev. Stat. Ann. Tit. XXXI, § 356, et seq.*
*(On Behalf of the New Hampshire Class)*

498.     *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 498**: Paragraph 498 contains no factual allegations to which a response is required.   To the extent a response is required, Pilgrim's denies the allegations.   Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

499.     *Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H. Rev. Stat. Ann. §§ 356:2, 3.*

**Answer to Paragraph 499**: Paragraph 499 contains Plaintiffs' legal conclusions under New Hampshire law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

500.     *Plaintiffs purchased Broilers within the State of New Hampshire during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 500**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 500 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 500.

501.     *Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).*

**Answer to Paragraph 501**: Paragraph 501 contains Plaintiffs' legal conclusions as to standing under New Hampshire law, to which no response is required. To the extent a response is required, Pilgrim's denies the allegations of Paragraph 501.

502.     *Defendants fixed, controlled or maintained prices for Broilers, allocated customers or markets for Broilers, and established, maintained or used monopoly power, or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, et seq.*

**Answer to Paragraph 502**: Denied.

503.     *Plaintiffs and members of the Class were injured with respect to purchases of Broilers in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.*

**Answer to Paragraph 503**: Denied.

### SIXTEENTH CLAIM FOR RELIEF
**Violation of the New Mexico Antitrust Act,**
**N.M. Stat. Ann. §§ 57-1-1, et seq.**
**(On Behalf of the New Mexico Class)**

504.     *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 504**: Paragraph 504 contains no factual allegations to which a response is required. To the extent a response is required, Pilgrim's denies the allegations. Pilgrim's

incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs'

Complaint as if fully set forth herein in its answer to this Paragraph.

> 505.   *The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices.  N.M. Stat. Ann. 57-1-15.*

**Answer to Paragraph 505**: Paragraph 505 contains Plaintiffs' legal conclusions under New

Mexico law, to which no response is required. To the extent a response is required, Pilgrim's admits

Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state

statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

> 506.   *Plaintiffs purchased Broilers within the State of New Mexico during the Class Period.  But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 506**: Pilgrim's lacks knowledge or information sufficient to form a belief

as to the truth of the allegations in the first sentence of Paragraph 506 and therefore denies them.

Pilgrim's denies the remaining allegations in Paragraph 506.

> 507.   *Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  N.M. Stat. Ann. § 57-1-3.*

**Answer to Paragraph 507**: Paragraph 507 contains Plaintiffs' legal conclusions regarding

standing under New Mexico law, to which no response is required.  To the extent a response is

required, Pilgrim's denies the allegations of Paragraph 507.

> 508.   *Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for Broilers within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, et seq.*

**Answer to Paragraph 508**: Denied.

> 509.   *Plaintiffs and members of the Class were injured with respect to purchases of Broilers in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.*

**Answer to Paragraph 509**: Denied.

## SEVENTEENTH CLAIM FOR RELIEF
### Violation of Section 340 of the New York General Business Law
### (On Behalf of the New York Class)

*510.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 510**: Paragraph 510 contains no factual allegations to which a response is required.  Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

*511.    Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York.  N.Y. Gen. Bus. Law § 340(1).*

**Answer to Paragraph 511**: Paragraph 511 contains Plaintiffs' legal conclusions under New York law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

*512.    Plaintiffs purchased Broilers within the State of New York during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 512**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 512 and therefore denies them. Pilgrim's denies the remaining allegations of Paragraph 512.

*513.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).*

**Answer to Paragraph 513**: Paragraph 513 contains Plaintiffs' legal conclusions regarding standing under New York law, to which no response is required.  To the extent a response is required, Pilgrim's denies the allegations of Paragraph 513.

*514.    Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of Broilers and restrained competition in the free*

*exercise of the conduct of the business of Broilers within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, et seq.*

**Answer to Paragraph 514**: Denied.

515.   *Plaintiffs and members of the Class were injured with respect to purchases of Broilers in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.*

**Answer to Paragraph 515**: Denied.

<u>*EIGHTEENTH CLAIM FOR RELIEF*</u>
*Violation of the North Carolina General Statutes,*
*N.C. Gen. Stat. § 75-1, et seq.*
*(On Behalf of the North Carolina Class)*

516.   *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 516**: Paragraph 516 contains no factual allegations to which a response is required.   Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

517.   *Defendants entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the Broiler Market, a substantial part of which occurred within North Carolina.*

**Answer to Paragraph 517**: Denied.

518.   *Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Broiler Market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.*

**Answer to Paragraph 518**: Denied.

519.   *Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.*

**Answer to Paragraph 519**: Denied.

520.   *As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.*

**Answer to Paragraph 520**: Denied.

521.    By reason of the foregoing, Plaintiffs and members of the North Carolina Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, et seq.

**Answer to Paragraph 521**: Denied.

### NINTEENTH CLAIM FOR RELIEF
**Violation of the North Dakota Uniform State Antitrust Act,**
**N.D. Cent. Code § 51-08.1, et seq.**
**(On Behalf of the North Dakota Class)**

522.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 522**: Paragraph 522 contains no factual allegations to which a response is required.  Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

523.    The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade.  N.D. Cent. Code § 51-08.1, et seq.

**Answer to Paragraph 523**: Paragraph 523 contains Plaintiffs' legal conclusions under North Dakota law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

524.    Plaintiffs purchased Broilers within the State of North Dakota during the Class Period.  But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.

**Answer to Paragraph 524**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 524 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 524.

525.    Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  N.D. Cent. Code § 51-08.1-08.

**Answer to Paragraph 525**: Paragraph 525 contains Plaintiffs' legal conclusions regarding standing under North Dakota law, to which no response is required. To the extent a response is required, Pilgrim's denies the allegations of Paragraph 525.

> 526.    Defendants contracted, combined or conspired in restraint of, or to monopolize trade or commerce in the market for Broilers, and established, maintained, or used a monopoly, or attempted to do so, for the purposes of excluding competition or controlling, fixing or maintaining prices for Broilers, in violation of N.D. Cent. Code §§ 51-08.1-02, 03.

**Answer to Paragraph 526**: Denied.

> 527.    Plaintiffs and members of the Class were injured with respect to purchases in North Dakota and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**Answer to Paragraph 527**: Denied.

### TWENTIETH CLAIM FOR RELIEF
### Violation of the Oregon Antitrust Law,
### Or. Rev. Stat. § 646.705, et seq.
### (On Behalf of the Oregon Class)

> 528.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 528**: Paragraph 528 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

> 529.    Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 899 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. § 646.715.

