**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION*<br><br>This Document Relates To:<br>Direct Purchaser Actions | Case No. 1:16-cv-08637<br><br>Hon. Thomas A. Durkin<br><br>Magistrate Judge Jeffrey T. Gilbert |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT WITH DEFENDANT FIELDALE FARMS CORPORATION**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. FACTUAL AND PROCEDURAL HISTORY .....................................................2

III. SUMMARY OF THE SETTLEMENT AGREEMENT.......................................4

IV. ARGUMENT .........................................................................................................5

    A.    The Court-Approved Notice Program Satisfies Due Process and Has Been Fully Implemented. .......................................................................................6

    B.    The Settlement Is Fair, Reasonable and Adequate and Should Be Granted Final Approval. ...........................................................................................8

        1.    The Settlement Consideration from Fieldale Farms Provides Considerable Benefit to the Class. ...............................................9

        2.    The Settlement Eliminates Significant Risk to a Class Facing Complex, Lengthy and Expensive Litigation. ...........................12

        3.    Class Members Unanimously Support the Settlement.............13

        4.    The Settlement is the Product of Arm's-Length Negotiations and Experienced Counsel Recommend Approval. ...........................14

V. CONCLUSION...................................................................................................15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re "Agent Orange" Prod. Liability Litig.*,
818 F.2d 145 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988)...........................................6

*Agretti v. ANR Freight Sys., Inc.*,
982 F.2d 242 (7th Cir. 1992) ...............................................................................................12

*Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*,
616 F.2d 305 (7th Cir. 1980), *overruled on other grounds, Felzen v. Andreas*,
134 F.3d 873 (7th Cir. 1998) ................................................................................................8

*Bynum v. Dist. of Columbia*,
412 F. Supp. 2d 73 (D.D.C. 2006) .......................................................................................14

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. 14-CV-2058 JST, 2015 WL 9266493 (N.D. Cal. Dec. 17, 2015).................10, 11, 14, 15

*In re Corrugated Container Antitrust Litig.*,
Case No. M.D.L. 310, 1981 WL 2093 (S.D. Tex. June 4, 1981) .....................................10, 11

*Depoister v. Mary M. Holloway Found.*,
36 F.3d 582 (7th Cir. 1994) ...................................................................................................9

*Gehrich v. Chase Bank USA, N.A.*,
316 F.R.D. 215 (N.D. Ill. 2016)......................................................................................12, 15

*Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*,
212 F.R.D. 400 (E.D. Wis. 2002) ....................................................................................9, 15

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) .......................................................................................8, 9, 15

*Kaufman v. Am. Exp. Travel Related Servs. Co.*,
264 F.R.D. 438 (N.D. Ill. 2009)............................................................................................6

*Kleen Prod. LLC v. Int'l Paper Co.*,
No. 1:10-CV-05711, 2017 WL 5247928 (N.D. Ill. Oct. 17, 2017) ................................11, 15

*Kolinek v. Walgreen Co.*,
311 F.R.D. 483 (N.D. Ill. 2015)...........................................................................................11

*Larsen v. Trader Joe's Co.*,
No. 11-cv-05188-WHO, 2014 WL 3404531 (N.D. Cal. July 11, 2014) ...............................13

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
   733 F. Supp. 2d 997 (E.D. Wis. 2010) ..............................................................10, 13

*In re Linerboard Antitrust Litig.*,
   292 F. Supp. 2d 631 (E.D. Pa. 2003) ................................................................10, 12

*Mangone v. First USA Bank*,
   206 F.R.D. 222 (S.D. Ill. 2001) ..............................................................................6

*Pallas v. Pac. Bell*,
   No. C-89-2373 DLJ, 1999 WL 1209495 (N.D. Cal. July 13, 1999).......................14

*Petrovic v. Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999) ..................................................................................6

*In re Processed Egg Prod. Antitrust Litig.*,
   284 F.R.D. 249 (E.D. Pa. 2012)..............................................................................15

*Redman v. RadioShack Corp.*,
   11-C-6741, 2014 WL 497438 (N.D. Ill. Feb. 7, 2014) .............................................8

*Rodriguez v. West Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ..................................................................................15

*Schuchardt v. Law Office of Rory W. Clark*,
   314 F.R.D. 673 (N.D. Cal. 2016)............................................................................16

*Schulte v. Fifth Third Bank*,
   805 F. Supp. 2d 560 (N.D. Ill. 2011) ................................................................12, 14

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*,
   309 F.3d 978 (7th Cir. 2002) ....................................................................................8

