# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>*Action Meat Distributors, Inc., et al. v. Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, et al.* | Case No. 1:16-cv-08637<br><br>**ANSWER OF FOSTER FARMS, LLC TO THE ACTION MEAT DISTRIBUTORS, INC. PLAINTIFFS' COMPLAINT** |

Foster Farms, LLC ("Foster Farms"), by and through its undersigned counsel, submits its answer to the Complaint of Action Meat Distributors, Inc., Associated Food Stores, Inc., Bashas' Inc., Certco, Inc., DiCarlo Distributors, Inc., Ira Higdon Grocery Company, Inc. Nicholas & Co., Inc., Pacific Agri-Products, Inc., Pacific Food Distributors, Inc., Troyer Foods, Inc., URM Stores, Inc., and Weinstein Wholesale Meats, Inc. filed on May 16, 2018 (ECF No. 936, Exhibit A), as follows:

## ANSWER

Plaintiffs Action Meat Distributors, Inc., Associated Food Stores, Inc., Bashas' Inc., Certco, Inc., DiCarlo Distributors, Inc., Ira Higdon Grocery Company, Inc., Nicholas & Co., Inc., Pacific Agri-Products, Inc., Pacific Food Distributors, Inc., Troyer Foods, Inc., URM Stores, Inc., and Weinstein Wholesale Meats, Inc. ("Plaintiffs") bring this action for treble damages under the federal antitrust laws against the Defendants identified below. Plaintiffs seek damages commencing from at least January 1, 2008 through December 31, 2016 for their purchases of chickens directly from Defendants at supra-competitive prices, and allege as follows, based upon information and belief except as to allegations relating to themselves:

**ANSWER**: The introductory paragraph of the Complaint asserts legal conclusions and Plaintiffs' description of their claims and allegations to which no response is required. To the extent the

introductory paragraph contains factual allegations, Foster Farms denies those allegations.

## I.        NATURE OF ACTION

1.        This is a case about how a cartel of America's chicken producers succeeded in illegally increasing chicken prices. Defendants' cartel had two prongs. One focused on the beginning of the distribution chain by reducing the supply of chickens into the market. The other prong focused on the end of the distribution chain by manipulating a price index used to set wholesale chicken prices for buyers in Illinois and across the nation.

**ANSWER**: Paragraph 1 of the Complaint asserts legal conclusions and Plaintiffs' description of their claims and allegations to which no response is required.  To the extent paragraph 1 contains factual allegations, Foster Farms denies those allegations.

2.        The first prong of Defendants' scheme curtailed the supply of chickens in the market via unprecedented cuts at the top of the supply chain in the form of jointly and collusively reducing "breeder flocks" that produce chickens ultimately slaughtered for meat consumption. Historically, when faced with low market prices, Defendants relied primarily on mechanisms that temporarily reduced production – at the middle or end of the supply chain, such as reducing eggs placements, killing newly-hatched chicks, or idling processing plants – but which still allowed them to ramp up production within weeks if chicken prices rose

**ANSWER**:  Paragraph 2 of the Complaint asserts legal conclusions and Plaintiffs' description of their claims and allegations to which no response is required.  To the extent paragraph 2 contains factual allegations, Foster Farms denies those allegations.

3.        By way of background, the pattern of annual increases in chicken production became so entrenched over decades of experience that by the 2000s, a widely-repeated industry quip was that life only held three certainties: death, taxes, "and 3% more broilers." A leading industry publication noted in early 2009 that chicken "production in the U.S. used to be just like government spending, it never went down and cutbacks only resulted in slowing the rate of growth, but not anymore," because for "the first time in decades, total broiler production in 2008 remained virtually unchanged from the year before."

**ANSWER**: Paragraph 3 contains allegations subject to proof by expert testimony, to which no response is required.  To the extent the allegations in paragraph 3 describe or refer to other documents and/or other sources, Foster Farms states that such other documents and other sources speak for themselves.  Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies all such allegations.

4.      In 2008, faced with cratering prices and anemic profits, Defendants collectively began cutting their ability to ramp up production in the long-term – up to 18 months – by materially reducing their breeder flocks. While in the past, Defendants undertook traditional, short-term production cuts, this was a significant shift in their behavior. Defendants' collective market-changing cuts to breeder flocks – a first round from 2008 to early 2009, and a subsequent round from 2011 to 2012 as the conspiracy continued into the current decade – effectively eliminated their ability to meaningfully increase supply for years.

**ANSWER**: To the extent the allegations in paragraph 4 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations.  Foster Farms denies all remaining allegations set forth in paragraph 4.

5.      Defendants' joint efforts to impose supply-side "discipline" included public statements by their senior executives about a Defendant's individual commitment to production cuts as well as the importance of instituting and maintaining this "discipline" within the industry as a whole. Defendants' public statements on the need for, and benefits of, industry-wide supply "discipline" marked a significant departure from past industry practice.

**ANSWER**: To the extent the allegations in paragraph 5 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations.  Foster Farms denies all remaining allegations set forth in paragraph 5.

6.      Defendants' coordinated output restriction scheme was successfully facilitated by, monitored and policed using reports purchased, at significant cost, from Defendant Agri Stats, Inc. ("Agri Stats"), a subsidiary of global pharmaceutical company Eli Lilly & Co. Agri Stats collects detailed, proprietary data from all Defendants, including housing used, breed of chicks, average size, and production and breeder flock levels. Although certain Defendants had used Agri Stats before 2008, the output-restriction part of Defendants' conspiracy began when Defendant Tyson Foods – which had stopped using Agri Stats sometime in the mid-2000s – became a subscriber again in early 2008 (as confirmed by the CEO in a January 28, 2008 earnings call).

**ANSWER**: To the extent the allegations in paragraph 6 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations.  To the extent the allegations in paragraph 6 describe or refer to other documents and/or other sources, Foster Farms states that such

other documents and other sources speak for themselves. Foster Farms denies all remaining

allegations set forth in paragraph 6.

7.      While the Agri Stats reports "anonymize" individual producer information, they are sufficiently detailed so that any reasonably informed producer may discern the identity of its competitors' information, including breeder flocks, and other production, capacity and cost data. Agri Stats, as detailed below, plays both a unique role in the chicken industry and an important role in the conspiracy alleged here, by enabling Defendants to know exactly what each other was doing.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 7 and, on that basis, denies all such allegations.

8.      The information available to Defendants in these Agri Stats reports is not the kind of information that, in a competitive market, would be disclosed by one competitor to another. Agri Stats reports include individual lines (sometimes called "rows") of facility-level data for over 100 of Defendants' chicken integrated production facilities. Most of these vast facilities, referred to as "complexes," include housing for Defendants' breeder flocks and hatcheries where breeder flock hens lay the eggs that will ultimately become the chickens sold to the market.

**ANSWER**: To the extent the allegations in paragraph 8 describe or refer to other documents and/or

other sources, Foster Farms refers to such documents or sources for their contents and context and

states that such other documents and sources speak for themselves.  Foster Farms lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations and, on that

basis, denies all such allegations.

9.      The Agri Stats reports identify each complex with unique numbers, including a coding system identifying the region and sub-region, for each chicken complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself. For example, "Region 20" includes "Sub-Region 21 – Upper Mid Atlantic," identifying, with a unique number, sixteen chicken complexes, including four Tyson complexes, four Perdue complexes, three Mountaire complexes, two Pilgrim's Pride complexes, and one George's complex.[1]

**ANSWER**: To the extent the allegations in paragraph 9 and its accompanying footnote describe or

---

[1] Agri Stats reports also include specific data for Defendants' chicken complexes (listed by producer and location) in: North Carolina ("Sub-Region 22"); Northern Georgia and Tennessee ("Sub-Region 31"); Southern Georgia, Florida and South Carolina ("Sub-Region 32"); Alabama and Mississippi (sub regions 41 and 42); lower Arkansas, Louisiana and Texas ("Sub-Region 51'); upper Arkansas and Missouri ("Sub-Region 52"); Kentucky, Ohio, Minnesota, Indiana and Wisconsin ("Sub-Region 60"); and California and the Pacific Northwest ("Region 10)" (which is composed solely of Defendant Foster Farms' three complexes).

refer to other documents and/or sources, Foster Farms refers to such documents and sources for their contents and context and states that such other documents and sources speak for themselves. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies all such allegations in paragraph 9 and its accompanying footnote.

10. Agri Stats' reports are not publicly available, and with very limited exceptions, Defendants closely guard the reports' contents and the degree of Defendants' participation in Agri Stats' data-gathering and -dissemination processes. But despite the secrecy of the Agri Stats reports, Plaintiffs' counsel's extensive investigation has confirmed that every Defendant named in this Complaint reports detailed data to Agri Stats on a regular basis, typically weekly, and Agri Stats both facilitated and participated in the conspiracy because, among other things:

- Agri Stats' coding system made it "easy" for Defendants' personnel to decipher, simply by eyeballing the "rows" in a given report, the production, feed, sales and other competitively-sensitive metrics of their competitors, many of whom had complexes "right down the road from" each other in the same Agri Stats sub-region;

- Agri Stats' regular meetings with each Defendant allowed Agri Stats to share production information among the Defendants. For example, mid-level Tyson personnel working at complexes in the Mid-Atlantic region were advised by their complex managers about competitors' production following quarterly meetings between the Tyson complex managers and Agri Stats account managers; and

- Agri Stats account managers created, for each of their Defendant customers, a series of data compilations known as "books," based on the competitively-sensitive data that a particular Defendant had submitted to Agri Stats. On a number of occasions, Agri Stats personnel sent copies of one Defendant's "books" to other Defendants.

**ANSWER**: To the extent the allegations in paragraph 10 and its subparts relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations. Foster Farms denies all remaining allegations set forth in paragraph 10.

11. The other prong of Defendants' conspiracy to illegally increase and maintain chicken prices was the manipulation and artificial inflation of prices on the "Georgia Dock," a widely used weekly benchmark price compiled and published by the Georgia Department of Agriculture (the "GDA"). Chicken buyers across the nation, including purchasers in Illinois, paid prices based on the Georgia Dock. The Georgia Dock also formed the basis of many chicken purchasing contracts and other business transactions between certain Plaintiffs and one or more of the Defendants. Unlike other price indices available to chicken buyers, the Georgia Dock benchmark price is a self-reported number from a

group of chicken producers identified below as the "Georgia Dock Defendants" (namely, Defendants Pilgrim's Pride, Tyson, Fieldale Farms, Perdue, Sanderson Farms, Koch Foods, Claxton Poultry, Harrison Poultry, Mar-Jac and Wayne Farms). Senior executives from eight of the ten Georgia Dock Defendants were members of a secretive "Georgia Dock Advisory Board," which played a role in the compilation and manipulation of the Georgia Dock benchmark price

**ANSWER**: Foster Farms denies the conspiracy alleged in paragraph 11. To the extent the allegations in paragraph 11 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. To the extent the allegations in paragraph 11 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 11 and, on that basis, denies all such allegations.

12.     Following intense scrutiny, first in mid-2016 from the U.S. Department of Agriculture ("USDA"), and then by the press, which in late 2016 first revealed the easily manipulated methodology used to create the Georgia Dock benchmark price, the GDA, on November 28, 2016, suspended reporting it. Realizing the antitrust implications of how the Georgia Dock benchmark price inputs were compiled and how the Georgia Dock benchmark price was computed, the GDA attempted to implement new price-reporting requirements, including the submission of an affidavit by each Georgia Dock Defendant vouching for the accuracy of their submitted price inputs. However, the Georgia Dock Defendants balked at these new rules, so in late November 2016, the GDA stopped publishing the Georgia Dock benchmark index altogether, citing a "lack of submissions" under the new reporting requirements.

**ANSWER**: To the extent the allegations in paragraph 12 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. To the extent the allegations in paragraph 12 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 12 and, on that basis, denies all such allegations.

13.     The November 23, 2016 Georgia Dock benchmark whole-bird price of $1.0975/lb. was the last one reported by the GDA, although at least one Defendant continued for several more months to peg its wholesale prices to that final $1.0975/lb. price point. The GDA later introduced the "Georgia Premium Poultry Price Index," which purported to be a more transparent, accurate, and verifiable pricing

mechanism – but abandoned the new index in February 2017 due to a lack of participation by chicken producers. The Antitrust Section of the Florida Attorney General's office is currently investigating the chicken industry for anticompetitive practices, including the manipulation of the Georgia Dock. Plaintiffs have reason to believe the Antitrust Division of the U.S. Department of Justice is also probing Defendants' roles in compiling the Georgia Dock benchmark price.

**ANSWER**: To the extent the allegations in paragraph 13 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. To the extent the allegations in paragraph 13 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13 and, on that basis, denies all such allegations.

14.     Both prongs of Defendants' conspiracy were instigated in a market with numerous characteristics making it highly susceptible to collusion, including: (a) a highly-concentrated market dominated by vertically-integrated producers; (b) high barriers to market entry; (c) a standardized, commodity product where competition is based principally on price; (d) inelastic demand for the product; (e) numerous opportunities for cartel members to conspire through a number of regularly scheduled trade association meetings; and (f) access to competitors' data through Agri Stats. Indeed, an internal memorandum drafted by the Antitrust Section of the Florida Attorney General's office as part of its ongoing investigation stated that the chicken industry has the "hallmarks of an industry susceptible to collusion," including high consolidation, "predictable demand" in a "commodity market," and "routine, public display of prices to deter cheating."

**ANSWER**: Paragraph 14 contains legal conclusions to which no response is required. To the extent paragraph 14 is deemed to include allegations requiring a response, Foster Farms denies all such allegations in paragraph 14.

## II.     PARTIES

### A.     Plaintiffs

15.     Plaintiff Action Meat Distributors, Inc. ("Action Meat") is a Texas corporation with its principal place of business in Houston. From January 1, 2008 through December 31, 2016, Action Meat purchased chicken at artificially inflated prices directly from one or more of Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**ANSWER**: Foster Farms denies that it participated in any alleged conspiracy or otherwise acted

wrongfully. Foster Farms lacks knowledge or information sufficient to form a belief about the truth

of the remaining allegations in paragraph 15 and, on that basis, denies them.

16. Plaintiff Associated Food Stores, Inc. ("Associated Food") is a Utah corporation with its principal place of business in Salt Lake City. From January 1, 2008 through December 31, 2016, Associated Food purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**ANSWER**: Foster Farms denies that it participated in any alleged conspiracy or otherwise acted

wrongfully. Foster Farms lacks knowledge or information sufficient to form a belief about the truth

of the remaining allegations in paragraph 16 and, on that basis, denies them.

17. Plaintiff Bashas' Inc. ("Bashas") is an Arizona corporation with its principal place of business in Chandler, Arizona, operating stores under several banners, including Food City, Bashas' Markets, Bashas' Dine, AJ's Fine Foods, and Eddie's Country Stores. From January 1, 2008 through December 31, 2016, Bashas purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**ANSWER**: Foster Farms denies that it participated in any alleged conspiracy or otherwise acted

wrongfully. Foster Farms lacks knowledge or information sufficient to form a belief about the truth

of the remaining allegations in paragraph 17 and, on that basis, denies them.

18. Plaintiff Certco, Inc. ("Certco") is a Wisconsin corporation with its principal place of business in Fitchburg, Wisconsin. From January 1, 2008 through December 31, 2016, Certco purchased chicken at artificially inflated prices directly from one or more of the Defendants and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**ANSWER**: Foster Farms denies that it participated in any alleged conspiracy or otherwise acted

wrongfully. Foster Farms lacks knowledge or information sufficient to form a belief about the truth

of the remaining allegations in paragraph 18 and, on that basis, denies them.

19. Plaintiff DiCarlo Distributors, Inc. ("DiCarlo") is a New York corporation with its principal place of business in Holtsville, New York. From January 1, 2008 through December 31, 2016, DiCarlo purchased chicken at artificially inflated prices directly from one or more of the Defendants and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**ANSWER**: Foster Farms denies that it participated in any alleged conspiracy or otherwise acted

wrongfully. Foster Farms lacks knowledge or information sufficient to form a belief about the truth

of the remaining allegations in paragraph 19 and, on that basis, denies them.

20.     Plaintiff Ira Higdon Grocery Company, Inc. ("Ira Higdon") is a Georgia corporation with its principal place of business in Cairo, Georgia. From January 1, 2008 through December 31, 2016, Ira Higdon purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**ANSWER**: Foster Farms denies that it participated in any alleged conspiracy or otherwise acted

wrongfully. Foster Farms lacks knowledge or information sufficient to form a belief about the truth

of the remaining allegations in paragraph 20 and, on that basis, denies them.

21.     Plaintiff Nicholas & Co., Inc. ("Nicholas") is a Utah corporation with its principal place of business in Salt Lake City. From January 1, 2008 through December 31, 2016, Nicholas purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**ANSWER**: Foster Farms denies that it participated in any alleged conspiracy or otherwise

acted wrongfully. Foster Farms lacks knowledge or information sufficient to form a belief about the

truth of the remaining allegations in paragraph 21 and, on that basis, denies them.

22.     Plaintiff Pacific Agri-Products, Inc. is a California corporation with its principal place of business in South San Francisco. From January 1, 2008 through December 31, 2016, Pacific Agri-Products, Inc. purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**ANSWER**: Foster Farms denies that it participated in any alleged conspiracy or otherwise acted

wrongfully. Foster Farms lacks knowledge or information sufficient to form a belief about the truth

of the remaining allegations in paragraph 22 and, on that basis, denies them.

23.     Plaintiff Pacific Food Distributors, Inc. ("PFD") is an Oregon corporation with its principal place of business in Clackamas, Oregon. From January 1, 2008 through December 31, 2016, PFD purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**ANSWER**: Foster Farms denies that it participated in any alleged conspiracy or otherwise acted

wrongfully. Foster Farms lacks knowledge or information sufficient to form a belief about the truth

of the remaining allegations in paragraph 23 and, on that basis, denies them.

24.     Plaintiff Troyer Foods, Inc. Inc. ("Troyer") is an Indiana corporation with its principal place of business in Goshen, Indiana. From January 1, 2008 through December 31, 2016, Troyer purchased chicken at artificially inflated prices directly from one or more of Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**ANSWER**: Foster Farms denies that it participated in any alleged conspiracy or otherwise acted

wrongfully. Foster Farms lacks knowledge or information sufficient to form a belief about the truth

of the remaining allegations in paragraph 24 and, on that basis, denies them.

25.     Plaintiff URM Stores, Inc. ("URM") is a Washington corporation with its principal place of business in Spokane. From January 1, 2008 through December 31, 2016, URM purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**ANSWER**: Foster Farms denies that it participated in any alleged conspiracy or otherwise acted

wrongfully. Foster Farms lacks knowledge or information sufficient to form a belief about the truth

of the remaining allegations in paragraph 25 and, on that basis, denies them.

26.     Plaintiff Weinstein Wholesale Meats, Inc. ("Weinstein") is an Illinois corporation with its principal place of business in Forest Park, Illinois. From January 1, 2008 through December 31, 2016, Weinstein purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**ANSWER**: Foster Farms denies that it participated in any alleged conspiracy or otherwise acted

wrongfully. Foster Farms lacks knowledge or information sufficient to form a belief about the truth

of the remaining allegations in paragraph 26 and, on that basis, denies them.

**B.      Defendants**

### i.     Claxton Poultry Farms

27.     Defendant Norman W. Fries, Inc., d/b/a Claxton Poultry Farms ("Claxton") is a Georgia corporation headquartered in Claxton, Georgia. Claxton reports to Agri Stats a wide variety of data, including information about its breeder flocks and hatchery capacity and its Claxton, Georgia complex. Until the Georgia Dock benchmark price stopped being published by the GDA in late November 2016, Claxton was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Its CEO also served on the Georgia Dock Advisory Board. Claxton is a Georgia Dock Defendant.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 27 and, on that basis, denies them.

## ii.    Fieldale Farms Corporation

28.    Defendant Fieldale Farms Corporation ("Fieldale") is a privately held Georgia corporation headquartered in Baldwin, Georgia. Fieldale reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and its Gainesville, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Fieldale was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Its owner and CEO also served on the Georgia Dock Advisory Board. Fieldale is a Georgia Dock Defendant

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 28 and, on that basis, denies them.

## iii.    Foster Farms, LLC

29.    Defendant Foster Farms, LLC ("Foster") is a privately held California corporation headquartered in Modesto, California. Foster reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Fresno, California, Livingston, California, and the Pacific Northwest.

**ANSWER**: Foster Farms admits that Foster Farms, LLC is a privately held California limited

liability company headquartered in Livingston, California. Foster Farms denies the remaining

allegations contained in paragraph 29.

## iv.    The George's Defendants

30.    Defendant George's Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 30 and, on that basis, denies them.

31.    Defendant George's Farms, Inc., is a privately held Arkansas corporation headquartered in Springdale, Arkansas. It is a wholly owned subsidiary of George's, Inc. Defendants George's Inc. and George's Farms, Inc. are together referred to as "George's" in this Complaint. George's reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Harrisonburg, Virginia and Springdale, Arkansas.

