# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

*IN BROILER CHICKEN ANTITRUST LITIGATION*

This Document Relates To:

*Action Meat Distributors, Inc., et al. v. Norman W. Fries, Inc. et al.*

Case No. 1:16-cv-08637

**ANSWER AND DEFENSES OF WAYNE FARMS LLC TO THE COMPLAINT OF ACTION MEAT DISTRIBUTORS, ET AL.**

## TABLE OF CONTENTS

Page(s)

I. NATURE OF THE ACTION ....................................................................................... 2

II. PARTIES ................................................................................................................... 10

    A. Plaintiffs ........................................................................................................ 10

    B. Defendants .................................................................................................... 14

        i. Claxton Poultry Farms ........................................................... 14

        ii. Fieldale Farms Corporation .................................................. 14

        iii. Foster Farms, LLC ................................................................. 14

        iv. The George's Defendants ....................................................... 15

        v. Harrison Poultry, Inc. ............................................................ 15

        vi. House of Raeford Farms, Inc. ............................................... 16

        vii. The Koch Defendants ............................................................ 16

        viii. Mar-Jac Poultry, Inc. ............................................................ 17

        ix. The Mountaire Farms Defendants ......................................... 18

        x. The O.K. Foods Defendants ................................................... 18

        xi. Peco Foods, Inc. .................................................................... 19

        xii. The Perdue Defendants ......................................................... 20

        xiii. Pilgrim's Pride Corporation ................................................ 20

        xiv. The Sanderson Farms Defendants ........................................ 21

        xv. Simmons Foods ..................................................................... 22

        xvi. The Tyson Defendants ........................................................... 23

        xvii. Wayne Farms, LLC ............................................................... 24

        xviii. Agri Stats .............................................................................. 25

III. JURISDICTION AND VENUE ................................................................................ 27

IV. TRADE AND COMMERCE .................................................................................... 29

V. FACTUAL ALLEGATIONS .................................................................................... 32

        A. Agri Stats Participated In, and Actively Facilitated, Defendants' Communications Among Themselves, and Provided Data Necessary to Effectuate, Monitor and Enforce the Conspiracy ................................................. 32

            (i) Agri Stats' Detailed Reports Enable Defendants to Accurately Assess and Monitor their Competitors' Production Levels and Breeder Flocks ............................ 36

            (ii) Agri Stats' Critical Role in the Chicken Industry ............ 41

i

(iii)     Defendants' Public Statements Show the Relevance of Agri Stats' Data to their Collective Efforts to Cut Production ....................................................... 45

B.     Defendants' Conspiracy Artificially Increased and Maintained Chicken Prices ............................................................................................................. 49

      (i)     Defendants' Historical Methods of Controlling Chicken Supply Are Ineffective in the Year Immediately Preceding the Conspiracy ........................... 49

      (ii)     The Conspiracy's First Prong:  Defendants Depart from Historical Practice by Collectively Reducing Breeder Flocks in Unprecedented Amounts Beginning in 2008 ............................................................ 52

           (a)     Defendants' Executives Publicly Decried the Effect of Oversupply on "Our Industry," Telling their Competitors that Unified Action Was Necessary .......................................... 54

           (b)     Defendants Begin to Cut Production in Concert ................................................................ 57

           (c)     Defendants' Chicken Production Cuts, from 2008 to Early 2009, Included Unprecedented Reductions to Chicken Breeder Flocks ................ 73

           (d)     Defendants' Conspiracy, Hatched in the Great Recession Continued into 2011 With Another Round of Collective Production Cuts ................................................................... 76

           (e)     Drastically-Reduced Breeder Flocks Boost Chicken Prices and Raise Defendants' Profits to Record Levels...................................... 85

      (iii)     The Conspiracy's Second Prong:  Collusively Manipulating the Georgia Dock Benchmark Price Index ....................................................................... 93

           (a)     The Georgia Dock Pricing Methodology and Its Susceptibility to Manipulation........................ 95

           (b)     Georgia Dock Prices Diverged from the USDA Composite and Urner Barry Price Indices Beginning in 2013 ................................. 102

C.     The Structure and Characteristics of the Chicken Market Make It Highly Susceptible to Collusion ..................................................................... 104

D.     Defendants Collusively Adopted Additional Strategies to Reinforce Their Conspiracy ...................................................................................................... 108

      (i)     A Collective Shift Away from Long-Term Fixed-Price Contracts ............................................................ 108

(ii)     Inter-Defendant Sales......................................................... 110

(iii)    Atypical Increases in Defendants' Exporting of
Chickens..................................................................... 113

E.    The Statute of Limitations Does Not Bar Plaintiffs' Claims ............................. 114

(i)    Plaintiffs Did Not Discover (and Could Not Have
Discovered) the Conspiracy Until 2016......................... 114

(ii)    Defendants Actively Concealed Their Conspiracy......... 117

VI.  ANTITRUST IMPACT .................................................................................... 120

VII.  CLAIMS FOR RELIEF AND CAUSES OF ACTION ...................................... 121

COUNT I ................................................................................................ 121

VIOLATION OF 15 U.S.C. § 1 (AGAINST ALL DEFENDANTS FOR
OUTPUT RESTRICTION) ................................................................. 121

COUNT II ............................................................................................... 122

VIOLATION OF 15 U.S.C. § 1 (AGAINST THE GEORGIA DOCK
DEFENDANTS FOR PRICE-FIXING) .............................................. 122

DEMAND FOR JUDGMENT............................................................................ 91

JURY DEMAND ............................................................................................... 92

Defendant Wayne Farms LLC ("Wayne Farms") hereby answers the Complaint of Action Meat Distributors, Inc., Associated Foods Stores, Inc., Bashas' Inc., Certco, Inc., DiCarlo Distributors, Inc., Ira Higdon Grocery Company, Inc., Nicholas & Co., Inc., Pacific Agri-Products, Inc., Pacific Food Distributors, Inc., Troyer Foods, Inc., URM Stores, Inc., and Weinstein Wholesale Meats, Inc., filed on December 8, 2017. Except where otherwise indicated, the answers herein are identified by the paragraph numbers of the Complaint and respond to the corresponding paragraph of the Complaint. To the extent that any paragraph in the Complaint incorporates by reference or re-alleges allegations contained in another paragraph, Wayne Farms incorporates by reference its answer to that other paragraph. Pursuant to Rule 8(b)(3), Wayne Farms "generally denies" all allegations of the Complaint "except those specifically admitted." Fed. R. Civ. P. 8(b)(3). Wayne Farms answers the Complaint as follows:

**Complaint Preamble**:

Plaintiffs Action Meat Distributors, Inc., Associated Food Stores, Inc., Bashas' Inc., Certco, Inc., DiCarlo Distributors, Inc., Ira Higdon Grocery Company, Inc., Nicholas & Co., Inc., Pacific Agri-Products, Inc., Pacific Food Distributors, Inc., Troyer Foods, Inc., URM Stores, Inc., and Weinstein Wholesale Meats, Inc. ("Plaintiffs") bring this action for treble damages under the federal antitrust laws against the Defendants identified below. Plaintiffs seek damages commencing from at least January 1, 2008 through December 31, 2016 for their purchases of chickens directly from Defendants at supra-competitive prices, and allege as follows, based upon information and belief except as to allegations relating to themselves.

**Answer to Complaint Preamble**:

In response to Plaintiffs' opening, unnumbered paragraph, Wayne Farms admits that Plaintiffs have filed a putative class action suit under the antitrust laws of the United States against

a number of Defendants, including Wayne Farms, but denies that Wayne Farms is liable, denies that Plaintiffs can satisfy the requirements of Federal Rule of Civil Procedure 23, and denies that Plaintiffs are entitled to any relief.

## I.     NATURE OF THE ACTION

1.     This is a case about how a cartel of America's chicken producers succeeded in illegally increasing chicken prices.  Defendants' cartel had two prongs.  One focused on the beginning of the distribution chain by reducing the supply of chickens into the market.  The other prong focused on the end of the distribution chain by manipulating a price index used to set wholesale chicken prices for buyers in Illinois and across the nation.

**Answer to Paragraph 1**: Wayne Farms denies the allegations in this paragraph.

2.     The first prong of Defendants' scheme curtailed the supply of chickens in the market via unprecedented cuts at the top of the supply chain in the form of jointly and collusively reducing "breeder flocks" that produce chickens ultimately slaughtered for meat consumption. Historically, when faced with low market prices, Defendants relied primarily on mechanisms that temporarily reduced production – at the middle or end of the supply chain, such as reducing eggs placements, killing newly-hatched chicks, or idling processing plants – but which still allowed them to ramp up production within weeks if chicken prices rose.

**Answer to Paragraph 2**:  Wayne Farms admits that it has several means to adjust its own unique production levels of certain products that may be within Plaintiffs' definition of "chickens" when Wayne Farms determines that doing so is in its independent interest, including, for example, reducing or increasing the size of breeder flocks and reducing or increasing egg sets or egg placements.  Wayne Farms denies the remaining allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

3.     By way of background, the pattern of annual increases in chicken production became so entrenched over decades of experience that by the 2000s, a widely-repeated industry quip was that life only held three certainties: death, taxes, "and 3% more broilers." A leading industry publication noted in early 2009 that chicken "production in the U.S. used to be just like government spending, it never went down and cutbacks only resulted in slowing the rate of growth, but not anymore," because for "the first time in decades, total broiler production in 2008 remained virtually unchanged from the year before."

**Answer to Paragraph 3**: Wayne Farms admits that this paragraph appears to quote—and attempts to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

4.     In 2008, faced with cratering prices and anemic profits, Defendants collectively began cutting their ability to ramp up production in the long-term – up to 18 months – by materially reducing their breeder flocks. While in the past, Defendants undertook traditional, short-term production cuts, this was a significant shift in their behavior. Defendants' collective market-changing cuts to breeder flocks – a first round from 2008 to early 2009, and a subsequent round from 2011 to 2012 as the conspiracy continued into the current decade – effectively eliminated their ability to meaningfully increase supply for years.

**Answer to Paragraph 4**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

5. Defendants' joint efforts to impose supply-side "discipline" included public statements by their senior executives about a Defendant's individual commitment to production cuts <u>as well as</u> the importance of instituting and maintaining this "discipline" within the industry as a whole. Defendants' public statements on the need for, and benefits of, industry-wide supply "discipline" marked a significant departure from past industry practice.

**Answer to Paragraph 5**: Wayne Farms denies the allegations in this paragraph.

6. Defendants' coordinated output restriction scheme was successfully facilitated by, monitored and policed using reports purchased, at significant cost, from Defendant Agri Stats, Inc. ("Agri Stats"), a subsidiary of global pharmaceutical company Eli Lilly & Co. Agri Stats collects detailed, proprietary data from all Defendants, including housing used, breed of chicks, average size, and production and breeder flock levels. Although certain Defendants had used Agri Stats before 2008, the output-restriction part of Defendants' conspiracy began when Defendant Tyson Foods – which had stopped using Agri Stats sometime in the mid-2000s – became a subscriber again in early 2008 (as confirmed by the CEO in a January 28, 2008 earnings call).

**Answer to Paragraph 6**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lack sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

7. While the Agri Stats reports "anonymize" individual producer information, they are sufficiently detailed so that any reasonably informed producer may discern the identity of its competitors' information, including breeder flocks, and other production, capacity and cost data. Agri Stats, as detailed below, plays both a unique role in the chicken industry and an important

role in the conspiracy alleged here, by enabling Defendants to know exactly what each other was doing.

**Answer to Paragraph 7**:  Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

8.     The information available to Defendants in these Agri Stats reports is not the kind of information that, in a competitive market, would be disclosed by one competitor to another. Agri Stats reports include individual lines (sometimes called "rows") of facility-level data for over 100 of Defendants' chicken integrated production facilities.  Most of these vast facilities, referred to as "complexes," include housing for Defendants' breeder flocks and hatcheries where breeder flock hens lay the eggs that will ultimately become the chickens sold to the market.

**Answer to Paragraph 8**:  Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

9.     The Agri Stats reports identify each complex with unique numbers, including a coding system identifying the region and sub-region, for each chicken complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself.  For example, "Region 20" includes "Sub-Region 21 – Upper Mid Atlantic," identifying, with a unique number, sixteen chicken complexes, including four Tyson

complexes, four Perdue complexes, three Mountaire complexes, two Pilgrim's Pride complexes, and one George's complex.[1]

**Answer to Paragraph 9**:  Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

10.    Agri Stats' reports are not publicly available, and with very limited exceptions, Defendants closely guard the reports' contents and the degree of Defendants' participation in Agri Stats' data-gathering and -dissemination processes.  But despite the secrecy of the Agri Stats reports, Plaintiffs' counsel's extensive investigation has confirmed that every Defendant named in this Complaint reports detailed data to Agri Stats on a regular basis, typically weekly, and Agri Stats both facilitated and participated in the conspiracy because, among other things:

- Agri Stats' coding system made it "easy" for Defendants' personnel to decipher, simply by eyeballing the "rows" in a given report, the production, feed, sales and other competitively-sensitive metrics of their competitors, many of whom had complexes "right down the road from" each other in the same Agri Stats sub-region;

- Agri Stats' regular meetings with each Defendant allowed Agri Stats to share production information among the Defendants.  For example, mid-level Tyson personnel working at complexes in the Mid-Atlantic region were advised by their complex managers about competitors' production following quarterly meetings between the Tyson complex managers and Agri Stats account managers; and

---

[1] Agri Stats reports also include specific data for Defendants' chicken complexes (listed by producer and location) in: North Carolina ("Sub-Region 22"); Northern Georgia and Tennessee ("Sub-Region 31"); Southern Georgia, Florida and South Carolina ("Sub-Region 32"); Alabama and Mississippi (sub-regions 41 and 42); lower Arkansas, Louisiana and Texas ("Sub-Region 51"); upper Arkansas and Missouri ("Sub-Region 52"); Kentucky, Ohio, Minnesota, Indiana and Wisconsin ("Sub-Region 60"); and California and the Pacific Northwest ("Region 10") (which is composed solely of Defendant Foster Farms' three complexes).

**Answer to Footnote 1**:  Wayne Farms admits that this footnote appears to be appears to be referencing—and attempting to characterize—one or more documents that speak for themselves.  To the extent a response is required, Wayne Farms denies the allegations in this footnote.

- Agri Stats account managers created, for each of their Defendant customers, a series of data compilations known as "books," based on the competitively-sensitive data that a particular Defendant had submitted to Agri Stats. On a number of occasions, Agri Stats personnel sent copies of one Defendant's "books" to other Defendants.

**Answer to Paragraph 10**: Wayne Farms admits that it receives Agri Stats reports on a confidential basis, and that Agri Stats has agreed to protect Wayne Farms' confidential data. Wayne Farms admits that Agri Stats has made periodic presentations to Wayne Farms, but Wayne Farms denies the characterizations of these meetings. Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

11. The other prong of Defendants' conspiracy to illegally increase and maintain chicken prices was the manipulation and artificial inflation of prices on the "Georgia Dock," a widely used weekly benchmark price compiled and published by the Georgia Department of Agriculture (the "GDA"). Chicken buyers across the nation, including purchasers in Illinois, paid prices based on the Georgia Dock. The Georgia Dock also formed the basis of many chicken purchasing contracts and other business transactions between certain Plaintiffs and one or more of the Defendants. Unlike other price indices available to chicken buyers, the Georgia Dock benchmark price is a self-reported number from a group of chicken producers identified below as the "Georgia Dock Defendants" (namely, Defendants Pilgrim's Pride, Tyson, Fieldale Farms, Perdue, Sanderson Farms, Koch Foods, Claxton Poultry, Harrison Poultry, Mar-Jac and Wayne Farms). Senior executives from eight of the ten Georgia Dock Defendants were members of a secretive "Georgia Dock Advisory Board," which played a role in the compilation and manipulation of the Georgia Dock benchmark price.

**Answer to Paragraph 11**:  Wayne Farms admits that, at times during the relevant time period, a percentage of its contracts included terms related to the Georgia Dock.  Wayne Farms admits that it provided data to the GDA's Poultry Market News, and that at the request of the GDA, it had an employee representative on the Georgia Dock Advisory committee, including most recently Steve Clever, but denies Plaintiffs' characterization of the committee.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

12.     Following intense scrutiny, first in mid-2016 from the U.S. Department of Agriculture ("USDA"), and then by the press, which in late 2016 first revealed the easily manipulated methodology used to create the Georgia Dock benchmark price, the GDA, on November 28, 2016, suspended reporting it.  Realizing the antitrust implications of how the Georgia Dock benchmark price inputs were compiled and how the Georgia Dock benchmark price was computed, the GDA attempted to implement new price-reporting requirements, including the submission of an affidavit by each Georgia Dock Defendant vouching for the accuracy of their submitted price inputs.  However, the Georgia Dock Defendants balked at these new rules, so in late November 2016, the GDA stopped publishing the Georgia Dock benchmark index altogether, citing a "lack of submissions" under the new reporting requirements.

**Answer to Paragraph 12**:  Wayne Farms admits that the GDA requested an affidavit from Wayne Farms.  Wayne Farms denies the remaining allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

13.     The November 23, 2016 Georgia Dock benchmark whole-bird price of $1.0975/lb. was the last one reported by the GDA, although at least one Defendant continued for several more

months to peg its wholesale prices to that final $1.0975/lb. price point.  The GDA later introduced the "Georgia Premium Poultry Price Index," which purported to be a more transparent, accurate, and verifiable pricing mechanism – but abandoned the new index in February 2017 due to a lack of participation by chicken producers.  The Antitrust Section of the Florida Attorney General's office is currently investigating the chicken industry for anticompetitive practices, including the manipulation of the Georgia Dock.  Plaintiffs have reason to believe the Antitrust Division of the U.S. Department of Justice is also probing Defendants' roles in compiling the Georgia Dock benchmark price.

**Answer to Paragraph 13**:  Wayne Farms admits that the above benchmark whole-bird price reported on November 23, 2016, was the last one reported by the GDA, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first since of this Paragraph and therefore denies them.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

14.     Both prongs of Defendants' conspiracy were instigated in a market with numerous characteristics making it highly susceptible to collusion, including:  (a) a highly-concentrated market dominated by vertically-integrated producers; (b) high barriers to market entry; (c) a standardized, commodity product where competition is based principally on price; (d) inelastic demand for the product; (e) numerous opportunities for cartel members to conspire through a number of regularly scheduled trade association meetings; and (f) access to competitors' data through Agri Stats.  Indeed, an internal memorandum drafted by the Antitrust Section of the Florida Attorney General's office as part of its ongoing investigation stated that the chicken industry has the "hallmarks of an industry susceptible to collusion," including high consolidation,

9

"predictable demand" in a "commodity market," and "routine, public display of prices to deter cheating."

