# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| AHOLD DELHAIZE USA, INC., <br><br> Plaintiff, <br><br> v. <br><br> KOCH FOODS, INCORPORATED; JCG FOODS OF ALABAMA LLC; JCG FOODS OF GEORGIA LLC; KOCH MEAT CO., INC.; TYSON FOODS, INC.; TYSON CHICKEN, INC.; TYSON BREEDERS, INC.; TYSON POULTRY, INC.; PILGRIM'S PRIDE CORPORATION; SANDERSON FARMS, INC.; SANDERSON FARMS, INC. (FOODS DIVISION); SANDERSON FARMS, INC. (PRODUCTION DIVISION); SANDERSON FARMS, INC. (PROCESSING DIVISION); HOUSE OF RAEFORD FARMS, INC.; MAR-JAC POULTRY, INC.; PERDUE FARMS INC.; PERDUE FOODS LLC; WAYNE FARMS LLC; FIELDALE FARMS CORPORATION; GEORGE'S, INC.; GEORGE'S FARMS, INC.; SIMMONS FOODS, INC.; SIMMONS PREPARED FOODS, INC.; O.K. FOODS, INC.; O.K. FARMS, INC.; O.K. INDUSTRIES, INC.; PECO FOODS INC.; HARRISON POULTRY, INC.; FOSTER FARMS, LLC; FOSTER POULTRY FARMS; CLAXTON POULTRY FARMS, INC.; MOUNTAIRE FARMS INC.; MOUNTAIRE FARMS, LLC; MOUNTAIRE FARMS OF DELAWARE, INC.; AMICK FARMS, LLC; CASE FOODS, INC.; CASE FARMS, LLC; CASE FARMS PROCESSING, INC.; and AGRI STATS, INC., <br><br> Defendants. | **AMENDED COMPLAINT** <br><br> **Case No.  1:16-cv-08637** <br> **1:18-cv-05351** <br><br> **PUBLIC REDACTED VERSION** <br><br><br><br> **Jury Trial Demanded** |

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ................................................................................. 1

   A.    As Part of an Unlawful Price-Fixing Agreement, Defendants Agreed to Restrict Output and Cut Production. .............................................................................................................. 2

   B.    As Part of an Unlawful Price-Fixing Agreement, Defendants Agreed to and Did in Fact Manipulate and Artificially Inflate the Georgia Dock. ........................................................ 5

II.    PARTIES ............................................................................................................... 9

   A.    Plaintiff ........................................................................................................................... 9

   B.    Defendants ..................................................................................................................... 10

      (i)    The Koch Defendants ................................................................................... 10

      (ii)    The Tyson Defendants ................................................................................. 10

      (iii)    Pilgrim's Pride Corporation ........................................................................ 11

      (iv)    The Sanderson Farms Defendants ............................................................... 12

      (v)    Mar-Jac Poultry, Inc. ................................................................................... 12

      (vi)    The Perdue Defendants ................................................................................ 13

      (vii)    Wayne Farms, LLC .................................................................................... 13

      (viii)    Fieldale Farms Corporation ......................................................................... 13

      (ix)    Harrison Poultry, Inc. .................................................................................. 14

      (x)    Claxton Poultry Farms, Inc. ........................................................................ 14

      (xi)    House of Raeford Farms, Inc. ...................................................................... 14

      (xii)    The George's Defendants ............................................................................ 15

      (xiii)    Simmons Foods ........................................................................................... 15

      (xiv)    The O.K. Foods Defendants ........................................................................ 15

      (xv)    Peco Foods Inc. ........................................................................................... 16

      (xvi)    Foster Farms ............................................................................................... 16

      (xvii)    The Mountaire Farms Defendants ............................................................... 17

      (xviii)    Amick ......................................................................................................... 17

      (xvx)    The Case Foods Defendants ...................................................................... 178

      (xx)    Agri Stats ................................................................................................. 179

III.  JURISDICTION AND VENUE ................................................................. 19

IV.  TRADE AND COMMERCE.................................................................... 21

V.  FACTUAL ALLEGATIONS ................................................................... 22

   A.  Background on the Broiler Chicken Industry. ........................................... 22

     (i)  Broiler Chicken.................................................................................. 22

     (ii)  There Is a National Market for Broiler Chicken Worth Billions of Dollars.............. 23

   B.  The Broiler Chicken Industry Is Highly Susceptible to Price-Fixing. .......................... 23

     (i)  Broiler Chicken is a Commodity. ............................................................ 23

     (ii)  The Chicken Industry Is Highly Consolidated and Vertically Integrated. ................ 24

     (iii)  The Broiler Market is Characterized by Inelastic Demand. ................................ 29

     (iv)  There Are No Significant Substitutes for Broiler Chicken.................................. 30

     (v)  The Broiler Industry Has a History of Government Investigations and Collusive Actions. .................................................................................................. 30

     (vi)  There are High Barriers to Entry in the Broiler Industry. .................................. 31

     (vii)  Defendants Have Similar Cost Structures and Work Collaboratively to Share Cost Information. ............................................................................................ 34

   C.  Defendants Had Frequent Opportunities to Conspire and Shared Information Through Industry Events and Agri Stats. ............................................................................... 36

     (i)  Frequent Industry Events Provided a Pretext for Defendants to Meet, Discuss, and Agree to Restrict Production and Raise Prices. ...................................................... 36

     (ii)  Agri Stats Participated in and Facilitated Defendants' Conspiracy by Allowing Them to Share Detailed Information and Monitor and Enforce Their Unlawful Agreement......... 39

     (iii)  Agri Stats Also Facilitated Information Sharing Beyond the Data It Provides.......... 50

   D.  Defendants Conspired to Cut Production and Raise Prices Beginning at Least as Early as 2008. ...................................................................................................... 53

     (i)  There Were Consistent Patterns in the Industry Before Defendants' Conspiracy and Production Cuts in 2008...................................................................................... 53

     (ii)  Defendants Announced Production Cuts to Each Other and to Their Investors, Communicating Their Commitment to the Conspiracy to One Another. ............................. 55

     (iii)  Defendants Closed Plants and Laid Off Workers as Part of Their Conspiracy to Restrict Production, Resulting in Long-Term Effects. ........................................................ 63

     (iv)  Defendants' Joint Efforts to Cut Production Worked and Did in Fact Raise Prices. .. 65

E.    Defendants Continued Their Conspiracy with Another Round of Collective Production Cuts in 2011. .................................................................................................................. 69

   (i)    After The Success of Their 2008 Cuts, Defendants Decided to Continue Restricting Supply in 2011. ........................................................................................................... 69

   (ii)    In 2011 and Beyond, Defendants Continued to Covertly Call on Each Other to Maintain "Discipline," *i.e.*, Their Agreed Upon Output Restrictions................................... 69

   (iii)    In 2011 and Beyond, Defendants Again Closed Plants and Laid Off Workers as Part of Their Conspiracy to Restrict Production. ...................................................................... 75

   (iv)    Defendants' Joint Efforts to Cut Production in 2011 Continued to Work and Raise Prices, Leading to Long-Term Effects.................................................................................. 77

F.    Defendants Collusively and Fraudulently Manipulated the Georgia Dock Benchmark Price Index. ............................................................................................................................ 84

   (i)    Background on the Relevant Price Indices: Georgia Dock, USDA Composite, Urner Barry, and EMI. ....................................................................................................... 84

   (ii)    The Georgia Dock Pricing Methodology and Its Susceptibility to Manipulation...... 86

   (iii)    The PMN, the Georgia Dock, and the PMN Advisory Committee Were Created and Sustained for the Benefit of the Georgia Dock Defendants and the Broiler Industry. ......... 90

   (iv)    The Georgia Poultry Federation's Role in Creating and Sustaining the Georgia Dock for the Benefit of Defendants and the Broiler Industry. ....................................................... 86

   (v) The Georgia Dock Became Ripe for Manipulation. ..................................................... 867

   (vi)    The Georgia Dock Price Index Diverged from the USDA Composite and Urner Barry Price Indices Beginning in 2011. ...................................................................................... 101

   (vii) The Regulatory Investigation and Demise of the Georgia Dock ............................... 103

   (viii) The Defendants Fraudulently Submitted False and Inflated Quotes to the Poultry Market News, Causing the Index to be Artificially High .................................................. 109

   (ix) Defendants Had Both the Motive and Opportunity to Perpetrate the Fraud and Specifically Intended To Do So ........................................................................................ 146

   (x) The Georgia Dock Defendants Fraudulently Failed to Inform Plaintiff of Their Control Over the Georgia Dock, Their Ability to Manipulate the Georgia Dock, and Their Actual Manipulation of the Georgia Dock ..................................................................................... 149

   (xi) Georgia Dock Defendants Made Fraudulent Misrepresentations to Plaintiff by Stating that the Georgia Dock Reflected the Broiler Chicken Market........................................... 154

   (xii) Plaintiff Was Harmed by Georgia Dock Defendants' Fraudulent Submissions, Omissions, and Misrepresentations ................................................................................... 156

   (xiii) Defendants Engaged in a Pattern of Racketeering Activity as Part of the Conduct of an Enterprise's Affairs.......................................................................................................... 157

(xiv) Georgia Dock Defendants Did Not Contract With Plaintiff in Good Faith .............. 159

G.    Defendants Collusively Adopted Additional Strategies to Reinforce Their Conspiracy..... ................................................................................................................. 119

(i)    Defendants Collectively Shifted Away from Long-Term Fixed-Price Contracts to Cash in on Their Conspiracy............................................................................... 161

(ii)    Inter-Defendant Sales. ................................................................................ 163

(iii)    Atypical Increases in Defendants' Exporting of Chickens....................... 166

H.    The Statute of Limitations Does Not Bar Plaintiff's Claims. ............................ 167

(i)    Plaintiff Did Not Discover and Could Not Have Discovered Defendants' Conspiracy Until 2016. ................................................................................................ 167

(ii)    Defendants Actively Concealed Their Conspiracyannd/or Fraud. .......................... 169

(iii)    Plaintiff's Claims Were Tolled by the Direct Purchaser Class Action Complaint Filed in 2016. ....................................................................................................... 172

VI.    ANTITRUST IMPACT ................................................................................... 172

VII.    CLAIMS FOR RELIEF AND CAUSES OF ACTION ................................................. 173

COUNT I – VIOLATION OF 15 U.S.C. § 1 (AGAINST ALL DEFENDANTS FOR OUTPUT RESTRICTION AND PRICE-FIXING)....................................................... 173

COUNT II – VIOLATION OF 15 U.S.C. § 1 (AGAINST ALL DEFENDANTS FOR CONCERTED OUTPUT RESTRICTION – PLEAD IN THE ALTERNATIVE TO COUNT I) ...................................................................................................................... 175

COUNT III – VIOLATION OF 15 U.S.C. § 1 (AGAINST THE GEORGIA DOCK DEFENDANTS FOR PRICE-FIXING– PLEAD IN THE ALTERNATIVE TO COUNT I)...................................................................................................................... 176

COUNT IV – COMMON LAW FRAUD – BY THE GEORGIA DOC DEFENDANTS ................................................................................................................... 1757

COUNT V – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (AGAINST ALL GEORGIA DOCK DEFENDANTS) ................... 180

COUNT VI – NEGLIGENT MISREPRESENTATION BY THE GEORGIA DOCK DEFENDANTS (PLEAD IN THE ALTERNATIVE TO COUNT VII) ................... 17581

COUNT VII – VIOLATION OF GA. CODE ANN. §§ 16-14-4(a) AND 16-14-6 (GEORGIA RICO) BY THE GEORGIA DOCK DEFENDANTS (ACQUIRING MONEY THROUGH RACKETEERING ACTIVITY) ............................................... 184

COUNT VIII – VIOLATION OF GA. CODE ANN. §§ 16-14-4(b) AND 16-14-6 (GEORGIA RICO) BY THE GEORGIA DOCK DEFENDANTS (CONDUCTING ENTERPRISE THROUGH RACKETEERING ACTIVITY) ....................................... 188

iv

COUNT IX – VIOLATION OF 18 U.S.C. §§ 1962(c) AND 1964(c) (FEDERAL RICO) BY THE GEORGIA DOCK DEFENDANTS .............................................................. 194

COUNT X – UNJUST ENRICHMENT BY THE GEORGIA DOCK DEFENDANTS ........................................................................................................................... 199

PRAYER FOR RELIEF ........................................................................................... 200

JURY DEMAND ...................................................................................................... 201

Plaintiff Ahold Delhaize USA, Inc. ("Plaintiff" or "Ahold Delhaize") brings this action to recover damages resulting from an anticompetitive conspiracy and unlawful actions amongst Broiler chicken producers and related entities to artificially increase the prices of Broiler chicken sold to retailers in the United States since at least 2008. Plaintiff brings this action against the Defendants identified below under the federal antitrust laws, Georgia and Federal RICO, and related common law claims. Plaintiff demands a trial by jury and will seek treble and punitive damages from Defendants, who are jointly and severally liable, for Plaintiff's purchases of Broiler chicken from the conspirators during the relevant time period. For its Amended Complaint, Plaintiff alleges upon personal knowledge as to itself and its own acts and experience, and upon information and belief with respect to all other matters, as follows:

## I.     NATURE OF THE ACTION

1.     For at least eight years, a powerful group of American chicken producers unlawfully conspired in a multifaceted scheme to restrain trade and raise the price of chicken to supracompetitive heights. The chicken producers' conspiracy began at least as early as 2008 and lasted through at least as late as 2016 (generally referred to herein as the "relevant period"). These chicken producers—named as Defendants herein—successfully implemented supracompetitive chicken prices on Plaintiff during the relevant period.

2.     Broiler chickens make up about 98% of all chicken meat sold in the United States, and the chicken meat industry has over $30 billion in annual wholesale revenue. The industry in the United States is highly concentrated, allowing a few producers to control supply—together, Defendants control approximately 90% of the wholesale chicken market. Tyson and Pilgrim's Pride are the two largest producers, with market shares around 22% and 17% respectively.

3.     The Broiler chicken industry has a history of anticompetitive conduct, and this lawsuit joins others that have challenged Defendants' most recent conspiracy. In fact, Defendant

1

Fieldale Farms Corporation has already settled similar claims by a putative class of direct purchasers for $2.25 million and by a putative class of commercial and institutional indirect purchaser plaintiffs for $1.4 million. Further, the Florida Attorney General's office is currently investigating at least some of the Defendants for anticompetitive practices.

4.      During the conspiracy at issue in this lawsuit, Defendants used two methods to restrain trade: one at the beginning of the distribution chain, and one at the end. On the front end, they unlawfully agreed to reduce the supply of Broiler chickens in the market, intending to and actually inflating the price of chicken paid by direct purchasers such as Plaintiff. On the back end, Defendants colluded to and did in fact manipulate the Georgia Dock price index, artificially increasing the price for wholesale chicken on Plaintiff and other direct purchasers. Their manipulation of the Georgia Dock price index was not only a conspiracy; it also constituted outright fraud, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████

**A.      As Part of an Unlawful Price-Fixing Agreement, Defendants Agreed to Restrict Output and Cut Production.**

5.      To reduce and restrict output, Defendants conspired to curtail the supply of chickens in the U.S. market via unprecedented cuts at the top of the supply chain. They jointly and collusively reduced "breeder flocks" that produce the chickens ultimately slaughtered for meat consumption.

6.      Defendants' collusive output restrictions changed the chicken market in the United States. Historically, the chicken industry went through boom and bust cycles: in response to rising prices, producers would increase production, which would then cause an oversupply and result in a decrease in chicken price.

7.      These boom and bust cycles became so expected over decades of experience that by the 2000's, an industry saying was that life only held three certainties: death, taxes, "and 3% more Broilers."

8.      In 2008, Defendants changed the face of the chicken industry when they conspired to restrict output, a process they discussed using the code word "discipline." Defendants collectively began cutting production *and* significantly handicapped their ability to ramp up production. As part of their conspiracy, Defendants first cut production and breeder flocks from 2008 to early 2009, and then continued to do so from 2011 to 2012 as the conspiracy continued into the current decade. Defendants effectively eliminated their ability to meaningfully increase supply for years.

9.      As part of their joint efforts to impose supply-side "discipline," Defendants made public statements regarding their individual commitments to production cuts as well as calls to their competitors about the importance of instituting and maintaining "discipline" industry-wide. Defendants' public statements on the need for, and benefits of, industry-wide supply "discipline" marked a significant departure from past industry practice.

10.     Defendant Agri Stats, Inc. ("Agri Stats"), knowingly facilitated Defendants' coordinated output restriction scheme, allowing Defendants to monitor and police each other through detailed reports purchased at significant cost.

11.     The information available to Defendants in these Agri Stats reports is not the kind of information that would be disclosed by one competitor to another in a competitive market. Agri Stats reports include individual rows of facility-level data for over 100 of Defendants' chicken facilities.

12.     While Agri Stats purports to "anonymize" individual producer data in its reports, it knew that the reports were detailed enough that any reasonably informed producer could discern the identity of its competitors' information, including breeder flock numbers, and other production, capacity, and cost data. Agri Stats reports identify each chicken facility with unique numbers, including a coding system identifying the region and sub-region, for each chicken complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself.[1]

13.     Agri Stats' reports are not publicly available and Defendants closely guard them from those outside the industry.

14.     Agri Stats both facilitated and participated in the conspiracy because, among other things:

- Agri Stats' coding system enabled Defendants' personnel to decipher, simply by eyeballing the "rows" in a given report, the production, feed, sales and other competitively-sensitive metrics of their competitors, many of whom had complexes "right down the road from" each other in the same Agri Stats sub-region;

- Agri Stats' regular meetings with each Defendant allowed Agri Stats to share production information among the Defendants. For example, mid-level Tyson personnel working at complexes in the Mid-Atlantic region were advised by their complex managers about competitors' production following quarterly meetings between the Tyson complex managers and Agri Stats account managers; and

- Agri Stats account managers created, for each of their Defendant customers, a series of data compilations known as "books," based on the competitively-sensitive data that a particular Defendant had submitted to Agri Stats. On a

---

[1] Agri Stats reports include specific data for Defendants' chicken complexes (listed by producer and location) including: Upper Mid Atlantic ("Sub-Region 21"), North Carolina ("Sub-Region 22"); Northern Georgia and Tennessee ("Sub-Region 31"); Southern Georgia, Florida and South Carolina ("Sub-Region 32"); Alabama and Mississippi (sub-regions 41 and 42); lower Arkansas, Louisiana and Texas ("Sub-Region 51"); upper Arkansas and Missouri ("Sub-Region 52"); Kentucky, Ohio, Minnesota, Indiana and Wisconsin ("Sub-Region 60"); and California and the Pacific Northwest ("Region 10)" (which is composed solely of Defendant Foster Farms' three complexes).

number of occasions, Agri Stats personnel sent copies of one Defendant's "books" to other Defendants.

15.     In early 2009, a leading industry publication noted that chicken "production in the U.S. used to be just like government spending, it never went down and cutbacks only resulted in slowing the rate of growth, but not anymore," because for "***the first time in decades, total broiler production in 2008 remained virtually unchanged*** from the year before. Watt PoultryUSA 2008 rankings data show the industry's total weekly ready-to-cook (RTC) production at 724.05 million pounds, just slightly more than the 723.71 million RTC pounds per week reported at the end of 2007." (Emphasis added).

**B.     As Part of an Unlawful Price-Fixing Agreement, Defendants Agreed to and Did in Fact Manipulate and Artificially Inflate the Georgia Dock.**

16.     A second component of Defendants' conspiracy to unlawfully increase and maintain chicken prices was the manipulation and artificial inflation of prices on the "Georgia Dock," a weekly benchmark price compiled and published by the Poultry Market News division (the "PMN") of the Georgia Department of Agriculture (the "GDA"). The Georgia Dock was widely used by chicken producers as a pricing component of their sales during the relevant period. Unlike other price indices available to chicken buyers, the Georgia Dock price index was a self-reported number from a group of nine chicken producers, referred to herein as the "Georgia Dock Defendants." Senior executives from eight of the nine Georgia Dock Defendants were members of a private sector "Poultry Market News Advisory Committee," playing a key role in establishing and overseeing the Georgia Dock benchmark price.

17.     Beginning in no later than early 2011, the Georgia Dock price index began to behave differently than other price indices for comparable products. In particular, although the Georgia Dock had historically been highly correlated with price indices compiled by Urner Barry (a commodity price reporting service) and the USDA, that correlation began to dissolve in 2011.

5

The Georgia Dock set upon an upward trajectory that was divorced from market realities. Over time periods when the Urner Barry and USDA price indices decreased, the Georgia Dock stayed flat or increased. This divergence continued and became especially pronounced in 2015.

18.     Although discovery is ongoing, discovery to date has revealed what caused the Georgia Dock price index to behave in this manner: █████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████

19.     █████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████

20.     █████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

21.  ████████████████████████████████████

████████████████████████████████████████████

22.  ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

23.  ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

24.  ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

25.     These are just a few of the many examples discussed in this Amended Complaint. Plaintiff was not in possession of this information about Defendants' fraudulent submissions until after filing its original Complaint and participating in recent discovery.

26.     In addition to their fraudulent submissions to the PMN, all of the Georgia Dock Defendants that sold chicken to Plaintiff fraudulently misrepresented, omitted, and failed to disclose critical, non-public information about the Georgia Dock. ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

27.     ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

28.     Following intense scrutiny by regulators and by the news media over allegations of manipulation, the GDA suspended reporting the Georgia Dock index in November 2016. The

Antitrust Section of the Florida Attorney General's office is currently investigating the chicken industry for anticompetitive practices, including the manipulation of the Georgia Dock.

## II.     PARTIES

### A.     Plaintiff

29.     Plaintiff Ahold Delhaize USA, Inc. is a Delaware corporation with a principal place of business in Quincy, Massachusetts. Ahold Delhaize brings this action on its own behalf and on behalf of its assignors (including, without limitation, Delhaize America, LLC; Food Lion, LLC; Hannaford Bros. Co., LLC; Bottom Dollar Food Northeast, LLC; Retained Subsidiary One, LLC; Delhaize America Distribution, LLC; Ahold U.S.A., Inc.; Giant Food Stores, LLC; Giant of Maryland LLC; Peapod, LLC; The Stop & Shop Supermarket Company LLC; Retail Business Services LLC; and C & S Wholesale Grocers, Inc.), each of which directly purchased Broiler chicken from one or more Defendants and their co-conspirators during the relevant period. The references in this Amended Complaint to "Ahold Delhaize" or "Plaintiff" includes Ahold Delhaize's assignors.

30.     Ahold Delhaize is the direct or indirect parent company of several local retail companies (including, without limitation, Food Lion, Giant Martin's, Giant Food, Hannaford, Peapod, Stop & Shop, Bottom Dollar, Harvey's, and Sweetbay) that own and operate retail grocery businesses and sell and sold Broiler chicken and other products. During the time relevant to Plaintiff's claims, Plaintiff directly purchased Broiler chicken in the United States from one or more of the Defendants and/or their co-conspirators and sustained injury and damage to its business as a proximate result of the antitrust violations and other unlawful activities alleged in this Amended Complaint.

**B.    Defendants**

(i)    The Koch Defendants

31.    Defendant Koch Foods, Incorporated is a privately held Delaware corporation headquartered in Park Ridge, Illinois.

32.    Defendant JCG Foods of Alabama LLC is an Alabama limited liability company headquartered in Park Ridge, Illinois and is a wholly owned subsidiary of Defendant Koch Foods, Incorporated.

33.    Defendant JCG Foods of Georgia LLC is a Georgia limited liability company headquartered in Park Ridge, Illinois and is a wholly owned subsidiary of Defendant Koch Foods, Incorporated.

34.    Defendant Koch Meat Co., Inc. is an Illinois corporation headquartered in Park Ridge and is a wholly owned subsidiary of Defendant Koch Foods, Incorporated.

35.    Defendants Koch Foods, Incorporated, JCG Foods of Alabama LLC, JCG Foods of Georgia LLC and Koch Meat Co., Inc. (collectively, "Koch") report detailed data to Agri Stats and receive Agri Stats reports.

36.    Koch, through JCG Foods of Georgia LLC, was one of nine chicken producers that submitted false and artificially inflated price quotes to the GDA until the Georgia Dock price index stopped being published in late November 2016. Its vice president of sales served on the Georgia Dock Advisory Committee. Koch is a Georgia Dock Defendant.

(ii)    The Tyson Defendants

37.    Defendant Tyson Foods, Inc. is a publicly held Delaware corporation headquartered in Springdale, Arkansas.

38.    Defendant Tyson Chicken, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

39.     Defendant Tyson Breeders, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

40.     Defendant Tyson Poultry, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

41.     Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc. and Tyson Poultry, Inc. (collectively, "Tyson") report detailed data to Agri Stats and receive Agri Stats reports.

42.     Tyson was one of nine chicken producers that submitted false and artificially inflated price quotes to the GDA until the Georgia Dock price index stopped being published in late November 2016. One of Tyson's plant managers served on the Georgia Dock Advisory Committee. Tyson is a Georgia Dock Defendant.

                    (iii)    Pilgrim's Pride Corporation

43.     Defendant Pilgrim's Pride Corporation ("Pilgrim's Pride") is a publicly held Delaware corporation headquartered in Greeley, Colorado.

44.     Pilgrim's Pride reports detailed data to Agri Stats and receives Agri Stats reports.

45.     Pilgrim's Pride was one of nine chicken producers that submitted false and artificially inflated price quotes to the GDA until the Georgia Dock price index stopped being published in late November 2016. Its executive vice president of sales and operations served on the Georgia Dock Advisory Committee. Pilgrim's Pride is a Georgia Dock Defendant.

46.     Defendant Pilgrim's Pride filed for bankruptcy in 2008. Defendant Pilgrim's Pride is liable for all conspiratorial and unlawful acts undertaken while it was in bankruptcy proceedings and when it participated in the conspiracy and other conduct alleged herein following its discharge from bankruptcy on December 29, 2009.

(iv)    The Sanderson Farms Defendants

47.    Defendant Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi.

48.    Defendant Sanderson Farms, Inc. (Foods Division) is a Mississippi corporation headquartered in Laurel, Mississippi and is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

49.    Defendant Sanderson Farms, Inc. (Production Division) is a Mississippi corporation headquartered in Laurel, Mississippi and is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

50.    Defendant Sanderson Farms, Inc. (Processing Division) is a Mississippi corporation headquartered in Laurel, Mississippi and is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

51.    Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division) and Sanderson Farms, Inc. (Processing Division) (collectively, "Sanderson Farms") report detailed data to Agri Stats and receive Agri Stats reports.

52.    Sanderson Farms was one of nine chicken producers that submitted false and artificially inflated price quotes to the GDA until the Georgia Dock price index stopped being published in late November 2016. Sanderson Farms is a Georgia Dock Defendant.

(v)    Mar-Jac Poultry, Inc.

53.    Defendant Mar-Jac Poultry, Inc. ("Mar-Jac") is a Georgia corporation headquartered in Gainesville, Georgia.

54.    Mar-Jac reports detailed data to Agri Stats and receives Agri Stats reports.

55.     Mar-Jac was one of the nine chicken producers that submitted false and artificially inflated price quotes to the GDA until the Georgia Dock price index stopped being published in late November 2016. Its vice president of operations served on the Georgia Dock Advisory Committee. Mar-Jac is a Georgia Dock Defendant.

(vi)     The Perdue Defendants

56.     Defendant Perdue Farms Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland.

57.     Defendant Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland and is a subsidiary of Defendant Perdue Farms, Inc.

58.     Defendants Perdue Farms Inc. and Perdue Foods LLC (collectively, "Perdue") report detailed data to Agri Stats and receive Agri Stats reports.

(vii)     Wayne Farms, LLC

59.     Defendant Wayne Farms, LLC ("Wayne Farms") is a Delaware limited liability company headquartered in Oakwood, Georgia.

60.     Wayne Farms reports detailed data to Agri Stats and receives Agri Stats reports.

61.     Wayne Farms was one of the nine chicken producers that submitted false and artificially inflated price quotes to the GDA until the Georgia Dock price index stopped being published in late November 2016. Its vice president of fresh sales served on the Georgia Dock Advisory Committee. Wayne Farms is a Georgia Dock Defendant.

(viii)     Fieldale Farms Corporation

62.     Defendant Fieldale Farms Corporation ("Fieldale") is a privately held Georgia corporation headquartered in Baldwin, Georgia.

63.     Fieldale reports detailed data to Agri Stats and receives Agri Stats reports.

64.     Fieldale was one of nine chicken producers that submitted false and artificially inflated price quotes to the GDA until the Georgia Dock price index stopped being published in late November 2016. Its owner and CEO also served on the Georgia Dock Advisory Committee. Fieldale is a Georgia Dock Defendant.

(ix)     Harrison Poultry, Inc.

65.     Defendant Harrison Poultry, Inc. ("Harrison") is a Georgia corporation headquartered in Bethlehem, Georgia.

66.     Harrison reports detailed data to Agri Stats and receives Agri Stats reports.

67.     Harrison was one of the nine chicken producers that submitted false and artificially inflated price quotes to the GDA until the Georgia Dock price index stopped being published by the GDA in late November 2016. Its owner and CEO served on the Georgia Dock Advisory Committee. Harrison is a Georgia Dock Defendant.

(x)     Claxton Poultry Farms, Inc.

68.     Defendant Claxton Poultry Farms, Inc. ("Claxton") is a Georgia corporation headquartered in Claxton, Georgia.

69.     Claxton reports detailed data to Agri Stats and receives Agri Stats reports.

70.     Claxton was one of nine chicken producers that submitted false and artificially inflated price quotes to the GDA until the Georgia Dock price stopped being published in late November 2016. Its CEO served on the Georgia Dock Advisory Committee. Claxton is a Georgia Dock Defendant.

(xi)     House of Raeford Farms, Inc.

71.     Defendant House of Raeford Farms, Inc. ("Raeford") is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina.

72.     Raeford reports detailed data to Agri Stats and receives Agri Stats reports.

14

(xii)   The George's Defendants

73.   Defendant George's, Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.

74.   Defendant George's Farms, Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas and is a wholly owned subsidiary of George's, Inc.

75.   Defendants George's, Inc. and George's Farms, Inc. (collectively, "George's") report detailed data to Agri Stats and receive Agri Stats reports.

(xiii)   Simmons Foods

76.   Defendant Simmons Foods, Inc. is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas.

77.   Simmons Prepared Foods, Inc. is a privately held Arkansas company headquartered in Siloam Springs, Arkansas and is a wholly-owned subsidiary of Simmons Foods, Inc. During the relevant period, Simmons Foods, Inc. exclusively sold the chicken it produced to Simmons Prepared Foods, Inc., which in turn resold the chicken in various forms to its customers. Simmons Prepared Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of Broilers, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States. Defendants Simmons Foods, Inc. and Simmons Prepared Foods, Inc. are collectively referred to as "Simmons" or "Simmons Foods."

