# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION* | Case No.1:16-cv-08637 |
| | Hon. Judge Thomas M. Durkin |
| This Document Relates To: | Magistrate Jeffrey T. Gilbert |
| Case No. 1:18-cv-00245: | **<u>FIRST AMENDED COMPLAINT</u>** |
| Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC, | (PUBLIC REDACTED VERSION) |
| Plaintiffs, | |
| v. | |
| Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC, Koch Meat Co, Inc., Tyson Foods, Inc., Tyson Chicken, Inc. Tyson Breeders, Inc., Tyson Poultry, Inc., Pilgrim's Pride Corporation, Perdue Farms, Inc., Perdue Foods LLC, Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division), Sanderson Farms, Inc. (Processing Division), Wayne Farms, LLC, Mountaire Farms, Inc., Mountaire Farms, LLC, Mountaire Farms of Delaware, Inc., Peco Foods, Inc., Foster Farms, LLC, House of Raeford Farms, Inc., Simmons Foods, Inc., Fieldale Farms Corporation, George's, Inc., George's Farms, Inc., O.K. Foods, Inc., O.K. Farms, Inc., O.K. Industries, Inc., Claxton Poultry Farms, Inc., Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, Inc., Harrison Poultry, Inc., Mar-Jac Poultry, Inc., Amick Farms, LLC, Case Foods, Inc., Case Farms, LLC, Case Farms Processing, Inc., and Agri Stats, Inc. | |
| Defendants. | |

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION ............................................................................... 1

  A.  As Part of an Unlawful Price-Fixing Agreement, Defendants Agreed to Restrict Output and Cut Production ................................................................. 2

  B.  As Part of an Unlawful Price-Fixing Agreement, Defendants Agreed to Manipulate and Artificially Inflate the Georgia Dock. ................................. 6

II.  JURISDICTION AND VENUE .......................................................................... 8

III.  PARTIES ............................................................................................................ 9

  A.  Plaintiffs. ..................................................................................................... 9

  B.  Defendants. ................................................................................................ 10

    1.  Koch Foods Defendants ................................................................. 10

    2.  Tyson Defendants ........................................................................... 11

    3.  Pilgrim's Pride Corporation ........................................................... 12

    4.  Perdue Defendants .......................................................................... 13

    5.  Sanderson Farms Defendants ......................................................... 14

    6.  Wayne Farms, LLC ........................................................................ 15

    7.  Mountaire Farms Defendants ......................................................... 16

    8.  Peco Foods ..................................................................................... 17

    9.  Foster Farms ................................................................................... 17

    10.  House of Raeford Farms ................................................................. 18

    11.  Simmons Foods ............................................................................... 19

    12.  Fieldale Farms ................................................................................ 19

    13.  The George's Defendants ............................................................... 20

    14.  O.K. Foods Defendants ................................................................... 21

    15.  Claxton Poultry Defendants ........................................................... 21

    16.  Harrison Poultry Defendant ........................................................... 22

    17.  Mar-Jac Poultry Defendants ........................................................... 23

    18.  Defendant Amick Farms ................................................................. 24

    19.  Defendant Case Farms .................................................................... 24

    20.  Defendant Agri Stats, Inc. .............................................................. 26

IV. AGENTS AND CO-CONSPIRATORS .................................................................... 27

V. TRADE AND COMMERCE ................................................................................... 28

VI. FACTUAL ALLEGATIONS .................................................................................. 28

    A. Background On Broilers. ............................................................................... 28

        1. **"Broilers."** .................................................................................... 28

        2. **Broilers Are A Commodity.** ...................................................... 28

        3. **The Broiler Market Is A National One Worth Over $30 Billion Annually.** ....... 28

        4. **Broiler Prices Have Risen Steadily Since 2008.** ...................... 30

        5. **The Broiler Price Indices.** ......................................................... 31

    B. Overview of Defendants' Illegal Conspiracy ............................................ 33

    C. The Conspiracy's Second Prong: Collusively Manipulating the Georgia Dock Benchmark Price Index ........................................................................ 36

        1. **The Georgia Dock Pricing Methodology and Its Susceptibility to Manipulation** 37

        2. **Georgia Dock Prices Diverged from the USDA Composite and Urner Barry Price Indices Beginning in 2011** .............................................. 42

    D. AGRI Stats Participated in and Actively Facilitated Defendants' Communications Among Themselves, and Provided Data Necessary to Effectuate, Monitor and Enforce The Conspiracy. 44

    E. Defendants Coordinated Production Cuts To Stabilize And Increase Broiler Prices From 2008-2012, And After That, Continued Restricting Broiler Supply To Maintain Artificially High Prices. 54

        1. **Time Period Before The Conspiracy.** ...................................... 57

        2. **Defendants' Production Cuts In 2008-2009.** ........................... 58

        3. **In 2008 and Early 2009, Defendants Made Unprecedented Reductions To Their Broiler Breeder Flocks.** ............................... 70

        4. **Defendants' Production Cuts In 2008 And 2009 Led To Record Broiler Prices.** 72

        5. **Defendants' Quick Reaction To Overproduction In 2011 Was Unprecedented, Leading To A Second Wave Of Production Cuts.** ....... 73

        6. **Defendants' Production Cuts In 2011-2012 Lowered Broiler Breeder Flocks To Unprecedented Levels And Led To Record Profits In 2013-2014.** ............. 83

        7. **Defendants' Supply Reduction Conspiracy Continued In 2015 and 2016.** ........ 89

    F. The Structure And Characteristics Of The Broiler Market, Along With Other Factors, Makes The Conspiracy Even More Economically Plausible. .......................... 93

        1. **The Broiler Industry Is Highly Vertically Integrated.** ......... 93

        2. **Supply and Demand For Broilers Is Inelastic.** ...................... 97

ii

**3. Broilers Have No Significant Substitutes.**.................................................97

**4. The Broiler Industry Has Experienced Significant Consolidation And Is Highly Concentrated.**.................................................97

**5. The Broiler Industry Has A History Of Government Investigations And Collusive Actions.**.................................................100

**6. Defendants' Opportunities To Collude.**.................................................102

**7. The Broiler Market Has High Barriers To Entry.**.................................................107

**8. Defendants Have Similar Cost Structures And Work Collaboratively To Share Cost Information.**.................................................109

G. Defendants' Collusion Resulted In Unprecedented Capacity Reductions, Artificially High Prices, And Record Profits.................................................111

H. Defendants Not Only Reduced Their Own Production And But Also Used Direct Purchases of Broilers To Reduce Industry Supply.................................................112

I. Defendants Made A Coordinated Move Away From Fixed-Price Contracts.................................................114

VII. ANTITRUST INJURY .................................................116

VIII. THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS.......117

A. Plaintiffs Did Not Discover And Could Not Have Discovered Defendants' Anticompetitive Conduct.................................................117

B. Defendants Actively and Fraudulently Concealed Their Conspiracy. .................................................118

C. Plaintiffs' Claims Were Tolled By The Direct Purchaser Class Action Complaint Filed In 2016 123

D. CONTINUING VIOLATION ALLEGATIONS.................................................123

IX. VIOLATION OF SECTION 1 OF THE SHERMAN ACT .................................................124

X. VIOLATION OF 15 U.S.C. § 1 (AGAINST THE GEORGIA DOCK DEFENDANTS FOR PRICE-FIXING (PLED IN THE ALTERNATIVE) .................................................126

XI. CONSPIRACY TO DEFRAUD (AGAINST THE GEORGIA DOCK DEFENDANTS) 127

XII. FRAUD (AGAINST THE GEORGIA DOCK DEFENDANTS IN THE ALTERNATIVE TO CONSPIRACY TO DEFRAUD) .................................................134

XIII. NEGLIGENT MISREPRESENTATION (THE GEORGIA DOCK DEFENDANTS IN THE ALTERNATIVE TO FRAUD CLAIMS).................................................141

XIV. VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FLA. STAT. § 501.201, *ET SEQ.*) (AGAINST FILEDALE).................................................146

XV. VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FLA. STAT. § 501.201, *ET SEQ.*) (AGAINST SANDERSON FARMS).................................................148

XVI. BREACH OF CONTRACT (AGAINST FIELDALE) .................................................150

XVII.       BREACH OF CONTRACT (AGAINST SANDERSON FARMS)................... 151

XVIII.      BREACH IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (AGAINST FIELDALE) ........................................................................................ 152

XIX.   BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (AGAINST SANDERSON) ................................................................................... 153

XX.   UNJUST ENRICHMENT (AGAINST FIELDALE IN THE ALTERNATIVE TO CONTRACT CLAIMS)...................................................................................... 155

XXI.   UNJUST ENRICHMENT (AGAINST SANDERSON IN THE ALTERNATIVE TO CONTRACT CLAIMS)...................................................................................... 155

XXII.      REQUEST FOR RELIEF ............................................................... 156

XXIII.     JURY TRIAL DEMAND ................................................................ 157

Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC ("Plaintiffs") bring this action as purchasers of Broilers[1] directly from Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present (the "Relevant Time Period"), for treble damages under the antitrust laws of the United States against Defendants.

## I.     NATURE OF THE ACTION

1.     Plaintiffs allege that, beginning at least as early as January 2008, Defendants and their co-conspirators conspired and combined to fix, raise, maintain, and stabilize the price of Broilers. Defendants implemented and executed their conspiracy by coordinating their output and limiting production with the intended and expected result of increasing prices of Broilers in the United States. In furtherance of their conspiracy, Defendants exchanged detailed, competitively sensitive, and closely-guarded non-public information about prices, capacity, sales volume, and demand, including through Defendant Agri Stats. In addition, Defendants fraudulently concealed their anticompetitive conduct from Plaintiffs in furtherance of the conspiracy; therefore, there may be other methods by which Defendants carried out their conspiracy presently not known to Plaintiffs.

2.     Broilers constitute approximately 98% of all chicken meat sold in the United States. The chicken companies named as Defendants are the leading suppliers of Broilers in an industry with over $30 billion in annual wholesale revenue. The Broiler industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants collectively control approximately 90% of the wholesale Broiler market.

---

[1] "Broilers" are chickens raised for meat consumption slaughtered before the age of 13 weeks, which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards.

3.     Defendants' restraint of trade was implemented through two mechanisms. The first focused on the beginning of the distribution chain by reducing the supply of broiler chickens into the market. The second focused on the end of the distribution chain by manipulating price indices with respect to wholesale chicken prices for buyers such as Plaintiffs, which purchased affected products directly from the Defendants and their affiliates.

**A.     As Part of an Unlawful Price-Fixing Agreement, Defendants Agreed to Restrict Output and Cut Production**

4.     One aspect of Defendants' scheme curtailed the supply of chickens in the market via unprecedented cuts at the top of the supply chain in the form of collusively reducing "breeder flocks" that produce chickens ultimately slaughtered for meat consumption. Historically, when faced with low market prices, Defendants relied primarily on mechanisms that temporarily reduced production – at the middle or end of the supply chain, such as reducing eggs placements, killing newly-hatched chicks, or idling processing plants – but which still allowed them to ramp up production within weeks if chicken prices increased.

5.     Historically, the Broiler industry was marked by boom and bust cycles where, in response to rising prices, producers increased production, which caused an oversupply and resulting decrease in pricing. However, that market pattern changed markedly in 2008. By their conspiratorial conduct, Defendants not only materially reduced or eliminated the historical boom and bust cycle of the Broiler industry, but they also artificially increased and maintained Broiler prices during periods of rapidly falling input costs by, among other means, coordinating supply restrictions.

6.     In 2007, Pilgrim's and Tyson attempted to cut their production levels enough to cause industry prices to rise. Despite Pilgrim's and Tyson's combined 40% market share, their

production cuts in 2007 were not enough to increase prices because other Broiler companies increased their production.

7.     In 2008, faced with dropping prices and low profits, Defendants collectively began cutting their ability to ramp up production by materially reducing their breeder flocks. While in the past, Defendants undertook traditional, short-term production cuts, this was a significant shift in their behavior. Defendants' collective market-changing cuts to breeder flocks – a first round from 2008 to early 2009, and a subsequent round from 2011 to 2012 as the conspiracy continued into the current decade – effectively eliminated their ability to meaningfully increase supply for years.

8.     In January 2008 Pilgrim's and Tyson concluded that only through broader cooperation among major producers in the Broiler industry could supply be cut enough to force prices to increase. At that time, both Pilgrim's and Tyson made clear to the Broiler industry that neither would continue to cut production while their competitors used the opportunity to take away their market share. After attending an industry event in late January 2008, Tyson's CEO announced it would be raising prices because "we have no choice [but] to raise prices substantially." A day later, a Pilgrim's executive announced publicly that it would cut its production and "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."

9.     The other Defendants followed Pilgrim's and Tyson's invitation to collude, making substantial cuts to their own production. However, in 2008, unlike Pilgrim's and Tyson's prior production cuts, Defendants did not rely solely on the ordinary mechanisms available to temporarily reduce production, which would have permitted production to be quickly ramped up if prices rose. Instead, Defendants cut their ability to ramp up production for *18 months or more*

by destroying Broiler breeder hens in their breeder flocks, which are responsible for supplying the eggs Defendants raise into Broilers. This Broiler breeder flock destruction was unparalleled and its consequences continue to be felt in the Broiler industry to this day. Further, in 2010, when some Defendants became "undisciplined" and began gradually increasing their production, Defendants made a second wave of coordinated production cuts in 2011 and 2012, which included further substantial Broiler breeder flock destruction. Defendants continued to limit the Broiler supply in subsequent years by destroying eggs, relying upon one another's production to meet customer needs, and exporting excess Broiler breeder flocks to Mexico, even when doing so was against their independent economic self-interest.

10.     Defendants' coordinated cuts in 2008 and 2011-2012 has resulted in a nearly 50% increase in Broiler wholesale prices since 2008, despite input costs (primarily corn and soybeans) falling roughly 20% to 23% over the same time period. The rise in Broiler prices relative to input costs has led to record profits for Defendants.

11.     To implement their conspiracy, Defendants shared detailed production and pricing information by electronically transferring vast amounts of production data to Agri Stats which, while supposedly anonymous, in fact provides Defendants with sufficient detail to determine individual producer data on production, cost, and general efficiencies. Through Agri Stats, Defendants shared, on a weekly and/or monthly basis, their confidential production and pricing information, including forward-looking production information, which can be easily forecasted based on Broiler breeder flock data that is reported and shared.

12.     Defendant Agri Stats, Inc. ("Agri Stats"), knowingly facilitated Defendants' coordinated output restriction scheme, allowing Defendants to monitor and police each other through detailed reports purchased at significant cost.

4

13.     The information available to Defendants in these Agri Stats reports is not the kind of information that would be disclosed by one competitor to another in a competitive market. Agri Stats reports include individual rows of facility-level data for over 100 of Defendants' chicken facilities. Most of these vast facilities, referred to as "complexes," include housing for Defendants' breeder flocks and hatcheries where breeder flock hens lay the eggs that will ultimately become the chickens sold to the market.

14.     While Agri Stats purports to "anonymize" individual producer data in its reports, it knew that the reports were detailed enough that any reasonably informed producer could discern the identity of its competitors' information, including breeder flock numbers and other production, capacity, and cost data. Agri Stats reports identify each chicken facility with unique numbers, including a coding system identifying the region and sub-region, for each chicken complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself.[2]

15.     Agri Stats' reports are not publicly available and Defendants closely guard them from those outside the industry.

16.     Agri Stats both facilitated and participated in the conspiracy because, among other things:

- Agri Stats' coding system enabled Defendants' personnel to decipher, simply by eyeballing the "rows" in a given report, the production, feed, sales and other competitively-sensitive metrics of their competitors, many of whom had

---

[2] Agri Stats reports include specific data for Defendants' chicken complexes (listed by producer and location) including: Upper Mid Atlantic ("Sub-Region 21"), North Carolina ("Sub-Region 22"); Northern Georgia and Tennessee ("Sub-Region 31"); Southern Georgia, Florida and South Carolina ("Sub-Region 32"); Alabama and Mississippi (sub-regions 41 and 42); lower Arkansas, Louisiana and Texas ("Sub-Region 51"); upper Arkansas and Missouri ("Sub-Region 52"); Kentucky, Ohio, Minnesota, Indiana and Wisconsin ("Sub-Region 60"); and California and the Pacific Northwest ("Region 10") (which is composed solely of Defendant Foster Farms' three complexes).

complexes "right down the road from" each other in the same Agri Stats subregion;

- Agri Stats' regular meetings with each Defendant allowed Agri Stats to share production information among the Defendants. For example, mid-level Tyson personnel working at complexes in the Mid-Atlantic region were advised by their complex managers about competitors' production following quarterly meetings between the Tyson complex managers and Agri Stats account managers; and

- Agri Stats account managers created, for each of their Defendant customers, a series of data compilations known as "books," based on the competitively sensitive data that a particular Defendant had submitted to Agri Stats. On a number of occasions, Agri Stats personnel sent copies of one Defendant's "books" to other Defendants.

17.     In early 2009, a leading industry publication noted that chicken "production in the U.S. used to be just like government spending, it never went down and cutbacks only resulted in slowing the rate of growth, but not anymore," because for "***the first time in decades, total broiler production in 2008 remained virtually unchanged*** from the year before. Watt PoultryUSA 2008 rankings data show the industry's total weekly ready-to-cook (RTC) production at 724.05 million pounds, just slightly more than the 723.71 million RTC pounds per week reported at the end of 2007." (Emphasis added).

### B.     As Part of an Unlawful Price-Fixing Agreement, Defendants Agreed to Manipulate and Artificially Inflate the Georgia Dock.

18.     A second component of Defendants' conspiracy to unlawfully increase and maintain chicken prices was the manipulation and artificial inflation of prices on the "Georgia Dock," a weekly benchmark price compiled and published by the Georgia Department of Agriculture (the "GDA") and widely used by chicken buyers. Unlike other price indices available to chicken buyers, the Georgia Dock benchmark price is a self-reported number from a group of at least nine chicken producers, referred to herein as the "Georgia Dock Defendants." Senior executives from eight of the nine Georgia Dock Defendants were members of a private

6

sector "Georgia Dock Advisory Board," playing a key role in the compilation and manipulation of the Georgia Dock benchmark price.

19.     Following intense scrutiny by regulators and by the news media over allegations of manipulation, the GDA suspended reporting the Georgia Dock index in November 2016. The Antitrust Section of the Florida Attorney General's office is currently investigating the chicken industry for anticompetitive practices, including the manipulation of the Georgia Dock.

20.     Furthermore, from late 2014 into 2016, when Broiler input costs fell significantly, economic theory would indicate that in a competitive market, all else being equal, Broiler prices similarly would fall.  However, prices remained artificially inflated due to Defendants' and their Broiler Co-Conspirators' agreement to restrict production and exchange sensitive pricing information through Agri-Stats.

21.     There are numerous "plus factors" in the Broiler industry during the Relevant Time Period that enabled Defendants' conspiracy and its success, including, but not limited to, the following: (a) extensive information sharing through Agri Stats, (b) numerous opportunities to collude, (c) a coordinated change from contracts with fixed Broiler prices to Broiler prices that float with the Broiler spot market, (d) inter-Defendant trades and purchases that often are against independent self-interest and take the place of individual increased production, and (e) numerous industry characteristics facilitating collusion, such as high vertical integration, high barriers to entry, high Broiler industry consolidation and concentration, inelastic supply and demand, a lack of significant substitutes for Broilers, and a history of government investigations and collusive conduct.

22.     Defendants' restriction of Broiler supply had the intended purpose and effect of increasing Broiler prices. As acknowledged by Defendants, supply and demand in the Broiler

7

industry are inelastic. Therefore, a coordinated decrease in supply necessarily will result in an increase in prices. As one industry consultant noted, "[b]ecause of the inelastic nature of the supply and demand [of Broilers,] a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

23.     In addition, as also acknowledged by Defendants and industry experts, pricing in virtually all Broiler sales is tied to spot market prices, which are reported through industry price indices. An expert economist testified that "internal [Defendant] documents show that virtually all chicken products, even if they're not sold spot, are tied to the spot prices. …"

24.     Defendants knew and intended that their coordinated limitation and reduction in Broiler supply would artificially increase all Broiler prices – for spot market and contract sales.

25.     As a result of Defendants' unlawful conduct, Plaintiffs paid artificially inflated prices for Broilers during the Relevant Time Period, higher than what they would have paid if the price for Broilers had been determined by a competitive market. Thus, Plaintiffs were directly injured by Defendants' conduct.

## II.     JURISDICTION AND VENUE

26.     This action is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages, costs, and reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and to enjoin further violations.

27.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

28.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d), because one or more

Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

29.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of Broilers throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

30.     The activities of the Defendants and all co-conspirators were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

III.    **PARTIES**

A.      **Plaintiffs.**

31.     Plaintiff Winn-Dixie Stores, Inc. is a corporation organized under the laws of the State of Florida. Its principal place of business is 8928 Prominence Parkway, #200, Jacksonville, Florida 32256.  It purchased Broilers directly from one or more Defendants during the Relevant Time Period and suffered antitrust injury as a result of Defendants' violations alleged herein.

32.     Plaintiff Bi-Lo Holdings, LLC is a limited liability company organized under the laws of the State of Delaware. Its principal place of business is 8928 Prominence Parkway, #200, Jacksonville, Florida 32256.  It purchased Broilers directly from one or more Defendants during

the Relevant Time Period and suffered antitrust injury as a result of Defendants' violations alleged herein.

**B.      Defendants.**

**1.      Koch Foods Defendants**

33.      Koch Foods, Inc. is a privately held Illinois corporation with its corporate headquarters in Park Ridge, Illinois, a sales office in Flowood, Mississippi and its export office in Chattanooga, Tennessee. During the Relevant Time Period, Koch Foods, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

34.      JCG Foods of Alabama, LLC is an Alabama corporation with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Relevant Time Period, JCG Foods of Alabama, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

35.      JCG Foods of Georgia, LLC is a Georgia corporation with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Relevant Time Period, JCG Foods of Georgia, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

36.      Koch Meat Co., Inc. is an Illinois corporation with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Relevant Time Period, Koch Meat Co., Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

37.      Defendants Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC, and Koch Meat Co., Inc. are collectively referred to as "Koch Foods."

38.     Koch reports detailed data to Agri Stats and receives Agri Stats reports. The wide variety of data Koch reports to Agri Stats, includes information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Tennessee, and Alabama.

39.     Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Koch, through JCG Foods of Georgia, LLC, was one of the nine Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice-president of sales served on the Georgia Dock Advisory Board.

40.     Koch is a Georgia Dock Defendant.

**2.     Tyson Defendants**

41.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Relevant Time Period, Tyson Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

42.     Tyson Chicken, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Relevant Time Period, Tyson Chicken, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

43.     Tyson Breeders, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Relevant Time Period, Tyson Breeders, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

44.     Tyson Poultry, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Relevant Time Period,

11

Tyson Poultry, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

45. Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc. are collectively referred to as "Tyson."

46. Tyson reports detailed data to Agri Stats and receives Agri Stats reports. The wide variety of data Tyson reports to Agri Stats, includes information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, Pennsylvania, North Carolina, Georgia, Alabama, Mississippi, Texas, Arkansas, Missouri, Indiana, Tennessee, and Kentucky.

47. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Tyson was one of the nine Defendants that submitted false and artificially inflated price quotes to the GDA. One of its plant managers served on the Georgia Dock Advisory Board.

48. Tyson is a Georgia Dock Defendant.

### 3. Pilgrim's Pride Corporation

49. Pilgrim's Pride Corporation is a Delaware corporation headquartered in Greeley, Colorado (hereinafter "Pilgrim's"). JBS USA Holdings, Inc. holds a 75.3% controlling interest in Pilgrim's. JBS USA Holdings and Pilgrim's are subsidiaries of JBS SA, a Brazilian corporation headquartered in Sao Paulo, Brazil. During the Relevant Time Period, Pilgrim's sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States. Pilgrim's reports detailed data to Agri Stats and receives Agri Stats reports. The wide variety of data Pilgrim's reports to Agri Stats, includes information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, West Virginia, North Carolina, Georgia, Tennessee, Florida, South Carolina, Alabama, Texas, Arkansas, and Kentucky.

50.     Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Pilgrim's Pride was one of the nine Defendants that submitted false and artificially inflated price quotes to the GDA. Its executive vice president of sales and operations served on the Georgia Dock Advisory Board.

51.     Pilgrim's Pride is a Georgia Dock Defendant.

    A.     Around December 1, 2008, Pilgrim's filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Texas. Effective December 28, 2009, Pilgrim's was discharged from bankruptcy under a plan of reorganization that paid all creditors in full largely due to rising Broiler prices leading to increased profits at Pilgrim's. Pilgrim's participated in the conspiracy alleged herein throughout the Relevant Time Period through the actions of many of Pilgrim's most senior executives, including former CEO Dr. Don Jackson and current President & CEO Bill Lovette, and others with responsibility for Broilers.

    B.     After its discharge from bankruptcy, Pilgrim's reaffirmed its participation in the conspiracy, in part by invitations to collude and pledges by and between Defendants that resulted in further idling of production capacity, reduced production, and price increases. Other specific post-discharge actions taken by Pilgrim's in furtherance of the conspiracy are alleged herein and are consistent with the actions taken by all of the Defendants and Pilgrim's throughout the Relevant Time Period.

    C.     Regardless of whether Pilgrim's participated in the conspiracy throughout the Relevant Time Period or joined or reaffirmed membership in the conspiracy immediately after its discharge from bankruptcy, this Complaint seeks to recover damages from Pilgrim's only for Pilgrim's post-discharge conduct, and in no way seeks to violate any Orders of the above- referenced Bankruptcy Court. However, by operation of law, the damages arising from Pilgrim's post-discharge conduct include damages incurred by Plaintiffs throughout the Relevant Time Period. This Complaint also seeks to recover damages from the other Defendants for Pilgrim's pre-discharge conspiratorial conduct. Therefore, Plaintiffs plead only a single Relevant Time Period as to all Defendants, but damages as to Pilgrim's are governed by the principles of joint and several liability and conspiracy law as noted above.

**4.     Perdue Defendants**

52.     Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland. During the Relevant Time Period, Perdue Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

53.     Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Relevant Time Period, Perdue Foods, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

54.     Defendants Perdue Farms Inc. and Perdue Foods LLC are collectively referred to as "Perdue." Perdue reports detailed data to Agri Stats and receives Agri Stats reports.  The wide variety of data Perdue reports to Agri Stats, includes information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware, Maryland, North Carolina, South Carolina, Florida, and Kentucky.

## 5.     Sanderson Farms Defendants

55.     Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi. During the Relevant Time Period, Sanderson Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

56.     Sanderson Farms, Inc. (Foods Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly-owned subsidiary of Sanderson Farms, Inc. During the Relevant Time Period, Sanderson Farms, Inc. (Foods Division) sold Broilers in interstate

commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

57.     Sanderson Farms, Inc. (Production Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly-owned subsidiary of Sanderson Farms, Inc. During the Relevant Time Period, Sanderson Farms, Inc. (Production Division) sold or supplied for sale Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

58.     Sanderson Farms, Inc. (Processing Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly-owned subsidiary of Sanderson Farms, Inc.   During the Relevant Time Period, Sanderson Farms, Inc. (Processing Division) sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

59.     Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division), and Sanderson Farms, Inc. (Processing Division) are collectively referred to as "Sanderson Farms." Sanderson Farms reports detailed data to Agri Stats and receives Agri Stats reports.  The wide variety of data Sanderson reports to Agri Stats, includes information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Mississippi, and Texas.

60.     Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Sanderson Farms was one of the nine Defendants that submitted false and artificially inflated price quotes to the GDA.

61.     Sanderson Farms is a Georgia Dock Defendant.

        **6.     Wayne Farms, LLC**

15

62.     Wayne Farms, LLC is a Delaware corporation headquartered in Oakwood, Georgia. It is an operating affiliate of its parent company, Continental Grain Company, a privately held company in Arlon, Belgium. During the Relevant Time Period, Wayne Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States. Wayne Farms reports detailed data to Agri Stats and receives Agri Stats reports. The wide variety of data Wayne Farms reports to Agri Stats, includes information about its breeder flocks and hatchery capacity, and data for its complexes in North Carolina, Georgia, Alabama, Mississippi, and Arkansas.

63.     Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Wayne Farms was one of the nine Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice president of fresh sales served on the Georgia Dock Advisory Board.

