# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>Certain DAP Actions Listed in Footnote 1[1] | Case No. 1:16-cv-08637 |

## MEMORANDUM IN SUPPORT OF CASE FARMS DEFENDANTS' CONSOLIDATED MOTION TO DISMISS DIRECT ACTION PLAINTIFF COMPLAINTS AS TO CASE

Dated July 22, 2019

/s/ Joseph D. Carney

Joseph D. Carney (0010886)
JOSEPH D. CARNEY & ASSOCIATES, LLC
1540 Peach Drive
Avon, OH 44044
Tel: (440) 289-5161/Fax: (866) 270-1221

Thomas M. Staunton (6217164)
Daniel M. Feeney (6224893)
MILLER SHAKMAN LEVINE & FELDMAN LLP
180 North LaSalle Street, Suite 3600
Chicago, IL 60601
Tel: (312) 263-3700/Fax: (312) 263-3270

Daniel R. Karon (6207193)
KARON LLC
700 West St. Clair Ave., Suite 200
Cleveland, OH 44113
Tel: (216) 622-1851/Fax: (216) 241-8175

Deborah A. Klar
D. KLAR LAW
2934 1/2 Beverly Glen Circle, Suite 761
Bel Air, California 90077-1724
Tel: (310) 858-9500

*Attorneys for Defendants Case Foods, Inc., Case Farms, LLC and Case Farms Processing, Inc.*

---

[1] This Memorandum relates to the following Actions: *Associated Wholesale Grocers, Inc. v. Koch Foods, Inc., et al.*, 18-cv-6316; *Associated Grocers of the South, Inc., et al. v. Tyson Foods, Inc., et al.*, 18-cv-4616; *Ahold Delhaize USA, Inc. v. Koch Foods, Incorporated, et al.*, 18-cv-5351; *The Kroger Co., et al. v. Tyson Foods, Inc., et al.*, 18-cv-4534; *Shamrock Foods Company, et al. v. Tyson Foods, Inc., et al.*, 18-cv-7284; *Checkers Drive-In Restaurants, Inc. v. Tyson Foods, Inc., et al.*, 19-cv-1283; United Supermarkets, LLC, et al. v. Tyson Foods, Inc., et al., 18-cv-6693; *BJ's Wholesale Club, Inc. v. Tyson Foods, Inc., et al.*, 18-cv-5877; *Darden Restaurants, Inc. v. Tyson Foods, Inc., et al.*, 19-cv-0530; *Jetro Holdings, LLC v. Tyson Foods, Inc., et al.*, 18-cv-4000; *Maximum Quality Foods, Inc. v. Tyson Foods, Inc., et al.*, 18-cv-6673; *Sherwood Food Distributors, L.L.C., et al. v. Tyson Foods, Inc., et al.*, 19-cv-0354; *Winn-Dixie Stores, Inc., et al. v. Koch Foods, Inc., et al.*, 18-cv-0245; *Save Mart Supermarkets v. Tyson Foods, Inc., et al*., 19-cv-2805; and *Conagra Brands, Inc., et al. v. Tyson Foods, Inc.,et al*., 19-cv-2190.

## I. INTRODUCTION

The claims asserted against Case Farms, LLC, Case Farms Processing, Inc. and Case Foods, Inc. (collectively "Case") in the Direct Action Complaints ("Complaints")[2] should be dismissed. Case does not seek to re-litigate issues addressed in this Court's November 20, 2017 Memorandum Opinion (R.541, "Op."). Instead, this Motion is based on Case's unique position as a fringe player in the Broiler industry and on the thin to non-existent allegations against Case in the Complaints. Based on the standards set forth in the Opinion and in controlling case law, and given the context of Case's particular position in the industry and in this litigation, the specific allegations in the recently-filed Complaints do not state a claim against Case.

