**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION, | Case No.: 1:16-cv-08637 |
| | The Honorable Thomas M. Durkin |
| This Document Relates To: | |
| THE DIRECT PURCHASER PLAINTIFF ACTION | |

**DIRECT PURCHASER PLAINTIFFS' MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF
THE SETTLEMENTS WITH DEFENDANTS PECO FOODS, INC., GEORGE'S, INC.,
GEORGE'S FARMS, INC., AND AMICK FARMS, LLC**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    LITIGATION BACKGROUND ...........................................................................2

III.   SUMMARY OF THE SETTLEMENT NEGOTIATIONS AND TERMS........................4

       A.     The Peco and George's Settlements ...........................................................5

       B.     The Amick Settlement ..................................................................................6

IV.   THE SETTLEMENTS SATISFY THE STANDARD FOR PRELIMINARY APPROVAL ...........................................................................................................7

       A.     The Settlements Resulted from Arm's Length Negotiations................................10

V.    THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS...........11

       A.     The Requirements of 23(a) Are Satisfied ...............................................12

              1.     Numerosity..............................................................................12

              2.     Common Questions of Law and Fact.........................................12

              3.     Typicality.................................................................................13

              4.     Adequacy..................................................................................14

       B.     The Settlement Class Satisfies Rule 23(b)(3) ........................................15

VI.   THE COURT SHOULD APPROVE THE PROPOSED NOTICE PLAN ......................16

VII.  THE COURT SHOULD SCHEDULE A FINAL APPROVAL HEARING ...................20

VIII. CONCLUSION....................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)..................................................................................11, 16, 17

*Armstrong v. Bd. of Sch. Dirs.*,
    616 F.2d 305 (7th Cir. 1980) ............................................................................7, 8

*City of Greenville v. Syngenta Crop Prot.*,
    No. 3:10-CV-188, 2012 WL 1948153 (S.D. Ill. May 30, 2012) ......................17, 19

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
    768 F.2d 884 (7th Cir. 1985) ................................................................................7

*Gautreaux v. Pierce*,
    690 F.2d 616 (7th Cir. 1982) ................................................................................8

*Goldsmith v. Tech. Solutions Co.*,
    No. 92-CV-4374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ...........................9

*Hughes v. Baird & Warner, Inc.*,
    No. 76-CV-3929, 1980 WL 1894 (N.D. Ill. Aug. 20, 1980) .................................15

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
    270 F.R.D. 330 (N.D. Ill. 2010).........................................................................10

*In re Catfish Antitrust Litig.*,
    826 F. Supp. 1019 (N.D. Miss. 1993)................................................................15

*In re Cmty. Bank of N. Va.*,
    418 F.3d 277 (3d Cir. 2005)...............................................................................11

*In re Corrugated Container Antitrust Litig.*,
    643 F.2d 195 (5th Cir. 1981) ............................................................................14

*In re Foundry Resins Antitrust Litig.*,
    242 F.R.D. 393 (S.D. Ohio 2007)......................................................................15

*In re Linerboard Antitrust Litig.*,
    292 F. Supp. 2d 631 (E.D. Pa. 2003) ..............................................................9, 10

*In re Mercedes- Benz Antitrust Litig.*,
    213 F.R.D. 180 (D.N.J. 2003)...........................................................................13

*In re Mid-Atlantic Toyota Antitrust Litig.*,
    564 F. Supp. 1379 (D. Md. 1983).......................................................................9

*In re NASDAQ Market-Makers Antitrust Litig.*,
176 F.R.D. 99 (S.D.N.Y 1997) ...................................................................8

*In re Warfarin Sodium Antitrust Litig.*,
212 F.R.D. 231 (D. Del. 2002) ....................................................................8

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) ...................................................................7, 8

*Kohen v. Pacific Inv. Mgmt.*,
571 F.3d 672 (7th Cir. 2009) ...................................................................14

*Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*,
231 F.R.D. 280 (N.D. Ill. 2005)..............................................................13

*Saltzman v. Pella Corp.*,
257 F.R.D. 471 (N.D. Ill. 2009).........................................................13, 15

*Schmidt v. Smith & Wollensky LLC*,
268 F.R.D. 323 (N.D. Ill. 2010)..............................................................12

*Thillens, Inc. v. Cmty. Currency Exch. Ass'n*,
97 F.R.D. 668 (N.D. Ill. 1983)................................................................12

*Uhl v. Thoroughbred Tech. & Telecomms, Inc.*,
309 F.3d 978 (7th Cir. 2002) .....................................................................8

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)..................................................................................12

## STATUTES

28 U.S.C. § 1715..........................................................................................20

Fed. R. Civ. Proc. 23(a) .........................................................................11, 15

Fed. R. Civ. Proc. 23(a)(1) ...........................................................................12

Fed. R. Civ. Proc. 23(a)(2) .....................................................................12, 13

Fed. R. Civ. Proc. 23(a)(3)......................................................................13, 14

Fed. R. Civ. Proc. 23(a)(4)......................................................................14, 15

