UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | No. 16 C 8637<br><br>Judge Thomas M. Durkin |

MEMORANDUM OPINION AND ORDER

All but one defendant in this case is an industrial producer of chicken meat.[1] (The industry term for such meat is "Broilers.") Plaintiffs are businesses and individuals who purchased Broilers from Defendants—either directly or indirectly—for resale, business, or personal use, between 2008 and 2016. In three class complaints (by classes of direct purchasers, indirect purchasers, and end-user consumers), Plaintiffs alleged that Defendants conspired to fix Broiler prices higher than the market would naturally support, in violation of the Sherman Act § 1 and state law. On November 20, 2017, the Court denied motions to dismiss the complaints for failure to state a claim. *See* R. 541 (*In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017)).

After the Court denied the motions to dismiss, a number of new plaintiffs, who directly purchase Broilers from Defendants, filed complaints separate from the direct-purchaser class alleging the same price-fixing conspiracy against Defendants. Some of those complaints include new claims under the Racketeer Influenced and

---

[1] The exception is Agri Stats, Inc., a subsidiary of Eli Lilly & Co. that produces subscription reports about the Broiler industry. The claims against Agri Stats are not implicated by this motion.

Corrupt Practices Act, 18 U.S.C. §§ 1962(c) and 1964(c), and a similar statute under the Georgia Code § 16-14-4(b), which the Court will refer to collectively as the "RICO" claims.[2] These claims allege that certain defendants conspired to unlawfully manipulate a Broiler price index known as "Georgia Dock." R. 2094; R. 2099; R. 2105; R. 2163. One of those defendants, Sanderson Farms, has moved to dismiss the RICO claims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). R. 2920. That motion is denied.

## Legal Standard

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the

---

[2] Plaintiffs also make claims under the Georgia Code § 16-14-4(a), but Sanderson has not moved to dismiss these claims because § 16-14-4(a) does not include an "enterprise" element analogous to that contained in the federal statute, which is the focus of Sanderson's motion. *See* R. 2915 at 1 n.2

2

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

Sanderson argues that the heightened pleading standard of Rule 9(b) applies to allegations of an "enterprise" under RICO, which is the focus of this motion. *See* R. 2915 at 7. The Court finds that the weight of authority is to the contrary, and so will apply the Rule 8 standard. *See United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013) ("We review *de novo* whether the Fund's enterprise allegations meet the pleading standards of Rule 8(a) of the Federal Rules of Civil Procedure."); *Kostovetsky v. Ambit Energy Holdings, LLC*, 2016 WL 105980, at *3 (N.D. Ill. Jan. 8, 2016) ("As in [*Drobny v. JP Morgan Chase Bank, NA*, 929 F. Supp. 2d 839, 844-45 (N.D. Ill. 2013)], because the Seventh Circuit has applied the ordinary Rule 8(a) pleading requirements to the enterprise element of a fraud-based RICO claim in at least one case, *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644-46 (7th Cir. 1995), this court will apply Rule 8(a) to the non-fraud elements of Kostovetsky's RICO claim and Rule 9(b) only to the allegations of mail and wire fraud.").

3

**Background**

There are three primary price indices for Broilers: Urner Barry; USDA; and Georgia Dock. From at least July 2002, until about January 2011, these three indices tracked each other, more or less:



Figure 1. USDA, Urner Barry, and Georgia Dock Wholesale Price Comparison (2002-2016)

Source: Georgia.gov, USDA.gov, Urner Barry

R. 2096 at 116. As is shown in this chart taken from one of the relevant complaints (and which is included in all of them), beginning in about January 2011, the Georgia Dock price no longer followed the decreases or increases of the Urner Barry and USDA. And then around June 2015, when the Urner Barry and USDA began substantial and similar declines, the Georgia Dock price remained historically high, relative to the preceding 14 years.

