# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION (Case No. 1:16-cv-08637) | Case No..: 1:20-cv-02013<br>Hon. Judge Thomas M. Durkin |
| This Document Relates To:<br><br>INDEPENDENT PURCHASING COOPERATIVE, INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>KOCH FOODS, INC.; JCG FOODS OF ALABAMA, LLC; JCG FOODS OF GEORGIA, LLC; KOCH MEATS CO., INC.; NORMAN W. FRIES, INC., d/b/a CLAXTON POULTRY FARMS; FOSTER FARMS, LLC; GEORGE'S, INC.; GEORGE'S FARMS, INC.; HARRISON POULTRY, INC.; HOUSE OF RAEFORD FARMS, INC.; KEYSTONE FOODS LLC; EQUITY GROUP EUFAULA DIVISION LLC; EQUITY GROUP-GEORGIA DIVISION LLC; EQUITY GROUP KENTUCKY DIVISION LLC; MAR-JAC POULTRY, INC.; MOUNTAIRE FARMS, INC.; MOUNTAIRE FARMS, LLC; MOUNTAIRE FARMS OF DELAWARE, INC.; O.K. FOODS, INC.; O.K. FARMS, INC.; O.K. INDUSTRIES, INC.; PECO FOODS, INC.; PERDUE FARMS, INC.; PERDUE FOODS, LLC; PILGRIM'S PRIDE CORPORATION; SANDERSON FARMS, INC.; SANDERSON FARMS, INC. (FOODS DIVISION); SANDERSON FARMS, INC. (PRODUCTION DIVISION); SANDERSON FARMS, INC. (PROCESSING DIVISION); SIMMONS FOODS, INC.; TYSON FOODS, INC.; TYSON CHICKEN, INC.; TYSON BREEDERS, INC.; TYSON POULTRY, INC.; WAYNE FARMS, LLC; AMICK FARMS, LLC; CASE FOODS, INC.; CASE FARMS, LLC; CASE FARMS PROCESSING, INC.; and AGRI STATS, INC.,<br><br>                    Defendants. | **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS**<br><br>**Jury Trial Demanded** |

Plaintiff Independent Purchasing Cooperative, Inc. ("IPC" or "Plaintiff"), brings this action for treble damages under the federal antitrust laws against the Defendants identified below. Plaintiff seeks damages commencing from at least January 1, 2008 through at least 2017 (hereafter, the "conspiracy period") for its purchases of chickens directly from Defendants at supra-competitive prices, and alleges as follows:

## I.     NATURE OF THE ACTION

1.     Defendants are purported competitors in the United States broiler chicken production industry.  In violation of Section 1 of the Sherman Act, Defendants combined and conspired during the conspiracy period to restrain trade and fix broiler chicken prices higher than the market would naturally support.

2.     As discussed herein, this conspiracy to inflate broiler chicken prices above competitive levels was executed by Defendants and their co-conspirators through numerous tactics during the conspiracy period, including a coordinated, collusive reduction of broiler chicken supply, bid rigging on broiler chicken sales, and the coordinated manipulation of the "Georgia Dock," which was a widely used weekly benchmark price compiled and published by the Georgia Department of Agriculture.

3.     Senior executives from two of the Defendants are already under criminal indictment by the United States Department of Justice in connection with their roles in the conspiracy, and the Department of Justice has also made clear that its investigation is ongoing.

4.     "Broilers," "chickens," or "broiler chickens" are "chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards." *See* November 20, 2017 Memorandum Opinion and

Order (D.E. 541) at 2-3, *In re Broiler Chicken Antitrust Litig.*, No. 16 CV 8637 N.D. Ill. Broiler chickens constitute approximately 98% of all chicken meat sold in the United States.

5.      Defendants are industrial broiler chicken producers, and collectively control nearly 90% of broiler chicken production in the United States.

6.      Defendants own or tightly control all aspects of broiler chicken production, including the laying of eggs; the hatching of chicks; the raising of chicks; the slaughtering of chickens; and processing and distributing the meat. The technology and process of industrial scale broiler chicken production is well known among Defendants, and all Defendants use the same types of equipment and processes.

7.      High barriers to entry exist in the broiler chicken market. Entry into the market would cost in excess of $100 million, and no company has created a new poultry company from scratch in decades.

8.      Defendants' cartel was implemented by coordinated and collusive activity in restrain of trade on both the "front end" and "back end" of the broiler chicken production and sale process. On the front end, Defendants coordinated and conspired to reduce the supply of chickens into the market. On the back end, Defendants conspired to manipulate a price index used to set wholesale chicken prices for buyers across the nation, and engaged in other collusive activity to maintain artificially high and supra-competitive prices for broiler chickens.

9.      Defendants curtailed the supply of chickens in the market on the front end via unprecedented cuts at the top of the supply chain. This included the coordinated and collusive reduction of production capacity and jointly and collusively reducing "breeder flocks" that produce chickens ultimately slaughtered for meat consumption.

10.　Historically, when faced with low market prices, Defendants relied primarily on mechanisms that temporarily reduced production – at the middle or end of the supply chain, such as reducing eggs placements, killing newly-hatched chicks, or idling processing plants – but which still allowed them to ramp up production within weeks if market conditions changed.

11.　Prior to the conspiracy period, the pattern of annual increases in chicken production became so entrenched over decades of experience that by the 2000s, a widely-repeated industry quip was that life only held three certainties: death, taxes, "and 3% more broilers."

12.　A leading industry publication noted in early 2009 that chicken "production in the U.S. used to be just like government spending, it never went down and cutbacks only resulted in slowing the rate of growth, but not anymore," because for "the first time in decades, total broiler production in 2008 remained virtually unchanged from the year before."

13.　In 2008, faced with cratering prices and anemic profits, Defendants collectively began cutting their ability to ramp up production in the near-term by materially reducing their breeder flocks.

14.　Defendants abandoned their traditional, short-term production cuts and instituted material changes that increased ramp up times by up to 18 months.　This was a significant shift in their behavior and signaled their commitment to the conspiracy.

15.　Defendants' collective market-changing cuts to breeder flocks – a first round from 2008 to early 2009, and a subsequent round from 2011 to 2012 as the conspiracy continued into the current decade – effectively eliminated each Defendant's ability to meaningfully increase supply for years.

16.　Defendants' joint efforts to impose supply-side "discipline" included, among other things, open signaling in the form of public statements by their senior executives about their

individual commitment to production cuts as well as the importance of instituting and maintaining this "discipline" across the industry as a whole. Defendants' public statements on the need for, and benefits of, industry-wide supply "discipline" marked a significant departure from past industry practice.

17.     Defendants were able to facilitate, monitor and police their coordinated output restriction scheme by, among other things, communicating through third parties including Urner Barry (a private commodity price reporting service) and Defendant Agri Stats, Inc. ("Agri Stats"). Defendants also used reports purchased, at significant cost, from Agri Stats, a subsidiary of global pharmaceutical company Eli Lilly & Co.

18.     Agri Stats collected detailed, proprietary data from all Defendants, including housing used, breed of chicks, average size, and production and breeder flock levels.

19.     Although the Agri Stats data was in theory supposed to be anonymized, by design Defendants were able to identify and track their purported competitors' production and output activities to ensure that others were following suit on implementing the coordinated output restrictions.

20.     The second aspect of Defendants' conspiracy was to illegally increase and maintain chicken prices on the back end. This included the manipulation and artificial inflation of prices on the Georgia Dock, a widely used weekly benchmark price compiled and published by the Georgia Department of Agriculture (the "GDA").

21.     Chicken buyers across the nation paid prices based on the Georgia Dock, while many more paid prices that were influenced by the Georgia Dock.

22.     Unlike other price indices available to chicken buyers, the Georgia Dock benchmark price is a self-reported number from a group of chicken producers identified herein as

the "Georgia Dock Defendants" (namely, Defendants Pilgrim's Pride, Tyson, Perdue, Sanderson Farms, Koch Foods, Claxton Poultry, Harrison Poultry, Mar-Jac, Wayne Farms, and Co-Conspirator Producer Fieldale).

23.     Senior executives from eight of the ten Georgia Dock Defendants were members of a secretive "Georgia Dock Advisory Board," which played a role in the compilation and manipulation of the Georgia Dock benchmark price.

24.     Starting in 2008, the Defendants also began moving away from long-term fixed-price contracts to shorter-term contracts with variable pricing pegged to one of several purportedly "fair" price indices.

25.     This coordinated effort indicated that Defendants anticipated higher profit margins would result from their production cuts, and would further allow Defendants to more quickly capitalize on those inflated non-competitive prices.

26.     Both aspects of Defendants' conspiracy were instigated in a market with numerous characteristics making it highly susceptible to collusion, including: (a) a highly-concentrated market dominated by vertically-integrated producers; (b) high barriers to market entry; (c) a standardized, commodity product where competition is based principally on price; (d) inelastic demand for the product; (e) numerous opportunities for cartel members to conspire through a number of regularly scheduled trade association meetings; and (f) access to competitors' data through Agri Stats.

27.     Indeed, an internal memorandum drafted by the Antitrust Section of the Florida Attorney General's office as part of its ongoing investigation stated that the chicken industry has the "hallmarks of an industry susceptible to collusion," including high consolidation, "predictable demand" in a "commodity market," and "routine, public display of prices to deter cheating."

28. Defendants' collusive agreements and understandings throughout the conspiracy period enabled Defendants, directly and through their wholly-owned or controlled subsidiaries and affiliates, to reap the benefits of their illegal conduct through the sale of broiler chickens at inflated non-competitive prices. Indeed, Defendants continuously urged one another to "lower supply in order to offset reduced demand and to support higher marker prices."

29. Through their collusive, coordinated anticompetitive actions, Defendants negated the economic benefits of increased competition. Defendants' conduct resulted in their customers, including IPC, paying hundreds of millions of dollars in overcharges to Defendants.

30. Defendants concealed their anticompetitive and unlawful conduct from their customers (including IPC), regulators, and the public. The conspiracy remained a secret and continued to extract artificially inflated prices from direct purchasers until, at the earliest, 2017.

## II.    PARTIES

**A.    Plaintiff**

31. IPC is a Delaware non-profit purchasing cooperative headquartered within Miami-Dade County, Florida. IPC is a cooperative purchasing agent for its members, which are Subway® franchisees. IPC brings this action regarding chicken purchased for its members as assignee of those distributors and processors who assigned their claims to IPC for chicken purchases that IPC coordinated.

32. During the conspiracy period, IPC or its assignors directly purchased chicken at artificially inflated prices directly from one or more of the Defendants and Producer Co-Conspirators (as defined below), and suffered injury to its business or property as a direct or proximate result of Defendants' and Co-Conspirators' wrongful conduct.

**B.      Defendants**

###### i.      The Koch Defendants

33.      Koch Foods, Inc. is a privately held Illinois corporation headquartered in Park Ridge, Illinois.

34.      JCG Foods of Alabama, LLC, an Alabama limited liability corporation headquartered in Park Ridge, Illinois, is a wholly owned subsidiary of Defendant Koch Foods, Inc.

35.      JCG Foods of Georgia, LLC, a Georgia limited liability corporation headquartered in Park Ridge, Illinois, is a wholly owned subsidiary of Defendant Koch Foods, Inc.

36.      Koch Meat Co., Inc., an Illinois corporation headquartered in Chicago, is a wholly owned subsidiary of Defendant Koch Foods, Inc.

37.      Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC and Koch Meat Co., Inc. are collectively referred to as "Koch" in this Complaint.

38.      Koch reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Tennessee, and Alabama.

39.      Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Koch, through JCG Foods of Georgia, LLC, was one of the ten Georgia Dock Defendants that participated in the manipulation and artificial inflation of the Georgia Dock index.

40.      Dale Tolbert, Koch vice-president of sales, served on the Georgia Dock Advisory Board.

###### ii.      Claxton Poultry Farms

41.      Norman W. Fries, Inc., d/b/a Claxton Poultry Farms ("Claxton Poultry") is a Georgia corporation headquartered in Claxton, Georgia.

42.    Claxton Poultry reports to Agri Stats a wide variety of data, including information about its breeder flocks and hatchery capacity and its Claxton, Georgia complex.

43.    Until the Georgia Dock benchmark price stopped being published by the GDA in late November 2016, Claxton Poultry was one of the ten Georgia Dock Defendants that participated in the manipulation and artificial inflation of the Georgia Dock index.

44.    Claxton Poultry's CEO also served on the Georgia Dock Advisory Board.

### iv.    Foster Farms, LLC

45.    Foster Farms, LLC ("Foster") is a privately held California corporation headquartered in Modesto, California.

46.    Foster reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Fresno, California, Livingston, California, and the Pacific Northwest.

### v.    The George's Defendants

47.    George's Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.

48.    George's Farms, Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.

49.    It is a wholly owned subsidiary of George's, Inc.

50.    George's Inc. and George's Farms, Inc. are together referred to as "George's" in this Complaint.

51.    George's reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Harrisonburg, Virginia and Springdale, Arkansas.

8

### vi. Harrison Poultry, Inc.

52. Harrison Poultry, Inc. ("Harrison") is a Georgia corporation headquartered in Bethlehem, Georgia.

53. Harrison reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Bethlehem, Georgia complex.

54. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Harrison was one of the ten Georgia Dock Defendants that participated in the manipulation and artificial inflation of the Georgia Dock index.

55. Harrison's owner and CEO served on the Georgia Dock Advisory Board.

### vii. House Of Raeford Farms, Inc.

56. House of Raeford Farms, Inc. ("Raeford") is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina.

57. Raeford reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its North Carolina and Louisiana complexes.

### viii. The Keystone Foods Defendants

58. Keystone Foods LLC was formerly a subsidiary of Marfrig Alimentos, S.A., a Brazilian company ("Marfrig"). On November 30, 2018, Defendant Tyson Foods, Inc. ("Tyson Foods") announced it had completed its acquisition of Keystone Foods LLC from Marfrig. Tyson Foods characterized the acquisition of Keystone Foods LLC as Tyson Foods' latest investment in furtherance of its growth strategy and expansion of its value-added protein capabilities.

59. When IPC filed its original complaint in this action, it had a mistaken understanding regarding the structure of Tyson Foods' acquisition of Keystone Foods LLC. IPC thereafter determined that Tyson Foods' acquisition of Keystone Foods LLC (and of the three affiliated

Equity Group entities listed below) was structured as a stock acquisition, which resulted in Tyson Foods' acquisition of all of Keystone Foods LLC's assets and liabilities, and that Keystone Foods LLC continued to exist as an operating entity subsequent to the acquisition.

60.     Equity Group Eufaula Division, LLC is a Delaware limited liability company with its headquarters in Bakerhill, Alabama and is a wholly-owned subsidiary of Keystone Foods LLC.

61.     Equity Group Kentucky Division LLC is a Delaware limited liability company with its headquarters in Franklin, Kentucky, and is a wholly-owned subsidiary of Grow-Out Holdings LLC.

62.     Equity Group – Georgia Division LLC is a Delaware limited liability company with its headquarters in Camilla, Georgia, and is a wholly-owned subsidiary of Keystone Foods LLC.

63.     As a result of Tyson Foods' acquisition of Keystone Foods LLC, Tyson also acquired all of the assets and liabilities of Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group – Georgia Division LLC.

64.     Keystone Foods LLC, Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group – Georgia Division LLC are collectively referred to as "Keystone Foods" in this Complaint.



65.

66.

ix.     **Mar-Jac Poultry, Inc.**

67.     Mar-Jac Poultry, Inc. ("Mar-Jac") is a Delaware corporation headquartered in Gainesville, Georgia.

68.     Mar-Jac reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Gainesville, Georgia complex.

69.     Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Mar-Jac was one of the ten Georgia Dock Defendants that participated in the manipulation and artificial inflation of the Georgia Dock index.

70.     Mar-Jac's vice president of operations served on the Georgia Dock Advisory Board.

x.      **The Mountaire Farms Defendants**

71.     Mountaire Farms, Inc. is a privately held Delaware corporation headquartered in Millsboro, Delaware.

72.     Mountaire Farms, LLC, a privately held Arkansas limited liability corporation headquartered in Little Rock, Arkansas, is a wholly owned subsidiary of Defendant Mountaire Farms, Inc.

73.     Mountaire Farms of Delaware, Inc., a privately held Delaware corporation headquartered in Millsboro, Delaware, is a wholly owned subsidiary of Defendant Mountaire Farms, Inc.

