**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION, | Case No.: 1:16-cv-08637 |
| | The Honorable Thomas M. Durkin |
| This Document Relates To: | |
| THE DIRECT PURCHASER PLAINTIFF ACTION | |

**DIRECT PURCHASER PLAINTIFFS' MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF THE
SETTLEMENTS WITH DEFENDANTS PECO FOODS, INC., GEORGE'S, INC.,
GEORGE'S FARMS, INC., AND AMICK FARMS, LLC**

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ........................................................................................................1

II. LITIGATION BACKGROUND .................................................................................2

III. SUMMARY OF THE SETTLEMENT NEGOTIATIONS AND TERMS.......................4

    A.  The Peco and George's Settlements ..................................................................5

    B.  The Amick Settlement ......................................................................................7

IV. ALL THREE SETTLEMENTS SATISFY THE STANDARD FOR FINAL
    APPROVAL .................................................................................................................8

    A.  The Court-Approved Notice Program Satisfies Due Process and Has Been
        Fully Implemented ............................................................................................9

    B.  The Settlements Are Fair, Reasonable, and Adequate, and Should Be
        Granted Final Approval. ..................................................................................11

        1.  The Settlements Provide Considerable Benefits to the Class ...................12

        2.  The Settlements Eliminate Significant Risk to a Class Facing
            Complex, Lengthy and Expensive Litigation. ...........................................15

        3.  The Class Member Reaction Supports Approval of the Settlements.........16

        4.  The Settlements are the Product of Arm's-Length Negotiations and
            Experienced Counsel Recommend Approval. ...........................................17

        5.  The Stage of the Proceedings and Amount of Discovery Supports
            Final Approval ...........................................................................................18

V.  CONCLUSION..........................................................................................................18

<u>**Table of Authorities**</u>

**Page(s)**

**Cases**

*In re "Agent Orange" Prod. Liability Litig.*,
 818 F.2d 145 (2d Cir. 1987)......................................................................9

*Agretti v. ANR Freight Sys., Inc.*,
 982 F.2d 242 (7th Cir. 1992) ...............................................................14

*Armstrong v. Bd. of Sch. Dirs.*,
 616 F.2d 305 (7th Cir. 1980) ...................................................8, 11, 12

*Bynum v. Dist. of Columbia*,
 412 F. Supp. 2d 73 (D.D.C. 2006)....................................................16

*City of Greenville v. Syngenta Crop Prot.*,
 No. 3:10-CV-188, 2012 WL 1948153 (S.D. Ill. May 30, 2012) ..............................9

*In re Corrugated Container*,
 1981 WL 2093 (S.D. Tex. June 4, 1981) ...............................................13

*Depoister v. Mary M. Holloway Found.*,
 36 F.3d 582 (7th Cir. 1994) .................................................................12

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
 768 F.2d 884 (7th Cir. 1985) ...............................................................8

*Gehrich v. Chase Bank USA, N.A.*,
 316 F.R.D. 215 (N.D. Ill. 2016).............................................................14

*Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers*,
 L.L.P., 212 F.R.D. 400 (E.D. Wis. 2002) ........................................12, 17

*Isby v. Bayh*,
 75 F.3d 1191 (7th Cir. 1996) ........................................................8, 11, 12

*Kleen Prod. LLC v. Int'l Paper Co.*,
 No. 1:10-CV-05711, 2017 WL 5247928 (N.D. Ill. Oct. 17, 2017) ..................13, 17

*Kolinek v. Walgreen Co.*,
 311 F.R.D. 483 (N.D. Ill. 2015).............................................................14

*Larsen v. Trader Joe's Co.*,
 No. 11-cv-05188-WHO, 2014 WL 3404531 (N.D. Cal. July 11, 2014) .................15

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
 733 F. Supp. 2d 997 (E.D. Wis. 2010).....................................................15

*In re Linerboard Antitrust Litig.*,
292 F. Supp. 2d 631 (E.D. Pa. 2003) ........................................................................13, 14, 17

*Mangone v. First USA Bank*,
206 F.R.D. 222 (S.D. Ill. 2001) ...........................................................................................9

*In re Omnivision*,
559 F.Supp.2d 1036, 1043 (N.D. Cal. 2007) ......................................................................17

*Pallas v. Pac. Bell*,
No. C-89-2373 DLJ, 1999 WL 1209495 (N.D. Cal. July 13, 1999)......................................17

*Petrovic v. Amoco Oil Co.*,
200 F.3d 1140 (8th Cir. 1999) ...........................................................................................9

*Redman v. RadioShack Corp.*,
11-C-6741, 2014 WL 497438 (N.D. Ill. Feb. 7, 2014) ........................................................11

