# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION*<br><br>This Document Relates To: Direct Purchaser Plaintiffs | Case No. 1:16-cv-08637<br><br>**DIRECT PURCHASER PLAINTIFFS' FIFTH AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**[PUBLIC REDACTED VERSION]** |

553072

TABLE OF CONTENTS

I.      NATURE OF ACTION ...................................................................................1

II.     JURISDICTION AND VENUE .......................................................................6

III.    PARTIES ........................................................................................................7

        A.    Plaintiffs ..............................................................................................7

        B.    Defendants ...........................................................................................8

IV.     AGENTS AND CO-CONSPIRATORS .........................................................22

V.      TRADE AND COMMERCE ..........................................................................33

VI.     FACTUAL ALLEGATIONS .........................................................................33

        A.    Background on Broilers. ....................................................................33

              1.    "Broilers." .................................................................................33

              2.    Broilers Are A Commodity. ......................................................34

              3.    The United States Broiler Market Is A National Market Worth Tens
                    Of Billions Of Dollars Annually. ............................................34

              4.    Broiler Prices Have Risen Steadily Since 2008. ......................35

              5.    Overview of the Georgia Dock, USDA Composite, Urner Barry,
                    and EMI Broiler price indices. .................................................36

        B.    The Georgia Dock Price Index Is Highly Susceptible To Collusion. In
              Fact, Certain Defendants Apparently Have Manipulated It To Further
              Their Conspiracy ...............................................................................38

        C.    Agri Stats Conspired to Act as a Vehicle for Collusion, and to Facilitate
              the Monitoring, Adoption, and Enforcement of Defendants' Conspiracy ............46

        D.    Defendants Coordinated Production Cuts To Stabilize And Then
              Increase The Price Of Broilers From 2008-2012, Then Continued
              Depressing Broiler Supply To Maintain Artificially High Prices. ......61

              1.    Pre-Class Period Events. ..........................................................64

              2.    2008-2009 Production Cuts. .....................................................65

              3.    Defendants' 2008 To Early 2009 Broiler Production Cuts Included
                    Unprecedented Reductions To Broiler Breeder Flocks. ..........79

4.    *The Cuts in 2008 and 2009 Led To Record Broiler Prices for Much Of 2009 and Early 2010.* ..............................................................80

5.    *Defendants Reacted With Unprecedented Speed To Overproduction In 2011, Which Led To A Second Wave Of Unprecedented Production Cuts.* ..............................................81

6.    *Defendants' 2011-2012 Production Cuts Lowered Broiler Breeder Flocks To Unprecedented Levels, Which Led To Record Profits For The 2013-2014 Time Period.* ..........................................92

7.    *Avian Flu Disrupted The Export Relief Valve During 2015, But Prices And Profitability Remained Relatively Stable Into 2016.* ..............98

E.    The Structure And Characteristics Of The Broiler Market, Together With Other Factors, Render The Conspiracy Economically Plausible. .......................103

    1.    *The Broiler Industry Is Highly Vertically Integrated.* .............................103

    2.    *The Market For Broilers Is Characterized By Inelastic Supply And Demand.* ....................................................................108

    3.    *There Are No Significant Substitutes For Broilers.* ................................108

    4.    *The Broiler Industry Has Experienced High Consolidation And Is Highly Concentrated.* ...............................................109

    5.    *The Broiler Industry Has A History Of Government Investigations And Collusive Actions.* ................................................111

    6.    *Defendants Had Numerous Opportunities To Collude.* ...........................113

    7.    *There Are High Barriers To Entry In The Broiler Market.* ...................123

    8.    *Defendants Have Similar Cost Structures and Work Collaboratively To Share Cost Information.* ...........................125

F.    In Furtherance of Their Conspiracy, Defendants Rigged Bids and Exchanged Pricing Terms that They Submitted to Broilers Purchasers. ............127

G.    Since 2008 Defendants' Collusion Has Led to Unprecedented Capacity Reductions, Artificially High Prices, and Record Profits. ...................................132

H.    Defendants Reduced Their Own Production And Used Direct Purchases of Broilers To Reduce Industry Supply. ..........................................................133

I.    Defendants Made A Coordinated Move Away From Fixed-Price Contracts To Contracts That Changed Prices Quarterly Or Followed Broiler Price Indexes. ..............................................................135

VII.    CLASS ACTION ALLEGATIONS ...................................................................137

VIII.   ANTITRUST INJURY ..................................................................................140

IX.     THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS........140

        A.    Plaintiffs Did Not and Could Not Have Discovered Defendants'
              Anticompetitive Conduct. ....................................................................140

        B.    Defendants Actively Concealed The Conspiracy. ...............................145

X.      VIOLATION OF SECTION 1 OF THE SHERMAN ACT ............................................150

XI.     REQUEST FOR RELIEF ................................................................................152

XII.    JURY TRIAL DEMANDED ...........................................................................153

Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class (the "Class") consisting of all persons who purchased Broilers[1] directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as January 1, 2008 until the Present (the "Class Period"). Plaintiffs bring this action for treble damages under the antitrust laws of the United States against Defendants, and demand a trial by jury.

## I.     NATURE OF ACTION

1.     Plaintiffs are informed and believe, and thereon allege, that in order to maintain price stability and increase profitability, beginning at least as early as January 2008 Defendants and their co-conspirators conspired and combined to fix, raise, maintain, and stabilize the price of Broilers. The principal (but not exclusive) method by which Defendants implemented and executed their conspiracy was by coordinating their output and limiting production with the intent and expected result of increasing prices of Broilers in the United States. In furtherance of their conspiracy, Defendants exchanged detailed, competitively sensitive, and closely-guarded non-public information about prices, capacity, sales volume, and demand, including through Defendant Agri Stats. Certain Defendants also directly exchanged information regarding prices for the purpose of fixing them and other price-related terms, as well as rigging bids. Plaintiffs are further informed and believe that Defendants fraudulently concealed their anticompetitive conduct from Plaintiffs and the Class in furtherance of the conspiracy, and as a result there may be other methods by which Defendants carried out their conspiracy which presently are not known to Plaintiffs. For

---

[1] "Broilers," as defined in ¶ 111 and as used in this complaint, are chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards.

instance, it was not publicly known until November 2016 that certain Defendants and their co-conspirators apparently manipulated and artificially inflated a widely used Broiler price index, the Georgia Dock. Additionally, it was not publicly known until June 2, 2020 that certain Defendants and their co-conspirators shared competitive, non-public pricing information and other price-related terms with one another and conspired to and did rig bids.

2.     Broilers constitute approximately 98% of all chicken meat sold in the United States. Defendants are the leading suppliers of Broilers in an industry with over $30 billion in annual wholesale revenue.  The Broiler industry is highly concentrated, with a small number of large producers in the United States controlling supply.  Defendants collectively control approximately 90% of the wholesale Broiler market.  Since the 1950s, the production of Broilers has become highly industrialized and commoditized.

3.     Historically, the Broiler industry was marked by boom and bust cycles where, in response to rising prices, producers increased production, which caused an oversupply and resulting decrease in pricing.  However, that market pattern changed markedly in 2008.  By their wrongful conduct as alleged in this complaint, Defendants not only materially reduced or eliminated the historical boom and bust cycle of the Broiler industry, they propped up Broiler prices during periods of rapidly falling input costs by, among other means, coordinating supply restrictions and manipulating one or more Broiler price indices.

4.     In 2007, Pilgrim's and Tyson attempted to cut their production levels enough to cause industry prices to rise.  However, despite Pilgrim's and Tyson's combined 40% market share, their production cuts in 2007 were not enough to increase prices through supply cuts because other Broiler companies increased their production.

5.      As a result, in January 2008 Pilgrim's and Tyson changed tactics and concluded that only through broader cooperation among major producers in the Broiler industry could supply be cut enough to force prices to increase.  In January 2008, both Pilgrim's and Tyson made clear to the Broiler industry that neither Pilgrim's nor Tyson would continue to cut production while their competitors used the opportunity to take away Pilgrim's and Tyson's market share.  A few days after attending an industry event in late January 2008, Tyson's CEO announced Tyson would be raising prices because "we have no choice [but] to raise prices substantially."   A day later, a Pilgrim's executive announced publicly that Pilgrim's would be cutting its production and "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."

6.      Subsequently, as described in detail below, the other Defendants followed Pilgrim's and Tyson's call to arms and made substantial cuts to their own production.  However, unlike Pilgrim's and Tyson's prior production cuts, in 2008 the Defendants did not rely solely on the ordinary mechanisms available to temporarily reduce production, which would have permitted production to be quickly ramped up if prices rose.  Instead, Defendants cut their ability to ramp up production for *18 months or more* by destroying Broiler breeder hens in their Broiler breeder flocks responsible for supplying the eggs Defendants raise into Broilers.  This destruction of the Broiler breeder flock was unparalleled and the consequences continue to reverberate in the Broiler industry to present day.  Further, when some Defendants in 2010 became "undisciplined" and began gradually increasing their production, Defendants made a second wave of coordinated production cuts in 2011 and 2012, which included further substantial destruction of industry Broiler breeder flocks.  Defendants continued to limit the United States Broiler supply in subsequent years by destroying eggs, relying upon one another's production to meet customer needs, and exporting

excess Broiler breeder flocks to Mexico, even when doing so was against their independent economic interest.

7.      The consequence of Defendants' cuts in 2008 and 2011-2012 has been a nearly 50% increase in Broiler wholesale prices by one measure since 2008, despite input costs (primarily corn and soybeans) *falling* roughly 20% to 23% over the same time period.  The rise in Broiler prices relative to input costs has led to record profits for Defendants.

8.      To effectuate their conspiracy, Defendants turned to a modernized version of an antitrust conspiracy in the Broiler industry during the 1970s.  During the 1970s, major Broiler producers held a weekly conference call to discuss production levels and prices for Broilers.  After the Department of Justice and civil antitrust plaintiffs sued, that practice was stopped.  However, by January 2008, modern technology provided a way for Defendants to share detailed production and pricing information without industry-wide conference calls.  Producers now electronically transfer vast amounts of production data to Agri Stats which, while supposedly anonymous, in fact provide Defendants with sufficient detail to determine with reasonable accuracy producer-level data on production, cost, and general efficiencies.  This permits the Defendants to share, on a weekly and/or monthly basis, their confidential production and pricing information, including forward-looking production information, which is easily forecasted on Broiler breeder flock data that is reported and shared.

9.      From late 2014 into 2016, Broiler input costs fell significantly.  Economic theory predicts that in a competitive market, all else being equal, Broiler prices similarly would fall. However, prices remained artificially inflated due to Defendants' and their Producer Co-Conspirators' agreement to artificially restrict production and their manipulation of the Georgia Dock Broiler price index, published by the Georgia Department of Agriculture ("GDA").  The

facts surrounding this episode were unknown to Plaintiffs and the public until November 2016, when it became public that the United States Department of Agriculture ("USDA") had requested in July 2016 that the GDA investigate and verify the accuracy of the Broiler prices provided to the GDA by several Defendants. When the GDA declined to do so, citing the industry's and its own lack of interest in verifying prices, USDA began publishing its own Broiler price statistic, which confirmed that the Georgia Dock price was inflated over already supracompetitive prices.

10.     There are numerous "plus factors" in the Broiler industry during the Class Period including, but not limited to, the following: (a) extensive information sharing through Agri Stats, (b) numerous opportunities to collude in a variety of forums, (c) a coordinated change from contracts with fixed Broiler prices to Broiler prices that float with the Broiler spot market, (d) inter-Defendant trades and purchases that often are against independent self-interest, and (e) multiple industry characteristics which facilitate collusion, such as high vertical integration, high barriers to entry, high Broiler industry consolidation and concentration, inelastic supply and demand, a lack of significant substitutes for Broilers, and a history of government investigations and collusive conduct.

11.     Defendants' restriction of Broiler supply had the intended purpose and effect of increasing Broiler prices to Plaintiffs and the Class. First, as Defendants themselves acknowledge, supply and demand in the Broiler industry are inelastic. Therefore, a coordinated decrease in supply as alleged herein necessarily will result in an increase in prices. As one industry consultant noted, "[b]ecause of the inelastic nature of the supply and demand [of Broilers,] a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

12. Second, as acknowledged by industry experts and Defendants themselves, pricing in virtually all Broiler sales is tied to spot market prices, which are publicly known and available through industry price indices. An expert economist has testified that "internal [Defendant] documents show that virtually all chicken products, even if they're not sold spot, are tied to the spot prices. . . ."

13. Therefore, Defendants knew and intended that their coordinated limitation and reduction in Broiler supply would artificially increase all Broiler prices—for spot market and contract sales—above the level they would have been absent the conduct alleged herein.

14. As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class paid artificially inflated prices for Broilers during the Class Period. Such prices exceeded the amount they would have paid if the price for Broilers had been determined by a competitive market. Thus, Plaintiffs and Class members were directly injured by Defendants' conduct.

15. Plaintiffs bring this action on behalf of all Class members to recover for the injury caused by Defendants' conduct in restricting the supply of Broilers and increasing the price of Broilers. Plaintiffs seek injunctive relief, treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violation of Section 1 of the Sherman Act (15 U.S.C. §1).

## II. JURISDICTION AND VENUE

16. This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Plaintiff Class by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and to enjoin further violations.

17. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

18.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

19.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of Broilers throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

20.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

21.     No other forum would be more convenient for the parties and witnesses to litigate this case.

### III. PARTIES

**A.  Plaintiffs**

22.     Maplevale Farms, Inc. is a New York corporation with its principal place of business in Falconer, New York.  It purchased Broilers directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

23.     John Gross and Company, Inc. is a Pennsylvania corporation with its principal place of business in Mechanicsburg, Pennsylvania.  It purchased Broilers directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

24.     Ferraro Foods, Inc. is a New Jersey corporation with its principal place of business in Piscataway, New Jersey.  It purchased Broilers directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

25.     Ferraro Foods of North Carolina, LLC, is a North Carolina Limited Liability Company with its principal place of business in Mebane, North Carolina.  It purchased Broilers directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

26.     Joe Christiana Food Distributors, Inc. is a Louisiana corporation with its principal place of business in Baton Rouge, Louisiana. It purchased Broilers directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

27.     Cedar Farms Co., Inc. is a Pennsylvania corporation with a principal place of business in Philadelphia, Pennsylvania.  It purchased Broilers directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**B.   Defendants**

    *1.     Koch Foods Defendants*

28.     Koch Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Park Ridge, Illinois.  It has its sales office in Flowood, Mississippi and its export office in Chattanooga, Tennessee.  During the Class Period, Koch Foods, Inc. sold Broilers in

interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

29.     JCG Foods of Alabama, LLC is an Alabama corporation with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, JCG Foods of Alabama, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

30.     JCG Foods of Georgia, LLC is a Georgia corporation with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, JCG Foods of Georgia, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

31.     Koch Meat Co., Inc. is an Illinois corporation with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Meat Co., Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

32.     Defendants Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC, and Koch Meat Co., Inc. are collectively referred to as "Koch Foods."

### 2.     *Tyson Defendants*

33.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas.  During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

34.     Tyson Chicken, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.  During the Class Period, Tyson

Chicken, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

35.     Tyson Breeders, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.  During the Class Period, Tyson Breeders, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

36.     Tyson Poultry, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Poultry, Inc.  During the Class Period, Tyson Poultry, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

37.     Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc. are collectively referred to as "Tyson."

### 3.      *Pilgrim's Pride Corporation*

38.     Pilgrim's Pride Corporation is a Delaware corporation headquartered in Greeley, Colorado (hereinafter "Pilgrim's").  JBS USA Holdings, Inc. holds a 75.3% controlling interest in Pilgrim's. JBS USA Holdings and Pilgrim's are subsidiaries of JBS SA, a Brazilian corporation headquartered in Sao Paulo, Brazil.  During the Class Period, Pilgrim's sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

A.     Around December 1, 2008, Pilgrim's filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Texas. Effective December 28, 2009, Pilgrim's was discharged from bankruptcy under a plan of reorganization that paid all creditors in full largely due to rising Broiler prices leading to increased profits at Pilgrim's.  Pilgrim's participated in the conspiracy alleged herein throughout the Class Period through the actions of many of Pilgrim's most senior executives, including

former CEO Dr. Don Jackson and current President & CEO Bill Lovette, and others with responsibility for Broilers.

B.    After its discharge from bankruptcy, Pilgrim's reaffirmed its participation in the conspiracy, in part by calls-to-arms and pledges by and between Defendants that were followed by actions that resulted in further idling of production capacity, reduced production, and price increases. Other specific post-discharge actions taken by Pilgrim's in furtherance of the conspiracy are alleged (see below) and are consistent with the actions taken by all of the Defendants and Pilgrim's throughout the Class Period.

C.    Regardless of whether Pilgrim's participated in the conspiracy throughout the Class Period or joined or reaffirmed membership in the conspiracy immediately after its discharge from bankruptcy, this Complaint seeks to recover damages from Pilgrim's only for Pilgrim's post-discharge conduct, and in no way seeks to violate any Orders of the above-referenced Bankruptcy Court. However, by operation of law, the damages arising from Pilgrim's post-discharge conduct include damages incurred by Plaintiffs and the Class throughout the Class Period. This Complaint also seeks to recover damages from the other Defendants for Pilgrim's pre-discharge conspiratorial conduct. Therefore, Plaintiffs plead only a single Class Period as to all Defendants, but damages as to Pilgrim's are governed by the principles of joint and several liability as noted above.

### 4.    *Perdue Defendants*

39.    Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland. During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

40.    Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

41.     Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to as "Perdue."

### 5.     *Sanderson Farms Defendants*

42.     Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi.  During the Class Period, Sanderson Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

43.     Sanderson Farms, Inc. (Foods Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly-owned subsidiary of Sanderson Farms, Inc.  During the Class Period, Sanderson Farms, Inc. (Foods Division) sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

44.     Sanderson Farms, Inc. (Production Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly-owned subsidiary of Sanderson Farms, Inc.  During the Class Period, Sanderson Farms, Inc. (Production Division) sold or supplied for sale Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

45.     Sanderson Farms, Inc. (Processing Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly-owned subsidiary of Sanderson Farms, Inc.  During the Class Period, Sanderson Farms, Inc. (Processing Division) sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

46.     Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division), and Sanderson Farms, Inc. (Processing Division) are collectively referred to as "Sanderson Farms."

### 6. *Wayne Farms, LLC*

47.     Wayne Farms, LLC is a Delaware corporation headquartered in Oakwood, Georgia. It is an operating affiliate of its parent company, Continental Grain Company, a privately held company in Arlon, Belgium.  During the Class Period, Wayne Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

### 7. *Mountaire Farms Defendants*

48.     Mountaire Farms, Inc. is a privately held Delaware corporation with its headquarters in Millsboro, Delaware.  During the Class Period, Mountaire Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

49.     Mountaire Farms, LLC is a privately held Arkansas corporation located in Little Rock, Arkansas, and is a wholly-owned subsidiary of Mountaire Farms, Inc.  During the Class Period, Mountaire Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

50.     Mountaire Farms of Delaware, Inc. is a privately held Delaware corporation located in Millsboro, Delaware, and is a wholly-owned subsidiary of Mountaire Farms, Inc.  During the Class Period, Mountaire Farms of Delaware, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

51.     Defendants Mountaire Farms, Inc., Mountaire Farms, LLC, and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire."

532461

13

### 8.    *Peco Foods*

52.    Peco Foods, Inc. is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama.  During the Class Period, Peco Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

### 9.    *Foster Farms*

53.    Foster Farms, LLC is a privately held California corporation headquartered in Modesto, California.  During the Class Period, Foster Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

54.    Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California.  Foster Poultry Farms is a related entity of Foster Farms, LLC.  During the Class Period, Foster Poultry Farms and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of Broilers, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

55.    Defendants Foster Farms, LLC and Foster Poultry Farms are collectively referred to as "Foster Farms."

### 10.    *House of Raeford Farms*

56.    House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina.  During the Class Period, House of Raeford operated in part through a division referred to as "Columbia Farms," which is a group of Broiler facilities and operations originally named Columbia Farms, Inc. and Columbia Farms of Georgia, Inc. when purchased by House of Raeford in 1998.  During the Class Period, House of Raeford Farms, Inc.

532461                                                    14

and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

### 11. *Simmons Foods*

57.     Simmons Foods, Inc. is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas.  During the Class Period, Simmons Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

58.     Simmons Prepared Foods, Inc. is a privately held Arkansas company headquartered in Siloam Springs, Arkansas.  Simmons Prepared Foods, Inc. is a wholly-owned subsidiary of Simmons Foods, Inc.  During the Class Period, Simmons Foods, Inc. exclusively sold the chicken it produced to Simmons Prepared Foods, Inc., which in turn resold the chicken in various forms to its customers.  Simmons Prepared Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of Broilers, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

59.     Defendants Simmons Foods, Inc. and Simmons Prepared Foods, Inc. are collectively referred to as "Simmons" or "Simmons Foods."

### 12. *Fieldale Farms*

60.     Fieldale Farms Corporation is a privately held Georgia corporation headquartered in Baldwin, Georgia.  During the Class Period, Fieldale Farms Corporation and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

### 13.    *George's Defendants*

61.    George's, Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.  During the Class Period, George's, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

62.    George's Farms, Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas, and is a wholly-owned subsidiary of George's Inc.  During the Class Period, George's Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold and/or supplied Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

63.    Defendants George's, Inc. and George's Farms, Inc. are collectively referred to as "George's."

### 14.    *O.K. Foods Defendants*

64.    Defendant O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.  O.K. Foods, Inc. is a subsidiary of Industrias Bachoco S.A., a Brazilian corporation headquartered in Sao Paulo, Brazil.  During the Class Period, O.K. Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

65.    O.K. Farms, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas, and is a wholly-owned subsidiary of O.K. Foods, Inc.  During the Class Period, O.K. Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

66.     O.K. Industries, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas, and is a wholly-owned subsidiary of O.K. Foods, Inc.  During the Class Period, O.K. Industries, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

67.     Defendants O.K. Foods, Inc., O.K. Farms, Inc., and O.K. Industries, Inc. are collectively referred to as "O.K. Foods."

### 15.     *Claxton Poultry Defendants*

68.     Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. During the Class Period, Claxton Poultry Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

69.     Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia.  During the Class Period, Norman W. Fries, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

70.     Defendants Claxton Poultry Farms, Inc. and Norman W. Fries, Inc. are collectively referred to as "Claxton Poultry."

### 16.     *Harrison Poultry*

71.     Harrison Poultry, Inc. is a Georgia corporation located in Bethlehem, Georgia. During the Class Period, Harrison Poultry, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

### 17.    *Mar-Jac Poultry Defendants*

72.    Mar-Jac Poultry, Inc. is a Delaware corporation located in Gainesville, Georgia. Mar-Jac Poultry, Inc. and its subsidiaries are controlled by Sterling Management Group, Inc. During the Class Period, Mar-Jac Poultry, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

73.    Mar-Jac Poultry MS, LLC is a Mississippi limited liability corporation located in Gainesville, Georgia.  During the Class Period, Mar-Jac Poultry MS, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

74.    Mar-Jac Poultry AL, LLC is an Alabama limited liability corporation located in Gainesville, Georgia.  During the Class Period, Mar-Jac Poultry AL, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

75.    Mar-Jac AL/MS, Inc. is a Delaware corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac AL/MS, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

76.    Mar-Jac Poultry, LLC is a Delaware corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Poultry, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

77.    Mar-Jac Holdings, LLC is a Delaware corporation located in Gainesville, Georgia and is the parent company of Mar-Jac Poultry, Inc., Mar Jac Poultry MS LLC, Mar-Jac AL, LLC,

Mar-Jac AL/MS, LLC, and Mar-Jac Poultry, LLC. During the Class Period, Mar-Jac Holdings, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

78. Defendants Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, Mar-Jac Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-Jac Poultry, LLC and Mar-Jac Holdings, LLC are collectively referred to as "Mar-Jac Poultry."

### 18. Defendant Amick Farms

79. Amick Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Batesburg-Leesville, South Carolina, and with facilities in South Carolina, Maryland, and Delaware. Amick Farms, LLC is a wholly-owned subsidiary of OSI Group, LLC, a privately held Delaware corporation with its corporate headquarters in Aurora, Illinois. During the Class Period, Amick Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

80. The Amick Company, Inc. is a privately held South Carolina corporation with its corporate headquarters in Batesburg-Leesville, South Carolina and is a wholly-owned subsidiary of OSI Group, LLC. During the Class Period, The Amick Company, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

81. Amick-OSI Broilers, LLC a privately held Delaware limited liability company with its corporate headquarters in Batesburg-Leesville, South Carolina and is a wholly-owned subsidiary of OSI Group, LLC. During the Class Period, Amick-OSI Broilers, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate

commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

82.     Amick-OSI Processing, LLC a privately held Delaware limited liability company with its corporate headquarters in Batesburg-Leesville, South Carolina and is a wholly-owned subsidiary of OSI Group, LLC. During the Class Period, Amick-OSI Broilers, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

83.     Defendants Amick Farms, LLC, The Amick Company, Inc., Amick-OSI Broilers, LLC, and Amick-OSI Processing, LLC are collectively referred to as "Amick."

### 19. Defendant Case Farms

84.     Case Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina. During the Class Period, Case Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

85.     Case Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in Ohio and North Carolina. Case Farms, LLC is a wholly-owned subsidiary of Case Foods, Inc. During the Class Period, Case Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

86.     Case Farms Processing, Inc. is a privately held North Carolina corporation with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in North

Carolina. Case Farms Processing, Inc. is a wholly-owned subsidiary of Case Foods, Inc. During the Class Period, Case Farms Processing, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

87.     Defendants Case Foods, Inc., Case Farms, LLC, and Case Farms Processing, Inc. are collectively referred to as "Case Foods."

### 20. Defendant Agri Stats, Inc.

88.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co.  Eli Lilly & Co. is an Indiana corporation located in Indianapolis, Indiana.  Throughout the Class Period, Agri Stats acted as a co-conspirator of Defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among Defendants and their co-conspirators.

89.     "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including Broilers companies that merged with or were acquired by the named Defendants and each named Defendant's wholly-owned or controlled subsidiaries or affiliates that sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the Class Period.  To the extent the term "Producer Defendants" is used herein, it refers to all Defendants other than Agri Stats.

