**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | Case No.: 1:16-cv-08637 |
| | The Honorable Thomas M. Durkin |
| This Document Relates To: Direct Purchaser Actions | Magistrate Judge Jeffrey T. Gilbert |
| | **PUBLIC REDACTED VERSION** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DIRECT**
**PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION ...................................................................................................1

II. FACTUAL BACKGROUND ..................................................................................3

    A. Defendants Implemented Coordinated Supply Cuts in 2008 and Early 2009 ...............................................................................................................5

    B. Defendants' Unprecedented and Coordinated Production Cuts Led to Supra-Competitive Prices and Profits in 2009 and 2010 ......................................10

    C. Defendants Initiated a Second Wave of Coordinated Production Cuts in 2011 and 2012 ..........................................................................................10

    D. Defendants' Coordinated Production Cuts in 2011 and 2012 Led to Supra-Competitive Prices and Profits ...............................................................15

    E. Defendants Continued Their Coordinated Production Cuts in 2015 ...................16

    F. Defendants Manipulated the Georgia Dock Price Index ........................................18

III. ARGUMENT ......................................................................................................24

    A. The Standard for Class Certification ...................................................................25

    B. The Class is Clearly Defined and Based on Objective Criteria .............................26

    C. The Proposed Class Satisfies the Requirements of Rule 23(a) ...............................27

        1. The Class is Sufficiently Numerous ............................................................27

        2. Questions of Law and Fact are Common to the Proposed Class ...............27

        3. Plaintiffs' Claims are Typical of Those of the Proposed Class Members ...............................................................................................28

        4. Plaintiffs and Their Counsel Will Adequately Represent the Interests of the Class ...................................................................................29

    D. The Proposed Class Satisfies the Requirements of Rule 23(b)(3) ........................31

        1. Common Issues of Law and Fact Predominate Over Individual Issues .............................................................................................................31

            (a) Common Proof Will be Used to Show the Existence of the Conspiracy ...................................................................................32

            (b) The Class-Wide Impact of Defendants' Conspiracy Will be Shown Using Common Evidence ...................................................34

            (c) Damages Can be Calculated on a Class-Wide Basis Using Common Evidence ........................................................................39

        2. A Class Action is the Superior Method for Adjudicating the Claims at Issue ...............................................................................................41

3.    The DPP Trial Plan Further Supports Predominance and
        Superiority...............................................................................................43

IV.   CONCLUSION.............................................................................................................43

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Sales Co., LLC v. Pfizer, Inc.*,
  No. 2:14-CV-361, 2017 WL 3669604 (E.D. Va. July 28, 2017)............................................40

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................................................................31, 33

*Bell v. WestRock CP, LLC*,
  No. 3:17-CV-829, 2019 WL 1874694 (E.D. Va. Apr. 26, 2019) ............................................41

*Butler v. Sears, Roebuck & Co.*,
  727 F.3d 796 (7th Cir. 2013) ..............................................................................................31, 32, 42

*In re Capacitors Antitrust Litig.(No. III)*
  No. 14-CV-03264, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018)  ........................................40

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001) .........................................................................................30

*In re Catfish Antitrust Litig.*,
  826 F. Supp. 1019 (N.D. Miss. 1993)......................................................................................33

*In re Chocolate Confectionary Antitrust Litig.*,
  289 F.R.D. 200 (M.D. Pa. 2012)............................................................................................34

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013).......................................................................................................34, 38, 39

*In re Disposable Contact Lens Antitrust Litig.*,
  329 F.R.D. 336 (M.D. Fla. 2018)........................................................................................36, 37

*In re EPDM Antitrust Litig.*,
  256 F.R.D. 82 (D. Conn. 2009)...............................................................................................36

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
  No. 17-MD-2785, 2020 WL 1180550 (D. Kan. Mar. 10, 2020) ............................................40

*Fox v. Riverview Realty Partners*,
  No. 12-CV-9350, 2014 WL 1613022 (N.D. Ill. Apr. 22, 2014)..............................................32

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Assoc.*,
  744 F.2d 588 (7th Cir. 1984) ..................................................................................................35

*In re Glassine and Greaseproof Paper Antitrust Litig.*,
  88 F.R.D. 302 (E.D. Pa. 1980) .................................................................31

*Harman v. Lyphomed, Inc.*,
  122 F.R.D. 522 (N.D. Ill. 1988) ...............................................................30

*Hawaii v. Standard Oil Co.*,
  405 U.S. 251 (1972) .................................................................................24

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ........................................................35, 37, 40

*Hughes v. Baird & Warner, Inc.*,
  No. 76-CV-3929, 1980 WL 1894 (N.D. Ill. Aug. 20, 1980) ...................33

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008).....................................................................34

*Johnson v. Meriter Health Servs. Emp. Ret. Plan*,
  702 F.3d 364 (7th Cir. 2012) ...................................................................29

*Kleen Prods. LLC v. Int'l Paper Co.*,
  831 F.3d 919 (7th Cir. 2016) .......................................................... *passim*

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
  571 F.3d 672 (7th Cir. 2009) ..............................................................29, 40

*In re Linerboard Antitrust Litig*,
  305 F.3d 145 (3d Cir. 2002)....................................................................28, 35

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ......................................................... *passim*

*In re Modafinil Antitrust Litig.*,
  837 F.3d 238 (3d Cir. 2016)......................................................................38

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) ...................................................................26

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  319 F.R.D. 158 (E.D. Pa. 2016).............................................................38, 40

*Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines*,
  231 F.R.D. 280 (N.D. Ill. 2005)................................................................28

*In Re Packaged Seafood Prods. Antitrust Litig.*,
  No. 15-MD-2670, 2019 WL 3429174 (S.D. Cal. July 30, 2019) ............40

*In re Polyester Staple Antitrust Litig.*,
  No. 3:03-CV-1516, 2007 WL 2111380 (W.D.N.C. July 19, 2007)........................................40

