**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>All Commercial and Institutional Indirect Purchaser Plaintiff Actions | Case No. 1:16-cv-08637 |

**MEMORANDUM OF LAW IN SUPPORT OF COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**<u>PUBLIC REDACTED VERSION</u>**

i

**TABLE OF CONTENTS**

**Page**

GLOSSARY OF TERMS ............................................................................................. x

I.     INTRODUCTION ............................................................................................ 1

II.    STATEMENT OF FACTS ............................................................................... 2

       A.    The Relevant Product: Broilers ........................................................... 2

       B.    The Parties ........................................................................................... 2

       C.    Common Documentary and Testimonial Evidence Demonstrates the
             Existence of Defendants' Conspiracy .................................................. 4

             1.    Pre-2008 History of Competition, Supply, and Low Margins ................... 4

             2.    Tyson and Pilgrim's Told Their Competitors They Would No
                   Longer Cut Supply to Raise Prices for the Rest of the Industry ............... 5

             3.    Defendants Entered Into an Agreement to Restrict Supply ....................... 6

             4.    Defendants Met and Cut Production after Tyson and Pilgrim's
                   Invitation to Collude ................................................................................ 7

             5.    Tyson Enlisted Agri-Stats and Continued to Communicate the Need
                   for Competitors to Agree to Cut .............................................................. 7

             6.    Defendants' Second Round of Cuts in 2008 ............................................. 8

             7.    After Encouraging Competitors to Cut Production, Tyson Keeps Up Its
                   End of the Bargain and Cuts Production, Increasing Industry Prices ......... 9

             8.    Defendants' Coordinated Supply Cuts in 2009 and Used Agri-Stats to
                   Facilitate and Monitor the Conspiracy .................................................... 10

             9.    Defendants' Maintained Production Cuts in 2010 Through Use of
                   Joint Ventures ........................................................................................ 11

             10.   Coordinated Conduct Led to Unprecedented Supply Cuts in 2011 ......... 12

             11.   Defendants Continued the Conspiracy from 2012 to 2014 and
                   Exchanged Pricing Information ............................................................... 15

             12.   Defendants' Conspiracy Continued into 2015 ........................................ 16

             13.   Continued Coordinated Cuts Led to Record Profits in 2016 – Present .... 17

             14.   Agri-Stats Detailed Data and De-Anonymization .................................. 17

             15.   Other Collusive Conduct by Defendants Demonstrating Close
                   Collaboration ......................................................................................... 18

D.   Common Economic Evidence Demonstrates the Existence of the Conspiracy and its Common, Widespread Impact ................................................................. 18

1.   CIIPPs' Expert is Qualified to Provide Expert Testimony Concerning Market Structure, Classwide Impact, and Damages ................................. 19

2.   CIIPPs Have Utilized Widely Accepted and Reliable Methodologies for Demonstrating Antitrust Impact and Artificial Price Elevation in the Broiler Market .................................................................................... 19

3.   CIIPPs' Quantitative Modeling, Common to the Class, Demonstrates that Broiler Supply Was Artificially Restrained ....................................... 21

4.   CIIPPs' Pass-Through Regressions Demonstrate Common Impact ......... 22

5.   The Structural Characteristics of the Broilers Market Facilitated the Conspiracy and Contributed to its Widespread Impact ........................... 22

6.   The Industry's Widespread Use of Pricing Indexes Supports Common Impact ...................................................................................................... 23

7.   CIIPPs Have Proffered Price Correlation Analyses Demonstrating Common Impact ........................................................................................ 24

8.   There is Common Evidence Regarding Defendants' Conduct that Economists Consider as Consistent with the Alleged Conspiracy ........... 24

9.   Common Documentary and Testimonial Evidence from the Case Demonstrates Widespread Antitrust Impact and Pass-Through .............. 25

a.   Documents and testimony confirm that Defendants' overcharges were widely dispersed throughout the market at the direct purchaser level .......................................................................... 25

b.   Evidence further confirms that Defendants' overcharges passed through the distribution chain to all or nearly all members of the CIIPP class ............................................................................... 26

III.   ARGUMENT ....................................................................................................... 28

A.   Legal Standard .................................................................................................. 28

B.   CIIPPs Satisfy Rule 23(a) ............................................................................... 29

C.   CIIPPs Satisfy Rule 23(b)(3) Because Common Questions of Fact and Law Predominate ..................................................................................................... 33

1.   The Existence of Defendants' Conspiracy Can Be Proven by Common Evidence ................................................................................................... 34

2.      Antitrust Impact and Damages Can be Presented on a Classwide Basis Using Common Evidence. CIIPPs Have Set Forth Reliable and Generally Accepted Methods for Establishing Common Impact ............ 34

    a.      Dr. Mangum's Multiple Regression Analysis Demonstrates Widespread Overcharges ................................................................ 35

    b.      Dr. Mangum's structural analysis of the market is common evidence of widespread overcharges and impact ......................... 38

    c.      Dr. Mangum's Price Correlation Analyses is Evidence of Common Impact ................................................................................ 39

    d.      "Pass-Through" of the Overcharges Can be Established Through Common Evidence ........................................................... 40

    e.      Aggregate Damages Demonstrates that Common Issues Predominate ........................................................................... 42

    f.      Alleged Intricacies in the Market Do Not Defeat Class Certification ...................................................................... 42

3.      The Class Action Device is Superior ........................................................ 44

IV.    CONCLUSION ................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Air Cargo Antitrust Litig.*,
  Master File No. 06-MD-1175, 2014 WL 7882100 (E.D.N.Y. 2014) ...............................36, 38

*In re Allstate Corp. Sec. Litig.*,
  966 F.3d 595 (7th Cir. 2020) ..........................................................................................28, 33

*Amchem Prods. Inc. v. Windsor*,
  521 U.S. 591 (1997)...............................................................................................................28

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)..........................................................................................................28, 33

*Barnes v. Airline Pilots Ass'n, Int'l*,
  310 F.R.D. 551 (N.D. Ill. 2015)............................................................................................29

*Bazemore v. Friday*,
  478 U.S. 385 (1986)...............................................................................................................36

*Beaton v. SpeedyPC Software*,
  907 F.3d 1018 (7th Cir. 2018) ..............................................................................................35

*In re Blood Reagents Antitrust Litig.*,
  MDL No. 09-2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) ..........................................38

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp.3d 772 (N.D. Ill. 2017) .....................................................................................32

*Butler v. Sears, Roebuck & Co.*,
  727 F.3d 796 (7th Cir. 2013) ................................................................................................33

*Carnegie v. Household Int'l, Inc.*,
  376 F.3d 656 (7th Cir. 2004) ................................................................................................44

*In re Catfish Antitrust Litig.*,
  826 F. Supp. 1019 (N.D. Miss. 1993)....................................................................................31

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  308 F.R.D. 606 (N.D. Cal. 2015)......................................................................................38, 40

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013)..................................36, 41

*In re Cipro Cases I and II*,
  17 Cal. Rptr.3d 1 (2004) ................................................................................35

*Day v. Check Brokerage Corp.*,
  240 F.R.D. 414 (N.D. Ill. 2007)......................................................................28

*Dow Chem. Co. v. Seegott Holdings, Inc. (In re Urethane Antitrust Litig.)*,
  768 F.3d 1245 (10th Cir. 2014) ................................................................34, 43

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  *Master File No. M-02-1486-PJH, 2013 WL 12333442 (N.D. Cal. Jan. 8,
  2013)* ........................................................................................................19, 34

*In re Fine Paper Antitrust Litig.*,
  82 F.R.D. 143 (E.D. Pa. 1979)........................................................................43

*Fond du Lac Bumper Exch., Inc. v. Jui Li Enter, Co.*,
  No. 09-cv-0852, 2016 2016 WL 3579953 (E.D. Wis. June 24, 2016) ...................38

*Gress v. Freedom Mortg. Corp.*,
  386 F. Supp. 3d 455 (M.D. Pa. 2019) ..............................................................32

*Hawaii v. Standard Oil Co.*,
  405 U.S. 251 (1972)......................................................................................28

*Hemmings v. Tidyman's Inc.*,
  285 F.3d 1174 (9th Cir. 2002) ........................................................................36

*In re High Fructose Corn Syrup Litig.*,
  295 F.3d 651 (7th Cir. 2002) ...............................................................35, 38, 39

*In re High-Tech Employee Antitrust Litig.*,
  985 F.Supp.2d 1167 (N.D. Cal. 2013) ..........................................................40, 42

*Hopkins v. De Beers Centenary AG*,
  No. CGC-04-432954, 2005 WL 1020868 (Cal. Sup. Ct. Apr. 15, 2005) ...............35

*Hospital Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta
  Pharms.*,
  333 F.R.D. 390 (M.D. Tenn. 2019) ..................................................................32

*Keele v. Wexler*,
  149 F.3d 589 (7th Cir. 1998) ..........................................................................30

*Kleen Prods. LLC v. International Paper Co.*,
  831 F.3d 919 (7th Cir. 2016) ............................................................... *passim*

*Kohen v. Pacific Inv. Mgt. Co. LLC*,
  244 F.R.D. 469 (N.D. Ill. 2007), *aff'd*, 571 F.3d 672 (7th Cir. 2009) .................29, 30, 35, 44

*In re Korean Ramen Antitrust Litig.*,
  Case No. 13-cv-04115-WHO, 2017 WL 235052 (N.D. Cal. Jan 19, 2017)...............19, 34, 35

*In re Linerboard Antitrust Litig.*,
  203 F.R.D. 197 (E.D. Pa. 2001)...................................................................................35

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420, 2016 WL 948874 (N.D. Cal. Mar. 14, 2016)..........................................32

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  256 F.R.D. 586 (N.D. Ill. 2009).....................................................................................32

*Marcial v. Coronet Ins. Co.*,
  880 F.2d 954 (7th Cir. 1989) ......................................................................................29

*McCabe v. Crawford & Co.*,
  210 F.R.D. 631 (N.D. Ill. 2002)....................................................................................28

*In re Mercedes-Benz Antitrust Litig.*,
  213 F.R.D. 180 (D.N.J. 2003).......................................................................................43

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) .............................................................................28, 33, 35

*In re Microcrystalline Cellulose Antitrust Litig.*,
  218 F.R.D. 79 (E.D. Pa. 2003).....................................................................................43

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) .......................................................................................45

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  No. 06-0620, 2015 WL 5767415 (E.D. Pa. Jul. 29, 2015) ...................................................37

*In re NorthShore Univ. HealthSystem Antitrust Litig.*,
  No. 07-cv-4446, 2018 WL 2383098 (N.D. Ill. Mar. 31, 2018) ............................................32

*Payton v. County of Kane*,
  308 F.3d 673 (7th Cir. 2002) .......................................................................................32

*In re Processed Egg Products Antitrust Litig.*,
  312 F.R.D. 171 (E.D. Pa. 2015)....................................................................................40

*In re Processed Egg Products Antitrust Litig.*,
  No. 08-md-2002, 2017 WL 3494221 (E.D. Pa. Aug. 14, 2017)...........................................37

*Quinn v. Specialized Loan Servicing, LLC*,
    331 F.R.D. 126 (N.D. Ill. 2019) ...................................................................44

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) .......................................................................................28

*In re Relafen Antitrust Litig.*,
    221 F.R.D 260 (D. Mass. 2004) ....................................................................34

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ......................................................................30

*In re Rubber Chemicals Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005) ..................................................................35

*Saltzman v. Pella Corp.*,
    257 F.R.D. 471 (N.D. Ill. 2009) ...................................................................31

*Schmidt v. Smith & Wollensky LLC*,
    268 F.R.D. 323 (N.D. Ill. 2010) ...................................................................29

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008) ..................................................................33, 35

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    264 F.R.D. 603 (N.D. Cal. 2009) ............................................................36, 41

*In re Sulfuric Acid Antitrust Litig.*,
    No. 03 C 4576, 2007 WL 898600 (N.D. Ill. Mar. 21, 2007) ....................30, 35

*Tatz v. Nanophase Techs. Corp.*,
    No. 01 C 8440, 2003 WL 21372471 (N.D. Ill. June 13, 2003) ....................30

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ..........................................................................................34

*In re TFT-LCD (Flat Panel) Antitrust Litig,*.
    267 F.R.D. 291 (N.D. Cal. 2010) ............................................................36, 44

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010) ............................................................28, 41

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07-1827 SI, 2012 WL 253298 (N.D. Cal. Jan. 26, 2012) ..................42

*In re Titanium Dioxide Antitrust Litig.*,
    284 F.R.D. 328 (D. Md. 2012) .....................................................................38

*In re Vitamins Antitrust Litig.*,
   209 F.R.D. 251 (D.D.C. 2002) .......................................................................43

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ........................................................................................30

*Wortman v. Air New Zealand*,
   326 F.R.D. 549 (N.D. Cal. 2018) ...................................................................19

**Rules**

Federal Rules of Civil Procedure
   Rule 23 ..................................................................................................... *passim*
   Rule 23(a) .........................................................................................................29
   Rule 23(a)(1) ....................................................................................................29
   Rule 23(a)(2) ....................................................................................................30
   Rule 23(a)(4) ....................................................................................................31
   Rule 23(b) .........................................................................................................29
   Rule 23(b)(2) ......................................................................................................1
   Rule 23(b)(3) ...........................................................................................1, 33, 44
   Rule 23(g) .........................................................................................................32

**Other Authorities**

Baker & Rubinfeld, "Empirical Methods in Antitrust Litigation," American Law
   and Economics Review, vol. 1 (1999) .............................................................20

Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," Reference
   Manual on Scientific Evidence (3d ed. 2011) .................................................20

NEWBERG ON CLASS ACTIONS (4th Ed. 2005)
   §2:3 ...................................................................................................................35
   § 10.05 ..............................................................................................................42

**GLOSSARY OF TERMS**

| Term | Definition |
| --- | --- |
| Agri-Stats | Agri Stats, Inc., a subsidiary of Eli Lilly & Co., is a data collection and analysis company that collects confidential data from Broiler integrators and uses this confidential data to send industry benchmarking reports to the Defendants on a weekly and monthly basis. |
| Amick | Amick Farms, LLC; The Amick Company, Inc.; Amick-OSI Broilers, LLC; Amick-OSI Processing, LLC. Privately held. |
| Appendix A | Chart of State Antitrust Claims & Harmonization Provisions |
| Appendix B | Chart of State Consumer Protection Statutes |
| Appendix C | Chart of Unjust Enrichment States |
| Arlon Group | Sister company to Wayne Farms, owned by Wayne's parent company, Continental Grain Company, a food and agriculture investment firm with a global network that invests in middle-market businesses across the entire food supply chain in the Americas. |
| Bird Weights | The producer's target weight of a Broiler, and an important supply metric to understand total production. |
| Breeders | The Hens which lay the eggs that will mature into Broilers. |
| Broilers | Chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, and whole or in parts, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards. |

| | |
|---|---|
| BSB | Boneless skinless chicken breast. |
| Buy vs. Grow | Programs implemented by certain Defendants whereby they cut their own Broiler production and operated in an oversold position, forcing them to buy the Broilers needed to fulfill contracts instead of growing Broilers. |
| Case | Case Foods, Inc.; Case Farms, LLC; Case Farms Processing, Inc. Privately held. |
| CIIPPs | Commercial and Institutional Indirect Purchaser Plaintiffs |
| Class Period | January 1, 2009, until July 31, 2019 |
| Class Representatives | Fargo Stopping Center, LLC; Sargent's Restaurant and Lounge; Wildwood Tavern, LLC; Bodega Brew Pub, Inc.; Sullott Corporation; Chicken Joe's, LLC; Eat This, Inc. dba Some Like It Hot; Alpine Special Treatment Center, Inc.; Tennis Bums, LLC dba Alabama Joes; Alabama Joe's 2, Inc. dba Alabama Joes; Tani Sushi Bistro, LLC; France 44 Foods, Inc.; Midtown Bar and Grill LLC; Avanti's of Phoenix, Inc.; Floersch IGA, Inc. dba Ray's Apple Market; Da Big Blue Enterprises Corp. dba Blue Tropix Bar and Grill and Da Big Kahuna Waikiki; Little Figs, Inc. dba Figaretti's Restaurant; Alliance Healthcare System, Inc.; Mookie's Southern Cuisine LLC; Eowyn, LLC dba Cabana; Peppers Grill & Bar, Inc.; Daliano's, Inc. dba Daliono's; Sumner Country Restaurant & Creamery LLC dba Kelley's Row Restaurant & Pub; Bashara & Company, LC dba J. Morgan's Steakhouse; Tic-Tac-O; Brix Tavern, LLC; Pancho's Taqueria, Inc. dba Pancho's Taqueria; Roost Fried Chicken LLC; Oregano Italian LLC dba Oregano Italian Kitchen; Bordenaro's Pizza, Inc. dba Bordenaro's Pizza, Telavi Hospitality, Inc. dba Levante; and FB Mall, LLC dba Fat Belly's |

| | |
|---|---|
| Claxton | Claxton Poultry Farms, Inc.; Norman W. Fries, Inc. dba Claxton Poultry Farms, Inc. |
| Dark meat | Thighs and other dark meat portions of the chicken. |
| Defendants | Koch Foods; Tyson; Pilgrim's; Perdue; Sanderson Farms; Wayne Farms; Mountaire; Peco Foods; Foster Farms; House of Raeford; Simmons; Fieldale Farms; George's; O.K. Foods; Claxton; Harrison; Mar-Jac; Agri-Stats; Amick; Case. |
| Distributors / Direct Purchasers | Middlemen entities that purchase Broilers directly from Defendants for one price, mark up the price, and sell it to members of the CIIPP class for another price. Includes Direct Action Plaintiffs ("DAPs") and Direct Purchaser Plaintiffs ("DPPs"). |
| EMI | Express Markets, Inc., subsidiary of Agri-Stats, releases daily pricing data to both Defendants and potential purchasers of Broilers, though the reporting service costs thousands of dollars and is not publicly available. EMI reports capture all transactions by Broiler producers, who automatically transmit invoice information electronically from each transaction to EMI. The reports include all sales volume information from the previous day, including the size of containers, type of cut, whether the product was chilled with ice or $CO_2$, the price, and numerous other pieces of information. |
| EUCPs / End Users | End User Consumer Plaintiffs. |
| Ex. | Exhibit to Declaration of Adam Zapala in Support of Commercial and Institutional Indirect Purchaser Plaintiffs' Motion for Class Certification ("Zapala Declaration"). |
| Fieldale Farms | Fieldale Farms Corporation. Privately held. |
| Foster Farms | Foster Farms, LLC; Foster Poultry Farms. Privately held. |

| | |
|---|---|
| George's | George's, Inc.; George's Farms, Inc. Privately held. |
| Georgia Dock | A weekly price quote released by the Poultry Market News ("PMN") division of the Georgia Department of Agriculture each Wednesday. The nine companies that participated were Pilgrims, Tyson, Sanderson, Wayne Farms, Koch, Fieldale, Mar Jac, Claxton, and Harrison. |
| Harrison | Harrison Poultry, Inc. |
| House of Raeford | House of Raeford Farms, Inc. Privately held. |
| Indirect Purchaser States | Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Illinois, Kansas, Massachusetts, Maine, Michigan, Minnesota, Missouri, Mississippi, Montana, North Carolina, North Dakota, Nebraska, New Hampshire, New Mexico, Nevada, New York, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Wisconsin, West Virginia |
| IPPE | International Producers and Processors Expo, the world's largest annual poultry, meat, and feed industry event welcoming a wide-range of international decision-makers to network and learn about the latest issues facing the industry. |
| Keystone Foods | Keystone Foods, Inc.; Keystone Foods Corporation; Keystone Foods Equity Group; Keystone Foods LLC; Equity Group Kentucky Division LLC; Equity Group – Georgia Division LLC. |
| Koch Foods | Koch Foods, Inc.; JCG Foods of Alabama, LLC; JCG Foods of Georgia, LLC; Koch Meat Co., Inc. Koch Foods, Inc. is privately held. |
| Mar-Jac | Mar-Jac Poultry, Inc.; Mar-Jac Poultry MS, LLC; Mar-Jac Poultry AL, LLC; Mar-Jac |

| | |
|---|---|
| | AL/MS, Inc.; Mar-Jac Poultry, LLC; Mar-Jac Holdings, LLC. |
| Mountaire | Mountaire Farms, Inc.; Mountaire Farms, LLC; Mountaire Farms of Delaware, Inc. Privately held. |
| NCC | National Chicken Council, represents integrated chicken producer-processors, the companies that produce, process and market chickens. There are approximately 40 member companies of NCC and they account for approximately 95 percent of the chicken sold in the United States. The CEOs of the top integrated Broiler producers are routinely on the board of directors and meet at least quarterly with one another through the NCC. Every Defendant and Co-Conspirator is a member of the NCC. |
| O.K. Foods | O.K. Foods, Inc.; O.K. Farms, Inc.; O.K. Industries, Inc. |
| Peco Foods | Peco Foods, Inc. Privately held. |
| Perdue | Perdue Farms, Inc.; Perdue Foods LLC. Privately held. |
| Pilgrim's | Pilgrim's Pride Corporation. JBS USA Holdings, Inc. holds a 75.3% controlling interest in Pilgrim's Pride Corporation. Pilgrim's Pride Corporation and JBS USA Holdings, Inc. are subsidiaries of JBS S.A., a Brazilian corporation headquartered in Sao Paulo, Brazil. |
| Producer Co-Conspirators | Allen Harim; Keystone Foods |
| Pullet | A female breeder chicken under 25 weeks of age. Once pullets reach sexual maturity and can begin producing eggs, they are considered Breeders. |
| Pullet / pullet placements | A pullet refers to a young hen, usually under one year of age. Once a chick develops feathers rather than down, it is then called a pullet if it is female. |

| | |
|---|---|
| | Pullets purchased by Broiler companies then become Breeders. Pullet placement numbers are an indication of future Broiler supply. |
| Rabobank | A Dutch multinational banking and financial services company headquartered in Utrecht, Netherlands. It is a global leader in food and agriculture financing and sustainability-oriented banking. Rabobank specializes in providing financing to Broiler integrators and growers. Rabobank is a key Arlon Group investor. |
| Sanderson Farms | Sanderson Farms, Inc.; Sanderson Farms, Inc. (Foods Division); Sanderson Farms, Inc. (Production Division); Sanderson Farms, Inc. (Processing Division).  Sometimes referred to as SAFM. |
| Simmons | Simmons Foods, Inc.; Simmons Prepared Foods, Inc. Privately held. |
| Southern Hens | One of two primary sources for breeder hen slaughtering services to Defendants. As of 2009, Defendants with ownership stake in Southern Hens included Foster Farms, George's, Koch Foods, O.K. Foods, Peco Foods, Pilgrim's, and Sanderson Farms. |
| Tip Top Poultry | One of two primary sources for breeder hen slaughtering services to Defendants. Members of Tip Top's Alliance Advisory Board included Defendants Case Foods, Fieldale Farms, Harrison Poultry, House of Raeford, Mar-Jac Poultry, Mountaire Farms, Perdue, Pilgrim's, and Wayne Farms as well as Co-Conspirators Allen Harim and Keystone Foods. |
| Trial Plan | CIIPPs' Trial Plan |
| Tyson | Tyson Foods, Inc.; Tyson Chicken, Inc.; Tyson Breeders, Inc.; Tyson Poultry, Inc. |
| Urner Barry | A reporting service that publishes daily prices ("quotes") for many Broiler products. |

| | |
|---|---|
| USDA | United States Department of Agriculture |
| Wayne Farms | Wayne Farms, LLC, an operating affiliate of its parent company, Continental Grain Company, a privately held company in Arlon, Belgium. |
| WOGs | Whole chickens without giblets. |

## I.       INTRODUCTION

The Commercial & Institutional Indirect Purchaser Plaintiffs ("CIIPPs") respectfully request that the Court certify classes for injunctive relief and for damages pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3). CIIPPs are a class comprised of commercial food preparers who purchased Broilers indirectly from the conspiring Defendants at supracompetitive prices. As the Motion outlines, CIIPPs have developed extensive common evidence in support of class certification. CIIPPs have adduced substantial common liability evidence, both documentary and testimonial, demonstrating that Defendants engaged in a conspiracy to artificially inflate the prices of Broilers, causing overcharges that were passed through the distribution chain in a common manner to CIIPP class members. CIIPPs' expert economist has analyzed the common documentary and testimonial evidence and has concluded that it is the type economists typically find as consistent with collusion.  Courts, including courts in this circuit, have repeatedly found antitrust conspiracy cases, such as this one, appropriate for the class action device.

But CIIPPs did not stop there. In addition to the common qualitative evidence justifying certification of the class, CIIPPs have also offered substantial expert analyses, utilizing advanced quantitative modeling, including, among other techniques, multiple regression analysis, price correlation analyses, pass-through regressions, and a structural analysis of the Broilers market and its related supply chain, to quantify damages and demonstrate common harm to virtually all class members. CIIPPs' empirical quantitative analyses are scientifically rigorous, robust, and present exactly the type of framework in support of class certification that courts have repeatedly accepted. CIIPPs' quantitative analyses are also firmly grounded in the facts and record evidence in this case, including Defendants' own voluminous transactional data produced during the course of this litigation.

1

As the extensive evidence in support of the Motion demonstrates, the Defendants attempted to, and did, coordinate their business conduct with the purpose of elevating the market prices of Broilers. Their conscious commitment to the common agreement succeeded, and the Broiler Defendants profited handsomely. This litigation stands as the only means for commercial food preparers, including our nation's treasured restaurants, to recover for the substantial harm caused by the Defendants. CIIPPs' Motion for Class Certification should be granted.

## II.    STATEMENT OF FACTS

### A.    The Relevant Product: Broilers

The relevant product is "Broilers," which for purposes of class certification are defined as "chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, and whole or in parts, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards." *See* Notice of Motion & Motion.[1] For their quantitative work, CIIPPs further divide Broilers into three product categories: Whole Chickens, or "WOGs"; Breast Products; and Wing Products. Expert Report of Dr. Russell Mangum ("Mangum Report") ¶¶ 149-150; 184-219.

### B.    The Parties

CIIPPs are entities—largely small businesses—located in numerous states[2] that purchased Broilers indirectly from a Defendant or co-conspirator in the United States for their own use in

---

[1] The definition of "Broilers" does not include dark meat chicken products. The definition also does not include certain "further processed" products, which means any chicken meat that has been breaded, cooked, or "formed," such as patties, or nuggets; or products made from mechanically separated meat such as chicken sausages; or products that are ground, sliced, diced, or cubed. Marinated, seasoned, frozen and portioned products, that are not otherwise further processed, are included within the definition of Broilers. Mangum Report ¶ 10.

