**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION* | No. 1:16-cv-08637 |
| This Document Relates To: | Honorable Thomas M. Durkin |
| All End-User Consumer Plaintiff Actions | Magistrate Judge Jeffrey T. Gilbert |

**END-USER CONSUMER PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

REDACTED VERSION

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................1

II. CLASS DEFINITION ..........................................................................................6

III. PROFFER OF FACTS COMMON TO THE CLASS.........................................7

    A. Evidence that is common to the class demonstrates that defendants agreed to restrict supply and stabilize the prices of chicken.....................7

        1. Between 2007 and 2009, the exchange of detailed information among competitors established ████████ ████████..........................................................................7

        2. ██████████████████ breeder hen processors helped defendants to meet and agree on more permanent supply cuts. .............................................................................12

        3. After the second round of historic production cuts, ████ █████████████████████..............................16

IV. LEGAL STANDARD..........................................................................................19

V. ARGUMENT.......................................................................................................20

    A. The elements of Rule 23(a) support certification. ..................................20

        1. The class is sufficiently numerous. ..........................................20

        2. Common questions of fact and law exist. .................................20

        3. The claims of the named plaintiffs are typical of the class claims. ........................................................................................21

        4. The named plaintiffs will adequately represent the class. .........................22

    B. The class satisfies Rule 23(b)(3)..............................................................23

        1. Questions of law and fact predominate over any individual questions. ..................................................................................23

            a. Common questions about defendants' violations of the antitrust laws predominate. .............................................24

            b. Antitrust impact will be proved through evidence that is common to the class........................................................26

(1) Defendants' conspiracy caused higher chicken prices. ..................................................................26

(2) Collusion inflated prices market-wide. ............................33

(3) Overcharges were passed through from direct purchasers to the class members. .......................................36

2. Damages to class members need not be measured with precision, but can be measured using a common methodology. ............................................................................41

3. A class action is superior to any other alternative. ...................................43

a. Class members cannot proceed individually. ...............................43

b. Litigating the claims of the class members from different States in this Court does not present manageability concerns. ...............................................44

4. The class is ascertainable. .........................................................44

C. Class Counsel are adequate under Rule 23(g). .....................................................45

VI. CONCLUSION .................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*In re Aluminum Phosphide Antitrust Litig.*,
160 F.R.D. 609,614-15 (D. Kan. 1995) ..................................................25

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)..................................................................................19

*In re Auction Houses Antitrust Litig.*,
193 F.R.D. 162,166 (S.D.N.Y. 2000) ......................................................25

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946)..................................................................................42

*In re Blood Reagents Antitrust Litig.*,
No. 09-2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) ......................34

*In re: Bulk [Extruded] Graphite Prods. Antitrust Litig.*,
2006 WL 891362 (D. N. J. Apr. 4, 2006) ...........................................31, 32

*In re Capacitors Antitrust Litig. (No. III)*,
2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ...................................25, 27

*In re Carbon Black Antitrust Litig*,
2005 WL 102966 (D. Mass. Jan. 18, 2005.) .............................................31

*Carnegie v. Household Int'l, Inc.*,
376 F.3d 656 (7th Cir. 2004) ....................................................................43

*In re Catfish Antitrust Litig.*,
826 F. Supp. 1019 (N.D. Miss. 1993).................................................24, 25

*Comcast v. Behrend*,
569 U.S. 33 (2013).............................................................................19, 41

*De La Fuente v. Stokely-Van Camp, Inc.*,
713 F.2d 225 (7th Cir. 1983) ....................................................................21

*DeLoach v. Philip Morris Cos., Inc.*,
206 F.R.D. 551 (M.D.N.C. 2002) .............................................................31

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
2006 WL 1530166 (N.D. Cal. June 5, 2006)......................................31, 32

*In re Flat Glass Antitrust Litig.*,
    191 F.R.D. 472(W.D. Pa. 1999) ...........................................................................32

*In re Flonase Antitrust Litig.*,
    284 F.R.D. 207 (E.D. Pa. 2012)..........................................................................32

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*,
    2012 U.S. Dist. LEXIS 125677 (E.D. Wis. Sept. 5, 2012)...................................36

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*,
    2017 U.S. Dist. LEXIS 142470 (E.D. Wis. Aug. 8, 2017)...................................36

*In re Foundry Resins Antitrust Litig.*,
    242 F.R.D. 393..................................................................................25, 32, 42

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
    744 F.2d 588 (7th Cir. 1984) (when "firms restrict output directly, price will
    as mentioned rise." (Posner, J.)) .........................................................................26

*Gomez v. PNC Bank, Nat'l Ass'n*,
    306 F.R.D. 156 (N.D. Ill. 2014)..........................................................................19

*Gordon v. Microsoft Corp.*,
    2001 U.S. Dist. LEXIS 26360 (D. Minn. Mar. 30, 2001).....................................36

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ........................................................... *passim*

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)...........................................................................................6

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*,
    737 F.2d 698 (7th Cir. 1984) ............................................................................27

*Keele v. Wexler*,
    149 F.3d 589 (7th Cir. 1998) ............................................................................20

*Kleen Prods. LLC v. Int'l Paper*,
    306 F.R.D. 585 (N.D. Ill. 2015)....................................................25, 33, 35, 41

*Kleen Prods. LLC v. Int'l. Paper Co.*,
    831 F.3d 919 (7th Cir. 2016) ..................................................... *passim*

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
    571 F.3d 672 (7th Cir. 2009) .......................................................................32, 42

*In re Korean Ramen Antitrust Litig.*,
    2017 U.S. Dist. LEXIS 7756 (N.D. Cal. Jan. 19, 2017)......................................36

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002)..........................................................................26, 31, 32

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ............................................................... *passim*

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) ....................................................................42, 44

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  319 F.R.D. 158 (E.D. Pa. 2016)...........................................................................34

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001)...............................................................................41

*In re OSB Antitrust Litig.*,
  2007 U.S. Dist. LEXIS 56617 (E.D. Pa. Aug. 3, 2007).........................................36

*Patterson v. Gen. Motors Corp.*,
  631 F.2d 476 (7th Cir. 1980) .............................................................................20

*Pecover v. Elec. Arts Inc.*,
  2010 U.S. Dist. LEXIS 140632 (N.D. Cal. Dec. 21, 2010)....................................36

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  582 F.3d 156 (1st Cir. 2009) .............................................................................42

*In re Polyester Staple Antitrust Litig.*,
  2007 WL 2111380 (W.D.N.C. July 19, 2007)..............................................31, 32

*In re Polyurethane Foam Antitrust Litig.*,
  314 F.R.D. 226 (N.D. Ohio 2014) .....................................................................42

*In re Polyurethane Foam Antitrust Litig.*,
  2014 WL 6461355 (N.D. Ohio Nov. 17, 2014)...................................................33

*In re Potash Antitrust Litig.*,
  159 F.R.D. 682 (D. Minn. 1995)...................................................................24, 25

*Prac. Mgmt. Support Servs., Inc. v. Cirque du Soleil, Inc.*,
  301 F. Supp. 3d 840 (N.D. Ill. 2018) ..................................................... *passim*

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
  2007 WL 4150666 (M.D. Pa. Nov. 19, 2007) ...................................................31

*Retired Chicago Police Ass'n City of Chicago*,
  7 F.3d 584 (7th Cir. 1993) ...............................................................................21

*In re Rubber Chems. Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005) .................................................................................21, 31

*Saltzman v. Pella Corp.*,
257 F.R.D. 471 (N.D. Ill. 2009) ............................................................................20, 21, 22

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) .......................................................................................25, 42

*In re Steel Antitrust Litig.*,
2015 WL 5304629 (N.D. Ill. Sept. 9, 2015) ................................................................21, 23

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931)............................................................................................................42

*In re Sulfuric Acid Antitrust Litig.*,
2007 WL 898600 (N.D. Ill. Mar. 21, 2007).................................................................24, 25

*In re TFT–LCD (Flat Panel) Antitrust Litig.*,
267 F.R.D. 291 (N.D. Cal. 2010) ......................................................................................32

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*,
209 F.R.D. 159 (C.D. Cal. 2002) .......................................................................................31

*Toys "R" Us v. Fed. Trade Comm'n*,
221 F.3d 928 (7th Cir. 2000) .............................................................................................23

*Transamerican Refining Corp. v. Dravo Corp.*,
130 F.R.D. 70 (S.D. Tex . 1990).........................................................................................24

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
219 F.R.D. 661 (D. Kan. 2004)..........................................................................................31

*In re Urethane Antitrust Litig.*,
251 F.R.D. 629 (D. Kan. 2008)..........................................................................................25

*In re Urethane Antitrust Litig.*,
768 F.3d 1245 (10th Cir. 2014) ...................................................................................25, 31

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
2015 WL 3623005 (E.D. Pa. June 10, 2015) ....................................................................41

*In re Urethane Antitrust Litig.*,
237 F.R.D. 440, 450-51 (D. Kan. 2006) ......................................................................31, 32

*In re Vitamins Antitrust Litig.*,
209 F.R.D. 251 (D.D.C. 2002).............................................................................................31

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .............................................................................................18, 20, 21

## FEDERAL STATUTES

Sherman Act § 1 ....................................................................................................3, 23, 43

## FEDERAL RULES

Federal Rule of Civil Procedure 23 ...................................................................... *passim*

## SECONDARY AUTHORITIES

Newberg on Class Actions § 18:53 (4th ed.) ................................................................32

Newberg on Class Actions § 20.23 (5th ed. 2020) .......................................................24

7 C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 1781 (3d ed.
2020) ........................................................................................................................24

| Glossary of *In re: Broiler Chicken Antitrust Litigation* Industry Terms ||
|---|---|
| **Term** | **Definition** |
| **A** ||
| ABF (Antibiotic Free) | An acronym for "Antibiotic Free." This refers to chicken that may be marketed or sold with the "no antibiotics ever" or "raised without antibiotics" labels. |
| AMS (Agricultural Marketing Service) | The USDA Agricultural Marketing Service is a set of programs that create domestic and international marketing opportunities for U.S. producers of food. |
| **B** ||
| back half | The back half of a chicken, which includes the thighs, legs and feet. |
| big bird | Chicken is often categorized as "big" or "small" depending on its weight. Big birds are slaughtered at plants designed for larger chickens and usually weigh between 7-9 lbs. |
| Bottom Line Report | An Agri Stats report that provided data on the profitability of each subscriber per pound of chicken produced. These reports were frequently reverse-engineered by defendants. |
| breaker | A person, firm, or business that cracks eggs to make egg products. Chicken producers can send fertilized eggs to a breaker to cut broiler chicken production. |
| breed | A group of birds having similar body shape and weight characteristics and when mated together produce offspring with those same characteristics. A breed may contain one or more varieties that are distinguished by different comb, color or other specific trait. |
| breeder hens | These birds produce the fertilized eggs that grow into broiler chicken for human consumption. |
| broiler | Chickens less than 13 weeks of age. After processing (i.e. slaughter), broiler chicken meat is directed to one of several market channels based primarily on its weight post-processing. |
| broker | A person or firm that negotiates transactions between buyers and sellers in the chicken market and charges a fee for the brokerage services. A broker does not take possession of the chicken product. |
| BSB (Boneless Skinless Breast Meat) | One of the most common cuts of chicken sold in grocery stores, this meat from the front half of a chicken has had the breastbone and skin removed. It is often sold fresh in tray packs at the grocery store. |
| **C** ||
| case | A container used in commercial practice for shipping goods. When referring to chicken meat, a standard size case is usually 40lbs, but the weight can vary. When referring to eggs, a standard sized case will usually hold 30-dozen eggs. |
| chick | Young chickens that have not grown large enough for human consumption. |
| chill pack | A chicken packaging technique used to increase the shelf life of raw chicken that is sold in a "fresh" state. |

| Glossary of *In re: Broiler Chicken Antitrust Litigation* Industry Terms | |
|---|---|
| **Term** | **Definition** |
| contract grower | The person that provides housing, equipment, labor, litter, power and heat, and cares for the poultry during growout. The contract grower does not own the poultry, but receives a stipulated fee for the services. |
| culling | The process of removing chickens, breeders, chicks, pullets, or eggs, from the production chain. |
| cutback | The process of reducing the number of pounds chicken meat that are produced. Cutbacks can occur using various methods |
| cut-up | Ready-to-cook poultry carcass cut into eight or nine pieces. Some are halved or quartered |
| cuts of chicken | • Backs – The back half of the chicken that consists of the drums, thighs, and backs<br>• Breast Halves or Splits – Chicken breasts cut in half along the breast bone (white meat)<br>• Breast Quarter – Breast, wing, and back portion (white meat)<br>• Cut-up Chicken (8 pcs.) – Whole chicken cut into two breast halves, two thighs, two drumsticks, two wings<br>• Drummette – Wing portion consisting of only the meatier first section; looks like a tiny drumstick<br>• Drumstick – Portion of the leg below the knee joint<br>• Fronts – The front half of the chicken that consists of the breasts and wings<br>• Halves or Splits – Whole chicken cut lengthwise into two pieces of approximately equal weight<br>• Leg Quarter – Drumstick and thigh (dark meat)<br>• Mid-Joint Wing – Wing portion consisting of only the flat, middle section<br>• Saddle – The back half of the chicken<br>• Tenders – Strips of boneless, skinless breast meat (white meat)<br>• Thigh – Portion of the leg above the knee joint (dark meat)<br>• Wing – Whole wing with all three sections |
| **D** | |
| dark meat | The thigh meat and leg meat of the bird (*see cuts of chicken*). |
| delivered | A bid, offer, or quote which includes the cost of loading, transporting, and unloading the product at the location specified by the buyer. |
| debone | The process of removing bones from chicken meat so that the consumer may cook the cuts more easily. Breasts are often sold deboned. |
| distributor | A person or firm that delivers product to customers, rather than selling it directly to consumers. |
| dressed | A chicken that has been fully processed (slaughtered, decapitated, de-feathered, and eviscerated) and is fit for human consumption. |

