**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE BROILER CHICKEN ANTITRUST LITIGATION** | Case No:  1:16-cv-08637 |
| | Judge Thomas Durkin |
| THIS DOCUMENT RELATES TO: DIRECT PURCHASER ACTIONS | Magistrate Judge Jeffrey T. Gilbert |
| | **[PUBLIC, REDACTED]** |

**DEFENDANTS' OPPOSITION TO DIRECT PURCHASER PLAINTIFFS'
<u>MOTION FOR CLASS CERTIFICATION</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................... 1

FACTUAL BACKGROUND ...................................................................... 8

    A.    Broiler Basics ............................................................................. 8

        1.    All Chicken Is Not Equal: Distinct Market Segments And Products ........ 8

        2.    Feed Prices Cannot Be Ignored ................................................ 11

    B.    Chronology Of Key Events: The "Perfect Storm." ............................. 12

        1.    2005-2007: The Renewable Fuel Standard (RFS) Passes And The USDA Forecasts Production Cuts In The Broiler Industry. .................... 12

        2.    Corn Prices Spike To Record Highs In 2008 ............................... 13

        3.    The Great Recession. ............................................................ 14

        4.    Industry Reaction: Financial Losses, Bankruptcies, And Supply Adjustments. .................................................................... 15

        5.    2011–2012: Corn Prices Shatter Previous Records, Devastate The Industry, And Lead To More Bankruptcies. ............................... 17

        6.    Producers Once Again Reacted Differently, Showing There Were No Unilateral Or Coordinated Cuts During The Class Period ................. 19

    C.    DPP Class Members Faced Different Contracting And Pricing Dynamics .......... 20

        1.    Purchasing Volume & Bargaining Power ................................... 20

        2.    Contracting Practices. ......................................................... 21

        3.    Direct Purchasers Paid Different Prices .................................... 22

    D.    Plaintiffs' Expert Model. ........................................................... 23

ARGUMENT ....................................................................................... 24

I.    The "Foundation" of Plaintiffs' Model Is Unreliable And Violates *Comcast*. ............... 25

    A.    Plaintiffs' Structural Break Supply Analysis Is Fundamentally Unreliable. ........ 27

        1.    The Model Is Inherently Unreliable: Ignores Demand & Costs. ............. 27

2.      Dr. Carter's Model Ignores The Individual Defendants' Production Decisions That Contradict His Conclusions. ............................................... 28

B.      Plaintiffs' Model Also Fails Under *Comcast v. Behrend*. .................................... 32

1.      Models That Sweep In Lawful Conduct Cannot Support Certification. ...................................................................................... 33

2.      Plaintiffs' Model Does Not Even Try To Isolate Unlawful Conduct ....... 35

C.      These Basic Failures Doom the DPPs' Entire Motion........................................... 41

II.     Dr. Carter's Models Do Not Demonstrate That Injury Is Susceptible To Common Proof...................................................................................................................... 42

A.      Dr. Carter's Overcharge Model Uses Bad Assumptions. ...................................... 43

B.      Dr. Carter Cannot Mask These Individualized Problems With Averages. ........... 51

C.      Dr. Carter's Overcharge Model Leads To Absurd Results.................................... 54

D.      Dr. Carter's Two "Tests" Do Not Show Common Impact Either. ....................... 55

1.      Dr. Carter's First "Test" Does Not Match Reality, Applies The Same Uniform Overcharges, And Generates False Positives........................... 55

2.      Dr. Carter's Second "Test" Extrapolates From His Flawed Benchmark And Projects Impossible Prices. ............................................. 57

3.      Dr. Carter's *Ipse Dixit* Also Does Not Show Common Injury. ............... 58

E.      Plaintiffs Do Not Have Any Methodology For Showing Damages, Either.......... 59

CONCLUSION................................................................................................................ 60

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
   336 F.R.D 5 (S.D.N.Y. 2020) (*"In re Aluminum"*) ........................................................ *passim*

*Cates v. Whirlpool Corp.*,
   2017 WL 1862640 (N.D. Ill. May 9, 2017) ........................................................................3, 28

*In re Catfish Antitrust Litig.*,
   826 F. Supp. 1019 (N.D. Miss. 1993) ....................................................................................50

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ........................................................................................................ *passim*

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ..............................................................................................54

*Food Lion, LLC v. Dean Foods Co.*,
   312 F.R.D. 472 (E.D. Tenn. 2016) ...................................................................................49, 57

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Assoc.*,
   744 F.2d 588 (7th Cir. 1984) ................................................................................................50

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) ..............................................................................49, 54, 59

*Hughes v. Baird & Warner, Inc.*,
   30 Fed. R. Serv. 2d 704 (N.D. Ill. 1980) ..............................................................................50

*Kleen Products LLC v. Int'l Paper Co.*,
   831 F.3d 919 (7th Cir. 2016) ...........................................................................................50, 51

*In re Lamictal Direct Purchaser Antitrust Litig.*,
   957 F.3d 184 (3d Cir. 2020) ..................................................................................................51

*Messner v. Northshore Univ. Healthsystem*,
   669 F.3d 802 (7th Cir. 2012) ................................................................................................50

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008) .....................................................................................................35

*In re Optical Disk Drive Antitrust Litig.*,
   303 F.R.D. 311 (N.D. Cal. 2014) .....................................................................................49, 53

*People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*,
111 F.3d 528 (7th Cir. 1997) ...............................................................................3, 4

*In re Pharmacy Benefit Managers Antitrust Litig.*,
2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ..................................................................34

*In re Photochromatic Lens Antitrust Litig.*,
2014 WL 1338605 (M.D. Fla. April 3, 2014)........................................49, 53, 59

*In re Pilgrim's Pride Corp.*,
448 B.R. 896 (Bankr. N.D. Tex. 2011).................................................................15, 16

*Polaroid Corp. v. Eastman Kodak Co.*,
1990 WL 324105 (D. Mass. Oct. 12, 1990)........................................40, 54, 58

*In re: Processed Egg Prod. Antitrust Litig.*,
2016 WL 410279 (E.D. Pa. Feb. 3, 2016) ............................................................35

*In re Processed Egg Prods. Litig.*,
312 F.R.D. 171 (E.D. Pa. 2015)........................................................................48, 53

*In re Rail Freight*,
292 F. Supp. 3d 14 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019)..................25, 34, 57

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) ...............................................................7, 25, 42

*Reed v. Advocate Health Care*,
268 F.R.D. 573 (N.D. Ill. 2009)..................................................................... *passim*

*In re Steel Antirust Litig.*,
2015 WL 5304629 (N.D. Ill. Sept. 9, 2015) ................................................. *passim*

*Whitserve, LLC v. Comput. Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012)..................................................................39, 54, 58

**Statutes**

42 U.S.C. § 7545 ...........................................................................................12

**Rules**

Fed. R. Civ. P. 23 .................................................................................... *passim*

## PRELIMINARY STATEMENT

The Direct Purchaser Plaintiffs (DPPs or Plaintiffs)[1] have no common methodology that can demonstrate class-wide impact or damages, and so cannot meet the Rule 23(b)(3) predominance requirement. The DPPs rely exclusively on the models of their expert, Dr. Carter. But Dr. Carter's models are rigged and thus cannot withstand the "rigorous analysis" required by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). All of his modeling depends on first identifying when the conspiracy began and ended, *i.e.*, a "conspiracy period." To do this, he purports to compare expected levels of broiler supply to actual levels. ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ These are not minor omissions, nor can any reliable analysis disregard them. They are the direct explanation for why some producers independently and rationally cut back in 2008 and 2011: the Great Recession and the two largest feed price spikes in the ***nation's history***.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ Different Defendants produce different size birds: small (fast food), medium (grocery store), and large (food service).

---

[1]    117 direct purchasers—representing 59% of sales—opted out of the class to proceed as Direct Action Plaintiffs.

Demand in each channel varies significantly, as we have all experienced during the COVID-19 pandemic, in which many restaurants closed for months.

██████████████████████████████████████████████████

As Defendants' expert economist, Dr. John H. Johnson IV, observes, █████████████

████████████████████████████████████████████████

██████████████████████████ Ex. 1, Dr. John Johnson Report ("Johnson") ¶¶ 24, 221.

████████████████████████████████████████████████

██████████████████ This defies common sense—and does not withstand the "rigorous analysis" the Court must perform at class certification. *Comcast*, 569 U.S. at 35.

While its flaws are many, Dr. Carter's three-part analysis is quite simple:

- ████████████████████████████████████████████████████████████ **Because that conclusion is the "foundation" of all of his subsequent modeling, this failure is fatal.**

- **Step 2:** ████████████████████████████████████████████ ████████████████████████████ Johnson ¶ 265.

- **Step 3:** ████████████████████████████████████████████████



To show common impact, DPPs' model must be sufficiently reliable to survive a "rigorous analysis." *Comcast*, 569 U.S. at 35. It must account for "salient explanatory variables." *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 537-38 (7th Cir. 1997). It cannot "ignore evidence." *Cates v. Whirlpool Corp.*, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017). In other words, the model must be "methodologically sound" in order to show predominance under Rule 23. *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D 5, 47 (S.D.N.Y. 2020) *("In re Aluminum")*. For the reasons summarized below and discussed more fully in this memorandum, Dr. Carter's model does not withstand a "rigorous analysis"—it does not even survive a cursory one.

As discussed in **Section I.A**,



Carter ¶¶ 48, 177-79.

And, if common sense is not persuasive enough, then the USDA's top economists should be. The USDA has an entire department of economists devoted to modeling broiler supply, and they were remarkably accurate in predicting the small supply dips

in 2008 and 2011.  And while the USDA's analysis looks at many variables (in comparison to ███

████████████████████ it emphasizes the importance of one:  feed prices.

Corn prices rose to their highest levels in history in 2008 and 2011.  That is a devastating fact that must not be ignored—as one neutral third-party agricultural economist explained, it is well understood that when there are "higher corn prices, the cost of producing . . . chicken . . . increases," and "[t]his reduces industry profits and causes at least some producers to scale back production."  Ex. 2, P. Westhoff (Food and Agricultural Policy Research Institute, University of Missouri), "Economics of Food," at 22-23.  ████████████████████████

████████████████████████████████████████████████

████ Ex. 3, Carter Dep. 106:4-7.  His **Structural Break Supply Analysis** does not control for the corn-price disasters that befell the industry at all, and so is fatally unreliable.  *People Who Care*, 111 F.3d at 537-38 (a model "that fails to correct for salient explanatory variables . . . has no value as causal explanation and is therefore inadmissible in a federal court").

