**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION* | Case: 1:16-cv-08637 |
| | |
| THIS DOCUMENT RELATES TO: | Honorable Thomas M. Durkin |
| | |
| End-User Consumer Plaintiffs | |

**DEFENDANTS' OPPOSITION TO END-USER CONSUMER**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**PUBLIC REDACTED VERSION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 5

I.      THE EUCP CLASS DEFINITION ..................................................................... 5

II.    THE REALITIES OF CHICKEN PRODUCTION ............................................. 6

        A.     The Different Market Segments, Cuts, and Chicken Products .............................6

        B.     EUCPs Fail to Demonstrate that the Alleged Production Cuts Resulted in Less Chicken for Consumers ........................................................................................9

                1.     Overall Production Increased, not Decreased, during the Class Period ..... 9

                2.     There were no uniform "Production Cuts" ............................................... 10

                3.     EUCPs Offer No Causal Connection Between Alleged "Cuts" and Alleged Overcharges ............................................................................................ 12

III.   EUCPS' OVERCHARGE CLAIMS IGNORE THE REALITY OF THE COMPLEX PROCESS OF SELLING AND DISTRIBUTING CHICKEN PRODUCTS ................... 13

        A.     EUCPs Ignore the Complexities in Chicken Purchasing ......................................13

                1.     The Chicken Purchasing Chain is Complex and Varied ........................... 13

                2.     Chicken Pricing Mechanisms Vary Widely and Did Not Apply Uniformly Across the Sales Channels that Sold Chicken Products to EUCPs ........... 15

                3.     Individual direct purchasers negotiated with individual Defendants for different volumes of different products .................................................... 17

          B.     EUCPs' Own Experts' Modeling Shows No Overcharges to Large Portions of the EUCP Class ..........................................................................................................21

                1.     Many Direct Purchasers who sold to EUCPs incurred no overcharges.... 21

                2.     Direct Purchasers did not uniformly pass-through any alleged overcharges to End-User Consumers ........................................................................... 23

ARGUMENT ................................................................................................................. 25

I.      LEGAL STANDARD.......................................................................................... 25

II.    EUCPS FAIL TO ESTABLISH PREDOMINANCE ....................................... 27

        A.     Dr. Sunding's Flawed Model Cannot Show Common Proof of Antitrust Impact.28

                1.     Dr. Sunding's Impact Analysis Violates Comcast.................................... 29

                2.     Dr. Sunding's Impact Analysis Does Not Isolate Unlawful Conduct ...... 31

                3.     Dr. Sunding's Overcharge Model is Fundamentally Unreliable .............. 32

                4.     Dr. Sunding's Pass-Through Model is Fundamentally Unreliable........... 34

        B.     Dr. Sunding's Damages Model Cannot Show Damages on a Class-Wide Basis ..38

i

C.  EUCPs Cannot Show Predominance Or Superiority Because Of Substantive
    Variations In The Many State Laws Governing Their Claims ............................41

    1.  There Are Material Variations Among The Twenty-One Jurisdictions'
        Antitrust Laws........................................................................................... 44

    2.  There Are Substantive Differences Between The Jurisdictions' Consumer
        Protection Laws ......................................................................................... 45

    3.  Plaintiffs Compound The Problem By Bringing Unjust Enrichment Claims
        Under The Laws of Twenty-Four Jurisdictions ........................................ 47

    4.  Plaintiffs Have Failed To Demonstrate Manageability ............................ 49

III.  EUCPS' CLASS DEFINITION CONTAINS A GREAT MANY UNINJURED
      CONSUMERS AND IS FATALLY OVERBROAD........................................................ 50

IV.  EUCPS FAIL TO ESTABLISH TYPICALITY AND ADEQUACY............................. 55

CONCLUSION............................................................................................................... 59

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Al Haj v. Pfizer Inc.*,
  2020 WL 13330367 (N.D. Ill. Mar. 23, 2020) .......................................................................55

*Alioto v. Town of Lisbon*,
  651 F.3d 715 (7th Cir. 2011) ...................................................................................................47

*In re Aluminum Warehousing Antitrust Litig.*,
  __ F.R.D. __, 2020 WL 4218329 (S.D.N.Y. July 23, 2020) .................................27, 29, 33, 38

*Am. Exp. Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013)..................................................................................................................26

*Am. Seed Co. v. Monsanto Co.*,
  238 F.R.D. 394 (D. Del. 2006) .................................................................................................27

*In re Aqua Dots Prods. Liab. Litig.*,
  270 F.R.D. 377 (N.D. Ill. 2010)................................................................................................48

*Arthur v. Microsoft Corp.*,
  267 Neb. 586 (Neb. 2004).........................................................................................................44

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018)...........................................................................................27, 52, 53

*Blades v. Monsanto Co.*,
  400 F.3d 562(8th Circ. 2005).....................................................................................................34

*In re Bridgestone/Firestone Tires Prods. Liab. Litig.*,
  288 F.3d 1012 (7th Cir. 2002) ......................................................................................35, 43, 45

*California v. Infineon Techs. AG*,
  No. C 06-4333 PJH, 2008 WL 4155665 (N.D. Cal. Sept. 5, 2008).........................................27

*CE Design Ltd. v. King Architectural Metals, Inc.*,
  637 F.3d 721 (7th Cir. 2011) ....................................................................................................57

*Ex parte Citicorp Acceptance Co.*,
  715 So. 2d 199 (Ala.1997)........................................................................................................25

*Clark v. Bumbo Int'l Tr.*,
  2017 WL 3704825 (E.D. Ill. August 28, 2017) ..................................................................51, 53

*Clay v. Am. Tobacco Co.*,
    188 F.R.D. 483 (S.D. Ill. 1999) ...........................................................................48

*Clayworth v. Pfizer, Inc.*,
    233 P.3d 1066 (Cal. 2010) ...................................................................................44

*In re Cmty. Bank of N. Va. & Guaranty Nat'l Bank of Tallahassee Second Mortg.*
    *Loan Litig.*,
    622 F.3d 275 (3d Cir. 2010)................................................................................45

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)................................................................................... *passim*

*Commander Props. Corp. v. Beech Aircraft Corp.*,
    164 F.R.D. 529 (D. Kan. 1995)...........................................................................48

*Conergy AG v. MEMC Elec. Materials, Inc.*,
    651 F. Supp. 2d 51 (S.D.N.Y. 2009)...................................................................44

*Dailey v. Groupon, Inc.*,
    2014 WL 4379232 (N.D. Ill. Aug. 27, 2014) ......................................................39

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) ......................................................57

*Dancel v. Groupon, Inc.*,
    949 F.3d 999 (7th Cir. 2019) ..............................................................................26

*In re Domestic Drywall Antitrust Litig.*,
    2017 U.S. Dist. LEXIS 135758 (E.D. Pa. Aug. 24, 2017)....................................42

*Doster Lighting, Inc. v. E-Conolight, LLC*,
    No. 12-C-0023, 2015 WL 3776491 (E.D. Wis. June 17, 2015) ............................41

*Dvorak v. St. Clair Cty.*,
    2018 U.S. Dist. LEXIS 10585 .............................................................................55

*In re Epipen Epinephrine Injection.*,
    No. 17-md-2785-DDC-TJJ, 2020 WL 1180550 (D. Kan. Mar. 10, 2020) ..................... *passim*

*Espenscheid v. DirectSat USA, LLC*,
    705 F.3d 770 (7th Cir. 2013) ..............................................................................40

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
    223 F.R.D. 506 (S.D. Ill. 2004) ..........................................................................34

*In re Flash Memory Antitrust Litig.*,
    No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) .......................27

*In re Florida Cement & Concrete Antitrust Litig.*,
278 F.R.D. 674 (S.D. Fla. 2012) ...................................................................27, 35

*In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*,
2017 WL 1196900 (E.D. Ill. March 31, 2017) ...............................................39, 52

*Foday v. Air Check, Inc.*,
2017 WL 2672294 (N.D. Ill. June 21, 2017) .........................................................25

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig. v. Ford Motor Co.*,
174 F.R.D. 332 (D.N.J. 1997) ......................................................................41, 49

*Freeman Indus., LLC v. Eastman Chem. Co.*,
172 S.W.3d 512 (Tenn. 2005) ..............................................................................44

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
No. 1:04-MD-1628RMB, 2008 WL 5661873 (S.D.N.Y. Feb. 20, 2008) ...............27

*Gen. Tel. Co. of the Sw. v. Falcon*,
457 U.S. 147 (1982) ..............................................................................................26

*Georgine v. Amchem Prods., Inc.*,
83 F.3d 610 (3d Cir. 1996), *aff'd sub nom Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ..............................................................................................43

*In re Grand Theft Auto Video Game Consumer Litig.*,
251 F.R.D. 139 (S.D.N.Y. 2008) ...........................................................................45

*Grandalski v. Quest Diagnostics, Inc.*,
767 F.3d 175 (3d Cir. 2014) ..................................................................................42

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008) .............................................................27, 35, 37

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ..............................................................................................26

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ..................................................................................37

*In re Intel Corp. Microprocessor Antitrust Litig.*,
No. CA 05-485-JJF, 2010 WL 8591815 (D. Del. July 28, 2010) ...........................27

*In re Intuniv Antitrust Litig. (Indirect Purchasers)*,
No. 1:16-CV-12396-ADB, 2019 WL 3947262 (D. Mass. Aug. 21, 2019) .......27, 52

*Issacs v. Sprint Corp.*,
261 F.3d 679 (7th Cir. 2001) .................................................................................27

*In re K-Dur Antitrust Litig.,*
  No. CIV.A. 01-1652 (JAG), 2008 WL 2660723 (D.N.J. Mar. 27, 2008) ...............................27

*Kleen Prods. LLC v. Int'l Paper Co.,*
  831 F.3d 919 (7th Circ. 2016) .................................................................................26, 38, 39

*In re Lamictal Direct Purchaser Antitrust Litigation,*
  957 F.3d 184,193-94 (3rd Circ. 2020) ...................................................................................28

*In re Lamictal,*
  957 F.3d at 194 .....................................................................................................................33

*In re Loestrin 24 Fe Antitrust Litig.,*
  410 F.Supp.3d 352 (D.R.I. 2019) ..........................................................................................50

*Mace v. Van Ru Credit Corp.,*
  109 F.3d 338 (7th Cir. 1997) .................................................................................................59

*Martz v. PNC Bank, N.A.,*
  2007 WL 2343800 (W.D. Pa. Aug. 15, 2007) .......................................................................56

*Messner v. Northshore Univ. HealthSystem,*
  669 F.3d 802 (7th Circ. 2012) ..........................................................................................28, 38

*In re Methionine Antitrust Litig.,*
  204 F.R.D. 161 (N.D. Cal. 2001) ...........................................................................................27

*Mowry v. JP Morgan Chase Bank, N.A.,*
  2007 WL 1772142 (N.D. Ill. June 19, 2007) .........................................................................56

