**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION* | Case: 1:16-cv-08637 |
| THIS DOCUMENT RELATES TO: | Honorable Thomas M. Durkin |
| | **[PUBLIC, REDACTED]** |
| All Commercial and Institutional Indirect Purchaser Plaintiff Actions | |

**DEFENDANTS' OPPOSITION TO COMMERCIAL AND INSTITUTIONAL**
**INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 5

I.  CIIPPS IGNORE COMPLEXITY AND VARIATION IN CHICKEN
    DISTRIBUTION AND PURCHASING. .......................................................... 5

    A.  CIIPPs Are Links In Complex Chicken Distribution Chains. ................. 5

    B.  There Is Widespread Price Variation Within These Distribution Chains. ............. 7

    C.  These Distribution-Side Dynamics Mean That There Could Be No
        Common Pass-Through Of Alleged Overcharges. ................................. 13

II. CIIPPS' ALLEGATIONS OF COORDINATED "PRODUCTION CUTS"
    IGNORE THE REALITIES OF CHICKEN PRODUCTION. ......................... 15

    A.  The So-Called Production Cuts Involved Defendants Selling More
        Chicken, Not Less. ................................................................................. 15

    B.  Some Defendants Reduced Production In Some Areas To Weather
        Historic Economic Turmoil, But Reductions Were Neither Uniform Nor
        Coordinated. ........................................................................................... 17

    C.  CIIPPs' Use Of The Term "Broilers" Misleadingly Collapses And
        Simplifies Different Industry Segments, Cuts, and Products. ............... 20

    D.  CIIPPs Also Ignore The Real-World Chicken Production Process. ...... 23

LEGAL STANDARD ............................................................................................. 24

ARGUMENT .......................................................................................................... 25

I.  CIIPPS CANNOT ESTABLISH PREDOMINANCE ................................... 26

    A.  Dr. Mangum's Flawed Models Cannot Conceal The Fact That
        Individualized Inquiries Will Overwhelm Any Common Proof Of
        Antitrust Injury ...................................................................................... 28

        1.  Dr. Mangum's Model Makes Improper Assumptions, Masks The
            Variation In The Chicken Industry, And Shows No Impact to Many
            Indirect Purchasers. .......................................................................... 30

        2.  CIIPPs' Unfounded Georgia Dock Claims Further Exemplify The
            Individualized Inquiries That Preclude Class Certification Here. .......... 40

    B.  CIIPPs Cannot Show Class-Wide Damages Using Common Proof. .................. 42

    C.  In Addition, CIIPPs Cannot Show Predominance Or Superiority Because
        Of Substantive Variations In The Many State Laws Governing Their
        Claims. ................................................................................................... 45

        1.  Material Variations Exist Between The Antitrust Laws Of The
            Twenty-Four Jurisdictions Relied Upon By CIIPPs. ........................ 46

2. *There Are Substantive Differences Between The Relevant States' Consumer Protection Laws.* ........................................................................ 48

3. *CIIPPs Compound The Variability Problem By Bringing Unjust Enrichment Claims Under The Laws of Four Jurisdictions.* ................... 50

4. *CIIPPs' Proposals To Address Differences In State Laws Are Unmanageable And Inadequate.* .............................................................. 51

**II**. CIIPPS' CLASS DEFINITIONS ARE FATALLY OVERBROAD. ............................... 52

**III**. CIIPPS FAIL TO ESTABLISH TYPICALITY. ............................................................... 56

**IV**. FIGARETTI'S AND SARGENT'S ARE NOT ADEQUATE CLASS REPRESENTATIVES. ..................................................................................................... 57

CONCLUSION ..................................................................................................................... 59

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
  336 F.R.D. 5 (S.D.N.Y. 2020) ....................................................................... *passim*

*Am. Exp. Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013) ........................................................................................24

*Anziulewicz v. Bluefield Cmty. Hosp., Inc.*,
  531 F.Supp. 49 (S.D.W. Va. 1981) .................................................................58

*In re Aqua Dots Prods. Liab. Litig.*,
  270 F.R.D. 377 (N.D. Ill. 2010) .....................................................................50

*Arthur v. Microsoft Corp.*,
  267 Neb. 586 (2004) .......................................................................................46

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018) .......................................................................53, 55

*Bell Atl. Corp. v. AT&T Corp.*,
  339 F.3d 294 (5th Cir. 2003) ..........................................................................47

*Bergstrom v. Noah*,
  266 Kan. 829 (1999) .......................................................................................51

*In re Bridgestone/Firestone, Inc.*,
  288 F.3d 1012 (7th Cir. 2002) .............................................................38, 45, 48

*Bunker's Glass Co. v. Pilkington PLC*,
  75 P.3d 99 (Ariz. 2003)...................................................................................51

*Cal v. Infineon Techs. AG*,
  No. C 06-4333 PJH, 2008 WL 4155665 (N.D. Cal. Sept. 5, 2008)................25

*CE Design Ltd. v. King Architectural Metals, Inc.*,
  637 F.3d 721 (7th Cir. 2011) ......................................................................53, 55

*Clark v. Bumbo Int'l Trust*,
  No. 15 C 2725, 2017 WL 3704825 (N.D. Ill. Aug. 28, 2017)....................53, 55

*Clay v. Am. Tobacco Co.*,
  188 F.R.D. 483 (S.D. Ill. 1999) ......................................................................50

*Clayworth v. Pfizer*,
233 P.3d 1066 (Cal. 2010) ...................................................................................47

*In re Cmty. Bank of N. Va.*,
622 F.3d 275 (3d Cir. 2010)..................................................................................47

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013).......................................................................... *passim*

*Comes v. Microsoft Corp.*,
646 N.W.2d 440 (Iowa 2002) ...............................................................................51

*Dailey v. Groupon, Inc.*,
No. 11 C 05685, 2014 WL 4379232 (N.D. Ill. Aug. 27, 2014).............................43

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
No. 09-cv-3690, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) ............................59

*Dancel v. Groupon, Inc.*,
949 F.3d 999 (7th Cir. 2019) ................................................................................24

*Dimidowich v. Bell & Howell*,
803 F.2d 1473 (9th Cir. 1986) ..............................................................................51

*Doster Lighting, Inc. v. E-Conolight, LLC*,
No. 12–C–0023, 2015 WL 3776491 (E.D. Wis. June 17, 2015)...........................45

*In re Epipen Antitrust Litig.*,
No. 17-md-2785-DDC-TJJ, 2020 WL 1180550 (D. Kan. Mar. 10, 2020) ......................48, 49

*Espenscheid v. DirectSat USA, LLC*,
No. 12–1943, 2013 WL 407446 (7th Cir. Feb. 4, 2013)........................................44

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
223 F.R.D. 506 (S.D. Ill. 2004) ..............................................................31, 32, 36

*In re Fla. Cement & Concrete Antitrust Litig.*,
278 F.R.D. 674 (S.D. Fla. 2012).................................................................25, 36, 37

*In re Fla. Cement & Concrete Antitrust Litig.*,
No. 09-CV-23187, 2012 WL 27668 (S.D. Fla. Jan. 3, 2012).................................34

*In re Fluidmaster Inc., Prods. Liab. Litig*,
No. 14-cv-5696, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ....................... *passim*

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
174 F.R.D. 332 (D. N.J. 1997)...............................................................................51

iv

*Freeman Industries, LLC v. Eastman Chem. Co.*,
    172 S.W.3d 512 (Tenn. 2005) ................................................................................................51

*General Telephone Co. v. Falcon*,
    457 U.S. 147 (1982) ...........................................................................................................24

*Gordon v. Caribbean Cruise Line, Inc.*,
    No. 14 C 5848, 2019 WL 498937 (N.D. Ill. 2019) ..............................................................24

*In re Grand Theft Auto Video Game Consumer Litig.*,
    251 F.R.D. 139 (S.D.N.Y. 2008) .........................................................................................48

*Grandalski v. Quest Diagnostics, Inc.*,
    767 F.3d 175 (3d Cir. 2014) .........................................................................................45, 52

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008) ................................................................................ *passim*

*Hettinger v. Glass Specialty Co.*,
    59 F.R.D. 286 (N.D. Ill. 1973) ...........................................................................................38

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008) .........................................................................................25, 38

*In re IMAX Sec. Litig.*,
    272 F.R.D. 138 (S.D.N.Y. 2010) .........................................................................................58

*In re Intuniv Antitrust Litig.*,
    No. 1:16-cv-12396-ADB, 2019 WL 3947262 (D. Mass. Nov. 6, 2019) ...............................53

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
    634 F.3d 883 (7th Cir. 2011) ..............................................................................................57

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ..................................................................................54

*Kleen Products LLC v. Int'l Paper Co.*,
    831 F.3d 919 (7th Cir. 2016) ...................................................................................... *passim*

*In re Lamictal Direct Purchaser Antitrust Litig.*,
    957 F.3d 184 (3d Cir. 2020) ....................................................................................... *passim*

*Lee v. Chicago Youth Centers*,
    69 F. Supp. 3d 885 (N.D. Ill. 2014) .....................................................................................54

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ..................................................................................59

*Lipton v. Chattem, Inc.*,
  289 F.R.D. 456 (N.D. Ill. 2013) ............................................................................ 61

*MacNamara v. City of New York*,
  275 F.R.D. 125, 143-44 (S.D.N.Y. 2011) .............................................................. 59

*Mazza v. Am. Honda Motor Co., Inc.*,
  666 F.3d 581 (9th Cir. 2012) ................................................................................ 48

*Messner v. Northshore Univ. Health Sys.*,
  669 F.3d 802 (7th Cir. 2012) ...................................................................... *passim*

*In re Methionine Antitrust Litig.*,
  204 F.R.D. 161 (N.D. Cal. 2001) .......................................................................... 36

*Miller v. Gen. Motors Corp.*,
  Nos. 98 C 7386, 98 C 2851, 2003 WL 168626 (N.D. Ill. Jan. 26, 2003) ............... 49

*Muehlbauer v. Gen. Motors Corp.*,
  No. 05 C 2676, 2009 WL 874511 (N.D. Ill. March 31, 2009) ................................ 50

*Muro v. Target Corp.*,
  580 F.3d 485 (7th Cir. 2009) ................................................................................ 56

*In re Optical Disk Drive Antitrust Litig.*,
  303 F.R.D. 311 (N.D. Cal. 2014) .......................................................................... 57

*Oshana v. Coca-Cola Bottling Co.*,
  225 F.R.D. 575 (N.D. Ill. 2005) ............................................................................ 53

*Orlowski v. Dominick's Finer Foods, Inc., ,*
  172 F.R.D. 370 (N.D. Ill. 1997) ............................................................................ 59

*In re Pilgrim's Pride Corp.*,
  448 B.R. 896 (Bankr. N.D. Tex. 2011) .................................................................... 2

*In re Pilgrims Pride Corp.*,
  728 F.3d 457 (5th Cir. 2013) ................................................................................ 43

*In re Plastic Additives Antitrust Litig.*,
  No. 03–CV–2038, 2010 WL 3431837 (E.D. Pa. Aug. 31, 2010) ..................... 28, 40

*In re Processed Egg Prods. Antitrust Litig.*,
  312 F.R.D. 124 (E.D. Pa. 2015) .................................................................. 25, 39, 49

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  292 F. Supp. 3d 14 (D.D.C. 2017) ........................................................................ 42

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    934 F.3d 619 (D.C. Cir. 2019) ............................................................................53

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) .....................................................................24, 28

*Randall v. Rolls-Royce Corp.*,
    637 F.3d 818 (7th Cir. 2011) ............................................................................58

*Reed v. Advocate Health Care*,
    268 F.R.D. 573 (N.D. Ill. 2009) .................................................................. *passim*

*Reed v. Advocate Health Care*,
    No. 06 C 3337, 2009 WL 3146999 (N.D. Ill. Sept. 28, 2009) .............................32

