**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION* | Civil Action No. 1:16-cv-08637 |
| | Judge Thomas M. Durkin |
| THIS DOCUMENT RELATES TO: | Magistrate Judge Jeffrey T. Gilbert |
| All Direct Action Plaintiffs | **FILED UNDER SEAL** |

# DIRECT ACTION PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT AND DEMAND FOR JURY TRIAL

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION .................................................................................................... 1

II.   CHART OF DIRECT ACTION PLAINTIFF CASES ........................................... 3

III.  SUMMARY OF DAP FACTUAL ALLEGATIONS.............................................. 52

    A.   Overview of the Broiler Industry................................................................52

    B.   Summary of Defendants' Conspiracy..........................................................54

    C.   Defendants' Coordinated Supply Restrictions.............................................55

    D.   Defendants' Manipulation of the Georgia Dock Price Index ......................57

    E.   Defendants' Bid-Rigging Conduct ..............................................................59

IV.  PARTIES ............................................................................................................. 60

    A.   Plaintiffs......................................................................................................60

    B.   Defendants .................................................................................................107

          1.    Agri Stats ........................................................................................108

          2.    Amick...............................................................................................108

          3.    Case.................................................................................................109

          4.    Claxton............................................................................................110

          5.    Fieldale............................................................................................111

          6.    Foster Farms....................................................................................111

          7.    George's..........................................................................................112

          8.    Harrison...........................................................................................112

          9.    House of Raeford.............................................................................112

          10.   Keystone Foods...............................................................................113

          11.   Koch ................................................................................................114

          12.   Mar-Jac ...........................................................................................115

          13.   Mountaire.........................................................................................116

14.   O.K. Foods ...........................................................................................117

15.   Peco ......................................................................................................117

16.   Perdue ..................................................................................................117

17.   Pilgrim's Pride .....................................................................................118

18.   Sanderson ............................................................................................118

19.   Simmons ..............................................................................................119

20.   Tyson....................................................................................................120

21.   Wayne ..................................................................................................121

22.   Rabobank .............................................................................................121

V.     Producer Co-Conspirators ...................................................................................... 122

    A.    Producer Co-Conspirator Allen Harim .......................................................122

    B.    Producer Co-Conspirator Marshall Durbin..................................................124

    C.    The Defendant Family Co-Conspirators ......................................................124

        1.   Koch .....................................................................................................124

        2.   Tyson....................................................................................................130

        3.   Perdue ..................................................................................................130

        4.   Wayne Farms .......................................................................................131

        5.   George's ...............................................................................................131

        6.   Peco Foods ...........................................................................................132

        7.   Pilgrim's Pride .....................................................................................132

        8.   Foster Farms ........................................................................................134

        9.   O.K. Foods ...........................................................................................134

        10.  House of Raeford .................................................................................134

        11.  Keystone Foods ...................................................................................136

VI.   NON-PRODUCER CO-CONSPIRATORS TIP TOP POULTRY, INC. AND SOUTHERN HENS, INC. ............................................................................................................. 136

VII.   JURISDICTION AND VENUE ....................................................................... 137

VIII.  TRADE AND COMMERCE............................................................................ 138

IX.    FACTUAL ALLEGATIONS REGARDING DEFENDANTS' UNLAWFUL
       CONSPIRACY ............................................................................................... 141

       A.    Production Cutting...............................................................................144

             1.    In an Early Phase of their Conspiracy, Defendants Departed from Their
                   Historical Practice by Collectively Reducing Breeder Flocks in
                   Unprecedented Amounts.........................................................................144

             2.    Defendants' Executives Publicly Decried the Effect of Oversupply on
                   "Our Industry," Telling their Competitors that Unified Action Was
                   Necessary ...............................................................................................146

       B.    Defendants Begin to Cut Production in Concert........................................149

       C.    Defendants' First Round of Chicken Production Cuts Included Unprecedented
             Reductions to Chicken Breeder Flocks....................................................161

       D.    Defendants Continued Their Conspiracy With a Second Massive Breeder Flock
             Cull in 2011 .......................................................................................164

       E.    Drastically-Reduced Breeder Flocks Boosted Chicken Prices and Raised
             Defendants' Profits to Record Levels.......................................................177

       F.    Defendants Utilized Urner Barry to Assist Them Capitalize on Their Supply
             Reduction Efforts....................................................................................184

       G.    Defendants Capitalized on Their Prior Actual Reduction of Broilers to Coordinate
             a False Supply Reduction ........................................................................188

       H.    Rabobank's Role and Participation............................................................189

       I.    The Conspiracy Also Included the Collusive and Fraudulent Manipulation of the
             Georgia Dock Price Index .......................................................................193

       J.    The PMN, the Georgia Dock, and the PMN Advisory Committee Were Created
             and Sustained for the Benefit of Georgia Dock Defendants and the Broiler
             Industry.................................................................................................201

       K.    The Georgia Poultry Federation's Role in Creating and Sustaining the Georgia
             Dock for the Benefit of Defendants and the Broiler Industry ...................207

       L.    The Georgia Dock Became Ripe for Manipulation ...................................208

       M.    Regulatory Investigation and Demise of the Georgia Dock .....................212

N.  The Georgia Dock Price Index Diverged From the USDA Composite and Urner Barry Price Indices Beginning in 2011 ......................................................215

O.  Defendants Fraudulently Submitted False and Inflated Quotes to the Poultry Market News, Causing the Index to Be Artificially High .........................................217

    1.  Pilgrim's Fraudulently Made False Submissions to the Georgia Dock ...........219

    2.  Koch Fraudulently Made False Submissions to the Georgia Dock .................227

    3.  Mar-Jac Fraudulently Made False Submissions to the Georgia Dock.............230

    4.  Harrison Fraudulently Made False Submissions to the Georgia Dock............233

    5.  Sanderson Farms Fraudulently Made False Submissions to the Georgia Dock ...........................................................................................................238

    6.  Tyson Fraudulently Made False Submissions to the Georgia Dock ................241

    7.  Claxton Fraudulently Made False Submissions to the Georgia Dock .............243

    8.  Wayne Farms Fraudulently Made False Submissions to the Georgia Dock ...........................................................................................................246

    9.  Fieldale Farms Also Made False Submissions to the Georgia Dock...............248

P.  The Georgia Dock Defendants Fraudulently Failed to Inform the Plaintiffs with Which They Did Business of their Control Over the Georgia Dock, Their Ability to Manipulate the Georgia Dock, and Their Actual Manipulation of the Georgia Dock.......................................................................................................................251

Q.  The Georgia Dock Defendants Made Fraudulent Misrepresentations to Plaintiffs by Stating that the Georgia Dock Reflected the Broiler Chicken Market ................256

R.  Plaintiffs Were Harmed by the Georgia Dock Defendants' Fraudulent Submissions, Omissions, and Misrepresentations ......................................................259

S.  Defendants Had Both the Motive and Opportunity to Perpetrate the Fraud and Specifically Intended To Do So ...............................................................................260

T.  Defendants Engaged in a Pattern of Racketeering Activity as Part of the Conduct of an Enterprise's Affairs...................................................................................262

U.  The Georgia Dock Defendants Did Not Contract with Plaintiffs in Good Faith.......264

V.  Defendants used the Georgia Dock Manipulation To Impact Higher Prices Charged to Contract Purchasers.................................................................................266

W.  Defendants' Bid-Rigging Conduct ...........................................................................267

X.  The Structure and Characteristics of the Chicken Market Make it Highly Susceptible to Collusion ................................................................................271

Y.  Defendants Collusively Adopted Additional Strategies to Reinforce Their Conspiracy ................................................................................................287

Z.  Agri Stats Actively Facilitated Defendants' Conspiratorial Communications And Provided Data Necessary To Effectuate, Monitor, And Enforce The Conspiracy ....293

AA. Plaintiffs' Claims are Timely ...................................................................310

X.  ANTITRUST IMPACT ........................................................................................ 318

XI. CLAIMS FOR RELIEF AND CAUSES OF ACTION .................................................... 318

COUNT I VIOLATION OF 15 U.S.C. § 1 (AGAINST ALL DEFENDANTS) ..............318

COUNT II VIOLATION OF 15 U.S.C. § 1 ...............................................................321

COUNT III VIOLATION OF 15 U.S.C. § 1 (AGAINST THE GEORGIA DOCK DEFENDANTS FOR PRICE-FIXING)...............................................................323

COUNT IV VIOLATION OF GA. CODE ANN. §§ 16-14-4(a) AND 16-14-6 (GEORGIA RICO) (AGAINST THE GEORGIA DOCK DEFENDANTS FOR ACQUIRING MONEY THROUGH RACKETEERING ACTIVITY)...................325

COUNT V VIOLATION OF GA. CODE ANN. §§ 16-14-4(b) AND 16-14-6 (GEORGIA RICO) (AGAINST THE GEORGIA DOCK DEFENDANTS FOR CONDUCTING ENTERPRISE THROUGH RACKETEERING ACTIVITY).......330

COUNT VI VIOLATION OF 18 U.S.C. §§ 1962(c) AND 1964(c) (FEDERAL RICO) (AGAINST THE GEORGIA DOCK DEFENDANTS)............................................336

COUNT VII CONSPIRACY TO DEFRAUD (AGAINST THE GEORGIA DOCK DEFENDANTS)................................................................................................341

COUNT VIII FRAUD (AGAINST THE GEORGIA DOCK DEFENDANTS)...............342

COUNT IX NEGLIGENT MISREPRESENTATION (AGAINST THE GEORGIA DOCK DEFENDANTS) ........................................................................................342

COUNT X VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (AGAINST SANDERSON) ........................................................343

COUNT XI BREACH OF CONTRACT (AGAINST SANDERSON) ............................345

COUNT XII BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (AGAINST SANDERSON) ..................................................................346

COUNT XIII UNJUST ENRICHMENT (AGAINST SANDERSON) .............................347

COUNT XIV VIOLATION OF THE WISCONSIN ANTITRUST ACT .........................348

COUNT XV VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT.............351

COUNT XVI COMMON LAW FRAUD (AGAINST THE GEORGIA DOCK
DEFENDANTS).....................................................................................353

COUNT XVII BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND
FAIR DEALING (AGAINST ALL GEORGIA DOCK DEFENDANTS)...............357

COUNT XVIII NEGLIGENT MISREPRESENTATION (AGAINST THE GEORGIA
DOCK DEFENDANTS) ...........................................................................358

COUNT XIX UNJUST ENRICHMENT (AGAINST THE GEORGIA DOCK
DEFENDANTS)......................................................................................360

COUNT XX VIOLATION OF S.C. CODE ANN §§ 39-3-10, *ET SEQ*. (AGAINST
ALL DEFENDANTS) ..............................................................................361

COUNT XXI VIOLATION OF S.C. CODE ANN §§ 39-35, *ET SEQ*. (AGAINST ALL
DEFENDANTS)......................................................................................362

COUNT XXII VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE
PRACTICES ACT, FLA. STAT. § 501.201(2), *ET SEQ*. (AGAINST ALL
DEFENDANTS)......................................................................................364

COUNT XXIII VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST
ACT, ARIZ. REV. STAT. § 44-1401, *ET SEQ*. (AGAINST ALL
DEFENDANTS)......................................................................................365

COUNT XXIV VIOLATION OF ILLINOIS ANTITRUST ACT, 740 Ill. COMP.
STAT. ANN. 10/1 (AGAINST ALL DEFENDANTS) ....................................366

COUNT XXV VIOLATION OF THE MINNESOTA ANTITRUST LAW, MINN.
STAT. §325D.49, *ET SEQ*. (AGAINST ALL DEFENDANTS) .............................367

COUNT XXVI VIOLATION OF THE NEW MEXICO ANTITRUST ACT, N.M.
STAT. ANN. §§ 57-1-15, *ET SEQ*. (AGAINST ALL DEFENDANTS)..................368

COUNT XXVII VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL
BUSINESS LAW (AGAINST ALL DEFENDANTS).............................................369

COUNT XXVIII VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT, 815 ILL. COMP. STAT. ANN.
505/10a, *ET SEQ*. (AGAINST ALL DEFENDANTS) .............................................370

COUNT XXIX VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT, MINN. STAT. § 325F.68, *ET SEQ*. (AGAINST ALL DEFENDANTS) ................371

COUNT XXX VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT, N.M. STAT. ANN. §§ 57-12-3, *ET SEQ*. (AGAINST ALL DEFENDANTS) ........372

COUNT XXXI VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT, CAL. BUS & PROF. CODE §16700, *ET SEQ* (AGAINST ALL DEFENDANTS)..................374

COUNT XXXII VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS & PROF. CODE § 17200, *ET SEQ*. (AGAINST ALL DEFENDANTS)................................................................................................375

COUNT XXXIII VIOLATION OF ALABAMA ANTITRUST LAW, ALABAMA CODE §§ 6-5-60, *ET SEQ*. (AGAINST ALL DEFENDANTS)..............................377

COUNT XXXIV VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT, COLO. REV. STAT., §§ 6-1-101, *ET SEQ*. (AGAINST ALL DEFENDANTS)................................................................................................378

COUNT XXXV VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT, D.C. CODE § 28-4501, *ET SEQ*. (AGAINST ALL DEFENDANTS) ...........380

COUNT XXXVI VIOLATION OF HAWAII ANTITRUST LAWS, HAWAII REV. STAT. § 480, *ET SEQ*. (AGAINST ALL DEFENDANTS) .....................................381

COUNT XXXVII VIOLATION OF THE MAINE'S ANTITRUST STATUTE, ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ*. (AGAINST ALL DEFENDANTS) .382

COUNT XXXVIII VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT, MICH. COMP. LAWS § 445.771, *ET SEQ*. (AGAINST ALL DEFENDANTS)....384

COUNT XXXIX VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT, MO. ANN. STAT. § 407.010, *ET SEQ*. (AGAINST ALL DEFENDANTS)................................................................................................385

COUNT XL VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT, NEV. REV. STAT. § 598A.010, *ET SEQ*. (AGAINST ALL DEFENDANTS).......386

COUNT XLI VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. § 598.0903, *ET SEQ*. (AGAINST ALL DEFENDANTS)................................................................................................388

COUNT XLII VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND BUSINESS PRACTICES ACT, N.C. GEN. STAT. § 75-1, *ET SEQ*. (AGAINST ALL DEFENDANTS)................................................................................389

COUNT XLIII VIOLATION OF THE RHODE ISLAND ANTITRUST ACT, R.I. GEN. LAWS ANN. §6-36-1, *ET SEQ*. (AGAINST ALL DEFENDANTS) ............391

COUNT XLIV VIOLATION OF THE UTAH ANTITRUST ACT, UTAH CODE ANN. § 76-10-911, *ET SEQ*. (AGAINST ALL DEFENDANTS) ............................392

COUNT XLV VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT, VA CODE ANN. § 59.1, *ET SEQ*. (AGAINST ALL DEFENDANTS) .........................394

COUNT XLVI VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT, KANS. STAT. ANN. § 50-101, *ET SEQ*. (AGAINST ALL DEFENDANTS) ........395

COUNT XLVII VIOLATION OF THE NEBRASKA JUNKIN ACT, NEB. REV. STAT. § 59-801, *ET SEQ*. (AGAINST ALL DEFENDANTS) ................................397

COUNT XLVIII VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT, NEB. REV. STAT. §59-1602, *ET SEQ*. (AGAINST ALL DEFENDANTS).398

COUNT XLIX VIOLATION OF NEW HAMPSHIRE'S CONSUMER PROTECTION ACT, N.H. REV. STAT. ANN. TIT. XXXI, 358-A, *ET SEQ*. (AGAINST ALL DEFENDANTS).............................................................................400

COUNT L UNJUST ENRICHMENT (AGAINST ALL DEFENDANTS) ......................402

COUNT LI VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT, TENN. CODE, § 47-25-101, ET SEQ. ...............................................................402

COUNT LII VIOLATION OF WISCONSIN ANTITRUST ACT, WIS. STAT. ANN. § 133.18(1)(1), ET SEQ..............................................................................404

COUNT LIII VIOLATION OF 15 U.S.C. § 1 (AGAINST CASE, CLAXTON, KOCH, MAR-JAC, PERDUE, PILGRIM'S PRIDE, SIMMONS, TYSON, AND WAYNE FOR BID-RIGGING – PLED IN THE ALTERNATIVE TO COUNT I)...............406

COUNT LIV VIOLATION OF 15 U.S.C. § 1 (AGAINST CLAXTON, HARRISON, KOCH, MAR-JAC, PILGRIM'S PRIDE, AND TYSON FOR BID RIGGING – PLED IN THE ALTERNATIVE TO COUNT I)......................................................410

COUNT LV VIOLATION OF 15 U.S.C. § 1 (AGAINST GEORGE'S, KOCH, PERDUE, PILGRIM'S PRIDE, AND TYSON FOR BID RIGGING – PLED IN THE ALTERNATIVE TO COUNT I) ..................................................................411

COUNT LVI BREACH OF CONTRACT (AGAINST TYSON AND TYSON SALES AND DISTRIBUTION, INC.) ................................................................................412

COUNT LVII VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §§ 39-5-10, *ET SEQ*....................................414

I.    **INTRODUCTION**

Pursuant to this Court's orders to file "a consolidated complaint" [ECF Nos. 3778, 3653, 3525] that "will contain all the allegations all the Direct-Action Plaintiffs make against all Defendants, and will function as an amendment to some of the complaints" [ECF No. 3526 at n.2], Direct Action Plaintiffs ("DAPs" or "Plaintiffs")[1] submit this compilation of the allegations of the various DAP complaints filed as of October 21, 2020.[2]  DAPs have attempted to set forth here all material factual allegations in each DAP's complaint and have listed each Plaintiff's (i) claims, (ii) defendants whom it has sued, (iii) and named Co-Conspirators.

DAPs filed the original consolidated complaint [ECF Nos. 3924, 3922], and this amended consolidated complaint, in accordance with the Court's direction, "to streamline the pleadings so that there is only one complaint and one answer on the docket for the Court and parties to reference, rather than over 100 separate direct-action complaints."  [ECF No. 4139 at 5]  As the Court has explained, "the purpose of the consolidated complaint is not to force any individual plaintiff to concede or make any allegation or claim." *Id.*

Where multiple DAPs allege similar factual allegations but do not use identical language in making those allegations, this pleading lists the factual allegation once rather than reproducing multiple iterations of similar factual allegations.  Because of differences in the underlying DAP complaints, certain factual allegations may only relate or be material to the claims of certain DAPs, but all factual allegations have nonetheless been included in the combined factual recitation

---

[1]    Given the consolidated nature of this complaint, the plural usage of the term "Plaintiffs" is used throughout to generally describe one or more DAP but should not be construed to necessarily refer to all DAPs for purposes of all factual allegations or legal causes of action as explained *infra* in this document.

[2]    DAPs objected to filing a consolidated complaint [ECF No. 3625], and maintain those objections for all purposes, including any appeals.

pursuant to this Court's orders. DAPs join in the factual allegations made in this pleading only to the extent consistent with their individual claims, and do not necessarily adopt the allegations, theories or legal positions of other DAPs.

Although this document compiles the factual allegations, DAPs have abided by the Court's order [ECF No. 3778] that "the parties are prohibited from using the preparation of consolidated pleadings as a vehicle for amending their pleadings." See also ECF No. 4139 at 5-6. DAPs understand the Court's orders to preserve the independent legal existence of each DAP case.

The submission of this consolidated complaint should not be construed as a waiver or relinquishment of any DAP's rights, including the due-process right to proceed outside of the putative class in this case and to prosecute claims separately in a direct action with counsel of each DAP's choosing. DAPs have not filed identical complaints and, in many instances, have sued different defendants and asserted different claims.[3] By compiling the factual allegations and claims from the various complaints pursuant to this Court's order, DAPs do not concede that consolidation beyond that permitted by the Federal Rules of Civil Procedure would be proper, especially for trial.[4]

---

[3] For example, some DAPs chose not to sue certain Defendants sued by other DAPs. Some DAPs' claims are based in whole or in part on the Georgia Dock Price Index in their supply agreements with certain Defendants; others are not. Some DAPs asserted state-law claims that are specific to their particular geographic locations; others did not. Some DAPs decided to include RICO claims in their complaint; many did not. Many DAPs filed only Sherman Act claims. Others included state law claims, and some include indirect purchaser claims in their complaints. Each DAP has performed its legal analysis of the causes of action applicable to it based on the facts specific to each DAP.

[4] In submitting this pleading, DAPs continue to maintain their "separate legal existence" and object to any loss of their individual due process rights. *In re Fluidmaster*, 149 F.Supp.3d 940, 947 (N.D. Ill. 2016) (quoting *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 586, 590-91 (6th Cir. 2013)); *In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, MDL 2272, 2012 WL 3582708, at *3 (N.D. Ill. Aug. 16, 2012) (collecting cases that state that "a master or consolidated complaint is a procedural device used to promote judicial efficiency and economy, not to be given the same effect as an ordinary complaint or considered to merge the suits into a

This Complaint is organized as follows: Section II sets out a chart identifying each Plaintiff and (1) the docket number on the consolidated docket for the DAP operative complaint, (2) the Defendants named in the DAP complaint (if a Plaintiff has dismissed a Defendant, that Defendant is no longer listed in the Defendant column but in the named co-conspirator column), (3) the co-conspirators named in the DAP complaint, and (4) the causes of action asserted in the DAP complaint (and the Counts in this pleading that correspond with the causes of action in the individual DAP complaint). Sections III through X set out the factual allegations. Section XI states all of the causes of action asserted by any DAP in its respective complaint.

## II. CHART OF DIRECT ACTION PLAINTIFF CASES

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Affiliated Foods, Inc. | ECF 577-1 | Agri Stats; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | N/A | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Alex Lee, Inc./Merchants Distributors, LLC | ECF 577-1 | Agri Stats; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | N/A | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

single cause, or change the rights of the parties, or make those who are parties in one suit parties in another.") (internal quotation marks omitted).

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Associated Grocers of New England, Inc. | ECF 577-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Big Y Foods, Inc. | ECF 577-1 | Agri Stats; Case Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Fareway Stores, Inc. | ECF 577-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Piggly Wiggly Alabama Distributing Co., Inc. | ECF 577-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Woodman's Food Market, Inc. | ECF 577-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Winn-Dixie Stores, Inc. | ECF 2143 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO); Count VII (Conspiracy to Defraud Against the GA Dock Defendants); Count VIII (Fraud Against the GA Dock Defendants); Count IX (Negligent Misrepresentation Against the GA Dock Defendants); Count X (Violation of FDUTPA Against Sanderson); Count XI (Breach of Contract Against Sanderson); Count XII (Breach of Fair Dealing Against Sanderson); Count XIII (Unjust Enrichment Against Sanderson) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Bi-Lo Holdings, LLC | ECF 2143 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO); Count VII (Conspiracy to Defraud Against the GA Dock Defendants); Count VIII (Fraud Against the GA Dock Defendants); Count IX (Negligent Misrepresentation Against the GA Dock Defendants); Count X (Violation of FDUTPA Against Sanderson); Count XI (Breach of Contract Against Sanderson); Count XII (Breach of Fair Dealing Against Sanderson); Count XIII (Unjust Enrichment Against Sanderson) |
| Sysco Corporation | ECF 4151; 4159 | Agri Stats; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Case; Keystone; Rabobank | Fieldale; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| US Foods, Inc. | ECF 4153; 4160 | Agri Stats; Claxton; Fieldale; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Case; Keystone; Rabobank | George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Action Meat Distributors, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Associated Foods Stores, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Bashas' Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Certco, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Ira Higdon Grocery Company, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Nicholas & Co., Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Pacific Food Distributors, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Troyer Foods, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| URM Stores, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Weinstein Wholesale Meats, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Associated Wholesale Grocers, Inc., as to its own claims, as well as the claims assigned to it by Affiliated Foods Midwest Cooperative, Inc. | ECF 2092 | Agri Stats; Case; Claxton; Foster Farms; Harrison; Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Perdue; Pilgrim's; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Amick; George's; Peco Foods; Defendant Family Co-Conspirators | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO); Count XIV (Violation of the Wisconsin Antitrust Act); Count XV (Violation of the Tennessee Antitrust Act). |
| Jetro Holdings, LLC | ECF 2130 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Associated Grocers of the South, Inc. | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Meijer, Inc./Meijer Distribution, Inc. | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| OSI Restaurant Partners, LLC | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Publix Super Markets, Inc. | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| SuperValu Inc. | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Unified Grocers, Inc. | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Associated Grocers of Florida, Inc. | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Wakefern Food Corporation | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| The Kroger Co. | ECF 2106 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Hy-Vee, Inc. | ECF 2106 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Albertsons Companies, Inc. | ECF 2106 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Ahold Delhaize USA, Inc. | ECF 2100 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO); Count XVI (Common Law Fraud Against all GA Dock Defendants); Count XVII (Breach of the Covenant of Good Faith and Fair Dealing Against all GA Dock Defendants); Count XVIII (Negligent Misrepresentation, Pled in the Alternative to Count XXI); Count XIX (Unjust Enrichment by the GA Dock Defendants) |
| Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc. | ECF 1134-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

16

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Colorado Boxed Beef Co. | ECF 1134-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| King Solomon Foods, Inc. | ECF 1134-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| W. Lee Flowers & Company, Inc. | ECF 1132-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count XX (Violation of S.C. CODE ANN §§ 39-3-10); Count XXI (Violation of S.C. CODE ANN §§ 39-5-10); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| BJ's Wholesale Club, Inc. | ECF 2125 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Maximum Quality Foods, Inc. | ECF 2134 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Mar-Jac; O.K. Foods; Peco; Simmons; Tyson | Allen Harim; Amick; Keystone Foods; Koch; Mountaire; Perdue; Pilgrim's Pride; Sanderson; Wayne | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| United Supermarkets, LLC | ECF 2115 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Krispy Krunchy Foods, LLC | ECF 2115 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Cheney Bros., Inc. | ECF 2115 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Shamrock Foods Company | ECF 2110 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Defendant Family Co-Conspirators | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| United Food Service, Inc. | ECF 2110 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Defendant Family Co-Conspirators | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Quirch Foods, LLC, f/k/a Quirch Foods Co. | ECF 1519-1 | Agri Stats; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Sherwood Food Distributors, L.L.C. | ECF 2135 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Harvest Meat Company, Inc. | ECF 2135 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Western Boxed Meat Distributors, Inc. | ECF 2135 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Hamilton Meat, LLC | ECF 2135 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Hooters of America, LLC | ECF 2109 | House of Raeford; Mar-Jac; Perdue; Pilgrim's Pride; Tyson | Agri Stats; Allen Harim; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; Keystone Foods; Koch; Mountaire; O.K. Foods; Peco; Sanderson; Simmons; Wayne | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Darden Restaurants, Inc. | ECF 2126 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Associated Grocers, Inc. | ECF 1 in 19-cv-638 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale; Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Brookshire Grocery Company | ECF 1 in 19-cv-638 | Agri Stats; Case; Claxton; Foster Farms; Fieldale; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Schnuck Markets, Inc. | ECF 1 in 19-cv-638 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale; Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Checkers Drive-In Restaurants, Inc. | ECF 2113 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXII (Violation of FDUTPA) |
| Conagra Brands, Inc. | ECF 2264 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | Count I (Sherman Act Claim for all Anticompetitive Conduct); |
| Pinnacle Foods, Inc. | ECF 2264 | Agri Stats; Case; Claxton;; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Kraft Heinz Foods Company | ECF 2264 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Nestlé USA, Inc. | ECF 2264 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Nestlé Purina PetCare Company | ECF 2264 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Giant Eagle, Inc. | ECF 1 in 19-cv-2758 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale; Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Save Mart Supermarkets | ECF 2163 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Walmart Inc. | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Wal-Mart Stores East, LP | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Wal-Mart Stores Arkansas, LLC | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Wal-Mart Stores Texas, LLC | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Wal-Mart Louisiana, LLC | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Sam's West, Inc. | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Sam's East, Inc. | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Services Group of America, Inc. | ECF 2274-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Restaurants of America, Inc. | ECF 3068 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [ROA seeks injunctive and equitable relief in Counts I, II, and III; ROA seeks damages except against Fieldale in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXIII (Violation of Arizona's Antitrust Act); Count XXV (Violation of the Minn. Antitrust Law); Count XXVI (Violation of New Mexico Antitrust Act); Count XXIX (Violation of the Minn. Consumer Fraud Act); Count XXX (Violation of New Mexico Unfair Practices Act); Count L (Unjust Enrichment) [Arizona, Minnesota, New Mexico] |
| LTP Management Group, Inc. | ECF 3068 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [LTP seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXII (Violation of FDUTPA); Count L (Unjust Enrichment) [Florida] |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Gibson, Greco & Wood, LTD | ECF 3068 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [GGW seeks injunctive and equitable relief in Counts I, II, and III; GGW seeks damages except against Fieldale in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Hooters Management Corporation | ECF 3068 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [HMC seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXII (Violation of FDUTPA); Count XXIV (Violation of Illinois Antitrust Act); Count XXVII (Violation of NY General Business Law); Count XXVIII (Violation of the Illinois Fraud Act); Count L (Unjust Enrichment) [Florida, Illinois] |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Anaheim Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Anaheim Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Gaslamp Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Gaslamp Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Mission Valley Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Mission Valley Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Oceanside Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Oceanside Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Costa Mesa Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Costa Mesa Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Rancho Bernardo Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct); ) [Rancho Bernardo Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Ontario Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Ontario Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Hollywood Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Hollywood Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| South Gate Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [South Gate Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Wings Over Long Beach, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Wings Over Long Beach seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Bonita Plaza Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Bonita Plaza Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Downtown Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Downtown Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Amigos Meat Distributors, LP | ECF 3074-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Amigos Meat & Poultry, LLC | ECF 3074-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); |
| Amigos Meat Distributors East LP | ECF 3074-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); |
| Amigos Meat Distributors West, LP | ECF 3074-1 | Agri Stats;; Case; Claxton; Foster Farms;; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| PJ Food Service, Inc. | ECF 3086-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Fieldale; Keystone; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| The Golub Corporation | ECF 3214-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale; Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Latina Boulevard Foods, LLC | ECF 3214-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale; Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| The Distribution Group, Inc. | ECF 3214-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale; Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| El Pollo Loco, Inc. | ECF 3547-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Independent Purchasing Cooperative, Inc. | ECF 3717 | Agri Stats; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Kraft Heinz Foods | ECF 3572 | Amick, Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Keystone Foods; Fieldale Farms | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Barbecue Integrated, Inc. (d/b/a/ Smokey Bones, Inc.) | ECF 3656-1 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Defendant Family Co-Conspirators | Count I (Sherman Act Claim for all Anticompetitive Conduct) |

| | | | | |
|---|---|---|---|---|
| The Johnny Rockets Group, Inc. | ECF 3660 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Defendant Family Co-Conspirators | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count XXIII (Violation of Arizona Antitrust Law); Count XXXIII (Violation of Alabama Antitrust Law); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count XXXIV (Violation of Colorado Consumer Protection Act); Count XXXV (Violation of District of Columbia Antitrust Act); Count XXII (Violation of FDUTPA); Count XXXVI (Violation of Hawaii Antitrust Law); Count XXIV (Violation of Illinois Antitrust Act); Count XXVIII (Violation of the Illinois Fraud Act); Count XXXVII (Violation of Maine Antitrust Act); Count XXXVIII (Violation of Michigan Antitrust Act); Count XXV (Violation of Minnesota Antitrust Law); Count XXIX (Violation of Minnesota Consumer Fraud Act); Count XXXIX (Violation of Missouri Merchandising Practices Act); Count XL (Violation of Nevada Unfair Trade Practices Act); Count XLI (Violation of Nevada Deceptive Trade Practices Act); Count XXVI (Violation of New Mexico Antitrust Act); Count XXX (Violation of New Mexico Unfair Practices Act); Count XXVII (Violation of NY General Business Law); Count XLII (Violation of North Carolina Unfair Trade Act); Count XLIII (Violation of the Rhode Island Antitrust Act); Count LVII (Violation of S.C. CODE ANN §§ 39-5-10); Count XLIV |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | | | (Violation of the Utah Antitrust Act); Count XLV(Violation of the Virginia Consumer Protection Act); Count LI (Violation of the Tennessee Antitrust Act); Count LII (Violation of the Wisconsin Antitrust Act) |
| FIC Restaurants, Inc. (d/b/a Friendly's) | ECF 3658-1 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Defendant Family Co-Conspirators | Count I (Sherman Act Claim for all Anticompetitive Conduct) |

| Boston Market Corporation | ECF 3654-1 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Defendant Family Co-Conspirators | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count XXIII (Violation of Arizona Antitrust Law); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count XXXIV (Violation of Colorado Consumer Protection Act); Count XXXV (Violation of District of Columbia Antitrust Act); Count XXII (Violation of FDUTPA); Count XXIV (Violation of Illinois Antitrust Act); Count XXVIII (Violation of the Illinois Fraud Act); Count XLVI (Violation of Kansas Antitrust Act); Count XXXVIII (Violation of Michigan Antitrust Act); Count XXV (Violation of Minnesota Antitrust Law); Count XXIX (Violation of Minnesota Consumer Fraud Act); Count XXXIX (Violation of Missouri Merchandising Practices Act); Count XLVII (Violation of Nebraska Junkin Act); Count XLVIII (Violation of the Nebraska Consumer Protection Act); Count XLIX (Violation of New Hampshire Antitrust Act); Count XL (Violation of Nevada Unfair Trade Practices Act); Count XLI (Violation of Nevada Deceptive Trade Practices Act); Count XXVI (Violation of New Mexico Antitrust Act); Count XXX (Violation of New Mexico Unfair Practices Act); Count XXVII (Violation of NY General Business Law); Count XLII (Violation of North Carolina Unfair Trade Act); Count XLIII (Violation of the Rhode Island Antitrust Act); |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | | | Count LVII (Violation of S.C. CODE ANN §§ 39-5-10); Count XLV (Violation of the Virginia Consumer Protection Act); Count LII (Violation of the Wisconsin Antitrust Act) |
| Bob Evans Farms, Inc. | ECF 3818-1 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Keystone Foods; Fieldale Farms | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| The Fresh Market, Inc. | ECF 3819-1 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Keystone Foods; Fieldale Farms | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Wawa, Inc. | ECF 3820-1 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Keystone Foods; Fieldale Farms | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| White Castle Purchasing Co. | ECF 3871 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Marshall Durbin | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Captain D's LLC | ECF 3912-1 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Marshall Durbin | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Cracker Barrel Old Country Store, Inc. and CBOCS Distribution, Inc. | ECF 3889 | Agri Stats;; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Marshall Durbin; Amick; Georges; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Golden Corral Corporation | ECF 3873 | Claxton; Pilgrim's Pride; George's | Allen Harim; Keystone Foods; Marshall Durbin; Agri Stats; Amick; Case; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Count I (Sherman Act Claim for all Anticompetitive Conduct) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Brookshire Brothers, Inc. | ECF 3906 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Peco; Tip Top; Southern Hens; Rabobank | Count I (Sherman Act Claim for All Anticompetitive Conduct); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| SpartanNash Company | ECF 3906 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Peco; Tip Top; Southern Hens; Rabobank | Count I (Sherman Act Claim for All Anticompetitive Conduct); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| WZ Franchise Corporation | ECF 3831-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Sanderson; Simmons; Tyson; Wayne | Amick | Count I (Sherman Act Claim for All Anticompetitive Conduct) |
| EMA Foods Co., LLC | ECF 1 in 1:20-cv-06347 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Rabobank; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| L. Hart, Inc. | ECF 1 in 1:20-cv-06347 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Rabobank; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) |
| R & D Marketing, LLC | ECF 1 in 1:20-cv-06347 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Rabobank; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) |
| Timber Lake Foods, Inc. | ECF 1 in 1:20-cv-06347 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Rabobank; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) |
| Campbell Soup Company; Campbell Soup Supply Company, L.L.C.; Pacific Foods of Oregon | ECF 4191 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Rabobank | Fieldale; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| ALDI, Inc. | ECF 4056 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Marshall Durbin; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Chick-fil-A, Inc. | ECF 4237 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Marshall Durbin; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XLIX (Sherman Act Claim for Bid Rigging, Pled in the Alternative to Count I) |
| Target Corporation | ECF 4193 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Rabobank | Amick; Fieldale; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Carl Buddig & Co. | Dkt No. 1 Case No: 1:20-cv-07419 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford Farms; JCG Foods; Mar-Jac Poultry; Mountaire; Koch Foods; O.K. Foods; Pilgrim; Perdue; Simmons; Tyson; Tyson Sales and Distribution, Inc.; Wayne Farms | Allen Harim Foods; Keystone Foods; Fieldale Farms; Amick Farms; Peco Foods; George's Farms | Count I (Sherman Act); Count II (Sherman Act for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count XXIV (Illinois Antitrust Act); Count XXVIII (Illinois Consumer Fraud And Deceptive Business Practices Act) |
| Caesars Enterprise Services, LLC | Dkt No. 1 Case No: 1:20-cv-07423 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford Farms; JCG Foods; Mar-Jac Poultry; Mountaire; Koch Foods; O.K. Foods; Pilgrim; Perdue; Simmons; Tyson; Tyson Sales and Distribution, Inc.; Wayne Farms | Allen Harim Foods; Keystone Foods; Fieldale Farms; Amick Farms; Peco Foods; George's Farms | Count I (Sherman Act); Count II (Sherman Act for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count X (Florida DUTPA); Count XVI (Fraud); Count XXIII (AZ State Antitrust Law); Count XXIV (Illinois Antitrust Act); Count XXVIII (Illinois Consumer Fraud And Deceptive Business Practices Act); Count XXVII (NY Gen. Bus. Law); Count XXXI (CA Cartwright Act); Count XXXII (CA UCL); Count XXXVIII (Michigan Antitrust Reform Act); Count XXXIX (Missouri Merchandising Practices); Count XL (Nev. UTPA); Count XLI (Nev. DTPA); XLII (NC Unfair Trade and Bus. Prac. Act); Count XLVI (Kansas Restraint of Trade Act); Count XLVII (Nebraska Junkin Act); Count LVI (Breach of Contract Unjust Enrichment) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Bojangles' Restaurants, Inc. and Bojangles Opco, LLC | ECF 1 in 1:20-cv-07734 | Claxton; Mar-Jac; George's; Agri Stats; Amick; Case; Foster Farms; Harrison; House of Raeford, Peco; Koch; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride, Sanderson; Simmons; Tyson, Wayne | Allen Harim; Keystone Foods; Marshall Durbin | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count XXII (Florida); Count XXIV (Illinois Antitrust Act); Count XXVIII (Illinois Fraud Act); Count XXXIII (Alabama); Count XLII (North Carolina); Count LVII (South Carolina); Count LI (Tennessee); Count XLV(Virginia); Count XXXV (DC) |
| Pollo Operations, Inc | ECF 4227 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Marshall Durbin; Peco, Tip Top Poultry, Southern Hens, Rabobank | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count L (Sherman Act Claim for Bid Rigging, Pled in the Alternative to Count I) |
| McLane Company, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| McLane/Mid-Atlantic, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| McLane/ Midwest, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| McLane Minnesota, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| McLane New Jersey, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| McLane/ Eastern, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| McLane/ Suneast, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| McLane Ohio, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| McLane/ Southern, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| McLane/ Western, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| McLane Express, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Kinexo, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| McLane Foodservice Distribution, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens; | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| McLane Foodservice, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| John Soules Foods, Inc. and John Soules Acquisitions LLC | ECF 4192 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Rabobank | Amick; Fieldale; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Red Bird Farms Distribution Company | ECF 1 in 1:21-cv-00261 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Rabobank; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Restaurant Services, Inc. | ECF 4180 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Fieldale Farms | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count LV (Sherman Act Claim for Bid Rigging, Pled in the Alternative to Count I) |
| Zaxby's Franchising LLC | ECF 1:21-cv-00486 | Claxton; Mar-Jac; Agri Stats; Case; Foster Farms; Harrison; House of Raeford; Koch; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride, Sanderson; Simmons; Tyson; Wayne | Amick; George's; Peco; Fieldale; Allen Harim; Keystone Foods; Marshall Durbin | Count I (Sherman Act Claim for all Anticompetitive Conduct) |

## III.    SUMMARY OF DAP FACTUAL ALLEGATIONS

### A.    Overview of the Broiler Industry

1.      This is a case about how some of America's chicken producers reached illegal agreements and restrained trade beginning at least as early as 2008 through at least early 2019. Through those unlawful agreements, and other anticompetitive actions, Defendants and their co-conspirators conducted a long-running conspiracy to restrain production, manipulate price indices, fix prices, and rig bids, the purpose and effect of which was to fix, raise, stabilize, and maintain prices of chicken meat throughout the United States.

2.      Defendants' restraint of trade was multi-faceted and involved many overt acts. They focused on the distribution chain by reducing the supply of broiler chickens into the market.

They also rigged bids on broiler chicken sales. They also focused on the end of the distribution chain by manipulating both individual customer price matrixes as well as an industry price index – specifically, the Georgia Dock price index – with respect to the prices of chicken they sold to purchasers such as Plaintiffs. Defendants all had the common objective of disrupting free market competition to harm Plaintiffs.

3. Four of the participants in the alleged conspiracy – Fieldale Farms, Peco, George's, and Amick – have already agreed to pay millions to settle claims by a putative class of direct purchasers alleging that they participated in this conspiracy. At least Fieldale Farms and Amick have entered into confidential settlement agreements with various DAPs who have filed their own separate lawsuits against Defendants.

4. Senior executives from at least five of the Defendants are already under criminal indictment by the United States Department of Justice in connection with their roles in the conspiracy, and the Department of Justice also made clear that its investigation is ongoing.

5. "Broilers," "chickens," or "broiler chickens" are "chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards." *See* November 20, 2017 Memorandum Opinion and Order (ECF No. 541) at 2–3. Broiler chickens constitute approximately 98% of all chicken meat sold in the United States. The broiler industry is a highly concentrated market with over $30 billion in annual wholesale revenue.

6. Defendants own or tightly control all aspects of broiler chicken production, including the laying of eggs; the hatching of chicks; the raising of chicks; the slaughtering of

chickens; and processing and distributing the meat. The technology and process of industrial-scale broiler chicken production is well known among Defendants, and all Defendants use the same types of equipment and processes.

7. High barriers to entry exist in the broiler chicken market. Entry into the market would cost in excess of $100 million, and no company has created a new poultry company from scratch in decades.

### B. Summary of Defendants' Conspiracy

8. Defendants used multiple means to sustain their conspiracy/conspiracies. For example, they focused on the distribution chain by reducing the supply of broiler chickens into the market. Defendants coordinated to monitor each others' supply and purposefully destroyed breeder hens and eggs to achieve these artificial decreases in broiler supply. They also focused on the end of the distribution chain by manipulating both individual customer price matrixes as well as an industry price index – specifically, the Georgia Dock price index – with respect to the prices of chicken they sold to purchasers such as Plaintiffs. Defendants also rigged bids on broiler chicken sales. While Defendants may have utilized multiple avenues, they all had the common objective of disrupting free market competition to harm Plaintiffs.

9. "Plus factors" are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms that are generally inconsistent with unilateral conduct but largely consistent with explicitly coordinated action. Numerous "plus factors" existed in the broiler industry during the relevant period including, but not limited to: (i) direct communications between Defendants regarding confidential production information which allowed Defendants to disseminate actual and false information regarding supply reductions to purchasers of broilers; (ii) coordinated manipulation by Defendants of the Georgia Dock price index; (iii) Defendants'

coordinated conduct to rig bids to restaurants and other contract purchasers of broilers; (iv) extensive information sharing through Agri Stats and other means; (v) numerous opportunities for Defendants to collude in a variety of forums; (vi) inter-Defendant trades and purchases that often were against independent self-interest; (vii) increased exports of broilers to other countries that were also often against independent self-interest; and (viii) multiple industry characteristics that facilitated collusion, such as high vertical integration, high barriers to entry, high industry consolidation and concentration, inelastic supply and demand, a lack of significant substitutes for chicken, depressed economic conditions, and a history of government investigations and collusive conduct.

### C.     <u>Defendants' Coordinated Supply Restrictions</u>

10.     Defendants curtailed the supply of chickens in the market on the front end via coordinated and unprecedented cuts at the top of the supply chain. This included the coordinated and collusive reduction of production capacity and jointly and collusively reducing "breeder flocks" that produce chickens ultimately slaughtered for meat consumption.

11.     Historically, when faced with low market prices, Defendants relied primarily on mechanisms that temporarily reduced production at the middle or end of the supply chain, such as reducing eggs placements, killing newly-hatched chicks, or idling processing plants. These mechanisms still allowed Defendants to ramp up production within weeks if market conditions changed.

12.     Prior to the relevant period, Defendants' pattern of annual increases in chicken production became so entrenched over decades of experience that by the 2000s, a widely-repeated industry quip was that life only held three certainties: death, taxes, "and 3% more broilers."

13.    A leading industry publication noted in early 2009 that chicken "production in the U.S. used to be just like government spending, it never went down and cutbacks only resulted in slowing the rate of growth, but not anymore," because for "the first time in decades, total broiler production in 2008 remained virtually unchanged from the year before."

14.    In 2008, faced with dropping prices and low profits, Defendants collectively began cutting their ability to ramp up production by materially reducing their breeder flocks.

15.    Defendants abandoned their traditional, short-term production cuts and instituted material changes that increased ramp-up times by up to 18 months.  This was a significant shift in their behavior and signaled their commitment to the conspiracy.

16.    Defendants' collective market-changing cuts to breeder flocks – a first round from 2008 to early 2009, and a subsequent round from 2011 to 2012 as the conspiracy continued into the current decade – effectively eliminated each Defendant's ability to meaningfully increase supply for years.

17.    Defendants' joint efforts to impose supply-side "discipline" included, among other things, open signaling in the form of public statements by their senior executives about their individual commitment to production cuts as well as the importance of instituting and maintaining this "discipline" across the industry as a whole.  Defendants' public statements on the need for, and benefits of, industry-wide supply "discipline" marked a significant departure from past industry practice.  Indeed, Defendants continuously urged one another to "lower supply in order to offset reduced demand and to support higher market prices."

18.    Defendants were able to facilitate, monitor and police their coordinated output restriction scheme by, among other things, communicating through third parties including Agri Stats and Urner Barry (a private commodity price reporting service).

19.     Defendants also were able to facilitate, monitor and police their coordinated output restriction scheme by using reports purchased, at significant cost, from Agri Stats, a former subsidiary of global pharmaceutical company Eli Lilly & Co.

20.     Agri Stats collected detailed, proprietary data from all Defendants, including data detailing the housing used, breed of chicks, average size, and production and breeder flock levels.

21.     The Agri Stats data was in theory supposed to be anonymized.  But by design, Defendants could identify and track their purported competitors' production and output activities to ensure that others were following suit on implementing the coordinated output restrictions. Defendants devoted significant time and resources to working collectively to de-anonymize Agri Stats data.

22.     Defendants' coordinated effort reflected their expectation that higher profit margins would result from coordinated production cuts.  Defendants expected that coordinated production cuts would also allow them to more quickly capitalize on those inflated non-competitive prices.

23.     Later in the relevant period, Defendants capitalized on their prior actual reduction of broilers to coordinate a false supply reduction, again with the same goal – to use the perceived reduction of supply to justify anticompetitive price increases of broilers.

### D.     Defendants' Manipulation of the Georgia Dock Price Index

24.     Another aspect of Defendants' conspiracy to illegally increase and maintain chicken prices was the manipulation and artificial inflation of prices on the "Georgia Dock," a widely used weekly benchmark price compiled and published by the Poultry Market News division (the "PMN") of the Georgia Department of Agriculture (the "GDA").

25.     Starting in 2008, the Defendants also began moving away from long-term fixed-price contracts to shorter-term contracts with variable pricing pegged to one of several purportedly

"fair" price indices. They made this move away from fixed-price contracts particularly with respect to certain distributor and grocer customers.

26.     Many chicken buyers across the nation paid prices based on the Georgia Dock, while many more paid prices that were influenced by the Georgia Dock.

27.     Unlike other price indices available to chicken buyers, the Georgia Dock benchmark price was a self-reported number from a group of chicken producers – Defendants Pilgrim's Pride, Tyson, Sanderson Farms, Koch Foods, Claxton Poultry, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale (collectively, the "Georgia Dock Defendants").

28.     Senior executives from at least seven of the Georgia Dock Defendants were members of a private-sector "Poultry Market News Advisory Committee," which played a role in the compilation and manipulation of the Georgia Dock benchmark price.

29.     Defendants – including both the Georgia Dock Defendants and the other Defendants – took advantage of the inflated, non-competitive prices reported on the Georgia Dock index. They used the inflated Georgia Dock prices to achieve higher prices for those purchasers who set their prices on purportedly "fair" price indices. Defendants also used the inflated prices reported on the Georgia Dock index to justify the higher prices they charged to their contract purchasers.

30.     In addition to their fraudulent submissions to the PMN, all of the Georgia Dock Defendants that sold chicken to Plaintiffs fraudulently misrepresented, omitted, and failed to disclose critical, non-public information about the Georgia Dock. In particular, they misrepresented that the Georgia Dock was or indicated the "market" price for broiler chicken, when in fact they knew they did not submit their own actual offering prices to the PMN. They also failed to disclose to Plaintiffs their ability to control the PMN by virtue of the Advisory

Committee (which consisted solely of executives of Georgia Dock Defendants), the fact that the Georgia Dock price each week was based solely on Defendants' bald assertions with no verification, and the fact that Defendants were manipulating the Georgia Dock price.

E.   **Defendants' Bid-Rigging Conduct**

31.   Defendants also engaged in bid-rigging conduct targeted at restaurants and others that purchased broilers in large volumes. Starting as early as 2012 and continuing until at least as late as 2019 ("Bid-Rigging Conduct Period"), Defendants conspired to fix prices and submit artificially high bids to restaurants and other purchasers and others in an effort to drive up prices, and in turn, Defendants' profits.

32.   As a result of Defendants' bid-rigging conduct, Defendants were able to exact significant price increases from restaurants and other purchasers.

33.   Senior executives from Defendants Pilgrim's Pride, Claxton, Tyson, Perdue, Koch, Case, and George's have been indicted by the United States Department of Justice. The Department of Justice's investigation remains ongoing.

34.   All aspects of Defendants' conspiracy were instigated in a market with numerous characteristics making it highly susceptible to collusion, including: (a) a highly-concentrated market dominated by vertically integrated producers; (b) high barriers to market entry; (c) a standardized, commodity product where competition is based principally on price; (d) inelastic demand for the product; (e) numerous opportunities for cartel members to conspire through a number of regularly scheduled trade association meetings; (f) extensive sharing about Broiler breederstock supply and slaughter levels, forecasting data, pricing inventory, and exports through the Strategic Alliance and Southern Hens, Inc.; and (g) access to competitors' data through Agri Stats.

35.     An internal memorandum drafted by the Antitrust Section of the Florida Attorney General's office as part of its ongoing investigation stated that the chicken industry has the "hallmarks of an industry susceptible to collusion," including high consolidation, "predictable demand" in a "commodity market," and "routine, public display of prices to deter cheating."

36.     Defendants' collusive agreements, anticompetitive acts, and understandings throughout the relevant period enabled Defendants, directly and through their wholly-owned or controlled subsidiaries and affiliates, to reap the benefits of their illegal conduct through the sale of broiler chickens at inflated non-competitive prices.  Defendants continuously urged one another to "lower supply in order to offset reduced demand and to support higher marker prices."

37.     Through their collusive, coordinated anticompetitive actions, Defendants negated the economic benefits of increased competition.  Defendants' conduct resulted in their customers, including all DAPs, paying at least hundreds of millions of dollars in overcharges to Defendants.

## IV.    **PARTIES**

### A.     **Plaintiffs**

38.     Each DAP along with its place of incorporation, principal place of business, and other information pertinent to its claims is listed as follows in alphabetical order:

39.     Plaintiff Action Meat Distributors, Inc. is a Texas corporation with its principal place of business in Houston.

40.     Plaintiff Affiliated Foods, Inc. is a Texas corporation headquartered in Amarillo, Texas.

41.     Plaintiff Ahold Delhaize USA, Inc. is a Delaware corporation with a principal place of business in Quincy, Massachusetts.  Ahold Delhaize is the direct or indirect parent company of several local retail companies (including, without limitation, Food Lion, Giant Martin's, Giant

Food, Hannaford, Peapod, Stop & Shop, Bottom Dollar, Harvey's, and Sweetbay) that own and operate retail grocery businesses and sell and sold Broiler chicken and other products. Ahold Delhaize brings this action on its own behalf and on behalf of its assignors (including, without limitation, Delhaize America, LLC; Food Lion, LLC; Hannaford Bros. Co., LLC; Bottom Dollar Food Northeast, LLC; Retained Subsidiary One, LLC; Delhaize America Distribution, LLC; Ahold U.S.A., Inc.; Giant Food Stores, LLC; Giant of Maryland LLC; Peapod, LLC; The Stop & Shop Supermarket Company LLC; Retail Business Services LLC; and C & S Wholesale Grocers, Inc.), each of which directly purchased Broiler chicken from one or more Defendants and their co-conspirators during the relevant period. The references in this Complaint to "Ahold Delhaize" or "Plaintiffs" includes Ahold Delhaize's assignors.

42.     Plaintiff Albertsons Companies, Inc. is a Delaware limited-liability company with its principal place of business in Boise, Idaho. Albertsons Companies, Inc. is the parent corporation of Albertsons LLC, New Albertsons Inc., and Safeway Inc. Albertsons Companies, Inc. brings this action on its own behalf and on behalf of its assignors, all of whom are wholly-owned subsidiaries of Albertsons Companies, Inc.

43.     Plaintiff ALDI, Inc. ("ALDI") is an Illinois corporation with a principal place of business in Batavia, Illinois. During the time relevant to Plaintiff's claims, Plaintiff directly purchased Broiler chicken in the United States from one or more of the Defendants and/or their co-conspirators and sustained injury and damage to its business as a proximate result of the antitrust violations and other unlawful activities alleged in this Complaint.

44.     Plaintiffs Alex Lee, Inc., and its wholly-owned subsidiary, Merchants Distributors, LLC (together, "Alex Lee") are, respectively, a North Carolina corporation and a North Carolina limited-liability company, with their principal places of business in Hickory, North Carolina.

45.     Plaintiff Amigos Meat Distributors, LP is a Texas limited partnership with its principal place of business in Houston, Texas.

46.     Plaintiff Amigos Meat Distributors East, LP is a Texas limited partnership with its principal place of business in Atlanta, Georgia.

47.     Plaintiff Amigos Meat Distributors West, LP is a Texas limited partnership with its principal place of business in Phoenix, Arizona.

48.     Plaintiff Amigos Meat & Poultry, LLC is a Texas limited-liability company with its principal place of business in Chicago, Illinois.

49.     Plaintiff Anaheim Wings, LLC, doing business as Hooters of Anaheim, is a Kansas Limited-liability company doing business in Anaheim, California.  Plaintiff Anaheim Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period.  As such, during the time period relevant to Plaintiff's claims, Anaheim Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.  Anaheim Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.

50.     Plaintiff Associated Food Stores, Inc. is a Utah corporation with its principal place of business in Salt Lake City.

51.     During the time period relevant to Plaintiffs' claims, Plaintiff Associated Grocers of Florida, Inc. was a Florida corporation with a principal place of business in Pompano Beach, Florida.

52. Plaintiff Associated Grocers of New England, Inc. is a New Hampshire corporation with its principal place of business in Pembroke, New Hampshire.

53. Plaintiff Associated Grocers of the South, Inc. is an Alabama corporation with its principal place of business located in Birmingham, Alabama.

54. Plaintiff Associated Wholesale Grocers, Inc. ("AWG") is a Kansas corporation with its principal place of business located at 5000 Kansas Avenue, Kansas City, Kansas 66106. AWG has distribution center locations in Kansas City, KS; Springfield, MO; Oklahoma City, OK; Goodlettsville, TN; Southaven, MS; Pearl River, LA; Norfolk, NE; and Kenosha, WI. During the relevant time period, AWG purchased broilers through its corporate headquarters and each of these distribution centers. AWG is also the assignee of claims arising from Affiliated Foods Midwest Cooperative, Inc. ("AFM"), which, during the relevant time period, purchased broilers directly from one or more Defendants and other producers of Broilers. Before AWG's acquisition of AFM assets in October 2016, AFM was a Nebraska corporation with its principal place of business in Norfolk, Nebraska and Elwood, Kansas. It served retailers in various states, including Oklahoma, Kansas, Colorado, Wyoming, Nebraska, Missouri, Illinois, Wisconsin, Iowa, South Dakota, North Dakota, Minnesota, and Michigan. AFM has assigned its claims arising from its purchases of broilers to AWG, and AWG brings this action on its own behalf and in addition as assignee of claims from AFM, both of which purchased Broilers from one or more Defendants, their co-conspirators, and others during the relevant period. All references in this complaint to Associated Wholesale Grocers, Inc. or AWG, or to Associated Wholesale Grocers, Inc.'s or AWG's Broiler purchases, refer both to Associated Wholesale Grocers, Inc. and Affiliated Foods Midwest Cooperative, Inc., or to their Broiler purchases, and to AWG as to its own claims, as well the claims assigned to it by AFM. The references in this Complaint to "Plaintiffs" include AWG as

to its own claims, as well as the claims assigned to it by AFM. During the relevant time period, AWG purchased Broilers at artificially inflated prices directly from Defendants, including, without limitation, from Pilgrim's Pride Corporation, Sanderson Farms, Inc., Mountaire Farms, Inc., and Tyson Foods, Inc., and other producers of Broilers. During the relevant time period, the price quoted in agreements between AWG and Defendants and other producers of Broilers referenced or were directly tied to the Georgia Dock, which was manipulated by Defendants and their Co-Conspirators.

55.     Plaintiff Barbeque Integrated, Inc. d/b/a Smokey Bones Bar & Fire Grill is a Delaware corporation with its principal place of business in Aventura, Florida. During the relevant period, Smokey Bones operated over 70 restaurants in multiple states. Smokey Bones brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates. To ensure consistency in taste and quality of their products across hundreds of locations spanning multiple states, Smokey Bones, like many restaurants, negotiates and contracts directly with Defendants for the production and supply of their proprietary chicken according to Smokey Bones' unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Smokey Bones with broilers. The contracts between Smokey Bones and Defendants identify Smokey Bones as the purchaser or customer, and set forth the agreed formula pricing (as represented by Defendants) and the volume of proprietary chicken products to be sold to Smokey Bones. The proprietary product Defendants produce and sell to Smokey Bones cannot be sold to any other customer.

56.     Plaintiff Bashas' Inc. is an Arizona corporation with its principal place of business in Chandler, Arizona, operating stores under several banners, including Food City, Bashas' Markets, Bashas' Dine, AJ's Fine Foods, and Eddie's Country Stores.

57.     Plaintiff Big Y Foods, Inc. is a Massachusetts corporation with its principal place of business in Springfield, Massachusetts.

58.     Plaintiff Bi-Lo Holdings, LLC is a limited-liability company organized under the laws of the State of Delaware.  Its principal place of business is 8928 Prominence Parkway, #200, Jacksonville, Florida 32256.  Bi-Lo Holdings, LLC brings this action on its own behalf and as the assignee of C&S Wholesale Grocers, Inc., a wholesaler that, during the relevant period, purchased chicken directly from Defendants for resale to Bi-Lo Holdings, LLC.

59.     Plaintiff BJ's Wholesale Club, Inc.is a Delaware corporation with its principal place of business in Westborough, Massachusetts.  BJ's brings this action on its own behalf and as the assignee of Burris Logistics, a food-service redistributor that, during the relevant period, purchased chicken from Defendants for resale to BJ's.

60.     Plaintiff Bob Evans Farms, Inc. ("Bob Evans") is a Delaware Corporation with its principal place of business in New Albany, Ohio.  Bob Evans brings this action on its own behalf and as assignee of Gordon Food Service, Inc., who purchased chicken on Bob Evans' behalf directly from Defendants and/or their co-conspirators during the relevant time period and assigned its claims arising out of these purchases to Bob Evans.  During the time period relevant to Bob Evans' claims, Bob Evans and/or its assignors directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damages as a proximate result of the antitrust violations alleged in this Complaint.  Both Bob Evans and Gordon

Food Service, Inc. are a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.

61.     Plaintiff Bojangles' Restaurants, Inc. ("BRI") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina.  Plaintiff Bojangles Opco, LLC is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina ("Opco", and together with BRI these parties are referred to herein as ("Bojangles"). Bojangles owns, operates, or alternatively is the franchisor (and trademark licensor of, more than 700 Bojangles branded restaurants in the United States (the "Bojangles Branded Restaurants"). Restaurants like Bojangles serve their proprietary chicken products in multiple locations throughout the country.  To ensure consistency in taste and quality of its products across hundreds of locations, Bojangles', like many restaurants, negotiated and contracted directly with Defendants for the production and supply of chicken for the Bojangles Branded Restaurants, according to Bojangles' unique recipes and specifications.  These negotiations and contracts governed the price and quantity at which Defendants would supply the Bojangles Branded Restaurants with Broilers (as that term is defined in the Consolidated Complaint).  Bojangles provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Bojangles' products and specific requirements for packaging and labeling Bojangles' proprietary products.  The agreements entered into between Bojangles and Defendants and coconspirators set forth the agreed price and volume of chicken products to be sold to Bojangles.  Bojangles brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates ("McLane"), as well as the assignee of various franchisee owners and operators of franchised Bojangles Branded Restaurants ("Franchisee Assignors").   During the conspiracy period, Bojangles and the

Franchisee Assignors purchased millions of dollars' worth of Broilers directly from certain Defendants and co-conspirators at artificially inflated prices throughout the Conspiracy Period. Bojangles contracted directly with Defendants and their co-conspirators for the purchase of Broilers, negotiating the price and quantity at which Defendants would supply Bojangles and the Franchisee Assignors with Broilers. As such, Bojangles has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Also during the Conspiracy Period, McLane purchased Broilers on behalf of Bojangles and the Franchisee Assignors' from Defendants and their co-conspirators. McLane has assigned its claims arising out of these purchases to Bojangles. Bojangles and the Franchisee Assignors also purchased Broilers indirectly from certain Defendants and their co-conspirators for use in food preparation in Bojangles' locations, and not for resale in unaltered form. The purchase orders for Broilers supplied to Bojangles Branded Restaurants were created and issued from Bojangles Branded Restaurant locations in multiple states, including the Florida, Illinois, Alabama, North Carolina, South Carolina, Virginia and Tennessee and the District of Columbia. Bojangles restaurants also received invoices for and shipments of Broilers. Bojangles and the Franchisee Assignors were damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers, and therefore have suffered antitrust injury as a result of Defendants' conduct. Bojangles brings this action to recover the overcharges it and the Franchisee Assignors paid for Broilers purchased during the Conspiracy Period.[5]

---

[5]     Bojangles' antitrust claims are predicated on all elements of Defendants' collusive conduct, including the bid-rigging that is the subject of the DOJ indictment. As alleged in the Indictment and recited in the Consolidated Complaint, Defendants engaged in bid-rigging conduct specifically targeted at Bojangles and other contract based customers. Bojangles solicited bids, negotiated terms, and contracted directly with Defendants for their proprietary chicken products, and assumed full responsibility to pay the contract obligations. Bojangles used distributors, including Pate Dawson Company ("Pate Dawson"), as purchasing agents, and the distributors were paid a set fee by Bojangles for their services. There is a dispute between Bojangles and Direct Action Plaintiff Cheney Bros., Inc. ("Cheney Brothers") as to who is the proper party to assert

62.     Plaintiff Bonita Plaza Wings, LLC, doing business as Hooters of Plaza Bonita, is a California Limited-liability company doing business in National City, California.  Plaintiff Bonita Plaza Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period.  As such, during the time period relevant to Plaintiff's claims, Bonita Plaza Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.  Bonita Plaza Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.

63.     Plaintiff Boston Market Corporation is a Delaware corporation with its principal place of business in Golden, Colorado.  During the relevant period, Boston Market operated over 450 stores across the country, and was registered to do business in each state in which it operated, including Arizona, California, District of Columbia, Florida, Illinois, Kansas, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Virginia and Wisconsin.  To ensure consistency in taste and quality of their products across hundreds of locations spanning multiple states, Boston Market, like many restaurants, negotiates and contracts directly with Defendants for the production and supply of their proprietary chicken according to Boston Market's unique recipes and specifications.  These negotiations and contracts governed the price and quantity at which Defendants would supply Boston Market with broilers.  The contracts between Boston Market and Defendants identify Boston Market as the purchaser or customer, and set forth the agreed formula pricing (as

---

direct purchaser claims with respect to purchases of Bojangles products from Defendants using Pate Dawson as purchasing agent.  On information and belief, Cheney Brothers acquired the assets of Pate Dawson in 2016.  Bojangles reserves all of its rights on this issue.

represented by Defendants) and the volume of proprietary chicken products to be sold to Boston Market. The contracts between Boston Market and Defendants further specify that Boston Market is responsible for all amounts due and owing to Defendants for proprietary Boston Market products. The agreements also state that should the agreement end, Boston Market must purchase all inventory of finished proprietary items and true up feed expenses purchased at Boston Market's direction. These provisions are put in place because the proprietary product Defendants produce and sell to Boston Market cannot be sold to any other customer. Boston Market brings this action on its own behalf, and additionally and alternatively, as assignee of Ben E. Keith Company d/b/a Ben E. Keith Foods, HAVI Global Solutions, Mattingly Foods, Inc., and McLane Foodservice, Inc. f/k/a MBM Corporation, Willow Run Foods, Inc., and their respective affiliates. During the relevant period, Boston Market purchased broilers directly from Defendants, Defendants' subsidiaries and affiliates, entities owned or controlled by Defendants, or agents Defendants or Defendants' subsidiaries and affiliates controlled. Also during the relevant period, Assignors purchased broilers on Boston Market's behalf from Defendants and/or their co-conspirators, including Tyson and Pilgrim's Pride. Assignors have assigned their claims arising out of these purchases to Boston Market. Boston Market also purchased broilers indirectly from Defendants, Defendants' subsidiaries and affiliates, entities owned or controlled by Defendants, or agents Defendants or Defendants' subsidiaries and affiliates controlled for use in food preparation in Boston Market's locations, and not for resale in unaltered form. The purchase orders for broilers supplied to Boston Market restaurants were created and issued from Boston Market restaurant locations in multiple states, including Arizona, California, District of Columbia, Florida, Illinois, Kansas, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Virginia and Wisconsin. Boston Market restaurants

also received invoices for and shipments of broilers. As such, Boston Market has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.[6]

64. Plaintiff Brookshire Brothers, Inc. ("Brookshire Brothers") is a Texas corporation with its principal place of business in Lufkin, Texas. During the Relevant Period, Brookshire Brothers purchased chicken at artificially inflated prices directly from one or more of the Defendants and suffered injury to its business or property as a direct and proximate result of Defendants' wrongful conduct.

65. Plaintiff Carl Buddig & Co., Inc. is an Illinois corporation with its principal place of business in Homewood, Illinois. From 2008 through at least 2017, Buddig purchased chicken at artificially inflated prices directly from various Defendants, and their affiliates and co-conspirators, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

66. Plaintiff Caesars Enterprise Services, LLC is a Delaware corporation with its principal place of business in Las Vegas, Nevada. From 2008 through at least 2017, Caesars purchased chicken at artificially inflated prices directly from various Defendants, and their

---

[6]     DAPs Boston Market, Johnny Rockets and Friendly's (Certain Restaurant DAPs) antitrust claims are predicated on all elements of Defendants' collusive conduct, including the bid-rigging that is the subject of the DOJ indictment. As alleged in the Indictment and recited in this Consolidated Complaint, Defendants engaged in bid-rigging conduct specifically targeted at Certain Restaurant DAPs and other contract based customers. Certain Restaurant DAPs solicited bids, negotiated terms, and contracted directly with Defendants for their proprietary chicken products, and assumed full responsibility to pay the contract obligations. Certain Restaurant DAPs used distributors, including Sysco and US Foods, as purchasing agents, and the distributors were paid a set fee by Certain Restaurant DAPs for their services. There is a dispute between Certain Restaurant DAPs on the one hand and Sysco and US Foods on the other hand as to who is the proper party to assert direct purchaser claims with respect to the purchases of Certain Restaurant DAPs' products from Defendants. By joining in this consolidated pleading, Certain Restaurant DAPs and Sysco and US Foods reserve their respective rights on this issue.

affiliates and co-conspirators, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

67.     Plaintiff Campbell Soup Company, is a New Jersey corporation with its principal place of business in Camden, New Jersey; Plaintiff Campbell Soup Supply Company L.L.C., is a Delaware corporation with its principal place of business in Camden, New Jersey; Plaintiff Pacific Foods of Oregon, LLC, is an Oregon corporation with its principal place of business in Tualatin, Oregon (collectively "Campbell").  Campbell is a manufacturer and marketer of high-quality, branded food and beverage products.  Campbell is a direct purchaser of Broilers from several producer Defendants.

68.     Plaintiff Captain D's LCC is a Delaware corporation with its principal place of business in Nashville, Tennessee.  During the Conspiracy Period, over 500 Captain D's restaurants operated in multiple states.  Restaurants like Captain D's serve their proprietary chicken products in multiple locations throughout the country.  To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, Captain D's, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to Captain D's unique recipes and specifications.  These negotiations and contracts governed the price and quantity at which Defendants would supply Captain D's with Broilers. Captain D's provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Captain D's products and specific requirements for packaging and labeling Captain D's products.  The contracts entered into between Captain D's and Defendants set forth the agreed price and volume of chicken products to be sold to Captain D's.  Captain D's brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates

71

("McLane" or "Assignor"). During the Conspiracy Period, Captain D's purchased Broilers directly from Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators. Also during the Conspiracy Period, McLane purchased Broilers on Captain D's behalf from Defendants and/or their co-conspirators. McLane has assigned its claims arising out of these purchases to Captain D's. Captain D's and/or its Assignor purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period. As such, Captain D's has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Captain D's was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Captain D's brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.

69. Plaintiff CBBC Opco, LLC d/b/a Colorado Boxed Beef is a Florida limited-liability corporation headquartered in Lakeland, Florida.

70. Plaintiff Certco, Inc. is a Wisconsin corporation with its principal place of business in Fitchburg, Wisconsin

71. Plaintiff Checkers Drive-In Restaurants, Inc. ("Checkers") is a Delaware corporation with its principal place of business in Tampa, Florida. Checkers owns and operates restaurants that sell chicken. Checkers brings this action on its own behalf for chicken purchased from Defendants and/or their co-conspirators for its entire system during the relevant period, and additionally and alternatively, as assignee of its purchasing agents, who assigned their claims to Checkers. During the relevant period, McLane Company, Inc. and its affiliates, purchased chicken

on Checkers' behalf from Defendants and/or their co-conspirators including, Koch Foods, Inc.,

OK Foods, Inc., Tyson Foods, Inc., and Wayne Farms, LLC, and assigned their claims arising out

of these purchases to Checkers.  Additionally, during the relevant time period, I Supply Company

and its affiliates, and Customized Distribution, LLC (CDI) and its affiliates, purchased chicken on

Checkers' behalf from Defendants and/or their co-conspirators including, Koch Foods, Inc., OK

Foods, Inc., Tyson Foods, Inc., Wayne Farms, LLC, Case Farms, LLC, and Pilgrim's Pride

Corporation, and assigned their claims arising out of these purchases to Checkers.  As such, during

the time period relevant to Plaintiffs' claims, Checkers and/or its assignors directly purchased

chicken in the United States from one or more Defendants and/or their co-conspirators, and

sustained injury and damages as a proximate result of the antitrust violations alleged here.

Checkers is a "person" with standing to sue Defendants for damages and other relief under Section

1 of the Sherman Act, 15 U.S.C. § 1.

72.     Plaintiff Cheney Bros., Inc. ("Cheney") is a Delaware corporation with its principal

place of business in Riviera Beach, Florida.  Cheney is a food service distributor that sells and

distributes chicken to members of the food service industry.  During the time period relevant to

Plaintiffs' claims, Cheney directly purchased chicken in the United States from one or more

Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of

the antitrust violations alleged here.  Cheney is a "person" with standing to sue Defendants for

damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.

73.     Plaintiff Chick-fil-A, Inc. ("CFA, Inc.") is a Georgia corporation with its principal

place of business in Fulton County, Georgia.  CFA, Inc. develops and supports a chain of retail

quick-service restaurants specializing in a boneless breast of chicken sandwich, known as the

Chick-fil-A® Chicken Sandwich.  Since CFA, Inc. was founded by Truett Cathy in 1964, it has

endeavored to conduct business with an emphasis on business ethics such as fairness, honesty, loyalty, and respect. The majority of Chick-fil-A branded restaurant businesses are owned and operated by independent franchisees, known as Operators. CFA, Inc. also operates various Chick-fil-A and other restaurants itself from time to time. Certain affiliates of Chick-fil-A operate certain Dwarf House restaurants and Truett's Grill restaurants, which are licensed to sell Chick-fil-A products. CFA, Inc. has also granted licenses to certain Chick-fil-A licensees. Collectively, these Chick-fil-A branded restaurants make up the "CFA Restaurant Group." Broiler chicken is the central ingredient in many of the proprietary products served at each Chick-fil-A branded restaurant, which include, but are not limited to, the Chick-fil-A® Chicken Sandwich, the Grilled Chicken Sandwich, the Spicy Chicken Sandwich, and the Chick-fil-A® Nuggets. These proprietary chicken products have directly contributed to the success and growth of the CFA Restaurant Group into one of the nation's largest quick service restaurant chains. To ensure consistency in taste and quality of products served across multiple locations spanning multiple states, CFA, Inc. negotiated and contracted directly with certain Defendants for the production and supply of its chicken according to CFA, Inc.'s unique recipes and specifications. These negotiations and contracts governed the price at which certain Defendants agreed to supply the CFA Restaurant Group with broiler chicken. CFA, Inc. provided certain Defendants with instructions regarding each step of the preparation and packaging process for the chicken products sold by the CFA Restaurant Group, including the recipe for those products and specific requirements for packaging and labeling those products. CFA, Inc. also utilized distributors such as Armada Supply Chain Solutions, LLC and Armada Warehouse Solutions, LLC (collectively "Armada"), Golden State Foods Corp. and Quality Custom Distribution Services, Inc. (collectively "GSF/QCD"), and Meadowbrook Meat Company, Inc. and McLane Foodservice, Inc.

(collectively "MBM/McLane"), to serve the CFA Restaurant Group. For purposes of this action, Armada, GSF/QCD, and MBM/McLane have all assigned their claims arising out of these transactions to CFA, Inc. CFA, Inc. brings this action on its own behalf, and additionally and alternatively, as assignee of Armada, GSF/QCD, MBM/McLane, and their affiliates (collectively "Assignors"). All references in this Complaint to "CFA, Inc." or "Plaintiff" include Chick-fil-A, Inc.'s Assignors. CFA, Inc. and/or its Assignors purchased billions of dollars worth of broiler chicken from Defendants and/or their co-conspirators throughout the relevant period at prices that were artificially inflated due to the conduct outlined below. As such, CFA, Inc. and the CFA Restaurant Group sustained injury and damages to their businesses as a proximate result of the antitrust violations and other unlawful activities alleged in this Complaint.

74.    Plaintiff Conagra Brands, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois. Conagra is one of North America's leading branded food companies. Conagra's brands include Healthy Choice, Marie Callender's, Banquet, Bertolli, Chef Boyardee, and Frontera, among others.

75.    Plaintiff Costa Mesa Wings, LLC, doing business as Hooters of Costa Mesa, is a Kansas Limited-liability company doing business in Costa Mesa, California. Plaintiff Costa Mesa Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Costa Mesa Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Costa Mesa Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.

76.     Plaintiff Cracker Barrel Old Country Store, Inc. is a Tennessee corporation with its principal place of business in Lebanon, Tennessee.  Plaintiff CBOCS Distribution, Inc. is a Tennessee corporation and is the wholly-owned subsidiary of Cracker Barrel Old Country Store, Inc.  Cracker Barrel Old Country Store, Inc. and CBOCS Distribution, Inc. are together referred to as "Cracker Barrel."  During the Conspiracy Period, Cracker Barrel operated over 600 restaurants in multiple states.  Restaurants like Cracker Barrel serve their proprietary chicken products in multiple locations throughout the country.  To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, Cracker Barrel, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken according to Cracker Barrel's unique recipes and specifications.  These negotiations and contracts governed the price and quantity at which Defendants would supply Cracker Barrel with Broilers.  Cracker Barrel provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Cracker Barrel's products and specific requirements for packaging and labeling Cracker Barrel products. The contracts entered into between Cracker Barrel and Defendants set forth the agreed price and volume of proprietary chicken products to be sold to Cracker Barrel.  Cracker Barrel brings this action on its own behalf, and additionally and alternatively, as assignee of Performance Food Group, Inc. and its affiliates ("PFG" or "Assignor").  During the Conspiracy Period, Cracker Barrel purchased Broilers directly from Defendants and their co-conspirators, Defendants' and their co-conspirators subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators.  Also during the Conspiracy Period, PFG purchased Broilers on Cracker Barrel's behalf from Defendants and/or their co-conspirators, including Pilgrim's Pride, Koch, and

Simmons.  PFG has assigned its claims arising out of these purchases to Cracker Barrel.  Cracker Barrel and/or its Assignor purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period.  As such, Cracker Barrel has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.  Cracker Barrel was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers.  Cracker Barrel brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.

77.     Plaintiff Darden Restaurants, Inc. is a Florida corporation with its principal place of business in Orlando, Florida.  Darden is the world's largest company-owned and operated full-service restaurant company.  Through various subsidiaries, Darden operates over 1,750 restaurants in the United States and Canada, including Olive Garden, LongHorn Steakhouse, The Capital Grille, Yard House, Seasons 52, Bahama Breeze, Eddie V's Prime Seafood, and Cheddar's Scratch Kitchen-brand restaurants.

78.     Plaintiff Downtown Wings, LLC, previously doing business as Hooters of Downtown LA, is a California Limited-liability company that did business in Los Angeles, California.  Plaintiff Downtown Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period.  As such, during the time period relevant to Plaintiff's claims, Downtown Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.  Downtown Wings, LLC is a "person" with standing to sue Defendants for damages

and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.

79.     Plaintiff El Pollo Loco, Inc. ("EPL") is a Delaware corporation with its principal place of business in Costa Mesa, California.  EPL owns/operates, or alternatively is the franchisor (and trademark licensor) of, more than 480 branded El Pollo Loco-branded restaurants in the United States.  Through concepts and recipes successfully developed by EPL, EPL Branded Restaurants specialize in fire-grilled citrus-marinated chicken and other chicken-based entrees and menu items that integrate the culinary traditions of Mexico with the healthier preferences and lifestyle of Southern California.  EPL brings this action on its own behalf and as the assignee of suppliers/distributors McLane Foodservice, Inc. and Testa Produce, Inc. (collectively, "Supplier/Distributor Assignors"), as well as the assignee of franchisee owner/operators of franchised EPL Branded Restaurants.  Based on price and estimated quantity terms typically negotiated by EPL, Supplier/Distributor Assignors purchased broiler chicken directly from Defendants and/or their affiliates or co-conspirators for the supply of EPL Branded Restaurants. The owner/operators of EPL Branded Restaurants were then provided chicken by Supplier/Distributor Assignors on a "cost-plus" price basis.  To avoid any doubt or dispute as to the proper plaintiff for the claims asserted herein, Supplier/Distributor Assignors have assigned to EPL all antitrust claims arising out of their purchases for broiler chicken made in connection with supplying or reselling to any EPL Branded Restaurants.  In addition, EPL has separately obtained assignments from Franchisee Assignors to the extent that they own any federal antitrust claims arising out of purchases of broiler chicken made for the supply of their respective EPL Branded Restaurant(s).  Thus, EPL seeks recovery under federal antitrust law for all unlawful overcharges incurred in connection with broiler chicken supplied to EPL Branded Restaurants nationwide

(whether the purchases for such supply are considered to have been directly made by EPL, its Supplier/Distributor Assignors, or its Franchisee Assignors).

80.    Plaintiff EMA Foods Co., LLC is a Mississippi limited liability company with its principal place of business in Tupelo, Mississippi.

81.    Plaintiff Fareway Stores, Inc. is an Iowa corporation with its principal place of business in Boone, Iowa.

82.    Plaintiff FIC Restaurants, Inc. is a Delaware corporation with its principal place of business in Wilbraham, Massachusetts.  During the relevant period, Friendly's operated over 150 restaurants in multiple states.  To ensure consistency in taste and quality of their products across hundreds of locations spanning multiple states, Friendly's, like many restaurants, negotiates and contracts directly with Defendants for the production and supply of their proprietary chicken according to Friendly's unique recipes and specifications.  These negotiations and contracts governed the price and quantity at which Defendants would supply Friendly's with broilers.  The contracts between Friendly's and Defendants identify Friendly's as the purchaser or customer, and set forth the agreed formula pricing (as represented by Defendants) and the volume of proprietary chicken products to be sold to Friendly's.  The proprietary product Defendants produce and sell to Friendly's cannot be sold to any other customer.

83.    Plaintiff Gaslamp Wings, LLC, previously doing business as Hooters of San Diego, is a Kansas Limited-liability company that previously did business in San Diego, California. Plaintiff Gaslamp Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period.  As such, during the time period relevant to Plaintiff's claims, Gaslamp Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury

and damage as a proximate result of the antitrust violations alleged in this Complaint. Gaslamp Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.

84. Plaintiff Giant Eagle, Inc. is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.

85. Plaintiff Gibson, Greco & Wood, Ltd. is a Louisiana corporation with its principal place of business in East Baton Rouge Parish, Baton Rouge, LA. Plaintiff Gibson, Greco & Wood, Ltd. brings this action on its own behalf and as assignee of the following entities, who have assigned their claims to Gibson, Greco & Wood, Ltd.: Blue Sky Management Company, LLC Wings-Up of Siegen, LLC; Wings-Up of West Monroe, LLC; Wings-Up of Baton Rouge, LLC; Wings-Up on the Westbank, LLC; Wings-Up of Lafayette, LLC; Wings-Up of Denham, LLC; Wings-Up of Slidell, LLC; Wings-Up of Boardwalk, LLC; and Wings-Up of Houma, LLC. Gibson, Greco & Wood, Ltd. brings this action on its own behalf for its purchases of chicken during the relevant time period. In addition, and alternatively, Gibson, Greco & Wood, Ltd. brings this action as assignee of its purchasing agents, Ben E. Keith Company and Bay Valley Foods, LLC (itself and as successor to Naturally Fresh, Inc.), who purchased chicken on Gibson, Greco & Wood, Ltd. Assignors' behalf during the relevant time period, from Defendants and/or their co-conspirators including Tyson, George's, and OK Foods, and who assigned their claims arising out of these purchases to Hooters of America, LLC, who subsequently assigned those claims to Plaintiff Gibson, Greco & Wood, Ltd. During the time relevant to Plaintiff's claims, Gibson, Greco & Wood, Ltd. and/or its assignors, directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. The references in this Complaint to

"Gibson, Greco & Wood, Ltd." refer collectively to Gibson, Greco & Wood, Ltd. and its assignors. Each of Plaintiff Gibson, Greco & Wood, Ltd., the Gibson, Greco & Wood, Ltd. Assignors, Bay Valley Foods, LLC, Naturally Fresh, Inc., Ben E. Keith Company, and Hooters of America, LLC, is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.

86.     Plaintiff Golden Corral Corporation is a North Carolina corporation with its principal place of business in Raleigh, North Carolina. During the Conspiracy Period, over 400 Golden Corral branded restaurants operated in multiple states. Restaurants like Golden Corral serve their proprietary chicken products in multiple locations throughout the country. To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, Golden Corral, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to Golden Corral's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Golden Corral with Broilers. Golden Corral provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Golden Corral's products and specific requirements for packaging and labeling Golden Corral proprietary products. The contracts entered into between Golden Corral and certain Defendants and co-conspirators set forth the agreed price and volume of chicken products to be sold to Golden Corral. Golden Corral brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates ("McLane" or "Assignor"). During the Conspiracy Period, Golden Corral purchased Broilers directly from certain Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and

their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators. Also during the Conspiracy Period, McLane purchased Broilers on Golden Corral's behalf from Defendants and/or their co-conspirators. McLane has assigned its claims arising out of these purchases to Golden Corral. Golden Corral and/or its Assignor purchased millions of dollars' worth of Broilers directly from Defendants and co-conspirators at artificially inflated prices throughout the Conspiracy Period. Golden Corral contracted directly with Defendants and their co-conspirators for the purchase of Broilers, negotiating the price and quantity at which Defendants would supply Golden Corral with Broilers. As such, Golden Corral has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Golden Corral was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Golden Corral brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.

87. Plaintiff Hollywood Wings, LLC, doing business as Hooters of Hollywood, is a Kansas Limited-liability company doing business in Hollywood, California. Plaintiff Hollywood Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Hollywood Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Hollywood Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.

88. Plaintiff Hooters of America, LLC is a Georgia limited-liability company with its principal place of business in Atlanta, Georgia. Hooters of America, through its affiliates, owns

and operates restaurants that sell chicken. Hooters of America brings this action on its own behalf for its purchases of chicken during the relevant time period. In addition, and alternatively, Hooters of America brings this action as assignee of its purchasing agent, Ben E. Keith who purchased chicken on Hooters of America's behalf during the relevant time period, from Defendants and/or their co-conspirators including Tyson and Pilgrim's Pride, and who assigned its claims arising out of these purchases to Hooters of America; and as assignee of its purchasing agent, Naturally Fresh, Inc., who purchased chicken on Hooters of America's behalf during the relevant time period from Defendants and/or their co-conspirators including Tyson, Pilgrim's Pride and Perdue, and who assigned its claims arising out of these purchases to Hooters of America. During the time period relevant to Plaintiff's claims, Hooters of America and/or its assignors, directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. The reference in this Complaint to "Hooters of America" refer collectively to Hooters of America, LLC and its assignors. Hooters of America is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.

89. Plaintiff Hooters Management Corporation is a Florida corporation with its principal place of business in Clearwater, Florida. Hooters Management Corporation brings this action on its own behalf and as assignee of the following entities, which have assigned their claims to Hooters Management Corporation: Hooters of Clearwater, Inc.; Hooters II, Inc.; Hooters III, Inc.; Hooters of Port Richey, Inc.; Hooters of Brandon, Inc.; Hooters of North Tampa, Inc.; Hooters of Spring Hill, Inc.; Hooters of South Tampa, Inc.; Hooters on 4th Street, Inc. (f/k/a Hooters on Roosevelt, Inc.); Hooters of Channelside, Inc.; Hooters of John's Pass, Inc.; Hooters of Clearwater Beach, Inc.; Hooters of Wells Street, Inc.; Hooters of Downers Grove, Inc.; Hooters of Orland

Park, Inc.; Hooters on Golf, Inc.; Hooters on Golf Holding Co.; Hooters of Oak Lawn, Inc.; Hooters of Lansing, Inc.; Hooters on Higgins, Inc.; Hooters of Aurora, Inc.; Hooters of Joliet, Inc.; Hooters of Melrose Park, Inc.; Hooters of Countryside, Inc.; Hooters of Gurnee, Inc.; Hoots of Cicero, Inc.; Hooters of 33rd Street, Inc.; Hooters of Manhattan, Ltd.; Hooters of Manhattan Inc.; Tyrone Hooters, Ltd.; Hooters of Vernon Hills, Inc.; Hooters of Crystal Lake, Inc.; Hooters of Palm Harbor, Inc.; Hooters Management Holding Co.; and Hooters Foods, Inc. These entities purchased chicken indirectly from Defendants and/or their co-conspirators including Koch, Tyson, and Pilgrim's Pride in Florida, New York, and Illinois, and assigned their claims arising out of these purchases to Hooters Management Corporation. As such, during the time period relevant to Plaintiff's claims, Hooters Management Corporation and/or its assignors, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Each of Plaintiff Hooters Management Corporation and its assignors is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein. The references in this Complaint to Hooters Management Corporation refer collectively to Hooters Management Corporation and its assignors.

90. Plaintiff Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc. is the trustee for Central Grocers, Inc. which was an Illinois corporation with its principal place of business in Joliet, Illinois.

91. Plaintiff Hy-Vee, Inc. ("Hy-Vee") is an Iowa corporation with its principal place of business in West Des Moines, Iowa. Hy-Vee brings this action on its own behalf and on behalf of

its assignor Perishable Distributors of Iowa (a wholly-owned subsidiary of Hy-Vee) and its other assignor Topco Associates, LLC.

92.     Plaintiff Independent Purchasing Cooperative, Inc. is a Delaware non-profit purchasing cooperative headquartered within Miami-Dade County, Florida.  IPC is a cooperative purchasing agent for its members, which are Subway® franchisees.  IPC brings this action regarding chicken purchased for its members as assignee of those distributors and processors who assigned their claims to IPC for chicken purchases that IPC coordinated.  During the conspiracy period, IPC or its assignors directly purchased chicken at artificially inflated prices directly from one or more of the Defendants and Producer Co-Conspirators (as defined below), and suffered injury to its business or property as a direct or proximate result of Defendants' and co-conspirators' wrongful conduct.

93.     Plaintiff Ira Higdon Grocery Company, Inc. is a Georgia corporation with its principal place of business in Cairo, Georgia.

94.     Plaintiff Jetro Holdings, LLC is a Delaware limited-liability company with its principal place of business in College Point, New York.  JRD Holdings, LLC, a Delaware limited liability holding company also located in College Point, New York, is the sole member of Jetro.  Jetro is the nation's leading wholesale grocer.  Jetro operates its wholesale grocer business through two divisions: Jetro Cash and Carry Enterprises, LLC and Restaurant Depot, LLC.  Jetro Cash and Carry Enterprises, LLC is a wholesale supplier that manages "cash-and-carry" warehouses (*i.e.*, a system of trading in which purchasers pay for goods in full in cash and carry them away at the time of purchase), which stock a broad variety of items, including both perishable and nonperishable bulk foods, food preparation equipment, and take-out containers.  Restaurant Depot,

LLC is a similar wholesale cash-and-carry operation with warehouses selling food, paper supplies, and tabletop items to independent food businesses nationwide.

95.     Plaintiff John Soules Foods, Inc., is a Texas corporation with its principal place of business in Tyler, Texas; Plaintiff John Soules Acquisitions, LLC, is a Georgia limited liability company with its principal place of business in Gainesville, Georgia, which on or around November 17, 2014, acquired the assets of Pro View Foods, LLC, and its affiliates, including claims that are the subject of this action (collectively "John Soules Foods"). John Soules Foods, is a direct purchaser of Broilers from several producer Defendants.

96.     Plaintiff King Solomon Foods, Inc. is a New York corporation with its principal place of business in Brooklyn, New York.

97.     Plaintiff Kraft Heinz Foods Company is a Pennsylvania limited-liability company co-headquartered in Pittsburgh, Pennsylvania and Chicago, Illinois. Kraft Heinz is the third largest food and beverage company in the United States and the fifth largest in the world. In October 2012, Kraft Foods, Inc. spun off Kraft Foods Group, Inc., as a North American grocery business, before changing its name from Kraft Foods, Inc. to Mondelez International, Inc. On July 2, 2015, through a series of transactions, Kraft Foods Group, Inc. merged with and into Kraft Heinz Foods Company (formerly known as H.J. Heinz Company). The Kraft Heinz Company is the parent company of operating entity Kraft Heinz Foods Company. In addition to the well-known Kraft and Heinz brands, Kraft Heinz's U.S. food brands include, among others, Oscar Mayer, Lunchables, Smart Made, and Smart Ones.

98.     Plaintiff Krispy Krunchy Foods, LLC ("Krispy Krunchy") is a Louisiana limited liability company with its principal place of business in Alexandria, Louisiana. Krispy Krunchy licenses its brand and fried chicken program to various retail outlets. During the time period

relevant to Plaintiffs' claims, Krispy Krunchy directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged here. Krispy Krunchy is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.

99.     Plaintiff L. Hart, Inc. is a Mississippi corporation with its principal place of business in Water Valley, Mississippi.

100.     Plaintiff Latina Boulevard Foods, LLC is a Florida limited-liability corporation with its principal place of business in Cheektowaga, New York.

101.     Plaintiff LTP Management Group, Inc. is a Florida corporation with its principal place of business in Fort Myers, Florida. LTP Management Group, Inc. brings this action on its own behalf and as assignee of the following entities, which have assigned their claims to LTP Management Group, Inc.: Lags Enterprises, Inc. d/b/a Hooters of Ft Myers; Country Bumpkins, Inc. d/b/a Hooters of Sunrise; Hooters of Sarasota, Inc.; Hooters of Bayside, Inc.; Hooters of Pembroke Pines, Inc.; Waterfront Concepts, Inc. d/b/a Hooters of Ft Myers Beach; Hooters of Doral, Inc.; Hooters of Cape Coral, Inc.; Hooters of BeachPlace, Inc.; Hooters of Cypress Creek, Inc.; Hooters of Port Charlotte, Inc.; Hooters of Bradenton, Inc.; Hooters of Naples, Inc.; Wings of Boca, Inc. d/b/a Hooters of Boca; Hooters of Miami, Inc. d/b/a Hooters of Coral Gables; Wings of Hialeah, Inc. d/b/a Hooters of Hialeah; Hooters of Hollywood, Inc.; Lag's Drinks of Orlando, Inc. d/b/a Adobe Gila's of Orlando; Lulu's Bait Shack of Fort Lauderdale, Inc. d/b/a Lulus of Fort Lauderdale; Pigs Galore, LLC d/b/a The Royal Pig Pub and Kitchen. These entities purchased chicken indirectly from Defendants and/or their co-conspirators including Perdue, Amick, Tyson, Koch and Pilgrim's Pride in Florida and assigned their claims arising out of these purchases to

LTP Management Group, Inc. As such, during the time period relevant to Plaintiff's claims, LTP Management Group, Inc. and/or its assignors, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations alleged in this Complaint. Each of Plaintiff LTP Management Group, Inc. and its assignors is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and under the state laws referenced herein. Reference in this Complaint to LTP Management Group, Inc. refers collectively to LTP Management Group, Inc. and its assignors.

102. Plaintiff Maximum Quality Foods, Inc. is a New Jersey corporation with its principal place of business in Linden, New Jersey.

103. Plaintiff McLane Company, Inc., d/b/a McLane/Southwest, McLane/Southeast, McLane Southeast, McLane/Northwest, McLane/Southeast – Dothan, McLane/ High Plains, and McLane/North Texas is a leading supply chain services company providing grocery and foodservice supply chain solutions to convenience stores, discount retailers, wholesale clubs, drug stores, military bases, and restaurants throughout the United States. McLane Company, Inc. is a Texas corporation with its principal place of business in Temple, Texas. It, along with its subsidiaries and affiliates, purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.

104. Plaintiff McLane/Mid-Atlantic, Inc., d/b/a McLane/Carolina and McLane Mid-Atlantic, is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.

105.    Plaintiff McLane/Midwest, Inc., d/b/a McLane/Cumberland, McLane/Midwest, McLane Midwest, and McLane/Ozark is a Texas corporation with its principal place of business in Temple, Texas.  It is a wholly-owned subsidiary of McLane Company, Inc.  It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.

106.    Plaintiff McLane Minnesota, Inc. is a Texas corporation with its principal place of business in Temple, Texas.  It is a wholly-owned subsidiary of McLane Company, Inc.  It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.

107.    Plaintiff McLane New Jersey, Inc. is a Delaware corporation with its principal place of business in Temple, Texas.  It is a wholly-owned subsidiary of McLane Company, Inc.  It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.

108.    Plaintiff McLane/Eastern, Inc., d/b/a McLane/Northeast, McLane/Northeast-Concord, and McLane PA is a Texas corporation with its principal place of business in Temple, Texas.  It is a wholly-owned subsidiary of McLane Company, Inc.  It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.

109.    Plaintiff McLane/Suneast, Inc., d/b/a McLane/Pacific, McLane/Southern California, McLane/Sunwest, McLane Sunwest, McLane/Suneast, and McLane Ocala is a Texas corporation with its principal place of business in Temple, Texas.  It is a wholly-owned subsidiary of McLane Company, Inc.  It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.

110.    Plaintiff McLane Ohio, Inc. is a Texas corporation with its principal place of business in Temple, Texas.  It is a wholly-owned subsidiary of McLane Company, Inc.  It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.

111.    Plaintiff McLane/Southern, Inc. is a Mississippi corporation with its principal place of business in Temple, Texas.  It is a wholly-owned subsidiary of McLane Company, Inc.  It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.

112.    Plaintiff McLane/Western, Inc. is a Colorado corporation with its principal place of business in Temple, Texas.  It is a wholly-owned subsidiary of McLane Company, Inc.  It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.

113.    Plaintiff McLane Express, Inc., d/b/a C.D. Hartnett Company, Inc. is a Texas corporation with its principal place of business in Weatherford, Texas.  It is a wholly-owned subsidiary of McLane Company, Inc.  It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.

114.    Plaintiff Kinexo, Inc. is a North Carolina corporation with its principal place of business in Rocky Mount, North Carolina.  It is a wholly-owned subsidiary of McLane Company, Inc.  It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.

115.    Plaintiff McLane Foodservice Distribution, Inc. is a North Carolina corporation with its principal place of business in Rocky Mount, North Carolina.  It is a wholly-owned

subsidiary of McLane Company, Inc.  It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.

116.    Plaintiff McLane Foodservice, Inc. is a Texas corporation with its principal place of business in Temple, Texas.  It is a wholly-owned subsidiary of McLane Company, Inc.  It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.

117.    Plaintiff Meijer, Inc. and Plaintiff Meijer Distribution, Inc. are Michigan corporations, with their principal place of business located in Grand Rapids, Michigan.

118.    Plaintiff Mission Valley Wings, LLC, doing business as Hooters of Mission Valley, is a Kansas Limited-liability company doing business in San Diego, California.  Plaintiff Mission Valley Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period.  As such, during the time period relevant to Plaintiff's claims, Mission Valley Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.  Mission Valley Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.

119.    Plaintiff Nestlé Purina PetCare Company is a Missouri corporation with its principal place of business in St. Louis, Missouri.  Nestlé Purina is one of the world's largest producers of pet food.

120.    Plaintiff Nestlé USA, Inc. is a Delaware corporation with its principal place of business in Arlington, Virginia.  Nestlé USA has manufacturing facilities across the U.S. and its

brands include, Stouffer's, Lean Cuisine, DiGiorno, Buitoni, Hot Pockets, Nescafe, Nestlé Toll House, and Coffee Mate.

121.    Plaintiff Nicholas & Co., Inc. is a Utah corporation with its principal place of business in Salt Lake City.

122.    Plaintiff Oceanside Wings, LLC, previously doing business as Hooters of Oceanside, is a Kansas Limited-liability company that did business in Oceanside, California. Plaintiff Oceanside Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period.  As such, during the time period relevant to Plaintiff's claims, Oceanside Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.  Oceanside Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.

123.    Plaintiff Ontario Wings, LLC, doing business as Hooters of Ontario, is a Kansas Limited-liability company doing business in Ontario, California.  Plaintiff Ontario Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period.  As such, during the time period relevant to Plaintiff's claims, Ontario Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.  Ontario Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.

124.     Plaintiff OSI Restaurant Partners, LLC is a Delaware company with its principal place of business located in Tampa, Florida.  OSI brings this action on its own behalf as a direct purchaser of chicken from one or more Defendants and their co-conspirators during the conspiracy and as an assignee of the claims of Kenneth O. Lester, Inc. d/b/a PFG Customized Distribution.

125.     Plaintiff Pacific Food Distributors, Inc. is an Oregon corporation with its principal place of business in Clackamas, Oregon.

126.     Plaintiff Piggly Wiggly Alabama Distributing Co., Inc. ("Piggly Wiggly") is an Alabama corporation with its principal place of business in Bessemer, Alabama.

127.     Plaintiff Pinnacle Foods, Inc. is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  Pinnacle Foods was acquired by Conagra in October 2018 and is now a wholly-owned subsidiary of Conagra.  As an independent, public company, Pinnacle Foods was a leading packaged foods company.  Pinnacle Foods' brands include Hungry-Man, Birds Eye, Armour, and Mama Celeste pizza, among others.

128.     Plaintiff PJ Food Service, Inc. is a Kentucky corporation with its principal place of business in Louisville, Kentucky.

129.     Plaintiff Pollo Operations, Inc. ("Pollo") is a Florida corporation with its principal place of business in Miami, Florida.  During the Conspiracy Period, Pollo operated restaurants under the Pollo Tropical banner.  Restaurants like Pollo serve their proprietary chicken products in multiple locations throughout the country.  To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, Pollo, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to Pollo's unique recipes and specifications.  These negotiations and contracts governed the price and quantity at which Defendants would supply Pollo with Broilers.  Pollo brings this

action on its behalf and on behalf of its affiliates and wholly-owned subsidiaries and as assignee of Kelly's Foods Inc. ("Kelly's") for overcharges on direct purchases of Broilers by Pollo, and by Kelly's that were sold to Pollo during the Conspiracy Period. During the Conspiracy Period, Kelly's purchased Broilers on Pollo's behalf from Defendants and/or their co-conspirators. Kelly's has assigned its claims arising out of these purchases to Pollo. Pollo was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Pollo's claims are based on all elements of Defendants' collusive conduct, including bid-rigging that is the subject of the Superseding Indictment. As alleged in the Superseding Indictment and herein, Defendants' bid-rigging conduct targeted Pollo.

130. Plaintiff Publix Super Markets, Inc. is a Florida corporation with its principal place of business located in Lakeland, Florida.

131. Plaintiff Quirch Foods, LLC is a Florida limited-liability company with its principal place of business in Coral Gables, Florida. Quirch brings this action on its own behalf and as assignee of Butts Foods, L.P. f/k/a Butts Foods, Inc. During the conspiracy period, Quirch and its assignor purchased chicken at artificially inflated prices directly from one or more of Defendants, and suffered injury to their business or property as a direct or proximate result of Defendants' wrongful conduct.

132. Plaintiff R & D Marketing, LLC is a Mississippi limited liability company with its principal place of business in Tupelo, Mississippi.

133. Plaintiff Rancho Bernardo Wings, LLC, doing business as Hooters of San Marcos, previously doing business as Hooters of Rancho Bernardo, is a California Limited-liability company doing business in San Marcos, California. Plaintiff Rancho Bernardo Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and

Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Rancho Bernardo Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Rancho Bernardo Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.

134. Plaintiff Red Bird Farms Distribution Company is a Colorado corporation with its principal place of business in Englewood, Colorado.

135. Plaintiff Restaurants of America, Inc. is a Texas corporation with its principal place of business in Centennial, Colorado. Restaurants of America, Inc. brings this action on its own behalf and as assignee of the following entities, who have assigned their claims to Restaurants of America, Inc.: Albuquerque Hooters, Inc.; Albuquerque West Hooters, LLC; Bloomington Hooters, Inc.; Colorado Springs Hooters, Inc.; Fiesta Mall Hooters, Inc.; Las Cruces Hooters, Ltd.; Lone Tree Hooters, Inc.; Metro Center Hooters, Inc.; Parker Road Hooters, Inc.; Hooters of Peoria, LP; Peoria Hooters, Inc.; Phoenix Hooters, Inc.; Scottsdale Hooters, Inc.; 8909 Indian Bend Hooters, LP; Thunder Mountain Hooters, LLC; Yuma Hooters, Inc.; West Phoenix Hooters, Inc.; Hooters of Westminster, LP; Westminster Hooters, Inc.; Bell Canyon Hooters, Inc.; Colorado Blvd. Hooters, Inc.; Colorado Springs North Hooters, Inc.; Chandler Hooters, Inc.; Southwest Hooters, Ltd.; Grand Junction Hooters, LP; Kipling Hooters, Ltd.; Mesa Hooters Inc.; Tucson Northwest Hooters Ltd.; Marana Hooters, Inc.; Tucson Hooters, Inc.; and Tempe Hooters, Inc. These entities purchased chicken indirectly from Defendants and/or their co-conspirators, including Tyson and George's, in Arizona, New Mexico, Colorado and Minnesota and assigned their claims arising out of these purchases to Restaurants of America, Inc. Plaintiff Restaurants of

America, Inc. also brings claims on behalf of itself as assignee of Ben E. Keith Company and Bay Valley Foods, LLC (itself and as successor to Naturally Fresh, Inc.), who directly purchased chicken from Defendants and/or their co-conspirators, including Tyson and George's, on Restaurants of America Assignors' behalf during the relevant time period, and assigned their claims arising out of these purchases to Hooters of America, LLC, who subsequently assigned those claims to Plaintiff Restaurants of America, Inc. Each of Plaintiff Restaurants of America, Inc., and its assignors, Ben E. Keith and Bay Valley Foods, LLC successor to Naturally Fresh, Inc., and Hooters of America, LLC, is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein. The references in this Complaint to "Restaurant of America" refer collectively to Restaurants of America, Inc. and its assignors.

136. Plaintiff Restaurant Services, Inc. ("RSI" or "Plaintiff") is a Delaware corporation with its principal place of business in Miami, Florida. RSI serves as the exclusive supply chain management and distribution cooperative for the BURGER KING® system of company-owned and franchisee-owned restaurants in the United States ("BK Restaurants"). BURGER KING® is the second largest fast food hamburger chain in the world. As the purchasing agent for BK Restaurants, RSI negotiates contracts and purchases products and distribution services on their behalf. During the relevant time period, RSI contracted with Defendants for the production and supply of Broilers. RSI also utilized distributors to supply BK Restaurants with Broilers purchased on their behalf pursuant to these negotiations and contracts. These distributors include McLane Company, Inc. ("McLane"), Nicholas and Company, Performance Food Group, Inc. ("PFG"), Reinhart Foodservice, LLC ("Reinhart"), Shamrock Foods Company ("Shamrock"), Sygma Network ("Sygma"), Sysco Montana, Inc. ("Sysco Montana"), and Maines Paper & Food Service,

Inc., including its wholly-owned subsidiaries, Maines Paper & Food Service - Maryland, Inc., Maines Paper & Food Service - New England, Inc., Maines Paper & Food Service - Ohio, Inc., Maines Paper & Food Service - NY Metro, Inc., Maines Paper & Food Service - Mid-Atlantic, Inc., and Maines Paper & Food Service - Tennessee, Inc. (collectively "Maines"), who have each assigned their claims arising out of these transactions to RSI. RSI brings this action on its own behalf, and as assignee of McLane, Nicholas and Company, PFG, Reinhart, Shamrock, Sygma, Sysco Montana, Maines, and their affiliates (collectively, "Assignors"). The references in this Complaint to "RSI" include RSI's Assignors.

137. During the time period relevant to RSI's claims, RSI and/or its Assignors directly purchased Broilers in the United States from Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations and other unlawful activities alleged in this Complaint. RSI's claims are based on all elements of Defendants' collusive conduct, including specifically, the bid-rigging that is the subject of the Superseding indictment. As alleged in the Superseding Indictment and herein, Defendants engaged in bid-rigging conduct specifically targeted at RSI and other customers with whom they entered into contracts for the supply of Broilers.

138. Plaintiff Sam's East, Inc. is an Arkansas corporation with its principal place of business in Bentonville, Arkansas.

139. Plaintiff Sam's West, Inc. is an Arkansas corporation with its principal place of business in Bentonville, Arkansas.

140. Plaintiff Save Mart Supermarkets, a California corporation has its principal place of business in Modesto, California. The reference in this Complaint to Save Mart refers to Save

Mart Supermarkets and its predecessors, successors, divisions, banners and trade names, including, without limitation, Save Mart, Lucky Supermarkets, FoodMaxx, and MaxxValue Foods.

141.    Plaintiff Services Group of America, Inc. is a Delaware corporation with its principal place of business in Scottsdale, Arizona.  SGA is one of the nation's leading marketers and distributors of food products and food services throughout the United States.  From 2008 through the present, SGA's former subsidiaries, Food Services of America, Inc., a Delaware Corporation ("FSA"), Systems Services of America, Inc., a Delaware corporation ("SSA"), and Ameristar Meats, Inc., a Delaware Corporation ("Ameristar"), purchased chicken on behalf of SGA at artificially inflated prices directly from Defendants, their affiliates, and co-conspirators. Because of the functional and economic unity of SGA with its wholly-owned subsidiaries, FSA, SSA, and Ameristar, in the purchase of chicken from Defendants, any antitrust injury suffered by FSA, SSA, or Ameristar was passed on to, and absorbed by, SGA.  Regardless of SGA's individual standing as a direct purchaser or as a result of its ownership or control of, or principal-agent relationship with, FSA, SSA, and Ameristar as direct purchasers from Defendants, FSA, SSA, and Ameristar have expressly assigned to SGA all claims and causes of action that FSA, SSA, or Ameristar could assert in this lawsuit through September 13, 2019.

142.    Plaintiff Shamrock Foods Company is an Arizona corporation with its principal place of business in Phoenix, Arizona.

143.    Plaintiff Sherwood Food Distributors, L.L.C. is a Michigan limited-liability company with its principal place of business in Detroit, Michigan; Plaintiff Harvest Meat Company, Inc. is a Delaware corporation with its principal place of business in National City, California; Plaintiff Western Boxed Meats Distributors, Inc. is an Oregon corporation with its principal place of business in Portland, Oregon; and Hamilton Meat, LLC is a California limited-

liability company with its principal place of business in Chula Vista, CA. These Plaintiffs are large affiliated distributors in the meat and food industry which service thousands of customers including retailers, wholesalers, institutional accounts, further processers, food service accounts, and cruise lines.

144.     Plaintiff South Gate Wings, LLC, doing business as Hooters of South Gate, is a California Limited-liability company doing business in South Gate, California. Plaintiff South Gate Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, South Gate Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. South Gate Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.

145.     Plaintiff SpartanNash Company ("SpartanNash"), formerly known as Spartan Stores, Inc., is a Michigan corporation with its principal place of business in Byron Center, Michigan. As used herein, "SpartanNash" refers to SpartanNash Company, Spartan Stores, Inc., Nash-Finch Company, and Spartan Stores Distribution, LLC. During the Relevant Period, SpartanNash purchased chicken at artificially inflated prices directly from one or more of the Defendants and suffered injury to its business or property as a direct and proximate result of Defendants' wrongful conduct.

146.     Plaintiff SuperValu Inc. is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

147. Plaintiff Sysco Corporation is a Delaware corporation with its principal place of business in Houston, Texas.

148. Plaintiff Target Corporation ("Target"), is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Target operates approximately 1900 retail stores throughout the United States and also engages in internet sales via Target.com. Target is a direct purchaser of Broilers from several producer Defendants.

149. Plaintiff The Distribution Group, Inc., doing business as the Van Eerden Foodservice Company is a Michigan corporation with its principal place of business in Grand Rapids, Michigan.

150. Plaintiff, The Fresh Market, Inc. ("Fresh Market") is a Delaware corporation with its principal place of business in Greensboro, North Carolina. Fresh Market owns and operates grocery stores that sell chicken. Fresh Market brings this action on its own behalf, and as assignee of its purchasing agent, Burris Logistics, who purchased chicken from Defendants and/or their co-conspirators on Fresh Market's behalf during the relevant time period, and assigned their claims arising out of these purchases to Fresh Market. During the time period relevant to Fresh Market's claims, Fresh Market and/or its assignors, directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations alleged in this Complaint. Both Fresh Market and Burris Logistics are a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.

151. Plaintiff The Golub Corporation, whose retail operating banners include Price Chopper, Market 32 and Market Bistro, is a Delaware corporation with its principal place of business in Schenectady, New York.

152.     Plaintiff The Johnny Rockets Group, Inc. d/b/a Johnny Rockets is a Delaware corporation with its principal place of business in Wilbraham, Massachusetts.  During the relevant period, Johnny Rockets operated over 450 stores across the country, and was registered to do business in each state in which it operated, including Alabama, Arizona, California, Colorado, District of Columbia, Florida, Hawaii, Illinois, Maine, Michigan, Minnesota, Missouri, Nevada, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Tennessee, Utah, Virginia and Wisconsin.

153.     To ensure consistency in taste and quality of their products across hundreds of locations spanning multiple states, Johnny Rockets, like many restaurants, negotiates and contracts directly with Defendants for the production and supply of their proprietary chicken according to Johnny Rockets unique recipes and specifications.  These negotiations and contracts governed the price and quantity at which Defendants would supply Johnny Rockets with broilers.  The contracts between Johnny Rockets and Defendants identify Johnny Rockets as the purchaser or customer, and set forth the agreed formula pricing (as represented by Defendants) and the volume of proprietary chicken products to be sold to Johnny Rockets.  The proprietary product Defendants produce and sell to Johnny Rockets cannot be sold to any other customer.  During the relevant period, Johnny Rockets purchased broilers directly from Defendants, Defendants' subsidiaries and affiliates, entities owned or controlled by Defendants, or agents Defendants or Defendants' subsidiaries and affiliates controlled.  Johnny Rockets contracted directly with Defendants for the purchase of broilers, negotiating the price and quantity at which Defendants would supply broilers to Johnny Rockets.   Johnny Rockets also purchased broilers indirectly from Defendants, Defendants' subsidiaries and affiliates, entities owned or controlled by Defendants, or agents Defendants or Defendants' subsidiaries and affiliates controlled for use in food preparation in

Johnny Rocket's locations, and not for resale in unaltered form. The purchase orders for broilers supplied to Johnny Rockets restaurants were created and issued from Johnny Rockets restaurant locations in multiple states, including Alabama, Arizona, California, Colorado, District of Columbia, Florida, Hawaii, Illinois, Maine, Michigan, Minnesota, Missouri, Nevada, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Tennessee, Utah, Virginia and Wisconsin. Johnny Rockets restaurants also received invoices for and shipments of broilers. As such, Johnny Rockets has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.

154. Plaintiff The Kroger Co. is an Ohio corporation with its principal place of business in Cincinnati, Ohio. The Kroger Co. brings this action on its own behalf and on behalf of its assignors, all of whom are wholly-owned subsidiaries of The Kroger Co.

155. Plaintiff Timber Lake Foods, Inc. is a Mississippi corporation with its principal place of business in Tupelo, Mississippi.

156. Plaintiff Troyer Foods, Inc. is an Indiana corporation with its principal place of business in Goshen, Indiana.

157. During the time period relevant to Plaintiffs' claims, Plaintiff Unified Grocers, Inc. was a California corporation with its principal place of business in Commerce, California.

158. Plaintiff United Food Service, Inc. is a Colorado corporation with its principal place of business in Commerce City, Colorado. United Food Service, Inc. is a wholly-owned subsidiary of Shamrock Foods Company.

159. Plaintiff United Supermarkets, LLC ("United Supermarkets") is a Texas limited liability company with its principal place of business in Lubbock, Texas. United Supermarkets owns and operates retail stores that sell chicken. During the time period relevant to Plaintiffs'

claims, United Supermarkets directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged here. United Supermarkets is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.

160. Plaintiff URM Stores, Inc. is a Washington corporation with its principal place of business in Spokane, Washington.

161. Plaintiff US Foods, Inc. is a Delaware corporation with its principal place of business in Rosemont, Illinois.

162. Plaintiff Wakefern Food Corporation is a New Jersey corporation with its principal place of business in Elizabeth, New Jersey.

163. Plaintiff Walmart Inc. is a Delaware corporation with its headquarters in Bentonville, Arkansas. Walmart Inc. is a retail corporation that operates grocery, department, and warehouse stores across the United States and internationally.

164. Plaintiff Wal-Mart Stores Arkansas, LLC is an Arkansas limited-liability company with its principal place of business in Bentonville, Arkansas.

165. Plaintiff Wal-Mart Stores East, LP (f/k/a Wal-Mart Stores East, Inc.) is a Delaware limited partnership with its principal place of business in Bentonville, Arkansas.

166. Plaintiff Wal-Mart Louisiana, LLC is a Delaware limited-liability company with its principal place of business in Bentonville, Arkansas.

167. Plaintiff Wal-Mart Stores Texas, LLC (f/k/a/ Wal-Mart Stores Texas, LP) is a Delaware limited-liability company with its principal place of business in Bentonville, Arkansas.

168. Plaintiff Wawa, Inc. ("Wawa") is a New Jersey corporation with its principal place of business in Wawa, Pennsylvania. Wawa owns and operates a chain of convenience stores and

dispensing facilities in the United States. Wawa brings this action on its own behalf, and as assignee of its purchasing agents, Taylor Fresh Foods, Inc., Taylor Farms, Florida, Inc., Taylor Farms New Jersey, Inc. and Safeway Fresh Foods LLC, all of whom purchased chicken on Wawa's behalf directly from Defendants and/or their co-conspirators during the relevant time period and assigned their claims arising out of these purchases to Wawa. During the time period relevant to Wawa's claims, Wawa and/or its assignors directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations alleged in this Complaint. Wawa and its assignors are each a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.

169. Plaintiff Weinstein Wholesale Meats, Inc. is an Illinois corporation with its principal place of business in Forest Park, Illinois.

170. Plaintiff White Castle Purchasing Co. is a Delaware corporation with its principal place of business in Columbus, Ohio. During the Conspiracy Period, White Castle operated over 400 restaurants in multiple states. Restaurants like White Castle serve their proprietary chicken products in multiple locations throughout the country and the world. To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, White Castle, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to White Castle's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply White Castle with Broilers. White Castle provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for White Castle's products and specific requirements for packaging and

labeling White Castle products.  The contracts entered into between White Castle and Defendants set forth the agreed price and volume of chicken products to be sold to White Castle.  White Castle brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates ("McLane" or "Assignor").  During the Conspiracy Period, White Castle purchased Broilers directly from Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators.  Also during the Conspiracy Period, McLane purchased Broilers on White Castle's behalf from Defendants and/or their co-conspirators, including Pilgrim's Pride and Wayne Farms.  McLane has assigned its claims arising out of these purchases to White Castle.  White Castle and/or its Assignor purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period.  As such, White Castle has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.  White Castle was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. White Castle brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.

171.    Plaintiff Wings Over Long Beach, LLC, doing business as Hooters of Long Beach, is a Kansas Limited-liability company doing business in Long Beach, California.  Plaintiff Wings Over Long Beach, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period.  As such, during the time period relevant to Plaintiff's claims, Wings Over Long Beach, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury

and damage as a proximate result of the antitrust violations alleged in this Complaint. Wings Over Long Beach, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.

172. Plaintiff Winn-Dixie Stores, Inc. is a corporation organized under the laws of the State of Florida. Its principal place of business is 8928 Prominence Parkway, #200, Jacksonville, Florida 32256. Winn-Dixie Stores, Inc. brings this action on its own behalf and as the assignee of C&S Wholesale Grocers, Inc., a wholesaler that, during the relevant period, purchased chicken directly from Defendants for resale to Winn-Dixie Stores, Inc.

173. Plaintiff W. Lee Flowers & Company, Inc. is a corporation organized, existing, and doing business under the laws of South Carolina, with its principal place of business in Scranton, South Carolina.

174. Plaintiff Woodman's Food Market, Inc. is a Wisconsin corporation with its principal place of business in Janesville, Wisconsin.

175. Plaintiff WZ Franchise Corporation is a Georgia corporation with its principal place of business in Atlanta, GA.

176. Plaintiff Zaxby's Franchising LLC ("Zaxby's") is a Georgia corporation with its principal place of business in Athens, Georgia. Zaxby's owns, operates, or alternatively is the franchisor (and trademark licensor) of, more than 500 Zaxby's branded restaurants in the United States (the "Zaxby's Branded Restaurants"). Restaurants like Zaxby's serve their proprietary chicken products in multiple locations throughout the country. To ensure consistency in taste and quality of its products across hundreds of locations, Zaxby's, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of chicken for the Zaxby's Branded Restaurants, according to Zaxby's unique recipes and specifications. These negotiations

and contracts governed the price and quantity at which Defendants would supply the Zaxby's Branded Restaurants with Broilers. Zaxby's provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Zaxby's products and specific requirements for packaging and labeling Zaxby's proprietary products. The agreements entered into between Zaxby's and Defendants and co-conspirators set forth the agreed price and volume of chicken products to be sold to Zaxby's. Zaxby's brings this action on its own behalf, and additionally and alternatively, as assignee of Performance Food Group, Inc. ("PFG"). During the conspiracy period, Zaxby's purchased hundreds of millions of dollars' worth of Broilers directly from certain Defendants and co-conspirators at artificially inflated prices throughout the Conspiracy Period. Zaxby's contracted directly with Defendants and their co-conspirators for the purchase of Broilers, negotiating the price and quantity at which Defendants would supply Zaxby's with Broilers. As such, Zaxby's has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Also during the Conspiracy Period, PFG purchased Broilers on behalf of Zaxby's from Defendants and their co-conspirators. PFG has assigned its claims arising out of these purchases to Zaxby's. Zaxby's was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers, and therefore has suffered antitrust injury as a result of Defendants' conduct. Zaxby's brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.

**B.**     **Defendants**

177.     Below is a list of the Defendants (in alphabetical order by Defendant family name) named in any DAP complaint. This does not mean that each Defendant has been named by each DAP. Additionally, some Defendants listed below may be named by certain DAPs as co-conspirators. The chart in Section 2 summarizes the Defendants and co-conspirators named by

each DAP to date.

### 1. Agri Stats

178.    Defendant Agri Stats, Inc. ("Agri Stats") is an Indiana corporation headquartered in Fort Wayne, Indiana, and a former subsidiary of Eli Lilly & Co., a publicly-held Indiana corporation headquartered in Indianapolis.

179.    Agri Stats has knowingly played an important and active role in Defendants' collusive scheme detailed in this Complaint. All of Agri Stats' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, or engaged in by Agri Stats' various officers, agents, employers or other representatives while actively engaged in the management and operation of Agri Stats' business affairs within the course and scope of their duties and employment, or with Agri Stats' actual apparent or ostensible authority. Agri Stats used the instrumentalities of interstate commerce to facilitate the conspiracy, and its conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the United States, including in this District.

180.    In 2008 and 2010, a representative from Agri Stats was elected to the board of the National Chicken Council, one of the industry's most important trade associations. Those were key years in the conspiracy alleged in this Complaint. Several Defendants, including Wayne Farms and Pilgrim's, also have hired former Agri Stats executives to work in senior sales positions, and Agri Stats employs or has employed several former executives of the Defendants. These facts highlight the unique and symbiotic relationship between Agri Stats and the other Defendants.

### 2. Amick

181.    Defendant Amick Farms, LLC ("Amick Farms") is a limited-liability company organized in Delaware with its headquarters located in Batesburg-Leesville, South Carolina.

Amick Farms is a producer of fresh and frozen chicken products and operates facilities in South Carolina, Maryland, and Delaware.

182.     Amick Farms is a wholly-owned subsidiary of OSI Group, LLC, a privately held Delaware corporation with its headquarters in Aurora, Illinois.

183.     During the relevant period, Amick Farms and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

184.     Amick Farms reports a wide variety of data to Agri Stats, including, without limitation, highly detailed, confidential information regarding its production and sales of broilers.

   3. <u>Case</u>

185.     Case Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina.  During the time period relevant to Plaintiffs' claims, Case Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

186.     Case Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in Ohio and North Carolina.  Case Farms, LLC is a wholly-owned subsidiary of Case Foods, Inc.  During the time period relevant to Plaintiffs' claims, Case Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

187.     Case Farms Processing, Inc. is a privately held North Carolina corporation with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in North

Carolina.  Case Farms Processing, Inc. is a wholly-owned subsidiary of Case Foods, Inc.  During

the time period relevant to Plaintiffs' claims, Case Farms Processing, Inc. and/or its predecessors,

wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly

or through its wholly-owned or controlled affiliates, to purchasers in the United States.

188.    Case Foods reports a wide variety of data to Agri Stats, including, without

limitation, highly detailed, confidential information regarding its production and sales of broilers.

189.    Defendants Case Foods, Inc., Case Farms, LLC and Case Farms Processing, Inc.

are collectively referred to as "Case Foods."

### 4.    Claxton

190.    Defendant Claxton Poultry Farms, Inc. is a Georgia corporation headquartered in

Claxton, Georgia.  Norman W. Fries, Inc. d/b/a Claxton Poultry Farms, Inc. is a Georgia

corporation located in Claxton, Georgia.  During the relevant time period, Norman W. Fries, Inc.

and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in

interstate commerce, directly or through its wholly-owned or controlled affiliates, in the United

States.  Defendants Claxton Poultry Farms, Inc. and Norman W. Fries, Inc. are collectively referred

to as "Claxton."  Claxton reports to Agri Stats a wide variety of data, including information about

its breeder flocks and hatchery capacity and its Claxton, Georgia complex.  Until the Georgia Dock

benchmark price stopped being published by the GDA in late November 2016, Claxton was one

of the Defendants that submitted false and artificially inflated price quotes to the GDA.  Its CEO

also served on the Georgia Dock Advisory Committee.  Claxton is a Georgia Dock Defendant and

during the relevant period sold broilers in interstate commerce, directly or through its wholly-

owned or controlled affiliates, to purchasers in the United States.

5.    Fieldale

191.    Fieldale Farms Corporation ("Fieldale") is a privately held Georgia corporation headquartered in Baldwin, Georgia.  Fieldale reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and its Gainesville, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Fieldale submitted false and artificially inflated price quotes to the GDA.  Its owner and CEO also served on the Georgia Dock Advisory Committee.  During the relevant period, Fieldale sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

6.    Foster Farms

192.    Defendant Foster Farms, LLC is a privately held California corporation headquartered in Modesto, California.  Foster reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Fresno, California, Livingston, California, and the Pacific Northwest.

193.    Defendant Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California.  Foster Poultry Farms is a related entity of Foster Farms, LLC.  During the relevant period, Foster Poultry Farms and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of broilers, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.  Defendants Foster Farms, LLC and Foster Poultry Farms are collectively referred to as "Foster" or "Foster Farms."

### 7. George's

194. Defendant George's Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.

195. Defendant George's Farms, Inc., is a privately held Arkansas corporation headquartered in Springdale, Arkansas. It is a wholly-owned subsidiary of George's, Inc. Defendants George's Inc. and George's Farms, Inc. are together referred to as "George's" in this Complaint. George's reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Harrisonburg, Virginia and Springdale, Arkansas. During the relevant period, George's sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

### 8. Harrison

196. Defendant Harrison Poultry, Inc. ("Harrison") is a Georgia corporation headquartered in Bethlehem, Georgia. Harrison reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Bethlehem, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Harrison was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its owner and CEO served on the Georgia Dock Advisory Committee. Harrison is a Georgia Dock Defendant.

### 9. House of Raeford

197. Defendant House of Raeford Farms, Inc. ("Raeford") is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. Raeford reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its North Carolina and Louisiana complexes.

112

10.   Keystone Foods

198.   Keystone Foods LLC was formerly a subsidiary of Marfrig Alimentos, S.A., a Brazilian company ("Marfrig").  On November 30, 2018, Defendant Tyson Foods, Inc. ("Tyson Foods") announced it had completed its acquisition of Keystone Foods LLC from Marfrig.  Tyson Foods characterized the acquisition of Keystone Foods LLC as Tyson Foods' latest investment in furtherance of its growth strategy and expansion of its value-added protein capabilities.  Tyson Foods' acquisition of Keystone Foods LLC (and the three affiliated Equity Group entities listed below) was structured as a stock acquisition, which resulted in Tyson Foods' acquisition of all Keystone Foods, LLC's assets and liabilities, and Keystone Foods continued to exist as an operating entity subsequent to the acquisition.

199.   Equity Group Eufaula Division, LLC is a Delaware limited-liability company with its headquarters in Bakerhill, Alabama and is a wholly-owned subsidiary of Keystone Foods LLC.

200.   Equity Group Kentucky Division LLC, formerly known as Cagle's-Keystone Foods, L.L.C., is a Delaware limited liability company with its headquarters in Franklin, Kentucky, and is a wholly-owned subsidiary of Grow-Out Holdings LLC.  During the relevant period, Equity Group Kentucky Division LLC sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

201.   Equity Group – Georgia Division LLC is a Delaware limited liability company with its headquarters in Camilla, Georgia, and is a wholly-owned subsidiary of Keystone Foods LLC.  During the relevant period, Equity Group – Georgia Division LLC sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

202. As a result of Tyson Foods' acquisition of Keystone Foods LLC, Tyson also acquired all of the assets and liabilities of Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group – Georgia Division LLC.

203. Keystone Foods LLC, Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group – Georgia Division LLC are collectively referred to as "Keystone Foods" in this Complaint.

204. Keystone Foods reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Alabama, Georgia, and Kentucky.

205. 

11. <u>Koch</u>

206. Defendant Koch Foods, Inc. is a privately held Illinois corporation headquartered in Park Ridge, Illinois.

207.    Defendant JCG Foods of Alabama, LLC, an Alabama limited liability corporation headquartered in Park Ridge, Illinois, is a wholly-owned subsidiary of Defendant Koch Foods, Inc.

208.    Defendant JCG Foods of Georgia, LLC, a Georgia limited liability corporation headquartered in Park Ridge, Illinois, is a wholly-owned subsidiary of Defendant Koch Foods, Inc.

209.    Defendant Koch Meat Co., Inc., an Illinois corporation headquartered in Chicago, is a wholly-owned subsidiary of Defendant Koch Foods, Inc.

210.    Defendants Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC and Koch Meat Co., Inc. are collectively referred to as "Koch" in this Complaint. Koch reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Tennessee, and Alabama.  Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Koch, through JCG Foods of Georgia, LLC, was one of the Defendants that submitted false and artificially inflated price quotes to the GDA.  Its vice-president of sales served on the Georgia Dock Advisory Committee.  Koch is a Georgia Dock Defendant.

12.    Mar-Jac

211.    Defendant Mar-Jac Poultry, Inc. is a Delaware corporation headquartered in Gainesville, Georgia.  Defendant Mar-Jac Poultry AL, LLC is an Alabama limited liability corporation located in Gainesville, Georgia.  Defendant Mar-Jac AL/MS, Inc. is a Delaware corporation located in Gainesville, Georgia.  Defendant Mar-Jac Poultry MS LLC is a Mississippi limited liability company located in Hattiesburg, Mississippi.  Defendant Mar-Jac Poultry, LLC is a Delaware corporation located in Gainesville, Georgia.  Defendant Mar-Jac Holdings, LLC is a

Delaware corporation located in Gainesville, Georgia and is the parent company of Mar-Jac Poultry, Inc., Mar-Jac Poultry MS LLC, Mar-Jac AL, LLC, Mar-Jac AL/MS, Inc., and Mar-Jac Poultry, LLC. Defendants Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, Mar-Jac Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-Jac Poultry, LLC and Mar-Jac Holdings, LLC are collectively referred to as "Mar-Jac Poultry" or "Mar-Jac." Mar-Jac reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Gainesville, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Mar-Jac was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice president of operations served on the Georgia Dock Advisory Committee. Mar-Jac is a Georgia Dock Defendant. During the relevant period, Mar-Jac sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

13. Mountaire

212. Defendant Mountaire Farms, Inc. is a privately held Delaware corporation headquartered in Millsboro, Delaware.

213. Defendant Mountaire Farms, LLC, a privately held Arkansas limited liability corporation headquartered in Little Rock, Arkansas, is a wholly-owned subsidiary of Defendant Mountaire Farms, Inc.

214. Defendant Mountaire Farms of Delaware, Inc., a privately held Delaware corporation headquartered in Millsboro, Delaware, is a wholly-owned subsidiary of Defendant Mountaire Farms, Inc.

215. Defendants Mountaire Farms, Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire Farms" in this Complaint. Mountaire

reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware and North Carolina.

14.    O.K. Foods

216.    Defendant O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.

217.    O.K. Farms, Inc., is an Arkansas corporation headquartered in Fort Smith, Arkansas, and is a wholly-owned subsidiary of Defendant O.K. Foods, Inc.

218.    O.K. Industries, Inc., an Arkansas corporation headquartered in Fort Smith, Arkansas, is a wholly-owned subsidiary of Defendant O.K. Foods, Inc.

219.    Defendants O.K. Foods, Inc., O.K. Farms, Inc., O.K. Industries, Inc., and their predecessors, subsidiaries, and affiliates, including Albertville Quality Foods, are collectively referred to as "O.K. Foods." In this Complaint, O.K. Foods are subsidiaries of the Mexican poultry conglomerate Industrias Bachoco, which reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Fort Smith, Arkansas complex.

15.    Peco

220.    Defendant Peco Foods, Inc. ("Peco Foods") is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama. Peco Foods reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Gordo, Alabama and Sebastopol, Louisiana.

16.    Perdue

221.    Defendant Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland.

222.    Defendant Perdue Foods, LLC, a privately held Maryland limited liability corporation headquartered in Salisbury, Maryland, is a subsidiary of Defendant Perdue Farms, Inc.

223.    Defendants Perdue Farms, Inc. and Perdue Foods, LLC are together referred to as "Perdue" in this Complaint.  Perdue reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware, Maryland, North Carolina, South Carolina, Florida, and Kentucky.

17.    <u>Pilgrim's Pride</u>

224.    Defendant Pilgrim's Pride Corporation ("Pilgrim's" or "Pilgrim's Pride") is a publicly held Delaware corporation headquartered in Greeley, Colorado.  Pilgrim's Pride reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, West Virginia, North Carolina, Georgia, Tennessee, Florida, South Carolina, Alabama, Texas, Arkansas, and Kentucky.  Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Pilgrim's Pride was one of the Defendants that submitted false and artificially inflated price quotes to the GDA.  Its executive vice president of sales and operations served on the Georgia Dock Advisory Committee.  Pilgrim's Pride is a Georgia Dock Defendant.

225.    Defendant Pilgrim's Pride is liable for all conspiratorial acts undertaken while it was in bankruptcy proceedings during 2009, and reentered, and reaffirmed its commitment to, the conspiracy following its discharge from bankruptcy on December 29, 2009.

18.    <u>Sanderson</u>

226.    Defendant Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi.

118

227.    Defendant Sanderson Farms, Inc. (Foods Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly-owned subsidiary of Defendant Sanderson Farms, Inc.

228.    Defendant Sanderson Farms, Inc. (Production Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly-owned subsidiary of Defendant Sanderson Farms, Inc.

229.    Defendant Sanderson Farms, Inc. (Processing Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly-owned subsidiary of Defendant Sanderson Farms, Inc.

230.    Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division) and Sanderson Farms, Inc. (Processing Division) are collectively referred to as "Sanderson Farms" in this Complaint. Sanderson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Mississippi, and Texas. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Sanderson Farms was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Sanderson Farms is a Georgia Dock Defendant.

        19.    Simmons

231.    Defendant Simmons Foods, Inc. is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas. Simmons Foods, Inc. reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its two Siloam Springs, Arkansas complexes.

232.    Simmons Prepared Foods, Inc. is a privately held Arkansas company headquartered

in Siloam Springs, Arkansas. Simmons Prepared Foods, Inc. is a wholly-owned subsidiary of Simmons Foods, Inc. During the relevant time period, Simmons Foods, Inc. exclusively sold the chicken it produced to Simmons Prepared Foods, Inc., which in turn resold the chicken in various forms to its customers. Simmons Prepared Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of broilers, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States. Defendants Simmons Foods, Inc. and Simmons Prepared Foods, Inc. are collectively referred to as "Simmons" or "Simmons Foods."

20.    Tyson

233.    Defendant Tyson Foods, Inc. is a publicly held Delaware corporation headquartered in Springdale, Arkansas.

234.    Defendant Tyson Chicken, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly-owned subsidiary of Defendant Tyson Foods, Inc.

235.    Defendant Tyson Breeders, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly-owned subsidiary of Defendant Tyson Foods, Inc.

236.    Defendant Tyson Poultry, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly-owned subsidiary of Defendant Tyson Foods, Inc.

237.    Defendant Tyson Sales And Distribution, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.

238.    Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc. and Tyson Poultry, Inc. are collectively referred to as "Tyson" in this Complaint. Tyson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity,

and data for its complexes in Virginia, Pennsylvania, North Carolina, Georgia, Alabama, Mississippi, Texas, Arkansas, Missouri, Indiana, Tennessee, and Kentucky. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Tyson was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. One of its plant managers served on the Georgia Dock Advisory Committee. Tyson is a Georgia Dock Defendant.

21. <u>Wayne</u>

239. Defendant Wayne Farms, LLC ("Wayne Farms") is a Delaware limited liability corporation headquartered in Oakwood, Georgia. Wayne Farms reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in North Carolina, Georgia, Alabama, Mississippi, and Arkansas. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Wayne Farms was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice president of fresh sales served on the Georgia Dock Advisory Committee. Wayne Farms is a Georgia Dock Defendant.

22. <u>Rabobank</u>

240. Defendant Utrecht-America Holdings, Inc., a Delaware corporation headquartered in New York, NY, is a commercial bank and financial services provider and the American subsidiary of the Dutch cooperative banks Cooperative Rabobank U.A. and Rabobank International Holding, B.V. Its subsidiaries include: Defendant Rabo AgriFinance LLC, a Delaware limited liability company headquartered in Saint Louis, MO, that provides financial services and insurance to agricultural producers and agribusinesses; Defendant Rabobank USA Financial Corporation, a Delaware corporation headquartered in New York, NY that is a special purpose entity formed to issue commercial paper notes; and financial services company Defendant

121

Utrecht-America Finance Co., a Delaware company headquartered in New York, NY. Collectively these Defendants are referred to herein as "Rabobank."

241.    "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including broilers companies that merged with or were acquired by the named Defendants and each named Defendant's wholly-owned or controlled subsidiaries or affiliates that sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the relevant period.  To the extent the term "Producer Defendants" is used herein, it refers to all Defendants other than Agri Stats.

242.    To the extent that subsidiaries and divisions within each Defendant's corporate family sold or distributed broilers to direct purchasers, these subsidiaries played a material role in the conspiracy alleged in this Complaint because Defendants wished to ensure that the prices paid for such broilers would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein.  Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing, and collecting monies from Plaintiff for broilers was known to and approved by their respective corporate parent named as a Defendant in this Complaint.  For the avoidance of doubt, several previously unnamed subsidiaries for Defendants are specifically identified as coconspirators below.

V.      **PRODUCER CO-CONSPIRATORS**

        A.      **Producer Co-Conspirator Allen Harim**

243.    Harim USA, Ltd. is a privately held Delaware corporation with its corporate headquarters in Seaford, Delaware.  During the relevant period, Harim USA Ltd. and/or its

predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

244. Allen Harim Foods, LLC is a privately held Delaware limited-liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland and North Carolina. Allen Harim Foods, LLC is a wholly-owned subsidiary of Harim USA Ltd. During the relevant period, Allen Harim Foods, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

245. Allen Harim Farms, LLC is a privately held Delaware limited-liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland and North Carolina. Allen Harim Farms, LLC is a wholly-owned subsidiary of Harim USA Ltd. During the relevant period, Allen Harim Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

246. Producer co-conspirators Harim USA, Ltd., Allen Harim Foods, LLC, and Allen Harim Farms, LLC are collectively referred to as "Allen Harim" in this Complaint.

247. All of the Defendants' and/or co-conspirators' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or engaged in by Defendants' or co-conspirators' various officers, agents, employees, or other representatives within the course and scope of their duties and employment, or with Defendants' or co-conspirators' actual, apparent or ostensible authority. Defendants and co-conspirators' used the instrumentalities of interstate commerce to facilitate the conspiracy, and

their conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the U.S., including in this District.

**B.** **Producer Co-Conspirator Marshall Durbin**

248. Marshall Durbin Companies and Marshall Durbin Food Corporation ("Marshall Durbin") was a poultry company headquartered in Birmingham, Alabama. Its assets included poultry processing plants in Hattiesburg, Mississippi, and Jasper, Alabama; feed mills in Haleyville, Alabama, and Waynesboro, Mississippi; hatcheries in Moulton, Alabama, and Waynesboro, Mississippi; a laboratory in Jackson, Mississippi; and a distribution center in Tarrant, Alabama.

249. On January 24, 2014, Defendant Mar-Jac Poultry Inc. ("Mar-Jac") announced that it had acquired the assets of Marshall-Durbin. Mar-Jac stated that its management team "expects a smooth transition with no disruption of operations." During the Conspiracy Period, Marshall Durbin, its predecessors, subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

250. Allen Harim and Marshall Durbin are collectively referred to as the "Producer Co-Conspirators."

**C.** **The Defendant Family Co-Conspirators**

251. Various subsidiaries and related entities of the Defendant families named herein actively participated in the conspiracy/conspiracies described in this Complaint and therefore are co-conspirators, including the following:

**1.** **Koch**

252. JCG Industries, Inc., is an Illinois corporation with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, JCG

Industries, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

253.     JCG Properties, L.L.C. is an Illinois limited-liability company with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the relevant period, JCG Properties, L.L.C. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

254.     JCG Land Holdings, LLC is an Illinois limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the relevant period, JCG Land Holdings, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

255.     JCG Foods LLC is a Delaware limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the relevant period, JCG Foods LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

256.     Koch Foods of Cumming LLC, formerly known as Greko, L.L.C., is a Georgia limited-liability company with its headquarters in Cumming, Georgia, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the relevant period, Koch Foods of Cumming LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

257.     Koch Foods of Gainesville LLC, formerly known as Gress Foods LLC, is a Georgia limited-liability company with its headquarters in Gainesville, Georgia, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the relevant period, Koch Foods of Gainesville LLC sold

broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

258.    JCG Farms of Georgia LLC is a Georgia limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the relevant period, JCG Farms of Georgia LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

259.    Koch Foods of Mississippi LLC is a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Mississippi LLC sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

260.    Koch Farms of Mississippi LLC is a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Mississippi LLC sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

261.    Koch Freezers LLC is a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the relevant period, Koch Freezers LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

262.    Koch Properties of Mississippi LLC was (presently dissolved) a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and was a wholly-owned subsidiary of Koch Foods, Inc.  During the relevant period, Koch Properties of Mississippi LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

263.    Koch Foods of Alabama LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Alabama LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

264.    Koch Farms of Alabama LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Alabama LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

265.    JCG Farms of Alabama LLC is an Alabama limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the relevant period, JCG Farms of Alabama LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

266.    Koch Foods of Ashland LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Ashland LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

267.    Koch Farms of Ashland LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Ashland LLC sold broilers in interstate commerce,

directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

268.     Koch Farms of Gadsden LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Gadsden LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

269.     Koch Foods of Gadsden LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Gadsden LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

270.     Koch Foods of Cincinnati LLC, f/k/a Preferred Foods, LLC, is an Ohio limited-liability company with its headquarters in Fairfield, Ohio, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the relevant period, Koch Foods of Cincinnati LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

271.     Koch Foods LLC, operating under the assumed names Koch Foods of Chattanooga and Koch Foods of Morristown, is a Tennessee limited-liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the relevant period, Koch Foods LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

272.     Koch Farms, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc.  During the Conspiracy Period, Koch Farms, LLC sold Broilers in interstate commerce, directly or indirectly through its wholly-owned or controlled affiliates, to purchasers in the United States.

273.     Koch Farms of Chattanooga, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Farms of Chattanooga, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

274.      Koch Foods of Chattanooga, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Foods of Chattanooga, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

275.     Koch Foods of Morristown, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Foods of Morristown, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

276.     Koch Farms of Morristown, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Farms of Morristown, LLC sold Broilers in interstate

commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

2.    Tyson

277.    Tyson Sales and Distribution, Inc. is a Delaware corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of Tyson Foods, Inc.  During the relevant period, Tyson Sales and Distribution, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

3.    Perdue

278.    Perdue Foods, Inc. (now dissolved) was a Maryland corporation with its headquarters in Salisbury, Maryland, and a wholly-owned subsidiary of Perdue Farms Inc.  During the relevant period, Perdue Foods, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

279.    Harvestland Holdings, LLC was a Maryland limited-liability company with its headquarters in Salisbury, Maryland and a wholly-owned subsidiary of Perdue Farms Inc.  During the relevant period, Harvestland Holdings, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

280.    Perdue Food Products, Inc. was a Maryland limited-liability company with its headquarters in Salisbury, Maryland and a wholly-owned subsidiary of Perdue Farms Inc.  During the relevant period, Perdue Food Products, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

281.    Perdue Farms, LLC is a Maryland limited liability company with its headquarters in Salisbury, Maryland and is wholly-owned subsidiary of Perdue Farms, Inc.  During the relevant

time period, Perdue Farms, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

282.    Perdue Farms Incorporated (now merged with Perdue Farms LLC) was a Maryland limited-liability company with its headquarters in Salisbury, Maryland and a wholly-owned subsidiary of Defendant Perdue Farms Inc.  During the relevant period, Perdue Farms Incorporated sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

### 4.    Wayne Farms

283.    WFSP Foods, LLC is a Georgia limited-liability company with its headquarters in Decatur, Alabama, and is a wholly-owned subsidiary of Defendant Wayne Farms.  During the relevant period, WFSP Foods, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

### 5.    George's

284.    George's Chicken, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia, and is a wholly-owned subsidiary of Defendant George's, Inc. During the relevant period, George's Chicken, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

285.    George's Family Farms, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia and is a wholly-owned subsidiary of Defendant George's, Inc. During the relevant period, George's Family Farms, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

286.    George's Foods, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia, and is a wholly-owned subsidiary of Defendant George's, Inc.  During the relevant period, George's Foods, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

287.    George's of Missouri, Inc. is a Missouri corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of Defendant George's, Inc.  During the relevant period, George's of Missouri, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

288.    George's Processing, Inc. is an Arkansas corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of Defendant George's, Inc.  During the relevant period, George's Processing, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

6.    Peco Foods

289.    Peco Farms of Mississippi, LLC is a Mississippi limited-liability company with its headquarters in Jackson, Mississippi and is a wholly-owned subsidiary of Defendant Peco Foods, Inc.  During the relevant period, Peco Farms of Mississippi, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

7.    Pilgrim's Pride

290.    PFS Distribution Company is a Delaware company with its headquarters in Arlington, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, PFS Distribution Company sold broilers in interstate commerce,

directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

291.    Merit Provisions, LLC is a Texas limited-liability company with its headquarters in Dallas, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, Merit Provisions, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

292.    GC Properties, LLC is a Georgia limited-liability company with its headquarters in Powder Springs, Georgia and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.  During the relevant period, GC Properties, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

293.    Pilgrim's Pride of Nevada, Inc. is a Nevada corporation with its headquarters in Greeley, Colorado and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, Pilgrim's Pride of Nevada, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

294.    PPC Marketing, Ltd. is a Texas company with its headquarters in Pittsburg, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.  During the relevant period, PPC Marketing, Ltd. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

295.    Pilgrim's Pride Corporation of West Virginia, Inc. is a West Virginia corporation with its headquarters in Greeley, Colorado and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.  During the relevant period, Pilgrim's Pride Corporation of West

Virginia, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

8.    Foster Farms

296.    Foster International Trading Company, Inc. is a corporation affiliated with Foster Farms, LLC and/or Foster Poultry Farms.  During the Conspiracy Period, Foster International Trading Company, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

297.    Napoleon Poultry Supply LLC is a Delaware limited-liability company with its headquarters in Livingston, California and is a wholly-owned subsidiary of Defendant Foster Farms, LLC.  During the relevant period, Napoleon Poultry Supply LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

9.    O.K. Foods

298.    O.K. Broiler Farms Limited Partnership was (presently dissolved) an Arkansas limited partnership with its headquarters in Fort Smith, Arkansas and is a wholly-owned subsidiary of Defendant O.K. Foods, Inc.  During the relevant period, O.K. Broiler Farms Limited Partnership sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

10.    House of Raeford

299.    House of Raeford Farms of Louisiana, L.L.C. is a Louisiana limited-liability company with its headquarters in Shreveport, Louisiana and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc.  During the relevant period, House of Raeford Farms of

Louisiana, L.L.C. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

300.    Johnson Breeders, Inc. is a North Carolina corporation with its headquarters in Rose Hill, North Carolina and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, Johnson Breeders, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

301.    Columbia Farms of Georgia, Inc. is a South Carolina corporation with its headquarters in Batesburgh-Leesville, South Carolina and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, Columbia Farms of Georgia, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

302.    Raeford Farms of Louisiana, L.L.C. is a Louisiana limited-liability company with its headquarters in Arcadia, Louisiana and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, Raeford Farms of Louisiana, L.L.C. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

303.    Columbia Farms, Inc. is a South Carolina corporation with its headquarters in Columbia, South Carolina and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, Columbia Farms, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

11. <u>Keystone Foods</u>

304. Keystone Foods Corporation was (now consolidated) a subsidiary of Keystone Foods, LLC and Marfrig Alimentos, S.A., a Brazilian company. During the relevant time period, Keystone Foods Corporation and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

## VI. <u>NON-PRODUCER CO-CONSPIRATORS TIP TOP POULTRY, INC. AND SOUTHERN HENS, INC.</u>

305. Non-Producer Co-Conspirator Tip Top Poultry, Inc, ("Tip Top") is a Georgia corporation headquartered in Marietta, Georgia and with facilities in other states, including Oklahoma. As alleged below, Tip Top played an active and important role in facilitating and implementing the production-restriction mechanism of the conspiracy detailed in this Consolidated Complaint.

306. Non-Producer Co-Conspirator Southern Hens, Inc. ("Southern Hens") is a Mississippi corporation headquartered in Moselle, Mississippi. As alleged below, Southern Hens played an active and important role in facilitating and implementing the production-restriction mechanism of the conspiracy detailed in this Consolidated Complaint.

307. Various other persons, firms, and corporations not named as Defendants have performed acts and made statements in furtherance of the Conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as Defendants in this Complaint. Throughout this Complaint, the Producer Co-Conspirators, the Defendant family co-conspirators, and the Non-Producer Co-Conspirators identified above, and the other persons, firms, and corporations not named as Defendants that performed acts and made statements in furtherance of the conspiracy are collectively referred to as "Co-Conspirators."

308.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

309.    Each of the Defendants acted as the agent of or joint-venturer for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

310.    The Defendants named in each underlying DAP complaint are jointly and severally liable for the acts of all Defendants and  Co-Conspirators named in that DAP complaint.

## VII.    **JURISDICTION AND VENUE**

311.    The Court has subject-matter jurisdiction of the various federal and state claims under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. §§ 15, 26.  This Court has supplemental jurisdiction over the state causes of action asserted herein pursuant to 28 U.S.C. § 1367 because those causes of action arise from the same set of operative facts as the federal causes of action.

312.    Venue is proper in this District under 15 U.S.C. § 15(a), 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) because during the relevant period, Defendants resided, transacted business, were found, or had agents in this District, and because a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District.  In addition, Defendants have already submitted to the jurisdiction and venue of this Court.

313.    Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 734 Ill. Comp. Stat. 5/2-209 because each Defendant has transacted business in this state and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.

314.     This Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy throughout the U.S., including in this District.  The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District.

315.     This Court also has personal jurisdiction over the Defendants because each of them knew, or should have known, that because the Georgia Dock index price was used to price chicken bought in Illinois and nationwide, their participation in the collusive manipulation of the Georgia Dock would have effects on the price of chicken purchased in Illinois based on the Georgia Dock benchmark.  The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business in the state of Illinois.

## VIII.   <u>TRADE AND COMMERCE</u>

316.     According to a 2012 report by Focus Management Group, chicken "is a commodity product with little or no product differentiation based on the processors," and the CEO of Defendant Pilgrim's Pride recently commented that "the chicken business *per se* is a commodity business."

317.     The commodity nature of chicken is evidenced by the fact that, as detailed below, numerous Defendants have during the relevant period purchased chicken from each other (then likely resold it) to buttress their conspiracy by soaking up excess supply in the market.

318.     Typically, when a product is characterized as a commodity, competition is based principally on price, as opposed to other attributes, such as product quality or customer service.

319.    Chicken producers pay USDA graders to examine their chickens, and almost all companies sell USDA Grade A chicken, meaning that there is very little differentiation amongst sellers.

320.    Due to the lack of product differentiation, Defendants compete on price (absent collusion) such that the supply decisions of each chicken producer impact the market price for chickens. While an individual producer often has the incentive to increase production to maximize profits, any increased production will ultimately reduce the profitability of the industry as a whole. Thus, the commodity nature of the product in the chicken industry makes it attractive to implement a price-fixing scheme and provides industry players with the incentive to agree to reduce overall supply.

321.    The United States chicken market is a national market, valued at nearly $41 billion in 2016. According to the U.S. Poultry & Egg Association, the value of wholesale U.S. Broilers produced in 2014 was $32.7 billion, up 6 percent from 2013. The market value varied between $21.8 and $30.7 billion from 2008-2013.

322.    During the relevant period, Defendants collectively controlled nearly 90% of the market for chicken in the United States.

323.    The chicken industry is almost entirely vertically integrated, with producers (sometimes known as "integrators") owning, or tightly controlling, each of the six stages of the supply chain: breeding, hatching, chick-rearing/feeding, slaughtering mature birds, processing, and selling.

324.    At the top of the supply chain are Defendants' "breeder flocks," which include the hens that lay the eggs that, when hatched, become chickens slaughtered for meat consumption.

325.     The prices for Plaintiffs' chicken purchases during the relevant period were based in part on prices published by one of three entities: Urner Barry, the Georgia Department of Agriculture (the "Georgia Dock"), and the United States Department of Agriculture (the "USDA Composite").

326.     The Georgia Dock, USDA Composite, and Urner Barry indices all measure the same (or very similar) size and grade of chicken.

327.     The USDA's publicly available Composite index collects and publishes chicken price information on a weekly basis.

328.     Urner Barry collects and publishes daily price information for chicken. This information is subscription-based, and all chicken producers and many chicken purchasers subscribe for a fee.

329.     The USDA and Urner Barry chicken price indices are purportedly based upon a system of double verification, which includes telephonic and written surveys of all or nearly all chicken producers. The Georgia Dock index was based on a materially different methodology discussed in more detail below.

330.     Published chicken prices from Urner Barry, Georgia Dock, and USDA relate to the spot market for chicken (a spot market purchase is a non-recurring purchase for immediate delivery). Defendants also used the prices for chicken on the spot market, especially as reported by Georgia Dock, to negotiate prices for their contract purchasers.

331.     As a consequence of the inelasticity of supply and demand in the chicken industry and the availability of the spot market price indices, public price announcements by Defendants were unnecessary. Defendants knew and intended that a decrease in supply pursuant to their

agreement would increase chicken spot market prices or maintain them at artificially inflated non-competitive levels, and therefore that all chicken prices would increase or be artificially high.

332.     During the relevant period, Defendants produced, sold, and shipped chicken in a continuous and uninterrupted flow of interstate commerce.  The conduct of the Defendants as alleged herein, including the conspiracy in which Defendants participated, was intended to have and had a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce in this District.

333.     During the relevant period, each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy.

334.     During the time period relevant to Plaintiffs' claims, Plaintiffs and/or their assignors, directly purchased chicken in the United States from one or more Defendants and/or their Co-Conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.  Plaintiffs are "persons" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.

## IX.     FACTUAL ALLEGATIONS REGARDING DEFENDANTS' UNLAWFUL CONSPIRACY

335.     Defendants used multiple means to sustain the conspiracy/conspiracies described in this Complaint.  Defendants engaged in a series of supply reductions at the start of the distribution chain.  Defendants coordinated their strategy for achieving their desired anti-competitive ends by exchanging confidential and commercially sensitive information regarding production, capacity, and pricing of broilers.  As part of this strategy, Defendants exchanged information regarding anticipated future production through Agri Stats.  Defendants also manipulated the Georgia Dock price index.  In furtherance of their conspiracy, Defendants also conspired to submit artificially high bids to purchasers in an effort to drive up prices, and in turn,

Defendants' profits. And Defendants engaged in pricing communications targeting specific customers.

336. In the year preceding the beginning of Defendants' conspiracy, the U.S. chicken market was foundering.

337. In 2007, a glut of chicken – the result of significant overproduction by Sanderson Farms, Mountaire Farms, and House of Raeford – began to flood the market, and prices cratered.

338. In 2007, Pilgrim's, Tyson, and a few other chicken producers (Foster, Peco, and Perdue) attempted to cut their production levels enough to cause industry prices to rise.

339. However, despite Pilgrim's and Tyson's combined 40% market share, their production cuts in 2007 were not enough to increase prices through supply cuts because other broiler companies increased their production.

340. Production cuts in 2007 followed the typical pattern of focusing on short-term reductions in production – such as slaughtering chickens early. Defendants did not, however, make significant cuts at the top of the supply chain – such as by culling of breeder flocks – which would have had longer-term effects on supply.

341. By the time the Great Recession hit the American economy in 2008, the oversupply and low prices of chickens put Defendants – individually and collectively – in dire financial straits. In 2008, the first year of the Great Recession, Defendants faced what promised to be a historically bad year for the chicken industry. As a result, Defendants agreed to depart from the previous industry practice of short-term or medium-term production cuts, which had led to the destructive boom-and-bust cycles that plagued chicken producers for years.

342. Instead, in early 2008, through press releases, earnings and investor calls, at investment bank conferences, at events hosted by Agri Stats, through communications both direct

and facilitated by third parties, and at the myriad trade association meetings attended by many of their senior-most executives, Defendants began implementing the conspiracy. Among other acts in furtherance of the conspiracy, Defendants called on one another to heed the mistakes of the past, preaching to one another that oversupply was decimating industry profits, and that increased supply-side "discipline" was needed to halt the downward trajectory of chicken prices.

343. Defendants collectively agreed to the reduction or relative stabilization of industry capacity, particularly at the breeder flock level, where such efforts would be most effective – as a mechanism to increase Defendants' profits.

344. Defendants' efforts were supported by public statements made by their executives, which involved more than an announcement of a Defendant's own conduct. As alleged below, many of Defendants' executives' calls for a new era of "discipline" included explicit statements that signaled deeper production cuts were an industry-wide imperative that would pay dividends for "the industry" as a whole.

345. Defendants, who collectively control nearly 90% of the U.S. chicken market, jointly engaged in this not-easily-reversed production reduction effort.

346. While spearheaded primarily by the CEOs and senior personnel of Defendants Tysons and Pilgrim's – which, as publicly held entities holding sizable but by no means controlling) shares of the U.S. chicken market, were well-positioned to rally the entire industry – Defendants' executives' public discussion of industry conditions was not limited to the larger, publicly held Defendants.

347. For example, Mike Welch, CEO of Defendant Harrison, was (along with Sanderson COO, Lampkin Butts) a panelist at a symposium hosted by industry journal WATT PoultryUSA, where the discussion topics included industry consolidation, efficiency, and bird size, with

references to information gleaned from Agri Stats (whose vice president, Mike Donohue, was in the audience).[7]

### A.   Production Cutting

1.   In an Early Phase of their Conspiracy, Defendants Departed from Their Historical Practice by Collectively Reducing Breeder Flocks in Unprecedented Amounts

348.   In 2008, and throughout the relevant period, the vertically integrated Defendants had the ability to manipulate supply to the chicken market at one or more stages of the supply chain.

349.   Beginning in early 2008, Defendants began utilizing this ability by making significant production cuts, including unprecedented cuts in their breeder flocks.

350.   Defendants knew they could effectively manipulate supply by reducing the size of breeder flocks, and retiring or killing breeders at an earlier age than the optimum age.

351.   By design, reducing breeder flocks would have significant, and long-lasting, effect on supply of chickens in the market more so than reducing supply down the chain.

352.   Because breeder flocks are created from a limited pool of so-called "grandparent" chickens from one of only three genetics companies (Aviagen, Hubbard, and Tyson's Cobb-Vantress), it takes substantial time – anywhere from six to eighteen months or more – to re-populate a breeder flock that has been reduced through early culling.

353.   While Defendants continued to use their historic methods to affect their supply-reduction scheme (at the middle or end of the supply chain, such as by reducing eggs placements,

---

7   Excerpts of comments made by Messrs. Welch and Butts are publicly available on WATT PoultryUSA's YouTube channel. *See* "Broiler company executives say bird size increase will continue," available at https://www.youtube.com/watch?v= ZBgEecBi7D4 and "Lampkin   Butts   describes   changes   in   the   poultry   industry,"   available   at https://www.youtube.com/watch?v=RN1IAphbQXs&t=53s  (both last visited July 23, 2020).

killing newly hatched chicks, or idling processing plants), their conspiracy was cemented by the long-term effects of breeder flock reductions that could not be easily reversed by Defendants.

354.    Defendants' calculated decisions to create long-term reductions are clear indicators of a collusive agreement because it would not be in an individual Defendant's economic self-interest to undertake the significant risk of reducing its own long-term production capacity unless it was known that competitors would undertake similar dramatic and long-term cuts to production capacity.

355.    Defendants' collective output-restriction caused a significant, not-easily-reversed, slowing in overall chicken production during the conspiracy – bucking the historic trend of steady annual production increases.

356.    The overall effect of this mechanism of Defendants' conspiracy is shown in the graph below, drawn from USDA data,[8] showing that while chicken production grew a total of 21% from 2000 to 2008 (an average of 2.3% per year, proof that the "3% more broilers" quip is more than anecdotal), it then slowed to a total of roughly 10% from 2008 through 2016 (an average of slightly more than 1% per year) – a significant decrease in the pace, timing and manner of chicken production during the relevant period:

---

[8]    NASS, Chickens, Young, Slaughter, FI, Certified, Chilled & Frozen – Production, Measured in LB, available at https://quickstats.nass.usda.gov/results/C33961EC-6D46-31DE-8CCB- 89780E3D1620 (last visited July 23, 2020).



### 2. Defendants' Executives Publicly Decried the Effect of Oversupply on "Our Industry," Telling their Competitors that Unified Action Was Necessary

357.     On January 23-25, 2008, numerous employees of Defendants, including many of Defendants' senior executives, attended the International Poultry Expo conference in Atlanta.

358.     According to the trade association organizing the annual multi-day event, attendees represented companies responsible for over 99.4% of the production of chicken.

359.     On a January 28, 2008 earnings call, Tyson CEO Richard Bond – who in the same call, disclosed that the company had re-joined Agri Stats and had "just recently ... got our first series of data" – stated that "we have no choice [but] to raise prices substantially."

360.     However, the commodity nature of chickens does not allow one producer to successfully raise market prices in the absence of widespread reductions in supply relative to the then-current demand.

361.    Mr. Bond's comment therefore made no economic sense absent an intention or knowledge on his part that Defendants would coordinate an industry-wide reduction in supply that could not be easily reversed.

362.    The day after Tyson's statements confirming its renewed participation in Agri Stats and expressing its plans to increase prices, Pilgrim's told its competitors to reduce their production of chickens to allow prices to recover.

363.    On a January 29, 2008 earnings call, Pilgrim's CFO Rick Cogdill communicated that the industry's oversupply of chickens was hurting market prices.

364.    Mr. Cogdill explained that Pilgrim's had done its part in 2007 by reducing production 5%, so "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."

365.    Mr. Cogdill went on to explain that Pilgrim's alone could not reduce supply enough to help market prices recover, and that its past efforts to reduce supply had merely led to smaller players increasing their market share at Pilgrim's expense.

366.    Mr. Cogdill noted that "we have walked away from sales in certain cases, where the pricing just did not make any sense.  So we are trying to hold the line.  We are losing at times the competitive bids ...  So we are trying to take a leadership position from a pricing perspective."

367.    He then made the following statements urging Pilgrim's competitors to do their part in reducing chicken industry supply: "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs.  We were the leader in cutting production last year to help drive that … [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price."

368.    When asked by an analyst "do you have an estimate internally of what the state of oversupply in the industry might be?  What you would hope to see cut from others that would make you feel like the industry was more rational?"  Cogdill replied "It's really hard to say that the faster we get to production adjustment the quicker the recovery could happen….  And if the industry doesn't react soon enough it will have to react stronger in the end."

369.    Cogdill also responded to an analyst's query about the industry's failure to follow Tyson's 2007 cuts by stating that, "I think you kind of hit on it there….  It's not like we had 5% of surplus capacity that we could just reduce our operations and not feel that….  I mean we cannot be the ones that are out there continually reducing production, and let the other producers capitalize on that.  I mean if it's 5% last year, 5% this year, 5% next year, you can see that that's a spiral to the demise of our company, which we are not willing to accept."

370.    On a January 31, 2008, earnings call, Sanderson Farms CEO Joe Sanderson explained that he, too, anticipated the industry would act in concert to cut production.

371.    Asked about production cuts by an analyst, Mr. Sanderson replied "we could see some reductions in production."

372.    Asked to expand on his comments by another analyst, Mr. Sanderson said he thought a production cut was "probable," and "if it's bad and ugly and deep in February, March, April, you'll see the production cuts take place during that period of time." He added, "[t]here's still 25% of the industry still making money but I would expect to see those reductions come over the next 90 to 120 days."

373.    Defendants also communicated privately. ███████████████████
███████████████████████████████████████████
███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████

### B. Defendants Begin to Cut Production in Concert

374.    Around March 4, 2008, senior executives from Defendants, including Pilgrim's CEO Clint Rivers, Tyson Senior VP Donnie Smith, Case Foods CEO Tom Shelton, Amick President and CEO Ben Harrison, and Fieldale Farms President Thomas Hensley, met in Washington, D.C., at an Executive Committee meeting of the National Chicken Council's Board of Directors.

375.    Shortly after that trade association meeting, Pilgrim's again sounded the call to cut overall industry supply, and it proceeded with production cuts.

376.    On March 12, 2008, Pilgrim's CEO Clint Rivers publicly announced the closure of seven chicken facilities in order to reduce industry oversupply, stating "we believe [these] actions … are absolutely necessary to help bring supply and demand into better balance….  That portion of the demand for our products that exists solely at pricing levels below the cost of production is no longer a demand that this industry can continue to supply."  (emphasis added)

377.    Under competitive conditions, other chicken producers would typically respond to Pilgrim's substantial supply cuts by increasing their production.  Yet just the opposite occurred.

378.    Following the Pilgrim's announcement, a series of production cuts were publicly announced by other Defendants between April 3 and April 11, 2008:

379.    On April 3, 2008, Fieldale Farms announced a 5% production cut, stating that "We're hoping this cut puts supply and demand back into better balance."

380.    Fieldale Farms is not a publicly traded company, and there was no reason – other than signaling to its fellow producers that it was following through on its conspiratorial agreement – why it would publicly disclose its production plans.

381.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

382.    On April 9, 2008, Simmons announced in a press release a 6% reduction in production throughout its processing plants, a move heralded by Wall Street analysts, who noted that production cuts across smaller companies in the chicken industry, like Simmons, would be positive for chicken prices.

383.    Simmons is not a publicly traded company, and there was no reason – other than signaling to its fellow producers that it was following through on its conspiratorial agreement – why it would publicly disclose its production plans.

384.    On April 10, 2008, Cagle's Inc. (later acquired by Koch Foods) announced in a press release a 4% reduction in processing of chickens, noting that the cut "will reduce product being sold through less profitable commodity outlets."

385.    On April 3-11, 2008, Wayne Farms, O.K. Foods, and Koch Foods each announced 2-8% reductions in production.

386.    Neither Wayne, nor O.K. Foods, nor Koch is publicly-traded, and there was no reason – other than signaling to their fellow producers that they were following through on their conspiratorial agreements – why they would publicly disclose their production plans.

387.    Several other chicken producers cut their production between April 1, 2008 and May 15, 2008 but did not publicly announce the cuts.

388.   Because of Agri Stats, there was no need to make a public announcement.

389.   For example, at the BMO Capital Markets Agriculture & Protein Conference presentation on May 15, 2008 at the Millennium Broadway Hotel in New York City, Sanderson Farms CEO Joe Sanderson stated – in the presence of several competitors attending the conference, including Pilgrim's CEO Clint Rivers and CFO Richard Cogdill and Tyson CEO Richard Bond – that "we have seen for the last 6 or 7 weeks … some companies in our industry announce cutbacks. There have been I think six companies have announced cutbacks. *I know some companies have cut back and have not announced*." (emphasis added)

390.   Such knowledge of non-public production cuts by competitors is highly suggestive of communication among chicken companies, either secret direct communications among themselves, or using Agri Stats as a facilitator, or both.

391.   After seeing many of its competitors abide by capacity reductions between April 3-11, on April 11, 2008, Pilgrim's realized that other Defendants were contributing to a widespread reduction in industry supply and decided it could now take further steps to reduce supply.

392.   On April 11, 2008, Pilgrim's suggested it might close its large El Dorado, Arkansas processing plant, which employed 1,620 workers.

393.   Then, on April 14, 2008, it announced a further production cut of 5% of egg sets.

394.   On April 29, 2008, Tyson CEO Dick Bond told a Wall Street analyst, "I think the industry has changed … I don't think the industry will be up [in production] that much anymore, we have seen some sizable declines here lately in egg sets and placements. So, we're going to be up a little bit but probably not a significant amount, not as much as we might have once anticipated."

395.    Despite the large number of coordinated production cuts announced by producers in April 2008, Pilgrim's CEO, Clint Rivers, encouraged further action by other chicken producers to curtail supply.

396.    Clint Rivers encouraged further industry-wide cuts at a May 15, 2008 speech at the BMO Capital Markets conference at the Millennium Broadway Hotel.  According to an industry publication, Rivers announced that he hoped to see the chicken industry continue to cut production to help the industry return to profitability, stating that "he would like the industry to trim total production by 3%-4%, calling it a prudent move in light of recent price volatility in the grain markets."  He also noted that "[t]he cuts need to be fairly deep."

397.    This conference was attended by Tyson CEO Richard Bond, and it is the same conference where Sanderson Farms CEO Joe Sanderson disclosed his knowledge of non-public, unannounced production cuts by competitors.  The conference was also attended by Pilgrim's CFO Richard Cogdill.

398.    A June 2008 Agri-Stats report noted that "[b]eginning in April [2008], the weekly hatchery data started to show declines in egg sets and chick placements relative to year-earlier, which confirms the announced intentions to reduce broiler production and will result in slaughter falling below year-ago by mid-June."  The same report also noted that "[i]t is unclear how long the slaughter declines will continue, and if other companies will choose to cut production as well making them deeper than initially thought.  Those who have announced cutbacks indicate they will continue until margins normalize.  At this time we expect to see the declines continue until at least late 2009, and cuts could be deeper than now projected."

399.    A May 21, 2008, *Wall Street Journal* article noted that conditions in the industry were starting to change: "Three things are making analysts more optimistic: Companies are cutting

production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines." The article also noted "[i]t is unusual for egg sets to decline at this time of year."

400. The reason such a reduction was unusual in May is that egg sets result in chickens that are ready for market approximately 10 weeks later, which in this case would have been first week of August – still the peak of the high-demand summer grilling season.

401. During an earnings call on May 22, 2008, Sanderson Farms CEO Joe Sanderson was asked if he thought industry cuts were sufficient to keep the industry profitable in the autumn. Sanderson responded: "[w]e don't know yet. We will make a cut as we always do after Labor Day. We will make a 4-5% cut following Labor Day as we always do going into Thanksgiving, Christmas, and January [and] we reduce our egg sets and around Thanksgiving, Christmas, New Years and Martin Luther King. That is a period of slow demand for us, and we don't announce that, but we always do it. It is just a period when we take downdays and we will do that. But if we think more is needed, we will evaluate that sometime in August, and if need be will do it. We cut back in 2006, we cut back in '97-98. I don't know if we announced it or not, but we will do what we need to do." Mr. Sanderson provided no explanation why Sanderson Farms chose to publicly disclose its "regular" production cut if it had never done so in the past. The reason was obvious – to signal the other Defendants to follow suit. In early June 2008, Pilgrim's CEO Clint Rivers noted in a June 4, 2008, presentation that "[o]ur supply in chicken, we are oversupply … we need to see some balance in the supply…. Simply put, at this time there is still too much breast meat available to drive market pricing significantly higher."

402. Other Defendant CEOs soon picked up on Rivers' call for further action. On June 19, 2008, chicken industry executives participated in a media conference call intended to lobby

the federal government to limit the ethanol mandate, a federal program requiring the production of corn-based ethanol, which Defendants claimed drove up their corn costs by lessening the amount of corn they could buy to feed their chickens. According to one report, Mark Hickman, Chairman of the National Chicken Council and CEO of Peco Foods, told participants that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year" and that "we are hearing talk that this was not nearly enough, so liquidation is in round two." This statement referred to the need for Defendants to reduce chicken breeder flocks to affect longer-term supply restraint in the industry, rather than the short-term production cuts like breaking eggs or slaughtering chickens earlier to reduce weight.

403.    On June 23, 2008, shortly after Peco Foods' CEO publicly suggested that further production cuts were needed, Wayne Farms announced a 6% production cut. Wayne Farms President & CEO Elton Maddox said in a statement that "[s]oaring feed ingredient costs aggravated by the government's food for fuel mandate has created the need for us to rationalize our business." Like many other executives, Maddox cited ethanol subsidies as the reason for the production cuts. Wayne Farms' announcement came only three days after Agri Stats suggested further cuts were needed and four days after Peco Foods CEO Hickman suggested further cuts were needed.

404.    On June 23-25, 2008, the industry organization USPOULTRY held its annual Financial Management Seminar. Defendants' senior executives attended the seminar.

405.    On July 2, 2008, Foster Farms announced it was abandoning plans to build a new chicken plant in northeastern Colorado that it had previously announced in April 2008 would employ about 1,000 people.

406.     In a statement, Foster Farms CEO, Don Jackson, noted "[i]n these difficult conditions with costs escalating primarily due to grain and fuel prices and chicken prices lagging it does not make economic sense to go forward with expansion at this time."

407.     Mr. Jackson's purported justifications for decreasing production capabilities were pretextual.

408.     On July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets, citing "record high prices for corn and soybean meal, which it attributes to the U.S. government's mandated ethanol policies along with recent flooding in the Midwest 'Corn Belt' region."

409.     O.K. Foods' purported justifications for decreasing production were pretextual.

410.     On July 20-22, 2008, the National Chicken Council held a three-day "Chicken Marketing Seminar" attended by Defendants' senior executives.  The event was billed as a marketing seminar that "includes social networking events and recreational opportunities, including a golf tournament."

411.     On August 11, 2008, Pilgrim's announced the closure of its Clinton, Arkansas, processing plant and a facility in Bossier City, Louisiana.  Pilgrim's press release noted the closures "are part of the company's ongoing effort to operate more efficiently and return to profitability amid high feed costs and an oversupply of chicken on the market."

412.     The closure of the Clinton processing plant represented an additional 1.25% incremental increase of the company's previously announced production cuts.

413.     Pilgrim's stated that it would keep both plants idled until "industry margins can be sustained at more normalized levels of profitability."  Pilgrim's also noted that "[w]ith Labor Day approaching and no indication that the actions taken to date by Pilgrim's Pride or other industry

members are having a positive effect on selling prices for our products, it is now clear that more significant decisive action is necessary."

414.    In August 2008, Raeford (a non-public company) announced publicly, as reported by newspaper *The Charlotte Observer*, that it would begin reducing its chicken production by 5 percent.  The company said in a statement to industry publication WATT PoultryUSA that "[t]he current obstacles that face our industry require that supply be brought in line with demand."

415.    A production cutback was remarkable for Raeford, which had pursued a strategy of aggressive production growth that resulted in the company doubling its chicken production from 2001 to 2007.

416.    ██████████████████████████████████████████

417.    On an August 26, 2008, earnings call, Sanderson Farms CEO Joe Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand."  When asked later whether the industry had already made enough production cuts, he noted "we kind of thought we were going to see reductions in July ... [based on] 213/214 [million] egg sets back in April and that really did not materialize.  When you look at USDA slaughter numbers in July, they were 100% and 101% and now we're looking at egg sets of 206 and 207 million that are going to show up sometime in October or November.  We'll see when we get there.  Those are barely impressive cuts.  My suspicion is, as I've told you in May, the industry typically make the cut [sic] and it's tentative.  We'll have to see if it works…. I'm very skeptical that those cuts are going to be enough to return us margins to cover these grain costs."

418.    By September 2008, chicken industry publication WATT PoultryUSA reported that "[m]ost U.S. chicken integrators ha[d] announced plans to close small operations, consolidate

complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'"

419.    On October 3, 2008, Defendants' senior executives attended the National Chicken Council's Annual Meeting in Washington, D.C.  Agri Stats CEO, Blair Snyder – elected the day before as a "director-at-large" to the National Chicken Council's board – moderated a CEO panel that included the CEOs of Pilgrim's, Tyson, Perdue and Sanderson Farms.  Explaining Pilgrim's desire to push through an industry-wide price increase, Pilgrim's CEO Clint Rivers told panel members and the audience "[w]e need to get those [input] costs pushed through, but we've yet to see that happen."

420.    On October 10, 2008, in response to a USDA report of falling egg sets in the chicken industry, Pilgrim's told the Associated Press that "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

421.    Indeed, an industry analyst noted that at the time "the industry has cut about 10 to 12 percent of its production."

422.    During Fall 2008, Sanderson Farms also implemented its previously announced "fall cuts" a month early and delayed the opening of a new deboning facility.

423.    On October 18, 2008, Wayne Farms President & CEO Elton Maddox released a statement (even though Wayne Farms was not a publicly traded company) announcing the closure of the company's College Park, Georgia plant, resulting in the layoff of over 600 employees.

424.    Maddox cited "changing market conditions" and a need to "maximize efficiencies" as justification for the plant closure.

425. On a November 10, 2008 earnings call, Tyson CEO Richard Bond claimed that Tyson would not be making additional production cuts because it had already done its part to reduce industry supply with prior production cuts, citing the company's focus on "supply and demand."

426. Despite Tyson's representations to the contrary, Tyson, in fact, substantially reduced production in December 2008.

427. First, on December 18, 2008, Tyson announced the canceling of a deboning contract with Petit Jean Poultry at Petit's Little Rock, Arkansas processing plant that resulted in the layoff of 700 Petit employees.

428. Second, by December 23, 2008, it was reported that Tyson had cut its production by 5%.

429. Asked by a reporter about the cuts, Tyson spokesman Gary Mickelson stated that "[w]hile we would rather not share details of our current poultry production levels, we can tell you we continue to closely evaluate market conditions in an effort to match customer demand with our supply." Tyson also noted that it had reduced production "in recent years through the closing or sale of poultry plants and by running the company's remaining operations at reduced capacity utilization."

430. During this time period, Defendants also utilized Urner Barry as a conduit for the sharing of information and ensuring compliance with the production cuts. ███████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████

431.    As further detailed below, these numerous collusive communications between O'Shaughnessy at Urner Barry and the Defendants furthered the conspiracy to limit output and resulted in higher prices than would have existed in the absence of such efforts.  And prices reflected in the indexes published by Urner Barry itself were also therefore necessarily inflated as a result of the conspiracy.  Both O'Shaughnessy and the Defendants knew that these inflated prices were the logical – and intended – result of their efforts to further the output limitation conspiracy.

432.    On January 28-30, 2009, Defendants' senior executives attended the 2009 International Poultry Expo in Atlanta, Georgia.

433.    In a February 18, 2009, interview, Tyson Senior Group Vice President Donnie Smith noted that "[a]cross our industry, we're down about six percent versus where we were a year ago.  We're seeing an impact from that on market prices … the industry fundamentals are improving."

434.    In late February 2009, a report noted that Pilgrim's had cut another 9-10% of its production.

435.    According to the same report, Tyson told the audience at a February 2009 investors' conference that it did not intend to reduce its production further because "[u]sing WATT PoultryUSA data on ready-to-cook (RTC) pounds, our numbers have declined 5-7% from 2000 to 2008 on RTC pounds while at the same time the industry has grown 31%.  Over time, we have done plenty of cutting back."  In other words, Tyson felt it had already taken its fair share of needed production cuts, so competitors needed to take any further action.

436.    Tyson communicated that it felt it had already perilously led the industry on production cuts and was confident that competitors would support through significant cuts of their own.  However, as indicated below, Tyson's statements about not reducing production appear to

be posturing, because generally Tyson did reduce production during the 2008-2015 time period in line with other producers.

437. By February 25, 2009, Sanderson Farms told *The Morning News* of Northwest Arkansas that it had made cuts to its supply of chickens by processing smaller chickens and running its plants at lower capacity utilization rates. Sanderson Farms also told a group of investors around this time that "[b]ecause we don't expect much help from the demand side, chicken market improvement will have to come from supply cuts."

438. Similarly, the CEO of Simmons Foods (a private company), Todd Simmons, noted in a February 25, 2009, interview that "[w]e are seeing lower demand in the food-service customer base. We have made adjustments in bird weights to ensure our production meets with our customer's needs."

439. Seeing further cuts from smaller producers in the industry led Pilgrim's to announce historically large cuts to its production on February 27, 2009.

440. In a press release announcing the closure of three processing plants located in Douglas, Georgia, El Dorado, Arkansas, and Farmerville, Louisiana, Pilgrim's stated the plants were "underperforming" and said the closures would "improve the company's product mix by reducing commodity production and to significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession." Pilgrim's also stated that the idling of these three plants would reduce its total pounds of chickens produced by 9-10%.

441. Overall, "[a]t least 11 companies reported reductions in weekly ready-to-cook production in 2008," including Defendants Tyson, Pilgrim's, Perdue, Simmons, Raeford, Cagle's

(later bought by Koch Foods), George's, O.K. Foods, Harrison, and GNP Company (now owned by Pilgrim's).

442.     Other companies reduced their planned production levels or delayed the planned opening of new chicken complexes.

443.     During 2009, Defendants also exchanged and agreed upon specific prices to charge common customers.

### C.     Defendants' First Round of Chicken Production Cuts Included Unprecedented Reductions to Chicken Breeder Flocks

444.     As noted above, in 2008, Defendants ended a decades-long trend of annual additional chicken production, surprising industry observers.

445.     What made the production cuts in 2008 and early 2009 particularly remarkable is that chicken producers did not just reduce the pounds of chickens they produced – they also went further up their supply chains than ever before to restrict their ability to ramp up production for years into the future.

446.     While previous downturns had led some producers to use short-term methods to reduce overall pounds of chickens supplied to the market, in 2008, Defendants took their reductions to the next level by substantially reducing their breeder flocks in ways that were not easily reversed and would result in a commitment to longer-term reductions, as shown in the highlighted section of the graph below:



447.    The effect of the supply cuts on chicken pricing in 2008 and the first months of 2009 was clear.  During the worst recession in generations, chicken prices rose through mid to late 2008, staying at or near all-time highs until late 2009.

448.    For instance, by May 28, 2009, Sanderson Farms reported strong profits that were twice the estimates of Wall Street analysts, which according to one industry publication was "aided by production cuts and lower feed costs that offset still-weak demand."

449.    Similarly, at a May 14, 2009, BMO Capital Markets conference in New York City, interim Tyson CEO Leland Tollett noted that "poultry market fundamentals had improved.  Pullet placements, an[] indication of future broiler supplies, have been down the past five months compared to the same period last year.  Egg sets continue to run six percent or more below year ago levels and cold storage inventories of poultry have declined about 20 percent since peaking in November 2008."  Pullet placement data was collected from Defendants and their Co-Conspirators by Agri Stats, and sent monthly in reports to Agri Stats subscribers, and used by the chicken industry to monitor and control future supply.

450. During 2009 and 2010, Defendants' senior executives continued to meet with one another at trade association meetings and industry events, such as the National Chicken Council and the International Poultry Expo.

451. Defendants also continued to utilize Mr. O'Shaughnessy of Urner Barry to communicate the plan to limit production. ████████████████████████████████████

████████████████████████████████

452. In another example, at the National Chicken Council's October 2009 Annual Conference, ████████████████████████████████████████

████████████████████████████ one industry analyst wrote that participants had emphasized continued "production discipline," Defendants' euphemism for limiting chicken supply.

453. However, as prices continued to rise during late 2009 and early 2010, producers started increasing production in response to the higher prices just as they had done in previous decades.

454. Because of 2008 and 2009's unprecedentedly deep and early breeder flock culls, this temporary spike in production took months to effectuate, rather than the few weeks it would have taken had producers killed off their breeder flocks at the rates and times at which they had done so in the past.

455. The rising production by producers in early 2010 led to a reported oversupply of chickens that began to depress prices by late 2010.

456. Defendants faced an incentive to revamp their conspiracy to make it more effective. Defendants had learned the value of coordinated supply reductions in 2008; they were quick to

react with a new round of production cuts in the first half of 2011. Those cuts caused prices to recover.

### D. Defendants Continued Their Conspiracy With a Second Massive Breeder Flock Cull in 2011

457. As before, Defendants communicated their efforts through Mr. O'Shaughnessy of Urner Barry. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

458. On January 24-26, 2011, Defendants' senior executives attended the International Poultry Expo in Atlanta, Georgia, including Tyson CEO Donnie Smith. The IPE featured an annual market intelligence panel with Mike Donohue from Agri Stats and industry-insider Paul Aho. According to one report, Donohue noted that "'2008 was the worst year financially for the (U.S.) broiler industry that most people have ever seen'…. The industry's response in 2008 was a 5 to 6% reduction in pounds produced. He said that the broiler industry is currently at record high weekly slaughter volumes." Aho noted "[t]his could be a very difficult year with cutbacks, rationalization, and consolidation…. The market is calling for around a 5% reduction in chicken production."

459. On a February 4, 2011, Tyson earnings call, COO James Lochner noted that "until industry supply more closely aligns with demand" Tyson's broiler business would "be challenged." Tyson CFO Dennis Leatherby also referred to a supply-demand imbalance in the chicken industry.

460. On a February 16, 2011, Cagle's (acquired by Koch) earnings call, Cagle's reportedly said it had begun a 20% reduction in production at a deboning operation in an effort to balance supply and demand. Cagle's told one publication that it was "optimistic that the industry

will exhibit the production restraint necessary to support higher pricing for Cagle's products allowing for return to profitable margins."

461.     On or around February 25, 2011, Sanderson Farms CEO, Joe Sanderson, announced on an earnings call that Sanderson would be delaying the development and construction of a second North Carolina broiler complex.

462.     On March 7, 2011, House of Raeford announced a 10% reduction in egg sets that began in early February. CEO Bob Johnson noted in an accompanying press release that "we decided that acting now was a responsible action for our company in light of continuing unstable economic conditions…. Hopefully the chicken prices will begin to increase later this year. In addition, if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."

463.     

464.     On March 15, 2011, Simmons announced it was laying off 180 workers at its Siloam Springs, Arkansas processing plant "[d]ue to economics specific to our industry, resulting from high grain prices predominantly caused by corn being used in ethanol, we have decided to realign some of our production resulting in the elimination of 180 positions as of April 15."

465.     On April 13-15, 2011, the Georgia Poultry Federation held its annual meeting at the Brasstown Valley Resort in Georgia. Defendants' senior executives attended the meeting. Among other positions that Defendants' employees were elected to at the meeting, Donnie

Wilburn (Director Live Operations, Harrison Poultry) was elected Vice Chairman of the Board of Directors and Phillip Turner (Plant Manager, Mar-Jac) was elected to the Board of Directors.

466. ████████████████████████████████████████████

████████████████████████████████████████████

████

467. On April 15, 2011, Defendant Mountaire disclosed, in a press report, the abandonment of a planned capacity increase, with Mountaire President Paul Downes explaining that "the only way to higher prices is less supply. The only way to less supply is ***chicken companies will shut down or cut back***…. I think that's what we're going to see." (emphasis added)

468. Downes' view of the state of the chicken industry was echoed, and amplified, by Joe Sanderson, CEO of Defendant Sanderson Farms, who stated on a May 24, 2011 earnings call that "the deal is that the industry – forget Sanderson – the industry cannot sustain losses like they are sustaining for a long period of time. They will – they can't do it and you have been observing this for years and years and the industry has been losing money since Novemberish and balance sheets deteriorate and losses have to stop. The only way to stop losses with $7 corn is to reduce production and get prices up. That is the rule and the law of the jungle." Sanderson continued, "***my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats.***" (emphasis added)

469. Sanderson's comments came roughly one week after he and Lampkin Butts, Sanderson's President and COO, attended the BMO Farm to Market Conference in New York City, along with the CEOs of Defendants Pilgrim's Pride (Bill Lovette) and Tyson (Donnie Smith).

470.    The conference included a presentation by Lovette that noted Pilgrim's new focus on matching production to meet demand, including by adjusting "head," *i.e.*, breeder flocks, to better balance supply and customer demand.

471.    ███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████

472.    ███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████

473.    On a June 6, 2011 earnings call announcing it would not increase capacity in the foreseeable future, Cagle's – a Georgia-based integrator whose assets were bought by Defendant Koch Foods in 2012 following Cagle's bankruptcy – said that "***the industry must lower supply*** in order to offset reduced demand and to support higher market prices."  (emphasis added)

474.    Other Defendants and Co-Conspirators, including Fieldale Farms and Mar-Jac, also began reducing production by cutting breeder flocks in the middle of 2011.

475.    Keystone Foods, like many of the Defendants, relied on Urner Barry as a conduit for information regarding the supply reduction aspect of the Defendants' conspiracy.  ██████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

████████████████████████████████████████████████████ Numerous communications such as these show how Defendants used Urner Barry to facilitate the flow of communication among them regarding production cuts.

476.    Keystone Foods also utilized Urner Barry as a conduit for sharing information regarding current broiler pricing and plant operations by other Defendants. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

477.    In approximately June 2011, Tyson pulled eggs from its incubators to reduce Broiler volumes.

478.    In June and July 2011, Defendants' senior executives attended industry events, including a seminar held by the U.S. Poultry & Egg Association and the 2011 Food Media Seminar, which included a panel made up of the CEOs of Defendants Tyson (Donnie Smith), Peco Foods (Mark Hickman), and Perdue (Jim Perdue), and Defendant Sanderson Farms' President and COO (Lampkin Butts).

479.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

480. ████████████████████████████████████████████████

481. On July 29, 2011, Pilgrim's announced the closure of its Dallas, Texas processing plant and the layoff of 1,000 employees. Pilgrim's President & CEO Bill Lovette explained that "[w]hile the decision to close a plant and eliminate jobs is always painful, we must make better use of our assets given the challenges facing our industry from record-high feed costs and an oversupply of chicken…. A key component of that effort is improving our capacity utilization through production consolidation and other operational changes. By closing the Dallas facility, we can consolidate that production volume at three other plants and help those sites run closer to full capacity."

482. On an August 1, 2011 earnings call, Sanderson Farms CEO, Joe Sanderson, informed analysts that the company's normal fall production cut of 4% beginning in November would remain in place beyond January 2012 or until such time as demand improved. Sanderson also stated that it "*wouldn't surprise me if the industry makes further, deeper reductions in egg sets in October or November*.... Nobody knows what cuts might be needed until we get to October, *but I think that the cutbacks may need to be more than the 6% in head that the industry has in place.*" (emphasis added)

483. A week later, on August 8, 2011, Tyson's CEO said on an earnings call that "domestic availability must be in balance with demand before *industry economics can improve*. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter…. Our goal is to match supply to demand. And following over-

production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market." (emphasis added)

484. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

485. On August 18, 2011, Cagle's, now a subsidiary of Koch Foods, announced it was reducing 20% of its production at its large Pine Mountain Valley, Georgia plant.

486. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████

487. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

488.     In early October 2011, Defendants' senior executives attended the National Chicken Council's 57th Annual Conference in Washington, D.C.  Among the discussion panels at the event was one about the "new paradigm" in the chicken industry.  The panel included senior executives from Defendants Perdue (Clint Rivers, by then Perdue's President of Foodservice and Supply Chain, after having been Pilgrim's CEO), Keystone (William Andersen, Senior Vice President) and Koch Foods (Mark Kaminsky, COO and CFO).  Panelists said that "the industry is accustomed to cycles, but not one quite like the latest, and ***companies are going to need to adjust***.  Discipline on the supply side was one suggestion.  Getting better prices from retailers was another."  (emphasis added)

489.     ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

490.    ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████

491.    On November 17, 2011, Wayne Farms issued a press release announcing the closure of its Decatur, Alabama plant and layoffs of 360 employees.

492.    On a November 21, 2011, earnings call, Sanderson Farms CEO, Joe Sanderson, responded to a question about a production decrease that "when we talk about the 4% number, that is what we project the industry to be.  Obviously, we're going to be a part of that."

493.    ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



494. Throughout 2012, Defendants continued to meet at trade association meetings and industry events, giving them the opportunity to discuss the impact of their collective production cuts and otherwise monitor their conspiracy.

495. In the first quarter of 2012, for example, Defendants' top executives attended the National Chicken Council's board of directors meeting in Atlanta, which was held in conjunction with the January 25-26, 2012 International Poultry and Processing Expo.

496. On March 20-21, 2012, the National Chicken Council's board of directors, which included many of Defendants' senior executives, met again in Washington, D.C.

497. In early 2012, Sanderson Farms cut its production by 4%, which included a reduction in breeder flocks.

498. At USPOULTRY's Hatchery-Breeder Clinic in January 2012 in Atlanta, Agri Stats Vice President, Mike Donohue, noted the importance of reducing breeder flocks, stating that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recover[y] in the short term by filing up incubators again." But he also noted that the Agri Stats data indicated that the industry was slaughtering breeder flocks at 59 to 60 weeks, instead of the typical 65 weeks. The kind of early slaughter of breeder flocks –

including, for example, the bird-age data included in the "Growth Rate Report" described above – meant that Defendants subsequently were unable to increase production for at least eighteen months, as they would have been able to do had they not made cuts at the top of the supply chain.

499. The shift in the way the industry supplied chicken was summarized in a March 2012 report published by agricultural lender, CoBank.

500. Entitled "The U.S. Chicken Industry: Re-invented and Revitalized" with sections captioned "'Same-Old, Same-Old' – No More" and "It's a New Ballgame," the report noted that the:

> "U.S. chicken industry has gone through the proverbial wringer, but last year appears to have been the low point. In recent years, the chicken companies have all lost money, some more than others. And five U.S. companies have exited the industry since 2008. As the losses mounted, the industry realized that its standard business practices sorely needed to be reformed. The surviving chicken companies found it to be not just prudent, but absolutely essential to revise those practices. The poultry industry today operates much differently than it did just a few years ago."

501. The CoBank report highlighted one of the reasons for this sea-change: the Defendants' reduction of breeder flocks that began in mid-2011, noting that "***the recent cuts in the hatchery flock will prevent a quick response,***" with "U.S. chicken production [...] on track to fall to its lowest level in 5 years by mid-2012." (emphasis added)

502. The highlighted section of the following graph shows that these cuts bucked the historical trend of breeder flock reductions, going even deeper than the then-unprecedented 2008-2009 cuts:



503.    The sentiment of CoBank's March 2012 report was echoed by Pilgrim's CEO, Bill Lovette, on an April 27, 2012 earnings call, where he reported that "the die is cast for 2012," and that "we're comfortable that *the industry is going to remain constrained.*"  (emphasis added)

504.    Trade association meetings and industry events in the middle of 2012 gave the Defendants additional opportunities to meet and discuss the effect of their collusive efforts to reduce production.  Examples of these opportunities to conspire included the National Chicken Council Board of Directors meeting in Washington D.C. on March 20-21, 2012; Urner Barry's annual marketing seminar, from April 29 - May 1, 2012; the National Chicken Council's board of directors meeting in Lake Tahoe on June 21, 2012; and the July 15, 2012 meeting of the National Chicken Council's marketing committee in Stowe, Vermont.  Each of these meetings were attended by a number of Defendants' senior executives.

505.    ███████████████████████████████████
███████████████████████████████████████████████
████████████

506. ██████████████████████████████████████████████

████████████████████████████████████████

507. On August 28, 2012, Sanderson Farms announced a further 2% production cut that it blamed on corn and soybean prices.

508. By September 2012, Defendants' 2011 production cuts, particularly their reduction of breeder flocks, had resulted in increased prices for Plaintiffs.

509. The higher chicken prices seen in the market by September 2012 were not justified by the costs of Defendants' primary inputs, corn and soybean meal, which by the fourth quarter of 2012, had dropped significantly in price following near-record highs in the summer of 2012.

510. On October 10-11, 2012, the National Chicken Council held its annual meeting in Washington, D.C.

511. Among Defendants' senior executives attending the meeting were the President of Fieldale Farms (Thomas Hensley) and CEO of O.K. Foods (Paul Fox).

512. Messrs. Hensley and Fox participated in an "Industry Outlook Panel" where participants discussed the question of what the industry "learn[ed] from 2011 and ***how will the industry apply those lessons in 2012 and 2013.***" (emphasis added)

513. Defendants also continued to directly communicate confidential pricing and production information to one another throughout 2013 and 2014, including, for example: ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

**E.** **Drastically-Reduced Breeder Flocks Boosted Chicken Prices and Raised Defendants' Profits to Record Levels**

514. For most of the remainder of 2012 through at least 2016, Defendants reaped the benefits of their coordinated supply restraints as prices rose and profits soared to record levels.

515. During this time, Defendants' executives repeatedly heralded the industry's newly found supply "discipline."

516. For example, on a May 3, 2013 investor call, Pilgrim's Pride CEO, Bill Lovette, touted the chicken industry's collective discipline:

> Obviously, revenue is going to be a function of price, in part, and in this case a big part; and obviously, price is going to strengthen as supply continues to be disciplined and constrained…. So I think *the industry is doing an admirable job in being disciplined on the supply side* and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying…. I believe *the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken* and not necessarily what corn or soybean meal costs. I think I'm confident to say, *we've figured that out and we're doing a good job* of balancing supply and demand. (emphasis added)

517. On the May 3, 2013 investor call, Lovette specifically referenced the continued importance of restraining the industry's breeder flocks:

> I only know what we've seen happen in the past. Now, certainly, this summer *if the industry chooses to grow the breeder supply significantly, that's definitely going to impact 2014. What I'm saying is, so far, we've seen no indication that the industry plans to grow the breeder supply and as a matter of fact, it's actually shrunk*…. I'll reiterate that I think the industry has learned that the economics of our business is tied very closely

177

to the supply of chickens and ***we've done a good job so far of maintaining discipline*** such that even paying nearly $8.50 for corn, we've been able to be profitable as an industry.  (emphasis added)

518.    On October 4, 2013, Defendants' CEOs and other senior executives met at the annual meeting of the National Chicken Council in Washington, D.C., where a panel, including the CEOs of Defendants Tyson (Donnie Smith) and Simmons Foods (Todd Simmons), was "chipper about the prospects for their industry in the next few years." ████████████████████ ████████████████████████████████████

519.    Defendants had reason to be positive.  For example, on a February 21, 2014 earnings call, Pilgrim's Pride CEO, Bill Lovette, reflected on what had led to the company's record earnings.  Lovette noted that "I think the one thing that creates … has created the stability is ***the discipline of the industry to not allow profitability in the past to drive supplies in the future*** …. And I think that discipline really … is the one ingredient that has made for more stable earnings that we have seen."  (emphasis added)

520.    At a March 12, 2014 industry conference, Tyson CEO, Donnie Smith, told attendees that a "meaningful change" in chicken production would not occur until the second half of 2015, a statement he could confidently make because Defendants' unprecedented 2011-2012 cuts in breeder flocks made it impossible for them to "meaningfully change" chicken production any sooner.

521.    ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████

522.    An October 2014 CoBank analysis noted that Defendants' strategy of targeting breeder flocks paid dividends during 2013 and 2014.  According to the report:

[P]roduct demand should remain robust through the rest of this year and well into 2015, bolstered by a gradually improving domestic economy, continued strength in export demand, and the towering prices of beef and pork. Broiler production, however, has been slow to respond, with integrators having had problems expanding the number of chicks placed for growout. Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015. Producers have been somewhat constrained in their attempts to expand the nation's chicken flock by the limited supply of broiler hatching eggs. When the broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been rebuilt to prior levels. Following seven months of [Year-over-Year ("YoY")] declines, the number of chicks placed for growout finally posted a modest 1 percent YoY gain in August. However, it will take another 6-9 months for integrators to rebuild the supply of broiler hatching eggs in preparation for expanding the overall flock, so significant growth in broiler production will not materialize until late 2015 or early 2016.

523. The October 2014 CoBank report also noted the effect of these production cuts, stating that wholesale prices for chicken "have risen to unusually high levels."

524. Defendants also continued to directly communicate confidential pricing and production information to one another throughout 2013 and 2014.





525. On October 29, 2014, Simmons Foods announced the closure of its Jay, Oklahoma spent hen processing plant. Spent hens are broiler breeders that have reached the end of their productive life cycle. The Simmons facility processed spent hens on behalf of many Defendants, providing Simmons with opportunities to monitor changes in other Defendants Broiler breeder supplies. The closure of Simmons' Jay, Oklahoma facility is indicative of the reduced broiler breeder capacity resulting from Defendants' initiatives to cut broiler breeder capacity across the industry.

526. During a February 12, 2015, earnings call, Pilgrim's President & CEO Bill Lovette summed up the restriction of supply which Defendants had implemented since 2008: "I looked at some numbers supplied by Agri Stats earlier in the week and found some interesting facts. If you go back to 2008, the industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies."

527.    ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

528.    The year 2015, like 2014, was a banner year for Defendants' profits resulting from their conspiracy.

529.    WATT PoultryUSA's March 2016 issue noted, for example, that Tyson had achieved "record earnings and sales in fiscal year 2015 ...  posting $40.6 billion in sales, including ringing up higher chicken sales.  Yet, Tyson lowered chicken production in 2015.  What's at work here?  This paradoxical performance, in part, reflects the fact that Tyson, along with other top U.S. broiler companies, is redefining its business model to achieve profitable growth."

530.    The true explanation for the 2015 performance of Tyson and its competitors, however, was the conspiracy alleged in this Complaint.

531.    This trend continued into 2016.  With the notable exception of the Georgia Dock, chicken prices declined in 2016, but significantly less than input costs.

532.    Defendants proactively maintained artificially high chicken prices and high profitability during 2016 by exercising "discipline" on the supply-restriction.

533.    For instance, during an April 2016 earnings call, an analyst noted that Pilgrim's CEO, Bill Lovette, "mentioned that you think the industry domestically has been much more disciplined than they have been in the past, I'm wondering if you could just elaborate a little bit more on what sort of drives that view and then maybe what gives you confidence that this discipline will hold."  Lovette responded, "[w]hat drives the view is the actual numbers that we see, ready to cook pounds are up about 3.1% year to date.  If you look at placements year to date,

they're up 1%, egg sets up 0.7%, hatchery utilization actually declined in Q1 to 91%. So in the phase of coming off two of the most profitable years in the industry, we're not seeing, not realizing large amount of production increases."

534. Tellingly, Pilgrim's CFO Fabio Sandri added immediately after Lovette's comments that "what drove that I believe it is that *[the] industry is more geared towards profitability rather than just market share* or field growth." (emphasis added)

535. Defendants were no longer competing with one another to gain market share by growing their companies as one would expect in a competitive market, but instead, worked collectively to increase profitability by being "disciplined" in terms of supply growth.

536. Defendants also kept up the regular use of signaling one another to perpetuate their collusion during 2016 by using the code word "discipline" to note their continued adherence to the supply-restriction dimension of their conspiracy by keeping breeder flocks low.

537. For instance, during a February 2016 earnings call, Pilgrim's CEO, Bill Lovette, noted that:

> *[T]he industry continues to be disciplined in terms of U.S. supply.* Although monthly pullet data tend to be volatile and have occasionally been at the high end of our expectations, we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits [sic] and chick placements as a positive. We believe that at least part of the reason is because *chicken producers are being disciplined* and are much quicker to react than in the past and in adjusting supply growth to the actual market conditions. (emphasis added)

538. Other CEOs also had to try to explain the marked shift in the chicken industry's profitability in recent years, after the decades-long pattern of boom and bust regarding chicken pricing and profitability.

539. Defendants again utilized Mr. O'Shaughnessy of Urner Barry to communicate the capacity at which their plants were running. ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

540.     During a February 2016 Sanderson Farms earnings call, BMO Capital Markets analyst Ken Zaslow noted the industry's history of volatility in pricing and profitability for chicken companies, questioning if there was "any changing of the industry dynamic" that had occurred. Sanderson Farms CEO Joe Sanderson replied "we might be at a capacity wall, you know?…. Since back in 2007 … there are three or four plants shuttered.… It does feel different."

541.     On an analyst call on May 26, 2016, Mr. Sanderson echoed his earlier statements about how much the industry had changed since 2007, noting that "when you go back and look and see how many eggs are being set right now and you go back and look at what the industry will [sic] set in 2007 … egg sets in 2007 were 220 million eggs a week, and we're setting 208 million, 209 million, 210 million eggs a week."

542.     Sanderson's comments about egg sets were amplified by Pilgrim's CEO Bill Lovette later that summer, stating on a July 28, 2016 analyst call that "I think what we have seen with egg sets is absolutely a testament to the discipline of our industry that we've seen in the last really two to three years."

543.     On the July 28, 2016 call, Lovette also commented on Defendants' continued restraint of breeder flock population, noting that "the breeder flock in total is only up about 0.5%" over the same time period, and ended the analyst call describing the "positive notion [we] have about the *discipline* that we continue to see exhibited by the entire industry," which "***gives us more confidence that we're going to do the right thing with respect to maintaining that discipline*** … and … gives us confidence that we're going to continue to be disciplined as an industry." (emphasis added)

544.    On an August 8, 2016 earnings call, Tyson's former CEO Donnie Smith – who was then transitioning the CEO role to Thomas Hayes, the company's former Chief Commercial Officer who became the CEO in late 2016 – stated that "our chicken business is ... it continues to do great," a comment seconded by Hayes, who said about the company's chicken business that "year-over-year, we're doing great ... all that business is very profitable to us."

**F.      Defendants Utilized Urner Barry to Assist Them Capitalize on Their Supply Reduction Efforts**

545.    Although Urner Barry prices are intended to be based on a system of double verification, which includes telephonic and written surveys of all or nearly all broiler producers, along with verification of reported prices from broiler purchasers such as brokers and customers, Defendants understood and took advantage of its susceptibility to manipulation.

546.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

547.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

548.    With knowledge of Mike O'Shaughnessy's susceptibility to influence, and his control over Urner Barry's prices, Defendants routinely, consistently, and collectively pressured Urner Barry to raise prices. ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

549. Defendants conspired together to pressure Urner Barry to raise prices. 

554. 

555.    Mike O'Shaughnessy actively and openly discussed broiler production with Defendants, to which Defendants used Urner Barry to facilitate communications among themselves.

556.

557.

558.

559.

560.

561. ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

562. ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████

563. ████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

564. ████████████████████████████████████

██████████████████████████

565.    Defendants improperly kept Urner Barry prices from falling when they should have.

███████████████████████████████████████████

███████████████████████████████████████████

█████████

566.    And when Urner Barry prices increased, Defendants linked the price increase to
their actions. ████████████████████████████████████

███████████████████████████████████████████

567.    While Defendants were not as successful at eradicating price volatility in Urner
Barry as they were the Georgia Dock – they did not have sole control over price inputs with Urner
Barry – their collective actions increased prices across all indices. ████████████████

████████████████████████████████████████

████████████████████████

568.     Indisputably, Defendants actions were interrelated.  Rising prices and price quotes inflated by coordinated pressure benefited each of the Defendants across each index, leading to higher broiler prices for Plaintiff.

569.     And individual pressure was not always possible, as Urner Barry took into account numerous sales numbers and quotes collectively from multiple Defendants.  In those instances, collective action was required.

570.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

## G.     Defendants Capitalized on Their Prior Actual Reduction of Broilers to Coordinate a False Supply Reduction

571.     Defendants also were able to take advantage of their coordinated reduction in the supply of broilers in price negotiations with restaurants and other contract purchasers.  This was especially the case with Small Birds.[9]

572.     For example, as part of their collective goal to increase the prices of broilers, Defendants coordinated inflated prices to restaurants and other contract purchasers in the time period beginning at least as early as 2012 and continuing through at least 2017.  One of the primary explanations Defendants presented for these inflated prices was what they said was a reduction in

---

[9]     Small Birds are generally defined as Broilers weighing 4.25 pounds or less.  Upon information and belief, Sanderson Farms, Foster Farms, Harrison Poultry, and Peco Foods did not produce Small Birds during the alleged bid rigging conduct period, and House of Raeford Farms, Inc. has not produced Small Birds since mid-2012, the beginning of the bid-rigging conduct period.

the supply of broilers. Defendants were able to point to the actual supply reduction that they orchestrated for broilers in the 2011-2012 timeframe. Yet, at the same time, the number of Small Birds killed increased significantly in the 2011-2013 period and remained elevated throughout the remainder of the relevant period.

573.    Defendants also used their coordinated false explanation of supply reduction for their elevated prices of broilers even for those restaurants that did not purchase Small Birds. Through these coordinated misrepresentations, Defendants were able to persuade restaurant chains and other purchasers to accept higher prices for broiler products.

## H.    Rabobank's Role and Participation

574.    Rabobank is the leading lender and financial institution serving the poultry industry. The broiler producers which have turned to Rabobank for credit and/or transactional work have included Fieldale, House of Raeford, Koch, Mountaire, Peco, Perdue, Pilgrim's Pride, Tyson, and Wayne Farms.

575.    At the outset of this case, it appeared that Rabobank was an innocent bystander, uninvolved in defendants' alleged misconduct. However, during discovery—including of Rabobank as a third-party—it has become apparent that Rabobank facilitated and participated in anticompetitive activities.

576.    Instead of serving as a disinterested market observer, lender, and advisor for transactions, Rabobank—to advance its own interests and bottom line—consistently sought industrywide action to alter the output and pricing of broilers.

577. One facet of Rabobank's anticompetitive conduct involved coordination with defendant Agri Stats. ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

578. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

███████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

581. Rabobank's role in the anticompetitive conduct also included encouraging communication among broiler producer competitors, and serving as a conduit for communications between and among those competitors. ████████████████████████████████████

████████████████████████████████████████████████

582.    Rabobank also communicated directly with producers as part of an effort to coordinate industrywide action with respect to production and/or pricing. ███████████

583.  ████████████████████████████████

584.  ████████████████████████████████

585.    Rabobank also used its reports and publications, shared widely with producers, including defendants, to effectuate producer coordination.

586.    Rabobank used its position as the leading lender and financial institution serving the industry to secure coordinated action.

I.      **The Conspiracy Also Included the Collusive and Fraudulent Manipulation of the Georgia Dock Price Index**

587.    Defendants buttressed their successful efforts to artificially boost chicken prices by collectively reducing supply by collusively and fraudulently manipulating the Georgia Dock benchmark price index, a chicken-industry pricing benchmark contained in contracts between Defendants and a significant proportion of their customers, including certain Plaintiffs.  The Georgia Dock was such an important index that, even when Plaintiffs' contracts were not explicitly indexed to the Georgia Dock, the prices paid by Plaintiffs were materially affected by the Georgia Dock price.  As such, the manipulation of the Georgia Dock did not only have an anticompetitive effect on the price for sales of broilers that were quoted based directly and expressly on the Georgia Dock; rather, it also contaminated and artificially raised prices for broilers that were not expressly tied to the Georgia Dock.  This contamination occurred because Defendants often used the Georgia Dock as a crosscheck or a baseline for transactions even where the Georgia Dock was not the primary benchmark that suppliers used to provide quotes to customers.  For example, Defendant Keystone Foods utilized Georgia Dock as a reference point across the board for pricing even when their agreements with, or quotes to, customers did not call for the price to be based on the Georgia Dock.

588.    During the relevant period, broiler chicken prices were reported primarily by three entities: Urner Barry (a commodity price reporting service), the Georgia Department of Agriculture through the Georgia Dock, and the USDA.  Additionally, as discussed below, Agri Stats collects detailed pricing information through its subsidiary Express Markets, Inc.  ("EMI").

589.    Urner Barry collects and publishes daily price information for broilers.  Urner Barry's chicken price information is subscription-based, so all producers and many purchasers subscribe for a fee.  The USDA and Urner Barry's broiler price indices are based upon a system

of double verification, which includes telephonic and written surveys of all or nearly all chicken producers, but also verification of reported prices from purchasers such as brokers and customers. The Georgia Dock price survey methodology, which contrasts materially with those of the USDA and Urner Barry, is discussed below.

590.     The most detailed price report is not publicly available and is produced by Agri Stats and its subsidiary, Express Markets, Inc.  According to a May 2010 FarmEcon study, EMI's pricing report[12] includes "pricing data on whole birds and chicken parts that is considerably more detailed than the USDA," Urner Barry, or Georgia Dock reports, as it is based on actual sales invoices from broiler companies.

591.     Published prices for broilers from Urner Barry, Georgia Dock, and USDA relate to the market for broilers.  Prices for chicken, whether sold under contract or on the spot market, generally move with spot market prices as reported by Georgia Dock or Urner Barry.

592.     Statements by chicken company executives and industry experts confirm that chicken sales, whether by contract or on the spot market, are tied to spot market pricing.  For instance, Sanderson Farms CEO Joe Sanderson explained in a May 2008 speech that Sanderson Farms' contract sales to retail customers have prices tied to the Georgia Dock price survey and Sanderson Farms' contract sales to food distributors are "based on formulas tied to the Urner Barry."  Similarly, expert economist Dr. Colin A. Carter from the University of California (Davis)

---

[12]     Agri Stats subsidiary EMI was formed around 2000 to compete with the price reporting service of Urner Barry.  Unlike Agri Stats reports for Defendants, EMI releases daily pricing data to both Defendants and potential purchasers of Broilers, though the reporting service costs thousands of dollars and is not publicly available.  EMI reports capture all transactions by Broiler producers, who automatically transmit invoice information electronically from each transaction to EMI.  The reports include all sales volume information from the previous day, including the size of containers, type of cut, whether the product was chilled with ice or $CO_2$, the price, and numerous other pieces of information.

testified that "internal Pilgrim's documents show that virtually all chicken products, even if they're not sold spot, are tied to the spot prices…. 83 percent of Pilgrim's chicken sales are reflecting the spot price within a given year. So there's only about 16 percent of their sales that are not tied to the spot market over a relatively short period of time." Further, because half of "fixed contracts" actually had terms tied to broiler spot market prices, Dr. Carter concluded that 92% of Pilgrim's broiler sales were tied to broiler spot market prices such as Georgia Dock. Similarly, many of Plaintiffs' purchases of broilers from Defendants were tied to the Georgia Dock price even when those purchases were not spot transactions.

593.    As a consequence of the inelasticity of supply and demand in the broiler industry (discussed below) and the availability of the spot market price indices (discussed above), public price increase announcements by Defendants were unnecessary. Defendants knew and intended that a decrease in supply pursuant to their agreement would increase broiler spot market prices, and therefore that all broiler prices would increase.

594.    The Georgia Dock, USDA Composite, and Urner Barry all measure the same (or very similar) size and grade of chicken.[13]

595.    The Georgia Dock benchmark price index, like the other two indices, sets prices for both the "whole bird" and various parts of the chicken (wings, tenders, leg quarters, thighs, drumsticks, and breasts) using the same pricing methodology. The "whole bird" price is the baseline for pricing all parts of a chicken.

---

[13]    Unlike the other indices, the Georgia Dock benchmark price did not include freight or transportation costs. At its inception, the Georgia Dock benchmark price was known as the "Georgia F.O.B. Dock" price; the Georgia Dock was "F.O.B." the supplier's shipping dock, meaning that the buyer was responsible for paying the freight.

596.    Buyers reasonably relied on the Georgia Dock benchmark price index because they believed it accurately reflected the market price for the chicken they bought, especially since the Georgia Dock was an industry-accepted benchmark price index for wholesale chicken prices that was meant to reflect the market price of chicken.  Many Plaintiffs purchased chicken from Defendants at prices that used the Georgia Dock as a component throughout the relevant period. In some instances, Defendants insisted upon using the Georgia Dock in their pricing with Plaintiffs and/or declined to use another form of pricing with Plaintiffs.

597.    Much like when the world's largest banks came together to manipulate numerous financial benchmarks (such as LIBOR), the Georgia Dock Defendants came together to manipulate the Georgia Dock benchmark price index.

598.    Compared to the other two indices available to chicken buyers, there were significant differences in how the Georgia Dock benchmark price index was compiled that made it highly susceptible to manipulation by the Georgia Dock Defendants.  The Georgia Dock Defendants are the nine producers that submitted price quotes that went into the Georgia Dock price index, namely (ranked by their market share in Georgia, which dictated how much weighting each producer's quote was given in compiling the Georgia Dock benchmark price): Pilgrim's Pride (approximately 35% of Georgia market share in 2016); Tyson (15%); Fieldale (15%); Mar-Jac (10%); Claxton (10%); Sanderson Farms (7%); Harrison (5%); and Koch and Wayne Farms (less than 2% each).

599.    The significant difference between the Georgia Dock price index and other broiler price indices in recent years cannot be explained by only one or two outlier companies reporting artificially high broiler prices to the GDA.  That is because of the GDA's "one cent rule," as discussed in more detail below.  Under this rule, prices that deviate by more than one cent from

the average price as initially calculated are excluded from the final Georgia Dock price. Instead, the deviation of the Georgia Dock price index from the prices in the other indices – indices that are themselves based on verified sales by Defendants – can be attributed only to all or nearly all participating broiler producers collectively submitting artificially high and identical or very nearly identical broiler prices to the GDA. In other words, all or most of the Defendants' submissions needed to be roughly within two cents of each other in order to inflate the Georgia Dock price and maintain an artificially inflated Georgia Dock price over time – a price which, for extended periods of time, was 20 or 30 cents higher than the comparable (and also inflated, due to the anticompetitive conspiracy alleged herein) Urner Barry price index. Notably, the Georgia Dock was also higher than the USDA and EMI indices.

600. To compile the Georgia Dock price index, according to an internal GDA document provided to the *New York Times* through an open records request, "each participating [Broiler producer] company is called [by the GDA] on Wednesday every week to report the price offered to companies in which they have contracts in place with." A single price is given by each broiler producer company and it is accepted without any verification of actual invoices or any other form of auditing to verify accuracy. In response to a press inquiry, the GDA explained its failure to audit any self-reported data from Defendants by stating, "We don't see any reason they would submit information that wasn't truthful."

601. Despite the GDA's public statements about confidence in the Georgia Dock price index, the GDA employee who collected prices each week from broiler companies, Arty Schronce, was deeply concerned. In a September 2016 internal GDA memorandum, disclosed publicly for the first time on November 17, 2016, in a *Washington Post* article, Schronce wrote that he "continue[d] to have concerns about" the Georgia Dock, had "voiced concerns in the past," and

that he thought the Georgia Dock price index was "a flawed product that is a liability to the Georgia Department of Agriculture." Schronce also noted, "I was told that poultry companies know what they are doing and all I need to do is to gather and consolidate the info I am provided. However, I have come to question the validity of some of the information provided."

602.    Schronce's memorandum confirms the significance of the one cent rule; it noted that after a January 2016 article about the Georgia Dock price index in the *Wall Street Journal*, one "company appears to basically not take part in the Whole Bird Dock Price process. They seem to deliberately submit a low bid that they know will be kicked out. However, they can claim that they are submitting something lower. In essence, they can take advantage of a high whole bird price while maintaining that they want it to be lower."

603.    Until late 2016, the Georgia Dock pricing methodology was not publicly available. Chicken buyers whose transactions with Defendants were tied to the Georgia Dock whole-bird price, reasonably but mistakenly believed it reflected the actual market price of chicken. Moreover, because (until August 2016) the USDA also published the Georgia Dock benchmark price alongside the USDA Composite, many chicken buyers, including Plaintiffs, erroneously believed the Georgia Dock price to be a USDA price.

604.    Plaintiffs were misinformed that the Georgia Dock benchmark was supposed to be based on the Georgia Dock Defendants' actual offering prices for the next week as reported to the GDA. This was false; the Georgia Dock Defendants did not report their true prices to the GDA. Instead, they agreed to, and in fact did, intentionally report false, artificially high (or artificially-stabilized) prices. The reality was that the Georgia Dock price was simply whatever the Georgia Dock Defendants said it was. Hypothetically, if one week the Georgia Dock price was $1.75, and the following week the Georgia Dock Defendants told the GDA that the offering price of their

chicken was now $2, the Georgia Dock price would become $2, and the prices that Plaintiffs and others paid for chicken would increase commensurately.

605.    Once a week, Schronce, his predecessor Greg Pilewitz, and/or their assistants at the PMN would call or email with representatives of the Georgia Dock Defendants to collect price submissions, which were supposed to reflect those Defendants' actual offering prices.  The PMN collected the Defendants' price submissions and weighted each of them by the Defendants' above-referenced relative market share (referred to by the PMN as that company's "voice").[14]

606.    In addition, many of the Defendants submitted price quotes to the PMN via email, and those emails confirm many of the specific false and inflated quotes to the PMN.

607.    All parties knew that Defendants were supposed to submit to the PMN their actual offering prices for 2.5 to 3 pound whole chickens, but only a handful of the Georgia Dock Defendants actually processed 2.5 to 3 pound birds in Georgia, so, according to the PMN, the Georgia Dock Defendants were "supposed to adjust their whole bird quote as if they are producing that sized bird."  The Georgia Dock Defendants knew that, if they did not sell 2.5 to 3 pound whole birds, they had to reliably convert their offering price each week for the whole birds they sold into a 2.5 to 3 pound bird.  Once the final Georgia Dock whole bird price was calculated, the PMN used a formula to calculate prices for different chicken cuts and parts based on the whole bird price the Georgia Dock Defendants provided to the PMN each Wednesday.

608.    In compiling the Georgia Dock benchmark price, there was no team of economists or statisticians surveying buyers and sellers in the national chicken market.  Unlike the USDA Composite or Urner Barry poultry indices, which use data from numerous producers and buyers on both sides of the market, the Georgia Dock reflected prices sourced solely from a handful of

---

[14]    There was only one change to the weighting formula during the relevant time period.

producers. In essence, from the inception of the Georgia Dock in the 1960s until late 2016, the PMN relied on the "honor system" as to the truthfulness and accuracy of the offering prices submitted by the Georgia Dock Defendants.

609. In addition, submission of prices to the PMN was entirely voluntary. There were no regulations, rules, or legislation requiring poultry producers operating in the state of Georgia to submit their prices to the PMN.

610. Schronce, who began compiling the Georgia Dock Defendants' price quotes in 2012 following the death of his predecessor Greg Pilewitz, first made a preliminary calculation of the weighted average using the single price submission from each company. Then "[a]ny company that provides a whole bird quote that is more than one cent above or below the initial dock price calculation will not be included in the calculation for the whole bird dock price that week. Its voice is taken out of the formula and the dock price is recalculated without it." This so-called "one-cent rule" is, according to internal GDA documents, meant "to shield [] one company having the ability to greatly influence the price up or down."

611. Because of the GDA's one-cent rule, it was not possible for only one or two broiler companies to report a broiler price that was significantly higher than the actual market price to the GDA without being disregarded as outliers by the GDA. Accordingly, certain Georgia Dock Defendants began reporting prices to the GDA that fell within a very narrow range but were also significantly above the actual market rate. As a result, Georgia Dock prices continued to rise and later stabilized during 2015-2016 at historic highs. It was not until a series of articles was published between November 3, 2016 and November 17, 2016 that information was publicly available to show Defendants may have fixed the Georgia Dock price.

612.     Nothing was done to verify or substantiate these numbers.  There was no "double-verification;" unlike with the other price indices, customers were never contacted to check to see if the producers' prices were legitimate.  The entire process was based on unverified "price quotes" from the same set of chicken producers (the Georgia Dock Defendants) submitted each week to one or two GDA employees, a methodology that was susceptible to manipulation.

**J.     The PMN, the Georgia Dock, and the PMN Advisory Committee Were Created and Sustained for the Benefit of Georgia Dock Defendants and the Broiler Industry**

613.     The Georgia Dock has been an industry tool ever since it was first created as part of the Poultry Market News Bulletin in 1965.  At that time, the GDA created the first Georgia Dock based on a recommendation from the Georgia Poultry Federation (the "GPF") that the GDA begin reporting a "live quotation" (*i.e.*, the price of a live bird).  The GPF was – and continues to be – a trade association comprised of Georgia poultry producers.

614.     In 1972, the poultry producers, through trade organizations such as the GPF and the Georgia Poultry Processors Association, began to lobby the GDA to discontinue the PMN "live quotation."  Instead, the joint industry group recommended that the PMN quote an F.O.B. dock equivalent price.  In their recommendations, the joint industry group even set out guidelines for what the PMN should be reporting.  As the Georgia Commissioner of Agriculture at that time, Tommy Irvin, stated in a February 11, 1972 letter, the joint industry group had recommended an F.O.B. dock price equivalent that represented "full truck load lots of Ice Pack, USDA Grade A, sized 2.5 to 3 pound broilers and fryers."

615.     The GDA accepted this recommendation and, on February 22, 1972, transitioned the PMN to reporting the F.O.B. dock price equivalent that is known today as the Georgia Dock.  Other than a switch to emailed (rather than telephonic) price submissions for some poultry

producers, there have been no further changes to the PMN's methodology for calculating the Georgia Dock since 1972.

616.    Since the transition in 1972, the stated purpose of the Georgia Dock has always been to report an F.O.B. dock price equivalent.  According to an email sent by Arty Schronce on August 2, 2016, "[o]n February 23, 1972, (Wednesday) the opening line of the report was: The Georgia F.O.B. dock price for next week's trading on full truck load lots of ice pack USDA Grade 'A' sized 2.5 to 3 pound broilers and fryers are being sold on the bases (basis) of 27 cents; 32% of the loads offered have been confirmed on the bases (basis) of 27 cents."  Indeed, as recently as April 2016, the GDA website page for the Georgia Dock stated that "we report the established prices of dressed f.o.b. dock broilers and fryers."

617.    Following the 1972 transition, and in order to facilitate their control over the Georgia Dock price index, the poultry industry had another recommendation for the GDA: the creation of a non-public, non-governmental PMN Advisory Committee.  As stated in the minutes from a Georgia Poultry Processors Association meeting from 1972, "[i]t was requested that the Federation recommend to the Department of Agriculture that an appointment of an Advisory Committee be made by the Commissioner to work in close relationship with the Market News Service and with the guidelines which were set forth in establishing the F.O.B. reporting system."  Again, the GDA accepted this recommendation and formed an Advisory Committee comprised of representatives from the poultry producers who submitted prices to the Poultry Market News.

618.    Defendants – through their roles in creating and contributing to the Georgia Dock and serving on the Advisory Committee – had intimate knowledge of the procedures by which the PMN collected, calculated, and reported on the established prices for dressed F.O.B. dock broilers and fryers that the Georgia Dock should have been reporting.  Defendants stayed apprised of this

knowledge through meetings between the poultry producers and the PMN, during which they would discuss and review the reporting policies and procedures for the Georgia Dock. Defendants' knowledge even extended to the calculation forms used internally at the PMN, which were circulated to members of the PMN Advisory Committee following one of their meetings on January 25, 2007.

619.    As is relevant to Defendants' fraudulent scheme as discussed further below, ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

620.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

621. 

622.     Not only did Defendants have intimate knowledge of what prices should be submitted to the PMN for inclusion in the Georgia Dock, but they also maintained firm control over the Georgia Dock through the Advisory Committee.   From its inception, the Advisory Committee was composed of senior executives from the Georgia Dock Defendants, and its mission was to advise the GDA on issues relating to the PMN division's collection of prices from Defendants and setting of the Georgia Dock price.

623. 

624.     From at least September 2012 through 2016, the Advisory Committee included Gus Arrendale (CEO, Fieldale Farms), Mike Welch (CEO and President, Harrison), Jerry Lane (Former CEO, Claxton Poultry), Jayson Penn (EVP Sales and Operations, Pilgrim's), Pete Martin (VP of Operations, Mar-Jac), Vernon Owenby (Manager of Tyson's facility in Cumming, Georgia), Steve Clever (VP of Fresh Sales, Wayne Farms), and Dale Tolbert (VP of Sales, Koch Foods).

625.     The Advisory Committee therefore consisted entirely of representatives of one side of the transaction: the poultry producers.  Despite the fact that the Georgia Dock affected both buyers and sellers of chicken alike, there were no representatives of buyers on the Advisory Committee.  There were also no neutral economists or members of academia.  The producers, and the producers alone, controlled the PMN, often working hand-in-hand with their current or former lobbyists within the GDA and from the Georgia Poultry Federation, as discussed in more detail below.

626.     The Advisory Committee controlled the process for calculating and, as set forth in this Complaint, reevaluating the Georgia Dock price.  When he was installed as director of the PMN, Arty Schronce was told that he could not make any changes to the Georgia Dock without first clearing them with the Advisory Committee.

627.



628.     The existence of the Advisory Committee also helped to ensure that the Georgia Dock Defendants were intimately aware of the process by which the Georgia Dock price was calculated, enabling them to manipulate it.  The Advisory Committee met periodically and

discussed how the Georgia Dock price was calculated. In addition, because of their familiarity with the underlying guidelines and internal PMN calculations, the Georgia Dock Defendants knew the prices they submitted to the PMN were not subject to verification, and that those submissions would be used to calculate the next Georgia Dock price unless they deviated from the initially-calculated weighted average by one cent or more. (Although it appears there was no representative of Sanderson Farms on the Advisory Committee throughout the entire relevant time period, Sanderson Farms was aware of this fact through communications with other Defendants.)

629. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████

630. The existence and conduct of the Advisory Committee was not known to chicken buyers, including until November 2016 when it was first made public following a press report about a September 2016 memorandum written by Schronce that was highly critical of the Georgia

Dock methodology. He wrote in the memorandum that he had "questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent."

K. **The Georgia Poultry Federation's Role in Creating and Sustaining the Georgia Dock for the Benefit of Defendants and the Broiler Industry**

631. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

632. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

633.     The GPF also regularly acted as a go-between for the GDA and the Advisory Committee; it would explain to Advisory Committee members the purpose of certain meetings and remind Advisory Committee members of their companies' obligations with respect to the Georgia Dock. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

634.    The GPF was another means through which the Georgia Dock Defendants knew that the Georgia Dock was supposed to represent the actual price at which Defendants would sell F.O.B. 2.5 to 3 pound whole birds in the upcoming week. ████████████████████████

██████████████████████████████████████████

█████████████████████████████

**L.      The Georgia Dock Became Ripe for Manipulation**

635.    A number of factors at the beginning of the relevant time period made the Dock more vulnerable to manipulation and ultimately resulted in a marked upward departure of the Georgia Dock from all other poultry pricing indices.

636.    In or around 2008 and 2009, with the GDA experiencing drastic budget cuts, Georgia Commissioner of Agriculture Tommy Irvin conducted an inquiry into the PMN Division to determine if staffing cuts or other efficiencies were warranted.  At the time, the PMN was staffed by four full-time employees: division director Greg Pilewitz, Toni Leslie, Nell Moncus, and Donald Carnes.  Over the next three years, the staff of the PMN Department was cut from four full-time employees down to two.

637.    ████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

638.    Due to budgetary constraints, Commissioner Black further reduced the staff of the PMN Department in 2011 and 2012.  When Mr. Pilewitz died unexpectedly in early 2012, Ms. Leslie was left to run the PMN Department alone until a replacement could be found.  In October of 2012, Arty Schronce was installed as director, but he only worked for the PMN part time. Schronce also performed other projects at GDA, including authoring a gardening column and working for the press office.  Shortly after Mr. Schronce assumed the position, Ms. Leslie was replaced by Demetria Mabry.  Mr. Schronce and Ms. Mabry were instructed to continue collecting the poultry producers' price submissions and calculating the Georgia Dock as it had always been calculated, but neither had the foundational knowledge to recognize the ways in which poultry producers began divorcing their price submissions from reality.

639.    These factors, combined with the Georgia Dock Defendants' knowledge of the Georgia Dock pricing process, enabled them to collectively devise and then execute a simple yet elegant scheme to artificially inflate the Dock price and sustain that inflated Dock price for approximately six years.  As discussed in further detail below, ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



640.

641.

642.



643.

644.    But the possibility that any change could be made to the Georgia Dock was illusory. Despite Defendant's knowledge that they were submitting information to the Poultry Market News that was contrary to the guidelines Defendants themselves had created, the system had never changed.

M.     **Regulatory Investigation and Demise of the Georgia Dock**

645.     The PMN's Director, Arty Schronce, had concerns that the Georgia Dock was unreliable, had been captured by the chicken producers, and was being manipulated by the chicken producers.  His concerns grew over time.  By September 2016, he articulated concerns in a memorandum, in which he noted that some companies have a "larger, even outsized role in determining the Georgia Whole Bird Dock Price," and that "[i]n essence, they can take advantage of a high whole bird price."

646.     Following the January 2016 *Wall Street Journal* article, federal governmental officials began to investigate.  On July 19 and 20, 2016, high-level USDA officials met with GDA representatives in Atlanta, Georgia to discuss the Georgia Dock price.  The USDA officials shared their conclusion that GDA could no longer simply accept broiler prices from Defendants without verification and instead would have to verify invoice-level data to confirm reported prices.  On July 20 and 21, 2016, USDA officials requested that the GDA provide the USDA with data from broiler producers to "test and review" the Georgia Dock price for accuracy.

647.     On July 22, 2016 USDA's weekly BMNR publication noted that beginning on August 5, 2016, GDA "will be issuing a new weekly market report for negotiated Georgia broiler/fryer whole birds and bird parts, which will replace the current [Georgia Dock price]."  The GDA did not comply with USDA's August 5 deadline, however, and in the August 5 USDA BMNR, all price information from the GDA and Georgia Dock was removed and only a hyperlink to the GDA's website was included.

648.     At that time, high level officials within the GDA began to raise antitrust concerns regarding the Georgia Dock.  For instance, a July 27, 2016, report from GDA Director of Regulatory Compliance & Budget Alec Asbridge to GDA Commissioner Gary Black concluded

that "[t]he 10 poultry producing companies now control over 80% of the industry output. The combination of vertical integration, limited competition and lowered production periods has led to steady prices that have shown to be fairly resistant to changing market conditions. These factors alone illicit [sic] anti-trust review."

649. GDA Director Asbridge's July 27, 2016, report also noted that over time, the GDA became a vehicle for Defendants to "report[] a weighted average price per pound on broilers [Georgia Dock price] based off of contracts that have been determined at the private level and reported without regulatory oversight. The formulas to calculate weighted average prices have been determined on the private level and have not been standardized since the inception of the [GDA Poultry Market News division] in 1968, which there is no written record of." In other words, it was Defendants themselves who wrote the rules and formulas that make up the Georgia Dock price, not the GDA.

650. Director Asbridge's July 27, 2016, report also concluded that "[t]he extent of the use of the [Georgia Dock price] in contract negotiations is presently unknown but inquiries made by media and other governmental entities indicate that it is utilized on a more regular basis than previously expected." In short, the GDA had been publishing the Georgia Dock price for decades, but until this time apparently did not know the scope of reliance on the Georgia Dock price. Significantly, a revised and highly sanitized version of the July 27, 2016 report from Director Asbridge to GDA Commissioner Black was circulated internally at GDA on August 5, 2016. The sanitized August 5 report removed references to the existence of factors in the broiler industry eliciting "antitrust review" and to the fact that the Georgia Dock price was reported for decades by GDA "without regulatory oversight."

651.    On August 12, 2016, GDA Director Asbridge provided Georgia Poultry Federation President Mike Giles with the sanitized version of the report and asked Giles to review it before the GDA sent it to the USDA, "to ensure what I presented is accurate and best represents industry's concern with only reporting a spot price."  The Georgia Poultry Federation represents the poultry industry in Georgia, and most Defendants are members.  Remarkably, the GDA also noted in a separate email the same day to Giles and the Georgia Poultry Federation that "[t]he GDA is in agreement with the poultry industry that there is no desire to review invoices for verification of data reported," even though the information and means to do so are readily at hand.  Defendants already report such invoice information to Agri Stats on a daily basis.  According to a subsequent email dated August 24, 2016, Georgia Poultry Federation President Giles called GDA Director Asbridge back and gave "his and industry's sign off on the dock price summary report.  We can move forward with sending to USDA."  GDA Director Asbridge also proposed another meeting between GDA and the Georgia Poultry Federation to discuss recommendations about verifying Georgia Dock data.

652.    Under pressure from the USDA, and realizing that the Georgia Dock pricing methodology raised significant antitrust concerns, the GDA considered revising the methodology in late 2016.  After the Georgia Dock Defendants balked at the GDA's new methodology – which would have required them to verify and attest to the accuracy of their price quotes – the GDA halted the Georgia Dock benchmark price index altogether.  It was no longer receiving sufficient price quotes to compile the index.  The last Georgia Dock benchmark price was published by the GDA on November 23, 2016.  Yet for several months after the last Georgia Dock price was published by the GDA, certain Defendants, including at least Pilgrim's, continued to use the November 23, 2016 benchmark price of $1.0975/lb. to set their wholesale prices to chicken buyers.

653. On October 6, 2016, a USDA press release noted the expansion of its National Whole Broiler/Fryer report, which included new weekly price information regarding 2.5 to 3 pound broilers that replaced the same weight broiler previously reported by the Georgia Dock price. Importantly, the new USDA price roughly matched the Urner Barry price, suggesting that the Georgia Dock price continued to be subject to manipulation by Defendants.

654. On November 3, 2016, the New York Times published the first account of the USDA's inquiry into the Georgia Dock, based on information received via Freedom of Information Act and open records requests for internal USDA and GDA documents. Subsequently, a November 8, 2016, article by the *Washington Post* provided additional detail on the inquiry, including a comment from the USDA that "they discontinued publishing the Georgia Dock price 'when data from the source report could not be independently verified.'" In the *Washington Post* article, Sanderson Farms CFO Mike Cockrell was quoted as saying "the Georgia Dock has come to be a trusted reflection of the supply and demand for retail stores." In a press release cited in a *Bloomberg News* article on November 17, 2016, Tyson stated that "[w]hen the Georgia Department of Agriculture asks us for pricing data, we provide accurate information based on actual and recent transactions." Sanderson Farms' and Tyson's continued defense of the Georgia Dock price index as one that customers should trust shows that Defendants continued their efforts to conceal the conspiracy alleged in this Complaint.

### N.     The Georgia Dock Price Index Diverged From the USDA Composite and Urner Barry Price Indices Beginning in 2011

655. Beginning in approximately early 2011, the Georgia Dock price index began to behave differently from Urner Barry and USDA indices. Historically, the Georgia Dock benchmark price had been highly correlated with those other two indices; although the Dock price had always been somewhat less volatile, its movement (*i.e.*, volatility) mirrored the patterns of the

other two indices (*e.g.*, prices went up or down depending on market forces). But as hindsight now shows, in 2011, the correlation began to dissolve. Over time periods when the Urner Barry and USDA price indices would decrease, the Georgia Dock would stay flat or sometimes increase. This divergence continued and became especially pronounced in 2015.[15]

656.     The changes resulted from the conspiracy by the Georgia Dock Defendants to agree on artificial prices quoted to the GDA for inclusion in the Georgia Dock benchmark price, as well as by the fraud perpetrated by the Georgia Dock Defendants.

657.     Starting in early 2011, the monthly price volatility in the Georgia Dock markedly decreased, particularly with respect to downward price movements (*i.e.*, when prices dropped, they dropped far less drastically than they had in the past). This near-disappearance of price volatility was unique to the Georgia Dock. Both of the other price indices stayed volatile while the Georgia Dock remained stable, as reflected in the following graph, which compares prices of the various indices both before and during the relevant period:

---

[15]     The prices reported in the EMI, Urner Barry, and USDA Composite price indices were also supra-competitive and artificially inflated by the output-restriction aspect of Defendants' scheme.



658.    When the Georgia Dock component of Defendants' conspiracy kicked into high gear, the Georgia Dock price – for the first time ever – began to materially diverge from the other two indices.  Although the other two indices continued to move closely together over time, the Georgia Dock price continued to diverge further and further from those prices.  By 2015, the gap between the Georgia Dock price and the prices on the other two indices was approximately three times greater than it had ever been in recent history, and approximately five to ten times greater than the typical gap between the prices on the other two indices.

### O.    Defendants Fraudulently Submitted False and Inflated Quotes to the Poultry Market News, Causing the Index to Be Artificially High

659.    The mechanics by which certain Defendants fraudulently manipulated the Georgia Dock price index is now clear.

660.    The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the PMN.  Moreover, the Georgia Dock Defendants fraudulently failed to inform their counterparties – that is, those Plaintiffs to whom they sold poultry on pricing tied to the Georgia

Dock – of the many serious flaws with the Dock, which accrued to their benefit and to the detriment of those counterparty Plaintiffs.

661.    By way of background, when the PMN calculated the Georgia Dock price each week, it rounded the price to the nearest 0.25 cents.  For example, the Dock price could increase from 110.25 cents to 110.50 cents, but not any amount in between.  Defendants also used increments of 0.25 cents in their submissions.  Under the PMN's one-cent rule, any submission that was at least one cent more or less than the initially calculated weighted average would be excluded.  As a result, on any given week only seven submissions could affect the Dock price:  the submission that happened to equal the initial calculation of the weighted average, and submissions that were +0.25 cents, +0.50 cents, +0.75 cents, -0.25 cents, -0.50 cents, and -0.75 cents when compared to the initial weighted average.  All other submissions were excluded.  Thus, in order to rig the Dock price, Defendants had to work in concert to make price submissions that fell within a narrow range of each other, yet far from the market price, week after week, for years.

662.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

663. 

664.     Each of the Georgia Dock Defendants' submissions to the PMN made the implicit statement that those Defendants were submitting their actual offering price for 2.5 to 3 pound whole birds for the next week, while in fact those submissions reflected that Defendants were seeking to inflate the Dock price to make money at the expense of their customers.

665.     The allegations set forth below are based on the information regarding Defendants' price submissions.

     1.    <u>Pilgrim's Fraudulently Made False Submissions to the Georgia Dock</u>

666.     Pilgrim's knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week.  But rather than determining its actual offering price for the next week and submitting it to the PMN, Pilgrim's made false and inflated price submissions as explained below.

667.     Due to its large production capacity, Pilgrim's had a "voice" of 35% (out of a total voice for all Georgia Dock Defendants of 100%) for purposes of the weighted average for the

Georgia Dock price. Pilgrim's voice of 35% was by far the weightiest of the Georgia Dock Defendants, and thus its submissions had the greatest influence on setting the Georgia Dock price. Pilgrim's knew that its submissions carried the most weight of any of the Defendants.

668. 

669.

670.

671.

672. 

673.

674.

675. 

676.

677.



678.

679.

680.

681.



682.

683.



684.

685.

686.    Pilgrim's submissions were false and inflated.  Pilgrim's was supposed to submit its actual offering price for 2.5 to 3 pound whole birds.  Because broilers are a commodity, Pilgrim's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Pilgrim's costs of production, rather than simply an attempt to artificially inflate the index.  Yet Pilgrim's did not submit its actual or converted offering price for 2.5 to 3 pound whole

birds each week. 

Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

687.     Pilgrim's knew that its submissions were false and inflated.  Pilgrim's knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds

At the very least, Pilgrim's acted with reckless indifference as to whether its submissions were false and inflated.

688.     Pilgrim's made its submissions with the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index and increased Plaintiffs' prices.  Pilgrim's fraudulent submissions were made by interstate wire.

689.     The intended targets of Pilgrim's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs.  Pilgrim's sold chicken to its customers based on the Georgia Dock price index.  Accordingly, as a result of Pilgrim's fraudulent submissions that artificially inflated the Georgia Dock price index, Pilgrim's and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

690.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████

2.  Koch Fraudulently Made False Submissions to the Georgia Dock

691.  Koch knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Koch made false and inflated price submissions as explained below.

692.  ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████

693.  ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

694.

695.





696. ███████████████████████████████████████████

697. ███████████████████████████████████████████

698.    Koch's submissions were false and inflated.  Koch was supposed to submit its actual offering price for 2.5 to 3 pound whole birds.  Because broilers are a commodity, Koch's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Koch's costs of production, rather than simply an attempt to artificially inflate the index.  Yet Koch did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.

██████████████████████████████████████████████████████

███████████████████████████████████████████████ Artificially high

quotes constitute false statements because manipulated quotes are literally false or insincere

responses to the PMN's request for submissions of actual offering prices.

699.    Koch knew that its submissions were false and inflated.  Koch knew that it was

supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds ██████

██████████████████████████████████████████████████████

███████████████████████████████████████████ At the very

least, Koch acted with reckless indifference as to whether its submissions were false and inflated.

700.    Koch made its submissions for the purpose of artificially inflating the Georgia Dock

price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price

index.  Koch's fraudulent submissions to the PMN were made by interstate wire.

701.    The intended targets of Koch's fraudulent submissions to the PMN were buyers of

chicken, including Plaintiffs.  Koch sold chicken to its customers based on the Georgia Dock price

index.  Accordingly, as a result of Koch's fraudulent submissions that artificially inflated the

Georgia Dock price index, Koch and the other members of this scheme and enterprise were able

to charge customers higher prices than they otherwise would have and therefore made more

money, and Plaintiffs were harmed.

3.    Mar-Jac Fraudulently Made False Submissions to the Georgia Dock

702.    Mar-Jac knew that, when submitting its price quotes to the PMN, it was supposed

to provide its offering price for 2.5 to 3 pound birds for the next week.  But rather than determining

its actual offering price for the next week and submitting it to the PMN, Mar-Jac made false and

inflated price submissions as explained below.

703. 

704.

705.

706.

███████████████████████████████████████████████████

█████████████████████████████████████████████

707.    Mar-Jac's submissions were false and inflated.  Mar-Jac was supposed to submit its actual offering price for 2.5 to 3 pound whole birds.  Because broilers are a commodity, Mar-Jac's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Mar-Jac's costs of production, rather than simply an attempt to artificially inflate the index.  Yet Mar-Jac did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.  ████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████  Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere response to the PMN's request for submissions of actual offering prices.

708.    Mar-Jac knew that its submissions were false and inflated.  Mar-Jac knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds ██

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████  At the very least, Mar-Jac acted with reckless indifference as to whether its submissions were false and inflated.

709.    Mar-Jac made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index.  Mar-Jac's fraudulent submissions to the PMN were made by interstate wire.

710.    The intended targets of Mar-Jac's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs.  Mar-Jac sold chicken to its customers based on the Georgia Dock

price index.  Accordingly, as a result of Mar-Jac's fraudulent submissions that artificially inflated the Georgia Dock price index, Mar-Jac and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

    4.    <u>Harrison Fraudulently Made False Submissions to the Georgia Dock</u>

711.    Harrison knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week.  But rather than determining its actual offering price for the next week and submitting it to the PMN, Harrison made false and inflated price submissions as explained below.

712.

713.



714.

715.

716.

717.

718.

719.    Like Koch and Mar-Jac, Harrison's practice stabilized the Georgia Dock price index, imposing an artificial floor that prevented the index from falling, while allowing other Defendants (such as Pilgrim's) to artificially inflate the index through their regularly-inflated submissions.  Harrison acted in concert with the other Defendants by playing this role.

720.    Harrison's submissions were false and inflated.  Harrison was supposed to submit its actual offering price for 2.5 to 3 pound whole birds.  Because broilers are a commodity, Harrison's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Harrison's costs of production, rather than simply an attempt to artificially inflate the index.  Yet Harrison did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.

█████████████████████████████████████ Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

721.    Harrison knew that its submissions were false and inflated.  Harrison knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds ██

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ At the very least, Harrison acted with reckless indifference as to whether its submissions were false and inflated.

722.    Harrison made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index.  Harrison's fraudulent submissions to the PMN were made by interstate wire.

723.    The intended targets of Harrison's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs.  Harrison sold chicken to its customers based on the Georgia Dock price index.  Accordingly, as a result of Harrison's fraudulent submissions that artificially inflated the Georgia Dock price index, Harrison and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

724.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



236



725. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

726.    This is further proof that the Defendants worked together to submit knowingly false

price quotes to the PMN as part of a coordinated effort to inflate the Dock price.

237

5.　　Sanderson Farms Fraudulently Made False Submissions to the Georgia Dock

727.　　Sanderson Farms knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week.  But rather than determining its actual offering price for the next week and submitting it to the PMN, Sanderson Farms made false and inflated price submissions as explained below.

728.



729.

730.

731. 

732.

733.

734.    Sanderson's submissions were false and inflated.  Sanderson was supposed to submit its actual offering price for 2.5 to 3 pound whole birds.  Because broilers are a commodity, Sanderson's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Sanderson's costs of production, rather than simply an attempt to artificially inflate the index.  Yet Sanderson did not submit its actual or converted offering price for 2.5 to 3 pound

whole birds each week. █████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ Artificially high quotes

constitute false statements because manipulated quotes are literally false or insincere responses to

the PMN's request for submissions of actual offering prices.

735.    Sanderson knew that its submissions were false and inflated.  Sanderson knew that

it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ At the very least, Sanderson acted with reckless

indifference as to whether its submissions were false and inflated.

736.    Sanderson made its submissions for the purpose of artificially inflating the Georgia

Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock

price index.  Sanderson Farms' fraudulent submissions to the PMN were made by interstate wire.

737.    The intended targets of Sanderson Farms' fraudulent submissions to the PMN were

buyers of chicken, including Plaintiffs.  Sanderson Farms sold chicken to its customers based on

the Georgia Dock price index.  Sanderson Farms used Georgia Dock-based pricing with its retail

customers, including Plaintiffs, in two ways: first, pursuant to a Georgia Dock bracketing system,

under which prices would move up or down according to whether they fell in various ranges of

Georgia Dock pricing, and second, pursuant to straightforward Georgia Dock formula pricing,

under which prices would be the Georgia Dock price plus a specified amount.  When the Georgia

Dock would increase, that would result in an increase of prices to Sanderson Farms' customers.

738.    Accordingly, as a result of Sanderson Farms' fraudulent submissions that artificially inflated the Georgia Dock price index, Sanderson Farms and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

      6.    <u>Tyson Fraudulently Made False Submissions to the Georgia Dock</u>

739.    Tyson knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. Tyson in fact produced a 2.5 to 3 pound bird. But rather than determining its actual offering price and submitting it to the PMN, Tyson made false and inflated price submissions as explained below.

740.    ███████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████

741.    ███████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████

742.    ███████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

743. 

744.

745.     Tyson's submissions were false and inflated.  Tyson was supposed to submit its actual offering price for 2.5 to 3 pound whole birds.  Because broilers are a commodity, Tyson's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Tyson's costs of production, rather than simply an attempt to artificially inflate the index.  Yet Tyson did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.

Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

746.     Tyson knew that its submissions were false and inflated.  Tyson knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████     At the very least, Tyson acted with reckless indifference as to whether its submissions were false and inflated.

747.    Tyson made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index.  Tyson's fraudulent submissions to the PMN were made by interstate wire.

748.    The intended targets of Tyson's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs.  Tyson sold chicken to its customers based on the Georgia Dock price index.  Throughout the relevant period, Tyson sold broilers and broiler products to its customers, including Plaintiffs, pursuant to pricing that used the Georgia Dock price index as a benchmark. Like Sanderson Farms, Tyson employed both bracketed and fixed pricing that used Georgia Dock as basis, dating back to at the latest 2010, when its account managers internally discussed that "where certain customers are not tied to the Georgia Dock market with brackets, we must address these situations."

749.    Accordingly, as a result of Tyson's fraudulent submissions that artificially inflated the Georgia Dock price index, Tyson and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

7.    <u>Claxton Fraudulently Made False Submissions to the Georgia Dock</u>

750.    Claxton knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week.  But rather than determining

its actual offering price and submitting it to the PMN, Claxton made false and inflated price submissions as explained below.

751. ██████████████████████████████████████
████████████████████████████████████████████

752. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

753. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████

754. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████

755. ██████████████████████████████████████
████████████████████████████████████████████

756.    Claxton knew that its submissions to the PMN were false and inflated.  At the very least, Claxton acted with reckless indifference as to whether its submissions were true or false.

757.    Claxton's submissions were false and inflated.  Claxton was supposed to submit its actual offering price for 2.5 to 3 pound whole birds.  Because broilers are a commodity, Claxton's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Claxton costs of production, rather than simply an attempt to artificially inflate the index.  Yet Claxton did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.  Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

758.    Claxton knew that its submissions were false and inflated.  Claxton knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds

████████████████████████████ At the very least, Claxton acted with reckless indifference as to whether its submissions were false and inflated.

759. Claxton made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Claxton's fraudulent submissions to the PMN were made by interstate wire.

760. The intended targets of Claxton's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Claxton sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Claxton's fraudulent submissions that artificially inflated the Georgia Dock price index, Claxton and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

8. <u>Wayne Farms Fraudulently Made False Submissions to the Georgia Dock</u>

761. Wayne Farms knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. But rather than determining its actual offering price and submitting it to the PMN, Wayne Farms made false and inflated price submissions as explained below.

762. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

763. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

764. ██████████████████████████████████████████████

765.     For instance, Lee Matthews made these false submissions by phone on behalf of Wayne Farms to Arty Schronce and Demetria Mabry of the PMN, at or approximately at the same date and time each week, for several years.

766.     Wayne Farms' submissions were false and inflated.  Wayne Farms was supposed to submit its actual offering price for 2.5 to 3 pound whole birds.  Because broilers are a commodity, Wayne Farms' actual offering price (absent manipulation of the index) should reflect actual market dynamics and Wayne Farms' costs of production, rather than simply an attempt to artificially inflate the index.  Yet Wayne Farms did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.  ████████████████████████

Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

767. Wayne Farms knew that its submissions were false and inflated. Wayne Farms knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds ███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ At the very least, Wayne Farms acted with reckless indifference as to whether its submissions were false and inflated.

768. Wayne Farms made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Wayne Farms' fraudulent submissions to the PMN were made by interstate wire.

769. The intended targets of Wayne Farms' fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Wayne Farms sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Wayne's fraudulent submissions that artificially inflated the Georgia Dock price index, Wayne Farms and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

9. Fieldale Farms Also Made False Submissions to the Georgia Dock

770. Fieldale knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds. But rather than determining its actual offering price and submitting that price to the PMN each week, Fieldale knowingly made false and inflated price submissions as explained below.

771. Due to its large production capacity in Georgia, Fieldale had a "voice" of 15% (out of a total voice of all Georgia Dock Defendants of 100%) for purposes of the weighted average for

the Georgia Dock price. Fieldale's voice of 15% put it among the top three weightiest voices among the Georgia Dock Defendants, and thus its submissions had a significant influence on setting the Georgia Dock price. Fieldale knew that its submissions carried significant weight compared to other Defendants' submissions.

772. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

773. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

774. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



775.

776.

777.

778.    Fieldale knew that its submissions to the PMN were false and inflated.  At the very least, Fieldale acted with reckless indifference as to whether its submissions were true or false. Fieldale made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Fieldale's fraudulent submissions to the PMN were made by interstate wire.

779.     The intended targets of Fieldale's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs.  Fieldale sold chicken to its customers, including Plaintiffs, based on the Georgia Dock price index.  Accordingly, as a result of Fieldale's fraudulent submissions that artificially inflated the Georgia Dock price index, Fieldale and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.

**P.     The Georgia Dock Defendants Fraudulently Failed to Inform the Plaintiffs with Which They Did Business of their Control Over the Georgia Dock, Their Ability to Manipulate the Georgia Dock, and Their Actual Manipulation of the Georgia Dock**

780.     All of the Georgia Dock Defendants sold broiler chicken at prices based off of the Georgia Dock to customers during the relevant period. ███████████████████████

██████████████████████████████████████████████████

███████████████████████████

781.     ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████

782.     ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████



784.     Thus, not only did the Georgia Dock Defendants knowingly make false submissions to the PMN for the purpose of inflating the Georgia Dock price index, but all of the Georgia Dock Defendants that did business with Plaintiffs failed to disclose significant, non-public information to Plaintiffs about the Georgia Dock price index and the Poultry Market News.

785.     Just as Defendants' role on the PMN Advisory Committee enabled Defendants to devise a scheme to manipulate the Georgia Dock, Defendants' role on the Advisory Committee created an information asymmetry that kept chicken buyers like Plaintiffs in the dark.  Unlike Defendants, which had intimate knowledge of the way in which the PMN operated and the Georgia Dock price was calculated, Plaintiffs knew only what all buyers of chicken knew and believed: that the Georgia Dock price index represented the actual offering prices of chicken producers for the next week – in other words, an actual market price for broilers based on verified, reliable, and objective information.

786.     All of the Georgia Dock Defendants knew they were submitting price quotes to the PMN each week, and that those quotes were being used by the PMN to calculate the Dock price.

All of the Georgia Dock Defendants knew how the Georgia Dock price index was calculated and that, unlike with the Urner Barry and the USDA Composite indices, the PMN obtained no information from buyers. All of the Georgia Dock Defendants knew that the PMN was not undertaking any effort to validate their submissions, such as by requiring Defendants to submit copies of their actual price sheets or invoices. Yet none of the Georgia Dock Defendants that did business with Plaintiffs shared this significant, non-public information with Plaintiffs.

787. All of the Georgia Dock Defendants knew of the existence of the PMN Advisory Committee and its control over the PMN and Georgia Dock price index. Specifically, the Georgia Dock Defendants knew that the Advisory Committee had the power to reevaluate the Georgia Dock price, to change the way in which the Dock price was calculated, and to influence who would be hired as the next Director of the PMN. The Georgia Dock Defendants also knew that the Advisory Committee consisted exclusively of representatives of chicken producers and not buyers or neutral third parties and that Defendants' then-current and former lobbyists supported the Advisory Committee and independently exercised control and influence over the PMN. Yet none of the Georgia Dock Defendants that did business with Plaintiffs shared this significant, non-public information with Plaintiffs.

788. All of the Georgia Dock Defendants knew they were conspiring with each other and part of an enterprise of Defendants that were associated in fact and did in fact submit false and inflated price quotes to the PMN for the purpose of inflating the Georgia Dock price index for their benefit and Plaintiffs' detriment. Yet none of the Georgia Dock Defendants that did business with Plaintiffs shared this significant, non-public information with Plaintiffs.

789. The Georgia Dock Defendants gave buyers of chicken, including Plaintiffs, the false impression that those Defendants were submitting their actual offering prices for 2.5 to 3

pound whole birds for the next week, instead of making submissions to the PMN to benefit their position as sellers of chicken.

790. 

791.

792.     The Georgia Dock Defendants intentionally failed to disclose this significant, non-public information in their communications with their customers regarding their transactions for the purchase and sale of chicken, including Plaintiffs.  By intentionally failing to disclose this information, the Georgia Dock Defendants were attempting to induce a false belief by buyers of chicken, including Plaintiffs, about the reliability of the Georgia Dock price index.  Defendants intended to induce this false belief by customers for the benefit of the Georgia Dock Defendants.

793.     The Georgia Dock Defendants that did business with Plaintiffs knew that Plaintiffs believed the Georgia Dock was a reliable price index and intentionally perpetuated that belief by failing to disclose this significant, non-public information.  The Georgia Dock Defendants knew

that their customers had little to no knowledge regarding how the Georgia Dock price index worked, because their customers had no ability to obtain such knowledge.

794.    The Georgia Dock Defendants that did business with Plaintiffs were successful in inducing a false belief by Plaintiffs about the reliability of the Georgia Dock price index; the Plaintiffs believed the Georgia Dock price index was reliable until information suggesting the Dock price may have been inflated was finally made public in late 2016.

795.    The Georgia Dock Defendants made these omissions when they communicated with Plaintiffs; when they bid on, offered, negotiated, and pitched Plaintiffs' business; and also when they contracted with Plaintiffs.  Many of the communications in which the Georgia Dock Defendants failed to disclose significant, non-public information to customers were made via interstate wires (both email and phone).

796.    Even if the origin and ultimate destination of any Defendants' wire communications referenced in this Complaint were within a single state, those wires were routed through other states.  Thus, even such wires constitute interstate wires.

797.    ███████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████



799.    Through their fraudulent acts and omissions, the Georgia Dock Defendants were successful in inducing a false belief by buyers of chicken, including Plaintiffs, about the reliability of the Georgia Dock price index.  Either through contracts directly indexed to the Georgia Dock price, or through pricing negotiations indirectly (but materially) influenced by the Georgia Dock price, all Plaintiffs paid inflated prices due to Defendants' manipulation of the George Dock index.

800.    The Georgia Dock Defendants' scheme deprived their victims of valuable economic information and depended for its completion on failure to disclose an essential element of the bargain.

**Q.      The Georgia Dock Defendants Made Fraudulent Misrepresentations to Plaintiffs by Stating that the Georgia Dock Reflected the Broiler Chicken Market**

801.    In addition to their material omissions, the Georgia Dock Defendants that did business with Plaintiffs also made false statements and affirmative misrepresentations about material facts to Plaintiffs over the relevant period.  The Georgia Dock Defendants knew that the Georgia Dock did not represent the broiler market because they did not submit their actual prices to the Poultry Market News.  But they told Plaintiffs that the Georgia Dock represented the market price for broiler chicken regardless.

802.     This practice was widespread: throughout the relevant period, the Georgia Dock Defendants stated, repeated, and maintained that the Georgia Dock represented the market for broilers, and they did so in a deliberate attempt to influence the business decisions made by customers like Plaintiffs.

803.     The Georgia Dock Defendants made these false statements and affirmative misrepresentations to Plaintiffs via telephone, in person, in writing, and over email in connection with their bids, pitches, offers, negotiations, and contracts with Plaintiffs.  Thus, many of these fraudulent misrepresentations were made via interstate wires (both email and phone).  As above, even if the origin and ultimate destination of any Defendants' wire communications were within a single state, those wires were routed through other states.  Thus, even such wires constitute interstate wires.

804.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████

805.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



806.    Additionally, Georgia Dock Defendants often asked for cost adjustments when the Georgia Dock continued to rise, even if the parties had a pricing arrangement that was not expressly tied to the Georgia Dock.

809.    The Georgia Dock Defendants knew that buyers of chicken, including Plaintiffs, believed the Georgia Dock to be a reliable price index and intentionally perpetuated that belief by making fraudulent misrepresentations promoting it.

810.    Plaintiffs relied on the Georgia Dock Defendants' false statements and affirmative misrepresentations about the Georgia Dock representing the broiler "market." As a result, Plaintiffs purchased broiler chicken based on Georgia Dock prices.

**R.    Plaintiffs Were Harmed by the Georgia Dock Defendants' Fraudulent Submissions, Omissions, and Misrepresentations**

811.    Plaintiffs bought broiler chicken based on pricing expressly tied to the Georgia Dock from Georgia Dock Defendants.

812.    Plaintiffs adjusted pricing of broiler products on multiple occasions after being asked to adjust such prices due to increases in the Georgia Dock, even when the Georgia Dock did not form the basis of the pricing agreement with the supplier who asked for an increase. ██

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

813.    Buyers of poultry, including Plaintiffs, were the targets of the Georgia Dock Defendants' fraudulent submissions to the PMN, and Plaintiffs reasonably relied on the veracity of those submissions.

814.    Georgia Dock Defendants falsely submitted prices to Poultry Market News and, as detailed above, artificially inflated the Georgia Dock.  The Georgia Dock price index was artificially inflated from no later than early 2011 through 2016 as a result of certain Defendants' fraudulent acts and omissions.  Plaintiffs had no reason to know that the Georgia Dock price index was inflated due to Defendants' fraudulent acts, misrepresentations, and omissions.

815.    Therefore, by using the Georgia Dock as the basis for the price of broiler chickens it purchased, whether pricing was expressly tied to the Georgia Dock or whether a price increase

was requested based on an increase in the Georgia Dock, Plaintiffs overpaid and were harmed due to the Georgia Dock Defendants' fraud.

### S.   Defendants Had Both the Motive and Opportunity to Perpetrate the Fraud and Specifically Intended To Do So

816.   The broiler chicken industry's long history of boom and bust cycles is well known to Defendants.  For example, in 2008, the entire poultry industry was profoundly affected by the bankruptcy filing of Pilgrim's Pride, which was then the largest poultry company in the United States.  In its filing, Pilgrim's disclosed that it had lost $998.6 million for the fiscal year, or $14.40 per share, prompting Pilgrim's shares to lose over 46 percent of their value in one day.  The collateral effects of this announcement reverberated throughout the industry, with several other leading poultry companies, such as Tyson and Sanderson, also experiencing sizable losses.  By the time Pilgrim's emerged from bankruptcy in December 2009, the industry was still struggling to make money, prompting a wave of consolidation and many of the collusive and fraudulent activities outlined in the Complaint.

817.   ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████

818.   ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

819.    As noted above, Defendants knew that the Georgia Dock was vulnerable to manipulation and thus presented Defendants with the unique opportunity to collude and/or defraud their retail grocery customers in pursuit of higher profits, thus ensuring that Defendants had both the motive and opportunity to manipulate the index.

820.    The manipulation of the Georgia Dock by Defendants served its intended purpose, enabling Defendants to bolster their financial results at their customers' expense.  Indeed, in some instances, the manipulation of the Georgia Dock allowed Defendants to recognize a profit instead of a loss.  For example, Mike Cockrell, Chief Financial Officer of Sanderson Farms, publicly stated in the New York Times that Sanderson was profitable in the fourth quarter of 2015 "only because we were making money from the chicken we were selling to the retail market."  Moreover, according to other published analyses, poultry companies such as Pilgrim's and Sanderson would have realized negative earnings and income in 2016 but for the profits realized from their sales based on the Georgia Dock.

821.    ████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

822.    Defendants acted with fraudulent intent and knew that their manipulation of the Georgia Dock was improper. ████████████████████████████

███████████████████████████████████████████████████

██████████████████████

823.    But Defendants did not care.  Instead, they intentionally pushed the Georgia Dock on unsuspecting retail grocery customers to ensure their own continued profitability (and secure lucrative individual bonuses for themselves). ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

**T.     Defendants Engaged in a Pattern of Racketeering Activity as Part of the Conduct of an Enterprise's Affairs**

824.    The Georgia Dock Defendants' fraudulent acts and omissions were not committed individually, but rather as part of the affairs of an enterprise whose purpose was to obtain excessive poultry proceeds by defrauding chicken buyers, including Plaintiffs.

825.    The enterprise was the group of Georgia Dock Defendants, which were associated in fact through their price submissions to the PMN, their role on the PMN Advisory Committee, their involvement in the Georgia Poultry Federation, and their use of the Dock in selling product. This enterprise was a continuing unit that associated together and acted with a common purpose: to sustain the existence of the PMN and Georgia Dock and to artificially inflate the Dock price for the benefit of the enterprise and the individual Defendants.

826.    There have been many relationships among those associated with the enterprise. Representatives from the Georgia Dock Defendants interacted with each other frequently at industry conferences and trade shows, as discussed throughout this Complaint. All but one of the Georgia Dock Defendants participated on the PMN Advisory Committee, which acted to preserve and enhance the PMN and Georgia Dock as discussed above.

827.    All of the Georgia Dock Defendants were members of the Georgia Poultry Federation, the largest lobbyist in Georgia for poultry producers. All of the Georgia Dock Defendants had positions on the Board of the Georgia Poultry Federation. Representatives from the Georgia Dock Defendants interacted often with leaders of the Georgia Poultry Federation (such as Abit Massey and Mike Giles). Those same leaders helped to preserve and enhance the power of the PMN Advisory Committee and the Georgia Dock, as discussed herein.

828.    The enterprise had longevity that was sufficient to permit those associated to pursue the enterprise's purpose. There was continuity among the representatives of the Defendants who served on the Advisory Committee, interacted with representatives of the Georgia Poultry Federation, and submitted price quotes to the PMN. The scheme of the Georgia Dock Defendants to manipulate the Georgia Dock price by making false and inflated price quotes, as discussed in this Complaint, began no later than early 2011 and lasted for at least five years.

829.    Not only were the Georgia Dock Defendants a part of this enterprise, but they acted in concert with each other in their fraudulent acts and omissions. ██████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

[REDACTED]

830.    The same was true with respect to the Georgia Dock Defendants' fraudulent omissions.  If any of the Georgia Dock Defendants had disclosed their knowledge about the lack of verification for their price submissions to the PMN, their ability to manipulate the Georgia Dock price index, or the fact they were manipulating the Georgia Dock price index, then all buyers would have lost confidence in the Georgia Dock earlier than the end of 2016.  That was important, non-public information that only the Georgia Dock Defendants had in their possession.  Because all of the Georgia Dock Defendants collectively benefited from their non-disclosure, the Georgia Dock Defendants worked in concert not to disclose this information.

**U.**      **The Georgia Dock Defendants Did Not Contract with Plaintiffs in Good Faith**

831.    Throughout the relevant period, the Georgia Dock Defendants entered into contracts and exchanged pricing sheets and invoices with customers, including Plaintiffs, that priced broiler chicken based on the Georgia Dock.  Pursuant to these agreements, the prices charged by the Georgia Dock Defendants to Plaintiffs were determined by a few methods, including bracket pricing based on the Georgia Dock and pricing that used the Georgia Dock as a percentage or fixed component of Plaintiffs' cost.

832.    Plaintiffs' broiler chicken contracts came in many forms, including oral agreements, formal written supply agreements, and other written agreements, including agreements made via email, purchase orders, and invoices.  [REDACTED]

██████████████████████████████████████████ An implied covenant of good faith and fair dealing was implied in all of the contracts between Plaintiffs and the Georgia Dock Defendants.

833.   Agreements that used Georgia Dock bracketing to determine the price of broiler chicken typically included the price at which broiler chicken would be sold to Plaintiffs depending on whether the Georgia Dock fell into one of multiple (usually three) brackets.  Contracts that pertained to more than one broiler product typically listed item codes and descriptions in rows, with corresponding prices set out for each bracket.  The price Plaintiffs paid for a given sale depended on what the Georgia Dock price was each week, and where it fell in the brackets listed. Throughout the relevant period, the Georgia Dock Defendants who used such bracketing systems had to add new bracket ranges on the high end to account for the "uncharted territory" into which the Georgia Dock entered.

834.   Other agreements specified that Plaintiffs would pay a fixed amount over the Georgia Dock pricing index's quotes for a given week.  This could take several different forms, whether by adding a percentage or a certain number of cents to the Georgia Dock price. ██████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████████

835.   Even where a contract had a fixed price, those prices were often based off of the Georgia Dock as an indicator. █████████████████████████████████████
█████████████████████████████████████████████████████████

836.   Regardless of which Georgia Dock pricing arrangement was used, the material pricing terms of the Georgia Dock Defendants' broiler chicken contracts provided that the amount

charged to Plaintiffs would be predicated on the Georgia Dock. None of these arrangements allowed the Georgia Dock Defendants to operate and control the Georgia Dock or to use their pricing submissions to PMN to falsely inflate each week's Georgia Dock price above the actual average offering price. Such a scheme undermined all validity to the Georgia Dock pricing system as being reflective of actual average offering prices, and gave the Georgia Dock Defendants the ability to maneuver their prices skyward, so long as on a week-to-week basis they stayed within the two-cent range permitted by the PMN. At the same time, the secrecy behind which the Georgia Dock Defendants kept the Georgia Dock shrouded deprived customers like Plaintiffs of any ability to uncover and detect that their purchases were based on an inflated pricing index.

### V.     Defendants used the Georgia Dock Manipulation To Impact Higher Prices Charged to Contract Purchasers

837.    Defendants' manipulation of the Georgia Dock not only had an anticompetitive effect on the prices of broilers that were based directly on the Georgia Dock; it also contaminated and artificially raised prices for broilers that were not expressly tied to the Georgia Dock.

838.    Defendants also used the artificial prices reported on the Georgia Dock index to justify price increases to their contract purchasers. This was especially the case during the latter part of the conspiracy when the Georgia Dock index deviated so dramatically from the Urner Berry and USDA Composite indices. It was true, moreover, even with respect to Defendants that did not submit pricing information to Georgia Dock.

839.    When Defendants engaged in negotiations with restaurants and other contract purchasers of broilers, and sought to explain why they were "forced" to increase prices, one of the main explanations that they used to justify the price increases was the artificially inflated Georgia Dock index. Defendants independently could not have provided restaurants and other contract purchasers with the same false explanation for price increases without coordinating the messaging.

W.     **Defendants' Bid-Rigging Conduct**

840.    Beginning at least as early as 2012 and continuing at least into 2019 ("Bid-Rigging Conduct Period"), Defendants and the Co-Conspirators engaged in a conspiracy to rig bids submitted for broilers sold to restaurants and other contract purchasers, with the intent to artificially inflate the prices paid by these customers.

841.    As part of their procurement process, many restaurants and other contract purchasers ("Bid Customers")[17] requested proposals or bids from Defendants for the volume of chicken needed.  The Bid Customers received bids from Defendants throughout the Bid-Rigging Conduct Period.

842.    The Bid Customers expected Defendants to engage in a competitive bidding process, which when complete, would allow the Bid Customers to award its contracts to the most competitive bidder(s).  Defendants, however, recognized that the Bid Customers offered an additional opportunity to effectuate their conspiracy.

843.    Defendants' and the Co-Conspirators' bid-rigging conduct took multiple forms.  At its most basic level, Defendants and the Co-Conspirators exchanged confidential information with each other regarding the bids they were submitting, or intended to submit, to specific identified Bid Customers, so that all supposedly competitive bids were aligned.

844.    On June 3, 2020, the Department of Justice issued an Indictment against officers of certain Defendants in the District of Colorado founded on Defendants' and the Co-Conspirators' bid-rigging conduct (the "June Indictment").  The June Indictment charged Jayson Penn, President

---

[17]    Pursuant to this Court's Order of September 22, 2020 (ECF No. 3835), the DAPs are permitted to use this Consolidated Pleading to amend their Complaints to include bid rigging claims.  All DAPs who have or could have been affected by the bid-rigging factual allegations join in these allegations and claims.

and CEO of Pilgrim's Pride, Mikell Fries, President of Claxton, Scott Brady, Vice President of Claxton, and Roger Austin Vice President of Pilgrim's Pride (the "First Indicted Defendants") with conspiring "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States" in violation of Section 1 of the Sherman Act.[18]

845. Specifically, the June Indictment alleged that from at least 2012 through at least 2017, the First Indicted Defendants and at least seven broiler chicken suppliers conspired:

- to reach agreements and understandings to submit aligned, though not necessarily identical, bids and to offer aligned, though not necessarily identical, prices, and price-related terms, including discount levels and lines of credit, for broiler chicken products sold in the United States;

- to participate in conversations and communications relating to nonpublic information such as bids, prices, and price-related terms, including discount levels and lines of credit, for broiler chicken products sold in the United States with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products sold in the United States; and

- to monitor bids submitted by, and prices and price-related terms, including discount levels and lines of credit, offered by, Suppliers and Co-Conspirators for broiler chicken products sold in the United States.

---

[18] *United States of America v. Jayson Jeffrey Penn et al.,* Crim. Action No. 20-cr-00152-PAB (D. Colo. June 2, 2020) [ECF No. 1].

846. The June Indictment expressly identified as victims of the First Indicted Defendants' conspiracy "[r]estaurants, grocery retailers and others who purchased large volumes of broiler chicken" who "received bids from or negotiated prices or other price-related terms, including discount levels, with Suppliers directly."

847. The June Indictment set forth a series of communications between Defendants and the Co-Conspirators – via phone, email and text messages – sharing and coordinating confidential bidding and pricing information in connection with multiple restaurant and grocer victims' requests for bids.

848. On October 7, 2020, the Department of Justice issued a Superseding Indictment in the District of Colorado, again founded on Defendants' bid-rigging conduct (the "Superseding Indictment"). The Superseding Indictment charged six additional executives, including Tim Mulrenin (Tyson/Perdue), Bill Kantola (Koch), Jimmie Little (Pilgrim's Pride), Bill Lovette (Pilgrim's Pride), Brian Roberts (Tyson/Case Foods), and Ric Blake (George's) (together with the First Indicted Defendants, the "Criminal Defendants") with conspiring "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States" in violation of Section 1 of the Sherman Act.[19]

849. The Superseding Indictment expanded the bid-rigging conduct period from at least as early as 2012 through at least early 2019, and stated that the bid-rigging conduct included but was not limited to ten different broiler chicken suppliers.

850. The Superseding Indictment also charged Defendant Jimmie Little with two additional counts for False Statements and Obstruction of Justice. The Superseding Indictment

---

[19] *United States of America v. Jayson Jeffrey Penn et al.,* Crim. Action No. 20-cr-00152-PAB (D. Colo. June 2, 2020) [ECF No. 101].

alleged that during an interview with special agents of the United States Department of Commerce and the Federal Bureau of Investigation, Little "knowingly and willfully made false statements to federal law enforcement agents." Specifically, "LITTLE stated words to the effect that (a) he had no contact with individuals at competing Suppliers outside of speaking to the individuals at industry trade shows; and (b) he had not called-or sent text messages to – any individuals at competing Suppliers. The Statements were false. As LITTLE then and there knew, he indeed had contact with individuals at competing Suppliers outside of trade shows, and had called and sent text messages to individuals at competing Suppliers."

851. The Obstruction of Justice count alleges that "LITTLE corruptly obstructed, influenced and impeded official proceedings, and corruptly attempted to obstruct, influence, and impede official proceedings, pending and about to be instituted in the District of Colorado, *to wit*, the pending grand jury investigation of price fixing in the broiler chicken industry, the pending prosecution of four individuals for conspiring to fix prices in the broiler chicken industry, and the then-about-to-be-instituted prosecution of LITTLE for conspiring to fix prices in the broiler chicken industry."

852. On October 13, 2020, the Department of Justice filed an Information charging Pilgrim's Pride.[20] The Information states that "[b]eginning at least as early as 2012 and continuing through at least early 2019 ... [Pilgrim's Pride] and its co-conspirators entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States. The combination and conspiracy engaged in by Defendant and its co-conspirators was a

---

[20] *United States of America v. Pilgrim's Pride Corporation.,* Crim. Action No. 1:20-cr-00330-RM (D. Col. October 14, 2020) [ECF No. 1].

*per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1."

853.    Plaintiffs incorporate by reference and adopt the allegations of the Superseding Indictment.  As a result of the bid-rigging conduct, pricing to the Bid Customers, for broilers was elevated.  The Bid Customers were injured in their business or property by paying more for broilers than they would have paid in the absence of the conspiracy.

## X.    The Structure and Characteristics of the Chicken Market Make it Highly Susceptible to Collusion

854.    ***Highly-Concentrated Market with Vertically-Integrated Producers***.    A concentrated market, such as the U.S. chicken market, facilitates the operation of a cartel because it is easier to coordinate behavior among possible co-conspirators and more difficult for customers to avoid the effects of collusive behavior.

855.    According to a November 2013 USDA report, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing.  According to the National Chicken Council, 55 federally inspected Broiler companies operated in 1995, compared with 41 companies in 2010."  By 2014, there were only 35 such companies.

856.    In fact, the trend towards consolidation among all segments of the Broiler industry goes back decades, as shown below.  This consolidation has largely squeezed out the large number of smaller Broiler companies that used to represent a significant portion of Broiler industry production.



857.    As of 2015, Defendants controlled 88.8% of Broiler production in the United States. Since the start of the relevant time period, there has been surprising stability in market share for each Defendant, as shown by the graph below.



858.    Defendants now collectively control nearly 90 percent of the U.S. wholesale chicken market.

859.    The U.S. chicken industry is almost entirely vertically integrated, with Defendants (known as "integrators") owning, or tightly controlling, each aspect of breeding, hatching, chick-rearing, feeding, processing, and selling.

860.    ***Inelastic Demand at Competitive Prices***.  Inelastic demand means that increases in price result in limited declines in quantity sold in the market.  In order for a cartel to profit from raising prices above competitive levels, demand must be inelastic at competitive prices, which allows cartel members to raise prices without seeing a decline in sales revenue.

861.    Industry studies show that in the U.S. chicken market, not only is the demand for chicken inelastic, it has become increasingly more inelastic over the past 40 years.

862.    In connection with a joint DOJ-USDA workshop on the poultry market in 2010, agriculture economist Michael Dicks presented research demonstrating how vertical integration incentivizes chicken producers to implement supply restrictions.  He stated that in the U.S. poultry industry "vertical coordination allows integrators to manage excess capacity to manage price.  Integrators can minimize the effect on producers by increasing the time between collection and delivery of birds or reducing the number of flocks per year … Because of the inelastic nature of the supply and demand a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

863.    ***Existence of Numerous Trade Associations and Access to Competitors' Data through Agri Stats***.  The existence of industry trade associations makes a market more susceptible to collusive behavior because such associations provide a pretext under which co-conspirators exchange sensitive company information, such as pricing and market allocation.  Industry trade associations also provide mechanisms for sharing information, and monitoring, deterring, detecting, and punishing cheating.

864.    The following U.S. chicken industry trade associations, all of which count all or nearly all Defendants as members, allowed Defendants to coordinate their price-fixing and supply restriction conspiracy: National Chicken Council ("NCC"), United States Poultry & Egg Export

Council, U.S. Poultry & Egg Association, Georgia Poultry Federation, North Carolina Poultry Federation, Poultry Federation (representing chicken producers in Arkansas, Missouri, and Oklahoma), and the International Poultry Council.

865.   According to Communication in Poultry Grower Relations: A Blueprint to Success, a book written by a management consultant affiliated with the U.S. Poultry & Egg Association, "representatives from the various [chicken producers] readily share information while attending the numerous seminars offered by the U.S. Poultry & Egg Association, National Chicken Council" and other trade groups.  The book notes that "industry leaders realize the industry's tremendous potential, and their spirit of cooperation is based on knowing that which is good for individual companies is good for the industry."

866.   Regular and frequent attendance by Defendants' CEOs and top level executives at trade association meetings is customary.  For example, NCC "represents integrated chicken producer-processors, the companies that produce, process and market chickens.  [The 40] member companies of NCC account for approximately 95 percent of the chicken sold in the United States."

867.   The CEOs of the top integrated broiler producers are routinely on the board of directors and meet at least quarterly with one another through the NCC.

868.   The NCC has three annual board meetings attended by Defendants' senior executives, including most or all Defendants' CEOs and other top executives.  Every Defendant and Co-Conspirator is a member of the NCC, including Mar-Jac, Claxton Poultry, Harrison Poultry, Keystone, and Allen Harim.  Amick President and CEO Ben Harrison, who served on the NCC Board of Directors throughout the relevant time period, was NCC's Chairman in 2018.  CEOs generally always attend the following three NCC meetings each year, in addition to special committee meetings or other special NCC events: (a) the January meeting of the NCC held along

with the International Poultry Expo, (b) the mid-year Board of Directors meeting, and (c) the NCC Annual Meeting in October.

869.    Generally, CEOs arrive the night before an NCC meeting and socialize with their colleagues, then have small private dinners with one or more of their competitors' CEOs or top executives. The next day, the formal NCC meetings are held and executives from Agri Stats and other allied industry organizations make presentations at the meeting. A formal lunch is held during the meeting and provides CEOs and top executives and opportunity to talk casually with their competitors. Following the meeting, Defendants' CEOs and top level executives often meet, socialize, and golf, hunt, or fish together. Defendants and Co-Conspirators also hold positions of power within the NCC. For example, Amick President and CEO Ben Harrison, served on the NCC Board of Directors throughout the relevant period, and subsequently served as NCC Chairman. Thomas Shelton, Chairman and CEO of Case Foods, has continuously been a member of NCC since 1988 through the relevant period serving on the Board of Directors and as President during that time. Numerous executives of Keystone Foods, including Jeff Bailey (Director of National Account Sales), Jenelle Duncan (Domestic Sales Manager), Chuck Cooper (Senior Director Supply Chain), Charles Hill (VP Sales & Marketing), and Keith Lewis (former Senior Vice President for U.S. Poultry and Fish), were also members of the NCC during the relevant period. William Andersen of Keystone Foods was also appointed to the board of directors for a three year term during the 2010-11 NCC cycle. Andersen was heavily involved with the NCC, assisting in preparation of annual reports and management reports, and preparing and sharing market reports including graphs on chicken production, eggs set, chick placements, hatching layers, and egg production.

870.    Similarly, Defendants and Co-Conspirators, and their senior executives, regularly attend the Georgia Poultry Federation's meetings (usually held in April, August and September). The Georgia Poultry Federation's mission is "[t]o protect and improve the competitive position of the poultry industry in Georgia, the nation's leading poultry producing state."  Defendants and Co-Conspirators House of Raeford, Perdue, Fieldale Farms, Wayne Farms, Tyson, Sanderson Farms, Pilgrim's, Mar-Jac Poultry, Harrison Poultry, and Claxton Poultry, and Keystone Foods are members of the Georgia Poultry Federation.  Keystone Foods' Clay Banks served as Chairman of the Georgia Poultry Federation during 2014-2015.

871.    Defendants also accessed each other's above-described data through co-Defendant Agri Stats to monitor cheating, if any, in the conspiracy.  Agri Stats acted as an active facilitator of Defendants' cartel.

872.    ***Investor Conferences.***  Defendants' CEOs and senior executives participate in numerous investor conferences organized by Wall Street analysts, providing further opportunities to meet and communicate with one another.  Such conferences are held on an annual and/or ad hoc basis including, but not limited to, the Goldman Sachs Global Staples Forum (held every May), Bank of America Merrill Lynch Global Agriculture Conference (held every February), BMO Capital Markets Annual Ag & Protein Conference (held every May), BMO Capital Markets Conference (held every May), BMO Farm to Market Conference (held every May), Urner Barry Annual Executive Conference and Marketing Seminar (held every April or May), and JP Morgan Basic Materials Conference (held every June).

873.    ***Competitor Plant Tours.***  Defendants also permitted one another to tour each other's Broiler plants, which revealed confidential business methods employed by a company.

While such tours were often framed as "best practices" information exchanges, they permitted the opportunity to conspire among senior executives.

874.   As additional examples of Defendants sharing competitive and sensitive information with each other, ██████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████

875.   Defendants also permit employees to regularly move between companies without non-compete limitations or confidentiality agreements that would protect a company's (seemingly) proprietary business knowledge and customer base.  For example, Dr. Don Jackson was President of Foster Farms' Poultry Division until December 2008, but then immediately took a position as CEO of Pilgrim's.  Similarly, Clint Rivers, Pilgrim's former President and CEO until December 2008, left the company and became Senior VP of Operations and Supply Chain Management for Perdue in 2009.  Rivers then moved to Wayne Farms in 2012, where he became Chief Operating Officer.  Greg Tatum served as CFO for Claxton Poultry, before moving to Pilgrim's in 2009 to serve as Senior VP of Business Development.  Numerous other high level and well as lower level

executives move freely between Broiler companies with little or no provision by Defendants to protect their confidential information.

876.   ***Mergers and Acquisitions.***   Senior executives from Defendants had numerous opportunities to directly communicate with one another regarding various mergers and acquisitions between 2008 and 2016.   These merger and acquisition discussions include both completed agreements, such as those described in Section VI(E)(4) of this Complaint, as well as proposed transactions that were never completed.   In connection with mergers and acquisition discussions, due diligence materials regarding confidential business information were shared between Defendants.

877.   In addition, Defendants all rely on debt financing and merger and acquisition services from the same small group of financial institutions.   In the course of providing such services, financial institutions obtain unusually detailed access to Defendants' non-public operational information, including production and pricing information, which provides another opportunity for Defendants to share confidential business information.

878.   ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████

879.   ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████

880. 

881.     ***Further Restricting Breeder Flock Supply and Sharing of Future Plans Through So-Called Strategic Alliances and Joint Ventures***.  Defendants and their Co-Conspirators facilitated the sharing of future plans for the slaughter of so called "fowl" including spent hens through a so-called "strategic alliances" and joint ventures, which also gave the Defendants and Co-Conspirators additional opportunities to implement the supply-restriction mechanism of their conspiracy, and achieve additional profits, by sending "spent hens," which are breeder hens that can no longer lay eggs, as well as roosters (which along with spent hens, are sometimes collectively referred to as "fowl,") to so-called "hen houses" for slaughter for meat consumption.

882.     Because, unlike the broilers produced by the Defendants and Co-Conspirators, hen houses had the capacity and equipment necessary to slaughter larger birds – often called "heavy fowl," which are spent hens and roosters weighing up to eight pounds – hen houses became a critical part of the Defendants' supply-restriction mechanism of their conspiracy by allowing them to send their breeder hens to slaughter at younger and younger ages, further reducing supply at the very top of the supply chain.  Sending breeder hens to hen houses for slaughter while they were still capable of laying eggs – that is, before 65 weeks of age – allowed the Defendants and Co-Conspirators to use information provided by both Agri Stats (which tracked average slaughter age, as detailed above) and the hen houses (which tracked and disseminated to their members similar

information) to project their own supply and also gain insight into the supply reductions of their ostensible competitors who were also members of such "strategic alliances."

883.     Discovery to date has uncovered the participation of the Defendants and their Co-Conspirators in two such entities, Non-Producer Co-Conspirator Tip Top and Non-Producer Co-Conspirator Southern Hens.

884.     The Tip Top Alliance was formed in 2009 by Defendants Case Farms, House of Raeford, Keystone, Mar-Jac, Mountaire, Perdue, Harrison, and Wayne Farms, and Co-Conspirators Amick Farms and Fieldale Farms, who were later joined by Defendants Pilgrim's and Simmons. ███████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ Members of the Tip Top Alliance held quarterly conference calls, and met in person at least once a year during the annual International Chickens Conference in Atlanta.  Brad Respess, the president of Tip Top, regularly sent emails, as well as quarterly performance reports, to all members of the alliance, and Mr. Respess also regularly received industry information from Agri Stats' Mike Donahue.

885.     ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ Rendering hens for non-food use has next to no value compared to slaughtering them for food, which means that the Tip Top alliance members gave up

a profit from Tip Top in order to cut back on broiler production by sending breeder hens to slaughter far earlier than they would otherwise have done in a truly competitive market.

886.    Communications between Mr. Respess and alliance members allowed each alliance member to know that its fellow alliance members were, consistent with the supply-restriction mechanism of their conspiracy, cutting broiler production by increasing their shipments of younger and younger breeder hens to Tip Top, taking supply out of the market at the very top of the supply chain.

887.    ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████



888.    ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

889.    ██████████████████████████████████████████
████████████████



890. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████

891. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

892. In addition to providing information by which its alliance members could (and did) coordinate their collusive supply-restriction scheme, Tip Top readily gave such information to non-alliance members, █████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

893.     Southern Hens, based in Moselle, Miss., was a joint venture formed by Defendants that facilitated the sharing of confidential information.  Southern Hens is described in its corporate filings as a poultry processing business.  It processes spent breeder hens for chicken producers including its joint owners.  Southern Hens' Board has included representatives from Aviagen, as well as Defendants Sanderson Farms, Koch, Foster Farms, OK Industries, Pilgrim's Pride, Mar-Jac, Peco Foods, and George's.

894.     The Board representatives have infrequently changed over the years.  For example, Bob Rosa (Sanderson Farms), served on the Board from at least 2007 through 2017.  Lance Buckert and Mark Kaminsky (Koch) also served during this same time-period, as did Denny Hickman (Peco Foods) and Ben Thompson (Aviagen).  Melissa Durbin (Marshall Durbin) served on the Board from at least 2008 until 2014 when Mar-Jac replaced Marshall Durbin after its acquisition. Bob Kenney (George's) served on the Board from 2010 through 2017.  Other Board members have included Monty Henderson (George's); Bob Hendrix, Walt Shafer and Randy Stroud (Pilgrim's); Pete Martin (Mar-Jac); and Tim Garber and Terry Thompson (Foster Farms).

895.     Southern Hens has also had the same General Manager, John Comino, since 1998. Comino regularly communicated with board members and helped to facilitate Defendants' sharing of information with each other.  For example, Comino attended NCC meetings on behalf of Southern Hens, and served on the Board of Directors with representatives from several Defendants, including Pete Martin (Mar-Jac), Gary George (George's), and Trent Goins (OK Foods).

896.    Comino also shared plans for production cuts among Defendants who used Southern Hens as a means to achieve these coordinated activities. 

897.    ***High Barriers to Entry***.  The intended effect of a conspiracy to fix prices, either explicitly (as is the case here with the Georgia Dock benchmark price index) and through restricting supply (which Defendants also did) is to generate higher profits for the participants. The normal impact of the artificially higher profits is to draw other profit seeking companies into the market.  In industries with substantial barriers to entry, such as the U.S. chicken market, however, companies – such as Defendants – are able to raise prices above competitive levels and still earn above-normal levels of profits.

898.    The existence of high entry barriers in the U.S. chicken market is demonstrated by the trend of increasing consolidation, with larger vertically integrated companies increasing their control over the industry.  Beyond the issue of vertical integration, there is a wide range of government food safety, worker safety, and environmental regulations that must be addressed by any new entrant into the chicken market.  The existence of low, and highly variable, profit margins also act as significant barriers to entry.  With such barriers to entry, companies that have the available resources and significant start-up capital to enter the market and benefit from economies of scale are able to reduce their average cost by producing more.  Companies already in the market

such as Defendants – are motivated to exclude other companies from the market to maintain their coordinated supply restriction conspiracy, and ultimately keep prices at artificially inflated levels. These high entry barriers also extend to large foreign meat conglomerates that have acquired U.S. broiler producers in the past decade, including Brazil's JBS S.A. (Pilgrim's), Mexico's Industrias Bachoco (O.K. Foods), Belgian company Continental Grain Company (Wayne Farms), Marfig Alimentos S.A. (Keystone Foods), and South Korea's Harim Group Corporation (Allen Harim). Each of these foreign meat conglomerates were already large players in the global meat industry and simply continued operating their pre-existing U.S. broiler company as a subsidiary. Ownership of U.S. broiler subsidiaries by such large, well-financed conglomerates deter entry by smaller, non-globalized companies that might want to enter the U.S. broiler production business.

899.    ***History of Government Investigation and Collusive Actions.***  In response to a Federal Trade Commission investigation in 1919 which found oligopoly domination and anti-competitive monopolistic behavior in the meat-packing industry, Congress passed the Packers and Stockyards Act ("PSA").  *See* 7 U.S.C. § 193(a), § 209.  Congress amended the law to include the poultry industry in 1935.

900.    In 1922, the Supreme Court upheld the constitutionality of the PSA in *Stafford v. Wallace*, finding that "the object of the PSA was to secure the flow of livestock from the farms and ranges to the slaughtering center and into meat products unburdened by collusion that unduly lowered the prices to the shipper and unduly increased the price to the consumer."

901.    In April 1973, the United States Department of Justice filed a civil antitrust action against the National Broiler Marketing Association ("NBMA") alleging the NBMA and its members conspired to fix Broiler prices and restrict Broiler production in violation of Section 1 of the Sherman Act.  The DOJ sought to enjoin the NBMA and its dozens of members from

continuing a conference call program where members (and even some non-members) coordinated the pricing and production of Broilers. In response, numerous private civil antitrust actions were filed against the NBMA and 42 individual defendants in the In re Chicken Antitrust Litigation case. The NBMA and Broiler producers eventually settled the case, resulting in a settlement of roughly $30 million.

902. Beginning in 2010, the USDA undertook a series of public workshops to explore competition issues in the upstream, contract-farmer Broiler market. A workshop held in Normal, Alabama, on May 21, 2010, focused on corporate concentration and lack of competition in the Broiler industry. The workshops led to the proposal of new rules aimed at encouraging competition in the meat industry, but extreme political pressure from Defendants and their allies eventually watered down the rule and led to the resignation of the official charged with imposing tougher regulations.

903. In 2011, George's Inc. acquired the Harrisonburg, Virginia processing plant from Tyson Foods. The DOJ brought an action to stop the acquisition (*United States v. George's, Inc.*), which alleged the purchase would impermissibly reduce the available options for contract farmers to sell their grower services. The DOJ eventually settled with George's in June 2011 after obtaining an agreement to require George's to make capital improvements to the facility that would increase its capacity and permit contract farmers to sell more grower services to the processing plant.

904. According to a June 2014 USDA Report, "the [Broiler] industry faces a range of public policy issues, [including] competition ... [c]oncerns[, including] the exercise of market power by Broiler integrators have prompted merger litigation, USDA regulatory initiatives, congressional proposals, and investigations by Federal agencies."

**Y.** **Defendants Collusively Adopted Additional Strategies to Reinforce Their Conspiracy**

905.     Defendants collectively adopted several strategies to buttress and sustain their conspiracy.

906.     *A Collective Shift Away From Long-Term Fixed-Price Contracts*.     First, particularly with respect to certain distributor and grocer customers, starting in 2008, the Defendants moved away from long-term fixed-price contracts to shorter-term contracts with variable pricing pegged to one of several publicly-available price indices (including the USDA composite Urner Barry, and the Georgia Dock).  A coordinated move away from fixed price contracts to contracts permitting prices to fluctuate with an indexed public market price helped facilitate a market-wide antitrust conspiracy.  *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 659 (7th Cir. 2002).  This was true even with respect to restaurants and other purchasers that continued to enter into term contracts with Defendants.

907.     Defendants' shift indicates that they anticipated higher, or artificially inflated non-competitive, prices resulting from their production cuts, and wanted the flexibility to take advantage of such prices without being locked in to longer-term, lower-pricing commitments to certain distributor and grocer customers.

908.     Starting around January 2008, senior executives from Koch Foods, Pilgrim's, Perdue, Sanderson Farms, and Tyson publicly announced an effort to reduce annual fixed-price contracts.

909.     This change coincided with Defendants' efforts to reduce chicken industry supplies to drive chicken market prices higher.

910. On January 28, 2008, Tyson CEO Richard Bond announced on an earnings call that Tyson was looking at shortening its fixed price contracts, and by June 2009 Tyson reported it had "dramatically" shortened the amount of fixed-price contracts over 90 days.

911. The next day, on January 29, 2008, Pilgrim's CFO Rick Cogdill reported on an earnings call that Pilgrim's had started moving away from fixed-price contracts, noting that "in a situation like where we are now where we need to drive commodity prices up, that [*i.e.*, having less fixed price contracts] is going to give us the opportunity for more immediate benefit to our P&L than what we would have had say, historically three year[s] ago, when a higher percentage was fixed price." Pilgrim's later reported that by March 2012, it had reduced its exposure to fixed price contracts, with most contracts now market-based or including a reset provision linked to the underlying commodity. By 2014, Pilgrim's reported that less than 5% of all its contracts were 12-month fixed price contracts.

912. On July 28, 2008, Perdue spokesperson Julie DeYoung told an industry publication that Perdue was looking to shorten its contract terms, stating, "the company is also seeking to raise prices and shorten its contracts."

913. Sanderson Farms' CEO Joe Sanderson noted in a July 31, 2008, earnings call that the industry may move towards "shorter term agreements."

914. On an August 6, 2012 earnings call, Tyson CEO Donnie Smith stated that "[o]ver the past couple of years we have substantially reduced a number of fixed price contracts we have with customers and currently have less than 15% of our Poultry volume [on] annual fixed price contracts. The vast majority of our contracts are tied to specific markets or allow for conversations about adjusting prices to move – prices to offset higher input and we will continue to push for even

more of these types of contracts. I believe supply will begin to rationalize as well, making it easier for us to have those pricing conversations."

915.    This collusive and coordinated shift toward reducing the number of longer-term fixed-price contracts had the intent and effect of creating supra-competitive market prices for broilers to all customers, including those customers who continued to enter into term contracts with Defendants.

916.    ***Coordinated Denial of Lines of Credit***. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

917.    ***Inter-Defendant Sales***. Third, the Defendants use direct purchases of chickens from one another and from smaller producers to meet each company's own sales needs.

918.    In addition to exemplifying the commodity nature of the chicken market, these inter-Defendant sales allowed Defendants to soak up excess supply that could potentially depress prices in the market and facilitated the opportunity to expressly discuss prices with competitors. Such purchases also permitted companies to maintain market share despite reducing their

production. In many instances large inter-Defendant purchases were negotiated by CEOs or other senior level executives of Defendants, thereby providing additional opportunities to conspire.

919. In 2011, for example, Tyson began using what was described as a "very unique strategy," called "Buy vs. Grow."

920. Tyson's strategy essentially treated the industry supply as though it were for a single unified company, rather than competing businesses that would rather sell self-produced product to a customer than a competitor. Tyson's adoption of this strategy was indeed "unique," because only a few years prior to adopting the "Buy vs. Grow" strategy, it had derided a similar strategy as a "stupid" subsidization of competitors' growth, with a Tyson executive explaining on an April 29, 2008 earnings call that "I think what we said along is we're going to match our supply and demand. We're not going to cut beyond that and then go out and buy open market meat to subsidize other people's growth."

921. Tyson's strategic shift in 2011 to buying chicken on the open market is evidence that by that time, it was confident that its fellow conspirators would maintain their production levels as they were and not increase them.

922. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

923. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████

924.     In a November 5, 2012, interview, Fieldale President Thomas Hensley noted his company was also pursuing a strategy to purchase excess supply from its competitors, stating that "[i]f you don't have a home for your chickens on Monday morning, you shouldn't have those chickens. Now we know where all our chickens are going. So we are buying chickens in that lower price area instead of selling them. So, no expansion for us."

925.     In a July 9, 2012 article, Donnie Smith of Tyson was quoted as saying "the company will not over produce chicken at these expensive grain levels, preferring to buy commodity pieces in the secondary market to fill orders where necessary."

926. ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

927.     On a January 31, 2014, earnings call, Smith reported that .

928.    through Tyson's "buy versus growth strategy we continue to keep our supply short of demand ...."

929.    By the end of 2014, Tyson reported it was buying over four million pounds of chickens on the open market each week.  Four million pounds of chicken per week is more than any of the 24th-30th largest chicken companies produce on a weekly basis, so the amount of Tyson's purchases was quite significant.

930.    During the first part of 2015, Tyson increased its Buy vs. Grow purchases by 50 percent, expanding its purchases from competitors to unprecedented levels.  Tyson announced plans in May 2015 to increase its Buy vs. Grow strategy to 10 percent of its sales in the second half of 2015 and 2016.  Ten percent of Tyson's 2014 ready-to-cook pounds was 17.6 million pounds per week, a volume that by itself would dwarf the entire average weekly production of any of the 15th-30th largest chicken producers.

931.    Notably, Tyson also announced in May 2015 that it planned to reduce its production after July 2015 and keep it flat through 2016 by increasing its Buy vs. Grow purchases.

932.    ***Atypical Increases in Exporting of Chickens***.  Fourth, during 2013 and into 2014, Defendants found new ways to actively depress the size of breeder flocks, such as using the pretext of avian flu in Mexico to justify exporting flock chickens to Mexico to repopulate flocks rather than use such chickens to increase domestic production levels.

933.    Indeed, Defendants continued their program of exporting chicken hens and eggs to Mexico in 2015, with Tyson explicitly noting in a May 4, 2015, earnings call that it was sending 3 percent of its eggs to Mexico to "fill incubators."

934.    Similarly, during a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted his "confidence that we're going to do the right thing with respect to maintaining [] discipline.  We've

certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million hatching eggs or so outside of the country. The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made. And so again that gives us confidence that we're going to continue to be disciplined as an industry."

935.     Tyson and other Defendants exported hatching eggs to Mexico and other foreign countries from 2013-2016 with the intent to artificially reduce the supply, and artificially inflate the price, of chickens in the U.S. The revenues Tyson and others received for exporting hatchery eggs to Mexico was far less than they would have generated hatching those same eggs and selling the chicken meat in the U.S. market.

936.     Thus, but for Defendants' agreement and conspiracy as alleged in this Complaint, it would have been against Tyson's independent economic self-interest to export hatching eggs to Mexico and forego higher hatching egg prices in the U.S. But Defendants' new-found "discipline" ameliorated any remaining risk and resulted in supra-competitively higher overall U.S. chicken prices.

**Z.     Agri Stats Actively Facilitated Defendants' Conspiratorial Communications And Provided Data Necessary To Effectuate, Monitor, And Enforce The Conspiracy**

937.     The USDA and various other entities publicly published aggregated weekly, monthly, and annual supply and pricing information concerning the U.S. chicken industry. But only Agri Stats received from Defendants, and then provided to Defendants, detailed information to accurately determine producer-specific production, costs, and general efficiency.

938.     Agri Stats is a company that generated confidential chicken industry data considerably more detailed than any similar types of available reports, including the following data categories:

- Breeder flock size and age, hatchery capacity, and the costs associated with breeder flocks, including feed and housing expense;

- Data about the production, delivery and formulation of feed, including corn and soybean meal costs, which are two of Defendants' most significant input costs;

- Grow-out information for chicken "flocks" provided to contract farmers, including the number of chickens placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (*i.e.*, "down time"), feed conversion rate (pounds of feed per pound of chicken), average daily weight gain by chicks, live pounds produced per square foot of grower house, grower compensation, including average grower payment in cents per pound and cents per square foot, breed composition of flock (breed or cross-breed of flocks), detailed information on numerous mechanical aspects of chicken housing, and numerous other detailed cost, mortality, and operational information about disease, transportation, labor, and other grow out related information;

- Slaughter, processing, and further processing information, including pay for processing plant workers, total production volume, market age of chickens at slaughter, weight of chickens at slaughter, birds per man hour, processing line speeds, and labor hours per pound;

- Inventory levels of chickens; and

- Financial information, such as monthly operating profit per live pound, sales per live pound, and cost per live pound.

939. Agri Stats collected data from Defendants, audited and verified the data, and ultimately reported back to Defendants detailed statistics on nearly every operating metric within the industry, including the size and age of breeder flocks. Agri Stats' survey methodology involved – from and to Defendants – direct electronic data submissions of financial, production, breeder flock size and age, capacity, cost, and numerous other categories of information by each chicken producer on a weekly and monthly basis.

940. At each of Defendants' chicken complexes, certain employees, typically in the accounting department, were responsible for submitting the data to Agri Stats once a week (historically, on Thursdays) using an AS400 data link system. Agri Stats used a detailed audit

process to verify the accuracy of data from each complex, often directly contacting Defendants to verify data before issuing reports to Agri Stats subscribers.

941.    Agri Stats described itself as a "benchmarking" service that "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance."

942.    Sanderson Farms CEO Joe Sanderson claimed, "[w]e use Agri Stats, which some of you are probably familiar with.  Agri Stats is a benchmarking service that we submit data to. Almost everyone in our industry does as well.  And we get the data back.  It's anonymous – the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over the industry."

943.    However, contrary to these assertions, Defendants were at all material times able to (and did) readily determine "whose numbers the numbers belong to."  Indeed, each Defendant knew that when it provided its internal, confidential information to Agri Stats, the other producers would be able to access that information and identify the Defendant that submitted it.

944.    There was no legitimate purpose to provide this specific, competitively-sensitive information to Agri Stats, nor was there any legitimate purpose for Agri Stats to disseminate the information in the detailed, readily-decipherable form in which it is sent to Defendants.  Instead, it was provided, compiled and transmitted for anti-competitive purposes.

945.    Agri Stats' critical importance for a collusive production-restriction scheme in the chicken market lies not only in the fact that it supplies data necessary to coordinate production limitations and manipulate prices, but also in its market-stabilizing power.  Price-fixing or output-restricting cartels, regardless of industry, are subject to inherent instability in the absence of policing mechanisms, as each individual member has the incentive to "cheat" other members of

the cartel – for example, by boosting chicken production to capture higher prices even as other cartelists heed their conspiratorial duty to limit production, which is what happened in the chicken industry for a short period in 2010, when Defendants' conspiracy temporarily faltered.

946.    Agri Stats' detailed statistics – coupled with its regular, in-person meetings with each Defendant and routine participation in trade association events widely attended by Defendants' senior executives – serve an indispensable monitoring function, allowing each member of Defendants' cartel to police each other's production figures (which are trustworthy because they have been audited and verified by Agri Stats' team) for any signs of "cheating."

947.    Agri Stats claimed to maintain the confidentiality and anonymity of individual companies' data by giving each company a report identifying only that company's specific chicken complexes by name, but not identifying by name other chicken producers' complexes described in the report, but rather, listing competitors' complexes by number.

948.    But, by design, Agri Stats reports were so detailed that any reasonably-informed producer could easily discern the identity of its competitors' individual chicken complexes.  It is common knowledge among producers that others could do so, with some Defendants referring to the task of determining the identity of individual competitor's data as "reverse engineering."

949.    After Tyson rejoined Agri Stats in 2008 and Perdue joined with all of its plants also in 2008, at least 95% of the Broiler Producers in the united States subscribed to Agri Stats providing most of its revenues and providing and receiving the detailed Agri Stats reports which were easily deciphered by the various producers so that they all knew the detailed information set forth hereafter about each other.

950.    Agri Stats reports identified each complex with unique numbers, including a coding system identifying the region and sub-region, for each chicken complex, with the cover pages of

each sub-regional report identifying by name the companies whose complexes are covered in the report itself.

951.    Specific complexes were easily identifiable from their codes.  Agri Stats' coding system made it easy for Defendants' employees – some of whom, including senior executives at both Wayne Farms and Pilgrim's, used to work at Agri Stats – to decipher production, feed, sales and other competitively-sensitive metrics for their competitors' facilities.

952.    In fact, Agri Stats' coding system, coupled with the insular nature of an industry where "everybody knows everybody," allowed for Defendants' employees to identify individual producers' data by eyeballing the rows in any Agri Stats report.  The coding system has never changed (*e.g.*, the Tyson complex in Cummings, Georgia has always been identified as complex "222"), meaning that once a Defendant deciphered the numeric code for a given competitor's complex, that Defendant had the ability to know their competitor's data in perpetuity.

953.    Agri Stats played a particularly important role in Defendants' signaling practices and policing efforts.  The specific type or size of breeder flock housing, breed of chick, average bird size, and production levels listed in Agri Stats data for Defendants' complexes allowed any given Defendant to "reverse-engineer" and interpret the public statements and other publicly available information about its competitors to determine which complexes were cutting back, and by how much.

954.    For example, if in January, a Defendant publicly states its intention to reduce production – even generically, without specifying which complexes will cut back, or by how much – all of their fellow cartel members will be able to tell from the February and March Agri Stats reports whether that Defendant is following through on its conspiratorial agreement.  Further, Defendants Tyson, Pilgrim's, and Sanderson are public companies that report some aggregated

data publicly, which executives from other companies could use to match up against the far more detailed information in the Agri Stats' reports to identify other specific data from their competitors.

955.    Each Defendant and other Co-Conspirators received numerous types of Agri Stats reports, including separate targeted reports for each major area of operations, such as breeding, hatching, hauling, feeding, processing, selling, and administration.

956.    Defendants' complex managers typically received the targeted reports for the specific aspects of chicken operations for which they have responsibility, and the CEO, CFO, and a few other of Defendants' and co-conspirators' top executives received Agri Stats' monthly "Bottom Line Report" (which, for a portion of the relevant period, was called the "Executive Report") geared to top level executives.  The Bottom Line Reports contained one row for each chicken company reporting to Agri Stats with columns for certain categories of information, such as operating profit dollars, profit percentage, corporate SG&A (aka overhead), interest expense, and other key operational information related to sales, revenues and costs.

957.    Within each Agri Stats report (including the Bottom Line Report), unique information referring to supposedly "anonymous" data permitted Defendants and Producer Co-Conspirators to identify their competitors' information contained within each category of report. For example, Agri Stats data on "Actual Live Production Cost," one of many important industry metrics listed in the Bottom Line Report, included line-items for each of the "sub-regions" (described above) that shows, for each particular sub-region, the weighted average figures for "chick cost," "grower cost," "feed ingredient cost," "[feed] mill delivery cost," and "vaccination and medical cost."

958.    Information helping Defendants and Producer Co-Conspirators to assess the size and age of breeder flocks was available in the "Growth Rate Report" section of Agri Stats, which

included complex-by-complex numbers showing the average age, in weeks (*e.g.*, "63.22" or "51.76") of the hens whose eggs, when hatched, became the chickens later killed for meat consumption and supplied to Plaintiffs and other chicken buyers.

959.     The hens comprising the breeder flocks produce fertile eggs (at a rate of roughly five per week) starting around 20 weeks of age, and are typically slaughtered at 65 weeks of age, when breeder hens lose the ability to consistently lay fertile eggs.  A breeder hen killed at 60 weeks lays 25 fewer eggs than a hen killed at 65 weeks, meaning that there are 25 fewer chicks hatched and 25 fewer mature chickens available to Plaintiffs and other chicken buyers.

960.     The bird-age data from the "Growth Rate Report" also shows how close a given breeder flock is to the end of its egg-laying lifespan, giving Defendants insight into how much longer that flock's capacity to lay eggs will impact the supply of chickens available for slaughter further down the supply chain.  In addition, because the "Growth Rate Report" was available each month, knowing the average age of a given flock from month to month can help determine when flocks were being slaughtered and removed from the supply chain (*e.g.*, if the average hen age drops to 4.00 weeks after being at 48.00 weeks in the prior month's "Growth Rate Report," that is a clear indication a breeder flock was slaughtered at 48 weeks).

961.     The "Actual Live Production Cost" section of an Agri Stats report also included (again, by sub-region), the average number and overall weight of the chickens being processed. Other sections of Agri Stats reports included similar, sub-region data for a range of competitively sensitive metrics, such as bird age and mortality, "chick cost per settled flock," and "grower expense."

962.     Knowing the number of complexes each Defendant operates in each sub-region – which, as detailed above, appeared by name at the very beginning of the Agri Stats reports – any

Defendant could, with relative ease, assess the performance of all competing complexes in a sub-region on a variety of important industry metrics.

963.     Discovery in this action has confirmed that Defendants often exchanged Agri Stats information directly with one another.  For instance, on March 24, 2009, Koch CFO Joe Grendys wrote to Amick VP of Sales and Marketing Steve Kernen, inquiring whether Amick had "Any luck yet on agristats #."

964. 

965.

966.     Agri Stats' role in the chicken industry extends far beyond the collection and dissemination of competitively sensitive data.  It was an active and knowing participant in, and facilitator of, Defendants' scheme, along with the Producer Co-Conspirators.

967.     Agri Stats' employees would confirm for Defendants and Producer Co-Conspirators the data for a particular company at quarterly meetings with each company, or at the numerous trade association meetings where Agri Stats executives presented on a regular basis.

968.     Nearly all of the Agri Stats Broiler division account managers responsible for Defendant and Co-Conspirator accounts during the relevant period were former employees of one or more Defendants and their Co-Conspirators and at least one senior account manager left Agri Stats to join Pilgrim's.  This revolving door among the Defendants, their Co-Conspirators and Agri

Stats included current or former Agri Stats employees: ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

969.     During the relevant period, Agri Stats offered a service to Defendants and Producer Co-Conspirators whereby each quarter – but oftentimes far more regularly than that, in some instances two or three times per month – personnel from Agri Stats would meet with each Defendant's employees and give presentations about both company- and industry-wide data. These meetings took place at both the production-plant level, where Agri Stats personnel met with Defendants' complex managers, and at the executive level, where Agri Stats personnel met with the leadership of Defendants' hatchery, breeder, and feed departments.   The executive-level meetings, referred to "quarterly reviews" or "executive reviews," often lasted several days, and

were attended by one or more Agri Stats account managers, often accompanied by Agri Stats vice president Mike Donohue, along with C-suite personnel from the Defendants or Producer Co-Conspirators. These multi-day meetings would touch on a range of competitively-sensitive topics, including the Defendants' and Co-Conspirators' profits, sales, margins, operating rates and capacity, including flock or egg-placement reductions.

970.    Throughout the relevant time period, Agri Stats executives and account managers fanned out across the chicken-producing regions of the country to meet with their clients and co-conspirators, the Defendants and Co-Conspirators.





971.    Similar meetings happened day after day, week after week, month after month, year after year, and ensured the success of the production-restriction mechanism of Defendants' conspiracy.  In addition, roughly every month, Agri Stats account managers would convene account manager meetings – sometimes at Agri Stats' Fort Wayne headquarters, sometimes closer to Mike Donohue's home office in Rhode Island, and sometimes over the phone – which gave Agri Stats employees the opportunity to share information about their various accounts, which could then be relayed to their clients, the Defendants and their Co-Conspirators, at one or more of their subsequent meetings.

972.    Since Agri Stats would travel and present among Defendants regularly, discussing each Defendant's non-public, proprietary data, Agri Stats was in a unique position to share information among Defendants and Producer Co-Conspirators at these regular meetings.  And that is exactly what happened.

973.    At these regular meetings with Defendants' executives, Agri Stats led detailed discussions about industry profitability and the key contributing factors, including size and average age of chicken breeder flocks, average hatchability of eggs, mortality rates, average bird rate, feed cost, and other performance factors based on data Defendants provided.  Agri Stats also led

discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and the top and bottom third of the industry.

974.    Agri Stats also told Defendants' executives how much the industry was over- or undersupplying the market and estimated demand, and shared other information based on data Defendants provided.

975.    Agri Stats' presentations to the Defendants were based in part on color-coded data compilations, known as "books," specifically tailored for each Defendant based on the data the Defendant has submitted to Agri Stats.   Agri Stats maintained at least six "books" for each Defendant: (1) the light-blue "Live" book, with information on the Defendant's breeders, hatchery feed and grow-out; (2) the red "Sales" book, with information on the Defendant's current and year-to-date sales, which provides competitors with information on the price of their product "mix" of chickens versus the national average prices for the same "mix," ranking companies from "best" to "poorest" in terms of performance; (3) the light-green "Production" book, with information on the Defendant's yields; (4) the brown "Profit" book, with information on the Defendant's profits and losses; (5) the mustard-yellow "Rendering" book, with information on the Defendant's rendering facilities; and (6) the "Bottom Line" book, with information on the totality of the Defendant's sales, revenues, and costs.

976.    Anyone at Agri Stats had the ability to pull one or more Defendant's "books" and relay that information to other Defendants.

977.    Indeed, Agri Stats shipped copies of one Defendant's "books" to other Defendants on a number of occasions.

978.     Despite the impropriety of this practice, when it was discovered following a routine review of shipping information, no one at Agri Stats was held accountable, nor were the "books" returned to Agri Stats.

979.     In addition to its in-person meetings with Defendants, Agri Stats employees, including company Vice President Michael Donohue and Broilers account managers Paul Austin, Paul Bunting, and Dana Weatherford, regularly hosted, or presented at, chicken industry events and investor conferences, often citing Agri Stats data in discussing market, production, and demand trends in the chicken industry.

980.     For example, Agri Stats holds events known as "poultry outlook conferences."  At one such conference on April 23, 2015 in Atlanta, Mr. Donohue made a presentation that included "broiler market situation and outlook" as an agenda item.

981.     Mr. Donohue also helped forecast supply and demand for the chicken industry by using Agri Stats data on breeder placements and inventory.  At the U.S. Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, for example, Donohue noted that chicken breast prices were at a particularly high level and "[i]t's not just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012."  He said "I hope this carries over into the latter half of 2012 based on some of the production forecasts that can be made based on breeder placements and inventories."

982.     ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████

983.    ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

984.    Among the thousands of such communications uncovered during discovery to date are the following examples, which are still being compiled in ongoing discovery:

985.    ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



986.

987.

988.    Defendants rarely mentioned their exchange of information with one another through Agri Stats.

989.    However, on certain public occasions, such as earnings or investor conference calls, executives from Defendants Sanderson and Tyson (two of the three publicly traded Defendants) noted the important role Agri Stats data plays in the industry.

990.    For example, Defendant Sanderson's CEO, Joe Sanderson, commented on an earnings call that he "look[s] at Agri Stats and see[s] what people are doing and not doing," and similarly stated on a May 2011 earnings call that "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats." (emphasis added). Asked later on the May 2011 call by an analyst why Mr. Sanderson made this statement and another statement a few months earlier that he "feel[s] confident that we are going to see cutbacks" based on Agri Stats data, Mr. Sanderson indicated:

> Industry participants expected that [the market would improve in June and July] and I think they wanted to carry their production into June and July and see if the market would reward them for that it appears right now .... And then once you get past July 4 ... I think then you will start seeing reduced egg sets .... Typically in my experience the first cut is not enough.

991.    Defendant Tyson similarly noted in a December 2014 investor presentation that:

> [t]he point being is that when you talk about the chicken cycle, most people will look at the cyclicality. It's very profitable right now. And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack. *We can tell that through Agri Stats*. Now at the same time, when there is more poultry available and the industry may not be as profitable, we would not expect to be anywhere close to what the bottom of that cycle would be. (emphasis added)

992.    There is no plausible, non-conspiratorial justification for Defendants to use Agri Stats to secretly share highly confidential and proprietary information about their breeder flock size and age, pricing, capacity, production, and costs at the level of detail at which they do.

993. In a competitive market, such proprietary, competitively sensitive information should be a closely guarded secret. Economic principles establish that the routine exchange among competitors of such sensitive internal company information reduces competition.

994. One chicken industry expert testified in a case against Defendant Pilgrim's brought under the Packers and Stockyard Act, 7 U.S.C. §§ 181-229, that sharing information through Agri Stats by chicken producers regarding pay for contract farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern." The same expert also remarked that Agri Stats was unusual even among other price surveys, noting:

> [t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue. Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive. As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry. An intensive inquiry is needed.

995. When given access to Agri Stats' reports in connection with litigation where he served as an expert witness, an agricultural economist who, to that point, had only "heard rumors of a secretive poultry industry information-sharing service," said that he "was shocked at the incredible detail" of the information presented in the reports.

996. A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively-sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:

> Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue. My experience is that competitors ... are prolific at quantifying their competitor's business information on their own. For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company ... started for the poultry industry in 1985. AGRISTATS has the following mission statement: "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY

PROVIDING ACCURATE AND TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES." Note the mission is to share comparative data while protecting individual companies. I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved. Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

997.    A 2017 *Bloomberg News* article titled "Is the Chicken Industry Rigged? Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," highlighted the role Agri Stats plays in Defendants' efforts to monitor and police their cartel:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data – for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence – so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."

### AA.    Plaintiffs' Claims are Timely

998.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting its claims for relief. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least 2016 or later. Defendants engaged in a secret conspiracy that did not reveal facts that put Plaintiffs on inquiry notice that there was a conspiracy to engage in anticompetitive conduct or otherwise harm Plaintiffs.

999.   And it was not until June 2020 with the Department of Justice's Colorado Indictment of executives of Defendants Claxton and Pilgrim's Pride that further evidence of the conspiracy became publicly known.  It was not until October 7, 2020 – when the Department of Justice issued its Superseding Indictment of six additional executives of Defendants Tyson, Koch, Pilgrim's Pride, and George's – that additional elements of Defendants' bid-rigging conduct involving broilers were revealed.  The Colorado Indictments revealed that Defendants Claxton and Pilgrim's Pride aided the conspiracy by engaging in direct price fixing and specific bid rigging of broilers, which affected purchasers of large volumes of broiler chickens.

1000.  With respect to the manipulation of the Georgia Dock, a January 18, 2016 *Wall Street Journal* article regarding Defendants' possible manipulation of the Georgia Dock benchmark price raised the possibility of collusion to artificially raise, fix, or maintain chicken prices using the Georgia Dock.  Subsequently, a series of articles in various publications published between November 3 and 17, 2016, detailed for the first time that the USDA had discontinued its reliance on the Georgia Dock benchmark price because its input prices could not be verified.

1001.  Yet even when faced with these public revelations, Defendants continued to assert the fairness and accuracy of the Georgia Dock benchmark price.

1002. For example, in a November 8, 2016, *Washington Post* article, Defendant Sanderson Farms represented that the Georgia Dock benchmark price was "reliable," to induce purchasers of chickens to believe the benchmark price was not subject to illegal manipulation by the Georgia Dock Defendants.

1003.  Not until November 10, 2016 was it disclosed publicly that the Georgia Dock Defendants had formed a secret Georgia Dock Advisory Committee that facilitated opportunities for executives to meet and also discuss their scheme to fix the Georgia Dock benchmark price.

1004.  The existence of this committee was not known to Plaintiffs, nor would Plaintiffs have been able to learn of how Defendants' executives conducted themselves in their non-public Georgia Dock Advisory Committee meetings.

1005.  Finally, not until November 17, 2016, was it publicly disclosed that the Florida Attorney General's Office was investigating the Georgia Dock benchmark price and its calculation and manipulation by the Georgia Dock Defendants.

1006.  Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. For example, the Agri Stats coordination coupled with direct industry communications (at trade shows and via email/calls) denied Plaintiffs the opportunity to know of the conspiracy.  Moreover, chickens are not exempt from antitrust regulation, and thus, before these recent events Plaintiffs reasonably considered the U.S. chicken industry to be a competitive industry.  Plaintiffs also reasonably believed its contract partners to be dealing with them on fair and honest terms, and that they could justifiably rely on Defendants' representations regarding the Georgia Dock as being truthful.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin investigating the legitimacy of Defendants' chicken prices before these recent events.

1007.  Plaintiffs exercised reasonable diligence.  Plaintiffs could not have discovered Defendants' alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants.

1008.  Throughout the relevant period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs.

1009.  Throughout the relevant period, Defendants repeatedly misrepresented to Plaintiffs through fraudulent statements and omissions that the inflated prices of the Georgia Dock reflected actual market conditions.

1010. The conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, (1) secret meetings, (2) surreptitious communications between Defendants via the wires (telephones, emails, text messages and other electronic communications) and in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, (3) limiting any explicit reference to competitor pricing or supply restraint communications in documents, (4) communicating competitively sensitive data to one another through Agri Stats, a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and (5) concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

1011. Defendants and Co-Conspirators used code words including "discipline" and "capacity discipline" in their public statements to conceal their conspiracy and signal one other, in furtherance of their conspiracy to restrain production while shielding their conspiracy from detection or suspicion. ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ (2) on a May 3, 2013, earnings call, Pilgrim's President & CEO Bill Lovette stated that "price is going to strengthen as supply continues to be disciplined and constrained" … and "we've done a good job so far of maintaining discipline;" and (3) on a July 2016 earnings call, Mr. Lovette noted that "I think what we've seen with egg sets is absolutely a testament to the discipline of our industry that we've seen the last really two to three years."

1012.  As alleged above, in 2008, after years of boom and bust cycles of production leading to the regular rise and fall of prices, the price of chickens began an unprecedentedly steady increase that continued at least through 2016.

1013.  Defendants affirmatively and falsely attributed rising prices to, among other things, increases in the price of inputs.  Defendants used these pretexts used to cover up the conspiracy. In fact, the chicken price increases were the result of Defendants' collusive conduct, which was undisclosed at the time.

1014.  During the relevant period, Defendants affirmatively made numerous misleading public statements falsely portraying the market for chickens as a competitive one.

1015.  For example, Defendants provided testimony at workshops held by the U.S. Department of Justice and USDA suggesting the chicken industry was competitive and not subject to anti-competitive practices and agreements, including testimony at a May 21, 2010 workshop of a National Chicken Council-commissioned study by Dr. Thomas Elam, which stated that "the chicken industry is competitive and thriving," and has "[i]ntense competition" that promotes "product innovation and lower prices for consumers."

1016.  Defendants also repeatedly blamed the Renewable Fuels mandate for increased Broiler prices, both through the NCC, other trade groups, and through press releases, speeches, and other public statements by Defendants' employees, rather than disclosing the existence of an agreement to illegally restrain the supply of Broilers.  Some instances of these pretextual explanations by Defendants and their agents include:

> A.  On a January 29, 2008, earnings call, Pilgrim's Interim CEO Clint Rivers claimed that "the U.S. government continues its misguided policy of subsidizing ethanol production at the expense of affordable food, and a lower corn yield expectation bypro USDA will contribute to decrease corn suppliers next year."

314

B.      On June 23, 2008, Wayne Farms President & CEO Elton Maddox said in a statement that "the government's food fuel mandate has created the need for us to rationalize our business."

C.      On July 7, 2008, O.K. Foods announced production cuts due to "record high prices for corn and soybean meal, which it attributed to the U.S. government's mandated ethanol policies."

D.      On June 24, 2009, Harrison Poultry President & CEO Mike Welch and Claxton Poultry President Jerry Lane met in Washington D.C. and encouraged elected officials to end the "mistake" of the ethanol subsidy.

E.      In 2010, Foster Farms delayed an expansion due, allegedly, to corn prices. Ira Brill, Foster Farm's Director of Market Services, blamed the ethanol mandate for the delay, stating that it "places enormous pressure on our input costs, and for that reason we can't go forward with our expansion plans."

F.      On March 7, 2011, House of Raeford announced production cuts due to increased prices. It stated that "if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."

G.      On March 15, 2011, Simmons announced downsizing at a plant due to economics "resulting from high grain prices predominantly caused by corn being used in ethanol." Simmons cited ethanol policies again on June 27, 2011, when it laid off another 223 employees.

H.      In an April 13, 2011, hearing before a congressional subcommittee, Michael Welch (President and CEO of Harrison Poultry) stated that production of broilers was threatened by the diversion of corn to fuel production. Welch claimed that shifting corn back to feed would "allow consumers of poultry products to continue to enjoy an ongoing, adequate supply of animal protein at reasonable prices." Welch repeated similar claims in 2012 as well, citing increased corn costs resulting in "tens of billions of dollars in increased costs for livestock and poultry producers and food manufacturers."

I.      In September 2011, Phillip Green (Vice President of Commodities, Foster Farms) testified on behalf of the American Feed Industry Association at a public hearing and blamed increasing meat costs on the ethanol mandate.

J.      On October 10, 2014, National Chicken Council President Mike Brown wrote an op-ed citing the Renewable Energy Standard as the primary reason for the poultry industry's inability to increase production. Brown cited the Renewable Fuel Standard again in a May 15, 2015 op-ed in the Wall Street Journal.

1017. To explain the decreasing supply of chickens since 2012, Defendants have provided a variety of pretextual explanations, including: (1) a breeding issue with chickens during 2014, (2) a Russian ban of U.S. chicken imports starting in 2014, and (3) a 2013 shortage in supply due in part due to an avian flu outbreak in Mexico that caused a surge in demand for hens to repopulate chicken farms in Mexico. These explanations were pretextual in that Defendants sought to hide their conspiracy from discovery by blaming chicken price increases, or artificially inflated chicken prices, on these factors rather than on Defendants' own collusive conduct (including their unprecedented cuts to breeder flocks).

1018. Throughout the relevant period, Defendants repeatedly also cited increasing input costs as a pretext for their collusion to restrain supply and manipulate prices by anticompetitive means.

1019. For instance, Defendants repeatedly claimed that input cost increases during 2008 justified chicken price increases. However, while corn was $5/bushel in 2005-2006 and increased to $9 by May or June 2008, it quickly fell back to below $5/bushel by fall 2008.

1020. Higher chicken prices later in the relevant period also were not justified by increased costs of corn, which, after a temporary spike in the summer of 2012, were not increasing at the level that would have warranted higher chicken prices.

1021. Defendants, through the National Chicken Council, other trade groups, and press releases, speeches, and other public statements by their employees, also repeatedly and publicly blamed the federal government's ethanol mandate for increased chicken prices, asserting that it increased their corn costs.

1022. Defendants made all of these pretextual representations so as to conceal their conspiracy and avoid disclosing their agreement to illegally restrain the supply of chickens.

1023.   By virtue of Defendants and all of their Co-Conspirators actively and intentionally concealing their above-described wrongful conduct, the running of any applicable statute of limitations has been (and continues to be) tolled and suspended with respect to Plaintiff's claims and causes of action resulting from the Defendants' unlawful conspiracy alleged in this Complaint under the fraudulent concealment doctrine and/or doctrine of equitable estoppel.

1024.   Pursuant 15 U.S.C. § 16(i), the running of any applicable statute of limitations was also tolled when the Department of Justice instituted a criminal antitrust proceeding by convening a grand jury (which appears to have been in January 2019), and for which the DOJ issued a subpoena on April 2019, seeking "[a]ll discovery" in this civil case.

1025.   Plaintiffs were members of the putative direct purchaser class action complaint asserted against Defendants, including, but not limited to *Maplevale Farms, Inc. v. Koch Foods, Inc. et al*., No. 1:16CV08637 (ECF No. 1) (N.D. Ill. Sept. 2, 2016).

1026.   Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related case law during the pendency of that direct purchaser class action asserted against Defendants, commencing at least as early as September 2, 2016.[21]

1027.   The statute of limitations relevant to DAPs' claims has also been tolled because it was not until June 2020 with the Department of Justice's Indictment of executives of Defendants Claxton and Pilgrim's Pride that the nature of Defendants' conspiracy to fix prices and rig bids of broilers was revealed.

---

[21]     To the extent certain Plaintiffs bring claims as indirect purchasers, they were members of an indirect purchaser class action complaint asserted against Defendants, including but not limited to *Fargo Stopping Center, LLC, et al. v. Koch Foods, Inc., et al.*, No. 16-cv-08851 (N.D. Ill.) and their claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related case law during the pendency of that indirect purchaser class action asserted against Defendants, commencing at least as early as September 2, 2016.

## X.     ANTITRUST IMPACT

1028.   During the relevant period, Plaintiffs, and, where applicable, their respective assignors, purchased substantial amounts of chicken from one or more Defendants.

1029.   As a direct and proximate result of the Defendants' above-described illegal conduct, Plaintiffs, and, where applicable, their respective assignors, were compelled to pay, and did pay, artificially inflated prices for chickens during the relevant period.

1030.   As a direct and proximate consequence of the Defendants' above-described wrongful conduct, Plaintiffs, and, where applicable, their respective assignors, sustained substantial losses and damage to their businesses and property in the form of overcharges for chickens.  The full amount and forms and components of such damages will be calculated after discovery and presented upon proof at trial.

## XI.     CLAIMS FOR RELIEF AND CAUSES OF ACTION

1031.   The pertinent and relevant factual allegations set forth herein are incorporated into and re-alleged into each of the foregoing counts as appropriate to state a claim.

### COUNT I
### VIOLATION OF 15 U.S.C. § 1
### (AGAINST ALL DEFENDANTS)

*Brought by Ahold Delhaize USA, Inc.; Albertsons Companies, Inc.; ALDI, Inc.; Amigos Meat Distributors, LP; Amigos Meat Distributors East LP; Amigos Meat Distributors West, LP; Amigos Meat & Poultry, LLC; Anaheim Wings, LLC; Associated Grocers of Florida, Inc.; Associated Grocers of the South, Inc.; Associated Wholesale Grocers, Inc.; Barbecue Integrated, Inc. (d/b/a Smokey Bones, Inc.; Bi-Lo Holdings, LLC; BJ's Wholesale Club, Inc.; Bob Evans Farms, Inc.; Bojangles' Restaurants, Inc. and Bojangles Opco, LLC; Bonita Plaza Wings, LLC; Boston Market Corporation; Caesars Enterprise Services, LLC; Campbell Soup Company; Campbell Soup Supply Company, L.L.C.; Captain D's LLC; Carl Buddig & Co.; Checkers Drive-In Restaurants, Inc.; Cheney Bros., Inc.; Chick-fil-A, Inc.; Conagra Brands, Inc.; Costa Mesa Wings, LLC; Darden Restaurants, Inc.; Cracker Barrel Old Country Store, Inc. and CBOCS Distribution, Inc.; Downtown Wings, LLC; EMA Foods Co., LLC; El Pollo Loco, Inc.; FIC Restaurants, Inc. (d/b/a Friendly's); Gaslamp Wings, LLC; Gibson, Greco & Wood, LTD; Golden Corral Corporation; Hamilton Meat, LLC; Harvest Meat Company, Inc.; Hollywood Wings, LLC; Hooters Management Corporation; Hooters of America, LLC; Hy-Vee, Inc.; Independent Purchasing Cooperative, Inc.; Jetro Holdings, LLC; John Soules Acquisitions LLC;*

*John Soules Foods, Inc.; Kinexo, Inc.; Kraft Heinz Foods Company; Krispy Krunchy Foods, LLC; L. Hart, Inc.; LTP Management Group, Inc.; Maximum Quality Foods, Inc.; McLane Company, Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.; Meijer, Inc./Meijer Distribution, Inc.; Mission Valley Wings, LLC; Nestlé Purina PetCare Company; Nestlé USA, Inc.; Oceanside Wings, LLC; Ontario Wings, LLC; OSI Restaurant Partners, LLC; Pacific Foods of Oregon; Pinnacle Foods, Inc.; PJ Food Service, Inc.; Pollo Operations, Inc.; Publix Super Markets, Inc.; Quirch Foods, LLC, f/k/a Quirch Foods Co.; R & D Marketing, LLC; Rancho Bernardo Wings, LLC; Red Bird Farms Distribution Company; Restaurants of America, Inc.; Restaurant Services, Inc.; Sam's East, Inc.; Sam's West, Inc.; Save Mart Supermarkets; Services Group of America, Inc.; Shamrock Foods Company; Sherwood Food Distributors, L.L.C.; South Gate Wings, LLC; SuperValu, Inc.; Sysco Corporation; Target Corporation; The Fresh Market, Inc.; The Johnny Rockets Group, Inc.; The Kroger Co.; Timber Lake Foods, Inc.; Unified Grocers, Inc.; United Supermarkets, LLC; United Food Service, Inc.; US Foods, Inc.; Wakefern Food Corporation; Walmart, Inc.; Wal-Mart Louisiana, LLC; Wal-Mart Stores Arkansas, LLC; Wal-Mart Stores East, LP; Wal-Mart Stores Texas, LLC; Wawa, Inc.; Western Boxed Meat Distributors, Inc.; White Castle Purchasing Co.; Wings Over Long Beach, LLC; Winn-Dixie Stores, Inc.; Brookshire Brothers, Inc.; SpartanNash Company; Zaxby's Franchising LLC; WZ Franchise Corporation*

1032.  Defendants entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1033.  Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

1034.  At least as early as January 1, 2008, and continuing until at least as late as 2019, the exact dates being unknown to Plaintiffs, Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for and/or restrain supply of broilers, manipulation of the Georgia Dock benchmarking price, and rig bids and allocate markets for broilers, thereby creating anticompetitive effects.

1035.   Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for broilers throughout the United States.

1036.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for broilers.

1037.   As a result of Defendants' unlawful conduct, Plaintiffs have been harmed by being forced to pay inflated, supra-competitive prices for broilers.

1038.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.

1039.   Defendants' conspiracy had the following effects, among others:

- Price competition in the market for broilers has been restrained, suppressed, and/or eliminated in the United States;

- Prices for broilers sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

- Plaintiffs, which directly purchased broilers from Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators, have been deprived of the benefits of free and open competition in the purchase of broilers.

1040.   Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of broilers paid by Plaintiffs to be higher than it would be but for Defendants' conduct.

1041.   As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs have been injured in their business or property and will continue to be injured in their business and

property by paying more for broilers than they would have paid and will pay in the absence of the conspiracy.

1042.   Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.

1043.   Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.

## COUNT II
## VIOLATION OF 15 U.S.C. § 1
### (AGAINST ALL DEFENDANTS FOR CONCERTED OUTPUT RESTRICTION)

*Brought by Action Meat Distributors, Inc.; Affiliated Foods, Inc.; Ahold Delhaize USA, Inc.; Albertsons Companies, Inc.; ALDI, Inc.; Alex Lee, Inc/Merchants Distributors, LLC; Amigos Meat & Poultry, LLC; Amigos Meat Distributors, LP; Amigos Meat Distributors East LP; Amigos Meat Distributors West, LP; Anaheim Wings, LLC; Associated Foods Stores, Inc.; Associated Grocers, Inc.; Associated Grocers of Florida, Inc.; Associated Grocers of New England, Inc.; Associated Grocers of the South, Inc.; Associated Wholesale Grocers, Inc.; Bashas' Inc.; Big Y Foods, Inc,; Bi-Lo Holdings, LLC; BJ's Wholesale Club, Inc.; Bob Evans Farms, Inc.; Bonita Plaza Wings, LLC; Brookshire Grocery Company; Caesars Enterprise Services, LLC; Campbell Soup Company; Campbell Soup Supply Company, L.L.C.; Carl Buddig & Co.; CBBC OPCO, LLC d/b/a Colorado Boxed Beef; Certco, Inc.; Checkers Drive-In Restaurants, Inc.; Cheney Bros., Inc.; Chick-fil-A, Inc.; Costa Mesa Wings, LLC; Darden Restaurants, Inc.; Downtown Wings, LLC; EMA Foods Co., LLC; El Pollo Loco, Inc.; Fareway Stores, Inc.; Gaslamp Wings, LLC; Giant Eagle, Inc.; Gibson, Greco & Wood, LTD; Hamilton Meat, LLC; Harvest Meat Company, Inc.; Hollywood Wings, LLC; Hooters Management Corporation; Hooters of America, LLC; Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc.; Hy-Vee, Inc.; Ira Higdon Grocery Company, Inc.; Jetro Holdings, LLC; John Soules Acquisitions LLC; John Soules Foods, Inc.; Kinexo, Inc.; King Solomon Foods, Inc.; Krispy Krunchy Foods, LLC; L. Hart, Inc.; Latina Boulevard Foods, LLC; LTP Management Group, Inc.; Maximum Quality Foods, Inc.; McLane Company, Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.; Meijer, Inc./Meijer Distribution, Inc.; Mission Valley Wings, LLC; Nicholas & Co., Inc.; Oceanside Wings, LLC; Ontario Wings, LLC; OSI Restaurant Partners, LLC; Pacific Food Distributors, Inc.; Pacific Foods of Oregon; Piggly Wiggly Alabama Distributing Co., Inc.; PJ Food Service, Inc.; Pollo Operations, Inc.; Publix Super Markets, Inc.; R & D Marketing, LLC; Rancho Bernardo Wings, LLC; Red Bird Farms Distribution Company;*

*Restaurants of America, Inc.; Restaurant Services, Inc.; Sam's East, Inc.; Sam's West, Inc.; Save Mart Supermarkets; Schnuck Markets, Inc.; Services Group of America, Inc.; Sherwood Food Distributors, L.L.C.; South Gate Wings, LLC; SuperValu, Inc.; Sysco Corporation; Target Corporation; The Distribution Group, Inc.; The Fresh Market, Inc.; The Golub Corporation; The Kroger Co.; Timber Lake Foods, Inc.; Troyer Foods, Inc.; Unified Grocers, Inc.; United Supermarkets, LLC; URM Stores, Inc.; US Foods, Inc.; Wakefern Food Corporation; Walmart, Inc.; Wal-Mart Louisiana, LLC; Wal-Mart Stores Arkansas, LLC; Wal-Mart Stores East, LP; Wal-Mart Stores Texas, LLC; Wawa, Inc.; Weinstein Wholesale Meats, Inc.; Western Boxed Meat Distributors, Inc.; Wings Over Long Beach, LLC; Winn-Dixie Stores, Inc.; W. Lee Flowers & Company, Inc.; Woodman's Food Market, Inc.*

1044.   In collusively restricting, limiting, and curtailing the supply of chicken in the United States, Defendants engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1045.   Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, Plaintiffs for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

1046.   Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiffs in the United States.

1047.   As a direct and proximate result of Defendants' above-described unlawful conduct, Plaintiffs paid artificially inflated prices for chicken.

1048.   As a direct and proximate result of Defendants' above-described anticompetitive conduct, Plaintiffs were damaged in their businesses or property by paying prices for chicken that

were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

1049.   Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.

1050.   Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.

### COUNT III
### VIOLATION OF 15 U.S.C. § 1
### (AGAINST THE GEORGIA DOCK DEFENDANTS FOR PRICE-FIXING)

*Brought by Action Meat Distributors, Inc.; Affiliated Foods, Inc.; Ahold Delhaize USA, Inc.; Albertsons Companies, Inc.; ALDI, Inc.; Alex Lee, Inc/Merchants Distributors, LLC; Amigos Meat Distributors, LP; Amigos Meat Distributors East LP; Amigos Meat Distributors West, LP; Amigos Meat & Poultry, LLC; Anaheim Wings, LLC; Associated Foods Stores, Inc.; Associated Grocers, Inc.; Associated Grocers of Florida, Inc.; Associated Grocers of New England, Inc.; Associated Grocers of the South, Inc.; Associated Wholesale Grocers, Inc.; Bashas' Inc.; Big Y Foods, Inc.; Bi-Lo Holdings, LLC; BJ's Wholesale Club, Inc.; Bob Evans Farms, Inc.; Bonita Plaza Wings, LLC; Brookshire Grocery Company; Caesars Enterprise Services, LLC; Campbell Soup Company; Campbell Soup Supply Company, L.L.C.; Carl Buddig & Co.; CBBC OPCO, LLC d/b/a Colorado Boxed Beef; Certco, Inc.; Checkers Drive-In Restaurants, Inc.; Cheney Bros., Inc.; Chick-fil-A, Inc.; Costa Mesa Wings, LLC; Darden Restaurants, Inc.; Downtown Wings, LLC; El Pollo Loco, Inc.; Fareway Stores, Inc.; Gaslamp Wings, LLC; Giant Eagle, Inc.; Gibson, Greco & Wood, LTD; Hamilton Meat, LLC; Harvest Meat Company, Inc.; Hollywood Wings, LLC; Hooters Management Corporation; Hooters of America, LLC; Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc.; Hy-Vee, Inc.; Ira Higdon Grocery Company, Inc.; Jetro Holdings, LLC; John Soules Acquisitions LLC; John Soules Foods, Inc.; Kinexo, Inc.; King Solomon Foods, Inc.; Krispy Krunchy Foods, LLC; Latina Boulevard Foods, LLC; LTP Management Group, Inc.; Maximum Quality Foods, Inc.; McLane Company, Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.; Meijer, Inc./Meijer Distribution, Inc.; Mission Valley Wings, LLC; Nicholas & Co., Inc.; Oceanside Wings, LLC; Ontario Wings, LLC; OSI Restaurant Partners, LLC; Pacific Food Distributors, Inc.; Pacific Foods of Oregon; Piggly Wiggly Alabama Distributing Co., Inc.; PJ Food Service, Inc.; Pollo Operations, Inc.; Publix Super Markets, Inc.; Rancho Bernardo Wings, LLC; Restaurants of America, Inc.; Restaurant Services, Inc.; Sam's East, Inc.; Sam's West, Inc.; Save Mart Supermarkets; Schnuck Markets, Inc.; Services Group of*

*America, Inc.; Sherwood Food Distributors, L.L.C.; South Gate Wings, LLC; SuperValu, Inc.; Sysco Corporation; Target Corporation; The Distribution Group, Inc.; The Fresh Market, Inc.; The Golub Corporation; The Kroger Co.; Troyer Foods, Inc.; Unified Grocers, Inc.; United Supermarkets, LLC; URM Stores, Inc.; US Foods, Inc.; Wakefern Food Corporation; Walmart, Inc.; Wal-Mart Louisiana, LLC; Wal-Mart Stores Arkansas, LLC; Wal-Mart Stores East, LP; Wal-Mart Stores Texas, LLC; Wawa, Inc.; Weinstein Wholesale Meats, Inc.; Western Boxed Meat Distributors, Inc.; Wings Over Long Beach, LLC; Winn-Dixie Stores, Inc,; W. Lee Flowers & Company, Inc.; Woodman's Food Market, Inc.; Brookshire Brothers, Inc.; SpartanNash Company*

1051.   In knowingly coordinating, falsifying, and manipulating prices quoted to the GDA for inclusion in the Georgia Dock benchmark price index for the intended unlawful purpose of fixing, maintaining, raising, and stabilizing the price of broilers sold in the United States, the Georgia Dock Defendants engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1052.   Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, Plaintiffs for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

1053.   The Georgia Dock Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiffs in the United States.

1054.   As a direct and proximate result of the Georgia Dock Defendants' above-described unlawful conduct, Plaintiffs paid artificially inflated prices for chicken.

1055.   As a direct and proximate result of the Georgia Dock Defendants' above-described anticompetitive conduct, Plaintiffs were damaged in their businesses or property by paying prices for chicken that were higher than they would have been but for the Georgia Dock Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

1056.   The Georgia Dock Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.

1057.   The Georgia Dock Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.

## COUNT IV
## VIOLATION OF GA. CODE ANN. §§ 16-14-4(a) AND 16-14-6 (GEORGIA RICO)
## (AGAINST THE GEORGIA DOCK DEFENDANTS FOR
## ACQUIRING MONEY THROUGH RACKETEERING ACTIVITY)

*Brought by Action Meat Distributors, Inc.; Affiliated Foods, Inc.; Ahold Delhaize USA, Inc.; Albertsons Companies, Inc.; ALDI, Inc.; Alex Lee, Inc/Merchants Distributors, LLC; Associated Foods Stores, Inc.; Associated Grocers, Inc.; Associated Grocers of Florida, Inc.; Associated Grocers of New England, Inc.; Associated Grocers of the South, Inc.; Associated Wholesale Grocers, Inc.; Bashas' Inc.; Big Y Foods, Inc.; Bi-Lo Holdings, LLC; Brookshire Brothers, Inc.; Brookshire Grocery Company; CBBC OPCO, LLC d/b/a Colorado Boxed Beef; Certco, Inc.; Fareway Stores, Inc.; Giant Eagle, Inc.; Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc.; Hy-Vee, Inc.; Ira Higdon Grocery Company, Inc.; Kinexo, Inc.; King Solomon Foods, Inc.; Latina Boulevard Foods, LLC McLane Company, Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.;  McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.; Meijer, Inc./Meijer Distribution, Inc.; Nicholas & Co., Inc.; Pacific Food Distributors, Inc.; Piggly Wiggly Alabama Distributing Co., Inc.; Publix Super Markets, Inc.; Save Mart Supermarkets; Schnuck Markets, Inc.; SpartanNash Company; SuperValu, Inc.; The Distribution Group, Inc.; The Golub Corporation; The Kroger Co.; Troyer Foods, Inc.; URM Stores, Inc.; Wakefern Food Corporation; Weinstein Wholesale Meats, Inc.; Winn-Dixie Stores, Inc.; W. Lee Flowers & Company, Inc.; Woodman's Food Market, Inc.*

1058.   The Georgia Dock Defendants violated the Georgia RICO statute, Ga. Code Ann. § 16-14-4(a), which makes it unlawful for any person to acquire any interest in personal property, including money, as a result of a pattern of racketeering activity.

1059.   The application of Georgia RICO is proper because Georgia was the locus for the fraud.  The Georgia Dock was compiled and published from the PMN's location in Georgia.  Each of the Georgia Dock Defendants had plants in Georgia.  The Georgia Dock Defendants knew that their price quotes each week to the PMN were sent into the State of Georgia.  The Georgia Dock Defendants' material omissions pertained to their conduct and activities in Georgia.

1060.   Each of the Georgia Dock Defendants engaged in racketeering activity as defined by Georgia law.  In particular, and as explained below, each of Georgia Dock Defendants engaged in conduct that falls within the scope of three predicate acts: (1) Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud), (2) Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency), and (3) Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception).

1061.   Each of the Georgia Dock Defendants committed at least two incidents of such racketeering activity that had the same or similar intents, results, accomplices, victims, or methods of commission or otherwise were interrelated by distinguishing characteristics and were not isolated incidents.   In particular, the Georgia Dock Defendants participated in the scheme described in this Complaint to inflate the Georgia Dock price index and thereby defraud people who purchased chicken based on that price index, including the Plaintiffs.

1062.   The Georgia Dock Defendants' racketeering activity falls into two categories of conduct:  fraudulent submissions and fraudulent omissions.

1063.   ***Fraudulent Submissions.***  The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the Poultry Market News each week from at least 2011 to the end

of 2016. As explained in detail in this Complaint, the Georgia Dock Defendants falsely reported on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2.5 to 3 pound whole birds. When the Georgia Dock Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity. These false submissions were reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of how the Georgia Dock index was used, specifically in tray pack and retail contracts where prices were often tied to the Georgia Dock.

1064. ***Fraudulent Omissions.*** The Georgia Dock Defendants also fraudulently failed to disclose information to the Plaintiffs to whom they sell poultry. The facts that the Georgia Dock Defendants failed to disclose to the Plaintiffs were basic to their transactions with Plaintiffs. For example, the Georgia Dock Defendants failed to disclose to Plaintiffs during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia Dock. The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock price or acted with reckless disregard for their falsity, because they knew the quotes lacked integrity and were higher than the actual prices they could have charged absent the Georgia Dock manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of the Plaintiffs. Each Georgia Dock Defendant owed a duty to disclose the foregoing to the Plaintiffs to whom they sold poultry, given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock Defendants benefited from Plaintiffs' trust in the

Georgia Dock price index as an impartial, government-issued index. Plaintiffs could not have discovered the truth through reasonable inquiry and/or were prevented from making such an inquiry given the secret nature of the manipulation.

1065. The Georgia Dock Defendants' conduct falls within the scope of Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud). The fraudulent submissions and omissions discussed above were part of the Georgia Dock Defendants' scheme to defraud their customers, including the Plaintiffs. The Georgia Dock Defendants intended to defraud those customers, who were the targets of the scheme to rig the index. Each of the Georgia Dock Defendants used multiple interstate wires in furtherance of the fraudulent scheme. The interstate wires included (i) Defendants' false submissions to the Poultry Market News and (ii) Defendants' communications with customers to whom they sold chicken based on the Georgia Dock price index and in which they failed to disclose information basic to their transactions to induce a false belief to their benefit.

1066. The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency). The fraudulent submissions discussed above were made to the Poultry Market News, a division of the Georgia Department of Agriculture, on a matter within the scope of the GDA's jurisdiction. The Georgia Dock Defendants knew that the information contained in their submissions to the PMN was false.

1067. The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception). With respect to the fraudulent omissions discussed above, the Georgia Dock Defendants intentionally created and/or confirmed their counterparty Plaintiffs' impressions regarding the reliability of the Georgia Dock price index that were false and which the Georgia Dock Defendants knew to be false. In addition, the Georgia Dock Defendants intentionally failed to correct their counterparty Plaintiffs' false impressions regarding

the reliability of the Georgia Dock price index, when they had previously created and/or confirmed those false impressions. Finally, the Georgia Dock Defendants obtained additional property by means of this deceitful means or artful practice with the intention of depriving their counterparty Plaintiffs of that property – specifically, the Georgia Dock Defendants were able to charge their counterparty Plaintiffs higher prices than they otherwise would have charged and therefore made more money from their counterparty Plaintiffs as a result of this conduct.

1068. As a result of the pattern of racketeering activity as described in this Complaint, each of the Georgia Dock Defendants acquired money that they otherwise would not have received from the sale of poultry that was tied to the Georgia Dock price index.

1069. The Georgia Dock Defendants' fraudulent submissions and omissions were intended to induce the reliance of the Plaintiffs. Specifically, the Georgia Dock Defendants made these fraudulent statements and omissions with the intent and understanding that that their false statements would be used to calculate the Georgia Dock benchmark price index upon which poultry purchasers like Plaintiffs relied when purchasing poultry. The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiffs to enter into contracts at inflated prices in reliance on Defendants' material misrepresentations and omissions.

1070. Plaintiffs purchased chicken based on the Georgia Dock price index. In so doing, the Plaintiffs reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiffs known that the Georgia Dock was not a legitimate price index and that the Defendants were manipulating it, Plaintiffs would not have agreed to prices tied to such a benchmark. Plaintiffs reasonably relied on these misrepresentations because the Georgia Dock benchmark price index was held out as a legitimate index and was an industry norm.

1071.   The Plaintiffs were injured as a result of the Georgia Dock Defendants' fraudulent submissions and omissions.  In particular, the Plaintiffs paid higher prices for chicken than they would have paid if the Georgia Dock Defendants had not rigged the index and failed to disclose the basic information discussed above.

1072.   As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent submissions and omissions, Plaintiffs were damaged in their business by paying higher prices for chicken.  The ascertainable damages will be established at trial.  These damages were the foreseeable and direct result of the false submissions and omissions.

## COUNT V
## VIOLATION OF GA. CODE ANN. §§ 16-14-4(b) AND 16-14-6 (GEORGIA RICO)
## (AGAINST THE GEORGIA DOCK DEFENDANTS FOR CONDUCTING ENTERPRISE THROUGH RACKETEERING ACTIVITY)

*Brought by Action Meat Distributors, Inc.; Affiliated Foods, Inc.; Ahold Delhaize USA, Inc.; Albertsons Companies, Inc.; ALDI, Inc.; Alex Lee, Inc/Merchants Distributors, LLC; Associated Foods Stores, Inc.; Associated Grocers, Inc.; Associated Grocers of Florida, Inc.; Associated Grocers of New England, Inc.; Associated Grocers of the South, Inc.; Associated Wholesale Grocers, Inc.; Bashas' Inc.; Big Y Foods, Inc.; Bi-Lo Holdings, LLC; Brookshire Brothers, Inc.; Brookshire Grocery Company; CBBC OPCO, LLC d/b/a Colorado Boxed Beef; Certco, Inc.; Fareway Stores, Inc.; Giant Eagle, Inc.; Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc.; Hy-Vee, Inc.; Ira Higdon Grocery Company, Inc.; Kinexo, Inc.; King Solomon Foods, Inc.; Latina Boulevard Foods, LLC; McLane Company, Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.;  McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.; Meijer, Inc./Meijer Distribution, Inc.; Nicholas & Co., Inc.; Pacific Food Distributors, Inc.; Piggly Wiggly Alabama Distributing Co., Inc.; Publix Super Markets, Inc.; Save Mart Supermarkets; Schnuck Markets, Inc.; SpartanNash Company; SuperValu, Inc.; The Distribution Group, Inc.; The Golub Corporation; The Kroger Co.; Troyer Foods, Inc.; URM Stores, Inc.; Wakefern Food Corporation; Weinstein Wholesale Meats, Inc.; Winn-Dixie Stores, Inc.; W. Lee Flowers & Company, Inc.; Woodman's Food Market, Inc.*

1073.   The Georgia Dock Defendants violated the Georgia RICO statute, Ga. Code Ann. § 16-14-4(b), which makes it unlawful for any person associated with an enterprise to participate in the enterprise through a pattern of racketeering activity.

1074.   The application of Georgia RICO is proper because Georgia was the locus for the fraud.  The Georgia Dock was compiled and published from the PMN's location in Georgia.  Each of the Georgia Dock Defendants had plants in Georgia.  The Georgia Dock Defendants knew that their price quotes each week to the PMN were sent into the State of Georgia.  The Georgia Dock Defendants' material omissions pertained to their conduct and activities in Georgia.

1075.   The Georgia Dock Defendants were associated with an enterprise.  The enterprise was the group of Georgia Dock Defendants associated in fact through their price submissions to the PMN, their role on the PMN Advisory Committee, their involvement with the Georgia Poultry Federation, and their use of the Georgia Dock price index in selling poultry.

1076.   The enterprise was a continuing unit that associated together and acted with a common purpose: specifically, to sustain the existence of the Poultry Market News and the Georgia Dock price index and to artificially inflate the Georgia Dock price index through fraudulent acts and omissions for the benefit of the enterprise and the individual Defendants.

1077.   There were relationships among the associates in the enterprise.  Representatives from the Georgia Dock Defendants interacted with each other frequently at industry conferences and trade shows, as discussed throughout this Complaint.  All but one Georgia Dock Defendant participated on the PMN Advisory Committee, which acted to preserve and enhance the PMN and Georgia Dock price index as discussed above.  All of the Georgia Dock Defendants were members of the Georgia Poultry Federation, the largest lobbying group in Georgia for the poultry producers.  Representatives from the Georgia Dock Defendants interacted often with leaders of the Georgia Poultry Federation, such as Abit Massey and Mike Giles, who helped to preserve and enhance the power of the PMN Advisory Committee and the Georgia Dock, as discussed in this Complaint.

1078.   The enterprise had longevity that was sufficient to permit the associates to pursue its purpose.  There was continuity among the representatives of the Defendants which served on the Advisory Committee, interacted with representatives of the Georgia Poultry Federation, and submitted price quotes to the PMN.  That continuity allowed the Georgia Dock Defendants to create and execute their scheme to fraudulently manipulate the Georgia Dock price index and conceal its critical flaws from customers, as described in this Complaint.  The scheme by Defendants to submit false and inflated prices to the PMN lasted more than three years.

1079.   The Georgia Dock Defendants participated in the enterprise through a pattern of racketeering activity as defined by Georgia law.  In particular, and as explained below, each of Georgia Dock Defendants engaged in conduct that falls within the scope of three predicate acts: Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud), Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency), and Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception).

1080.   Each of the Georgia Dock Defendants committed at least two incidents of such racketeering activity that had the same or similar intents, results, accomplices, victims, or methods of commission or otherwise were interrelated by distinguishing characteristics and were not isolated incidents.   In particular, the Georgia Dock Defendants participated in the scheme described in this Complaint to inflate the Georgia Dock price index and thereby defraud people who purchased chicken based on that price index, including Plaintiffs.

1081.   The Georgia Dock Defendants' racketeering activity falls into two categories of conduct:  fraudulent submissions and fraudulent omissions.

1082.   ***Fraudulent Submissions.***  The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the Poultry Market News each week from at least 2011 to the end of 2016.  As explained in detail in this Complaint, the Georgia Dock Defendants falsely reported

on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2.5 to 3 pound whole birds. When the Georgia Dock Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity. These false submissions were reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of how the Georgia Dock index was used, specifically in tray pack and retail contracts where prices were often tied to the Georgia Dock.

1083. ***Fraudulent Omissions.*** The Georgia Dock Defendants also fraudulently failed to disclose information to Plaintiffs to whom they sell poultry. The facts that the Georgia Dock Defendants failed to disclose to Plaintiffs were basic to their transactions with Plaintiffs. For example, the Georgia Dock Defendants failed to disclose to Plaintiffs during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia Dock. The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock price or acted with reckless disregard for their falsity, because they knew the quotes lacked integrity and were higher than the actual prices they could have charged absent the Georgia Dock manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of Plaintiffs. Each Georgia Dock Defendant owed a duty to disclose the foregoing to Plaintiffs to whom they sold poultry, given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock Defendants benefited from Plaintiffs' trust in the Georgia Dock price index as an impartial, government-issued index. Plaintiffs could not have discovered

the truth through reasonable inquiry and/or were prevented from making such an inquiry given the secret nature of the manipulation.

1084.   The Georgia Dock Defendants' conduct falls within the scope of Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud).  The fraudulent submissions and omissions discussed above were part of the Georgia Dock Defendants' scheme to defraud their customers, including Plaintiffs. The Georgia Dock Defendants intended to defraud those customers, who were the targets of the scheme to rig the index.  Each of the Georgia Dock Defendants used multiple interstate wires in furtherance of the fraudulent scheme.   The interstate wires included (i) Defendants' false submissions to the Poultry Market News, and (ii) Defendants' communications with customers to whom they sold chicken based on the Georgia Dock price index and in which they failed to disclose information basic to their transactions to induce a false belief to their benefit.

1085.   The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency).  The fraudulent submissions discussed above were made to the Poultry Market News, a division of the Georgia Department of Agriculture, on a matter within the scope of the GDA's jurisdiction.  The Georgia Dock Defendants knew that the information contained in their submissions to the PMN was false.

1086.   The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception).  With respect to the fraudulent omissions discussed above, the Georgia Dock Defendants intentionally created and/or confirmed their counterparty Plaintiffs' impressions regarding the reliability of the Georgia Dock price index that were false and which the Georgia Dock Defendants knew to be false.   In addition, the Georgia Dock Defendants intentionally failed to correct their counterparty Plaintiffs' false impressions regarding the reliability of the Georgia Dock price index, when they had previously created and/or confirmed

those false impressions. Finally, the Georgia Dock Defendants obtained additional property by means of this deceitful means or artful practice with the intention of depriving their counterparty Plaintiffs of that property – specifically, the Georgia Dock Defendants were able to charge their counterparty Plaintiffs higher prices than they otherwise would have charged and therefore made more money from their counterparty Plaintiffs as a result of this conduct.

1087.   The Georgia Dock Defendants acted in concert with each other with respect to their fraudulent acts and omissions. Defendants' fraudulent submissions were committed for the benefit of the enterprise. The Georgia Dock Defendants were economically interdependent with respect to their fraudulent submissions and omissions; all of the Georgia Dock Defendants benefited from an inflated Georgia Dock price index through false submissions yet none could manipulate the price index alone. The Georgia Dock Defendants sustained that inflated price index for years by hiding significant, non-public information from buyers.

1088.   The Georgia Dock Defendants' fraudulent submissions and omissions were intended to induce the reliance of Plaintiffs. Specifically, the Georgia Dock Defendants made these fraudulent statements and omissions with the intent and understanding that that their false statements would be used to calculate the Georgia Dock benchmark price index upon which poultry purchasers like Plaintiffs relied when purchasing poultry. The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiffs to enter into contracts at inflated prices in reliance on Defendants' material misrepresentations and omissions.

1089.   Plaintiffs purchased chicken based on the Georgia Dock price index. In so doing, Plaintiffs reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiffs known that the Georgia Dock was not a legitimate price index and that the Defendants

were manipulating it, Plaintiffs would not have agreed to prices tied to such a benchmark. Plaintiffs reasonably relied on these misrepresentations because the Georgia Dock benchmark price index was held out as a legitimate index and was an industry norm.

1090.   Plaintiffs were injured as a result of the Georgia Dock Defendants' fraudulent submissions and omissions.  In particular, Plaintiffs paid higher prices for chicken than they would have paid if the Georgia Dock Defendants had not rigged the index and failed to disclose the basic information discussed above.

1091.   As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent submissions and omissions, Plaintiffs were damaged in their businesses by paying higher prices for chicken.  The ascertainable damages will be established at trial.  These damages were the foreseeable and direct result of the false submissions and omissions.

## COUNT VI
## VIOLATION OF 18 U.S.C. §§ 1962(c) AND 1964(c) (FEDERAL RICO)
## (AGAINST THE GEORGIA DOCK DEFENDANTS)

*Brought by Action Meat Distributors, Inc.; Affiliated Foods, Inc.; Ahold Delhaize USA, Inc.; Albertsons Companies, Inc.; ALDI, Inc.; Alex Lee, Inc/Merchants Distributors, LLC; Associated Foods Stores, Inc.; Associated Grocers, Inc.; Associated Grocers of Florida, Inc.; Associated Grocers of New England, Inc.; Associated Grocers of the South, Inc.; Associated Wholesale Grocers, Inc.; Bashas' Inc.; Big Y Foods, Inc.; Bi-Lo Holdings, LLC; Brookshire Brothers, Inc.; Brookshire Grocery Company; CBBC OPCO, LLC d/b/a Colorado Boxed Beef; Certco, Inc.; Fareway Stores, Inc.; Giant Eagle, Inc.; Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc.; Hy-Vee, Inc.; Ira Higdon Grocery Company, Inc.; Kinexo, Inc.; King Solomon Foods, Inc.; Latina Boulevard Foods, LLC McLane Company, Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.;  McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.;  Meijer, Inc./Meijer Distribution, Inc.; Nicholas & Co., Inc.; Pacific Food Distributors, Inc.; Piggly Wiggly Alabama Distributing Co., Inc.; Publix Super Markets, Inc.; Save Mart Supermarkets; Schnuck Markets, Inc.; SpartanNash Company; SuperValu, Inc.; The Distribution Group, Inc.; The Golub Corporation; The Kroger Co.; Troyer Foods, Inc.; URM Stores, Inc.; Wakefern Food Corporation; Weinstein Wholesale Meats, Inc.; Winn-Dixie Stores, Inc.; W. Lee Flowers & Company, Inc.; Woodman's Food Market, Inc.*

1092.  The Georgia Dock Defendants violated the Federal RICO statute, 18 U.S.C. § 1962(c), which makes it unlawful for any person associated with an enterprise to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity.

1093.  The Georgia Dock Defendants were associated with an enterprise.  The enterprise was the group of Georgia Dock Defendants associated in fact through their price submissions to the PMN, their role on the PMN Advisory Committee, their involvement with the Georgia Poultry Federation, and their use of the Georgia Dock price index in selling poultry.

1094.  The enterprise was a continuing unit that associated together and acted with a common purpose: specifically, to sustain the existence of the Poultry Market News and the Georgia Dock price index and to artificially inflate the Georgia Dock price index through fraudulent acts and omissions for the benefit of the enterprise and the individual Defendants.

1095.  There were relationships among the associates in the enterprise.  Representatives from the Georgia Dock Defendants interacted with each other frequently at industry conferences and trade shows, as discussed throughout this Complaint.  All but one Georgia Dock Defendant participated on the PMN Advisory Committee, which acted to preserve and enhance the PMN and Georgia Dock price index as discussed above.  All of the Georgia Dock Defendants were members of the Georgia Poultry Federation, the largest lobbying group in Georgia for the poultry producers. Representatives from the Georgia Dock Defendants interacted often with leaders of the Georgia Poultry Federation, such as Abit Massey and Mike Giles, who helped to preserve and enhance the power of the PMN Advisory Committee and the Georgia Dock, as discussed in this Complaint.

1096.  The enterprise had longevity that was sufficient to permit the associates to pursue its purpose.  There was continuity among the representatives of the Defendants which served on the Advisory Committee, interacted with representatives of the Georgia Poultry Federation, and

submitted price quotes to the PMN.  That continuity allowed the Georgia Dock Defendants to create and execute their scheme to fraudulently manipulate the Georgia Dock price index and conceal its critical flaws from customers, as described in this Complaint.  The scheme by Defendants to submit false and inflated prices to the PMN lasted more than three years.

1097.  The Georgia Dock Defendants conducted and participated in the conduct of the enterprise through a pattern of racketeering activity as defined by federal law.  In particular, and as explained below, each of Georgia Dock Defendants conducted and participated in the conduct of the enterprise through conduct that falls within the scope of 18 U.S.C. § 1343 (federal wire fraud) (incorporated through 18 U.S.C. § 1961).

1098.  The Georgia Dock Defendants' racketeering activity falls into two categories of conduct:  fraudulent submissions and fraudulent omissions.

1099.  Fraudulent submissions.  The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the Poultry Market News each week from at least 2011 to the end of 2016.  As explained in detail in this Complaint, the Georgia Dock Defendants falsely reported on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2.5 to 3 pound whole birds.  When the Georgia Dock Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity.  These false submissions were reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of how the Georgia Dock index was used, specifically in tray pack and retail contracts where prices were often tied to the Georgia Dock.

1100.  Fraudulent omissions.  The Georgia Dock Defendants also fraudulently failed to disclose information to Plaintiffs to whom they sell poultry.  The facts that the Georgia Dock

Defendants failed to disclose to Plaintiffs were basic to their transactions with Plaintiffs. For example, the Georgia Dock Defendants failed to disclose to Plaintiffs during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia Dock. The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock price or acted with reckless disregard for their falsity, because they knew the quotes lacked integrity and were higher than the actual prices they could have charged absent the Georgia Dock manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of Plaintiffs. Each Georgia Dock Defendant owed a duty to disclose the foregoing to Plaintiffs to whom they sold poultry, given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock Defendants benefited from Plaintiff's trust in the Georgia Dock price index as an impartial, government-issued index. Plaintiffs could not have discovered the truth through reasonable inquiry and/or were prevented from making such an inquiry given the secret nature of the manipulation.

1101. The Georgia Dock Defendants' conduct falls within the scope of 18 U.S.C. § 1343 (federal wire fraud) (incorporated through 18 U.S.C. § 1961). The fraudulent submissions and omissions discussed above were part of the Georgia Dock Defendants' scheme to defraud their customers, including Plaintiffs. The Georgia Dock Defendants intended to defraud those customers, who were the targets of the scheme to rig the index. Each of the Georgia Dock Defendants used multiple interstate wires in furtherance of the fraudulent scheme. The interstate wires included: (i) Defendants' false submissions to the Poultry Market News, and (ii) Defendants'

communications with customers to whom they sold chicken based on the Georgia Dock price index and in which they failed to disclose information basic to their transactions to induce a false belief to their benefit.

1102.   The Georgia Dock Defendants acted in concert with each other with respect to their fraudulent acts and omissions.  Defendants' fraudulent submissions were committed for the benefit of the enterprise.  The Georgia Dock Defendants were economically interdependent with respect to their fraudulent submissions and omissions; all of the Georgia Dock Defendants benefited from an inflated Georgia Dock price index through false submissions yet could not manipulate the price index alone.  The Georgia Dock Defendants also sustained that inflated price index for years by hiding significant, non-public information from buyers.

1103.  The Georgia Dock Defendants' fraudulent submissions and omissions were intended to induce the reliance of Plaintiffs.  Specifically, the Georgia Dock Defendants made these fraudulent statements and omissions with the intent and understanding that that their false statements would be used to calculate the Georgia Dock benchmark price index upon which poultry purchasers like Plaintiffs relied when purchasing poultry.  The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiffs to enter into contracts at inflated prices in reliance on Defendants' material misrepresentations and omissions.

1104.   Plaintiffs purchased chicken based on the Georgia Dock price index.  In so doing, Plaintiffs reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price.  Had Plaintiffs known that the Georgia Dock was not a legitimate price index and that the Defendants were manipulating it, Plaintiffs would not have agreed to prices tied to such a benchmark.

Plaintiffs reasonably relied on these misrepresentations because the Georgia Dock benchmark price index was held out as a legitimate index and was an industry norm.

1105.  Plaintiffs were injured as a result of the Georgia Dock Defendants' fraudulent submissions and omissions.  In particular, Plaintiffs paid higher prices for chicken than they would have paid if the Georgia Dock Defendants had not rigged the index and failed to disclose the basic information discussed above.

1106.  As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent submissions and omissions, Plaintiffs were damaged in its businesses by paying higher prices for chicken.  The ascertainable damages will be established at trial.  These damages were the foreseeable and direct result of the false submissions and omissions.

### COUNT VII
### CONSPIRACY TO DEFRAUD
### (AGAINST THE GEORGIA DOCK DEFENDANTS)

*Brought by Bi-Lo Holdings, LLC; Winn-Dixie Stores, Inc.*

1107.  Plaintiffs reasonably and justifiably relied on the material misrepresentations and omissions made by the Georgia Dock Defendants relating to the Georgia Dock pricing index, and believing the Georgia Dock pricing Index provided an honest and accurate reflection of actual pricing in the broiler chicken market, Plaintiffs were induced to and did and entered into broiler chicken supply contracts which tied the pricing of broiler chickens to the Georgia Dock as a market base during the Georgia Dock period.

1108.  If Plaintiffs knew of the Defendants' collusive actions to inflate the Georgia Dock price, Plaintiffs would not have entered into contracts which tied the contract price of broiler chicken to the Georgia Dock price.

1109.   As a result of Plaintiffs' reasonable reliance on these false representations and/or omissions, Plaintiffs entered into contracts which were tied to the Georgia Dock price index as a market base and Plaintiffs suffered damages in the form of increased broiler prices.

## COUNT VIII
## FRAUD (AGAINST THE GEORGIA DOCK DEFENDANTS)

*Brought by Bi-Lo Holdings, LLC; Winn-Dixie Stores, Inc.*

1110.   Plaintiffs reasonably and justifiably relied on the material misrepresentations and omissions made by the Georgia Dock Defendants relating to the Georgia Dock pricing index, and believing the Georgia Dock pricing Index provided an honest and accurate reflection of actual pricing in the broiler chicken market, Plaintiffs were induced to and did and entered into broiler chicken supply contracts which tied the pricing of broiler chickens to the Georgia Dock as a market base during the Georgia Dock period.

1111.   If Plaintiffs knew of the Defendants' collusive actions to inflate the Georgia Dock price, Plaintiffs would not have entered into contracts which tied the contract price of broiler chicken to the Georgia Dock price.

1112.   As a result of Plaintiffs' reasonable reliance on these false representations and/or omissions, Plaintiffs entered into contracts which were tied to the Georgia Dock price index as a market base and Plaintiffs suffered damages in the form of increased broiler prices.

## COUNT IX
## NEGLIGENT MISREPRESENTATION
## (AGAINST THE GEORGIA DOCK DEFENDANTS)

*Brought by Bi-Lo Holdings, LLC; Winn-Dixie Stores, Inc.*

1113.   Plaintiffs reasonably and justifiably relied on the material misrepresentations and omissions made by the Georgia Dock Defendants relating to the Georgia Dock pricing index, and believing the Georgia Dock pricing Index provided an honest and accurate reflection of actual

pricing in the broiler chicken market, Plaintiffs were induced to and did and entered into broiler chicken supply contracts which tied the pricing of broiler chickens to the Georgia Dock as a market base during the Georgia Dock period.

1114.  If Plaintiffs knew of the Defendants' collusive actions to inflate the Georgia Dock price, Plaintiffs would not have entered into contracts which tied the contract price of broiler chicken to the Georgia Dock price.

1115.  As a result of Plaintiffs' reasonable reliance on these false representations and/or omissions, Plaintiffs entered into contracts which were tied to the Georgia Dock price index as a market base and Plaintiffs suffered damages in the form of increased broiler prices.

**COUNT X**
**VIOLATION OF THE FLORIDA DECEPTIVE AND**
**UNFAIR TRADE PRACTICES ACT (AGAINST SANDERSON)**

*Brought by Bi-Lo Holdings, LLC; Caesars Enterprise Services, LLC; Winn-Dixie Stores, Inc.*

1116.  The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq*. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade.  Florida Stat. § 501.204(1).

1117.  Chapter 501 of the Florida Annotated Statutes generally governs consumer protection within the State of Florida (the "FDUTPA").  Fla. Stat. § 501.201, *et seq*.

1118.  The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

1119.   Under the FDUTPA, "trade or commerce" means "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated."  Fla. Stat. § 501.203(8).

1120.   The FDUTPA outlaws "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).

1121.   Plaintiffs purchased broilers from Sanderson within the State of Florida during the Georgia Dock Conduct Period that were tied to the Georgia Dock index.

1122.   But for Defendants' deceptive and/or unfair conduct as set forth herein, the Plaintiffs paid more per pound for broilers than they otherwise would have, in an amount to be determined at trial.

1123.   Defendant Sanderson sold broiler chickens to Plaintiffs through contracts whereby the price of the broilers were tied to the weekly Georgia Dock price.

1124.   As noted above, during the Georgia Dock Conduct Period Sanderson colluded with the other Georgia Dock Defendants to raise and did raise the price of broiler chickens sold to Plaintiffs and other purchasers by agreeing to report inflated chicken prices to the GDA in order to inflate the Georgia Dock price which was often used by Defendants to adjust prices in various chicken supply contracts including supply contracts entered into between Plaintiffs and Sanderson during the Georgia Dock Conduct Period.

1125.  Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

1126.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property by virtue of additional overcharges for broilers during the Georgia Dock Conduct Period

1127.   By reason of the foregoing, Plaintiffs are entitled to inter alia actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

**COUNT XI**
**BREACH OF CONTRACT**
**(AGAINST SANDERSON)**

*Brought by Bi-Lo Holdings, LLC; Winn-Dixie Stores, Inc.*

1128.   Sanderson offered to supply Plaintiffs with broiler chickens pursuant to an agreement where the price of chicken was tied to the Georgia Dock as a market base.  Plaintiffs Winn-Dixie and Bi-Lo Holdings accepted Fieldale's offer and entered into broiler chicken supply agreements with Fieldale farms throughout the Georgia Dock Period.  The agreements between Plaintiffs and Fieldale contained bracket pricing in which the price of broiler chicken was adjusted based on the price reported by the Georgia Dock as the market base.  Typically under the contract, increases of the Georgia Dock from one bracket to the next would correspondingly raise Plaintiffs' prices under the contract.

1129.   The agreements were governed by Florida Law.

1130.   Sanderson breached its warranty under the contract by colluding to undermine Plaintiffs' right to purchase Chicken based on Georgia Dock prices that were based on reliable and accurate reported prices.

1131.   Sanderson's manipulation of the Georgia Dock frustrated an important purpose of the contract which was to fairly adjust the price for broilers based on legitimate market forces.

However, as Fieldale manipulated the Georgia Dock price, Plaintiffs paid more than they otherwise would have for broiler chickens from Sanderson under the supply agreements with Sanderson.

1132.  As a direct and proximate cause of these breaches of supply contracts, including by breaches of the implied covenant of good faith and fair dealing, and of Defendants' frustration of the purposes of these contracts, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial.

## COUNT XII
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (AGAINST SANDERSON)

*Brought by Bi-Lo Holdings, LLC; Winn-Dixie Stores, Inc.*

1133.  Sanderson offered to supply Plaintiffs with broiler chickens pursuant to an agreement where the price of chicken was tied to the Georgia Dock price.  Plaintiffs Winn-Dixie and Bi-Lo Holdings accepted Sanderson's offer and entered broiler chicken supply agreements with Sanderson during the Georgia Dock Period.  The agreements between Plaintiffs and Sanderson contained bracket pricing whereby the price of broiler chicken was adjusted based on the price reported by the Georgia Dock as the market base.  Typically under the contract, increases of the Georgia Dock from one bracket to the next would correspondingly raise Plaintiffs' prices under the contract.

1134.  The agreements were governed by Florida Law.

1135.  The agreements included an implied covenant that Sanderson will act in good faith and deal fairly with Plaintiffs, and that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

1136.   Sanderson breached the implied covenant of good faith and fair dealing by colluding to undermine Plaintiffs' right to purchase Chicken based on Georgia Dock prices that were based on reliable and accurate reported prices.

1137.   Sanderson also breached the implied covenant of good faith and fair dealing by obtaining contractual benefits from its collusive and manipulative acts, in the form of receiving higher prices from Plaintiffs based on the Georgia Dock Price that Sanderson helped artificially inflate.

1138.   Defendants' collusion to manipulate the Georgia Dock frustrated an important purpose of the contract which was to fairly adjust the price for broilers based on legitimate market forces.   However, as Sanderson manipulated the Georgia Dock price, Plaintiffs paid more than they otherwise would have for broiler chickens from Sanderson under the supply agreements with Sanderson.

1139.   Plaintiffs have fully performed all of their obligations under the supply agreements with Sanderson.

1140.   As a direct and proximate cause of Sanderson's breach of the implied covenant of good faith and fair dealing, Sanderson frustrated the purpose of these contracts and Plaintiffs have been damaged as alleged herein in an amount to be proven at trial.

## COUNT XIII
## UNJUST ENRICHMENT
## (AGAINST SANDERSON)

*Brought by Bi-Lo Holdings; Winn-Dixie Stores, Inc.*

1141.   As alleged herein, Plaintiffs conferred a benefit upon Sanderson, Sanderson had knowledge of that benefit, and voluntarily accepted it from Plaintiffs.

1142. It would be inequitable for Sanderson to be permitted to retain the benefit which Sanderson obtained from its manipulative acts at the expense of the Plaintiffs.

1143. Plaintiffs are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

1144. Alternatively or additionally Sanderson should pay restitution or be required to disgorge to Plaintiffs its own unjust enrichment based on the reasonable value of the benefit conferred upon it.

## COUNT XIV
## VIOLATION OF THE WISCONSIN ANTITRUST ACT

*Brought by Associated Wholesale Grocers, Inc.*

1145. Plaintiff Associated Wholesale Grocers, Inc. purchased broilers from Defendants and other producers of broilers at and for its Kenosha, WI distribution center. Affiliated Foods Midwest Cooperative, Inc. ("AFM"), which assigned its claims to Plaintiff Associated Wholesale Grocers, Inc., also purchased broilers from Defendants from Kenosha, WI.

1146. Defendants and all of their Co-Conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of § 133.03 of the Wisconsin Antitrust Act. Wis. Stat. § 133.03.

1147. Defendants' acts in furtherance of their contract, combination, or conspiracy included, but were not limited to: (a) coordinating their output and limiting production with the intent and expected result of increasing prices of broilers in the United States, (b) manipulating price indices used to set wholesale chicken prices for buyers in Wisconsin and across the United States, and (c) rigging bids and allocating markets for broilers.

1148.   Defendants' acts in furtherance of their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

1149.   At least as early as January 1, 2008, and continuing until present, the exact dates being unknown to Plaintiffs, Defendants and all of their Co-Conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for broilers, thereby creating anticompetitive effects.

1150.   Defendants' anticompetitive acts involved commerce in Wisconsin, and had a direct, substantial, and foreseeable effect on Wisconsin's commerce by raising and fixing prices for broilers throughout the state.

1151.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for broilers.

1152.   As a result of Defendants' unlawful conduct, Plaintiff Associated Wholesale Grocers, Inc. and AFM have been harmed by being forced to pay inflated, supra-competitive prices for broilers.

1153.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all of their Co-Conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.  Defendants' conspiracy had the following effects, among others:

      A.     Price competition in the market for broilers has been restrained, suppressed, and/or eliminated in Wisconsin;

      B.     Prices for broilers sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their Producer Co-Conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout Wisconsin; and

       C.     Plaintiff has been deprived of the benefits of free and open competition in the purchase of broilers.

1154. Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of broilers on the spot market to be higher than it would be but for Defendants' conduct. Defendants also knew and intended that such an artificial inflation of spot market prices would increase other broiler market prices, including those paid by Plaintiff Associated Wholesale Grocers, Inc. and AFM.

1155. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff Associated Wholesale Grocers, Inc. and AFM have been injured in their business or property and will continue to be injured in their business and property by paying more for broilers than they would have paid and will pay in the absence of Defendants' contract, combination, or conspiracy.

1156. Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Wisconsin antitrust law.

1157. Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.

1158. The contracts between Plaintiff Associated Wholesale Grocers, Inc. with Defendants and between AFM with Defendants are therefore void, and payments made upon, under or pursuant to such contracts are recoverable from Defendants. Wis. Stat. § 133.14.

## COUNT XV
## VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT

*Brought by Associated Wholesale Grocers, Inc.*

1159.  Plaintiff Associated Wholesale Grocers, Inc. purchased broilers from Defendants and other producers of broilers in Tennessee, including at and for a distribution center in Goodlettsville, TN.

1160.  Defendants and all of their Co-Conspirators entered into and engaged in an arrangement, contract, agreement, trust, or combination to advance and control the price of broilers in violation of § 47-25-101 of the Tennessee Trade Practices Act. Tenn. Code § 47-25-101.

1161.  Defendants' acts in furtherance of their arrangement, contract, agreement, trust, or combination included, but were not limited to: (a) coordinating their output and limiting production with the intent and expected result of increasing prices of broilers in the United States, (b) manipulating price indices used to set wholesale chicken prices for buyers in Tennessee and across the United States, and (c) rigging bids and allocating markets for broilers.

1162.  Defendants' acts in furtherance of their arrangement, contract, agreement, trust, or combination were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

1163.  At least as early as January 1, 2008, and continuing until present, the exact dates being unknown to Plaintiff Associated Wholesale Grocers, Inc., Defendants and all of their Co-Conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to advance and control prices for broilers, thereby creating anticompetitive effects.

1164.  Defendants' anticompetitive acts involved commerce in Tennessee, and had a direct, substantial, and foreseeable effect on Tennessee's commerce by raising and fixing prices for broilers throughout the state.

1165.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for broilers.

1166.   As a result of Defendants' unlawful conduct, Plaintiff Associated Wholesale Grocers, Inc. has been harmed by being forced to pay inflated, supra-competitive prices for broilers.

1167.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all of their Co-Conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.  Defendants' conspiracy had the following effects, among others:

> A.    Price competition in the market for broilers has been restrained, suppressed, and/or eliminated in Tennessee;
>
> B.    Prices for broilers sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their Producer Co-Conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout Tennessee; and
>
> C.    Plaintiff has been deprived of the benefits of free and open competition in the purchase of broilers.

1168.   Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of broilers on the spot market to be higher than it would be but for Defendants' conduct.  Defendants also knew and intended that such an artificial inflation of spot market prices would increase other broiler market prices, including those paid by Plaintiff Associated Wholesale Grocers, Inc.

1169.   As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff Associated Wholesale Grocers, Inc. has been injured in their business or property and will continue to be injured in their business and property by paying more for broilers than they would have paid

and will pay in the absence of Defendants' arrangement, contract, agreement, trust, or combination.

1170.   Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Tennessee antitrust law.

1171.   Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.

1172.   Contracts between Plaintiff Associated Wholesale Grocers, Inc. and Defendants are therefore void, and Plaintiff Associated Wholesale Grocers, Inc. is entitled to recover the full consideration or sum paid by Plaintiff pursuant to such contracts.  Tenn. Code §§ 47-25-101, 47-25-106.

**COUNT XVI**
**COMMON LAW FRAUD**
**(AGAINST THE GEORGIA DOCK DEFENDANTS)**

*Brought by Ahold Delhaize USA, Inc.; Caesars Enterprise Services, LLC*

1173.   Each of the Georgia Dock Defendants knowingly made false statements and/or material omissions concerning material facts, as explained below.

1174.   ***Fraudulent Submissions.***  The Georgia Dock Defendants knowingly submitted false and inflated price quotes to the Poultry Market News each week from at least 2011 to the end of 2016 (the exact dates being unknown to Plaintiffs).  As explained in detail in this Complaint, the Georgia Dock Defendants falsely reported on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2.5 to 3 pound whole birds.  When Defendants made their false submissions, they knew their submissions were false or acted with

353

reckless disregard for their falsity. These false submissions were also reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of the common uses of the Georgia Dock quotes, specifically their use in tray pack and retail contracts and other sales where prices were often tied to the Georgia Dock.

1175. The Georgia Dock Defendants are jointly and severally liable to Plaintiffs for the damages Plaintiffs incurred because of purchases it made based on Georgia Dock pricing during the relevant period, whether or not such a purchase was made from one of the Georgia Dock Defendants or another chicken supplier.

1176. ***Fraudulent Misrepresentations.*** The Georgia Dock Defendants also made material, fraudulent affirmative misrepresentations to their customers, including Plaintiffs, regarding the nature of and methodology for calculating the Georgia Dock. These misrepresentations were intended to induce, and did induce, the reliance of Plaintiffs on the inflated Georgia Dock prices. These misrepresentations were also reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of the common uses of the Georgia Dock quotes, specifically their use in tray pack and retail contracts and other sales where prices were often tied to the Georgia Dock.

1177. ***Fraudulent Omissions.*** In addition, all of the Georgia Dock Defendants fraudulently failed to disclose information to the Plaintiffs to whom they sold broilers or broiler products. The facts that they failed to disclose to Plaintiffs were basic to their transactions with Plaintiffs. For example, they failed to disclose to Plaintiffs during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia

Dock, a fact that was basic to their transactions with Plaintiffs. The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock price quotes from no later than early 2011 through the end of 2016 or had reckless disregard for their falsity, because the Georgia Dock Defendants each knew that the quotes lacked integrity and were higher than the actual prices they could have charged absent Georgia Dock manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of Plaintiffs.

1178. Each Georgia Dock Defendant owed a duty to disclose the foregoing to the Plaintiffs to whom they sold broilers or broiler products, given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock Defendants benefited from Plaintiffs' trust in the Georgia Dock price index as an impartial, government-issued index. Defendants used this to their advantage by pushing Plaintiffs either to incorporate the Georgia Dock into its pricing and contracts, or to justify a change to its non-Georgia-Dock-based pricing by using the Georgia Dock as a point of reference.

1179. By failing to disclose the unreliability of the Georgia Dock, the Georgia Dock Defendants concealed a material fact, intending to induce a false belief. Plaintiffs could not have discovered the truth through reasonable inquiry and/or was prevented from making such an inquiry given the secret nature of the manipulation.

1180. The Georgia Dock Defendants' fraudulent submissions, fraudulent misrepresentations, and fraudulent omissions were intended to induce the reliance of Plaintiffs. Specifically, the Georgia Dock Defendants made these false statements and omissions with the

intent and understanding that that their false statements would be used to calculate the Georgia Dock price index upon which poultry purchasers like Plaintiffs relied when purchasing broilers and broiler products. The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiffs to enter into contracts at inflated prices in reliance on Defendants' misrepresentations and omissions of material fact.

1181. Plaintiffs purchased chicken based on the Georgia Dock price index, and/or raised its non-Georgia Dock-based pricing by using the Georgia Dock as a point of reference, and in so doing reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiffs known that the Georgia Dock was not a legitimate price index and that the Defendants were manipulating it, Plaintiffs would not have agreed to prices tied to such a benchmark. Plaintiffs reasonably relied on these misrepresentations because the Georgia Dock price index was held out as a legitimate index of poultry producers' actual offering prices and was an industry norm.

1182. Plaintiffs justifiably relied on the inflated Georgia Dock price index and was injured as a result of the Georgia Dock Defendants' fraudulent acts and omissions pertaining to the Georgia Dock price index. Plaintiffs paid higher prices than it would have had the Georgia Dock Defendants submitted accurate price quotes and not caused an artificially inflated Georgia Dock price index.

1183. As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent acts and omissions, Plaintiffs' business was damaged by paying higher prices for chicken. The ascertainable damages will be established at trial. These damages were the foreseeable and direct result of the false submissions and omissions.

## COUNT XVII
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (AGAINST ALL GEORGIA DOCK DEFENDANTS)

*Brought by Ahold Delhaize USA, Inc.*

1184.   Throughout the relevant period, Plaintiffs contracted to purchase chicken from Defendants at prices based, in whole or in part, on the Georgia Dock.  Each of Plaintiffs' contracts with the Georgia Dock Defendants had an implied covenant that the parties would act in good faith and deal fairly with each other.  Neither party was to do anything that would have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.

1185.   Plaintiffs acted in good faith, dealt fairly with Defendants, and performed all of its obligations under these contracts.  All conditions required for the Georgia Dock Defendants' performance of those contracts were satisfied.

1186.   The Georgia Dock Defendants unfairly interfered with Plaintiff's right to receive the benefits of the contracts by secretly manipulating the Georgia Dock to inflate prices, as alleged above in the foregoing paragraphs.

1187.   By intentionally and falsely inflating their price submissions that were used by the GDA to calculate the Georgia Dock, and by failing to inform Plaintiffs that they were doing so and that they controlled both the manner in which the Georgia Dock was calculated and the prices that were used to calculate it, the Georgia Dock Defendants breached their implied duty of good faith and fair dealing and prevented Plaintiffs from receiving the full benefit of their contractual agreements.  Specifically, their inflation of the Georgia Dock price index resulted in Plaintiffs paying more for broiler chicken than they would have had the Georgia Dock Defendants based their GDA submissions on their actual offering prices.

1188.  Plaintiffs were directly and proximately harmed by Defendants' actions since Plaintiffs were impoverished by paying more for chicken than Plaintiffs would have absent Defendants' manipulation, and absent the Defendants' breach of the implied covenant of good faith and fair dealing.  Defendants were enriched with increased payment for their chicken.

### COUNT XVIII
### NEGLIGENT MISREPRESENTATION
### (AGAINST THE GEORGIA DOCK DEFENDANTS)

*Brought by Ahold Delhaize USA, Inc.*

1189.  Each of the Georgia Dock Defendants negligently made false statements and/or material omissions concerning material facts, as explained below.

1190.  ***False Submissions.***  The Georgia Dock Defendants submitted false and inflated price quotes to the Poultry Market News each week from no later than early 2011 through the end of 2016, as explained in detail in this Complaint.  When Defendants made their false submissions, they did not exercise reasonable care or competence in determining whether their submissions were true or false and/or obtaining or communicating the information.  Each Georgia Dock Defendant knew and/or had reason to know that Plaintiffs were among the class of businesses that would likely receive and rely on the representations made regarding the Georgia Dock.  The Georgia Dock Defendants supplied the inaccurate and inflated price quotes in order to guide Plaintiffs' transactions.

1191.  The Georgia Dock Defendants had a special relationship with Plaintiffs; they intended for and knew Plaintiffs relied on the representations in entering contracts or other financial transactions tied to the Georgia Dock, or when factoring the Georgia Dock into their decisions to increase non-Georgia Dock-based prices.  They had superior knowledge about the components of and methodology for calculating the Georgia Dock, and their manipulation thereof

was conducted in secret and concealed until the end of 2016. The Georgia Dock Defendants owed Plaintiffs a duty to communicate accurate information because of this special relationship. Plaintiffs justifiably relied on the information and suffered loss as a result. It was foreseeable that Plaintiffs would be harmed by the false submissions.

1192. ***Negligent Omissions.*** In addition, all of the Georgia Dock Defendants negligently failed to disclose information to Plaintiffs. The price manipulation and other facts that they failed to disclose to Plaintiffs were basic to their transactions with Plaintiffs. The Georgia Dock Defendants had direct dealings with and entered into contracts with Plaintiffs. The relationships imposed a duty on the Counterparty Georgia Dock Defendants to make accurate and good-faith representations to Plaintiffs since the Defendants had superior and exclusive knowledge of the integrity of the Georgia Dock price index. There was a special duty because the Georgia Dock Defendants controlled the Georgia Dock price index by reporting what should have been accurate price quotes but what were, in reality, fake prices.

1193. The Defendants failed to disclose to Plaintiffs additional facts that would make their representations regarding the Georgia Dock price index not materially misleading. Each Georgia Dock Defendant failed to disclose that it and other poultry producers were manipulating the Georgia Dock to their benefit and that the Georgia Dock did not accurately reflect actual prices absent manipulation. Each Georgia Dock Defendant used the inflated Georgia Dock to their advantage by making material misrepresentations and omissions knowing that they were false and/or with reckless disregard for their truth.

1194. By failing to disclose the foregoing information, the Georgia Dock Defendants did not exercise reasonable care or competence in determining whether such information should be

shared with Plaintiffs. They knew Plaintiffs would look to the Georgia Dock for guidance in contract formation and as a base for other transactions. Plaintiffs were foreseeable victims.

1195. Plaintiffs reasonably relied on and were injured as a result of the Georgia Dock Defendants' negligent acts and omissions. Plaintiffs entered into contracts and other financial transactions tied to the Georgia Dock, and/or raised their non-Georgia Dock-based prices based on references to the Georgia Dock, and were therefore directly and proximately injured by the Georgia Dock Defendants. Plaintiffs paid more for chicken than they would have absent the Georgia Dock Defendants' negligent acts and omissions. Plaintiffs were injured as a result of the Georgia Dock Defendants' negligent acts and omissions pertaining to the Georgia Dock price index.

**COUNT XIX**
**UNJUST ENRICHMENT**
**(AGAINST THE GEORGIA DOCK DEFENDANTS)**

*Brought by Ahold Delhaize USA, Inc.*

1196. In the alternative to remedies at law, through manipulating the Georgia Dock by submitting false price quotes and then misrepresenting and/or omitting the material fact of this manipulation to Plaintiffs, the Georgia Dock Defendants knowingly acted in an unconscionable, unfair, and oppressive manner toward Plaintiffs, violating the fundamental principles of justice, equity, and good conscience. The Georgia Dock Defendants received higher payment then they were entitled to and acted with conscious disregard for Plaintiffs' rights.

1197. It would be inequitable for the Georgia Dock Defendants to be permitted to retain the ill-gotten gains they obtained through these fraudulent and manipulative acts. The Georgia Dock Defendants' enrichment resulted directly and proximately from the alleged conduct.

1198. If Plaintiffs have no adequate remedy at law, the Court can and should compel the Georgia Dock Defendants to disgorge all unlawful or inequitable proceeds. Plaintiffs are entitled

to the establishment of a constructive trust impressed upon the benefits to the Georgia Dock Defendants from their inequitable actions and unjust enrichment. Alternatively, each Defendant could pay its own unjust enrichment to Plaintiffs.

**COUNT XX**
**VIOLATION OF S.C. CODE ANN §§ 39-3-10, *ET SEQ.***
**(AGAINST ALL DEFENDANTS)**

*Brought by W. Lee Flowers & Company, Inc.*

1199.  S.C. Code Ann. § 39-3-10, in pertinent part, declares unlawful all arrangements, contracts, agreements, or combinations between two or more firms made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles in South Carolina or which tend to advance or control the price to the consumer of any such product or article or which may lessen or affect in any manner the full and free competition in any prices in any branch of trade, business, or commerce.

1200.  The conduct of Defendants and their Co-Conspirators as alleged herein violates S.C. Code Ann. § 39-3-10 in that the conduct of Defendants as herein alleged tended to lessen the full and free competition and control the price of broiler chickens imported into the state of South Carolina by Defendants and purchased by Plaintiffs and other South Carolina residents.

1201.  S.C. Code Ann. § 39-3-30 provides, in pertinent part, that any person who may be injured or damaged by any such arrangement, contract, agreement, or combination described in § 39-3-10 may sue those firms responsible in any court of competent jurisdiction and recover the full consideration or sum paid for any goods, wares, merchandise, or articles the sale of which was controlled by such unlawful arrangement, contract, agreement, or combination.

1202.  Plaintiffs are entitled to recover the full amount of consideration they paid Defendants for the broiler chickens they purchased from Defendants during the time period in which the illegal contract, agreement, arrangement, or combination was in effect.

## COUNT XXI
## VIOLATION OF S.C. CODE ANN §§ 39-35, *ET SEQ.*
## (AGAINST ALL DEFENDANTS)

*Brought by W. Lee Flowers & Company, Inc.*

1203.  S.C. Code Ann. § 39-5-20(a) declares as unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

1204.  S.C. Code Ann. § 39-5-20(b) provides that it is the intent of the South Carolina legislature that in construing paragraph (a) of that section that the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to § 5(a)(1) of the Federal Trade Commission Act, as from time to time amended.

1205.  Plaintiffs purchased broiler chickens from one or more Defendants from within the State of South Carolina during the relevant period.

1206.  Defendants engaged in an unfair or deceptive act or practice with the intent to injure competition through supra-competitive profits.

1207.  Defendants' conduct was unfair or deceptive within the conduct of commerce directed to or within the State of South Carolina.

1208.  Defendants' unlawful conduct substantially affected South Carolina's trade and commerce, in that Defendants' conduct had the following effects: (1) broiler chicken competition was restrained, suppressed, and eliminated in South Carolina; (2) broiler chicken prices were raised, fixed, maintained, and/or stabilized at artificially high levels in South Carolina; (3)

Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supracompetitive, artificially inflated prices for broiler chickens.

1209.   Defendants' conduct was willful.

1210.   The conduct of Defendants herein thus violates § 5(a)(1) of the Federal Trade Commission Act and also constitutes a violation of S.C. Code Ann. § 39-5-20(a).

1211.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

1212.   The conduct of Defendants also impacts, or has the potential to impact, the public interest in that, among other things, it is capable of repetition.

1213.   S.C. Code Ann. § 39-5-140 provides that any person who suffers any ascertainable loss of money or property as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by § 39-5-20 may bring an action individually to recover actual damages, and if the court finds that the use or employment of the unfair or deceptive method, act, or practice was a willing or knowing violation of § 39-5-20, the court shall award three times the actual damages sustained and may provide for such other relief as it deems necessary or proper.   For purposes of this section, a willful violation occurs when the party committing the violation knew or should have known that its conduct was a violation of § 39-5-20.

1214.   S.C. Code Ann. § 39-5-140(a) also provides that the court, upon a finding of a violation of § 39-5-20, shall award to the person bringing the action reasonable attorneys' fees and costs.

1215.   Defendants knew or should have known that their conduct alleged herein was a violation of § 39-5-20, and Plaintiffs are entitled to an award in the amount of three times their actual damages sustained plus reasonable attorneys' fees and costs.

### COUNT XXII
### VIOLATION OF FLORIDA DECEPTIVE AND
### UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201(2), *ET SEQ.*
### (AGAINST ALL DEFENDANTS)

*Brought by Checkers Drive-In Restaurants, Inc.; Hooters Management Corporation; and LTP Management Group, Inc.; Bojangles' Restaurants, Inc. and Bojangles Opco, LLC; Boston Market Corporation; The Johnny Rockets Group, Inc.*

1216.   The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade.  Florida Stat. § 501.204(1).

1217.   The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

1218.   Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint.  Fla. Stat. § 501.211(a) ("…anyone aggrieved by a violation of this [statute] may bring an action…").

1219.   Plaintiffs purchased broilers within the State of Florida during the relevant period.

1220.   But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.

1221.   Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of trade or commerce in the broilers market, a substantial part of which occurred within Florida.

1222.   Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for broilers, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2008 and continuing through the date of this filing.

1223.   Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

1224.   Defendants' unlawful conduct substantially affected Florida's trade and commerce.

1225.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property by virtue of overcharges for broilers and are threatened with further injury.

1226.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

### COUNT XXIII
### VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT, ARIZ. REV. STAT. § 44-1401, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC; The Johnny Rockets Group, Inc.; Restaurants of America, Inc.*

1227.   By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. § 44-1401, *et seq.*

1228.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the broilers market, a substantial portion of which occurred within Arizona.

1229.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial portion of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the broiler market.

1230.   Defendants' violations of Arizona law were flagrant.

1231.   Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

1232.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury.

1233.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq*.

1234.   Pursuant to Arizona Revised Statute § 44-1415, with the filing of this Complaint, a copy is being served upon the Attorney General of Arizona.

## COUNT XXIV
## VIOLATION OF ILLINOIS ANTITRUST ACT, 740 Ill. COMP. STAT. ANN. 10/1
## (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Bojangles' Restaurants, Inc. and Bojangles Opco, LLC; Caesars Enterprise Services, LLC; Carl Buddig & Co.; Hooters Management Corporation; The Johnny Rockets Group, Inc.*

1235.   The Illinois Antitrust Act, 740 ILCS 10/1, *et seq*., aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are

secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade ....” 740 ILCS 10/2.

1236.   Plaintiffs purchased broilers within the State of Illinois during the relevant period. But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.

1237.   Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint.  740 ILCS 10/7(2).

1238.   Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for broilers sold, and/or for allocating customers or markets for broilers within intrastate commerce in Illinois.

1239.   Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for broilers in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, *et seq.*

1240.   Defendants' conduct was willful.

1241.   Plaintiffs were injured with respect to purchases of broilers in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

**COUNT XXV**
**VIOLATION OF THE MINNESOTA ANTITRUST LAW,**
**MINN. STAT. §325D.49, *ET SEQ.* (AGAINST ALL DEFENDANTS)**

*Brought by Boston Market Corporation; Restaurants of America, Inc.; The Johnny Rockets Group, Inc.*

1242.   The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any

contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

1243.  Plaintiffs purchased broilers within the State of Minnesota during the relevant period.  But for Defendants' conduct set forth herein the price per pound of broilers would have been lower, in an amount to be determined at trial.

1244.  Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  Minn. Stat. § 325D.56.

1245.  Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for broilers within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade of commerce in the market for broilers within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for broilers within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq*.

1246.  Plaintiffs were injured with respect to purchases of broilers in Minnesota and is entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

## COUNT XXVI
## VIOLATION OF THE NEW MEXICO ANTITRUST ACT,
## N.M. STAT. ANN. §§ 57-1-15, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Restaurants of America, Inc.; The Johnny Rockets Group, Inc.*

1247.  The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices.  N.M. Stat. Ann. §§ 57-1-15.

1248.   Plaintiffs purchased broilers within the State of New Mexico during the relevant period.  But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.

1249.   Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  N.M. Stat. Ann. § 57-1-3.

1250.   Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for broilers within intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq*.

1251.   Plaintiffs were injured with respect to purchases of broilers in New Mexico and is entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## COUNT XXVII
## VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL BUSINESS LAW
## (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC; Hooters Management Corporation; The Johnny Rockets Group, Inc.*

1252.   Article 22 of the New York General Business Law generally prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York.  N.Y. Gen. Bus. Law. § 340(1).

1253.   Plaintiffs purchased broilers within New York State during the relevant period.  But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.

1254.   Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  N.Y. Gen. Bus. Law. § 340(6).

1255.   Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of broilers and restrained competition in the free exercise of the conduct of the business of broilers within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq*.

1256.   Plaintiffs were injured with respect to purchases of broilers in New York and is entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000 and reasonable attorneys' fees.

1257.   Pursuant to N.Y. Gen. Bus. Law Section 340(5), with the filing of this Complaint, a copy is being served upon the Attorney General of New York.

## COUNT XXVIII
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILL. COMP. STAT. ANN. 505/10a, *ET SEQ*.
## (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC; Carl Buddig & Co.; Hooters Management Corporation; The Johnny Rockets Group, Inc.; Bojangles' Restaurants, Inc. and Bojangles Opco, LLC*

1258.   By reason of the conduct alleged herein, Defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq*.

1259.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the broilers market, a substantial part of which occurred within Illinois.

1260.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred in Illinois, for the purpose of excluding competition or controlling, fixing, or maintained prices in the broiler market.

1261.   Defendants conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

1262.   Defendants conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs.

1263.   Defendants' unlawful conduct substantially affected Illinois trade and commerce.

1264.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and is threatened with further injury.  Plaintiffs' claim falls within the scope of the Illinois statute.

1265.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*.

## COUNT XXIX
## VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT, MINN. STAT. § 325F.68, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Restaurants of America, Inc.; The Johnny Rockets Group, Inc.*

1266.   By reason of the conduct alleged herein, Defendants have violated Minn. Stat. § 325F.68, *et seq*.

1267.   Defendants engaged in deceptive trade practices with intent to injure competitors and consumers through supra-competitive profits.

1268.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the broilers market, a substantial part of which occurred in Minnesota, for the purpose of controlling, fixing, or maintaining prices in the broilers market.

1269.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.

1270.   Defendants conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

1271.   Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

1272.   Defendants' conduct was willful.

1273.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury.  Plaintiffs' claims fall within the scope of the Minnesota statute.

1274.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, *et seq*. and applicable case law.

## COUNT XXX
## VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT,
## N.M. STAT. ANN. §§ 57-12-3, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Restaurants of America, Inc.; The Johnny Rockets Group, Inc.*

1275.   By reason of the conduct alleged herein, Defendants have violated N.M. Stat. Ann. §§ 57-12-3, *et seq*.

1276.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade of commerce in the broilers market, a substantial part of which occurred within New Mexico.

1277.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred

within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the broilers market.

1278.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

1279.   Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs.

1280.   Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

1281.   Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the price paid by them for broilers as set forth in N.M. Stat. Ann. § 57-12-2E.

1282.   Defendants conduct was willful.

1283.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in its business or property and is threatened with further injury.

1284.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater plus reasonable attorneys' fees under N.M. Stat. Ann. § 57-12-10.

**COUNT XXXI**
**VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,**
**CAL. BUS & PROF. CODE §16700, *ET SEQ* (AGAINST ALL DEFENDANTS)**

*Brought by Anaheim Wings, LLC; Bonita Plaza Wings, LLC; Boston Market Corporation; Caesars Enterprise Services, LLC; Costa Mesa Wings, LLC; Downtown Wings, LLC; Gaslamp Wings, LLC; Hollywood Wings, LLC; Mission Valley Wings, LLC; Oceanside Wings, LLC; Ontario Wings, LLC; Rancho Bernardo Wings, LLC; South Gate Wings, LLC; The Johnny Rockets Group, Inc.; Wings Over Long Beach, LLC*

1285.   The California Business & Professions Code generally governs conduct of corporate entities.  The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

1286.   California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace.  Cal. Bus. & Prof. Code § 301.

1287.   Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  Cal. Bus. & Prof. Code § 16750(a).

1288.   A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity.  Cal. Bus. & Prof. Code § 16720.  Every trust is unlawful except as provided by the Code. Id. § 16726.

1289.   Plaintiffs purchased broilers within the State of California during the relevant period.  But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.

1290.   Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq*.

1291.   Plaintiffs were injured in their business or property, with respect to purchases of broilers in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

**COUNT XXXII**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,**
**CAL. BUS & PROF. CODE § 17200, *ET SEQ.* (AGAINST ALL DEFENDANTS)**

*Brought by Anaheim Wings, LLC; Bonita Plaza Wings, LLC; Caesars Enterprise Services, LLC; Costa Mesa Wings, LLC; Downtown Wings, LLC; Gaslamp Wings, LLC; Hollywood Wings, LLC; Mission Valley Wings, LLC; Oceanside Wings, LLC; Ontario Wings, LLC; Rancho Bernardo Wings, LLC; South Gate Wings, LLC; Wings Over Long Beach, LLC; The Johnny Rockets Group, Inc.; Boston Market Corporation*

1292.   The violations of federal antitrust law set forth above also constitute violations of section 17200, *et seq*. of the California Business and Professions Code.

1293.   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

1294.   This claim is instituted pursuant to sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.

1295.   The Defendants' conduct as alleged herein violated the UCL.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including,

375

but not limited to, the violations of section 16720, *et seq.*, of the California Business and Professions Code, set forth above.

1296.   Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

1297.   Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

1298.   The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

1299.   The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs to pay supra-competitive and artificially-inflated prices for broilers sold in the State of California.   Plaintiffs suffered injury in fact and lost money or property as a result of such unfair competition.

1300.   As alleged in this Complaint, Defendants and their Co-Conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.

## COUNT XXXIII
## VIOLATION OF ALABAMA ANTITRUST LAW,
## ALABAMA CODE §§ 6-5-60, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by The Johnny Rockets Group, Inc. and Bojangles' Restaurants, Inc. and Bojangles Opco, LLC*

1301.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Alabama and was registered to do business in Alabama.  During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Alabama from its locations in Alabama.  As a result of Defendants' Conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at its store locations in Alabama.

1302.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through its vendors, for use in food preparation in Plaintiffs' Alabama locations, and not for resale in unaltered form.  Plaintiffs then sold prepared chicken meals to customers in Alabama.

1303.   As a result of Plaintiffs' presence in Alabama and the substantial business it conducted in Alabama – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Alabama – Plaintiffs are entitled to the protection of the laws of Alabama.

1304.   Ala. Code §§ 6-5-60 provides that "any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct, or indirect, may in each instance of such injury or damage, recover the sum of $500 and all actual damages."

1305.   Under Alabama law, Plaintiffs have standing to maintain an action under the antitrust provisions of the Alabama Code based on the facts alleged in this Complaint.  Alabama Code §§ 6-5-60 *et seq*.

1306.   Defendants combined, contracted, understood and agreed in the market for broilers in an unlawful manner, with the effect of restraining trade, increasing the price of broilers sold to

Plaintiffs in Alabama, and hindering competition in the sale of broilers, in violation of Alabama Code §§ 6-5-60 *et seq.* But for Defendants' conduct set forth herein, the price of broilers sold to Plaintiffs in Alabama would have been lower.

1307.   During the relevant period, Defendants' illegal conduct substantially affected Alabama commerce.  Plaintiffs were injured and is threatened with injury with respect to purchases of broilers in Alabama in that they paid and will pay supra-competitive prices for broilers due to Defendants' unlawful conduct, and are entitled to all forms of relief available under Alabama Code §§ 6-5-60 *et seq.*

## COUNT XXXIV
## VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT, COLO. REV. STAT., §§ 6-1-101, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by The Johnny Rockets Group, Inc.*

1308.   Defendants have violated the Colorado Consumer Protection Act, Colorado Rev. Stat. §§ 6-1-101, *et seq.*, by engaging in the acts or practices specified above.

1309.   Defendants engaged in unfair or deceptive trade practices as alleged above during the course of their regular business that significantly impacted Plaintiffs in Colorado.

1310.   Plaintiffs have suffered an injury in fact to a legally protected interest and lost money or property as a result of Defendants' concerted actions.

1311.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Colorado and was registered to do business in Colorado.  During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Colorado from its locations in Colorado.  As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Colorado.

1312.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through its vendors, for use in food preparation in Plaintiffs' Colorado locations, and not for resale in unaltered form.  Plaintiffs then sold prepared chicken meals to customers in Colorado.

1313.   As a result of Plaintiffs' presence in Colorado and the substantial business it conducted in Colorado – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Colorado – Plaintiffs are entitled to the protection of the laws of Colorado.

1314.   But for Defendants' conduct set forth herein, the price of broilers paid by Plaintiffs would have been lower.

1315.   Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Plaintiffs.  Specifically, Defendants directly caused Plaintiffs and others to pay supra-competitive and artificially inflated prices for broilers. Defendants' conduct also substantially affected commerce in Colorado during the relevant period.

1316.   In addition, Defendants fraudulently concealed their actions from Plaintiffs.  As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping communications with Co-Conspirators secret and making false statements publicly and to Plaintiffs about the reasons for artificially inflated prices of broilers.  Plaintiffs were likely to be deceived, and were in fact deceived by Defendants' fraudulent actions.

1317.   Therefore, Plaintiffs seek any and all relief, to the fullest extent allowable, under the Colorado Consumer Protection Act, Colorado Rev. Stat. §§ 6-1-101, *et seq*., and as equity so requires.

**COUNT XXXV**
**VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT,**
**D.C. CODE § 28-4501, *ET SEQ.* (AGAINST ALL DEFENDANTS)**

*Brought by Boston Market Corporation; The Johnny Rockets Group, Inc.; Bojangles'*
*Restaurants, Inc. and Bojangles Opco, LLC*

1318.   The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

1319.   During the relevant period, Plaintiffs conducted a substantial volume of business in the District of Columbia and was registered to do business in the District of Columbia.  During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in the District of Columbia from their locations in the District of Columbia.  As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in the District of Columbia.

1320.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' District of Columbia locations, and not for resale in unaltered form.  Plaintiffs then sold prepared chicken meals to customers in the District of Columbia.

1321.   But for Defendants' conduct set forth herein, the price of broilers paid by Plaintiffs would have been lower.

1322.   During the relevant period, Plaintiffs conducted substantial business in the District of Columbia – including submitting purchase orders for, receiving invoices for, and receiving shipments of broilers in the District of Columbia – suffered injury in the District of Columbia, and are entitled to the protection of the laws of the District of Columbia.

1323.   Under District of Columbia law, Plaintiffs have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint.  *See* D.C. Code § 28-4509(a).

1324.   Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and to rig bids and allocate markets for broilers sold within the District of Columbia, in violation of D.C. Code §§ 28-4501–28-4581.  Defendants' conduct substantially affected District of Columbia commerce.

1325.   Plaintiffs were injured with respect to their and/or their vendors' purchases of broilers in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

## COUNT XXXVI
## VIOLATION OF HAWAII ANTITRUST LAWS,
## HAWAII REV. STAT. § 480, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by The Johnny Rockets Group, Inc.*

1326.   The contract, combination, or conspiracy alleged above violates Hawaii Rev. Stat. § 480-4(a), which prohibits, inter alia, every contract, combination or conspiracy "in restraint of trade or commerce in the State;" and Hawaii Rev. Stat. § 480-4(b)(1), which, inter alia, makes it unlawful to "fix, control or maintain the price of any commodity."

1327.   Broilers are "commodities" within the meaning of Hawaii Rev. Stat. § 480-1. Defendants' combinations or conspiracies restrained, suppressed and eliminated price competition for broilers in Hawaii, restrained trade and commerce in Hawaii, and caused the prices of broilers to be raised, fixed, maintained and stabilized at supracompetitive levels, in violation of Hawaii antitrust laws.

1328.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Hawaii and was registered to do business in Hawaii.   During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Hawaii from their locations in Hawaii.   As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Hawaii.

1329.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Hawaii locations, and not for resale in unaltered form.   Plaintiffs then sold prepared chicken meals to customers in Hawaii.

1330.   As a result of Plaintiffs' presence in Hawaii and the substantial business it conducted in Hawaii – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Hawaii – Plaintiffs are entitled to the protection of the laws of Hawaii.

1331.   By reason of Defendants' contract, combination or conspiracy alleged above, Plaintiffs paid more for broilers than they would have paid in the absence of such conduct.   As a result, Plaintiffs have sustained injury and are entitled to all relief available under Hawaii Rev. Stat. §§ 480 *et seq*.

## COUNT XXXVII
## VIOLATION OF THE MAINE'S ANTITRUST STATUTE,
## ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by The Johnny Rockets Group, Inc.*

1332.   Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine.   Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade.   Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.

1333.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Maine and was registered to do business in Maine.   During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Maine from their locations in Maine.   As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Maine.

1334.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Maine locations, and not for resale in unaltered form.   Plaintiffs then sold prepared chicken meals to customers in Maine.

1335.   As a result of Plaintiffs' presence in Maine and the substantial business it conducted in Maine – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Maine – Plaintiffs are entitled to the protection of the laws of Maine.

1336.   Under Maine law, Plaintiffs have standing to maintain an action based on the facts alleged in this Complaint.   Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

1337.   Defendants contracted, combined or conspired in restraint of trade or commerce of broilers within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq*.   But for Defendants' conduct set forth herein, the price of broilers would have been lower.

1338.   As a result, Plaintiffs were injured with respect to broilers sold to Plaintiffs in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

## COUNT XXXVIII
## VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT,
## MICH. COMP. LAWS § 445.771, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC; The Johnny Rockets Group, Inc.*

1339.   The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce ... to prohibit monopolies and attempts to monopolize trade or commerce ... [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

1340.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Michigan and was registered to do business in Michigan. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Michigan from their locations in Michigan. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Michigan.

1341.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Michigan locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Michigan.

1342.   As a result of Plaintiffs' presence in Michigan and the substantial business it conducted in Michigan – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Michigan – Plaintiffs are entitled to the protection of the laws of Michigan.

1343.   Under the Michigan Antitrust Reform Act, Plaintiffs have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws § 452.778(2).

1344.   Defendants contracted, combined or conspired to restrain or commerce in the market for broilers, in violation of Mich. Comp. Laws § 445.772, *et seq.*

1345.   Defendants' violations of Michigan law were flagrant.  But for Defendants' conduct set forth herein, the price of broiler paid by Plaintiffs would have been lower.

1346.   As a result, Plaintiffs were injured with respect to their and/or their vendors' purchases of broilers in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## COUNT XXXIX
## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT, MO. ANN. STAT. § 407.010, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Caesars Enterprise Services, LLC; The Johnny Rockets Group, Inc.*

1347.   Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

1348.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Missouri and was registered to do business in Missouri.  During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Missouri from their locations in Missouri.  As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Missouri.

1349.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Missouri locations, and not for resale in unaltered form.  Plaintiffs then sold prepared chicken meals to customers in Missouri.

1350.   As a result of Plaintiffs' presence in Missouri and the substantial business they conducted in Missouri – including the submission of purchase orders for, receiving invoices for,

and receiving shipment of broilers in Missouri – Plaintiffs are entitled to the protection of the laws of Missouri.

1351. Under Missouri law, Plaintiffs have standing to maintain an action under the MMPA based on the facts alleged in this Complaint.

1352. Defendants contracted, combined or conspired in restraint of trade or commerce of broilers within the intrastate commerce of Missouri, through agreements to fix prices, rig bids and allocate markets and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq*. But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower.

1353. As a result, Plaintiffs were injured with respect to their purchases of broilers in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**COUNT XL**
**VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,**
**NEV. REV. STAT. § 598A.010, *ET SEQ.* (AGAINST ALL DEFENDANTS)**

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC; The Johnny Rockets Group, Inc.*

1354. The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities ... is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

1355. The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, inter alia, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

1356.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Nevada and was registered to do business in Nevada.  During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Nevada from their locations in Nevada.  As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Nevada.

1357.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Nevada locations, and not for resale in unaltered form.  Plaintiff then sold prepared chicken meals to customers in Nevada.

1358.   As a result of Plaintiffs' presence in Nevada and the substantial business it conducted in Nevada – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Nevada – Plaintiffs are entitled to the protection of the laws of Nevada.

1359.   Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint.  Nev. Rev. Stat. Ann. § 598A.210(2).

1360.   Defendants fixed prices for broilers sold to Plaintiffs and/or their vendors in Nevada, rigged bids and divided Nevada markets, allocated Nevada customers, and engaged in a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq*.

1361.   But for Defendants' conduct set forth herein, the prices of broilers paid by Plaintiffs and/or their vendors for broilers in Nevada would have been lower.  Plaintiffs were injured with respect to the broilers purchased in Nevada at supra-competitive prices caused by Defendants' conduct.

1362.   Accordingly, Johnny Rockets is entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

1363.   In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by Plaintiffs.

## COUNT XLI
## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. § 598.0903, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC; The Johnny Rockets Group, Inc.*

1364.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Nevada and was registered to do business in Nevada.  During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Nevada from their locations in Nevada.  As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Nevada.

1365.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Nevada locations, and not for resale in unaltered form.  Plaintiffs then sold prepared chicken meals to customers in Nevada.

1366.   As a result of Plaintiffs' presence in Nevada and the substantial business they conducted in Nevada – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Nevada – Plaintiffs are entitled to the protection of the laws of Nevada.

1367.   By reason of the conduct alleged herein, Defendants have violated Nev. Rev. Stat. § 598.0903, *et seq*.

1368.   Defendants engaged in a deceptive trade practice with the intent to injure Plaintiffs and to substantially lessen competition.

1369.   Defendants established, maintained, or used or attempted to establish a conspiracy in restraint of trade or commerce in the broilers Market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices of broilers sold to Plaintiffs in Nevada.

1370.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

1371.   Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

1372.   Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

1373.   Defendants' conduct was willful.  As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury.

1374.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.

## COUNT XLII
## VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE
## AND BUSINESS PRACTICES ACT, N.C. GEN. STAT. § 75-1, *ET SEQ.*
## (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC; The Johnny Rockets Group, Inc.; Bojangles' Restaurants, Inc. and Bojangles Opco, LLC*

1375.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of North Carolina and was registered to do business in North Carolina.  During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at

store locations in North Carolina from their locations in North Carolina. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in North Carolina.

1376. During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' North Carolina locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in North Carolina.

1377. As a result of Plaintiffs' presence in North Carolina and the substantial business they conducted in North Carolina – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in North Carolina – Plaintiffs are entitled to the protection of the laws of North Carolina.

1378. Defendants established, maintained, or used, or attempted to establish, a conspiracy in restraint of trade or commerce in the market for broilers, for the purpose of affecting competition or controlling, fixing, or maintaining prices and rigging bids for broilers sold to Plaintiffs and/or their vendors in North Carolina, a substantial part of which occurred within North Carolina.

1379. Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

1380. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury.

1381. By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, *et seq*.

## COUNT XLIII
## VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,
## R.I. GEN. LAWS ANN. §6-36-1, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; The Johnny Rockets Group, Inc.*

1382.   The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition.  R.I. Gen. Laws § 6-36-2(a)(2).

1383.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Rhode Island and was registered to do business in Rhode Island.  During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Rhode Island from their locations in Rhode Island.  As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Rhode Island.

1384.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Rhode Island locations, and not for resale in unaltered form.  Plaintiffs then sold prepared chicken meals to customers in Rhode Island.

1385.   As a result of Plaintiffs' presence in Rhode Island and the substantial business it conducted in Rhode Island – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Rhode Island – Plaintiffs are entitled to the protection of the laws of Rhode Island.

1386.   But for Defendants' conduct set forth herein, the price of broilers sold to Plaintiffs and/or their vendors would have been lower.

1387.   Under the Rhode Island Antitrust Act, as of July 15, 2013, Plaintiffs have standing to maintain an action based on the facts alleged in this Complaint.  *See* R.I. Gen. Laws § 6-36-11(a).  In Rhode Island, Plaintiffs' claims alleged herein run from July 15, 2013, through the date that the effects of Defendants' anticompetitive conduct cease.

1388.   Defendants contracted, combined and conspired in restraint of trade of broilers within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a conspiracy in restraint of trade of broilers for the purpose of excluding competition or controlling, fixing or maintaining prices and rigging bids for broilers sold to Plaintiffs and/or their vendors in Rhode Island, and allocating markets for broilers within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, *et seq*.

1389.   Plaintiffs were injured with respect to their and/or their vendors' purchases of broilers in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

1390.   In accordance with the requirements of R.I. Gen. Laws Ann. § 6-36-21, notice of this action was mailed to the Rhode Island Attorney General by Plaintiffs and proof of service has been filed with the Court.

**COUNT XLIV**
**VIOLATION OF THE UTAH ANTITRUST ACT,**
**UTAH CODE ANN. § 76-10-911, *ET SEQ.* (AGAINST ALL DEFENDANTS)**

*Brought by The Johnny Rockets Group, Inc.*

1391.   The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce ...."  Utah Code Ann. § 76-10-3102.

1392.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Utah and was registered to do business in Utah.  During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Utah from their locations in Utah.  As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Utah.

1393.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Utah locations, and not for resale in unaltered form.  Plaintiffs then sold prepared chicken meals to customers in Utah.

1394.   As a result of Plaintiffs' presence in Utah and the substantial business they conducted in Utah – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Utah – Plaintiffs are entitled to the protection of the laws of Utah.

1395.   But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower.

1396.   Under the Utah Antitrust Act, Plaintiffs have standing to maintain an action based on the facts alleged in this Complaint.  Utah Code Ann. § 76-10-3109(1)(a).

1397.   Defendants contracted, combined or conspired in restraint of trade or commerce of broilers, in violation of Utah Code Ann. § 76-10-3101, *et seq*.

1398.   Plaintiffs are a Utah citizen and was injured with respect to their purchases of broilers in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

## COUNT XLV
## VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT,
## VA CODE ANN. § 59.1, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by The Johnny Rockets Group, Inc.; Boston Market Corporation; and Bojangles' Restaurants, Inc. and Bojangles Opco, LLC*

1399.   By reason of the conduct alleged herein, Defendants have violated Va. Code Ann. § 59.1-196, *et seq*.

1400.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Virginia and was registered to do business in Virginia.  During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers they received at store locations in Virginia from their locations in Virginia.  As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Virginia.

1401.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Virginia locations, and not for resale in unaltered form.  Plaintiffs then sold prepared chicken meals to customers in Virginia.

1402.   As a result of Plaintiffs' presence in Virginia and the substantial business it conducted in Virginia – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Virginia – Plaintiffs are entitled to the protection of the laws of Virginia.

1403.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the broilers market, a substantial part of which occurred in Virginia.

1404.   Defendants conspired for the purpose of excluding or limiting competition or controlling or maintaining prices, or rigging bids for broilers sold to Plaintiffs and/or their vendors in Virginia, and allocating markets, a substantial part of which occurred within Virginia.

1405.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Virginia.

1406.   Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

1407.   Defendants' unlawful conduct substantially affected Virginia's trade and commerce.

1408.   Defendants' conduct was willful.  As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property.

1409.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief available, including treble damages, under Va. Code Ann. § 59.1-204(A), *et seq*.

**COUNT XLVI**
**VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT,**
**KANS. STAT. ANN. § 50-101, *ET SEQ*. (AGAINST ALL DEFENDANTS)**

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC*

1410.   The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state."  Kan. Stat. Ann. § 50-112.

1411.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Kansas and was registered to do business in Kansas.  During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers they received at store locations in Kansas from their locations in Kansas.  As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Kansas.

1412. During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiff's Kansas locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Kansas.

1413. As a result of Plaintiffs' presence in Kansas and the substantial business it conducted in Kansas – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Kansas – Plaintiffs are entitled to the protection of the laws of Kansas.

1414. Under the Kansas Restraint of Trade Act, Plaintiffs have standing to maintain an action based on the facts alleged in this Complaint. *See* Kan. Stat. Ann § 50-161(b).

1415. Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of broilers, increasing the price of broilers sold to Plaintiffs and/or their vendors in Kansas, preventing competition in the sale of broilers, rigging bids and allocating markets for the sale of broilers to Plaintiffs and/or their vendors in Kansas, in a manner that established the price of broilers and precluded free and unrestricted competition among themselves in the sale of broilers to Plaintiffs and/or their vendors in Kansas, in violation of Kan. Stat. Ann. § 50-101, *et seq*.

1416. But for Defendants' conduct set forth herein, the price of broilers paid by Plaintiffs would have been lower. As a result, Plaintiffs were injured with respect to their and/or their vendors purchases of broilers in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

## COUNT XLVII
## VIOLATION OF THE NEBRASKA JUNKIN ACT,
## NEB. REV. STAT. § 59-801, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC*

1417.   Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices.  Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

1418.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Nebraska and were registered to do business in Nebraska.  During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers they received at store locations in Nebraska from their locations in Nebraska.  As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Nebraska.

1419.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Nebraska locations, and not for resale in unaltered form.  Plaintiffs then sold prepared chicken meals to customers in Nebraska.

1420.   As a result of Plaintiffs' presence in Nebraska and the substantial business they conducted in Nebraska – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Nebraska – Plaintiffs are entitled to the protection of the laws of Nebraska.

1421.   Under Nebraska law, Plaintiffs have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint.  *See* Neb. Rev. Stat. § 59-821.

1422.   Defendants contracted, combined or conspired in restraint of trade or commerce of broilers within the intrastate commerce of Nebraska, by agreeing to fix prices and rig bids for

broilers sold to Plaintiffs and/or their vendors in Nebraska, and to allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq*.

1423.   Plaintiffs were injured with respect to their or their vendors' purchases of broilers in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

### COUNT XLVIII
### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT, NEB. REV. STAT. §59-1602, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation*

1424.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Nebraska and was registered to do business in Nebraska.  During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers they received at store locations in Nebraska from their locations in Nebraska.  As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Nebraska.

1425.   During the relevant period, Plaintiff purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Nebraska locations, and not for resale in unaltered form.  Plaintiff then sold prepared chicken meals to customers in Nebraska.

1426.   As a result of Plaintiffs' presence in Nebraska and the substantial business it conducted in Nebraska – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Nebraska – Plaintiffs are entitled to the protection of the laws of Nebraska.

1427.   By reason of the conduct alleged herein, Defendants have violated Neb. Rev. Stat. § 59-1602, *et seq*.

1428.  Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the broilers Market, a substantial part of which occurred within Nebraska.

1429.  Defendants established, maintained, or attempted to establish, conspiracy in restraint of trade or commerce in the broilers Market, for the purpose of excluding or limiting competition or controlling or maintaining prices or rigging bids for broilers sold to Plaintiffs and/or their vendors in Nebraska, and allocating markets, a substantial part of which occurred within Nebraska.

1430.  Defendants' conduct was conducted with the intent to deceive Plaintiffs regarding the nature of Defendants' actions within the stream of Nebraska commerce.

1431.  Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

1432.  Defendants' conduct misled Plaintiffs, withheld material facts, and had a direct or indirect impact upon Plaintiffs' ability to protect themselves.  Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

1433.  As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury.  Plaintiffs are within the scope of the Nebraska statute.

1434.  By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59-1614.

**COUNT XLIX**
**VIOLATION OF NEW HAMPSHIRE'S CONSUMER PROTECTION ACT,**
**N.H. REV. STAT. ANN. TIT. XXXI, 358-A, *ET SEQ.* (AGAINST ALL DEFENDANTS)**

*Brought by Boston Market Corporation*

1435.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of New Hampshire and was registered to do business in New Hampshire.  During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers they received at store locations in New Hampshire from their locations in New Hampshire.  As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in New Hampshire.

1436.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiff's New Hampshire locations, and not for resale in unaltered form.  Plaintiffs then sold prepared chicken meals to customers in New Hampshire.

1437.   As a result of Plaintiffs' presence in New Hampshire and the substantial business it conducted in New Hampshire – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in New Hampshire – Plaintiffs are entitled to the protection of the laws of New Hampshire.

1438.   By reason of the conduct alleged herein, Defendants have violated N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, *et seq*.

1439.   Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, trade or commerce in the relevant market, a substantial part of which occurred within New Hampshire.

1440.   Defendants established, maintained, or used, or attempted to establish, a conspiracy in restraint of trade or commerce in the relevant market, for the purpose of excluding or limiting competition or controlling or maintaining prices of broilers sold to Plaintiffs in New Hampshire, a substantial part of which occurred within New Hampshire.

1441.   Defendants' conduct was conducted with the intent to deceive Plaintiffs regarding the nature of Defendants' actions within the stream of New Hampshire commerce.

1442.   Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

1443.   Defendants' conduct was willful and knowing.   Defendants' conduct misled Plaintiffs, withheld material facts, and had a direct impact upon Plaintiffs' ability to protect itself.

1444.   Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

1445.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury.   Plaintiffs are within the scope of the New Hampshire statute.

1446.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. Tit. XXXI, §§ 358-A:10 and 358-A:10-a.

## COUNT L
## UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

*Brought by Anaheim Wings, LLC; Bonita Plaza Wings, LLC; Costa Mesa Wings, LLC; Downtown Wings, LLC; Gaslamp Wings, LLC; Hollywood Wings, LLC; Hooters Management Corporation; LTP Management Group, Inc.; Mission Valley Wings, LLC; Oceanside Wings, LLC; Ontario Wings, LLC; Rancho Bernardo Wings, LLC; Restaurants of America, Inc.; South Gate Wings, LLC; Wings Over Long Beach, LLC*

1447.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of broilers.

1448.   Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs in Arizona, California, Florida, Illinois, Minnesota, and New Mexico.

## COUNT LI
## VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,
## TENN. CODE, § 47-25-101, ET SEQ.

*Brought by The Johnny Rockets Group, Inc. and Bojangles' Restaurants, Inc. and Bojangles Opco, LLC*

1449.   The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, inter alia, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee.   All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void.  Tenn. Code, § 47-25-101.

1450.   During the Conspiracy Period, Johnny Rockets conducted a substantial volume of business in the State of Tennessee and was registered to do business in Tennessee.  During the Conspiracy Period, Johnny Rockets submitted purchase orders for all shipments of Broilers it

402

received at store locations in Tennessee from its locations in Tennessee. As a result of Defendants' Conspiracy, Johnny Rockets took delivery of Broilers at artificially inflated prices at its store locations in Tennessee.

1451. During the Conspiracy Period, Johnny Rockets purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Johnny Rockets' Tennessee locations, and not for resale in unaltered form. Johnny Rockets then sold prepared chicken meals to customers in Tennessee.

1452. As a result of Johnny Rockets' presence in Tennessee and the substantial business it conducted in Tennessee – including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Tennessee – Johnny Rockets is entitled to the protection of the laws of Tennessee.

1453. Defendants competed unfairly and colluded by meeting to fix prices, rig bids, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47-25-101, *et seq.*

1454. Defendants' conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods sold to Johnny Rockets in Tennessee. Specifically, Defendants' combination or conspiracy had the following effects:(1) price competition for Broilers sold to Johnny Rockets in Tennessee was restrained, suppressed, and eliminated; (2) prices for Broilers sold to Johnny Rockets in Tennessee were raised, fixed, maintained and stabilized at artificially high levels; (3) Johnny Rockets was deprived of free and open competition; and (4) Johnny Rockets paid supra-competitive, artificially inflated prices for Broilers sold to Johnny Rockets in Tennessee.

1455.   But for Defendants' conduct set forth herein, the price of Broilers sold to Johnny Rockets in Tennessee would have been lower.  As a direct and proximate result of Defendants' unlawful conduct, Johnny Rockets has been injured in its business and property and are threatened with further injury.

1456.   Under Tennessee law, Johnny Rockets has standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint.

1457.   Johnny Rockets was injured with respect to Broilers sold to Johnny Rockets in Tennessee and is entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

## COUNT LII
## VIOLATION OF WISCONSIN ANTITRUST ACT,
## WIS. STAT. ANN. § 133.18(1)(1), ET SEQ.

*Brought by Boston Market; The Johnny Rockets Group, Inc.*

1458.   Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition."  Wis. Stat. §133.01.

1459.  During the Conspiracy Period, Plaintiffs conducted a substantial volume of business in the State of Wisconsin and were registered to do business in Wisconsin.  During the Conspiracy Period, Plaintiffs submitted purchase orders for all shipments of Broilers they received at store locations in Wisconsin from their locations in Wisconsin.  As a result of Defendants' Conspiracy, Plaintiffs took delivery of Broilers at artificially inflated prices at its store locations in Wisconsin.

1460.   During the Conspiracy Period, Plaintiffs purchased Broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Wisconsin locations, and not for resale in unaltered form.  Plaintiffs then sold prepared chicken meals to customers in Wisconsin.

1461.   As a result of Plaintiffs' presence in Wisconsin and the substantial business they conducted in Wisconsin – including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Wisconsin – Plaintiffs are entitled to the protection of the laws of Wisconsin.

1462.   Under Wisconsin law, Plaintiffs have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint.  *See* Wis. Stat. § 133.18(a).

1463.   Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, *et seq*.

1464.   Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs.  Their injuries consist of: (1) being denied the opportunity to purchase lower-priced Broilers from Defendants in Wisconsin, and (2) paying higher prices for Defendants' Broilers than they would have in the absence of Defendants' conduct.  These injuries are of the type of the laws of Wisconsin were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

1465.   Plaintiffs were injured with respect to Broilers sold to Plaintiffs and/or their vendors in Wisconsin.  Accordingly, Plaintiffs are entitled to all forms of relief, including actual damages,

treble damages, costs and reasonable attorneys' fees, and injunctive relief. Defendants are jointly and severally liable for all damages suffered by Plaintiffs.

## COUNT LIII
## VIOLATION OF 15 U.S.C. § 1
## (AGAINST CASE, CLAXTON, KOCH, MAR-JAC, PERDUE, PILGRIM'S PRIDE, SIMMONS, TYSON, AND WAYNE FOR BID-RIGGING – PLED IN THE ALTERNATIVE TO COUNT I)

*Brought by Chick-fil-A, Inc.*

1466. CFA, Inc. incorporates by reference and adopts the allegations set forth above and the allegations in the Superseding Indictment returned by the grand jury in *United States v. Jayson Jeffrey Penn, et al.*, 20-cv-152 (D. Colo.) [ECF No. 101], on October 6, 2020 (the "Superseding Indictment").

1467. CFA, Inc. maintains a roster of pre-approved suppliers for its chicken products, which over time has included Defendants Claxton, Koch, Mar-Jac, Pilgrim's, Perdue, Simmons, Tyson, and Wayne Farms.

1468. Beginning at least as early as 2012 and continuing at least into 2019 ("Bid-Rigging Conduct Period"), CFA, Inc.'s suppliers engaged in an unlawful and anticompetitive conspiracy to coordinate pricing and rig bids submitted to CFA, Inc. for broiler products, with the purpose and intent to artificially inflate the prices paid by CFA, Inc.

1469. As part of its procurement process, CFA, Inc. expected its suppliers to engage in a competitive bidding process, which when complete, would allow CFA, Inc. to award its purchase volume to the most competitive bidders.

1470. Rather than engage in a competitive bidding process, CFA, Inc.'s suppliers routinely exchanged confidential information with each other regarding bids they were submitting, or intended to submit, so that their supposedly competitive bids were aligned. The suppliers

utilized phone calls, text messages, and email communications to carry out this exchange of confidential information. These actions were inherently anticompetitive and undermined CFA, Inc.'s purpose of securing the most favorable and competitive pricing from its suppliers.

1471. By exchanging confidential and competitively sensitive information, CFA, Inc.'s suppliers were able to use that information as a benchmark for their own pricing, thus ensuring that their supposedly competitive bids were aligned. For instance, on or about January 21, 2013, Scott Brady, Vice President of National Accounts at Claxton, emailed Mikell Fries, President of Claxton, to pass on price "overage" information from competitors Perdue, Koch, and Pilgrim's.

1472. Again, on or about March 4, 2013,  that contained pricing information received from competitors ████ ████, and compared ████'s pricing against ████'s pricing.

1473. CFA, Inc.'s suppliers' voluntary sharing of their respective confidential pricing information became even more pronounced following CFA, Inc.'s announcement in February 2014 that it planned to serve antibiotic free or No Antibiotic Ever ("NAE") broiler chicken meat at all of its restaurants within the following five years.

1474. Indeed, the information sharing related to CFA, Inc.'s transition to NAE chicken is chronicled in the Superseding Indictment, which described conduct that specifically affected a victim identified by the pseudonym QSR-5.

1475. CFA, Inc. is the victim identified in the Superseding Indictment by the pseudonym QSR-5.

1476. For instance, on or about April 1, 2014, employees of suppliers Claxton, Pilgrim's, and Perdue engaged in multiple phone conversations with one another during which they discussed potential pricing for NAE broiler chicken to be sold to CFA, Inc. Following these conversations,

███████████, an employee of Perdue, sent an email to another Perdue employee stating "I also found out that Pilgrim's is going to upcharge approx. $.3124/lb on the ABF product. Claxton will be around the some cost." The Perdue employee responded: "Great info."

1477.   Approximately two weeks later, on April 18, 2014, Tim Mulrenin, an employee of supplier Tyson, called Scott Brady for approximately 12 minutes. Following that conversation, Brady sent text messages to his superior, Mikell Fries, recapping his call with Mulrenin and reciting Tyson's potential pricing for NAE broiler chicken to be sold to CFA, Inc. In that same conversation, Brady confirmed to Fries that, in addition to Tyson, he was also coordinating with Perdue and Pilgrim's regarding a potential price for NAE broiler chicken to be sold to CFA, Inc.

1478.   The conspiracy to coordinate bids to CFA, Inc. continued into the summer of 2014. From at least July to September 2014, ████████████████ texted on multiple occasions regarding █████'s conversations with competitors at ████████████████ regarding their pricing and bids to CFA, Inc.

1479.   Brady and employees of other CFA, Inc. suppliers continued to exchange their pricing information by email throughout this period, such as on August 7, 2014, when ██████ ████████████████████████████████████████████

1480.   Defendants' bid-rigging conspiracy not only continued after 2014, but expanded to include additional CFA, Inc. suppliers. For instance, Defendant Mar-Jac did not begin supplying broiler chicken to CFA, Inc. until 2017. ████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████



1481.  A year later, on August 19, 2016, ████████████████████ ████████████████████████████████ These communications, in furtherance of the conspiracy, occurred in the midst of the bidding period for CFA, Inc.'s 2017 broiler business. ████████████████████████

1482.  CFA, Inc. was directly and proximately injured by the bid-rigging conduct described above and in the Superseding Indictment.

1483.  Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, CFA, Inc. for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) CFA, Inc. was deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

1484.  As a direct and proximate result of Defendants' above-described unlawful conduct, CFA, Inc. paid artificially inflated prices for chicken.

1485.  As a direct and proximate result of Defendants' above-described anticompetitive conduct, CFA, Inc. was damaged in its business or property by paying prices for chicken that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

1486.   Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Alternatively, Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.

### COUNT LIV
### VIOLATION OF 15 U.S.C. § 1 (AGAINST CLAXTON, HARRISON, KOCH, MAR-JAC, PILGRIM'S PRIDE, AND TYSON FOR BID RIGGING – PLED IN THE ALTERNATIVE TO COUNT I)

*Brought by Pollo Operations, Inc.*

1487.   Pollo incorporates by reference and adopts the allegations set forth above and the allegations in the Superseding Indictment returned by the grand jury in *United States v. Jayson Jeffrey Penn, et al.*, 20-cv-152 (D. Colo.) [ECF No. 101], on October 6, 2020.

1488.   Pollo was directly and proximately injured by the bid-rigging conduct described in the Superseding Indictment.

1489.   Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, Plaintiff for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiff was deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

1490.   Defendants named in the above Count directly and proximately caused injury to Pollo in the United States.

1491.   As a direct and proximate result of Defendants' above-described unlawful conduct, Pollo paid artificially inflated prices for chicken.

1492.   As a direct and proximate result of Defendants' above-described anticompetitive conduct, Pollo was damaged in its business or property by paying prices for chicken that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

1493.   Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.

1494.   Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.

### COUNT LV
### VIOLATION OF 15 U.S.C. § 1
### (AGAINST GEORGE'S, KOCH, PERDUE, PILGRIM'S PRIDE, AND TYSON FOR BID RIGGING – PLED IN THE ALTERNATIVE TO COUNT I)

*Brought by Restaurant Services, Inc.*

1495.   RSI incorporates by reference and adopts the allegations set forth above and the allegations in the Superseding Indictment returned by the grand jury in *United States v. Jayson Jeffrey Penn, et al.*, 20-cv-152 (D. Colo.) [ECF No. 101], on October 6, 2020 ("Superseding Indictment").

1496.   RSI was directly and proximately injured by the bid-rigging conduct described in the Superseding Indictment.

1497.   Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices

charged to, and paid by, RSI for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) RSI was deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

1498.   Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiff in the United States.

1499.   As a direct and proximate result of Defendants' above-described unlawful conduct, RSI paid artificially inflated prices for chicken.

1500.   As a direct and proximate result of Defendants' above-described anticompetitive conduct, RSI was damaged in its business or property by paying prices for chicken that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

1501.   Defendants' anticompetitive conduct described in this Complaint constitutes a *per se* violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.  Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for Broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.

### COUNT LVI
### BREACH OF CONTRACT
### (AGAINST TYSON AND TYSON SALES AND DISTRIBUTION, INC.)

*Brought by Caesars Enterprise Services, LLC*

1502.   Caesars incorporates and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

1503.   Caesars entered into a series of contracts with Tyson to supply chicken at a specified price with precise estimate quantities.  The contract is governed by Nevada law.  Caesars

purchased the broiler chickens and components of the chicken pursuant to these agreements on the agreed upon terms to specify the requirements of its restaurants.

1504.  Like all contracts, these agreements contain an implied covenant of good faith and fair dealing pursuant to which Tyson covenanted not to do anything that would frustrate the purpose of the agreement, namely to supply chickens at an agreed price based on the terms of negotiations.  Tyson would regularly refer to the Georgia dock to justify its prices.  By conspiring with the other defendants to fix supply and manipulate the Georgia Dock, Tyson has manipulated the market price for the chicken and has unlawfully conspired to deprive Caesar of the benefit of the contract, namely chicken at a negotiated, lawful, price driven by the market forces discussed during negotiations.  By submitted fraudulent bids to the Georgia Dock and using the Dock during negotiations with Tysons, Tysons has further breached the covenant and its obligations to Caesars.

1505.  Caesars has substantially performed all obligations legally required of it under the agreements.

1506.  Caesars has been damaged by the breach of contract in an amount to be determined at trial but in no event less than: (1) the difference between the actual price and a market price without the influence of Tyson and its conspirators unlawful conduct, (2) the unjust enrichment of Tyson from the unlawful scheme from Caesars business, and (3) all other damages or losses reasonably foreseeable from the breach described here.

1507.  As a direct and proximate cause of these breaches of contracts, including by breaches of the implied covenant of good faith and fair dealing, and of Defendants' frustration of the purposes of these contracts, Plaintiff has been damaged as alleged herein in an amount to be proven at trial.

1508.  Caesars conferred a benefit upon Tyson, Tyson had knowledge of that benefit, and voluntarily accepted it from Plaintiff.  It would be inequitable and unjust for Tyson to be permitted to be enriched or to retain the benefit which Tyson obtained from its manipulative acts at the expense of Caesars.  Caesars is entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## COUNT LVII
## VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §§ 39-5-10, *ET SEQ.*

*Brought by Boston Market Corporation; Bojangles' Restaurants, Inc. and Bojangles Opco, LLC; and The Johnny Rockets Group, Inc.*

1509.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

1510.  By reason of the conduct alleged herein, Defendants have violated S.C. Code Ann. §§39-5-10.

1511.  Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the Broilers Market, a substantial part of which occurred within South Carolina.

1512.  Defendants established, maintained, or used, or attempted to establish, a conspiracy in restraint of trade or commerce in the market for Broilers, for the purpose of excluding or limiting competition or controlling or maintaining prices, or rigging bids for Broilers sold to Plaintiffs and/or its vendors in South Carolina, and allocating markets, a substantial part of which occurred within South Carolina.

1513.  Defendants' conduct was conducted with the intent to deceive Plaintiffs regarding the nature of Defendants' actions within the stream of South Carolina commerce.

1514.   Defendants' conduct misled Plaintiffs, withheld material facts, and had a direct or indirect impact upon Plaintiffs' ability to protect themselves.  Plaintiffs are within the scope of the South Carolina statute.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.      Enter joint and several judgments against Defendants in favor of Plaintiffs;

B.      Award Plaintiffs damages against Defendants in a joint and several judgment for an amount to be determined at trial to the maximum extent allowed under the claims stated above as well as treble damages, any other enhancement of damages, attorneys' fees, expenses, and costs as provided by law;

C.      Award Plaintiffs bringing claims under full-consideration statutes, including but not limited to under Wisconsin, Tennessee, and South Carolina state antitrust laws, the full amounts paid on the contracts with Defendants;

D.      Award Plaintiff damages in an amount to be determined at trial to the maximum extent allowed under Georgia RICO (Ga. Code Ann. § 16-14-1 *et seq.*) and Federal RICO (18 U.S.C. § 19621 *et seq.*), and enter a judgment in favor of Plaintiffs against the Georgia Dock Defendants, with the judgment being for joint and several liability, in an amount to be trebled to the extent such laws permit;

E.      Award Plaintiffs damages or other relief permitted by law or equity for Plaintiff's common law claims in an amount to be determined at trial;

F.      Award Plaintiffs punitive damages as appropriate under applicable law;

G.      Award Plaintiffs their pre- and post-judgment interest as provided by law, with such interest to be awarded at the highest legal rate;

H.     Award Plaintiffs their attorneys' fees, litigation expenses, and costs, as provided by law, including the federal and state antitrust laws, Georgia RICO, and Federal RICO; and

I.     Award Plaintiffs the costs of investigation and litigation pursuant to Ga. Code Ann. § 16-14-6(c);

J.     Enter an order prohibiting and permanently enjoining Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and

K.     Grant Plaintiffs such other and further relief that the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

Dated:  January 29, 2021

/s/ *Julie B. Porter*

Julie B. Porter (#6243787)
SALVATORE PRESCOTT PORTER & PORTER, PLLC
1010 Davis Street
Evanston, Illinois  60201
Tel:  (312) 283-5711
E-mail:  porter@sppplaw.com

***Co-Liaison Counsel for Direct Action Plaintiffs***

/s/ *Scott E. Gant*

Scott E. Gant
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington, D.C.  20005
Tel:  (202) 237-2727
Fax:  (202) 237-6131
E-mail:  sgant@bsfllp.com

***Co-Liaison Counsel for Direct Action Plaintiffs***

**DAP Counsel and DAPs joining in this Consolidated Complaint**

/s/ *Eric R. Lifvendahl*

L&G LAW GROUP
Eric R. Lifvendahl
175 W. Jackson Boulevard
Suite 950
Chicago, Illinois  60604
Tel:  (312) 364-2500
E-mail:  elifvendahl@lgcounsel.com

KAPLAN FOX & KILSHEIMER, LLP
Robert N. Kaplan
Jeffrey P. Campisi
Matthew P. McCahill
850 Third Avenue, 14th Floor
New York, New York 10022
Tel:  (212) 687-1980
E-mail:  rkaplan@kaplanfox.com
E-mail:  jcampisi@kaplanfox.com
E-mail:  mmccahill@kaplanfox.com

THE COFFMAN LAW FIRM
Richard L. Coffman
Edison Plaza
350 Pine Street
Suite 700
Beaumont, Texas  77701
Tel:  (409) 833-7700
E-mail:  rcoffman@coffmanlawfirm.com

CERA LLP
Solomon B. Cera
595 Market Street
Suite 2300
San Francisco, California  94105
Tel:  (415) 777-2230
E-mail:  scera@cerallp.com

CERA LLP
C. Andrew Dirksen
800 Boylston Street
16th Floor
Boston, MA  02199
Tel:  (857) 453-6555
E-mail:  cdirksen@cerallp.com

HAYNSWORTH SINKLER BOYD P.A.
Manton M. Grier
Elizabeth H. Black
Mary C. Eldridge
1201 Main Street
22nd Floor
Columbia, SC  29201-3226
Tel:  (803) 540-7753
E-mail:  mgrier@hsblawfirm.com
E-mail:  eblack@hsblawfirm.com
E-mail:  meldridge@hsblawfirm.com

417

MARCUS & SHAPIRA LLP
Bernard D. Marcus
Moira Cain-Mannix
Erin Gibson Allen
One Oxford Center
35th Floor
Pittsburgh, PA 15219
Tel: (412) 471-3490
E-mail: marcus@marcus-shapira.com
E-mail: cain-mannix@marcus-shapira.com
E-mail: allen@marcus-shapira.com

**Counsel for the Affiliated Foods Plaintiffs**

/s/ *Ryan P. Phair*
Ryan P. Phair (#479050)
Craig Y. Lee (admitted *pro hac vice*)
Emily K. Bolles (admitted *pro hac vice*)
Christopher C. Brewer (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037-1701
Tel: (202) 955-1500
E-mail: rphair@huntonak.com
　　　craiglee@huntonak.com
　　　ebolles@huntonak.com
　　　brewerc@huntonak.com

John S. Martin (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Tel: (804) 788-8200
E-mail: martinj@huntonak.com

Matthew J. Calvert (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Bank of America Plaza, Suite 4100
600 Peachtree Street NE
Atlanta, GA 30308
(404) 888-4000
E-mail: mcalvert@huntonak.com

Julie B. Porter (#6243787)
SALVATORE PRESCOTT & PORTER, PLLC
1010 Davis Street
Evanston, Illinois 60201
Tel: (312) 283-5711
E-mail: porter@spplawyers.com

**Counsel for Plaintiffs Ahold Delhaize USA, Inc., ALDI, Inc., and Chick-fil-A, Inc.**

/s/ *Peter K. Taaffe*
THE BUZBEE LAW FIRM
Anthony G. Buzbee
Peter K. Taaffe
J.P. Morgan Chase Tower
600 Travis
Suite 7300
Houston, Texas 77002
Tel: (713) 223-5393
Fax: (713) 223-5909
E-mail: tbuzbee@txattorneys.com
　　　ptaaffe@txattorneys.com

Spencer G. Markle
Obed De La Cruz
MARKLE • DELACRUZ, LLP
700 Gemini Avenue
Suite 240
Houston, Texas 77058
Tel: (281) 486-0677
Fax: (281) 486-0694
E-mail: spencer@mdlcfirm.com
　　　obed@mdlcfirm.com

Laurence M. Landsman, Esq.
LANDSMAN LAW FIRM, LLC
33 North LaSalle, Suite 1400
Chicago, IL 60602
Tel: (312) 251-1165
Fax: (312) 251-1147

**Counsel for Plaintiffs Amigos Meat Distributors, LP, Amigos Meat & Poultry, LLC, Amigos Meat Distributors East, LP and Amigos Meat Distributors West, LP**

/s/ *David P. Germaine*
Paul E. Slater
Joseph M. Vanek
David P. Germaine
John P. Bjork
SPERLING & SLATER, P.C.
55 West Monroe Street
Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
E-mail: PES@Sperling-law.com
       JVanek@Sperling-law.com
       DGermaine@Sperling-law.com
       JBjork@Sperling-law.com

Phillip F. Cramer
Ryan T. Holt
SHERRARD ROE VOIGT & HARBISON, PLC
150 3rd Avenue South
Suite 1100
Nashville, TN 37201
Tel: (615) 742-4200
E-mail: pcramer@srvhlaw.com
       rholt@srvhlaw.com

**Counsel for Plaintiffs Associated Grocers of the South, Inc., Meijer, Inc., Meijer Distribution, Inc., OSI Restaurant Partners, LLC, Publix Super Markets, Inc., Supervalu Inc.; Unified Grocers, Inc.; Associated Grocers of Florida, Inc.; and Wakefern Food Corp.**

/s/ *Amy D. Fitts*
Amy D. Fitts (IL Bar No. 629248)
Daniel D. Owen (MO Bar No. 41514, *Pro Hac Vice*)
Guillermo G. Zorogastua (MO Bar No. 59643, *Pro Hac Vice*)
POLSINELLI PC
900 W. 48th Place
Suite 900
Kansas City, MO 64112
Tel: (816) 753-1000
Fax: (816) 753-1536
E-mail: afitts@polsinelli.com
       dowen@polsinelli.com
       gzorogastua@polsinelli.com

Rodney L. Lewis (IL Bar No. 6288353)
POLSINELLI PC
150 N. Riverside Plaza
Suite 3000
Chicago, Illinois 60606
Tel: (312) 819-1900
Fax: (312) 819-1910
E-mail: rodneylewis@polsinelli.com

**Counsel for Plaintiff Associated Wholesale Grocers, Inc.**

/s/ *David C. Eddy*
David C. Eddy, Esquire
N.D. Illinois Bar No. 72258
Dennis J. Lynch, Esquire
N.D. Illinois Bar No. 07622
ANTITRUST LAW GROUP, LLC
1601 Assembly Street
P.O. Box 8117
Columbia, SC 29202
Tel: (803) 253-8267
E-mail: deddy@theantitrustlawgroup.com
       dlynch@theantitrustlawgroup.com

**Counsel for Plaintiffs Conagra Brands, Inc.; Pinnacle Foods, Inc.; Kraft Heinz Foods Company; Nestlé USA, Inc.; and, Nestlé Purina PetCare Company**

/s/ *Judith A. Zahid*
Judith A. Zahid
Eric W. Buetzow
ZELLE LLP
555 12th Street
Suite 1230
Oakland, CA 94607
Tel: (415) 693-0700
E-mail: jzahid@zelle.com
    ebuetzow@zelle.com

James R. Martin
Jennifer Duncan Hackett
ZELLE LLP
1775 Pennsylvania Avenue, N.W.
Suite 375
Washington, D.C. 20006
Tel: (202) 899-4100
E-mail: jmartin@zelle.com
    jhackett@zelle.com

**Counsel for Plaintiff El Pollo Loco, Inc.**

/s/ *Jay B. Shapiro*
Jay B. Shapiro (*Admitted pro hac vice*)
Samuel O. Patmore (*Admitted pro hac vice*)
Carlos J. Canino (*Admitted pro hac vice*)
Abigail G. Corbett (*Admitted pro hac vice*)
STEARNS WEAVER MILLER WEISSLER
  ALHADEFF & SITTERSON, P.A.
150 West Flagler Street
Suite 2200
Miami, Florida 33130
Tel: (305) 789-3200
Fax: (305) 789-3395
E-mail: jshapiro@stearnsweaver.com
    spatmore@stearnsweaver.com
    ccanino@stearnsweaver.com
    acorbett@stearnsweaver.com

Marvin A. Miller
Matthew E. Van Tine
Andrew Szot
MILLER LAW LLC
115 S. LaSalle Street
Suite 2910
Chicago, Illinois 60603
Tel: (312) 332-3400
Fax: (312) 676-2676
E-mail: mmiller@millerlawllc.com
    mvantine@millerlawllc.com
    aszot@millerlawllc.com

**Counsel for Plaintiffs Quirch Foods, LLC,
and Independent Purchasing Cooperative,
Inc.**

/s/ *Lori P. Lustrin*
Robert W. Turken
Lori P. Lustrin
Scott N. Wagner
BILZIN SUMBERG BAENA PRICE & AXELROD
LLP
1450 Brickell Avenue
Suite 2300
Miami, Florida 33131-3456
Tel: (305) 374-7580
Fax: (305) 374-7593
E-mail: rturken@bilzin.com
    llustrin@bilzin.com
    swagner@bilzin.com

**Counsel for Plaintiffs Shamrock Foods
Company, United Food Service, Inc.,
Boston Market Corporation, Bojangles'
Restaurants, Inc. and Bojangles Opco,
LLC, WZ Franchise Corporation, Zaxby's
Franchising LLC, Barbeque Integrated,
Inc. d/b/a Smokey Bones Bar & Fire Grill,
FIC Restaurants, Inc. d/b/a Friendly's,
The Johnny Rockets Group, Inc., Golden
Corral Corporation, White Castle
Purchasing Co., Cracker Barrel Old
Country Store, Inc., Captain D's LLC, and
CBOCS Distribution, Inc.**

/s/ *Scott E. Gant*

Scott E. Gant
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
E-mail: sgant@bsfllp.com

Colleen A. Harrison
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8204
Fax: (202) 237-6131
E-mail: charrison@bsfllp.com

*Counsel for Plaintiffs Campbell Soup Company, Campbell Soup Supply Company, L.L.C., John Soules Foods, Inc., John Soules Acquisitions LLC, Pacific Foods of Oregon, Sysco Corp., Target Corp., and US Foods, Inc.*

/s/ *William J. Blechman*

William J. Blechman
Kevin Murray
Douglas Patton
Samuel Randall
Michael Ponzoli
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
Fax: (305) 372-1861
E-mail: wblechman@knpa.com
         kmurray@knpa.com
         dpatton@knpa.com
         srandall@knpa.com
         mponzoli@knpa.com

*Counsel for Plaintiffs The Kroger Co., Albertsons Companies, Inc., Hy-Vee, Inc., Save Mart Supermarkets and Pollo Operations, Inc.*

/s/ *David Esau*

David B. Esau
Kristin A. Gore
Amanda R. Jesteadt
Stephen A. Cohen
Casey R. McGowan
CARLTON FIELDS, P.A.
525 Okeechobee Boulevard
Suite 1200
West Palm Beach, Florida 33401
Tel: (561) 659-7070
Fax: (561) 659-7368
E-mail: desau@carltonfields.com
         kgore@carltonfields.com
         ajesteadt@carltonfields.com
         scohen@carltonfields.com
         cmcgowan@calrtonfields.com

Amy M. Bowers
CARLTON FIELDS, P.A.
100 S.E. Second Street
Suite 4200
Miami, Florida 33131
Tel: (305) 530-0050
Fax: (305) 530-0055
E-mail: abowers@carltonfields.com

*Counsel for Plaintiffs United Supermarkets, LLC, Krispy Krunchy Foods, LLC, Cheney Bros. Inc., Hooters of America, LLC, Checkers Drive-In Restaurants Inc., Restaurants of America, Inc., LTP Management Group, Inc., Gibson, Greco & Wood, Ltd, Hooters Management Corporation, Anaheim Wings, LLC d/b/a Hooters of Anaheim, Bonita Plaza Wings, LLC d/b/a Hooters of Plaza Bonita, Costa Mesa Wings, LLC d/b/a Hooters of Costa Mesa, Downtown Wings, LLC previously d/b/a Hooters of Downtown LA, Gaslamp Wings, LLC previously d/b/a Hooters of San Diego, Hollywood Wings, LLC d/b/a Hooters of Hollywood, Mission Valley Wings, LLC d/b/a Hooters of Mission Valley, Oceanside Wings, LLC previously d/b/a Hooters of*

*Oceanside, Ontario Wings, LLC d/b/a
Hooters of Ontario, Rancho Bernardo
Wings, LLC d/b/a Hooters of San Marcos,
South Gate Wings, LLC d/b/a Hooters of
South Gate, Wings Over Long Beach, LLC
d/b/a Hooters of Long Beach, Bob Evans
Farms, Inc., The Fresh Market, Inc.,
Wawa, Inc., and Restaurant Services, Inc.*


Joseph M. Vanek
Michael G. Dickler
SPERLING & SLATER, P.C.
55 West Monroe Street
Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
E-mail: jvanek@sperling-law.com
         mdickler@sperling-law.com

*Designated Local Counsel for the United
Supermarkets et al. Plaintiffs under N.D.
Ill. LR 83.15*


Jana Eisinger
LAW OFFICE OF JANA EISINGER, PLLC
4610 South Ulster Street
Suite 150
Denver, Colorado 80237
Tel: (303) 209-0266
Fax: (303) 353-0786
E-mail: jeisinger@eisingerlawfirm.com

*Co-Counsel for Plaintiffs United
Supermarkets, LLC and Krispy Krunchy
Foods, LLC*

Clay M. Taylor
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street
Suite 1000
Fort Worth, Texas 76102
Tel: (817) 779-4300
Fax (817) 405-6902
E-mail: Clay.Taylor@bondsellis.com

*Co-Counsel for Plaintiff United
Supermarkets, LLC*


/s/ *Shawn J. Rabin*
Neal S. Manne (2017083)
Ryan Caughey
SUSMAN GODFREY L.L.P.
1000 Louisiana Street
Suite 5100
Houston, Texas 77002
Tel: (713) 651-9366
E-mail: nmanne@susmangodfrey.com
         rcaughey@susmangodfrey.com

Shawn J. Rabin
Steven M. Shepard
Ravi P.S. Bhalla
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas
32nd Floor
New York, N.Y. 10019-6023
Tel: (212) 336-8330
E-mail: srabin@susmangodfrey.com
         sshepard@susmangodfrey.com
         rbhalla@susmangodfrey.com

Terence H. Campbell
COTSIRILOS, TIGHE, STREICKER, POULOS
 & CAMPBELL
33 N. Dearborn Street
Suite 600
Chicago, Illinois 60602
Tel: (312) 263-0345
E-mail: tcampbell@cotsiriloslaw.com

***Counsel for Plaintiffs Walmart Inc.; Wal-Mart Stores East, LP; Wal-Mart Stores Arkansas, LLC; Wal-Mart Stores Texas, LLC; Wal-Mart Louisiana, LLC; Sam's West, Inc.; Sam's East, Inc.***

/s/ *Patrick J. Ahern*
Patrick J. Ahern
Theodore B. Bell
AHERN & ASSOCIATES, P.C.
Willoughby Tower
8 South Michigan Avenue
Suite 3600
Chicago, Illinois 60603
Tel: (312) 404-3760
E-mail:
patrick.ahern@ahernandassociatespc.com

***Counsel for Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC; and Kraft Heinz Foods as to CA Number 3572***

/s/ *John F. Gibbons*
John F. Gibbons
Illinois Bar No. 6190493
Thomas E. Dutton
Illinois Bar No. 6195923
GREENBERG TRAURIG, L.L.P.
77 West Wacker Drive
Suite 3100
Chicago, Illinois 60601
Tel: (312) 456-8400
Fax: (312) 456-8435
E-mail: gibbonsj@gtlaw.com
     duttont@gtlaw.com

Gregory J. Casas (admitted *pro hac vice*)
Texas Bar No: 00787213
Erik Weber (admitted *pro hac vice*)
Texas Bar No: 240898587
300 West Sixth Street
Suite 2050
Austin, Texas 78701-4052
Tel: (512) 320-7200
Fax: (512) 320-7210
E-mail: casasg@gtlaw.com
     weberer@gtlaw.com

Dominic E. Draye (admitted *pro hac vice*)
Arizona Bar No. 033012
2375 East Camelback Road, Suite 700
Phoenix, Arizona 85016
Tel: (602) 445-8000
Fax: (602) 445-8100
E-mail: drayed@gtlaw.com

***Counsel for Plaintiff Services Group of America, Inc.***

/s/ *Philip J. Iovieno*
Philip J. Iovieno
Nicholas A. Gravante, Jr.
Karen C. Dyer
Lawrence S. Brandman
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Tel: (212) 504-6000
Fax: (212) 504-6666
E-mail: philip.iovieno@cwt.com
     nicholas.gravante@cwt.com
     karen.dyer@cwt.com
     lawrence.brandman@cwt.com

Anne M. Nardacci
Mark A. Singer
BOIES SCHILLER FLEXNER LLP
30 South Pearl Street
Albany, N.Y.  12207
Tel:  (518) 434-0600
Fax:  (518) 434-0665
E-mail:  anardacci@bsfllp.com
       msinger@bsfllp.com

***Counsel for Plaintiffs Jetro Holdings, LLC; BJ's Wholesale Club, Inc.; Maximum Quality Foods, Inc.; Sherwood Food Distributors, L.L.C.; Harvest Meat Company, Inc.; Western Boxed Meat Distributors, Inc.; Hamilton Meat, LLC; Darden Restaurants, Inc.; and PJ Food Service, Inc. and Co-Counsel for Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC***

/s/ *Kathryn A. Reilly*
Kathryn A. Reilly
Judith P. Youngman
Camille Papini-Chapla
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202
Tel:  (303) 244-1800
Fax:  (303) 244-1879
Email:  Reilly@wtotrial.com
      Youngman@wtotrial.com
      PapiniChapla@wtotrial.com

***Counsel for Plaintiffs McLane Company, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.;  McLane New Jersey, Inc.; McLane/Eastern, Inc.; McLane/Suneast, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Western, Inc.; McLane Express, Inc.; Kinexo, Inc.; McLane Foodservice Distribution, Inc., McLane Foodservice, Inc.***

/s/ *Paul J. Ripp*
Paul J. Ripp
WILIIAMS MONTGOMERY & JOHN LTD.
233 S. Wacker Drive, Suite 6800
Chicago, IL 60606
Telephone: (312) 443-3200
Facsimile: (312) 630-8500
pjr@willmont.com

Charles E. Tompkins (*pro hac vice* forthcoming)
WILLIAMS MONTGOMERY & JOHN LTD.
1607 22nd Street, NW, Suite 300
Washington D.C. 20008
Telephone: (202) 791-9951
Facsimile: (312) 630-8586
cet@willmont.com

W. Lawrence Deas (*pro hac vice* forthcoming)
LISTON & DEAS PLLC
605 Crescent Boulevard, Suite 200
Ridgeland, MS 39157
Telephone: (601) 981-1636
Facsimile: (601) 982-0371
Lawrence@listondeas.com

Michael Gratz, Jr. (*pro hac vice* forthcoming)
GRATZ & GRATZ, P.A.
312 N. Green Street
Tupelo, MS 38804
Telephone: (662) 844-5531
Facsimile: (662) 844-8747
michael@gratzandgratz.com

***Counsel for Plaintiffs L. Hart, Inc., R & D Marketing, LLC, Timber Lake Foods, Inc., and EMA Foods Co., LLC***

/s/ *Floyd A. Mandell*
Floyd A. Mandell
Jeffrey A. Wakolbinger
Catherine E. O'Brien
KATTEN MUNCHIN ROSEMAN LLP
525 West Monroe Street
Chicago, Illinois 60661-3639
Tel: (312) 902-5235
Fax: (312) 902-1061
floyd.mandell@katten.com
jeffery.wakolbinger@katten.com
 catherine.obrien@katten.com

Yonaton M. Rosenzweig
2029 Century Park East, Suite 2600
Los Angeles, California 90034
Tel: (310) 788-4460
Fax: (310) 712-8222
yoni.rosenzweig@katten.com

**Counsel for Caesars Enterprise Services, LLC
and Carl Buddig & Co.**