**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION, | Case No.: 1:16-cv-08637 |
| | The Honorable Thomas M. Durkin |
| This Document Relates To: | |
| THE DIRECT PURCHASER PLAINTIFF ACTION | |

**DIRECT PURCHASER PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENTS WITH DEFENDANTS PILGRIM'S PRIDE CORP., TYSON FOODS, INC., TYSON CHICKEN, INC., TYSON BREEDERS, INC., AND TYSON POULTRY, INC.**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...............................................................................................1

II.      LITIGATION BACKGROUND ........................................................................3

III.      SUMMARY OF THE SETTLEMENT NEGOTIATIONS AND TERMS........................5

     A.      The Pilgrim's Settlement ..................................................................8

     B.      The Tyson Settlement .......................................................................8

IV.      THE SETTLEMENTS SATISFY THE STANDARD FOR PRELIMINARY APPROVAL ........................................................................................................9

     A.      The Settlements Resulted from Arm's Length Negotiations................11

     B.      The Settlements Provide Substantial Relief to the Settlement Class....................12

V.      THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS............13

     A.      The Requirements of 23(a) Are Satisfied ..........................................14

         1.      Numerosity.............................................................................14

         2.      Common Questions of Law and Fact........................................15

         3.      Typicality...............................................................................15

         4.      Adequacy ...............................................................................16

     B.      The Settlement Class Satisfies Rule 23(b)(3) ....................................17

VI.      THE COURT SHOULD APPROVE THE PROPOSED NOTICE PLAN ....................19

VII.      THE COURT SHOULD SCHEDULE A FINAL APPROVAL HEARING ..................23

VIII.      CONCLUSION................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................................13, 18, 19

*Armstrong v. Bd. of Sch. Dirs.*,
    616 F.2d 305 (7th Cir. 1980) ...........................................................................9

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
    270 F.R.D. 330 (N.D. Ill. 2010) ....................................................................11

*In re Catfish Antitrust Litig.*,
    826 F. Supp. 1019 (N.D. Miss. 1993) ............................................................18

*City of Greenville v. Syngenta Crop Prot.*,
    No. 3:10-CV-188, 2012 WL 1948153 (S.D. Ill. May 30, 2012) ................19, 20, 23

*In re Cmty. Bank of N. Va.*,
    418 F.3d 277 (3d Cir. 2005).............................................................................13

*In re Corrugated Container Antitrust Litig.*,
    643 F.2d 195 (5th Cir. 1981) ...........................................................................17

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
    768 F.2d 884 (7th Cir. 1985) ...........................................................................9

*In re Foundry Resins Antitrust Litig.*,
    242 F.R.D. 393 (S.D. Ohio 2007) ...................................................................18

*Gautreaux v. Pierce*,
    690 F.2d 616 (7th Cir. 1982) ...........................................................................9

*Goldsmith v. Tech. Solutions Co.*,
    No. 92-CV-4374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ...........................11

*Hughes v. Baird & Warner, Inc.*,
    No. 76-CV-3929, 1980 WL 1894 (N.D. Ill. Aug. 20, 1980) ..................................18

*Isby v. Bayh*,
    75 F.3d 1191 (7th Cir. 1996) ......................................................................9, 10

*Kohen v. Pacific Inv. Mgmt.*,
    571 F.3d 672 (7th Cir. 2009) ...........................................................................17

*In re Linerboard Antitrust Litig.*,
   292 F. Supp. 2d 631 (E.D. Pa. 2003) ...........................................................11, 12

*In re Mercedes-Benz Antitrust Litig.*,
   213 F.R.D. 180 (D.N.J. 2003) .............................................................................16

*In re Mid-Atlantic Toyota Antitrust Litig.*,
   564 F. Supp. 1379 (D. Md. 1983) ........................................................................10

*In re NASDAQ Market-Makers Antitrust Litig.*,
   176 F.R.D. 99 (S.D.N.Y 1997) ............................................................................10

*Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*,
   231 F.R.D. 280 (N.D. Ill. 2005) ..........................................................................16

*Saltzman v. Pella Corp.*,
   257 F.R.D. 471 (N.D. Ill. 2009) ....................................................................15, 18

*Schmidt v. Smith & Wollensky LLC*,
   268 F.R.D. 323 (N.D. Ill. 2010) ..........................................................................14

*Thillens, Inc. v. Cmty. Currency Exch. Ass'n*,
   97 F.R.D. 668 (N.D. Ill. 1983) ............................................................................15

*Uhl v. Thoroughbred Tech. & Telecomms, Inc.*,
   309 F.3d 978 (7th Cir. 2002) ...............................................................................10

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .............................................................................................15

*In re Warfarin Sodium Antitrust Litig.*,
   212 F.R.D. 231 (D. Del. 2002) ..............................................................................9

**Statutes and Rules**

28 U.S.C. § 1715 .....................................................................................................24

Fed. R. Civ. P. 23(a) .................................................................................14, 15, 16

Fed. R. Civ. P. 23(b) ..........................................................................................17, 18

Fed. R. Civ. P. 23(c) ..........................................................................................19, 21

Fed. R. Civ. P. 23(e) ..................................................................................9, 10, 19

**Other Authorities**

Manual For Complex Litigation (Fourth) § 21.632 (2004) ......................................10

2 NEWBERG ON CLASS ACTIONS, § 11.24 (3d ed. 1992)...........................................................9, 10

2 NEWBERG ON CLASS ACTIONS, § 11.40 (2d ed. 1985)................................................................11

4 NEWBERG ON CLASS ACTIONS, § 11.53 (4th ed. 2002) ............................................................19

## I.    INTRODUCTION

The Direct Purchaser Plaintiffs ("DPPs") in this class action, alleging that Defendants conspired to fix, raise, maintain, and stabilize the prices of Broiler chicken sold in the United States, hereby seek preliminary approval of settlements with two additional groups of defendants: Pilgrim's Pride Corp. ("Pilgrim's"), and Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc. (collectively "Tyson") (Pilgrim's and Tyson collectively are referred to as the "Settling Defendants"). Under the settlements (collectively, "Settlements" or "Settlement Agreements"), Pilgrim's will pay $75 million and Tyson will pay $80 million. Collectively, the Settlements provide up to $155 million to the Settlement Class (as defined in Section V *infra*) from Settling Defendants, bringing the total recovery to date to over $170 million. (*See* Declaration of W. Joseph Bruckner in Support of Motion ("Bruckner Decl.") at ¶ 8.) In addition to this monetary relief, both Pilgrim's and Tyson have agreed to provide meaningful cooperation, which may assist DPPs in the prosecution of their claims against the remaining defendants in the case.