**Answer to Paragraph 529**: Paragraph 529 contains Plaintiffs' legal conclusions under Oregon law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

*530.    Plaintiffs purchased Broilers within the State of Oregon during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 530**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 530 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 530.

*531.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint.  Or. Rev. Stat. § 646.780(1)(a).*

**Answer to Paragraph 531**: Paragraph 531 contains Plaintiffs' legal conclusions regarding standing under Oregon law, to which no response is required.  To the extent a response is required, Pilgrim's denies the allegations of Paragraph 531.

*532.    Defendants contracted, combined, or conspired in restraint of trade or commerce of Broilers, and monopolized or attempted to monopolize the trade or commerce of Broilers, in violation of Or. Rev. Stat. § 646.705, et seq.*

**Answer to Paragraph 532**: Denied.

*533.    Plaintiffs and members of the Class were injured with respect to purchases of Broilers within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.*

**Answer to Paragraph 533**: Denied.

### *TWENTY-FIRST CLAIM FOR RELIEF*
### *Violation of the Rhode Island Antitrust Act,*
### *R.I. Gen Laws § 6-36-1, et seq.*
### *(On Behalf of the Rhode Island Class)*

*534.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 534**: Paragraph 534 contains no factual allegations to which a response is required.   Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

*535.    The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition.  R.I. Gen. Laws § 6-36-2(a)(2).*

**Answer to Paragraph 535**: Paragraph 535 contains Plaintiffs' legal conclusions under Rhode Island law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

*536.    Plaintiffs purchased Broilers within the State of Rhode Island during the Class Period.  But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 536**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 536 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 536.

*537.    Under the Rhode Island Antitrust Act, as of January 1, 2008, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  R.I. Gen. Laws § 6-36-11(a).  In Rhode Island, the claims of the Plaintiffs and the Class alleged herein run from January 1, 2008, through the date that the effects of Defendants' anticompetitive conduct cease.*

**Answer to Paragraph 537**: Paragraph 537 contains Plaintiffs' legal conclusions regarding standing under Rhode Island law, to which no response is required.  To the extent a response is required, Pilgrim's denies the allegations of Paragraph 537.

*538.    Defendants contracted, combined and conspired in restraint of trade of Broilers within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a monopoly in the trade of Broilers for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, et seq.*

**Answer to Paragraph 538**: Denied.

*539.    Plaintiffs and members of the Class were injured with respect to purchases of Broilers in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.*

**Answer to Paragraph 539**: Denied.

### TWENTY-SECOND CLAIM FOR RELIEF
*Violation of the South Dakota Antitrust Statute,*
*S.D. Codified Laws § 37-1-3.1, et seq.*
*(On Behalf of the South Dakota Class)*

540.    *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 540**: Paragraph 540 contains no factual allegations to which a response is required.   Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

541.    *Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices.  S.D. Codified Laws §§ 37-1- 3.1, 3.2.*

**Answer to Paragraph 541**: Paragraph 541 contains Plaintiffs' legal conclusions under South Dakota law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

542.    *Plaintiffs purchased Broilers within the State of South Dakota during the Class Period.  But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 542**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 542 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 542.

543.    *Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint.  S.D. Codified Laws § 37-1-33.*

**Answer to Paragraph 543**: Paragraph 543 contains Plaintiffs' legal conclusions regarding standing under South Dakota law, to which no response is required.  To the extent a response is required, Pilgrim's denies the allegations of Paragraph 543.

544. *Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of Broilers within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1, et seq.*

**Answer to Paragraph 544**: Denied.

545. *Plaintiffs and members of the Class were injured with respect to purchases of Broilers in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.*

**Answer to Paragraph 545**: Denied.

### *TWENTY-THIRD CLAIM FOR RELIEF*
*Violation of the Tennessee Trade Practices Act,*
*Tenn. Code, § 47-25-101, et seq.*
*(On Behalf of the Tennessee Class)*

546. *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 546**: Paragraph 546 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

547. *The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, inter alia, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. Tenn. Code, § 47-25-101.*

**Answer to Paragraph 547**: Paragraph 547 contains Plaintiffs' legal conclusions under Tennessee law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

548. *Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47-25-101, et seq.*

186

**Answer to Paragraph 548**: Denied.

> 549.    Defendant's conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendants' combination or conspiracy had the following effects: (1) price competition for Broilers was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for Broilers were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and the Tennessee Class were deprived of free and open competition; and (4) Plaintiffs and the Tennessee Class paid supra-competitive, artificially inflated prices for Broilers.

**Answer to Paragraph 549**: Denied.

> 550.    During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce as Broilers were sold in Tennessee.

**Answer to Paragraph 550**: Denied.

> 551.    Plaintiffs and the Tennessee Class purchased Broilers within the State of Tennessee during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Tennessee Class have been injured in their business and property and are threatened with further injury

**Answer to Paragraph 551**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 551 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 551.

> 552.    Under Tennessee law, indirect purchasers (such as Plaintiffs and the Tennessee Class) have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint.

**Answer to Paragraph 552**: Paragraph 552 contains Plaintiffs' legal conclusions regarding standing under Tennessee law, to which no response is required. To the extent a response is required, Pilgrim's denies the allegations of Paragraph 552.

> 553.    Plaintiffs and members of the Tennessee Class were injured with respect to purchases of Broilers in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

**Answer to Paragraph 553**: Denied.

### *TWENTY-FOURTH CLAIM FOR RELIEF*
*Violation of the Utah Antitrust Act,*
*Utah Code Ann. §§ 76-10-911, et seq.*
*(On Behalf of the Utah Class)*

554. *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 554**: Paragraph 554 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

555. *The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.*

**Answer to Paragraph 555**: Paragraph 555 contains Plaintiffs' legal conclusions under Utah law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

556. *Plaintiffs purchased Broilers within the State of Utah during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 556**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 556 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 556.

557. *Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).*

**Answer to Paragraph 557**: Paragraph 557 contains Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Pilgrim's denies the allegations of Paragraph 587.