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)......................................................................................13

## Other Authorities

*4 Newberg on Class Actions*, §§ 13:39 *et seq.* ....................................................6, 9, 15

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................................6, 7

Federal Rule of Civil Procedure 23(e) ...................................................................1, 4, 8

Pursuant to Federal Rule of Civil Procedure 23(e) and the Court's orders granting preliminary approval of the proposed settlement and conditional class certification (Dkt. No. 462, "Preliminary Approval Order") and approval of the plan of notice of settlement (Dkt. No. 994, "Plan of Notice Order"), the Direct Purchaser Plaintiffs ("DPPs") submit this memorandum in support of final approval of the settlement ("Settlement" or "Settlement Agreement") reached with Defendant Fieldale Farms Corporation ("Fieldale Farms" or "Settling Defendant").

## I. INTRODUCTION

This icebreaker Settlement between the DPPs and Fieldale Farms is fair, reasonable, and adequate, because it provides the class with real and substantial benefit. Class members have recognized this benefit – after receiving notice of the Settlement and an opportunity to be heard on whether it should be approved, not a single class member has objected to the Settlement.

To notify the class of the Settlement, the settlement administrator mailed more than one hundred thousand notice forms, emailed more than twenty thousand notice forms, published notice in industry publications, and established and maintained both a dedicated website and toll-free call-in number. *See* Supplemental Declaration of Jennifer M. Keough Regarding Notice Administration ("Keough Supp. Decl.") ¶¶ 3-14. The reaction of the class was overwhelmingly positive. With 109,695 identified potential class members, there were only 43 effective opt-out requests (identifying entities that account for fewer than 3.21% of the class members), and *no class member objected* to the Settlement. *See id.* ¶¶ 5-8, 16-19.

As set forth in more detail below, the Settlement Agreement provides substantial benefit to the class and should be finally approved as fair, reasonable, and adequate. Among other things, the Settlement Agreement provides for payment to the class of $2,250,000. *See* Declaration of Neil Swartzberg in Support of Final Approval of Class Action Settlement with Fieldale Farms Defendant ("Swartzberg Decl.") Ex. 1 (Settlement Agreement) § II.A.1.

Moreover, Fieldale Farms has agreed to cooperate with the DPPs in their prosecution of the case against the remaining Defendants. *See* Settlement Agreement § II.A.2. Also, Fieldale Farms' sales remain in the case for the purpose of computing damages against the remaining Defendants. *See* Settlement Agreement § I.B.25. The Settlement is fair, reasonable, and adequate, satisfies the requirements of Rule 23, is recommended by Class Counsel in their judgment, and meets with the approval of the class. For these reasons, it should be granted final approval.

## II.    FACTUAL AND PROCEDURAL HISTORY

This case involves an antitrust class action filed against certain producers of Broilers.[1] The DPPs allege that Defendants combined and conspired to fix, raise, elevate, maintain, or stabilize prices of Broilers sold in the U.S. The DPPs allege that Defendants implemented their conspiracy in various ways, including via coordinated supply restrictions, sharing competitively sensitive price and production information, and fixing the Georgia Dock Broiler price index.

The DPPs commenced this litigation on September 2, 2016, when they filed a class action lawsuit on behalf of all direct purchasers of Broilers in the U.S. On October 14, 2016, the Court appointed the undersigned as Interim Co-Lead Counsel for the DPPs. *See* Dkt. No. 144. The DPPs filed a Consolidated Amended Complaint on October 28, 2016 (Dkt. No. 178) and a Second Amended Complaint on November 23, 2016 (Dkt. No. 212). On January 27, 2017, all of the Defendants filed motions to dismiss the Complaint. *See* Dkt. Nos. 274-291, 294-298. All Plaintiffs, including the DPPs, filed oppositions to those motions on March 15, 2017, and

---

[1] Broilers are defined in the DPPs' complaint and in the Settlement Agreement as chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards; Fieldale Farms agrees to this definition only for purposes of this Settlement Class. *See* DPPs' Second Amended Complaint ("Complaint") ¶ 79; Settlement Agreement § I.B.2.

Defendants filed replies on April 12, 2017. *See* Dkt. Nos. 343, 345, 360, 363-64, 366, 368-373. Those motions were still pending when the DPPs and Fieldale Farms entered the Settlement Agreement on July 27, 2017.[2]

Unlike many other civil antitrust actions, the DPPs developed and brought this case without the benefit of a formal antitrust investigation by the U.S. Department of Justice ("DOJ") or the assistance of a leniency applicant under the DOJ's corporate leniency program. As a result, from filing their initial complaint, the DPPs had already conducted significant factual investigation into the conspiracy alleged in the Complaint, which they continued as they then pressed to set the parameters for discovery (which began in full after the motions to dismiss were denied). Therefore, as part of their strategic prosecution of claims against the Defendants during that initial phase of litigation, the DPPs' Co-Lead Counsel negotiated an "icebreaker" settlement with Fieldale Farms.