**ANSWER**: Paragraph 31 contains Plaintiffs' explanation of a defined term, to which no response is

required. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of

the remaining allegations in paragraph 31 and, on that basis, denies them.

v.     Harrison Poultry Inc.

32.     Defendant Harrison Poultry, Inc. ("Harrison") is a Georgia corporation headquartered in Bethlehem, Georgia. Harrison reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Bethlehem, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Harrison was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Its owner and CEO served on the Georgia Dock Advisory Board. Harrison is a Georgia Dock Defendant.

**ANSWER**: Paragraph 32 contains Plaintiffs' explanation of a defined term, to which no response is required. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 32 and, on that basis, denies them.

vi.     House of Raeford Farms, Inc.

33.     Defendant House of Raeford Farms, Inc. ("Raeford") is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. Raeford reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its North Carolina and Louisiana complexes.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 and, on that basis, denies them.

vii.     The Koch Defendants

34.     Defendant Koch Foods, Inc. is a privately held Illinois corporation headquartered in Park Ridge, Illinois.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 and, on that basis, denies them.

35.     Defendant JCG Foods of Alabama, LLC, an Alabama limited liability corporation headquartered in Park Ridge, Illinois, is a wholly owned subsidiary of Defendant Koch Foods, Inc.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35 and, on that basis, denies them.

36.     Defendant JCG Foods of Georgia, LLC, a Georgia limited liability corporation headquartered in Park Ridge, Illinois, is a wholly owned subsidiary of Defendant Koch Foods, Inc.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 36 and, on that basis, denies them.

37.     Defendant Koch Meat Co., Inc., an Illinois corporation headquartered in Chicago, is a wholly owned subsidiary of Defendant Koch Foods, Inc

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 37 and, on that basis, denies them.

38.     Defendants Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC and Koch Meat Co., Inc. are collectively referred to as "Koch" in this Complaint. Koch reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Tennessee, and Alabama. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Koch, through JCG Foods of Georgia, LLC, was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice-president of sales served on the Georgia Dock Advisory Board. Koch is a Georgia Dock Defendant.

**ANSWER**: Paragraph 38 contains Plaintiffs' explanation of a defined term, to which no response is

required. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of

the remaining allegations in paragraph 38 and, on that basis, denies them.

viii.     Mar-Jac Poultry, Inc.

39.     Defendant Mar-Jac Poultry, Inc. ("Mar-Jac") is a Delaware corporation headquartered in Gainesville, Georgia. Mar-Jac reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Gainesville, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Mar-Jac was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice president of operations served on the Georgia Dock Advisory Board. Mar-Jac is a Georgia Dock Defendant

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 39 and, on that basis, denies them.

ix.     The Mountaire Farms Defendants

40.     Defendant Mountaire Farms, Inc. is a privately held Delaware corporation headquartered in Millsboro, Delaware.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 40 and, on that basis, denies them.

41.     Defendant Mountaire Farms, LLC, a privately held Arkansas limited liability corporation headquartered in Little Rock, Arkansas, is a wholly owned subsidiary of Defendant Mountaire Farms, Inc.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 41 and, on that basis, denies them.

42.     Defendant Mountaire Farms of Delaware, Inc., a privately held Delaware corporation headquartered in Millsboro, Delaware, is a wholly owned subsidiary of Defendant Mountaire Farms, Inc.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 42 and, on that basis, denies them.

43.     Defendants Mountaire Farms, Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire Farms" in this Complaint. Mountaire reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware and North Carolina.

**ANSWER**: Paragraph 43 contains Plaintiffs' explanation of a defined term, to which no response is

required. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of

the remaining allegations in paragraph 43 and, on that basis, denies them.

x.     The O.K. Foods Defendants

44.     Defendant O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 44 and, on that basis, denies them.

45.     O.K. Farms, Inc., an Arkansas corporation headquartered in Fort Smith, Arkansas, is a wholly owned subsidiary of Defendant O.K. Foods, Inc.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 45 and, on that basis, denies them.

46.     O.K. Industries, Inc., an Arkansas corporation headquartered in Fort Smith, Arkansas, is a wholly owned subsidiary of Defendant O.K. Foods, Inc.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 46 and, on that basis, denies them.

47.     Defendants O.K. Foods, Inc., O.K. Farms, Inc. and O.K. Industries, Inc. are collectively referred to collectively as "O.K. Foods" in this Complaint. O.K. Foods, which is a subsidiary of the Mexican poultry conglomerate Industrias Bachoco, reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Fort Smith, Arkansas complex.

**ANSWER**: Paragraph 47 contains Plaintiffs' explanation of a defined term, to which no response is

required. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of

the remaining allegations in paragraph 47 and, on that basis, denies them.

xi.     <u>Peco Foods, Inc.</u>

48.     Defendant Peco Foods, Inc. ("Peco Foods") is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama. Peco Foods reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Gordo, Alabama and Sebastopol, Louisiana.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 48 and, on that basis, denies them.

xii.     <u>The Perdue Defendants</u>

49.     Defendant Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 49 and, on that basis, denies them.

50.     Defendant Perdue Foods, LLC, a privately held Maryland limited liability corporation headquartered in Salisbury, Maryland, is a subsidiary of Defendant Perdue Farms, Inc.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 50 and, on that basis, denies them.

51.     Defendants Perdue Farms, Inc. and Perdue Foods, LLC are together referred to as "Perdue" in this Complaint. Perdue reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware, Maryland, North Carolina, South Carolina, Florida, and Kentucky. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Perdue was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Perdue is a Georgia Dock Defendant.

**ANSWER**: Paragraph 51 contains Plaintiffs' explanation of a defined term, to which no response is

required. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 51 and, on that basis, denies them.

### xiii. Pilgrim's Pride Corporation

52.     Defendant Pilgrim's Pride Corporation ("Pilgrim's" or "Pilgrim's Pride") is a publicly held Delaware corporation headquartered in Greeley, Colorado. Pilgrim's Pride reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, West Virginia, North Carolina, Georgia, Tennessee, Florida, South Carolina, Alabama, Texas, Arkansas, and Kentucky. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Pilgrim's Pride was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Its executive vice president of sales and operations served on the Georgia Dock Advisory Board. Pilgrim's Pride is a Georgia Dock Defendant.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52 and, on that basis, denies them.

53.     Defendant Pilgrim's Pride is liable for all conspiratorial acts undertaken while it was in bankruptcy proceedings during 2009, and reentered, and reaffirmed its commitment to, the conspiracy following its discharge from bankruptcy on December 29, 2009.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 53 and, on that basis, denies them.

### xiv. The Sanderson Farms Defendants

54.     Defendant Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 54 and, on that basis, denies them.

55.     Defendant Sanderson Farms, Inc. (Foods Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 55 and, on that basis, denies them.

56.     Defendant Sanderson Farms, Inc. (Production Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 56 and, on that basis, denies them.

57.     Defendant Sanderson Farms, Inc. (Processing Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 57 and, on that basis, denies them.

58.     Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division) and Sanderson Farms, Inc. (Processing Division) are collectively referred to as "Sanderson Farms" in this Complaint. Sanderson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Mississippi, and Texas. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Sanderson Farms was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Sanderson Farms is a Georgia Dock Defendant.

**ANSWER**: Paragraph 58 contains Plaintiffs' explanation of a defined term, to which no response is

required. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of

the remaining allegations in paragraph 58 and, on that basis, denies them.

xv.     <u>Simmons Foods</u>

59.     Defendant Simmons Foods, Inc. ("Simmons Foods") is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas. Simmons Foods reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its two Siloam Springs, Arkansas complexes.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 59 and, on that basis, denies them.

xvi.     <u>The Tyson Defendants</u>

60.     Defendant Tyson Foods, Inc. is a publicly held Delaware corporation headquartered in Springdale, Arkansas.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 60 and, on that basis, denies them.

61.     Defendant Tyson Chicken, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 61 and, on that basis, denies them.

62.    Defendant Tyson Breeders, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 62 and, on that basis, denies them.

63.    Defendants Tyson Poultry, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 63 and, on that basis, denies them.

64.    Defendant Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc. and Tyson Poultry, Inc. are collectively referred to as "Tyson" in this Complaint. Tyson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, Pennsylvania, North Carolina, Georgia, Alabama, Mississippi, Texas, Arkansas, Missouri, Indiana, Tennessee, and Kentucky. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Tyson was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. One of its plant managers served on the Georgia Dock Advisory Board. Tyson is a Georgia Dock Defendant.

**ANSWER**: Paragraph 64 contains Plaintiffs' explanation of a defined term, to which no response is

required. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of

the remaining allegations in paragraph 64 and, on that basis, denies them.

xvii.    Wayne Farms, LLC

65.    Defendant Wayne Farms, LLC ("Wayne Farms") is a Delaware limited liability corporation headquartered in Oakwood, Georgia. Wayne Farms reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in North Carolina, Georgia, Alabama, Mississippi, and Arkansas. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Wayne Farms was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice president of fresh sales served on the Georgia Dock Advisory Board. Wayne Farms is a Georgia Dock Defendant.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 65 and, on that basis, denies them.

66.    All of the above-named Defendants are collectively referred to as "Defendants" in this Complaint. All Defendants are horizontal competitors in the United States chicken market. Defendants and their co-conspirators, directly and through their wholly owned or controlled affiliates, produced and

sold chicken throughout the United States, including in this District, at prices that were artificially inflated as a result of their conspiracy alleged in this Complaint.

**ANSWER**: The first sentence of paragraph 66 consists of Plaintiffs' explanation of a defined term, to which no response is required. Paragraph 66 further contains legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, Foster Farms denies such conclusions and/or allegations. To the extent the allegations in paragraph 66 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations. Foster Farms denies all remaining allegations set forth in paragraph 66.

67. All of Defendants' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or engaged in by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management and operation of Defendants' business affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, or with Defendants' actual, apparent or ostensible authority. Defendants used the instrumentalities of interstate commerce to facilitate the conspiracy, and its conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the U.S., including in this District.

**ANSWER**: Paragraph 67 contains legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent the allegations in paragraph 67 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations. Foster Farms denies all remaining allegations set forth in paragraph 67.

xviii. Agri Stats

68. Defendant Agri Stats, Inc. (which is referred to in this Complaint as "Agri Stats" to distinguish it from the chicken-manufacturing entities referred to as "Defendants") is an Indiana corporation headquartered in Fort Wayne, Indiana, and is a subsidiary of Eli Lilly & Co., a publicly-held Indiana corporation headquartered in Indianapolis. Agri Stats has a unique and deep relationship with the chicken industry generally, and specifically with each of the Defendants listed above, all of which are Agri Stats' primary customers.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in paragraph 68 and, on that basis, denies them.

69.    The unique and symbiotic relationship between Agri Stats and the Defendants is exemplified by the fact that a representative from Agri Stats was elected to the board of the National Chicken Council, one of the industry's most important trade associations, in 2008 and 2010 – two key periods in the conspiracy alleged in this Complaint. Several Defendants, including Wayne Farms and Pilgrim's, also have hired former Agri Stats executives to work in senior sales positions, and Agri Stats employs or has employed several former executives of the Defendants.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Foster Farms lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph

69 and, on that basis, denies these allegations.

70.    Agri Stats is a co-conspirator of the Defendants, and has knowingly played an important and active role as a facilitator of Defendants' collusive scheme detailed in this Complaint. All of Agri Stats' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, or engaged in by Agri Stats' various officers, agents, employers or other representatives while actively engaged in the management and operation of Agri Stats' business affairs within the course and scope of their duties and employment, or with Agri Stats' actual apparent or ostensible authority. Agri Stats used the instrumentalities of interstate commerce to facilitate the conspiracy, and its conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the U.S., including in this District.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint.  Paragraph 70 contains

legal conclusions and/or allegations subject to proof, including by expert testimony, to which no

response is required. To the extent a response is deemed required, Foster Farms denies such

conclusions and/or allegations. To the extent the allegations in paragraph 70 relate to other

Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a

belief as to the truth of these allegations and, on that basis, denies all such allegations.  Foster Farms

denies all remaining allegations set forth in paragraph 70.

### III.    JURISDICTION AND VENUE

71.    This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiffs resulting from Defendants' conspiracy to restrain trade in the chicken market. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

**ANSWER**: Foster Farms admits that Plaintiff purports to bring its case under Section 1 of the

Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a). Foster Farms admits that Plaintiffs have filed an action to obtain certain relief and damages. Foster Farms admits this Court has subject matter jurisdiction over this matter only. Foster Farms denies the conspiracy alleged in the Complaint and any violation by Foster Farms of the Sherman Act or the Clayton Act. Foster Farms further denies that Plaintiff is entitled to any recovery of damages, costs or fees in this action. Foster Farms denies all remaining allegations in paragraph 71 of the Complaint.

72.     Venue is proper in this District under 15 U.S.C. §§ 15(a); 22 and 28 U.S.C. §§ 1391(b); (c); and (d) because during the relevant period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District.

**ANSWER**: Foster Farms admits that venue is proper in this District for purposes of the current action only. To the extent the allegations in paragraph 72 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations. Foster Farms denies all remaining allegations set forth in paragraph 72.

73.     Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 734 Ill. Comp. Stat. 5/2-209 because each Defendant has transacted business in this state and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.

**ANSWER**: Paragraph 73 contains legal conclusions to which no response is required. To the extent the allegations in paragraph 73 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations. Foster Farms denies all remaining allegations set forth in paragraph 73.

74.     This Court has personal jurisdiction over each Defendant because each Defendant – throughout the U.S. and including in this District – has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District.

**ANSWER**: Foster Farms admits that it is subject to the personal jurisdiction of this Court for purposes of this action only. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 74 as they relate to other Defendants and, on that basis, denies all such allegations. Foster Farms denies all remaining allegations set forth in paragraph 74.

75.     This Court also has personal jurisdiction over the Georgia Dock Defendants because each of them knew, or should have known, that because the Georgia Dock index price was used to price chicken bought in Illinois and nationwide, their participation in the collusive manipulation of the Georgia Dock would have effects on the price of chicken purchased in Illinois based on the Georgia Dock benchmark. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business in the state of Illinois.

**ANSWER**: Paragraph 75 contains legal conclusions to which no response is required. Foster Farms denies the conspiracy alleged in the Complaint. To the extent the allegations in paragraph 75 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. To the extent the allegations in paragraph 75 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations. Foster Farms denies all remaining allegations set forth in paragraph 75.

## IV.     TRADE AND COMMERCE

76.     Chicken, as the term is used in this Complaint, refers to chicken raised for meat consumption to be slaughtered before the age of 10 weeks (also known as either "broilers" or "fryers," which the USDA states are "regional terms for the same type of bird and thus used interchangeably"), and sold either fresh or frozen, raw or cooked, or whole or in parts, or as a meat ingredient in a value added product, but excluding chicken grown, processed and sold according to halal, kosher, free-range or organic standards. According to a 2012 report by Focus Management Group, chicken "is a commodity product with little or no product differentiation based on the processors," and the CEO of defendant Pilgrim's recently commented that "the chicken business per se is a commodity business." The commodity nature of chicken is evidenced by the fact that, as detailed below, numerous Defendants have during the relevant time period purchased chicken from each other (then likely resold it) to buttress their conspiracy by soaking up excess supply in the market.[2]

---

[2] On January 1, 2014, the USDA's Food Safety and Inspection Service ("FSIS") implemented a final rule lowering the age definitions for broilers/fryers from 13 weeks to the current 10 weeks. *See* 9 C.F.R. 381.170 (2014) (also noting that "FSIS is not establishing separate definitions for 'broiler' and 'fryer' chickens in this final rule.").

**ANSWER**: Paragraph 76 contains Plaintiffs' explanation of a defined term as used in its Complaint, to which no response is required. Foster Farms denies that the definition of the term "Chicken" provided in the Complaint is clear, accurate or consistent with the way that term is used by Foster Farms in the ordinary course of business. To the extent the allegations in paragraph 76 and its accompanying footnote describe or refer to other documents and/or sources, Foster Farms refers to such documents and sources for their contents and context and states that such other documents and sources speak for themselves. Foster Farms denies all remaining allegations in paragraph 76 and its accompanying footnote.

77. Typically, when a product is characterized as a commodity, competition is based principally on price—as opposed to other attributes, such as product quality or customer service. The market for chickens involves significant competition on the basis of price. Chicken producers pay USDA graders to examine their chickens, and almost all companies sell USDA Grade A chicken, meaning that there is very little differentiation amongst sellers.

**ANSWER**: Paragraph 77 contains legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent the allegations in paragraph 77 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations. To the extent a response is deemed required, Foster Farms denies all remaining allegations set forth in paragraph 77.

78. Due to the lack of product differentiation, Defendants are forced to compete on price such that the supply decisions of each chicken producer impact the market price for chickens. While an individual producer often has the incentive to increase production to maximize profits, any increased production will ultimately reduce the profitability of the industry as a whole. Thus, the commodity nature of the product in the chicken industry makes it easier to implement a price-fixing cartel and provides industry players with the incentive to agree to reduce overall supply.

**ANSWER**: Paragraph 78 contains legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 78 and, on that basis, denies all such allegations.

79.     The United States chicken market is a national market, valued at nearly $41 billion in 2016. During the relevant period, Defendants collectively controlled nearly 90% of the market for chicken in the United States. The chicken industry is almost entirely vertically integrated, with producers (sometimes known as "integrators") owning, or tightly controlling, each of the six stages of the supply chain: breeding, hatching, chick-rearing and feeding, slaughtering mature birds, processing, and selling. At the very top of the supply chain are Defendants' "breeder flocks," which include the hens that lay the eggs that, when hatched, become chickens slaughtered for meat consumption.

**ANSWER**: Paragraph 79 contains legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required.  To the extent a response is deemed required, Foster Farms denies such conclusions and/or allegations.  Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 79 and, on that basis, denies them.

80.     Like many other chicken buyers, the prices for certain Plaintiffs' chicken purchases were based on the Georgia Dock whole-bird price, which was one of three benchmark price indices used by chicken buyers until early 2017. The other indices used by chicken purchasers are: (1) the U.S. Department of Agriculture's weekly National Whole Broiler/Fryer Report (colloquially known as the "USDA Composite," available for free on the USDA website); and (2) the weekly index compiled by Urner Barry, a subscription service.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80 and, on that basis, denies them.

81.     Defendants' conduct, as described in this Complaint, was within the flow of, intended to, and did have a substantial effect on, the interstate commerce of the U.S., including in this District.

**ANSWER**: Paragraph 81 of the Complaint asserts legal conclusions and Plaintiffs' description of their claims and allegations to which no response is required.  To the extent paragraph 81 contains factual allegations, Foster Farms denies those allegations.

82.     During the relevant period, Defendants produced, sold and shipped chicken in a continuous and uninterrupted flow of interstate commerce. The conspiracy in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce in Illinois.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint.  Paragraph 82 asserts legal conclusions and Plaintiffs' description of their claims and allegations to which no response is required.  To the extent an answer is required, Foster Farms denies the remainder of the allegations

in paragraph 82.

83.     During the relevant period, each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 83 asserts legal

conclusions and Plaintiffs' description of their claims and allegations to which no response is

required. To the extent paragraph 83 contains factual allegations, Foster Farms denies them.

## V.     FACTUAL ALLEGATIONS

**A.     Agri Stats Participated In, and Actively Facilitated, Defendants' Communications Among Themselves, and Provided Data Necessary to Effectuate, Monitor and Enforce the Conspiracy**

84.     The USDA and various other entities publicly publish aggregated weekly, monthly, and annual supply and pricing information concerning the U.S. chicken industry. But only Agri Stats receives from Defendants, and then provides to Defendants, detailed information to accurately determine producer-specific production, costs, and general efficiency. Agri Stats is a company that generates confidential chicken industry data considerably more detailed than any similar types of available reports, including the following data categories.

(a)     Breeder flock size and age, hatchery capacity, and the costs associated with breeder flocks, including feed and housing expense;

(b)     Data about the production, delivery and formulation of feed, including corn and soybean meal costs, which are two of Defendants' most significant input costs;

(c)     Grow-out information for chicken "flocks" provided to contract farmers, including the number of chickens placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (*i.e.*, "down time"), feed conversion rate (pounds of feed per pound of chicken), average daily weight gain by chicks, live pounds produced per square foot of grower house, grower compensation, including average grower payment in cents per pound and cents per square foot, breed composition of flock (breed or cross-breed of flocks), detailed information on numerous mechanical aspects of chicken housing, and numerous other detailed cost, mortality, and operational information about disease, transportation, labor, and other grow out related information;

(d)     Slaughter, processing, and further processing information, including pay for processing plant workers, total production volume, market age of chickens at slaughter, weight of chickens at slaughter, birds per man hour, processing line speeds, and labor hours per pound;

(e)     Inventory levels of chickens; and

(f)     Financial information, such as monthly operating profit per live pound, sales per live pound, and cost per live pound.