**Answer to Paragraph 14**:  Wayne Farms admits that this paragraph appears to be referencing – and attempting to characterize – one or more documents that speak for themselves. Wayne Farms denies the allegations in the first sentence of this paragraph.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

## II.    PARTIES

### A.    Plaintiffs

15.    Plaintiff Action Meat Distributors, Inc. ("Action Meat") is a Texas corporation with its principal place of business in Houston.  From January 1, 2008 through December 31, 2016, Action Meat purchased chicken at artificially inflated prices directly from one or more of Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**Answer to Paragraph 15**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

16.    Plaintiff Associated Food Stores, Inc.  ("Associated Food") is a Utah corporation with its principal place of business in Salt Lake City.  From January 1, 2008 through December 31, 2016, Associated Food purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**Answer to Paragraph 16**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

17.     Plaintiff Bashas' Inc. ("Bashas") is an Arizona corporation with its principal place of business in Chandler, Arizona, operating stores under several banners, including Food City, Bashas' Markets, Bashas' Dine, AJ's Fine Foods, and Eddie's Country Stores. From January 1, 2008 through December 31, 2016, Bashas purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**Answer to Paragraph 17**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

18.     Plaintiff Certco, Inc. ("Certco") is a Wisconsin corporation with its principal place of business in Fitchburg, Wisconsin. From January 1, 2008 through December 31, 2016, Certco purchased chicken at artificially inflated prices directly from one or more of the Defendants and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**Answer to Paragraph 18**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

19.     Plaintiff DiCarlo Distributors, Inc. ("DiCarlo") is a New York corporation with its principal place of business in Holtsville, New York. From January 1, 2008 through December 31, 2016, DiCarlo purchased chicken at artificially inflated prices directly from one or more of the Defendants and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**Answer to Paragraph 19**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

20.      Plaintiff Ira Higdon Grocery Company, Inc. ("Ira Higdon") is a Georgia corporation with its principal place of business in Cairo, Georgia.  From January 1, 2008 through December 31, 2016, Ira Higdon purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**Answer to Paragraph 20**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

21.      Plaintiff Nicholas & Co., Inc. ("Nicholas") is a Utah corporation with its principal place of business in Salt Lake City.  From January 1, 2008 through December 31, 2016, Nicholas purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**Answer to Paragraph 21**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

22.      Plaintiff Pacific Agri-Products, Inc. is a California corporation with its principal place of business in South San Francisco.  From January 1, 2008 through December 31, 2016, Pacific Agri-Products, Inc. purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**Answer to Paragraph 22**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

23.      Plaintiff Pacific Food Distributors, Inc. ("PFD") is an Oregon corporation with its principal place of business in Clackamas, Oregon.  From January 1, 2008 through December 31,

2016, PFD purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**Answer to Paragraph 23**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

24.     Plaintiff Troyer Foods, Inc. ("Troyer") is an Indiana corporation with its principal place of business in Goshen, Indiana.  From January 1, 2008 through December 31, 2016, Troyer purchased chicken at artificially inflated prices directly from one or more of Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**Answer to Paragraph 24**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

25.     Plaintiff URM Stores, Inc. ("URM") is a Washington corporation with its principal place of business in Spokane.  From January 1, 2008 through December 31, 2016, URM purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**Answer to Paragraph 25**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

26.     Plaintiff Weinstein Wholesale Meats, Inc. ("Weinstein") is an Illinois corporation with its principal place of business in Forest Park, Illinois.  From January 1, 2008 through December 31, 2016, Weinstein purchased chicken at artificially-inflated prices directly from one or more of the Defendants, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

**Answer to Paragraph 26**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

**B.     Defendants**

i.     Claxton Poultry Farms

27.     Defendant Norman W. Fries, Inc., d/b/a Claxton Poultry Farms ("Claxton") is a Georgia corporation headquartered in Claxton, Georgia.  Claxton reports to Agri Stats a wide variety of data, including information about its breeder flocks and hatchery capacity and its Claxton, Georgia complex.  Until the Georgia Dock benchmark price stopped being published by the GDA in late November 2016, Claxton was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA.  Its CEO also served on the Georgia Dock Advisory Board.  Claxton is a Georgia Dock Defendant.

**Answer to Paragraph 27**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

ii.     Fieldale Farms Corporation

28.     Defendant Fieldale Farms Corporation ("Fieldale") is a privately held Georgia corporation headquartered in Baldwin, Georgia.  Fieldale reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and its Gainesville, Georgia complex.  Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Fieldale was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA.  Its owner and CEO also served on the Georgia Dock Advisory Board.  Fieldale is a Georgia Dock Defendant.

**Answer to Paragraph 28**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

iii.     Foster Farms, LLC

29.     Defendant Foster Farms, LLC ("Foster") is a privately held California corporation headquartered in Modesto, California.  Foster reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Fresno, California, Livingston, California, and the Pacific Northwest.

**Answer to Paragraph 29**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

iv.     The George's Defendants

30.     Defendant George's Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.

**Answer to Paragraph 30**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

31.     Defendant George's Farms, Inc., is a privately held Arkansas corporation headquartered in Springdale, Arkansas.  It is a wholly owned subsidiary of George's, Inc. Defendants George's Inc. and George's Farms, Inc. are together referred to as "George's" in this Complaint.  George's reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Harrisonburg, Virginia and Springdale, Arkansas.

**Answer to Paragraph 31**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

v.     Harrison Poultry, Inc.

32.     Defendant Harrison Poultry, Inc. ("Harrison") is a Georgia corporation headquartered in Bethlehem, Georgia.  Harrison reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Bethlehem, Georgia complex.  Until the Georgia Dock benchmark price index stopped being published by the

15

GDA in late November 2016, Harrison was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Its owner and CEO served on the Georgia Dock Advisory Board. Harrison is a Georgia Dock Defendant.

**Answer to Paragraph 32**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

vi.    <u>House of Raeford Farms, Inc.</u>

33.    Defendant House of Raeford Farms, Inc. ("Raeford") is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. Raeford reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its North Carolina and Louisiana complexes.

**Answer to Paragraph 33**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

vii.    <u>The Koch Defendants</u>

34.    Defendant Koch Foods, Inc. is a privately held Illinois corporation headquartered in Park Ridge, Illinois.

**Answer to Paragraph 34**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

35.    Defendant JCG Foods of Alabama, LLC, an Alabama limited liability corporation headquartered in Park Ridge, Illinois, is a wholly owned subsidiary of Defendant Koch Foods, Inc.

**Answer to Paragraph 35**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

36.    Defendant JCG Foods of Georgia, LLC, a Georgia limited liability corporation headquartered in Park Ridge, Illinois, is a wholly owned subsidiary of Defendant Koch Foods, Inc.

16

**Answer to Paragraph 36**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

37.     Defendant Koch Meat Co., Inc., an Illinois corporation headquartered in Chicago, is a wholly owned subsidiary of Defendant Koch Foods, Inc.

**Answer to Paragraph 37**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

38.     Defendants Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC and Koch Meat Co., Inc. are collectively referred to as "Koch" in this Complaint. Koch reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Tennessee, and Alabama. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Koch, through JCG Foods of Georgia, LLC, was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice-president of sales served on the Georgia Dock Advisory Board. Koch is a Georgia Dock Defendant.

**Answer to Paragraph 38**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

viii.     Mar-Jac Poultry, Inc.

39.     Defendant Mar-Jac Poultry, Inc. ("Mar-Jac") is a Delaware corporation headquartered in Gainesville, Georgia. Mar-Jac reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Gainesville, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Mar-Jac was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice president of operations served on the Georgia Dock Advisory Board. Mar-Jac is a Georgia Dock Defendant.

**Answer to Paragraph 39**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

ix.      The Mountaire Farms Defendants

40.     Defendant Mountaire Farms, Inc. is a privately held Delaware corporation headquartered in Millsboro, Delaware.

**Answer to Paragraph 40**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

41.     Defendant Mountaire Farms, LLC, a privately held Arkansas limited liability corporation headquartered in Little Rock, Arkansas, is a wholly owned subsidiary of Defendant Mountaire Farms, Inc.

**Answer to Paragraph 41**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

42.     Defendant Mountaire Farms of Delaware, Inc., a privately held Delaware corporation headquartered in Millsboro, Delaware, is a wholly owned subsidiary of Defendant Mountaire Farms, Inc.

**Answer to Paragraph 42**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

43.     Defendants Mountaire Farms, Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire Farms" in this Complaint.  Mountaire reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware and North Carolina.

**Answer to Paragraph 43**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

x.      The O.K. Foods Defendants

44.     Defendant O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.

**Answer to Paragraph 44**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

45.     O.K. Farms, Inc., an Arkansas corporation headquartered in Fort Smith, Arkansas, is a wholly owned subsidiary of Defendant O.K. Foods, Inc.

**Answer to Paragraph 45**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

46.     O.K. Industries, Inc., an Arkansas corporation headquartered in Fort Smith, Arkansas, is a wholly owned subsidiary of Defendant O.K. Foods, Inc.

**Answer to Paragraph 46**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

47.     Defendants O.K. Foods, Inc., O.K. Farms, Inc. and O.K. Industries, Inc. are collectively referred to collectively as "O.K. Foods" in this Complaint. O.K. Foods, which is a subsidiary of the Mexican poultry conglomerate Industrias Bachoco, reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Fort Smith, Arkansas complex.

**Answer to Paragraph 47**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

xi.      <u>Peco Foods, Inc.</u>

48.     Defendant Peco Foods, Inc. ("Peco Foods") is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama.  Peco Foods reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Gordo, Alabama and Sebastopol, Louisiana.

19

**Answer to Paragraph 48**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

xii.    The Perdue Defendants

49.    Defendant Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland.

**Answer to Paragraph 49**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

50.    Defendant Perdue Foods, LLC, a privately held Maryland limited liability corporation headquartered in Salisbury, Maryland, is a subsidiary of Defendant Perdue Farms, Inc.

**Answer to Paragraph 50**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

51.    Defendants Perdue Farms, Inc. and Perdue Foods, LLC are together referred to as "Perdue" in this Complaint.  Perdue reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware, Maryland, North Carolina, South Carolina, Florida, and Kentucky.  Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Perdue was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Perdue is a Georgia Dock Defendant.

**Answer to Paragraph 51**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

xiii.    Pilgrim's Pride Corporation

52.    Defendant Pilgrim's Pride Corporation ("Pilgrim's" or "Pilgrim's Pride") is a publicly held Delaware corporation headquartered in Greeley, Colorado.  Pilgrim's Pride reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery

20

capacity, and data for its complexes in Virginia, West Virginia, North Carolina, Georgia, Tennessee, Florida, South Carolina, Alabama, Texas, Arkansas, and Kentucky. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Pilgrim's Pride was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Its executive vice president of sales and operations served on the Georgia Dock Advisory Board. Pilgrim's Pride is a Georgia Dock Defendant.

**Answer to Paragraph 52**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

53. Defendant Pilgrim's Pride is liable for all conspiratorial acts undertaken while it was in bankruptcy proceedings during 2009, and reentered, and reaffirmed its commitment to, the conspiracy following its discharge from bankruptcy on December 29, 2009.

**Answer to Paragraph 53**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

xiv. <u>The Sanderson Farms Defendants</u>

54. Defendant Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi.

**Answer to Paragraph 54**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

55. Defendant Sanderson Farms, Inc. (Foods Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

**Answer to Paragraph 55**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

56.    Defendant Sanderson Farms, Inc. (Production Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

**Answer to Paragraph 56**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

57.    Defendant Sanderson Farms, Inc. (Processing Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

**Answer to Paragraph 57**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

58.    Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division) and Sanderson Farms, Inc. (Processing Division) are collectively referred to as "Sanderson Farms" in this Complaint.  Sanderson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Mississippi, and Texas.  Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Sanderson Farms was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA.  Sanderson Farms is a Georgia Dock Defendant.

**Answer to Paragraph 58**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

xv.    Simmons Foods

59.    Defendant Simmons Foods, Inc. ("Simmons Foods") is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas.  Simmons Foods reports a wide variety

22

of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its two Siloam Springs, Arkansas complexes.

**Answer to Paragraph 59**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

xvi.    The Tyson Defendants

60.    Defendant Tyson Foods, Inc. is a publicly held Delaware corporation headquartered in Springdale, Arkansas.

**Answer to Paragraph 60**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

61.    Defendant Tyson Chicken, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

**Answer to Paragraph 61**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

62.    Defendant Tyson Breeders, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

**Answer to Paragraph 62**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

63.    Defendant Tyson Poultry, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

**Answer to Paragraph 63**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

64.    Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc. and Tyson Poultry, Inc.  are collectively referred to as "Tyson" in this Complaint.  Tyson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery

23

capacity, and data for its complexes in Virginia, Pennsylvania, North Carolina, Georgia, Alabama, Mississippi, Texas, Arkansas, Missouri, Indiana, Tennessee, and Kentucky. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Tyson was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. One of its plant managers served on the Georgia Dock Advisory Board. Tyson is a Georgia Dock Defendant.

**Answer to Paragraph 64**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

xvii.    Wayne Farms, LLC

65.    Defendant Wayne Farms, LLC ("Wayne Farms") is a Delaware limited liability corporation headquartered in Oakwood, Georgia. Wayne Farms reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in North Carolina, Georgia, Alabama, Mississippi, and Arkansas. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Wayne Farms was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice president of fresh sales served on the Georgia Dock Advisory Board. Wayne Farms is a Georgia Dock Defendant.

**Answer to Paragraph 65**: Wayne Farms admits that Wayne Farms LLC is a Delaware corporation headquartered in Oakwood, Georgia. Wayne Farms admits that its vice president had some involvement in the Georgia Dock Advisory Board. Wayne Farms admits that certain of its employees have transferred data to Agri Stats on a confidential basis and that some of that data has been transferred electronically, but otherwise denies any allegations in this paragraph to the extent they relate to Wayne Farms.

66.     All of the above-named Defendants are collectively referred to as "Defendants" in this Complaint.  All Defendants are horizontal competitors in the United States chicken market. Defendants and their co-conspirators, directly and through their wholly owned or controlled affiliates, produced and sold chicken throughout the United States, including in this District, at prices that were artificially inflated as a result of their conspiracy alleged in this Complaint.

**Answer to Paragraph 66**:  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

67.     All of Defendants' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or engaged in by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management and operation of Defendants' business affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, or with Defendants' actual, apparent or ostensible authority.  Defendants used the instrumentalities of interstate commerce to facilitate the conspiracy, and its conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the U.S., including in this District.

**Answer to Paragraph 67**:  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

xviii.   Agri Stats

25

68.     Defendant Agri Stats, Inc. (which is referred to in this Complaint as "Agri Stats" to distinguish it from the chicken-manufacturing entities referred to as "Defendants") is an Indiana corporation headquartered in Fort Wayne, Indiana, and is a subsidiary of Eli Lilly & Co., a publicly-held Indiana corporation headquartered in Indianapolis. Agri Stats has a unique and deep relationship with the chicken industry generally, and specifically with each of the Defendants listed above, all of which are Agri Stats' primary customers.

**Answer to Paragraph 68**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

69.     The unique and symbiotic relationship between Agri Stats and the Defendants is exemplified by the fact that a representative from Agri Stats was elected to the board of the National Chicken Council, one of the industry's most important trade associations, in 2008 and 2010 – two key periods in the conspiracy alleged in this Complaint. Several Defendants, including Wayne Farms and Pilgrim's, also have hired former Agri Stats executives to work in senior sales positions, and Agri Stats employs or has employed several former executives of the Defendants.

**Answer to Paragraph 69**:  Wayne Farms admits that the National Chicken Council is a trade association. Wayne Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

70.     Agri Stats is a co-conspirator of the Defendants, and has knowingly played an important and active role as a facilitator of Defendants' collusive scheme detailed in this Complaint. All of Agri Stats' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, or engaged in by Agri Stats' various officers, agents, employers or other representatives while actively engaged in the management and operation of Agri Stats' business affairs within the course and scope of

their duties and employment, or with Agri Stats' actual apparent or ostensible authority. Agri Stats used the instrumentalities of interstate commerce to facilitate the conspiracy, and its conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the U.S., including in this District.

**Answer to Paragraph 70**: This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

### III.    JURISDICTION AND VENUE

71.    This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiffs resulting from Defendants' conspiracy to restrain trade in the chicken market. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

**Answer to Paragraph 71**: This paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

72.    Venue is proper in this District under 15 U.S.C. §§ 15(a); 22 and 28 U.S.C. §§ 1391(b); (c); and (d) because during the relevant period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District.

**Answer to Paragraph 72**: Wayne Farms admits that venue is proper in this district for this matter only but otherwise denies the remaining allegations in this paragraph.

73.     Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 734 Ill. Comp. Stat. 5/2-209 because each Defendant has transacted business in this state and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.

**Answer to Paragraph 73**:  Wayne Farms admits that it is amenable to service of process in this District for purposes of this matter only but otherwise denies the remaining allegations in this paragraph.

74.     This Court has personal jurisdiction over each Defendant because each Defendant – throughout the U.S. and including in this District – has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District.

**Answer to Paragraph 74**:  Wayne Farms admits that it has transacted business in the United States and in this district at certain points in time, and that the Court has personal jurisdiction over it.  To the extent a further response is required, Wayne Farms denies the remaining allegations in this paragraph.

75.     This Court also has personal jurisdiction over the Georgia Dock Defendants because each of them knew, or should have known, that because the Georgia Dock index price was used to price chicken bought in Illinois and nationwide, their participation in the collusive manipulation of the Georgia Dock would have effects on the price of chicken purchased in Illinois based on the Georgia Dock benchmark.  The alleged scheme and conspiracy have been directed

28

at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business in the state of Illinois.

**Answer to Paragraph 75**:  Wayne farms admits that the Court has personal jurisdiction over Wayne Farms for purposes of this matter only.  To the extent a further response is required, Wayne Farms denies the remaining allegations in this paragraph.

## IV.    TRADE AND COMMERCE

76.    Chicken, as the term is used in this Complaint, refers to chicken raised for meat consumption to be slaughtered before the age of 10 weeks[2] (also known as either "broilers" or "fryers," which the USDA states are "regional terms for the same type of bird and thus used interchangeably"), and sold either fresh or frozen, raw or cooked, or whole or in parts, or as a meat ingredient in a value added product, but excluding chicken grown, processed and sold according to halal, kosher, free-range or organic standards.  According to a 2012 report by Focus Management Group, chicken "is a commodity product with little or no product differentiation based on the processors," and the CEO of defendant Pilgrim's recently commented that "the chicken business per se is a commodity business." The commodity nature of chicken is evidenced by the fact that, as detailed below, numerous Defendants have during the relevant time period purchased chicken from each other (then likely resold it) to buttress their conspiracy by soaking up excess supply in the market.

**Answer to Paragraph 76**:  Wayne Farms admits that this paragraph includes the definition Plaintiffs have created for the term "Chicken," as used in the Complaint, but denies that it is a clear

---

[2] On January 1, 2014, the USDA's Food Safety and Inspection Service ("FSIS") implemented a final rule lowering the age definitions for broilers/fryers from 13 weeks to the current 10 weeks.  *See* 9 C.F.R. 381.170 (2014) (also noting that "FSIS is not establishing separate definitions for 'broiler' and 'fryer' chickens in this final rule.").
**Answer to Footnote 2**:  Wayne Farms admits that this footnote appears to be referencing – and attempting to characterize – one or more documents that speak for themselves.  To the extent a response is required, Wayne Farms denies the allegations in this footnote.

or accurate definition or one used by Wayne Farms in the ordinary course of business. Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms denies the remaining allegations in this paragraph.

77. Typically, when a product is characterized as a commodity, competition is based principally on price—as opposed to other attributes, such as product quality or customer service. The market for chickens involves significant competition on the basis of price. Chicken producers pay USDA graders to examine their chickens, and almost all companies sell USDA Grade A chicken, meaning that there is very little differentiation amongst sellers.

**Answer to Paragraph 77**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

78. Due to the lack of product differentiation, Defendants are forced to compete on price such that the supply decisions of each chicken producer impact the market price for chickens. While an individual producer often has the incentive to increase production to maximize profits, any increased production will ultimately reduce the profitability of the industry as a whole. Thus, the commodity nature of the product in the chicken industry makes it easier to implement a price-fixing cartel and provides industry players with the incentive to agree to reduce overall supply.

**Answer to Paragraph 78**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

79. The United States chicken market is a national market, valued at nearly $41 billion in 2016. During the relevant period, Defendants collectively controlled nearly 90% of the market for chicken in the United States. The chicken industry is almost entirely vertically integrated, with producers (sometimes known as "integrators") owning, or tightly controlling, each of the six stages

of the supply chain: breeding, hatching, chick-rearing and feeding, slaughtering mature birds, processing, and selling. At the very top of the supply chain are Defendants' "breeder flocks," which include the hens that lay the eggs that, when hatched, become chickens slaughtered for meat consumption.

**Answer to Paragraph 79**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

80. Like many other chicken buyers, the prices for certain Plaintiffs' chicken purchases were based on the Georgia Dock whole-bird price, which was one of three benchmark price indices used by chicken buyers until early 2017. The other indices used by chicken purchasers are: (1) the U.S. Department of Agriculture's weekly National Whole Broiler/Fryer Report (colloquially known as the "USDA Composite," available for free on the USDA website); and (2) the weekly index compiled by Urner Barry, a subscription service.

**Answer to Paragraph 80**: Wayne Farms admits that, at times during the relevant time period, a percentage of its contracts included terms related to "the Georgia Dock price." Wayne Farms admits that Urner Barry and the USDA have collected and reported pricing information for chicken. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

81. Defendants' conduct, as described in this Complaint, was within the flow of, intended to, and did have a substantial effect on, the interstate commerce of the U.S., including in this District.

**Answer to Paragraph 81**:  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent that a response is required, Wayne Farms denies the allegations in this paragraph.