78.   Simmons Foods reports detailed data to Agri Stats and receives Agri Stats reports.

(xiv)   The O.K. Foods Defendants

79.   Defendant O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.

15

80.     O.K. Farms, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas and is a wholly owned subsidiary of Defendant O.K. Foods, Inc.

81.     O.K. Industries, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas and is a wholly owned subsidiary of Defendant O.K. Foods, Inc.

82.     Defendants O.K. Foods, Inc., O.K. Farms, Inc. and O.K. Industries, Inc. (collectively, "O.K. Foods"), which are subsidiaries of the Mexican poultry conglomerate Industrias Bachoco, report detailed data to Agri Stats and receive Agri Stats reports.

(xv)    Peco Foods Inc.

83.     Defendant Peco Foods Inc. ("Peco Foods") is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama.

84.     Peco Foods reports detailed data to Agri Stats and receives Agri Stats reports.

(xvi)   Foster Farms

85.     Defendant Foster Farms, LLC is a privately held California corporation headquartered in Livingston, California.

86.     Defendant Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California and is a related entity of Foster Farms, LLC. During the relevant period, Foster Poultry Farms and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of Broilers, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States. Defendants Foster Farms, LLC and Foster Poultry Farms are collectively referred to as "Foster."

87.     Foster reports detailed data to Agri Stats and receives Agri Stats reports.

(xvii)   The Mountaire Farms Defendants

88.     Defendant Mountaire Farms Inc. is a privately held Delaware corporation headquartered in Millsboro, Delaware.

89.     Defendant Mountaire Farms, LLC is a privately held Arkansas limited liability company headquartered in Little Rock, Arkansas and is a wholly owned subsidiary of Defendant Mountaire Farms Inc.

90.     Defendant Mountaire Farms of Delaware, Inc. is a privately held Delaware corporation headquartered in Millsboro, Delaware and is a wholly owned subsidiary of Defendant Mountaire Farms Inc.

91.     Defendants Mountaire Farms Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc. (collectively, "Mountaire Farms") report detailed data to Agri Stats and receive Agri Stats reports.

(xviii)   Amick

92.     Defendant Amick Farms, LLC ("Amick") is a privately held Delaware limited liability company headquartered in Batesburg-Leesville, South Carolina that has facilities in South Carolina, Maryland, and Delaware.

93.     Amick Farms is a wholly-owned subsidiary of OSI Group, LLC, a privately held Delaware corporation headquartered in Aurora, Illinois.

94.     Defendant Amick reports detailed data to Agri Stats and receives Agri Stats reports.

(xix)   The Case Foods Defendants

95.     Defendant Case Foods, Inc. is a privately held Delaware corporation headquartered in Troutman, North Carolina.

17

96.     Defendant Case Farms, LLC is a privately held Delaware limited liability company headquartered in Troutman, North Carolina with facilities and operations in Ohio and North Carolina. Case Farms, LLC is a wholly-owned subsidiary of Case Foods, Inc.

97.     Defendant Case Farms Processing, Inc. is a privately held North Carolina corporation headquartered in Troutman, North Carolina with facilities and operations in North Carolina. Case Farms Processing, Inc. is a wholly-owned subsidiary of Case Foods, Inc.

98.     Defendants Case Foods, Inc.; Case Farms, LLC; and Case Farms Processing, Inc. are collectively referred to as "Case Foods."

99.     Defendant Case Foods reports detailed data to Agri Stats and receives Agri Stats reports.

100.    All of the above-named Defendants are collectively referred to as "Defendants" in this Amended Complaint. Defendants are horizontal competitors in the United States chicken market. Defendants and their co-conspirators, directly and through their wholly owned or controlled affiliates, produced and sold chicken throughout the United States, including in this District, at prices that were artificially inflated as a result of their conspiracy and other unlawful conduct alleged in this Amended Complaint.

101.    All of Defendants' wrongful actions described in this Amended Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or engaged in by Defendants' various officers, agents, employees, or other representatives within the course and scope of their duties and employment, or with Defendants' actual, apparent or ostensible authority. Defendants used the instrumentalities of interstate commerce to facilitate their unlawful conduct, and their conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the U.S., including in this District.

18

(xx)    <u>Agri Stats</u>

102.    Defendant Agri Stats is an Indiana corporation headquartered in Fort Wayne, Indiana, and a subsidiary of Eli Lilly & Co., a publicly-held Indiana corporation headquartered in Indianapolis. Agri Stats produces reports on the Broiler industry available via paid subscription.

103.    Agri Stats is a co-conspirator of the Defendants and has knowingly played an important and active role in Defendants' collusive scheme detailed in this Amended Complaint. All of Agri Stats' wrongful actions described in this Amended Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, or engaged in by Agri Stats' various officers, agents, employers or other representatives while actively engaged in the management and operation of Agri Stats' business affairs within the course and scope of their duties and employment, or with Agri Stats' actual, apparent or ostensible authority. Agri Stats used the instrumentalities of interstate commerce to facilitate the conspiracy alleged herein, and its conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the U.S., including in this District.

104.    A representative from Agri Stats was elected to the board of the National Chicken Council ("NCC"), one of the industry's most important trade associations, in 2008 and 2010—two key periods in the conspiracy alleged in this Amended Complaint. Several Defendants, including Wayne Farms and Pilgrim's Pride, also have hired former Agri Stats executives to work in senior sales positions, and Agri Stats employs or has employed several former executives of the Defendants. All of these facts highlight the unique and symbiotic relationship between Agri Stats and the chicken-producer Defendants.

## III.    JURISDICTION AND VENUE

105.    This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a); the Georgia Racketeer Influenced and Corrupt

Organizations Act ("Georgia RICO"), Ga. Code Ann. § 16-14-1 *et seq.*; and the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal RICO"), 18 U.S.C. § 1961 *et seq.* Plaintiff also assert claims for common-law fraud, negligent misrepresentation, breach of implied covenant of good faith and fair dealing, and unjust enrichment.

106. Plaintiff seeks to recover treble damages (under the federal antitrust laws, Georgia RICO, and Federal RICO), punitive damages (for Georgia RICO and common-law fraud), costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiff resulting from Defendants' racketeering activities and illegal conspiracy to restrain trade.

107. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15. This Court has supplemental jurisdiction over the state-law causes of action asserted herein pursuant to 28 U.S.C. § 1367 because those causes of action arise from the same set of operative facts as the federal causes of action—in particular, the facts surrounding certain Defendants' conduct related to the Georgia Dock price index.

108. Venue is proper in this District under 15 U.S.C. § 15(a), 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) because Defendants resided, transacted business, were found, or had agents in this District during the relevant period, and because a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District. In addition, Defendants have already submitted to the jurisdiction and venue of this Court.

109. Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute, 734 Ill. Comp. Stat. 5/2-209, because each Defendant has transacted business in this State and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the State of Illinois to satisfy Due Process.

110.     This Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy throughout the United States, including in this District. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the United States, including in this District.

111.     This Court also has personal jurisdiction over the Defendants because each of them knew, or should have known, that because the Georgia Dock index price was used to price chicken sold in Illinois and nationwide, their participation in the manipulation of the Georgia Dock would have effects on the price of chicken purchased in Illinois based on the Georgia Dock price index. The alleged scheme, conspiracy, and fraud have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business in the State of Illinois.

## IV.     TRADE AND COMMERCE

112.     Defendants' conduct, as described in this Amended Complaint, was within the flow of, intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

113.     During the relevant period, Defendants produced, sold and shipped chicken in a continuous and uninterrupted flow of interstate commerce. The conspiracy and other unlawful acts in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce in Illinois.

114.     During the relevant period, each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy and fraudulent scheme.

21

## V.     FACTUAL ALLEGATIONS

115.    All of the above allegations are hereby incorporated as if fully set forth herein.

### A.     Background on the Broiler Chicken Industry.

(i)     Broiler Chicken.

116.    A Broiler is a chicken slaughtered before 10-13 weeks that is raised for meat consumption; within the industry they are also referred to as "fryers."[2] Throughout this Amended Complaint we refer to them and their meat as "Broilers" or "chicken."

117.    Broiler chicken can be sold in a variety of forms, for example, whole or in parts, fresh or frozen, raw or cooked, and alone or in a value-added product. However, as used in this Amended Complaint, the term excludes chicken grown, processed and sold according to halal, kosher, free-range, or organic standards.

118.    Prices for Broilers sold in the United States are quoted in whole bird or disassembled parts, with adjustments for transportation, product form (taking into consideration degree of processing or added value, *i.e.*, boneless chicken), and packaging at the time of sale.

119.    About 50–70% of Broilers are sold under contract with a customer, about 10–20% are sold on the spot market, and roughly 17–20% are exported.

120.    Plaintiff purchases chicken from Defendants pursuant to contracts and on the spot market and did so throughout the relevant period.

121.    The prices for certain of Defendants' chicken sales were based on benchmark price indices, including the Georgia Dock whole-bird price, which was one of three benchmark price indices used by chicken buyers until early 2017.

---

[2] Midway through the relevant period, the USDA's Food Safety and Inspection Service lowered the age definitions for Broilers from 13 weeks to the current 10 weeks. *See* 9 C.F.R. 381.170 (2014) (also declining to establish separate definitions of "broiler" and "fryer" chickens). Thus, before January 1, 2014, the definition of a Broiler was a chicken slaughtered before 13 weeks raised to be meat.

(ii)     There Is a National Market for Broiler Chicken Worth Billions of Dollars.

122.     There is a single national market for Broilers in the United States.

123.     Broiler chicken is a multi-billion dollar industry. According to the U.S. Poultry & Egg Association, the value of wholesale U.S. Broilers produced was $25.9 billion in 2016, $28.7 billion in 2015, and $32.7 billion in 2014. The market value varied between $21.8 and $30.7 billion from 2008–2013.

**B.     The Broiler Chicken Industry Is Highly Susceptible to Price-Fixing.**

(i)     Broiler Chicken is a Commodity.

124.     Chicken is a commodity product. A 2012 report by Focus Management Group confirmed that chicken "is a commodity product with little or no product differentiation based on the processors." The CEO of Defendant Pilgrim's Pride agrees, recently stating that "the chicken business **per se** is a commodity business." Defendants' methods of production are nearly identical, and Broilers are substantially similar across all of Defendants' brands. In fact, Defendants themselves illustrate the interchangeability of their products because, as detailed below, they have purchased chicken from each other (and then likely resold it) to soak up excess supply in the market to further their conspiracy. Further, almost all producers opt to have the USDA grade their chicken and sell USDA "Grade A" chicken, meaning that there is very little differentiation between the products that different producers sell.

125.     In a commodity market, sellers generally have to compete on price rather than other attributes, like product quality or customer service. Absent collusion, Defendants would compete on price, and in doing so would make supply decisions that would impact the market price for chicken. While an individual chicken producer would generally have the incentive to increase production to maximize profits, that increased production would reduce the profitability

23

of the industry as a whole. In the chicken industry, then, producers have the incentive to unlawfully agree to reduce supply and fix prices.

(ii)     The Chicken Industry Is Highly Consolidated and Vertically Integrated.

126.    During the relevant period, Defendants collectively controlled nearly 90% of the national chicken market.

127.    The Broiler industry is almost entirely vertically integrated, with chicken companies (known as "integrators") owning or tightly controlling each aspect of breeding, hatching, rearing, feeding, processing, and selling.

128.    The chicken industry uses contract farmers to raise chicks to slaughter-ready Broilers. These contract farmers remain under ownership and control of the integrator, which closely controls the process: integrators provide chicks and feed to the contract farmers, monitor the chickens during their "grow out" period of about 6–7 weeks, and then pick up the chickens at the end of the grow out period. The chickens are then brought to an integrator-owned slaughterhouse/processing plant. Some chickens are further processed by integrators into value-added specialty products (for example, chicken fingers or chicken nuggets).

129.    The graphic below shows the typical operation of a vertically integrated poultry firm, illustrating how integrators have complete control over supply:



130.    A former expert witness for Tyson noted the following in a 2010 paper prepared in connection with a workshop that the USDA and DOJ held to explore competition issues in the agriculture sector: "[i]n the poultry industry vertical coordination allows integrators to manage excess capacity to manage price. Integrators can minimize the effect on producers by increasing the time between collection and delivery of birds or reducing the number of flocks per year rather than terminating grower contracts in much the same way the USDA requires all commodity program recipients to adhere to acreage reduction program guidelines and grower associations require members to cut back marketable output."

131.    At the top of the supply chain are primary breeder companies, which own a "biological lock" on their Broiler lines and tightly control the genetic strain of chickens bred for meat, which produce desirable traits including a large breast. They own the great-grandparent and grandparent birds that produce breeding birds (called "multiplier" or "parent" flocks). Eggs from these "multiplier flocks" hatch and become the Broiler chickens that integrators slaughter and sell. The integrators have "multiplier farms" to produce eggs that are then taken to incubators at a hatchery owned by the integrator.

132.   Nearly all U.S. chicken producers now rely on three global genetics conglomerates: Cobb-Vantress, which is owned by Tyson, Aviagen, and Hubbard Breeders, which is now a subsidiary of Aviagen. In 2006, four primary breeder companies supplied 98% of the U.S. and 80% of the world supply of Broilers. But there has been even further consolidation recently: the Tyson-owned Cobb-Vantress purchased key assets of the Perdue-owned Heritage in 2014, and Aviagen purchased Hubbard Breeders in 2017 as mentioned above. Tyson's Cobb-Vantress subsidiary has approximately 50% market share.

133.   When Perdue sold its primary breeder company to Tyson, it issued a press release that stated that "[w]ith the outstanding exception of the Cobb-Vantress enterprise owned by Tyson Foods, no producer has managed to effectively compete using an in-company breeding program against a multinational primary breeder. To be cost effective a genetics program based on index selection incorporating the measurement of significant traits and applying sophisticated molecular markers and field testing requires a magnitude of scale exceeding the capacity of individual producers."

134.   Tyson's ownership and control of one of the three main primary breeding companies provides it with exceptional leverage over other Defendants because their business is dependent on a supply of primary breeders and they do not have many other options. Tyson has control over Cobb-Vantress' unique Broiler genetic lines, with desirable qualities like high conversion rates of feed into meat. It can also use Cobb-Vantress to provide inferior, sick, or an insufficient number of breeder birds to a competitor who chooses not to go along with the conspiracy alleged in this Amended Complaint.

135.   Of course, primary breeders are not the only companies consolidating in the chicken industry. In November 2013, USDA reported that "[d]uring the past 16 years, firms in

the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing . . . 55 federally inspected broiler firms operated in 1995, compared with 41 firms in 2010."

136. The chicken industry has steadily consolidated over decades, as tracked by Watt PoultryUSA and shown in the graphic below:



137. The trend towards consolidation has continued in recent years, squeezing out small producers as the top companies gain market share, as tracked by Watt PoultryUSA and shown in the graphic below:



138.    Defendants controlled 88.8% of Broiler production in the United States in 2015 as shown in the graphic below. Defendants have generally experienced stable market share with few exceptions (including Pilgrim's Pride's bankruptcy and Koch's purchase of new plants).



139.    Even these numbers may be under-representative of the actual control the top producers exert over the industry. Defendants engage in a "de facto" consolidation whereby they acquire nearly complete control over seemingly independent, smaller companies through co-packing contracts that allow the large producers to buy all of a smaller producer's chicken and

market it under the large producer's name. This de facto consolidation results in "zombie" companies that are separate entities on paper, but are actually controlled by Defendants. Tyson has co-packing arrangements with a number of smaller producers where Tyson either (1) purchases the smaller producer's entire production of Broiler chicken, including dark meat, or (2) purchases all of the smaller producer's white meat and encourages it to remove its dark meat from the United States market by exporting it.

140.    Upon information and belief, Defendants' co-packing contracts with smaller producers are typically two to five years in length. Defendants can pressure smaller producers to limit their production—even where the co-packing arrangement only covers 10–20% of a smaller producer's overall supply. Co-packing contracts give Defendants control over most aspects of smaller producers' production, including the breeds of bird smaller producers grow, what feed they use, and how many birds are grown. Defendants also require exacting specifications for processing, and Defendants' own employees are involved in and supervise the co-packer's slaughtering and processing.

141.    Upon information and belief, the purpose and/or effect of Defendants' co-packing arrangements is to avoid scrutiny from antitrust regulators that would come with formal merger arrangements, including possible discovery of Defendants' anticompetitive agreement to reduce the supply of Broilers in the U.S.

(iii)    The Broiler Market is Characterized by Inelastic Demand.

142.    Inelastic demand means that demand generally does not increase or decrease when prices rise or fall. An industry with inelastic demand makes it easier for a group of companies to profit from raising prices to supracompetitive levels because demand will not substantially decrease even though prices are high.

29

143.    The demand for chicken is inelastic and has become increasingly more inelastic over the past 40 years. A 2010 paper written by a former expert witness for Tyson notes that "[b]ecause of the inelastic nature of the supply and demand a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

(iv)    There Are No Significant Substitutes for Broiler Chicken.

144.    Although pork and beef are the most likely alternatives to chicken, they are not economic substitutes for chicken. The cross elasticity of demand between chicken, beef, and pork is either negative or statistically insignificant: pork and beef are *complements* to chicken, but not substitutes.

145.    Historically, there has been a high spread between the price of pork and beef versus the price of chicken, which also reduces any possibility of substitution between chicken and pork or beef.

(v)    The Broiler Industry Has a History of Government Investigations and Collusive Actions.

146.    In April 1973, the United States Department of Justice ("DOJ") filed a civil antitrust action against the National Broiler Marketing Association ("NBMA") alleging that the NBMA and its members violated Section 1 of the Sherman Act by conspiring to fix the price of chicken. The DOJ sought an injunction preventing the NBMA and its members from engaging in a conference call program whereby participants coordinated the pricing and production of Broiler chicken. Shortly thereafter, private civil antitrust actions were filed against the NBMA and 42 individual defendants in the *In re Chicken Antitrust Litigation* case. The NBMA and Broiler producers eventually settled the case for roughly $30 million in the early 1980's (around $78 million in today's dollars).

147.    Historically, purchasers have not been the only ones harmed by anticompetitive activity in the Broiler industry. In 2010, the USDA and the DOJ began a series of public workshops exploring competition issues in the upstream contract-farmer Broiler market. Regulators faced extreme challenge from integrated processors.

148.    Contract farmers have challenged the industry in cases such as *Adams v. Pilgrim's Pride*, No. 2:090-cv-00397 (E.D. Tex.), *Been v. O.K. Industries*, No. 08-7078 (E.D. Okla.), and *Wheeler v. Pilgrim's Pride Corp.*, No. 5:06-cv-00004 (E.D. Tex.), for violations of the Packers and Stockyards Act by integrated Broiler processors.

149.    In that same vein, the DOJ brought an action to stop an acquisition by George's of a Harrisonburg, Virginia processing plant from Tyson in 2011.[3] The DOJ alleged the plant acquisition would impermissibly reduce the available options for contract farmers to sell their grower services. George's settled the case in June 2011 after agreeing to make capital improvements to the facility that would increase its capacity and permit contract farmers to sell more services to the processing plant.

150.    A June 2014 USDA Report states: "the [Broiler] industry faces a range of public policy issues, [including] competition . . . . [c]oncerns[, including] the exercise of market power by Broiler integrators [that] have prompted merger litigation, USDA regulatory initiatives, congressional proposals, and investigations by Federal agencies."

(vi)    There are High Barriers to Entry in the Broiler Industry.

151.    The existence of high barriers to entry makes markets more susceptible to collusion. Under basic economic principles, a collusive arrangement that raises product prices above competitive levels would attract new entrants to the market seeking to benefit from the supracompetitive pricing without high barriers to entry. But where there are significant barriers

---

[3] *United States v. George's Foods, LLC, et al.*, No. 5:11-cv-00043 (W.D. Va.).

to entry, new entrants are less likely, meaning that barriers to entry can help create the conditions for formation and maintenance of a conspiracy.

152.    The U.S. chicken industry has high barriers to entry, as demonstrated by the trend of increasing consolidation within the industry, with large, vertically integrated companies increasing their control. Even beyond the issue of vertical integration, there are many food safety, worker safety, and environmental regulations that must be addressed by any new entrant into the chicken market. The existence of low, and highly variable, profit margins also act as significant barriers to entry. A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, construction of processing plants, feed mills, hatcheries, equipment, energy, transportation distribution infrastructure (aka, "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, long-standing customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.

153.    The price of construction of a new integrated Broiler processing complex (including a hatchery, feed mill, and processing plant) able to compete on price with current integrated producers is quite high. Even for a current market participant, such as Sanderson Farms, the third-largest producer, construction of a new Broiler complex in 2010 was estimated to cost $100–$125 million.

154.    Defendants themselves acknowledge the substantial costs of entering the market and view it as important that new entrants not be able to purchase closed chicken facilities. For example, when the State of Louisiana pressured Pilgrim's Pride to sell its closed Farmerville Broiler complex, Pilgrim's Pride executives expressed concern about any state assistance to the

prospective buyer of the Farmerville Broiler complex because such assistance could substantially reduce the buyer's costs, which could then permit the buyer to flood the market with low-cost chicken. Companies already in the market—such as Defendants—are motivated to exclude other companies from the market, especially where, as here, they want to maintain their coordinated supply restriction conspiracy and ultimately keep prices at artificially inflated levels. In a February 2014 earnings call, Pilgrim's Pride was asked whether it had any plans to sell "a couple of idled U.S. facilities . . . to use that as a source of capital," to which CFO Fabio Sandri replied, "[n]o. We are thinking those are held defensive, so we don't plan to sell them in this short-term or in the near future."

155. The barriers to entry in the Broiler industry have proved insurmountable: no company has created a new poultry company from scratch in decades. When one foreign meat company, a Ukrainian company called Omtron, tried to enter the U.S. market in February 2011 by buying a portion of the assets of a bankrupt Broiler producer, it too went bankrupt only five months after making the purchase.

156. A number of large foreign meat conglomerates have acquired U.S. Broiler producers in the past decade, including Brazil's JBS S.A. (Pilgrim's Pride), Mexico's Industrias Bachoco (O.K. Foods), Belgian company Continental Grain Company (Wayne Farms), and Brazil's Marfrig Alimentos S.A. (Keystone Foods). Each of these foreign meat conglomerates were already large players in the global meat industry and simply continued operating a pre-existing U.S. Broiler company as a subsidiary. Ownership of U.S. Broiler subsidiaries by such large, well-financed conglomerates further deter entry by smaller, non-globalized companies that might otherwise want to enter the U.S. Broiler production business.

        (vii)   Defendants Have Similar Cost Structures and Work Collaboratively to Share Cost Information.

157.    Another factor that makes a market more susceptible to price-fixing is similar cost structures between competitors. All other factors being equal, when production costs are mostly variable, there is less incentive for a producer to operate its facilities at full capacity, and this may allow a group of producers to boost prices artificially with greater success than when fixed costs are the largest component of production costs.

158.    The majority of production costs for Broiler producers are variable. The single largest cost component of producing Broilers is feed, which primarily consists of soybean meal and corn. Broiler feed prices have varied widely from 2007–2016, reaching 71% of the cost of growing Broilers in 2012, but falling to only about 50% by 2014. Input costs other than feed include processing plant labor costs, materials, and capital equipment. Labor costs have declined significantly over the past two decades for Defendants, while at the same time labor productivity has substantially increased.

159.    Defendants have relatively similar cost structures. The technology and process of chicken production is well known amongst Defendants, and they employ the same types of equipment and processes in the production processes. Defendants also have only three companies from which they can obtain breeder stock, so there are very limited options with respect to purchasing the most cost efficient Broiler genetic lines. Similarly, Defendants all purchase corn and soybeans on the open market, so they have limited ability to obtain substantially different pricing on these key variable cost inputs.

160.    Defendants use Agri Stats to share extraordinarily detailed cost information, so they are able to constantly realign their cost structures with one another. Agri Stats permits each

Defendant to have unusually detailed knowledge of competitor costs and to make adjustments to standardize each company's cost structure across all Agri Stats participants.

161.    Defendants engage in a program of "feedmill cross-testing" in which some Defendants exchange feed and chicks with one another for the purported purpose of determining which Defendants' feed and/or chicks have superior qualities. Defendants claim this strategy helps them maximize efficiency. However, it is not economically rational in a truly competitive market for a producer to provide its proprietary feed mixes and/or chicks to its competitor, thereby giving away any competitive cost advantage it has over its competitors.

162.    It is also not unusual for Defendants to permit competitor's CEOs access to each other's production complexes. In a competitive industry, production methods typically are closely guarded to protect proprietary methods of production that save a company money and give it a competitive advantage over its competitors. However, this is not the case in the Broiler industry. For example, from April 19–21, 2013, Pilgrim's Pride's President & CEO Bill Lovette, Perdue Chairman of the Board Jim Perdue, and Sanderson Farms President & COO Lampkin Butts attended a three day long "Chicken Media Summit" in North Carolina that included visits by attendees to a Sanderson Farms grow house and processing plant. Similarly, from April 19–21, 2015, another Chicken Media Summit included tours of Perdue's operations and panel discussions with Defendants' senior executives. While such tours were often framed as "best practices" information exchanges, they permitted the opportunity to conspire among senior executives.

163.    Defendants also permit employees to regularly move between companies without non-compete limitations or confidentiality agreements that would protect a company's (seemingly) proprietary business knowledge and customer base. For example, Dr. Don Jackson

was President of Foster Farms' Poultry Division until December 2008, but then immediately took a position as CEO of Pilgrim's Pride. Similarly, Clint Rivers, Pilgrim's Pride's former President and CEO until December 2008, left the company and became Senior VP of Operations and Supply Chain Management for Perdue in 2009. Rivers then moved to Wayne Farms in 2012, where he became Chief Operating Officer. Greg Tatum served as CFO for Claxton Poultry, before moving to Pilgrim's Pride in 2009 to serve as Senior VP of Business Development. Pilgrim's Pride CEO Bill Lovette and Executive Vice President Jayson Penn both came from Case Foods to Pilgrim's Pride in 2011. Numerous other high level and well as lower level executives move freely between Broiler companies with little or no provision by Defendants to protect their confidential information.

164.    Further, Defendants' executives communicated with each other via telephone. Don Tyson, John Tyson, and Archie Schaffer, former top-level executives at Tyson, had regular telephonic and facsimile correspondence with executives and high-ranking employees of the other Defendants in this litigation, including at critical points during the supply restrictions alleged in Plaintiff's complaints during 2008-2009 and 2011.

### C.    Defendants Had Frequent Opportunities to Conspire and Shared Information Through Industry Events and Agri Stats.

#### (i)    Frequent Industry Events Provided a Pretext for Defendants to Meet, Discuss, and Agree to Restrict Production and Raise Prices.

165.    Industry trade associations and frequent industry meetings provide a pretext under which co-conspirators agree to and engage in anticompetitive conduct. They can also facilitate information sharing between co-conspirators and allow co-conspirators to monitor and enforce the conspiracy.

166.    All or nearly all Defendants belong to the following U.S. chicken industry trade associations, which allowed Defendants to agree to, coordinate, monitor, and enforce their

conspiracy: the NCC, United States Poultry & Egg Export Council, U.S. Poultry & Egg Association, Georgia Poultry Federation, North Carolina Poultry Federation, and Poultry Federation (representing chicken producers in Arkansas, Missouri and Oklahoma). *Communication in Poultry Grower Relations: A Blueprint to Success*, a book published in 2000, confirms that "representatives from the various [chicken producers] readily share information while attending the numerous seminars offered by the U.S. Poultry & Egg Association, National Chicken Council" and other trade groups.

167.    Defendants' CEOs and top level executives regularly and frequently attend trade association meetings and other industry forums. Defendants are members of multiple industry groups, which each have numerous regular events, giving these executives regular access to each other through which they effectuated their conspiracy.

168.    Many Defendants are and have been members of the NCC, which represents chicken producers. The NCC has three annual board meetings attended by Defendants' executives, including CEOs, which are generally "invitation only." These events include multiple cocktail hours, formal meals, golf outings, and other opportunities for Defendants' executives to talk casually with their competitors. The meetings themselves include presentations from allied industry organizations—including Agri Stats, discussed further below. Defendants' executives often meet, socialize and golf, hunt, or fish together after the meeting.

169.    For example, on July 20-22, 2008, the NCC held a three-day "Chicken Marketing Seminar" attended by Defendants' senior executives. The event was billed as a marketing seminar that "includes social networking events and recreational opportunities, including a golf tournament."

170.     Many Defendants are and have been members of the United States Poultry & Egg Export Council ("USAPEEC"), which promotes exports of U.S. poultry and eggs worldwide. USAPEEC holds Board of Directors meetings quarterly, which Defendants' executives attend.

171.     Many Defendants are and have been members of the U.S. Poultry & Egg Association ("U.S. Poultry"). U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall, which Defendants' executives typically attend.

172.     Many Defendants are and have been members of the Georgia Poultry Federation. Until recently, the Georgia Poultry Federation's stated purpose on its website was "[t]o protect and improve the competitive position of the poultry industry in Georgia, the nation's leading poultry producing state." The Georgia Poultry Federation holds regular meetings each April, August, and September, which Defendants' executives typically attend.

173.     Many Defendants are and have been members of the North Carolina Poultry Federation, which has a stated mission "to create a favorable climate for business success for everyone involved in the poultry industry in North Carolina." The North Carolina Poultry Federation holds regular meetings each year, including annual meetings and Board of Directors meetings which Defendants' executives typically attend.

174.     Many Defendants are and have been members of the Poultry Federation, which "is a multi-state trade organization representing the poultry and egg industry in Arkansas, Kansas, Missouri and Oklahoma." The Poultry Federation holds regular meetings each year, including Board of Directors meetings, which Defendants' executives typically attend.

175.     Defendants, including Tyson, Cobb-Vantress (a Tyson subsidiary), and Sanderson Farms, are and have been members of the International Poultry Council, which was formed in

2005 and is composed of national trade associations from more than 20 countries, as well as more than 40 individual companies that are "Associate" members.

176.     Defendants' executives and other employees also attended trade shows annually. The International Poultry Expo ("IPE") was held annually from 2008–2012, and in 2013 it was integrated into the International Producers and Processors Expo ("IPPE"). The IPE billed itself as "the networking hub of the world for the poultry industry." The IPPE is "the world's largest annual poultry, meat, and feed industry event." An Agri Stats executive regularly speaks at the expo. Defendants' executives and other employees attended these expos annually.