64.     Wayne Farms is a Georgia Dock Defendant.

### 7.     Mountaire Farms Defendants

65.     Mountaire Farms, Inc. is a privately held Delaware corporation with its headquarters in Millsboro, Delaware. During the Relevant Time Period, Mountaire Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

66.     Mountaire Farms, LLC is a privately held Arkansas corporation located in Little Rock, Arkansas, and is a wholly-owned subsidiary of Mountaire Farms, Inc. During the Relevant Time Period, Mountaire Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

67. Mountaire Farms of Delaware, Inc. is a privately held Delaware corporation located in Millsboro, Delaware, and is a wholly-owned subsidiary of Mountaire Farms, Inc. During the Relevant Time Period, Mountaire Farms of Delaware, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

68. Defendants Mountaire Farms, Inc., Mountaire Farms, LLC, and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire." Mountaire reports detailed data to Agri Stats and receives Agri Stats reports. The wide variety of data Mountaire reports to Agri Stats, includes information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware and North Carolina.

### 8. Peco Foods

69. Peco Foods, Inc. is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama. During the Relevant Time Period, Peco Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

70. Peco Foods reports detailed data to Agri Stats and receives Agri Stats reports. The wide variety of data Peco Foods reports to Agri Stats, includes information about its breeder flocks and hatchery capacity, and data for its complexes in Gordo, Alabama and Sebastopol, Louisiana.

### 9. Foster Farms

71. Foster Farms, LLC is a privately held California corporation headquartered in Modesto, California. During the Relevant Time Period, Foster Farms, LLC and/or its predecessors,

wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

72.     Defendant Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms, LLC. During the Relevant Period, Foster Poultry Farms and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of Broilers, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States. Defendants Foster Farms, LLC and Foster Poultry Farms are collectively referred to as "Foster" or "Foster Farms."

73.     Foster Farms reports detailed data to Agri Stats and receives Agri Stats reports.  The wide variety of data Foster Farms reports to Agri Stats includes information about its breeder flocks and hatchery capacity, and data for its complexes in Fresno, California, Livingston, California, and the Pacific Northwest.

### 10.     House of Raeford Farms

74.     House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. During the Relevant Time Period, House of Raeford operated in part through a division referred to as "Columbia Farms," which is a group of Broiler facilities and operations originally named Columbia Farms, Inc. and Columbia Farms of Georgia, Inc. when purchased by House of Raeford in 1998. During the Relevant Time Period, House of Raeford Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

75.     House of Raeford reports detailed data to Agri Stats and receives Agri Stats reports. The wide variety of data House of Raeford reports to Agri Stats includes information about its breeder flocks and hatchery capacity, and data for its North Carolina and Louisiana complexes.

### 11.     Simmons Foods

76.     Simmons Foods, Inc. is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas. During the Relevant Time Period, Simmons Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

77.     Simmons Prepared Foods, Inc. is a privately held Arkansas company headquartered in Siloam Springs, Arkansas. Simmons Prepared Foods, Inc. is a wholly-owned subsidiary of Simmons Foods, Inc. During the relevant period, Simmons Foods, Inc. exclusively sold the chicken it produced to Simmons Prepared Foods, Inc., which in turn resold the chicken in various forms to its customers. Simmons Prepared Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of Broilers, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States. Defendants Simmons Foods, Inc. and Simmons Prepared Foods, Inc. are collectively referred to as "Simmons" or "Simmons Foods."

78.     Simmons Foods reports detailed data to Agri Stats and receives Agri Stats reports. The wide variety of data Simmons Foods reports to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its two Siloam Springs, Arkansas complexes.

### 12.     Fieldale Farms

79.     Fieldale Farms Corporation is a privately held Georgia corporation headquartered in Baldwin, Georgia. During the Relevant Time Period, Fieldale Farms Corporation and/or its

19

predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States. Fieldale Farms reports detailed data to Agri Stats and receives Agri Stats reports. The wide variety of data Fieldale Farms reports to Agri Stats, includes information about its breeder flocks and hatchery capacity, and its Gainesville, Georgia complex.

80.     Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Fieldale Farms was one of the nine Defendants that submitted false and artificially inflated price quotes to the GDA. Its owner and CEO also served on the Georgia Dock Advisory Board.

81.     Fieldale Farms is a Georgia Dock Defendant.

### 13.     The George's Defendants

82.     George's, Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas. During the Relevant Time Period, George's, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

83.     George's Farms, Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas, and is a wholly-owned subsidiary of George's Inc. During the Relevant Time Period, George's Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold and/or supplied Broilers in interstate commerce, directly to purchasers in the United States. Defendants George's, Inc. and George's Farms, Inc. are collectively referred to as "George's."

84.     George's reports detailed data to Agri Stats and receives Agri Stats reports. The wide variety of data George's reports to Agri Stats, includes information about its breeder flocks

and hatchery capacity, and data for its complexes in Harrisonburg, Virginia and Springdale, Arkansas.

### 14.    O.K. Foods Defendants

85.    Defendant O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas. O.K. Foods, Inc. is a subsidiary of Industrias Bachoco S.A., a Brazilian corporation headquartered in Sao Paulo, Brazil. During the Relevant Time Period, O.K. Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

86.    O.K. Farms, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas, and is a wholly-owned subsidiary of O.K. Foods, Inc. During the Relevant Time Period, O.K. Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

87.    O.K. Industries, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas, and is a wholly-owned subsidiary of O.K. Foods, Inc. During the Relevant Time Period, O.K. Industries, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly to purchasers in the United States.

88.    Defendants O.K. Foods, Inc., O.K. Farms, Inc., and O.K. Industries, Inc. are collectively referred to as "O.K. Foods."  O.K. Foods are subsidiaries of the Mexican poultry conglomerate Industrias Bachoco, which reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Fort Smith, Arkansas complex.

### 15.    Claxton Poultry Defendants

89.    Defendant Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia.

90.    Defendant Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. Claxton Poultry Farms, Inc. and Norman W. Fries, Inc. are collectively referred to as "Claxton Poultry."

91.    During the Class Period, Norman W. Fries, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

92.    Claxton reports detailed data to Agri Stats and receives Agri Stats reports.  The wide variety of data Claxton reports to Agri Stats, includes information about its breeder flocks and hatchery capacity and data for its Claxton, Georgia complex.

93.    Until the Georgia Dock benchmark price stopped being published by the GDA in late November 2016, Claxton was one of the nine Defendants that submitted false and artificially inflated price quotes to the GDA. Its CEO also served on the Georgia Dock Advisory Board.

94.     Claxton is a Georgia Dock Defendant.

**16.    Harrison Poultry Defendant**

95.    Harrison Poultry, Inc. is a Georgia corporation located in Bethlehem, Georgia.

During the Class Period, Harrison Poultry, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States. Throughout the Relevant Time Period, Harrison Poultry, Inc. acted as a co-conspirator of Defendants by participating in the conspiracy alleged herein.

22

96. Harrison reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Bethlehem, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Harrison was one of the nine Defendants that submitted false and artificially inflated price quotes to the GDA. Its owner and CEO served on the Georgia Dock Advisory Board.

97. Harrison is a Georgia Dock Defendant.

### 17. Mar-Jac Poultry Defendants

98. Mar-Jac Poultry, Inc. is a Delaware corporation located in Gainesville, Georgia.

99. Mar-Jac Poultry MS, LLC is a Mississippi limited liability corporation located in Gainesville, Georgia. Mar-Jac Poultry AL, LLC is an Alabama limited liability corporation located in Gainesville, Georgia.

100. Mar-Jac AL/MS, Inc. is a Delaware corporation located in Gainesville, Georgia. Mar-Jac Poultry, LLC is a Delaware corporation located in Gainesville, Georgia.

101. Mar- Jac Holdings, LLC is a Delaware corporation located in Gainesville, Georgia and is the parent company of Mar-Jac Poultry, Inc., Mar Jac Poultry MS LLC, Mar-Jac AL, LLC, Mar-Jac AL/MS, LLC, and Mar-Jac Poultry, LLC.

102. Defendants Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, Mar-Jac Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-Jac Poultry, LLC and Mar-Jac Holdings, LLC are collectively referred to as "Mar-Jac Poultry."

103. During the Class Period, Mar-Jac Poultry and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States. Throughout the Relevant

Time Period, Mar-Jac Poultry, Inc. acted as a co-conspirator of Defendants by participating in the conspiracy alleged herein.

104.    Mar-Jac Poultry reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Gainesville, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Mar-Jac was one of the nine Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice president of operations served on the Georgia Dock Advisory Board.

105.    Mar-Jac Poultry is a Georgia Dock Defendant. [3]

### 18.    Defendant Amick Farms

106.    Amick Farms, LLC ("Amick") is a privately held Delaware limited liability company with its corporate headquarters in Batesburg-Leesville, South Carolina, and with facilities in South Carolina, Maryland, and Delaware. Amick Farms, LLC is a wholly-owned subsidiary of OSI Group, LLC, a privately held Delaware corporation with its corporate headquarters in Aurora, Illinois. During the Class Period, Amick Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

### 19.    Defendant Case Farms

107.    Case Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina. During the Class Period, Case Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate

---

[3] The Georgia Dock Defendant identified in this Complaint are: Pilgrim's Pride, Tyson, Fieldale, Sanderson Farms, Koch, Claxton, Mar-Jac, Harrison and Wayne Farms.

commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

108.    Case Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in Ohio and North Carolina. Case Farms, LLC is a wholly-owned subsidiary of Case Foods, Inc. During the Class Period, Case Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

109.    Case Farms Processing, Inc. is a privately held North Carolina corporation with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in North Carolina. Case Farms Processing, Inc. is a wholly-owned subsidiary of Case Foods, Inc. During the Class Period, Case Farms Processing, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

110.    Defendants Case Foods, Inc., Case Farms, LLC, and Case Farms Processing, Inc. are collectively referred to as "Case Foods."

111.    "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including Broilers companies that merged with or were acquired by the named Defendants and each named Defendant's wholly-owned or controlled subsidiaries or affiliates that sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the Relevant Time Period.

112.    To the extent that subsidiaries and divisions within each Defendant's corporate family sold or distributed Broilers to direct purchasers, these subsidiaries played a material role in the conspiracy alleged in this Complaint because Defendants wished to ensure that the prices paid for such Broilers would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein. Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing and collecting monies from Plaintiffs for Broilers was known to and approved by their respective corporate parent named as a Defendant in this Complaint.

### 20.    Defendant Agri Stats, Inc.

113.    Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co. Eli Lilly & Co. is an Indiana corporation located in Indianapolis, Indiana. Throughout the Relevant Time Period, Agri Stats acted as a co-conspirator of Defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among Defendants and their co-conspirators.

114.    Agri Stats is a co-conspirator of the Defendants, and has knowingly played an important and active role in Defendants' collusive scheme detailed in this Complaint. All of Agri Stats' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, or engaged in by Agri Stats' various officers, agents, employers or other representatives while actively engaged in the management and operation of Agri Stats' business affairs within the course and scope of their duties and employment, or with Agri Stats' actual apparent or ostensible authority. Agri Stats used the instrumentalities of interstate commerce to facilitate the conspiracy, and its conduct was within

the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the U.S., including in this District.

115.    A representative from Agri Stats was elected to the board of the National Chicken Council, one of the industry's most important trade associations, in 2008 and 2010 – two key periods in the conspiracy alleged in this Complaint. Several Defendants, including Wayne Farms and Pilgrim's, also have hired former Agri Stats executives to work in senior sales positions, and Agri Stats employs or has employed several former executives of the Defendants. All of these facts highlight the unique and symbiotic relationship between Agri Stats and the chicken-producer Defendants.

## IV.    AGENTS AND CO-CONSPIRATORS

116.    Various other persons, firms and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

117.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

118.    Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

119.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## V.      TRADE AND COMMERCE

120.     During the Relevant Time Period, each Defendant, directly or through its subsidiaries or other affiliates, sold Broilers in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

121.     During the Relevant Time Period, Defendants collectively controlled a majority of the market for Broilers in the United States.

122.     Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VI.     FACTUAL ALLEGATIONS

### A.      Background On Broilers.

#### 1.      "Broilers."

123.      "Broilers" are chickens raised for meat consumption.  They are slaughtered before the age of 13 weeks, and may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards.

#### 2.      Broilers Are A Commodity.

124.     According to a 2012 report by Focus Management Group, Broilers "are a commodity product with little or no product differentiation based on the processors."

125.     Defendants acknowledge that Broilers are a commodity. For example, in February 2014, Pilgrim's CEO commented that "… the [Broiler] chicken business per se is a commodity business."

#### 3.      The Broiler Market Is A National One Worth Over $30 Billion Annually.

126.     According to the U.S. Poultry & Egg Association, the value of wholesale U.S. Broilers produced in 2014 was $32.7 billion, up 6 percent from 2013. The market value varied between $21.8 and $30.7 billion from 2008-2013.

127.     There is a single national market for Broilers in the United States. Prices for Broilers sold in the United States are quoted in whole bird or disassembled parts, with adjustments for transportation, product form (*i.e.*, degree of processing or added value), and packaging at the time of sale.

128.     About 50-70% of Broilers are sold under contract with a customer, about 10-20% are sold on the spot market, and roughly 17-20% are exported.

129.     According to expert testimony in July 2011 in *Adams v. Pilgrim's Pride*,[4] spot market Broilers are "anything left over [that is] sold fresh" within 3 days. Broiler industry executives sometimes refer to the Broiler spot market as the "sell it or smell it market," meaning that if the Broiler isn't sold within 3 days, then it will rot. According to Janette Barnard, founder of a spot market trading platform called The Poultry Exchange, "there are no secrets in the spot market, very few anyway. As soon as a sales manager picks up the phone and calls a customer or trader, the word is out and other people will soon know that X company has one load available."

130.     The prices for certain Defendants' broiler chicken sales were based on benchmark price indices, including the Georgia Dock whole-bird price, which was used by chicken buyers, including Plaintiffs, until early 2017.

---

[4] No. 2:09-cv-00397 (N.D. Tex.).

131.    Broilers exported from the United States decrease available supply and increase Broiler prices in the United States. Therefore, exports by Defendants were another mechanism used by Defendants to effect their United States-based Broiler market conspiracy.

###    4.    Broiler Prices Have Risen Steadily Since 2008.

132.    During the Relevant Time Period, Broiler prices were increased above competitive levels due to Defendants' conduct, contrary to pricing patterns prior to the Relevant Time Period, and to what would be expected in a competitive market. During much of the Great Recession, Broiler prices steadily rose despite flat or declining input costs. Similarly, Broiler prices during the 2015 through 2016 time period remained artificially inflated and failed to account for the historic drop in corn and soybean prices, which constitute 50 – 70% of Broiler input costs.



133.    In November 2013, a Bloomberg News compilation of industry analyst forecasts predicted Broiler prices would drop 7.1% in 2014 due to a 50% fall in corn prices, but instead, Broiler prices increased 9.2%. Since January 1, 2008, by one measure Broiler prices have been at or near all-time highs roughly half of the time, even though the 2008-2009 period was during the Great Recession.

### 5.    The Broiler Price Indices.

134.    Broiler prices are reported primarily by three entities: Urner Barry (a commodity price reporting service), the Georgia Department of Agriculture (aka "Georgia Dock,"), and the USDA.  Additionally, Agri Stats collects detailed pricing information through its subsidiary Express Markets, Inc. ("EMI").

135.    Agri Stats subsidiary EMI was formed around 2000 to compete with the price reporting service of Urner Barry. Unlike Agri Stats reports for Defendants, EMI releases daily pricing data to both Defendants and potential purchasers of Broilers, though the reporting service costs thousands of dollars and is not publicly available. EMI reports capture all transactions by Broiler producers, who automatically transmit invoice information electronically from each transaction to EMI. The reports include all sales volume information from the previous day, including the size of containers, type of cut, whether the product was chilled with ice or $CO_2$, the price, and numerous other pieces of information.

136.    Urner Barry collects and publishes daily price information for Broilers. The USDA's Composite index collects and publishes Broiler price information on a weekly basis, and is publicly available for free. Urner Barry's Broiler price information is subscription-based, so all Broiler producers and many Broiler purchasers subscribe for a fee. The USDA and Urner Barry's Broiler price indices are based upon a system of double verification, which includes telephonic

and written surveys of all or nearly all Broiler producers, but also verification of reported prices from Broiler purchasers such as brokers and customers.

137.    The most detailed price report produced by Agri Stats and its subsidiary, Express Markets, Inc. is not publicly available. According to a May 2010 FarmEcon study, EMI's pricing report  includes "pricing data on whole birds and chicken parts that is considerably more detailed than the USDA," Urner Barry, or Georgia Dock reports, as it is based on actual sales invoices from Broiler companies.

138.    Published prices for Broilers from Urner Barry, Georgia Dock, and USDA relate to the spot market for Broilers.  However, prices for Broilers, whether sold under contract or on the spot market, generally move with spot market prices as reported by Georgia Dock or Urner Barry.

139.    Broiler company executives and industry experts confirm that Broiler sales, whether by contract or on the spot market, are tied to spot market pricing.  In a May 2008 speech, Sanderson Farms CEO Joe Sanderson explained that Sanderson Farms' contract sales to retail customers have prices tied to the Georgia Dock price survey and Sanderson Farms' contract sales to food distributors are "based on formulas tied to the Urner Barry." Similarly, expert economist Dr. Colin A. Carter from the University of California (Davis) testified that "internal Pilgrim's documents show that virtually all chicken products, even if they're not sold spot, are tied to the spot prices. … 83 percent of Pilgrim's chicken sales are reflecting the spot price within a given year. So there's only about 16 percent of their sales that are not tied to the spot market over a relatively short period of time." Further, because half of "fixed contracts" actually had terms tied to Broiler spot market prices, Dr. Carter concluded that 92% of Pilgrim's Broiler sales were tied to Broiler spot market prices such as Georgia Dock.

140.     As a consequence of the inelasticity of supply and demand in the Broiler industry and the availability of the spot market price indices, public price increase announcements by Defendants were unnecessary. Defendants knew and intended that a decrease in supply pursuant to their agreement would increase Broiler spot market prices, and therefore all Broiler prices would increase.

**B.     Overview of Defendants' Illegal Conspiracy**

141.     In 2007, Pilgrim's, Tyson, and a few other chicken producers attempted to cut their production levels enough to cause industry prices to rise. However, despite Pilgrim's and Tyson's combined 40% market share, their production cuts in 2007 were not enough to increase prices through supply cuts because other Broiler companies increased their production.

142.     As a result, in January 2008 Pilgrim's and Tyson changed tactics, seeking broader cooperation among major producers in the Broiler industry to increase prices. In January 2008, both Pilgrim's and Tyson publicly stated to the chicken industry that neither Pilgrim's nor Tyson would continue to cut production. A few days after attending an industry event in late January 2008, Tyson's CEO announced Tyson would be raising prices because "we have no choice [but] to raise prices substantially." A day later, a Pilgrim's executive announced publicly that Pilgrim's would be cutting its production and "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."

143.     The other Defendants soon joined Pilgrim's and Tyson's plan, making substantial cuts to their own production.

144.     Defendants went further, however, cutting their ability to ramp up production for *18 months or more* by destroying breeder hens which are responsible for supplying the eggs Defendants raise into chicken. This destruction of breeder hens was unparalleled and the

consequences reverberated in the chicken industry for many years. Further, when some Defendants in 2010 became "undisciplined" and began gradually increasing their production, Defendants coordinated a second wave of production cuts in 2011 and 2012, which included further substantial destruction of industry breeder flocks. Defendants continued to limit the United States chicken supply in subsequent years by destroying eggs, relying upon one another's production to meet customer needs, and exporting excess breeder flocks to Mexico, even when doing so was against their independent economic interest.

145.    The consequence of Defendants' cuts in 2008 and 2011-2012 has been a nearly 50% increase in wholesale chicken prices since 2008, by one measure, despite input costs (primarily corn and soybeans) *falling* roughly 20% to 23% over the same time period. The rise in chicken prices relative to input costs has led to record profits for Defendants.

146.    To effectuate their conspiracy, Defendants turned to a modernized version of an antitrust conspiracy from the 1970s. During the 1970s, major chicken producers held a weekly conference call to discuss production levels and prices for chicken. After the Department of Justice and civil antitrust plaintiffs sued, that practice was suspended.

147.    However, by January 2008, modern technology provided a way for Defendants to share detailed production and pricing information and coordinate without industry-wide conference calls. Producers now electronically transfer vast amounts of production data to Agri Stats which, while supposedly anonymous, in fact provides Defendants with sufficient detail to determine with reasonable accuracy producer-level data on production, cost, and general efficiencies. This permits the Defendants to share, on a weekly and/or monthly basis, their confidential production and pricing information, including forward-looking production information, which is easily forecasted on Broiler breeder flock data that is reported and shared.

34

148.     From late 2014 into 2016, chicken input costs fell significantly. Economic theory predicts that in a competitive market, all else being equal, chicken prices similarly would fall. However, prices remained artificially inflated due to the Defendants' agreement to artificially restrict production and their manipulation of the Georgia Dock Broiler price index, published by the Georgia Department of Agriculture ("GDA"). The facts surrounding this episode were unknown to Plaintiffs and the public until November 2016, when it became public that the United States Department of Agriculture ("USDA") had requested in July 2016 that the GDA investigate and verify the accuracy of the Broiler prices provided to the GDA by several Defendants. When the GDA declined to do so, citing the industry's and its own lack of interest in verifying prices, USDA began publishing its own chicken price statistic.

149.     "Plus factors" are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are generally inconsistent with unilateral conduct but largely consistent with explicitly coordinated action. There are numerous "plus factors" in the chicken industry during the relevant period including, but not limited to, the following: (a) extensive information sharing through Agri Stats and other means, (b) numerous opportunities to collude in a variety of forums, (c) a coordinated change from contracts with fixed chicken prices to chicken prices that float with the chicken spot market, (d) inter-Defendant trades and purchases that often are against independent self-interest, and (e) multiple industry characteristics which facilitate collusion, such as high vertical integration, high barriers to entry, high industry consolidation and concentration, inelastic supply and demand, a lack of significant substitutes for chicken, and a history of government investigations and collusive conduct.

150.     Defendants' restriction of the chicken supply had the purpose and effect of increasing prices to Plaintiffs and other purchasers nationwide. First, as Defendants themselves

acknowledge, supply and demand in the chicken industry are inelastic. Therefore, a coordinated decrease in supply as alleged in this Complaint, all else equal, necessarily will result in an increase in Defendants' revenues (and profits). As one industry consultant, Professor Michael Dicks, noted, "[b]ecause of the inelastic nature of the supply and demand a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

151.    Second, as acknowledged by industry experts and Defendants themselves, pricing in virtually all chicken sales is tied to spot market prices, which are publicly known and available through industry price indices. For example, expert economist Dr. Colin A. Carter from the University of California (Davis) has testified in another matter that the business records of Defendants and their customers show that virtually all chicken products, even if they're not sold spot, are tied to the spot prices.

152.    Defendants knew and intended that their coordinated limitation and reduction in chicken supply would artificially increase all chicken prices – for spot market and contract sales – above the level they would have been absent the conduct alleged in this Complaint.

### C.    The Conspiracy's Second Prong: Collusively Manipulating the Georgia Dock Benchmark Price Index

153.    Defendants' successful efforts to boost chicken prices by collectively reducing supply was buttressed in the latter years of their output-reduction scheme, by collusively manipulating the Georgia Dock benchmark price index, a chicken industry pricing benchmark contained in contracts between Defendants and a significant proportion of their customers, including Plaintiffs here. The Georgia Dock, USDA Composite, and Urner Barry all measure the

same (or very similar) size and grade of chicken.[5] The Georgia Dock benchmark price index, like the other two indices, sets prices for both the "whole bird" and various parts of the chicken (wings, tenders, leg quarters, thighs, drumsticks and breasts) using the same pricing methodology. The "whole bird" price is the baseline for pricing all parts of a chicken.

154. Buyers, including Plaintiffs here, relied on the Georgia Dock benchmark price index because they believed it accurately reflected the market price for the chicken they bought—especially since the Georgia Dock was an industry-accepted benchmark price index for wholesale chicken prices that was, according to an internal memorandum drafted by the Florida Attorney General's office as part of its investigation, "meant to reflect the market price of chicken." And, much like the world's largest banks came together to manipulate numerous financial benchmarks (such as LIBOR), the Georgia Dock Defendants came together to manipulate the Georgia Dock benchmark price index.

155. Compared to the other two indices available to chicken buyers, there were significant differences in how the Georgia Dock benchmark price index was compiled that made it highly susceptible to manipulation by the Georgia Dock Defendants, who are the nine chicken producers that submitted price quotes to the GDA for inclusion in the index.

### 1. The Georgia Dock Pricing Methodology and Its Susceptibility to Manipulation

156. Until late 2016, the Georgia Dock pricing methodology was not publicly available.

---

[5] Unlike the other indices, the Georgia Dock benchmark price did not include freight or transportation costs. At its inception, the Georgia Dock benchmark price was known as the "Georgia F.O.B. Dock" price; the Georgia Dock was "F.O.B." the supplier's shipping dock, meaning that the buyer was responsible for paying the freight.

157. Chicken buyers, including Plaintiffs, whose transactions with certain Defendants were based on the Georgia Dock whole-bird price, mistakenly believed it reflected the actual market price of chicken. Moreover, until August 2016 the USDA also published the Georgia Dock benchmark price alongside the USDA Composite.

158. In addition, Defendants falsely represented that the Georgia Dock benchmark price is based on a complicated "algorithm" from the GDA that takes into account various factors, such as bird weights, weather, mortality rates, and demand. Plaintiffs were misinformed that the Georgia Dock benchmark was supposed to be based on the Georgia Dock Defendants' actual sales prices as reported to the GDA. But neither was true: there was no complicated "algorithm," nor did the Georgia Dock Defendants report their true prices to the GDA, agreeing instead to intentionally report false, artificially-high (or artificially-stabilized) prices. The reality was that the Georgia Dock price was simply whatever the Georgia Dock Defendants said it was.

Hypothetically, if one week the Georgia Dock price was $1.75, and the following week the Georgia Dock Defendants told the GDA that the sales price of their chicken was now $2, the Georgia Dock price was $2 – and the prices that certain Plaintiffs and others paid for chicken increased commensurately.

159. In compiling the Georgia Dock benchmark price, there was no team of economists or statisticians surveying buyers and sellers in the national chicken market. Unlike the USDA Composite or Urner Barry, which use data from numerous producers and buyers on both sides of the market, the Georgia Dock reflected prices sourced solely from a handful of producers. The Georgia Dock Defendants are the nine producers whose price quotes went into the Georgia Dock index, namely (ranked by their market share in Georgia, which dictated how much weighting each producer's quote was given in compiling the Georgia Dock benchmark price): Pilgrim's Pride

(33%); Tyson (14%); Fieldale (14%); Perdue (9%); Sanderson Farms, Koch, Claxton, Mar-Jac, Harrison and Wayne Farms, each with a 5% market share.

160.     Once a week, a single GDA employee, Arty Schronce, would call the same individuals at the Georgia Dock Defendants to collect price quotes, which were supposed to reflect their actual sales prices. He weighted each producer's price quote by its above-referenced relative market share (referred to by the GDA as that company's "voice").

161.     Mr. Schronce, who began compiling the Georgia Dock Defendants' price quotes in 2012 following the retirement of his predecessor, first made a preliminary calculation based on the single price quotation from each company. Then "[a]ny company that provides a whole bird quote that is more than one cent above or below the initial dock price calculation will not be included in the calculation for the whole bird dock price that week. Its voice is taken out of the formula and the dock price is recalculated without it." This so-called "one-cent rule" is, according to internal GDA documents, meant "to shield [] one company having the ability to greatly influence the price up or down."

162.     Nothing was done to verify or substantiate these numbers. There was no "double-verification;" customers were never contacted to check to see if the producers' prices were legitimate. The entire process was based on unverified, verbal "price quotes" from the same small set of chicken producers (the Georgia Dock Defendants) submitted each week to a single GDA employee – a methodology that the Florida Attorney General's office concluded was "susceptible to manipulation."

163.     The price quoted by each Georgia Dock Defendant to the GDA was based on 2.5-to-3 pound whole chickens, but only a handful of the Georgia Dock Defendants actually processed 2.5-to-3 pound birds in Georgia, so, according to internal GDA documents, the Georgia Dock

Defendants were "supposed to adjust their whole bird quote as if they are producing that sized bird." Once the final Georgia Dock whole bird price was calculated, the GDA then used a formula to calculate prices for different chicken cuts and parts based on the whole bird price the Georgia Dock Defendants provided to the GDA each Wednesday.