Case is a fringe producer with a nominal market share of roughly 2%. It was named as a Defendant for the first time by any Direct Action Plaintiff in mid-April 2019, after it already had produced voluminous documents via third-party subpoena. Notwithstanding having the benefit of substantial discovery, the Complaints contain few if any well-pleaded allegations against Case. Three fail to include even the threshold allegation that Case engaged in the parallel conduct underlying the purported conspiracy – cutting or restraining production. Those three Complaints should be dismissed for this reason alone.

The remaining Complaints include, at most, a single allegation of parallel conduct: an isolated and temporary incident of egg breaking in late 2011. But those Complaints contain few if any allegations of "factual enhancements" necessary to support an inference that this purported parallel conduct was prompted by an unlawful agreement to cut production. Importantly, the allegations regarding Case in the Complaints are far fewer than those in the Class Complaints relied on by the Court in denying the earlier motions to dismiss, despite the fact that they were

---

[2] The present Motion requests that the Court dismiss R.2092, R.2096, R.2100, R.2106, R.2110, R.2113, R.2115, R.2125, R.2126, R.2130, R.2134, R.2135, R.2143, R.2163, and R.2264.

filed years later and with the benefit of extensive discovery. The anemic and irrelevant allegations regarding Case do not plausibly support an inference of conspiracy, particularly in light of (i) Case's 2% market share, which renders its participation in any conspiracy to depress production economically and practically implausible, and (ii) the fact (as established by documents referred to in the Complaints) that Case *increased* production at an average annual rate of approximately 10% during the time of the alleged conspiracy to reduce production.

Because three Complaints fail to allege that Case engaged in parallel conduct, and all fifteen lack allegations supporting a plausible inference that that any parallel behavior by Case was the result of a preceding agreement, all claims against Case should be dismissed.

## II. RELEVANT FACTS

### A. Allegations Regarding Case's Purported Parallel Conduct

Plaintiffs' Sherman Act claims are premised on the alleged parallel conduct of all Defendants in cutting or restraining production. Three Complaints contain no such allegation against Case. Winn Dixie advances no allegations of Case conduct *at all*, R.2143, while Conagra's and Associated Wholesale Grocers' limited allegations do not assert that Case restrained production. R.2264 and R.2092. The remaining Complaints each contain a single allegation directed at Case regarding production restraint. In similar language, each alleges that, one month after an email exchange in which a Case competitor stated "[o]ne more round of cuts would do the trick," Case purportedly broke eggs "to reduce its production."[3] That supposed egg breaking is alleged to have begun on September 15, 2011, and Case purportedly "continued those cuts into 2012." *Id.* The Complaints include no other allegations (i) that Case restrained production during the relevant time frame or (ii) that link the alleged egg breaking to any

---

[3] *See* R.2113 ¶¶254, 256; R.2096 ¶248; R.2100 ¶284; R.2106 ¶242; R.2110 ¶¶277, 279; R.2115 ¶¶254, 256; R.2125 ¶¶255, 257; R.2126 ¶¶255, 257; R.2130 ¶¶255, 257; R.2134 ¶¶288, 290; R.2135 ¶¶255, 257; and R.2163 ¶240.

2

unlawful agreement.

## B. Other Allegations Specific to Case

The Complaints collectively allege random conduct by Case that the Plaintiffs may argue tie Case to a conspiracy or constitute "factual enhancements" for the purposes of Section 1 analysis. None of the following allegations, even if true, supports a plausible inference that Case's alleged egg breaking resulted from an illegal agreement with any other Defendant:

1. Defendants' employees, including two Case employees, moved between Defendant producers without non-compete agreements or other restrictive covenants. *See* R.2100 ¶163.

2. Case employees attended meetings of the National Chicken Council and the North Carolina Poultry Federation. *See*, *e.g.*, R.2113 ¶¶188, 365, 370. Associated Wholesale Grocers (one of the three Plaintiffs who failed to allege any parallel conduct) also alleges that Case attended two meetings hosted by Express Markets, Inc. R.2092 ¶¶206, 257.