Fed. R. Civ. Proc. 23(b) ...............................................................................11

Fed. R. Civ. Proc. 23(b)(3) ...............................................................11, 15, 16

Fed. R. Civ. Proc. 23(c)(2) ...........................................................................19

Fed. R. Civ. Proc. 23(c)(2)(B) ..................................................................................16, 17, 18

Fed. R. Civ. Proc. 23(e) ..........................................................................................8, 9, 16, 19

**OTHER AUTHORITIES**

4 *Newberg on Class Actions* § 11.53 (4th ed. 2002) ...................................................................17

## I.     INTRODUCTION

The Direct Purchaser Plaintiffs ("DPPs") in this class action, alleging that Defendants conspired to fix, raise, maintain, and stabilize the prices of Broiler chicken sold in the United States, hereby seek preliminary approval of settlements with three additional groups of defendants: Peco Foods, Inc. ("Peco"), George's, Inc. and George's Farms, Inc. ("George's"), and Amick Farms, LLC ("Amick") (collectively "Settling Defendants"). The agreements with the Settling Defendants constitute the second set of DPP settlements in this case. On November 16, 2018, this Court granted final approval to the DPPs' settlement with Fieldale Farms Corporation ("Fieldale"), which provided a total financial settlement of $2.25 million. Each of the Settling Defendants has a market share similar to Fieldale, but their settlements provide substantially more monetary relief: Peco will pay $5.15 million, George's will pay $4.25 million, and Amick will pay $3.95 million (collectively "Settlements" or "Settlement Agreements"). Collectively, the Settlements provide up to $13.35 million to the Settlement Class from Settling Defendants, who account for approximately 6.5% of the Settlement Class.  These Settlements bring the total amount recovered by DPPs from defendants to date to $15.6 million.

The ratcheted increases in the settlement amounts—both on a gross and proportionate basis—support approval of the Settlements. As detailed in this Motion for Preliminary Approval of the Settlements ("Motion") and the supporting documents, the Settlements were the product of the DPPs' dogged efforts in litigating this case and extensive arm's length negotiations among the parties. Each of the Settlements is fair, reasonable, and adequate, and satisfy all of the factors for preliminary approval. The DPPs respectfully request that the Court grant their Motion, approve the proposed notice plan, and set a schedule for final approval of the Settlements.

## II.    LITIGATION BACKGROUND

This is an antitrust class action against certain producers of Broilers.[1] DPPs allege that Defendants combined and conspired to fix, raise, maintain, or stabilize prices of Broilers sold in the United States. DPPs allege that Defendants implemented their conspiracy in various ways, including via coordinated supply restrictions, sharing competitively sensitive price and production information, and otherwise manipulating Broiler prices.

DPPs commenced this litigation on September 2, 2016, when they filed a class action lawsuit on behalf of all direct purchasers of Broilers in the United States. (ECF No. 1.) Other class plaintiffs and direct action plaintiffs subsequently filed similar actions. On October 14, 2016, the Court appointed the undersigned law firms as Direct Purchaser Plaintiffs' Interim Co-Lead and Liaison Counsel. (ECF No. 144.) After extensive briefing by the parties, on November 20, 2017 the Court denied Defendants'[2] Motions to Dismiss the DPPs' First Consolidated Amended Complaint ("FCAC"). (ECF No. 541.) DPPs filed their operative Fourth Consolidated Amended Complaint on January 15, 2019. (ECF No. 1565, "Complaint".)[3]

DPPs performed a thorough investigation and engaged in extensive discovery prior to reaching the Settlements. These efforts commenced prior to the filing of DPPs' initial complaint and included pre-litigation investigation into Defendants' conduct that formed the basis of the

---

[1] Consistent with the Complaint, the term Broilers is defined in the Settlement Agreements as "chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards." (*See* Settlement Agreements § I.B.2.) The Settling Defendants agree to this definition only for purposes of the Settlement Class. (*Id.*)

[2] Amick was not a party to this action at the time of these motions.

[3] Amick was first added as a defendant in this Complaint.

DPPs' complaints. (*See* Declaration of W. Joseph Bruckner in Support of Motion ("Bruckner Decl.") at ¶ 4.) In denying Defendants' motions to dismiss, the Court held that these "alleged factual circumstances plausibly demonstrate that [Defendants'] parallel conduct was a product of a conspiracy." (*See* ECF No. 541, at p. 18.) During the litigation, DPPs obtained responses to multiple sets of interrogatories, and received over 8 million documents in response to their requests for production and third party subpoenas. (*See* Bruckner Decl. ¶ 5.) DPPs, along with other plaintiffs, have taken over one hundred depositions of the Defendants and third parties. (*Id.* ¶ 6.) DPPs have also provided responses to written discovery, produced documents, and appeared for depositions noticed by the Defendants. (*Id.* ¶ 7.)