4

Georgia Dock differs from Urner Barry and USDA in how underlying data is collected. "The USDA and Urner Barry's Broiler price indices are based upon a system of double verification, which includes telephonic and written surveys of all or nearly all chicken producers, but also verification of reported prices from purchasers such as brokers and customers." R. 2096 at 93 (¶ 294). By contrast, the Georgia Dock price is set based on unverified reports of prices by only nine Broiler producers who sell Broilers in Georgia. *See id.* at 95-97 (¶¶ 301-03). No Broiler purchasers are consulted in calculating the Georgia Dock price.

The Georgia Dock price is not a simple average of the nine producer reports. First, the weighted average of the reports is taken, weighted by each producer's market share. *Id.* at 95-96 (¶ 301). Then, any report that is more than one cent above or below the weighted average is discarded from the final weighted average. *Id.* at 96 (¶ 302). This is known as the "one-cent rule." *Id.*

Plaintiffs allege that Sanderson and the other eight Georgia Dock producers (collectively the "Georgia Dock RICO Defendants") gave false pricing reports to Georgia Dock. Plaintiffs allege further that the Georgia Dock RICO Defendants agreed that they would report prices to Georgia Dock within the same one-cent range to ensure that they could maintain a high price despite the one-cent rule.

The Georgia Dock price index is compiled and published by the Poultry Market News division of the Georgia Department of Agriculture. R. 2096 at 11 (¶ 16). Senior executives from seven of the Georgia Dock RICO Defendants were also members of the Poultry Market News Advisory Committee. *Id.* Members of the

5

Advisory Committee learned how Georgia Dock data was collected and how the price was calculated. *Id.* at 102 (¶ 320). Plaintiffs allege that the Advisory Committee "controlled the process for calculating and . . . reevaluating the Georgia Dock price." *Id.* at 104 (¶ 326). Sanderson did not have a representative on the Advisory Committee.

Sanderson is a member of the Georgia Poultry Federation. *Id.* at 169 (¶ 539). The Georgia Poultry Federation "acted as a go-between for the [Georgia Department of Agriculture] and the Advisory Committee." *Id.* at 106 (¶ 333). Additionally, Sanderson and the other Georgia Dock RICO Defendants "interacted with each other frequently at industry conferences and trade shows." *Id.* at 154 (¶ 497).

## Analysis

The federal RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c). "Racketeering activity" is defined with respect to a number of federal crimes. *See* 18 U.S.C. § 1961(1). Sanderson does not challenge Plaintiffs' allegations of "racketeering activity" on this motion.

The RICO statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). To allege an "association in fact," Plaintiffs must allege "at least three structural features: [1] a

6

purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Plaintiffs allege that the Georgia Dock RICO Defendants were associated in fact for the purpose of manipulating the Georgia Dock price. (Sanderson does not question the allegations of longevity.)

Sanderson argues that Plaintiffs' RICO claims against it fail because Plaintiffs concede that Sanderson was not a member of the Advisory Committee. But the Advisory Committee is not the RICO enterprise that is alleged. Rather, as Sanderson concedes, membership on the Advisory Committee is only one of many allegations of relationships among the Georgia Dock RICO Defendants in the complaints. *See* R. 2915 at 1 ("the Georgia Dock Defendants associated with each other to form and participate in a RICO 'enterprise' *in part* through their Advisory Committee membership" (emphasis added)). Although Sanderson was not an Advisory Committee member, Plaintiffs allege that Sanderson had relationships with the other Georgia Dock RICO Defendants through industry meetings and conferences. Plaintiffs also allege that Sanderson had a relationship with the Advisory Committee and the Georgia Dock through its membership in the Georgia Poultry Federation. As one of only nine producers who contributed pricing to the Georgia Dock, Plaintiffs have plausibly alleged that Sanderson had relationships with the Georgia Dock RICO Defendants.