74.     Mountaire Farms, Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire Farms" in this Complaint.

75.     Mountaire reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware and North Carolina.

### xi.     The O.K. Foods Defendants

76.     O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.

77.     O.K. Farms, Inc., an Arkansas corporation headquartered in Fort Smith, Arkansas, is a wholly owned subsidiary of Defendant O.K. Foods, Inc.

78.     O.K. Industries, Inc., an Arkansas corporation headquartered in Fort Smith, Arkansas, is a wholly owned subsidiary of Defendant O.K. Foods, Inc.

79.     O.K. Foods, Inc., O.K. Farms, Inc. and O.K. Industries, Inc. are collectively referred to collectively as "O.K. Foods" in this Complaint.

80.     O.K. Foods, which is a subsidiary of the Mexican poultry conglomerate Industrias Bachoco, reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity and data for its Fort Smith, Arkansas complex.

### xii.     Peco Foods, Inc.

81.     Peco Foods, Inc. ("Peco Foods") is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama.

82.     Peco Foods reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Gordo, Alabama and Sebastopol, Louisiana.

### xiii.     The Perdue Defendants

83.     Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland.

84.     Perdue Foods, LLC, a privately held Maryland limited liability corporation headquartered in Salisbury, Maryland, is a subsidiary of Defendant Perdue Farms, Inc.

85.     Perdue Farms, Inc. and Perdue Foods, LLC are together referred to as "Perdue" in this Complaint.

86.     Perdue reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware, Maryland, North Carolina, South Carolina, Florida, and Kentucky.

87.     Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Perdue was one of the ten Georgia Dock Defendants that participated in the manipulation and artificial inflation of the Georgia Dock index.

### xiv.     Pilgrim's Pride Corporation

88.     Pilgrim's Pride Corporation ("Pilgrim's" or "Pilgrim's Pride") is a publicly held Delaware corporation headquartered in Greeley, Colorado.

89.     Pilgrim's Pride reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, West Virginia, North Carolina, Georgia, Tennessee, Florida, South Carolina, Alabama, Texas, Arkansas, and Kentucky.

90.     Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Pilgrim's Pride was one of the ten Georgia Dock Defendants that participated in the manipulation and artificial inflation of the Georgia Dock index.

91.     Pilgrim's Pride's executive vice president of sales and operations served on the Georgia Dock Advisory Board.

92.     In December 2008, Pilgrim's Pride filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Texas. Effective December 28, 2009, Pilgrim's Pride was discharged from bankruptcy under a plan of reorganization.

93.     After its discharge from bankruptcy, Pilgrim's Pride reaffirmed its participation in the conspiracy, in part by continuing to engage in the conduct described herein. Specific post-discharge actions taken by Pilgrim's Pride in furtherance of the conspiracy are alleged herein and are consistent with the actions taken by all of the Defendants throughout the conspiracy period.

94.     Accordingly, Defendant Pilgrim's Pride is jointly and severally liable for all conspiratorial acts undertaken during the entire conspiracy period, as well as all damages caused thereby.

**xv.     The Sanderson Farms Defendants**

95.     Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi.

96.     Sanderson Farms, Inc. (Foods Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

97.     Sanderson Farms, Inc. (Production Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

98.     Sanderson Farms, Inc. (Processing Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly owned subsidiary of Defendant Sanderson Farms, Inc.

99.     Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division) and Sanderson Farms, Inc. (Processing Division) are collectively referred to as "Sanderson Farms" in this Complaint.

100. Sanderson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Mississippi, and Texas.

101. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Sanderson Farms was one of the ten Georgia Dock Defendants that participated in the manipulation and artificial inflation of the Georgia Dock index.

### xvi. Simmons Foods

102. Simmons Foods, Inc. ("Simmons Foods") is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas.

103. Simmons Foods reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its two Siloam Springs, Arkansas complexes.

### xvii. The Tyson Defendants

104. Tyson Foods, Inc. is a publicly held Delaware corporation headquartered in Springdale, Arkansas.

105. Tyson Chicken, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

106. Tyson Breeders, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

107. Tyson Poultry, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

108. Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc. are collectively referred to as "Tyson" in this Complaint.

109.     Tyson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, Pennsylvania, North Carolina, Georgia, Alabama, Mississippi, Texas, Arkansas, Missouri, Indiana, Tennessee, and Kentucky.

110.     Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Tyson was one of the ten Georgia Dock Defendants that participated in the manipulation and artificial inflation of the Georgia Dock index.

111.     One of Tyson's plant managers served on the Georgia Dock Advisory Board.

### xviii.     Wayne Farms, LLC

112.     Wayne Farms, LLC ("Wayne Farms") is a Delaware limited liability corporation headquartered in Oakwood, Georgia.

113.     Wayne Farms reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in North Carolina, Georgia, Alabama, Mississippi, and Arkansas.

114.     Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Wayne Farms was one of the ten Georgia Dock Defendants that participated in the manipulation and artificial inflation of the Georgia Dock index.

115.     Wayne Farms' vice president of fresh sales served on the Georgia Dock Advisory Board.

### xix.     Amick Farms

116.     Amick Farms, LLC ("Amick") is a privately held Delaware limited liability company with its corporate headquarters in Batesburg-Leesville, South Carolina, and with facilities in South Carolina, Maryland and Delaware. Amick Farms, LLC is a wholly-owned

subsidiary of OSI Group, LLC, a privately held Delaware corporation with its corporate headquarters in Aurora, Illinois.

### xx. Case Foods

117.     Case Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina.

118.     Case Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in Ohio and North Carolina. Case Farms, LLC is a wholly-owned subsidiary of Case Foods, Inc.

119.     Case Farms Processing, Inc. is a privately held North Carolina corporation with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in North Carolina. Case Farms Processing, Inc. is a wholly-owned subsidiary of Case Foods, Inc.

120.     Defendants Case Foods, Inc., Case Farms, LLC, and Case Farms Processing, Inc. are collectively referred to as "Case Foods" in this Complaint.

121.     All of the above-named Defendants are collectively referred to in this Complaint as "Defendants" or "Producer Defendants."

122.     All Producer Defendants are horizontal competitors in the United States chicken market.

123.     Producer Defendants and their co-conspirators, directly and through their wholly owned or controlled affiliates and subsidiaries, produced and sold chicken throughout the United States, including in this District, at prices that were artificially inflated as a result of their conspiracy alleged in this Complaint.

124.     All of Producer Defendants' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or

engaged in by Producer Defendants' various officers, agents, employees, or other representatives while actively engaged in the management and operation of Producer Defendants' business affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, or with Producer Defendants' actual, apparent or ostensible authority.

125.    Producer Defendants used the instrumentalities of interstate commerce to facilitate the conspiracy, and their conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the U.S., including in this District.

### xxi.    Agri Stats

126.    Agri Stats, Inc. (which is referred to in this Complaint as "Agri Stats" to distinguish it from the chicken-manufacturing entities referred to as the Producer Defendants) is an Indiana corporation headquartered in Fort Wayne, Indiana, and is a subsidiary of Eli Lilly & Co., a publicly-held Indiana corporation headquartered in Indianapolis.

127.    Agri Stats has a unique and deep relationship with the chicken industry generally, and specifically with each of the Producer Defendants listed above, all of which are Agri Stats' primary customers.

128.    The unique and symbiotic relationship between Agri Stats and the Producer Defendants is exemplified by the fact that a representative from Agri Stats was elected to the board of the National Chicken Council, one of the industry's most important trade associations, in 2008 and 2010 – two key periods in the conspiracy alleged in this Complaint.

129.    Several Producer Defendants, including Wayne Farms and Pilgrim's, also have hired former Agri Stats executives to work in senior sales positions, and Agri Stats employs or has employed several former executives of the Producer Defendants.

130.    Agri Stats is a co-conspirator of the Producer Defendants, and has knowingly played an important and active role as a facilitator of Producer Defendants' collusive scheme detailed in this Complaint.

131.    All of Agri Stats' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, or engaged in by Agri Stats' various officers, agents, employers or other representatives while actively engaged in the management and operation of Agri Stats' business affairs within the course and scope of their duties and employment, or with Agri Stats' actual apparent or ostensible authority.

132.    Agri Stats used the instrumentalities of interstate commerce to facilitate the conspiracy, and its conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the U.S., including in this District.

### III.    PRODUCER CO-CONSPIRATORS

**A.    Producer Co-Conspirator Allen Harim**

133.    Harim USA, Ltd. is a privately held Delaware corporation with its corporate headquarters in Seaford, Delaware. During the conspiracy period, Harim USA Ltd. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

134.    Allen Harim Foods, LLC is a privately held Delaware limited liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland and North Carolina.  Allen Harim Foods, LLC is a wholly-owned subsidiary of Harim USA Ltd.   During the conspiracy period, Allen Harim Foods, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate

commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

135.    Allen Harim Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland and North Carolina.  Allen Harim Farms, LLC is a wholly-owned subsidiary of Harim USA Ltd.  During the conspiracy period, Allen Harim Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

136.    Producer Co-Conspirators Harim USA, Ltd., Allen Harim Foods, LLC, and Allen Harim Farms, LLC are collectively referred to as "Allen Harim" in this Complaint.

**B.    Producer Co-Conspirator Fieldale Farms**

137.    Fieldale Farms Corporation ("Fieldale") is a privately held Georgia corporation headquartered in Baldwin, Georgia. Fieldale reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and its Gainesville, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Fieldale submitted false and artificially inflated price quotes to the GDA. Its owner and CEO also served on the Georgia Dock Advisory Board.

138.    When appropriate in the context, Fieldale, Allen Harim, and various subsidiaries and related entities of the Defendants' corporate families actively participated in the conspiracy alleged herein and therefore are co-conspirators, referred to collectively in this Complaint as the "Producer Co-Conspirators."

139.    Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in

furtherance of the conspiracy. The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

140. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

141. Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

142. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

### IV. JURISDICTION AND VENUE

143. This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiff resulting from Defendants' conspiracy to restrain trade in the chicken market.

144. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 15 U.S.C. § 15.

145. Venue is proper in this District under 15 U.S.C. §§ 15(a), and 22 because during the conspiracy period Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District.

146. In the alternative, venue is proper in this District under 28 U.S.C. §§ 1391(b) because Defendants are subject to personal jurisdiction in this district and during the conspiracy

period Defendants resided in this District, a substantial portion of the events giving rise to Plaintiff's claim occurred in this District, or a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District.

147. Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute, 734 Ill. Comp. Stat. 5/2-209, because each Defendant has transacted business in this state, and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.

148. This Court has personal jurisdiction over each Defendant because each Defendant – throughout the U.S. and including in this District – has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy.

149. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District.

150. This Court also has personal jurisdiction over the Defendants because each of them knew, or should have known, that because the Georgia Dock index price was used to price chicken bought in Illinois and nationwide, their participation in the collusive manipulation of the Georgia Dock would have effects on the price of chicken purchased in Illinois based on the Georgia Dock benchmark. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business in the state of Illinois.

## V. TRADE AND COMMERCE

151. According to a 2012 report by Focus Management Group, chickens or broilers are "a commodity product with little or no product differentiation based on the processors," and the

CEO of Defendant Pilgrim's recently commented that "the chicken business per se is a commodity business."

152.    The commodity nature of chicken is evidenced by the fact that, as detailed below, numerous Defendants have during the conspiracy period purchased chicken from each other (then likely resold it) to buttress their conspiracy by soaking up excess supply in the market.

153.    Typically, when a product is characterized as a commodity, competition is based principally on price—as opposed to other attributes, such as product quality or customer service.

154.    The market for chickens involves significant competition on the basis of price. Chicken producers pay USDA graders to examine their chickens, and almost all companies sell USDA Grade A chicken, meaning that there is very little differentiation amongst sellers.

155.    Due to the lack of product differentiation, Defendants are forced to compete on price such that the supply decisions of each chicken producer impact the market price for chickens. While an individual producer often has the incentive to increase production to maximize profits, any increased production will ultimately reduce the profitability of the industry as a whole.  Thus, the commodity nature of the product in the chicken industry makes it easier to implement a price-fixing cartel and provides industry players with the incentive to agree to reduce overall supply and artificially inflate prices to, or maintain prices at, supra-competitive levels.

156.    The United States chicken market is a national market, valued at nearly $41 billion in 2016.

157.    During the conspiracy period, Defendants collectively controlled nearly 90% of the market for chicken in the United States.

158.    The chicken industry is almost entirely vertically integrated, with producers (sometimes known as "integrators") owning, or tightly controlling, each of the six stages of the

supply chain: breeding, hatching, chick-rearing and feeding, slaughtering mature birds, processing, and selling.

159.    At the very top of the supply chain are Defendants' "breeder flocks," which include the hens that lay the eggs that, when hatched and raised, become chickens slaughtered for meat consumption.

160.    Like many chicken buyers, the prices for certain of Plaintiff's chicken purchases during the conspiracy period were based on prices published by one of three entities: Urner Barry, the Georgia Department of Agriculture (the "Georgia Dock"), and the United States Department of Agriculture (the "USDA Composite").

161.    The Georgia Dock, USDA Composite, and Urner Barry indices all measure the same (or very similar) size and grade of chicken.

162.    The USDA's publicly available Composite index collects and publishes chicken price information on a weekly basis.

163.    Urner Barry collects and publishes daily price information for chicken. This information is subscription-based, and all chicken producers and many chicken purchasers subscribe for a fee.

164.    The USDA and Urner Barry chicken price indices are purportedly based upon a system of double verification, which includes telephonic and written surveys of all or nearly all chicken producers.  The Georgia Dock index was based on a materially different methodology discussed in more detail below.

165.    Published chicken prices from Urner Barry, Georgia Dock, and USDA relate to the spot market for chicken (i.e., a non-recurring purchase for immediate delivery). However, prices

for chicken, whether sold under contract or on the spot market, generally moved with spot market prices as reported by Georgia Dock or Urner Barry

166.    As a consequence of the inelasticity of supply and demand in the chicken industry and the availability of the spot market price indices, public price announcements by Defendants were unnecessary. Defendants knew and intended that a decrease in supply pursuant to their agreement would increase chicken spot market prices or maintain them as artificially inflated non-competitive levels, and therefore that all chicken prices would increase or be artificially high.

167.    During the conspiracy period, Defendants produced, sold and shipped chicken in a continuous and uninterrupted flow of interstate commerce.  The conduct of the Defendants as alleged herein, including the conspiracy in which Defendants participated, was intended to and had a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce in this District.

168.    During the conspiracy period, each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy.

## VI.    FACTUAL ALLEGATIONS

### A.    Defendants' Conspiracy Artificially Increased And Maintained Chicken Prices

169.    Defendants employed at least two methods to illegally control the chicken market, establish artificially high non-competitive prices, and boost their profits.  One targeted output at the beginning of the supply chain by reducing breeder flocks which the other targeted the end of the supply chain by manipulating the Georgia Dock benchmark price.

170.    In the year preceding the beginning of Defendants' conspiracy, the U.S. chicken market was foundering.

171.    In 2007, a glut of chicken – the result of significant overproduction by Sanderson Farms, Mountaire Farms and Raeford – began to flood the market, and prices cratered.

25

172.    During 2007, the two largest chicken producers, Pilgrim's and Tyson, reduced their production, and a few other producers – Foster, Peco Farms and Perdue – followed their lead.

173.    But those reductions by only five industry participants were not enough to affect industry supply to the point that industry-wide prices would meaningfully increase.

174.    In addition, production cuts in 2007 followed the typical pattern of focusing on short-term reductions in production, such as slaughtering chickens early, but not on significant cuts at the top of the supply chain, particularly culling of breeder flocks, which have longer-term effects on supply.

175.    By the time the Great Recession hit the American economy in 2008, the oversupply and low prices of chickens put Defendants – individually and collectively, as an industry – in dire financial straits.  In 2008, the first year of the Great Recession, Defendants faced what promised to be a historically bad year for the chicken industry.

176.    As a result, Defendants agreed not to return to the previous industry practice of short-term or medium-term production cuts, which had led to the destructive boom-and-bust cycles that plagued chicken producers for years.

177.    Instead, in early 2008, through press releases, earnings and investor calls, at investment bank conferences, at events hosted by Agri Stats, through communications both direct and facilitated by third parties, and at the myriad trade association meetings attended by many of their senior-most executives, Defendants began implementing the conspiracy by, among other things, calling on the industry to jointly heed the mistakes of the past, preaching to one another that oversupply was decimating industry profits, and that increased supply-side "discipline" was needed to halt the downward trajectory of chicken prices.