*Rodriguez v. West Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) ..........................................................................................17

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011) ...........................................................................14, 17

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*,
309 F.3d 978 (7th Cir. 2002) ...........................................................................................11

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005)...............................................................................................15

**Statutes and Rules**

*4 Newberg on Class Actions,* § 13:43 ....................................................................................17

Fed. R. Civ. P. 23.......................................................................................................8, 9

Fed. R. Civ. P. 23(c) ...................................................................................................9, 10

Fed. R. Civ. P. 23(e) ...................................................................................................8, 11

## I.    INTRODUCTION

The Direct Purchaser Plaintiffs ("DPPs") hereby seek final approval of the settlements with Defendants Peco Foods, Inc. ("Peco"), George's, Inc. and George's Farms, Inc. ("George's"), and Amick Farms, LLC ("Amick") (collectively "Settling Defendants").[1] In granting preliminary approval to these settlements, the Court found they fell within the range of reasonableness and ordered notice to be provided to the class members.

Class counsel and the settlement administrator have executed the notice plan in accordance with the Court's order. This process has confirmed that the settlements with Peco, George's, and Amick (collectively "Settlements" or "Settlement Agreements") are fair reasonable, and adequate, and should be granted final approval by the Court. The reaction of the Class members has been extremely positive, with no member of the Settlement Class objecting to the Settlements.[2] The vast majority of commerce that has opted out of the Settlements is on behalf of direct action plaintiffs who had filed their own lawsuits prior to issuance of the Court's preliminary approval order.

The Settlements provide millions of dollars in relief to the Class members while eliminating the risk, uncertainty, and expense of continuing litigation, and preserving DPPs' right to obtain additional settlements or judgments against the numerous remaining Defendants. DPPs therefore respectfully request that the Court grant final approval to the Settlements and enter final judgment.

---

1 The DPPs understand that George's and Peco intend to submit a separate filing supporting final approval of the settlement, but addressing certain issues regarding opt outs with partial assignments.

2 The term "Class" or "Settlement Class" is consistent with the definition of the term in the Court's Preliminary Approval Order issued on January 8, 2020 (ECF No. 3394).

## II.    LITIGATION BACKGROUND

This is an antitrust class action against certain producers of Broilers.[3] DPPs allege that Defendants combined and conspired to fix, raise, maintain, or stabilize prices of Broilers sold in the United States. DPPs allege that Defendants implemented their conspiracy in various ways, including via coordinated supply restrictions, sharing competitively sensitive price and production information, and otherwise manipulating Broiler prices.   Defendants deny all allegations of wrongdoing in the Action and would allege numerous defenses to DPPs' claims, but desire to settle the Action to avoid, among other things, the further expense, inconvenience, disruption, and burden of this litigation.

DPPs commenced this litigation on September 2, 2016, when they filed a class action lawsuit on behalf of all direct purchasers of Broilers in the United States. (ECF No. 1.) Other class plaintiffs and direct action plaintiffs subsequently filed similar actions. On October 14, 2016, the Court appointed the undersigned law firms as Direct Purchaser Plaintiffs' Interim Co-Lead and Liaison Counsel. (ECF No. 144.) After extensive briefing by the parties, on November 20, 2017 the Court denied Defendants' Motions to Dismiss the DPPs' First Consolidated Amended

---

[3] Consistent with the Complaint, the term Broilers is defined in the Settlement Agreements as "chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards." (*See* Settlement Agreements § I.B.2.) The Settling Defendants agree to this definition only for purposes of the Settlement Class. (*Id.*)

Complaint ("FCAC"). (ECF No. 541.)[4] DPPs filed their operative Fourth Consolidated Amended Complaint on January 15, 2019. (ECF No. 1565, "Complaint".)[5]

DPPs performed a thorough investigation and engaged in extensive discovery prior to reaching the Settlements. These efforts commenced prior to the filing of DPPs' initial complaint and included pre-litigation investigation into Defendants' conduct that formed the basis of the DPPs' complaints. (*See* Declaration of Bobby Pouya in Support of Motion ("Pouya Decl.") at ¶ 4.) In denying Defendants' motions to dismiss, the Court held that these "alleged factual circumstances plausibly demonstrate that [Defendants'] parallel conduct was a product of a conspiracy." (*See* ECF No. 541, at p. 18.) During the litigation, DPPs obtained responses to multiple sets of interrogatories, and received over 8 million documents in response to their requests for production and third-party subpoenas. (*See* Pouya Decl. ¶ 5.) DPPs, along with other Plaintiffs, have taken over one hundred depositions of the Defendants and third parties. (*Id.* ¶ 6.) DPPs have also provided responses to written discovery, produced documents, and appeared for depositions noticed by the Defendants. (*Id.* ¶ 7.)