90.     To the extent that subsidiaries and divisions within each Defendant's corporate family sold or distributed Broilers to direct purchasers, these subsidiaries played a material role in the conspiracy alleged in this Complaint because Defendants wished to ensure that the prices paid for such Broilers would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein.  Thus, all

such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing and collecting monies from Plaintiffs and the members of the Plaintiff Class for Broilers was known to and approved by their respective corporate parent named as a Defendant in this Complaint. For the avoidance of doubt, several previously unnamed subsidiaries for Defendants are specifically identified as co-conspirators below.

## IV. AGENTS AND CO-CONSPIRATORS

### *Producer Co-Conspirator Allen Harim*

91.     Harim USA, Ltd. is a privately held Delaware corporation with its corporate headquarters in Seaford, Delaware. During the Class Period, Harim USA Ltd. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

92.     Allen Harim Foods, LLC is a privately held Delaware limited liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland and North Carolina. Allen Harim Foods, LLC is a wholly-owned subsidiary of Harim USA Ltd. During the Class Period, Allen Harim Foods, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

93.     Allen Harim Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland and North Carolina. Allen Harim Farms, LLC is a wholly-owned subsidiary of Harim USA Ltd. During the Class Period, Allen Harim Farms, LLC and/or its predecessors,

wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

94.     Producer Co-Conspirators Harim USA, Ltd., Allen Harim Foods, LLC, and Allen Harim Farms, LLC are collectively referred to as "Allen Harim."

### *Producer Co-Conspirator Keystone Foods*

95.     Keystone Foods LLC is a subsidiary of Marfrig Alimentos, S.A., a Brazilian company.  On November 30, 2018, Defendant Tyson Foods, Inc. announced it had completed its acquisition of Keystone Foods LLC from Marfrig.  During the Class Period, Keystone Foods LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

96.     Keystone Foods Corporation was (now consolidated) a subsidiary of Keystone Foods, LLC and Marfrig Alimentos, S.A., a Brazilian company. During the Class Period, Keystone Foods Corporation and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

97.     Equity Group Eufaula Division, LLC is a Delaware limited liability company with its headquarters in Bakerhill, Alabama and is a wholly-owned subsidiary of Keystone Foods LLC. During the Class Period, Equity Group Eufaula Division, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

98.     Equity Group Kentucky Division LLC, formerly known as Cagle's-Keystone Foods, L.L.C., is a Delaware limited liability company with its headquarters in Franklin, Kentucky and is a wholly-owned subsidiary of Grow-Out Holdings LLC.  During the Class Period, Equity

Group Kentucky Division LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

99.    Equity Group – Georgia Division LLC is a Delaware limited liability company with its headquarters in Camilla, Georgia and is a wholly-owned subsidiary of Keystone Foods LLC. During the Class Period, Equity Group – Georgia Division LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled or controlled affiliates, to purchasers in the United States.

100.    Producer Co-Conspirators Keystone Foods LLC, Keystone Foods Corporation, Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group – Georgia Division LLC are collectively referred to as "Keystone Foods."

101.    Among the Defendant families included in this complaint, various subsidiaries and related entities actively participated in the conspiracy alleged herein and therefore are co-conspirators, including the following:

### A.  Koch Foods

i.    JCG Industries, Inc. is an Illinois corporation with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, JCG Industries, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

ii.    JCG Properties L.L.C. is an Illinois limited liability company with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, JCG Properties L.L.C. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

iii.    JCG Land Holdings, LLC is an Illinois limited liability company with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, JCG Land Holdings, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

24

iv.  JCG Foods LLC is a Delaware limited liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, JCG Foods LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

v.  Koch Foods of Cumming LLC, formerly known as Greko, L.L.C. is a Georgia limited liability company with its headquarters in Cumming, Georgia, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods of Cumming LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

vi.  Koch Foods of Gainesville LLC, formerly known as Gress Foods LLC is a Georgia limited liability company with its headquarters in Gainesville, Georgia, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods of Gainesville LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

vii.  JCG Farms of Georgia LLC is a Georgia limited liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, JCG Farms of Georgia LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

viii.  Koch Foods of Mississippi LLC is a Mississippi limited liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods of Mississippi LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

ix.  Koch Farms of Mississippi LLC is a Mississippi limited liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Farms of Mississippi LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

x.  Koch Freezers LLC is a Mississippi limited liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Freezers LLC sold Broilers in interstate commerce, directly or

through its wholly-owned or controlled affiliates, to purchasers in the United States.

xi. Koch Properties of Mississippi LLC is a Mississippi limited liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Properties of Mississippi LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

xii. Koch Foods of Alabama LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Foods of Alabama LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

xiii. Koch Farms of Alabama LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Farms of Alabama LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

xiv. JCG Farms of Alabama LLC is an Alabama limited liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, JCG Farms of Alabama LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

xv. Koch Foods of Ashland LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Foods of Ashland LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

xvi. Koch Farms of Ashland LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Farms of Ashland LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

xvii. Koch Farms of Gadsden LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a

wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Farms of Gadsden LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

xviii.   Koch Foods of Gadsden LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Foods of Gadsden LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

xix.   Koch Foods of Cincinnati LLC, f/k/a Preferred Foods, LLC is an Ohio limited liability company with its headquarters in Fairfield, Ohio, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Foods of Cincinnati LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

xx.   Koch Foods LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Foods LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

xxi.   Koch Farms LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Farms LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

xxii.   Koch Farms of Chattanooga LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Farms of Chattanooga LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

xxiii.   Koch Foods of Chattanooga LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Foods of Chattanooga LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

xxiv.  Koch Foods of Morristown LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Foods of Morristown LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

xxv.  Koch Farms of Morristown LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Farms of Morristown LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

**B. Tyson**

i.  Tyson Sales and Distribution, Inc. is a Delaware corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Sales and Distribution, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

**C. Perdue**

i.  Perdue Foods, Inc. (presently dissolved) was a Maryland corporation with its headquarters in Salisbury, Maryland and is a wholly-owned subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

ii.  Harvestland Holdings, LLC (presently merged) was a Maryland limited liability company with its headquarters in Salisbury, Maryland and is a wholly-owned subsidiary of Perdue Farms, Inc. During the Class Period, Harvestland Holdings, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

iii.  Perdue Food Products, Inc. (presently merged) was a Maryland limited liability company with its headquarters in Salisbury, Maryland and is a wholly-owned subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Food Products, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

iv.  Perdue Farms, LLC is a Maryland limited liability company with its headquarters in Salisbury, Maryland and is a wholly-owned

subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Farms, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

v. Perdue Farms Incorporated (presently merged) was a Maryland limited liability company with its headquarters in Salisbury, Maryland and is a wholly-owned subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Farms Incorporated sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

### D. Wayne Farms

i. WFSP Foods, LLC is an Alabama limited liability company with its headquarters in Decatur, Alabama, and is a wholly-owned subsidiary of Wayne Farms, LLC. During the Class Period, WFSP Foods, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

### E. George's

i. George's Chicken, LLC is an Arkansas limited liability company with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of George's, Inc. During the Class Period, George's Chicken, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

ii. George's Family Farms, LLC is an Arkansas limited liability company with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of George's, Inc. During the Class Period, George's Family Farms, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

iii. George's Foods, LLC is an Arkansas limited liability company with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of George's, Inc. During the Class Period, George's Foods, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

iv. George's of Missouri, Inc. is an Arkansas corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of George's, Inc. During the Class Period, George's of Missouri, Inc. sold Broilers in interstate commerce, directly or

through its wholly-owned or controlled affiliates, to purchasers in the United States.

v. George's Processing, Inc. is an Arkansas corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of George's, Inc. During the Class Period, George's Processing, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

## F. Peco

i. Peco Farms of Mississippi, LLC is a Mississippi limited liability company with its headquarters in Jackson, Mississippi and is a wholly-owned subsidiary of Peco Foods, Inc. During the Class Period, Peco Farms of Mississippi, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

## G. Pilgrim's

i. PFS Distribution Company is a Delaware company with its headquarters in Arlington, Texas and is a wholly-owned subsidiary of Pilgrim's Pride Corporation. During the Class Period, PFS Distribution Company sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

ii. Merit Provisions, LLC is a Delaware limited liability company with its headquarters in Dallas, Texas and is a wholly-owned subsidiary of Pilgrim's Pride Corporation. During the Class Period, Merit Provisions, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

iii. GC Properties, LLC is a Georgia limited liability company with its headquarters in Powder Springs, Georgia and is a wholly-owned subsidiary of Pilgrim's Pride Corporation. During the Class Period, GC Properties, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

iv. Pilgrim's Pride of Nevada, Inc. is a Nevada corporation with its headquarters in Greeley, Colorado and is a wholly-owned subsidiary of Pilgrim's Pride Corporation. During the Class Period, Pilgrim's Pride of Nevada, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

v. PPC Marketing, Ltd. is a Texas company with its headquarters in Pittsburg, Texas and is a wholly-owned subsidiary of Pilgrim's Pride Corporation. During the Class Period, PPC Marketing, Ltd. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

vi. Pilgrim's Pride Corporation of West Virginia, Inc. is a West Virginia corporation with its headquarters in Greeley, Colorado and is a wholly-owned subsidiary of Pilgrim's Pride Corporation. During the Class Period, Pilgrim's Pride Corporation of West Virginia, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

## H. Foster Farms

i. Foster International Trading Company, Inc. is a corporation affiliated with Foster Farms, LLC and/or Foster Poultry Farms. During the Class Period, Foster International Trading Company, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

ii. Napoleon Poultry Supply, LLC is a Delaware limited liability company with its headquarters in Livingston, California and is a wholly-owned subsidiary of Foster Farms, LLC. During the Class Period, Napoleon Poultry Supply, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

## I. OK Foods

i. O.K. Broiler Farms Limited Partnership was (presently dissolved) an Arkansas limited partnership with its headquarters in Fort Smith, Arkansas and is a wholly-owned subsidiary of O.K. Foods, Inc. During the Class Period, O.K. Broiler Farms Limited Partnership sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

## J. House of Raeford

i. House of Raeford Farms of Louisiana, LLC is a Louisiana limited liability company with its headquarters in Shreveport, Louisiana and is a wholly-owned subsidiary of House of Raeford Farms, Inc. During the Class Period, House of Raeford Farms of Louisiana, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

ii. Johnson Breeders, Inc. is a North Carolina corporation with its headquarters in Rose Hill, North Carolina and is a wholly-owned subsidiary of House of Raeford Farms, Inc. During the Class Period, Johnson Breeders, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

iii. Columbia Farms of Georgia, Inc. is a South Carolina corporation with its headquarters in Lavonia, Georgia and is a wholly-owned subsidiary of House of Raeford Farms, Inc. During the Class Period, Columbia Farms of Georgia, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

iv. Raeford Farms of Louisiana, LLC is a Louisiana limited liability company with its headquarters in Arcadia, Louisiana and is a wholly-owned subsidiary of House of Raeford Farms, Inc. During the Class Period, Raeford Farms of Louisiana, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

v. Columbia Farms, Inc. is a South Carolina corporation with its headquarters in Columbia, South Carolina and is a wholly-owned subsidiary of House of Raeford Farms, Inc. During the Class Period, Columbia Farms, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

102. When appropriate in the context, Keystone Foods, Allen Harim, and the subsidiaries and affiliates identified immediately above for certain Defendant families, are referred to collectively in this Complaint as the "Producer Co-Conspirators."

103. Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

104. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or

representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

105.     Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

106.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## V. TRADE AND COMMERCE

107.     During the Class Period, each Defendant, directly or through its subsidiaries or other affiliates, sold Broilers in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

108.     During the Class Period, Defendants collectively controlled a majority of the market for Broilers in the United States.

109.     Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VI. FACTUAL ALLEGATIONS

### A.  Background on Broilers.

#### 1.   *"Broilers."*

110.     As used in this Complaint, "Broilers" are chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards.

### 2. Broilers Are A Commodity.

111. According to a 2012 report by Focus Management Group, Broilers "are a commodity product with little or no product differentiation based on the processors."

112. Defendants acknowledge that Broilers are a commodity. For instance, Pilgrim's CEO commented in February 2014 that "I would add too, our business…the [Broiler] chicken business per se is a commodity business."

### 3. The United States Broiler Market Is A National Market Worth Tens Of Billions Of Dollars Annually.

113. According to the U.S. Poultry & Egg Association, the value of wholesale U.S. Broilers produced in 2014 was $32.7 billion, up 6 percent from 2013. The market value varied between $21.8 and $30.7 billion from 2008-2013.

114. There is a single national market for Broilers in the United States. Prices for Broilers sold in the United States are quoted in whole bird or disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

115. About 50-70% of Broilers are sold under contract with a customer, about 10-20% are sold on the spot market, and roughly 17-20% are exported.

116. According to expert testimony in July 2011 in *Adams v. Pilgrim's Pride*,[2] spot market Broilers are "anything left over [that is] sold fresh" within 3 days. Broiler industry executives sometimes refer to the Broiler spot market as the "sell it or smell it market," meaning that if the Broiler isn't sold within 3 days, then it will rot. According to Janette Barnard, founder of a spot market trading platform called The Poultry Exchange, "there are no secrets in the spot

---

[2] No. 2:09-cv-00397 (N.D. Tex.).

34

market, very few anyway. As soon as a sales manager picks up the phone and calls a customer or trader, the word is out and other people will soon know that X company has one load available."

117. Exports of Broilers from the United States account for approximately 45% of all United States meat exports. Broilers produced in the U.S. are exported to well over 100 different countries, with the major export markets including Mexico, Canada, Hong Kong, and China. Some of the exports from the United States include products less desirable to United States consumers, such as chicken feet or dark meat, but exports also increasingly include white meats and other products widely consumed in the United States.

118. Exports of Broilers from the United States have increased since 2007 both in quantity and value. Before the Class Period, in 2006 exports constituted only 14.8% of U.S. exports and increased to 16.5% by 2007. But between 2008-2014 export levels were never lower than 18.5% of U.S. production levels, dropping down to 16% in 2015 due to export bans by countries due to Avian Flu concerns.

119. While this complaint does not seek damages for Broilers sold into export commerce, Broilers exported from the United States decrease available supply and increase Broiler prices in the United States. Therefore, exports by Defendants were an important mechanism used by Defendants to effect their United States-based Broiler market conspiracy.

### 4. *Broiler Prices Have Risen Steadily Since 2008.*

120. Broiler prices were significantly elevated during the Class Period due to Defendants' conduct. This is contrary to pricing patterns prior to the Class Period, and contrary to what would be expected in a competitive market. For instance, during much of the Great Recession, Broiler prices steadily rose despite flat or declining input costs. Similarly, Broiler prices during the 2015 through 2016 time period remained artificially inflated and failed to account

for the historic drop in corn and soybean prices, which constitute 50 – 70% of Broiler input costs (*see below*, ¶ 384).



121.    As of November 2013, a Bloomberg News compilation of industry analyst forecasts predicted Broiler prices would drop 7.1% in 2014 due to a 50% fall in corn prices, but instead, Broiler prices *increased* 9.2%.  Since January 1, 2008, by one measure Broiler prices have been at or near all-time highs roughly half of the time, even though the 2008-2009 period was during the Great Recession.

> ### 5.   *Overview of the Georgia Dock, USDA Composite, Urner Barry, and EMI Broiler price indices.*

122.    Broiler prices are reported primarily by three entities: Urner Barry (a commodity price reporting service), the Georgia Department of Agriculture (aka "Georgia Dock,"), and the

USDA. Additionally, as discussed below, Agri Stats collects detailed pricing information through its subsidiary Express Markets, Inc. ("EMI").

123. Urner Barry collects and publishes daily price information for Broilers, while for the USDA's Composite index, USDA collects and publishes Broiler price information on a weekly basis. USDA's Composite price index is publicly available for free. Urner Barry's Broiler price information is subscription-based, so all Broiler producers and many Broiler purchasers subscribe for a fee. The USDA and Urner Barry's Broiler price indices are based upon a system of double verification, which includes telephonic and written surveys of all or nearly all Broiler producers, but also verification of reported prices from Broiler purchasers such as brokers and customers. The Georgia Dock price-survey methodology, which contrasts materially with those of the USDA and Urner Barry, is discussed below in Section VI(B).

124. The most detailed price report is not publicly available and is produced by Agri Stats and its subsidiary, Express Markets, Inc. According to a May 2010 FarmEcon study, EMI's pricing report[3] includes "pricing data on whole birds and chicken parts that is considerably more detailed than the USDA," Urner Barry, or Georgia Dock reports, as it is based on actual sales invoices from Broiler companies.

---

[3] Agri Stats subsidiary EMI was formed around 2000 to compete with the price reporting service of Urner Barry. Unlike Agri Stats reports for Defendants, EMI releases daily pricing data to both Defendants and potential purchasers of Broilers, though the reporting service costs thousands of dollars and is not publicly available. EMI reports capture all transactions by Broiler producers, who automatically transmit invoice information electronically from each transaction to EMI. The reports include all sales volume information from the previous day, including the size of containers, type of cut, whether the product was chilled with ice or $CO_2$, the price, and numerous other pieces of information.

125.    Published prices for Broilers from Urner Barry, Georgia Dock, and USDA relate to the spot market for Broilers.  However, prices for Broilers, whether sold under contract or on the spot market, generally move with spot market prices as reported by Georgia Dock or Urner Barry.

126.    Statements by Broiler company executives and industry experts confirm that Broiler sales, whether by contract or on the spot market, are tied to spot market pricing.  For instance, Sanderson Farms CEO Joe Sanderson explained in a May 2008 speech that Sanderson Farms' contract sales to retail customers have prices tied to the Georgia Dock price survey and Sanderson Farms' contract sales to food distributors are "based on formulas tied to the Urner Barry."  Similarly, expert economist Dr. Colin A. Carter from the University of California (Davis) testified that "internal Pilgrim's documents show that virtually all chicken products, even if they're not sold spot, are tied to the spot prices. . . . 83 percent of Pilgrim's chicken sales are reflecting the spot price within a given year.  So there's only about 16 percent of their sales that are not tied to the spot market over a relatively short period of time."  Further, because half of "fixed contracts" actually had terms tied to Broiler spot market prices, Dr. Carter concluded that 92% of Pilgrim's Broiler sales were tied to Broiler spot market prices such as Georgia Dock.

127.    As a consequence of the inelasticity of supply and demand in the Broiler industry (discussed below) and the availability of the spot market price indices (discussed above), public price increase announcements by Defendants were unnecessary.  Defendants knew and intended that a decrease in supply pursuant to their agreement would increase Broiler spot market prices, and therefore that all Broiler prices would increase.

**B.    The Georgia Dock Price Index Is Highly Susceptible To Collusion. In Fact, Certain Defendants Apparently Have Manipulated It To Further Their Conspiracy.**

128.    The Georgia Dock price is compiled on a weekly basis by the GDA.  For decades, it has been used by producers and others as a benchmark to set Broiler prices.  Until very recently,

little if any information was publicly available regarding how the GDA compiles the Georgia Dock price. In fact, Defendants intentionally disseminated misinformation that the Georgia Dock price is derived through a complex algorithm and is an accurate and reliable measure of actual Broiler transaction prices. Public revelations in early November 2016, however, indicated for the first time that the Georgia Dock price index not only may be unreliable, but that its survey methodology makes it susceptible to manipulation by Broiler producers.

129.    To compile the Georgia Dock price index, according to an internal GDA document provided recently to the New York Times through an open records request, "each participating [Broiler producer] company is called [by the GDA] on Wednesday every week to report the price offered to companies in which they have contracts in place with." A single price is given by each Broiler producer company and it is accepted without any verification of actual invoices, double-verification with purchasers, or any other form of auditing to verify accuracy. Remarkably, in response to a recent press inquiry, the GDA justified its failure to audit any self-reported data from Defendants by stating, "We don't see any reason they would submit information that wasn't truthful."

130.    Despite the GDA's public statements about confidence in the Georgia Dock price index, the GDA employee who collected prices each week from Broiler companies, Arty Schronce, was deeply concerned. In a 2016 internal GDA memorandum (hereinafter, "2016 Schronce Memorandum") disclosed publicly for the first time on November 17, 2016, in a Washington Post article, Mr. Schronce wrote that he "continue[d] to have concerns about" the Georgia Dock, had "voiced concerns in the past," and that he thought the Georgia Dock price index was "a flawed product that is a liability to the Georgia Department of Agriculture." Mr. Schronce also noted, "I was told that poultry companies know what they are doing and all I need to do is to gather and

consolidate the info I am provided.  However, I have come to question the validity of some of the information provided."  Mr. Schronce also reported that the Broiler companies reporting prices to him gave "lackadaisical and rude responses to my requests for information," such as responding "just keep em' the same" when asked for a company's updated Broiler price.

131.    The Broiler companies that participated in the Georgia Dock price survey during the relevant time period all own at least one Broiler processing facility located within the State of Georgia.  They included Defendants Pilgrim's, Tyson, Fieldale Farms, Perdue, Sanderson Farms, Koch Foods, and Wayne Farms, Claxton Poultry, Mar-Jac Poultry, and Harrison Poultry. According to the GDA, each weekly price report from these Broiler producers is weighted to account for the particular company's market share of Broilers processed in Georgia (referred to by GDA as that company's "voice").  A preliminary calculation is made based on the single price quotation from each company, then "[a]ny company that provides a whole bird quote that is more than one cent above or below the initial dock price calculation will not be included in the calculation for the whole bird dock price that week.  Its voice is taken out of the formula and the dock price is recalculated without it" (hereinafter, the "One Cent Rule").  According to internal GDA documents, the One Cent Rule is meant "to shield [] one company having the ability to greatly influence the price up or down."

132.    The price quoted by each company to the GDA is based on 2.5-to-3 pound whole Broilers, but only a handful of companies who report to GDA actually process 2.5-to-3 pound birds in Georgia, so internal GDA documents state that Broiler companies "are supposed to adjust their whole bird quote as if they are producing that sized bird."  Once the final Georgia Dock whole bird price is calculated, then the GDA uses a formula to calculate prices for different Broiler cuts

and parts of those whole birds, but that calculation is based *entirely* on the *single* original price that each Broiler company provided to the GDA each Wednesday.

133.    Historically, the Georgia Dock price was roughly comparable to the prices reflected by the Urner Barry, EMI, and USDA Composite indices. However, beginning around January 2015, the Georgia Dock price began to depart significantly from the pricing reflected by the EMI, Urner Barry, and USDA Composite indices (*see above*, ¶ 121).[4]

134.    The significant difference between the Georgia Dock price index and other Broiler price indices in recent years cannot be explained by only one or two outlier companies reporting artificially high Broiler prices to the GDA, as the One Cent Rule requires that outlier prices deviating by more than one cent from the initial dock price be excluded from the final Georgia Dock price. Instead, the deviation of the Georgia Dock price index from other indices – indices that are themselves based on verified sales by Defendants – can only be attributed to all or nearly all participating Broiler producers collectively submitting artificially high and identical or very nearly identical Broiler prices to the GDA.

135.    The 2016 Schronce Memorandum confirms the significance of the One Cent Rule. Mr. Schronce's memorandum noted that after a January 2016 article about the Georgia Dock price index in the Wall Street Journal (*see below*, ¶ 317), one "company appears to basically not take part in the Whole Bird Dock Price process. They seem to deliberately submit a low bid that they know will be kicked out. However, they can claim that they are submitting something lower. In essence, they can take advantage of a high whole bird price while maintaining that they want it to be lower."

---

[4] To be clear, Plaintiffs allege that prices reported in the EMI, Urner Barry, and USDA Composite price indices during the Class Period were also supracompetitive and artificially inflated by the conduct of Defendants and their Co-Conspirators, as alleged in this Complaint.

136.     To facilitate their control of the Georgia Dock price, Defendants convinced the GDA to convene a secret "Georgia Dock Advisory Committee" composed of senior executives from eight Defendants to advise the GDA on the Georgia Dock price.  The Georgia Dock Advisory Committee recently included Gus Arrendale (CEO, Fieldale Farms), Mike Welch (CEO & President, Harrison Poultry), Jerry Lane (Former CEO, Claxton Poultry), Jayson Penn (EVP Sales & Operations, Pilgrim's), Pete Martin (VP of Operations, Mar-Jac), Vernon Owenby (Plant Manager (Cumming, GA), Tyson), Steve Clever (VP of Fresh Sales, Wayne Farms), and Dale Tolbert (VP of Sales, Koch Foods).  Prior to November 10, 2016, the existence and conduct of this secret Georgia Dock Advisory Committee was not known to Plaintiffs.  In his 2016 memorandum, Mr. Schronce wrote "I have questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent.  I was told I could not make any changes without clearing them with the Advisory Board."

137.     USDA publishes a weekly report on poultry production and prices called the Broiler Market News Report ("USDA BMNR"), which until very recently included a reprint of the GDA's separately compiled Georgia Dock price.  According to the November 17, 2016, Washington Post article, the GDA stated that "a review process began in December 2015 after 'serious concerns' emerged" with the Georgia Dock price.  Sometime in the first half of 2016, the USDA began investigating how the Georgia Dock price survey was conducted.

138.     On July 19–20, 2016, high-level USDA officials met with GDA representatives in Atlanta, Georgia to discuss the Georgia Dock price.  The USDA officials shared their conclusion that GDA could no longer simply accept Broiler prices from Defendants without verification, and instead would have to verify invoice-level data to confirm reported prices.  On July 20–21, 2016,

USDA officials requested that the GDA provide the USDA with data from Broiler producers to "test and review" the Georgia Dock price for accuracy.

139. On July 22, 2016 USDA's weekly BMNR publication noted that beginning on August 5, 2016, GDA "will be issuing a new weekly market report for negotiated Georgia broiler/fryer whole birds and bird parts, which will replace the current [Georgia Dock price]." The GDA did not comply with USDA's August 5 deadline, however, and in the August 5 USDA BMNR all price information from the GDA and Georgia Dock was removed and only a hyperlink to the GDA's website was included.