*In re Processed Egg Prods. Antitrust Litig.*,
  312 F.R.D. 171 (E.D. Pa. 2015)...............................................................................38, 40

*Rodriguez v. West Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) .............................................................................................29

*In re Rubber Chems. Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005)................................................................................25, 28

*Saltzman v. Pella Corp.*,
  257 F.R.D. 471 (N.D. Ill. 2009).................................................................25, 26, 28, 31

*Schmidt v. Smith & Wollensky LLC*,
  268 F.R.D. 323 (N.D. Ill. 2010)........................................................................................27

*In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*,
  967 F.3d 264 (3d Cir. 2020)...............................................................................................38

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) .......................................................................................35, 38

*Sullivan v. DB Invs.*,
  667 F.3d 273 (3d Cir. 2011)........................................................................................25, 32

*Szabo v. Bridgeport Machs., Inc.*,
  249 F.3d 672 (7th Cir. 2001) .............................................................................................25

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 291 (N.D. Cal. 2010)......................................................................................40

*Thillens, Inc. v. Cmty. Currency Exch. Ass'n*,
  97 F.R.D. 668 (N.D. Ill. 1983)..........................................................................................27

*In re Titanium Dioxide Antitrust Litig.*,
  284 F.R.D. 328 (D. Md. 2012)...........................................................................................42

*In re Urethane Antitrust Litig.*,
  251 F.R.D. 629 (D. Kan. 2008)................................................................................. *passim*

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) .........................................................................................40

*In re Vitamins Antitrust Litig.*,
  209 F.R.D. 251 (D.D.C. 2002)...........................................................................................31

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) ............................................................................................25, 27

**Statutes & Rules**

Federal Rules of Civil Procedure, Rule 23 ....................................................... *passim*

Federal Rules of Civil Procedure, Rule 23(a) ................................................... *passim*

Federal Rules of Civil Procedure, Rule 23(a)(1) ...................................................27

Federal Rules of Civil Procedure, Rule 23(a)(2) ...............................................27, 28

Federal Rules of Civil Procedure, Rule 23(a)(3) ...............................................28, 29

Federal Rules of Civil Procedure, Rule 23(a)(4) ...................................................29

Federal Rules of Civil Procedure, Rule 23(b)(3) .............................................. *passim*

Sherman Act, 15 U.S.C. § 1 ...................................................................................1, 3

**Other Authorities**

6 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 18.28 (4th ed. 2002) ...............34

7 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1781 (3d ed. 2005)...........34

6 William B. Rubenstein, *Newberg on Class Actions* § 20:52 (5th ed. 2011)..............................35

## I.    **INTRODUCTION**

The Direct Purchaser Plaintiffs ("Plaintiffs" or "DPPs") seek to certify a class to prosecute their claims for violations of the Sherman Act, 15 U.S.C. § 1, arising from Defendants' unlawful scheme to fix, raise, and stabilize the price of Broilers sold in the United States.[1] As the Court knows, DPPs are the first in the chain of distribution and buy directly from the Defendants. Although discovery has not yet been completed, the nature of Plaintiffs' claims and the evidence collected to date demonstrate that this case fits the paradigm for prosecution as a class action. Broilers are a commodity product with inelastic demand and the market is collectively controlled by Defendants, who are some of the largest producers of Broilers. From at least December 1, 2008 through July 31, 2019 ("Class Period") Defendants exploited their market power by collectively restraining supply and manipulating the Georgia Dock pricing index in addition to other collusive acts described in this Motion and the supporting evidence. The Producer Defendants also routinely exchanged their confidential and competitively sensitive information with each other through Defendant Agri Stats.[2] Defendants' unlawful conspiracy had the purpose and effect of fixing, raising, and stabilizing Broiler prices. In cases involving commodity products such as Broilers, supply restraints implemented at the industry level have been recognized as an effective means to increase prices to all purchasers. Similarly, the manipulation of a commonly used pricing index,

---

[1] The term "Broiler" or "Broilers" refer to chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards. Fifth Amended and Consolidated Class Action Complaint ("FCAC") (ECF Nos. 3919 (Redacted) and 3935 (Unredacted)) ¶ 110. All capitalized terms have the same meaning as in the FCAC unless noted otherwise.

[2] "Broiler Producer Defendants" or "the Producer Defendants" refers to all defendants in the DPP action except for Agri Stats. *See* FCAC ¶¶ 28-90. Unless otherwise noted the references to each Defendant (*e.g.*, Tyson) in this Motion shall have the same meaning as set forth in FCAC.

such as the Georgia Dock, raises market prices and thereby impacts all customers who rely on that index not only for their own contract, but on market pricing in general.

Certification of Plaintiffs' proposed Class[3] is supported by fundamental and well-established economic principles as well as legal precedent. Although merits determinations are premature at the class certification stage, Plaintiffs have supported this Motion with evidence regarding the means, methods, and manner by which Defendants implemented their conspiracy—all of which are common to all Class members and which can ultimately be presented in a single class trial. Furthermore, Plaintiffs support this Motion with the expert economic analysis of Dr. Colin A. Carter, who has conducted an in-depth study of the industry, as well as Defendants' transactional-level structured data, to develop an established methodology for calculating the impact of Defendants' price fixing scheme and the damages suffered by Class Members as a result thereof.

As set forth in detail in this Motion, Plaintiffs have satisfied each element of class certification pursuant to Federal Rule of Civil Procedure ("Rule") 23. Plaintiffs have demonstrated that: (i) the Class is sufficiently numerous (there are thousands of direct purchasers), (ii) the proposed class representatives' claims are typical of the claims of other Class members, and the proposed class representatives will adequately represent the Class (as they have throughout the course of the case), (iii) the Class is represented by experienced and qualified counsel (who have vigorously prosecuted this matter to date), (iv) the core issues relating to the existence of the conspiracy and impact on Class Members are not only common to all class members, but will predominate over any individual issues (as shown by the predominance analysis, supporting evidence, and expert analysis herein); and (v) a class action is a far superior and efficient means

---

[3] The term Class as used in this Motion refers to the class defined in Section III.B, herein.