[2] For CIIPPs that are asserting damages claims, the entities and small businesses reside or purchased Broilers in: Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Illinois, Kansas, Massachusetts, Maine, Michigan, Minnesota, Missouri, Mississippi, Montana, North Carolina, North

commercial food preparation from January 1, 2009 to July 31, 2019 (the "Class Period"). The putative CIIPP class is largely comprised of restaurants, commercial food preparers, and grocery store deli counters, which purchase chicken for prepared meals. CIIPPs have broken the Class Period into two impact periods to address Defendants' coordinated rounds of supply cuts: (1) January 1, 2009 through November 30, 2011 ("first impact period"); and (2) December 1, 2011 through July 31, 2019 ("second impact period"). *See* Mangum Report ¶¶ 144-146; 150.[3]

The Defendants,[4] sellers of Broilers, along with their agents and co-conspirators, engaged in a ten-year conspiracy to fix, raise, maintain, and/or stabilize the prices of Broilers. Defendants achieved their goal through, *inter alia*, colluding on supply reductions, exchanging non-public information on output and prices, coordinating prices, and other collusive conduct. *See* CIIPPs' 7th Consolidated Amended Complaint ("7th CAC"), ECF No. 3929. The Defendants are largely "vertically integrated" enterprises, which means they control many aspects of Broiler production from the layer/breeder pullets and feed mills through to the broiler slaughter and distribution phase. Mangum Report ¶ 25. Collectively, the Defendants controlled approximately 92% to 97% of the market during the Class Period. *Id.* ¶ 59.

Defendants' conspiracy was facilitated by the existence of certain market factors, including "Agri-Stats." *Id.* ¶¶ 91-107. Agri-Stats is a data collection and analysis company that collects data from broiler integrators and uses it to send industry benchmarking reports to the Defendants on a weekly and monthly basis. *Id.* The data that Agri-Stats collected was incredibly granular – they

---

Dakota, Nebraska, New Hampshire, New Mexico, Nevada, New York, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Wisconsin, West Virginia ("Indirect Purchaser States").

[3] Plaintiffs continue allege the conspiracy began in 2008, but seek to prove common impact and damages starting January 1, 2009.

[4] Koch Foods; Tyson; Pilgrim's Pride Corporation; Perdue; Sanderson Farms; Wayne Farms; Mountaire Farms; Peco Foods; Foster Farms; House of Raeford; Simmons Foods; Fieldale Farms; George's; O.K. Foods; Claxton Poultry; Harrison Poultry; Mar-Jac Poultry; Agri-Stats, Inc.; Amick Farms; and Case Foods.

provided Defendants with production statistics as far down as at the plant level. *Id.* Though Agri-Stats claimed to provide anonymized data, there is substantial evidence that Defendants de-anonymized it and knew which production and data figures applied to which integrators. *Id.* In fact, several Defendants participated in the direct sharing of Agri-Stats information with one another. The Agri-Stats reports "readily provided the Defendants with detailed information on their competitors' costs, prices, profits, and production statistics at the plant level." Mangum Report ¶ 95. The Broiler market also utilized price indexes, which not only tracked the market prices of Broiler parts, but also served as a benchmark for spot and contract prices to customers in the supply chain. Two such indexes were the "Georgia Dock"[5] and "Urner Barry."[6]

### C.   Common Documentary and Testimonial Evidence Demonstrates the Existence of Defendants' Conspiracy

At trial, CIIPPs will present common evidence that demonstrates Defendants engaged in a conspiracy to fix, increase, or stabilize the prices of Broilers.

#### 1.   Pre-2008 History of Competition, Supply, and Low Margins

Between 2000-2007, the Broiler industry was characterized by low prices and the perception by Defendants that broiler producers created too much industry supply. *See* Declaration of Adam J. Zapala in Support of Motion for Class Certification ("Zapala Decl.") ¶ 3, Ex. 1 (Sanderson-0003396986).[7] On occasion during this period, Tyson took on the responsibility of cutting its supply, which—given its large market share—impacted overall industry supply and thus

---

[5] The Georgia Dock was a weekly price quote released by a division of the Georgia Department of Agriculture. Although Georgia Dock is meant to represent a WOG price, in contracts with retailers, it is common for Georgia Dock to provide the basis for the price of numerous chicken products. The GA Dock price was commonly used for whole-birds in the food service channel. Mangum Report ¶¶ 121-125.

[6] Urner Barry is a reporting service that publishes daily prices ("quotes") for many Broiler products. There are often several daily quotes within each broad category of Broiler products. For example, there are series for jumbo wings, medium wings, and small wings.

[7] All citations to Exhibits ("Ex.") hereinafter reference exhibits attached to the Zapala Declaration.

helped the entire industry stabilize pricing. Ex. 2 (DPP0000020177). Initially, few competitors joined Tyson in cutting supply in 2007, but others took advantage of those cuts to maintain their production and increase their own market share. *See id.* As a result, between 2000 and 2007, Tyson lost 5-7% of its market share, while the rest of industry production grew by 31%. *See id.*; Ex. 3 (TF-0007881275). Pilgrim's similarly cut production unilaterally in 2007 and ███████ ████████████████████████████████████████████████████. Ex. 4 (PERDUE0000782379 at 401). In early 2007, Tyson ██████████████████████████████████████████████████████, unlike most of its competitors, █████████████████████████████████████████████████ ████████████████████████████████████████████████████████████. Ex. 5 (2018-02-27 Tyson Objs. Resps. to All Pls Second Set of Interrogatories to All Dfs). Defendant ██████████████████████████████████████████. Ex. 6 (PERDUE0001639615).

> **2.     Tyson and Pilgrim's Told Their Competitors They Would No Longer Cut Supply to Raise Prices for the Rest of the Industry**

Beginning in 2008, Tyson and Pilgrim's made clear at Defendants' annual mass-gathering of industry executives for the International Poultry Expo ("IPE") that they ████████████ ████████████████████████████████████████████████. Ex. 7 (TF-0002727575). Tyson reiterated that position publicly on their earnings call only days later. Ex. 8 (PILGRIMS-0009990886, at 902). Pilgrim's followed Tyson's lead and announced on its earnings call that others would have to cut their "fair share." Ex. 4 (PERDUE0000782379 at 391).

With Tyson and Pilgrim's disavowing their prior role of cutting supply, the Defendants recognized the prisoners dilemma they faced, as shown by a summary of comments made by producers: "██████████████████████████████████████████████████████ ██████████████████████████████." Ex. 7 (TF-0002727575 at 76).

### 3.    Defendants Entered Into an Agreement to Restrict Supply

Under Tyson's leadership, the nineteen Defendant Broiler Producers—representing over 90% of production in the industry—stopped operating as separate producers and began operating as a single organization with 19 different divisions. In 2008, other Defendants accepted Tyson and Pilgrim's invitation, agreed to reduce supply, and keep supply short of demand. The agreement was simple: each would keep their supply short of industry demand, which all Defendants agreed was critical in raising broiler industry pricing.  Defendants adopted the euphemism of each producer doing "its fair share" to reduce production. *See* Ex. 9 (Weststrate Tr. at 156, 241, 251-52).

Defendants were greatly aided by factors that economists have repeatedly shown facilitate a conspiracy: trade associations, frequent direct communications, and extensive information exchanges through Agri-Stats. Mangum Report ¶¶ 89-135. The former president of Mountaire admitted, remarkably, that it was *normal* for competitors to discuss their supply and industry supply relative to demand, and how it impacts market pricing. Ex. 70 (Pogge Tr. 150:4-151:7). The Defendants were all subscribers to Agri-Stats and its subsidiary Express Markets Inc. ("EMI"). The conspiracy was further aided and abetted by Rabobank, a financial lender with billions in loans to various Defendants. Given its hefty investment, Rabobank was motivated to ensure the industry profited.  As one Rabobank executive testified, in 2008 and 2011, "███████████ ███████████████████████████████████████ ████████████" Ex. 9 (Weststrate Tr. at 161; *see also id*. at 152-53). Weststrate further testified the industry should ██████████████████████. *Id.* at 161.

### 4. Defendants Met and Cut Production after Tyson and Pilgrim's Invitation to Collude

Most Defendants' executives met for the National Chicken Council ("NCC") Meeting on February 22-23, 2008 at the Four Seasons Resort in Maui, Hawaii. Ex. 10 (NCC0000000083). At this meeting, Westrate of Rabobank explicitly stated that industry "███████████ ██████." Ex. 11(OKFoods_0000001575 at 598)). Shortly after the meeting, on March 12, 2008, Pilgrim's announced the closure of seven Broiler facilities to reduce supply, which, along with Tyson's call to arms, helped kickstart the first large wave of industry production cuts. Ex. 12 (KOCH_0000048522). Pilgrim's also engaged in actions aimed at lowering industry supply: "██ ████████████████████████████████████████████████████████████████ ███████" *Id.* Pilgrims' permanent cuts were quickly followed by Fieldale, Amick, Simmons, Wayne Farm, Koch Foods, OK Foods, and Peco. Ex. 13, (Supply Restriction Chart at 2-5). Despite none of these companies being public, many chose to make public announcements, ensuring their competitors would learn of the cuts. Ex. 14, (FIELDALE_1261831). As Peco's CEO testified, the ██████████████████████████████████████████. Ex. 15 (Hickman Tr. at 143-144). Tyson in turn contributed to cuts by █████████████████. Ex. 16 (TF-0002608481).

### 5. Tyson Enlisted Agri-Stats and Continued to Communicate the Need for Competitors to Agree to Cut

In the wake of the industry supply cuts in early April 2008, Tyson contacted EMI to ██ █████████████████████████████████████████████████████████████████ ████ Ex. 17 (TF-0007860236); Ex. 18 (AGSTAT-15392759) (confirming 5-6% cut necessary to raise prices). EMI acted as a conduit and told Tyson that "██████████████████████ █████████████████████████████████████" Ex. 17 (TF-0007860236). Tyson held an earnings call on April 28, 2008. Ex. 19 (PERDUE0001639443). On the earnings call and at other industry events, Tyson continued to make clear to its competitors that it was done cutting

unilaterally, and that any supply cuts would have to be coordinated throughout the industry. *Id.*; *see also* Ex. 20 (Rabo_0000050062). Furthermore, in explicit discussions with its competitors at an NCC meeting on April 29-30, 2008, Chairman of the Board Don Tyson made the same exhortation to its direct horizontal competitors in private one-on-one conversations, including in a communication with OK Foods' CEO Randy Goins. *Id.*

### 6. Defendants' Second Round of Cuts in 2008

By May 2008, it was becoming clear to Defendants that a second round of supply cuts was needed to drive prices higher. Ex. 21 (Pilgrims-0009993491 at 494). Defendants held an NCC Board meeting on June 17, 2008. Ex. 22 (TF-0002602742); Ex. 23 (NCC0000000094). Two days later, armed with information from its competitors at the NCC meeting, immediate-past NCC chairman Mark Hickman was reported to have said ████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████ Ex. 24 (DPP0000021292). The Summer of 2008 was filled with additional supply cuts, including by ████████████████████████. Ex. 13 (Supply Restrictions Chart. at 2-4). Not all cuts were publicly announced, yet Tyson somehow knew them. Ex. 25 (TF-0002728778). Sanderson and Foster Farms announced they would delay construction of planned facilities, keeping future supply off the market. Ex. 13 (Supply Restrictions Chart at 2-4). Sanderson urged breast prices to hit $2.25 and encouraged the industry to make further production cuts. Ex. 26 (PECO0000163802).

The cuts put in place by July 2008, however, were not enough. During EMI's July 16, 2008 webcast to Defendants, it explained that "████████████████" were necessary. Ex. 27 (Qualls Tr. 45:5-47:14); Ex. 28 (HRF_0000369715 at 768). Trudell of Agri-Stats delivered the same message in a subsequent NCC presentation. Ex. 29 (AGSTAT-14611910); *see also* Ex. 30

(Rabo_0000052519); Ex. 31 (AGSTAT-14611887). Trudell knew it was illegal to discuss production cuts at a meeting of Broiler competitors stating, "███████████████████

██████████████████████████████ *Id.* Within a few weeks

of receiving EMI and Trudell's message to collectively cut, ██████████████████████

██████████████████ Ex. 13 (Supply Restrictions Chart, at 1-2, 3, 5. In fact,

House of Raeford had never cut production in its history. Pilgrim's cuts included permanent

closures of facilities. *Id.* George's, Harrison, and Tyson responded with further cuts. Supply

Restrictions Chart, 1,4-5.

During August to September 2008, Rabobank retained ████████████████████

████████████████████████████ Ex. 32 (AGSTAT-14611742-

743); Ex. 33 (AGSTAT-14611697). Rabobank again took on the role of conduit and used these

analyses to push the industry to cut production further, noting "████████████████████

███████████████" . . . ." Ex. 34 (AGSTAT-14604518; AGSTAT-14604528).

### 7.    After Encouraging Competitors to Cut Production, Tyson Keeps Up Its End of the Bargain and Cuts Production, Increasing Industry Prices

On October 1, 2008, Defendants' senior executives met for a NCC Board of Directors

meeting where discussions of cutbacks occurred.[8] For example:

- There were numerous private meetings between Defendants' top executives. *See, e.g.*, Ex. 37 (Sanderson-0002630578); Ex. 38 (Sanderson-0001223441); Ex. 39 (PECO0000635521).

- A report entitled "Tidbits from the NCC Meeting" noted "████████████████████ ████████████████ Ex. 40 (PILGRIMS-0005684322).

- A Tyson document stated that the take-away of other conference goers was "████████ ████████████████████ Ex. 41 (TF-0003793669).