| Glossary of *In re: Broiler Chicken Antitrust Litigation* Industry Terms ||
| Term | Definition |
| --- | --- |
| **E** ||
| EMI | Express Markets, Inc. Agri Stats' subsidiary. |
| evisceration | The process of removing the internal organs from the chicken. |
| **F** ||
| fowl | Once a spent hen has been slaughtered, it becomes fowl meat. Fowl meat is much tougher than broiler chicken meat and is often used in commercial soups and stocks or in other items, such as pet food. |
| flock | A group of birds that feed or move together. These birds will normally be of the same type and age, and housed together. |
| free range chicken | The USDA approves this label on chicken products on a case-by-case basis. Free range chickens must have access to the outdoors for at least some part of the day. All organic chicken must be free range. |
| fresh poultry | Poultry and cuts that have never been stored below 26 °F. |
| further-processed poultry product | Poultry products prepared by cooking, smoking, grinding, deboning, dehydrating or otherwise processing beyond the cut-up stage so as to change form, appearance, texture or to keep quality. Further-processed products include nuggets, patties, hot dogs, pot pies, and hundreds of other products. |
| further processor | A firm which uses whole carcasses or poultry products for the production of fresh or frozen products, and may include the following types of processing: cutting and deboning, cooking, seasoning, smoking, canning, grinding, chopping, dicing, forming or breading. |
| **G** ||
| Georgia Dock | A regularly prepared price index for a 2-3lb whole broiler compiled by the Georgia Department of Agriculture. |
| giblets | The term used to describe the portion of poultry carcasses that consists of hearts, gizzards, and livers. |
| grow-out house | A building that is used for raising broilers. |
| **H** ||
| halal | Products prepared by federally inspected meat packing plants identified with labels bearing references to "Halal" must be handled according to Islamic law and under Islamic authority. |
| hatchability | The number of saleable chickens that hatch from all eggs incubated – usually expressed as a percentage. |
| hatchery | A facility for hatching eggs. Fertilized eggs are placed into an incubator that maintains conditions favorable for hatching. Chicken eggs will hatch 21 days after they are set. |
| hatchery capacity | The maximum number of chicken eggs the hatchery can incubate and grow into chicks. |
| hatchery capacity utilization | The percentage of incubator space the hatchery is actually using. |

| Glossary of *In re: Broiler Chicken Antitrust Litigation* Industry Terms | |
|---|---|
| **Term** | **Definition** |
| hen | A hen is a female bird of egg laying age. In the chicken industry, hens are usually over 20 weeks old, and raised for egg production purposes. |
| **I** | |
| IQF (Individually Quick Frozen) | A method for quickly freezing chicken parts that does not allow large ice crystals to form. |
| **L** | |
| layer | Hens (including those molting) or pullets producing table or commercial type shell eggs. These hens are usually at least 20 weeks old and may include the breeder hen that produces broiler-type or egg-type hatching eggs. |
| leg quarters | The rear portion of a ready-to-cook young chicken consisting of the drumsticks, thighs, and back portion. This item is marketed at retail or further processed. |
| **M** | |
| molting | Forced or induced molting is the process of provoking a flock of breeders to stop laying eggs, typically by withdrawing food and light for a period. |
| **N** | |
| natural | Under USDA regulations, a "natural" product has no artificial ingredients, coloring ingredients, or chemical preservatives, and is minimally processed, just enough to get it ready to be cooked. Almost all ready-to-cook chicken can be labeled "natural." |
| NCC | National Chicken Council is a trade association based in Washington, D.C. that represents the interests of the United States chicken industry in lobbying efforts. |
| **O** | |
| organic | Producers of organic chicken must provide chickens with outdoor access, use preventative health management with no antibiotics or drugs, and feed chickens only certified organic feed (feed ingredients and pasture are produced without synthetic fertilizers and pesticides). The entire operation is inspected by auditors. |
| **P** | |
| pieces | Whole chicken cut in eight or nine pieces – drumsticks, thighs, breast halves and wings. Back may be separate or part of the breast and thigh pieces. |
| processed *or* processing | The term used to describe slaughtering live chickens and turning the carcass into raw chicken products fit for human consumption. |
| processor | The vertically integrated firm which owns and operates a plant that slaughters and eviscerates broiler chicken. |
| pullet | Young breeder hens who are not yet of egg laying age |
| **R** | |

| Glossary of *In re: Broiler Chicken Antitrust Litigation* Industry Terms ||
| Term | Definition |
| --- | --- |
| ready-to-cook (RTC) | Raw dressed chicken meat that is fit for sale to consumers. Ready to cook items include products like tray packs of boneless skinless breast meat. |
| render | Subjecting disposed animal carcasses to grinding, extraction, heat or other treatments to convert into by-products for use in feed rations and fertilizers. |
| replacement | Young bird grown to replace breeding stock. |
| **S** ||
| small bird | Chicken is often categorized as "big" or "small" depending on its weight. Small birds are slaughtered at plants designed for smaller chickens and usually weigh between 4.5-7 lbs, |
| spent hen | A breeder or commercial type egg hen that no longer lays eggs at the consistency required for efficient production. |
| **T** ||
| table egg | A chicken egg, fit for human consumption, that is sold fresh and in the shell. |
| trader | A person or firm that buys chicken, takes possession of the chicken, and then sells it to another market participant. A trader makes profit by speculating on future prices, supply, or demand. |
| tray pack (TP) | Product packaged in a plastic tray within the case pack. Chicken is often sold to consumers in grocery stores in a tray pack format. |
| **U** ||
| Urner Barry | A company that reports chicken prices and news to subscribers, who include chicken processors and purchasers. |
| USDA | The U.S. Department of Agriculture is the federal agency that proposes programs and implements policies and regulations related to American farming, forestry, ranching, food quality, and nutrition. |
| USDA ERS | The Economic Research Service is a component of the United States Department of Agriculture and provides information and research on agriculture and economics. |
| **W** ||
| weighted average | A mathematical computation derived by dividing the total value of the sales during the period by the total number of units sold during the period. |
| white meat | The front (breast quarters) of a bird. |
| WOGs | An acronym commonly used throughout the chicken industry that refers to whole dressed birds without giblets, i.e. whole birds that are ready for sale. |

| TABLE OF ABBREVIATIONS | |
|---|---|
| **Short Cite** | **Long Cite** |
| Ex. | All exhibit references are to the Declaration of Steve W. Berman in Support of End-User Consumer Plaintiffs' Motion for Class Certification |
| Azari | Declaration of Cameron R. Azari in Support of End-User Consumer Plaintiffs' Motion for Class Certification |
| Cabral | Declaration of Dr. Luis Cabral in Support of End-User Consumer Plaintiffs' Motion for Class Certification, dated Oct. 30, 2020 |
| Paschall | Declaration of Jeff Paschall, dated October 30, 2020 |
| Sunding | Declaration of Dr. David L. Sunding in Support of End-User Consumer Plaintiffs' Motion for Class Certification, dated Oct. 30, 2020 |
| Opp'n to MTC | Defendants' Opposition to Class Plaintiffs' Motion to Compel Production of Additional Structured Data, Contracts and 30(b)(6) Testimony at 10, April 22, 2020, EFC No. 3574 |
| ESI Order | Order Regarding Production of Electronically Stored Information and Paper Documents, Aug. 15, 2017, ECF No. 459 |
| **PARTIES** | |
| Agri Stats | Defendant Agri Stats, Inc. |
| Claxton | Defendants Claxton Poultry Farms, Inc.; Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, Inc. |
| EUCP | End-User Class Plaintiffs |
| Fieldale | Defendant Fieldale Farms Corporation |
| Foster | Defendants Foster Farms, LLC; Foster Poultry Farms |
| George's | Defendants George's, Inc.; George's Farms, Inc. |
| Harrison | Defendant Harrison Poultry, Inc. |
| HOR | Defendant House of Raeford Farms, Inc. |
| Koch | Defendants Koch Foods, Inc.; JCG Foods of Alabama, LLC; JCG Foods of Georgia; LLC, Koch Meat Co., Inc. |
| Mar-Jac | Defendants Mar-Jac Poultry, Inc.; Mar-Jac Poultry AL, LLC; Mar-Jac AL/MS, Inc.; Mar-Jac Poultry, LLC; Mar-Jac Holdings, LLC |
| Mountaire | Defendants Mountaire Farms, Inc.; Mountaire Farms, LLC; Mountaire Farms of Delaware, Inc. |
| OKF | Defendants O.K. Foods, Inc.; O.K. Farms, Inc.; O.K. Industries, Inc. |
| Peco | Defendant Peco Foods, Inc. |
| Perdue | Defendants Perdue Farms, Inc.; Perdue Foods LLC |
| PPC | Defendant Pilgrim's Pride Corporation |

| TABLE OF ABBREVIATIONS | |
|---|---|
| Sanderson | Defendants Sanderson Farms, Inc.; Sanderson Farms, Inc. (Foods Division); Sanderson Farms, Inc. (Production Division); Sanderson Farms, Inc. (Processing Division) |
| Simmons | Defendants Simmons Foods, Inc.; Simmons Prepared Foods, Inc. |
| Tyson | Defendants Tyson Foods, Inc.; Tyson Chicken, Inc.; Tyson Breeders, Inc.; Tyson Poultry, Inc. |
| Wayne Farms | Defendant Wayne Farms, LLC |

## I. INTRODUCTION

Defendants here are the largest chicken processors in the country. They and their co-conspirators produce between 96 to 98 percent of the chicken that tens of millions of consumers cook and eat in the United States. Sunding ¶ 159. ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ his heavily consolidated market both facilitated the start of the conspiracy and ensured its success.

An ordinary grocery shopper buying raw chicken has almost certainly never heard of Agri Stats. This obscurity was entirely intentional: ██████████████████████████

███████████████████████████ o this day, its website cryptically describes its work as "partner[ing] with customers to identify efficiency opportunities on a farm, flock or plant level."[2] Shielded by its anonymity, this obscure company generated millions by focusing on one objective: facilitating the exchange of highly sensitive cost, supply and pricing information among chicken processors. Cabral ¶¶ 10-11, Ex. 2.

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

██████. Cabral ¶ 22-23. It circulated the data in weekly and monthly reports for the chicken

---

[1] Ex. 1 at 233-35 ████████

[2] *See* Agri Stats, Inc., Partnership and Services, https://www.agristats.com/ (last visited October 30, 2020).

[3] Ex. 2 ████████████████████

processors.



Since Agri Stats is a for-profit company, one might assume Agri Stats would sell its reports to any paying customer who learned of its services. But many eager customers who might want to buy Agri Stats reports cannot, █████████████████████ ██████████████ ████████ ███ ████████ █████████████████ Instead of generating revenue from these

---

[4] Ex. 3 at 251, 255-58 ███████ Tr.); Ex. 4.

[5] Ex. 5 at 38 (████████████

[6] *See, e.g.*, Ex. 3 at 148-151 ████████████████████████████████████████ 169 (████████████████

[7] Ex. 3 at 245-46 ███████

[8] Ex. 5 at 37-8 █████████

[9] *See* Ex. 1 at 233 ████████████████████████████████████████



[11] *See* Ex. 9 at ███████████████████████████████████.

[12] *See* Ex. 10 ████████████████████████████████████████

potential customers, Agri Stats only allowed chicken processors who contributed data to see the reports. This ensured *only* competitor processors could see each other's detailed production and sales data, or know that such information was exchanged. Cabral ¶ 23.

Using Agri Stats, shared breeder hen processors (Southern Hens and Tip Top) and direct communications between competitors, defendants entered into an agreement to restrict the supply and stabilize the price of chicken being sold to consumers. The conspiracy predictably led to an increase in the price of raw chicken (primarily breasts and whole birds) sold to consumers in grocery stores. American consumers paid more for chicken than they would have in the absence of the illegal agreement. The supracompetitive prices from the conspiracy are illustrated by the following figure, which compares USDA whole broiler prices with defendants' variable costs, and shows that defendants' margins increased well above historical levels in 2012 and stayed elevated throughout the class period:



This agreement violated the Sherman Act and the state antitrust and consumer protection laws. Plaintiffs bring claims under both the *per se* standard of these laws and under a rule of reason standard.

Plaintiffs move to certify a class of end-user consumers who purchased raw breast meat or raw whole chickens at grocery stores for personal consumption between January 1, 2012, and July 31, 2019. The chicken sold in grocery stores to the class is broadly referred to as "tray pack" chicken because it is often packaged in Styrofoam trays. It makes up a particular segment of the chicken market which is sufficient for Agri Stats to create ███████████████ [3] In this tray pack segment ██████████████████████████████████████ spent on fresh chicken being spent on boneless breasts.[14]

The class of end-user consumers satisfies the four elements of Federal Rule of Civil Procedure 23(a). The class is undoubtedly numerous. There are many common questions of law and fact, such as the existence of the conspiracy, the actions of defendants, and whether the class was harmed. And the named plaintiffs have each suffered small losses that make them typical of absent class members and are sufficiently committed to this litigation that they will adequately represent the class. ***See* section V.A**.

Plaintiffs also meet the requirements of Rule 23(b)(3). Common questions of fact and law predominate in this action. Plaintiffs present robust evidence, common to the class, of the defendants' agreement to restrict the supply and stabilize the price of chicken. ***See* section III**. Dr. Sunding, a professor of Agricultural Economics at the University of California, Berkeley, presents a multivariate regression model, of the kind widely accepted in both the field of

---

[13] Ex. 11 at ███████████████

[14] Ex. 12 at ███████████████

economics and in litigation, to measure the higher prices caused by this conspiracy. ***See* section V.B.1**.

Those common questions, alone, are enough to certify the class, but plaintiffs present additional corroboration that the higher prices caused by the conspiracy inevitably impacted all class products. Dr. Sunding performs several econometric analyses which all point towards common impact, including a price movement analysis similar to that authorized by the Seventh Circuit in *Kleen Prods. LLC v. Int'l. Paper Co.*, 831 F.3d 919, 927 (7th Cir. 2016). This analysis directly compares transaction prices before and after a series of price shocks and shows that 92 percent of individual transaction prices move in tandem during those shocks. Sunding ¶ 286. Dr. Sunding also examines the defendants' widespread use of benchmarks in this industry, such as the Urner Barry, Georgia Dock and Agri Stats, which link individual transaction prices to an indexed national price for chicken. All Dr. Sunding's conclusions are fully supported by the defendants' own documents ███████████████████████████████████████████████████ ██████████████████████████ ***See* section V.B.1.b(** ██████████████████████████████████████████[15] Testimony by, and documents from, market participants and the defendants, as well as a robust set of pass-through regressions, also provide common evidence that the overcharges were passed through to the end-user class. ***See* section V.B.1.b(3)**.