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ All of this underscores that the analysis makes no attempt to explain the choices or predicaments facing each individual broiler producer.

As discussed in **Section I.B**, the ████████████████████████

████████████ it does not meet the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  ████████████████████████

████████████████████████████████ Johnson ¶ 213.

Doing so is not optional; it is a Supreme Court requirement.  *Comcast*, 569 U.S. at 35.  ████

4

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

Put another way, Dr. Carter makes ***no effort*** to answer the question: ████████████

███████████████████████████████████████████████████████████

████████████████ The need to answer that question isn't theoretical; the USDA itself testified

██████████████████████████████ Ex. 4, Shagam (USDA) Dep. 66:13-67:2; 68:22-

69:13.  Indeed, at least five producers—including the largest processor at the time—went ***bankrupt***

during the class period, and nearly all lost millions. ███████████████████

████████████████████████████ That is modeling irrational behavior,

not the real world.  And it certainly is not measuring what cuts happened because of conspiracy.

*Cf. Comcast*, 569 U.S. at 35; *In re Aluminum.*, 336 F.R.D. at 57 (denying certification because the

"models are repeatedly insensitive to conduct which is conspiratorial and conduct which is not").

Next, as set out in **<u>Sections II.A and II.B</u>**, ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████ Courts repeatedly warn against such lumping and averaging in complex cases

like this one.  *See*, *e.g.*, *Reed v. Advocate Health Care*, 268 F.R.D. 573, 592 (N.D. Ill. 2009) ("[T]he

5

relative movements of mere *averages* . . . do not prove common impact to individual [class members].");  *In re Steel Antirust Litig.*, 2015 WL 5304629, at *11 (N.D. Ill. Sept. 9, 2015) (denying class certification where average regression model did not account for "the realities of the steel industry").

The problem with lumping and averaging is that it masks variation:  the highs and the lows. Perhaps a customer paid $1.00 for a breast and another paid $2.00 for a wing.  Or Costco paid $.75 for a breast and another customer (with less bargaining power) paid $1.50.  ██████████

██████████████████████████████████████

████████████  ███████  ███████ Johnson ¶ 265.  ████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████ That is not acceptable, reliable, or common under the law.  *Reed*, 268 F.R.D. at 592.

Moreover, as discussed in **<u>Section II.C</u>**, ████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████



Johnson Ex. 3 & ¶ 25.  required under Rule 23. *Comcast*, 569 U.S. at 27, 37.

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013).

This is a complex case involving 19 producer Defendants; 43.6 million transactions; and over 20,000 products. But while the facts are complex, the problems with DPPs' motion are not. Their sole expert, Dr. Carter, cuts corners, ignores critical facts, tries to take the easy way out by Rule 23 demands more. It demands a "methodologically sound" model that shows class-wide impact and that can withstand "rigorous[] examin[ation]." *In re Aluminum*, 336 F.R.D. at 46. That, DPPs have not provided; not even close.

## FACTUAL BACKGROUND

**A.  Broiler Basics.**

      **1.  All Chicken Is Not Equal:  Distinct Market Segments And Products.**

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████  This matters.  Changes

in demand may manifest in one market segment (*e.g.*, restaurants) while other segments might

experience those changes differently.  Indeed, this happened during the Great Recession, and more

recently, as our common experience shows, during the COVID-19 pandemic.  ████████████████

████████████████████████████████████████████████████████

      **a.  Bird Size:  Small, Medium, and Large.**

There are three distinct "segments" in the market for broiler products, each of which

purchases chicken from different sizes of birds:  Small, Medium, and Large.  These sizes refer to

the physical size of the birds grown for consumption, which are tailored to different uses.[2]

- **Small Birds:**  These are broilers typically under 4.5 pounds, sold to fast food restaurants that buy chicken priced on a per pound basis, and sell it per piece.  Ex. 6, USDA Broiler Market News Report, Dec. 2019; Carter Dep. 150:23-25.

- **Medium Birds:**  These 4.5 to 8 pound "tray pack" birds are most commonly sold in grocery stores, for sale to customers in styrofoam trays.  Ex. 6, USDA Broiler Market News Report, Dec. 2019; Johnson ¶ 79.

- **Big Birds:**  These birds are over 8 pounds, and are most commonly de-boned by the producer and then sold to food service distributors.  Johnson ¶ 78.

Supply thus varies for each *type* of bird.  And different Defendants operate in different segments:

---

[2]   Dr. Carter relies on the testimony of ████████████████████████████████████████ ████████████████████████████████████  Carter ¶ 134; Ex. 5, Qualls 30(b)(6) Dep. 46:2-13.



Johnson Ex. H-6. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* ████████████████████

██████████████████████████ Ex. 7, Reese Dep. 72:17-74:6.

Demand varies by Bird Size as well. Restaurant demand may go up, particularly in a strong economy. In contrast, during the Great Recession, restaurant demand plummeted. ████████

████████████████████████████████████████████████████████

███████████████████████████████ Johnson ¶ 78. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ *Id.*

Defendants **cannot easily change a Big Bird plant to a Small Bird**, and so on: converting a plant to a new bird size requires extensive, costly overhauls of factory equipment. Ex. 8, Downes 30(b)(6) Dep. 36:6-37:22; Johnson ¶ 85. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Ex. 9, Kenney Dep. 63:17-22 (emphasis added); *see also* Ex. 10, Windham Dep. 373:11-13.

### b. Different Production Responses.

Changes in output *varied across segments*— ██████████████████████████

Carter Dep. 152:16-153:1. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████ Johnson Ex. 13. The same is true of the second period 2011 to 2012. *Id.* Ex. 14.

Far from "coordinated" reactions, producers made widely varying decisions. For example,

Koch increased its Medium Bird output 13% and decreased its Small Bird output 5% in 2008–09.

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

### c. Broiler Parts: Breasts, Wings, and More.

████████████████████████████████████████████████████

███████████████████████████████████████ *Id.* ¶¶ 73-74 & Ex. 5. As is the

case for different bird sizes, demand and pricing dynamics vary widely for different parts as well.

███████████████████████████████████████████████████

Carter Dep. 24:8-9, doing nothing to address the fact that different parts may nonetheless be

***demanded*** differently. This is because different types of customers prefer different cuts. For

example, grocery stores tend to buy breasts, whereas certain restaurants ███████████████

███████████████████████████████████ Johnson ¶¶ 73-74. Plaintiffs' expert ████████

████████████████████████████████████████████████████████ Carter Dep

201:24-202:5. ██████████████████████████████████

████████████████████████████████████████████████████

████████████████ Johnson ¶ 139 (emphasis added). Even when averaged across all different

types of customers, the prices of different cuts behave differently. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮



Johnson Ex. 19.

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Johnson ¶ 282. ▮▮▮▮▮▮

▮▮▮▮▮▮ *Id.*

**2.     Feed Prices Cannot Be Ignored.**

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Carter Dep. at 103:1-6. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at

100:22-101:3. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ *Id.* at 106:4-7.

Accordingly, when corn prices get too high, ***producers lose money on each bird sold***.  As

detailed below, that is exactly what happened during both 2008 to 2009 and 2011 to 2012,

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Johnson ¶ 134.

11

**B.**     **Chronology Of Key Events:  The "Perfect Storm."**

**1.**     **2005-2007:  The Renewable Fuel Standard (RFS) Passes And The USDA Forecasts Production Cuts In The Broiler Industry.**

The RFS—first passed by Congress in 2005 but not fully implemented until 2007—mandated that gasoline sold in the United States must contain a certain percentage of ethanol, which increased over time.  42 U.S.C. § 7545.  ████████████████████████

████████████████████████████████████████████████████████

██████  Carter Dep. 90:6-19.

The USDA—which has a significant role in analyzing broiler supply, price, and demand[3]—anticipated adverse effects on the broiler industry from the RFS as early as 2007.  ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████  Shagam (USDA) Dep. 17:23-18:7.  ████████████████

██████████████████████████████  *Id.* at 26:4-19.  And from 2006 to 2007, the USDA significantly reduced its projection for broiler production as a result of the RFS.  Ex. 14, 2007 USDA Projections at 51; Ex. 15, 2006 USDA Projections at 49; *see also infra* at I.B.

That is, USDA forecasts dating back to February 2007—***22 months before the start of the class period***—forecasted supply reductions for reasons that have nothing to do with conspiracy, but instead because corn prices began to rise in 2007 in reaction to the RFS.  USDA economists thus completed—contemporaneously—the same broiler supply analysis Dr. Carter purports to

---

[3]     Ex. 11, USDA National Agricultural Statistics Service, available at https://www.nass.usda.gov/About_NASS/index.php.

[4]     *E.g.*, Ex. 12, USDA, Economics, Statistics, and Market Information System, "Chicken & Eggs" (reports covering egg sets, pullet placements); Ex. 13, Agricultural Marketing Service, "Broiler Market News Report" (covering pounds, head produced), both available at http://usda.library.cornell.edu.

conduct. *Infra* at I.B. Both the USDA and Dr. Carter observed reduced output at the start of the proposed class period. But the USDA attributed those reductions to the predictable results of higher feed costs, ███████████████████████████ It bears emphasis: ***the USDA projected reduced output across the broiler industry during the purported class period***. As Shayle Shagam—a USDA economist who has analyzed the livestock sector for over three decades—testified, ████████████████████████ Shagam (USDA) Dep. 176:9-178:18. The USDA thus recognized what Plaintiffs and their expert, Dr. Carter, do not. Broiler production declines—in the aggregate—were entirely predictable, and fully consistent with rational independent decisions.

### 2. Corn Prices Spike To Record Highs In 2008.

The USDA's predictions were correct. The RFS led to a sharp and shocking spike in demand for corn. Between 2005 and 2011, the share of the U.S. corn crop used for ethanol rose from less than ***20% to more than 40%***. Ex. 16, Shagam (USDA) Dep. Ex. 977 at 8. That trend continued throughout the class period, as the use of corn for ethanol eventually eclipsed the use of corn for livestock feed. Ex. 17, *Id.* Ex. 990 at 20. On top of this backdrop of steadily rising corn demand, unanticipated weather led to a shortfall in corn supply. The 2008 corn crop was significantly hampered by heavy rainfall and flooding in key corn-producing Midwest states.[5]

████████████████████████████████ Carter Dep. 92:3-12. These dramatic spikes in the cost of chicken feed ***resulted in over $7.8 billion in additional costs to the poultry industry*** between October 2006 and October 2008.[6] Plaintiffs' own expert admits

---

[5]  Ex. 18, "2008 Midwestern U.S. Floods," National Oceanic and Atmospheric Administration, *available at* ftp://ftp ncdc noaa.gov/pub/data/extremeevents/specialreports/2008 Midwestern US Floods.pdf.