*Muehlbauer v. Gen. Motors Corp.,*
  2009 WL 874511 (N.D. Ill. 2009) ..........................................................................................48

*Oshana v. Coca-Cola Co.,*
  225 F.R.D. 575 (N.D. Ill. 2005) .............................................................................................50

*In re Plastic Additives,*
  2010 WL 3431837 (E.D. Pa. Aug. 31, 2010) .........................................................................28

*In re Processed Egg Prods. Antitrust Litig.,*
  312 F.R.D. 124(E.D. Pa. 2015) ..............................................................................................47

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
  292 F. Supp. 3d 14 (D.D.C. 2017) .........................................................................................38

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
  725 F.3d 244 (D.C. Cir. 2013) .........................................................................................26, 29

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   934 F.3d 619 (D.C. Cir. 2019) ..........................................................................52

*Randall v. Rolls-Royce Corp.*,
   637 F.3d 818 (7th Cir. 2011) ............................................................................57

*Reed v. Advocate Health Care*,
   268 F.R.D. 573 (N.D. Ill. 2009) ................................................................. *passim*

*In re Relafen Antitrust Litig.*,
   225 F.R.D. 14 (D. Mass. 2004) ........................................................................27

*Retired Chicago Police Ass'n v. City of Chicago*,
   7 F.3d 584 (7th Cir. 1993) ..........................................................................26, 57

*In re Rhone-Poulenc Rorer, Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ......................................................................43, 50

*Riffey v. Rauner*,
   910 F.3d 314 (7th Cir. 2018) ......................................................26, 28, 39, 51

*Riffey v. Rauner*,
   No. 10 CV 02477, 2016 WL 3165725 (N.D. Ill. June 7, 2016), *aff'd*, 873 F.3d
   558 (7th Cir. 2017), *cert. granted, judgment vacated*, 138 S. Ct. 2708, 201 L.
   Ed. 2d 1094 (2018) ....................................................................................50, 52

*Sheet Metal Workers Local 441 Health & Welfare Plan v. Glaxosmithkline, PLC*,
   No. CIV.A. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ...................27

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
   299 F.R.D. 555 (E.D. Tenn. 2014) ....................................................................27

*Somers v. Apple, Inc.*,
   258 F.R.D. 354 (N.D. Cal. 2009) ......................................................................27

*Spano v. The Boeing Co.*,
   633 F.3d 574 (7th Cir. 2011) ............................................................................51

*In re Steel Antitrust Litig.*,
   2015 WL 5304629 (N.D. Ill. 2015) ..............................................................27, 28

*Suchanek v. Sturm Foods, Inc.*,
   764 F.3d 750 (7th Cir. 2014) ............................................................................28

*Susman v. Lincoln Am. Corp.*,
   561 F.2d 86 (7th Cir. 1977) ..............................................................................56

*Swan v. Bd. of Educ. of Chicago*,
  2013 WL 4047734 ...........................................................................................................26

*In re Thalomid & Revlimid Antitrust Litig.*,
  No. CV 14-6997, 2018 WL 6573118 (D.N.J. Oct. 30, 2018)...........................................27, 52

*Thompson v. Jiffy Lube Int'l, Inc.*,
  250 F.R.D. 607 (D. Kan. 2008)........................................................................................46

*Turner v. Micro Switch*,
  No. 98-cv-50276, 2001 WL 13255 (N.D. Ill. Jan. 3, 2001), *aff'd sub nom.*
  *Turner v. Honeywell, Micro Switch Div.*, 54 F. App'x 236 (7th Cir. 2002) ...........................47

*Vega v. T-Mobile USA, Inc.*,
  564 F.3d 1256 (11th Cir. 2009) .......................................................................................48

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
  No. 2:06-CV-1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015).................................. *passim*

*Vulcan Golf, LLC v. Google Inc.*,
  254 F.R.D. 521 (N.D. Ill. 2008).......................................................................................49

*Williamson v. S.A. Gear Co.*,
  No. 15-CV-365-SMY-DGW, 2018 WL 2735593 (S.D. Ill. June 7, 2018)...........................51

*In re Yasmin & Yaz*,
  2012 WL 865041 (S.D. Ill. Mar. 13, 2012) ......................................................................52

**Statutes**

6 R.I. Gen. Laws Ann. § 6-36-7(c) ..........................................................................................44

Cal. Bus. & Prof. Code § 16750.1 ...........................................................................................45

Kan. Stat. Ann. § 60-512 .......................................................................................................45

MCLA § 445.781 ..................................................................................................................45

Me. Rev. Stat. Ann. § 752 .....................................................................................................45

Me. Rev. Stat. tit. 10 § 1101 ..................................................................................................44

N.C. Gen. Stat. Ann. § 75-1 ..................................................................................................44

N.C. Gen. Stat. § 75-16.2 ......................................................................................................45

N.H. Rev. Stat. § 356.12 ........................................................................................................45

N.Y. Gen. Bus. Law § 340(5) ................................................................................................45

N.Y. Gen. Bus. Law § 340(6) ...........................................................................................44

Nebraska Consumer Protection Act .................................................................................47

New Mexico's Unfair Trade Practices Act .......................................................................47

New York's Donnelly Act, N.Y. Gen. Bus. L. § 340(1) ..................................................44

Or. Rev. Stat. Ann. § 646.715 .........................................................................................44

S.D. Codified L. § 37-1-3.1 to -3.2 ..................................................................................44

**Other Authorities**

Fed R. Civ. P. 23(a)(3)-(4) ...............................................................................................55

Rule 23 ......................................................................................................................... *passim*

Rule 23(b)(3) ................................................................................................26, 27, 42, 45

The undersigned Defendants respectfully submit their Opposition to the End-User Consumer Plaintiffs' (the "EUCPs" or "Plaintiffs") Motion for Class Certification, Dkt. No. 3971 (the "Motion").

## PRELIMINARY STATEMENT

EUCPs' Motion attempts to gloss over the many individualized factors that are fatal to class certification. Through their Motion, EUCPs seek to certify a class of "millions" of consumers who purchased thousands of different raw chicken products at grocery and other retail stores in twenty-five states over a seven-year period.[1] EUCPs' Motion attempts to take the multi-step, complicated processes of producing, selling, and distributing thousands of chicken products to millions of consumers and describe it as an uncomplicated process of selling a "commodity." The reality is that the thousands of chicken products at issue in this Motion are anything but a "commodity" product, and the fundamental complexities that pervade every step of the production, distribution, and sales processes present insurmountable individual issues for the proposed class.

EUCPs' conspiracy claims fail to get out of the starting gates because their alleged "production cuts," which largely took place before EUCPs' Class Period (January 2012 through July 2019), did not involve coordinated or even parallel conduct. An examination of actual production data shows that the Defendants responded differently to "the perfect storm" of challenging economic circumstances—including the Great Recession, historic droughts, and exorbitant feed prices. In the face of these challenges, there were no uninform movements in production. Some Defendants increased production, some decreased production, and others kept

---

[1] EUCP Mot. at 20. Although EUCPs assert in their Motion that the class contains "millions of consumers," no EUCP expert actually offered an opinion on the number of proposed class members, and EUCPs offer no explanation as to how many "millions" of class members they seek to represent. Exhibit 1 to the Declaration of Danielle R. Foley, ███████████ ████████████████████████ All Exhibits cited hereto are exhibits to the Foley Declaration.

1

production the same.  There simply were no coordinated production cuts that could have impacted the EUCP class.  Then, during the EUCP Class Period, production actually increased *each and every* year.

Against this background, EUCPs' Motion fails to satisfy the elements of Rule 23 for three reasons.  ***First***, EUCPs cannot show predominance.  EUCPs rely upon the expert report of Dr. Sunding to attempt to satisfy predominance.  ██████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████ None of Dr. Sunding's models come close to making these showings.  For one, ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████[2] ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████[3] That is, his opinion is disconnected from Plaintiffs' theory of harm.

Even if Dr. Sunding's models were tied to Plaintiffs' theory of harm (which they are not), they are fundamentally flawed and unreliable and cannot show impact on a class-wide basis.  ██ ████████████████████████████████████████████████████████████████████

---

[2] ██████████████████████████████████████████████.
[3] █████████████████████████████████████████████████████████.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

EUCPs also fail to show that common issues of damages predominate. Again, EUCPs rely upon Dr. Sunding, and again, Dr. Sunding's model cannot show class-wide damages using common proof. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ On top of these

predominance problems, EUCPs also fail to account for or manageably address the multiple substantive conflicts of law that exist between the 25 jurisdictions whose laws they invoke.

**Second**, EUCPs' definition of the proposed class is impermissibly broad. As shown by an examination of Dr. Sunding's model, ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ EUCPs do not even address this issue, but instead try to sweep it under the rug by claiming that class members can "self-identify." That argument does not provide any method to weed out the uninjured class members, but rather only highlights the individual inquires that would still need to be done in order to determine class membership. Nor could EUCPs address this issue by attempting to amend the class definition. Any attempt to do so would only result in an unmanageable, individualized inquiry to separate out the uninjured.

**Third**, EUCPs fail to establish typicality and adequacy. For example, ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ For all these reasons, the Motion must be denied.

**FACTUAL BACKGROUND**

**I.    THE EUCP CLASS DEFINITION**

EUCPs seek to certify a class of "end-user consumers who purchased raw breast meat or raw whole chicken at grocery stores for personal consumption between January 1, 2012 and July 31, 2019." (Mot. at 4).[4]  This definition does not include all chicken products purchased by consumers, but instead, as EUCPs describe it, their class products include "tray pack" chicken, which is "often packaged in Styrofoam trays." (*Id.*).  Specifically excluded from this description is (a) dark meat that is <u>not</u> sold as part of a "whole cut-up bird[] purchased within a package," and (b) any chicken (including breast meat or whole birds) that is marketed as "halal, kosher, free range, organic, diced, minced, ground, seasoned, flavored, or breaded." (*Id.* at 6).  Despite the attempt to simplify the class description, this definition includes over 20,000 individual products purchased by potentially millions of consumers from thousands of different entities in 25 states over a seven-year period.  Any attempt to assess potential impact and damages arising from EUCPs' alleged supply restriction conspiracy must consider the complexities of the different types of chicken products that Defendants produced during the Class Period, the processes through which Defendants produced those products, and the complex web of distribution and sales that put those products in the hands of end-user consumers.

---

[4] EUCPs' full definition is: "All persons and entities who indirectly purchased the following types raw chicken [sic], whether fresh or frozen: whole birds (with or without giblets), whole cut-up birds purchased within a package, breast cuts or tenderloin cuts, but excluding chicken that is marketed as halal, kosher, free range, organic, diced, minced, ground, seasoned, flavored or breaded – from defendants or co-conspirators for personal consumption in the Repealer Jurisdictions from January 1, 2012 to July 31, 2019." (Mot. at 6).  The "Repealer Jurisdictions" are California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, and Wisconsin. (*Id.*).