*In re Relafen Antitrust Litig.*,
    221 F.R.D. 260 (D. Mass. 2004) .......................................................................46

*Retired Chicago Police Ass'n v. City of Chicago*,
    7 F.3d 584 (7th Cir. 1993) ....................................................................24, 57, 59

*In re Rhone-Poulenc Rorer, Inc.*,
    51 F.3d 1293 (7th Cir. 1995) ............................................................................45

*Riffey v. Rauner*,
    910 F.3d 314 (7th Cir. 2018) ......................................................................27, 43

*Riffey v. Rauner*,
    No. 10 CV 02477, 2016 WL 3165725 (N.D. Ill. June 7, 2016) ..........................53

*Shady Grove Orthopedic Assoc., P.A. v. All State Ins. Co.*,
    559 U.S. 393 (2010) .........................................................................................24

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
    No. CIV.A. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ....................39

*Siegel v. Shell Oil Co.*,
    256 F.R.D. 580 (N.D. Ill. 2008) .......................................................................45

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
    299 F.R.D. 555 (E.D. Tenn. 2014) ............................................................25, 46, 50

*Spano v. The Boeing Co.*,
    633 F.3d 574 (7th Cir. 2011) ............................................................................53

*Sperry v. Crompton Corp.*,
    8 N.Y.3d 204 (2007) ........................................................................................51

*In re Steel Antitrust Litig.*,
   No. 08 C 5214, 2015 WL 5304629 (N.D. Ill. Sept. 9, 2015)...........................................*passim*

*Suchanek v. Sturm Foods, Inc.*,
   764 F.3d 750 (7th Cir. 2014) ...................................................................................26

*In re Thalomid & Revlimid Antitrust Litig.*,
   No. 14-6997, 2018 WL 6573118 (D.N.J. Oct. 30, 2018) .......................................53

*Thompson v. Jiffy Lube Int., Inc.*,
   250 F.R.D. 607 (D. Kan. 2008) ................................................................................48

*Thorogood v. Sears, Roebuck and Co.*,
   547 F.3d 742 (7th Cir. 2008) ...................................................................................49

*Vega v. T-Mobile USA, Inc.*,
   564 F.3d 1256 (11th Cir. 2009) ...............................................................................51

*Vista Health Plan, Inc. v. Cephalon, Inc.*,
   No. 2:06–cv–1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015) ..................................*passim*

*In re Vitamins Antitrust Litigation*,
   259 F. Supp. 2d 1 (D.D.C. 2003) .............................................................................47

*Vulcan Golf, LLC v. Google, Inc.*,
   254 F.R.D. 521 (N.D. Ill. 2008)...............................................................................50

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..................................................................................................24

*Windham v. Am. Brands, Inc.*,
   565 F.2d 59 (4th Cir. 1977) .....................................................................................38

**Statutes**

Cal. Bus. & Prof. Code § 16750.1 .............................................................................47

DC ST § 28-4509(b) ..................................................................................................47

Kan. Stat. Ann. § 60-512 ...........................................................................................47

MCLA § 445.781 .......................................................................................................47

Me. Rev. Stat. Ann. § 752..........................................................................................47

N.C. Gen. Stat. § 75-16.2...........................................................................................47

N.H. Rev. Stat. § 356.12 ............................................................................................47

N.Y. Gen. Bus. Law § 340(5) ...................................................................................................47

**Other Authorities**

Fed R. Civ. P. 23(a)(3).............................................................................................................56

Fed. R. Civ. P. 23(b)(2)............................................................................................................54

Fed. R. Civ. P. 23(b)(3)...............................................................................................26, 47, 54

The undersigned Defendants respectfully submit their Opposition to the Commercial and Institutional Indirect Purchaser Plaintiffs' ("CIIPPs") Motion for Class Certification (Dkt. 3968).[1]

<u>**PRELIMINARY STATEMENT**</u>

Faced with a complex industry involving countless individualized factors relating to production and sales, CIIPPs do the only thing they can to seek certification of their untenable classes: oversimplify and aggregate. After reading their Motion, one would think that Defendants produce identical widgets that CIIPPs purchased through a "straightforward distribution chain" (MOL at 41)—all of which purportedly renders class certification little more than a speed bump. But that could not be further from the truth.

CIIPPs' Motion is crafted to mask the individualized issues that ultimately doom it. CIIPPs' expert, Dr. Mangum, attempts to build a supply model to support CIIPPs' allegations of "coordinated production cuts" in the supply of chicken. But this supply model ignores reality.



---

[1] Together with the accompanying Memorandum of Law (Dkt. 3968-1, or "MOL"), the "Motion".

The same can be said for CIIPPs' treatment of the actual products Defendants produce in Dr. Mangum's overcharge model. Dr. Mangum and CIIPPs treat all "CIIPP Class Products"[2] as undifferentiated items made by undifferentiated producers. Even a basic understanding of the industry reveals that CIIPPs' assumptions lack any basis in reality. The so-called CIIPP Class Products consist of over 21,000 different chicken products produced for customers serving different customer segments, with different supply and demand characteristics, and produced from different sized birds, which require different processing facilities and methods. Dr. Mangum's overcharge model also fails to account for the complexities of the distribution chains (in which CIIPPs—a mix of large and small entities—are but one link); the individual negotiations that occur at each link of those chains and resulting multitude of pricing mechanisms; and the impossibility of common pass-through given these dynamics. In light of these errors, the Motion fails under Rule 23 for several independent reasons.

**First**, CIIPPs' reliance on Dr. Mangum's models cannot satisfy the critical requirement of predominance. Perhaps the most fundamental flaw is Dr. Mangum's inability to separate lawful production decisions—such as reductions in production overseen by a federal bankruptcy court during Pilgrim's Pride's Chapter 11 bankruptcy—from allegedly unlawful ones.[3] The models also rely on unreasonable assumptions, including that Defendants could have increased production to levels beyond their physical or financial capacity. Dr. Mangum's overcharge model yields

---

[2] CIIPP Class Products, which the Motion terms "Broilers," includes "chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, and whole or in parts, but excluding [1] chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards[;] [2] dark meat chicken products[;]" and [3] "'further processed' products," which CIIPPs define as "any chicken meat that has been breaded, cooked, or 'formed'[.]" MOL at 2, n.1.

[3] *In re Pilgrim's Pride Corp.*, 448 B.R. 896, 905-07 (Bankr. N.D. Tex. 2011) (Pilgrim's had "incurr[ed] huge losses that could best be stemmed by reducing their production . . . [and] clearly had a valid business purpose for their actions.").

nonsensical results. ██████████████████████████████████████████████████

██████████████████████████████ Through rote reliance on averaging, Dr. Mangum ignores varied pricing mechanisms and fails to reliably show common pass-through. Indeed, Dr. Mangum includes a material percentage of false positives, claiming injury to indirect purchasers that were unharmed by any alleged conspiracy. Any one of these flaws shows Dr. Mangum's overcharge model cannot survive a "rigorous analysis" and cannot support class certification. And even if the models were sound (they are not), CIIPPs cannot meet the predominance standard because they fail to establish a manageable way to address the substantive conflicts of law that exist between the 31 jurisdictions whose laws they invoke.[4]

**Second**, CIIPPs seek to certify an impermissibly broad class of nearly one million entities that purchased chicken for over a decade. Yet, CIIPPs have not met their burden of reliably showing class-wide impact. To do so, CIIPPs must show that (i) direct purchasers in CIIPPs' supply chain paid an overcharge; and (ii) the overcharge was passed on to CIIPPs in a common way. Dr. Mangum's models cannot meet this task. First, the so-called overcharge models do not show overcharges for various Defendants at various points in time: ██████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████ How could any CIIPP have been impacted on such sales when there was no overcharge in the first place? Similarly, a closer look at Dr. Mangum's proposed economic models reveals periods of time where there are no overcharges

---

[4] Collectively, the proposed state law damages classes and the national class for injunctive relief are referred to as the "Proposed Classes".

for entire segments of the industry. Even after assuming a conspiracy, Dr. Mangum's models are riddled with errors that *still* show no overcharge or pass-through.

**Third**, CIIPPs' named class representatives fail to fulfill Rule 23's requirement of typicality.  The differences in the claims of purported antitrust injuries between CIIPPs means that the class representatives do not bring claims that are typical of absent class members.

**Finally**, two class representatives—Figaretti's and Sargent's—are not adequate representatives. Without class representatives, these state classes fail.

At bottom, Dr. Mangum's models cannot withstand the rigorous analysis required for class certification. The flaws in his models and arguments are glaringly apparent, and Rule 23 requires far more. Chicken sold to restaurants are not undifferentiated widgets. Poultry producers are not undifferentiated manufacturers. And, critically, the distribution chain and negotiations at each step between producers and CIIPPs do not amount to a "straightforward" path to easy class certification. CIIPPs' Motion should be denied.

## STATEMENT OF FACTS[5]

### I. CIIPPS IGNORE COMPLEXITY AND VARIATION IN CHICKEN DISTRIBUTION AND PURCHASING.

CIIPPs ignore the complexity and variability in the distribution chain.



#### A. CIIPPs Are Links In Complex Chicken Distribution Chains.



---

[5] The Motion includes several assertions that are unsupported by the cited exhibits. While those bearing on class certification are discussed in this opposition, several others simply misrepresent the record— ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (MOL at 14). Appendix A includes several of the most egregious examples, including some that actually are contradicted by the documents to which CIIPPs point for support.

[6] Defendants' Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification, filed January 22, 2021.

[7] Expert Report of Dr. John G. Johnson, IV ("Johnson Rep.") dated Jan. 22, 2021 and Appendices, filed concurrently herewith.



---

[8] *See* Dkt. No. 4118 at 8, 12.

[9] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.*, Ex. 1 (Telavi Hospitality 30(b)(6) Dep. 54:6-54:25); Ex. 2 (Sullot Corp. 30(b)(6) Dep. 37:24-38:8); Ex. 3 (Wildwood Tavern 30(b)(6) Dep. 23:7-24:12).



**B.** **There Is Widespread Price Variation Within These Distribution Chains.**



---

[10] Ex. 4 (Cheney Brothers 30(b)(6) Dep. 29:22-30:11); Ex. 5 (Alabama Joe's 30(b)(6) Dep. 96:15-97:20); Ex. 6 (T. Sargent Dep. 79:7-12).

[11] Johnson Rep. at ¶ 141; *see also Id.* at ¶ 393; Ex. 7 (N. Cramm Dep. 50:14-51:7); Ex. 8 (US Foods 30(b)(6) Dep. 118:15-23) (██████████████████)

[12] Ex. 9 (Pilgrim's Pride 30(b)(6) Dep. 27:18-28:4, 29:22-31:5); Ex. 10 (Krispy Krunchy Foods 30(b)(6) Dep. 135:4-7).

[13] ██████████████████████████████████



---

See Ex. 11 (PILGRIMS-0000048617).
█████████████████ See, e.g., Ex. 12 (Koch 30(b)(6)
(J. Marler) Dep. 17:4-13); Ex. 13 (Sanderson Farms 30(b)(6) Dep. 52:24-53:16).

[14] See Johnson Rep. at ¶¶ 141, n.299, 159, Ex. 26 ████████████████ Ex.
14 (CASEFOODS0000613856) ████████████████████████
█████████).

[15] Johnson Rep. at ¶ 160; see also Ex. 13 (Sanderson Farms 30(b)(6) Dep. 84:5-86:18)

[16] Johnson Rep. at ¶ 151, n.339; see also Ex. 13 (Sanderson Farms 30(b)(6) Dep. 95:5-97:7)
(██████████████████████████████████████████████████);
Ex. 10 (Krispy Krunchy Foods 30(b)(6) Dep. 135:4-8) (██████████████████████).