The Settlement Agreements with the Settling Defendants constitute the third set of DPP settlements in this case, and also a third "step up" by market share point. This Court has granted final approval to DPP settlements twice before in this matter; on November 16, 2018 with Fieldale Farms Corporation ("Fieldale"), which provided a total financial settlement of $2.25 million; and on October 27, 2020 with Peco Foods, Inc. ("Peco"), George's, Inc., George's Farms, Inc. (collectively, "George's"), and Amick Farms, LLC ("Amick"), which provided a total financial settlement of $13,011,600.[1] Each of the prior settlements were by very small market participants, yet the respective Settlement Classes received substantial monetary relief reaching up to $2 million per market share point for the Peco, George's and Amick settlements. The Settlements with the

---

[1] $4,964,600 from Peco, $4,097,000 from George's, and $3,950,000 from Amick.

Settling Defendants bring the total amount recovered by DPPs from settling defendants to date to $170,261,600. Accounting for currently anticipated opt-outs from prior settlements, Tyson and Pilgrim's collectively constitute 37.5% (Settlement Class definition, *see* Section V *infra*) of commerce sold to DPPs. Therefore, these third round Settlements constitute a step-up in damages to a range of approximately $4 million per market share point.

The ratcheted increases in the Settlement amounts—both on a gross and proportionate basis—support approval of the Settlements. As a result of the substantial recovery obtained to date, DPPs are now in a position, with the Court's approval, to distribute the combined net settlement proceeds to Settlement Class members.[2] As detailed in this Motion for Preliminary Approval of the Settlements ("Motion") and the supporting documents, each Settlement was the product of the DPPs' efforts in litigating this case and extensive arm's length negotiations among the parties and with the assistance of experienced and nationally-renowned mediators. The Settling Defendants have not admitted any liability concerning and continue to deny the legal claims alleged in DPPs' Complaint, and have agreed to the Settlements to avoid the cost and burden of litigation and eliminate the risk of an adverse judgment, but have done so without admission and while fully reserving all rights. By contrast, the DPPs believe they would have prevailed at trial, but have agreed to the Settlements to obtain the cooperation from the Settling Defendants and avoid the risk of an adverse outcome during litigation or trial. Accordingly, these Settlements are the product of compromise and reflect the independent decisions of the DPPs, on the one hand, and the Settling Defendants, on the other hand, to resolve this matter.

---

[2] As described in Section III, *infra*, of this Motion, DPP Class Counsel will move the Court separately to approve a plan to distribute net settlement proceeds to qualified members of the DPP Class.

Moreover, as described below, each of the Settlements is fair, reasonable, and adequate, and satisfies all of the factors for preliminary approval. The DPPs respectfully request that the Court grant their Motion, approve the proposed notice plan, and set a schedule for final approval of the Settlements.

## II.  LITIGATION BACKGROUND

This is an antitrust class action against certain producers of Broilers.[3] DPPs allege that Defendants combined and conspired to fix, raise, maintain, or stabilize prices of Broilers sold in the United States. DPPs allege that Defendants implemented their conspiracy in various ways, including via coordinated supply restrictions, sharing competitively sensitive price and production information, and otherwise manipulating Broiler prices.

DPPs commenced this litigation on September 2, 2016, when they filed a class action lawsuit on behalf of all direct purchasers of Broilers in the United States. (ECF No. 1.) Other class plaintiffs and direct action plaintiffs subsequently filed similar actions. On October 14, 2016, the Court appointed the undersigned law firms as Direct Purchaser Plaintiffs' Interim Co-Lead and Liaison Counsel. (ECF No. 144.) After extensive briefing by the parties, on November 20, 2017 the Court denied Defendants' Motions to Dismiss the DPPs' First Consolidated Amended Complaint ("FCAC"). (ECF No. 541.) DPPs filed their operative Fifth Consolidated Amended Complaint on October 23, 2020. (ECF No. Nos. 3919 (Redacted) and 3935 (Unredacted).)

---

[3] Consistent with the Complaint, the term Broilers is defined in the Settlement Agreements as "chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards." (*See* Settlement Agreements § 1.d.) The Settling Defendants agree to this definition only for purposes of approving the Settlements and certifying the proposed Settlement Class and otherwise reserve all rights, arguments and defenses with respect to this definition. (*Id.*)

DPPs performed a thorough investigation and engaged in extensive discovery prior to reaching the Settlements. These efforts commenced prior to the filing of DPPs' initial complaint and included pre-litigation investigation into Defendants' conduct that formed the basis of the DPPs' complaints. (*See* Bruckner Decl. ¶ 4.) In denying Defendants' motions to dismiss, the Court held that these "alleged factual circumstances plausibly demonstrate that [Defendants'] parallel conduct was a product of a conspiracy." (*See* ECF No. 541, p. 18.) During the litigation, DPPs obtained responses to multiple sets of interrogatories, and received over 8 million documents in response to their requests for production and third party subpoenas. (*See* Bruckner Decl. ¶ 5.) DPPs, along with other plaintiffs, have taken over 100 depositions of the Defendants and third parties. (*Id.* ¶ 6.) DPPs have also provided responses to written discovery, produced documents, and appeared for depositions noticed by the Defendants. (*Id.* ¶ 7.)