*558. Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers, and monopolized or attempted to monopolize trade or commerce of Broilers, in violation of Utah Code Ann. § 76-10-3101, et seq.*

**Answer to Paragraph 558**: Denied.

*559. Plaintiffs and members of the Class who are either Utah residents or Utah citizens were injured with respect to purchases of Broilers in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.*

**Answer to Paragraph 559**: Denied.

### TWENTY-FIFTH CLAIM FOR RELIEF
**Violation of the West Virginia Antitrust Act,
W. Va. Code §47-18-1, et seq.
(On Behalf of the West Virginia Class)**

*560. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 560**: Paragraph 560 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

*561. The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.*

**Answer to Paragraph 561**: Paragraph 561 contains Plaintiffs' legal conclusions under West Virginia law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

*562. During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of W. Va. Code § 47-18-1, et seq.*

**Answer to Paragraph 562**: Denied.

189

563. *Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.*

**Answer to Paragraph 563**: Denied.

564. *As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the West Virginia Class have been injured in their business and property in that they paid more for Broilers than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiffs and members of the West Virginia Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.*

**Answer to Paragraph 564**: Denied.

### TWENTY-SIXTH CLAIM FOR RELIEF
**Violation of the Wisconsin Antitrust Act,
Wis. Stat. Ann. § 133.01(1), et seq.
(On Behalf of the Wisconsin Class)**

565. *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 565**: Paragraph 565 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

566. *Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.*

**Answer to Paragraph 566**: Paragraph 566 contains Plaintiffs' legal conclusions under Wisconsin law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

567. *Plaintiffs purchased Broilers within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.*

**Answer to Paragraph 567**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 567 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 567.

> 568.    Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint.  Wis. Stat. 133.18(a).

**Answer to Paragraph 568**: Paragraph 568 contains Plaintiffs' legal conclusions regarding standing under Wisconsin law, to which no response is required.  To the extent a response is required, Pilgrim's denies the allegations of Paragraph 568.

> 569.    Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers, and monopolized or attempted to monopolize the trade or commerce of Broilers, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, et seq.

**Answer to Paragraph 569**: Denied.

> 570.    Plaintiffs and members of the Class were injured with respect to purchases of Broilers in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of purchasers in Wisconsin paying substantially higher prices for Defendants' Broilers in Wisconsin.

**Answer to Paragraph 570**: Denied.

> 571.    Accordingly, Plaintiffs and members of the Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

**Answer to Paragraph 571**: Denied.

> 572.    Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States.  Their injuries consist of:  (1) being denied the opportunity to purchase lower-priced Broilers from Defendants, and (2) paying higher prices for Defendants' Broilers than they would have in the absence of Defendants' conduct.  These injuries are of the type of the laws of the above States were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

**Answer to Paragraph 572**: Denied.

573. *Defendants are jointly and severally liable for all damages suffered by Plaintiffs and members of the Classes.*

**Answer to Paragraph 573**: Paragraph 573 contains arguments, Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Pilgrim's denies such arguments, characterizations, and/or conclusions.

## XII. *VIOLATIONS OF STATE UNFAIR AND DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAWS*

574. *Plaintiffs incorporate by reference the allegations in the preceding paragraphs.*

**Answer to Paragraph 574**: Paragraph 574 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

575. *The following twenty-seventh through forty-first Claims for Relief are pleaded under the consumer protection or similar laws of each State or jurisdiction identified below, on behalf of the indicated class.*

**Answer to Paragraph 575**: Paragraph 575 contains no factual allegations to which a response is required.

576. *Each of the unfair and deceptive trade practices and consumer protection claims pled in the following claims are pled properly on behalf of the Plaintiffs and Classes on this Complaint.*

**Answer to Paragraph 576**: The allegations of Paragraph 576 contain legal arguments or conclusions, which require no response. To the extent a response is required, Pilgrim's denies the allegations of Paragraph 576.

**TWENTY-SEVENTH CLAIM FOR RELIEF**
**Violation of the Arkansas Deceptive Trade Practices Act,**
**Ark. Code Ann. § 4-88-101, et seq.**
**(On Behalf of the Arkansas Class)**

577. *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 577**: Paragraph 577 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

> 578.    By reason of the conduct alleged herein, Defendants have violated Ark. Code Ann. § 4-88-101, et seq.

**Answer to Paragraph 578**: Pilgrim's denies that Plaintiffs are entitled to any relief pursuant to claims under the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, et seq., as the Court dismissed these claims in its November 20, 2017 Order. Pilgrim's denies the allegations of Paragraph 578.

> 579.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Broiler market, a substantial part of which occurred within Arkansas.

**Answer to Paragraph 579**: Denied.

> 580.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Arkansas, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Broiler Market.

**Answer to Paragraph 580**: Denied.

> 581.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Arkansas.

**Answer to Paragraph 581**: Denied.

> 582.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the Classes.

**Answer to Paragraph 582**: Denied.

> 583.    Defendants' unlawful conduct substantially affected Arkansas's trade and commerce.

**Answer to Paragraph 583**: Denied.

> 584.    Defendants' conduct was willful.

**Answer to Paragraph 584**: Denied.

585.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Arkansas Class have been injured in their business or property and are threatened with further injury.

**Answer to Paragraph 585**: Denied.

586.    By reason of the foregoing, Plaintiffs and members of the Arkansas Class are entitled to seek all forms of relief, including actual damages plus reasonable attorney's fees under Ark. Code Ann. § 4-88-113.

**Answer to Paragraph 586**: Pilgrim's denies that Plaintiffs are entitled to any relief under the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, et seq., as the Court dismissed these claims in its November 20, 2017 Order.  Pilgrim's also denies the allegations in Paragraph 586.

### TWENTY-EIGHTH CLAIM FOR RELIEF
### Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, et seq. (the "UCL")
### (On Behalf of the California Class)

587.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 587**: Paragraph 587 contains no factual allegations to which a response is required.   Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

588.    The violations of federal antitrust law set forth above also constitute violations of section 17200, et seq. of California Business and Professions Code.

**Answer to Paragraph 588**: Denied.

589.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

**Answer to Paragraph 589**: Denied.

*590.    This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.*

**Answer to Paragraph 590**: Pilgrim's admits Plaintiffs purport to bring this claim as described above but deny Pilgrims violated the UCL, that Plaintiffs are entitled to any relief, and any other allegations of Paragraph 590.