As detailed herein, in addition to the payment of money, this first settlement requires Fieldale Farms to provide cooperation to the DPPs in their continued prosecution of claims against the remaining Defendants. Moreover, Fieldale Farms has one of the smallest Broiler market shares of all Defendants named in the Complaint. *See, e.g.,* Swartzberg Decl. Ex. 2 (*Watt Poultry USA, 2017 Exclusive Survey*, p. 17)) (Field Farms ranks 12th out of 14 Defendants in "Million lbs. total liveweight"). Therefore, the Settlement with Fieldale Farms will not materially affect the size of the Defendant group remaining or the exposure to liability that all remaining Defendants face. As also detailed herein, the remaining Defendants are jointly and severally liable for any damages resulting from Fieldale Farms' Broiler sales during the class period.

---

[2] On November 20, 2017, the Court denied the motions in their entirety as to the DPPs' claims. *See* Dkt. No. 541.

### III.    SUMMARY OF THE SETTLEMENT AGREEMENT

After extensive arm's length negotiations, the DPPs agreed to settle with Fieldale Farms in return for its agreement to pay $2,250,000 to the Settlement Class, and to provide cooperation to the DPPs in their ongoing prosecution of the case.  *See* Settlement Agreement, § II.A.1-2. Fieldale Farms paid that amount in full into an interest-bearing escrow account on or about August 28, 2017.  *See* Swartzberg Decl. ¶ 4.  In consideration, the DPPs and the proposed Settlement Class agreed to release claims against Fieldale Farms which were or could have been brought in this litigation arising from the conduct alleged in the Complaint  *See* Settlement Agreement, §§ I.B.25, II.B.   The release does not extend to any other Defendant and excludes claims for product defects, breach of warranty, and breach of contract.  *Id.*  The release is thus limited to the subject matter of this lawsuit – direct purchases of Broilers.  *See, e.g., Procedural Guidance for Class Action Settlements*, U.S.D.C., N.D. Cal. (Feb. 11, 2016) ¶ 1(c) (available at www.cand.uscourts.gov/ ClassActionSettlementGuidance.)

The Settlement also requires Fieldale Farms to provide DPPs documents it produced to the Office of the Florida Attorney General in a related inquiry into the Broiler industry; produce Agri-Stats reports, phone records, ESI, and other documents; make five current or former employees available for interviews and depositions; and make an attorney proffer to describe the principal facts known to Fieldale Farms that are relevant to the conduct at issue in the litigation. *See* Settlement Agreement, § II.A.2.

The Settlement Agreement becomes final upon: (1) Court entering an order and final judgment granting final approval to this Settlement Agreement pursuant to Rule 23(e) (which order and judgment includes entry of a final judgment of dismissal with prejudice as to Fieldale Farms); and (ii) the expiration of the time for appeal (or, if an appeal is taken, the affirmance of the judgment with no further possibility of appeal).  *See* Settlement Agreement § II.E.9.

Subject to the approval and direction of the Court, the Settlement proceeds (with accrued interest) will be used to: (1) pay for notice costs and costs incurred in the administration of the Settlement and distribution of Settlement proceeds;[3] (2) pay taxes and tax-related costs associated with the escrow account for Settlement proceeds; (3) pay attorneys' fees to Counsel for the Settlement Class, as well as costs and expenses, that may be awarded by the Court; and (4) make a distribution to Settlement Class members in accordance with a proposed plan of allocation.[4] *See* Settlement Agreement §§ I.B.19., II.C.2, 6-9.

The Settlement Agreement allowed Fieldale Farms, within a specified time, to terminate if purchasers accounting for more than 42% of Fieldale Farms' sales from 2014-16 opt out of the Settlement Class. *See* Settlement Agreement § II.E.10. As set forth herein, this threshold does not appear to have been met by the limited opt-outs requested by class members.[5]

## IV.  ARGUMENT

Any dismissal, compromise, or settlement of a class action is subject to court approval. Rule 23 jurisprudence has led to a defined procedure and specific criteria for class action settlement approval, namely: certification of a settlement class and preliminary approval of the proposed settlement; dissemination of notice of the settlement to all affected class members,

---

[3] Such notice and administration costs are, absent court approval, capped at $500,000. *See* Settlement Agreement § II.C.2. Consistent with Section II.C.2., as well as the Preliminary Approval Order and the Plan of Notice Order, the DPPs are using Settlement proceeds to reimburse settlement administrator JND Legal Administration ("JND") in the amount of $195,896.66. That is the amount of notice and administration costs expended so far by JND in connection with the Settlement's notice program. *See* Keough Supp. Decl. ¶¶ 20-21.