**ANSWER**: To the extent the allegations in paragraph 84 describe or refer to other documents and/or other sources, Foster Farms refers to such documents and sources for their contents and context and states that such other documents and sources speak for themselves. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 84 and, on that basis, denies them.[3]

85.     Agri Stats collects data from Defendants, audits and verifies the data, and ultimately reports back to, Defendants detailed statistics on nearly every operating metric within the industry, including the size and age of breeder flocks. Agri Stats' survey methodology involves – from and to Defendants – direct electronic data submissions of financial, production, breeder flock size and age, capacity, cost, and numerous other categories of information by each chicken producer on a weekly and monthly basis. At each of Defendants' chicken complexes, certain employees, typically in the accounting department, are responsible for submitting the data to Agri Stats once a week (historically, on Thursdays) using an AS400 data link system. Agri Stats uses a detailed audit process to verify the accuracy of data from each complex, often directly contacting Defendants to verify data before issuing reports to Agri Stats subscribers.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 85 and, on that basis, denies them.

86.     Agri Stats describes itself as a "benchmarking" service that "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance." Sanderson Farms CEO Joe Sanderson claimed "[w]e use Agri Stats, which some of you are probably familiar with. Agri Stats is a benchmarking service that we submit data to. Almost everyone in our industry does as well. And we get the data back. It's anonymous – the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over the industry."

**ANSWER**: To the extent the allegations in paragraph 86 describe or refer to other documents and/or other sources, Foster Farms states that such other documents and other sources speak for themselves. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies all such allegations.

---

[3] The "Factual Allegations" Section of Plaintiffs' Complaint includes argumentative section headings, which characterize Plaintiffs' claims and to which no response is required. To the extent that a response to the section headings is required, Foster Farms denies them.

87.     However, contrary to these assertions, Defendants can (and do) readily determine "whose numbers the numbers belong to." Indeed, each Defendant knows that when it provides its internal, confidential information to Agri Stats, the other producers will be able to access that information and identify the Defendant that submitted it. There is no legitimate purpose to provide this specific, competitively-sensitive information to Agri Stats, nor is there any legitimate purpose for Agri Stats to disseminate the information in the detailed, readily-decipherable form in which it is sent to Defendants; rather, it is provided, compiled and transmitted for anti-competitive purposes.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 87 and, on that basis, denies them.

88.     Agri Stats' critical importance for a collusive production-restriction scheme in the chicken market lies not only in the fact that it supplies data necessary to coordinate production limitations and manipulate prices, but also in its market-stabilizing power. Price-fixing or output-restricting cartels, regardless of industry, are subject to inherent instability in the absence of policing mechanisms, as each individual member has the incentive to "cheat" other members of the cartel – for example, by boosting chicken production to capture higher prices even as other cartelists heed their conspiratorial duty to limit production, which is what happened in the chicken industry for a short period in 2010, when Defendants' conspiracy temporarily faltered.

**ANSWER**: Paragraph 88 contains legal conclusions and/or allegations subject to proof, including

by expert testimony, to which no response is required.  To the extent a response is deemed required,

Foster Farms denies the allegations in paragraph 88.

89.     Agri Stats' detailed statistics – coupled with its regular, in-person meetings with each Defendant and routine participation in trade association events widely attended by Defendants' senior executives – serve an indispensable monitoring function, allowing each member of Defendants' cartel to police each other's production figures (which are trustworthy because they have been audited and verified by Agri Stats' team) for any signs of "cheating."

**ANSWER**: To the extent the allegations in paragraph 89 relate to other Defendants and/or third

parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of

these allegations and, on that basis, denies all such allegations.  Foster Farms denies all remaining

allegations set forth in paragraph 89.

(i)     Agri Stats' Detailed Reports Enabled Defendants to Accurately Assess and Monitor their Competitors' Production Levels and Breeder Flocks

90.     Agri Stats claims to maintain the confidentiality and anonymity of individual companies' data by giving each company a report identifying only that company's specific chicken complexes by name, but not identifying by name other chicken producers' complexes described in the report, but rather, listing competitors' complexes by number. But Agri Stats reports are so detailed that any reasonably-

informed producer can easily discern the identity of its competitors' individual chicken complexes. It is common knowledge among producers that others can do so, with some Defendants referring to the task of determining the identity of individual competitor's data as "reverse engineering."

**ANSWER**: To the extent the allegations in paragraph 90 describe or refer to other documents or other sources, Foster Farms states that such other documents and/or other sources speak for themselves. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 90 and, on that basis, denies them.

91. As described above, Agri Stats reports identify each complex with unique numbers, including a coding system identifying the region and sub-region, for each chicken complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself. Specific complexes are easily identifiable from their codes. Agri Stats' coding system made it easy for Defendants' employees – some of whom, including senior executives at both Wayne Farms and Pilgrim's, used to work at Agri Stats – to decipher production, feed, sales and other competitively-sensitive metrics for their competitors' facilities.

**ANSWER**: To the extent the allegations in paragraph 91 describe or refer to other documents or other sources, Foster Farms states that such other documents and/or other sources speak for themselves. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 91 and, on that basis, denies them.

92. In fact, Agri Stats' coding system, coupled with the insular nature of an industry where "everybody knows everybody," allows for Defendants' employees to identify individual producers' data by eyeballing the rows in any Agri Stats report. The coding system has never changed (*e.g.*, the Tyson complex in Cummings, Georgia has always been identified as complex "222"), meaning that once a Defendant deciphered the numeric code for a given competitor's complex, that Defendant had the ability to know their competitor's data indefinitely.

**ANSWER**: To the extent the allegations in paragraph 92 describe or refer to other documents or other sources, Foster Farms states that such other documents and/or other sources speak for themselves. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 92 and, on that basis, denies them.

93. Agri Stats plays a particularly important role in Defendants' signaling practices and policing efforts. The specific type or size of breeder flock housing, breed of chick, average bird size, and production levels listed in Agri Stats data for Defendants' complexes allows any given Defendant to "reverse-engineer" and interpret the public statements and other publicly-available information about its competitors to determine which complexes are cutting back, and by how much. For example, if in

January, a Defendant publicly states its intention to reduce production – even generically, without specifying which complexes will cut back, or by how much – all of their fellow cartel members will be able to tell from the February and March Agri Stats reports whether that Defendant is following through on its conspiratorial agreement. Further, Defendants Tyson, Pilgrim, and Sanderson are public companies that report some aggregated data publicly, which executives from other companies that report some aggregated data publicly, which executives from other companies use to match up against the far more detailed information in the Agri Stats' reports to identify other specific data from their competitors.

**ANSWER**: To the extent the allegations in paragraph 93 describe or refer to other documents or other sources, Foster Farms states that such other documents and/or other sources speak for themselves. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 93 and, on that basis, denies them.

94. Each Defendant receives numerous types of Agri Stats reports, including separate targeted reports for each major area of operations, such as breeding, hatching, hauling, feeding, processing, selling, and administration. Defendants' complex managers typically receive the targeted reports for the specific aspects of chicken operations for which they have responsibility, and the CEO, CFO, and a few other of Defendants' top executives receive Agri Stats' monthly "Bottom Line Report" (which, for a portion of the relevant time period, was called the "Executive Report") geared to top level executives. The Bottom Line Reports contain one row for each chicken company reporting to Agri Stats with columns for certain categories of information, such as operating profit dollars, profit percentage, corporate SG&A (aka overhead), interest expense, and other key operational information related to sales, revenues and costs.

**ANSWER**: To the extent the allegations in paragraph 94 describe or refer to other documents or other sources, Foster Farms states that such other documents and/or other sources speak for themselves. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 94 and, on that basis, denies them.

95. Within each Agri Stats report (including the Bottom Line Report), unique information referring to supposedly "anonymous" data permits Defendants to identify their competitors' information contained within each category of report. For example, Agri Stats data on "Actual Live Production Cost," one of many important industry metrics listed in the Bottom Line Report, includes line-items for each of the "sub-regions" (described above) that shows, for each particular sub-region, the weighted average figures for "chick cost," "grower cost," "feed ingredient cost," "[feed] mill delivery cost," and "vaccination and medical cost."

**ANSWER**: To the extent the allegations in paragraph 95 describe or refer to other documents or other sources, Foster Farms states that such other documents and/or other sources speak for themselves. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in paragraph 95 and, on that basis, denies them.

96.     Information helping Defendants to assess the size and age of breeder flocks is available in the "Growth Rate Report" section of Agri Stats, which includes complex-by-complex numbers showing the average age, in weeks (e.g., "63.22" or "51.76") of the hens whose eggs, when hatched, become the chickens later killed for meat consumption and supplied to Plaintiff and other chicken buyers. The hens compromising the breeder flocks produce fertile eggs (at a rate of roughly five per week) starting around 20 weeks of age, and are typically slaughtered at 65 weeks of age, when breeder hens lose the ability to consistently lay fertile eggs. A breeder hen killed at 60 weeks lays 25 fewer eggs than a hen killed at 65 weeks, meaning that there are 25 fewer chicks hatched and 25 fewer mature chickens available to Plaintiff and other chicken buyers.

**ANSWER**: To the extent the allegations in paragraph 96 describe or refer to other documents and/or sources, Foster Farms refers to such documents and sources for their contents and context and states that such other documents and sources speak for themselves. Paragraph 96 contains legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, Foster Farms denies such conclusions and/or allegations. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 96 and, on that basis, denies all such allegations.

97.     The bird-age data from the "Growth Rate Report" shows how close a given breeder flock is to the end of its egg-laying lifespan, giving Defendants insight into how much longer that flock's capacity to lay eggs will impact the supply of chickens available for slaughter further down the supply chain. In addition, because the "Growth Rate Report" is available each month, knowing the average age of a given flock from month to month can help determine when flocks are being slaughtered and removed from the supply chain (*e.g.*, if the average hen age drops to 4.00 weeks after being at 48.00 weeks in the prior month's "Growth Rate Report," that is a clear indication a breeder flock was slaughtered at 48 weeks).

**ANSWER**: To the extent the allegations in paragraph 97 describe or refer to other documents and/or sources, Foster Farms refers to such documents and sources for their contents and context and states that such other documents and sources speak for themselves. Paragraph 97 contains legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, Foster Farms denies such conclusions and/or allegations. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 97 and, on that basis, denies them.

98.    The "Actual Live Production Cost" section of an Agri Stats report also includes (again, by sub-region), the average number and overall weight of the chickens being processed. Other sections of Agri Stats reports include similar, sub-region data for a range of competitively sensitive metrics, such as bird age and mortality, "chick cost per settled flock," and "grower expense." Knowing the number of complexes each Defendant operates in each sub-region – which, as detailed above, appear by name at the very beginning of the Agri Stats reports – any Defendant can, with relative ease, assess the performance of all competing complexes in a sub-region on a variety of important industry metrics.

**ANSWER**: To the extent the allegations in paragraph 98 describe or refer to other documents or other sources, Foster Farms states that such other documents and/or other sources speak for themselves.  Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 98 and, on that basis, denies them.

(ii)    <u>Agristats' Critical Role in Chicken Industry</u>

99.    Agri Stats' role in the chicken industry extends far beyond the collection and dissemination of competitively-sensitive data. It is an active and knowing participant in, and facilitator of, Defendants' scheme. Agri Stats' employees confirm for Defendants the data for a particular company at quarterly meetings with each company, or at the numerous trade association meetings where Agri Stats executives present on a regular basis.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 99 and, on that basis, denies them.

100.    Agri Stats offers a service to Defendants whereby each quarter, personnel from Agri Stats meet with each Defendant's employees and give presentations about both company- and industry-wide data. These meetings took place at both the production-plant level, where Agri Stats personnel meet with Defendants' complex managers, and at the executive level, where Agri Stats personnel meet with the leadership of Defendants' hatchery, breeder and feed departments.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 100 and, on that basis, denies them.

101.    Since Agri Stats travels and presents among Defendants regularly, discussing each Defendant's non-public, proprietary data, Agri Stats is in a unique position to share information among Defendants at these regular meetings. And that is exactly what happened. For example, during the conspiracy, mid-level Tyson personnel working at complexes in the Mid-Atlantic region were advised by their complex managers about competitors' non-public production information following quarterly meetings between the Tyson complex managers and Agri Stats account managers.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 101 and, on that basis, denies them.

102. At these regular meetings with Defendants' executives, Agri Stats lead detailed discussions about industry profitability and the key contributing factors, including size and average age of chicken breeder flocks, average hatchability of eggs, mortality rates, average bird rate, feed cost, and other performance factors based on data Defendants provided. Agri Stats also led discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and the top and bottom third of the industry. Agri Stats also told Defendants' executives how much the industry was over or undersupplying the market and estimated demand, and shared other information based on data Defendants provided.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 102 and, on that basis, denies them.

103. Agri Stats' presentations to the Defendants were based in part on color-coded data compilations, known as "books," specifically tailored for each Defendant based on the data the Defendant has submitted to Agri Stats. Agri Stats maintained at least six "books" for each Defendant: (1) the light-blue "Live" book, with information on the Defendant's breeders, hatchery feed and grow-out; (2) the red "Sales" book, with information on the Defendant's current and year-to-date sales; (3) the light-green "Production" book, with information on the Defendant's yields; (4) the brown "Profit" book, with information on the Defendant's profits and losses; (5) the mustard-yellow "Rendering" book, with information on the Defendant's rendering facilities; and (6) the "Bottom Line" book, with information on the totality of the Defendant's sales, revenues and costs.

**ANSWER**: To the extent the allegations in paragraph 103 describe or refer to other documents or other sources, Foster Farms states that such other documents and/or other sources speak for themselves. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 103 and, on that basis, denies them.

104. Anyone at Agri Stats had the ability to pull one or more Defendant's "books" and relay that information to other Defendants. Indeed, Agri Stats has shipped copies of one Defendant's "books" to other Defendants on a number of occasions. Despite the impropriety and illegality of this practice, when it was discovered following a routine review of shipping information, no one at Agri Stats was held accountable nor were the "books" returned to Agri Stats.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 104 and, on that basis, denies all such allegations.

105. In addition to its in-person meetings with Defendants, Agri Stats employees, including company Vice President Michael Donohue and account managers Paul Austin, Paul Bunting and Dana Weatherford, regularly host, or present at, chicken industry events and investor conferences, often citing Agri Stats data in discussing market, production, and demand trends in the chicken industry. For example, Agri Stats holds events known as "poultry outlook conferences." At one such conference on

April 23, 2015 in Atlanta, Mr. Donohue made a presentation that included "broiler market situation and outlook" as an agenda item.

**ANSWER**: To the extent the allegations in paragraph 105 describe or refer to other documents and/or sources, Foster Farms refers to such documents and sources for their contents and context and states that such other documents and sources speak for themselves. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies them.

106.    Mr. Donohue also helps forecast supply and demand for the chicken industry by using Agri Stats data on breeder placements and inventory. At the U.S. Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, for example, he noted that chicken breast prices were at a particularly high level and "[i]t's not just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012," he said. "I hope this carries over into the latter half of 2012 based on some of the production forecasts that can be made based on breeder placements and inventories." Mr. Donohue also noted a concern that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recover[y] in the short term by filing up incubators again."

**ANSWER**: To the extent the allegations in paragraph 106 describe or refer to other documents and/or sources, Foster Farms refers to such documents and sources for their contents and context and states that such other documents and sources speak for themselves. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies them.

(iii)    Defendants' Public Statements Show the Relevance of Agri Stats' Data to their Collective Efforts to Cut Production

107.    Defendants rarely mention their exchange of information with one another through Agri Stats. However, on certain public occasions, such as earnings or investor conference calls, executives from Defendants Sanderson and Tyson (two of the three publicly-traded Defendants) noted the important role Agri Stats data plays in the industry.

**ANSWER**: To the extent the allegations in paragraph 107 describe or refer to other documents and/or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 107 and, on that

basis, denies them.

108. For example, Defendant Sanderson's CEO, Joe Sanderson, commented on an earnings call that he "*look[s] at Agri* Stats *and see[s] what people are doing and not doing*," and similarly stated on a May 2011 earnings call that "my judgment is that there will be some others that are going to have to make some adjustments that *I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats.*" (emphasis added). Asked later on the May 2011 call by an analyst why Mr. Sanderson made this statement and another statement a few months earlier that he "feel[s] confident that we are going to see cutbacks" based on Agri Stats data, Mr. Sanderson indicated:

> Industry participants expected that [the market would improve in June and July] and I think they wanted to carry their production into June and July and see if the market would reward them for that it appears right now. . . . And then once you get past July 4 . . . I think then you will start seeing reduced egg sets. . . . Typically in my experience the first cut is not enough.

**ANSWER**: To the extent the allegations in paragraph 108 describe or refer to other documents and/or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies all such allegations.

109. Defendant Tyson similarly noted in a December 2014 investor presentation that:

> [t]he point being is that when you talk about the chicken cycle, most people will look at the cyclicality. It's very profitable right now. And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack. *We can tell that through Agri Stats.* Now at the same time, when there is more poultry available and the industry may not be as profitable, we would not expect to be anywhere close to what the bottom of that cycle would be. (emphasis added)

**ANSWER**: To the extent the allegations in paragraph 109 describe or refer to other documents and/or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies all such allegations.

110. There is no plausible, non-conspiratorial justification for Defendants to use Agri Stats to secretly share highly confidential and proprietary information about their breeder flock size and age,

pricing, capacity, production, and costs at the level of detail at which they do. In a competitive market, such proprietary, competitively sensitive information should be a closely guarded secret. Economic theory suggests that the routine exchange among competitors of such sensitive internal company information reduces competition.

**ANSWER**: Paragraph 110 contains allegations subject to proof by expert testimony and/or legal conclusions, to which no response is required. To the extent paragraph 110 contains allegations to which a response is required, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies them.

111.    One chicken industry expert testified in a case against defendant Pilgrim's brought under the Packers and Stockyard Act, 7 U.S.C. §§ 181-229, that sharing information through Agri Stats by chicken producers regarding pay for contract farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern." The same expert also remarked that Agri Stats was unusual even among other price surveys, noting:

> [t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue. Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive. As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry.  An intensive inquiry is needed.

**ANSWER**: Paragraph 111 contains allegations subject to proof by expert testimony and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 111 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies all such allegations.

112.    When given access to Agri Stats' reports in connection with litigation where he served as an expert witness, an agricultural economist who, to that point, had only "heard rumors of a secretive poultry industry information-sharing service," said that he "was shocked at the incredible detail" of the information presented in the reports.

**ANSWER**: To the extent the allegations in paragraph 112 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations and, on that basis, denies all such allegations.

113.     A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively-sensitive FDA egg-farm reports stated, with respect to Agri Stats, that

> Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue. My experience is that competitors . . . are prolific at quantifying their competitor's business information on their own. For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company . . . started for the poultry industry in 1985. AGRISTATS has the following mission statement: "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING ACCURATE AND TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES." Note the mission is to share comparative data while protecting individual companies. I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved. Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

**ANSWER**: To the extent the allegations in paragraph 113 characterize or describe documents or

other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent

characterization or description of them. Foster Farms lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations and, on that basis, denies all such allegations.

114.     A 2017 Bloomberg *News* article titled "Is the Chicken Industry Rigged? Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," highlighted the role Agri Stats plays in Defendants' efforts to monitor and police their cartel

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data – for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence – so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. To the extent the

allegations in paragraph 114 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies all such allegations.

B.   **Defendants' Conspiracy Artificially Increased and Maintained Chicken Prices**

115.   Defendants adopted a two-pronged approach to illegally control the chicken market, increase prices, and boost their profits. One prong targeted output, in particular the beginning of the supply chain (reducing breeder flocks); the other prong targeted the end of the supply chain (the Georgia Dock benchmark price).

**ANSWER**: Foster Farms denies the allegations in paragraph 115.

(i)   <u>Defendants' Historical Methods of Controlling Chicken Supply Are Ineffective in the Year Immediately Preceding the Conspiracy</u>

116.   In the year preceding the beginning of Defendants' conspiracy, the U.S. chicken market was foundering. In 2007, a glut of chicken – the result of significant overproduction by Sanderson Farms, Mountaire Farms and Raeford – began to flood the market, and prices cratered. By the time the Great Recession hit the American economy in 2008, the oversupply and low prices of chickens put Defendants – individually and collectively, as an industry – in dire straits.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 116 contains legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 116 and, on that basis, denies them.

117.   In 2007, the two largest chicken producers, Pilgrim's and Tyson, reduced their production, and a few other producers – Foster, Peco Farms and Perdue – followed their lead. But cuts by only five industry participants were not enough to affect industry supply to the point that prices would meaningfully increase. In addition, production cuts in 2007 followed the typical pattern of focusing on short-term reductions in production, such as slaughtering chickens early, but not on significant cuts at the top of the supply chain, particularly culling of breeder flocks, which have longer-term effects on supply.

**ANSWER**: Paragraph 117 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 117 relate to other Defendants and/or third parties to this action,

Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these

allegations and, therefore, denies them. Otherwise, Foster Farms denies the allegations in paragraph

117.