82.    During the relevant period, Defendants produced, sold and shipped chicken in a continuous and uninterrupted flow of interstate commerce.  The conspiracy in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce in Illinois.

**Answer to Paragraph 82**:  Wayne Farms admits that it conducts business Illinois and sells various products in interstate commerce.  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent that a response is required, Wayne Farms denies the allegations in this paragraph.

83.    During the relevant period, each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy.

**Answer to Paragraph 83**:  Wayne Farms denies the allegations in this paragraph.

## V.    FACTUAL ALLEGATIONS

**A.    Agri Stats Participated In, and Actively Facilitated, Defendants' Communications Among Themselves, and Provided Data Necessary to Effectuate, Monitor and Enforce the Conspiracy**

84.    The USDA and various other entities publicly publish aggregated weekly, monthly, and annual supply and pricing information concerning the U.S. chicken industry.  But only Agri Stats receives from Defendants, and then provides to Defendants, detailed information to accurately determine producer-specific production, costs, and general efficiency.  Agri Stats is a

company that generates confidential chicken industry data considerably more detailed than any similar types of available reports, including the following data categories:

(a) Breeder flock size and age, hatchery capacity, and the costs associated with breeder flocks, including feed and housing expense;

(b) Data about the production, delivery and formulation of feed, including corn and soybean meal costs, which are two of Defendants' most significant input costs;

(c) Grow-out information for chicken "flocks" provided to contract farmers, including the number of chickens placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (*i.e.*, "down time"), feed conversion rate (pounds of feed per pound of chicken), average daily weight gain by chicks, live pounds produced per square foot of grower house, grower compensation, including average grower payment in cents per pound and cents per square foot, breed composition of flock (breed or cross-breed of flocks), detailed information on numerous mechanical aspects of chicken housing, and numerous other detailed cost, mortality, and operational information about disease, transportation, labor, and other grow out related information;

(d) Slaughter, processing, and further processing information, including pay for processing plant workers, total production volume, market age of chickens at slaughter, weight of chickens at slaughter, birds per man hour, processing line speeds, and labor hours per pound;

(e) Inventory levels of chickens; and

(f) Financial information, such as monthly operating profit per live pound, sales per live pound, and cost per live pound.

**Answer to Paragraph 84**: Wayne Farms admits that the USDA publishes pricing information regarding the chicken industry. Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

85. Agri Stats collects data from Defendants, audits and verifies the data, and ultimately reports back to, Defendants detailed statistics on nearly every operating metric within the industry, including the size and age of breeder flocks. Agri Stats' survey methodology involves – from and

to Defendants – direct electronic data submissions of financial, production, breeder flock size and age, capacity, cost, and numerous other categories of information by each chicken producer on a weekly and monthly basis. At each of Defendants' chicken complexes, certain employees, typically in the accounting department, are responsible for submitting the data to Agri Stats once a week (historically, on Thursdays) using an AS400 data link system. Agri Stats uses a detailed audit process to verify the accuracy of data from each complex, often directly contacting Defendants to verify data before issuing reports to Agri Stats subscribers.

**Answer to Paragraph 85**: Wayne Farms admits that Agri Stats has collected information from Wayne Farms on a confidential basis, and that Agri Stats has reported anonymized information to Wayne Farms for pro-competitive benchmarking purposes. Wayne Farms denies any remaining allegations to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

86.     Agri Stats describes itself as a "benchmarking" service that "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance." Sanderson Farms CEO Joe Sanderson claimed "[w]e use Agri Stats, which some of you are probably familiar with. Agri Stats is a benchmarking service that we submit data to. Almost everyone in our industry does as well. And we get the data back. It's anonymous – the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over the industry."

**Answer to Paragraph 86**: Wayne Farms admits that Agri Stats purports to maintain the confidentiality and anonymity of individual companies in its reports, but otherwise denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that

34

this paragraph appears to be selectively quoting from—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

87. However, contrary to these assertions, Defendants can (and do) readily determine "whose numbers the numbers belong to." Indeed, each Defendant knows that when it provides its internal, confidential information to Agri Stats, the other producers will be able to access that information and identify the Defendant that submitted it. There is no legitimate purpose to provide this specific, competitively-sensitive information to Agri Stats, nor is there any legitimate purpose for Agri Stats to disseminate the information in the detailed, readily-decipherable form in which it is sent to Defendants; rather, it is provided, compiled and transmitted for anti-competitive purposes.

**Answer to Paragraph 87**: Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.

88. Agri Stats' critical importance for a collusive production-restriction scheme in the chicken market lies not only in the fact that it supplies data necessary to coordinate production limitations and manipulate prices, but also in its market-stabilizing power. Price-fixing or output-restricting cartels, regardless of industry, are subject to inherent instability in the absence of policing mechanisms, as each individual member has the incentive to "cheat" other members of the cartel - for example, by boosting chicken production to capture higher prices even as other cartelists heed their conspiratorial duty to limit production, which is what happened in the chicken industry for a short period in 2010, when Defendants' conspiracy temporarily faltered.

35

**Answer to Paragraph 88**:  Wayne Farms denies the allegations in this paragraph.

89.     Agri Stats' detailed statistics - coupled with its regular, in-person meetings with each Defendant and routine participation in trade association events widely attended by Defendants' senior executives - serve an indispensable monitoring function, allowing each member of Defendants' cartel to police each other's production figures (which are trustworthy because they have been audited and verified by Agri Stats' team) for any signs of "cheating."

**Answer to Paragraph 89**:  Wayne Farms denies the allegations in this paragraph.

(i)     Agri Stats' Detailed Reports Enable Defendants to Accurately Assess and Monitor their Competitors' Production Levels and Breeder Flocks

90.     Agri Stats claims to maintain the confidentiality and anonymity of individual companies' data by giving each company a report identifying only that company's specific chicken complexes by name, but not identifying by name other chicken producers' complexes described in the report, but rather, listing competitors' complexes by number.  But Agri Stats reports are so detailed that any reasonably-informed producer can easily discern the identity of its competitors' individual chicken complexes.  It is common knowledge among producers that others can do so, with some Defendants referring to the task of determining the identity of individual competitor's data as "reverse engineering."

**Answer to Paragraph 90**:  Wayne Farms admits that Agri Stats purports to maintain the confidentiality and anonymity of individual companies in its reports, but otherwise denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms admits that this paragraph appears to be referencing —and attempting to characterize—one or more documents that speak for themselves.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

36

91.     As described above, Agri Stats reports identify each complex with unique numbers, including a coding system identifying the region and sub-region, for each chicken complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself.  Specific complexes are easily identifiable from their codes. Agri Stats' coding system made it easy for Defendants' employees – some of whom, including senior executives at both Wayne Farms and Pilgrim's, used to work at Agri Stats – to decipher production, feed, sales and other competitively-sensitive metrics for their competitors' facilities.

**Answer to Paragraph 91**:  Wayne Farms admits that this paragraph appears to be referencing —and attempting to characterize—one or more documents that speak for themselves. Wayne Farms admits that certain Agri Stats reports contain data on an anonymized basis, but otherwise denies the allegations in this paragraph to the extent they relate to Wayne Farms.

92.     In fact, Agri Stats' coding system, coupled with the insular nature of an industry where "everybody knows everybody," allows for Defendants' employees to identify individual producers' data by eyeballing the rows in any Agri Stats report.  The coding system has never changed (*e.g.*, the Tyson complex in Cummings, Georgia has always been identified as complex "222"), meaning that once a Defendant deciphered the numeric code for a given competitor's complex, that Defendant had the ability to know their competitor's data indefinitely.

**Answer to Paragraph 92**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

93.     Agri Stats plays a particularly important role in Defendants' signaling practices and policing efforts.  The specific type or size of breeder flock housing, breed of chick, average bird size, and production levels listed in Agri Stats data for Defendants' complexes allows any given

Defendant to "reverse-engineer" and interpret the public statements and other publicly-available information about its competitors to determine which complexes are cutting back, and by how much. For example, if in January, a Defendant publicly states its intention to reduce production – even generically, without specifying which complexes will cut back, or by how much – all of their fellow cartel members will be able to tell from the February and March Agri Stats reports whether that Defendant is following through on its conspiratorial agreement. Further, Defendants Tyson, Pilgrim, and Sanderson are public companies that report some aggregated data publicly, which executives from other companies use to match up against the far more detailed information in the Agri Stats' reports to identify other specific data from their competitors.

**Answer to Paragraph 93**: Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

94. Each Defendant receives numerous types of Agri Stats reports, including separate targeted reports for each major area of operations, such as breeding, hatching, hauling, feeding, processing, selling, and administration. Defendants' complex managers typically receive the targeted reports for the specific aspects of chicken operations for which they have responsibility, and the CEO, CFO, and a few other of Defendants' top executives receive Agri Stats' monthly "Bottom Line Report" (which, for a portion of the relevant time period, was called the "Executive Report") geared to top level executives. The Bottom Line Reports contain one row for each chicken company reporting to Agri Stats with columns for certain categories of information, such

as operating profit dollars, profit percentage, corporate SG&A (aka overhead), interest expense, and other key operational information related to sales, revenues and costs.

**Answer to Paragraph 94**:  Wayne Farms admits that it has transferred data to Agri Stats on a confidential basis and that Agri Stats has reported anonymized information to Wayne Farms for pro-competitive benchmarking purposes. Wayne Farms also admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms denies the remaining allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

95.     Within each Agri Stats report (including the Bottom Line Report), unique information referring to supposedly "anonymous" data permits Defendants to identify their competitors' information contained within each category of report.  For example, Agri Stats data on "Actual Live Production Cost," one of many important industry metrics listed in the Bottom Line Report, includes line-items for each of the "sub-regions" (described above) that shows, for each particular sub-region, the weighted average figures for "chick cost," "grower cost," "feed ingredient cost," "[feed] mill delivery cost," and "vaccination and medical cost."

**Answer to Paragraph 95**:  Wayne Farms also admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms denies the remaining allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

96.     Information helping Defendants to assess the size and age of breeder flocks is available in the "Growth Rate Report" section of Agri Stats, which includes complex-by-complex

numbers showing the average age, in weeks (*e.g.*, "63.22" or "51.76") of the hens whose eggs, when hatched, become the chickens later killed for meat consumption and supplied to Plaintiff and other chicken buyers. The hens comprising the breeder flocks produce fertile eggs (at a rate of roughly five per week) starting around 20 weeks of age, and are typically slaughtered at 65 weeks of age, when breeder hens lose the ability to consistently lay fertile eggs. A breeder hen killed at 60 weeks lays 25 fewer eggs than a hen killed at 65 weeks, meaning that there are 25 fewer chicks hatched and 25 fewer mature chickens available to Plaintiff and other chicken buyers.

**Answer to Paragraph 96**: Wayne Farms admits that it received anonymized benchmarking information from Agri Stats. Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

97. The bird-age data from the "Growth Rate Report" shows how close a given breeder flock is to the end of its egg-laying lifespan, giving Defendants insight into how much longer that flock's capacity to lay eggs will impact the supply of chickens available for slaughter further down the supply chain. In addition, because the "Growth Rate Report" is available each month, knowing the average age of a given flock from month to month can help determine when flocks are being slaughtered and removed from the supply chain (*e.g.*, if the average hen age drops to 4.00 weeks after being at 48.00 weeks in the prior month's "Growth Rate Report," that is a clear indication a breeder flock was slaughtered at 48 weeks).

**Answer to Paragraph 97**: Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves.

Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

98. The "Actual Live Production Cost" section of an Agri Stats report also includes (again, by sub-region), the average number and overall weight of the chickens being processed. Other sections of Agri Stats reports include similar, sub-region data for a range of competitively sensitive metrics, such as bird age and mortality, "chick cost per settled flock," and "grower expense." Knowing the number of complexes each Defendant operates in each sub-region – which, as detailed above, appear by name at the very beginning of the Agri Stats reports – any Defendant can, with relative ease, assess the performance of all competing complexes in a sub-region on a variety of important industry metrics.

**Answer to Paragraph 98**:  Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms denies the remaining allegations in this paragraph.

(ii) Agri Stats' Critical Role in the Chicken Industry

99. Agri Stats' role in the chicken industry extends far beyond the collection and dissemination of competitively-sensitive data.  It is an active and knowing participant in, and facilitator of, Defendants' scheme.  Agri Stats' employees confirm for Defendants the data for a particular company at quarterly meetings with each company, or at the numerous trade association meetings where Agri Stats executives present on a regular basis.

**Answer to Paragraph 99**:  Wayne Farms denies the allegations in this paragraph.

100. Agri Stats offers a service to Defendants whereby each quarter, personnel from Agri Stats meet with each Defendant's employees and give presentations about both company-and industry-wide data.  These meetings took place at both the production-plant level, where Agri Stats

41

personnel meet with Defendants' complex managers, and at the executive level, where Agri Stats personnel meet with the leadership of Defendants' hatchery, breeder and feed departments.

**Answer to Paragraph 100**:  Wayne Farms admits that it has met with representatives of Agri Stats, but otherwise denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

101.    Since Agri Stats travels and presents among Defendants regularly, discussing each Defendant's non-public, proprietary data, Agri Stats is in a unique position to share information among Defendants at these regular meetings.  And that is exactly what happened.  For example, during the conspiracy, mid-level Tyson personnel working at complexes in the Mid-Atlantic region were advised by their complex managers about competitors' non-public production information following quarterly meetings between the Tyson complex managers and Agri Stats account managers.

**Answer to Paragraph 101**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

102.    At these regular meetings with Defendants' executives, Agri Stats lead detailed discussions about industry profitability and the key contributing factors, including size and average age of chicken breeder flocks, average hatchability of eggs, mortality rates, average bird rate, feed cost, and other performance factors based on data Defendants provided.  Agri Stats also led discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and the top and bottom third of the industry.  Agri Stats also told Defendants' executives how much the industry was over- or undersupplying the market and estimated demand, and shared other information based on data Defendants provided.

**Answer to Paragraph 102**: Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

103. Agri Stats' presentations to the Defendants were based in part on color-coded data compilations, known as "books," specifically tailored for each Defendant based on the data the Defendant has submitted to Agri Stats. Agri Stats maintained at least six "books" for each Defendant: (1) the light-blue "Live" book, with information on the Defendant's breeders, hatchery feed and grow-out; (2) the red "Sales" book, with information on the Defendant's current and year-to-date sales; (3) the light-green "Production" book, with information on the Defendant's yields; (4) the brown "Profit" book, with information on the Defendant's profits and losses; (5) the mustard-yellow "Rendering" book, with information on the Defendant's rendering facilities; and (6) the "Bottom Line" book, with information on the totality of the Defendant's sales, revenues and costs.

**Answer to Paragraph 103**: Wayne Farms admits that it has met with representatives of Agri Stats, but otherwise denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

104. Anyone at Agri Stats had the ability to pull one or more Defendant's "books" and relay that information to other Defendants. Indeed, Agri Stats has shipped copies of one Defendant's "books" to other Defendants on a number of occasions. Despite the impropriety and illegality of this practice, when it was discovered following a routine review of shipping

information, no one at Agri Stats was held accountable nor were the "books" returned to Agri Stats.

**Answer to Paragraph 104**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

105.    In addition to its in-person meetings with Defendants, Agri Stats employees, including company Vice President Michael Donohue and account managers Paul Austin, Paul Bunting and Dana Weatherford, regularly host, or present at, chicken industry events and investor conferences, often citing Agri Stats data in discussing market, production, and demand trends in the chicken industry.  For example, Agri Stats holds events known as "poultry outlook conferences." At one such conference on April 23, 2015 in Atlanta, Mr. Donohue made a presentation that included "broiler market situation and outlook" as an agenda item.

**Answer to Paragraph 105**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms admits that this paragraph appears to be selectively quoting from—and attempting to characterize—one or more documents that speak for themselves.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

106.    Mr. Donohue also helps forecast supply and demand for the chicken industry by using Agri Stats data on breeder placements and inventory. At the U.S. Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, for example, he noted that chicken breast prices were at a particularly high level and "[i]t's not just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012," he said.  "I hope this carries over into the latter half of 2012 based on some of the production forecasts that can be made based on breeder placements and inventories." Mr. Donohue

also noted a concern that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recovery] in the short term by filing up incubators again."

**Answer to Paragraph 106**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be selectively quoting from—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

    (iii)    <u>Defendants' Public Statements Show the Relevance of Agri Stats' Data to their Collective Efforts to Cut Production</u>

107. Defendants rarely mention their exchange of information with one another through Agri Stats. However, on certain public occasions, such as earnings or investor conference calls, executives from Defendants Sanderson and Tyson (two of the three publicly-traded Defendants) noted the important role Agri Stats data plays in the industry.

**Answer to Paragraph 107**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

108. For example, Defendant Sanderson's CEO, Joe Sanderson, commented on an earnings call that he *"look[s] at Agri Stats and see[s] what people are doing and not doing,"* and similarly stated on a May 2011 earnings call that "my judgment is that there will be some others that are going to have to make some adjustments that *I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats."* (emphasis added). Asked later on the May 2011

45

call by an analyst why Mr. Sanderson made this statement and another statement a few months

earlier that he "feel[s] confident that we are going to see cutbacks" based on Agri Stats data, Mr.

Sanderson indicated:

> Industry participants expected that [the market would improve in June and July] and I think they wanted to carry their production into June and July and see if the market would reward them for that it appears right now. . . . And then once you get past July 4 . . . I think then you will start seeing reduced egg sets. . . . Typically in my experience the first cut is not enough.

**Answer to Paragraph 108**: Wayne Farms denies the allegations in this paragraph to the

extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be

selectively quoting from—and attempting to characterize—one or more documents that speak for

themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the

truth of the remaining allegations in this paragraph and therefore denies them.

109.    Defendant Tyson similarly noted in a December 2014 investor presentation that:

> [t]he point being is that when you talk about the chicken cycle, most people will look at the cyclicality. It's very profitable right now. And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack. *We can tell that through Agri Stats.* Now at the same time, when there is more poultry available and the industry may not be as profitable, we would not expect to be anywhere close to what the bottom of that cycle would be.  (emphasis added)

**Answer to Paragraph 109**: Wayne Farms denies the allegations in this paragraph to the

extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be

selectively quoting from—and attempting to characterize—one or more documents that speak for

themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the

truth of the remaining allegations in this paragraph and therefore denies them.

110.    There is no plausible, non-conspiratorial justification for Defendants to use Agri

Stats to secretly share highly confidential and proprietary information about their breeder flock

size and age, pricing, capacity, production, and costs at the level of detail at which they do.  In a

46

competitive market, such proprietary, competitively sensitive information should be a closely guarded secret. Economic theory suggests that the routine exchange among competitors of such sensitive internal company information reduces competition.

**Answer to Paragraph 110**: Wayne Farms denies the allegations in this paragraph.

111. One chicken industry expert testified in a case against defendant Pilgrim's brought under the Packers and Stockyard Act, 7 U.S.C. §§ 181-229, that sharing information through Agri Stats by chicken producers regarding pay for contract farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern." The same expert also remarked that Agri Stats was unusual even among other price surveys, noting:

> [t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue. Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive. As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry. An intensive inquiry is needed.

**Answer to Paragraph 111**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be selectively quoting from—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

112. When given access to Agri Stats' reports in connection with litigation where he served as an expert witness, an agricultural economist who, to that point, had only "heard rumors of a secretive poultry industry information-sharing service," said that he "was shocked at the incredible detail" of the information presented in the reports.

**Answer to Paragraph 112**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be

47

selectively quoting from—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

113.     A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively-sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:

> Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue.  My experience is that competitors . . . are prolific at quantifying their competitor's business information on their own.  For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company . . . started for the poultry industry in 1985. AGRISTATS has the following mission statement:  "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING ACCURATE AND TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES." Note the mission is to share comparative data while protecting individual companies.  I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved. Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

**Answer to Paragraph 113**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be selectively quoting from—and attempting to characterize—one or more documents that speak for themselves.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

114.     A 2017 *Bloomberg News* article titled "Is the Chicken Industry Rigged? Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," highlighted the role Agri Stats plays in Defendants' efforts to monitor and police their cartel:

Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data – for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence - so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."