177.     For example, on January 28-30, 2009, Defendants' senior executives attended the 2009 International Poultry Expo in Atlanta, Georgia.

178.     Defendants' executives also participate in numerous investor conferences organized by Wall Street analysts, providing further opportunities to meet and communicate with one another. Such conferences are held on an annual and/or ad hoc basis.

179.     Upon information and belief, Defendants' executives discuss pricing, production, and other non-public, proprietary information while attending industry events and during informal meetings and activities surrounding industry events. These regular, informal, and in-person opportunities to discuss pricing and production in the Broiler industry gives Defendants' executives comfort that their competitors remain committed to a plan to artificially restrict Broiler production.

       (ii)    <u>Agri Stats Participated in and Facilitated Defendants' Conspiracy by Allowing Them to Share Detailed Information and Monitor and Enforce Their Unlawful Agreement.</u>

180.     Without a policing mechanism, price-fixing and output-restriction conspiracies are unstable, because each conspirator has the incentive to "cheat." Here, an individual

conspirator has the incentive to raise its own chicken production to capture higher prices, even as the other producers remain faithful to the conspiracy and restrict production.

181.    Agri Stats knowingly participated in the producer Defendants' conspiracy by allowing Defendants to police, signal, and coordinate with one another and to ensure that no one cheated. Agri Stats' detailed statistics enabled Defendants to monitor one another's production figures for any signs of "cheating."

182.    Tyson had ceased being a member of Agri Stats—until the cusp of Defendants' conspiracy. Upon information and belief, in the wake of a $1.3 billion jury verdict in 2004 against Tyson for a conspiracy to manipulate pay to cattle farmers, increased fears of antitrust liability led Tyson to withdraw from Agri Stats.

183.    But then, in or around January of 2008, Tyson resumed its participation in Agri Stats. This was just after Tyson and Pilgrim's Pride attempted to lead production cuts that failed to raise prices in 2007. And it was a huge boon for Agri Stats, since Tyson is and was the largest Broiler company with over 20% market share at times.

184.    It was also a boon for the other Defendants, since they now had access to data from Tyson—which, again, is the largest player in the Broiler market.

185.    Agri Stats describes itself as "a privately held company providing professional benchmarking services to the commercial livestock industries." It claims its mission is to "improve the bottom line profitability for . . . participants by providing accurate and timely comparative data while preserving the confidentiality of individual companies."

186.    But Agri Stats does not "preserve the confidentiality of individual companies." Defendants know that when they provide their internal, confidential information to Agri Stats, other producers will be able to access that information and identify the company that submitted

it. Defendants unreasonably restrain trade by providing specific, competitively-sensitive information to Agri Stats, and Agri Stats participates by disseminating that information in a detailed way that it knows is readily-decipherable to Defendants.

187. Some sources, like the USDA, publish aggregated weekly, monthly, or annual supply and pricing information for the U.S. chicken industry. But Agri Stats is different: it gathers extremely detailed information from individual Defendants, which it then provides to all other Defendants. The level of detail in Agri Stats' data allows Defendants to accurately determine producer-specific production, cost, and general efficiency information. Agri Stats allowed Defendants to monitor whether co-conspirators were upholding their end of the bargain and actively facilitated Defendants' conspiracy.

188. Agri Stats gathers data from more than 95% of the poultry industry. It collects electronic data from Defendants at least as frequently as monthly. Defendants each employ people, typically in their accounting departments, who are responsible for submitting data to Agri Stats once a week (historically, on Thursdays) using an AS400 data link system. Agri Stats staff then convert, audit, and verify the data, and generate reports that go back to Defendants. Agri Stats' detailed audit process often involves directly contacting Defendants to verify data before issuing reports to Agri Stats subscribers. These reports include detailed statistics on nearly every operating metric within the industry.

189. Agri Stats collects and reports chicken industry data that is considerably more detailed than that provided by any similar service. The information Agri Stats collects and reports includes the following:

- Breeder flock size and age, hatchery capacity, and costs associated with breeder flocks, including feed and housing expense;

- Name of genetics company used for primary breeder stock;

41

- Data about the production, delivery and formulation of feed, including corn and soybean meal costs;

- Grow-out information for chicken "flocks" provided to contract farmers, including the number of chickens placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (*i.e.*, "down time"), feed conversion rate (pounds of feed per pound of chicken), average daily weight gain by chicks, live pounds produced per square foot of grower house, grower compensation, including average grower payment in cents per pound and cents per square foot, breed composition of flock (breed or cross-breed of flocks), detailed information on numerous mechanical aspects of chicken housing, and numerous other detailed cost, mortality, and operational information about disease, transportation, labor, and other grow out related information;

- Slaughter, processing, and further processing information, including pay for processing plant workers, total production volume, market age of chickens at slaughter, weight of chickens at slaughter, birds per man hour, processing line speeds, and labor hours per pound;

- Inventory levels of chickens;

- Sales data for finished product form and type, such as type of cut (whole bird, cut-up, deboned), various packaging forms (such as bulk, tray pack, etc.), and data segmented into various categories (such as exports, retail, foodservice, etc.); and

- Financial information, such as monthly operating profit per live pound, sales per live pound, and cost per live pound.

190. Agri Stats reports may not identify each producer by name—but that does little to preserve confidentiality. Any reasonably-informed producer, including Defendants, can easily deduce which individual chicken complexes discussed in the reports belong to which competitor. It is common knowledge among Defendants (including Agri Stats) that producers can "reverse engineer" the data.

191. Agri Stats reports identify each complex with unique numbers, including a coding system identifying the region and sub-region, for each chicken complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself. Specific complexes are easily identifiable from their codes. Agri Stats' coding

42

system made it easy for Defendants' employees—some of whom, including senior executives at both Wayne Farms and Pilgrim's Pride, used to work at Agri Stats—to decipher production, feed, sales and other competitively-sensitive metrics for their competitors' facilities.

192.    Agri Stats' coding system, coupled with the insular nature of an industry where "everybody knows everybody," allows for Defendants' employees to identify individual producers' data by eyeballing the rows in any Agri Stats report. The coding system has never changed (*e.g.*, the Tyson complex in Cummings, Georgia has always been identified as complex "222"), meaning that once a Defendant deciphered the numeric code for a given competitor's complex, that Defendant had the ability to know their competitor's data indefinitely.

193.    The specific information about the breeder flocks, average bird size, and production levels listed in Agri Stats reports for Defendants' complexes allows any given Defendant to "reverse-engineer" the data to determine which competitor's complex is which. It thus allows Defendants to determine which complexes are cutting back, especially when they read the data alongside public statements and other publicly-available information from competitors. For example, if a Defendant publicly states its intention to reduce production—even generically, without specifying which complexes will cut back, or by how much—all of their fellow producers will be able to tell from the subsequent Agri Stats reports whether that Defendant followed through, and where and how it achieved the production cut. Agri Stats gives meat to the Defendants' conspiracy.

194.    Each Defendant receives numerous types of Agri Stats reports, including separate targeted reports for each major area of operations, such as breeding, hatching, hauling, feeding, processing, selling, and administration. Defendants' complex managers typically receive the targeted reports for the specific aspects of chicken operations for which they have responsibility,

43

and the CEO, CFO, and a few other of Defendants' top executives receive Agri Stats' top-secret monthly "Bottom Line Report" (which, for a portion of the relevant period, was called the "Executive Report") geared to top level executives. The Bottom Line Reports contain one row for each chicken company reporting to Agri Stats with columns for certain categories of information, such as operating profit dollars, profit percentage, corporate SG&A (*i.e.*, overhead), interest expense, and other key operational information related to sales, revenues and costs. The Bottom Line Report was not publicly available.

195.    Within each Agri Stats report (including the Bottom Line Report), unique information referring to supposedly "anonymous" data permits Defendants to identify their competitors' information contained within each category of report. For example, Agri Stats data on "Actual Live Production Cost," one of many important industry metrics listed in the Bottom Line Report, includes line-items for each of the "sub-regions" (described above) that shows, for each particular sub-region, the weighted average figures for "chick cost," "grower cost," "feed ingredient cost," "[feed] mill delivery cost," and "vaccination and medical cost."

196.    Information helping Defendants assess the size and age of breeder flocks is available in the "Growth Rate Report" section of Agri Stats, which includes complex-by-complex numbers showing the average age, in weeks (*e.g.*, "63.22" or "51.76") of the hens whose eggs, when hatched, become the chickens later killed for meat consumption and supplied to Plaintiff and other chicken buyers. The hens comprising the breeder flocks produce fertile eggs (at a rate of roughly five per week) starting around 20 weeks of age, and are typically slaughtered at 65 weeks of age, when breeder hens lose the ability to consistently lay fertile eggs. A breeder hen killed at 60 weeks lays 25 fewer eggs than a hen killed at 65 weeks, meaning that

there are 25 fewer chicks hatched and 25 fewer mature chickens available to Plaintiff and other chicken buyers.

197.    The bird-age data from the "Growth Rate Report" shows how close a given breeder flock is to the end of its egg-laying lifespan, giving Defendants insight into how much longer that flock's capacity to lay eggs will impact the supply of chickens available for slaughter further down the supply chain. In addition, because the "Growth Rate Report" is available each month, knowing the average age of a given flock from month to month can help determine when flocks are being slaughtered and removed from the supply chain (*e.g.*, if the average hen age drops to 4.00 weeks after being at 48.00 weeks in the prior month's "Growth Rate Report," that is a clear indication a breeder flock was slaughtered at 48 weeks).

198.    The "Actual Live Production Cost" section of an Agri Stats report also includes (again, by sub-region), the average number and overall weight of the chickens being processed. Other sections of Agri Stats reports include similar, sub-region data for a range of competitively sensitive metrics, such as bird age and mortality, "chick cost per settled flock," and "grower expense." Knowing the number of complexes each Defendant operates in each sub-region—which, as detailed above, appear by name at the very beginning of the Agri Stats reports—any Defendant can, with relative ease, assess the performance of all competing complexes in a sub-region on a variety of important industry metrics.

199.    Agri Stats knowingly engaged in the conspiracy and reaped the benefits of being Defendants' policing and monitoring mechanism. For one, Agri Stats significantly increased its income when Tyson joined its service at the beginning of the conspiracy. Agri Stats charges substantial fees of hundreds of thousands of dollars annually to each Defendant, higher than

other data aggregation services. In fact, Broiler producers have paid Agri Stats at least $45.8 million.[4]

200.    Agri Stats has profited by its participation in this conspiracy through its receipt of payments from producer Defendants of a share of the revenues earned from supracompetitive prices charged for chicken as a result of the conspiracy.

201.    Defendants are typically reticent about their use of Agri Stats and do not tend to broadcast that they have a proprietary way to exchange information through Agri Stats. However, through the years some Defendants have provided a glimpse into their use of Agri Stats, for example:

- In May 2008, Sanderson Farms reported that "every year, we say the same thing, every year we review our operations and every facet within [A]gr[i] [S]tats. . . . We set out operational goals every year . . . and [we] try to improve our operations with this benchmarking—within this benchmarking service we call [A]gr[i] [S]tats."

- In December 2009, Joe Sanderson, the CEO of Sanderson Farms, stated "my judgment is that based on what I see in Agr[i] [S]tats nobody is planning on, pullet placements say no ramp up and what I've gleaned from Agr[i] [S]tats, people are not planning on ramping up. I see a lot of information from Agr[i] [S]tats that tells me that nobody is going to ramp up."

- In May 2011, Joe Sanderson again discussed Sanderson Farms' use of Agri Stats, stating: "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats."

- In December 2014, Tyson stated that "when you talk about the chicken cycle, most people will look at the cyclicality. It's very profitable right now. And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack. We can tell that through Agri Stats. Now at the same time, when there is more poultry available and the industry may not be as profitable, we would not expect to be anywhere close to what the bottom of that cycle would be."

---

[4] *See* Mem. by End User Consumer Pls. in Opp'n to Mot. for Protective Order [Redacted Version] at 9, June 1, 2018, ECF No. 940.

- In May 2015, Harrison CEO Mike Welch and Sanderson Farms COO Lampkin Butts were panelists at a symposium hosted by industry journal Watt PoultryUSA, which referenced information gleaned from Agri Stats (whose vice president, Mike Donohue, was in the audience).[5]

202.    One Broiler industry expert testified in a case brought by contract farmers against chicken producers that the sharing of information through Agri Stats by Broiler producers regarding pay for contract-farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern." The same expert also remarked that Agri Stats was unusual even among other price surveys, noting "[t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue. Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive. As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry. An intensive inquiry is needed."

203.    Defendants often exchanged Agri Stats information directly with one another, as shown during discovery to date in the *Broiler Chicken Antitrust Litigation*. For example, ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████  In exchange,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████

---

[5] Excerpts of comments made by Messrs. Welch and Butts are publicly available on Watt PoultryUSA's YouTube channel. *See* "Broiler company executives say bird size increase will continue," *available at* https://www.youtube.com/watch?v=ZBgEecBi7D4 and "Lampkin Butts describes changes in the poultry industry," *available at* https://www.youtube.com/watch?v=RN1IAphbQXs&t=53s. (both last visited January 26, 2018).

204.    Defendants' use of Agri Stats to secretly share highly confidential and proprietary information about the innermost details of their business—from their breeder flock age and size to capacity, pricing, production, and costs—constitutes an unreasonable and anticompetitive restraint of trade. Such proprietary, competitively sensitive information should be a closely guarded secret in a competitive market. Competitors routinely exchanging such sensitive internal business information reduces competition significantly.

205.    The FTC's and DOJ's 2000 Guidelines For Collaborations Among Competitors ("FTC/DOJ Guidelines") suggest that information sharing through Agri Stats is anticompetitive and impermissible. For example:

- The FTC/DOJ Guidelines note the high risk of antitrust issues for information sharing programs in industries with a history of collusion. The chicken industry has such a history of collusion, as discussed further below.

- The more competitively sensitive the information being shared is, the higher the antitrust concern is for such information sharing. Upon information and belief, the weekly and monthly Agri Stats reports include dozens of categories of detailed information that would be considered trade secrets in a competitive industry. Therefore, the competitive sensitivity of the information in Agri Stats' reports suggests a particularly high level of antitrust concern that it is being shared between competitors.

- The older or more historical the information being shared is, the less concern the FTC and DOJ have with information collaborations. Agri Stats reports are issued weekly and/or monthly, and EMI reports are issued daily, which provide nearly current production, sales, and other data to Defendants. Moreover, the nature of Broiler breeder flocks is that they predict future Broiler supply, so by sharing such information in a way that permits company-by-company identification, Defendants are in fact sharing future anticipated production information with one another, which clearly suggests high antitrust concern under the FTC/DOJ Guidelines.

- The FTC/DOJ Guidelines also provide a "safety zone" (*i.e.*, presumptively permissible) for collaborations among competitors that account for no more than 20 percent of each relevant market in which competition may be affected. Defendants account for approximately 90–95% of Broiler production, presenting high antitrust concern.

48

206.    Before serving as an expert witness, an agricultural economist had "heard rumors of a secretive poultry industry information-sharing service"; once he gained access to Agri Stats reports in his capacity as an expert witness he "was shocked at the incredible detail" of the information presented in the reports.

207.    A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively-sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:

> Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue. My experience is that competitors . . . are prolific at quantifying their competitor's business information on their own. For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company . . . started for the poultry industry in 1985. AGRISTATS has the following mission statement: "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING ACCURATE AND TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES." Note the mission is to share comparative data while protecting individual companies. I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved. Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

208.    Bloomberg News reported on Agri Stats in 2017, noting the direct role Agri Stats played in allowing producers to monitor and police each other:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of

information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."

(iii) <u>Agri Stats Also Facilitated Information Sharing Beyond the Data It Provides.</u>

209. Agri Stats goes beyond just collecting and distributing competitively sensitive information between the Defendants; it also actively participates in and facilitates Defendants' conspiracy. Agri Stats knew that Defendants were unmasking its purportedly "anonymized" data. Where producers were unable to individually identify a specific competitor's data from Agri Stats reports, Agri Stats employees confirmed the data for a particular company during individual meetings that they have with Defendants and during the numerous trade association meetings they attend with Defendants.

210. Agri Stats offers a service to Defendants whereby each quarter, personnel from Agri Stats meet with each Defendant's employees and give presentations about both company- and industry-wide data. These meetings take place at both the production-plant level, where Agri Stats personnel meet with Defendants' complex managers, and at the executive level, where Agri Stats personnel meet with the leadership of Defendants' hatchery, breeder and feed departments.

211. Agri Stats' regular meetings with Defendants, in which it discusses each Defendant's non-public, proprietary data, enable Agri Stats to shuttle information between Defendants. For example, mid-level Tyson personnel working at complexes in the Mid-Atlantic region were advised by their complex managers about competitors' non-public production information following quarterly meetings between the Tyson complex managers and Agri Stats account managers.

212. At these regular meetings with Defendants' executives, Agri Stats led detailed discussions about industry profitability and the key contributing factors, including size and average age of chicken breeder flocks, average hatchability of eggs, mortality rates, average bird

rate, feed cost, and other performance factors based on data Defendants provided. Agri Stats also led discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and the top and bottom third of the industry. Agri Stats also told Defendants' executives how much the industry was over- or under-supplying the market and estimated demand, and shared other information based on data Defendants provided.

213.    Agri Stats' presentations to the Defendants were based in part on color-coded data compilations, known as "books," specifically tailored for each Defendant based on the data the Defendant has submitted to Agri Stats. Agri Stats maintained at least six "books" for each Defendant: (1) the light-blue "Live" book, with information on the Defendant's breeders, hatchery feed and grow-out; (2) the red "Sales" book, with information on the Defendant's current and year-to-date sales; (3) the light-green "Production" book, with information on the Defendant's yields; (4) the brown "Profit" book, with information on the Defendant's profits and losses; (5) the mustard-yellow "Rendering" book, with information on the Defendant's rendering facilities; and (6) the "Bottom Line" book, with information on the totality of the Defendant's sales, revenues and costs.

214.    Anyone at Agri Stats had the ability to pull one or more Defendant's "books" and relay that information to other Defendants. Indeed, Agri Stats has shipped copies of one Defendant's "books" to other Defendants on a number of occasions. Despite the impropriety and illegality of this practice, when it was discovered following a routine review of shipping information, no one at Agri Stats was held accountable nor were the "books" returned to Agri Stats.

215.  Agri Stats employees also regularly attend, host, and present at industry events. In many instances, Agri Stats has far outstepped its stated role of a benchmarking service and has instead suggested specifically what chicken production levels should be based on its data:

- In July 2012 trial testimony in a lawsuit against Pilgrim's Pride by contract farmers, testimony revealed that a November 2008 Agri Stats report "made statements to the effect that it thought the industry was 5-percent oversupplied . . . relative . . . to demand."

- Agri Stats holds regular "poultry outlook conferences" for industry executives. One such conference was held April 18, 2013, and included a forward-looking presentation by Agri Stats Vice President Sue Trudell called "Broiler Industry Outlook" as well as presentations on the "Macroeconomic Outlook" and "Feed Ingredient Outlook." The presentations are not publicly available.

- Sanderson Farms hosted Agri Stats employees at investor events, for example, it included a presentation by Ms. Trudell at its October 18, 2013 investor event.

- In January 2009, Agri Stats Vice President Mike Donohue commented that "We [chicken processors] are an industry that is in demand . . . . We have a product that people want and continue to consume."

- Agri Stats subsidiary EMI also holds regular invitation-only "Analytics Web Conference" calls.

- Agri Stats Vice President Donohue is often invited to and attends industry events, including the Spring 2011 IPE conference, where he was a speaker at the annual "market intelligence" forum. Paul Aho, Donohue's co-panelist and international poultry economist, stated that "[t]he market is calling for around a 5% reduction in chicken production" in order for producers to achieve higher prices in 2011.

- Donohue also authors articles for the Agri Stats publication EMI Vital Signs, the tagline of which is "the pulse of the poultry industry." The sole "sample" publication available on EMI's website is a May 2013 article written by Donahue, in which he analyzes whether Broiler producers could continue to achieve high profit levels. He concludes that "[w]hen supply and demand factors are in good shape the industry can get a good return on investment and for the short and medium term it appears that there is certainly room for optimism in these factors."

- In January of 2012, at the US Poultry & Egg Association's Hatchery-Breeder Clinic, Donohue noted the high price of chicken breasts and said, "[i]t's not

just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012 . . . . I hope this carries over into the latter half of 2012 based on some of the production forecasts that can be made based on breeder placements and inventories." He noted the importance of reducing breeder flocks, stating that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recovery in the short term by filling up incubators again," but found that the industry is slaughtering breeder flocks at 59 to 60 weeks (instead of the typical 65 weeks), which "boded well" for prices to remain high. The kind of early slaughter of breeder flocks—including, for example, the bird-age data included in the "Growth Rate Report" described above—meant that Defendants subsequently were unable to increase production for at least eighteen months, as they would have been able to do had they not made cuts at the top of the supply chain.

### D. Defendants Conspired to Cut Production and Raise Prices Beginning at Least as Early as 2008.

#### (i) There Were Consistent Patterns in the Industry Before Defendants' Conspiracy and Production Cuts in 2008.

216. In the years leading up to Defendants' conspiracy, the chicken market in the United States increased in average annual production year after year. The market generally underwent boom and bust cycles, where producers would overproduce and then engage in short-term or medium-term production cuts by, for example, destroying egg sets or excess Broilers. On the cusp of the Great Recession, Defendants were contending with an oversupply of chickens, meaning low prices—and low profits.

217. In 2007, Tyson and Pilgrim's Pride, the two largest producers, cut production to try to raise prices. Although a few additional producers followed their lead, including Foster Farms, Peco Foods, and Perdue, the cuts were not enough to increase prices meaningfully, and other producers increased production.

218. After their 2007 production cuts failed to meaningfully raise prices, Tyson and Pilgrim's Pride realized that more of the industry needed to participate in production cuts and that the production cuts needed to be more permanent to be effectual. Otherwise, if Tyson and

Pilgrim's Pride continued to unilaterally make cuts, they realized they would be giving away market share to competitors. Tyson and Pilgrim's Pride spearheaded the conspiracy between all Defendants, and as the top two producers, they were well positioned to successfully rally the industry.

219.   In 2008, the chicken market changed. The clarion call to cut production came through press releases, earnings and investor calls, investment bank conferences, events hosted by Agri Stats, and the many trade association meetings attended by many of Defendants' senior-most executives. Defendants implored one another to fix the mistakes of the past and impose supply-side "discipline" to keep chicken prices from falling.

220.   "Discipline" meant production cuts. In only a few short months, Defendants implemented their conspiracy and made significant cuts industry-wide. Defendants, who control nearly 90% of the chicken market in the United States all together, jointly reduced production. Defendants designed their production cuts to increase chicken costs and, with it, Defendants' profits.

221.   While Defendants continued to use traditional methods to reduce supply (such as by reducing eggs placements, killing newly-hatched chicks, or idling processing plants, which all occur towards the middle of the supply chain), they also reduced breeder flocks at the top of the supply chain, which had longer-term effects. Because they were vertically integrated, Defendants could cut production at many levels of the supply chain. Defendants reduced the size of breeder flocks at the top of the supply chain by killing and retiring breeder birds earlier than usual and also by exporting breeder flocks at higher rates than usual.

222.   Cutting production by culling breeder flocks has a long-lasting impact. Breeder flocks are created by mating birds from only three genetics companies (Aviagen, Hubbard which

54

is now a subsidiary of Aviagen, and Tyson-owned Cobb-Vantress). It takes months to re-populate a breeder flock that has been destroyed. Destroying breeder flocks went further to inhibit Defendants' ability to increase supply than the traditional methods of production control Defendants had used in the past.

(ii)     Defendants Announced Production Cuts to Each Other and to Their Investors, Communicating Their Commitment to the Conspiracy to One Another.

223.     Defendants' executives announced production cuts to the industry and to investors, and in doing so called for "discipline" in the industry. Their announcements made clear that industry-wide production cuts were *expected*—by them and their purported competitors—and that the industry would see higher profits in return.

224.     On January 10, 2008, ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

225.     On January 23–25, 2008, Defendants attended the IPE conference in Atlanta. Thirty-five of the top thirty-eight chicken companies attended, accounting for 99.4% of the production of major Broiler companies.

226.     On a January 28, 2008 earnings call, Tyson CEO Dick Bond disclosed that Tyson had joined Agri Stats at the end of 2007 and said they "just recently . . . got [their] first series of data" from Agri Stats, and that the company had "no other choice but to raise prices substantially." The context of the industry is important to understand the meaning of this statement: because chicken is a commodity industry, one producer alone cannot successfully raise prices. Tyson had just learned that lesson in 2007, after its attempt to unilaterally cut

production failed to significantly raise industry prices. Bond's statement does not make sense absent his knowledge that there would be widespread production cuts that would allow Tyson to successfully raise prices.

227.    The very next day, Pilgrim's Pride CFO Rick Cogdill explicitly called on the industry to collectively cut production. After discussing how oversupply was hurting market prices in the chicken industry, he said "as we've mentioned in the past, we actually cut our production last year, 5%. . . . So it's clear that Pilgrim's [Pride] was the party, probably the primary party that led the reduction last year. . . . And the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system." He made several statements along the same lines on that call, imploring Pilgrim's Pride's competitors to cut production:

- "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs. . . . [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price."

- "It's really hard to say that the faster we get to production adjustment the quicker the recovery could happen . . . . And if the industry doesn't react soon enough it will have to react stronger in the end."

- "[W]e cannot be the ones that are out there continually reducing production, and let the other producers capitalize on that. I mean if it's 5% last year, 5% this year, 5% next year, you can see that that's a spiral to the demise of our company, which we are not willing to accept."

228.    That same week, on a January 31, 2008 earnings call, Sanderson Farms CEO Joe Sanderson also indicated that he anticipated the industry would cut production. Mr. Sanderson said he thought a production cut was "probable" and "if it's bad and ugly and deep in February, March and April, you'll see the production cuts take place during that period of time. There's still 25% of the industry still making money but I would expect to see those reductions come over the next 90 to 120 days."

56

229. On or about March 4, 2008, several senior executives of Defendants, including Clint Rivers, Pilgrim's Pride's CEO; Donnie Smith, a senior Vice President at Tyson; Bernard Leonard, a group vice president at Tyson, Thomas Hensley, Fieldale President, Ben Harrison, Amick President and CEO, and Tom Shelton, Case Foods CEO, attended an Executive Committee meeting of the NCC's Board of Directors. At the meeting, Schaffer and Smith were appointed to the board of directors, Hensley was appointed as the secretary-treasurer of the board, and Rivers and Leonard were elected to the executive committee.

230. About a week later, on March 12, 2008, Pilgrim's Pride took action to initiate production cuts. Under competitive conditions, other chicken producers would typically increase production when a large chicken company made substantial supply cuts to increase their own market share and profits. But that did not happen this time. Instead, the other Defendants announced production cuts, too:

- On April 3, 2008, Fieldale announced a 5% production cut stating that "We're hoping this cut puts supply and demand back into better balance." Fieldale is not a publicly-traded company, and there was no reason—other than signaling to its fellow producers that it was following through on its conspiratorial agreement—why it would publicly disclose its production plans.

- On April 3, 2008, Amick 

- On April 9, 2008, Simmons announced in a press release a 6% reduction in production throughout its processing plants, a move heralded by Wall Street analysts, who noted that production cuts across smaller companies in the chicken industry, like Simmons, would be positive for chicken prices. Simmons is not a publicly-traded company, and there was no

57

reason—other than signaling to its fellow producers that it was following through on its conspiratorial agreement—why it would publicly disclose its production plans.

- On April 10, 2008, Cagle's Inc. ("Cagles"), which was later acquired by Koch, announced a 4% reduction in chicken processing, which "will reduce product being sold through less profitable commodity outlets."

- On April 3–11, 2008, Wayne Farms, O.K. Foods, and Koch each announced 2–8% reductions in production. None of these companies are publicly-traded, and there was no reason—other than signaling to their fellow producers that they were following through on their conspiratorial agreements—why they would publicly disclose their production plans.

231. On April 29, 2008, Tyson CEO Dick Bond commented on this change in behavior, telling a Wall Street analyst that "I think the industry has changed . . . . I don't think the industry will be up [in production] that much anymore, we have seen some sizable declines here lately in egg sets and placements. So, we're going to be up a little bit but probably not a significant amount, not as much as we might have once anticipated."

232. This wave of production cuts was just the beginning. A *Wall Street Journal* article published in May of 2008 noted the change in the chicken industry: "Three things are making analysts more optimistic: Companies are cutting production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines." The article also noted "[i]t is unusual for egg sets to decline at this time of year." Egg set decline in May is unusual because egg sets take approximately 10 weeks to turn into chickens ready for market, and May is approximately 10 weeks before the peak of summer grilling season, which carries high demand for chicken.

233. Clint Rivers, Pilgrim's Pride's CEO, kept up the pressure on his competitors at a May 15, 2008 speech at the BMO Capital Markets conference at the Millennium Broadway Hotel. The *Wall Street Journal* reported that Rivers "would like the industry to trim total

production by 3%–4%, calling it a prudent move in light of recent price volatility in the grain markets."

234. On a May 22, 2008 earnings call, Sanderson Farms CEO Joe Sanderson reinforced the company's dedication to production cuts: "We will make a cut as we always do after Labor Day. We will make a 4–5% cut following Labor Day as we always do going into Thanksgiving, Christmas, and January [and] we reduce our egg sets and around Thanksgiving, Christmas, New Years and Martin Luther King. That is a period of slow demand for us, and we don't announce that, but we always do it. It is just a period when we take downdays and we will do that. But if we think more is needed, we will evaluate that sometime in August, and if need be will do it. We cut back in 2006, we cut back in '97–98. I don't know if we announced it or not, but we will do what we need to do." Sanderson did not explain why he was announcing these cuts now if the company had never done so in the past.

235. On June 4, 2008, Pilgrim's Pride CEO Clint Rivers expressed concern that there was still what he considered an oversupply of chicken, stating "[o]ur supply in chicken, we are oversupply . . . we need to see some balance in the supply. . . . Simply put, at this time there is still too much breast meat available to drive market pricing significantly higher."

236. On June 19, 2008, Mark Hickman, the Chairman of the NCC and CEO of Peco Foods broadcasted the company's commitment to further production cuts, even after the industry had already been destroying breeder flocks and making other long-term cuts, when he announced that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year" and that "we are hearing talk that this was not nearly enough, so liquidation is in round two."