164.     To facilitate their control of the Georgia Dock benchmark price, the Georgia Dock Defendants convinced the GDA to convene a secret "Advisory Board" composed of senior executives from eight of the nine Georgia Dock Defendants to advise the GDA on the Georgia Dock price. From at least September 2012 through 2016, the Advisory Board included Gus Arrendale (CEO, Fieldale Farms), Mike Welch (CEO and President, Harrison), Jerry Lane (Former CEO, Claxton Poultry), Jayson Penn (EVP Sales and Operations, Pilgrim's), Pete Martin (VP of Operations, Mar-Jac), Vernon Owenby (Manager of Tyson's facility in Cumming, Georgia), Steve Clever (VP of Fresh Sales, Wayne Farms), and Dale Tolbert (VP of Sales, Koch Foods).

165.     The existence and conduct of this secret Advisory Board was not known to chicken buyers until November 2016 when it was first made public following a press report about a September 2016 memorandum written by Mr. Schronce that was highly critical of the Georgia Dock methodology. He wrote in the memorandum that he had "questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent. I was told I could not make any changes without clearing them with the Advisory Board." The Advisory Board gave the Georgia Dock Defendants a vehicle to discuss and artificially set price quotes to ensure compliance with their price-fixing agreement.

166.     In December 2015, the GDA began an internal review process of the Georgia Dock pricing methodology, in large part, because the agency had "serious concerns" about the way the index was compiled. The GDA's internal review was not made public at the time it began, and

was not revealed until it was described in a series of press reports beginning in November 2016. Mr. Schronce, in his September 2016 memorandum, expressed concerns that some companies have a "larger, even outsized role in determining the Georgia Whole Bird Dock Price," and that "[i]n essence, they can take advantage of a high whole bird price."

167. Mr. Schronce also suggested that the Georgia Dock benchmark price be eliminated altogether because it was "a flawed product that is a liability to the Georgia Department of Agriculture." Mr. Schronce's memorandum concluded by noting that he "was told the poultry companies know what they are doing and all I need to do is gather and consolidate the info I am provided. However, I have come to question the validity of some of the information provided." The memorandum also stated that the Georgia Dock Defendants gave "lackadaisical and rude responses to my requests for information," such as responding "just keep 'em the same" when asked for a company's updated price quote.

168. Under pressure from the USDA, and realizing that the Georgia Dock pricing methodology raised significant antitrust concerns, the GDA attempted to revise the methodology in the autumn of 2016. After the Georgia Dock Defendants balked at the GDA's new methodology – which required them to verify and attest to the accuracy of their price quotes – the GDA halted the Georgia Dock benchmark price index altogether when it did not receive sufficient price quotes to compile the index. The last Georgia Dock benchmark price was published by the GDA on November 23, 2016. However, for at least three months after the last Georgia Dock price was published by the GDA, certain Defendants, including at least Pilgrim's, continued to use the November 23, 2016 benchmark price of $1.0975/lb. to set their wholesale prices to chicken buyers.

169. On November 3, 2016, the New York Times published the first account of the USDA's inquiry into the Georgia Dock, based on information received via Freedom of Information

Act and open records requests for internal USDA and GDA documents. Subsequently, a November 8, 2016, article by the Washington Post provided additional detail on the inquiry, including a comment from the USDA that "they discontinued publishing the Georgia Dock price 'when data from the source report could not be independently verified.'" In the Washington Post article, Sanderson Farms CFO Mike Cockrell was quoted as saying "the Georgia Dock has come to be a trusted reflection of the supply and demand for retail stores." In a press release cited in a Bloomberg News article on November 17, 2016, Tyson stated that "[w]hen the Georgia Department of Agriculture asks us for pricing data, we provide accurate information based on actual and recent transactions." Sanderson Farms' and Tyson's continued defense of the Georgia Dock price index as one that customers should trust shows that Defendants continue their efforts to conceal the conspiracy alleged in this Complaint.

## 2. Georgia Dock Prices Diverged from the USDA Composite and Urner Barry Price Indices Beginning in 2011

170. In early 2011, at roughly the time increased prices began to take hold as a result of Defendants' mid-2011 breeder flock reductions, the behavior of the Georgia Dock index significantly changed. The changes resulted from the conspiracy by the Georgia Dock Defendants to agree on artificial prices quoted to the GDA for inclusion in the Georgia Dock benchmark price.

171. Beginning in early 2011 and continuing until November 2016, the Georgia Dock Defendants agreed among themselves to submit artificially high and identical, or near-identical, prices to the GDA, which allowed them to continually increase, and successfully stabilize, chicken prices tied to the Georgia Dock benchmark price index.

172. Historically, the Georgia Dock benchmark price was highly correlated to the prices in the USDA Composite and Urner Barry indices; the movement (*i.e.*, volatility) of the Georgia Dock price mirrored the patterns of the other two indices (*e.g.*, prices go up or down depending on

42

market forces, such as supply and demand). This changed in 2011, when the price volatility that had marked the Georgia Dock (and which still marks the other two indices) largely disappeared. Georgia Dock prices mostly stabilized, while prices in the other two indices remained volatile.

173. Starting in 2011, monthly price volatility in the Georgia Dock markedly decreased, particularly with respect to downward price movements (*i.e.*, when prices dropped, they dropped far less drastically than they had prior to 2011). This near-disappearance of price volatility was unique to the Georgia Dock – both of the other price indices stayed volatile while the Georgia Dock remained stable, as reflected in the following graph, which compares prices of the various indices both before and during the relevant period:



Figure 1. USDA, Urner Barry, and Georgia Dock Wholesale Price Comparison (2002-2016)

174. Beginning in 2011, the Georgia Dock benchmark price began to behave in a markedly different manner due to Defendants' price-fixing conspiracy. Starting in early 2011, the Georgia Dock prong of Defendants' conspiracy kicked into high gear, as the Georgia Dock price – for the first time ever – became negatively correlated with the other two price indices (*i.e.*, the Georgia Dock price increased while prices in the other two indices decreased). This marks a dramatic change from 2002 to 2012, where all three indices were positively correlated with each other (*i.e.*, they moved up and down together). After 2011, the USDA Composite and Urner Barry indices remained positively correlated with each other.

175. After at least a decade of high correlation with the USDA Composite and Urner Barry indices, the Georgia Dock benchmark price diverged dramatically from the other two indices in 2011 and thereafter – Georgia Dock prices were far more stable, and substantially higher, than the USDA Composite and Urner Barry prices. The stability and level of Georgia Dock prices from 2011 through November 2016 was the direct result of Defendants' conspiracy.[6]

**D.      AGRI Stats Participated in and Actively Facilitated Defendants' Communications Among Themselves, and Provided Data Necessary to Effectuate, Monitor and Enforce The Conspiracy.**

176. According to a May 2010 study prepared for the National Chicken Council ("NCC"), Agri Stats, Inc. is a private company that generates Broiler industry data "considerably more detailed than [] USDA reports," including data on weighted average price, top third average, bottom third average, and volume traded on a daily, weekly, and monthly basis, supply, sales volume by detailed product type and form, export, and pricing information for whole and cut-up

---

[6] To be clear, Plaintiffs allege that prices reported in the EMI, Urner Barry, and USDA Composite price indices during the RelevantPeriod were also supracompetitive and artificially inflated by the conduct of Defendants and their Co-Conspirators, as alleged in this Complaint.

Broilers.[7] The USDA and various other entities publish aggregated weekly, monthly, and annual supply and pricing information concerning the Broiler industry. Only Agri Stats provides Defendants and other producers information with sufficient detail for an informed subscriber to determine with reasonable accuracy producer-specific production, cost, and general efficiency data. Agri Stats also collects from and reports back to Defendants detailed statistics on almost every conceivable operating metric within the industry.

177. Defendants participate in Agri Stats and provide and receive the detailed information described herein. However, because many Broiler companies have kept their participation in Agri Stats secret, certain unnamed co-conspirators may also participate in Agri Stats.

178. Agri Stats has profited from collecting and reporting Defendants' confidential business information, including by charging substantial fees of hundreds of thousands of dollars annually to each Defendant. Around March 2014, Agri Stats was acquired by the Eli Lilly Company, which has allowed Eli Lilly to sell drugs and vaccines to Broiler producers based on the information Eli Lilly obtains through Agri Stats about producers' operations.

179. According to former Pilgrim's CEO Don Jackson, Agri Stats is "basically a [] third party accounting firm that companies [use] in their process." Agri Stats' mission is to "[i]mprove the bottom line profitability for our participants by providing accurate and timely comparative data while preserving confidentiality of individual companies." Agri Stats describes itself as a "benchmarking" service, which it says "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance."

---

[7] Because Agri Stats reports are not publicly available, Plaintiffs' allegations regarding Agri Stats and its reports are upon information and belief, except as to the public statements alleged herein.

180.     According to an expert witness for Pilgrim's in contract-farmer litigation against Pilgrim's, "[p]robably no one in the industry would know better than [Agri Stats economist] Mike Donahue [as to whether Broiler production increased in 2008] because EMI is the same company as AgriStats, which is the company that gathers operating statistics from virtually every company in the chicken industry. And they know definitively how many breeders are out there, how many pullets are out there, how many broilers are produced every week, and head count and pounds, everything else. They have massive amounts of statistics. And that's why they're so effective at reporting all of this [production information]."

181.     Upon information and belief, in the wake of a $1.3 billion jury verdict in 2004 against Tyson for a conspiracy to manipulate pay to cattle farmers, increased fears of antitrust liability led Tyson to withdraw from Agri Stats. However, in or around January 2008, Tyson resumed its participation in Agri Stats.

182.     Upon information and belief, certain Agri Stats reports list complex-level data for roughly 120 Broiler complexes and identify each complex with unique numbers, including identifying the sub-region of the data for each Broiler complex.

183.     Agri Stats purports to maintain the confidentiality and anonymity of individual companies' data by providing each company a report identifying only that company's specific Broiler complexes by name, but not identifying by name other Broiler producers' complexes described in the report. For instance, in May 2008 Sanderson Farms CEO Joe Sanderson claimed "[w]e use Agri Stats, which some of you are probably familiar with. Agri Stats is a benchmarking service that we submit data to. Almost everyone in our industry does as well. And we get the data back. It's anonymous – the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over the industry."

46

184.    However, upon information and belief, Agri Stats reports are so detailed that a reasonably informed producer can discern the identity of competitors' individual Broiler complexes, and it is common knowledge among producers that others can do so. The specific type or size of a Broiler house, breed of chick, average bird size, and production levels listed in Agri Stats data for complexes allows an industry insider to identify each Defendant's individual Broiler complexes. Some Defendants refer to the task of determining the identity of individual competitor's data as "reverse engineering."

185.    Each Defendant receives numerous types of Agri Stats reports, including separate targeted reports for each major area of operations including, but not limited to, its breeding, hatching, hauling, feeding, processing, selling, and administration, which are regularly shared with area managers specifically dealing with those categories of information in their daily business. Summaries of these separate Agri Stats reports are regularly provided to Defendants' senior executives. Within each report, unique information referring to supposedly "anonymous" data permits Defendants to identify their competitors' information contained within each category of report.

186.    While some of Defendants' managers received the targeted reports for the specific aspects of Broiler operations for which they have responsibility, only the CEO, CFO, and a few other top executives at Defendants are given access to Agri Stats' monthly "Bottom Line Report" that is geared to top level executives at each company. The contents of the Bottom Line report are a closely guarded secret by company executives. The report contains one row for each Broiler company reporting to Agri Stats, then has columns for certain categories of information, such as operating profit dollars, profit percentage, corporate SG&A (aka overhead), interest expense, and other key operational information. While each company receives a report that only identifies by

name that particular company's "row" in the Bottom Line Report, top executives at each company know their competitors well enough to pick out recurring unique data points for other companies such that they are often able to identify competitors on the Bottom Line Report. Furthermore, Tyson, Pilgrim, and Sanderson are public companies which report some aggregated data publicly, which top executives from other companies then can match up against the far more detailed information in the Bottom Line Report to help identify specific data from these companies. In other instances, a company's interest expense data in Agri Stats can be matched up against information already known about each Defendant's debt level.

187.    Even if a producer is unable to individually identify a specific competitor's data from the Bottom Line Report, Agri Stats' employees are able to confirm for Defendants the data for a particular company at quarterly meetings with each company or at the numerous trade association meetings where Agri Stats executives present on a regular basis. For instance, Agri Stats provided a service to Defendants whereby each quarter Agri Stats would meet each Defendant's executives and make a detailed presentation about company and industry data. At these presentations, Agri Stats would lead detailed discussions about industry profitability and the key factors that contribute thereto, including items such as size and average age of Broiler breeder flock, average hatchability of eggs, mortality rates, average bird rate, feed cost, and other performance factors based on data Defendants provided. At these presentations Agri Stats would also lead discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and top and bottom third of the industry. Agri Stats would also tell company executives how much the industry was over- or undersupplying the market, indicate its estimate of demand, and share other information based on the data Defendants provided. At such meetings, Agri Stats would often be asked to confirm the identity of a particular

competitor in an Agri Stats report, which it could do more subtly during the Q&A portion of the meeting. Further, since Agri Stats travelled between each Defendant regularly and discussed each Defendant's non-public, proprietary data, Agri Stats was in a unique position to share information among Defendants.

188. Agri Stats reports are as yet not publicly available because Defendants and Agri Stats permit only participating Broiler producers to receive the reports. Accordingly, there is little publicly available information about even the categories of information contained in the lengthy weekly and monthly reports each Broiler producer receives. For instance, in response to a request for production of Agri Stats reports by the State of Oklahoma in litigation involving environmental issues, George's Inc. responded that Agri Stats "information is proprietary, privileged and is also confidential business/financial information not subject to disclosure." Nevertheless, despite the tight control over Agri Stats data, the National Chicken Council has ready access to it and relies on Agri Stats data summaries for its studies and publications.

189. Upon information and belief, Agri Stats' survey methodology involves direct electronic data submissions on a daily, weekly, and monthly basis of financial, production, capacity, cost, and numerous other categories of information by each Broiler producer. At each of Defendants' Broiler complexes, an employee is responsible for submitting its data to Agri Stats. Agri Stats relies upon a detailed audit process to verify the accuracy of data from each complex, sometimes directly contacting Defendants to verify data.

190. While Agri Stats reports are a closely guarded secret by Defendants, based on a handful of public comments by Defendants' senior executives and other information, Agri Stats reports include at a minimum the following categories of information:

      A.    Name of genetics company used for primary breeder stock;

B. Hatchery capacity, costs, and age of Broiler breeder flocks;

C. Feed Manufacturing, Delivery and Formulation data, including corn and soybean meal costs;

D. Growout information for Broiler "flocks" provided to contract farmers, including the number of Broilers placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (aka, "down time"), feed conversion rate (pounds of feed per pound of Broiler), average daily weight gain by chicks, live pounds produced per square foot of grower house, grower compensation, including average grower payment in cents per pound and cents per square foot, breed composition of flock (breed or cross-breed of flocks), detailed information on numerous mechanical aspects of Broiler housing, and numerous other detailed cost, mortality, and operational information about disease, transportation, labor, and other grow out related information;

E. Slaughter, processing, and further processing information, including pay for processing plant workers, total production volume, market age of Broilers at slaughter, weight of Broilers at slaughter, birds per man hour, processing line speeds, and labor hours per pound;

F. Inventory levels of Broilers;

G. Sales data for finished product form and type, such as type of cut (whole bird, cut-up, deboned), various packaging forms (such as bulk, tray pack, etc.), and data segmented into various categories (such as exports, retail, foodservice, etc.); and

H. Financial information, such as monthly operating profit per live pound, sales per live pound, and cost per live pound.

191. Defendants rarely mention their "proprietary, privileged, and confidential" exchange of information with one another through Agri Stats. However, on a few occasions, Broiler producers have referenced Agri Stats information on earnings calls or in public statements:

A. Sanderson Farms reported in May 2008 that "every year we review our operations and every facet within Agristats… we set operational goals every year … and [we] try to improve our operations within this benchmarking service we call Agristats."

B. Sanderson Farms CEO Joe Sanderson commented on a December 2009 earnings call that "my judgment is that based on what I see in Agr[i] stats nobody is planning on, pullet placements say no ramp up and what I've

gleaned from Agr[i] stats, people are not planning on ramping up. I see a lot of information from Agr[i] stats that tells me that nobody is going to ramp up."

C.     Sanderson Farms CEO Joe Sanderson commented in a May 2011 earnings call that "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats." Asked later on the call by an analyst why he had said on the call and a few months earlier that he "feel[s] confident that we are going to see cutbacks" based on Agri Stats data, Sanderson indicated "industry participants expected that [the market would improve in June and July] and I think they wanted to carry their production into June and July and see if the market would reward them for that it appears right now. … And then once you get past July 4 … I think then you will start seeing reduced egg sets. … Typically in my experience the first cut is not enough and you go back and look at 2008, I think the industry started cutting back maybe in June and that cut back was not enough and then they made another cut in the late fall and I believe the industry became profitable in January."

D.     At a May 19, 2010 BMO Conference, Tyson compared its operating profit per live pound statistic from Agri Stats against what it said were the total of 121 plants in the Agri Stats survey.

E.     Tyson Foods noted in a December 2014 investor presentation that "[t]he point being is that when you talk about the chicken cycle, most people will look at the cyclicality. It's very profitable right now. And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack. We can tell that through Agri Stats. Now at the same time, when there is more poultry available and the industry may not be as profitable, we would not expect to be anywhere close to what the bottom of that cycle would be."

192.   Agri Stats has also on occasion referred to the secret exchange of information it facilitates among Defendants. In many instances, Agri Stats played the role of industry cheerleader rather than industry benchmarking service, suggesting specifically how much Broiler production should be cut based on its data.

A.     In July 2012 trial testimony in a contract-farmer lawsuit against Pilgrim's, testimony revealed that a November 2008 Agri Stats report "made statements to the effect that it thought the industry was 5-percent oversupplied … relative … to demand."

B.     Agri Stats holds regular "poultry outlook conferences" for meat industry executives. For instance, Agri Stats hosted an April 23, 2015, conference in Atlanta, Georgia for which an agenda indicated a presentation by Agri Stats Vice President Sue Trudell would be provided concerning the "broiler market situation and outlook" and an analysis of feed and macroeconomic factors. Such presentations are restricted from circulation outside the invited participants to EMI's poultry outlook conference and are not publicly available.

C.     Defendant Sanderson Farms invites Agri Stats employees to present about the industry to Sanderson's own investors, such as an October 18, 2013, presentation by Agri Stats Vice President Sue Trudell.

D.     In January 2009 Agri Stats Vice President Mike Donohue commented that "We [*i.e.*, Broiler producers] are an industry that is in demand ... . We have a product that people want and continue to consume."

E.     Agri Stats subsidiary EMI also holds regular invitation-only "Analytics Web Conference" calls.

F.     Agri Stats Vice President Donohue also frequently appears at industry events, such as the Spring 2011 IPE conference. Donohue provided comments as part of an annual "market intelligence" forum about various industry performance metrics. Additionally, Donohue's co-panelist, Broiler industry insider Paul Aho, explicitly suggested "[t]he market is calling for around a 5% reduction in chicken production" in order for producers to achieve higher prices in 2011.

G.     Donohue also authors articles for the Agri Stats publication EMI Vital Signs. For instance, the sole "sample" publication available on EMI's website is a May 2013 article in EMI Vital Signs by Donohue, which analyzes whether Broiler producers could continue to achieve high profit levels. Donohue carefully analyzed Agri Stats data concerning pricing, inventory, and production levels, ultimately concluding "[w]hen supply and demand factors are in good shape the industry can get a good return on investment and for the short and medium term it appears that there is certainly room for optimism in these factors."

H.     Donohue helps forecast supply and demand for the Broiler industry by using Agri Stats data on breeder placements and inventory. For instance, at the US Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, Donohue noted that chicken breast prices were at a particularly high level and "[i]t's not just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012," he said. "I hope this carries over into the latter half of 2012 based on some of the production forecasts that can be made based on breeder placements and inventories." Donohue also noted a concern that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recover[y] in the short term by filing up

incubators again," but noted that Agri Stats data indicates the industry is slaughtering breeder flocks at 59 to 60 weeks (instead of the typical 65 weeks), which suggested to him the industry was managing its production carefully.

193.    In a contract-farmer case, a Broiler industry expert testified that the sharing of information through Agri Stats by Broiler producers regarding pay for contract-farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern." This conclusion is important because, besides Defendants, their agents, and their co-conspirators, only expert witnesses and court-approved advisors in a handful of prior litigations, have even seen an actual Agri Stats report. Such individuals are expressly prohibited from publicly releasing or discussing such reports by the terms of protective orders Defendants require before producing Agri Stats reports in discovery. The same expert also remarked that Agri Stats was unusual even among other price surveys, noting "[t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue. Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive. As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry. An intensive inquiry is needed."

194.    Defendants have no non-conspiratorial justification for using Agri Stats to secretly share highly confidential and proprietary information about their pricing, capacity, production, and costs at the level of detail at which they do. In a competitive market, such proprietary, competitively sensitive information would be a closely guarded secret. Economic theory suggests that, when competitors routinely exchange such sensitive internal company information, competition is reduced.

195.    According to the FTC's and DOJ's 2000 Guidelines for Collaborations Among Competitors ("FTC/DOJ Guidelines"), Agri Stats is far outside the scope of permissible information sharing among competitors. For example:

A.    The FTC/DOJ Guidelines note the high risk of antitrust issues for information sharing programs in industries with a history of collusion.

B.    The more competitively sensitive the information being shared, the higher the antitrust concern for such information sharing. Upon information and belief, the weekly and monthly Agri Stats reports include dozens of categories of detailed information that in a competitive industry would be considered trade secrets. Therefore, the competitive sensitivity of Agri Stats reports suggests a particularly high level of antitrust concern.

C.    The older or more historical the information being shared, the less concern the FTC and DOJ have with information collaborations. However, Agri Stats reports are issued weekly and/or monthly, and its EMI reports are issued daily, so as to provide nearly current production, sales, and other data to Defendants. Moreover, it is the nature of Broiler breeder flocks to predict future Broiler supply, so by sharing such information in a way that permits company-by-company identification, Defendants are in fact sharing future anticipated production information with one another, which clearly creates a significant antitrust concern under the FTC/DOJ Guidelines.

196.    The FTC/DOJ Guidelines also provide a "safety zone" (i.e., presumptively permissible zone) for collaborations among competitors that account for no more than 20 percent of each relevant market in which competition may be affected, but Defendants account for approximately 90-95% of Broiler production.

**E.    Defendants Coordinated Production Cuts To Stabilize And Increase Broiler Prices From 2008-2012, And After That, Continued Restricting Broiler Supply To Maintain Artificially High Prices.**

197.    Defendants engaged in a conspiracy to fix, raise, stabilize, and maintain the price of Broilers throughout the Relevant Time Period. Defendants' conduct in furtherance of their conspiracy included, but were not limited, to the following: engaging in continuous communications on confidential and proprietary business matters to eliminate price competition;

allocating market shares; restricting supply of Broilers; using input costs and other events as a pretext for industry-wide production cuts; and concocting mechanisms to nullify competitive sales processes to their customers.

198.    In 2008, Pilgrim's retained consultant Bain & Company to analyze its business operations. Bain outlined a strategy for Pilgrim's to help reshape the dynamic of the Broiler industry. The Bain plan suggested that Pilgrim's management needed to take action to reduce supply in the Broiler industry, similar to other industries which in the then-recent past had been able to restrict production and increase prices.

199.    Defendants adopted the euphemism "capacity discipline" or simply "discipline" to refer to their agreement to limit Broiler production. The key to "production discipline" and "capacity discipline" is widespread participation by the industry. Broiler companies will not reap supracompetitive profits if only one or a few companies exercise discipline by cutting production. For example, if a single Broiler company reduces Broiler capacity, there is no guarantee that competitors will do the same, and therefore the company acting alone has simply ceded market share to its competitors. However, if other Broiler companies similarly exercise discipline and reduce capacity and production, Broiler purchasers will be faced with resulting higher prices, which they will have no choice but to pay. The alternative – to not purchase Broilers – is not an option for most of Defendants' customers.

200.    Thus, exercising capacity discipline will only benefit a Broiler company if it knows or is reasonably sure that its competitors will do likewise. Absent such assurance, it would be against each Broiler company's independent economic self-interest to cut capacity and production. In Defendants' case, their shared commitment to capacity discipline was made feasible and rational by their knowledge that each had agreed to engage in the same capacity limitations.  Defendants

repeatedly confirmed to each other that they remained committed to this agreement by publicly (and privately) discussing their plans to continue exercising "capacity discipline," so long as others did the same.

201.　Given Broiler producers' vertical integration and control of breeder farms, hatcheries, growout farms, and slaughter houses, Broiler producers employed several mechanisms to reduce the supply of Broilers, including the following:

A.　Reduce the size of Broiler breeder flocks through two measures: (1) retire and kill off Broiler breeders at an earlier age than would normally be the optimum age for doing so, and/or (2) reducing purchases of Breeder pullets from genetics companies that supply them. Such reductions in Broiler breeder flock purchases by Broiler companies effectively forces genetics companies to in turn reduce their own stocks of parent and grandparent Broiler breeders from which broiler company pullets are supplied. Such reductions by the genetics companies extend into a period of years the time it takes to materially increase the supplies of Broilers.

B.　Reduce "egg sets" or "egg placements" (*i.e.*, number of eggs placed in incubators) by destroying such eggs and selling them to a rendering plant, which causes a reduction in production within roughly 7 weeks;

C.　"Break eggs" at hatcheries by destroying the eggs prior to setting them in incubators;

D.　Pull (*i.e.*, destroy) eggs already set in incubators sometime before the 21 days necessary for eggs to hatch;

E.　Destroy newly hatched chicks at hatcheries before delivery to farmers for grow-out;

F.　Reduce the number or health of chicks delivered to contract farmers for grow-out, including manipulating the genetics of chicks or providing an inferior type of Broiler to farmers for grow-out into mature Broilers;

G.　Extend the period of time between slaughter of mature Broilers and delivery of new chicks to contract-farmers for grow-out (a/k/a, "days between flocks");

H.　Reduce the size of birds at slaughter, including slaughtering birds before they reach full maturity or weight;

56

I.     Slow down, temporarily close, or permanently close Broiler processing plants; and

J.    Export hatching eggs and/or day-old chicks outside the United States.

202.    Prior to 2008, Broiler producers used shorter-term production cuts, such as slaughtering Broilers early, destroying eggs before incubation, killing newly hatched chicks before delivery to contract farmers, and/or increasing the days between flocks delivered to contract farmers. Broiler companies historically did not cut their Broiler breeder flocks (except for normal seasonal variations), however, because doing so would leave a producer unable to ramp up production in the short or medium term should market conditions improve.

203.    By contrast, from 2008 through the present, Broiler producers used not only traditional production cuts (short-term in nature), but also unprecedented reductions in Broiler breeder flocks. Specifically, Broiler producers made substantial, unprecedented cuts to Broiler breeder flocks in 2008 and 2011 in order to prevent them from being able to meaningfully increase supply for years to follow.

### 1.    Time Period Before The Conspiracy.

204.    In 2007, the two largest Broiler producers, Pilgrim's and Tyson, reduced their production of Broilers, but only a few other Broiler producers followed their lead -- namely Foster Farms (4.8% reduction in Ready-to-Cook ("RTC") pounds), Peco Foods (5.4% reduction in RTC pounds), and Perdue (unspecified cuts). However, those cuts were not enough to affect industry supply sufficient to increase prices meaningfully. Industry publications noted that oversupply of Broilers was due to overproduction by Sanderson Farms, Mountaire Farms, and House of Raeford Farms. Due to the resulting oversupply of Broilers, prices fell in late 2007 and into early 2008. In addition, production cuts in 2007 were shorter-term reductions in production, such as slaughtering Broilers early, not on longer-term reductions of Broiler breeder flocks.

205.     Due to the failure of the 2007 shorter-term production cuts to raise prices, Tyson and Pilgrim's realized that their supply cuts would never be enough to raise industry prices without a broader industry supply reduction by most of their competitors, and that reductions that did not reduce Broiler breeder flocks left the industry vulnerable to near-term increases in supply. Tyson and Pilgrim's realized that by making cuts that were not followed by their competitors, they were essentially giving away market share to those competitors.