3. Case "reported a wide variety of data" to AgriStats. *See*, *e.g.*, R.2264 ¶97.

4. Case employees exchanged five emails over a four-year period (2009-2013) with employees of other producers regarding market prices, packaging costs, operations, "bird diet" and bird weight. *See, e.g.*, R.2110 ¶¶248, 272, 285, 287, 288.

5. Case was able to "de-anonymize Agri Stats' bottom line reports and determine its competitor's rankings." *See, e.g.*, R.2135 ¶144.

6. Case participated in a purported "joint venture" to process spent breeder hens, which due to their size and other physiological differences cannot be processed in Case's Broiler facilities. *See*, *e.g.*, R.2113 ¶¶386-87, 390.

7. Case communicated with competitors in 2015 about fuel surcharges. *See* R.2113 ¶288.

These are the only substantive allegations naming Case (other than the egg-breaking allegation discussed above). Missing from the Complaints are allegations that link any of this alleged conduct to purported production cuts or any supposed agreement to collude on production cuts. For example, there is no allegation that the subject of production cuts was discussed at any of the NCC or North Carolina Poultry Federation meetings Case allegedly attended. Similarly, the inter-producer communications alleged are random and pertain to

3

subjects (e.g. bird diets) irrelevant to production output. None make any reference to agreement or collusion. Given the extensive discovery available to the DAP Plaintiffs, the omission of specific allegations against Case supporting their claim of an alleged illegal agreement to cut or otherwise restrain production creates the reasonable inference that no such evidence exists.

### C. The Complaints Belatedly Added Case as a Defendant After Substantial Discovery.

All of the DAP Plaintiffs or their counsel had access to the voluminous discovery in the *In Re Broiler Chicken Antitrust Litigation* before they filed the present Complaints naming Case as a defendant. *See* Case's Request to for Judicial Notice ¶¶9-12, filed contemporaneously herewith ("Case RJN").[4] By February 18, 2019, two months before the first Complaint naming Case, Plaintiffs had received approximately 7.6 million documents from Defendants and third parties, including over 93,000 documents totaling 600,883 pages from Case. *Id.* By April 15, 2019, they had conducted 73 depositions at which thousands of exhibits were marked. *Id*.

### D. Case's Market Share and Consistent Production Increases

#### 1. Case is a Fringe Player with a 2% Market Share.

Although readily available and provided in discovery, no Complaints expressly allege Case's share of the Broiler market. However, undisputed data referred to in the Complaints shows that Case was a fringe player in the industry. According to the WATT PoultryUSA rankings for the relevant years (collectively, the "WATT Reports") on which the Complaints rely to support their core allegations of consolidation and market share,[5] Case's market share in the Broiler industry grew modestly from roughly 1.5% to 2.25% during the relevant time frame. *See*

---

[4] All of the Complaints except the one filed by Save Mart Supermarkets are amended complaints filed on behalf of Plaintiffs already party to the Broiler litigation and with full access to the documents produced in discovery. And despite the fact that Save Mart was not previously a plaintiff, its counsel had access to all discovery in this action as counsel for The Kroger Co. *See* R.2106 and R.2163.

[5] *See* R.2100 ¶¶15, 136, 138; R.2096 ¶¶7, 522, 523; R.2092 ¶¶411, 356, 357; R.2125, 2126, 2130, 2134, 2135 ¶¶7, 355, 356; R.2113 ¶¶7, 352, 353; R.2264 ¶¶8, 357, 358; R.2106 ¶¶7, 513, 514; R.2163 ¶¶7, 509, 510; R.2115 ¶¶7, 352, 353; R.2143 ¶¶17, 341, 342, 381. Only the Complaint of Shamrock Foods, R.2110, does not rely on the WATT Reports expressly.