On June 21, 2019, the United States Department of Justice ("DOJ") moved to intervene in the civil case and stay the depositions of Defendants, pending the DOJ's criminal investigation into the Broiler industry. (ECF No. 2268.) On June 27, 2019, the Court granted an initial stay on the depositions of Defendants until September 27, 2019. (ECF No. 2302.) On October 16, 2019, the Court extended the stay on the depositions of Defendants (with certain exceptions) until June 27, 2020. (ECF No. 3153.)

Prior to the Court's ruling on Defendants' motions to dismiss, Plaintiffs reached an "ice-breaker" settlement with Defendant Fieldale. Fieldale, a small producer with a market share or approximately 2.1% of Settlement Class sales[4] agreed to pay $2.25 million, provide cooperation including attorney and witness proffers, and produce certain documents to DPPs. (*See* Bruckner

---

[4] The market share estimates in this Motion are based on DPPs' analysis and estimates of sales to putative members of the Settlement Class by Defendants and their alleged co-conspirators, based on information that is currently available to DPPs from 2008 through 2017. (Bruckner Decl. ¶ 8.) These estimates and analysis are ongoing and may be subject to modification in the future.

Decl. ¶ 8.) The Court granted final approval to the Fieldale settlement on November 18, 2018. (*See* ECF No. 1414.)

## III.  SUMMARY OF THE SETTLEMENT NEGOTIATIONS AND TERMS

The Settlement Agreements with Peco, George's, and Amick were reached through protracted arm's length settlement negotiations. The Peco and George's settlements were the product of a joint negotiation process that commenced in February 2018. The Amick settlement was separately negotiated in a process that started in December 2018. The core settlement terms are substantially similar in each of the Agreements, and the settlement amounts reflect the market share and other factors affecting these Settling Defendants. Each of the Settlements represents an increase—on a proportionate and gross basis—from the Fieldale settlement. Collectively the Settlements provide up to $13.35 million in recovery to the Settlement Class,[5] and bring the total amount recovered by DPPs to $15.6 million.

Subject to the approval and direction of the Court, the Settlements (with accrued interest) will be used to: (1) pay for notice costs and costs incurred in the administration and distribution of the Settlements; (2) pay taxes and tax-related costs associated with the escrow account for proceeds from the Settlements; (3) make a distribution to Settlement Class Members in accordance with a to be filed proposed plan of distribution; (4) pay attorneys' fees to Counsel for the Settlement Class, as well as costs and expenses, that may be awarded by the Court; and (5) pay incentive awards to the named Plaintiffs. At this time, DPPs do not intend to distribute settlement proceeds or to seek attorneys' fees or costs (other than the costs of notice) from the Settlements.  DPPs will make a motion for distribution of settlement proceeds, and attorneys' fees, costs, and incentive awards at an appropriate date in the future.

---

[5] The "Settlement Class" definition is set forth in Section V at p. 12 herein.

A.      **The Peco and George's Settlements**

Peco and George's were named as defendants in DPPs' original complaint. After filing the lawsuit, DPPs exchanged written discovery and negotiated the scope of discovery pending the Court's decision on Defendants' motions to dismiss. Once Defendants' motions to dismiss were denied, Plaintiffs proceeded with discovery against Peco and George's, which included responses to interrogatories, the production of documents, deposing three executives from Peco (including Peco's President and CEO), and deposing five executives from George's (including two former CEOs).

DPPs' settlement negotiations with Peco commenced in February 2017, but did not result in an agreement at that time. (*See* Bruckner Decl. ¶ 9.) In January 2018, DPPs and Peco reengaged in settlement discussions, which George's joined in February 2018. (*Id.* ¶ 10). After several months of negotiations, the parties could not reach a settlement, but agreed to participate in a mediation with Kenneth R. Feinberg in October 2018. (*Id.* ¶ 11.) The parties were unable to reach an agreement during the mediation. (*Id.*) Over the next year, the parties periodically continued their negotiations via telephone conferences and email exchanges. (*Id.* ¶ 12) In August and September 2019, DPPs made comprehensive settlement offers to Peco and George's, respectively. (*Id.* ¶ 13.) The parties reached agreement on the settlement terms with Peco and George's on December 5, 2019. (*See* Peco Settlement, attached as Exhibit A to Bruckner Decl.; George's Settlement, attached as Exhibit B to Bruckner Decl.)

The Peco and George's settlement agreements require Peco to pay $5.15 million and George's to pay $4.25 million to the Settlement Class. (*See* Peco Settlement and George's Settlement § II.A.1.) Peco and George's will cooperate with DPPs solely with regard to the authentication of documents in the litigation. (*Id.* § II.A.1.d.) In exchange, the DPPs and the

proposed Settlement Class will release claims against Peco and George's which were or could have been brought in this litigation arising from the conduct alleged in the Complaint. (*See Id.* §§ I.B.26, II.B.) The release does not extend to other Defendants or to unrelated claims that are not the subject matter of the lawsuit. (*Id.*) The Peco and George's settlements contain a reduction mechanism in the event that class members who opt out of the Settlement Class represent more than 50% of all Defendants' United States total annual sales for 2008-2017. (*See id.* at § II.E.10.b.) The Peco and George's settlements do not contain a termination provision based on opt-outs. DPPs will report on the number of opt-outs and the amount recovered by the Settlement Class prior to final approval.