Plaintiffs allege that the Advisory Committee was how the Georgia Dock RICO Defendants learned about the Georgia Dock's data collection and calculation

7

methods, which permitted them to manipulate the price. Sanderson argues that since it was not on the Advisory Committee, it could not have learned this information. But it is entirely plausible that this information was communicated among the Georgia Dock RICO Defendants at times other than Advisory Committee meetings in particular. Thus, the fact that Sanderson was not an Advisory Committee member does not mean that Sanderson could not have learned information from the Advisory Committee members during other interactions, which are alleged in the complaint.

Sanderson's motion might have more merit if membership in the Advisory Committee, the Georgia Poultry Federation, and general industry relationships were the only allegations indicating collusion among the Georgia Dock RICO Defendants. But the other allegations in the complaint overwhelmingly indicate that the Georgia Dock RICO Defendants conspired to manipulate the Georgia Dock price, whatever their specific means of communication. There were only nine price contributors to the Georgia Dock. Their price submissions were never verified. And starting in January 2015, the Georgia Dock price completely deviated from the Urner Berry and USDA prices. Such a deviation makes it plausible that it was caused intentionally. And with the "one-cent rule" knocking out outliers, the majority of the Georgia Dock RICO Defendants had to be deviating from the Urner Berry and USDA prices in order for the Georgia Dock price to exhibit the deviation that it did. (The one-cent rule mathematically assured that the price would move with the weighted majority.) Moreover, Plaintiff allege that the Georgia

8

Department of Agriculture employee responsible for collecting Georgia Dock price information, Arty Schronce, testified that it was very rare for any price submission to be excluded under the one-cent rule, and he could only recall two instances when that happened. R. 2096 at 97, 138 (¶¶ 304, 431). It is possible that not all the Georgia Dock RICO Defendants colluded to align their price submissions. Submissions could have been knocked out by the one-cent rule. And maybe that was true of Sanderson's submissions. But absent coordination, more one-cent rule exclusions would likely have occurred and been noticed. It was possible for only a weighted majority of the Georgia Dock RICO Defendants to manipulate the price. But the more Georgia Dock RICO Defendants who did not participate, the more likely it would be that the scheme would be noticed. For the alleged scheme to evade detection, all of the Georgia Dock RICO Defendants needed to participate so that outliers would be rare. So, even though it was possible to manipulate the Georgia Dock price with fewer than all the Georgia Dock RICO Defendants participating, Plaintiffs allegations make it *plausible* that all the Georgia Dock RICO Defendants colluded to submit prices within a range that took into account the one-cent rule, in order to keep the Georgia Dock price high. The allegations of "relationship" and "purpose" (along with undisputed longevity) are sufficient to plausibly allege an "enterprise."

Sanderson argues that this reasoning impermissibly defines the enterprise "coextensively with the pattern of racketeering," despite the requirement that "the existence of the enterprise [must be] a separate element from a pattern of

racketeering activity." R. 3096-1 at 7 (quoting *United States v. Chester*, 2017 WL 3394746, at *5 (N.D. Ill. Aug. 8, 2017), and *Boyle*, 556 U.S. at 947). But three sentences after making this argument, Sanderson concedes that the Supreme Court has said that "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise *may in particular cases coalesce.*" *Boyle*, 556 U.S. at 947 (emphasis added). That is true of Plaintiffs' allegations in this case. Plaintiffs' allegations plausibly show both common and concerted unlawful activity, because the Georgia Dock price would not have remained high above the Urner Barry and USDA prices unless at least a weighted majority of the Georgia Dock RICO Defendants agreed to submit higher prices within a range that avoided being knocked out by the one-cent rule. Sanderson also notes that the Supreme Court has emphasized that allegations of a pattern of racketeering activity "would not be enough to show that the individuals were members of an enterprise," if the individuals acted "independently and without coordination." R. 3096-1 at 7. But here, the racketeering activity alleged permits the plausible inference that the fraudulent price submissions were coordinated. Contrary to Sanderson's concerns, this interpretation of the allegations does not "collapse" the "two statutory elements" into "one." It simply acknowledges, as has the Supreme Court, that sometimes the same allegations can be a basis to show both racketeering activity and an enterprise. Despite Sanderson's argument, this is an uncontroversial conclusion that has been reached by a number of courts. *See, e.g., G & G Closed Circuit Events, LLC v. Castillo*, 327 F. Supp. 3d 1119, 1137 (N.D. Ill. 2018) ("There

10

is no requirement that the Court 'zero out' the alleged RICO predicate acts when deciding whether [the] three structural features [described in *Boyle*] have been alleged.").