178.    Defendants collectively agreed to the reduction or relative stabilization of industry capacity, particularly at the breeder flock level, where such efforts would be most effective – as a mechanism to increase Defendants' profits.

179.    Defendants' efforts were supported by public statements made by their executives, which involved more than an announcement of a Defendant's own conduct.  In fact, as alleged below, many of Defendants' executives' calls for a new era of "discipline" included explicit statements that signaled deeper production cuts were an industry-wide imperative that would pay dividends for "the industry" as a whole.

180.    Defendants, who collectively control nearly 90% of the U.S. chicken market, jointly engaged in this not-easily-reversed production reduction effort.

181.    While spearheaded primarily by the CEOs and senior personnel of Defendants Tysons and Pilgrim's – which, as publicly-held entities holding sizable (but by no means controlling) shares of the U.S. chicken market, were well-positioned to rally the entire industry – Defendants' executives' public discussion of industry conditions was not limited to the larger, publicly-held Defendants.

182.    For example, Mike Welch, CEO of Defendant Harrison, was (along with Sanderson COO, Lampkin Butts) a panelist at a symposium hosted by industry journal WATT PoultryUSA, where the discussion topics included industry consolidation, efficiency, and bird size, with references to information gleaned from Agri Stats (whose vice president, Mike Donohue, was in the audience).[1]

---

[1] Excerpts of comments made by Messrs.  Welch and Butts are publicly available on WATT PoultryUSA's YouTube channel.  See "Broiler company executives say bird size increase will continue," available at https://www.youtube.com/watch?v=ZBgEecBi7D4 and "Lampkin Butts describes changes in the poultry industry," available at https://www.youtube.com/watch?v=RN1IAphbQXs&t=53s.  (both last visited July 23, 2020).

(i) **In The First Phase Of Their Conspiracy Defendants Departed From Their Historical Practice By Collectively Reducing Breeder Flocks In Unprecedented Amounts**

183. In 2008, and throughout the conspiracy period, the vertically integrated Defendants had the ability to manipulate supply to the chicken market at one or more stages of the supply chain.

184. Beginning in early 2008, Defendants began utilizing this ability by making significant production cuts, including unprecedented cuts in their breeder flocks.

185. At the top of the supply chain, Defendants knew they could effectively manipulate supply by reducing the size of breeder flocks, and retiring or killing breeders at an earlier age than the optimum age.

186. By design, reducing breeder flocks would have the most significant, and long-lasting, effect on supply of chickens in the market.

187. Because breeder flocks are created from a limited pool of so-called "grandparent" chickens from one of only three genetics companies (Aviagen, Hubbard, and Tyson's Cobb-Vantress), it takes substantial time – anywhere from six to eighteen months or more – to re-populate a breeder flock that has been reduced through early culling.

188. While Defendants continued to use their historic methods to affect their supply-reduction scheme (at the middle or end of the supply chain, such as by reducing eggs placements, killing newly-hatched chicks, or idling processing plants), their conspiracy was cemented by the long-term effects of breeder flock reductions that could not be easily reversed by Defendants.

189. These perilous decisions to create long-term reductions are clear indicators of a collusive agreement because it would not be in an individual Defendant's economic self interest to undertake the significant risk of reducing its own long-term production capacity unless it was

known that competitors would undertake similar dramatic and long-term cuts to production capacity.

190.    Defendants' collective output-restriction caused a significant, not-easily-reversed, slowing in overall chicken production during the conspiracy – bucking the historic trend of steady annual production increases.

191.    The overall effect of this prong of Defendants' conspiracy is shown in the graph below, drawn from USDA data,[2] showing that while chicken production grew a total of 21% from 2000 to 2008 (an average of 2.3% per year, proof that the "3% more broilers" quip is more than anecdotal), it then slowed to a total of roughly 10% from 2008 through 2016 (an average of slightly more than 1% per year) – a significant decrease in the pace, timing and manner of chicken production during the conspiracy period:

---

[2] NASS, Chickens, Young, Slaughter, FI, Certified, Chilled & Frozen – Production, Measured in LB, available at https://quickstats.nass.usda.gov/results/C33961EC-6D46-31DE-8CCB-89780E3D1620 (last visited July 23, 2020).



     (a)    **Defendants' Executives Publicly Decried The Effect Of Oversupply On "Our Industry," Telling Their Competitors That Unified Action Was Necessary**

192.    On January 23-25, 2008, numerous employees of Defendants, including many of Defendants' senior executives, attended the International Poultry Expo conference in Atlanta.

193.    According to the trade association organizing the annual multi-day event, attendees represented companies responsible for over 99.4% of the production of chicken.

194.    On a January 28, 2008 earnings call, Tyson CEO Richard Bond – who in the same call, disclosed that the company had re-joined Agri Stats and had "just recently . . . got our first series of data" – stated that "we have no choice [but] to raise prices substantially."

195.    However, the commodity nature of chickens does not allow one producer to successfully raise market prices in the absence of widespread reductions in supply relative to the then-current demand.

196.    Mr. Bond's comment therefore made no economic sense absent an intention or knowledge on his part that Defendants would coordinate an industry-wide reduction in supply that could not be easily reversed.

197.    The day after Tyson's statements confirming its renewed participation in Agri Stats and expressing its plans to increase prices, Pilgrim's told its competitors to reduce their production of chickens to allow prices to recover.

198.    On a January 29, 2008 earnings call, Pilgrim's CFO Rick Cogdill's message was that the industry's oversupply of chickens was hurting market prices.

199.    Mr. Cogdill explained that Pilgrim's had done its part in 2007 by reducing production 5%, so "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."

31

200. Mr. Cogdill went on to explain that Pilgrim's alone could not reduce supply enough to help market prices recover, and that its past efforts to reduce supply had merely led to smaller players increasing their market share at Pilgrim's expense.

201. Mr. Cogdill noted that "we have walked away from sales in certain cases, where the pricing just did not make any sense. So we are trying to hold the line. We are losing at times the competitive bids . . . So we are trying to take a leadership position from a pricing perspective."

202. He then made the following statements urging Pilgrim's competitors to do their part in reducing chicken industry supply:

(a) "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs. We were the leader in cutting production last year to help drive that . . . [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price;"

(b) When asked by an analyst "do you have an estimate internally of what the state of oversupply in the industry might be? What you would hope to see cut from others that would make you feel like the industry was more rational?" Mr. Cogdill replied "It's really hard to say that the faster we get to production adjustment the quicker the recovery could happen . . . And if the industry doesn't react soon enough it will have to react stronger in the end;" and

(c) Mr. Cogdill responded to an analyst's query about the industry's failure to follow Tyson's 2007 cuts by stating that, "I think you kind of hit on it there . . . It's not like we had 5% of surplus capacity that we could just reduce our operations and not feel that . . . I mean we cannot be the ones that are out there continually reducing production, and let the other producers capitalize on that. I mean if it's 5% last year, 5% this year, 5% next year, you can see that that's a spiral to the demise of our company, which we are not willing to accept."

203. On a January 31, 2008, earnings call, Sanderson Farms CEO Joe Sanderson explained that he, too, anticipated the industry would act in concert to cut production.

204. Asked about production cuts by an analyst, Mr. Sanderson replied "we could see some reductions in production."

205. Asked to expand on his comments by another analyst, Mr. Sanderson said he thought a production cut was "probable," and "if it's bad and ugly and deep in February, March

and April, you'll see the production cuts take place during that period of time. There's still 25% of the industry still making money but I would expect to see those reductions come over the next 90 to 120 days."

206. Defendants also communicated privately. For example, Case Foods' vice president of sales and marketing, Kevin Phillips, engaged in several emails with managers from other Defendants indicating the existence of concerted action to decrease production. Even going so far as to state that, "we're on the same page"; "trying to give you a [heads] up"; and "one more round of cuts on placement would do the trick."

(b)    <strong>Defendants Begin To Cut Production In Concert</strong>

207. Around March 4, 2008, senior executives from Defendants and co-conspirators, including Pilgrim's newly-installed CEO, Clint Rivers, Tyson Senior VP Donnie Smith, Case Foods CEO Tom Shelton, Amick President and CEO Ben Harrison, and Fieldale Farms President Thomas Hensley, met in Washington, D.C., at an Executive Committee meeting of the National Chicken Council's Board of Directors.

208. Shortly after that trade association meeting, Pilgrim's again sounded the call to cut overall industry supply, but this time it backed up its rhetoric with production cuts.

209. On March 12, 2008, Pilgrim's new CEO, Clint Rivers, publicly announced the closure of seven chicken facilities in order to reduce industry oversupply, stating "we believe [these] actions . . . are absolutely necessary to help bring supply and demand into better balance . . . That portion of the demand for our products that exists solely at pricing levels below the cost of production is no longer a demand that this industry can continue to supply." (emphasis added).

210. Normal supply and demand would suggest that in the wake of substantial supply cuts by Pilgrim's, other chicken producers would increase their production. Just the opposite occurred.

211.    Following  Pilgrim's announcement, a series of production cuts were publicly announced by other Defendants between April 3-11, 2008:

212.     On April 3, 2008, Fieldale Farms announced a 5% production cut stating that "We're hoping this cut puts supply and demand back into better balance."

213.    Fieldale Farms is not a publicly-traded company, and there was no reason – other than signaling to its fellow cartelists that it was following through on its conspiratorial agreement – why it would publicly disclose its production plans.

214.    On April 9, 2008, Simmons announced in a press release a 6% reduction in production throughout its processing plants, a move heralded by Wall Street analysts, who noted that production cuts across smaller companies in the chicken industry, like Simmons, would be positive for chicken prices.

215.    Simmons is not a publicly-traded company, and there was no reason – other than signaling to its fellow cartelists that it was following through on its conspiratorial agreement – why it would publicly disclose its production plans.

216.     On April 10, 2008, Cagle's Inc. (later acquired by Koch Foods) announced in a press release a 4% reduction in processing of chickens, noting that the cut "will reduce product being sold through less profitable commodity outlets."

217.     On April 3-11, 2008, Wayne Farms, O.K. Foods, and Koch Foods each announced 2-8% reductions in production.

218.    None of Wayne Farms, O.K. Foods, or Koch Foods are publicly-traded, and there was no reason – other than signaling to their fellow cartelists that they were following through on their conspiratorial agreements – why they would publicly disclose their production plans.

219.     Several other chicken companies cut their production between April 1, 2008 and May 15, 2008, but did not publicly announce their cuts.

220.      Because of Agri Stats, there was no need to make a public announcement.

221.     For instance, at his BMO Capital Markets Agriculture & Protein Conference presentation on May 15, 2008 at the Millennium Broadway Hotel in New York City, Sanderson Farms CEO Joe Sanderson stated – in the presence of several competitors attending the conference, including Pilgrim's CEO Clint Rivers, Pilgrim's CFO Richard Cogdill and Tyson's CEO Richard Bond – that "we have seen for the last 6 or 7 weeks . . . some companies in our industry announce cutbacks.  There have been I think six companies have announced cutbacks.  I know some companies have cut back and have not announced."

222.     Such knowledge of non-public production cuts by competitors is highly suggestive of communication among chicken companies, either secret direct communications among themselves, or using a non-producer as a facilitator, or both.

223.     After seeing many of its competitors reduce production capacity between April 3-11, Pilgrim's realized that other Defendants were contributing to a widespread reduction in industry supply, and decided it could now take further steps to curtail supply.

224.     On April 11, 2008, Pilgrim's suggested it might close its large El Dorado, Arkansas processing plant, which employed 1,620 workers.

225.     Then, on April 14, 2008, it announced a further production cut of 5% of egg sets (i.e., fertile eggs placed in incubators).

226.     On April 29, 2008, Tyson CEO Richard Bond told a Wall Street analyst, "I think the industry has changed . . . I don't think the industry will be up that much anymore, we have

seen some sizable declines here lately in egg sets and placements.  So, we're going to be up a little bit but probably not a significant amount, not as much as we might have once anticipated."

227.    Despite the large number of coordinated production cuts announced by producers in April 2008, Pilgrim's concluded these cuts were not sufficient.

228.    So Pilgrim's CEO Clint Rivers encouraged further industry-wide action at a May 15, 2008, speech at the BMO Capital Markets conference at the Millennium Broadway Hotel. In his speech, Mr. Rivers announced that he hoped to see the chicken industry continue to cut production to help the industry return to profitability, stating that "he would like the industry to trim total production by 3%-4%, calling it a prudent move in light of recent price volatility in the grain markets."  He also elaborated that "[t]he cuts need to be fairly deep."

229.    This was the same conference also attended by Tyson CEO Richard Bond, and where Sanderson Farms CEO Joe Sanderson disclosed his knowledge of non-public, unannounced production cuts by competitors.

230.    A market report from June 2008 noted that "[b]eginning in April [2008], the weekly hatchery data started to show declines in egg sets and chick placements relative to year-earlier, which confirms the announced intentions to reduce broiler production and will result in slaughter falling below year-ago by mid-June."  The same report also noted that "[i]t is unclear how long the slaughter declines will continue, and if other companies will choose to cut production as well making them deeper than initially thought. Those who have announced cutbacks indicate they will continue until margins normalize.  At this time we expect to see the declines continue until at least late 2009, and cuts could be deeper than now projected."

231.    A May 21, 2008, Wall Street Journal article noted that conditions in the industry were starting to change: "Three things are making analysts more optimistic: Companies are cutting

production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines." The article also noted "[i]t is unusual for egg sets to decline at this time of year."

232. The reason why such a reduction was unusual in May is because egg sets result in chickens that are ready for market approximately 10 weeks later, which in this case would have been first week of August, which is still the peak of the high-demand summer grilling season.

233. During an earnings call on May 22, 2008, Sanderson Farms CEO Joe Sanderson was asked if he thought industry cuts were sufficient to keep the industry profitable in the autumn. In response, Mr. Sanderson noted, "[w]e don't know yet. We will make a cut as we always do after Labor Day. We will make a 4-5% cut following Labor Day as we always do going into Thanksgiving, Christmas, and January we reduce our egg sets and around Thanksgiving, Christmas, New Years and Martin Luther King. That is a period of slow demand for us, and we don't announce that, but we always do it. It is just a period when we take downdays and we will do that. But if we think more is needed, we will evaluate that sometime in August, and if need be will do it. We cut back in 2006, we cut back in '97-98. I don't know if we announced it or not, but we will do what we need to do." Mr. Sanderson provided no explanation why Sanderson Farms chose to publicly disclose its "regular" production cut if it had never done so in the past. The reason, of course, was obvious – to signal the other Defendants to follow suit.

234. In early June 2008, Pilgrim's CEO Clint Rivers continued to keep up the drumbeat for further production cuts, noting in a June 4, 2008, presentation that "[o]ur supply in chicken, we are oversupply . . . we need to see some balance in the supply . . . Simply put, at this time there is still too much breast meat available to drive market pricing significantly higher."

235.     As intended, other Defendant CEOs quickly picked up on Mr. Rivers' call for further action.  On June 19, 2008, chicken industry executives participated in a media conference call intended to lobby the federal government to limit the ethanol mandate – a federal program requiring the production of corn-based ethanol, which Defendants claimed drove up their corn costs by lessening the amount of corn they could buy to feed their chickens.  According to one report, Mark Hickman, Chairman of the National Chicken Council and CEO of Peco Foods, told participants that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year.  'We are hearing talk that this was not nearly enough, so liquidation'" – a reference to the need for Defendants' decision to reduce chicken breeder flocks to affect longer-term supply restraint in the industry, rather than the short-term production cuts like breaking eggs or slaughtering chickens earlier to reduce weight – "'is in round two.'"

236.     On June 23, 2008, shortly after Peco Foods' CEO publicly suggested that further production cuts were needed, Wayne Farms announced a 6% production cut.

237.     On June 23-25, 2008, the industry organization USPOULTRY held its annual Financial Management Seminar.  Defendants' senior executives attended the seminar.

238.     On July 2, 2008, Foster Farms announced it was abandoning plans to build a new chicken plant in northeastern Colorado that it had previously announced in April 2008 would employ about 1,000 people.

239.     In a statement, Foster Farms CEO Don Jackson noted, "[i]n these difficult conditions with costs escalating primarily due to grain and fuel prices and chicken prices lagging it does not make economic sense to go forward with expansion at this time."

240. As alleged later herein, Mr. Jackson's purported justifications for decreasing production capabilities were pretextual.