On June 21, 2019, the United States Department of Justice ("DOJ") moved to intervene in the civil case and stay the depositions of Defendants, pending the DOJ's criminal investigation into the Broiler industry. (ECF No. 2268.) On June 27, 2019, the Court granted an initial stay on the depositions of Defendants until September 27, 2019. (ECF No. 2302.) On October 16, 2019, the Court extended the stay on the depositions of Defendants (with certain exceptions). (ECF No. 3153.)

---

[4] Amick was not a party to this action at the time of these motions.

[5] Amick was first added as a defendant in this Complaint.

Prior to the Court's ruling on Defendants' motions to dismiss, Plaintiffs reached an "ice-breaker" settlement with Defendant Fieldale. Fieldale, a small producer with a market share of 2.1% of Settlement Class sales, agreed to pay $2.25 million, provide cooperation including attorney and witness proffers, and produce certain documents to DPPs.[6] (*See* Pouya Decl. ¶ 8.) The Court granted final approval to the Fieldale Settlement on November 18, 2018. (*See* ECF No. 1414.)

The Court granted preliminary approval to the Settlements with Peco, George's and Amick on December 20, 2019 (ECF No. 3359), with the corrected order issued on January 8, 2020. (ECF No. 3394.)

## III.    SUMMARY OF THE SETTLEMENT NEGOTIATIONS AND TERMS

The Settlement Agreements with Peco, George's, and Amick were reached through protracted arm's length negotiations. The Peco and George's Settlements were the product of a joint negotiation process that commenced in earnest in February 2018. The Amick settlement was separately negotiated in a process that started in December 2018. The core settlement terms are substantially similar in each of the Settlements, and the settlement amounts reflect the market share and other factors affecting these Settling Defendants. Each of the Settlements represents an increase—on a proportionate and gross basis—from the Fieldale settlement. Collectively, the Settlements provide over $13 million in recovery to the Class.

The Settlements (with accrued interest) will be used to: (1) pay for notice costs and costs incurred in the administration of the Settlements and distribution of Settlements; (2) pay taxes and

---

[6] The market share estimates in this Motion are based on DPPs' analysis and estimates of sales to putative members of the Settlement Class by Defendants and their alleged co-conspirators, based on information that is currently available to DPPs from 2008 through 2017. (Pouya Decl. ¶ 8.) These estimates and analysis are ongoing and may be subject to modification in the future.

tax-related costs associated with the escrow account for proceeds from the Settlements; (3) make a distribution to Settlement Class Members in accordance with a proposed plan of distribution to be filed in the future; (4) pay any Court-awarded attorneys' fees and expenses to Counsel for the Settlement Class; and (5) pay incentive awards to the named Plaintiffs. At this time, DPPs do not intend to distribute settlement proceeds to qualified Settlement Class Members or to seek attorneys' fees or costs (other than the costs of notice) from the Settlements. DPPs will make a motion for distribution of settlement proceeds, and attorneys' fees and costs at an appropriate date in the future.

### A.     The Peco and George's Settlements

Peco and George's were named as defendants in DPPs' original complaint. After filing the lawsuit, DPPs exchanged written discovery and negotiated the scope of discovery pending the Court's decision on Defendants' motions to dismiss. Once Defendants' motions to dismiss were denied, Plaintiffs proceeded with discovery against Peco and George's, which included responses to interrogatories, production of documents, depositions of three Peco executives (including Peco's President and CEO), and depositions of five George's executives (including two former CEOs).

DPPs' settlement negotiations with Peco commenced in February 2017 but did not result in an agreement at that time. (*See* Pouya Decl. ¶ 9.) In January 2018, DPPs and Peco reengaged in settlement discussions, which George's joined in February 2018. (*Id.* ¶ 10.) After several months of negotiations, the parties could not reach a settlement, but agreed to engage in mediation with Kenneth R. Feinberg in October 2018. (*Id.* ¶ 11.) The parties were unable to reach an agreement during the mediation. (*Id.*) Over the next year, the parties periodically continued their negotiations via telephone conferences and email exchanges. (*Id.* ¶ 12.) In August and September 2019, DPPs made comprehensive settlement offers to Peco and George's, respectively. (*Id.* ¶ 13.) The parties

reached agreement on the settlement terms with Peco and George's on December 5, 2019. (*See* Peco Settlement (ECF No. 3324, pp. 8-34); George's Settlement (ECF No. 3324, pp. 36-62).)