140. During the weeks after the July 19–20 meeting with the USDA, the GDA coordinated closely with Defendants and the Georgia Poultry Federation—the Broiler industry's representative—to determine how to deal with the USDA's inquiry into the Georgia Dock price. Within the GDA, high-level officials began to raise antitrust concerns regarding the Georgia Dock. For instance, a July 27, 2016, report from GDA Director of Regulatory Compliance & Budget Alec Asbridge to GDA Commissioner Gary Black concluded that "[t]he top 10 poultry producing companies now control over 80% of the industry output. The combination of vertical integration, limited competition and lowered production periods has led to steady prices that have shown to be fairly resistant to changing market conditions. These factors alone illicit [sic] anti-trust review." (Emphasis added.)

141. GDA Director Asbridge's July 27, 2016, report also noted that over time, the GDA became a vehicle for Defendants to "report[] a weighted average price per pound on broilers [Georgia Dock price] based off of contracts that have been determined at the private level and reported without regulatory oversight. The formulas to calculate weighted average prices have been determined on the private level and have not been standardized since the inception of the

[GDA Poultry Market News division] in 1968, which there is no written record of." (emphasis added). In other words, it was Defendants themselves who wrote the rules and formulas that make up the Georgia Dock price, not the GDA.

142. Director Asbridge's July 27, 2016, report also concluded that "[t]he extent of the use of the [Georgia Dock price] in contract negotiations is presently unknown but inquiries made by media and other governmental entities indicate that it is utilized on a more regular basis than previously expected." (emphasis added). In short, the GDA had been publishing the Georgia Dock price for decades, but until the last few months, apparently did not know the scope of reliance on the Georgia Dock price. Notably, a revised and highly sanitized version of the July 27, 2016 report from Director Asbridge to GDA Commissioner Black was circulated internally at GDA on August 5, 2016. The sanitized August 5 report removed references to the existence of factors in the Broiler industry eliciting "antitrust review" and to the fact that the Georgia Dock price was reported for decades by GDA "without regulatory oversight."

143. On August 12, 2016, GDA Director Asbridge provided Georgia Poultry Federation President Mike Giles with the sanitized version of the report and asked Giles to review it before the GDA sent it to the USDA, "to ensure what I presented is accurate and best represents industry's concern with only reporting a spot price." As noted elsewhere in this Complaint, the Georgia Poultry Federation represents the poultry industry in Georgia, and most Defendants are members.[5] Remarkably, the GDA also noted in a separate email the same day to Giles and the Georgia Poultry Federation that "[t]he GDA is in agreement with the poultry industry that there is no desire to review invoices for verification of data reported," even though the information and means to do so are readily at hand—Defendants and their co-conspirators already report such invoice information

---

[5] *See* ¶ 354 below.

to Agri Stats on a daily basis. According to a subsequent email dated August 24, 2016, Georgia Poultry Federation President Giles called GDA Director Asbridge back and gave "his and industry's sign off on the dock price summary report. We can move forward with sending to USDA." GDA Director Asbridge also proposed another meeting between GDA and the Georgia Poultry Federation to discuss recommendations about verifying Georgia Dock data.

144.    On October 6, 2016, a USDA press release noted the expansion of its National Whole Broiler/Fryer report, which included new weekly price information regarding 2.5-to-3 pound Broilers that replaced the same weight Broiler previously reported by the Georgia Dock price. Importantly, the new USDA price roughly matched the Urner Barry price, suggesting that the Georgia Dock price continues to be subject to manipulation by Defendants and does not reflect actual market prices.

145.    In an email dated October 7, 2016, a GDA official reported to the USDA that it had not determined how to proceed with new verification procedures for the Georgia Dock price, as it was "cultivating multiple opinions on usefulness as well as playing with various algorithms."

146.    On November 3, 2016, the New York Times published the first account of the USDA's inquiry into the Georgia Dock, based on information received via Freedom of Information Act and open records requests for internal USDA and GDA documents. Subsequently, a November 8, 2016, article by the Washington Post provided additional detail on the inquiry, including a comment from the USDA that "they discontinued publishing the Georgia Dock price 'when data from the source report could not be independently verified.'" In the Washington Post article, Sanderson Farms CFO Mike Cockrell was quoted as saying "the Georgia Dock has come to be a trusted reflection of the supply and demand for retail stores." In a press release cited in a Bloomberg News article on November 17, 2016, Tyson stated that "[w]hen the Georgia

Department of Agriculture asks us for pricing data, we provide accurate information based on actual and recent transactions." Sanderson Farms' and Tyson's continued defense of the Georgia Dock price index as one that customers should trust shows that Defendants continue their efforts to conceal the conspiracy alleged in this Complaint.

### C. Agri Stats Conspired to Act as a Vehicle for Collusion, and to Facilitate the Monitoring, Adoption, and Enforcement of Defendants' Conspiracy.

147. Agri Stats consciously committed to a common scheme to restrain and stabilize the price and supply of Broilers. Agri Stats operated not just as a central clearing house for the Broiler conspirators, but also purposefully collected and re-circulated the Producer Defendants' competitively-sensitive data in a form (approved by Defendants) easily disaggregated by Producer Defendants and their respective plants.

148. The Producer Defendants then used this information to reach agreement on supply constraints to fix or raise prices, and Agri Stats and the Producer Defendants used this information to enforce the agreement among competitors. Agri Stats thus knowingly provided, and Defendants and their co-conspirator producers used Agri Stats as, both a method to collude and a mechanism by which to enforce the conspiracy.

149. According to a May 2010 study prepared for the National Chicken Council ("NCC"), Defendant Agri Stats, Inc. is a private company that generates Broiler industry data "considerably more detailed than [] USDA reports," including data on weighted average price, top-third average, bottom-third average, and volume traded on a daily, weekly, and monthly basis, and supply, sales volume by detailed product type and form, export, and pricing information for

whole and cut-up Broilers.[6]  The USDA and various other entities publish *aggregated* weekly, monthly, and annual supply and pricing information concerning the Broiler industry. But only Agri Stats provides Defendants and other producers information with sufficient detail for an informed subscriber to determine with reasonable accuracy producer-specific production, cost, and general efficiency data.  Agri Stats also collects from and reports back to Defendants and their Producer Co-Conspirators detailed statistics on almost every conceivable operating metric within the industry.

150.    Every Producer Defendant and Producer Co-Conspirator included in this complaint is known to participate in Agri Stats and provides and receives the detailed information described in this complaint.    Additionally, certain entities acquired by Defendants have previously participated in Agri Stats, including Cagle's, Inc., BC Natural Chicken, Peterson Farms, and Townsend's.

151.    Agri Stats has profited from collecting and reporting the Producer Defendants' and Producer Co-Conspirators' confidential business information, including by charging substantial fees of hundreds of thousands of dollars annually to each Defendant and Producer Co-Conspirator. Around March 2014, Agri Stats was acquired by the Eli Lilly Company, which has enabled Eli Lilly to sell drugs and vaccines to Broiler producers based on the information Eli Lilly obtains through Agri Stats about producers' operations.

152.    According to former Pilgrim's CEO Don Jackson, Agri Stats is "basically a [] third party accounting firm that companies [use] in their process."  Agri Stats claims its mission is to "[i]mprove the bottom line profitability for our participants by providing accurate and timely

---

[6] Because Agri Stats reports are not publicly available, *see, e.g.*, ¶¶ 169, 171, Plaintiffs' allegations regarding Agri Stats and its reports are upon information and belief, except as to the public statements alleged herein.

comparative data while preserving confidentiality of individual companies." Agri Stats describes itself as a "benchmarking" service, which it says "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance."

153. According to an expert witness for Pilgrim's in contract-farmer litigation against Pilgrim's, "[p]robably no one in the industry would know better than [Agri Stats economist] Mike Donahue [as to whether Broiler production increased in 2008] because EMI is the same company as AgriStats, which is the company that gathers operating statistics from virtually every company in the chicken industry. And they know definitively how many breeders are out there, how many pullets are out there, how many broilers are produced every week, and head count and pounds, everything else. They have massive amounts of statistics. And that's why they're so effective at reporting all of this [production information]."

154. Upon information and belief, in the wake of a $1.3 billion jury verdict in 2004 against Tyson for a conspiracy to manipulate pay to cattle farmers, increased fears of antitrust liability led Tyson to withdraw from Agri Stats. However, in or around January 2008, Tyson resumed its participation in Agri Stats.

155. Upon information and belief, certain Agri Stats reports list complex-level data for roughly 120 Broiler complexes and identify each complex with unique numbers, including identifying the sub-region of the data for each Broiler complex.

156. Agri Stats purports to maintain the confidentiality and anonymity of individual companies' data by providing each company a report identifying only that company's specific Broiler complexes by name, but not identifying by name other Broiler producers' complexes described in the report. For instance, in May 2008 Sanderson Farms CEO Joe Sanderson claimed "[w]e use Agri Stats, which some of you are probably familiar with. Agri Stats is a benchmarking

service that we submit data to. Almost everyone in our industry does as well. And we get the data back. It's anonymous – the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over the industry."

157.    However, upon information and belief, Agri Stats reports are so detailed that a reasonably informed producer can discern the identity of competitors' individual Broiler complexes, and it is common knowledge among producers that others can do so. For example, the specific type or size of a Broiler house, breed of chick, average bird size, and production levels listed in Agri Stats data for complexes allows an industry insider to identify each Defendant's individual Broiler complexes. Some Defendants refer to the task of determining the identity of individual competitor's data as "reverse engineering."

158.    Agri Stats reported information from so few producers, that certain regions clearly revealed the identity of participants. For example, on information and belief, the Pacific Northwest region of Agri Stats' reports (Region 10) is composed solely of Defendant Foster Farms' three complexes.

159.    Employees of some Defendants have conceded that they engage in reverse engineering. For example, asked in a recent deposition whether he knew which of his employer's competitors participated in Agri Stats, ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

160.    Likewise, Jay Moss, manager of "fresh strategy and analysis" for Defendant Wayne Farms, testified that ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

161.    In another example of reverse engineering, ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████



████  Sanderson, like other Defendants, then used this type of information to reverse-engineer the Agri Stats data. The following chart shows ██████████████████████



163.     Each Producer Defendant and Producer Co-Conspirator receives numerous types of Agri Stats reports, including separate targeted reports for each major area of operations, including but not limited to its breeding, hatching, hauling, feeding, processing, selling, and administration, which are regularly shared with area managers specifically dealing with those categories of information in their daily business.  Summaries of these separate Agri Stats reports are regularly provided to Producer Defendants' and Producer Co-Conspirators' senior executives. Within each report, unique information referring to supposedly "anonymous" data permits the Producer Defendants and Producer Co-Conspirators to identify their competitors' information contained within each category of report.

164.    As the Supreme Court long ago held in *American Column & Lumber Co. v. United States*,[7] "[g]enuine competitors do not make daily, weekly and monthly reports of the minutest details of their business to their rivals." The Defendants and co-conspirators here violated these very basic tenets. Broiler producers shared detailed information on a weekly basis with Agri Stats, including product mix, feed information, and processing information. On a monthly basis, Broiler producers shared payroll, bottom line, egg production, hatchery data, and information regarding flocks sold. Moreover, information provided by survey participants was not historical (based on data that was more than three months old). For example, one Processing Analysis report from Agri Stats dated June 2014 contained contemporaneous information through June 2014.

165.    Similarly, in some reports, Agri Stats shows ███████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████

166.    While some of Producer Defendants' and Producer Co-Conspirators' managers received the targeted reports for the specific aspects of Broiler operations for which they have responsibility, only the CEO, CFO, and a few other top executives at Producer Defendants and Producer Co-Conspirators are given access to Agri Stats' monthly "Bottom Line Report" that is geared to top-level executives at each company. The contents of the Bottom Line report are a closely guarded secret by company executives. The report contains one row for each Broiler company reporting to Agri Stats, then has columns for certain categories of information, such as operating profit dollars, profit percentage, corporate SG&A (aka overhead), interest expense, and other key operational information. While each company receives a report that only identifies by

---

[7] *American Column & Lumber Co. v. United States*, 257 U.S. 377 (1921).

name that particular company's "row" in the Bottom Line Report, top executives at each company know their competitors well enough to pick out recurring unique data points for other companies such that they are often able to identify competitors on the Bottom Line Report.  Furthermore, Tyson, Pilgrim, and Sanderson are public companies which report some aggregated data publicly, which top executives from other companies then can match up against the far more detailed information in the Bottom Line Report to help identify specific data from these companies.  In other instances, a company's interest-expense data in Agri Stats can be matched up against information already known about each Producer Defendant's and Producer Co-Conspirator's debt level.

167.    Even if a producer is unable to individually identify a specific competitor's data from the Bottom Line Report, Agri Stats' employees are able to confirm for Producer Defendants and Producer Co-Conspirators the data for a particular company at quarterly meetings with each company or at the numerous trade-association meetings where Agri Stats executives present on a regular basis.  For instance, Agri Stats provided a service to its Producer Defendants whereby each quarter Agri Stats would meet each Producer Defendant's and Producer Co-Conspirator's executives and make a detailed presentation about company and industry data.   At these presentations, Agri Stats would lead detailed discussions about industry profitability and the key factors that contribute thereto, including items such as size and average age of Broiler breeder flock, average hatchability of eggs, mortality rates, average bird rate, feed cost, and other performance factors based on data Producer Defendants and Producer Co-Conspirators provided.  At these presentations, Agri Stats would also lead discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and top and bottom third of the industry.  Agri Stats would also tell company executives how much the industry

was over- or undersupplying the market, indicate its estimate of demand, and share other information based on the data Defendants provided. At such meetings, Agri Stats would often be asked to confirm the identity of a particular competitor in an Agri Stats report, which it could do more subtly during the Q&A portion of the meeting. Further, since Agri Stats travelled between each Producer Defendant and Producer Co-Conspirator regularly and discussed each Producer Defendant's and Producer Co-Conspirator's non-public, proprietary data, Agri Stats was in a unique position to share information among its Producer Defendants and Producer Co-Conspirators.

168. Agri Stats reports are not publicly available because Agri Stats, its Producer Defendants, and Producer Co-Conspirators permit only participating Broiler producers to receive the reports. Accordingly, there is little publicly available information about even the *categories* of information contained in the lengthy weekly and monthly reports each Broiler producer receives. For instance, in response to a request for production of Agri Stats reports by the State of Oklahoma in litigation involving environmental issues, George's Inc. responded that Agri Stats "information is proprietary, privileged and is also confidential business/financial information not subject to disclosure." Nevertheless, despite this response, the National Chicken Council has ready access to Agri Stats data summaries and relies on them for its studies and publications.

169. Upon information and belief, Agri Stats' survey methodology involves direct electronic data submissions on a daily, weekly, and monthly basis of financial, production, capacity, cost, and numerous other categories of information by each Broiler producer. At each of Defendants' and Producer Co-Conspirators' Broiler complexes, at least one employee is responsible for submitting its data to Agri Stats. Agri Stats relies upon a detailed audit process to

verify the accuracy of data from each complex, sometimes directly contacting Producer Defendants and Producer Co-Conspirators to verify data.

170.    While Agri Stats reports are a closely guarded secret by Defendants and Producer Co-Conspirators, based on a handful of public comments by Defendants' and Producer Co-Conspirators' senior executives and other information, and after an extensive investigation, Plaintiffs believe and allege that Agri Stats reports include at a minimum the following categories of information:

A.    Name of genetics company used for primary breeder stock;

B.    Hatchery capacity, costs, and age of Broiler breeder flocks;

C.    Feed Manufacturing, Delivery, and Formulation data, including corn and soybean meal costs;

D.    Growout information for Broiler "flocks" provided to contract farmers, including the number of Broilers placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (aka, "down time"), feed conversion rate (pounds of feed per pound of Broiler), average daily weight gain by chicks, live pounds produced per square foot of grower house, grower compensation, including average grower payment in cents per pound and cents per square foot, breed composition of flock (breed or cross-breed of flocks), detailed information on numerous mechanical aspects of Broiler housing, and numerous other detailed cost, mortality, and operational information about disease, transportation, labor, and other growout related information;

E.    Slaughter, processing, and further processing information, including pay for processing plant workers, total production volume, market age of Broilers at slaughter, weight of Broilers at slaughter, birds per man hour, processing line speeds, and labor hours per pound;

F.    Inventory levels of Broilers;

G.    Sales data for finished product form and type, such as type of cut (whole bird, cut-up, deboned), various packaging forms (such as bulk, tray pack, etc.), and data segmented into various categories (such as exports, retail, foodservice, etc.); and

H.    Financial information, such as monthly operating profit per live pound, sales per live pound, and cost per live pound.

171.    Defendants and Producer Co-Conspirators rarely mention their "proprietary, privileged, and confidential" exchange of information with one another through Agri Stats. However, on a very small number of occasions, Broiler producers (primarily Sanderson Farms) have referenced Agri Stats information on earnings calls or in public statements.  For instance:

A.    Sanderson Farms reported in May 2008 that "every year we review our operations and every facet within Agristats… we set operational goals every year . . . and [we] try to improve our operations within this benchmarking service we call Agristats."

B.    Sanderson Farms CEO Joe Sanderson commented on a December 2009 earnings call that "my judgment is that based on what I see in Agr[i] stats nobody is planning on, pullet placements say no ramp up and what I've gleaned from Agr[i] stats, people are not planning on ramping up. I see a lot of information from Agr[i] stats that tells me that nobody is going to ramp up."

C.    Sanderson Farms CEO Joe Sanderson commented in a May 2011 earnings call that "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats."  Asked later on the call by an analyst why he had said on the call and a few months earlier that he "feel[s] confident that we are going to see cutbacks" based on Agri Stats data, Sanderson indicated "industry participants expected that [the market would improve in June and July] and I think they wanted to carry their production into June and July and see if the market would reward them for that it appears right now. . . . And then once you get past July 4 . . . I think then you will start seeing reduced egg sets. . . . Typically in my experience the first cut is not enough and you go back and look at 2008, I think the industry started cutting back maybe in June and that cut back was not enough and then they made another cut in the late fall and I believe the industry became profitable in January."

D.    At a May 19, 2010 BMO Conference, Tyson compared its operating profit per live pound statistic from Agri Stats against what it said were the total of 121 plants in the Agri Stats survey.

E.    Tyson Foods noted in a December 2014 investor presentation that "[t]he point being is that when you talk about the chicken cycle, most people will look at the cyclicality. It's very profitable right now. And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack. We can tell that through Agri Stats.  Now at the same time, when there is more

poultry available and the industry may not be as profitable, we would not expect to be anywhere close to what the bottom of that cycle would be."

172.     Similar to its Producer Defendants and Producer Co-Conspirators, Agri Stats on occasion refers to the secret exchange of information it facilitates among Defendants and Producer Co-Conspirators. In many instances, Agri Stats has played the role of industry cheerleader rather than industry benchmarking service, with Agri Stats suggesting specifically how much Broiler production should be cut based on Agri Stats data.

A.     In July 2012 trial testimony in a contract-farmer lawsuit against Pilgrim's, testimony revealed that a November 2008 Agri Stats report "made statements to the effect that it thought the industry was 5-percent oversupplied . . . relative . . . to demand."

B.     Agri Stats holds regular "poultry outlook conferences" for meat-industry executives. For instance, Agri Stats hosted an April 23, 2015, conference in Atlanta, Georgia for which an agenda indicated a presentation by Agri Stats Vice President Sue Trudell would be provided concerning the "broiler market situation and outlook" and an analysis of feed and macroeconomic factors. Such presentations are restricted from circulation outside the invited participants in EMI's poultry outlook conference and are not publicly available.

C.     Defendant Sanderson Farms invites Agri Stats employees to present about the industry to Sanderson's own investors, such as an October 18, 2013, presentation by Agri Stats Vice President Sue Trudell.

D.     In January 2009, Agri Stats Vice President Mike Donohue commented that "We [i.e., Broiler producers] are an industry that is in demand . . . . We have a product that people want and continue to consume." (emphasis added).

E.     Agri Stats subsidiary EMI also holds regular invitation-only "Analytics Web Conference" calls.

F.     Agri Stats Vice President Donohue also frequently appears at industry events, such as the Spring 2011 IPE conference. Donohue provided comments as part of an annual "market intelligence" forum about various industry performance metrics. Additionally, Donohue's co-panelist, Broiler industry insider Paul Aho, explicitly suggested "[t]he market is calling for around a 5% reduction in chicken production" in order for producers to achieve higher prices in 2011.

G.    Donohue also authors articles for the Agri Stats publication EMI Vital Signs. For instance, the sole "sample" publication available on EMI's website is a May 2013 article in EMI Vital Signs by Donohue, which analyzes whether Broiler producers could continue to achieve high profit levels. Donohue carefully analyzed Agri Stats data concerning pricing, inventory, and production levels, ultimately concluding "[w]hen supply and demand factors are in good shape the industry can get a good return on investment and for the short and medium term it appears that there is certainly room for optimism in these factors."

H.    Donohue helps forecast supply and demand for the Broiler industry by using Agri Stats data on breeder placements and inventory. For instance, at the US Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, Donohue noted that chicken breast prices were at a particularly high level and "[i]t's not just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012," he said. "I hope this carries over into the latter half of 2012 based on some of the production forecasts that can be made based on breeder placements and inventories." Donohue also noted a concern that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recover[y] in the short term by filing up incubators again," but noted that Agri Stats data indicates the industry is slaughtering breeder flocks at 59 to 60 weeks (instead of the typical 65 weeks), which suggested to him the industry was managing its production carefully.

I.    

173.    Parts of Agri Stats reports have entered the public record in other ways as well. One such instance is a presentation by Dr. Steve Bolen, an executive with Cobb-Vantress, a bird genetics company wholly owned by Tyson Foods, Inc. Below is a single Agri Stats page that was made available by Dr. Bolen in a presentation:

## Agristats Boneless Breast Yield



Jun 2, 2014 - 13:39     BONELESS BREAST W/O SKIN YIELD - ADJ FOR CONDIMENTS     Page: 3.8-1

*(Agri Stats report table — numerical data illegible)*

Jun 2, 2014 - 13:39     BONELESS BREAST W/O SKIN YIELD - ADJ FOR CONDIMENTS     Book Page: 138

174. Each line in the above table is for a broiler production complex, which is a small geographic area, with all production facilities typically located within a 50-mile radius of a broiler company's feed mill and processing plant. The above table is for a single month – March 2014. The report provides the various yields of the lines of Defendants' facilities for various cuts of meat (breast, fillets and tenders). This table illustrates the incredible detail of the Agri Stats reports.

175. One Broiler industry expert testified in a contract-farmer case that the sharing of information through Agri Stats by Broiler producers regarding pay for contract-farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern." This conclusion is important because besides Agri Stats' Co-Defendants, their agents, and their Producer Co-

59

Conspirators, only expert witnesses and court-approved advisors in a handful of previous litigation have even *seen* an actual Agri Stats reports, but such individuals are expressly prohibited from publicly releasing or discussing such reports by the terms of protective orders Defendants and Producer Co-Conspirators require before producing Agri Stats reports in discovery. The same expert also remarked that Agri Stats was unusual even among other price surveys, noting "[t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue. Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive. As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry. An intensive inquiry is needed."

176. Through discovery in the *Broiler Chicken Antitrust Litigation*, it is now apparent that Defendants often exchanged Agri Stats information directly with one another. For instance,



177. There is no plausible, non-conspiratorial justification for Producer Defendants and Producer Co-Conspirators to use Agri Stats to secretly share highly confidential and proprietary information about their pricing, capacity, production, and costs at the level of detail at which they do. In a competitive market, such proprietary, competitively sensitive information would be a

closely guarded secret. Economic theory suggests that the routine exchange among competitors of such sensitive internal company information reduces the intensity of competition.

178.     The FTC's and DOJ's 2000 Guidelines For Collaborations Among Competitors ("FTC/DOJ Guidelines"), and presentations by FTC attorneys, suggest that the scheme involving Agri Stats is far outside the scope of permissible information-sharing among competitors. For example:

A.     The FTC/DOJ Guidelines note the high risk of antitrust issues for information sharing programs in industries with a history of collusion.

B.     The more competitively sensitive the information being shared, the higher the antitrust concern for such information sharing. Upon information and belief, the weekly and monthly Agri Stats reports include dozens of categories of detailed information that in a competitive industry would be considered trade secrets. Therefore, the competitive sensitivity of Agri Stats reports suggests a particularly high level of antitrust concern.

C.     The older or more historical the information being shared, the less concern the FTC and DOJ have with information collaborations. However, Agri Stats reports are issued weekly and/or monthly, and its EMI reports are issued daily, so as to provide nearly current production, sales, and other data to Defendants. Moreover, the nature of Broiler breeder flocks is that they predict future Broiler supply, so by sharing such information in a way that permits company-by-company identification, Defendants are in fact sharing future anticipated production information with one another, which clearly suggests high antitrust concern under the FTC/DOJ Guidelines.

D.     The FTC/DOJ Guidelines also provide a "safety zone" (i.e., presumptively permissible) for collaborations among competitors that account for no more than 20 percent of each relevant market in which competition may be affected, but Defendants account for approximately 90-95% of Broiler production.

## D.     Defendants Coordinated Production Cuts To Stabilize And Then Increase The Price Of Broilers From 2008-2012, Then Continued Depressing Broiler Supply To Maintain Artificially High Prices.

179.     As alleged in this Complaint, Defendants engaged in a conspiracy to fix, raise, stabilize, and maintain the price of Broilers throughout the Class Period. Defendants' acts, practices, and course of conduct in furtherance of their conspiracy evolved over time and included

but were not limited to the following: engaging in continuous communications on confidential and proprietary business matters to eliminate price competition; allocating market shares; restricting supply of Broilers; using input costs and other events as a pretext for industry-wide production cuts; manipulating one or more publicly reported Broiler price indices; and concocting mechanisms to nullify competitive sales processes to their customers. Examples of Defendants' conduct are described in detail below.

180. In 2008, Pilgrim's retained consultant Bain & Company to analyze its business operations. Bain outlined a strategy for Pilgrim's to help reshape the dynamic of the Broiler industry. The Bain plan suggested that Pilgrim's management needed to take action to reduce supply in the Broiler industry, similar to other industries which in the then-recent past had been able to restrict production and increase prices.