2

of adjudicating the claims of the thousands of Class members (rather than thousands of individual lawsuits). As such, Plaintiffs respectfully request that the Court certify the proposed Class, appoint the named Plaintiffs as class representatives, appoint Pearson, Simon & Warshaw LLP and Lockridge Grindal Nauen P.L.L.P. as Co-Lead Class Counsel, and appoint Hart, McLaughlin & Eldridge, LLC as Class Liaison Counsel.

## II.    FACTUAL BACKGROUND

The Broiler Producer Defendants are the leading suppliers in the multi-billion-dollar U.S. Broiler market; they collectively control 90% of the wholesale Broiler market. *See* Report of Colin A. Carter, Ph.D. ("Carter Report") ¶¶ 28-31. Defendant Agri Stats is a data-sharing service company, which regularly compiles reports including critical information pertaining to the price, production, cost, and supply of Broilers. *See, e.g.,* FCAC ¶¶ 147-78.

---

[4] All references to "Ex." refer to exhibits to the Pouya Decl. unless otherwise noted.



**A.** <u>Defendants Implemented Coordinated Supply Cuts in 2008 and Early 2009</u>



██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

        █████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████▌  █████████████████████████████████████

████████████████████████████████████████████████ Two

days later on June 19, 2008, immediate-past NCC chairman Mark Hickman was reported to have

said that the Broiler industry was entering a second phase of production cutbacks, after 1 to 2%

cutbacks "was not nearly enough, so liquidation is in round two." *See* Ex. 30, Rita J. Gabbert, *Meat*

*industry leaders warn cutbacks are coming*, Meatingplace (June 19, 2008). ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[9] ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

7



**B.** **Defendants' Unprecedented and Coordinated Production Cuts Led to Supra-Competitive Prices and Profits in 2009 and 2010**

██████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

**C.** **Defendants Initiated a Second Wave of Coordinated Production Cuts in 2011 and 2012**

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

13 ███████████████████████████████████████

██████████████████████████████████



---

16 





████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**D.**     **Defendants' Coordinated Production Cuts in 2011 and 2012 Led to Supra-Competitive Prices and Profits**

Defendants reaped the benefits of the long-term and deep conspiratorial supply cuts made

in 2011 and 2012. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



**E.** **Defendants Continued Their Coordinated Production Cuts in 2015**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

    ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

**F.**    **Defendants Manipulated the Georgia Dock Price Index**

In addition to coordinating supply control measures, Defendants manipulated the Georgia Dock price index in furtherance of their price-fixing conspiracy. ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

The Georgia Dock price report was published every Wednesday by the Poultry Market News Division ("PMN") of the Georgia Department of Agriculture, and purported to report on sales of 2.5-3 pound "premium" Broilers. *See* Ex. 100, GDA0000030743; Ex. 101, GDA0000015801. Participation in the Georgia Dock was limited to Broiler producers in the State of Georgia. Based on these criteria, nine Broiler producers participated in the Georgia Dock: Pilgrim's Pride, Tyson, Sanderson Farms, Fieldale Farms, Koch Foods, Wayne Farms, Harrison Poultry, Claxton Poultry, and Mar-Jac Poultry (hereinafter collectively, the "Georgia Dock Defendants").

██████████████████████████████████████████████████

███████

█████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████ The Advisory Committee had a surprising and improper amount of power to influence the Georgia Dock, including the rules regarding the calculation of the Georgia Dock price and re-evaluating (retroactively changing) the Georgia Dock price if it felt that it was too low. *See* Ex. 110, GDA0000000431 (Written procedure for re-evaluating the Georgia Dock price). █████████████████████████████████████

██████████████████████████████████████████████████

█████████████

████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████





In subsequent months the Georgia Dock began to increase, and eventually was far higher than the Urner Barry and the USDA composite price index. *See* Carter Report ¶¶ 89-90, Figure 4 (below).

**Carter Report Figure 4: Manipulation of the Georgia Dock Whole Broiler Price**



(b) GA Dock vs. Other Price Indices



Although not known publicly until November 2016, the Georgia Dock pricing index raised anticompetitive concerns within regulatory agencies. In July 2016, the USDA's Agricultural Marketing Service ("AMS") agreed to look into the Georgia Dock after the United States Department of Justice raised concerns about it. *See* Ex. 127, USDA0000000005. During the week of July 18, 2016, AMS met with Dr. James Sutton, the GDA's Director of Operations, and Dr. Robert Cobb, the GDA's State Veterinarian. *Id.* They also worked with PMN personnel to review reporting procedures concerning the Georgia Dock. *Id.* After observing PMN personnel collect the information from the Georgia Dock Defendants, AMS found that the GDA was unable to verify the information reported in the Georgia Dock and discontinued publishing the AMS Market News report based upon the Georgia Dock report on August 5, 2016. *Id.*



The Georgia Dock price was not published that week because the GDA "did not receive a sufficient number [of attestations] to meet minimum statistical reporting standards." *See* Ex. 129, GDA0000017371. The same was true for the following two reporting weeks: no Georgia Dock price was published because not enough

Defendants were willing to attest to the accuracy of their submissions. *See* Ex. 130, GDA0000001556; Ex. 131, GDA0000000064. On December 21, 2016, the fourth week in a row where the GDA did not receive a sufficient number of attestations, the GDA decided to indefinitely suspend the Georgia Dock.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

## III.  <u>ARGUMENT</u>

Almost 50 years ago, the Supreme Court recognized the importance of private actions such as this in enforcing federal antitrust laws:

> Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation. . . . Congress chose to permit all persons to sue to recover three times their actual damages every time they were injured in their business or property by an antitrust violation. By offering potential litigants the prospect of recovery of three times the amount of their damages, Congress encouraged these persons to serve as "private attorneys general." . . . Rule 23 of the Federal Rules of Civil Procedure provides for class actions that may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture.

*Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972) (citation omitted).

Class actions are essential to effective private antitrust enforcement. Price-fixing conspiracies typically succeed by extracting relatively small amounts from each of hundreds or thousands of victims over time. As a result, federal courts have certified classes in numerous antitrust conspiracy cases involving a wide range of products and industries, reflecting the fact that these cases are "particularly well suited" for class treatment under Rule 23. *See, e.g., In re*

*Urethane Antitrust Litig.*, 251 F.R.D. 629, 635 (D. Kan. 2008) ("*Urethane*"); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012); *Sullivan v. DB Invs.*, 667 F.3d 273, 298 (3d Cir. 2011) (*en banc*); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) ("a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers.") (citations omitted). The conduct of the conspirators, the showing of impact, and the measurement of damages are three central issues in antitrust conspiracy cases; and in this case, as in many others, all three elements can be proven—or defended—with evidence that is common to the class. *See Urethane*, 251 F.R.D. at 635; *see also Sullivan*, 667 F.3d at 298. As discussed below, Plaintiffs meet all the requirements for class certification under Rule 23.

A.      **The Standard for Class Certification**

The principal inquiry at class certification is whether evidence common to all class members can be used to prove or disprove Plaintiffs' central allegations. If so, those common issues will predominate over any individual issues and, assuming Rule 23's other requirements are met, certification is appropriate. *See Messner*, 669 F.3d at 818; *see also Saltzman v. Pella Corp.*, 257 F.R.D. 471, 475 (N.D. Ill. 2009). Plaintiffs need not prove their case on the merits at the class certification stage, *see id.*, but nevertheless courts perform a "rigorous analysis" under Rule 23. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (quoting *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982)); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672 (7th Cir. 2001). Such an analysis may require courts to "probe beyond the pleadings," scrutinize the record presented (including the expert reports), and determine whether Plaintiffs' claims are susceptible to common proof at trial. *See Szabo*, 249 F.3d at 677. However, "in conducting this analysis, the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *See Messner*, 669 F.3d at 811.

### B.     The Class is Clearly Defined and Based on Objective Criteria

For a class to be certified, a class must be defined clearly and based on objective criteria. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). Whether a class is ascertainable depends on "the adequacy of the class definition itself … not [on] whether, given an adequate class definition, it would be difficult to identify particular members of the class." *See id.* (declining to adopt an administrative feasibility requirement in order to satisfy the requirements of Rule 23). Here, the proposed Class is defined as:

> All persons who purchased raw Broilers directly from any of the Defendants or their respective subsidiaries or affiliates either fresh or frozen, in the form of: whole birds (with or without giblets), whole cut-up birds, or parts (boneless or bone in) derived from the front half of the whole bird, for use or delivery in the United States from December 1, 2008 until July 31, 2019.
>
> Specifically excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any Co-Conspirator identified in this action.

This definition is sufficiently precise and includes direct purchasers of the Class Broiler Products[25] which can be identified in sales data produced by Defendants. The proposed Class Period has a clear beginning and ending date, and the class is limited to purchases of Broilers directly from Defendants for use or delivery in the United States. For these reasons, the Class is properly defined with reference to objective criteria. *See Saltzman*, 257 F.R.D. at 476; *Urethane*, 251 F.R.D. at 632 (Approving similar class definition).[26]

---

[25] "Class Broiler Products" refers to the products that fall within the scope of the class definition set forth above. A complete list of products included within the DPP Class is set forth in Appendix C to the Carter Report.

[26] This definition is narrower than the class definition in the previous complaints filed by DPPs. As a result of the enormous amount of discovery conducted in this case, and consistent

### C. The Proposed Class Satisfies the Requirements of Rule 23(a)

#### 1. The Class is Sufficiently Numerous

Rule 23(a)(1) requires that the proposed class be so numerous that joinder is "impracticable." ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████ *see also Schmidt v. Smith & Wollensky LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010) ("A class of more than 40 members is generally believed to be sufficiently numerous").

#### 2. Questions of Law and Fact are Common to the Proposed Class

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Plaintiffs must show that resolution of an issue of fact or law "is central to the validity of each" class member's claim; "[e]ven a single [common] question will" satisfy the commonality requirement. *See Dukes*, 564 U.S. at 359 (internal citation omitted). A central allegation in the case is that Defendants illegally conspired to restrict supply and increase prices of Broilers. Proof of this conspiracy will be common to all Class members. *See, e.g.*, *Thillens, Inc. v. Cmty. Currency Exch. Ass'n*, 97 F.R.D. 668, 677 (N.D. Ill. 1983) ("The overriding common issue of law is to determine the existence of a conspiracy"); *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 923 (7th Cir. 2016) (recognizing that antitrust conspiracies are conducive to common proof). In addition to that central overarching question, this case is replete with other questions of law and fact common to the Class that are suited for class treatment including: (1) whether Defendants affirmatively concealed their agreement; (2) whether Defendants' conspiratorial conduct caused

---

with the law, the class definition at the may be amended at the class certification stage to conform with evidence. *Messner*, 669 F.3d at 826 n.15.

the prices of Broilers to be inflated; and (3) the appropriate measure of damages. All of these issues are central to the Class members' claims, and each establishes commonality under Rule 23(a)(2).