---

[8] *See, e.g.*, Ex. 35 (NCC0000000100); Ex. 36 (Rabo_0000053820).

- Continuing to strong-arm the smaller defendants, Tyson, again told the other Defendants at NCC that it was refusing to cut.  Ex. 42 (TF-0003793670 at 671).

Following Defendants' meeting and Tyson's continued refusal to commit to cutting without the support of the rest of the industry, Koch, Peco, Wayne Farms, and Perdue all accepted the invitation to collude to coordinate cuts. Ex. 13 (Supply Restriction Chart at 2-4). By October 23, 2008, a Rabobank report authored by EMI's Sue Trudell noted that the " ████████████████████████████████████████████ " Ex. 43(AGSTAT-14604425). Finally satisfied that its competitors kept their end of the agreement, Tyson publicly announced a 5% supply cut on December 23, 2008. Ex. 147 (TF-0007877156); Ex. 45 (Rabo_0000059197).  Not coincidentally, ███████████████████████████████████████████. Ex. 46 (AGSTAT-14612647 at 649).

### 8. Defendants' Coordinated Supply Cuts in 2009 and Used Agri-Stats to Facilitate and Monitor the Conspiracy

Defendants continued to maintain their conspiracy through 2009. For example:

- At the January 2009, NCC meeting held during the annual IPPE, Fieldale's Tom Hensley made a presentation to the top executives of other Defendants.  Hensley noted " ████████████████████████████████████████  In speaking directly to his competitors, Hensley discussed " ████████████████████████ Ex. 47 (FIELDALE_0238023)

- Hensley also discussed increasing prices during his presentation with his competitors, the Defendants.

Defendants continued to cut production consistent with the agreement:

- Sanderson announced it had cut its production 10% between September 2008 and January 2009.  Ex. 13 (Supply Restrictions Chart, at 2, 6).

- On February 27, 2009, Pilgrim's announced further production cuts at three processing plants. *Id.* at 6. A February 18, 2009, Pilgrim's presentation indicated that its supply cut was in response to Agri-Stats' estimate of industry oversupply, noting " ████████████████████ ████████████ Ex. 48 (PILGRIMS-0007236346 at 353).

Despite being in bankruptcy and closing plants, Pilgrim's only sold one plant to a competitor, choosing instead to close and dismantle the others, thereby ensuring industry supply from those plants was permanently lowered. As Pilgrim's CRO Bill Snyder wrote on March 12, 2009 with regard to a possible sale of plants to Foster Farms, "██████████████████ ███████████████████████████████████████████ ████████████████████" Ex. 49 (PILGRIMS-0007412281). Don Jackson testified "[███████████████████████████" Ex. 50 (Jackson Tr. 160:22-24.).

In July 2009, Sue Trudell again presented at an NCC conference, but the NCC lawyer was concerned about ██████████████████████████. *See* Ex. 51 (AGSTAT-00384480). Trudell nevertheless emailed the original presentation material, including projections and forecasts, to industry participants, including Tyson. *Id.* The role that Agri-Stats and trade association meetings, such as NCC, played in helping Defendants facilitate their conspiracy cannot be overstated. *See* Ex. 52 (FIELDALE_0214218) (██████████ ████████████████████████████████); Ex. 53 (AGSTAT-00203920 at 21) (██████████████████████████ ██████████████████████).

### 9. Defendants' Maintained Production Cuts in 2010 Through Use of Joint Ventures

Defendants participated in many joint ventures—such as Southern Hens and Tip Top— that also facilitated the conspiracy. Tip Top and Southern Hens were controlled by Defendants, with Southern Hens owned by six Defendants and Tip Top being advised by an "Alliance Advisory Board" of 14 Defendants and Co-Conspirators. Mar-Jac's representative to Tip Top's Board conceded it did not serve any legitimate purpose. Ex. 54 (Williams Tr. at 51-53). Tyson and the

other Defendants, through Southern Hens and Tip Top, commenced 

. *See* Ex. 55 (KOCH_0002051097); Ex. 56 (PILGRIMS-0000038129).

Concerned about a coming overproduction, Tyson embarked

. Ex. 13 (Supply Restrictions Chart, at 8). Tyson also simultaneously confirmed that

other Defendants                                                      . Ex. 57 (TF-

0002289686). Tyson publicly announced the cut on November 23, 2010, which led Perdue to say,

"                                            " Ex. 58 (PERDUE0000173408).

### 10. Coordinated Conduct Led to Unprecedented Supply Cuts in 2011

Tyson was again concerned that other producers would rely on it to bear the brunt of

industry supply cuts as it had pre-2008. Ex. 59 (TF-0002292235). It used the annual series of IPPE

meetings in late January to communicate the necessity of *collective industry* cuts, similar to that

of 2008, and that Tyson would not cut production unilaterally. *See* Ex. 60 (TF-0002932966) ("...in

Atlanta the message will be sent that Tyson is in balance."); Ex. 61 (USPoultry0000023246 at 54)

(conclusion from IPPE was 5% cutback needed for industry). Internally, Tyson

Ex. 59 (TF-0002292235).

Following Tyson's renewed invitation to strengthen their colluding, several Defendants

complied and dutifully announced cuts or delayed expansions, including Sanderson, Mountaire,

Peco, OK Foods, House of Raeford, Simmons, and Fieldale. Ex. 13, (Supply Restrictions Chart

11, 12-15). Defendants discussed these cuts in private collusive meetings. For example:

- At a February 12, 2011 Pebble Beach Pro-Am event attended by executives from Peco, Simmons, Mountaire, and Tyson, and hosted by Tyson's breeder company, Cobb-Vantress, the competitor Defendants discussed          . Ex. 62 (PECO0000173939); Ex. 63 (Bishop Tr. at 155-158).

12

- Similarly, Peco, Pilgrim's, Keystone, Wayne Farms, Mar Jac, Perdue, Koch, and Sanderson Farms attended a quail hunt on February 18-20, 2011. Bishop admitted it was possible (*i.e.*, likely) he discussed ███████████████████████████████. *Id.* at 160. In fact, only 30 minutes into the event, Bishop emailed Peco's CEO that Pilgrim's was ████████████ ███████████████████████████" Ex. 64 (PECO0000639506). Bishop agreed " ████████████████████████████████████████████████████████ who has since been indicted, █████████████████████████████████████████. Ex. 63 (Bishop Tr. at Bishop Tr. 175:6-17).

In the spring of 2011, Tyson implemented its "Buy vs. Grow" program to help manage aggregate industry supply. This program allowed itself and Defendants to reduce their production by buying chicken from competitors. *See* Ex. 65 (R. Costner Tr. at 98-99); Mangum Report ¶¶ 125-129. As part of Buy vs. Grow, competitors would sell to Tyson below market to restrict supply in the open market and drive up the market price. Ex. 65 at 98-99; Ex. 66 (TF-0002460013); Ex. 67 (TF-0002461114).

In April and May of 2011, Defendants continued their supply cuts and engaged in a pattern of nearly identical 10% cuts—announced by Wayne Farms, Simmons, Peco, and Tyson, as well as cuts by Pilgrim's and Harrison. Ex. 13 (Supply Restrictions Chart, 10-15). Pilgrims felt it had already "████████████" ████████████████████████████. Ex. 68 (PILGRIMS-0005902168).

Defendants stayed informed of their competitors' cuts through direct communications at industry conferences and meetings. For example:

- Tyson CEO Donnie Smith and other senior executives attended the May 1-3, 2011, Urner Barry Annual Executive Conference, where Mountaire spoke ████████████████████ ██████████████████ Ex. 69 (MTA-PL0000021808); Ex. 70 (Pogge Tr. 150:4-151:7); Ex. 71 (KOCH_0001681461).

- The Defendants further utilized ████████████████████████████████████ ███████████. *E.g.* Ex. 72 (PILGRIMS-0005739024). Even Simmons, who was not a member of Tip Top in 2011, ████████████████████████████████████████████ ████████████████████████████████████████████████████ Ex. 73 (KOCH_00001139276); Ex. 74 (Murphy Tr. 196:8-15). Murphy admitted that ████████ ████████████████████████████████████. *Id.* 205:1-206:14; *see also id.* at 197:20-198:10.

- On July 21, 2011, Amick communicated ██████████████████████ Ex. 75 (PECO0000127158); Ex. 63 (Bishop Tr. at 253-254).

- Mountaire's Larry Saywell also sent Tyson employee, Drew McGee, an email on July 27, 2011, stating that "████████████████████████████████████████████ ██████ Ex. 76 (TF-0002832480); Ex. 112 (Saywell Tr. at 248) (admitting he "stepped over the line").

- Just prior to Mountaire telling Tyson it was on board, Mountaire had publicly announced plans to abandon a 3-5% expansion and cut production. *See* Exhibit 77 (AGSTAT-14595068); *see also* Ex. 13 (Supply Restrictions at 12). Mountaire's President admitted ██████████ ██████████████████████ Ex. 70 (Pogge Tr. 230:4-7; 231:18-232:5).

    Like 2008, once Tyson was satisfied its competitors had made their fair share of cuts, Tyson kept up its end of the bargain and also cut production:

- On June 29, 2011 Tyson announced taking "████████████████████████████████ ██████████████, which was understood by other Defendants. Ex. 78 (KOCH_0001141445).

- Tyson then began ████████████████████████████████████ ██████. Ex. 79 (TF-0003062507).

- Tyson's competitors at times expressed ████████████████████████████████ ████████. Ex. 80 (TF-0007424939) ("██████████████████████████████████ ██████████████████████████████").

    Defendants continued to engage in discussions with one another about the collective need to cut supply. For example,

- On August 17, 2011, House of Raeford wrote to Case Foods noting that "████████████ ████████████████." Ex. 81 (CASEFOODS0000000286).

- A few weeks later, Case Foods complied and cut production. Ex. 82 (S. Trudell Tr. at 45); Ex. 83 (TRUDELL000307 at 361).

- Meanwhile, Agri-Stats provided Sanderson analyses to determine the effect of supply cuts on prices. Ex. 84 (Sanderson-0001498118), Ex. 85(Sanderson-0003396982).

- At an October 2011 NCC meeting, Defendants discussed how "████████████████████████" and getting better prices from retailers would increase profits. Ex. 86 (KOCH_0001319002).

- The following month, Wayne Farms announced the permanent closure of a plant. Ex. 87 (FIELDALE_0185464). A few days later, on November 21, 2011, Tyson stated on an earnings call that "when we talk about the 4% [supply cut] number, that is what we project the industry to be. Obviously, we're going to be a part of that." Ex. 88 (TF-0002653641). Perdue also reported a production decrease beginning in 2011 into 2012. Ex. 13 (Supply Chart, at 11).

### 11. Defendants Continued the Conspiracy from 2012 to 2014 and Exchanged Pricing Information

By mid-2012, Defendants appeared at ease that the collective agreement worked and the conspiracy constrained industry supply as planned. For example:

- Pilgrim's stated that " ███████████████████████████████████ ███████████████████████████████ *See* Ex. 89 (PILGRIMS-0002562835).

- Seeking to capitalize on the collective supply shortage, Pilgrim's Larry Higdem wrote to Tyson's Drew McGee " ██████████████ " Ex. 90 (TF-0002845573).

- Wayne Farms' CFO Courtney Fazekas summed up why 2011 and 2012 had been so good: " ██████████████████████████████████████ ███████████████████████████████ Ex. 91 (WF-0001277294) (emphasis added).

- Discussion of supply cuts among competitors continued until the end of 2012. *See, e.g.*, Ex. 92 (Butts Tr. at 194:2-12) (admitting it was ████████████████████████████████ ███████████ .

Throughout 2013 and 2014, Defendants used in-person meetings and public earnings calls to reassure one another of their adherence to the collective agreement. *See* Ex. 93 (PILGRIMS-0005346894 at 904); Ex. 94 (PILGRIMS-0003595559). One executive was so bold as to expressly state that his company engaged in " ████████ to their competitors. *See* Ex. 95 (Sanderson-0002841322) (" ██████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ "). Defendant Simmons even expressly alluded to Defendants' agreement, stating " ███████████████████████████ ██████████████████████████████████ ." Ex. 96 (SIMM000249568) (emphasis added).

12.    **Defendants' Conspiracy Continued into 2015**

In early 2015, it became apparent that quick supply cuts were needed keep supply below demand.  Defendants, therefore, continued to discuss and signal supply cuts with each other:

- At the same time as the IPPE with Tyson's competitors, Tyson's Donnie King emailed within Tyson ████████████████████████████████████████████████. Ex. 97 (TF-0002700437).

- On May 4, 2015, Tyson held its quarterly earnings call where Donnie Smith noted that Tyson did not plan to increase its production and instead would expand its Buy vs. Grow program, and also that Tyson was exporting hatching eggs to Mexico. Ex. 98 (PILGRIMS-0002758557).

- Senior executives from Sanderson Farms, Pilgrim's, and Tyson also each attended the May 2015 BMO Capital Markets Conference, and each made presentations about their expectations on industry production and that it would remain constrained. Ex. 146 (KF_0400601).

- In fact, Pilgrim's noted at the conference with its competitors that it would "remain with the same market share so will grow with industry."  *Id*.

- A June 24, 2015, email from Brad Respess to Tip Top's Alliance Advisory Board (composed of many Defendants, as noted above) stated that "█████████████████████████████
  ████████████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████████████
  ███████████████████████████ "  Ex. 99 (Harim0000051097); Ex. 100 (Harrison 00022003).