The existence of a relevant antitrust market for chicken and defendants' market power, are separate questions of fact and law which predominate, each of which are relevant to the end-user consumer class's separate claim that defendants' agreement to share information violated the rule of reason. Dr. Sunding performs a market analysis to demonstrate the existence of a

---

█ ███████████████████████████████████████████████

relevant market, the market power of the defendants, and evidence that defendants successfully raised prices and suppressed output. Plaintiffs also provide the testimony of an economist, Luis Cabral, who specializes in the dynamics of firm competition. Dr. Cabral discusses the economic effects of information exchanges between competitors and concludes, based on evidence common to the class, that defendants' sharing of information through Agri Stats had an anticompetitive impact. ***See* section V.B.1.a**.

Finally, litigation of these claims through a collective action is superior to any individual claims. Each class member will have suffered harm, but hardly enough to justify a lawsuit against such large businesses. And yet, joined together, the damages to the end-user class are estimated to be $3.916 billion. ***See* sections V.B.2.** Without the existence of a class action, there will be no action at all.

For all these reasons, plaintiffs respectfully requests that the Court certify the class.

## II. CLASS DEFINITION

The proposed class definition for the end-user consumer class is:

> All persons and entities who indirectly purchased the following types raw chicken, whether fresh or frozen: whole birds (with or without giblets), whole cut-up birds purchased within a package, breast cuts or tenderloin cuts, but excluding chicken that is marketed as halal, kosher, free range, organic, diced, minced, ground, seasoned, flavored or breaded – from defendants or co-conspirators for personal consumption in the Repealer Jurisdictions from January 1, 2012 to July 31, 2019.

The Repealer Jurisdictions are those states which have "repealed" the Supreme Court's holding in *Illinois Brick Co. v. Illinois*[16] and provide standing to indirect purchasers.[17]

---

[16] *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

[17] For purposes of this class certification motion, those jurisdictions are: California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Nebraska,

### III.    PROFFER OF FACTS COMMON TO THE CLASS

**A.    Evidence that is common to the class demonstrates that defendants agreed to restrict supply and stabilize the prices of chicken.**

**1.    Between 2007 and 2009, the exchange of detailed information among competitors established ██████████████████[18]**

Historically, the chicken market was dominated by the boom and bust cycles typical of commodity markets: when prices were high during a boom, chicken companies expanded production, trying to reap as much profit as possible. But as expansion continued, supply would eventually outpace demand, triggering a bust, causing prices to fall. To balance supply and demand in response, some companies might try to cut supply. But when they limited production, others would respond by increasing it, capturing market share. This was a competitive market. Sunding ¶ 25.



Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, and Wisconsin.

[18] *See* Ex. 13 at ████████

[19] *See* Ex. 14 ████████████████████████████████████████████ (industry shows ████████████████)

██████████████████████████████████████████

[21] *See* Ex. 17.

[22] Ex. 1 at 77-79 ████████

[23] Ex. 1 at 78-79; Ex. 2 (chart ████████ evenue).

███████████████████████████████████████████████████████████████████

████████████████████████████████ ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████ ███ it exchanged that information

through Agri Stats.

When rising grain prices and an economic recession began putting severe downward

pressure on chicken processor profits in 2008 and 2009, Agri Stats and its subsidiary Express

Markets, Inc. (EMI) (which forecasted future chicken prices and supply)████████████

██████████████████████████████████████ For example, Agri

Stats's vice president Mike Donohue wrote, ███████████████████████████████

██████████████████"[26]

Agri Stats and EMI worked closely with Rabobank,[27] a lender that had committed ████

████████████████████,[28] to amplify the message that chicken processors needed to

make coordinated cuts. Rabobank used its position at industry conferences to tell defendants that

████████████████████████████ ████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████."[30]

---

[24] *See* Ex. 18 ███████████████████

[25] Ex. 19 at 166 █████████.

[26] Ex. 3 at 178-183 ██████████ Ex. 20 at ████████████████

[27] Rabobank is perhaps most infamously known as one of the engineers of the LIBOR conspiracy, which occurred during this same period. *See* ████████████████████████████

[28] Ex. 21 at 59-61, 182-183 (███████████████

[29] *Id.* at 107-114 (████████████

[30] *Id.* at 250-252, 264:25-265:2 (█████████████

Rabobank also worked with ████████████████████████████████████

████████" at conferences, such as the National Chicken Council Conference.[31]

The industry understood the message: coordinate cuts and keep supply short of demand. defendants adopted the euphemism that each producer would ██████████[2] to reduce production and maintain production ███████████[33] either by cutting supply or delaying plans to increase capacity. As chicken processors heeded these warnings, EMI helped them ██████ ████████████████ d secretly told them how to ████████████████████ ███████████████ ████████████████████████████ ████████████████████████" Ex. 34. ███████████████ ████████████████████████████ ████████████████" *Id*. In private emails, ████████████████ ████████████████s. Cabral ¶¶ 103-104.

While ████████████████████████████████ senior management

<hr />

[31] Ex. 22 at ████████████

[32] *See, e.g.*, Ex. 23 at ████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████

[33] *See, e.g.*, Ex. 26 at 56-57 (████████████████ ████████████████████████████"); Ex. 27 at 192-193 ( (discipline was "██ ████████████ Ex. 28 at ███(█ prices for tray packs and noting that "the industry continues to be disciplined"); Ex. 29 at PILGRIMS- ██████████████ Ex.30 at ████████

[34] *See* Ex. 26 at 230 ████████ Ex. 31 ████████████ Ex. 33 (██████████ ████████████████████████

for the chicken producers also regularly met in person and at conferences █████████

███████████████████████████ ████████████████████████████████

████████████ ███████████████████████████████████

Throughout 2008 and 2009, defendants enacted historic supply cuts. The coordination

among chicken processors was remarkable ████████████████████████████

████████████████████[8] As a result, prices rose, and every chicken producer █████

████████████████[39]

Tyson credited Agri Stats with ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Cabral Decl., ¶¶ 132-33. In early ████████

█████████████████████████████████. Ex. 47.



---

[35] *See, e.g.*, Ex. 35 at 113-14, 119-122 ████████████████████████████
████████████████ Ex. 36 (████████████████████████████████
███████████.

[36] *See, e.g.*, Ex. 37 ████████████████████████████████████
████████████████████████████████ *see also* Ex. 40
████████████████████████); Ex. 41 (2011 email:
████████████; Ex. 42 at ████████ email: ████████████████

[37] *See e.g.*, Ex. 43 ████████████████████████████████████
████████████████████████

[38] Ex. 44 at ████████████ (emphasis in original).

[39] Ex. 45 at ████████████████



The ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████.[40] In reality, one non-defendant processor had

previously warned Agri Stats that it would not subscribe because, ███████████████████

██████████████ ████████████████████████████████████████████████████

████████████████████████████████████. *See* Ex. 2. █████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████. *Id.*

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████ ,"[42] Agri Stats recognized that given the data it had, "███████████████████████████

████████████████████████████████████ ,"[43] ████████████████████████████ Agri

Stats ████████████████████████████████████ t provided ████████████████

████████ ,[44] used "███████████████████████████████ industry,[45] and told the industry how much it

---

[40] *See* Ex. 48 ████████████████████ Chicken producers were already regularly unmaking each other in these reports; Tyson began unmasking competitors weeks after joining the reports in 2007, for example. *See* Ex. 49 at ████████████ .

[41] Ex. 1 at 150-53 (████████████ Ex. 50.

[42] Ex. 13 at ████████████████████

[43] *Id.*

[44] *See e.g.*, Ex. 52 ████████████████████████████████████████████████████ ████████████████████████████ *also* Ex. 53; Ex. 54 at 11; Ex. 55; Ex. 56.

[45] *See, e.g.*, Ex. 57 at ████████████████████ (in 2011, Donohue of Agri Stats writes, ████████████████████████████████████████████████████████████████ ████████████████ x. 58 at ████████████████████████████████████████████

████████████████████████████ [46]

**2.** ████████████████████████████**: breeder hen processors helped defendants to meet and agree on more permanent supply cuts.**

Chicken processors can make long-term supply cuts by reducing the size of their breeder flocks. Breeders are hatched by genetics companies and then bought, raised and fed by chicken processors. Sunding ¶¶ 10-11. They are the mother hens of the chicken world; the eggs they lay during their 12 to 18 month lifespan grow into chicken we buy at the grocery store. *Id.* ¶ 12.

████████████████████████████ chicken processors lapsed into their old habits of expanding production to take advantage of higher prices.[47] But supply was expanding while processors' feed costs (e.g., corn) were also rising.[48] As a result of input costs increasing while supply also rose, the chicken industry faced another bust by early 2011.[49] Responding to souring market conditions, Agri Stats and EMI encouraged the industry to work together and again coordinate supply cuts in 2011.

As Agri Stats' Donohue emphasized in his January 2011 newsletter to the chicken processors, ████████████████████████████

████████████████████████████ "[50] Instead, EMI and Agri Stats told defendants

---

████████████████████████████

[46] *See* Ex. 59 (████████████████████████████ ; Ex. 60

[47] Ex. 21 at 255 ████████████████████████████

[48] Ex. 21 at 255 ████████████████████████████

[49] Ex. 21 at 226 ████████████████████████████

████████████████████████████

[50] Ex. 6 ████████████████████████████

███████████████████████████████████████████████████████████████████████.[51]

In response, processors coordinated dramatic cuts to their breeder flocks. Sunding ¶¶ 38-45. These cuts had a cascading effect on the breeder industry: as defendants reduced their orders for new breeders, genetics companies reduced the size of the grandparent and great-grandparent chicken flocks.[52] Sunding ¶ 47. Bill Lovette, who had transitioned from Tyson to Pilgrim's, acknowledged that, ███████████████████████████████████████████████████████████ ███████████████████████████████████████.".[53]

Defendants also slaughtered their existing breeder hens early. Sunding ¶ 82. By the summer of 2011, chicken processors had ███████████████████████████████████[4] Chicken processors slaughtered so many breeders that breeder processing plants could not accommodate them, and defendants began sacrificing short-term profits by "rendering" breeders, i.e., grinding them up instead of slaughtering them and extracting their meat for sale. Tip Top Poultry – which slaughtered breeders for many defendants – documented the trend: in July 2011, it rendered ██████████████████████████████████████████████████████████ █████████████████████████████."[55] These extraordinary methods

---

[51] Ex. 60 (telling █████████████████████████████████████████████████████████ rs). *See also* Ex. 59 (in a private email to a Wayne Farms executive, ██████████████████████████████████████████████ ) *also* Ex. 62 at ████████████████████████████.

[52] As Joe Sanderson explained, these companies were █████████████████████████ ██████████████████████████████ Ex. 63 at

[53] Ex. 64 at ████████████████

[54] Ex. 65 at ████████████████

[55] Ex. 66 at ████████████████

constrained the number of chickens the industry could produce for years. Sunding ¶ 47.

Defendants employed several strategies to ensure that all competitors were doing their fair share to cut production, including signaling using public statements,[56] ███████████████ ██████████████████████████████████ █ ████████████████

Because every Agri Stats report listed the individual companies that provided data for that report, defendants were able to easily ████████████████████████ ███████████████████████ ████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████ ████████████████████████████

Chicken processors also monitored their competitors through the companies that specialized in slaughtering breeders. Breeders are older and larger than the chickens we eat – they thus present such unique slaughtering challenges (i.e., eggs in their bodies and diseases) that

---

[56] *See, e.g.*, Ex. 67 at ████████████████████████ ████████████████████████████████

[57] *See, e.g.*, Ex. 35 at 132-141 ████████ Ex. 40.

[58] Ex. 6 ████████████████████████████ ████████████████████

[59] *See, e.g.*, Ex. 19 at 43-58 ████████ (discussing hi ████████████████████████

[60] *See, e.g.*, **Amick:** Ex. 70, Ex. 71; **Case:** Ex. 72, Ex. 73; **George's:** Ex. 74, Ex. 75; **Koch:**; Ex. 76; **Mar-Jac:** Ex. 77; **OK Foods:** Ex. 78, Ex. 79; **Peco:** Ex. 80, Ex. 81; **Perdue:** Ex. 82; **Pilgrims:** Ex. 83 at 85:18 -89:6; 93:21 (Bontz Tr.); **Sanderson:** Ex. 84; **Tyson:** Ex. 85 at 184-185, 229, 273 ████████ Ex. 86, **Wayne Farms:** Ex. 87, Ex. 88, Ex. 89.

[61] *See, e.g.*, Ex. 90 (████████████████████████████████████ Ex. 91 (████████████████████████████████

███████████████████████████████████" through an ordinary chicken processing plant.[62]

Instead, chicken processors send their breeders to special facilities, called "fowl" processing

plants, to be killed. Sunding ¶ 196. By 2011, just three companies slaughtered nearly all breeders

in the United States: (1) Tip Top Poultry; (2) Southern Hens; and (3) Tyson. Sunding ¶ 75.

███████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████ These defendants would meet to discuss their breeder flock slaughter

███████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████ [4] In addition, Tip Top and

Southern Hens facilitated information exchange between defendants about their breeder

slaughter operations. Sunding ¶¶ 197-98. Because defendants were able to use fowl processors to

█████████████████████████████████"[65] they could cut their breeder flocks without any fear

of losing market share to their rivals.

In this environment, it is not surprising that deep, coordinated production cuts again

occurred. Between 2011 and 2012, almost every chicken processor defendant either cut supply[66]

---



[62] Ex. 92 at 95 (██████████

████████████████████ Ex. 94 at

███████████████ ; *id*, at 176-177

██████████████████████

[65] Ex. 96 at ████████████

[66] *See, e.g,* **Amick:** Ex. 97; **Case:** Ex. 98; **Fieldale:** Ex. 99; **Harrison:** Ex. 100 at H███████

**HRF:** Ex. 101; **Koch:** Ex. 102, Ex. 103; **OK Foods:** Ex. 104 at ███████████ Ex. 105; **Peco:** Ex.

or announced plans to abandon expansion.[67] By December 2011, the deep cuts to breeder flocks caused chicken production to decline by nearly nine percent. Sunding ¶ 90. Prices and profits rose. Sunding ¶¶ 96-101. But this time, as chicken processors' profits increased, they continued to restrict supply.[68] As Wayne Farms' CFO put it, ███████████████████████████ ████████████████ "[69]

3. **After the second round of historic production cuts,** ███████████ ████████████████████████ "[70]

The historic breeder cuts leading into the class period suppressed the supply of chicken for the long-term.[71] By 2012, the chicken industry had fundamentally changed: Tyson observed the ████████████ away from a model where ████████████████████████ [72] Instead, chicken processors kept chicken supply ████████████████████ Ex.123.