[6]  Ex. 19, M. Donohue & D.L. Cunningham, "Effects of Grain and Oilseed Prices on the Costs of US Poultry Production," *Journal of Applied Poultry Research*, 18:325-337, at 334.

██████████████████████████████████ Carter Dep. 99:5-8 ███████

████████████████████████████████████████████████████████████

████████ This is why, in 2008, the USDA's chief economist testified to Congress that "livestock and dairy producers will adjust to higher feed costs by reducing production."[7]

### 3. The Great Recession.

Corn prices were not the only macro-economic headwind facing the industry in 2008. The Great Recession—which officially ran from December 2007 through June 2009 and was the most severe economic downturn since the Great Depression—hit at the same time. Key components of consumer demand plummeted: unemployment peaked at 10% in the fall of 2009, 8.7 million jobs were shed from the economy, and real GDP contracted by 4.2%.[8] Along with general consumer demand, demand for broiler chicken products in particular fell sharply, ***declining by nearly six percent***.[9] The Great Recession significantly changed consumer spending habits: money spent dining outside of the home declined precipitously.[10] The restaurant industry reached its lowest point in 30 years, and the share of food expenditures spent at restaurants had not yet reached pre-recession levels in 2016, ***seven years*** after the Recession officially ended.[11] ████████████

████████████████████████████████ Carter Dep. 199:4-12.

---

[7] Ex. 20, *Biofuels Impact on Food Prices, Before Comm. on Energy and National Resources*, 110 Cong. 110-529 (2008) (statement of J. Glauber, USDA).

[8] Shagam (USDA) Dep. 141:20-142:10; Ex. 21, U.S. Bureau of Labor Statistics, "Civilian Unemployment Rate."

[9] Christopher R. Sims, "Time Series Forecast Analysis in Wholesale Broiler Markets," at 15 (Dec. 2017).

[10] *See, e.g.*, Ex. 22, McCann Dep. 261:21-262:4; Ex. 23, Macaraeg Dep. 81:2-11; Shagam (USDA) Dep. 51:6-53:4.

[11] Ex. 24, TROYER.CHICKENS.017850-52 at 855 (mentioning "FS industry," i.e. food service industry); Shagam (USDA) Dep. Ex. 978; Ex. 25, Sunding Dep. (Rough) 120:15-19 ("it was kind of a slow climb-out").



4.    **Industry Reaction:  Financial Losses, Bankruptcies, And Supply Adjustments.**



Carter Dep. 99:5-12.  *Id*. at 99:14-19.

Carter Fig. 12

Ex. 26, Cogdill Dep. 259:14-18; *see also* Ex. 27, Welch Dep. 372:11-16.  Some producers—not surprisingly—seriously struggled to meet their financial obligations to their lenders.  The former President of Wayne Farms testified that, in 2008:

Carter Dep. 109:4-8.  Wayne Farms survived the bust cycle, but others were not as fortunate.  Most notably Pilgrim's Pride—the largest producer in 2008—filed for bankruptcy on December 1, 2008.  As the Bankruptcy Court explained:

- Pilgrim's had to make production cuts in connection with its bankruptcy because it "***faced a choice between production cutbacks and corporate extinction***."  *In re Pilgrim's Pride Corp.*, 448 B.R. 896, 905-07 (Bankr. N.D. Tex. 2011) (emphasis added).

15

- The court emphasized: "***the <u>evidence is overwhelming</u> that Debtors were incurring huge losses that could best be <u>stemmed by reducing their production</u>*** . . . The plants selected were poor performers and/or required immediate, substantial investment. Thus, ***Debtors clearly had a valid business purpose for their actions. It would not be possible for a reasonable jury to conclude otherwise***." *Id.* (emphasis added).

Indeed, Pilgrim's 2008–2009 plant closures in connection with its bankruptcy represented approximately 5% of total industry production. Ex. 29, PILGRIMS-0002555920 at 5923; Johnson ¶ 103 & n. 197. ████████████████████████████████████████████████████████████

████████████████ Carter Dep. 207:2-8.

Given the above, it would not have been at all surprising ████████████████████

████████████████████████████ DPP Br. at 7. But, in reality, producers reacted to the deepening recession and ongoing corn costs not with uniform cuts, but instead with a zig-zag of differing decisions, as reflected in the chart showing the change from the last year of the pre-class period (Dec. 2007 – Nov. 2008) to the first year of the class period (Dec. 2008 – Nov. 2009):

████████████████████████████████████████████████████████████

Johnson Ex. 11. As Dr. Johnson's graph shows, ████████████████████████████████

████████████████████████████████████████████████████████████

---

[12] This chart shows only a snapshot; other Defendants may have increased production over different periods. For instance, Claxton increased its average weekly live pounds slaughtered by 2% from calendar year 2008 to calendar year 2009. And ████████████████████████████████████████████████████████



### 5. 2011–2012: Corn Prices Shatter Previous Records, Devastate The Industry, And Lead To More Bankruptcies.

The staggering feed costs in 2008 would soon be bested in 2011 and 2012, when corn reached $8 per bushel as a result of disastrous weather, and, in turn, a disastrous corn crop. ████

████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 34, Sanderson-0003048807.  Following a rainy spring, the entire Corn Belt experienced excessive heat, which led to drought conditions in some states.  By August 2011, the USDA lowered its projections for the 2011 corn harvest and projected corn prices to reach $6.20 to $7.20 per bushel.  Ex. 35, Aug. 11, 2011 USDA Supply and Demand Estimate at 2.

████████████████████████ Carter Dep. at 99:20-25.  By August 2012, the US government predicted "the lowest yield in 17 years."[15]  Corn prices soared again, rising 50% between June and August 2012.  *Id.*  That summer, analysts correctly predicted that

████████████████████████████████████████████████████████

---

[13]  Ex. 30, CASEFOODS0000620603 at 615; Ex. 31, CASEFOODS0000620573 at 593.

[14]  Ex. 32, OKFoods_0000368041; Ex. 33, OKFoods_0000936145.

[15]  Ex. 36, Patti Domm, "Massive US Drought Leads to Worst Fears for Corn Crop," *CNBC* (Aug. 10, 2012).

2012 corn prices would exceed $8 per bushel—besting records set just a year before in 2011.[16]  By August 2012, the situation became so dire that the government intervened:  the Secretary of Agriculture made the dramatic decision to purchase excess broiler chicken products through the United States government.[17]  ███████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████ Ex. 39, Donohue Dep. 209:24-210:1, 190:16-21.

        In these disastrous circumstances, output reductions were, █████████████████████

████ DPP Br. 5, an essential means of self-preservation.  As the USDA put it in this very case:

████████████████████████████████████████████████████████████████

████████████████████████████████████████  Shagam (USDA) Dep. 19:22-20:1.  Put simply:  ██████████████████████████████████████

█████████████████████████████████  Id. at 309:13-310:8 (emphasis added).  Underscoring that reality, analysts estimated that in 2012, broiler producers were losing between 5 and 10 cents on every pound they produced.[19]  Accordingly, the USDA again lowered its forecast for broiler supply.  Ex. 41, July 11, 2012 USDA Estimate at 2, 4.

        Indeed, several producers declared bankruptcy during this period on account of unsustainable input costs and their inability to pass those on to customers:

        **Townsends, Inc.** declared bankruptcy on December 19, 2010.  ██████████████

█████████████████████████Carter ¶ 172.  Townsends' CFO swore that Townsend's

---

[16]  Ex. 37, Andrew Johnson, Jr., "Corn Prices Soar as Midwest Bakes," THE WALL STREET JOURNAL (July 10, 2012) (reporting that corn prices were "just cents away from the nominal record $7.9975 a bushel reached in June 2011, when prices were rising because of worries about flood damage"); Shagam (USDA) Dep. 219:5-9.

[17]  Ex. 38, "Agriculture Secretary Vilsack Announces Meat Purchase to Assist Livestock Producers …," USDA Press Release (Aug. 13, 2012).

[18]  ████████████████████████████████████████████  Shagam (USDA) Dep. 38:6-9.

[19]  Ex. 40, Jane Wells, "Poultry Industry May Face Losses Thanks to Corn Prices," CNBC (September 18, 2012).

lost $48.9 million in 2008 and landed in bankruptcy *due to high feed costs and the "historic economic downturn."* *In re Townsends, Inc.*, 10-14092-CSS, Dkt. 3 (Bankr. D. Del. 2010).

**Allen Family Foods, Inc.** filed for bankruptcy on June 9, 2011. Its VP of Finance and Secretary-Treasurer testified the "leading adverse factor" was the "steady and significant rise in the cost of feed" since 2008. *He explained that for "every $1 increase in corn prices," the company's annual expenses increased $10 million.* "[S]taffing reductions, volume reductions, eliminated management benefits, and customer price increases" were insufficient. *In re Allen Family Foods, Inc*., 11-11764-KJC, Dkt. 3 (Bankr. D. Del. 2011).

**Cagles, Inc.** filed for bankruptcy on October 19, 2011, after sustaining losses of $11.4 million in 2009. According to its CFO, *high feed costs, specifically corn prices as high as $8 per bushel, "resulted in the Company losing as much as $3 million per month."* *In re Cagle's Inc.*, 11-80202-pwb, Dkt. 14 (Bankr. N.D. Ga. 2011).

**Zacky Farms, LLC** filed for bankruptcy on October 9, 2012. Its Chief Restructuring Officer testified that high corn and soy prices meant the company was spending *$1.8 million per week on chicken feed.* As a result, the company was forced to declare bankruptcy. *In re Zacky Farms, LLC*, 12-37961, Dkt. 5 (Bankr. E.D. Ca. 2012).

### 6. Producers Once Again Reacted Differently, Showing There Were No Unilateral Or Coordinated Cuts During The Class Period.

Just as in 2008, Defendants again dealt with these dire circumstances differently. Contrary

█████████████████████████████████████████████████████████████████

██████ DPP Br. at 10, a comparison of 2011–12 to the prior year shows different decisions.

██████████████████████████████████████████████████████████████████████

Johnson Ex. 12. Some producers did indeed reduce output during this period, but others kept production consistent. ***Eight producers increased production by at least 4%***—Sanderson, Koch,

Mountaire, George's, Peco, Case, Claxton, and Harrison. The reasons for these production increases vary. Sanderson, for example, opened a brand new production plant in 2011.[20] In contrast, Mar-Jac—one of the smallest producers in the industry— █████████████████████

███████████████████████████████████████████████ *See* Ex. 43, Mar-Jac_0000366510; Ex. 44, Mar-Jac_0000866757.