## II.     THE REALITIES OF CHICKEN PRODUCTION

In contrast to the picture EUCPs attempt to present, the reality is that the production, distribution, and pricing of the thousands of different products are complex and multi-faceted processes.  When these complex processes are considered, EUCPs' allegations of an agreement to restrict supply fall apart, and the impact, if any, of those allegations on EUCPs cannot be established on a class-wide basis.

### A.     The Different Market Segments, Cuts, and Chicken Products

While EUCPs focus their class definition on fresh or frozen whole bird and breast meat bought by consumers at retail, those are only a small fraction of the universe of products that Defendants produce.  Defendants produce, process, and package thousands of different types of "Broiler" chicken products.  Broiler chickens are grown to different sizes (generally called "small bird," "medium bird," and "big bird"), with each size intended for sale to a different customer segment, with different product attributes.[5]  Defendants sell products derived from these different bird sizes to thousands of customers, including whole birds sold to club stores, tray packs with boneless skinless breasts to supermarkets for resale to consumers, breast meat to distributors for resale to restaurants, customized cut-up products to fast food restaurants, and chicken wings to wing specialty restaurants.



Not surprisingly, Defendants orient their businesses in different ways around these different segments.  A processor's ability to slaughter a bird of a certain size does not mean it has the ability (or strategic interest) to slaughter birds of all sizes.  To the contrary, different production processes—involving different genetic stock and facilities—apply to each of these market segments, and producers cannot easily convert facilities from one size to another.[6]   During the Class Period, there was significant variation among the Defendants in their production for each segment.  For example, ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████[7] Given all of these differences, █████████████

_____

[6] ████████████████████████████████████████████████████.

[7] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████

Further complicating the issue is that Defendants process numerous different preparations and cuts of meat from the birds they produced. Cuts include breast, wings, whole bird, tender, fillet, thighs, drumsticks, legs, and leg quarters, as well as other cuts like feet and gizzards. (Ex. 3, Johnson Report at ¶ 73 and Ex. 5). All of these cuts may be sold fresh, frozen, or further processed – whether marinated, breaded, seasoned, or otherwise, and determining which cut or processing method requires distinct steps along the production process. (Ex. 3, Johnson Report at ¶ 75). Within these cuts and further processing methods, additional product variations exist. For example, some Defendants produce products with additional "attributes," including all vegetable feed, no antibiotics ever ("NAE"), antibiotic free ("ABF"), California-grown, and specific trimming of breast meat, while others produced "yellow" chicken (*i.e.,* chicken that is fed marigold extract to impart a yellow color to the meat, which for some consumers, particularly in the Hispanic community, is considered a premium "niche" product).[8] *See* █████████████████████████

████████████████████████████████████

████████████████████████████████████

---

████████████████████████████████████

[8] ████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ [9] Each of these

different products and attributes leads to different supply and demand dynamics.

**B.** **EUCPs Fail to Demonstrate that the Alleged Production Cuts Resulted in Less Chicken for Consumers**

1. *Overall Production Increased, not Decreased, during the Class Period*

EUCP's theory makes little sense given ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

EUCPs offer no explanation to reconcile this simple fact with their supposed conspiracy.

Even if EUCPs' allegations of "production cuts" before the Class Period had any bearing

on the injury they purportedly suffered (which they do not) these supposed "production cuts" are

not supported by evidence. While EUCPs focus ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ [10]

─────────────────────

[9] ████████████████████████████████████████████████████████████
████████████████████████████████████████████.

[10] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████

## 2. There were no uniform "Production Cuts"

Despite EUCPs' claims of "unprecedent[ed]" coordinated production cuts, there were no uniform "production cuts" across Defendants, either before or during the alleged Class Period.

EUCPs' claims must be considered in the context of the "perfect storm" of economic circumstances Defendants faced. Beginning in late 2008, the Great Recession weakened demand for many chicken products. Consumer spending habits changed profoundly in ways that impacted the meat industry.[11] This economic shock, which EUCPs' own expert does not allege was part of any conspiracy, overlaps with their "2008 Production Cut" and had long-lasting effects. ███

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ Further, the cost of chicken feed—the largest input cost for raising chickens—soared to unheard-of levels in 2008. This historic run-up in feed cost had two main drivers: (1) "ethanol mandate" legislation massively increased the demand for corn,[12] which, in turn, increased the cost of chicken feed, which is mostly corn[13]; and (2) flooding struck the

---

[11] *See, e.g.* Ex. 17, Christopher R. Sims, *Time Series Forecast Analysis in Wholesale Broiler Markets*, University of Arkansas Theses and Dissertations, at 15 (Dec. 2017) ("total meat consumption dropped by approximately 9 percent; poultry accounted for nearly 6 percent of the decline."); Ex. 18, Paul Aho, *The Great Meat Recession*, WattAgNet (Apr. 14, 2014) (per capita meat and poultry consumption dropped 10% in the United States during the Great Recession, and that meat consumption tracks median income levels); *see also* Ex. 23, A. Pauk Dep. Tr. at 149:24-151:2 (explaining that she reduced chicken purchasing when her husband lost his job during the Great Recession).

[12] *See* Ex. 19, D. Streitfield, *U.S. May Free Up More Land for Corn Crops*, NY Times (June 21, 2008) (reporting that a quarter of the entire U.S. corn crop was used for biofuels); Ex. 20, M. Donohue & D.L. Cunningham, *Effects of Grain and Oilseed Prices on the Costs of US Poultry Production*, J. Appl. Poult. Res. 325, 327 (2009).

[13] *See* Ex. 19, Streitfied, *supra* n. 12. (reporting that industry groups urged easing the ethanol mandate to free up corn for animal feed); Ex. 21, Associated Press, *Flooding Will Send Food Prices Soaring*, https://www.dailynews.com/2008/06/23/flooding-will-send-food-prices-soaring/

Midwest in 2008 and drowned cornfields.[14]   Accordingly, chicken producers simultaneously experienced shrinking demand for some chicken products, economic uncertainty surrounding a historic recession, and spiraling input costs.

Against this backdrop, some Defendants, based on their own circumstances, individually decided to reduce production in some areas of their businesses in 2008.



(June 23, 2008) (noting that U.S. corn prices had increased by 80% as "developing countries like China and India scramble for grains to feed people and livestock . . . [and] production of ethanol . . . has [] pushed prices higher").

[14] *See* Ex. 21, Associated Press, *supra* n.13; Ex. 19, Stretfield, *supra* n. 12 (four million acres of farmland in the Midwest was washed away by the 2008 floods); Ex. 22, D. Goldman, *Midwest Floods May Send Gas up 15%*, CNNMoney (June 13, 2008) https://money.cnn.com/2008/06/13/news/economy/ corn_ethanol/?postversion=2008061316 (noting that fuel prices, another input cost for Defendants, also increased due to the historic flooding).



The facts surrounding the "2011 Production Cut" are similar. As in 2008, ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████ EUCPs' assertions about "coordinated

output reductions" are simply inconsistent with reality.

### 3. EUCPs Offer No Causal Connection Between Alleged "Cuts" and Alleged Overcharges

EUCPs' claims regarding supposed "production cuts" are untethered to reality and the

purported injuries that EUCPs allege occurred *during* the Class Period. Tellingly, despite

allegations about "production cuts" *before* the Class Period even began, EUCPs provide no

explanation of what production would have been but for the alleged conspiracy and no explanation

of how those production cuts caused overcharges *during* the Class Period. While they offer vague

assertions about an agreement to keep "supply short of demand" and another "round of production

cuts" in the Class Period, EUCPs again offer no evidence of what production levels would have

been but for the alleged conspiracy or anyway to separate the alleged impact of the conspiracy

from non-conspiratorial conduct. (*E.g.,* Mot. at 16.) ████████████████████████

███████████████████████████████████████████████████████████

---

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████



## III. EUCPS' OVERCHARGE CLAIMS IGNORE THE REALITY OF THE COMPLEX PROCESS OF SELLING AND DISTRIBUTING CHICKEN PRODUCTS

### A. EUCPs Ignore the Complexities in Chicken Purchasing

EUCPs also mask the complexity and variability that characterizes purchasing of chicken products. Those products take different paths from Defendants to EUCPs, passing through intermediaries that use unique pricing mechanisms and discounts. Among other things, prices vary in the distribution chains due to pricing mechanisms in upstream contracts; individual intermediaries' bargaining power; individual retailers' pricing and discount strategies; meat preparation, cut, and product; the Defendant in question; the season and region; prices of meat generally; and more. The price variability throughout this purchasing process means that the both the possibility of overcharges and the pass-through of any alleged overcharge would be anything but uniform.

### 1. The Chicken Purchasing Chain is Complex and Varied

.

13

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

██ ████████████████████. Chicken suppliers sell numerous different products to direct purchasers, which include retailers like Costco and Walmart, as well as distributors. Retailers, which often have many different locations around the country, resell chicken products to consumers like EUCPs. Distributors, on the other hand, resell chicken products to one or more additional intermediaries, such as smaller independent grocery stores, before those products change hands for a third time to consumers. EUCPs therefore purchased chicken products from multiple distribution chains, with different kinds and numbers of intermediaries. ████████

████████████████████████████████████████████

███

There is significant diversity among the direct purchasers. ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

Considering the relationships between direct purchasers and individual Defendants reveals still more complexity. ██████████████████████████████

14



The variation multiplies further at the end of these distribution chains. Plaintiffs' proposed class includes millions of individuals around the country who purchased various kinds of raw chicken from different sources that range from local grocers to national retailers to discount-club stores. Some of these purchases flowed along a distribution chain with one intermediary, while others wound their way through several, each with their own pricing strategies. Therefore, EUCPs' experiences—including the possibility of paying any alleged overcharge—would have diverged in this context.

> **2.    Chicken Pricing Mechanisms Vary Widely and Did Not Apply Uniformly Across the Sales Channels that Sold Chicken Products to EUCPs**

Because prices vary dramatically across each link of these distribution chains, there was no uniform price for any EUCP class product. This price variation resulted from a number of factors.

For example, the intermediaries through which consumers obtain chicken products may use many different pricing mechanisms when transacting with Defendants—even when dealing with a single supplier. ████████████████████████████████████
██████████████████████████16 █████████████████████████████████████████████
█████████████████████████████████ ████████████████████

———————————————

█ ████████████████████████████████████████████████████████████
█ ████████████████████████████████████████████████████████████





### 3. Individual direct purchasers negotiated with individual Defendants for different volumes of different products

The prices that retailers and distributors paid also varied based on their individual bargaining power. Large purchasers tend to have more bargaining power, meaning they can often command a lower price than other entities that are buying the exact same product, from the same

---

[23] Ex. 3, Johnson Report ¶ 164; *see also* Ex. 97, C. Thompson Dep. Tr. at 57:16-58:17 (explaining that there are "times where a bracket may jump, but we were told to keep [a customer] in the -- in its current bracket"); Ex. 30, C. Matthews Dep. Tr. at 39:9-40:3, 49:8-50:6; Ex. 44, PILGRIMS-0010293430 (Pilgrim's internal presentation recommending *not* to use a renegotiation clause that would lead to a higher price, in favor of increasing volume).