[17] Johnson Rep. at ¶ 160; see also Ex. 15 (C. Thompson Dep. 57:16-58:17)
█████████
Ex. 9 (Pilgrim's Pride 30(b)(6) Dep. 39:15-40:3, 49:8-50:6); Ex. 16 (PILGRIMS-0010293430)
(██████████████████████████████████████████████
█████████████████████ Ex. 17 (Mountaire 30(b)(6) (M.
Little) Dep. 84:4-85:3).



CIIPPs ignore these variations, some of which their expert acknowledged, and erroneously assert that "widespread use of formulaic pricing and pricing indices contributes to common impact." MOL at 23-24.

---

[18] Ex. 9 (Pilgrim's Pride 30(b)(6) Dep. 31:6-22); Ex. 18 (PILGRIMS-0002592528) ( ).

[19] Ex. 19 (Pacific Food Distributors 30(b)(6) Dep. 71:15-21, 72:11-17) ); *see also* Ex. 20 (Urner Barry 30(b)(6) Dep. 115:2-17) ). *See* Ex. 9 (Pilgrim's Pride 30(b)(6) Dep. 41:13-42:2). . Ex. 21 (B. Kellert Dep. 21:25-22:10). *See id.* at 20:18-21:15.

[20] *See* Ex. 9 (Pilgrim's Pride 30(b)(6) Dep. 24:14-25:3, 27:18-28:4, 29:22-30:4, 55:8-15).



---

[21] *See, e.g.*, Ex. 9 (Pilgrim's Pride 30(b)(6) Dep. 39:15-40:3) ███████████████
████████████████████; Ex. 13 (Sanderson Farms 30(b)(6) Dep. 86:7-18) ███████
████████████████████); Ex. 23 (B. Reese Dep. 200:23-202:23) ███████
████████████; Ex. 24 (N. Morgan Dep. 125:16-126:19) ███████
████████).

[22] *See, e.g.*, Ex. 25 (SYS-BR-0000054031) ████████████████████████
██████████████); Ex. 26 (Sanderson-0004518261) ████████████████████
█████████████████)





24 *See, e.g.*, Ex. 32 (Oregano Italian Kitchen 30(b)(6) Dep. 87:2-16, 139:7-140:3) ( ███████ ███████ ) Ex. 33 (Avanti's of Phoenix 30(b)(6) Dep. 97:9-23, 99:7-24) ████████████████████



In sum, the prices of chicken products vary dramatically based on multiple intersecting variables, meaning that there is nothing resembling a uniform price for CIIPP Class Products.

**C.    These Distribution-Side Dynamics Mean That There Could Be No Common Pass-Through Of Alleged Overcharges.**

Even accepting CIIPPs' allegation of a collusive overcharge (which did not occur), the complexities described above mean that overcharges would not be passed through to CIIPPs in a common manner, if at all.

13



---

[25] *See* Ex. 23 (B. Reese Dep. 72:17-74:6) (████████████████████████████████ ████████████████); *id.* at 200:23-202:23; Ex. 39 (FF-BC-00471838). ████████████████████████████████████████████████████████ *See, e.g.*, Ex. 33 (Avanti's of Phoenix 30(b)(6) Dep. 105:7-107:8); Ex. 40 (Roost Fried Chicken 30(b)(6) Dep. 82:9-83:12).

[26] *See also* Ex. 41 (E. Eigen Dep. 212:20-213:16) (████████████████████████████).



Johnson Rep. at ¶ 393. Expert analysis of pass-through has confirmed the above observations—*i.e.*, different direct purchasers had different levels of pass-through even for broad categories of products. *Id.* at ¶ 397, Ex. 104.

## II. CIIPPS' ALLEGATIONS OF COORDINATED "PRODUCTION CUTS" IGNORE THE REALITIES OF CHICKEN PRODUCTION.

CIIPPs attempt to certify classes based on allegations that contravene record evidence.

### A. The So-Called Production Cuts Involved Defendants Selling More Chicken, Not Less.

CIIPPs' alleged "production cuts" falter out of the gate. While CIIPPs focus on the number of Defendants' breeder hens, *see* Mangum Rep. at ¶¶ 52, 54, this case is not about Defendants selling breeder hens (primarily used to produce broiler eggs), but rather selling pounds of chicken

---

27 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Compare, e.g.*, Ex. 42 (M. Byrum Dep. 71:22-73:17) (▮▮▮ ▮▮▮▮▮▮▮ *with* Ex. 43 (Peppers Bar & Grille 30(b)(6) Dep. 47:16-20, 160:22-24) (▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮); *see also* Johnson Rep. at ¶ 393.

meat.[28] In any event, the data shows that during CIIPPs' so-called "coordinated rounds of supply cuts" beginning in 2008, purportedly followed by a "renewed" effort in 2011, MOL at 5-6, 12,



[28]                                                                                  *See* CIIPP Ex. 55,
KOCH_0002051097; CIIPP Ex. 56, PILGRIMS-00000038129.

[29]

**B.      Some Defendants Reduced Production In Some Areas To Weather Historic Economic Turmoil, But Reductions Were Neither Uniform Nor Coordinated.**



31
(*e.g.*, Ex. 45 (PILGRIMS-0009997579 at 606) (*e.g.*, Ex. 46 (Sanderson-0002841329 at 331)). (*e.g.*, Ex. 47 (CASEFOODS0000197570) (

32 Ex. 49 (W. Snyder Dep. 56:24-58:24). Ex. 50 (DPP0000012518 at 544 (*City of Clinton v. Pilgrim's Pride Corp.*, 2:09-cv-397 (N.D. Tex. July 31, 2012) Trial Tr. at 27:1-12 (Don Jackson testifying)).



[33] *See* Ex. 37 (J. McCann Dep. 273:20-274:6) (████████████████████████████████
████████████████).



**C.** **CIIPPs' Use Of The Term "Broilers" Misleadingly Collapses And Simplifies Different Industry Segments, Cuts, and Products.**

CIIPPs define their Proposed Classes to include entities that indirectly purchased "Broilers." MOL at 1. But CIIPPs' use of the term Broilers is deceptively over-simplified. Defendants are not a homogenous set of businesses that churn out identical "Broilers."



When these material differences are considered—as they must be—an entirely different reality from CIIPPs' misleading allegations of "Broiler production cuts" emerges.



---

[34] *See, e.g.*, Ex. 54 (Mountaire 30(b)(6) (P. Downes) Dep. 36:3-37:22). *See also* Johnson Rep. at ¶ 80 (                                                                    *See* Ex. 70 (R. Mangum Dep. 90:1-92:7).



Johnson Rep. at ¶ 75, n.81. Notably, CIIPPs have revised their definition of their Class Products since the Complaint to exclude certain "further processed products," seeking to capture products that "remain unchanged from the Defendants to the CIIPP class." *Compare* Compl. ¶ 136 *with* MOL at 2-3, n.2; MOL at 41-42. This narrowing does not solve the problem and actually simply illustrates ███████████████████████████████████

---

[35] *See, e.g.*, Ex. 55 (R. Boyce Dep. 181:8-182:4) (████████████████████████████
████████████████████ Ex. 56 (W. Shafer Dep. 93:15-94:8)





[36] *See* Ex. 41 (E. Eigen Dep. 223:20-224:4); Ex. 48 (USDA 30(b)(6) (S. Shagam) Dep. 123:15-124:15).

[37] *See* Ex. 57 (L. Guest Dep. 81:14-82:17).

[REDACTED]

[REDACTED] Johnson Rep. at ¶ 282, n. 560. In sum, Dr. Mangum acknowledges variation in how economic factors affect pricing for different products, but only scratches the surface of the applicable differentiating factors.

[REDACTED]

*Id.* at ¶¶ 74-75.[38] Yet, Dr. Mangum ignores this significant variation and custom specifications, instead grouping these thousands of products under the heading of "Broilers."

     **D.**     **CIIPPs Also Ignore The Real-World Chicken Production Process.**

[REDACTED]

---

[38] *See, e.g.*, Ex. 58 (S. McLaurin Dep. 101:9-102:17) ([REDACTED]); *id.* ([REDACTED]); Ex. 59 (D. Keck Dep. 90:13-91:1) (similar); Ex. 60 (K. Grindle Dep. 49:19-51:3) (similar); Johnson Rep. at ¶ 78.



## LEGAL STANDARD

Class actions should not be approved lightly. *General Telephone Co. v. Falcon*, 457 U.S. 147, 161 (1982). Rule 23 "does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). As the Rule's requirements are "stringent" and "exclude most claims," *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 229 (2013), "certification is far from automatic." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 249 (D.C. Cir. 2013) ("*Rail Freight*"). CIIPPs bear "the burden of demonstrating that certification is appropriate" by a preponderance of the evidence. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). In assessing whether Rule 23's requirements are satisfied, courts cannot "simply assume the truth of the matters as asserted by the plaintiff." *Gordon v. Caribbean Cruise Line, Inc.*, No. 14 C 5848, 2019 WL 498937 at *5 (N.D. Ill. Feb. 8, 2019). Rather, they must "probe behind the pleadings" and conduct a "rigorous analysis" of the competing evidence and arguments. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted); *see also Dancel v. Groupon, Inc.*, 949 F.3d 999, 1005 (7th Cir. 2019).

That burden is no lighter in antitrust cases: Rule 23 "provides a one-size-fits-all formula for deciding the class-action question," *Shady Grove Orthopedic Assoc., P.A. v. All State Ins. Co.*, 559 U.S. 393, 399 (2010), so courts "should not suppress 'doubt' as to whether a Rule 23

requirement is met—no matter the area of substantive law." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 321 (3d Cir. 2008). As such, courts have not hesitated to reject certification attempts where indirect purchasers in an antitrust action fail to carry their burden.[39]

## ARGUMENT

The Motion should be denied for four primary reasons. *First*, CIIPPs cannot clear the critical hurdle of predominance required by Rule 23. CIIPPs cannot show that antitrust impact can be established on a class-wide basis through common proof. Their expert's models—which this Court must closely scrutinize at the class certification stage—rely on unreasonable assumptions, ignore the realities of the chicken industry, and arrive at a single overcharge by relying on impermissible aggregation. CIIPPs also cannot show class-wide damages using common proof. They again lean too heavily on averaging (rather than confronting the actual, highly variable data) and fail to separate the effect of permissible conduct from that of the alleged conspiracy. On top of these insurmountable predominance problems, CIIPPs fail to establish a manageable way to address the multiple substantive conflicts of law that exist between the 31 jurisdictions at issue.

*Second*, CIIPPs seek to certify impermissibly broad classes, sweeping in practically every entity that indirectly purchased what they call "Broilers" from any Defendant, for the Proposed Class Period, throughout the nation for their proposed injunctive class, and throughout thirty-one different states for their proposed damages class. The problem with casting such a wide net, however, is that it captures a great many putative class members that could not have been harmed,

---

[39] *See, e.g., In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 130 (E.D. Pa. 2015) (declining to certify class of indirect purchasers); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 560 (E.D. Tenn. 2014) (same); *In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 687 (S.D. Fla. 2012) (same); *Cal v. Infineon Techs. AG*, No. C 06-4333 PJH, 2008 WL 4155665, at *13 (N.D. Cal. Sept. 5, 2008) (denying class certification for direct and indirect purchasers).

as shown by Dr. Mangum's models. And this deficiency cannot be remedied without necessitating highly individualized analyses simply to determine class membership.

*Third*, CIIPPs cannot satisfy Rule 23's requirement of typicality. Several named plaintiffs present unique issues that differentiate their claims—and the defenses against them—from those of absent class members. Further,



*Finally*, CIIPPs cannot demonstrate that proposed class representatives Figaretti's and Sargent's Restaurant and Lounge are adequate class representatives.

For all these reasons, the Motion must be denied.