On June 21, 2019, the United States Department of Justice ("DOJ") moved to intervene in the civil case and stay the depositions of Defendants, pending the DOJ's criminal investigation into the Broiler industry. (ECF No. 2268.) On June 27, 2019, the Court granted an initial stay on the depositions of Defendants until September 27, 2019. (ECF No. 2302.) On October 16, 2019, the Court extended the stay on the depositions of Defendants (with certain exceptions) until June 27, 2020. (ECF No. 3153.) Among the criminal defendants are three Pilgrim's executives, including Pilgrim's former CEOs Jayson Penn and William Lovette. Furthermore, Pilgrim's itself pled guilty to criminal price-fixing charges and agreed to pay $110.5 million in criminal penalties.[4] Tyson has announced that "it took appropriate actions to address the internal issues and has been

---

[4] Pilgrim's Announces Agreement with DOJ Antitrust Division, PILGRIM'S PRIDE CORP. (2020), https://ir.pilgrims.com/news-releases/news-release-details/pilgrims-announces-agreement-doj-antitrust-division (last visited Feb. 1, 2021).

fully cooperating with the DOJ as part of its application for leniency under the DOJ's Corporate Leniency Program."[5]

Prior to the Court's ruling on Defendants' motions to dismiss, Plaintiffs reached an "ice-breaker" settlement with Defendant Fieldale. Fieldale, a small producer, agreed to pay $2.25 million, provide cooperation including attorney and witness proffers, and produce certain documents to DPPs. (*See* Bruckner Decl. ¶ 8.) The Court granted final approval to the Fieldale settlement on November 18, 2018. (*See* ECF No. 1414.) Plaintiffs later reached settlements with Defendants Amick, Peco, and George's. Like Fieldale, these three Defendant groups are small producers. (*See* Bruckner Decl. ¶ 8.) In addition to providing cooperation to DPPs, Peco paid $4,964,600, George's paid $4,097,000, and Amick paid $3,950,000. (*See Id.*) The Court granted final approval of the Amick, Peco, and George's settlements on October 27, 2020. (*See* ECF Nos. 3944 (Peco and George's), 3945 (Amick).)

## III.    SUMMARY OF THE SETTLEMENT NEGOTIATIONS AND TERMS

The Settlement Agreements with Pilgrim's and Tyson were each reached through confidential, protracted, arm's length settlement negotiations. (*See* Bruckner Decl. ¶¶ 9-18.) The Pilgrim's settlement was the product of a negotiation process that commenced in December 2020. (*Id.* ¶ 9.) The Tyson settlement was negotiated separately in a process that started in December 2019. (*Id.* ¶ 12.) The core settlement terms are substantially similar in each of the Agreements, and the settlement amounts reflect the size and other factors affecting these Settling Defendants. Each of the Settlements represents an increase—on a proportionate and gross basis—from the prior

---

[5] Tyson Foods' Statement on Department of Justice Indictment in Broiler Chicken Investigation, TYSON FOODS, INC. (2020), https://www.tysonfoods.com/news/news-releases/2020/6/tyson-foods-statement-department-justice-indictment-broiler-chicken (last visited Feb. 1, 2021).

settlements. Collectively the Settlements provide up to $155 million in recovery to the Settlement Class,[6] and bring the total amount recovered by DPPs to $170,261,600.

In addition to monetary relief, the Settling Defendants will: (1) cooperate with DPPs in a manner that is consistent with the provisions of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"), if applicable; (2) provide an attorney proffer regarding the principal facts known to Settling Defendants relevant to the alleged conduct at issue in this Action; (3) use reasonable efforts to authenticate documents and assist DPPs to understand previously-produced structured data, (4) producing live witnesses at trial; and (5) not oppose the DPPs' depositions of specifically-named current and former executives. (*See* Pilgrim's Settlement, attached as Exhibit "A" to Bruckner Decl., § 10; Tyson Settlement, attached as Exhibit "B" to Bruckner Decl., § 10.)

In exchange, the DPPs and the proposed Settlement Class will separately release certain Released Claims (as defined in the Settlement Agreements) against the Released Parties (as defined in the Settlement Agreements). (*See Id.* §§ 14, 15.) The releases do not extend to other Defendants or to unrelated claims that are not the subject matter of the lawsuit. (*Id.*) Each of the Settlement Agreements contains a reduction mechanism that could result in a reduction of the settlement amount if the opt-outs exceed agreed-upon thresholds based on sales attributed to opt-outs of previous settlements with DPPs and entities who have filed direct action lawsuits. (*See* Pilgrim's Settlement § 19; Tyson Settlement § 21.) Neither the Pilgrim's nor Tyson Settlement contains a termination provision based on opt-outs. DPPs will report on the number of opt-outs and the final amount recovered by the Settlement Class prior to final approval. Finally, each Settlement refers to a judgment-sharing agreement among certain Defendants and, consistent with

---

[6] The "Settlement Class" definition is set forth in Section V *infra* herein.

that agreement (per the Settling Defendants), each Settlement removes from the calculation of a damages award resulting from any verdict and Final Judgment DPPs may obtain against any other Defendant who is a signatory to Defendants' judgment-sharing agreement certain amounts intended to reflect the Settling Defendants' approximately proportionate sales of Broilers (Pilgrim's Settlement § 38; Tyson Settlement § 40). Thus, any other such Defendant against whom DPPs obtain a verdict and judgment would not be jointly and severally liable for Tyson or Pilgrim's share of damages removed pursuant to the judgment-sharing agreement resulting from sales to the DPP Class.

Subject to the approval and direction of the Court, the settlement amounts (with accrued interest) will be used to: (1) pay for notice costs and costs incurred in the administration and distribution of the Settlements; (2) pay taxes and tax-related costs associated with the escrow account[7] for proceeds from the Settlements; (3) make a distribution to Settlement Class Members in accordance with a to-be-filed proposed plan of distribution; (4) pay attorneys' fees to Counsel for the Settlement Class, as well as costs and expenses, that may be awarded by the Court; and (5) pay incentive awards to the named Plaintiffs. DPPs will move the Court to approve a plan to distribute net settlement proceeds to qualified class members, and to award attorneys' fees (not to exceed 33⅓%), reimbursement of litigation expenses (not to exceed $4.5 million), and service awards to the named Class Representatives (not to exceed $25,000 per Class Representative) at an appropriate date in the future, but at least two weeks before the last date to opt out or object to the Settlements.[8]

---

[7] Plaintiffs respectfully request that the Court appoint US Bank as the Escrow Agent.