*591.    The Defendants' conduct as alleged herein violated the UCL.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, et seq., of California Business and Professions Code, set forth above.*

**Answer to Paragraph 591**: Denied.

*592.    Defendants' acts, omissions, misrepresentations, practices, and non- disclosures, as described above, whether or not in violation of section 16720, et seq., of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.*

**Answer to Paragraph 592**: Denied.

*593.    Plaintiffs and members of the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.*

**Answer to Paragraph 593**: Denied.

*594.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.*

**Answer to Paragraph 594**: Denied.

*595.    The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the California Class to pay supra-competitive and artificially-inflated prices for Broilers sold in the State of California.  Plaintiffs and the members of the California Class suffered injury in fact and lost money or property as a result of such unfair competition.*

**Answer to Paragraph 595**: Denied.

*596.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair*

*competition. Plaintiffs and the members of the California Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.*

**Answer to Paragraph 596**: Denied.

### THIRTY-NINTH CLAIM FOR RELIEF
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. § 501.201(2), et seq.**
**(On Behalf of the Florida Class)**

*597. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 597**: Paragraph 597 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

*598. The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, et seq. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).*

**Answer to Paragraph 598**: Paragraph 598 contains Plaintiffs' legal conclusions under Florida law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

*599. The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2). The members of the Florida class are covered by this statute.*

**Answer to Paragraph 599**: Paragraph 599 contains Plaintiffs' legal conclusions under Florida law, to which no response is required. To the extent a response is required, Pilgrim's admits

196

Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

> 600.   A claim for damages under the FDUTPA has three elements:  (1) a prohibited practice; (2) causation; and (3) actual damages.

**Answer to Paragraph 600**: Paragraph 600 contains Plaintiffs' legal conclusions under Florida law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

> 601.   Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint.  Fla. Stat. § 501.211(a) ("...anyone aggrieved by a violation of this [statute] may bring an action...").

**Answer to Paragraph 601**: Paragraph 601 contains Plaintiffs' legal conclusions regarding standing under Florida law, to which no response is required.  To the extent a response is required, Pilgrim's denies the allegations of Paragraph 601.

> 602.   Plaintiffs purchased Broilers within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.

**Answer to Paragraph 602**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 602 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 602.

> 603.   Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Broilers market, a substantial part of which occurred within Florida.

**Answer to Paragraph 603**: Denied.

> 604.   Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Broilers, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2000 and continuing through the date of this filing.

**Answer to Paragraph 604**: Denied.

605. Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

**Answer to Paragraph 605**: Denied.

606. Defendants' unlawful conduct substantially affected Florida's trade and commerce.

**Answer to Paragraph 606**: Denied.

607. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Florida Class have been injured in their business or property by virtue of overcharges for Broilers and are threatened with further injury.

**Answer to Paragraph 607**: Denied.

608. By reason of the foregoing, Plaintiffs and the members of the Florida Class is entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

**Answer to Paragraph 608**: Denied.

### THIRTEETH CLAIM FOR RELIEF
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 Ill. Comp. Stat. Ann. 505/10a, et seq.**
**(On Behalf of the Illinois Class)**

609. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 609**: Paragraph 609 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

610. By reason of the conduct alleged herein, Defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), et seq.

**Answer to Paragraph 610**: Denied.

611.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Broilers market, a substantial part of which occurred within Illinois.

**Answer to Paragraph 611**: Denied.

612.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Broiler Market.

**Answer to Paragraph 612**: Denied.

613.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

**Answer to Paragraph 613**: Denied.

614.     Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the Classes.

**Answer to Paragraph 614**: Denied.

615.     Defendants' unlawful conduct substantially affected Illinois's trade and commerce.

**Answer to Paragraph 615**: Denied.

616.     As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and members of the Illinois Class have been injured in their business or property and are threatened with further injury.  The members of the Illinois class are within the scope of the Illinois statute.

**Answer to Paragraph 616**: Denied.

617.     By reason of the foregoing, Plaintiffs and members of the Illinois Class are entitled to seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10a, et seq.

**Answer to Paragraph 617**: Denied.

### ***THIRTY-FIRST CLAIM FOR RELIEF***
***Violation of the Minnesota Consumer Fraud Act,***
***Minn. Stat. § 325F.68, et seq.***
***(On Behalf of the Minnesota Class)***

618.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 618**: Paragraph 618 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

*619. By reason of the conduct alleged herein, Defendants have violated Minn. Stat. § 325F.68, et seq.*

**Answer to Paragraph 619**: Denied.

*620. Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.*

**Answer to Paragraph 620**: Denied.

*621. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Broilers Market, a substantial part of which occurred within Minnesota, for the purpose of controlling, fixing, or maintaining prices in the Broilers Market.*

**Answer to Paragraph 621**: Denied.

*622. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.*

**Answer to Paragraph 622**: Denied.

*623. Defendants' conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.*

**Answer to Paragraph 623**: Denied.

*624. Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.*

**Answer to Paragraph 624**: Denied.

*625. Defendants' conduct was willful.*

**Answer to Paragraph 625**: Denied.

*626. As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Minnesota Class have been injured in their business or property and are threatened with further injury. The members of the Minnesota class are within the scope of the Minnesota statute.*

**Answer to Paragraph 626**: Denied.

627.    By reason of the foregoing, the Plaintiffs and the members of the Minnesota Class are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, et seq. and applicable case law.

**Answer to Paragraph 627**: Denied.

### THIRTY-SECOND CLAIM FOR RELIEF
#### Violation of the Nebraska Consumer Protection Act,
#### Neb. Rev. Stat. § 59-1602, et seq.
#### (On Behalf of the Nebraska Class)

628.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 628**: Paragraph 628 contains no factual allegations to which a response is required.  Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

629.    By reason of the conduct alleged herein, Defendants have violated Neb. Rev. Stat. § 59-1602, et seq.

**Answer to Paragraph 629**: Denied.

630.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Broilers Market, a substantial part of which occurred within Nebraska.

**Answer to Paragraph 630**: Denied.

631.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Broilers Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

**Answer to Paragraph 631**: Denied.

632.    Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of Defendants' actions within the stream of Nebraska commerce.

**Answer to Paragraph 632**: Denied.

633.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

201

**Answer to Paragraph 633**: Denied.

634.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs and members-of-the-Classes' ability to protect themselves.

**Answer to Paragraph 634**: Denied.

635.    Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

**Answer to Paragraph 635**: Denied.

636.    As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Nebraska Class have been injured in their business or property and are threatened with further injury.  The member of the Nebraska class are within the scope of the Nebraska statute.

**Answer to Paragraph 636**: Denied.

637.    By reason of the foregoing, Plaintiffs and members of the Nebraska Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59- 1614.

**Answer to Paragraph 637**: Denied.

### THIRTY-THIRD CLAIM FOR RELIEF
**Violation of the Nevada Deceptive Trade Practices Act,**
**Nev. Rev. Stat. § 598.0903, et seq.**
**(On Behalf of the Nevada Class)**

638.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 638**: Paragraph 638 contains no factual allegations to which a response is required.   Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

639.    By reason of the conduct alleged herein, Defendants have violated Nev. Rev. Stat. § 598.0903, et seq.

**Answer to Paragraph 639**: Denied.

640.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

**Answer to Paragraph 640**: Denied.

641.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Broilers Market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Broilers Market.