[4] Consistent with the Settlement Agreement and the notice approved by the Court and disseminated to the class, Co-Lead Counsel are not seeking their fees or to distribute Settlement proceeds to qualified claimants at this time; when Co-Lead Counsel determine to do so, they will notify the class and seek the Court's approval. *See, e.g.,* Settlement Agreement § II.C.9.; DPPs' Motion to Approve a Plan of Notice of Settlement with Defendant Fieldale Farms (Dkt. No. 950) at 4; Keough Supp. Decl. Ex. B at 4, *What are the Fieldale Settlement benefits being used for?*.

[5] On October 25, 2018, Counsel for the Settlement Class provided Fieldale Farms with a list of all persons and entities who requested to opt out of the Settlement Class. Therefore, the deadline for Fieldale Farms to seek termination on the basis of opt-outs expires November 8, 2018. *See* Swartzberg Decl. ¶ 5. Counsel for the Settlement Class will provide the Court with an update on this matter before the November 13, 2018 fairness hearing.

including an opportunity to object to the proposed settlement; and a fairness hearing at which class members may be heard regarding the settlement, and counsel may present evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement. *See 4 Newberg on Class Actions,* §§ 13:39 *et seq.* Final Judicial Approval of Proposed Class Action Settlements (5th ed.). This procedure safeguards class members' due process rights and enables the Court to fulfill its role as the guardian of class interests. *See id.*

A.     **The Court-Approved Notice Program Satisfies Due Process and Has Been Fully Implemented.**

The Court-approved notice plan related to the Settlement has been successfully implemented and class members have been notified of the Settlement.

When a proposed class action settlement is presented for court approval, the Federal Rules require "the best notice that is practicable under the circumstances," and that certain specifically identified items in the notice be "clearly and concisely state in plain, easily understood language." Fed. R. Civ. P. 23(c)(2)(B). A settlement notice is a summary, not a complete source, of information. *See, e.g.*, *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999); *In re "Agent Orange" Prod. Liability Litig.*, 818 F.2d 145, 170 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988); *Mangone v. First USA Bank*, 206 F.R.D. 222, 233 (S.D. Ill. 2001); *see also Kaufman v. Am. Exp. Travel Related Servs. Co.*, 264 F.R.D. 438, 445-46 (N.D. Ill. 2009) (rejecting proposed notice as inadequate in both form and substance).

The notice plan approved by this Court is commonly used in class actions like this one. It constitutes valid, due, and sufficient notice to class members, and is the best notice practicable under the circumstances. The content of the court-approved notice, which incorporated suggestions made by this Court, complies with the requirements of Rule 23(c)(2)(b). Both the summary and long-form notices clearly and concisely explained in plain English the nature of the

action and the terms of the Settlement. The notices provided a clear description of who is a member of the Settlement Class and the binding effects of class membership. They also explained how to exclude oneself from the Settlement Class, how to object to the Settlement, and how to contact Co-Lead Counsel for the Settlement Class. *See* Keough Supp. Decl. Exs. A-C. The notices also explained that they provided only a summary of the Settlement, and that the Settlement Agreement, as well as other important documents related to the litigation, are available online at www.broilerchickenantitrustlitigation.com. *See id.* Consequently, every provision of the Settlement was available to each class member. In addition, the information from that website, as well as the toll-free call-in number for the Settlement, were available in both English and Spanish. *See id.* ¶¶ 9, 11.