118.    In 2008, the first year of the Great Recession, Defendants faced what promised to be a
historically bad year for the chicken industry. So they made a conscious, joint decision not to return to
the previous industry practice of short-term or medium-term production cuts, which had led to the
destructive boom-and-bust cycles that plagued chicken producers for years.

**ANSWER**: Paragraph 118 contains Plaintiffs' characterization of their claims, allegations subject

to proof by expert testimony, and/or legal conclusions, to which no response is required. Foster

Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in paragraph 118 and, on that basis, denies them.

119.    Rather, in early 2008, through press releases, earnings and investor calls, at investment
bank conferences, at events hosted by Agri Stats, and at the myriad trade association meetings attended
by many of their senior-most executives, Defendants began calling on the industry to heed the mistakes
of the past, preaching to one another that oversupply was decimating industry profits, and increased
supply-side "discipline" was needed to halt the downward trajectory of chicken prices.

**ANSWER**: Paragraph 119 contains Plaintiffs' characterization of their claims, allegations subject

to proof by expert testimony, and/or legal conclusions, to which no response is required. Foster

Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in paragraph 119 and, on that basis, denies them.

120.    This production "discipline" – *i.e.*, the reduction or relative stabilization of industry
capacity, particularly at the breeder flock level, where such efforts would be most effective – was a
mechanism to increase Defendants' profits. Defendants' efforts were supported by public statements
made by their executives, which involved more than an announcement of a Defendant's own conduct. In
fact, as alleged below, many of Defendants' executives' calls for a new era of "discipline" included
explicit statements that deeper production cuts were an industry-wide imperative that would pay
dividends for "the industry" as a whole. Defendants, who collectively control nearly 90% of the U.S.
chicken market, jointly engaged in this production reduction effort.

**ANSWER**: : Paragraph 120 contains Plaintiffs' characterization of their claims, allegations subject

to proof by expert testimony, and/or legal conclusions, to which no response is required. Foster

Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in paragraph 120 and, on that basis, denies them.

121. While spearheaded primarily by the CEOs and senior personnel of Defendants Tysons and Pilgrim's – who, as publicly-held entities holding sizable, but by no means controlling, shares of the U.S. chicken market, were well-positioned to rally the entire industry – Defendants' executives' public discussion of industry conditions was not limited to the larger, publicly-held Defendants. For example, Mike Welch, CEO of Defendant Harrison, was (along with Sanderson COO Lampkin Butts) a paelist at a symposium hosted by industry journal Watts PoultryUSA, where the discussion topics included industry consolidation, efficiency, and bird size, with references to information gleaned from Agri Stats (whose vice president, Mike Donohue, was in the audience).[4]

**ANSWER**: To the extent the allegations in paragraph 121 and its accompanying footnote characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 121 and its accompanying footnote and, on that basis, denies them.

(ii) <u>The Conspiracy's First Prong: Defendants Depart from Historical Practice by Collectively Reducing Breeder Flocks in Unprecedented Amounts Beginning in 2008</u>

122. Beginning in early 2008, Defendants implemented the first prong of their conspiracy by making significant production cuts, including unprecedented cuts in their breeder flocks. The vertically integrated Defendants have the ability to manipulate supply to the chicken market at one or more stages of the supply chain. At the top of the supply chain, Defendants can most effectively manipulate supply by reducing the size of breeder flocks, and retiring or killing breeders at an earlier age than the optimum age. Reducing breeder flocks has the most significant, and long-lasting, effect on supply of chickens in the market.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 122 also contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 122

---

[4] Excerpts of comments made by Messrs. Welch and Butts are publicly available on Watts PoultryUSA's YouTube channel. *See* "Broiler company executives say bird size increase will continue," available at https://www.youtube.com/watch?v=ZBgEecBi7D4 and "Lampkin Butts describes changes in the poultry industry," available at https://www.youtube.com/watch?v=RN1IAphbQXs&t=53s. (both last visited December 2, 2017).

and, on that basis, denies them.

123. Because breeder flocks are created from a limited pool of so-called "grandparent" chickens from one of only three genetics companies (Aviagen, Hubbard, and Tyson's Cobb-Vantress), it takes substantial time – anywhere from six to eighteen months or more – to re-populate a breeder flock that has been reduced through early culling. While Defendants continued to use their historic methods to affect their supply-reduction scheme (at the middle or end of the supply chain, such as by reducing eggs placements, killing newly-hatched chicks, or idling processing plants), their conspiracy was cemented by the long-term effects of breeder flock reductions.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 123 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. Foster Farms admits Aviagen, Cobb-Vantress, and Hubbard are chicken genetics companies. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 123 and, on that basis, denies them.

124. Defendants' collective output-restriction caused a significant slowing in overall chicken production during the conspiracy – bucking the historic trend of steady annual production increases. The overall effect of this prong of Defendants' conspiracy is shown in the graph below, drawn from USDA data,[4] showing that while chicken production grew a total of 21% from 2000 to 2008 (an average of 2.3% per year, proof that the "3% more broilers" quip is more than anecdotal), but then slowed to a total of roughly 10% from 2008 through 2016 (an average of slightly more than 1% per year) – a significant decrease in the pace, timing and manner of chicken production during the conspiracy period.



**Production of Young Chickens (lbs) with Pre-Conspiracy Trend**

Production (lbs) vs Year

Legend: Pre-Conspiracy Period — Conspiracy Period — Linear (Pre-Conspiracy Period)

**ANSWER**: Paragraph 124 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 124 and its accompanying graph characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 124 and, on that basis, denies them. In addition, Foster Farms lacks knowledge or information sufficient to form a belief as to the accuracy of the graph accompanying paragraph 124 and, on that basis, denies it.

    (a)    **Defendants' Executives Publicly Decried the Effect of Oversupply on "Our Industry," Telling their Competitors that Unified Action Was Necessary**

125.    On January 23-25, 2008, Defendants attended the International Poultry Expo conference in Atlanta where, according to the trade association organizing the annual multi-day event, attendees representing over 99.4% of the production of the major chicken companies participated. Numerous employees from Defendants attended the conference, including Defendants' senior executives.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 125 and, on that basis, denies them.

126.    On a January 28, 2008, earnings call, Tyson CEO Dick Bond – who in the same call, disclosed that the company had re-joined Agri Stats and had "just recently . . . got our first series of data" – stated that "we have no choice [but] to raise prices substantially." However, the commodity nature of chickens does not allow one producer to successfully raise market prices in the absence of widespread reductions in supply relative to the then-current demand, so Mr. Bond's comment does not make sense absent an intention (or knowledge) on his part that Defendants would coordinate an industry-wide reduction in supply.

**ANSWER**: Paragraph 126 contains legal conclusions and allegations subject to proof by expert testimony, to which no response is required. To the extent the allegations in paragraph 126 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 126 and, on that basis, denies them.

127.    The day after Tyson's statements confirming its use of Agri Stats and expressing its plans to increase prices, Pilgrim's told its competitors to reduce their production of chickens to allow prices to recover. On a January 29, 2008, earnings call, Pilgrim's CFO Rick Cogdill said the industry's oversupply of chickens was hurting market prices. Mr. Cogdill explained that Pilgrim's had done its part in 2007 by reducing production 5%, so "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."

**ANSWER**: To the extent the allegations in paragraph 127 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 127 and, on that basis, denies them.

128. Mr. Cogdill went on to explain that Pilgrim's alone could not reduce supply enough to help market prices recover, and that its past efforts to reduce supply had merely led to smaller players increasing their market share at Pilgrim's expense. Mr. Cogdill noted that "[W]e have walked away from sales in certain cases, where the pricing just did not make any sense. So we are trying to hold the line. We are losing at times the competitive bids . . . . So we are trying to take a leadership position from a pricing perspective." He then made the following statements urging Pilgrim's competitors to do their part in reducing chicken industry supply:

- "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs. We were the leader in cutting production last year to help drive that. . . [W]e've got to make sure that we get the supply in line with demand at an acceptable prie, not just in line with what the customer wants to buy at a cheap price;"

- When asked by an analyst "do you have an estimate internally of what the state of oversupply in the industry might be? What you would hope to see cut from others that would make you feel like the industry was more rational?" mr. Cogdill replied "It's really hard to say that the faster we get to production adjustment the quicker the recovery could happen . . . And if the industry doesn't react soon enough it will have to react stronger in the end;" and

- Mr. Cogdill responded to an analyst's query about the industry's failure to follow Tyson's 2007 cuts by stating that, "I think you kind of hit on it there. . . . It's not like we had 5% of surplus capacity that we could just reduce our operations and not feel that . . . I mean we cannot be the ones that are out there continually reducing production, and let the other producers capitalize on that. I mean if it's 5% last year, 55 this year, 5% next year, you can see that that's a spiral to the demise of our company, which we are not willing to accept."

**ANSWER**: To the extent the allegations in paragraph 128 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 128 and, on that basis, denies them.

129. On a January 31, 2008, earnings call, Sanderson Farms CEO Joe Sanderson explained that he, too, anticipated the industry would cut production. Asked about production cuts by an analyst, Mr. Sanderson replied "we could see some reductions in production." Asked to expand on his comments by another analyst, Mr. Sanderson said he thought a production cut was "probable" and "if it's bad and ugly and deep in February, March and April, you'll see the production cuts take place during that period of time. There's still 25% of the industry still making money but I would expect to see those reductions come over the next 90 to 120 days."

**ANSWER**: To the extent the allegations in paragraph 129 characterize or describe documents or

other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 129 and, on that basis, denies them.

### (b)    Defendants Begin to Cut Production in Concert

130.    Around March 4, 2008, senior executives from Defendants, including Pilgrim's newly-installed CEO, Clint Rivers, Tyson Senior VP Donnie Smith, and Fieldale Farms President Thomas Hensley, met in Washington, D.C., at an Executive Committee meeting of the National Chicken Council's Board of Directors.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 130 and, therefore, denies them.

131.    Shortly after that trade association meeting, Pilgrim's again sounded the call to cut overall industry supply, but this time it backed up its rhetoric with production cuts. On March 12, 2008, Pilgrim's new CEO Clint Rivers, publicly announced the closure of seven chicken facilities in order to reduce industry oversupply, stating "we believe [these] actions . . . are absolutely necessary to help bring supply and demand into better balance . . . . That portion of the demand for our products that exists solely at pricing levels below the cost of production is no longer a demand that this industry can continue to supply." (emphasis added).

**ANSWER**: To the extent the allegations in paragraph 131 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 131 and, therefore, denies them.

132.    Normal supply and demand would suggest that in the wake of substantial supply cuts by Pilgrim's, other chicken producers would increase their production. Yet just the opposite occurred. Following Pilgrim's announcement, a series of production cuts were publicly announced by other Defendants between April 3-11, 2008.

April 3, 2008: Fieldale Farms announced a 5% production cut stating that "We're hoping this cut puts supply and demand back into better balance." Fieldale Farms is not a publicly-traded company, and there was no reason – other than signaling to its fellow cartelists that it was following through on its conspiratorial agreement – why it would publicly disclose its production plans.

April 9, 2008: Simmons announced in a press release a 6% reduction in production throughout its processing plants, a move heralded by Wall Street analysts, who noted that production cuts across smaller companies in the chicken industry, like Simmons, would be positive for chicken prices. Simmons is not a publicly-traded company, and there was no reason – other than signaling to its fellow cartelists that it was following through on its conspiratorial agreement – why it would publicly disclose its production plans

April 10, 2008: Cagle's Inc. (later acquired by Koch Foods) announced in a press release a 4% reduction in processing of chickens, noting that the cut "will reduce product being sold through less profitable commodity outlets."

April 3-11, 2008: Wayne Farms, O.K. Foods, and Koch Foods each announced 2-8% reductions in production. None of these companies are publicly-traded, and there was no reason – other than signaling to their fellow cartelists that they were following through on their conspiratorial agreements – why they would publicly disclose their production plans.

**ANSWER**: Paragraph 132 and its subparts contain Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 132 and its subparts characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 132 and, on that basis, denies them.

133.    Several other chicken companies cut their production between April 1, 2008 and May 15, 2008, but did not publicly announce their cuts. But because of Agri Stats, there was not a need to make a public announcement. For instance, at his BMO Capital Markets Agriculture & Protein Conference presentation on May 15, 2008 at the Millennium Broadway Hotel in New York City, Sanderson Farms CEO Joe Sanderson stated – in the presence of several competitors attending the conference, including Pilgrim's CEO Clint Rivers and CFO Richard Cogdill and Tyson CEO Richard Bond – that "we have seen for the last 6 or 7 weeks . . . some companies in our industry announce cutbacks. There have been I think six companies have announced cutbacks. I know some companies have cut back and have not announced." Such knowledge of non-public production cuts by competitors as highly suggestive of communication among chicken companies, either secret direct communications among themselves, or using Agri Stats as a facilitators, or both.

**ANSWER**: Paragraph 133 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the

extent the allegations in paragraph 133 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 133 and, on that basis, denies them.

134.  After seeing many of its competitors reduce production capacity between April 3-11, Pilgrim's realized that other Defendants were contributing to a widespread reduction in industry supply, and decided it could now take further steps to curtail supply. On April 11, 2008, Pilgrim's suggested it might close its large El Dorado, Arkansas processing plant, which employed 1,620 workers. Then, on April 14, 2008, it announced a further production cut of 5% of egg sets."

**ANSWER**: Paragraph 134 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 134 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 134 and, on that basis, denies all such allegations.

135.  On April 29, 2008, Tyson CEO Dick Bond told a Wall Street analyst, "I think the industry has changed . . . . I don't think the industry will be up that much anymore, we have seen some sizable declines here lately in egg sets and placements. So, we're going to be up a little bit but probably not a significant amount, not as much as we might have once anticipated.

**ANSWER**: To the extent the allegations in paragraph 135 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 135 and, therefore, denies them.

136.  Despite the large number of coordinated production cuts announced by producers in April 2008, Pilgrim's concluded these cuts were not sufficient. So Pilgrim's CEO Clint Rivers encouraged further action by the industry at a May 15, 2008, speech at the BMO Capital Markets conference at the Millennium Broadway Hotel – the same conference, also attended by Tyson CEO Richard Bond, where Sanderson Farms CEO Joe Sanderson disclosed his knowledge of non-public, unannounced production cuts by competitors. According to an industry publication, Mr. Rivers announced that he hoped to see the chicken industry continue to cut production to help the industry return to profitability, stating that

"he would like the industry to trim total production by 3%-4%, calling it a prudent move in light of recent price volatility in the grain markets." He also noted that "[t]he cuts need to be fairly deep."

**ANSWER**: To the extent the allegations in paragraph 136 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 136 and, therefore, denies them.

137.    A market report from June 2008 noted that "[b]eginning in April [2008], the weekly hatchery data started to show declines in egg sets and chick placements relative to year-earlier, which confirms the announced intentions to reduce broiler production and will result in slaughter falling below year-ago by mid-June." The same report also noted that "[i]t is unclear how long the slaughter declines will continue, and if other companies will choose to cut production as well making them deeper than initially thought. Those who have announced cutbacks indicate they will continue until margins normalize. At this time we expect to see the declines continue until at least late 2009, and cuts could be deeper than now projected."

**ANSWER**: To the extent the allegations in paragraph 137 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 137 and, therefore, denies them.

138.    A May 21, 2008, *Wall Street Journal* article noted that conditions in the industry were starting to change: "Three things are making analysts more optimistic: Companies are cutting production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines." The article also noted "[i]t is unusual for egg sets to decline at this time of year." The reason such a reduction was unusual in May is that egg sets result in chickens that are ready for market approximately 10 weeks later, which in this case would have been first week of August, and is still the peak of the high-demand summer grilling season.

**ANSWER**: To the extent the allegations in paragraph 138 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Paragraph 138 contains legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required.  To the extent a

response is deemed required, Foster Farms denies them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 138 and, therefore, denies them, except that Foster Farms admits that the first week of August is approximately 10 weeks after May 21, 2008.

139.   During an earnings call on May 22, 2008, Sanderson Farms CEO Joe Sanderson was asked if he thought industry cuts were sufficient to keep the industry profitable in the autumn. In response, Mr. Sanderson noted, "[w]e don't know yet. We will make a cut as we always do after Labor Day. We will make a 4-5% cut following Labor Day as we always do going into Thanksgiving, Christmas, and January we reduce our egg sets and around Thanksgiving, Christmas, New Years and Martin Luther King. That is a period of slow demand for us, and we don't announce that, but we always do it. It is just a period when we take downdays and we will do that.  But if we think more is needed, we will evaluate that sometime in August, and if need be will do it.  We cut back in 2006, we cut back in '97-98.  I don't know if we announced it or not, but we will do what we need to do."  Mr. Sanderson provided no explanation why Sanderson Farms chose to publicly disclose its "regular" production cut if it had never done so in the past.

**ANSWER**: To the extent the allegations in paragraph 139 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 139 and, therefore, denies them.

140.   In early June 2008, Pilgrim's CEO Clint Rivers continued to keep up the drumbeat for further production cuts, noting in a June 4, 2008, presentation that "[o]ur supply in chicken, we are oversupply . . . we need to see some balance in the supply. . . . Simply put, at this time there is still too much breast meat available to drive market pricing significantly higher."

**ANSWER**: To the extent the allegations in paragraph 140 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 140 and, therefore, denies them.

141.   Other Defendant CEOs soon picked up on Mr. Rivers' call for further action. On June 19, 2008, chicken industry executives participated in a media conference call intended to lobby the federal government to limit the ethanol mandate – a federal program requiring the production of corn-

based ethanol, which Defendants claimed drove up their corn costs by lessening the amount of corn they could buy to feed their chickens. According to one report, Mark Hickman, Chairman of the National Chicken Council and CEO of Peco Foods, told participants that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year. 'We are hearing talk that this was not nearly enough, so liquidation'" – a reference to the need for Defendants' decision to reduce chicken breeder flocks to affect longer-term supply restraint in the industry, rather than the short-term production cuts like breaking eggs or slaughtering chickens earlier to reduce weight – "'is in round two.'"

**ANSWER**: Foster Farms denies that this was a "call for further action." To the extent the allegations in paragraph 141 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 141 and, therefore, denies them.

142.    On June 23, 2008, shortly after Peco Foods' CEO publicly suggested that further production cuts were needed, Wayne Farms announced a 6% production cut.

**ANSWER**: To the extent the allegations in paragraph 142 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 142 and, therefore, denies them.

143.    On June 23-25, 2008, USPOULTRY held its annual Financial Management Seminar. Defendants' senior executives attended the seminar.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 143 and, therefore, denies them.

144.    On July 2, 2008, Foster Farms announced it was abandoning plans to build a new chicken plant in northeastern Colorado that it had previously announced in April 2008 would employ about 1,000 people. In a statement, Foster Farms CEO Don Jackson noted "[i]n these difficult conditions with costs escalating primarily due to grain and fuel prices and chicken prices lagging it does not make economic sense to go forward with expansion at this time."

**ANSWER**: To the extent the allegations in paragraph 144 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent

characterization or description of them. Foster Farms denies any remaining allegations in paragraph 144.

145.     On July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets, citing "record high prices for corn and soybean meal, which it attributes to the U.S. government's mandated ethanol policies along with recent flooding in the Midwest 'Corn Belt' region."

**ANSWER**: To the extent the allegations in paragraph 145 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 145 and, therefore, denies them.

146.     On July 20-22, 2008, the National Chicken Council held a three-day "Chicken Marketing Seminar" attended by Defendants' senior executives. The event was billed as a marketing seminar that "includes social networking events and recreational opportunities, including a golf tournament."

**ANSWER**: To the extent the allegations in paragraph 146 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 146 and, therefore, denies them.

147.     On August 11, 2008, Pilgrim's announced the closure of its Clinton, Arkansas, processing plant and a facility in Bossier City, Louisiana. Pilgrim's press release noted the closures "are part of the company's ongoing effort to operate more efficiently and return to profitability amid high feed costs and an oversupply of chicken on the market." The closure of the Clinton processing plant represented an additional 1.25% incremental increase of the company's previously announced production cuts. Pilgrim's stated that it would keep both plants idled until "industry margins can be sustained at more normalized levels of profitability." Pilgrim's also noted that "[w]ith Labor Day approaching and no indication that the actions taken to date by Pilgrim's Pride or other industry members are having a positive effect on selling prices for our products, it is now clear that more significant decisive action is necessary."

**ANSWER**: To the extent the allegations in paragraph 147 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 147 and, therefore, denies them.

148.    In August 2008, Raeford (a non-public company) announced that it would begin reducing its chicken production by 5 percent. The company said in a statement that "[t]he current obstacles that face our industry require that supply be brought in line with demand." A production cutback was remarkable for Raeford, which had pursued a strategy of aggressive production growth that resulted in the company doubling its chicken production from 2001 to 2007.

**ANSWER**: To the extent the allegations in paragraph 148 describe or refer to other documents and/or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them.  Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies all such allegations.