**Answer to Paragraph 114**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be selectively quoting from—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

## B. Defendants' Conspiracy Artificially Increased and Maintained Chicken Prices

115. Defendants adopted a two-pronged approach to illegally control the chicken market, increase prices, and boost their profits. One prong targeted output, in particular the beginning of the supply chain (reducing breeder flocks); the other prong targeted the end of the supply chain (the Georgia Dock benchmark price).

**Answer to Paragraph 115**: Wayne Farms denies the allegations in this paragraph.

(i) Defendants' Historical Methods of Controlling Chicken Supply Are Ineffective in the Year Immediately Preceding the Conspiracy

116. In the year preceding the beginning of Defendants' conspiracy, the U.S. chicken market was foundering. In 2007, a glut of chicken - the result of significant overproduction by Sanderson Farms, Mountaire Farms and Raeford - began to flood the market, and prices cratered.

By the time the Great Recession hit the American economy in 2008, the oversupply and low prices of chickens put Defendants - individually and collectively, as an industry - in dire straits.

**Answer to Paragraph 116**: Wayne Farms denies the allegations in this paragraph.

117.     In 2007, the two largest chicken producers, Pilgrim's and Tyson, reduced their production, and a few other producers - Foster, Peco Farms and Perdue - followed their lead.  But cuts by only five industry participants were not enough to affect industry supply to the point that prices would meaningfully increase.  In addition, production cuts in 2007 followed the typical pattern of focusing on short-term reductions in production, such as slaughtering chickens early, but not on significant cuts at the top of the supply chain, particularly culling of breeder flocks, which have longer-term effects on supply.

**Answer to Paragraph 117**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

118.     In 2008, the first year of the Great Recession, Defendants faced what promised to be a historically bad year for the chicken industry.  So they made a conscious, joint decision not to return to the previous industry practice of short-term or medium-term production cuts, which had led to the destructive boom-and-bust cycles that plagued chicken producers for years.

**Answer to Paragraph 118**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

119.     Rather, in early 2008, through press releases, earnings and investor calls, at investment bank conferences, at events hosted by Agri Stats, and at the myriad trade association meetings attended by many of their senior-most executives, Defendants began calling on the industry to heed the mistakes of the past, preaching to one another that oversupply was decimating industry profits, and increased supply-side "discipline" was needed to halt the downward trajectory of chicken prices.

**Answer to Paragraph 119**:  Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

120.     This production "discipline" – *i.e.*, the reduction or relative stabilization of industry capacity, particularly at the breeder flock level, where such efforts would be most effective – was a mechanism to increase Defendants' profits.  Defendants' efforts were supported by public statements made by their executives, which involved more than an announcement of a Defendant's own conduct.  In fact, as alleged below, many of Defendants' executives' calls for a new era of "discipline" included explicit statements that deeper production cuts were an industry-wide imperative that would pay dividends for "the industry" as a whole.  Defendants, who collectively control nearly 90% of the U.S. chicken market, jointly engaged in this production reduction effort.

**Answer to Paragraph 120**:  Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.

Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

121.    While spearheaded primarily by the CEOs and senior personnel of Defendants Tysons and Pilgrim's – who, as publicly-held entities holding sizable, but by no means controlling, shares of the U.S. chicken market, were well-positioned to rally the entire industry – Defendants' executives' public discussion of industry conditions was not limited to the larger, publicly-held Defendants.  For example, Mike Welch, CEO of Defendant Harrison, was (along with Sanderson COO Lampkin Butts) a panelist at a symposium hosted by industry journal Watts PoultryUSA, where the discussion topics included industry consolidation, efficiency, and bird size, with references to information gleaned from Agri Stats (whose vice president, Mike Donohue, was in the audience).[3]

**Answer to Paragraph 121**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to quote— and attempts to characterize—one or more documents that speaks for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

(ii)    <u>The Conspiracy's First Prong:  Defendants Depart from Historical Practice by Collectively Reducing Breeder Flocks in Unprecedented Amounts Beginning in 2008</u>

122.    Beginning in early 2008, Defendants implemented the first prong of their conspiracy by making significant production cuts, including unprecedented cuts in their breeder

---

[3] Excerpts of comments made by Messrs.  Welch and Butts are publicly available on Watts PoultryUSA's YouTube channel.  *See* "Broiler company executives say bird size increase will continue," available at https://www.youtube.com/watch?v=ZBgEecBi7D4 and "Lampkin Butts describes changes in the poultry industry," available at https://www.youtube.com/watch?v=RN1IAphbQXs&t=53s.  (both last visited December 2, 2017).
**Answer to Footnote 3**:  This footnote does not contain factual allegations to which a response is required.  To the extent a response is required, Wayne Farms denies the allegations in this footnote.

flocks. The vertically integrated Defendants have the ability to manipulate supply to the chicken market at one or more stages of the supply chain.  At the top of the supply chain, Defendants can most effectively manipulate supply by reducing the size of breeder flocks, and retiring or killing breeders at an earlier age than the optimum age.  Reducing breeder flocks has the most significant, and long-lasting, effect on supply of chickens in the market.

**Answer to Paragraph 122**:  Wayne Farms denies the allegations in this paragraph.

123.    Because breeder flocks are created from a limited pool of so-called "grandparent" chickens from one of only three genetics companies (Aviagen, Hubbard, and Tyson's Cobb-Vantress), it takes substantial time - anywhere from six to eighteen months or more - to re-populate a breeder flock that has been reduced through early culling.  While Defendants continued to use their historic methods to affect their supply-reduction scheme (at the middle or end of the supply chain, such as by reducing eggs placements, killing newly-hatched chicks, or idling processing plants), their conspiracy was cemented by the long-term effects of breeder flock reductions.

**Answer to Paragraph 123**:  Wayne Farms admits that Aviagen, Cobb-Vantress, and Hubbard are poultry genetics companies, and that breeder hens produce eggs that may be incubated at hatcheries.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

124.    Defendants' collective output-restriction caused a significant slowing in overall chicken production during the conspiracy – bucking the historic trend of steady annual production increases. The overall effect of this prong of Defendants' conspiracy is shown in the graph below, drawn from USDA data,[4] showing that while chicken production grew a total of 21% from 2000

---

[4] NASS, Chickens, Young, Slaughter, FI, Certified, Chilled & Frozen – Production, Measured in LB, available at https://quickstats.nass.usda.gov/results/C33961EC-6D46-31DE-8CCB-89780E3D1620 (last visited December 2, 2017).

to 2008 (an average of 2.3% per year, proof that the "3% more broilers" quip is more than anecdotal), but then slowed to a total of roughly 10% from 2008 through 2016 (an average of slightly more than 1% per year) – a significant decrease in the pace, timing and manner of chicken production during the conspiracy period :



**Answer to Paragraph 124**: Wayne Farms admits that this paragraph appears to depict— and attempts to characterize—a graphic that speaks for itself. Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient

**Answer to Footnote 4**: This footnote does not contain factual allegations to which a response is required. To the extent a response is required, Wayne Farms denies the allegations in this footnote.

knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

> **(a)** **Defendants' Executives Publicly Decried the Effect of Oversupply on "Our Industry," Telling their Competitors that Unified Action Was Necessary**

125.    On January 23-25, 2008, Defendants attended the International Poultry Expo conference in Atlanta where, according to the trade association organizing the annual multi-day event, attendees representing over 99.4% of the production of the major chicken companies participated.    Numerous employees from Defendants attended the conference, including Defendants' senior executives.

**Answer to Paragraph 125**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

126.    On a January 28, 2008, earnings call, Tyson CEO Dick Bond – who in the same call, disclosed that the company had re-joined Agri Stats and had "just recently . . . got our first series of data" – stated that "we have no choice [but] to raise prices substantially." However, the commodity nature of chickens does not allow one producer to successfully raise market prices in the absence of widespread reductions in supply relative to the then-current demand, so Mr. Bond's comment does not make sense absent an intention (or knowledge) on his part that Defendants would coordinate an industry-wide reduction in supply.

**Answer to Paragraph 126**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

127.    The day after Tyson's statements confirming its use of Agri Stats and expressing its plans to increase prices, Pilgrim's told its competitors to reduce their production of chickens to allow prices to recover.  On a January 29, 2008, earnings call, Pilgrim's CFO Rick Cogdill said the industry's oversupply of chickens was hurting market prices.  Mr.  Cogdill explained that Pilgrim's had done its part in 2007 by reducing production 5%, so "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."

**Answer to Paragraph 127**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

128.    Mr.  Cogdill went on to explain that Pilgrim's alone could not reduce supply enough to help market prices recover, and that its past efforts to reduce supply had merely led to smaller players increasing their market share at Pilgrim's expense.  Mr.  Cogdill noted that "[W]e have walked away from sales in certain cases, where the pricing just did not make any sense.  So we are trying to hold the line.  We are losing at times the competitive bids . . . . So we are trying to take a leadership position from a pricing perspective."  He then made the following statements urging Pilgrim's competitors to do their part in reducing chicken industry supply:

- "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs.  We were the leader in cutting production last year to help drive that. . . [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price;"

- When asked by an analyst "do you have an estimate internally of what the state of oversupply in the industry might be? What you would hope to see cut from others that would make you feel like the industry was more rational?" Mr. Cogdill replied "It's really hard to say that the faster we get to production adjustment the quicker the recovery could happen . . . . And if the industry doesn't react soon enough it will have to react stronger in the end;" and

- Mr. Cogdill responded to an analyst's query about the industry's failure to follow Tyson's 2007 cuts by stating that, "I think you kind of hit on it there. . . . It's not like we had 5% of

surplus capacity that we could just reduce our operations and not feel that . . . I mean we cannot be the ones that are out there continually reducing production, and let the other producers capitalize on that. I mean if it's 5% last year, 5% this year, 5% next year, you can see that that's a spiral to the demise of our company, which we are not willing to accept."

**Answer to Paragraph 128**: Wayne Farms admits that this paragraph appears to quote—and attempts to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

129. On a January 31, 2008, earnings call, Sanderson Farms CEO Joe Sanderson explained that he, too, anticipated the industry would cut production. Asked about production cuts by an analyst, Mr. Sanderson replied "we could see some reductions in production." Asked to expand on his comments by another analyst, Mr. Sanderson said he thought a production cut was "probable" and "if it's bad and ugly and deep in February, March and April, you'll see the production cuts take place during that period of time. There's still 25% of the industry still making money but I would expect to see those reductions come over the next 90 to 120 days."

**Answer to Paragraph 129**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

### (b) Defendants Begin to Cut Production in Concert

130. Around March 4, 2008, senior executives from Defendants, including Pilgrim's newly-installed CEO, Clint Rivers, Tyson Senior VP Donnie Smith, and Fieldale Farms President Thomas Hensley, met in Washington, D.C., at an Executive Committee meeting of the National Chicken Council's Board of Directors.

**Answer to Paragraph 130**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

131.    Shortly after that trade association meeting, Pilgrim's again sounded the call to cut overall industry supply, but this time it backed up its rhetoric with production cuts.  On March 12, 2008, Pilgrim's new CEO Clint Rivers, publicly announced the closure of seven chicken facilities in order to reduce industry oversupply, stating "we believe [these] actions . . . are absolutely necessary to help bring supply and demand into better balance . . . . That portion of the demand for our products that exists solely at pricing levels below the cost of production is no longer a demand that this industry can continue to supply." (emphasis added).

**Answer to Paragraph 131**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

132.    Normal supply and demand would suggest that in the wake of substantial supply cuts by Pilgrim's, other chicken producers would increase their production.  Yet just the opposite occurred.  Following Pilgrim's announcement, a series of production cuts were publicly announced by other Defendants between April 3-11, 2008:

April 3, 2008:  Fieldale Farms announced a 5% production cut stating that "We're hoping this cut puts supply and demand back into better balance." Fieldale Farms is not a publicly-traded company, and there was no reason – other than signaling to its fellow cartelists that it was following through on its conspiratorial agreement – why it would publicly disclose its production plans.

April 9, 2008:  Simmons announced in a press release a 6% reduction in production throughout its processing plants, a move heralded by Wall Street analysts, who noted that production cuts across smaller companies in the chicken industry, like

Simmons, would be positive for chicken prices. Simmons is not a publicly-traded company, and there was no reason – other than signaling to its fellow cartelists that it was following through on its conspiratorial agreement – why it would publicly disclose its production plans.

<u>April 10, 2008</u>: Cagle's Inc. (later acquired by Koch Foods) announced in a press release a 4% reduction in processing of chickens, noting that the cut "will reduce product being sold through less profitable commodity outlets."

<u>April 3-11, 2008</u>: Wayne Farms, O.K. Foods, and Koch Foods each announced 2-8% reductions in production. None of these companies are publicly-traded, and there was no reason – other than signaling to their fellow cartelists that they were following through on their conspiratorial agreements – why they would publicly disclose their production plans.

**Answer to Paragraph 132**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

133. Several other chicken companies cut their production between April 1, 2008 and May 15, 2008, but did not publicly announce their cuts. But because of Agri Stats, there was not a need to make a public announcement. For instance, at his BMO Capital Markets Agriculture & Protein Conference presentation on May 15, 2008 at the Millennium Broadway Hotel in New York City, Sanderson Farms CEO Joe Sanderson stated – in the presence of several competitors attending the conference, including Pilgrim's CEO Clint Rivers and CFO Richard Cogdill and Tyson CEO Richard Bond – that "we have seen for the last 6 or 7 weeks . . . some companies in our industry announce cutbacks. There have been I think six companies have announced cutbacks. I know some companies have cut back and have not announced." Such knowledge of non-public production cuts by competitors is highly suggestive of communication among chicken companies, either secret direct communications among themselves, or using Agri Stats as a facilitator, or both.

**Answer to Paragraph 133**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

134. After seeing many of its competitors reduce production capacity between April 3-11, Pilgrim's realized that other Defendants were contributing to a widespread reduction in industry supply, and decided it could now take further steps to curtail supply. On April 11, 2008, Pilgrim's suggested it might close its large El Dorado, Arkansas processing plant, which employed 1,620 workers. Then, on April 14, 2008, it announced a further production cut of 5% of egg sets.

**Answer to Paragraph 134**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

135. On April 29, 2008, Tyson CEO Dick Bond told a Wall Street analyst, "I think the industry has changed . . . . I don't think the industry will be up that much anymore, we have seen some sizable declines here lately in egg sets and placements. So, we're going to be up a little bit but probably not a significant amount, not as much as we might have once anticipated."

**Answer to Paragraph 135**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

136. Despite the large number of coordinated production cuts announced by producers in April 2008, Pilgrim's concluded these cuts were not sufficient. So Pilgrim's CEO Clint Rivers

encouraged further action by the industry at a May 15, 2008, speech at the BMO Capital Markets conference at the Millennium Broadway Hotel – the same conference, also attended by Tyson CEO Richard Bond, where Sanderson Farms CEO Joe Sanderson disclosed his knowledge of non-public, unannounced production cuts by competitors. According to an industry publication, Mr. Rivers announced that he hoped to see the chicken industry continue to cut production to help the industry return to profitability, stating that "he would like the industry to trim total production by 3%-4%, calling it a prudent move in light of recent price volatility in the grain markets." He also noted that "[t]he cuts need to be fairly deep."

**Answer to Paragraph 136**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

137.    A market report from June 2008 noted that "[b]eginning in April [2008], the weekly hatchery data started to show declines in egg sets and chick placements relative to year-earlier, which confirms the announced intentions to reduce broiler production and will result in slaughter falling below year-ago by mid-June." The same report also noted that "[i]t is unclear how long the slaughter declines will continue, and if other companies will choose to cut production as well making them deeper than initially thought. Those who have announced cutbacks indicate they will continue until margins normalize. At this time we expect to see the declines continue until at least late 2009, and cuts could be deeper than now projected."

**Answer to Paragraph 137**: Wayne Farms admits that this paragraph appears to be selectively quoting from—and attempting to characterize—one or more documents that speak for

themselves.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

138.    A May 21, 2008, *Wall Street Journal* article noted that conditions in the industry were starting to change:  "Three things are making analysts more optimistic:  Companies are cutting production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines." The article also noted "[i]t is unusual for egg sets to decline at this time of year." The reason such a reduction was unusual in May is that egg sets result in chickens that are ready for market approximately 10 weeks later, which in this case would have been first week of August, and is still the peak of the high-demand summer grilling season.

**Answer to Paragraph 138**:  Wayne Farms admits that this paragraph appears to quote—and attempts to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

139.    During an earnings call on May 22, 2008, Sanderson Farms CEO Joe Sanderson was asked if he thought industry cuts were sufficient to keep the industry profitable in the autumn. In response, Mr. Sanderson noted, "[w]e don't know yet.  We will make a cut as we always do after Labor Day.  We will make a 4-5% cut following Labor Day as we always do going into Thanksgiving, Christmas, and January we reduce our egg sets and around Thanksgiving, Christmas, New Years and Martin Luther King.  That is a period of slow demand for us, and we don't announce that, but we always do it.  It is just a period when we take downdays and we will do that.  But if we think more is needed, we will evaluate that sometime in August, and if need be will do it.  We cut back in 2006, we cut back in '97-98.  I don't know if we announced it or not,

but we will do what we need to do." Mr. Sanderson provided no explanation why Sanderson Farms chose to publicly disclose its "regular" production cut if it had never done so in the past.

**Answer to Paragraph 139**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

140.    In early June 2008, Pilgrim's CEO Clint Rivers continued to keep up the drumbeat for further production cuts, noting in a June 4, 2008, presentation that "[o]ur supply in chicken, we are oversupply . . . we need to see some balance in the supply. . . . Simply put, at this time there is still too much breast meat available to drive market pricing significantly higher."

**Answer to Paragraph 140**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

141.    Other Defendant CEOs soon picked up on Mr. Rivers' call for further action.  On June 19, 2008, chicken industry executives participated in a media conference call intended to lobby the federal government to limit the ethanol mandate – a federal program requiring the production of corn-based ethanol, which Defendants claimed drove up their corn costs by lessening the amount of corn they could buy to feed their chickens.  According to one report, Mark Hickman, Chairman of the National Chicken Council and CEO of Peco Foods, told participants that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year.  'We are hearing talk that this was not nearly enough, so liquidation'" – a reference to the need for Defendants' decision to reduce chicken

breeder flocks to affect longer-term supply restraint in the industry, rather than the short-term production cuts like breaking eggs or slaughtering chickens earlier to reduce weight – '"is in round two.'"

**Answer to Paragraph 141**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

142.    On June 23, 2008, shortly after Peco Foods' CEO publicly suggested that further production cuts were needed, Wayne Farms announced a 6% production cut.

**Answer to Paragraph 142**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—a document that speaks for itself.  Wayne Farms further admits that it made a public announcement on June 23, 2008 about its independent decision to decrease in its own unique production levels for certain products, but otherwise denies the remaining allegations in this paragraph to the extent they relate to Wayne Farms, including any characterization or description that is inconsistent with the referenced document.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

143.    On June 23-25, 2008, USPOULTRY held its annual Financial Management Seminar.  Defendants' senior executives attended the seminar.

**Answer to Paragraph 143**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

144.    On July 2, 2008, Foster Farms announced it was abandoning plans to build a new chicken plant in northeastern Colorado that it had previously announced in April 2008 would employ about 1,000 people.  In a statement, Foster Farms CEO Don Jackson noted "[i]n these difficult conditions with costs escalating primarily due to grain and fuel prices and chicken prices lagging it does not make economic sense to go forward with expansion at this time."

**Answer to Paragraph 144**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

145.    On July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets, citing "record high prices for corn and soybean meal, which it attributes to the U.S. government's mandated ethanol policies along with recent flooding in the Midwest 'Corn Belt' region."

**Answer to Paragraph 145**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

146.    On July 20-22, 2008, the National Chicken Council held a three-day "Chicken Marketing Seminar" attended by Defendants' senior executives.  The event was billed as a marketing seminar that "includes social networking events and recreational opportunities, including a golf tournament."

**Answer to Paragraph 146**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves.

Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

147.     On August 11, 2008, Pilgrim's announced the closure of its Clinton, Arkansas, processing plant and a facility in Bossier City, Louisiana.  Pilgrim's press release noted the closures "are part of the company's ongoing effort to operate more efficiently and return to profitability amid high feed costs and an oversupply of chicken on the market." The closure of the Clinton processing plant represented an additional 1.25% incremental increase of the company's previously announced production cuts.  Pilgrim's stated that it would keep both plants idled until "industry margins can be sustained at more normalized levels of profitability." Pilgrim's also noted that "[w]ith Labor Day approaching and no indication that the actions taken to date by Pilgrim's Pride or other industry members are having a positive effect on selling prices for our products, it is now clear that more significant decisive action is necessary."