237.    Also in June of 2008, an Agri Stats report joined in, stating ""Those who have announced cutbacks indicate they will continue until margins normalize. At this time we expect to see the declines continue until at least late 2009, and cuts could be deeper than now projected." It also noted that "[b]eginning in April, the weekly hatchery data started to show declines in egg sets and chick placements relative to year-earlier, which confirms the announced intentions to reduce broiler production and will result in slaughter falling below year-ago by mid-June."

238.    On June 23, 2008, Wayne Farms President and CEO Elton Maddox announced a 6% production cut. Like other executives, he blamed the scapegoat of "[s]oaring feed ingredient costs aggravated by the government's food for fuel mandate" for "the need for us to rationalize our business." To put things in perspective, this announcement came only three days after Agri Stats told the industry to make further cuts and only four days after Peco Foods CEO Hickman told the industry to make further cuts.

239.    On July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets, and, similar to Peco Foods, cited "record high prices for corn and soybean meal, which it attributes to the U.S. government's mandated ethanol policies along with recent flooding in the Midwest 'Corn Belt' region."

240.    In August 2008, Raeford publicly announced a 5% production cut. The company wrote in a statement to Watt PoultryUSA, an industry publication, that "[t]he current obstacles that face our industry require that supply be brought in line with demand." Raeford had previously pursued a strategy of aggressive growth and had doubled its chicken production from 2001 to 2007; a production cut was highly unusual.

241.   On an August 26, 2008, earnings call, Sanderson Farms CEO Joe Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand." He also indicated that he thought the industry had to go even farther with production cuts:

> [W]e kind of thought we were going to see reductions in July . . . [based on] 213/214 [million] egg sets back in April and that really did not materialize. When you look at USDA slaughter numbers in July, they were 100% and 101% and now we're looking at egg sets of 206 and 207 million that are going to show up sometime in October or November. We'll see when we get there. Those are barely impressive cuts. My suspicion is, as I've told you in May, the industry typically make the cut and it's tentative. We'll have to see if it works. . . . I'm very skeptical that those cuts are going to be enough to return us margins to cover these grain costs.

242.   On October 3, 2008, Defendants' senior executives had another chance to collude at the NCC's Annual Meeting in Washington, D.C. Agri Stats CEO Blair Snyder, who had been elected the day before as a "director-at-large" for the NCC's board, moderated a CEO panel that included the head executives from Pilgrim's Pride, Tyson, Perdue and Sanderson Farms. Pilgrim's Pride CEO Clint Rivers told panel members and the audience "[w]e need to get those [input] costs pushed through, but we've yet to see that happen." That meant that he wanted the industry to raise prices.

243.   On October 10, 2008, Pilgrim's Pride reacted to a USDA report showing declining numbers of egg sets in the chicken industry by telling the Associated Press that "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

244.   As reported on December 23, 2008, an industry analyst estimated that Tyson cut its production by 5%.

245. On February 18, 2009, Tyson Senior Group Vice President Donnie Smith gave an interview and stated that "[a]cross our industry, we're down about six percent versus where we were a year ago. We're seeing an impact from that on market prices . . . the industry fundamentals are improving."

246. In February 2009, Pilgrim's Pride announced that it would reduce its chicken production levels by 9–10%.

247. Also in February 2009, Tyson Senior Group Vice President Donnie Smith told investors that, "[u]sing WATT PoultryUSA data on ready-to-cook (RTC) pounds, our numbers have declined 5–7% from 2000 to 2008 on RTC pounds while at the same time the industry has grown 31%. Over time, we have done plenty of cutting back." Smith sent a clear message that Tyson believed it had already done its fair share of production cuts, and competitors were expected to pick up the slack. It is notable that, although Tyson made these statements to the industry, Tyson did also reduce its production during the relevant period in line with other producers.

248. On February 25, 2009, the Morning News of Northwest Arkansas reported that Sanderson Farms had cut its chicken supply by processing smaller chickens and running its plants at lower capacity utilization rates. Around the same time, Sanderson Farms told its shareholders that "[b]ecause we don't expect much help from the demand side, chicken market improvement will have to come from supply cuts."

249. On that same day, Todd Simmons, CEO of Simmons Foods, echoed Sanderson Farms' approach, noting that "[w]e are seeing lower demand in the food-service customer base. We have made adjustments in bird weights to ensure our production meets with our customer's needs."

250.   Overall, "[a]t least 11 companies reported reductions in weekly ready-to-cook production in 2008," including Defendants Tyson, Pilgrim's Pride, Perdue, Simmons, Raeford, Cagle's (acquired by Koch), George's, O.K. Foods, Harrison, and GNP Company (now owned by Pilgrim's Pride). But other chicken producers also cut their production without publicly announcing, instead proving that they were engaging in production cuts by sharing information through Agri Stats.

251.   On May 15, 2008 Sanderson Farms CEO Joe Sanderson stated that "we have seen for the last 6 or 7 weeks . . . some companies in our industry announce cutbacks. There have been I think six companies have announced cutbacks. ***I know some companies have cut back and have not announced***." (Emphasis added). The fact that Sanderson had this non-public knowledge strongly indicates that the competitors were conspiring with one another, either through secret direct communications or by using Agri Stats as a facilitator.

(iii)   <u>Defendants Closed Plants and Laid Off Workers as Part of Their Conspiracy to Restrict Production, Resulting in Long-Term Effects.</u>

252.   On March 12, 2008, Pilgrim's Pride issued a press release stating that it was going to close one processing plant and six distribution facilities to reduce supply. Clint Rivers, Pilgrim's Pride's CEO, stated "we believe the[se] actions we are announcing today are absolutely necessary to help bring supply and demand into better balance. That portion of the demand for our products that exists solely at pricing levels below the cost of production is no longer a demand that ***this industry*** can continue to supply." (Emphasis added).

253.   Then, on April 11, 2008, Pilgrim's Pride announced that it may close its large El Dorado, Arkansas processing plant, which employed more than 1,600 workers. In 2009, Pilgrim's Pride did close the plant.

254.     On July 2, 2008, Foster Farms abandoned plans to build a new chicken processing facility in Colorado. Foster Farms had announced the new facility in April of 2008, and it was set to employ at least 1,200 people. In a statement, Foster Farms CEO Don Jackson said that "it does not make economic sense to go forward with expansion at this time."

255.     On August 11, 2008, Pilgrim's Pride announced that it planned to "idle" a processing plant in Clinton, Arkansas and a further-processing facility in Bossier City, Louisiana, resulting in a loss of 600 jobs. Pilgrim's Pride "attributed [the] announcement to the continued imbalance in supply and demand in the U.S. chicken industry." Idling the Clinton processing plant resulted in an additional 1.25% incremental increase on top of the company's previously announced production cuts. Pilgrim's Pride noted its desire for more drastic production cuts industry wide: "[w]ith Labor Day approaching and no indication that the actions taken to date by Pilgrim's Pride or other industry members are having a positive effect on selling prices for our products, it is now clear that more significant decisive action is necessary."

256.     Watt PoultryUSA, an industry publication, reported that by September 2008, "[m]ost U.S. chicken integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'"

257.     On October 18, 2008, Wayne Farms President and CEO Elton Maddox announced the closure of a processing plant in College Park, Georgia, which resulted in the loss of more than 600 jobs. Maddox said that the closure was due to "changing market conditions" and a need to "maximize efficiencies." Wayne Farms was not a publicly-traded company, making this type of announcement somewhat unusual.

64

258.     During fall of 2008, Sanderson Farms delayed the opening of a new deboning facility.

259.     In December of 2008, it was reported that Tyson had reduced production "in recent years through the closing or sale of poultry plants and by running the company's remaining operations at reduced capacity utilization."

260.     On February 27, 2009, upon seeing that smaller producers were upholding their end of the conspiracy, Pilgrim's Pride announced historically large production cuts. A press release announced the closure of three processing plants located in Douglas, Georgia, El Dorado, Arkansas, and Farmerville, Louisiana. Pilgrim's Pride stated the plants were "underperforming" and said the closures would "improve the company's product mix by reducing commodity production and to significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession." Pilgrim's Pride also stated that the idling of these three plants would reduce its total pounds of chickens produced by 9–10%.

      (iv)    <u>Defendants' Joint Efforts to Cut Production Worked and Did in Fact Raise Prices.</u>

261.     Defendants successfully reduced supply of Broiler chicken. In the fall of 2008, an industry analyst noted that at the time "the industry has cut about 10 to 12 percent of its production."

262.     At a May 14, 2009 BMO Capital Markets conference in New York, interim Tyson CEO Leland Tollett remarked that "poultry market fundamentals had improved. Pullet placements, an[] indication of future broiler supplies, have been down the past five months compared to the same period last year. Egg sets continue to run six percent or more below year

ago levels and cold storage inventories of poultry have declined about 20 percent since peaking in November 2008."

263. Defendants' collective production cuts significantly slowed overall chicken production during the relevant period, deviating from the historical trends that showed steady annual production increases. The graph below, which was made from USDA data, shows this change: while chicken production grew 21% from 2000 to 2008 (an average of 2.3% per year), but then drastically slowed to a total of roughly 10% from 2008 through 2016 (an average of only slightly more than 1% per year). Defendants' conspiracy led to a significant decrease in the pace, timing and manner of chicken production during the relevant period.



264. In 2008, Defendants surprised industry observers by bucking a decades-long trend of an annual increase in chicken production. In the 2008–2009 production cuts, producers did not just reduce the pounds of chicken produced—they restricted their ability to ramp production up

quickly. By cutting farther up the supply chain than ever before, producers made these cuts more long-lasting. Even though in previous downturns some producers had used short-term methods to reduce chicken production, starting in 2008, Defendants took their reductions to the next level by substantially reducing their breeder flocks, shown in the following graph:



265.    Defendants' production cuts had their intended effect: they caused Broiler prices to be significantly elevated during the relevant period. These chicken prices are contrary to pricing patterns prior to the relevant period and contrary to what one could expect in a competitive market. During the Great Recession, chicken prices rose steadily even when input costs stayed flat or declined. In addition, chicken prices from 2015 to 2016 remained artificially inflated and did not respond to the historic drop in corn and soybean prices, even though feed is the major component of input cost, constituting up to 70% of total chicken production cost.



266.    In 2013, Bloomberg reported that "[c]orn fell 50% from its peak during last year's U.S. drought, boosting profit for Tyson Foods Inc. and other poultry producers . . . ." Industry analysts predicted that that Broiler prices would drop 7.1% in 2014 due to that fall in corn prices—but Broiler prices ***increased*** 9.2% instead.

267.    Broiler feed costs have been decreasing sharply since record highs in 2012. For example, prices for soybean meal were down 10% in 2014. Since January 1, 2008, corn prices have declined roughly 21% and soybean prices have declined 13%. But during the same period, Broiler prices increased roughly 50%.

268.    By one measure, Broiler prices have been at or near all-time highs roughly half of the time since January 1, 2008 despite the Great Recession.

269.    And those high chicken prices turned into profits for Defendants. For example, by May 28, 2009, Sanderson Farms reported strong profits that were twice the estimates of Wall Street analysts, "aided by production cuts and lower feed costs that offset still-weak demand."

68

**E.    Defendants Continued Their Conspiracy with Another Round of Collective Production Cuts in 2011.**

(i)    <u>After The Success of Their 2008 Cuts, Defendants Decided to Continue Restricting Supply in 2011.</u>

270.    As Defendants reaped the benefits of their production cuts in 2009, their senior executives continued to meet with each other at industry meetings and events and reiterate their commitment to reduce production. For example, in October of 2009, one industry analyst wrote that participants had emphasized continued "production discipline," the euphemism Defendants used for limiting chicken supply.

271.    But as chicken prices continued to rise in the later part of 2009 and into 2010, producers started to increase production to cash in, just like in previous decades. Of course, due to the unprecedentedly deep cuts, which also targeted the top of the supply chain, the temporary spike in production took much longer to realize than in the past. Still, this rising production began to depress prices by late 2010, and Defendants decided to commit to their conspiracy with even more vigor. Having learned how successful their conspiracy could be, they quickly engaged in more publicly-announced production cuts in the first half of 2011 to raise prices yet again.

(ii)    <u>In 2011 and Beyond, Defendants Continued to Covertly Call on Each Other to Maintain "Discipline," *i.e.*, Their Agreed Upon Output Restrictions.</u>

272.    In January 2011, Defendants' senior executives attended the IPE in Atlanta, Georgia. The annual market intelligence panel included industry insider Paul Aho and Agri Stats Vice President Mike Donohue. One report noted that Donohue said that "2008 was the worst year financially for the broiler industry that most people have ever seen" and that "[t]he industry's response in 2008 was a 5 to 6% reduction in pounds produced. . . . [T]he broiler industry is currently at record high weekly slaughter volumes." Aho agreed that the year could see "cutbacks, rationalization, and consolidation . . . ."

69

273.     On a February 4, 2011 earnings call, Tyson COO James Lochner noted that "until industry supply more closely aligns with demand" Tyson's chicken business would "be challenged." Dennis Leatherby, Tyson's CFO, also alluded to a supply-demand imbalance in the Broiler industry.

274.     On a February 2011 earnings call, Cagle's (later acquired by Koch) announced that it had begun a 20% reduction in production at a deboning facility. Cagle's expressed "optimis[m] that the industry will exhibit the production restraint necessary to support higher pricing for Cagle's products allowing for return to profitable margins."

275.     In March 2011, Raeford announced a 10% reduction in egg sets, which had begun in February of that year. In a press release, Raeford CEO Bob Johnson was quoted as saying "we decided that acting now was a responsible action for our company in light of continuing unstable economic conditions. . . . Hopefully the chicken prices will begin to increase later this year." As in the past, he blamed grain prices for the cuts: "In addition, if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."

276.     In April 2011, the Georgia Poultry Federation held its annual meeting near Lake Lanier Islands in Georgia. Defendants' senior executives attended the meeting: Donnie Wilburn, Director Live Operations of Harrison Poultry, was elected Vice Chairman of the Board of Directors and Phillip Turner, Plant Manager at Mar-Jac, was elected to the Board of Directors.

277.     In May 2011, Joe Sanderson, the CEO of Sanderson Farms, and Lampkin Butts, its President and COO, attended the BMO Farm to Market Conference in New York City, along with many other Defendants' executives. The conference included a presentation by Pilgrim's

Pride's CEO, which noted Pilgrim's Pride's new focus on reducing production, including by adjusting "head," *i.e.*, breeder flocks, to better balance supply with customer demand.

278.    On a May 24, 2011 earnings call, Sanderson Farms CEO Joe Sanderson stated that "the deal is that the industry—forget Sanderson—the industry cannot sustain losses like they are sustaining for a long period of time. They will—they can't do it and you have been observing this for years and years and the industry has been losing money since Novemberish and balance sheets deteriorate and losses have to stop. The only way to stop losses with $7 corn is to reduce production and get prices up. That is the rule and the law of the jungle. . . . [M]y judgment is that there will be some others that are going to have to make some adjustments that ***I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats***." (Emphasis added).

279.    On a June 6, 2011 earnings call, Cagle's (later acquired by Koch) said that "the industry must lower supply in order to offset reduced demand and to support higher market prices. Cagle's continues to process at 80 per cent of capacity at its Pine Mountain Valley deboning facility and does not contemplate any increase in the foreseeable future."

280.    In June and July 2011, Defendants' senior executives attended industry events, including a seminar held by the 2011 Food Media Seminar, which included a panel made up of the CEOs of Defendants Tyson, Peco Foods, and Perdue, and Defendant Sanderson Farms' President and COO; a June 27–29, 2011 Financial Management Seminar held by the US Poultry & Egg Association that included a presentation by Pilgrim's Pride's President and CEO Bill Lovette, and a July 12, 2011 panel at the 2011 Food Media Seminary that included executives from Tyson, Sanderson Farms, Peco Foods, and Perdue.

281.    On July 21, 2011, Defendant Amick ████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████

282.    On an August 1, 2011 earnings call, Joe Sanderson, Sanderson Farms CEO, told analysts that Sanderson Farms' 4% fall production cut beginning in November would remain in place beyond January 2012 or until demand improved. Sanderson stated that it "wouldn't surprise me if *the industry* makes further, deeper reductions in egg sets in October or November . . . . Nobody knows what cuts might be needed until we get to October, but I think that the cutbacks may need to be more than the 6% in head that *the industry* has in place." (Emphasis added).

283.    On an August 8, 2011 earnings call, Tyson's CEO stated that "domestic availability must be in balance with demand before *industry* economics can improve. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter . . . . Our goal is to match supply to demand. And following over-production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market." (Emphasis added).

284.    On August 17, 2011, ███████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████

285.    In October 2011, Defendants' executives attended the NCC's 57th Annual Conference in Washington, D.C. One panel discussed the "new paradigm" in the Broiler industry, and the speakers included senior executives from Perdue and Koch. Mark Kaminsky, the COO and CFO of Koch, said that "the industry is accustomed to cycles, but not one quite like the latest, and companies are going to need to adjust. *Discipline* on the supply side was one suggestion. Getting better prices from retailers was another." (Emphasis added).

286.    On a November 21, 2011, earnings call, Sanderson Farms CEO Joe Sanderson responded to a question about a production decrease by saying "when we talk about the 4% number, that is what we project the industry to be. Obviously, we're going to be a part of that."

287.    Defendants' executives continued to meet with one another to plan production cuts and monitor their conspiracy at trade association meetings and industry events throughout 2012. For example, Defendants' executives attended the NCC's board of directors meeting in Atlanta, held in conjunction with the January 2012 IPPE, and in March 2012, the NCC's board of directors met in Washington, D.C. Other opportunities to conspire included Urner Barry's annual marketing seminar from April 29 to May 1, 2012; the NCC's board of directors meeting in Lake Tahoe on June 21, 2012; and the July 15, 2012 meeting of the NCC's marketing committee in Stowe, Vermont. Each of these meetings were attended by a number of Defendants' senior executives.

288.    On an April 27, 2012 earnings call, Pilgrim's Pride's CEO reported that "the die is cast for 2012," and that "we're comfortable that *the industry* is going to remain constrained." (Emphasis added).

289.    In August 2012, Bloomberg Businessweek reported that Koch CEO Joseph Grendys stated that "[c]osts have gone up so much due to the drought that the industry will be forced to get price increases of 10 to 15 percent across all product lines" for 2013, and that "[t]he industry needs to be smart and focus on pricing to ensure it remains profitable . . . . Even if it does become unprofitable in the fourth quarter, the industry may resume making money after the first quarter of 2013." The article also mentioned that Koch was going to adjust price quarterly in its contracts for the first time since 2008.

290.    On August 28, 2012, Sanderson Farms announced an additional 2% production cut, blaming corn and soybean prices.

291.    In October 2012, the NCC held its annual meeting in Washington, D.C. with many of Defendants' senior executives in attendance. Executives from Fieldale and O.K. Foods spoke on an "Industry Outlook Panel" and discussed the question of what the industry "learn[ed] from 2011 and *how will the industry apply those lessons in 2012 and 2013.*" (Emphasis added).

292.    Defendants continued to signal one another to perpetuate their collusion into 2016, including by maintaining calls for "discipline" to note their continued adherence reducing supply. For example, during a February 2016 earnings call, Pilgrim's Pride's CEO Bill Lovette said:

> [T]he *industry* continues to be *disciplined* in terms of U.S. supply. Although monthly pullet data tend to be volatile and have occasionally been at the high end of our expectations, we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits [sic] and chick placements as a positive. We believe that at least part of the reason is because *chicken producers*

***are being disciplined*** and are much quicker to react than in the past and in adjusting supply growth to the actual market conditions.

(Emphasis added).

293.    On an analyst call on May 26, 2016, Sanderson Farms CEO Joe Sanderson noted that "when you go back and look and see how many eggs are being set right now and you go back and look at what the industry will set in 2007 . . . egg sets in 2007 were 220 million eggs a week, and we're setting 208 million, 209 million, 210 million eggs a week."

294.    On a July 28, 2016 analyst call, Pilgrim's Pride CEO Bill Lovette built on Mr. Sanderson's comments, stating, "I think what we have seen with egg sets is absolutely a testament to the ***discipline of our industry*** that we've seen in the last really two to three years." (Emphasis added). Lovette also noted that "the breeder flock in total is only up about 0.5%" and said there was a "positive notion [we] have about ***the discipline that we continue to see exhibited by the entire industry***," which "gives us more confidence that we're going to do the right thing with respect to maintaining that discipline. . . . [A]nd . . . gives us ***confidence that we're going to continue to be disciplined as an industry***." (Emphasis added).

295.    On an August 8, 2016 earnings call, Tyson's former CEO Donnie Smith—who was then transitioning the CEO role to Thomas Hayes, the company's former Chief Commercial Officer who became the CEO in late 2016—stated that "our chicken business is . . . it continues to do great," a comment seconded by Hayes, who said about the company's chicken business that "year-over-year, we're doing great . . . all that business is very profitable to us."

(iii)    In 2011 and Beyond, Defendants Again Closed Plants and Laid Off Workers as Part of Their Conspiracy to Restrict Production.

296.    In February 2011, Sanderson Farms CEO Joe Sanderson announced that the company was going to delay development and construction of a second North Carolina chicken facility.

75

297.    In March 2011, Simmons announced that, "[d]ue to economics specific to our industry, resulting from high grain prices predominantly caused by corn being used in ethanol, we have decided to realign some of our production resulting in the elimination of 180 positions as of April 15."

298.    In an April 15, 2011 press release, Mountaire Farms announced it was abandoning a planned capacity increase. Mountaire Farms President Paul Downes explained: "the only way to higher prices is less supply. The only way to less supply is chicken companies will shut down or cut back. . . . I think that's what we're going to see."

299.    On June 21, 2011, Cagle's (later acquired by Koch) announced it was going to lay off 300 employees at its Pine Mountain Valley, Georgia plant to reduce Broiler volumes.

300.    On June 27, 2011, Simmons layoffs of 223 employees at its Siloam Springs, Arkansas plant, blaming ethanol policies for high feed prices.

301.    On July 29, 2011, Pilgrim's Pride announced that it was closing its Dallas, Texas processing plant and laying off around 1,000 employees. Pilgrim's Pride's President and CEO Bill Lovette explained that "[w]hile the decision to close a plant and eliminate jobs is always painful, we must make better use of our assets given the challenges facing our industry from record-high feed costs and an oversupply of chicken . . . . A key component of that effort is improving our capacity utilization through production consolidation and other operational changes. By closing the Dallas facility, we can consolidate that production volume at three other plants and help those sites run closer to full capacity."

302.    In a November 17, 2011 press release, Wayne Farms announced the closure of its Decatur, Alabama plant and layoffs of 360 employees.

303.     On May 7, 2012, Tyson held an earnings call and announced it had decreased its production by 4% through longer days between flocks for its growers and by increasing its Buy vs. Grow program. Tyson noted on its earnings call that "the industry as a whole has reduced production pounds by 4% to 6% year-over-year. To help keep our production balanced, we bought chicken on the open market rather than growing all the birds we needed. We won't grow a bird solely for the part in the highest demand because we have to sell the entire bird. Grow versus buy is a strategy we look at continually based on input costs, revenue demand forecast and the needs of our customers." Tyson CEO Donnie Smith also noted on the earning call that "we began to cut back last year" with respect to egg sets and placements.

304.     On June 6, 2012, Pilgrim's Pride announced it would lay off 190 employees at its Chattanooga, Tennessee deboning plant.

305.     On October 29, 2014, Simmons Foods announced it was closing its Jay, Oklahoma "spent hen" processing plant. "Spent hens" are breeder chickens that have reached the end of their productive life cycle. The spent hen facility processed such breeders on behalf of multiple Defendants, which gave Simmons the opportunity to monitor changes in other Defendants' breeder numbers. The fact that Simmons closed the plant indicates that Defendants significantly reduced Broiler breeder flocks.

306.     All of Defendants' above actions, taken collectively and not in isolation, demonstrate a level of coordination and "discipline" not seen in the industry before the relevant period.

> (iv)     Defendants' Joint Efforts to Cut Production in 2011 Continued to Work and Raise Prices, Leading to Long-Term Effects.

307.     Agricultural lender CoBank noted shifts in the chicken industry in its March 2012 report titled "The U.S. Chicken Industry: Re-invented and Revitalized":

[The] U.S. chicken industry has gone through the proverbial wringer, but last year appears to have been the low point. In recent years, the chicken companies have all lost money, some more than others. And five U.S. companies have exited the industry since 2008. As the losses mounted, the industry realized that its standard business practices sorely needed to be reformed. The surviving chicken companies found it to be not just prudent, but absolutely essential to revise those practices. The poultry industry today operates much differently than it did just a few years ago.

308.  That report attributed the shift in part to Defendants' reductions of breeder flocks beginning in 2011, stating, "the recent cuts in the hatchery flock will prevent a quick response," with "U.S. chicken production [. . . ] on track to fall to its lowest level in 5 years by mid-2012."

309.  The following graph shows that the 2011 breeder flock cuts flew in the face of the historical trends in breeder flock numbers, reducing breeder flocks even more than the then-unprecedented 2008–2009 cuts:



310.  By September 2012, Plaintiff experienced increased prices due to Defendants' 2011 production cuts, particularly Defendants' reductions of breeder flocks. These higher Broiler

prices in the market by September 2012 were not justified by the corn and soy prices, Defendants' primary input costs, which had dropped significantly by the fourth quarter of 2012.

311.    Until at least 2016, Defendants reaped the benefits of their coordinated output restrictions as chicken prices rose and Defendants' profits soared to record levels. Defendants' executives cooed about the industry's newfound "discipline." For example, on a May 3, 2013 investor call, Pilgrim's Pride's CEO Bill Lovette said:

> Obviously, revenue is going to be a function of price, in part, and in this case a big part; and obviously, price is going to strengthen as supply continues to be disciplined and constrained . . . So I think *the industry is doing an admirable job in being disciplined* on the supply side and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying. . . . I believe *the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken* and not necessarily what corn or soybean meal costs. I think I'm confident to say, we've figured that out and we're doing a good job of balancing supply and demand.

(Emphasis added).

312.    On that same call, Lovette expressly stated that culling and restraining breeder flocks was an important part of supply reduction:

> I only know what we've seen happen in the past. Now, certainly, this summer if the industry chooses to grow the breeder supply significantly, that's definitely going to impact 2014. What I'm saying is, so far, *we've seen no indication that the industry plans to grow the breeder supply* and as a matter of fact, it's actually shrunk. . . . I'll reiterate that I think the industry has learned that the economics of our business is tied very closely to the supply of chickens and we've done a good job so far of maintaining discipline such that even paying nearly $8.50 for corn, we've been able to be profitable as an industry.

(Emphasis added).

313.    On October 4, 2013, Defendants' senior executives met in Washington D.C. for the NCC meeting, which included a panel including executives from Tyson and Simmons that was "chipper about the prospects for their industry in the next few years."

314.    On a February 21, 2014 earnings call, Pilgrim's Pride's CEO Bill Lovette opined on the reasons for higher chicken prices: "I think the one thing that creates . . . has created the stability is **the discipline of the industry to not allow profitability in the past to drive supplies** in the future . . . . And I think that discipline really . . . is the one ingredient that has made for more stable earnings that we have seen." (Emphasis added).

315.    At an industry conference on March 12, 2014, Tyson CEO Donnie Smith told attendees that a "meaningful change" in chicken production would not occur until the second half of 2015—a statement that made sense only because Defendants' unprecedented 2011–2012 breeder flock reductions made it impossible for them to "meaningfully change" chicken production any sooner.

316.    On May 6, 2014, an industry analyst with Stephens, Inc. said in an interview that historically, "it has been very easy to increase the chicken supply because the cycle is so short. It only takes four to eight weeks to grow a chicken, but U.S. chicken producers are having a hard time increasing the chicken supply by much. They cut production capacity throughout the supply chain when grain prices were very high. Because of this, they cannot materially increase supply for 2014. We likely won't see a material increase in production until the second-half of 2015."

317.    An October 2014 CoBank analysis similarly noted producers' inability to increase supply:

> [P]roduct demand should remain robust through the rest of this year and well into 2015, bolstered by a gradually improving domestic economy, continued strength in export demand, and the towering prices of beef and pork. Broiler production, however, has been slow to respond, with integrators having had problems expanding the number of chicks placed for growout. Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015. Producers have been somewhat constrained in their attempts to expand the nation's chicken flock by the limited supply of broiler hatching eggs. When the broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been

rebuilt to prior levels. Following seven months of [Year-over-Year ("YoY")] declines, the number of chicks placed for growout finally posted a modest 1 percent YoY gain in August. However, it will take another 6–9 months for integrators to rebuild the supply of broiler hatching eggs in preparation for expanding the overall flock, so significant growth in broiler production will not materialize until late 2015 or early 2016.

318.    That report simultaneously noted that wholesale prices for chicken "***have risen to unusually high levels***." (Emphasis added).

319.    On October 10, 2014, NCC President Mike Brown wrote an op-ed in The National Provisioner called "Biofuel policy holds back production rampup," which continued to blame ethanol policy for high prices, rather than Defendants' collusive agreement to cut production and to not increase production in line with demand. Brown wrote, "current favorable market conditions ***would normally stimulate production to be somewhat higher***, that is, a percentage more aligned with the long-run annual average of 4 percent. So why are chicken producers not stepping up production to better match the long-term average of 4 percent? We would if we could, but we can't. We would like to produce more pounds of chicken, but unfortunately we are not there yet. The primary reason for the industry's inability to increase production can be attributed to problems caused by a failed policy . . . ." Brown also went on to also blame fertility issues in breeder stock and a propane shortage for lackluster chicken production.

320.    On a February 12, 2015 earnings call, Pilgrim's Pride's President and CEO Bill Lovette also noted that the chicken industry was keeping production artificially restrained even in the face of rising demand: "I looked at some numbers supplied by Agri Stats earlier in the week and found some interesting facts. If you go back to 2008, the industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you

81

look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. So with all of that data in mind, what it tells me is ***the industry remains fairly disciplined on the supply side and demand has been increasing for chicken*** against the backdrop of increasing beef and pork supplies." (Emphasis added).

321.    2015 was also a banner year for Defendants' profits resulting from their conspiracy. Watt PoultryUSA's March 2016 issue noted that Tyson, for example, made "record earnings and sales in fiscal year 2015 . . . posting $40.6 billion in sales, including ringing up higher chicken sales. Yet, Tyson lowered chicken production in 2015. What's at work here? This paradoxical performance, in part, reflects the fact that Tyson, along with other top U.S. broiler companies, is redefining its business model to achieve profitable growth." Of course, as explained throughout this Amended Complaint, Tyson could not have done it alone: the true explanation for Tyson's 2015 performance was the conspiracy alleged herein.