**2.     Defendants' Production Cuts In 2008-2009.**

206.     On January 23-25, 2008, Defendants attended the IPE conference in Atlanta, Georgia. According to the IPE, companies representing over 99.4% of the Broiler production participated in the IPE. Numerous of Defendants' employees attended the conference, including their senior executives.

207.     On a January 28, 2008, earnings call, Tyson CEO Dick Bond declared bluntly "we have no choice [but] to raise prices substantially." However, the commodity nature of Broilers does not allow one producer to successfully raise market prices in the absence of widespread reductions in supply relative to current demand. Therefore, Bond's comment does not make sense absent an intention (or knowledge) on his part that Defendants would coordinate a reduction in supply across the Broiler industry.  After learning in 2007 that its production cuts alone could not increase industry prices, Tyson sent a clear message to its co-Defendants and co-conspirators that it would not make production cuts until they did so.

208.     In response, Pilgrim's issued a call to action for its competitors to reduce their production of Broilers to allow prices to recover. On a January 29, 2008, earnings call, Pilgrim's CFO Rick Cogdill said the industry was oversupplying Broilers and hurting market prices. Cogdill explained that his company had done its part in 2007 by reducing production 5%, so "the rest [] of

the market is going to have to pick-up a fair share in order for the production to come out of the system." During the call, Cogdill explained that Pilgrim's alone could not reduce supply enough to help market prices recover and its past efforts to reduce supply had merely led to other players increasing their market share at Pilgrim's expense. Cogdill suggested that the industry needed to coordinate production cuts in order to drive up market pricing, including making the following statements urging Pilgrim's competitors to do their part in reducing Broiler industry supplies:

A.      "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs. We were the leader in cutting production last year to help drive that. … . [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price."

B.      When asked by an analyst "do you have an estimate internally of what the state of oversupply in the industry might be? What you would hope to see cut from others that would make you feel like the industry was more rational?" Pilgrim's CFO Cogdill replied "It's really hard to say that the faster we get to production adjustment the quicker the recovery could happen … . And if the industry doesn't react soon enough it will have to react stronger in the end."

C.      "[W]e have walked away from sales in certain cases, where the pricing just did not make any sense. So we are trying to hold the line. We are losing at times the competitive bids … . So we are trying to take a leadership position from a pricing perspective."

D.      JP Morgan analyst Pablo Zuanic asked "[D]o you and Tyson have the evidence that your production call backs lead to significant price improvements last year[?]…. Clearly, there are more producers who are not following you. On my mask [sic], according to USDA, the industry was up 5% in the December quarter…. So, it means that the rest of the industry was up about 9% in the December quarter. So there is evidence that rest of the industry is not following you. You guys are the leaders. You know that this worked last year … . Is it just that last year we did it for the industry, and they didn't follow and now it's their turn?" In response, CFO Cogdill noted, "I think you kind of hit on it there. … . It's not like we had 5% of surplus capacity that we could just reduce our operations and not feel that …  I mean we cannot be the ones that are out there continually reducing production, and let the other producers capitalize on that. I mean if it's 5% last year, 5% this year, 5% next year, you can see that that's a spiral to the demise of our company, which we are not willing to accept."

209.    On a January 31, 2008, earnings call, Sanderson Farms CEO Joe Sanderson explained that he anticipated the industry would cut production. Asked about Broiler industry cuts by an analyst, Sanderson replied "we could see some reductions in production." Asked to expand on his comments by another analyst, CEO Sanderson said he thought a production cut was "probable" and "if it's bad and ugly and deep in February, March and April, you'll see the production cuts take place during that period of time. There's still 25% of the industry still making money but I would expect to see those reductions come over the next 90 to 120 days." Upon information and belief, CEO Sanderson's basis for the statement that "25% of the industry [was] still making money" was through the secret sharing of information by Defendants through Agri Stats.

210.    Around March 4, 2008, senior executives from Defendants met at an Executive Committee meeting of the National Chicken Council's Board of Directors including Pilgrim's CEO Clint Rivers, Tyson Senior VP Donnie Smith, and Fieldale Farms President Thomas Hensley.

211.    Pilgrim's again led the charge to cut overall industry supplies. On March 12, 2008, Pilgrim's announced a massive closure of its Broiler processing plants. Pilgrim's CEO, Clint Rivers, announced the closure of seven Broiler facilities in order to reduce industry oversupply, stating "we believe [these] actions … are absolutely necessary to help bring supply and demand into better balance … . That portion of the demand for our products that exists solely at pricing levels below the cost of production is no longer a demand that this *industry* can continue to supply." (emphasis added).

212.    Normal supply and demand would suggest that in the wake of massive supply cuts by Pilgrim's, other Broiler producers would jump into the gap in supply. However, following

Pilgrim's announcement, a series of production cuts were announced by other Defendants between April 3 and April 11, 2008.

A.  On April 3, 2008, Fieldale Farms announced a 5% production cut. In connection with the cut, Executive Vice President Thomas Hensley commented that Fieldale has had trouble passing on cost increases to both foodservice and retail customers. "Every time we try [to increase prices], one of our competitors comes in with a price lower than our previous price," Hensley said. Fieldale, which has been absorbing feed-cost increases, hopes its move will help ease continuing price pressure. "We can't sell [some of] the chickens at a price higher than the cost," Hensley said. "We're hoping this cut puts supply and demand back into better balance."

B.  On April 9, 2008, Simmons Foods announced a 6% reduction in production throughout its processing plants. Simmons Prepared Foods President David Jackson said in a press release that "[r]ecent U.S. chicken market price levels have not allowed processors to recover the spiraling costs of corn and soy meal. … This increased cost burden has yet to be reflected in domestic poultry prices." On April 9, 2008, BMO Capital Markets analyst Kenneth Zaslow welcomed Simmons' production cut, saying in a note to investors that production cuts across smaller companies in the Broiler industry would be positive for Broiler prices.

C.  On April 10, 2008, Cagle's Inc. announced a 4% reduction in processing of Broilers. According to a press release from Cagle's President and CEO, Doug Cagle, "[c]urrent chicken prices have failed to reflect the tremendous increase in the cost of feed. Ingredient prices, mostly corn and soybean meal, have increased over 80 percent in the last two years raising the cost to produce chicken by more than $.17 a pound. These are unprecedented times and given current USDA forecasts it appears that high feed costs are here for the foreseeable future. The cut back in production will not effect [sic] our customers with existing commitments but will reduce product being sold through less profitable commodity outlets."

D.  Between April 3-11, 2008, Wayne Farms, O.K. Foods, and Koch Foods each announced 2-8% reductions in production.

E.  Other Broiler companies cut their production between April 1, 2008 and May 28, 2008, but did not publicly announce those cuts. Instead, these Broiler companies communicated such cuts to their Producer Co-Conspirators through Agri Stats and/or other means of communication. For instance, at his BMO Capital Markets Conference presentation on May 28, 2008, Sanderson Farms CEO Joe Sanderson stated that "we have seen for the last 6 or 7 weeks … some companies in our industry announce cutbacks. There have been I think six companies have announced cutbacks. I know some companies have cut back

and have not announced." Such knowledge of non-public production cuts by competitors is highly suggestive of secret communication among Broiler companies.

213. After witnessing its competitors close production capacity between April 3 and 11, Pilgrim's saw that other industry participants were contributing to reducing industry supply. Pilgrim's decided it could now take further steps to reduce industry supply. Thus, on April 11, 2008, Pilgrim's suggested it might close its large El Dorado, Arkansas processing plant, which employed 1,620 workers.

214. On April 14, 2008, Pilgrim's announced a further production cut of 5% of egg sets.

215. On April 29, 2008, Tyson CEO Dick Bond described the change in the industry in response to an analyst question, noting "[y]ou are right. I think the industry has changed. Diane, I don't think the industry will be up that much anymore, we have seen some sizable declines here lately in egg sets and placements. So, we're going to be up a little bit but probably not a significant amount, not as much as we might have once anticipated."

216. Despite the large number of coordinated production cuts announced by producers in April 2008, Pilgrim's concluded these cuts were not sufficient. Pilgrim's CEO Clint Rivers encouraged further action by the industry at a May 15, 2008, speech at the BMO Capital Markets Third Annual Ag & Protein Conference, which was attended by Sanderson Farms CEO Joe Sanderson and CFO Mike Cockrell, Tyson CEO Richard Bond, and Pilgrim's CFO Richard Cogdill. CEO Rivers announced that he hoped to see the Broiler industry continue to cut production to help the industry return to profitability, stating that "he would like the industry to trim total production by 3%-4%, calling it a prudent move in light of recent price volatility in the grain markets." He also noted that "[t]he cuts need to be fairly deep."

217.    A May 21, 2008, Wall Street Journal article noted that conditions in the industry were starting to change. "Three things are making analysts more optimistic: Companies are cutting production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines." The article also noted "[i]t is unusual for egg sets to decline at this time of year." The reason such a reduction was unusual in May is that egg sets result in Broilers that are ready for market approximately 10 weeks later, which in this case would have been the first week of August, and is still the peak of the high-demand summer grilling season.

218.    During an earnings call on May 22, 2008, Sanderson Farms CEO Joe Sanderson was asked if he thought industry cuts were sufficient to keep the industry profitable in the Fall.  In response, Sanderson noted, "[w]e don't know yet. We will make a cut as we always do after Labor Day. We will make a 4-5% cut following Labor Day as we always do going into Thanksgiving, Christmas, and January we reduce our egg sets and around Thanksgiving, Christmas, New Years and Martin Luther King. That is a period of slow demand for us, and we don't announce that, but we always do it. It is just a period when we take downdays and we will do that. But if we think more is needed, we will evaluate that sometime in August, and if need be will do it. We cut back in 2006, we cut back in '97-98. I don't know if we announced it or not, but we will do what we need to do." Sanderson provided no explanation why it was choosing to publicly disclose its "regular" production cut if it had never done so in the past.

219.    Six days later, on May 28, 2008, CEO Sanderson attended the BMO Capital Markets Conference Presentation. One or more of Sanderson Farms' competitors attended the same conference. Sanderson explained to the attendees that the company tracks egg set data closely and it had observed many companies cutting production "for the last 6 or 7 weeks."

63

220.    In early June 2008, Pilgrim's CEO Clint Rivers continued to encourage further industry production cuts, noting in a June 4, 2008, presentation that "[o]ur supply in chicken, we are oversupply … we need to see some balance in the supply. … Simply put, at this time there is still too much breast meat available to drive market pricing significantly higher."

221.    Other CEOs picked up on Pilgrim's call for further action. A few weeks later, on June 19, 2008, Broiler industry executives participated in a media conference call intended to lobby the federal government to limit the ethanol subsidy. According to one report, Mark Hickman, Chairman of the National Chicken Council and CEO of Peco Foods, told participants that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year.  'We are hearing talk that this was not nearly enough, so liquidation is in round two.'" Upon information and belief, "liquidation" is a reference to the need for Defendants' decision to reduce Broiler breeder flocks in order to effectuate a longer-term supply restraint in the industry, rather than mere short-term production cuts like breaking eggs or slaughtering Broilers earlier to reduce weight.

222.    As noted above, Agri Stats' subsidiary EMI issues regular reports to its clients, which are not publicly available. However, EMI's website currently has available a "sample" report available from June 20, 2008. The sample report notes that "[b]eginning in April [2008], the weekly hatchery data started to show declines in egg sets and chick placements relative to year-earlier, which confirms the announced intentions to reduce Broiler production and will result in slaughter falling below year-ago by mid June." The same report also notes that "[i]t is unclear how long the slaughter declines will continue, and if other companies will choose to cut production as well making them deeper than initially thought. Those who have announced cutbacks indicate they

will continue until margins normalize. At this time we expect to see the declines continue until at least late 2009, and cuts could be deeper than now projected."

223.    Three days later, on June 23, 2008, Wayne Farms announced an additional 6% production cut. Wayne Farms President & CEO Elton Maddox said in a statement that "[s]oaring feed ingredient costs aggravated by the government's food for fuel mandate has created the need for us to rationalize our business." Like many other executives, Maddox cited ethanol subsidies as the reason for the production cuts. Wayne Farms' announcement came only three days after Agri Stats suggested further cuts were needed and four days after Peco Foods CEO Hickman suggested further cuts were needed.

224.    On June 23-25, 2008, USPOULTRY held its annual Financial Management Seminar. Defendants' senior executives attended the seminar.

225.    On July 2, 2008, Foster Farms announced it was abandoning plans to build a new Broiler plant in northeastern Colorado that it had previously announced in April 2008 would employ about 1,000 people. In a statement, Foster Farms CEO Don Jackson noted "[i]n these difficult conditions with costs escalating primarily due to grain and fuel prices and chicken prices lagging it does not make economic sense to go forward with expansion at this time."

226.    On July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets, citing "record high prices for corn and soybean meal, which it attributes to the U.S. government's mandated ethanol policies along with recent flooding in the Midwest 'Corn Belt' region."

227.    On July 20-22, 2008, the National Chicken Council held a three-day "Chicken Marketing Seminar" attended by Defendants' senior executives. The event was billed as a marketing seminar that "includes social networking events and recreational opportunities, including a golf tournament."

228.    On July 31, 2008, Tyson cancelled a contract with Petit Jean Poultry for the processing of Broilers at Petit's Buffalo, Missouri plant. Tyson subsequently told the City of Buffalo that no amount of incentives could convince it to renew its contract with Petit.

229.    On August 11, 2008, Pilgrim's announced the closure of its Clinton, Arkansas, processing plant and a further processing facility in Bossier City, Louisiana.  Pilgrim's press release noted the closures "are part of the company's ongoing effort to operate more efficiently and return to profitability amid high feed costs and an oversupply of chicken on the market."  The closure of the Clinton processing plant represented an additional 1.25% incremental increase of the company's previously announced production cuts. Pilgrim's stated that it would keep both plants idled until "industry margins can be sustained at more normalized levels of profitability." Pilgrim's also noted that "[w]ith Labor Day approaching and no indication that the actions taken to date by Pilgrim's Pride or other industry members are having a positive effect on selling prices for our products, it is now clear that more significant decisive action is necessary."

230.    In August 2008, House of Raeford announced that it would begin reducing its Broiler production by 5%. The company said in a statement that "[t]he current obstacles that face our industry require that supply be brought in line with demand." A production cutback was remarkable for House of Raeford, which had pursued a strategy of aggressive production growth that resulted in the company doubling its Broiler production from 2001 to 2007.

231.    On an August 26, 2008, earnings call, Sanderson Farms CEO Joe Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand." When asked later whether the industry had already made enough production cuts, he noted "we kind of thought we were going to see reductions in July … [based on] 213/214 [million] eggs sets back in April and that really did not materialize. When you

look at USDA slaughter numbers in July, they were 100% and 101% and now we're looking at egg sets of 206 and 207 million that are going to show up sometime in October or November. We'll see when we get there. Those are barely impressive cuts. My suspicion is, as I've told you in May, the industry typically make the cut [sic] and it's tentative. We'll have to see if it works. … I'm very skeptical that those cuts are going to be enough to return us margins to cover these grain costs."

232.    On September 23, 2008, Pilgrim's announced the layoff of 100 employees at its El Dorado, Arkansas processing plant.

233.    By September 2008, Broiler industry publication Watts PoultryUSA reported that "[m]ost U.S. broiler integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'"

234.    On October 3, 2008, Defendants' senior executives attended the National Chicken Council's Annual Meeting. Agri Stats CEO Bill Snyder moderated a CEO panel that included Pilgrim's, Tyson's, Perdue's, and Sanderson Farms' CEOs. Explaining Pilgrim's desire to push through an industry-wide price increase, Pilgrim's CEO Clint Rivers told panel members and the audience "[w]e need to get those [input] costs pushed through, but we've yet to see that happen."

235.    On October 10, 2008, Pilgrim's gave an interview to the Associated Press regarding a USDA report of falling egg sets in the Broiler industry. Spokesman Gary Rhodes noted that "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

236.    During Fall 2008, Sanderson Farms also implemented its previously announced "fall cuts" a month early and delayed the opening of a new deboning facility.

237. On October 18, 2008, Wayne Farms President & CEO Elton Maddox released a statement announcing the closure of the company's College Park, Georgia plant, resulting in the layoff of over 600 employees. Maddox cited "changing market conditions" and a need to "maximize efficiencies" as justification for the plant closure.

238. On a November 10, 2008, Tyson earnings call, CEO Dick Bond claimed that Tyson would not be making additional production cuts because it had already done its part to reduce industry supply with prior production cuts in 2007 and earlier. However, D.A. Davidson & Co. analyst Tim Ramey asked "Dick, a year ago you talked about price encourage [sic] then I was out with Donnie Smith four five months ago, you guys talked about well we're not going to be the one to cut." Tyson didn't respond directly, but cited Tyson's attention to "supply and demand."

239. On November 12, 2008, industry analyst Ken Zaslow noted that "many companies, such as Pilgrim's, have pledged to cut production …. The industry has cut about 10 to 12 percent of its production."

240. Despite claims to the contrary on its November 2008 earnings call, Tyson substantially reduced production in December 2008. First, on December 18, 2008, Tyson announced the canceling of a deboning contract with Petit Jean Poultry at Petit's Little Rock, Arkansas processing plant that resulted in the layoff of 700 employees by Petit. Second, by December 23, 2008, it was reported that Tyson had cut its production by 5%. Asked by a reporter about the cuts, Tyson spokesman Gary Mickelson stated that "[w]hile we would rather not share details of our current poultry production levels, we can tell you we continue to closely evaluate market conditions in an effort to match customer demand with our supply." Tyson also noted that it had reduced production "in recent years through the closing or sale of poultry plants and by running the company's remaining operations at reduced capacity utilization."

241.     On a January 26, 2009, Tyson earnings call, an analyst asked why Tyson cut production in December 2008 after claiming it would not do so in its November 2008 earnings call. Tyson's Senior VP Donnie Smith replied that Tyson's inventory growth had triggered it to cut production in December 2008.

242.     On January 28-30, 2009, Defendants' senior executives attended the 2009 International Poultry Expo in Atlanta, Georgia.

243.     In a February 18, 2009, interview, Tyson Senior Group Vice President Donnie Smith noted that "[a]cross our industry, we're down about six percent versus where we were a year ago. We're seeing an impact from that on market prices … the industry fundamentals are improving."

244.     In late February 2009, a report noted that Pilgrim's had cut another 9-10% of its production. According to the same report, Tyson told the audience at a February 2009 investors' conference that it did not intend to reduce its production further because "[u]sing WATT PoultryUSA data on ready-to-cook (RTC) pounds, our numbers have declined 5-7% from 2000 to 2008 on RTC pounds while at the same time the industry has grown 31%. Over time, we have done plenty of cutting back." In other words, Tyson felt it had already taken its fair share of needed production cuts, so competitors needed to take further actions. However, as indicated below, Tyson's statements about not reducing production appear to be posturing, because generally Tyson did reduce its production during the 2008-2015 time period in line with other producers, apparently hoping the threat of it not reducing production would lead other producers to reduce production first.

245.     By February 25, 2009, Sanderson Farms told The Morning News that it had made cuts to its supply of Broilers by processing smaller Broilers and running its plants at lower capacity

utilization rates. Sanderson also told a group of investors around this time that "[b]ecause we don't expect much help from the demand side, chicken market improvement will have to come from supply cuts."

246. In a February 25, 2009, interview, Simmons Foods CEO Todd Simmons noted that "[w]e are seeing lower demand in the food-service customer base. We have made adjustments in bird weights to ensure our production meets with our customer's needs."

247. Seeing further cuts from other producers in the industry led Pilgrim's to announce historically large cuts to its production on February 27, 2009. In a press release announcing the closure of three processing plants located in Douglas, Georgia, El Dorado, Arkansas, and Farmerville, Louisiana, Pilgrim's indicated the plants were "underperforming" and said the closures would "improve the company's product mix by reducing commodity production and to significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession." Pilgrim's indicated that the idling of these three plants would reduce production 9-10% in total pounds of Broilers produced by the company.

248. Overall, "[a]t least 11 companies reported reductions in weekly ready-to-cook production in 2008," including Tyson, Pilgrim's, Perdue, Simmons, House of Raeford, Cagle's, George's, O.K. Foods, Coleman Natural Foods, Harrison Poultry, and GNP Company. Other companies reduced their planned production levels and/or delayed the planned opening of new Broiler complexes.

      **3.**     **In 2008 and Early 2009, Defendants Made Unprecedented Reductions To Their Broiler Breeder Flocks.**

249. The production cuts in 2008 were even more remarkable because Broiler producers not only made unprecedented reductions in the pounds of Broilers they produced, but also reduced

Broiler breeder flocks, thereby forcing genetics companies to reduce supplies of grandparent stocks.

250.    Broiler breeder flocks on average are kept in active "lay" for 65 weeks, so over its lifespan a breeder hen produces an average of 140 eggs per year that are incubated at Broiler producer-owned hatcheries. Because Broiler breeder flocks are created from a limited pool of grandparent Broilers from the three Broiler genetics companies (Tyson's Cobb-Vantress, Aviagen, and Hubbard), it takes substantial time to re-populate a Broiler breeder flock that has been reduced through early slaughter. By reporting the size of each Defendant's supply flocks through Agri Stats, Defendants could closely monitor one another's supply flock reductions and deal with a co-conspirator who was ramping up production in conflict with Defendants' conspiracy.

251.    Defendants' reduction in Broiler breeder flocks during 2008 and the first two months of 2009 was unprecedented. While previous downturns had led some producers to use short-term methods to reduce overall pounds of Broilers slaughtered, in 2008 Defendants took their reductions further by substantially reducing their Broiler breeder flocks (aka, "Broiler Hatchery Supply Flock"), as shown below.



Source: National Agricultural Statistical Service, U.S.D.A., https://quickstats.nass.usda.gov/

### 4. Defendants' Production Cuts In 2008 And 2009 Led To Record Broiler Prices.

252. The production cuts in 2008 and 2009 clearly had an impact on Broiler pricing in 2008 and the first two months of 2009 – during the Great Recession, Broiler prices rose through mid to late 2008, staying at or near all-time highs until late 2009. For instance, by May 28, 2009, Sanderson Farms reported strong profits that were twice the predictions of Wall Street analysts, which according to one industry publication was "aided by production cuts and lower feed costs that offset still-weak demand." Similarly, at a May 14, 2009, BMO Capital Markets conference, interim Tyson CEO Leland Tollett noted that "poultry market fundamentals had improved. Pullet placements, an[] indication of future Broiler supplies, have been down the past five months compared to the same period last year. Egg sets continue to run six percent or more below year

ago levels and cold storage inventories of poultry have declined about 20 percent since peaking in November 2008."

253.    However, as prices continued to rise during late 2009 and early 2010, producers started increasing production in response to the higher prices, as they had done in previous decades. The rising production by producers in early 2010 led to a reported oversupply of Broilers that began to depress prices (below the supracompetitive levels) by late 2010. However, having learned the value of coordinated supply reductions in 2008, Defendants were quick to react with a new round of publicly announced production cuts in the first half of 2011, which quickly helped prices recover to their anticompetitive levels.

254.    During 2009 and 2010, Defendants' senior executives continued to meet with one another at trade association meetings and industry events, such as the National Chicken Council and the International Poultry Expo. For instance, at the National Chicken Council's October 2009 Annual Conference, one industry analyst wrote that participants had emphasized continued "production discipline." As used by Defendants, "production discipline" is a euphemism for limiting Broiler supplies. Defendants' conspiratorial efforts to artificially limit Broiler supplies enabled Defendants to raise prices of Broilers to supracompetitive levels.

### 5.    Defendants' Quick Reaction To Overproduction In 2011 Was Unprecedented, Leading To A Second Wave Of Production Cuts.

255.    Around early 2011, Tyson anticipated the coming overproduction of Broilers. In addition to limiting its own production, Tyson embarked on a new strategy to soak up excess supply produced by its competitors. Tyson called the strategy "Buy vs. Grow." Tyson's Buy vs. Grow strategy allowed Tyson to buy up excess production from its competitors and avoid the decrease in prices that would occur had the excess production been sold on the open market. In return, Tyson could communicate the volumes of Broilers it would be willing to purchase from

competitors in the current and future months, thus suggesting to each competitor the amount of production it should cut that would not be purchased by Tyson. As one investment analyst described it, Tyson's program "involves maintaining or even reducing [Tyson's] own chicken production levels, with buying more chicken on the open market from their rival chicken producers, in an effort to keep the chicken market from being over supplied." Even though it would have been cheaper (with respect to the cost of pounds purchased) for Tyson to grow its own Broilers instead of buying them from a competitor, Tyson engaged in its Buy vs. Grow program because it allowed Tyson to better control supply and production in the Broiler industry and reap the benefit of higher market prices on all of the rest of its Broiler pounds sold.

256.     On January 24-26, 2011, Defendants' senior executives attended the International Poultry Expo in Atlanta, Georgia, including Tyson CEO Donnie Smith. The IPE featured an annual market intelligence panel with Mike Donohue from Agri Stats and industry-insider Paul Aho. According to one report, Donohue noted that "'2008 was the worst year financially for the (U.S.) broiler industry that most people have ever seen' … The industry's response in 2008 was a 5 to 6% reduction in pounds produced. He said that the broiler industry is currently at record high weekly slaughter volumes." Aho noted "[t]his could be a very difficult year with cutbacks, rationalization, and consolidation … . The market is calling for around a 5% reduction in chicken production."

257.     On a February 4, 2011, Tyson earnings call, COO James Lochner noted that "until industry supply more closely aligns with demand" Tyson's Broiler business would "be challenged." Tyson CFO Dennis Leatherby also referred to a supply-demand imbalance in the chicken industry.

258.    On a February 16, 2011, earnings call, Cagle's reportedly said it had begun a 20% reduction in production at a deboning operation in an effort to balance supply and demand. Cagle's told one publication that it was "optimistic that the industry will exhibit the production restraint necessary to support higher pricing for Cagle's products allowing for return to profitable margins."

259.    On or around February 25, 2011, Sanderson Farms CEO Joe Sanderson announced on an earnings call that Sanderson would be delaying the development and construction of a second North Carolina Broiler complex.

260.    On March 7, 2011, House of Raeford announced a 10% reduction in egg sets that began in early February. CEO Bob Johnson noted in an accompanying press release that "we decided that acting now was a responsible action for our company in light of continuing unstable economic conditions. ... . Hopefully the chicken prices will begin to increase later this year. In addition, if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."

261.    On March 15, 2011, Simmons announced it was laying off 180 workers at its Siloam Springs, Arkansas processing plant "[d]ue to economics specific to our industry, resulting from high grain prices predominantly caused by corn being used in ethanol, we have decided to realign some of our production resulting in the elimination of 180 positions as of April 15."

262.    On April 13-15, 2011, the Georgia Poultry Federation held its annual meeting at the Brasstown Valley Resort in Georgia. Defendants' senior executives attended the meeting. Among other positions that Defendants' employees were elected to at the meeting, Donnie Wilburn (Director Live Operations, Harrison Poultry) was elected Vice Chairman of the Board of Directors and Phillip Turner (Plant Manager, Mar-Jac) was elected to the Board of Directors.

263.    On April 15, 2011, Mountaire Farms announced it was abandoning a 3-5% capacity increase. Mountaire President Paul Downes explained Mountaire's decision in simple terms: "The only way to higher prices is less supply. The only way to less supply is chicken companies will shut down or cut back. That's not good for poultry growers or the economy. But I think that's what we're going to see." In other words, Mountaire had learned from the industry's coordinated action in 2008 to reduce supply and realized that the oversupply and decreasing prices in early 2011 could only be addressed through collective action by the Broiler industry to restrain production.

264.    During 2011, Fieldale Farms reduced its production by an unspecified amount.

265.    During 2011, Mar-Jac reduced its production 10% and reported that other Broiler Producers were doing so as well.

266.    On May 1-3, 2011, Defendants' senior executives, including Tyson CEO Donnie Smith, attended Urner Barry's Annual Executive Conference and Marketing Seminar, which includes an annual golf outing at a local country club.

267.    On May 17-18, 2011, senior executives from Sanderson Farms, Pilgrim's, and Tyson attended the BMO Farm to Market Conference. Attending were Sanderson Farms CEO & Chairman Joe Sanderson, Sanderson President & COO Lampkin Butts, Pilgrim's President & CEO Bill Lovette, Tyson CEO Donnie Smith, and Tyson Senior Group VP of Fresh Meats Noel White.