Ex. 1 hereto; Case RJN Exs. A-C (WATT Reports covering 2007-2016). The following chart sets forth Case's 2007 through 2016 market share, calculated by dividing Case's output by total industry output as reported in the WATT Reports relied on by Plaintiffs (Ex. 1; Case RJN Ex. C):

| Year | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Case Market Share | 1.38% | 1.64% | 1.83% | 1.84% | 1.84% | 2.04% | 2.20% | 2.27% | 2.26% | 2.28% |

Because the WATT Reports are relied on and central to multiple core allegations in the Complaints, they may be considered at the pleading stage. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007); *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012); Case RJN ¶¶1,3. In addition, this Court can take judicial notice of the WATT Reports, the reliability and accuracy of which is unquestioned by any party. Fed. R. Evid. 201(b)(2); *Schmude v. Sheahan*, 312 F. Supp. 2d 1047, 1064 (N.D. Ill. 2004); Case RJN ¶¶7-9.

> **2. The WATT Reports Show That Case Increased Production Every Year From 2007 to 2016 at the Average Rate of Almost 10%.**

Plaintiffs' theory is that an alleged conspiracy from 2007 to 2016 led to a decrease in production of Broilers relative to the historic 3% annual growth rate in the industry. *See, e.g.*, R.2164 ¶8; Op. at 26-27, 32. Plaintiffs specifically allege two periods of production cuts, one in 2008-09 and one in 2011-12. Op. at 26. In sharp contrast, the WATT Reports that the Plaintiffs have relied upon in their Complaints establish that Case increased production every year from 2007 through 2016. Ex. 1; Case RJN Exs. A-C. They also show that Case's average weekly Broiler production grew from 10.13 million lbs. in 2007 to 18.90 million lbs. in 2016, an average annual gain of 9.6%. *Id.* In denying the original Defendants' motions to dismiss, this Court cited USDA data showing that overall Broiler production increased at an average annual rate of only 0.5% from 2008 to 2014, the period covering the alleged decreases in 2008-09 and 2011-12,

5

noting that rate was significantly lower than that alleged historic 3% rate. Op. at 32. In contrast, during that same period Case grew on average more than 10% annually, from approximately 11.04 million lbs. in 2008 to approximately 17.86 million lbs. in 2014, with a nearly 9% increase from 2008 to 2009 and an 18% increase from 2011 to 2012. Ex. 1; RJN Ex. B.

### III. ARGUMENT

Based on the applicable legal standards on a motion to dismiss, the Complaints against Case should be dismissed because (a) the allegations in certain Complaints fail to allege that Case engaged in the parallel conduct of cutting or reducing production that forms the basis for the alleged conspiracy; and (b) when put in context, the only alleged "factual enhancements" specific to Case have no connection to any alleged parallel conduct and do not plausibly suggest that Case joined the purported conspiracy alleged in the Complaints.

**A. Applicable Legal Standards On A Motion To Dismiss.**

To allege an unlawful agreement, the DAP Plaintiffs are required to allege both parallel conduct and so-called "factual enhancements" or "plus factors" that, when considered in context, plausibly suggest that any parallel conduct was the result of an illegal agreement. "[W]ithout more, allegations of parallel conduct are 'merely consistent with,' but do not 'plausibly suggest' the existence of an agreement." Op. at 21 (quoting *Twombly*, 550 U.S. at 557). Even allegations of conscious parallelism are insufficient. *Id.* Rather, to adequately state a claim, a plaintiff must supplement allegations of parallel conduct with "'a context that raises a suggestion of a preceding agreement.'" *Id.* at 22 (quoting *Twombly*, 550 U.S. at 557). "Absent additional 'factual enhancement' or a 'circumstance pointing toward a meeting of the minds,' an allegation of parallel conduct 'stops short of the line between possibility and plausibility.'" *Id.* To illustrate the kind of allegations that would suffice to meet this test, the *Twombly* Court pointed to allegations of the "specific time, place, [and] person involved in the alleged conspiracies," i.e., "which

6

[defendants] supposedly agreed" and "when and where the illicit agreement took place." *Twombly*, 550 U.S. at 565 n.10.