**B.    The Amick Settlement**

Prior to DPPs naming Amick as a Defendant in the Complaint, they alleged that Amick was a co-conspirator. (*See, e.g.*, Third Consolidated Amended Complaint, ECF No. 709.) Accordingly, the DPPs served Amick with a subpoena, and engaged in discovery negotiations with Amick which closely tracked discovery of the named Defendants. (Bruckner Decl. ¶ 15.) Once Amick was named as a Defendant, it responded to Plaintiffs' written discovery, and produced documents responsive to Plaintiffs' requests for production. (*Id.* ¶ 17.) DPPs were prepared to commence the depositions of Amick's witnesses, which were postponed due to the announcement of the DOJ investigation and subsequent DOJ Stay. (*Id.* ¶ 18.)

DPPs engaged in preliminary settlement discussions with Amick before naming it as a defendant. In December 2018, DPPs and Amick held an in-person settlement conference, which did not result in an agreement. (*See* Bruckner Decl. ¶ 16.) DPPs named Amick as a Defendant in their operative Complaint filed in January 2019. (ECF No. 1565.) In July 2019, DPPs and Amick resumed settlement discussions. During the next several months, the parties held multiple rounds

of discussions and exchanged emails regarding a potential settlement. (*See* Bruckner Decl. ¶ 19.) Shortly after parties reached an agreement in principle, they finalized the terms of the final written settlement agreement. (*See* Amick Settlement, attached as Exhibit C to Bruckner Decl.)

Pursuant to the settlement, Amick will pay $3.95 million to the Settlement Class. (*See* Amick Settlement, § II.A.1.) Like the Peco and George's settlements, Amick will cooperate with DPPs solely with regard to authentication of documents produced in the litigation. (*Id.*) The scope of the Amick release is the same as Peco and George's. (*Id.*, §§ I.B.27, II.B.) The Amick Settlement includes a reduction mechanism if the persons who opt out of the Settlement Class represent, in aggregate, more than 50% of Amick's United States total annual sales for 2008-2017 (excluding sales for export or sales to other Defendants). (*Id.* at § II.E.10.b.ii.) The Amick Settlement also contains a termination provision if the persons who opt out of the Settlement Class represent, in aggregate, more than 55% of Amick's United States total annual sales for 2008-2017 (excluding sales for export or sales to other Defendants). (*Id.* at § II.E.10.b.iii.) DPPs will report on the number of opt-outs and the amount recovered by the Settlement Class at final approval.

## IV.    THE SETTLEMENTS SATISFY THE STANDARD FOR PRELIMINARY APPROVAL

There is an overriding public interest in settling litigation, and this is particularly true in class actions. *See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 888-89 (7th Cir. 1985), *cert. denied,* 478 U.S. 1004 (1986) (noting that there is a general policy favoring voluntary settlements of class action disputes); *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement."), *overruled on other*

grounds, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Class action settlements minimize the litigation expenses of the parties and reduce the strain such litigation imposes upon already scarce judicial resources. *Armstrong*, 616 F.2d at 313 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). However, a class action may be settled only with court approval. Fed. R. Civ. P. 23(e).

"The first step in district court review of a class action settlement is a preliminary, pre-notification hearing to determine whether the proposed settlement is 'within the range of possible approval.'" 2 NEWBERG ON CLASS ACTIONS, §11.24 (3d ed. 1992); *see also Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982); *Armstrong*, 616 F.2d at 314; *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254 (D. Del. 2002); *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y 1997). Generally, before directing notice to the class members, a court makes a preliminary evaluation of the proposed class action settlement pursuant to Rule 23(e). The Manual For Complex Litigation (Fourth) § 21.632 (2004) explains:

> Review of a proposed class action settlement generally involves two hearings. First counsel submit the proposed terms of settlement and the judge makes a preliminary fairness evaluation . .. The Judge must make a preliminary determination on the fairness, reasonableness and adequacy of the settlement terms and must direct the preparation of notice of the . . . proposed settlement, and the date of the [formal Rule 23(e)] fairness hearing.

A proposed settlement falls within the "range of possible approval" when it is conceivable that the proposed settlement will meet the standards applied for final approval. The standard for final approval of a class action settlement is whether the proposed settlement is fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e); *see also Uhl v. Thoroughbred Tech. & Telecomms, Inc.*, 309 F.3d 978, 986 (7th Cir. 2002); *Isby*, 75 F.3d at 1198-99. When granting preliminary approval, the court does not conduct a "definitive proceeding on the fairness of the

proposed settlement," and the court "must be careful to make clear that the determination permitting notice to members of the class is not a finding that the settlement is fair, reasonable and adequate." *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983) (quoting *In re Montgomery Cty. Real Estate Antitrust Litig.*, 83 F.R.D. 305, 315-16 (D. Md. 1979). That determination must await the final hearing when the court can assess the fairness, reasonableness, and adequacy of the proposed settlement.