Sanderson also argues that Plaintiffs' allegations of racketeering activity do not permit a plausible inference of concerted conduct, because: (1) "Plaintiffs have not actually alleged any parallel price submissions to the Georgia Dock by Sanderson Farms"; and (2) "It does not follow, as Plaintiffs suggest in their opposition, that the scheme could not succeed without all bidders." R. 3096-1 at 8, 10. It is true that Plaintiffs have not made specific allegations regarding Sanderson's price submissions. Plaintiffs have discovered records of more than 500 price submissions made by five Georgia Dock RICO Defendants that total almost 67% of the market, but none from Sanderson, apparently because Sanderson, unlike the five defendants for whom Plaintiffs have price submission records, reported its price submissions over the phone and did not keep records. *See* R. 2096 at 118 (¶ 363). And it is also true that, mathematically, these five Georgia Dock RICO Defendants could have colluded to manipulate the Georgia Dock price without the agreement of the other four Georgia Dock RICO Defendants, including Sanderson. But the *evidence* cited in the complaint (both documentary and testimonial), shows that the five Georgia Dock RICO Defendants' price submissions were always within one cent of the previous week's price, and were very rarely lower than the previous week's price. This evidence plausibly indicates an agreement among those five Georgia Dock RICO Defendants. Considering the testimony that price submissions

11

were very rarely knocked out by the one-cent rule, and there are only four other Georgia Dock RICO Defendants, who all regularly interacted through the Advisory Committee, the Georgia Poultry Federation, and other industry meetings, it is also plausible that the other four Georgia Dock RICO Defendants, including Sanderson, participated in the collusion to maintain a high Georgia Dock price. The allegations, of course, do not eliminate the possibility that Sanderson did not participate in the enterprise. But the allegations are sufficient to plausibly allege the claim that Sanderson did participate.[3]

Lastly, Sanderson argues in passing that Plaintiffs have failed to allege that Sanderson "conducted" the enterprise, which is another element of the claims. *See* R. 3096-1 at 3. But Sanderson is "alleged to be part of the enterprise itself," which is sufficient to allege "conduct" under RICO. *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 979 (7th Cir. 1995). The allegation of Sanderson's express agreement with the other Georgia Dock RICO Defendants to submit fraudulent prices to the Georgia Dock, which the Court finds Plaintiffs have plausibly alleged, is sufficient to allege "conduct." *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 378 (3d Cir. 2010) ("[I]f defendants band together to commit

---

[3] As noted, the heightened pleading of Rule 9(b) does not apply to pleading the "enterprise" element. The Court finds this remains true even when allegations of "racketeering" also serve as allegations of the "enterprise." Sanderson has not addressed this specific issue. Nevertheless, the Court would find that Plaintiffs' allegation of the particular person responsible for submitting the allegedly fraudulent prices, *see* R. 2096 at 137 (¶ 429), and Plaintiffs' allegation that the prices were submitted to the Georgia Dock, satisfies the particularity requirements of Rule 9(b), with respect to the "racketeering" element.

12

[violations] they cannot accomplish alone . . . then they cumulatively are conducting the association-in-fact enterprise's affairs, and not [simply] their own affairs.").

## Conclusion

More than two years ago, the Court denied motions to dismiss claims under the Sherman Act § 1, finding that the allegations plausibly demonstrated collusive agreement among Defendants. The allegations of collusive manipulation of the Georgia Dock are even stronger. Therefore, Sanderson's motion to dismiss [2920] is denied.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: March 3, 2020