241. On July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets, citing "record high prices for corn and soybean meal, which it attributes to the U.S. government's mandated ethanol policies along with recent flooding in the Midwest 'Corn Belt' region."

242. As alleged later herein, O.K. Foods' purported justifications for decreasing production were pretextual.

243. On July 20-22, 2008, the National Chicken Council held a three-day "Chicken Marketing Seminar" attended by Defendants' senior executives. The event was billed as a marketing seminar that "includes social networking events and recreational opportunities, including a golf tournament."

244. On August 11, 2008, Pilgrim's announced the closure of its Clinton, Arkansas, processing plant and a facility in Bossier City, Louisiana. Pilgrim's press release noted the closures "are part of the company's ongoing effort to operate more efficiently and return to profitability amid high feed costs and an oversupply of chicken on the market."

245. The closure of the Clinton processing plant represented an additional 1.25% incremental increase of the company's previously announced production cuts.

246. Pilgrim's stated that it would keep both plants idled until "industry margins can be sustained at more normalized levels of profitability." Pilgrim's also noted that "[w]ith Labor Day approaching and no indication that the actions taken to date by Pilgrim's Pride or other industry members are having a positive effect on selling prices for our products, it is now clear that more significant decisive action is necessary."

247. In August 2008, Raeford (a non-public company) announced that it would begin reducing its chicken production by 5 percent. The company said in a statement that "[t]he current obstacles that face our industry require that supply be brought in line with demand."

248. A production cutback was remarkable for Raeford, which had pursued a strategy of aggressive production growth that resulted in the company doubling its chicken production from 2001 to 2007.

249. On an August 26, 2008 earnings call, Sanderson Farms CEO Joe Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand." When asked later whether the industry had already made enough production cuts, he noted "we kind of thought we were going to see reductions in July . . . [based on] 213/214 [million] egg sets back in April and that really did not materialize. When you look at USDA slaughter numbers in July, they were 100% and 101% and now we're looking at egg sets of 206 and 207 million that are going to show up sometime in October or November. We'll see when we get there. Those are barely impressive cuts. My suspicion is, as I've told you in May, the industry typically make the cut [sic] and it's tentative. We'll have to see if it works . . . I'm very skeptical that those cuts are going to be enough to return us margins to cover these grain costs."

250. By September 2008, chicken industry publication WATT PoultryUSA reported that "[m]ost U.S. chicken integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'"

251. On October 3, 2008, Defendants' senior executives attended the National Chicken Council's Annual Meeting in Washington, D.C. Agri Stats CEO Blair Snyder – elected the day

before as a "director-at-large" to the National Chicken Council's board – moderated a CEO panel that included Pilgrim's, Tyson's, Perdue's, and Sanderson Farms' CEOs. Explaining Pilgrim's desire to push through an industry-wide price increase, Pilgrim's CEO Clint Rivers told panel members and the audience "[w]e need to get those [input] costs pushed through, but we've yet to see that happen."

252. On October 10, 2008, in response to a USDA report of falling egg sets in the chicken-industry, Pilgrim's told the Associated Press that "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

253. Indeed, an industry analyst noted that at the time "the industry has cut about 10 to 12 percent of its production."

254. During Autumn 2008, Sanderson Farms also implemented its previously announced "fall cuts" a month early and delayed the opening of a new deboning facility.

255. On October 18, 2008, Wayne Farms President & CEO Elton Maddox released a statement (even though Wayne Farms was not a publicly-traded company) announcing the closure of the company's College Park, Georgia plant, resulting in the layoff of over 600 employees.

256. Mr. Maddox cited "changing market conditions" and a need to "maximize efficiencies" as justification for the plant closure.

257. On a November 10, 2008 earnings call, Tyson CEO Richard Bond claimed that Tyson would not be making additional production cuts because it had already done its part to reduce industry supply with prior production cuts, citing the company's focus on "supply and demand."

258.    Despite protestations to the contrary, Tyson, in fact, substantially reduced production in December 2008.  First, on December 18, 2008, Tyson announced the canceling of a deboning contract with Petit Jean Poultry at Petit's Little Rock, Arkansas processing plant that resulted in the layoff of 700 Petit employees.  Second, by December 23, 2008, it was reported that Tyson had cut its production by 5%.

259.    Asked by a reporter about the cuts, Tyson spokesman Gary Mickelson stated that "[w]hile we would rather not share details of our current poultry production levels, we can tell you we continue to closely evaluate market conditions in an effort to match customer demand with our supply.  Tyson also noted that it had reduced production "in recent years through the closing or sale of poultry plants and by running the company's remaining operations at reduced capacity utilization."

260.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

261.    As further detailed below, these numerous collusive communications between ████████████████████ and the Defendants furthered the conspiracy to limit output and resulted in higher prices than would have existed in the absence of such efforts. And prices reflected in the indexes published by ██████████ itself were also therefore necessarily inflated as a result of the conspiracy. Both ██████████ and the Defendants knew that these inflated prices were the logical – and intended – result of their efforts to further the output limitation conspiracy.

262.    On January 28-30, 2009, Defendants' senior executives attended the 2009 International Poultry Expo in Atlanta, Georgia.

263.    In a February 18, 2009 interview, Tyson Senior Group Vice President Donnie Smith noted that "[a]cross our industry, we're down about six percent versus where we were a year ago.   We're seeing an impact from that on market prices . . . the industry fundamentals are improving."

264.    In late February 2009, a report noted that Pilgrim's had cut another 9-10% of its production.

265.    According to that same report, Tyson told the audience at a February 2009 investors' conference that it did not intend to reduce its production further because "[u]sing WATT PoultryUSA data on ready-to-cook (RTC) pounds, our numbers have declined 5-7% from 2000 to 2008 on RTC pounds while at the same time the industry has grown 31%.  Over time, we have done plenty of cutting back."

266.    In other words, Tyson communicated that it felt it had already perilously led the industry on production cuts and was confident that competitors would support through significant cuts of their own.

267.    By February 25, 2009, Sanderson Farms told The Morning News of Northwest Arkansas that it had made cuts to its supply of chickens by processing smaller chickens and running its plants at lower capacity utilization rates. Sanderson Farms also told a group of investors around this time that "[b]ecause we don't expect much help from the demand side, chicken market improvement will have to come from supply cuts."

268.    Similarly, the CEO of Simmons Foods (a non-public company) Todd Simmons noted in a February 25, 2009 interview that "[w]e are seeing lower demand in the food-service

customer base. We have made adjustments in bird weights to ensure our production meets with our customer's needs."

269. Seeing further cuts from smaller producers in the industry led Pilgrim's to announce historically large cuts to its production on February 27, 2009.

270. In a press release announcing the closure of three processing plants located in Douglas, Georgia; El Dorado, Arkansas; and Farmerville, Louisiana, Pilgrim's stated the plants were "underperforming" and said the closures would "improve the company's product mix by reducing commodity production and to significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession." Pilgrim's also stated that the idling of these three plants would reduce its total pounds of chickens produced by 9-10%.

271. Overall, "[a]t least 11 companies reported reductions in weekly ready-to-cook production in 2008," including Tyson, Pilgrim's, Perdue, Simmons, Raeford, Cagle's (later bought by Koch Foods), George's, O.K. Foods, Harrison, and GNP Company (now owned by Pilgrim's).

272. Other companies reduced their planned production levels or delayed the planned opening of new chicken complexes.

(c) **Defendants' First Round Chicken Production Cuts Included Unprecedented Reductions To Chicken Breeder Flocks**

273. As noted above, in 2008, Defendants ended a decades-long trend of annual additional chicken production, surprising industry observers.

274. What made the production cuts in 2008 and early 2009 remarkable is that chicken producers did not just reduce the pounds of chickens they produced – they also went further up their supply chains than ever before to restrict their ability to ramp up production for years into the future.

44

275.    While previous downturns had led some producers to use short-term methods to reduce overall pounds of chickens supplied to the market, in 2008, Defendants took their reductions to the next level by substantially reducing their breeder flocks in ways that were not easily reversed and would result in a commitment to longer-term reductions, as shown in the highlighted section of the graph below:



Source: National Agricultural Statistical Service, U.S.D.A., https://quickstats.nass.usda.gov/

276.    The effect of the supply cuts on chicken pricing in 2008 and the first months of 2009 was clear – during the worst recession in generations, chicken prices rose through mid to late 2008, staying at or near all-time highs until late 2009.

277.    For instance, by May 28, 2009, Sanderson Farms reported strong profits that were twice the estimates of Wall Street analysts, which according to one industry publication was "aided by production cuts and lower feed costs that offset still-weak demand."

278.    Similarly, at a May 14, 2009, BMO Capital Markets conference in New York City, interim Tyson CEO Leland Tollett noted that "poultry market fundamentals had improved.  Pullet placements, an[] indication of future broiler supplies, have been down the past five months compared to the same period last year.  Egg sets continue to run six percent or more below year ago levels and cold storage inventories of poultry have declined about 20 percent since peaking in November 2008."

279.    During 2009 and 2010, Defendants' senior executives continued to meet with one another at trade association meetings and industry events, such as the National Chicken Council and the International Poultry Expo.

280.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

281.    In another example at the National Chicken Council's October 2009 Annual Conference, which was attended by Ben Harrison (Amick President & CEO), one industry analyst wrote that participants had emphasized continued "production discipline," Defendants' euphemism for limiting chicken supply.

282.    However, as prices continued to rise during late 2009 and early 2010, producers started increasing production in response to the higher prices just as they had done in previous decades.

283.    Because of 2008 and 2009's unprecedentedly deep and early breeder flock culls, this temporary spike in production took months to effectuate, rather than the few weeks it would have taken had producers killed off their breeder flocks at the rates and times at which they had done so in the past.

46

284.    The rising production by producers in early 2010 led to a reported oversupply of chickens that began to depress prices by late 2010.

285.    It was thus time for Defendants to revamp their faltering conspiracy to make it more effective.  Defendants had learned the value of coordinated supply reductions in 2008; they were quick to react with a new round of publicly-announced production cuts in the first half of 2011, which quickly helped prices recover.

  (d)    **Defendants Continued Their Conspiracy With A Second Massive Breeder Flock Cull In 2011**

286.    █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

287.    ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

288.    █████████████████████████████████████████████████████████████████████████████████████████

47



289.    On April 15, 2011, Defendant Mountaire disclosed, in a press report, the abandonment of a planned capacity increase, with Mountaire President Paul Downes explaining that "the only way to higher prices is less supply.  The only way to less supply is *chicken companies will shut down or cut back* . . . I think that's what we're going to see."  (emphasis added).

290.    Mr. Downes' view of the state of the chicken industry was echoed, and amplified in grim terms, by Joe Sanderson, CEO of Defendant Sanderson Farms, who stated on a May 24, 2011 earnings call that "the deal is that the industry – forget Sanderson – the industry cannot sustain losses like they are sustaining for a long period of time.  They will – they can't do it and you have been observing this for years and years and the industry has been losing money since Novemberish and balance sheets deteriorate and losses have to stop.  The only way to stop losses with $7 corn is to reduce production and get prices up.  That is the rule and the law of the jungle."  Mr. Sanderson continued, "my judgment is that there will be some others that are going to have to make some adjustments that ***I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats***."  (emphasis added).

291.    Mr. Sanderson's comments came roughly one week after he and Lampkin Butts, Sanderson's President and COO, attended the BMO Farm to Market Conference in New York City, along with the CEOs of Defendants Pilgrim's Pride (Bill Lovette) and Tyson (Donnie Smith).

292.    The conference included a presentation by Mr. Lovette that noted Pilgrim's new focus on matching production to meet demand, including by adjusting "head," *i.e.*, breeder flocks, to better balance supply and customer demand.

293.    ███████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████

294.    On a June 6, 2011 earnings call announcing it would not increase capacity in the foreseeable future, Cagle's – a Georgia-based integrator whose assets were bought by Defendant Koch Foods in 2012 following Cagle's bankruptcy – said that "the industry must lower supply in order to offset reduced demand and to support higher market prices."  (emphasis added).

295.    Other Defendants and co-conspirators, including Fieldale Farms and Mar-Jac, also began reducing production by cutting breeder flocks in the middle of 2011.

296.    In June and July 2011, Defendants' senior executives attended industry events, including a seminar held by the U.S. Poultry & Egg Association and the 2011 Food Media Seminar, which included a panel made up of the CEOs of Defendants Tyson (Donnie Smith), Peco Foods (Mark Hickman), and Perdue (Jim Perdue), and Defendant Sanderson Farms' President and COO (Lampkin Butts).

297.    On an August 1, 2011 earnings call, Sanderson Farms CEO, Joe Sanderson, informed analysts that the company's normal fall production cut of 4% beginning in November would remain in place beyond January 2012 or until such time as demand improved.  Mr.

Sanderson also stated that it "*wouldn't surprise me if the industry makes further, deeper reductions in egg sets in October or November . . . Nobody knows what cuts might be needed until we get to October, but I think that the cutbacks may need to be more than the 6% in head that the industry has in place.*" (emphases added).

298.    A week later, Tyson's CEO said on an earnings call that "domestic availability must be in balance with demand before *industry economics can improve*.  Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter . . .  Our goal is to match supply to demand.  And following over-production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market." (emphasis added).

299.    In early October 2011, Defendants' senior executives attended the National Chicken Council's 57th Annual Conference in Washington, D.C. Among the discussion panels at the event was one about the "new paradigm" in the chicken industry.  The panel included senior executives from Perdue (Clint Rivers, by then Perdue's President of Foodservice and Supply Chain, after having been Pilgrim's CEO), Keystone (William Andersen, Senior Vice President) and Koch Foods (Mark Kaminsky, COO and CFO).  Panelists said that "the industry is accustomed to cycles, but not one quite like the latest, and *companies are going to need to adjus*t.  Discipline on the supply side was one suggestion.  Getting better prices from retailers was another." (emphasis added).

300.    Throughout 2012, Defendants continued to meet at trade association meetings and industry events, giving them the opportunity to discuss the impact of their collective production cuts and otherwise monitor their conspiracy.

301.    In the first quarter of 2012, for example, Defendants' top executives attended the National Chicken Council's board of directors meeting in Atlanta, which was held in conjunction with the January 25-26, 2012 International Poultry and Processing Expo.

302.    On March 20-21, 2012, the National Chicken Council's board of directors, which included many of Defendants' senior executives, met again in Washington, D.C.

303.    In early 2012, Defendant Sanderson Farms cut its production by 4%, which included a reduction in breeder flocks.

304.    At USPOULTRY's Hatchery-Breeder Clinic in January 2012 in Atlanta, Agri Stats Vice President, Mike Donohue, noted the importance of reducing breeder flocks, stating that "if the industry chose to do so, it could ramp up production within a 10-week period of time.  The industry could blow apart any recover[y] in the short term by filing up incubators again."  But he also noted that the Agri Stats data indicated that the industry was slaughtering breeder flocks at 59 to 60 weeks, instead of the typical 65 weeks.

305.    The kind of early slaughter of breeder flocks – including, for example, the bird-age data included in the "Growth Rate Report" described above – meant that Defendants subsequently were unable to increase production for at least eighteen months, as they would have been able to do had they not made cuts at the top of the supply chain.

306.    The shift in the way the industry supplied chicken was summarized in a March 2012 report published by agricultural lender, CoBank.

307.    Entitled "The U.S. Chicken Industry:  Re-invented and Revitalized" with sections captioned "'Same-Old, Same-Old' – No More" and "It's a New Ballgame," the report noted that the:

> U.S. chicken industry has gone through the proverbial wringer, but last year appears to have been the low point.  In recent years, the chicken companies have all lost money,

some more than others. And five U.S. companies have exited the industry since 2008. As the losses mounted, the industry realized that its standard business practices sorely needed to be reformed. The surviving chicken companies found it to be not just prudent, but absolutely essential to revise those practices. The poultry industry today operates much differently than it did just a few years ago.

308. The CoBank report highlighted one of the reasons for this sea-change: the Defendants' reduction of breeder flocks that began in mid-2011, noting that "*the recent cuts in the hatchery flock will prevent a quick response*," with "U.S. chicken production [ . . . ] on track to fall to its lowest level in 5 years by mid-2012." (emphasis added).

309. The highlighted section of the following graph shows that these cuts bucked the historical trend of breeder flock reductions, going even deeper than the then-unprecedented 2008-2009 cuts:



Source: National Agricultural Statistical Service, U.S.D.A., https://quickstats.nass.usda.gov/

310. The sentiment of CoBank's March 2012 report was mirrored by Pilgrim's CEO, Bill Lovette, on an April 27, 2012 earnings call, where he reported that "the die is cast for 2012," and that "we're comfortable that *the industry is going to remain constrained*." (emphasis added).