The Peco and George's Settlements required Peco to pay up to $5.15 million and George's to pay up to $4.25 million to the Settlement Class. (*See* Peco Settlement and George's Settlement § II.A.1.) In exchange, the DPPs and the proposed Settlement Class would release claims against Peco and George's which were or could have been brought in this litigation arising from the conduct alleged in the Complaint. (*See Id.* §§ I.B.26, II.B.) The release does not extend to any other Defendant or to unrelated claims that are not the subject matter of the lawsuit. (*Id.*) The Peco and George's Settlements contain a reduction mechanism in the event that class members who opt out of the Settlement Class represent more than 50% of all Defendants' United States total annual sales for 2008-2017. (*See id.* at § II.E.10.b.)

After completion of the settlement administration process, the opt out calculation for the Peco and George's Settlements is 51% of all Defendants' United States total annual sales for 2008-2017, including opt-outs based on partial assignments. *See* Declaration of Jennifer M. Keough in Support of Motion for Final Approval ("Keough Decl."), ¶ 21.[7] The Peco and George's Settlements call for a reduction of 2% for each percentage point exceeding 50%. (*See* Peco Settlement and

---

[7] This opt-out calculation reflects requested opt-outs that are based on partial assignments of claims as calculated by the Administrator after the process described in Section IV.A. If (a) the Court accepts these partial assignments as calculated by the Administrator as valid and (b) if the list of persons and entities identified by the Administrator as having validly requested exclusion from the Class is assumed to be a complete list, then Peco and George's agree that the opt-out rate is 51%. However, George's and Peco will separately assert that certain opt-out requests based on partial assignments are not valid. Any rejection of such opt-out requests, or reduction of their scope, would reduce the opt-out rate. If the partial assignments challenged by George's and Peco are not included in the opt-out calculation and the other assumptions hold, then the parties agree that the opt-out rate would be less than 50% and no corresponding reduction to either the Peco or George's settlement amounts is required.

George's Settlement, at § II.E.10.b.) Therefore, the total reduction amount is 2% resulting in net settlement amounts of $5,047,000 from Peco and $4,165,000 from George's.

### B. **The Amick Settlement**

Prior to DPPs naming Amick as a Defendant in the Complaint, they alleged that Amick was a co-conspirator. (*See, e.g.*, Third Consolidated Amended Complaint, ECF No. 709.) Accordingly, the DPPs served Amick with a subpoena, and engaged in discovery negotiations with Amick which closely tracked discovery of the named Defendants. (Pouya Decl. ¶ 15.) Once Amick was named as a Defendant, it responded to Plaintiffs' written discovery, and produced documents responsive to Plaintiffs' additional requests for production. (*Id.* ¶ 17.) DPPs were prepared to commence the depositions of Amick's witnesses, which were postponed due to the announcement of the DOJ investigation and subsequent DOJ Stay. (*Id.* ¶ 18.)

DPPs engaged in preliminary settlement discussions with Amick before naming it as a defendant. In December 2018, DPPs and Amick held an in-person settlement conference, which did not result in an agreement. (*See* Pouya Decl. ¶ 16.) DPPs named Amick as a Defendant in their operative Complaint filed in January 2019. (ECF No. 1565.) In July 2019, DPPs and Amick resumed settlement discussions. During the next several months, the parties held multiple rounds of discussions and exchanged emails regarding a potential settlement. (*See* Pouya Decl. ¶ 19.) Shortly after parties reached an agreement in principle, they finalized the terms of the final written settlement agreement. (*See* Amick Settlement (ECF No. 3324, pp. 64-93).)

Pursuant to the settlement, Amick will pay $3.95 million to the Settlement Class. (*See* Amick Settlement, § II.A.1.) The scope of the Amick release is similar to Peco and George's. (*Id.*, §§ I.B.27, II.B.) The Amick Settlement includes a reduction mechanism if the persons who opt out of the Settlement Class represent, in aggregate, more than 50% of Amick's United States total

937936.4

7

annual sales for 2008-2017 (excluding sales for export or sales to other Defendants). (*Id.* at §
II.E.10.b.ii.) The Amick Settlement also allowed Amick to terminate the Settlement if the persons
who opt out of the Settlement Class represent, in aggregate, more than 55% of Amick's United
States total annual sales for 2008-2017 (excluding sales for export or sales to other Defendants).
(*Id.* at § II.E.10.b.iii.)

Neither threshold was reached. The total opt-out calculation for Amick is less than 50% of
Amick's sales between for the period from 2008-2017, which means that there is no reduction to
the Amick settlement amount of $3.95 million, and the option to terminate was never triggered.
(*See* Keough Decl. ¶ 21.)