181. Defendants adopted the euphemism "capacity discipline" or simply "discipline" to refer to their agreement to limit Broiler production. The key to "production discipline" and "capacity discipline" is widespread participation by the industry. Broiler companies will not reap outsized profits if only one or a few Broiler companies exercise discipline by cutting production. Put differently, if a single Broiler company reduces Broiler capacity, there is no guarantee that competitors will do the same, and therefore the company acting alone has simply ceded market share to its competitors. However, if other Broiler companies similarly exercise discipline and reduce capacity and production, Broiler purchasers will be faced with resulting higher prices, which they will have no choice but to pay. The alternative – to not purchase Broilers – is not an option for most of Defendants' customers.

182. Thus, exercising capacity discipline will only benefit a Broiler company if it knows or is reasonably sure that its competitors will do likewise. Absent such assurance, it would be

against each Broiler company's independent self-interest to cut capacity and production. In Defendants' case, their shared commitment to capacity discipline was made feasible and rational by their knowledge that each had agreed to engage in the same capacity limitations. As explained in this complaint, Defendants repeatedly confirmed to each other that they remained committed to this agreement by publicly (and privately) discussing their plans to continue exercising "capacity discipline," so long as others did the same.

183. Broiler producers have several mechanisms to reduce the supply of Broilers. Given Broiler producers' vertical integration and control of breeder farms, hatcheries, growout farms, and slaughter houses, they have several methods to manipulate supply, including the following:

> A. Reduce the size of Broiler breeder flocks through two measures: (1) retire and kill off Broiler breeders at an earlier age than would normally be the optimum age for doing so and/or (2) reducing purchases of Breeder pullets from genetics companies that supply them. Such reductions in Broiler breeder flock purchases by Broiler companies effectively forces genetics companies to in turn reduce their own stocks of parent and grandparent Broiler breeders (the one from which broiler company pullets are supplied). Such reductions by the genetics companies extend into a period of years the time it takes to materially increase the supplies of Broilers.

> B. Reduce "egg sets" or "egg placements" (i.e., number of eggs placed in incubators) by destroying such eggs and selling them to a rendering plant, which causes a reduction in production within roughly 7 weeks, but this does not reduce the size of Broiler breeder flock itself and does not prevent a producer from being able to ramp up production in the short or medium term should it subsequently decide it wants to quickly ramp up production;

> C. "Break eggs" at hatcheries by destroying the eggs prior to setting them in incubators;

> D. Pull (i.e., destroy) eggs already set in incubators sometime before the 21 days necessary for eggs to hatch;

> E. Destroy newly hatched chicks at hatcheries before delivery to farmers for grow-out;

> F. Reduce the number or health of chicks delivered to contract farmers for grow-out, including by manipulation of the genetics of chicks or providing

an inferior type of Broiler to farmers for grow-out of Broilers into mature Broilers;

G. Extend the period of time between pickup of mature Broilers for slaughter and delivery of new chicks to contract-farmers for grow-out (a/k/a, "days between flocks");

H. Reduce the size of birds at slaughter, including by slaughtering birds before they reach full maturity or weight;

I. Slow down, temporarily close, or permanently close Broiler processing plants; and

J. Export hatching eggs and/or day-old chicks outside the United States.

184. Historically, when Broiler producers "cut production," they did so through short-term cuts that targeted the end of the supply chain, such as slaughtering Broilers early, destroying eggs before incubation, killing newly hatched chicks before delivery to contract farmers, and/or increasing the days between flocks delivered to contract farmers. Broiler companies historically did not cut their Broiler breeder flocks (except for normal seasonal variations), however, because doing so would leave a producer unable to ramp up production in the short or medium term should market conditions improve.

185. With respect to the *type* of production cuts used by Broiler producers, the period from 2008 through the present is characterized by both traditional production cuts (short-term in nature), as well as by unprecedented reductions in Broiler breeder flocks by Broiler producers. As discussed below, Broiler producers made substantial and unprecedented cuts to Broiler breeder flocks in 2008 and 2011 that prevented them from being able to meaningfully increase supply for years to follow.

### 1. *Pre-Class Period Events.*

186. In 2007, the two largest Broiler producers, Pilgrim's and Tyson, reduced their production of Broilers, but only a few other Broiler producers followed their lead, namely Foster Farms (4.8% reduction in Ready-to-Cook ("RTC") pounds), Peco Foods (5.4% reduction in RTC

pounds), and Perdue (unspecified cuts).  However, cuts by only five industry participants were not enough to affect industry supply sufficient to increase prices meaningfully.  Industry publications noted that oversupply of Broilers was due to overproduction by Sanderson Farms, Mountaire Farms, and House of Raeford Farms.  Due to the resulting oversupply of Broilers, prices fell in late 2007 and into early 2008.  In addition, production cuts in 2007 followed the typical pattern of focusing on short-term reductions in production, such as slaughtering Broilers early, but not on longer-term cuts to Broiler breeder flocks.

187.    The failure of the 2007 shorter-term production cuts to raise prices made Tyson and Pilgrim's realize that their unilateral supply cuts would never be enough to raise industry prices without a broader industry supply cut by most of their competitors, and further, that cuts that did not reduce Broiler breeder flocks left the industry vulnerable to near-term increases in supply. Tyson and Pilgrim's realized that by making cuts that were not followed by their smaller competitors, they were essentially giving away market share to those competitors.

### 2.    2008-2009 Production Cuts.

188.    On January 23-25, 2008, Defendants attended the IPE conference in Atlanta, Georgia.  According to the IPE, attendees representing over 99.4% of the production of the major Broiler companies participated in the IPE.  Numerous employees from Defendants attended the conference, including Defendants' senior executives.

189.    On a January 28, 2008, earnings call, Tyson CEO Dick Bond declared bluntly "we have no choice [but] to raise prices substantially."  However, the commodity nature of Broilers does not allow one producer to successfully raise market prices in the absence of widespread reductions in supply relative to the then-current demand, so Bond's comment does not make sense absent an intention (or knowledge) on his part that Defendants would coordinate a reduction in supply across the Broiler industry.  After learning in 2007 that its production cuts alone could not

force up industry prices, Tyson also sent a clear message to its co-Defendants and co-conspirators: we are not making production cuts until you do.

190.    In response, Pilgrim's issued a call to action for its competitors to reduce their production of Broilers to allow prices to recover.  On a January 29, 2008, earnings call, Pilgrim's CFO Rick Cogdill said the industry was oversupplying Broilers and it was hurting market prices. Cogdill explained that his company had done its part in 2007 by reducing production 5%, so "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."  During the call, Cogdill went on to explain that Pilgrim's alone could not reduce supply enough to help market prices recover and its past efforts to reduce supply had merely led to smaller players increasing their market share at Pilgrim's expense.  Cogdill went even further in describing specifically how he thought the industry needed to coordinate production cuts in order to drive up market pricing, including making the following statements urging Pilgrim's competitors to do their part in reducing Broiler industry supplies:

A.    "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs.  We were the leader in cutting production last year to help drive that. . . . [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price."

B.    When asked by an analyst "do you have an estimate internally of what the state of oversupply in the industry might be?  What you would hope to see cut from others that would make you feel like the industry was more rational?" Pilgrim's CFO Cogdill replied "It's really hard to say that the faster we get to production adjustment the quicker the recovery could happen . . . . And if the industry doesn't react soon enough it will have to react stronger in the end."

C.    "[W]e have walked away from sales in certain cases, where the pricing just did not make any sense.  So we are trying to hold the line.  We are losing at times the competitive bids . . . . So we are trying to take a leadership position from a pricing perspective."

D.    JP Morgan analyst Pablo Zuanic asked "[D]o you and Tyson have the evidence that your production call backs lead to significant price

improvements last year[?]....Clearly, there are more producers who are not following you.  On my mask [sic], according to USDA, the industry was up 5% in the December quarter....So, it means that the rest of the industry was up about 9% in the December quarter.  So there is evidence that rest of the industry is not following you.  You guys are the leaders.  You know that this worked last year. . . . Is it just that last year we did it for the industry, and they didn't follow and now it's their turn?"  In response, CFO Cogdill noted, "I think you kind of hit on it there. . . . It's not like we had 5% of surplus capacity that we could just reduce our operations and not feel that . . . I mean we cannot be the ones that are out there continually reducing production, and let the other producers capitalize on that.  I mean if it's 5% last year, 5% this year, 5% next year, you can see that that's a spiral to the demise of our company, which we are not willing to accept."

191.    On a January 31, 2008, earnings call, Sanderson Farms CEO Joe Sanderson explained that he anticipated the industry would cut production.  Asked about Broiler industry cuts by an analyst, Sanderson replied "we could see some reductions in production."  Asked to expand on his comments by another analyst, CEO Sanderson said he thought a production cut was "probable" and "if it's bad and ugly and deep in February, March and April, you'll see the production cuts take place during that period of time.  There's still 25% of the industry still making money but I would expect to see those reductions come over the next 90 to 120 days."  Upon information and belief, CEO Sanderson's basis for the statement that "25% of the industry [was] still making money" was through the secret sharing of information by Defendants through Agri Stats.

192.    Around March 4, 2008, senior executives from Defendants met at an Executive Committee meeting of the National Chicken Council's Board of Directors including Pilgrim's CEO Clint Rivers, Tyson Senior VP Donnie Smith, Fieldale Farms President Thomas Hensley, Amick President and CEO Ben Harrison, and Case Foods CEO Tom Shelton.

193.    Only a month and a half after installing its new CEO, Pilgrim's again led the charge to cut overall industry supplies, but this time it backed up its rhetoric with production cuts.  On

March 12, 2008, Pilgrim's announced a massive closure of its Broiler processing plants.  Just five days after taking over the position of Pilgrim's CEO, Clint Rivers, publicly announced the closure of seven Broiler facilities in order to reduce industry oversupply, stating "we believe [these] actions . . . are absolutely necessary to help bring supply and demand into better balance . . . . That portion of the demand for our products that exists solely at pricing levels below the cost of production is no longer a demand that this *industry* can continue to supply." (emphasis added).

194.    Normal supply and demand would suggest that in the wake of massive supply cuts by Pilgrim's, other Broiler producers would jump into the massive gap in supply that Pilgrim's closures left.  However, just the opposite occurred.  Following Pilgrim's announcement, a series of production cuts were publicly announced by other Defendants between April 3 and April 11, 2008.

A.    On April 3, 2008, Fieldale Farms announced a 5% production cut.  In connection with the cut, Executive Vice President Thomas Hensley commented that Fieldale has had trouble passing on cost increases to both foodservice and retail customers. "Every time we try [to increase prices], one of our competitors comes in with a price lower than our previous price," Hensley said. Fieldale, which has been absorbing feed-cost increases, hopes its move will help ease continuing price pressure. "We can't sell [some of] the chickens at a price higher than the cost," Hensley said. "We're hoping this cut puts supply and demand back into better balance."

B.    On April 3, 2008, Amick Farms 

C.    On April 9, 2008, Simmons Foods announced a 6% reduction in production throughout its processing plants.  Simmons Prepared Foods President David Jackson said in a press release that "[r]ecent U.S. chicken market price

levels have not allowed processors to recover the spiraling costs of corn and soy meal. . . . This increased cost burden has yet to be reflected in domestic poultry prices." BMO Capital Markets analyst Kenneth Zaslow welcomed Simmons' production cut, saying in a note to investors that production cuts across smaller companies in the Broiler industry would be positive for Broiler prices. On April 9, 2008, BMO Capital Markets analyst Kenneth Zaslow welcomed Simmons' production cut, saying in a note to investors that production cuts across smaller companies in the Broiler industry would be positive for Broiler prices.

D.  On April 10, 2008, Cagle's Inc. announced a 4% reduction in processing of Broilers. According to a press release from Cagle's President and CEO, Doug Cagle, "[c]urrent chicken prices have failed to reflect the tremendous increase in the cost of feed. Ingredient prices, mostly corn and soybean meal, have increased over 80 percent in the last two years raising the cost to produce chicken by more than $.17 a pound. These are unprecedented times and given current USDA forecasts it appears that high feed costs are here for the foreseeable future. The cut back in production will not effect [sic] our customers with existing commitments but will reduce product being sold through less profitable commodity outlets."

E.  Between April 3-11, 2008, Wayne Farms, O.K. Foods, and Koch Foods each announced 2-8% reductions in production.

F.  A number of other Broiler companies cut their production between April 1, 2008 and May 28, 2008, but did not publicly announce those cuts. Instead, these Broiler companies communicated such cuts to their co-conspirators through Agri Stats and/or other means of communication. For instance, at his BMO Capital Markets Conference presentation on May 28, 2008, Sanderson Farms CEO Joe Sanderson stated that "we have seen for the last 6 or 7 weeks . . . some companies in our industry announce cutbacks. There have been I think six companies have announced cutbacks. I know some companies have cut back and have not announced." Such knowledge of non-public production cuts by competitors is highly suggestive of secret communication among Broiler companies.

195.  After witnessing a steady stream of its competitors close production capacity between April 3 and 11, Pilgrim's saw that other industry participants were contributing to reducing industry supply. Pilgrim's decided it could now take further steps to reduce industry supply.

196.    On April 11, 2008, Pilgrim's suggested it might close its large El Dorado, Arkansas processing plant, which employed 1,620 workers.

197.    On April 14, 2008, Pilgrim's announced a further production cut of 5% of egg sets.

198.    On April 29, 2008, Tyson CEO Dick Bond described the change in the industry in response to an analyst question, noting "[y]ou are right. I think the industry has changed. Diane, I don't think the industry will be up that much anymore, we have seen some sizable declines here lately in egg sets and placements. So, we're going to be up a little bit but probably not a significant amount, not as much as we might have once anticipated."

199.    Despite the large number of coordinated production cuts announced by producers in April 2008, Pilgrim's concluded these cuts were not sufficient.  Therefore, Pilgrim's CEO Clint Rivers encouraged further action by the industry at a May 15, 2008, speech at the BMO Capital Markets Third Annual Ag & Protein Conference, which was attended by Sanderson Farms CEO Joe Sanderson and CFO Mike Cockrell, Tyson CEO Richard Bond, and Pilgrim's CFO Richard Cogdill.  CEO Rivers announced that he hoped to see the Broiler industry continue to cut production to help the industry return to profitability, stating that "he would like the industry to trim total production by 3%-4%, calling it a prudent move in light of recent price volatility in the grain markets."  He also noted that "[t]he cuts need to be fairly deep."

200.    A May 21, 2008, Wall Street Journal article noted that conditions in the industry were starting to change.  "Three things are making analysts more optimistic: Companies are cutting production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines."  The article also noted "[i]t is unusual for egg sets to decline at this time of year."  The reason such a reduction was unusual in May is that egg sets result in Broilers that are ready for market approximately 10 weeks later,

which in this case would have been first week of August, and is still the peak of the high-demand summer grilling season.

201.     During an earnings call on May 22, 2008, Sanderson Farms CEO Joe Sanderson was asked if he thought industry cuts were sufficient to keep the industry profitable in the fall.  In response, Sanderson noted, "[w]e don't know yet.  We will make a cut as we always do after Labor Day.  We will make a 4-5% cut following Labor Day as we always do going into Thanksgiving, Christmas, and January we reduce our egg sets and around Thanksgiving, Christmas, New Years and Martin Luther King. That is a period of slow demand for us, and we don't announce that, but we always do it.  It is just a period when we take downdays and we will do that.  But if we think more is needed, we will evaluate that sometime in August, and if need be will do it.  We cut back in 2006, we cut back in '97-98.  I don't know if we announced it or not, but we will do what we need to do."  Sanderson provided no explanation why it was choosing to publicly disclose its "regular" production cut if it had never done so in the past.

202.     Six days later, on May 28, 2008, CEO Sanderson attended the BMO Capital Markets Conference Presentation.  One or more of Sanderson Farms' competitors attended the same conference.  Sanderson explained to the attendees that the company tracks egg set data closely and it had observed many companies cutting production "for the last 6 or 7 weeks."

203.     In early June 2008, Pilgrim's CEO Clint Rivers continued to keep up the drumbeat for further production cuts, noting in a June 4, 2008, presentation that "[o]ur supply in chicken, we are oversupply . . . we need to see some balance in the supply. . . . Simply put, at this time there is still too much breast meat available to drive market pricing significantly higher."

204.     Other CEOs picked up on Pilgrim's call for further action.  A few weeks later on June 19, 2008, Broiler industry executives participated in a media conference call intended to

lobby the federal government to limit the ethanol subsidy. According to one report, Mark Hickman, Chairman of the National Chicken Council and CEO of Peco Foods, told participants that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year. 'We are hearing talk that this was not nearly enough, so liquidation is in round two.'" Upon information and belief, "liquidation" is a reference to the need for Defendants' decision to reduce Broiler breeder flocks to affect longer-term supply restraint in the industry, rather than mere short-term production cuts like breaking eggs or slaughtering Broilers earlier to reduce weight.

205. As noted above, Agri Stats' subsidiary EMI issues regular reports to its clients, which are not publicly available. However, EMI's website currently has available a "sample" report available from June 20, 2008. The sample report notes that "[b]eginning in April [2008], the weekly hatchery data started to show declines in egg sets and chick placements relative to year-earlier, which confirms the announced intentions to reduce Broiler production and will result in slaughter falling below year-ago by mid June." The same report also notes that "[i]t is unclear how long the slaughter declines will continue, and if other companies will choose to cut production as well making them deeper than initially thought. Those who have announced cutbacks indicate they will continue until margins normalize. At this time we expect to see the declines continue until at least late 2009, and cuts could be deeper than now projected."

206. Three days later, on June 23, 2008, Wayne Farms announced an additional 6% production cut. Wayne Farms President & CEO Elton Maddox said in a statement that "[s]oaring feed ingredient costs aggravated by the government's food for fuel mandate has created the need for us to rationalize our business." Like many other executives, Maddox cited ethanol subsidies as the reason for the production cuts. Wayne Farms' announcement came only three days after

Agri Stats suggested further cuts were needed and four days after Peco Foods CEO Hickman suggested further cuts were needed.

207.     On June 23-25, 2008, USPOULTRY held its annual Financial Management Seminar.  Defendants' senior executives attended the seminar.

208.     On July 2, 2008, Foster Farms announced it was abandoning plans to build a new Broiler plant in northeastern Colorado that it had previously announced in April 2008 would employ about 1,000 people.  In a statement, Foster Farms CEO Don Jackson noted "[i]n these difficult conditions with costs escalating primarily due to grain and fuel prices and chicken prices lagging it does not make economic sense to go forward with expansion at this time."

209.     On July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets, citing "record high prices for corn and soybean meal, which it attributes to the U.S. government's mandated ethanol policies along with recent flooding in the Midwest 'Corn Belt' region."

210.     On July 20-22, 2008, the National Chicken Council held a three-day "Chicken Marketing Seminar" attended by Defendants' senior executives.  The event was billed as a marketing seminar that "includes social networking events and recreational opportunities, including a golf tournament."

211.     On July 31, 2008, Tyson cancelled a contract with Petit Jean Poultry for the processing of Broilers at Petit's Buffalo, Missouri plant.  Tyson subsequently told the City of Buffalo that no amount of incentives could convince it to renew its contract with Petit.

212.     On August 11, 2008, Pilgrim's announced the closure of its Clinton, Arkansas, processing plant and a further processing facility in Bossier City, Louisiana.[8]  Pilgrim's press

---

[8] "Further processing plants" are facilities that process whole or cut-up Broilers into products for end users, such as chicken nuggets.  Notably, further processing plants alone are not a bottleneck

release noted the closures "are part of the company's ongoing effort to operate more efficiently and return to profitability amid high feed costs and an oversupply of chicken on the market." The closure of the Clinton processing plant represented an additional 1.25% incremental increase of the company's previously announced production cuts. Pilgrim's stated that it would keep both plants idled until "industry margins can be sustained at more normalized levels of profitability." Pilgrim's also noted that "[w]ith Labor Day approaching and no indication that the actions taken to date by Pilgrim's Pride or other industry members are having a positive effect on selling prices for our products, it is now clear that more significant decisive action is necessary."

213.    In August 2008, House of Raeford announced that it would begin reducing its Broiler production by 5%. The company said in a statement that "[t]he current obstacles that face our industry require that supply be brought in line with demand." A production cutback was remarkable for House of Raeford, which had pursued a strategy of aggressive production growth that resulted in the company doubling its Broiler production from 2001 to 2007.

214.    On an August 26, 2008, earnings call, Sanderson Farms CEO Joe Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand." When asked later whether the industry had already made enough production cuts, he noted "we kind of thought we were going to see reductions in July . . . [based on] 213/214 [million] eggs sets back in April and that really did not materialize. When you look at USDA slaughter numbers in July, they were 100% and 101% and now we're looking at

---

for the supply of Broilers and were not the focus of Defendants' coordination to reduce and restrict Broiler supplies as alleged herein. During the Class Period, some Defendants have increased the amount of further processing they perform internally in order to capture profits that had previously been earned by third party further processors who purchased unprocessed Broilers from Defendants. A few further processing plant closures are noted in this Complaint where they were closed in conjunction with processing plants.

egg sets of 206 and 207 million that are going to show up sometime in October or November. We'll see when we get there. Those are barely impressive cuts. My suspicion is, as I've told you in May, the industry typically make the cut [sic] and it's tentative. We'll have to see if it works. . . . I'm very skeptical that those cuts are going to be enough to return us margins to cover these grain costs."

215.    On September 23, 2008, Pilgrim's announced the layoff of 100 employees at its El Dorado, Arkansas processing plant.

216.    By September 2008, Broiler industry publication Watts PoultryUSA reported that "[m]ost U.S. broiler integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'"

217.    On October 3, 2008, Defendants' senior executives attended the National Chicken Council's Annual Meeting. Agri Stats CEO Bill Snyder moderated a CEO panel that included Pilgrim's, Tyson's, Perdue's, and Sanderson Farms' CEOs. Explaining Pilgrim's desire to push through an industry-wide price increase, Pilgrim's CEO Clint Rivers told panel members and the audience "[w]e need to get those [input] costs pushed through, but we've yet to see that happen."

218.    On October 10, 2008, Pilgrim's gave an interview to the Associated Press regarding a USDA report of falling egg sets in the Broiler industry. Spokesman Gary Rhodes noted that "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

219.    During Fall 2008, Sanderson Farms also implemented its previously announced "fall cuts" a month early and delayed the opening of a new deboning facility.

220.    On October 18, 2008, Wayne Farms President & CEO Elton Maddox released a statement announcing the closure of the company's College Park, Georgia plant, resulting in the layoff of over 600 employees.  Maddox cited "changing market conditions" and a need to "maximize efficiencies" as justification for the plant closure.

221.    On a November 10, 2008, Tyson earnings call, CEO Dick Bond claimed that Tyson would not be making additional production cuts because it had already done its part to reduce industry supply with prior production cuts in 2007 and earlier.  However, D.A. Davidson & Co. analyst Tim Ramey asked "Dick, a year ago you talked about price encourage [sic] then I was out with Donnie Smith four five months ago, you guys talked about well we're not going to be the one to cut."  Tyson didn't respond directly, but cited Tyson's attention to "supply and demand."

222.    On November 12, 2008, industry analyst Ken Zaslow noted that "many companies, such as Pilgrim's, have pledged to cut production, but Tyson increased its volume about 6 percent in the quarter . . . . The industry has cut about 10 to 12 percent of its production."

223.    Despite claims to the contrary on its November 2008 earnings call, Tyson substantially reduced production in December 2008.  First, on December 18, 2008, Tyson announced the canceling of a deboning contract with Petit Jean Poultry at Petit's Little Rock, Arkansas processing plant that resulted in the layoff of 700 employees by Petit.  Second, by December 23, 2008, it was reported that Tyson had cut its production by 5%.  Asked by a reporter about the cuts, Tyson spokesman Gary Mickelson stated that "[w]hile we would rather not share details of our current poultry production levels, we can tell you we continue to closely evaluate market conditions in an effort to match customer demand with our supply."  Tyson also noted that it had reduced production "in recent years through the closing or sale of poultry plants and by running the company's remaining operations at reduced capacity utilization."

224.    On a January 26, 2009, Tyson earnings call, an analyst asked why Tyson cut production in December 2008 after claiming it would not do so in its November 2008 earnings call.  Tyson's Senior VP Donnie Smith replied that Tyson's inventory growth had triggered it to cut production in December 2008.

225.    On January 28-30, 2009, Defendants' senior executives attended the 2009 International Poultry Expo in Atlanta, Georgia.

226.    In a February 18, 2009, interview, Tyson Senior Group Vice President Donnie Smith noted that "[a]cross our industry, we're down about six percent versus where we were a year ago.  We're seeing an impact from that on market prices . . . the industry fundamentals are improving."

227.    In late February 2009, a report noted that Pilgrim's had cut another 9-10% of its production.  According to the same report, Tyson told the audience at a February 2009 investors' conference that it did not intend to reduce its production further because "[u]sing WATT PoultryUSA data on ready-to-cook (RTC) pounds, our numbers have declined 5-7% from 2000 to 2008 on RTC pounds while at the same time the industry has grown 31%. Over time, we have done plenty of cutting back."  In other words, Tyson felt it had already taken its fair share of needed production cuts, so competitors needed to take further actions.  However, as indicated below, Tyson's statements about not reducing production appear to be posturing, because generally Tyson did reduce its production during the 2008-2015 time period in line with other producers, apparently hoping the threat of it not reducing production would lead other producers to reduce production first.

228.    By February 25, 2009, Sanderson Farms told The Morning News that it had made cuts to its supply of Broilers by processing smaller Broilers and running its plants at lower capacity

utilization rates. Sanderson also told a group of investors around this time that "[b]ecause we don't expect much help from the demand side, chicken market improvement will have to come from supply cuts."

229. Similarly, Simmons Foods CEO Todd Simmons noted in a February 25, 2009, interview that "[w]e are seeing lower demand in the food-service customer base. We have made adjustments in bird weights to ensure our production meets with our customer's needs."