### 3. Plaintiffs' Claims are Typical of Those of the Proposed Class Members

Rule 23(a)(3) requires that class representatives' claims be "typical" of the proposed class' claims. Typicality "is closely related to commonality and should be liberally construed." *See Saltzman*, 257 F.R.D. at 479. When "the representative party's claim arises from the same course of conduct that gives rise to the claims of other class members and all of the claims are based on the same legal theory," factual differences among class members do not defeat typicality. *See id.* (citation omitted). Typicality is a "low hurdle," requiring "neither complete coextensivity nor even substantial identity of claims." *See Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines*, Inc., 231 F.R.D. 280, 282 (N.D. Ill. 2005).

In antitrust cases, typicality is satisfied where "plaintiffs and all class members alleg[e] the same antitrust violations by defendants." *See Rubber Chems.*, 232 F.R.D. at 351 (quotation marks omitted); *Urethane*, 251 F.R.D. at 640 ("[t]ypicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff") (citation omitted). Where "it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical[.]" *See In re Linerboard Antitrust Litig*, 305 F.3d 145, 207 (3d Cir. 2002) (quoting *In re Catfish Antitrust Litig.,* 826 F. Supp. 1019, 1035 (N.D. Miss. 1993)).

DPPs allege that Defendants conspired to fix, maintain, and inflate the price of Broilers in the United States. The proposed Class Representative Plaintiffs allege they were victims of that conspiracy, and to prevail they will have to prove the same elements that absent Class members would have to prove (*i.e.*, the existence and effect of such a conspiracy). As alleged in the FCAC and confirmed by the evidence, each putative Class Representative purchased Broilers directly

from one or more Defendants, and were overcharged and suffered an antitrust injury as a result of the violations alleged in the Complaint. *See* FCAC ¶¶ 22-27; Carter Report ¶¶ 27, 188-92; Class Rep. Declarations ¶ 3.[27] Because the putative Class Representative Plaintiffs' claims arise out of the same alleged illegal anticompetitive conduct, are based on the same theories, and will require the same types of evidence to prove those claims, the typicality requirement of Rule 23(a)(3) is satisfied.

### 4.     Plaintiffs and Their Counsel Will Adequately Represent the Interests of the Class

Finally, Rule 23(a)(4) requires that the class representatives fairly and adequately represent the interests of the class. Adequacy is a two-part test: (i) the named Plaintiffs must not have claims in conflict with other class members, and (ii) the named Plaintiffs and proposed class counsel must be able to litigate the case vigorously and competently on behalf of named and absent class members alike. *See Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 679 (7th Cir. 2009); *Urethane*, 251 F.R.D. at 644. "The adequacy of representation requirement is satisfied as long as one of the class representatives is an adequate class representative." *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009). The mere potential for a conflict of interest is not sufficient to defeat class certification. *See, e.g., Kohen*, 571 F.3d at 679-80 ("At this stage in the litigation, the existence of such conflicts is hypothetical. If and when they become real, the district court can certify subclasses with separate representation of each....") (citing authority); *Johnson v.*

---

[27] The term "Class Rep. Declarations" refers collectively to the following declarations on behalf of each of the named Plaintiffs filed concurrently herewith: (1) Joseph Oscar Christiana, Jr. of Joe Christiana Food Distributors, Inc.; (2) Scott Wagner of John Gross and Company, Inc.; (3) Chris Loomis of Maplevale Farms, Inc.; (4) Peter G. Pahides of Cedar Farms Co., Inc.; and (5) Dean Barcelona of Ferraro Foods, Inc. and Ferraro Foods of North Carolina, LLC.

*Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012) ("It is premature to declare the alleged conflicts of interest an insoluble bar to the class action.").

Here, the Plaintiffs' interests are aligned with those of the putative Class Members. Plaintiffs allege that the Class Members were injured by the *same conduct* in the *same manner*. Plaintiffs, like all direct purchasers, assert claims arising from Defendants' conspiracy to raise prices and share a strong interest in establishing Defendants' liability and maximizing class-wide damages. *See* Class Rep. Declarations ¶¶ 3-5. Therefore, the first prong of the adequacy requirement is satisfied. *See Harman v. Lyphomed, Inc.*, 122 F.R.D. 522, 528 (N.D. Ill. 1988); *see also In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 306 (E.D. Mich. 2001) ("Defendants' arguments about potential conflicts are thus insufficient to deny class certification.").

Plaintiffs are also represented by skilled counsel with extensive experience prosecuting antitrust and class action litigation to represent the Class. *See* ECF Nos. 44-0 – 44-3 (DPPs' Motion to Appoint Interim Co-Lead and Liaison Counsel); ECF No. 144, p. 3 (Court's Order of October 14, 2016 granting same); *see also* Pouya Decl. ¶¶ 6-15, Ex. 1; Declaration of W. Joseph Bruckner ("Bruckner Decl.") ¶¶ 15-18, Ex. 1; Declaration of Steven A. Hart ("Hart Decl.") ¶¶ 3-11, Ex. 1. The attorneys and firms appointed by the Court have devoted substantial time and resources necessary to prosecute this action. *See* Pouya Decl. ¶¶ 2-5; Bruckner Decl. ¶¶ 2-14; Hart Decl. ¶¶ 2, 10-11. They will continue to vigorously pursue this litigation on behalf of Plaintiffs and the Class. *Id.* Furthermore, each of the named Plaintiffs has actively participated in the litigation, including reviewing and responding to written discovery; preparing for and having their depositions taken; searching for, collecting, preserving, and producing documents; and keeping up to date on the progress of the case. Class Rep. Declarations ¶¶ 3-7. Accordingly, "there is no

ground for supposing that plaintiffs will not adequately represent the class" going forward. *See In re Glassine and Greaseproof Paper Antitrust Litig.*, 88 F.R.D. 302, 306 (E.D. Pa. 1980).

### D.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

Once Rule 23(a)'s four prerequisites are met, Plaintiffs must show that the proposed Class satisfies the predominance and superiority requirements of Rule 23(b)(3) by showing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. Proc. 23(b)(3).