- The discipline in the industry to implement these cuts was notable, as described in an internal Wayne Farms presentation to Arlon Group. Ex. 101 (WF-0001011084)████████████████
  ████████████████████████████████████████████████████████ Ex. 102 (Maddox 118:25, 119:1-15).

In May through July, Foster Farms, Perdue and others made production cuts. Ex. 13, (Supply Restrictions Chart, at 22-26). During July through September 2015, Koch, Foster Farms, Peco, OK Foods, Wayne Farms, OK Foods, and Pilgrim's all implemented production cuts. *Id.*; Ex. 103 (WF-0001021027).  By November 2015, Agri Stats reported ████████████████
████████████████████████. *See* Ex. 104 (AGSTAT-09387979).

### 13. Continued Coordinated Cuts Led to Record Profits in 2016 – Present

In 2016, Defendants continued to implement supply cuts consistent with the agreement to maintain supply below anticipated demand. Ex. 105 (Pilgrims-0005871416)(discussing "████ ████████████████ . ."; *see also* Ex. 13 (Supply Restrictions Chart, 22-23 )(noting that in late May both ████████████████████). By March 2016, Tyson and other Defendants were achieving ██████ as Defendants maintained supply discipline given the prior success with collective action. Ex. 106 (PILGRIMS-0005990854, at 865); Ex. 107 (PILGRIMS-0003675887 at 900). After the first lawsuit was filed on September 2, 2016, Koch CEO Joe Grendys stated to another Koch executive that "████████████████████ ██████" Ex. 108 (KOCH_0001123939) (emphasis added).

### 14. Agri-Stats Detailed Data and De-Anonymization

In addition to the direct exchanges of supply and pricing information, all Defendants participated in Agri-Stats. The Defendants were provided different books with their competitors plants' profits, pricing and production. The reports were allegedly anonymized, but it was well understood that Defendants de-anonymized them to identify their competitors.[9] Other Defendants such as Sanderson, Perdue, Koch, Peco, and Mar-Jac would simply ask each other what line they were in the report or exchanged Agri-Stats reports and numbers directly.[10] In addition to providing breathtaking granularity about their competitors' business, Agri-Stats provided information about

---

[9] Tyson: Ex. 109 (Wilson Tr. 187:10-198:3; 23:11-24:13; 95:23–96:11; 102:1-6; 106:6–107:3; 281:7-19); Ex. 110 (TF-0007485166); Pilgrim's: Ex. 111 (Bontz Tr. 86:18–89:5; 105:20–107:12); Mountaire: Ex. 112 (Saywell Tr. 248:4–252:14; 93:12-15; 118:10–121:4); Wayne Farms: Ex. 113 (Leach Tr. 96:11–97:12; 115:6-15; 122:15-123:19; 127:25–128:5); Ex. 114 (WF-0001311295); George's: Ex. 115 (George Tr. 57:11-23; 67:18-79:21; 71:19–73:14); Mar-Jac: Ex. 116 (Martin Dep. 245:21-246:20); Amick: Ex. 117 (AMICK0000390141); and Case Foods: Ex. 118 (CASEFOODS0000037130); Ex. 119 CASEFOODS0000083920).

[10] Ex. 120 (Pettus Tr. 143:1–145:19; 152:5–153:17); Ex. 121 (Sanderson-0000506200); Ex. 122 (Grendys Tr. 90:3-16; 96:13-97:24); Ex. 123 (McLaurin Tr. 54:12 – 56:17); Ex. 116 (Martin Tr. 41:1-42:5).

bird weight, a figure Defendants thought was a "critical" supply metric. Ex. 112 (Saywell Tr. 138:21-139:4). Divulging highly detailed and competitively sensitive information to one's competitors is not rational behavior in the absence of a conspiracy. Indeed, executives admitted it did not concern them if their competitors were learning their Agri-Stats data. Ex. 70 (Pogge Tr. 186:6-14; 186:22-187:7).

### 15. Other Collusive Conduct by Defendants Demonstrating Close Collaboration

Defendants engaged in other collusive conduct when the opportunity arose, demonstrating the collaborative nature of the industry. For example:

- On May 23, 2014, Fieldale CEO Gus Arrendale convened a call with competitors Claxton, Pilgrim's and others to discuss █████████████████████. Ex. 124 (Franklin Tr. 61:3-65:18.).

- A Defendant executive, Mr. Franklin, testified that █████████████████████. *Id.* at Franklin Tr. 61:3–66:18.

- Five days later, on May 28, 2014, at least six members of the Advisory Committee formally █████████████████████. Ex. 125 (Harrison 00025507); Ex. 126 (GDA0000000408). Arty Schronce then █████████████████████. Ex. 127 (GDA0000001529).

- At his deposition on November 2, 2018, Gus Arrendale invoked the Fifth Amendment as to all substantive questions. Ex. 128 (Arrendale Tr. at 19-20).

### D. Common Economic Evidence Demonstrates the Existence of the Conspiracy and its Common, Widespread Impact

In addition to the foregoing common documentary and testimonial evidence, CIIPPs will present common economic and expert evidence demonstrating conduct consistent with conspiracy, the magnitude of the conspiracy's effects, and the widespread, common impact of the conspiracy. CIIPPs have proffered the expert opinion of Dr. Russell Mangum, who has set forth standard and well-accepted economic, statistical, and econometric methodologies demonstrating that supply was restrained and prices were elevated beyond competitive levels during the Class Period. As

summarized below, Dr. Mangum's report outlines six mutually reinforcing methods, all of which support his ultimate conclusions that (1) supply was artificially restrained, (2) prices were artificially elevated, and (3) the conspiracy impacted all, or nearly all, class members.

### 1. CIIPPs' Expert is Qualified to Provide Expert Testimony Concerning Market Structure, Classwide Impact, and Damages

CIIPPs' expert—Dr. Mangum, a Ph.D economist—is eminently qualified to provide the opinions he has in this case. Dr. Mangum has evaluated and modeled the effects of anticompetitive conduct with the use of statistics, economics, and econometrics for over 20 years. *Id.* ¶ 4. From 1995 to 1998, Dr. Mangum served as a staff economist at the United States Federal Trade Commission ("FTC"), in the Antitrust Division of the Bureau of Economics, where he conducted economic investigations into proposed mergers and other business practices with potentially anticompetitive effects, including investigations into coordinated interactions, boycotts, and price-fixing. *Id.* Dr. Mangum's opinions and techniques have been widely accepted by courts in evaluating class certification, utilizing statistical and econometric techniques to evaluate the magnitude of anticompetitive conduct, and in modeling and quantifying damages. *See, e.g., Wortman v. Air New Zealand,* 326 F.R.D. 549 (N.D. Cal. 2018) (certifying class); *In re Korean Ramen Antitrust Litig.,* Case No. 13-cv-04115-WHO, 2017 WL 235052 (N.D. Cal. Jan 19, 2017) (certifying class); *In re Dynamic Random Access Memory (DRAM)) Antitrust Litig.,* Master File No. M-02-1486-PJH, 2013 WL 12333442 (N.D. Cal. Jan. 8, 2013) (certifying class).

### 2. CIIPPs Have Utilized Widely Accepted and Reliable Methodologies for Demonstrating Antitrust Impact and Artificial Price Elevation in the Broiler Market

In order to demonstrate that Defendants' conspiratorial conduct caused artificial price elevation on a class-wide basis to the CIIPP class, Dr. Mangum first examines whether the economic evidence shows that the direct purchasers, from whom the CIIPP class purchased

Broilers, suffered an overcharge as a result of the conspiracy, and the extent of that overcharge. He then examined the empirical question of whether that overcharge was passed on by the direct purchasers to the CIIPP class, thereby causing harm and antitrust impact.

In determining the first question, Dr. Mangum utilized what courts have described as the gold standard: multiple regression analysis. Dr. Mangum employed multiple regression analysis both to demonstrate the magnitude of the overcharge and that the overcharge was passed on to CIIPPs. Multiple regression analysis is an econometric technique that has been widely accepted by courts as reliable for purposes of establishing and isolating an overcharge due to anticompetitive conduct.[11] Multiple regression analysis is used to explain the behavior of one variable, called the "dependent variable," based on the behavior of other variables, called "independent variables," "regressors," or "explanatory variables." Mangum Report ¶¶ 184-188. By utilizing multiple regression analysis, economists can isolate and measure the effect of a particular variable on the dependent variable, while simultaneously controlling for the effects of a number of other variables.

Dr. Mangum's direct purchaser overcharge regression utilizes millions of real-world observations from Defendants' own transactional data. *Id.* ¶¶ 188-190. The dependent variable in Dr. Mangum's regression are the prices actually charged by Defendants. *Id.* Dr. Mangum's model compares the prices of Broilers before the conspiracy (the so called competitive before- benchmark period) to prices during the conspiracy period. *Id.* ¶¶ 198-199. In doing so, Dr. Mangum employed rigorous independent or explanatory variables that help control for factors like supply and demand, which are changing over the before- and during- conspiracy periods. *Id.* ¶¶ 200-211. Dr. Mangum

---

[11] *See, e.g.*, Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," Reference Manual on Scientific Evidence (3d ed. 2011), Federal Judicial Center, pp. 305-06 ("Regression analysis has been used most frequently in cases of sex and race discrimination, antitrust violations, and cases involving class certification (under Rule 23)."); Baker & Rubinfeld, "Empirical Methods in Antitrust Litigation," American Law and Economics Review, vol. 1 (1999) at 392 ("Reduced form price equations are perhaps the most commonly employed in price-fixing cases . . . as a basis for finding liability and measuring damages.")

analyzes this price elevation separately by part: Whole Chickens ("WOGS"), Breast Products, and Wings Products. *Id.* ¶¶ 212-219. And he does so over two periods within the Class Period: (a) the first impact period; and (b) the second impact period. His direct purchaser overcharge regression generates positive and statistically significant coefficients on the overcharge variables for the three part-categories over the two time periods. Each of the results are significant at the 99% level, meaning there is less than a 1% chance that the results were obtained by chance. The chart below demonstrates the overcharges estimated by Dr. Mangum's direct purchaser overcharge regression:

| | January 1, 2009 through November 30, 2011 | December 1, 2011 through July 31, 2019 |
|---|---|---|
| **WOGs** | 5.2% | 9.6% |
| **Breast Meat Products** | 4% | 14.6% |
| **Wing Products** | 13.9% | 24.6% |

### 3. CIIPPs' Quantitative Modeling, Common to the Class, Demonstrates that Broiler Supply Was Artificially Restrained

Because CIIPPs allege that Defendants achieved their artificial price elevation, in part, through coordinated supply restraints, Dr. Mangum empirically tested whether, and to what degree, supply was artificially restrained during the Class Period. *See* Mangum Report ¶¶ 138-149. He did so through a rigorous and robust multiple regression analysis, utilizing production as the dependent variable and comparing supply in the before- period to supply during the conspiracy, again controlling for all other factors that would affect production. *Id.* The results of his supply regression demonstrate statistically significant coefficients for both time periods during the conspiracy, *i.e.*, evidence that actual supply was lower than it would have been absent the conspiracy. For the first impact period, the production regression estimates that supply was artificially restrained at a rate 4.8% lower than otherwise would have prevailed in a competitive

market. It further estimates that supply was 7.4% lower in the second impact period. The results are significant at the 99% level, meaning, again, there is less than a one percent probability that the results are due to chance. *Id.* ¶ 149.

### 4. CIIPPs' Pass-Through Regressions Demonstrate Common Impact

Having empirically demonstrated that prices charged to direct purchasers were artificially elevated and supply in the Broiler market was artificially restrained, Dr. Mangum next employed multiple regression analysis to measure the degree to which the overcharge was passed on to CIIPP class members from direct purchasers. *Id.* ¶¶ 250-254.[12] Dr. Magnum finds robust pass-through rates by food service distributors, with a weighted and median pass through rate of 96%.

### 5. The Structural Characteristics of the Broilers Market Facilitated the Conspiracy and Contributed to its Widespread Impact

In addition to empirical testing, Dr. Mangum also analyzed the Broiler market's structural characteristics. Mangum Report ¶¶ 58-135; 151-165. He concluded that its structural characteristics (1) make the market conducive to collusion; and (2) indicate that collusion impacted all, or nearly all, class members. As Dr. Mangum testified, the market characteristics that support these conclusions are:

- **Dominant market power**: The Defendants controlled at least over 90% of the market during the Class Period. Dominant market power by the cartel is important in imposing widespread impact because non-participants cannot undermine its effectiveness; and thus, purchasers cannot avoid the overcharge and impact is widespread. *Id.* ¶¶ 58-61.

- **Significant barriers to entry**:, The Broiler industry is characterized by high barriers to entry. In markets with lower barriers to entry, outside participants would recognize the industry's supracompetitive profits and enter at lower price points to capture more of the market. High barriers to entry make it infeasible for new producers to recognize supracompetitive profits, enter, and undermine the conspiracy. *Id.* ¶¶ 77-84.

---

[12] As discussed *infra*, CIIPPs subpoenaed substantial purchase and sales data from intermediary distributors in the supply chain.

- **Commodity nature of broilers**: Broilers, as Defendants themselves recognize, are indisputably commodity products. Economists recognize that cartels are more likely to form when the products sold are homogeneous, interchangeable, or commodity-like. *Id.* ¶¶ 62-76.