During the class period, chicken processors kept supply short of demand by continuing to practice production ████████████ Sunding ¶¶ 48-50.[73] For example, when ████████ nd others

---

40; **Perdue:** Ex. 106; **Pilgrims:** Ex. 107; **Sanderson:** Ex. 108; **Simmons:** Ex. 109; **Tyson:** Ex. 110; **Wayne Farms:** Ex. 111 a ████████████

[67]**Mountaire:** Ex. 112; Ex. 113 (Mountaire emails Tyson and states, ████████████████████ ████████████████████████████████████████████████████ **Sanderson:** Ex. 114 at Sanderson-0000404686 (████████████████████████████ ████████████

[68] *See, e.g.*, Ex. 115 ████████████ Ex. 116 ████████████ Ex. 117 at 194 ████████████ ████████████

[69] Ex. 118 at ████████████

[70] Ex. 119.

[71] *See* Ex. 120 at ████████████ Lovette tells investors, ████████████████████ ████████████████████

[72] Ex. 121 ████████████████████ *see also* Ex. 122 ████████████████████████ ████████████

[73] *See also* Ex. 124 ████████████████████████████████ ████████████████████████████

needed additional chicken to fill customers' orders, they bought chickens from competitors, rather than expanding their own production.[74] This is common among cartels.[75]

The pace at which defendant ███████████████████████████████████████ ███████████████████████████ (Cabral ¶ 148) and any ████████████████ Sunding ¶ 70) accelerated early in the class period. Plaintiffs believe that discovery will confirm that all defendants continued to participate in Agri Stats during the class period.[76] ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████ Cabral ¶¶ 126-143. These predictions turned prophetic – the defendants saw historically high profit margins during the class period. Sunding ¶ 100.

Some defendants also used other methods to stabilize output and inflate prices, such as manipulating pricing indexes, like the Georgia Dock. Defendants also sometimes acted more overtly – such as by ████████████████████████████████████ Ex. 128 at 9-39.

Despite historically high margins, in 2015 Agri Stats and EMI were quick to ████ ████████████████████████████████ of a "██████ would soon hit the broiler industry. Ex. 129. ██████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[74] *See, e.g.*, Ex. 125; Ex. 126; Ex. 127.

[75] *See High Fructose*, 295 F.3d at 659 ("A seller who experiences a surge in demand, but meets the surge by buying what it needs from another seller rather than by expanding its own production, protects the other firm's market share and so preserves peace among the cartelists.").

[76] *See* Opp'n to MTC at 10.

███████████████████████████████████████████████████████

███████████████████████████ Ex. 130. After that meeting, members accepted that they

needed to kill breeders quickly. Another round of breeder cuts occurred. Sunding ¶ 58.[77]

Defendants continued to ███████████████████████████████ Sunding ¶ 60.

The CEO of Pilgrim's, Bill Lovette, again warned the industry to be "████████ n July 2016.

Ex. 144 at 11.

Defendants implemented additional strategies between 2012 through 2019 to curb output,

including: destroying hatching eggs before they could grow into chickens, reducing hours of

operation for their slaughter plants, reducing the number of chickens they planned to grow, and

delaying the construction of new plants. Sunding ¶ 59. These actions allowed defendants to

sustain their historically unprecedented profits from 2012 through 2019. Sunding ¶¶ 96-100.

Not even the filing of this civil suit unraveled this conspiracy. Although plaintiffs'

discovery of late-period documents was limited,[78] ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████ unding ¶ 90. Defendants have also

continued ███████████████████ monitor each other; for example, one Wayne

Farms employee ███████████████████████████ until the day of his

deposition.[79]

---

[77] See also Ex. 131 (**Amick**); Ex. 132 (**Claxton**); Ex. 133; Ex. 134 (**Foster Farms**); Ex. 135 (**Harrison**); Ex. 136 (**Koch**); Ex. 137 (**OK Foods**) at ██████████████ Ex. 138 (**Perdue**); Ex. 139 (**Peco**); Ex. 140 (**Pilgrims**); Ex. 141 (**Sanderson**); Ex. 142 (**Tyson**); Ex. 143 (**Wayne**).

[78] See ESI Order (limiting the production of documents, except structured data to September 2, 2016).

[79] Ex. 145 at 78-93 (████████████████████████████████████████████ Ex. 146.

## IV.    LEGAL STANDARD

A party seeking to certify a class action must show that the proposed class satisfies the four prerequisites of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation, and one of the subsections of Rule 23(b).[80] District courts have "broad discretion" in determining whether a proposed class satisfies Rule 23.[81]

While plaintiffs "bear the burden of showing that a proposed class satisfies the Rule 23 requirements,"[82] it "is sufficient if each disputed requirement has been proven by a preponderance of evidence."[83] This does not mean that "the court should . . . turn the class certification proceedings into a dress rehearsal for the trial on the merits."[84] "If there are material factual disputes, the court must 'receive evidence . . . and resolve the disputes before deciding whether to certify the class.'"[85] "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim,'"[86] but "[m]erits questions may be considered . . . only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class

---

[80] *See Kleen Prods.*, 831 F.3d at 923.

[81] *See id.* at 922 (reiterating that "the applicable standard of review" for a district court's decision to certify a class "is deferential (as the cases say, only for 'abuse of discretion')") (internal citation omitted); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 369 (2011) ("[M]ost issues arising under Rule 23 . . . [are] committed in the first instance to the discretion of the district court.") (Internal quotation marks and citation omitted; alteration in original).

[82] *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

[83] *Id.* (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008)).

[84] *Id.*

[85] *Id.* (quoting *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)); *see also Kleen Prods.*, 831 F.3d at 928 (affirming class certification and clarifying that "[w]e are not saying that any of these points have been proven, of course, but we are saying that this evidence is enough to support class treatment of the merits").

[86] *Comcast v. Behrend*, 569 U.S. 33, 33-34 (2013) (quoting *Dukes*, 564 U.S. at 351).

certification are satisfied."[87]

## V.      ARGUMENT

### A.      The elements of Rule 23(a) support certification.

#### 1.      The class is sufficiently numerous.

The numerosity requirement of Rule 23(a)(1) is satisfied where joiner of all putative class members is "impracticable."[88] Given that courts consider a class of forty to be "generally sufficient,"[89] the proposed class of millions of consumers indisputably meets this bar.[90]

#### 2.      Common questions of fact and law exist.

Commonality is satisfied if "there are questions of law or fact common to the class."[91] A common nucleus of operative facts exists between the named plaintiffs and the class, such that commonality is met, when a defendant has "engaged in standardized conduct towards members of the proposed class."[92] While factual variations among the class grievances do not defeat a class action,[93] plaintiffs should identify an issue of fact or law whose resolution "is central to the validity of each" class member's claim.[94] The common issue or fact "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity

---

[87] *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013); *see also Kleen Prods.*, 831 F.3d at 928; *Gomez v. PNC Bank, Nat'l Ass'n*, 306 F.R.D. 156, 166 (N.D. Ill. 2014), *aff'd sub nom. Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360 (7th Cir. 2015).

[88] *Prac. Mgmt. Support Servs., Inc. v. Cirque du Soleil, Inc.*, 301 F. Supp. 3d 840, 849 (N.D. Ill. 2018).

[89] *Id.*

[90] *See* Azari ¶¶ 6-20 (discussing size of class and plan for administration).

[91] Fed. R. Civ. P. 23(a)(2).

[92] *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 475 (N.D. Ill. 2009), *aff'd*, 606 F.3d 391 (7th Cir. 2010).

[93] *Patterson v. Gen. Motors Corp.*, 631 F.2d 476, 481 (7th Cir. 1980).

[94] *Dukes*, 564 U.S. at 350.

will resolve an issue that is central to the validity of each one of the claims in one stroke."[95]

Here, defendants' conspiracy to stabilize the supply and price of chicken presents common, classwide questions that will yield common, classwide answers. Plaintiffs will offer evidence, common to the class, to establish the conspiracy. The end effect of this conspiracy – the impact on class members – is that raw chicken cost more for consumers to purchase from January 2012 to July 2019. Plaintiffs are offering a regression model, common to the class, to demonstrate impact and also to show the extent of damages to class members.[96] In addition to this regression model demonstrating overcharge, plaintiffs also use additional econometric tools to show that all prices for the breast meat and whole bird class products moved together in this segment of the market.[97] These models show the "glue" requested by the Supreme Court in *Dukes*, the thing that ensures these questions are common to all class members.[98] Commonality is satisfied.[99]

### 3. The claims of the named plaintiffs are typical of the class claims.

Under Rule 23(a), typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."[100] The typicality requirement "directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large."[101] In the antitrust context, a "plaintiff's claim

---

[95] *Id.*; *Cirque du Soleil, Inc.*, 301 F. Supp. 3d at 849 (same).

[96] *See* section V.B.1.b(1), *infra*.

[97] *See* section V.B.1.b(2), *infra*.

[98] *Dukes*, 564 U.S. at 352.

[99] *See In re Steel Antitrust Litig.*, 08 C 5214, 2015 WL 5304629, at *3 (N.D. Ill. Sept. 9, 2015) (finding commonality despite arguments that the class members varied in size and product type purchased).

[100] Fed. R. Civ. P. 23(a).

[101] *Retired Chicago Police Ass'n City of Chicago*, 7 F.3d 584, 597 (7th Cir. 1993).

is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members,"[102] and "plaintiffs and all class members alleg[e] the same antitrust violations by defendants."[103] "The issue of typicality is closely related to commonality and should be liberally construed."[104]

Here, each of the named plaintiffs purchased whole chickens and/or breast meat on a regular basis for their own consumption during the class period. They and the class all base their claims on the same legal theories, and the claims arise from the same course of conduct (a conspiracy to restrict the supply and stabilize the price of chicken). Typicality is satisfied.

### 4. The named plaintiffs will adequately represent the class.

The proposed plaintiffs are adequate representatives of the proposed class.[105] *See* Appendix A (listing the name plaintiff proposed a representative for each jurisdiction). The adequacy requirement is satisfied where the named representatives have a sufficient interest in the outcome of the case to ensure vigorous advocacy, and do not have interests antagonistic to those of the class.[106] The named plaintiffs have no material conflict with other class members. Each purchased chicken from grocery stores, unaware of the existence of defendants' agreement to stabilize the price and supply of chicken. No one individual class member could escape an overcharge. Each named plaintiff is aligned with the class in establishing defendants' liability and maximizing class-wide damages.

---

[102] *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (internal quotation marks and citation omitted).

[103] *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 351 (N.D. Cal. 2005).

[104] *Saltzman*, 257 F.R.D. at 479-80 (citing *Keele*, 149 F.3d at 595); *see also Steel Antitrust Litig.*, 2015 WL 5304629, at *3.

[105] Fed. R. Civ. P. 23(a)(4).

[106] *Saltzman*, 257 F.R.D. at 480.

**B.    The class satisfies Rule 23(b)(3).**

To satisfy Rule 23(b)(3), plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy."[107] Each of these prongs is satisfied here.

### 1.    Questions of law and fact predominate over any individual questions.

"There is no mathematical or mechanical test for evaluating predominance."[108] Rather, predominance occurs when "'common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication.'"[109] "Common questions can predominate if a 'common nucleus of operative facts and issues' underlies the claims brought by the proposed class."[110] "Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole."[111]

"Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'"[112] The essential elements of plaintiffs' *per se* cause of action arising under § 1 of the Sherman Act, and the harmonized state laws, are "(1) a violation of antitrust law[]; (2) individual injury, or impact, caused by that violation; and (3) measurable

---

[107] Fed. R. Civ. P. 23(b)(3).

[108] *Messner*, 669 F.3d at 814.

[109] *Kleen Prods.*, 831 F.3d at 925 (quoting *Messner*, 669 F.3d at 815; ellipsis in original).

[110] *Messner*, 669 F.3d at 815 (quoting *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006)); *see also Kleen Prods.*, 831 F.3d at 925.

[111] *Messner*, 669 F.3d at 815.

[112] *Cirque du Soleil, Inc*., 301 F. Supp. 3d at 855 (internal citation omitted).

damages."[113] Plaintiffs' rule of reason claim for information exchange contains the same three elements, with a few additional requirements for establishing the first element.[114] Each of these elements presents crucial class-wide questions.

> ### a. Common questions about defendants' violations of the antitrust laws predominate.

Whether defendants violated antitrust laws by conspiring to restrict supply and stabilize prices in the market for chicken or by conspiring to participate in an anticompetitive information exchange presents the kind of common questions that makes class-wide resolution appropriate. As leading treatises have recognized, "whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3)."[115]

Because the question of violation (or liability) will focus exclusively on the actions of the defendants, plaintiffs will rely on evidence common to the entire class to make their case.[116] As

---

[113] *Steel Antitrust*, 2015 WL 5304629, at *5 (internal quotation marks and citation omitted).

[114] To establish an antitrust violation in a rule of reason case, plaintiffs must also establish anticompetitive effects. One way they can be established is by showing that defendants exercised market power in a relevant market. *See e.g.*, *Toys "R" Us v. Fed. Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000).

[115] 7 C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 1781 (3d ed. 2020); *accord* 6 Newberg on Class Actions § 20.23 (5th ed. 2020) ("Price fixing cases are generally well-suited for class action adjudication" in part because "[t]he legal violation is established per se.").

[116] *See In re Sulfuric Acid Antitrust Litig.*, No. 03 C 4576, 2007 WL 898600, at *6 (N.D. Ill. Mar. 21, 2007) ("[T]he existence of a conspiracy is a common question that can be addressed at the class-wide level and need not be addressed again as a stumbling block for finding predominance."); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 694 (D. Minn. 1995) ("Whether Defendants agreed to fix the price of potash between April 1987 and July 8, 1994, clearly involves questions common to the entire class. This element relates solely to Defendants' conduct, and as such proof for these issues will not vary among class members."); *accord In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1039 (N.D. Miss. 1993) ("Evidence of a national conspiracy to fix the prices of catfish and processed catfish products would revolve around what the defendants did, and said, if anything, in pursuit of a price fixing scheme."); *Transamerican Refining Corp. v. Dravo Corp.*, 130 F.R.D. 70, 75 (S.D. Tex . 1990) (holding that proof of conspiracy is susceptible to generalized proof because inquiry focuses on defendants' conduct).

the Seventh Circuit explained in *Kleen*, "the existence of the conspiracy c[an] be (perhaps **ha[s] to be**) proven by evidence common to the class."[117] Here, as in other antitrust cases, plaintiffs will use common evidence to show that defendants formed a *per se* illegal conspiracy, including defendants' own documents and testimony of defendants' employees. *See* section III, *supra*. Likewise, plaintiffs have retained two economists, both of whom provide testimony and analyses, common to the class, of the impact of this conspiracy on the class.