At bottom, the industry as a whole did not move in a unified direction. At certain times, some producers cut back, while others simultaneously expanded or maintained consistent output levels. Some "zigged" while others "zagged." ████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

## C. DPP Class Members Faced Different Contracting And Pricing Dynamics.

In addition to variation among the chicken products that they purchased, there is significant variation among DPP class members themselves. These include (1) their size and bargaining power, as well as (2) their individual contracting practices.

### 1. Purchasing Volume & Bargaining Power.

The proposed class includes approximately 6,000 direct purchasers. ████████████

████████████████████████████████████████████████

Johnson ¶¶ 9, 88. ████████████████████████████████████████████

███████████████████████████████ *See* Johnson ¶ 87 & n. 127.

---

[20] Ex. 42, Sanderson-0000031424 at 31427 █████████████████████████████████
█████████████████████████████████████

████████████████████████████████████████████████████

████ Johnson ¶ 146. DPPs with bargaining leverage could succeed in pushing back on price increases proposed by Defendant producers. *See*, *e.g.*, Ex. 45, Stevens Dep. 93:10-16; *see also* Johnson ¶ 143 ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ Johnson ¶ 140.

Purchase concentration also impacted a given direct purchaser's bargaining power. ██████

████████████████████████████████████████ Johnson Ex. 20. ██████

████████████████████████████████████████████████████

████████████████████████████████ Johnson ¶ 143.

### 2. Contracting Practices.

The contracts and pricing structures also varied greatly. The following are just some of the types of contracts entered into by the DPPs:

- **Spot Purchases:** ████████████████████████████ Dkt. 3935, DPP Fifth Am. Compl. ¶ 115. ████████████ Ex. 5 at 113:1-114:17; Ex. 46, Matthews 30(b)(6) Dep. 41:17-25, and had pricing that could vary from typical contract terms, *e.g.*, Ex. 47, PILGRIMS-0002593049.

- **Cost-Plus Contracts:** Some contracts set prices on a "cost-plus" or "grain-plus" basis. ██████ Johnson ¶ 141 & n. 297. ████████████████████████████████ *Id.*

- **Fixed-Price Contracts:** ████████████████████████ *Id.*

- **Index Prices:** ████████████████████████████ Johnson ¶ 157. Contracts based on these indices set different prices for different parts (e.g., index plus one cent) or used brackets (e.g., index up to five cents means price is "x"). For example, ████████████████████████████████

21

██████████████████████████████████████████████████ Johnson

¶ 161.

These contracts further varied by customer. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ Johnson Ex. 29.

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

Contracts could also be influenced by differences between *Defendants*, including brand

loyalty. For example, some evidence suggests that ██████████████████████

██████████████████████████ Ex. 48, JGC0000051153; *see also* Ex. 49, Wagner Dep.

150:13-151:15. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Johnson ¶ 176.

3.    **Direct Purchasers Paid Different Prices.**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ Carter Dep. 93:19-21, 96:1-7. Unsurprisingly, however, significant

differences in bargaining power and contracting practice led to enormous variation in the prices:

- ████████████████████████████████████████████████
  ███████████ Johnson ¶ 180.

22

- ███████████████████████████████████████████████████
  ████████████████████████ *Id.*

- ███████████████████████████████████████████████████
  ████████████████████████████████ Ex. 50, MTA-PL0001265456; Ex. 51, MTA-
  PL0001185105; Ex. 52, MTA-PL0001265302.

██████████████████████████████████████████████████████

██████████████████████████████████ Johnson ¶ 168 n.375, 236.

## D.    Plaintiffs' Expert Model.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████ DPP Br. at 26.  To justify certifying this large class of many types of

products and many different DPPs, Plaintiffs rely on the expert report of Dr. Colin A. Carter to

establish class-wide common injury (or "impact"), and damages.  DPP Br. at 2.  ███████████

██████████████████████████████████████████████ Carter Dep.

39:12-44:16.  It consists of three parts.

*First,* ████████████████████████████████████████████████

██████████████████████████████ Carter ¶¶ 177, 190; DPP Br. at 39.  ██████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████ Carter Dep. 73:1-4; Carter ¶

179 & Fig. 17.  ████████████████████████████████████████████



Carter Dep. 77:16-19.

*Id*. at 39:7-11.

*Second*,

*Id*. at 129:6-9.

*Third*,

Carter ¶ 188.

Johnson Ex. 3.

## ARGUMENT

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast*, 569 U.S. at 33. Thus, a district court must conduct a "rigorous analysis" of the Rule 23 requirements before certifying a class. *Id*. at 35. That means satisfying all of the requirements of Rule 23(a), as well as, in this damages case, the "more demanding" predominance requirement of Rule 23(b). *Id*. at 34.

Making this showing requires, among other things, that "[p]laintiffs . . . affirmatively show how common evidence and a single, reliable common methodology will prove an element on a simultaneous, class-wide basis." *In re Steel*, 2015 WL 5304629, at *5. In particular, Plaintiffs must "show (1) that the existence of individual injury resulting from the alleged antitrust violation (referred to as antitrust impact) was capable of proof at trial through evidence that [was] common to the class rather than individual to its members; and (2) that the damages resulting from that injury were measurable on a class-wide basis through use of a common methodology." *Comcast*, 569 U.S. at 30.

Where Plaintiffs argue that expert models can supply this needed common method of proof, courts are "require[d] … to take a hard look" at the soundness of the model. *In re Steel*, 2015 WL 5304629, at *9; *In re Aluminum*, 336 F.R.D at 47; *In re Rail Freight*, 725 F.3d at 252-53 ("Common questions of fact cannot predominate where there exists no reliable means of proving classwide injury in fact."). Here, Dr. Carter's model falls apart under even passing scrutiny. The Court should hold that Plaintiffs have not met their burden of proving that this case is subject to common proof—and so deny class certification.[21]

## I. THE "FOUNDATION" OF PLAINTIFFS' MODEL IS UNRELIABLE AND VIOLATES *COMCAST*.



Carter ¶¶ 163, 177-79; DPP Br. 39; Carter Dep. 83:7-15; *see also infra* at I.A-B. This is all he does:

---

[21] While Defendants intend to file a *Daubert* motion and Dr. Carter should be excluded, class certification should be denied regardless—"reliability under Rule 23 is a higher standard than reliability under *Daubert*." *In re Rail Freight*, 292 F. Supp. 3d 14, 91 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019) (denying class certification because expert's model failed to show predominance, despite declining to exclude expert under *Daubert*); *In re Steel*, 2015 WL 5304629, at *9–11 (similar).



███████████████████████████████████████████████ Carter Dep.

63:13-17.



███ *Id.* at 83:7-15; Carter ¶¶ 163, 177. ████████████████████████

██████████████████████████████████ Carter ¶¶ 177-79; *infra* at I.A-B.

████████████████████████████████████████████████████

Carter ¶ 176. ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████ Carter Dep. 39:2-11 (emphasis added) ████████

█████████████████████████

To support class certification, an expert's model must withstand "rigorous analysis." *Comcast*, 569 U.S. at 35. It also must isolate the wrongful conduct: a model that "identifies damages that are not the result of the wrong" is impermissible. *Id.* Here, ████████████████████ ████████████████████ fails both tests. ***First***, it does not withstand a "rigorous analysis" (or hardly any analysis) since it ████████████████████████████████████████████

██████████████████████████████████████████ *Infra* Section I.A. **Second**, it does not even attempt to isolate the wrongful conduct; ████████████████████████████████████

████████████████████████████████████████████ *Infra* Section I.B.

### A. Plaintiffs' Structural Break Supply Analysis Is Fundamentally Unreliable.

#### 1. The Model Is Inherently Unreliable: Ignores Demand & Costs.

Where, as here, "an expert's model is the basis for a plaintiff's claim of class-wide impact and causation, a court is obliged to rigorously examine the soundness of that model at the class certification stage. A court may certify a class under these circumstances only where the Court finds the model methodologically sound." *In re Aluminum*, 336 F.R.D. at 46-47. Dr. Carter's

█████████████████████████████████████████████████████████████████

████████████████████████████████ That's it. There is no analysis or modeling of ***anything at all*** that might affect supply. No variables are controlled for—"no" truly means ***none***. At deposition, Dr. Carter agreed ████████████████████████

- ██████████████████████████████████████████████████ Carter Dep. 85:24-25.
- ████████████████████████████████████████████ *Id*. at 86:1-3.
- Ignores all other factors too. *See id.* at 63:13-17; *id*. at 127:19-23.

His model is as simple as ███████████████████████████████████████████

████████████████████████████████████████ *Id.* at 77:6-19. It projects supply up and away into the future, without an ounce of reality. *Id.* at 73:1-4 ████████████████

████████████████████████████████████████████

But considering variables such as cost and demand is hardly novel—or optional—it's common sense. The USDA—which has analyzed and predicted Broiler supply for the past 24 years—█████████████████████ Shagam (USDA) Dep. 100:24-101:24 (USDA economist

agreeing they consider ██████████████████████████████████████████

████████████████████████████████████[22]; Carter Dep. 70:16-20 ████████████████

████████████████        So does the Food and Agricultural Policy Research Institute ("FAPRI") at

the University of Missouri—████████████████████████████        *See, e.g.*, Ex. 54,

FAPRI March 2010 US Baseline Briefing Book, at 46; Carter Dep. 57:17-19. Analysts at banks

like JPMorgan consider these factors too. *See, e.g.*, Ex. 55, JPMS-00052857 at 857-61.

███████████████████████████████████████████████████████

███████████████████████████████████████████ Carter Dep. 74:6-20.

That underscores the problem. ████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████ But an expert

cannot put his head in the sand and "simply ignore evidence that is contrary to [his]

opinion." *Cates*, 2017 WL 1862640, at *15. An expert must put out a "methodologically sound"

model, particularly where, as here, it is "the foundation" for all of his impact and damages analysis.

*In re Aluminum*, 336 F.R.D at 47. For this reason alone—that the DPPs essentially phoned it in at

the first step—no class can be certified.

> **2. Dr. Carter's Model Ignores The Individual Defendants' Production Decisions That Contradict His Conclusions.**

In analyzing whether—and when—there were supposed structural breaks (*i.e.,* dips below

2.4% growth), Dr. Carter makes another insurmountable mistake: █████████████████

---

[22]        *See also, e.g.*, Ex. 14, Feb. 2007 USDA Projections (factoring in high feed costs); Ex. 53, Feb. 2009 USDA Projections (factoring in "global economic slowdown").