[24] Ex. 3, Johnson Report ¶ 167 (describing examples of Mountaire and Simmons' contracts with direct purchasers incorporating floor and ceiling pricing). *See also* Ex. 45, Mountaire 30(b)(6) Dep. Tr. at 84:4-85:3.

[25] Many retailers and distributors bought chicken products using more than one of these pricing mechanisms at once. For example, Sanderson's contract with US Foods for private label products prices some parts based on the Georgia Dock, some based on individual Urner Barry indices, and some based on "flat" prices: prices for the 87 unique products in this contract would <u>not</u> change in a uniform way over time. (Ex. 3, Johnson Report ¶ 147). Costco, which does a significant business in rotisserie chickens, would base the prices it was willing to pay for other chicken products on the price it would pay for rotisserie birds—which are not included within Plaintiffs' class definitions. *Id.*; *see also* Ex. 46, FF-BC-00267499-7520 (internal Foster Farms document describing this pricing dynamic as "The Costco Conundrum"); Ex. 47, WM-BROILERS_0000793450 (discussing the need for Pilgrim's to "balance[]" tray pack and rotisserie products in its bid).

[26] Pilgrim's used many different pricing mechanisms and formulas in its contracts with direct purchasers. *See* Ex. 30, C. Matthews Dep. Tr. at 24:14-25:3, 27:18-28:4, 29:22-30:4.

source, at the same time.

███████████████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████

EUCPs experienced widely differing prices when purchasing chicken products, whether from retailers that transact directly with Defendants or those that go through distributors. ████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



. These special low prices may result in retailers taking a loss on that subset of products—known as "loss leaders"[28]—



---

[28] *See* Ex. 68, James D. Hess, et al., *Loss Leader and Rain Check Policy*, Marketing Science 358-74 (1987).

Chicken product prices also vary by season and region.  For example, d

**B.    EUCPs' Own Experts' Modeling Shows No Overcharges to Large Portions of the EUCP Class**

**1.    Many Direct Purchasers who sold to EUCPs incurred no overcharges**

The significant complexity and variability in purchasing and pricing mechanisms discussed

above undercuts EUCPs' assertion that there was widespread overcharge.

---

30    While there are many flaws in Dr. Sunding's market definition discussion that would render it unreliable, addressing that portion of his report is unnecessary for purposes of class certification given all of the other flaws in his opinions. Defendants reserve all rights to address Dr. Sunding's market definition and market power opinions if necessary.





The absence of overcharges to these direct purchasers and for these products sold to direct purchasers means that there can be *no* overcharges to EUCPs on such purchases from these direct purchasers.

### 2. Direct Purchasers did not uniformly pass-through any alleged overcharges to End-User Consumers

Even accepting Plaintiffs' allegation of an overcharge (which did not occur), the complexities described above mean that overcharges would not be passed through to EUCPs in a common manner, if at all.

As discussed above,



---

[32] *See, supra,* Factual Background Section III.A.3.

[33]





As a result of all of the issues described above, determining whether any EUCP was injured as a result of the Defendants' alleged conduct, and to what extent, would require highly individualized inquiries. The EUCP class should not be certified under these circumstances.

## ARGUMENT

### I. LEGAL STANDARD

Class actions should "not be approved lightly." *Ex parte Citicorp Acceptance Co.,* 715 So. 2d 199, 203 (Ala.1997) *(citing Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 161 (1982)). A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only" and "[t]o come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Foday v. Air Check,*

*Inc.*, 2017 WL 2672294, at *2 (N.D. Ill. June 21, 2017) (citations omitted). Consequently, class certification is warranted only if EUCPs "actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014); *see also Dancel v. Groupon, Inc.*, 949 F.3d 999, 1005 (7th Cir. 2019) ("Rule 23 is more than a mere pleading standard"); *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993).

As the Rule 23 requirements are "stringent" and "exclude most claims," *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013), "certification is far from automatic." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 249 (D.C. Cir. 2013).[37] A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites [to certification] have been satisfied." *Gen. Tel. of the Sw.*, 457 U.S. at 161. "The decision whether to certify a class is one that depends on a careful assessment of the facts, of potential differences among class members, of management challenges, and of the overall importance of the common issues of law or fact to the ultimate outcome." *Riffey v. Rauner*, 910 F.3d 314, 318 (7th Cir. 2018); *Swan v. Bd. of Educ. of Chicago*, 2013 WL 4047734, at *4. To conduct this analysis, courts must

---

[37] EUCPs attempt to side-step their burden to establish common, class-wide impact by claiming that they are entitled to some "presumption" or "inference" of class-wide impact. (Mot. at 26 & fn. 120.) This is incorrect and attempts to turn Rule 23 on its head. As the Supreme Court and the Seventh Circuit have made clear, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule . . . ." (*Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 922 (7th Circ. 2016) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,350 (2011). The court "must therefore take a careful look at the evidence that the [plaintiffs] present[] in support of class certification…." *Id.* Where antitrust plaintiffs have not satisfied this burden, courts have denied certification. *See*, *e.g.*, *Reed v. Advocate Health Care*, 268 F.R.D. 573, 581-82 (N.D. Ill. 2009).

"probe behind the pleadings" and conduct a "rigorous analysis" of the law and facts. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted).

Simply put, Plaintiffs' proposed class would be a "nightmare of a class action." *Issacs v. Sprint Corp.*, 261 F.3d 679, 681-82 (7th Cir. 2001). Not surprisingly, courts have denied certification to many end-user antitrust class like the proposed EUCP class. [38]

## II. EUCPS FAIL TO ESTABLISH PREDOMINANCE

A critical requirement of Rule 23(b)(3) is the showing that "common proof will predominate with respect to each . . . element[] of [Plaintiffs'] claims," including antitrust impact and resulting damages. *Reed*, 268 F.R.D. at 581 (citations omitted). In particular, "Plaintiffs must affirmatively show how common evidence and a single, reliable methodology will prove [these] element[s] on a simultaneous, class-wide basis." *In re Steel Antitrust Litig.*, 2015 WL 5304629 at *5 (N.D. Ill. 2015). If putative class members would need to present varying evidence regarding

---

[38] The long list of end-user/end-payor cases in which courts **denied** class certification includes: *In re Aluminum Warehousing Antitrust Litig.*, __ F.R.D. __, 2020 WL 4218329 (S.D.N.Y. July 23, 2020); *In re Epipen Epinephrine Injection.*, No. 17-md-2785-DDC-TJJ, 2020 WL 1180550 (D. Kan. Mar. 10, 2020); *In re Intuniv Antitrust Litig. (Indirect Purchasers)*, No. 1:16-CV-12396-ADB, 2019 WL 3947262 (D. Mass. Aug. 21, 2019); *In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018); *In re Thalomid & Revlimid Antitrust Litig.*, No. CV 14-6997, 2018 WL 6573118 (D.N.J. Oct. 30, 2018); *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 572 (E.D. Tenn. 2014); *In re Florida Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 686 (S.D. Fla. 2012); *Sheet Metal Workers Local 441 Health & Welfare Plan v. Glaxosmithkline, PLC*, No. CIV.A. 04-5898, 2010 WL 3855552, at *31 (E.D. Pa. Sept. 30, 2010); *In re Intel Corp. Microprocessor Antitrust Litig.*, No. CA 05-485-JJF, 2010 WL 8591815, at *28–35 (D. Del. July 28, 2010); *In re Flash Memory Antitrust Litig.*, No. C 070086 SBA, 2010 WL 2332081, at *19 (N.D. Cal. June 9, 2010); *Somers v. Apple, Inc.*, 258 F.R.D. 354, 361 (N.D. Cal. 2009); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 507 (N.D. Cal. 2008); *In re K-Dur Antitrust Litig.*, No. CIV.A. 01-1652 (JAG), 2008 WL 2660723, at *8–14 (D.N.J. Mar. 27, 2008); *California v. Infineon Techs. AG*, No. C 06-4333 PJH, 2008 WL 4155665, at *13 (N.D. Cal. Sept. 5, 2008); *In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 1:04-MD-1628RMB, 2008 WL 5661873, at *5 (S.D.N.Y. Feb. 20, 2008); *Am. Seed Co. v. Monsanto Co.*, 238 F.R.D. 394, 402 (D. Del. 2006); *In re Relafen Antitrust Litig.*, 225 F.R.D. 14, 28 (D. Mass. 2004); *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 167 (N.D. Cal. 2001).

an essential question, then that question is not common. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Circ. 2012); *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) ("Where the defendant's allegedly injurious conduct differs from plaintiff to plaintiff . . . no common answers are likely to be found."). Critical to assessing predominance is whether the essential questions can be resolved without a "highly individualized inquiry." *Riffey*, 910 F.3d at 319.

Here, Plaintiffs have not established (and cannot establish) predominance for several independent reasons. First, Plaintiffs' flawed economic model cannot show class-wide antitrust impact; rather, given the many nuances that Plaintiffs' Motion and model ignore, individualized inquiries will overwhelm any common questions of impact. Second, Plaintiffs' damages model cannot show damages on a class-wide basis for the same reasons that Plaintiffs cannot show common proof of antitrust impact. Finally, Plaintiffs cannot establish predominance, or superiority, because they fail to account for or manageably address multiple substantive conflicts in the laws of the 25 jurisdictions that govern their claims.

### A. Dr. Sunding's Flawed Model Cannot Show Common Proof of Antitrust Impact

To establish predominance for antitrust impact in this case, Plaintiffs must offer a "common methodology for proving that prices increased on a class-wide, rather than individual, basis." *In re Steel*, 2015 WL 5304629, at *9. This common methodology must offer a "reliable" means for determining impact. *Reed*, 268 F.R.D. at 582. The methodology must be based on record evidence, not speculation or conjecture of an expert. *In re Plastic Additives*, 2010 WL 3431837, at *4, *6 (E.D. Pa. Aug. 31, 2010). The court must "take a hard look at the soundness of statistical models that purport to show predominance." *In re Steel*, 2015 WL 5304629, at *9; *In re Lamictal Direct Purchaser Antitrust Litigation*, 957 F.3d 184,193-94 (3rd Circ. 2020) (the

court must "scrutinize the evidence to determine what was credible and could be used in the expert analysis;" this scrutiny may include "multi-leveled microeconomic analysis of what each Defendant would or would not have possibly done in the but-for world"); *In re Rail Freight Fuel Surcharge*, 725 F.3d at 255("Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it").  A flawed statistical model cannot support class certification because it "measures harm not attributable to the conspiracy, yields false positives, masks uninjured class members by using an 'averaging' mechanism to allocate injury across the class, or otherwise fails to demonstrate with scientific rigor that classwide impact can be established through common proof."  *In re Aluminum Warehousing Antitrust Litig.*, No. 14-cv-3116-PAE, 2020 WL 4218329, at *41 (S.D.N.Y. July 23, 2020) (citations omitted).