## I. CIIPPS CANNOT ESTABLISH PREDOMINANCE.

A critical requirement of Rule 23(b)(3) is the showing that "common proof will predominate with respect to each . . . element[] of [CIIPPs'] claims," including antitrust injury and resulting damages. *Reed v. Advocate Health Care*, 268 F.R.D. 573, 581 (N.D. Ill. 2009) (citations omitted). CIIPPs "must affirmatively show how common evidence and a single, reliable methodology will prove [these] element[s] on a simultaneous, class-wide basis." *In re Steel Antitrust Litig.*, No. 08 C 5214, 2015 WL 5304629, at *5 (N.D. Ill. Sept. 9, 2015). If putative class members would need to present varying evidence regarding an essential question, then that question is not common. *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 815 (7th Cir. 2012); *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) ("Where the

defendant's allegedly injurious conduct differs from plaintiff to plaintiff . . . no common answers are likely to be found."). Critical to assessing predominance is whether the essential questions can be resolved without a "highly individualized inquiry." *Riffey v. Rauner*, 910 F.3d 314, 319 (7th Cir. 2018).

The predominance requirement does not impose "a mere pleading standard." *Kleen Products LLC v. Int'l Paper Co.*, 831 F.3d 919, 922 (7th Cir. 2016) (citation omitted). Instead, CIIPPs must "demonstrate (not merely allege) that there is proof common to all class members" of the elements of their claims, which necessitates "a careful look at the evidence." *Id.* at 922, 926. "If there are material factual disputes, the court must 'receive evidence . . . and resolve the disputes before deciding whether to certify the class.'" *Messner*, 669 F.3d at 811 (citation omitted); *see also In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 187 (3d Cir. 2020) ("[J]udges must conduct a rigorous analysis of the facts, evidence, and arguments submitted at the class certification stage." (quotation omitted)).

CIIPPs cannot satisfy Rule 23's predominance requirement. *First*, as to antitrust injury, individualized inquiries will overwhelm any common questions given the many nuances that the Motion ignores. Dr. Mangum's economic models are seriously flawed: They make patently unreasonable assumptions, ignore the realities of the chicken industry, and attempt to show class-wide impact by glossing over all the variations in play. Indeed, Dr. Mangum's models project injury for indirect purchasers that he admits could not have been overcharged. Johnson Rep. at ¶¶ 282-90. CIIPPs' Georgia Dock allegations fare no better. ███████████████████

███████████████████████████████████████████████████████████

████████████ *Second*, as to class-wide damages, Dr. Mangum's proposed model also misses the mark. For many of the same reasons they cannot show that common questions predominate for

antitrust injury, individual determinations will overwhelm any common questions as to damages. *Finally*, CIIPPs cannot show predominance and superiority because they fail to address multiple substantive conflicts in the laws of 31 jurisdictions that govern their claims.

### A. Dr. Mangum's Flawed Models Cannot Conceal The Fact That Individualized Inquiries Will Overwhelm Any Common Proof Of Antitrust Injury.

To show antitrust injury, CIIPPs must have suffered a loss "that stems from a competition-reducing aspect of [Defendants'] behavior"; to establish predominance, they must offer a "common methodology for proving that prices increased on a class-wide, rather than individual, basis." *In re Steel*, 2015 WL 5304629, at *9. This common methodology must offer a "reliable" means for determining injury, *Reed*, 268 F.R.D. at 582, and it must be based on the record evidence. *See In re Plastic Additives Antitrust Litig.*, No. 03–CV–2038, 2010 WL 3431837, at *4, *6 (E.D. Pa. Aug. 31, 2010) (plaintiffs failed to establish predominance where "the evidence of record" did not support their impact theory). The court must "take a hard look at the soundness of statistical models that purport to show predominance." *In re Steel*, 2015 WL 5304629, at *9; *see also In re Lamictal*, 957 F.3d at 193-94 (the court must "scrutinize the evidence to determine what was credible and could be used in the expert analysis;" this scrutiny may include "multi-leveled microeconomic analysis of what each Defendant would or would not have possibly done in the but-for world"); *Rail Freight*, 725 F.3d at 255 ("Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it.").

A flawed statistical model results in a denial of class certification because it "measures harm not attributable to the conspiracy, yields false positives, masks uninjured class members by using an 'averaging' mechanism to allocate injury across the class, or otherwise fails to demonstrate with scientific rigor that classwide impact can be established through common proof."

*In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 49 (S.D.N.Y. 2020) (citations omitted).

Dr. Mangum's economic models suffer from all these fatal flaws. They rely on unfounded assumptions regarding the alleged harm, ignore the real-world characteristics of the chicken industry with average overcharges, and even show that many indirect purchasers could not have been and/or were not impacted by any overcharge. Thus, CIIPPs cannot establish that the alleged conspiracy actually impacted all or most putative class members without relying on highly individualized evidence, which precludes certification. *See id.* at 46 ("A court may certify a class . . . only where the Court finds the model methodologically sound.").



1. *Dr. Mangum's Model Makes Improper Assumptions, Masks The Variation In The Chicken Industry, And Shows No Impact to Many Indirect Purchasers.*

Dr. Mangum's overcharge model attempts to show injury to all or virtually all members of the Proposed Classes. However, its fundamental flaws—which the Court should "take a hard look at," *In re Steel*, 2015 WL 5304629, at *9—mean that it cannot serve as a reliable, common methodology of demonstrating class-wide antitrust impact. *First*, Dr. Mangum's model is not linked to the alleged "coordinated supply reductions."



*Second,* Dr. Mangum's overcharge model is not capable of distinguishing the effects of the additional alleged anticompetitive conduct related to Agri Stats and the allegations of manipulation of the Georgia Dock.

CIIPPs grossly overstate the so-called production cuts that they allege occurred in 2008 and 2011.



---

40 *See supra* p.17-18 & n.31.

*See*

DPP Opp. at 15-17; Ex. 61 (AssocGrocers_0000572635)

███████████

███████████

████████ *See Comcast*, 569 U.S. at 35 (a model that "identifies damages that are not the result of the wrong" is impermissible); *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513-14 (S.D. Ill. 2004) (common proof cannot establish antitrust injury without showing "the causal link between the antitrust violation and the damages suffered"); *Aluminum Warehousing*, 336 F.R.D. at 51-54 (denying certification on predominance grounds where plaintiffs' expert failed to isolate alleged effects of the conspiracy from other economic factors).

*Second*, Dr. Mangum's models paint over real-world variations that exist in the distribution and pricing of chicken products, by imputing an average overcharge for three cherry-picked product categories per "period," totaling six average overcharges,[41] to direct purchasers that allegedly flowed through to all CIIPPs. Put another way, CIIPPs assume the answer to the very question that must be answered: Were all class members injured? Yet averages do not satisfy CIIPPs' burden. To the contrary, in complex industries involving individualized factors like negotiations and discounts, averages often are *not* an acceptable way to show common proof of antitrust impact. *See In re Lamictal*, 957 F.3d at 194. In such circumstances, averages "mask individualized injury" that bar predominance. *Id.*; *see also, e.g.*, *Aluminum Warehousing*, 336 F.R.D., at 56, 61-62 (rejecting model's attempt to "elide[]" complexities in data through averaging as unreliable and incapable of proving common impact); *Reed*, 268 F.R.D. at 590-91 ("Measuring average base wage suppression does not indicate whether each putative class member suffered harm from the alleged conspiracy. [I]t is not a methodology common to the class that can determine

███████████████████████████████████████████████

---

[41] *See* Mangum Rep. at ¶¶ 212-19.

impact with respect to each class member."); *Exhaust Unlimited*, 223 F.R.D. at 513-14 (no predominance where "only individualized inquiry could account for" factors including "var[iation] over time . . . customer needs, supplier costs, and other factors affecting market price, and would depend on the mix of products and services being considered").[42] Dr. Mangum's models run afoul of this case law, masking numerous individualized factors in the complex chicken industry—factors that mean the essential questions cannot be resolved through common proof.

In particular, CIIPPs strategically mask the complexity and variability on both the production and distribution sides of the chicken industry.  Mangum Rep. at ¶¶ 180-81.

*See supra* n.33. Notably, Dr. Mangum's theory of simple supply-side substitution is at odds with EUCP expert Dr. Sunding, who recognizes that Ex. 63 (D. Pogge Dep. 175-76). And his theory of demand-side substitution ignores

---

[42] *See also, e.g.*, *Reed v. Advocate Health Care*, No. 06-C-3337, 2009 WL 3146999 at *17 (N.D. Ill. Sept. 28, 2009) (noting that "averaging by definition glides over what may be important differences" between class members (citation omitted)); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 494 (N.D. Cal. 2008) (finding that averaging had "masked important differences between products and purchasers").



---

[43] CIIPPs exclude further-processed" chicken their Class Products where it is "breaded, cooked, or 'formed,'" but not when it is "[m]arinated, seasoned, frozen [or] portioned" and "not otherwise further-processed" (MOL at 2, n.1). They offer no rationale for this distinction.

[44]

*See, e.g.*, Ex. 64 (TF-0007138632) (

Courts have long warned of the dangers of lumping and averaging when doing so masks variation. *In re Lamictal*, 957 F.3d at 194; *see also In re Fla. Cement & Concrete Antitrust Litig.*, No. 09-CV-23187, 2012 WL 27668, at *10 (S.D. Fla. Jan. 3, 2012) (rejecting Dr. Mangum's "correlation analysis" and criticizing reliance on "aggregat[ing] all customers"). Dr. Mangum, however, does just that, beginning with ███████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████ *See* Mangum Rep. at ¶¶ 170-78; Johnson Rep. at ¶¶ 322-23. Even Dr. Mangum admits that █████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████ Mangum Rep. at ¶ 177. ███████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████ *See* Johnson Rep. at ¶ 323, n.599.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████



---

[45] To the extent a direct purchaser was able to resist any alleged overcharge, that direct purchaser and its indirect purchaser customers could not have sustained antitrust injury. *See infra* p.36-37.

████████████████████████████████████████ Ex. 42 (M. Byrum Dep. 71:22-73:17) ████

█████████████████████████████████████ Ex. 40 (Roost Fried

Chicken 30(b)(6) Dep. 89:16-90:1) ████████████████████████████████████████

Predominance is not established when assessing impact requires an individualized consideration

of the mix of products and services covered by given transactions, as would be the case with bundle

pricing and bulk discounts. *See Exhaust Unlimited*, 223 F.R.D. at 513-14.

Dr. Mangum also fails to consider ████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████[46] Rather than confront

these complex industry realities, Dr. Mangum retreats to basic averaging. When that "improper

averaging mechanism [is] excised, [the] model is devoid of common proof that conspiratorial

conduct caused pricing injury to all purchasers." *Aluminum Warehousing*, 336 F.R.D. at 56.

Importantly, all the masked variability makes it impossible for there to have been common

pass-through of an overcharge—a fact that has been confirmed by expert analysis (*see* SOF Part

II.C). Yet, as indirect purchasers, CIIPPs bear the "double burden" of demonstrating not only an

overcharge, but also that any overcharge was passed through to them, rather than absorbed by an

intermediary, with common proof. *In re Fla. Cement*, 278 F.R.D. at 682; *see also In re Methionine*

*Antitrust Litig.*, 204 F.R.D. 161, 164 (N.D. Cal. 2001) (indirect purchaser plaintiffs must show

"there is a reasonable method for determining on a class-wide basis whether and to what extent

that overcharge was passed on to each of the indirect purchasers at all levels of the distribution

chain"); *Graphics Processing Units*, 253 F.R.D. at 499 ("[I]ndirect-purchaser plaintiffs must

---

[46] *See* Ex. 21 (B. Kellert Dep. 50:3-7); Ex. 8 (US Foods 30(b)(6) Dep. 79:20-80:25) (██████████

████████████████████████████████████████

demonstrate that defendants overcharged their direct purchasers for graphics products and that those direct purchasers passed on the overcharges to plaintiffs. In so doing, they must find a way to account for the decision-making of a variety of resellers and manufacturers."). CIIPPs have not carried this burden—instead, they fall back on averaging in an attempt to avoid admitting that pass-through would "require[] a reseller-by-reseller analysis." *Graphics Processing Units*, 253 F.R.D. at 505 (denying class certification where pass-through analysis was flawed); *see also In re Fla. Cement*, 278 F.R.D. at 684-85 (denying class certification where pass-through analysis did not account for variation).