[8] The Settlements further provide for the use of up to $500,000 ($250,000 per Settling Defendant as authorized by the Settlement Agreements, § 6.c) of Settlement proceeds for the cost of notice without seeking further approval from the Court.

### A.    The Pilgrim's Settlement

DPPs' settlement negotiations with Pilgrim's commenced in December 2020. (*See* Bruckner Decl. ¶ 9.) After discussions between counsel throughout December 2020, on January 5, 2021, DPPs and Pilgrim's engaged in a mediation with Professor Eric Green, a nationally renowned mediator. (*Id.* ¶ 10.) The parties were unable to reach an agreement during the face-to-face videoconference mediation session, but continued discussions and ultimately reached an agreement. (*Id.*) Thereafter, the parties continued to negotiate (with the assistance of Professor Green) regarding the settlement terms, ultimately executing the Pilgrim's Settlement Agreement on January 19, 2021. *See* Bruckner Decl. ¶ 11.)

The Pilgrim's Settlement requires Pilgrim's to pay up to $75 million. (*See* Pilgrim's Settlement § 9.)

### B.    The Tyson Settlement

DPPs' settlement negotiations with Tyson commenced in December 2019. (*See* Bruckner Decl. ¶ 12.) After engaging in initial discussions the parties agreed to engage Judge Daniel Weinstein (ret.), another nationally renowned mediator. The settlement negotiations with Tyson were thorough and extensive. With the assistance of Judge Weinstein, DPPs and Tyson exchanged mediation briefs, made presentations addressing the merits of the case, and exchanged settlement offers and demands throughout the course of 2020. This process included numerous conferences with Judge Weinstein and his team, a face-to-face videoconference mediation, as well as other discussions. (*Id.* ¶ 13) None of these efforts resulted in a settlement, and there were times when it appeared that the parties had reached an impasse. (*Id.*) On January 6, 2021, DPPs and Tyson attended another face-to-face videoconference mediation with Judge Weinstein. (*Id.* ¶ 14.) The parties were unable to reach an agreement during the January 6, 2021 session; however, the parties

continued to negotiate through the mediator. (*Id.*) On Saturday, January 9, 2021, the parties reconvened via face-to-face videoconference with Judge Weinstein and, after hours of further negotiating, an agreement was reached. (*Id.* ¶ 15.) Thereafter, the parties continued to negotiate regarding the settlement terms, ultimately executing the Tyson Settlement Agreement on January 23, 2021. (*See* Tyson Settlement; *see also* Bruckner Decl. ¶ 16.)

The Tyson Settlement Agreement requires Tyson to pay up to $80 million. (*See* Tyson Settlement § 9.)

## IV. THE SETTLEMENTS SATISFY THE STANDARD FOR PRELIMINARY APPROVAL

There is an overriding public interest in settling litigation, and this is particularly true in class actions. *See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 888-89 (7th Cir. 1985), *cert. denied*, 478 U.S. 1004 (1986) (noting that there is a general policy favoring voluntary settlements of class action disputes); *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement."), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Class action settlements minimize the litigation expenses of the parties and reduce the strain such litigation imposes upon already scarce judicial resources. *Armstrong*, 616 F.2d at 313 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). However, a class action may be settled only with court approval. Fed. R. Civ. P. 23(e).

"The first step in district court review of a class action settlement is a preliminary, pre-notification hearing to determine whether the proposed settlement is 'within the range of possible approval.'" 2 NEWBERG ON CLASS ACTIONS, § 11.24 (3d ed. 1992); *see also Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982); *Armstrong*, 616 F.2d at 314; *In re Warfarin Sodium Antitrust*

*Litig.*, 212 F.R.D. 231, 254 (D. Del. 2002); *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y 1997). Generally, before directing notice to the class members, a court makes a preliminary evaluation of the proposed class action settlement pursuant to Rule 23(e). The Manual For Complex Litigation (Fourth) § 21.632 (2004) explains:

> Review of a proposed class action settlement generally involves two hearings. First counsel submit the proposed terms of settlement and the judge makes a preliminary fairness evaluation . . . The Judge must make a preliminary determination on the fairness, reasonableness and adequacy of the settlement terms and must direct the preparation of notice of the . . . proposed settlement, and the date of the [formal Rule 23(e)] fairness hearing.

A proposed settlement falls within the "range of possible approval" when it is conceivable that the proposed settlement will meet the standards applied for final approval. *See* Newberg, § 11.25, at 38-39 (quoting Manual for Complex Litigation, §30.41 (3d ed.)). The standard for final approval of a class action settlement is whether the proposed settlement is fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e); *see also Uhl v. Thoroughbred Tech. & Telecomms, Inc.*, 309 F.3d 978, 986 (7th Cir. 2002); *Isby*, 75 F.3d at 1198-99. When granting preliminary approval, the court does not conduct a "definitive proceeding on the fairness of the proposed settlement," and the court "must be careful to make clear that the determination permitting notice to members of the class is not a finding that the settlement is fair, reasonable and adequate." *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983) (quoting *In re Montgomery Cty. Real Estate Antitrust Litig.*, 83 F.R.D. 305, 315-16 (D. Md. 1979)). That determination must await the final hearing when the court can assess the fairness, reasonableness, and adequacy of the proposed settlement.