**Answer to Paragraph 641**: Denied.

642.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

**Answer to Paragraph 642**: Denied.

643.    Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

**Answer to Paragraph 643**: Denied.

644.    Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

**Answer to Paragraph 644**: Denied.

645.    Defendants' conduct was willful.

**Answer to Paragraph 645**: Denied.

646.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Nevada Class have been injured in their business or property and are threatened with further injury.

**Answer to Paragraph 646**: Denied.

647.    By reason of the foregoing, the Nevada Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.

**Answer to Paragraph 647**: Denied.

### THIRTY-FOURTH FOR RELIEF
**Violation of the New Hampshire Consumer Protection Act,
N.H. Rev. Stat. Ann. Tit. XXXI, § 358-A, et seq.
(On Behalf of the New Hampshire Class)**

648.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 648**: Paragraph 648 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

*649. By reason of the conduct alleged herein, Defendants have violated N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, et seq.*

**Answer to Paragraph 649**: Denied.

*650. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Broilers Market, a substantial part of which occurred within New Hampshire.*

**Answer to Paragraph 650**: Denied.

*651. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Broilers Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.*

**Answer to Paragraph 651**: Denied.

*652. Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of Defendants' actions within the stream of New Hampshire commerce.*

**Answer to Paragraph 652**: Denied.

*653. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.*

**Answer to Paragraph 653**: Denied.

*654. Defendants' conduct was willful and knowing.*

**Answer to Paragraph 654**: Denied.

*655. Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs and members-of-the-Classes' ability to protect themselves.*

**Answer to Paragraph 655**: Denied.

*656. Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.*

**Answer to Paragraph 656**: Denied.

657.    As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the New Hampshire Class have been injured in their business or property and are threatened with further injury. The members of the New Hampshire class are within the scope of the New Hampshire statute.

**Answer to Paragraph 657**: Denied.

658.    By reason of the foregoing, the Plaintiffs and the members of the New Hampshire Class are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 and 358-A:10-a.

**Answer to Paragraph 658**: Denied.

### THIRTY-FIFTH CLAIM FOR RELIEF
***Violation of the New Mexico Unfair Practices Act,***
***N.M. Stat. Ann. §§ 57-12-3, et seq.***
***(On Behalf of the New Mexico Class)***

659.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 659**: Paragraph 659 contains no factual allegations to which a response is required.   Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

660.    By reason of the conduct alleged herein, Defendants have violated N.M. Stat. Ann. §§ 57-12-3, et seq.

**Answer to Paragraph 660**: Denied.

661.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Broilers market, a substantial part of which occurred within New Mexico.

**Answer to Paragraph 661**: Denied.

662.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Broilers Market.

**Answer to Paragraph 662**: Denied.

663. *Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.*

**Answer to Paragraph 663**: Denied.

664. *Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the Class.*

**Answer to Paragraph 664**: Denied.

665. *Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.*

**Answer to Paragraph 665**: Denied.

666. *Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the New Mexico class members and the price paid by them for Broilers as set forth in N.M. Stat. Ann. § 57-12-2E.*

**Answer to Paragraph 666**: Denied.

667. *Defendants' conduct was willful.*

**Answer to Paragraph 667**: Denied.

668. *As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the New Mexico Class have been injured in their business or property and are threatened with further injury.*

**Answer to Paragraph 668**: Denied.

669. *By reason of the foregoing, Plaintiffs and members of the New Mexico Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.*

**Answer to Paragraph 669**: Denied.

### *THIRTY-SIXTH CLAIM FOR RELIEF*
**Violation of the North Carolina Unfair Trade and Business Practices Act,
*N.C. Gen. Stat. § 75-1.1, et seq.*
*(On Behalf of the North Carolina Class)***

670. *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 670**: Paragraph 670 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

> 671. By reason of the conduct alleged herein, Defendants have violated N.C. Gen. Stat. § 75-1.1, et seq.

**Answer to Paragraph 671**: Denied.

> 672. Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the Broilers Market, a substantial part of which occurred within North Carolina.

**Answer to Paragraph 672**: Denied.

> 673. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

**Answer to Paragraph 673**: Denied.

> 674. Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

**Answer to Paragraph 674**: Denied.

> 675. Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the Class.

**Answer to Paragraph 675**: Denied.

> 676. Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

**Answer to Paragraph 676**: Denied.

> 677. Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

**Answer to Paragraph 677**: Denied.

> 678. As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the North Carolina Class have been injured in their business or

*property and are threatened with further injury. The member of the North Carolina class are within the scope of the North Carolina statute.*

**Answer to Paragraph 678**: Denied.

*679. By reason of the foregoing, the Plaintiffs and the members of the North Carolina Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 75-16.*

**Answer to Paragraph 679**: Denied.

### THIRTY-SEVENTH CLAIM FOR RELIEF
### Violation of the Oregon Unlawful Trade Practices Act,
### Or. Rev. Stat. § 646.605, et seq.
### (On Behalf of the Oregon Class)

*680. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 680**: Paragraph 680 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

*681. By reason of the conduct alleged herein, Defendants have violated Or. Rev. Stat. § 646.608, et seq.*

**Answer to Paragraph 681**: Denied.

*682. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Broilers Market, a substantial part of which occurred within Oregon.*

**Answer to Paragraph 682**: Denied.

*683. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Broilers Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.*

**Answer to Paragraph 683**: Denied.

*684. Defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of Defendants' actions within the stream of Oregon commerce. The members of the Oregon Class are within the scope of the Oregon statute.*

**Answer to Paragraph 684**: Denied.

685. *Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.*

**Answer to Paragraph 685**: Denied.

686. *Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs' and members-of-the-Classes' ability to protect themselves.*

**Answer to Paragraph 686**: Denied.

687. *Defendants' unlawful conduct substantially affected Oregon's trade and commerce.*

**Answer to Paragraph 687**: Denied.

688. *As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Oregon Class have been injured in their business or property and are threatened with further injury.*

**Answer to Paragraph 688**: Denied.

689. *By reason of the foregoing, the Plaintiffs and the members of the Oregon Class are entitled to seek all forms of relief available under Or. Rev. Stat. § 646.638.*

**Answer to Paragraph 689**: Denied.

690. *Pursuant to section 646.638 of the Oregon Unlawful Trade Practices Act, with the filing of this action, a copy of this Complaint is being served upon the Attorney General of Oregon.*

**Answer to Paragraph 690**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 690 and therefore denies them.

### *THIRTY-EIGHTH CLAIM FOR RELIEF*
*Violation of the South Carolina's Unfair Trade Practices Act,*
*S.C. Code Ann. §§ 39-5-10, et seq.*
*(On Behalf of the South Carolina Class)*

691. *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 691**: Paragraph 691 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

> 692.    By reason of the conduct alleged herein, Defendants have violated S.C. Code Ann. §§ 39-5-10.