The notice plan was implemented by the settlement administrator JND. *See* Keough Supp. Decl. Specifically, using customer information obtained from Defendants, JND mailed 108,415 print notices and emailed 20,673 electronic notices to potential class members. *See id.* ¶¶ 5–6, Exs. A-B. JND also published notice in the following industry print publications (or banner advertisements in digital media) on the dates indicated: *Progressive Grocer* (print Sept. 2018, digital Aug. 16-Sept. 13, 2018), *Meat + Poultry* (print Sept. 2018, digital Aug. 16-Sept. 13, 2018), *Poultry Times* (print Aug. 20, 2018, digital Aug. 16-Sept. 13, 2018), *Frozen & Refrigerated* (print Sept. 2018), *Supermarket News* (print Sept. 2018, digital Aug. 16-Sept. 13, 2018), *Grocery Headquarters* (print Sept. 2018, digital Aug. 16-Sept. 13, 2018), and *Fast Casual* (digital Aug. 16-Sept. 13, 2018). *See id.* ¶¶ 13-14, Exs. C-D. In addition, JND continues to maintain the case website, where class members can view and print important documents and

obtain other information related to the litigation. *See id.* ¶¶ 9-10. JND similarly continues to maintain a toll-free call-in number to answer class members' questions. *See id.* ¶¶ 11-12.[6]

As noted above, the costs expended so far in connection with the notice program are $195,896.66. *See id.* Decl. ¶¶ 20-21.

### B. The Settlement Is Fair, Reasonable and Adequate and Should Be Granted Final Approval.

The standard for final approval of a class action settlement is whether the settlement is fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e); *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002); *Isby v. Bayh*, 75 F.3d 1191, 1198-99 (7th Cir. 1996). There is an overriding public interest in settling litigation, and this is particularly true in class actions. *See Isby*, 75 F.3d at 1196 ("Federal courts naturally favor the settlement of class action litigation."); *accord Redman v. RadioShack Corp.*, 11-C-6741, 2014 WL 497438, at *3 (N.D. Ill. Feb. 7, 2014); *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 312 (7th Cir. 1980), *overruled on other grounds, Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Class action settlements minimize the litigation expenses of the parties and reduce the strain such litigation imposes upon already scarce judicial resources. *See Armstrong*, 616 F.2d at 313.

Evaluation and approval of a class action settlement are committed to the sound discretion of the Court. *See Isby*, 75 F.3d at 1197. The proper focus "is upon 'the general principles governing approval of class action settlements' and not upon the 'substantive law governing the claims asserted in the litigation.' " *Isby*, 75 F.3d at 1197 (quoting *Armstrong*, 616 F.2d at 315). As part of the Court having wide latitude in making its determination, there is "no requirement that an evidentiary hearing be conducted as a precondition to approving a settlement in a class action suit." *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994).

---

[6] Notice was not included in the *Shelby Report* because that publication would not agree to run notice of the Settlement. *See* Keough Supp. Decl. ¶ 15.

In evaluating the fairness of a proposed class action settlement, courts typically consider the following factors: (1) the strength of plaintiffs' case compared to the amount of defendants' settlement offer; (2) an assessment of the likely complexity, length and expense of the litigation; an evaluation of the amount of opposition to settlement among affected parties; (4) the opinion of competent counsel; and, (5) the stage of the proceedings and the amount of discovery completed at the time of settlement. *See Isby*, 75 F.3d at 1198–99.

In addition, there is an initial presumption that a proposed class action settlement is fair, reasonable and adequate when the settlement was the result of arm's-length negotiations. *See 4 Newberg on Class Actions,* § 13:43 Presumptions governing approval process—Generally; *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002).

### 1. The Settlement Consideration from Fieldale Farms Provides Considerable Benefit to the Class.

The consideration from Fieldale Farms for the Settlement (*i.e.* "the amount of defendants' settlement offer" – *Isby*, 75 F.3d at 1199) is significant and provides considerable benefit to the class – especially given the characteristics of Fieldale Farms (a smaller producer with a different product mix than other Defendants) and the timing of the Settlement (as an "icebreaker" settlement).

In terms of pure monetary value, the Settlement provides for a payment of $2,250,000, which is an amount that puts the Settlement within the range of possible final approval when compared to other cases. Because Fieldale Farms accounts for approximately 2.28% of all of the Defendants' market share, the "per point" of market share recovery value of the Settlement is approximately $986,842. *See* Swartzberg Decl. Ex. 2.[7] Therefore, based on the above figures,

---

[7] The 2.28% figure is based on the "Million lbs. total liveweight" figures in Ex. 2 for each of the Defendants.

the monetary recovery here is in line with the amounts in other settlements in price-fixing cases that were finally approved. *See, e.g., In re Linerboard Antitrust Litig.,* 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003) (granting final approval to "ice-breaker" settlement with a defendant controlling approximately 17% of all defendants' market share and 12% of total market share, and explaining that the monetary recovery of "roughly $750,000.00 per point of settling defendants' total market share [as] is in the range of settlements approved by other courts").