149.    On an August 26, 2008, earnings call, Sanderson Farms CEO Joe Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand." When asked later whether the industry had already made enough production cuts, he noted "we kind of thought we were going to see reductions in July . . . [based on] 213/214 [million] egg sets back in April and that really did not materialize. When you look at USDA slaughter numbers in July, they were 100% and 101% and now we're looking at egg sets of 206 and 207 million that are going to show up sometime in October or November. We'll see when we get there. Those are barely impressive cuts. My suspicion is, as I've told you in May, the industry typically make the cut [sic] and it's tentative. We'll have to see if it works. . . . I'm very skeptical that those cuts are going to be enough to return us margins to cover these grain costs."

**ANSWER**: To the extent the allegations in paragraph 149 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 149 and, therefore, denies them.

150.    By September 2008, chicken industry publication Watts Poultry USA reported that "[m]ost U.S. chicken integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'"

**ANSWER**: To the extent the allegations in paragraph 150 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent

characterization or description of them. To the extent paragraph 150 contains factual allegations, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of them and, therefore, denies them.

151. On October 3, 2008, Defendants' senior executives attended the National Chicken Council's Annual Meeting in Washington, D.C. Agri Stats CEO Blair Snyder – elected the day before as a "director-at-large" to the National Chicken Council's board – moderated a CEO panel that included Pilgrim's, Tyson's, Perdue's, and Sanderson Farms' CEOs. Explaining Pilgrim's desire to push through an industry-wide price increase, Pilgrim's CEO Clint Rivers told panel members and the audience "[w]e need to get those [input] costs pushed through, but we've yet to see that happen."

**ANSWER**: To the extent the allegations in paragraph 151 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 151 and, therefore, denies them.

152. On October 10, 2008, in response to a USDA report of falling egg sets in the chicken-industry, Pilgrim's told the Associated Press that "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

**ANSWER**: To the extent the allegations in paragraph 152 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 152 and, therefore, denies them.

153. Indeed, an industry analyst noted that at the time "the industry has cut about 10 to 12 percent of its production."

**ANSWER**: To the extent the allegations in paragraph 153 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 153 and, therefore, denies

them.

154.     During Autumn 2008, Sanderson Farms also implemented its previously announced "fall cuts" a month early and delayed the opening of a new deboning facility.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 154 and, therefore, denies them.

155.     On October 18, 2008, Wayne Farms President & CEO Elton Maddox released a statement (even though Wayne Farms was not a publicly-traded company) announcing the closure of the company's College Park, Georgia plant, resulting in the layoff of over 600 employees. Mr. Maddox cited "changing market conditions" and a need to "maximize efficiencies" as justification for the plant closure.

**ANSWER**: To the extent the allegations in paragraph 155 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 155 and, therefore, denies them.

156.     On a November 10, 2008 earnings call, Tyson CEO Dick Bond claimed that Tyson would not be making additional production cuts because it had already done its part to reduce industry supply with prior production cuts, citing the company's focus on "supply and demand." Yet despite protestations to the contrary, Tyson, in fact, substantially reduced production in December 2008. First, on December 18, 2008, Tyson announced the canceling of a deboning contract with Petit Jean Poultry at Petit's Little Rock, Arkansas processing plant that resulted in the layoff of 700 Petit employees. Second, by December 23, 2008, it was reported that Tyson had cut its production by 55. Asked by a reporter about the cuts, Tyson spokesman Gary Mickelson stated that "[w]hile we would rather not share details of ur current poultry production levels, we can tell you we continue to closely evaluate market conditions in an effort to match customer demand with our supply." Tyson also noted that it had reduced production "in recent years through the closing or sale of poultry plants and by running the company's remaining operations at reduced capacity utilization."

**ANSWER**: To the extent the allegations in paragraph 156 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 156 and, therefore, denies them.

157.    On January 28-30, 2009, Defendants' senior executives attended the 2009 International Poultry Expo in Atlanta, Georgia.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 157 and, therefore, denies them.

158.    In a February 18, 2009, interview, Tyson Senior Group Vice President Donnie Smith noted that "[a]cross our industry, we're down about six percent versus where we were a year ago. We're seeing an impact from that on market prices . . . the industry fundamentals are improving."

**ANSWER**: To the extent the allegations in paragraph 158 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 158 and, therefore, denies them.

159.    In late February 2009, a report noted that Pilgrim's had cut another 9-10% of its production. According to the same report, Tyson told the audience at a February 2009 investors' conference that it did not intend to reduce its production further because "[u]sing WATT PoultryUSA data on ready-to-cook (RTC) pounds, our numbers have declined 5-7% from 2000 to 2008 on RTC pounds while at the same time the industry has grown 31%. Over time, we have done plenty of cutting back." In other words, Tyson felt it had already taken its fair share of needed production cuts, so competitors needed to take any further action. However, as indicated below, Tyson's statements about not reducing production appear to be posturing, because generally Tyson did reduce its production during the 2008-2015 time period in line with other producers, apparently hoping the threat of it not reducing production would lead other producers to reduce production first.

**ANSWER**: Paragraph 159 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 159 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Otherwise, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 159 and, therefore, denies them.

160.    By February 25, 2009, Sanderson Farms told *The Morning News* of Northwest Arkansas that it had made cuts to its supply of chickens by processing smaller chickens and running its plants at lower capacity utilization rates. Sanderson Farms also told a group of investors around this time that

"[b]ecause we don't expect much help from the demand side, chicken market improvement will have to come from supply cuts."

**ANSWER**: To the extent the allegations in paragraph 160 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 160 and, therefore, denies them.

161.    Similarly, the CEO of Simmons Foods (a non-public company) Todd Simmons noted in a February 25, 2009, interview that "[w]e are seeing lower demand in the food-service customer base. We have made adjustments in bird weights to ensure our production meets with our customer's needs."

**ANSWER**: To the extent the allegations in paragraph 161 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 161 and, therefore, denies them.

162.    Seeing further cuts from smaller producers in the industry led Pilgrim's to announce historically large cuts to its production on February 27, 2009. In a press release announcing the closure of three processing plants located in Douglas, Georgia, El Dorado, Arkansas, and Farmerville, Louisiana, Pilgrim's stated the plants were "underperforming" and said the closures would "improve the company's product mix by reducing commodity production and to significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession." Pilgrim's also stated that the idling of these three plants would reduce its total pounds of chickens produced by 9-10%.

**ANSWER**: To the extent the allegations in paragraph 162 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 162 and, therefore, denies them.

163.    Overall, "[a]t least 11 companies reported reductions in weekly ready-to-cook production in 2008," including Defendants Tyson, Pilgrim's, Perdue, Simmons, Raeford, Cagle's (later bought by

Koch Foods), George's, O.K. Foods, Harrison, and GNP Company (now owned by Pilgrim's). Other companies reduced their planned production levels or delayed the planned opening of new chicken complexes.

**ANSWER**: To the extent the allegations in paragraph 163 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 163 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. Foster Farms denies all remaining allegations in paragraph 163.

    (c)    **Defendants' Chicken Production Cuts, from 2008 to Early 2009, Included Unprecedented Reductions to Chicken Breeder Flocks**

164.    As noted above, in 2008, Defendants ended a decades-long trend of annual additional chicken production, surprising industry observers. What makes the production cuts in 2008 and early 2009 remarkable is that chicken producers did not just reduce the pounds of chickens they produced – they also went further up their supply chains than ever before to restrict their ability to ramp up production for years into the future. While previous downturns had led some producers to use short-term methods to reduce overall pounds of chickens supplied to the market, in 2008, Defendants took their reductions to the next level by substantially reducing their breeder flocks, as shown in the highlighted section of the graph below:



*Source: National Agricultural Statistical Service, U.S.D.A., https://quickstats.nass.usda.gov/*

**ANSWER**: : Paragraph 164 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 164 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. To the extent the remaining allegations in paragraph 164 purport to relate to Foster Farms, Foster Farms denies them. Foster Farms also denies that the chart accompanying paragraph 164 is accurate and denies that the chart accurately reflects Foster Farms' hatchery supply flocks.

165.    The effect of the supply cuts on chicken pricing in 2008 and the first months of 2009 was clear – during the worst recession in generations, chicken prices rose through mid to late 2008, staying at or near all-time highs until late 2009. For instance, by May 28, 2009, Sanderson Farms reported strong profits that were twice the estimates of Wall Street analysts, which according to one industry publication was "aided by production cuts and lower feed costs that offset still-weak demand."

**ANSWER**: Paragraph 165 contains Plaintiffs' characterizations of their claims, allegations subject

to proof by expert testimony, and/or legal conclusions, to which no response is required. To the

extent the allegations in paragraph 165 characterize or describe documents or other sources, Foster

Farms notes that such sources speak for themselves and denies any inconsistent characterization or

description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to

the truth of the remaining allegations in paragraph 165 and, therefore, denies them.

166.    Similarly, at a May 14, 2009, BMO Capital Markets conference in New York City, interim Tyson CEO Leland Tollett noted that "poultry market fundamentals had improved. Pullet placements, an[] indication of future broiler supplies, have been down the past five months compared to the same period last year. Egg sets continue to run six percent or more below year ago levels and cold storage inventories of poultry have declined about 20 percent since peaking in November 2008."

**ANSWER**: To the extent the allegations in paragraph 166 characterize or describe documents or

other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent

characterization or description of them. Foster Farms lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 166 and, therefore, denies

them.

167.    During 2009 and 2010, Defendants' senior executives continued to meet with one another at trade association meetings and industry events, such as the National Chicken Council and the International Poultry Expo. For instance, at the National Chicken Council's October 2009 Annual Conference, one industry analyst wrote that participants had emphasized continued "production discipline," Defendants' euphemism for limiting chicken supply.

**ANSWER**: To the extent the allegations in paragraph 167 characterize or describe documents or

other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent

characterization or description of them. Foster Farms lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 167 and, therefore, denies

them.

168.    However, as prices continued to rise during late 2009 and early 2010, producers started increasing production in response to the higher prices just as they had done in previous decades – although, because of 2008 and 2009's unprecedentedly deep and early breeder flock culls, this temporary spike in production took months to effectuate, rather than the few weeks it would have taken had producers killed off their breeder flocks at the rates and times at which they had done so in the past. The rising production by producers in early 2010 led to a reported oversupply of chickens that began to

depress prices by late 2010. It was time for Defendants to revamp their faltering conspiracy to make it more effective. Defendants had learned the value of coordinated supply reductions in 2008; they were quick to react with a new round of publicly-announced production cuts in the first half of 2011, which quickly helped prices recover.

**ANSWER**: Paragraph 168 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. Foster Farms denies that it participated in coordinated supply reductions. To the extent the allegations in paragraph 168 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Otherwise, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 168 and, therefore, denies them.

#### (d) Defendants' Conspiracy, Hatched in the Great Recession Continued into 2011 With Another Round of Collective Production Cuts

169. On April 15, 2011, Defendant Mountaire disclosed, in a press report, the abandonment of a planned capacity increase, with Mountaire President Paul Downes explaining that "the only way to higher prices is less supply. The only way to less supply is *chicken companies will shut down or cut back*. . . . I think that's what we're going to see." (emphasis added).

**ANSWER**: To the extent the allegations in paragraph 169 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth the remaining allegations in paragraph 169 and, therefore, denies them.

170. Mr. Downes' view of the state of the chicken industry was echoed, and amplified in grim terms, by Joe Sanderson, CEO of Defendant Sanderson Farms, who stated on a May 24, 2011 earnings call that "*the deal is that the industry – forget Sanderson – the industry cannot sustain losses like they are sustaining for a long period of time.* They will – they can't do it and you have been observing this for years and years and the industry has been losing money since Novemberish and balance sheets deteriorate and losses have to stop. The only way to stop losses with $7 corn is to reduce production and get prices up. That is the rule and the law of the jungle." Mr. Sanderson continued, "my judgment is that there will be some others that are going to have to make some adjustments that *I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats.*" (emphasis added)

**ANSWER**: To the extent the allegations in paragraph 170 characterize or describe documents or

other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent

characterization or description of them. Foster Farms lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 170 and, therefore, denies

them.

171.    Mr. Sanderson's comments came roughly one week after he and Lampkin Butts, Defendant Sanderson's President and COO, attended the BMO Farm to Market Conference in New York City, along with the CEOs of Defendants Pilgrim's Pride (Bill Lovette) and Tyson (Donnie Smith). The conference included a presentation by Mr. Lovette that noted Pilgrim's new focus on matching production to meet demand, including by adjusting "head," *i.e.*, breeder flocks, to better balance supply and customer demand.

**ANSWER**: To the extent the allegations in paragraph 171 characterize or describe documents or

other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent

characterization or description of them. Foster Farms lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 171 and, therefore, denies

them.

172.    On a June 6, 2011 earnings call announcing it would not increase capacity in the foreseeable future, Cagle's – a Georgia-based integrator whose assets were bought by Defendant Koch Foods in 2012 following Cagle's bankruptcy – said that "*the industry must lower supply in order to offset reduced demand and to support higher market prices.*" (emphasis added).

**ANSWER**: To the extent the allegations in paragraph 172 characterize or describe documents or

other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent

characterization or description of them. Foster Farms lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 172 and, therefore, denies

them.

173.    Other Defendants, *including* Fieldale Farms and Mar-Jac, also began reducing production by cutting breeder flocks in the middle of 2011.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 173 and, therefore, denies them.

174.    In June and July 2011, Defendants' senior executives attended industry events, including a seminar held by the U.S. Poultry & Egg Association and the 2011 Food Media Seminar, which included a panel made up of the CEOs of Defendants Tyson (Donnie Smith), Peco Foods (Mark Hickman), and Perdue (Jim Perdue), and Defendant Sanderson Farms' President and COO (Lampkin Butts).

**ANSWER**: To the extent the allegations in paragraph 174 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. To the extent the allegations in paragraph 174 purport to relate to Foster Farms, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies them.

175.    On an August 1, 2011 earnings call, Defendant Sanderson Farms CEO, Joe Sanderson, informed analysts that the company's normal fall production cut of 4% beginning in November would remain in place beyond January 2012 or until such time as demand improved. Mr. Sanderson also stated that it "*wouldn't surprise me if the industry makes further, deeper reductions in egg sets in October or November . . . Nobody knows what cuts might be needed until we get to October, but I think that the cutbacks may need to be more than the 6% in head that the industry has in place.*" (emphasis added).

**ANSWER**: To the extent the allegations in paragraph 175 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 175 and, therefore, denies them.

176.    A week later, Defendant Tyson's CEO said on an earnings call that "domestic availability must be in balance with demand before *industry economics can improve*. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter . . . . Our goal is to match supply to demand. And following over-production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market." (emphasis added).

**ANSWER**: To the extent the allegations in paragraph 176 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 176 and, therefore, denies them.

177.    In early October 2011, Defendants' senior executives attended the National Chicken Council's 57th Annual Conference in Washington, D.C. Among the discussion panels at the event was one about the "new paradigm" in the chicken industry. The panel included senior executives from Defendants Perdue (Clint Rivers, by then Perdue's President of Foodservice and Supply Chain, after having been Pilgrim's CEO) and Koch Foods (Mark Kaminsky, COO and CFO). Panelists said that "the industry is accustomed to cycles, but not one quite like the latest, and companies are going to need to adjust. Discipline on the supply side was one suggestion. Getting better prices from retailers was another." (emphasis added).

**ANSWER**: To the extent the allegations in paragraph 177 characterize or describe documents or

other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent

characterization or description of them. Foster Farms lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 177 and, therefore, denies

them.

178.    Throughout 2012, Defendants continued to meet at trade association meetings and industry events, giving them the opportunity to discuss the impact of their collective production cuts and otherwise monitor their conspiracy. In the first quarter of 2012, for example, Defendants' top executives attended the National Chicken Council's board of directors meeting in Atlanta, which was held in conjunction with the January 25-26, 2012 International Poultry and Processing Expo. On March 20-21, 2012, the National Chicken Council's board of directors, which included many of Defendants' senior executives, met again in Washington, D.C.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 178 and, therefore, denies them.

179.    In early 2012, Defendant Sanderson Farms cut its production by 4%, which included a reduction in breeder flocks.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 179 and, therefore, denies them.

180.    At USPOULTRY's Hatchery-Breeder Clinic in January 2012 in Atlanta, Agri Stats Vice President, Mike Donohue, noted the importance of reducing breeder flocks, stating that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recover[y] in the short term by filing up incubators again." But he also noted that the Agri Stats data indicated that the industry was slaughtering breeder flocks at 59 to 60 weeks, instead of the typical 65 weeks. The kind of early slaughter of breeder flocks – including, for example, the bird-age data included in the "Growth Rate Report" described above – meant that Defendants subsequently were unable to increase production for at least eighteen months, as they would have been able to do had they not made cuts at the top of the supply chain.

**ANSWER**: Paragraph 180 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 180 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 180 and, therefore, denies them.

181.    The shift in the way the industry supplied chicken was summarized in a March 2012 report published by agricultural lender, CoBank. Entitled "The U.S. Chicken Industry: Re-invented and Revitalized" with sections captioned "'Same-Old' – No More" and "It's a New Ballgame," the report noted that the:

> U.S. chicken industry has gone through the proverbial wringer, but last year appears to have been the low point. In recent years, the chicken companies have all lost money, some more than others. And five U.S. companies have exited the industry since 2008. As the losses mounted, the industry realized that its standard business practices sorely needed to be reformed. The surviving chicken companies found it to be not just prudent, but absolutely essential to revise those practices. The poultry industry today operates much differently than it did just a few years ago

**ANSWER**: Paragraph 181 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 181 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 181 and, therefore, denies them.

182.    The CoBank report highlighted one of the reasons for this sea-change: the Defendants' reduction of breeder flocks that began in mid-2011, noting that "the recent cuts in the hatchery flock will prevent a quick response," with "U.S. chicken production [. . .] on track to fall to its lowest level in 5 years by mid-2012." The highlighted section of the following graph shows that these cuts bucked the historical trend of breeder flock reductions, going even deeper than the then-unprecedented 2008-2009 cuts:



**ANSWER**: Paragraph 182 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 182 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 182 and, therefore, denies them. In addition, Foster Farms denies that the graph accompanying paragraph 182 is accurate and denies that it accurately depicts changes in Foster Farms' hatchery supply flocks.

183. The sentiment of CoBank's March 2012 report was mirrored by Pilgrim's CEO, Bill Lovette, on an April 27, 2012 earnings call, where he reported that "the die is cast for 2012," and that "we're comfortable that *the industry is going to remain constrained.*" (emphasis added).

**ANSWER**: To the extent the allegations in paragraph 183 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 183 and, therefore, denies them.

184.    Trade association meetings and industry events in the middle of 2012 gave the Defendants additional opportunities to meet and discuss the effect of their collusive efforts to reduce production. Examples of these opportunities to conspire included Urner Barry's annual marketing seminar, from April 29 – May 1, 2012, the National Chicken Council's board of directors meeting in Lake Tahoe on June 21, 2012, and the July 15, 2012 meeting of the National Chicken Council's marketing committee in Stowe, Vermont. Each of these meetings were attended by a number of Defendants' senior executives.

**ANSWER**: Paragraph 184 contains Plaintiffs' characterizations of their claims and legal conclusions, to which no response is required. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 184 and, therefore, denies them.

185.    On August 28, 2012, Defendant Sanderson Farms announced a further 2% production cut.

**ANSWER**: Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 185 and, therefore, denies them.

186.    By September 2012, Defendants' 2011 production cuts, particularly their reduction of breeder flocks, had resulted in increased prices for Plaintiffs. The higher chicken prices seen in the market by September 2012 were not justified by the costs of Defendants' primary inputs, corn and soybean meal, which by the fourth quarter of 2012, had dropped significantly in price following near-record highs in the summer of 2012.

**ANSWER**: Foster Farms denies that it engaged in the production cuts referenced in paragraph 186. Paragraph 186 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent paragraph 186 contains additional factual allegations, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them.

187.    On October 10-11, 2012, the National Chicken Council held its annual meeting in Washington, D.C. Among Defendants' senior executives attending the meeting were the President of Defendant Fieldale Farms (Thomas Hensley) and CEO of Defendant O.K. Foods (Paul Fox). Messrs. Hensley and Fox participated in an "Industry Outlook Panel" where participants discussed the question of what the industry "learn[ed] from 2011 and *how will the industry apply those lessons in 2012 and 2013*." (emphasis added).

**ANSWER**: To the extent the allegations in paragraph 187 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent

characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 187 and, therefore, denies them.

**(e)**     **Drastically Reduced Breeder Flocks Boos Chicken Prices and Raise Defnedants' Profits to Record Levels**

188.     For most of the remainder of 2012 through 2016, Defendants reaped the benefits of their coordinated supply restraints as prices rose and profits soared to record levels. During this time, Defendants' executives repeatedly heralded the industry's newly found supply "discipline." For example, on a May 3, 2013 investor call, Pilgrim's Pride CEO, Bill Lovette, said that:

> Obviously, revenue is going to be a function of price, in part, and in this case a big part; and obviously, price is going to strengthen as supply continues to be disciplined and constrained . . . So I think *the industry is doing an admirable job in being disciplined* on the supply side and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying. . . . I believe *the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken* and not necessarily what corn or soybean meal costs. I think I'm confident to say, *we've figured that out and we're doing a good job* of balancing supply and demand. (emphasis added).