**Answer to Paragraph 147**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

148.     In August 2008, Raeford (a non-public company) announced that it would begin reducing its chicken production by 5 percent.  The company said in a statement that "[t]he current obstacles that face our industry require that supply be brought in line with demand." A production cutback was remarkable for Raeford, which had pursued a strategy of aggressive production growth that resulted in the company doubling its chicken production from 2001 to 2007.

**Answer to Paragraph 148**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves.

66

Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

149.     On an August 26, 2008, earnings call, Sanderson Farms CEO Joe Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand." When asked later whether the industry had already made enough production cuts, he noted "we kind of thought we were going to see reductions in July . . . [based on] 213/214 [million] egg sets back in April and that really did not materialize.  When you look at USDA slaughter numbers in July, they were 100% and 101% and now we're looking at egg sets of 206 and 207 million that are going to show up sometime in October or November. We'll see when we get there.  Those are barely impressive cuts.  My suspicion is, as I've told you in May, the industry typically make the cut [sic] and it's tentative.  We'll have to see if it works. . . . I'm very skeptical that those cuts are going to be enough to return us margins to cover these grain costs."

**Answer to Paragraph 149**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

150.     By September 2008, chicken industry publication Watts Poultry USA reported that "[m]ost U.S. chicken integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'"

**Answer to Paragraph 150**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves.

Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

151.    On October 3, 2008, Defendants' senior executives attended the National Chicken Council's Annual Meeting in Washington, D.C. Agri Stats CEO Blair Snyder – elected the day before as a "director-at-large" to the National Chicken Council's board – moderated a CEO panel that included Pilgrim's, Tyson's, Perdue's, and Sanderson Farms' CEOs.  Explaining Pilgrim's desire to push through an industry-wide price increase, Pilgrim's CEO Clint Rivers told panel members and the audience "[w]e need to get those [input] costs pushed through, but we've yet to see that happen."

**Answer to Paragraph 151**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

152.    On October 10, 2008, in response to a USDA report of falling egg sets in the chicken-industry, Pilgrim's told the Associated Press that "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

**Answer to Paragraph 152**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

153.    Indeed, an industry analyst noted that at the time "the industry has cut about 10 to 12 percent of its production."

**Answer to Paragraph 153**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

154.    During Autumn 2008, Sanderson Farms also implemented its previously announced "fall cuts" a month early and delayed the opening of a new deboning facility.

**Answer to Paragraph 154**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

155.    On October 18, 2008, Wayne Farms President & CEO Elton Maddox released a statement (even though Wayne Farms was not a publicly-traded company) announcing the closure of the company's College Park, Georgia plant, resulting in the layoff of over 600 employees. Mr. Maddox cited "changing market conditions" and a need to "maximize efficiencies" as justification for the plant closure.

**Answer to Paragraph 155**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms admits that it made a public announcement on October 17, 2008 regarding its own independent decision to begin a phased transfer of production away from its College Park, Georgia further processing facility in 2009, but otherwise denies the remaining allegations in this paragraph, including any characterization or description that is inconsistent with the referenced document.

156.    On a November 10, 2008 earnings call, Tyson CEO Dick Bond claimed that Tyson would not be making additional production cuts because it had already done its part to reduce industry supply with prior production cuts, citing the company's focus on "supply and demand." Yet despite protestations to the contrary, Tyson, in fact, substantially reduced production in December 2008.  First, on December 18, 2008, Tyson announced the canceling of a deboning contract with Petit Jean Poultry at Petit's Little Rock, Arkansas processing plant that resulted in the layoff of 700 Petit employees.  Second, by December 23, 2008, it was reported that Tyson had cut its production by 5%.  Asked by a reporter about the cuts, Tyson spokesman Gary Mickelson stated that "[w]hile we would rather not share details of our current poultry production levels, we can tell you we continue to closely evaluate market conditions in an effort to match customer demand with our supply." Tyson also noted that it had reduced production "in recent years through the closing or sale of poultry plants and by running the company's remaining operations at reduced capacity utilization."

**Answer to Paragraph 156**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

157.    On January 28-30, 2009, Defendants' senior executives attended the 2009 International Poultry Expo in Atlanta, Georgia.

**Answer to Paragraph 157**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

158.    In a February 18, 2009, interview, Tyson Senior Group Vice President Donnie Smith noted that "[a]cross our industry, we're down about six percent versus where we were a year

ago. We're seeing an impact from that on market prices . . . the industry fundamentals are improving."

**Answer to Paragraph 158**: Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

159. In late February 2009, a report noted that Pilgrim's had cut another 9-10% of its production. According to the same report, Tyson told the audience at a February 2009 investors' conference that it did not intend to reduce its production further because "[u]sing WATT PoultryUSA data on ready-to-cook (RTC) pounds, our numbers have declined 5-7% from 2000 to 2008 on RTC pounds while at the same time the industry has grown 31%. Over time, we have done plenty of cutting back." In other words, Tyson felt it had already taken its fair share of needed production cuts, so competitors needed to take any further action. However, as indicated below, Tyson's statements about not reducing production appear to be posturing, because generally Tyson did reduce its production during the 2008-2015 time period in line with other producers, apparently hoping the threat of it not reducing production would lead other producers to reduce production first.

**Answer to Paragraph 159**: Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

160. By February 25, 2009, Sanderson Farms told *The Morning News* of Northwest Arkansas that it had made cuts to its supply of chickens by processing smaller chickens and running

71

its plants at lower capacity utilization rates. Sanderson Farms also told a group of investors around this time that "[b]ecause we don't expect much help from the demand side, chicken market improvement will have to come from supply cuts."

**Answer to Paragraph 160**: Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

161. Similarly, the CEO of Simmons Foods (a non-public company) Todd Simmons noted in a February 25, 2009, interview that "[w]e are seeing lower demand in the food-service customer base. We have made adjustments in bird weights to ensure our production meets with our customer's needs."

**Answer to Paragraph 161**: Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

162. Seeing further cuts from smaller producers in the industry led Pilgrim's to announce historically large cuts to its production on February 27, 2009. In a press release announcing the closure of three processing plants located in Douglas, Georgia, El Dorado, Arkansas, and Farmerville, Louisiana, Pilgrim's stated the plants were "underperforming" and said the closures would "improve the company's product mix by reducing commodity production and to significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession." Pilgrim's also stated that the idling of these three plants would reduce its total pounds of chickens produced by 9-10%.

**Answer to Paragraph 162**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

163.    Overall, "[a]t least 11 companies reported reductions in weekly ready-to-cook production in 2008," including Defendants Tyson, Pilgrim's, Perdue, Simmons, Raeford, Cagle's (later bought by Koch Foods), George's, O.K. Foods, Harrison, and GNP Company (now owned by Pilgrim's).  Other companies reduced their planned production levels or delayed the planned opening of new chicken complexes.

**Answer to Paragraph 163**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

### (c)    Defendants' Chicken Production Cuts, from 2008 to Early 2009, Included Unprecedented Reductions to Chicken Breeder Flocks

164.    As noted above, in 2008, Defendants ended a decades-long trend of annual additional chicken production, surprising industry observers.  What makes the production cuts in 2008 and early 2009 remarkable is that chicken producers did not just reduce the pounds of chickens they produced – they also went further up their supply chains than ever before to restrict their ability to ramp up production for years into the future.  While previous downturns had led some producers to use short-term methods to reduce overall pounds of chickens supplied to the market, in 2008, Defendants took their reductions to the next level by substantially reducing their breeder flocks, as shown in the highlighted section of the graph below:



**Answer to Paragraph 164**: Wayne Farms admits that this paragraph appears to depict –

and attempts to characterize – a graphic that speaks for itself. Wayne Farms denies the allegations

in this paragraph.

165.   The effect of the supply cuts on chicken pricing in 2008 and the first months of

2009 was clear – during the worst recession in generations, chicken prices rose through mid to late

2008, staying at or near all-time highs until late 2009. For instance, by May 28, 2009, Sanderson

Farms reported strong profits that were twice the estimates of Wall Street analysts, which

according to one industry publication was "aided by production cuts and lower feed costs that

offset still-weak demand."

**Answer to Paragraph 165**: Wayne Farms admits that there was a recession in 2007-2008,

but otherwise denies the remaining allegations in this paragraph to the extent they relate to Wayne

Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

166. Similarly, at a May 14, 2009, BMO Capital Markets conference in New York City, interim Tyson CEO Leland Tollett noted that "poultry market fundamentals had improved. Pullet placements, an[] indication of future broiler supplies, have been down the past five months compared to the same period last year. Egg sets continue to run six percent or more below year ago levels and cold storage inventories of poultry have declined about 20 percent since peaking in November 2008."

**Answer to Paragraph 166**: Wayne Farms admits that there was a recession in 2007-2008, but otherwise denies the remaining allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

167. During 2009 and 2010, Defendants' senior executives continued to meet with one another at trade association meetings and industry events, such as the National Chicken Council and the International Poultry Expo. For instance, at the National Chicken Council's October 2009 Annual Conference, one industry analyst wrote that participants had emphasized continued "production discipline," Defendants' euphemism for limiting chicken supply.

**Answer to Paragraph 167**: Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves.

Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

168.    However, as prices continued to rise during late 2009 and early 2010, producers started increasing production in response to the higher prices just as they had done in previous decades – although, because of 2008 and 2009's unprecedentedly deep and early breeder flock culls, this temporary spike in production took months to effectuate, rather than the few weeks it would have taken had producers killed off their breeder flocks at the rates and times at which they had done so in the past.  The rising production by producers in early 2010 led to a reported oversupply of chickens that began to depress prices by late 2010.  It was time for Defendants to revamp their faltering conspiracy to make it more effective.  Defendants had learned the value of coordinated supply reductions in 2008; they were quick to react with a new round of publicly-announced production cuts in the first half of 2011, which quickly helped prices recover.

**Answer to Paragraph 168**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

> (d)    **Defendants' Conspiracy, Hatched in the Great Recession Continued into 2011 With Another Round of Collective Production Cuts**

169.    On April 15, 2011, Defendant Mountaire disclosed, in a press report, the abandonment of a planned capacity increase, with Mountaire President Paul Downes explaining that "the only way to higher prices is less supply.  The only way to less supply is *chicken companies will shut down or cut back*. . . . I think that's what we're going to see." (emphasis added).

**Answer to Paragraph 169**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves.

Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

170.     Mr. Downes' view of the state of the chicken industry was echoed, and amplified in grim terms, by Joe Sanderson, CEO of Defendant Sanderson Farms, who stated on a May 24, 2011 earnings call that "*the deal is that the industry – forget Sanderson – the industry cannot sustain losses like they are sustaining for a long period of time.* They will – they can't do it and you have been observing this for years and years and the industry has been losing money since Novemberish and balance sheets deteriorate and losses have to stop. The only way to stop losses with $7 corn is to reduce production and get prices up. That is the rule and the law of the jungle." Mr. Sanderson continued, "my judgment is that there will be some others that are going to have to make some adjustments that *I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats.*" (emphasis added).

**Answer to Paragraph 170**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

171.     Mr. Sanderson's comments came roughly one week after he and Lampkin Butts, Defendant Sanderson's President and COO, attended the BMO Farm to Market Conference in New York City, along with the CEOs of Defendants Pilgrim's Pride (Bill Lovette) and Tyson (Donnie Smith). The conference included a presentation by Mr. Lovette that noted Pilgrim's new focus on matching production to meet demand, including by adjusting "head," *i.e.*, breeder flocks, to better balance supply and customer demand.

**Answer to Paragraph 171**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

172.    On a June 6, 2011 earnings call announcing it would not increase capacity in the foreseeable future, Cagle's – a Georgia-based integrator whose assets were bought by Defendant Koch Foods in 2012 following Cagle's bankruptcy – said that "*the industry must lower supply in order to offset reduced demand and to support higher market prices.*" (emphasis added).

**Answer to Paragraph 172**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

173.    Other Defendants, including Fieldale Farms and Mar-Jac, also began reducing production by cutting breeder flocks in the middle of 2011.

**Answer to Paragraph 173**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

174.    In June and July 2011, Defendants' senior executives attended industry events, including a seminar held by the U.S. Poultry & Egg Association and the 2011 Food Media Seminar, which included a panel made up of the CEOs of Defendants Tyson (Donnie Smith), Peco Foods (Mark Hickman), and Perdue (Jim Perdue), and Defendant Sanderson Farms' President and COO (Lampkin Butts).

**Answer to Paragraph 174**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

175.    On an August 1, 2011 earnings call, Defendant Sanderson Farms CEO, Joe Sanderson, informed analysts that the company's normal fall production cut of 4% beginning in November would remain in place beyond January 2012 or until such time as demand improved. Mr. Sanderson also stated that it "*wouldn't surprise me if the industry makes further, deeper reductions* in egg sets in October or November . . . Nobody knows what cuts might be needed until we get to October, but *I think that the cutbacks may need to be more than the 6% in head that the industry has in place*." (emphasis added).

**Answer to Paragraph 175**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

176.    A week later, Defendant Tyson's CEO said on an earnings call that "domestic availability must be in balance with demand before *industry economics can improve.*  Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter . . . . Our goal is to match supply to demand.  And following overproduction the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market." (emphasis added).

**Answer to Paragraph 176**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves.

Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

177.    In early October 2011, Defendants' senior executives attended the National Chicken Council's 57th Annual Conference in Washington, D.C. Among the discussion panels at the event was one about the "new paradigm" in the chicken industry.  The panel included senior executives from Defendants Perdue (Clint Rivers, by then Perdue's President of Foodservice and Supply Chain, after having been Pilgrim's CEO) and Koch Foods (Mark Kaminsky, COO and CFO).  Panelists said that "the industry is accustomed to cycles, but not one quite like the latest, and *companies are going to need to adjust*.  Discipline on the supply side was one suggestion. Getting better prices from retailers was another." (emphasis added).

**Answer to Paragraph 177**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

178.    Throughout 2012, Defendants continued to meet at trade association meetings and industry events, giving them the opportunity to discuss the impact of their collective production cuts and otherwise monitor their conspiracy.  In the first quarter of 2012, for example, Defendants' top executives attended the National Chicken Council's board of directors meeting in Atlanta, which was held in conjunction with the January 25-26, 2012 International Poultry and Processing Expo.  On March 20-21, 2012, the National Chicken Council's board of directors, which included many of Defendants' senior executives, met again in Washington, D.C.

**Answer to Paragraph 178**: Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

179.    In early 2012, Defendant Sanderson Farms cut its production by 4%, which included a reduction in breeder flocks.

**Answer to Paragraph 179**: Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

180.    At USPOULTRY's Hatchery-Breeder Clinic in January 2012 in Atlanta, Agri Stats Vice President, Mike Donohue, noted the importance of reducing breeder flocks, stating that "if the industry chose to do so, it could ramp up production within a 10-week period of time.  The industry could blow apart any recover[y] in the short term by filing up incubators again." But he also noted that the Agri Stats data indicated that the industry was slaughtering breeder flocks at 59 to 60 weeks, instead of the typical 65 weeks.  The kind of early slaughter of breeder flocks – including, for example, the bird-age data included in the "Growth Rate Report" described above – meant that Defendants subsequently were unable to increase production for at least eighteen months, as they would have been able to do had they not made cuts at the top of the supply chain.

**Answer to Paragraph 180**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

181.    The shift in the way the industry supplied chicken was summarized in a March 2012 report published by agricultural lender, CoBank.    Entitled "The U.S. Chicken Industry:

Re-invented and Revitalized" with sections captioned "'Same-Old, Same-Old' – No More" and "It's a New Ballgame," the report noted that the:

> U.S. chicken industry has gone through the proverbial wringer, but last year appears to have been the low point. In recent years, the chicken companies have all lost money, some more than others. And five U.S. companies have exited the industry since 2008. As the losses mounted, the industry realized that its standard business practices sorely needed to be reformed. The surviving chicken companies found it to be not just prudent, but absolutely essential to revise those practices. The poultry industry today operates much differently than it did just a few years ago.

**Answer to Paragraph 181**: Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

182. The CoBank report highlighted one of the reasons for this sea-change: the Defendants' reduction of breeder flocks that began in mid-2011, noting that "the recent cuts in the hatchery flock will prevent a quick response," with "U.S. chicken production [. . . ] on track to fall to its lowest level in 5 years by mid-2012." The highlighted section of the following graph shows that these cuts bucked the historical trend of breeder flock reductions, going even deeper than the then-unprecedented 2008-2009 cuts:



**Answer to Paragraph 182**: Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms further admits that this paragraph appears to depict – and attempts to characterize – a graphic that speaks for itself. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

183. The sentiment of CoBank's March 2012 report was mirrored by Pilgrim's CEO, Bill Lovette, on an April 27, 2012 earnings call, where he reported that "the die is cast for 2012," and that "we're comfortable that *the industry is going to remain constrained*." (emphasis added).

**Answer to Paragraph 183**: Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

184.    Trade association meetings and industry events in the middle of 2012 gave the Defendants additional opportunities to meet and discuss the effect of their collusive efforts to reduce production.  Examples of these opportunities to conspire included Urner Barry's annual marketing seminar, from April 29 – May 1, 2012, the National Chicken Council's board of directors meeting in Lake Tahoe on June 21, 2012, and the July 15, 2012 meeting of the National Chicken Council's marketing committee in Stowe, Vermont.  Each of these meetings were attended by a number of Defendants' senior executives.

**Answer to Paragraph 184**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

185.    On August 28, 2012, Defendant Sanderson Farms announced a further 2% production cut.

**Answer to Paragraph 185**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

186.    By September 2012, Defendants' 2011 production cuts, particularly their reduction of breeder flocks, had resulted in increased prices for Plaintiffs.  The higher chicken prices seen in the market by September 2012 were not justified by the costs of Defendants' primary inputs, corn and soybean meal, which by the fourth quarter of 2012, had dropped significantly in price following near-record highs in the summer of 2012.

**Answer to Paragraph 186**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient knowledge or information to

form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

187.     On October 10-11, 2012, the National Chicken Council held its annual meeting in Washington, D.C. Among Defendants' senior executives attending the meeting were the President of Defendant Fieldale Farms (Thomas Hensley) and CEO of Defendant O.K. Foods (Paul Fox). Messrs. Hensley and Fox participated in an "Industry Outlook Panel" where participants discussed the question of what the industry "learn[ed] from 2011 and *how will the industry apply those lessons in 2012 and 2013*." (emphasis added).

**Answer to Paragraph 187**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

> (e)     **Drastically-Reduced Breeder Flocks Boost Chicken Prices and Raise Defendants' Profits to Record Levels**

188.     For most of the remainder of 2012 through 2016, Defendants reaped the benefits of their coordinated supply restraints as prices rose and profits soared to record levels.  During this time, Defendants' executives repeatedly heralded the industry's newly found supply "discipline." For example, on a May 3, 2013 investor call, Pilgrim's Pride CEO, Bill Lovette, said that:

> Obviously, revenue is going to be a function of price, in part, and in this case a big part; and obviously, price is going to strengthen as supply continues to be disciplined and constrained . . . So I think *the industry is doing an admirable job in being disciplined* on the supply side and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying. . . . I believe *the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken* and not necessarily what corn or soybean meal costs.  I think I'm confident to say, *we've figured that out and we're doing a good job* of balancing supply and demand.  (emphasis added).

**Answer to Paragraph 188**: Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

189.    On the May 3, 2013 investor call, Mr. Lovette specifically referenced the continued importance of restraining the industry's breeder flocks:

> I only know what we've seen happen in the past. Now, certainly, this summer if *the industry chooses to grow the breeder supply significantly, that's definitely going to impact 2014. What I'm saying is, so far, we've seen no indication that the industry plans to grow the breeder supply and as a matter of fact, it's actually shrunk*. . . . I'll reiterate that *I think the industry has learned* that the economics of our business is tied very closely to the supply of chickens and *we've done a good job so far of maintaining discipline* such that even paying nearly $8.50 for corn, *we've been able to be profitable as an industry.* (emphasis added).