322.    In late 2015, industry analyst Heather Jones observed that the supply of Broilers had not increased as expected after the Avian Flu due because Defendants had started breaking eggs rather than setting eggs. Defendants coordinated this breaking of eggs among each other through information exchanged by Agri Stats.

323.    The trend of unusually high chicken prices continued into 2016. Although at first glance chicken prices declined in 2016, they declined ***significantly less than input costs***. (That is, chicken prices declined as tracked by measurements other than the Georgia Dock, which is addressed below.) Defendants maintained these artificially high chicken prices that could not be

explained by input costs through their conspiracy to exercise "discipline" over chicken supply, and profited enormously from doing so.

324.    For instance, during an April 2016 earnings call, an analyst asked Pilgrim's Pride's CEO Bill Lovette, "you mentioned that you think the industry domestically has been much more ***disciplined*** than they have been in the past, I'm wondering if you could just elaborate a little bit more on what sort of drives that view and then maybe what gives you confidence that this discipline will hold." (Emphasis added). Lovette responded: "[w]hat drives the view is the actual numbers that we see, ready to cook pounds are up about 3.1% year to date. If you look at placements year to date, they're up 1%, egg sets up 0.7%, hatchery utilization actually declined in Q1 to 91%. So in the phase of coming off two of the most profitable years in the industry, we're not seeing, not realizing large amount of production increases."

325.    Immediately after Lovette's statements, Pilgrim's Pride's CFO Fabio Sandri added that "what drove that I believe it is that [the] industry is more geared towards profitability rather than just market share or field growth." Put differently, Defendants were no longer competing with one another for market share as could be expected in a competitive market and were instead conspiring together to restrict and not increase supply.

326.    On a February 2016 Sanderson Farms earnings call, BMO Capital Markets analyst Ken Zaslow questioned if there was "any changing of the industry dynamic" that had occurred since the days of market volatility in the chicken industry. CEO Joe Sanderson replied "we might be at a capacity wall, you know? . . . Since back in 2007 . . . there are three or four plants shuttered . . . . It does feel different."

**F.    Defendants Collusively and Fraudulently Manipulated the Georgia Dock Benchmark Price Index.**

(i)    Background on the Relevant Price Indices: Georgia Dock, USDA Composite, Urner Barry, and EMI.

327.    Defendants did not only conspire to jointly engage in output restriction. They also agreed to, and did in fact, raise prices in another way: by collusively and fraudulently manipulating the Georgia Dock price index.

328.    In general, there are three entities that report Broiler chicken prices: Urner Barry, the GDA (through the "Georgia Dock"), and the USDA. Of course, Agri Stats also collects detailed pricing information through its subsidiary Express Markets, Inc. ("EMI") but, as discussed above, Agri Stats reports are not publicly available and are tightly restricted.

329.    Urner Barry is a commodity price reporting service, and it publishes daily price information for Broilers. It is a subscription service, meaning that all producers and many purchasers subscribe to the pricing service for a fee. Urner Barry's Broiler price index is doubly verified by telephonic and written surveys of all or nearly all chicken producers and verification of reported prices from purchasers.

330.    The USDA publishes a Composite index, publishing Broiler price information generally on a weekly basis. The agency's Composite price index is free and publicly available. Like Urner Barry, the USDA double verifies its price index.

331.    Agri Stats, through EMI, publishes the most detailed price report. According to a May 2010 FarmEcon study, EMI's Broilers pricing report[6] includes "pricing data on whole birds

---

[6] Agri Stats formed EMI in 2000 to compete with Urner Barry. Unlike the Agri Stats reports for Defendants discussed earlier in this Amended Complaint, EMI releases daily pricing data to both Defendants and potential purchasers of Broilers, though the reporting service is not publicly available and costs thousands of dollars. EMI gathers and identifies daily commodity transactions from 90% of Broiler producers, which automatically transmit invoice information electronically from each of their transactions to EMI.

84

and chicken parts that is considerably more detailed than the USDA" and other price indices because it is based on actual sales invoices from chicken producers.

332.  The Georgia Dock price index was a chicken industry pricing benchmark published by Poultry Market News ("PMN") division of the Georgia Department of Agriculture ("GDA"). It measured the same (or very similar) size and grade of chicken as Urner Barry and the USDA.[7] It set prices for both "whole bird" and various chicken parts (wings, tenders, thighs, drumsticks, leg quarters, and breasts). The "whole bird" price is the baseline for pricing all parts of a chicken. Unlike the other price indices, the Georgia Dock was not doubly verified and was based solely on an "honor system" whereby nine poultry producers submitted weekly price quotes to the PMN.

333.  Urner Barry, Georgia Dock, and USDA prices relate to the Broiler spot market, but prices for chicken sold under contract generally are tied to and move with spot market prices as reported by these price indices. For example, Sanderson Farms CEO Joe Sanderson has stated explicitly that the company prices chicken based on the Georgia Dock in contracts with retailers.

334.  Expert economist Dr. Colin A. Carter from the University of California (Davis) has testified that "internal Pilgrim's [Pride's] documents show that virtually all chicken products, even if they're not sold spot, are tied to the spot prices. . . . 83 percent of Pilgrim's [Pride's] chicken sales are reflecting the spot price within a given year. So there's only about 16 percent of their sales that are not tied to the spot market over a relatively short period of time." Further, because half of "fixed contracts" actually had terms tied to Broiler spot market prices, Dr. Carter concluded that 92% of Pilgrim's Pride's Broiler sales were tied to Broiler spot market prices

---

[7] Unlike the other indices, the Georgia Dock did not include freight or transportation costs in its benchmark price. Thus, the Georgia Dock benchmark price was called "Georgia F.O.B. Dock" price.

such as the Georgia Dock. Many of Plaintiff's purchases of Broilers from Defendants were similarly tied to the Georgia Dock even when those purchases were not spot transactions.

335.    Many chicken buyers, including Plaintiff, reasonably relied on the Georgia Dock because they naturally believed that its benchmark price index accurately reflected the weekly offering prices and the market price for chicken. The Georgia Dock was accepted in the industry as a reflection of the market price for chicken and was a widely used benchmark price index for wholesale chicken prices nationwide. But unbeknownst to Plaintiff and other buyers, several Defendants conspired and did in fact manipulate the Georgia Dock price index.

336.    Plaintiff purchased chicken from Defendants at prices that used the Georgia Dock as a component throughout the relevant period. In some instances, Defendants insisted upon using the Georgia Dock in their pricing with Plaintiff and/or declined to use another form of pricing with Plaintiff.

(ii)    <u>The Georgia Dock Pricing Methodology and Its Susceptibility to Manipulation.</u>

337.    The Georgia Dock was different from the other available price indices in ways that made it more susceptible to manipulation by the Georgia Dock Defendants. The Georgia Dock Defendants are the nine producers that submitted price quotes that went into the Georgia Dock price index, namely (ranked by their market share in Georgia, which dictated how much weighting each producer's quote was given in compiling the Georgia Dock benchmark price): Pilgrim's Pride (approximately 35% of Georgia market share in 2016 ); Tyson (15%); Fieldale (15%); Mar-Jac (10%); Claxton (10%); Sanderson Farms (7%); Harrison (5%); and Koch and Wayne Farms (less than 2% each).

338.    Until late 2016, the methodology behind the Georgia Dock pricing index was unknown to the public, including chicken buyers, like Plaintiff. Buyers, including Plaintiff, made

purchases based on the Georgia Dock whole-bird price, with the reasonable, but mistaken, belief that the Georgia Dock reflected poultry producers' actual weekly offering prices and the actual market price of chicken. Additionally, until August 2016, the USDA published the Georgia Dock benchmark price alongside its own price index, giving credence to the Georgia Dock numbers and making many chicken buyers, including Plaintiff, believe that the Georgia Dock price had the impression of USDA approval.

339.    Plaintiffs were misinformed that the Georgia Dock benchmark was in fact based on the poultry producers' actual offering prices for the next week. This was false; the Georgia Dock Defendants did not report their true offering prices to the GDA. Instead they agreed to, and in fact did, intentionally report false and artificially high prices. The reality was that the Georgia Dock price was simply whatever the Georgia Dock Defendants said it was. Hypothetically, if one week the Georgia Dock price was $1.75, and the following week the Georgia Dock Defendants told the GDA that the offering price of their chicken was $2, the Georgia Dock price would become $2, and the prices that Plaintiffs and others paid for chicken would increase commensurately.

340.    The Poultry Market News—which for the majority of the relevant period was run by a GDA employee named Arty Schronce—calculated the Georgia Dock as follows. Each week, a PMN representative would call or email the same nine employees working for the nine Georgia Dock Defendants and collect price submissions from those Defendants for the Wednesday Georgia Dock. As stated in an internal GDA document, "each participating [Broiler producer] company is called [by the GDA] on Wednesday every week to report the price offered to companies in which they have contracts in place with."

341.    The Georgia Dock Defendants' submissions were supposed to reflect their actual offering price based on 2.5-to-3 pound whole birds, but not many of them actually processed 2.5-to 3-pound birds in Georgia. So instead, the Georgia Dock Defendants were instructed to adjust their whole bird quote as if they were producing that sized bird. Once the final Georgia Dock whole bird price was calculated, the GDA then used a formula to calculate prices for different chicken cuts and parts based off of that number.

342.    Submission of prices to the PMN was entirely voluntary. There were no regulations, rules, or legislation requiring poultry producers operating in the state of Georgia to submit their prices to the PMN Division.

343.    The GDA did not verify or substantiate the Georgia Dock Defendants' price quotes. There was no double-verification. Buyers were not contacted to check to see if the producers' price quotes mirrored actual sale prices. In essence, from the inception of the Georgia Dock in to 1960s until late 2016, the PMN relied on the "honor system" as to the truthfulness and accuracy of the offering prices submitted by the Georgia Dock Defendants. Thus, the entire basis of the Georgia Dock benchmark price was unverified because it was based off of verbal "price quotes" from the same small set of chicken producers submitted weekly to a single GDA employee, a methodology that was susceptible to manipulation to say the least.

344.    Unlike other price indices like the USDA Composite or Urner Barry, which use data from a great many producers and also use data from buyers, the Georgia Dock was based solely on information provided by a handful of producers. The GDA did not survey buyers and sellers in the national chicken market as part of coming to the Georgia Dock benchmark price. The director of regulatory compliance at GDA explained the GDA's failure to verify any of the

Georgia Dock Defendants' self-reported data thusly: "We don't see any reason they would submit information that wasn't truthful."

345.    After a PMN representative gathered these price quotes, which were ***supposed*** to reflect Georgia Dock Defendants' actual offering prices, he or she weighted each Georgia Dock Defendant's price quote by its relative market share in the state of Georgia (this is referred to as the company's "voice"). The PMN first made a preliminary calculation based on the single price quotation from each company. Then "[a]ny company that provides a whole bird quote that is more than one cent above or below the initial dock price calculation will not be included in the calculation for the whole bird dock price that week. Its voice is taken out of the formula and the dock price is recalculated without it." This so-called "one-cent rule" was meant "to shield [] one company having the ability to greatly influence the price up or down."

346.    But the one-cent rule actually did something else: as easy as it may have been to manipulate the Georgia Dock, it meant that Defendants had to conspire together to do so. Over the relevant period, the Georgia Dock benchmark price became significantly different from other price indices, which cannot be explained by only one or two outlier companies reporting artificially high Broiler prices to that service. The difference between the Georgia Dock and other indices, which are based on *doubly verified* numbers, could only have happened if all or nearly all of the Georgia Dock Defendants submitted artificially high Broiler prices that were identical or very nearly identical so that they conformed with the one-cent rule. In other words, all or most of the Defendants' submissions needed to be within two cents of each other in order to inflate the Georgia Dock price and maintain an artificially inflated Georgia Dock price over time—a price which, for extended periods of time, was 20 or 30 cents higher than the comparable (and also inflated, due to the anticompetitive conspiracy and fraud alleged herein)

Urner Barry price index. Notably, the Georgia Dock was also higher than the USDA and EMI indices.

347.     Because of the GDA's one-cent rule, it was not possible for only one or two Broiler companies to report a Broiler price that was significantly higher than the actual market price to the GDA without being disregarded as outliers by the GDA. Accordingly, and as explained in detail below based on information learned in discovery so far, certain Georgia Dock Defendants began reporting prices to the GDA that fell within a very narrow range but were also significantly above the actual market rate. As a result, Georgia Dock prices continued to rise and later stabilized during 2015-2016 at historic highs. As described further in this Amended Complaint, it was not until a series of articles was published between November 3, 2016 and November 17, 2016 that information was publicly available to show that Defendants may have fixed the Georgia Dock price.  Upon information and belief, Georgia Dock Defendants began collectively reporting prices to the GDA that were identical or nearly identical and significantly above the actual market rate in order to fix the Georgia Dock price and raise the price of chicken.

> (iii)     The PMN, the Georgia Dock, and the PMN Advisory Committee Were Created and Sustained for the Benefit of Georgia Dock Defendants and the Broiler Industry

348.     The Georgia Dock has been an industry tool ever since it was first created as part of the *Poultry Market News Bulletin* in 1965. At that time, the GDA created the first Georgia Dock based on a recommendation from the Georgia Poultry Federation (the "GPF") that the GDA begin reporting a "live quotation" (i.e., the price of a live bird).  The GPF was—and continues to be—a trade association comprised of Georgia poultry producers.

349.     In 1972, the poultry producers, through trade organizations such as the GPF and the Georgia Poultry Processors Association, began to lobby the GDA to discontinue the PMN "live quotation." Instead, the joint industry group recommended that the PMN quote a F.O.B.

dock equivalent price. In their recommendations, the joint industry group even set out guidelines for what the PMN should be reporting. As the Georgia Commissioner of Agriculture at that time, Tommy Irvin, stated in a February 11, 1972 letter, the joint industry group had recommended a F.O.B. dock price equivalent that represented "full truck load lots of Ice Pack, USDA Grade A, sized 2 ½ to 3 pound broilers and fryers."

350.    The GDA accepted this recommendation and, on February 22, 1972, transitioned the PMN to reporting the F.O.B. dock price equivalent that is known today as the Georgia Dock. Other than a switch to emailed (rather than telephonic) price submissions for some poultry producers, there have been no further changes to the PMN's methodology for calculating the Georgia Dock since 1972.

351.    Since the transition in 1972, the stated purpose of the Georgia Dock has always been to report a F.O.B. dock price. According to an email sent by Arty Schronce on August 2, 2016, "[o]n February 23, 1972, (Wednesday) the opening line of the report was: The Georgia F.O.B. dock price for next week's trading on full truck load lots of ice pack USDA Grade "A" sized 2.5 to 3 pound broilers and fryers are being sold on the bases (basis) of 27 cents; 32% of the loads offered have been confirmed on the bases (basis) of 27 cents."  Indeed, as recently as April 2016, the GDA website page for the Georgia Dock stated that "we report the established prices of dressed f.o.b. dock broilers and fryers."

352.    Following the 1972 transition, and in order to facilitate their control over the Georgia Dock price index, the poultry industry had another recommendation for the GDA: the creation of a non-public, non-governmental PMN Advisory Committee. As stated in the minutes from a Georgia Poultry Processors Association meeting from 1972, "[i]t was requested that the Federation recommend to the Department of Agriculture that an appointment of an Advisory

91

Committee be made by the Commissioner to work in close relationship with the Market News Service and with the guidelines which were set forth in establishing the F.O.B. reporting system." Again, the GDA accepted this recommendation and formed an Advisory Committee comprised exclusively of representatives from the poultry producers who submitted prices to the PMN.

353.    Georgia Dock Defendants—through their roles in creating and contributing to the Georgia Dock and serving on the Advisory Committee—had intimate knowledge of the procedures by which the PMN collected, calculated, and reported on the established prices for dressed F.O.B. dock broilers and fryers that the Georgia Dock was intended to report. They stayed apprised of this knowledge through meetings between the poultry producers and the PMN, during which they would discuss and review the reporting policies and procedures for the Georgia Dock.  Georgia Dock Defendants' knowledge even extended to the calculation forms used internally at the PMN, which were circulated to members of the PMN Advisory Committee following one of their meetings on January 25, 2007.

354.    As discussed further below, the Georgia Dock Defendants also knew that the Georgia Dock quotes had to based off their actual offering prices for a 2½- to 3-pound whole bird equivalent for the next week. ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████

355.    ████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████

356.    ████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

357.    Not only did Defendants have intimate knowledge of what prices should be submitted to the PMN for inclusion in the Georgia Dock, but they also maintained firm control over the Georgia Dock through the Advisory Committee.  From its inception, the Advisory Committee was composed of senior executives from the Georgia Dock Defendants, and its mission was to advise the GDA on issues relating to the PMN's collection of prices and calculation of the Georgia Dock price.

358.    ████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

359.    From at least September 2012 through 2016, the Advisory Committee included Gus Arrendale (CEO, Fieldale Farms), Mike Welch (CEO and President, Harrison), Jerry Lane (Former CEO, Claxton Poultry), Jayson Penn (EVP Sales and Operations, Pilgrim's Pride), Pete Martin (VP of Operations, Mar-Jac), Vernon Owenby (Manager of Tyson's facility in Cumming, Georgia), Steve Clever (VP of Fresh Sales, Wayne Farms), and Dale Tolbert (VP of Sales, Koch Foods).  The Advisory Committee always consisted entirely of representatives of one side of the transaction: the poultry producers.  Despite the fact that the Georgia Dock affected both buyers and sellers of chicken alike, there were no representatives of buyers on the Advisory Committee.  There were also no neutral economists or members of academia.  The producers, and the producers alone, controlled the PMN, often working hand-in-hand with their current or former lobbyists within the GDA and from the Georgia Poultry Federation, as discussed in more detail below.

360.    The Advisory Committee controlled the process for calculating and, as set forth in this Amended Complaint, reevaluating the Georgia Dock price.  When he was installed as director of the PMN, Arty Schronce was told that he could not make any changes to the Georgia Dock without first clearing them with the Advisory Committee.

361.    ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

[REDACTED]

362.     The existence of the Advisory Committee also helped to ensure that the Georgia

Dock Defendants were intimately aware of the process by which the Georgia Dock price was

calculated, enabling them to manipulate it.   The Advisory Committee met periodically and

discussed how the Georgia Dock price was calculated.   In addition, because of their familiarity

with the underlying guidelines and internal PMN calculations, the Georgia Dock Defendants

knew the prices they submitted to the PMN were not subject to verification, and that those

submissions would be used to calculate the next Georgia Dock price unless they deviated from

the initially calculated weighted average by one cent or more.   [REDACTED]

[REDACTED]

363.   [REDACTED]

[REDACTED]

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

364.    The existence and conduct of the Advisory Committee was not known to chicken buyers, including Plaintiff, until November 2016 when it was first made public following a press report about a September 2016 memorandum written by Schronce that was highly critical of the Georgia Dock methodology. Schronce wrote in the memorandum that he had "questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent," and that he had been told he "could not make any changes without clearing them with the Advisory Board."

        (iv)    <u>The Georgia Poultry Federation's Role in Creating and Sustaining the Georgia Dock for the Benefit of Defendants and the Broiler Industry</u>

365.    The poultry producers also maintained a level of control over the Georgia Dock through their trade association, the Georgia Poultry Federation.  The GPF was a constant source of reference for the GDA as to the continued utility of the Georgia Dock to the poultry industry in Georgia and nationwide.  The GDA considered the GPF to be its point of contact when it needed input from the poultry industry, so GPF representatives would often attend meetings with Arty Schronce and the PMN to advise on matters relating to the Georgia Dock.  The GPF worked diligently throughout the relevant period to sustain the PMN in the face of budget cuts and staffing reductions, so that Defendants could continue to use the inflated Georgia Dock price for their benefit and to the detriment of buyers like Plaintiff.

366.    As set forth above, the GPF also monitored and dictated to the GDA the membership of the Advisory Committee; in fact, the GPF had such control that when the Georgia

Dock was investigated in 2016, the GDA Commissioner had to reach out to the GPF to determine the identity of the members of his own PMN Advisory Committee.

367.    The GPF also regularly acted as a go-between for the GDA and the Advisory Committee; it would explain to Advisory Committee members the purpose of certain meetings and remind Advisory Committee members of their companies' obligations with respect to the Georgia Dock. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

368.    The GPF was another means through which the Georgia Dock Defendants knew that the Georgia Dock was supposed to represent the ***actual*** price at which Defendants would sell a F.O.B. 2½- to 3-pound whole bird equivalent in the upcoming week.  ███████████████

████████████████████████████████████████████████

██████████████████████████████████

(v)    The Georgia Dock Became Ripe for Manipulation

369.    A number of factors at the beginning of the relevant period made the Dock more vulnerable to manipulation and ultimately resulted in a marked upward departure of the Georgia Dock from all other poultry pricing indices.

370.    In or around 2008 and 2009, with the GDA experiencing drastic budget cuts, Georgia Commissioner of Agriculture Tommy Irvin conducted an inquiry into the PMN to determine if staffing cuts or other efficiencies were warranted. At the time, the PMN was staffed

97

by four full-time employees: division director Greg Pilewitz, Toni Leslie, Nell Moncus, and Donald Carnes. Over the next three years, the staff of the PMN was cut from four full-time employees down to two.

371. 

372. Due to budgetary constraints, Commissioner Black further reduced the staff of the PMN Department in 2011 and 2012. When Mr. Pilewicz died unexpectedly in early 2012, Ms. Leslie was left to run the PMN Department alone until a replacement could be found. In October of 2012, Arty Schronce was installed as director, but he only worked for the PMN part time. Schronce also performed other projects at GDA, including authoring a gardening column and working for the press office. Shortly after Mr. Schronce assumed the position, Ms. Leslie was replaced by Demetria Mabry.

373. Mr. Schronce and Ms. Mabry were instructed to continue collecting the poultry producers' price submissions and calculating the Georgia Dock as it had always been calculated,

but neither had the institutional knowledge to recognize the ways in which poultry producers had already begun divorcing their price submissions from reality.

374.    These factors, combined with the Georgia Dock Defendants' knowledge of the Georgia Dock pricing process, enabled them to collectively devise and then execute a simple yet elegant scheme to artificially inflate the Georgia Dock price and sustain that inflated Dock price for approximately six years. As discussed in further detail below, █████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

375.    The Georgia Dock Defendants collectively worked within the parameters of the one-cent rule in perpetrating their conspiracy and fraud.  Significantly, ████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████ even

when the Urner Barry price index was twenty or thirty cents less than those submissions.

376.    ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

377.

378.

379. ██████████████████████████████████████

380.    But the possibility that any change could be made to the Georgia Dock was illusory. The system had not been changed since its inception in 1972, despite Defendants' knowledge that they were submitting information to the Poultry Market News that was contrary to the guidelines Defendants themselves had created.

    (vi)    <u>The Georgia Dock Price Index Diverged from the USDA Composite and Urner Barry Price Indices Beginning in 2011.</u>

381.    Beginning no later than early 2011, the Georgia Dock price index began to behave differently from Urner Barry and USDA indices. Pre-2011, the Georgia Dock benchmark price had remained in line with those other two indices; although the Dock price had always been somewhat less volatile, its movements correlated with the those of the other two indices (*e.g.*,

prices went up or down depending on market forces). But in 2011, the correlation began to dissolve. Over time periods when the Urner Barry and USDA price indices would decrease, the Georgia Dock would stay flat or sometimes increase. This divergence continued and became especially pronounced in 2015.

382.  In early 2011, the Georgia Dock's price volatility largely disappeared. This decrease in monthly price volatility was particularly apparent with respect to downward price movements (*i.e.*, when prices did drop, they dropped far less drastically than they had previously). But both of the other price indices stayed volatile while the Georgia Dock stabilized,[8] as reflected in the following graphs, which compare prices of the main indices both before and during the relevant period:



Figure 1. USDA, Urner Barry, and Georgia Dock Wholesale Price Comparison (2002-2016)

Source: Georgia.gov, USDA.gov, Urner Barry

---

[8] Plaintiff alleges that prices reported in the EMI, Urner Barry, and USDA Composite price indices were also supracompetitive and artificially inflated by the conduct of Defendants.

In addition to stabilizing, early 2011 marked the first time when the Georgia Dock price became negatively correlated with the other two price indices, meaning that the Georgia Dock price **increased** while the other two **decreased**. This marked a dramatic change from the period between 2002 to 2010, where all three indices were positively correlated with each other, meaning they moved up and down together.[9]

383.    The change in behavior exhibited by the Georgia Dock from 2011 through November 2016—marked by the level and stability of its prices—was the direct result of Defendants' price-fixing conspiracy, as well as by the fraud perpetrated by the Georgia Dock Defendants as set forth in this Amended Complaint.

(vii)    Regulatory Investigation and Demise of the Georgia Dock

384.    In November 2016, the Washington Post published an article uncovering a September 2016 internal GDA memorandum in which Arty Schronce expressed that he "continue[d] to have concerns about" the process, had "voiced concerns in the past," thought the Georgia Dock price index was "a flawed product that is a liability to the Georgia Department of Agriculture," and that he "was told that poultry companies know what they are doing and all [he] need[s] to do is to gather and consolidate the info [he is] provided. However, [he has] come to question the validity of some of the information provided."

385.    Schronce's memorandum further noted that, after the *Wall Street Journal* published an article questioning Georgia Dock practices in January of 2016, one company ▮▮

---

[9] After 2013, the USDA Composite and Urner Barry indices remained positively correlated with each other. In fact, they continued to move closer together over time, while the Georgia Dock price continued to diverge from them. By 2015, the gap between the Georgia Dock price and the prices on the other two indices was approximately three times greater than it had ever been in recent history and approximately five to ten times greater than the typical gap between the prices on the other two indices.

███████████ "appears to basically not take part in the Whole Bird Dock Price process. They seem to deliberately submit a low bid that they know will be kicked out. However, they can claim that they are submitting something lower. In essence, they can take advantage of a high whole bird price while maintaining that they want it to be lower."

386. Schronce also expressed concerns that some companies have a "larger, even outsized role in determining the Georgia Whole Bird Dock Price," and that "[i]n essence, they can take advantage of a high whole bird price."

387. Even before Schronce's memorandum became public, the GDA began an internal review of the methodology used to set the Georgia Dock benchmark price, stating that it had "serious concerns." But the GDA's internal review was kept secret and only revealed in the series of news reports about the Georgia Dock beginning in November 2016.

388. Following the *Wall Street Journal* article in January 2016, officials within the federal government began to investigate. In July 2016, high level USDA officials met with GDA representatives in Atlanta, Georgia to "review reporting procedures concerning the Georgia Dock." The USDA officials concluded that the GDA "was unable to verify the information reported on its Georgia Dock report" and concluded that changes needed to be made to the Georgia Dock methodology.

389. On July 22, 2016 USDA's weekly BMNR publication noted that the GDA "will be issuing a new weekly market report for negotiated Georgia broiler/fryer whole birds and bird parts, which will replace the current [Georgia Dock price]." But, "[o]n July 25, 2016, GDA informed [the USDA] of its decision to continue publishing its Georgia Dock report, unchanged, on the GDA Web site *because of concerns raised by the poultry processors who contribute data to the current report.*" (Emphasis added). In the August 5, 2016 USDA BMNR, all price

information from the GDA and Georgia Dock was removed and only a hyperlink to the GDA's website was included.

390. High level officials within the GDA began to raise antitrust concerns regarding the Georgia Dock in 2016. For instance, a July 27, 2016, report from GDA Director of Regulatory Compliance & Budget Alec Asbridge to GDA Commissioner Gary Black concluded that "[t]he top 10 poultry producing companies now control over 80% of the industry output. The combination of vertical integration, limited competition and lowered production periods has led to steady prices that have shown to be fairly resistant to changing market conditions. These factors alone illicit [sic] anti-trust review." (Emphasis added).

391. GDA Director Asbridge's July 27, 2016, report also noted that over time, the GDA became a vehicle for Defendants to "report[] a weighted average price per pound on broilers [Georgia Dock price] based off of contracts that have been determined at the private level and reported without regulatory oversight. The formulas to calculate weighted average prices have been determined on the private level and have not been standardized since the inception of the [GDA Poultry Market News division] in 1968, which there is no written record of." In other words, it was Defendants themselves who wrote the rules and formulas that make up the Georgia Dock price, not the GDA.

392. Director Asbridge's July 27, 2016, report also concluded that "[t]he extent of the use of the [Georgia Dock price] in contract negotiations is presently unknown but inquiries made by media and other governmental entities indicate that it is utilized on a more regular basis than previously expected." In short, the GDA had been publishing the Georgia Dock price for decades, but until this time apparently did not know the scope of reliance on the Georgia Dock price. Notably, a revised and highly sanitized version of the July 27, 2016 report from Director

Asbridge to GDA Commissioner Black was circulated internally at GDA on August 5, 2016. The sanitized August 5 report removed references to the existence of factors in the Broiler industry eliciting "antitrust review" and to the fact that the Georgia Dock price was reported for decades by GDA "without regulatory oversight."

393. On August 12, 2016, GDA Director Asbridge provided Georgia Poultry Federation President Mike Giles with the sanitized version of the report and asked Giles to review it before the GDA sent it to the USDA, "to ensure what I presented is accurate and best represents industry's concern with only reporting a spot price." As noted elsewhere in this Amended Complaint, the Georgia Poultry Federation represents the poultry industry in Georgia, and most Defendants are members.

394. On that same day, the GDA reiterated that "[t]he GDA is *in agreement with the poultry industry that there is no desire to review invoices for verification* of data reported." They made this decision even though the pertinent information was readily available, since Defendants already reported invoice information to Agri Stats on a daily basis.

395. According to a subsequent email dated August 24, 2016, Georgia Poultry Federation President Giles called GDA Director Asbridge back and gave "his and industry's sign off on the dock price summary report. We can move forward with sending to USDA." GDA Director Asbridge also proposed another meeting between GDA and the Georgia Poultry Federation to discuss recommendations about verifying Georgia Dock data.

396. Beginning on October 7, 2016, the USDA expanded its National Whole Broiler/Fryer report to include chicken weight groups that had been previously reported by the Georgia Dock. Significantly, the new USDA prices roughly matched Urner Barry prices, conflicting with the Georgia Dock price.