268.    Pilgrim's President & CEO Bill Lovette presented at the May 17, 2011, BMO Farm to Market Conference. Lovette's presentation noted Pilgrim's shift away from fixed-rate contracts to market-based pricing. Pilgrim's also noted its new focus on matching production to forecasted demand, including by adjusting head and bird weights at selected plants to better balance supply and customer demand.

269.     On a May 24, 2011, earnings call, Sanderson Farms CEO Joe Sanderson stated "the deal is that the industry — forget Sanderson — the industry cannot sustain losses like they are sustaining for a long period of time. They will — they can't do it and you have been observing this for years and years and the industry has been losing money since Novemberish and balance sheets deteriorate and losses have to stop. The only way to stop losses with $7 corn is to reduce production and get prices up. That is the rule and the law of the jungle." Sanderson continued, "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats."

270.     On June 6, 2011, Cagle's announced on an earnings call that "[t]he industry must lower supply in order to offset reduced demand and to support higher market prices. Cagle's continues to process at 80 per cent of capacity at its Pine Mountain Valley deboning facility and does not contemplate any increase in the foreseeable future."

271.     On June 7-10, 2011, the USAPEEC held its annual meeting at The Greenbrier America's Resort in West Virginia. Defendants' senior executives attended.

272.     On approximately June 20, 2011, Tyson began pulling eggs from its incubators to reduce Broiler volumes.

273.     On June 21, 2011, Cagle's announced it was laying off 300 employees at its Pine Mountain Valley, Georgia plant to reduce Broiler volumes.

274.     On June 27-29, 2011, the US Poultry & Egg Association held a Financial Management Seminar at the Ritz Carlton in Amelia Island, Florida. Pilgrim's President & CEO Bill Lovette presented to a group of 150 attendees that included senior executives from Defendants.

275.    On June 27, 2011, Simmons announced it was laying off 223 employees by August at its Siloam Springs, Arkansas plant to "shift production to better address soaring corn prices." In its press release, Simmons blamed U.S. Ethanol policies for reducing its production.

276.    On July 12, 2011, Tyson CEO Donnie Smith, Tyson executive Bernard Leonard (Chairman of the NCC at the time), Sanderson Farms COO Lampkin Butts, Peco Foods CEO Mark Hickman, and Perdue CEO Jim Perdue participated in a panel together at the 2011 Food Media Seminar.

277.    On July 29, 2011, Pilgrim's announced the closure of its Dallas, Texas processing plant and the layoff of 1,000 employees. Pilgrim's President & CEO Bill Lovette explained that "[w]hile the decision to close a plant and eliminate jobs is always painful, we must make better use of our assets given the challenges facing our industry from record-high feed costs and an oversupply of chicken …. A key component of that effort is improving our capacity utilization through production consolidation and other operational changes. By closing the Dallas facility, we can consolidate that production volume at three other plants and help those sites run closer to full capacity."

278.    On an August 1, 2011, earnings call, Sanderson Farms' CEO reportedly said that Sanderson Farms' normal fall production cut of 4% beginning in November would remain in place beyond January of 2012 [and . . .] until demand improves. Sanderson also stated "we aren't going to set any more eggs until we pick up a big account or we can't supply our customers' needs. We think demand improvement will require unemployment to drop … . It wouldn't surprise me if the industry makes further, deeper reductions in egg sets in October or November," he said. "Nobody knows what cuts might be needed until we get to October," "but I think that the cutbacks may need to be more than the 6% in head that the industry already has in place."

279.    On an August 8, 2011, Tyson earnings call, CEO Donnie Smith said that "[d]omestic availability must be in balance with demand before industry economics can improve. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter. … Our goal is to match supply to demand. And following over-production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market."

280.    On August 18, 2011, Cagle's announced it was reducing 20% of its production at its large Pine Mountain Valley, Georgia plant.

281.    From October 5-7, 2011, Defendants' senior executives attended the National Chicken Council's 57th Annual Conference. As part of the conference, senior executives from Perdue and Koch Foods participated in a panel regarding the "new paradigm" in the Broiler industry. Panel members Clint Rivers (Perdue, President of Foodservice and Supply Chain), Bill Anderson (Senior Vice President, Keystone Foods), Mike Helgeson (CEO, GNP), and Mark Kaminsky (Koch Foods COO & CFO) said "the industry is accustomed to cycles, but not one quite like the latest, and companies are going to need to adjust. Discipline on the supply side was one suggestion.  Getting better prices from retailers was another."

282.    On November 17, 2011, Wayne Farms issued a press release announcing the closure of its Decatur, Alabama plant and layoffs of 360 employees.

283.    On a November 21, 2011, earnings call, Sanderson Farms CEO Joe Sanderson responded to a question about a production decrease that "when we talk about the 4% number, that is what we project the industry to be. Obviously, we're going to be a part of that."

284.    On December 6-8, 2011, the USAPEEC held its annual Council members-only winter meeting.  Defendants' senior executives attended the meeting.

285. At USPOULTRY's Hatchery-Breeder Clinic in January 2012, Agri Stats Vice President Donohue noted the importance of reducing Broiler breeder flocks, noting that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recover[y] in the short term by filling up incubators again," but noted that Agri Stats data indicates the industry is slaughtering breeder flocks at 59 to 60 weeks (instead of the typical 65 weeks), which suggested to him the industry was managing its production carefully. The early slaughter of breeder flocks in 2011 through mid-2012 meant that Defendants subsequently were unable to increase production for at least eighteen months.

286. Defendants' senior executives attended the January 25-26, 2012, International Poultry and Processing Expo in Atlanta, Georgia. The National Chicken Council held its Board of Directors meeting in conjunction with the meeting.

287. In early 2012, Sanderson Farms cut its production 4%.

288. On March 20-21, 2012, the National Chicken Council Board of Directors met in Washington D.C. Defendants' senior executives attended the meeting.

289. On an April 27, 2012, earnings call, Pilgrim's President & CEO Bill Lovette reported that "the die is cast for 2012," and that "we're comfortable that the industry is going to remain constrained."

290. On April 29-May 1, 2012, Urner Barry held its Annual Executive Conference and Marketing Seminar. Defendants' senior executives attended the conference.

291. On May 7, 2012, Tyson held an earnings call and announced it had decreased its production by 4% through longer days between flocks for its growers and by increasing its Buy vs. Grow program. Tyson noted on its earnings call that "the industry as a whole has reduced production pounds by 4% to 6% year-over-year. To help keep our production balanced, we bought

80

chicken on the open market rather than growing all the birds we needed. We won't grow a bird solely for the part in the highest demand because we have to sell the entire bird. Grow versus buy is a strategy we look at continually based on input costs, revenue demand forecast and the needs of our customers." Tyson CEO Donnie Smith also noted on the earnings call that "we began to cut back last year" with respect to egg sets and placements.

292.    On June 6, 2012, Pilgrim's announced the layoff of 190 employees at its Chattanooga, Tennessee deboning plant. The company noted that "[w]hile the decision to reduce the workforce in Chattanooga was not made lightly, we are confident that these actions will improve the efficiency of our plant, maintain our mutually profitable relationship with growers, and strengthen our ability to produce quality poultry products in Tennessee, … [but] [t]he Chattanooga operation remains a vital part of our ongoing strategy."

293.    On June 21, 2012, the National Chicken Council Board of Directors held its summer meeting at the Ritz-Carlton Highlands in Lake Tahoe, California. Defendants' senior executives attended the meeting.

294.    In a July 9, 2012, article, Tyson CEO Donnie Smith was quoted as saying "the company will not over produce chicken at these expensive grain levels, preferring to buy commodity pieces in the secondary market to fill orders where necessary."

295.    On July 15, 2012, Defendants' senior executives attended a meeting of the National Chicken Council's Marketing Committee at the Stone Mountain Lodge in Stowe, Vermont.

296.    On an August 6, 2012, earnings call, Tyson CEO Donnie Smith stated that "[o]ver the past couple of years we have substantially reduced a number of fixed price contracts we have with customers and currently have less than 15% of our Poultry volume [on] annual fixed price contracts. The vast majority of our contracts are tied to specific markets or allow for conversations

about adjusting prices to move – prices to offset higher input and we will continue to push for even more of these types of contracts. I believe supply will begin to rationalize as well, making it easier for us to have those pricing conversations."

297. On August 23, 2012, Koch Foods CEO Joseph Grendys gave an interview with Bloomberg News. He stated that "[c]osts have gone up so much due to the drought that the industry will be forced to get price increases of 10 to 15 percent across all product lines" for 2013 over this year. He went on to note that "'[t]he industry needs to be smart' and focus on pricing to ensure it remains profitable … . Even if it does become unprofitable in the fourth quarter, the industry may resume making money after the first quarter of 2013." The article also mentioned Koch was going to use quarterly adjustments for price in its contracts for the first time since 2008.

298. On August 28, 2012, Sanderson Farms announced a further 2% production cut that it blamed on corn and soybean prices.

299. By September 2012, the effect of Defendants' earlier production cuts starting in 2011 had begun to result in increased Broiler prices. Most importantly, Defendants had not just cut the number of pounds of Broilers slaughtered, but they also destroyed a significant proportion of their Broiler breeder flocks. As noted previously, doing so meant that Defendants could not increase Broiler supplies in the short or medium term, even if they wanted to.

300. On October 10-11, 2012, the National Chicken Council held its annual meeting at The Mandarin Hotel in Washington, D.C. Defendants' senior executives attended the meeting. The meeting featured an "Industry Outlook Panel" that included speakers Thomas Hensley (President, Fieldale Farms) and Paul Fox (CEO, O.K. Foods) and discussed the question of "[w]hat did the broiler industry learn from 2011 and how will the industry apply those lessons in 2012 and 2013?" O.K. Foods CEO Paul Fox's comments during the panel continued to point to the ethanol mandate

as a pretext for higher Broiler prices, stating "[i]n 2006, the ethanol mandate began to really take a bite against the protein complex, and since that time on a cumulative basis, we've seen about $31 billion in new costs that have come in to the chicken business."

301.     The actions alleged above, taken collectively and not in isolation, demonstrate a level of coordination and "discipline" not seen in this industry prior to the Relevant Time Period alleged herein.

### 6. Defendants' Production Cuts In 2011-2012 Lowered Broiler Breeder Flocks To Unprecedented Levels And Led To Record Profits In 2013-2014.

302.     Defendants' cuts to the Broiler breeder flocks in 2011-2012 sent flock levels down to levels not seen for almost two decades, as shown by the graph below.



303.     For much of the remainder of 2012 through 2014, Defendants reaped the benefits of coordinated supply restraints in the form of rising prices and record profits. During this period

Defendants' executives repeatedly made statements congratulating industry players on the "discipline" they had shown by keeping supply restrained. For instance, on a May 3, 2013, earnings call, Pilgrim's President & CEO Bill Lovette stated that "[w]ell, obviously, revenue is going to be a function of price, in part, and in this case a big part; and obviously, price is going to strengthen as supply continues to be disciplined and constrained … . So I think the industry is doing an admirable job in being disciplined on the supply side and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying." Lovette also commented that "I believe the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken and not necessarily what corn or soybean meal costs. I think I'm confident to say we've, we figured that out and we're doing a good job of balancing supply and demand."

304.    On the May 3, 2013, earnings call, Pilgrim's President & CEO Lovette also discussed the importance of continued restraint of the industry's breeder supply flock, noting "[w]ell, I only know what we've seen happen in the past. Now, certainly, this summer if the industry chooses to grow the breeder supply significantly, that's definitely going to impact 2014. What I'm saying is, so far, we've seen no indication that the industry plans to grow the breeder supply and as a matter of fact, it's actually shrunk. So that's the source of my comments. Do I know what's going to happen in June or July or August of this year with respect to breeder placements, I don't know that. I would tell you that based on the last three to five years, though, again, I'll reiterate that I think the industry has learned that the economics of our business is tied very closely to the supply of chickens and we've done a good job so far of maintaining discipline such that even paying nearly $8.50 for corn, we've been able to be profitable as an industry."

305. On October 4, 2013, CEOs and other senior executives of Defendants' companies met at the annual NCC meeting in Washington D.C. The meeting featured a panel with GNP CEO Mike Helgeson, Tyson CEO Donnie King, and Simmons Foods CEO Todd Simmons. According to one publication's account of the panel, the CEOs were "chipper about the prospects for their industry in the next few years."

306. On a January 31, 2014, earnings call, Tyson CEO Donnie Smith reported that through Tyson's "buy versus growth strategy we continue to keep our supply short of demand … ." Tyson's continued use of Buy vs. Grow, including through the present, allows Tyson and other Defendants to reduce production on a month-to-month basis and have opportunities to learn more information about one another's production and pricing.

307. On a February 21, 2014, earnings call, Pilgrim's President & CEO Bill Lovette reflected on what had led to record earnings for Pilgrim's. He noted that "I think the one thing that creates…has created that stability is the discipline of the industry to not allow profitability in the past to drive supplies in the future. I think we all have an understanding that our industry is mature, especially in the U.S. Consumption of total meat in the last five years has not grown and our growth in the future is going to come from markets outside the U.S. And so, we have a different model today than we had 15…10 or 15 years ago in that consumption in this country is not growing as robustly as it used to. And I think that discipline really, Ken, is the one ingredient that has made for more stable earnings that we have seen. We have certainly seen a lot of volatility in feed ingredient costs, even as recent as this past year. And I don't know what…I mean you can make a solid argument for corn and soybean meal being much cheaper in 2014 and '15, given the rebuilding of world inventories of corn and growing inventories of soybeans. But we just don't

know what the next weather event in either, South America, North America or even Eastern Europe may present in terms of the supplies of those feed ingredients."

308.    On March 12, 2014, Tyson CEO Donnie Smith attended an industry conference and told the attendees that "[a 'meaningful change' in bird production won't occur until the second half of 2015." Smith's confidence about broiler production was possible because of the radical reductions in Broiler breeder flocks Defendants had made during 2011 and early 2012, which Smith knew made it impossible for Defendants to "meaningful[ly] change" Broiler production.

309.    Industry analysts noted the change in the nature of Defendants' production cuts. On May 6, 2014, a Stephens, Inc. analyst said in an interview that historically "it has been very easy to increase the chicken supply because the cycle is so short. It only takes four to eight weeks to grow a chicken, but U.S. chicken producers are having a hard time increasing the chicken supply by much. They cut production capacity throughout the supply chain when grain prices were very high. Because of this, they cannot materially increase supply for 2014. We likely won't see a material increase in production until the second-half of 2015."

310.    During 2013 and into 2014, Defendants continued to find ways to actively depress the size of Broiler hatchery flocks, such as using the pretext of avian flu in Mexico to justify exporting Broiler hatchery flocks to Mexico to repopulate flocks there rather than use such Broilers to increase domestic production levels. Indeed, Defendants continued their program of exporting Broiler hens and eggs to Mexico in 2015, with Tyson explicitly noting in a May 4, 2015, earnings call that it was sending 3% of its eggs to Mexico to "fill incubators." Similarly, during a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted his "confidence that we're going to do the right thing with respect to maintaining [] discipline. We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million

hatching eggs or so outside of the country. The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made. And so again that gives us confidence that we're going to continue to be disciplined as an industry."

311.     Defendants' coordinated exportation of Broiler hatching eggs from the U.S. from 2013 through the present is an active effort to artificially reduce the supply of Broilers in the U.S. below what it would be absent Defendants' active and continued participation in an illegal antitrust conspiracy. Upon information and belief, Tyson and other Defendants exported hatching eggs to Mexico and other foreign countries from 2013-2016 to artificially reduce the supply of Broilers in the U.S. and increase the price of Broilers in the U.S. The value Tyson and others received for exporting hatchery eggs to Mexico would have been far exceeded by the price Tyson would have received for hatching those same eggs in the U.S. and selling the resulting Broiler meat in the U.S. market. Therefore, but for Defendants' agreement and conspiracy it would have been against Tyson's independent economic self-interest to export hatching eggs to Mexico and to forgo higher hatching egg prices in the United States. But Defendants' new-found discipline lessened any remaining risk and resulted in higher U.S. broiler prices.

312.     According to an October 1, 2014, CoBank analysis of the Broiler industry, the strategy of Defendants to target Broiler breeder flocks paid dividends during 2013 and 2014. According to the report, "[b]roiler product demand should remain robust through the rest of this year and well into 2015, bolstered by a gradually improving domestic economy, continued strength in export demand, and the towering prices of beef and pork. Broiler production, however, has been slow to respond, with integrators having had problems expanding the number of chicks placed for growout. Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015. Producers have been somewhat constrained in their

attempts to expand the nation's chicken flock by the limited supply of broiler hatching eggs. When the broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been rebuilt to prior levels. Following seven months of [Year-over-Year ("YoY")] declines, the number of chicks placed for growout finally posted a modest 1 percent YoY gain in August. However, it will take another 6-9 months for integrators to rebuild the supply of broiler hatching eggs in preparation for expanding the overall flock, so significant growth in broiler production will not materialize until late-2015 or early-2016."

313. On October 10, 2014, NCC President Mike Brown wrote an op-ed in The National Provisioner. The title of Brown's article, "Biofuel policy holds back production ramp-up," continued to blame the Renewable Fuel Standard (aka the ethanol mandate) instead of Broiler producers' collusive agreement to restrict production. Brown wrote, "current favorable market conditions would normally stimulate production to be somewhat higher, that is, a percentage more aligned with the long-run annual average of 4 percent. So why are chicken producers not stepping up production to better match the long-term average of 4 percent? We would if we could, but we can't. We would like to produce more pounds of chicken, but unfortunately we are not there yet. The primary reason for the industry's inability to increase production can be attributed to problems caused by a failed policy" of the Renewable Energy Standard. Brown also went on to blame fertility issues in the breeder stock and a propane shortage that made it difficult to heat chicken houses as other reasons the industry could not increase production.

314. On October 29, 2014, Simmons Foods announced the closure of its Jay, Oklahoma spent hen processing plant. Spent hens are Broiler breeders that have reached the end of their productive life cycle. The Simmons facility processed spent hens on behalf of many Defendants, providing Simmons with opportunities to monitor changes in other Defendants Broiler breeder

supplies. The closure of Simmons' Jay, Oklahoma facility is further evidence of Defendants' initiatives to cut Broiler breeder capacity across the industry.

### 7. Defendants' Supply Reduction Conspiracy Continued In 2015 and 2016.

315. Signs in late 2014 began to point towards the possibility of rising production levels. A few Defendants announced production cuts, but due to the substantial reductions in Broiler breeder flocks Defendants had already taken, Defendants' production was already constrained. Defendants undertook various affirmative acts in furtherance of the conspiracy, including exporting of hatching eggs outside the U.S., inter-Defendant purchases in furtherance of Defendants' conspiracy such as Tyson's Buy vs. Grow program, breaking eggs rather than setting eggs, dumping of excess Broiler supply in foreign markets, and closing Broiler production facilities.

316. For example, Tyson announced on May 4, 2015, the closure of its Buena Vista, Georgia Broiler plant as part of an ongoing effort to "increase efficiencies." Tyson also announced it was eliminating one shift at its Dawson, Georgia plant. Tyson announced in May 2015 that it planned to reduce its production after July 2015 and keep production flat through 2016 by increasing its Buy vs. Grow purchases.

317. During 2015, despite the devastation Avian Flu caused to the turkey and table egg industries, the Broiler industry was largely unaffected by the disease, with the primary effect being temporary bans on exports from some specific states or of all Broiler exports from the U.S. to various countries, such as China, Korea, and a number of other nations.

318. Avian Flu-related export limitations during 2015 caused frozen Broiler inventories to build up in the U.S., threatening the stability of Broiler prices. In response, Defendants worked in concert to coordinate the dumping of excess inventories of Broilers in foreign markets to avoid

89

deterioration of the artificially high prices in the U.S. resulting from Defendants' conspiracy. For instance, in early October 2015, Vietnam launched an inquiry into dumping by U.S. Broiler producers after Vietnamese Broiler producers determined that dumping of frozen chicken by U.S. producers had cost it over $120 million in the last 16 months. A report by Vietnam's Southeast Livestock Association concluded that U.S. Broiler companies were selling chicken thighs in Vietnam for 29% of the price of a similar product sold in the U.S. market (*e.g.*, at a Walmart), excluding the additional cost of frozen shipping rates, import duties and other fees associated with U.S. producers selling chicken thighs in the Vietnamese market. By late May 2016, Sanderson Farms CEO Joe Sanderson reported on an earnings call that all but one of the Avian Flu export bans had been lifted.

319.    In late 2015, Broiler industry analyst Heather Jones noted that chicken supplies had not increased as expected from the Avian Flu due to the fact Defendants had started breaking eggs rather than setting eggs. Defendants coordinated the breaking of eggs with one another during 2015, in part, by the exchange of production information through Agri Stats.

320.    Watts PoultryUSA's March 2016 issue noted that Tyson Foods achieved "record earnings and sales in fiscal year 2015 … posting $40.6 billion in sales, including ringing up higher chicken sales. Yet, Tyson lowered chicken production in 2015. What's at work here?  This paradoxical performance, in part, reflects the fact that Tyson, along with other top U.S. broiler companies, is redefining its business model to achieve profitable growth." In fact, the explanation for Tyson's "paradoxical" 2015 performance – including increasing its Broiler profits but lowering its Broiler production – was the result of the illegal conspiracy alleged herein.

321.    Prices during the first half of 2015 remained relatively flat, which led NCC President Mike Brown to write another op-ed in The Wall Street Journal on May 15, 2015, to try

to explain why Broiler prices remained so high. Like his previous op-ed, he again blamed the Renewable Fuel Standard for increased Broiler prices.

322.    During 2016, Broiler prices declined, but significantly less so than input costs. Defendants maintained artificially high Broiler prices and high profitability during 2016 by exercising "discipline" on their Broiler supply. For instance, during an April 2016 earnings call, an analyst noted that Pilgrim's CEO Bill Lovette "mentioned that you think the industry domestically has been much more disciplined than they have been in the past, I'm wondering if you could just elaborate a little bit more on what sort of drives that view and then maybe what gives you confidence that this discipline will hold." Lovette responded, "[w]hat drives the view is the actual numbers that we see, ready to cook pounds are up about 3.1% year to date. If you look at placements year to date, they're up 1%, egg sets up 0.7%, hatchery utilization actually declined in Q1 to 91%. So in the phase of coming off two of the most profitable years in the industry, we're not seeing, not realizing large amount of production increases." Tellingly, Pilgrim's CFO Fabio Sandri added immediately after Lovette's comments that "what drove that I believe it is that industry is more geared towards profitability rather than just market share or field growth." Put another way, Defendants are no longer competing with one another to gain market share by growing their companies as one would expect in a competitive market, but instead Defendants are working collectively to increase profitability by being "disciplined" in terms of supply growth.

323.    Other CEOs have also been forced recently to try to explain the marked shift in the Broiler industry's profitability in recent years, after the decades'-long pattern of boom and bust regarding Broiler pricing and profitability. During a February 2016 Sanderson Farms earnings call, BMO Capital Markets analyst Ken Zaslow noted the Broiler industry's history of volatility in pricing and profitability for chicken companies and questioned if there was "any changing of the

industry dynamic" that had occurred. Sanderson Farms CEO Joe Sanderson replied "we might be at a capacity wall, you know? … Since back in 2007 … there are three or four plants shuttered … It does feel different."

324.     During 2016, Defendants' profitability was also aided, in part, by the fact that input costs have decreased substantially, though Broiler prices have not experienced a similar decline. During a Broiler industry conference in February 2016, industry analyst Dr.  Paul Aho reported that overall profitability has remained steady or increased, as input costs have drastically decreased. Aho noted that during 2016 there have been "broad-based declines in key commodities, especially feed grains and energy." In fact, in May 2016 Tyson posted record quarterly growth, with profit margins for Broilers rising to between 9 and 11 percent.

325.     Not only is the harmony among Defendants and resulting high profit margins achieved by Tyson and other Defendants in recent years remarkable, so is their fairly recent ability to accurately predict their profit margins into the future. For instance, before 2008, Tyson had profit margins in the 5-6% range and would not predict future profit margins, but after 2008, Tyson would routinely predict record margins of 13% or more with surprising accuracy.

326.     Defendants have also kept up the use of signals to one another to perpetuate their conspiracy during 2016 by using the code word "discipline" to note their continued adherence to Defendants' conspiracy. For instance, during a February 2016 earnings call, Pilgrim's CEO Bill Lovette noted that "[t]he industry continues to be disciplined in terms of U.S. supply. Although monthly pullet data tend to be volatile and have occasionally been at the high end of our expectations, we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits [sic] and chick placements as a positive. We believe that at least part of the reason is because chicken producers are being disciplined and are much quicker to react than in the past and

in adjusting supply growth to the actual market conditions."  Similarly, in a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted that "I think what we've seen with egg sets is absolutely a testament to the discipline of our industry that we've seen the last really two to three years."

### F.     The Structure And Characteristics Of The Broiler Market, Along With Other Factors, Makes The Conspiracy Even More Economically Plausible.

#### 1.     The Broiler Industry Is Highly Vertically Integrated.

327.    The Broiler industry is almost entirely vertically integrated, with Broiler-processing firms owning or tightly controlling almost all aspects of production, processing, and marketing. In the Broiler industry, "vertical integration" means the Broiler company owns or controls each aspect of breeding, hatching, rearing, feeding, basic processing, and selling of Broilers. Many integrated Broiler companies also own further processing plants.

328.    Broiler producers have determined over time that the economics of growing chicks into full size Broilers are unfavorable. Thus, the Broiler industry has developed a system of production-contract farming. The integrated producers provide the feed and chicks to farmers (which remain under ownership of the integrated producer); the contract farmer then has roughly 6-7 weeks to grow the chicks into full size Broilers. During this "grow out" period, the integrated producer's employees frequently monitor the Broilers. Once fully grown, Broilers are picked up by the integrated producer and brought to an integrator-owned processing plant (aka, slaughterhouse). Some of the Broilers are sold without any further processing, while other Broilers are further processed by integrated companies into value-added specialty products (*e.g.*, chicken nuggets, etc.).

329.    The graphic below indicates the key stages of Broiler production that vertically integrated Broiler companies control, which are all points in the production process that provide

integrated Broiler companies complete control over supply and allow them to capture the greatest profit margin:



330.    According to a paper prepared in connection with the USDA and DOJ' s failed effort to increase competition in the Broiler industry in 2010, "[c]ontrol over the number of birds delivered to the processing plants allows processors to match more closely inputs to plant capacities and lower per-unit processing costs, as well as to better meet consumer requirements." In connection with the same effort by the USDA and DOJ, a former expert witness for Defendant Tyson, Michael Dicks, wrote, "[i]n the poultry industry vertical coordination allows integrators to manage excess capacity to manage price. Integrators can minimize the effect on producers by

94

increasing the time between collection and delivery of birds or reducing the number of flocks per year rather than terminating grower contracts in much the same way the USDA requires all commodity program recipients to adhere to acreage reduction program guidelines and grower associations require members to cut back marketable output."

331.    Modern Broiler producers rely on a handful of unique Broiler breed lines to mass produce essentially identical chickens with desirable genetic traits. Genetics companies, which develop strains of grandparent and great-grandparent breeding stock, sell to integrated Broiler producers breeders that have special hybrid characteristics, such as a tendency to produce a large chicken breast. Genetics companies create a "biological lock" on their unique Broiler lines by tightly controlling the purebred genetic strain that they develop. After an integrated producer purchases young breeder hens (aka, "breeder pullets") from a primary breeder, the integrated producer raises the birds to be breeders that lay eggs to be taken to incubators at an integrator-owned hatchery. The chicks from Broiler company hatcheries are then sent out to the integrated producer's contract-farmers to raise into adult Broilers.

332.    At present, no Broiler company except Tyson owns the genetics or produces the grandparent or great-grandparent strain for the Broilers it raises and slaughters. Nearly all U.S. producers now rely on 3 global genetics conglomerates: Cobb-Vantress (owned by Tyson), Hubbard, and Aviagen. These three companies supply the breeder stock, and therefore ultimately the Broilers, that account for 98% of Broilers raised in the U.S. and 80% of Broilers raised globally. While there were 26 Broiler genetics companies world-wide in 1981, acquisitions by the three remaining companies have essentially eliminated any other meaningful competitors in the U.S. Tyson's Cobb-Vantress subsidiary has approximately 50% market share.