Plausibility requires allegations that show what each defendant did that is asserted to be wrongful *and* that each defendant joined the conspiracy and knew of its scope. *See Bank of America v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (dismissing with prejudice complaint that lumped all defendants together and did not provide details of who did what). General allegations of conspiratorial activity against a group of defendants are insufficient. *Id.* ("A complaint based on a theory of collective responsibility must be dismissed. That is true even for allegations of conspiracy."); *In re Elevator Antitrust Litigation*, 502 F.3d 47, 50-51 (2d Cir. 2007) (affirming dismissal because a list of allegations in "entirely general terms without any specification of any particular activities by any particular defendant…is nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever"). This is because the Rules of Civil Procedure set up a system of notice pleading in which each defendant is entitled to know what it did that is asserted to be wrongful. "A contention that 'the defendants looted the corporation' – without any details about who did what – is inadequate. . . . An allegation that someone looted a corporation does not propound a plausible contention that a particular person did anything wrong." *Bank of America*, 725 F.3d at 815. *See also In re Musical Instruments & Equip. Antitrust Litigation*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) ("plaintiffs must plead evidentiary facts: who, did what, to whom (or with whom), where, and when"); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) ("A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group.").

**B. Complaints That Fail to Allege Parallel Conduct by Case Should Be Dismissed.**

The Winn-Dixie, Associated Wholesale Grocers, and ConAgra Brands Complaints fail to

7

allege that Case engaged in the parallel conduct at issue. *See* §II.A, above. That defect should be deemed fatal and those Complaints should be summarily dismissed. Because they lack direct evidence of a conspiracy, allegations of parallel behavior are a threshold requirement of the Plaintiffs' Sherman Act claims. *See Twombly,* 550 U.S. at 553; Op. at 21.

C. **The Complaints Should Be Dismissed For Failure To Allege Factual Enhancements That Plausibly Show That Case Conspired To Restrain Production.**

1. **Plaintiffs' Claim that Case, a Fringe Player in the Market, Joined the Alleged Conspiracy is Inherently Implausible.**

Under *Iqbal* and *Twombly*, whether the Plaintiffs' allegations against Case are sufficient to plausibly allege an agreement or conspiracy must be considered in context. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"). The Complaints advance the conclusory theory that the original Defendants – producers who are alleged to make up over 88% of the market for broiler chickens – supposedly asked fringe player Case to join their purported conspiracy.

Plaintiffs have offered no evidence to suggest that the original Defendants entered into an illegal agreement to restrain production. But assuming for purposes of this Motion only that they did, they would not have benefitted from allegedly inviting a fringe player like Case into the group. As Judge Posner has stated, "provided that the fringe of competitive firms is unable to expand output sufficiently to drive the price back down to the competitive level, the leading firms can fix prices without worrying about competition from the fringe." *In re Text Messaging Antitrust Litigation*, 782 F.3d 867, 871 (2015). It is not plausible that Case, which for eleven straight years has controlled no more than about 2% of the market, could have expanded its output sufficiently to "drive the price back down to the competitive level." Accordingly, purportedly recruiting Case would have provided no benefit to the alleged co-conspirators.

8

On the other hand, allegedly recruiting Case would have exposed the original Defendants to at least two significant recognized risks. First, price-fixing efforts must be clandestine "because the activity is unlawful and secrecy is easier with fewer conspirators." Robert D. Blair and Christine Piette Durrance, *Umbrella Damages: Toward a Coherent Antitrust Policy*, Contemporary Economic Policy, Vol. 36, No. 2 (April 2018) at 248. Second, adding firms would have increased "the costs of group decision making." *Id*.

For Case, the risks similarly would have outweighed any benefit. Case would have benefited from the higher market prices resulting from the purported cartel's alleged production cuts whether it joined the alleged conspiracy or not. *See, e.g., id.* at 247 ("the economically rational behavior of nonconspirators is to raise price under the umbrella created by the cartel," and "[c]ustomers of the nonconspirators are overcharged as a direct consequence of the cartel behavior"); *U.S. Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 627 (7th Cir. 2003) (when a cartel cuts output resulting in an elevated price throughout the market, "customers of fringe firms (sellers that have not joined the cartel) pay this higher price . . . "). And because of its low market share, Case would not have been able to generate any material increase in the market price by joining the supposed conspiracy.