The requirement that class action settlements be fair is designed to protect against collusion among the parties. *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. at 1383. There is usually an initial presumption that a proposed settlement is fair and reasonable when it was the result of arm's length negotiations. *See* 2 NEWBERG ON CLASS ACTIONS, § 11.40 at 451 (2d ed. 1985); *Goldsmith v. Tech. Solutions Co.*, No. 92-CV-4374, 1995 WL 17009594, at *3 n.2 (N.D. Ill. Oct. 10, 1995) ("[I]t may be presumed that the agreement is fair and adequate where, as here, a proposed settlement is the product of arm's length negotiations."). Settlements that are proposed by experienced counsel and result from arm's length negotiations are entitled to deference from the court. *See, e.g., In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) ("A presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery.") (quoting *Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997)). The initial presumption in favor of such settlements reflects courts' understanding that vigorous negotiations between seasoned counsel protect against collusion and advance the fairness concerns of Rule 23(e). In making the determination as to whether a proposed settlement is fair, reasonable, and adequate, the Court necessarily will evaluate the judgment of the attorneys for the parties regarding the

"strength of plaintiffs' case compared to the terms of the proposed settlement." *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 346 (N.D. Ill. 2010).

## A.    The Settlements Resulted from Arm's Length Negotiations

In this case, each of the proposed Settlements satisfy the standard for preliminary approval. As detailed in this Motion, each of the Settlements was the product of extensive arm's length negotiations that took place over the course of several months. (*See* Section II, *infra*; *see also* Bruckner Decl. ¶¶ 9-22.) The Peco and George's settlement process included mediation, and over a year of periodic settlement negotiations. (*See id.*) The Amick settlement negotiations included an in-person settlement conference, and several months of ongoing settlement discussions. (*See id.*) These protracted arm's length settlement negotiations support approval of the Settlements by demonstrating they are free from collusion. *See, e.g.*, *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 640. Moreover, the fact that the negotiations occurred over an extended time, and were supported by substantial discovery, indicate that DPPs worked to achieve the best possible result on behalf of the Settlement Class. *Id.*

Even though such a finding is not required at the preliminary approval stage, the fairness, reasonableness, and adequacy of the Settlements is also supported by the relief obtained on behalf of the Settlement Class. Each of the Settlements provides more monetary relief to the class members than the Fieldale settlement, which has been granted final approval. The Fieldale settlement was for $2.25 million and represented approximately 2.1% of the Settlement Class sales. By comparison, through the proposed Settlements with Peco, George's, and Amick, the Class will recover at a higher rate on a dollar per market share basis than the Fieldale settlement. Collectively, the Settling Defendants represent approximately 6.5% of the DPP class sales and will provide the Settlement Class with up to $13.35 million in monetary relief. This is a significant amount of money for a relatively small percentage of the Settlement Class sales.

## V.    THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS

At the preliminary approval stage, the Court must also determine whether the proposed Settlement Class should be certified for settlement purposes under Federal Rule of Civil Procedure ("Rule") 23. *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Certification of a settlement class must satisfy each requirement set forth in Rule 23(a), as well as at least one of the separate provisions of Rule 23(b). *Id.* at 613-14; *see also In re Cmty. Bank of N. Va.*, 418 F.3d 277, 299 (3d Cir. 2005) ("[C]ertification of classes for settlement purposes only [is] consistent with Fed. R. Civ. P. 23, provided that the district court engages in a Rule 23(a) and (b) inquiry[.]").

Here, DPPs seek certification of a Settlement Class (also referred to as "Class") of:

> All persons who purchased Broilers directly from any of the Defendants or any Co-Conspirator[6] identified in this action, or their respective subsidiaries or affiliates for use or delivery in the United States from at least as early as January 1, 2008 until the Date of Preliminary Approval. Specifically excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any Co-Conspirator identified in this action.

(Settlement Agreements, § II.E.2.) This is the same class proposed in the Complaint and already approved in the Fieldale settlement. (*See* Fieldale Final Approval Order, ECF No. 1414.) As detailed below, this proposed Class meets the requirements of Rule 23(a) as well as the requirements of Rule 23(b)(3).

---

[6] The term "Co-Conspirator" is synonymous with the term "Defendant Family Co-Conspirator," in the Peco and George's Settlement Agreements, which is defined as those entities named as co-conspirators in paragraph 102 of the Operative Complaint.

## A.    The Requirements of 23(a) Are Satisfied

### 1.    Numerosity

Rule 23(a)(1) requires that the class be so numerous as to make joinder of its members "impracticable." No magic number satisfies the numerosity requirement, however, "a class of more than 40 members is generally believed to be sufficiently numerous for Rule 23 purposes." *Schmidt v. Smith & Wollensky LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010) (citations omitted). The proposed Settlement Class consists of persons and entities that purchased Broilers from the Defendants during the period from January 1, 2008 to the Date of Preliminary Approval. DPPs' investigation and discovery has confirmed that there are thousands of persons and entities that fall within the Settlement Class definition. (Bruckner Decl. ¶ 23.) Thus, joinder would be impracticable and Rule 23 (a)(1) is satisfied.