311. Trade association meetings and industry events in the middle of 2012 gave the Defendants additional opportunities to meet and discuss the effect of their collusive efforts to reduce production. Examples of these opportunities to conspire included Urner Barry's annual marketing seminar, from April 29 – May 1, 2012, the National Chicken Council's board of directors meeting in Lake Tahoe on June 21, 2012, and the July 15, 2012 meeting of the National Chicken Council's marketing committee in Stowe, Vermont.

312. Each of these meetings were attended by a number of Defendants' senior executives.

313. On August 28, 2012, Sanderson Farms announced a further 2% production cut.

314. By September 2012, Defendants' 2011 production cuts, particularly their reduction of breeder flocks, had resulted in increased prices for Plaintiff.

315. The higher chicken prices seen in the market by September 2012 were not justified by the costs of Defendants' primary inputs, corn and soybean meal, which by the fourth quarter of 2012, had dropped significantly in price following near-record highs in the summer of 2012.

316. On October 10-11, 2012, the National Chicken Council held its annual meeting in Washington, D.C.

317. Among Defendants' and co-conspirators' senior executives attending the meeting were the President of Fieldale Farms (Thomas Hensley) and CEO of Defendant O.K. Foods (Paul Fox).

318.    Messrs. Hensley and Fox participated in an "Industry Outlook Panel" where participants discussed the question of what the industry "learn[ed] from 2011 and *how will the industry apply those lessons in 2012 and 2013*." (emphasis added).

(e)    **Drastically-Reduced Breeder Flocks Boosted Chicken Prices And Raised Defendants' Profits To Record Levels**

319.    For most of the remainder of 2012 through 2017, Defendants reaped the benefits of their coordinated supply restraints as prices rose and profits soared to record levels.

320.    During this time, Defendants' executives repeatedly heralded the industry's newly found supply "discipline."

321.    For example, on a May 3, 2013 investor call, Pilgrim's Pride CEO, Bill Lovette, said that:

> Obviously, revenue is going to be a function of price, in part, and in this case a big part; and obviously, price is going to strengthen as supply continues to be disciplined and constrained . . . So I think *the industry is doing an admirable job in being disciplined* on the supply side and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying . . . I believe *the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken* and not necessarily what corn or soybean meal costs.  I think I'm confident to say, we've figured that out and we're doing a good job of balancing supply and demand.  (emphases added).

322.    On the May 3, 2013 investor call, Mr. Lovette specifically referenced the continued importance of restraining the industry's breeder flocks:

> I only know what we've seen happen in the past.  Now, certainly, this summer *if the industry chooses to grow the breeder supply significantly, that's definitely going to impact 2014.  What I'm saying is, so far, we've seen no indication that the industry plans to grow the breeder supply and as a matter of fact, it's actually shrunk*. . . . I'll reiterate that *I think the industry has learned* that the economics of our business is tied very closely to the supply of chickens and *we've done a good job so far of maintaining discipline* such that even paying nearly $8.50 for corn, *we've been able to be profitable as an industry*.  (emphases added).

323.    On October 4, 2013, Defendants' CEOs and other senior executives met at the annual meeting of the National Chicken Council in Washington, D.C., where a panel, including the CEOs of Defendants Tyson (Donnie Smith) and Simmons Foods (Todd Simmons), was "chipper about the prospects for their industry in the next few years." Keystone Foods' executive Tim Esslinger was also present at the meeting.

324.    Defendants had reason to be positive.  For example, on a February 21, 2014 earnings call, Pilgrim's Pride CEO, Bill Lovette, reflected on what had led to the company's record earnings.  Mr. Lovette noted that "I think the one thing that creates . . . has created the stability is *the discipline of the industry to not allow profitability in the past to drive supplies* in the future . . . And I think that discipline really . . . is the one ingredient that has made for more stable earnings that we have seen." (emphasis added).

325.    At a March 12, 2014 industry conference, Tyson CEO, Donnie Smith, told attendees that a "meaningful change" in chicken production would not occur until the second half of 2015, a statement he could confidently make because Defendants' unprecedented 2011-2012 cuts in breeder flocks made it impossible for them to "meaningfully change" chicken production any sooner.

326.    An October 2014 CoBank analysis noted that Defendants' strategy of targeting breeder flocks paid dividends during 2013 and 2014.  According to the report:

> [P]roduct demand should remain robust through the rest of this year and well into 2015, bolstered by a gradually improving domestic economy, continued strength in export demand, and the towering prices of beef and pork.  Broiler production, however, has been slow to respond, with integrators having had problems expanding the number of chicks placed for growout.  Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015.  Producers have been somewhat constrained in their attempts to expand the nation's chicken flock by the limited supply of broiler hatching eggs.  When the broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been rebuilt to prior levels.  Following seven

months of [Year-over-Year ("YoY")] declines, the number of chicks placed for growout finally posted a modest 1 percent YoY gain in August. However, it will take another 6-9 months for integrators to rebuild the supply of broiler hatching eggs in preparation for expanding the overall flock, so significant growth in broiler production will not materialize until late 2015 or early 2016.

The October 2014 CoBank report also noted the effect of these production cuts, stating that wholesale prices for chicken "have risen to unusually high levels."

327.     During a February 12, 2015, earnings call, Pilgrim's President & CEO Bill Lovette summed up the restriction of supply which Defendants had implemented since 2008: "I looked at some numbers supplied by Agri Stats earlier in the week and found some interesting facts. If you go back to 2008, the industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies."

328.     The year 2015, like 2014, was a banner year for Defendants' profits resulting from their conspiracy.

329.     WATT PoultryUSA's March 2016 issue noted, for example, that Defendant Tyson had achieved "record earnings and sales in fiscal year 2015 . . . posting $40.6 billion in sales, including ringing up higher chicken sales. Yet, Tyson lowered chicken production in 2015. What's at work here? This paradoxical performance, in part, reflects the fact that Tyson, along with other top U.S. broiler companies, is redefining its business model to achieve profitable growth."

330.    The true explanation for the 2015 performance of Tyson and its competitors, however, was the conspiracy alleged in this Complaint.

331.    This trend continued into 2016.  With the notable exception of the Georgia Dock, chicken prices declined in 2016, but significantly less than input costs.

332.    Defendants maintained artificially high chicken prices and high profitability during 2016 by exercising "discipline" on the supply-restriction prong of their conspiracy.

333.    For instance, during an April 2016 earnings call, an analyst noted that Pilgrim's CEO, Bill Lovette, "mentioned that you think the industry domestically has been much more disciplined than they have been in the past, I'm wondering if you could just elaborate a little bit more on what sort of drives that view and then maybe what gives you confidence that this discipline will hold."  Mr. Lovette responded, "[w]hat drives the view is the actual numbers that we see, ready to cook pounds are up about 3.1% year to date.  If you look at placements year to date, they're up 1%, egg sets up 0.7%, hatchery utilization actually declined in Q1 to 91%.  So in the phase of coming off two of the most profitable years in the industry, we're not seeing, not realizing large amount of production increases."

334.    Tellingly, Pilgrim's CFO Fabio Sandri added immediately after Mr. Lovette's comments that "what drove that I believe it is that *[the] industry is more geared towards profitability rather than just market share* or field growth."  (emphasis added).

335.    In other words, Defendants were no longer competing with one another to gain market share by growing their companies as one would expect in a competitive market, but instead, worked collectively to increase profitability by being "disciplined" in terms of supply growth.

336.    Defendants also kept up the regular use of signaling one another to perpetuate their collusion during 2016 by using the code word "discipline" to note their continued adherence to the supply-restriction prong of their conspiracy by keeping breeder flocks low.

337.    For instance, during a February 2016 earnings call, Pilgrim's CEO, Bill Lovette, noted that:

> [T]he industry continues to be disciplined in terms of U.S. supply.  Although monthly pullet data tend to be volatile and have occasionally been at the high end of our expectations, we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits [sic] and chick placements as a positive.  We believe that at least part of the reason is because *chicken producers are being disciplined* and are much quicker to react than in the past and in adjusting supply growth to the actual market conditions.  (emphases added).

338.    Other CEOs also had to try to explain the marked shift in the chicken industry's profitability in recent years, after the decades-long pattern of boom and bust regarding chicken pricing and profitability.

339.    

340.    During a February 2016 Sanderson Farms earnings call, BMO Capital Markets analyst Ken Zaslow noted the industry's history of volatility in pricing and profitability for chicken companies, questioning if there was "any changing of the industry dynamic" that had occurred. Sanderson Farms CEO Joe Sanderson replied "we might be at a capacity wall, you know?  . . . Since back in 2007 . . . there are three or four plants shuttered . . . It does feel different."

341.    On an analyst call on May 26, 2016, Mr. Sanderson echoed his earlier statements about how much the industry had changed since 2007, noting that "when you go back and look and see how many eggs are being set right now and you go back and look at what the industry will

[sic] set in 2007 . . . egg sets in 2007 were 220 million eggs a week, and we're setting 208 million, 209 million, 210 million eggs a week."

342.    Mr. Sanderson's comments about egg sets were amplified by Pilgrim's CEO Bill Lovette later that summer, stating on a July 28, 2016 analyst call that "I think what we have seen with egg sets is absolutely a testament to the discipline of our industry that we've seen in the last really two to three years."

343.    On the July 28, 2016 call, Mr. Lovette also commented on Defendants' continued restraint of breeder flock population, noting that "the breeder flock in total is only up about 0.5%" over the same time period, and ended the analyst call describing the "positive notion [we] have about the discipline that we continue to see exhibited by the entire industry," which "gives us more confidence that we're going to do the right thing with respect to maintaining that discipline . . . and . . . gives us confidence that we're going to continue to be disciplined as an industry."

344.    On an August 8, 2016 earnings call, Tyson's former CEO Donnie Smith – who was then transitioning the CEO role to Thomas Hayes, the company's former Chief Commercial Officer who became the CEO in late 2016 – stated that "our chicken business is . . . it continues to do great," a comment seconded by Mr. Hayes, who said about the company's chicken business that "year-over-year, we're doing great . . . all that business is very profitable to us."

**(ii)    The Conspiracy Also Included Collusive Manipulation of The Georgia Dock Price Index**

345.    Defendants' successful efforts to boost chicken prices by collectively and collusively reducing supply was buttressed in the latter years of their output-reduction scheme, by collusively manipulating the Georgia Dock benchmark price index – a chicken industry pricing benchmark contained in contracts between Defendants and a significant proportion of their customers.

59

346.    The Georgia Dock, USDA Composite, and Urner Barry all purport to measure the same (or very similar) size and grade of chicken.[3]

347.    The Georgia Dock benchmark price index, like the other two indices, calculates prices for both the "whole bird" and various parts of the chicken (wings, tenders, leg quarters, thighs, drumsticks and breasts) using the same pricing methodology.  The "whole bird" price is the baseline for pricing all parts of a chicken.

348.    Buyers in the market relied on the Georgia Dock benchmark price index because they were led to believe that it accurately reflected the market price for the chicken they bought —especially since the Georgia Dock was an industry-accepted benchmark price index for wholesale chicken prices that was, according to an internal memorandum drafted by the Florida Attorney General's office as part of its investigation, "meant to reflect the market price of chicken."

349.    And, much like when the world's largest banks came together to manipulate numerous financial benchmarks (such as LIBOR), the Georgia Dock Defendants came together to manipulate the Georgia Dock benchmark price index.

350.    Compared to the other two indices available to chicken buyers, there were significant differences in how the Georgia Dock benchmark price index was compiled that made it highly susceptible to manipulation by the Georgia Dock Defendants, who are the ten chicken producers that submitted price quotes to the GDA for inclusion in the index.

---

[3] Unlike the other indices, the Georgia Dock benchmark price did not include freight or transportation costs.  At its inception, the Georgia Dock benchmark price was known as the "Georgia F.O.B. Dock" price; the Georgia Dock was "F.O.B." the supplier's shipping dock, meaning that the buyer was responsible for paying the freight.

       (a)      **The Georgia Dock Pricing Methodology And Its Susceptibility To Manipulation**

351.    Until late 2016, the Georgia Dock pricing methodology was not publicly available.

352.    Chicken buyers in the market whose transactions with Defendants were based on the Georgia Dock whole-bird price, mistakenly believed it reflected the actual market price of chicken. Moreover, because (until August 2016) the USDA also published the Georgia Dock benchmark price alongside the USDA Composite, many chicken buyers erroneously believed the Georgia Dock price to be a USDA price.

353.    In addition, Defendants falsely represented that the Georgia Dock benchmark price is based on a complicated "algorithm" from the GDA that takes into account various factors, such as bird weights, weather, mortality rates, and demand. Buyers in the market were misinformed that the Georgia Dock benchmark was supposed to be based on the Georgia Dock Defendants' actual sales prices as reported to the GDA.

354.    But neither was true. The reality was that the Georgia Dock price was simply determined by the Georgia Dock Defendants. Hypothetically, if one week the Georgia Dock price was $1.75, and the following week the Georgia Dock Defendants told the GDA that the sales price of their chicken was now $2, the Georgia Dock price was $2 – and the prices that buyers in the market paid for chicken increased commensurately.

355.    In compiling the Georgia Dock benchmark price, there was no team of economists or statisticians surveying buyers and sellers in the national chicken market.

356.    Unlike the USDA Composite or Urner Barry indices, which purport to use data from numerous producers and buyers on both sides of the market, the Georgia Dock reflected prices sourced solely from a handful of producers.

357.     The Georgia Dock Defendants are the ten producers whose price quotes went into the Georgia Dock index, namely (ranked by their market share in Georgia, which dictated how much weighting each producer's quote was given in compiling the Georgia Dock benchmark price): Pilgrim's Pride (33%); Tyson (14%); Fieldale (14%); Perdue (9%); and Sanderson Farms, Koch, Claxton Poultry, Mar-Jac, Harrison and Wayne Farms, each with a 5% market share.

358.     Once a week, a single GDA employee, Arty Schronce, would call the same ten individuals at the Georgia Dock Defendants to collect price quotes, which were supposed to reflect their actual sales prices. He weighted each producer's price quote by its above-referenced relative market share (referred to by the GDA as that company's "voice").

359.     Mr. Schronce, who began compiling the Georgia Dock Defendants' price quotes in 2012 following the retirement of his predecessor, first made a preliminary calculation based on the single price quotation from each company. Then, "[a]ny company that provides a whole bird quote that is more than one cent above or below the initial dock price calculation will not be included in the calculation for the whole bird dock price that week. Its voice is taken out of the formula and the dock price is recalculated without it."

360.     This so-called "one-cent rule" is, according to internal GDA documents, meant "to shield [] one company having the ability to greatly influence the price up or down."

361.     Nothing was done to verify or substantiate these numbers. There was no "double-verification"; customers were never contacted to check to see if the producers' prices were legitimate. The entire process was based on unverified, verbal "price quotes" from the same small set of chicken producers (the Georgia Dock Defendants) submitted each week to a single GDA employee – a methodology that the Florida Attorney General's office correctly concluded was "susceptible to manipulation."

362.    The price quoted by each Georgia Dock Defendant to the GDA was based on 2.5-to-3 pound whole chickens, but only a handful of the Georgia Dock Defendants actually processed 2.5-to-3 pound birds in Georgia. Consequently, according to internal GDA documents, the Georgia Dock Defendants were "supposed to adjust their whole bird quote as if they are producing that sized bird."

363.    Once the final Georgia Dock whole bird price was calculated, the GDA then used a formula to calculate prices for different chicken cuts and parts based on the whole bird price the Georgia Dock Defendants provided to the GDA each Wednesday.

364.    To facilitate their control of the Georgia Dock benchmark price, the Georgia Dock Defendants convinced the GDA to convene a secret "Advisory Board" composed of senior executives from eight of the ten Georgia Dock Defendants to advise the GDA on the Georgia Dock price.

365.    From at least September 2012 through 2016, the Advisory Board included Gus Arrendale (CEO, Fieldale Farms), Mike Welch (CEO and President, Harrison), Jerry Lane (Former CEO, Claxton Poultry), Jayson Penn (EVP Sales and Operations, Pilgrim's), Pete Martin (VP of Operations, Mar-Jac), Vernon Owenby (Manager of Tyson's facility in Cumming, Georgia), Steve Clever (VP of Fresh Sales, Wayne Farms), and Dale Tolbert (VP of Sales, Koch Foods).