## IV. ALL THREE SETTLEMENTS SATISFY THE STANDARD FOR FINAL APPROVAL

There is an overriding public interest in settling litigation, and this is particularly true in
class actions. *See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor
the settlement of class action litigation."); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884,
888-89 (7th Cir. 1985), *cert. denied,* 478 U.S. 1004 (1986) (noting that there is a general policy
favoring voluntary settlements of class action disputes); *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d
305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the
voluntary resolution of litigation through settlement."), *overruled on other grounds, Felzen v.
Andreas*, 134 F.3d 873 (7th Cir. 1998). Class action settlements minimize the litigation expenses
of the parties and reduce the strain such litigation imposes upon already scarce judicial resources.
*Armstrong*, 616 F.2d at 313 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)).
However, a class action may be settled only with court approval. Fed. R. Civ. P. 23(e).

Any dismissal, compromise, or settlement of a class action is subject to court approval.
Rule 23 jurisprudence has led to a defined procedure and specific criteria for class action settlement

approval, namely: certification of a settlement class and preliminary approval of the proposed settlement; dissemination of notice of the settlement to all affected class members, including an opportunity to object to the proposed settlement; and a fairness hearing at which class members may be heard regarding the settlement, and counsel may present evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement. *See* 4 Newberg on Class Actions, §§ 13:39 et seq. Final Judicial Approval of Proposed Class Action Settlements (5th ed.). This procedure safeguards class members' due process rights and enables the Court to fulfill its role as the guardian of class interests. *See id*.

A. **The Court-Approved Notice Program Satisfies Due Process and Has Been Fully Implemented**

The Court-approved notice plan related to the Settlements has been successfully implemented and class members have been notified of the Settlements. When a proposed class action settlement is presented for court approval, the Federal Rules require "the best notice that is practicable under the circumstances," and that certain specifically identified items in the notice be "clearly and concisely state in plain, easily understood language." Fed. R. Civ. P. 23(c)(2)(B). A settlement notice is a summary, not a complete source, of information. *See, e.g., Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999); *In re "Agent Orange" Prod. Liability Litig.*, 818 F.2d 145, 170 (2d Cir. 1987), *cert. denied,* 484 U.S. 1004 (1988); *Mangone v. First USA Bank*, 206 F.R.D. 222, 233 (S.D. Ill. 2001).

The notice plan approved by this Court—which relies primarily on direct notice to Class members supplemented by publication notice—is commonly used in class actions like this one. *Amchem Prods.*, 521 U.S. at 617 (quoting Fed. R. Civ. P. 23(c)(2)); *City of Greenville v. Syngenta Crop Prot.*, No. 3:10-CV-188, 2012 WL 1948153, at *4 (S.D. Ill. May 30, 2012) (same); Fed. R. Civ. P. 23(c)(2)(B). It constitutes valid, due, and sufficient notice to class members, and is the

best notice practicable under the circumstances. The content of the court-approved notice complies with the requirements of Rule 23(c)(2)(b). Both the summary and long-form notice clearly and concisely explained in plain English the nature of the action and the terms of the Settlements. (*See* Keough Decl. Exs. A-C.) The notices provided a clear description of who is a member of the settlement Class and the binding effects of class membership. *Id.* They also explained how to exclude oneself from the settlement Class, how to object to the Settlement, and how to contact Co-Lead Counsel for the settlement Class. *Id.* The notices also explained that they provided only a summary of the Settlements, and that the Settlement Agreements, as well as other important documents related to the litigation, are available online at www.broilerchickenantitrustlitigation.com. (*See id.*) In addition, the information from that website, as well as the toll-free call-in number for the Settlements, were available in both English and Spanish. (*See id.* ¶¶ 11, 14.) Consequently, every provision of the Settlements was available to each Class member.

The notice plan was implemented by the settlement administrator JND. Specifically, using customer information obtained from Defendants, JND mailed 21,754 print notices and emailed 9,253 electronic notices to potential class members. (*See* Keough Decl. ¶¶ 7–8, Exs. A-B.) JND also published notice in the following industry print publications (or banner advertisements in digital media) on the dates indicated: *Poultry Times*, *Meat + Poultry*, *Supermarket News*, *Progressive Grocer*, *Grocery Headquarters*, and *Frozen & Refrigerated*. (*See id.* ¶¶ 16-17, Exs. C-D.) In addition, JND continues to maintain the case website, where class members can view and print important documents and obtain other information related to the litigation. (*See id.* ¶¶ 11-13.) The settlement website was updated with notices that the original hearing on this motion was continued by Court orders in response to the COVID-19 national emergency and other Court

orders. (*See id.*) JND also continues to maintain a toll-free call-in number to answer class members' questions. (*See id.* ¶¶ 14-15.)