230. Seeing further cuts from smaller producers in the industry led Pilgrim's to announce historically large cuts to its production on February 27, 2009. In a press release announcing the closure of three processing plants located in Douglas, Georgia, El Dorado, Arkansas, and Farmerville, Louisiana, Pilgrim's indicated the plants were "underperforming" and said the closures would "improve the company's product mix by reducing commodity production and to significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession." Pilgrim's indicated that the idling of these three plants would reduce production 9-10% in total pounds of Broilers produced by the company.

231. Overall, "[a]t least 11 companies reported reductions in weekly ready-to-cook production in 2008," including Tyson, Pilgrim's, Perdue, Simmons, House of Raeford, Cagle's, George's, O.K. Foods, Coleman Natural Foods, Harrison Poultry, and GNP Company. Other companies reduced their planned production levels and/or delayed the planned opening of new Broiler complexes.

232. During 2009, Defendants also exchanged and agreed upon specific prices to charge common customers. For instance, Defendants Case Foods and House of Raeford ███████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

### 3. Defendants' 2008 To Early 2009 Broiler Production Cuts Included Unprecedented Reductions To Broiler Breeder Flocks.

233. As noted above, 2008 ended a decades-long trend of additional Broiler production, and surprised industry observers. However, what makes the production cuts in 2008 even more remarkable is that Broiler producers did not merely make an unprecedented reduction in the pounds of Broilers they produced – they also went further up their supply chains than ever before to restrict their ability to ramp up production for years into the future. This production restriction was accomplished by reducing Broiler breeder flocks and thereby forcing genetics companies to reduce supplies of grandparent stocks.

234. Broiler breeder flocks on average are kept in active "lay" for 65 weeks, so over its lifespan a breeder hen produces an average of 140 eggs per year that are incubated at Broiler producer-owned hatcheries. Because Broiler breeder flocks are created from a limited pool of grandparent Broilers from the three Broiler genetics companies (Tyson's Cobb-Vantress, Aviagen, and Hubbard), it takes substantial time to re-populate a Broiler breeder flock that has been reduced through early slaughter. By reporting the size of each Defendant's supply flocks through Agri Stats, Defendants could closely monitor one another's supply flock reductions and deal with a co-conspirator who was ramping up production in conflict with Defendants' conspiracy.

235. Defendants' reduction in Broiler breeder flocks during 2008 and the first two months of 2009 was unprecedented. While previous downturns had led some producers to use short-term methods to reduce overall pounds of Broilers slaughtered, in 2008 Defendants took

their reductions to the next level by substantially reducing their Broiler breeder flocks (aka, "Broiler Hatchery Supply Flock"), as shown below.



*Source: National Agricultural Statistical Service, U.S.D.A., https://quickstats.nass.usda.gov/*

### 4. The Cuts in 2008 and 2009 Led To Record Broiler Prices for Much Of 2009 and Early 2010.

236.    The effect of the supply cuts on Broiler pricing in 2008 and the first two months of 2009 was clear – during the worst recession in generations, Broiler prices rose through mid to late 2008, staying at or near all-time highs until late 2009. For instance, by May 28, 2009, Sanderson Farms reported strong profits that were twice the predictions of Wall Street analysts, which according to one industry publication was "aided by production cuts and lower feed costs that offset still-weak demand." Similarly, at a May 14, 2009, BMO Capital Markets conference, interim Tyson CEO Leland Tollett noted that "poultry market fundamentals had improved. Pullet

placements, an[] indication of future Broiler supplies, have been down the past five months compared to the same period last year. Egg sets continue to run six percent or more below year ago levels and cold storage inventories of poultry have declined about 20 percent since peaking in November 2008."

237.   However, as prices continued to rise during late 2009 and early 2010, producers started increasing production in response to the higher prices, as they had done in previous decades. The rising production by producers in early 2010 led to a reported oversupply of Broilers that began to depress prices by late 2010. However, Defendants had learned the value of coordinated supply reductions in 2008, so were quick to react with a new round of publicly announced production cuts in the first half of 2011, which quickly helped prices recover.

238.   During 2009 and 2010, Defendants' senior executives continued to meet with one another at trade association meetings and industry events, such as the National Chicken Council and the International Poultry Expo. For instance, at the National Chicken Council's October 2009 Annual Conference, which was attended by Ben Harrison (Amick President & CEO) and Robert Turley (Allen Harim President & CEO), one industry analyst wrote that participants had emphasized continued "production discipline." As used by Defendants, "capacity discipline" is a euphemism for limiting Broiler supplies. Defendants' conspiratorial efforts to artificially limit Broiler supplies enabled Defendants to raise prices of Broilers to supracompetitive levels.

### 5.   Defendants Reacted With Unprecedented Speed To Overproduction In 2011, Which Led To A Second Wave Of Unprecedented Production Cuts.

239.   Around early 2011, Tyson was one of the first Defendants to see the coming overproduction of Broilers. In addition to limiting its own production, Tyson embarked on a new strategy to soak up excess supply produced by its competitors. Tyson called the strategy "Buy vs. Grow." As described further in Section VI(G) of this Complaint, Tyson's Buy vs. Grow strategy

allowed Tyson to buy up excess production from its competitors and avoid the depression of prices that would occur had the excess production been sold on the open market. In return, Tyson could communicate the volumes of Broilers it would be willing to purchase from competitors in the current and future months, thus suggesting to each competitor the amount of production it should cut that would not be purchased by Tyson. As one investment analyst described it, Tyson's program "involves maintaining or even reducing [Tyson's] own chicken production levels, with buying more chicken on the open market from their rival chicken producers, in an effort to keep the chicken market from being over supplied." Even though it would have been cheaper (with respect to the cost of pounds purchased) for Tyson to grow its own Broilers instead of buying them from a competitor, Tyson engaged in its Buy vs. Grow program because it allowed Tyson to better control supply and production in the Broiler industry and reap the benefit of higher market prices on all of the rest of its Broiler pounds sold.

240. On January 24-26, 2011, Defendants' senior executives attended the International Poultry Expo in Atlanta, Georgia, including Tyson CEO Donnie Smith. The IPE featured an annual market intelligence panel with Mike Donohue from Agri Stats and industry-insider Paul Aho. According to one report, Donohue noted that "'2008 was the worst year financially for the (U.S.) broiler industry that most people have ever seen' . . . The industry's response in 2008 was a 5 to 6% reduction in pounds produced. He said that the broiler industry is currently at record high weekly slaughter volumes." Aho noted "[t]his could be a very difficult year with cutbacks, rationalization, and consolidation . . . . The market is calling for around a 5% reduction in chicken production."

241. On a February 4, 2011, Tyson earnings call, COO James Lochner noted that "until industry supply more closely aligns with demand" Tyson's Broiler business would "be

challenged." Tyson CFO Dennis Leatherby also referred to a supply-demand imbalance in the chicken industry.

242.    On a February 16, 2011, Cagle's earnings call, Cagle's reportedly said it had begun a 20% reduction in production at a deboning operation in an effort to balance supply and demand. Cagle's told one publication that it was "optimistic that the industry will exhibit the production restraint necessary to support higher pricing for Cagle's products allowing for return to profitable margins."

243.    On or around February 25, 2011, Sanderson Farms CEO Joe Sanderson announced on an earnings call that Sanderson would be delaying the development and construction of a second North Carolina Broiler complex.

244.    On March 7, 2011, House of Raeford announced a 10% reduction in egg sets that began in early February. CEO Bob Johnson noted in an accompanying press release that "we decided that acting now was a responsible action for our company in light of continuing unstable economic conditions. . . . Hopefully the chicken prices will begin to increase later this year. In addition, if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."

245.    On March 15, 2011, Simmons announced it was laying off 180 workers at its Siloam Springs, Arkansas processing plant "[d]ue to economics specific to our industry, resulting from high grain prices predominantly caused by corn being used in ethanol, we have decided to realign some of our production resulting in the elimination of 180 positions as of April 15."

246.    On April 13-15, 2011, the Georgia Poultry Federation held its annual meeting at the Brasstown Valley Resort in Young Harris, Georgia. Defendants' senior executives attended the meeting. Among other positions that Defendants' employees were elected to at the meeting,

Donnie Wilburn (Director Live Operations, Harrison Poultry) was elected Vice Chairman of the Board of Directors and Phillip Turner (Plant Manager, Mar-Jac) was elected to the Board of Directors.

247. On April 15, 2011, Mountaire Farms announced it was abandoning a 3-5% capacity increase. Mountaire President Paul Downes explained Mountaire's justification for the cut to anticipated capacity in starkly simple terms: "The only way to higher prices is less supply. The only way to less supply is chicken companies will shut down or cut back. That's not good for poultry growers or the economy. But I think that's what we're going to see." In other words, Mountaire had learned from the industry's coordinated action in 2008 to reduce supply and realized that the oversupply and decreasing prices in early 2011 could only be addressed through collective action by the Broiler industry to restrain production.

248. During 2011, Fieldale Farms reduced its production by an unspecified amount.

249. During 2011, Mar-Jac reduced its production 10% and reported that other Broiler Producers were doing so as well.

250. On May 1-3, 2011, Defendants' senior executives, including Tyson CEO Donnie Smith, attended Urner Barry's Annual Executive Conference and Marketing Seminar, which includes an annual golf outing at a local country club.

251. On May 17-18, 2011, senior executives from Sanderson Farms, Pilgrim's, and Tyson attended the BMO Farm to Market Conference. Attending were Sanderson Farms CEO & Chairman Joe Sanderson, Sanderson President & COO Lampkin Butts, Pilgrim's President & CEO Bill Lovette, Tyson CEO Donnie Smith, and Tyson Senior Group VP of Fresh Meats Noel White.

252. Pilgrim's President & CEO Bill Lovette (who also was COO of competitor Case Foods from 2008 to early 2011) presented at the May 17, 2011, BMO Farm to Market Conference.

Lovette's presentation noted Pilgrim's shift away from fixed-rate contracts to market-based pricing. Pilgrim's also noted its new focus on matching production to forecasted demand, including by adjusting head and bird weights at selected plants to better balance supply and customer demand.

253. On a May 24, 2011, earnings call, Sanderson Farms CEO Joe Sanderson stated:

[T]he deal is that the industry — forget Sanderson — the industry cannot sustain losses like they are sustaining for a long period of time. They will — they can't do it and you have been observing this for years and years and the industry has been losing money since Novemberish and balance sheets deteriorate and losses have to stop. The only way to stop losses with $7 corn is to reduce production and get prices up. That is the rule and the law of the jungle.

254. Sanderson continued, "[M]y judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats."

255. On June 6, 2011, Cagle's announced on an earnings call that "[t]he industry must lower supply in order to offset reduced demand and to support higher market prices. Cagle's continues to process at 80 per cent of capacity at its Pine Mountain Valley deboning facility and does not contemplate any increase in the foreseeable future."

256. On June 7-10, 2011, the USAPEEC held its annual meeting at The Greenbrier America's Resort in West Virginia. Defendants' senior executives attended.

257. On approximately June 20, 2011, Tyson begin pulling eggs from its incubators to reduce Broiler volumes.

258.    On June 21, 2011, Cagle's announced it was laying off 300 employees at its Pine Mountain Valley, Georgia plant to reduce Broiler volumes.

259.    On June 27-29, 2011, the US Poultry & Egg Association held a Financial Management Seminar at the Ritz Carlton in Amelia Island, Florida.  Among other presentations, Pilgrim's President & CEO Bill Lovette presented to a group of 150 attendees that included senior executives from Defendants.

260.    On June 27, 2011, Simmons announced it was laying off 223 employees by August at its Siloam Springs, Arkansas plant to "shift production to better address soaring corn prices." In its press release, Simmons blamed U.S. Ethanol policies for reducing its production.

261.    On July 11, 2011, Defendants House of Raeford and Case Foods ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████

262.    On July 12, 2011, Tyson CEO Donnie Smith, Tyson executive Bernard Leonard (Chairman of the NCC at the time), Sanderson Farms COO Lampkin Butts, Peco Foods CEO Mark Hickman, and Perdue CEO Jim Perdue participated in a panel together at the 2011 Food Media Seminar.

263.    On July 21, 2011, Amick ████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

264.    On July 29, 2011, Pilgrim's announced the closure of its Dallas, Texas processing plant and the layoff of 1,000 employees.  Pilgrim's President & CEO Bill Lovette explained that

"[w]hile the decision to close a plant and eliminate jobs is always painful, we must make better use of our assets given the challenges facing our industry from record-high feed costs and an oversupply of chicken . . . . A key component of that effort is improving our capacity utilization through production consolidation and other operational changes. By closing the Dallas facility, we can consolidate that production volume at three other plants and help those sites run closer to full capacity."

265. On an August 1, 2011, earnings call, Sanderson Farms' CEO reportedly said that Sanderson Farms' normal fall production cut of 4% beginning in November would remain in place beyond January of 2012 [and . . .] until demand improves. Sanderson also stated "we aren't going to set any more eggs until we pick up a big account or we can't supply our customers' needs. We think demand improvement will require unemployment to drop . . . . It wouldn't surprise me if the industry makes further, deeper reductions in egg sets in October or November," he said. "Nobody knows what cuts might be needed until we get to October," "but I think that the cutbacks may need to be more than the 6% in head that the industry already has in place."

266. On an August 8, 2011, Tyson earnings call, CEO Donnie Smith said that "[d]omestic availability must be in balance with demand before industry economics can improve. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter. . . . Our goal is to match supply to demand. And following over-production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market."

267. On August 17, 2011, ███████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

268.   On August 18, 2011, Cagle's announced it was reducing 20% of its production at its large Pine Mountain Valley, Georgia plant.

269.   On September 15, 2011, Case Foods ███████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████

270.   From October 5-7, 2011, Defendants' senior executives attended the National Chicken Council's 57th Annual Conference.  As part of the conference, senior executives from Perdue and Koch Foods participated in a panel regarding the "new paradigm" in the Broiler industry.  Panel members Clint Rivers (Perdue, President of Foodservice and Supply Chain), Bill Anderson (Senior Vice President, Keystone Foods), Mike Helgeson (CEO, GNP), and Mark Kaminsky (Koch Foods COO & CFO) said "the industry is accustomed to cycles, but not one quite like the latest, and companies are going to need to adjust.  Discipline on the supply side was one suggestion.  Getting better prices from retailers was another."

271.   On November 17, 2011, Wayne Farms issued a press release announcing the closure of its Decatur, Alabama plant and layoffs of 360 employees.

272.   On a November 21, 2011, earnings call, Sanderson Farms CEO Joe Sanderson responded to a question about a production decrease that "when we talk about the 4% number, that is what we project the industry to be. Obviously, we're going to be a part of that."

273.   On December 6-8, 2011, the USAPEEC held its annual Council members only winter meeting.  Defendants' senior executives attended the meeting.

274.    At USPOULTRY's Hatchery-Breeder Clinic in January 2012, Agri Stats Vice President Donohue noted the importance of reducing Broiler breeder flocks, noting that "if the industry chose to do so, it could ramp up production within a 10-week period of time.  The industry could blow apart any recover[y] in the short term by filing up incubators again," but noted that Agri Stats data indicates the industry is slaughtering breeder flocks at 59 to 60 weeks (instead of the typical 65 weeks), which suggested to him the industry was managing its production carefully. The early slaughter of breeder flocks in 2011 through mid-2012 meant that Defendants subsequently were unable to increase production for at least eighteen months, as they would have been able to do had they not made cuts so high in the supply chain.

275.    Defendants' senior executives attended the January 25-26, 2012, International Poultry and Processing Expo in Atlanta, Georgia. The National Chicken Council held its Board of Directors meeting in conjunction with the meeting.

276.    In early 2012, Sanderson Farms cut its production 4%.

277.    On March 20-21, 2012, the National Chicken Council Board of Directors met in Washington D.C.  Defendants' senior executives attended the meeting.

278.    On an April 27, 2012, earnings call, Pilgrim's President & CEO Bill Lovette reported that "the die is cast for 2012," and that "we're comfortable that the industry is going to remain constrained."

279.    On April 29-May 1, 2012, Urner Barry held its Annual Executive Conference and Marketing Seminar.  Defendants' senior executives attended the conference.

280.    On May 7, 2012, Tyson held an earnings call and announced it had decreased its production by 4% through longer days between flocks for its growers and by increasing its Buy vs. Grow program.  Tyson noted on its earnings call that "the industry as a whole has reduced

production pounds by 4% to 6% year-over-year. To help keep our production balanced, we bought chicken on the open market rather than growing all the birds we needed. We won't grow a bird solely for the part in the highest demand because we have to sell the entire bird. Grow versus buy is a strategy we look at continually based on input costs, revenue demand forecast and the needs of our customers." Tyson CEO Donnie Smith also noted on the earning call that "we began to cut back last year" with respect to egg sets and placements.

281. On June 6, 2012, Pilgrim's announced the layoff of 190 employees at its Chattanooga, Tennessee deboning plant. The company noted that "[w]hile the decision to reduce the workforce in Chattanooga was not made lightly, we are confident that these actions will improve the efficiency of our plant, maintain our mutually profitable relationship with growers, and strengthen our ability to produce quality poultry products in Tennessee, . . . [but] [t]he Chattanooga operation remains a vital part of our ongoing strategy."

282. On June 21, 2012, the National Chicken Council Board of Directors held its summer meeting at the Ritz-Carlton Highlands in Lake Tahoe, California. Defendants' senior executives attended the meeting.

283. In a July 9, 2012, article, Tyson CEO Donnie Smith was quoted as saying "the company will not over produce chicken at these expensive grain levels, preferring to buy commodity pieces in the secondary market to fill orders where necessary."

284. On July 15, 2012, Defendants' senior executives attended a meeting of the National Chicken Council's Marketing Committee at the Stone Mountain Lodge in Stowe, Vermont.

285. On an August 6, 2012, earnings call, Tyson CEO Donnie Smith stated that "[o]ver the past couple of years we have substantially reduced a number of fixed price contracts we have with customers and currently have less than 15% of our Poultry volume [on] annual fixed price

contracts. The vast majority of our contracts are tied to specific markets or allow for conversations about adjusting prices to move – prices to offset higher input and we will continue to push for even more of these types of contracts. I believe supply will begin to rationalize as well, making it easier for us to have those pricing conversations."

286. On August 23, 2012, Koch Foods CEO Joseph Grendys gave an interview with Bloomberg News. He stated that "[c]osts have gone up so much due to the drought that the industry will be forced to get price increases of 10 to 15 percent across all product lines" for 2013 over this year. He went on to note that "'[t]he industry needs to be smart' and focus on pricing to ensure it remains profitable . . . . Even if it does become unprofitable in the fourth quarter, the industry may resume making money after the first quarter of 2013." The article also mentioned Koch was going to use quarterly adjustments for price in its contracts for the first time since 2008.

287. On August 28, 2012, Sanderson Farms announced a further 2% production cut that it blamed on corn and soybean prices.

288. By September 2012, the effect of Defendants' earlier production cuts starting in 2011 had begun to lead to increased Broiler prices. Most important to the record profits that were to come, Defendants had not just cut the number of pounds of Broilers slaughtered, but Defendants destroyed a significant proportion of their Broiler breeder flocks. As noted previously, doing so meant that Defendants *could not* increase Broiler supplies in the short or medium term, even if they wanted to.

289. On October 10-11, 2012, the National Chicken Council held its annual meeting at The Mandarin Hotel in Washington, D.C. Defendants' senior executives attended the meeting. The meeting featured an "Industry Outlook Panel" that included speakers Thomas Hensley (President, Fieldale Farms) and Paul Fox (CEO, O.K. Foods) and discussed the question of "[w]hat

did the broiler industry learn from 2011 and how will the industry apply those lessons in 2012 and 2013?" O.K. Foods CEO Paul Fox's comments during the panel continued to point to the ethanol mandate as a pretext for higher Broiler prices, stating "[i]n 2006, the ethanol mandate began to really take a bite against the protein complex, and since that time on a cumulative basis, we've seen about $31 billion in new costs that have come in to the chicken business."

290.    The actions alleged above, taken collectively and not in isolation, demonstrate a level of coordination and "discipline" not seen in this industry prior to the Class Period alleged herein.

### 6. Defendants' 2011-2012 Production Cuts Lowered Broiler Breeder Flocks To Unprecedented Levels, Which Led To Record Profits For The 2013-2014 Time Period.

291.    Defendants' cuts to the Broiler breeder flocks in 2011-2012 sent flock levels down to levels not seen for almost two decades, as shown by the graph below.



*Source: National Agricultural Statistical Service, U.S.D.A., https://quickstats.nass.usda.gov/*

292.    For much of the remainder of 2012 through 2014, Defendants reaped the benefits of coordinated supply restraints in the form of rising prices and record profits.  During this period Defendants' executives repeatedly made statements congratulating industry players on the "discipline" they had shown by keeping supply restrained.  For instance, on a May 3, 2013, earnings call, Pilgrim's President & CEO Bill Lovette stated that "[w]ell, obviously, revenue is going to be a function of price, in part, and in this case a big part; and obviously, price is going to strengthen as supply continues to be disciplined and constrained . . . .  So I think the industry is doing an admirable job in being disciplined on the supply side and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying."  Lovette also commented that "I believe the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken and not necessarily what corn or soybean meal costs. I think I'm confident to say we've, we figured that out and we're doing a good job of balancing supply and demand."

293.    On the May 3, 2013, earnings call, Pilgrim's President & CEO Lovette also discussed the importance of continued restraint of the industry's breeder supply flock, noting "[w]ell, I only know what we've seen happen in the past. Now, certainly, this summer if the industry chooses to grow the breeder supply significantly, that's definitely going to impact 2014. What I'm saying is, so far, we've seen no indication that the industry plans to grow the breeder supply and as a matter of fact, it's actually shrunk. So that's the source of my comments. Do I know what's going to happen in June or July or August of this year with respect to breeder placements, I don't know that. I would tell you that based on the last three to five years, though, again, I'll reiterate that I think the industry has learned that the economics of our business is tied

very closely to the supply of chickens and we've done a good job so far of maintaining discipline such that even paying nearly $8.50 for corn, we've been able to be profitable as an industry."

294.     On October 4, 2013, CEOs and other senior executives of Defendants' companies met at the annual NCC meeting in Washington D.C.  The meeting featured a panel with GNP CEO Mike Helgeson, Tyson CEO Donnie King, and Simmons Foods CEO Todd Simmons.  According to one publication's account of the panel, the CEOs were "chipper about the prospects for their industry in the next few years."  This meeting was also attended by Keystone Foods executive Tim Esslinger.

295.     On a January 31, 2014, earnings call, Tyson CEO Donnie Smith reported that through Tyson's "buy versus growth strategy we continue to keep our supply short of demand . . . ."  Tyson's continued use of Buy vs. Grow, including through the present, allows Tyson and other Defendants to reduce production on a month-to-month basis and have opportunities to learn more information about one another's production and pricing.

296.     On a February 21, 2014, earnings call, Pilgrim's President & CEO Bill Lovette reflected on what had led to record earnings for Pilgrim's.  He noted that "I think the one thing that creates…has created that stability is the discipline of the industry to not allow profitability in the past to drive supplies in the future. I think we all have an understanding that our industry is mature, especially in the U.S. Consumption of total meat in the last five years has not grown and our growth in the future is going to come from markets outside the U.S. And so, we have a different model today than we had 15…10 or 15 years ago in that consumption in this country is not growing as robustly as it used to. And I think that discipline really, Ken, is the one ingredient that has made for more stable earnings that we have seen. We have certainly seen a lot of volatility in feed ingredient costs, even as recent as this past year. And I don't know what…I mean you can make a

solid argument for corn and soybean meal being much cheaper in 2014 and '15, given the rebuilding of world inventories of corn and growing inventories of soybeans. But we just don't know what the next weather event in either, South America, North America or even Eastern Europe may present in terms of the supplies of those feed ingredients."

297.    On March 12, 2014, Tyson CEO Donnie Smith attended an industry conference and told the attendees that "[a] 'meaningful change' in bird production won't occur until the second half of 2015." Smith's confidence about broiler production was possible because of the radical reductions in Broiler breeder flocks Defendants had made during 2011 and early 2012, which Smith knew made it impossible for Defendants to "meaningful[ly] change" Broiler production.

298.    Industry analysts noted the change in the nature of Defendants' production cuts. On May 6, 2014, a Stephens, Inc. analyst said in an interview that historically "it has been very easy to increase the chicken supply because the cycle is so short. It only takes four to eight weeks to grow a chicken, but U.S. chicken producers are having a hard time increasing the chicken supply by much. They cut production capacity throughout the supply chain when grain prices were very high. Because of this, they cannot materially increase supply for 2014. We likely won't see a material increase in production until the second-half of 2015."

299.    During 2013 and into 2014, Defendants continued to find ways to actively depress the size of Broiler hatchery flocks, such as using the pretext of avian flu in Mexico to justify exporting hatchery flock Broilers to Mexico to repopulate flocks rather than use such Broilers to increase domestic production levels. Indeed, Defendants continued their program of exporting Broiler hens and eggs to Mexico in 2015, with Tyson explicitly noting in a May 4, 2015, earnings call that it was sending 3% of its eggs to Mexico to "fill incubators." Similarly, during a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted his "confidence that we're going to do the right

thing with respect to maintaining [] discipline. We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million hatching eggs or so outside of the country. The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made. And so again that gives us confidence that we're going to continue to be disciplined as an industry."

300.     Defendants' coordinated exportation of Broiler hatching eggs from the U.S. from 2013 through the present is an active effort to artificially reduce the supply of Broilers in the U.S. below what it would be absent Defendants' active and continued participation in an illegal antitrust conspiracy.  Upon information and belief, Tyson and other Defendants exported hatching eggs to Mexico and other foreign countries from 2013-2016 to artificially reduce the supply of Broilers in the U.S. and increase the price of Broilers in the U.S.  The value Tyson and others received for exporting hatchery eggs to Mexico would have been far exceeded by the price Tyson would have received for hatching those same eggs in the U.S. and selling the resulting Broiler meat in the U.S. market.  Therefore, but for Defendants' agreement and conspiracy as alleged in this Complaint, it would have been against Tyson's independent economic self-interest to export hatching eggs to Mexico and to forgo higher hatching egg prices in the United States.  But Defendants' new-found discipline ameliorated any remaining risk and resulted in higher U.S. broiler prices.