#### 1.    Common Issues of Law and Fact Predominate Over Individual Issues

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "Predominance is satisfied when 'common questions represent a significant aspect of a case and ... can be resolved for all members of a class in a single adjudication.'" *See Kleen*, 831 F.3d at 925 (citing *Messner*, 669 F.3d at 811). While the predominance inquiry is more demanding than commonality under Rule 23(a), "[c]onsiderable overlap exists between the court's determination of commonality and a finding of predominance." *See Saltzman*, 257 F.R.D. at 484. Thus, "[a] finding of commonality will likely satisfy a finding of predominance because, like commonality, predominance is found where there exists a common nucleus of operative facts." *Id.*

Predominance is typically met where "there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis[.]" *See In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 262 (D.D.C. 2002). Every issue in the case need not be common; the question is whether substantial common issues predominate. *See Messner*, 669 F.3d at 815; *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (Rejecting the argument that "predominance is determined simply by counting noses: that is, determining whether there are more common issues

or more individual issues, regardless of relative importance."); *Fox v. Riverview Realty Partners*, No. 12-CV-9350, 2014 WL 1613022, at *5 (N.D. Ill. Apr. 22, 2014) ("[t]he issue for Rule 23(b)(3) purposes is not whether there are individual issues—there are some individual issues in virtually every situation in which class certification is sought—but rather whether common issues predominate over any individual issues.").

The predominance inquiry does not permit the Court to conduct an inquiry in the merits to determine who will prevail at trial. *Kleen*, 831 F.3d at 931 ("the fact that class certification decisions must be supported by evidence does not mean that certification is possible only for a party who can demonstrate that it will win on the merits."). Moreover, "it is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." *See Messner*, 669 F.3d at 815; *Butler*, 727 F.3d at 801 ("It would drive a stake through the heart of the class action device, in cases in which damages were sought . . . to require that every member of the class have identical damages"). Instead, the Seventh Circuit has noted, the predominance inquiry in antitrust cases focuses on "two points: whether common methods of proof can be used to demonstrate the existence of the alleged collusion and its effect on prices in the [ ] market; and whether the existence and impact of any such collusion predominate over other factors that may affect an individual plaintiff's damages." *See id.* at 926.

This antitrust class action satisfies the standard for predominance under Rule 23(b)(3).

### (a) *Common Proof Will be Used to Show the Existence of the Conspiracy*

In antitrust conspiracy cases such as this one, common proof may be used at trial to support the key elements of Plaintiffs' claims. The central issue in the case is whether Defendants conspired, the contours of the conspiracy, each Defendant's role in the conspiracy, and whether the conspiracy violated the antitrust laws. *See, e.g., Messner*, 669 F.3d at 815; *Sullivan*, 667 F.3d

at 298-301 (holding predominance is met because antitrust conspiracy claims necessarily turn on defendants' common course of conduct and a common theory of market impact); *Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); *Catfish*, 826 F. Supp. at 1039 ("As a rule of thumb, a price fixing antitrust conspiracy model is generally regarded as well suited for class treatment."). In antitrust class actions, the central nature of the existence of the conspiracy, which drives the issue of liability and damages as to the class members and predominate over individual issues. *See Hughes v. Baird & Warner, Inc.*, No. 76-CV-3929, 1980 WL 1894, at *3 (N.D. Ill. Aug. 20, 1980) ("Clearly, the existence of a conspiracy is the common issue in this case. That issue predominates over issues affecting only individual sellers.").

This case is no different. As detailed in Section II, *supra*, of this Motion and in the supporting evidence, the existence and scope of the conspiracy alleged by the Plaintiffs in this case center on common facts and evidence related to the improper supply restraints, manipulation of the Georgia Dock, and other means to increase prices across the industry. ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

Accordingly, establishing the existence of a conspiracy will focus on common evidence including deposition testimony, telephonic and electronic communications, and documents, which will prove the claims of all Class Members. *Compare* Trial Plan, Section III.D.3, *infra*; *with Kleen*, 831 F.3d at 927 (recognizing that such antitrust conspiracies can be proven using common evidence). Such common proof is precisely why the existence of a conspiracy "is a common question that is thought to predominate over other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3)." *See* 7 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1781 at 228 (3d ed. 2005); *see also* 6 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 18.28 at 102 (4th ed. 2002) ("As a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions.").

**(b)**     <u>***The Class-Wide Impact of Defendants' Conspiracy Will be Shown Using Common Evidence***</u>

Causation, also known as antitrust impact or injury in fact, turns on whether the alleged conspiracy caused higher market prices. Due to the nature of antitrust conspiracies, "there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market." *See Urethane*, 251 F.R.D. at 636-37. An impacted customer is "one who 'tak[es] at least one transaction at a supracompetitive price.'" *See In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 221 (M.D. Pa. 2012).

At the class certification stage, Plaintiffs' burden is not to prove the element of antitrust impact itself, but only to demonstrate that the element of antitrust impact "is capable of proof at trial through evidence that is common to the class rather than individual to its members." *See Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013); *see also In re Hydrogen Peroxide Antitrust*

*Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008). As the Seventh Circuit has cautioned, predominance does not require a showing "that every class member must prove at least some impact." *See Kleen*, 831 F.3d at 927; *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014) ("[i]f the [district] court thought that no class can be certified until proof exists that every member has been harmed, it was wrong."). Moreover, district courts should not require a greater showing of common evidence than is contemplated by Rule 23. *See Messner*, 669 F.3d at 808 ("In essence, it is important not to let a quest for perfect evidence become the enemy of good evidence").