- **Inelastic demand**: Economists recognize inelastic demand as a factor facilitating cartel conduct. Inelastic demand allows cartels to charge supracompetitive prices because higher prices do not drive away significant sales volume (as more commonly occurs in price-sensitive markets with elastic demand). Defendants themselves openly acknowledged the inelasticity of demand in the Broilers market. *See, e.g.*, Ex. 129 (AGSTAT-00201423); Mangum Report ¶¶ 85-88.

- **Opportunities for forming, monitoring, and enforcing the agreement**: There were numerous inter-Defendant communications regarding output and pricing. These inter-Defendant communicates were facilitated, in part, by frequent trade association meetings and various business dealings between and among Defendants, such as joint ventures. *See Id.* ¶¶ 89-135.

- **Extensive data sharing through Agri-Stats and other trade associations**: Agri-Stats permitted Defendants to monitor detailed data on pricing, production, and feed costs. The granularity of the data was breathtaking. Agri-Stats collects and disseminates data at the plant level. Many Defendants testified not only about the ease of ███████████████ ███████████████████████████. *E.g.*, Ex. 145 (Wilson Tr. 184:2-185:7, 229, 273); Ex. 130 (Irwin Tr. 73:2-80:21); Ex. 112 (Saywell Tr. 112-118); Ex. 116 (Martin Tr. 41:1-43:25, 65:3-23); Ex. 111 (Bontz Dep. 86:18-89:5); Ex. 131(Maness Dep. 68:15-76:4).██████████████████████████████████. *See* Ex. 145 at 187:10-198:3.

### 6. The Industry's Widespread Use of Pricing Indexes Supports Common Impact

In addition to common market characteristics facilitating collusion and widespread impact, the Mangum Report outlines the industry's ubiquitous use of formula pricing and price indexes, such as Urner Barry and the Georgia Dock, as contributing to common impact. Mangum Report ¶¶ 155-163. In the food service industry, as witnesses testified, many customers' pricing was tied to the Urner Barry price index. *Id.* Similarly, the Georgia Dock is used to set the food service industry's WOG prices. *Id.*

Because Defendants' price-fixing and collusive supply restrictions moved the market equilibrium to higher market prices, which would be (and was) reflected in the industry's price

indexes, and because the food service industry largely relies on formulaic and price index pricing, widespread common impact from Defendants' conspiracy occurred. Mangum Report ¶¶ 153-155 ("The use of market-based price formulas means that as the alleged conspiracy resulted in increases in the market price indices, the prices for every customer that is based on these market price indices similarly increases"). The widespread use of formulaic pricing and price indexes contributes to common impact.

       7.      **CIIPPs Have Proffered Price Correlation Analyses Demonstrating Common Impact**

CIIPPs have also offered Dr. Mangum's price correlation analyses, which also support his finding of common impact. His price correlation analyses all demonstrate high degrees of correlation within the relevant Broiler parts and show that prices for the parts moved together over time, and thus, create common impact in response to common stimuli, such as the supply restraints at issue in the case. The price correlation analyses also demonstrate the existence of a pricing structure. Mangum Report ¶¶ 170-178.

       8.      **There is Common Evidence Regarding Defendants' Conduct that Economists Consider as Consistent with the Alleged Conspiracy**

Dr. Mangum's opinions do not rest on economic modeling or statistical testing alone. His economic analyses and empirical work are specifically informed by, and grounded in, the record evidence. Dr. Mangum has analyzed the Broiler market structure, the Defendant firms, the relevant supply chains, and the documentary evidence in the case. Having done so, Dr. Mangum has identified conduct that economists typically consider as being consistent with collusion. Dr. Mangum analyzed inter-defendant communications, discussions at trade association events, press releases from *private* companies *publicly* announcing supply cuts, and other documentary and testimonial evidence. Mangum Report ¶¶ 89-135. He has concluded that there is common evidence

consistent with CIIPPs' allegations. As noted, the foregoing conclusion is supportive of, and mutually reinforcing to, Dr. Mangum's quantitative analysis.

> ### 9. Common Documentary and Testimonial Evidence from the Case Demonstrates Widespread Antitrust Impact and Pass-Through

While discovery of the nature and extent of Defendants' wrongdoing remains ongoing, the documentary and testimonial evidence adduced in the litigation to date demonstrates that Defendants' conduct systematically raised prices and forestalled price erosion; thereby imposing widespread overcharges. The evidence also establishes that these overcharges passed-through the distribution chain to virtually all members of the CIIPP class.

> #### a. Documents and testimony confirm that Defendants' overcharges were widely dispersed throughout the market at the direct purchaser level

Aside from Dr. Mangum's quantitative empirical modeling, Defendants' own documents demonstrate that their supply cuts and other collusive market conduct led to widespread increases or stabilizations of Broiler prices. In internal discussions and in outreach to investors, Defendants candidly confirmed that cutting production enabled them to increase market prices. For example:

- In a Fall 2008 Management presentation, Koch Foods reported that supply cuts and stronger demand ████ ███████████████████████████████████████ Ex. 132 (Koch0000270546, at 570).

- A 2008 presentation by Pilgrim's states: First, "████████████████████████████ ████████████████████████████ Ex. 133(PILGRIMS-0007408570 at 574). A graph in the same presentation touted the inverse relationship shown in ████████ ███████. *Id.* at 579.

- A Rabobank International US Poultry Industry Analysis from June 2010 tracked this same dynamic, observing that ████████████████████████████████████ ████████████████████████████████████████████████ " Ex. 134 (Rabo_0000081422). It continued, "████████████████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████ ." *Id.*

Further communications by and among Defendants during and after the additional production cuts in 2011 reconfirmed this linkage between supply restrictions and higher prices:

- A September 2011 Fieldale presentation to investors reported, "████████████████████████████ ███████████████████████████████████████████████████████████████ Ex. 135 (FIELDALE_1382353) (emphasis added);

- Perdue, in a presentation at the February 2012 Board of Directors Meeting, confirmed that tight supply led "████████████████." Ex. 136 (PERDUE0001661907 at 911); *see also id. at* 908, 910).

- A May 17, 2012 Wayne Farms Foodservice Supplier Business Review presentation gushed, "████████████████████████████████████████████████████████████████ ███████████████ Ex. 137 (WF-0000948695 at 701).

Defendant executives have repeatedly admitted that basic laws of supply and demand equally affect the Broiler market:

- David Pogge, President of Mountaire testified that "████████████████████████ Ex. 70 (Pogge Tr. 238:2-3; 73; 263:12-264:8; 278).

- Brandi Cato of Pilgrim's testified that "████████████████████████████████ Ex. 138 (Cato Tr. 43:1-6).

The documentary and testimonial evidence, common to the class, further supports widespread impact.

> **b.** **Evidence further confirms that Defendants' overcharges passed through the distribution chain to all or nearly all members of the CIIPP class**

Substantial record evidence of pass-through to the CIIPP classes also exists in this case. Defendants' direct purchaser customers testified that in virtually all circumstances they passed

along price stabilizations or increases to the next level of the distribution chain. Direct purchasers consistently testified that their standard practice was to apply a markup above sourcing costs. Mangum Report ¶ VI.B.2.a. For example:

- Russell Fontenot, on behalf of Affiliated Foods, testified that it charged █████████████████████████████████████████ Ex. 139 (Fontenot Tr., 127:20-128:4) (████████████████████████████████████████████████ ).

- Mr. Stevens confirmed Colorado Boxed Beef ████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 140 (Stevens Aug. 15, 2019 Tr., 164:13-20).

Consistent markups meant that when Defendants stabilized or raised prices to their direct purchaser customers, those direct purchasers stabilized or raised prices to indirect purchasers in turn. For example,

- Mr. Lohmier, from Sherwood Foods, acknowledged that: "Q. █████████████████████████████████████████████████████████████████ Ex. 141 (Lohmier Tr., 183:14-20).

- William Hart Wyatt testified that his employer, distributor Cheney Brothers, similarly █████████████████████████████████████████████████████ Ex. 142 (W. Wyatt Tr., 197:20-198:3).

- Mr. Allen testified that Pacific Food Distributors ███████████████████████████████████████████████████████████████ Ex. 143 (D. Allen Tr., 112:9-14).

- Neal Yoder of distributor Troyer Foods testified that instances ██████████████████████████████████████████████████████████████████████ Ex. 144 (N. Yoder Tr., 85:14-17); Ex. 109 (T. Wilson Tr., 109:20-23).

That the direct purchasers passed price stabilizations or increases along to their downstream indirect purchasers should come as no surprise, since selling to customers for more than the sourcing cost is the entire logic of these intermediaries' business model.

## III.   ARGUMENT

### A.   Legal Standard

The United States Supreme Court has long recognized that antitrust class actions play a critical role in enforcing the antitrust laws. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972). Because of this important enforcement mechanism, courts resolve doubts in favor of certifying classes under Rule 23. *See Day v. Check Brokerage Corp.*, 240 F.R.D. 414, 417 (N.D. Ill. 2007) ("Doubts about whether to grant certification generally are resolved in favor of certification.") (citing *Rogers v. Baxter Int'l., Inc.* No. 04 C 6476, 2006 WL 794734, at *2 (N.D. Ill. March 22, 2006)); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 591–592 (N.D. Cal. 2010) ("*LCDs II*") ("[W]hen courts are in doubt as to whether certification is warranted, courts tend to favor class certification . . . . Courts have stressed that price-fixing cases are appropriate for class certification . . . .")

Antitrust conspiracy cases are often considered the prototypical case for the class device. As the Supreme Court stated, predominance is "readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The Seventh Circuit has adopted this view. *See In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020) ("*Allstate*") ("The predominance requirement is 'stringent' but is 'readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.'"); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) ("[I]n antitrust cases, Rule 23, when applied rigorously, will frequently lead to certification.").

"The court has broad discretion in deciding whether certification of a class is proper." *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002). In conducting its analysis, "the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner*, 669 F.3d at 811; *see Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). In moving for class certification, plaintiffs "must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b)." *Id.*

### B.     CIIPPs Satisfy Rule 23(a)

Rule 23(a) is satisfied if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). CIPPs readily clear the low-threshold requirements of Rule 23(a).

**<u>The CIIPP Classes Are So Numerous as to Make Joinder Impracticable</u>.** "A plaintiff need not plead or prove the exact number of class members to establish numerosity under Rule 23(a)(1), *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989), and the court may make common sense assumptions to determine numerosity." *Barnes v. Airline Pilots Ass'n, Int'l*, 310 F.R.D. 551, 557 (N.D. Ill. 2015). "While there is no threshold or magic number at which joinder is impracticable, a class of more than 40 members is generally believed to be sufficiently numerous for Rule 23 purposes." *Schmidt v. Smith & Wollensky LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010).

Here, CIIPPs unquestionably meet the standard for numerosity. CIIPPs are made up of virtually every restaurant in the United States for the injunctive relief; and every restaurant in the thirty-one Indirect Purchaser States for damages claims. The restaurants alone—and these are only one slice of the CIIPP class—make up hundreds of thousands of entities. The CIIPP classes also

include other commercial food preparers of Broilers, like grocery stores' deli counters, hotel dining operations, and other commercial food preparers. Numerosity is met.

**CIIPPs' Case Raises Common Questions of Law and Fact**. "Commonality is satisfied as long as one question of law or fact is common to the class." *Kohen v. Pacific Inv. Mgt. Co. LLC*, 244 F.R.D. 469, 476 (N.D. Ill. 2007), *aff'd*, 571 F.3d 672 (7th Cir. 2009); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (requiring only one common question to satisfy Rule 23(a)(2)). "Commonality generally exists when the defendant has engaged in 'standardized conduct' towards the members of the proposed class." *In re Sulfuric Acid Antitrust Litig.*, No. 03 C 4576, 2007 WL 898600, at *2 (N.D. Ill. Mar. 21, 2007). "The commonality requirement has been referred to as a low hurdle that is easily surmounted." *Kohen*, 244 F.R.D. at 476. Most courts find that antitrust conspiracy cases—such as this one—readily meet the standards of Rule 23(a)(2). "[T]he issue of whether or not that conspiracy existed—i.e., whether or not Defendants practiced 'standardized conduct' toward all parties—is one that is common . . . ." *Sulfuric Acid*, 2007 WL 898600, at *4.

The CIIPP Classes easily satisfy the "permissive" standard for commonality under Rule 23(a)(2). Common questions of law and fact exist. *See* CIIPPs' 7th CAC (ECF No. 3929) ¶¶ 453. The central common issues to the class are, *inter alia*, whether Defendants engaged in the alleged conspiracy, which Defendants conspired, the duration of the conspiracy, the structure of the Broiler market, the supply cuts by Defendants, and whether the conspiracy inflated prices.

**CIIPPs' Class Representatives' Claims are Typical.** "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998); *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (same);

*Kohen*, 244 F.R.D. at 477-78, *aff'd*, 571 F.3d 672 (7th Cir. 2009) (same). "The Rule does not require that each member of a class suffer exactly the same injury as the named class representative." *Tatz v. Nanophase Techs. Corp.*, No. 01 C 8440, 2003 WL 21372471, at *6 (N.D. Ill. June 13, 2003). "The issue of typicality is closely related to commonality and should be liberally construed." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 479 (N.D. Ill. 2009). Courts find the typicality requirement readily satisfied in antitrust conspiracy cases because where "the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members." *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1035 (N.D. Miss. 1993).

Here, as the complaint and Class Representative declarations make clear, the Class Representatives' claims are typical of the claims of absent class members. All members of the classes, including the Class Representatives, purchased Broilers and allege that they were overcharged through Defendants' collusive conduct. The claims alleged by the Class Representatives, with few exceptions, are based on state antitrust and unfair competition law and are typical of the absent class members' claims. CIIPPs have satisfied this element of the class certification analysis.