Dr. Cabral offers testimony common to the class, explaining why the data exchanges through Agri Stats and EMI were consistent with collusion and had anticompetitive effects. Cabral ¶¶ 10-13. Dr. Sunding provides economic evidence that defendants occupy a relevant antitrust market and collectively wielded power in that market. Sunding ¶¶ 109-183. The common evidence produced in this litigation supports the opinions of these experts. Because these dispositive liability questions are the "focus of the dispute here," they predominate over any individual questions.[118]

---

[117] *Kleen Prods.*, 831 F.3d at 927 (emphasis added).

[118] *Messner*, 669 F.3d at 816; *See also Kleen Prods.*, 831 F.3d at 929 (finding that "[t]he district court did not commit reversible error when it concluded that the class issues predominated" because "[i]f Purchasers prevail on the common issues, both liability and aggregate damages will be resolved"); *Sulfuric Acid*, 2007 WL 898600, at *6; *see generally In re Urethane Antitrust Litig.* ("*Urethane I*"), 768 F.3d 1245, 1255 (10th Cir. 2014) ("In price-fixing cases, courts have regarded the existence of a conspiracy as the overriding issue even when the market involves diversity in products, marketing, and prices."); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("'predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws,' because proof of the conspiracy is a common question that is thought to predominate over the other issues of the case" (quoting *Amchem*, 521 U.S. at 625; ellipsis in original)); *In re Capacitors Antitrust Litig. (No. III)*, No. 14-CV-03264-JD, 2018 WL 5980139, at *5 (N.D. Cal. Nov. 14, 2018) ("[A]s many courts have noted, the claim of a conspiracy to fix prices inherently lends itself to a finding of commonality and predominance, even when the market involves different products and prices.").

### b. Antitrust impact will be proved through evidence that is common to the class.

The second element of plaintiffs' claim is antitrust impact, or "fact of damage."[119] The "prevailing view" is that "price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated."[120] Plaintiffs do not, however, rely on a mere presumption of impact. Rather, plaintiffs offer a three-part common proof of impact based on the record evidence and the expert opinions of Drs. Sunding and Cabral: (1) that the alleged conspiracy, if successful, caused higher prices for the chicken products contained in the class; (2) that prices were inflated market-wide; and (3) that those price increases were passed on to the end-user plaintiff class members.

### (1) Defendants' conspiracy caused higher chicken prices.

In a case alleging a supply restriction conspiracy, the basic laws of supply and demand makes causation a common issue. As explained by Dr. Sunding, reducing the supply of chicken

---

[119] *Messner*, 669 F.3d at 816; *In re Urethane Antitrust Litig.* ("*Urethane II*"), 251 F.R.D. 629, 634-36 (D. Kan. 2008) (the legal inquiry for impact "is whether, as a result of defendants' alleged . . . conspiracy, the putative class plaintiffs paid a price that was artificially high").

[120] *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 600 (N.D. Ill. 2015) ("*Kleen Prods. I*") (quoting *Urethane I*, 768 F.3d at 1254). *See also Urethane II* , 251 F.R.D. at 636-37 ("there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market") (citations and internal quotation marks omitted); *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609,614-15 (D. Kan. 1995) ("If successful on this [collusion] claim, it is likely that each plaintiff would have experienced the same impact of paying more for aluminum phosphide products than they would have paid in a truly competitive market.") (Internal citation omitted.); *Catfish*, 826 F. Supp. at 1040-41 ("In an illegal price fixing scheme, there is a presumption that all purchasers will be impacted/injured by having to pay the higher price."); *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 409 ("Where, as here, Plaintiffs have allege a conspiracy to fix-prices and allocate markets, courts have presumed class-wide impact.") (citing *In re Carbon Black Antitrust Litig*, No. Civ.A.03-1019-DPW, 2005 WL 102966, at *15 (D. Mass. Jan. 18, 2005.); *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162,166 (S.D.N.Y. 2000) ("Price fixing conspiracies, at least to the extent they succeed in fixing prices, almost invariably injure everyone who purchases the relevant goods or services."); *Potash Antitrust Litig.*, 159 F.R.D. at 695 ("[B]ecause the gravamen of a price-fixing claim is that the price in a given market is artificially high, there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market.").

causes a market-wide increase in the price of chicken products sold to the class.[121] Statements by defendants and other market participants confirm this basic economic theory applies to the chicken industry.[122] For example, a Sanderson sales executive testified that ███████████ ████████████████████████████████████████████████████ Sunding ¶ 260. In addition, Dr. Sunding's analysis shows that the structure of the chicken industry indicates that collusion would have been generally successful at raising prices throughout the entire chicken market (*id.* ¶¶ 251-58).

The Seventh Circuit in *Kleen Products* recognized that to establish predominance plaintiffs may rely on evidence that "the structure of the [relevant] market was conducive to successful collusion" as "common proof that will establish antitrust injury . . . on a classwide basis."[123] Each of the market characteristics that the Seventh Circuit held were relevant in *Kleen Products* for showing common proof of injury are also present here: (1) a concentrated market; (2) vertical integration; (3) barriers to entry; (4) no competition from foreign imports; (5) lack of substitutes; and (6) a commodity product.[124]

**Concentration/Vertical Integration**: The market for chicken is highly concentrated among a set of vertically integrated producers. "The chicken industry has been subject to continued consolidation for several decades," and today the ███ largest providers produced more

---

[121] Sunding ¶ 259. *See also In re Linerboard Antitrust Litig.*, 305 F.3d 145, 152 (3d Cir. 2002) ("A reduction in supply will cause prices to rise."); *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984) (when "firms restrict output directly, price will as mentioned rise." (Posner, J.)).

[122] Sunding ¶¶ 260-68.

[123] *Kleen Prods.*, 831 F.3d at 927.

[124] *Id.* (citing *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 872 (7th Cir. 2015); *see also Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 859-60 (7th Cir. 2012) (*en banc*))); *High Fructose*, 295 F.3d at 657; *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710-11 (7th Cir. 1984)).

than 80 percent of the raw chicken sold in grocery stores.[125] Defendants and co-conspirators together accounted for between 96 to 98 percent of the relevant market during the entire class period.[126] And the "chicken industry is vertically integrated in that the major broiler processors control every stage of production of a broiler," one of the two genetics companies designing breeders through the sale of chicken products to direct purchasers like grocery stores, club stores, distributors, and food service.[127] This combination of a concentrated market and vertical integration makes the market for chicken particularly ripe for collusion.[128]

**Barriers to Entry**: Defendants themselves repeatedly recognized substantial barriers to entry because of high, fixed capital costs. Sanderson has explained that the ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████[129] Koch's assessment of market entry is similar: ████████ ████████████████████████████████████████████," and the fact that the industry is ██████████████████████████████████████████████████"[130]

---

[125] Sunding ¶¶ 160-61.

[126] Sunding ¶ 159; *compare Kleen Prods.*, 831 F.3d at 924, 927 (describing market as concentrated when defendants were responsible for 74% of production).

[127] Sunding ¶ 110; *see also id.*, ¶ 112 (USDA Economic Research diagram showing industry's vertical integration); *id.* ¶ 142 ████████████████████████████████████████████████

[128] *See Kleen Prods.*, 831 F.3d at 927; *Capacitors*, 2018 WL 5980139, at *8 (certifying class and noting that plaintiffs' expert "provided considerable material about how the structure of the market for capacitors was conducive to price fixing, including evidence about the concentration of manufacturers"); *cf. High Fructose*, 295 F.3d at 656 (describing price fixing as less likely "in markets that have many sellers"); *see also* Sunding ¶ 110 ("vertically integrated companies are better able to collude" citing economic study).

[129] Sunding ¶ 169; *see also*

[130] *Id.* ¶ 163; *see also id.* ¶ 164 (industry analysts noting that



Cabral

Beyond the ███████████████████████████" required to build a broiler

complex, ████████████████████████████████████

████████████████████████████"[131] Such high barriers to entry make

the market for chicken even more susceptible to collusion, given that – as the Seventh Circuit has

held – a ██████████████████████████████████████

███████████████████████████████"[132]

**No Competition from Imports**: Nor are foreign producers likely to threaten defendants'

control of the market.[133] Defendants ████████████████████████████

████████████████ in part due to federal food safety guidelines that ██████████

███████████████████████████████████ This, too,

defendants have acknowledged, going so far as to declare that ████████████████

██████"[135]

**Lack of Substitutes**: Markets with "no good substitutes" and a "low elasticity of

demand" are "accepted characteristics of a market that is subject to cartelization."[136] Both apply

demand" are "accepted characteristics of a market that is subject to cartelization."[136] Both apply

---

¶ 78 (Pilgrim's presentation - ████████████████████████████████

████████████████████

[131] Sunding ¶ 167. Costco, the only new entrant to the market in recent decades, represents ████████████

████████ *Id.* ¶ 170 ████████"—primarily the rotisserie chicken—and so,

████████████████████████████████████

████████████ *Id.* ¶ 171. In other words, as Pilgrim's emphasized, Costco

enjoys a "███████████████████████████ leaving ██████████████████████

██████████ even after Costco's entry. *Id.* ¶ 172.

[132] *Kleen Prods.*, 831 F.3d at 927.

[133] *See id.* (identifying "weak competition from import[s]" as characteristic of market conducive to collusion).

[134] Sunding ¶ 150; *see also id.* ¶ 149 (analyst stating that ████████████████████████

[135] *Id.* ¶ 148 (emphasis added); *see id.* (Sanderson noting that ████████████████████

[136] *Kleen Prods.*, 831 F.3d at 927.

to chicken, which is a ██████████████████████████ including that it is both cheaper and healthier than other proteins such as beef, pork, and turkey. Sunding ¶¶ 128-29. According to OK Foods, chicken's "████████████████████ such as "██████████████ ████████████████ ake chicken ████████████████████████ ████ ."[137] The result is that, according to the USDA, chicken has low cross-price elasticity with beef or pork, its closest substitutes. Sunding ¶ 128.

**Commodity Product**: The market for chicken also satisfies the final "characteristics of a market that is subject to cartelization" because chicken is "a standardized, commodity product."[138] "A commodity is a good that is undifferentiable and interchangeable with any other good of the same type." Sunding ¶ 252. That definition applies to chicken because ████████ ████████████████████████████████████████████████████████ ████████ a fact to which defendants and third-parties in this matter have repeatedly testified.[139] A consumer will easily substitute chicken from one processor (say, Tyson) with chicken from another (say, Pilgrim's). Outside of the label, the chicken is indistinguishable to the consumer.[140] For this reason, chicken processors are only able to compete on price, maximizing

---

[137] Sunding ¶ 135; *see also id.*, ¶ 136 (Sanderson's CEO, noting that he has never seen a ████████████ etween high prices for beef and pork and corresponding demand for chicken).

[138] *Kleen Prods.*, 831 F.3d at 927.

[139] *Id.*; Paschall ¶ 2 (same); *see, e.g.*, Ex. 147 at 447 ██████████ Ex. 21 at 265 (██████████████ (describing chicken as "██████████████ *ee* Cabral ¶ 80 ██████████████████████

[140] Paschall ¶ 2 ("Aside from labels, a breast from one processor's tray pack of conventional boneless skinless breasts is indistinguishable from such a breast from another processor. Retail grocers, club stores, and other outlets can substitute between conventional chicken products from different broiler processors"); Ex. 148 at 23-24 (██████████ ████████████████████████████████████████████████ ████████████████████████████████████

both their incentive and ability to collude.[141] As the CEO of defendant Koch stated, ██████████

██████████████████████████████ ,"[142]

Defendants' conduct also demonstrates they saw chicken as a commodity, as ██████



. Sunding ¶ 252. So too

does the widespread use of price indexes such as Urner Barry and the Georgia Dock, which

published a ████████████████████ ," because "████████████████

████████████████████████████████████████

████████████████ unding ¶ 256. Antitrust impact is routinely found to

be a common issue in cases involving commodity goods.[143]

---

[141] *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 658 (7th Cir. 2002) (when a "product is uniform (a 'commodity'), . . . competition would be expected to prevent any one seller from raising his price to any of his customers above his cost").

[142] Ex. 147 at 447:4-15 (██████████ *see also* Paschall ¶ 2 ("Retail grocers, club stores, and other outlets can substitute between conventional chicken products from different broiler processors.").

[143] *See, e.g.*, *Messner*, 669 F.3d at 816 (establishing common impact is "relatively simple" in cases involving "a market for a generic, undifferentiated commodity" and "simple supply and demand curves[.]"); *In re Polyester Staple Antitrust Litig.*, MDL No. 3:03CV1516, 2007 WL 2111380, at *21 (W.D.N.C. July 19, 2007) (emphasizing interchangeable nature of products); *Linerboard*, 305 F.3d at 153 (affirming certification where expert emphasized "fungible nature of the products"); *In re Pressure Sensitive Labelstock Antitrust Litig.*, MDL No. 1556, 2007 WL 4150666, at *12-13 (M.D. Pa. Nov. 19, 2007) (crediting expert opinion on commodity issue); *In re Urethane Antitrust Litig.* ("*Urethane III*), 237 F.R.D. 440, 450-51 (D. Kan. 2006) (certifying class where expert opined that "the products are fungible commodity products"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *8 (N.D. Cal. June 5, 2006) (common proof of impact is possible because "DRAM is a commodity"); *In re: Bulk [Extruded] Graphite Prods. Antitrust Litigation*, No. Civ. 02-6030(WHW), 2006 WL 891362, at *12 (D. N. J. Apr. 4, 2006) (certifying class where expert found "that extruded graphite products can be considered undifferentiated commodities"); *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 354 n.3 (N.D. Cal. 2005) ("Rubber Chemicals are highly fungible"; class certified); *Carbon Black*, 2005 WL 102966, at *19 (class certified where "carbon black is a commodity-like product"; "); *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661, 678 (D. Kan. 2004) (class certified where "product is a fungible, homogenous product"); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.* , 209 F.R.D. 159, 166-67 (C.D. Cal. 2002) (same); *DeLoach v. Philip Morris Cos., Inc.*, 206 F.R.D. 551, 562-63 (M.D.N.C. 2002) (same); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 267 (D.D.C. 2002) (same).