██████████████████████████████████████████[23] Carter Dep. 69:13-15 ████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ *See id.* at 186:20-23. ██████████

██████████████████████████████████████████ These are just examples,

but the same is true for all 19 producer Defendants. *Id.* at 69:13-15. ███████

███████████████████████████████████████████████████████

████████████████████████████[24].

█████████████████████████████████████ Carter Dep. at 68:21-69:7. ████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

---

[23] Dr. Carter didn't even check ██████████████████████████████ *Compare* Carter Dep. 154:13–14 *with* Ex. 56, Sanderson Farms 2012 Form 10-K at 27 (showing pounds sold).

[24] ███████████████████████████████████████████████████████ That is simply false—Defendants produced detailed data tracking their live production operations from pullet placement to broiler slaughter from ████████████████ ████████████████████████ Johnson ¶ 5 & n.6. Indeed, Defendants' expert Dr. Johnson did exactly that. *Id.* Plaintiffs have gotten the production data they've asked for in this case and more. Ex. 57, 2/28/2017 All Plts' 1st RFPs to All Dfts, Requests Nos. 48-53; *see e.g.*, Ex. 58, 2/26/2018 Ltr. from S. Pepper to B. Clark at 30-33; Ex. 59, 7/13/2018 Ltr. from M. O'Brien to M. Moskovitz et al. Plaintiffs even moved to compel more production data, which the Court granted. Dkt. 3537, 3/18/2020 Pls' Mot. Compel Structured Data at 6█████████████████████████████ █████████████ Dkt. 3574, Defs' Opp. to Pls' Mot. Compel Structured Data at 4 (explaining that Defendants produced clean data from January 1, 2004 through December 31, 2017); Dkt. 3622, 5/19/2020 Order; Dkt. 3624, Hr'g Tr. at 33:6-8█████████████████████████████████████████████████████████ █████████████ Ex. 60, 7/22/2020 Ltr from S. Pepper to B. Clark (producing structured data "pursuant to the Court's May 19, 2020 Order"). This data just doesn't show what Plaintiffs want it to show.



Johnson Ex. 11.  In fact, Defendants' production decisions show no cohesiveness at all.  For example, while Pilgrim's Pride made steep cuts due to its bankruptcy proceedings, Simmons *increased* its live pounds by almost the same margin, with producers like Case and Amick following close behind.

The same went for alleged production cuts in 2011 and 2012.  No consistent reaction prevailed—in fact, a considerable number of producers *increased* their supply, rather than decreasing in lockstep.  Further, certain producers that previously increased their live pounds in 2008 (*e.g.*, Simmons) now decreased from 2011 to 2012, and vice versa (*e.g.*, Wayne Farms).



Johnson Ex. 12.  The reality of production rates tells a story of producers each adjusting their individual production levels as they responded to recessions, bankruptcies, multiple rounds of corn price spikes, and everything in between; not a story of homogenous industry collusion.

Looking at individual data instead of aggregated data reveals that there was █████████ ████████████████████████████████████████████████ as Dr. Carter also claims. Carter ¶ 179; Johnson ¶¶ 128-29. As Dr. Johnson's analysis shows, ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ In the chart below, red bars represent statistically significant cuts, while blue bars represent statistically significant increases. ████████ ████████████████████████████



Johnson Ex. 16. Put another way, there is no common statistically significant supply dip for ***all*** 19 producer Defendants at any point—in any year. That is precisely because some grew, some stayed the same, and some cutback. Take 2008, for example. Only one out of 19 producers had a significant supply cut: Pilgrim's Pride, which filed for bankruptcy. There were no "coordinated supply cuts" in 2008; what Dr. Carter measures is the industry's largest producer going bankrupt.

The same holds true for 2011. ██████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ Johnson Ex. 16. There is no structural break (or cut) at all in 2011 for 17 out of 19 producer Defendants. The reality is that there is no year where all Defendants cut back in parallel. ***None***. Individual producers' supply levels diverged both above

31

and below ██████████████████ and did so at different times, not in unison. ████████

████████████████████████████████████████████

████ In other words, individual issues predominate: when Defendants' data—which DPPs ignored—is applied to his model, the results are ███████████████████ ████

██████████████████████████ But **when** there were supply cuts, **who** made the cuts, and whether they were **coordinated** is not a side-show issue; that is **the** question in this case. Dr. Carter cannot ignore it—particularly where the individual data shows no common "structural" break at all. ████████████████████ Accordingly, it cannot support class certification. *See, e.g.*, *In re Aluminum*, 336 F.R.D. at 47.

## B. Plaintiffs' Model Also Fails Under *Comcast v. Behrend*.

Plaintiffs' model faces another problem—and one that is not surprising given its utter lack of sophistication and controls. Dr. Carter cannot answer the basic question: would there have been supply reductions, absent the alleged conspiracy? ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[25] This lack of parallel conduct—and these examples do not even get into differences throughout the class period, by product, or by customer—shows plaintiffs have not met their burden even to show that the alleged conspiracy was common across the class, let alone its impact. *See In re Steel*, 2015 WL 5304629, at *5 ("Plaintiffs must show that common proof will predominate with respect to each of the elements of their claims.").

██████████

Carter Dep. 125:4-9; *id*. at 127:19-23 (emphasis added). As discussed below, answering the question of whether supply reductions were due to unlawful conduct is ***required***. *Comcast*, 569 U.S. at 37; *In re Aluminum.*, 336 F.R.D. at 57 (rejecting model as "insensitive to conduct which is conspiratorial and conduct which is not").

### 1.     Models That Sweep In Lawful Conduct Cannot Support Certification.

The Supreme Court has made clear that an expert's model must be able to ***isolate*** the impact of the alleged wrongful conduct. Sweeping in wrongful and lawful conduct together will not do. As the Supreme Court emphasized in *Comcast*, translating "the *legal theory of the harmful event* into an analysis of the economic impact *of that event*" is a foundational requirement for modeling alleged class-wide injuries. 569 U.S. at 38. A model that "identifies damages that are not the result of the wrong" is impermissible. *Id.*; *In re Aluminum*, 336 F.R.D. at 57.

In *Comcast*, the plaintiffs asserted four theories of antitrust injury, but the district court held that three of the four were not susceptible to class-wide proof, leaving only the plaintiffs' remaining "overbuilder theory." 569 U.S. at 31-32. The Court explained that to meet the predominance standard, the plaintiffs' damages model had to disaggregate the injury resulting from that theory from the injury resulting from the other discredited theories. *Id.* at 36-37. Thus, "a model purporting to serve as evidence of damages in this class action must measure ***only those damages attributable to that theory***." *Id.* at 35 (emphasis added). Otherwise, the Court reasoned, "it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* Because the *Comcast* plaintiffs lacked any reliable method to isolate injury for the one accepted theory, the Court decertified the class.

In the years since, courts have repeatedly applied *Comcast* to hold that in order to support class certification, an expert model must isolate the injury resulting from the alleged wrong—and

disaggregate it from other factors, including lawful conduct. Judge Engelmayer's decision for the Southern District of New York in *In re Aluminum*—which Plaintiffs do not mention or even cite— is illustrative. There, plaintiffs sought to certify a class of aluminum purchasers purportedly injured by an alleged conspiracy to inflate prices by "load[ing] 'excess' amounts of aluminum . . . thus lengthening the queues at [key] warehouses." 336 F.R.D. at 51-52. Plaintiffs supported their motion with an expert model, which, in its first step, "modeled the 'excess load-outs' that allegedly would not have occurred in the but-for world." *Id.* However, the model failed to control for a "doubling of the [London Market Exchange's] minimum load-out rule in April 2012—or any LME rule change." *Id.* at 52. The court denied certification, explaining:

> By not controlling for the rule change, Dr. Gilbert's model treats that doubling of daily load-outs as resulting from the alleged conspiracy, rather than as a result of the rule change . . . . The excess load-out model thus suffers from a classic *Comcast* infirmity, in that ***it impermissibly "identifies damages that are not the result [of the] wrong***."

*Id.* at 52-53 ("Because Dr. Gilbert's model fails to isolate the effects of the conspiracy . . . [plaintiffs] lack classwide proof[.]") (emphasis added).

Court after court has applied this principle and denied certification where models violated it. "***[A] model that does not even attempt to identify and isolate 'damages' that are not the certain result of the wrong cannot be used to establish that damages are susceptible of measurement across an entire class*** for purposes of Rule 23(b)(3)." *In re Steel*, 2015 WL 5304629, at *10 (emphasis added); *In re Rail Freight*, 292 F. Supp. 3d at 131 ("The Court therefore cannot find that [plaintiffs'] damages model reliably distinguishes overcharges due to the alleged conspiracy from competitively negotiated conduct. This flaw is fatal[.]"); *In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398, at *31 (E.D. Pa. Jan. 18, 2017) (denying certification because model "failed to isolate the difference in reimbursement rates attributable to an alleged antitrust conspiracy from any difference attributable to legitimate bargaining power or other

market factors").[26]  Even before *Comcast*, courts correctly rejected models that failed to isolate the effects of unlawful conduct.[27]

### 2. Plaintiffs' Model Does Not Even Try To Isolate Unlawful Conduct.



He cannot answer the key question:  but for the alleged conspiracy, would Defendants have cut back production, and by how much?  He admits:                                     Carter Dep. 125:4-9, 127:19-23.

*Id*. at 77:12-14 (emphasis added).  But the record points to many obviously valid reasons for supply reductions.

*First*, there were two huge macroeconomic factors—corn prices and the Great Recession— that clearly affected supply levels.

*Id*. at 106:4-7.

[28]  These pivotal events not only

---

[26]   *Accord In re: Processed Egg Prod. Antitrust Litig.*, 2016 WL 410279, at *8 (E.D. Pa. Feb. 3, 2016) ("[T]he price variance . . . intermingles lawful and unlawful behavior between 2008 and 2013.").

[27]   *See, e.g.*, *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 27 (1st Cir. 2008) (affirming denial of certification because plaintiffs "cannot show that it was the horizontal conspiracy that caused the impact").

[28]   Clare Cho et al., "Food Spending of Middle-Income Households Hardest Hit by the Great Recession," *Amber Waves*, USDA Economic Research Service (Sept. 27, 2018).

factored into production decisions; they were ***the*** factors for production decisions. ██████

████████████████████████████████████████████████████████████

███████████████████████████████████ Shagam (USDA) Dep. 140:3-

141:9; Ex. 39, 209:24-210:1, 190:16-21. ████████████████████████

████████████████████████████████████████████ Carter Dep.

107:7-10, Dr. Carter admits that he puts his head in the sand.

Dr. Carter's unreal model becomes only more untenable once considered against the

projections of a key source that he agrees ███████████████████ the USDA. Carter Dep.