Here, Plaintiffs assert that they offer "a three-part common proof of impact based on the ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████ None of Plaintiffs' "three-prongs" suffice to establish predominance as to antitrust impact. Rather, Plaintiffs' purported "common methodology" fails for several different reasons.

### 1.     Dr. Sunding's Impact Analysis Violates *Comcast*

████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████ At its core, Plaintiffs' theory is that EUCP class members suffered overcharges due to Defendants' alleged conspiracy, which consisted of three primary components: (i) an agreement by Defendants to cut supply beginning in 2008; (ii) other methods by some Defendants

to "stabilize output and inflate prices," such as manipulating the Georgia Dock index; and (iii) Defendants' sharing of information through Agri Stats.  (*See* Mot. at 7-18).   However, ███

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ As the Supreme Court emphasized in *Comcast Corp. v. Behrend*, translating "the *legal theory of the harmful event into an analysis of the economic impact of that event*" is a foundational requirement for modeling alleged class-wide impact.  569 U.S. 27, 38 (2013) (emphasis in original).   Here, ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ ████████████████████████

████████████████████████████████████████ In light of this disconnect from



Plaintiffs' theory of harm, Dr. Sunding's model does not and cannot show common impact to the class. *See Comcast*, 569 U.S. at 35 ("at the class-certification stage…any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation'" (citation omitted)).

### 2. Dr. Sunding's Impact Analysis Does Not Isolate Unlawful Conduct

Even if Dr. Sunding's model was tied to Plaintiffs' theory of harm (which it is not), it is fundamentally flawed and unreliable because it does not establish a *causal connection* between any alleged production cuts and overcharges in the Class Period. A methodology offered to assess antitrust impact must causally link purported impact to the allegedly anticompetitive conduct at issue. Here, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

Importantly, ██████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ In other words, ██

---

41 ███████████████████████████████████████████████████ is improper expert testimony. Defendants will fully address all of the bases on which Dr. Sunding's opinions should be excluded in their forthcoming motion to exclude.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ ██

### 3.       Dr. Sunding's Overcharge Model is Fundamentally Unreliable

Dr. Sunding's overcharge model is unreliable because it does not (and cannot) show common impact across direct purchasers. Without a reliable method of showing impact to direct purchasers, there can be no reliable method of showing impact to EUCPs. ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

Dr. Sunding's overcharge model fails for another reason. ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

_____

█ ██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████



*In re Aluminum Warehousing Antitrust Litig.*, 2020 WL 4218329, at \*48. Specifically,

Without overcharges for large numbers of direct purchasers, there can be no overcharges for them to "pass through" to any EUCPs.

For this very reason, in complex markets which involve individualized factors such as negotiations and discounts – like the ones present here – courts have found that utilizing averages is *not* an acceptable way to establish predominance for antitrust impact. *See In re Lamictal*, 957 F.3d at 194 (averages operate to "mask individualized injury" that bar predominance); *see also, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 2020 WL 4218329, at \*48, \*53-54 (rejecting impact model's attempt to "elide[]" complexities in the data through averaging as unreliable and incapable of proving common impact); *Reed*, 268 F.R.D. at 590-91 ("Measuring average base

wage suppression does not indicate whether each putative class member suffered harm from the alleged conspiracy. . . it is not a methodology common to the class that can determine impact with respect to each class member."); *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513-14 (S.D. Ill. 2004) (no predominance where "only individual inquiry could account for" factors including "var[iation] over time . . . customer needs, supplier costs, and other factors affecting market price, and would depend on the mix of products and services being considered"); *Blades v. Monsanto Co.*, 400 F.3d 562, 573(8th Circ. 2005) (similar).

### 4. Dr. Sunding's Pass-Through Model is Fundamentally Unreliable

Even assuming Dr. Sunding's model could reliably show common impact across direct purchasers (which it cannot), Dr. Sunding's "pass-through" model does not provide a reliable, common method for showing impact to EUCPs. First, ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

Here again, ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████ *See In re Graphics Processing Units*

*Antitrust Litig.*, 253 F.R.D. at 505 (denying class certification where pass-through analysis was flawed); *In re Fla. Cement*, 278 F.R.D. at 684-85 (denying class certification where pass-through analysis did not account for variations); *In re Bridgestone/Firestone Tires Prods. Liab. Litig.*, 288 F.3d 1012 (7th Cir. 2002) (reversing grant of class certification where putative class members had

purchased numerous different products, in a complex distribution chain with variations in pricing, discounts, and other factors).[43]

Second, ███████████████████████████████████████████

███████████████████ ████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



Finally, █████████████████████████████████████████

██████████████████████████████████████████████████ issues regarding pass-through cannot possibly predominate. *See In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. at 505; *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 314 (3d Cir. 2008) (certification inappropriate where the need to incorporate a "multitude of different variables" to determine customers' impact "defeat[s] any reasonable

notion of proof common to the class").[46]

### B. Dr. Sunding's Damages Model Cannot Show Damages on a Class-Wide Basis

In analyzing predominance, a court must also "see if there is a classwide method for proving damages, and if not, whether individual damage determinations will overwhelm the common questions on liability and impact." *Kleen Products LLC*, 831 F.3d at 929; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, at 142 (D.D.C. 2017) ("At this stage [] the Court must determine whether plaintiffs have shown by a preponderance of the evidence that there is a reliable means of proving class-wide damages.").[47]  Plaintiffs fail on both counts.

*First*, Plaintiffs fail to provide a reliable method to show damages on a class-wide basis for the same reasons they cannot show common impact.  As explained above, ███████████████ ████████████████████████████████████████████████████████████████████

---

[46] While the Plaintiffs' argue that *Messner* and *Kleen Products* support certification even in the face of these profound individualized questions, they misapply those cases.  *Messner* and *Kleen* did not involve the use of a fundamentally flawed and unreliable methodology to show class-wide impact, as here. In fact, those defendants had not even challenged the plaintiffs' proposed methodologies as unreliable.  *See Messner*, 669 F.3d at 823-24; *Kleen Products*, 831 F.3d at 922. And while Plaintiffs urge that *Messner* allowed certification of a class alleging antitrust injury in a complex industry with differentiated contracts, the *Messner* plaintiffs' model specifically accounted for and incorporated those complexities—rather than eliding and averaging them out, like Plaintiffs here do.  *See Messner*, 669 F.3d at 819-20.  As for *Kleen*, the court made clear that "the Defendants' price increases were not tailored to each individual purchaser," a fact that stands in stark contrast to the multi-level price and pass-through variation observed here.  *Kleen Products*, 831 F.3d at 925.

[47] While Plaintiffs urge that some individualized proof of damages is not an obstacle to class certification (Motion at 41), this does not obviate the need to establish a class-wide method of proving damages or the need to show that any such individualized proof will not overwhelm common questions.  *See Kleen Products*, 831 F.3d at 929.  Moreover, even if some individualized proof of damages does not defeat class certification standing alone, it is a factor to consider in the predominance analysis.  *See In re Aluminum Warehousing Antitrust Litig.*, 2020 WL 4218329, at *36.



"method for calculating their individualized damages other than having hundreds, or even thousands, of individualized hearings." *Dailey v. Groupon, Inc.*, 2014 WL 4379232, at *9 (N.D. Ill. Aug. 27, 2014); *see also Riffey*, 910 F.3d at 319 ("[H]ow much money each individual class member is entitled to recoup—is particularly ill-suited for class treatment, because it depends on a myriad of factors particular to each individual [class member]."); *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, 2017 WL 1196900, at *58 (E.D. Ill. March 31, 2017) (declining to certify class and finding predominance issues where indirect purchasers "tr[ied] to prove damages through averages").[48] In short, the EUCPs' proposed damages model is "clearly inadequate." *Reed*, 268 F.R.D. at 595.

**Second**, without a reliable method of showing class-wide damages through common proof, it is clear that "individual damage determinations will overwhelm the common questions." *See Kleen Products*, 831 F.3d at 929; *see also Reed*, 268 F.R.D. at 595 (denying class certification where "[t]he amount of damages suffered by each [class] plaintiff will necessitate individualized



inquiries"); *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773 (7th Cir. 2013) (holding that class certification was improper where no "mechanical, formulaic" damages calculation was possible). ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

The damages analysis would be f████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████ These individual damages inquiries would undoubtedly and "inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34.

**C.  EUCPs Cannot Show Predominance Or Superiority Because Of Substantive Variations In The Many State Laws Governing Their Claims**

EUCPs request that this Court certify a class asserting claims under materially different state antitrust, consumer protection and unjust enrichment laws from 25 different jurisdictions. This includes claims under the antitrust statutes of 20 states plus the District of Columbia, claims under the consumer protection statutes of 12 states plus the District of Columbia, and claims under common-law unjust enrichment laws of 23 states plus the District of Columbia. However, EUCPs have not even attempted to show how they can establish predominance or superiority and/or avoid individualized inquiries given the variations among the state laws. They do not even address the unjust enrichment laws at all, thus waiving the issue. Despite the fact that the laws under which EUCPs have asserted their claims vary materially from state to state, EUCPs have made no effort to address any such differences and have not sustained their burden of proving predominance or superiority.

EUCPs falter right out of the gate in trying to meet their burden to show how their claims under the 25 different states' laws do not present problems with predominance. In a motion for class certification involving numerous state laws, "the party seeking certification must provide an *extensive analysis* of state law variations to address whether the differences in law pose insuperable obstacles." *Doster Lighting, Inc. v. E-Conolight, LLC*, No. 12-C-0023, 2015 WL 3776491, at *15 (E.D. Wis. June 17, 2015) (emphasis added); *see* also *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig. v. Ford Motor Co.*, 174 F.R.D. 332, 349 (D.N.J. 1997); *Vista*, 2015 WL 3623005, at *36-40. EUCPs do not even attempt to carry their burden on this point. EUCPs instead list cherry-picked language from the 21 antitrust statutes and related case law, and claim that those states "have an antitrust or consumer statute that harmonizes with the federal Sherman Act, ensuring that the core questions of liability will be proved with common evidence."

41

(Mot. at 44).  Providing no analysis of the differences among the state antitrust statutes, EUCPs offer the broad, sweeping, and unsupported statement that "[t]he similarity of these statutes demonstrates predominance under Rule 23(b)(3)."  (Mot. at 44).  EUCPs do not even identify the consumer protection laws upon which their claims are based, let alone offer any "extensive analysis" of the state consumer protection statures and how those statutes differ.[49]  Nor do EUCPs make *any* mention at all of their unjust enrichment claims.  EUCPs' efforts to address the state law variations fall woefully short of the extensive analysis required to demonstrate predominance.  *See Vista*, 2015 WL 3623005, at *35 (denying class certification where plaintiffs' accounting of state law variances was "not comprehensive and glosse[d] over important differences").