CIIPPs erroneously estimate pass-through rates by studying total cost pass-through, as opposed to pass-through of the alleged overcharge. *See* Mangum Rep. at ¶ 222. This analysis fails to measure *common* or *uniform* pass-through of the alleged overcharge, ███████████████

██████████████████████████████████████████████████

████████████████████████████ *See* Johnson Rep. at ¶¶ 409-12. Dr. Mangum therefore fails to study the relevant question: was the *alleged upstream overcharge* passed through on a class-wide basis to all (or nearly all) prices that putative CIIPP class members paid for relevant chicken products? At bottom, Dr. Mangum's models create average "overcharges" by impermissibly homogenizing and averaging in the face of the many important, individualized industry factors. This is not a permissible method to show class-wide injury.

When the real-world evidence is considered and CIIPPs' contrived average overcharges are not simply assumed to apply to all class members, it is clear that there is not common proof of class-wide injury. Differently situated buyers paid different prices for different products, sold by different Defendants, in different volumes, at different points in time. Determining whether any given plaintiff was allegedly overcharged, and thus suffered antitrust injury, would require a highly

individualized, fact-specific inquiry into their unique circumstances—the opposite of a common question. *See* 2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Principles and Their Application* § 398c n.14 (2019) (observing that "[w]here transaction prices are negotiated," "proof of antitrust injury is bound to be individualized") ("Areeda & Hovenkamp"); *see also Hydrogen Peroxide*, 552 F.3d at 314 (affirming denial of class certification where the need to incorporate a "multitude of different variables" to determine impact "defeat[s] any reasonable notion of proof common to the class"); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018-19 (7th Cir. 2002) (reversing class certification where putative class members had purchased numerous different products, in a complex distribution chain with variations in pricing, discounts, and other factors).[47]

CIIPPs' arguments that *Messner* and *Kleen Products* support certification despite these myriad individualized questions cannot be sustained. Unlike CIIPPs, *Messner* and *Kleen Products* did not involve the use of a fundamentally flawed and unreliable methodology to show class-wide impact; in fact, plaintiffs' proposed methodologies in those cases were not challenged as unreliable. *See Messner*, 669 F.3d at 823-24; *Kleen Products*, 831 F.3d at 922. And while CIIPPs urge that *Messner* allowed certification of a class alleging antitrust injury in a complex industry with differentiated contracts, the *Messner* plaintiffs' model specifically accounted for and incorporated those complexities—rather than averaging them out, like CIIPPs here do. *See Messner*, 669 F.3d at 819-20. As for *Kleen Products*, that court made clear that "the Defendants'

---

[47] *See also, e.g.*, *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68-72 (4th Cir. 1977) (affirming denial of class certification where distinctions included a large number of product types, grades, and forms; different geographic regions; and widely fluctuating prices); *Hettinger v. Glass Specialty Co.*, 59 F.R.D. 286, 294 (N.D. Ill. 1973) (class could not be certified because questions relating to individual agreements, geographic regions, and differentiated pricing predominated over common questions and "would necessitate a plethora of mini trials").

price increases were not tailored to each individual purchaser," a fact standing in stark contrast to the multilevel price and pass-through variation observed here. *Kleen Products*, 831 F.3d at 925; *see also* Areeda & Hovenkamp, *supra* at § 398c n.14; *see also In re Processed Egg Prods.*, 312 F.R.D. at 159 (denying class certification of indirect purchaser class where prices varied over class period, showing "it is not reliable to assume, without substantiation," common pass-through).

*Finally*, Dr. Mangum's models show that many indirect purchasers could not have been impacted—a serious deficiency undermining their reliability. The Seventh Circuit has explained it is not acceptable to include "a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *Messner*, 669 F.3d at 824-25. This is just such a case. Expert analysis has shown ████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████ Johnson Rep. at ¶¶ 290, 379. Thus, in its proposed class of "millions," CIIPPs' "would sweep in countless people who would never have standing," rendering class certification inappropriate. *In re Fluidmaster Inc., Prods. Liab. Litig*, No. 14-cv-5696, 2017 WL 1196990, at *46 (N.D. Ill. Mar. 31, 2017); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, No. CIV.A. 04-5898, 2010 WL 3855552, at *26 (E.D. Pa. Sept. 30, 2010) ("If only some [CIIPPs] paid increased prices, this would suggest [they] will have to prove economic impact customer-by-customer." (citation omitted)).

In sum, CIIPPs' approach to predominance is to average their way to purported overcharges and then assume that all class members ultimately paid them. This methodology rests on unfounded assumptions, ignores the industry's dynamics requiring individualized inquiries to establish impact, and sweeps in many plaintiffs that even their expert's analysis shows were not impacted by any alleged conspiracy. CIIPPs fail to carry their burden of showing there is a reliable

methodology for demonstrating antitrust impact through common proof. *See In re Steel*, 2015 WL 5304629, at *5; *Reed*, 268 F.R.D. at 582; *In re Plastic Additives*, 2010 WL 3431837, at *4, 6.

> 2. *CIIPPs' Unfounded Georgia Dock Claims Further Exemplify The Individualized Inquiries That Preclude Class Certification Here.*

CIIPPs also allege that ten of the twenty Defendants manipulated the Georgia Dock index, pointing to a supposed divergence between the Georgia Dock and other indices around January 2015. *See, e.g.*, Compl. at ¶¶ 158-61; MOL at 18. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ For example, the Georgia Dock measured the price of a two and a half to three pound USDA Grade A WOG; USDA measured an average price of all grades and all sizes it collected; Urner Barry measured only spot market sales. *See* Ex. 20 (Urner Barry 30(b)(6) Dep. 112:11-113:23); *supra* n.18; Ex. 68 (J. Scroggs Dep. 229:7-19); Ex. 69 (J. Karwal Dep. 73:20-75:1).



48



inquiries would be further complicated by analysis of how any alleged Georgia Dock-related overcharge could have been passed through to CIIPPs by intermediaries. "[C]lasses that require highly individualized determinations of member eligibility may not be sufficiently cohesive to warrant adjudication by representation." *Aluminum Warehousing*, 336 F.R.D. at 63 (quotations and citations omitted) (rejecting impact model that failed to account for variability in whether and how contracts were tied to price indices). For these reasons, CIIPPs' Georgia Dock allegations highlight exactly why the Proposed Classes cannot be certified.

41

**B.     CIIPPs Cannot Show Class-Wide Damages Using Common Proof.**

In analyzing predominance, a court must also "see if there is a classwide method for proving damages, and if not, whether individual damage determinations will overwhelm the common questions on liability and impact." *Kleen Products LLC*, 831 F.3d at 929; *see also In re Rail Freight*, 292 F. Supp. 3d 14, 142 (D.D.C. 2017) ("At this stage [] the Court must determine whether plaintiffs have shown by a preponderance of the evidence that there is a reliable means of proving class-wide damages.").[49] CIIPPs fail on both fronts.

CIIPPs have not offered a reliable method of showing class-wide damages through common proof. Their expert purports to estimate the share of Defendants' sales of CIIPP Class Products to direct purchasers that in turn sold to putative CIIPP class members and then attempts to identify the subset of the direct purchasers' customers who are putative CIIPPs class members. Mangum Rep. at ¶¶ 255-57. 

*Id*. at ¶¶ 257-62. Dr. Mangum next applies his purported overcharge and pass-through rate to the

*Id.* at ¶ 263. As discussed above in the context of antitrust impact, this analysis fails to account for the

---

[49] While CIIPPs urge that some individualized proof of damages is not an obstacle to class certification (Motion at 33-34 (citing *Messner*, 669 F.3d at 815; *Kleen Products LLC*, 831 F.3d at 922; *Butler*, 727 F.3d at 801)), this does not obviate the need for a class-wide method of proving damages or the need to show that any such individualized proof will not overwhelm common questions. *See Kleen Products LLC*, 831 F.3d at 929. Moreover, even if some individualized proof of damages does not defeat class certification alone, it is a factor to consider in the predominance analysis. *See Aluminum Warehousing*, 336 F.R.D. at 44.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Such widespread variability, which CIIPPs once again attempt to overcome with averaging, means that they cannot propose an accurate "method for calculating their individualized damages other than having hundreds, or even thousands, of individualized hearings." *Dailey v. Groupon, Inc.*, No. 11 C 05685, 2014 WL 4379232, at *9 (N.D. Ill. Aug. 27, 2014); *see also Riffey*, 910 F.3d at 319 ("[H]ow much money each individual class member is entitled to recoup—is particularly ill-suited for class treatment, because it depends on a myriad of factors particular to each individual [class member]."); *Fluidmaster*, 2017 WL 1196990, at *58 (declining to certify class and finding predominance issues where indirect purchasers "tr[ied] to prove damages through averages").[50]

CIIPPs also fail to segregate any effect of the alleged harm from other, permissible explanations for price changes. █████████████████████████████████ ████████████████████████ Mangum Rep. at n.117; Ex. 70 (R. Mangum Dep. 180:1-3), █ ████████████████████████████████████████████

████████████████████[51] ████████████████████████████████

---

[50] Averaging is problematic in the damages context because, among other things, it would result in rampant over- and under-recovery. *Fluidmaster*, 2017 WL 1196990, at *58.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
*In re Pilgrims Pride Corp.*, 728 F.3d 457 (5th Cir. 2013) (finding that Pilgrim's pre-filing and post-filing cost-saving measures were undertaken due to "severe economic difficulties" and holding that its "unilateral decision to reduce production was neither illegitimate nor anti-competitive").

███████████████████ *See* Ex. 74 (D. Sunding Dep. 133:17-19) ████████████

███████████████████████████████████████ ██████████████████

███████████████████████████████████████ ██████████████████

█████████████████████████████████████████████████████████████

There can be no genuine dispute that all of these, along with other factors, would have been present even in Dr. Mangum's far-fetched "but-for" world. Ignoring these conditions is an independent, fatal flaw for the proposed economic models. "A model that 'identifies damages that are not the result of the wrong is an impermissible basis for calculating class-wide damages.'" *In re Steel*, 2015 WL 5304629, at *10-11 (quoting *Comcast*, 569 U.S. at 37); *see also Fluidmaster*, 2017 WL 1196990, at *57 (similar). Dr. Mangum's proposed models are "clearly inadequate." *Reed*, 268 F.R.D. at 595.

Without a reliable method of showing class-wide damages through common proof, "individual damage determinations will overwhelm the common questions." *Kleen Products LLC*, 831 F.3d at 929; *see also Reed,* 268 F.R.D. at 595 (denying class certification where "[t]he amount of damages suffered by each [class] plaintiff will necessitate individualized inquiries"); *Espenscheid v. DirectSat USA, LLC*, No. 12–1943, 2013 WL 407446, at *2 (7th Cir. Feb. 4, 2013) (holding that class certification was improper where no "mechanical, formulaic" damages calculation was possible). Determining whether, and by how much, any individual indirect purchaser was overcharged would not just require "consideration of the variegated nature of the businesses included in [] the proposed class[]," *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 304 (5th Cir. 2003) (affirming denial of class certification), but also the varied nature of Defendants and the thousands of direct purchasers with which the indirect purchasers dealt, as well as the degree to which any overcharge actually passed through multiple distribution chains that are

subject to layers of unique pricing arrangements, discounts, and rebates. In sum, CIIPPs have not met their burden of propounding a method of proving class-wide damages or showing that damage inquiries will not overwhelm common questions. *See Comcast*, 569 U.S. at 34.

### C.   In Addition, CIIPPs Cannot Show Predominance Or Superiority Because Of Substantive Variations In The Many State Laws Governing Their Claims.