The requirement that class action settlements be fair is designed to protect against collusion among the parties. *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. at 1383. There is usually an initial presumption that a proposed settlement is fair and reasonable when it was the result of

arm's length negotiations. *See* 2 NEWBERG ON CLASS ACTIONS, § 11.40 at 451 (2d ed. 1985); *Goldsmith v. Tech. Solutions Co.*, No. 92-CV-4374, 1995 WL 17009594, at *3 n.2 (N.D. Ill. Oct. 10, 1995) ("[I]t may be presumed that the agreement is fair and adequate where, as here, a proposed settlement is the product of arm's length negotiations."). Settlements that are proposed by experienced counsel and result from arm's length negotiations are entitled to deference from the court. *See, e.g., In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) ("A presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery.") (quoting *Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997)). The initial presumption in favor of such settlements reflects courts' understanding that vigorous negotiations between seasoned counsel protect against collusion and advance the fairness concerns of Rule 23(e). In making the determination as to whether a proposed settlement is fair, reasonable, and adequate, the Court necessarily will evaluate the judgment of the attorneys for the parties regarding the "strength of plaintiffs' case compared to the terms of the proposed settlement." *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 346 (N.D. Ill. 2010).

A.    **The Settlements Resulted from Arm's Length Negotiations**

In this case, each of the proposed Settlements satisfies the standard for preliminary approval. As detailed in this Motion and supporting declarations, each of the Settlements was the product of extensive arm's length negotiations that took place over the course of several months. (*See* Sections II and III *infra*; *see also* Bruckner Decl. ¶¶ 9-18.) The Pilgrim's settlement process included over a month of settlement negotiations and a virtual (due to the ongoing COVID-19 pandemic) face-to-face mediation session with Professor Green. (*See id.*) The Tyson settlement negotiations extended over a year, during which settlement discussion remained ongoing with Judge Weinstein, and included three virtual (due to the ongoing COVID-19 pandemic) face-to-

face mediation sessions. (*See id.*) These protracted arm's length settlement negotiations support approval of the Settlements by demonstrating they are free from collusion. *See, e.g.*, *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 640. Moreover, the fact that the negotiations occurred over an extended time, and were supported by substantial discovery taken thus far in this litigation, indicate that DPPs worked to achieve the best possible result on behalf of the Settlement Class. *Id.*[9]

### B. The Settlements Provide Substantial Relief to the Settlement Class

Even though such a finding is not required at the preliminary approval stage, the fairness, reasonableness, and adequacy of the Settlements is also supported by the relief obtained on behalf of the Settlement Class including up to $155 million in monetary relief and meaningful cooperation. This is a significant monetary recovery on behalf of the Settlement Class and brings the total amount of settlements to over $170 million, with 14 Defendants still remaining in the case. In addition to the monetary component, the Settlements provide for meaningful cooperation, including attorney proffers, depositions, live witnesses at trial, and the authentication and production of documents. Thus, the Settlements provide a significant recovery from the Settling Defendants, while increasing the DPPs' ability to maximize their recovery from the remaining Defendants. Prior to entering into the Settlements, DPPs and Co-Lead Counsel conducted extensive discovery and analysis of the relevant facts during the four years since first filing this case. (Bruckner Decl. ¶¶ 4-7.) Co-Lead Counsel further considered the stage of the proceedings, the strength of Plaintiffs' claims and the Settling Defendants defenses, and the substantial benefits that the Settlements will provide to the Settlement Class. (*Id.*)

---

[9] At the time each Settlement was reached, the parties had conducted years of discovery, excluding the hiatus in discovery upon the intervention by the Department of Justice, and the parties are well into briefing DPPs' motion for class certification.

Further, each of the Settlements provides proportionally more monetary relief to class members than the prior settlements, which have been granted final approval. The Fieldale settlement was for $2.25 million representing approximately $1 million per market share point. The Peco, George's, and Amick settlements totaled $13,011,600, representing approximately $2 million per market share point. By comparison, the proposed Settlements with Pilgrim's and Tyson provide substantially more recovery on both a gross and proportional basis. In evaluating the Settlement, the DPPs considered the recovery from Tyson and Pilgrim's based on numerous factors, including a percentage of market share excluding current and anticipated opt-outs. (*See* Bruckner Decl. ¶ 8.) Based on this criteria, Tyson and Pilgrim's collectively constitute 37.5% of commerce sold to DPPs. (*Id.*) Accordingly, the recovery for DPPs from the Tyson and Pilgrim's settlements is approximately $4 million per market share point. This is a very significant amount of money recovered for the Settlement Class and undoubtedly sets the standard for the remainder of the litigation. The Settlements thus constitute a tremendous result, fall well within the range of possible approval, and should be granted preliminary approval by the Court.

## V.     THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS

At the preliminary approval stage, the Court must also determine whether the proposed Settlement Class should be certified for settlement purposes under Federal Rule of Civil Procedure ("Rule") 23. *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Certification of a settlement class must satisfy each requirement set forth in Rule 23(a), as well as at least one of the separate provisions of Rule 23(b). *Id.* at 613-14; *see also In re Cmty. Bank of N. Va.*, 418 F.3d 277, 299 (3d Cir. 2005) ("[C]ertification of classes for settlement purposes only [is] consistent with Fed. R. Civ. P. 23, provided that the district court engages in a Rule 23(a) and (b) inquiry[.]").

Here, DPPs seek certification of a Settlement Class (also referred to as "Class") of:

> All persons who purchased Broilers directly from any of the Defendants or any co-conspirator identified in this action, or their respective subsidiaries or affiliates for use or delivery in the United States from at least as early as January 1, 2008 until December 20, 2019. Specifically excluded from the Settlement Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Settlement Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

(Settlement Agreements, § 5.) This is the same class proposed in the Complaint and already approved in the prior settlements. (*See* ECF Nos. 3944 (Peco and George's), 3945 (Amick).) As detailed below, this proposed Class meets the requirements of Rule 23(a) as well as the requirements of Rule 23(b)(3).