**Answer to Paragraph 692**: Denied.

> 693.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Broilers Market, a substantial part of which occurred within Oregon.

**Answer to Paragraph 693**: Denied.

> 694.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Broilers Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

**Answer to Paragraph 694**: Denied.

> 695.    Defendants' conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of Defendants' actions within the stream of South Carolina commerce.

**Answer to Paragraph 695**: Denied.

> 696.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

**Answer to Paragraph 696**: Denied.

> 697.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs' and members-of-the-Classes' ability to protect themselves. The member of the South Carolina Class are within the scope of the South Carolina statute.

**Answer to Paragraph 697**: Denied.

> 698.    Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

**Answer to Paragraph 698**: Denied.

699.    Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as nearly all members of the public purchase and consume Broilers.

**Answer to Paragraph 699**: Denied.

### THIRTY-NINTH CLAIM FOR RELIEF
**Violation of the South Dakota Deceptive Trade Practices and Consumer Protection Law,**
**S.D. Codified Laws § 37-24, et seq.**
**(On Behalf of the South Dakota Class)**

700.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 700**: Paragraph 700 contains no factual allegations to which a response is required.  Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

701.    By reason of the conduct alleged herein, Defendants have violated S.D. Codified Laws § 37-24-6.

**Answer to Paragraph 701**: Denied.

702.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

**Answer to Paragraph 702**: Denied.

703.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Broiler Market, a substantial part of which occurred within South Dakota, for the purpose of controlling, fixing, or maintaining prices in the Broiler Market.

**Answer to Paragraph 703**: Denied.

704.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Dakota.

**Answer to Paragraph 704**: Denied.

705.    Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

**Answer to Paragraph 705**: Denied.

706.    Defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

**Answer to Paragraph 706**: Denied.

707.    Defendants' conduct was willful.

**Answer to Paragraph 707**: Denied.

708.    As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the South Dakota Class have been injured in their business or property and are threatened with further injury.  The members of the South Dakota Class are within the scope of the South Dakota statute.

**Answer to Paragraph 708**: Denied.

709.    By reason of the foregoing, Plaintiffs and the members of the South Dakota Class are entitled to seek all forms of relief, including actual damages and injunctive relief under S.D. Codified Laws § 37-24-31.

**Answer to Paragraph 709**: Denied.

### *FOURTEETH CLAIM FOR RELIEF*
### *Violation of the Utah Unfair Practices Act,*
### *Utah Code All. §§ 13-5-1, et seq.*
### *(On Behalf of the Utah Class)*

710.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 710**: Paragraph 710 contains no factual allegations to which a response is required.  Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

711.    By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-5-1, et seq.

**Answer to Paragraph 711**: Denied.

712.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Broilers market, a substantial part of which occurred within Utah.

**Answer to Paragraph 712**: Denied.

713. *Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Broilers Market.*

**Answer to Paragraph 713**: Denied.

714. *Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.*

**Answer to Paragraph 714**: Denied.

715. *Defendants' unlawful conduct substantially affected Utah's trade and commerce.*

**Answer to Paragraph 715**: Denied.

716. *As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Utah Class have been injured in their business or property and are threatened with further injury.*

**Answer to Paragraph 716**: Denied.

717. *By reason of the foregoing, the Plaintiffs and the members of the Utah Class is entitled to seek all forms of relief, including actual damages or $2000 per Utah Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5-14, et seq.*

**Answer to Paragraph 717**: Denied.

### ***FORTY-FIRST CLAIM FOR RELIEF***
***Violation of the Vermont Consumer Fraud Act,***
***Vt. Stat. Ann. Tit. 9, §§ 2453, et seq.***
***(On Behalf of the Vermont Class)***

718. *Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**Answer to Paragraph 718**: Paragraph 718 contains no factual allegations to which a response is required. Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

719. *Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont. Chapter 63 thereof governs consumer protection and prohibits, inter alia, unfair methods competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization. Vt. Stat. Ann. Tit. 9 § 2453(a).*

**Answer to Paragraph 719**: Paragraph 719 contains Plaintiffs' legal conclusions under Vermont law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

> 720. One such unfair method of competition is through collusion, defined as agreeing, contracting, combining or conspiring to engage in price fixing, market division and/or allocation of goods, constituting unfair competition in the commerce of Broilers. Vt. Stat. Ann. Tit. 9, § 2451a(h).

**Answer to Paragraph 720**: Paragraph 720 contains Plaintiffs' legal conclusions under Vermont law, to which no response is required. To the extent a response is required, Pilgrim's admits Plaintiffs appear to be selectively quoting and/or attempting to characterize the language of a state statute and Pilgrim's denies any characterization or description that is inconsistent therewith.

> 721. Plaintiffs purchased Broilers within the State of Vermont during the Class Period. But for Defendants' conduct set forth herein, the price per pound of Broilers would have been lower, in an amount to be determined at trial.

**Answer to Paragraph 721**: Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 721 and therefore denies them. Pilgrim's denies the remaining allegations in Paragraph 721.

> 722. Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this Complaint. Vt. Stat. Ann. Tit. 9, § 2465(b).

**Answer to Paragraph 722**: Paragraph 722 contains Plaintiffs' legal conclusions regarding standing under Vermont law, to which no response is required. To the extent a response is required, Pilgrim's denies the allegations of Paragraph 722.

> 723. Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Vt. Stat. Ann. Tit. 9, § 2453, et seq.

**Answer to Paragraph 723**: Denied.

724.    *Plaintiffs and members of the Classes were injured with respect to purchases of Broilers in Vermont and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.  The members of the Vermont Class are within the scope of the Vermont statute.*

**Answer to Paragraph 724**: Denied.

## XIII.    *FORTY-SECOND CLAIM FOR RELIEF*
## *UNJUST ENRICHMENT*

725.    *Plaintiffs incorporate by reference the allegations in the preceding paragraphs.*

**Answer to Paragraph 725**: Paragraph 725 contains no factual allegations to which a response is required.   Pilgrim's incorporates by reference and reasserts its answers to each preceding paragraph in Plaintiffs' Complaint as if fully set forth herein in its answer to this Paragraph.