By themselves, the above figures support finding that the settlement amount from Fieldale Farms favors final approval. Several non-monetary aspects related to the settlement consideration from Fieldale Farms also support final approval. First, the Settlement calls for Fieldale Farms to cooperate with DPPs, which courts have recognized as a valuable benefit to class members because such cooperation "save[s] time, reduce[s] the DPPs' costs, and provide[s] information, witnesses, and documents that the DPPs may otherwise not be able to access" regarding the conspiracy. *In re Cathode Ray Tube (CRT) Antitrust Litig.,* No. 14-CV-2058 JST, 2015 WL 9266493, at *6 (N.D. Cal. Dec. 17, 2015) ("*In re CRT II*"); *In re Linerboard*, 292 F. Supp. 2d at 643 ("The provision of such assistance is a substantial benefit to the classes and strongly militates toward approval of the Settlement Agreement."); *In re Corrugated Container Antitrust Litig.*, Case No. M.D.L. 310, 1981 WL 2093, at *16 (S.D. Tex. June 4, 1981) ("The cooperation clauses constituted a substantial benefit to the class."); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1002 (E.D. Wis. 2010) (describing cooperation as "invaluable").

Second, the Settlement does not reduce DPPs' potential total recovery because it preserves their ability to recover damages based on Fieldale Farms' sales from the remaining Defendants, based on joint and several liability. *See In re Corrugated Container*, 1981 WL 2093,

at *17; *accord Kleen Prod. LLC v. Int'l Paper Co.,* No. 1:10-CV-05711, 2017 WL 5247928, at *2 (N.D. Ill. Oct. 17, 2017); *see also CRT II*, 2015 WL 9266493, at *6 (explaining that preserving the right to litigate against the non-settling defendants "provides increased value . . . by creating added incentive for the remaining defendants to settle or allowing greater recovery for the Plaintiffs at trial.").

Third, the Settlement takes into account the fact that the agreement was entered into before the Court ruled on Defendants' motions to dismiss. Fieldale Farms raised arguments in defense that were unique from those raised by other Defendants. In addition to the arguments raised by all Defendants, Fieldale Farms argued that, as a producer of antibiotic free Broilers, its product was not the same commodity as the Broilers produced by other Defendants. In fact, Fieldale Farms argued that their antibiotic free Broilers were much more akin to the halal, kosher, free range, and organic Broilers not included in the DPPs' proposed class. *See* Fieldale Farms motion to dismiss (Dkt. No. 281). Although rejected in the order on the motions to dismiss, the Court cautioned that the argument could prevail at a later stage in the litigation. *See* Order (Dkt. No. 541) at 52-53. Because the Settlement was negotiated before the Court ruled on Fieldale Farm's motion to dismiss, the DPPs properly took into account the risk of that argument prevailing at the motion to dismiss stage or later – which likely would eliminate most or all of the claims against Fieldale Farms. *See, e.g., Kolinek v. Walgreen Co.,* 311 F.R.D. 483, 494 (N.D. Ill. 2015) ("Although Kolinek withstood Walgreens's motion to dismiss on both grounds, the Court observed in its written orders as to both [defense] issues that further factual development might prove that plaintiffs did indeed consent or that the calls were made for emergency purposes."); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 582 (N.D. Ill. 2011) ("While Plaintiffs maintain that their claims would ultimately succeed, the above discussion

establishes that Fifth Third has a number of potentially meritorious defenses. Absent settlement, Class Members would face the real risk that they would win little or no recovery."); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 229 (N.D. Ill. 2016) ("In light of Chase's potential defenses, the legal uncertainty concerning the application of the TCPA, and the time and expense inherent to litigation, proceeding to trial, and obtaining relief posed risks to Plaintiffs, and a possibility existed that they would have recovered nothing.").

These factors satisfy the standard for an initial "icebreaker" settlement with a smaller Defendant that both allows the DPPs to continue their prosecution against the remaining Defendants and may facilitate settlement with those larger Defendants. As this Circuit has recognized, "[i]n complex litigation with a plaintiff class, 'partial settlements often play a vital role in resolving class actions.'" *Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 247 (7th Cir. 1992) (quoting 1–Part A *Manual for Complex Litigation Second, Moore's Federal Practice* § 30.46 (1986)); *see also In re Linerboard*, 292 F. Supp. 2d at 643 ("The Court also notes that this settlement has significant value as an 'icebreaker' settlement—it is the first settlement in the litigation—and should increase the likelihood of future settlements.").