**ANSWER**: Paragraph 188 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 188 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the remaining allegations contained in paragraph 188 purport to relate to Foster Farms, Foster Farms denies them.

189.     On the May 3, 2013 investor call, Mr. Lovette specifically referenced the continued importance of restraining the industry's breeder flocks:

> I only know what we've seen happen in the past. Now, certainly, this summer *if the industry chooses to grow the breeder supply significantly, that's definitely going to impact 2014. What I'm saying is, so far, we've seen no indication that the industry plans to grow the breeder supply and as a matter of fact, it's actually shrunk.* . . . I'll reiterate that *I think the industry has learned* that the economics of our business is tied very closely to the supply of chickens and *we've done a good job so far of maintaining discipline* such that even paying nearly $8.50 for corn, *we've been able to be profitable as an industry.* (emphasis added).

**ANSWER**: To the extent the allegations in paragraph 189 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 189 and, therefore, denies them.

190.   On October 4, 2013, Defendants' CEOs and other senior executives met at the annual meeting of the National Chicken Council in Washington, D.C., where a panel, including the CEOs of Defendants Tyson (Donnie Smith) and Simmons Foods (Todd Simmons), was "chipper about the prospects for their industry in the next few years

**ANSWER**: To the extent the allegations in paragraph 190 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 190 and, therefore, denies them.

191.   Defendants had reason to be positive. For example, on a February 21, 2014 earnings call, Pilgrim's Pride CEO, Bill Lovette, reflected on what had led to the company's record earnings. Mr. Lovette noted that "I think the one thing that creates . . . has created the stability is *the discipline of the industry to not allow profitability in the past to drive supplies* in the future . . . . And I think that discipline really . . . is the one ingredient that has made for more stable earnings that we have seen." (emphasis added).

**ANSWER**: Paragraph 191 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 191 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Otherwise, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 191 and, therefore, denies them.

192.   At a March 12, 2014 industry conference, Tyson CEO, Donnie Smith, told attendees that a "meaningful change" in chicken production would not occur until the second half of 2015, a statement he could confidently make because Defendants' unprecedented 2011-2012 cuts in breeder flocks made it impossible for them to "meaningfully change" chicken production any sooner.

**ANSWER**: To the extent the allegations in paragraph 192 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Otherwise, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 192 and, therefore, denies them.

193.    An October 2014 CoBank analysis noted that Defendants' strategy of targeting breeder flocks paid dividends during 2013 and 2014. According to the report:

> [P]roduct demand should remain robust through the rest of this year and well into 2015, bolstered by a gradually improving domestic economy, continued strength in export demand, and the towering prices of beef and pork. Broiler production, however, has been slow to respond, with integrators having had problems expanding the number of chicks placed for growout. Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015. Producers have been somewhat constrained in their attempts to expand the nation's chicken flock by the limited supply of broiler hatching eggs. When the broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been rebuilt to prior levels. Following seven months of [Year-over-Year ("YoY")] declines, the number of chicks placed for growout finally posted a modest 1 percent YoY gain in August. However, it will take another 6-9 months for integrators to rebuild the supply of broiler hatching eggs in preparation for expanding the overall flock, so significant growth in broiler production will not materialize until late 2015 or early 2016.

The October 2014 CoBank report also noted the effect of these production cuts, stating that wholesale prices for chicken "have risen to unusually high levels."

**ANSWER**: Paragraph 193 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 193 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Otherwise, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 193 and, therefore, denies them.

194.    During a February 12, 2015, earnings call, Pilgrim's President & CEO Bill Lovette summed up the restriction of supply which Defendants had implemented since 2008: "I looked at some numbers supplied by Agri Stats earlier in the week and found some interesting facts. If you go back to 2008, the industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by

approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies."

**ANSWER**: To the extent the allegations in paragraph 194 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 194 and, therefore, denies them.

195.    The year 2015, like 2014, was a banner year for Defendants' profits resulting from their conspiracy. Watts PoultryUSA's March 2016 issue noted, for example, that Defendant Tyson had achieved "record earnings and sales in fiscal year 2015 . . . . posting $40.6 billion in sales, including ringing up higher chicken sales. Yet, Tyson lowered chicken production in 2015. What's at work here? This paradoxical performance, in part, reflects the fact that Tyson, along with other top U.S. broiler companies, is redefining its business model to achieve profitable growth." The true explanation for the 2015 performance of Tyson and its competitors, however, was the conspiracy alleged in this Complaint.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 195 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 195 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 195 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. To the extent the remaining allegations in paragraph 195 purport to relate to Foster Farms, Foster Farms denies them.

196.    This trend continued into 2016. With the notable exception of the Georgia Dock, chicken prices declined in 2016, but significantly less than input costs. Defendants maintained artificially high chicken prices and high profitability during 2016 by exercising "discipline" on the supply-restriction prong of their conspiracy.

**ANSWER**: Paragraph 196 contains Plaintiffs' characterization of their claims, allegations subject

to proof by expert testimony, and/or legal conclusions, to which no response is required. Foster Farms denies the remaining allegations in paragraph 196.

197.    For instance, during an April 2016 earnings call, an analyst noted that Pilgrim's CEO, Bill Lovette, "mentioned that you think the industry domestically has been much more disciplined than they have been in the past, I'm wondering if you could just elaborate a little bit more on what sort of drives that view and then maybe what gives you confidence that this discipline will hold." Mr. Lovette responded, "[w]hat drives the view is the actual numbers that we see, ready to cook pounds are up about 3.1% year to date. If you look at placements year to date, they're up 1%, egg sets up 0.7%, hatchery utilization actually declined in Q1 to 91%. So in the phase of coming off two of the most profitable years in the industry, we're not seeing, not realizing large amount of production increases."

**ANSWER**: To the extent the allegations in paragraph 197 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 197 and, therefore, denies them.

198.    Tellingly, Pilgrim's CFO Fabio Sandri added immediately after Mr. Lovette's comments that "what drove that I believe it is that *[the] industry is more geared towards* profitability rather than just market share or field growth." (emphasis added). In order words, Defendants were no longer competing with one another to gain market share by growing their companies as one would expect in a competitive market, but instead, worked collectively to increase profitability by being "disciplined" in terms of supply growth."

**ANSWER**: To the extent the allegations in paragraph 198 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 198 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. To the extent the remaining allegations in paragraph 198 purport to relate to Foster Farms, Foster Farms denies them.

199.    Defendants also kept up the regular use of signaling one another to perpetuate their collusion during 2016 by using the code word "discipline" to note their continued adherence to the supply-restriction prong of their conspiracy by keeping breeder flocks low. For instance, during a February 2016 earnings call, Pilgrim's CEO, Bill Lovette, noted that:

*[T]he industry continues to be disciplined in terms of U.S. supply.* Although monthly

pullet data tend to be volatile and have occasionally been at the high end of our expectations, we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits [sic] and chick placements as a positive. We believe that at least part of the reason is because *chicken producers are being disciplined* and are much quicker to react than in the past and in adjusting supply growth to the actual market conditions. (emphasis added).

**ANSWER**: Foster Farm denies the conspiracy alleged in the Complaint. Paragraph 199 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 199 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 199 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. To the extent the remaining allegations in paragraph 199 purport to relate to Foster Farms, Foster Farms denies them.

200. Other CEOs also had to try to explain the marked shift in the chicken industry's profitability in recent years, after the decades-long pattern of boom and bust regarding chicken pricing and profitability. During a February 2016 Sanderson Farms earnings call, BMO Capital Markets analyst Ken Zaslow noted the industry's history of volatility in pricing and profitability for chicken companies, questioning if there was "any changing of the industry dynamic" that had occurred. Sanderson Farms CEO Joe Sanderson replied "we might be at a capacity wall, you know? . . . Since back in 2007 . . . there are three or four plants shuttered . . . It does feel different."

**ANSWER**: Paragraph 200 contains allegations subject to proof by expert testimony, to which no response is required. To the extent the allegations in paragraph 200 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 200 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. To the extent the remaining allegations in paragraph 200 purport to relate to Foster Farms, Foster Farms denies them.

201. On an analyst call on May 26, 2016, Mr. Sanderson echoed his earlier statements about how much the industry had changed since 2007, noting that "when you go back and look and see how many eggs are being set right now and you go back and look at what the industry will [*sic*] set in 2007 . . . egg sets in 2007 were 220 million eggs a week, and we're setting 208 million, 209 million, 210 million eggs a week." Mr. Sanderson's comments about egg sets were amplified by Pilgrim's CEO Bill Lovette later that summer, stating on a July 28, 2016 analyst call that "I think what we have seen with egg sets is absolutely a testament to the discipline of our industry that we've seen in the last really two to three years.

**ANSWER**: Paragraph 201 contains allegations subject to proof by expert testimony, to which no response is required. To the extent the allegations in paragraph 201 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the remaining allegations in paragraph 201 purport to relate to Foster Farms, Foster Farms denies them.

202. On the July 28, 2016 call, Mr. Lovette also commented on Defendants' continued restraint of breeder flock population, noting that "the breeder flock in total is only up about 0.5%" over the same time period, and ended the analyst call describing the "positive notion [we] have about the discipline that we continue to see exhibited by the entire industry," which "gives us more confidence that we're going to do the right thing with respect to maintaining that discipline. . . .and . . . gives us confidence that we're going to continue to be disciplined as an industry."

**ANSWER**: To the extent the allegations in paragraph 202 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 202 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. To the extent the remaining allegations in paragraph 202 purport to relate to Foster Farms, Foster Farms denies them.

203. On an August 8, 2016 earnings call, Tyson's former CEO Donnie Smith – who was then transitioning the CEO role to Thomas Hayes, the company's former Chief Commercial Officer who became the CEO in late 2016 – stated that "our chicken business is . . . it continues to do great," a comment seconded by Mr. Hayes, who said about the company's chicken business that "year-over-year, we're doing great . . . all that business is very profitable to us."

**ANSWER**: To the extent the allegations in paragraph 203 characterize or describe documents or

other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 203 and, therefore, denies them.

    (iii)    <u>The Conspiracy's Second Prong: Collusively Manipulating the Georgia Dock Benchmark Price Index</u>

    204.    Defendants' successful efforts to boost chicken prices by collectively reducing supply was buttressed in the latter years of their output-reduction scheme, by collusively manipulating the Georgia Dock benchmark price index, a chicken industry pricing benchmark contained in contracts between Defendants and a significant proportion of their customers, including certain Plaintiffs. The Georgia Dock, USDA Composite, and Urner Barry all measure the same (or very similar) size and grade of chicken.[5] The Georgia Dock benchmark price index, like the other two indices, sets prices for both the "whole bird" and various parts of the chicken (wings, tenders, leg quarters, thighs, drumsticks and breasts) using the same pricing methodology. The "whole bird" price is the baseline for pricing all parts of a chicken.

**<u>ANSWER</u>**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 204 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 204 and its accompanying footnote describe or refer to other documents and/or sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 204 and its accompanying footnote relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies them. To the extent the allegations in paragraph 204 and its accompanying footnote purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the

---

[5] Unlike the other indices, the Georgia Dock benchmark price did not include freight or transportation costs. At its inception, the Georgia Dock benchmark price was known as the "Georgia F.O.B. Dock" price; the Georgia Dock was "F.O.B." the supplier's shipping dock, meaning that the buyer was responsible for paying the freight.

allegations regarding the Georgia Dock Price Index in paragraph 204 and its accompanying footnote and, therefore, denies them. Foster Farms denies all remaining allegations set forth in paragraph 199 and its accompanying footnote.

205.    Buyers, including certain Plaintiffs, relied on the Georgia Dock benchmark price index because they believed it accurately reflected the market price for the chicken they bought —especially since the Georgia Dock was an industry-accepted benchmark price index for wholesale chicken prices that was, according to an internal memorandum drafted by the Florida Attorney General's office as part of its investigation, "meant to reflect the market price of chicken." And, much like the world's largest banks came together to manipulate numerous financial benchmarks (such as LIBOR), the Georgia Dock Defendants came together to manipulate the Georgia Dock benchmark price index.

**ANSWER**: Paragraph 205 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 205 describe or refer to other documents and/or sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 205 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Georgia Dock Price Index in paragraph 205 and, therefore, denies them. Foster Farms denies all remaining allegations set forth in paragraph 205.

206.    Compared to the other two indices available to chicken buyers, there were significant differences in how the Georgia Dock benchmark price index was compiled that made it highly susceptible to manipulation by the Georgia Dock Defendants, who are the ten chicken producers that submitted price quotes to the GDA for inclusion in the index.

**ANSWER**: Paragraph 206 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 206 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Georgia Dock Price Index in paragraph 206 and, therefore, denies them.

**(a) The Georgia Dock Pricing Methodology and Its Susceptibility to Manipulation**

207.    Until late 2016, the Georgia Dock pricing methodology was not publicly available. Chicken buyers, including certain Plaintiffs, whose transactions with Defendants were based on the Georgia Dock whole-bird price, mistakenly believed it reflected the actual market price of chicken. Moreover, because (until August 2016) the USDA also published the Georgia Dock benchmark price alongside the USDA Composite, many chicken buyers erroneously believed the Georgia Dock price to be a USDA price.

**ANSWER**: To the extent the allegations in paragraph 207 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 207 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies them. To the extent the allegations in paragraph 207 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Georgia Dock Price Index in paragraph 207 and, therefore, denies them.

208.    In addition, Defendants falsely represented that the Georgia Dock benchmark price is based on a complicated "algorithm" from the GDA that takes into account various factors, such as bird weights, weather, mortality rates, and demand. Plaintiffs were misinformed that the Georgia Dock benchmark was supposed to be based on the Georgia Dock Defendants' actual sales prices as reported to the GDA. But neither was true: there was no complicated "algorithm," nor did the Georgia Dock Defendants report their true prices to the GDA, agreeing instead to intentionally report false, artificially-high (or artificially-stabilized) prices. The reality was that the Georgia Dock price was simply whatever the Georgia Dock Defendants said it was. Hypothetically, if one week the Georgia Dock price was $1.75, and the following week the Georgia Dock Defendants told the GDA that the sales price of their chicken was now $2, the Georgia Dock price was $2 – and the prices that certain Plaintiffs and others paid for chicken increased commensurately.

**ANSWER**: Paragraph 208 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 208 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 208 purport to relate to Foster Farms,

Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 208 and, therefore, denies them.

209.    In compiling the Georgia Dock benchmark price, there was no team of economists or statisticians surveying buyers and sellers in the national chicken market. Unlike the USDA Composite or Urner Barry, which use data from numerous producers and buyers on both sides of the market, the Georgia Dock reflected prices sourced solely from a handful of producers. The Georgia Dock Defendants are the ten producers whose price quotes went into the Georgia Dock index, namely (ranked by their market share in Georgia, which dictated how much weighting each producer's quote was given in compiling the Georgia Dock benchmark price): Pilgrim's Pride (33%); Tyson (14%); Fieldale (14%); Perdue (9%); and Sanderson Farms, Koch, Claxton, Mar-Jac, Harrison and Wayne Farms, each with a 5% market share.

**ANSWER**: Paragraph 209 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 209 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies them. To the extent the allegations in paragraph 209 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Georgia Dock Price Index in paragraph 209 and, therefore, denies them.

210.    Once a week, a single GDA employee, Arty Schronce, would call the same ten individuals at the Georgia Dock Defendants to collect price quotes, which were supposed to reflect their actual sales prices. He weighted each producer's price quote by its above-referenced relative market share (referred to by the GDA as that company's "voice").

**ANSWER**: To the extent the allegations in paragraph 210 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 210 and, therefore, denies them.

211.    Mr. Schronce, who began compiling the Georgia Dock Defendants' price quotes in 2012 following the retirement of his predecessor, first made a preliminary calculation based on the single price quotation from each company. Then "[a]ny company that provides a whole bird quote that is more than

one cent above or below the initial dock price calculation will not be included in the calculation for the whole bird dock price that week. Its voice is taken out of the formula and the dock price is recalculated without it." This so-called "one-cent rule" is, according to internal GDA documents, meant "to shield [] one company having the ability to greatly influence the price up or down."

**ANSWER**: To the extent the allegations in paragraph 211 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 211 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 211 and, therefore, denies them.

212.     Nothing was done to verify or substantiate these numbers. There was no "double-verification;" customers were never contacted to check to see if the producers' prices were legitimate. The entire process was based on unverified, verbal "price quotes" from the same small set of chicken producers (the Georgia Dock Defendants) submitted each week to a single GDA employee – a methodology that the Florida Attorney General's office concluded was "susceptible to manipulation."

**ANSWER**: Paragraph 212 contains Plaintiffs' characterizations of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 212 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 212 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Georgia Dock Price Index in paragraph 212 and, therefore, denies them.

213.     The price quoted by each Georgia Dock Defendant to the GDA was based on 2.5-to-3 pound whole chickens, but only a handful of the Georgia Dock Defendants actually processed 2.5-to-3 pound birds in Georgia, so, according to internal GDA documents, the Georgia Dock Defendants were "supposed to adjust their whole bird quote as if they are producing that sized bird." Once the final Georgia Dock whole bird price was calculated, the GDA then used a formula

**ANSWER**: To the extent the allegations in paragraph 213 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent

characterization or description of them. To the extent the allegations in paragraph 213 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 213 and, therefore, denies them.

214.　To facilitate their control of the Georgia Dock benchmark price, the Georgia Dock Defendants convinced the GDA to convene a secret "Advisory Board" composed of senior executives from eight of the ten Georgia Dock Defendants to advise the GDA on the Georgia Dock price. From at least September 2012 through 2016, the Advisory Board included Gus Arrendale (CEO, Fieldale Farms), Mike Welch (CEO and President, Harrison), Jerry Lane (Former CEO, Claxton Poultry), Jayson Penn (EVP Sales and Operations, Pilgrim's), Pete Martin (VP of Operations, Mar-Jac), Vernon Owenby (Manager of Tyson's facility in Cumming, Georgia), Steve Clever (VP of Fresh Sales, Wayne Farms), and Dale Tolbert (VP of Sales, Koch Foods).

**ANSWER**: To the extent the allegations in paragraph 214 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index or "Advisory Board." As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 214 and, therefore, denies them.

215.　The existence and conduct of this secret Advisory Board was not known to chicken buyers until November 2016 when it was first made public following a press report about a September 2016 memorandum written by Mr. Schronce that was highly critical of the Georgia Dock methodology. He wrote in the memorandum that he had "questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent. I was told I could not make any changes without clearing them with the Advisory Board." The Advisory Board gave the Georgia Dock Defendants a vehicle to discuss and artificially set price quotes to ensure compliance with their price-fixing agreement.

**ANSWER**: To the extent the allegations in paragraph 215 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 215 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 215 and, therefore, denies them.

216.　In December 2015, the GDA began an internal review process of the Georgia Dock pricing methodology, in large part, because the agency had "serious concerns" about the way the index

was compiled. The GDA's internal review was not made public at the time it began, and was not revealed until it was described in a series of press reports beginning in November 2016. Mr. Schronce, in his September 2016 memorandum, expressed concerns that some companies have a "larger, even outsized role in determining the Georgia Whole Bird Dock Price," and that "[i]n essence, they can take advantage of a high whole bird price."

**ANSWER**: To the extent the allegations in paragraph 216 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 216 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 216 and, therefore, denies them.

217. Mr. Schronce also suggested that the Georgia Dock benchmark price be eliminated altogether because it was "a flawed product that is a liability to the Georgia Department of Agriculture." Mr. Schronce's memorandum concluded by noting that he "was told the poultry companies know what they are doing and all I need to do is gather and consolidate the info I am provided. However, I have come to question the validity of some of the information provided." The memorandum also stated that the Georgia Dock Defendants gave "lackadaisical and rude responses to my requests for information," such as responding "just keep 'em the same" when asked for a company's updated price quote.

**ANSWER**: To the extent the allegations in paragraph 217 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 217 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 217 and, therefore, denies them.

218. Under pressure from the USDA, and realizing that the Georgia Dock pricing methodology raised significant antitrust concerns, the GDA attempted to revise the methodology in the autumn of 2016. After the Georgia Dock Defendants balked at the GDA's new methodology – which required them to verify and attest to the accuracy of their price quotes – the GDA halted the Georgia Dock benchmark price index altogether when it did not receive sufficient price quotes to compile the index. The last Georgia Dock benchmark price was published by the GDA on November 23, 2016. However, for at least three months after the last Georgia Dock price was published by the GDA, certain Defendants, including at least Pilgrim's, continued to use the November 23, 2016 benchmark price of $1.0975/lb. to set their wholesale prices to chicken buyers, including certain Plaintiffs.

**ANSWER**: To the extent the allegations in paragraph 218 characterize or describe documents or other sources, Foster Farms notes that such sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 218 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 218 and, therefore, denies them.