**Answer to Paragraph 189**: Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

190.    On October 4, 2013, Defendants' CEOs and other senior executives met at the annual meeting of the National Chicken Council in Washington, D.C., where a panel, including the CEOs of Defendants Tyson (Donnie Smith) and Simmons Foods (Todd Simmons), was "chipper about the prospects for their industry in the next few years."

**Answer to Paragraph 190**: Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

191.    Defendants had reason to be positive.  For example, on a February 21, 2014 earnings call, Pilgrim's Pride CEO, Bill Lovette, reflected on what had led to the company's record earnings.  Mr. Lovette noted that "I think the one thing that creates . . . has created the stability is *the discipline of the industry to not allow profitability in the past to drive supplies* in the future . . . . And I think that discipline really . . . is the one ingredient that has made for more stable earnings that we have seen." (emphasis added).

**Answer to Paragraph 191**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

192.    At a March 12, 2014 industry conference, Tyson CEO, Donnie Smith, told attendees that a "meaningful change" in chicken production would not occur until the second half of 2015, a statement he could confidently make because Defendants' unprecedented 2011-2012 cuts in breeder flocks made it impossible for them to "meaningfully change" chicken production any sooner.

**Answer to Paragraph 192**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

193.    An October 2014 CoBank analysis noted that Defendants' strategy of targeting breeder flocks paid dividends during 2013 and 2014.  According to the report:

> [P]roduct demand should remain robust through the rest of this year and well into
> 2015, bolstered by a gradually improving domestic economy, continued strength in
> export demand, and the towering prices of beef and pork.  Broiler production,
> however, has been slow to respond, with integrators having had problems

expanding the number of chicks placed for growout. Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015. Producers have been somewhat constrained in their attempts to expand the nation's chicken flock by the limited supply of broiler hatching eggs. When the broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been rebuilt to prior levels. Following seven months of [Year-over-Year ("YoY")] declines, the number of chicks placed for growout finally posted a modest 1 percent YoY gain in August. However, it will take another 6-9 months for integrators to rebuild the supply of broiler hatching eggs in preparation for expanding the overall flock, so significant growth in broiler production will not materialize until late 2015 or early 2016.

The October 2014 CoBank report also noted the effect of these production cuts, stating that wholesale prices for chicken "have risen to unusually high levels."

**Answer to Paragraph 193**: Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

194. During a February 12, 2015, earnings call, Pilgrim's President & CEO Bill Lovette summed up the restriction of supply which Defendants had implemented since 2008: "I looked at some numbers supplied by Agri Stats earlier in the week and found some interesting facts. If you go back to 2008, the industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies."

**Answer to Paragraph 194**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

195.    The year 2015, like 2014, was a banner year for Defendants' profits resulting from their conspiracy.  Watts PoultryUSA's March 2016 issue noted, for example, that Defendant Tyson had achieved "record earnings and sales in fiscal year 2015 . . . posting $40.6 billion in sales, including ringing up higher chicken sales. Yet, Tyson lowered chicken production in 2015. What's at work here? This paradoxical performance, in part, reflects the fact that Tyson, along with other top U.S. broiler companies, is redefining its business model to achieve profitable growth." The true explanation for the 2015 performance of Tyson and its competitors, however, was the conspiracy alleged in this Complaint.

**Answer to Paragraph 195**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

196.    This trend continued into 2016. With the notable exception of the Georgia Dock, chicken prices declined in 2016, but significantly less than input costs. Defendants maintained artificially high chicken prices and high profitability during 2016 by exercising "discipline" on the supply-restriction prong of their conspiracy.

**Answer to Paragraph 196**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks sufficient knowledge or information to

form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

197.    For instance, during an April 2016 earnings call, an analyst noted that Pilgrim's CEO, Bill Lovette, "mentioned that you think the industry domestically has been much more disciplined than they have been in the past, I'm wondering if you could just elaborate a little bit more on what sort of drives that view and then maybe what gives you confidence that this discipline will hold." Mr. Lovette responded, "[w]hat drives the view is the actual numbers that we see, ready to cook pounds are up about 3.1% year to date.  If you look at placements year to date, they're up 1%, egg sets up 0.7%, hatchery utilization actually declined in Q1 to 91%. So in the phase of coming off two of the most profitable years in the industry, we're not seeing, not realizing large amount of production increases."

**Answer to Paragraph 197**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

198.    Tellingly, Pilgrim's CFO Fabio Sandri added immediately after Mr. Lovette's comments that "what drove that I believe it is that *[the] industry is more geared towards profitability rather than just market share* or field growth." (emphasis added).  In other words, Defendants were no longer competing with one another to gain market share by growing their companies as one would expect in a competitive market, but instead, worked collectively to increase profitability by being "disciplined" in terms of supply growth.

**Answer to Paragraph 198**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

199.    Defendants also kept up the regular use of signaling one another to perpetuate their collusion during 2016 by using the code word "discipline" to note their continued adherence to the supply-restriction prong of their conspiracy by keeping breeder flocks low.  For instance, during a February 2016 earnings call, Pilgrim's CEO, Bill Lovette, noted that:

> [T]he industry continues to be disciplined in terms of U.S. supply.  Although monthly pullet data tend to be volatile and have occasionally been at the high end of our expectations, we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits [sic] and chick placements as a positive. We believe that at least part of the reason is because *chicken producers are being disciplined* and are much quicker to react than in the past and in adjusting supply growth to the actual market conditions.  (emphasis added).

**Answer to Paragraph 199**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

200.    Other CEOs also had to try to explain the marked shift in the chicken industry's profitability in recent years, after the decades-long pattern of boom and bust regarding chicken pricing and profitability.  During a February 2016 Sanderson Farms earnings call, BMO Capital Markets analyst Ken Zaslow noted the industry's history of volatility in pricing and profitability for chicken companies, questioning if there was "any changing of the industry dynamic" that had

occurred. Sanderson Farms CEO Joe Sanderson replied "we might be at a capacity wall, you know? . . . Since back in 2007 . . . there are three or four plants shuttered . . . It does feel different."

**Answer to Paragraph 200**: Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

201. On an analyst call on May 26, 2016, Mr. Sanderson echoed his earlier statements about how much the industry had changed since 2007, noting that "when you go back and look and see how many eggs are being set right now and you go back and look at what the industry will [*sic*] set in 2007 . . . egg sets in 2007 were 220 million eggs a week, and we're setting 208 million, 209 million, 210 million eggs a week." Mr. Sanderson's comments about egg sets were amplified by Pilgrim's CEO Bill Lovette later that summer, stating on a July 28, 2016 analyst call that "I think what we have seen with egg sets is absolutely a testament to the discipline of our industry that we've seen in the last really two to three years."

**Answer to Paragraph 201**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

202. On the July 28, 2016 call, Mr. Lovette also commented on Defendants' continued restraint of breeder flock population, noting that "the breeder flock in total is only up about 0.5%" over the same time period, and ended the analyst call describing the "positive notion [we] have about the discipline that we continue to see exhibited by the entire industry," which "gives us more

confidence that we're going to do the right thing with respect to maintaining that discipline. . . .and . . . gives us confidence that we're going to continue to be disciplined as an industry."

**Answer to Paragraph 202**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

203.    On an August 8, 2016 earnings call, Tyson's former CEO Donnie Smith - who was then transitioning the CEO role to Thomas Hayes, the company's former Chief Commercial Officer who became the CEO in late 2016 - stated that "our chicken business is . . . it continues to do great," a comment seconded by Mr. Hayes, who said about the company's chicken business that "year-over-year, we're doing great . . . all that business is very profitable to us."

**Answer to Paragraph 203**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

(iii)    The Conspiracy's Second Prong:  Collusively Manipulating the Georgia Dock Benchmark Price Index

204.    Defendants' successful efforts to boost chicken prices by collectively reducing supply was buttressed in the latter years of their output-reduction scheme, by collusively manipulating the Georgia Dock benchmark price index, a chicken industry pricing benchmark contained in contracts between Defendants and a significant proportion of their customers, including certain Plaintiffs.  The Georgia Dock, USDA Composite, and Urner Barry all measure

the same (or very similar) size and grade of chicken.[5] The Georgia Dock benchmark price index, like the other two indices, sets prices for both the "whole bird" and various parts of the chicken (wings, tenders, leg quarters, thighs, drumsticks and breasts) using the same pricing methodology. The "whole bird" price is the baseline for pricing all parts of a chicken.

**Answer to Paragraph 204**:   Wayne Farms admits it provided data to the GDA.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.  Wayne Farms denies the allegations as they relate to Wayne Farms.

205.    Buyers, including certain Plaintiffs, relied on the Georgia Dock benchmark price index because they believed it accurately reflected the market price for the chicken they bought — especially since the Georgia Dock was an industry-accepted benchmark price index for wholesale chicken prices that was, according to an internal memorandum drafted by the Florida Attorney General's office as part of its investigation, "meant to reflect the market price of chicken." And, much like the world's largest banks came together to manipulate numerous financial benchmarks (such as LIBOR), the Georgia Dock Defendants came together to manipulate the Georgia Dock benchmark price index.

**Answer to Paragraph 205**:   Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

---

[5] Unlike the other indices, the Georgia Dock benchmark price did not include freight or transportation costs.  At its inception, the Georgia Dock benchmark price was known as the "Georgia F.O.B. Dock" price; the Georgia Dock was "F.O.B." the supplier's shipping dock, meaning that the buyer was responsible for paying the freight.
**Answer to Footnote 5**:  Wayne Farms lacks sufficient knowledge of information to form a belief about the truth of the allegations in this footnote and therefore denies them.

206.    Compared to the other two indices available to chicken buyers, there were significant differences in how the Georgia Dock benchmark price index was compiled that made it highly susceptible to manipulation by the Georgia Dock Defendants, who are the ten chicken producers that submitted price quotes to the GDA for inclusion in the index.

**Answer to Paragraph 206**:  Wayne Farms admit that, at times, it submitted confidential data to the GDA.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.  Wayne Farms denies the allegations as they relate to Wayne Farms.

> ### (a)    The Georgia Dock Pricing Methodology and Its Susceptibility to Manipulation

207.    Until late 2016, the Georgia Dock pricing methodology was not publicly available. Chicken buyers, including certain Plaintiffs, whose transactions with Defendants were based on the Georgia Dock whole-bird price, mistakenly believed it reflected the actual market price of chicken.  Moreover, because (until August 2016) the USDA also published the Georgia Dock benchmark price alongside the USDA Composite, many chicken buyers erroneously believed the Georgia Dock price to be a USDA price.

**Answer to Paragraph 207**:  Wayne Farms admits that the GDA has collected pricing information for products that may fall within Plaintiffs' definition of "chicken."  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

208.    In addition, Defendants falsely represented that the Georgia Dock benchmark price is based on a complicated "algorithm" from the GDA that takes into account various factors, such as bird weights, weather, mortality rates, and demand.  Plaintiffs were misinformed that the

Georgia Dock benchmark was supposed to be based on the Georgia Dock Defendants' actual sales prices as reported to the GDA. But neither was true: there was no complicated "algorithm," nor did the Georgia Dock Defendants report their true prices to the GDA, agreeing instead to intentionally report false, artificially-high (or artificially-stabilized) prices. The reality was that the Georgia Dock price was simply whatever the Georgia Dock Defendants said it was. Hypothetically, if one week the Georgia Dock price was $1.75, and the following week the Georgia Dock Defendants told the GDA that the sales price of their chicken was now $2, the Georgia Dock price was $2 – and the prices that certain Plaintiffs and others paid for chicken increased commensurately.

**Answer to Paragraph 208**: Wayne Farms denies the allegations in this paragraph.

209. In compiling the Georgia Dock benchmark price, there was no team of economists or statisticians surveying buyers and sellers in the national chicken market. Unlike the USDA Composite or Urner Barry, which use data from numerous producers and buyers on both sides of the market, the Georgia Dock reflected prices sourced solely from a handful of producers. The Georgia Dock Defendants are the ten producers whose price quotes went into the Georgia Dock index, namely (ranked by their market share in Georgia, which dictated how much weighting each producer's quote was given in compiling the Georgia Dock benchmark price): Pilgrim's Pride (33%); Tyson (14%); Fieldale (14%); Perdue (9%); and Sanderson Farms, Koch, Claxton, Mar-Jac, Harrison and Wayne Farms, each with a 5% market share.

**Answer to Paragraph 209**: Wayne Farms admits that the GDA has collected pricing information for products that may fall within Plaintiffs' definition of "chicken." Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms

lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

210. Once a week, a single GDA employee, Arty Schronce, would call the same ten individuals at the Georgia Dock Defendants to collect price quotes, which were supposed to reflect their actual sales prices. He weighted each producer's price quote by its above-referenced relative market share (referred to by the GDA as that company's "voice").

**Answer to Paragraph 210**: Wayne Farms admits that the GDA has collected pricing information for products that may fall within Plaintiffs' definition of "chicken." Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

211. Mr. Schronce, who began compiling the Georgia Dock Defendants' price quotes in 2012 following the retirement of his predecessor, first made a preliminary calculation based on the single price quotation from each company. Then "[a]ny company that provides a whole bird quote that is more than one cent above or below the initial dock price calculation will not be included in the calculation for the whole bird dock price that week. Its voice is taken out of the formula and the dock price is recalculated without it." This so-called "one-cent rule" is, according to internal GDA documents, meant "to shield [] one company having the ability to greatly influence the price up or down."

**Answer to Paragraph 211**: Wayne Farms admits that this paragraph appears to be selectively quoting from – and attempting to characterize – one or more documents that speak for themselves. Wayne Farms denies the allegations in this paragraph to the extent they relate to

Wayne Farms.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

212.    Nothing was done to verify or substantiate these numbers.  There was no "double-verification;" customers were never contacted to check to see if the producers' prices were legitimate.  The entire process was based on unverified, verbal "price quotes" from the same small set of chicken producers (the Georgia Dock Defendants) submitted each week to a single GDA employee – a methodology that the Florida Attorney General's office concluded was "susceptible to manipulation."

**Answer to Paragraph 212**:  Wayne Farms admits that the GDA has collected pricing information for products that may fall within Plaintiffs' definition of "chicken."  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

213.    The price quoted by each Georgia Dock Defendant to the GDA was based on 2.5-to-3 pound whole chickens, but only a handful of the Georgia Dock Defendants actually processed 2.5-to-3 pound birds in Georgia, so, according to internal GDA documents, the Georgia Dock Defendants were "supposed to adjust their whole bird quote as if they are producing that sized bird." Once the final Georgia Dock whole bird price was calculated, the GDA then used a formula to calculate prices for different chicken cuts and parts based on the whole bird price the Georgia Dock Defendants provided to the GDA each Wednesday.

**Answer to Paragraph 213**:  Wayne Farms admits that it has provided certain information to the GDA about products that may be within the Plaintiffs' definition of "Broilers," but otherwise denies the allegations in the paragraph to the extent they relate to Wayne Farms. Wayne Farms

also admits that this paragraph appears to be selectively quoting from—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

214.    To facilitate their control of the Georgia Dock benchmark price, the Georgia Dock Defendants convinced the GDA to convene a secret "Advisory Board" composed of senior executives from eight of the ten Georgia Dock Defendants to advise the GDA on the Georgia Dock price.  From at least September 2012 through 2016, the Advisory Board included Gus Arrendale (CEO, Fieldale Farms), Mike Welch (CEO and President, Harrison), Jerry Lane (Former CEO, Claxton Poultry), Jayson Penn (EVP Sales and Operations, Pilgrim's), Pete Martin (VP of Operations, Mar-Jac), Vernon Owenby (Manager of Tyson's facility in Cumming, Georgia), Steve Clever (VP of Fresh Sales, Wayne Farms), and Dale Tolbert (VP of Sales, Koch Foods).

**Answer to Paragraph 214**:  Wayne Farms admits that Steve Clever served as the company's designated point of contact for the Georgia Department Agriculture, but otherwise denies the remaining allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be selectively quoting from—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

215.    The existence and conduct of this secret Advisory Board was not known to chicken buyers until November 2016 when it was first made public following a press report about a September 2016 memorandum written by Mr.  Schronce that was highly critical of the Georgia Dock methodology.  He wrote in the memorandum that he had "questions about the 'Advisory

Board' and its role over an office of a state regulatory agency that is supposed to be independent. I was told I could not make any changes without clearing them with the Advisory Board." The Advisory Board gave the Georgia Dock Defendants a vehicle to discuss and artificially set price quotes to ensure compliance with their price-fixing agreement.

**Answer to Paragraph 215**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be selectively quoting from – and attempting to characterize – one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

216. In December 2015, the GDA began an internal review process of the Georgia Dock pricing methodology, in large part, because the agency had "serious concerns" about the way the index was compiled. The GDA's internal review was not made public at the time it began, and was not revealed until it was described in a series of press reports beginning in November 2016. Mr. Schronce, in his September 2016 memorandum, expressed concerns that some companies have a "larger, even outsized role in determining the Georgia Whole Bird Dock Price," and that "[i]n essence, they can take advantage of a high whole bird price."

**Answer to Paragraph 216**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be selectively quoting from – and attempting to characterize – one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

217. Mr. Schronce also suggested that the Georgia Dock benchmark price be eliminated altogether because it was "a flawed product that is a liability to the Georgia Department of

Agriculture." Mr. Schronce's memorandum concluded by noting that he "was told the poultry companies know what they are doing and all I need to do is gather and consolidate the info I am provided. However, I have come to question the validity of some of the information provided." The memorandum also stated that the Georgia Dock Defendants gave "lackadaisical and rude responses to my requests for information," such as responding "just keep 'em the same" when asked for a company's updated price quote.

**Answer to Paragraph 217**:  Wayne Farms admits that this paragraph appears to be selectively quoting from – and attempting to characterize – one or more documents that speak for themselves.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

218.    Under pressure from the USDA, and realizing that the Georgia Dock pricing methodology raised significant antitrust concerns, the GDA attempted to revise the methodology in the autumn of 2016.  After the Georgia Dock Defendants balked at the GDA's new methodology – which required them to verify and attest to the accuracy of their price quotes – the GDA halted the Georgia Dock benchmark price index altogether when it did not receive sufficient price quotes to compile the index.  The last Georgia Dock benchmark price was published by the GDA on November 23, 2016.  However, for at least three months after the last Georgia Dock price was published by the GDA, certain Defendants, including at least Pilgrim's, continued to use the November 23, 2016 benchmark price of $1.0975/lb. to set their wholesale prices to chicken buyers, including certain Plaintiffs.

**Answer to Paragraph 218**:  Wayne Farms admits the GDA explored a substitute pricing index to replace "the Georgia Dock" in 2016.  Wayne Farms lacks sufficient knowledge or

information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

### (b) Georgia Dock Prices Diverged from the USDA Composite and Urner Barry Price Indices Beginning in 2013

219.     In early 2013, at roughly the time increased prices began to take hold as a result of Defendants' mid-2011 breeder flock reductions, the behavior of the Georgia Dock index significantly changed.  The changes resulted from the conspiracy by the Georgia Dock Defendants to agree on artificial prices quoted to the GDA for inclusion in the Georgia Dock benchmark price.

**Answer to Paragraph 219**:  Wayne Farms denies the allegations in this paragraph.

220.     Beginning in early 2013 and continuing until November 2016, the Georgia Dock Defendants agreed among themselves to submit artificially high and identical, or near-identical, prices to the GDA, which allowed them to continually increase, and successfully stabilize, chicken prices tied to the Georgia Dock benchmark price index.

**Answer to Paragraph 220**:  Wayne Farms denies the allegations in this paragraph.

221.     Historically, the Georgia Dock benchmark price was highly correlated to the prices in the USDA Composite and Urner Barry indices; the movement (*i.e.*, volatility) of the Georgia Dock price mirrored the patterns of the other two indices (*e.g.*, prices go up or down depending on market forces, such as supply and demand).  This changed in 2013, when the price volatility that had marked the Georgia Dock (and which still marks the other two indices) largely disappeared. Georgia Dock prices mostly stabilized, while prices in the other two indices remained volatile.