397.    On November 3, 2016, the New York Times broke the first major news story about the inquiry into the Georgia Dock. The New York Times based the article on information received via Freedom of Information Act and open records requests for internal USDA and GDA documents. Then, the Washington Post published an article on November 8, 2016, which included a comment from the USDA that "they discontinued publishing the Georgia Dock price 'when data from the source report could not be independently verified.'"

398.    And still, Defendants kept up their ruse. The Washington Post quotes Sanderson Farms CFO Mike Cockrell as saying: "the Georgia Dock has come to be a trusted reflection of the supply and demand for retail stores." Bloomberg News quoted a Tyson press release article as saying: "[w]hen the Georgia Department of Agriculture asks us for pricing data, we provide accurate information based on actual and recent transactions." Defendants' continued defense of the Georgia Dock price index as one that customers could trust affirms that Defendants continue their efforts to conceal the conspiracy alleged in this Amended Complaint.

399.    Also in November of 2016, Seeking Alpha published an article titled "Evidence Of Chicken Price Manipulation: The Curious Case Of The Georgia Dock," positing that the chicken companies "may be manipulating the Georgia Dock price index in order to receive a much higher price than real market prices." Seeking Alpha noted that Defendants' price index manipulation "has accounted for >100% of earnings for pure-play chicken companies recently." Seeking Alpha projected a "60% downside for [Pilgrim's Pride], 40% downside for [Sanderson], 40% downside for [Tyson]" upon correction of their behavior, before any "potential penalties." Seeking Alpha reported that the result of the "potential LIBOR-rigging type scandal" was that "US consumers have been over-charged for chicken by more than $3 billion per year" and that

major chicken producers were "significantly over-earning as a result of what may be a manipulated price index."

400.    The GDA was caught between a rock and a hard place: it faced pressure from the USDA and the media and realized that the pricing methodology it employed raised antitrust concerns, but any attempt to revise the methodology requiring verification was met with resistance from the Georgia Dock Defendants.  In a last-ditch effort to rescue the Georgia Dock, the GDA asked the Georgia Dock Defendants to sign attestations swearing to the truth and accuracy of the pricing they submitted to the Poultry Market News department.  Although they wanted to see the Georgia Dock continue, not all Georgia Dock Defendants were willing to make these written commitments.

401.    Unable to obtain the requisite attestations, the GDA halted the Georgia Dock price index altogether, citing a lack of participation after its last benchmark price published on November 23, 2016.  Nevertheless, for several months after the last Georgia Dock benchmark price was published by the GDA, several of the Georgia Dock Defendants, including at least Pilgrim's Pride, Wayne Farms, and Sanderson, "froze" their Georgia Dock-based pricing and continued to use the November 23, 2016 benchmark prices to set their prices to at least some chicken buyers.

402.    In January of 2017, the GDA attempted to introduce the "Georgia Premium Poultry Price Index," which purported to be a more transparent, accurate, and verifiable pricing mechanism—but it abandoned the new index in mid-February 2017 due to a lack of participation by chicken producers.

      (viii)   The Defendants Fraudulently Submitted False and Inflated Quotes to the Poultry Market News, Causing the Index to be Artificially High

403.    Although discovery is ongoing, Plaintiff has already begun to determine the mechanics by which certain Defendants fraudulently manipulated the Georgia Dock price index.

404.    It is now clear that the Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the PMN. Moreover, the Georgia Dock Defendants fraudulently misrepresented and/or failed to inform their counterparties—that is, those to whom they sold poultry on pricing tied to the Georgia Dock, including Plaintiff—of the many serious flaws with the Dock, which accrued to their benefit and to the detriment of Plaintiff.

405.    By way of background, when the PMN calculated the Georgia Dock price each week, it rounded the price to the nearest 0.25 cents. For example, the Dock price could increase from 110.25 cents to 110.50 cents, but not any amount in between. Georgia Dock Defendants also used increments of 0.25 cents in their submissions. Under the PMN's one-cent rule, any submission that was at least one cent more or less than the initially-calculated weighted average would be excluded. As a result, on any given week only nine submissions could affect the Dock price: the submission that happened to equal the initial calculation of the weighted average, and submissions that were +0.25 cents, +0.50 cents, +0.75 cents, +0.1 cents, -0.25 cents, -0.50 cents, -0.75 cents, and -0.1 cents when compared to the initial weighted average. All other submissions were excluded. Thus, in order to rig the Dock price, Defendants had to work in concert to make price submissions that fell within a narrow range of each other, yet far from the market price, week after week for years.

406.    ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



407.

408. Each of the Georgia Dock Defendants' submissions to the PMN made the implicit

statement that those Defendants were submitting their actual offering price for a 2½- to 3-pound

whole bird equivalent for the next week, while in fact those submissions reflected nothing of the

sort. In some cases, they were pure regurgitations or tweaks of prices from the prior week's

---

[10] For two of the Defendants who made their submissions to the PMN by phone ▮▮▮▮▮ ▮▮▮▮▮▮ the person who submitted those quotes has recently been deposed; for the others ▮▮▮▮▮▮▮ that person has not yet been deposed, and the record continues to develop.

PMN report; in others, they were aspirational quotes of what the submitter believed the Georgia Dock should be. All were false or unfounded characterizations of the companies' actual offering prices, and all resulted in a gradual, but persistent, increase in the Georgia Dock between early 2011 until the end of 2016.

409. The allegations set forth below are based on the information regarding Georgia Dock Defendants' price submissions obtained in discovery to date.

**Pilgrim's Pride fraudulently made false submissions to the Georgia Dock**

410. Pilgrim's Pride knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for a 2½- to 3-pound bird equivalent for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Pilgrim's Pride made false and inflated price submissions as explained below.

411. Due to its large production capacity in Georgia, Pilgrim's Pride had a "voice" of 35% (out of a total voice for all Georgia Dock Defendants of 100%) for purposes of the weighted average for the Georgia Dock price. Pilgrim's Pride's voice of 35% was by far the most of the Georgia Dock Defendants, and thus its submissions had the greatest influence on setting the Georgia Dock price. Pilgrim's Pride knew that its submissions carried the most weight of any of the Defendants.



████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

414.    ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

415.    ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

416.    ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

417. █████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

418. █████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

419. █████████████████████████████████████████████

██████████████████████████████████████████████████

420.

421.



422.

423.

424.

425.



426.

427.



428.

429.

430.    Pilgrim's Pride's submissions were false and inflated. Pilgrim's Pride was supposed to submit its actual offering price for 2 ½- to 3-pound whole birds. Because Broilers are a commodity, Pilgrim's Pride's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Pilgrim's Pride's costs of production, rather than simply an attempt to artificially inflate the index. Yet Pilgrim's Pride did not submit its actual or converted offering price for 2- ½ to 3-pound whole birds each week. ██████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████ Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

431.    Pilgrim's Pride knew that its submissions were false and inflated. Pilgrim's Pride knew that it was supposed to submit its actual or converted offering price for 2- ½ to 3-pound whole birds ████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████ At the very least, Pilgrim's Pride acted with reckless indifference as to whether its submissions were false or inflated.

432.    Pilgrim's Pride made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index.  Pilgrim's Pride's fraudulent submissions were made by interstate wire.

433.     The intended target of Pilgrim's Pride's fraudulent submissions to the PMN were buyers of chicken, including Plaintiff.  Pilgrim's Pride sold chicken to its customers, including Plaintiff, based on the Georgia Dock price index.  Accordingly, as a result of Pilgrim's Pride's fraudulent submissions that artificially inflated the Georgia Dock price index, the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiff was harmed.

434.     ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

**Koch fraudulently made false submissions to the Georgia Dock**

435.     Koch knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for a 2 ½- to 3-pound bird equivalent for the next week.  ████ ████████████████████████████████████ during the relevant period, so Koch easily could have determined its offering price and submitted that price to the PMN.  But Koch did not do so. Instead, Koch made false and inflated price submissions as explained below.

436.     ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



437.

438.

439.

11

120

440.

441. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

442.    Koch's submissions to the PMN were false and inflated.  Koch was supposed to

submit its actual offering price for 2 ½- to 3-pound whole birds. Because Broilers are a

commodity, Koch's actual offering price (absent manipulation of the index) should reflect actual

market dynamics and Koch's costs of production, rather than simply an attempt to artificially

inflate the index. Yet Koch did not submit its actual or converted offering price for 2½- to 3-

pound whole birds each week. ██████████████████████████████████

████████████████████████████████████████████████

████████████████    Artificially high quotes constitute false statements because manipulated

quotes are literally false or insincere responses to the PMN's request for submissions of actual

offering prices.

443.    Koch knew that its submissions were false and inflated. Koch knew that it was

supposed to submit its actual or converted offering price for 2 ½- to 3-pound whole birds ██

████████████████████████████████████████████████

████████████████████████████████████████████  At the

very least, Koch acted with reckless indifference as to whether its submissions were false and

inflated.

444.    Koch made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index.  Koch's fraudulent submissions to the PMN were made by interstate wire.

445.    The intended target of Koch's fraudulent submissions to the PMN were buyers of chicken, including Plaintiff.  Koch sold chicken to its customers, including Plaintiff, based on the Georgia Dock price index.  Accordingly, as a result of Koch's fraudulent submissions that artificially inflated the Georgia Dock price index, Koch and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiff was harmed.

**Mar-Jac fraudulently made false submissions to the Georgia Dock**

446.    Mar-Jac knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for a 2½- to 3-pound bird equivalent for the next week.  But rather than determining its actual offering price for the next week and submitting it to the PMN, Mar-Jac made false and inflated price submissions as explained below.

447.    ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

448. 

449.

450.

451. Mar-Jac's submissions to the PMN were false and inflated. Mar-Jac was supposed to submit its actual offering price for 2 ½- to 3-pound whole birds. Because Broilers are a commodity, Mar-Jac's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Mar-Jac's costs of production, rather than simply an attempt to artificially inflate the index. Yet Mar-Jac did not submit its actual or converted offering price for 2 ½- to 3-pound whole birds each week.

███████████████████████████████████████████████

███████████████████████████████████████████████

Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

452.     Mar-Jac knew that its submissions were false and inflated. Mar-Jac knew that it was supposed to submit its actual or converted offering price for 2 ½- to 3-pound whole birds

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████ At the very least, Mar-Jac acted with reckless indifference as to whether its submissions were false and inflated.

453.     Mar-Jac made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index.  Mar-Jac's fraudulent submissions to the PMN were made by interstate wire.

454.     The intended target of Mar-Jac's fraudulent submissions to the PMN were buyers of chicken, including Plaintiff.  Mar-Jac sold chicken to its customers, including  Plaintiff, based on the Georgia Dock price index.  Accordingly, as a result of Mar-Jac's fraudulent submissions that artificially inflated the Georgia Dock price index, Mar-Jac and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiff was harmed.

**Harrison fraudulently made false submissions to the Georgia Dock**

455.     Harrison knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for a 2½- to 3-pound bird equivalent for the next week.  But rather

than determining its actual offering price for the next week and submitting it to the PMN, Harrison made false and inflated price submissions as explained below.



456.

457.

even when the Urner Barry price began to drop precipitously below the Dock price.



458. ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████

459. ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████



460.

461.

462.

463. Like Koch and Mar-Jac, Harrison's practice stabilized the Georgia Dock price index, imposing an artificial floor that prevented the index from falling, while allowing other Defendants (such as Pilgrim's Pride) to artificially inflate the index through their regularly-inflated submissions. Harrison acted in concert with the other Defendants by playing this role.

464.    Harrison's submissions were false and inflated. Harrison was supposed to submit its actual offering price for 2 ½- to 3-pound whole birds. Because Broilers are a commodity, Harrison's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Harrison's costs of production, rather than simply an attempt to artificially inflate the index. Yet Harrison did not submit its actual or converted offering price for 2 ½- to 3-pound whole birds each week. Instead, ███████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

465.    Harrison knew that its submissions were false and inflated. Harrison knew that it was supposed to submit its actual or converted offering price for 2 ½- to 3-pound whole birds ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████ At the very least, Harrison acted with reckless indifference as to whether its submissions were false and inflated.

466.    Harrison made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Harrison's fraudulent submissions to the PMN were made by interstate wire.

467.    The intended target of Harrison's fraudulent submissions to the PMN were buyers of chicken, including Plaintiff. Harrison sold chicken to its customers, including Plaintiff, based on the Georgia Dock price index. Accordingly, as a result of Harrison's fraudulent submissions that artificially inflated the Georgia Dock price index, Harrison and the other members of this

scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiff was harmed.

468.



469. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

470.    This is further proof that the Defendants worked together to knowingly submit false price quotes to the PMN as part of a coordinated effort to inflate the Dock price.

**Sanderson Farms fraudulently made false submissions to the Georgia Dock**

---



471.     Sanderson Farms knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for a 2½- to 3-pound bird equivalent for the next week.  On an investor call hosted by CEO Joe Sanderson in 2013, Sue Trudell reported to Sanderson Farms employees and investors that "this Georgia report is defined as a 2.5 to 3.25 pound chicken, whole chicken, sold in the State of Georgia. But other sizes can be included in that market report and ***adjusted to an equivalent kind of basis*** so that if one is selling an eight pound chicken ***one can report that to the State of Georgia with whatever calibrations are appropriate*** to put an equivalent to that smaller chicken."  Sanderson Farms employees managing retail sales, utilizing the Georgia Dock, and making submissions to the Georgia Dock all acknowledged that the Georgia Dock was based on a 2 ½- to 3-pound bird equivalent.

472.     ██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

473.     ██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████



474.

475.

476.

477. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

478. Sanderson Farms' submissions were false and inflated. Sanderson Farms was supposed to submit its actual offering price for 2 ½- to 3-pound whole birds. Because Broilers are a commodity, Sanderson Farms' actual offering price (absent manipulation of the index) should reflect actual market dynamics and Sanderson Farms' costs of production, rather than simply an attempt to artificially inflate the index. Yet Sanderson Farms did not submit its actual or converted offering price for 2 ½- to 3-pound whole birds each week. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

479. Sanderson Farms knew that its submissions were false and inflated. Sanderson Farms knew that it was supposed to submit its actual or converted offering price for 2 ½- to 3-pound whole birds ████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████ At the

very least, Sanderson Farms acted with reckless indifference as to whether its submissions were

false and inflated.

480.    Sanderson Farms made its submissions for the purpose of artificially inflating the

Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the

Georgia Dock price index.  Sanderson Farms' fraudulent submissions to the PMN were made by

interstate wire.

481.    The intended target of Sanderson Farms' fraudulent submissions to the PMN were

buyers of chicken, including Plaintiff. ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

482.    Accordingly, as a result of Sanderson Farms' fraudulent submissions that

artificially inflated the Georgia Dock price index, Sanderson Farms and the other members of

this scheme and enterprise were able to charge customers higher prices than they otherwise

would have and therefore made more money, and Plaintiff was harmed.

**Tyson fraudulently made false submissions to the Georgia Dock**

483.    Tyson knew that, when submitting its price quotes to the PMN, it was supposed to

provide its offering price for a 2½- to 3-pound bird equivalent for the next week.  Tyson in fact

produced and sold a 2½- to 3-pound bird. But rather than determining its actual offering price and submitting it to the PMN, Tyson made false and inflated price submissions as explained below.

484. Due to its large production capacity in Georgia, Tyson had a "voice" of 15% (out of a total voice of all Georgia Dock Defendants of 100%) for purposes of the weighted average for the Georgia Dock price. Tyson's voice of 15% put it among the top three highest voices among the Georgia Dock Defendants, and thus its submissions had significant influence on setting the Georgia Dock price. Fieldale knew that its submissions carried significant weight compared to the other Defendants.

485. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████

486. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████

487. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

████████████████████████████████████████████████████

████

488. ███████████████████████████████████████████

████████████████████████ ████ ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████

489. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

490.    Tyson's submissions were false and inflated. Tyson was supposed to submit its actual offering price for 2 ½- to 3-pound whole birds. Because Broilers are a commodity, Tyson's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Tyson's costs of production, rather than simply an attempt to artificially inflate the index. Yet Tyson did not submit its actual or converted offering price for 2 ½- to 3-pound whole birds each week. ████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ Artificially high quotes constitute false

statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

491.    Tyson knew that its submissions were false and inflated. Tyson knew that it was supposed to submit its actual or converted offering price for 2 ½- to 3-pound whole birds ███ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████ At the very least, Tyson acted with reckless indifference as to whether its submissions were false or inflated.

492.    Tyson made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index.  Tyson's fraudulent submissions to the PMN were made by interstate wire.

493.    The intended target of Tyson's fraudulent submissions to the PMN were buyers of chicken, including Plaintiff.  Throughout the relevant period, Tyson sold Broilers and Broiler Products to its customers, including Plaintiffs, pursuant to pricing that used the Georgia Dock price index as a benchmark. Like Sanderson Farms, Tyson employed both bracketed and fixed pricing that used Georgia Dock as basis, dating back to at the latest 2010, when its account managers internally discussed that "where certain customers are not tied to the Georgia Dock market with brackets, we must address these situations."

494.    Accordingly, as a result of Tyson's fraudulent submissions that artificially inflated the Georgia Dock price index, Tyson and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiff was harmed.

**Claxton fraudulently made false submissions to the Georgia Dock**

495.     Claxton knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for a 2½- to 3-pound bird equivalent for the next week.  But rather than determining its offering price and submitting it to the PMN, Claxton made false and inflated price submissions as explained below.

496.     ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

497.     ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

498.     ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████

499.     ███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

500.   ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

501.   Claxton's submissions were false and inflated. Claxton was supposed to submit its actual offering price for 2 ½- to 3-pound whole birds. Because Broilers are a commodity, Claxton's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Claxton's costs of production, rather than simply an attempt to artificially inflate the index. Yet Claxton did not submit its actual or converted offering price for 2 ½- to 3-pound whole birds each week. ████████████████████████████████

███████████████████████████████████████████

████████████████████████████████  Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

502.   Claxton knew that its submissions were false and inflated. Claxton knew that it was supposed to submit its actual or converted offering price for 2 ½- to 3-pound whole birds

███████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████ At the very least, Claxton acted with reckless

indifference as to whether its submissions were false and inflated.

503.    Claxton made its submissions for the purpose of artificially inflating the Georgia

Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock

price index.  Claxton's fraudulent submissions to the PMN were made by interstate wire.

504.    The intended target of Claxton's fraudulent submissions to the PMN were buyers

of chicken, including Plaintiff.  Claxton sold chicken to its customers, including Plaintiff, based

on the Georgia Dock price index.  Accordingly, as a result of Claxton's fraudulent submissions

that artificially inflated the Georgia Dock price index, Claxton and the other members of this

scheme and enterprise were able to charge customers higher prices than they otherwise would

have and therefore made more money, and Plaintiff was harmed.

**Wayne Farms fraudulently made false submissions to the Georgia Dock**

505.    Wayne Farms knew that, when submitting its price quotes to the PMN, it was

supposed to provide its offering price for a 2½- to 3-pound bird equivalent for the next week.

But rather than determining its actual offering price and submitting it to the PMN, Wayne Farms

made false and inflated price submissions as explained below.

506.    ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

507. 

508.

509.

510.    Wayne Farms' submissions were false and inflated. Wayne Farms was supposed to submit its actual offering price for 2 ½- to 3-pound whole birds. Because Broilers are a commodity, Wayne Farms' actual offering price (absent manipulation of the index) should reflect actual market dynamics and Wayne Farms' costs of production, rather than simply an attempt to artificially inflate the index. Yet Wayne Farms did not submit its actual or converted offering price for 2 ½- to 3-pound whole birds each week.

███████████████████████████████████████

████████████████████████ Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

511. Wayne Farms knew that its submissions were false and inflated. Wayne Farms knew that it was supposed to submit its actual or converted offering price for 2 ½- to 3-pound whole birds ██████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████ At the very least, Wayne Farms acted with reckless indifference as to whether its submissions were false and inflated.

512. Wayne Farms made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Wayne Farms' fraudulent submissions to the PMN were made by interstate wire.

513. The intended target of Wayne Farms' fraudulent submissions to the PMN were buyers of chicken, including Plaintiff. Wayne Farms sold chicken to its customers, including Plaintiff, based on the Georgia Dock price index. Accordingly, as a result of Claxton's fraudulent submissions that artificially inflated the Georgia Dock price index, Wayne Farms and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiff was harmed.

**Fieldale fraudulently made false submissions to the Georgia Dock**

514. Fieldale knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for a 2½- to 3-pound bird equivalent for the next week. But rather

143

than determining its actual offering price and submitting that price to the PMN each week, Fieldale made false and inflated price submissions as explained below.

515.    Due to its large production capacity in Georgia, Fieldale had a "voice" of 15% (out of a total voice of all Georgia Dock Defendants of 100%) for purposes of the weighted average for the Georgia Dock price. Fieldale's voice of 15% put it among the top three highest voices among the Georgia Dock Defendants, and thus its submissions had a significant influence on setting the Georgia Dock price. Fieldale knew that its submissions carried significant weight compared to other Defendants.

516.    ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████

517.    ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

518.    ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

519.

520.

521.

522. Fieldale knew that its submissions to the PMN were false and inflated. At the very least, Fieldale acted with reckless indifference as to whether its submissions were true or false. Fieldale made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Fieldale's fraudulent submissions to the PMN were made by interstate wire.

523. The intended target of Fieldale's fraudulent submissions to the PMN were buyers of chicken, including Plaintiff. Fieldale sold chicken to its customers, including Plaintiff, based on the Georgia Dock price index. Accordingly, as a result of Fieldale's fraudulent submissions that artificially inflated the Georgia Dock price index, Fieldale and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiff was harmed.

(ix) Defendants Had Both the Motive and Opportunity to Perpetrate the Fraud and Specifically Intended To Do So.

524. The broiler chicken industry's long history of boom and bust cycles is well known to Defendants. For example, in 2008, the entire poultry industry was profoundly affected by the bankruptcy filing of Pilgrim's Pride, which was then the largest U.S. poultry company. In its filing, Pilgrim's Pride disclosed that it had lost $998.6 million for the fiscal year, or $14.40 per share, prompting Pilgrim's Pride shares to lose over 46 percent of their value in one day. The collateral effects of this announcement reverberated throughout the industry, with several other leading poultry companies, such as Tyson and Sanderson Farms, also experiencing sizable losses. By the time Pilgrim's Pride emerged from bankruptcy in December 2009, the industry was still struggling to make money, prompting a wave of consolidation and many of the collusive and fraudulent activities outlined in the Amended Complaint.

525. 

526.

527. As noted above, Georgia Dock Defendants knew that the Georgia Dock was vulnerable to manipulation and thus presented them with the unique opportunity to collude and/or defraud their retail customers in pursuit of higher profits, thus ensuring that Defendants' had both the motive and opportunity to manipulate the index.

528. The manipulation of the Georgia Dock by Defendants served its intended purpose, enabling Defendants to bolster their financial results at their customer's expense. Indeed, in some instances, the manipulation of the Georgia Dock allowed Defendants to recognize a profit instead of a loss. For example, Mike Cockrell, Chief Financial Officer of Sanderson Farms, publicly stated in the New York Times that Sanderson was profitable in the fourth quarter of 2015 "only because we were making money from the chicken we were selling to the retail market." Moreover, according to Seeking Alpha's November 2016 analysis, poultry companies

such as Pilgrim's Pride and Sanderson would have realized negative earnings and income in 2016 but for the profits realized from their sales based on the Georgia Dock.

529.  ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

530.  Defendants acted with fraudulent intent and knew that their manipulation of the Georgia Dock was improper. ██████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

531.  But Defendants did not care.  Instead, they intentionally pushed the Georgia Dock on unsuspecting retail customers to ensure their own continued profitability (and secure lucrative individual bonuses for themselves). ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

(x)     The Georgia Dock Defendants Fraudulently Failed to Inform Plaintiff of Their Control Over the Georgia Dock, Their Ability to Manipulate the Georgia Dock, and Their Actual Manipulation of the Georgia Dock

532.    Perhaps unsurprisingly, all of the Georgia Dock Defendants sold Broiler chicken at prices based off of the Georgia Dock to customers during the relevant period. In fact, Sanderson Farms' ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████

533.    Tyson ███████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████

534.    As another example, █████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████

535.    ██████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

536.    So not only did the Georgia Dock Defendants knowingly make false submissions to the PMN for the purpose of inflating the Georgia Dock price index, but the Georgia Dock Defendants also priced off of the Georgia Dock to customers, including Plaintiff, without disclosing significant, non-public information to their customers about the Georgia Dock price index and the PMN. All of the Georgia Dock Defendants that sold Broiler chicken to Plaintiff based on the Georgia Dock failed to disclose their control over, manipulation of, and fraudulent submissions to the Georgia Dock.

537.    Just as the Georgia Dock Defendants' role on the PMN Advisory Committee enabled Defendants to devise an elegant scheme to manipulate the Georgia Dock, Defendants' role on the Advisory Committee created an information asymmetry that kept chicken buyers like Plaintiff in the dark.  Unlike the Georgia Dock Defendants, which had intimate knowledge of the way in which the PMN operated and the Georgia Dock price was calculated, Plaintiff knew only what all buyers of chicken knew and believed:  that the Georgia Dock price index represented the actual offering prices of chicken producers for the next week—in other words, an actual market price for broilers based on verified, reliable, and objective information.

538.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

539.    ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████

540.    Each of the Georgia Dock Defendants knew they were conspiring with each other and part of an enterprise of Defendants that were associated in fact and did in fact submit false and inflated price quotes to the PMN for the purpose of inflating the Georgia Dock price index for their benefit and Plaintiff's detriment.  Yet none of the Georgia Dock Defendants that did business with Plaintiff shared this significant, non-public information with Plaintiff.

541.    Each of the Georgia Dock Defendants did nothing to correct the false impression that the Georgia Dock was based on actual offering prices for a 2½- to 3-pound whole bird equivalent for the next week, instead of on inflated submissions not tied to actual offering prices.

542.    ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

543.     The Georgia Dock Defendants intentionally failed to disclose the above-listed significant, non-public information in their communications with Plaintiff regarding their transactions for the purchase and sale of chicken.   By intentionally failing to disclose this information, the Georgia Dock Defendants were attempting to induce a false belief by Plaintiff about the reliability of the Georgia Dock price index.   Defendants intended to induce this false belief by Plaintiff for the benefit of the Georgia Dock Defendants.

544.     All of the Georgia Dock Defendants knew that their customers, including Plaintiff, perceived the Georgia Dock price index as reliable, which was far from the truth.   All of the Georgia Dock Defendants knew their customers had little to no knowledge regarding how the Georgia Dock price index worked, because their customers had no ability to obtain such knowledge.

545.     Plaintiff's relationship with the Georgia Dock Defendants was managed by the following individuals, among others, who communicated with Plaintiff regarding sales and pricing: ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████     This list is non-exclusive and may be supplemented over the course of discovery.

546.    Georgia Dock Defendants made material omissions as detailed above when they communicated with Plaintiff; when they bid on, offered, negotiated, and pitched Plaintiff's business; and also when they contracted with Plaintiff. Many of the communications in which Defendants failed to disclose significant, non-public information to customers were made via interstate wires (both email and phone). Even if the origin and ultimate destination of any Defendants' wire communications referenced in this Amended Complaint were within a single state, those wires were routed through other states. Thus, even such wires constitute interstate wires.

547.    One example took place in ████████████ when Sanderson Farms representative ██████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████

548.    Another example ███████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████

153

549. Through their fraudulent acts and omissions, the Georgia Dock Defendants were successful in inducing a false belief by buyers of chicken, including Plaintiff, about the reliability of the Georgia Dock price index.

550. The Georgia Dock Defendants' scheme deprived their victims of valuable economic information and depended for its completion on a failure to disclose an essential element of the bargain.

(xi) <u>Georgia Dock Defendants Made Fraudulent Misrepresentations to Plaintiff by Stating that the Georgia Dock Reflected the Broiler Chicken Market.</u>

551. In addition to their material omissions, the Georgia Dock Defendants that did business with Plaintiff also made false statements and affirmative misrepresentations about material facts to Plaintiff over the relevant period. ████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████

552. This practice was widespread: ██████████████████████
████████████████████████████████
████████████████████████████████
████████████

553. The Georgia Dock Defendants made these false statements and affirmative misrepresentations ██████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

████████████████████████████████████ Thus, even such wires constitute interstate wires.

554.    For example, as early as ███████████ Tyson ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ Among other examples, the following Tyson representatives sent the above language to Plaintiff: ███████████████████████████████

███████████████████ ██████████████████████████ Tyson knew that the Georgia Dock did not represent ██████████████████████████ because it was not submitting actual prices to the PMN.

555.    As another example, in ████████████, Pilgrim's Pride representative ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ But Pilgrim's Pride knew that the Georgia Dock did not represent market conditions because it was not submitting actual prices to the PMN.

556.    Additionally, Georgia Dock Defendants often asked for cost adjustments when the Georgia Dock continued to rise, even if the parties had a pricing arrangement that was not expressly tied to the Georgia Dock.

557.    For example, in ██████████, Claxton representative ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ But ███████████████████████████████████████,

155

and Claxton knew that the Georgia Dock was not reflective of the Broiler market because it did not submit actual prices to the PMN.

558.   Another example occurred in ██████████, when Fieldale representative



Fieldale knew that the Georgia Dock did not represent the Broiler market, since it did not submit its actual prices to the PMN. ████████████████.

559.   The Georgia Dock Defendants knew that buyers of chicken, including Plaintiff, believed the Georgia Dock to be a reliable price index and intentionally perpetuated that belief by making fraudulent misrepresentations promoting it.

560.   Plaintiff relied on the Georgia Dock Defendants' false statements and affirmative misrepresentations about the Georgia Dock representing the Broiler "market." As a result, Plaintiff purchased Broiler chicken based on Georgia Dock prices.

(xii)   <u>Plaintiff Was Harmed by Georgia Dock Defendants' Fraudulent Submissions, Omissions, and Misrepresentations.</u>

561.   Plaintiff bought Broiler chicken based on pricing expressly tied to the Georgia Dock from Georgia Dock Defendants, including but not limited to from ████████████ ██████████████ Plaintiff also bought Broiler chicken based on pricing expressly tied to the Georgia Dock from ████████████████.

562.   Plaintiff adjusted pricing of Broiler products on multiple occasions after being asked to adjust such prices due to increases in the Georgia Dock, even when the Georgia Dock did not form the basis of the pricing agreement with the supplier who asked for an increase.

████████████████████████████████████████████████

████████████████████████████████ Further discovery is needed to detail all of the instances where Defendants requested and Plaintiff granted such adjustments based off of Georgia Dock increases.

563. Buyers of poultry, including Plaintiff, were the targets of the Georgia Dock Defendants' fraudulent submissions to the PMN, and Plaintiff reasonably relied on the veracity of those submissions.