333.    Since a supply of primary breeders is essential to each Broiler producer's business, Tyson's ownership and control of subsidiary Cobb-Vantress provides it with unusually significant leverage over other Defendants to mandate compliance with Defendants' illegal agreement. Tyson can offer other Defendants the carrot of access to Cobb-Vantress' unique Broiler genetic lines, with desirable qualities like high conversion rates of feed into meat. However, Tyson can also use Cobb-Vantress as a stick against any competitor who Tyson and/or its co-conspirators believe is overproducing Broilers by providing such competitors inferior, sick, or an insufficient number of breeder pullets, or withholding breeder pullets altogether that the competitor needs to operate a profitable business.

334.    Perdue was the last Broiler integrator in the U.S. to maintain its own genetics research company besides Tyson, but Perdue sold its genetics company to Tyson in 2014. In announcing the sale, Perdue issued a press release that stated "there are no longer significant advantages to having our own breed … it is important that we have the flexibility to select the breeder combination that works best for each specific customer requirement." The press release went on to note that "[w]ith the outstanding exception of the Cobb-Vantress enterprise owned by Tyson Foods, no producer has managed to effectively compete using an in-company breeding program against a multinational primary breeder. To be cost effective a genetics program based on index selection incorporating the measurement of significant traits and applying sophisticated molecular markers and field testing requires a magnitude of scale exceeding the capacity of individual producers."

335.    Upon information and belief, Defendant Tyson, through its Cobb-Vantress subsidiary, intentionally manipulates the supply of grandparent and great-grandparent Broiler stock (from which it supplies integrators with Breeder pullets) including, but not limited to, only

96

providing healthy and high quality breeder pullets to certain of its co-conspirators, but providing inferior and sick quality breeder pullets to other smaller non-Defendant Broiler producers.

### 2. Supply and Demand For Broilers Is Inelastic.

336. According to a May 2010 paper written by Broiler industry consultant Michael Dicks, "[b]ecause of the inelastic nature of the supply and demand [of Broilers,] a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

337. Broiler producers have asserted in public statements that changes in wholesale Broiler prices have been due to changes in "supply and demand." However, demand for Broilers has been flat since 2008, while at the same time wholesale Broiler prices have risen roughly 50%. Therefore, it is the reduction in the supply of Broilers that has led to Broiler price increases.

### 3. Broilers Have No Significant Substitutes.

338. Pork and beef are the most likely alternative sources of protein to Broilers, but pork and beef are not economic substitutes for Broilers. Numerous studies have found that the cross elasticity of demand between Broilers, beef, and pork is either negative or statistically insignificant, meaning that pork and beef are complements to Broilers, but not *substitutes*.

339. The historically high spread between the price of pork and beef versus Broilers since 2008 has also reduced any possibility of substitution of Broilers with pork or beef.

### 4. The Broiler Industry Has Experienced Significant Consolidation And Is Highly Concentrated.

340. According to a November 2013 USDA report, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing. According to the National Chicken

Council, 55 federally inspected Broiler companies operated in 1995, compared with 41 companies in 2010." By 2014, there were only 35 such companies.

341. In fact, the trend towards consolidation among all segments of the Broiler industry goes back decades, as shown below. This consolidation has largely squeezed out the large number of smaller Broiler companies that used to represent a significant portion of Broiler industry production.



342. As of 2015, Defendants controlled 88.8% of Broiler production in the United States. Since the start of the Relevant Time Period, there has been surprising stability in market share for each Defendant, as shown by the graph below. The two exceptions are Pilgrim's loss of market share due to its large plant closures during bankruptcy in 2008-2009 and Koch Foods' increase in market share due to the purchase of a plant from Tyson and purchase of bankrupt Cagle's, Inc.



343.    In addition to formal consolidation among Defendants, increased antitrust scrutiny of acquisitions in the Broiler industry by the U.S. Department of Justice has led Broiler companies to increasingly rely on de facto consolidation whereby Defendants acquire nearly complete control over seemingly independent smaller Broiler companies. Defendants' de facto consolidation creates "zombie" Broiler companies that on paper are separate and independent entities, but are in fact completely controlled by Defendants through co-packing contracts. For instance, Tyson Foods has co-packing arrangements with a number of smaller Broiler producers in which Tyson purchases either (1) the company's entire production of Broilers (including dark meat) or (2) all of the company's white meat (*i.e.*, chicken breast and wings) and encourages the company to export the less valuable dark meat to remove that supply from the United States market.

344.    Upon information and belief, Defendants' co-packing contracts with smaller producers are typically 2-5 years in length. Even where the co-packing arrangement is only 10-20% of a smaller producer's overall supply, Defendants are in a position to pressure smaller producers to limit their production. Co-packing contracts give Defendants unprecedented control over supposedly independent producers, including control over the breed of bird grown, what feed

can be used, how many birds can be grown, and numerous other aspects of raising Broilers. With respect to processing, Defendants not only require exacting specifications for co-packing partners, but also put Defendants' own employees in the processing plants of their co-packers and supervise every significant detail of the slaughter and packing process.

345.    Upon information and belief, the purpose and/or effect of Defendants' co-packing arrangements was and is to avoid scrutiny from antitrust regulators that would bring formal merger investigations, including possible discovery of Defendants' anti-competitive agreement to reduce the supply of Broilers in the U.S.

           **5.    The Broiler Industry Has A History Of Government Investigations
                   And Collusive Actions.**

346.    In April 1973, the United States Department of Justice filed a civil antitrust action against the National Broiler Marketing Association ("NBMA") alleging the NBMA and its members conspired to fix Broiler prices and restrict Broiler production in violation of Section 1 of the Sherman Act. The DOJ sought to enjoin the NBMA and its dozens of members from continuing a conference call program where members (and even some non-members) coordinated the pricing and production of Broilers. In response, numerous private civil antitrust actions were filed against the NBMA and 42 individual defendants in the *In re Chicken Antitrust Litigation* case. The NBMA and Broiler producers eventually settled the case, resulting in a settlement of roughly $30 million.

347.    Beginning in 2010, the USDA undertook a series of public workshops to explore competition issues in the upstream, contract-farmer Broiler market. A workshop held in Normal, Alabama, on May 21, 2010, focused on corporate concentration and lack of competition in the Broiler industry. The workshops led to the proposal of new rules aimed at encouraging competition in the meat industry, but extreme political pressure from Defendants and their allies eventually

watered down the rule and led to the resignation of the official charged with imposing tougher regulations.

348.    In 2011, George's Inc. acquired the Harrisonburg, Virginia processing plant from Tyson Foods. The DOJ brought an action to stop the acquisition (*United States v. George's, Inc.*),[8] which alleged the purchase would impermissibly reduce the available options for contract farmers to sell their grower services.  The DOJ eventually settled with George's in June 2011 after obtaining an agreement to require George's to make capital improvements to the facility that would increase its capacity and permit contract farmers to sell more grower services to the processing plant.

349.    According to a June 2014 USDA Report, "the [Broiler] industry faces a range of public policy issues, [including] competition … [c]oncerns[, including] the exercise of market power by Broiler integrators [which has] prompted merger litigation, USDA regulatory initiatives, congressional proposals, and investigations by Federal agencies."

350.    Numerous cases in recent years have documented the lack of competition in the contract-farmer Broiler market, which while upstream in the supply chain from the Plaintiffs' direct purchaser market, suggest an absence of true competition and instead suggest a practice of coordination and collusion among Defendants. In cases such as *Adams v. Pilgrim's Pride*, No. 2:090-cv-00397 (E.D. Tex.), *Been v. O.K. Industries*, No. 08-7078 (E.D. Okla.), and *Wheeler v. Pilgrim's Pride Corp.*, No. 5:06-cv-00004 (E.D. Tex.), contract-farmers have alleged violations of the Packers and Stockyards Act by integrated Broiler producers.

---

[8] *United States v. George's Foods, LLC et al.*, No. 5:11-cv-00043 (W.D. Va.).

### 6. Defendants' Opportunities To Collude.

#### a) Trade Associations.

351. Defendants are members of several Broiler-related trade associations and other forums, which they used to facilitate their conspiratorial conduct. Integrated Broiler producers have numerous regular events through which they can communicate in person with one another. Regular and frequent attendance by Defendants' CEOs and top-level executives at trade association meetings is the norm rather than the exception.

352. According to its website, "[t]he National Chicken Council represents integrated chicken producer-processors, the companies that produce, process and market chickens. [The 40] member companies of NCC account for approximately 95 percent of the chicken sold in the United States." The CEOs of the top integrated Broiler producers are routinely on the board of directors and meet at least quarterly with one another through the NCC.

353. The NCC has three annual board meetings attended by Defendants' senior executives, including most or all Defendants' CEOs and other top executives. CEOs generally always attend the following three NCC meetings each year, in addition to special committee meetings or other special NCC events: (a) the January meeting of the NCC held along with the International Poultry Expo, (b) the mid-year Board of Directors meeting, and (c) the NCC Annual Meeting in October. Generally, CEOs arrive the night before an NCC meeting and socialize with their colleagues, then have small private dinners with one or more of their competitors' CEOs or top executives. The next day, the formal NCC meetings are held and executives from Agri Stats and other allied industry organizations make presentations at the meeting. A formal lunch is held during the meeting and provides CEOs and top executives an opportunity to talk casually with

their competitors. Following the meeting, Defendants' CEOs and top-level executives often meet, socialize and golf, hunt, or fish together.

354. Upon information and belief, CEOs and top-level executives from Defendants discuss topics with one another relating to pricing, production, and other non-public, proprietary information outside of NCC's formal meetings at the informal settings surrounding NCC meetings described above. These regular, informal, and in-person opportunities to discuss pricing and production in the Broiler industry give CEOs and top-level executives comfort that their competitors remain committed to a plan to artificially restrict Broiler production.

355. The United States Poultry & Egg Export Council ("USAPEEC") has its home office in Stone Mountain, Georgia. Defendants are all members of USAPEEC. USAPEEC has a network of international offices and consultants in key export markets. The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world. The group has evolved into an association that is an advocate for the industry on trade policy issues. USAPEEC has about 200 member companies and organizations. USAPEEC holds Board of Directors meetings quarterly and includes executives from all or nearly all Defendants and their co-conspirators.

356. The U.S. Poultry & Egg Association ("U.S. Poultry") describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and processors of Broilers, turkeys, ducks, eggs and breeding stock, as well as allied companies. Defendants are all members of U.S. Poultry. U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall.

357. The Georgia Poultry Federation "is a non-profit trade association which represents the poultry industry in Georgia, the nation's leading broiler producing state. The Federation was founded in 1951, and since that time has represented the interests of the entire poultry industry at

the state and federal level on legislative and regulatory matters." The Georgia Poultry Federation's mission is "[t]o protect and improve the competitive position of the poultry industry in Georgia, the nation's leading poultry producing state." The Georgia Poultry Federation has regular meetings each April, August, and September which typically are attended by Defendants' senior executives. Defendants House of Raeford, Perdue, Fieldale Farms, Wayne Farms, Tyson, Sanderson Farms, and Pilgrim's, Mar-Jac Poultry, Harrison Poultry, and Claxton Poultry are members of the Georgia Poultry Federation.

358.    The North Carolina Poultry Federation "has been the voice of the North Carolina poultry industry since 1968." The mission of the North Carolina Poultry Federation "is to create a favorable climate for business success for everyone involved in the poultry industry in North Carolina." The North Carolina Poultry Federation holds regular meetings each year, including annual meetings and Board of Directors meetings which typically are attended by Defendants' senior executives. Defendants Tyson Foods, Perdue, Mountaire Farms, House of Raeford, Wayne Farms, Sanderson Farms, and Pilgrim's are each members of the North Carolina Poultry Federation.

359.    The Poultry Federation was established in 1954 as a non-profit trade organization to represent the poultry and egg industries in Arkansas, Missouri, and Oklahoma. In 1998, the Arkansas, Missouri, and Oklahoma organizations were consolidated and became The Poultry Federation. The Poultry Federation claims to promote all poultry interests relating to production, distribution, merchandising, and consumption of poultry, and poultry products.   It disseminates information relating to the various phases of the Broiler industry to improve and expand markets, to increase efficiency in production and marketing, and to encourage and support research in production and marketing of poultry. The Poultry Federation holds regular meetings each year,

including Board of Directors meetings with Defendants' senior executives identified below. Defendants Foster Farms, O.K. Industries, Inc., Pilgrim's, Simmons Foods, Peco Foods, Tyson Foods, George's, Inc., and Wayne Farms are each members of the Poultry Federation.

360.    The International Poultry Expo ("IPE") was held annually from 2008-2012. The IPE billed itself as "the networking hub of the world for the poultry industry." The IPE was held annually in late January in Atlanta, Georgia. Defendants' and the Producer Co-Conspirators' senior executives, and numerous mid-level executives and other employees, attended the IPE each year. The International Producers and Processors Expo ("IPPE") is the world's largest annual poultry, meat, and feed industry event. IPPE held its first event in January 2013 and combined three previously separate expos – the IPE, the International Feed Expo, and the International Meat Expo. According to the IPPE's website, a wide range of international decision-makers attend this annual event to network and become informed on the latest technological developments and issues facing the industry. The 2015 IPPE featured more than 7,245 international visitors from over 103 countries, including attendees from Chile, France, Singapore, and Australia. IPPE indicates that Defendants and co-conspirators each sent their "Top Management" to the 2014 IPPE in January 2014. The most popular panel each year is the "market intelligence" forum, which features an Agri Stats executive speaking regarding the Broiler industry. Similarly, Defendants' and the Producer Co-Conspirators' senior executives attended IPPE in 2015 and 2016.

361.    The International Poultry Council ("IPC") was formed in 2005 and is composed of national trade associations from 23 countries, as well as 40 individual companies that are "Associate" members. The IPC website bills the organization as the "voice of the global poultry industry" and its mission is to "strengthen communication between the industries of different countries." The NCC, USAPEEC, and USPOULTRY are members of the IPC on behalf of United

States poultry producers, along with individual company members of the IPC, including Tyson, Cobb-Vantress (a Tyson subsidiary), Sanderson Farms, and JBS S.A. (Pilgrim's parent company). Additionally, the Chilean poultry trade association ("APA") and the Australian Chicken Meat Federation ("ACMF") are also members of the IPC.

### b) Investor Conferences.

362.  Defendants' CEOs and senior executives participate in numerous investor conferences organized by Wall Street analysts, providing further opportunities to meet and communicate with one another. Such conferences are held on an annual and/or ad hoc basis including, but not limited to, the Goldman Sachs Global Staples Forum (held every May), Bank of America Merrill Lynch Global Agriculture Conference (held every February), BMO Capital Markets Annual Ag & Protein Conference (held every May), BMO Capital Markets Conference (held every May), BMO Farm to Market Conference (held every May), Urner Barry Annual Executive Conference and Marketing Seminar (held every April or May), and JP Morgan Basic Materials Conference (held every June).

### c) Competitor Plant Tours.

363.  Defendants also permitted one another to tour each other's Broiler plants, which revealed confidential business methods employed by a company.   While such tours were often framed as "best practices" information exchanges, they permitted the opportunity to conspire among senior executives.

### d) Other Business Dealings.

364.  Defendants also engaged in various business dealings with one another, including purchasing feed from one another and forming joint ventures for various purposes, such as construction and operation of rendering plants.

### 7. The Broiler Market Has High Barriers To Entry.

365. The existence of high barriers to entry is one factor which makes markets susceptible to collusion. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

366. During the Relevant Time Period and continuing today, substantial barriers impede entry into the Broiler market. A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, construction of processing plants, feed mills, hatcheries, equipment, energy, transportation distribution infrastructure (aka, "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, long-standing customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.

367. Defendants themselves acknowledge the substantial costs of entering the market and view it as important that new entrants not be able to purchase closed facilities. For example, when the State of Louisiana pressured Pilgrim's to sell its closed Farmerville Broiler complex, Pilgrim's executives expressed concern about any state assistance to the buyer to purchase the Farmerville Broiler complex because such assistance could substantially reduce the buyer's cost basis therein, which could then permit the buyer to flood the market with low-cost Broilers.

368. The price of construction of a new integrated Broiler processing complex (hatchery, feed mill, and processing plant) able to compete on price with current integrated producers is relatively high. Even for a current market participant, such as the third-largest producer (Sanderson

Farms), construction of a new Broiler complex (*i.e.*, hatchery, feed mill, and processing plant) in 2010 was estimated to cost $100-$125 million. However, these costs fail to account for other hurdles to new market participants, discussed above.

369.    The barriers to entry in the Broiler industry have proved insurmountable for potential new market entrants. No company has created a new poultry company from scratch in decades. Furthermore, when one foreign meat company (a Ukrainian company, Omtron) tried to enter the U.S. market in February 2011 by buying a portion of the assets of bankrupt Broiler producer Townsend's, Omtron invested $35 million to improve the facility's processing operations, but went bankrupt only five months after making the purchase.

370.    A number of large foreign meat conglomerates have acquired U.S. Broiler producers in the past decade, including Brazil's JBS S.A. (Pilgrim's), Mexico's Industrias Bachoco (O.K. Foods), Belgian company Continental Grain Company (Wayne Farms), and Marfig Alimentos S.A. (Keystone Foods). However, each of these foreign meat conglomerates were already large players in the global meat industry and simply continued operating their pre-existing U.S. Broiler company as a subsidiary. Ownership of U.S. Broiler subsidiaries by such large, well-financed conglomerates deter entry by smaller, non-globalized companies that might want to enter the U.S. Broiler production business.

371.    A further barrier to new entrants is the unwillingness of large vertically integrated producers to sell an idled Broiler complex, which also keeps open the threat that an integrated producer will restart a closed Broiler complex. Pilgrim's has been explicit about this threat to new market entrants. For instance, in a February 2014 earnings call, Pilgrim's was asked whether it had any plans to sell "a couple of idled U.S. facilities … to use that as a source of capital," to which Pilgrim's CFO Fabio Sandri replied "[n]o. We are thinking those are held defensive, so we don't

plan to sell them in this short-term or in the near future." Such a threat of restarting idled facilities, rather than selling those facilities, represents a substantial barrier to entry for new market participants because an existing Broiler producer can merely restart a closed mill to drive down prices and run a new entrant out of business.

### 8. Defendants Have Similar Cost Structures And Work Collaboratively To Share Cost Information.

372.    Under antitrust law and economics, another factor that makes markets susceptible to price-fixing is similar cost structures. The majority of production costs for Broiler producers are variable. All other factors being equal, when variable costs are a high percentage of production costs, there is less incentive for a producer to operate its facilities at full capacity, and this may allow a cartel to boost prices artificially with greater success than when fixed costs are the largest component of production costs.

373.    The single largest cost component of producing Broilers is feed, which primarily consists of soybean meal and corn. Broiler feed prices have varied widely from 2007-2016, reaching 71% of the cost of growing Broilers in 2012, but falling to only about 50% by 2014.

374.    Input costs other than feed include processing plant labor costs (~15%), materials (~11%), and capital equipment (~2.5%). Labor costs have declined significantly over the past two decades for Defendants, while at the same time labor productivity has substantially increased.

375.    Broiler feed costs have been decreasing sharply since record highs in 2012. For instance, prices for soybean meal were down 10% in 2014. Since January 1, 2008, corn prices have declined roughly 21% and soybean prices have declined 13%. During the same period, Broiler prices increased roughly 50%.

376.    Defendants have relatively similar cost structures. The technology and process of industrial scale growing and processing Broilers is well known and Defendants employ the same

types of equipment and processes in the production process. Defendants also have only three companies from which they can obtain breeder stock from which to raise Broilers, so there are very limited options with respect to purchasing the most cost efficient Broiler genetic lines. Similarly, Defendants all purchase corn and soybeans on the open market, so they have limited ability to obtain substantially different pricing on these key variable cost inputs for their Broilers.

377.    Defendants use Agri Stats to share extraordinarily detailed cost information, so they are able to constantly align their cost structures with one another. Agri Stats permits each Defendant to have extremely unusually detailed knowledge of competitor costs and to make adjustments to standardize each company's cost structure across all Agri Stats participants.

378.    Defendants engage in a program of "feedmill cross-testing" in which some Defendants exchange feed and chicks with one another for the purported purpose of determining which Defendants' feed and/or chicks have superior qualities. Defendants claim this strategy helps them maximize efficiency. However, it is not economically rational in a truly competitive market for a producer to provide its proprietary feed mixes and/or chicks to its competitor, thereby giving away any competitive cost advantage over its competitors.

379.    Another sign that Defendants do not view production costs as secret is the fact that it is not unusual for Defendants to permit competitor's CEOs access to each other's production complexes. In a competitive industry, production methods should be closely guarded to protect proprietary methods of production that save a company money and give it a competitive advantage over its competitors. However, this is not the case in the Broiler industry. For example, from April 19-21, 2013, Pilgrim's President & CEO Bill Lovette, Perdue Chairman of the Board Jim Perdue, and Sanderson Farms President & COO Lampkin Butts attended a three day long "Chicken Media Summit" in North Carolina that included visits by attendees to a Sanderson Farms growhouse and

processing plant. Similarly, from April 19-21, 2015, another Chicken Media Summit was sponsored by the NCC and USAPEEC and included tours of Perdue's operations and panel discussions with Defendants' senior executives.

### G.    Defendants' Collusion Resulted In Unprecedented Capacity Reductions, Artificially High Prices, And Record Profits.

380.    Broiler prices have been artificially inflated since 2008, despite a historic trend of boom and bust cycles for Broilers as producers oversupply the market in response to price increases, leading to low single-digit profit margins in the Broiler industry. As one industry observer noted, "[t]he profit margins of the nation's biggest meat packers rose dramatically between 2008 and 2010 (the most recent year for which good data is available), even as the national economy cratered.  Tyson Foods, the nation's biggest meat company, reported record profits of $778 million last year [*i.e.*, 2013] as the company hiked prices for beef, pork, and chicken."

381.    The historic pattern of annual increases in Broiler production was so entrenched over decades of experience by the 2000s that one widely repeated quip in the industry was that there were now only three things certain in life: "Death, taxes and 3% more broilers." A leading industry publication noted in early 2009 that "[b]roiler production in the U.S. used to be just like government spending, it never went down and cutbacks only resulted in slowing the rate of growth, but not anymore" because "[f]or the first time in decades, total broiler production in 2008 remained virtually unchanged from the year before. WATT PoultryUSA 2008 rankings data show the industry's total weekly ready-to-cook (RTC) production at 724.05 million pounds, just slightly more than the 723.71 million RTC pounds per week reported at the end of 2007."

382.    During a February 12, 2015, earnings call, Pilgrim's President & CEO Bill Lovette summed up the restriction of supply which Defendants had implemented since 2008: "I looked at some numbers supplied by Agri Stats earlier in the week and found some interesting facts. If you

go back to 2008, the industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies."

### H. Defendants Not Only Reduced Their Own Production And But Also Used Direct Purchases of Broilers To Reduce Industry Supply.

383.    Economic theory and good business strategy suggests that relying upon one's competitors to meet a company's own commitments to its customers is not rational, as the competitor can decide to cut out the middleman and sell directly to the end customer. Nevertheless, Tyson, Fieldale Farms, Koch Foods, and other Defendants have created a system of inter-dependence whereby some Broiler companies purposely under-produce Broilers on the assumption their competitors will sell them what they need.

384.    Defendants use direct purchases of Broilers from one another and from smaller Broiler producers to meet each company's own sales needs. This permits Defendants to soak up excess supply that could depress prices in the market and also facilitates the opportunity to expressly discuss prices with competitors. Such purchases also permit companies to maintain their market share despite reducing their own production. Additionally, in many instances large inter-Defendant purchases are negotiated by CEOs or other senior level executives of Defendants, providing an additional opportunity for such individuals to conspire.

112

385.    Further, Defendants' participation in Agri Stats gives them visibility into each other's profitability, operating margins, and supply that no ordinary customer could hope to achieve.

386.    In 2011, Tyson began using what was described as a "very unique strategy," called "Buy vs. Grow." Tyson's strategy essentially treats the industry supply as though it were for a single unified company, rather than competing businesses that would rather sell self-produced product to a customer than a competitor.

387.    What makes Tyson's program exceptionally "unique" is that only a few years before adopting a "Buy vs. Grow" strategy, Tyson declared such a strategy to be "stupid" because it would be subsidizing a competitor's growth. Tyson's Executive Vice President & CFO, Wade Miquelon explained on an April 29, 2008, earnings call that "I think what we said along is we're going to match our supply and demand. We're not going to cut beyond that and then go out and buy open market meat to subsidize other people's growth." Therefore, Tyson's change in view towards open market purchases suggests it had confidence by 2011 that its competitors would maintain their production levels and *not* grow.

388.    In a November 5, 2012, interview, Fieldale Farms President Thomas Hensley noted his company was also pursuing a strategy to buy up excess supply from its competitors, stating that "[i]f you don't have a home for your chickens on Monday morning, you shouldn't have those chickens. Now we know where all our chickens are going. So we are buying chickens in that lower price area instead of selling them. So, no expansion for us."

389.    By the end of 2014, Tyson reported it was buying over 4 million pounds of Broilers on the open market each week. Four million pounds of Broilers per week is more than any of the

24th-30th largest Broiler companies produce on a weekly basis, so the amount of Tyson's purchases was quite significant in terms of volume.

390.    During the first part of 2015, Tyson increased its Buy vs. Grow purchases by 50%, expanding Tyson's purchases from competitors to unprecedented levels.

391.    Tyson announced plans in May 2015 to increase its Buy vs. Grow strategy to *10 percent* of its sales in the second half of 2015 and 2016. Ten percent of Tyson's 2014 pounds RTC is 17.6 *million* pounds per week, a volume that by itself would dwarf the entire average weekly production of any of the 15th-30th largest Broiler producers. Notably, Tyson also announced in May 2015 that it planned to reduce its production after July 2015 and keep production flat through 2016 by increasing its Buy vs. Grow purchases.

392.    Upon information and belief, Defendants made use of Broiler purchases from and purchase contracts between one another and smaller Broiler producers to reduce their own production while soaking up excess supply from competitors.

393.    Defendants' use of direct purchases from one another and from smaller Broiler producers provided Defendants an uninterrupted flow of supply and pricing information and opportunities to communicate directly with one another.

## I.    Defendants Made A Coordinated Move Away From Fixed-Price Contracts.

394.    A coordinated move away from fixed price contracts to contracts that permit prices to fluctuate with an indexed public market price helps facilitate an antitrust conspiracy. This is what occurred in the Broiler market during the Relevant Time Period.

395.    For several years prior to the Relevant Time Period, many vertically integrated Broiler producers offered some customers long-term fixed-price contracts of a year or more. This

guaranteed customers a fixed price, but also prevented Broiler producers from being able to realize market price increases that would naturally result from their planned supply cuts.

396.   Starting around January 2008, senior executives from Koch Foods, Pilgrim's, Perdue, Sanderson Farms, and Tyson Foods publicly announced an effort to reduce annual fixed-price contracts. This change coincided with Defendants' efforts to reduce Broiler industry supplies so as to drive Broiler market prices higher.

397.   On January 28, 2008, Tyson CEO Dick Bond announced on an earnings call that Tyson was looking at shortening its fixed price contracts, and by June 2009 Tyson reported it had "dramatically" shortened the amount of fixed-price contracts over 90 days.

398.   On January 29, 2008, Pilgrim's CFO Rick Cogdill reported on an earnings call that Pilgrim's had started moving away from fixed-price contracts, but Pilgrim's moves were being held back by legacy fixed-price contracts entered into by Gold Kist prior to its acquisition by Pilgrim's in late 2006. Cogdill also noted that "in a situation like where we are now where we need to drive commodity prices up, that [*i.e.*, having less fixed price contracts] is going to give us the opportunity for more immediate benefit to our P&L than what we would have had say, historically three year[s] ago, when a higher percentage was fixed price." Pilgrim's later reported that by March 2012 it had reduced its exposure to fixed price contracts, with most contracts now market-based or including a reset provision linked to the underlying commodity. By 2014, Pilgrim's reported that less than 5% of all its contracts were 12-month fixed price contracts.

399.   On July 28, 2008, Perdue spokesperson Julie DeYoung told an industry publication that Perdue was looking to shorten its contract terms, stating, "the company is also seeking to raise prices and shorten its contracts."

400.    Sanderson Farms' CEO Joe Sanderson noted in a July 31, 2008, earnings call that the industry may move towards "shorter term agreements."