For both Case and for the larger market participants, allegedly conspiring with each other to reduce production would have been practically and economically irrational. Accordingly, the Court properly should conclude that Plaintiffs' conclusory claim that Case entered into such an unlawful agreement is implausible and grant Case's Motion to Dismiss. *See, e.g.*, *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984) (stating that "[i]n considering a motion to dismiss, the court is not required to don blinders and to ignore commercial reality" and dismissing a claim that was "utterly implausible" and based on a "preposterous" premise); *Brunson Communications, Inc. v. Arbitron*, 239 F. Supp. 2d 550, 563 (E.D. Pa. 2002)

9

(dismissing claim based on alleged conspiracy that "makes no economic sense"). The assertion that Case participated in the conspiracy alleged here "ignores commercial reality."

### 2. The Allegations of Case's Conduct Do Not Plausibly Show that it Entered into a Conspiracy to Reduce Production.

Factual enhancements or plus factors are alleged facts that "push an allegation of parallel conduct into the realm of a plausible conspiracy." Op. at 22 (citing *Twombly*, 550 U.S. at 556 n.4.) In its decision denying the motions to dismiss the Class Action Complaints, the Court identified the following factual enhancements: (i) a shift away from fixed price to variable price contracts; (ii) slaughter or export of breeder flocks; (iii) use of inter-company sale agreements; (iv) an increase in exports; (v) public statements of intent to cut production; (vi) reported data to Agri Stats; and (vii) communications with other producers. *Id*. at 11-15, 18-19, 37-42. The Court concluded that, at the pre-discovery pleading stage, these factual enhancements could support an inference of an agreement to reduce production and provided a plausible explanation for why and how Defendants sustained alleged production cuts. *Id*. at 28-29, 37-38.

By comparison, the Complaints allege far fewer factual enhancements related to Case. Those few allegations, reviewed in context, do not support a plausible inference of an agreement to reduce production. Instead, Plaintiffs rely on a series of random unrelated allegations of conduct by Case, clearly harvested from the voluminous discovery already completed, in an attempt to demonstrate the plausibility of their conspiracy allegation. But nowhere do Plaintiffs allege that these random unrelated facts enabled Case to sustain any production cuts. Further, the random actions alleged cannot reasonably be construed to permit an inference that the purported parallel conduct was the product of an unlawful conspiracy.

For example, the allegation that two Case employees moved between Case and Pilgrim without non-compete agreements or other restrictive covenants does not and could not

10

reasonably be alleged to support an inference that Case entered into any agreement to restrain production. Nor does it have any connection to the alleged egg breaking in September 2011. *See, e.g.*, R.2100 ¶163. Moreover, Plaintiffs suggestion that Case was being *anti-competitive* because it did not *restrict competition* in the labor market turns logic on its head.

The vague allegation that Case's CEO attended a single meeting of the NCC Executive Committee in March 2008, with no discussion of what was said or occurred at that meeting, is not and could not reasonably be tied to the Plaintiffs' allegation that Case in September 2011 began breaking eggs. Nor can it support a reasonable inference that Case's alleged September 2011 egg breaking was the product of a supposed conspiracy. Similarly, the vague allegations that Case attended meetings of the North Carolina Poultry Federation during the relevant time frame also are not tied to any egg breaking allegation and do not create a reasonable inference that Case's alleged egg breaking was the product of an agreement with its competitors.