### 2.    Common Questions of Law and Fact

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Plaintiffs must show that resolution of an issue of fact or law "is central to the validity of each" class member's claim and "[e]ven a single [common] question will" satisfy the commonality requirement. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). A central allegation in the Complaint is that Defendants illegally conspired to restrict supply and increase prices of Broilers. Proof of this conspiracy will be common to all Class members. *See, e.g.*, *Thillens, Inc. v. Cmty. Currency Exch. Ass'n*, 97 F.R.D. 668, 677 (N.D. Ill. 1983) ("The overriding common issue of law is to determine the existence of a conspiracy."). In addition to that overarching question, this case is replete with other questions of law and fact common to the Settlement Class including: (1) the role of each Defendant in the conspiracy; (2) whether Defendants' conduct violated Section 1 of the Sherman Act; (3) whether Defendants affirmatively concealed their

agreement; (4) whether Defendants' conspiratorial conduct restricted Broiler supplies and caused the prices of Broilers to be inflated; (5) the appropriate measure of monetary relief, including the appropriate measure of damages; and (6) whether Plaintiffs and Class members are entitled to declaratory and/or injunctive relief. Accordingly, the Settlement Class satisfies Rule 23(a)(2).

### 3. **Typicality**

Rule 23(a)(3) requires that the class representatives' claims be "typical" of class members' claims. "[T]ypicality is closely related to commonality and should be liberally construed." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 479 (N.D. Ill. 2009) (citations omitted). Typicality is a "low hurdle," requiring "neither complete coextensivity nor even substantial identity of claims." *Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 282 (N.D. Ill. 2005). When "the representative party's claim arises from the same course of conduct that gives rise to the claims of other class members and all of the claims are based on the same legal theory," factual differences among class members do not defeat typicality. *Id.* Courts generally find typicality in cases alleging a price-fixing conspiracy. *See, e.g.*, *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 185 (D.N.J. 2003) (finding that plaintiffs met the typicality requirement based on the fact that plaintiffs' main claim - that they were harmed by an illegal price-fixing conspiracy - was the same for all class members).

DPPs here allege a conspiracy to fix, maintain, and stabilize the price of Broilers sold in the United States. The named Plaintiffs will have to prove the same elements that absent Settlement Class members would have to prove, i.e., the existence and effect of such a conspiracy. As alleged in the Complaint, each named representative purchased Broilers directly from one or more Defendants, and was overcharged and suffered an antitrust injury as a result of the violations alleged in the Complaint. (Complaint, ¶¶ 22-28.) Because the representative

Plaintiffs' claims arise out of the same alleged illegal anticompetitive conduct and are based on the same alleged theories and will require the same types of evidence to prove those theories, the typicality requirement of Rule 23(a)(3) is satisfied.

### 4. Adequacy

Rule 23(a)(4) requires that, for a case to proceed as a class action, the court must find that "the representative parties will fairly and adequately protect the interests of the class." Adequacy of representation is measured by a two-part test: (i) the named plaintiffs cannot have claims in conflict with other class members, and (ii) the named plaintiffs and proposed class counsel must demonstrate their ability to litigation the case vigorously and competently on behalf of named and absent class members alike. *See Kohen v. Pacific Inv. Mgmt.*, 571 F.3d 672, 679 (7th Cir. 2009).

Both requirements are satisfied here. As they demonstrated at the time they sought appointment, Co-Lead Counsel are qualified, experienced, and thoroughly familiar with antitrust class action litigation. (*See* Order Appointing Co-Lead Counsel, ECF No. 144.) Co-Lead Counsel have successfully litigated many significant antitrust actions and have prosecuted and will continue to vigorously prosecute this lawsuit. (*Id.*) Co-Lead Counsel respectfully submit that they have diligently represented the interests of the Class throughout this litigation and will continue to do so.

Moreover, the interests of the Settlement Class Members are aligned with those of the representative Plaintiffs. Plaintiffs, like all Settlement Class Members, share an overriding interest in obtaining the largest possible monetary recovery. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) (certifying settlement class and holding that "so long as all class members are united in asserting a common right, such as achieving the

maximum possible recovery for the class, the class interests are not antagonistic for representation purposes"). The class representatives have fulfilled their duties to the Class by actively participating throughout the litigation including sitting for depositions, responding to written discovery, and producing documents. (*See* Bruckner Decl. ¶ 7.) Accordingly, the requirements of Rule 23(a)(4) are satisfied.