366.    These members, although purportedly competitors, used the secretive Advisory Board as a mechanism to discuss and coordinate each others' pricing of chickens.

367.    Beginning in early 2013 and continuing until November 2016, the Georgia Dock Defendants agreed among themselves to submit artificially high and identical, or near-identical, prices to the GDA, which allowed them to continually increase, and successfully stabilize, chicken prices tied to the Georgia Dock benchmark price index.

368.    The existence and conduct of the secret GDA "Advisory Board" was not known to chicken buyers until November 2016 when it was first made public following a press report about a September 2016 memorandum written by Mr. Schronce that was highly critical of the Georgia Dock methodology.

369.    He wrote in the memorandum that he had "questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent. I was told I could not make any changes without clearing them with the Advisory Board."

370.    The Advisory Board gave the Georgia Dock Defendants a vehicle to discuss and artificially set price quotes to ensure compliance with their price-fixing agreement.

371.    In December 2015, the GDA began an internal review process of the Georgia Dock pricing methodology, in large part, because the agency had "serious concerns" about the way the index was compiled.

372.    The GDA's internal review was not made public at the time it began, and was not revealed until it was described in a series of press reports beginning in November 2016.

373.    Mr. Schronce, in his September 2016 memorandum, expressed concerns that some companies have a "larger, even outsized role in determining the Georgia Whole Bird Dock Price," and that "[i]n essence, they can take advantage of a high whole bird price."

374.    Mr. Schronce also suggested that the Georgia Dock benchmark price be eliminated altogether because it was "a flawed product that is a liability to the Georgia Department of Agriculture." Mr. Schronce's memorandum concluded by noting that he "was told the poultry companies know what they are doing and all I need to do is gather and consolidate the info I am provided. However, I have come to question the validity of some of the information provided." The memorandum also stated that the Georgia Dock Defendants gave "lackadaisical and rude

responses to my requests for information," such as responding "just keep 'em the same" when asked for a company's updated price quote.

375.    Under pressure from the USDA, and realizing that the Georgia Dock pricing methodology raised significant antitrust concerns, the GDA attempted to revise the methodology in the autumn of 2016.

376.    This new methodology included a requirement that the Georgia Dock Defendants verify and attest to the accuracy of their price quotes.

377.    Faced with the prospect of having to swear to the accuracy of their price submissions under the GDA's new methodology, the Georgia Dock Defendants simply decided to stop making such submissions to the GDA.  Consequently, the GDA halted the Georgia Dock benchmark price index altogether because it was no longer receiving sufficient price quotes to compile the index.

378.    The last Georgia Dock benchmark price was published by the GDA on November 23, 2016.

379.    However, for at least three months after the last Georgia Dock price was published by the GDA, certain Defendants, including at least Pilgrim's, continued to use the November 23, 2016 benchmark price of $1.0975/lb. to set their wholesale prices to chicken buyers.

**(b)     Defendants' Georgia Dock manipulation affected prices of broiler sales that were not based directly or expressly on the Georgia Dock.**

380.    The manipulation of the Georgia Dock did not only have an anticompetitive effect on the price for sales of broilers that were quoted based directly and expressly on the Georgia Dock; rather, it also contaminated and artificially raised prices for broilers that were not expressly tied to the Georgia Dock.

381.    This contamination occurred because Defendants often used the Georgia Dock as a crosscheck or a baseline for transactions even where the Georgia Dock was not the primary benchmark that suppliers used to provide quotes to customers. ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

**(iii)    For Transactions Not Based On A Price Index, The Defendants' Conspiracy Utilized Explicit Bid Rigging**

382.    Defendants' comprehensive efforts to artificially and collusively inflate the sale prices on Broilers were not limited to coordinated supply reductions or manipulation of supply indexes. For Broiler transactions where the price was not based directly or indirectly on price indexes manipulated by Defendants, Defendants ensured that those prices too were artificially inflated. They did so by explicitly rigging the bids with their supposed competitors.

383.    The rigged bids included bids for sales to restaurants, grocery retailers, purchasing cooperatives, and others who purchased large volumes of broiler chicken products.  These actions began as early as 2012 and continued at least until 2017.

384.    Quick service restaurants ("QSRs") like Subway and large volume purchasers of Broilers became the unknowing targets of poultry suppliers.

385.    And IPC, like many others in the QSR industry, sought and received bids from Defendants before entering contracts for the procurement of large volumes of Broilers.

386.    During this window of time, Defendants strengthened their conspiracy by colluding to fix prices and to submit artificially high bids in an effort to drive up broiler prices, and in turn, Defendants' profits.

**(a)    To-date, Executives Of Two Defendants Have Been Indicted For Their Roles In The Conspiracy.**

387. On June 3, 2020, the Department of Justice indicted Jayson Penn, the former President and CEO of Defendant Pilgrim's Pride, Roger Austin, the former Vice President of Pilgrim's Pride, Mikell Fries, the President of Defendant Claxton, and Scott Brady, the Vice President of Claxton (collectively, the "Criminal Defendants"), in the U.S. District Court for the District of Colorado (the "Colorado Indictment"). *See U.S. v. Penn, et al.*, Case No. 1:20-cr-00152-PAB, ECF No. 1 (D. Colo. July 25, 2001).

388. The Colorado Indictment charges the Criminal Defendants with conspiring "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States" in violation of Section 1 of the Sherman Act.

389. Beginning at least as early as 2012 and continuing at least into 2017, Defendants' conspiracy to fix prices and rig bids submitted for Broilers sold to large volume purchasers like Plaintiff was carried out with the intent to artificially inflate the prices paid, and had that intended effect.

390. Indeed, between 2014 and 2017 alone, Defendants increased prices for certain broiler contracts in excess of 15 percent. This occurred notwithstanding the historic drop in corn and soybean prices during the same period. These price increases also occurred at the same time that comparable wholesale prices were decreasing significantly.

391. Defendants also pointed their customers to the concomitant increase in Georgia Dock prices—that Defendants themselves manipulated and artificially inflated—as further justification for the price increases on Broilers.

**B.      The Structure And Characteristics Of The Chicken Market Make It Highly Susceptible To Collusion**

392.    **Highly-Concentrated Market with Vertically-Integrated Producers**.    A concentrated market, such as the U.S. chicken market, facilitates the operation of a cartel because it is easier to coordinate behavior among possible co-conspirators and more difficult for customers to avoid the effects of collusive behavior.

393.    Defendants collectively control nearly 90 percent of the U.S. wholesale chicken market.

394.    The U.S. chicken industry is almost entirely vertically integrated, with Defendants (known as "integrators") owning, or tightly controlling, each aspect of breeding, hatching, chick-rearing, feeding, processing, and selling.

395.    **Inelastic Demand at Competitive Prices**.  Inelastic demand means that increases in price result in limited declines in quantity sold in the market.  In order for a cartel to profit from raising prices above competitive levels, demand must be inelastic at competitive prices, which allows cartel members to raise prices without seeing a decline in sales revenue.

396.    Industry studies show that in the U.S. chicken market, not only is the demand for chicken inelastic, it has become increasingly more inelastic over the past 40 years.

397.    In connection with a joint DOJ-USDA workshop on the poultry market in 2010, agriculture economist Dr. Michael Dicks presented research demonstrating how vertical integration incentivizes chicken producers to implement supply restrictions, stating that in the U.S. poultry industry "vertical coordination allows integrators to manage excess capacity to manage price.  Integrators can minimize the effect on producers by increasing the time between collection and delivery of birds or reducing the number of flocks per year…Because of the inelastic nature of the supply and demand a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

398.    **Existence of Numerous Trade Associations and Access to Competitors' Data through Agri Stats.**  The existence of industry trade associations makes a market more susceptible to collusive behavior because they provide a pretext under which co-conspirators exchange sensitive company information, such as pricing and market allocation.  Industry trade associations also provide mechanisms for sharing information, and monitoring, deterring, detecting and punishing cheating.

399.    The following U.S. chicken industry trade associations, all of which count all or nearly all Defendants as members, allowed Defendants to coordinate their price-fixing and supply restriction conspiracy:  National Chicken Council ("NCC"), United States Poultry & Egg Export Council, U.S. Poultry & Egg Association, Georgia Poultry Federation, North Carolina Poultry Federation, and Poultry Federation (representing chicken producers in Arkansas, Missouri and Oklahoma).

400.    Indeed, according to *Communication in Poultry Grower Relations:  A Blueprint to Success*, a book written by a management consultant affiliated with the U.S. Poultry & Egg Association, "representatives from the various [chicken producers] readily share information while attending the numerous seminars offered by the U.S. Poultry & Egg Association, National Chicken Council" and other trade groups, further noting that "industry leaders realize the industry's tremendous potential, and their spirit of cooperation is based on knowing that that which is good for individual companies is good for the industry."

401.    Regular and frequent attendance by Defendants' CEOs and top level executives at trade association meetings is customary.  For example, NCC "represents integrated chicken producer-processors, the companies that produce, process and market chickens.  [The 40] member companies of NCC account for approximately 95 percent of the chicken sold in the United States."

The CEOs of the top integrated Broiler producers are routinely on the board of directors and meet at least quarterly with one another through the NCC.

402.    The NCC has three annual board meetings attended by Defendants' senior executives, including most or all Defendants' CEOs and other top executives.  Every Defendant and Co-Conspirator is a member of the NCC, including Mar-Jac, Claxton Poultry, Harrison Poultry, Keystone, and Allen Harim.  CEOs generally always attend the following three NCC meetings each year, in addition to special committee meetings or other special NCC events:  (a) the January meeting of the NCC held along with the International Poultry Expo, (b) the mid-year Board of Directors meeting, and (c) the NCC Annual Meeting in October.

403.    Generally, CEOs arrive the night before an NCC meeting and socialize with their colleagues, then have small private dinners with one or more of their competitors' CEOs or top executives.  The next day, the formal NCC meetings are held and executives from Agri Stats and other allied industry organizations make presentations at the meeting.  A formal lunch is held during the meeting and provides CEOs and top executives and opportunity to talk casually with their competitors.  Following the meeting, Defendants' CEOs and top level executives often meet, socialize and golf, hunt, or fish together.  Defendants and Co-Conspirators also hold positions of power within the NCC.  For example, Amick President and CEO Ben Harrison, served on the NCC Board of Directors throughout the relevant period, and subsequently served as NCC Chairman.  Thomas Shelton, Chairman and CEO of Case Foods, has continuously been a member of NCC since 1988 through the relevant period serving on the Board of Directors and as President during that time.  Numerous executives of Keystone Foods, including Jeff Bailey (Director of National Account Sales), Jenelle Duncan (Domestic Sales Manager), Chuck Cooper (Senior Director Supply Chain), Charles Hill (VP Sales & Marketing), and Keith Lewis (former Senior Vice

President for U.S. Poultry and Fish), were also members of the NCC during the conspiracy period. William Andersen of Keystone Foods was also appointed to the board of directors for a three year term during the 2010-11 NCC cycle. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

404.	Similarly, Defendants and Co-Conspirators, and their senior executives, regularly attend the Georgia Poultry Federation's meetings (usually held in April, August and September). The Georgia Poultry Federation's mission is "[t]o protect and improve the competitive position of the poultry industry in Georgia, the nation's leading poultry producing state." Defendants and co-conspirators House of Raeford, Perdue, Fieldale Farms, Wayne Farms, Tyson, Sanderson Farms, Pilgrim's, Mar-Jac Poultry, Harrison Poultry, and Claxton Poultry, and Keystone Foods are members of the Georgia Poultry Federation. Keystone Foods' Clay Banks served as Chairman of the Georgia Poultry Federation during 2014-2015.

405.	Defendants also accessed each other's above-described data through co-Defendant Agri Stats to monitor cheating in the conspiracy. Agri Stats acted as an active facilitator of Defendants' cartel.

406.	**Sharing of Future Plans Through Joint Ventures.** Defendants and the Producer Co-Conspirators facilitated the sharing of future plans for the slaughter of spent broiler hens through joint ventures. For example, the Strategic Alliance was formed through a series of contracts entered into beginning in or around October 2009 between Tip Top Poultry, Inc. ("Tip Top"), Defendants, and the Producer Co-Conspirators. Members of the Strategic Alliance include but are not limited to Allen Harim, Case Foods, Harrison Poultry, House of Raeford, Keystone

Foods, Mar-Jac, Mountaire, Perdue, Pilgrim's Pride, Simmons Foods, and Wayne Farms. Officers of said members of the Strategic Alliance hold regular meetings via conference call and in person.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

407.    **High Barriers to Entry**.  The intended effect of a conspiracy to fix prices, either explicitly (as is the case here with the Georgia Dock benchmark price index) and through restricting supply (which Defendants also did) is to generate higher profits for the participants. The normal impact of the artificially higher profits is to draw other profit seeking companies into the market.  In industries with substantial barriers to entry, such as the U.S. chicken market, however, companies—such as Defendants—are able to raise prices above competitive levels and still earn above-normal levels of profits.

408.    The existence of high entry barriers in the U.S. chicken market is demonstrated by the trend of increasing consolidation, with larger vertically integrated companies increasing their control over the industry.  Beyond the issue of vertical integration, there is a wide range of government food safety, worker safety, and environmental regulations that must be addressed by any new entrant into the chicken market.  The existence of low, and highly variable, profit margins also act as significant barriers to entry.  With such barriers to entry, companies that have the available resources and significant start-up capital to enter the market and benefit from economies of scale are able to reduce their average cost by producing more. Companies already in the market – such as Defendants – are motivated to exclude other companies from the market to maintain their coordinated supply restriction conspiracy, and ultimately keep prices at artificially inflated levels.

409.    These high entry barriers also extend to large foreign meat conglomerates that have

acquired U.S. broiler producers in the past decade, including Brazil's JBS S.A. (Pilgrim's), Mexico's Industrias Bachoco (O.K. Foods), Belgian company Continental Grain Company (Wayne Farms), Marfig Alimentos S.A. (Keystone Foods), and South Korea's Harim Group Corporation (Allen Harim). Each of these foreign meat conglomerates were already large players in the global meat industry and simply continued operating their pre-existing U.S. broiler company as a subsidiary. Ownership of U.S. broiler subsidiaries by such large, well-financed conglomerates deter entry by smaller, non-globalized companies that might want to enter the U.S. broiler production business.

**C.     Defendants Collusively Adopted Additional Strategies To Reinforce Their Conspiracy.**

410.    Defendants collectively adopted several strategies to buttress and sustain their conspiracy.

**(i)      A Collective Shift Away From Long-Term Fixed-Price Contracts**

411.    First, starting in 2008, the Defendants moved away from long-term fixed-price contracts to shorter-term contracts with variable pricing pegged to one of several publicly-available price indices (including the USDA composite Urner Barry, and the Georgia Dock**).** A coordinated move away from fixed price contracts to contracts permitting prices to fluctuate with an indexed public market price helps facilitate an antitrust conspiracy.

412.    Defendants' shift indicates that they anticipated higher, or artificially inflated non-competitive, prices resulting from their production cuts, and wanted the flexibility to take advantage of such prices without being locked in to longer term lower pricing commitments.

413.    Starting around January 2008, senior executives from Koch Foods, Pilgrim's, Perdue, Sanderson Farms, and Tyson publicly announced an effort to reduce annual fixed-price contracts.

73

414.    This change coincided with Defendants' efforts to reduce chicken industry supplies to drive chicken market prices higher.

415.    On January 28, 2008, Tyson CEO Richard Bond announced on an earnings call that Tyson was looking at shortening its fixed price contracts, and by June 2009 Tyson reported it had "dramatically" shortened the amount of fixed-price contracts over 90 days.

416.    The next day, on January 29, 2008, Pilgrim's CFO Rick Cogdill reported on an earnings call that Pilgrim's had started moving away from fixed-price contracts, noting that "in a situation like where we are now where we need to drive commodity prices up, that [*i.e.*, having less fixed price contracts] is going to give us the opportunity for more immediate benefit to our P&L than what we would have had say, historically three year[s] ago, when a higher percentage was fixed price." Pilgrim's later reported that by March 2012, it had reduced its exposure to fixed price contracts, with most contracts now market-based or including a reset provision linked to the underlying commodity. By 2014, Pilgrim's reported that less than 5% of all its contracts were 12-month fixed price contracts.