The Settlement Administrator reviewed and processed all applications for requests for exclusion. (*See* Keough Decl. ¶¶ 19-28.) This process included determining the timeliness and validity of any requests for exclusion, identifying the entities that fell within the scope of valid requests for exclusion, conducting appropriate follow ups with opt-out applicants to determine the scope and value of any assignments or partial assignments, and assisting the parties in determining the opt-out calculations. (*See id.*; *see also* ECF No. 3567 (Providing the Court with an initial report of entities who have requested exclusion and advising the Court of the process for valid assignments).) As a result of this process the Administrator has come up with a final recommended list of valid opt-outs, which are set forth at Exhibit E1 – E4 of the Keough Declaration. This recommended list of opt-outs includes certain partial assignments which are set forth at Exhibit H to the Keough Declaration.

**B.**     **The Settlements Are Fair, Reasonable, and Adequate, and Should Be Granted Final Approval.**

The standard for final approval of a class action settlement is whether the settlement is fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e); *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002); *Isby v. Bayh*, 75 F.3d 1191, 1198-99 (7th Cir. 1996). There is an overriding public interest in settling litigation, and this is particularly true in class actions. *See Isby*, 75 F.3d at 1196 ("Federal courts naturally favor the settlement of class action litigation."); accord *Redman v. RadioShack Corp.*, 11-C-6741, 2014 WL 497438, at *3 (N.D. Ill. Feb. 7, 2014); *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 312 (7th Cir. 1980), overruled on other grounds, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Class action settlements

minimize the litigation expenses of the parties and reduce the strain such litigation imposes upon already scarce judicial resources. *See Armstrong*, 616 F.2d at 313.

Evaluation and approval of a class action settlement are committed to the sound discretion of the Court. *See Isby*, 75 F.3d at 1197. The proper focus "is upon 'the general principles governing approval of class action settlements' and not upon the 'substantive law governing the claims asserted in the litigation.'" *Id.* (quoting Armstrong, 616 F.2d at 315). As part of the Court having wide latitude in making its determination, there is "no requirement that an evidentiary hearing be conducted as a precondition to approving a settlement in a class action suit." *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994).

In evaluating the fairness of a proposed class action settlement, courts typically consider the following factors: (1) the strength of plaintiffs' case compared to the amount of defendants' settlement offer; (2) an assessment of the likely complexity, length and expense of the litigation; an evaluation of the amount of opposition to settlement among affected parties; (3) the reaction of the class members; (4) the opinion of competent counsel; and, (5) the stage of the proceedings and the amount of discovery completed at the time of settlement. *See Isby*, 75 F.3d at 1198–99.

In addition, there is an initial presumption that a proposed class action settlement is fair, reasonable and adequate when the settlement was the result of arm's-length negotiations. *See* 4 Newberg on Class Actions, § 13:43 Presumptions governing approval process—Generally; *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers*, L.L.P., 212 F.R.D. 400, 410 (E.D. Wis. 2002).

## 1.    The Settlements Provide Considerable Benefits to the Class

The consideration from Peco, George's, and Amick for the Settlements (i.e. "the amount of defendants' settlement offer" – *Isby*, 75 F.3d at 1199) is significant and provides considerable

benefit to the class – especially given that Peco, George's, and Amick are smaller broiler producers, and represent the second round of settlements in this antitrust litigation.

In terms of pure monetary value, the Settlements provide for a payment of over $13 million, which is an amount that puts the Settlements within the range of possible final approval when compared to other cases. Since Peco, George's, and Amick represent 6.5% of all of the Defendants' market share, the "per point" of market share recovery value of the Settlement is approximately $2 million. This is a step up from the Fieldale settlement which provided approximately $986,842 per market share point in recovery.

The monetary recovery here is in line with the amounts in other settlements in price-fixing cases that were finally approved. *See, e.g., In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003) (granting final approval to an "ice-breaker" settlement with a defendant controlling approximately 17% of all defendants' market share and 12% of total market share, and explaining that the monetary recovery of "roughly $750,000.00 per point of settling defendants' total market share [as] is in the range of settlements approved by other courts").

Moreover, the Settlements do not reduce DPPs' potential total recovery because they preserve DPPs' ability to recover damages based on Peco, George's, and Amick sales from the remaining Defendants, based on joint and several liability. *See In re Corrugated Container Antitrust Litig.*, 1981 WL 2093, at *17 (S.D. Tex. June 4, 1981); *accord Kleen Prod. LLC v. Int'l Paper Co.*, No. 1:10-CV-05711, 2017 WL 5247928, at *2 (N.D. Ill. Oct. 17, 2017); *see also CRT II*, 2015 WL 9266493, at *6 (explaining that preserving the right to litigate against the non-settling defendants "provides increased value . . . by creating added incentive for the remaining defendants to settle or allowing greater recovery for the Plaintiffs at trial.").