301.     According to an October 1, 2014, CoBank analysis of the Broiler industry, the strategy of Defendants to target Broiler breeder flocks paid dividends during 2013 and 2014. According to the report, "[b]roiler product demand should remain robust through the rest of this year and well into 2015, bolstered by a gradually improving domestic economy, continued strength in export demand, and the towering prices of beef and pork.  Broiler production, however, has been slow to respond, with integrators having had problems expanding the number of chicks placed

for growout. Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015. Producers have been somewhat constrained in their attempts to expand the nation's chicken flock by the limited supply of broiler hatching eggs. When the broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been rebuilt to prior levels. Following seven months of [Year-over-Year ("YoY")] declines, the number of chicks placed for growout finally posted a modest 1 percent YoY gain in August. However, it will take another 6-9 months for integrators to rebuild the supply of broiler hatching eggs in preparation for expanding the overall flock, so significant growth in broiler production will not materialize until late-2015 or early-2016."

302.    On October 10, 2014, NCC President Mike Brown wrote an op-ed in The National Provisioner. The title of Brown's article, "Biofuel policy holds back production ramp-up," continued to blame the Broiler industry's boogey man of the Renewable Fuel Standard (aka the ethanol mandate) instead of Broiler producers' collusive agreement to not increase production in line with demand. Brown wrote, "current favorable market conditions would normally stimulate production to be somewhat higher, that is, a percentage more aligned with the long-run annual average of 4 percent. So why are chicken producers not stepping up production to better match the long-term average of 4 percent? We would if we could, but we can't. We would like to produce more pounds of chicken, but unfortunately we are not there yet. The primary reason for the industry's inability to increase production can be attributed to problems caused by a failed policy" of the Renewable Energy Standard. Brown also went on to blame fertility issues in the breeder stock and a propane shortage that made it difficult to heat chicken houses as other reasons the industry could not increase production.

303. On October 29, 2014, Simmons Foods announced the closure of its Jay, Oklahoma spent hen processing plant. Spent hens are Broiler breeders that have reached the end of their productive life cycle. The Simmons facility processed spent hens on behalf of many Defendants, providing Simmons with opportunities to monitor changes in other Defendants Broiler breeder supplies. The closure of Simmons' Jay, Oklahoma facility is indicative of the reduced Broiler breeder capacity resulting from Defendants' initiatives to cut Broiler breeder capacity across the industry.

### 7. *Avian Flu Disrupted The Export Relief Valve During 2015, But Prices And Profitability Remained Relatively Stable Into 2016.*

304. Signs in late 2014 began to point towards the possibility of rising production levels. A few Defendants announced production cuts, but due to the substantial reductions in Broiler breeder flocks Defendants had already taken, Defendants' production was already constrained. Defendants undertook various affirmative acts in furtherance of the conspiracy, including exporting of hatching eggs outside the U.S., inter-Defendant purchases in furtherance of Defendants' conspiracy such as Tyson's Buy vs. Grow program, breaking eggs rather than setting eggs, dumping of excess Broiler supply in foreign markets, closing Broiler production facilities, and manipulating at least one Broiler price index.

305. For example, Tyson announced on May 4, 2015, the closure of its Buena Vista, Georgia, Broiler plant as part of an ongoing effort to "increase efficiencies." Tyson also announced it was eliminating one shift at its Dawson, Georgia plant. Tyson announced in May 2015 that it planned to reduce its production after July 2015 and keep production flat through 2016 by increasing its Buy vs. Grow purchases.

306.    In addition to the continuation of Defendants' illegal supply restriction that artificially increased the price of all Broilers, around January 2015 the Georgia Dock price index began to deviate significantly from other price indices (*see* ¶¶ 129-147).

307.    As alleged above, due to the GDA's One Cent Rule, it was not possible for only one or two Broiler companies to report a significantly higher Broiler price to the Georgia Dock without being disregarded as outliers by the GDA.   Accordingly, on information and belief, Plaintiffs allege that Defendants began collectively reporting prices to the GDA that not only were identical or nearly identical, but also were significantly above the actual market rate.   As a result, Georgia Dock prices continued to rise and later stabilize during 2015-2016 at near historic highs. As described further in this Complaint, it was not until a series of articles was published between November 3, 2016 and November 17, 2016 that information was publicly available to show Defendants may have fixed the Georgia Dock price.

308.    During 2015, despite the devastation Avian Flu caused to the turkey and table egg industries, the Broiler industry was largely unaffected by the disease, with the primary effect being temporary bans on exports from some specific states or of all Broiler exports from the U.S. to various countries, such as China, Korea, and a number of other nations.

309.    In order to further increase already supra-competitive Broiler prices resulting from supply cuts, Broiler companies also began colluding on fuel surcharges to customers. ███████

███████████████████████████████████████████████████████

███████████████████████████████████████

310.    Avian Flu-related export limitations during 2015 caused frozen Broiler inventories to build up in the U.S., threatening the stability of Broiler prices Defendants had worked so hard to increase since 2008.   In response, Defendants worked in concert to coordinate the dumping of

excess inventories of Broilers in foreign markets to avoid deterioration of the artificially high prices in the U.S. resulting from Defendants' conspiracy. For instance, in early October 2015, Vietnam launched an inquiry into dumping by U.S. Broiler producers after Vietnamese Broiler producers determined that dumping of frozen chicken by U.S. producers had cost it over $120 million in the last 16 months. A report by Vietnam's Southeast Livestock Association concluded that U.S. Broiler companies were selling chicken thighs in Vietnam for 29% of the price of a similar product sold in the U.S. market (e.g., at a Walmart), excluding the additional cost of frozen shipping rates, import duties and other fees associated with U.S. producers selling chicken thighs in the Vietnamese market. By late May 2016, Sanderson Farms CEO Joe Sanderson reported on an earnings call that all but one of the Avian Flu export bans had been lifted.

311. In late 2015, Broiler industry analyst Heather Jones noted that chicken supplies had not increased as expected from the Avian Flu due to the fact Defendants had started breaking eggs rather than setting eggs. Defendants coordinated the breaking of eggs with one another during 2015, in part, by the exchange of production information through Agri Stats.

312. Watts PoultryUSA's March 2016 issue noted that Tyson Foods achieved "record earnings and sales in fiscal year 2015 . . . posting $40.6 billion in sales, including ringing up higher chicken sales. Yet, Tyson lowered chicken production in 2015. What's at work here? This paradoxical performance, in part, reflects the fact that Tyson, along with other top U.S. broiler companies, is redefining its business model to achieve profitable growth." In fact, the explanation for Tyson's "paradoxical" 2015 performance—including increasing its Broiler profits but lowering its Broiler production—was the result of the illegal conspiracy alleged in this Complaint.

313. Prices during the first half of 2015 remained relatively flat, which led NCC President Mike Brown to write another op-ed in The Wall Street Journal on May 15, 2015, to try

100

to explain why Broiler prices remained so high. Like his previous op-ed, he again blamed the Broiler industry's typical boogeyman – the Renewable Fuel Standard – for increased Broiler prices.

314. During 2016, Broiler prices have declined, but significantly less so than input costs. Defendants have maintained artificially high Broiler prices and high profitability during 2016 by exercising "discipline" on their Broiler supply and manipulating at least one Broiler price index. For instance, during an April 2016 earnings call, an analyst noted that Pilgrim's CEO Bill Lovette "mentioned that you think the industry domestically has been much more disciplined than they have been in the past, I'm wondering if you could just elaborate a little bit more on what sort of drives that view and then maybe what gives you confidence that this discipline will hold." Lovette responded, "[w]hat drives the view is the actual numbers that we see, ready to cook pounds are up about 3.1% year to date. If you look at placements year to date, they're up 1%, egg sets up 0.7%, hatchery utilization actually declined in Q1 to 91%. So in the phase of coming off two of the most profitable years in the industry, we're not seeing, not realizing large amount of production increases." Tellingly, Pilgrim's CFO Fabio Sandri added immediately after Lovette's comments that "what drove that I believe it is that industry is more geared towards profitability rather than just market share or field growth." Put another way, Defendants are no longer competing with one another to gain market share by growing their companies as one would expect in a competitive market, but instead Defendants are working collectively to increase profitability by being "disciplined" in terms of supply growth.

315. Other CEOs have also been forced recently to try to explain the marked shift in the Broiler industry's profitability in recent years, after the decades'-long pattern of boom and bust regarding Broiler pricing and profitability. During a February 2016 Sanderson Farms earnings

call, BMO Capital Markets analyst Ken Zaslow noted the Broiler industry's history of volatility in pricing and profitability for chicken companies and questioned if there was "any changing of the industry dynamic" that had occurred. Sanderson Farms CEO Joe Sanderson replied "we might be at a capacity wall, you know? . . . Since back in 2007 . . . there are three or four plants shuttered . . . It does feel different."

316. A January 18, 2016, article in The Wall Street Journal questioned whether Defendants, including Tyson, Sanderson Farms, Pilgrim's, and Wayne Farms, have intentionally manipulated the pricing data they report to the Georgia Department of Agriculture. As discussed above, in early November 2016 evidence became public suggesting that the Defendants may be fixing the Georgia Dock price.

317. During 2016, Defendants' profitability has also been aided, in part, by the fact that input costs have decreased substantially, though Broiler prices have not experienced a similar decline. During a Broiler industry conference in February 2016, industry analyst Dr. Paul Aho reported that overall profitability has remained steady or increased, as input costs have drastically decreased. Aho noted that during 2016 there have been "broad-based declines in key commodities, especially feed grains and energy." In fact, in May 2016 Tyson posted record quarterly growth, with profit margins for Broilers rising to between 9 and 11 percent.

318. Not only is the harmony among Defendants and resulting high profit margins achieved by Tyson and other Defendants in recent years remarkable, so is their fairly recent ability to accurately predict their profit margins into the future. For instance, before 2008, Tyson had profit margins in the 5-6% range and would not predict future profit margins, but after 2008, Tyson would routinely predict record margins of 13% or more with surprising accuracy.

319.    Defendants have also kept up the use of signals to one another to perpetuate their conspiracy during 2016 by using the code word "discipline" to note their continued adherence to Defendants' conspiracy.  For instance, during a February 2016 earnings call, Pilgrim's CEO Bill Lovette noted that "[t]he industry continues to be disciplined in terms of U.S. supply.  Although monthly pullet data tend to be volatile and have occasionally been at the high end of our expectations, we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits [sic] and chick placements as a positive.  We believe that at least part of the reason is because chicken producers are being disciplined and are much quicker to react than in the past and in adjusting supply growth to the actual market conditions."  Similarly, in a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted that "I think what we've seen with egg sets is absolutely a testament to the discipline of our industry that we've seen the last really two to three years."

### E.   The Structure And Characteristics Of The Broiler Market, Together With Other Factors, Render The Conspiracy Economically Plausible.

#### 1.   The Broiler Industry Is Highly Vertically Integrated.

320.    The Broiler industry is almost entirely vertically integrated, with Broiler-processing firms owning or tightly controlling almost all aspects of production, processing, and marketing. In the Broiler industry, "vertical integration" means the Broiler company owns or controls each aspect of breeding, hatching, rearing, feeding, basic processing, and selling of Broilers.  Many integrated Broiler companies also own further processing plants.[9]

321.    Because Broiler producers have determined over time that the economics of growing chicks into full size Broilers are unfavorable, the Broiler industry has developed a system of production-contract farming.  The integrated producers provide the feed and chicks to farmers

---

[9] *See* fn. 7 above.

(which remain under ownership of the integrated producer); the contract farmer then has roughly 6-7 weeks to grow the chicks into full size Broilers.  During this "grow out" period, the integrated producer's employees frequently monitor the Broilers.  Once fully grown, Broilers are picked up by the integrated producer and brought to an integrator-owned processing plant (aka, slaughterhouse).  Some of the Broilers are sold without any further processing, while other Broilers are further processed by integrated companies into value-added specialty products (e.g., chicken nuggets, etc.).

322.    The graphic below indicates the key stages of Broiler production that vertically integrated Broiler companies control, which are all those points in the production process which provide integrated Broiler companies complete control over supply and allow them to capture the greatest profit margin:



323.    According to a paper prepared in connection with the USDA and DOJ's failed effort to increase competition in the Broiler industry in 2010, "[c]ontrol over the number of birds delivered to the processing plants allows processors to match more closely inputs to plant capacities and lower per-unit processing costs, as well as to better meet consumer requirements." In connection with the same effort by the USDA and DOJ, a former expert witness for Defendant Tyson, Michael Dicks, wrote, "[i]n the poultry industry vertical coordination allows integrators to manage excess capacity to manage price. Integrators can minimize the effect on producers by increasing the time between collection and delivery of birds or reducing the number of flocks per year rather than terminating grower contracts in much the same way the USDA requires all commodity program recipients to adhere to acreage reduction program guidelines and grower associations require members to cut back marketable output."

324.     Modern Broiler producers rely on a handful of unique Broiler breed lines to mass produce essentially identical chickens with desirable genetic traits.  Genetics companies, which develop strains of grandparent and great-grandparent breeding stock, sell to integrated Broiler producers breeders that have special hybrid characteristics, such as a tendency to produce a large chicken breast.  Genetics companies create a "biological lock" on their unique Broiler lines by tightly controlling the purebred genetic strain that they develop.  After an integrated producer purchases young breeder hens (aka "breeder pullets") from a primary breeder, the integrated producer raises the birds to be breeders that lay eggs to be taken to incubators at an integrator-owned hatchery.  The chicks from Broiler company hatcheries are then sent out to the integrated producer's contract-farmers to raise into adult Broilers.

325.     At present, no Broiler company except Tyson owns the genetics or produces the grandparent or great-grandparent strain for the Broilers it raises and slaughters.  Nearly all U.S. producers now rely on 3 global genetics conglomerates:  Cobb-Vantress (owned by Tyson), Hubbard, and Aviagen.  These three companies supply the breeder stock, and therefore ultimately the Broilers, that account for 98% of Broilers raised in the U.S. and 80% of Broilers raised globally. While there were 26 Broiler genetics companies world-wide in 1981, acquisitions by the three remaining companies have essentially eliminated any other meaningful competitors in the U.S. Tyson's Cobb-Vantress subsidiary has approximately 50% market share.

326.     Since a supply of primary breeders is essential to each Broiler producer's business, Tyson's ownership and control of subsidiary Cobb-Vantress provides it with exceptional leverage over other Defendants to mandate compliance with Defendants' illegal agreement.  Tyson can offer other Defendants the carrot of access to Cobb-Vantress' unique Broiler genetic lines, with desirable qualities like high conversion rates of feed into meat.  However, Tyson can also use

Cobb-Vantress as a stick against any competitor who Tyson and/or its co-conspirators believe is overproducing Broilers by providing such competitors inferior, sick, or an insufficient number of breeder pullets, or withholding breeder pullets altogether that the competitor needs to operate a profitable business.

327. Perdue was the last Broiler integrator in the U.S. to maintain its own genetics research company besides Tyson, but Perdue sold its genetics company to Tyson in 2014. In announcing the sale, Perdue issued a press release that stated "there are no longer significant advantages to having our own breed . . . it is important that we have the flexibility to select the breeder combination that works best for each specific customer requirement." The press release went on to note that "[w]ith the outstanding exception of the Cobb-Vantress enterprise owned by Tyson Foods, no producer has managed to effectively compete using an in-company breeding program against a multinational primary breeder. To be cost effective a genetics program based on index selection incorporating the measurement of significant traits and applying sophisticated molecular markers and field testing requires a magnitude of scale exceeding the capacity of individual producers."

328. Upon information and belief, Defendant Tyson, through its Cobb-Vantress subsidiary, intentionally manipulates the supply of grandparent and great-grandparent Broiler stock (from which it suppliers integrators with Breeder pullets) including, but not limited to, only providing healthy and high quality breeder pullets to certain of its co-conspirators, but providing inferior and sick quality breeder pullets to other smaller non-Defendant Broiler producers. This practice contributed significantly to the bankruptcy or failure of a number of smaller Broiler companies in the 2010 time period.

### 2. The Market For Broilers Is Characterized By Inelastic Supply And Demand.

329.    According to a May 2010 paper written by Broiler industry consultant Michael Dicks, "[b]ecause of the inelastic nature of the supply and demand [of Broilers,] a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."  A study by consultant The Hudson River Group for Pilgrim's in 2008 found that a one percent decrease in the supply of Broilers leads to a 0.8% increase in the price of Broilers.  In other words, demand for Broilers is inelastic, so a decrease in supply will increase prices.

330.    Defendants acknowledge that supply and demand in the Broiler industry is inelastic.  For instance, in his May 2010 paper, Broiler industry consultant Michael Dicks wrote that "[a]ttempting to maintain supply levels would reduce price to levels unsustainable even in the short run.  Because of the inelastic nature of the supply and demand a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

331.    Broiler producers have asserted in public statements that changes in wholesale Broiler prices have been due to changes in "supply and demand."  However, demand for Broilers has been flat since 2008, while at the same time wholesale Broiler prices have risen roughly 50%.  Therefore, it is the reduction in the *supply* of Broilers that has led to Broiler price increases.

### 3. There Are No Significant Substitutes For Broilers.

332.    Pork and beef are the most likely alternative sources of protein to Broilers, but pork and beef are not economic substitutes for Broilers.  Numerous studies have found that the cross elasticity of demand between Broilers, beef, and pork is either negative or statistically insignificant, meaning that pork and beef are *complements* to Broilers, but not *substitutes*.

333.    The historically high spread between the price of pork and beef versus Broilers since 2008 has also reduced any possibility of substitution of Broilers with pork or beef.

### 4. The Broiler Industry Has Experienced High Consolidation And Is Highly Concentrated.

334. According to a November 2013 USDA report, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing. According to the National Chicken Council, 55 federally inspected Broiler companies operated in 1995, compared with 41 companies in 2010." By 2014, there were only 35 such companies.

335. In fact, the trend towards consolidation among all segments of the Broiler industry goes back decades, as shown below. This consolidation has largely squeezed out the large number of smaller Broiler companies that used to represent a significant portion of Broiler industry production.



336. As of 2015, Defendants controlled 88.8% of Broiler production in the United States. Since the start of the Class Period, there has been surprising stability in market share for each Defendant, as shown by the graph below. The two exceptions are Pilgrim's loss of market share

due to its large plant closures during bankruptcy in 2008-2009 and Koch Foods' increase in market

share due to the purchase of a plant from Tyson and purchase of bankrupt Cagle's, Inc.



337.     In addition to formal consolidation among Defendants, increased antitrust scrutiny

of acquisitions in the Broiler industry by the U.S. Department of Justice has led Broiler companies

to increasingly rely on de facto consolidation whereby Defendants acquire nearly complete control

over seemingly independent smaller Broiler companies.   Defendants' de facto consolidation

creates "zombie" Broiler companies that on paper are separate and independent entities, but are in

fact completely controlled by Defendants through co-packing contracts.   For instance, Tyson

Foods has co-packing arrangements with a number of smaller Broiler producers in which Tyson

purchases either (1) the company's entire production of Broilers (including dark meat) or (2) all

of the company's white meat (i.e., chicken breast and wings) and encourages the company to export the less valuable dark meat to remove that supply from the United States market.

338.   Upon information and belief, Defendants' co-packing contracts with smaller producers are typically 2-5 years in length.  Even where the co-packing arrangement is only 10-20% of a smaller producer's overall supply, Defendants are in a position to pressure smaller producers to limit their production.  Co-packing contracts give Defendants unprecedented control over supposedly independent producers, including control over the breed of bird grown, what feed can be used, how many birds can be grown, and numerous other aspects of raising Broilers.  With respect to processing, Defendants not only require exacting specifications for co-packing partners, but also put Defendants' own employees in the processing plants of their co-packers and supervise every significant detail of the slaughter and packing process.

339.   Upon information and belief, the purpose and/or effect of Defendants' co-packing arrangements is it avoids scrutiny from antitrust regulators that would come with formal merger arrangements, including possible discovery of Defendants' anti-competitive agreement to reduce the supply of Broilers in the U.S.

### 5. *The Broiler Industry Has A History Of Government Investigations And Collusive Actions.*

340.   In response to a Federal Trade Commission investigation in 1919 which found oligopoly domination and anti-competitive monopolistic behavior in the meat-packing industry, Congress passed the Packers and Stockyards Act ("PSA").  *See* 7 U.S.C. § 193(a), § 209.  Congress amended the law to include the poultry industry in 1935.

341.   In 1922, the Supreme Court upheld the constitutionality of the PSA in *Stafford v. Wallace*, finding that "the object of the PSA was to secure the flow of livestock from the farms

and ranges to the slaughtering center and into meat products unburdened by collusion that unduly lowered the prices to the shipper and unduly increased the price to the consumer."

342. In April 1973, the United States Department of Justice filed a civil antitrust action against the National Broiler Marketing Association ("NBMA") alleging the NBMA and its members conspired to fix Broiler prices and restrict Broiler production in violation of Section 1 of the Sherman Act. The DOJ sought to enjoin the NBMA and its dozens of members from continuing a conference call program where members (and even some non-members) coordinated the pricing and production of Broilers. In response, numerous private civil antitrust actions were filed against the NBMA and 42 individual defendants in the *In re Chicken Antitrust Litigation* case. The NBMA and Broiler producers eventually settled the case, resulting in a settlement of roughly $30 million.

343. Beginning in 2010, the USDA undertook a series of public workshops to explore competition issues in the upstream, contract-farmer Broiler market. A workshop held in Normal, Alabama, on May 21, 2010, focused on corporate concentration and lack of competition in the Broiler industry. The workshops led to the proposal of new rules aimed at encouraging competition in the meat industry, but extreme political pressure from Defendants and their allies eventually watered down the rule and led to the resignation of the official charged with imposing tougher regulations.

344. In 2011, George's Inc. acquired the Harrisonburg, Virginia processing plant from Tyson Foods. The DOJ brought an action to stop the acquisition (*United States v. George's, Inc.*),[10] which alleged the purchase would impermissibly reduce the available options for contract farmers to sell their grower services. The DOJ eventually settled with George's in June 2011 after

---

[10] *United States v. George's Foods, LLC et al.*, No. 5:11-cv-00043 (W.D. Va.).

obtaining an agreement to require George's to make capital improvements to the facility that would increase its capacity and permit contract farmers to sell more grower services to the processing plant.

345.    According to a June 2014 USDA Report, "the [Broiler] industry faces a range of public policy issues, [including] competition . . . . [c]oncerns[, including] the exercise of market power by Broiler integrators have prompted merger litigation, USDA regulatory initiatives, congressional proposals, and investigations by Federal agencies."

346.    Numerous cases in recent years have documented the lack of competition in the contract-farmer Broiler market, which while upstream in the supply chain from the Plaintiffs' and Plaintiff Class's direct purchaser market, suggest an absence of true competition and instead suggest a practice of coordination and collusion among Defendants.  In cases such as *Adams v. Pilgrim's Pride*, No. 2:090-cv-00397 (E.D. Tex.), *Been v. O.K. Industries*, No. 08-7078 (E.D. Okla.), and *Wheeler v. Pilgrim's Pride Corp.*, No. 5:06-cv-00004 (E.D. Tex.), contract-farmers have alleged violations of the Packers and Stockyards Act by integrated Broiler producers.

### 6.    *Defendants Had Numerous Opportunities To Collude.*

#### a.    *Trade Associations.*

347.    Defendants are members of several Broiler-related trade associations and other forums, which they used to facilitate their conspiratorial conduct.  Integrated Broiler producers have numerous regular events through which they can communicate in person with one another. Regular and frequent attendance by Defendants' CEOs and top level executives at trade association meetings is the norm rather than the exception.

348.    According to its website, "[t]he National Chicken Council represents integrated chicken producer-processors, the companies that produce, process and market chickens.  [The 40]

532461                                             113

member companies of NCC account for approximately 95 percent of the chicken sold in the United States." The CEOs of the top integrated Broiler producers are routinely on the board of directors and meet at least quarterly with one another through the NCC.

349. The NCC has three annual board meetings attended by Defendants' senior executives, including most or all Defendants' CEOs and other top executives. Every Defendant and Co-Conspirator is a member of the NCC, including Mar-Jac, Claxton Poultry, Harrison Poultry, Case Foods, Keystone, Amick, and Allen Harim. CEOs generally always attend the following three NCC meetings each year, in addition to special committee meetings or other special NCC events: (a) the January meeting of the NCC held along with the International Poultry Expo, (b) the mid-year Board of Directors meeting, and (c) the NCC Annual Meeting in October. Generally, CEOs arrive the night before an NCC meeting and socialize with their colleagues, then have small private dinners with one or more of their competitors' CEOs or top executives. The next day, the formal NCC meetings are held and executives from Agri Stats and other allied industry organizations make presentations at the meeting. A formal lunch is held during the meeting and provides CEOs and top executives and opportunity to talk casually with their competitors. Following the meeting, Defendants' CEOs and top level executives often meet, socialize and golf, hunt, or fish together. Amick President and CEO Ben Harrison, who served on the NCC Board of Directors throughout the Class Period, is currently the NCC's Chairman. Similarly, Allen Harim President and CEO Robert Turley served on the NCC Board of Directors throughout the Class Period and regularly attended its meetings. Thomas Shelton, Chairman and CEO of Case Foods, has continuously been a member of NCC since 1988 through the Class Period serving on the Board of Directors and as President during that time. Numerous executives of Keystone Foods, including Jeff Bailey (Director of National Account Sales), Jenelle Duncan

(Domestic Sales Manager), Chuck Cooper (Senior Director Supply Chain), Charles Hill (VP Sales & Marketing), and Keith Lewis (former Senior Vice President for U.S. Poultry and Fish), were also members of the NCC during the Class Period.

350.    Upon information and belief, CEOs and top level executives from Defendants and Producer Co-Conspirators discuss topics with one another relating to pricing, production, and other non-public, proprietary information outside of NCC's formal meetings at the informal settings surrounding NCC meetings described above.  These regular, informal, and in-person opportunities to discuss pricing and production in the Broiler industry gives CEOs and top level executives comfort that their competitors remain committed to a plan to artificially restrict Broiler production.