Predominance in this case is supported by the established economic view that, in a commodity industry, agreements among producers to restrict output will typically cause higher prices. *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (Explaining structural conditions under which collusion is likely to "have an effect on price"); 6 William B. Rubenstein, *Newberg on Class Actions* § 20:52 (5th ed. 2011) ("Classes alleging horizontal price-fixing conspiracies will typically satisfy the predominance requirement because all of the customers that purchased the product from the defendants paid higher prices than they would have paid absent the anticompetitive acts and were therefore impacted in the same way.") (citations omitted). Concerted action to restrict supply will raise prices throughout the market under the basic law of supply and demand, as Judge Posner has explained:

> An agreement on output also equates to a price-fixing agreement. . . . [If] firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply. Thus, with exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effect.

*See Gen. Leaseways, Inc. v. Nat'l Truck Leasing Assoc.*, 744 F.2d 588, 594-95 (7th Cir. 1984) (emphasis added); *see also see also Linerboard*, 305 F.3d at 153 (Certifying class where defendants restricted supply of primary input). ███████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████ Establishing common impact is "relatively simple" in cases involving straightforward theories of "supply and demand." *Messner*, 669 F.3d at 816.

Similarly, manipulation of a price index such as the Georgia Dock, which purported to represent a market price for Broiler products and is utilized as a basis for pricing, is by definition intended to raise prices in a manner that commonly impacts customers and is ideally suited for class treatment. *See In re EPDM Antitrust Litig.*, 256 F.R.D. 82, 89 (D. Conn. 2009) ("Proof of a conspiracy to establish a 'base' price would establish at least the fact of damage, even if the extent of the actual damages suffered by the plaintiffs would vary."); *In re Disposable Contact Lens Antitrust Litig.*, 329 F.R.D. 336, 420-21 (M.D. Fla. 2018) (citing authority).



███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████ This type of economic analysis,

based on a qualified expert's analysis of the market and the evidentiary record, has been established

as an accepted method of supporting common impact and predominance. *Kleen*, 831 F.3d at 927

(finding predominance is satisfied based on plaintiffs showings and evidence regarding the

structure of the market which made it susceptible to cartelization), *see also Fructose*, 295 F.3d at

657 (Product standardization facilitates a more "successful conspiracy").

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

This analysis confirms the operation of the economic principles on which Dr. Carter based his opinion, and further demonstrates that all or virtually all Class Members have been harmed by Defendants' collusive conduct, as alleged by Plaintiffs. *Id.* This combination of market-based and statistical analysis is more than sufficient to satisfy Plaintiffs' burden of demonstrating that class-wide impact is capable of proof at trial through common evidence. *Kleen*, 831 F.3d at 927; *Suchanek,* 764 F.3d at 757; *Comcast*, 569 U.S. at 30.

Dr. Carter's methodology also ties directly to Plaintiffs' liability theory, *i.e.*, that Defendants artificially raised Broiler prices in violation of the Sherman Act, by means including restraining supply and manipulating the Georgia Dock index. *See* Carter Report § 8; *see also In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 270 (3d Cir. 2020) (accepting plaintiffs' damage model which examined "the totality of [defendant's] actions" and "all the acts taken together [to determine whether they] show the willful acquisition or maintenance of a monopoly."); *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 262 (3d Cir. 2016), as amended (Sept. 29, 2016) (accepting Plaintiff's damage model because "their theory of liability is that each individual agreement contributed to the market-wide harm, and that all five original defendants are jointly and severally liable for this harm as concurrent tortfeasors. This theory may ultimately be proven wrong, but it does match Plaintiffs' damages theory."); *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171, 192 (E.D. Pa. 2015) ("Defendants' proposed disaggregation requirement is based on hypotheticals that the Court has no basis to consider at this moment, as there was no argument at the class certification stage from Defendants that any disaggregated part of the alleged conspiracy should be found lawful or otherwise incapable of common proof."); *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 207 (E.D.

Pa. 2016) (accepting Plaintiffs' single damage model which accounted for a single overcharge accounting for "both the supply control and price fixing claims [that] remain in this case.").

(c) ***Damages Can be Calculated on a Class-Wide Basis Using Common Evidence***

At class certification, Plaintiff must show that "damages are capable of measurement on a classwide basis." *See Comcast*, 569 U.S. at 34. Dr. Carter has presented a workable and widely-accepted methodology for calculating class-wide damages based on standardized statistical analyses of industry pricing based on transactional data produced by the Defendants. *See* Carter Report § 8.



*see also In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1260-61 (10th Cir. 2014); *In Re Packaged Seafood Prods. Antitrust Litig.*, No. 15-MD-2670, 2019 WL 3429174, at *9 (S.D. Cal. July 30, 2019); *Kohen*, 571 F.3d at 676; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 313 (N.D. Cal. 2010) ("Courts have accepted multiple regression and correlation analyses as means of proving antitrust injury and damages on a class-wide basis.").[29]

This well-reasoned and evidence-based expert opinion, combined with the other evidence presented and relied upon by Plaintiffs, provide relevant, probative and common evidence to assess damages on a class-wide basis. *See Fructose*, 295 F.3d at 660-61 (Expert's statistical analysis held admissible to establish class-wide impact at trial); *Am. Sales Co., LLC v. Pfizer, Inc.*, No. 2:14-CV-361, 2017 WL 3669604, at *17 (E.D. Va. July 28, 2017) ("Plaintiffs rely upon a widely-

---

[29] *See In re Polyester Staple Antitrust Litig.,* No. 3:03-CV-1516, 2007 WL 2111380, at *1 (W.D.N.C. July 19, 2007) (expert regression analysis accepted as common proof of impact); *In re Capacitors Antitrust Litig. (No. III)*, No. 14-CV-03264, 2018 WL 5980139, at *6 (N.D. Cal. Nov. 14, 2018) ("[A] multiple regression approach that is a widely used econometric technique for determining whether prices were higher during a class period than they otherwise would have been without anti-competitive conduct."); *Processed Egg Prods.*, 312 F.R.D. at 193 ("Courts frequently recognize that regression analysis can be used to isolate the effect of an alleged conspiracy on price, taking into consideration other factors that might also influence price, like cost and demand." (quotation marks omitted)); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-MD-2785, 2020 WL 1180550 (D. Kan. Mar. 10, 2020); *Mushroom*, 319 F.R.D. at 202.

accepted mathematical formula for assessing damages with class wide proof. The fact that individualized inquiry may be necessary to allocate those damages will not defeat class certification.") (internal citation omitted); *Bell v. WestRock CP, LLC,* No. 3:17-CV-829, 2019 WL 1874694, at *5 (E.D. Va. Apr. 26, 2019) (finding predominance satisfied because "'if liability is found, the issue of damages can be decided by a special master or by another method.'") (citation omitted). Therefore, the predominance requirement of Rule 23(b)(3) is satisfied.