**CIIPPs' Class Representatives and Lead Counsel are Adequate to Represent the Classes**. The proposed CIIPP Class Representatives also meet the requirement that they will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Indeed, they have already done so throughout this litigation. As their declarations make clear, they have dedicated their time and energy toward prosecuting this highly complex litigation. They have approved pleadings, responded to discovery, searched for and collected voluminous documents, stayed abreast of the litigation, and sat for depositions, among many other tasks. *See* Compendium of

Class Representative Declarations. The Class—comprised of restaurants and other commercial food preparers who have suffered greatly throughout this pandemic—have demonstrated are adequate in their roles as class representatives.

Adequacy is also satisfied in this case because the interests of the Class Representatives do not conflict with absent class members. All members of the CIIPP Classes seek primarily the same relief in the form of overcharges. *See, e.g., Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 599 (N.D. Ill. 2009) (citing *Rosario*, 963 F.2d at 1018). Moreover, although many courts, including this Court,[13] have found that class representatives are not required for every state, CIIPPs have selected and retained Class Representatives from the vast majority of the Indirect Purchaser States.[14]

Finally, the Class Representatives—along with the Court pursuant to Rule 23(g)—have selected adequate class counsel to represent their interests in this litigation. As this Court recognized when it appointed Cotchett, Pitre & McCarthy, LLP and Gustafson Gluek PLLC to lead the CIIPP litigation, the Class Representatives retained counsel with extensive experience in

---

[13] *See In re Broiler Chicken Antitrust Litig.,* 290 F. Supp.3d 772, 809-810 (N.D. Ill. 2017).

[14] If this Court finds any of the proposed class representatives to be inadequate, other CIIPPs class representatives who satisfy the Rule 23 criteria may adequately represent the class in their place. *Payton v. County of Kane,* 308 F.3d 673, 680 (7th Cir. 2002) (concluding that plaintiffs may be entitled to represent a class suing all 19 defendant counties if they fulfill the requirements of Rule 23); *Hospital Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta Pharms.,* 333 F.R.D. 390, 414 (M.D. Tenn. 2019) (rejecting contention that indirect purchasers were required for every state where claims were asserted and finding that out of state class representatives could adequately protect absent class members in those states because the antitrust claims were virtually the same); *Gress v. Freedom Mortg. Corp.*, 386 F. Supp. 3d 455, 462 (M.D. Pa. 2019) ("capacity to state claims under the laws of other states on behalf of putative class members, who themselves likely would have standing to raise those claims, is a matter to be decided under the rubric of Rule 23…"). If an additional or alternative class representative is necessary, CIIPPs request leave to substitute. *See, e.g., In re NorthShore Univ. HealthSystem Antitrust Litig.*, No. 07-cv-4446, 2018 WL 2383098, at *1 (N.D. Ill. Mar. 31, 2018) (permitting substitution); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2016 WL 948874 (N.D. Cal. Mar. 14, 2016) (permitting substitution).

prosecuting indirect purchaser antitrust cases, class actions, and other complex cases to successful resolution. *See* Order Appointing Interim Lead Counsel, ECF No. 144.

### C. CIIPPs Satisfy Rule 23(b)(3) Because Common Questions of Fact and Law Predominate

Rule 23(b)(3) requires plaintiffs to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members . . . ." Fed. R. Civ. P. 23(b)(3). The Rule requires showing that *questions* common to the class predominate; but it does not require proof that those questions will be answered in the classes' favor on the merits. *Amgen*, 133 S. Ct. at 1191; *see also Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). The focus of the predominance requirement is whether the proposed Class is "sufficiently cohesive to warrant adjudication by representation." *Amgen*, 568 U.S. at 469. As the Seventh Circuit has recently reiterated, the predominance requirement is "readily met" in antitrust cases. *Allstate*, 966 F.3d at 603. This is because "proof of the conspiracy is a common question that is thought to predominate over the other issues of the class." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008). Further, the choice of the word "predominate" in Rule 23 is important and intentional. The predominance standard does not require that *all* issues be common to the class, otherwise the drafters would have used the word "exclusive" to convey that common questions be absolute. As the Seventh Circuit held in the *Kleen Products* antitrust litigation, "it remains true that Rule 23 does not demand that *every* issue be common; classes are routinely certified under Rule 23(b)(3) where common questions exist and predominate, even though other individual issues will remain . . . ." *Kleen Prods. LLC v. International Paper Co.*, 831 F.3d 919, 922 (7th Cir. 2016). The *Kleen Products* decision follows a long line of such holdings. As another Seventh Circuit case has held, "[i]ndividual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those

33

questions not predominate over the common questions affecting the class as a whole." *Messner*, 669 F.3d at 815.

Here, issues common to the CIIPPs predominate with respect to proof of the elements of their antitrust claims: (1) Defendants' participation in a conspiracy to fix the prices of Broilers; (2) common injury in the form of common impact arising from the overcharges; and (3) damages as a result of the antitrust violations, which can be calculated on an aggregate, formulaic basis.

### 1. The Existence of Defendants' Conspiracy Can Be Proven by Common Evidence

As Section II.C., *supra*, demonstrates, the Class will rely on evidence that is common regarding Defendants' conspiracy and their liability. Moreover, common issues regarding liability predominate because all class members will rely on the same evidence at trial to prove the overwhelmingly predominant issue of whether Defendants conspired to elevate prices through supply restrictions and other collusive means. Courts have therefore found that common issues predominate in antitrust cases because the focus is on the defendants' conduct and not on the conduct of individual class members. *See In re Relafen Antitrust Litig.*, 221 F.R.D 260, 275 (D. Mass. 2004).

### 2. Antitrust Impact and Damages Can be Presented on a Classwide Basis Using Common Evidence. CIIPPs Have Set Forth Reliable and Generally Accepted Methods for Establishing Common Impact

A horizontal price-fixing conspiracy is a *per se* violation of the antitrust laws. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). This is because horizontal price-fixing is "so plainly anticompetitive that no elaborate study of the industry is needed to establish [its] illegality." *Id*. Consequently, as many courts have held, evidence of coordinated price setting behavior is evidence of impact by itself. Under "the prevailing view, price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually

negotiated." *Dow Chem. Co. v. Seegott Holdings, Inc. (In re Urethane Antitrust Litig.)*, 768 F.3d 1245, 1254 (10th Cir. 2014); *In re Dynamic Random Access Memory (DRAM)) Antitrust Litig.*, Master File No. M-02-1486-PJH, 2006 WL 1530166 at *7 (N.D. Cal. June 5, 2006) (collecting cases recognizing a presumption of impact); *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 352 (N.D. Cal. 2005) (recognizing presumption of impact in *per se* cases).[15] Indeed, even Defendants' own documents demonstrate common impact. *See supra* at Section II.D.9(a)-(b).

Courts hold in antitrust cases that common issues predominate when plaintiffs offer evidence *capable of* showing "common impact." *See, e.g., In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 220 (E.D. Pa. 2001); *Scrap Metal*, 527 F.3d at 535. In *Kohen*, for example, the Seventh Circuit expressly held that a class can be certified even where certain class members remain uninjured. *Kohen*, 571 F.3d at 677. The Seventh Circuit reaffirmed this principle in *Messner* when it rejected the contention that uniform price increases were required for purposes of demonstrating common impact. *Messner*, 669 F.3d at 818-19; *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1029 (7th Cir. 2018) (holding predominance satisfied despite presence of individualized liability issues); *see also* NEWBERG ON CLASS ACTIONS §2:3.

### a. Dr. Mangum's Multiple Regression Analysis Demonstrates Widespread Overcharges

Courts across the country, including those within the Seventh Circuit, have found that multiple regression analysis—of the type that Dr. Mangum performed here— provides a reliable measure of impact and damages in class actions and is widely accepted. *See, e.g.*, *Kleen Prods.*, 831 F.3d at 928; *In re High Fructose Corn Syrup Litig.*, 295 F.3d 651, 660-61 (7th Cir. 2002);

---

[15] Indeed, under many states' laws, there is a presumption of common impact in horizontal *per se* cases. *See In re Cipro Cases I and II*, 17 Cal. Rptr.3d 1, 8 (2004) (Impact is "ordinarily a permissible assumption in cases where consumers have purchased products in an anticompetitive market, even if some consumers did not actually have to pay the overcharge because of their individual circumstances."); *Hopkins v. De Beers Centenary AG*, No. CGC-04-432954, 2005 WL 1020868, *5 (Cal. Sup. Ct. Apr. 15, 2005).

*Sulfuric Acid*, 2007 WL 898600, at *7; *Ramen*, 2017 WL 235052, at *17 (regression model alone sufficient to show how plaintiffs can prove impact and damages); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 WL 5391159, *7 (N.D. Cal. Sept. 24, 2013) ("*CRTs I*") (regressions analysis can be used to certify indirect purchaser classes); *In re TFT-LCD (Flat Panel) Antitrust Litig*,. 267 F.R.D. 291, 313 (N.D. Cal. 2010) ("*LCDs I*") ("courts have accepted multiple regression and correlation analyses as means of proving antitrust injury and damages on a class-wide basis"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 616 (N.D. Cal. 2009) (*"SRAM II"*) ("The economic principles and regression models relied upon by [Indirect Purchaser] Plaintiffs' experts . . . are solidly grounded in the academic literature.").

The standard for admissibility of regression models is liberal. As the Supreme Court has held, regression analyses are probative even if they contain "less than all measurable variables …." *See Bazemore v. Friday*, 478 U.S. 385 (1986); *see also Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) ("[T]he law does not require the near-impossible standard of eliminating all possible [innocuous] factors."); *In re Air Cargo Antitrust Litig.*, Master File No. 06-MD-1175, 2014 WL 7882100 at *59 (E.D.N.Y. 2014) (regression models "need not be flawless . . . to merit the court's consideration of it as proof common to the class.").

In addition to the foregoing case law, academic and industry literature on the subject confirms that Dr. Mangum's use of multiple regression analysis has wide support.[16] Not only does Dr. Mangum utilize widely-accepted econometric techniques in his overcharge model, but the model is well-specified. The model does not assume an overcharge but tests for one. Mangum Report ¶¶ 212-219. It uses millions of real-world observations from Defendants' own transactional data as the dependent variable, it incorporates independent or "explanatory" variables, such as

---

[16] *See, supra* at n. 11.

demand over time; cost variables; fixed effect variables accounting for systematic differences in customers or products; variables addressing the "seasonality" of certain Broiler products; variables to account for competing proteins, such as pork or beef; variables addressing inventory share in the Wing Products regression; and trend variables addressing the increase in yield over time. Mangum ¶¶ 200-211.

The results of Dr. Mangum's regression model demonstrate that Broilers prices were significantly higher during the Class Period than they otherwise should have been absent the conspiracy. As discussed, Dr. Mangum's multiple regression analysis shows positive and statistically significant overcharges for all three Broiler parts over the two impact periods. The statistical properties of his models indicate that the models are well-specified and he has reliably demonstrated classwide impact: as noted, the overcharges are significant at the one percent level, indicating that there is less than a one percent chance that the statistical results are due to chance alone. *Id.* ¶¶ 212-219.

As noted in the fact section, although he did not need to perform this additional analysis, Dr. Mangum also estimated—through his production regression—the "but for" supply in the market. Many courts have relied on similar, mutually reinforcing, quantitative methodologies in certifying classes. *See, e.g., In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415 at *17 (E.D. Pa. Jul. 29, 2015) (finding that regression and supply control test supported class certification); *In re Processed Egg Products Antitrust Litig.*, No. 08-md-2002, 2017 WL 3494221 (E.D. Pa. Aug. 14, 2017) (rejecting defendants attempt to decertify the class and relying, *inter alia*, on the overcharge and production regressions). Dr. Mangum's empirical and rigorous analysis demonstrates that supply was artificially restrained during the conspiracy. The coefficients on the indicator variables are again statistically significant at the 99% level. The

results of Dr. Mangum's production regression are significant for three reasons: *first*, they support the inference that Defendants' engaged in the alleged conspiracy; *second*, they empirically demonstrate that supply was artificially restrained; and *third*, they are supportive of Dr. Mangum's findings with respect to his direct purchaser overcharge regression.

### b. Dr. Mangum's structural analysis of the market is common evidence of widespread overcharges and impact

Courts routinely accept expert opinion concerning the structural characteristics of a market in support of common impact and class certification in antitrust conspiracy cases. *See, e.g., High Fructose*, 295 F.3d at 656 (crediting expert opinion that market structure conducive to cartelization and common impact); *In re Blood Reagents Antitrust Litig.*, MDL No. 09-2081, 2015 WL 6123211, at *31 (E.D. Pa. Oct. 19, 2015) ("Many courts have accepted market-structure analyses in finding predominance with respect to antitrust impact."); *Air Cargo*, 2014 WL 7882100, at *48 (accepting industrial organization analysis of the airfreight market and certifying the class); *Fond du Lac Bumper Exch., Inc. v. Jui Li Enter, Co.*, No. 09-cv-0852, 2016 2016 WL 3579953 at *7, 10 (E.D. Wis. June 24, 2016) (finding market structure analysis as supportive of class certification); *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 341 (D. Md. 2012) (same); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 627 (N.D. Cal. 2015) ("*CRTs II*").