In sum, plaintiffs' evidence – including Dr. Sunding's report – demonstrates that "the structure of the [relevant] market was conducive to successful collusion" and offers common proof that will establish antitrust injury on a classwide basis.[144]

*In addition*, Dr. Sunding offers common evidence in the form of a multiple regression analysis that *proves empirically* that defendants' collusion caused higher prices. Sunding ¶¶ 184-247. As Dr. Sunding explains:



Sunding ¶ 269. Dr. Sunding uses his overcharge regression to determine the conspiracy inflated the price of chicken breasts sold by the defendants by 17 percent and whole chickens sold by the defendants by 13 percent. *Id.* ¶ 244. The type of regression analysis performed by Dr. Sunding is well established as an appropriate tool for proving antitrust impact and estimating damages on a class-wide basis.[145]

---

[144] *Kleen Prods.*, 831 F.3d at 927.

[145] *See, e.g.*, *Fructose*, 295 F.3d at 660-61; *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009); *In re TFT–LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 313 (N.D. Cal. 2010) ("courts have accepted multiple regression and correlation analyses as means of proving antitrust injury and damages on a class-wide basis"); *In re Polyester Staple Antitrust Litig.*, MDL No. 3:03CV1516, 2007 WL 2111380 at *27-28 (W.D.N.C. July 19, 2007) (expert regression analysis accepted as common proof of impact); *Foundry Resins,* 242 F .R.D. at 411 (characterizing multiple regression models as "reasonable damage methodologies"); *DRAM*, 2006 WL 1530166, at *10 ("other courts have already upheld [multiple regression models] as valid means for proving damages on a class-wide basis") (collecting cases); *Graphite*, 2006 WL 891362, at *15 (proposed regression "methods are widely accepted"); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 485-87(W.D. Pa. 1999) ("[t]here is no dispute that when used

### (2)     Collusion inflated prices market-wide.

"Rule 23 does not require proof of impact on each purchaser before a class can be certified."[146] Instead, "plaintiffs' burden at the class certification stage" is "only to demonstrate that the element of antitrust impact is *capable of proof at trial* through evidence that is common to the class."[147] "If it appears that plaintiffs may be able to prove at trial . . . the price range was affected generally, then the plaintiffs can show impact without a 'but-for' comparison, and this is so even if there are negotiated prices or a variety of prices."[148] However, in addition to offering common evidence that defendants' collusion inflated chicken prices above the competitive level, plaintiffs have offered common evidence that price increases *in fact* had a market-wide impact.

First, Dr. Sunding testifies that 

" Sunding ¶¶ 272-74. Defendants have testified                        As a result, "the

---

properly multiple regression analysis is one of the mainstream tools in economic study and it is an accepted method of determining damages in antitrust litigation"); *Urethane III*, 237 F.R.D. at 452 ("damages are also likely susceptible to class-wide proof" using multiple regression analysis); *Linerboard*, 305 F.3d at 153-55 (same); Newberg on Class Actions § 18:53 at 177 (4th ed.).

[146] *Kleen Prods.*, 831 F.3d at 927 (7th Cir. 2016). *See also Kohen*, 571 F.3d at 676 (rejecting argument that class certification requires proof of injury for every class member); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 227 (E.D. Pa. 2012) ("the inability to show injury as to a few does not defeat class certification where the plaintiffs can show widespread injury to the class") (internal citation and quotation marks omitted).

[147] *Messner*, 669 F.3d at 818-19 (emphasis in original; citations and internal quotation marks omitted).

[148] *Kleen Prods. I*, 306 F.R.D. at 595 (internal quotation marks omitted).

[149] Paschall ¶ 3 ("Given the relationship between the supply of conventional chickens and the supply of constituent chicken parts, it is my experience that a reduction in the number of chickens produced will generally lead to higher prices for *all* of the derivative conventional chicken products comprised of breasts and WOGs, and which are produced by Defendant integrators simply by slaughtering, processing, and cutting up whole chickens into different arrangements of their constituent parts.").

prices of any conventional chicken products directly derived from chickens and produced by the Defendants would be impacted by a reduction in supply of the only material input, chicken."[150] Such basic economic realities undergird finding that antitrust impact can be proven with common evidence because "the more closely [given] products resemble a prototypical commodity, like gasoline of a given grade, the more cohesive an industry cartel will be and the more widespread the price effects."[151]

Second, documentary evidence, mostly from defendants themselves, repeatedly confirms that a reduction in the quantity of chicken produced will lead to higher prices for chicken products ███████████ Sunding ¶ 275. For example, one report prepared for Pilgrim's observed in July 2011 tha ████████████████████████████████████

████████████████████████████████████████████

██████████████████"[152] Similarly, Dave Pogge, CEO of Mountaire wrote in March 2012 that ████████████████████████████████████████

████████████████████████████████████[153]

Finally, Tyson observed that ██████████████████████████

████████████████████████████████[154] Indeed, Express Markets specifically ran a regression analysis that ████████████████████████

---

[150] *Id.* ¶ 3.

[151] *See, e.g.*, *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2014 WL 6461355, at *19 (N.D. Ohio Nov. 17, 2014).

[152] Ex. 149 at ███████████████ (emphasis added).

[153] Ex. 150 at ████████████ (emphasis added).

[154] Ex. 151 (emphasis added).

██████████████████████████████████████████.[155] Such record evidence is "probative of whether common issues will predominate with respect to antitrust impact, as it is probative of whether the conspiracy occurred and was anticompetitive."[156]

Third, any increases in chicken prices resulting from the conspiracy would have been broadly spread across the market due to widespread use of pricing formulas based on benchmarks such as Agri Stats, Urner Barry, and the Georgia Dock. Sunding ¶¶ 277-280. As Sanderson's CFO wrote to an investor in an email ███████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████"[157] A Fieldale executive wrote in 2011 that "████████████████████████████ ██████████████████████████████"[158] In addition, the defendants regularly used Agri Stats to benchmark prices to each other and to the market. Sunding ¶ 280. The widespread use of benchmarks ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████."[159]

Finally, Dr. Sunding performed an empirical price movement analysis to confirm that defendants' conspiracy to restrict supply would result in higher prices across all class products.

---

[155] Ex. 152 at ███████████████████

[156] *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 200 (E.D. Pa. 2016) (internal quotation marks and citation omitted); *accord In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *33 (E.D. Pa. Oct. 19, 2015) (finding that although the defendants' internal "documents, standing alone, would not suffice to prove impact," they "lend support to a finding of predominance").

[157] Ex. 153 at ███████████████████

[158] Ex. 154 at █████████████████

[159] Sunding ¶ 279; *see also Kleen Prods. I*, 306 F.R.D. at 596 (finding predominance satisfied where "vast majority of sales of . . . Containerboard Products are pegged to published price indices").

Sunding ¶¶ 283-87. The Seventh Circuit has found that these kinds of price movement analyses are relevant for finding common impact.[160] Here, Dr. Sunding identified a series of price shocks where breast and whole chicken prices moved dramatically (similar in magnitude of change to the overcharge caused by the conspiracy) during a one-year period. *Id.* Dr. Sunding then used defendants' transactional data to identify identical products that were sold in the same months of the year before and after these price shocks occurred. He found that products representing 92 percent of volume participated in the average price movements reflected in the price shock. *Id.* ¶ 286. Dr. Sunding concludes that " ███████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ Sunding ¶ 287.

> **(3)** **Overcharges were passed through from direct purchasers to the class members.**

Beyond demonstrating the overcharges due to the conspiracy, common impact on all direct purchasers, plaintiffs also offer extensive common proof of impact through evidence that overcharges were passed-through the distribution chain to class members. When, as here, the products purchased by class members are the complete products unchanged from how defendants sold them to direct purchasers, courts recognize that "the price charged by the manufacturer will largely determine the [price] paid by the end user."[161] Indeed, a Foster Farms executive testified:

---

[160] *See Kleen Prods.*, 831 F.3d at 924 (crediting experts' examination of "price movements" which "compared the actual prices paid by a sample of class members before and after the Defendants' price increases and found that in 92% of cases those prices increased").

[161] *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, No. 09-cv-00852, 2012 U.S. Dist. LEXIS 125677, at *14 (E.D. Wis. Sept. 5, 2012); *see also Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, No. 09-cv-00852, 2017 U.S. Dist. LEXIS 142470 (E.D. Wis. Aug. 8, 2017) (certifying statewide classes

███████████████████████████████████████████████████████

████████ [62] Courts have repeatedly held that a common showing of injury by pass-through

analysis warrants certification for classes of indirect purchasers.[163] This accords with basic

economic theory, which uniformly predicts that in a competitive market, firms will consistently

pass-through cost changes. Sunding ¶¶ 292-95.

Consistent with precedent and economic theory, plaintiffs offer extensive common proof

of pass-through in the form of (1) record evidence of pass-through; and (2) empirical regression

analysis based on billions of dollars of transactions.

First, extensive evidence demonstrates direct purchasers passed through cost changes.

The two primary stages in the distribution chain are distributors and retailers. Distributors

purchase from defendants and then sell to retailers. Retailers include grocers (such as Kroger's)

and club stores (such as Costco), and they almost always purchase either directly from

defendants or from distributors. *Id.* ¶ 296.

Distributor executives repeatedly testified that it is standard practice for distributors to set

their price by adding a markup percentage on their cost. *Id.* ¶¶ 297-303. ████████ Midwest

distributor, testified: "████████████████████████████████████████

---

of indirect purchasers who purchased aftermarket sheet metal auto parts that traveled down the
distribution chain substantially unchanged).

[162] Ex. 155 at 70 (████████████

[163] *See, e.g.*, *In re Korean Ramen Antitrust Litig.*, No. 13-cv-04115-WHO, 2017 U.S. Dist. LEXIS 7756,
at *59 n.38 (N.D. Cal. Jan. 19, 2017) (accepting pass-through analysis because "[t]he ramen market does
not present the same sort of complexities" as actions involving component parts); *In re OSB Antitrust
Litig.*, No. 06-826, 2007 U.S. Dist. LEXIS 56617, at *29-32 (E.D. Pa. Aug. 3, 2007) (certifying class of
indirect purchasers of defendants' products, but not class of homebuyers); *Gordon v. Microsoft Corp.*,
No. 00-5994, 2001 U.S. Dist. LEXIS 26360, at *33-39 (D. Minn. Mar. 30, 2001) (product unchanged
through distribution); *Pecover v. Elec. Arts Inc.*, No. C 08-2820 VRW, 2010 U.S. Dist. LEXIS 140632, at
*63-68 (N.D. Cal. Dec. 21, 2010) (video games unchanged through distribution).



████████████████ ██████████████████████████████████████████████████

██ [165] Distributors confirmed that ██████████████████████████████████████

██████████████████████████████████████████████████████████ [66] And

distributors testified that they regularly revised their prices based on their costs, confirming that

changes in their cost would be rapidly reflected in their price. An executive of ████████████████

██ testified that ████████████████████████████████ and confirmed that ██

██████████████████████████████████████████.[167]

Large retailers publicly confirmed that their strategy of passing along cost increases.

████████████ stated that ██████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██ ████████████████████████████ testified that price increases are "████████████

██████████████████████████████ ████████████ onfirmed that it passed its

costs through to its consumers ████████████[170]

Cleveland Research, a third party research analyst, conducted an extensive survey of

retailers in 2007, including meetings with Kroger, Safeway, and Supervalu, and reported that

---

[164] Ex. 156 at 85 (██████████

[165] *See* Ex. 157 at 122 (████████████ (representative of distributor ████████████ testifying that
the company has ████████████████████████████████████████████████████████

[166] *See* Ex.158 at ████████████████████████████████████████████████████████
████████████ Ex. 159 at 44-45 ████████████████ (grocery store ████████████████

[167] Ex. 160 at 164-65 ████████

[168] Ex. 161 at 2 ████████ Earnings Call Tr.). *See also* Ex. 162 at 2 ████████████████

[169] Ex. 163 at 174 (████████████

[170] Ex. 164 at 185 (████████████

████████████████████████████████████████████████."[171] In a

subsequent 2011 study, it noted that ███████████████████████████████

██████████████████████████ and that ████████ the largest supermarket retailer, was ████

███████████████████████."[172]

Moreover, the record reveals sophisticated processes that supermarket retailers

implemented to pass through cost changes. For example, ███████████ reated a cost increases

exception report to achieve the ███████████████████████████████

████"[173] The report automatically flagged any cost increase ██████████████████████

██████████████████████████████████."[174]

Defendants themselves repeatedly acknowledged that direct purchasers passed through

cost changes. In 2012, a senior Tyson executive wrote that increasing costs for chicken ██████

██████████████████████ [175] Similarly, a senior vice president of Foster Farms testified

that retail customers ████████████████████████████████████████████

███████████████████████████████ [76] Indeed, Tyson and Perdue

specifically ██████████████████████████████████████████████

████████████████████████████. [177] Similarly, a Foster Farms executive

████████████████████████████████████████████████████

---

[171] Ex. 165 at ████████████████

[172] Ex. 166 at ███████████████████████████

[173] Ex. 167 at █████████████████████

[174] *Id*. at ████████████████████

[175] Ex. 168.

[176] Ex. 148 at 149 ████████████

[177] Ex. 169; Ex. 170 at ████████████████; Sunding ¶¶ 330-36.

███████████████████████████████████████████████████████████

███ Agri Stats also confirmed that, ████████████████████████████████

██████ "[179] *See also* Sunding ¶¶ 304-340.

Second, Dr. Sunding also offers common evidence of impact in the form of multiple pass-through regressions. To establish the basic relationship between chicken retail price and wholesale price, Dr. Sunding first measures pass-through level using data from the U.S. government on nation-wide wholesale and retail chicken prices. *Id.* ¶¶ 345-49. Then, Dr. Sunding analyzes pass through using a series of fixed-effects regressions on a product-by-product, company-by-company basis. Dr. Sunding's pass-through regression analyses "measures the percentage change in the retail sales price a company makes with respect to a one percent increase in the wholesale price therefore providing a measure of pass-through." *Id.* ¶ 351. For example, if a wholesale price increase of $1 led to a corresponding retail price change on the same product of $.90 then Dr. Sunding would measure a pass-through rate of 90 percent.

Dr. Sunding identified five distribution channels: (1) retail grocers, (2) retail club stores, (3) distributors, (4) trader/brokers, and (5) parts processors. *Id.* ¶ 343. Dr. Sunding ran his regressions independently on 28 different market participants, covering all five distribution channels. These market participants included U.S. Foods and Sysco, the two largest distributors, as well as various retailers accounting for over 50% of total commerce in the class, including some of the largest supermarket retailers in the country, such as Wal-Mart, Kroger, Publix, and Ahold Delhaize. In total, Dr. Sunding used his regression to evaluate pass-through on 10,576

---

[178] Ex. 155 at 86 (████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

[179] Ex. 171.

class products sold by 28 companies totaling more than $25 billion in commerce. *Id.* ¶ 357.