70:16-20. ***In 2006***, the USDA's projections looked much like Dr. Carter's in this case. But the

revised ***2007*** projections—which did not have the benefit of knowing that the Great Recession and

2011 drought were coming—still accurately tracked the severe impact to industry production that

would result from corn prices and the Renewable Fuel Standard:



Ex. 14, at 51; Ex. 15, at 49; Johnson Ex. 7. ██████████████████████

██████████████████████████████████████████████████████████

██████████████████████████ That is how big of a deal corn prices are—and precisely

why they cannot be ignored. █████████████████████████████████

████████████████████████ Carter Dep. 56:14-16. But the USDA significantly

36

lowered its supply projections due to high corn prices starting in February 2007, ***twenty-two months before the supposed start of the conspiracy*** in December 2008.  And even when deposed in this case in 2019, the USDA did not agree there was ███████████████████████ Shagam (USDA) Dep. 151:16-20.

███████████████████████████████████████████

████████████████████████████████████ Carter Dep.

106:4-7. ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ Because his

"model fails to isolate the effects of the conspiracy," it cannot support certification.  *In re Aluminum*, 336 F.R.D. at 52-53.

***Second***, the record is clear that supply reductions had to happen due to some producers' significant financial distress and bankruptcies.  ███████████████████████████████

█ Johnson ¶ 93; *supra* at 13-22. ███████████████████████████

███████████████████████████ Carter Dep. 108:5-7, 111:6-9. ████████████████

███████████████████████████████████████████████

---

[29] ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████ Johnson ¶ 206.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████ Ex. 29 at 5923; Johnson ¶¶ 5,

103, n.197; Carter Dep. 83:7-15. And, as the bankruptcy court recognized, these cuts had to

happen. *In re Pilgrim's Pride Corp.*, 448 B.R. at 905–07 ("[Pilgrim's] faced a choice between

production cutbacks and corporate extinction. . . . Debtors were incurring huge losses that could

best be stemmed by reducing their production . . . . It would not be possible for a reasonable jury

to conclude otherwise."). ████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

            And Pilgrim's was not alone. ████████████████████████████████

█████████████████████████████████████████████ *See supra.*

at 20. There can be no serious contention that supply reductions due to third parties' bankruptcies

(or even Defendants') were made pursuant to any conspiracy.[30] ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████ That is fatal under *Comcast*. *See* 569 U.S. at 36-37.

      ███████████████████████████████████████████████

Johnson ¶ 134 & n.276. To take just one example, in 2011, Sanderson Farms reported both the

largest ever net sales and the largest annual net loss in the company's history. Ex. 61, Sanderson

---

[30]   Curiously, Dr. Carter excludes ███████████████████████████████

██████████████████████████████████

Farms Q4 2011 Earnings Call at 3 ("Our net sales for the full year of $1.978 billion, a 2.7% increase over fiscal 2010, were another record for Sanderson Farms.  However, our net loss of $127.1 million, or $5.74 per share, was also a record.").  Due to steep increases in corn costs, Sanderson



Ex. 62, Sanderson-0000733197.

Johnson ¶ 134 & Ex. 18.

Johnson Ex. 18.

Carter Dep. 99:5-8.

*Id.* at 127:19-23.  That makes no sense— and models ignoring such massive financial losses must be rejected.  *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 33 (Fed. Cir. 2012) (rejecting model as "frankly, out of line with [the]

economic reality" of defendant's profit margins); *Polaroid Corp. v. Eastman Kodak Co.*, 1990 WL 324105, at *72 (D. Mass. Oct. 12, 1990) (expecting a defendant "to operate an all-out effort in order to achieve a disastrous loss" is "simply unrealistic"). By ignoring massive bankruptcies and enormous producer losses, Dr. Carter again "fails to isolate the effects of the conspiracy." *In re Aluminum*, 336 F.R.D. at 52-53.

███████████████████████████████████████████

████████████ whether individual Defendants made reductions at all, or if they were made for reasons having nothing to do with conspiracy. Examples abound of obviously lawful supply

████████████████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
████████████████████████

███████████████████████████████████
███████████████████████████████████
██████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
██████████████████████████

40



Carter Dep. 125:4-9; *id*. at 127:19-23.  His model fails

for this reason too.  *In re Steel*, 2015 WL 5304629, at *10; *In re Aluminum*, 336 F.R.D at 46-47.

### C.    These Basic Failures Doom the DPPs' Entire Motion.

Dr. Carter and Plaintiffs realized the above are real—and fatal—problems.

Carter Dep. 39:7-

11 (emphasis added).  On that, the parties agree:  Dr. Carter's entire analysis fails without it.  To

reiterate:

*Id.*; *id*. at 129:6-9.  Simply put, under *Comcast* and its progeny, drawing a straight line is hardly a

"model" at all, let alone one that survives a rigorous analysis.  In any event, the upshot is clear:

because Dr. Carter plainly fails to adequately model supply reductions due to conspiracy—in a

case about supply reductions—no class can be certified.  As Judge Engelmayer explained in *In re*

*Aluminum*, a "chain of models" fails where the first step mixes lawful and unlawful conduct:

> Dr. Gilbert's model never accurately identifies any excess warrant cancellations in
> the first place; rather, he identifies [lawful] increased load-outs attributable to the
> doubling of the LME load-out rule.  His chain of models is not saved simply
> because he did not compound his error by ignoring the LME rule change a second

time when converting his flawed 'excess load-out' model results into an estimated impact[.]

336 F.R.D. at 53.

## II. DR. CARTER'S MODELS DO NOT DEMONSTRATE THAT INJURY IS SUSCEPTIBLE TO COMMON PROOF.

The DPPs have a heavy burden: putting forth a reliable, common methodology to show class-wide impact; *i.e.*, that class members—whose purchases span 10 years and 43.6 million transactions—faced an "overcharge."



Carter Dep. 93:18-21, 96:1-7.

Carter ¶ 186.[31]

Sometimes wings are in demand (*e.g.*, Superbowl Sunday and summers) and sometimes not (*e.g.*, Christmas). Or our common experience that wings are more popular now than they were 20 years ago. Dr. Carter further ignores that there are entirely different demand factors impacting different channels and segments—something the Great Recession made clear, and that the COVID-19

---

[31] 

*Id.* at 19:6-20:20, 21:14-16, 22:5-11. At a minimum, these products must be excluded from the class to the extent they are not already. *In re Rail Freight*, 725 F.3d at 253 ("No damages model, no predominance, no class certification.").

restaurant closures underscored yet again. ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

## A.     Dr. Carter's Overcharge Model Uses Bad Assumptions.

The Court must "take a hard look at the soundness of statistical models that purport to show predominance." *In re Steel*, 2015 WL 5304629, at *9. A review of Dr. Carter's ███████████ shows precisely how bare-bones it is. This is what he did:

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

No other expert utilized such a basic model. This is because the problems with doing so are many. *First,* take the **Product Problem**. Just because all class products are chicken meat does not mean that all products should be treated exactly the same. Every grocery shopper knows that wings are a different product from WOGs. Breast meat is different from thighs. This is precisely

Mangum ¶ 179.

Johnson ¶ 207.

If common sense is not enough to establish this simple point—that different parts face different demand forces—then the data surely does. For example,

44

Johnson, Ex. 19.  It is economics 101 that different demand forces are in play:



Carter Dep. 141:22-25, 201:24-202:2 (emphasis added).  This basic failure alone means the model cannot withstand "rigorous"—or even basic—scrutiny.  *See In re Aluminum*, 336 F.R.D. at 40.

    *Second*, the **Segment Problem** is equally fatal.

Johnson, Ex. H-6.

Carter Dep. 156:22-157:17.



Johnson Ex. H-19.  And demand also varied significantly:  during the Great Recession, demand for restaurants fell, even though grocery products (cheaper products) were less impacted.  This flaw, too, is fatal.

 *Third,* the fact that Dr. Carter ignores ████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ Johnson ¶ 189.

But the record shows these customers had starkly different bargaining power:



Johnson ¶ 221 & 87 n.125. ██████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ Johnson ¶ 222.



*Id.*[32]

Carter Dep. 146:11-14.

Johnson Ex. 20.

---

[32] Carter Dep. 199:4-200:1.



Johnson Ex. 45.

Johnson ¶ 26 (emphasis added).

*See, e.g., In re Processed Egg Prods. Litig.*, 312 F.R.D. 171, 201 (E.D. Pa. 2015) (rejecting model that "ha[d] not established . . . baseline facts about the egg industry").

Carter Dep. 146:17-19.

48

████████████████████ Carter ¶¶ 87-91, 145-46, 196. ██████████████████████████

████████████████████████████████████████████████████████████████ *E.g.*, Ex. 73,

Guest Dep. 43:25-44:16; Ex. 74, Goins Dep. 273:12-21; Ex. 75, Fries Dep. 190:25-192:17;

Johnson ¶ 150. And worse, Plaintiffs' own allegations confirm that any injury from index pricing

could ***not*** have been class-wide, where the Urner Barry and Georgia Dock indexes did not even

agree with each other. To the contrary, and as Plaintiffs have repeatedly emphasized in this case,

██████████████████████████████████████████ Dkt. 3935 at ¶ 120.[33] ████████████████

██████████████████████████████████ Johnson ¶ 152.

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

Indeed, courts often reject classes where experts fail to account for complex and individualized

negotiations. *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 490-91 (N.D. Cal.

2008); *see also In re Photochromatic Lens Antitrust Litig.*, 2014 WL 1338605, at *22 (M.D. Fla.

April 3, 2014) (denying class certification in "case[] involving negotiated transactions"); *In re

Optical Disk Drive Antitrust Litig.,* 303 F.R.D. 311, 317 (N.D. Cal. 2014) (similar). As was true

in another case involving grocery products, class certification must be denied where "inquiry will

be needed as to which members of the class had negotiated prices, the terms of their negotiated

agreements, when the formula was established, and the extent of their damages, if any, as to both

formula-pricing and non-formula-pricing purchases." *Food Lion, LLC v. Dean Foods Co.*, 312

F.R.D. 472, 496 (E.D. Tenn. 2016).

---

[33]   Defendants dispute Plaintiffs' allegations about these indices, where among other things, the indices did not even measure the same or all relevant products. But it is enough for now that these indices do not support class certification even if Plaintiffs could prove that their allegations were true.