An analysis of the substantive variations in the many state laws governing Plaintiffs' claims reveals that EUCPs cannot demonstrate predominance or superiority.  In fact, courts have denied indirect purchaser class certification due (in part) to state law variations in cases involving fewer states/state laws than those alleged by EUCPs.  *See, e.g., In re Domestic Drywall Antitrust Litig.*, 2017 U.S. Dist. LEXIS 135758, *46-49 (E.D. Pa. Aug. 24, 2017) (denying class certification for indirect purchasers who brought claims under antitrust, consumer protection and unjust enrichment laws of 11 states).

"Variations in state law may swamp any common issues and defeat predominance." *Grandalski v. Quest Diagnostics, Inc.*, 767 F.3d 175, 180 (3d Cir. 2014) (citation omitted).  Even if the law "differ[s] among the states only in nuance . . . nuance can be important," creating significant case management problems such as "differing state pattern [jury] instructions" and

---

[49]     There are four states—Florida, Hawaii, Massachusetts, and South Carolina—where EUCPs only bring a consumer protection statute claim and not a state antitrust claim.  Put differently, they make absolutely no mention of the state laws of these four states under which they purport to proceed.

"differing judicial formulations." *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995). As such, courts have long held that class certification is not proper "unless all litigants are governed by the same legal rules." *In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1015, 1015.

At the outset, this Court would have to analyze—for each putative class member—which state's law governs their claims based on their individual chicken purchases over seven years. See *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 627 (3d Cir. 1996), *aff'd sub nom Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ("[B]ecause we must apply an individualized choice of law analysis to each plaintiff's claims, the proliferation of disparate factual and legal issues is compounded exponentially." (citation omitted)). ██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████ Moreover, given that not all of these jurisdictions fall within EUCPs' proposed class, the claims relating to purchases in those jurisdictions would need to be excluded. These individualized inquiries, which are incompatible with Rule 23's predominance requirement, would have to be repeated for each putative class member just to determine which state's substantive law applies.

_____

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

### 1. There Are Material Variations Among The Twenty-One Jurisdictions' Antitrust Laws

Even a cursory review of the state antitrust laws shows significant variations among the substantive laws of the many jurisdictions at issue. (*See* Mot. at App. B). For example, only some of the state antitrust laws relied upon by Plaintiffs require that the alleged conspiracy had a substantial effect on intrastate commerce. *Compare Conergy AG v. MEMC Elec. Materials, Inc.*, 651 F. Supp. 2d 51, 61 (S.D.N.Y. 2009) (requiring an effect on "intrastate commerce" under New York's Donnelly Act, N.Y. Gen. Bus. L. § 340(1)); N.C. Gen. Stat. Ann. § 75-1 (prohibiting antitrust conduct "in the State of North Carolina"), *with Arthur v. Microsoft Corp.*, 267 Neb. 586, 597 (Neb. 2004) (Nebraska antitrust law "provide[s] consumers with protection against unlawful practices in the conduct of any trade or commerce which directly or indirectly affects the people of Nebraska"); Or. Rev. Stat. Ann. § 646.715 (explaining that Oregon's antitrust law applies to "intrastate trade or commerce, and to interstate trade or commerce").[51] Because the necessary nexus between alleged conduct and effect varies from one jurisdiction to another, this Court would have to apply differing legal standards in an individualized, unmanageable process.

Similarly, there are critical differences among state antitrust laws with respect to defenses, damages, and duplicative recovery. Several jurisdictions limit or even eliminate recovery when an alleged overcharge has been passed through multiple levels of distribution. *See, e.g.*, *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1086 (Cal. 2010) (permitting a "pass on defense" where "multiple levels of purchasers have sued" for the same antitrust conspiracy); N.Y. Gen. Bus. Law § 340(6)

---

[51] *See also, e.g.*, 6 R.I. Gen. Laws Ann. § 6-36-7(c) ("No action or proceeding instituted pursuant to the provisions of this chapter shall be barred on the ground that the activity or conduct complained of in any way affects or involves foreign commerce."); Me. Rev. Stat. tit. 10 § 1101; S.D. Codified L. § 37-1-3.1 to -3.2; S.D. Codified L. § 37-1-3.1; *id.* § 37-13.2; *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 522-24 (Tenn. 2005).

44

("[A] defendant shall be entitled to prove as a partial or complete defense to a claim for damages that the illegal overcharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of damages."). This defense is particularly important here because ███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████ But the availability of this defense is not uniform across the 21 jurisdictions implicated by Plaintiffs' state antitrust claims. This nuance further impedes class adjudication of these claims.

There is also variability in the statutes of limitations that would apply. For example, Maine has a six-year statute of limitations; California, Michigan, North Carolina, New Hampshire, and New York have a four-year statute of limitations; and Kansas has a three-year limitations period. *Compare* Me. Rev. Stat. Ann. § 752, *with* Cal. Bus. & Prof. Code § 16750.1; MCLA § 445.781; N.H. Rev. Stat. § 356.12; N.Y. Gen. Bus. Law § 340(5); N.C. Gen. Stat. § 75-16.2, *and with* Kan. Stat. Ann. § 60-512. Even if Plaintiffs could rely on the discovery rule to extend the statute of limitations, reliance on "equitable tolling to save [some of] their claims . . . presents an individual question of law and fact that could predominate over common questions under Rule 23(b)(3)" and therefore precludes class certification. *In re Cmty. Bank of N. Va. & Guaranty Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 622 F.3d 275, 294 (3d Cir. 2010).

> ## 2. There Are Substantive Differences Between The Jurisdictions' Consumer Protection Laws

EUCPs also ignore material differences among the 13 consumer protection laws at issue. "State consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules." *In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1018; *see also In re Grand Theft Auto Video Game*

*Consumer Litig.*, 251 F.R.D. 139, 147 (S.D.N.Y. 2008) ("Most of the courts that have addressed the issue have determined that the consumer-fraud . . . laws in the fifty states differ in relevant respects."); *Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 625 (D. Kan. 2008) ("[T]here are significant differences among the States' consumer protection laws.").

For instance, "[t]he amount of damages recoverable for a consumer protection violation varies from state to state." *Thompson*, 250 F.R.D. at 625. These key differences mean that Plaintiffs' claims would need to be treated individually, overwhelming common issues. *See In re Epipen* , 2020 WL 1180550, at *54 (D. Kan. Mar. 10, 2020) ("The differences among state consumer protection statutes are significant, they present individual issues, and they overwhelm common questions."). The intent required to prove the allegedly unfair or deceptive act—a potentially dispositive difference in the elements of the claim—also varies among the 13 jurisdictions implicated here. *See Vista*, 2015 WL 3623005, at *36, *40 ("[t]he states vary considerably in their formulation of the intent a plaintiff must prove."). For instance: Utah requires that the act be done "knowingly or intentionally[;]" New Mexico requires that the act be done "knowingly." *Id.* at *36. These differences, too, would overwhelm common issues.

States also apply different standards in determining what qualifies as prohibited conduct under their particular statutes. *See In re Epipen,* 2020 WL 1180550, at *55-57 (denying certification of consumer protection damages class). For example, Florida uses a multifactor test, weighing whether the practice offends public policy or the common law; whether it is immoral, unethical, oppressive, or unscrupulous; and whether it substantially injures consumers. *Id.* at *55 & n.61; *Vista*, 2015 WL 3623005, at *36-37. Nebraska, New Hampshire, and New Mexico apply

46

other standards, which are even different from one another, to define prohibited unfair conduct.[52] *In re Epipen*, 2020 WL 1180550, at *55 & n.63. And within California, there is intrastate disagreement about the applicable test. *Id.* at *55 & n.65. Ultimately, these nuanced differences across multiple aspects of the 13 jurisdictions' consumer protection laws create individualized issues and make class adjudication unmanageable. *See In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 143(E.D. Pa. 2015) (rejecting plaintiffs' "attempt[] to place 21 square pegs into a single round hole, asking the Court to envision 21 statewide classes under the antitrust laws of 21 states, the consumer protection laws of seven states, and the unjust enrichment laws of 17 states, all tried in a single proceeding as if it were a nationwide class under federal antitrust law").

### 3. Plaintiffs Compound The Problem By Bringing Unjust Enrichment Claims Under The Laws of Twenty-Four Jurisdictions

While EUCPs allege in their Complaint that Defendants were unjustly enriched according to the common law of 24 different jurisdictions, EUCPs *do not even mention their unjust enrichment claims* in their Motion. For that reason alone, certification of EUCPs' unjust enrichment claims should be denied.[53] If the Court does consider certification of the unjust

---

[52] Specifically, Nebraska requires the plaintiff asserting a Nebraska Consumer Protection Act claim to "prove that the practice either '(1) fell within some common-law, statutory, or other established concept of unfairness or (2) was immoral, unethical, oppressive, or unscrupulous.'; New Hampshire applies "the rascality test"…[which] requires that "the objectionable conduct ... attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce; and New Mexico's Unfair Trade Practices Act specifically defines the conduct prohibited…"an act or practice ... that to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid. *See In re Epipen* , 2020 WL 1180550, at n.63.

[53] *See Turner v. Micro Switch*, No. 98-cv-50276, 2001 WL 13255, at *8 n.5 (N.D. Ill. Jan. 3, 2001), *aff'd sub nom. Turner v. Honeywell, Micro Switch Div.*, 54 F. App'x 236 (7th Cir. 2002) (concluding that plaintiff's failure to request class certification waived class action allegations); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (explaining that "under our case law . . . a person waives an argument by failing to make it before the district court").

enrichment claims, certification should nonetheless be denied because the equitable claims depend on considerations unique to each individual EUCP and vary significantly among the jurisdictions.