CIIPPs bring claims under the laws of 31 different jurisdictions, alleging violations of state antitrust statutes (23 states and D.C.), consumer protection statutes (14 states), and state common-law unjust enrichment principles (four states). None of these three categories fully overlaps with the others—each presents a unique mix of jurisdictions, with many states falling into only one category. *See* Dkt. Nos. 3968-2, 3968-3, 3968-4. This unmanageable mix of claims arising under the substantively conflicting laws of dozens of different jurisdictions does not lend itself to class wide adjudication, and CIIPPs have not carried their burden of establishing predominance and superiority in light of this material variation.

"Variations in state law . . . may swamp any common issues and defeat predominance." *Grandalski v. Quest Diagnostics, Inc.*, 767 F.3d 175, 180 (3d Cir. 2014). Even if the law "differ[s] among the states only in nuance . . . nuance can be important," creating significant case management problems such as "differing state pattern [jury] instructions" and "differing judicial formulations." *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995). As such, class certification is not proper "unless all litigants are governed by the same legal rules." *Bridgestone/Firestone*, 288 F.3d at 1015, 1018.

Where, as here, movants seek to certify classes implicating the laws of many jurisdictions, they "must provide an extensive analysis of state law variations to address whether the differences in law pose insuperable obstacles." *Doster Lighting, Inc. v. E-Conolight, LLC*, No. 12–C–0023, 2015 WL 3776491, at *15 (E.D. Wis. June 17, 2015); *see also Siegel v. Shell Oil Co.*, 256 F.R.D.

580, 583 (N.D. Ill. 2008) (It is "well-established … that if the states' laws differ, class certification is improper."). The analysis of state law variation is critical in this case, which includes not only a complex mix of antitrust, consumer protection, and unjust enrichment claims, but also implicates purchasers with locations in multiple states.[52] This analysis, which CIIPPs gloss over, reveals yet another reason why the Motion cannot be granted.

       *1. Material Variations Exist Between The Antitrust Laws Of The Twenty-Four Jurisdictions Relied Upon By CIIPPs.*

CIIPPs seek to avail themselves of the local antitrust laws of twenty-four different jurisdictions—presenting a materially varied legal landscape. *See* Dkt. No. 3968-2. As courts have recognized, "state antitrust . . . laws vary on such issues as prohibited practices and limitations periods"—both of which can be claim-dispositive. *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 276 (D. Mass. 2004); *In re Skelaxin*, 299 F.R.D. at 588-89 ("The antitrust laws of many states differ markedly."). For example, only some of the state antitrust laws relied upon by CIIPPs require that the alleged conspiracy substantially affect intrastate commerce. *Compare, e.g.*, *Arthur v. Microsoft Corp.*, 267 Neb. 586, 597 (2004) (Nebraska antitrust law "provide[s] consumers with protection against unlawful practices in the conduct of any trade or commerce which directly or indirectly affects the people of Nebraska") *with In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 266-67 (S.D.N.Y. 2019) (Mississippi law focuses on the "location where the anticompetitive conduct occurred rather than the effects of such anticompetitive conduct"). Because the necessary nexus between alleged conduct and effect varies

---

[52] *See, e.g.*, Ex. 75 (Chicken Joe's 30(b)(6) Dep. 41:18-47:4) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

from one jurisdiction to another, this Court would have to apply differing legal standards in an individualized, unmanageable process, rending class treatment inappropriate.

Similarly, there are critical differences among state antitrust laws with respect to defenses, damages, and duplicative recovery. Several jurisdictions limit or even eliminate recovery when an alleged overcharge has been passed through multiple levels of distribution. *See, e.g.*, *Clayworth v. Pfizer*, 233 P.3d 1066, 1086 (Cal. 2010) (permitting a "pass-on defense" where "multiple levels of purchasers have sued" for the same antitrust conspiracy); *In re Vitamins Antitrust Litigation*, 259 F. Supp. 2d 1, 8-9 (D.D.C. 2003) (interpreting Michigan antitrust law to implicitly include a "pass through defense"); DC ST § 28-4509(b) (statutory law of the District of Columbia allows for a "partial or complete defense" that the alleged overcharge was "passed on to others who are themselves entitled to recover"). But the availability of this defense—which is particularly important in this case brought by indirect purchasers—is not uniform across the 24 jurisdictions implicated by CIIPPs' state antitrust claims, further impeding class adjudication of these claims.

The statutes of limitations under state laws also vary. For example, Maine has a six-year statute of limitations; California, Michigan, North Carolina, New Hampshire, and New York have a four-year statute of limitations; and Kansas has a three-year limitations period.[53] Even if CIIPPs could rely on the discovery rule to extend the statute of limitations, reliance on "equitable tolling to save [some of] their claims . . . presents an individual question of law and fact that could predominate over common questions under Rule 23(b)(3)" and preclude class certification. *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 294 (3d Cir. 2010).

---

[53] *Compare* Me. Rev. Stat. Ann. § 752, *with* Cal. Bus. & Prof. Code § 16750.1; MCLA § 445.781; N.H. Rev. Stat. § 356.12; N.Y. Gen. Bus. Law § 340(5); N.C. Gen. Stat. § 75-16.2, *and with* Kan. Stat. Ann. § 60-512.

> ### 2. *There Are Substantive Differences Between The Relevant States' Consumer Protection Laws.*

CIIPPs also ignore material differences between the 14 state consumer protection laws they invoke. "State consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules." *Bridgestone/Firestone*, 288 F.3d at 1018; *see also In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 147 (S.D.N.Y. 2008) ("Most of the courts that have addressed the issue have determined that the consumer-fraud . . . laws in the fifty states differ in relevant respects."). Further, "[t]he amount of damages recoverable for a consumer protection violation varies from state to state." *Thompson v. Jiffy Lube Int., Inc.*, 250 F.R.D. 607, 625 (D. Kan. 2008); *see also Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 591 (9th Cir. 2012) (noting the "material differences" in remedies available under different states' consumer protection laws). "The differences among state consumer protection statutes are significant, they present individual issues, and they overwhelm the common questions." *In re Epipen Antitrust Litig.*, No. 17-md-2785-DDC-TJJ, 2020 WL 1180550, at *54 (D. Kan. Mar. 10, 2020).

The intent required to prove the allegedly unfair or deceptive act—a potentially dispositive element of the claim—also varies among CIIPPs' 14 states. *See Vista Health Plan, Inc. v. Cephalon, Inc.*, No. 2:06–cv–1833, 2015 WL 3623005, at *36, *40 (E.D. Pa. June 10, 2015) ("The states vary considerably in their formulation of the intent a plaintiff must prove."). For instance: New Mexico and South Dakota require that the act be done "knowingly." *Id.* at *36. Vermont, on the other hand, requires that the act be done intentionally. *Id.* Minnesota takes a unique approach, requiring "undert[aking] the unfair conduct or deceptive practice with the intent that persons would rely on the prohibited act." *Id.* These differences would overwhelm common issues and require

the application of individualized standards. *See Miller v. Gen. Motors Corp.*, Nos. 98 C 7386, 98 C 2851, 2003 WL 168626, at *4 (N.D. Ill. Jan. 26, 2003).

States also apply different standards in determining what qualifies as prohibited conduct under their particular statutes. *See In re Epipen Antitrust Litig.*, 2020 WL 1180550, at *55-57 (denying certification of consumer protection damages class). For example, some states (including Florida, Illinois, North Carolina, and Vermont) use a multifactor test, weighing whether the practice offends public policy or the common law; whether it is immoral, unethical, oppressive, or unscrupulous; and whether it substantially injures consumers. *Id.* at *55 & n.61; *Vista Health*, 2015 WL 3623005, at *36-37. Nebraska, New Hampshire, and New Mexico, however, apply their own standards to define prohibited unfair conduct. *In re Epipen Antitrust Litig.*, 2020 WL 1180550, at *55 & n.63. Meanwhile, Nevada's statute only prohibits deceptive conduct, but not unfair conduct. *Id.* at *55 & n.64. And within California, there is intrastate disagreement about the applicable test. *Id.* at *55 & n.65. Ultimately, these nuanced differences across multiple aspects of the 14 states' consumer protection laws create individualized issues and make class adjudication unmanageable. *See In re Processed Egg Prods.*, 312 F.R.D. at 143 (rejecting plaintiffs' "attempt[] to place 21 square pegs into a single round hole, asking the Court to envision 21 statewide classes under the antitrust laws of 21 states, the consumer protection laws of seven states, and the unjust enrichment laws of 17 states, all tried in a single proceeding as if it were a nationwide class under federal antitrust law"); *see also Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 746 (7th Cir. 2008) ("The instructions to the jury on the law it is to apply will be an amalgam of the consumer protection laws of the 29 jurisdictions").

3. *CIIPPs Compound The Variability Problem By Bringing Unjust Enrichment Claims Under The Laws of Four Jurisdictions.*

CIIPPs also allege that Defendants were unjustly enriched under the common laws of Hawaii, Massachusetts, Missouri, and Montana. Dkt. No. 3968-4. As courts in this District have concluded, "unjust enrichment [classes] are fraught with procedural and choice-of-law problems that . . . preclude certification." *In re Aqua Dots Prods. Liab. Litig.*, 270 F.R.D. 377, 385 (N.D. Ill. 2010); *see also Muehlbauer v. Gen. Motors Corp.*, No. 05 C 2676, 2009 WL 874511, at *5 (N.D. Ill. March 31, 2009) ("[T]he cases explain that multi-state class actions for unjust enrichment are inappropriate."); *Vulcan Golf, LLC v. Google, Inc.*, 254 F.R.D. 521, 533 (N.D. Ill. 2008) (collecting cases rejecting multi-state unjust enrichment classes). This is because "unjust enrichment claims . . . vary state-by-state." *In re Skelaxin Antitrust Litig.*, 299 F.R.D. at 588-89; *see also Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 501 (S.D. Ill. 1999) (similar). Ultimately, this variation poses "insurmountable" problems that will swamp any supposed common proof offered by CIIPPs. *In re Aqua Dots*, 270 F.R.D. at 386; *see also Vista Health*, 2015 WL 3623005, at *27 (summarizing seven differences between state unjust enrichment law).

CIIPPs' varying unjust enrichment claims would quickly devolve into mini-trials about which elements to apply to purchases by any particular class member. For example, Hawaii's and Massachusetts' unjust enrichment laws require a showing that there is no adequate remedy at law. *See id.* at *28, *32. Given their (misplaced) assertion that Dr. Mangum's models show common proof of damages, CIIPPs would not even be entitled to damages for unjust enrichment in these two states. Further, Massachusetts requires a showing that the defendant appreciates or has knowledge of the benefit obtained from their improper conduct. *Id.* at *28-29, *32. Again, as with their dozens of state antitrust and consumer protection claims, CIIPPs introduce too much variability for class adjudication by invoking the unique state laws of four jurisdictions on unjust

enrichment. Further, the individualized inquiries necessary to determine whether under "the particular circumstances of an individual case…that, without a remedy, inequity would result or persist," is yet another reason why courts "have found unjust enrichment claims inappropriate for class action treatment." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009).

> ### 4. CIIPPs' Proposals To Address Differences In State Laws Are Unmanageable And Inadequate.

CIIPPs bear the burden of demonstrating manageability, and "a court cannot rely on assurances of counsel that any problems with predominance or superiority can be overcome." *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 350 (D. N.J. 1997) (citation omitted). They have not done so.