## A. The Requirements of 23(a) Are Satisfied

### 1. Numerosity

Rule 23(a)(1) requires that the class be so numerous as to make joinder of its members "impracticable." No magic number satisfies the numerosity requirement, however, "a class of more than 40 members is generally believed to be sufficiently numerous for Rule 23 purposes." *Schmidt v. Smith & Wollensky LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010) (citations omitted). The proposed Settlement Class consists of persons and entities that purchased Broilers from the Defendants during the period from January 1, 2008 to December 20, 2019. DPPs' investigation and discovery has confirmed that there are thousands of persons and entities that fall within the Settlement Class definition. (Bruckner Decl. ¶ 19.) Thus, joinder would be impracticable and Rule 23 (a)(1) is satisfied.

### 2. Common Questions of Law and Fact

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Plaintiffs must show that resolution of an issue of fact or law "is central to the validity of each" class member's claim and "[e]ven a single [common] question will" satisfy the commonality requirement. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). This litigations focuses on the Defendants' alleged conspiracy to fix, raise, maintain, or stabilize prices of Broilers sold in the United States, including via coordinated supply restrictions, sharing competitively sensitive price and production information, and otherwise manipulating Broiler prices. Proof of this conspiracy will be common to all Class members. *See, e.g.*, *Thillens, Inc. v. Cmty. Currency Exch. Ass'n*, 97 F.R.D. 668, 677 (N.D. Ill. 1983) ("The overriding common issue of law is to determine the existence of a conspiracy."). In addition to that overarching question, this case is replete with other questions of law and fact common to the Settlement Class including: (1) the role of each Defendant in the conspiracy; (2) whether Defendants' conduct violated Section 1 of the Sherman Act; (3) whether Defendants affirmatively concealed their agreement; (4) whether Defendants' conspiratorial conduct caused the prices of Broilers to be inflated; (5) the appropriate measure of monetary relief, including the appropriate measure of damages; and (6) whether Plaintiffs and Class members are entitled to declaratory and/or injunctive relief. Accordingly, the Settlement Class satisfies Rule 23(a)(2).

### 3. Typicality

Rule 23(a)(3) requires that the class representatives' claims be "typical" of class members' claims. "[T]ypicality is closely related to commonality and should be liberally construed." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 479 (N.D. Ill. 2009) (citations omitted). Typicality is a "low hurdle," requiring "neither complete coextensivity nor even substantial identity of claims."

*Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 282 (N.D. Ill. 2005). When "the representative party's claim arises from the same course of conduct that gives rise to the claims of other class members and all of the claims are based on the same legal theory," factual differences among class members do not defeat typicality. *Id.* Courts generally find typicality in cases alleging a price-fixing conspiracy. *See, e.g.*, *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 185 (D.N.J. 2003) (finding that plaintiffs met the typicality requirement based on the fact that plaintiffs' main claim - that they were harmed by an illegal price-fixing conspiracy - was the same for all class members).

DPPs here allege a conspiracy to fix, maintain, and stabilize the price of Broilers sold in the United States. The named Plaintiffs will have to prove the same elements that absent Settlement Class members would have to prove, *i.e.*, the existence and effect of such a conspiracy. As alleged in the Complaint, each named representative purchased Broilers directly from one or more Defendants, and was overcharged and suffered an antitrust injury as a result of the violations alleged in the Complaint. (*See generally* Complaint.) Because the representative Plaintiffs' claims arise out of the same alleged illegal anticompetitive conduct and are based on the same alleged theories and will require the same types of evidence to prove those theories, the typicality requirement of Rule 23(a)(3) is satisfied.

### 4.    <u>Adequacy</u>

Rule 23(a)(4) requires that, for a case to proceed as a class action, the court must find that "the representative parties will fairly and adequately protect the interests of the class." Adequacy of representation is measured by a two-part test: (1) the named plaintiffs cannot have claims in conflict with other class members, and (2) the named plaintiffs and proposed class counsel must

demonstrate their ability to litigation the case vigorously and competently on behalf of named and absent class members alike. *See Kohen v. Pacific Inv. Mgmt.*, 571 F.3d 672, 679 (7th Cir. 2009).

Both requirements are satisfied here. As they demonstrated at the time they sought appointment, Co-Lead Counsel are qualified, experienced, and thoroughly familiar with antitrust class action litigation. (*See* Order Appointing Co-Lead Counsel, ECF No. 144.) Co-Lead Counsel have successfully litigated many significant antitrust actions and have prosecuted and will continue to vigorously prosecute this lawsuit. (*Id.*) Co-Lead Counsel respectfully submit that they have diligently represented the interests of the Class throughout this litigation and will continue to do so.

Moreover, the interests of the Settlement Class members are aligned with those of the representative Plaintiffs. Plaintiffs, like all Settlement Class members, share an overriding interest in obtaining the largest possible monetary recovery. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) (certifying settlement class and holding that "so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes"). The class representatives have fulfilled their duties to the Class by actively participating throughout the litigation including sitting for depositions, responding to written discovery, and producing documents. (*See* Bruckner Decl. ¶ 7.) Accordingly, the requirements of Rule 23(a)(4) are satisfied.

**B.**     **The Settlement Class Satisfies Rule 23(b)(3)**

Once Rule 23(a)'s four prerequisites are met, Plaintiffs must show the proposed Settlement Class satisfies Rule 23(b)(3) by showing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." As to

predominance, "[c]onsiderable overlap exists between the court's determination of commonality and a finding of predominance. A finding of commonality will likely satisfy a finding of predominance because, like commonality, predominance is found where there exists a common nucleus of operative facts." *Saltzman*, 257 F.R.D. at 484. In antitrust conspiracy cases such as this one, courts consistently find that common issues of the existence and scope of the conspiracy predominate over individual issues. *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 408 (S.D. Ohio 2007); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1039 (N.D. Miss. 1993) ("As a rule of thumb, a price fixing antitrust conspiracy model is generally regarded as well suited for class treatment."). This follows from the central nature of a conspiracy in such cases. *Hughes v. Baird & Warner, Inc.*, No. 76-CV-3929, 1980 WL 1894, at *3 (N.D. Ill. Aug. 20, 1980) ("Clearly, the existence of a conspiracy is the common issue in this case. That issue predominates over issues affecting only individual sellers."); *see also Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.").