726.    *As a result of their unlawful conduct described above, Defendants have and will continued to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of Broilers.*

**Answer to Paragraph 726**: Denied.

727.    *Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs and members of the Classes in the following states:  Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.*

**Answer to Paragraph 727**: Paragraph 727 contains arguments, Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required.  To the extent a response is required, Pilgrim's denies such arguments, characterizations, and/or conclusions.

## XIV.    *REQUEST FOR RELIEF*

*WHEREFORE, Plaintiffs, on behalf of themselves and the Classes of all others so similarly situated, respectfully requests judgment against Defendants as follows:*

728.    *The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as*

*Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;*

**Answer to Paragraph 728**: Paragraph 728 contains no factual assertions to which a response is required. Paragraph 728 further states legal conclusions and Plaintiffs' characterizations of this action with which Pilgrim's disagrees and to which no response is required. To the extent Paragraph 728 may be deemed to require a response, it is denied. Pilgrim's denies that Plaintiffs are entitled to any of the relief requested in Paragraph 728.

*729. The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act and listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;*

**Answer to Paragraph 729**: Paragraph 729 contains no factual assertions to which a response is required. Paragraph 729 further states legal conclusions and Plaintiffs' characterizations of this action with which Pilgrim's disagrees and to which no response is required. To the extent Paragraph 729 may be deemed to require a response, it is denied. Pilgrim's denies that Plaintiffs are entitled to any of the relief requested in Paragraph 729.

*730. Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;*

**Answer to Paragraph 730**: Paragraph 730 contains no factual assertions to which a response is required. Paragraph 730 further states legal conclusions and Plaintiffs' characterizations of this action with which Pilgrim's disagrees and to which no response is required. To the extent Paragraph 730 may be deemed to require a response, it is denied. Pilgrim's denies that Plaintiffs are entitled to any of the relief requested in Paragraph 730.

*731. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or*

*combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;*

**Answer to Paragraph 731**: Paragraph 731 contains no factual assertions to which a response is required. Paragraph 731 further states legal conclusions and Plaintiffs' characterizations of this action with which Pilgrim's disagrees and to which no response is required. To the extent Paragraph 731 may be deemed to require a response, it is denied. Pilgrim's denies that Plaintiffs are entitled to any of the relief requested in Paragraph 731.

*732. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;*

**Answer to Paragraph 732**: Paragraph 732 contains no factual assertions to which a response is required. Paragraph 732 further states legal conclusions and Plaintiffs' characterizations of this action with which Pilgrim's disagrees and to which no response is required. To the extent Paragraph 732 may be deemed to require a response, it is denied. Pilgrim's denies that Plaintiffs are entitled to any of the relief requested in Paragraph 732.

*733. Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;*

**Answer to Paragraph 733**: Paragraph 733 contains no factual assertions to which a response is required. Paragraph 733 further states legal conclusions and Plaintiffs' characterizations of this action with which Pilgrim's disagrees and to which no response is required. To the extent Paragraph 733 may be deemed to require a response, it is denied. Pilgrim's denies that Plaintiffs are entitled to any of the relief requested in Paragraph 733.

*734. Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and*

**Answer to Paragraph 734**: Paragraph 734 contains no factual assertions to which a response is required. Paragraph 734 further states legal conclusions and Plaintiffs' characterizations of this action with which Pilgrim's disagrees and to which no response is required. To the extent Paragraph 734 may be deemed to require a response, it is denied. Pilgrim's denies that Plaintiffs are entitled to any of the relief requested in Paragraph 734.

> 735.    *Plaintiffs and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.*

**Answer to Paragraph 735**: Paragraph 735 contains no factual assertions to which a response is required. Paragraph 735 further states legal conclusions and Plaintiffs' characterizations of this action with which Pilgrim's disagrees and to which no response is required. To the extent Paragraph 735 may be deemed to require a response, it is denied. Pilgrim's denies that Plaintiffs are entitled to any of the relief requested in Paragraph 735.

## XV.    *JURY TRIAL DEMANDED*

> 736.    *Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.*

**Answer to Paragraph 736**: Paragraph 736 does not contain any assertions of fact to which a response is required. To the extent Paragraph 736 requires a response, Pilgrim's also demands a jury trial, as set forth below.

### *DEFENDANT PILGRIM'S PRIDE CORPORATION'S AFFIRMATIVE DEFENSES*

In stating these affirmative and other defenses, Pilgrim's does not concede that it has the burden of proof on any defense or denial set forth below. Pilgrim's also adopts by reference any applicable defense pleaded by any other Defendant that is not otherwise expressly set forth below.

1.    Plaintiffs' claims and the claims of any putative class members are barred, in whole

or in part, because Plaintiffs have not suffered any injury in fact and/or any injury cognizable under the antitrust laws.

2.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because they lack standing to bring this action against Pilgrim's.

3.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because any alleged injuries and damages were not legally or proximately caused by any acts or omissions of Pilgrim's and/or were caused, if at all, solely and proximately by the conduct of Plaintiffs themselves or third parties including, without limitations, the prior, intervening or superseding conduct of such Plaintiffs or third parties.

4.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because Plaintiffs failed to mitigate any damages they may have suffered.

5.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of waiver.

6.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of estoppel.

7.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of laches.

8.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the applicable limitations period set out in contracts and/or agreements executed by Plaintiffs.

9.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, to the extent Plaintiffs seek to impose liability on Pilgrim's based on the exercise of any person or entity's right to petition federal, state and local legislative bodies, because such conduct

was immune under the *Noerr-Pennington* doctrine and privileged under the First Amendment to the U.S. Constitution.

10.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the Filed Rate Doctrine.

11.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, to the extent that they are subject to contractual arbitration and/or forum selection provisions.

12.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of unclean hands.

13.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of accord and satisfaction.

14.     Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by Pilgrim's right to set off any amounts paid to Plaintiffs by any Defendants other than Pilgrim's who have settled, or do settle, Plaintiffs' claims against them in this action.

15.     To the extent there is a finding of an illegal overcharge, Plaintiffs' claims are barred, in whole or in part, to the extent that such overcharge was not absorbed, in whole or in part, by Plaintiffs, but was passed through to others.

16.     Plaintiffs' claims and claims of any putative class members are barred, in whole or in part, to the extent they seek improper multiple damage awards, and damage awards duplicative of those sought in other actions, in violation of the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution.