### 2. The Settlement Eliminates Significant Risk to a Class Facing Complex, Lengthy and Expensive Litigation.

While the DPPs believe their case is strong, the Settlement eliminates significant risks they would face if the action were to proceed against Fieldale Farms, including due to the complexity, length and expense of these types of litigations. Indeed, as reflected in the extensive docket, this case is already two years old and the DPPs have expended significant effort to make it through the motion to dismiss phase and (after several disputes related to manner and scope of discovery) begin discovery in full. The Settlement allows class members to recover from one of the smallest Defendants (who also raised a unique defense) and obtain both monetary and non-

monetary recovery that will aid the DPPs in their prosecution of claims against larger Defendants. Absent settlement, the DPPs would need to go to trial and bear the burden of establishing liability, impact and damages. *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) ("'Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal.'" (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998))). Continued litigation against the remaining Defendants will likely involve significant additional expenses and protracted legal battles; although those too may be avoided through further settlements. Therefore, the complexity, length and expense of further litigation, which the Settlement mitigates at least as to Fieldale Farms, also favors final approval. *See Larsen v. Trader Joe's Co.,* No. 11-cv-05188-WHO, 2014 WL 3404531, at *4 (N.D. Cal. July 11, 2014) ("Avoiding such unnecessary and unwarranted expenditure of resources and time would benefit all parties, as well as conserve judicial resources…. Accordingly, the high risk, expense, and complex nature of the case weigh in favor of approving the settlement.") (cited authority omitted); *In re Lawnmower Engine Horsepower*, 733 F. Supp. 2d at 1008 ("The 'complexity, length and expense of further litigation' factor strongly favors this settlement….").

### 3.  Class Members Unanimously Support the Settlement.

The reaction of the class members to the Settlement supports final approval. Pursuant to the Court's order, more than 125,000 notices were sent directly to potential class members (108,415 via mail, 20,673 via email), which was in addition to giving publication notice in industry trade press (print and online) and the settlement administrator maintaining both an informational website and toll-free call-in center. After this outreach, and with 109,695 identified potential class members, there were only 43 effective opt-out requests (identifying

entities that account for less than 3.21% of those members), and *no class member objected* to the Settlement.[8]   That positive reaction supports finding the Settlement fair, adequate, and reasonable.  *See Bynum v. Dist. of Columbia*, 412 F. Supp. 2d 73, 77 (D.D.C. 2006) ("The low number of opt outs and objectors (or purported objectors) supports the conclusion that the terms of the settlement were viewed favorably by the overwhelming majority of class members."); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) ("A very small percentage of affected parties have opposed the settlement….  only 342 [of more than 100,000] Class Members excluded themselves from the settlement and only 15 Class Members submitted documents that could be considered objections."); *Pallas v. Pac. Bell*, No. C-89-2373 DLJ, 1999 WL 1209495, at *8 (N.D. Cal. July 13, 1999) ("The small percentage—less than 1%—of persons raising objections is a factor weighing in favor of approval of the settlement.").  In fact, the absence (or limited number) of opt-outs and objections to a settlement especially favors approval when, as here, "much of the class consists of sophisticated business entities."  *CRT II*, 2015 WL 9266493, at *7 (citing *Linerboard*, 321 F. Supp. 2d at 629).

### 4.   The Settlement is the Product of Arm's-Length Negotiations and Experienced Counsel Recommend Approval.

The Settlement here was the product of good faith, arm's-length negotiations among experienced and well-informed counsel. *See* Declaration of W. Joseph Bruckner in Support of Motion for Preliminary Approval (Dkt. No. 447-1) ¶ 6 (detailing three months of intensive

---

[8] Per the Plan of Notice Order, a list of those effectively seeking exclusion from the class was filed on October 25, 2018.  *See* Dkt. No. 1326; *see also* Keough Supp. Decl. ¶ 17, Exs. E1-E2.  As reflected in that list, many of the 352 members effectively seeking exclusion are related entities.  *See id.* (listing more than 75 Sysco entities).

In addition to the effective requests for exclusion, there were two requests for exclusion which JND identified as ineffective, e.g. requests that were untimely or did not specifically identify any person or entity seeking exclusion. *See* Keough Supp. Decl. ¶ 17, Exs. F1-F2.  Those requests have also been filed with the Court.  *See* Dkt. No. 1326.