**(b)      Georgia Dock Prices Diverged from the USDA Composite and Urner Barry Price Indices Beginning in 2013**

219.    In early 2013, at roughly the time increased prices began to take hold as a result of Defendants' mid-2011 breeder flock reductions, the behavior of the Georgia Dock index significantly changed. The changes resulted from the conspiracy by the Georgia Dock Defendants to agree on artificial prices quoted to the GDA for inclusion in the Georgia Dock benchmark price.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 219 contains allegations subject to proof by expert testimony, to which no response is required. To the extent the remaining allegations in paragraph 219 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 219 and, therefore, denies them.

220.    Beginning in early 2013 and continuing until November 2016, the Georgia Dock Defendants agreed among themselves to submit artificially high and identical, or near-identical, prices to the GDA, which allowed them to continually increase, and successfully stabilize, chicken prices tied to the Georgia Dock benchmark price index.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. To the extent the allegations in paragraph 220 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Georgia Dock Price Index in paragraph 220 and, therefore, denies them.

221. Historically, the Georgia Dock benchmark price was highly correlated to the prices in the USDA Composite and Urner Barry indices; the movement (*i.e.*, volatility) of the Georgia Dock price mirrored the patterns of the other two indices (*e.g.*, prices go up or down depending on market forces, such as supply and demand). This changed in 2013, when the price volatility that had marked the Georgia Dock (and which still marks the other two indices) largely disappeared. Georgia Dock prices mostly stabilized, while prices in the other two indices remained volatile.

**ANSWER**: Paragraph 221 contains allegations subject to proof by expert testimony, to which no response is required. To the extent the remaining allegations in paragraph 221 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 221 and, therefore, denies them.

222. Starting in 2013, monthly price volatility in the Georgia Dock markedly decreased, particularly with respect to downward price movements (*i.e.*, when prices dropped, they dropped far less drastically than they had prior to 2013). This near-disappearance of price volatility was unique to the Georgia Dock – both of the other price indices stayed volatile while the Georgia Dock remained stable, as reflected in the following graph, which compares prices of the various indices both before and during the relevant period:



**ANSWER**: Paragraph 222 contains allegations subject to proof by expert testimony, to which no response is required. To the extent the remaining allegations in paragraph 222 purport to relate to

Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Georgia Dock Price Index in paragraph and, therefore, denies them. Furthermore, Foster Farms lacks knowledge or information sufficient to form a belief as to the accuracy of the graph accompanying paragraph 222 and, therefore, denies it.

223.    Beginning in 2013, the Georgia Dock benchmark price began to behave in a markedly different manner due to Defendants' price-fixing conspiracy. Starting in early 2013, the Georgia Dock prong of Defendants' conspiracy kicked into high gear, as the Georgia Dock price – for the first time ever – became negatively correlated with the other two price indices (*i.e.*, the Georgia Dock price increased while prices in the other two indices decreased). This marks a dramatic change from 2002 to 2012, where all three indices were positively correlated with each other (*i.e.*, they moved up and down together).[6]

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 223 and its accompanying footnote contain allegations subject to proof by expert testimony, to which no response is required. To the extent the remaining allegations in paragraph 223 and its accompanying footnote purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 223 and its accompanying footnote and, therefore, denies them.

224.    After at least a decade of high correlation with the USDA Composite and Urner Barry indices, the Georgia Dock benchmark price diverged dramatically from the other two indices in 2013 and thereafter – Georgia Dock prices were far more stable, and substantially higher, than the USDA Composite and Urner Barry prices.  The stability and level of Georgia Dock prices from 2013 through November 2016 was the direct result of Defendants' conspiracy.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 224 contains allegations subject to proof by expert testimony, to which no response is required. To the extent the remaining allegations in paragraph 224 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or

---

[6] After 2013, the USDA Composite and Urner Barry indices remained positively correlated with each other.

information sufficient to form a belief as to the truth of the allegations regarding the Georgia Dock

Price Index in paragraph 224 and, therefore, denies them.

## C.      The Structure and Characteristics of the Chicken Market Make It Highly Susceptible to Collusion

225.    **Highly Concentrated Market with Vertically Integrated Producers.**    A concentrated market, such as the U.S. chicken market, facilitates the operation of a cartel because it is easier to coordinate behavior among possible co-conspirators and more difficult for customers to avoid the affects of collusive behavior.  Defendants collectively control nearly 90 percent of the U.S. wholesale chicken market.  The U.S. chicken industry is almost entirely vertically integrated, with Defendants (known as "integrators") owning, or tightly controlling, each aspect of breeding, hatching, chick-rearing, feeding, processing, and selling.

**ANSWER**: Paragraph 225 contains legal conclusions and allegations subject to proof by expert

testimony, to which no response is required. Foster Farms lacks knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in paragraph 225 and, therefore, denies

them.

226.    **Inelastic Demand at Competitive Prices.** Inelastic demand means that increases in price result in limited declines in quantity sold in the market. In order for a cartel to profit from raising prices above competitive levels, demand must be inelastic at competitive prices, which allows cartel members to raise prices without seeing a decline in sales revenue. Industry studies show that in the U.S. chicken market, not only is the demand for chicken inelastic, it has become increasingly more inelastic over the past 40 years. In connection with a joint DOJ-USDA workshop on the poultry market in 2010, agriculture economist, Dr. Michael Dicks, presented research demonstrating how vertical integration incentivizes chicken producers to implement supply restrictions, stating that in the U.S. poultry industry "vertical coordination allows integrators to manage excess capacity to manage price. Integrators can minimize the effect on producers by increasing the time between collection and delivery of birds or reducing the number of flocks per year. . . . Because of the inelastic nature of the supply and demand a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

**ANSWER**: Paragraph 226 contains Plaintiffs' characterization of their claims, allegations subject

to proof by expert testimony, and/or legal conclusions, to which no response is required. To the

extent the allegations in paragraph 226 characterize or describe documents or other sources, Foster

Farms notes that such documents speak for themselves and denies any inconsistent characterization

or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as

to the truth of the remaining allegations in paragraph 226 and, therefore, denies them.

227. **Existence of Numerous Trade Associations and Access to Competitors' Data through Agri Stats.** The existence of industry trade associations makes a market more susceptible to collusive behavior because they provide a pretext under which co-conspirators exchange sensitive company information, such as pricing and market allocation. Industry trade associations also provide mechanisms for sharing information, and monitoring, deterring, detecting and punishing cheating. The following U.S. chicken industry trade associations, all of which count all or nearly all Defendants as members, allowed Defendants to coordinate their price-fixing and supply restriction conspiracy: National Chicken Council, United States Poultry & Egg Export Council, U.S. Poultry & Egg Association, Georgia Poultry Federation, North Carolina Poultry Federation, and Poultry Federation (representing chicken producers in Arkansas, Missouri and Oklahoma). Indeed, according to *Communication in Poultry Grower Relations: A Blueprint to Success*, a book written by a management consultant affiliated with the U.S. Poultry & Egg Association, "representatives from the various [chicken producers] readily share information while attending the numerous seminars offered by the U.S. Poultry & Egg Association, National Chicken Council" and other trade groups, further noting that "industry leaders realize the industry's tremendous potential, and their spirit of cooperation is based on knowing that that which is good for individual companies is good for the industry.

**ANSWER**: Paragraph 227 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is deemed required, Foster Farms denies such conclusions and/or allegations. To the extent the allegations in paragraph 227 characterize or describe documents or other sources, Foster Farms notes that such documents speak for themselves and denies any inconsistent characterization or description of them. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 227 and, on that basis, denies all such allegations.

228. Defendants also accessed each other's above-described data through co-Defendant Agri Stats to monitor cheating in the conspiracy. Agri Stats acted as an active facilitator of Defendants' cartel

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. To the extent the allegations in paragraph 228 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations. Foster Farms denies all remaining allegations set forth in paragraph 228.

229. **High Barriers to Entry.** The intended effect of a conspiracy to fix prices, either explicitly (as is the case here with the Georgia Dock benchmark price index) and through restricting supply (which

Defendants also did) is to generate higher profits for the participants. The normal impact of the artificially higher profits is to draw other profit seeking companies into the market. In industries with substantial barriers to entry, such as the U.S. chicken market, however, companies—such as Defendants—are able to raise prices above competitive levels and still earn above-normal levels of profits.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 229 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent paragraph 229 contains factual allegations, Foster Farms denies them.

230.    The existence of high entry barriers in the U.S. chicken market is demonstrated by the trend of increasing consolidation, with larger vertically integrated companies increasing their control over the industry. Beyond the issue of vertical integration, there is a wide range of government food safety, worker safety, and environmental regulations that must be addressed by any new entrant into the chicken market. The existence of low, and highly variable, profit margins also act as significant barriers to entry. With such barriers to entry, companies that have the available resources and significant start-up capital to enter the market and benefit from economies of scale are able to reduce their average cost by producing more. Companies already in the market – such as Defendants – are motivated to exclude other companies from the market to maintain their coordinated supply restriction conspiracy, and ultimately keep prices at artificially inflated levels.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 230 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent the allegations in paragraph 230 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations.  Foster Farms denies all remaining allegations set forth in paragraph 230.

### D.    Defendants Collusively Adopted Additional Strategies to Reinforce Their Conspiracy

231.    Defendants collectively adopted several strategies to buttress and sustain their conspiracy.

**ANSWER**: Foster Farms denies the allegations in paragraph 231.

(i)    A Collective Shift Away from Long-Term Fixed-Price Contracts

232.     First, starting in 2008, the Defendants moved away from long-term fixed-price contracts to shorter-term contracts with variable pricing pegged to one of several publicly-available price indices (including the USDA composite Urner-Barry, and the Georgia Dock).  A coordinated move away from fixed price contracts to contracts permitting prices to fluctuate with an indexed public market price helps facilitate an antitrust conspiracy.  *See In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 659 (7th Cir. 2002).  Defendants' shift indicates that they anticipated higher prices resulting from their production cuts, and wanted the flexibility to take advantage of such increased prices.

**ANSWER**: Paragraph 232 contains allegations subject to proof by expert testimony and legal

conclusions, to which no response is required. To the extent the allegations in paragraph 232 describe

or refer to other documents and/or other sources, Foster Farms states that such other documents and

other sources speak for themselves. To the extent the allegations in paragraph 232 relate to other

Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a

belief as to the truth of these allegations and, on that basis, denies all such allegations.  Foster Farms

denies all remaining allegations set forth in paragraph 232.

233.     Starting around January 2008, senior executives from Koch Foods, Pilgrim's, Perdue, Sanderson Farms, and Tyson publicly announced an effort to reduce annual fixed-price contracts. This change coincided with Defendants' efforts to reduce chicken industry supplies so as to drive chicken market prices higher

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 233 contains

allegations subject to proof by expert testimony and legal conclusions, to which no response is

required. To the extent the allegations in paragraph 233 describe or refer to other documents and/or

other sources, Foster Farms states that such other documents and other sources speak for themselves.

To the extent the allegations in paragraph 233 relate to other Defendants and/or third parties, Foster

Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations

and, on that basis, denies all such allegations.  Foster Farms denies all remaining allegations set forth

in paragraph 233.

234.     On January 28, 2008, Tyson CEO Dick Bond announced on an earnings call that Tyson was looking at shortening its fixed price contracts, and by June 2009 Tyson reported it had "dramatically" shortened the amount of fixed-price contracts over 90 days.

**ANSWER**: To the extent the allegations in paragraph 234 describe or refer to other documents and/or other sources, Foster Farms notes that such other documents and other sources speak for themselves and denies any characterizations or descriptions that is inconsistent therewith. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies all such allegations.

235.     On January 29, 2008, Pilgrim's CFO Rick Cogdill reported on an earnings call that Pilgrim's had started moving away from fixed-price contracts, noting that "in a situation like where we are now where we need to drive commodity prices up, that [*i.e.*, having less fixed price contracts] is going to give us the opportunity for more immediate benefit to our P&L than what we would have had say, historically three year[s] ago, when a higher percentage was fixed price." Pilgrim's later reported that by March 2012, it had reduced its exposure to fixed price contracts, with most contracts now market-based or including a reset provision linked to the underlying commodity. By 2014, Pilgrim's reported that less than 5% of all its contracts were 12-month fixed price contracts.

**ANSWER**: To the extent the allegations in paragraph 235 describe or refer to other documents and/or other sources, Foster Farms notes that such other documents and other sources speak for themselves and denies any characterizations or descriptions that is inconsistent therewith. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies them.

236.     On July 28, 2008, Perdue spokesperson Julie DeYoung told an industry publication that Perdue was looking to shorten its contract terms, stating, "the company is also seeking to raise prices and shorten its contracts."

**ANSWER**: To the extent the allegations in paragraph 236 describe or refer to other documents and/or other sources, Foster Farms notes that such other documents and other sources speak for themselves and denies any characterizations or descriptions that is inconsistent therewith. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies them.

237.     Sanderson Farms' CEO Joe Sanderson noted in a July 31, 2008, earnings call that the industry may move towards "shorter term agreements."

**ANSWER**: To the extent the allegations in paragraph 237 describe or refer to other documents

and/or other sources, Foster Farms notes that such other documents and other sources speak for themselves and denies any characterizations or descriptions that is inconsistent therewith. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies them.

(ii)    Inter-Defendant Sales

238.    Second, Defendants use direct purchases of chickens from one another and from smaller producers to meet each company's own sales needs. In addition to exemplifying the commodity nature of the chicken market, these inter-Defendant sales allowed Defendants to soak up excess supply that could potentially depress prices in the market and facilitated the opportunity to expressly discuss prices with competitors. Such purchases also permitted companies to maintain market share despite reducing their production. In many instances large inter-Defendant purchases were negotiated by CEOs or other senior level executives of Defendants, thereby providing additional opportunities to conspire.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 238 contains legal conclusions and/or allegations subject to proof by expert testimony, to which no response is required. To the extent the allegations in paragraph 238 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations.  Foster Farms denies all remaining allegations set forth in paragraph 238.

239.    In 2011, for example, Tyson began using what was described as a "very unique strategy," called "Buy vs. Grow." Tyson's strategy essentially treated the industry supply as though it were for a single unified company, rather than competing businesses that would rather sell self-produced product to a customer than a competitor. Tyson's adoption of this strategy was indeed "unique," because only a few years prior to adopting the "Buy vs. Grow" strategy, it had derided a similar strategy as a "stupid" subsidization of competitors' growth, with a Tyson executive explaining on an April 29, 2008 earnings call that "I think what we said along is we're going to match our supply and demand. We're not going to cut beyond that and then go out and buy open market meat to subsidize other people's growth." Tyson's strategic shift in 2011 to buying chicken on the open market is evidence that by that time, it was confident that its fellow cartelists would maintain their production levels as they were and not increase them.

**ANSWER**: Paragraph 239 contains legal conclusions and/or allegations subject to proof by expert testimony, to which no response is required.  To the extent a response is deemed required, Foster Farms denies such conclusions and/or allegations.  To the extent the allegations in paragraph 239 describe or refer to other documents and/or other sources, Foster Farms states that such other

documents and other sources speak for themselves. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies them.

240. In a November 5, 2012, interview, Fieldale President Thomas Hensley noted his company was also pursuing a strategy to purchase excess supply from its competitors, stating that "[i]f you don't have a home for your chickens on Monday morning, you shouldn't have those chickens. Now we know where all our chickens are going. So we are buying chickens in that lower price area instead of selling them. So, no expansion for us."

**ANSWER**: To the extent the allegations in paragraph 240 describe or refer to other documents and/or other sources, Foster Farms states that such other documents and other sources speak for themselves. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies them.

241. By the end of 2014, Tyson reported it was buying over four million pounds of chickens on the open market each week. Four million pounds of chicken per week is more than any of the 24th-30th largest chicken companies produce on a weekly basis, so the amount of Tyson's purchases was quite significant.

**ANSWER**: Paragraph 241 contains legal conclusions and/or allegations subject to proof by expert testimony, to which no response is required. To the extent a response is deemed required, Foster Farms denies such conclusions and/or allegations. Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies them.

242. During the first part of 2015, Tyson increased its Buy vs. Grow purchases by 50 percent, expanding its purchases from competitors to unprecedented levels. Tyson announced plans in May 2015 to increase its Buy vs. Grow strategy to 10 percent of its sales in the second half of 2015 and 2016. Ten percent of Tyson's 2014 ready-to-cook pounds was 17.6 million pounds per week, a volume that by itself would dwarf the entire average weekly production of any of the 15th-30th largest chicken producers. Notably, Tyson also announced in May 2015 that it planned to reduce its production after July 2015 and keep it flat through 2016 by increasing its Buy vs. Grow purchases.

**ANSWER**: Paragraph 242 contains legal conclusions and/or allegations subject to proof by expert testimony, to which no response is required. To the extent a response is deemed required, Foster Farms denies such conclusions and/or allegations. To the extent the allegations in paragraph 242 describe or refer to other documents and/or other sources, Foster Farms states that such other documents and other sources speak for themselves. Foster Farms lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations and, on that basis, denies them.

(iii)    Atypical Increases in Defendants' Exporting of Chickens

243.    Third, during 2013 and into 2014, Defendants found new ways to actively depress the size of breeder flocks, such as using the pretext of avian flu in Mexico to justify exporting flock chickens to Mexico to repopulate flocks rather than use such chickens to increase domestic production levels. Indeed, Defendants continued their program of exporting chicken hens and eggs to Mexico in 2015, with Tyson explicitly noting in a May 4, 2015, earnings call that it was sending 3 percent of its eggs to Mexico to "fill incubators.".

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 243 contains

legal conclusions and/or allegations subject to proof by expert testimony, to which no response is

required. To the extent the allegations in paragraph 243 describe or refer to other documents and/or

other sources, Foster Farms states that such other documents and other sources speak for themselves

and denies any inconsistent characterization or description of them.  To the extent the allegations in

paragraph 243 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or

information sufficient to form a belief as to the truth of these allegations and, on that basis, denies

all such allegations.  Foster Farms denies all remaining allegations set forth in paragraph 243.

244.    Similarly, during a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted his "confidence that we're going to do the right thing with respect to maintaining [] discipline. We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million hatching eggs or so outside of the country. The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made. And so again that gives us confidence that we're going to continue to be disciplined as an industry."

**ANSWER**: To the extent the allegations in paragraph 244 describe or refer to other documents

and/or other sources, Foster Farms states that such other documents and other sources speak for

themselves and denies any inconsistent characterization or description of them.  Foster Farms lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations and,

on that basis, denies them.

245.    Defendants' coordinated exportation of chicken hatching eggs, from 2013 through 2016, was an active effort to artificially reduce the supply of chickens in the U.S. below what it would have been absent their active and continued participation in an illegal antitrust conspiracy

**ANSWER**: Foster Farms denies the allegations in paragraph 245.

246.    Tyson and other Defendants exported hatching eggs to Mexico and other foreign countries from 2013-2016 with the intent to artificially reduce the supply, and increase the price, of chickens in the U.S. The revenues Tyson and others received for exporting hatchery eggs to Mexico was far less than they would have generated hatching those same eggs and selling the chicken meat in the U.S. market. Thus, but for Defendants' agreement and conspiracy as alleged in this Complaint, it would have been against Tyson's independent economic self-interest to export hatching eggs to Mexico and forego higher hatching egg prices in the U.S. But Defendants' new-found "discipline" ameliorated any remaining risk and resulted in higher overall U.S. chicken prices.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 246 contains legal conclusions and/or allegations subject to proof by expert testimony, to which no response is required. To the extent the allegations in paragraph 246 describe or refer to other documents and/or other sources, Foster Farms states that such other documents and other sources speak for themselves and denies any inconsistent characterization or description of them.  To the extent the allegations in paragraph 246 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations.  Foster Farms denies all remaining allegations set forth in paragraph 246.

**E.      The Statute of Limitations Does Not Bar Plaintiffs' Claims**

(i)     Plaintiffs Did Not Discover (and Could Not Have Discovered) the Conspiracy Until 2016

247.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claims for relief. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until approximately 2016. Defendants engaged in a secret conspiracy that did not reveal facts that put Plaintiffs on inquiry notice that there was a conspiracy to fix prices for chickens.

**ANSWER**: Paragraph 247 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required. To the extent paragraph 247 contains characterization or description of provisions of the federal or state statutes or regulations, Foster Farms notes that the provisions referenced in or underlying paragraph 247 speak for themselves, and denies any inconsistent characterization or description of them. To the

extent paragraph 247 contains factual allegations, Foster Farms denies them.

248.    With respect to the output-restriction element of Defendants' conspiracy, Plaintiffs did not discover, nor could have discovered through the exercise of reasonable diligence, the facts supporting their claims for relief, until the filing of a direct purchaser class action, *Maplevale Farms, Inc. v. Koch Foods, Inc. et al.*, in this District in September 2016. The filing of the *Maplevale Farms* complaint, which alleges a class of which Plaintiffs are absent members, caused Plaintiffs and their counsel to start an independent and extensive investigation into the facts alleged in this Complaint.