**Answer to Paragraph 221**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

222.     Starting in 2013, monthly price volatility in the Georgia Dock markedly decreased, particularly with respect to downward price movements (*i.e.*, when prices dropped, they dropped

far less drastically than they had prior to 2013). This near-disappearance of price volatility was unique to the Georgia Dock – both of the other price indices stayed volatile while the Georgia Dock remained stable, as reflected in the following graph, which compares prices of the various indices both before and during the relevant period:



Figure 1. USDA, Urner Barry, and Georgia Dock Wholesale Price Comparison (2002-2016)

**Answer to Paragraph 222**: Wayne Farms admits that this paragraph appears depict – and attempts to characterize – a graphic that speaks for itself. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

223. Beginning in 2013, the Georgia Dock benchmark price began to behave in a markedly different manner due to Defendants' price-fixing conspiracy. Starting in early 2013, the Georgia Dock prong of Defendants' conspiracy kicked into high gear, as the Georgia Dock price – for the first time ever – became negatively correlated with the other two price indices (*i.e.*, the

103

Georgia Dock price <u>increased</u> while prices in the other two indices <u>decreased</u>).  This marks a dramatic change from 2002 to 2012, where all three indices were positively correlated with each other (*i.e.*, they moved up and down together).[6]

**Answer to Paragraph 223**:  Wayne Farms admits that this paragraph appears to be referencing – and attempting to characterize – data that speaks for itself.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

224.    After at least a decade of high correlation with the USDA Composite and Urner Barry indices, the Georgia Dock benchmark price diverged dramatically from the other two indices in 2013 and thereafter – Georgia Dock prices were far more stable, and substantially higher, than the USDA Composite and Urner Barry prices.  The stability and level of Georgia Dock prices from 2013 through November 2016 was the direct result of Defendants' conspiracy.

**Answer to Paragraph 224**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.  Wayne Farms denies the remaining allegations in this paragraph to the extent they relate to Wayne Farms.

**C.    The Structure and Characteristics of the Chicken Market Make It Highly Susceptible to Collusion**

225.    **Highly-Concentrated Market with Vertically-Integrated Producers.**    A concentrated market, such as the U.S. chicken market, facilitates the operation of a cartel because it is easier to coordinate behavior among possible co-conspirators and more difficult for customers to avoid the effects of collusive behavior.  Defendants collectively control nearly 90 percent of the U.S. wholesale chicken market.  The U.S. chicken industry is almost entirely vertically integrated,

---

[6] After 2013, the USDA Composite and Urner Barry indices remained positively correlated with each other.
**Answer to Footnote 6**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the allegations in this footnote and therefore denies them.

with Defendants (known as "integrators") owning, or tightly controlling, each aspect of breeding, hatching, chick-rearing, feeding, processing, and selling.

**Answer to Paragraph 225**:  Wayne Farms admits that it and certain Defendants sell poultry products that may fit within Plaintiffs' definition of "Chickens." Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

226.    **Inelastic Demand at Competitive Prices.**  Inelastic demand means that increases in price result in limited declines in quantity sold in the market.  In order for a cartel to profit from raising prices above competitive levels, demand must be inelastic at competitive prices, which allows cartel members to raise prices without seeing a decline in sales revenue.  Industry studies show that in the U.S. chicken market, not only is the demand for chicken inelastic, it has become increasingly more inelastic over the past 40 years.   In connection with a joint DOJ-USDA workshop on the poultry market in 2010, agriculture economist, Dr. Michael Dicks, presented research demonstrating how vertical integration incentivizes chicken producers to implement supply restrictions, stating that in the U.S. poultry industry "vertical coordination allows integrators to manage excess capacity to manage price.  Integrators can minimize the effect on producers by increasing the time between collection and delivery of birds or reducing the number of flocks per year…Because of the inelastic nature of the supply and demand a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

**Answer to Paragraph 226**:     The first sentence of this paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Wayne

Farms denies the allegations. Wayne Farms admits that this paragraph appears to be quoting – and attempting to characterize – one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

227. **Existence of Numerous Trade Associations and Access to Competitors' Data through Agri Stats.** The existence of industry trade associations makes a market more susceptible to collusive behavior because they provide a pretext under which co-conspirators exchange sensitive company information, such as pricing and market allocation. Industry trade associations also provide mechanisms for sharing information, and monitoring, deterring, detecting and punishing cheating. The following U.S. chicken industry trade associations, all of which count all or nearly all Defendants as members, allowed Defendants to coordinate their price-fixing and supply restriction conspiracy: National Chicken Council, United States Poultry & Egg Export Council, U.S. Poultry & Egg Association, Georgia Poultry Federation, North Carolina Poultry Federation, and Poultry Federation (representing chicken producers in Arkansas, Missouri and Oklahoma). Indeed, according to *Communication in Poultry Grower Relations: A Blueprint to Success*, a book written by a management consultant affiliated with the U.S. Poultry & Egg Association, "representatives from the various [chicken producers] readily share information while attending the numerous seminars offered by the U.S. Poultry & Egg Association, National Chicken Council" and other trade groups, further noting that "industry leaders realize the industry's tremendous potential, and their spirit of cooperation is based on knowing that which is good for individual companies is good for the industry."

**Answer to Paragraph 227**: The first two sentences of this paragraph contain Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or

legal conclusions, to which no response is required. To the extent a response is required, Wayne Farms denies the allegations. Wayne Farms admits that this paragraph appears to be quoting – and attempting to characterize – one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

228. Defendants also accessed each other's above-described data through co-Defendant Agri Stats to monitor cheating in the conspiracy. Agri Stats acted as an active facilitator of Defendants' cartel.

**Answer to Paragraph 228**: Wayne Farms denies the allegations in this paragraph.

229. **High Barriers to Entry.** The intended effect of a conspiracy to fix prices, either explicitly (as is the case here with the Georgia Dock benchmark price index) and through restricting supply (which Defendants also did) is to generate higher profits for the participants. The normal impact of the artificially higher profits is to draw other profit seeking companies into the market. In industries with substantial barriers to entry, such as the U.S. chicken market, however, companies—such as Defendants—are able to raise prices above competitive levels and still earn above-normal levels of profits.

**Answer to Paragraph 229**: Wayne Farms admits that this paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is required, Wayne Farms denies the allegations. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

230. The existence of high entry barriers in the U.S. chicken market is demonstrated by the trend of increasing consolidation, with larger vertically integrated companies increasing their

control over the industry. Beyond the issue of vertical integration, there is a wide range of government food safety, worker safety, and environmental regulations that must be addressed by any new entrant into the chicken market. The existence of low, and highly variable, profit margins also act as significant barriers to entry. With such barriers to entry, companies that have the available resources and significant start-up capital to enter the market and benefit from economies of scale are able to reduce their average cost by producing more. Companies already in the market - such as Defendants - are motivated to exclude other companies from the market to maintain their coordinated supply restriction conspiracy, and ultimately keep prices at artificially inflated levels.

**Answer to Paragraph 230**: Wayne Farms admits that there is a wide range of government food safety, worker safety, and environmental regulations in the poultry industry. Wayne Farms denies the remaining allegations in this paragraph.

## D. Defendants Collusively Adopted Additional Strategies to Reinforce Their Conspiracy

231. Defendants collectively adopted several strategies to buttress and sustain their conspiracy.

**Answer to Paragraph 231**: Wayne Farms denies the allegations in this paragraph.

(i) A Collective Shift Away from Long-Term Fixed-Price Contracts

232. First, starting in 2008, the Defendants moved away from long-term fixed-price contracts to shorter-term contracts with variable pricing pegged to one of several publicly-available price indices (including the USDA composite Urner-Barry, and the Georgia Dock). A coordinated move away from fixed price contracts to contracts permitting prices to fluctuate with an indexed public market price helps facilitate an antitrust conspiracy. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 659 (7th Cir. 2002). Defendants' shift indicates that

they anticipated higher prices resulting from their production cuts, and wanted the flexibility to take advantage of such increased prices.

**Answer to Paragraph 232**:  Wayne Farms admits that this paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations.  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

233.    Starting around January 2008, senior executives from Koch Foods, Pilgrim's, Perdue, Sanderson Farms, and Tyson publicly announced an effort to reduce annual fixed-price contracts.  This change coincided with Defendants' efforts to reduce chicken industry supplies so as to drive chicken market prices higher.

**Answer to Paragraph 233**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

234.    On January 28, 2008, Tyson CEO Dick Bond announced on an earnings call that Tyson was looking at shortening its fixed price contracts, and by June 2009 Tyson reported it had "dramatically" shortened the amount of fixed-price contracts over 90 days.

**Answer to Paragraph 234**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

235.    On January 29, 2008, Pilgrim's CFO Rick Cogdill reported on an earnings call that Pilgrim's had started moving away from fixed-price contracts, noting that "in a situation like where we are now where we need to drive commodity prices up, that [*i.e.*, having less fixed price contracts] is going to give us the opportunity for more immediate benefit to our P&L than what we would have had say, historically three year[s] ago, when a higher percentage was fixed price."

Pilgrim's later reported that by March 2012, it had reduced its exposure to fixed price contracts, with most contracts now market-based or including a reset provision linked to the underlying commodity. By 2014, Pilgrim's reported that less than 5% of all its contracts were 12-month fixed price contracts.

**Answer to Paragraph 235**: Wayne Farms admits that this paragraph appears to quote—and attempts to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

236. On July 28, 2008, Perdue spokesperson Julie DeYoung told an industry publication that Perdue was looking to shorten its contract terms, stating, "the company is also seeking to raise prices and shorten its contracts."

**Answer to Paragraph 236**: Wayne Farms admits that this paragraph appears to quote—and attempts to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

237. Sanderson Farms' CEO Joe Sanderson noted in a July 31, 2008, earnings call that the industry may move towards "shorter term agreements."

**Answer to Paragraph 237**: Wayne Farms admits that this paragraph appears to quote—and attempts to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

(ii)    Inter-Defendant Sales

238. Second, Defendants use direct purchases of chickens from one another and from smaller producers to meet each company's own sales needs. In addition to exemplifying the

commodity nature of the chicken market, these inter-Defendant sales allowed Defendants to soak up excess supply that could potentially depress prices in the market and facilitated the opportunity to expressly discuss prices with competitors. Such purchases also permitted companies to maintain market share despite reducing their production. In many instances large inter-Defendant purchases were negotiated by CEOs or other senior level executives of Defendants, thereby providing additional opportunities to conspire.

**Answer to Paragraph 238**: Wayne Farms admits that it has, from time to time, engaged in legitimate arms-length business relationships with other broiler producers in the ordinary course of business when it has been in Wayne Farms' unilateral, independent self-interest to do so. Wayne Farms denies the remaining allegations in this paragraph.

239. In 2011, for example, Tyson began using what was described as a "very unique strategy," called "Buy vs. Grow." Tyson's strategy essentially treated the industry supply as though it were for a single unified company, rather than competing businesses that would rather sell self-produced product to a customer than a competitor. Tyson's adoption of this strategy was indeed "unique," because only a few years prior to adopting the "Buy vs. Grow" strategy, it had derided a similar strategy as a "stupid" subsidization of competitors' growth, with a Tyson executive explaining on an April 29, 2008 earnings call that "I think what we said along is we're going to match our supply and demand. We're not going to cut beyond that and then go out and buy open market meat to subsidize other people's growth." Tyson's strategic shift in 2011 to buying chicken on the open market is evidence that by that time, it was confident that its fellow cartelists would maintain their production levels as they were and not increase them.

**Answer to Paragraph 239**: Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

240.    In a November 5, 2012, interview, Fieldale President Thomas Hensley noted his company was also pursuing a strategy to purchase excess supply from its competitors, stating that "[i]f you don't have a home for your chickens on Monday morning, you shouldn't have those chickens.  Now we know where all our chickens are going.  So we are buying chickens in that lower price area instead of selling them.  So, no expansion for us."

**Answer to Paragraph 240**:  Wayne Farms admits that this paragraph appears to quote— and attempts to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

241.    By the end of 2014, Tyson reported it was buying over four million pounds of chickens on the open market each week.  Four million pounds of chicken per week is more than any of the 24th-30th largest chicken companies produce on a weekly basis, so the amount of Tyson's purchases was quite significant.

**Answer to Paragraph 241**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

242.    During the first part of 2015, Tyson increased its Buy vs. Grow purchases by 50 percent, expanding its purchases from competitors to unprecedented levels.  Tyson announced plans in May 2015 to increase its Buy vs. Grow strategy to 10 percent of its sales in the second half of 2015 and 2016.  Ten percent of Tyson's 2014 ready-to-cook pounds was 17.6 million pounds per week, a volume that by itself would dwarf the entire average weekly production of any of the 15th-30th largest chicken producers.  Notably, Tyson also announced in May 2015 that it planned to reduce its production after July 2015 and keep it flat through 2016 by increasing its Buy vs. Grow purchases.

**Answer to Paragraph 242**:  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

    (iii)    <u>Atypical Increases in Defendants' Exporting of Chickens</u>

243.    Third, during 2013 and into 2014, Defendants found new ways to actively depress the size of breeder flocks, such as using the pretext of avian flu in Mexico to justify exporting flock chickens to Mexico to repopulate flocks rather than use such chickens to increase domestic production levels.  Indeed, Defendants continued their program of exporting chicken hens and eggs to Mexico in 2015, with Tyson explicitly noting in a May 4, 2015, earnings call that it was sending 3 percent of its eggs to Mexico to "fill incubators."

**Answer to Paragraph 243**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

244.    Similarly, during a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted his "confidence that we're going to do the right thing with respect to maintaining [] discipline.  We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million hatching eggs or so outside of the country.  The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made.  And so again that gives us confidence that we're going to continue to be disciplined as an industry."

**Answer to Paragraph 244**:  Wayne Farms admits that this paragraph appears to be quoting—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

245.     Defendants' coordinated exportation of chicken hatching eggs, from 2013 through 2016, was an active effort to artificially reduce the supply of chickens in the U.S. below what it would have been absent their active and continued participation in an illegal antitrust conspiracy.

**Answer to Paragraph 245**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

246.     Tyson and other Defendants exported hatching eggs to Mexico and other foreign countries from 2013-2016 with the intent to artificially reduce the supply, and increase the price, of chickens in the U.S. The revenues Tyson and others received for exporting hatchery eggs to Mexico was far less than they would have generated hatching those same eggs and selling the chicken meat in the U.S. market.  Thus, but for Defendants' agreement and conspiracy as alleged in this Complaint, it would have been against Tyson's independent economic self-interest to export hatching eggs to Mexico and forego higher hatching egg prices in the U.S. But Defendants' new-found "discipline" ameliorated any remaining risk and resulted in higher overall U.S. chicken prices.

**Answer to Paragraph 246**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

**E.     The Statute of Limitations Does Not Bar Plaintiffs' Claims**

    (i)     <u>Plaintiffs Did Not Discover (and Could Not Have Discovered) the Conspiracy Until 2016</u>

114

247.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claims for relief.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until approximately 2016.  Defendants engaged in a secret conspiracy that did not reveal facts that put Plaintiffs on inquiry notice that there was a conspiracy to fix prices for chickens.

**Answer to Paragraph 247**:  Wayne Farms denies the allegations in this paragraph.

248.    With respect to the output-restriction element of Defendants' conspiracy, Plaintiffs did not discover, nor could have discovered through the exercise of reasonable diligence, the facts supporting their claims for relief, until the filing of a direct purchaser class action, *Maplevale Farms, Inc. v. Koch Foods, Inc. et al.*, in this District in September 2016.  The filing of the *Maplevale Farms* complaint, which alleges a class of which Plaintiffs are absent members, caused Plaintiffs and their counsel to start an independent and extensive investigation into the facts alleged in this Complaint.

**Answer to Paragraph 248**:  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

249.    With respect to the manipulation of the Georgia Dock, a January 18, 2016 *Wall Street Journal* article regarding Defendants' possible manipulation of the Georgia Dock benchmark price raised the possibility of collusion to artificially raise, fix, or maintain chicken prices using the Georgia Dock.  Subsequently, a series of articles in various publications published

between November 3 and 17, 2016, detailed for the first time that the USDA had discontinued its reliance on the Georgia Dock benchmark price because its input prices could not be verified.

**Answer to Paragraph 249**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to be referencing—and attempting to characterize—one or more documents that speak for themselves. Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

250. Yet even when faced with these public revelations, Defendants continued to assert the fairness and accuracy of the Georgia Dock benchmark price. For example, in a November 8, 2016, *Washington Post* article, Defendant Sanderson Farms represented that the Georgia Dock benchmark price was "reliable," so as to induce purchasers of chickens to believe the benchmark price was not subject to illegal manipulation by the Georgia Dock Defendants. Not until November 10, 2016, was it disclosed publicly that the Georgia Dock Defendants had formed a secret Georgia Dock Advisory Board that facilitated opportunities for executives to meet and also discuss their scheme to fix the Georgia Dock benchmark price. The existence of this board was not known to Plaintiffs, nor would they have been able to learn of how Defendants' executives conducted themselves in their non-public Georgia Dock Advisory Board meetings. Finally, not until November 17, 2016, was it publicly disclosed that the Florida Attorney General's Office was investigating the Georgia Dock benchmark price and its calculation and manipulation by the Georgia Dock Defendants.

**Answer to Paragraph 250**: Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms admits that this paragraph appears to quote — and attempts to characterize—one or more documents that speak for themselves. Wayne Farms

lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

251.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Chickens are not exempt from antitrust regulation, and thus, before these recent events Plaintiffs reasonably considered the U.S. chicken industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin investigating the legitimacy of Defendants' chicken prices before these recent events.

**Answer to Paragraph 251**: Wayne Farms denies the allegations in this paragraph.

252.    Plaintiffs exercised reasonable diligence. Plaintiffs could not have discovered Defendants' alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants.

**Answer to Paragraph 252**: Wayne Farms denies the allegations in this paragraph.

(ii)    Defendants Actively Concealed Their Conspiracy

253.    Throughout the relevant period (2008 to 2016), Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs.

**Answer to Paragraph 253**: Wayne Farms denies the allegations in this paragraph.

254.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, (1) secret meetings, (2) surreptitious communications between Defendants via the wires (telephones, emails, text messages and other electronic communications) and in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, (3) limiting any explicit reference to competitor pricing or supply restraint communications in documents, (4) communicating competitively sensitive data to one another through Agri Stats, a "proprietary,

117

privileged, and confidential" system that kept both the content and participants in the system secret, and (5) concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

**Answer to Paragraph 254**: Wayne Farms denies the allegations in this paragraph.

255.     Defendants used code words including "discipline" and "capacity discipline" in their public statements to conceal their conspiracy and signal one other in furtherance of their conspiracy to restrain production while shielding their conspiracy from detection or suspicion.  As alleged above, specific examples of the use of such coded language include, without limitation: (1) the National Chicken Council's Annual Conference in October 2011 where a report reflected that panel members Clint Rivers (then of Perdue) and Mark Kaminsky of Koch Foods noted that "[d]iscipline on the supply side was one suggestion" to increase chicken prices; (2) on a May 3, 2013, earnings call, Pilgrim's President & CEO Bill Lovette stated that "price is going to strengthen as supply continues to be disciplined and constrained….and "we've done a good job so far of maintaining discipline;" and (3) on a July 2016 earnings call Mr. Lovette noted that "I think what we've seen with egg sets is absolutely a testament to the discipline of our industry that we've seen the last really two to three years."

**Answer to Paragraph 255**: Wayne Farms denies the allegations in this paragraph.

256.     As alleged above, in 2008, after years of boom and bust cycles of production leading to the regular rise and fall of prices, the price of chickens began an unprecedentedly steady increase that continued at least through 2016.  Defendants affirmatively and falsely attributed rising prices to, among other things, increases in the price of inputs.  Defendants used these pretexts used to cover up the conspiracy.  In fact, the chicken price increases were the result of Defendants' collusive conduct, which was undisclosed at the time.

**Answer to Paragraph 256**: Wayne Farms denies the allegations in this paragraph.

257.     During the relevant period, Defendants affirmatively made numerous misleading public statements falsely portraying the market for chickens as a competitive one.  For example, Defendants provided testimony at workshops held by the U.S. Department of Justice and USDA suggesting the chicken industry was competitive and not subject to anti-competitive practices and agreements, including testimony at a May 21, 2010 workshop of a National Chicken Council-commissioned study by Dr. Thomas Elam, which stated that "the chicken industry is competitive and thriving," and has "[i]ntense competition" that promotes "product innovation and lower prices for consumers."