564. Georgia Dock Defendants falsely submitted prices to Poultry Market News and, as detailed above, artificially inflated the Georgia Dock. The Georgia Dock price index was artificially inflated from no later than early 2011 through 2016 as a result of certain Defendants' fraudulent acts and omissions. Plaintiff had no reason to know that the Georgia Dock price index was inflated due to Defendants' fraudulent acts, misrepresentations, and omissions.

565. Therefore, by using the Georgia Dock as the basis for the price of Broiler chickens it purchased, whether pricing was expressly tied to the Georgia Dock or whether a price increase was requested based on an increase in the Georgia Dock, Plaintiff overpaid and was harmed due to the Georgia Dock Defendants' fraud.

(xiii) Defendants Engaged in a Pattern of Racketeering Activity as Part of the Conduct of an Enterprise's Affairs

566. The Georgia Dock Defendants' fraudulent acts and omissions were not committed individually, but rather as part of the affairs of an enterprise whose purpose was to obtain excessive poultry proceeds by defrauding chicken buyers, including Plaintiff.

567. The enterprise was the group of Georgia Dock Defendants, which were associated in fact through their price submissions to the PMN, their role on the PMN Advisory Committee, their involvement in the Georgia Poultry Federation, and their use of the Dock in selling product.

This enterprise was a continuing unit that associated together and acted with a common purpose: to sustain the existence of the PMN and Georgia Dock and to artificially inflate the Dock price for the benefit of the enterprise and the individual Defendants.

568.    There have been many relationships among those associated with the enterprise. Representatives from the Georgia Dock Defendants interacted with each other frequently at industry conferences and trade shows, as discussed throughout this Amended Complaint. All but one of the Georgia Dock Defendants participated on the PMN Advisory Committee, which acted to preserve and enhance the PMN and Georgia Dock as discussed above.

569.    All of the Georgia Dock Defendants were members of the Georgia Poultry Federation, the largest lobbyist in Georgia for poultry producers. All of the Georgia Dock Defendants had positions on the Board of the Georgia Poultry Federation. Representatives from the Georgia Dock Defendants interacted often with leaders of the Georgia Poultry Federation (such as Abit Massey and Mike Giles). Those same leaders helped to preserve and enhance the power of the PMN Advisory Committee and the Georgia Dock, as discussed herein.

570.    The enterprise had longevity that was sufficient to permit those associated to pursue the enterprise's purpose. There was continuity among the representatives of the Georgia Dock Defendants who served on the Advisory Committee, interacted with representatives of the Georgia Poultry Federation, and submitted price quotes to the PMN. The scheme of the Georgia Dock Defendants to manipulate the Georgia Dock price by making false and inflated price quotes, as discussed in this Amended Complaint, began no later than early 2011 and lasted for at least five years.

571.    Not only were the Georgia Dock Defendants a part of this enterprise, but they acted in concert with each other in their fraudulent acts and omissions. ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████

572.     The same was true with respect to the Georgia Dock Defendants' fraudulent misrepresentation and omissions.  If any of the Georgia Dock Defendants had disclosed their knowledge about the lack of verification for their price submissions to the PMN, their ability to manipulate the Georgia Dock price index, or the fact they were manipulating the Georgia Dock price index, then all buyers would have lost confidence in the Georgia Dock earlier than the end of 2016.  That was important, non-public information that only the Georgia Dock Defendants had in their possession. Because all of the Georgia Dock Defendants collectively benefited from their scheme, the Georgia Dock Defendants worked in concert not to disclose this information.

(xiv)   Georgia Dock Defendants Did Not Contract With Plaintiff in Good Faith.

573.     Throughout the relevant period, the Georgia Dock Defendants entered into contracts and exchanged pricing sheets and invoices with customers, including Plaintiff, that priced Broiler chicken based on the Georgia Dock. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

574.    Plaintiff's Broiler chicken contracts came in many forms, including oral agreements, formal written supply agreements, and other written agreements, including agreements made via email, purchase orders, and invoices. Of the Georgia Dock Defendants,

████████████████████████████████████████████████████████████

████████████████████████████████████████████ An implied covenant of good faith and fair dealing was implied in all of the contracts between Plaintiff and the Georgia Dock Defendants.

575.    ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

576.    ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

577.    Even where a contract had a fixed price, those prices were often based off of the

Georgia Dock as an indicator. For example, ████████████████████████████████████

████████████████████████████████████████████████

578.    Regardless of which Georgia Dock pricing arrangement was used, the material

pricing terms of the Georgia Dock Defendants' Broiler chicken contracts provided that the

amount charged to Plaintiff would be predicated on the Georgia Dock. None of these

arrangements allowed the Georgia Dock Defendants to operate and control the Georgia Dock or

to use their pricing submissions to PMN to falsely inflate each week's Georgia Dock price above

the actual average offering price. Such a scheme undermined all validity to the Georgia Dock

pricing system as being reflective of actual average offering prices, and gave the Georgia Dock

Defendants the ability to maneuver their prices skyward, so long as on a week-to-week basis they

stayed within the two-cent range permitted by the PMN. At the same time, the secrecy behind

which the Georgia Dock Defendants kept the Georgia Dock shrouded deprived customers like

Plaintiff of any ability to uncover and detect that their purchases were based on an inflated

pricing index.

### G.    Defendants Collusively Adopted Additional Strategies to Reinforce Their Conspiracy.

#### (i)    Defendants Collectively Shifted Away from Long-Term Fixed-Price Contracts to Cash in on Their Conspiracy.

579.    A coordinated move away from fixed-price contracts to contracts permitting

prices to fluctuate with an indexed public market price helps facilitate an antitrust conspiracy.

*See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 659 (7th Cir. 2002). Such a

shift indicates that sellers anticipate higher prices resulting from a conspiracy to restrict output and that they wanted to be able to take advantage of those higher prices.

580.    Fixed-price contracts would not allow Defendants to reap the benefits of the market price increases that resulted from their conspiracy. So, beginning in 2008, Defendants started to move away from long-term fixed-price contracts to shorter-term contracts with variable pricing pegged to one of several price indices discussed above (including the Georgia Dock). Defendants, including Koch Foods, Pilgrim's Pride, Sanderson Farms, and Tyson, publicly announced their effort to reduce annual fixed-price contracts in 2008. This change coincided with Defendants' efforts to cut production and reduce chicken supply so as to drive chicken market prices higher.

581.    On a January 28, 2008 earnings call, Tyson CEO Dick Bond announced that the company was looking to shorten its fixed-price contracts. By June 2009, Tyson reported that it had "dramatically" shortened its fixed-price contracts over 90 days.

582.    On a January 29, 2008 earnings call, Pilgrim's Pride's CFO Rick Cogdill reported that Pilgrim's Pride was also moving away from fixed-price contracts, saying, "in a situation like where we are now where we need to drive commodity prices up, that [*i.e.*, having less fixed price contracts] is going to give us the opportunity for more immediate benefit to our P&L than what we would have had say, historically three year[s] ago, when a higher percentage was fixed price." By March 2012, Pilgrim's Pride had reduced the number of fixed-price contracts it had, instead basing prices off of the market or including a reset provision linked to the underlying commodity. By 2014, less than 5% of all Pilgrim's Pride contracts were 12-month fixed price contracts.

583.    On July 28, 2008, an industry publication reported that Perdue was "seeking to raise prices and shorten its contracts."

584.    On a July 31, 2008 earnings call, Sanderson Farms' CEO Joe Sanderson noted that the industry may move towards "shorter term agreements."

585.    On an August 6, 2012 earnings call, Tyson CEO Donnie Smith stated that "[o]ver the past couple of years we have substantially reduced a number of fixed price contracts we have with customers and currently have less than 15% of our Poultry volume [on] annual fixed price contracts. The vast majority of our contracts are tied to specific markets or allow for conversations about adjusting prices to move—prices to offset higher input and we will continue to push for even more of these types of contracts. I believe supply will begin to rationalize as well, making it easier for us to have those pricing conversations."

586.    A December 2013 report by an industry analyst with Stephens, Inc. noted the change in the industry: "[w]ith volume growth generally limited, companies are developing more sophisticated strategies to generate profits . . . . 'Rather than annual fixed price contract[s] that are negotiated every fall, companies are partnering with customers and creating contracts that can be multi-year in duration. Contracts are now being negotiated all year long and employ a wide variety of pricing methodologies.'" Even long-term contracts were not "fixed," *i.e.*, they allowed price increases when Defendants' joint supply reductions drove up Broiler market prices.

(ii)    Inter-Defendant Sales.

587.    Defendants started directly purchasing chickens from one another—and from smaller producers—to soak up what they saw as excess supply that could potentially depress prices in the market. It also provided Defendants the opportunity to expressly discuss chicken prices with competitors. Further, and attractively to the bigger players in the chicken industry,

inter-Defendant sales permitted companies to maintain market share despite reducing their production. On many occasions, large inter-Defendant sales were negotiated by senior level executives, providing additional opportunities to conspire.

588.    Early in 2011, Tyson embarked on a strategy to soak up excess supply produced by its competitors, in addition to its own production cuts. Tyson termed its strategy "Buy vs. Grow," meaning Tyson bought its competitors' chicken to prevent it from being sold on the open market in an effort to avoid price decreases. Through this program, Tyson communicated to its competitors the volume of chicken it would be willing to purchase, thus suggesting to its competitors the amount of production each competitor should cut based on what would not be bought up by Tyson. One investment analyst described the program, stating it "involves maintaining or even reducing [Tyson's] own chicken production levels, with buying more chicken on the open market from their rival chicken producers, in an effort to keep the chicken market from being over supplied." In terms of the cost of pounds purchased, it would have been cheaper for Tyson to grow its own Broilers instead of buying them from competitors, but Tyson engaged in this program anyway because it allowed Tyson to better reduce supply industrywide.

589.    In a July 9, 2012 article, Donnie Smith of Tyson was quoted as saying "the company will not over produce chicken at these expensive grain levels, preferring to buy commodity pieces in the secondary market to fill orders where necessary."

590.    On a January 31, 2014, earnings call, Smith reported that through Tyson's "buy versus growth strategy we continue to keep our supply short of demand . . . ."

591.    By the end of 2014, Tyson was buying over four million pounds of chicken on the open market *each week*, more than any of the 24th–30th largest chicken producers *produce* on a weekly basis.

592.    Tyson increased its inter-Defendant purchases by 50 percent in the later part of 2015. In May 2015, Tyson announced plans to increase its Buy vs. Grow strategy to 10 percent of its sales in the second half of 2015 and into 2016, which translates to 17.6 million pounds per week, more than the average weekly production of any of the 15th–30th largest chicken producers. Tyson's plan was to reduce its own production after July 2015 and keep it flat through 2016, instead relying on its Buy vs. Grow purchases. Tyson continues to use its Buy vs. Grow strategy.

593.    Tyson's Buy vs. Grow strategy was described as a "very unique strategy." Tyson essentially treated the industry's chicken supply as if it was the supply of a single company, contrary to usual competitive incentives. Indeed, only a few years prior, on an April 29, 2008 earnings call, a Tyson executive said, "I think what we said along is we're going to match our supply and demand. *We're not going to cut beyond that and then go out and buy open market meat to subsidize other people's growth*." (Emphasis added). The fact that Tyson felt comfortable enough to buy its competitors' chicken by 2011 indicates its confidence that other producers would keep up their end of the conspiracy and decline to ramp up production.

594.    Tyson was not the only producer buying "excess" chicken. Fieldale President Thomas Hensley gave a November 5, 2012 interview in which he confirmed that his company was also engaging in a strategy to purchase excess supply from its competitors. He said: "[i]f you don't have a home for your chickens on Monday morning, you shouldn't have those chickens. Now we know where all our chickens are going. So we are buying chickens in that lower price area instead of selling them. So, no expansion for us."

595.    The practice of inter-defendant sales also exemplifies the commodity nature of the chicken market.

(iii)    Atypical Increases in Defendants' Exporting of Chickens.

596.    In 2012, Broiler exports from the United States accounted for approximately 45% of all United States meat exports. U.S. Broilers are exported to over 100 countries, with major export markets including Mexico, Canada, and China. Although more than half of exports consist of dark meat and other chicken parts that are undesirable to many U.S. consumers, exports increasingly include white meat and other products widely consumed in the U.S.

597.    The number and percentage of Broilers exported rose during the relevant period. From 2002 to 2006, the market share of Broilers that were exported remained between 14.2% to 16.5% annually. But in 2008, they shot up to 19.1%, and between 2008–2014 they were never lower than 18.5%. That percentage dropped down to 16.0% in 2015 due to export bans by countries due to Avian Flu concerns—and has slowly been ticking up ever since.

598.    From 2013 to 2014, Defendants conspired to use the pretext of Avian Flu in Mexico to justify exporting ***hatching eggs and flocks*** to the country. Upon information and belief, Defendants continued to export hatching eggs to Mexico in large numbers into 2016 in an active effort to artificially reduce the supply of chickens in the U.S. below what it would have been absent their active and continued participation in an unlawful antitrust conspiracy.

599.    On a May 4, 2015 earnings call, Tyson explicitly stated that it was sending 3% of its eggs to Mexico to "fill incubators" there.

600.    On a July 2016 earnings call, Pilgrim's Pride's CEO Bill Lovette linked Defendants' desire for "discipline" to the practice of exporting hatching eggs, expressing "confidence that we're going to do the right thing with respect to maintaining [] ***discipline***. We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million hatching eggs or so outside of the country. The industry could have chosen to set some of those eggs domestically, but that was not the choice

166

that was made. And so again that gives us confidence that we're going to continue to be disciplined as an industry."

601. Some of the Defendants, including Peco Foods, Pilgrim's Pride, Sanderson Farms, Tyson, and Wayne Farms, participated in an organization of exporters called Overseas Distribution Solutions, which was founded in 1999 and operated through 2011. Those exports were also part of Defendants' efforts to artificially reduce supply and raise prices of chicken sold in the United States pursuant to their price-fixing conspiracy.

602. Upon information and belief, Defendants conspired to export hatching eggs and flocks to Mexico and other countries from 2013 to 2016 to artificially reduce the supply of Broilers in the United States and thus increase the price of Broilers in the United States. The value Tyson and other defendants received from these exports is less than the price they would have received for keeping those eggs in the United States, hatching them, and selling the resulting Broiler meat in the U.S. market. But for Defendants' unlawful agreement and conspiracy as alleged in this Amended Complaint, it would have been against Tyson's independent economic self-interest to export hatching eggs and flocks to Mexico. But Defendants knew that their competitors would maintain "discipline" at home, ameliorating any risk that the exports presented and allowing them to capture artificially high prices.

## H. The Statute of Limitations Does Not Bar Plaintiff's Claims.

### (i) Plaintiff Did Not Discover and Could Not Have Discovered Defendants' Conspiracy and/or Fraud Until 2016.

603. Plaintiff did not have actual nor constructive knowledge of the facts alleged herein and constituting its claims for relief. Plaintiff did not and could not discover, through the exercise of reasonable diligence, the existence of Defendants' conspiracy and/or fraud until approximately 2016. Plaintiff was not and could not have been on inquiry notice that there was a

conspiracy to fix prices for chickens, a conspiracy to manipulate the Georgia Dock, and a fraudulent scheme to inflate the Georgia Dock because Defendants' conspiracy and/or fraud were secret and inherently unknowable.

604.    Plaintiff did not and could not have discovered, through the exercise of reasonable diligence, the facts supporting their claim for relief with respect to the output-restriction component of Defendants' conspiracy until the filing of a direct purchaser class action, *Maplevale Farms, Inc. v. Koch Foods, Inc., et al.*, in this District in September 2016. The *Maplevale Farms* complaint, which alleges a class of which Plaintiff is an absent member, caused Plaintiff and its counsel to start an investigation into the facts alleged in Plaintiff's Complaint. Although some of the allegations in the Complaint are based on public statements made by Defendants, Plaintiff did not monitor every one of Defendants' public statements in real time and in comparison to each other, nor should Plaintiff have been reasonably required to do so. A reasonable person would not have connected all of the dots until reports and investigations began to appear.

605.    Defendants' production cut in or around 2011 is a continuation of their conspiracy that included their production cut that occurred in or around 2008.

606.    Plaintiff similarly did not and could not have discovered, through the exercise of reasonable diligence, the facts supporting their claim for relief with respect to the Georgia Dock manipulation component of Defendants' conspiracy and/or the fraudulent misrepresentations and omissions made by Defendants at the very least until a January 18, 2016 *Wall Street Journal* article was published raising Defendants' possible manipulation of the Georgia Dock benchmark price. It was not until November 10, 2016 when it was disclosed publicly that the Georgia Dock Defendants had formed a secret Advisory Committee. Not until November 17, 2016 was it

publicly disclosed that the Florida Attorney General's Office had opened an investigation into the Georgia Dock benchmark price and its manipulation by the Georgia Dock Defendants.

607.     Defendants' anticompetitive conspiracy and fraud, by its very nature, was self-concealing and inherently unknowable. Defendants' fraudulent omissions regarding their control over the Georgia Dock, their ability to manipulate the Georgia Dock, and their actual manipulation of the Georgia Dock were incapable of detection by Plaintiff, even through the exercise of reasonable diligence, because Defendants kept their actions secret so that Plaintiff would continue to purchase Broilers at prices above competitive levels.

608.     Before these recent events Plaintiff reasonably considered the U.S. chicken industry to be a competitive industry, as the chicken industry is not exempt from antitrust regulations. Plaintiff also reasonably believed its contract partners to be dealing with it on fair and honest terms, and that it could justifiably rely on Defendants' representations regarding the Georgia Dock as being truthful. Accordingly, a reasonable person under the circumstances would not have been alerted to begin investigating the legitimacy of Defendants' chicken prices before these recent events.

609.     Plaintiff exercised reasonable diligence. Plaintiff could not have discovered Defendants' alleged conspiracy and/or fraud at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants.

(ii)     <u>Defendants Actively Concealed Their Conspiracy and/or Fraud.</u>

610.     Throughout the relevant period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy and/or fraud from Plaintiff and other buyers.

611.     The combination and conspiracy and/or fraud alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to: (1) secret

169

meetings, (2) surreptitious communications between Defendants via the wires (telephones, emails, text messages and other electronic communications) and in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, (3) limiting any explicit reference to competitor pricing or supply restraint communications in documents, (4) communicating competitively sensitive data to one another through Agri Stats, a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and (5) concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers) (6) misrepresentations regarding the actual offering price of products intended to defraud a class of chicken buyers, and (7) false statements and omissions made directly to Plaintiff.

612. Defendants used code words, including the word "discipline," in their public statements to conceal their conspiracy and signal one another in furtherance of their conspiracy to restrain production while shielding their conspiracy from detection or suspicion.

613. As alleged above, in 2008, after years of boom and bust cycles of production leading to the regular rise and fall of prices, the price of chickens began an unprecedentedly steady increase that continued at least through 2016. Defendants affirmatively and falsely attributed rising prices to, among other things, increases in the price of inputs. Defendants used these pretexts used to cover up the conspiracy and/or fraud. In fact, the chicken price increases (including the inflation of the Georgia Dock) were the result of Defendants' collusive conduct (and/or fraud), which was undisclosed at the time.

614. During the relevant period, Defendants affirmatively made numerous misleading public statements falsely portraying the market for chickens as a competitive one. For example, Defendants provided testimony at workshops held by the DOJ and USDA suggesting the chicken

industry was competitive and not subject to anti-competitive practices and agreements, including testimony at a May 21, 2010 workshop of a NCC-commissioned study by Dr. Thomas Elam, which stated that "the chicken industry is competitive and thriving," and has "[i]ntense competition" that promotes "product innovation and lower prices for consumers."

615.    To explain the decreasing supply of chickens since 2012, Defendants have provided a variety of pretextual explanations, including: (1) a breeding issue with chickens during 2014, (2) a Russian ban of U.S. chicken imports starting in 2014, and (3) a 2013 shortage in supply due in part due to an Avian Flu outbreak in Mexico that caused a surge in demand for hens to repopulate chicken farms in Mexico. These explanations were pretextual in that Defendants sought to hide their conspiracy from discovery by blaming chicken price increases on these factors rather than Defendants' own collusive conduct (including their unprecedented cuts to breeder flocks).

616.    Throughout the relevant period, Defendants repeatedly also cited increasing input costs as a pretext for their collusion to restrain supply and increase prices. For instance, Defendants repeatedly claimed that input cost increases during 2008 justified chicken price increases. However, while corn was $5/bushel in 2005–2006 and increased to $9 by May or June 2008, it quickly fell back to below $5/bushel by fall 2008. Higher chicken prices later in the relevant period also were not justified by increased costs of corn, which, after a temporary spike in the summer of 2012, were not increasing at the level that would have warranted higher chicken prices. Defendants, through the NCC, other trade groups, and press releases, speeches, and other public statements by their employees, also repeatedly and publicly blamed the federal government's ethanol mandate for increased chicken prices, asserting that it increased their corn

costs. Defendants made all of these pretextual representations to conceal their conspiracy and avoid disclosing their agreement to illegally restrain the supply of chickens.

617.    Throughout the relevant period, Defendants repeatedly misrepresented to Plaintiff through fraudulent statements and omissions that the inflated prices of the Georgia Dock reflected actual market conditions.

618.    By virtue of Defendants actively and intentionally concealing their above-described wrongful conduct, the running of any applicable statute of limitations has been (and continues to be) tolled and suspended with respect to Plaintiff's claims and causes of action resulting from Defendants' and Agri Stats' unlawful combination and conspiracy and fraud alleged in this Amended Complaint under the fraudulent concealment doctrine, Discovery Rule, and/or doctrine of equitable estoppel.

(iii)    <u>Plaintiff's Claims Were Tolled by the Direct Purchaser Class Action Complaint Filed in 2016.</u>

619.    Plaintiff was a member of direct purchaser class action complaints asserted against Defendants, including, but not limited to *Maplevale Farms, Inc. v. Koch Foods, Inc., et al.*, No. 1:16-cv-08637 (Dkt. No. 1) (N.D. Ill. Sept. 2, 2016).

620.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities during the pendency of that direct purchaser class action asserted against Defendants, commencing at least as early as September 2, 2016.

## VI.    ANTITRUST IMPACT

621.    Defendants' conspiracy had the following effects, among others:

- Price competition has been restrained or eliminated with respect to Broilers;

- The prices of Broilers have been fixed, raised, stabilized, or maintained at artificially inflated levels; and

172

- Purchasers of Broilers have been deprived of free and open competition among Defendants.

622. During the relevant period, Plaintiff purchased chicken from most of the Defendants (and their affiliates). As a direct and proximate result of Defendants' above-described illegal conduct, Plaintiff was compelled to pay, and did pay, artificially inflated prices for chickens.

623. As a direct and proximate consequence of Defendants' and Agri Stats' above-described wrongful conduct, Plaintiff sustained substantial losses and damage to its businesses and property in the form of overcharges for chickens. The full amount and forms and components of such damages will be calculated after discovery and presented upon proof at trial.

## VII.  CLAIMS FOR RELIEF AND CAUSES OF ACTION

### COUNT I

### <u>VIOLATION OF 15 U.S.C. § 1</u>
### (AGAINST ALL DEFENDANTS FOR OUTPUT RESTRICTION AND PRICE-FIXING)

624. All of the above allegations are hereby incorporated as if fully set forth herein.

625. Defendants entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

626. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

627. At least as early as January 1, 2008, and continuing until at least as late as 2016, the exact dates being unknown to Plaintiff, Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for Broilers, thereby creating anticompetitive effects.

628. Defendants' anticompetitive acts involved United States domestic commerce and import commerce and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Broilers throughout the United States.

629. The conspiratorial acts and combinations have caused unreasonable restraints in the market for Broilers.

630. As a result of Defendants' unlawful conduct, Plaintiff has been harmed by being forced to pay inflated, supracompetitive prices for Broilers.

631. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Amended Complaint. Defendants' conspiracy had the following effects, among others:

- Price competition in the market for Broilers has been restrained, suppressed, and/or eliminated in the United States;

- Prices for Broilers sold by Defendants, their divisions, subsidiaries, and affiliates, and their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

- Plaintiff, who directly purchased Broilers from Defendants, their divisions, subsidiaries, and affiliates, and their co-conspirators, has been deprived of the benefits of free and open competition in the purchase of Broilers.

632. Defendants took all of the actions alleged in this Amended Complaint with the knowledge and intended effect that their actions would proximately cause the price of Broilers to be higher than it would be but for Defendants' conduct. Defendants also knew and intended that an artificial inflation of spot market prices would increase other Broiler market prices, including those paid by Plaintiff.

633. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff has been injured in its business or property and will continue to be injured in its business and

property by paying more for Broilers than they would have paid and will pay in the absence of the conspiracy.

634.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## COUNT II

### VIOLATION OF 15 U.S.C. § 1
### (AGAINST ALL DEFENDANTS FOR CONCERTED OUTPUT RESTRICTION – PLED IN THE ALTERNATIVE TO COUNT I)

635.    All of the above allegations are hereby incorporated as if fully set forth herein.

636.    In collusively restricting, limiting, and curtailing the supply of chicken in the United States, Defendants engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

637.    Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, Plaintiff for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiff was deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

638.    Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiff in the United States.

639.    As a direct and proximate result of Defendants' above-described unlawful conduct, Plaintiff paid artificially inflated prices for chicken.

640.     As a direct and proximate result of Defendants' above-described anticompetitive conduct, Plaintiff was damaged in its businesses or property by paying prices for chicken that were higher than it would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

### COUNT III

### VIOLATION OF 15 U.S.C. § 1
### (AGAINST THE GEORGIA DOCK DEFENDANTS FOR PRICE-FIXING – PLED IN THE ALTERNATIVE TO COUNT I)

641.     All of the above allegations are hereby incorporated as if fully set forth herein.

642.     In knowingly coordinating, falsifying, and manipulating prices quoted to the GDA for inclusion in the Georgia Dock price index for the intended unlawful purpose of fixing, maintaining, raising, and stabilizing the price of Broilers sold in the United States, the Georgia Dock Defendants engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

643.     Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, Plaintiff for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiff was deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

644.     The Georgia Dock Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiff in the United States.

645.     As a direct and proximate result of the Georgia Dock Defendants' above-described unlawful conduct, Plaintiff paid artificially inflated prices for chicken.

646.    As a direct and proximate result of the Georgia Dock Defendants' above-described anticompetitive conduct, Plaintiff was damaged in its businesses or property by paying prices for chicken that were higher than it would have been but for the Georgia Dock Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

## COUNT IV

## COMMON LAW FRAUD
## BY THE GEORGIA DOCK DEFENDANTS

647.    All of the above allegations are hereby incorporated as if fully set forth herein.

648.    Each of the Georgia Dock Defendants knowingly made false statements and/or material omissions concerning material facts, as explained below.

649.    Fraudulent submissions.  The Georgia Dock Defendants knowingly submitted false and inflated price quotes to the Poultry Market News each week from at least 2011 to the end of 2016 (the exact dates being unknown to Plaintiff).  As explained in detail in this Amended Complaint, the Georgia Dock Defendants falsely reported on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2½- to 3-pound whole birds. When Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity. These false submissions were also reasonably calculated to deceive Plaintiff to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of the common uses of the Georgia Dock quotes, specifically their use in tray pack and retail contracts and other sales where prices were often tied to the Georgia Dock.

650.    The Georgia Dock Defendants are jointly and severally liable to Plaintiff for the damages Plaintiff incurred because of purchases it made based on Georgia Dock pricing during

the relevant period, whether or not such a purchase was made from one of the Georgia Dock Defendants or another chicken supplier.

651.    Fraudulent misrepresentations. The Georgia Dock Defendants also made material, fraudulent affirmative misrepresentations to their customers, including Plaintiff, regarding the nature of and methodology for calculating the Georgia Dock. These misrepresentations were intended to induce, and did induce, the reliance of Plaintiff on the inflated Georgia Dock prices. These misrepresentations were also reasonably calculated to deceive Plaintiff to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of the common uses of the Georgia Dock quotes, specifically their use in tray pack and retail contracts and other sales where prices were often tied to the Georgia Dock.

652.    Fraudulent omissions.    In addition, all of the Georgia Dock Defendants fraudulently failed to disclose information to the Plaintiff to whom they sold Broilers or Broiler Products.  The facts that they failed to disclose to Plaintiff were basic to their transactions with Plaintiff.  For example, they failed to disclose to Plaintiff during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia Dock, a fact that was basic to their transactions with Plaintiff.  The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock price quotes from no later than early 2011 through the end of 2016 or had reckless disregard for their falsity, because the Georgia Dock Defendants each knew that the quotes lacked integrity and were higher than the actual prices they could have charged absent Georgia Dock manipulation.  The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of Plaintiff.

653.    Each Georgia Dock Defendant owed a duty to disclose the foregoing to the Plaintiff to whom they sold Broilers or Broiler Products, given their superior knowledge and the secretive aspect of the manipulation.   Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price.  The Georgia Dock Defendants benefited from Plaintiff's trust in the Georgia Dock price index as an impartial, government-issued index.  Defendants used this to their advantage by pushing Plaintiff either to incorporate the Georgia Dock into its pricing and contracts, or to justify a change to its non-Georgia-Dock-based pricing by using the Georgia Dock as a point of reference.

654.    By failing to disclose the unreliability of the Georgia Dock, the Georgia Dock Defendants concealed a material fact, intending to induce a false belief.  Plaintiff could not have discovered the truth through reasonable inquiry and/or was prevented from making such an inquiry given the secret nature of the manipulation.

655.    The  Georgia  Dock  Defendants'  fraudulent  submissions,  fraudulent misrepresentations, and fraudulent omissions were intended to induce the reliance of  Plaintiff. Specifically, the Georgia Dock Defendants made these false statements and omissions with the intent and understanding that that their false statements would be used to calculate the Georgia Dock price index upon which poultry purchasers like Plaintiff relied when purchasing Broilers and Broiler Products. The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiff to enter into contracts at inflated prices in reliance on Defendants' misrepresentations and omissions of material fact.

656.    Plaintiff purchased chicken based on the Georgia Dock price index, and/or raised its non-Georgia-Dock-based pricing by using the Georgia Dock as a point of reference, and in so

doing reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiff known that the Georgia Dock was not a legitimate price index and that the Defendants were manipulating it, Plaintiff would not have agreed to prices tied to such a benchmark. Plaintiff reasonably relied on these misrepresentations because the Georgia Dock price index was held out as a legitimate index of poultry producers' actual offering prices and was an industry norm.