401.    Industry observers noted the trend of Broiler producers moving away from fixed-price contracts. For instance, a December 2013 report by Stephens, Inc. analyst Farha Aslam noted that "[w]ith volume growth generally limited, companies are developing more sophisticated strategies to generate profits … . 'Rather than annual fixed price contract[s] that are negotiated every fall, companies are partnering with customers and creating contracts that can be multi-year in duration. Contracts are now being negotiated all year long and employ a wide variety of pricing methodologies.'"  This confirms that even contracts which are long-term in duration are not "fixed" so as to prevent price increases when coordinated supply reductions drive up Broiler market price indices.

## VII.    ANTITRUST INJURY

402.    Defendants' conspiracy had the following effects, among others:

A.    Price competition has been restrained or eliminated with respect to Broilers;

B.    The prices of Broilers have been fixed, raised, stabilized, or maintained at artificially inflated levels; and

C.    Purchasers of Broilers have been deprived of free and open competition.

403.    During the Relevant Time Period, Plaintiffs paid supracompetitive prices for Broilers.

404.    By reason of the alleged violations of the antitrust laws, Plaintiffs have sustained injury to their businesses or property, having paid higher prices for Broilers than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages.

405.     This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.   THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS

### A.     Plaintiffs Did Not Discover And Could Not Have Discovered Defendants' Anticompetitive Conduct.

406.     Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  The earliest possible time that Plaintiffs could have been on constructive notice of the existence of the conspiracy was when the first Direct Purchaser Class Action complaint was filed in this Court. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix prices for Broilers.

407.     With respect to the manipulation of the Georgia Dock, a January 18, 2016 *Wall Street Journal* article regarding Defendants' possible manipulation of the Georgia Dock benchmark price raised the possibility of collusion to artificially raise, fix, or maintain chicken prices using the Georgia Dock. Subsequently, a series of articles in various publications published between November 3 and 17, 2016, detailed for the first time that the USDA had discontinued its reliance on the Georgia Dock benchmark price because its input prices could not be verified.

408.     Yet even when faced with these public revelations, Defendants continued to assert the fairness and accuracy of the Georgia Dock benchmark price. For example, in a November 8, 2016, Washington *Post* article, Defendant Sanderson Farms represented that the Georgia Dock benchmark price was "reliable," so as to induce purchasers of chickens to believe the benchmark price was not subject to illegal manipulation by the Georgia Dock Defendants. Not until November 10, 2016, was it disclosed publicly that the Georgia Dock Defendants had formed a secret Georgia

117

Dock Advisory Board that facilitated opportunities for executives to meet and also discuss their scheme to fix the Georgia Dock benchmark price. The existence of this board was not known to plaintiffs, nor would they have been able to learn of how Defendants' executives conducted themselves in their non-public Georgia Dock Advisory Board meetings. Finally, not until November 17, 2016, was it publicly disclosed that the Florida Attorney General's Office was investigating the Georgia Dock benchmark price and its calculation and manipulation by the Georgia Dock Defendants.

409.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Broilers are not exempt from antitrust regulation, and thus, before these recent events Plaintiffs reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Broilers prices before these recent events.

410.    Plaintiffs exercised reasonable diligence and could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and all of their co-conspirators to conceal their combination.

**B.    Defendants Actively and Fraudulently Concealed Their Conspiracy.**

411.    Throughout the Relevant Time Period, Defendants and their Co-Conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs.

412.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person

meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

413.    Defendants used code words including "discipline" and "capacity discipline" in their public statements to conceal their conspiracy and signal one another in furtherance of their conspiracy to restrain production while shielding their conspiracy from detection or suspicion. Specific examples of the use of such coded language abound during the Relevant Time Period, including (1) the National Chicken Council's Annual Conference in October 2011 where a report noted that panel members Clint Rivers of Perdue Farms, Bill Anderson of Keystone Foods, Mike Helgeson of GNP, and Mark Kaminsky of Koch Foods noted that "[d]iscipline on the supply side was one suggestion" to increase Broiler prices, (2) on a May 3, 2013, earnings call, Pilgrim's President & CEO Bill Lovette stated that "price is going to strengthen as supply continues to be disciplined and constrained….and "we've done a good job so far of maintaining discipline," and (3) on a July 2016 earnings call Pilgrim's CEO Bill Lovette noted that "I think what we've seen with egg sets is absolutely a testament to the discipline of our industry that we've seen the last really two to three years."

414.    Defendants affirmatively and falsely attributed price increases to increases in the price of inputs, among other reasons. These were pretexts used to cover up the conspiracy. In fact, these price increases were the result of collusive conduct among Defendants, which was undisclosed at the time.

415.    During the relevant period, Defendants affirmatively made numerous misleading public statements falsely portraying the market for Broilers as a competitive one. For example, Defendants provided testimony at workshops held by the U.S. Department of Justice and USDA suggesting the Broiler industry was competitive and not subject to anti-competitive practices and agreements. This included testimony at a May 21, 2010 workshop of a National Chicken Council-commissioned study by Dr. Thomas Elam, which stated that "the chicken industry is competitive and thriving," and has "[i]ntense competition" that promotes "product innovation and lower prices for consumers."

416.    Defendants also repeatedly blamed the Renewable Fuels mandate for increased Broiler prices, both through the NCC, other trade groups, and through press releases, speeches, and other public statements by Defendants' employees, rather than disclosing the existence of an agreement to illegally restrain the supply of Broilers. Some instances of these pretextual explanations include:

A.    On a January 29, 2008, earnings call, Pilgrim's Interim CEO Clint Rivers claimed that "the U.S. government continues its misguided policy of subsidizing ethanol production at the expense of affordable food, and a lower corn yield expectation by USDA will contribute to decrease corn suppliers next year."

B.    On June 23, 2008, Wayne Farms President & CEO Elton Maddox said in a statement that "the government's food fuel mandate has created the need for us to rationalize our business."

C.    On July 7, 2008, O.K. Foods announced production cuts due to "record high prices for corn and soybean meal, which it attributed to the U.S. government's mandated ethanol policies."

D.    On June 24, 2009, Harrison Poultry President & CEO Mike Welch and Claxton Poultry President Jerry Lane met in Washington DC and encouraged elected officials to end the "mistake" of the ethanol subsidy.

E.    In 2010, Foster Farms delayed an expansion due, allegedly, to corn prices. Ira Brill, Foster Farm's Director of Market Services, blamed the ethanol

mandate for the delay, stating that it "places enormous pressure on our input costs, and for that reason we can't go forward with our expansion plans."

F.    On March 7, 2011, House of Raeford announced production cuts due to increased prices. It stated that "if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."

G.    On March 15, 2011, Simmons announced downsizing at a plant due to economics "resulting from high grain prices predominantly caused by corn being used in ethanol." Simmons cited ethanol policies again on June 27, 2011, when it laid off another 223 employees.

H.    In an April 13, 2011, hearing before a congressional subcommittee, Michael Welch (President and CEO of Harrison Poultry) stated that production of broilers was threatened by the diversion of corn to fuel production. Welch claimed that shifting corn back to feed would "allow consumers of poultry products to continue to enjoy an ongoing, adequate supply of animal protein at reasonable prices." Welch repeated similar claims in 2012 as well, citing increased corn costs resulting in "tens of billions of dollars in increased costs for livestock and poultry producers and food manufacturers."

I.    In September 2011, Phillip Green (Vice President of Commodities, Foster Farms) testified on behalf of the American Feed Industry Association at a public hearing and blamed increasing meat costs on the ethanol mandate.

J.    On October 10, 2014, National Chicken Council President Mike Brown wrote an op-ed citing the Renewable Energy Standard as the primary reason for the poultry industry's inability to increase production. Brown cited the Renewable Fuel Standard again in a May 15, 2015 op-ed in the Wall Street Journal.

417.    To explain the shortage of Broilers since 2012, Defendants have provided a variety of pretextual explanations, including the following: (a) a breeding issue with Broilers during 2014, (b) a Russian ban of U.S. Broiler imports starting in 2014, and (c) a 2013 shortage in supply due in part due to an Avian Flu outbreak in Mexico that caused a surge in demand for hens to repopulate farms in Mexico (see, e.g., ¶ 224 above). However, these explanations were pretextual and Defendants sought to hide their conspiracy from discovery by blaming Broiler price increases on these factors rather than Defendants' own collusive conduct.

418.   Throughout the Relevant Time Period, Defendants repeatedly cited increasing input costs as a pretext for their collusion to restrain supply and increase prices. For instance, Defendants repeatedly claimed that input cost increases during 2008 justified Broiler price increases. However, while corn was $5/bushel in 2005-2006 and increased to $9 by May or June 2008, it quickly fell back to below $5/bushel by fall 2008. In fact, prior to 2008 there is a statistical correlation between Broiler prices and corn prices, but during the Relevant Time Period there has been no statistical correlation between Broiler and corn prices. In other words, despite Defendants' pretextual explanations to the contrary, Defendants were not determining the price of Broilers based on the input price for corn.

419.   Another example of the pretextual nature of cost justifications for Broiler price increases is a November 2012 interview, in which Fieldale Farm President Thomas Hensley was asked whether he thought the recently concluded NCC Annual Conference focused too much time on the Renewable Fuel Standard because eliminating the ethanol subsidy would not "move the needle on corn supply and prices that much" and whether there was "any danger the industry has focused too much on this as a magic bullet?" Hensley responded, "I think that's accurate. The best-case scenario is that corn would go down $1.25 per bushel and some people say it will only go down 50 cents."

420.   The National Chicken Council has served as the mouthpiece for Defendants publicized pretextual excuses for rising Broiler prices. Among other actions, the following indicate an intent to deceive purchasers of Broilers into believing that input costs, rather than a collusive agreement among Defendants to reduce supply, was the cause of rising Broiler prices:

A.   Through the National Chicken Council, Defendants ensured that the pretext for their production cuts and price increases, the ethanol mandate, continued to be blamed for increased chicken prices rather than Defendants' secret conspiracy. A May 19, 2010, report by FarmEcon LLC was commissioned

122

by the NCC and concluded "[o]n the national scale, it is the overall conclusion of this study that the chicken industry is a competitive and thriving sector." The NCC trumpeted the findings through a press release on its website with the headline "Competition in Broiler Sector Benefits Chicken Farmers, Companies, and Consumers, Study Finds."

B.  As noted above, Brown's October 10, 2014, and May 15, 2015, op-eds in national newspapers attempted to explain away why "current favorable market conditions that would normally stimulate production to be somewhat higher" were not doing so. These op-eds were intended to convince purchasers of Broilers that input costs, rather than a secret conspiracy, were to blame for increasing Broiler prices.

421.  By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs have as a result of the unlawful combination and conspiracy alleged in this Complaint.

**C.  Plaintiffs' Claims Were Tolled By The Direct Purchaser Class Action Complaint Filed In 2016**

422.  Plaintiffs were members of a direct purchaser class action complaint asserted against Defendants, including, but not limited to *Maplevale Farms, Inc. v. Koch Foods, Inc., et al.*, No. 1:16-cv-08637 ( Dkt. No. 1) (N.D. Ill. Sept. 2, 2016).

423.  Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities during the pendency of that direct purchaser class action asserted against Defendants, commencing at least as early as September 2, 2016.

**D.  CONTINUING VIOLATION ALLEGATIONS**

424.  Defendants' coordinated supply reduction, the acts in furtherance of it, and the resulting injury caused to Plaintiffs was a continuing antitrust violation.

425.  Specifically, Defendants created, agreed to and engaged in the coordinated supply reduction, which they knew would (a) reduce the number of broiler chickens, (b) increase the price

of broiler chickens above competitive levels, and (c) have a lasting effect beyond the coordinated reduction in supply, such that the supracompetitive prices caused by the coordinated supply reduction would last for several years beyond the last coordinated reduction in supply in 2012. Indeed, Defendants knew that the slaughter of breeder flocks would have the effect of reducing the supply of broiler chickens for 2 years or more

426.    In addition, Defendants continued to charge supracompetitive prices after the last coordinated reduction in supply. Every time that a Defendant charged such a supracompetitive price after the last coordinated supply reduction and every time Plaintiffs purchased broiler chickens at that supracompetitive price, the purchase constituted an overt act and a new statutory period would begin to run.

427.    Thus, since Plaintiffs purchased broiler chickens from Defendants at supracompetitive prices caused by the coordinated supply reduction, Defendants engaged in a continuing antitrust violation, and therefore, this action is timely

## IX.    VIOLATION OF SECTION 1 OF THE SHERMAN ACT

428.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

429.    Defendants and all of their co-conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

430.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

431.    At least as early as January 1, 2008, and continuing until present, the exact dates being unknown to Plaintiffs, Defendants and all of their co-conspirators entered into a continuing

agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for Broilers, thereby creating anticompetitive effects.

432.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Broilers throughout the United States.

433.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Broilers.

434.    As a result of Defendants' unlawful conduct, Plaintiffs have been harmed by being forced to pay inflated, supracompetitive prices for Broilers.

435.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all of their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

    A.    Price competition in the market for Broilers has been restrained, suppressed, and/or eliminated in the United States;

    B.    Prices for Broilers sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their Producer Co-Conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

    C.    Plaintiffs, who directly purchased Broilers from Defendants, their divisions, subsidiaries, and affiliates, and all of their Producer Co-Conspirators, have been deprived of the benefits of free and open competition in the purchase of Broilers.

436.    Defendants took all of the actions alleged herein with the knowledge and intended effect that their actions would proximately cause the price of Broilers on the spot market to be higher than it would be but for Defendants' conduct. Defendants also knew and intended that such

an artificial inflation of spot market prices would increase other Broiler market prices, including those paid by Plaintiffs.

437.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs have been injured in their business or property and will continue to be injured in their business and property by paying more for Broilers than they would have paid and will pay in the absence of the conspiracy.

438.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## X.    VIOLATION OF 15 U.S.C. § 1 (AGAINST THE GEORGIA DOCK DEFENDANTS FOR PRICE-FIXING (PLED IN THE ALTERNATIVE)

439.    Plaintiffs incorporate all preceding paragraphs by reference.

440.    In knowingly coordinating, falsifying, and manipulating prices quoted to the GDA for inclusion in the Georgia Dock benchmark price index for the intended unlawful purpose of fixing, maintaining, raising, and stabilizing the price of Broilers sold in the United States, the Georgia Dock Defendants engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

441.    Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, Plaintiffs for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in

establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

442. The Georgia Dock Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiffs in the United States.

443. As a direct and proximate result of the Georgia Dock Defendants' above-described unlawful conduct, Plaintiffs paid artificially inflated prices for chicken.

## XI. CONSPIRACY TO DEFRAUD (AGAINST THE GEORGIA DOCK DEFENDANTS)

444. Plaintiffs incorporate all preceding paragraphs and factual allegations by reference.

445. Winn-Dixie and Bi-Lo Holdings, like many other chicken purchasers relied on the Georgia Dock which they believed was an accurate benchmark for market prices.

446. As noted above The Georgia Dock Defendants are the nine producers whose price quotes went into the Georgia Dock index, namely: Pilgrim's Pride, Tyson, Fieldale, Sanderson Farms, Koch, Claxton, Mar-Jac, Harrison and Wayne Farms.

447. The Georgia Dock, like other price discovery indices such as Urner Barry and the USDA Composite, reported spot market prices for broilers and served as a price discovery mechanism for broiler chicken market. As noted above, virtually all broiler sales were tied to spot market prices including the Georgia Dock.

448. While all of the broiler chicken price indices were artificially inflated by the Defendants' supply reduction conspiracy, the Georgia Dock Defendants sought to further benefit themselves by further artificially inflating the price of broiler chickens by reporting false price information to the GDA, which then used the false pricing information submitted by the Georgia Dock Defendants to calculate and report the Georgia Dock price index.

449.     Beginning sometime in early 2011 and continuing until the GDA ceased reporting the Georgia Dock price index at the end of November 2016 ("the Georgia Dock Conduct period"), the Georgia Dock Defendants each individually began reporting further inflated and false pricing information to the GDA to further artificially inflate the Georgian Dock price reported by the GDA.

450.     By virtue of participating in the publicly reported Georgia Dock price index, each Georgia Dock Defendant owed a duty to honestly and accurately report their broiler chicken prices to the GDA and not to intentionally mislead Plaintiffs Winn Dixie, Bi-Lo and other market participants by secretly and collectively manipulating the Georgia Dock for their gain and to the detriment of Plaintiffs and others in the broiler chicken market.

451.     As noted in a November 8, 2016, article by the Washington Post above Sanderson Farms CFO Mike Cockrell was quoted as saying "the Georgia Dock has come to be a trusted reflection of the supply and demand for retail stores." In a press release cited in a Bloomberg News article on November 17, 2016, Tyson stated that "[w]hen the Georgia Department of Agriculture asks us for pricing data, we provide accurate information based on actual and recent transactions."

452.     The reporting of inflated and false pricing information by the Georgia Dock Defendants was not unilateral conduct but a concerted effort by the Georgia Dock Defendants to further enhance the effects of their price-fixing scheme for all Defendants.

453.     As noted above, the Georgia Dock Defendants had extensive opportunities to collude through numerous trade association meetings, through Agri Stats and through direct contact with each other and through the Georgia Dock Advisory Board.

454.     As noted above, the Georgia Dock prices closely tracked and were positively correlated to the other broiler chicken spot prices indices at all times prior to the Georgia Dock

Conduct period. However, beginning no later than 2011, and around the time the Defendants were implementing their second round of supply cuts, the Georgia Dock stopped tracking any downward movements of the other spot market indices and consistently deviated upwards and away from both Urner Barry and the USDA composite indices. In fact, the Georgia Dock price reached unprecedented and historic record highs during the Georgia Dock Conduct period.

455.    It was during the Georgia Dock Conduct Period that:

> A.  The Georgia Dock stopped tracking the broiler chicken spot prices reported by Urner Barry and USDA Composite;
>
> B.  The Georgia Dock became negatively correlated to price decreases reported by Urner Barry and the USDA Composite;
>
> C.  A significantly larger price differential developed between the Georgia Dock and the Urner Barry and USDA Composite price indices;
>
> D.  That record high prices were posted by the Georgia Dock.

456.    On information and belief each of the forgoing factors were highly unusual and unprecedented events for the Georgia Dock.

457.    As previously noted above, the GDA applied a one-cent rule when calculating the weekly Georgia dock price to prevent any one company from being able to individually sway the Georgia Dock price. Under the one-cent rule the GDA would calculate the average price of all submissions by the Georgia Dock Defendants. Then the GDA would discard all reported prices that deviated more than one cent from the initially calculated average price calculate the final reported weekly Georgia Dock price based on the remaining reported prices.

458.    In addition, the Georgia Dock reported the price of a 2 ½–to–3 pound bird which was a size that most defendants didn't even produce. Accordingly, in order to report their prices to the GDA, most GDA Defendants had to convert their compiled prices to reflect the price of a bird that they did not sell. On information and belief, there was no standardized method provided

129

to or utilized by the Georgia Dock Defendants for converting their prices to a 2 ½ - 3 pound bird that they reported to the GDA.

459. Remarkably, Arty Schronce of the GDA has indicated that he could only recall a couple of instances during the Georgia Dock Conduct Period where he recalls having to remove any reported prices under the one-cent rule when calculating the final weekly Georgia Dock weekly reported price. This means, for the most part, that during the time the Georgia dock price stopped tracking the Urner Barry and USDA Composite indices and experienced an unprecedented deviation from the other price indexes including notable increases in price, including record highs, the Georgia Dock Defendants were somehow able to consistently report prices that were predominately within one-penny of the average price reported to GDA every week.

460. In addition, as noted above, there was no shortage of opportunities for the Defendants to conspire to reduce the supply of broilers or otherwise fix prices. In addition to participation in the Georgia Dock Advisory Board, and in various trade shows, the use of Agri Stats, and extensive communications between Defendants, 8 of the 9 Georgia Dock Defendants sat on the Georgia Dock advisory board which had oversight over the Georgia Dock.

461. Based on the forgoing, the unprecedented changes in the Georgia Dock prices during the Georgia Dock Conduct period could not have plausibly been the result of independent conduct by the Georgia Dock Defendants, but instead were the result of concerted action by the Georgia Dock Defendants to further increase the anticompetitive prices caused by their conspiracy to reduce the supply and increase the price of broiler chickens.

462. Moreover, (1) the Georgia Dock Defendants knew that they were submitting inaccurate Georgia Dock Quotes, (2) the Georgia Dock Defendants understood the impact on the Georgia Dock as the Georgia Dock Defendants often tied pricing in their supply contracts to the

Georgia Dock, and (3) there is no conceivably legitimate purpose for submitting inaccurate Georgia Dock quotes.

463.     In any event, based on the above, on information and belief, each of the Georgia Dock Defendants through their designated reporting employees, reported false and inflated broiler chicken prices every week during the Georgia Dock Conduct Period via telephone to the GDA in order to further inflate the price of broiler chickens to all purchasers who entered into a broiler chicken supply contracts or agreements that tied pricing under the contract to the reported Georgia Dock price.

464.     Winn-Dixie and Bi-Lo Holding entered supply contracts, including contracts in effect during the Georgia Dock Conduct Period whereby their purchase price for broiler chicken was directly tied the reported Georgia Dock price.

465.     At all relevant times the Defendants misled Plaintiffs and other purchases of broiler Chicken to believe that the Georgia Dock was accurately reporting offering prices of the Georgia Dock defendants.

466.     At all relevant times the Defendants led plaintiffs and other purchases of broiler Chicken to believe the Georgia Dock price was calculated using sophisticated algorithms.

467.     At all relevant times the Defendants misled plaintiffs and other purchases of broiler Chicken to believe the Georgia Dock price was an accurate and reliable representation of the average weekly broiler offering prices of the Defendants.

468.     At no time did any Georgia Dock Defendants inform the Plaintiffs, and in fact concealed from Plaintiffs, that the Georgia Dock prices were not verified or audited.

469.    At no time did any Georgia Dock Defendants inform the Plaintiffs and in fact concealed from Plaintiffs, that the Georgia Dock prices they reported during the Georgia Dock Conduct Period were not accurate or reliable representations of their weekly broiler offering prices.

470.    At no time did any Georgia Dock Defendants inform the Plaintiffs and in fact concealed from Plaintiffs, that the Georgia Dock prices were based solely on the prices reported by the Georgia Dock Defendants and that buyers were never contacted to report pricing.

471.    At no time did any Georgia Dock Defendants inform the Plaintiffs, and in fact concealed from Plaintiffs, the existence of the Georgia Dock Advisory Board, that the majority of the Georgia Dock Defendants sat on the Georgia Dock Advisory Board, and that the Georgia Dock Advisory Board had oversight over the Georgia Dock.

472.    At no time did any Georgia Dock Defendants inform the Plaintiffs and in fact concealed from Plaintiffs, that the GDA could not make any changes to the Georgia Dock or how prices were reported without the approval of the Georgia Dock Advisory Committee.

473.    At no time did any of the Georgia Dock Defendants inform the Plaintiffs and in fact concealed from Plaintiffs, that the Georgia Dock Defendants were reporting false and inflated pricing information to the GDA during the Georgia Dock Conduct Period.

474.    At no time did any Georgia Dock Defendants inform the Plaintiffs, and in fact concealed from Plaintiffs, that the Georgia Dock did not uses any sophisticated algorithms to calculate the weekly Georgia Dock price which instead was based solely on prices reported by the Georgia Dock Defendants during the Georgia Dock Conduct Period.

475.    At all times including as relevant here the period of 2011 through the end of 2016, each Georgia Dock Defendant impliedly represented on a weekly basis that:

>    A.    Its weekly price submissions of broiler chicken prices to the GDA were an honest reflection of its broiler chicken offering prices, and

      B.     Its weekly submissions of broiler chicken prices to the GDA represented the competitive offering prices for the sale of broiler chickens.

476.    The Georgia Dock Defendants made the above representations and omissions knowing they were false and would mislead the Plaintiffs who purchased chicken at prices tied to the Georgia Dock as a base market.

477.    Each of the above representations or omissions of fact were material because they affected the accuracy of the Georgia Dock Price and the prices for broiler chickens sold through contracts or agreements where pricing was tied to the Georgia Dock price.

478.    The Georgia Dock Defendants all recognized the importance of the Georgia Dock pricing as a pricing benchmark and intended that others would rely on it.

479.    The Plaintiffs here relied on the Georgia Dock pricing, which they believed provided an honest and accurate reflection of market prices in the broiler chicken market, and were induced to and entered into supply contracts during the Georgia Dock Conduct Period that tied pricing to the Georgia Dock.

480.    For example, Plaintiffs entered supply contracts with Fieldale Farms and Sanderson Farms during the Georgia Dock Conduct Period where Plaintiffs' purchase price for broiler chicken was directly tied to the reported Georgia Dock price as a market base for pricing.

481.    In addition, pursuant to its contracts with Plaintiffs, Fieldale Farms affirmatively represented and warranted to Plaintiffs, including during the Georgia Dock Conduct Period, that Fieldale Farms was ███████████████████████████████████

482.    The Plaintiffs reasonably and justifiably relied on the material representations and omissions made by the Geogia Dock Defendants relating to the Georgia Dock pricing index, and believing the Georgia Dock Pricing Index provided an honest and accurate reflection of actual

pricing in the broiler chicken market, Plaintiffs were induced to and did and entered into broiler chicken supply contracts which tied the pricing of broiler chickens to the Georgia Dock as a market base during the Georgia Dock Conduct Period including contracts with Fieldale Farms and Sanderson Farms.

483.    If Plaintiffs knew of the defendants' collusive actions to inflate the Georgia Dock price, plaintiffs would not have entered into contracts which tied the contract price of broiler chicken to the Georgia Dock price.

484.    As a result of Plaintiffs' reasonable reliance on these false representations and/or omissions, Plaintiffs Winn-Dixie, Inc. and Bi-Lo Holdings, LLC entered into contracts which were tied to the Georgia Dock price index as a market base and Plaintiffs suffered damages in the form of increased broiler prices.

## XII.    FRAUD (AGAINST THE GEORGIA DOCK DEFENDANTS IN THE ALTERNATIVE TO CONSPIRACY TO DEFRAUD)

485.    Plaintiffs incorporate all preceding paragraphs and factual allegations by reference.

486.    Winn-Dixie and Bi-Lo Holdings, like many other chicken purchasers relied on the Georgia Dock which they believed was an accurate benchmark for market prices.

487.    As noted above The Georgia Dock Defendants are the nine producers whose price quotes went into the Georgia Dock index, namely: Pilgrim's Pride, Tyson, Fieldale, Sanderson Farms, Koch, Claxton, Mar-Jac, Harrison and Wayne Farms.

488.    The Georgia Dock, like other price discovery indices such as Urner Barry and the USDA Composite, reported spot market prices for broilers and served as a price discovery mechanism for broiler chicken market.  As noted above, virtually all broiler sales were tied to spot market prices including the Georgia Dock.

489.     While all of the broiler chicken price indices were artificially inflated by the Defendants' supply reduction conspiracy, the Georgia Dock defendants sought to further benefit themselves and their co-conspirators by further artificially inflating the price of broiler chickens by reporting false price information to the GDA, which then used the false pricing information submitted by the Georgia Dock defendants to calculate and report the Georgia Dock price index.

490.     Beginning sometime in early 2011 and continuing until the GDA ceased reporting the Georgia Dock price index at the end of November 2016 ("the Georgia Dock Conduct period"), the Georgia Dock Defendants began reporting further inflated and false pricing information to the GDA to further artificially inflate the Georgian Dock price reported by the GDA.

491.     By virtue of participating in the publicly reported Georgia Dock price index, each Georgia Dock Defendant owed a duty to honestly and accurately report their broiler chicken prices to the GDA and not to intentionally mislead Plaintiffs Winn Dixie, Bi-Lo and other market participants by secretly and collectively manipulating the Georgia Dock for their gain and to the detriment of Plaintiffs and others in the broiler chicken market.

492.     As noted in a November 8, 2016, article by the Washington Post above Sanderson Farms CFO Mike Cockrell was quoted as saying "the Georgia Dock has come to be a trusted reflection of the supply and demand for retail stores." In a press release cited in a Bloomberg News article on November 17, 2016, Tyson stated that "[w]hen the Georgia Department of Agriculture asks us for pricing data, we provide accurate information based on actual and recent transactions.".

493.     The reporting of inflated and false pricing information by the each individual Georgia Dock Defendant was to the Georgia Dock was to inflate the Georgia Dock index in order to further inflate the price of Chicken paid by Plaintiffs and others who purchased chicken at prices tied to the Georgia Dock index.