In general, allegations that Case participated in industry associations do not "move the needle" and make conspiracy any more plausible. *Washington County Health Care Authority, Inc. v. Baxter*, 328 F. Supp. 3d 824, 843 (N.D. Ill. 2018). Rather, it is something that happens "in virtually every industry; trade organizations are ubiquitous and serve numerous legitimate and pro-competitive purposes." *Id; see also Twombly*, 550 U.S. at 567 n.12 (a court cannot draw a plausible inference of collusion simply "because [one] belong[s] to the same trade guild as one of his competitors"); *Text Messaging Antitrust Litig.*, 782 F.2d at 878 ("as there is no evidence of what information was exchanged at these meetings, there is no basis for an inference that they were using the meetings to plot prices [sic] increases."); *In re Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement.").

The Complaints that include allegations of (i) five Case employee email exchanges over a

11

four-year period (2009-2013) regarding market prices, packaging costs, "bird diet" and bird weight and (ii) 2015 communications Case had with Koch, House of Raeford "and others" regarding fuel surcharges, also fail to allege any facts that connect any of these communications to Case's alleged September 2011 egg breaking, let alone connect that egg breaking to any purported agreement with another Defendant to restrain production. To state a claim that Case conspired to reduce production, the Direct Action Plaintiffs must do more than allege a few random, unrelated ambiguous communications over a nine year period on topics unrelated to production output. *See, e.g. In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 406 (3d Cir. 2015) ("[S]ocial contacts between competitors without more are not unlawful."); *Valspar Corp. v. E.I. Du Pont De Nemours*, 152 F. Supp. 3d 234, 246 (D. Del. 2016) (communication between competitors "does not, without more, raise an inference of an agreement."), *aff'd sub nom. Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185 (3d Cir. 2017).

Vague allegations that Case participated in a purported "joint venture" to process spent breeder hens, like Plaintiffs' other plus factor allegations, are wholly unconnected to Case's purported September 2011 egg breaking or an agreement with any Defendant to restrain production. They cannot reasonably be construed to give rise to an inference that Case's alleged egg breaking was the product of a conspiracy. Case's alleged decision to use an outside company to process "spent" (i.e., older and larger) breeder hens is not illegal or nefarious, and certainly is not evidence of a conspiracy regarding production of Broilers. The fact that other Broiler producers used the same facility, therefore providing them with information regarding the slaughter of Case's breeder hens, falls far short of supporting an inference that Case broke eggs in 2011 due to an economically implausible agreement to restrain production.

Finally, Plaintiffs' allegations that Case (i) was able to "de-anonymize Agri Stats' bottom line reports and determine its competitor's rankings;" and (ii) provided "a wide variety" of

information to Agri Stats, fail to allege any facts that connect these alleged activities to Case's purported September 2011 egg breaking and do not create a reasonable inference that Case's alleged egg breaking was the product of an unlawful conspiracy. And there is no allegation that Case "de-anonymized" Agri Stats data related to production output. Providing information to a benchmarking service like Agri Stats is common and does not suggest anything improper, much less an illegal agreement. *See, e.g., United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) (providing information to benchmarking services can, in some circumstances, increase economic efficiency and render markets more, rather than less, competitive); *Valspar Corp.*, 873 F.3d at 198 (evidence of trade association data sharing program could not satisfy plaintiffs' burden of showing a conspiracy existed); *Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1119 (6th Cir. 1983) ("in the absence of a purpose or effect to restrain competition, or some other evidence of an actual agreement to restrain competition . . . the exchange of price data does not offend § 1 of the Sherman Act.").

### 3. Plaintiffs' Claim that Case Broke Eggs Pursuant to a Conspiracy to Restrain Production is Implausible in Light of Case's Reported Production Increases.

According to certain Plaintiffs, Case broke eggs during one brief period – from September 2011 and "into 2012" – pursuant to an alleged agreement with other Defendants to reduce Broiler production. But this theory cannot be reconciled with information in the WATT Reports on which Plaintiffs rely. Those reports show that Case *increased* its aggregate production every year from 2007 through 2016, the time of the alleged coordinated production cuts, at the average annual rate of almost 10%. *See* Ex. 1 and §II.D.2, above (relying on documents referred to in the Complaints and central to Plaintiffs' claims); Case RJN Exs. A-C. So whatever might have led Case to break an unspecified number of eggs in late 2011 and early 2012, it is implausible to conclude that it did so to comply with an agreement to reduce overall

13

production, an agreement that it clearly was not following.

For all of the above reasons, Plaintiffs have not plausibly alleged a claim that Case entered into the alleged conspiracy to reduce or restrain Broiler production and the Section 1 claims against Case should be dismissed. As the Supreme Court has instructed, the careful scrutiny of pleadings and dismissal of claims that do not meet the plausibility threshold are necessary to protect blameless defendants from the "enormous expense of discovery." *Twombly*, 550 U.S. at 559 ("[I]t is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support a § 1 claim.") (internal quotation marks omitted).

**D. The State Law Claims Asserted in Two Complaints Should Be Dismissed.**

Two of the Direct Action Plaintiffs assert pendent state law claims against Case. Checkers asserts that Case and the other Defendants violated the Florida Deceptive and Unfair Practices Act by "enter[ing] into a contract, combination or conspiracy between two or more persons in restraint of trade or commerce in the Broilers market, a substantial part of which occurred in Florida." R.2113 ¶474 and Count IV. Associated Wholesale Grocers asserts that Case and the other Defendants (a) "entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of §13303 of the Wisconsin Antitrust Act" and (b) "entered into and engaged in an arrangement, contract, agreement, trust, or combination to advance and control the price of Broilers in violation of § 47-25-101 of the Tennessee Trade Practices Act." R.2092 ¶466 Count IX and ¶480 Count X.

Each of these state law claims should be dismissed for the reasons set forth above. Each is premised and dependent upon the same core assertion that Case and the other Defendants entered into an agreement or conspiracy to restrain the production of Broilers. As explained

14

above, the Complaints fail to plausibly allege any such agreement or conspiracy. The state law claims and Sherman Act claims fail for the same reason. Alternatively, this Court should decline to exercise supplemental jurisdiction over these three state law claims once it has disposed of all federal claims. *See East-Miller v. Lake Cty. Highway Dep't*, 421 F.3d 558, 564–65 (7th Cir. 2005) ("It is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed. . . .").

### E. Plaintiffs Should Not Be Granted Leave To Amend.

In denying the prior motions to dismiss, the Court stated: "Defendants criticize the lack of details, but when a conspiracy is secret such details will not be available without discovery, and thus cannot be required at the pleading stage." Op. at 18. The same analysis should not apply here. It is undisputed that, before the first DAP Complaint against Case was filed, Plaintiffs had access to millions of documents and substantial deposition testimony. Notwithstanding this discovery, the Complaints do not include "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *See Twombly*, 550 U.S. at 556.

By April 2019, the Direct Action Plaintiffs had a full opportunity to develop specific facts to support their claim against Case. They failed to do so. The discovery available to the Plaintiffs has increased even further since then. *See* Case RJN ¶11. Accordingly, the dismissal of the Complaints should be with prejudice unless the Direct Action Plaintiffs can demonstrate in opposition to this Motion that they can plead with factual support specific allegations of parallel conduct and factual enhancements specific to Case that can plausibly an illegal agreement between Case and other Defendants to cut or reduce production during the relevant time frame.

### CONCLUSION

For the reasons stated above, the Complaints should be dismissed with prejudice.

## **CERTIFICATE OF SERVICE**

I, Daniel M. Feeney, hereby certify that a true and correct copy of the foregoing Memorandum in Support of Case Farms Defendants' Motion to Dismiss Direct Action Plaintiff Complaints was electronically filed with the Clerk of the Court using the CM/ECF system on July 22, 2019, which constitutes service on counsel of record who are registered electronic filing users.

Dated: July 22, 2019　　　　　　　　　　　　　/s/ Daniel M. Feeney
　　　　　　　　　　　　　　　　　　　　　　Daniel M. Feeney