### B.    The Settlement Class Satisfies Rule 23(b)(3)

Once Rule 23(a)'s four prerequisites are met, Plaintiffs must show the proposed Settlement Class satisfies Rule 23(b)(3) by showing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." As to predominance, "[c]onsiderable overlap exists between the court's determination of commonality and a finding of predominance. A finding of commonality will likely satisfy a finding of predominance because, like commonality, predominance is found where there exists a common nucleus of operative facts." *Saltzman*, 257 F.R.D. at 484. In antitrust conspiracy cases such as this one, courts consistently find that common issues of the existence and scope of the conspiracy predominate over individual issues. *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 408 (S.D. Ohio 2007); *In re Catfish Antitrust Litig.,* 826 F. Supp. 1019, 1039 (N.D. Miss. 1993) ("As a rule of thumb, a price fixing antitrust conspiracy model is generally regarded as well suited for class treatment."). This follows from the central nature of a conspiracy in such cases. *Hughes v. Baird & Warner, Inc.*, No. 76-CV-3929, 1980 WL 1894, at *3 (N.D. Ill. Aug. 20, 1980) ("Clearly, the existence of a conspiracy is the common issue in this case. That issue predominates over issues affecting only individual sellers."); *see*

*also Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.").

Plaintiffs must also show that a class action is superior to individual actions, which is evaluated by four considerations:

> (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of the class action.

Fed. R. Civ. P. 23(b)(3).

Here, any Class Member's interest in individually controlling the prosecution of separate claims is outweighed by the efficiency of the class mechanism. Thousands of entities purchased Broilers during the class period; settling these claims in the context of a class action conserves both judicial and private resources and hastens the Settlement Class Members' recovery. Finally, while Plaintiffs see no management difficulties in this case, this consideration is not pertinent to approving a settlement class. *See Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.").

## VI.    THE COURT SHOULD APPROVE THE PROPOSED NOTICE PLAN

Rule 23(e) requires that prior to final approval, notice of a proposed settlement be given in a reasonable manner to all class members who would be bound by such a settlement. For a class proposed under Rule 23(b)(3), whether litigated or by virtue of a settlement, Rule 23(c)(2)(B) states:

> The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition

> of the class certified; (iii) the class claims, issues, or defenses; (iv)
> that a class member may enter an appearance through an attorney
> if the member so desires; (v) that the court will exclude from the
> class any member who requests exclusion; (vi) the time and
> manner for requesting exclusion; and (vii) the binding effect of a
> class judgment on members under Rule 23(c)(3).

The form of notice is "adequate if it may be understood by the average class member." 4 *Newberg on Class Actions* § 11.53 (4th ed. 2002) ("*Newberg*").

Notice to class members must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem Prods.*, 521 U.S. at 617 (quoting Fed. R. Civ. P. 23(c)(2)); *City of Greenville v. Syngenta Crop Prot.*, No. 3:10-CV-188, 2012 WL 1948153, at *4 (S.D. Ill. May 30, 2012) (same). Individual notice should be sent to members who can be identified through reasonable effort. Such notice may be by United States mail, electronic means, or other appropriate means. Fed. R. Civ. P. 23(c)(2)(B). Other members may be notified by publication. *City of Greenville*, 2012 WL 1948153 at *4.

The proposed notice plan in this case satisfies these criteria, and this Court approved an essentially identical plan in connection with the Fieldale settlement. (*See* Order Approving Fieldale Notice Plan, ECF No. 994.) As in the Fieldale settlement, DPPs propose to the Court a plan of notice that comports with due process and provides reasonable notice to known and reasonably identifiable customers of Defendants pursuant to Rule 23.

The class notice documents consisting of the long form, email, and publication notice comply with the requirements of Rule 23(c)(2)(B). (The proposed long form, email, and publication notices are attached to the Declaration of Jennifer Keough in Support of the Motion ("Keough Decl.") as Exhibits "B," "C," and "D" respectively.) The notice documents define the Settlement Class, describe the nature of the action, summarize the class claims, and explain the

procedure for requesting exclusion from the Settlement Class and objecting to the proposed Settlements. The notice documents describe the terms of the Settlement Agreements, and inform the Settlement Class Members that there is no plan of distribution at this time. The notice documents will provide the date, time and place of the final approval hearing (once that hearing is set by the Court), and inform Settlement Class Members that they do not need to enter an appearance through counsel, but may do so if they choose. The notice documents also inform Settlement Class Members how to exercise their rights to participate in, opt out of, or object to the proposed Settlements, how to make informed decisions regarding the proposed Settlements, and tell Settlement Class Members that the Settlements will be binding upon them if they do not opt out.

DPPs' proposed notice plan also comports with due process and Rule 23. The plan includes: (1) direct notice by U.S. mail or email to Class Members who can be identified by reasonable effort, including but not limited to Defendants' customer lists; (2) publication of the summary notice in industry-related mailed and digital media; and (3) the posting of notice on the existing case website, http://www.broilerchickenantitrustlitigation.com. Since the Settlement Class Members in this case directly purchased Broilers from Defendants, DPPs have obtained mailing addresses for the vast majority of Settlement Class Members from Defendants' customer lists, and will rely predominantly on direct mail and email to Class Members who can be identified through reasonable effort. Fed. R. Civ. P. 23(c)(2)(B).

As with the Fieldale settlement, Plaintiffs have retained JND Legal Administration, an experienced national class action notice provider and claims administrator, to administer the notice plan for the Settling Defendants. (*See* Order Approving Notice Plan at ECF No. 994; *see also* Bruckner Decl. ¶ 24, Keough Decl. ¶¶ 1-7 and Exhibit A.) JND will mail the long form

notice via first-class U.S. mail to Settlement Class Members who can be identified through Defendants' records. (Keough Decl. ¶ 15.) JND will also send the email notice to all Settlement Class Members for whom email addresses are provided in the class list data. (*Id.* ¶ 17.) The email notice will provide Settlement Class Members with an electronic link to the settlement website, where they can obtain more information including the long form notice and the Settlement Agreements. (*Id.*) This direct mail and email notice should reach the vast majority of Settlement Class Members. (*Id.* ¶ 18.)

JND further plans to supplement the direct mail and email notice via publication notice. This will include both print and digital media components. Suggested print publications include *Progressive Grocer*, *Meat & Poultry*, *Poultry Times*, *Frozen & Refrigerated Buyer*, *Supermarket News*, and *Grocery Headquarters*. (Keough Decl. ¶ 19.) The print ads are expected to be included in a single issue of each of the publications. Suggested digital media publications include *Progressive Grocer*, *Meat & Poultry*, *Poultry Times*, *Supermarket News*, *Grocery Headquarters*, and *Fast Casual*. (*Id.*)

JND will also host the settlement website, providing additional information and documents, and a toll-free number for frequently asked questions and requests for mailing of further information. (Keough Decl. ¶¶ 20-21.) The website and call center will be available in both English and Spanish. (*See id.*)

This notice plan, which was successfully implemented for the Fieldale settlement, satisfies Fed. R. Civ. P. 23(c)(2) and 23(e) and constitutes the best notice practicable under the circumstances, and thus should be approved. *See City of Greenville*, 2012 WL 1948153, at *4 (quotation omitted); (Keough Decl. ¶ 24.)

## VII.    THE COURT SHOULD SCHEDULE A FINAL APPROVAL HEARING

The last step in the settlement approval process is the final approval hearing, at which the Court may hear all evidence necessary to evaluate the proposed Settlements. At that hearing, proponents of the Settlements may explain and describe their terms and conditions and offer argument in support of the Settlements' approval, and members of the Settlement Class or their counsel may be heard regarding the proposed settlements if they choose. DPPs propose the following schedule of events necessary for a hearing on final approval of the Settlements.

| DATE | EVENT |
|---|---|
| Within 21 days after preliminary approval | Settlement Administrator to provide direct mail and email notice, and commence the publication notice plan |
| 60 days after the mailing of Notice | Last day for Settlement Class Members to request exclusion from the Settlement Class; for Settlement Class Members to object to the Settlements; and for Settlement Class Members to file notices to appear at the Fairness Hearing |
| 10 days after last day to request exclusion from the Settlements | Class Counsel shall file with the Court a list of all persons and entities who have timely and adequately requested exclusion from the Settlement Class |
| 14 days before Fairness Hearing | Class Counsel shall file a motion for final approval of the Settlements and all supporting papers, and Class Counsel and the Settling Defendants may respond to any objections to the proposed Settlements |
| 30 days after last day to request exclusion from the Settlements[7] | Final Settlement Fairness Hearing |

---

[7] Under the Class Action Fairness Act, 28 U.S.C. § 1715 ("CAFA"), the Court may not issue an order giving final approval of a proposed settlement earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with notice of these proposed Settlements.  *Id.* at § 1715(d).  Under each of the three Settlement Agreements, within ten days of the filing of this motion, each Settling Defendant will provide to the appropriate state officials and the appropriate federal official the CAFA notice required by §1715(b).  This schedule will allow the Court to schedule a Fairness Hearing as DPPs propose in the schedule above, in conformance with CAFA's requirements.

## VIII.   CONCLUSION

For these reasons, Interim Co-Lead Counsel respectfully request that the Court preliminary approve the Peco, George's, and Amick Settlement Agreements, preliminary certify the Settlement Class, order notice to be disseminated to the Settlement Class, and set a schedule for the final fairness hearing.

Date: December 11, 2019

*/s/ W. Joseph Bruckner*

W. Joseph Bruckner
Elizabeth R. Odette
Brian D. Clark
Simeon A. Morbey
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com

Clifford H. Pearson
Bobby Pouya
Michael H. Pearson
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
cpearson@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

Bruce L. Simon
PEARSON SIMON & WARSHAW, LLP
350 Sansome Street, Suite 680
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com

*Direct Purchaser Plaintiffs Interim Co-Lead Class Counsel*

Steven A. Hart (#6211008)
Brian Eldridge (#6281336)
Kyle Pozan (#6306761)
HART MCLAUGHLIN & ELDRIDGE, LLC
121 West Wacker Drive, Suite 1050
Chicago, IL 60601
Telephone: (312) 955-0545
Facsimile: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com
kpozan@hmelegal.com

*Direct Purchaser Plaintiffs Liaison Counsel*