417.    On July 28, 2008, Perdue spokesperson Julie DeYoung told an industry publication that Perdue was looking to shorten its contract terms, stating, "the company is also seeking to raise prices and shorten its contracts."

418.    Sanderson Farms' CEO Joe Sanderson noted in a July 31, 2008, earnings call that the industry may move towards "shorter term agreements."

419.    This collusive and coordinated shift toward reducing the number of longer-term fixed-price contracts had the intent and effect of creating supra-competitive market prices for Broilers to all customers.

**(ii)     Inter-Defendant Sales**

74

420.     Second, the Defendants use direct purchases of chickens from one another and from smaller producers to meet each company's own sales needs.

421.     In addition to exemplifying the commodity nature of the chicken market, these inter-Defendant sales allowed Defendants to soak up excess supply that could potentially depress prices in the market and facilitated the opportunity to expressly discuss prices with competitors. Such purchases also permitted companies to maintain market share despite reducing their production.  In many instances large inter-Defendant purchases were negotiated by CEOs or other senior level executives of Defendants, thereby providing additional opportunities to conspire.

422.     In 2011, for example, Tyson began using what was described as a "very unique strategy," called "Buy vs. Grow."

423.     Tyson's strategy essentially treated the industry supply as though it were for a single unified company, rather than competing businesses that would rather sell self-produced product to a customer than a competitor.

424.     Tyson's adoption of this strategy was indeed "unique," because only a few years prior to adopting the "Buy vs. Grow" strategy, it had derided a similar strategy as a "stupid" subsidization of competitors' growth, with a Tyson executive explaining on an April 29, 2008 earnings call that "I think what we said along is we're going to match our supply and demand. We're not going to cut beyond that and then go out and buy open market meat to subsidize other people's growth."

425.     Tyson's strategic shift in 2011 to buying chicken on the open market is evidence that by that time, it was confident that its fellow conspirators would maintain their production levels as they were and not increase them.

426. 

427.

428.     In a November 5, 2012, interview, Fieldale President Thomas Hensley noted his company was also pursuing a strategy to purchase excess supply from its competitors, stating that "[i]f you don't have a home for your chickens on Monday morning, you shouldn't have those chickens.  Now we know where all our chickens are going.  So we are buying chickens in that lower price area instead of selling them.  So, no expansion for us."

429.    By the end of 2014, Tyson reported it was buying over four million pounds of chickens on the open market each week.  Four million pounds of chicken per week is more than any of the 24th-30th largest chicken companies produce on a weekly basis, so the amount of Tyson's purchases was quite significant.

430.    During the first part of 2015, Tyson increased its Buy vs. Grow purchases by 50 percent, expanding its purchases from competitors to unprecedented levels.  Tyson announced plans in May 2015 to increase its Buy vs. Grow strategy to 10 percent of its sales in the second half of 2015 and 2016.  Ten percent of Tyson's 2014 ready-to-cook pounds was 17.6 million pounds per week, a volume that by itself would dwarf the entire average weekly production of any of the 15th-30th largest chicken producers.

431.    Notably, Tyson also announced in May 2015 that it planned to reduce its production after July 2015 and keep it flat through 2016 by increasing its Buy vs. Grow purchases.

**(iii)    Atypical Increases In Defendants' Exporting Of Chickens**

432.    Third, during 2013 and into 2014, Defendants found new ways to actively depress the size of breeder flocks, such as using the pretext of avian flu in Mexico to justify exporting flock chickens to Mexico to repopulate flocks rather than use such chickens to increase domestic production levels.

433.    Indeed, Defendants continued their program of exporting chicken hens and eggs to Mexico in 2015, with Tyson explicitly noting in a May 4, 2015, earnings call that it was sending 3 percent of its eggs to Mexico to "fill incubators."

434.    Similarly, during a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted his "confidence that we're going to do the right thing with respect to maintaining [] discipline. We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million hatching eggs or so outside of the country. The industry could

have chosen to set some of those eggs domestically, but that was not the choice that was made. And so again that gives us confidence that we're going to continue to be disciplined as an industry."

435.     Tyson and other Defendants exported hatching eggs to Mexico and other foreign countries from 2013-2016 with the intent to artificially reduce the supply, and artificially inflate the price, of chickens in the U.S.  The revenues Tyson and others received for exporting hatchery eggs to Mexico was far less than they would have generated hatching those same eggs and selling the chicken meat in the U.S. market.

436.     Thus, but for Defendants' agreement and conspiracy as alleged in this Complaint, it would have been against Tyson's independent economic self-interest to export hatching eggs to Mexico and forego higher hatching egg prices in the U.S. But Defendants' new-found "discipline" ameliorated any remaining risk and resulted in supra-competitively higher overall U.S. chicken prices.

**D.     Agri Stats Actively Facilitated Defendants' Conspiratorial Communications And Provided Data Necessary To Effectuate, Monitor, And Enforce The Conspiracy.**

437.     The USDA and various other entities publicly published aggregated weekly, monthly, and annual supply and pricing information concerning the U.S. chicken industry.  But only Agri Stats received from Defendants, and then provided to Defendants, detailed information to accurately determine producer-specific production, costs, and general efficiency.

438.     Agri Stats is a company that generated confidential chicken industry data considerably more detailed than any similar types of available reports, including the following data categories:

> (a)     Breeder flock size and age, hatchery capacity, and the costs associated with breeder flocks, including feed and housing expense;
>
> (b)     Data about the production, delivery and formulation of feed, including corn and soybean meal costs, which are two of Defendants' most significant input costs;

(c)    Grow-out information for chicken "flocks" provided to contract farmers, including the number of chickens placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (*i.e.*, "down time"), feed conversion rate (pounds of feed per pound of chicken), average daily weight gain by chicks, live pounds produced per square foot of grower house, grower compensation, including average grower payment in cents per pound and cents per square foot, breed composition of flock (breed or cross-breed of flocks), detailed information on numerous mechanical aspects of chicken housing, and numerous other detailed cost, mortality, and operational information about disease, transportation, labor, and other grow out related information;

(d)    Slaughter, processing, and further processing information, including pay for processing plant workers, total production volume, market age of chickens at slaughter, weight of chickens at slaughter, birds per man hour, processing line speeds, and labor hours per pound;

(e)    Inventory levels of chickens; and

(f)    Financial information, such as monthly operating profit per live pound, sales per live pound, and cost per live pound.

439.    Agri Stats collected data from Defendants, audited and verified the data, and ultimately reported back to Defendants detailed statistics on nearly every operating metric within the industry, including the size and age of breeder flocks. Agri Stats' survey methodology involved – from and to Defendants – direct electronic data submissions of financial, production, breeder flock size and age, capacity, cost, and numerous other categories of information by each chicken producer on a weekly and monthly basis.

440.    At each of Defendants' chicken complexes, certain employees, typically in the accounting department, were responsible for submitting the data to Agri Stats once a week (historically, on Thursdays) using an AS400 data link system. Agri Stats used a detailed audit process to verify the accuracy of data from each complex, often directly contacting Defendants to verify data before issuing reports to Agri Stats subscribers.

441.     Agri Stats described itself as a "benchmarking" service that "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance."

442.     Sanderson Farms CEO Joe Sanderson claimed, "[w]e use Agri Stats, which some of you are probably familiar with. Agri Stats is a benchmarking service that we submit data to. Almost everyone in our industry does as well. And we get the data back. It's anonymous – the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over the industry."

443.     However, contrary to these assertions, Defendants were at all material times able to (and did) readily determine "whose numbers the numbers belong to."  Indeed, each Defendant knew that when it provided its internal, confidential information to Agri Stats, the other producers would be able to access that information and identify the Defendant that submitted it.

444.     There was no legitimate purpose to provide this specific, competitively-sensitive information to Agri Stats, nor was there any legitimate purpose for Agri Stats to disseminate the information in the detailed, readily-decipherable form in which it is sent to Defendants. Instead, it was provided, compiled and transmitted for anti-competitive purposes.

445.     Agri Stats' critical importance for a collusive production-restriction scheme in the chicken market lies not only in the fact that it supplies data necessary to coordinate production limitations and manipulate prices, but also in its market-stabilizing power.  Price-fixing or output-restricting cartels, regardless of industry, are subject to inherent instability in the absence of policing mechanisms, as each individual member has the incentive to "cheat" other members of the cartel – for example, by boosting chicken production to capture higher prices even as other

cartelists heed their conspiratorial duty to limit production, which is what happened in the chicken industry for a short period in 2010, when Defendants' conspiracy temporarily faltered.

446.     Agri Stats' detailed statistics – coupled with its regular, in-person meetings with each Defendant and routine participation in trade association events widely attended by Defendants' senior executives – serve an indispensable monitoring function, allowing each member of Defendants' cartel to police each other's production figures (which are trustworthy because they have been audited and verified by Agri Stats' team) for any signs of "cheating."

**(iv)     Agri Stats' Detailed Reports Enabled Defendants To Accurately Assess And Monitor Their Competitors' Production Levels And Breeder Flocks**

447.     Agri Stats claimed to maintain the confidentiality and anonymity of individual companies' data by giving each company a report identifying only that company's specific chicken complexes by name, but not identifying by name other chicken producers' complexes described in the report, but rather, listing competitors' complexes by number.

448.     But, by design, Agri Stats reports were so detailed that any reasonably-informed producer could easily discern the identity of its competitors' individual chicken complexes. It is common knowledge among producers that others could do so, with some Defendants referring to the task of determining the identity of individual competitor's data as "reverse engineering."

449.     Agri Stats reports identified each complex with unique numbers, including a coding system identifying the region and sub-region, for each chicken complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself.

450.     Specific complexes were easily identifiable from their codes. Agri Stats' coding system made it easy for Defendants' employees – some of whom, including senior executives at

both Wayne Farms and Pilgrim's, used to work at Agri Stats – to decipher production, feed, sales and other competitively-sensitive metrics for their competitors' facilities.

451. In fact, Agri Stats' coding system, coupled with the insular nature of an industry where "everybody knows everybody," allowed for Defendants' employees to identify individual producers' data by eyeballing the rows in any Agri Stats report. The coding system has never changed (*e.g.*, the Tyson complex in Cummings, Georgia has always been identified as complex "222"), meaning that once a Defendant deciphered the numeric code for a given competitor's complex, that Defendant had the ability to know their competitor's data indefinitely.

452. Agri Stats played a particularly important role in Defendants' signaling practices and policing efforts. The specific type or size of breeder flock housing, breed of chick, average bird size, and production levels listed in Agri Stats data for Defendants' complexes allowed any given Defendant to "reverse-engineer" and interpret the public statements and other publicly-available information about its competitors to determine which complexes were cutting back, and by how much.

453. For example, if in January, a Defendant publicly states its intention to reduce production – even generically, without specifying which complexes will cut back, or by how much – all of their fellow cartel members will be able to tell from the February and March Agri Stats reports whether that Defendant is following through on its conspiratorial agreement. Further, Defendants Tyson, Pilgrim, and Sanderson are public companies that report some aggregated data publicly, which executives from other companies could use to match up against the far more detailed information in the Agri Stats' reports to identify other specific data from their competitors.

454. Each Defendant and Producer Co-Conspirator received numerous types of Agri Stats reports, including separate targeted reports for each major area of operations, such as breeding, hatching, hauling, feeding, processing, selling, and administration.

455. Defendants' complex managers typically received the targeted reports for the specific aspects of chicken operations for which they have responsibility, and the CEO, CFO, and a few other of Defendants' and Producer Co-Conspirators' top executives received Agri Stats' monthly "Bottom Line Report" (which, for a portion of the conspiracy period, was called the "Executive Report") geared to top level executives. The Bottom Line Reports contained one row for each chicken company reporting to Agri Stats with columns for certain categories of information, such as operating profit dollars, profit percentage, corporate SG&A (aka overhead), interest expense, and other key operational information related to sales, revenues and costs.

456. Within each Agri Stats report (including the Bottom Line Report), unique information referring to supposedly "anonymous" data permitted Defendants and Producer Co-Conspirators to identify their competitors' information contained within each category of report. For example, Agri Stats data on "Actual Live Production Cost," one of many important industry metrics listed in the Bottom Line Report, included line-items for each of the "sub-regions" (described above) that shows, for each particular sub-region, the weighted average figures for "chick cost," "grower cost," "feed ingredient cost," "[feed] mill delivery cost," and "vaccination and medical cost."

457. Information helping Defendants and Producer Co-Conspirators to assess the size and age of breeder flocks was available in the "Growth Rate Report" section of Agri Stats, which included complex-by-complex numbers showing the average age, in weeks (*e.g.*, "63.22" or

"51.76") of the hens whose eggs, when hatched, became the chickens later killed for meat consumption and supplied to Plaintiff and other chicken buyers.

458.     The hens comprising the breeder flocks produce fertile eggs (at a rate of roughly five per week) starting around 20 weeks of age, and are typically slaughtered at 65 weeks of age, when breeder hens lose the ability to consistently lay fertile eggs.  A breeder hen killed at 60 weeks lays 25 fewer eggs than a hen killed at 65 weeks, meaning that there are 25 fewer chicks hatched and 25 fewer mature chickens available to Plaintiff and other chicken buyers.

459.     The bird-age data from the "Growth Rate Report" also shows how close a given breeder flock is to the end of its egg-laying lifespan, giving Defendants insight into how much longer that flock's capacity to lay eggs will impact the supply of chickens available for slaughter further down the supply chain.  In addition, because the "Growth Rate Report" was available each month, knowing the average age of a given flock from month to month can help determine when flocks were being slaughtered and removed from the supply chain (*e.g.*, if the average hen age drops to 4.00 weeks after being at 48.00 weeks in the prior month's "Growth Rate Report," that is a clear indication a breeder flock was slaughtered at 48 weeks).

460.     The "Actual Live Production Cost" section of an Agri Stats report also included (again, by sub-region), the average number and overall weight of the chickens being processed. Other sections of Agri Stats reports included similar, sub-region data for a range of competitively sensitive metrics, such as bird age and mortality, "chick cost per settled flock," and "grower expense."

461.     Knowing the number of complexes each Defendant operates in each sub-region – which, as detailed above, appeared by name at the very beginning of the Agri Stats reports – any

Defendant could, with relative ease, assess the performance of all competing complexes in a sub-region on a variety of important industry metrics.

### (v)  Agri Stats' Critical Role In The Chicken Industry

462.    Agri Stats' role in the chicken industry extends far beyond the collection and dissemination of competitively sensitive data.  It was an active and knowing participant in, and facilitator of, Defendants' scheme, along with the Producer Co-Conspirators.

463.    Agri Stats' employees would confirm for Defendants and Producer Co-Conspirators the data for a particular company at quarterly meetings with each company, or at the numerous trade association meetings where Agri Stats executives presented on a regular basis.

464.    During the conspiracy period, Agri Stats offered a service to Defendants and Producer Co-Conspirators whereby each quarter, personnel from Agri Stats would meet with each Defendant's employees and give presentations about both company- and industry-wide data. These meetings took place at both the production-plant level, where Agri Stats personnel met with Defendants' complex managers, and at the executive level, where Agri Stats personnel met with the leadership of Defendants' hatchery, breeder, and feed departments.

465.    Since Agri Stats would travel and present among Defendants regularly, discussing each Defendant's non-public, proprietary data, Agri Stats was in a unique position to share information among Defendants and Producer Co-Conspirators at these regular meetings. And that is exactly what happened.

466.    For example, during the conspiracy period, mid-level Tyson personnel working at complexes in the Mid-Atlantic region were advised by their complex managers about competitors' non-public production information following quarterly meetings between the Tyson complex managers and Agri Stats account managers.

467.    At these regular meetings with Defendants' executives, Agri Stats led detailed discussions about industry profitability and the key contributing factors, including size and average age of chicken breeder flocks, average hatchability of eggs, mortality rates, average bird rate, feed cost, and other performance factors based on data Defendants provided.   Agri Stats also led discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and the top and bottom third of the industry.

468.    Agri Stats also told Defendants' executives how much the industry was over- or undersupplying the market and estimated demand, and shared other information based on data Defendants provided.

469.    Agri Stats' presentations to the Defendants were based in part on color-coded data compilations, known as "books," specifically tailored for each Defendant based on the data the Defendant has submitted to Agri Stats.   Agri Stats maintained at least six "books" for each Defendant: (1) the light-blue "Live" book, with information on the Defendant's breeders, hatchery feed and grow-out; (2) the red "Sales" book, with information on the Defendant's current and year-to-date sales; (3) the light-green "Production" book, with information on the Defendant's yields; (4) the brown "Profit" book, with information on the Defendant's profits and losses; (5) the mustard-yellow "Rendering" book, with information on the Defendant's rendering facilities; and (6) the "Bottom Line" book, with information on the totality of the Defendant's sales, revenues, and costs.

470.    Anyone at Agri Stats had the ability to pull one or more Defendant's "books" and relay that information to other Defendants.

471.    Indeed, Agri Stats shipped copies of one Defendant's "books" to other Defendants on a number of occasions.

472.    Despite the impropriety of this practice, when it was discovered following a routine review of shipping information, no one at Agri Stats was held accountable, nor were the "books" returned to Agri Stats.

473.    In addition to its in-person meetings with Defendants, Agri Stats employees, including company Vice President Michael Donohue and account managers Paul Austin, Paul Bunting, and Dana Weatherford, regularly hosted, or presented at, chicken industry events and investor conferences, often citing Agri Stats data in discussing market, production, and demand trends in the chicken industry.

474.    For example, Agri Stats holds events known as "poultry outlook conferences." At one such conference on April 23, 2015 in Atlanta, Mr. Donohue made a presentation that included "broiler market situation and outlook" as an agenda item.

475.    Mr. Donohue also helped forecast supply and demand for the chicken industry by using Agri Stats data on breeder placements and inventory.  At the U.S. Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, for example, Donohue noted that chicken breast prices were at a particularly high level and "[i]t's not just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012," he said.  "I hope this carries over into the latter half of 2012 based on some of the production forecasts that can be made based on breeder placements and inventories."

**(vi)    Defendants' Public Statements Show The Importance Of Agri Stats' Data To The Defendant's Collective Production Cuts**

476.    Defendants rarely mentioned their exchange of information with one another through Agri Stats.

477. However, on certain public occasions, such as earnings or investor conference calls, executives from Defendants Sanderson and Tyson (two of the three publicly-traded Defendants) noted the important role Agri Stats data plays in the industry.

478. For example, Defendant Sanderson's CEO, Joe Sanderson, commented on an earnings call that he "look[s] at Agri Stats and see[s] what people are doing and not doing," and similarly stated on a May 2011 earnings call that "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats." (emphasis added). Asked later on the May 2011 call by an analyst why Mr. Sanderson made this statement and another statement a few months earlier that he "feel[s] confident that we are going to see cutbacks" based on Agri Stats data, Mr. Sanderson indicated:

> Industry participants expected that [the market would improve in June and July] and I think they wanted to carry their production into June and July and see if the market would reward them for that it appears right now . . . . And then once you get past July 4 . . . I think then you will start seeing reduced egg sets . . . . Typically in my experience the first cut is not enough.

479. Defendant Tyson similarly noted in a December 2014 investor presentation that:

> [t]he point being is that when you talk about the chicken cycle, most people will look at the cyclicality. It's very profitable right now. And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack. *We can tell that through Agri Stats*. Now at the same time, when there is more poultry available and the industry may not be as profitable, we would not expect to be anywhere close to what the bottom of that cycle would be. (emphasis added)

480. There is no plausible, non-conspiratorial justification for Defendants to use Agri Stats to secretly share highly confidential and proprietary information about their breeder flock size and age, pricing, capacity, production, and costs at the level of detail at which they do.

481.    In a competitive market, such proprietary, competitively sensitive information should be a closely guarded secret.  Economic theory suggests that the routine exchange among competitors of such sensitive internal company information reduces competition.

482.    One chicken industry expert testified in a case against Defendant Pilgrim's brought under the Packers and Stockyard Act, 7 U.S.C. §§ 181-229, that sharing information through Agri Stats by chicken producers regarding pay for contract farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern."  The same expert also remarked that Agri Stats was unusual even among other price surveys, noting:

> [t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue.  Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive.  As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry.  An intensive inquiry is needed.

483.    When given access to Agri Stats' reports in connection with litigation where he served as an expert witness, an agricultural economist who, to that point, had only "heard rumors of a secretive poultry industry information-sharing service," said that he "was shocked at the incredible detail" of the information presented in the reports.

484.    A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively-sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:

> Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue.  My experience is that competitors . . . are prolific at quantifying their competitor's business information on their own.  For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company . . . started for the poultry industry in 1985. AGRISTATS has the following mission statement:  "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING ACCURATE AND TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES."  Note the mission is to

share comparative data while protecting individual companies. I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved. Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

485. A 2017 *Bloomberg News* article titled "Is the Chicken Industry Rigged? Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," highlighted the role Agri Stats plays in Defendants' efforts to monitor and police their cartel:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data – for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence – so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."

**E. The Statute Of Limitations Does Not Bar Plaintiff's Claims**

**(i) Plaintiff Did Not Discover (And Could Not Have Discovered) the Conspiracy Until At Least 2016 For Some Of Defendants' Illegal Activities, And Not Until 2020 For Other Illegal Activities**

486. Plaintiff had neither actual nor constructive knowledge of the facts constituting its claims for relief. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least 2016 or later. Defendants engaged in a secret conspiracy that did not reveal facts that put Plaintiff on inquiry notice that there was a conspiracy to fix prices for chickens.

487. With respect to the output-restriction element of Defendants' conspiracy, Plaintiff did not discover, nor could have discovered through the exercise of reasonable diligence, the facts

supporting its claims for relief, until the filing of a direct purchaser class action, *Maplevale Farms, Inc. v. Koch Foods, Inc. et al.*, in this District in September 2016.

488.    And it was not until June 2020 with the Department of Justice's Colorado Indictment of executives of Defendants Claxton and Pilgrim's Pride that further evidence of the conspiracy became publicly known.  The Colorado Indictment revealed that Defendants Claxton and Pilgrim's Pride aided the conspiracy by engaging in direct price fixing and specific bid rigging of Broilers, which affected purchasers of large volumes of Broiler chickens.

489.    With respect to the manipulation of the Georgia Dock, a January 18, 2016 *Wall Street Journal* article regarding Defendants' possible manipulation of the Georgia Dock benchmark price raised the possibility of collusion to artificially raise, fix, or maintain chicken prices using the Georgia Dock.  Subsequently, a series of articles in various publications published between November 3 and 17, 2016, detailed for the first time that the USDA had discontinued its reliance on the Georgia Dock benchmark price because its input prices could not be verified.

490.    Yet even when faced with these public revelations, Defendants continued to assert the fairness and accuracy of the Georgia Dock benchmark price.

491.    For example, in a November 8, 2016, *Washington Post* article, Defendant Sanderson Farms represented that the Georgia Dock benchmark price was "reliable," to induce purchasers of chickens to believe the benchmark price was not subject to illegal manipulation by the Georgia Dock Defendants.

492.    Not until November 10, 2016 was it disclosed publicly that the Georgia Dock Defendants had formed a secret Georgia Dock Advisory Board that facilitated opportunities for executives to meet and also discuss their scheme to fix the Georgia Dock benchmark price.

493. The existence of this board was not known to Plaintiff, nor would it have been able to learn of how Defendants' executives conducted themselves in their non-public Georgia Dock Advisory Board meetings.

494. Finally, not until November 17, 2016, was it publicly disclosed that the Florida Attorney General's Office was investigating the Georgia Dock benchmark price and its calculation and manipulation by the Georgia Dock Defendants.

495. Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Chickens are not exempt from antitrust regulation, and thus, before these recent events Plaintiff reasonably considered the U.S. chicken industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin investigating the legitimacy of Defendants' chicken prices before these recent events.

496. Plaintiff exercised reasonable diligence. Plaintiff could not have discovered Defendants' alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants.

**(ii)     Defendants Actively Concealed Their Conspiracy**

497. Throughout the conspiracy period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

498. The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, (1) secret meetings, (2) surreptitious communications between Defendants via the wires (telephones, emails, text messages and other electronic communications) and in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, (3) limiting any explicit reference to competitor pricing or supply restraint communications in documents, (4) communicating competitively sensitive data to one another through Agri Stats, a "proprietary,

privileged, and confidential" system that kept both the content and participants in the system secret, and (5) concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

499.    Defendants and co-conspirators used code words including "discipline" and "capacity discipline" in their public statements to conceal their conspiracy and signal one other, in furtherance of their conspiracy to restrain production while shielding their conspiracy from detection or suspicion.  As alleged above, specific examples of the use of such coded language include, without limitation:  (1) the National Chicken Council's Annual Conference in October 2011 where a report reflected that panel members Clint Rivers (then of Perdue), William Andersen of Keystone Foods, and Mark Kaminsky of Koch Foods noted that "[d]iscipline on the supply side was one suggestion" to inflate chicken prices; (2) on a May 3, 2013, earnings call, Pilgrim's President & CEO Bill Lovette stated that "price is going to strengthen as supply continues to be disciplined and constrained….and "we've done a good job so far of maintaining discipline"; and (3) on a July 2016 earnings call, Mr. Lovette noted that "I think what we've seen with egg sets is absolutely a testament to the discipline of our industry that we've seen the last really two to three years."

500.    As alleged above, in 2008, after years of boom and bust cycles of production leading to the regular rise and fall of prices, the price of chickens began an unprecedentedly steady increase that continued at least through 2016.

501.    Defendants affirmatively and falsely attributed rising prices to, among other things, increases in the price of inputs.  Defendants used these pretexts used to cover up the conspiracy. In fact, the chicken price increases were the result of Defendants' collusive conduct, which was undisclosed at the time.

502. During the conspiracy period, Defendants affirmatively made numerous misleading public statements falsely portraying the market for chickens as a competitive one.

503. For example, Defendants provided testimony at workshops held by the U.S. Department of Justice and USDA suggesting the chicken industry was competitive and not subject to anti-competitive practices and agreements, including testimony at a May 21, 2010 workshop of a National Chicken Council-commissioned study by Dr. Thomas Elam, which stated that "the chicken industry is competitive and thriving," and has "[i]ntense competition" that promotes "product innovation and lower prices for consumers."

504. To explain the decreasing supply of chickens since 2012, Defendants have provided a variety of pretextual explanations, including: (1) a breeding issue with chickens during 2014, (2) a Russian ban of U.S. chicken imports starting in 2014, and (3) a 2013 shortage in supply due in part due to an Avian Flu outbreak in Mexico that caused a surge in demand for hens to repopulate chicken farms in Mexico. These explanations were pretextual in that Defendants sought to hide their conspiracy from discovery by blaming chicken price increases, or artificially inflated chicken prices, on these factors rather than on Defendants' own collusive conduct (including their unprecedented cuts to breeder flocks).

505. Throughout the conspiracy period, Defendants repeatedly also cited increasing input costs as a pretext for their collusion to restrain supply and manipulate prices by anticompetitive means.

506. For instance, Defendants repeatedly claimed that input cost increases during 2008 justified chicken price increases. However, while corn was $5/bushel in 2005-2006 and increased to $9 by May or June 2008, it quickly fell back to below $5/bushel by fall 2008.

507. Higher chicken prices later in the conspiracy period also were not justified by increased costs of corn, which, after a temporary spike in the summer of 2012, were not increasing at the level that would have warranted higher chicken prices.

508. Defendants, through the National Chicken Council, other trade groups, and press releases, speeches, and other public statements by their employees, also repeatedly and publicly blamed the federal government's ethanol mandate for increased chicken prices, asserting that it increased their corn costs.

509. Defendants made all of these pretextual representations so as to conceal their conspiracy and avoid disclosing their agreement to illegally restrain the supply of chickens.

510. By virtue of Defendants and all of their co-conspirators actively and intentionally concealing their above-described wrongful conduct, the running of any applicable statute of limitations has been (and continues to be) tolled and suspended with respect to Plaintiff's claims and causes of action resulting from the Defendants' unlawful combination and conspiracy alleged in this Complaint under the fraudulent concealment doctrine and/or doctrine of equitable estoppel.

**(iii) Plaintiff's Claims Were Tolled By The Direct Purchaser Class Action Complaint Filed In 2016**

511. Plaintiff was a member of the putative direct purchaser class action complaint asserted against Defendants, including, but not limited to *Maplevale Farms, Inc. v. Koch Foods, Inc. et al*., No. 1:16CV08637 (Dkt. No. 1) (N.D. Ill. Sept. 2, 2016).

512. Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related case law during the pendency of that direct purchaser class action asserted against Defendants, commencing at least as early as September 2, 2016.

## VII.   ANTITRUST IMPACT

513.    During the conspiracy period, Plaintiff purchased substantial amounts of chicken from one or more Defendants.

514.    As a direct and proximate result of the Producer Defendants' above-described illegal conduct, Plaintiff was compelled to pay, and did pay, artificially inflated prices for chickens during the conspiracy period.

515.    As a direct and proximate consequence of the Producer Defendants' and Agri Stats' above-described wrongful conduct, Plaintiff sustained substantial losses and damage to its businesses and property in the form of overcharges for chickens.  The full amount and forms and components of such damages will be calculated after discovery and presented upon proof at trial.

### COUNT I

### <u>VIOLATION OF 15 U.S.C. § 1</u>
### (AGAINST ALL DEFENDANTS)

516.    The preceding factual statements and allegations are incorporated by reference.  For paragraphs 517 to 528, the term "Defendants" explicitly includes Agri Stats.

517.    Defendants entered into and engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

518.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

519.    At least as early as January 1, 2008, and continuing until at least as late as 2017, the exact dates being unknown to Plaintiff, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for chickens, thereby creating anticompetitive effects. This conspiracy was executed in varying ways

including through the tactics discussed herein relating to the coordinated reduction of Broiler supply, the express bid rigging on certain Broiler sales, and the manipulation of the Georgia Dock benchmarking price which infected prices across the Broiler market.

520.     Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for chickens throughout the United States.

521.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for chickens.

522.     As a result of Defendants' unlawful conduct, Plaintiff has been harmed by being forced to pay inflated, supra-competitive prices for chickens.

523.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.

524.     Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for chickens has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for chickens sold by Producer Defendants, their divisions, subsidiaries, and affiliates, and all of their Producer Co-Conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiff, which directly purchased chickens from one or more Defendants, their divisions, subsidiaries, and affiliates, and all of their Producer Co-Conspirators, has been deprived of the benefits of free and open competition in the purchase of chickens.

525.     Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of chickens on the spot market to be higher than it would be but for Defendants' conduct.

526. Defendants also knew and intended that such an artificial inflation of spot market prices would increase, or artificially increase, other chicken market prices, including those paid by Plaintiff.

527. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff has been injured in its business or property and will continue to be injured in its business and property by paying more for chickens than it would have paid and will pay in the absence of the conspiracy.

528. The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Enter joint and several judgments against all Defendants in favor of Plaintiff;

B. Award Plaintiff's damages (*i.e.*, three times the overcharges) in an amount to be determined at trial to the maximum extent allowed under the federal antitrust laws;

C. Award Plaintiff its post-judgment interest as provided by law, with such interest to be awarded at the highest legal rate;

D. Award Plaintiff its attorneys' fees, litigation expenses, and costs, as provided by law;

E. Grant Plaintiff such other and further relief to which Plaintiff is justly entitled.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated:  July 24, 2020                    Respectfully submitted,

                                         s/ *Jay B. Shapiro*_____
                                         Jay B. Shapiro
                                         Samuel O. Patmore
                                         Carlos J. Canino
                                         Abigail G. Corbett
                                         **STEARNS WEAVER MILLER WEISSLER**
                                         **ALHADEFF & SITTERSON, P.A.**
                                         150 West Flagler Street, Suite 2200
                                         Miami, Florida 33130
                                         Tel:    305.789.3200
                                         Fax:    305.789.3395
                                         Email:  jshapiro@stearnsweaver.com
                                                 spatmore@stearnsweaver.com
                                                 ccanino@stearnsweaver.com
                                                 acorbett@stearnsweaver.com


                                         s/ *Marvin A. Miller*_____
                                         Marvin A. Miller
                                         Andrew Szot
                                         **Miller Law LLC**
                                         115 S. LaSalle Street, Suite 2910
                                         Chicago, IL 60603
                                         Tel:    312.332.3400
                                         Fax:    312.676.2676
                                         Email: mmiller@millerlawllc.com
                                                 aszot@millerlawllc.com


                                         *Counsel for Independent Purchasing Cooperative, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2020, a true and correct copy of the foregoing was served on all counsel of record via the ECF document filing system for the United States District Court for the Northern District of Illinois.

By:  /s/ Marvin A. Miller
Marvin A. Miller