The Settlements take into account the fact that the agreement was entered into before the Court ruled on DPPs' motion for class certification, Defendants' anticipated motions for summary judgment, and trial. *See, e.g., Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 494 (N.D. Ill. 2015) ("Although Kolinek withstood Walgreens's motion to dismiss on both grounds, the Court observed in its written orders as to both [defense] issues that further factual development might prove that plaintiffs did indeed consent or that the calls were made for emergency purposes."); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 582 (N.D. Ill. 2011) ("While Plaintiffs maintain that their claims would ultimately succeed, the above discussion establishes that Fifth Third has a number of potentially meritorious defenses. Absent settlement, Class Members would face the real risk that they would win little or no recovery."); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 229 (N.D. Ill. 2016) ("In light of Chase's potential defenses, the legal uncertainty concerning the application of the TCPA, and the time and expense inherent to litigation, proceeding to trial, and obtaining relief posed risks to Plaintiffs, and a possibility existed that they would have recovered nothing.").

These factors satisfy the standard for early settlements with smaller Defendants that both allow the DPPs to continue their prosecution against the remaining Defendants and may facilitate settlement with larger Defendants. As this Circuit has recognized, "[i]n complex litigation with a plaintiff class, 'partial settlements often play a vital role in resolving class actions.'" *Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 247 (7th Cir. 1992) (quoting 1–Part A Manual for Complex Litigation Second, Moore's Federal Practice § 30.46 (1986)); *see also In re Linerboard*, 292 F. Supp. 2d at 643 (Approving an initial settlement in the case in recognition that it "should increase the likelihood of future settlements.").

    **2.**    **The Settlements Eliminate Significant Risk to a Class Facing Complex, Lengthy and Expensive Litigation.**

While the DPPs believe their case is strong, the Settlements eliminate significant risks they would face if the action were to proceed against Peco, George's, and Amick, including due to the complexity, length and expense of these types of litigations. Indeed, as reflected in the extensive docket, this case is nearly four years old and the DPPs have expended significant effort to defeat motions to dismiss, conduct discovery, and prepare for class certification and trial. The Settlements allow Class members to recover a significant sum from three of the smallest Defendants that will aid the DPPs in their prosecution of claims against larger Defendants. Absent settlement, the DPPs would need to obtain class certification, go to trial, and bear the burden of establishing liability, impact and damages before obtaining any recovery. *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) ("'Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal.'") (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998)). Continued litigation against the remaining Defendants will likely involve significant additional expenses and protracted legal battles; although those too may be avoided through future settlements. Therefore, the complexity, length and expense of further litigation, which the Settlement mitigates at least as to the Settling Defendants, also favor final approval. *See Larsen v. Trader Joe's Co.,* No. 11-cv-05188-WHO, 2014 WL 3404531, at *4 (N.D. Cal. July 11, 2014) ("Avoiding such unnecessary and unwarranted expenditure of resources and time would benefit all parties, as well as conserve judicial resources…. Accordingly, the high risk, expense, and complex nature of the case weigh in favor of approving the settlement.") (cited authority omitted); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices*

*Litig.,* 733 F. Supp. 2d 997, 1008 (E.D. Wis. 2010) ("The 'complexity, length and expense of further litigation' factor strongly favors this settlement….").

### 3. The Class Member Reaction Supports Approval of the Settlements

The reaction of class members to the Settlement supports final approval. Pursuant to the Court's order, more than 31,007 notices were sent directly to potential class members (21,754 via mail, 9,253 via email), which was in addition to giving publication notice in industry trade press (print and online) and the settlement administrator maintaining both an informational website and toll-free call-in center. (Keough Decl. ¶¶ 7-8.) After this outreach, and with 26,676 identified potential class members, no class member objected to any of the Settlements. (*Id.* ¶ 4, 28). The vast majority of class members did not opt-out of the settlements. There were only 113 opt-out requests of which 14 were deemed invalid. There were 99 valid opt-out requests to the Peco and George's Settlements, and 95 valid opt-outs to the Amick Settlements. (*Id.* ¶ 19.) A number of the requests for exclusion were filed on behalf of multiple related entities (*e.g.*, Request ID 18 contains 185 Sysco entities). (*See* Keough Decl. Exs. E1-E4 (listing the persons and entities who are subject to a valid request for exclusion to the Settlements).)

The opt-out percentage for the Settlements, which is approximately half the commerce at issue, is consistent with what the parties anticipated when entering into the Settlements and did not result in substantial reductions to the Settlement sums. (*See* Keough Decl., ¶ 21). Notably, over 80% of the class member opt-outs were on behalf of entities who had filed their own direct action lawsuits prior to receiving notice of the lawsuit. (*See id.* ¶ 22.)

The positive reaction of the Class supports finding the Settlements are fair, adequate, and reasonable. *See Bynum v. Dist. of Columbia*, 412 F. Supp. 2d 73, 77 (D.D.C. 2006) ("The low number of opt-outs and objectors (or purported objectors) supports the conclusion that the terms

of the settlement were viewed favorably by the overwhelming majority of class members."); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) ("A very small percentage of affected parties have opposed the settlement…. only 342 [of more than 100,000] Class Members excluded themselves from the settlement and only 15 Class Members submitted documents that could be considered objections."); *Pallas v. Pac. Bell*, No. C-89-2373 DLJ, 1999 WL 1209495, at *8 (N.D. Cal. July 13, 1999) ("The small percentage—less than 1%—of persons raising objections is a factor weighing in favor of approval of the settlement."). In fact, the absence of objections and limited opt-outs to the Settlements especially favor approval when, as here, "much of the class consists of sophisticated business entities." *CRT II*, 2015 WL 9266493, at *7 (citing *Linerboard*, 321 F. Supp. 2d at 629).

### 4. The Settlements are the Product of Arm's-Length Negotiations and Experienced Counsel Recommend Approval.

The fact that the Settlements are the product of arm's length negotiations strongly supports an initial presumption that the Settlements are fair, reasonable and adequate. *See 4 Newberg on Class Actions,* § 13:43 Presumptions governing approval process—Generally (5th ed.); *Great Neck Capital Appreciation*, 212 F.R.D. at, 410; *see also Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution.").

Moreover, it is well established that the judgment and opinion of experienced and competent counsel should be taken into account when assessing whether a settlement is fair, reasonable and adequate. "The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *CRT II*, 2015 WL 9266493, at *6 (*quoting In re Omnivision*, 559 F.Supp.2d 1036, 1043 (N.D. Cal. 2007)); *see also Kleen Prod. LLC*, 2017 WL 5247928, at *3 ("The Settlement was negotiated by highly skilled and experienced antitrust and class action

lawyers, who have held leadership positions in some of the largest class actions around the country."). Therefore, the endorsement of the Settlement by Counsel for the Settlement Class (which the Court knows to have handled several major antitrust class actions), is yet another factor that supports final approval.

**5.**      <u>The Stage of the Proceedings and Amount of Discovery Supports</u><br><u>Final Approval</u>

While this case has been pending for some time, the stage of the case strongly supports granting final approval to the Settlements. Namely, the Settlements have been entered into prior to the filing and ruling on DPPs' motion for class certifications, Defendants' motions for summary judgment and summary adjudication, and trial on the merits. While Plaintiffs are confident in their case, each of these important hurdles present time, expense, and risk, which supports the security offered by the millions of dollars in settlement proceeds provided by the Settlements.

Moreover, the amount of discovery and the investigation performed before the Settlements were entered, ensured that DPPs and their counsel made informed decisions to approve and recommend the Settlements to the Class and the Court. As set forth herein, the Settlements were entered into after DPPs had the opportunity to take dozens of depositions, analyze millions of documents, and engage in extensive written discovery. (*See* Pouya Decl. ¶¶ 4-8). Therefore, the procedural posture and status of the case supports granting final approval to the Settlements.

**V.**      **CONCLUSION**

For these reasons, Interim Co-Lead Counsel respectfully request that the Court grant final approval to the Peco, George's, and Amick Settlement Agreements.

Date: August 13, 2020

*/s/ Bobby Pouya*

W. Joseph Bruckner
Brian D. Clark
Simeon A. Morbey
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com

Clifford H. Pearson
Bobby Pouya
Michael H. Pearson
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
cpearson@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

Bruce L. Simon
PEARSON SIMON & WARSHAW, LLP
350 Sansome Street, Suite 680
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com

*Direct Purchaser Plaintiffs Interim Co-Lead
Class Counsel*

Steven A. Hart (#6211008)
Brian Eldridge (#6281336)
Kyle Pozan (#6306761)
HART MCLAUGHLIN & ELDRIDGE, LLC
121 West Wacker Drive, Suite 1050
Chicago, IL 60601
Telephone: (312) 955-0545
Facsimile: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com
kpozan@hmelegal.com

*Direct Purchaser Plaintiffs Liaison Counsel*