351.    The United States Poultry & Egg Export Council ("USAPEEC") has its home office in Stone Mountain, Georgia.  Defendants are all members of USAPEEC.  USAPEEC has a network of international offices and consultants in key export markets.  The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world.  The group has evolved into an association that is an advocate for the industry on trade policy issues.  USAPEEC has about 200 member companies and organizations. USAPEEC holds Board of Directors meetings quarterly and includes executives from all or nearly all Defendants and co-conspirators.

352.    The U.S. Poultry & Egg Association ("U.S. Poultry") describes itself as the world's largest and most active poultry organization.  U.S. Poultry's members include producers and processors of Broilers, turkeys, ducks, eggs and breeding stock, as well as allied companies. Defendants and Producer Co-Conspirators are all members of U.S. Poultry.  U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall.

353.    The Georgia Poultry Federation "is a non-profit trade association which represents the poultry industry in Georgia, the nation's leading broiler producing state. The Federation was

founded in 1951, and since that time has represented the interests of the entire poultry industry at the state and federal level on legislative and regulatory matters." The Georgia Poultry Federation's mission is "[t]o protect and improve the competitive position of the poultry industry in Georgia, the nation's leading poultry producing state." The Georgia Poultry Federation has regular meetings each April, August, and September which typically are attended by Defendants' senior executives. Defendants House of Raeford, Perdue, Fieldale Farms, Wayne Farms, Tyson, Sanderson Farms, Pilgrim's, Mar-Jac Poultry, Harrison Poultry, and Claxton Poultry, and Producer Co-Conspirator Keystone Foods, are members of the Georgia Poultry Federation.

354. The North Carolina Poultry Federation "has been the voice of the North Carolina poultry industry since 1968." The mission of the North Carolina Poultry Federation "is to create a favorable climate for business success for everyone involved in the poultry industry in North Carolina." The North Carolina Poultry Federation holds regular meetings each year, including annual meetings and Board of Directors meetings which typically are attended by Defendants' senior executives. Defendants Tyson Foods, Perdue, Mountaire Farms, House of Raeford, Wayne Farms, Sanderson Farms, and Pilgrim's, and Case Foods are each members of the North Carolina Poultry Federation.

355. The Poultry Federation was established in 1954 as a non-profit trade organization to represent the poultry and egg industries in Arkansas, Missouri, and Oklahoma. In 1998, the Arkansas, Missouri, and Oklahoma organizations were consolidated and became The Poultry Federation. The Poultry Federation claims to promote all poultry interests relating to production, distribution, merchandising, and consumption of poultry, and poultry products. It disseminates information relating to the various phases of the Broiler industry to improve and expand markets, to increase efficiency in production and marketing, and to encourage and support research in

production and marketing of poultry. The Poultry Federation holds regular meetings each year, including Board of Directors meetings with Defendants' senior executives identified below. Defendants Foster Farms, O.K. Industries, Inc., Pilgrim's, Simmons Foods, Peco Foods, Tyson Foods, George's, Inc., and Wayne Farms are each members of the Poultry Federation.

356.    The International Poultry Expo ("IPE") was held annually from 2008-2012. The IPE billed itself as "the networking hub of the world for the poultry industry." The IPE was held annually in late January in Atlanta, Georgia. Defendants' senior executives, and numerous mid-level executives and other employees, attended the IPE each year. The International Producers and Processors Expo ("IPPE") is the world's largest annual poultry, meat, and feed industry event. IPPE held its first event in January 2013 and combined three previously separate expos – the IPE, the International Feed Expo, and the International Meat Expo. According to the IPPE's website, a wide range of international decision-makers attend this annual event to network and become informed on the latest technological developments and issues facing the industry. The 2015 IPPE featured more than 7,245 international visitors from over 103 countries, including attendees from Chile, France, Singapore, and Australia. IPPE indicates that Defendants and co-conspirators each sent their "Top Management" to the 2014 IPPE in January 2014. The most popular panel each year is the "market intelligence" forum, which features an Agri Stats executive speaking regarding the Broiler industry. Similarly, Defendants' senior executives attended IPPE in 2015 and 2016.

357.    The International Poultry Council ("IPC") was formed in 2005 and is composed of national trade associations from 23 countries, as well as 40 individual companies that are "Associate" members. The IPC website bills the organization as the "voice of the global poultry industry" and its mission is to "strengthen communication between the industries of different countries." The NCC, USAPEEC, and USPOULTRY are members of the IPC on behalf of United

States poultry producers, along with individual company members of the IPC, including Tyson, Cobb-Vantress (a Tyson subsidiary), Sanderson Farms, and JBS S.A. (Pilgrim's parent company). Additionally, the Chilean poultry trade association ("APA") and the Australian Chicken Meat Federation ("ACMF") are also members of the IPC.

### b.  Overseas Distribution Solutions.

358.    Overseas Distribution Solutions ("ODS") is a Webb Pomerene[11] organization founded by a group of Defendants in 1999.  A Webb Pomerene organization is an association of exporters that is exempt from certain provisions of the Sherman Antitrust Act while engaging in conduct to promote United States trade abroad.  A Webb Pomerene organization may not engage in importation or sales within the United States, however, and its members may undertake what would otherwise be considered actionable collusive conduct only to export similar products.

359.    ODS continued to operate at least through 2011.  ODS membership by Defendants has included Defendants Wayne Farms, Peco Foods, Sanderson Farms, Pilgrim's, and Tyson, as well as Cagle's.  The principal office for ODS was located for much of the Class Period in the same town as Sanderson Farms' headquarters – Laurel, Mississippi.

360.    While originally a member of ODS around the time it was founded, Tyson withdrew from ODS some time prior to the start of the Class Period.  However, Tyson re-joined ODS in 2010, but then inexplicably withdrew within a few months.  Within a few years of Tyson's sudden departure, ODS disbanded and stopped filing for Webb Pomerene status.

361.    While ODS had a mandate under the Webb Pomerene Act to have no impact on the U.S. domestic market, Broiler industry executives recognize it is inevitable that exports will impact U.S. domestic Broiler prices.  For instance, former Pilgrim's CEO Dr. Don Jackson has noted that

---

[11] Webb Pomerene Act of 1918, 15 U.S.C. §§ 61-66.

"the broiler market is global in nature. Obviously, the U.S. business generally has more volume obviously going into the domestic market, but both the domestic and export makes up the market. And at times, the export market can be very impactful favorably or unfavorably to the U.S. market." Therefore, according to the testimony of one of Defendants' own CEOs, it was impossible for ODS to comply with the Webb Pomerene requirement that ODS not impact domestic prices for U.S. Broilers.

### c. *Investor Conferences.*

362.    Defendants' CEOs and senior executives participate in numerous investor conferences organized by Wall Street analysts, providing further opportunities to meet and communicate with one another. Such conferences are held on an annual and/or ad hoc basis including, but not limited to, the Goldman Sachs Global Staples Forum (held every May), Bank of America Merrill Lynch Global Agriculture Conference (held every February), BMO Capital Markets Annual Ag & Protein Conference (held every May), BMO Capital Markets Conference (held every May), BMO Farm to Market Conference (held every May), Urner Barry Annual Executive Conference and Marketing Seminar (held every April or May), and JP Morgan Basic Materials Conference (held every June).

### d. *Competitor Plant Tours.*

363.    Defendants also permitted one another to tour each other's Broiler plants, which revealed confidential business methods employed by a company. While such tours were often framed as "best practices" information exchanges, they permitted the opportunity to conspire among senior executives.

364.    Defendants also permit employees to regularly move between companies without non-compete limitations or confidentiality agreements that would protect a company's (seemingly) proprietary business knowledge and customer base. For example, Dr. Don Jackson was President

of Foster Farms' Poultry Division until December 2008, but then immediately took a position as CEO of Pilgrim's. Similarly, Clint Rivers, Pilgrim's former President and CEO until December 2008, left the company and became Senior VP of Operations and Supply Chain Management for Perdue in 2009. Rivers then moved to Wayne Farms in 2012, where he became Chief Operating Officer. Greg Tatum served as CFO for Claxton Poultry, before moving to Pilgrim's in 2009 to serve as Senior VP of Business Development. Current Pilgrim's CEO Bill Lovette and his second-in command, Executive Vice President Jayson Penn, both came from Case Foods to Pilgrim's in 2011. Bill Lovette also worked at Tyson through October 2007, before moving to Case Foods in 2008, then to Pilgrim's in 2011, where he currently serves as CEO. Mountaire's Jim Moran (COO & SVP Operations) joined Allen Harim in 2015 as Executive Director of Operations, before becoming CEO of Allen Harim in 2016. Numerous other high level and well as lower level executives move freely between Broiler companies with little or no provision by Defendants to protect their confidential information.

### e. Merger, Acquisition, and Capital Financing Discussions.

365. Senior executives from Defendants had numerous opportunities to directly communicate with one another regarding various mergers and acquisitions between 2008 and 2016. These merger and acquisition discussions include both completed agreements, such as those described in Section VI(E)(4) of this Complaint, as well as proposed transactions that were never completed. In connection with mergers and acquisition discussions, due diligence materials regarding confidential business information were shared between Defendants.

366. In addition, Defendants all rely on debt financing and merger and acquisition services from the same small group of financial institutions. In the course of providing such services, financial institutions obtain unusually detailed access to Defendants' non-public

operational information, including production and pricing information, which provides another opportunity for Defendants to share confidential business information.

367.     Complete information regarding the full scope of merger, acquisition, and capital financing discussions, communications, and due diligence information exchanged presently is known only to Defendants and their agents.

### f.     Other Business Dealings.

368.     Defendants also engaged in various business dealings with one another, including purchasing feed from one another and forming joint ventures for various purposes, such as construction and operation of rendering plants and for the slaughter of spent Broiler breeders (including both hens and roosters, commonly referred to as "fowl").

369.     ██████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

370.     ██████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████

371. 

372.

373.



374. ████████████████████████████████████████████████████

### 7. *There Are High Barriers To Entry In The Broiler Market.*

375.     The existence of high barriers to entry is one factor which makes markets susceptible to collusion.  A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

376.     During the Class Period and continuing today, substantial barriers impede entry into the Broiler market.  A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, construction of processing plants, feed mills, hatcheries, equipment, energy, transportation distribution infrastructure (aka, "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, long-standing customer relationships, safety and quality

assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.

377. Defendants themselves acknowledge the substantial costs of entering the market and view it as important that new entrants not be able to purchase closed facilities. For example, when the State of Louisiana pressured Pilgrim's to sell its closed Farmerville Broiler complex, Pilgrim's executives expressed concern about any state assistance to the buyer to purchase the Farmerville Broiler complex because such assistance could substantially reduce the buyer's cost basis therein, which could then permit the buyer to flood the market with low-cost Broilers.

378. The price of construction of a new integrated Broiler processing complex (hatchery, feed mill, and processing plant) able to compete on price with current integrated producers is relatively high. Even for a current market participant, such as the third-largest producer (Sanderson Farms), construction of a new Broiler complex (i.e., feed mill, hatchery, and processing plant) in 2010 was estimated to cost $100-$125 million. However, these costs fail to account for other hurdles to new market participants, discussed above.

379. The barriers to entry in the Broiler industry have proved insurmountable for potential new market entrants. No company has created a new poultry company from scratch in decades. Further, when one foreign meat company (Omtron, a Ukrainian company) tried to enter the U.S. market in February 2011 by buying a portion of the assets of bankrupt Broiler producer Townsend's, Omtron invested $35 million to improve the facility's processing operations, but went bankrupt only five months after making the purchase.

380. A number of large foreign meat conglomerates have acquired U.S. Broiler producers in the past decade, including Brazil's JBS S.A. (Pilgrim's), Mexico's Industrias Bachoco (O.K. Foods), Belgian company Continental Grain Company (Wayne Farms), Marfig

Alimentos S.A. (Keystone Foods), and South Korea's Harim Group Corporation (Allen Harim). However, each of these foreign meat conglomerates were already large players in the global meat industry and simply continued operating their pre-existing U.S. Broiler company as a subsidiary. Ownership of U.S. Broiler subsidiaries by such large, well-financed conglomerates deter entry by smaller, non-globalized companies that might want to enter the U.S. Broiler production business.

381.    A further barrier to new entrants is the unwillingness of large vertically integrated producers to sell an idled Broiler complex, which also keeps open the threat that an integrated producer will restart a closed Broiler complex. Pilgrim's has been explicit about this threat to new market entrants. For instance, in a February 2014 earnings call, Pilgrim's was asked whether it had any plans to sell "a couple of idled U.S. facilities . . . to use that as a source of capital," to which Pilgrim's CFO Fabio Sandri replied "[n]o. We are thinking those are held defensive, so we don't plan to sell them in this short-term or in the near future." Such a threat of restarting idled facilities, rather than selling those facilities, represents a substantial barrier to entry for new market participants because an existing Broiler producer can merely restart a closed mill to drive down prices and run a new entrant out of business.

### 8.    Defendants Have Similar Cost Structures and Work Collaboratively To Share Cost Information.

382.    Another factor antitrust law and economics have identified as making markets susceptible to price-fixing is similar cost structures. The majority of production costs for Broiler producers are variable. All other factors being equal, when variable costs are a high percentage of production costs, there is less incentive for a producer to operate its facilities at full capacity, and this may allow a cartel to boost prices artificially with greater success than when fixed costs are the largest component of production costs.

383.    The single largest cost component of producing Broilers is feed, which primarily consists of soybean meal and corn.  Broiler feed prices have varied widely from 2007-2016, reaching 71% of the cost of growing Broilers in 2012, but falling to only about 50% by 2014.

384.    Input costs other than feed include processing plant labor costs (~15%), materials (~11%), and capital equipment (~2.5%).  Labor costs have declined significantly over the past two decades for Defendants, while at the same time labor productivity has substantially increased.

385.    Broiler feed costs have been decreasing sharply since record highs in 2012.  For instance, prices for soybean meal were down 10% in 2014.  Since January 1, 2008, corn prices have declined roughly 21% and soybean prices have declined 13%.  During the same period, Broiler prices increased roughly 50%.

386.    Defendants have relatively similar cost structures.  The technology and process of industrial scale growing and processing Broilers is well known and Defendants employ the same types of equipment and processes in the production process.  Defendants also have only three companies from which they can obtain breeder stock from which to raise Broilers, so there are very limited options with respect to purchasing the most cost efficient Broiler genetic lines.  Similarly, Defendants all purchase corn and soybeans on the open market, so they have limited ability to obtain substantially different pricing on these key variable cost inputs for their Broilers.

387.    Defendants use Agri Stats to share extraordinarily detailed cost information (as discussed below), so they are able to constantly realign their cost structures with one another.  Agri Stats permits each Defendant to have extremely unusual knowledge of competitor costs and to make adjustments to standardize each company's cost structure across all Agri Stats participants.

388.    ██████████████████████████████████████████
████████████████████████████████████████████████

█████████████████████████████████████

█████████████████████████

389.    Defendants engage in a program of "feedmill cross-testing" in which some Defendants exchange feed and chicks with one another for the purported purpose of determining which Defendants' feed and/or chicks have superior qualities.  Defendants claim this strategy helps them maximize efficiency.  However, it is not economically rational in a truly competitive market for a producer to provide its proprietary feed mixes and/or chicks to its competitor, thereby giving away any competitive cost advantage over its competitors.

390.    Another sign that Defendants do not view production costs as secret is the fact that it is not unusual for Defendants to permit competitor's CEOs access to each other's production complexes.  In a competitive industry, production methods should be closely guarded to protect proprietary methods of production that save a company money and give it a competitive advantage over its competitors.  However, this is not the case in the Broiler industry.  For example, from April 19-21, 2013, Pilgrim's President & CEO Bill Lovette, Perdue Chairman of the Board Jim Perdue, and Sanderson Farms President & COO Lampkin Butts attended a three day long "Chicken Media Summit" in North Carolina that included visits by attendees to a Sanderson Farms growhouse and processing plant.  Similarly, from April 19-21, 2015, another Chicken Media Summit was sponsored by the NCC and USAPEEC and included tours of Perdue's operations and panel discussions with Defendants' senior executives.

F.    **In Furtherance of Their Conspiracy, Defendants Rigged Bids and Exchanged Pricing Terms that They Submitted to Broilers Purchasers.**

391.    Certain Defendants conspired to and did rig bids and exchanged other Broiler price-related terms with each other throughout the Class Period, as alleged below.

392.    In this regard, certain Defendants conspired:

A.  to reach agreements and understandings to submit aligned—though not necessarily identical—bids and to offer aligned—though not necessarily identical—prices, and price-related terms, including discount levels, for Broilers chicken products sold in the United States;

B.  to exchange non-public information such as bids, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States, with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for Broilers chicken products sold in the United States; and

C.  to monitor bids submitted by, and prices and price-related terms, including discount levels, offered by Suppliers and co-conspirators for Broilers chicken products sold in the United States.

393.     As with the other means of executing their conspiracy as alleged in this Complaint, these Defendants' conduct in this regard had the purpose and effect of fixing, maintaining, stabilizing, and raising prices of Broilers sold in the United States.  By exchanging information regarding prices, these Defendants were able to undermine fair pricing negotiations with customers, and turn what were intended to be blind and competitive pricing negotiations into pricing coordinated among Defendants.

394.     Defendants exchanged information in furtherance of the conspiracy via in-person meetings, telephone calls, text messages, email communications, and other methods of electronic communications.  Examples of instances of certain Defendants' price-fixing and bid-rigging include, but on information and belief are not limited to the following:

A.



B.

C.



D.

E.

F.

G.

H.

I.

J.

K.

L.



M.

N.

O.

P.

Q.

395.    Details of these Defendants' bid-rigging began coming to light publicly in June 2, 2020, when the United States Department of Justice (the "DOJ") indicted four employees of Defendants for price-fixing and rigging bids for Broilers. The four employees were:



- Jayson Penn,

- Mikell Fries

- Scott Brady,                                          and

- Roger Austin,

396.    On October 6, 2020, the DOJ filed a Superseding Indictment and charged six additional employees of Defendants with conspiring to rig bids and fix prices and other price-related terms for Broilers. The six additional employees are:

- Timothy Mulrenin, 
- William Kantola,
- Jimmie Little, [12]
- Bill Lovette,
- Gary Roberts, and
- Rickie Blake,

397.    The Superseding Indictment also makes specific reference to co-conspirators who aided these Defendants in the conspiracy but whose identities are not yet known.

398.    In addition, Defendant Tyson has admitted that it engaged in price-fixing and bid-rigging for Broiler products. After the DOJ filed the initial Indictment, Tyson disclosed that in April 2019 it was served with a grand jury subpoena concerning the DOJ's criminal antitrust investigation into the Broiler industry, and that subsequently it self-reported to the DOJ and admitted its participation in the conspiracy to fix prices and rig bids for Broilers. In return for Tyson's admission and its subsequent cooperation with the DOJ, it obtained leniency under the DOJ's Corporate Leniency Program.

399.    Pilgrim's also entered into a plea agreement with the DOJ in relation to its criminal antitrust investigation into price-fixing and bid-rigging in the Broiler industry. As part of the plea agreement, Pilgrim's admitted that it fixed prices and rigged bids. Pilgrim's will pay a fine of $110,524,140 for restraint of competition and cooperate with the DOJ's ongoing investigation. In return, the DOJ will not bring any additional charges against Pilgrim's.

---

[12] Jimmie Little was also charged with making false statements and obstructing justice. According to the Superseding Indictment, Little knowingly told federal law enforcement agents that he did not have any contact with employees of ▮▮▮▮▮ competitors outside of industry trade shows, and that he did not call or send text messages to any employees of ▮▮▮▮▮ competitors. However, he did communicate with employees of ▮▮▮▮▮ competitors outside of industry trade shows, and he did call and send text messages to employees of ▮▮▮▮▮ competitors.

**G. Since 2008 Defendants' Collusion Has Led to Unprecedented Capacity Reductions, Artificially High Prices, and Record Profits.**

400.     As described above, Broiler prices have been artificially inflated since 2008, despite a historic trend of boom and bust cycles for Broilers as producers oversupply the market in response to price increases, leading to low single-digit profit margins in the Broiler industry.  As one industry observer noted, "[t]he profit margins of the nation's biggest meat packers rose dramatically between 2008 and 2010 (the most recent year for which good data is available), even as the national economy cratered. Tyson Foods, the nation's biggest meat company, reported record profits of $778 million last year [i.e., 2013] as the company hiked prices for beef, pork, and chicken."

401.     The historic pattern of annual increases in Broiler production was so entrenched over decades of experience by the 2000s that one widely repeated quip in the industry was that there were now only three things certain in life: "Death, taxes and 3% more broilers."  A leading industry publication noted in early 2009 that "[b]roiler production in the U.S. used to be just like government spending, it never went down and cutbacks only resulted in slowing the rate of growth, but not anymore" because "[f]or the first time in decades, total broiler production in 2008 remained virtually unchanged from the year before.  *WATT PoultryUSA* 2008 rankings data show the industry's total weekly ready-to-cook (RTC) production at 724.05 million pounds, just slightly more than the 723.71 million RTC pounds per week reported at the end of 2007."

402.     During a February 12, 2015, earnings call, Pilgrim's President & CEO Bill Lovette summed up the restriction of supply which Defendants had implemented since 2008 (including Lovette himself, as COO of competitor Case Foods from 2008 to 2011): "I looked at some numbers supplied by Agri Stats earlier in the week and found some interesting facts.  If you go back to 2008, the industry slaughtered 8.35 billion head.  And by 2011, that slaughtered head had declined

by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies."

### H. Defendants Reduced Their Own Production And Used Direct Purchases of Broilers To Reduce Industry Supply.

403.    Economic theory and good business strategy suggests that relying upon one's competitors to meet a company's own commitments to its customers is not rational, as the competitor can decide to cut out the middleman and sell directly to the end customer.  Nevertheless, Tyson, Fieldale Farms, Koch Foods, and other Defendants have created a system of inter-dependence whereby some Broiler companies purposely under-produce Broilers on the assumption their competitors will sell them what they need.

404.    Defendants use direct purchases of Broilers from one another and from smaller Broiler producers to meet each company's own sales needs. This permits Defendants to soak up excess supply that could depress prices in the market and also facilitates the opportunity to expressly discuss prices with competitors.  Such purchases also permit companies to maintain their market share despite reducing their own production.  Additionally, in many instances large inter-Defendant purchases are negotiated by CEOs or other senior level executives of Defendants, providing an additional opportunity for such individuals to conspire.

405.    Further, Defendants' participation in Agri Stats gives them visibility into each other's profitability, operating margins, and supply that no ordinary customer could hope to achieve.

406.    In 2011, as noted above in Section VI(D)(5), Tyson began using what was described as a "very unique strategy," called "Buy vs. Grow." Tyson's strategy essentially treats the industry supply as though it were for a single unified company, rather than competing businesses that would rather sell self-produced product to a customer than a competitor.

407.    What makes Tyson's program exceptionally "unique" is that only a few years before adopting a "Buy vs. Grow" strategy, Tyson declared such a strategy to be "stupid" because it would be subsidizing a competitor's growth. Tyson's Executive Vice President & CFO, Wade Miquelon explained on an April 29, 2008, earnings call that "I think what we said along is we're going to match our supply and demand. We're not going to cut beyond that and then go out and buy open market meat to subsidize other people's growth." Therefore, Tyson's change in view towards open market purchases suggests it had confidence by 2011 that its competitors would maintain their production levels and *not* grow.

408.    In a November 5, 2012, interview, Fieldale Farms President Thomas Hensley noted his company was also pursuing a strategy to buy up excess supply from its competitors, stating that "[i]f you don't have a home for your chickens on Monday morning, you shouldn't have those chickens. Now we know where all our chickens are going. So we are buying chickens in that lower price area instead of selling them. So, no expansion for us."

409.    By the end of 2014, Tyson reported it was buying over 4 million pounds of Broilers on the open market each week. Four million pounds of Broilers per week is more than any of the

24th-30th largest Broiler companies produce on a weekly basis, so the amount of Tyson's purchases was quite significant in terms of volume.

410.    During the first part of 2015, Tyson increased its Buy vs. Grow purchases by 50%, expanding Tyson's purchases from competitors to unprecedented levels.

411.    Tyson announced plans in May 2015 to increase its Buy vs. Grow strategy to *10 percent* of its sales in the second half of 2015 and 2016.  Ten percent of Tyson's 2014 pounds RTC is 17.6 *million* pounds per week, a volume that by itself would dwarf the entire average weekly production of any of the 15th-30th largest Broiler producers.  Notably, Tyson also announced in May 2015 that it planned to reduce its production after July 2015 and keep production flat through 2016 by increasing its Buy vs. Grow purchases.

412.    Upon information and belief, Defendants made use of Broiler purchases from and purchase contracts between one another and smaller Broiler producers to reduce their own production while soaking up excess supply from competitors.

413.    Defendants' use of direct purchases from one another and from smaller Broiler producers provided Defendants an uninterrupted flow of supply and pricing information and opportunities to communicate directly with one another.

I.    **Defendants Made A Coordinated Move Away From Fixed-Price Contracts To Contracts That Changed Prices Quarterly Or Followed Broiler Price Indexes.**

414.    A coordinated move away from fixed price contracts to contracts that permit prices to fluctuate with an indexed public market price helps facilitate an antitrust conspiracy.  *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 659 (7th Cir. 2002).  This is precisely what occurred in the Broiler market during the Class Period.

415.    For several years prior to the Class Period, many vertically integrated Broiler producers offered some customers long-term fixed-price contracts of a year or more.  This

guaranteed customers a fixed price, but also prevented Broiler producers from being able to realize market price increases that would naturally result from their planned supply cuts.

416.    Starting around January 2008, senior executives from Koch Foods, Pilgrim's, Perdue, Sanderson Farms, and Tyson Foods publicly announced an effort to reduce annual fixed-price contracts. This change coincided with Defendants' efforts to reduce Broiler industry supplies so as to drive Broiler market prices higher.

417.    On January 28, 2008, Tyson CEO Dick Bond announced on an earnings call that Tyson was looking at shortening its fixed price contracts, and by June 2009 Tyson reported it had "dramatically" shortened the amount of fixed-price contracts over 90 days.

418.    On January 29, 2008, Pilgrim's CFO Rick Cogdill reported on an earnings call that Pilgrim's had started moving away from fixed-price contracts, but Pilgrim's moves were being held back by legacy fixed-price contracts entered into by Gold Kist prior to its acquisition by Pilgrim's in late 2006. Cogdill also noted that "in a situation like where we are now where we need to drive commodity prices up, that [i.e., having less fixed price contracts] is going to give us the opportunity for more immediate benefit to our P&L than what we would have had say, historically three year[s] ago, when a higher percentage was fixed price." Pilgrim's later reported that by March 2012 it had reduced its exposure to fixed price contracts, with most contracts now market-based or including a reset provision linked to the underlying commodity. By 2014, Pilgrim's reported that less than 5% of all its contracts were 12-month fixed price contracts.

419.    On July 28, 2008, Perdue spokesperson Julie DeYoung told an industry publication that Perdue was looking to shorten its contract terms, stating, "the company is also seeking to raise prices and shorten its contracts."

420.     Sanderson Farms' CEO Joe Sanderson noted in a July 31, 2008, earnings call that the industry may move towards "shorter term agreements."

421.     Industry observers noted the trend of Broiler producers moving away from fixed-price contracts.  For instance, a December 2013 report by Stephens, Inc. analyst Farha Aslam noted that "[w]ith volume growth generally limited, companies are developing more sophisticated strategies to generate profits . . . . 'Rather than annual fixed price contract[s] that are negotiated every fall, companies are partnering with customers and creating contracts that can be multi-year in duration.  Contracts are now being negotiated all year long and employ a wide variety of pricing methodologies.'"  This confirms that even contracts which are long-term in duration are not "fixed" so as to prevent price increases when coordinated supply reductions drive up Broiler market price indices.

## VII.     CLASS ACTION ALLEGATIONS

422.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class:

> All persons who purchased Broilers directly from any of the Producer Defendants or any Producer co-conspirator identified in this action, or their respective subsidiaries or affiliates for use or delivery in the United States from at least as early as January 1, 2008 until the Present.  Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

423.    Class Identity: The Plaintiff Class is readily identifiable and is one for which records should exist.

424.    Numerosity: Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of Defendants.  Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.  For example, Pilgrim's alone reports that it has over 5,000 customers.

425.    Typicality: Plaintiffs' claims are typical of the claims of the members of the Plaintiff Class because Plaintiffs purchased Broilers directly from one or more of the Producer Defendants, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

426.    Common Questions Predominate: There are questions of law and fact common to the Class, including, but not limited to:

A.    Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of Broilers sold in interstate commerce in the United States;

B.    The identity of the participants of the alleged conspiracy;

C.    The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

D.    Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

E.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the Plaintiff Class;

F.    The effect of Defendants' alleged conspiracy on the prices of Broilers sold in the United States during the Class Period;

G.    Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

H.    The appropriate class-wide measure of damages.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Plaintiff Class.

427.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who directly purchased Broilers and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

428.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class members compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

429.    The Class is readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

430.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

431.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

### VIII.    ANTITRUST INJURY

432.    Defendants' conspiracy had the following effects, among others:

A.    Price competition has been restrained or eliminated with respect to Broilers;

B.    The prices of Broilers have been fixed, raised, stabilized, or maintained at artificially inflated levels; and

C.    Purchasers of Broilers have been deprived of free and open competition.

433.    During the Class Period, Plaintiffs and the members of the Class paid supracompetitive prices for Broilers.

434.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Class have sustained injury to their businesses or property, having paid higher prices for Broilers than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages.

435.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

### IX.    THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS

**A.    Plaintiffs Did Not and Could Not Have Discovered Defendants' Anticompetitive Conduct.**

436.    Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the

532461                                                                    140

existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices and rig bids for Broilers.

437. The *Adams v. Pilgrim's Pride* case was originally filed as an adversarial bankruptcy proceeding against Pilgrim's in 2009, but was stayed pending resolution of Pilgrim's bankruptcy. The bankruptcy court subsequently allowed the *Adams* case to proceed. The Amended Complaint in the *Adams* case was filed on December 7, 2009, and like the original complaint, disclosed nothing about a horizontal conspiracy among Broiler producers to fix the price of Broilers.

438. On February 18, 2014, "investigative reporter Christopher Leonard [published *The Meat Racket*,] the first-ever account of how a handful of companies have seized the nation's meat supply." The book was credited with being the first to explain how the meat industry had changed over the past forty years into an "oligarchy controlling much of the food we eat." While *The Meat Racket* did not conclude that Broiler producers were engaged in a horizontal conspiracy, it did suggest for the first time in a widely circulated book that conditions in the Broiler industry had become susceptible to collusion.

439. In addition, six recent investigations by foreign governments into price-fixing conspiracies in Broiler markets suggest that such price-fixing was possibly taking place in the United States. French, Chilean, Singaporean, Australian, Indonesian, and South Korean price-fixing investigations in the past two years (described in sub-paragraphs A-F) have indicated that collusion is evidently rampant in Broiler industry. In particular, the large fine levied by France's competition authority against 21 separate companies and 2 other organizations suggests that even in a Broiler industry with almost two dozen participants, a price-fixing conspiracy is plausible in the modern, industrialized reality of Broiler production.

A.    Chile: In a September 25, 2014, decision, Chile's Tribunal de Defensa de la Libre Competencia (Court for the Defense of Free Competition) concluded that three Chilean Broiler producers had colluded to limit the production of Broiler meat offered to the domestic market and allocated market shares of production and marketing of Broiler.  The Court found that "the summoned poultry companies, by demand projections developed in conjunction with the APA[, a Chilean Broiler trade association], pursued the range in which Broiler prices should fluctuate through coordinated definition of a certain level of production."  Based on the projected future demand for broilers, each conspirator would be allocated a production quota.  The collusion was established through emails and other documents seized by the competition authority.  The Court imposed fines equivalent to roughly $85 million and disbanded a Broiler trade association used by the defendants to facilitate their conspiracy.

B.    Australia: On February 2, 2015, The Australian newspaper disclosed that the Australian Competition & Consumer Commission had initiated an investigation into price-fixing in the Australian broiler industry.  The investigation is ongoing.

C.    Singapore: On March 7, 2015, a local newspaper reported for the first time that the Competition Commission of Singapore (CCS) was investigating price-fixing among live chicken slaughtering and fresh chicken distribution by Malaysian based broiler producers and the Poultry Merchants' Association.  On March 8, 2016, the Competition Commission of Singapore charged thirteen fresh chicken companies that make up ninety percent of the market in Singapore with engaging in anti-competitive discussions from 2007 through 2014.  The matter is ongoing.

D.    France: On May 6, 2015, France's competition authority, l'Autorité de la Concurrence announced that after an investigation into the entire French Broiler industry, it had decided to impose approximately $17.18 million in fines on 21 companies and 2 organizations for price fixing. The French competition authority concluded that between 2000–2007, French Broiler producers held a large number of meetings to discuss the prices to charge their customers, as well as other business details, all for the purpose of gaining a stronger position in price negotiations with France's larger supermarket chains.  One of the French broiler company conspirators, Doux, collaborated with Pilgrim's parent company, JBS, S.A., in the Brazilian broiler market.

E.    Indonesia: On February 3, 2016, Indonesia's Business Competition Supervisory Commission (KPPU) announced that it had compiled enough evidence of price-fixing in the poultry industry to summon 12 companies

who constitute 90 percent of Indonesia's poultry production. The investigation is ongoing.

F.   South Korea: In early August 2017, it was reported that South Korea's Fair Trade Commission (KFTC) is currently investigating Harim Group Corporation (parent company of Producer Co-Conspirator Allen Harim), the country's largest poultry producer, for price-fixing. According to local media reports, the KFTC began investigating Harim and other firms amid allegations they colluded to adjust their chicken output. The probe is also looking into the involvement of the Korea Broiler includes allegations of pricing-fixing involving the Korea Broiler Council as well.

440.   The Wall Street Journal article on January 18, 2016 regarding possible manipulation by Defendants of the Georgia Dock Broiler price index raised the possibility of collusion by Defendants to artificially raise, fix, or maintain Broiler prices. Subsequently, the series of articles published between November 3 and 17, 2016, detailed for the first time that the USDA had discontinued its reliance on the Georgia Dock price because its prices could not be verified. In an April 2016 letter to the Securities and Exchange Commission and the November 8, 2016, Washington Post article, Defendant Sanderson Farms continued to represent that the Georgia Dock price was "reliable," in order to induce purchasers of Broilers to believe the price was not subject to illegal manipulation by Defendants. Further, not until November 10, 2016, was it disclosed publicly that Defendants had formed a secret Georgia Dock Advisory Committee that facilitated opportunities for executives to meet and also discuss their scheme to fix the Georgia Dock price. The existence of this Committee was not known to the Plaintiffs, nor would they have been able to learn of how they conducted themselves in their secret meetings. Finally, not until November 17, 2016, was it publicly disclosed that the Florida Attorney General's Office was investigating the accuracy of the Georgia Dock price index.

441.   One way to assess whether the public was aware of facts suggesting an antitrust conspiracy among Defendants is to analyze the reaction of the market to the filing of the first

complaint in this action. In a reaction widely seen as driven exclusively by the filing of the *Maplevale Farms* complaint, on October 7, 2016, Defendant Tyson Food, Inc.'s stock price dropped as much as 11.5%, while Defendants Sanderson Farms and Pilgrim's Pride dropped 6.9% and 6.1% respectively. Similarly, the November 3, 2016, the New York Times article, published online that evening, revealed for the first time the USDA's inquiry regarding the Georgia Dock price index and raised the possibility that the index had been manipulated by Broiler companies. The next business day, the stock prices of Defendants Tyson Food, Inc., Sanderson Farms, and Pilgrim's Pride dropped 4%, 7%, and 8%, respectively, which media reports blamed on fallout from the disclosure of the USDA inquiry regarding the Georgia Dock price in the New York Times article.

442. Details of certain Defendants' participation in the combination and conspiracy to fix prices and other price-related terms and rig bids for Broilers became public on June 2, 2020 with the filing of the DOJ's Indictment against four senior executives: Jayson Penn, Pilgrim's Executive VP of Sales & Operations and later its President & CEO; Mikell Fries, Sales Director, Member of the Board of Directors of Directors, and President of Claxton Poultry; Scott Brady, Vice President at Pilgrim's and a Vice President at Claxton Poultry; and Roger Austin, Vice President at Pilgrim's. A Superseding Indictment filed on October 6, 2020 added significantly more detail and charged six additional employees of Defendants: Bill Lovette, Pilgrim's President & CEO; Timothy Mulrenin, a sales executive at Tyson and a sales executive at Perdue; William Kantola, a sales executive at Koch Foods; Jimmie Little, a sales director at Pilgrim's; Gary Roberts, an employee at Tyson and a manager and director at Case Foods; and Rickie Blake, a director and manager at George's. Plaintiffs and the members of the Plaintiff Class did not learn, and could not learn through the exercise of reasonable diligence, the details of certain Defendants'

participation in the combination and conspiracy until these details were made public by the filing of the Indictment and the Superseding Indictment.

443. Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Broilers are not exempt from antitrust regulation, and thus, before these recent events Plaintiffs reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Broilers prices before these recent events.

444. Plaintiffs exercised reasonable diligence. Plaintiffs and the members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and all of their co-conspirators to conceal their combination.

**B.  Defendants Actively Concealed The Conspiracy.**

445. Throughout the Class Period set forth in this Complaint, Defendants and their Producer Co-Conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the Class members by jointly agreeing and acting with their co-conspirators to keep the purpose and effectiveness of the combination and conspiracy secret.

446. The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through a "proprietary,

privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

447.    Defendants used code words including "discipline" and "capacity discipline" in their public statements to conceal their conspiracy and signal one other in furtherance of their conspiracy to restrain production while shielding their conspiracy from detection or suspicion.  As alleged above, specific examples of the use of such coded language abound during the Class Period, including (1) the National Chicken Council's Annual Conference in October 2011 where a report noted that panel members Clint Rivers of Perdue Farms, Bill Anderson of Keystone Foods, Mike Helgeson of GNP, and Mark Kaminsky of Koch Foods noted that "[d]iscipline on the supply side was one suggestion" to increase Broiler prices, (2) on a May 3, 2013, earnings call, Pilgrim's President & CEO Bill Lovette stated that "price is going to strengthen as supply continues to be disciplined and constrained….and "we've done a good job so far of maintaining discipline," and (3) on a July 2016 earnings call Pilgrim's CEO Bill Lovette noted that "I think what we've seen with egg sets is absolutely a testament to the discipline of our industry that we've seen the last really two to three years."

448.    As alleged above, in 2008, after years of boom and bust cycles of production leading to the regular rise and fall of prices, the price of Broilers began an unprecedentedly steady increase that continues through the filing of this Complaint.  Defendants affirmatively and falsely attributed the price increase to increases in the price of inputs, among other reasons.  These were pretexts used to cover up the conspiracy.  In fact, these price increases were the result of collusive conduct among Defendants, which was undisclosed at the time.

449.     During the relevant period, Defendants affirmatively made numerous misleading public statements falsely portraying the market for Broilers as a competitive one.  For example, Defendants provided testimony at workshops held by the U.S. Department of Justice and USDA suggesting the Broiler industry was competitive and not subject to anti-competitive practices and agreements.  This included testimony at a May 21, 2010 workshop of a National Chicken Council-commissioned study by Dr. Thomas Elam, which stated that "the chicken industry is competitive and thriving," and has "[i]ntense competition" that promotes "product innovation and lower prices for consumers."

450.     Defendants also repeatedly blamed the Renewable Fuels mandate for increased Broiler prices, both through the NCC, other trade groups, and through press releases, speeches, and other public statements by Defendants' employees, rather than disclosing the existence of an agreement to illegally restrain the supply of Broilers.  Some instances of these pretextual explanations by Defendants and their agents include:

A.     On a January 29, 2008, earnings call, Pilgrim's Interim CEO Clint Rivers claimed that "the U.S. government continues its misguided policy of subsidizing ethanol production at the expense of affordable food, and a lower corn yield expectation by USDA will contribute to decrease corn suppliers next year."

B.     On June 23, 2008, Wayne Farms President & CEO Elton Maddox said in a statement that "the government's food fuel mandate has created the need for us to rationalize our business."

C.     On July 7, 2008, O.K. Foods announced production cuts due to "record high prices for corn and soybean meal, which it attributed to the U.S. government's mandated ethanol policies."

D.     On June 24, 2009, Harrison Poultry President & CEO Mike Welch and Claxton Poultry President Jerry Lane met in Washington DC and encouraged elected officials to end the "mistake" of the ethanol subsidy.

E.     In 2010, Foster Farms delayed an expansion due, allegedly, to corn prices. Ira Brill, Foster Farm's Director of Market Services, blamed the ethanol

mandate for the delay, stating that it "places enormous pressure on our input costs, and for that reason we can't go forward with our expansion plans."

F.   On March 7, 2011, House of Raeford announced production cuts due to increased prices. It stated that "if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."

G.   On March 15, 2011, Simmons announced downsizing at a plant due to economics "resulting from high grain prices predominantly caused by corn being used in ethanol." Simmons cited ethanol policies again on June 27, 2011, when it laid off another 223 employees.

H.   In an April 13, 2011, hearing before a congressional subcommittee, Michael Welch (President and CEO of Harrison Poultry) stated that production of broilers was threatened by the diversion of corn to fuel production. Welch claimed that shifting corn back to feed would "allow consumers of poultry products to continue to enjoy an ongoing, adequate supply of animal protein at reasonable prices." Welch repeated similar claims in 2012 as well, citing increased corn costs resulting in "tens of billions of dollars in increased costs for livestock and poultry producers and food manufacturers."

I.   In September 2011, Phillip Green (Vice President of Commodities, Foster Farms) testified on behalf of the American Feed Industry Association at a public hearing and blamed increasing meat costs on the ethanol mandate.

J.   On October 10, 2014, National Chicken Council President Mike Brown wrote an op-ed citing the Renewable Energy Standard as the primary reason for the poultry industry's inability to increase production. Brown cited the Renewable Fuel Standard again in a May 15, 2015 op-ed in the Wall Street Journal.

451.   To explain the shortage of Broilers since 2012, Defendants have provided a variety of pretextual explanations, including the following: (a) a breeding issue with Broilers during 2014, (b) a Russian ban of U.S. Broiler imports starting in 2014, and (c) a 2013 shortage in supply due in part due to an Avian Flu outbreak in Mexico that caused a surge in demand for hens to repopulate farms in Mexico (see, e.g., ¶ 301 above). However, these explanations were pretextual and Defendants sought to hide their conspiracy from discovery by blaming Broiler price increases on these factors rather than Defendants' own collusive conduct.

452.    Throughout the Class Period Defendants repeatedly cited increasing input costs as a pretext for their collusion to restrain supply and increase prices.  For instance, Defendants repeatedly claimed that input cost increases during 2008 justified Broiler price increases.  However, while corn was $5/bushel in 2005-2006 and increased to $9 by May or June 2008, it quickly fell back to below $5/bushel by fall 2008.  In fact, prior to 2008 there is a statistical correlation between Broiler prices and corn prices, but during the Class Period there has been no statistical correlation between Broiler and corn prices.  In other words, despite Defendants' pretextual explanations to the contrary, Defendants were not determining the price of Broilers based on the input price for corn.

453.    Another example of the pretextual nature of cost justifications for Broiler price increases is a November 2012 interview, in which Fieldale Farm President Thomas Hensley was asked whether he thought the recently concluded NCC Annual Conference focused too much time on the Renewable Fuel Standard because eliminating the ethanol subsidy would not "move the needle on corn supply and prices that much" and whether there was "any danger the industry has focused too much on this as a magic bullet?"  Hensley responded, "I think that's accurate.  The best-case scenario is that corn would go down $1.25 per bushel and some people say it will only go down 50 cents."

454.    The National Chicken Council has served as the mouthpiece for Defendants publicized pretextual excuses for rising Broiler prices.  Among other actions, the following indicate an intent to deceive purchasers of Broilers into believing that input costs, rather than a collusive agreement among Defendants to reduce supply, was the cause of rising Broiler prices:

> A.    Through the National Chicken Council, Defendants ensured that the pretext for their production cuts and price increases, the ethanol mandate, continued to be blamed for increased chicken prices rather than Defendants' secret conspiracy.  A May 19, 2010, report by FarmEcon LLC was commissioned

by the NCC and concluded "[o]n the national scale, it is the overall conclusion of this study that the chicken industry is a competitive and thriving sector." The NCC trumpeted the findings through a press release on its website with the headline "Competition in Broiler Sector Benefits Chicken Farmers, Companies, and Consumers, Study Finds."

B.  As noted above, Brown's October 10, 2014, and May 15, 2015, op-eds in national newspapers attempted to explain away why "current favorable market conditions that would normally stimulate production to be somewhat higher" were not doing so. These op-eds were intended to convince purchasers of Broilers that input costs, rather than a secret conspiracy, were to blame for increasing Broiler prices.

455.    Using the methods described above, the purpose and effectiveness of Defendants' combination and conspiracy was kept secret. As a result, Plaintiffs and the Class members did not know and could not have known that they were paying supracompetitive prices for Broilers.

456.    By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## X.    VIOLATION OF SECTION 1 OF THE SHERMAN ACT

457.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

458.    Defendants and all of their co-conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

459.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

460.    At least as early as January 1, 2008, and continuing until present, the exact dates being unknown to Plaintiffs, Defendants and all of their co-conspirators entered into a continuing

agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for Broilers, thereby creating anticompetitive effects.

461.  Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Broilers throughout the United States.

462.  The conspiratorial acts and combinations have caused unreasonable restraints in the market for Broilers.

463.  As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for Broilers.

464.  In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all of their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.  Defendants' conspiracy had the following effects, among others:

A.  Price competition in the market for Broilers has been restrained, suppressed, and/or eliminated in the United States;

B.  Prices for Broilers sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their Producer Co-Conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C.  Plaintiffs and members of the Class who directly purchased Broilers from Defendants, their divisions, subsidiaries, and affiliates, and all of their Producer Co-Conspirators have been deprived of the benefits of free and open competition in the purchase of Broilers.

465.  Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of Broilers on the spot market to be higher than it would be but for Defendants' conduct. Defendants also knew and

intended that such an artificial inflation of spot market prices would increase other Broiler market prices, including those paid by Plaintiffs and members of the Class.

466.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for Broilers than they would have paid and will pay in the absence of the conspiracy.

467.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## XI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

468.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

469.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

> A.    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and
>
> B.    A *per se* violation of Section 1 of the Sherman Act;

470.    Plaintiffs and the Class recover damages, to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

471.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

472.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

473.    Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

474.    Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

475.    Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XII.    JURY TRIAL DEMANDED

476.    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: October 23, 2020

s/Steven Hart
Steven Hart (#6211008)
Brian Eldridge (#6281336)
Kyle Pozan (#6306761)
HART MCLAUGHLIN & ELDRIDGE
121 West Wacker Drive, Suite 1050
Chicago, IL 60601
T: (312) 955-0545
F: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com
kpozan@hmelegal.com

*Direct Purchaser Plaintiffs Interim Liaison Class Counsel*

W. Joseph Bruckner
Brian D. Clark
Simeon Morbey
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
F: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com

Bruce L. Simon
Neil Swartzberg
PEARSON, SIMON & WARSHAW, LLP
350 Sansome Street
Suite 680
San Francisco, CA 94104
T: (415) 433-9000
F: (415) 433-9008
bsimon@pswlaw.com
nswartzberg@pswlaw.com

Clifford H. Pearson
Daniel Warshaw
Bobby Pouya
Michael H. Pearson
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
T: (818) 788-8300
F: (818) 788-8104
cpearson@pswlaw.com
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

*Direct Purchaser Plaintiffs Interim Co-Lead Class Counsel*

Allan Steyer
D. Scott Macrae
Jill Manning
STEYER LOWENTHAL BOODROOKAS
ALVAREZ
& SMITH LLP
One California Street, 3rd Floor
San Francisco, CA 94111
T:  (415) 743-2808
F:  (415) 421-2234
asteyer@steyerlaw.com
smacrae@steyerlaw.com
jmanning@steyerlaw.com

Linda P. Nussbaum
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036-8718
T: (917) 438-9102
lnussbaum@nussbaumpc.com

Arthur N. Bailey
Marco Cercone
RUPP BAASE PFALZGRAF
CUNNINGHAM, LLC
1600 Liberty Building
424 Main Street
Buffalo, NY 14202
T: (716) 854-3400
F: (716) 332-0336
bailey@ruppbaase.com
cercone@ruppbaase.com

Michael J. Freed
Steven A. Kanner
Robert J. Wozniak
Jonathan M. Jagher
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
T:  (224) 632-4500
F:  (224) 632-4519
mfreed@fklmlaw.com
skanner@fklmlaw.com
rwozniak@fklmlaw.com
jjagher@fklmlaw.com

Kevin B. Love
Michael E. Criden
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, Florida 33143
T: (305) 357-9000
F: (305) 357-9050
klove@cridenlove.com
mcriden@cridenlove.com

E. Powell Miller
Sharon S. Almonrode (Admitted ND Illinois)
Devon P. Allard
THE MILLER LAW FIRM, P.C.
950 W. University Dr., Suite 300
Rochester, MI 48307
T: (248) 841-2200
F: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
dpa@millerlawpc.com

Whitney Street
BLOCK & LEVITON LLP
610 16th Street, Suite 214
Oakland, CA 94612
T:  (415) 968-1852
F:  (617) 507-6020
wstreet@blockesq.com

Robert G. Eisler
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, New York 10017
T: (646) 722-8500
reisler@gelaw.com

Vincent J. Esades
HEINS MILLS &OLSON PLC
310 Clifton Avenue
Minneapolis, Minnesota 55403
T: (612) 338-4605
vesades@heinsmills.com

Steven J. Greenfogel
Mindee J. Reuben
LITE DEPALMA GREENBERG, LLC
1835 Market Street, Suite 2700
Philadelphia, Pennsylvania 19103
T: (267) 519-8306; (973) 623-3000
sgreenfogel@litedepalma.com
mreuben@litedepalma.com

Burton LeBlanc
BARON & BUDD, P.C
2600 Citiplace Drive
Baton Rouge, Louisiana 70808
T: (225) 927-5441
bleblanc@baronbudd.com

Roland Tellis
BARON & BUDD, P.C.
15910 Ventura Blvd., #1600
Encino, California 91435
T: (818) 839-2333
rtellis@baronbudd.com

532461

157

Mark Reinhardt
Garrett D. Blanchfield, Jr.
REINHARDT WENDORF & BLANCHFIELD
E1250 First National Bank Building
332 Minnesota Street
St. Paul, MN  55101
T: (651) 287-2100
m.reinhardt@rwblawfirm.com
g.blanchfield@rwblawfirm.com

Roberta D. Liebenberg
Adam Pessin
FINE, KAPLAN AND BLACK RPC
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
T: (215) 567-6565
rliebenberg@finekaplan.com
apessin@finekaplan.com

Guido Saveri
R. Alexander Saveri
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
T: (415) 217-6810
guido@saveri.com
rick@saveri.com
cadio@saveri.com

Stanley Bernstein
BERNSTEIN LIEBHARD LLP
10 East 40th Street
New York, New York 10016
T: (212) 779-1414
F: (212) 779-3218
sbernstein@bernlieb.com

Eugene A. Spector
SPECTOR ROSEMAN KODROFF
  & WILLIS PC
1818 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
T:  (215) 496-0300
espector@srkw-law.com

Noah Axler
Marc Goldich
AXLER GOLDICH LLC
1650 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
T: (267) 207-2920
F: (267) 319-7901
naxler@axgolaw.com
mgoldich@axgolaw.com

Thomas C. Cronin
CRONIN & CO., LTD
161 N. Clark Street, Suite 2550
Chicago, Illinois 60601
T: (312) 201-7100
F: (312) 201-7101
tcc@cronincoltd.com

*Direct Purchaser Plaintiffs Class Counsel*