### 2.   A Class Action is the Superior Method for Adjudicating the Claims at Issue

Rule 23(b)(3) provides that certification is warranted if a class-wide trial is "superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3). To establish superiority, Plaintiffs must also show that a class action is superior to individual actions, which is evaluated by four considerations:

> (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of the class action.

*See id*.

Class certification is more efficient than any other procedure available for resolving the relevant factual and legal issues raised here. *See Messner*, 669 F.3d at n.5 ("There are so many common issues of law and fact relating to the issue of [liability], however, that the superiority requirement likely poses no serious obstacle to class certification here."). The record to date— showing that Plaintiffs can establish their claims on a class-wide basis using predominantly common proof—underscores the manageability of this case. *See Kleen*, 831 F.3d at 929.

In finding the superiority requirement satisfied, courts have explained that an alternative— litigating hundreds or thousands of lawsuits individually—would be wasteful, inefficient and

unfeasible for many plaintiffs. *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 349 (D. Md. 2012) ("[T]his Court concludes that because common issues predominate, class action treatment is superior to other available methods of adjudicating the Plaintiffs' claims."). Here, there are no feasible, let alone superior, alternatives to a class action. While a handful of direct action Plaintiffs—generally very large purchasers—have opted out of the direct purchaser action to bring individual suits against Defendants, the vast majority of the class members have not done so. *See, e.g.*, Keough Decl. in Support of Final Approval of DPP Settlements With Peco Foods, George's, and Amick (ECF No. 3757) (reflecting a total of 99 valid opt-out requests representing 1,500 entities, out of over 25,000 potential class member entities). Thus, a denial of certification would likely result in the filing of additional individual actions or, just as likely, the abandonment of claims by Class Members whose injury, while quite real, is not large enough to economically justify the costs of litigation. The first alternative—additional individual actions—would be grossly inefficient, costly, and time consuming because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation. The second—abandonment of meritorious claims—is directly contrary to the well-established principle that private actions are essential to the effective enforcement of the antitrust laws.

In addition, the thousands of class members are dispersed across the country, each with materially identical claims. Certainly, the most feasible and efficient way for these plaintiffs to pursue their claims is by way of a class action. *See Urethane*, 237 F.R.D. at 453; *Butler*, 727 F.3d at 801 ("[T]he more claimants there are, the more likely a class action is to yield substantial economies in litigation") (quoting *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)). This reasoning applies here and class treatment is the superior way for this case to proceed.

### 3. The DPP Trial Plan Further Supports Predominance and Superiority

On January 10, 2020 the DPPs submitted their proposed trial plan for this case. (ECF No. 3400.) While the Court did not formally order a trial schedule, Judge Gilbert stated during the January 17, 2020 status conference that "the DPP's suggestion of going first, that's where this should go." Jan. 17, 2020 Hrg. Tr., at p. 30. The proposed DPP trial plan, which is predicated on the class-wide adjudication of common issues, further supports the superiority of the class action pursuant to Rule 23(b)(3). Namely, DPPs proposed that the claims of their thousands of Class Members be tried in a single action with approximately 40 hours of testimony on each side to resolve the issues of liability and damages on behalf of thousands of direct purchasers against Defendants. *See* ECF No. 3400. During the trial, the DPPs intend to focus on testimony and documents proving Defendants' unlawful conduct; expert evidence regarding the impact and damages resulting from Defendants' unlawful scheme; and testimony from additional witnesses such as Plaintiffs, third parties, and industry experts. Resolving the claims of all DPP Class members in a single trial is a far superior means of managing the case. As a practical matter, if the DPPs prevail in their trial, it will substantially shorten and make more efficient the trial of any remaining classes or direct action plaintiffs. Additionally, the number, complexity, and duration of the direct action trials would increase exponentially and unnecessarily if this case is not certified as a class action.

## IV. CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully submit that the proposed Class meets all requirements under Rule 23 and that the Court should certify the proposed Class, appoint the named Plaintiffs as class representatives, appoint Pearson, Simon & Warshaw LLP and Lockridge Grindal Nauen P.L.L.P. as Co-Lead Class Counsel, and appoint Hart, McLaughlin & Eldridge, LLC as Class Liaison Counsel.

Date: October 30, 2020

*/s/ Bobby Pouya*
Clifford H. Pearson
Bobby Pouya
Michael H. Pearson
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
cpearson@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

Bruce L. Simon
**PEARSON, SIMON & WARSHAW, LLP**
350 Sansome Street, Suite 680
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com

W. Joseph Bruckner
Brian D. Clark
Simeon A. Morbey
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com

*Direct Purchaser Plaintiffs Interim Co-Lead Class Counsel*

Steven A. Hart (#6211008)
Brian Eldridge (#6281336)
Kyle Pozan (#6306761)
**HART MCLAUGHLIN & ELDRIDGE, LLC**
121 West Wacker Drive, Suite 1050
Chicago, IL 60601
Telephone: (312) 955-0545
Facsimile: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com
kpozan@hmelegal.com

*Direct Purchaser Plaintiffs' Interim Liaison Counsel*