In his structural analysis, Dr. Mangum not only concludes that the Broiler market was susceptible to cartelization, but that in light of its market characteristics, impact would be widespread, causing damage to all, or nearly all, direct purchasers. Dr. Mangum's analysis of the structure of the Broilers markets shows: market power by the cartel firms, the indisputable commodity nature of the products, significant barriers to entry, vertical integration, the widespread use of extensive (and granular) data sharing in the industry, and the industry's pervasive use of formulaic and index pricing, among other factors. Mangum Report ¶¶ 58-135; 151-165. These

structural characteristics are common to the CIIPP Classes and will be presented to the jury as common evidence.

In affirming the grant of class certification in *Kleen Products*, the Seventh Circuit noted that "this was a commodity market with a structure conducive to collusion" and also found that use of pricing indexes to be indicative of common impact. *Kleen Products*, 831 F.3d at 925; *and see High Fructose*, 295 F.3d at 658 (same). The ubiquity of price indices such as the Urner Barry and Georgia Dock, and parallel movement of actual defendant prices with those indices demonstrates common impact. *Kleen*, 31 F.3d at 925. Dr. Mangum's structural analysis of the Broiler market is yet another methodology—in addition to his multiple regression analysis and his price correlation analyses—that is capable of demonstrating class wide impact and damages.

### c. Dr. Mangum's Price Correlation Analyses is Evidence of Common Impact

In addition to the foregoing empirical work, Dr. Mangum also explored the degree to which the three Broiler parts exhibited signs of price correlation.[17] Dr. Mangum looked at price correlation by part in a variety of ways, including the degree to which they are correlated (a) to pricing indexes;[18] (b) across Defendants;[19] (c) across geographic regions;[20] and (d) across individual customers.[21] Mangum Report ¶¶ 170-178. As Dr. Mangum testifies, "[t]his empirical

---

[17] Price correlation analyses were described *supra* at 24.

[18] To demonstrate that, to the extent collusive supply restrictions and other collusive conduct alter the market equilibrium and thus price indexes, CIIPPs would be impacted based on the prices they paid.

[19] To demonstrate that CIIPPs could not have avoided the overcharge by buying from certain members of the cartel because not only do the individual parts move together in response to common stimuli, but they also move together by Defendant.

[20] To demonstrate that CIIPPs could not have avoided the overcharge to the extent that they lived in different geographic areas.

[21] To demonstrate that CIIPPs could not have avoided the overcharge based on the size or sophistication of the customer.

analysis is further evidence that no individual direct purchaser could have avoided the impact of the alleged conspiracy." Mangum Report ¶¶ 170.

Many courts have found that price correlation analyses—such as Dr. Mangum's here—are scientifically rigorous, supportive of class certification, and bolster the conclusion of common impact. *See Kleen Products, LLC*, 831 F.3d at 928 (finding prices correlated to each other and price indexes as supportive of common impact and class certification); *In re Processed Egg Products Antitrust Litig.,* 312 F.R.D. 171, 187-88 (E.D. Pa. 2015) (commenting favorably on price correlation and co-movement analysis); *CRTs II*, 308 F.R.D. 606, 629 (N.D. Cal. 2015) ("use of regression and correlation analysis is well established as a means of providing classwide proof of antitrust injury and damages."); *In re High-Tech Employee Antitrust Litig.,* 985 F.Supp.2d 1167, 1221 (N.D. Cal. 2013) (correlation analyses, along with the other expert theories "are capable of demonstrating causation on a class-wide basis.").

Here, Dr. Mangum's price correlation analyses demonstrate robust results, showing that the prices move together in response to common stimuli. The part prices are highly correlated (a) to price indexes, (b) across Defendants, (c) across customers, and (d) across geographic regions. In combination with Dr. Mangum's other quantitative and qualitative work, the price correlation analyses are further evidence in support of common impact and class certification.

### d. "Pass-Through" of the Overcharges Can be Established Through Common Evidence

In addition to running all of the foregoing empirical tests, Dr. Mangum also conducted multiple regression analysis to determine whether the overcharges were passed through to CIIPPs. Class Counsel subpoenaed substantial quantities of transactional data—both purchase and sales data—from non-party food service distributors. Dr. Mangum estimates that he received approximately 65% of the overall nonparty distributor data of Broilers sold from Defendants to

CIIPPs. Mangum Report ¶ 247. This is no small feat. In Class Counsel's experience—experience that includes prosecuting multiple indirect purchaser cases—this is extraordinary. It is rare that indirect purchasers are able to obtain this high of a percentage of overall data from the intermediary in the chain of distribution. The robustness of the data received from the non-parties enhances the precision and power of Dr. Mangum's pass-through analysis. Dr. Mangum's task was made simpler by the straightforward distribution chain alleged in this case: the CIIPP Classes consist of individuals and entities that purchased raw Broilers from food service distributors. Dr. Mangum's pass-through regressions include millions of observations. Not surprisingly, given the nature of the market, the distribution chain, testimonial evidence, and economic theory, Mangum's models show substantial, statistically significant pass-through rates. Mangum Report ¶¶ 229-254.

And moreover, as noted, it is not surprising that CIIPPs found pass-through. Indeed, pass-through is a feature of this market and would be expected. If food service distributors were not passing along the overcharge, they would be out of business. This distribution chain is simple: this is not an indirect purchaser case where the class purchased a finished product that had a price-fixed component part like, for example, the *LCDs* litigation where the price-fixed component was the liquid display panel and the indirect purchasers purchased finished LCD TV sets. *See LCDs II*.[22] The CIIPP class is defined as entities that purchased raw Broilers from distributors that in turn purchased the same Broilers from the Defendants. The Broilers that the CIIPPs purchased did not pass through multiple distribution chains; they were not incorporated into a larger, more complex product where tracing the overcharge and allocating it to a component part might prove

---

[22] It bears noting that even in this complicated distribution chain, courts nevertheless certify indirect purchaser classes and find pass through. *See id.*; *see also SRAM I*, 264 F.R.D. 603 (N.D. Cal. 2009) (certifying a class of indirect purchasers where price-fixed SRAM incorporated into a range of highly-complex electronic products, including computers); *CRTs I*, 2013 WL 5391159 at *7 (N.D. Cal. Sept. 24, 2013) (overcharge on CRT tubes passed through the end-product TVs).

difficult; and the Broilers remain unchanged from the Defendants to the CIIPP class. The intermediaries in this chain purchase broilers; mark them up; and sell them to CIIPPs. There could hardly be a more straightforward pass-through case. CIIPPs have demonstrated pass through on a common basis.

### e. Aggregate Damages Demonstrates that Common Issues Predominate

As many courts have held, including the Seventh Circuit, a computation of aggregate damages in price-fixing cases is permitted. *See, e.g., Kleen Products Inc.*, 831 F.3d at 929 (finding aggregate damages appropriate); NEWBERG ON CLASS ACTIONS, § 10.05 (4th Ed. 2005) ("aggregate computation of class monetary relief is lawful and proper."); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 253298, at *5 (N.D. Cal. Jan. 26, 2012) ("the use of aggregate damages in antitrust cases has been approved numerous times"); *In re: High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1223-26 (N.D. Cal. 2013) (same).

Here, given the multiple quantitative methodologies produced by Dr. Mangum demonstrating common impact, he has developed a formulaic method for calculating aggregate damages to the CIIPP classes. Mangum Report ¶¶ 255-263. That CIIPPs have proffered such a method demonstrates that class certification is appropriate for this additional reason.

### f. Alleged Intricacies in the Market Do Not Defeat Class Certification

As is the standard playbook, Defendants will likely argue that the market at issue in this case is too complex; the products too varied; the pricing processes too intricate; the intervening catastrophes too great; or the experts failed to use some variable that would have made all the difference; or, likely, some combination of all of the foregoing. These likely arguments ignore that these alleged market intricacies do not preclude class certification, as many courts have held.

Courts have certified antitrust class action cases even where the markets at issue are far more complex, the products far more varied, with pricing processes that were far more convoluted than those prevailing in this case. *See, e.g., Kleen Products Inc.*, 831 F.3d at 925 (individual customer negotiations does not preclude class certification or common impact); *aff'd sub nom*, 831 F.3d at 928-29 ("Even for transactions where prices were negotiated individually or a longer term contract existed, the district court found, reasonably, that the starting point for those negotiations would be higher if the market price for the product was artificially inflated.").

Indeed, the court in the microcrystalline case stated it best, finding "[t]he bulk of the evidence presented in opposition to class certification attempts to convince me that there are enough complications in the MCC market that I should not expect the market to behave as a simplified economic model would predict . . . Antitrust cases nearly always require some speculation as to what would have happened under competitive conditions . . . but this is not fatal to class certification." *In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79, 92–93 (E.D. Pa. 2003); *In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 263 (D.D.C. 2002) (rejecting arguments that the market was too complicated to model and certifying the class); *In re Fine Paper Antitrust Litig.,* 82 F.R.D. 143, 151-52 (E.D. Pa. 1979) (granting certification despite concerns about diversity of product, marketing practices, and pricing in conspiracy cases because conspiracy is "the overriding predominant question); *In re Mercedes-Benz Antitrust Litig.,* 213 F.R.D. 180, 187 (D.N.J. 2003) (rejecting contention that "the idiosyncrasies of each transaction also preclude the possibility that common issues will predominate on the element of impact."); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014) (rejecting the contention that pricing negotiations negates common impact and class certification).

Here, there is no dispute that Broilers are the very definition of a commodity product, as Defendants regard them as such. Thus, they are priced as a commodity product—meaning their pricing rises and falls according to normal supply and demand mechanisms. And given that they are commodity products and that the very point of the collusion was to raise the market price of Broilers, the prices CIIPPs paid moved together, thus causing common impact. Dr. Mangum's models empirically test whether the foregoing is true and answer the question, unsurprisingly, in the affirmative. Further, as noted, this is not a case where the price-fixed products pass-through elaborate distribution chains; or even multiple levels of complex distribution chains. The product is a raw Broiler; and it makes its way to the CIIPP class in the same way it leaves Defendants' premises. Whatever complexities Defendants attempt to erect cannot hide the fact that the product and distribution chain in this case are simple.

### 3. The Class Action Device is Superior

Rule 23(b)(3) requires that the class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." In antitrust conspiracy cases, courts generally have ruled that the superiority prerequisite of Rule 23(b)(3) is satisfied where common questions predominate. *LCD I*, 267 F.R.D. at 314. Moreover, the more claimants there are, the "more likely a class action is to yield substantial economies in litigation." *Carnegie v. Household Int'l, Inc*., 376 F.3d 656, 661 (7th Cir. 2004). Similarly, as the district court stated in certifying the class in *Kohen*, "[c]onsidering that the size of the potential class is estimated at over one thousand, the class action is a superior method for adjudicating this case. Class actions permit pooled claims that otherwise would be uneconomical to litigate individually…." 244 F.R.D. at 480-81; *Quinn v. Specialized Loan Servicing, LLC*, 331 F.R.D. 126, 134 (N.D. Ill. 2019) ("Class actions are also desirable where collective treatment would achieve economies of time, effort, and expense….")

Here, the class action device is undoubtedly superior to alternative methods of litigation. Just as in *Carnegie* and *Kohen*, the CIIPP class is comprised of hundreds of thousands of commercial food preparers geographically dispersed throughout the United States in all of the Indirect Purchaser States. The class device, therefore, will achieve real economies and efficiencies and given the predominance of common issues, will decide the liability and damages questions against Defendants in one stroke. *See Kleen Products*, 831 F.3d at 922 (finding a class action, in a case much like this one, superior because "the determination of the aggregate classwide damages is something that can be handled most efficiently as a class action, and the allocation of that total sum among the class members can be managed individually, should the case ever reach that point. If in the end the Defendants win on the merits, this entire matter will be over in one fell swoop.").

The manageability of the class is also an element of superiority, although the bar is low. The Seventh Circuit has recognized that, "refusing to certify on manageability grounds alone should be the last resort." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 664 (7th Cir. 2015). Although not required, CIIPPs submit a Proposed Trial Plan which addresses the common issues to be tried, and describes the claims administration process to allocate an award of damages, should CIIPPs prevail. Moreover, manageability has already been demonstrated, as this case has been and will continue to be successfully managed as a class action alongside the two related classes of purchasers. There is nothing about the size or composition of the CIIPP class that has prevented the litigation from moving forward, nor do any obstacles exist that would prevent a trial on common issues of whether defendants conspired, whether there was class wide impact, and aggregate damages.

## IV. CONCLUSION

For all of the foregoing reasons, CIIPPs respectfully request that the Court grant the motion for class certification in its entirety.

Respectfully Submitted:

Dated:  October 30, 2020

/s/ *Adam J. Zapala*
Adam J. Zapala
Tamarah Prevost
James G.B. Dallal
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: (650) 697-6000
azapala@cpmlegal.com
tprevost@cpmlegal.com
jdallal@cpmlegal.com

Alexander E. Barnett
**COTCHETT, PITRE & MCCARTHY, LLP**
40 Worth Street, 10th Floor
New York, NY 10013
Tel: (212) 201-6820
abarnett@cpmlegal.com

Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Joshua J. Rissman
Brittany Resch
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street #2600
Minneapolis, MN 55402
Tel: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
bresch@gustafsongluek.com

*Interim Co-Class Counsel on Behalf of*
*Commercial and Institutional Indirect Purchasers*

Kenneth A. Wexler
Edward A. Wallace
Melinda J. Morales
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
Tel: (312) 346-2222

kaw@wexlerwallace.com
eaw@wexlerwallace.com
mjm@wexlerwallace.com

***Interim Liaison Counsel on Behalf of
Commercial and Institutional Indirect
Purchasers***