Consistent with the documentary evidence, Dr. Sunding found consistently high, positive rates of past-through *independently* for each and for every market participant whose data he was able to obtain to analyze in the pass-through regression. *Id.* ¶ 364. Dr. Sunding then combined market-share weighted pass-through rates for each market participant in a particular channel to create a pass-through rate for each distribution stage (*id.* ¶ 357):

| Stage | Pass-Through | # Companies | Products | Revenue ($M) | Coverage |
|---|---|---|---|---|---|
| I.  Grocery | 80% | 9 | 3,260 | 20,055 | 54.1% |
| II.  Club Store | 98% | 2 | 81 | 2,952 | 88.7% |
| III.  Distributor | 83% | 15 | 6,767 | 2,696 | NA |
| IV.  Trader/Broker | 81% | 1 | 252 | 77 | NA |
| V.  Parts Processor | 68% | 1 | 216 | 16 | NA |

### 2. Damages to class members need not be measured with precision, but can be measured using a common methodology.

In antitrust cases, a lesser level of proof is needed to support the amount of damages than the fact of antitrust injury. "Proof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)."[180] "[The] distinction between impact and damages is crucial in a case like this, where Plaintiffs have presented (1) record and expert evidence independently showing impact and (2) an econometric model that attempts to prove both damages and therefore impact."[181] Once an antitrust violation and its causal relation to plaintiffs' injury is established, "the presence of individualized questions regarding damages does not prevent certification."[182]

---

[180] *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188 (3d Cir. 2001).

[181] *Kleen Prods. I*, 306 F.R.D. at 595.

[182] *Messner*, 669 F.3d at 815.

At the class certification stage, an actual calculation of damages is not necessary, as long as a valid method has been proposed for calculating damages.[183] Damages calculations need not be exact.[184] Any other rule would act as an "inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain."[185] The use of aggregate damages calculations is also well established.[186]

Plaintiffs here propose a valid methodology to calculate aggregate damages to the class. Dr. Sunding first calculates the total volume of purchases by class members of products included in class. Sunding ¶¶ 366-371. He then multiplies the total volume of purchases by the applicable overcharge rates for each product category derived from his overcharge regression. *Id*. ¶ 372. Multiple regression models are a reliable and generally accepted tool for estimating antitrust damages on a class-wide basis.[187] Finally, he multiplies by the applicable pass-through rate for

---

[183] *See Kleen Prods. I*, 306 F.R.D. at 605 ("But in a complicated antitrust case such as this, where the theory of harm is that the entire market price of a product was inflated as a result of a conspiracy, 'plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages.'" (internal citation omitted); *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1833, 2015 WL 3623005, at *22 (E.D. Pa. June 10, 2015) ("At the class certification stage, the plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis." (citation omitted); *see also Comcast*, 569 U.S. at 35 (holding that damages "[c]alculations need not be exact" at the class certification stage, so long as those calculations are "consistent with [plaintiffs'] liability case").

[184] *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).

[185] *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946).

[186] *See In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197- 98 (1st Cir. 2009) ("The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself."); *Scrap Metal*, 527 F.3d at 534 ("Damages in an antitrust class action may be determined on a classwide, or aggregate, basis. . . ."); *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 267 (N.D. Ohio 2014) ("In an antitrust action, that 'classwide' figure can be an aggregate damages sum.").

[187] *See, e.g., Kohen*, 571 F.3d at 676 ("[C]ourts have accepted multiple regression and correlation analyses as means of proving antitrust injury and damages on a class-wide basis."); *High Fructose*, 295 F.3d at 660-61; *Scrap Metal*, 527 F.3d at 532-34. *See Foundry Resins*, 242 F.R.D. at 411 (characterizing multiple regression models as "reasonable damage methodologies").

each processor defendant weighted by channel volume to calculate the amount of the overcharge passed on to the end-user consumer class. The damages numbers are calculated by the Repealer Jurisdictions alone. The resulting damages total $3.916 billion before trebling.

### 3. A class action is superior to any other alternative.

"Rule 23(b)(3)'s superiority requirement . . . is comparative: the court must assess efficiency [of a class action] with an eye toward 'other available methods.'"[188] Rule 23 instructs that the matters pertinent to this inquiry include: (A) class members' interests in individually controlling the prosecution of separate actions; (B) whether other litigation exists concerning this controversy; (C) the desirability of concentrating the litigation in this forum; and (D) any difficulties in managing a class action.[189] Each of these factors supports certification.

### a. Class members cannot proceed individually.

Like most other class actions in this District, where the harm caused to any one individual class member is small, but the collective harm is great, the first three factors of Rule 23(b)(3) weigh heavily in favor of certification. Here, class members have "little economic incentive to sue individually based on the amount of potential recovery involved, there are no known existing individual lawsuits, and judicial efficiency is served by managing claims in one proceeding."[190] Class members purchased fresh chicken in grocery and club stores repeatedly week after week during the class period.[191] And yet, individual damages are far smaller than the funds required to

---

[188] *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 664 (7th Cir. 2015).

[189] Fed. R. Civ. P. 23(b)(3).

[190] *Cirque du Soleil, Inc.*, 301 F. Supp. 3d at 856.

[191] *See, e.g.*, Ex. 172 at 65 (Adams Tr.) (named Plaintiff Ian Adams (California) testifying that he purchases chicken every two weeks and often purchases whole chickens); Ex.173 at 106, 108 (Holt Tr.) (named Plaintiff Steven Holt (New York and Washington D.C.) testifying that he buys chicken at least monthly and mostly buys boneless skinless breasts).

litigate against some of the largest protein companies in the country. Litigation of these claims on an individual basis is not realistic.[192]

        **b.**      **Litigating the claims of the class members from different States in this Court does not present manageability concerns.**

Plaintiffs bring claims under the laws of twenty-five jurisdictions, each of which have an antitrust or consumer statute that harmonizes with the federal Sherman Act, ensuring that the core questions of liability will be proved with common evidence. Plaintiffs outline the statutory bases of the claims in Appendix B. The similarity of these statutes demonstrates predominance under Rule 23(b)(3). Each of the states provides for standing for indirect purchasers, permits an inference of class-wide injury and provides for class-wide proof of damages.

    **4.**      **The class is ascertainable.**

The proposed class is ascertainable because it is "defined clearly and based on objective criteria."[193] In *Mullins*, the Seventh Circuit made clear that any class member identification issues instead must be assessed in the context of "the likely difficulties of managing a class action" prong of the superiority requirement (Fed. R. Civ. P. 23(b)(3)(D)), which involves a relative assessment of the "costs *and benefits* of the class device."[194] But the *Mullins* court also made clear that manageability is almost never a bar to class certification.[195] The Seventh Circuit warned against "[r]elying on concerns about what are essentially claim administration issues to

---

[192] *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004), *cert. denied*, 543 U.S. 1051 (2005) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.") (Emphasis in original.)

[193] *Mullins*, 795 F.3d at 659.

[194] *Id.* at 657-58, 663; *see also Cirque du Soleil.*, 301 F. Supp. 3d at 857.

[195] *Mullins*, 795 F.3d at 664 ("refusing to certify on manageability grounds alone should be the last resort").

deny certification."[196] It explained that "a class action has to be unwieldy indeed before it can be pronounced an inferior alternative . . . to no litigation at all."[197]

Here, a class member may self-identify simply by looking at the class definition. But plaintiffs have done more. Plaintiffs have identified a series of groceries stores who maintain identification for persons who have purchased chicken.[198] Upon certification of a class, the contact information can be collected and stored with a neutral claims administrator, and used to contact class members, a procedure has been approved by multiple other courts.[199] Ascertainability does not present a bar here to certification.

**C.    Class Counsel are adequate under Rule 23(g).**

Two firms have litigated this case on behalf of the end-user class for nearly four years. Each firm has devoted considerable time and resources to prosecute this action vigorously since its inception, and each is committed to continuing to do so through the course of this litigation. The firms have overseen the litigation strategy, the briefing and argument of motions, the coordination and review of millions of from defendants and third parties, the taking and defending of dozens of depositions, and the retention of experts. The end-user class respectfully request that Hagens Berman Sobol Shapiro LLP and Cohen Milstein Sellers & Toll, PLLC be appointed to act as co-lead class counsel under Rule 23(g) for the end-user consumer class.

## VI.    CONCLUSION

For all of these reasons, plaintiffs respectfully request that the class be certified.

---

[196] *Id.* at 667-68.

[197] *Id.* at 658.

[198] Azari ¶¶ 6-20.

[199] *Id.* ¶¶ 20-27.

DATED: October 30, 2020           HAGENS BERMAN SOBOL SHAPIRO LLP


By     s/ Steve W. Berman
        STEVE W. BERMAN

Breanna Van Engelen
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

Shana E. Scarlett
Rio R. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

Benjamin D. Brown
Brent W. Johnson
Daniel H. Silverman
Alison Deich
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
bjohnson@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com

*Proposed Co-Lead Counsel for End-User*
*Consumer Class*

**APPENDIX A**

| Plaintiffs | State |
|---|---|
| Ian Adams | HI |
| Angela Ashby | NB |
| Linda Cheslow | CA |
| Kenneth Cote | RI |
| Kristin Davis | FL |
| Abraham Drucker | CA |
| James D. Flasch, Jr. | WI |
| Christina Hall | SC |
| Matthew Hayward | MA |
| Richard Heftel | UT |
| Stephen Holt | NY/DC |
| Joshua Madsen | MN |
| William David Marino | NC |
| Dorothy Monahan | MI |
| Dina Morris | ME |
| Alison Pauk | NM |
| Daniel Percy | IA |
| Michael Perry | NV |
| Catherine Senkle | SD |
| Diane Spell | MO |
| Mago Stack | TN |
| Marilyn Stangeland | IL |
| Eric Thomas | OR |
| David and Leslie Wiedner | KS |
| Natalie Wilbur | NH |

# APPENDIX B

| ANTITRUST STATUTES | | | | | |
|---|---|---|---|---|---|
| **JURISDICTION** | **ANTITRUST STATUTE** | **HARMONIZATION WITH FEDERAL LAW** | **INDIRECT PURCHASER STANDING** | **STATUTE OF LIMITATIONS** | **PROOF OF COMMON IMPACT NECESSARY** |
| California (Cartwright Act) | Cal. Bus. & Prof. Code § 16700, *et seq.* | Yes. *See Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 541 n.2 (1998) ("Though not always directly probative of the Cartwright Act drafters' intent, judicial interpretations of the Sherman Act are, nevertheless, often helpful because of the similarity in language and purpose between the federal and state statutes."). | Yes. *See* Cal Bus & Prof Code § 16750(a); *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1082 (Cal. 2010). | 4 yrs. *See* Cal. Bus. & Prof. Code § 16750.1. | No. *See* Cal. Code Civ. Proc. § 384; *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341, 1351 (1987) ("[A] jury can infer the fact of injury when a conspiracy to fix prices has been established and plaintiffs have established that they purchased the affected goods or services. This inference eliminates the need for each class member to prove individually the consequences of the defendants' actions to him or her." (quotation marks and citation omitted)). |
| District of Columbia | D.C. Code § 28-4501, *et seq.* | Yes. *See* D.C. Code § 4515 ("[A] court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes."). | Yes. *See* D.C. Code § 28-4509(a). | 4 yrs. *See* D.C. Code § 28-4511(b). | No. *See* D.C. Code § 28-4508(c) ("In any class action brought under this section by purchasers or sellers, the fact of injury and the amount of damages sustained by the members of the class may be proven on a class-wide basis, without requiring proof of such matters by each individual member of the class."). |
| Illinois | 740 ILCS 10/1, *et seq.* | Yes. *See* 740 Ill. Comp. Stat. 10/11 ("When the wording of this Act is identical or similar to that of a federal antitrust law, | Yes. *See* 740 Ill. Comp. Stat. Ann. 10/7 ("No provision of this Act shall deny any person who | 4 yrs. *See* 740 Ill. Comp. Stat. 10/7. | No. *See Bueker v. Madison Cty.*, 61 N.E.3d 237, 250–52 (Ill. App. 2016) (holding that certification of |

| ANTITRUST STATUTES | | | | | |
|---|---|---|---|---|---|
| JURISDICTION | ANTITRUST STATUTE | HARMONIZATION WITH FEDERAL LAW | INDIRECT PURCHASER STANDING | STATUTE OF LIMITATIONS | PROOF OF COMMON IMPACT NECESSARY |
| | | the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act.") | is an indirect purchaser the right to sue for damages."). | | liability-only class was proper despite defendants' argument that some class members were unaffected by alleged conspiracy) |
| Iowa | Iowa Code § 553.1, *et seq.* | Yes. *See* Iowa Code § 553.2 ("This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose of this chapter."). | Yes. *See Comes v. Microsoft*, 646 N.W. 2d 440, 447–48 (Iowa 2002). | 4 yrs. *See* Iowa Code § 553.16(2). | No. *See Comes v. Microsoft Corporation*, 696 N.W.2d 318, 323–25 (Iowa 2005) (common issues of liability make class treatment appropriate even without a finding of commonality as to impact and damages). |
| Kansas | Kan. Stat. Ann. § 50-101, *et seq.* | Yes. *See Bergstrom v. Noah*, 974 P.2d 520, 531 (Kan. 1999) (Federal Sherman Act cases "may be persuasive authority of any state court interpreting its antitrust laws, [but] such authority is not binding upon any court in Kansas interpreting Kansas antitrust laws."). | Yes. *See* Kan. Stat. § 50-161(b). | 3 yrs. *See* Kan. Stat. Ann. § 60-512; *Four B Corp. v. Daicel Chem. Indus.*, 253 F. Supp. 2d 1147, 1155 (D. Kan. 2003). | Yes. *But see W. States Wholesale Natural Gas Antitrust Litig. v. Williams Cos.*, 633 F. Supp. 2d 1151, 1159 (D. Nev. 2007) (statute does not require the court to determine what a just and reasonable rate would have been in the relevant market absent defendants' alleged misconduct). |
| Maine | 10 Maine Rev. Stat. § 1101, *et seq.* | Yes. *See Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1081 (1st Cir. 1993) ("The Maine antitrust statutes parallel the Sherman Act."). | Yes. *See* 10 Maine Rev. Stat. § 1104(1). | 6 yrs. *See* 14 Maine Rev. Stat. § 752. | Yes. *See Karofsky v. Abbott Labs.*, No. CV-95-1009, 1997 WL 34504652, at *11 (Me. Super. Oct. 16, 1997) ("Proof of an antitrust conspiracy may logically lead to a conclusion that the subject of the conspiracy, the retailers, have each been harmed. No such conclusion |

| ANTITRUST STATUTES | | | | | |
|---|---|---|---|---|---|
| JURISDICTION | ANTITRUST STATUTE | HARMONIZATION WITH FEDERAL LAW | INDIRECT PURCHASER STANDING | STATUTE OF LIMITATIONS | PROOF OF COMMON IMPACT NECESSARY |
| | | | | | logically follows without specific proof tracing that overcharge on to consumers."). |
| Michigan | Mich. Comp. Laws Ann. § 445.773, *et seq.* | Yes. *See ETT Ambulance Service, Inc.*, 516 N.W.2d 498, 500 (Mich. App. 1994) ("The Michigan antitrust laws were patterned after the Sherman Anti-Trust Act, 15 U.S.C. § 1 *et seq.*"). | Yes. *See* Mich. Comp. Laws Ann. § 445.778(2). | 4 yrs. *See* Mich. Comp. Laws Ann. § 445.781(2). | Yes. *But see* In re Cardizem CD Antitrust Litig. 200 F.R.D. 326, 344 (E.D. Mich. 2001) (holding that pay-for-delay plaintiff could prove class-wide impact based on expert testimony that indirect purchasers were overcharged by examining the price differential between the generic and the brand drug at the retail level only, rather than tracing overcharges as they are passed through the chain of distribution). |
| Minnesota (Antitrust Law) | Minn. Stat. § 325D.49, *et seq.* | Yes. *See Minnesota Twins P'ship v. State*, 592 N.W.2d 847, 851 (Minn. 1999) ("Minnesota's antitrust laws are generally interpreted consistently with federal court's construction of federal antitrust laws."). | Yes. *See* Minn. Stat. § 325D.57. | 4 yrs. *See* Minn. Stat. § 325D.64. | Yes. *But see Gordon v. Microsoft Corp.*, No. 00-5994, 2001 WL 366432, at *11 (D. Minn. Mar. 30, 2001) (plaintiffs must prove that defendant's conduct increased prices paid by direct purchasers, and that some amount of this overcharge was passed on to the consumer, but as to damage, that "factfinder may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and |

| ANTITRUST STATUTES | | | | | |
| --- | --- | --- | --- | --- | --- |
| JURISDICTION | ANTITRUST STATUTE | HARMONIZATION WITH FEDERAL LAW | INDIRECT PURCHASER STANDING | STATUTE OF LIMITATIONS | PROOF OF COMMON IMPACT NECESSARY |
| | | | | | their tendency to injure . . . that defendants' wrongful acts had caused damage to the [indirect purchaser] plaintiffs" (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–24 (1969) |
| Missouri (Merchandising Practices Act) | Mo. Ann. Stat. § 407.020. | Yes. See Mo. Code Regs. Ann. tit. 10, § 60-8.020(1) (authorized by Mo. Rev. Stat. § 407.145) (prohibiting "any practice which . . . offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or . . . is unethical, oppressive, or unscrupulous; and . . . presents a risk of, or causes, substantial injury to consumers."). | Yes. *See Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669–70 (Mo. 2007) (rejecting privity requirement); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 415 (E.D. Pa. 2010) (applying to indirect purchasers). | 5 yrs. *See* Mo. Ann. Stat. § 516.120(2). | No. *See Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 975 (D. Minn. 2020) (finding that "market-based evidence may be used to establish the fact of injury under the MMPA"); *In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*, 422 F. Supp. 3d 194, 264 (D.D.C. 2019) (finding in MMPA class case that "elements of causation and ascertainable loss are subject to common proof and are thus 'common questions' for purposes of analyzing predominance."). |
| Nebraska (Antitrust Act) | Neb. Rev. Stat. § 59-801, *et seq.* | Yes. *See* Neb. Rev. Stat. § 59-829 ("When any provision of sections 59-801 to 59-821 and sections 84-211 to 84-214 or any provision of chapter 59 is the same as or similar to the language of the federal antitrust law, | Yes. *See* Neb. Rev. Stat. § 59-821. | 4 yrs. See Neb. Rev. Stat. § 59-1612. | Undetermined. |

| ANTITRUST STATUTES | | | | | |
|---|---|---|---|---|---|
| **JURISDICTION** | **ANTITRUST STATUTE** | **HARMONIZATION WITH FEDERAL LAW** | **INDIRECT PURCHASER STANDING** | **STATUTE OF LIMITATIONS** | **PROOF OF COMMON IMPACT NECESSARY** |
| | | the courts of this state in construing such sections or chapters shall follow the construction given to the federal law by the federal courts.") | | | |
| Nevada (Unfair Trade Practice Act) | Nev. Rev. Stat. § 598A.010, *et seq.* | Yes. *See* Nev. Rev. Stat. § 598A.050 ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes.") | Yes. *See* Nev Rev. Stat. § 598A.210(2). | 4 yrs. See Nev. Rev. Stat. § 598A.220(2). | Yes. |
| New Hampshire (Antitrust Act) | N.H. Rev. Stat. Ann. § 356:1, *et seq.* | Yes. *See Minuteman v. Microsoft Corp.*, 795 A.2d 833, 836 (N.H. 2002) ("While judicial review of our antitrust law is sparse, both we and the United States District Court for the District of New Hampshire have looked to federal law when construing RSA chapter 356.") | Yes. *See* N.H. Rev. Stat. Ann. § 356:11(II) (effective Jan. 1, 2008). | 4 yrs. *See* N.H. Rev. Stat. Ann. § 356:12. | Undetermined. |
| New Mexico (Antitrust Act) | N.M. Stat. Ann. § 57-1-1, *et seq.* | Yes. *See* N.M. Stat. Ann. § 57-1-15 ("Unless otherwise provided in the Antitrust Act, the Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws. This construction shall be made to achieve uniform application of the state and federal laws prohibiting restraints of trade and monopolistic practices."). | Yes. *See* N.M. Stat. Ann. §57-1-3(A). | 4 yrs. *See* N.M. Stat. Ann. § 57-1-12. | Yes. |
| New York (General | N.Y. Gen. Bus. Law | Yes. *See Agency Dev., Inc. v.* | Yes. *See* N.Y. Gen. Bus. Law § | 4 yrs. *See* N.Y. Gen. Bus. Law | No. *See Cox v. Microsoft Corp.*, |

| ANTITRUST STATUTES | | | | | |
|---|---|---|---|---|---|
| **JURISDICTION** | **ANTITRUST STATUTE** | **HARMONIZATION WITH FEDERAL LAW** | **INDIRECT PURCHASER STANDING** | **STATUTE OF LIMITATIONS** | **PROOF OF COMMON IMPACT NECESSARY** |
| Business Law) | § 340, *et seq.* | *MedAmerica Ins. Co.*, 310 F. Supp. 2d 538, 543 n.6 (W.D.N.Y. 2004) ("A Donnelly Act claim generally is construed in accordance with the Sherman Act. Therefore, the analysis . . . applies equally to plaintiff's state and federal antitrust claims."). | 340(6). | § 340(5). | No. 105193/2000, 2005 WL 3288130, at *5 (N.Y. Sup. Ct. July 29, 2005) (holding that questions of pass-through and whether the retailers raised the prices on their end-products as the result of defendant's conduct are not determinative of the question of class certification); *but see Weiner v. Snapple Beverage Corp.*, No. 07-cv-8742, 2011 WL 196930, at *5 (S.D.N.Y. Jan. 21, 2011) ("[I]t is settled law that the injured party must proffer evidence sufficient to demonstrate damages with a degree of certainty."). |
| North Carolina | N.C. Gen. Stat. § 75-1, *et seq.* | Yes. *See Rose v. Vulcan Materials Co.*, 194 S.E. 2d 521, 530 (N.C. 1973) ("[T]he body of law applying the Sherman Act, although not binding upon this Court in applying G.S. § 75-1, is nonetheless instructive in determining the full reach of that statute.") | Yes. *See Hyde v. Abbott Labs., Inc.*, 473 S.E.2d 680, 688 (N.C. App. 1996) (holding "that indirect purchasers have standing under N.C.G.S. § 75-16 to sue for Chapter 75 violations."). | 4 yrs. *See* N.C. Gen. Stat. § 75-16.2. | Yes. |
| Oregon (Antitrust Law) | Or. Rev. Stat. § 646.705, *et seq.* | Yes. *See Willamette Dental Group, P.C. v. Oregon Dental Serv. Corp.*, 882 P.2d 637, 640 (Or. Ct. App. 1994) (looking to "federal decisions interpreting section 2 of the Sherman Act | Yes. *See* Or. Rev. Stat. § 646.780(1)(a). | 4 yrs. *See* Or. Rev. Stat. § 646.800(2). | No. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1012 (C.D. Cal. 2015) ("The causation/reliance element of an OUTPA claim is susceptible of |

| ANTITRUST STATUTES | | | | | |
|---|---|---|---|---|---|
| **JURISDICTION** | **ANTITRUST STATUTE** | **HARMONIZATION WITH FEDERAL LAW** | **INDIRECT PURCHASER STANDING** | **STATUTE OF LIMITATIONS** | **PROOF OF COMMON IMPACT NECESSARY** |
| | | for persuasive, albeit not binding, guidance" in interpreting "Oregon's 'little Sherman Act'"). | | | classwide proof."), *aff'd sub nom. Briseno v. ConAgra Foods*, Inc., 844 F.3d 1121 (9th Cir. 2017), *and aff'd sub nom. Briseno v. ConAgra Foods*, Inc., 674 F. App'x 654 (9th Cir. 2017). |
| Rhode Island (Antitrust Act) | R.I. Gen. Laws Ann. § 6-36-1, *et seq.* | Yes. *See* R.I. Gen. Laws Ann. § 6-36-2(b) ("This chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed."). | Yes. *See* R.I. Gen. Laws Ann. § 6-36-11(a) (effective July 15, 2013); *see also* Order on MTD, Dkt. No. 541 (noting that only after July 15, 2013 did Rhode Island law grant indirect purchasers standing to pursue a claim). | 4 years. *See* R.I. Gen. Laws Ann. § 6-36-23. | No. *See* R.I. Gen. Laws Ann. § 6-36-13 ("The attorney general may recover aggregate damages sustained by the public bodies and by the citizens and residents of this state as respectively their interests shall appear in the case, without separately proving the claims of each of them; and his or her proof of the damages may be based upon statistical sampling methods, the pro rata allocation of excess profits to sales of other transactions occurring wholly or partially within this state or, any other reasonable system of estimating aggregate damages that the court in its discretion may permit."). |
| South Dakota | S.D.C.L. § 37-1-3.1, *et seq.* | Yes. *See* S.D.C.L. § 37-1-22 ("It is the intent of the Legislature that in construing this chapter, courts may use as a guide interpretations given by the federal or state courts to comparable | Yes. *See* S.D.C.L. § 37-1-33. | 4 yrs. *See* S.D.C.L. § 37-1-14.4. | Yes. *But see In re S.D. Microsoft Antitrust Litig.*, 657 N.W.2d 668, 676–78 (S.D. 2003) (indirect purchaser class could show common impact using common evidence and economic |

| ANTITRUST STATUTES | | | | | |
|---|---|---|---|---|---|
| **JURISDICTION** | **ANTITRUST STATUTE** | **HARMONIZATION WITH FEDERAL LAW** | **INDIRECT PURCHASER STANDING** | **STATUTE OF LIMITATIONS** | **PROOF OF COMMON IMPACT NECESSARY** |
| | | antitrust statutes."). | | | methodologies to demonstrate that direct purchasers paid anticompetitive prices as a result of defendant's violation and they passed a portion of the overcharge to indirect purchasers). |
| Tennessee (Trade Practices Act) | Tenn. Code Ann. § 47-25-101, *et seq.* | Yes. *See State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, at *2 n.2 (Tenn. Ch. Sept. 25, 1980) ("The State anti-trust statute passed in 1891 is quite similar to the Sherman Anti-Trust Act passed by Congress in 1890. 15 U. S. C. § 1. Authorities which define the character of private damage suits under the federal anti-trust statutes, particularly the Sherman Act, are most persuasive."). | Yes. *See Sherwood v. Microsoft Corp.*, No. M2000-01850-COA-R9CV, 2003 WL 21780975, at *29 (Tenn. Ct. App. July 31, 2003) (holding that "indirect purchasers are 'persons' who may bring an action for an injury caused by violation of the TTPA"). | 3 yrs. *See* Tenn. Code Ann. § 28-3-105 (providing that property tort actions are subject to three-year statute of limitations); *State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, at *1 (Tenn. Ch. Sept. 25, 1980) (holding state antitrust claims subject to § 28-3-105). | Yes. |
| Utah (Antitrust Act) | Utah Code Ann. § 76-10-3101, *et seq.* | Yes. *See* Utah Code Ann. § 76-10-3118 ("The Legislature intends that the courts, in construing this act, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes."). | Yes. *See* Utah Code Ann. § 76-10-3109 (a)(1). | 4 yrs. *See* Utah Code Ann. § 76-10-3117. | No. *See* Utah Code Ann. § 76-10-3109(7) ("in the absence of proof to the contrary," courts may "presume[]" that indirect purchasers "incurred at least 1/3 of the damages, and shall, therefore, recover at least 1/3 of the awarded damages"). |
| Wisconsin | Wis. Stat. § 133.01, *et seq.* | Yes. *See Grams v. Boss*, 294 N.W.2d 473, 480 (1980) ("We have repeatedly stated that [Wisconsin's antitrust law] was intended as a reenactment of the | Yes. *See* Wis. Stat. §133.18(1)(a). | 6 yrs. *See* Wis. Stat. Ann. § 133.18(2). | Yes. |

| ANTITRUST STATUTES | | | | | |
|---|---|---|---|---|---|
| JURISDICTION | ANTITRUST STATUTE | HARMONIZATION WITH FEDERAL LAW | INDIRECT PURCHASER STANDING | STATUTE OF LIMITATIONS | PROOF OF COMMON IMPACT NECESSARY |
| | | first two sections of the federal Sherman Antitrust Act . . . and that the question of what acts constitute a combination or conspiracy in restraint of trade is controlled by federal court decisions under the Sherman Act." (collecting cases)). | | | |