***Finally***, all of these problems distinguish this case from *Kleen Products LLC v. Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016), and *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802 (7th Cir. 2012), upon which Plaintiffs heavily rely. Defendants did not challenge the expert's model in either *Messner* or *Kleen*—in stark contrast to Defendants' argument here.[34] Both cases were also decided on strikingly different facts. *Kleen* involved a much simpler market for containerboard, "sold in standardized compositions," with prices "not tailored" to different purchasers; 96% of prices were tied to an index. 831 F.3d at 923-24, 925. Nor was there the evidence of varying conduct among defendants that exists here. *Messner* was a merger case and did not involve varying conduct among a large number of defendants producing different products at different levels at all. 669 F.3d at 816. And the defendant's ***own expert*** admitted to a "price increase of nine to ten percent." *Id.* at 809. DPPs' other, aged authorities—prior to the Supreme Court's instruction in *Comcast* that an expert model must survive a "rigorous analysis" to support class certification—are of no help to them either. *E.g.*, *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1039 (N.D. Miss. 1993); *Hughes v. Baird & Warner, Inc.*, 30 Fed. R. Serv. 2d 704, *3 (N.D. Ill. 1980) (involving a "traditional price-fixing case where injury follows directly from proof of purchase in mechanical fashion").[35]

At bottom, as Plaintiffs themselves admit, Seventh Circuit law requires that Plaintiffs have

███████████████████████████████████████████████████████

██████████████████████████████████████████████████ DPP

---

[34] *Messner*, 669 F.3d at 823-24 ("Perhaps [defendant] could have used its evidence regarding [uninjured class members] to argue [plaintiffs' expert's] methodologies were flawed."); *Kleen*, 831 F.3d at 922 (noting defendants did not challenge the expert and thus the court could "rely on the expert evidence for class certification").

[35] *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Assoc.*, 744 F.2d 588, 594-95 (7th Cir. 1984) is also inapposite, as it decided only an appeal from a preliminary injunction, not consider issues of common injury or class certification.

Br. at 32 (quoting *Kleen*, 831 F.3d at 926). Given the problems outlined above, Plaintiffs do not provide anything like that required common proof here.

### B. Dr. Carter Cannot Mask These Individualized Problems With Averages.

To get around these individualized problems of different chicken parts, bird sizes, customer bargaining power, and others, ████████████████████████████████████████

████████████████████████████████████████ Carter Dep.

156:5-6 ████████████████████████████████████████

████████████████████████████████████████

Johnson ¶ 265. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Johnson ¶ 266—████████████████████████████████

████████████████████████ is a fatal error—as courts have long warned, experts cannot use average results to support class certification, if those results only "mask individualized inquiry." *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020); *see also Reed*, 268 F.R.D. at 582; *In re Aluminum*, 336 F.R.D at 53-54.

████████████████████████████████████████

████████████████ *See* Johnson ¶ 276████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████ Johnson ¶ 280—even
under Dr. Carter's flawed model.  Take this chart, for breasts sold to distributors:

███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████

*See* Johnson, Ex. 70. ████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████ Johnson ¶ 277. █████████    █████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

The same trend holds true across other class products. For whole-bird products sold to distributors, for example, ███████████████████████████████████████████ ██████████████████████ Johnson Ex. 71. Such results underscore what the complex realities of the chicken industry should already make clear: this is not an antitrust case susceptible to common proof via a single overcharge result. ██████████████████████████████████████

████████████████████████████████████████████████████

██████████████████ Merely "applying [an] overcharge percentage estimated on a class-wide basis," ██████████████████████████████████████ "makes no attempt to establish, but instead simply assumes, class-wide impact." *In re Optical Disk Drive.*, 303 F.R.D. at 321.

Indeed, courts repeatedly deny class certification where averages ignore industry complexities. *See*, *e.g.*, *In re Steel*, 2015 WL 5304629, at *9 (rejecting "a single, average [ ] overcharge" model, which did not capture "[t]he realities of the steel industry," including "differences in steel chemistry, product specifications, and end-uses"); *In re Processed Egg*, 312 F.R.D. at 200-01 (same where expert had not "established [] baseline facts about the egg industry" and lacked proof of the "substitutability of different types of egg products"); *In re Photochromatic Lens Antitrust Litig.*, 2014 WL 1338605, at *24-25 (M.D. Fla. 2014) (same where average impact model "fail[ed] to account for non-standard pricing," in case where "larger customers . . . were able to extract lower prices due to bargaining power"). And although Plaintiffs will surely balk and complain that averaging is useful in at least some scenarios, the point is not that the Court need hold that averaging is never appropriate. Instead, it is enough that averaging is not appropriate ***in cases like this one***, where Defendants, their products, and their customers are complex. As one court put it: "it simply cannot be ignored that the products at issue are highly diverse and were sold to a number of distinct purchasers," some of whom "had no negotiating power at all," and

some of whom "likely had more bargaining power than defendants themselves." *In re Graphics*, 253 F.R.D. at 489, 494.

### C.     Dr. Carter's Overcharge Model Leads To Absurd Results.



Johnson Ex. 3 & ¶¶ 25, 220.

Carter Dep. 161:20-23.

The DPPs are "frankly, out of line with [the] economic reality," and so cannot carry their burden of proof. *See Whitserve*, 694 F.3d at 33; *Polaroid*, 1990 WL 324105, at *72; *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) (rejecting model that "was not grounded in the economic reality" of the market).

### D. Dr. Carter's Two "Tests" Do Not Show Common Impact Either.



To be sure, this is the DPPs' burden: to show that they have a reliable method for determining impact across the class. *Reed*, 268 F.R.D. at 591 (denying class certification where plaintiffs failed to demonstrate a reliable "methodology common to the class that can determine impact with respect to each member").

buried at the end of his report and mentioned only in a few paragraphs—only show just how unreliable his methodology really is.

#### 1. Dr. Carter's First "Test" Does Not Match Reality, Applies The Same Uniform Overcharges, And Generates False Positives.



Carter Dep. 42:19-43:8; Johnson ¶¶ 167-28.  None of this shows common impact.



Johnson Ex. 82.

Johnson ¶¶ 28, 308.

Johnson ¶¶ 315, 319.

███████████████████████████████████████

████████████████ A model that predicts overcharges—no matter what, conspiracy or not—cannot show common impact. Instead, such false positives mean that it is not "a reliable means for proving class-wide injury." *In re Rail Freight*, 292 F. Supp. 3d at 131; *see also Food Lion*, 312 F.R.D. at 495–96 (denying certification because plaintiffs' "result[s] in a false positive" and "does not reliably measure the effects of the alleged conspiracy").

### 2. Dr. Carter's Second "Test" Extrapolates From His Flawed Benchmark And Projects Impossible Prices.

Dr. Carter's second "test" fares no better. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

▮ ██████████████████████████████████████

▮ ██████████████████████████████████████
██████████████████████████████

▮ ████████████████████████████████

Carter Dep. 43:12-23; Carter Table 17. Sounds reasonable enough; but it is clearly—and completely—flawed. ████████████████████████████████████

████████████████ That internal—unexplained—inconsistency alone is a red flag. (No doubt that is why Carter calculated but did not disclose them. Carter Dep. 178:20-180:3.)

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████



Johnson Ex. 4.

Carter Dep. 110:1-4.

By ignoring enormous real world facts, the model spits out ridiculous results. Once again, it is "simply unrealistic" to predict that producers should have charged prices below cost for years. *Whitserve*, 694 F.3d at 33; *Polaroid*, 1990 WL 324105, at *72.

### 3. Dr. Carter's *Ipse Dixit* Also Does Not Show Common Injury.

Carter ¶ 189.

*Id.*

Carter Dep. 173:10-14.

█████████████████████████████████████████████████████████

███████████████████████████████████████████████ *Supra* at 22-23.

█████████████████████████████████████████████████████████

█████████████████████████████████ Johnson ¶ 306.

In sum, DPPs have not—because they cannot—shown common impact. ███████████

███████████████████████████████████████████████████ But this one-size-fits-all

approach does not fit in the chicken industry. ███████████████████████████████

█████████████████████████████████████████████████████████

██████ And yet producing such a reliable method is Plaintiffs' burden at this stage. As courts have repeatedly explained, Plaintiffs' burden of production is to "offer[] . . . a reliable method of proving impact," *Reed*, 268 F.R.D. at 582, and show "that the model is methodologically sound," *In re Aluminum*, 336 F.R.D. at 46; *see also Comcast*, 569 U.S. at 34 (without a methodology, "respondents cannot show Rule 23(b)(3) predominance"). This is why courts deny class certification where models do not consider "the realities of the . . . industry," *In re Steel*, 2015 WL 5304629, at *8, where experts ignore significant evidence of bargaining power and nonstandard pricing, *In re Photochromatic Lens Antitrust Litig.*, 2014 WL 1338605, at *24-25, *In re Graphics*, 253 F.R.D. at 489, 494, and where they simply cannot withstand Rule 23's "rigorous analysis," *In re Aluminum*, 336 F.R.D. at 47. Ultimately, it is not just the complexities of this industry that require that class certification be denied. Instead, it is also Plaintiffs' failure to produce a model that can capably grapple with those complexities—a simple failure of proof, which alone is enough to reject Plaintiffs' motion. *In re Aluminum*, 336 F.R.D. at 46-47.

### E. Plaintiffs Do Not Have Any Methodology For Showing Damages, Either.

For all the reasons set forth above, individual issues also predominate for determining damages. "Even if Plaintiffs determined that the overall price of [chicken] increased, individual

inquiries into the damages each class member incurred would be required and predominate over issues common to the class." *In re Steel,* 2015 WL 5304629, at *11.

## CONCLUSION

The DPPs choose to bring this sprawling lawsuit against 20 Defendants alleging a decades-long conspiracy. ████████████████████████████████████████████████████████ ███████████████████████████████████████████ But they have not put in the work, or shown that that work is even possible: ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████████████ DPPs have the burden of putting forth a reliable model of proving class-wide injury. Having failed to carry that burden after years of discovery, their motion should be denied, with prejudice.[36]

---

[36] Defendants respectfully request that the Court set a hearing on the DPPs' Motion.

Dated:  January 22, 2021                    Respectfully submitted,

                                            */s/ Daniel E. Laytin, P.C.*
                                            Daniel E. Laytin, P.C.
                                            Christa C. Cottrell, P.C.
                                            Stacy Pepper
                                            Rachel B. Haig
                                            KIRKLAND & ELLIS LLP
                                            300 North LaSalle Street
                                            Chicago, IL 60654
                                            (312) 862-2000
                                            dlaytin@kirkland.com
                                            ccottrell@kirkland.com
                                            stacy.pepper@kirkland.com
                                            rachel.haig@kirkland.com

                                            *Attorneys for Defendants Sanderson Farms,
                                            Inc., Sanderson Farms, Inc. (Processing
                                            Division), Sanderson Farms, Inc. (Production
                                            Division), & Sanderson Farms, Inc. (Foods
                                            Division) and Liaison Counsel for Defendants*

DEFENDANTS' ATTORNEYS

KIRKLAND & ELLIS LLP

By: /s/ *Daniel E. Laytin, P.C.*
Daniel E. Laytin, P.C.
Christa C. Cottrell, P.C.
Stacy Pepper
Rachel B. Haig
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
dlaytin@kirkland.com
ccottrell@kirkland.com
stacy.pepper@kirkland.com
rachel.haig@kirkland.com

*Attorneys for Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Processing Division), and Sanderson Farms, Inc. (Production Division) and Liaison Counsel for Defendant*

VENABLE LLP

By: /s/ *J. Douglas Baldridge*
J. Douglas Baldridge (#437678)
Lisa Jose Fales (admitted *pro hac vice*)
Danielle Foley (admitted *pro hac vice*)
Andrew Hernacki (admitted *pro hac vice*)
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4000
Facsimile: 202-344-8300
jdbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
athernacki@venable.com

FALKENBERG IVES LLP

Kirstin B. Ives
30 N. LaSalle St., Ste 4020
Chicago, IL 60602
Telephone: (312) 566-4803
Facsimile: (312) 566-4810
kbi@ffilaw.com

*Attorneys for Defendants Perdue Farms, Inc. and Perdue Foods LLC*

ROSE LAW FIRM

By: /s/ *John W. Treece*
John W. Treece (#3122889)
1135 West Montana Street
Chicago, IL 60614
Telephone: (312) 961-7808
jtreece@jwtreece.com

Amanda K. Wofford (admitted *pro hac vice*)
Bourgon Reynolds (admitted *pro hac vice*)
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131
Facsimile: (501) 375-1309
awofford@roselawfirm.com
breynolds@roselawfirm.com

*Attorneys for Defendants Mountaire Farms Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc.*

MAYER BROWN LLP

By: /s/ *Carmine R. Zarlenga*
Carmine R. Zarlenga (#90784529)
William H. Stallings (admitted *pro hac vice*)
Stephen M. Medlock (admitted *pro hac vice*)
Oral D. Pottinger (admitted *pro hac vice*)
1999 K Street N.W.
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
czarlenga@mayerbrown.com
wstallings@mayerbrown.com
smedlock@mayerbrown.com
opottinger@mayerbrown.com

*Attorneys for Defendant Foster Farms, LLC and Foster Poultry Farms, a California Corporation*

NOVACK AND MACEY LLP

By: /s/ *Stephen Novack*
Stephen Novack
Stephen J. Siegel
Christopher S. Moore
100 North Riverside Plaza
Chicago, IL 60606
Telephone: (312) 419-6900
Facsimile: (312) 419-6928
snovack@novackmacey.com
ssiegel@novackmacey.com
cmoore@novackmacey.com

*Attorneys for Defendants Koch Foods Incorporated, JCG Foods of Alabama LLC, JCG Foods of Georgia LLC and Koch Meat Co., Inc.*

PROSKAUER ROSE LLP

By: /s/ *Christopher E. Ondeck*
Christopher E. Ondeck (admitted *pro hac vice*)
Stephen R. Chuk (admitted *pro hac vice*)
1001 Pennsylvania Ave., NW, Ste 600 South
Washington, DC 20004
Telephone: (202) 416-6800
Facsimile: (202) 416-6899
condeck@proskauer.com
schuk@proskauer.com

*Attorneys for Wayne Farms LLC*

KUTAK ROCK LLP

By: /s/ *John P. Passarelli*
John P. Passarelli (admitted *pro hac vice*)
James M. Sulentic (admitted *pro hac vice*)
1650 Farnam Street
Omaha, NE 68102
Telephone: (402) 346-6000
Facsimile: (402) 346-1148
john.passarelli@kutakrock.com
james.sulentic@kutakrock.com

J.R. Carroll (admitted *pro hac vice*)
Jeffrey M. Fletcher (admitted *pro hac vice*)
234 East Millsap Road, Ste 200
Fayetteville, AR 72703-4099
Telephone: (479) 973-4200
Facsimile: (479) 973-0007
jr.caroll@kutakrock.com
Jeffrey.fletcher@kuakrock.com

Kimberly M. Hare (#6323326)
One South Wacker Drive, Ste 2050
Chicago, IL 60606-4614
Telephone: (312) 602-4100
Facsimile: (312) 602-4101
kimberly.hare@kutakrock.com

*Attorneys for Defendants O.K. Foods, Inc.,*
*O.K. Farms, Inc., and O.K. Industries, Inc.*

EDWARD C. KONIECZNY LLC

By: */s/ Edward C. Konieczny*
Edward C. Konieczny (admitted *pro hac vice*)
400 Colony Square, Ste 1501
1201 Peachtree Street, NE
Atlanta, GA 30361
Telephone: (404) 380-1430
Facsimile: (404) 382-6011
ed@koniecznylaw.com

SMITH, GAMBRELL & RUSSELL, LLP

David C. Newman (admitted *pro hac vice*)
W. Parker Sanders (admitted *pro hac vice*)
1230 Peachtree Street, N.E.
Promenade, Ste 3100
Atlanta, GA 30309
Telephone: (404) 815-3500
Facsimile: (404) 815-3509
dnewman@sgrlaw.com
psanders@sgrlaw.com

James L. Thompson
Lynch Thompson LLP
150 S. Wacker Drive, Suite 2600
Chicago, IL 60606
T: (312) 445-4623
F: (312) 896-5883
jthompson@lynchthompson.com

*Attorneys for Defendants Mar-Jac Poultry,*
*Inc.*

65

VAUGHAN & MURPHY

By:  /s/ *Charles C. Murphy, Jr.*
Charles C. Murphy, Jr. (admitted *pro hac vice*)
690 S Ponce Court NE
Atlanta, GA 30307
Telephone: (404) 667-0714
Facsimile: (404) 529-4193
cmurphy@vaughanandmurphy.com

WINSTON & STRAWN LLP

James F. Herbison
Michael P. Mayer
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
jherbison@winston.com
mmayer@winston.com

*Attorneys for Defendant Norman W. Fries, Inc. d/b/a Claxton Poultry Farms*

HOGAN LOVELLS US LLP

By:  /s/ *William L. Monts III*
William L. Monts III (admitted *pro hac vice*)
Justin W. Bernick (admitted *pro hac vice*)
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
Telephone:  (202) 637-5910
Facsimile: (202) 637-5911
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

MILLER, CANFIELD, PADDOCK, AND STONE P.L.C.

Jacob D. Koering
225 West Washington Street, Ste 2600
Chicago, Illinois  60606
Telephone:  (312) 460-4272
Facsimile:  (312) 460-4201
koering@millercanfield.com

*Attorneys for Defendant Agri Stats, Inc.*

SHOOK HARDY & BACON LLP

By: /s/ *Lynn H. Murray*
Lynn H. Murray
111 S. Wacker Dr., Ste 4700
Chicago IL 60606
Telephone: (312) 704-7700
Facsimile: (312) 558-1195
lhmurray@shb.com

Laurie A. Novion
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
lnovion@shb.com

CONNER & WINTERS

John R. Elrod
Vicki Bronson (admitted *pro hac vice*)
4375 N. Vantage Drive, Ste. 405
Fayetteville, AR 72703
Telephone: (479) 582-5711
jelrod@cwlaw.com
vbronson@cwlaw.com

*Attorneys for Defendant Simmons Foods, Inc.*
*and Simmons Prepared Foods Inc.*

VEDDER PRICE P.C.

By: /s/ *Gregory G. Wrobel*
Gregory G. Wrobel (#3122900)
222 N. LaSalle Street
Chicago, IL 60601
Telephone: (312) 609-7722
Facsimile: (312) 609-5005
gwrobel@vedderprice.com

JORDAN PRICE WALL GRAY JONES &
CARLTON, PLLC

Henry W. Jones, Jr. (admitted *pro hac vice*)
1951 Clark Avenue
Raleigh, NC 27605
Telephone: (919) 828-2501
Facsimile: (919) 834-8447
hjones@jordanprice.com

*Attorneys for Defendant House of Raeford*
*Farms, Inc.*

EVERSHEDS SUTHERLAND (US) LLP

By: /s/ *Patricia A. Gorham*
James R. McGibbon
Patricia A. Gorham
Peter M. Szeremeta
Kaitlin A. Carreno
Dylan W. de Fouw
999 Peachtree Street, N.E., Ste 2300
Atlanta, Georgia 30309-3996
Telephone: (404) 853-8000
Facsimile:  (404) 853-8806
jimmcgibbon@eversheds-sutherland.com
patriciagorham@eversheds-sutherland.com
peterszeremeta@eversheds-sutherland.com
kaitlincarreno@eversheds-sutherland.com
dylandefouw@eversheds-sutherland.com


SMITH AMUNDSEN LLC

Ronald Balfour
150 N. Michigan Avenue, Ste 3300
Chicago, Illinois 60601
Telephone: (312) 894-3369
Facsimile: (312) 997-1816
rbalfour@salawus.com

*Attorneys for Defendant Harrison Poultry, Inc.*

JOSEPH D. CARNEY & ASSOCIATES LLC

By:  /s/ *Joseph D. Carney*
Joseph D. Carney (admitted pro hac vice)
OFFICE ADDRESS:
139 Crocker Park Boulevard, Ste. 400
Westlake, OH 44145
MAILING ADDRESS:
1540 Peach Drive
Avon, OH 44011
Telephone: 440-249-0860
Facsimile: 866-270-1221
jdc@jdcarney.com
case@jdcarney.com

MILLER SHAKMAN LEVINE &
FELDMAN LLP

Thomas M. Staunton
Daniel M. Feeney
180 North LaSalle Suite 3600
Chicago, IL 60601
Telephone: 312-263-3700
tstaunton@millershakman.com
dfeeney@millershakman.com

D.KLAR LAW

Deborah A. Klar (admitted pro hac vice)
2934 1/2 Beverly Glen Circle, Suite 761
Bel Air, CA 90077
Telephone: 310-858-9500
dklar@dklarlaw.com

Paul L. Binder, Esq. (admitted pro hac vice)
Attorney at Law
20780 Brandywine
Fairview Park, OH 44126-2805
Telephone: 440-376-6850
binderpl@yahoo.com

*Attorneys for Defendants Case Foods, Inc., Case Farms, LLC, and Case Farms Processing, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2021, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Daniel E. Laytin, P.C.*

Daniel E. Laytin, P.C.