In fact, courts have repeatedly held that "multi-state class actions for unjust enrichment are inappropriate." *Muehlbauer v. Gen. Motors Corp.*, 2009 WL 874511, at *5 (N.D. Ill. 2009); *see also Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009). Consequently, "[d]ue to the necessity of this inquiry into the individualized equities attendant to each class member, courts . . . have found unjust enrichment claims inappropriate for class action treatment." *Vega*, 564 F.3d at 1274. *See also Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 500 (S.D. Ill. 1999) ("Unjust enrichment is an equitable doctrine that . . . depends upon the analysis of each individual situation," and "requires individualized determinations."); *Vista*, 2015 WL 3623005, at *34–35 (finding that "common factual issues do not predominate as to [the] [p]laintiffs' proposed unjust enrichment class" and listing numerous courts that have found that unjust enrichment claims are inappropriate for class certification); *In re Epipen*, 2020 WL 1180550, at *57-58 ("[D]ifferences among state law definitions of unjust enrichment and its availability as a remedy make federal courts, in general, reluctant to certify a nationwide class on this theory"). As one court explained, "[e]ven if it could be said that [EUCPs'] general theory of liability for unjust enrichment, (i.e., that [the defendant] was unjustly enriched when class members paid expenses [defendant] should have paid), is uniform among class members, individual questions remain about whether a particular [member of the proposed class] actually incurred any such expenses." *Commander Props. Corp. v. Beech Aircraft Corp.*, 164 F.R.D. 529, 540 (D. Kan. 1995) (denying class certification). EUCPs cannot overcome this need for individualized inquiry.[54]

---

[54] Courts have also concluded that "unjust enrichment [classes] are fraught with procedural and choice-of-law problems that . . . preclude certification." *In re Aqua Dots Prods. Liab. Litig.*, 270

Plaintiffs' varying unjust enrichment claims would quickly devolve into mini trials about which elements apply to any particular class member. For example, 6 of the 24 unjust enrichment laws relied upon by Plaintiffs (Hawaii, Massachusetts, Minnesota, North Carolina, Tennessee, and Utah) require a showing that there is no adequate remedy at law. *See Vista,* 2015 WL 3623005 at *27. Moreover, 11 of the 24 (California, Florida, Kansas, Maine, Massachusetts, Nevada, New Mexico, North Carolina, Tennessee, Utah, and Wisconsin) require a showing that the defendant appreciates or has knowledge of the benefit obtained from their improper conduct. *Id.* at *29. Some states also have materially different statutes of limitations for unjust enrichment; for example, Kansas has a three-year limitations period running from "when the enrichment becomes unjust," while Michigan's is twice as long but runs from when the wrong occurred, regardless of when damage occurred. *See In re Epipen*, 2020 WL 1180550, at *58 & n.68. Again, as with their dozens of state antitrust and consumer protection claims, EUCPs introduce too much variability for class adjudication by invoking the laws of 24 jurisdictions on unjust enrichment.

### 4. Plaintiffs Have Failed To Demonstrate Manageability

EUCPs bear the burden of demonstrating manageability, and "a court cannot rely on assurances of counsel that any problems with predominance or superiority can be overcome." *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. at 350 (citation omitted).

In light of the many material differences in the state laws, EUCPs have failed to demonstrate that class litigation would be manageable. *See Vista,* 2015 WL 3623005, at *35 (finding that "the variations in state law also render[ed] class litigation unmanageable"). In fact,

---

F.R.D. 377, 385 (N.D. Ill. 2010); *Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 533 (N.D. Ill. 2008) (collecting cases rejecting multi-state unjust enrichment class).

EUCPs offer no "trial plan" at all and make no effort to demonstrate manageability.[55]  Proceeding without such a plan is also fatal as it fails to protect Defendants' Seventh Amendment to a jury trial and Due Process rights.  *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995); *see also In re Loestrin 24 Fe Antitrust Litig.*, 410 F.Supp.3d 352, 403 (D.R.I. 2019) (denying certification of end payor class where the plaintiffs failed to show that their "proposed adjudication" was "protective of defendants' Seventh Amendment and due process rights") (citation omitted).

### III.    EUCPS' CLASS DEFINITION CONTAINS A GREAT MANY UNINJURED CONSUMERS AND IS FATALLY OVERBROAD

EUCPs define their proposed class in an overly broad manner that includes a great many class members who could not have been harmed by the alleged conspiracy.  This definitional defect cannot be cured through amendment.

An appropriate class definition "must be sufficiently definite to permit ascertainment of class members," but "not [] so broad as to include individuals who are without standing to maintain the action on their own behalf."  *Oshana v. Coca-Cola  Co.*, 225 F.R.D. 575, 580 (N.D. Ill. 2005) (citations omitted).  Where the class definition is so broad that "'a great many' or 'a great number of' putative class members could not have been harmed by defendants' conduct, then the proposed class is too broad and should not be certified."  *Riffey v. Rauner*, No. 10 CV 02477, 2016 WL 3165725, at *4 (N.D. Ill. June 7, 2016), *aff'd*, 873 F.3d 558 (7th Cir. 2017), *cert. granted, judgment*



*vacated*, 138 S. Ct. 2708, 201 L. Ed. 2d 1094 (2018), and *aff'd*, 910 F.3d 314 (7th Cir. 2018); *see Williamson v. S.A. Gear Co.*, No. 15-CV-365-SMY-DGW, 2018 WL 2735593, at *4–5 (S.D. Ill. June 7, 2018). Although "[t]here is no precise measure for 'a great many,'" the determination is "a matter of degree, and will turn on the facts as they appear from case to case." *Clark v. Bumbo Int'l Tr.*, 2017 WL 3704825, at *4 (E.D. Ill. August 28, 2017).

When a class definition is as "breathtaking in its scope" as that proffered here, *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011), it should come as no surprise that it includes a great many putative class members that could not have been harmed by the alleged conduct. EUCPs contend that the class would encompass millions of people. *See* Mot. at 20. It would include people that bought chicken from sources as disparate as big-box retailers with a global footprint, regional supermarket chains, and even local family-owned grocery stores. These sources, in turn, purchased many different products, in different volumes, under many different pricing mechanisms, from different Defendants (or combinations of Defendants), at different points in time. This is the veritable definition of an unworkably broad class definition.

As explained above, ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

51



Because there can be no doubt that the EUCPs' class definition "would sweep in countless people who would never have standing," certification should be denied. *In re Fluidmaster*, 2017 WL 1196900, at *46 (N.D. Ill. Mar. 31, 2017); *see also Riffey,* 2016 WL 3165725, at *4; *In re Yasmin & Yaz,* 2012 WL 865041, at *15 (S.D. Ill. Mar. 13, 2012).[57]

---

[57] Other courts have denied certification where there were even smaller amounts of uninjured class members. *See, e.g.*, *Vista*, 2015 WL 3623005 at *20-21 (denying class certification based, in part, on a finding that at least 5% of the putative class was uninjured); *In re Intuniv* 2019 WL 3947262, at *7 (denying certification where defendants' expert showed that at least 8% of the putative class members were uninjured); *In re Asacol* , 907 F.3d at 53-54 (reversing grant of class certification where more than 10% of the putative class members were uninjured brand loyalists); *In re Thalomid & Revlimid* , 2018 WL 6573118, at *14 (denying class certification where 10% of the putative class was uninjured); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623-25 (D.C. Cir. 2019) (affirming denial of class certification where plaintiffs' model showed that 12.7% of the putative class members did not experience overcharges).

This "is not a case in which a very small absolute number of class members might be picked off in a manageable, individualized process at or before trial." *In re Asacol,* 907 F.3d at 53-54. Even if EUCPs attempted to amend the class definitions so as to exclude the numerous members who could not have been harmed, any such amended definitions would require an onerous, unmanageable inquiry that would defeat one of the main purposes of class adjudication—efficiency. *See Clark*, 2017 WL 3704825, at *2-4 (rejecting request to amend overly broad class definition because it suffered from more than "a 'minor' overbreadth problem").[58]

Plaintiffs do not even address the overbreadth issues with their proposed class. Instead, they simply claim that the class is somehow ascertainable because "a class member may self-identify simply by looking at the class definition." (Mot. at 44-45). As explained, above, however, simply "self-identify[ing]" as a person who purchased whole birds or breast meat products does not even begin to answer the question of whether that consumer could have incurred an overcharge

---

[58] As explained above,

on her purchases.[59]  Instead, the court would still need to engage in multiple individual inquiries just to weed out the uninjured class members.

Moreover, EUCPs' attempt to show they have somehow "done more" by claiming that 

_____

[59] EUCPs' reliance on *Mullins,* and the assertion that self-serving class member affidavits would suffice, ignore the right that Defendants would have to challenge such declarations and the claims by class members as to the essential elements of injury and causation.  Defendants would reserve the right to challenge such affidavits, resulting in potentially "millions" of mini trials.



[REDACTED]

[REDACTED]

## IV.     EUCPS FAIL TO ESTABLISH TYPICALITY AND ADEQUACY

As a result of their multiple legal theories and different factual circumstances, EUCPs are unable to satisfy Rule 23's requirements of typicality and adequacy.  *See* Fed R. Civ. P. 23(a)(3)-(4).  To satisfy typicality, "there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Dvorak v. St. Clair Cty.*, 2018 U.S. Dist. LEXIS 10585, at *13 ((S.D. Ill. January 23, 2018) (citation omitted).  The "adequacy requirement is satisfied when the named representative has 'a sufficient interest in the outcome of the case to ensure vigorous advocacy' and 'does not have interests antagonistic to those of the class.'" *Id.* at 19 (citation omitted).  "The 'presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation.'" *Id.* at 13 (quoting *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011)).  Put differently, "[f]or class certification, it is not enough for [a named plaintiff] to demonstrate that [it] *could* prevail at trial; rather, [the named plaintiff] must demonstrate, at the very least, [it] is as well-positioned to prevail as an ordinary member of the putative class." *Al Haj v. Pfizer Inc.*, 2020 WL 13330367, at *4 (N.D. Ill. Mar. 23, 2020).

---

[62] There are numerous additional problems with Mr. Azari's opinion.  For example, [REDACTED] Defendants will address the myriad flaws with Mr. Azari's opinion in a forthcoming motion to exclude.

The named plaintiffs here cannot advance the same factual and legal arguments as the putative class—indeed, even the class representatives are differently situated from one another, and their claims would present unique issues that diverge from the interests of the putative class.

*First*, 

*See, e.g.*, *Mowry v. JP Morgan Chase Bank, N.A.*, 2007 WL 1772142, at *3-4 (N.D. Ill. June 19, 2007) ("close friend" of class counsel for 6 years inadequate); *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 91 (7th Cir. 1977) ("Courts also have expressed fear as to the danger of champerty because of the close relationship between the putative class representative and counsel."); *Martz v. PNC Bank, N.A.*, 2007 WL 2343800, at *4 (W.D. Pa. Aug. 15, 2007). For both of these reasons, ████████████████████████████ those claims

should be dismissed. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, at *8 (N.D. Ill. Aug. 23, 2013).

*Second*, ███████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ Because these behaviors create defenses "peculiar to [such] named plaintiff," they "destroy[s] the required typicality of the class." *CE Design Ltd.*, 637 F.3d at 726; *see also Retired Chicago Police Ass'n*, 7 F.3d at 597-98 (where class representative was not subject to the same allegedly injurious treatment as the putative class, typicality not established).

*Third*, the named plaintiffs exhibit a variety of unique purchasing behaviors that distinguish them from members of the putative class. ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ █ ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Similarly, as noted above, ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ These unique defenses render each of these named Plaintiffs an inadequate representative. *See Randall v. Rolls-Royce Corp.*, 637 F.3d

---

█ ████████████████████████████████████████████████████████

57

818, 824 (7th Cir. 2011) ("named plaintiffs who are subject to a defense that would not defeat unnamed class members are not adequate class representatives.").[66]

*Finally*, it is not clear that EUCPs are capable of identifying the nature, location, quantity, or price of their chicken purchasing over the years—further undermining the typicality of their claims. ████████████████████████████████████████████
████████████████████████████████████████ ██████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

_____

██████████████████████████████████████████████
████████████████████████████████████████████
████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████



This is just another reason why they fail to demonstrate that they "can advance the same factual and legal arguments" as putative class members.  *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 341 (7th Cir. 1997).

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion should be denied.  Defendants respectfully request the Court to set a hearing on EUCPs' Motion.


DATED: January 22, 2021

Respectfully submitted,

VENABLE LLP

By: /s/ *J. Douglas Baldridge*

J. Douglas Baldridge (#437678)
Lisa Jose Fales (admitted *pro hac vice*)
Danielle Foley (admitted *pro hac vice*)
Andrew Hernacki (admitted *pro hac vice*)
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4000
Facsimile: 202-344-8300
jdbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
athernacki@venable.com
*Attorneys for Defendants Perdue Farms, Inc. and Perdue Foods LLC*

DEFENDANTS' ATTORNEYS

WEIL GOTSHAL & MANGES LLP

By: */s/ Carrie C. Mahan*
Carrie C. Mahan (#459802)
Christopher J. Abbott (#1014487)
2001 M Street N.W., Ste. 600
Washington, D.C. 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
carrie.mahan@weil.com
christopher.abbott@weil.com

Pravin R. Patel (#0099939)
Brian G. Liegel (#0119269)
1395 Brickell Avenue, Ste. 1200
Miami, FL 33131
Telephone: 305-577-3100
pravin.patel@weil.com
brian.liegel@weil.com

EIMER STAHL LLP

Michael L. McCluggage (#01820966)
224 South Michigan Avenue, Ste. 1100
Chicago, IL 60604
Telephone: (312) 660-7665
Facsimile: (312) 692-1718
mmccluggage@eimerstahl.com

*Attorneys for Defendant Pilgrim's Pride
Corporation*

VENABLE LLP

By: */s/ J. Douglas Baldridge*
J. Douglas Baldridge (#437678)
Lisa Jose Fales (admitted *pro hac vice*)
Danielle Foley (admitted *pro hac vice*)
Andrew Hernacki (admitted *pro hac vice*)
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4000
Facsimile: 202-344-8300
jdbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
athernacki@venable.com

FALKENBERG IVES LLP

Kirstin B. Ives
30 N. LaSalle St., Ste 4020
Chicago, IL 60602
Telephone: (312) 566-4803
Facsimile: (312) 566-4810
kbi@ffilaw.com

*Attorneys for Defendants Perdue Farms, Inc.
and Perdue Foods LLC*

60

By: /s/ *John W. Treece*

John W. Treece (#3122889)
1135 West Montana Street
Chicago, IL 60614
Telephone: (312) 961-7808
jtreece@jwtreece.com

ROSE LAW FIRM

Amanda K. Wofford (admitted *pro hac vice*)
Bourgon Reynolds (admitted *pro hac vice*)
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131
Facsimile: (501) 375-1309
awofford@roselawfirm.com
breynolds@roselawfirm.com

*Attorneys for Defendants Mountaire Farms Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc.*

MAYER BROWN LLP

By: /s/ *Carmine R. Zarlenga*

Carmine R. Zarlenga (#90784529)
William H. Stallings (admitted *pro hac vice*)
Stephen M. Medlock (admitted *pro hac vice*)
Oral D. Pottinger (admitted *pro hac vice*)
1999 K Street N.W.
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
czarlenga@mayerbrown.com
wstallings@mayerbrown.com
smedlock@mayerbrown.com
opottinger@mayerbrown.com

*Attorneys for Defendant Foster Farms, LLC and Foster Poultry Farms, a California Corporation*

NOVACK AND MACEY LLP

By: /s/ *Stephen Novack*
Stephen Novack
Stephen J. Siegel
Christopher S. Moore
100 North Riverside Plaza
Chicago, IL 60606
Telephone: (312) 419-6900
Facsimile: (312) 419-6928
snovack@novackmacey.com
ssiegel@novackmacey.com
cmoore@novackmacey.com

*Attorneys for Defendants Koch Foods Incorporated, JCG Foods of Alabama LLC, JCG Foods of Georgia LLC and Koch Meat Co., Inc.*

VEDDER PRICE P.C.

By: /s/ *Gregory G. Wrobel*
Gregory G. Wrobel (#3122900)
222 N. LaSalle Street
Chicago, IL 60601
Telephone: (312) 609-7722
Facsimile: (312) 609-5005
gwrobel@vedderprice.com

JORDAN PRICE WALL GRAY JONES & CARLTON, PLLC

Henry W. Jones, Jr. (admitted *pro hac vice*)
1951 Clark Avenue
Raleigh, NC 27605
Telephone: (919) 828-2501
Facsimile: (919) 834-8447
hjones@jordanprice.com

*Attorneys for Defendant House of Raeford Farms, Inc.*

KIRKLAND & ELLIS LLP

By: /s/ *Daniel E. Laytin, P.C.*
Daniel E. Laytin, P.C.
Christa C. Cottrell, P.C.
Stacy Pepper
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
dlaytin@kirkland.com
ccottrell@kirkland.com
stacy.pepper@kirkland.com

*Attorneys for Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Processing Division), and Sanderson Farms, Inc. (Production Division) and Liaison Counsel for Defendants*

PROSKAUER ROSE LLP

By: /s/ *Christopher E. Ondeck*
Christopher E. Ondeck (admitted *pro hac vice*)
Stephen R. Chuk (admitted *pro hac vice*)
1001 Pennsylvania Ave., NW, Ste 600 South
Washington, DC 20004
Telephone: (202) 416-6800
Facsimile: (202) 416-6899
condeck@proskauer.com
schuk@proskauer.com

*Attorneys for Wayne Farms LLC*

KUTAK ROCK LLP

By: /s/ *John P. Passarelli*
John P. Passarelli (admitted *pro hac vice*)
James M. Sulentic (admitted *pro hac vice*)
1650 Farnam Street
Omaha, NE 68102
Telephone: (402) 346-6000
Facsimile: (402) 346-1148
john.passarelli@kutakrock.com
james.sulentic@kutakrock.com

J.R. Carroll (admitted *pro hac vice*)
Jeffrey M. Fletcher (admitted *pro hac vice*)
234 East Millsap Road, Ste 200
Fayetteville, AR 72703-4099
Telephone: (479) 973-4200
Facsimile: (479) 973-0007
jr.caroll@kutakrock.com
Jeffrey.fletcher@kuakrock.com

Kimberly M. Hare (#6323326)
One South Wacker Drive, Ste 2050
Chicago, IL 60606-4614
Telephone: (312) 602-4100
Facsimile: (312) 602-4101
kimberly.hare@kutakrock.com

*Attorneys for Defendants O.K. Foods, Inc.,*
*O.K. Farms, Inc., and O.K. Industries, Inc.*

EDWARD C. KONIECZNY LLC

By: */s/ Edward C. Konieczny*
Edward C. Konieczny (admitted *pro hac vice*)
400 Colony Square, Ste 1501
1201 Peachtree Street, NE
Atlanta, GA 30361
Telephone: (404) 380-1430
Facsimile: (404) 382-6011
ed@koniecznylaw.com

SMITH, GAMBRELL & RUSSELL, LLP

David C. Newman (admitted *pro hac vice*)
W. Parker Sanders (admitted *pro hac vice*)
1230 Peachtree Street, N.E.
Promenade, Ste 3100
Atlanta, GA 30309
Telephone: (404) 815-3500
Facsimile: (404) 815-3509
dnewman@sgrlaw.com
psanders@sgrlaw.com

James L. Thompson
Lynch Thompson LLP
150 S. Wacker Drive, Suite 2600
Chicago, IL 60606
T: (312) 445-4623
F: (312) 896-5883
jthompson@lynchthompson.com

*Attorneys for Defendants Mar-Jac Poultry,*
*Inc.*

VAUGHAN & MURPHY

By:  /s/ *Charles C. Murphy, Jr.*
Charles C. Murphy, Jr. (admitted *pro hac vice*)
690 S Ponce Court NE
Atlanta, GA 30307
Telephone: (404) 667-0714
Facsimile: (404) 529-4193
cmurphy@vaughanandmurphy.com

WINSTON & STRAWN LLP

James F. Herbison
Michael P. Mayer
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
jherbison@winston.com
mmayer@winston.com

*Attorneys for Defendant Norman W. Fries, Inc. d/b/a Claxton Poultry Farms*

HOGAN LOVELLS US LLP

By:  /s/ *William L. Monts III*
William L. Monts III (admitted *pro hac vice*)
Justin W. Bernick (admitted *pro hac vice*)
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
Telephone:  (202) 637-5910
Facsimile: (202) 637-5911
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

MILLER, CANFIELD, PADDOCK, AND STONE P.L.C.

Jacob D. Koering
225 West Washington Street, Ste 2600
Chicago, Illinois  60606
Telephone:  (312) 460-4272
Facsimile:  (312) 460-4201
koering@millercanfield.com

*Attorneys for Defendant Agri Stats, Inc.*

64

SHOOK HARDY & BACON LLP

By: /s/ *Lynn H. Murray*
Lynn H. Murray
111 S. Wacker Dr., Ste 4700
Chicago IL 60606
Telephone: (312) 704-7700
Facsimile: (312) 558-1195
lhmurray@shb.com

Laurie A. Novion
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
lnovion@shb.com

CONNER & WINTERS

John R. Elrod
Vicki Bronson (admitted *pro hac vice*)
4375 N. Vantage Drive, Ste. 405
Fayetteville, AR 72703
Telephone: (479) 582-5711
jelrod@cwlaw.com
vbronson@cwlaw.com

*Attorneys for Defendant Simmons Foods, Inc. and Simmons Prepared Foods Inc.*

EVERSHEDS SUTHERLAND (US) LLP

By: /s/ *Patricia A. Gorham*
James R. McGibbon (admitted *pro hac vice*)
Patricia A. Gorham (admitted *pro hac vice*)
Peter M. Szeremeta (admitted *pro hac vice*)
Kaitlin A. Carreno (admitted *pro hac vice*)
Dylan de Fouw (admitted *pro hac vice*)
999 Peachtree Street, N.E., Ste 2300
Atlanta, Georgia 30309-3996
Telephone: (404) 853-8000
Facsimile: (404) 853-8806
jimmcgibbon@eversheds-sutherland.com
patriciagorham@eversheds-sutherland.com
peterszeremeta@eversheds-sutherland.com
katilincarreno@eversheds-sutherland.com
dylandefouw@eversheds-sutherland.com

SMITH AMUNDSEN LLC

Ronald Balfour
150 N. Michigan Avenue, Ste 3300
Chicago, Illinois 60601
Telephone: (312) 894-3369
Facsimile: (312) 997-1816
rbalfour@salawus.com

*Attorneys for Defendant Harrison Poultry, Inc.*

CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2021 a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ J. Douglas Baldridge.*

J. Douglas Baldridge