CIIPPs' proposal to overcome the widespread variability in the state laws they invoke by arguing "proof of a federal antitrust claim constitutes a violation of state antitrust, consumer protection, and/or unjust enrichment law" (Dkt. 3968-5 at 3) must be rejected. Courts in many states have rejected federal precedent and found differences between federal and state antitrust laws. *See, e.g., Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 102 (Ariz. 2003) (in Arizona, courts do not read the state antitrust laws as requiring a court to "rigidly follow federal precedent on every issue of antitrust law regardless of whether differing concerns and interests exist in the state and federal systems."); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1477 (9th Cir. 1986) (similar); *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 446 (Iowa 2002) (similar); *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215 (2007) (similar); *Freeman Industries, LLC v. Eastman Chem. Co.,* 172 S.W.3d 512, 519 (Tenn. 2005) (similar); *Bergstrom v. Noah*, 266 Kan. 829, 844-45 (1999) (similar).

CIIPPs' trial plan fails to address the differences in the states' approaches and ignores that they "face a significant burden to demonstrate that grouping is a workable solution." *Grandalski*

*v. Quest Diagnostics, Inc.*, 767 F.3d 175, 183 (3d Cir. 2014). It is only possible where differences in the applicable laws fall into "a limited number of predictable patterns, and any deviations could be overcome at trial by grouping state laws together and applying them as a unit." *Id.* Yet, CIIPPs offer no trial plan that could reasonably accommodate the numerous differences highlighted above and in Appendices A, B, and C to their Motion. Thus, CIIPPs fail to meet their "significant burden" to justify grouping the claims together. *Grandalski*, 767 F.3d at 183. Like their predominance arguments generally, their plan fails to satisfy Rule 23 as it merely seeks to gloss over relevant differences in a rush to certification. The many substantive differences in state laws invoked by CIIPPs are just one more reason that the Proposed Classes cannot be certified.

## II.    CIIPPS' CLASS DEFINITIONS ARE FATALLY OVERBROAD.

CIIPPs define their Proposed Classes in an overly broad manner. Their proposed class definitions indiscriminately include all entities that purchased Broilers indirectly from a Defendant or named co-conspirator in the United States" (for their proposed injunctive class) or in an Indirect Purchaser State (for their proposed damages class) for their own use in commercial food preparation from January 1, 2009 until July 31, 2019. Dkt. 3968 at 1-3. This sweeping definition covers "chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, and whole or in parts." MOL at 2, n.1. The only exceptions are (1) chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards," (2) dark meat chicken products," and (3) "'further processed' products," vaguely defined as "any chicken meat that has been breaded, cooked, or 'formed'[.]" *Id.* CIIPPs' definition sweeps in a great many class members that were demonstrably unharmed. This definitional defect—one of several independent reasons why their Motion fails—cannot be cured through amendment.

An appropriate class definition "must be sufficiently definite to permit ascertainment of class members," but "not [] so broad as to include individuals who are without standing to maintain the action on their own behalf." *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 580 (N.D. Ill. 2005) (citations omitted). If it sweeps in "'a great many' or 'a great number putative class members [that] could not have been harmed by defendants' conduct, then the proposed class is too broad and should not be certified." *Riffey v. Rauner*, No. 10 CV 02477, 2016 WL 3165725, at *4 (N.D. Ill. June 7, 2016), *vacated on other grounds* 138 S. Ct. 2708 (2018). Although "[t]here is no precise measure for 'a great many,'" the determination is "a matter of degree, and will turn on the facts as they appear from case to case." *Clark v. Bumbo Int'l Trust*, No. 15 C 2725, 2017 WL 3704825, at *4 (N.D. Ill. Aug. 28, 2017).[54]

When a class definition is as "breathtaking in its scope" as those proffered here, *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011), it comes as no surprise that it includes a great many putative class members that could not have been and/or were not impacted by any anticompetitive conduct. CIIPPs' putative classes would encompass: (1) "hundreds of thousands of entities"—from "virtually every restaurant," to nursing homes to universities to deli counters to hotel dining and to gas stations, MOL at 29-30; (2) that purchased any of the myriad chicken products that fit CIIPPs' now revised litigation definition of "Broilers"; (3) indirectly from any Defendant or alleged co-conspirator; (4) during the Proposed Class Period of January 1, 2009 to

---

[54] *See, e.g., Vista Health*, 2015 WL 3623005, at *20-21 (denying class certification based in part on finding that at least 5% of putative class was uninjured); *In re Intuniv Antitrust Litig.*, No. 1:16-cv-12396-ADB, 2019 WL 3947262, at *7 (D. Mass. Nov. 6, 2019) (similar for 8% of putative class members); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018) (similar for 10% of putative class members); *In re Thalomid & Revlimid Antitrust Litig.*, No. 14-6997, 2018 WL 6573118, at *14 (D.N.J. Oct. 30, 2018) (similar for 10% of putative class members); *In re Rail Freight*, 934 F.3d 619, 623-25 (D.C. Cir. 2019) (similar where plaintiffs' model showed that 12.7% of putative class members did not experience overcharges, and noting that 6% would not necessarily be considered *de minimis* for a large putative class).

July 31, 2019; and (5) either nationwide (for injunctive relief)[55] or across thirty-one states (for monetary relief). *See id.* at 2-3, 29-30 & n.1. Indeed, CIIPPs are estimated to include "hundreds of thousands" of diverse entities, MOL at 29-30, who in turn purchased many different products in different volumes on different pricing terms from different Defendants (or combinations of Defendants) at different points in time. This is the epitome of an unworkably broad class definition.



---

[55] CIIPPs request that this Court "certify classes for injunctive relief and for damages pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3). MOL at 1. But they fail to argue that they have satisfied Rule 23(b)(2)'s requirements anywhere else in their argument. This waives the issue. *See Lee v. Chicago Youth Centers*, 69 F. Supp. 3d 885, 888 (N.D. Ill. 2014) ("undeveloped, unsupported, perfunctory, or skeletal arguments in briefs are waived"). In any event, certification of a Rule 23(b)(2) injunctive relief class is "necessarily improper" where, as here, "plaintiffs have not suffered irreparable harm" and any alleged injury would be "remedied by an award of money damages." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011). There can be no doubt CIIPPs case is "exclusively or predominantly" about obtaining relief through "money damages," making certification under Rule 23(b)(2) inappropriate. *Id.* (citation omitted).

███████████████████████████████████████████████████

█████████████████████████ Johnson Rep. at ¶¶ 290, 379. Therefore, because CIIPPs'

Proposed Class of millions "would sweep in countless people who would never have standing,"

class certification is inappropriate. *Fluidmaster*, 2017 WL 1196990, at *46.

This "is not a case in which a very small absolute number of class members might be picked

off in a manageable, individualized process at or before trial." *In re Asacol*, 907 F.3d at 53-54.

Any amendment to exclude the numerous members who could not have been harmed would

require an unmanageable inquiry that would defeat one of the main purposes of class

adjudication—efficiency. *See Clark*, 2017 WL 3704825, at *2-4 (rejecting request to amend overly

broad class definition because it suffered from more than "a 'minor' overbreadth problem") ██



customers, the relevant inquiry is whether the final price paid by the proposed class member (as

negotiated directly) was elevated due to the alleged conduct. *See Aluminum Warehousing,* 336

F.R.D, at 64 (denying class certification where, *inter alia,* the proposed class definition would

require "[i]ndividualized inquiries . . . to determine whether putative class members purchased aluminum pursuant to a contract based on [different price indices]"). CIIPPs' class definitions are simply unworkable.

## III. CIIPPS FAIL TO ESTABLISH TYPICALITY.

Given the considerable differences between the small class representatives and the massive chains and resorts included in the Proposed Class, CIIPPs are unable to satisfy Rule 23's requirement that the claims of class representatives be typical of those of the absent members of the putative class. *See* Fed R. Civ. P. 23(a)(3). This mandate "directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009). If a representative's claim is not typical, its interests diverge from those of the class, because its claim may fail where other class members' would not, or, conversely, may prevail on grounds that are unavailable to other class members. *See CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011) (citation omitted).



[57] *See, e.g.*, Ex. 43 (Peppers Bar & Grille 30(b)(6) Dep. 160:22-24); Ex. 32 (Oregano Italian Kitchen 30(b)(6) Dep. 101:21-102:6); Ex. 79 (S. Parker Dep. 159:11-20); Ex. 80 (C. Bordenaro Dep. 42:24-43:19)

███████████████████████████████████ *See, e.g.,* Ex. 66 (Alabama_Joes_00000043 at 044). ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *See* Johnson Rep. at ¶ 374, n.680. These bargaining power and purchase volume "disparit[ies] between the named [CIIPPs] and others in the class [are] acute," meaning the class representatives' claims fail typicality. *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 318 (N.D. Cal. 2014) (typicality not shown where named plaintiffs included "small companies," whereas "the putative class encompasse[d] a myriad of other [] purchasers whose volumes and means of [] purchases do not compare"); *see also Graphics Processing Units*, 253 F.R.D. at 489-90 (no typicality where absent class members had substantial bargaining power and "came to the negotiating table in a fundamentally different position than the representative plaintiffs").

## IV. FIGARETTI'S AND SARGENT'S ARE NOT ADEQUATE CLASS REPRESENTATIVES.

Class representatives also must be tested under Rule 23 to ensure that they are adequate representatives of the interests of the class members. "Adequacy of representation is composed of two parts: 'the adequacy of the named plaintiff's counsel and the adequacy of representation provided in protecting the different, separate, and distinct interest' of class members." *Retired Chicago Police Ass'n*, 7 F.3d at 598. Two of CIIPP proposed class representatives—Figaretti's and Sargent's—fail this test.

Figaretti's seeks to represent West Virginia. However, Figaretti's never purchased broilers in West Virginia, instead purchasing ██████████████████████████████████████████ ██████████ *See* Ex. 76 (D. Figaretti Dep. 100:19-104:11) (referring to Ex. 77 (LittleFigs_000001);

Ex. 78 (LittleFigs_000002)). Such purchases are outside the bounds of West Virginia antitrust law, which is "directed towards intrastate commerce." *Anziulewicz v. Bluefield Cmty. Hosp., Inc.*, 531 F.Supp. 49, 53 (S.D. W. Va. 1981). Defendants therefore have a colorable defense to Figaretti's claims that applies uniquely to Figaretti's – but likely not other absent putative class members Figaretti's seeks to represent. This renders Figaretti's an inadequate class representative. *See Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) ("named plaintiffs who are subject to a defense that would not defeat unnamed class members are not adequate class representatives"); *Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 459 (N.D. Ill. 2013) ("The Seventh Circuit has emphasized that a proposed class representative is inadequate if she is subject to 'even an arguable defense' not applicable to the class as a whole.").[58]



*See* Ex. 6 (T. Sargent Dep. 21:20-22:5, 59:20-22).

*See id.* at 59:20-62:9. Courts have made clear that such familial connections to individual counsel raise the appearance of impropriety sufficient to disqualify Sargent's as a class representative. *See In re IMAX Sec. Litig.*, 272 F.R.D. 138, 156-57 & n.88 (S.D.N.Y. 2010) (noting that the close relationship between class representative and counsel "should have been brought to the attention of the Court at an earlier stage"). CIIPPs cannot dispute that the non-disclosure of Sargent's separate counsel, the son of its owners, as well as the unknown fee arrangement with the same, at a bare minimum raises the

---

[58] The Seventh Circuit in *CE Design Ltd.,* 637 F.3d at 726 also explained that this conflict can render Figaretti's not typical of the class.

appearance of impropriety. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 566-68 (S.D.N.Y. 2018). This is sufficient to render Sargent's an unsuitable class representative.

All Rule 23(a) requirements are "prerequisites to certification" and the "failure to meet any one of them precludes certification as a class." *Retired Chicago Police Ass'n*, 7 F.3d at 596. Here Figaretti's and Sargent's are not adequate class representatives; accordingly, the damages classes for West Virginia and South Dakota fail to meet Rule 23(a)(4) and cannot be certified. *See Orlowski v. Dominick's Finer Foods, Inc.*, 172 F.R.D. 370, 375 (N.D. Ill. 1997) (denying certification of one proposed subclass for lack of adequate class representative); *MacNamara v. City of New York*, 275 F.R.D. 125, 143-44 (S.D.N.Y. 2011) (denying certification of one subclass "for lack of an adequate class representative"). CIIPPs wrongly contend that these deficiencies can be filled by "out of state class representatives." MOL at 32, n.14. To the contrary, courts within this District have routinely held that class representatives lack standing to raise claims "for states in which they do not reside and/or did not purchase the products at issue." *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09-cv-3690, 2013 WL 4506000, at *8 (N.D. Ill. Aug. 23, 2013) (collecting cases). For this additional reason, the Court should refuse to certify the putative West Virginia and South Dakota classes.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny CIIPPs' Motion for Class Certification. Further, Defendants respectfully request that the Court set a hearing on CIIPPs' Motion.

Dated: January 22, 2021

WEIL GOTSHAL & MANGES LLP

By: */s/ Carrie C. Mahan*
Carrie C. Mahan (#459802)
Christopher J. Abbott (#1014487)
2001 M Street N.W., Ste. 600
Washington, D.C. 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
carrie.mahan@weil.com
christopher.abbott@weil.com

Pravin R. Patel (#0099939)
Brian G. Liegel (#0119269)
1395 Brickell Avenue, Ste. 1200
Miami, FL 33131
Telephone: 305-577-3100
pravin.patel@weil.com
brian.liegel@weil.com

EIMER STAHL LLP

Michael L. McCluggage (#01820966)
224 South Michigan Avenue, Ste. 1100
Chicago, IL 60604
Telephone: (312) 660-7665
Facsimile: (312) 692-1718
mmccluggage@eimerstahl.com

*Attorneys for Defendant Pilgrim's Pride Corporation*

Respectfully submitted,

VENABLE LLP

By: /s/ *Douglas Baldridge*
J. Douglas Baldridge (#437678)
Lisa Jose Fales (admitted *pro hac vice*)
Danielle Foley (admitted *pro hac vice*)
Andrew Hernacki (admitted *pro hac vice*)
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4000
Facsimile: 202-344-8300
jdbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
athernacki@venable.com

FALKENBERG IVES LLP

Kirstin B. Ives
30 N. LaSalle St., Ste 4020
Chicago, IL 60602
Telephone: (312) 566-4803
Facsimile: (312) 566-4810
kbi@ffilaw.com

*Attorneys for Defendants Perdue Farms, Inc. and Perdue Foods LLC*

By: /s/ *John W. Treece*

John W. Treece (#3122889)
1135 West Montana Street
Chicago, IL 60614
Telephone: (312) 961-7808
jtreece@jwtreece.com

ROSE LAW FIRM

Amanda K. Wofford (admitted *pro hac vice*)
Bourgon Reynolds (admitted *pro hac vice*)
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131
Facsimile: (501) 375-1309
awofford@roselawfirm.com
breynolds@roselawfirm.com

*Attorneys for Defendants Mountaire Farms, Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc.*

MAYER BROWN LLP

By: /s/ *Carmine R. Zarlenga*

Carmine R. Zarlenga (#90784529)
William H. Stallings (admitted *pro hac vice*)
Stephen M. Medlock (admitted *pro hac vice*)
Oral D. Pottinger (admitted *pro hac vice*)
1999 K Street N.W.
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
czarlenga@mayerbrown.com
wstallings@mayerbrown.com
smedlock@mayerbrown.com
opottinger@mayerbrown.com

*Attorneys for Defendant Foster Farms, LLC and Foster Poultry Farms, a California Corporation*

NOVACK AND MACEY LLP

By: /s/ *Stephen Novack*
Stephen Novack
Stephen J. Siegel
Christopher S. Moore
100 North Riverside Plaza
Chicago, IL 60606
Telephone: (312) 419-6900
Facsimile: (312) 419-6928
snovack@novackmacey.com
ssiegel@novackmacey.com
cmoore@novackmacey.com

*Attorneys for Defendants Koch Foods*
*Incorporated, JCG Foods of Alabama LLC,*
*JCG Foods of Georgia LLC and Koch Meat*
*Co., Inc.*


VEDDER PRICE P.C.

By: /s/ *Gregory G. Wrobel*
Gregory G. Wrobel (#3122900)
222 N. LaSalle Street
Chicago, IL 60601
Telephone: (312) 609-7722
Facsimile: (312) 609-5005
gwrobel@vedderprice.com

JORDAN PRICE WALL GRAY JONES &
CARLTON, PLLC

Henry W. Jones, Jr. (admitted *pro hac vice*)
1951 Clark Avenue
Raleigh, NC 27605
Telephone: (919) 828-2501
Facsimile: (919) 834-8447
hjones@jordanprice.com

*Attorneys for Defendant House of Raeford*
*Farms, Inc.*

PROSKAUER ROSE LLP

By: /s/ *Christopher E. Ondeck*
Christopher E. Ondeck (admitted *pro hac*
*vice*)
Stephen R. Chuk (admitted *pro hac vice*)
1001 Pennsylvania Ave., NW, Ste 600 South
Washington, DC 20004
Telephone: (202) 416-6800
Facsimile: (202) 416-6899
condeck@proskauer.com
schuk@proskauer.com

*Attorneys for Wayne Farms LLC*

KIRKLAND & ELLIS LLP

By: /s/ *Daniel E. Laytin, P.C.*
Daniel E. Laytin, P.C.
Christa C. Cottrell, P.C.
Martin L. Roth
Stacy Pepper
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
dlaytin@kirkland.com
ccottrell@kirkland.com
martin.roth@kirkland.com
stacy.pepper@kirkland.com

*Attorneys for Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Processing Division), and Sanderson Farms, Inc. (Production Division)*

VAUGHAN & MURPHY

By: /s/ *Charles C. Murphy, Jr.*
Charles C. Murphy, Jr. (admitted *pro hac vice*)
690 S Ponce Court NE
Atlanta, GA 30307
Telephone: (404) 667-0714
Facsimile: (404) 529-4193
cmurphy@vaughanandmurphy.com

WINSTON & STRAWN LLP

James F. Herbison
Michael P. Mayer
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
jherbison@winston.com
mmayer@winston.com

*Attorneys for Defendant Norman W. Fries, Inc. d/b/a Claxton Poultry Farms*

KUTAK ROCK LLP

By: /s/ *John P. Passarelli*
John P. Passarelli (admitted *pro hac vice*)
James M. Sulentic (admitted *pro hac vice*)
1650 Farnam Street
Omaha, NE 68102
Telephone: (402) 346-6000
Facsimile: (402) 346-1148
john.passarelli@kutakrock.com
james.sulentic@kutakrock.com

J.R. Carroll (admitted *pro hac vice*)
Jeffrey M. Fletcher (admitted *pro hac vice*)
234 East Millsap Road, Ste 200
Fayetteville, AR 72703-4099
Telephone: (479) 973-4200
Facsimile: (479) 973-0007
jr.caroll@kutakrock.com
Jeffrey.fletcher@kuakrock.com

Kimberly M. Hare (#6323326)
One South Wacker Drive, Ste 2050
Chicago, IL 60606-4614
Telephone: (312) 602-4100
Facsimile: (312) 602-4101
kimberly.hare@kutakrock.com

*Attorneys for Defendants O.K. Foods, Inc.,*
*O.K. Farms, Inc., and O.K. Industries, Inc.*

EDWARD C. KONIECZNY LLC

By: /s/ *Edward C. Konieczny*
Edward C. Konieczny
400 Colony Square, Ste 1501
1201 Peachtree Street, NE
Atlanta, GA 30361
Telephone: (404) 380-1430
Facsimile: (404) 382-6011
ed@koniecznylaw.com

SMITH, GAMBRELL & RUSSELL, LLP

David C. Newman (admitted *pro hac vice*)
W. Parker Sanders (admitted *pro hac vice*)
1230 Peachtree Street, N.E.
Promenade, Ste 3100
Atlanta, GA 30309
Telephone: (404) 815-3500
Facsimile: (404) 815-3509
dnewman@sgrlaw.com
psanders@sgrlaw.com

*Attorneys for Defendants Mar-Jac Poultry,*
*Inc., Mar-Jac Poultry MS, LLC, Mar-Jac*
*Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-*
*Jac Poultry, LLC, Mar-Jac Holdings, Inc.*

SHOOK HARDY & BACON LLP

By: /s/ *Lynn H. Murray*
Lynn H. Murray
111 S. Wacker Dr., Ste 4700
Chicago IL 60606
Telephone: (312) 704-7700
Facsimile: (312) 558-1195
lhmurray@shb.com

Laurie A. Novion
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
lnovion@shb.com

CONNER & WINTERS

John R. Elrod
Vicki Bronson (admitted *pro hac vice*)
4375 N. Vantage Drive, Ste. 405
Fayetteville, AR 72703
Telephone: (479) 582-5711
jelrod@cwlaw.com
vbronson@cwlaw.com

*Attorneys for Defendant Simmons Foods, Inc.*
*and Simmons Prepared Foods Inc.*

JOSEPH D. CARNEY & ASSOCIATES LLC

By: /s/ *Joseph D. Carney*
Joseph D. Carney (admitted *pro hac vice*)
OFFICE ADDRESS:
139 Crocker Park Boulevard, Ste. 400
Westlake, OH 44145
MAILING ADDRESS:
1540 Peach Drive
Avon, OH 44011
Telephone: 440-249-0860
Facsimile: 866-270-1221
jdc@jdcarney.com
case@jdcarney.com

MILLER SHAKMAN LEVINE &
FELDMAN LLP

Thomas M. Staunton
Daniel M. Feeney
180 North LaSalle Suite 3600
Chicago, IL 60601
Telephone: 312-263-3700
tstaunton@millershakman.com
dfeeney@millershakman.com

D.KLAR LAW

Deborah A. Klar (admitted *pro hac vice*)
2934 1/2 Beverly Glen Circle, Suite 761
Bel Air, CA 90077
Telephone: 310-858-9500
dklar@dklarlaw.com

Paul L. Binder, Esq. (admitted pro hac vice)
Attorney at Law
20780 Brandywine
Fairview Park, OH 44126-2805
Telephone: 440-376-6850
binderpl@yahoo.com

*Attorneys for Defendants Case Foods, Inc.,*
*Case Farms, LLC, and Case Farms*
*Processing, Inc.*

65

HOGAN LOVELLS US LLP

By: /s/ *William L. Monts III*
William L. Monts III (admitted *pro hac vice*)
Justin W. Bernick (admitted *pro hac vice*)
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5910
Facsimile: (202) 637-5911
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

MILLER, CANFIELD, PADDOCK, AND
STONE P.L.C.

Jacob D. Koering
225 West Washington Street, Ste 2600
Chicago, Illinois 60606
Telephone: (312) 460-4272
Facsimile: (312) 460-4201
koering@millercanfield.com

*Attorneys for Defendant Agri Stats, Inc.*

EVERSHEDS SUTHERLAND (US) LLP

By: /s/ *Patricia A. Gorham*
James R. McGibbon
Patricia A. Gorham
Peter M. Szeremeta
Kaitlin A. Carreno
Dylan W. de Fouw
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street, N.E., Ste 2300
Atlanta, Georgia 30309-3996
Telephone: (404) 853-8000
Facsimile:  (404) 853-8806
jimmcgibbon@eversheds-sutherland.com
patriciagorham@eversheds-sutherland.com
peterszeremeta@eversheds-sutherland.com
kaitlincarreno@eversheds-sutherland.com
dylandefouw@eversheds-sutherland.com

Ronald Balfour
SMITH AMUNDSEN LLC
150 N. Michigan Avenue, Ste 3300
Chicago, Illinois 60601
Telephone: (312) 894-3369
Facsimile: (312) 997-1816
rbalfour@salawus.com

*Attorneys for Defendant Harrison Poultry, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2021 the foregoing document was served via CM/ECF on all counsel of record:

/s/ *Carrie C. Mahan*
Carrie C. Mahan