In this case, issues common to the Class will predominate over any individual issues. In addition to the existence of the conspiracy itself, other predominant classwide issues include, for instance: (1) the role of each Defendant in the conspiracy; (2) whether Defendants' conduct violated Section 1 of the Sherman Act; (3) whether Defendants affirmatively concealed their agreement; (4) whether Defendants' conspiratorial conduct caused the prices of Broilers to be inflated; (5) the appropriate measure of monetary relief, including the appropriate measure of damages; and (6) whether Plaintiffs and Class members are entitled to declaratory and/or injunctive relief.

Plaintiffs must also show that a class action is superior to individual actions, which is evaluated by four considerations:

> (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of the class action.

Fed. R. Civ. P. 23(b)(3).

Here, any Class Member's interest in individually controlling the prosecution of separate claims is outweighed by the efficiency of the class mechanism. Thousands of entities purchased Broilers during the Class Period; settling these claims in the context of a class action conserves both judicial and private resources and hastens the Settlement Class members' recovery. Finally, while Plaintiffs see no management difficulties in this case, this consideration is not pertinent to approving a settlement class. *See Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.").

## VI.     THE COURT SHOULD APPROVE THE PROPOSED NOTICE PLAN

Rule 23(e) requires that prior to final approval, notice of a proposed settlement be given in a reasonable manner to all class members who would be bound by such a settlement. For a class proposed under Rule 23(b)(3), whether litigated or by virtue of a settlement, Rule 23(c)(2)(B) states:

> The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for

requesting exclusion; and (vii) the binding effect of a class judgment
on members under Rule 23(c)(3).

The form of notice is "adequate if it may be understood by the average class member." 4 NEWBERG

ON CLASS ACTIONS, § 11.53 (4th ed. 2002).

Notice to class members must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem*, 521 U.S. at 617 (quoting Fed. R. Civ. P. 23(c)(2)); *City of Greenville v. Syngenta Crop Prot.*, No. 3:10-CV-188, 2012 WL 1948153, at *4 (S.D. Ill. May 30, 2012) (same). Individual notice should be sent to members who can be identified through reasonable effort. Such notice may be by United States mail, electronic means, or other appropriate means. Fed. R. Civ. P. 23(c)(2)(B). Other members may be notified by publication. *City of Greenville*, 2012 WL 1948153 at *4.

As with the prior settlements, Plaintiffs respectfully request that the Court appoint JND Legal Administration, an experienced national class action notice provider and claims administrator, to administer the notice plan for the Settling Defendants. (*See* Order Approving Fieldale Notice Plan, ECF No. 980; Peco, George's and Amick Preliminary Approval Order, ECF No. 3394 (approving the proposed notice plan); *see also* Bruckner Decl. ¶ 20; Declaration of Jennifer Keough in Support of the Motion ("Keough Decl.") ¶¶ 1-8 and Exhibit "A.") The proposed notice plan in this case satisfies the requisite criteria, and this Court approved essentially identical plans in connection with the prior settlements. (*See* Order Approving Fieldale Notice Plan, ECF No. 980; Peco, George's and Amick Preliminary Approval Order, ECF No. 3394 (approving the proposed notice plan).) As in the prior approved settlements, DPPs propose to the Court a plan of notice that comports with due process and provides reasonable notice to known and reasonably identifiable customers of Defendants pursuant to Rule 23.

The class notice documents, consisting of the long form, email, and publication notices, as well as the claim form, comply with the requirements of Rule 23(c)(2)(B). (The proposed long form, email, and publication notices are attached to the Keough Decl. as Exhibits "B," "C," and "D," respectively; Claim Form and Purchase Audit Request form[10] are attached to the Keough Decl. as Exhibits "E" and "F," respectively.) The notice documents define the Settlement Class, describe the nature of the action, summarize the class claims, and explain the procedure for requesting exclusion from the Settlement Class and objecting to the proposed Settlements. The notice documents describe the terms of the Settlement Agreements, and inform the Settlement Class members that DPPs will move the Court to approve a plan to distribute net settlement proceeds to qualified class members, and award attorneys' fees (not to exceed 33⅓%), reimbursement of litigation expenses (not to exceed $4.5 million), and service awards to the named Class Representatives (not to exceed $25,000 per Class Representative).[11] The notice documents will provide the date, time, and place of the final approval hearing (once that hearing is set by the Court), and inform Settlement Class members that they do not need to enter an appearance through counsel, but may do so if they choose. The notice documents also inform Settlement Class members how to exercise their rights to participate in, opt out of, or object to the proposed Settlements, how to make informed decisions regarding the proposed Settlements, and tell Settlement Class members that the Settlements will be binding upon them if they do not opt out.

---

[10] The Purchase Audit Request form will be available to Settlement Class members on the Settlement Website should any claimant disagree with any of the pre-populated claim information provided on the Claim Form. The Purchase Audit Request form and any supporting documentation will then be reviewed by the Settlement Administrator and, if necessary, Class Counsel.

[11] The Settlements further provide for the use of up to $500,000 ($250,000 per Settling Defendant as authorized by the Settlement Agreements, § 6.c) of Settlement proceeds for the cost of notice without seeking further approval from the Court.

DPPs' proposed notice plan also comports with due process and Rule 23. The plan includes: (1) direct notice by U.S. mail or email to Settlement Class members who can be identified by reasonable effort, including but not limited to Defendants' customer lists; (2) publication of the summary notice in industry-related mailed and digital media; and (3) the posting of notice on the existing case website, http://www.broilerchickenantitrustlitigation.com. Since the Settlement Class members in this case directly purchased Broilers from Defendants, DPPs have obtained mailing addresses for the vast majority of Settlement Class members from Defendants' customer lists, and will rely predominantly on direct mail and email to Settlement Class members who can be identified through reasonable effort. Fed. R. Civ. P. 23(c)(2)(B). Class members will have pre-printed Claim Forms that will include calculated amounts for their Broiler purchases from each of the Defendants during the Class Period based on data produced by the Defendants. (*See* Keough Decl. ¶ 20.) Settlement Class members will have the opportunity to submit their Claim Forms via mail, email or using the Settlement Website. The Claim Forms allow Settlement Class members to submit documentation to correct their purchase amounts if they see fit.

JND will mail the long form notice and claim form via First-Class U.S. Mail to Settlement Class members who can be identified through Defendants' records. (*Id*. ¶¶ 17-19.) JND will also send the email notice to all Settlement Class members for whom email addresses are provided in the class list data. (*Id.* ¶¶ 21-22.) Settlement Class members for whom a physical mailing address and email address is provided will be sent both the mailed and emailed notices. (*Id*.) The email notice will provide Settlement Class members with an electronic link to the settlement website, where they can obtain more information including the long form notice and the Settlement Agreements and submit their claims. (*Id*.) The email notice will provide a personal Access Code that each Settlement Class Member can use to access their pre-populated online claim form. This

direct mail and email notice should reach the vast majority of Settlement Class members. (*Id.* ¶ 23.)

JND further plans to supplement the direct mail and email notice via publication notice. This will include both print and digital media components. Suggested print publications include *Progressive Grocer*, *Meat & Poultry*, *Poultry Times*, *Frozen & Refrigerated Buyer*, *Supermarket News*, and *Winsight Grocery Business/Grocery Headquarters*. (*Id.* ¶ 24.) The print ads are expected to be included in a single issue of each of the publications. Suggested digital media publications include *ProgressiveGrocer.com*, *MeatPoultry.com*, *PoultryTimes.com*, *SupermarketNews.com*, *Winsightgrocerybusiness.com*, *FastCasual.com* and *ShelbyReport.com*. (*Id.*)

JND will also host the settlement website, provide additional information and documents, allow Settlement Class members to request claim forms, establish a dedicated email address for class member inquiries, and provide a toll-free number for frequently asked questions and requests for further information. (*Id.* ¶¶ 25-29.) The website and call center agents will be available in both English and Spanish. (*See Id.*)

This notice plan, which was successfully implemented for the Fieldale, Peco, George's, and Amick settlements, satisfies Rules 23(c)(2) and 23(e) and constitutes the best notice practicable under the circumstances, and thus should be approved. *See City of Greenville*, 2012 WL 1948153, at *4 (quotation omitted); (Keough Decl. ¶ 30.)

## VII.  THE COURT SHOULD SCHEDULE A FINAL APPROVAL HEARING

The last step in the settlement approval process is the final approval hearing, at which the Court may hear all evidence necessary to evaluate the proposed Settlements. At that hearing, proponents of the Settlements may explain and describe their terms and conditions and offer

argument in support of the Settlements' approval, and members of the Settlement Class or their counsel may be heard regarding the proposed settlements if they choose. DPPs propose the following schedule of events necessary for a hearing on final approval of the Settlements:

| DATE | EVENT |
|---|---|
| Within 21 days after preliminary approval | Settlement Administrator to provide direct mail and email notice, and commence the publication notice plan |
| 45 days after the mailing of Notice | Plaintiffs to file their Motion for Attorneys' Fees, Costs, and Service Awards |
| 60 days after the mailing of Notice | Last day to request exclusion from the Settlement Class; and for Settlement Class members to file claims, challenge calculated purchase amounts, object to the Settlements, and file notices to appear at the Fairness Hearing |
| 14 days before Fairness Hearing | Class Counsel shall file with the Court a list of all persons and entities who have timely and adequately requested exclusion from the Settlement Class |
| 14 days before Fairness Hearing | Class Counsel shall file a motion for final approval of the Settlements and all supporting papers, and Class Counsel and the Settling Defendants may respond to any objections to the proposed Settlements |
| 30 days after last day to request exclusion from the Settlements[12] | Final Settlement Fairness Hearing |

## VIII.   CONCLUSION

For these reasons, Interim Co-Lead Counsel respectfully request that the Court preliminary approve the Pilgrim's and Tyson Settlement Agreements, preliminary certify the Settlement Class,

---

[12] Under the Class Action Fairness Act, 28 U.S.C. § 1715 ("CAFA"), the Court may not issue an order giving final approval of a proposed settlement earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with notice of these proposed Settlements. *Id.* at § 1715(d). Under each of the Settlement Agreements, within ten days of the filing of this motion, each Settling Defendant will serve upon the appropriate state officials and the appropriate federal official the CAFA notice required by Section 1715(b). This schedule will allow the Court to schedule a Fairness Hearing as DPPs propose in the schedule above, in conformance with CAFA's requirements.

appoint US Bank as the Escrow Agent, appoint and order JND Legal Administration to distribute

notice to the Settlement Class, and set a schedule for the final fairness hearing.

Date: February 2, 2021

_/s/ Steven A. Hart_

W. Joseph Bruckner (*Pro Hac Vice*)
Brian D. Clark (*Pro Hac Vice*)
Simeon A. Morbey (*Pro Hac Vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com

Clifford H. Pearson (*Pro Hac Vice*)
Daniel L. Warshaw (*Pro Hac Vice*)
Thomas J. Nolan (*Pro Hac Vice*)
Bobby Pouya (*Pro Hac Vice*)
Michael H. Pearson (*Pro Hac Vice*)
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
cpearson@pswlaw.com
dwarshaw@pswlaw.com
tnolan@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

Bruce L. Simon (*Pro Hac Vice*)
PEARSON SIMON & WARSHAW, LLP
350 Sansome Street, Suite 680
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com

*Direct Purchaser Plaintiffs Interim Co-Lead Class Counsel*

Steven A. Hart (#6211008)
Brian Eldridge (#6281336)
Kyle Pozan (#6306761)
HART MCLAUGHLIN & ELDRIDGE, LLC
22 West Washington Street, Suite 1600
Chicago, IL 60602
Telephone: (312) 955-0545
Facsimile: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com
kpozan@hmelegal.com

*Direct Purchaser Plaintiffs Liaison Counsel*