17.     The Complaint is ambiguous as to whether the alleged state law violations are intended to be asserted on behalf of a purported nationwide class of indirect purchasers or just on behalf of the residents of those states whose laws were cited.  To the extent that the Complaint seeks to assert claims or obtain relief on behalf of indirect purchasers located outside of the jurisdictions governed by those laws, those claims are barred as improper assertions of extraterritorial jurisdiction and any effort to enforce those laws as to residents of other states would violate Pilgrim's' right to due process under the United States and various state laws and constitutions.

18.     Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations, including but not limited to: 15 U.S.C. § 15b; Ariz. Rev. Stat. Ann. § 44-1410; Cal. Bus. & Prof. Code § 16750.1; D.C. Code § 28-4511; Mich. Comp. Laws § 445.781(2); Minn. Stat. Ann. § 325D.64; Neb. Rev. Stat. Ann. § 25-206; N.H. Rev. Stat. Ann. § 356:12; N.Y. Gen. Bus. Law § 340; N.C. Gen. Stat. § 75-16.2; N.D. Cent. Code Ann. § 51-08.1-10; Or. Rev. Stat. Ann. § 646.800(1)-(2); S.D. Codified Laws §37-1-14.4; Utah Code Ann. § 76-10-3117(2); Iowa Code § 553.16; Nev. Rev. Stat. Ann. § 598A.220(2); N.M. Stat. Ann. § 57-1-12; R.I. Gen. Laws Ann. § 6-36-23; W. Va. Code Ann. § 47-18-11; Utah Code Ann. § 13-11-19(8); Or. Rev. Stat. Ann. § 646.638 (6); D.C. Code Ann. § 12-301(8); 815 Ill. Comp. Stat. Ann. 505/10a(e); S.C. Code Ann. § 39-5-150; Utah Code Ann. § 78B-2-305(4); N.H. Rev. Stat. Ann. § 358-A:3(IV-a); *Monzione v. U.S. Bank, N.A.*, 2013 WL 310013, at *4 (D.N.H. Jan. 25, 2013) (applying N.H. Rev. Stat. Ann. § 508:4); *Lehane v. Wachovia Mortg.*, FSB, 2013 WL 1637166, at *3 n. 5 (D.N.H. Apr. 16, 2013) (same); Cal. Bus. & Prof. Code § 17208; Fla. Stat. Ann. § 501.207(5); *Sundance Apartments I, Inc. v. Gen. Elec. Capital Corp.*, 581 F. Supp. 2d 1215, 1223 (S.D. Fla. 2008); Mass. Gen. Laws Ch. 260 § 5A; Neb. Rev. Stat. Ann. § 59-1612; Nev. Rev. Stat. Ann. § 11.190(2)(d); N.M. Stat.

Ann. § 37-1-4; *Porcell v. Lincoln Wood Prods., Inc.*, 2010 WL 1541264, at *5 (D.N.M. Mar. 31, 2010); *Nance v. L.J. Dolloff Assocs., Inc.*, 126 P.3d 1215, 1220 (N.M. Ct. App. 2005); N.C. Gen. Stat. § 75-16.2; S.D. Codified Laws §37-24-33.

19.     Plaintiffs' claims for damages and relief, including injunctive relief, would result in an unjust and uncompensated taking contrary to the United States Constitution.

20.     Any recovery by Plaintiffs must be reduced or offset by amounts Plaintiffs received or will receive from others for the same injuries claimed in this lawsuit.

21.     Plaintiffs' claims under state law are barred, in whole or in part, to the extent that Plaintiffs seek damages that are duplicative of damages sought in other actions, and, under state law, the Court shall take all necessary steps to avoid duplicative recovery.

22.     Plaintiffs' claims under state law are barred, in whole or in part, to the extent that Plaintiffs seek damages for private plaintiffs where the state laws do not permit a remedy of damages for private plaintiffs.

23.     Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs failed to comply with notice requirements under particular state laws.

24.     Plaintiffs' claims are barred, in whole or in part, to the extent particular state laws only allow consumers to assert claims under the statutes at issue.

25.     Plaintiffs' claims are barred, in whole or in part, to the extent particular state laws only allow natural persons to assert claims under the statutes at issue.

26.     Plaintiffs' claims are barred, in whole or in part, to the extent particular state laws cannot be used to enforce alleged antitrust violations.

27.     Pilgrim's adopts and incorporates by reference any and all other defenses asserted by any other Defendant to the extent that the defense would apply to Pilgrim's.

28.     Pilgrim's has not knowingly or intentionally waived any applicable defenses, and it reserves the right to assert and rely upon other defenses as this action proceeds up to and including the time of trial.  Pilgrim's reserves the right to amend or seek to amend its answers and/or affirmative defenses.

## PRAYER FOR RELIEF

WHEREFORE, Pilgrim's denies that Plaintiffs are entitled to any relief whatsoever and respectfully requests: (a) that Plaintiffs take nothing by their action; (b) that this Court dismiss Plaintiffs' claims with prejudice; (c) that this Court assess costs and fees against Plaintiffs; and (d) that this Court award Pilgrim's such other and further relief to which it may be justly entitled.

## JURY TRIAL DEMANDED

Pursuant to the Federal Rules of Civil Procedure 38, Defendant Pilgrim's demands a trial by jury on all claims so triable.

Dated: January 24, 2018

Respectfully submitted,

WEIL GOTSHAL & MANGES LLP

By: */s/ Carrie C. Mahan*
Carrie C. Mahan
Daniel E. Antalics
Christopher J. Abbott
2001 M Street N.W., Suite 600
Washington, D.C. 20036
Telephone: 202-682-0000
Facsimile: 202-857-0940
carrie.mahan@weil.com
daniel.antalics@weil.com
christopher.abbott@weil.com

Kevin J. Arquit
767 Fifth Avenue
New York, NY 10153
Telephone: 212-310-0950
Facsimile: 212-310-8007
kevin.arquit@weil.com

BAILEY BRAUER PLLC
Clayton E. Bailey
8350 N. Central Expressway, Ste. 935
Dallas, TX 75206
Telephone: 214-360-7433
Facsimile: 214-360-7424
cbailey@baileybrauer.com

EIMER STAHL LLP
Michael L. McCluggage (#01820966)
224 South Michigan Avenue, Ste. 1100
Telephone: 312-660-7665
Facsimile: 312-660-7665
mmccluggage@eimerstahl.com

*Attorneys for Defendant Pilgrim's Pride Corporation*

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on January 24, 2018, a true and correct copy of the foregoing ***DEFENDANT PILGRIM'S PRIDE CORPORATION'S ANSWER AND DEFENSES TO THE COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS' THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*** was filed electronically. Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic system.

<em>/s/ Carrie C. Mahan</em>