Also, for each request that did not sufficiently identify persons or entities for whom the request for exclusion was being made, JND asked that sufficient identifying information be provided before the November 13, 2018 fairness hearing.  *See* Keough Supp. Decl. ¶ 17.  Counsel for the Settlement Class will provide the Court with an update on this matter at or before the hearing on this motion for final approval.

negotiations). That alone supports an initial presumption that the Settlement is fair, reasonable and adequate. *See 4 Newberg on Class Actions,* § 13:43 Presumptions governing approval process—Generally (5th ed.); *Great Neck Capital Appreciation*, 212 F.R.D. at, 410; *see also Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution."). Moreover, it is well established that the judgment and opinion of experienced and competent counsel should be taken into account when assessing whether a settlement is fair, adequate and reasonable. "The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *CRT II*, 2015 WL 9266493, at *6 (*quoting In re Omnivision*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2007)); *see also Kleen Prod. LLC*, 2017 WL 5247928, at *3 ("The Settlement was negotiated by highly skilled and experienced antitrust and class action lawyers, who have held leadership positions in some of the largest class actions around the country."). Therefore, the endorsement of the Settlement by Counsel for the Settlement Class (which the Court knows to have handled several major antitrust class actions), is yet another factor that supports final approval.[9]

## V. CONCLUSION

For the reasons stated herein, the Court should grant final approval of the Settlement.

---

[9] The fifth factor that courts in this Circuit typically consider – "the stage of the proceedings and the amount of discovery completed at the time of settlement" – *Isby*, 75 F.3d at 1199) – should, if not supportive of final approval, at least be deemed neutral. Although extensive discovery had not occurred when agreement with Fieldale Farms was reached, the Settlement was intended as an "icebreaker" settlement, which often takes place early in the proceedings when discovery may be limited. Moreover, courts have recognized that extensive discovery is not necessarily required before settlement, including when: class counsel has conducted an extensive pre-suit investigation – as was the case here; the cost of discovery may be significant; and , the parties fully grasp key legal issues that are central to resolution of the case – such as Fieldale Farms' argument about its Broilers being antibiotic free. *See, e.g., In re Processed Egg Prod. Antitrust Litig.*, 284 F.R.D. 249, 270 (E.D. Pa. 2012) ("Interim Co–Lead Counsel has represented to the Court that they 'conducted extensive investigations into the case in preparation for filing of the complaint.'"); *Gehrich*, 316 F.R.D. at 230 ("extensive formal discovery would entail substantial cost and might not have placed the parties in a materially better position than they are now to determine an appropriate settlement value"); *Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673, 684–85 (N.D. Cal. 2016) ("The parties only engaged in limited, informal discovery before discovery was stayed. [] But they fully briefed Defendant's summary judgment motion on the dispositive issue in this case… but settled before the Court held oral argument or ruled on the motion. [] This briefing allowed the parties to gain an understanding of their respective positions on the primary legal issue before reaching settlement…").

Dated:  October 29, 2018                              Respectfully submitted,

                                                      /s/ Bruce L. Simon
W. Joseph Bruckner                                    Bruce L. Simon
Elizabeth R. Odette                                   PEARSON, SIMON & WARSHAW, LLP
Brian D. Clark                                        44 Montgomery Street, Suite 2450
Simeon A. Morbey                                      San Francisco, CA 94104
LOCKRIDGE GRINDAL NAUEN P.L.L.P.                      T: (415) 433-9000
100 Washington Avenue South, Suite 2200               F: (415) 433-9008
Minneapolis, MN 55401                                 bsimon@pswlaw.com
T: (612) 339-6900
F: (612) 339-0981                                     Clifford H. Pearson
wjbruckner@locklaw.com                                Bobby Pouya
erodette@locklaw.com                                  Michael H. Pearson
bdclark@locklaw.com                                   PEARSON SIMON & WARSHAW, LLP
samorbey@locklaw.com                                  15165 Ventura Boulevard, Suite 400
                                                      Sherman Oaks, CA 92403
                                                      T: (818) 788-8300
                                                      F: (818) 788-8104
                                                      cpearson@pswlaw.com
                                                      mpearson@pswlaw.com
                                                      bpouya@pswlaw.com

*Direct Purchaser Plaintiffs Interim Co-Lead Class Counsel*

                   Steven Hart (#6211008)
                   Brian Eldridge (#6281336)
                   Kyle Pozan (#6306761)
                   HART MCLAUGHLIN & ELDRIDGE, LLC
                   121 West Wacker Drive, Suite 1050
                   Chicago, IL 60601
                   T: (312) 955-0545
                   F: (312) 971-9243
                   shart@hmelegal.com
                   beldridge@hmelegal.com
                   kpozan@hmelegal.com

*Direct Purchaser Plaintiffs Interim Liaison Class Counsel*