**ANSWER**: Paragraph 248 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required. To the extent the allegations in paragraph 248 describe or refer to other documents and/or other sources, Foster Farms states that such other documents and other sources speak for themselves and denies any inconsistent characterization or description of them. To the extent paragraph 248 contains factual allegations, Foster Farms denies them.

249.    With respect to the manipulation of the Georgia Dock, a January 18, 2016 *Wall Street Journal* article regarding Defendants' possible manipulation of the Georgia Dock benchmark price raised the possibility of collusion to artificially raise, fix, or maintain chicken prices using the Georgia Dock. Subsequently, a series of articles in various publications published between November 3 and 17, 2016, detailed for the first time that the USDA had discontinued its reliance on the Georgia Dock benchmark price because its input prices could not be verified.

**ANSWER**: Paragraph 249 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required. To the extent the allegations in paragraph 249 describe or refer to other documents and/or other sources, Foster Farms states that such other documents and other sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 249 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. Foster Farms denies all remaining allegations in paragraph 249.

250.    Yet even when faced with these public revelations, Defendants continued to assert the fairness and accuracy of the Georgia Dock benchmark price. For example, in a November 8, 2016,

Washington Post article, Defendant Sanderson Farms represented that the Georgia Dock benchmark price was "reliable," so as to induce purchasers of chickens to believe the benchmark price was not subject to illegal manipulation by the Georgia Dock Defendants. Not until November 10, 2016, was it disclosed publicly that the Georgia Dock Defendants had formed a secret Georgia Dock Advisory Board that facilitated opportunities for executives to meet and also discuss their scheme to fix the Georgia Dock benchmark price. The existence of this board was not known to Plaintiffs, nor would they have been able to learn of how Defendants' executives conducted themselves in their non-public Georgia Dock Advisory Board meetings. Finally, not until November 17, 2016, was it publicly disclosed that the Florida Attorney General's Office was investigating the Georgia Codk benchmark price and its calculation and manipulation by the Georgia Dock Defendants.

**ANSWER**: Paragraph 250 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required. To the extent the allegations in paragraph 250 describe or refer to other documents and/or other sources, Foster Farms states that such other documents and other sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 250 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. As a result, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. Foster Farms denies all remaining allegations in paragraph 250.

251. Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Chickens are not exempt from antitrust regulation, and thus, before these recent events Plaintiffs reasonably considered the U.S. chicken industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin investigating the legitimacy of Defendants' chicken prices before these recent events.

**ANSWER**: Foster Farms denies the allegations in paragraph 251.

252. Plaintiffs exercised reasonable diligence. Plaintiffs could not have discovered Defendants' alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants.

**ANSWER**: Foster Farms denies the allegations in paragraph 252.

(ii)    Defendants Actively Concealed Their Conspiracy

253. Throughout the relevant period (2008 to 2016), Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs.

**ANSWER**: Foster Farms denies the allegations in paragraph 253.

254. The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, (1) secret meetings, (2) surreptitious communications between Defendants via the wires (telephones, emails, text messages and other electronic communications) and in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, (3) limiting any explicit reference to competitor pricing or supply restraint communications in documents, (4) communicating competitively sensitive data to one another through Agri Stats, a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and (5) concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

**ANSWER**: Foster Farms denies the allegations in paragraph 254.

255. Defendants used code words including "discipline" and "capacity discipline" in their public statements to conceal their conspiracy and signal one other in furtherance of their conspiracy to restrain production while shielding their conspiracy from detection or suspicion. As alleged above, specific examples of the use of such coded language include, without limitation: (1) the National Chicken Council's Annual Conference in October 2011 where a report reflected that panel members Clint Rivers (then of Perdue) and Mark Kaminsky of Koch Foods noted that "[d]iscipline on the supply side was one suggestion" to increase chicken prices; (2) on a May 3, 2013, earnings call, Pilgrim's President & CEO Bill Lovette stated that "price is going to strengthen as supply continues to be disciplined and constrained….and "we've done a good job so far of maintaining discipline;" and (3) on a July 2016 earnings call Mr. Lovette noted that "I think what we've seen with egg sets is absolutely a testament to the discipline of our industry that we've seen the last really two to three years.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 255 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required. To the extent the allegations in paragraph 255 describe or refer to other documents and/or other sources, Foster Farms states that such other documents and other sources speak for themselves and denies any inconsistent characterization or description of them. To the extent paragraph 255 contains factual allegations, Foster Farms denies them.

256. As alleged above, in 2008, after years of boom and bust cycles of production leading to the regular rise and fall of prices, the price of chickens began an unprecedentedly steady increase that continued at least through 2016. Defendants affirmatively and falsely attributed rising prices to, among other things, increases in the price of inputs. Defendants used these pretexts used to cover up the conspiracy. In fact, the chicken price increases were the result of Defendants' collusive conduct, which was undisclosed at the time.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 256 contains

Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required. To the extent the allegations in paragraph 256 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. To the extent the remaining allegations in paragraph 256 purport to relate to Foster Farms, Foster Farms denies them.

257.    During the relevant period, Defendants affirmatively made numerous misleading public statements falsely portraying the market for chickens as a competitive one. For example, Defendants provided testimony at workshops held by the U.S. Department of Justice and USDA suggesting the chicken industry was competitive and not subject to anti-competitive practices and agreements, including testimony at a May 21, 2010 workshop of a National Chicken Council-commissioned study by Dr. Thomas Elam, which stated that "the chicken industry is competitive and thriving," and has "[i]ntense competition" that promotes "product innovation and lower prices for consumers."

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 257 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required. To the extent the allegations in paragraph 257 describe or refer to other documents and/or other sources, Foster Farms states that such other documents and other sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 257 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. To the extent the remaining allegations in paragraph 257 purport to relate to Foster Farms, Foster Farms denies them.

258.    To explain the decreasing supply of chickens since 2012, Defendants have provided a variety of pretextual explanations, including: (1) a breeding issue with chickens during 2014, (2) a Russian ban of U.S. chicken imports starting in 2014, and (3) a 2013 shortage in supply due in part due to an Avian Flu outbreak in Mexico that caused a surge in demand for hens to repopulate chicken farms in Mexico. These explanations were pretextual in that Defendants sought to hide their conspiracy from discovery by blaming chicken price increases on these factors rather than Defendants' own collusive conduct (including their unprecedented cuts to breeder flocks).

**ANSWER**: Paragraph 258 contains Plaintiffs' characterization of their claims, allegations subject

to proof by expert testimony, and/or legal conclusions to which no response is required. To the extent the allegations in paragraph 258 describe or refer to other documents and/or other sources, Foster Farms states that such other documents and other sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 258 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. To the extent the remaining allegations in paragraph 258 purport to relate to Foster Farms, Foster Farms denies them.

259.    Throughout the relevant period, Defendants repeatedly also cited increasing input costs as a pretext for their collusion to restrain supply and increase prices. For instance, Defendants repeatedly claimed that input cost increases during 2008 justified chicken price increases. However, while corn was $5/bushel in 2005-2006 and increased to $9 by May or June 2008, it quickly fell back to below $5/bushel by fall 2008. Higher chicken prices later in the relevant period also were not justified by increased costs of corn, which, after a temporary spike in the summer of 2012, were not increasing at the level that would have warranted higher chicken prices. Defendants, through the National Chicken Council, other trade groups, and press releases, speeches, and other public statements by their employees, also repeatedly and publicly blamed the federal government's ethanol mandate for increased chicken prices, asserting that it increased their corn costs. Defendants made all of these pretextual representations so as to conceal their conspiracy and avoid disclosing their agreement to illegally restrain the supply of chickens.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 259 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required. To the extent the allegations in paragraph 259 describe or refer to other documents and/or other sources, Foster Farms states that such other documents and other sources speak for themselves and denies any inconsistent characterization or description of them. To the extent the allegations in paragraph 259 relate to other Defendants and/or third parties to this action, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies them. To the extent the remaining allegations in paragraph 259 purport to relate to Foster Farms, Foster Farms denies them.

260.    By virtue of Defendants and all of their co-conspirators actively and intentionally concealing their above-described wrongful conduct, the running of any applicable statute of limitations

has been (and continues to be) tolled and suspended with respect to Plaintiffs' claims and causes of action resulting from Defendants' and Agri Stats' unlawful combination and conspiracy alleged in this Complaint under the fraudulent concealment doctrine and/or doctrine of equitable estoppel

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint. Paragraph 260 contains

Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or

legal conclusions, to which no response is required. To the extent paragraph 260 contains factual

allegations, Foster Farms denies them.

## VI.     ANTITRUST IMPACT

261.    During the relevant period, Plaintiffs purchased substantial amounts of chicken from one or more Defendants. As a direct and proximate result of Defendants' above-described illegal conduct, Plaintiffs were compelled to pay, and did pay, artificially inflated prices for chickens during the relevant period.

**ANSWER**: Foster Farms denies the conspiracy alleged in the Complaint.  Paragraph 261 contains

legal conclusions and/or allegations subject to proof, including by expert testimony, to which no

response is required.  To the extent the allegations in paragraph 261 relate to other Defendants and/or

third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth

of these allegations and, on that basis, denies all such allegations.  Foster Farms denies all remaining

allegations set forth in paragraph 261.

262.    As a direct and proximate consequence of Defendants' and Agri Stats' above-described wrongful conduct, Plaintiffs sustained substantial losses and damage to their businesses and property in the form of overcharges for chickens. The full amount and forms and components of such damages will be calculated after discovery and presented upon proof at trial.

**ANSWER**: Foster Farms denies the allegations in paragraph 262.

## VII.    CLAIMS FOR RELIEF AND CAUSES OF ACTION

## COUNT 1

## VIOLATION OF 15 U.S.C. § 1
## (AGAINST ALL DEFENDANTS FOR OUTPUT RESTRICTION

263.    The preceding factual statements and allegations are incorporated by reference. For paragraphs 255-259, the term "Defendants" includes Agri Stats.

**ANSWER**: Foster Farms incorporates by reference its answers to each preceding paragraph as if fully set forth herein in response to paragraph 263.

264.     In collusively restricting, limiting, and curtailing the supply of chicken in the United States, Defendants engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER**: Foster Farms denies the allegations in paragraph 264.

265.     Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, Plaintiffs for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

**ANSWER**: Foster Farms denies the allegations in paragraph 265.

266.     Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiffs in the United States.

**ANSWER**: Foster Farms denies the allegations in paragraph 266.

267.     As a direct and proximate result of Defendants' above-described unlawful conduct, Plaintiffs paid artificially inflated prices for chicken.

**ANSWER**: Foster Farms denies the allegations in paragraph 267.

268.     As a direct and proximate result of Defendants' above-described anticompetitive conduct, Plaintiffs were damaged in their businesses or property by paying prices for chicken that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

**ANSWER**: Foster Farms denies the allegations in paragraph 268.

## COUNT II

## VIOLATION OF 15 U.S.C. § 1
## (AGAINST THE GEORGIA DOCK DEFENDANTS FOR PRICE-FIXING)

269.     The preceding factual statements and allegations are incorporated by reference.

**ANSWER**: Foster Farms incorporates by reference its answers to each preceding paragraph as if fully set forth herein in response to paragraph 269.

270.     In fixing, raising, and maintaining prices quoted to the GDA for inclusion in the Georgia Dock benchmark price index, the Georgia Dock Defendants engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER**: To the extent the allegations in paragraph 270 purport to relate to Foster Farms, Foster

Farms denies that it ever participated in the Georgia Dock Price Index. To the extent the allegations

in paragraph 270 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or

information sufficient to form a belief as to the truth of these allegations and, on that basis, denies

all such allegations.  Foster Farms denies the remaining allegations contained in paragraph 270.

271.     Defendants' unlawful contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, Plaintiffs for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

**ANSWER**: Foster Farms denies the allegations in paragraph 271.

272.     The Georgia Dock Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiffs in the United States.

**ANSWER**: To the extent the allegations in paragraph 272 purport to relate to Foster Farms, Foster

Farms denies that it ever participated in the Georgia Dock Price Index. To the extent the allegations

in paragraph 272 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or

information sufficient to form a belief as to the truth of these allegations and, on that basis, denies

all such allegations.  Foster Farms denies the remaining allegations contained in paragraph 272.

273.     As a direct and proximate result of the Georgia Dock Defendants' above-described unlawful conduct, certain Plaintiffs paid artificially-inflated prices for chicken.

**ANSWER**: To the extent the allegations in paragraph 273 purport to relate to Foster Farms, Foster

Farms denies that it ever participated in the Georgia Dock Price Index. To the extent the allegations

in paragraph 273 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or

information sufficient to form a belief as to the truth of these allegations and, on that basis, denies

all such allegations. Foster Farms denies the remaining allegations contained in paragraph 273.

274. As a direct and proximate result of the Georgia Dock Defendants' above-described anticompetitive conduct, certain Plaintiffs were damaged in their business or property by paying prices for chicken that were higher than they would have been but for the Georgia Dock Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

**ANSWER**: To the extent the allegations in paragraph 274 purport to relate to Foster Farms, Foster Farms denies that it ever participated in the Georgia Dock Price Index. To the extent the allegations in paragraph 274 relate to other Defendants and/or third parties, Foster Farms lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on that basis, denies all such allegations. Foster Farms denies the remaining allegations contained in paragraph 274.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Enter joint and several judgments against defendants in favor of Plaintiffs;
B. Award Plaintiffs' damages (*i.e.*, three times the overcharges) in an amount to be determined at trial;
C. Award Plaintiffs their attorneys' fees, litigation expenses, and costs, as provided by law; and
D. Grant Plaintiffs such other and further relief to which Plaintiffs are justly entitled.

**ANSWER**: Plaintiffs' Demand for Judgment contains no factual assertions to which a response is required. Plaintiffs' Demand for Judgment further states legal conclusions and Plaintiffs' characterizations of this action, with which Foster Farms disagrees and to which no response is required. To the extent Plaintiffs' Demand for Judgment requires a response, it is denied. Foster Farms denies that Plaintiffs are entitled to any of the relief requested in Plaintiffs' Demand for Judgment.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

**ANSWER**: Plaintiff's Jury Demand contains no factual allegations to which a response is required.

## AFFIRMATIVE DEFENSES[7]

Without assuming any burden that it otherwise would not bear, and reserving the right to assert additional defenses as those defenses become known during discovery, Foster Farms asserts the following separate and additional affirmative defenses:

## FIRST DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not suffered any injury in fact and/or any injury cognizable under the antitrust laws. Plaintiffs cannot establish an actual injury. Plaintiffs' alleged harm lies in its speculation that a conspiracy among nearly twenty companies colluded seamlessly over almost a decade resulting in their harm. In reality, Plaintiffs complain about the impact of naturally unpredictable changes in the market conditions that exist in a global economy. That Plaintiffs believe they felt the impact of these events does not establish actual injury. To the extent that plaintiffs maintain that they were injured by these events, such an injury is not cognizable under the antitrust laws.

## SECOND DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because Plaintiffs failed to exercise reasonable care to mitigate any damages they may have suffered. The precise set of facts Plaintiffs cite in support of their claims were made public more than four years ago. To the extent Plaintiffs believed that Foster Farms had unfairly increased the price of chicken by agreeing to cut chicken production, Plaintiffs had an obligation to mitigate their damages by seeking other sources of supply, including from other producers. Plaintiffs' failure to

---

[7] The defenses that must be affirmatively stated in a pleading per Federal Rule of Civil Procedure 8 are affirmative defenses referenced in Rule 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including [identified defenses.]"). To the extent plaintiff takes a different position, Foster Farms states that the complaint fails to state a claim upon which relief can be granted and fails to allege various elements of the cited claims, as discussed in part in Foster Farms' Motion to Dismiss and supporting papers.

exercise reasonable care to mitigate damages was the complete or partial cause of any damages Plaintiffs may have suffered.

**THIRD DEFENSE**

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of waiver. The precise set of facts Plaintiffs cite in support of their claims were made public more than four years ago. Plaintiffs' conduct in continuing to purchase chicken at what they now allege are inflated prices is evidence of an intention to waive any right to bring this suit and was inconsistent with any intention other than to waive their right to bring suit. Plaintiffs, by their actions, accepted the benefits of an ongoing relationship with defendants and relinquished their right to bring suit.

**FOURTH DEFENSE**

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of estoppel. The precise set of facts Plaintiffs cite in support of their claims were made public more than four years ago. Defendants relied in good faith, and to their detriment, on Plaintiffs' actions in continuing to purchase chicken without complaint. Defendants had no knowledge of Plaintiffs' alleged complaints or means to discover these complaints. Plaintiffs' claims are therefore estopped.

**FIFTH DEFENSE**

Plaintiffs' claims are barred by the equitable doctrine of laches. The laches doctrine dictates that "those who sleep on their rights, lose them." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999). Specifically, laches will bar relief in the face of: "(1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom." *Id.* (*citing Cannon v. Univ. of Health Sciences/Chi. Med. Sch.*, 710 F.2d 351, 359 (7th Cir. 1983)). The challenged conduct that underlies Plaintiffs' claims occurred between seven and ten years ago.

Likewise, the specific facts Plaintiffs cite in support of their claims were publicly available long ago. Yet, Plaintiffs sat on their allegations until 2018. This unreasonable lack of diligence in raising their claims bars them now. Accordingly, the equitable principles embodied in the laches doctrine bar Plaintiffs from seeking relief at this delayed juncture.

## SIXTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations. The statute of limitations for Plaintiffs' claims is four years. 15 U.S.C. § 15(b). Thus, their claims must be dismissed unless Plaintiffs can sufficiently allege that they could not have discovered the claimed offense within the limitations period exercising reasonable diligence. Plaintiffs cannot satisfy this burden: the challenged conduct occurred between seven and ten years ago. Moreover, the precise set of facts Plaintiffs cite in support of their claims—including publicly announced cuts, price increases, alleged signals, trade association meetings, and industry structure—were publicly known more than four years ago. Plaintiff's attempt to justify its delay by claiming fraudulent concealment fails—it simply recycles its underlying allegations and conclusively asserts fraudulent concealment. Accordingly, Plaintiff's Complaint is time-barred.

## SEVENTH DEFENSE

Plaintiffs' claims include allegations that one or more Defendants made public statements about changes needed in alternative fuel mandates under federal law. These mandates increased usage of corn and other animal feed used to produce alternative fuels, and thereby greatly increased feed costs incurred by Defendants for live Broiler operations. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, to the extent Plaintiffs seek to impose liability on Defendants based on the exercise of any person or entity's right to petition federal, state and local legislative bodies, including through public statements, because such conduct was immune under the *Noerr-Pennington* doctrine and privileged under the First Amendment to the U.S.

Constitution.

**EIGHTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, to the extent the sales contracts pursuant to which Plaintiffs purchased broilers contain arbitration clauses or clauses providing a different forum for the resolution of their claims. *See, e.g.*, *Cont'l Ins. Co. v. M/V Orsula*, 354 F.3d 603 (7th Cir. 2003); *West Shore Pipe Line Co. v. Associated Electric & Gas Ins. Services, Ltd.*, 791 F. Supp. 200 (N.D. Ill. 1992)        .

**NINTH DEFENSE**

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, to the extent they seek to impose improper treble damages awards, including treble damages awards duplicative of those sought in parallel actions, in violation of the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

**TENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, due to the ratification of, and consent to, the conduct of Foster Farms. Plaintiffs' Complaint relies on publicly available information—much of which has been available for years—thereby demonstrating their long-standing ratification of and consent to the complained-of conduct. For example, Plaintiff has known for *more than a decade* whether certain Broiler producers participate in and receive reports from Agri Stats. Likewise, Plaintiffs benefit from Defendants' participation in trade association meetings and other industry events. These meetings and events promote, among other issues, lobbying efforts, regulations, industry safety, animal health, and training and education. Accordingly, because Plaintiffs have been aware for years of the very same conduct they now challenge—much of which has provided Plaintiffs a direct benefit—Plaintiffs' claims are barred by the doctrine of ratification.

## ELEVENTH DEFENSE

Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, by non-settling Defendants' right to set off any amounts paid to Plaintiffs by any Defendants who have settled, or do settle, Plaintiffs' claims against them in this action.

## TWELFTH DEFENSE

Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs entered into cost-plus contracts with parties who purchased from Plaintiffs before Plaintiffs began paying any purported overcharge.

## THIRTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent they seek improper multiple damage awards, and damage awards duplicative of those sought in other actions, in violation of the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution. Foster Farms reserves the right to assert other defenses as this action proceeds up to and including the time of trial.

[SIGNATURE BLOCK ON NEXT PAGE]

Dated: February 15, 2019

Respectfully submitted,

/s/ *Carmine R. Zarlenga*

Carmine R. Zarlenga
William H. Stallings
Stephen M. Medlock
Oral D. Pottinger
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3000
czarlenga@mayerbrown.com
wstallings@mayerbrown.com
smedlock@mayerbrown.com
opottinger@mayerbrown.com

*Attorneys for Defendants Foster Poultry Farms, a California Corporation and Foster Farms, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2019, the foregoing document was served via ECF on the all counsel of record.

*/s/ Carmine R. Zarlenga*