**Answer to Paragraph 257**: Wayne Farms denies the allegations in this paragraph.

258.     To explain the decreasing supply of chickens since 2012, Defendants have provided a variety of pretextual explanations, including:  (1) a breeding issue with chickens during 2014, (2) a Russian ban of U.S. chicken imports starting in 2014, and (3) a 2013 shortage in supply due in part due to an Avian Flu outbreak in Mexico that caused a surge in demand for hens to repopulate chicken farms in Mexico.  These explanations were pretextual in that Defendants sought to hide their conspiracy from discovery by blaming chicken price increases on these factors rather than Defendants' own collusive conduct (including their unprecedented cuts to breeder flocks).

**Answer to Paragraph 258**: Wayne Farms denies the allegations in this paragraph.

259.     Throughout the relevant period, Defendants repeatedly also cited increasing input costs as a pretext for their collusion to restrain supply and increase prices.  For instance, Defendants repeatedly claimed that input cost increases during 2008 justified chicken price increases. However, while corn was $5/bushel in 2005-2006 and increased to $9 by May or June 2008, it quickly fell back to below $5/bushel by fall 2008.  Higher chicken prices later in the relevant

period also were not justified by increased costs of corn, which, after a temporary spike in the summer of 2012, were not increasing at the level that would have warranted higher chicken prices. Defendants, through the National Chicken Council, other trade groups, and press releases, speeches, and other public statements by their employees, also repeatedly and publicly blamed the federal government's ethanol mandate for increased chicken prices, asserting that it increased their corn costs. Defendants made all of these pretextual representations so as to conceal their conspiracy and avoid disclosing their agreement to illegally restrain the supply of chickens.

**Answer to Paragraph 259**:  Wayne Farms denies the allegations in this paragraph.

260.    By virtue of Defendants and all of their co-conspirators actively and intentionally concealing their above-described wrongful conduct, the running of any applicable statute of limitations has been (and continues to be) tolled and suspended with respect to Plaintiffs' claims and causes of action resulting from Defendants' and Agri Stats' unlawful combination and conspiracy alleged in this Complaint under the fraudulent concealment doctrine and/or doctrine of equitable estoppel.

**Answer to Paragraph 260**:  Wayne Farms denies the allegations in this paragraph.

## VI.    ANTITRUST IMPACT

261.    During the relevant period, Plaintiffs purchased substantial amounts of chicken from one or more Defendants. As a direct and proximate result of Defendants' above-described illegal conduct, Plaintiffs were compelled to pay, and did pay, artificially inflated prices for chickens during the relevant period.

**Answer to Paragraph 261**:  Wayne Farms denies the allegations in this paragraph.

262.    As a direct and proximate consequence of Defendants' and Agri Stats' above-described wrongful conduct, Plaintiffs sustained substantial losses and damage to their businesses

and property in the form of overcharges for chickens. The full amount and forms and components of such damages will be calculated after discovery and presented upon proof at trial.

**Answer to Paragraph 262**: Wayne Farms denies the allegations in this paragraph.

## VII.   CLAIMS FOR RELIEF AND CAUSES OF ACTION

### COUNT I

### VIOLATION OF 15 U.S.C. § 1
### (AGAINST ALL DEFENDANTS FOR OUTPUT RESTRICTION)

263.   The preceding factual statements and allegations are incorporated by reference. For paragraphs 264 to 268, the term "Defendants" includes Agri Stats.

**Answer to Paragraph 263**:  Wayne Farms incorporates and re-alleges each preceding answer.

264.   In collusively restricting, limiting, and curtailing the supply of chicken in the United States, Defendants engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer to Paragraph 264**:  Wayne Farms denies the allegations in this paragraph.

265.   Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States:  (1) prices charged to, and paid by, Plaintiffs for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

**Answer to Paragraph 265**:  Wayne Farms denies the allegations in this paragraph.

266. Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiffs in the United States.

**Answer to Paragraph 266**: Wayne Farms denies the allegations in this paragraph.

267. As a direct and proximate result of Defendants' above-described unlawful conduct, Plaintiffs paid artificially inflated prices for chicken.

**Answer to Paragraph 267**: Wayne Farms denies the allegations in this paragraph.

268. As a direct and proximate result of Defendants' above-described anticompetitive conduct, Plaintiffs were damaged in their businesses or property by paying prices for chicken that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

**Answer to Paragraph 268**: Wayne Farms denies the allegations in this paragraph.

## COUNT II

### VIOLATION OF 15 U.S.C. § 1
### (AGAINST THE GEORGIA DOCK DEFENDANTS FOR PRICE-FIXING)

269. The preceding factual statements and allegations are incorporated by reference.

**Answer to Paragraph 269**: Wayne Farms incorporates and re-alleges each preceding answer.

270. In fixing, raising, and maintaining prices quoted to the GDA for inclusion in the Georgia Dock benchmark price index, the Georgia Dock Defendants engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer to Paragraph 270**: Wayne Farms denies the allegations in this paragraph.

271. Defendants' unlawful contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices

122

charged to, and paid by, Plaintiffs for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

**Answer to Paragraph 271**:  Wayne Farms denies the allegations in this paragraph.

272.    The Georgia Dock Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiffs in the United States.

**Answer to Paragraph 272**:  Wayne Farms denies the allegations in this paragraph.

273.    As a direct and proximate result of the Georgia Dock Defendants' above-described unlawful conduct, certain Plaintiffs paid artificially-inflated prices for chicken.

**Answer to Paragraph 273**:  Wayne Farms denies the allegations in this paragraph.

274.    As a direct and proximate result of the Georgia Dock Defendants' above-described anticompetitive conduct, certain Plaintiffs were damaged in their business or property by paying prices for chicken that were higher than they would have been but for the Georgia Dock Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

**Answer to Paragraph 274**:  Wayne Farms denies the allegations in this paragraph.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Enter joint and several judgments against defendants in favor of Plaintiffs;

B.    Award Plaintiffs' damages (*i.e.*, three times the overcharges) in an amount to be determined at trial;

C.    Award Plaintiffs their attorneys' fees, litigation expenses, and costs, as provided by law; and

D.     Grant Plaintiffs such other and further relief to which Plaintiffs are justly entitled.

**Answer to Unnumbered Demand for Judgment Paragraph**:  WHEREFORE, Wayne Farms respectfully requests that the Court dismiss the action with prejudice and order such other, further and general relief as is just and proper and denies Plaintiffs' prayer for relief as set forth in the Complaint.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

**Answer to Unnumbered Jury Demand Paragraph**:  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

## AFFIRMATIVE DEFENSES

Wayne Farms reserves its right to assert other and additional defenses, cross claims and third party claims not asserted herein of which it becomes aware through discovery or other investigation. In asserting these defenses, Wayne Farms does not assume any burden of proof, persuasion or production with respect to any issue where the applicable law places the burden upon Plaintiffs.

## FIRST DEFENSE

1.     Plaintiffs' claims are barred, in whole or in part, because it lacks standing to bring this action against Wayne Farms.

## SECOND DEFENSE

2.     Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

3.      The statute of limitations for Plaintiffs' claims is four years.  15 U.S.C. § 15(b).

Thus, their claims must be dismissed unless Plaintiffs can sufficiently allege that it could not have

discovered the challenged conduct within the limitations period exercising reasonable diligence.

4.      Plaintiffs cannot satisfy this burden:  the challenged conduct occurred between

seven and ten years ago.  *See* Complaint, ECF No. 1, Case No. 18-cv-03471 (hereafter "Compl."

Or "Complaint") at ¶ 4 (Plaintiff alleges Defendants made "collective market-changing cuts to

breeder flocks – a first round from 2008 to early 2009…").

5.      Moreover, the precise set of facts Plaintiffs allege in support of their claims were

made public more than four years ago.  For example:

- **Publicly Announced Cuts**.  As Plaintiffs acknowledge, the alleged supply decisions at issue in this case were no secret.  *See, e.g.*, ¶ 131 ("On March 12, 2008, Pilgrim's new CEO Clint Rivers, publicly announced the closure of seven chicken facilities…").  Indeed, the supply cuts alleged by Plaintiffs in their complaint were publicly announced years ago.  *See, e.g.*, ¶ 132 ("April 9, 2008: Simmons announced in a press release a 6% reduction in production . . .").

- **Price Increases**.  Plaintiffs admit that price information was reported daily by Urner Barry and the GDA and weekly by the USDA.  It goes on to point out that information published by the USDA has long been "available for free."  *See, e.g.*, ¶ 80.

- **Alleged Signals**.  Similarly, Plaintiffs rely on public statements allegedly made as far back as 2008 in its signaling allegations.  *See, e.g.*, ¶¶ 126-27 (summarizing comments by Tyson and Pilgrim's Pride in their respective January 28 and 29, 2008 earnings calls).  If, as they claim, these statements were obvious indicators of misconduct, they triggered Plaintiffs' duty to inquire as early as 2008.

- **Agri Stats**.  Plaintiffs also rely on public statements regarding the use of Agri Stats, many from *ten* years ago.  *See, e.g.*, ¶ 279 (quoting May 2008 statement in which "Sanderson Farms CEO Joe Sanderson claimed "[w]e use Agri Stats . . . . . Almost everyone in our industry does as well."").

- **Trade Associations**.  Defendants' alleged participation in trade conferences and meetings was public when it occurred, many years ago.  *See, e.g.*, ¶ 167 ("[A]t the National Chicken Council's October 2009 Annual Conference, one industry analyst wrote that participants had emphasized continued 'production discipline.'").

- **Industry Structure**. The alleged nature of the Broiler industry's structure has been known for decades.  Plaintiffs cites no new information that was not otherwise

available in 2008 or contemporaneously as plants were allegedly closed. *See, e.g.*, ¶ 150 ("By September 2008, Broiler industry publication Watts PoultryUSA reported that "[m]ost U.S. broiler integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'"").

6.      Put simply, Plaintiffs' attempt to justify their delay by claiming fraudulent concealment fails—it simply recycles its underlying allegations and conclusively asserts fraudulent concealment. Compl. ¶¶ 253-260. Accordingly, Plaintiffs' Complaint is time-barred.

## THIRD DEFENSE

7.      Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to exercise reasonable care to mitigate any damages they may have suffered.

8.      The precise set of facts Plaintiffs allege in support of their claims was made public more than four years ago.

9.      Wayne Farms hereby incorporates the above Paragraph 5 in support of this defense.

10.     To the extent Plaintiffs believed that Wayne Farms had unfairly increased the price of chicken by agreeing to cut Broiler production, Plaintiffs had an obligation to mitigate their damages by seeking other sources of supply, including from other producers.

11.     Plaintiffs' failure to exercise reasonable care to mitigate damages was the complete or partial cause of any damages Plaintiffs may have suffered.

## FOURTH DEFENSE

12.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

13.     The precise set of facts Plaintiffs allege in support of their claims were made public more than four years ago.

14.     Wayne Farms hereby incorporates the above Paragraph 5 in support of this defense.

126

15.     Plaintiffs' conduct in continuing to purchase Broilers at what they now allege are inflated prices is evidence of Plaintiffs' intention to waive any right to bring this suit and was inconsistent with any intention other than to waive their right to bring suit.

16.     Plaintiffs, by their actions, accepted the benefits of an ongoing relationship with Defendants and relinquished its right to bring suit.

## FIFTH DEFENSE

17.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

18.     The precise set of facts Plaintiffs cite in support of their claims were made public more than four years ago.

19.     Wayne Farms hereby incorporates the above Paragraph 5 in support of this defense.

20.     Wayne Farms relied in good faith, and to its detriment, on Plaintiffs' actions in continuing to purchase chicken without complaint.

21.     Wayne Farms had no knowledge of Plaintiffs' alleged complaints or means to discover these complaints.

22.     Plaintiffs' claims are therefore estopped.

## SIXTH DEFENSE

23.     Plaintiffs' claims are barred by the equitable doctrine of laches.

24.     The laches doctrine dictates that "those who sleep on their rights, lose them." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999).  Specifically, laches will bar relief in the face of: "(1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom."  *Id.* (*citing Cannon v. Univ. of Health Sciences/Chi. Med. Sch.*, 710 F.2d 351, 359 (7th Cir. 1983)).

25.     Wayne Farms hereby incorporates the above Paragraph 5 in support of this defense.

127

26.     Plaintiffs demonstrated an unreasonable lack of diligence in bringing their claims. As set forth in support of Wayne Farms' statute of limitations defense, the challenged conduct that underlies Plaintiffs' claims occurred at least seven to ten years ago.  *See, e.g.*, Compl. ¶ 139. Likewise, the specific facts Plaintiff cites in support of their claims were publicly available long ago.  *See*, *e.g.*, Compl. ¶¶ 80, 131-32, 126-27, 150, 167, 279.  Yet, Plaintiffs sat on their allegations until 2016.  This unreasonable lack of diligence in raising their claims bars it now.

27.     Accordingly, the equitable principles embodied in the laches doctrine bar Plaintiffs from seeking relief at this delayed juncture.

## SEVENTH DEFENSE

28.     Plaintiffs' claims are barred, in whole or in part, due to the ratification of, and consent to, the conduct of Wayne Farms.

29.     Defendants hereby incorporate the above Paragraph 5 in support of this defense.

30.     Plaintiffs' Complaint relies on publicly available information—much of which has been available for years—thereby demonstrating its long-standing ratification of and consent to the challenged conduct.

31.     For example, Plaintiffs have known for *more than a decade* that certain Broiler producers participate in and receive reports from Agri Stats.  *See, e.g.*, ¶ 6 (stating that Tyson withdrew from Agri Stats "sometime in the mid-2000s" but "became a subscriber again in early 2008").

32.     Likewise, Plaintiffs benefit from Defendants' alleged participation in trade association meetings and other industry events.  Such meetings and events would promote, among other issues, lobbying efforts, regulations, industry safety, animal health, and training and education.

33.     To the extent that Plaintiffs purchased Broilers based on the Georgia Dock index or otherwise alleges any injury based on Georgia Dock-based pricing, Plaintiffs knew about and consented to industry use of the Georgia Dock index.  The Georgia Dock index was publicly accessible online, making any deviation between the Georgia Dock and other price indices— including Urner Barry—readily available to Plaintiffs.

34.     Accordingly, because Plaintiffs have been aware for years of the very same conduct it now challenges—much of which has provided Plaintiffs a direct benefit—Plaintiffs' claims are barred by the doctrine of ratification.

## EIGHTH DEFENSE

35.     Plaintiffs' claims include allegations that one or more Defendants made public statements about changes needed in alternative fuel mandates under federal law.

36.     These mandates increased usage of corn and other animal feed used to produce alternative fuels, and thereby increased feed costs incurred by Wayne Farms for live Broiler operations.

37.     Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs seek to impose liability on Wayne Farms based on the exercise of any person or entity's right to petition federal, state and local legislative bodies, including through public statements, because such conduct was immune under the Noerr-Pennington doctrine and privileged under the First Amendment to the U.S. Constitution.

## NINTH DEFENSE

38.     Plaintiffs' claims are barred, in whole or in part, to the extent the contracts governing the Plaintiffs' commercial relationships with Wayne Farms contain arbitration clauses or clauses providing a different forum for the resolution of their claims.  *See, e.g.*, *Cont'l Ins. Co.*

*v. M/V Orsula*, 354 F.3d 603 (7th Cir. 2003); *West Shore Pipe Line Co. v. Associated Electric & Gas Ins. Services, Ltd.*, 791 F. Supp. 200 (N.D. Ill. 1992).

## TENTH DEFENSE

39.     Upon information and belief, Plaintiffs' claims are barred, in whole or in part, by Wayne Farms' right to set off any amount paid to Plaintiffs by damages attributable to Plaintiffs' conduct to the extent Plaintiffs unlawfully coordinated regarding the purchase price of Broilers, including by communicating and sharing competitively sensitive information.

## ELEVENTH DEFENSE

40.     Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, by non-settling Defendants' right to set off any amounts paid to Plaintiffs by any Defendants who have settled, or do settle, Plaintiffs' claims against them in this action.

## TWELFTH DEFENSE

41.     Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs entered into cost-plus contracts with parties who purchased from Plaintiffs before Plaintiffs began paying any purported overcharge.

## THIRTEENTH DEFENSE

42.     Plaintiffs' claims are barred, in whole or in part, to the extent they seek improper multiple damage awards, and damage awards duplicative of those sought in other actions, in violation of the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution.

## FOURTEENTH DEFENSE

*43.*     Plaintiffs' claims are barred, in whole or in part, by the Filed Rate Doctrine.

44.     Under the Filed Rate Doctrine, rates that are filed with or regulated by state or federal agencies are per se reasonable and unassailable in judicial proceedings brought by ratepayers.

45.     The Georgia Dock index was compiled and issued by the Georgia Department of Agriculture.

46.     To the extent that Plaintiffs seek damages for purchase of Broilers based on the Georgia Dock index or otherwise alleges any injury based on Georgia Dock-based pricing, Plaintiffs' claims are barred by the Filed Rate Doctrine.

## FIFTEENTH DEFENSE

47.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not suffered any injury in fact and/or any injury cognizable under the antitrust laws.

48.     Plaintiffs cannot establish an actual injury.  Plaintiffs' alleged harm lies in the speculation that nearly twenty companies colluded seamlessly over almost a decade resulting in Plaintiffs' harm.  In reality, Plaintiffs complain about the impact of naturally unpredictable changes in the market conditions that exist in a global economy.  Those events include: lowered consumer demand due to a severe recession; the bankruptcy of the then-largest U.S. Broiler producer; volatility in feed costs due to global events and a historic drought; increased use of ethanol impacting the availability of corn for feed; and avian influenza outbreaks impacting the supply of Broilers.

49.     To the extent that Plaintiffs maintain that they were injured by these events, an injury is not cognizable under the antitrust laws.

## SIXTEENTH DEFENSE

50.     Plaintiffs' claims are barred, in whole or in part, because any alleged injuries and damages were not legally or proximately caused by any acts or omissions of Defendants and/or

131

were caused, if at all, solely and proximately by the conduct of Plaintiffs themselves or third parties including, without limitations, the prior, intervening, or superseding conduct of such Plaintiff or third parties.

### SEVENTEENTH DEFENSE

51.    Wayne Farms adopts and incorporates by reference any and all other defenses asserted by any other Defendant to the extent Wayne Farms may share in such defenses.

### EIGHTEENTH DEFENSE

52.    Wayne Farms has not knowingly or intentionally waived any applicable defenses, and it reserves the right to assert and rely upon other defenses as this action proceeds up to and including the time of trial.  Wayne Farms reserves the right to amend or seek to amend its answers and/or affirmative defenses.

Defenses that must be affirmatively stated in a pleading pursuant to Federal Rule of Civil Procedure 8 are affirmative defenses referenced in Rule 8(c)("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including [identified defenses.]"  To the extent Plaintiffs take a different position, Wayne Farms states that the Complaint fails to state a claim upon which relief can be granted and fails to allege various elements of the cited claims, as discussed in part in Wayne Farms' Motion to Dismiss and supporting papers.  *See* ECF No. 283. Plaintiffs have not provided admissible evidence establishing the accuracy of the statements in the Complaint and in many cases, the statements are directly contradicted by evidence of market conditions and other facts, as reflected in Wayne Farms' Answers to identical or similar allegations in the Class Complaints.  *See* ECF No. 613; ECF No. 661; ECF No. 659.  Plaintiffs have not yet responded to discovery seeking the basis for their claims, and Wayne Farms reserves all rights to

132

identify defenses through discovery.  Finally, to the extent any of the defenses above are found to be defenses but not affirmative defenses, Wayne Farms identifies them as such.

## PRAYER FOR RELIEF

WHEREFORE, Wayne Farms respectfully requests that judgment be entered in favor of Wayne Farms and the other Defendants and against Plaintiffs, dismissing the Complaint in its entirety with prejudice.  Wayne Farms further requests that this Court: (i) award Wayne Farms its costs and disbursements; and (ii) award such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to the Federal Rules of Civil Procedure 38, Defendant Wayne Farms demands a trial by jury on all claims so triable.

Dated:  February 15, 2019

Respectfully submitted,

PROSKAUER ROSE LLP

*/s/ Christopher E. Ondeck*

By: */s/ Christopher E. Ondeck*
Christopher E. Ondeck
Stephen R. Chuk
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004
Telephone: (202) 416-6800
*Attorneys for Wayne Farms LLC*