657.    Plaintiff justifiably relied on the inflated Georgia Dock price index and was injured as a result of the Georgia Dock Defendants' fraudulent acts and omissions pertaining to the Georgia Dock price index. Plaintiff paid higher prices than it would have had the Georgia Dock Defendants submitted accurate price quotes and not caused an artificially inflated Georgia Dock price index.

658.    As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent acts and omissions, Plaintiff's business was damaged by paying higher prices for chicken. The ascertainable damages will be established at trial. These damages were the foreseeable and direct result of the false submissions and omissions.

### COUNT V

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (AGAINST ALL GEORGIA DOCK DEFENDANTS)

659.    All of the above allegations are hereby incorporated as if fully set forth herein.

660.    Throughout the relevant period, Plaintiff contracted to purchase chicken from Defendants at prices based, in whole or in part, on the Georgia Dock. Each of Plaintiff's contracts with the Georgia Dock Defendants had an implied covenant that the parties would act in good faith and deal fairly with each other. Neither party was to do anything that would have

the effect of destroying or injuring the right of the other party to receive the benefits of the contract.

661.    Plaintiff acted in good faith, dealt fairly with Defendants, and performed all of its obligations under these contracts.  All conditions required for the Georgia Dock Defendants' performance of those contracts were satisfied.

662.    The Georgia Dock Defendants unfairly interfered with Plaintiff's right to receive the benefits of the contracts by secretly manipulating the Georgia Dock to inflate prices, as alleged above in the foregoing paragraphs.

663.    By intentionally and falsely inflating their price submissions that were used by the GDA to calculate the Georgia Dock, and by failing to inform Plaintiff that they were doing so and that they controlled both the manner in which the Georgia Dock was calculated and the prices that were used to calculate it, the Georgia Dock Defendants breached their implied duty of good faith and fair dealing and prevented Plaintiff from receiving the full benefit of its contractual agreements. Specifically, their inflation of the Georgia Dock price index resulted in Plaintiff paying more for  Broiler chicken than it would have had the Georgia Dock Defendants based their GDA submissions on their actual offering prices.

664.    Plaintiff was directly and proximately harmed by Defendants' actions since Plaintiff was impoverished by paying more for chicken than Plaintiff would have absent Defendants' manipulation, and absent the Defendants' breach of the implied covenant of good faith and fair dealing.  Defendants were enriched with increased payment for their chicken.

**COUNT VI**

**NEGLIGENT MISREPRESENTATION**
**BY THE GEORGIA DOCK DEFENDANTS**
**(PLEAD IN THE ALTERNATIVE TO COUNT IV)**

665.    All of the above allegations are hereby incorporated as if fully set forth herein.

666.    Each of the Georgia Dock Defendants negligently made false statements and/or material omissions concerning material facts, as explained below.

667.    False submissions.  The Georgia Dock Defendants submitted false and inflated price quotes to the Poultry Market News each week from no later than early 2011 through the end of 2016, as explained in detail in this Amended Complaint.  When Defendants made their false submissions, they did not exercise reasonable care or competence in determining whether their submissions were true or false and/or obtaining or communicating the information.  Each Georgia Dock Defendant knew and/or had reason to know that Plaintiff was among the class of businesses that would likely receive and rely on the representations made regarding the Georgia Dock.  The Georgia Dock Defendants supplied the inaccurate and inflated price quotes in order to guide Plaintiff's transactions.

668.    The Georgia Dock Defendants had a special relationship with Plaintiff; they intended for and knew Plaintiff relied on the representations in entering contracts or other financial transactions tied to the Georgia Dock, or when factoring the Georgia Dock into its decisions to increase non-Georgia-Dock-based prices.  They had superior knowledge about the components of and methodology for calculating the Georgia Dock, and their manipulation thereof was conducted in secret and concealed until the end of 2016.  The Georgia Dock Defendants owed Plaintiff a duty to communicate accurate information because of this special relationship.  Plaintiff justifiably relied on the information and suffered loss as a result.  It was foreseeable that Plaintiff would be harmed by the false submissions.

669.    Negligent omissions.  In addition, all of the Georgia Dock Defendants negligently failed to disclose information to  Plaintiff.  The price manipulation and other facts that they

182

failed to disclose to Plaintiff were basic to their transactions with Plaintiff. The Georgia Dock Defendants had direct dealings with and entered into contracts with Plaintiff. The relationships imposed a duty on the Counterparty Georgia Dock Defendants to make accurate and good-faith representations to Plaintiff since the Defendants had superior and exclusive knowledge of the integrity of the Georgia Dock price index. There was a special duty because the Georgia Dock Defendants controlled the Georgia Dock price index by reporting what should have been accurate price quotes but what were, in reality, fake prices.

670. The Defendants failed to disclose to Plaintiff additional facts that would make their representations regarding the Georgia Dock price index not materially misleading. Each Georgia Dock Defendant failed to disclose that it and other poultry producers were manipulating the Georgia Dock to their benefit and that the Georgia Dock did not accurately reflect actual prices absent manipulation. Each Georgia Dock Defendant used the inflated Georgia Dock to their advantage by making material misrepresentations and omissions knowing that they were false and/or with reckless disregard for their truth.

671. By failing to disclose the foregoing information, the Georgia Dock Defendants did not exercise reasonable care or competence in determining whether such information should be shared with Plaintiff. They knew Plaintiff would look to the Georgia Dock for guidance in contract formation and as a base for other transactions. Plaintiff was a foreseeable victim.

672. Plaintiff reasonably relied on and was injured as a result of the Georgia Dock Defendants' negligent acts and omissions. Plaintiff entered into contracts and other financial transactions tied to the Georgia Dock, and/or raised its non-Georgia-Dock-based prices based on references to the Georgia Dock, and was therefore directly and proximately injured by the Georgia Dock Defendants. Plaintiff paid more for chicken than it would have absent the Georgia

Dock Defendants' negligent acts and omissions. Plaintiff was injured as a result of the Georgia Dock Defendants' negligent acts and omissions pertaining to the Georgia Dock price index.

COUNT VII

<b>VIOLATION OF GA. CODE ANN. §§ 16-14-4(a) AND 16-14-6 (GEORGIA RICO)</b><br><b>BY THE GEORGIA DOCK DEFENDANTS</b><br><b>(ACQUIRING MONEY THROUGH RACKETEERING ACTIVITY)</b>

673.     All of the above allegations are hereby incorporated as if fully set forth herein.

674.     The Georgia Dock Defendants violated the Georgia RICO statute, Ga. Code Ann. § 16-14-1 *et seq.*, which makes it unlawful for any person to acquire any interest in personal property, including money, as a result of a pattern of racketeering activity.

675.     The application of Georgia RICO is proper because Georgia was the locus for the fraud. The Georgia Dock was compiled and published from the PMN's location in Georgia. Each of the Georgia Dock Defendants had plants in Georgia. The Georgia Dock Defendants knew that their price quotes each week to the PMN were sent into the state of Georgia. The Georgia Dock Defendants' material omissions pertained to their conduct and activities in Georgia

676.     Each of the Georgia Dock Defendants engaged in racketeering activity as defined by Georgia law. In particular, and as explained below, each of Georgia Dock Defendants engaged in conduct that falls within the scope three predicated acts: (1) Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud), (2) Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency), and (3) Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception).

677.     Each of the Georgia Dock Defendants committed at least two incidents of such racketeering activity that had the same or similar intents, results, accomplices, victims, or methods of commission or otherwise were interrelated by distinguishing characteristics and were

184

not isolated incidents. In particular, the Georgia Dock Defendants participated in the scheme described in this Amended Complaint to inflate the Georgia Dock price index and thereby defraud people who purchased chicken based on that price index, including Plaintiff.

678.    The Georgia Dock Defendants' racketeering activity falls into two categories of conduct: fraudulent submissions and fraudulent omissions.

679.    Fraudulent submissions. The Georgia Dock fraudulently submitted false and inflated price quotes to the Poultry Market News each week from no later than early 2011 to the end of 2016, as explained in detail in this Amended Complaint. Each of the Georgia Dock Defendants falsely reported on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2 ½ to 3-pound whole birds. When the Georgia Dock Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity. These false submissions were reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of how the Georgia Dock index was used, specifically in tray pack and retail contracts where prices were often tied to the Georgia Dock.

680.    Fraudulent omissions. The Georgia Dock Defendants also fraudulently failed to disclose information to the Plaintiff. The facts that the Georgia Dock Defendants failed to disclose to the Plaintiff were basic to their transactions with Plaintiff. For example, the Georgia Dock Defendants failed to disclose to Plaintiffs during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia Dock. The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock prices or acted with reckless disregard for their falsity, because they knew the quotes lacked integrity and were higher than the actual prices they could have charged absent the Georgia Dock

185

manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of Plaintiff. Each Georgia Dock Defendant owed a duty to disclose the foregoing to the Plaintiff, given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock Defendants benefitted from Plaintiff's trust in the Georgia Dock price index as an impartial, government-issued index. Plaintiff could not have discovered the truth through reasonable inquiry and/or was prevented from making such an inquiry given the secret nature of the manipulation.

681. The Georgia Dock Defendants' conduct falls within the scope of Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud). The fraudulent submissions and omissions discussed above were part of the Georgia Dock Defendants' scheme to defraud their customers, including Plaintiff. The Georgia Dock Defendants intended to defraud those customers, who were the targets of the scheme to rig the index. Each of the Georgia Dock Defendants used multiple interstate wires in furtherance of the fraudulent scheme. The interstate wires included (i) Defendants' false submissions to the Poultry Market News and (ii) Defendants' communications with customers to whom they sold chicken based on the Georgia Dock price index and in which they failed to disclose information basic to their transactions to induce a false belief to their benefit.

682. The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency). The fraudulent submissions discussed above were made to the Poultry Market News, a division of the Georgia

186

Department of Agriculture, on a matter within the scope of the GDA's jurisdiction. The Georgia Dock Defendants knew that the information contained in their submissions to the PMN was false.

683.    The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception).    With respect to the fraudulent omissions discussed above, the Georgia Dock Defendants intentionally created and/or confirmed Plaintiff's impressions regarding the reliability of the Georgia Dock price index that were false and which the Georgia Dock Defendants knew to be false.    In addition, the Georgia Dock Defendants intentionally failed to correct Plaintiff's false impressions regarding the reliability of the Georgia Dock price index when they had previously created and/or confirmed those false impressions. Finally, the Georgia Dock Defendants obtained additional property by means of this deceitful means or artful practice with the intention of depriving Plaintiff of that property—specifically, the Georgia Dock Defendants were able to charge Plaintiff higher prices than they otherwise would have charged and therefore made more money from Plaintiff as a result of this conduct.

684.    As a result of the pattern of racketeering activity as described in this Amended Complaint, each of the Georgia Dock Defendants acquired money that they otherwise would not have received from the sale of poultry that was tied to the Georgia Dock price index.

685.    The Georgia Dock Defendants' fraudulent submissions and omissions were intended to induce the reliance of Plaintiff. Specifically, the Georgia Dock Defendants made these fraudulent statements and omissions with the intent and understanding that their false statements would be used to calculate the Georgia Dock price index upon which customers like Plaintiff relied on when purchasing poultry. The Georgia Dock Defendants therefore acted for

the intended, unlawful purpose of inducing Plaintiffs to enter into contracts at inflated prices in reliance on Defendants' material misrepresentations and omissions.

686.    Plaintiff purchased chicken based on the Georgia Dock price index. In so doing, Plaintiff reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiff known that the Georgia Dock was not a legitimate price index and that Defendants were manipulating it, Plaintiff would not have agreed to prices tied to such a benchmark. Plaintiff reasonably relied on these misrepresentations because the Georgia Dock price index was held out as a legitimate index and was an industry norm.

687.    Plaintiff was injured as a result of the Georgia Dock Defendants' fraudulent submissions and omissions. In particular, Plaintiff paid higher prices for chicken than it would have paid if the Georgia Dock Defendants had not rigged the index and failed to disclose the basic information discussed above.

688.    As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent submissions and omissions, Plaintiff was damaged in its business and property by paying higher prices for chicken. The ascertainable damages will be established at trial. These damages were the foreseeable and direct result of the false submissions and omissions.

## COUNT VIII

### VIOLATION OF GA. CODE ANN. §§ 16-14-4(b) AND 16-14-6 (GEORGIA RICO) BY THE GEORGIA DOCK DEFENDANTS (CONDUCTING ENTERPRISE THROUGH RACKETEERING ACTIVITY)

689.    All of the above allegations are hereby incorporated as if fully set forth herein.

690.     The Georgia Dock Defendants violated the Georgia RICO statute, Ga. Code Ann. § 16-14-1 *et seq.*, which makes it unlawful for any person associated with an enterprise to participate in the enterprise through a pattern of racketeering activity.

691.     The application of Georgia RICO is proper because Georgia was the locus for the fraud.  The Georgia Dock was compiled and published from the PMN's location in Georgia. Each of the Georgia Dock Defendants had plants in Georgia.  The Georgia Dock Defendants knew that their price quotes each week to the PMN were sent into the State of  Georgia. The Georgia Dock Defendants' material omissions pertained to their conduct and activities in Georgia.

692.     The Georgia Dock Defendants were associated with an enterprise.  The enterprise was the group of Georgia Dock Defendants associated in fact through their price submissions to the PMN, their role on the PMN Advisory Committee, their involvement with the Georgia Poultry Federation, and their use of the Georgia Dock price index in selling poultry.

693.     The enterprise was a continuing unit that associated together and acted with a common purpose:  specifically, to sustain the existence of the Poultry Market News and the Georgia Dock price index and to artificially inflate the Georgia Dock price index through fraudulent acts and omissions for the benefit of the enterprise and the individual Defendants.

694.     There were relationships among the associates in the enterprise.  Representatives from the Georgia Dock Defendants interacted with each other frequently at industry conferences and trade shows, as discussed throughout this Amended Complaint.  All but one Georgia Dock Defendant participated on the PMN Advisory Committee, which acted to preserve and enhance the PMN and Georgia Dock price index as discussed above. All of the Georgia Dock Defendants were members of the Georgia Poultry Federation, the largest lobbying group in Georgia for the

poultry producers. Representatives from the Georgia Dock Defendants interacted often with leaders of the Georgia Poultry Federation, such as Abit Massey and Mike Giles, who helped to preserve and enhance the power of the PMN Advisory Committee and the Georgia Dock, as discussed in this Amended Complaint.

695.    The enterprise had longevity that was sufficient to permit the associates to pursue its purpose.  There was continuity among the representatives of the Defendants who served on the Advisory Committee, interacted with representatives of the Georgia Poultry Federation, and submitted price quotes to the PMN.  That continuity allowed the Georgia Dock Defendants to create and execute their scheme to fraudulently manipulate the Georgia Dock price index and conceal its critical flaws from customers, as described in this Amended Complaint.  The scheme by Defendants to submit false and inflated prices to the PMN lasted more than three years.

696.    The Georgia Dock Defendants participated in the enterprise through a pattern of racketeering activity as defined by Georgia law.  In particular, and as explained below, each of Georgia Dock Defendants  engaged in conduct that falls within the scope of three predicate acts: (1) Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud), (2) Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency), and (3) Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception).

697.    Each of the Georgia Dock Defendants committed at least two incidents of such racketeering activity that had the same or similar intents, results, accomplices, victims, or methods of commission or otherwise were interrelated by distinguishing characteristics and were not isolated incidents.  In particular, the Georgia Dock Defendants participated in the scheme described in this Amended Complaint to inflate the Georgia Dock price index and thereby defraud people who purchased chicken based on that price index, including Plaintiff.

698.     The Georgia Dock Defendants' racketeering activity falls into two categories of conduct:  fraudulent submissions and fraudulent omissions.

699.     Fraudulent submissions.  The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the Poultry Market News each week from no later than early 2011 to the end of 2016. As explained in detail in this Amended Complaint,  the Georgia Dock Defendants falsely reported on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2 /1/2 to 3-pound whole birds.  When the Georgia Dock Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity. These false submissions were reasonably calculated to deceive Plaintiff to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of how the Georgia Dock index was used, specifically in tray pack and retail contracts where prices were often tied to the Georgia Dock.

700.     Fraudulent omissions.  The Georgia Dock Defendants also fraudulently failed to disclose information to Plaintiff.  The facts that the Georgia Dock Defendants failed to disclose to Plaintiff were basic to their transactions with Plaintiff. For example, the Georgia Dock Defendants failed to disclose to Plaintiff during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the PMN. The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock prices or acted with reckless disregard for their falsity, because they knew the quotes lacked integrity and were higher than the actual prices they could have charged absent Georgia Dock manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of Plaintiff. Each Georgia Dock Defendant owed a duty to disclose the foregoing to the Plaintiff,

given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock Defendants benefitted from Plaintiff's trust in the Georgia Dock price index as an impartial, government-issued index. Plaintiff could not have discovered the truth through reasonable inquiry and/or was prevented from making such an inquiry given the secret nature of the manipulation.

701.    The Georgia Dock Defendants' conduct falls within the scope of Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud).  The fraudulent submissions and omissions discussed above were part of the Georgia Dock Defendants' scheme to defraud their customers, including Plaintiff.  The Georgia Dock Defendants intended to defraud those customers, who were the targets of the scheme to rig the index.  Each of the Georgia Dock Defendants used multiple interstate wires in furtherance of the fraudulent scheme.  The interstate wires included (i) Defendants' false submissions to the Poultry Market News and (ii) Defendants' communications with customers to whom they sold chicken based on the Georgia Dock price index and in which they failed to disclose information basic to their transactions to induce a false belief to their benefit.

702.    The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency). The fraudulent submissions discussed above were made to the Poultry Market News, a division of the Georgia Department of Agriculture, on a matter within the scope of the GDA's jurisdiction.  The Georgia Dock Defendants knew that the information contained in their submissions to the PMN was false.

703.    The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception).  With respect to the fraudulent omissions

192

discussed above, the Georgia Dock Defendants intentionally created and/or confirmed Plaintiff's impressions regarding the reliability of the Georgia Dock price index that were false and which the Georgia Dock Defendants knew to be false. In addition, the Georgia Dock Defendants intentionally failed to correct Plaintiff's false impressions regarding the reliability of the Georgia Dock price index, when they had previously created and/or confirmed those false impressions. Finally, the Georgia Dock Defendants obtained additional property by means of this deceitful means or artful practice with the intention of depriving Plaintiff of that property—specifically, the Georgia Dock Defendants were able to charge Plaintiff higher prices than they otherwise would have charged and therefore made more money from Plaintiff as a result of this conduct.

704. The Georgia Dock Defendants acted in concert with each other with respect to their fraudulent acts and omissions. Defendants' fraudulent submissions were committed for the benefit of the enterprise. The Georgia Dock Defendants were economically interdependent with respect to their fraudulent submissions and omissions; all of the Georgia Dock Defendants benefited from an inflated Georgia Dock price index through false submissions yet none could manipulate the price index alone. The Georgia Dock Defendants sustained that inflated price index for years by hiding significant, non-public information from buyers.

705. The Georgia Dock Defendants' fraudulent submissions and omissions were intended to induce Plaintiff's reliance. Specifically, the Georgia Dock Defendants made these fraudulent statements and omissions with the intent and understanding that their false statements would be used to calculate the Georgia Dock price index upon which customers like Plaintiff relied on when purchasing poultry. The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiff to enter into contracts at inflated prices in reliance on Defendants' material misrepresentations and omissions.

706.     Plaintiff purchased chicken based on the Georgia Dock price index. In doing so, Plaintiff reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiff known that the Georgia Dock was not a legitimate price index and that the Defendants were manipulating it, Plaintiff would not have agreed to prices tied to such a benchmark. Plaintiff reasonably relied on these misrepresentations because the Georgia Dock price index was held out as a legitimate index and was an industry norm.

707.     Plaintiff was injured as a result of the Georgia Dock Defendants' fraudulent submissions and omissions. In particular, Plaintiff paid higher prices for chicken than it would have paid if the Georgia Dock Defendants had not rigged the index and failed to disclose the basic information discussed above.

708.     As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent submissions and omissions, Plaintiff's business and property were damaged by paying higher prices for chicken. The ascertainable damages will be established at trial. These damages were the foreseeable and direct result of the false submissions and omissions.

## COUNT IX

## VIOLATION OF 18 U.S.C. §§ 1962(c) AND 1964(c) (FEDERAL RICO) BY THE GEORGIA DOCK DEFENDANTS

709.     All of the above allegations are hereby incorporated as if fully set forth herein.

710.     The Georgia Dock Defendants violated the Federal RICO statute, 18 U.S.C. § 1961 *et seq.*, which makes it unlawful for any person associated with an enterprise to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity.

711.     The Georgia Dock Defendants were associated with an enterprise.  The enterprise was the group of Georgia Dock Defendants associated in fact through their price submissions to

the PMN, their role on the PMN Advisory Committee, their involvement with the Georgia Poultry Federation, and their use of the Georgia Dock price index in selling poultry.

712.    The enterprise was a continuing unit that associated together and acted with a common purpose:   specifically, to sustain the existence of the Poultry Market News and the Georgia Dock price index and to artificially inflate the Georgia Dock price index through fraudulent acts and omissions for the benefit of the enterprise and the individual Defendants.

713.    There were relationships among the associates in the enterprise.   Representatives from the Georgia Dock Defendants interacted with each other frequently at industry conferences and trade shows, as discussed throughout this Amended Complaint.   All but one Georgia Dock Defendant participated on the PMN Advisory Committee, which acted to preserve and enhance the PMN and Georgia Dock price index as discussed above. All of the Georgia Dock Defendants were members of the Georgia Poultry Federation, the largest lobbying group in Georgia for the poultry producers. Representatives from the Georgia Dock Defendants interacted often with leaders of the Georgia Poultry Federation, such as Abit Massey and Mike Giles, who helped to preserve and enhance the power of the PMN Advisory Committee and the Georgia Dock, as discussed in this Amended Complaint.

714.    The enterprise had longevity that was sufficient to permit the associates to pursue its purpose.   There was continuity among the representatives of the Defendants who served on the Advisory Committee, interacted with representatives of the Georgia Poultry Federation, and submitted price quotes to the PMN.   That continuity allowed the Georgia Dock Defendants to create and execute their scheme to fraudulently manipulate the Georgia Dock price index and conceal its critical flaws from customers, as described in this Amended Complaint.   The scheme by Defendants to submit false and inflated prices to the PMN lasted more than three years.

195

715.    The Georgia Dock Defendants conducted and participated in the conduct of the enterprise through a pattern of racketeering activity as defined by federal law.  In particular, and as explained below, each of the Georgia Dock Defendants conducted and participated in the conduct of the enterprise through conduct that falls within the scope of 18 U.S.C. § 1343 (federal wire fraud) (incorporated through 18 U.S.C. § 1961).

716.    The Georgia Dock Defendants' racketeering activity falls into two categories of conduct:  fraudulent submissions and fraudulent omissions.

717.    Fraudulent submissions.  The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the Poultry Market News each week from no later than early 2011 to the end of 2016. As explained in detail in this Amended Complaint, the Georgia Dock Defendants falsely reported on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2 ½- to 3-pound whole birds.   When the Georgia Dock Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity. These false submissions were reasonably calculated to deceive Plaintiff to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of how the Georgia Dock index was used, specifically in tray pack and retail contracts where prices were often tied to the Georgia Dock.

718.    Fraudulent omissions.  The Georgia Dock Defendants also fraudulently failed to disclose information to Plaintiff.  The facts that the Georgia Dock Defendants failed to disclose to Plaintiff were basic to their transactions with Plaintiff. For example, the Georgia Dock Defendants failed to disclose to Plaintiff during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia Dock. The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock prices

196

or acted with reckless disregard for their falsity, because they knew the quotes lacked integrity and were higher than the actual prices they could have charged absent the Georgia Dock manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of Plaintiff. Each Georgia Dock Defendant who sold Broiler chicken to Plaintiff owed a duty to disclose the forgoing to the Plaintiff, given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock Defendants benefitted from Plaintiff's trust in the Georgia Dock price index as an impartial, government-issued index. Plaintiff could not have discovered the truth through reasonable inquiry and/or was prevented from making such an inquiry given the secret nature of the manipulation.

719. The Georgia Dock Defendants' conduct falls within the scope of 18 U.S.C. § 1343 (federal wire fraud) (incorporated through 18 U.S.C. § 1961). The fraudulent submissions and omissions discussed above were part of the Georgia Dock Defendants' scheme to defraud their customers, including Plaintiff. The Georgia Dock Defendants intended to defraud those customers, who were the targets of the scheme to rig the index. Each of the Georgia Dock Defendants used multiple interstate wires in furtherance of the fraudulent scheme. The interstate wires included (i) Defendants' false submissions to the Poultry Market News and (ii) Defendants' communications with customers to whom they sold chicken based on the Georgia Dock price index and in which they failed to disclose information basic to their transactions to induce a false belief to their benefit.

720.     The Georgia Dock Defendants were economically interdependent with respect to their fraudulent submissions and omissions; all of the Georgia Dock Defendants benefited from an inflated Georgia Dock price index yet could not manipulate the price index alone.  They sustained that inflated price index for years by hiding significant, non-public information from buyers. The Georgia Dock Defendants acted in concert with each other with respect to their fraudulent acts and omissions.  Defendants' fraudulent submissions were committed for the benefit of the enterprise. The Georgia Dock Defendants were economically interdependent with respect to their fraudulent submissions and omissions; all of the Georgia Dock Defendants benefitted from an inflated Georgia Dock price index through false submissions yet could not manipulate the price index alone. The Georgia Dock Defendants also sustained that inflated price index for years by hiding significant, non-public information from buyers.

721.     The Georgia Dock Defendants fraudulent submissions and omissions were intended to induce the reliance of Plaintiff. Specifically, the Georgia Dock Defendants made these fraudulent statements and omissions with the intent and understanding that their false statements would be used to calculate the Georgia Dock price index upon which poultry purchasers like Plaintiff relied when purchasing poultry. The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiff to enter into contracts at inflated prices in reliance on Defendants' material misrepresentations and omissions.

722.     Plaintiff purchased chicken based on the Georgia Dock price index. In doing so, Plaintiff reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiff known that the Georgia Dock was not a legitimate price index and that the Defendants were manipulating it, Plaintiff would not have agreed to prices tied to such a

benchmark. Plaintiff reasonably relied on these misrepresentations because the Georgia Dock price index was held out as a legitimate index and was an industry norm.

723.    Plaintiff was injured as a result of the Georgia Dock Defendants' fraudulent submissions and omissions. In particular, Plaintiff paid higher prices for chicken than it would have paid if the Georgia Dock Defendants had not rigged the index and failed to disclose the basic information discussed above.

724.    As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent submissions and omissions, Plaintiff's business and property were damaged by paying higher prices for chicken. The ascertainable damages will be established at trial. These damages were the foreseeable and direct result of the false submissions and omissions.

## COUNT X

### UNJUST ENRICHMENT
### BY THE GEORGIA DOCK DEFENDANTS

725.    All of the above allegations are hereby incorporated as if fully set forth herein.

726.    In the alternative to the foregoing remedies at law, through manipulating the Georgia Dock by submitting false price quotes and then misrepresenting and/or omitting the material fact of this manipulation to Plaintiff, the Georgia Dock Defendants knowingly acted in an unconscionable, unfair, and oppressive manner toward Plaintiff, violating the fundamental principles of justice, equity, and good conscience.   The Georgia Dock Defendants received higher payment then they were entitled to and acted with conscious disregard for Plaintiff's rights.

727.    It would be inequitable for the Georgia Dock Defendants to be permitted to retain the ill-gotten gains they obtained through these fraudulent and manipulative acts. The Georgia Dock Defendants' enrichment resulted directly and proximately from the alleged conduct.

728.     If Plaintiff has no adequate remedy at law, the Court can and should compel the Georgia Dock Defendants to disgorge all unlawful or inequitable proceeds. Plaintiff is entitled to the establishment of a constructive trust impressed upon the benefits to the Georgia Dock Defendants from their inequitable actions and unjust enrichment.  Alternatively, each Defendant could pay its own unjust enrichment to Plaintiff.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A.     Enter joint and several judgments against Defendants in favor of Plaintiff;

B.     Award Plaintiff damages in an amount to be determined at trial to the maximum extent allowed under federal antitrust laws and enter a joint and several judgment against Defendants in favor of Plaintiff in an amount to be trebled to the extent such laws permit;

C.     Award Plaintiff damages in an amount to be determined at trial to the maximum extent allowed under Georgia RICO (Ga. Code Ann. §16-14-1 *et seq.*) and Federal RICO (18 U.S.C. § 19621 *et seq.*), and enter a judgment in favor of Plaintiff against the Georgia Dock Defendants, with the judgment being for joint and several liability, in an amount to be trebled to the extent such laws permit;

D.     Award Plaintiff damages or other relief permitted by law or equity for Plaintiff's common law claims in an amount to be determined at trial;

D.     Award Plaintiff punitive damages as appropriate under applicable law;

E.     Award Plaintiff its post-judgment interest as provided by law, with such interest to be awarded at the highest legal rate;

F.     Award Plaintiff its attorneys' fees, litigation expenses, and costs, as provided by law, including the federal antitrust laws, Georgia RICO, and Federal RICO; and

G.      Award Plaintiff the costs of investigation and litigation pursuant to Ga. Code Ann. § 16-14-6(c);

H.      Grant Plaintiff such other and further relief that the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,


Dated: April 15, 2019                      _____/s/ Ryan P. Phair_____
                                           Ryan P. Phair

                                           Torsten M. Kracht (#501905)
                                           Ryan P. Phair (#479050)
                                           HUNTON ANDREWS KURTH LLP
                                           2200 Pennsylvania Avenue, NW
                                           Washington, D.C. 20037-1701
                                           (202) 955-1500
                                           tkracht@huntonak.com
                                           rphair@huntonak.com

                                           John S. Martin (admitted *pro hac vice*)
                                           HUNTON ANDREWS KURTH LLP
                                           Riverfront Plaza, East Tower
                                           951 East Byrd Street
                                           Richmond, VA 23219-4074
                                           (804) 788-8200
                                           martinj@huntonak.com

                                           Julie B. Porter (#6243787)
                                           SALVATORE PRESCOTT & PORTER, PLLC
                                           1010 Davis Street
                                           Evanston, IL 60201
                                           (312) 283-5711
                                           porter@spplawyers.com

                                           *Attorneys for Plaintiff Ahold Delhaize USA, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 18th day of April, 2019, I caused a true and correct copy of the

foregoing document to be served upon all counsel of record via the Court's CM/ECF system.


/s/ Ryan P. Phair
Ryan P. Phair