494.     As noted above, the Georgia dock prices closely tracked and were positively correlated to the other broiler chicken spot prices indices at all times prior to the Georgia Dock Conduct period.  However, beginning no later than 2011, and around the time the Defendants were implementing their second round of supply cuts, the Georgia Dock stopped tracking the downward movements of the other spot market indices and consistently deviated upwards and away from both Urner Barry and the USDA composite indices.  In fact, the Georgia Dock price reached unprecedented and historic record highs during the Georgia Dock Conduct period.

495.     It was during the Georgia Dock Conduct Period that:

E.   The Georgia Dock stopped tracking the broiler chicken spot prices reported by Urner Barry and USDA Composite;

F.   The Georgia Dock became negatively correlated to price decreases reported by Urner Barry and the USDA Composite;

G.   A significantly larger price differential developed between the Georgia Dock and  the Urner Barry and USDA Composite price indices;

H.   That record high prices were posted by the Georgia Dock.

496.     On information and belief each of the forgoing factors were highly unusual and unprecedented events for the Georgia Dock.

497.     As previously noted above, the GDA applied a one-cent rule when calculating the weekly Georgia dock price to prevent any one company from being able to individually sway the Georgia Dock price.  Under the one-cent rule the GDA would calculate the average price of all submissions by the Georgia Dock Defendants.  Then the GDA would discard all reported prices that deviated more than one cent from the initially calculated average price calculate the final reported weekly Georgia Dock price based on the remaining reported prices.

498.     In addition, the Georgia Dock reported the price of a 2 ½–to–3 pound bird which was a size that most defendants didn't even produce.  Accordingly, in order to report their prices

to the GDA, most GDA Defendants had to convert their compiled prices to reflect the price of a bird that they did not sell. On information and belief, there was no standardized method provided to or utilized by the Georgia Dock Defendants for converting their prices to a 2 ½ - 3 pound bird that they reported to the GDA.

499. Moreover, (1) each Georgia Dock Defendant knew that it was submitting inaccurate Georgia Dock Quotes, (2) each Georgia Dock Defendant understood the impact of its price submissions the Georgia Dock as each Georgia Dock Defendant often tied pricing in their supply contracts to the Georgia Dock, and (3) there is no conceivably legitimate purpose for each Georgia Dock defendant to submit inaccurate Georgia Dock quotes to the GDA.

500. In any event, based on the above, on information and belief, each individual Georgia Dock Defendant through its designated reporting employees, reported false and inflated broiler chicken prices every week during the Georgia Dock Conduct Period via telephone to the GDA in order to further inflate the price of broiler chickens to all purchasers who entered into a broiler chicken supply contracts or agreements that tied pricing under the contract to the reported Georgia Dock price.

501. Winn-Dixie and Bi-Lo Holding entered supply contracts, including contracts in effect during the Georgia Dock Conduct Period whereby their purchase price for broiler chicken was directly tied the reported Georgia Dock price.

502. At all relevant times each Defendant misled Plaintiffs and other purchases of broiler Chicken to believe that each Georgia Dock defendant was accurately reporting its offering prices to the Georgia Dock.

503. At all relevant times each Georgia Dock the Defendant led plaintiffs and other purchases of broiler Chicken to believe the Georgia Dock price was calculated using sophisticated algorithms.

504. At all relevant times each Georgia Dock Defendant misled plaintiffs and other purchases of broiler Chicken to believe the Georgia Dock price was an accurate and reliable representation of the average weekly broiler offering prices of each Defendant.

505. At no time did any Georgia Dock Defendant inform the Plaintiffs, and in fact each concealed from Plaintiffs, that the Georgia Dock prices were not verified or audited.

506. At no time did any Georgia Dock Defendant inform the Plaintiffs and in fact each Georgia Dock Defendant concealed from Plaintiffs, that the Georgia Dock prices it reported during the Georgia Dock Conduct Period was not an accurate or reliable representation of its weekly broiler offering prices.

507. At no time did any Georgia Dock Defendant inform the Plaintiffs, and in fact each Georgia Dock Defendant concealed from Plaintiffs, that the Georgia Dock prices were based solely on the prices reported by each of each Georgia Dock Defendant and that buyers were never contacted to report pricing.

508. At no time did any Georgia Dock Defendant inform the Plaintiffs, and in fact each Georgia Dock concealed from Plaintiffs, the existence of the Georgia Dock Advisory Board, that the majority of the Georgia Dock Defendants sat on the Georgia Dock Advisory Board, and that the Georgia Dock Advisory Board had oversight over the Georgia Dock.

509. At no time did any Georgia Dock Defendant inform the Plaintiffs and in fact each Georgia Dock Defendant concealed from Plaintiffs, that the GDA could not make any changes to

the Georgia Dock or how prices were reported without the approval of the Georgia Dock Advisory Committee.

510.    At no time did any of the Georgia Dock Defendants inform the Plaintiffs and in fact each Georgia Dock Defendant concealed from Plaintiffs, that each it was reporting false and inflated pricing information to the GDA during the Georgia Dock Conduct Period.

511.    At no time did any Georgia Dock Defendants inform the Plaintiffs, and in fact each Georgia Dock Defendant concealed from Plaintiffs that the Georgia Dock did not use any sophisticated algorithms to calculate the weekly Georgia Dock price which instead was based solely on prices reported by the Georgia Dock Defendants during the Georgia Dock Conduct Period.

512.    At all times including as relevant here the period of 2011 through the end of 2016, each Georgia Dock Defendant impliedly represented on a weekly basis that:

A.    Its weekly price submissions of broiler chicken prices to the GDA were an honest reflection of its broiler chicken offering prices, and

B.    Its weekly submissions of broiler chicken prices to the GDA  represented the competitive offering prices for the sale of broiler chickens.

513.    Each Georgia Dock Defendant made the above representation and omissions, knowing its representations were false and would mislead the Plaintiffs who purchased chicken at prices tied to the Georgia Dock.

514.    Each of the above representations or omissions of fact made by each Georgia dock Defendant was material because they affected the accuracy of the Georgia Dock Price and the prices for broiler chickens sold through contracts or agreements where pricing was tied to the Georgia Dock price.

515.    The Georgia Dock Defendants each recognized the importance of the Georgia Dock pricing as a pricing benchmark and each Georgia Dock Defendant intended that others would rely on it.

516.    The Plaintiffs here relied on the Georgia Dock pricing, which they believed provided an honest and accurate reflection of market prices in the broiler chicken market, and were induced to and entered into supply contracts during the Georgia Dock Conduct Period that tied pricing to the Georgia Dock.

517.    For example, Plaintiffs entered supply contracts with Fieldale Farms and Sanderson Farms during the Georgia Dock Conduct Period where Plaintiffs' purchase price for broiler chicken was directly tied to the reported Georgia Dock price as a market base for pricing.

518.    In addition, in relation to its contracts with Plaintiffs, Fieldale Farms affirmatively represented and warranted to Plaintiffs, including during the Georgia Dock Conduct Period, that Fieldale Farms was ███████████████████████████████

519.    The Plaintiffs reasonably and justifiably relied on the material representations and omissions made by the Georgia Dock Defendants relating to the Georgia Dock pricing index, and believing the Georgia Dock Pricing Index provided an honest and accurate reflection of actual pricing in the broiler chicken market, Plaintiffs were induced to and did and entered into broiler chicken supply contracts which tied the pricing of broiler chickens to the Georgia Dock as a market base during the Georgia Dock Conduct Period including contracts with Fieldale Farms and Sanderson Farms.

520.    If Plaintiffs had know of each Georgia Dock Defendant's actions to inflate the Georgia Dock price, Plaintiffs would not have entered into contracts which tied the contract price of broiler chicken to the Georgia Dock price.

521.    As a result of Plaintiffs' reasonable reliance on these false representations and/or omissions made by Each Georgia Dock Defendant, Plaintiffs Winn-Dixie, Inc. and Bi-Lo Holdings, LLC entered into contracts during the Georgia Dock Conduct Period which were tied to the Georgia Dock price index and suffered damages in the form of increased broiler chicken prices.

## XIII.   NEGLIGENT MISREPRESENTATION (THE GEORGIA DOCK DEFENDANTS IN THE ALTERNATIVE TO FRAUD CLAIMS)

522.    Plaintiffs incorporate all other paragraphs and factual allegations stated herein by reference.

523.    Winn-Dixie and Bi-Lo Holdings, like many other chicken purchasers relied on the Georgia Dock which they believed was an accurate benchmark for market prices.

524.    As noted above The Georgia Dock Defendants are the nine producers whose price quotes went into the Georgia Dock index, namely: Pilgrim's Pride, Tyson, Fieldale, Sanderson Farms, Koch, Claxton, Mar-Jac, Harrison and Wayne Farms.

525.    The Georgia Dock, like other price discovery indices such as Urner Barry and the USDA Composite, reported spot market prices for broilers and served as a price discovery mechanism for broiler chicken market.  As noted above, virtually all broiler sales were tied to spot market prices including the Georgia Dock.

526.    By virtue of participating in the publicly reported Georgia Dock price index, each Georgia Dock Defendant owed a duty to honestly and accurately report their broiler chicken prices to the GDA and not to intentionally mislead Plaintiffs Winn Dixie, Bi-Lo and other market participants by secretly and collectively manipulating the Georgia Dock for their gain and to the detriment of Plaintiffs and others in the broiler chicken market.

527.    As noted in a November 8, 2016, article by the Washington Post above Sanderson Farms CFO Mike Cockrell was quoted as saying "the Georgia Dock has come to be a trusted reflection of the supply and demand for retail stores." In a press release cited in a Bloomberg News article on November 17, 2016, Tyson stated that "[w]hen the Georgia Department of Agriculture asks us for pricing data, we provide accurate information based on actual and recent transactions."

528.    The reporting of inflated and false pricing information by the each individual Georgia Dock Defendant was to the Georgia Dock was to inflate the Georgia Dock index in order to further inflate the price of Chicken paid by Plaintiffs and others who purchased chicken at prices tied to the Georgia Dock index.

529.    As noted above, the Georgia dock prices closely tracked and were positively correlated to the other broiler chicken spot prices indices at all times prior to the Georgia Dock Conduct period.  However, beginning no later than 2011, and around the time the Defendants were implementing their second round of supply cuts, the Georgia Dock stopped tracking the downward movements of the other spot market indices and consistently deviated upwards and away from both Urner Barry and the USDA composite indices.  In fact, the Georgia Dock price reached unprecedented and historic record highs during the Georgia Dock Conduct period.

530.    It was during the Georgia Dock Conduct Period that:

   A.  The Georgia Dock stopped tracking the broiler chicken spot prices reported by Urner Barry and USDA Composite;

   B.  The Georgia Dock became negatively correlated to price decreases reported by Urner Barry and the USDA Composite;

   C.  A significantly larger price differential developed between the Georgia Dock and  the Urner Barry and USDA Composite price indices;

   D.  That record high prices were posted by the Georgia Dock.

142

531.    On information and belief each of the forgoing factors were highly unusual and unprecedented events for the Georgia Dock.

532.    As previously noted above, the GDA applied a one-cent rule when calculating the weekly Georgia dock price to prevent any one company from being able to individually sway the Georgia Dock price.  Under the one-cent rule the GDA would calculate the average price of all submissions by the Georgia Dock Defendants.  Then the GDA would discard all reported prices that deviated more than one cent from the initially calculated average price calculate the final reported weekly Georgia Dock price based on the remaining reported prices.

533.    In addition, the Georgia Dock reported the price of a 2 ½–to–3 pound bird which was a size that most defendants didn't even produce.  Accordingly, in order to report their prices to the GDA, most GDA Defendants had to convert their compiled prices to reflect the price of a bird that they did not sell.  On information and belief, there was no standardized method provided to or utilized by the Georgia Dock Defendants for converting their prices to a 2 ½ - 3 pound bird that they reported to the GDA.

534.    Moreover, (1) each Georgia Dock Defendant knew or should have known that it was submitting inaccurate Georgia Dock Quotes, (2) each Georgia Dock Defendant understood the impact of its price submissions the Georgia Dock as each Georgia Dock Defendant often tied pricing in their supply contracts to the Georgia Dock, and (3) there is no conceivably legitimate purpose for each Georgia Dock defendant to submit inaccurate Georgia Dock quotes to the GDA.

535.    On information and belief, each individual Georgia Dock Defendant through its designated reporting employees, reported false and inflated broiler chicken prices every week during the Georgia Dock Conduct Period via telephone to the GDA which inflated the price of

broiler chickens to all purchasers who entered into a broiler chicken supply contracts or agreements that tied pricing under the contract to the reported Georgia Dock price.

536.    Winn-Dixie and Bi-Lo Holding entered supply contracts, including contracts in effect during the Georgia Dock Conduct Period whereby their purchase price for broiler chicken was directly tied the reported Georgia Dock price.

537.    At all relevant times each Defendant misled Plaintiffs and other purchases of broiler Chicken to believe that each Georgia Dock defendant was accurately reporting its offering prices to the Georgia Dock.

538.    At all relevant times each Georgia Dock Defendant misled plaintiffs and other purchases of broiler Chicken to believe the Georgia Dock price was an accurate and reliable representation of the average weekly broiler offering prices of each Defendant.

539.    At all times including as relevant here the period of 2011 through the end of 2016, each Georgia Dock Defendant impliedly represented on a weekly basis that:

    A.    Its weekly price submissions of broiler chicken prices to the GDA were an honest reflection of its broiler chicken offering prices, and

    B.    Its weekly submissions of broiler chicken prices to the GDA  represented the competitive offering prices for the sale of broiler chickens.

540.    When each Georgia Dock Defendant made the above representations and omissions, each Georgia Dock Defendant either knew of the misrepresentations, made the misrepresentations recklessly or negligently without knowledge of their truth or falsity, or should have known that the misrepresentations were false.

541.    Each of the above representations or omissions of fact made by each Georgia dock Defendant was material because they affected the accuracy of the Georgia Dock Price and the

prices for broiler chickens sold through contracts or agreements where pricing was tied to the Georgia Dock price.

542. The Georgia Dock Defendants each recognized the importance of the Georgia Dock pricing as a pricing benchmark and each Georgia Dock Defendant intended to induce Plaintiffs to rely upon their misrepresentations of material fact.

543. The Plaintiffs here relied on the Georgia Dock pricing, which they believed provided an honest and accurate reflection of market prices in the broiler chicken market, and were induced to and entered into supply contracts during the Georgia Dock Conduct Period that tied pricing to the Georgia Dock.

544. For example, Plaintiffs entered supply contracts with Fieldale Farms and Sanderson Farms during the Georgia Dock Conduct Period where Plaintiffs' purchase price for broiler chicken was directly tied to the reported Georgia Dock price as a market base for pricing.

545. In addition, pursuant to its contracts with Plaintiffs, Fieldale Farms affirmatively represented and warranted to Plaintiffs, including during the Georgia Dock Conduct Period, that Fieldale Farms was ████████████████████████████

546. The Plaintiffs reasonably and justifiably relied on the material representations and omissions made by the Geogia Dock Defendants relating to the Georgia Dock pricing index, and believing the Georgia Dock Pricing Index provided an honest and accurate reflection of actual pricing in the broiler chicken market, Plaintiffs were induced to and did and entered into broiler chicken supply contracts which tied the pricing of broiler chickens to the Georgia Dock as a market base during the Georgia Dock Conduct Period including contracts with Fieldale Farms and Sanderson Farms.

547.    If Plaintiffs had known of each Georgia Dock Defendant's misrepresentations, Plaintiffs would not have entered into contracts which tied the contract price of broiler chicken to the Georgia Dock price.

548.    As a result of Plaintiffs' reasonable reliance on these false representations and/or omissions made by Each Georgia Dock Defendant, Plaintiffs Winn-Dixie, Inc. and Bi-Lo Holdings, LLC entered into contracts during the Georgia Dock Conduct Period which were tied to the Georgia Dock price index and suffered damages in the form of increased broiler chicken prices.

## XIV.  VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FLA. STAT. § 501.201, *ET SEQ.*) (AGAINST FILEDALE)

549.    Plaintiffs incorporate all other paragraphs and factual allegations stated herein by reference.

550.    The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, et seq. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

551.    Chapter 501 of the Florida Annotated Statutes generally governs consumer protection within the State of Florida (the "FDUTPA"). Fla. Stat. § 501.201, *et seq*.

552.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

553.    Under the FDUTPA, "trade or commerce" means "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203(8).

554.    The FDUTPA outlaws "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

555.    Plaintiffs purchased Broilers from Fieldale within the State of Florida during the Georgia Dock Conduct Period that were tied to the Georgia Dock index.

556.    But for Defendants' deceptive and/or unfair conduct as set forth herein, the Plaintiffs paid more per pound for Broilers than they otherwise would have, in an amount to be determined at trial.

557.    Defendant Fieldale sold broiler chickens to Plaintiffs through contracts whereby the price of the broilers were tied to the weekly Georgia Dock price.

558.    As noted above, during the Georgia Dock Conduct Period Fieldale colluded with the other Georgia Dock Defendants to raise and did raise the price of broiler chickens sold to Plaintiffs and other purchasers by agreeing to report inflated chicken prices to the GDA in order to inflate the Georgia Dock price which was often used by Defendants to adjust prices in various chicken supply contracts including supply contracts entered into between Plaintiffs and Fieldale during the Georgia Dock Conduct Period.

559.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

560.    Defendants' unlawful conduct substantially affected Florida's trade and commerce.

147

561. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property by virtue of additional overcharges for Broilers during the Georgia Dock Conduct Period

562. By reason of the foregoing, Plaintiffs are entitled to *inter alia* actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

## XV. VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FLA. STAT. § 501.201, *ET SEQ.*) (AGAINST SANDERSON FARMS)

563. Plaintiffs incorporate all other paragraphs and factual allegations stated herein by reference.

564. The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, et seq. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

565. Chapter 501 of the Florida Annotated Statutes generally governs consumer protection within the State of Florida (the "FDUTPA"). Fla. Stat. § 501.201, *et seq*.

566. The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

567. Under the FDUTPA, "trade or commerce" means "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203(8).

568.     The FDUTPA outlaws "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

569.     Plaintiffs purchased Broilers from Sanderson within the State of Florida during the Georgia Dock Conduct Period that were tied to the Georgia Dock index.

570.     But for Defendants' deceptive and/or unfair conduct as set forth herein, the Plaintiffs paid more per pound for Broilers than they otherwise would have, in an amount to be determined at trial.

571.     Defendant Sanderson sold broiler chickens to Plaintiffs through contracts whereby the price of the broilers were tied to the weekly Georgia Dock price.

572.     As noted above, during the Georgia Dock Conduct Period, Sanderson colluded with the other Georgia Dock Defendants to raise and did raise the price of broiler chickens sold to Plaintiffs and other purchasers by agreeing to report inflated chicken prices to the GDA in order to inflate the Georgia Dock price which was often used by Defendants to adjust prices in various chicken supply contracts including supply contracts entered into between Plaintiffs and Sanderson during the Georgia Dock Conduct Period.

573.     Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

574.     Defendants' unlawful conduct substantially affected Florida's trade and commerce.

575.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property by virtue of additional overcharges for Broilers during the Georgia Dock Conduct Period

576.     By reason of the foregoing, Plaintiffs are entitled to *inter alia* actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

## XVI.   BREACH OF CONTRACT (AGAINST FIELDALE)

577.     Plaintiffs incorporate all preceding paragraphs and factual allegations by reference.

578.     Fieldale offered to supply Plaintiffs with broiler chickens pursuant to an agreement where the price of chicken was tied to the Georgia Dock as a market base.  Plaintiffs Winn-Dixie and Bi-Lo Holdings accepted Fieldale's offer and entered into broiler chicken supply agreements with Fieldale farms throughout the Georgia Dock Period.  The agreements between Plaintiffs and Fieldale contained bracket pricing in which the price of broiler chicken was adjusted based on the price reported by the Georgia Dock as the market base.  Typically under the contract, increases of the Georgia Doc from one bracket to the next would correspondingly raise Plaintiffs' prices under the contract.

579.     The agreements were governed by Florida Law.

580.     In addition, pursuant to the agreements ███████████████████████████
████████████████████████████████████████████████████

581.     Fieldale breached its warranty under the contract by colluding to undermine plaintiffs' right to purchase Chicken based on Georgia Dock prices that were based on reliable and accurate reported prices.

582.     Fieldales' manipulation of the Georgia Dock frustrated an important purpose of the contract which was to fairly adjust the price for broilers based on legitimate market forces. However, as Fieldale manipulated the Georgia Dock price, Plaintiffs paid more than they otherwise would have for broiler chickens from Fieldale under the supply agreements with Fieldale.

583.     Plaintiffs have fully performed all of their obligations under the supply agreements with Fieldale.

584.     As a direct and proximate cause of these breaches of supply contracts, including by breaches of the implied covenant of good faith and fair dealing, and of Defendants' frustration of the purposes of these contracts, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial.

## XVII.  BREACH OF CONTRACT (AGAINST SANDERSON FARMS)

585.     Plaintiffs incorporate all preceding paragraphs and factual allegations by reference.

586.     Sanderson Farms offered to supply Plaintiffs with broiler chickens pursuant to an agreement where the price of chicken was tied to the Georgia Dock as a market base.  Plaintiffs Winn-Dixie and Bi-Lo Holdings accepted Sanderson Farms' offer and entered into broiler chicken supply agreements with Sanderson Farms during the Georgia Dock Period.  The agreements between Plaintiffs and Fieldale contained bracket pricing in which the price of broiler chicken was adjusted based on the price reported by the Georgia Dock as the market base.  Typically under the contract, increases of the Georgia Doc from one bracket to the next would correspondingly raise Plaintiffs' prices under the contract.

587.     The agreements were governed by Florida Law.

588.     Sanderson Farms' manipulation of the Georgia Dock frustrated an important purpose of the contract which was to fairly adjust the price for broilers based on legitimate market forces.  However, as Sanderson Farms manipulated the Sanderson Farms price, Plaintiffs paid more than they otherwise would have for broiler chickens from Sanderson Farms under the supply agreements with Sanderson Farms.

589. Plaintiffs have fully performed all of their obligations under the supply agreements with Fieldale.

590. As a direct and proximate cause of these breaches of supply contracts, including by breaches of the implied covenant of good faith and fair dealing, and of Defendants' frustration of the purposes of these contracts, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial.

## XVIII. BREACH IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (AGAINST FIELDALE)

591. Plaintiffs incorporate all preceding paragraphs and factual allegations by reference.

592. Fieldale offered to supply Plaintiffs with broiler chickens pursuant to an agreement where the price of chicken was tied to the Georgia Dock price. Plaintiffs Winn-Dixie and Bi-Lo Holdings accepted Fieldale's offer and entered broiler chicken supply agreements with Fieldale farms during the Georgia Dock Period. The agreements between Plaintiffs and Fieldale contained bracket pricing whereby the price of broiler chicken was adjusted based on the price reported by the Georgia Dock as the market base. Typically under the contract, increases of the Georgia Doc from one bracket to the next would correspondingly raise Plaintiffs' prices under the contract.

593. The agreements were governed by Florida Law.

594. The agreements included an implied covenant that Fieldale will act in good faith and deal fairly with plaintiff, and that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

595. Fieldale breached the implied covenant of good faith and fair dealing by colluding to undermine plaintiffs' right to purchase Chicken based on Georgia Dock prices that were based on reliable and accurate reported prices.

596.     Fieldale also breached the implied covenant of good faith and fair dealing by obtaining contractual benefits from its collusive and manipulative acts, in the form of receiving higher prices from Plaintiffs based on the Georgia Dock Price that Fieldale helped artificially inflate.

597.     Defendants' collusion to manipulate the Georgia Dock frustrated an important purpose of the contract which was to fairly adjust the price for broilers based on legitimate market forces.  However, as Fieldale manipulated the Georgia Dock price, Plaintiffs paid more than they otherwise would have for broiler chickens from Fieldale under the supply agreements with Fieldale.

598.     Plaintiffs have fully performed all of their obligations under the supply agreements with Fieldale.

599.     As a direct and proximate cause of Fieldale Farms' breach of the implied covenant of good faith and fair dealing, Fieldale frustrated the purpose of these contracts and Plaintiffs have been damaged as alleged herein in an amount to be proven at trial.

## XIX.   BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (AGAINST SANDERSON)

600.     Plaintiffs incorporate all preceding paragraphs and factual allegations by reference.

601.     Sanderson Farms offered to supply Plaintiffs with broiler chickens pursuant to an agreement where the price of chicken was tied to the Georgia Dock price.  Plaintiffs Winn-Dixie and Bi-Lo Holdings accepted Sanderson Farms' offer and entered broiler chicken supply agreements with Fieldale farms during the Georgia Dock Period.  The agreements between Plaintiffs and Sanderson Farms contained bracket pricing whereby the price of broiler chicken was adjusted based on the price reported by the Georgia Dock as the market base.  Typically under the

contract, increases of the Georgia Doc from one bracket to the next would correspondingly raise Plaintiffs' prices under the contract.

602.     The agreements were governed by Florida Law.

603.     The agreements included an implied covenant that Sanderson Farms will act in good faith and deal fairly with plaintiff, and that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

604.     Sanderson Farms breached the implied covenant of good faith and fair dealing by colluding to undermine plaintiffs' right to purchase Chicken based on Georgia Dock prices that were based on reliable and accurate reported prices.

605.     Sanderson Farms also breached the implied covenant of good faith and fair dealing by obtaining contractual benefits from its collusive and manipulative acts, in the form of receiving higher prices from Plaintiffs based on the Georgia Dock Price that Sanderson Farms helped artificially inflate.

606.     Defendants' collusion to manipulate the Georgia Dock frustrated an important purpose of the contract which was to fairly adjust the price for broilers based on legitimate market forces.  However, as Fieldale manipulated the Georgia Dock price, Plaintiffs paid more than they otherwise would have for broiler chickens from Fieldale under the supply agreements with Fieldale.

607.     Plaintiffs have fully performed all of their obligations under the supply agreements with Fieldale.

608.     As a direct and proximate cause of Sanderson Farms' breach of the implied covenant of good faith and fair dealing, Sanderson Farms frustrated the purpose of these contracts and Plaintiffs have been damaged as alleged herein in an amount to be proven at trial.

## XX. UNJUST ENRICHMENT (AGAINST FIELDALE IN THE ALTERNATIVE TO CONTRACT CLAIMS)

609.    Plaintiffs incorporate all proceeding paragraphs by reference.

610.    As alleged herein, Plaintiffs conferred a benefit upon Fieldale, Fieldale had knowledge of that benefit, and voluntarily accepted it from Plaintiffs.

611.    It would be inequitable for Fieldale to be permitted to retain the benefit which Fieldale obtained from its manipulative acts at the expense of the Plaintiffs.

612.    The Plaintiffs are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

613.    Alternatively or additionally Fieldale should pay restitution or be required to disgorge to Plaintiffs its own unjust enrichment based on the reasonable value of the benefit conferred upon it.

## XXI. UNJUST ENRICHMENT (AGAINST SANDERSON IN THE ALTERNATIVE TO CONTRACT CLAIMS)

614.    Plaintiffs incorporate all proceeding paragraphs by reference.

615.    As alleged herein, Plaintiffs conferred a benefit upon Sanderson and Sanderson had knowledge of that benefit, and voluntarily accepted it from Plaintiffs.

616.    It would be inequitable for Sanderson to be permitted to retain the benefit which Sanderson obtained from its manipulative acts at the expense of the Plaintiffs.

617.    The Plaintiffs are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

618.    Alternatively or additionally Sanderson should pay restitution or be required to disgorge to Plaintiffs its own unjust enrichment based on the reasonable value of the benefit conferred upon it.

## XXII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

619.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

> A.    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and
>
> B.    A *per se* violation of Section 1 of the Sherman Act;

620.    Plaintiffs recover damages, to the maximum extent allowed under federal antitrust laws, in an amount to be trebled to the extent such laws permit; Plaintiffs recover damages, to the maximum extent allowed for violations of the common law and the Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq*., and that a joint and several judgment in favor of Plaintiffs be entered against Defendants;

621.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

622.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

156

623.     Plaintiffs be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

624.     Plaintiffs recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

625.     Plaintiffs have such other and further relief as the case may require and the Court may deem just and proper.

## XXIII. JURY TRIAL DEMAND

626.     Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: April 15, 2019

Patrick J. Ahern
Theodore B. Bell
Ahern & Associates, P.C.
Willoughby Tower
8 South Michigan Avenue
Suite 3600
Chicago, Illinois 60603
Phone: (312) 404-3760
patrick.ahern@ahernandassociatespc.com

*Attorney for Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC*