## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION* | Civil Action No. 1:16-cv-08637 |
| | Judge Thomas M. Durkin |
| THIS DOCUMENT RELATES TO: | Magistrate Judge Jeffrey T. Gilbert |
| All Direct Action Plaintiffs | **PUBLIC REDACTED VERSION** |

### DEFENDANTS' CONSOLIDATED ANSWER AND DEFENSES TO
### DIRECT ACTION PLAINTIFFS' AMENDED AND CONSOLIDATED COMPLAINT

Defendants Agri Stats, Inc. ("Agri Stats"); Amick Farms, LLC ("Amick Farms"), Case Foods, Inc., Case Farms, LLC, and Case Farms Processing, Inc. (collectively "Case"); Norman W. Fries, Inc. d/b/a Claxton Poultry Farms and a Defendant erroneously sued separately as "Claxton Poultry Farms, Inc." (collectively "Claxton"); Harrison Poultry, Inc. ("Harrison Poultry"); House of Raeford Farms, Inc. ("House of Raeford"); Fieldale Farms Corporation ("Fieldale"); Foster Farms, LLC and Foster Poultry Farms (collectively "Foster Farms"); George's Inc. and George's Farms, Inc. (collectively "George's"); Koch Foods Incorporated, JCG Foods of Alabama LLC, JCG Foods of Georgia LLC and Koch Meat Co., Inc. (collectively "Koch"); Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, Mar-Jac Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-Jac Poultry, LLC and Mar-Jac Holdings, Inc. (collectively "Mar-Jac"); Mountaire Farms Inc., Mountaire Farms, LLC, and Mountaire Farms of Delaware, Inc. (collectively "Mountaire"); Peco Foods, Inc. ("Peco"); O.K. Foods, Inc., O.K. Farms, Inc. and O.K. Industries, Inc. (collectively "O.K. Foods"); Perdue Farms, Inc. and Perdue Foods LLC (collectively "Perdue"); Pilgrim's Pride Corporation ("Pilgrim's"); Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division), and Sanderson Farms, Inc. (Processing Division) (collectively

1

"Sanderson Farms"); Simmons Foods, Inc. and Simmons Prepared Foods, Inc. (collectively "Simmons"); Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., Tyson Poultry, Inc., Keystone Foods LLC, Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group – Georgia Division LLC (collectively "Tyson"); and Wayne Farms LLC ("Wayne Farms") answer and set forth their affirmative defenses to Direct Action Plaintiffs' ("Plaintiffs") Amended Consolidated Complaint ("Complaint") as follows.[1] Defendants deny each and every allegation in Plaintiffs' Complaint except as expressly admitted below.

## I.     INTRODUCTION[2]

*Pursuant to this Court's orders to file "a consolidated complaint" [ECF Nos. 3778, 3653, 3525] that "will contain all the allegations all the Direct-Action Plaintiffs make against all Defendants, and will function as an amendment to some of the complaints" [ECF No. 3526 at n.2], Direct Action Plaintiffs ("DAPs" or "Plaintiffs")[1] submit this compilation of the allegations of the various DAP complaints filed as of October 21, 2020.[2] DAPs have attempted to set forth here all material factual allegations in each DAP's complaint and have listed each Plaintiff's (i) claims, (ii) defendants whom it has sued, (iii) and named Co-Conspirators.*

*DAPs filed the original consolidated complaint [ECF Nos. 3924, 3922], and this amended consolidated complaint, in accordance with the Court's direction, "to streamline the pleadings so that there is only one complaint and one answer on the docket for the Court and parties to reference, rather than over 100 separate direct-action complaints." [ECF No. 4139 at 5] As the Court has explained, "the purpose of the consolidated complaint is not to force any individual plaintiff to concede or make any allegation or claim." Id.*

---

[1] For the purposes of this Consolidated Answer, all denials and admissions on behalf of "Defendants" are answers only by the Defendants named by each DAP and, for each count, only by the Defendants named in that Count. To distinguish Agri Stats from other Defendants who actually produced broiler chicken, answers on behalf of "Producer Defendants" do not include Agri Stats. "Producer Defendants" refers to any Defendant family that produces broiler chicken without specifying which entity within that family produces broiler chicken, and without conceding that they all do. Where one or more specific Defendant entities are referred to collectively, answers on behalf of the collective entity are on behalf of at least one, but not necessarily all, of the included Defendant entities.

[2] Defendants include DAPs' headers and introductory clauses to complaint paragraphs for the convenience of the Court. These headers contain no factual allegations to which a response is required. To the extent a response is required, Defendants deny all factual allegations contained in Plaintiffs' headers and introductory clauses to complaint paragraphs.

*Where multiple DAPs allege similar factual allegations but do not use identical language in making those allegations, this pleading lists the factual allegation once rather than reproducing multiple iterations of similar factual allegations. Because of differences in the underlying DAP complaints, certain factual allegations may only relate or be material to the claims of certain DAPs, but all factual allegations have nonetheless been included in the combined factual recitation pursuant to this Court's orders. DAPs join in the factual allegations made in this pleading only to the extent consistent with their individual claims, and do not necessarily adopt the allegations, theories or legal positions of other DAPs.*

*Although this document compiles the factual allegations, DAPs have abided by the Court's order [ECF No. 3778] that "the parties are prohibited from using the preparation of consolidated pleadings as a vehicle for amending their pleadings." See also ECF No. 4139 at 5-6. DAPs understand the Court's orders to preserve the independent legal existence of each DAP case.*

*The submission of this consolidated complaint should not be construed as a waiver or relinquishment of any DAP's rights, including the due-process right to proceed outside of the putative class in this case and to prosecute claims separately in a direct action with counsel of each DAP's choosing. DAPs have not filed identical complaints and, in many instances, have sued different defendants and asserted different claims. [3] By compiling the factual allegations and claims from the various complaints pursuant to this Court's order, DAPs do not concede that consolidation beyond that permitted by the Federal Rules of Civil Procedure would be proper, especially for trial.[4]*

*This Complaint is organized as follows: Section II sets out a chart identifying each Plaintiff and (1) the docket number on the consolidated docket for the DAP operative complaint, (2) the Defendants named in the DAP complaint (if a Plaintiff has dismissed a Defendant, that Defendant is no longer listed in the Defendant column but in the named co-conspirator column), (3) the co-conspirators named in the DAP complaint, and (4) the causes of action asserted in the DAP complaint (and the Counts in this pleading that correspond with the causes of action in the individual DAP complaint). Sections III through X set out the factual allegations. Section XI states all of the causes of action asserted by any DAP in its respective complaint.*

*FN 1: Given the consolidated nature of this complaint, the plural usage of the term "Plaintiffs" is used throughout to generally describe one or more DAP but should not be construed to necessarily refer to all DAPs for purposes of all factual allegations or legal causes of action as explained infra in this document.*

*FN 2: DAPs objected to filing a consolidated complaint [ECF No. 3625], and maintain those objections for all purposes, including any appeals.*

*FN 3: For example, some DAPs chose not to sue certain Defendants sued by other DAPs. Some DAPs' claims are based in whole or in part on the Georgia Dock Price Index in their supply agreements with certain Defendants; others are not. Some DAPs asserted state-law claims that are specific to their particular geographic*

*locations; others did not. Some DAPs decided to include RICO claims in their complaint; many did not. Many DAPs filed only Sherman Act claims. Others included state law claims, and some include indirect purchaser claims in their complaints. Each DAP has performed its legal analysis of the causes of action applicable to it based on the facts specific to each DAP.*

*FN 4: In submitting this pleading, DAPs continue to maintain their "separate legal existence" and object to any loss of their individual due process rights. In re Fluidmaster, 149 F.Supp.3d 940, 947 (N.D. Ill. 2016) (quoting In re Refrigerant Compressors Antitrust Litig., 731 F.3d 586, 590-91 (6th Cir. 2013)); In re Zimmer Nexgen Knee Implant Prods. Liab. Litig., MDL 2272, 2012 WL 3582708, at \*3 (N.D. Ill. Aug. 16, 2012) (collecting cases that state that "a master or consolidated complaint is a procedural device used to promote judicial efficiency and economy, not to be given the same effect as an ordinary complaint or considered to merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another.") (internal quotation marks omitted).*

**ANSWER:** DAPs' "Introduction" contains no factual allegations to which a response is required. Instead, it contains DAPs' legal conclusions and characterizations of this action, including their interpretation of orders of this Court and legal argument related to the scope and propriety of those orders. To the extent a response is required, Defendants deny all allegations in the Introduction, including those in the accompanying Footnotes.

## II.    CHART OF DIRECT ACTION PLAINTIFF CASES

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Affiliated Foods, Inc. | ECF 577-1 | Agri Stats; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | N/A | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Alex Lee, Inc./Merchants Distributors, LLC | ECF 577-1 | Agri Stats; Claxton; Fieldale; Foster Farms; George's; Harrison; House of | N/A | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for |

4

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Associated Grocers of New England, Inc. | ECF 577-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Big Y Foods, Inc. | ECF 577-1 | Agri Stats; Case Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Fareway Stores, Inc. | ECF 577-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Piggly Wiggly Alabama Distributing Co., Inc. | ECF 577-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Woodman's Food Market, Inc. | ECF 577-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Winn-Dixie Stores, Inc. | ECF 2143 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14- 4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO); Count VII (Conspiracy to Defraud Against the GA Dock Defendants); Count VIII (Fraud Against the GA Dock Defendants); Count IX (Negligent Misrepresentation Against the GA Dock Defendants); Count X (Violation of FDUTPA Against Sanderson); |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | | | Count XI (Breach of Contract Against Sanderson); Count XII (Breach of Fair Dealing Against Sanderson); Count XIII (Unjust Enrichment Against Sanderson) |
| Bi-Lo Holdings, LLC | ECF 2143 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO); Count VII (Conspiracy to Defraud Against the GA Dock Defendants); Count VIII (Fraud Against the GA Dock Defendants); Count IX (Negligent Misrepresentation Against the GA Dock Defendants); Count X (Violation of FDUTPA Against Sanderson); Count XI (Breach of Contract Against Sanderson); Count XII (Breach of Fair Dealing Against Sanderson); Count XIII (Unjust Enrichment Against Sanderson) |
| Sysco Corporation | ECF 4151; 4159 | Agri Stats; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; | Fieldale; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); |

7

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Case; Keystone; Rabobank | | Count III (Sherman Act for GA Dock Manipulation) |
| US Foods, Inc. | ECF 4153; 4160 | Agri Stats; Claxton; Fieldale; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Case; Keystone; Rabobank | George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Action Meat Distributors, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Associated Foods Stores, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Bashas' Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Certco, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Ira Higdon Grocery Company, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Nicholas & Co., Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Pacific Food Distributors, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; | Amick | Count II (Sherman Act Claim for Output Restriction); Count III |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Troyer Foods, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-4-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| URM Stores, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Weinstein Wholesale Meats, Inc. | ECF 936-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Associated Wholesale Grocers, Inc., as to its own claims, as well as the claims assigned to it by Affiliated Foods Midwest Cooperative, Inc. | ECF 2092 | Agri Stats; Case; Claxton; Foster Farms; Harrison; Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Perdue; Pilgrim's; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Amick; George's; Peco Foods; Defendant Family Co-Conspirators | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-144(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO); Count XIV (Violation of the Wisconsin Antitrust Act); Count XV (Violation of the Tennessee Antitrust Act). |
| Jetro Holdings, LLC | ECF 2130 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Associated Grocers of the South, Inc. | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614- |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | | | 4(b)); Count VI (Federal RICO) |
| Meijer, Inc./Meijer Distribution, Inc. | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| OSI Restaurant Partners, LLC | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Publix Super Markets, Inc. | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| SuperValu Inc. | ECF 2096 | Agri Stats; Case; Claxton; Foster | Amick; Fieldale | Count I (Sherman Act Claim for all |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| Unified Grocers, Inc. | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Associated Grocers of Florida, Inc. | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| Wakefern Food Corporation | ECF 2096 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| The Kroger Co. | ECF 2106 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| Hy-Vee, Inc. | ECF 2106 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| Albertsons Companies, Inc. | ECF 2106 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| Ahold Delhaize USA, Inc. | ECF 2100 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO); Count XVI (Common Law Fraud Against all GA Dock Defendants); Count XVII (Breach of the Covenant of Good Faith and Fair Dealing Against all GA Dock Defendants); Count XVIII (Negligent Misrepresentation, Pled in the Alternative to Count XXI); Count XIX (Unjust Enrichment by the GA Dock Defendants) |
| Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc. | ECF 1134-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Colorado Boxed Beef Co. | ECF 1134-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| King Solomon Foods, Inc. | ECF 1134-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| W. Lee Flowers & Company, Inc. | ECF 1132-1 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count XX (Violation of S.C. CODE ANN §§ 39-3-10); Count XXI (Violation of S.C. CODE ANN §§ 39-5-10); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| BJ's Wholesale Club, Inc. | ECF 2125 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Maximum Quality Foods, Inc. | ECF 2134 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Mar-Jac; O.K. Foods; Peco; Simmons; Tyson | Allen Harim; Amick; Keystone Foods; Koch; Mountaire; Perdue; Pilgrim's Pride; Sanderson; Wayne | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| United Supermarkets, LLC | ECF 2115 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Krispy Krunchy Foods, LLC | ECF 2115 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Cheney Bros., Inc. | ECF 2115 | Agri Stats; Amick; Case; Claxton; | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Shamrock Foods Company | ECF 2110 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Defendant Family Co-Conspirators | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| United Food Service, Inc. | ECF 2110 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Defendant Family Co-Conspirators | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Quirch Foods, LLC, f/k/a Quirch Foods Co. | ECF 1519-1 | Agri Stats; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Sherwood Food Distributors, L.L.C. | ECF 2135 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; | Allen Harim; Keystone Foods; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Harvest Meat Company, Inc. | ECF 2135 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Western Boxed Meat Distributors, Inc. | ECF 2135 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Hamilton Meat, LLC | ECF 2135 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Hooters of America, LLC | ECF 2109 | House of Raeford; Mar-Jac; Perdue; Pilgrim's Pride; Tyson | Agri Stats; Allen Harim; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; Keystone | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | | Foods; Koch; Mountaire; O.K. Foods; Peco; Sanderson; Simmons; Wayne | in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Darden Restaurants, Inc. | ECF 2126 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Associated Grocers, Inc. | ECF 1 in 19-cv-638 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale; Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Brookshire Grocery Company | ECF 1 in 19-cv-638 | Agri Stats; Case; Claxton; Foster Farms; Fieldale; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Schnuck Markets, Inc. | ECF 1 in 19-cv-638 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; | Fieldale; Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16- |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | 14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Checkers Drive-In Restaurants, Inc. | ECF 2113 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXII (Violation of FDUTPA) |
| Conagra Brands, Inc. | ECF 2264 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | Count I (Sherman Act Claim for all Anticompetitive Conduct); |
| Pinnacle Foods, Inc. | ECF 2264 | Agri Stats; Case; Claxton;; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); |
| Kraft Heinz Foods Company | ECF 2264 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; | Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | |
| Nestlé USA, Inc. | ECF 2264 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Nestlé Purina PetCare Company | ECF 2264 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Giant Eagle, Inc. | ECF 1 in 19-cv-2758 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale; Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act Claim for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Save Mart Supermarkets | ECF 2163 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; | Amick; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for |

22

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Simmons; Tyson; Wayne | | GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| Walmart Inc. | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Wal-Mart Stores East, LP | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Wal-Mart Stores Arkansas, LLC | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Wal-Mart Stores Texas, LLC | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Wal-Mart Louisiana, LLC | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Sam's West, Inc. | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Sam's East, Inc. | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Wayne | N/A | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Services Group of America, Inc. | ECF 2274-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Restaurants of America, Inc. | ECF 3068 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [ROA seeks injunctive and equitable relief in Counts I, II, and III; ROA seeks damages except against Fieldale |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXIII (Violation of Arizona's Antitrust Act); Count XXV (Violation of the Minn. Antitrust Law); Count XXVI (Violation of New Mexico Antitrust Act); Count XXIX (Violation of the Minn. Consumer Fraud Act); Count XXX (Violation of New Mexico Unfair Practices Act); Count L (Unjust Enrichment) [Arizona, Minnesota, New Mexico] |
| LTP Management Group, Inc. | ECF 3068 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [LTP seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXII (Violation of FDUTPA); Count L (Unjust Enrichment) [Florida] |
| Gibson, Greco & Wood, LTD | ECF 3068 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [GGW seeks injunctive and equitable relief in Counts I, II, and |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | III; GGW seeks damages except against Fieldale in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Hooters Management Corporation | ECF 3068 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [HMC seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXII (Violation of FDUTPA); Count XXIV (Violation of Illinois Antitrust Act); Count XXVII (Violation of NY General Business Law); Count XXVIII (Violation of the Illinois Fraud Act); Count L (Unjust Enrichment) [Florida, Illinois] |
| Anaheim Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Anaheim Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | | | Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Gaslamp Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Gaslamp Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Mission Valley Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Mission Valley Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count |

27

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | | | XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Oceanside Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Oceanside Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Costa Mesa Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Costa Mesa Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | | | California's UCL); Count L (Unjust Enrichment) [California] |
| Rancho Bernardo Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct); ) [Rancho Bernardo Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Ontario Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Ontario Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Hollywood Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Hollywood Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| South Gate Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [South Gate Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Wings Over Long Beach, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Wings Over |

30

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | Long Beach seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Bonita Plaza Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Bonita Plaza Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Downtown Wings, LLC | ECF 3066 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; | Allen Harim; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct) [Downtown Wings seeks injunctive and equitable relief only in Counts I, II, and III]; Count II (Sherman Act |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count L (Unjust Enrichment) [California] |
| Amigos Meat Distributors, LP | ECF 3074-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Amigos Meat & Poultry, LLC | ECF 3074-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); |
| Amigos Meat Distributors East LP | ECF 3074-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | | | Pled in the Alternative to Count I); |
| Amigos Meat Distributors West, LP | ECF 3074-1 | Agri Stats;; Case; Claxton; Foster Farms;; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); |
| PJ Food Service, Inc. | ECF 3086-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Fieldale; Keystone; Amick | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| The Golub Corporation | ECF 3214-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale; Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| Latina Boulevard Foods, LLC | ECF 3214-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale; Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| The Distribution Group, Inc. | ECF 3214-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale; Amick | Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| El Pollo Loco, Inc. | ECF 3547-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; Keystone Foods | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| Independent Purchasing Cooperative, Inc. | ECF 3717 | Agri Stats; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne[3] | Allen Harim; Fieldale | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Kraft Heinz Foods | ECF 3572 | Amick, Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; | Keystone Foods; Fieldale Farms | Count I (Sherman Act Claim for all Anticompetitive Conduct) |

[3] The Parties agree that the Court's February 26, 2021 Order (Dkt. 4346) amended the Complaint by interlineation to include Amick Farms and Case in the list of Defendants sued by Independent Purchasing Cooperative.

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | |
| Barbecue Integrated, Inc. (d/b/a/ Smokey Bones, Inc.) | ECF 3656-1 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Defendant Family Co-Conspirators | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| The Johnny Rockets Group, Inc. | ECF 3660 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Defendant Family Co-Conspirators | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count XXIII (Violation of Arizona Antitrust Law); Count XXXIII (Violation of Alabama Antitrust Law); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count XXXIV (Violation of Colorado Consumer Protection Act); Count XXXV (Violation of District of Columbia Antitrust Act); Count XXII (Violation of FDUTPA); Count XXXVI (Violation of Hawaii Antitrust Law); Count XXIV (Violation of Illinois Antitrust Act); Count XXVIII (Violation of the Illinois Fraud Act); Count XXXVII (Violation of Maine Antitrust Act); Count XXXVIII (Violation of Michigan |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | | | Antitrust Act); Count XXV (Violation of Minnesota Antitrust Law); Count XXIX (Violation of Minnesota Consumer Fraud Act); Count XXXIX (Violation of Missouri Merchandising Practices Act); Count XL (Violation of Nevada Unfair Trade Practices Act); Count XLI (Violation of Nevada Deceptive Trade Practices Act); Count XXVI (Violation of New Mexico Antitrust Act); Count XXX (Violation of New Mexico Unfair Practices Act); Count XXVII (Violation of NY General Business Law); Count XLII (Violation of North Carolina Unfair Trade Act); Count XLIII (Violation of the Rhode Island Antitrust Act); Count LVII (Violation of S.C. CODE ANN §§ 39-5- 10); Count XLIV (Violation of the Utah Antitrust Act); Count XLV(Violation of the Virginia Consumer Protection Act); Count LI (Violation of the Tennessee Antitrust Act); Count LII (Violation of the Wisconsin Antitrust Act) |
| FIC Restaurants, Inc. (d/b/a Friendly's) | ECF 3658-1 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; | Allen Harim; Keystone Foods; Defendant Family Co-Conspirators | Count I (Sherman Act Claim for all Anticompetitive Conduct) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | | |
| Boston Market Corporation | ECF 3654-1 | Agri Stats; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Defendant Family Co-Conspirators | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count XXIII (Violation of Arizona Antitrust Law); Count XXXI (Violation of California's Cartwright Act); Count XXXII (Violation of California's UCL); Count XXXIV (Violation of Colorado Consumer Protection Act); Count XXXV (Violation of District of Columbia Antitrust Act); Count XXII (Violation of FDUTPA); Count XXIV (Violation of Illinois Antitrust Act); Count XXVIII (Violation of the Illinois Fraud Act); Count XLVI (Violation of Kansas Antitrust Act); Count XXXVIII (Violation of Michigan Antitrust Act); Count XXV (Violation of Minnesota Antitrust Law); Count XXIX (Violation of Minnesota Consumer Fraud Act); Count XXXIX (Violation of Missouri Merchandising Practices Act); Count XLVII (Violation of Nebraska Junkin Act); Count XLVIII (Violation of the Nebraska Consumer Protection Act); Count XLIX (Violation of New Hampshire Antitrust Act); Count XL |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | | | (Violation of Nevada Unfair Trade Practices Act); Count XLI (Violation of Nevada Deceptive Trade Practices Act); Count XXVI (Violation of New Mexico Antitrust Act); Count XXX (Violation of New Mexico Unfair Practices Act); Count XXVII (Violation of NY General Business Law); Count XLII (Violation of North Carolina Unfair Trade Act); Count XLIII (Violation of the Rhode Island Antitrust Act); Count LVII (Violation of S.C. CODE ANN §§ 39-510); Count XLV (Violation of the Virginia Consumer Protection Act); Count LII (Violation of the Wisconsin Antitrust Act) |
| Bob Evans Farms, Inc. | ECF 3818-1 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Keystone Foods; Fieldale Farms | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| The Fresh Market, Inc. | ECF 3819-1 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue; Pilgrim's | Allen Harim; Keystone Foods; Fieldale Farms | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Pride; Sanderson Farms; Simmons; Tyson; Wayne Farms | | GA Dock Manipulation, Pled in the Alternative to Count I) |
| Wawa, Inc. | ECF 3820-1 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Keystone Foods; Fieldale Farms | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I) |
| White Castle Purchasing Co. | ECF 3871 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Marshall Durbin | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Captain D's LLC | ECF 3912-1 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Marshall Durbin | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Cracker Barrel Old Country Store, Inc. and CBOCS Distribution, Inc. | ECF 3889 | Agri Stats;; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; | Allen Harim; Keystone Foods; Marshall Durbin; Amick; Georges; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Simmons; Tyson; Wayne | | |
| Golden Corral Corporation | ECF 3873 | Claxton; Pilgrim's Pride; George's | Allen Harim; Keystone Foods; Marshall Durbin; Agri Stats; Amick; Case; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Count I (Sherman Act Claim for all Anticompetitive Conduct) |
| Brookshire Brothers, Inc. | ECF 3906 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Peco; Tip Top; Southern Hens; Rabobank | Count I (Sherman Act Claim for All Anticompetitive Conduct); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| SpartanNash Company | ECF 3906 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Peco; Tip Top; Southern Hens; Rabobank | Count I (Sherman Act Claim for All Anticompetitive Conduct); Count III (Sherman Act for GA Dock Manipulation); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 16-14-4(b)); Count VI (Federal RICO) |
| WZ Franchise Corporation | ECF 3831-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Sanderson; Simmons; Tyson; Wayne | Amick | Count I (Sherman Act Claim for All Anticompetitive Conduct) |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| EMA Foods Co., LLC | ECF 1 in 1:20- cv-06347 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Rabobank; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct; Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) |
| L. Hart, Inc. | ECF 1 in 1:20- cv-06347 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Rabobank; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) |
| R & D Marketing, LLC | ECF 1 in 1:20- cv-06347 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Rabobank; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) |
| Timber Lake Foods, Inc. | ECF 1 in 1:20- cv-06347 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Rabobank; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) |
| Campbell Soup | ECF 4191 | Agri Stats; Case; Claxton; Foster | Fieldale; George's; Peco | Count I (Sherman Act Claim for all |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Company; Campbell Soup Supply Company, L.L.C.; Pacific Foods of Oregon | | Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaine; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Rabobank | | Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| ALDI, Inc. | ECF 4056 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Marshall Durbin; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| Chick-fil-A, Inc. | ECF 4237 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Marshall Durbin; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count XLIX (Sherman Act Claim for Bid Rigging, Pled in the Alternative to Count I)[4] |
| Target Corporation | ECF 4193 | Agri Stats; Case; Claxton; Foster Farms; Harrison; | Amick; Fieldale; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive |

---

[4] This Count has been dismissed as against Simmons (Dkt. 4319).

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Rabobank | | Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Carl Buddig & Co. | Dkt No. 1 Case No: 1:20-cv-07419 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford Farms; JCG Foods; Mar-Jac Poultry; Mountaire; Koch Foods; O.K. Foods; Pilgrim; Perdue; Simmons; Tyson; Tyson Sales and Distribution, Inc.; Wayne Farms | Allen Harim Foods; Keystone Foods; Fieldale Farms; Amick Farms; Peco Foods; George's Farms | Count I (Sherman Act); Count II (Sherman Act for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count XXIV (Illinois Antitrust Act); Count XXVIII (Illinois Consumer Fraud And Deceptive Business Practices Act) |
| Caesars Enterprise Services, LLC | Dkt No. 1 Case No: 1:20-cv-07423 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford Farms; JCG Foods; Mar-Jac Poultry; Mountaire; Koch Foods; O.K. Foods; Pilgrim; Perdue; Simmons; Tyson; Tyson Sales and Distribution, Inc.; Wayne Farms | Allen Harim Foods; Keystone Foods; Fieldale Farms; Amick Farms; Peco Foods; George's Farms | Count I (Sherman Act); Count II (Sherman Act for Output Restriction); Count III (Sherman Act for GA Dock Manipulation); Count X (Florida DUTPA); Count XVI (Fraud); Count XXIII (AZ State Antitrust Law); Count XXIV (Illinois Antitrust Act); Count XXVIII (Illinois Consumer Fraud And Deceptive Business Practices Act); Count XXVII (NY Gen. Bus. Law); Count XXXI (CA Cartwright Act); Count XXXII (CA UCL); Count XXXVIII (Michigan Antitrust Reform Act); Count XXXIX (Missouri Merchandising Practices); Count XL (Nev. UTPA); Count XLI (Nev. DTPA); XLII (NC Unfair Trade and Bus. Prac. Act); Count |

43

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | | | XLVI (Kansas Restraint of Trade Act); Count XLVII (Nebraska Junkin Act); Count LVI (Breach of Contract Unjust Enrichment) |
| Bojangles' Restaurants, Inc. and Bojangles Opco, LLC | ECF 1 in 1:20- cv-07734 | Claxton; Mar-Jac; George's; Agri Stats; Amick; Case; Foster Farms; Harrison; House of Raeford, Peco; Koch; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride, Sanderson; Simmons; Tyson, Wayne | Allen Harim; Keystone Foods; Marshall Durbin | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count XXII (Florida); Count XXIV (Illinois Antitrust Act); Count XXVIII (Illinois Fraud Act); Count XXXIII (Alabama); Count XLII (North Carolina); Count LVII (South Carolina); Count LI (Tennessee); Count XLV(Virginia); Count XXXV (DC) |
| Pollo Operations, Inc | ECF 4227 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Marshall Durbin; Peco, Tip Top Poultry, Southern Hens, Rabobank | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count L (Sherman Act Claim for Bid Rigging, Pled in the Alternative to Count I) |
| McLane Company, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | | | RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| McLane/Mid-Atlantic, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| McLane/ Midwest, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| McLane Minnesota, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16- |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Fieldale; George's; Peco Rabobank | | 14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| McLane New Jersey, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| McLane/ Eastern, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| McLane/ Suneast, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Fieldale; George's; Peco Rabobank | | (GA RICO Based on 16-14-(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| McLane Ohio, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I);Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| McLane/ Southern, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I);Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| McLane/ Western, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I);Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Wayne; Amick; Fieldale; George's; Peco Rabobank | | to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| McLane Express, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| Kinexo, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| McLane Foodservice Distribution, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens; | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) Count III (Sherman Act Claim for GA Dock Manipulation, |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | | Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based on 1614-4(b)); Count VI (Federal RICO) |
| McLane Foodservice, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Amick; Fieldale; George's; Peco Rabobank | Allen Harim; Marshall Durbin; Defendant Family Co-Conspirators; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count IV (GA RICO Based on 16-14-4(a)); Count V (GA RICO Based 1614-4(b)); Count VI (Federal RICO) |
| John Soules Foods, Inc. and John Soules Acquisitions LLC | ECF 4192 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Rabobank | Amick; Fieldale; George's; Peco | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction); Count III (Sherman Act for GA Dock Manipulation) |
| Red Bird Farms Distribution Company | ECF 1 in 1:21- cv-00261 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's; Rabobank; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Tip Top; Southern Hens | Count I (Sherman Act Claim for all Anticompetitive Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) |
| Restaurant Services, Inc. | ECF 4180 | Agri Stats; Amick; Case; Claxton; Foster Farms; | Allen Harim; Fieldale Farms | Count I (Sherman Act Claim for all Anticompetitive |

| Plaintiff Name | Operative Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| | | George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson Farms; Simmons; Tyson; Wayne Farms | | Conduct); Count II (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count III (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count LV (Sherman Act Claim for Bid Rigging, Pled in the Alternative to Count I) |
| Zaxby's Franchising LLC | ECF 1:21-cv-00486 | Claxton; Mar-Jac; Agri Stats; Case; Foster Farms; Harrison; House of Raeford; Koch; Mountaine; O.K. Foods; Perdue; Pilgrim's Pride, Sanderson, Simmons; Tyson; Wayne | Amick; George's; Peco; Fieldale; Allen Harim; Keystone Foods; Marshall Durbin | Count I (Sherman Act Claim for all Anticompetitive Conduct) |

**ANSWER:** Plaintiffs' "Chart of Direct Action Plaintiffs Cases" contains no factual allegations to which a response is required. Instead, this chart contains Plaintiffs' characterizations of named parties and claims included in more than 50 complaints filed by more than 140 DAPs or groups of DAPs. To the extent a response is required, Defendants admit that Plaintiffs purport to bring their actions against Defendants under various legal theories, but deny that Plaintiffs accurately state those claims and/or are entitled to any of the requested relief. Defendants further deny each statement in the Chart that purports to describe a Claim or Count of the Complaint as being asserted against a Defendant that is not named in the specific allegations of such Count. Defendants deny any remaining allegations in the Plaintiffs' chart.

### III. SUMMARY OF DAP FACTUAL ALLEGATIONS

**A.** **Overview of the Broiler Industry**

*1. This is a case about how some of America's chicken producers reached illegal agreements and restrained trade beginning at least as early as 2008 through at least early 2019. Through those unlawful agreements, and other anticompetitive actions, Defendants and their co- conspirators conducted a long-running conspiracy to restrain production, manipulate price indices, fix prices, and rig bids, the purpose and effect of which was to fix, raise, stabilize, and maintain prices of chicken meat throughout the United States.*

**ANSWER:**  To the extent the allegations in Paragraph 1 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer the second sentence of Paragraph 1 at this time.  Defendants deny the remaining allegations in Paragraph 1.

*2. Defendants' restraint of trade was multi-faceted and involved many overt acts. They focused on the distribution chain by reducing the supply of broiler chickens into the market. They also rigged bids on broiler chicken sales. They also focused on the end of the distribution chain by manipulating both individual customer price matrixes as well as an industry price index – specifically, the Georgia Dock price index – with respect to the prices of chicken they sold to purchasers such as Plaintiffs. Defendants all had the common objective of disrupting free market competition to harm Plaintiffs.*

**ANSWER:**  To the extent the allegations in Paragraph 2 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer the third sentence of Paragraph 2 at this time. Defendants deny the remaining allegations in Paragraph 2.

*3. Four of the participants in the alleged conspiracy – Fieldale Farms, Peco, George's, and Amick – have already agreed to pay millions to settle claims by a putative class of direct purchasers alleging that they participated in this conspiracy. At least*

*Fieldale Farms and Amick have entered into confidential settlement agreements with various DAPs who have filed their own separate lawsuits against Defendants.*

**ANSWER:**  Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy.[5]  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 3 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 3 to the extent that they relate to other Defendants and/or third parties.  Defendants admit that Fieldale, Peco, George's, and Amick Farms have reached settlements with a putative class of direct purchasers, which have been approved by the Court.   To the extent the allegations in Paragraph 3 characterize those settlement agreements, Defendants deny any characterization or description that is inconsistent with the referenced sources.   Defendants other than Fieldale and Amick Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 3 and therefore deny them.  Fieldale admits that it has entered into confidential settlement agreements with some DAPs but states that it did so in the interests of avoiding the risk and uncertainty of continued litigation and that Fieldale also denies any liability or wrongdoing.  Amick Farms admits that it has entered into confidential settlement agreements with some DAPs, but the settlements do not reflect any admission of liability or wrongdoing.

4.     *Senior executives from at least five of the Defendants are already under criminal indictment by the United States Department of Justice in connection with their*

---

[5] For the avoidance of doubt, all references to "Plaintiffs' alleged conspiracy" do not include allegations that have been stayed pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835).

*roles in the conspiracy, and the Department of Justice also made clear that its investigation is ongoing.*

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer the allegations in Paragraph 4 at this time.

> 5.      *"Broilers," "chickens," or "broiler chickens" are "chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards." See November 20, 2017 Memorandum Opinion and Order (ECF No. 541) at 2–3. Broiler chickens constitute approximately 98% of all chicken meat sold in the United States. The broiler industry is a highly concentrated market with over $30 billion in annual wholesale revenue.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 5 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 5 to the extent that they relate to other Defendants and/or third parties.  The first sentence of Paragraph 5 contains Plaintiffs' explanation of a defined term used in their Complaint, to which no response is required. To the extent a response is required, Defendants admit that Plaintiffs have defined "Broilers" in their Complaint as described in the first sentence of Paragraph 5.  Defendants admit that Broilers[6] constitute a substantial portion of all chicken meat sold in the United States, but lack knowledge or information sufficient to form a belief as to the precise percentage alleged in the second sentence of Paragraph 5 and therefore deny them.  Defendants deny the allegation that the "broiler industry is a highly concentrated market," and lack knowledge or information sufficient to form a belief as to the precise dollar amount of annual wholesale revenue alleged in the third sentence of Paragraph 5 and therefore deny them.   Defendants deny any remaining allegations in Paragraph 5.

---

[6] To the extent Defendants refer to "Broilers" in this Answer, Defendants refer to Broilers as defined by Plaintiffs in the Complaint.

6. *Defendants own or tightly control all aspects of broiler chicken production, including the laying of eggs; the hatching of chicks; the raising of chicks; the slaughtering of chickens; and processing and distributing the meat. The technology and process of industrial-scale broiler chicken production is well known among Defendants, and all Defendants use the same types of equipment and processes.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 6 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 6 to the extent that they relate to other Defendants and/or third parties. The Producer Defendants admit that they have ownership and control over aspects of their respective production, including processing and selling. As the term "tightly control" in the first sentence of Paragraph 6 is imprecise, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in that sentence and therefore deny them. Defendants deny any remaining allegations in Paragraph 6.

7. *High barriers to entry exist in the broiler chicken market. Entry into the market would cost in excess of $100 million, and no company has created a new poultry company from scratch in decades.*

**ANSWER:** As the term "high barriers" is imprecise, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7 and therefore deny them. To the extent that the allegations in Paragraph 7 relate to barriers or costs that third parties would face in entering the Broiler market, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations and therefore deny them. Defendants deny any remaining allegations in Paragraph 7.

## B. Summary of Defendants' Conspiracy

8. *Defendants used multiple means to sustain their conspiracy/conspiracies. For example, they focused on the distribution chain by reducing the supply of broiler chickens into the market. Defendants coordinated to monitor each others' supply and purposefully destroyed breeder hens and eggs to achieve these artificial decreases in broiler supply. They also focused on the end of the distribution chain by manipulating both individual customer price matrixes as well as an industry price index – specifically, the Georgia Dock price index – with respect to the prices of chicken they sold to purchasers*

*such as Plaintiffs. Defendants also rigged bids on broiler chicken sales. While Defendants may have utilized multiple avenues, they all had the common objective of disrupting free market competition to harm Plaintiffs.*

**ANSWER:**  Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. To the extent the allegations in Paragraph 8 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer the fifth sentence of Paragraph 8 at this time.  Defendants deny the remaining allegations in Paragraph 8.

9.  *"Plus factors" are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms that are generally inconsistent with unilateral conduct but largely consistent with explicitly coordinated action. Numerous "plus factors" existed in the broiler industry during the relevant period including, but not limited to: (i) direct communications between Defendants regarding confidential production information which allowed Defendants to disseminate actual and false information regarding supply reductions to purchasers of broilers; (ii) coordinated manipulation by Defendants of the Georgia Dock price index; (iii) Defendants' coordinated conduct to rig bids to restaurants and other contract purchasers of broilers; (iv) extensive information sharing through Agri Stats and other means; (v) numerous opportunities for Defendants to collude in a variety of forums; (vi) inter-Defendant trades and purchases that often were against independent self-interest; (vii) increased exports of broilers to other countries that were also often against independent self-interest; and (viii) multiple industry characteristics that facilitated collusion, such as high vertical integration, high barriers to entry, high industry consolidation and concentration, inelastic supply and demand, a lack of significant substitutes for chicken, depressed economic conditions, and a history of government investigations and collusive conduct.*

**ANSWER:**  To the extent the allegations in Paragraph 9 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer subpart (iii) of the second sentence of Paragraph 9 at this time.  Defendants deny the remaining allegations in Paragraph 9.

**C.    Defendants' Coordinated Supply Restrictions**

10.  *Defendants curtailed the supply of chickens in the market on the front end via coordinated and unprecedented cuts at the top of the supply chain. This included the coordinated and collusive reduction of production capacity and jointly and collusively*

*reducing "breeder flocks" that produce chickens ultimately slaughtered for meat consumption.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 10 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 10 to the extent that they relate to other Defendants and/or third parties. Defendants admit that each Producer Defendant plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Defendants deny that any such production decisions were coordinated or made pursuant to a conspiracy or agreement. Defendants deny any remaining allegations in Paragraph 10.

*11.    Historically, when faced with low market prices, Defendants relied primarily on mechanisms that temporarily reduced production at the middle or end of the supply chain, such as reducing eggs placements, killing newly-hatched chicks, or idling processing plants. These mechanisms still allowed Defendants to ramp up production within weeks if market conditions changed.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 11 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 11 to the extent that they relate to other Defendants and/or third parties. Defendants admit that each Producer Defendant plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Defendants deny that any such production decisions were coordinated or made pursuant to a conspiracy or agreement. Defendants deny any remaining allegations in Paragraph 11.

*12.    Prior to the relevant period, Defendants' pattern of annual increases in chicken production became so entrenched over decades of experience that by the 2000s, a*

56

*widely-repeated industry quip was that life only held three certainties: death, taxes, "and 3% more broilers."*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 and therefore deny them.

13. *A leading industry publication noted in early 2009 that chicken "production in the U.S. used to be just like government spending, it never went down and cutbacks only resulted in slowing the rate of growth, but not anymore," because for "the first time in decades, total broiler production in 2008 remained virtually unchanged from the year before."*

**ANSWER:** To the extent the allegations in Paragraph 13 characterize or describe an unidentified 2009 industry publication, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants deny any remaining allegations in Paragraph 13.

14. *In 2008, faced with dropping prices and low profits, Defendants collectively began cutting their ability to ramp up production by materially reducing their breeder flocks.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 14 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 14 to the extent that they relate to other Defendants and/or third parties. Defendants admit that each Producer Defendant plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Defendants deny that any such production decisions were coordinated or made pursuant to a conspiracy or agreement. Defendants deny any remaining allegations in Paragraph 14.

*15. Defendants abandoned their traditional, short-term production cuts and instituted material changes that increased ramp-up times by up to 18 months. This was a significant shift in their behavior and signaled their commitment to the conspiracy.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 15 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 15 to the extent that they relate to other Defendants and/or third parties. Defendants admit that each Producer Defendant plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Defendants deny that any such production decisions were coordinated or made pursuant to a conspiracy or agreement. Defendants deny any remaining allegations in Paragraph 15.

*16. Defendants' collective market-changing cuts to breeder flocks – a first round from 2008 to early 2009, and a subsequent round from 2011 to 2012 as the conspiracy continued into the current decade – effectively eliminated each Defendant's ability to meaningfully increase supply for years.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 16 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 16 to the extent that they relate to other Defendants and/or third parties. Defendants admit that each Producer Defendant plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Defendants deny that any such production decisions were coordinated or made pursuant to a conspiracy or agreement. Defendants deny any remaining allegations in Paragraph 16.

*17. Defendants' joint efforts to impose supply-side "discipline" included, among other things, open signaling in the form of public statements by their senior*

*executives about their individual commitment to production cuts as well as the importance of instituting and maintaining this "discipline" across the industry as a whole. Defendants' public statements on the need for, and benefits of, industry-wide supply "discipline" marked a significant departure from past industry practice. Indeed, Defendants continuously urged one another to "lower supply in order to offset reduced demand and to support higher market prices."*

**ANSWER:** Defendants deny the allegations in Paragraph 17.

*18.      Defendants were able to facilitate, monitor and police their coordinated output restriction scheme by, among other things, communicating through third parties including Agri Stats and Urner Barry (a private commodity price reporting service).*

**ANSWER:** Defendants deny the allegations in Paragraph 18.

*19.      Defendants also were able to facilitate, monitor and police their coordinated output restriction scheme by using reports purchased, at significant cost, from Agri Stats, a former subsidiary of global pharmaceutical company Eli Lilly & Co.*

**ANSWER:** Defendants deny the allegations in Paragraph 19.

*20.      Agri Stats collected detailed, proprietary data from all Defendants, including data detailing the housing used, breed of chicks, average size, and production and breeder flock levels.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 20 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 20 to the extent that they relate to other Defendants and/or third parties. Defendants admit that Agri Stats collects information from certain Producer Defendants, and that Agri Stats has reported anonymized and historical information to certain individual Producer Defendants for pro-competitive benchmarking purposes. Defendants refer to Agri Stats reports for their contents and deny any characterization or description that is inconsistent therewith. Foster Farms and Harrison Poultry deny that they

participated in all Agri Stats reports for the entire Relevant Period.[7]  Defendants deny any remaining allegations in Paragraph 20.

> 21.    *The Agri Stats data was in theory supposed to be anonymized. But by design, Defendants could identify and track their purported competitors' production and output activities to ensure that others were following suit on implementing the coordinated output restrictions. Defendants devoted significant time and resources to working collectively to de-anonymize Agri Stats data.*

**ANSWER:**  Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy.  Defendants admit that Agri Stats reported anonymized and historical information to certain individual Producer Defendants for pro-competitive benchmarking purposes and refer to Agri Stats reports for their contents, but otherwise deny any characterization of Agri Stats reports in Paragraph 21.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 21 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 21 to the extent that they relate to other Defendants and/or third parties.  Defendants deny the allegations in the second sentence of Paragraph 21 and any remaining allegations in Paragraph 21.

> 22.    *Defendants' coordinated effort reflected their expectation that higher profit margins would result from coordinated production cuts. Defendants expected that coordinated production cuts would also allow them to more quickly capitalize on those inflated non-competitive prices.*

**ANSWER:**  Defendants deny the allegations in Paragraph 22.

> 23.    *Later in the relevant period, Defendants capitalized on their prior actual reduction of broilers to coordinate a false supply reduction, again with the same goal – to use the perceived reduction of supply to justify anticompetitive price increases of broilers.*

**ANSWER:**  Defendants deny the allegations in Paragraph 23.

---

[7] For the purposes of this Answer, Defendants use the term "Relevant Period" to mean January 1, 2008 until the Present.

**D.**     **Defendants' Manipulation of the Georgia Dock Price Index**

    *24.*     *Another aspect of Defendants' conspiracy to illegally increase and maintain chicken prices was the manipulation and artificial inflation of prices on the "Georgia Dock," a widely used weekly benchmark price compiled and published by the Poultry Market News division (the "PMN") of the Georgia Department of Agriculture (the "GDA").*

**ANSWER:**   Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Defendants admit that the Georgia Department of Agriculture published the Georgia Dock Index at certain times during the Relevant Period,[8] but deny the remaining allegations in Paragraph 24.

    *25.*     *Starting in 2008, the Defendants also began moving away from long-term fixed- price contracts to shorter-term contracts with variable pricing pegged to one of several purportedly "fair" price indices. They made this move away from fixed-price contracts particularly with respect to certain distributor and grocer customers.*

**ANSWER:**   Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 25 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 25 to the extent that they relate to other Defendants and/or third parties. Producer Defendants admit that the pricing mechanisms under contracts with customers are negotiated vigorously and change over time based upon the interests of the customer and each Defendants' own judgment of its independent business interests. Agri Stats lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 and therefore denies them. Defendants deny any remaining allegations in Paragraph 25.

---

[8] To the extent Defendants refer to the "Georgia Dock Index" in this Answer, the reference is to the Georgia Dock Quoted Poultry Prices announced on Wednesdays by the Poultry Market News at the Georgia Department of Agriculture.

26.     *Many chicken buyers across the nation paid prices based on the Georgia Dock, while many more paid prices that were influenced by the Georgia Dock.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 26 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 26 to the extent that they relate to other Defendants and/or third parties.  Defendants admit that certain "chicken buyers" may have purchased chicken on terms related to the Georgia Dock index.  Defendants deny any remaining allegations in Paragraph 26.

27.     *Unlike other price indices available to chicken buyers, the Georgia Dock benchmark price was a self-reported number from a group of chicken producers – Defendants Pilgrim's Pride, Tyson, Sanderson Farms, Koch Foods, Claxton Poultry, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale (collectively, the "Georgia Dock Defendants").*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 27 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 27 to the extent that they relate to other Defendants and/or third parties.  Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale admit that in the past certain Producer Defendants submitted requested information to the Georgia Department of Agriculture for the Department's use in compiling the Georgia Dock Index, but deny any characterization thereof. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 and therefore deny them.  Defendants deny any remaining allegations in Paragraph 27.

28.   *Senior executives from at least seven of the Georgia Dock Defendants were members of a private-sector "Poultry Market News Advisory Committee," which played a role in the compilation and manipulation of the Georgia Dock benchmark price.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 28 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 28 to the extent that they relate to other Defendants and/or third parties. Defendants Sanderson Farms, O.K. Foods, Case, Perdue, Foster Farms, House of Raeford, Simmons, Agri Stats, Amick Farms, Peco, George's, and Mountaire deny that they were members of any "Poultry Market News Advisory Committee," and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 28 and therefore deny them. Defendants Harrison Poultry, Claxton, Pilgrim's, Mar-Jac, Tyson, Wayne Farms, Fieldale, and Koch admit that at various points in the Relevant Period, at the request of the Georgia Department of Agriculture, they had an employee representative on the Poultry Market News Advisory Committee, but deny Plaintiffs' characterization of the Committee and all remaining allegations in Paragraph 28. Harrison Poultry further states that it withdrew from any participation in the Poultry Market News Advisory Committee in early January 2016.

29.   *Defendants – including both the Georgia Dock Defendants and the other Defendants – took advantage of the inflated, non-competitive prices reported on the Georgia Dock index. They used the inflated Georgia Dock prices to achieve higher prices for those purchasers who set their prices on purportedly "fair" price indices. Defendants also used the inflated prices reported on the Georgia Dock index to justify the higher prices they charged to their contract purchasers.*

**ANSWER:** Defendants deny the allegations in Paragraph 29.

30.   *In addition to their fraudulent submissions to the PMN, all of the Georgia Dock Defendants that sold chicken to Plaintiffs fraudulently misrepresented, omitted, and failed to disclose critical, non-public information about the Georgia Dock. In particular, they misrepresented that the Georgia Dock was or indicated the "market" price for broiler chicken, when in fact they knew they did not submit their own actual offering prices to the PMN. They also failed to disclose to Plaintiffs their ability to control the PMN by virtue*

*of the Advisory Committee (which consisted solely of executives of Georgia Dock Defendants), the fact that the Georgia Dock price each week was based solely on Defendants' bald assertions with no verification, and the fact that Defendants were manipulating the Georgia Dock price.*

**ANSWER:**  Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations in Paragraph 30.  Sanderson Farms denies that it was a member of any Poultry Market News "Advisory Committee" and therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations related to the "Advisory Committee" and therefore denies them.  Sanderson Farms denies the remaining allegations in Paragraph 30. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 and therefore deny them.

## E.    Defendants' Bid-Rigging Conduct

*31.    Defendants also engaged in bid-rigging conduct targeted at restaurants and others that purchased broilers in large volumes. Starting as early as 2012 and continuing until at least as late as 2019 ("Bid-Rigging Conduct Period"), Defendants conspired to fix prices and submit artificially high bids to restaurants and other purchasers and others in an effort to drive up prices, and in turn, Defendants' profits.*

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 31 at this time.

*32.    As a result of Defendants' bid-rigging conduct, Defendants were able to exact significant price increases from restaurants and other purchasers.*

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 32 at this time.

33.     *Senior executives from Defendants Pilgrim's Pride, Claxton, Tyson, Perdue, Koch, Case, and George's have been indicted by the United States Department of Justice. The Department of Justice's investigation remains ongoing.*

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 33 at this time.

34.     *All aspects of Defendants' conspiracy were instigated in a market with numerous characteristics making it highly susceptible to collusion, including: (a) a highly-concentrated market dominated by vertically integrated producers; (b) high barriers to market entry; (c) a standardized, commodity product where competition is based principally on price; (d) inelastic demand for the product; (e) numerous opportunities for cartel members to conspire through a number of regularly scheduled trade association meetings; (f) extensive sharing about Broiler breederstock supply and slaughter levels, forecasting data, pricing inventory, and exports through the Strategic Alliance and Southern Hens, Inc.; and (g) access to competitors' data through Agri Stats.*

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 34 at this time.  Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy.

35.     *An internal memorandum drafted by the Antitrust Section of the Florida Attorney General's office as part of its ongoing investigation stated that the chicken industry has the "hallmarks of an industry susceptible to collusion," including high consolidation, "predictable demand" in a "commodity market," and "routine, public display of prices to deter cheating."*

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 35 at this time.  Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy.

36.     *Defendants' collusive agreements, anticompetitive acts, and understandings throughout the relevant period enabled Defendants, directly and through their wholly-owned or controlled subsidiaries and affiliates, to reap the benefits of their illegal conduct through the sale of broiler chickens at inflated non-competitive prices.*

*Defendants continuously urged one another to "lower supply in order to offset reduced demand and to support higher marker prices."*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 36 at this time. Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy.

37. *Through their collusive, coordinated anticompetitive actions, Defendants negated the economic benefits of increased competition. Defendants' conduct resulted in their customers, including all DAPs, paying at least hundreds of millions of dollars in overcharges to Defendants.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 37 at this time. Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy.

## IV. PARTIES

**A.    Plaintiffs**

38. *Each DAP along with its place of incorporation, principal place of business, and other information pertinent to its claims is listed as follows in alphabetical order:*

**ANSWER:** Paragraph 38 contains no factual allegations to which a response is required. To the extent a response is required, Defendants admit that Plaintiffs purport to list each DAP along with its place of incorporation, principal place of business, and other information pertinent to its claims in alphabetical order, but deny any remaining allegations in Paragraph 38.

39. *Plaintiff Action Meat Distributors, Inc. is a Texas corporation with its principal place of business in Houston.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and therefore deny them.

40.     *Plaintiff Affiliated Foods, Inc. is a Texas corporation headquartered in Amarillo, Texas.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 and therefore deny them.

41.     *Plaintiff Ahold Delhaize USA, Inc. is a Delaware corporation with a principal place of business in Quincy, Massachusetts. Ahold Delhaize is the direct or indirect parent company of several local retail companies (including, without limitation, Food Lion, Giant Martin's, Giant Food, Hannaford, Peapod, Stop & Shop, Bottom Dollar, Harvey's, and Sweetbay) that own and operate retail grocery businesses and sell and sold Broiler chicken and other products. Ahold Delhaize brings this action on its own behalf and on behalf of its assignors (including, without limitation, Delhaize America, LLC; Food Lion, LLC; Hannaford Bros. Co., LLC; Bottom Dollar Food Northeast, LLC; Retained Subsidiary One, LLC; Delhaize America Distribution, LLC; Ahold U.S.A., Inc.; Giant Food Stores, LLC; Giant of Maryland LLC; Peapod, LLC; The Stop & Shop Supermarket Company LLC; Retail Business Services LLC; and C & S Wholesale Grocers, Inc.), each of which directly purchased Broiler chicken from one or more Defendants and their co-conspirators during the relevant period. The references in this Complaint to "Ahold Delhaize" or "Plaintiffs" includes Ahold Delhaize's assignors.*

**ANSWER:**  Defendants admit Plaintiffs intend references in this Complaint to "Ahold Delhaize" or "Plaintiffs" to include Ahold Delhaize's assignors.  Although Defendants admit that Plaintiff Ahold Delhaize, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 41 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 41 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 41 and therefore deny them.

42.     *Plaintiff Albertsons Companies, Inc. is a Delaware limited-liability company with its principal place of business in Boise, Idaho. Albertsons Companies, Inc. is the parent corporation of Albertsons LLC, New Albertsons Inc., and Safeway Inc.*

*Albertsons Companies, Inc. brings this action on its own behalf and on behalf of its assignors, all of whom are wholly- owned subsidiaries of Albertsons Companies, Inc.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 and therefore deny them.

> 43.    *Plaintiff ALDI, Inc. ("ALDI") is an Illinois corporation with a principal place of business in Batavia, Illinois. During the time relevant to Plaintiff's claims, Plaintiff directly purchased Broiler chicken in the United States from one or more of the Defendants and/or their co-conspirators and sustained injury and damage to its business as a proximate result of the antitrust violations and other unlawful activities alleged in this Complaint.*

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 43.  Although Defendants admit that Plaintiff ALDI, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 43 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 43 to the extent that they relate to other Defendants and/or third parties.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 43 and therefore deny them.

> 44.    *Plaintiffs Alex Lee, Inc., and its wholly-owned subsidiary, Merchants Distributors, LLC (together, "Alex Lee") are, respectively, a North Carolina corporation and a North Carolina limited-liability company, with their principal places of business in Hickory, North Carolina.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 and therefore deny them.

> 45.    *Plaintiff Amigos Meat Distributors, LP is a Texas limited partnership with its principal place of business in Houston, Texas.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 and therefore deny them.

46.     *Plaintiff Amigos Meat Distributors East, LP is a Texas limited partnership with its principal place of business in Atlanta, Georgia.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 and therefore deny them.

47.     *Plaintiff Amigos Meat Distributors West, LP is a Texas limited partnership with its principal place of business in Phoenix, Arizona.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 and therefore deny them.

48.     *Plaintiff Amigos Meat & Poultry, LLC is a Texas limited-liability company with its principal place of business in Chicago, Illinois.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 and therefore deny them.

49.     *Plaintiff Anaheim Wings, LLC, doing business as Hooters of Anaheim, is a Kansas Limited-liability company doing business in Anaheim, California. Plaintiff Anaheim Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Anaheim Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Anaheim Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:**     Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 49.  The last sentence of Paragraph 49 consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 49 and therefore deny them.

50.     *Plaintiff Associated Food Stores, Inc. is a Utah corporation with its principal place of business in Salt Lake City.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 and therefore deny them.

51.     *During the time period relevant to Plaintiffs' claims, Plaintiff Associated Grocers of Florida, Inc. was a Florida corporation with a principal place of business in Pompano Beach, Florida.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 and therefore deny them.

52.     *Plaintiff Associated Grocers of New England, Inc. is a New Hampshire corporation with its principal place of business in Pembroke, New Hampshire.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52 and therefore deny them.

53.     *Plaintiff Associated Grocers of the South, Inc. is an Alabama corporation with its principal place of business located in Birmingham, Alabama.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53 and therefore deny them.

54.     *Plaintiff Associated Wholesale Grocers, Inc. ("AWG") is a Kansas corporation with its principal place of business located at 5000 Kansas Avenue, Kansas City, Kansas 66106. AWG has distribution center locations in Kansas City, KS; Springfield, MO; Oklahoma City, OK; Goodlettsville, TN; Southaven, MS; Pearl River, LA; Norfolk, NE; and Kenosha, WI. During the relevant time period, AWG purchased broilers through its corporate headquarters and each of these distribution centers. AWG is also the assignee of claims arising from Affiliated Foods Midwest Cooperative, Inc. ("AFM"), which, during the relevant time period, purchased broilers directly from one or more Defendants and other producers of Broilers.  Before AWG's acquisition of AFM assets in October 2016, AFM was a Nebraska corporation with its principal place of business in Norfolk, Nebraska and Elwood, Kansas. It served retailers in various states, including Oklahoma, Kansas, Colorado, Wyoming, Nebraska, Missouri, Illinois, Wisconsin, Iowa, South Dakota, North Dakota, Minnesota, and Michigan. AFM has assigned its claims arising from its purchases of broilers to AWG, and AWG brings this action on its own behalf and in addition as assignee of claims from AFM, both of which purchased Broilers from one or more Defendants, their co- conspirators, and others during the relevant period. All references in this complaint to Associated Wholesale Grocers, Inc. or AWG, or to Associated Wholesale Grocers, Inc.'s or AWG's Broiler purchases, refer both to Associated Wholesale*

*Grocers, Inc. and Affiliated Foods Midwest Cooperative, Inc., or to their Broiler purchases, and to AWG as to its own claims, as well the claims assigned to it by AFM. The references in this Complaint to "Plaintiffs" include AWG as to its own claims, as well as the claims assigned to it by AFM. During the relevant time period, AWG purchased Broilers at artificially inflated prices directly from Defendants, including, without limitation, from Pilgrim's Pride Corporation, Sanderson Farms, Inc., Mountaire Farms, Inc., and Tyson Foods, Inc., and other producers of Broilers. During the relevant time period, the price quoted in agreements between AWG and Defendants and other producers of Broilers referenced or were directly tied to the Georgia Dock, which was manipulated by Defendants and their Co- Conspirators.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 54. To the extent the allegations in Paragraph 54 characterize contracts or other documents, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 54 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 54 to the extent that they relate to other Defendants and/or third parties. With respect to the allegations of the first, second and third sentences, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them. With respect to the allegations of assignments in the fourth and seventh sentences, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them. With respect to the remaining allegations in the fourth and seventh sentences, Defendants admit that Plaintiff Associated Wholesale Grocers, Inc. and/or its purported assignor, AFM, directly purchased Broiler chicken from at least one Defendant during the Relevant Period, but lack knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 54 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 54 to the extent that they relate to other Defendants and/or third parties. With respect to the allegations in the fifth and sixth sentences of Paragraph 54, Defendants lack knowledge or

information sufficient to form a belief as to the truth of the allegations and therefore deny them. The eighth and ninth sentences of Paragraph 54 contain no factual allegations to which a response is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them. With respect to the tenth sentence in Paragraph 54, Defendants Pilgrim's, Tyson, and Mountaire admit they each sold various poultry products directly to AWG during the Relevant Period, but deny that AWG made any purchases from them at artificially inflated prices, that AWG was in any way injured as a result of purchases from them, and that they engaged in any wrongful conduct. Sanderson Farms admits it sold chicken to AWG and AFM during the Relevant Period, but denies AWG or AFM made any purchases from Sanderson Farms at artificially inflated prices. Sanderson Farms further denies AWG or AFM were in any way injured as a result of purchases from Sanderson Farms or that Sanderson Farms engaged in any wrongful conduct. Defendants deny the remaining allegations in the tenth sentence of Paragraph 54. With respect to the last sentence in Paragraph 54, Pilgrim's, Tyson, and Sanderson Farms admit that at various points in the Relevant Period certain of their customers paid prices related to the "Georgia Dock," but deny the Georgia Dock was manipulated. Harrison Poultry and Mountaire specifically deny that the prices of its sales were based on the Georgia Dock during the Relevant Period. All other Defendants lack knowledge or information sufficient to form a belief as to the allegations in the last sentence in Paragraph 54 and therefore deny them. Defendants deny any remaining allegations in Paragraph 54.

> 55. *Plaintiff Barbeque Integrated, Inc. d/b/a Smokey Bones Bar & Fire Grill is a Delaware corporation with its principal place of business in Aventura, Florida. During the relevant period, Smokey Bones operated over 70 restaurants in multiple states. Smokey Bones brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates. To ensure consistency in taste and quality of their products across hundreds of locations spanning*

*multiple states, Smokey Bones, like many restaurants, negotiates and contracts directly with Defendants for the production and supply of their proprietary chicken according to Smokey Bones' unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Smokey Bones with broilers. The contracts between Smokey Bones and Defendants identify Smokey Bones as the purchaser or customer, and set forth the agreed formula pricing (as represented by Defendants) and the volume of proprietary chicken products to be sold to Smokey Bones. The proprietary product Defendants produce and sell to Smokey Bones cannot be sold to any other customer.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 55. To the extent the allegations in Paragraph 55 characterize contracts or other documents, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 55 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 55 to the extent that they relate to other Defendants and/or third parties. With respect to the allegations in the first three sentences of Paragraph 55, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them. Defendants admit that Plaintiff Barbeque Integrated, Inc.'s purported assignor, McLane Foodservice, Inc., directly purchased Broiler chicken from at least one Defendant during the Relevant Period, but Defendants deny that Plaintiff Barbeque Integrated, Inc. directly purchased Broiler chicken from any Defendant during the Relevant Period. Defendants deny any remaining allegations in Paragraph 55.

> 56. *Plaintiff Bashas' Inc. is an Arizona corporation with its principal place of business in Chandler, Arizona, operating stores under several banners, including Food City, Bashas' Markets, Bashas' Dine, AJ's Fine Foods, and Eddie's Country Stores.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 56 and therefore deny them.

57.     *Plaintiff Big Y Foods, Inc. is a Massachusetts corporation with its principal place of business in Springfield, Massachusetts.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57 and therefore deny them.

58.     *Plaintiff Bi-Lo Holdings, LLC is a limited-liability company organized under the laws of the State of Delaware. Its principal place of business is 8928 Prominence Parkway, #200, Jacksonville, Florida 32256. Bi-Lo Holdings, LLC brings this action on its own behalf and as the assignee of C&S Wholesale Grocers, Inc., a wholesaler that, during the relevant period, purchased chicken directly from Defendants for resale to Bi-Lo Holdings, LLC.*

**ANSWER:**  Defendants admit that Plaintiff Bi-Lo Holdings' purported assignor, C&S Wholesale Grocers, Inc., directly purchased Broiler chicken from at least one Defendant during the Relevant Period, but each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 58 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 58 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 58 and therefore deny them.

59.     *Plaintiff BJ's Wholesale Club, Inc.is a Delaware corporation with its principal place of business in Westborough, Massachusetts. BJ's brings this action on its own behalf and as the assignee of Burris Logistics, a food-service redistributor that, during the relevant period, purchased chicken directly from Defendants for resale to BJ's.*

**ANSWER:**  Defendants admit that BJ's Wholesale Club, Inc.'s purported assignor, Burris Logistics, directly purchased Broiler chicken from at least one Defendant during the Relevant Period, but each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 59 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 59 to the extent that they relate to other Defendants and/or third parties.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 59 and therefore deny them.

60.    *Plaintiff Bob Evans Farms, Inc. ("Bob Evans") is a Delaware Corporation with its principal place of business in New Albany, Ohio. Bob Evans brings this action on its own behalf and as assignee of Gordon Food Service, Inc., who purchased chicken on Bob Evans' behalf directly from Defendants and/or their co-conspirators during the relevant time period and assigned its claims arising out of these purchases to Bob Evans. During the time period relevant to Bob Evans' claims, Bob Evans and/or its assignors directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damages as a proximate result of the antitrust violations alleged in this Complaint.  Both Bob Evans and Gordon Food Service, Inc. are a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:**    Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 60.  Although Defendants admit that Plaintiff Bob Evans Farms, Inc. and/or its purported assignor, Gordon Food Service, Inc., directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 60 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 60 to the extent that they relate to other Defendants and/or third parties.  The last sentence of Paragraph 60 consists of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations in this sentence.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 60 and therefore deny them.

61.    *Plaintiff Bojangles' Restaurants, Inc. ("BRI") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. Plaintiff Bojangles Opco, LLC is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina ("Opco", and together with BRI these parties are referred to herein as ("Bojangles"). Bojangles owns, operates, or alternatively is the franchisor (and trademark licensor) of, more than 700 Bojangles branded restaurants in the United States (the "Bojangles Branded Restaurants"). Restaurants like Bojangles serve their proprietary chicken products in multiple locations throughout the country. To ensure consistency in taste and quality of its products across hundreds of locations, Bojangles', like many restaurants, negotiated and contracted directly with Defendants for the production and supply of chicken for the Bojangles Branded Restaurants, according to Bojangles' unique recipes and specifications.  These negotiations and contracts governed the price and quantity at which Defendants would supply the Bojangles Branded*

*Restaurants with Broilers (as that term is defined in the Consolidated Complaint). Bojangles provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Bojangles' products and specific requirements for packaging and labeling Bojangles' proprietary products. The agreements entered into between Bojangles and Defendants and coconspirators set forth the agreed price and volume of chicken products to be sold to Bojangles. Bojangles brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates ("McLane"), as well as the assignee of various franchisee owners and operators of franchised Bojangles Branded Restaurants ("Franchisee Assignors"). During the conspiracy period, Bojangles and the Franchisee Assignors purchased millions of dollars' worth of Broilers directly from certain Defendants and co-conspirators at artificially inflated prices throughout the Conspiracy Period. Bojangles contracted directly with Defendants and their co-conspirators for the purchase of Broilers, negotiating the price and quantity at which Defendants would supply Bojangles and the Franchisee Assignors with Broilers. As such, Bojangles has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Also during the Conspiracy Period, McLane purchased Broilers on behalf of Bojangles and the Franchisee Assignors' from Defendants and their co-conspirators. McLane has assigned its claims arising out of these purchases to Bojangles. Bojangles and the Franchisee Assignors also purchased Broilers indirectly from certain Defendants and their co-conspirators for use in food preparation in Bojangles' locations, and not for resale in unaltered form. The purchase orders for Broilers supplied to Bojangles Branded Restaurants were created and issued from Bojangles Branded Restaurant locations in multiple states, including the Florida, Illinois, Alabama, North Carolina, South Carolina, Virginia and Tennessee and the District of Columbia. Bojangles restaurants also received invoices for and shipments of Broilers. Bojangles and the Franchisee Assignors were damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers, and therefore have suffered antitrust injury as a result of Defendants' conduct. Bojangles brings this action to recover the overcharges it and the Franchisee Assignors paid for Broilers purchased during the Conspiracy Period.[5]*

> *FN 5: Bojangles' antitrust claims are predicated on all elements of Defendants' collusive conduct, including the bid-rigging that is the subject of the DOJ indictment. As alleged in the Indictment and recited in the Consolidated Complaint, Defendants engaged in bid-rigging conduct specifically targeted at Bojangles and other contract based customers. Bojangles solicited bids, negotiated terms, and contracted directly with Defendants for their proprietary chicken products, and assumed full responsibility to pay the contract obligations. Bojangles used distributors, including Pate Dawson Company ("Pate Dawson"), as purchasing agents, and the distributors were paid a set fee by Bojangles for their services. There is a dispute between Bojangles and Direct Action Plaintiff Cheney Bros., Inc. ("Cheney Brothers") as to who is the proper party to assert direct purchaser claims with respect to purchases of Bojangles products from Defendants using Pate Dawson as purchasing agent. On information and belief,*

*Cheney Brothers acquired the assets of Pate Dawson in 2016. Bojangles reserves all of its rights on this issue.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 61. To the extent the allegations in Paragraph 61 characterize contracts or other documents, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 61 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 61 to the extent that they relate to other Defendants and/or third parties. With respect to the allegations in the first four sentences, and the thirteenth, fourteenth, and fifteenth sentence of Paragraph 61, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them. The ninth, twelfth, eighteenth, and nineteenth sentences of Paragraph 61 contain Plaintiffs' characterizations of their claims and legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations of the twelfth, eighteenth, and nineteenth sentence in Paragraph 61 and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the ninth sentence of Paragraph 61 and therefore deny them. Defendants admit that Bojangles and/or its assignors directly purchased Broiler chicken from at least one Defendant during the Relevant Period, but each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 61 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 61 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 61. Pursuant to the Court's September 22, 2020

Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Footnote 5 at this time.

> 62. *Plaintiff Bonita Plaza Wings, LLC, doing business as Hooters of Plaza Bonita, is a California Limited-liability company doing business in National City, California. Plaintiff Bonita Plaza Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Bonita Plaza Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Bonita Plaza Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 62. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 62 and therefore deny them. The last sentence of Paragraph 62 consists of Plaintiff's legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 62 and therefore deny them.

> 63. *Plaintiff Boston Market Corporation is a Delaware corporation with its principal place of business in Golden, Colorado. During the relevant period, Boston Market operated over 450 stores across the country, and was registered to do business in each state in which it operated, including Arizona, California, District of Columbia, Florida, Illinois, Kansas, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Virginia and Wisconsin. To ensure consistency in taste and quality of their products across hundreds of locations spanning multiple states, Boston Market, like many restaurants, negotiates and contracts directly with Defendants for the production and supply of their proprietary chicken according to Boston Market's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Boston Market with broilers. The contracts between Boston Market and Defendants identify Boston Market as the purchaser or customer, and set forth the agreed formula pricing (as represented by Defendants) and the volume of proprietary chicken products to be sold to Boston Market. The contracts between Boston Market and Defendants further specify that Boston Market is responsible for all amounts due and owing to Defendants for proprietary Boston Market products. The agreements also state that should the agreement end, Boston Market must purchase all inventory of finished proprietary items and true up feed expenses*

*purchased at Boston Market's direction. These provisions are put in place because the proprietary product Defendants produce and sell to Boston Market cannot be sold to any other customer. Boston Market brings this action on its own behalf, and additionally and alternatively, as assignee of Ben E. Keith Company d/b/a Ben E. Keith Foods, HAVI Global Solutions, Mattingly Foods, Inc., and McLane Foodservice, Inc. f/k/a MBM Corporation, Willow Run Foods, Inc., and their respective affiliates. During the relevant period, Boston Market purchased broilers directly from Defendants, Defendants' subsidiaries and affiliates, entities owned or controlled by Defendants, or agents Defendants or Defendants' subsidiaries and affiliates controlled. Also during the relevant period, Assignors purchased broilers on Boston Market's behalf from Defendants and/or their co-conspirators, including Tyson and Pilgrim's Pride. Assignors have assigned their claims arising out of these purchases to Boston Market. Boston Market also purchased broilers indirectly from Defendants, Defendants' subsidiaries and affiliates, entities owned or controlled by Defendants, or agents Defendants or Defendants' subsidiaries and affiliates controlled for use in food preparation in Boston Market's locations, and not for resale in unaltered form. The purchase orders for broilers supplied to Boston Market restaurants were created and issued from Boston Market restaurant locations in multiple states, including Arizona, California, District of Columbia, Florida, Illinois, Kansas, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Virginia and Wisconsin. Boston Market restaurants also received invoices for and shipments of broilers. As such, Boston Market has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.[6]*

> *FN 6: DAPs Boston Market, Johnny Rockets and Friendly's (Certain Restaurant DAPs) antitrust claims are predicated on all elements of Defendants' collusive conduct, including the bid-rigging that is the subject of the DOJ indictment. As alleged in the Indictment and recited in this Consolidated Complaint, Defendants engaged in bid-rigging conduct specifically targeted at Certain Restaurant DAPs and other contract based customers. Certain Restaurant DAPs solicited bids, negotiated terms, and contracted directly with Defendants for their proprietary chicken products, and assumed full responsibility to pay the contract obligations. Certain Restaurant DAPs used distributors, including Sysco and US Foods, as purchasing agents, and the distributors were paid a set fee by Certain Restaurant DAPs for their services. There is a dispute between Certain Restaurant DAPs on the one hand and Sysco and US Foods on the other hand as to who is the proper party to assert direct purchaser claims with respect to the purchases of Certain Restaurant DAPs' products from Defendants. By joining in this consolidated pleading, Certain Restaurant DAPs and Sysco and US Foods reserve their respective rights on this issue.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 63. To the extent the allegations in Paragraph 63 characterize contracts or other documents, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as

to the truth of any allegations in Paragraph 63 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 63 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, eleventh, twelfth and thirteenth sentences of Paragraph 63 and therefore deny them. The ninth and sixteenth sentences of Paragraph 63 contain Plaintiffs' characterizations of their claims and legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations of the sixteenth sentence in Paragraph 63 and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the ninth sentence of Paragraph 63 and therefore deny them. Defendants admit that Plaintiff Boston Market and/or its purported assignors directly purchased Broiler chicken from at least one Defendant during the Relevant Period, but each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 63 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 63 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's and Tyson lack knowledge or information sufficient to form a belief as to the specific agreements referenced in Paragraph 63 and therefore deny them. Pilgrim's admits it has sold poultry to Ben E. Keith Company, Mattingly Foods, Inc., McLane Foodservice, Inc., and Willow Run Foods, Inc. during the Relevant Period, but denies it has sold directly to Plaintiff Boston Market. Pilgrim's also admits that at one point it had a contract with Boston Market, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 63 and therefore denies them. Tyson admits that it sold certain poultry products to Boston Market during the Relevant Period, but lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 63 and therefore

denies them. Defendants deny any remaining allegations in Paragraph 63. Pursuant to the Court's

September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree

that Defendants shall not answer Footnote 6 at this time.

> 64.     *Plaintiff Brookshire Brothers, Inc. ("Brookshire Brothers") is a Texas corporation with its principal place of business in Lufkin, Texas. During the Relevant Period, Brookshire Brothers purchased chicken at artificially inflated prices directly from one or more of the Defendants and suffered injury to its business or property as a direct and proximate result of Defendants' wrongful conduct.*

**ANSWER:**     Defendants deny the allegations of conspiracy and antitrust injury in

Paragraph 64. Although Defendants admit that Plaintiff Brookshire Brothers, Inc. directly

purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

Paragraph 64 that relate to other Defendants and/or third parties, and therefore each Defendant

denies the allegations in Paragraph 64 to the extent that they relate to other Defendants and/or third

parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 64 and therefore deny them.

> 65.     *Plaintiff Carl Buddig & Co., Inc. is an Illinois corporation with its principal place of business in Homewood, Illinois. From 2008 through at least 2017, Buddig purchased chicken at artificially inflated prices directly from various Defendants, and their affiliates and co- conspirators, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.*

**ANSWER:**     Defendants deny the allegations of conspiracy and antitrust injury in

Paragraph 65. Although Defendants admit that Plaintiff Carl Buddig & Co., Inc. directly

purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

Paragraph 65 that relate to other Defendants and/or third parties, and therefore each Defendant

denies the allegations in Paragraph 65 to the extent that they relate to other Defendants and/or third

parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 65 and therefore deny them.

> 66. *Plaintiff Caesars Enterprise Services, LLC is a Delaware corporation with its principal place of business in Las Vegas, Nevada. From 2008 through at least 2017, Caesars purchased chicken at artificially inflated prices directly from various Defendants, and their affiliates and co-conspirators, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 66. Although Defendants admit that Plaintiff Caesars Enterprise Services, LLC directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 66 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 66 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 66 and therefore deny them.

> 67. *Plaintiff Campbell Soup Company, is a New Jersey corporation with its principal place of business in Camden, New Jersey; Plaintiff Campbell Soup Supply Company L.L.C., is a Delaware corporation with its principal place of business in Camden, New Jersey; Plaintiff Pacific Foods of Oregon, LLC, is an Oregon corporation with its principal place of business in Tualatin, Oregon (collectively "Campbell"). Campbell is a manufacturer and marketer of high-quality, branded food and beverage products. Campbell is a direct purchaser of Broilers from several producer Defendants.*

**ANSWER:** Defendants admit that Plaintiff Campbell Soup Company directly purchased Broiler chicken from at least one Defendant during the Relevant Period, but each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 67 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 67 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 67 and therefore deny them.

68.     Plaintiff Captain D's LCC is a Delaware corporation with its principal place of business in Nashville, Tennessee. During the Conspiracy Period, over 500 Captain D's restaurants operated in multiple states. Restaurants like Captain D's serve their proprietary chicken products in multiple locations throughout the country. To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, Captain D's, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to Captain D's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Captain D's with Broilers. Captain D's provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Captain D's products and specific requirements for packaging and labeling Captain D's products. The contracts entered into between Captain D's and Defendants set forth the agreed price and volume of chicken products to be sold to Captain D's. Captain D's brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates ("McLane" or "Assignor"). During the Conspiracy Period, Captain D's purchased Broilers directly from Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co- conspirators. Also during the Conspiracy Period, McLane purchased Broilers on Captain D's behalf from Defendants and/or their co-conspirators. McLane has assigned its claims arising out of these purchases to Captain D's. Captain D's and/or its Assignor purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period. As such, Captain D's has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Captain D's was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Captain D's brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.

**ANSWER:**    Defendants deny the allegations of conspiracy and antitrust injury in

Paragraph 68. To the extent the allegations in Paragraph 68 characterize contracts or other

documents, Defendants deny any characterization or description that is inconsistent with the

referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as

to the truth of any allegations in Paragraph 68 that relate to other Defendants and/or third parties,

and therefore each Defendant denies the allegations in Paragraph 68 to the extent that they relate

to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to

form a belief as to the truth of the allegations in the first through third and tenth and eleventh

sentences of Paragraph 68 and therefore deny them. The eighth, thirteenth, fourteenth, and

fifteenth sentences of Paragraph 68 contain Plaintiffs' characterizations of their claims and legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations of the thirteenth, fourteenth, and fifteenth sentences in Paragraph 68 and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the eighth sentence of Paragraph 68 and therefore deny them. Although Defendants admit that Plaintiff Captain D's purported assignor, McLane Foodservice, Inc., directly purchased Broiler chicken from at least one Defendant during the Relevant Period, Defendants deny that Plaintiff Captain D's directly purchased Broiler chicken from any Defendant during the Relevant Period. Defendants deny any remaining allegations in Paragraph 68.

69. *Plaintiff CBBC Opco, LLC d/b/a Colorado Boxed Beef is a Florida limited-liability corporation headquartered in Lakeland, Florida.*

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69 and therefore deny them.

70. *Plaintiff Certco, Inc. is a Wisconsin corporation with its principal place of business in Fitchburg, Wisconsin*

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70 and therefore deny them.

71. *Plaintiff Checkers Drive-In Restaurants, Inc. ("Checkers") is a Delaware corporation with its principal place of business in Tampa, Florida. Checkers owns and operates restaurants that sell chicken. Checkers brings this action on its own behalf for chicken purchased from Defendants and/or their co-conspirators for its entire system during the relevant period, and additionally and alternatively, as assignee of its purchasing agents, who assigned their claims to Checkers. During the relevant period, McLane Company, Inc. and its affiliates, purchased chicken on Checkers' behalf from Defendants and/or their co-conspirators including, Koch Foods, Inc., OK Foods, Inc., Tyson Foods, Inc., and Wayne Farms, LLC, and assigned their claims arising out of these purchases to Checkers. Additionally, during the relevant time period, I Supply Company and its affiliates, and Customized Distribution, LLC (CDI) and its affiliates, purchased chicken on Checkers' behalf from Defendants and/or their co-conspirators including, Koch Foods, Inc., OK Foods, Inc., Tyson Foods, Inc., Wayne Farms, LLC, Case Farms, LLC, and Pilgrim's Pride Corporation, and assigned their claims arising out of these purchases to Checkers. As such, during the time period relevant to Plaintiffs' claims, Checkers and/or*

*its assignors directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations alleged here. Checkers is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 71. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 71 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 71 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first two sentences of Paragraph 71 and therefore deny them. The third, sixth, and seventh sentences of Paragraph 71 contain Plaintiff's characterizations of their claims and legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations of the sixth and seventh sentence in Paragraph 71 and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the third sentence of Paragraph 71 and therefore deny them. Although Defendants admit that Plaintiff Checkers Drive-In Restaurants, Inc. and/or its purported assignors, McLane Company, Inc., I Supply Company, and Customized Distribution, LLC, directly purchased Broiler chicken from certain Defendants during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 71 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 71 to the extent that they relate to other Defendants and/or third parties. Defendants other than Koch, O.K. Foods, Pilgrim's, Tyson, Wayne Farms, and Case lack knowledge or information sufficient to form a belief as to the specific agreements referenced in Paragraph 71 and therefore deny them and any remaining allegations in Paragraph 71. Pilgrim's admits it sold various poultry products directly to Checkers and its assignors McLane Company and I Supply

Company during the Relevant Period. Pilgrim's denies that Checkers and/or its assignors were in any way injured as a result of purchases from Pilgrim's and that Pilgrim's engaged in any wrongful conduct. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 71 and therefore denies them. Wayne Farms admits it sold chicken to Checkers and I-Supply during the Relevant Period, but denies that Checkers, I-Supply, Customized Distribution, LLC, or any of their affiliates and/or assignors were injured as a result of purchases from Wayne Farms, and denies the allegation that Wayne Farms engaged in wrongful conduct. Wayne Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 71 and therefore denies them. O.K. Foods admits it has sold chicken to McLane Company, Customized Distribution, LLC, and I Supply Company during the Relevant Period, but denies that Checkers and/or its assignors were in any way injured as a result of chicken purchases from O.K. Foods and further denies that O.K. Foods engaged in any wrongful conduct. O.K. Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 71 and therefore denies them. Tyson admits that it sold various poultry products to Checkers during the Relevant Period, but otherwise lacks knowledge or information sufficient to form a belief as to Checkers' contractual arrangements with third parties and therefore denies any remaining allegations in Paragraph 71. Case admits it sold various poultry products to Customized Distribution, LLC and I Supply Company during the Relevant Period, but denies that those entities or Checkers were injured as a result of any purchases from Case or that Case engaged in any wrongful conduct. Case otherwise lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 71 and therefore denies them. Koch admits that an entity known as Checkers purchased chicken directly and/or indirectly from one or more of the Koch Defendants or their affiliates during the

Relevant Period, and denies any remaining allegations in Paragraph 71. Defendants deny any remaining allegations in Paragraph 71.

> 72.     Plaintiff Cheney Bros., Inc. ("Cheney") is a Delaware corporation with its principal place of business in Riviera Beach, Florida. Cheney is a food service distributor that sells and distributes chicken to members of the food service industry. During the time period relevant to Plaintiffs' claims, Cheney directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged here. Cheney is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:**     Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 72. Although Defendants admit that Plaintiff Cheney Bros., Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 72 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 72 to the extent that they relate to other Defendants and/or third parties. The last sentence of Paragraph 72 consists of Plaintiff's legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 72 and therefore deny them.

> 73.     Plaintiff Chick-fil-A, Inc. ("CFA, Inc.") is a Georgia corporation with its principal place of business in Fulton County, Georgia. CFA, Inc. develops and supports a chain of retail quick-service restaurants specializing in a boneless breast of chicken sandwich, known as the Chick-fil-A® Chicken Sandwich. Since CFA, Inc. was founded by Truett Cathy in 1964, it has endeavored to conduct business with an emphasis on business ethics such as fairness, honesty, loyalty, and respect. The majority of Chick-fil-A branded restaurant businesses are owned and operated by independent franchisees, known as Operators. CFA, Inc. also operates various Chick- fil-A and other restaurants itself from time to time. Certain affiliates of Chick-fil-A operate certain Dwarf House restaurants and Truett's Grill restaurants, which are licensed to sell Chick-fil-A products. CFA, Inc. has also granted licenses to certain Chick-fil-A licensees. Collectively, these Chick-fil-A branded restaurants make up the "CFA Restaurant Group." Broiler chicken is the central ingredient in many of the proprietary products served at each Chick-fil-A branded restaurant, which include, but are not limited to, the Chick-fil-A® Chicken Sandwich, the

*Grilled Chicken Sandwich, the Spicy Chicken Sandwich, and the Chick-fil-A® Nuggets. These proprietary chicken products have directly contributed to the success and growth of the CFA Restaurant Group into one of the nation's largest quick service restaurant chains. To ensure consistency in taste and quality of products served across multiple locations spanning multiple states, CFA, Inc. negotiated and contracted directly with certain Defendants for the production and supply of its chicken according to CFA, Inc.'s unique recipes and specifications. These negotiations and contracts governed the price at which certain Defendants agreed to supply the CFA Restaurant Group with broiler chicken. CFA, Inc. provided certain Defendants with instructions regarding each step of the preparation and packaging process for the chicken products sold by the CFA Restaurant Group, including the recipe for those products and specific requirements for packaging and labeling those products. CFA, Inc. also utilized distributors such as Armada Supply Chain Solutions, LLC and Armada Warehouse Solutions, LLC (collectively "Armada"), Golden State Foods Corp. and Quality Custom Distribution Services, Inc. (collectively "GSF/QCD"), and Meadowbrook Meat Company, Inc. and McLane Foodservice, Inc. (collectively "MBM/McLane"), to serve the CFA Restaurant Group. For purposes of this action, Armada, GSF/QCD, and MBM/McLane have all assigned their claims arising out of these transactions to CFA, Inc. CFA, Inc. brings this action on its own behalf, and additionally and alternatively, as assignee of Armada, GSF/QCD, MBM/McLane, and their affiliates (collectively "Assignors"). All references in this Complaint to "CFA, Inc." or "Plaintiff" include Chick-fil-A, Inc.'s Assignors. CFA, Inc. and/or its Assignors purchased billions of dollars worth of broiler chicken from Defendants and/or their co-conspirators throughout the relevant period at prices that were artificially inflated due to the conduct outlined below. As such, CFA, Inc. and the CFA Restaurant Group sustained injury and damages to their businesses as a proximate result of the antitrust violations and other unlawful activities alleged in this Complaint.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 73. To the extent the allegations in Paragraph 73 characterize contracts or other documents, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 73 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 73 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first ten sentences and the thirteenth and fourteenth sentences of Paragraph 73 and therefore deny them. The fifteenth, sixteenth, and eighteenth sentences of Paragraph 73 contain Plaintiff's characterizations of their claims and legal

conclusions to which no response is required. To the extent a response is required, Defendants

deny the allegations of the eighteenth sentence in Paragraph 73 and lack knowledge or information

sufficient to form a belief as to the truth of the allegations of the fifteenth and sixteenth sentences

of Paragraph 73 and therefore deny them. Although Defendants admit that Plaintiff Chick-fil-A,

Inc. and/or its purported assignors, Armada, GSF/QCD, and MBM/McLane, directly purchased

Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks

knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph

73 that relate to other Defendants and/or third parties, and therefore each Defendant denies the

allegations in Paragraph 73 to the extent that they relate to other Defendants and/or third parties.

The nineteenth sentence of Paragraph 73 contain Plaintiffs' characterizations of their claims and

legal conclusions to which no response is required. Defendants deny any remaining allegations in

Paragraph 73.

> 74. *Plaintiff Conagra Brands, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois. Conagra is one of North America's leading branded food companies. Conagra's brands include Healthy Choice, Marie Callender's, Banquet, Bertolli, Chef Boyardee, and Frontera, among others.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 74 and therefore deny them.

> 75. *Plaintiff Costa Mesa Wings, LLC, doing business as Hooters of Costa Mesa, is a Kansas Limited-liability company doing business in Costa Mesa, California. Plaintiff Costa Mesa Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Costa Mesa Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Costa Mesa Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in

Paragraph 75. The last sentence of Paragraph 75 consists of Plaintiff's legal conclusions, to which

no response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 75 and therefore deny them.

> 76. *Plaintiff Cracker Barrel Old Country Store, Inc. is a Tennessee corporation with its principal place of business in Lebanon, Tennessee. Plaintiff CBOCS Distribution, Inc. is a Tennessee corporation and is the wholly-owned subsidiary of Cracker Barrel Old Country Store, Inc. Cracker Barrel Old Country Store, Inc. and CBOCS Distribution, Inc. are together referred to as "Cracker Barrel." During the Conspiracy Period, Cracker Barrel operated over 600 restaurants in multiple states. Restaurants like Cracker Barrel serve their proprietary chicken products in multiple locations throughout the country. To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, Cracker Barrel, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken according to Cracker Barrel's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Cracker Barrel with Broilers. Cracker Barrel provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Cracker Barrel's products and specific requirements for packaging and labeling Cracker Barrel products. The contracts entered into between Cracker Barrel and Defendants set forth the agreed price and volume of proprietary chicken products to be sold to Cracker Barrel. Cracker Barrel brings this action on its own behalf, and additionally and alternatively, as assignee of Performance Food Group, Inc. and its affiliates ("PFG" or "Assignor"). During the Conspiracy Period, Cracker Barrel purchased Broilers directly from Defendants and their co-conspirators, Defendants' and their co- conspirators subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators. Also during the Conspiracy Period, PFG purchased Broilers on Cracker Barrel's behalf from Defendants and/or their co-conspirators, including Pilgrim's Pride, Koch, and Simmons. PFG has assigned its claims arising out of these purchases to Cracker Barrel. Cracker Barrel and/or its Assignor purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period. As such, Cracker Barrel has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Cracker Barrel was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Cracker Barrel brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 76. To the extent the allegations in Paragraph 76 characterize contracts or other documents, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as

to the truth of any allegations in Paragraph 76 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 76 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first four sentences and the, eleventh, twelfth, and thirteenth sentences of Paragraph 76 and therefore deny them. The ninth, fourteenth, fifteenth, and sixteenth sentences of Paragraph 76 contain Plaintiff's characterizations of their claims and legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations of the fourteenth, fifteenth, and sixteenth sentence in Paragraph 76 and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the ninth sentence of Paragraph 76 and therefore deny them. Although Defendants admit that Plaintiff Cracker Barrel Old Country Store, Inc. and/or its purported assignor, Performance Food Group, Inc., directly purchased Broiler chicken from certain Defendants during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 76 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 76 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's, Simmons, and Koch lack knowledge or information sufficient to form a belief as to the specific agreements referenced in Paragraph 76 and therefore deny them and any remaining allegations in Paragrsaph 76. Pilgrim's and Simmons admit they each sold poultry to Performance Food Group, Inc. during the Relevant Period, but denies they sold directly to or has a contract with Cracker Barrel Old Country Store, Inc., that Performance Food Group, Inc. made any purchases from them at artificially inflated prices, that Performance Food Group, Inc. was in any way injured as a result of purchases from them, and that they engaged in any wrongful conduct. Pilgrim's and Simmons lack knowledge or

91

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 76 and therefore deny them. Koch admits that an entity known as Cracker Barrel purchased chicken directly and/or indirectly from one or more of the Koch Defendants or their affiliates during the Relevant Period, and denies any remaining allegations in Paragraph 76.

> 77. *Plaintiff Darden Restaurants, Inc. is a Florida corporation with its principal place of business in Orlando, Florida. Darden is the world's largest company-owned and operated full- service restaurant company. Through various subsidiaries, Darden operates over 1,750 restaurants in the United States and Canada, including Olive Garden, LongHorn Steakhouse, The Capital Grille, Yard House, Seasons 52, Bahama Breeze, Eddie V's Prime Seafood, and Cheddar's Scratch Kitchen-brand restaurants.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77 and therefore deny them.

> 78. *Plaintiff Downtown Wings, LLC, previously doing business as Hooters of Downtown LA, is a California Limited-liability company that did business in Los Angeles, California. Plaintiff Downtown Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Downtown Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Downtown Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 78. The last sentence of Paragraph 78 consists of Plaintiff's legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 78 and therefore deny them.

> 79. *Plaintiff El Pollo Loco, Inc. ("EPL") is a Delaware corporation with its principal place of business in Costa Mesa, California. EPL owns/operates, or alternatively is the franchisor (and trademark licensor) of, more than 480 branded El Pollo Loco-branded restaurants in the United States. Through concepts and recipes successfully developed by EPL, EPL Branded Restaurants specialize in fire-grilled citrus-marinated chicken and other chicken-based entrees and menu items that integrate the culinary traditions of Mexico with the healthier preferences and lifestyle of Southern California.*

*EPL brings this action on its own behalf and as the assignee of suppliers/distributors McLane Foodservice, Inc. and Testa Produce, Inc. (collectively, "Supplier/Distributor Assignors"), as well as the assignee of franchisee owner/operators of franchised EPL Branded Restaurants. Based on price and estimated quantity terms typically negotiated by EPL, Supplier/Distributor Assignors purchased broiler chicken directly from Defendants and/or their affiliates or co-conspirators for the supply of EPL Branded Restaurants. The owner/operators of EPL Branded Restaurants were then provided chicken by Supplier/Distributor Assignors on a "cost-plus" price basis. To avoid any doubt or dispute as to the proper plaintiff for the claims asserted herein, Supplier/Distributor Assignors have assigned to EPL all antitrust claims arising out of any of their purchases for broiler chicken made in connection with supplying or reselling to any EPL Branded Restaurants. In addition, EPL has separately obtained assignments from Franchisee Assignors to the extent that they own any federal antitrust claims arising out of purchases of broiler chicken made for the supply of their respective EPL Branded Restaurant(s). Thus, EPL seeks recovery under federal antitrust law for all unlawful overcharges incurred in connection with broiler chicken supplied to EPL Branded Restaurants nationwide (whether the purchases for such supply are considered to have been directly made by EPL, its Supplier/Distributor Assignors, or its Franchisee Assignors).*

**ANSWER:**  To the extent the allegations in Paragraph 79 characterize contracts or other documents, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 79 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 79 to the extent that they relate to other Defendants and/or third parties.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first three sentences and the fifth, sixth, seventh, and eighth sentence of Paragraph 79 and therefore deny them.  The fourth and ninth sentences of Paragraph 79 contain Plaintiff's characterizations of their claims and legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations of the ninth sentence in Paragraph 79 and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the fourth sentence of Paragraph 79 and therefore deny them. Defendants admit that Plaintiff El Pollo Loco, Inc. and its purported assignors, McLane Foodservice, Inc., Testa Produce, Inc., and franchised EPL Branded Restaurants, directly

purchased Broiler chicken from at least one Defendant during the Relevant Period, but each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 79 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 79 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 79.

80. *Plaintiff EMA Foods Co., LLC is a Mississippi limited liability company with its principal place of business in Tupelo, Mississippi.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 80 and therefore deny them.

81. *Plaintiff Fareway Stores, Inc. is an Iowa corporation with its principal place of business in Boone, Iowa.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81 and therefore deny them.

82. *Plaintiff FIC Restaurants, Inc. is a Delaware corporation with its principal place of business in Wilbraham, Massachusetts. During the relevant period, Friendly's operated over 150 restaurants in multiple states. To ensure consistency in taste and quality of their products across hundreds of locations spanning multiple states, Friendly's, like many restaurants, negotiates and contracts directly with Defendants for the production and supply of their proprietary chicken according to Friendly's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Friendly's with broilers. The contracts between Friendly's and Defendants identify Friendly's as the purchaser or customer, and set forth the agreed formula pricing (as represented by Defendants) and the volume of proprietary chicken products to be sold to Friendly's. The proprietary product Defendants produce and sell to Friendly's cannot be sold to any other customer.*

**ANSWER:** To the extent the allegations in Paragraph 82 characterize contracts or other documents, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 82 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 82 to the extent that they relate

to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first two sentences of Paragraph 82 and therefore deny them. Although Defendants admit that Plaintiff FIC Restaurants, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 82 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 82 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 82.

83.     *Plaintiff Gaslamp Wings, LLC, previously doing business as Hooters of San Diego, is a Kansas Limited-liability company that previously did business in San Diego, California. Plaintiff Gaslamp Wings, LLC purchased chicken indirectly from Defendants and/or their co- conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Gaslamp Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Gaslamp Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 83. The last sentence of Paragraph 83 consists of Plaintiff's legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 83 and therefore deny them.

84.     *Plaintiff Giant Eagle, Inc. is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84 and therefore deny them.

85.     *Plaintiff Gibson, Greco & Wood, Ltd. is a Louisiana corporation with its principal place of business in East Baton Rouge Parish, Baton Rouge, LA. Plaintiff Gibson, Greco & Wood, Ltd. brings this action on its own behalf and as assignee of the following*

*entities, who have assigned their claims to Gibson, Greco & Wood, Ltd.: Blue Sky Management Company, LLC Wings-Up of Siegen, LLC; Wings-Up of West Monroe, LLC; Wings-Up of Baton Rouge, LLC; Wings-Up on the Westbank, LLC; Wings-Up of Lafayette, LLC; Wings-Up of Denham, LLC; Wings-Up of Slidell, LLC; Wings-Up of Boardwalk, LLC; and Wings-Up of Houma, LLC. Gibson, Greco & Wood, Ltd. brings this action on its own behalf for its purchases of chicken during the relevant time period. In addition, and alternatively, Gibson, Greco & Wood, Ltd. brings this action as assignee of its purchasing agents, Ben E. Keith Company and Bay Valley Foods, LLC (itself and as successor to Naturally Fresh, Inc.), who purchased chicken on Gibson, Greco & Wood, Ltd. Assignors' behalf during the relevant time period, from Defendants and/or their co- conspirators including Tyson, George's, and OK Foods, and who assigned their claims arising out of these purchases to Hooters of America, LLC, who subsequently assigned those claims to Plaintiff Gibson, Greco & Wood, Ltd. During the time relevant to Plaintiff's claims, Gibson, Greco & Wood, Ltd. and/or its assignors, directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. The references in this Complaint to "Gibson, Greco & Wood, Ltd." refer collectively to Gibson, Greco & Wood, Ltd. and its assignors. Each of Plaintiff Gibson, Greco & Wood, Ltd., the Gibson, Greco & Wood, Ltd. Assignors, Bay Valley Foods, LLC, Naturally Fresh, Inc., Ben E. Keith Company, and Hooters of America, LLC, is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 85. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 85 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 85 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first three sentences and sixth sentence of Paragraph 85 and therefore deny them. The fourth fifth, and seventh sentences of Paragraph 85 contains Plaintiff's characterizations of their claims and legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations of the fourth fifth, and seventh sentences in Paragraph 85. Although Defendants admit that Plaintiff Gibson, Greco & Wood, Ltd. and/or its purported assignors, Blue Sky Management Company, LLC Wings-Up of Siegen, LLC; Wings-Up of West Monroe, LLC; Wings-Up of Baton Rouge, LLC; Wings-Up

on the Westbank, LLC; Wings-Up of Lafayette, LLC; Wings-Up of Denham, LLC; Wings-Up of Slidell, LLC; Wings-Up of Boardwalk, LLC; Wings-Up of Houma, LLC; Ben E. Keith Company; and Bay Valley Foods, LLC, directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 85 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 85 to the extent that they relate to other Defendants and/or third parties. Defendants other than George's, O.K. Foods, and Tyson lack knowledge or information sufficient to form a belief as to the specific agreements referenced in Paragraph 85 and therefore deny them and any remaining allegations in Paragraph 85. George's admits that it sold Broiler chicken to Ben E. Keith and Hooters of America during the Relevant Period, but denies that either was in any way injured as a result of purchases from George's and that George's engaged in any wrongful conduct. George's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 85 and therefore denies them. O.K. Foods admits it sold chicken to Ben E. Keith Company during the Relevant Period. O.K. Foods denies that Gibson, Greco & Wood, Ltd. and/or its assignors were in any way injured as a result of purchases from O.K. Foods, and further denies that O.K. Foods engaged in any wrongful conduct. O.K. Foods lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 85 and therefore denies them. Tyson admits it has sold poultry to Ben E. Keith during the Relevant Period, but denies that Gibson, Greco & Wood, Ltd. and/or its assignors were in any way injured as a result of purchases from Tyson and that Tyson engaged in any wrongful conduct. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 85 and therefore denies them.

86.    Plaintiff Golden Corral Corporation is a North Carolina corporation with its principal place of business in Raleigh, North Carolina. During the Conspiracy Period, over 400 Golden Corral branded restaurants operated in multiple states. Restaurants like Golden Corral serve their proprietary chicken products in multiple locations throughout the country. To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, Golden Corral, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to Golden Corral's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Golden Corral with Broilers. Golden Corral provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Golden Corral's products and specific requirements for packaging and labeling Golden Corral proprietary products. The contracts entered into between Golden Corral and certain Defendants and co-conspirators set forth the agreed price and volume of chicken products to be sold to Golden Corral. Golden Corral brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates ("McLane" or "Assignor"). During the Conspiracy Period, Golden Corral purchased Broilers directly from certain Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators. Also during the Conspiracy Period, McLane purchased Broilers on Golden Corral's behalf from Defendants and/or their co-conspirators. McLane has assigned its claims arising out of these purchases to Golden Corral. Golden Corral and/or its Assignor purchased millions of dollars' worth of Broilers directly from Defendants and co-conspirators at artificially inflated prices throughout the Conspiracy Period. Golden Corral contracted directly with Defendants and their co-conspirators for the purchase of Broilers, negotiating the price and quantity at which Defendants would supply Golden Corral with Broilers. As such, Golden Corral has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Golden Corral was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Golden Corral brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.

**ANSWER:**    Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 86. To the extent the allegations in Paragraph 86 characterize contracts or other documents, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 86 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 86 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to

form a belief as to the truth of the allegations in the first three sentences and, and tenth and eleventh sentences of Paragraph 86 and therefore deny them. The eighth, fourteenth, fifteenth, and sixteenth sentences of Paragraph 86 contain Plaintiff's characterizations of their claims and legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations of the fourteenth, fifteenth, and sixteenth sentence in Paragraph 86 and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the eighth sentence of Paragraph 86 and therefore deny them. Although Defendants admit that Plaintiff Golden Corral Corporation and/or its purported assignor, McLane Foodservice, Inc., directly purchased Broiler chicken from at least one Defendant, during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 86 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 86 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 86.

> 87. Plaintiff Hollywood Wings, LLC, doing business as Hooters of Hollywood, is a Kansas Limited-liability company doing business in Hollywood, California. Plaintiff Hollywood Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Hollywood Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Hollywood Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 87. The last sentence of Paragraph 87 consists of Plaintiff's legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 87 and therefore deny them.

88.     *Plaintiff Hooters of America, LLC is a Georgia limited-liability company with its principal place of business in Atlanta, Georgia. Hooters of America, through its affiliates, owns and operates restaurants that sell chicken. Hooters of America brings this action on its own behalf for its purchases of chicken during the relevant time period. In addition, and alternatively, Hooters of America brings this action as assignee of its purchasing agent, Ben E. Keith who purchased chicken on Hooters of America's behalf during the relevant time period, from Defendants and/or their co-conspirators including Tyson and Pilgrim's Pride, and who assigned its claims arising out of these purchases to Hooters of America; and as assignee of its purchasing agent, Naturally Fresh, Inc., who purchased chicken on Hooters of America's behalf during the relevant time period from Defendants and/or their co-conspirators including Tyson, Pilgrim's Pride and Perdue, and who assigned its claims arising out of these purchases to Hooters of America. During the time period relevant to Plaintiff's claims, Hooters of America and/or its assignors, directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. The reference in this Complaint to "Hooters of America" refer collectively to Hooters of America, LLC and its assignors. Hooters of America is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 88. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 88 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 88 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first three sentences and the sixth sentence of Paragraph 88 and therefore deny them. The fourth, fifth, and seventh sentences of Paragraph 88 contain Plaintiff's characterizations of their claims and legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations of the fifth and seventh sentence in Paragraph 88 and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the fourth sentence of Paragraph 88 and therefore deny them. Defendants other than Pilgrim's, Perdue, and Tyson lack knowledge or information sufficient to form a belief as to the specific agreements referenced in Paragraph 88 and therefore deny them. Pilgrim's admits it has sold poultry to Ben E. Keith during the Relevant Period, but denies it has

sold directly to Plaintiff Hooters of America, LLC.  Pilgrim's denies that Plaintiff Hooters of America, LLC and/or its assignors were in any way injured as a result of purchases from Pilgrim's and that Pilgrim's engaged in any wrongful conduct. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 88 and therefore denies them.  Perdue admits it has sold poultry products to Ben E. Keith Company and Bay Valley Foods, LLC during the Relevant Period, but denies it has sold poultry products directly to or had a contract with Plaintiff Hooters of America, LLC, that Ben E. Keith Company or Bay Valley Foods, LLC made any purchases from it at artificially inflated prices, that Ben E. Keith Company and Bay Valley Foods, LLC were in any way injured as a result of purchases from it, and that Perdue engaged in any wrongful conduct. Perdue lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 88 and therefore denies them. Tyson admits it has sold poultry to Ben E. Keith during the Relevant Period, but denies that Hooters of America, LLC, and/or its assignors were in any way injured as a result of purchases from Tyson and that Tyson engaged in any wrongful conduct.  Tyson lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 88 and therefore denies them.  Defendants deny any remaining allegations in Paragraph 88.

> 89.    *Plaintiff Hooters Management Corporation is a Florida corporation with its principal place of business in Clearwater, Florida. Hooters Management Corporation brings this action on its own behalf and as assignee of the following entities, which have assigned their claims to Hooters Management Corporation: Hooters of Clearwater, Inc.; Hooters II, Inc.; Hooters III, Inc.; Hooters of Port Richey, Inc.; Hooters of Brandon, Inc.; Hooters of North Tampa, Inc.; Hooters of Spring Hill, Inc.; Hooters of South Tampa, Inc.; Hooters on 4th Street, Inc. (f/k/a Hooters on Roosevelt, Inc.); Hooters of Channelside, Inc.; Hooters of John's Pass, Inc.; Hooters of Clearwater Beach, Inc.; Hooters of Wells Street, Inc.; Hooters of Downers Grove, Inc.; Hooters of Orland Park, Inc.; Hooters on Golf, Inc.; Hooters on Golf Holding Co.; Hooters of Oak Lawn, Inc.; Hooters of Lansing, Inc.; Hooters on Higgins, Inc.; Hooters of Aurora, Inc.; Hooters of Joliet, Inc.; Hooters of Melrose Park, Inc.; Hooters of Countryside, Inc.; Hooters of Gurnee, Inc.; Hoots of Cicero, Inc.; Hooters of 33rd Street, Inc.; Hooters of Manhattan, Ltd.; Hooters of Manhattan Inc.; Tyrone Hooters, Ltd.; Hooters of Vernon Hills, Inc.; Hooters of Crystal*

*Lake, Inc.; Hooters of Palm Harbor, Inc.; Hooters Management Holding Co.; and Hooters Foods, Inc. These entities purchased chicken indirectly from Defendants and/or their co-conspirators including Koch, Tyson, and Pilgrim's Pride in Florida, New York, and Illinois, and assigned their claims arising out of these purchases to Hooters Management Corporation. As such, during the time period relevant to Plaintiff's claims, Hooters Management Corporation and/or its assignors, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Each of Plaintiff Hooters Management Corporation and its assignors is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein. The references in this Complaint to Hooters Management Corporation refer collectively to Hooters Management Corporation and its assignors.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 89. The fourth and fifth sentences of Paragraph 89 contain Plaintiff's characterizations of their claims and legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations of the fourth and fifth sentence in Paragraph 89. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 89 and therefore deny them.

90. *Plaintiff Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc. is the trustee for Central Grocers, Inc. which was an Illinois corporation with its principal place of business in Joliet, Illinois.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90 and therefore deny them.

91. *Plaintiff Hy-Vee, Inc. ("Hy-Vee") is an Iowa corporation with its principal place of business in West Des Moines, Iowa. Hy-Vee brings this action on its own behalf and on behalf of its assignor Perishable Distributors of Iowa (a wholly-owned subsidiary of Hy-Vee) and its other assignor Topco Associates, LLC.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 91 and therefore deny them.

92. *Plaintiff Independent Purchasing Cooperative, Inc. is a Delaware non-profit purchasing cooperative headquartered within Miami-Dade County, Florida. IPC is a cooperative purchasing agent for its members, which are Subway® franchisees. IPC brings this action regarding chicken purchased for its members as assignee of those*

*distributors and processors who assigned their claims to IPC for chicken purchases that IPC coordinated. During the conspiracy period, IPC or its assignors directly purchased chicken at artificially inflated prices directly from one or more of the Defendants and Producer Co-Conspirators (as defined below), and suffered injury to its business or property as a direct or proximate result of Defendants' and co-conspirators' wrongful conduct.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 92. Although Defendants admit that Plaintiff Independent Purchasing Cooperative, Inc. and/or its purported assignors, Subway franchisees, directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 92 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 92 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 92 and therefore deny them.

93. *Plaintiff Ira Higdon Grocery Company, Inc. is a Georgia corporation with its principal place of business in Cairo, Georgia.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93 and therefore deny them.

94. *Plaintiff Jetro Holdings, LLC is a Delaware limited-liability company with its principal place of business in College Point, New York. JRD Holdings, LLC, a Delaware limited liability holding company also located in College Point, New York, is the sole member of Jetro. Jetro is the nation's leading wholesale grocer. Jetro operates its wholesale grocer business through two divisions: Jetro Cash and Carry Enterprises, LLC and Restaurant Depot, LLC. Jetro Cash and Carry Enterprises, LLC is a wholesale supplier that manages "cash-and-carry" warehouses (i.e., a system of trading in which purchasers pay for goods in full in cash and carry them away at the time of purchase), which stock a broad variety of items, including both perishable and nonperishable bulk foods, food preparation equipment, and take-out containers. Restaurant Depot, LLC is a similar wholesale cash-and-carry operation with warehouses selling food, paper supplies, and tabletop items to independent food businesses nationwide.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94 and therefore deny them.

95. *Plaintiff John Soules Foods, Inc., is a Texas corporation with its principal place of business in Tyler, Texas; Plaintiff John Soules Acquisitions, LLC, is a Georgia limited liability company with its principal place of business in Gainesville, Georgia, which on or around November 17, 2014, acquired the assets of Pro View Foods, LLC, and its affiliates, including claims that are the subject of this action (collectively "John Soules Foods"). John Soules Foods, is a direct purchaser of Broilers from several producer Defendants.*

**ANSWER:** Defendants admit that Plaintiff John Soules Food, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, but each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 95 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 95 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 95 and therefore deny them.

96. *Plaintiff King Solomon Foods, Inc. is a New York corporation with its principal place of business in Brooklyn, New York.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96 and therefore deny them.

97. *Plaintiff Kraft Heinz Foods Company is a Pennsylvania limited-liability company co-headquartered in Pittsburgh, Pennsylvania and Chicago, Illinois. Kraft Heinz is the third largest food and beverage company in the United States and the fifth largest in the world. In October 2012, Kraft Foods, Inc. spun off Kraft Foods Group, Inc., as a North American grocery business, before changing its name from Kraft Foods, Inc. to Mondelez International, Inc. On July 2, 2015, through a series of transactions, Kraft Foods Group, Inc. merged with and into Kraft Heinz Foods Company (formerly known as H.J. Heinz Company). The Kraft Heinz Company is the parent company of operating entity Kraft Heinz Foods Company. In addition to the well-known Kraft and Heinz brands, Kraft*

*Heinz's U.S. food brands include, among others, Oscar Mayer, Lunchables, Smart Made, and Smart Ones.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97 and therefore deny them.

98.     *Plaintiff Krispy Krunchy Foods, LLC ("Krispy Krunchy") is a Louisiana limited liability company with its principal place of business in Alexandria, Louisiana. Krispy Krunchy licenses its brand and fried chicken program to various retail outlets. During the time period relevant to Plaintiffs' claims, Krispy Krunchy directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged here. Krispy Krunchy is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:**  Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 98.  The last sentence of Paragraph 98 consists of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations in this sentence.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 98 and therefore deny them.

99.     *Plaintiff L. Hart, Inc. is a Mississippi corporation with its principal place of business in Water Valley, Mississippi.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99 and therefore deny them.

100.     *Plaintiff Latina Boulevard Foods, LLC is a Florida limited-liability corporation with its principal place of business in Cheektowaga, New York.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 100 and therefore deny them.

101.     *Plaintiff LTP Management Group, Inc. is a Florida corporation with its principal place of business in Fort Myers, Florida. LTP Management Group, Inc. brings this action on its own behalf and as assignee of the following entities, which have assigned their claims to LTP Management Group, Inc.: Lags Enterprises, Inc. d/b/a Hooters of Ft Myers; Country Bumpkins, Inc. d/b/a Hooters of Sunrise; Hooters of Sarasota, Inc.; Hooters of Bayside, Inc.; Hooters of Pembroke Pines, Inc.; Waterfront Concepts, Inc. d/b/a Hooters of Ft Myers Beach; Hooters of Doral, Inc.; Hooters of Cape Coral, Inc.; Hooters*

*of BeachPlace, Inc.; Hooters of Cypress Creek, Inc.; Hooters of Port Charlotte, Inc.; Hooters of Bradenton, Inc.; Hooters of Naples, Inc.; Wings of Boca, Inc. d/b/a Hooters of Boca; Hooters of Miami, Inc. d/b/a Hooters of Coral Gables; Wings of Hialeah, Inc. d/b/a Hooters of Hialeah; Hooters of Hollywood, Inc.; Lag's Drinks of Orlando, Inc. d/b/a Adobe Gila's of Orlando; Lulu's Bait Shack of Fort Lauderdale, Inc. d/b/a Lulus of Fort Lauderdale; Pigs Galore, LLC d/b/a The Royal Pig Pub and Kitchen. These entities purchased chicken indirectly from Defendants and/or their co-conspirators including Perdue, Amick, Tyson, Koch and Pilgrim's Pride in Florida and assigned their claims arising out of these purchases to LTP Management Group, Inc. As such, during the time period relevant to Plaintiff's claims, LTP Management Group, Inc. and/or its assignors, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations alleged in this Complaint. Each of Plaintiff LTP Management Group, Inc. and its assignors is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and under the state laws referenced herein. Reference in this Complaint to LTP Management Group, Inc. refers collectively to LTP Management Group, Inc. and its assignors.*

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 101.   The fourth and fifth sentences of Paragraph 101 contain Plaintiff's characterizations of their claims and legal conclusions to which no response is required.   To the extent a response is required, Defendants deny the allegations of the fourth and fifth sentence in Paragraph 101.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 101 and therefore deny them.

102.   *Plaintiff Maximum Quality Foods, Inc. is a New Jersey corporation with its principal place of business in Linden, New Jersey.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102 and therefore deny them.

103.   *Plaintiff McLane Company, Inc., d/b/a McLane/Southwest, McLane/Southeast, McLane Southeast, McLane/Northwest, McLane/Southeast – Dothan, McLane/ High Plains, and McLane/North Texas is a leading supply chain services company providing grocery and foodservice supply chain solutions to convenience stores, discount retailers, wholesale clubs, drug stores, military bases, and restaurants throughout the United States. McLane Company, Inc. is a Texas corporation with its principal place of business in Temple, Texas. It, along with its subsidiaries and affiliates, purchased*

*Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 103. Although Defendants admit that Plaintiff McLane Company, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 103 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 103 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 103 and therefore deny them.

*104. Plaintiff McLane/Mid-Atlantic, Inc., d/b/a McLane/Carolina and McLane Mid- Atlantic, is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 104. Although Defendants admit that Plaintiff McLane/Mid-Atlantic, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 104 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 104 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 104 and therefore deny them.

*105. Plaintiff McLane/Midwest, Inc., d/b/a McLane/Cumberland, McLane/Midwest, McLane Midwest, and McLane/Ozark is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the*

*relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 105. Although Defendants admit that Plaintiff McLane/Midwest, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 105 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 105 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 105 and therefore deny them.

106. *Plaintiff McLane Minnesota, Inc. is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 106. Although Defendants admit that Plaintiff McLane Minnesota, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 106 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 106 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 106 and therefore deny them.

107. *Plaintiff McLane New Jersey, Inc. is a Delaware corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the*

*relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 107.  Although Defendants admit that Plaintiff McLane New Jersey, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 107 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 107 to the extent that they relate to other Defendants and/or third parties.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 107 and therefore deny them.

108.   *Plaintiff McLane/Eastern, Inc., d/b/a McLane/Northeast, McLane/Northeast- Concord, and McLane PA is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 108.  Although Defendants admit that Plaintiff McLane/Eastern, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 108 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 108 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 108 and therefore deny them.

109.   *Plaintiff McLane/Suneast, Inc., d/b/a McLane/Pacific, McLane/Southern California, McLane/Sunwest, McLane Sunwest, McLane/Suneast, and McLane Ocala is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or*

*more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 109. Although Defendants admit that Plaintiff McLane/Suneast, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 109 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 109 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 109 and therefore deny them.

*110. Plaintiff McLane Ohio, Inc. is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 110. Although Defendants admit that Plaintiff McLane Ohio, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 110 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 110 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 110 and therefore deny them.

*111. Plaintiff McLane/Southern, Inc. is a Mississippi corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the*

*relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 111. Although Defendants admit that Plaintiff McLane/Southern, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 111 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 111 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 111 and therefore deny them.

*112. Plaintiff McLane/Western, Inc. is a Colorado corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 112. Although Defendants admit that Plaintiff McLane/Western, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 112 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 112 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 112 and therefore deny them.

*113. Plaintiff McLane Express, Inc., d/b/a C.D. Hartnett Company, Inc. is a Texas corporation with its principal place of business in Weatherford, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or*

*more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 113. Although Defendants admit that Plaintiff McLane Express, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 113 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 113 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 113 and therefore deny them.

*114. Plaintiff Kinexo, Inc. is a North Carolina corporation with its principal place of business in Rocky Mount, North Carolina. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 114. Although Defendants admit that Plaintiff Kinexo, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 114 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 114 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 114 and therefore deny them.

*115. Plaintiff McLane Foodservice Distribution, Inc. is a North Carolina corporation with its principal place of business in Rocky Mount, North Carolina. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from*

*one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 115.  Although Defendants admit that Plaintiff McLane Foodservice Distribution, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 115 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 115 to the extent that they relate to other Defendants and/or third parties.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 115 and therefore deny them.

> *116.    Plaintiff McLane Foodservice, Inc. is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 116. Although Defendants admit that Plaintiff McLane Foodservice, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 116 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 116 to the extent that they relate to other Defendants and/or third parties.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 116 and therefore deny them.

> *117.    Plaintiff Meijer, Inc. and Plaintiff Meijer Distribution, Inc. are Michigan corporations, with their principal place of business located in Grand Rapids, Michigan.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 117 and therefore deny them.

118.     *Plaintiff Mission Valley Wings, LLC, doing business as Hooters of Mission Valley, is a Kansas Limited-liability company doing business in San Diego, California. Plaintiff Mission Valley Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Mission Valley Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Mission Valley Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:**     Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 118. The last sentence of Paragraph 118 consists of Plaintiff's legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 118 and therefore deny them.

119.     *Plaintiff Nestlé Purina PetCare Company is a Missouri corporation with its principal place of business in St. Louis, Missouri. Nestlé Purina is one of the world's largest producers of pet food.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 119 and therefore deny them.

120.     *Plaintiff Nestlé USA, Inc. is a Delaware corporation with its principal place of business in Arlington, Virginia. Nestlé USA has manufacturing facilities across the U.S. and its brands include, Stouffer's, Lean Cuisine, DiGiorno, Buitoni, Hot Pockets, Nescafe, Nestlé Toll House, and Coffee Mate.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 120 and therefore deny them.

121.     *Plaintiff Nicholas & Co., Inc. is a Utah corporation with its principal place of business in Salt Lake City.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121 and therefore deny them.

122.     *Plaintiff Oceanside Wings, LLC, previously doing business as Hooters of Oceanside, is a Kansas Limited-liability company that did business in Oceanside,*

*California. Plaintiff Oceanside Wings, LLC purchased chicken indirectly from Defendants and/or their co- conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Oceanside Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Oceanside Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 122. The last sentence of Paragraph 122 consists of Plaintiff's legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 122 and therefore deny them.

*123. Plaintiff Ontario Wings, LLC, doing business as Hooters of Ontario, is a Kansas Limited-liability company doing business in Ontario, California. Plaintiff Ontario Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Ontario Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Ontario Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 123. The last sentence of Paragraph 123 consists of Plaintiff's legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 123 and therefore deny them.

*124. Plaintiff OSI Restaurant Partners, LLC is a Delaware company with its principal place of business located in Tampa, Florida. OSI brings this action on its own behalf as a direct purchaser of chicken from one or more Defendants and their co-*

*conspirators during the conspiracy and as an assignee of the claims of Kenneth O. Lester, Inc. d/b/a PFG Customized Distribution.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 124. Although Defendants admit that Plaintiff OSI Restaurant Partners, LLC directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 124 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 124 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 124 and therefore deny them.

*125. Plaintiff Pacific Food Distributors, Inc. is an Oregon corporation with its principal place of business in Clackamas, Oregon.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125 and therefore deny them.

*126. Plaintiff Piggly Wiggly Alabama Distributing Co., Inc. ("Piggly Wiggly") is an Alabama corporation with its principal place of business in Bessemer, Alabama.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 126 and therefore deny them.

*127. Plaintiff Pinnacle Foods, Inc. is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Pinnacle Foods was acquired by Conagra in October 2018 and is now a wholly-owned subsidiary of Conagra. As an independent, public company, Pinnacle Foods was a leading packaged foods company. Pinnacle Foods' brands include Hungry-Man, Birds Eye, Armour, and Mama Celeste pizza, among others.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 127 and therefore deny them.

128.    Plaintiff PJ Food Service, Inc. is a Kentucky corporation with its principal place of business in Louisville, Kentucky.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 128 and therefore deny them.

129.    Plaintiff Pollo Operations, Inc. ("Pollo") is a Florida corporation with its principal place of business in Miami, Florida. During the Conspiracy Period, Pollo operated restaurants under the Pollo Tropical banner. Restaurants like Pollo serve their proprietary chicken products in multiple locations throughout the country. To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, Pollo, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to Pollo's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Pollo with Broilers.  Pollo brings this action on its behalf and on behalf of its affiliates and wholly-owned subsidiaries and as assignee of Kelly's Foods Inc. ("Kelly's") for overcharges on direct purchases of Broilers by Pollo, and by Kelly's that were sold to Pollo during the Conspiracy Period. During the Conspiracy Period, Kelly's purchased Broilers on Pollo's behalf from Defendants and/or their co-conspirators. Kelly's has assigned its claims arising out of these purchases to Pollo. Pollo was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Pollo's claims are based on all elements of Defendants' collusive conduct, including bid-rigging that is the subject of the Superseding Indictment. As alleged in the Superseding Indictment and herein, Defendants' bid-rigging conduct targeted Pollo.

**ANSWER:**  To the extent the allegations in Paragraph 129 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer the last two sentences of Paragraph 129 at this time.  Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 129. To the extent the allegations in Paragraph 129 characterize contracts or other documents, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 129 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 129 to the extent that they relate to other Defendants and/or third parties. Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in the first three sentences and seventh and eighth sentence of Paragraph 129 and therefore deny them. The sixth and ninth sentences of Paragraph 129 contain Plaintiff's characterizations of their claims and legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations of the ninth sentence in Paragraph 129 and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the sixth sentence of Paragraph 129 and therefore deny them. Although Defendants admit that Plaintiff Pollo Operations, Inc. and its purported assignor, Kelly's Foods Inc., directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 129 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 129 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 129.

> 130. *Plaintiff Publix Super Markets, Inc. is a Florida corporation with its principal place of business located in Lakeland, Florida.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130 and therefore deny them.

> 131. *Plaintiff Quirch Foods, LLC is a Florida limited-liability company with its principal place of business in Coral Gables, Florida. Quirch brings this action on its own behalf and as assignee of Butts Foods, L.P. f/k/a Butts Foods, Inc. During the conspiracy period, Quirch and its assignor purchased chicken at artificially inflated prices directly from one or more of Defendants, and suffered injury to their business or property as a direct or proximate result of Defendants' wrongful conduct.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 131. Although Defendants admit that Plaintiff Quirch Foods, LLC and/or its purported assignor, Butts Food, L.P., directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as

to the truth of any allegations in Paragraph 131 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 131 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 131 and therefore deny them.

132. *Plaintiff R & D Marketing, LLC is a Mississippi limited liability company with its principal place of business in Tupelo, Mississippi.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 132 and therefore deny them.

133. *Plaintiff Rancho Bernardo Wings, LLC, doing business as Hooters of San Marcos, previously doing business as Hooters of Rancho Bernardo, is a California Limited-liability company doing business in San Marcos, California. Plaintiff Rancho Bernardo Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Rancho Bernardo Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Rancho Bernardo Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 133. The last sentence of Paragraph 133 consists of Plaintiff's legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 133 and therefore deny them.

134. *Plaintiff Red Bird Farms Distribution Company is a Colorado corporation with its principal place of business in Englewood, Colorado.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 134 and therefore deny them.

135. *Plaintiff Restaurants of America, Inc. is a Texas corporation with its principal place of business in Centennial, Colorado. Restaurants of America, Inc. brings this action on its own behalf and as assignee of the following entities, who have assigned*

*their claims to Restaurants of America, Inc.: Albuquerque Hooters, Inc.; Albuquerque West Hooters, LLC; Bloomington Hooters, Inc.; Colorado Springs Hooters, Inc.; Fiesta Mall Hooters, Inc.; Las Cruces Hooters, Ltd.; Lone Tree Hooters, Inc.; Metro Center Hooters, Inc.; Parker Road Hooters, Inc.; Hooters of Peoria, LP; Peoria Hooters, Inc.; Phoenix Hooters, Inc.; Scottsdale Hooters, Inc.; 8909 Indian Bend Hooters, LP; Thunder Mountain Hooters, LLC; Yuma Hooters, Inc.; West Phoenix Hooters, Inc.; Hooters of Westminster, LP; Westminster Hooters, Inc.; Bell Canyon Hooters, Inc.; Colorado Blvd. Hooters, Inc.; Colorado Springs North Hooters, Inc.; Chandler Hooters, Inc.; Southwest Hooters, Ltd.; Grand Junction Hooters, LP; Kipling Hooters, Ltd.; Mesa Hooters Inc.; Tucson Northwest Hooters Ltd.; Marana Hooters, Inc.; Tucson Hooters, Inc.; and Tempe Hooters, Inc. These entities purchased chicken indirectly from Defendants and/or their co-conspirators, including Tyson and George's, in Arizona, New Mexico, Colorado and Minnesota and assigned their claims arising out of these purchases to Restaurants of America, Inc. Plaintiff Restaurants of America, Inc. also brings claims on behalf of itself as assignee of Ben E. Keith Company and Bay Valley Foods, LLC (itself and as successor to Naturally Fresh, Inc.), who directly purchased chicken from Defendants and/or their co-conspirators, including Tyson and George's, on Restaurants of America Assignors' behalf during the relevant time period, and assigned their claims arising out of these purchases to Hooters of America, LLC, who subsequently assigned those claims to Plaintiff Restaurants of America, Inc. Each of Plaintiff Restaurants of America, Inc., and its assignors, Ben E. Keith and Bay Valley Foods, LLC successor to Naturally Fresh, Inc., and Hooters of America, LLC, is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein. The references in this Complaint to "Restaurant of America" refer collectively to Restaurants of America, Inc. and its assignors.*

**ANSWER:**    Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 135. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 135 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 135 to the extent that they relate to other Defendants and/or third parties.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first three sentences and sixth sentence of Paragraph 135 and therefore deny them.  The fourth and fifth sentences of Paragraph 135 contain Plaintiff's characterizations of their claims and legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations of the fifth sentence of Paragraph 135 and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the fourth sentence of Paragraph 135 and therefore deny them. Although Defendants

admit that Plaintiff Restaurants of America, Inc. and/or its purported assignors, Ben E. Keith Company and Bay Valley Foods, LLC successor to Naturally Fresh, Inc., directly purchased Broiler chicken from certain Defendants during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 135 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 135 to the extent that they relate to other Defendants and/or third parties. Defendants other than George's and Tyson lack knowledge or information sufficient to form a belief as to the specific agreements referenced in Paragraph 135 and therefore deny them. George's and Tyson each admit they sold poultry to Ben E. Keith during the Relevant Period, but deny they sold directly to Plaintiff Restaurants of America, Inc., that Plaintiff Restaurants of America, Inc. and/or its assignors were in any way injured as a result of purchases from them, and that they engaged in any wrongful conduct. George's and Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 135 and therefore deny them. Defendants deny any remaining allegations in Paragraph 135.

136. *Plaintiff Restaurant Services, Inc. ("RSI" or "Plaintiff") is a Delaware corporation with its principal place of business in Miami, Florida. RSI serves as the exclusive supply chain management and distribution cooperative for the BURGER KING® system of company-owned and franchisee-owned restaurants in the United States ("BK Restaurants"). BURGER KING® is the second largest fast food hamburger chain in the world. As the purchasing agent for BK Restaurants, RSI negotiates contracts and purchases products and distribution services on their behalf. During the relevant time period, RSI contracted with Defendants for the production and supply of Broilers. RSI also utilized distributors to supply BK Restaurants with Broilers purchased on their behalf pursuant to these negotiations and contracts. These distributors include McLane Company, Inc. ("McLane"), Nicholas and Company, Performance Food Group, Inc. ("PFG"), Reinhart Foodservice, LLC ("Reinhart"), Shamrock Foods Company ("Shamrock"), Sygma Network ("Sygma"), Sysco Montana, Inc. ("Sysco Montana"), and Maines Paper & Food Service, Inc., including its wholly-owned subsidiaries, Maines Paper & Food Service - Maryland, Inc., Maines Paper & Food Service - New England, Inc., Maines Paper & Food Service - Ohio, Inc., Maines Paper & Food Service - NY Metro, Inc., Maines Paper & Food Service - Mid-Atlantic, Inc., and Maines Paper & Food Service - Tennessee, Inc. (collectively "Maines"), who have each assigned their claims arising out of these*

*transactions to RSI. RSI brings this action on its own behalf, and as assignee of McLane, Nicholas and Company, PFG, Reinhart, Shamrock, Sygma, Sysco Montana, Maines, and their affiliates (collectively, "Assignors"). The references in this Complaint to "RSI" include RSI's Assignors.*

**ANSWER:** Defendants admit Plaintiff intends references in this Complaint to "RSI" to include RSI and its assignors. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 136 and therefore deny them.

*137. During the time period relevant to RSI's claims, RSI and/or its Assignors directly purchased Broilers in the United States from Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations and other unlawful activities alleged in this Complaint. RSI's claims are based on all elements of Defendants' collusive conduct, including specifically, the bid-rigging that is the subject of the Superseding indictment. As alleged in the Superseding Indictment and herein, Defendants engaged in bid- rigging conduct specifically targeted at RSI and other customers with whom they entered into contracts for the supply of Broilers.*

**ANSWER:** To the extent the allegations in Paragraph 137 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer the last two sentences of Paragraph 137 at this time. Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 137. Although Defendants admit that Plaintiff Restaurant Services, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 137 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 137 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 137 and therefore deny them.

138.    Plaintiff Sam's East, Inc. is an Arkansas corporation with its principal place of business in Bentonville, Arkansas.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 138 and therefore deny them.

139.    Plaintiff Sam's West, Inc. is an Arkansas corporation with its principal place of business in Bentonville, Arkansas.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 139 and therefore deny them.

140.    Plaintiff Save Mart Supermarkets, a California corporation has its principal place of business in Modesto, California. The reference in this Complaint to Save Mart refers to Save Mart Supermarkets and its predecessors, successors, divisions, banners and trade names, including, without limitation, Save Mart, Lucky Supermarkets, FoodMaxx, and MaxxValue Foods.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 140 and therefore deny them.

141.    Plaintiff Services Group of America, Inc. is a Delaware corporation with its principal place of business in Scottsdale, Arizona. SGA is one of the nation's leading marketers and distributors of food products and food services throughout the United States. From 2008 through the present, SGA's former subsidiaries, Food Services of America, Inc., a Delaware Corporation ("FSA"), Systems Services of America, Inc., a Delaware corporation ("SSA"), and Ameristar Meats, Inc., a Delaware Corporation ("Ameristar"), purchased chicken on behalf of SGA at artificially inflated prices directly from Defendants, their affiliates, and co-conspirators. Because of the functional and economic unity of SGA with its wholly-owned subsidiaries, FSA, SSA, and Ameristar, in the purchase of chicken from Defendants, any antitrust injury suffered by FSA, SSA, or Ameristar was passed on to, and absorbed by, SGA.  Regardless of SGA's individual standing as a direct purchaser or as a result of its ownership or control of, or principal-agent relationship with, FSA, SSA, and Ameristar as direct purchasers from Defendants, FSA, SSA, and Ameristar have expressly assigned to SGA all claims and causes of action that FSA, SSA, or Ameristar could assert in this lawsuit through September 13, 2019.

**ANSWER:**    Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 141.  Although Defendants admit that Plaintiff Services Group of America, Inc.'s purported assignors, Food Services of America, Inc., Systems Services of America, Inc., and Ameristar Meats, Inc, directly purchased Broiler chicken from at least one Defendant during the

Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to

the truth of any allegations in Paragraph 141 that relate to other Defendants and/or third parties,

and therefore each Defendant denies the allegations in Paragraph 141 to the extent that they relate

to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 141 and therefore deny them.

> 142. *Plaintiff Shamrock Foods Company is an Arizona corporation with its principal place of business in Phoenix, Arizona.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 142 and therefore deny them.

> 143. *Plaintiff Sherwood Food Distributors, L.L.C. is a Michigan limited-liability company with its principal place of business in Detroit, Michigan; Plaintiff Harvest Meat Company, Inc. is a Delaware corporation with its principal place of business in National City, California; Plaintiff Western Boxed Meats Distributors, Inc. is an Oregon corporation with its principal place of business in Portland, Oregon; and Hamilton Meat, LLC is a California limited-liability company with its principal place of business in Chula Vista, CA. These Plaintiffs are large affiliated distributors in the meat and food industry which service thousands of customers including retailers, wholesalers, institutional accounts, further processers, food service accounts, and cruise lines.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 143 and therefore deny them.

> 144. *Plaintiff South Gate Wings, LLC, doing business as Hooters of South Gate, is a California Limited-liability company doing business in South Gate, California. Plaintiff South Gate Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, South Gate Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. South Gate Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in

Paragraph 144. The last sentence of Paragraph 144 consists of Plaintiff's legal conclusions, to

which no response is required. To the extent a response is required, Defendants deny the

allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 144 and therefore deny them.

> 145. Plaintiff SpartanNash Company ("SpartanNash"), formerly known as Spartan Stores, Inc., is a Michigan corporation with its principal place of business in Byron Center, Michigan. As used herein, "SpartanNash" refers to SpartanNash Company, Spartan Stores, Inc., Nash-Finch Company, and Spartan Stores Distribution, LLC. During the Relevant Period, SpartanNash purchased chicken at artificially inflated prices directly from one or more of the Defendants and suffered injury to its business or property as a direct and proximate result of Defendants' wrongful conduct.

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 145. Although Defendants admit that Plaintiff SpartanNash Company directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 145 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 145 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 145 and therefore deny them.

> 146. Plaintiff SuperValu Inc. is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 146 and therefore deny them.

> 147. Plaintiff Sysco Corporation is a Delaware corporation with its principal place of business in Houston, Texas.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 147 and therefore deny them.

> 148. Plaintiff Target Corporation ("Target"), is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Target operates approximately

*1900 retail stores throughout the United States and also engages in internet sales via Target.com. Target is a direct purchaser of Broilers from several producer Defendants.*

**ANSWER:** Defendants admit that Plaintiff Target Corporation directly purchased Broiler chicken from at least one Defendant during the Relevant Period, but each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 148 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 148 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 148 and therefore deny them.

149. *Plaintiff The Distribution Group, Inc., doing business as the Van Eerden Foodservice Company is a Michigan corporation with its principal place of business in Grand Rapids, Michigan.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 149 and therefore deny them.

150. *Plaintiff, The Fresh Market, Inc. ("Fresh Market") is a Delaware corporation with its principal place of business in Greensboro, North Carolina. Fresh Market owns and operates grocery stores that sell chicken. Fresh Market brings this action on its own behalf, and as assignee of its purchasing agent, Burris Logistics, who purchased chicken from Defendants and/or their co- conspirators on Fresh Market's behalf during the relevant time period, and assigned their claims arising out of these purchases to Fresh Market. During the time period relevant to Fresh Market's claims, Fresh Market and/or its assignors, directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations alleged in this Complaint. Both Fresh Market and Burris Logistics are a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 150. The last sentence of Paragraph 150 consists of Plaintiff's legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Although Defendants admit that Plaintiff The Fresh Market, Inc. and/or its purported assignor, Burris Logistics, directly purchased Broiler chicken from at least

one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 150 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 150 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 150 and therefore deny them.

151.    *Plaintiff The Golub Corporation, whose retail operating banners include Price Chopper, Market 32 and Market Bistro, is a Delaware corporation with its principal place of business in Schenectady, New York.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 151 and therefore deny them.

152.    *Plaintiff The Johnny Rockets Group, Inc. d/b/a Johnny Rockets is a Delaware corporation with its principal place of business in Wilbraham, Massachusetts. During the relevant period, Johnny Rockets operated over 450 stores across the country, and was registered to do business in each state in which it operated, including Alabama, Arizona, California, Colorado, District of Columbia, Florida, Hawaii, Illinois, Maine, Michigan, Minnesota, Missouri, Nevada, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Tennessee, Utah, Virginia and Wisconsin.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 152 and therefore deny them.

153.    *To ensure consistency in taste and quality of their products across hundreds of locations spanning multiple states, Johnny Rockets, like many restaurants, negotiates and contracts directly with Defendants for the production and supply of their proprietary chicken according to Johnny Rockets unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Johnny Rockets with broilers. The contracts between Johnny Rockets and Defendants identify Johnny Rockets as the purchaser or customer, and set forth the agreed formula pricing (as represented by Defendants) and the volume of proprietary chicken products to be sold to Johnny Rockets. The proprietary product Defendants produce and sell to Johnny Rockets cannot be sold to any other customer. During the relevant period, Johnny Rockets purchased broilers directly from Defendants, Defendants' subsidiaries and affiliates, entities owned or controlled by Defendants, or agents Defendants or Defendants' subsidiaries and affiliates controlled. Johnny Rockets contracted directly with Defendants for the purchase of broilers, negotiating the price and quantity at which Defendants would supply broilers to Johnny Rockets. Johnny Rockets also purchased broilers indirectly from*

*Defendants, Defendants' subsidiaries and affiliates, entities owned or controlled by Defendants, or agents Defendants or Defendants' subsidiaries and affiliates controlled for use in food preparation in Johnny Rocket's locations, and not for resale in unaltered form. The purchase orders for broilers supplied to Johnny Rockets restaurants were created and issued from Johnny Rockets restaurant locations in multiple states, including Alabama, Arizona, California, Colorado, District of Columbia, Florida, Hawaii, Illinois, Maine, Michigan, Minnesota, Missouri, Nevada, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Tennessee, Utah, Virginia and Wisconsin. Johnny Rockets restaurants also received invoices for and shipments of broilers. As such, Johnny Rockets has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.*

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 153. To the extent the allegations in Paragraph 153 characterize contracts or other documents, Defendants deny any characterization or description that is inconsistent with the referenced sources.   Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 153 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 153 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the seventh, eighth, and ninth sentences of Paragraph 153 and therefore deny them.  The tenth sentence of Paragraph 153 consists of Plaintiff's characterizations of their claims and legal conclusions to which no response is required.   To the extent a response is required, Defendants deny the allegations of the tenth sentence in Paragraph 153.  Although Defendants admit that Plaintiff The Johnny Rockets Group, Inc. directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 153 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 153 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any remaining allegations in Paragraph 153.

154.    Plaintiff The Kroger Co. is an Ohio corporation with its principal place of business in Cincinnati, Ohio. The Kroger Co. brings this action on its own behalf and on behalf of its assignors, all of whom are wholly-owned subsidiaries of The Kroger Co.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 154 and therefore deny them.

155.    Plaintiff Timber Lake Foods, Inc. is a Mississippi corporation with its principal place of business in Tupelo, Mississippi.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 155 and therefore deny them.

156.    Plaintiff Troyer Foods, Inc. is an Indiana corporation with its principal place of business in Goshen, Indiana.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 156 and therefore deny them.

157.    During the time period relevant to Plaintiffs' claims, Plaintiff Unified Grocers, Inc. was a California corporation with its principal place of business in Commerce, California.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 157 and therefore deny them.

158.    Plaintiff United Food Service, Inc. is a Colorado corporation with its principal place of business in Commerce City, Colorado.  United Food Service, Inc. is a wholly-owned subsidiary of Shamrock Foods Company.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 158 and therefore deny them.

159.    Plaintiff United Supermarkets, LLC ("United Supermarkets") is a Texas limited liability company with its principal place of business in Lubbock, Texas. United Supermarkets owns and operates retail stores that sell chicken.  During the time period relevant to Plaintiffs' claims, United Supermarkets directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged here. United

*Supermarkets is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:**  Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 159. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first two sentences of Paragraph 159 and therefore deny them.  The third and fourth sentences of Paragraph 159 contain Plaintiff's characterizations of their claims and legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations of the third and fourth sentences in Paragraph 159.  Although Defendants admit that Plaintiff United Supermarkets, LLC directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 159 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 159 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any remaining allegations in Paragraph 159.

160.    *Plaintiff URM Stores, Inc. is a Washington corporation with its principal place of business in Spokane, Washington.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 160 and therefore deny them.

161.    *Plaintiff US Foods, Inc. is a Delaware corporation with its principal place of business in Rosemont, Illinois.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 161 and therefore deny them.

162.    *Plaintiff Wakefern Food Corporation is a New Jersey corporation with its principal place of business in Elizabeth, New Jersey.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 162 and therefore deny them.

163.    *Plaintiff Walmart Inc. is a Delaware corporation with its headquarters in Bentonville, Arkansas. Walmart Inc. is a retail corporation that operates grocery, department, and warehouse stores across the United States and internationally.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 163 and therefore deny them.

164.    *Plaintiff Wal-Mart Stores Arkansas, LLC is an Arkansas limited-liability company with its principal place of business in Bentonville, Arkansas.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 164 and therefore deny them.

165.    *Plaintiff Wal-Mart Stores East, LP (f/k/a Wal-Mart Stores East, Inc.) is a Delaware limited partnership with its principal place of business in Bentonville, Arkansas.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 165 and therefore deny them.

166.    *Plaintiff Wal-Mart Louisiana, LLC is a Delaware limited-liability company with its principal place of business in Bentonville, Arkansas.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 166 and therefore deny them.

167.    *Plaintiff Wal-Mart Stores Texas, LLC (f/k/a/ Wal-Mart Stores Texas, LP) is a Delaware limited-liability company with its principal place of business in Bentonville, Arkansas.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 167 and therefore deny them.

168.    *Plaintiff Wawa, Inc. ("Wawa") is a New Jersey corporation with its principal place of business in Wawa, Pennsylvania. Wawa owns and operates a chain of convenience stores and dispensing facilities in the United States. Wawa brings this action*

*on its own behalf, and as assignee of its purchasing agents, Taylor Fresh Foods, Inc., Taylor Farms, Florida, Inc., Taylor Farms New Jersey, Inc. and Safeway Fresh Foods LLC, all of whom purchased chicken on Wawa's behalf directly from Defendants and/or their co-conspirators during the relevant time period and assigned their claims arising out of these purchases to Wawa. During the time period relevant to Wawa's claims, Wawa and/or its assignors directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations alleged in this Complaint. Wawa and its assignors are each a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 168. The last sentence of Paragraph 168 consists of Plaintiff's legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Although Defendants admit that Plaintiff Wawa, Inc. and/or its purported assignors, Taylor Fresh Foods, Inc., Taylor Farms, Florida, Inc., Taylor Farms New Jersey, Inc., and Safeway Fresh Foods LLC, directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 168 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 168 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 168 and therefore deny them.

169. *Plaintiff Weinstein Wholesale Meats, Inc. is an Illinois corporation with its principal place of business in Forest Park, Illinois.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 169 and therefore deny them.

170. *Plaintiff White Castle Purchasing Co. is a Delaware corporation with its principal place of business in Columbus, Ohio. During the Conspiracy Period, White Castle operated over 400 restaurants in multiple states. Restaurants like White Castle serve their proprietary chicken products in multiple locations throughout the country and the world. To ensure consistency in taste and quality of its products across hundreds of*

locations spanning multiple states, White Castle, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to White Castle's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply White Castle with Broilers. White Castle provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for White Castle's products and specific requirements for packaging and labeling White Castle products. The contracts entered into between White Castle and Defendants set forth the agreed price and volume of chicken products to be sold to White Castle. White Castle brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates ("McLane" or "Assignor"). During the Conspiracy Period, White Castle purchased Broilers directly from Defendants and their co- conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators. Also during the Conspiracy Period, McLane purchased Broilers on White Castle's behalf from Defendants and/or their co- conspirators, including Pilgrim's Pride and Wayne Farms. McLane has assigned its claims arising out of these purchases to White Castle. White Castle and/or its Assignor purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period. As such, White Castle has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. White Castle was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. White Castle brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 170. To the extent the allegations in Paragraph 170 characterize contracts or other documents, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 170 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 170 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first three sentences and the tenth and eleventh sentence of Paragraph 170 and therefore deny them. The eighth, thirteenth, fourteenth, and fifteenth sentences of Paragraph 170 contain Plaintiff's characterizations of their claims and legal conclusions to which no response is required. To the extent a response is required,

Defendants deny the allegations of the thirteenth, fourteenth, and fifteenth sentence in Paragraph 170 and lack knowledge or information sufficient to form a belief as to the truth of the allegations of the eighth sentence of Paragraph 170 and therefore deny them. Although Defendants admit that Plaintiff White Castle Purchasing Co. and its purported assignor, McLane Foodservice, Inc., directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 170 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 170 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 170.

*171. Plaintiff Wings Over Long Beach, LLC, doing business as Hooters of Long Beach, is a Kansas Limited-liability company doing business in Long Beach, California. Plaintiff Wings Over Long Beach, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Wings Over Long Beach, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Wings Over Long Beach, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 171. The last sentence of Paragraph 171 consists of Plaintiff's legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 171 and therefore deny them.

*172. Plaintiff Winn-Dixie Stores, Inc. is a corporation organized under the laws of the State of Florida. Its principal place of business is 8928 Prominence Parkway, #200, Jacksonville, Florida 32256. Winn-Dixie Stores, Inc. brings this action on its own behalf*

*and as the assignee of C&S Wholesale Grocers, Inc., a wholesaler that, during the relevant period, purchased chicken directly from Defendants for resale to Winn-Dixie Stores, Inc.*

**ANSWER:** Defendants admit that Plaintiff Winn-Dixie Stores, Inc.'s purported assignor, C&S Wholesale Grocers, Inc., directly purchased Broiler chicken from at least one Defendant during the Relevant Period, but each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 172 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 172 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 172 and therefore deny them.

> 173. *Plaintiff W. Lee Flowers & Company, Inc. is a corporation organized, existing, and doing business under the laws of South Carolina, with its principal place of business in Scranton, South Carolina.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 173 and therefore deny them.

> 174. *Plaintiff Woodman's Food Market, Inc. is a Wisconsin corporation with its principal place of business in Janesville, Wisconsin.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 174 and therefore deny them.

> 175. *Plaintiff WZ Franchise Corporation is a Georgia corporation with its principal place of business in Atlanta, GA.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 175 and therefore deny them.

> 176. *Plaintiff Zaxby's Franchising LLC ("Zaxby's") is a Georgia corporation with its principal place of business in Athens, Georgia. Zaxby's owns, operates, or alternatively is the franchisor (and trademark licensor) of, more than 500 Zaxby's branded restaurants in the United States (the "Zaxby's Branded Restaurants"). Restaurants like Zaxby's serve their proprietary chicken products in multiple locations throughout the country. To ensure consistency in taste and quality of its products across hundreds of*

*locations, Zaxby's, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of chicken for the Zaxby's Branded Restaurants, according to Zaxby's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply the Zaxby's Branded Restaurants with Broilers. Zaxby's provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Zaxby's products and specific requirements for packaging and labeling Zaxby's proprietary products. The agreements entered into between Zaxby's and Defendants and co-conspirators set forth the agreed price and volume of chicken products to be sold to Zaxby's. Zaxby's brings this action on its own behalf, and additionally and alternatively, as assignee of Performance Food Group, Inc. ("PFG"). During the conspiracy period, Zaxby's purchased hundreds of millions of dollars' worth of Broilers directly from certain Defendants and co-conspirators at artificially inflated prices throughout the Conspiracy Period. Zaxby's contracted directly with Defendants and their co-conspirators for the purchase of Broilers, negotiating the price and quantity at which Defendants would supply Zaxby's with Broilers. As such, Zaxby's has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Also during the Conspiracy Period, PFG purchased Broilers on behalf of Zaxby's from Defendants and their co-conspirators. PFG has assigned its claims arising out of these purchases to Zaxby's. Zaxby's was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers, and therefore has suffered antitrust injury as a result of Defendants' conduct. Zaxby's brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in

Paragraph 176. To the extent the allegations in Paragraph 176 characterize contracts or other

documents, Defendants deny any characterization or description that is inconsistent with the

referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as

to the truth of any allegations in Paragraph 176 that relate to other Defendants and/or third parties,

and therefore each Defendant denies the allegations in Paragraph 176 to the extent that they relate

to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to

form a belief as to the truth of the allegations in the first three sentences and twelfth and thirteenth

sentences of Paragraph 176 and therefore deny them. The eighth, eleventh, fourteenth, and

fifteenth sentences of Paragraph 176 contain Plaintiff's characterizations of their claims and legal

conclusions to which no response is required. To the extent a response is required, Defendants

deny the allegations of the eleventh, fourteenth, and fifteenth sentence in Paragraph 176 and lack

knowledge or information sufficient to form a belief as to the truth of the allegations of the eighth sentence of Paragraph 176 and therefore deny them. Although Defendants admit that Plaintiff Zaxby's Franchising LLC and/or its purported assignor, Performance Food Group, Inc., directly purchased Broiler chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 176 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 176 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 176.

**B.    Defendants**

*177.    Below is a list of the Defendants (in alphabetical order by Defendant family name) named in any DAP complaint. This does not mean that each Defendant has been named by each DAP. Additionally, some Defendants listed below may be named by certain DAPs as co- conspirators. The chart in Section 2 summarizes the Defendants and co-conspirators named by each DAP to date.*

**ANSWER:** Paragraph 177 contains no factual allegations to which a response is required. To the extent a response is required, Defendants admit that Plaintiffs purport to list each Defendant in alphabetical order, but deny any remaining allegations in Paragraph 177.

**1.    Agri Stats**

*178.    Defendant Agri Stats, Inc. ("Agri Stats") is an Indiana corporation headquartered in Fort Wayne, Indiana, and a former subsidiary of Eli Lilly & Co., a publicly-held Indiana corporation headquartered in Indianapolis.*

**ANSWER:** The Producer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 178 and therefore deny them. Agri Stats admits that it is an Indiana corporation headquartered in Fort Wayne, Indiana. Agri Stats denies the remaining allegations contained in Paragraph 178.

*179.    Agri Stats has knowingly played an important and active role in Defendants' collusive scheme detailed in this Complaint. All of Agri Stats' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct*

*alleged herein, and were authorized, ordered, or engaged in by Agri Stats' various officers, agents, employers or other representatives while actively engaged in the management and operation of Agri Stats' business affairs within the course and scope of their duties and employment, or with Agri Stats' actual apparent or ostensible authority. Agri Stats used the instrumentalities of interstate commerce to facilitate the conspiracy, and its conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the United States, including in this District.*

**ANSWER:** Defendants deny the allegations in Paragraph 179.

*180. In 2008 and 2010, a representative from Agri Stats was elected to the board of the National Chicken Council, one of the industry's most important trade associations. Those were key years in the conspiracy alleged in this Complaint. Several Defendants, including Wayne Farms and Pilgrim's, also have hired former Agri Stats executives to work in senior sales positions, and Agri Stats employs or has employed several former executives of the Defendants. These facts highlight the unique and symbiotic relationship between Agri Stats and the other Defendants.*

**ANSWER:** Producer Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 180. Agri Stats admits that an Agri Stats employee was elected to the board of the National Chicken Council in 2008 and 2010. Defendants deny the allegations in the second sentence of Paragraph 180. With respect to the third sentence of Paragraph 180, Defendants other than Agri Stats, Pilgrim's, and Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them. With respect to the third sentence of Paragraph 180, Pilgrim's admits that it hired a former Agri Stats account manager, but denies that he was an "executive" at Agri Stats or that he worked in a "senior sales position" at Pilgrim's and lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants and/or third parties and therefore denies them. With respect to the third sentence of Paragraph 180, Agri Stats admits that past employees have been employed by Wayne Farms and Pilgrim's and that it has employed persons who previously worked for other Defendants. Agri Stats denies any remaining allegations of the third sentence of Paragraph 180. With respect to the third sentence of Paragraph 180, Wayne Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations

and therefore denies them. Defendants deny the allegations of the fourth sentence of Paragraph 180 and any remaining allegations in Paragraph 180.

## 2.     Amick

181.     *Defendant Amick Farms, LLC ("Amick Farms") is a limited-liability company organized in Delaware with its headquarters located in Batesburg-Leesville, South Carolina. Amick Farms is a producer of fresh and frozen chicken products and operates facilities in South Carolina, Maryland, and Delaware.*

**ANSWER:** Defendants other than Amick Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 181 and therefore deny them. Amick Farms admits the allegations in Paragraph 181.

182.     *Amick Farms is a wholly-owned subsidiary of OSI Group, LLC, a privately held Delaware corporation with its headquarters in Aurora, Illinois.*

**ANSWER:** Defendants other than Amick Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 182 and therefore deny them. Amick Farms admits that Amick Farms, LLC is a majority-owned subsidiary of OSI Group, LLC, which is itself a privately held Delaware limited liability company headquartered in Aurora, Illinois. Amick Farms denies the remaining allegations in Paragraph 182.

183.     *During the relevant period, Amick Farms and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Amick Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 183 and therefore deny them. Amick Farms admits that it sold certain chicken products during the Relevant Period in the United States. Amick Farms denies the remaining allegations in Paragraph 183.

*184.    Amick Farms reports a wide variety of data to Agri Stats, including, without limitation, highly detailed, confidential information regarding its production and sales of broilers.*

**ANSWER:**  Defendants other than Amick Farms and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 184 and therefore deny them.  Amick Farms and Agri Stats admit that Amick Farms has provided certain information to Agri Stats.  Amick Farms and Agri Stats deny the remaining allegations in Paragraph 184.

**3.    Case**

*185.    Case Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina. During the time period relevant to Plaintiffs' claims, Case Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 185 and therefore deny them.  Case admits that Case Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina, and that it is the owner of Case Farms Processing, Inc. Case admits that Case Farms, LLC is under common control with Case Foods, Inc. and Case Farms Processing, Inc. and may be considered an affiliate under certain definitions, and that Case Farms, LLC has sold Broilers in interstate commerce to purchasers in the United States.  Case denies the remaining allegations in Paragraph 185.

*186.    Case Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in Ohio and North Carolina. Case Farms, LLC is a wholly-owned subsidiary of Case Foods, Inc. During the time period relevant to Plaintiffs' claims, Case Farms, LLC and/or its predecessors, wholly- owned or controlled subsidiaries, or affiliates sold*

*broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 186 and therefore deny them. Case admits that Case Farms, LLC is a Delaware limited liability company with its entity headquarters in Troutman, North Carolina, but denies that it has a corporate headquarters in Troutman, North Carolina. Case Farms, LLC denies that it is a wholly owned subsidiary of Case Foods, Inc. Case Farms, LLC denies that it has wholly-owned or controlled subsidiaries in the Broiler business. Case Farms, LLC admits that it sold Broilers in interstate commerce to purchasers in the United States. Case admits that Case Farms, LLC has operations in Ohio and North Carolina. Case denies the remaining allegations in Paragraph 186.

> 187.     *Case Farms Processing, Inc. is a privately held North Carolina corporation with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in North Carolina. Case Farms Processing, Inc. is a wholly-owned subsidiary of Case Foods, Inc. During the time period relevant to Plaintiffs' claims, Case Farms Processing, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 187 and therefore deny them. Case admits that Case Farms Processing, Inc. is a North Carolina corporation headquartered in Troutman, North Carolina with facilities and operations in North Carolina and Ohio. Case admits that Case Farms Processing, Inc. is a wholly-owned subsidiary of Case Foods, Inc. Case admits that Case Farms, LLC is under common control with Case Farms Processing, Inc. and may be considered an affiliate under certain definitions, and that Case Farms, LLC has sold Broilers in interstate commerce to purchasers in the United States. Case denies any remaining allegations in Paragraph 187.

188.     *Case Foods reports a wide variety of data to Agri Stats, including, without limitation, highly detailed, confidential information regarding its production and sales of broilers.*

**ANSWER:**  Defendants other than Case and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 188 and therefore deny them.  Case and Agri Stats admit that Case has provided certain information to Agri Stats, but deny the remaining allegations in Paragraph 188.

189.     *Defendants Case Foods, Inc., Case Farms, LLC and Case Farms Processing, Inc. are collectively referred to as "Case Foods."*

**ANSWER:**  Paragraph 189 contains no factual allegations to which a response is required.

**4.     Claxton**

190.     *Defendant Claxton Poultry Farms, Inc. is a Georgia corporation headquartered in Claxton, Georgia. Norman W. Fries, Inc. d/b/a Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. During the relevant time period, Norman W. Fries, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, in the United States. Defendants Claxton Poultry Farms, Inc. and Norman W. Fries, Inc. are collectively referred to as "Claxton." Claxton reports to Agri Stats a wide variety of data, including information about its breeder flocks and hatchery capacity and its Claxton, Georgia complex.  Until the Georgia Dock benchmark price stopped being published by the GDA in late November 2016, Claxton was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its CEO also served on the Georgia Dock Advisory Committee. Claxton is a Georgia Dock Defendant and during the relevant period sold broilers in interstate commerce, directly or through its wholly- owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Claxton and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 190 and therefore deny them.  Agri Stats admits that Claxton has provided certain information to Agri Stats but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 190 and therefore denies them.  Claxton denies that Claxton Poultry Farms, Inc. is an existing Georgia corporation located in Claxton, Georgia. Claxton admits Norman W. Fries, Inc. is a Georgia corporation located in Claxton, Georgia.  Claxton admits that during the Relevant

142

Period, Norman W. Fries, Inc. d/b/a Claxton Poultry Farms sold products that may fall within the Plaintiffs' litigation definition of Broilers in interstate commerce to purchasers in the United States. Claxton admits that Plaintiffs purport to refer to Claxton Poultry Farms, Inc. and Norman W. Fries, Inc. jointly throughout the Complaint as "Claxton Poultry," but denies that Claxton Poultry Farms, Inc. is an existing legal or fictitious entity. Claxton admits that at various points in the Relevant Period it provided certain information to Agri Stats and, at the request of the Georgia Department of Agriculture, provided certain information to the Georgia Department of Agriculture and had an employee representative on the Poultry Market News Advisory Committee. Claxton denies the remaining allegations of Paragraph 190.

### 5.    Fieldale

> 191.    *Fieldale Farms Corporation ("Fieldale") is a privately held Georgia corporation headquartered in Baldwin, Georgia. Fieldale reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and its Gainesville, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Fieldale submitted false and artificially inflated price quotes to the GDA. Its owner and CEO also served on the Georgia Dock Advisory Committee. During the relevant period, Fieldale sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Fieldale and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 191 and therefore deny them. Agri Stats admits that Fieldale has provided certain information to Agri Stats, but lacks or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 191 and therefore denies them. Fieldale admits that it is a privately held Georgia corporation headquartered in Baldwin, Georgia. Fieldale admits that it submitted information to Agri Stats and received Agri Stats reports during the Relevant Period alleged in the Amended Complaint. Fieldale admits that it had a representative on the Georgia Dock Advisory Board. Fieldale admits that it

sold broiler chickens in interstate commerce in the United States during the Relevant Period alleged in the Amended Complaint. Fieldale denies the remaining allegations in Paragraph 191.

### 6. Foster Farms

*192.* *Defendant Foster Farms, LLC is a privately held California corporation headquartered in Modesto, California. Foster reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Fresno, California, Livingston, California, and the Pacific Northwest.*

**ANSWER:** Defendants other than Foster Farms and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 192 and therefore deny them. Agri Stats admits that Foster Farms has provide it certain information, but lacks ir information sufficient to form a belief about the truth of the remaining allegations in Paragraph 192 and therefore denies them. Foster Farms admits that Foster Farms, LLC is a privately held California limited liability company headquartered in Livingston, California. Foster Farms denies the remaining allegations in Paragraph 192.

*193.* *Defendant Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms, LLC. During the relevant period, Foster Poultry Farms and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of broilers, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States. Defendants Foster Farms, LLC and Foster Poultry Farms are collectively referred to as "Foster" or "Foster Farms."*

**ANSWER:** Defendants other than Foster Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 193 and therefore deny them. Foster Farms admits that Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Farms admits that Foster Poultry Farms is engaged in the processing, distribution, sale, pricing, and marketing of Broilers (as the term is inaccurately defined in this Complaint). Foster Farms lacks knowledge or information sufficient to form a belief as to whether Foster Farms, LLC is a related entity to Foster Poultry Farms because Plaintiffs

144

provide no definition of the term "related entity." Foster Farms admits that Plaintiffs purport to refer to Foster Farms, LLC and Foster Poultry Farms collectively as "Foster" or "Foster Farms" throughout the Complaint. Foster Farms denies the remaining allegations in Paragraph 193.

### 7. George's

194. *Defendant George's Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.*

**ANSWER:** Defendants other than George's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 194 and therefore deny them. George's admits the allegations in Paragraph 194.

195. *Defendant George's Farms, Inc., is a privately held Arkansas corporation headquartered in Springdale, Arkansas. It is a wholly-owned subsidiary of George's, Inc. Defendants George's Inc. and George's Farms, Inc. are together referred to as "George's" in this Complaint. George's reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Harrisonburg, Virginia and Springdale, Arkansas. During the relevant period, George's sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than George's and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 195 and therefore deny them. Agri Stats admits that Georgie's has provided it certain information, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 195 and therefore denies them. George's admits that George's Farms, Inc. is a privately held Arkansas corporation headquartered in Springdale Arkansas, and wholly owned by George's Inc. George's admits that Plaintiffs purport to refer to George's Inc. and George's Farms, Inc. as "George's" throughout the Complaint. George's admits that it provides certain information to Agri Stats for lawful, non-conspiratorial purposes, but denies that the allegations in Paragraph 195 fully and accurately describe the information reported. George's admits that during the Relevant Period, George's or its affiliates sold products that fall within Plaintiffs' litigation definition of Broilers in

interstate commerce to purchasers in the United States. George's denies the remaining allegations in Paragraph 195.

8.    **Harrison**

196.    *Defendant Harrison Poultry, Inc. ("Harrison") is a Georgia corporation headquartered in Bethlehem, Georgia. Harrison reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Bethlehem, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Harrison was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its owner and CEO served on the Georgia Dock Advisory Committee. Harrison is a Georgia Dock Defendant.*

**ANSWER:** Defendants other than Harrison Poultry and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 196 and therefore deny them. Agri Stats admits that Harrison Poultry provided certain information to it, but lacks knowledgeor information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 196 and therefore denies them. Harrison Poultry admits the allegations of the first sentence of Paragraph 196. Harrison Poultry admits that it reported sales and production data to Agri Stats during some portions of the Relevant Period, which is data that speaks for itself. Harrison Poultry denies any description or characterization inconsistent therewith. Harrison Poultry admits that it provided requested information to the Georgia Department of Agriculture during some portions of the Relevant Period related to the production and pricing of various poultry products, including some that may fall within Plaintiffs' litigation definition of "Broilers." Harrison Poultry denies that it "submitted false and artificially inflated price quotes to the GDA" and that it submitted any price information to the GDA after early January 2016. Harrison Poultry admits that during some portions of the Relevant Period through early January 2016, at the request of the Georgia Commissioner of Agriculture, Mike Welch was a member of the Poultry Market News Advisory Committee, but denies that its owner was a member of this body during the

Relevant Period. The last sentence of Paragraph 196 does not contain factual allegations to which a response is required. Harrison Poultry denies the remaining allegations in Paragraph 196.

## 9. House of Raeford

197. *Defendant House of Raeford Farms, Inc. ("Raeford") is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. Raeford reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its North Carolina and Louisiana complexes.*

**ANSWER:** Defendants other than House of Raeford and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 197 and therefore deny them. Agri Stats admits that House of Raeford has provided certain information to it, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 197 and therefore denies them. House of Raeford lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 197 and therefore deny them, except House of Raeford admits that it is a privately held entity with a main office in Rose Hill, North Carolina, and that from time to time it has submitted certain information to Agri Stats for legitimate procompetitive benchmarking purposes.

## 10. Keystone Foods

198. *Keystone Foods LLC was formerly a subsidiary of Marfrig Alimentos, S.A., a Brazilian company ("Marfrig"). On November 30, 2018, Defendant Tyson Foods, Inc. ("Tyson Foods") announced it had completed its acquisition of Keystone Foods LLC from Marfrig. Tyson Foods characterized the acquisition of Keystone Foods LLC as Tyson Foods' latest investment in furtherance of its growth strategy and expansion of its value-added protein capabilities. Tyson Foods' acquisition of Keystone Foods LLC (and the three affiliated Equity Group entities listed below) was structured as a stock acquisition, which resulted in Tyson Foods' acquisition of all Keystone Foods, LLC's assets and liabilities, and Keystone Foods continued to exist as an operating entity subsequent to the acquisition.*

**ANSWER:** Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 198 and therefore deny them. Tyson admits that Keystone Foods, LLC was a subsidiary of Marfrig Alimentos, S.A. from 2010 to 2018. In

2018, Tyson acquired Keystone Foods, LLC. To the extent the allegations in Paragraph 198 characterize or describe documents or other sources, Tyson notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith and any remaining allegations in Paragraph 198.

*199.    Equity Group Eufaula Division, LLC is a Delaware limited-liability company with its headquarters in Bakerhill, Alabama and is a wholly-owned subsidiary of Keystone Foods LLC.*

**ANSWER:**  Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 199 and therefore deny them.  Tyson admits that Equity Group Eufaula Division, LLC is a Delaware limited liability company with its headquarters in Eufaula, Alabama and a wholly owned subsidiary of Keystone Foods, LLC.  Tyson denies any remaining allegations in Paragraph 199.

*200.    Equity Group Kentucky Division LLC, formerly known as Cagle's-Keystone Foods, L.L.C., is a Delaware limited liability company with its headquarters in Franklin, Kentucky, and is a wholly-owned subsidiary of Grow-Out Holdings LLC.  During the relevant period, Equity Group Kentucky Division LLC sold broilers in interstate commerce, directly or through its wholly- owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:**   Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 200 and therefore deny them.  Tyson admits that Equity Group Kentucky Division, LLC is a Delaware limited liability company with its headquarters in Franklin, Kentucky and a wholly owned subsidiary of Keystone Foods, LLC. Tyson admits the remaining allegations in Paragraph 200.

*201.    Equity Group – Georgia Division LLC is a Delaware limited liability company with its headquarters in Camilla, Georgia, and is a wholly-owned subsidiary of Keystone Foods LLC. During the relevant period, Equity Group – Georgia Division LLC*

*sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 201 and therefore deny them. Tyson admits that Equity Group Georgia Division, LLC is a Delaware limited liability company with its headquarters in Camilla, Georgia and a wholly owned subsidiary of Keystone Foods, LLC. Tyson admits the remaining allegations in Paragraph 201.

> 202. *As a result of Tyson Foods' acquisition of Keystone Foods LLC, Tyson also acquired all of the assets and liabilities of Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group – Georgia Division LLC.*

**ANSWER:** Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 202 and therefore deny them. Tyson admits it acquired the assets and liabilities of Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group – Georgia Division LLC. Tyson denies any remaining allegations in Paragraph 202.

> 203. *Keystone Foods LLC, Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group – Georgia Division LLC are collectively referred to as "Keystone Foods" in this Complaint.*

**ANSWER:** Paragraph 203 contains no factual allegations to which a response is required.

> 204. *Keystone Foods reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Alabama, Georgia, and Kentucky.*

**ANSWER:** Defendants other than Tyson and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 204 and therefore deny them. Tyson and Agri Stats admit that Keystone submitted information to and received reports from Agri Stats for pro-competitive benchmarking purposes, but deny any further characterization thereof. To the extent the allegations in Paragraph 204 characterize or describe documents or other

sources, Tyson and Agri Stats note that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Tyson and Agri Stats deny any remaining allegations in Paragraph 204.



**ANSWER:** Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 205 and therefore deny them. ███████████████████████████████████████████████████████████████ To the extent the allegations in Paragraph 205 characterize or describe documents or other sources, Tyson notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in Paragraph 205.

11.    **Koch**

        206.    *Defendant Koch Foods, Inc. is a privately held Illinois corporation headquartered in Park Ridge, Illinois.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 206 and therefore deny them. Koch admits that Koch Foods Incorporated is a privately held corporation with its corporate headquarters in Park Ridge, Illinois. Koch denies the remaining allegations of Paragraph 206.

207.    Defendant JCG Foods of Alabama, LLC, an Alabama limited liability corporation headquartered in Park Ridge, Illinois, is a wholly-owned subsidiary of Defendant Koch Foods, Inc.

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 207 and therefore deny them.  Koch admits that JCG Foods of Alabama LLC is an Alabama limited liability company.  Koch denies the remaining allegations of Paragraph 207.

208.    Defendant JCG Foods of Georgia, LLC, a Georgia limited liability corporation headquartered in Park Ridge, Illinois, is a wholly-owned subsidiary of Defendant Koch Foods, Inc.

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 208 and therefore deny them.  Koch admits that JCG Foods of Georgia LLC is a Georgia limited liability company.   Koch denies the remaining allegations of Paragraph 208.

209.    Defendant Koch Meat Co., Inc., an Illinois corporation headquartered in Chicago, is a wholly-owned subsidiary of Defendant Koch Foods, Inc.

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 209 and therefore deny them.  Koch admits that Koch Meat Co., Inc. is an Illinois corporation, with its headquarters in Park Ridge, Illinois. Koch denies the remaining allegations of Paragraph 209.

210.    Defendants Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC and Koch Meat Co., Inc. are collectively referred to as "Koch" in this Complaint. Koch reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Tennessee, and Alabama. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Koch, through JCG Foods of Georgia, LLC, was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its

*vice-president of sales served on the Georgia Dock Advisory Committee. Koch is a Georgia Dock Defendant.*

**ANSWER:**  The first sentence of Paragraph 210 contains no factual allegations to which a response is required.  Defendants other than Koch and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 210 and therefore deny them.  Agri Stats admits that Kock provided it certain information, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 210 and therefore denies them.  Koch admits that it provided a variety of data to Agri Stats, including information about breeder flocks and hatchery capacity, and data for various complexes in Georgia, Tennessee, and Alabama, for procompetitive benchmarking purposes.  Koch admits that JCG Foods of Georgia LLC submitted certain information to the Georgia Department of Agriculture, from approximately June 2012, when one or more Koch entities purchased substantially all of Cagle's Inc.'s assets, until in or around August 2016, but denies that any information submitted was "false and artificially inflated."  Koch further admits that during the foregoing time period one of its employees, whose title changed from time to time, served on an advisory committee put together by the Georgia Department of Agriculture.  To the extent the allegations in Paragraph 210 relate to Plaintiffs, other Defendants, third parties and/or information allegedly derived from other sources, Koch lacks knowledge or information sufficient to form a belief as to the truth of those allegations and therefore denies them.  Koch denies the remaining allegations in Paragraph 210.

**12.  Mar-Jac**

*211.  Defendant Mar-Jac Poultry, Inc. is a Delaware corporation headquartered in Gainesville, Georgia. Defendant Mar-Jac Poultry AL, LLC is an Alabama limited liability corporation located in Gainesville, Georgia. Defendant Mar-Jac AL/MS, Inc. is a Delaware corporation located in Gainesville, Georgia. Defendant Mar-Jac Poultry MS LLC is a Mississippi limited liability company located in Hattiesburg, Mississippi. Defendant Mar-Jac Poultry, LLC is a Delaware corporation located in Gainesville,*

*Georgia. Defendant Mar-Jac Holdings, LLC is a Delaware corporation located in Gainesville, Georgia and is the parent company of Mar-Jac Poultry, Inc., Mar-Jac Poultry MS LLC, Mar-Jac AL, LLC, Mar-Jac AL/MS, Inc., and Mar-Jac Poultry, LLC. Defendants Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, Mar-Jac Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-Jac Poultry, LLC and Mar-Jac Holdings, LLC are collectively referred to as "Mar-Jac Poultry" or "Mar-Jac." Mar-Jac reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Gainesville, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Mar-Jac was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice president of operations served on the Georgia Dock Advisory Committee. Mar-Jac is a Georgia Dock Defendant. During the relevant period, Mar-Jac sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** The seventh and eleventh sentence of Paragraph 211 contain no factual allegations to which a response is required. Defendants other than Mar-Jac and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 211 and therefore deny them. Agri Stats admits that Mar-Jac have provided it certain information, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 211 and therefore denies them. Mar-Jac admits that Plaintiffs refer to Mar-Jac as a "Georgia Dock Defendant." Mar-Jac admits that Mar-Jac Poultry, Inc. is a Georgia corporation located in Gainesville, Georgia. Mar-Jac admits that Mar-Jac Poultry MS, LLC is a Mississippi limited liability company located in Mississippi. Mar-Jac admits that Mar-Jac Poultry AL, LLC is an Alabama limited liability company located in Alabama. Mar-Jac admits that Mar-Jac AL/MS, Inc. is a Delaware corporation located in Gainesville, Georgia. Mar-Jac admits that Mar-Jac Poultry, LLC is a Delaware limited liability company located in Alabama. Mar-Jac admits that Mar-Jac Holdings, Inc. is a Delaware corporation located in Gainesville, Georgia. Mar-Jac admits that Mar-Jac provided various data to, and received anonymized information from, Agri Stats for procompetitive benchmarking purposes. Mar-Jac admits that Mar-Jac Poultry, Inc. submitted some information to the Georgia Department of Agriculture regarding

the Georgia Dock. Mar-Jac admits that its former Vice President of Operations was a member of the Georgia Dock Advisory Board. Mar-Jac admits that Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, and Mar-Jac AL, LLC sell broilers in interstate commerce to purchasers in the United States, but denies that the remaining Mar-Jac entities produced or sold broilers. Mar-Jac specifically denies that Mar-Jac AL/MS, Inc., Mar-Jac Poultry, LLC, and Mar-Jac Holdings, Inc., produced or sold broilers, and Mar-Jac states that those entities are not "Producer Defendants" as that term is used in this Answer. Mar-Jac denies the remaining allegations in Paragraph 211.

**13.     Mountaire**

> *212.     Defendant Mountaire Farms, Inc. is a privately held Delaware corporation headquartered in Millsboro, Delaware.*

**ANSWER:** Defendants other than Mountaire lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 212 and therefore deny them. Mountaire admits that Mountaire Farms Inc. is a privately held Delaware corporation located in Millsboro, Delaware. Mountaire denies the remaining allegations in Paragraph 212.

> *213.     Defendant Mountaire Farms, LLC, a privately held Arkansas limited liability corporation headquartered in Little Rock, Arkansas, is a wholly-owned subsidiary of Defendant Mountaire Farms, Inc.*

**ANSWER:** Defendants other than Mountaire lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 213 and therefore deny them. Mountaire admits that Mountaire Farms, LLC is a privately held Arkansas limited liability company located in Little Rock, Arkansas. Mountaire denies the remaining allegations in Paragraph 213.

214. *Defendant Mountaire Farms of Delaware, Inc., a privately held Delaware corporation headquartered in Millsboro, Delaware, is a wholly-owned subsidiary of Defendant Mountaire Farms, Inc.*

**ANSWER:** Defendants other than Mountaire lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 214 and therefore deny them. Mountaire admits that Mountaire Farms of Delaware, Inc. is a privately held Delaware corporation located in Millsboro, Delaware. Mountaire denies the remaining allegations in Paragraph 214.

215. *Defendants Mountaire Farms, Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire Farms" in this Complaint. Mountaire reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware and North Carolina.*

**ANSWER:** The first sentence of Paragraph 215 contains no factual allegations to which a response is required. Defendants other than Mountaire and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 215 and therefore deny them. Mountaire and Agri Stats admit that Mountaire transfers certain data to Agri Stats for lawful, non-conspiratorial, and procompetitive purposes. Mountaire and Agri Stats deny any remaining allegations in Paragraph 215.

**14. O.K. Foods**

216. *Defendant O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.*

**ANSWER:** Defendants other than O.K. Foods lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 216 and therefore deny them. O.K. Foods admits that it is an Arkansas corporation headquartered in Fort Smith, Arkansas. O.K. Foods denies the remaining allegations in Paragraph 216.

217. *O.K. Farms, Inc., is an Arkansas corporation headquartered in Fort Smith, Arkansas, and is a wholly-owned subsidiary of Defendant O.K. Foods, Inc.*

**ANSWER:** Defendants other than O.K. Foods lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 217 and therefore deny them. O.K. Foods denies the allegations contained in Paragraph 217.

218. *O.K. Industries, Inc., an Arkansas corporation headquartered in Fort Smith, Arkansas, is a wholly-owned subsidiary of Defendant O.K. Foods, Inc.*

**ANSWER:** Defendants other than O.K. Foods lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 218 and therefore deny them. O.K. Foods denies the allegations contained in Paragraph 218.

219. *Defendants O.K. Foods, Inc., O.K. Farms, Inc., O.K. Industries, Inc., and their predecessors, subsidiaries, and affiliates, including Albertville Quality Foods, are collectively referred to as "O.K. Foods." In this Complaint, O.K. Foods are subsidiaries of the Mexican poultry conglomerate Industrias Bachoco, which reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Fort Smith, Arkansas complex.*

**ANSWER:** The first sentence of Paragraph 219 contains no factual allegations to which a response is required. Defendants other than O.K. Foods and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 219 and therefore deny them. Agri Stats admits that O.K Foods have provide it certain information, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 219 and therefore denies them. O.K. Foods, Inc. admits that it is the subsidiary of Industrias Bachoco, which is located in Mexico, and that O.K. Foods, Inc. reports certain historical data to Agri Stats, including data about its breeder and hatching operations and its Fort Smith, Arkansas, operations. O.K. Foods denies the remaining allegations in Paragraph 219.

156

15.     **Peco**

        *220.    Defendant Peco Foods, Inc. ("Peco Foods") is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama. Peco Foods reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Gordo, Alabama and Sebastopol, Louisiana.*

        **ANSWER:** Defendants other than Peco and Agri Stats lack knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 220 and therefore deny

them. Agri Stats admits that Peco has provided it certain information, but lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 220

and therefore denies them. Peco admits that it is a privately held Alabama corporation

headquartered in Tuscaloosa, Alabama. Peco further admits that Agri Stats collects certain

information from Peco related to its complexes in Gordo, Alabama, and Sebastopol, Mississippi.

Peco denies that it has a complex located in Sebastopol, Louisiana, or that such complex reported

information to Agri Stats. Peco denies any remaining allegations in Paragraph 220.

16.     **Perdue**

        *221.    Defendant Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland.*

        **ANSWER:** Defendants other than Perdue lack knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 221 and therefore deny them. Perdue

admits that Perdue Farms, Inc. is a privately held Maryland corporation headquartered in

Salisbury, Maryland. Perdue denies any remaining allegations in Paragraph 221.

        *222.    Defendant Perdue Foods, LLC, a privately held Maryland limited liability corporation headquartered in Salisbury, Maryland, is a subsidiary of Defendant Perdue Farms, Inc.*

        **ANSWER:** Defendants other than Perdue lack knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 222 and therefore deny them. Perdue

admits that Perdue Foods, LLC is a privately held Maryland limited liability company

headquartered in Salisbury, Maryland. Perdue admits that Perdue Foods, LLC is a subsidiary of Perdue Farms, Inc. Perdue denies any remaining allegations in Paragraph 222.

> 223. *Defendants Perdue Farms, Inc. and Perdue Foods, LLC are together referred to as "Perdue" in this Complaint. Perdue reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware, Maryland, North Carolina, South Carolina, Florida, and Kentucky.*

**ANSWER:** The first sentence of Paragraph 223 contains no factual allegations to which a response is required. Defendants other than Perdue and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 223 and therefore deny them. Agri Stats admits that Perdue has provided it certain information, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 223 and therefore denies them. Perdue admits that it submits complex-level data to Agri Stats from certain complexes but denies any remaining allegations in Paragraph 223.

## 17. Pilgrim's Pride

> 224. *Defendant Pilgrim's Pride Corporation ("Pilgrim's" or "Pilgrim's Pride") is a publicly held Delaware corporation headquartered in Greeley, Colorado. Pilgrim's Pride reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, West Virginia, North Carolina, Georgia, Tennessee, Florida, South Carolina, Alabama, Texas, Arkansas, and Kentucky. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Pilgrim's Pride was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its executive vice president of sales and operations served on the Georgia Dock Advisory Committee. Pilgrim's Pride is a Georgia Dock Defendant.*

**ANSWER:** Defendants other than Pilgrim's and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 224 and therefore deny them. Agri Stats admits that Pilgrim's has provided it certain information, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 224 and therefore denies them. Pilgrim's admits the allegations in the first sentence of Paragraph 224.

Pilgrim's admits that it reports complex-level data to Agri Stats, including complexes located in the above-mentioned states. Pilgrim's admits that the Georgia Department of Agriculture stopped publishing the Georgia Dock benchmark price index in late November 2016, but denies that it ever submitted false or artificially inflated data to the Georgia Department of Agriculture. Pilgrim's admits that at various points in the Relevant Period, at the request of the Georgia Department of Agriculture, it had an employee representative on the Poultry Market News Advisory Committee, including an employee who at one time was the executive vice president of sales and operations. Pilgrim's admits Plaintiffs refer to Pilgrim's as a "Georgia Dock Defendant." Pilgrim's denies the remaining allegations in Paragraph 224.

> *225.     Defendant Pilgrim's Pride is liable for all conspiratorial acts undertaken while it was in bankruptcy proceedings during 2009, and reentered, and reaffirmed its commitment to, the conspiracy following its discharge from bankruptcy on December 29, 2009.*

**ANSWER:**  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 225 and therefore deny them. Paragraph 225 contains Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Pilgrim's denies the existence of and its participation in Plaintiffs' alleged conspiracy – either pre- or post-bankruptcy – and any remaining factual allegations in Paragraph 225.

**18.     Sanderson**

> *226.     Defendant Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi.*

**ANSWER:**  Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 226 and therefore deny them. Sanderson Farms admits the allegations in Paragraph 226.

227. *Defendant Sanderson Farms, Inc. (Foods Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly-owned subsidiary of Defendant Sanderson Farms, Inc.*

**ANSWER:** Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 227 and therefore deny them. Sanderson Farms admits the allegations in Paragraph 227.

228. *Defendant Sanderson Farms, Inc. (Production Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly-owned subsidiary of Defendant Sanderson Farms, Inc.*

**ANSWER:** Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 228 and therefore deny them. Sanderson Farms admits the allegations in Paragraph 228.

229. *Defendant Sanderson Farms, Inc. (Processing Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly-owned subsidiary of Defendant Sanderson Farms, Inc.*

**ANSWER:** Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 229 and therefore deny them. Sanderson Farms admits the allegations in Paragraph 229.

230. *Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division) and Sanderson Farms, Inc. (Processing Division) are collectively referred to as "Sanderson Farms" in this Complaint. Sanderson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Mississippi, and Texas. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Sanderson Farms was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Sanderson Farms is a Georgia Dock Defendant.*

**ANSWER:** The first and last sentence of Paragraph 230 contain no factual allegations to which a response is required. Defendants other than Sanderson Farms and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 230 and therefore deny them. Agri Stats admits that Sanderson Farms has provided

certain information to it, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 230 and therefore denies them. Sanderson Farms admits that it provides information to Agri Stats, but denies any characterization of the information it submits to Agri Stats. Sanderson Farms admits that it submitted certain information to the Georgia Department of Agriculture, but refers to Georgia Dock Index reports for their contents and denies any characterization or description that is inconsistent therewith. To the extent the allegations in the third sentence of Paragraph 230 relate to other Defendants and/or third parties, Sanderson Farms is without information sufficient to form a belief as to the truth of these allegations and therefore denies those allegations. Sanderson Farms denies any remaining allegations in Paragraph 230.

**19.    Simmons**

231.    *Defendant Simmons Foods, Inc. is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas. Simmons Foods, Inc. reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its two Siloam Springs, Arkansas complexes.*

**ANSWER:** Defendants other than Simmons and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 231 and therefore deny them. Agri Stats admits that Simmons has provided it certain information, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 231 and therefore denies them. Simmons admits it is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas and that it reports certain data to Agri Stats, but denies the remaining allegations in Paragraph 231.

232.    *Simmons Prepared Foods, Inc. is a privately held Arkansas company headquartered in Siloam Springs, Arkansas. Simmons Prepared Foods, Inc. is a wholly-owned subsidiary of Simmons Foods, Inc. During the relevant time period, Simmons Foods, Inc. exclusively sold the chicken it produced to Simmons Prepared Foods, Inc., which in turn resold the chicken in various forms to its customers. Simmons Prepared Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates*

*was engaged in the processing, distribution, sale, pricing, and/or marketing of broilers, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States. Defendants Simmons Foods, Inc. and Simmons Prepared Foods, Inc. are collectively referred to as "Simmons" or "Simmons Foods."*

**ANSWER:**  The last sentence of Paragraph 232 contains no factual allegations to which a response is required.  Defendants other than Simmons lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 232 and therefore deny them. Simmons Prepared Foods Inc. admits that it is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas that largely, although not exclusively, purchased chicken from Simmons Foods, Inc., and that it sold chicken in various forms to its customers, including in the United States.  Simmons denies the remaining allegations of Paragraph 232.

**20.    Tyson**

*233.    Defendant Tyson Foods, Inc. is a publicly held Delaware corporation headquartered in Springdale, Arkansas.*

**ANSWER:**  Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 233 and therefore deny them.  Tyson admits the allegations in Paragraph 233.

*234.    Defendant Tyson Chicken, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly-owned subsidiary of Defendant Tyson Foods, Inc.*

**ANSWER:**  Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 234 and therefore deny them.  Tyson admits the allegations in Paragraph 234.

*235.    Defendant Tyson Breeders, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly-owned subsidiary of Defendant Tyson Foods, Inc.*

**ANSWER:**  Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 235 and therefore deny them.  Tyson admits the allegations in Paragraph 235.

*236. Defendant Tyson Poultry, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly-owned subsidiary of Defendant Tyson Foods, Inc.*

**ANSWER:** Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 236 and therefore deny them. Tyson admits that Tyson Poultry, Inc. is a Delaware corporation headquartered in Springdale, Arkansas. Tyson denies that Tyson Poultry, Inc. is a wholly-owned subsidiary of Tyson Poultry, Inc.

*237. Defendant Tyson Sales And Distribution, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.*

**ANSWER:** Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 237 and therefore deny them. Tyson admits the allegations in Paragraph 237.

*238. Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc. and Tyson Poultry, Inc. are collectively referred to as "Tyson" in this Complaint. Tyson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, Pennsylvania, North Carolina, Georgia, Alabama, Mississippi, Texas, Arkansas, Missouri, Indiana, Tennessee, and Kentucky. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Tyson was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. One of its plant managers served on the Georgia Dock Advisory Committee. Tyson is a Georgia Dock Defendant.*

**ANSWER:** The first sentence of Paragraph 238 contains no factual allegations to which a response is required. Defendants other than Tyson and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 238 and therefore deny them. Agri Stats that Tyson has provided it certain information, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 238 and therefore denies them. The first sentence of Paragraph 238 contains Plaintiffs' explanation of a defined term, to which no response is required. Tyson admits that it directly submits certain information to Agri Stats about its Broiler operations for procompetitive benchmarking purposes.

Tyson further admits that the Georgia Dock was discontinued in 2016. Tyson further admits that the manager of its Cumming, Georgia complex, who has no pricing authority, was a representative on the Georgia Dock Advisory Committee, but denies that his role on that committee enabled him to control the Georgia Dock price. To the extent the allegations in Paragraph 238 characterize or describe documents or other sources, Tyson notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Tyson denies the remaining allegations in Paragraph 238.

**21.    Wayne**

> *239.    Defendant Wayne Farms, LLC ("Wayne Farms") is a Delaware limited liability corporation headquartered in Oakwood, Georgia. Wayne Farms reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in North Carolina, Georgia, Alabama, Mississippi, and Arkansas. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Wayne Farms was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice president of fresh sales served on the Georgia Dock Advisory Committee. Wayne Farms is a Georgia Dock Defendant.*

**ANSWER:**    Defendants other than Wayne Farms and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 239 and therefore deny them. Agri Stats admits that Wayne Farms has provided it certain information, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 239 and therefore denies them. Wayne Farms admits that Wayne Farms LLC is a Delaware corporation headquartered in Oakwood, Georgia. Wayne Farms admits that its vice president had some involvement in the Georgia Dock Advisory Board. Wayne Farms admits that certain of its employees have transferred data to Agri Stats on a confidential basis and that some of that data has been transferred electronically, but otherwise denies any allegations in Paragraph 239 to the extent they relate to Wayne Farms.

22. **Rabobank**

240. *Defendant Utrecht-America Holdings, Inc., a Delaware corporation headquartered in New York, NY, is a commercial bank and financial services provider and the American subsidiary of the Dutch cooperative banks Cooperative Rabobank U.A. and Rabobank International Holding, B.V. Its subsidiaries include: Defendant Rabo AgriFinance LLC, a Delaware limited liability company headquartered in Saint Louis, MO, that provides financial services and insurance to agricultural producers and agribusinesses; Defendant Rabobank USA Financial Corporation, a Delaware corporation headquartered in New York, NY that is a special purpose entity formed to issue commercial paper notes; and financial services company Defendant Utrecht-America Finance Co., a Delaware company headquartered in New York, NY. Collectively these Defendants are referred to herein as "Rabobank."*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 240 and therefore deny them.

241. *"Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including broilers companies that merged with or were acquired by the named Defendants and each named Defendant's wholly- owned or controlled subsidiaries or affiliates that sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the relevant period. To the extent the term "Producer Defendants" is used herein, it refers to all Defendants other than Agri Stats.*

**ANSWER:** Paragraph 241 contains Plaintiffs' explanation of defined terms used in their Complaint, to which no response is required. To the extent a response is required, Defendants admit that Plaintiffs have defined "Defendant" or "Defendants" and "Producer Defendants" as described in Paragraph 241.

242. *To the extent that subsidiaries and divisions within each Defendant's corporate family sold or distributed broilers to direct purchasers, these subsidiaries played a material role in the conspiracy alleged in this Complaint because Defendants wished to ensure that the prices paid for such broilers would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein. Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing, and collecting monies from Plaintiff for broilers was known to and approved by their respective corporate parent named as a Defendant in this*

*Complaint. For the avoidance of doubt, several previously unnamed subsidiaries for Defendants are specifically identified as coconspirators below.*

**ANSWER:** The last sentence of Paragraph 242 contains no factual allegations to which a response is required. To the extent a response is required, Defendants deny the allegations in the last sentence of Paragraph 242. Defendants deny all remaining allegations in Paragraph 242.

## V.    PRODUCER CO-CONSPIRATORS

### A.    Producer Co-Conspirator Allen Harim

*243.    Harim USA, Ltd. is a privately held Delaware corporation with its corporate headquarters in Seaford, Delaware. During the relevant period, Harim USA Ltd. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 243 and therefore deny them.

*244.    Allen Harim Foods, LLC is a privately held Delaware limited-liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland and North Carolina. Allen Harim Foods, LLC is a wholly-owned subsidiary of Harim USA Ltd. During the relevant period, Allen Harim Foods, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 244 and therefore deny them.

*245.    Allen Harim Farms, LLC is a privately held Delaware limited-liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland and North Carolina. Allen Harim Farms, LLC is a wholly-owned subsidiary of Harim USA Ltd. During the relevant period, Allen Harim Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 245 and therefore deny them.

246.     Producer co-conspirators Harim USA, Ltd., Allen Harim Foods, LLC, and *Allen Harim Farms, LLC are collectively referred to as "Allen Harim" in this Complaint.*

**ANSWER:**  Paragraph 246 contains no factual allegations to which a response is required.

247.     All of the Defendants' and/or co-conspirators' wrongful actions described *in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or engaged in by Defendants' or co-conspirators' various officers, agents, employees, or other representatives within the course and scope of their duties and employment, or with Defendants' or co-conspirators' actual, apparent or ostensible authority. Defendants and co-conspirators' used the instrumentalities of interstate commerce to facilitate the conspiracy, and their conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the U.S., including in this District.*

**ANSWER:**  Defendants deny the allegations in Paragraph 247.

## B.     Producer Co-Conspirator Marshall Durbin

248.     Marshall Durbin Companies and Marshall Durbin Food Corporation *("Marshall Durbin") was a poultry company headquartered in Birmingham, Alabama. Its assets included poultry processing plants in Hattiesburg, Mississippi, and Jasper, Alabama; feed mills in Haleyville, Alabama, and Waynesboro, Mississippi; hatcheries in Moulton, Alabama, and Waynesboro, Mississippi; a laboratory in Jackson, Mississippi; and a distribution center in Tarrant, Alabama.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 248 and therefore deny them.

249.     On January 24, 2014, Defendant Mar-Jac Poultry Inc. ("Mar-Jac") *announced that it had acquired the assets of Marshall-Durbin. Mar-Jac stated that its management team "expects a smooth transition with no disruption of operations." During the Conspiracy Period, Marshall Durbin, its predecessors, subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Mar-Jac lack knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 249 and therefore deny them.  Mar-Jac

admits that an announcement was made that assets of certain Marshall Durbin entities were

acquired and that Mar-Jac's management team expected a smooth transition with no disruption of

operations. Mar-Jac denies that the assets were acquired by Mar-Jac Poultry, Inc. Mar-Jac is lacks

knowledge or information sufficient to form a belief as to the truth of allegations in the third sentence of Paragraph 249, and therefore denies those allegations. Mar-Jac denies the remaining allegations in Paragraph 249.

250. *Allen Harim and Marshall Durbin are collectively referred to as the "Producer Co- Conspirators."*

**ANSWER:** Paragraph 250 contains no factual allegations to which a response is required.

**C.    The Defendant Family Co-Conspirators**

251. *Various subsidiaries and related entities of the Defendant families named herein actively participated in the conspiracy/conspiracies described in this Complaint and therefore are co-conspirators, including the following:*

**ANSWER:** Defendants deny the allegations in Paragraph 251.

**1.    Koch**

252. *JCG Industries, Inc., is an Illinois corporation with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Industries, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 252 and therefore deny them. Koch admits that JCG Industries, Inc. is an Illinois corporation with its headquarters in Chicago, Illinois. Koch denies the remaining allegations of Paragraph 252.

253. *JCG Properties, L.L.C. is an Illinois limited-liability company with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Properties, L.L.C. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 253 and therefore deny them. Koch admits

that JCG Properties, L.L.C. is an Illinois limited liability company with its principal office in Chicago, Illinois. Koch denies the remaining allegations of Paragraph 253.

> 254.    *JCG Land Holdings, LLC is an Illinois limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Land Holdings, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 254 and therefore deny them. Koch admits that JCG Land Holdings, LLC is an Illinois limited liability company with its principal office in Park Ridge, Illinois. Koch denies the remaining allegations of Paragraph 254.

> 255.    *JCG Foods LLC is a Delaware limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Foods LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 255 and therefore deny them. Koch admits that JCG Foods LLC is a Delaware limited liability company, and that Koch Foods, Inc. is its sole member. Koch denies the remaining allegations of Paragraph 255.

> 256.    *Koch Foods of Cumming LLC, formerly known as Greko, L.L.C., is a Georgia limited-liability company with its headquarters in Cumming, Georgia, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Cumming LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 256 and therefore deny them. Koch admits that Koch Foods of Cumming LLC, formerly known as Greko, L.L.C., is a Georgia limited liability company with its principal office in Cumming, Georgia, and that it sold broiler chicken to

purchasers in the United States during the Relevant Period. Koch denies the remaining allegations of Paragraph 256.

> 257.   *Koch Foods of Gainesville LLC, formerly known as Gress Foods LLC, is a Georgia limited-liability company with its headquarters in Gainesville, Georgia, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Gainesville LLC  sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 257 and therefore deny them.  Koch admits that Koch Foods of Gainesville LLC, formerly known as Gress Foods LLC, is a Georgia limited liability company with its principal office in Gainesville, Georgia, and that it sold broiler chicken to purchasers in the United States during the Relevant Period. Koch denies the remaining allegations of Paragraph 257.

> 258.   *JCG Farms of Georgia LLC is a Georgia limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Farms of Georgia LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 258 and therefore deny them.  Koch admits that JCG Farms of Georgia LLC is a Georgia limited liability company with its principal office in Pine Mountain Valley, Georgia. Koch denies the remaining allegations of Paragraph 258.

> 259.   *Koch Foods of Mississippi LLC is a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Mississippi LLC sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 259 and therefore deny them.  Koch admits that Koch Foods of Mississippi LLC is a Mississippi limited liability company with its principal

office in Morton, Mississippi, that Koch Foods, Inc. is its sole member, and that it sold broiler chicken to purchasers in the United States during the Relevant Period. Koch denies the remaining allegations of Paragraph 259.

> 260. *Koch Farms of Mississippi LLC is a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Mississippi LLC sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 260 and therefore deny them. Koch admits that Koch Farms of Mississippi LLC is a Mississippi limited liability company with its principal office in Morton, Mississippi. Koch denies the remaining allegations of Paragraph 260.

> 261. *Koch Freezers LLC is a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Freezers LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 261 and therefore deny them. Koch admits that Koch Freezers LLC is a Mississippi limited liability company with its principal office in Morton, Mississippi. Koch denies the remaining allegations of Paragraph 261.

> 262. *Koch Properties of Mississippi LLC was (presently dissolved) a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and was a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Properties of Mississippi LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 262 and therefore deny them. Koch admits that Koch Properties of Mississippi LLC was a Mississippi limited liability company, and that Koch Foods, Inc. was its sole member. Koch denies the remaining allegations of Paragraph 262.

263.    *Koch Foods of Alabama LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Alabama LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 263 and therefore deny them. Koch admits that Koch Foods of Alabama LLC is an Alabama limited liability company with its principal business address in Montgomery, Alabama, that Koch Foods, Inc. is its sole member, and that it sold broiler chicken to purchasers in the United States during the Relevant Period. Koch denies the remaining allegations of Paragraph 263.

264.    *Koch Farms of Alabama LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Alabama LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 264 and therefore deny them. Koch admits that Koch Farms of Alabama LLC is an Alabama limited liability company with its principal business address in Montgomery, Alabama. Koch denies the remaining allegations of Paragraph 264.

265.    *JCG Farms of Alabama LLC is an Alabama limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Farms of Alabama LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 265 and therefore deny them. Koch admits that JCG Farms of Alabama LLC is an Alabama limited liability company with its principal

business address in Collinsville, Alabama.  Koch denies the remaining allegations of Paragraph 265.

   *266. Koch Foods of Ashland LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Ashland LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

  **ANSWER:**  Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 266 and therefore deny them.  Koch admits that Koch Foods of Ashland LLC is an Alabama limited liability company with its principal business address in Montgomery, Alabama, and that it sold broiler chicken to purchasers in the United States during the Relevant Period.    Koch denies the remaining allegations of Paragraph 266.

   *267. Koch Farms of Ashland LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Ashland LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

  **ANSWER:**  Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 267 and therefore deny them.  Koch admits that Koch Farms of Ashland LLC is an Alabama limited liability company with its principal business address in Montgomery, Alabama.  Koch denies the remaining allegations of Paragraph 267.

   *268. Koch Farms of Gadsden LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Gadsden LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

  **ANSWER:**  Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 268 and therefore deny them.  Koch admits

that Koch Farms of Gadsden LLC is an Alabama limited liability company with its principal

business address in Gadsden, Alabama. Koch denies the remaining allegations of Paragraph 268.

269. *Koch Foods of Gadsden LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Gadsden LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 269 and therefore deny them. Koch admits

that Koch Foods of Gadsden LLC is an Alabama limited liability company with its principal

business address in Gadsden, Alabama, and that it sold broiler chicken to purchasers in the United

States during the Relevant Period. Koch denies the remaining allegations of Paragraph 269.

270. *Koch Foods of Cincinnati LLC, f/k/a Preferred Foods, LLC, is an Ohio limited- liability company with its headquarters in Fairfield, Ohio, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Cincinnati LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 270 and therefore deny them. Koch admits

that Koch Foods of Cincinnati LLC, f/k/a Preferred Foods, LLC, is an Ohio limited liability

company with its headquarters in Fairfield, Ohio, and that it sold broiler chicken to purchasers in

the United States during the Relevant Period. Koch denies the remaining allegations of Paragraph

270.

271. *Koch Foods LLC, operating under the assumed names Koch Foods of Chattanooga and Koch Foods of Morristown, is a Tennessee limited-liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods LLC sold broilers in interstate*

*commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 271 and therefore deny them. Koch admits that Koch Foods LLC, is a Tennessee limited liability company with its principal office in Chattanooga, Tennessee, that Koch Foods, Inc. is its sole member, and that it sold broiler chicken to purchasers in the United States during the Relevant Period. Koch denies the remaining allegations of Paragraph 271.

272. *Koch Farms, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Conspiracy Period, Koch Farms, LLC sold Broilers in interstate commerce, directly or indirectly through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 272 and therefore deny them. Koch admits that Koch Farms LLC, is a Tennessee limited liability company with its principal office in Chattanooga, Tennessee, and that Koch Foods, Inc. is its 99% member. Koch denies the remaining allegations of Paragraph 272.

273. *Koch Farms of Chattanooga, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Farms of Chattanooga, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 273 and therefore deny them. Koch admits that Koch Farms of Chattanooga LLC, is the assumed name of a Tennessee limited liability company with its principal office in Chattanooga, Tennessee, and that Koch Foods, Inc. is its 99% member. Koch denies the remaining allegations of Paragraph 273.

274.    *Koch Foods of Chattanooga, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Foods of Chattanooga, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 274 and therefore deny them.  Koch admits that Koch Foods of Chattanooga LLC, is the assumed name of a Tennessee limited liability company with its principal office in Chattanooga, Tennessee, that Koch Foods, Inc. is its sole member, and that it sold broiler chicken to purchasers in the United States during the Relevant Period.  Koch denies the remaining allegations of Paragraph 274.

275.    *Koch Foods of Morristown, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Foods of Morristown, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 275 and therefore deny them.  Koch admits that Koch Foods of Morristown LLC, is the assumed name of a Tennessee limited liability company with its principal office in Chattanooga, Tennessee, that Koch Foods, Inc. is its sole member, and that it sold broiler chicken to purchasers in the United States during the Relevant Period.  Koch denies the remaining allegations of Paragraph 275.

276.    *Koch Farms of Morristown, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Farms of Morristown, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 276 and therefore deny them. Koch admits that Koch Farms of Morristown LLC, is the assumed name of a Tennessee limited liability company

with its principal office in Chattanooga, Tennessee, and that Koch Foods, Inc. is its 99% member.

Koch denies the remaining allegations of Paragraph 276.

## 2.     Tyson

277.     *Tyson Sales and Distribution, Inc. is a Delaware corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of Tyson Foods, Inc. During the relevant period, Tyson Sales and Distribution, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Tyson lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 277 and therefore deny them. Tyson admits

that Tyson Sales and Distribution, Inc. is a Delaware corporation with headquarters in Springdale,

Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc. Tyson further admits that, during

the Relevant Period, Tyson Sales and Distribution, Inc. sold Broilers in interstate commerce to

purchasers in the United States. Tyson lacks knowledge or information sufficient to form a belief

as to the remaining allegations in Paragraph 277, and on this basis denies those allegations.

## 3.     Perdue

278.     *Perdue Foods, Inc. (now dissolved) was a Maryland corporation with its headquarters in Salisbury, Maryland, and a wholly-owned subsidiary of Perdue Farms Inc. During the relevant period, Perdue Foods, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Perdue lack knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 278 and therefore deny them. Perdue

admits that Perdue Foods, Inc. was dissolved on October 19, 2011, that Harvestland Holdings,

LLC merged into Perdue Farms Incorporated on July 20, 2012, that Perdue Food Products, Inc.

merged into Perdue Farms Incorporated on September 25, 2012, that Perdue Farms Incorporated

merged into Perdue Farms LLC on September 28, 2012, that Perdue Farms, LLC became Perdue

Foods, LLC on September 28, 2012, and that the aforementioned entities sold Broilers, during the Relevant Period, in the United States. Perdue denies the remaining allegations in Paragraph 278.

> 279.     *Harvestland Holdings, LLC was a Maryland limited-liability company with its headquarters in Salisbury, Maryland and a wholly-owned subsidiary of Perdue Farms Inc. During the relevant period, Harvestland Holdings, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Perdue lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 279 and therefore deny them. Perdue admits that Perdue Foods, Inc. was dissolved on October 19, 2011, that Harvestland Holdings, LLC merged into Perdue Farms Incorporated on July 20, 2012, that Perdue Food Products, Inc. merged into Perdue Farms Incorporated on September 25, 2012, that Perdue Farms Incorporated merged into Perdue Farms LLC on September 28, 2012, that Perdue Farms, LLC became Perdue Foods, LLC on September 28, 2012, and that the aforementioned entities sold Broilers, during the Relevant Period, in the United States. Perdue denies the remaining allegations in Paragraph 279.

> 280.     *Perdue Food Products, Inc. was a Maryland limited-liability company with its headquarters in Salisbury, Maryland and a wholly-owned subsidiary of Perdue Farms Inc. During the relevant period, Perdue Food Products, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Perdue lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 280 and therefore deny them. Perdue admits that Perdue Foods, Inc. was dissolved on October 19, 2011, that Harvestland Holdings, LLC merged into Perdue Farms Incorporated on July 20, 2012, that Perdue Food Products, Inc. merged into Perdue Farms Incorporated on September 25, 2012, that Perdue Farms Incorporated merged into Perdue Farms LLC on September 28, 2012, that Perdue Farms, LLC became Perdue Foods, LLC on September 28, 2012, and that the aforementioned entities sold Broilers, during the Relevant Period, in the United States. Perdue denies the remaining allegations in Paragraph 280.

281.    *Perdue Farms, LLC is a Maryland limited liability company with its headquarters in Salisbury, Maryland and is wholly-owned subsidiary of Perdue Farms, Inc. During the relevant time period, Perdue Farms, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Perdue lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 281 and therefore deny them.  Perdue admits that Perdue Foods, Inc. was dissolved on October 19, 2011, that Harvestland Holdings, LLC merged into Perdue Farms Incorporated on July 20, 2012, that Perdue Food Products, Inc. merged into Perdue Farms Incorporated on September 25, 2012, that Perdue Farms Incorporated merged into Perdue Farms LLC on September 28, 2012, that Perdue Farms, LLC became Perdue Foods, LLC on September 28, 2012, and that the aforementioned entities sold Broilers, during the Relevant Period, in the United States.  Perdue denies the remaining allegations in Paragraph 281.

282.    *Perdue Farms Incorporated (now merged with Perdue Farms LLC) was a Maryland limited-liability company with its headquarters in Salisbury, Maryland and a wholly-owned subsidiary of Defendant Perdue Farms Inc.  During the relevant period, Perdue Farms Incorporated sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Perdue lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 282 and therefore deny them.  Perdue admits that Perdue Foods, Inc. was dissolved on October 19, 2011, that Harvestland Holdings, LLC merged into Perdue Farms Incorporated on July 20, 2012, that Perdue Food Products, Inc. merged into Perdue Farms Incorporated on September 25, 2012, that Perdue Farms Incorporated merged into Perdue Farms LLC on September 28, 2012, that Perdue Farms, LLC became Perdue Foods, LLC on September 28, 2012, and that the aforementioned entities sold Broilers, during the Relevant Period, in the United States.  Perdue denies the remaining allegations in Paragraph 282.

### 4. Wayne Farms

*283. WFSP Foods, LLC is a Georgia limited-liability company with its headquarters in Decatur, Alabama, and is a wholly-owned subsidiary of Defendant Wayne Farms. During the relevant period, WFSP Foods, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 283 and therefore deny them. Wayne Farms admits that it partnered with Salm Partners LLC to create WFSP Foods, LLC, headquartered in Decatur, AL. Wayne Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 283 and therefore denies them.

### 5. George's

*284. George's Chicken, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia, and is a wholly-owned subsidiary of Defendant George's, Inc. During the relevant period, George's Chicken, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than George's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 284 and therefore deny them. George's admits that George's Chicken, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia. George's admits that George's Chicken, LLC has core business operations in the areas of breeding, growing, hatching, processing, distribution, or sale of Broilers. George's denies the remaining allegations in Paragraph 284.

*285. George's Family Farms, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia and is a wholly-owned subsidiary of Defendant George's, Inc. During the relevant period, George's Family Farms, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than George's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 285 and therefore deny them. George's

admits that George's Family Farms, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia. George's admits that George's Family Farms, LLC has core business operations in the areas of breeding, growing, hatching, processing, distribution, or sale of Broilers. George's denies the remaining allegations in Paragraph 285.

> 286. *George's Foods, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia, and is a wholly-owned subsidiary of Defendant George's, Inc. During the relevant period, George's Foods, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than George's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 286 and therefore deny them. George's admits that George's Foods, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia. George's admits that George's Foods, LLC has core business operations in the areas of breeding, growing, hatching, processing, distribution, or sale of Broilers. George's denies the remaining allegations in Paragraph 286.

> 287. *George's of Missouri, Inc. is a Missouri corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of Defendant George's, Inc. During the relevant period, George's of Missouri, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than George's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 287 and therefore deny them. George's admits that George's of Missouri, Inc. is a Missouri corporation with its headquarters in Springdale, Arkansas. George's admits that George's of Missouri, Inc. has core business operations in the areas of breeding, growing, hatching, processing, distribution, or sale of Broilers. George's denies the remaining allegations in Paragraph 287.

> 288. *George's Processing, Inc. is an Arkansas corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of Defendant George's, Inc. During the relevant period, George's Processing, Inc. sold broilers in interstate commerce,*

*directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than George's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 288 and therefore deny them. George's admits that George's Processing, Inc. is an Arkansas corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of George's, Inc. George's admits that George's Processing, Inc. has core business operations in the areas of breeding, growing, hatching, processing, distribution, or sale of Broilers. George's denies the remaining allegations in Paragraph 288.

6.     **Peco Foods**

289.     *Peco Farms of Mississippi, LLC is a Mississippi limited-liability company with its headquarters in Jackson, Mississippi and is a wholly-owned subsidiary of Defendant Peco Foods, Inc. During the relevant period, Peco Farms of Mississippi, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Peco lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 289 and therefore deny them. Peco denies the conspiracy or conspiracies alleged in the Complaint. Peco denies the remaining allegations in Paragraph 289, except Peco admits that (i) Peco Farms of Mississippi, LLC, is wholly owned by Peco Foods, Inc., and (ii) Peco Farms of Mississippi, LLC, is a Mississippi limited liability company.

7.     **Pilgrim's Pride**

290.     *PFS Distribution Company is a Delaware company with its headquarters in Arlington, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, PFS Distribution Company sold broilers in*

*interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 290 and therefore deny them. Pilgrim's admits PFS Distribution Company is a Delaware company and a wholly-owned subsidiary of Pilgrim's Pride Corporation, but denies all remaining allegations in Paragraph 290.

*291.   Merit Provisions, LLC is a Texas limited-liability company with its headquarters in Dallas, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, Merit Provisions, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 291 and therefore deny them. Pilgrim's admits that in April 2017, it acquired a minority interest in Merit Provisions, LLC, which is headquartered in Dallas, Texas. Pilgrim's admits that until March 2011, Merit purchased inventory from Pilgrim's for ultimate distribution to a single foodservice company. In June 2011, Pilgrim's purchased the remaining 51% ownership interest in Merit and it no longer holds any assets. Pilgrim's denies all remaining allegations in 291.

*292.   GC Properties, LLC is a Georgia limited-liability company with its headquarters in Powder Springs, Georgia and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, GC Properties, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 292 and therefore deny them. Pilgrim's admits that GC Properties, LLC was a partnership in which Pilgrim's first held an ownership interest and ultimately was wholly-owned by Pilgrim's Pride Corporation before its dissolution.

Pilgrim's admits that GC Properties, LLC was headquartered in Powder Springs, Georgia. Pilgrim's denies all remaining allegations in Paragraph 292.

> 293.  *Pilgrim's Pride of Nevada, Inc. is a Nevada corporation with its headquarters in Greeley, Colorado and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, Pilgrim's Pride of Nevada, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 293 and therefore deny them.  Pilgrim's admits the allegations in the first sentence of Paragraph 293.  Pilgrim's denies all remaining allegations in Paragraph 293.

> 294.  *PPC Marketing, Ltd. is a Texas company with its headquarters in Pittsburg, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, PPC Marketing, Ltd. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 294 and therefore deny them.  Pilgrim's admits PPC Marketing, Ltd. is indirectly wholly-owned by Pilgrim's Pride Corporation, but denies all remaining allegations in Paragraph 294.

> 295.  *Pilgrim's Pride Corporation of West Virginia, Inc. is a West Virginia corporation with its headquarters in Greeley, Colorado and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.  During the relevant period, Pilgrim's Pride Corporation of West Virginia, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 295 and therefore deny them. Pilgrim's admits the allegations in the first sentence of Paragraph 295. Pilgrim's admits that during the Relevant Period, Pilgrim's Pride Corporation of West Virginia, Inc. sold poultry products that may

fit within the Plaintiffs' litigation definition of "Broilers." Pilgrim's denies any remaining allegations in Paragraph 295.

**8.    Foster Farms**

*296.    Foster International Trading Company, Inc. is a corporation affiliated with Foster Farms, LLC and/or Foster Poultry Farms. During the Conspiracy Period, Foster International Trading Company, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER**:  Defendants other than Foster Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 296 and therefore deny them.  Foster Farms denies that Foster International Trading Company, Inc. ever sold Broilers, as the term is inaccurately described in the Complaint. Foster Farms denies all remaining allegations in Paragraph 296.

*297.    Napoleon Poultry Supply LLC is a Delaware limited-liability company with its headquarters in Livingston, California and is a wholly-owned subsidiary of Defendant Foster Farms, LLC. During the relevant period, Napoleon Poultry Supply LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Foster Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 297 and therefore deny them.  Foster Farms denies that Napoleon Poultry Supply LLC ever sold Broilers, as the term is inaccurately described in the Complaint. Foster Farms denies all remaining allegations in Paragraph 297.

**9.    O.K. Foods**

*298.    O.K. Broiler Farms Limited Partnership was (presently dissolved) an Arkansas limited partnership with its headquarters in Fort Smith, Arkansas and is a wholly-owned subsidiary of Defendant O.K. Foods, Inc.  During the relevant period, O.K. Broiler Farms Limited Partnership sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than O.K. Foods lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 298 and therefore deny them.  O.K.

Foods denies the allegations in Paragraph 298, except O.K. Foods admits that O.K. Broiler Farms Limited Partnership was an Arkansas limited partnership with its headquarters in Ft. Smith, Arkansas.

**10.    House of Raeford**

*299.    House of Raeford Farms of Louisiana, L.L.C. is a Louisiana limited-liability company with its headquarters in Shreveport, Louisiana and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, House of Raeford Farms of Louisiana, L.L.C. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**    Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 299 and therefore deny them.  House of Raeford admits that the entities named in Paragraph 299 are related entities of House of Raeford. House of Raeford lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 299 and therefore denies those allegations.

*300.    Johnson Breeders, Inc. is a North Carolina corporation with its headquarters in Rose Hill, North Carolina and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, Johnson Breeders, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**    Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 300 and therefore deny them.  House of Raeford admits that the entities named in Paragraph 300 are related entities of House of Raeford.  House of Raeford lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 300 and therefore denies those allegations.

*301.    Columbia Farms of Georgia, Inc. is a South Carolina corporation with its headquarters in Batesburgh-Leesville, South Carolina and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc.  During the relevant period, Columbia Farms*

*of Georgia, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 301 and therefore deny them.  House of Raeford admits that the entities named in Paragraph 301 are related entities of House of Raeford.  House of Raeford lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 301 and therefore denies those allegations.

*302.    Raeford Farms of Louisiana, L.L.C. is a Louisiana limited-liability company with its headquarters in Arcadia, Louisiana and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, Raeford Farms of Louisiana, L.L.C. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 302 and therefore deny them.  House of Raeford admits that the entities named in Paragraph 302 are related entities of House of Raeford.  House of Raeford lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 302 and therefore denies those allegations.

*303.    Columbia Farms, Inc. is a South Carolina corporation with its headquarters in Columbia, South Carolina and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc.  During the relevant period, Columbia Farms, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 303 and therefore deny them.  House of Raeford admits that the entities named in Paragraph 303 are related entities of House of Raeford.  House of Raeford lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 303 and therefore denies those allegations.

11.    **Keystone Foods**

304.    *Keystone Foods Corporation was (now consolidated) a subsidiary of Keystone Foods, LLC and Marfrig Alimentos, S.A., a Brazilian company. During the relevant time period, Keystone Foods Corporation and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:**  Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 304 and therefore deny them.  Tyson admits that Keystone Foods, LLC was a subsidiary of Marfrig Alimentos, S.A. from 2010 to 2018.  In 2018, Tyson acquired Keystone Foods, LLC.  Tyson denies the remaining allegations in Paragraph 304.

## VI.    NON-PRODUCER CO-CONSPIRATORS TIP TOP POULTRY, INC. AND SOUTHERN HENS, INC.

305.    *Non-Producer Co-Conspirator Tip Top Poultry, Inc, ("Tip Top") is a Georgia corporation headquartered in Marietta, Georgia and with facilities in other states, including Oklahoma. As alleged below, Tip Top played an active and important role in facilitating and implementing the production-restriction mechanism of the conspiracy detailed in this Consolidated Complaint.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 305 and therefore deny them.  Defendants deny the allegations in the second sentence of Paragraph 305.

306.    *Non-Producer Co-Conspirator Southern Hens, Inc. ("Southern Hens") is a Mississippi corporation headquartered in Moselle, Mississippi. As alleged below, Southern Hens played an active and important role in facilitating and implementing the production-restriction mechanism of the conspiracy detailed in this Consolidated Complaint.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 306 and therefore deny them.  Defendants deny the allegations in the second sentence of Paragraph 306.

307.    *Various other persons, firms, and corporations not named as Defendants have performed acts and made statements in furtherance of the Conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named*

188

*as Defendants in this Complaint. Throughout this Complaint, the Producer Co-Conspirators, the Defendant family co- conspirators, and the Non-Producer Co-Conspirators identified above, and the other persons, firms, and corporations not named as Defendants that performed acts and made statements in furtherance of the conspiracy are collectively referred to as "Co-Conspirators."*

**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 307. The second sentence of Paragraph 307 contains Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in the second sentence of Paragraph 307. The last sentence of Paragraph 307 contains Plaintiffs' explanation of a defined term used in their Complaint, to which no response is required. To the extent a response is required, Defendants admit that Plaintiffs have defined "Co-Conspirators" as described in Paragraph 307, but deny any remaining allegations in Paragraph 307.

*308. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.*

**ANSWER:** Paragraph 308 contains Plaintiffs' explanation of a defined term used in their Complaint, to which no response is required. To the extent a response is required, Defendants admit that Plaintiffs have defined "any act of any corporation" as described in Paragraph 308, but deny any remaining allegations in Paragraph 308.

*309. Each of the Defendants acted as the agent of or joint-venturer for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.*

**ANSWER:** Paragraph 309 contains Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 309.

310. *The Defendants named in each underlying DAP complaint are jointly and severally liable for the acts of all Defendants and Co-Conspirators named in that DAP complaint.*

**ANSWER:** Paragraph 310 contains Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 310.

## VII. JURISDICTION AND VENUE

311. *The Court has subject-matter jurisdiction of the various federal and state claims under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. §§ 15, 26. This Court has supplemental jurisdiction over the state causes of action asserted herein pursuant to 28 U.S.C. § 1367 because those causes of action arise from the same set of operative facts as the federal causes of action.*

**ANSWER:** Defendants admit that the Court has subject matter jurisdiction over this action.

312. *Venue is proper in this District under 15 U.S.C. § 15(a), 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) because during the relevant period, Defendants resided, transacted business, were found, or had agents in this District, and because a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District. In addition, Defendants have already submitted to the jurisdiction and venue of this Court.*

**ANSWER:** Defendants admit that venue properly lies in this District for purposes of this action only. Defendants deny any remaining allegations in Paragraph 312.

313. *Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 734 Ill. Comp. Stat. 5/2-209 because each Defendant has transacted business in this state and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.*

**ANSWER:** Defendants admit that they or certain of their affiliates named in the Complaint have transacted business in the state of Illinois. Defendants deny any remaining allegations in Paragraph 313.

314. *This Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy throughout the U.S., including in this District. The alleged scheme and conspiracy have been directed at, and had the*

*intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District.*

**ANSWER:** Defendants admit that the Court has personal jurisdiction over Defendants and Defendants admit that they or certain of their affiliates named in the Complaint have transacted business in this District, but deny all remaining allegations in Paragraph 314.

> *315. This Court also has personal jurisdiction over the Defendants because each of them knew, or should have known, that because the Georgia Dock index price was used to price chicken bought in Illinois and nationwide, their participation in the collusive manipulation of the Georgia Dock would have effects on the price of chicken purchased in Illinois based on the Georgia Dock benchmark. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business in the state of Illinois.*

**ANSWER:** Defendants admit that the Court has personal jurisdiction over Defendants. Defendants or certain of their affiliates named in the Complaint admit that they have transacted business in this District. Defendants deny all remaining allegations in Paragraph 315.

## VIII. TRADE AND COMMERCE

> *316. According to a 2012 report by Focus Management Group, chicken "is a commodity product with little or no product differentiation based on the processors," and the CEO of Defendant Pilgrim's Pride recently commented that "the chicken business per se is a commodity business."*

**ANSWER:** To the extent the allegations in Paragraph 316 characterize or describe a 2012 report by Focus Management Group, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 316 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 316 to the extent that they relate to other Defendants and/or third parties. To the extent the allegations in Paragraph 316 characterize or describe an unidentified statement by Pilgrim's CEO, Defendants other than Pilgrim's deny any characterization or description that is inconsistent therewith. Pilgrim's denies that Plaintiffs have accurately quoted the statement and denies any

characterization or description that is inconsistent with the actual statement.  Defendants deny any remaining allegations in Paragraph 316.

317.    *The commodity nature of chicken is evidenced by the fact that, as detailed below, numerous Defendants have during the relevant period purchased chicken from each other (then likely resold it) to buttress their conspiracy by soaking up excess supply in the market.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 317 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 317 to the extent that they relate to other Defendants and/or third parties.  Producer Defendants other than Harrison Poultry admit that at certain times they have purchased chicken from each other based on their own business judgment of what was in their independent interest.  Harrison Poultry denies that it purchased chicken from any other chicken producers during the Relevant Period.  Harrison Poultry further states that it primarily produces a specialty product known as "yellow chicken," with unique feeding and processing requirements.  Like Halal, kosher, and other forms of chicken excluded in Plaintiffs' definition, the yellow chicken produced by Harrison Poultry is sold in different markets and at different prices than conventional broilers.  Defendants deny any remaining allegations in Paragraph 317.

318.    *Typically, when a product is characterized as a commodity, competition is based principally on price, as opposed to other attributes, such as product quality or customer service.*

**ANSWER:**  Defendants deny the allegations in Paragraph 318.

*319.    Chicken producers pay USDA graders to examine their chickens, and almost all companies sell USDA Grade A chicken, meaning that there is very little differentiation amongst sellers.*

**ANSWER:**  Defendants admit that chicken producers can pay USDA graders to examine their chicken, and that many sell USDA Grade A chicken, but deny any remaining allegations in Paragraph 319.

*320.    Due to the lack of product differentiation, Defendants compete on price (absent collusion) such that the supply decisions of each chicken producer impact the market price for chickens.  While an individual producer often has the incentive to increase production to maximize profits, any increased production will ultimately reduce the profitability of the industry as a whole.  Thus, the commodity nature of the product in the chicken industry makes it attractive to implement a price-fixing scheme and provides industry players with the incentive to agree to reduce overall supply.*

**ANSWER:**  Defendants admit that price is one component of competition but deny all remaining allegations in Paragraph 320.

*321.    The United States chicken market is a national market, valued at nearly $41 billion in 2016. According to the U.S. Poultry & Egg Association, the value of wholesale U.S. Broilers produced in 2014 was $32.7 billion, up 6 percent from 2013. The market value varied between $21.8 and $30.7 billion from 2008-2013.*

**ANSWER:**  To the extent the allegations in Paragraph 321 characterize or describe selected statistics published by the U.S. Poultry & Egg Association, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants deny all remaining allegations in Paragraph 321.

*322.    During the relevant period, Defendants collectively controlled nearly 90% of the market for chicken in the United States.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 322 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 322 to the extent that they relate to other Defendants and/or third parties. As the term "collectively controlled" is imprecise,

Defendants are unable to form a belief as to the truth of the allegations contained in Paragraph 322 and on this basis deny them.

> 323.    The chicken industry is almost entirely vertically integrated, with producers (sometimes known as "integrators") owning, or tightly controlling, each of the six stages of the supply chain: breeding, hatching, chick-rearing/feeding, slaughtering mature birds, processing, and selling.

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 323 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 323 to the extent that they relate to other Defendants and/or third parties.  The Producer Defendants admit that they have ownership and control over aspects of their production, including processing and selling. Defendants deny the characterization of "vertical integration" in Paragraph 323.  Defendants deny any remaining allegations in Paragraph 323.

> 324.    At the top of the supply chain are Defendants' "breeder flocks," which include the hens that lay the eggs that, when hatched, become chickens slaughtered for meat consumption.

**ANSWER:**  Defendants admit that Broiler breeder hens produce eggs that may become broiler chickens slaughtered for meat consumption.  Defendants deny any remaining allegations in Paragraph 324.

> 325.    The prices for Plaintiffs' chicken purchases during the relevant period were based in part on prices published by one of three entities: Urner Barry, the Georgia Department of Agriculture (the "Georgia Dock"), and the United States Department of Agriculture (the "USDA Composite").

**ANSWER:**  Defendants admit that Urner Barry, the Georgia Department of Agriculture, and the USDA have published pricing data for certain poultry products.  Defendants deny any remaining allegations in Paragraph 325.

326. *The Georgia Dock, USDA Composite, and Urner Barry indices all measure the same (or very similar) size and grade of chicken.*

**ANSWER:** Defendants deny the allegations in Paragraph 326.

327. *The USDA's publicly available Composite index collects and publishes chicken price information on a weekly basis.*

**ANSWER:** Defendants admit that the USDA has reported pricing data for certain poultry products and that some of that data is publicly available for free. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 327 and therefore deny them.

328. *Urner Barry collects and publishes daily price information for chicken. This information is subscription-based, and all chicken producers and many chicken purchasers subscribe for a fee.*

**ANSWER:** Defendants admit that Urner Barry has reported pricing data for certain poultry products and that Urner Barry provides some subscription-based data services. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 328 and therefore deny them.

329. *The USDA and Urner Barry chicken price indices are purportedly based upon a system of double verification, which includes telephonic and written surveys of all or nearly all chicken producers. The Georgia Dock index was based on a materially different methodology discussed in more detail below.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 329 and therefore deny them.

330. *Published chicken prices from Urner Barry, Georgia Dock, and USDA relate to the spot market for chicken (a spot market purchase is a non-recurring purchase for immediate delivery). Defendants also used the prices for chicken on the spot market, especially as reported by Georgia Dock, to negotiate prices for their contract purchasers.*

**ANSWER:** Defendants who submitted information to the Georgia Department of Agriculture deny that the Georgia Dock related to the spot market. Defendants who did not submit information to the Georgia Department of Agriculture lack knowledge or information sufficient to

form a belief as to the truth of the allegation that the Georgia Dock related to the spot market and therefore deny this allegation. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 330 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 330 to the extent that they relate to other Defendants and/or third parties. As Paragraph 330 does not indicate to which specific data provided by Urner Barry and USDA the allegations contained in Paragraph 330 refer, Defendants are unable to form a belief as to the truth of the remaining allegations in Paragraph 330 and therefore deny them. Defendants deny the allegations in the last sentence of Paragraph 330.

     *331.    As a consequence of the inelasticity of supply and demand in the chicken industry and the availability of the spot market price indices, public price announcements by Defendants were unnecessary. Defendants knew and intended that a decrease in supply pursuant to their agreement would increase chicken spot market prices or maintain them at artificially inflated non- competitive levels, and therefore that all chicken prices would increase or be artificially high.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 331 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 331 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 331.

     *332.    During the relevant period, Defendants produced, sold, and shipped chicken in a continuous and uninterrupted flow of interstate commerce. The conduct of the Defendants as alleged herein, including the conspiracy in which Defendants participated, was intended to have and had a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce in this District.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Paragraph 332 contains Plaintiffs' characterization of their claims, arguments subject

to proof by expert testimony, and/or legal conclusions, to which no response is required.  To the extent that a response is required, Defendants admit they sold certain broiler products in the United States, but deny any remaining allegations in Paragraph 332.

*333.    During the relevant period, each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy.*

**ANSWER:**  Defendants deny the allegations in Paragraph 333.

*334.    During the time period relevant to Plaintiffs' claims, Plaintiffs and/or their assignors, directly purchased chicken in the United States from one or more Defendants and/or their Co-Conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.  Plaintiffs are "persons" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:**  Paragraph 334 contains Plaintiffs' characterization of their claims, arguments subject to proof by expert testimony, and/or legal conclusions, to which no response is required. Defendants admit they sold various poultry products to certain Plaintiffs during the Relevant Period, but deny Plaintiffs sustained any injury as a result of any purchase from Defendants and that Defendants committed any antitrust violations.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 334 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 334 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any remaining allegations in Paragraph 334.

## IX.    FACTUAL ALLEGATIONS REGARDING DEFENDANTS' UNLAWFUL CONSPIRACY

*335.    Defendants used multiple means to sustain the conspiracy/conspiracies described in this Complaint. Defendants engaged in a series of supply reductions at the start of the distribution chain. Defendants coordinated their strategy for achieving their desired anti- competitive ends by exchanging confidential and commercially sensitive information regarding production, capacity, and pricing of broilers. As part of this strategy, Defendants exchanged information regarding anticipated future production through Agri Stats. Defendants also manipulated the Georgia Dock price index. In furtherance of their conspiracy, Defendants also conspired to submit artificially high bids*

*to purchasers in an effort to drive up prices, and in turn, Defendants' profits. And Defendants engaged in pricing communications targeting specific customers.*

**ANSWER:** To the extent the allegations in Paragraph 335 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer the sixth sentence of Paragraph 335 at this time. Defendants deny the remaining allegations in Paragraph 335.

*336. In the year preceding the beginning of Defendants' conspiracy, the U.S. chicken market was foundering.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 336 and therefore deny them.

*337. In 2007, a glut of chicken – the result of significant overproduction by Sanderson Farms, Mountaire Farms, and House of Raeford – began to flood the market, and prices cratered.*

**ANSWER:** Defendants deny Plaintiffs' characterization of their respective production decisions; each Producer Defendant planned and executed their respective U.S. Broiler production based on their own, unilateral business judgment of what is in their independent interest. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 337 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 337 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations Paragraph 337 and therefore deny them.

*338. In 2007, Pilgrim's, Tyson, and a few other chicken producers (Foster, Peco, and Perdue) attempted to cut their production levels enough to cause industry prices to rise.*

**ANSWER:** Defendants deny Plaintiffs' characterization of their respective production decisions; each Producer Defendant planned and executed their respective U.S. Broiler production

based on their own, unilateral business judgment of what is in their independent interest. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 338 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 338 to the extent that they relate to other Defendants and/or third parties.  Defendants Pilgrim's, Tyson, Foster Farms, Peco, and Perdue deny the allegations in Paragraph 338 related to them.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations Paragraph 338 and therefore deny them.

*339.    However, despite Pilgrim's and Tyson's combined 40% market share, their production cuts in 2007 were not enough to increase prices through supply cuts because other broiler companies increased their production.*

**ANSWER:**  Defendants other than Pilgrim's and Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 339 and therefore deny them.  With respect to the allegations in Paragraph 339, Tyson admits that in 2007, as in every year, Tyson adjusted its U.S. Broiler production based on its own business judgment of what is in its independent interest. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the precise figures set forth in the second sentence of Paragraph 339, and on this basis denies those allegations. To the extent the allegations in Paragraph 339 relate to other Defendants and/or third parties, Tyson lacks knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies the allegations. Pilgrim's denies the allegations in the first sentence of Paragraph 339 and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 339 and therefore denies them. Defendants deny any remaining allegations in Paragraph 339.

*340.    Production cuts in 2007 followed the typical pattern of focusing on short-term reductions in production – such as slaughtering chickens early. Defendants did not,*

*however, make significant cuts at the top of the supply chain – such as by culling of breeder flocks – which would have had longer-term effects on supply.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 340 and therefore deny them.

> 341. *By the time the Great Recession hit the American economy in 2008, the oversupply and low prices of chickens put Defendants – individually and collectively – in dire financial straits. In 2008, the first year of the Great Recession, Defendants faced what promised to be a historically bad year for the chicken industry. As a result, Defendants agreed to depart from the previous industry practice of short-term or medium-term production cuts, which had led to the destructive boom-and-bust cycles that plagued chicken producers for years.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 341 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 341 to the extent that they relate to other Defendants and/or third parties. As the terms "dire financial straits," "historically bad year," and "boom-and-bust cycles" in Paragraph 341 are imprecise, Defendants are unable to form a belief as to the truth of the allegations in Paragraph 341 and therefore deny them. Pilgrim's admits that it was in financial distress in 2007, which ultimately led to its bankruptcy in 2008, but Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of allegations related to other Defendants or third parties in Paragraph 341 and therefore denies them. Defendants deny any remaining allegations in Paragraph 341.

> 342. *Instead, in early 2008, through press releases, earnings and investor calls, at investment bank conferences, at events hosted by Agri Stats, through communications both direct and facilitated by third parties, and at the myriad trade association meetings attended by many of their senior-most executives, Defendants began implementing the conspiracy. Among other acts in furtherance of the conspiracy, Defendants called on one another to heed the mistakes of the past, preaching to one another that oversupply was decimating industry profits, and that increased supply-side "discipline" was needed to halt the downward trajectory of chicken prices.*

**ANSWER:** Defendants deny the allegations in Paragraph 342.

343.    Defendants collectively agreed to the reduction or relative stabilization of industry capacity, particularly at the breeder flock level, where such efforts would be most effective – as a mechanism to increase Defendants' profits.

**ANSWER:**  Defendants deny the allegations in Paragraph 343.

344.    Defendants' efforts were supported by public statements made by their executives, which involved more than an announcement of a Defendant's own conduct. As alleged below, many of Defendants' executives' calls for a new era of "discipline" included explicit statements that signaled deeper production cuts were an industry-wide imperative that would pay dividends for "the industry" as a whole.

**ANSWER:**  Defendants deny the allegations in Paragraph 344.

345.    Defendants, who collectively control nearly 90% of the U.S. chicken market, jointly engaged in this not-easily-reversed production reduction effort.

**ANSWER:**  Defendants deny the allegations in Paragraph 345.

346.    While spearheaded primarily by the CEOs and senior personnel of Defendants Tysons and Pilgrim's – which, as publicly held entities holding sizable but by no means controlling) shares of the U.S. chicken market, were well-positioned to rally the entire industry – Defendants' executives' public discussion of industry conditions was not limited to the larger, publicly held Defendants.

**ANSWER:**  Defendants deny the allegations in Paragraph 346.

347.    For example, Mike Welch, CEO of Defendant Harrison, was (along with Sanderson COO, Lampkin Butts) a panelist at a symposium hosted by industry journal WATT PoultryUSA, where the discussion topics included industry consolidation, efficiency, and bird size,  with references to information gleaned from Agri Stats (whose vice president, Mike Donohue, was in the audience).[7]

> FN 7: Excerpts of comments made by Messrs. Welch and Butts are publicly available on WATT PoultryUSA's YouTube channel. See "Broiler company executives say bird size increase will continue," available at https://www.youtube.com/watch?v= ZBgEecBi7D4 and "Lampkin Butts describes changes in the poultry industry," available at https://www.youtube.com/watch?v=RN1IAphbQXs&t=53s (both last visited July 23, 2020).

**ANSWER:**  To the extent the allegations in Paragraph 347 and Footnote 7 characterize or describe a YouTube recording of a portion of a symposium, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Harrison

201

Poultry and Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 347 and Footnote 7 and therefore deny them. Harrison Poultry admits that its CEO Mike Welch participated in a panel hosted by the National Chicken Council in October 2014 but denies any remaining allegations in Paragraph 347 and Footnote 7. Sanderson Farms admits that its President & COO Lampkin Butts participated in a panel hosted by the National Chicken Council in October 2014, but denies any remaining allegations in Paragraph 347 and Footnote 7.

A.      **Production Cutting**

1.      **In an Early Phase of their Conspiracy, Defendants Departed from Their Historical Practice by Collectively Reducing Breeder Flocks in Unprecedented Amounts**

> 348.    *In 2008, and throughout the relevant period, the vertically integrated Defendants had the ability to manipulate supply to the chicken market at one or more stages of the supply chain.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 348 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 348 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 348.

> 349.    *Beginning in early 2008, Defendants began utilizing this ability by making significant production cuts, including unprecedented cuts in their breeder flocks.*

**ANSWER:** Defendants deny the allegations in Paragraph 349.

> 350.    *Defendants knew they could effectively manipulate supply by reducing the size of breeder flocks, and retiring or killing breeders at an earlier age than the optimum age.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the

truth of any allegations in Paragraph 350 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 350 to the extent that they relate to other Defendants and/or third parties. Defendants admit that Producer Defendants theoretically have several means to adjust production of Broilers in the event an individual Producer Defendant determines doing so is in its independent interest, including reducing or increasing the size of breeder flocks and reducing or increasing egg sets, which impacts chick placements. Defendants deny any remaining allegations in Paragraph 350.

> 351. By design, reducing breeder flocks would have significant, and long-lasting, effect on supply of chickens in the market more so than reducing supply down the chain.

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 351 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 351 to the extent that they relate to other Defendants and/or third parties. Defendants admit that Producer Defendants theoretically have several means to adjust production of Broilers in the event an individual Producer Defendant determines doing so is in its independent interest, including reducing or increasing the size of breeder flocks and reducing or increasing egg sets, which impacts chick placements, but deny any remaining allegations in Paragraph 351.

> 352. Because breeder flocks are created from a limited pool of so-called "grandparent" chickens from one of only three genetics companies (Aviagen, Hubbard, and Tyson's Cobb- Vantress), it takes substantial time – anywhere from six to eighteen months or more – to re- populate a breeder flock that has been reduced through early culling.

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 352 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 352 to the extent that they relate to other Defendants and/or third parties. Defendants admit that Producer Defendants theoretically

have several means to adjust production of Broilers in the event an individual Producer Defendant determines doing so is in its independent interest, including reducing or increasing the size of breeder flocks and reducing or increasing egg sets, which impacts chick placements. Defendants admit that Aviagen, Cobb-Vantress, and Hubbard (part of Aviagen Group as of July 2017) are Broiler genetics companies. Harrison Poultry further states that for the majority of the Relevant Period, Cobb-Vantress, Aviagen, and Hubbard were not its primary suppliers of breeder stock. Defendants deny any remaining allegations in Paragraph 352.

353. *While Defendants continued to use their historic methods to affect their supply-reduction scheme (at the middle or end of the supply chain, such as by reducing eggs placements, killing newly hatched chicks, or idling processing plants), their conspiracy was cemented by the long-term effects of breeder flock reductions that could not be easily reversed by Defendants.*

**ANSWER:** Defendants deny the allegations in Paragraph 353.

354. *Defendants' calculated decisions to create long-term reductions are clear indicators of a collusive agreement because it would not be in an individual Defendant's economic self-interest to undertake the significant risk of reducing its own long-term production capacity unless it was known that competitors would undertake similar dramatic and long-term cuts to production capacity.*

**ANSWER:** Defendants deny the allegations in Paragraph 354.

355. *Defendants' collective output-restriction caused a significant, not-easily-reversed, slowing in overall chicken production during the conspiracy – bucking the historic trend of steady annual production increases.*

**ANSWER:** Defendants deny the allegations in Paragraph 355.

356. *The overall effect of this mechanism of Defendants' conspiracy is shown in the graph below, drawn from USDA data,[8] showing that while chicken production grew a total of 21% from 2000 to 2008 (an average of 2.3% per year, proof that the "3% more broilers" quip is more than anecdotal), it then slowed to a total of roughly 10% from 2008 through 2016 (an average of slightly more than 1% per year) – a significant decrease in the pace, timing and manner of chicken production during the relevant period:*



*FN 8: NASS, Chickens, Young, Slaughter, FI, Certified, Chilled & Frozen – Production, Measured in LB, available at https://quickstats.nass.usda.gov/results/C33961EC-6D46-31DE-8CCB-89780E3D1620 (last visited July 23, 2020).*

**ANSWER:** Defendants admit that the graphic in Paragraph 356 is purportedly based on USDA data; Defendants refer to that data for its contents and deny any characterization or description that is inconsistent therewith. Defendants deny any remaining allegations in Paragraph 356 and Footnote 8.

**2.     Defendants' Executives Publicly Decried the Effect of Oversupply on "Our Industry," Telling their Competitors that Unified Action Was Necessary**

357.     *On January 23-25, 2008, numerous employees of Defendants, including many of Defendants' senior executives, attended the International Poultry Expo conference in Atlanta.*

**ANSWER:** While Defendants admit that personnel of certain Defendants have attended certain International Poultry Expo events, Defendants other than Amick Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 357 and therefore deny them. Amick Farms admits that certain of its employees attended legitimate trade association meetings and other legitimate industry events during the Relevant Period, including

the 2008 IPE conference. Amick Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 357 and therefore denies them.

358. *According to the trade association organizing the annual multi-day event, attendees represented companies responsible for over 99.4% of the production of chicken.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 358 and therefore deny them.

359. *On a January 28, 2008 earnings call, Tyson CEO Richard Bond – who in the same call, disclosed that the company had re-joined Agri Stats and had "just recently ... got our first series of data" – stated that "we have no choice [but] to raise prices substantially."*

**ANSWER:** To the extent the allegations in the first sentence of Paragraph 359 characterize or describe selected statements by Tyson CEO Dick Bond from a January 28, 2008 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 359 and therefore deny them. Tyson admits that it held an earnings call for its investors on January 28, 2008, but denies any remaining allegations in Paragraph 359.

360. *However, the commodity nature of chickens does not allow one producer to successfully raise market prices in the absence of widespread reductions in supply relative to the then-current demand.*

**ANSWER:** Defendants deny the allegations in Paragraph 360.

361. *Mr. Bond's comment therefore made no economic sense absent an intention or knowledge on his part that Defendants would coordinate an industry-wide reduction in supply that could not be easily reversed.*

**ANSWER:** Defendants deny the allegations in Paragraph 361.

362. *The day after Tyson's statements confirming its renewed participation in Agri Stats and expressing its plans to increase prices, Pilgrim's told its competitors to reduce their production of chickens to allow prices to recover.*

**ANSWER:** Defendants deny the allegations in Paragraph 362.

363. *On a January 29, 2008 earnings call, Pilgrim's CFO Rick Cogdill communicated that the industry's oversupply of chickens was hurting market prices.*

**ANSWER:** To the extent the allegations in Paragraph 363 characterize or describe selected statements by Pilgrim's CFO Rick Cogdill from a January 29, 2008 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 363 and therefore deny them. Pilgrim's admits it held an earnings call on January 29, 2008 on which then-Chief Financial Officer Rick Cogdill participated, but denies any remaining allegations in Paragraph 363.

364. *Mr. Cogdill explained that Pilgrim's had done its part in 2007 by reducing production 5%, so "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."*

**ANSWER:** To the extent the allegations in Paragraph 364 characterize or describe selected statements by Pilgrim's CFO Rick Cogdill from a January 29, 2008 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 364 and therefore deny them. Pilgrim's admits it held an earnings call on January 29, 2008 on which then-Chief Financial Officer Rick Cogdill participated, but denies any remaining allegations in Paragraph 364.

365. *Mr. Cogdill went on to explain that Pilgrim's alone could not reduce supply enough to help market prices recover, and that its past efforts to reduce supply had merely led to smaller players increasing their market share at Pilgrim's expense.*

**ANSWER:** To the extent the allegations in Paragraph 365 characterize or describe selected statements by Pilgrim's CFO Rick Cogdill from a January 29, 2008 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 365 and therefore deny them. Pilgrim's admits it held an earnings call on January 29, 2008 on which then-Chief Financial Officer Rick Cogdill participated, but denies any remaining allegations in Paragraph 365.

> 366.    Mr. Cogdill noted that "we have walked away from sales in certain cases, where the pricing just did not make any sense. So we are trying to hold the line. We are losing at times the competitive bids ... So we are trying to take a leadership position from a pricing perspective."

**ANSWER:** To the extent the allegations in Paragraph 366 characterize or describe selected statements by Pilgrim's CFO Rick Cogdill from a January 29, 2008 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 366 and therefore deny them. Pilgrim's admits it held an earnings call on January 29, 2008 on which then-Chief Financial Officer Rick Cogdill participated, but denies any remaining allegations in Paragraph 366.

> 367.    He then made the following statements urging Pilgrim's competitors to do their part in reducing chicken industry supply: "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs. We were the leader in cutting production last year to help drive that ... [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price."

**ANSWER:** To the extent the allegations in Paragraph 367 characterize or describe selected statements by Pilgrim's CFO Rick Cogdill from a January 29, 2008 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 367 and therefore deny them. Pilgrim's admits it held an earnings call on January 29, 2008 on which then-Chief Financial Officer Rick Cogdill participated, but denies any remaining allegations in Paragraph 367.

368.    When asked by an analyst "do you have an estimate internally of what the state of oversupply in the industry might be? What you would hope to see cut from others that would make you feel like the industry was more rational?" Cogdill replied "It's really hard to say that the faster we get to production adjustment the quicker the recovery could happen…. And if the industry doesn't react soon enough it will have to react stronger in the end."

**ANSWER:**    To the extent the allegations in Paragraph 368 characterize or describe selected statements by Pilgrim's CFO Rick Cogdill from a January 29, 2008 earnings call and a statement by an analyst, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 368 and therefore deny them.  Pilgrim's admits it held an earnings call on January 29, 2008 on which then-Chief Financial Officer Rick Cogdill participated, but denies any remaining allegations in Paragraph 368.

369.    Cogdill also responded to an analyst's query about the industry's failure to follow Tyson's 2007 cuts by stating that, "I think you kind of hit on it there…. It's not like we had 5% of surplus capacity that we could just reduce our operations and not feel that…. I mean we cannot be the ones that are out there continually reducing production, and let the other producers capitalize on that. I mean if it's 5% last year, 5% this year, 5% next year, you can see that that's a spiral to the demise of our company, which we are not willing to accept."

**ANSWER:**    To the extent the allegations in Paragraph 369 characterize or describe selected statements by Pilgrim's CFO Rick Cogdill from a January 29, 2008 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 369 and therefore deny them.  Pilgrim's admits it held an earnings call on January 29, 2008 on which then-Chief Financial Officer Rick Cogdill participated, but denies any remaining allegations in Paragraph 369.

370.   On a January 31, 2008, earnings call, Sanderson Farms CEO Joe Sanderson explained that he, too, anticipated the industry would act in concert to cut production.

**ANSWER:**   To the extent the allegations in Paragraph 370 characterize or describe documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 370 and therefore deny them.  Sanderson Farms denies that it held a January 31, 2008 earnings call. Paragraph 370 appears to purport to quote a February 26, 2008 earnings call; Sanderson Farms denies any characterization or description that is inconsistent therewith.  Sanderson Farms denies the remaining allegations in Paragraph 370.

371.   Asked about production cuts by an analyst, Mr. Sanderson replied "we could see some reductions in production."

**ANSWER:** To the extent the allegations in Paragraph 371 characterize or describe documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 371 and therefore deny them. Sanderson Farms denies that it held a January 31, 2008 earnings call. Paragraph 371 appears to purport to quote a February 26, 2008 earnings call; Sanderson Farms denies any characterization or description that is inconsistent therewith.  Sanderson Farms denies the remaining allegations in Paragraph 371.

372.   Asked to expand on his comments by another analyst, Mr. Sanderson said he thought a production cut was "probable," and "if it's bad and ugly and deep in February, March, April, you'll see the production cuts take place during that period of

*time." He added, "[t]here's still 25% of the industry still making money but I would expect to see those reductions come over the next 90 to 120 days."*

**ANSWER:** To the extent the allegations in Paragraph 372 characterize or describe documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 372 and therefore deny them. Sanderson Farms denies that it held a January 31, 2008 earnings call. Paragraph 372 appears to purport to quote a February 26, 2008 earnings call; Sanderson Farms denies any characterization or description that is inconsistent therewith. Sanderson Farms denies the remaining allegations in Paragraph 372.



373.    *Defendants also communicated privately.*

**ANSWER:**

Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 373 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 373 to the extent that they relate to other Defendants and/or third parties. Defendants other than Case lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 373 and therefore deny them.

████████████████████████████████

Case denies the remaining allegations in Paragraph 373.

**B.      Defendants Begin to Cut Production in Concert**

> 374.     Around March 4, 2008, senior executives from Defendants, including Pilgrim's CEO Clint Rivers, Tyson Senior VP Donnie Smith, Case Foods CEO Tom Shelton, Amick President and CEO Ben Harrison, and Fieldale Farms President Thomas Hensley, met in Washington, D.C., at an Executive Committee meeting of the National Chicken Council's Board of Directors.

**ANSWER:**  While Defendants admit that personnel of certain Defendants have attended events held by the National Chicken Council, Defendants other than Pilgrim's, Tyson, Amick Farms, Fieldale, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 374 and therefore deny such allegations.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 374 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 374 to the extent that they relate to other Defendants and/or third parties.

Tyson admits that Donnie Smith attended the Executive Committee meeting of the National Chicken Council's Board of Directors around March 4, 2008, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 374 and therefore denies them.  Pilgrim's admits that Clint Rivers was appointed CEO of Pilgrim's on or about March 4, 2008, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 374 and therefore denies them.  Case admits that CEO Tom Shelton may have attended the meeting around March 4, 2008 of the Executive Committee meeting of the National Chicken Council's Board of Directors for lawful purposes and not for conspiratorial purposes, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 374 and therefore denies them.  Fieldale admits that Tom Hensley attended a NCC Board of Directors meeting around March 4, 2008, but

lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 374 and therefore denies them. Amick Farms denies the remaining allegations of Paragraph 374.

> 375. *Shortly after that trade association meeting, Pilgrim's again sounded the call to cut overall industry supply, and it proceeded with production cuts.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 375 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 375 to the extent that they relate to other Defendants and/or third parties. Defendants deny the remaining allegations of Paragraph 375.

> 376. *On March 12, 2008, Pilgrim's CEO Clint Rivers publicly announced the closure of seven chicken facilities in order to reduce industry oversupply, stating "we believe [these] actions … are absolutely necessary to help bring supply and demand into better balance…. That portion of the demand for our products that exists solely at pricing levels below the cost of production is no longer a demand that this industry can continue to supply." (emphasis added)*

**ANSWER:** To the extent the allegations in Paragraph 376 characterize or describe an unidentified statement by Pilgrim's CEO Client Rivers, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 376 and therefore deny them. Pilgrim's admits that its Board of Directors elected J. Clinton Rivers to the position of President and Chief Executive Officer on March 5, 2008. Pilgrim's further admits that on March 12, 2008, it issued a press release announcing the closure of one poultry processing plant and six distribution centers, which included statements from Mr. Rivers, but denies any remaining allegations in Paragraph 376.

377.     Under competitive conditions, other chicken producers would typically respond to Pilgrim's substantial supply cuts by increasing their production. Yet just the opposite occurred.

**ANSWER:**  Defendants deny the allegations in Paragraph 377.

378.     Following the Pilgrim's announcement, a series of production cuts were publicly announced by other Defendants between April 3 and April 11, 2008:

**ANSWER:**  Defendants admit they adjust their U.S. Broiler production based on their own business judgment of what is in each Defendants independent interest. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 378 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 378 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 378.

379.     On April 3, 2008, Fieldale Farms announced a 5% production cut, stating that "We're hoping this cut puts supply and demand back into better balance."

**ANSWER:**  To the extent the allegations in Paragraph 379 characterize or describe an unidentified statement by Fieldale Farms, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 379 and therefore deny them.  Fieldale admits that Plaintiffs have quoted from a meatingplace.com article dated April 3, 2008 that includes statements by Fieldale executives, but denies any remaining allegations in Paragraph 379.

380.     Fieldale Farms is not a publicly traded company, and there was no reason – other than signaling to its fellow producers that it was following through on its conspiratorial agreement – why it would publicly disclose its production plans.

**ANSWER:**  Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 380 and therefore deny them.  Fieldale

214

admits that it is not a publicly traded company, but denies the remaining allegations in Paragraph 380.

381. ████████████████████████████████████████

**ANSWER:** Defendants other than Amick Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 381 and therefore deny them. Amick Farms denies cutting production during this time period and denies making any public announcement of any alleged production cuts. To the extent that allegations in Paragraph 381 characterize or describe documents or sources, Amick Farms denies any characterization or description inconsistent therewith. Amick Farms denies any remaining allegations in Paragraph 381.

382. *On April 9, 2008, Simmons announced in a press release a 6% reduction in production throughout its processing plants, a move heralded by Wall Street analysts, who noted that production cuts across smaller companies in the chicken industry, like Simmons, would be positive for chicken prices.*

**ANSWER:** To the extent the allegations in Paragraph 382 characterize or describe an unidentified press release by Simmons, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Simmons lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 382 and therefore deny them. Simmons admits that it announced a production cut on April 9, 2008, but denies that such a cut took place on any long-term basis and lacks knowledge and information sufficient to form a belief of the remaining allegations in Paragraph 382 and therefore denies them.

*383.    Simmons is not a publicly traded company, and there was no reason – other than signaling to its fellow producers that it was following through on its conspiratorial agreement – why it would publicly disclose its production plans.*

**ANSWER:**  Defendants other than Simmons lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 383 and therefore deny them.  Simmons admits that it is a private company, but denies the remaining allegations in Paragraph 383.

*384.    On April 10, 2008, Cagle's Inc. (later acquired by Koch Foods) announced in a press release a 4% reduction in processing of chickens, noting that the cut "will reduce product being sold through less profitable commodity outlets."*

**ANSWER:**  To the extent the allegations in Paragraph 384 characterize or describe an unidentified statement by Cagle's Inc., Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 384 and therefore deny them.  Koch admits that in 2012, one or more Koch-related entities purchased substantially all of Cagle's Inc.'s assets.  Koch lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 384 and therefore denies them.

*385.    On April 3-11, 2008, Wayne Farms, O.K. Foods, and Koch Foods each announced 2-8% reductions in production.*

**ANSWER:**  To the extent the allegations in Paragraph 385 characterize or describe an unidentified document or documents, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 385 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 385 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Wayne Farms, O.K. Foods, and Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 385 and therefore deny them.  Wayne Farms denies the

remaining allegations in Paragraph 385 to the extent they relate to Wayne Farms. Koch denies the allegations in Paragraph 385 to the extent they relate to Koch, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 385 and therefore denies them. O.K. Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 385 and therefore denies them. Defendants deny any remaining allegations in Paragraph 385.

386.     *Neither Wayne, nor O.K. Foods, nor Koch is publicly-traded, and there was no reason – other than signaling to their fellow producers that they were following through on their conspiratorial agreements – why they would publicly disclose their production plans.*

**ANSWER:** Defendants other than Wayne Farms, O.K. Foods, or Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 386 and therefore deny them. O.K. Foods, Koch, and Wayne Farms each admit they are not publicly traded, deny the remaining allegations in Paragraph 386 directed at them, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 386 and therefore deny them.

387.     *Several other chicken producers cut their production between April 1, 2008 and May 15, 2008 but did not publicly announce the cuts.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 387 and therefore deny them.

388.     *Because of Agri Stats, there was no need to make a public announcement.*

**ANSWER:** Defendants deny the allegations in Paragraph 388.

389.     *For example, at the BMO Capital Markets Agriculture & Protein Conference presentation on May 15, 2008 at the Millennium Broadway Hotel in New York City, Sanderson Farms CEO Joe Sanderson stated – in the presence of several competitors attending the conference, including Pilgrim's CEO Clint Rivers and CFO Richard Cogdill and Tyson CEO Richard Bond – that "we have seen for the last 6 or 7 weeks … some companies in our industry announce cutbacks. There have been I think six companies have*

217

*announced cutbacks. **I know some companies have cut back and have not announced**." (emphasis added)*

**ANSWER:** To the extent the allegations in Paragraph 389 characterize or describe a BMO Capital Markets Agriculture & Protein presentation, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 389 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 389 to the extent that they relate to other Defendants and/or third parties. Defendants other than Sanderson Farms, Pilgrim's, or Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 389 and therefore deny them. Sanderson Farms admits that Sanderson Farms CEO Joe Sanderson attended the May 2008 BMO Capital Markets Conference. Tyson admits that Richard Bond attended the BMO Capital Markets Third Annual Agriculture & Protein Conference on May 15, 2008 in the ordinary course of his responsibilities as CEO. Pilgrim's admits that then-CEO Clint Rivers and then-CFO Richard Cogdill attended the referenced BMO Capital Markets conference. Defendants deny any remaining allegations in Paragraph 389.

390.    *Such knowledge of non-public production cuts by competitors is highly suggestive of communication among chicken companies, either secret direct communications among themselves, or using Agri Stats as a facilitator, or both.*

**ANSWER:** Defendants deny the allegations in Paragraph 390.

391.    *After seeing many of its competitors abide by capacity reductions between April 3- 11, on April 11, 2008, Pilgrim's realized that other Defendants were contributing to a widespread reduction in industry supply and decided it could now take further steps to reduce supply.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 391 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 391 to the extent that they relate

to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 391 and therefore deny them. Pilgrim's denies the allegations in Paragraph 391.

> 392.    On April 11, 2008, Pilgrim's suggested it might close its large El Dorado, Arkansas processing plant, which employed 1,620 workers.

**ANSWER:** Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 392 and therefore deny them. Pilgrim's admits that in April 2008, it was independently evaluating a wide variety of changes to its business in its attempts to avoid bankruptcy, and that closure of the El Dorado facility, which employed over 1,600 workers, was one option considered. Pilgrim's further admits that Plaintiffs are selectively quoting from—and attempting to characterize—an unidentified document but denies any remaining allegations in Paragraph 392, including Plaintiffs' characterization of the document.

> 393.    Then, on April 14, 2008, it announced a further production cut of 5% of egg sets.

**ANSWER:** Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 393 and therefore deny them. Pilgrim's admits that on April 14, 2008 it issued a press release announcing that it planned to cut weekly chicken processing by approximately 5% as part of its continuing effort to better balance supply and demand amid record-high costs for feed ingredients and that the reduction began with egg sets that month. Pilgrim's denies any remaining allegations in Paragraph 393.

> 394.    On April 29, 2008, Tyson CEO Dick Bond told a Wall Street analyst, "I think the industry has changed ... I don't think the industry will be up [in production] that much anymore, we have seen some sizable declines here lately in egg sets and placements. So, we're going to be up a little bit but probably not a significant amount, not as much as we might have once anticipated."

**ANSWER:** To the extent the allegations in Paragraph 394 characterize or describe an April 29, 2008 statement by Tyson CEO Dick Bond, Defendants deny any characterization or

description that is inconsistent with the referenced source. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 394 and therefore deny them. Tyson admits that it held an earnings call on April 29, 2008 for its investors who expect Tyson to provide information relevant to the company's financial performance including observations about the supply of and demand for Tyson's products, but denies the remaining allegations in Paragraph 394.

> 395.   *Despite the large number of coordinated production cuts announced by producers in April 2008, Pilgrim's CEO, Clint Rivers, encouraged further action by other chicken producers to curtail supply.*

**ANSWER:**   Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 395 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 395 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 395 and therefore deny them. Pilgrim's denies the remaining allegations in Paragraph 395.

> 396.   *Clint Rivers encouraged further industry-wide cuts at a May 15, 2008 speech at the BMO Capital Markets conference at the Millennium Broadway Hotel. According to an industry publication, Rivers announced that he hoped to see the chicken industry continue to cut production to help the industry return to profitability, stating that "he would like the industry to trim total production by 3%-4%, calling it a prudent move in light of recent price volatility in the grain markets." He also noted that "[t]he cuts need to be fairly deep."*

**ANSWER:**   To the extent the allegations in Paragraph 396 characterize or describe a May 15, 2008 speech by Pilgrim's CEO Clint Rivers, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 396 and therefore deny them. Pilgrim's admits that then-CEO Clint Rivers attended the referenced

BMO Capital Markets conference, and that Mr. Rivers gave a presentation, but denies any remaining allegations in Paragraph 396.

> 397.    *This conference was attended by Tyson CEO Richard Bond, and it is the same conference where Sanderson Farms CEO Joe Sanderson disclosed his knowledge of non-public, unannounced production cuts by competitors. The conference was also attended by Pilgrim's CFO Richard Cogdill.*

**ANSWER:**    To the extent the allegations in Paragraph 397 characterize or describe a speech by Sanderson Farms CEO Joe Sanderson, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 397 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 397 to the extent that they relate to other Defendants and/or third parties. Defendants other than Sanderson Farms, Tyson, and Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 397 and therefore deny them. Sanderson Farms admits that Sanderson Farms CEO Joe Sanderson attended the BMO Capital Markets Farm to Market Conference in May 2008, but denies all remaining allegations in Paragraph 397. Tyson admits that Richard Bond attended the BMO Capital Markets Third Annual Agriculture & Protein Conference on May 15, 2008 in the ordinary course of his responsibilities as CEO, but denies any remaining allegations in Paragraph 397. Pilgrim's admits that then-CEO Clint Rivers and then CFO Richard Cogdill attended the referenced BMO Capital Markets conference, but denies any remaining allegations in Paragraph 397.

> 398.    *A June 2008 Agri-Stats report noted that "[b]eginning in April [2008], the weekly hatchery data started to show declines in egg sets and chick placements relative to year-earlier, which confirms the announced intentions to reduce broiler production and will result in slaughter falling below year-ago by mid-June." The same report also noted that "[i]t is unclear how long the slaughter declines will continue, and if other companies will choose to cut production as well making them deeper than initially thought. Those who have announced cutbacks indicate they will continue until margins normalize. At this time*

*we expect to see the declines continue until at least late 2009, and cuts could be deeper than now projected."*

**ANSWER:** To the extent the allegations in Paragraph 398 characterize or describe an Agri Stats report available on or about June 2008, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 398 and therefore deny them.

399. *A May 21, 2008, Wall Street Journal article noted that conditions in the industry were starting to change: "Three things are making analysts more optimistic: Companies are cutting production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines." The article also noted "[i]t is unusual for egg sets to decline at this time of year."*

**ANSWER:** To the extent the allegations in Paragraph 399 characterize or describe a May 21, 2008 Wall Street Journal article, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants deny any remaining allegations in Paragraph 399.

400. *The reason such a reduction was unusual in May is that egg sets result in chickens that are ready for market approximately 10 weeks later, which in this case would have been first week of August – still the peak of the high-demand summer grilling season.*

**ANSWER:** To the extent the allegations in Paragraph 400 characterize or describe a May 21, 2008 Wall Street Journal article, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants deny any remaining allegations in Paragraph 400.

401. *During an earnings call on May 22, 2008, Sanderson Farms CEO Joe Sanderson was asked if he thought industry cuts were sufficient to keep the industry profitable in the autumn. Sanderson responded: "[w]e don't know yet. We will make a cut as we always do after Labor Day. We will make a 4-5% cut following Labor Day as we always do going into Thanksgiving, Christmas, and January [and] we reduce our egg sets and around Thanksgiving, Christmas, New Years and Martin Luther King. That is a period of slow demand for us, and we don't announce that, but we always do it. It is just a period*

*when we take downdays and we will do that. But if we think more is needed, we will evaluate that sometime in August, and if need be will do it. We cut back in 2006, we cut back in '97-98. I don't know if we announced it or not, but we will do what we need to do."* *Mr. Sanderson provided no explanation why Sanderson Farms chose to publicly disclose its "regular" production cut if it had never done so in the past. The reason was obvious – to signal the other Defendants to follow suit. In early June 2008, Pilgrim's CEO Clint Rivers noted in a June 4, 2008, presentation that "[o]ur supply in chicken, we are oversupply … we need to see some balance in the supply.…  Simply put, at this time there is still too much breast meat available to drive market pricing significantly higher."*

**ANSWER:**  To the extent the allegations in Paragraph 401 characterize or describe a May 22, 2008 Sanderson Farms earnings call and a June 4, 2008 statement by Pilgrim's CEO Clint Rivers, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 401 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 401 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Sanderson Farms and Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.  Sanderson Farms admits that it held a May 22, 2008 earnings call, but denies any remaining alegations in Paragraph 401.  Pilgrim's admits that then-CEO Clint Rivers presented at a June 2, 2008 Stephens Inc. Spring Investment Conference, but denies any remaining allegations in Paragraph 401, including that Plaintiffs have quoted the presentation correctly.

*402.    Other Defendant CEOs soon picked up on Rivers' call for further action. On June 19, 2008, chicken industry executives participated in a media conference call intended to lobby the federal government to limit the ethanol mandate, a federal program requiring the production of corn-based ethanol, which Defendants claimed drove up their corn costs by lessening the amount of corn they could buy to feed their chickens. According to one report, Mark Hickman, Chairman of the National Chicken Council and CEO of Peco Foods, told participants that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year" and that "we are hearing talk that this was not nearly enough, so liquidation is in round two." This statement referred to the need for Defendants to reduce chicken breeder flocks to affect*

*longer-term supply restraint in the industry, rather than the short-term production cuts like breaking eggs or slaughtering chickens earlier to reduce weight.*

**ANSWER:** Defendants deny the allegations in the first and last sentences of Paragraph 402. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation that certain Defendants participated in an unidentified "media conference call" and therefore deny that allegation. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 402 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 402 to the extent that they relate to other Defendants and/or third parties. To the extent the allegations in Paragraph 402 characterize or describe a report by Chairman of the National Chicken Council and Peco Foods CEO Mark Hickman, Defendants other than Peco deny any characterization or description that is inconsistent with the referenced sources. With respect to the allegations relating to Mark Hickman of Peco and his purported statement, Peco denies the allegations, including the statement that Mr. Hickman was Chairman of the National Chicken Council in June 2008, except Peco admits that Mr. Hickman was CEO of Peco and participated in a June 2008 media conference call on the subject of the ethanol mandate. Defendants deny any remaining allegations in Paragraph 402.

> 403. *On June 23, 2008, shortly after Peco Foods' CEO publicly suggested that further production cuts were needed, Wayne Farms announced a 6% production cut. Wayne Farms President & CEO Elton Maddox said in a statement that "[s]oaring feed ingredient costs aggravated by the government's food for fuel mandate has created the need for us to rationalize our business." Like many other executives, Maddox cited ethanol subsidies as the reason for the production cuts. Wayne Farms' announcement came only three days after Agri Stats suggested further cuts were needed and four days after Peco Foods CEO Hickman suggested further cuts were needed.*

**ANSWER:** To the extent the allegations in Paragraph 403 characterize or describe a June 23, 2008 statement by Wayne Farms President and CEO Elton Maddox, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

Paragraph 403 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 403 to the extent that they relate to other Defendants and/or third parties. Defendants other than Wayne Farms and Peco lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 403 and therefore deny them. Peco denies the allegation that its CEO, Mark Hickman, "suggested that further production cuts were needed" and any remaining allegations in Paragraph 403. Wayne Farms admits that it made a public announcement on June 23, 2008 about its independent decision to decrease its own unique production levels for certain products, but otherwise denies the remaining allegations in Paragraph 403 to the extent they relate to Wayne Farms. Wayne Farms lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 403 and therefore denies them.

> 404. On June 23-25, 2008, the industry organization USPOULTRY held its annual Financial Management Seminar. Defendants' senior executives attended the seminar.

**ANSWER:** While Defendants admit that personnel of certain Defendants have attended events held by the USPOULTRY,[9] Defendants other than Amick Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 404 and therefore deny them. Amick Farms admits that certain of its employees attended legitimate trade association meetings and other legitimate industry events during the Relevant Period, including the June 2008 USPOULTRY Financial Management Seminar. Amick Farms lacks

---

[9] In Paragraph 404, Plaintiffs abbreviate the U.S. Poultry & Egg Association as "U.S. Poultry." Therefore, Defendants assume that when Plaintiffs refer to "USPOULTRY," they mean to refer to the U.S. Poultry & Egg Association. Defendants answer under that assumption whenever Plaintiffs refer to "USPOULTRY."

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 404 and therefore denies them.

>    405.    On July 2, 2008, Foster Farms announced it was abandoning plans to build a new chicken plant in northeastern Colorado that it had previously announced in April 2008 would employ about 1,000 people.

**ANSWER:**  To the extent the allegations in Paragraph 405 characterize or describe a July 2, 2008 statement by Foster Farms, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Foster Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 405 and therefore deny them.  Foster Farms admits that, based on its business judgment of what was in its independent self-interest, it decided not to build a Greenfield poultry processing facility in northeastern Colorado in 2008.  Foster Farms admits this quote appeared in a local news article, but lacks knowledge or information sufficient to form a belief as to whether it accurately reflects any statement made by Foster Farms and therefore denies all such allegations.  Foster Farms denies any remaining allegations in Paragraph 405.

>    406.    In a statement, Foster Farms CEO, Don Jackson, noted "[i]n these difficult conditions with costs escalating primarily due to grain and fuel prices and chicken prices lagging it does not make economic sense to go forward with expansion at this time."

**ANSWER:**  To the extent the allegations in Paragraph 406 characterize or describe a July 2, 2008 statement by Foster Farms CEO Don Jackson, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Foster Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 406 and therefore deny them.  Foster Farms admits that, based on its business judgment of what was in its independent self-interest, it decided not to build a Greenfield poultry processing facility in northeastern Colorado in 2008.  Foster Farms admits this quote appeared in a local news article, but lacks knowledge or information sufficient to form a belief as to whether

it accurately reflects any statement made by Don Jackson and therefore denies all such allegations. Foster Farms denies any remaining allegations in Paragraph 406.

> 407. *Mr. Jackson's purported justifications for decreasing production capabilities were pretextual.*

**ANSWER:** Defendants other than Foster Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 407 and therefore deny them. Foster Farms denies the allegations in Paragraph 407.

> 408. *On July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets, citing "record high prices for corn and soybean meal, which it attributes to the U.S. government's mandated ethanol policies along with recent flooding in the Midwest 'Corn Belt' region."*

**ANSWER:** To the extent the allegations in Paragraph 408 characterize or describe an unidentified July 7, 2008 announcement by O.K. Foods, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than O.K. Foods lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 408 and therefore deny them. O.K. Foods admits that it announced on its website it had reduced production in response to soaring corn and soybean costs. O.K. Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 408 and therefore denies them.

> 409. *O.K. Foods' purported justifications for decreasing production were pretextual.*

**ANSWER:** Defendants other than O.K. Foods lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 409 and therefore deny them. O.K. Foods denies the allegations in Paragraph 409.

> 410. *On July 20-22, 2008, the National Chicken Council held a three-day "Chicken Marketing Seminar" attended by Defendants' senior executives. The event was*

*billed as a marketing seminar that "includes social networking events and recreational opportunities, including a golf tournament."*

**ANSWER:**  To the extent the allegations in Paragraph 410 characterize or describe an unidentified National Chicken Council publication, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 410 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 410 to the extent that they relate to other Defendants and/or third parties.   While Defendants admit that personnel of certain Defendants have attended events held by the National Chicken Council, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 410 and therefore deny them.

> *411.    On August 11, 2008, Pilgrim's announced the closure of its Clinton, Arkansas, processing plant and a facility in Bossier City, Louisiana. Pilgrim's press release noted the closures "are part of the company's ongoing effort to operate more efficiently and return to profitability amid high feed costs and an oversupply of chicken on the market."*

**ANSWER:**  To the extent the allegations in Paragraph 411 characterize or describe an August 11, 2008 press release by Pilgrim's, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 411 and therefore deny them.  Pilgrim's admits that on August 11, 2008, it issued a press release announcing that it would idle a processing plant in Clinton, Arkansas and a further processing plant in Bossier City, Louisiana, but denies any remaining allegations in Paragraph 411.

> *412.    The closure of the Clinton processing plant represented an additional 1.25% incremental increase of the company's previously announced production cuts.*

**ANSWER:**  To the extent the allegations in Paragraph 412 characterize or describe an August 11, 2008 press release by Pilgrim's, Defendants deny any characterization or description

that is inconsistent with the referenced source. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 412 and therefore deny them. Pilgrim's admits that on August 11, 2008, it issued a press release announcing that it would idle a processing plant in Clinton, Arkansas and a further processing plant in Bossier City, Louisiana, but denies any remaining allegations in Paragraph 412.

> 413.    Pilgrim's stated that it would keep both plants idled until "industry margins can be sustained at more normalized levels of profitability." Pilgrim's also noted that "[w]ith Labor Day approaching and no indication that the actions taken to date by Pilgrim's Pride or other industry members are having a positive effect on selling prices for our products, it is now clear that more significant decisive action is necessary."

**ANSWER:** To the extent the allegations in Paragraph 413 characterize or describe an August 11, 2008 press release by Pilgrim's, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 413 and therefore deny them. Pilgrim's admits that on August 11, 2008, it issued a press release announcing that it would idle a processing plant in Clinton, Arkansas and a further processing plant in Bossier City, Louisiana, but denies any remaining allegations in Paragraph 413.

> 414.    In August 2008, Raeford (a non-public company) announced publicly, as reported by newspaper The Charlotte Observer, that it would begin reducing its chicken production by 5 percent. The company said in a statement to industry publication WATT PoultryUSA that "[t]he current obstacles that face our industry require that supply be brought in line with demand."

**ANSWER:** To the extent the allegations in Paragraph 414 characterize or describe statements by House of Raeford made to *The Charlotte Observer* and WATT PoultryUSA, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 414 and therefore deny them. House of Raeford lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations and therefore denies them, except House of Raeford admits that it issued a public announcement about its production in August 2008, but denies that House of Raeford reduced production at that time apart from normal fluctuations that occur in operations for chicken production or that House of Raeford chicken production declined during 2008.

415.    *A production cutback was remarkable for Raeford, which had pursued a strategy of aggressive production growth that resulted in the company doubling its chicken production from 2001 to 2007.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 415 and therefore deny them.

416.    ████████████████████████████████

**ANSWER:**  Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 416 and therefore deny them.  Tyson admits that in 2008, as in every year, Keystone set production levels in its independent business judgment, and denies any characterization thereof. Tyson denies any remaining allegations in Paragraph 416.

417.    *On an August 26, 2008, earnings call, Sanderson Farms CEO Joe Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand." When asked later whether the industry had already made enough production cuts, he noted "we kind of thought we were going to see reductions in July ... [based on] 213/214 [million] egg sets back in April and that really did not materialize. When you look at USDA slaughter numbers in July, they were 100% and 101% and now we're looking at egg sets of 206 and 207 million that are going to show up sometime in October or November. We'll see when we get there. Those are barely impressive cuts. My suspicion is, as I've told you in May, the industry typically make the cut [sic] and it's tentative.  We'll have to see if it works…. I'm very skeptical that those cuts are going to be enough to return us margins to cover these grain costs."*

**ANSWER:**  To the extent the allegations in Paragraph 417 characterize or describe statements by Sanderson Farms CEO Joe Sanderson on an August 26, 2008 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any

allegations in Paragraph 417 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 417 to the extent that they relate to other Defendants and/or third parties. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 417 and therefore deny them. Sanderson Farms admits that it held an August 26, 2008 earnings call from which Plaintiffs appear to quote, but denies any remaining allegations in Paragraph 417.

418. *By September 2008, chicken industry publication WATT PoultryUSA reported that "[m]ost U.S. chicken integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'"*

**ANSWER:** To the extent the allegations in Paragraph 418 characterize or describe a September 2008 Watts PoultryUSA publication, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants lack knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 418 and therefore deny them.

419. *On October 3, 2008, Defendants' senior executives attended the National Chicken Council's Annual Meeting in Washington, D.C. Agri Stats CEO, Blair Snyder – elected the day before as a "director-at-large" to the National Chicken Council's board – moderated a CEO panel that included the CEOs of Pilgrim's, Tyson, Perdue and Sanderson Farms. Explaining Pilgrim's desire to push through an industry-wide price increase, Pilgrim's CEO Clint Rivers told panel members and the audience "[w]e need to get those [input] costs pushed through, but we've yet to see that happen."*

**ANSWER:** To the extent the allegations in Paragraph 419 characterize or describe an unidentified statement by Pilgrim's CEO Clint Rivers, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 419 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 419 to the extent that they relate to other Defendants and/or third parties. While

Defendants admit that personnel of certain Defendants have attended certain National Chicken Council events, Defendants other than Koch, Pilgrim's, Tyson, Perdue, Sanderson Farms, Amick Farms, and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 419 and therefore deny them. Koch denies that Koch personnel attended the October 2008 National Chicken Council Annual Meeting, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 419 and therefore denies them. Pilgrim's admits that then-CEO Clint Rivers attended the National Chicken Council's Annual Meeting on October 3, 2008, and spoke on a panel at that conference, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of Paragraph 419 and therefore denies them. Pilgrim's denies Mr. Rivers prefaced his remarks by "[e]xplaining Pilgrim's desire to push through an industrywide price increase," denies Plaintiffs' characterization of his statement, denies that Plaintiffs quoted the statement accurately, and denies any remaining allegations in Paragraph 419. Sanderson Farms admits that Sanderson Farms CEO Joe Sanderson attended the October 2008 National Chicken Council Annual Meeting and participated in a CEO panel, but denies any remaining allegations in Paragraph 419. Tyson admits that its former CEO attended the National Chicken Council's Annual Meeting on October 3, 2008 in the ordinary course of his duties as CEO of Tyson, which was a member of the National Chicken Council, but Tyson lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 419 and therefore denies them. Perdue admits that at times its executives and employees have been members of certain legitimate trade associations and at times attended events sponsored by legitimate trade associations, including the National Chicken Council. Perdue admits that its Chief Executive Officer attended the October 3, 2008 National Chicken Council Annual Meeting, but

denies any remaining allegations in Paragraph 419. Amick Farms admits that certain of its employees attended legitimate trade association meetings and other legitimate industry events during the Relevant Period, including the October 2008 National Chicken Council's Annual Meeting, but denies any remaining allegations in Paragraph 419. Agri Stats admits that some of its employees attended the National Chicken Council's Annual Meeting described in Paragraph 419, but denies any remaining allegations in Paragraph 419.

> 420.    On October 10, 2008, in response to a USDA report of falling egg sets in the chicken industry, Pilgrim's told the Associated Press that "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

**ANSWER:**  To the extent the allegations in Paragraph 420 characterize or describe an October 10, 2008 Associated Press interview with Pilgrim's spokesman Gary Rhodes, Defendants deny any characterization or description that is inconsistent with the referenced source.   Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 420 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 420 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 420 and therefore deny them.  Pilgrim's admits that the Associated Press published an article in October 2008, but denies any remaining allegations in Paragraph 420.

> 421.    Indeed, an industry analyst noted that at the time "the industry has cut about 10 to 12 percent of its production."

**ANSWER:**  To the extent the allegations in Paragraph 421 characterize or describe a statement by an industry analyst, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants lack knowledge or information sufficient to

form a belief as to the truth of any remaining allegations in Paragraph 421 and therefore deny them.

> 422.    During Fall 2008, Sanderson Farms also implemented its previously announced "fall cuts" a month early and delayed the opening of a new deboning facility.

**ANSWER:**    To the extent the allegations in Paragraph 422 characterize or describe a December 4, 2008 Sanderson Farms press release, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 422 and therefore deny them.  Sanderson Farms denies the remaining allegations in Paragraph 422.

> 423.    On October 18, 2008, Wayne Farms President & CEO Elton Maddox released a statement (even though Wayne Farms was not a publicly traded company) announcing the closure of the company's College Park, Georgia plant, resulting in the layoff of over 600 employees.

**ANSWER:**    To the extent the allegations in Paragraph 423 characterize or describe an October 18, 2008 statement by Wayne Farms President & CEO Elton Maddox, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 423 and therefore deny them.  Wayne Farms admits that it made a public announcement on October 17, 2008 regarding its own independent decision to begin a phased transfer of production away from its College Park, Georgia further processing facility in 2009, but otherwise denies the remaining allegations in Paragraph 423.

> 424.    Maddox cited "changing market conditions" and a need to "maximize efficiencies" as justification for the plant closure.

**ANSWER:**    To the extent the allegations in Paragraph 424 characterize or describe an October 18, 2008 statement by Wayne Farms President & CEO Elton Maddox, Defendants deny

any characterization or description that is inconsistent with the referenced source. Defendants other than Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 424 and therefore deny them. Wayne Farms admits that it made a public announcement on October 17, 2008 regarding its own independent decision to begin a phased transfer of production away from its College Park, Georgia further processing facility in 2009, but otherwise denies the remaining allegations in Paragraph 424.

> 425. *On a November 10, 2008 earnings call, Tyson CEO Richard Bond claimed that Tyson would not be making additional production cuts because it had already done its part to reduce industry supply with prior production cuts, citing the company's focus on "supply and demand."*

**ANSWER:** To the extent the allegations in Paragraph 425 characterize or describe selected statements by Tyson CEO Dick Bond from a November 10, 2008 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 425 and therefore deny them. Tyson admits it held an earnings call on November 10, 2008 for its investors who expect Tyson to provide information relevant to the company's financial performance including observations about the supply of, and demand for, Tyson's products. Tyson denies the remaining allegations in Paragraph 425.

> 426. *Despite Tyson's representations to the contrary, Tyson, in fact, substantially reduced production in December 2008.*

**ANSWER:** Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 426 and therefore deny them. Tyson admits that in 2008, as in every year, Tyson adjusted its U.S. Broiler production based on its own business judgment of what is in its independent interest. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 426 and therefore denies them.

> 427.    First, on December 18, 2008, Tyson announced the canceling of a deboning contract with Petit Jean Poultry at Petit's Little Rock, Arkansas processing plant that resulted in the layoff of 700 Petit employees.

**ANSWER:**  To the extent the allegations in Paragraph 427 characterize or describe an unidentified statements and reports regarding Tyson, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 427 and therefore deny them.  Tyson admits that in 2008, as in every year, Tyson adjusted its U.S. Broiler production based on its own business judgment of what is in its independent interest.  Tyson denies that the referenced cancellation of the deboning contract with Petit Jean Poultry in Little Rock constituted a production cut. Petit Jean's president, Rick Milsap, is quoted in an article that appeared in the Arkansas Democrat Gazette on December 18, 2008 as saying "They've [Tyson] decided to do more of their own products in house."  Tyson lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 427 and therefore denies them.

> 428.    Second, by December 23, 2008, it was reported that Tyson had cut its production by 5%.

**ANSWER:**  To the extent the allegations in Paragraph 428 characterize or describe an unidentified statements and reports regarding Tyson, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 428 and therefore deny them.  Tyson admits that in 2008, as in every year, Tyson adjusted its U.S. Broiler production based on its own business judgment of what is in its

independent interest. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 428 and therefore denies them.

> 429.    *Asked by a reporter about the cuts, Tyson spokesman Gary Mickelson stated that "[w]hile we would rather not share details of our current poultry production levels, we can tell you we continue to closely evaluate market conditions in an effort to match customer demand with our supply." Tyson also noted that it had reduced production "in recent years through the closing or sale of poultry plants and by running the company's remaining operations at reduced capacity utilization."*

**ANSWER:** To the extent the allegations in Paragraph 429 characterize or describe a statement by Tyson spokesman Gary Michelson and unidentified statements and reports regarding Tyson, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 429 and therefore deny them. Tyson admits that in 2008, as in every year, Tyson adjusted its U.S. Broiler production based on its own business judgment of what is in its independent interest. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 429 and therefore denies them.

> 430.    *During this time period, Defendants also utilized Urner Barry as a conduit for the sharing of information and ensuring compliance with the production cuts.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Defendants deny the allegations in the first sentence of Paragraph 430. To the extent the allegations in Paragraph 430 characterize or describe a statement by House of Raeford, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 430 that relate to other Defendants and/or third parties, and therefore each

Defendant denies the allegations in Paragraph 430 to the extent that they relate to other Defendants and/or third parties. Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 430 and therefore deny them. House of Raeford denies any remaining allegations in Paragraph 430 related to House of Raeford and any remaining allegations in Paragraph 430.

*431. As further detailed below, these numerous collusive communications between O'Shaughnessy at Urner Barry and the Defendants furthered the conspiracy to limit output and resulted in higher prices than would have existed in the absence of such efforts. And prices reflected in the indexes published by Urner Barry itself were also therefore necessarily inflated as a result of the conspiracy. Both O'Shaughnessy and the Defendants knew that these inflated prices were the logical – and intended – result of their efforts to further the output limitation conspiracy.*

**ANSWER:** Defendants deny the allegations in Paragraph 431.

*432. On January 28-30, 2009, Defendants' senior executives attended the 2009 International Poultry Expo in Atlanta, Georgia.*

**ANSWER:** While Defendants admit that personnel of certain Defendants have attended the Poultry Expo in Atlanta, Georgia, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations that any such meeting occurred on January 28-30, 2009, or that any "senior executive" attended this specific meeting and therefore denies the remaining allegations in Paragraph 432. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 432 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 432 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 432.

*433. In a February 18, 2009, interview, Tyson Senior Group Vice President Donnie Smith noted that "[a]cross our industry, we're down about six percent versus where*

*we were a year ago. We're seeing an impact from that on market prices ... the industry fundamentals are improving."*

**ANSWER:** To the extent the allegations in Paragraph 433 characterize or describe a memorialization of a February 18, 2009 interview, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 433 and therefore deny them. Tyson admits that Donnie Smith participated in the February 18, 2009 press briefing in the ordinary course of Tyson's business. Tyson denies the remaining allegations in Paragraph 433.

> 434. *In late February 2009, a report noted that Pilgrim's had cut another 9-10% of its production.*

**ANSWER:** To the extent the allegations in Paragraph 434 characterize or describe an unidentified February 2009 report, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 434 and therefore deny them.

> 435. *According to the same report, Tyson told the audience at a February 2009 investors' conference that it did not intend to reduce its production further because "[u]sing WATT PoultryUSA data on ready-to-cook (RTC) pounds, our numbers have declined 5-7% from 2000 to 2008 on RTC pounds while at the same time the industry has grown 31%. Over time, we have done plenty of cutting back." In other words, Tyson felt it had already taken its fair share of needed production cuts, so competitors needed to take any further action.*

**ANSWER:** To the extent the allegations in Paragraph 435 characterize or describe an unidentified February 2009 report, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 435 and therefore deny them. Tyson denies the remaining allegations in Paragraph 435.

> 436.    Tyson communicated that it felt it had already perilously led the industry on production cuts and was confident that competitors would support through significant cuts of their own. However, as indicated below, Tyson's statements about not reducing production appear to be posturing, because generally Tyson did reduce production during the 2008-2015 time period in line with other producers.

**ANSWER:**  To the extent the allegations in Paragraph 436 characterize or describe an unidentified February 2009 report, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 436 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 436 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 436 and therefore deny them.  Tyson denies the remaining allegations in Paragraph 436.

> 437.    By February 25, 2009, Sanderson Farms told The Morning News of Northwest Arkansas that it had made cuts to its supply of chickens by processing smaller chickens and running its plants at lower capacity utilization rates.  Sanderson Farms also told a group of investors around this time that "[b]ecause we don't expect much help from the demand side, chicken market improvement will have to come from supply cuts."

**ANSWER:**  To the extent the allegations in Paragraph 437 characterize or describe an unidentified statement by Sanderson Farms to The Morning News on or about February 25, 2009 and an unidentified statement to a group of investors, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 437 and therefore deny them.  Sanderson Farms denies any remaining allegations in Paragraph 437.

> 438.    Similarly, the CEO of Simmons Foods (a private company), Todd Simmons, noted in a February 25, 2009, interview that "[w]e are seeing lower demand in the food-

240

*service customer base. We have made adjustments in bird weights to ensure our production meets with our customer's needs."*

**ANSWER:** To the extent the allegations in Paragraph 438 characterize or describe a February 25, 2009 interview by Simmons Foods CEO Todd Simmons, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Simmons lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 438 and therefore deny them. Simmons admits that the statement quoted in Paragraph 438 was reported and, while Simmons cannot confirm the precise words used in the interview nine years after the fact, Simmons does not deny that the report is essentially accurate. Simmons denies that this statement would support the allegations of a conspiracy or conspiracies. Simmons denies any remaining allegations in Paragraph 438.

439. *Seeing further cuts from smaller producers in the industry led Pilgrim's to announce historically large cuts to its production on February 27, 2009.*

**ANSWER:** To the extent the allegations in Paragraph 439 characterize or describe a February 27, 2009 press release by Pilgrim's, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the in Paragraph 439 and therefore deny them. Pilgrim's admits that on February 27, 2009, it was in Chapter 11 bankruptcy and operating its business under the supervision of the U.S. Bankruptcy Court, and that it issued a press release announcing it intended to idle three chicken processing plants by mid-May 2009 as part of organizational restructuring approved by the Court, but denies any remaining allegations in Paragraph 439.

440. *In a press release announcing the closure of three processing plants located in Douglas, Georgia, El Dorado, Arkansas, and Farmerville, Louisiana, Pilgrim's stated the plants were "underperforming" and said the closures would "improve the company's product mix by reducing commodity production and to significantly reduce its costs in the midst of an industry- wide oversupply of chicken and weak consumer demand resulting*

*from a national recession." Pilgrim's also stated that the idling of these three plants would reduce its total pounds of chickens produced by 9-10%.*

**ANSWER:**  To the extent the allegations in Paragraph 440 characterize or describe a February 27, 2009 press release by Pilgrim's, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the in Paragraph 440 and therefore deny them.  Pilgrim's admits that on February 27, 2009, it was in Chapter 11 bankruptcy and operating its business under the supervision of the U.S. Bankruptcy Court, and that it issued a press release announcing it intended to idle three chicken processing plants by mid-May 2009 as part of organizational restructuring approved by the Court, but Pilgrim's denies any remaining allegations in Paragraph 440.

> *441.    Overall, "[a]t least 11 companies reported reductions in weekly ready-to-cook production in 2008," including Defendants Tyson, Pilgrim's, Perdue, Simmons, Raeford, Cagle's (later bought by Koch Foods), George's, O.K. Foods, Harrison, and GNP Company (now owned by Pilgrim's).*

**ANSWER:**  To the extent the allegations in Paragraph 441 characterize or describe an unidentified source, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants admit that in 2008, as in every year, each Producer Defendant planned and executed its respective U.S. Broiler production based on its own, unilateral business judgment of what is in its independent interest. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 441.

> *442.    Other companies reduced their planned production levels or delayed the planned opening of new chicken complexes.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 442 and therefore denies them.

443. *During 2009, Defendants also exchanged and agreed upon specific prices to charge common customers.*

**ANSWER:** To the extent the allegations in Paragraph 443 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 443 at this time. Defendants deny any remaining allegations in Paragraph 443.

C. **Defendants' First Round of Chicken Production Cuts Included Unprecedented Reductions to Chicken Breeder Flocks**

444. *As noted above, in 2008, Defendants ended a decades-long trend of annual additional chicken production, surprising industry observers.*

**ANSWER:** Defendants deny the allegations of Paragraph 444.

445. *What made the production cuts in 2008 and early 2009 particularly remarkable is that chicken producers did not just reduce the pounds of chickens they produced – they also went further up their supply chains than ever before to restrict their ability to ramp up production for years into the future.*

**ANSWER:** Defendants deny the allegations of Paragraph 445.

446. *While previous downturns had led some producers to use short-term methods to reduce overall pounds of chickens supplied to the market, in 2008, Defendants took their reductions to the next level by substantially reducing their breeder flocks in ways that were not easily reversed and would result in a commitment to longer-term reductions, as shown in the highlighted section of the graph below:*



**ANSWER:** To the extent the allegations in Paragraph 446 characterize or describe selected statistics from the National Agricultural Statistical Service of the USDA, represented in Plaintiffs' graphic above, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants deny any remaining allegations in Paragraph 446.

447. *The effect of the supply cuts on chicken pricing in 2008 and the first months of 2009 was clear. During the worst recession in generations, chicken prices rose through mid to late 2008, staying at or near all-time highs until late 2009.*

**ANSWER:** Defendants admit that the "worst recession in generations" occurred in 2008 and 2009. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 447 and therefore deny them.

448. *For instance, by May 28, 2009, Sanderson Farms reported strong profits that were twice the estimates of Wall Street analysts, which according to one industry publication was "aided by production cuts and lower feed costs that offset still-weak demand."*

**ANSWER:** To the extent the allegations in Paragraph 448 characterize or describe an unidentified May 28, 2009 report, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Sanderson Farms lack knowledge

or information sufficient to form a belief as to the truth of the allegations in Paragraph 448 and

therefore deny them. Sanderson Farms denies the remaining allegations in Paragraph 448.

> 449.    Similarly, at a May 14, 2009, BMO Capital Markets conference in New York
> City, interim Tyson CEO Leland Tollett noted that "poultry market fundamentals had
> improved. Pullet placements, an[] indication of future broiler supplies, have been down
> the past five months compared to the same period last year. Egg sets continue to run six
> percent or more below year ago levels and cold storage inventories of poultry have declined
> about 20 percent since peaking in November 2008." Pullet placement data was collected
> from Defendants and their Co-Conspirators by Agri Stats, and sent monthly in reports to
> Agri Stats subscribers, and used by the chicken industry to monitor and control future
> supply.

**ANSWER:** To the extent the allegations in Paragraph 449 characterize or describe a May

14, 2009 statement by Tyson CEO Leland Tollett at the BMO Capital Markets conference,

Defendants deny any characterization or description that is inconsistent with the referenced

sources. Defendants admit that Agri Stats collects information from certain Producer Defendants,

and that Agri Stats has reported anonymized and historical information to certain individual

Producer Defendants for pro-competitive benchmarking purposes. Defendants refer to Agri Stats

reports for their contents and deny any characterization or description that is inconsistent

therewith. Each Defendant lacks knowledge or information sufficient to form a belief as to the

truth of any allegations in Paragraph 449 that relate to other Defendants and/or third parties, and

therefore each Defendant denies the allegations in Paragraph 449 to the extent that they relate to

other Defendants and/or third parties. Defendants other than Tyson lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 449 and therefore

deny them. Tyson admits that Leland Tollett attended the BMO Capital Markets conference on

May 14, 2009 in the ordinary course of Tyson's business, but denies the remaining allegations in

Paragraph 449.

450.    *During 2009 and 2010, Defendants' senior executives continued to meet with one another at trade association meetings and industry events, such as the National Chicken Council and the International Poultry Expo.*

**ANSWER:**   While Defendants admit that personnel of certain Defendants have attended events held by the National Chicken Council and International Poultry Expo, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations that any "senior executives" attended any specific meeting or event and therefore denies those allegations in Paragraph 450.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 450 and therefore deny them.

451.    *Defendants also continued to utilize Mr. O'Shaughnessy of Urner Barry to communicate the plan to limit production.*

**ANSWER:**   Defendants deny the allegations of the first sentence of Paragraph 451 and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in in Paragraph 451 and therefore deny them.

452.    *In another example, at the National Chicken Council's October 2009 Annual Conference,* *one industry analyst wrote that participants had emphasized continued "production discipline," Defendants' euphemism for limiting chicken supply.*

**ANSWER:**   To the extent the allegations in Paragraph 452 characterize or describe an unidentified industry analyst's statement regarding the National Chicken Council's October 2009 Annual Conference, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants admit that Plaintiffs purport to define and characterize "production discipline" in the last sentence of Paragraph 452, but deny that the term necessarily has the meaning that Plaintiffs ascribe to it.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 452 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph

452 to the extent that they relate to other Defendants and/or third parties. Defendants other than Amick Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 452 and therefore deny them. ███████████████ ████████████████████████████████████████████████████ To the extent the remaining allegations contained in Paragraph 452 relate to Amick Farms, those allegations are denied. Amick Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 452 and therefore denies them.

> *453.    However, as prices continued to rise during late 2009 and early 2010, producers started increasing production in response to the higher prices just as they had done in previous decades.*

**ANSWER:** Defendants admit that each Producer Defendant plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 453 and therefore deny them.

> *454.    Because of 2008 and 2009's unprecedentedly deep and early breeder flock culls, this temporary spike in production took months to effectuate, rather than the few weeks it would have taken had producers killed off their breeder flocks at the rates and times at which they had done so in the past.*

**ANSWER:** Defendants deny the allegations in Paragraph 454.

> *455.    The rising production by producers in early 2010 led to a reported oversupply of chickens that began to depress prices by late 2010.*

**ANSWER:** Defendants admit that each Producer Defendant plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 455 and therefore deny them.

> *456.    Defendants faced an incentive to revamp their conspiracy to make it more effective. Defendants had learned the value of coordinated supply reductions in 2008; they*

*were quick to react with a new round of production cuts in the first half of 2011. Those cuts caused prices to recover.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Defendants admit that each Producer Defendant plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 456 and therefore deny them. Defendants deny any remaining allegations in Paragraph 456.

**D.** **Defendants Continued Their Conspiracy With a Second Massive Breeder Flock Cull in 2011**

    *457. As before, Defendants communicated their efforts through Mr. O'Shaughnessy of Urner Barry.* ██████████████████████████████████████████
████████████████████████████████████

**ANSWER:** Defendants deny the allegations of the first sentence of Paragraph 457. To the extent the allegations in Paragraph 457 characterize or describe an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 457 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 457 to the extent that they relate to other Defendants and/or third parties. Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 457 and therefore deny them. House of Raeford denies the allegations of Paragraph 457.

    *458. On January 24-26, 2011, Defendants' senior executives attended the International Poultry Expo in Atlanta, Georgia, including Tyson CEO Donnie Smith. The IPE featured an annual market intelligence panel with Mike Donohue from Agri Stats and industry-insider Paul Aho. According to one report, Donohue noted that "'2008 was the worst year financially for the (U.S.) broiler industry that most people have ever seen'....*

*The industry's response in 2008 was a 5 to 6% reduction in pounds produced. He said that the broiler industry is currently at record high weekly slaughter volumes." Aho noted "[t]his could be a very difficult year with cutbacks, rationalization, and consolidation.... The market is calling for around a 5% reduction in chicken production."*

**ANSWER:**   To the extent the allegations in Paragraph 458 characterize or describe an unidentified report containing statements made by Mike Donohue and Paul Aho, Defendants deny any characterization or description that is inconsistent with the referenced sources.   Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 458 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 458 to the extent that they relate to other Defendants and/or third parties.   While Defendants admit that personnel of certain Defendants have attended International Poultry Expo events, Defendants other than Tyson, Harrison Poultry, Amick Farms, and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations that any "senior executives" attended this specific meeting and therefore deny the allegations in the first sentence of Paragraph 458.   Tyson admits that Donnie Smith attended the January 2011 International Poultry Expo on behalf of Tyson in the ordinary course of his duties as CEO.   Harrison Poultry admits that its former CEO Mike Welch and its former Vice President of Sales and Marketing Larry Guest attended the January 2011 International Poultry Expo.   Amick Farms admits that certain of its employees attended legitimate trade association meetings and other legitimate industry events during the Relevant Period, including the 2011 International Poultry Expo.   Agri Stats admits that some of its employees attended the International Poultry Expo described in Paragraph 458 and that Mike Donohue participated on a broiler-related panel during the International Poultry Expo.   Defendants deny any remaining allegations in Paragraph 458.

*459.    On a February 4, 2011, Tyson earnings call, COO James Lochner noted that "until industry supply more closely aligns with demand" Tyson's broiler business*

*would "be challenged." Tyson CFO Dennis Leatherby also referred to a supply-demand imbalance in the chicken industry.*

**ANSWER:** To the extent the allegations in Paragraph 459 characterize or describe selected statements by Tyson COO James Lochner and Tyson CFO Dennis Leatherby from a February 4, 2011 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 459 and therefore deny them. Tyson admits that it held an earnings call on February 4, 2011 for its investors who expect Tyson to provide information relevant to the company's financial performance including observations about the supply and demand for Tyson's products. Tyson denies any remaining allegations in Paragraph 459.

460. *On a February 16, 2011, Cagle's (acquired by Koch) earnings call, Cagle's reportedly said it had begun a 20% reduction in production at a deboning operation in an effort to balance supply and demand. Cagle's told one publication that it was "optimistic that the industry will exhibit the production restraint necessary to support higher pricing for Cagle's products allowing for return to profitable margins."*

**ANSWER:** To the extent the allegations in Paragraph 460 characterize or describe a February 16, 2011 Cagle's earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 460 and therefore deny them. Koch admits that in 2012, one or more Koch-related entities purchased substantially all of Cagle's Inc.'s assets. Koch lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 460 and therefore denies them.

461.    On or around February 25, 2011, Sanderson Farms CEO, Joe Sanderson, announced on an earnings call that Sanderson would be delaying the development and construction of a second North Carolina broiler complex.

**ANSWER:**  To the extent the allegations in Paragraph 461 characterize or describe a statement by Sanderson Farms CEO Joe Sanderson in a February 25, 2011 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 461 and therefore deny them.  Sanderson Farms admits that it held a February 24, 2011 earnings call and denies any description or characterization that is inconsistent therewith.  Sanderson Farms denies any remaining allegations in Paragraph 461.

462.    On March 7, 2011, House of Raeford announced a 10% reduction in egg sets that began in early February. CEO Bob Johnson noted in an accompanying press release that "we decided that acting now was a responsible action for our company in light of continuing unstable economic conditions.... Hopefully the chicken prices will begin to increase later this year. In addition, if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."

**ANSWER:**  To the extent the allegations in Paragraph 462 characterize or describe a March 7, 2011 House of Raeford press release, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 462 and therefore deny them.  House of Raeford lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore denies them, on except House of Raeford admits that it issued a public announcement about House of Raeford production in March 2011, but denies that House of Raeford reduced production at that time apart from normal fluctuations that occur in operations for chicken production, or that House of Raeford chicken production declined during 2011.

*463.* 

**ANSWER:**  To the extent the allegations in Paragraph 463 characterize or describe an unidentified March 9, 2011 email, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 463 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 463 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Sanderson Farms and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 463 and therefore deny them.  To the extent the allegations in Paragraph 463 characterize or describe an unidentified March 9, 2011 email, Sanderson Farms and Case deny any characterization or description that is inconsistent therewith.

*464.    On March 15, 2011, Simmons announced it was laying off 180 workers at its Siloam Springs, Arkansas processing plant "[d]ue to economics specific to our industry, resulting from high grain prices predominantly caused by corn being used in ethanol, we have decided to realign some of our production resulting in the elimination of 180 positions as of April 15."*

**ANSWER:**  To the extent the allegations in Paragraph 464 characterize or describe an unidentified March 15, 2011 statement by Simmons, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Simmons lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 464 and therefore deny them. Simmons admits this announcement but denies it supports Plaintiffs' allegations of a conspiracy or conspiracies and denies any remaining allegations in Paragraph 464.

> 465.    On April 13-15, 2011, the Georgia Poultry Federation held its annual meeting at the Brasstown Valley Resort in Georgia. Defendants' senior executives attended the meeting. Among other positions that Defendants' employees were elected to at the meeting, Donnie Wilburn (Director Live Operations, Harrison Poultry) was elected Vice Chairman of the Board of Directors and Phillip Turner (Plant Manager, Mar-Jac) was elected to the Board of Directors.

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 465 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 465 to the extent that they relate to other Defendants and/or third parties. While Defendants other than Amick Farms admit that personnel of certain Defendants have attended events held by the Georgia Poultry Federation, Defendants other than Harrison Poultry and Mar-Jac lack knowledge or information sufficient to form a belief as to the truth of allegations that any such meeting occurred on April 13-15, 2011 or that any "senior executive" attended that meeting and therefore deny them and any remaining allegations in Paragraph 465. Harrison Poultry admits that Donnie Wilburn attended the annual meeting of the Georgia Poultry Federation in 2011 and was elected to the position of Vice Chairman of the Board of Directors, but denies any remaining allegations in Paragraph 465. Mar-Jac admits that Phillip Turner attended the annual meeting of the Georgia Poultry Federation in 2011 and was elected to the Board of Directors. Mar-Jac lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 465 related to Mar-Jac and therefore denies them.

466. ███████████████████████████████
███████████████████████████

**ANSWER:** Defendants other than Case lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 466 and therefore deny them. ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ Accordingly, Case lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 466 and therefore denies them.

467. *On April 15, 2011, Defendant Mountaire disclosed, in a press report, the abandonment of a planned capacity increase, with Mountaire President Paul Downes explaining that "the only way to higher prices is less supply. The only way to less supply is **chicken companies will shut down or cut back**…. I think that's what we're going to see." (emphasis added)*

**ANSWER:** To the extent the allegations in Paragraph 467 characterize or describe

documents or other sources, Defendants deny any characterization or description that is

inconsistent with the referenced sources. Each Defendant lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in Paragraph 467 that relate to other

Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph

467 to the extent that they relate to other Defendants and/or third parties. Defendants other than

Mountaire lack knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 467 and therefore deny them. Mountaire denies that it "abandon[ed]" a

"capacity increase" or "disclosed" any such "abandon[ment]" "in a press report" on April 15, 2011

or "explained" such an "abandonment" as alleged in Paragraph 467 and any remaining allegations

in Paragraph 467.

468. *Downes' view of the state of the chicken industry was echoed, and amplified, by Joe Sanderson, CEO of Defendant Sanderson Farms, who stated on a May 24, 2011 earnings call that "the deal is that the industry – forget Sanderson – the industry*

*cannot sustain losses like they are sustaining for a long period of time. They will – they can't do it and you have been observing this for years and years and the industry has been losing money since Novemberish and balance sheets deteriorate and losses have to stop. The only way to stop losses with $7 corn is to reduce production and get prices up. That is the rule and the law of the jungle." Sanderson continued, "**my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats.**" (emphasis added)*

**ANSWER:**   To the extent the allegations in Paragraph 468 characterize or describe statements by Sanderson Farms CEO Joe Sanderson in a May 24, 2011 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source.   Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 468 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 468 to the extent that they relate to other Defendants and/or third parties.   Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 468 and therefore deny them.   Sanderson Farms admits that it held a May 24, 2011 earnings call and denies any description or characterization that is inconsistent therewith.   Sanderson Farms denies the remaining allegations in Paragraph 468.

> 469.     *Sanderson's comments came roughly one week after he and Lampkin Butts, Sanderson's President and COO, attended the BMO Farm to Market Conference in New York City, along with the CEOs of Defendants Pilgrim's Pride (Bill Lovette) and Tyson (Donnie Smith).*

**ANSWER:**   Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 469 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 469 to the extent that they relate to other Defendants and/or third parties.   Defendants other than Sanderson Farms, Pilgrim's, and Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 469 and therefore deny them.   Pilgrim's admits Bill Lovette was President

255

and CEO of Pilgrim's in May 2011, that Mr. Lovette presented on May 17, 2011 at the BMO Farm to Market Conference, but denies any remaining allegations in Paragraph 469. Tyson admits that Donnie Smith attended the BMO Farm to Market Conference on May 17-18, 2011 in the ordinary course of Tyson's business. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 469 and therefore denies them. Sanderson Farms admits that Sanderson Farms CEO & Chairman Joe Sanderson and President & COO Lampkin Butts attended the BMO Capital Markets Farm to Market Conference in May 2011, but denies the remaining allegations in Paragraph 469.

> 470.     The conference included a presentation by Lovette that noted Pilgrim's new focus on matching production to meet demand, including by adjusting "head," i.e., breeder flocks, to better balance supply and customer demand.

**ANSWER:** To the extent the allegations in Paragraph 470 characterize or describe a May 17, 2011 presentation by Pilgrim's President and CEO Bill Lovette at the BMO Farm to Market Conference, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 470 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 470 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 470 and therefore deny them. Pilgrim's admits Bill Lovette was President and CEO of Pilgrim's in May 2011, that Mr. Lovette presented on May 17, 2011 at the BMO Farm to Market Conference, but denies any remaining allegations in Paragraph 470.

> 471.     ███████████████████████████████████████████████

[REDACTED]

**ANSWER:**   To the extent the allegations in Paragraph 471 characterize or describe communications by Marshall Durbin and Keystone, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 471 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 471 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Mar-Jac and Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 471 and therefore deny them.  [REDACTED]

[REDACTED] Mar-Jac lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 471 related to Mar-Jac and therefore denies them. Mar-Jac and Tyson deny any remaining allegations in Paragraph 471.

*472.*   [REDACTED]

**ANSWER:**   To the extent the allegations in Paragraph 472 characterize or describe communications with Tyson and Koch, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 472 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 472 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Tyson and Koch lack knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 472 and therefore deny them. Tyson and Koch deny any remaining allegations in Paragraph 472.

> 473.    On a June 6, 2011 earnings call announcing it would not increase capacity in the foreseeable future, Cagle's – a Georgia-based integrator whose assets were bought by Defendant Koch Foods in 2012 following Cagle's bankruptcy – said that "**the industry must lower supply** in order to offset reduced demand and to support higher market prices." (emphasis added)

**ANSWER:**  To the extent the allegations in Paragraph 473 characterize or describe a June 6, 2011 Cagle's earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 473 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 473 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the in Paragraph 473 and therefore deny them.  Koch admits that in 2012, one or more Koch-related entities purchased substantially all of Cagle's Inc.'s assets.  Koch lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 473 and therefore denies them.

> 474.    Other Defendants and Co-Conspirators, including Fieldale Farms and Mar-Jac, also began reducing production by cutting breeder flocks in the middle of 2011.

**ANSWER:**  Defendants other than Fieldale and Mar-Jac lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 474 and therefore deny them.  Fieldale admits that it made a variety of changes to its live production operation in and around 2011 that resulted in an increase in the production of antibiotic free chicken and a decrease in the production of conventional chicken, including changes in the management of its breeder flocks.  Fieldale denies the remaining allegations in Paragraph 474.  Mar-Jac denies that it began

reducing production by cutting breeder flocks in the middle of 2011.  Mar-Jac lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in Paragraph

474 and therefore denies them.

> 475.    *Keystone Foods, like many of the Defendants, relied on Urner Barry as a*
> *conduit for information regarding the supply reduction aspect of the Defendants'*
> *conspiracy.*



> *Numerous*
> *communications such as these show how Defendants used Urner Barry to facilitate the*
> *flow of communication among them regarding production cuts.*

**ANSWER:**  Defendants deny the allegations in the first sentence of Paragraph 475. To the

extent the allegations in Paragraph 475 characterize or describe communications with Keystone,

Defendants deny any characterization or description that is inconsistent with the referenced source.

Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any

allegations in Paragraph 475 that relate to other Defendants and/or third parties, and therefore each

Defendant denies the allegations in Paragraph 475 to the extent that they relate to other Defendants

and/or third parties.  Defendants other than Tyson lack knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 475 and therefore deny them.

Tyson denies any remaining allegations in Paragraph 475.   Defendants deny any remaining

allegations in Paragraph 475.

> 476.    *Keystone Foods also utilized Urner Barry as a conduit for sharing*
> *information regarding current broiler pricing and plant operations by other Defendants.*



███████████████████████████████████████████████

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. To the extent the allegations in Paragraph 476 characterize or describe communications with Keystone or George's, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 476 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 476 to the extent that they relate to other Defendants and/or third parties. Defendants other than Tyson and George's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 476 and therefore deny them. Tyson denies any remaining allegations in Paragraph 476. George's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 476 and therefore denies them.

477. *In approximately June 2011, Tyson pulled eggs from its incubators to reduce Broiler volumes.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 477 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 477 to the extent that they relate to other Defendants and/or third parties. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 477 and therefore deny them. Pulling eggs from incubators is an activity that commonly occurs at one or more of the dozens of hatcheries that Tyson operates throughout the United States. Without more specific allegations as to the hatchery in question or the significance of the June 20, 2011 date, Tyson lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 477 and therefore denies them.

478.    In June and July 2011, Defendants' senior executives attended industry events, including a seminar held by the U.S. Poultry & Egg Association and the 2011 Food Media Seminar, which included a panel made up of the CEOs of Defendants Tyson (Donnie Smith), Peco Foods (Mark Hickman), and Perdue (Jim Perdue), and Defendant Sanderson Farms' President and COO (Lampkin Butts).

**ANSWER:**   Defendants other than Tyson, Sanderson Farms, Peco, Amick Farms, and Perdue lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 478 and therefore deny them.   Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 478 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 478 to the extent that they relate to other Defendants and/or third parties.   Sanderson Farms admits that Sanderson Farms COO Lampkin Butts attended the 2011 Food Media Seminar, but denies any remaining allegations in Paragraph 478.   Tyson admits that Bernard Leonard and Donnie King attended the 2011 Food Media Seminar on behalf of Tyson in the ordinary course of their duties, but denies any remaining allegations in Paragraph 478.   Perdue admits that Perdue CEO Jim Perdue attended the National Chicken Council's 2011 Food Media Seminar, but denies any remaining allegations in Paragraph 478.   Peco admits that its personnel, including Mark Hickman, attended industry events, including events held by the U.S. Poultry & Egg Association, for legitimate, procompetitive purposes and participated in panels from time to time, but lacks knowledge or information sufficient to form a belief as to the truth of the specific allegations in Paragraph 478 and therefore denies such allegations.   Amick Farms admits that certain of its employees attended legitimate trade association meetings and other legitimate industry events during the Relevant Period, including the June 2011 US Poultry & Egg Association Financial Management Seminar.   Amick Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 478 and therefore denies them.

*479.* ███████████████████████████████

**ANSWER:** ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 479 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 479 to the extent that they relate to other Defendants and/or third parties. Defendants other than House of Raeford and Case lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 479 and therefore deny them. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

*480.* ███████████████████████████████

**ANSWER:** Defendants other than Amick Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 480 and therefore deny them. Amick Farms denies the allegations of Paragraph 480.

> *481. On July 29, 2011, Pilgrim's announced the closure of its Dallas, Texas processing plant and the layoff of 1,000 employees. Pilgrim's President & CEO Bill Lovette explained that "[w]hile the decision to close a plant and eliminate jobs is always painful, we must make better use of our assets given the challenges facing our industry*

*from record-high feed costs and an oversupply of chicken.... A key component of that effort is improving our capacity utilization through production consolidation and other operational changes. By closing the Dallas facility, we can consolidate that production volume at three other plants and help those sites run closer to full capacity."*

**ANSWER:** To the extent the allegations in Paragraph 481 characterize or describe a July 29, 2011 statement by Pilgrim's President and CEO Bill Lovette, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 481 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 481 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 481 and therefore deny them. Pilgrim's admits that on July 29, 2011, it issued a press release announcing the closure of a further-processing plant (which did not slaughter birds) in Dallas, Texas within 60 days as part of its continuing effort to reduce costs and operate more efficiently, and that that the press release stated that approximately 1,000 employees would be affected by the closure, and that Pilgrim's expected to be able to offer positions at other facilities to interested employees, and that the press release included statements from Mr. Lovette, but denies any remaining allegations in Paragraph 481.

*482. On an August 1, 2011 earnings call, Sanderson Farms CEO, Joe Sanderson, informed analysts that the company's normal fall production cut of 4% beginning in November would remain in place beyond January 2012 or until such time as demand improved. Sanderson also stated that it "**wouldn't surprise me if the industry makes further, deeper reductions in egg sets in October or November**.... Nobody knows what cuts might be needed until we get to October, **but I think that the cutbacks may need to be more than the 6% in head that the industry has in place.**" (emphasis added)*

**ANSWER:** To the extent the allegations in Paragraph 482 purport to characterize or describe statements by Sanderson Farms CEO Joe Sanderson on an August 1, 2011 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source.

Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 482 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 482 to the extent that they relate to other Defendants and/or third parties. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 482 and therefore deny them. Sanderson Farms denies that it held an August 1, 2011 earnings call and any remaining allegations in Paragraph 482.

483.    *A week later, on August 8, 2011, Tyson's CEO said on an earnings call that "domestic availability must be in balance with demand before **industry economics can improve**. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter…. Our goal is to match supply to demand. And following over-production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market." (emphasis added)*

**ANSWER:**    To the extent the allegations in Paragraph 483 characterize or describe an August 8, 2011 Tyson earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 483 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 483 to the extent that they relate to other Defendants and/or third parties. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 483 and therefore deny them. Tyson admits that it held an earnings call on August 8, 2011 for its investors who expect Tyson to provide information relevant to the company's financial performance including observations about the supply of, and demand for, Tyson's products. Tyson denies any remaining allegations in Paragraph 483.

484.

**ANSWER:**

Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 484 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 484 to the extent that they relate to other Defendants and/or third parties. Defendants other than House of Raeford and Case lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 484 and therefore deny them.

██████████████████████ Further answering, Case incorporates its answer to Paragraph 486.

Case denies the remaining allegations in Paragraph 484.

> 485.    On August 18, 2011, Cagle's, now a subsidiary of Koch Foods, announced it was reducing 20% of its production at its large Pine Mountain Valley, Georgia plant.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 485 and therefore deny them.

> 486. ████████████████████████████████████████████
> ████████████████████████████████████████████████
> ██████████████████████████

**ANSWER:** ████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 486 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 486 to the extent that they relate to other Defendants and/or third parties. Defendants other than House of Raeford and Case lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 486 and therefore deny them. House of Raeford denies the conspiracy allegations in the Complaint. To the extent the allegations in Paragraph 486 relate to other Defendants and/or third parties, House of Raeford lacks knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies them. ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Further

answering, Case incorporates its answer to Paragraph 484. Case denies the remaining allegations

in Paragraph 486.



**ANSWER:** ████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Each Defendant

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

Paragraph 487 that relate to other Defendants and/or third parties, and therefore each Defendant

denies the allegations in Paragraph 487 to the extent that they relate to other Defendants and/or

third parties. Defendants deny any remaining allegations in Paragraph 487.

488.    *In early October 2011, Defendants' senior executives attended the National Chicken Council's 57th Annual Conference in Washington, D.C. Among the discussion panels at the event was one about the "new paradigm" in the chicken industry. The panel included senior executives from Defendants Perdue (Clint Rivers, by then Perdue's President of Foodservice and Supply Chain, after having been Pilgrim's CEO), Keystone (William Andersen, Senior Vice President) and Koch Foods (Mark Kaminsky, COO and CFO). Panelists said that "the industry is accustomed to cycles, but not one quite like the*

*latest, and **companies are going to need to adjust**. Discipline on the supply side was one suggestion. Getting better prices from retailers was another." (emphasis added)*

**ANSWER:**  To the extent the allegations in Paragraph 488 characterize or describe an unidentified joint statement during a panel discussion at the National Chicken Council's 57th Annual Conference, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 488 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 488 to the extent that they relate to other Defendants and/or third parties.  While Defendants admit that personnel of certain Defendants have attended events held by the National Chicken Council, Defendants other than Perdue, Harrison Poultry, Amick Farms, and Koch cannot ascertain the truth or falsity of the specific allegations in the first sentence in Paragraph 488 based on a reasonable effort at this time, and therefore deny them.  Pilgrim's admits that the National Chicken Council held its 57th Annual Conference on October 5-7, 2011, that at least one senior executive attended some or all of that conference, but denies any remaining allegations in Paragraph 488.  Perdue admits that at times its executives and employees have been members of certain legitimate trade associations, and at times attended events sponsored by legitimate trade associations, such as the National Chicken Council. Harrison Poultry admits that its former Vice President of Sales and Marketing Larry Guest attended the National Chicken Council's annual conference held from October 5-7, 2011.  Koch admits that Mark Kaminsky, then CFO and COO of Defendant Koch Foods Incorporated, attended the National Chicken Council's annual conference in or around October 2011, and participated in a panel regarding the Broiler industry.  Amick Farms admits that certain of its employees attended legitimate trade association meetings and other legitimate industry events during the Relevant Period, including the October 2011 National Chicken Council annual meeting.  Koch, Harrison

Poultry, Amick Farms, Mar-Jac, and Perdue lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 488 and therefore deny them. Defendants deny any remaining allegations in Paragraph 488.

489. 

**ANSWER:** To the extent the allegations in Paragraph 489 characterize or describe an email with Keystone executives, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 489 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 489 to the extent that they relate to other Defendants and/or third parties. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 489 and therefore deny them. Tyson denies any remaining allegations in Paragraph 489.

490. 

**ANSWER:** To the extent the allegations in Paragraph 490 characterize or describe an email with Keystone executives, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 490 and therefore deny them. Tyson denies any remaining allegations in Paragraph 490.

> 491.    On November 17, 2011, Wayne Farms issued a press release announcing the closure of its Decatur, Alabama plant and layoffs of 360 employees.

**ANSWER:** To the extent the allegations in Paragraph 491 characterize or describe a press release, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 491 and therefore deny them. Wayne Farms admits that it made a public announcement on November 17, 2011 regarding its independent decision about production at its Decatur, Alabama further processing facility, but otherwise denies the remaining allegations in Paragraph 491.

> 492.    On a November 21, 2011, earnings call, Sanderson Farms CEO, Joe Sanderson, responded to a question about a production decrease that "when we talk about the 4% number, that is what we project the industry to be. Obviously, we're going to be a part of that."

**ANSWER:** To the extent the allegations in Paragraph 492 characterize or describe statements by Sanderson Farms CEO Joe Sanderson from a November 21, 2011 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 492 and therefore deny them. Sanderson Farms denies that it held a November 21, 2011 earnings call and denies the remaining allegations in Paragraph 492.

> 493.



  


**ANSWER:** ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ Each Defendant

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

Paragraph 493 that relate to other Defendants and/or third parties, and therefore each Defendant

denies the allegations in Paragraph 493 to the extent that they relate to other Defendants and/or

third parties. Defendants other than Tyson lack knowledge or information sufficient to form a

belief as to the truth of the in Paragraph 493 and therefore deny them. ██████████████

████████████████████████████████████████████████████

███████████

      *494.    Throughout 2012, Defendants continued to meet at trade association meetings and industry events, giving them the opportunity to discuss the impact of their collective production cuts and otherwise monitor their conspiracy.*

    **ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. While Defendants admit that personnel of certain Defendants attended trade association meetings and industry events in 2012, they deny the remaining allegations in Paragraph 494.

        *495.    In the first quarter of 2012, for example, Defendants' top executives attended the National Chicken Council's board of directors meeting in Atlanta, which was*

*held in conjunction with the January 25-26, 2012 International Poultry and Processing Expo.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 495 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 495 to the extent that they relate to other Defendants and/or third parties.  While Defendants admit that personnel of certain Defendants have attended certain International Production & Processing Expo[10] and National Chicken Council events, Defendants other than Harrison Poultry and Amick Farms lack knowledge or information sufficient to form a belief as to the allegations that this specific meeting occurred or that their "senior executives" attended and therefore deny the allegations in Paragraph 495.  Harrison Poultry admits that its former CEO Mike Welch and its former Vice President of Sales and Marketing Larry Guest attended the International Production and Processing Expo from January 25-26, 2012 in Atlanta, Georgia.  Amick Farms admits that certain of its employees attended legitimate trade association meetings and other legitimate industry events during the Relevant Period, including the January 2012 International Poultry and Processing Expo. Defendants deny any remaining allegations in Paragraph 495.

496.    *On March 20-21, 2012, the National Chicken Council's board of directors, which included many of Defendants' senior executives, met again in Washington, D.C.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 496 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 496 to the extent that they relate to other Defendants and/or third parties.  While Defendants admit that personnel of certain

---

[10] Defendants assume that when Plaintiffs refer to the "International Poultry and Processing Expo," they mean to refer to the International Production & Processing Expo.  Defendants answer under that assumption.

Defendants have attended events held by the National Chicken Council, Defendants other than Amick Farms lack knowledge or information sufficient to form a belief as to the allegations that this specific meeting occurred or that their "senior executives" attended and therefore deny the allegations in Paragraph 496. Amick Farms admits that certain of its employees attended legitimate trade association meetings and other legitimate industry events during the Relevant Period, including the March 2012 National Chicken Council board of directors meeting, but denies any remaining allegations in Paragraph 496.

497. *In early 2012, Sanderson Farms cut its production by 4%, which included a reduction in breeder flocks.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 497 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 497 to the extent that they relate to other Defendants and/or third parties. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 497 and therefore deny them. Sanderson Farms admits that in 2012, as in every year, Sanderson Farms planned and executed its U.S. Broiler production based on its own, unilateral business judgment of what is in its independent interest. Sanderson Farms denies the remaining allegations in Paragraph 497, as it has grown its production each year since 2008.

498. *At USPOULTRY's Hatchery-Breeder Clinic in January 2012 in Atlanta, Agri Stats Vice President, Mike Donohue, noted the importance of reducing breeder flocks, stating that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recover[y] in the short term by filing up incubators again." But he also noted that the Agri Stats data indicated that the industry was slaughtering breeder flocks at 59 to 60 weeks, instead of the typical 65 weeks. The kind of early slaughter of breeder flocks – including, for example, the bird-age data included in the "Growth Rate Report" described above – meant that Defendants subsequently were*

*unable to increase production for at least eighteen months, as they would have been able to do had they not made cuts at the top of the supply chain.*

**ANSWER:** To the extent the allegations in Paragraph 498 characterize or describe unidentified statements by Agri Stats Vice President Donohue at US Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, Defendants deny any characterization or description that is inconsistent therewith. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 498 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 498 to the extent that they relate to other Defendants and/or third parties. Defendants other than Agri Stats lack knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 498 and therefore deny them. Agri Stats admits that its employees periodically host and present at chicken industry events and conferences, but denies any remaining allegations in Paragraph 498.

499.    *The shift in the way the industry supplied chicken was summarized in a March 2012 report published by agricultural lender, CoBank.*

**ANSWER:** To the extent the allegations in Paragraph 499 characterize or describe a report by CoBank, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 499 and therefore denies the allegations in Paragraph 499.

500.    *Entitled "The U.S. Chicken Industry: Re-invented and Revitalized" with sections captioned "'Same-Old, Same-Old' – No More" and "It's a New Ballgame," the report noted that the:*

 *"U.S. chicken industry has gone through the proverbial wringer, but last year appears to have been the low point. In recent years, the chicken companies have all lost money, some more than others. And five U.S. companies have exited the industry since 2008. As the losses mounted, the industry realized that its standard business practices sorely needed to be reformed. The surviving chicken companies found it to be not just prudent,*

*but absolutely essential to revise those practices. The poultry industry today operates much differently than it did just a few years ago."*

**ANSWER:** To the extent the allegations in Paragraph 500 characterize or describe a report by CoBank, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 500 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 500 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 500.

*501. The CoBank report highlighted one of the reasons for this sea-change: the Defendants' reduction of breeder flocks that began in mid-2011, noting that "**the recent cuts in the hatchery flock will prevent a quick response**," with "U.S. chicken production [...] on track to fall to its lowest level in 5 years by mid-2012." (emphasis added)*

**ANSWER:** To the extent the allegations in Paragraph 501 characterize or describe a report by CoBank, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 501 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 501 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 501.

*502. The highlighted section of the following graph shows that these cuts bucked the historical trend of breeder flock reductions, going even deeper than the then-unprecedented 2008- 2009 cuts:*



**ANSWER:**  To the extent the allegations in Paragraph 502 characterize or describe selected statistics from the National Agricultural Statistical Service of the USDA, represented in Plaintiffs' graphic above, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 502 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 502 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any remaining allegations in Paragraph 502.

> 503.    The sentiment of CoBank's March 2012 report was echoed by Pilgrim's CEO, Bill Lovette, on an April 27, 2012 earnings call, where he reported that "the die is cast for 2012," and that "we're comfortable that **the industry is going to remain constrained.**" (emphasis added)

**ANSWER:**  To the extent the allegations in Paragraph 503 characterize or describe the transcript of an April 27, 2012 Pilgrim's earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 503 that relate

to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 503 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 503 and therefore deny them. Pilgrim's admits it held an earnings call on April 27, 2012, in which President and CEO Bill Lovette participated, but denies that Plaintiffs have quoted the document correctly and any remaining allegations in Paragraph 503.

> 504. Trade association meetings and industry events in the middle of 2012 gave the Defendants additional opportunities to meet and discuss the effect of their collusive efforts to reduce production. Examples of these opportunities to conspire included the National Chicken Council Board of Directors meeting in Washington D.C. on March 20-21, 2012; Urner Barry's annual marketing seminar, from April 29 - May 1, 2012; the National Chicken Council's board of directors meeting in Lake Tahoe on June 21, 2012; and the July 15, 2012 meeting of the National Chicken Council's marketing committee in Stowe, Vermont. Each of these meetings were attended by a number of Defendants' senior executives.

**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 504. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 504 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 504 to the extent that they relate to other Defendants and/or third parties. While Defendants admit that personnel of certain Defendants have attended events held by the National Chicken Council and Urner Barry, Defendants other than Harrison Poultry, Koch, Amick Farms, and Pilgrim's lack knowledge or information sufficient to form a belief as to the allegations that this specific meeting occurred or that their "senior executives" attended and therefore deny the allegations in Paragraph 504. Koch admits that personnel from one or more of the Koch Defendants attended an Urner Barry conference at or around this time. Koch admits that personnel from one or more of the Koch Defendants attended National Chicken Council annual meetings from time to time, but deny that Koch personnel attended the June and July, 2012 National Chicken Council meetings. Koch lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations of Paragraph 504 and therefore denies them. Pilgrim's admits that the National Chicken Council Board of Directors held its summer meeting on June 21, 2012, and that at least one of its senior executives attended some or all of that conference. Pilgrim's admits its employees have attended the National Chicken Council's Marketing Committee meeting and that a meeting occurred on July 15, 2012, but lacks knowledge or information sufficient to form a belief as to the truth of the allegation that a "senior executive" attended this specific meeting. Harrison Poultry admits that its former CEO Mike Welch attended the National Chicken Council board of directors meeting in Lake Tahoe on June 21, 2012. Harrison Poultry admits that its former Vice President of Sales and Marketing Larry Guest attended the National Chicken Council marketing committee meeting in Stowe, Vermont on July 15, 2012. Amick Farms admits that certain of its employees attended legitimate trade association meetings and other legitimate industry events during the Relevant Period, including the National Chicken Council Board of Directors meeting in Washington D.C. on March 20-21, 2012 and the National Chicken Council's board of directors meeting in Lake Tahoe on June 21, 2012. Amick Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 504 and therefore denies them. Defendants deny any remaining allegations in Paragraph 504.

*505.* ████████████████████████████████████
████████████████████████████████

**ANSWER:** To the extent the allegations in Paragraph 505 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 505 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 505 to the extent that they relate

to other Defendants and/or third parties. Defendants other than Pilgrim's and Amick Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 505 and therefore deny them ███████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████ Pilgrim's admits Plaintiffs appear to be selectively quoting from – and attempting to characterize – an unidentified document, but denies Plaintiffs' characterization of the document and lacks knowledge or information sufficient to form a belief as to whether Plaintiffs have quoted the document accurately and therefore denies it. Pilgrim's denies the remaining allegations in Paragraph 505.

506.   ████████████████████████████████████████
█████████████████████████████

**ANSWER:**   To the extent the allegations in Paragraph 506 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 506 and therefore deny them. Case denies the allegations in Paragraph 506.

507.   *On August 28, 2012, Sanderson Farms announced a further 2% production cut that it blamed on corn and soybean prices.*

**ANSWER:**   To the extent the allegations in Paragraph 507 characterize a transcript of an announcement, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 507 and therefore deny them. Sanderson Farms admits that it held an August 28, 2012 earnings call, but denies the remaining allegations in Paragraph 507.

508.    By September 2012, Defendants' 2011 production cuts, particularly their *reduction of breeder flocks, had resulted in increased prices for Plaintiffs.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 508 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 508 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any remaining allegations in Paragraph 508.

509.    *The higher chicken prices seen in the market by September 2012 were not justified by the costs of Defendants' primary inputs, corn and soybean meal, which by the fourth quarter of 2012, had dropped significantly in price following near-record highs in the summer of 2012.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 509 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 509 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any remaining allegations in Paragraph 509.

510.    *On October 10-11, 2012, the National Chicken Council held its annual meeting in Washington, D.C.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 510 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 510 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Pilgrim's, Amick Farms, and Harrison Poultry lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 510 and therefore deny them.  Pilgrim's, Harrison Poultry, and Amick Farms admit that the National Chicken Council held its annual meeting on October 10-11,

2012 but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 510 and therefore deny them.

> 511.    Among Defendants' senior executives attending the meeting were the President of Fieldale Farms (Thomas Hensley) and CEO of O.K. Foods (Paul Fox).

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 511 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 511 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Fieldale and O.K. Foods lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 511 and therefore deny them.  Fieldale admits that its executive Tom Hensley participated on a panel at the National Chicken Council meeting on October 10-11, 2012, but lacks knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 511 and therefore denies them.  O.K. Foods lacks knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 511 and therefore denies them.

> 512.    Messrs. Hensley and Fox participated in an "Industry Outlook Panel" where participants discussed the question of what the industry "learn[ed] from 2011 and **how will the industry apply those lessons in 2012 and 2013.**" (emphasis added)

**ANSWER:**  To the extent the allegations in Paragraph 512 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Fieldale and O.K. Foods lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 512 and therefore deny them.  Fieldale admits that Tom Hensley participated on a panel. Fieldale lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 512. O.K. Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 512 and therefore denies them.

513.    *Defendants also continued to directly communicate confidential pricing and production information to one another throughout 2013 and 2014, including,*



**ANSWER:**  To the extent the allegations in Paragraph 513 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 513 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 513 to the extent that they relate to other Defendants and/or third parties.  Defendants other than House of Raeford, Case, Amick Farms, and Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 513 and therefore deny them.

Defendants deny any remaining allegations in Paragraph 513.

**E.**    **Drastically-Reduced Breeder Flocks Boosted Chicken Prices and Raised Defendants' Profits to Record Levels**

*514.    For most of the remainder of 2012 through at least 2016, Defendants reaped the benefits of their coordinated supply restraints as prices rose and profits soared to record levels.*

**ANSWER:** Defendants deny the allegations in Paragraph 514.

*515.    During this time, Defendants' executives repeatedly heralded the industry's newly found supply "discipline."*

**ANSWER:**  Defendants deny the allegations in Paragraph 515.

*516.    For example, on a May 3, 2013 investor call, Pilgrim's Pride CEO, Bill Lovette, touted the chicken industry's collective discipline:*

> *Obviously, revenue is going to be a function of price, in part, and in this case a big part; and obviously, price is going to strengthen as supply continues to be disciplined and constrained…. So I think **the industry is doing an admirable job in being disciplined on the supply side** and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying…. I believe **the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken** and not necessarily what corn or soybean meal costs. I think I'm confident to say, **we've figured that out and we're doing a good job** of balancing supply and demand. (emphasis added)*

**ANSWER:**  To the extent the allegations in Paragraph 516 characterize or describe a statement by Pilgrim's President and CEO Bill Lovette from a May 3, 2013 earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 516 and therefore deny them.  Pilgrim's admits it held an earnings call on May 3, 2013, in which Mr. Lovette participated, but denies any remaining allegations in Paragraph 516.

*517.    On the May 3, 2013 investor call, Lovette specifically referenced the continued importance of restraining the industry's breeder flocks:*

*I only know what we've seen happen in the past. Now, certainly, this summer **if the industry chooses to grow the breeder supply significantly, that's definitely going to impact 2014. What I'm saying is, so far, we've seen no indication that the industry plans to grow the breeder supply and as a matter of fact, it's actually shrunk**.... I'll reiterate that I think the industry has learned that the economics of our business is tied very closely to the supply of chickens and **we've done a good job so far of maintaining discipline** such that even paying nearly $8.50 for corn, we've been able to be profitable as an industry. (emphasis added)*

**ANSWER:** To the extent the allegations in Paragraph 517 characterize or describe a May 3, 2013 Pilgrim's earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 517 and therefore deny them. Pilgrim's admits it held an earnings call on May 3, 2013, in which Mr. Lovette participated, but denies any remaining allegations in Paragraph 517.

*518. On October 4, 2013, Defendants' CEOs and other senior executives met at the annual meeting of the National Chicken Council in Washington, D.C., where a panel, including the CEOs of Defendants Tyson (Donnie Smith) and Simmons Foods (Todd Simmons), was "chipper about the prospects for their industry in the next few years."*

████████████████████████████████████████████

**ANSWER:** To the extent the allegations in Paragraph 518 characterize or describe an unidentified publication about the October 2013 NCC meeting, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 518 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 518 to the extent that they relate to other Defendants and/or third parties. While Defendants admit that personnel of certain Defendants have attended events held by the National Chicken Council, Defendants other than Tyson, Simmons, Koch, Amick Farms, Fieldale, and Harrison Poultry lack knowledge or information sufficient to form a belief as to the allegations that this specific meeting occurred or that their "senior executives" attended and

therefore deny the allegations in Paragraph 518. Tyson admits that Donnie King attended the National Chicken Council meeting in October 2013 on behalf of Tyson in the ordinary course of Tyson's business, but denies any remaining allegation in Paragraph 518. Because Simmons does not maintain a centralized list of Simmons employees who attend industry events such as the annual NCC meeting on October 4, 2013 in Washington D.C., Simmons lacks knowledge or information sufficient to form a belief as to the truth of the allegations relating to Simmons in Paragraph 518 and therefore denies them. Koch admits that personnel of one or more of the Koch Defendants attended the National Chicken Council meeting in or around October 2013, but denies any remaining allegation in Paragraph 518. Harrison Poultry admits that its former CEO Mike Welch attended the National Chicken Council meeting held on October 4, 2013 in Washington, D.C., but denies any remaining allegation in Paragraph 518. Amick Farms admits that certain of its employees attended legitimate trade association meetings and other legitimate industry events during the Relevant Period, including the October 2013 National Chicken Council annual meeting, but denies any remaining allegation in Paragraph 518. Fieldale admits that one or more of its employees or executives attended the National Chicken Council meeting in October 2013, but denies any remaining allegation in Paragraph 518.

> *519.  Defendants had reason to be positive. For example, on a February 21, 2014 earnings call, Pilgrim's Pride CEO, Bill Lovette, reflected on what had led to the company's record earnings. Lovette noted that "I think the one thing that creates ... has created the stability is **the discipline of the industry to not allow profitability in the past to drive supplies in the future….** And I think that discipline really ... is the one ingredient that has made for more stable earnings that we have seen." (emphasis added)*

**ANSWER:**  To the extent the allegations in Paragraph 519 characterize or describe a February 21, 2014 Pilgrim's earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 519 that relate to other

Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 519 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 519 and therefore deny them. Pilgrim's admits it held an earnings call on February 21, 2014, in which CEO Bill Lovette participated, but deny any remaining allegations in Paragraph 519.

> 520. At a March 12, 2014 industry conference, Tyson CEO, Donnie Smith, told attendees that a "meaningful change" in chicken production would not occur until the second half of 2015, a statement he could confidently make because Defendants' unprecedented 2011-2012 cuts in breeder flocks made it impossible for them to "meaningfully change" chicken production any sooner.

**ANSWER:** To the extent the allegations in Paragraph 520 characterize or describe a March 12, 2014 statement by Tyson CEO Donnie Smith, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 520 and therefore deny them. Because the Complaint does not identify the conference referenced in the first sentence of Paragraph 520, Tyson lacks knowledge or information sufficient to form a belief as to the truth of those allegations and therefore denies them and any remaining allegations in Paragraph 520.



521.

**ANSWER:**

Each Defendant lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in Paragraph 521 that relate

to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 521 to the extent that they relate to other Defendants and/or third parties. Defendants other than Case and Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 521 and therefore deny them. ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ Accordingly, Case lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 521 and therefore denies them. Agri Stats denies any remaining allegations in Paragraph 521.

> 522. *An October 2014 CoBank analysis noted that Defendants' strategy of targeting breeder flocks paid dividends during 2013 and 2014. According to the report:*

>> *[P]roduct demand should remain robust through the rest of this year and well into 2015, bolstered by a gradually improving domestic economy, continued strength in export demand, and the towering prices of beef and pork. Broiler production, however, has been slow to respond, with integrators having had problems expanding the number of chicks placed for growout. Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015. Producers have been somewhat constrained in their attempts to expand the nation's chicken flock by the limited supply of broiler hatching eggs. When the broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been rebuilt to prior levels. Following seven months of [Year-over-Year ("YoY")] declines, the number of chicks placed for growout finally posted a modest 1 percent YoY gain in August. However, it will take another 6-9 months for integrators to rebuild the supply of broiler hatching eggs in preparation for expanding the overall flock, so significant growth in broiler production will not materialize until late 2015 or early 2016.*

**ANSWER:** To the extent the allegations in Paragraph 522 characterize or describe an October 1, 2014 CoBank report, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 522 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph

522 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 522.

      523.     *The October 2014 CoBank report also noted the effect of these production cuts, stating that wholesale prices for chicken "have risen to unusually high levels."*

**ANSWER:** To the extent the allegations in Paragraph 523 characterize or describe an October 1, 2014 CoBank report, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 523 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 523 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 523.

      524.     *Defendants also continued to directly communicate confidential pricing and production information to one another throughout 2013 and 2014.*



**ANSWER:** To the extent the allegations in Paragraph 524 characterize or describe a specific documents or communications, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 524 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph

524 to the extent that they relate to other Defendants and/or third parties. Defendants other than Case, House of Raeford, and Amick Farms deny the remaining allegations in Paragraph 524. Koch denies the allegations in Paragraph 524 to the extent they relate to Koch, and denies any remaining allegations in Paragraph 524.

Amick Farms denies the remaining allegations of Paragraph 524.

*525.    On October 29, 2014, Simmons Foods announced the closure of its Jay, Oklahoma spent hen processing plant. Spent hens are broiler breeders that have reached the end of their productive life cycle. The Simmons facility processed spent hens on behalf of many Defendants, providing Simmons with opportunities to monitor changes in other Defendants Broiler breeder supplies. The closure of Simmons' Jay, Oklahoma facility is indicative of the reduced broiler breeder capacity resulting from Defendants' initiatives to cut broiler breeder capacity across the industry.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 525 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 525 to the extent that they relate

to other Defendants and/or third parties. Defendants admit that Broiler breeders that have reached the end of their productive life cycle sometimes are referred to as "spent hens." Defendants other than Simmons lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 525 and therefore deny them. Simmons admits that Simmons Custom Processing Inc. closed its Jay, Oklahoma processing plant but denies that such closing supports Plaintiffs' claims of conspiracy or conspiracies and any remaining allegations in Paragraph 525.

> 526.     During a February 12, 2015, earnings call, Pilgrim's President & CEO Bill Lovette summed up the restriction of supply which Defendants had implemented since 2008: "I looked at some numbers supplied by Agri Stats earlier in the week and found some interesting facts. If you go back to 2008, the industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies."

**ANSWER:** To the extent the allegations in Paragraph 526 characterize or describe a February 12, 2015 Pilgrim's earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 526 and therefore deny them. Pilgrim's admits it held an earnings call on February 12, 2015, in which CEO Bill Lovette participated, but denies any remaining allegations in Paragraph 526.

> 527.



**ANSWER:** Defendants deny the allegations of conspiracy in Paragraph 527. ▮

Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 527 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 527 to the extent that they relate to other Defendants and/or third parties. Defendants other than Case, Koch, and House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 527 and therefore deny them. To the extent the remaining allegations in Paragraph 527 relate to Koch and House of Raeford, Koch, and House of Raeford deny those allegations and any remaining allegations in paragraph 527. ▮

528.     The year 2015, like 2014, was a banner year for Defendants' profits resulting from their conspiracy.

**ANSWER:** Defendants deny the allegations in Paragraph 528.

529.     WATT PoultryUSA's March 2016 issue noted, for example, that Tyson had achieved "record earnings and sales in fiscal year 2015 ... posting $40.6 billion in sales, including ringing up higher chicken sales. Yet, Tyson lowered chicken production in 2015. What's at work here? This paradoxical performance, in part, reflects the fact that Tyson,

*along with other top U.S. broiler companies, is redefining its business model to achieve profitable growth."*

**ANSWER:** To the extent the allegations in Paragraph 529 characterize or describe a March 2016 issue of Watts PoultryUSA, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 529 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 529 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 529.

530. *The true explanation for the 2015 performance of Tyson and its competitors, however, was the conspiracy alleged in this Complaint.*

**ANSWER:** Defendants deny the allegations in Paragraph 530.

531. *This trend continued into 2016. With the notable exception of the Georgia Dock, chicken prices declined in 2016, but significantly less than input costs.*

**ANSWER:** The allegations in Paragraph 531 are imprecise and therefore Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny them.

532. *Defendants proactively maintained artificially high chicken prices and high profitability during 2016 by exercising "discipline" on the supply-restriction.*

**ANSWER:** Defendants deny the allegations in Paragraph 532.

533. *For instance, during an April 2016 earnings call, an analyst noted that Pilgrim's CEO, Bill Lovette, "mentioned that you think the industry domestically has been much more disciplined than they have been in the past, I'm wondering if you could just elaborate a little bit more on what sort of drives that view and then maybe what gives you confidence that this discipline will hold." Lovette responded, "[w]hat drives the view is the actual numbers that we see, ready to cook pounds are up about 3.1% year to date. If you look at placements year to date, they're up 1%, egg sets up 0.7%, hatchery utilization*

*actually declined in Q1 to 91%. So in the phase of coming off two of the most profitable years in the industry, we're not seeing, not realizing large amount of production increases."*

**ANSWER:**  To the extent the allegations in Paragraph 533 characterize or describe April 2016 statements made by an unidentified analyst and Bill Lovette during a Pilgrim's earnings call, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 533 and therefore deny them.  Pilgrim's admits it held an earnings call on April 28, 2016 and that Mr. Lovette participated, but denies any remaining allegations in Paragraph 533.

534.    *Tellingly, Pilgrim's CFO Fabio Sandri added immediately after Lovette's comments that "what drove that I believe it is that **[the] industry is more geared towards profitability rather than just market share** or field growth." (emphasis added)*

**ANSWER:**  To the extent the allegations in Paragraph 534 characterize or describe April 2016 statements made by Fabio Sandri during a Pilgrim's earnings call, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 534 and therefore deny them.  Pilgrim's admits it held an earnings call on April 28, 2016 in which Mr. Sandri participated, but denies any remaining allegations in Paragrph 534.

535.    *Defendants were no longer competing with one another to gain market share by growing their companies as one would expect in a competitive market, but instead, worked collectively to increase profitability by being "disciplined" in terms of supply growth.*

**ANSWER:**  Defendants deny the allegations in Paragraph 535.

536.    *Defendants also kept up the regular use of signaling one another to perpetuate their collusion during 2016 by using the code word "discipline" to note their*

*continued adherence to the supply-restriction dimension of their conspiracy by keeping breeder flocks low.*

**ANSWER:**  Defendants deny the allegations in Paragraph 536.

*537.  For instance, during a February 2016 earnings call, Pilgrim's CEO, Bill Lovette, noted that:*

> *[T]he industry continues to be disciplined in terms of U.S. supply. Although monthly pullet data tend to be volatile and have occasionally been at the high end of our expectations, we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits [sic] and chick placements as a positive. We believe that at least part of the reason is because **chicken producers are being disciplined** and are much quicker to react than in the past and in adjusting supply growth to the actual market conditions. (emphasis added)*

**ANSWER:**  To the extent the allegations in Paragraph 537 characterize or describe February 2016 and July 2016 Pilgrim's earnings calls, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 537 and therefore deny them.  Pilgrim's admits it held earnings calls on February 11 and July 28, 2016, in which Mr. Lovette participated, but denies that Plaintiffs have quoted the transcripts correctly and any remaining allegations in Paragraph 537.

*538.  Other CEOs also had to try to explain the marked shift in the chicken industry's profitability in recent years, after the decades-long pattern of boom and bust regarding chicken pricing and profitability.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 538 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 538 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any remaining allegations in Paragraph 538.

*539.  Defendants again utilized Mr. O'Shaughnessy of Urner Barry to communicate the capacity at which their plants were running.* ▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████

**ANSWER:** Defendants deny the allegations of the first sentence of Paragraph 539. To the extent the allegations in Paragraph 539 characterize or describe specific communications, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 539 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 539 to the extent that they relate to other Defendants and/or third parties. Defendants other than Amick Farms, Mountaire, Perdue, and House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 539 and therefore deny them. Amick Farms, Perdue, Mountaire and House of Raeford deny the allegations in Paragraph 539 related to themselves.

> 540. During a February 2016 Sanderson Farms earnings call, BMO Capital Markets analyst Ken Zaslow noted the industry's history of volatility in pricing and profitability for chicken companies, questioning if there was "any changing of the industry dynamic" that had occurred. Sanderson Farms CEO Joe Sanderson replied "we might be at a capacity wall, you know?…. Since back in 2007 … there are three or four plants shuttered…. It does feel different."

**ANSWER:** To the extent the allegations in Paragraph 540 characterize or describe statements made by BMO Capital Markets analyst Ken Zaslow and Sanderson Farms CEO Joe Sanderson during a February 2016 Sanderson Farms earnings call, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 540 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 540 to the extent that they relate to other Defendants and/or third parties. Defendants other than Sanderson Farms lack knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in Paragraph 540 and therefore deny them. Sanderson Farms admits that its CEO has spoken during earnings calls about his view of industry dynamics and that it held a February 2016 earnings call, but denies the remaining allegations in Paragraph 540.

> 541.    On an analyst call on May 26, 2016, Mr. Sanderson echoed his earlier statements about how much the industry had changed since 2007, noting that "when you go back and look and see how many eggs are being set right now and you go back and look at what the industry will [sic] set in 2007 … egg sets in 2007 were 220 million eggs a week, and we're setting 208 million, 209 million, 210 million eggs a week."

**ANSWER:**    To the extent the allegations in Paragraph 541 characterize or describe a Sanderson Farms analyst call, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 541 and therefore deny them. Sanderson Farms admits that it held a May 26, 2016 earnings call, but denies the remaining allegations in Paragraph 541.

> 542.    Sanderson's comments about egg sets were amplified by Pilgrim's CEO Bill Lovette later that summer, stating on a July 28, 2016 analyst call that "I think what we have seen with egg sets is absolutely a testament to the discipline of our industry that we've seen in the last really two to three years."

**ANSWER:**    To the extent the allegations in Paragraph 542 characterize or describe a July 2016 Pilgrim's earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 542 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 542 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations

296

in Paragraph 542 and therefore deny them. Pilgrim's admits it held an earnings call on July 28, 2016, in which Mr. Lovette participated, but denies any remaining allegations in Paragraph 542.

> 543. *On the July 28, 2016 call, Lovette also commented on Defendants' continued restraint of breeder flock population, noting that "the breeder flock in total is only up about 0.5%" over the same time period, and ended the analyst call describing the "positive notion [we] have about the discipline that we continue to see exhibited by the entire industry," which "**gives us more confidence that we're going to do the right thing with respect to maintaining that discipline** ... and ... gives us confidence that we're going to continue to be disciplined as an industry." (emphasis added)*

**ANSWER:** To the extent the allegations in Paragraph 543 characterize or describe a July 2016 Pilgrim's earnings call, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 543 and therefore deny them. Pilgrim's admits it held an earnings call on July 28, 2016, in which Mr. Lovette participated, but denies any remaining allegations in Paragraph 543.

> 544. *On an August 8, 2016 earnings call, Tyson's former CEO Donnie Smith – who was then transitioning the CEO role to Thomas Hayes, the company's former Chief Commercial Officer who became the CEO in late 2016 – stated that "our chicken business is ... it continues to do great," a comment seconded by Hayes, who said about the company's chicken business that "year-over-year, we're doing great ... all that business is very profitable to us."*

**ANSWER:** To the extent the allegations in Paragraph 544 characterize or describe an August 8, 2016 Tyson earnings call, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 544 and therefore deny them. Tyson admits it held an earnings call on August 8, 2016 for its investors who expect Tyson to provide information relevant to the company's financial performance including observations about the supply of, and demand for, Tyson's products. Tyson denies the remaining allegations in Paragraph 544.

**F.**   **Defendants Utilized Urner Barry to Assist Them Capitalize on Their Supply Reduction Efforts**

> *545.     Although Urner Barry prices are intended to be based on a system of double verification, which includes telephonic and written surveys of all or nearly all broiler producers, along with verification of reported prices from broiler purchasers such as brokers and customers, Defendants understood and took advantage of its susceptibility to manipulation.*

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 545. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 545 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 545 to the extent that they relate to other Defendants and/or third parties. Defendants deny the remaining allegations in Paragraph 545.



**ANSWER:**   To the extent the allegations in Paragraph 546 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Simmons lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 546 and therefore deny them.



Simmons denies the remaining allegations of Paragraph 546.

**ANSWER:**  To the extent the allegations in Paragraph 547 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Claxton lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 547 and therefore deny them.

> 548.    *With knowledge of Mike O'Shaughnessy's susceptibility to influence, and his control over Urner Barry's prices, Defendants routinely, consistently, and collectively pressured Urner Barry to raise prices.*

**ANSWER:**    Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 548.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 548 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 548 to the extent that they relate to other Defendants and/or third parties.  Defendants deny the remaining allegations of Paragraph 548.

> 549.    *Defendants conspired together to pressure Urner Barry to raise prices.*

**ANSWER:**  Defendants deny the allegations in the first sentence of Paragraph 549.  To the extent the allegations in Paragraph 549 characterize an unidentified document, Defendants

deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 549 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 549 to the extent that they relate to other Defendants and/or third parties. Defendants other than Mountaire, Wayne Farms, and Case lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 549 and therefore deny them. ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Wayne Farms lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 549 and therefore denies them. ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

550. ██████████████████████████████████
████████████████████████████████████████
██████████████████████

**ANSWER:** ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████ Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 550 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 550 to the extent that they relate to other Defendants and/or third parties. Defendants other than House of Raeford and Case lack

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 550 and therefore deny them.



House of Raeford and Case deny the remaining allegations in Paragraph 550.

551. 

**ANSWER:**  To the extent the allegations in Paragraph 551 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Harrison Poultry lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 551 and therefore deny them.

 Harrison Poultry denies the remaining allegations and characterizations in Paragraph 551.

552.

**ANSWER:**  To the extent the allegations in Paragraph 552 characterize an unidentified document or documents, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 552 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 552 to the extent that

they relate to other Defendants and/or third parties. Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 552 and therefore deny them.



**ANSWER:** To the extent the allegations in Paragraph 553 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 553 and therefore deny them. House of Raeford denies the allegations in Paragraph 553.

554.

**ANSWER:** To the extent the allegations in Paragraph 554 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Sanderson Farms, Fieldale, Koch, and House of Raeford, lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 554 and therefore deny them. House of Raeford, Sanderson Farms, Koch, and Fieldale deny any remaining allegations in Paragraph 554.

555.    *Mike O'Shaughnessy actively and openly discussed broiler production with Defendants, to which Defendants used Urner Barry to facilitate communications among themselves.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 555. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 555 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 555 to the extent that they relate to other Defendants and/or third parties. Defendants deny the remaining allegations Paragraph 555.

556.



**ANSWER:** To the extent the allegations in Paragraph 556 characterize an email exchange, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 556 and therefore deny them. House of Raeford denies any remaining allegations in Paragraph 556.

557.

**ANSWER:** To the extent the allegations in Paragraph 557 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 557 and therefore deny them. House of Raeford denies any remaining allegations in Paragraph 557.

558.

[REDACTED]

**ANSWER:** To the extent the allegations in Paragraph 558 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 558 and therefore deny them. House of Raeford denies the allegations in Paragraph 558.

559. [REDACTED]

**ANSWER:** To the extent the allegations in Paragraph 559 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 559 and therefore deny them. Tyson denies any remaining allegations in Paragraph 559.

560. [REDACTED]

**ANSWER:** To the extent the allegations in Paragraph 560 characterize a June 2011 email excange, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 560 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 560 to the extent that they relate to other Defendants and/or third parties. Defendants other than Tyson and Case lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 560 and therefore deny them. Tyson and Case deny any remaining allegations in Paragraph 560.

561.



**ANSWER:** To the extent the allegations in Paragraph 561 characterize an email exchange, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 561 and therefore deny them.

562.



**ANSWER:** To the extent the allegations in Paragraph 562 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 562 and therefore deny them. House of Raeford denies any remaining allegations in Paragraph 562.

563.



**ANSWER:** To the extent the allegations in Paragraph 563 characterize a February 2016 email, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 563 and therefore deny them. House of Raeford denies any remaining allegations in Paragraph 563.

564. ████████████████████████████████████

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 564 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 564 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 564.

565. *Defendants improperly kept Urner Barry prices from falling when they should have.* ████████████████████████████████

**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 565. To the extent the allegations in Paragraph 565 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than O.K. Foods and Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 565 and therefore deny them. O.K. Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 565 and therefore denies them. Tyson denies any remaining allegations in Paragraph 565.

566. *And when Urner Barry prices increased, Defendants linked the price increase to their actions.* ████████████████████████████████

**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 566. To the extent the allegations in Paragraph 566 characterize an August 2012 email, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

Paragraph 566 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 566 to the extent that they relate to other Defendants and/or third parties. Defendants other than House of Raeford lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 566 and therefore deny them. House of Raeford denies any remaining allegations in Paragraph 566.

> 567. *While Defendants were not as successful at eradicating price volatility in Urner Barry as they were the Georgia Dock – they did not have sole control over price inputs with Urner Barry – their collective actions increased prices across all indices.*

**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 567. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 567 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 567 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 567 and therefore deny them.

> 568. *Indisputably, Defendants actions were interrelated. Rising prices and price quotes inflated by coordinated pressure benefited each of the Defendants across each index, leading to higher broiler prices for Plaintiff.*

**ANSWER:** Defendants deny the allegations in Paragraph 568.

> 569. *And individual pressure was not always possible, as Urner Barry took into account numerous sales numbers and quotes collectively from multiple Defendants. In those instances, collective action was required.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 569 that relate to other Defendants and/or third parties, and

therefore each Defendant denies the allegations in Paragraph 569 to the extent that they relate to other Defendants and/or third parties.  Defendants deny the remaining allegations Paragraph 569.

570.



**ANSWER:**  To the extent the allegations in Paragraph 570 characterize unidentified documents or communications, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 570 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 570 to the extent that they relate to other Defendants and/or third parties.  Defendants other than House of Raeford, Mountaire, Case, Tyson, Sanderson Farms, Pilgrim's, Koch, Harrison Poultry, Simmons, Wayne Farms, and Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 570 and therefore deny them.  Defendants House of Raeford, Tyson, Koch, Case, Sanderson Farms, and Fieldale deny the remaining allegations of Paragraph 570.  Wayne Farms lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 570 and therefore denies them.

### G. Defendants Capitalized on Their Prior Actual Reduction of Broilers to Coordinate a False Supply Reduction

*571.    Defendants also were able to take advantage of their coordinated reduction in the supply of broilers in price negotiations with restaurants and other contract purchasers. This was especially the case with Small Birds.[9]*

*FN 9: Small Birds are generally defined as Broilers weighing 4.25 pounds or less. Upon information and belief, Sanderson Farms, Foster Farms, Harrison Poultry, and Peco Foods did not produce Small Birds during the alleged bid rigging conduct period, and House of Raeford Farms, Inc. has not produced Small Birds since mid-2012, the beginning of the bid-rigging conduct period.*

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 571 and Footnote 9 at this time.

*572.    For example, as part of their collective goal to increase the prices of broilers, Defendants coordinated inflated prices to restaurants and other contract purchasers in the time period beginning at least as early as 2012 and continuing through at least 2017.  One of the primary explanations Defendants presented for these inflated prices was what they said was a reduction in the supply of broilers. Defendants were able to point to the actual supply reduction that they orchestrated for broilers in the 2011-2012 timeframe. Yet, at the same time, the number of Small Birds killed increased significantly in the 2011-2013 period and remained elevated throughout the remainder of the relevant period.*

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 572 this time.

*573.    Defendants also used their coordinated false explanation of supply reduction for their elevated prices of broilers even for those restaurants that did not purchase Small Birds. Through these coordinated misrepresentations, Defendants were able to persuade restaurant chains and other purchasers to accept higher prices for broiler products.*

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 573 at this time.

## H. Rabobank's Role and Participation

> 574. *Rabobank is the leading lender and financial institution serving the poultry industry. The broiler producers which have turned to Rabobank for credit and/or transactional work have included Fieldale, House of Raeford, Koch, Mountaire, Peco, Perdue, Pilgrim's Pride, Tyson, and Wayne Farms.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 574 and therefore deny them. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 574 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 574 to the extent that they relate to other Defendants and/or third parties. Defendants other than House of Raeford, Mountaire, Fieldale, Tyson, Pilgrim's, Koch, Peco, Perdue, and Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 574 and therefore deny them. Tyson, Wayne Farms, Koch, Pilgrim's, Fieldale, Peco, Perdue, and House of Raeford admit that they each had independent business relationships with Rabobank at certain points in the Relevant Period but deny any remaining allegations in Paragraph 574. Mountaire admits that Rabobank was a participant in a loan to Mountaire that was originated by another lender, but denies the remaining allegations related to Mountaire contained in Paragraph 574. Harrison Poultry specifically denies that it engaged Rabobank for credit or transactional work during the Relevant Period. Defendants deny any remaining allegations in Paragraph 574.

> 575. *At the outset of this case, it appeared that Rabobank was an innocent bystander, uninvolved in defendants' alleged misconduct. However, during discovery— including of Rabobank as a third-party—it has become apparent that Rabobank facilitated and participated in anticompetitive activities.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury and any remaining allegations of Paragraph 575.

576. *Instead of serving as a disinterested market observer, lender, and advisor for transactions, Rabobank—to advance its own interests and bottom line—consistently sought industrywide action to alter the output and pricing of broilers.*



**ANSWER:** To the extent the allegations in Paragraph 576 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 576 and lack knowledge or information sufficient to form a belief as to the truth of the allegations related to Rabobank and therefore deny them. Defendants deny any remaining allegations in Paragraph 576.

577. *One facet of Rabobank's anticompetitive conduct involved coordination with defendant Agri Stats.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 577. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 577 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 577 to the extent that they relate to other Defendants and/or third parties. Producer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 577 and therefore deny them.

578.



**ANSWER:**  To the extent the allegations in Paragraph 578 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 578 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 578 to the extent that they relate to other Defendants and/or third parties.  Producer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 578 and therefore deny them.  To the extent that Paragraph 578 contains any factual allegations requiring a response from Agri Stats, Agri Stats denies such allegations.

579.

**ANSWER:**

Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 579 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 579 to the extent that they relate to other Defendants and/or third parties.  Producer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 579 and therefore deny them.  To the extent that Paragraph 579 contains any factual allegations requiring a response from Agri Stats, Agri Stats denies such allegations.

580.

312

█████████████████████████████████████████████████████████

**ANSWER:**  To the extent the allegations in Paragraph 580 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 580 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 580 to the extent that they relate to other Defendants and/or third parties.  Producer Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 580 and therefore deny them.  To the extent that Paragraph 580 contains any factual allegations requiring a response from Agri Stats, Agri Stats denies such allegations.

> 581.  *Rabobank's role in the anticompetitive conduct also included encouraging communication among broiler producer competitors, and serving as a conduit for communications between and among those competitors.*

███████████████████████████████████████████████████████████

**ANSWER:**  To the extent the allegations in Paragraph 581 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer the fourth sentence of Paragraph 581 at this time.  Defendants deny the allegations in the first sentence of Paragraph 581.  To the extent the allegations in the second, third, and fourth sentences of Paragraph 581 characterize an unidentified document, Defendants deny any characterization or description

that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 581 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 581 to the extent that they relate to other Defendants and/or third parties. Defendants other than Perdue and Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 581. ███████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████ Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 581 and therefore denies them.



582. *Rabobank also communicated directly with producers as part of an effort to coordinate industrywide action with respect to production and/or pricing.*

**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 582. █████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████ Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 582 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 582 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 582 and therefore deny them. ████████████████



**ANSWER:** To the extent the allegations in Paragraph 583 characterize an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 583 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 583 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 583 and therefore deny them. Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 583 and therefore denies them.



315

██████████████████████████ Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 584 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 584 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 584 and Footnote 10.

585.    *Rabobank also used its reports and publications, shared widely with producers, including defendants, to effectuate producer coordination.*



**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 585. To the extent the allegations in Paragraph 585 and Footnote 11 characterize an unidentified presentation and an unidentified report, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 585 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 585 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 585 and Footnote 11.

586.    *Rabobank used its position as the leading lender and financial institution serving the industry to secure coordinated action.*



**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 586. 

Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 586 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 586 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 586.

I. **The Conspiracy Also Included the Collusive and Fraudulent Manipulation of the Georgia Dock Price Index**

587. *Defendants buttressed their successful efforts to artificially boost chicken prices by collectively reducing supply by collusively and fraudulently manipulating the Georgia Dock benchmark price index, a chicken-industry pricing benchmark contained in contracts between Defendants and a significant proportion of their customers, including certain Plaintiffs. The Georgia Dock was such an important index that, even when Plaintiffs' contracts were not explicitly indexed to the Georgia Dock, the prices paid by Plaintiffs were materially affected by the Georgia Dock price. As such, the manipulation of the Georgia Dock did not only have an anticompetitive effect on the price for sales of broilers that were quoted based directly and expressly on the Georgia Dock; rather, it also contaminated and artificially raised prices for broilers that were not expressly tied to the Georgia Dock. This contamination occurred because Defendants often used the Georgia Dock as a crosscheck or a baseline for transactions even where the Georgia Dock was not the primary benchmark that suppliers used to provide quotes to customers. For example, Defendant Keystone Foods utilized Georgia Dock as a reference point across the board for pricing even when their agreements with, or quotes to, customers did not call for the price to be based on the Georgia Dock.*

**ANSWER:** Defendants deny the allegations in the first four sentences of Paragraph 587. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 587 and therefore deny them. Tyson admits that Keystone utilized the Georgia Dock in pricing certain products to certain customers but denies any further characterization thereof. The remaining allegations in Paragraph 587

317

contain legal conclusions to which no response is required. To the extent a response is required, Tyson denies the remaining allegations.

> 588. *During the relevant period, broiler chicken prices were reported primarily by three entities: Urner Barry (a commodity price reporting service), the Georgia Department of Agriculture through the Georgia Dock, and the USDA. Additionally, as discussed below, Agri Stats collects detailed pricing information through its subsidiary Express Markets, Inc. ("EMI").*

**ANSWER:** Defendants admit that Urner Barry, the Georgia Department of Agriculture, and the USDA have publicly reported information for certain poultry products during the Relevant Period. Defendants further admit that EMI collects and reports information for certain poultry products. Defendants deny any remaining allegations in Paragraph 588.

> 589. *Urner Barry collects and publishes daily price information for broilers. Urner Barry's chicken price information is subscription-based, so all producers and many purchasers subscribe for a fee. The USDA and Urner Barry's broiler price indices are based upon a system of double verification, which includes telephonic and written surveys of all or nearly all chicken producers, but also verification of reported prices from purchasers such as brokers and customers. The Georgia Dock price survey methodology, which contrasts materially with those of the USDA and Urner Barry, is discussed below.*

**ANSWER:** Defendants admit that Urner Barry collects and publishes data on various poultry products, that some data collections are daily, and that Urner Barry subscibers pay a fee for their Urner Barry subscription. Defendants further admit that Plaintiffs refer to the Georgia Dock further into their Complaint, but deny their characterization of the Georgia Dock "methodology." Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 589 and therefore deny them.

> 590. *The most detailed price report is not publicly available and is produced by Agri Stats and its subsidiary, Express Markets, Inc. According to a May 2010 FarmEcon study, EMI's pricing report[12] includes "pricing data on whole birds and chicken parts that is considerably more detailed than the USDA," Urner Barry, or Georgia Dock reports, as it is based on actual sales invoices from broiler companies.*

> *FN 12: Agri Stats subsidiary EMI was formed around 2000 to compete with the price reporting service of Urner Barry. Unlike Agri Stats reports for Defendants, EMI releases daily pricing data to both Defendants and potential purchasers of*

*Broilers, though the reporting service costs thousands of dollars and is not publicly available. EMI reports capture all transactions by Broiler producers, who automatically transmit invoice information electronically from each transaction to EMI. The reports include all sales volume information from the previous day, including the size of containers, type of cut, whether the product was chilled with ice or CO2, the price, and numerous other pieces of information.*

**ANSWER:** To the extent the allegations in Paragraph 590 characterize or describe an unidentified document and a FarmEcon study, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants admit that data from Agri Stats and EMI is subscription based. With respect to the allegations of Footnote 12, Defendants admit EMI data is subscription based, for which certain Producer Defendants pay, but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of the remaining sentences of Footnote 12 and therefore deny them. Harrison Poultry further denies that it received daily pricing data from EMI and further denies that it transmitted invoice information to EMI during the Relevant Period. Defendants deny any remaining allegations in Paragraph 590.

591. *Published prices for broilers from Urner Barry, Georgia Dock, and USDA relate to the market for broilers. Prices for chicken, whether sold under contract or on the spot market, generally move with spot market prices as reported by Georgia Dock or Urner Barry.*

**ANSWER:** Defendants admit that Urner Barry, Georgia Dock, and USDA published information related to certain broiler products, but deny the remaining allegations in Paragraph 591.

592. *Statements by chicken company executives and industry experts confirm that chicken sales, whether by contract or on the spot market, are tied to spot market pricing. For instance, Sanderson Farms CEO Joe Sanderson explained in a May 2008 speech that Sanderson Farms' contract sales to retail customers have prices tied to the Georgia Dock price survey and Sanderson Farms' contract sales to food distributors are "based on formulas tied to the Urner Barry." Similarly, expert economist Dr. Colin A. Carter from the University of California (Davis) testified that "internal Pilgrim's documents show that virtually all chicken products, even if they're not sold spot, are tied to the spot prices…. 83 percent of Pilgrim's chicken sales are reflecting the spot price within a given year. So there's only about 16 percent of their sales that are not tied to the spot market over a relatively short period of time." Further, because half of "fixed contracts" actually had terms tied to broiler spot market prices, Dr. Carter concluded that 92% of Pilgrim's broiler sales were tied to broiler spot market prices such as Georgia*

*Dock. Similarly, many of Plaintiffs' purchases of broilers from Defendants were tied to the Georgia Dock price even when those purchases were not spot transactions.*

**ANSWER:** Defendants deny the allegations of conspiracy in Paragraph 592. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 592 relating to unidentified "statements" by unidentified "Broiler company executives and industry experts" and therefore deny them. To the extent the allegations in Paragraph 592 characterize presentations or testimony, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 592 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 592 to the extent that they relate to other Defendants and/or third parties. Defendants deny the remaining allegations in the first four sentences of Paragraph 592, including Plaintiffs' characterization of the documents. As the term "many" in the last sentence of Paragraph 592 is imprecise, Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations and therefore deny them. Defendants deny any remaining allegations in Paragraph 592.

593.     *As a consequence of the inelasticity of supply and demand in the broiler industry (discussed below) and the availability of the spot market price indices (discussed above), public price increase announcements by Defendants were unnecessary. Defendants knew and intended that a decrease in supply pursuant to their agreement would increase broiler spot market prices, and therefore that all broiler prices would increase.*

**ANSWER:** Defendants deny the allegations in Paragraph 593.

594.     *The Georgia Dock, USDA Composite, and Urner Barry all measure the same (or very similar) size and grade of chicken.[13]*

*FN 13: Unlike the other indices, the Georgia Dock benchmark price did not include freight or transportation costs. At its inception, the Georgia Dock benchmark price was known as the "Georgia F.O.B. Dock" price; the Georgia Dock was "F.O.B."*

*the supplier's shipping dock, meaning that the buyer was responsible for paying the freight.*

**ANSWER:** Defendants deny the allegations in Paragraph 594. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Footnote 13 and therefore deny them.

> 595. *The Georgia Dock benchmark price index, like the other two indices, sets prices for both the "whole bird" and various parts of the chicken (wings, tenders, leg quarters, thighs, drumsticks, and breasts) using the same pricing methodology. The "whole bird" price is the baseline for pricing all parts of a chicken.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 595 and therefore deny them.

> 596. *Buyers reasonably relied on the Georgia Dock benchmark price index because they believed it accurately reflected the market price for the chicken they bought, especially since the Georgia Dock was an industry-accepted benchmark price index for wholesale chicken prices that was meant to reflect the market price of chicken. Many Plaintiffs purchased chicken from Defendants at prices that used the Georgia Dock as a component throughout the relevant period. In some instances, Defendants insisted upon using the Georgia Dock in their pricing with Plaintiffs and/or declined to use another form of pricing with Plaintiffs.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the allegations in the first sentence of Paragraph 596 and therefore deny them. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 596 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 596 to the extent that they relate to other Defendants and/or third parties. Defendants admit that some Defendants sold certain poultry products at various points in the Relevant Period on terms related to the Georgia Dock, but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the second sentence of Paragraph 596. Defendants deny the allegations of the third sentence of Paragraph 596.

597.    *Much like when the world's largest banks came together to manipulate numerous financial benchmarks (such as LIBOR), the Georgia Dock Defendants came together to manipulate the Georgia Dock benchmark price index.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 597 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 597 to the extent that they relate to other Defendants and/or third parties.  Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations in Paragraph 597.  Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 597 and therefore deny them.

598.    *Compared to the other two indices available to chicken buyers, there were significant differences in how the Georgia Dock benchmark price index was compiled that made it highly susceptible to manipulation by the Georgia Dock Defendants. The Georgia Dock Defendants are the nine producers that submitted price quotes that went into the Georgia Dock price index, namely (ranked by their market share in Georgia, which dictated how much weighting each producer's quote was given in compiling the Georgia Dock benchmark price): Pilgrim's Pride (approximately 35% of Georgia market share in 2016); Tyson (15%); Fieldale (15%); Mar-Jac (10%); Claxton (10%); Sanderson Farms (7%); Harrison (5%); and Koch and Wayne Farms (less than 2% each).*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 598 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 598 to the extent that they relate to other Defendants and/or third parties.   Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the Georgia Dock was "susceptible to manipulation" and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of Paragraph 598 and therefore deny them. Defendants Pilgrim's, Tyson, Mar-Jac, Claxton, Sanderson Farms, Harrison Poultry, Koch,

Fieldale, and Wayne Farms further admit that Plaintiffs refer to these Defendants as "Georgia Dock Defendants" and that they each independently responded to requests for information from the Georgia Department of Agriculture at certain points in the Relevant Period. Harrison Poultry further states that it ceased responding to the Georgia Department of Agriculture's requests for information in early January 2016. Defendants Pilgrim's, Tyson, Mar-Jac, Claxton, Sanderson Farms, Harrison Poultry, Koch, Fieldale, and Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 598 and therefore deny them. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 598 and therefore deny them.

> 599.     The significant difference between the Georgia Dock price index and other broiler price indices in recent years cannot be explained by only one or two outlier companies reporting artificially high broiler prices to the GDA. That is because of the GDA's "one cent rule," as discussed in more detail below. Under this rule, prices that deviate by more than one cent from the average price as initially calculated are excluded from the final Georgia Dock price. Instead, the deviation of the Georgia Dock price index from the prices in the other indices – indices that are themselves based on verified sales by Defendants – can be attributed only to all or nearly all participating broiler producers collectively submitting artificially high and identical or very nearly identical broiler prices to the GDA. In other words, all or most of the Defendants' submissions needed to be roughly within two cents of each other in order to inflate the Georgia Dock price and maintain an artificially inflated Georgia Dock price over time – a price which, for extended periods of time, was 20 or 30 cents higher than the comparable (and also inflated, due to the anticompetitive conspiracy alleged herein) Urner Barry price index. Notably, the Georgia Dock was also higher than the USDA and EMI indices.

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 599 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 599 to the extent that they relate to other Defendants and/or third parties. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations in the first

sentence of Paragraph 599. Harrison Poultry further states that it ceased responding to the Georgia Department of Agriculture's requests for information in early January 2016. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case deny they submitted any information to the Georgia Department of Agriculture during the Relevant Period. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 599 and therefore deny them.

> 600.     To compile the Georgia Dock price index, according to an internal GDA document provided to the New York Times through an open records request, "each participating [Broiler producer] company is called [by the GDA] on Wednesday every week to report the price offered to companies in which they have contracts in place with." A single price is given by each broiler producer company and it is accepted without any verification of actual invoices or any other form of auditing to verify accuracy. In response to a press inquiry, the GDA explained its failure to audit any self-reported data from Defendants by stating, "We don't see any reason they would submit information that wasn't truthful."

**ANSWER:** To the extent the allegations in Paragraph 600 characterize or describe an internal GDA memorandum, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants lack knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 600 and therefore deny them.

> 601.     Despite the GDA's public statements about confidence in the Georgia Dock price index, the GDA employee who collected prices each week from broiler companies, Arty Schronce, was deeply concerned. In a September 2016 internal GDA memorandum, disclosed publicly for the first time on November 17, 2016, in a Washington Post article, Schronce wrote that he "continue[d] to have concerns about" the Georgia Dock, had "voiced concerns in the past," and that he thought the Georgia Dock price index was "a flawed product that is a liability to the Georgia Department of Agriculture." Schronce also noted, "I was told that poultry companies know what they are doing and all I need to do is to gather and consolidate the info I am provided. However, I have come to question the validity of some of the information provided."

324

**ANSWER:**  To the extent the allegations in Paragraph 601 characterize or describe a September 2016 internal GDA memorandum or a November 17, 2016 Washington Post article, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 601 and therefore deny them.   Defendants deny any remaining allegations in Paragraph 601.

> 602.    *Schronce's memorandum confirms the significance of the one cent rule; it noted that after a January 2016 article about the Georgia Dock price index in the Wall Street Journal, one "company appears to basically not take part in the Whole Bird Dock Price process. They seem to deliberately submit a low bid that they know will be kicked out. However, they can claim that they are submitting something lower. In essence, they can take advantage of a high whole bird price while maintaining that they want it to be lower."*

**ANSWER:**  To the extent the allegations in Paragraph 602 characterize or describe a January 2016 Wall Street Journal article, Defendants deny any characterization or description that is inconsistent with the referenced source.   Defendants deny any remaining allegations in Paragraph 602.

> 603.    *Until late 2016, the Georgia Dock pricing methodology was not publicly available. Chicken buyers whose transactions with Defendants were tied to the Georgia Dock whole-bird price, reasonably but mistakenly believed it reflected the actual market price of chicken. Moreover, because (until August 2016) the USDA also published the Georgia Dock benchmark price alongside the USDA Composite, many chicken buyers, including Plaintiffs, erroneously believed the Georgia Dock price to be a USDA price.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 603 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 603 to the extent that they relate to other Defendants and/or third parties.   Defendants admit the USDA independently included in various publications information based on or including the Georgia Dock poultry reports at certain

325

points in Relevant Period.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 603 and therefore deny them.

> 604.    Plaintiffs were misinformed that the Georgia Dock benchmark was supposed to be based on the Georgia Dock Defendants' actual offering prices for the next week as reported to the GDA. This was false; the Georgia Dock Defendants did not report their true prices to the GDA. Instead, they agreed to, and in fact did, intentionally report false, artificially high (or artificially- stabilized) prices. The reality was that the Georgia Dock price was simply whatever the Georgia Dock Defendants said it was. Hypothetically, if one week the Georgia Dock price was $1.75, and the following week the Georgia Dock Defendants told the GDA that the offering price of their chicken was now $2, the Georgia Dock price would become $2, and the prices that Plaintiffs and others paid for chicken would increase commensurately.

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 604 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 604 to the extent that they relate to other Defendants and/or third parties.  Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 604 and deny all the remaining allegations in Paragraph 604.  Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 604 and therefore deny them.

> 605.    Once a week, Schronce, his predecessor Greg Pilewitz, and/or their assistants at the PMN would call or email with representatives of the Georgia Dock Defendants to collect price submissions, which were supposed to reflect those Defendants' actual offering prices. The PMN collected the Defendants' price submissions and weighted each of them by the Defendants' above- referenced relative market share (referred to by the PMN as that company's "voice").[14]

*FN 14: There was only one change to the weighting formula during the relevant time period.*

**ANSWER:**  To the extent the allegations in Paragraph 605 characterize or describe an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 605 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 605 to the extent that they relate to other Defendants and/or third parties.  Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale admit they were periodically contacted by various employees of the Georgia Department of Agriculture, including Mr. Schronce for some period of time, with requests for information either by telephone or by email.  Harrison Poultry further states that it ceased responding to the Georgia Department of Agriculture's requests for information in early January 2016.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 605 and Footnote 14 and therefore deny them.

606.    *In addition, many of the Defendants submitted price quotes to the PMN via email, and those emails confirm many of the specific false and inflated quotes to the PMN.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 606 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 606 to the extent that they relate to other Defendants and/or third parties.  Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale admit that, at times, they each independently submitted requested information to the Georgia Department of Agriculture, but each deny they submitted any "false" or "inflated" information and deny any remaining allegations in Paragraph 606. Harrison Poultry further states that it ceased responding to the Georgia Department

327

of Agriculture's requests for information in early January 2016. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case deny they submitted information to the Georgia Department of Agriculture during the Relevant Period, but lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 606 and therefore deny them.

> 607.     All parties knew that Defendants were supposed to submit to the PMN their actual offering prices for 2.5 to 3 pound whole chickens, but only a handful of the Georgia Dock Defendants actually processed 2.5 to 3 pound birds in Georgia, so, according to the PMN, the Georgia Dock Defendants were "supposed to adjust their whole bird quote as if they are producing that sized bird." The Georgia Dock Defendants knew that, if they did not sell 2.5 to 3 pound whole birds, they had to reliably convert their offering price each week for the whole birds they sold into a 2.5 to 3 pound bird. Once the final Georgia Dock whole bird price was calculated, the PMN used a formula to calculate prices for different chicken cuts and parts based on the whole bird price the Georgia Dock Defendants provided to the PMN each Wednesday.

**ANSWER:** To the extent the allegations in Paragraph 607 characterize or describe an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 607 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 607 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations about "all parties" in the first sentence of Paragraph 607 and all allegations in the last sentence of Paragraph 607 and therefore deny them. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 607 and therefore deny them. Defendants Pilgrim's, Tyson, Koch, Claxton, Mar-Jac, Wayne Farms, and Fieldale admit that among the information requested by the Georgia Department of Agriculture was information

related to 2.5 to 3 pound whole broilers. Pilgrim's admits that more than one of its facilities in the state of Georgia produced products from 2.5 to 3 pound whole birds. Harrison Poultry and Sanderson Farms deny the first and second sentences of Paragraph 607. Harrison Poultry states that it did not produce 2.5-to-3-pound whole birds during the Relevant Period and that the representatives of the Poultry Market News were aware of that fact. Sanderson Farms states that it did not produce a 2.5 to 3 pound bird during the Relevant Period, and that it told that to the Poultry Market News. Mar-Jac admits that Mar-Jac Poultry, Inc., produced 2.5 to 3.0 pound whole birds and denies any remaining allegations in Paragraph 607 related to Mar-Jac. Wayne Farms admits that it provided data to the GDA's Poultry Market News. Wayne Farms lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 607 and therefore denies them. Tyson states that in submitting information to the Georgia Department of Agriculture, Tyson submitted a price at which Tyson projected it could buy and sell product. To the extent the allegations in Paragraph 607 characterize or describe documents or other sources, Tyson notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 607 and on this basis denies those allegations. Claxton admits Claxton admits that it sold a 2.5 to 3 pound whole bird and provided certain information at the request of the Georgia Department of Agriculture, but denies any remaining allegations directed at Claxton. Koch lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 607 and therefore denies them. Defendants deny any remaining allegations in Paragraph 607.

> 608.   In compiling the Georgia Dock benchmark price, there was no team of economists or statisticians surveying buyers and sellers in the national chicken market. Unlike the USDA Composite or Urner Barry poultry indices, which use data from numerous producers and buyers on both sides of the market, the Georgia Dock reflected

*prices sourced solely from a handful of producers. In essence, from the inception of the Georgia Dock in the 1960s until late 2016, the PMN relied on the "honor system" as to the truthfulness and accuracy of the offering prices submitted by the Georgia Dock Defendants.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 608 and therefore deny them.

*609. In addition, submission of prices to the PMN was entirely voluntary. There were no regulations, rules, or legislation requiring poultry producers operating in the state of Georgia to submit their prices to the PMN.*

**ANSWER:** Defendants Pilgrim's, Tyson, Fieldale, Mar-Jac, Claxton, Sanderson Farms, Harrison Poultry, Koch, and Wayne Farms admit they were not legally required to respond to requests for information from the Georgia Department of Agriculture. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 609 and therefore deny them. Defendants deny any remaining allegations in Paragraph 609.

*610. Schronce, who began compiling the Georgia Dock Defendants' price quotes in 2012 following the death of his predecessor Greg Pilewitz, first made a preliminary calculation of the weighted average using the single price submission from each company. Then "[a]ny company that provides a whole bird quote that is more than one cent above or below the initial dock price calculation will not be included in the calculation for the whole bird dock price that week. Its voice is taken out of the formula and the dock price is recalculated without it." This so-called "one-cent rule" is, according to internal GDA documents, meant "to shield [] one company having the ability to greatly influence the price up or down."*

**ANSWER:** To the extent the allegations in Paragraph 610 characterize or describe an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 610 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 610 to the extent that

they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 610 and therefore deny them.

> *611.     Because of the GDA's one-cent rule, it was not possible for only one or two broiler companies to report a broiler price that was significantly higher than the actual market price to the GDA without being disregarded as outliers by the GDA. Accordingly, certain Georgia Dock Defendants began reporting prices to the GDA that fell within a very narrow range but were also significantly above the actual market rate. As a result, Georgia Dock prices continued to rise and later stabilized during 2015-2016 at historic highs. It was not until a series of articles was published between November 3, 2016 and November 17, 2016 that information was publicly available to show Defendants may have fixed the Georgia Dock price.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 611 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 611 to the extent that they relate to other Defendants and/or third parties. Defendants Pilgrim's, Tyson, Sanderson Farms, Harrison Poultry, Koch, Claxton, Mar-Jac, Wayne Farms, and Fieldale lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 611 and therefore deny them and deny all remaining allegations in Paragraph 611. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 611 and therefore deny them.

> *612.     Nothing was done to verify or substantiate these numbers. There was no "double- verification;" unlike with the other price indices, customers were never contacted to check to see if the producers' prices were legitimate. The entire process was based on unverified "price quotes" from the same set of chicken producers (the Georgia Dock Defendants) submitted each week to one or two GDA employees, a methodology that was susceptible to manipulation.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 612 that relate to other Defendants and/or third parties,

and therefore each Defendant denies the allegations in Paragraph 612 to the extent that they relate to other Defendants and/or third parties.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 612 and therefore deny them.  Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 612 and therefore deny them.  Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale admit they responded to requests for information from the Georgia Department of Agriculture at certain times during the Relevant Period, but deny that the Georgia Dock was "susceptible to manipulation," and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 612 and therefore deny them. Harrison Poultry further states that it ceased responding to the Georgia Department of Agriculture's requests for information in early January 2016.

**J.     The PMN, the Georgia Dock, and the PMN Advisory Committee Were Created and Sustained for the Benefit of Georgia Dock Defendants and the Broiler Industry**

613.    *The Georgia Dock has been an industry tool ever since it was first created as part of the Poultry Market News Bulletin in 1965. At that time, the GDA created the first Georgia Dock based on a recommendation from the Georgia Poultry Federation (the "GPF") that the GDA begin reporting a "live quotation" (i.e., the price of a live bird). The GPF was – and continues to be – a trade association comprised of Georgia poultry producers.*

**ANSWER:** Defendants admits the Georgia Poultry Federation is an industry association, but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 613 and therefore deny them.

614.    *In 1972, the poultry producers, through trade organizations such as the GPF and the Georgia Poultry Processors Association, began to lobby the GDA to discontinue the PMN "live quotation." Instead, the joint industry group recommended that the PMN quote an F.O.B. dock equivalent price. In their recommendations, the joint industry group even set out guidelines for what the PMN should be reporting. As the*

*Georgia Commissioner of Agriculture at that time, Tommy Irvin, stated in a February 11, 1972 letter, the joint industry group had recommended an F.O.B. dock price equivalent that represented "full truck load lots of Ice Pack, USDA Grade A, sized 2.5 to 3 pound broilers and fryers."*

**ANSWER:**   To the extent the allegations in Paragraph 614 characterize or describe an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 614 and therefore deny them.

615.    *The GDA accepted this recommendation and, on February 22, 1972, transitioned the PMN to reporting the F.O.B. dock price equivalent that is known today as the Georgia Dock. Other than a switch to emailed (rather than telephonic) price submissions for some poultry producers, there have been no further changes to the PMN's methodology for calculating the Georgia Dock since 1972.*

**ANSWER:**   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 615 and therefore deny them.

616.    *Since the transition in 1972, the stated purpose of the Georgia Dock has always been to report an F.O.B. dock price equivalent. According to an email sent by Arty Schronce on August 2, 2016, "[o]n February 23, 1972, (Wednesday) the opening line of the report was: The Georgia F.O.B. dock price for next week's trading on full truck load lots of ice pack USDA Grade 'A' sized 2.5 to 3 pound broilers and fryers are being sold on the bases (basis) of 27 cents; 32% of the loads offered have been confirmed on the bases (basis) of 27 cents." Indeed, as recently as April 2016, the GDA website page for the Georgia Dock stated that "we report the established prices of dressed f.o.b. dock broilers and fryers."*

**ANSWER:**   To the extent the allegations in Paragraph 616 characterize or describe an August 2, 2016 email and the GDA website page for the Georgia Dock, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 616 and therefore deny them.

617.    *Following the 1972 transition, and in order to facilitate their control over the Georgia Dock price index, the poultry industry had another recommendation for the GDA: the creation of a non-public, non-governmental PMN Advisory Committee. As stated in the minutes from a Georgia Poultry Processors Association meeting from 1972, "[i]t*

*was requested that the Federation recommend to the Department of Agriculture that an appointment of an Advisory Committee be made by the Commissioner to work in close relationship with the Market News Service and with the guidelines which were set forth in establishing the F.O.B. reporting system." Again, the GDA accepted this recommendation and formed an Advisory Committee comprised of representatives from the poultry producers who submitted prices to the Poultry Market News.*

**ANSWER:** To the extent the allegations in Paragraph 617 characterize or describe minutes from a Georgia Poultry Processors Association meeting, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale admit that, at times during the Relevant Period, at the request of the Georgia Department of Agriculture, they would have an employee representative on the Poultry Market News Advisory Committee, but deny any characterization of the Committee. Harrison Poultry further states that it withdrew from any participation in the Poultry Market News Advisory Committee in early January 2016. Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 617 and therefore deny them. Defendants Sanderson Farms, Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 617 and therefore deny them.

*618. Defendants – through their roles in creating and contributing to the Georgia Dock and serving on the Advisory Committee – had intimate knowledge of the procedures by which the PMN collected, calculated, and reported on the established prices for dressed F.O.B. dock broilers and fryers that the Georgia Dock should have been reporting. Defendants stayed apprised of this knowledge through meetings between the poultry producers and the PMN, during which they would discuss and review the reporting policies and procedures for the Georgia Dock. Defendants' knowledge even extended to the*

*calculation forms used internally at the PMN, which were circulated to members of the PMN Advisory Committee following one of their meetings on January 25, 2007.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 618 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 618 to the extent that they relate to other Defendants and/or third parties. Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale admit that, at certain times during the Relevant Period, at the request of the Georgia Department of Agriculture, they would have an employee representative on the Poultry Market News Advisory Committee and that the Committee rarely met during the Relevant Period, but deny any characterization of the Committee and its meetings and any remaining allegations in Paragraph 618. Harrison Poultry further states that it withdrew from any participation in the Poultry Market News Advisory Committee in early January 2016. Defendants Sanderson Farms, Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case deny the remaining allegations in Paragraph 618.

    619.  *As is relevant to Defendants' fraudulent scheme as discussed further below,*



**ANSWER:** Defendants deny the existence of and participation in any "fraudulent scheme." Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 619 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 619 to the extent that they relate to

other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case deny the remaining allegations in Paragraph 619. 

Defendants deny any remaining allegations in

Paragraph 619.

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████

**ANSWER:**  To the extent the allegations in Paragraph 620 characterize or describe an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 620 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 620 to the extent that they relate to other Defendants and/or third parties. ████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████



Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case deny the first sentence of Paragraph 620 and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 620 and therefore deny them. Defendants deny any remaining allegations in Paragraph 620.

621. 

**ANSWER:** To the extent Paragraph 621 incorporates or re-alleges allegations above or below, Defendants incorporate and re-state any responses made to those allegations.

Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 621 and therefore deny them.

> 622. *Not only did Defendants have intimate knowledge of what prices should be submitted to the PMN for inclusion in the Georgia Dock, but they also maintained firm control over the Georgia Dock through the Advisory Committee. From its inception, the Advisory Committee was composed of senior executives from the Georgia Dock Defendants, and its mission was to advise the GDA on issues relating to the PMN division's collection of prices from Defendants and setting of the Georgia Dock price.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 622 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 622 to the extent that

they relate to other Defendants and/or third parties. Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale admit that, at times during the Relevant Period, at the request of the Georgia Department of Agriculture, they would have an employee representative on the Poultry Market News Advisory Committee, but deny Plaintiffs' characterization of that Committee and any remaining allegations in Paragraph 622. Harrison Poultry further states that it withdrew from any participation in the Poultry Market News Advisory Committee in early January 2016. Sanderson Farms denies that it was a member of any Poultry Market News "Advisory Committee." Sanderson Farms therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations related to the "Advisory Committee" in Paragraph 622 and therefore denies those and any other allegations in Paragraph 622. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case deny the first sentence of Paragraph 622 and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 622 and therefore deny them.



**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 623 and therefore deny them.

624.    From at least September 2012 through 2016, the Advisory Committee included Gus Arrendale (CEO, Fieldale Farms), Mike Welch (CEO and President, Harrison), Jerry Lane (Former CEO, Claxton Poultry), Jayson Penn (EVP Sales and Operations, Pilgrim's), Pete Martin (VP of Operations, Mar-Jac), Vernon Owenby

*(Manager of Tyson's facility in Cumming, Georgia), Steve Clever (VP of Fresh Sales, Wayne Farms), and Dale Tolbert (VP of Sales, Koch Foods).*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 624 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 624 to the extent that they relate to other Defendants and/or third parties. Pilgrim's admits that Jayson Penn (who was at one time the Executive Vice President of Sales and Operations at Pilgrim's) served as an employee representative on the Poultry Market News Advisory Committee. Fieldale admits that Gus Arrendale served on the Georgia Dock Advisory Committee. Harrison Poultry admits that during some portions of the Relevant Period through early January 2016, at the request of the Georgia Commissioner of Agriculture, Harrison Poultry's former CEO Mike Welch was a member of the Poultry Market News Advisory Committee. Mar-Jac admits that Pete Martin, Mar-Jac Poultry, Inc.'s former Vice President of Operations, was a member of the Poultry Market News Advisory Committee. Wayne Farms admits that at the request of the GDA, it had an employee representative on the Georgia Dock Advisory committee, including most recently Steve Clever, but denies Plaintiffs' characterization of the committee. Tyson admits that the manager of its Cumming, Georgia complex, Vernon Owenby, who has no pricing authority, was a representative on the Georgia Dock Advisory Committee, but denies that Mr. Owenby's role on that committee has enabled him to control the Georgia Dock price. Claxton admits that at the request of the Georgia Department of Agriculture, Jerry Lane served as its representative on the Georgia Dock Advisory Committee, but denies any remaining allegations directed at Claxton. Koch admits that Dale Tolbert, currently a Vice President of Fresh Supply Chain, was on the Advisory Committee from at least September 2012 through mid-2016. Defendants Sanderson Farms, Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms,

340

Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 624 and therefore deny them. Defendants Pilgrim's, Tyson, Koch, Claxton, Mar-Jac, Wayne Farms, Harrison Poultry, and Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 624 and therefore deny them. Defendants deny any remaining allegations in Paragraph 624.

> 625. *The Advisory Committee therefore consisted entirely of representatives of one side of the transaction: the poultry producers. Despite the fact that the Georgia Dock affected both buyers and sellers of chicken alike, there were no representatives of buyers on the Advisory Committee. There were also no neutral economists or members of academia. The producers, and the producers alone, controlled the PMN, often working hand-in-hand with their current or former lobbyists within the GDA and from the Georgia Poultry Federation, as discussed in more detail below.*

**ANSWER:** Defendants Agri Stats, Sanderson Farms, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 625 and therefore deny them. Defendants Agri Stats, Sanderson Farms, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 625 and therefore deny them. Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the remaining allegations in Paragraph 625.

> 626. *The Advisory Committee controlled the process for calculating and, as set forth in this Complaint, reevaluating the Georgia Dock price. When he was installed as director of the PMN, Arty Schronce was told that he could not make any changes to the Georgia Dock without first clearing them with the Advisory Committee.*

**ANSWER:** Defendants Agri Stats, Sanderson Farms, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 626 and therefore deny them. Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the first sentence of Paragraph 626. Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 626 and therefore deny them.



627.

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 627 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 627 to the extent that they relate to other Defendants and/or third parties. Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations in the first sentence of Paragraph 627 and lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 627 and therefore deny them.

Defendants Agri Stats, Sanderson Farms, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case

lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 627 and therefore deny them.

> 628. *The existence of the Advisory Committee also helped to ensure that the Georgia Dock Defendants were intimately aware of the process by which the Georgia Dock price was calculated, enabling them to manipulate it. The Advisory Committee met periodically and discussed how the Georgia Dock price was calculated. In addition, because of their familiarity with the underlying guidelines and internal PMN calculations, the Georgia Dock Defendants knew the prices they submitted to the PMN were not subject to verification, and that those submissions would be used to calculate the next Georgia Dock price unless they deviated from the initially- calculated weighted average by one cent or more. (Although it appears there was no representative of Sanderson Farms on the Advisory Committee throughout the entire relevant time period, Sanderson Farms was aware of this fact through communications with other Defendants.)*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 628 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 628 to the extent that they relate to other Defendants and/or third parties. Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations in the first sentence of Paragraph 628. Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale further admit that, at times during the Relevant Period, the Poultry Market News Advisory Committee would meet, but deny any characterization of these meetings. Harrison Poultry further states that it withdrew from any participation in the Poultry Market News Advisory Committee in early January 2016. Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 628. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 628 and therefore deny them. Sanderson Farms admits that a Poultry Market News "Advisory Committee" existed, and admits that it was

not a member of that committee; to the extent the other allegations in Paragraph 628 refer to Sanderson Farms, Sanderson Farms denies those and any remaining allegations in Paragraph 628.



**ANSWER:** To the extent the allegations in Paragraph 629 characterize or describe unidentified documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 629 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 629 to the extent that they relate to other Defendants and/or third parties. ███████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████ Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 629 and therefore deny them. ████████████████████████

██████████████████████████████████████

██████████████████████████████████████



Fieldale lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 629. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 629 and therefore deny them. Defendants deny any remaining allegations in Paragraph 629.

> 630. *The existence and conduct of the Advisory Committee was not known to chicken buyers, including until November 2016 when it was first made public following a press report about a September 2016 memorandum written by Schronce that was highly critical of the Georgia Dock methodology. He wrote in the memorandum that he had "questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent."*

**ANSWER:**  To the extent the allegations in Paragraph 630 characterize or describe a September 2016 memorandum, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants lack knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 630 and therefore deny them.

**K.  The Georgia Poultry Federation's Role in Creating and Sustaining the Georgia Dock for the Benefit of Defendants and the Broiler Industry**

> 631.



**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 631 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 631 to the extent that they relate to other Defendants and/or third parties. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations in the first and last sentence of Paragraph 631.

Koch lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 631 and therefore denies them. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case deny the first sentence of Paragraph 631 and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 631 and therefore deny them.

632.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 632 and therefore deny them.

633. *The GPF also regularly acted as a go-between for the GDA and the Advisory Committee; it would explain to Advisory Committee members the purpose of certain meetings and remind Advisory Committee members of their companies' obligations with respect to the Georgia Dock.*



**ANSWER:** To the extent the allegations in Paragraph 633 characterize or describe unidentified documents, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 633 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 633 to the extent that they relate to other Defendants and/or third parties. Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations in the first sentence of Paragraph 633, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

Sanderson Farms is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 633 and therefore denies them. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Sanderson Farms, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 633 and therefore deny them.

634. *The GPF was another means through which the Georgia Dock Defendants knew that the Georgia Dock was supposed to represent the actual price at which*

*Defendants would sell F.O.B. 2.5 to 3 pound whole birds in the upcoming week.* ████████

**ANSWER:** To the extent the allegations in Paragraph 634 characterize or describe an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 634 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 634 to the extent that they relate to other Defendants and/or third parties. Defendants Pilgrim's, Tyson, Koch, Claxton, Mar-Jac, Wayne Farms, and Fieldale lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 634 and therefore deny them. Harrison Poultry denies the first sentence of Paragraph 634 and states that it did not produce 2.5 to 3 pound whole birds during the Relevant Period and that the representatives of the Poultry Market News were aware of that fact. Sanderson Farms denies the allegations in the first sentence of Paragraph 634 and states that it did not produce 2.5 to 3 pound whole birds during the Relevant Period, and that it told that to the Poultry Market News. ████████

████████████████████████

████████████ Sanderson Farms is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 634 and therefore denies those allegations. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 634 and therefore deny them.

L.    **The Georgia Dock Became Ripe for Manipulation**

635.    *A number of factors at the beginning of the relevant time period made the Dock more vulnerable to manipulation and ultimately resulted in a marked upward departure of the Georgia Dock from all other poultry pricing indices.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 635 and therefore deny them.

636.    *In or around 2008 and 2009, with the GDA experiencing drastic budget cuts, Georgia Commissioner of Agriculture Tommy Irvin conducted an inquiry into the PMN Division to determine if staffing cuts or other efficiencies were warranted. At the time, the PMN was staffed by four full-time employees: division director Greg Pilewitz, Toni Leslie, Nell Moncus, and Donald Carnes. Over the next three years, the staff of the PMN Department was cut from four full-time employees down to two.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 636 and therefore deny them.



637.

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as

to the truth of any allegations in Paragraph 637 that relate to other Defendants and/or third parties,

and therefore each Defendant denies the allegations in Paragraph 637 to the extent that they relate

to other Defendants and/or third parties.  Defendants Agri Stats, George's, Peco, Amick Farms,

Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case

lack knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 637 and therefore deny them.  Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison

Poultry, Wayne Farms, and Fieldale lack knowledge or information sufficient to form a belief as

to the truth of the allegations in the first, second, fourth, and last sentences of Paragraph 637 and

therefore deny them ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ Mar-Jac lacks knowledge or information sufficient to form

a belief as to the truth of the allegations in the second, fourth, and last sentences of Paragraph 637

and therefore denies them ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ Sanderson Farms lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 637 and therefore

deny them.  Koch denies the allegations in the third sentence of Paragraph 637 to the extent they

relate to Koch.  Defendants Wayne Farms, Tyson, Pilgrim's, and Koch each lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in the third

sentence of Paragraph 637 and therefore deny them ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ Defendants deny any remaining allegations in Paragraph 637.

> 638.    Due to budgetary constraints, Commissioner Black further reduced the staff
> of the PMN Department in 2011 and 2012. When Mr. Pilewitz died unexpectedly in early

*2012, Ms. Leslie was left to run the PMN Department alone until a replacement could be found. In October of 2012, Arty Schronce was installed as director, but he only worked for the PMN part time. Schronce also performed other projects at GDA, including authoring a gardening column and working for the press office. Shortly after Mr. Schronce assumed the position, Ms. Leslie was replaced by Demetria Mabry. Mr. Schronce and Ms. Mabry were instructed to continue collecting the poultry producers' price submissions and calculating the Georgia Dock as it had always been calculated, but neither had the foundational knowledge to recognize the ways in which poultry producers began divorcing their price submissions from reality.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 638 and therefore deny them.

*639.     These factors, combined with the Georgia Dock Defendants' knowledge of the Georgia Dock pricing process, enabled them to collectively devise and then execute a simple yet elegant scheme to artificially inflate the Dock price and sustain that inflated Dock price for approximately six years. As discussed in further detail below,*



**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as

to the truth of any allegations in Paragraph 639 that relate to other Defendants and/or third parties,

and therefore each Defendant denies the allegations in Paragraph 639 to the extent that they relate

to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms,

Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case

lack knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 639 and therefore deny them. Defendants deny the remaining allegations in Paragraph

639.

*640.*



**ANSWER:**

Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 640 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 640 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 640 and therefore deny them. Defendants deny the remaining allegations in Paragraph 640.

*641.*



**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 641 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 641 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case deny they submitted any information to the Georgia Department of Agriculture during the Relevant

Period and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 641 and therefore deny them. Defendants deny the remaining allegations in Paragraph 641.



**ANSWER:**

Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 642 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 642 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 642.



**ANSWER:**  To the extent the allegations in Paragraph 643 characterize or describe an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 643 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 643 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any remaining allegations in Paragraph 643.

> 644.  *But the possibility that any change could be made to the Georgia Dock was illusory. Despite Defendant's knowledge that they were submitting information to the Poultry Market News that was contrary to the guidelines Defendants themselves had created, the system had never changed.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 644 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 644 to the extent that they relate to other Defendants and/or third parties.  Defendants deny the remaining allegations in Paragraph 644.

**M.     Regulatory Investigation and Demise of the Georgia Dock**

> 645.  *The PMN's Director, Arty Schronce, had concerns that the Georgia Dock was unreliable, had been captured by the chicken producers, and was being manipulated by the chicken producers. His concerns grew over time. By September 2016, he articulated concerns in a memorandum, in which he noted that some companies have a "larger, even outsized role in determining the Georgia Whole Bird Dock Price," and that "[i]n essence, they can take advantage of a high whole bird price."*

**ANSWER:**  To the extent the allegations in Paragraph 645 characterize or describe a September 2016 memorandum, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in Paragraph 645 that relate to other

Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph

645 to the extent that they relate to other Defendants and/or third parties. Defendants deny any

remaining allegations in Paragraph 645.

> *646. Following the January 2016 Wall Street Journal article, federal governmental officials began to investigate. On July 19 and 20, 2016, high-level USDA officials met with GDA representatives in Atlanta, Georgia to discuss the Georgia Dock price. The USDA officials shared their conclusion that GDA could no longer simply accept broiler prices from Defendants without verification and instead would have to verify invoice-level data to confirm reported prices. On July 20 and 21, 2016, USDA officials requested that the GDA provide the USDA with data from broiler producers to "test and review" the Georgia Dock price for accuracy.*

**ANSWER:** To the extent the allegations in Paragraph 646 characterize or describe a

January 2016 Wall Street Journal article and other unidentified documents, Defendants deny any

characterization or description that is inconsistent with the referenced sources. Each Defendant

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

Paragraph 646 that relate to other Defendants and/or third parties, and therefore each Defendant

denies the allegations in Paragraph 646 to the extent that they relate to other Defendants and/or

third parties. Defendants deny any remaining allegations in Paragraph 646.

> *647. On July 22, 2016 USDA's weekly BMNR publication noted that beginning on August 5, 2016, GDA "will be issuing a new weekly market report for negotiated Georgia broiler/fryer whole birds and bird parts, which will replace the current [Georgia Dock price]." The GDA did not comply with USDA's August 5 deadline, however, and in the August 5 USDA BMNR, all price information from the GDA and Georgia Dock was removed and only a hyperlink to the GDA's website was included.*

**ANSWER:** To the extent the allegations in Paragraph 647 characterize or describe a July

22, 2016 publication, Defendants deny any characterization or description that is inconsistent with

the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief

as to the truth of any allegations in Paragraph 647 that relate to other Defendants and/or third

parties, and therefore each Defendant denies the allegations in Paragraph 647 to the extent that

they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 647.

> 648. At that time, high level officials within the GDA began to raise antitrust concerns regarding the Georgia Dock. For instance, a July 27, 2016, report from GDA Director of Regulatory Compliance & Budget Alec Asbridge to GDA Commissioner Gary Black concluded that "[t]he top 10 poultry producing companies now control over 80% of the industry output. The combination of vertical integration, limited competition and lowered production periods has led to steady prices that have shown to be fairly resistant to changing market conditions. These factors alone illicit [sic] anti-trust review."

**ANSWER:** To the extent the allegations in Paragraph 648 characterize or describe a July 27, 2016 report, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 648 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 648 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 648.

> 649. GDA Director Asbridge's July 27, 2016, report also noted that over time, the GDA became a vehicle for Defendants to "report[] a weighted average price per pound on broilers [Georgia Dock price] based off of contracts that have been determined at the private level and reported without regulatory oversight. The formulas to calculate weighted average prices have been determined on the private level and have not been standardized since the inception of the [GDA Poultry Market News division] in 1968, which there is no written record of." In other words, it was Defendants themselves who wrote the rules and formulas that make up the Georgia Dock price, not the GDA.

**ANSWER:** To the extent the allegations in Paragraph 649 characterize or describe a July 27, 2016 report, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 649 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 649 to the extent that they relate

to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 649.

> 650. Director Asbridge's July 27, 2016, report also concluded that "[t]he extent of the use of the [Georgia Dock price] in contract negotiations is presently unknown but inquiries made by media and other governmental entities indicate that it is utilized on a more regular basis than previously expected." In short, the GDA had been publishing the Georgia Dock price for decades, but until this time apparently did not know the scope of reliance on the Georgia Dock price. Significantly, a revised and highly sanitized version of the July 27, 2016 report from Director Asbridge to GDA Commissioner Black was circulated internally at GDA on August 5, 2016. The sanitized August 5 report removed references to the existence of factors in the broiler industry eliciting "antitrust review" and to the fact that the Georgia Dock price was reported for decades by GDA "without regulatory oversight."

**ANSWER:** To the extent the allegations in Paragraph 650 characterize or describe a July 27, 2016 report, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 650 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 650 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 650.

> 651. On August 12, 2016, GDA Director Asbridge provided Georgia Poultry Federation President Mike Giles with the sanitized version of the report and asked Giles to review it before the GDA sent it to the USDA, "to ensure what I presented is accurate and best represents industry's concern with only reporting a spot price." The Georgia Poultry Federation represents the poultry industry in Georgia, and most Defendants are members. Remarkably, the GDA also noted in a separate email the same day to Giles and the Georgia Poultry Federation that "[t]he GDA is in agreement with the poultry industry that there is no desire to review invoices for verification of data reported," even though the information and means to do so are readily at hand. Defendants already report such invoice information to Agri Stats on a daily basis. According to a subsequent email dated August 24, 2016, Georgia Poultry Federation President Giles called GDA Director Asbridge back and gave "his and industry's sign off on the dock price summary report. We can move forward with sending to USDA." GDA Director Asbridge also proposed another meeting

*between GDA and the Georgia Poultry Federation to discuss recommendations about verifying Georgia Dock data.*

**ANSWER:**  To the extent the allegations in Paragraph 651 characterize or describe an August 12, 2016 report, an unidentified email, and an August 24, 2016 email, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 651 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 651 to the extent that they relate to other Defendants and/or third parties.  Defendants admit that the Georgia Poultry Federation is an industry organization and that some Defendants were members of the Georgia Poultry Federation at certain points in the Relevant Period, but deny any remaining allegations of Paragraph 651.

> 652.   *Under pressure from the USDA, and realizing that the Georgia Dock pricing methodology raised significant antitrust concerns, the GDA considered revising the methodology in late 2016. After the Georgia Dock Defendants balked at the GDA's new methodology – which would have required them to verify and attest to the accuracy of their price quotes – the GDA halted the Georgia Dock benchmark price index altogether. It was no longer receiving sufficient price quotes to compile the index. The last Georgia Dock benchmark price was published by the GDA on November 23, 2016. Yet for several months after the last Georgia Dock price was published by the GDA, certain Defendants, including at least Pilgrim's, continued to use the November 23, 2016 benchmark price of $1.0975/lb. to set their wholesale prices to chicken buyers.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 652 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 652 to the extent that they relate to other Defendants and/or third parties.  To the extent the allegations in Paragraph 652 characterize or describe contracts or other documents, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 652 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale admit the Georgia Department of Agriculture explored a substitute pricing index to replace the "Georgia Dock" in 2016 and that the Georgia Department of Agriculture ceased publishing the Poultry Market News in November 2016. Harrison Poultry admits that, based on its own business judgment, it stopped submitting price and volume information to the Georgia Department of Agriculture in early January 2016 and withdrew from any further participation in the Georgia Dock, including the Georgia Department of Agriculture's attempt to create a substitute pricing index. Harrison Poultry specifically denies that the prices of its Broiler sales during the Relevant Period were based on the Georgia Dock. Sanderson Farms admits that the Georgia Department of Agriculture considered adopting a so-called Georgia Premium Poultry Price Index and that Sanderson Farms declined to participate in that index based on its own business judgment of what is in its independent interest. Sanderson Farms admits that certain customers paid prices informed by the Georgia Dock Index for a certain period of time. Fieldale admits that the Georgia Department of Agriculture attempted to revise the methodology for the Georgia Dock and even created a replacement price index, the "Georgia Premium Poultry Price Index" and that Fieldale was involved in discussions to create the GPPPI. Fieldale denies that it "balked" at a new methodology or at any requirements to verify and attest to the accuracy of its submitted information. Fieldale lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 652 and therefore denies them. Pilgrim's admits that the Georgia Department of Agriculture explored the creation of the Georgia Premium Poultry Price Index and that it independently decided not to participate in that index. Pilgrim's and Koch each further admit that each agreed with certain of their customers to continue to use the November 23,

2016 Georgia Dock quotation for a period of time while mutually agreeable substitute pricing terms could be discussed. Mar-Jac admits that the Georgia Department of Agriculture considered adopting a so-called Georgia Premium Poultry Price Index and that Mar-Jac Poultry, Inc., expressed interest in participating in that index. Mar-Jac admits it and some customers agreed to prices informed by the Georgia Dock Index for a certain period of time. Tyson admits that that the Georgia Department of Agriculture considered creating the Georgia Premium Poultry Price Index and that Tyson determined, in its independent business judgment, that it did not provide any benefit to participate in a new index. Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in Paragraph 652 characterize or describe documents or other sources, Tyson notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 652 relate to other Defendants and/or third parties to this action, Tyson lacks knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies these allegations. To the extent the remaining allegations in Paragraph 652 purport to relate to Tyson, Tyson denies these allegations. To the extent the remaining allegations in Paragraph 652 purport to relate to Claxton, Claxton denies them. To the extent the remaining allegations in Paragraph 652 purport to relate to Wayne Farms, Wayne Farms denies them. Defendants deny any remaining allegations in Paragraph 652.

653. *On October 6, 2016, a USDA press release noted the expansion of its National Whole Broiler/Fryer report, which included new weekly price information regarding 2.5 to 3 pound broilers that replaced the same weight broiler previously reported by the Georgia Dock price. Importantly, the new USDA price roughly matched the Urner Barry price, suggesting that the Georgia Dock price continued to be subject to manipulation by Defendants.*

**ANSWER:** To the extent the allegations in Paragraph 653 characterize or describe an October 6, 2016 press release or data reported by the USDA or Urner Barry, Defendants deny any

characterization or description that is inconsistent with the referenced sources. Defendants deny any remaining allegations in Paragraph 653.

> 654. *On November 3, 2016, the New York Times published the first account of the USDA's inquiry into the Georgia Dock, based on information received via Freedom of Information Act and open records requests for internal USDA and GDA documents. Subsequently, a November 8, 2016, article by the Washington Post provided additional detail on the inquiry, including a comment from the USDA that "they discontinued publishing the Georgia Dock price 'when data from the source report could not be independently verified.'" In the Washington Post article, Sanderson Farms CFO Mike Cockrell was quoted as saying "the Georgia Dock has come to be a trusted reflection of the supply and demand for retail stores." In a press release cited in a Bloomberg News article on November 17, 2016, Tyson stated that "[w]hen the Georgia Department of Agriculture asks us for pricing data, we provide accurate information based on actual and recent transactions." Sanderson Farms' and Tyson's continued defense of the Georgia Dock price index as one that customers should trust shows that Defendants continued their efforts to conceal the conspiracy alleged in this Complaint.*

**ANSWER:** To the extent the allegations in Paragraph 654 characterize or describe newspaper articles or other documents, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 654 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 654 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 654.

**N. The Georgia Dock Price Index Diverged From the USDA Composite and Urner Barry Price Indices Beginning in 2011**

> 655. *Beginning in approximately early 2011, the Georgia Dock price index began to behave differently from Urner Barry and USDA indices. Historically, the Georgia Dock benchmark price had been highly correlated with those other two indices; although the Dock price had always been somewhat less volatile, its movement (i.e., volatility) mirrored the patterns of the other two indices (e.g., prices went up or down depending on market forces). But as hindsight now shows, in 2011, the correlation began to dissolve. Over time periods when the Urner Barry and USDA price indices would decrease, the Georgia Dock would stay flat or sometimes increase. This divergence continued and became especially pronounced in 2015.[15]*

*FN 15: The prices reported in the EMI, Urner Barry, and USDA Composite price indices were also supra-competitive and artificially inflated by the output-restriction aspect of Defendants' scheme.*

**ANSWER:**  To the extent the allegations in Paragraph 655 characterize or describe data from Urner Barry, USDA, and the Georgia Dock, Defendants deny any characterization or description that is inconsistent with the referenced sources.  In response to Footnote 15 in Paragraph 655, Defendants admit the Footnote 15 purports to set forth Plaintiffs' allegations and case theories regarding other pricing indices, but lack knowledge or information sufficient to form a belief as to the truth of the allegations in Footnote 15 and therefore deny them.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 655 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 655 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any remaining allegations in Paragraph 655 and Footnote 15.

656.    *The changes resulted from the conspiracy by the Georgia Dock Defendants to agree on artificial prices quoted to the GDA for inclusion in the Georgia Dock benchmark price, as well as by the fraud perpetrated by the Georgia Dock Defendants.*

**ANSWER:**  Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 656.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 656 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 656 to the extent that they relate to other Defendants and/or third parties.  Defendants deny the remaining allegations in Paragraph 656.

657.    *Starting in early 2011, the monthly price volatility in the Georgia Dock markedly decreased, particularly with respect to downward price movements (i.e., when prices dropped, they dropped far less drastically than they had in the past). This near-disappearance of price volatility was unique to the Georgia Dock. Both of the other price indices stayed volatile while the Georgia Dock remained stable, as reflected in the*

*following graph, which compares prices of the various indices both before and during the relevant period:*



**ANSWER:** To the extent the allegations in Paragraph 657 characterize or describe data from Urner Barry, USDA, and the Georgia Dock, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants deny any remaining allegations in Paragraph 657.

> 658.    *When the Georgia Dock component of Defendants' conspiracy kicked into high gear, the Georgia Dock price – for the first time ever – began to materially diverge from the other two indices. Although the other two indices continued to move closely together over time, the Georgia Dock price continued to diverge further and further from those prices. By 2015, the gap between the Georgia Dock price and the prices on the other two indices was approximately three times greater than it had ever been in recent history, and approximately five to ten times greater than the typical gap between the prices on the other two indices.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 658. To the extent the allegations in Paragraph 658 characterize or describe data from Urner Barry, USDA, and the Georgia Dock, Defendants deny any characterization or description

that is inconsistent with the referenced sources. Defendants deny any remaining allegations in Paragraph 658.

O. **Defendants Fraudulently Submitted False and Inflated Quotes to the Poultry Market News, Causing the Index to Be Artificially High**

659. *The mechanics by which certain Defendants fraudulently manipulated the Georgia Dock price index is now clear.*

**ANSWER:** Defendants deny the allegations in Paragraph 659.

660. *The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the PMN. Moreover, the Georgia Dock Defendants fraudulently failed to inform their counterparties – that is, those Plaintiffs to whom they sold poultry on pricing tied to the Georgia Dock – of the many serious flaws with the Dock, which accrued to their benefit and to the detriment of those counterparty Plaintiffs.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 660. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 660 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 660 to the extent that they relate to other Defendants and/or third parties. Defendants deny the remaining allegations in Paragraph 660.

661. *By way of background, when the PMN calculated the Georgia Dock price each week, it rounded the price to the nearest 0.25 cents. For example, the Dock price could increase from 110.25 cents to 110.50 cents, but not any amount in between. Defendants also used increments of 0.25 cents in their submissions. Under the PMN's one-cent rule, any submission that was at least one cent more or less than the initially calculated weighted average would be excluded. As a result, on any given week only seven submissions could affect the Dock price: the submission that happened to equal the initial calculation of the weighted average, and submissions that were +0.25 cents, +0.50 cents, +0.75 cents, -0.25 cents, -0.50 cents, and -0.75 cents when compared to the initial weighted average. All other submissions were excluded. Thus, in order to rig the Dock price, Defendants had to work in concert to make price submissions that fell within a narrow range of each other, yet far from the market price, week after week, for years.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 661. Each Defendant lacks knowledge or information sufficient to form a belief as to

the truth of any allegations in Paragraph 661 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 661 to the extent that they relate to other Defendants and/or third parties. Defendants deny the remaining allegations in Paragraph 661.

662. 

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 662. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 662 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 662 to the extent that they relate to other Defendants and/or third parties. Defendants deny the remaining allegations in Paragraph 662.

663. 

███████████████████████████████████████████

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 663.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 663 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 663 to the extent that they relate to other Defendants and/or third parties.  Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations in the first and second sentences of Paragraph 663. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████  Defendants deny any remaining allegations

in Paragraph 663.

664.     Each of the Georgia Dock Defendants' submissions to the PMN made the
implicit statement that those Defendants were submitting their actual offering price for 2.5
to 3 pound whole birds for the next week, while in fact those submissions reflected that
Defendants were seeking to inflate the Dock price to make money at the expense of their
customers.

**ANSWER:**  Defendants deny the allegations of conspiracy and antitrust injury in

Paragraph 664.  Each Defendant lacks knowledge or information sufficient to form a belief as to

the truth of any allegations in Paragraph 664 that relate to other Defendants and/or third parties,

and therefore each Defendant denies the allegations in Paragraph 664 to the extent that they relate

to other Defendants and/or third parties.  Defendants deny the remaining allegations in Paragraph

664.

665.     The allegations set forth below are based on the information regarding
Defendants' price submissions.

**ANSWER:**  Paragraph 665 contains no factual allegations to which a response is required.

To the extent a response is required, Defendants deny the allegations in Paragraph 665.

1.     **Pilgrim's Fraudulently Made False Submissions to the Georgia Dock**

666.     Pilgrim's knew that, when submitting its price quotes to the PMN, it was
supposed to provide its offering price for 2.5 to 3 pound birds for the next week.  But rather
than determining its actual offering price for the next week and submitting it to the PMN,
Pilgrim's made false and inflated price submissions as explained below.

**ANSWER:**  To the extent the allegations in Paragraph 666 characterize or describe

submissions to the Georgia Department of Agriculture, Defendants deny any characterization or

description that is inconsistent with the referenced sources.  Defendants other than Pilgrim's lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

666 and therefore deny them. Pilgrim's admits that the Georgia Department of Agriculture

requested information related to 2.5 to 3 pound whole birds at least once a week, and that Pilgrim's provided such information at least once a week, but denies any remaining allegations in Paragraph 666.

*667.    Due to its large production capacity, Pilgrim's had a "voice" of 35% (out of a total voice for all Georgia Dock Defendants of 100%) for purposes of the weighted average for the Georgia Dock price. Pilgrim's voice of 35% was by far the weightiest of the Georgia Dock Defendants, and thus its submissions had the greatest influence on setting the Georgia Dock price. Pilgrim's knew that its submissions carried the most weight of any of the Defendants.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 667 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 667 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 667 and therefore deny them.  Pilgrim's lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first two sentences of Paragraph 667 and therefore denies them. Pilgrim's denies the last sentence of Paragraph 667 and any remaining allegations in Paragraph 667.

*668.* ████████████████████████████████████████████████
████████████████████████████████████████████████████

**ANSWER:**  To the extent the allegations in Paragraph 668 characterize or describe Pilgrim's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 668 and therefore deny them.

*669.* ████████████████████████████████████████████████
████████████████████████████████████████████████████



**ANSWER:** To the extent the allegations in Paragraph 669 characterize or describe Pilgrim's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 669 and therefore deny them. Pilgrim's denies the allegations of the first sentence of Paragraph 669. Pilgrim's admits that Plaintiffs appear to be attempting to summarize – and characterize – unidentified data. Pilgrim's denies Plaintiffs' characterization of this data and lacks knowledge or information sufficient to form a belief as to whether Plaintiffs have summarized this data accurately and therefore denies them and any remaining allegations in the second through fourth sentences of Paragraph 669. Pilgrim's denies the allegations of the last sentence of Paragraph 669 and any remaining allegations in Paragraph 669.

670.


**ANSWER:** To the extent the allegations in Paragraph 670 characterize or describe Pilgrim's submissions to the Georgia Department of Agriculture or Urner Barry data, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 670 that relate to other Defendants and/or third parties, and therefore each

Defendant denies the allegations in Paragraph 670 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 670 and therefore deny them.



671.

**ANSWER:** To the extent the allegations in Paragraph 671 characterize or describe Pilgrim's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 671 and therefore deny them. Pilgrim's denies the remaining allegations of Paragraph 671.

672.



**ANSWER:** To the extent the allegations in Paragraph 672 characterize or describe Defendants' submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 672 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 672 to the extent that they relate to other Defendants and/or

third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 672 and therefore deny them. Pilgrim's denies any remaining allegations of Paragraph 672.



**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 673 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 673 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 673 and therefore deny them



**ANSWER:** To the extent the allegations in Paragraph 674 characterize or describe a February 26, 2013 internal Pilgrim's email, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Pilgrim's lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 674 and therefore deny them. Pilgrim's denies the allegations of Paragraph 674.

675. 

**ANSWER:**   To the extent the allegations in Paragraph 675 characterize or describe Pilgrim's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 675 and therefore deny them. Pilgrim's denies the remaining allegations in Paragraph 675.



Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 676 and therefore deny them.  Pilgrim's denies any remaining allegations in Paragraph 676.

*677.*



**ANSWER:** To the extent the allegations in Paragraph 677 characterize or describe Pilgrim's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 677 and therefore deny them. Pilgrim's denies any remaining allegations in Paragraph 677.

*678.*



**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 678 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 678 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 678 and therefore deny them. Pilgrim's denies the remaining allegations in Paragraph 678.

*679.*





**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 679 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 679 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 679 and therefore deny them. Pilgrim's denies the remaining allegations in Paragraph 679.

680.

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 680 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 680 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 680 and therefore deny them. Pilgrim's denies the allegations in Paragraph 680.

681.





**ANSWER:** To the extent the allegations in Paragraph 681 chart, summarize, characterize or describe Pilgrim's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 681 and therefore deny them. Pilgrim's denies any remaining allegations in Paragraph 681.



**ANSWER:** To the extent the allegations in Paragraph 682 attempt to chart, summarize, characterize or describe Pilgrim's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced

sources. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 682 and therefore deny them.

683. 

**ANSWER:** To the extent the allegations in Paragraph 683 characterize or describe Pilgrim's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 683 and therefore deny them. Pilgrim's denies the remaining allegations of Paragraph 683.

684. 

**ANSWER:** To the extent the allegations in Paragraph 684 characterize or describe Pilgrim's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 684 and therefore deny them. Pilgrim's denies the remaining allegations of Paragraph 684.

685. 

**ANSWER:** To the extent the allegations in Paragraph 685 characterize or describe Pilgrim's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 685 and therefore deny them. Pilgrim's denies the remaining allegations of Paragraph 685.

686. *Pilgrim's submissions were false and inflated. Pilgrim's was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Pilgrim's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Pilgrim's costs of production, rather than simply an attempt to artificially inflate the index. Yet Pilgrim's did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.*

*Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.*

**ANSWER:** To the extent the allegations in Paragraph 686 characterize or describe Pilgrim's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 686 and therefore deny them. Pilgrim's denies the allegations of the first sentence of Paragraph 686. Pilgrim's admits that the Georgia Department of Agriculture requested information related to 2.5 to 3 pound whole birds at least once a week, and that Pilgrim's provided such information at least once a week. Pilgrim's denies that any of its

submissions were "false" or "inflated" or "insincere" and any remaining allegations in Paragraph 686.

> 687.    *Pilgrim's knew that its submissions were false and inflated. Pilgrim's knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole bird* ██████████████████████████████████████ *At the very least, Pilgrim's acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:**    To the extent the allegations in Paragraph 687 characterize or describe Pilgrim's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 687 and therefore deny them. Pilgrim's denies the allegations of the first sentence of Paragraph 687. Pilgrim's admits that the Georgia Department of Agriculture requested information related 2.5 to 3 pound whole birds at least once a week, and that Pilgrim's provided such information at least once a week. Pilgrim's denies that any of its submissions were "false" or "inflated" or that it acted with "reckless indifference," and any remaining allegations in Paragraph 687.

> 688.    *Pilgrim's made its submissions with the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index and increased Plaintiffs' prices. Pilgrim's fraudulent submissions were made by interstate wire.*

**ANSWER:**    Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 688 and therefore deny them. Pilgrim's denies the allegations in Paragraph 688.

> 689.    *The intended targets of Pilgrim's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Pilgrim's sold chicken to its customers based on the*

*Georgia Dock price index. Accordingly, as a result of Pilgrim's fraudulent submissions that artificially inflated the Georgia Dock price index, Pilgrim's and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 689 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 689 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 689 and therefore deny them. Pilgrim's admits that at various points in the Relevant Period a percentage of its contracts included terms related to the "Georgia Dock," but denies any remaining allegations in Paragraph 689.

690.



**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. To the extent the allegations in Paragraph 690 characterize or describe submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 690 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 690 to the extent that they relate to other Defendants and/or third parties. Defendants Pilgrim's,

Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the remaining allegations in Paragraph 690.

2.  **Koch Fraudulently Made False Submissions to the Georgia Dock**

> 691.    *Koch knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Koch made false and inflated price submissions as explained below.*

**ANSWER:**  To the extent the allegations in Paragraph 691 characterize or describe submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 691 and therefore deny them.  Koch denies the allegations in Paragraph 691.

> 692.



**ANSWER:**  To the extent the allegations in Paragraph 692 characterize or describe the former testimony of Fran Stiles, Defendants deny any characterization or description that is inconsistent with such testimony.  Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 692 and therefore deny them.

Koch denies any remaining allegations in Paragraph 692.

*693.*



**ANSWER:**

Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 693 and therefore deny them. Koch denies the allegations in Paragraph 693.

*694.*



**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 694. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 694 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 694 to the extent that they relate to other Defendants and/or third parties. Defendants other than Koch lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 694 and therefore deny them. Koch denies the allegations in Paragraph 694. Footnote 16 contains no factual allegations to which a response is required.

695.



**ANSWER:** To the extent the allegations in Paragraph 695 characterize or describe Koch's submissions to the Georgia Department of Agriculture and unidentified documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 695 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 695 to the extent that they relate to other Defendants and/or third parties. Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 695 and therefore deny them

 Koch denies any remaining allegations in Paragraph 695.

**ANSWER:**

Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 696 and therefore deny them. Koch denies the allegations in Paragraph 696 to the extent they relate to Koch. To the extent the allegations in Paragraph 696 relate to Plaintiffs, other Defendants, third parties and/or information allegedly derived from other sources, Koch lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them. Koch denies the remaining allegations in Paragraph 696.



**ANSWER:** To the extent the allegations in Paragraph 697 characterize or describe emails, submissions to the Georgia Department of Agriculture, and/or Urner Barry data, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 697 and therefore deny them.

698. *Koch's submissions were false and inflated. Koch was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Koch's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Koch's costs of production, rather than simply an attempt to artificially inflate the index. Yet Koch did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week* *Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.*

**ANSWER:** To the extent the allegations in Paragraph 698 characterize or describe Koch's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 698 and therefore deny them. Koch denies the allegations in Paragraph 698.

699. *Koch knew that its submissions were false and inflated. Koch knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds* *At the very least, Koch acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:** To the extent the allegations in Paragraph 699 characterize or describe Koch's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 699 and therefore deny them. Koch denies the allegations in Paragraph 699.

> 700.    *Koch made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Koch's fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 700. Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 700 and therefore deny them. Koch denies the allegations in Paragraph 700.

> 701.    *The intended targets of Koch's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Koch sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Koch's fraudulent submissions that artificially inflated the Georgia Dock price index, Koch, and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 701. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 701 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 701 to the extent that they relate to other Defendants and/or third parties. Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 701 and therefore deny them. Koch admits that it sold chicken to customers, and that at times the Georgia Dock was a factor in the pricing as to some customers. Koch denies the remaining allegations in Paragraph 701.

3.    **Mar-Jac Fraudulently Made False Submissions to the Georgia Dock**

> 702.    *Mar-Jac knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Mar-Jac made false and inflated price submissions as explained below.*

**ANSWER:**  To the extent the allegations in Paragraph 702 characterize or describe submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Mar-Jac lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 702 and therefore deny them. Mar-Jac admits that Mar-Jac Poultry, Inc. produced 2.5 to 3.0 pound whole birds and denies the remaining allegations in Paragraph 702.

> 703.



**ANSWER:**  To the extent the allegations in Paragraph 703 characterize or describe Mar-Jac's emailed submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Mar-Jac lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 703 and therefore deny them. Mar-Jac denies that it participated in any alleged conspiracy or otherwise acted wrongfully.  Paragraph 703 contains Plaintiffs' characterization of its claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Mar-Jac

386

denies such characterization, allegations, and conclusions. Defendants deny any remaining allegations in Paragraph 703.

    *704.*



    **ANSWER:** To the extent the allegations in Paragraph 704 characterize or describe emails or Mar-Jac's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Mar-Jac lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 704 and therefore deny them. ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mar-Jac states that Paragraph 704 contains allegations subject to proof by expert testimony, to which no response is required, but to the extent a response is required, Mar-Jac denies such allegations. Mar-Jac denies the remaining allegations in Paragraph 704.

    *705.*



    **ANSWER:** To the extent the allegations in Paragraph 705 characterize or describe an email, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Mar-Jac lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 705 and therefore deny them. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Mar-Jac states that Paragraph 705 contains allegations subject to proof by expert testimony, to which no response is required, but to the extent a response is required, Mar-Jac denies such allegations. Mar-Jac denies the remaining allegations in Paragraph 705.

706.



**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 706. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 706 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 706 to the extent that they relate to other Defendants and/or third parties. Defendants other than Mar-Jac lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 706 and therefore deny them. Mar-Jac and Koch deny the allegations in Paragraph 706.

> 707. *Mar-Jac's submissions were false and inflated. Mar-Jac was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Mar-Jac's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Mar-Jac's costs of production, rather than simply an attempt to artificially inflate the index. Yet Mar-Jac did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.* rtificially high quotes constitute false statements because *manipulated quotes are literally false or insincere response to the PMN's request for submissions of actual offering prices.*

**ANSWER:** To the extent the allegations in Paragraph 707 characterize or describe Mar-Jac's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Mar-Jac lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 707 and therefore deny them. Mar-Jac admits that Mar-Jac Poultry, Inc., produced 2.5 to 3.0 pound whole birds and denies the remaining allegations in Paragraph 707.

708. *Mar-Jac knew that its submissions were false and inflated. Mar-Jac knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole bird* ██████ ██████████████████████████████████████████████ ██████████████████████████████████████████████████ *At the very least, Mar-Jac acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:** To the extent the allegations in Paragraph 708 characterize or describe Mar-Jac's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Mar-Jac lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 708 and therefore deny them. Mar-Jac admits that Mar-Jac Poultry, Inc. produced 2.5 to 3.0 pound whole birds and denies the remaining allegations in Paragraph 708.

709. *Mar-Jac made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Mar-Jac's fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 709. Defendants other than Mar-Jac lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 709 and therefore deny them. Mar-Jac denies the allegations in Paragraph 709.

710. *The intended targets of Mar-Jac's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Mar-Jac sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Mar-Jac's fraudulent submissions that artificially inflated the Georgia Dock price index, Mar-Jac and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 710. Each Defendant lacks knowledge or information sufficient to form a belief as to

the truth of any allegations in Paragraph 710 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 710 to the extent that they relate to other Defendants and/or third parties. Defendants other than Mar-Jac lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 710 and therefore deny them. Mar-Jac admits that at various points in the Relevant Period some of its agreements included terms related to the "Georgia Dock," but denies any remaining allegations in Paragraph 710.

4.    **Harrison Fraudulently Made False Submissions to the Georgia Dock**

711.    *Harrison knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Harrison made false and inflated price submissions as explained below.*

**ANSWER:**    Defendants other than Harrison Poultry lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 711 and therefore deny them. Harrison Poultry denies the allegations in Paragraph 711.



*712.*

**ANSWER:**

Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 712 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 712 to the extent that they relate to other Defendants and/or third parties. Defendants other than Harrison

Poultry lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 712 and therefore deny them. Harrison Poultry admits the allegations in the first sentence of Paragraph 712.



713.

**ANSWER:** To the extent the allegations in Paragraph 713 attempt to characterize or describe documents or data, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 713 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 713 to the extent that they relate to other Defendants and/or third parties. Defendants other than Harrison Poultry lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 713 and therefore deny them. █████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████ Harrison Poultry denies any remaining allegations in Paragraph 713.

    *714.* ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

**ANSWER:** To the extent the allegations in Paragraph 714 characterize or describe documents or data, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 714 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 714 to the extent that they relate to other Defendants and/or third parties. Defendants other than Harrison Poultry lack

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 714 and therefore deny them.



715.

**ANSWER:** To the extent the allegations in Paragraph 715 characterize or describe submissions to the Georgia Department of Agriculture and/or Urner Barry data, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Harrison Poultry lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 715 and therefore deny them. Harrison Poultry denies the allegations in Paragraph 715.



716.

**ANSWER:** To the extent the allegations in Paragraph 716 characterize or describe submissions to the Georgia Department of Agriculture and/or Urner Barry data, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Harrison Poultry lack knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in Paragraph 716 and therefore deny them. █████████



717.

**ANSWER:** To the extent the allegations in Paragraph 717 characterize or describe Harrison Poultry's submissions to the Georgia Department of Agriculture and/or Urner Barry data, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Harrison Poultry lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 717 and therefore deny them.

718.

**ANSWER:** Defendants other than Harrison Poultry lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 718 and therefore deny them. Harrison Poultry denies the allegations in Paragraph 718 ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

719.    *Like Koch and Mar-Jac, Harrison's practice stabilized the Georgia Dock price index, imposing an artificial floor that prevented the index from falling, while allowing other Defendants (such as Pilgrim's) to artificially inflate the index through their regularly-inflated submissions. Harrison acted in concert with the other Defendants by playing this role.*

**ANSWER:**    Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 719.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 719 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 719 to the extent that they relate to other Defendants and/or third parties.   Defendants other than Harrison Poultry, Koch, and Mar-Jac lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 719 and therefore deny them.  Harrison Poultry, Koch, and Mar-Jac deny the allegations in Paragraph 719.

720.    *Harrison's submissions were false and inflated. Harrison was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Harrison's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Harrison's costs of production, rather than simply an attempt to artificially inflate the index. Yet Harrison did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.* ████████████████████ ████████████████████████ *Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.*

**ANSWER:**    To the extent the allegations in Paragraph 720 characterize or describe Harrison Poultry's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other

than Harrison Poultry lack knowledge or information sufficient to form a belief as to the truth of

the remaining allegations in Paragraph 720 and therefore deny them.  Harrison Poultry denies the

allegations in Paragraph 720.

> 721.    *Harrison knew that its submissions were false and inflated. Harrison knew*
> *that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound*
> *whole birds* ████████████████████████████████████████████████████████
> ████████████████████████████████████████████████████████████████████
> ████████████████████████████████████  *At the very least,*
> *Harrison acted with reckless indifference as to whether its submissions were false and*
> *inflated.*

**ANSWER:**    To the extent the allegations in Paragraph 721 characterize or describe

Harrison Poultry's submissions to the Georgia Department of Agriculture, Defendants deny any

characterization or description that is inconsistent with the referenced sources.  Defendants other

than Harrison Poultry lack knowledge or information sufficient to form a belief as to the truth of

the remaining allegations in Paragraph 721 and therefore deny them.   Harrison Poultry denies the

allegations in Paragraph 721.

> 722.    *Harrison made its submissions for the purpose of artificially inflating the*
> *Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the*
> *Georgia Dock price index. Harrison's fraudulent submissions to the PMN were made by*
> *interstate wire.*

**ANSWER:**    Defendants deny the allegations of conspiracy and antitrust injury in

Paragraph 722.  Defendants other than Harrison Poultry lack knowledge or information sufficient

to form a belief as to the truth of the allegations in Paragraph 722 and therefore deny them.

Harrison Poultry denies the allegations in Paragraph 722.

> 723.    *The intended targets of Harrison's fraudulent submissions to the PMN were*
> *buyers of chicken, including Plaintiffs.  Harrison sold chicken to its customers based on the*
> *Georgia Dock price index. Accordingly, as a result of Harrison's fraudulent submissions*
> *that artificially inflated the Georgia Dock price index, Harrison and the other members of*

*this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 723. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 723 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 723 to the extent that they relate to other Defendants and/or third parties. Defendants other than Harrison Poultry lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 723 and therefore deny them. Harrison Poultry specifically denies that it sold broilers to its customers based on the Georgia Dock price and all remaining allegations in Paragraph 723.

724. 



**ANSWER:**   To the extent that Paragraph 724 incorporates and re-alleges allegations above, Defendants incorporate and re-allege any response made to those allegations.  Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 724.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 724 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 724 to the extent that they relate to other Defendants and/or third parties. Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations in the first sentence of Paragraph 724, deny that Plaintiffs' chart is accurate, and deny any remaining allegations in Paragraph 724. ██████████████ ███████████████████████████████████████████████████████ ██████████████████████████████ Defendants Agri Stats, Sanderson Farms, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 724 and therefore deny them.

*725.*



**ANSWER:** Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods,

Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case deny they submitted

any information to the PMN during the Relevant Period and lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 725 and therefore

deny them. Defendants deny the remaining allegations in Paragraph 725.

*726.    This is further proof that the Defendants worked together to submit knowingly false price quotes to the PMN as part of a coordinated effort to inflate the Dock price.*

**ANSWER:** Defendants deny the allegations in Paragraph 726.

**5.    Sanderson Farms Fraudulently Made False Submissions to the Georgia Dock**

*727.    Sanderson Farms knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Sanderson Farms made false and inflated price submissions as explained below.*

**ANSWER:** To the extent the allegations in Paragraph 727 characterize or describe

submissions to the Georgia Department of Agriculture, Defendants deny any characterization or

description that is inconsistent with the referenced sources. Defendants other than Sanderson

Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 727 and therefore deny them. Sanderson Farms denies the allegations in Paragraph 727.

Sanderson Farms further states that it did not produce a 2.5 to 3 pound bird, and that it told that to

the Poultry Market News.

*728.*

██████████████████████████████████████████████████████

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 728 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 728 to the extent that they relate to other Defendants and/or third parties. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 728 and therefore deny them ████████████████████████████████████████████
████████████████████████████████ Sanderson Farms denies the remaining allegations in Paragraph 728.

*729.* ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

**ANSWER:** ██████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████ Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 729 and therefore deny them. ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████

*730.* ████████████████████████████████████████
████████████████████████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

**ANSWER:**   To the extent the allegations in Paragraph 730 characterize or describe Sanderson Farms' submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 730 and therefore deny them. ████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

████████████████████ The second, third, and fourth sentences in Paragraph 730 are legal conclusions to which no response is required.  To the extent a response is required, Sanderson Farms denies the allegations in the second, third, and fourth sentences of Paragraph 730 and any remaining allegations in Paragraph 730.

*731.* ██████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

**ANSWER:** ██████████████████████████████████████████
██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████ Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 731 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 731 to the extent that they relate to other Defendants and/or third parties. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 731 and therefore deny them. Sanderson Farms lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 731 and therefore denies them and any remaining allegations in Paragraph 731.

732. ████████████████████████████████████████████████

███████████████████████████████████████████

**ANSWER:** To the extent the allegations in Paragraph 732 characterize or describe submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 732 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 732 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 732 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the remaining allegations in Paragraph 732.

*733.* █████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████

**ANSWER:** ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ Defendants other than Sanderson Farms lack knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph

733 and therefore deny them. ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ Sanderson Farms denies the allegations in the last sentence of

Paragraph 733. Sanderson Farms lacks knowledge or information sufficient to form a belief as to

the truth of the remaining allegations in Paragraph 733 and therefore denies those allegations.

> *734.    Sanderson's submissions were false and inflated. Sanderson was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Sanderson's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Sanderson's costs of production, rather than simply an attempt to artificially inflate the index. Yet Sanderson did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.* ████████████████████
████████████████████████████████████████████
████████████████ *Artificially high quotes constitute false statements*

*because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.*

**ANSWER:** To the extent the allegations in Paragraph 734 characterize or describe Sanderson Farms' submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 734 and therefore deny them. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ The last sentence in Paragraph 734 contains legal conclusions that do not require a response. To the extent a response is required, Sanderson Farms denies the allegations in the last sentence of Paragraph 734. Sanderson Farms denies any remaining allegations in Paragraph 734.

735. *Sanderson knew that its submissions were false and inflated. Sanderson knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole* ████████████████████████████████████████

*At the very least, Sanderson acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:** To the extent the allegations in Paragraph 735 characterize or describe Sanderson Farms' submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 735 and therefore deny them. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████ The last sentence in Paragraph 735 contains legal conclusions that do not require a response. To the extent a response is required, Sanderson Farms denies the allegations in the last sentence of Paragraph 735. Sanderson Farms denies any remaining allegations in Paragraph 735.

> 736. *Sanderson made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Sanderson Farms' fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 736. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 736 and therefore deny them. Sanderson Farms denies the allegations in Paragraph 736.

> 737. *The intended targets of Sanderson Farms' fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Sanderson Farms sold chicken to its customers based on the Georgia Dock price index. Sanderson Farms used Georgia Dock-based pricing with its retail customers, including Plaintiffs, in two ways: first, pursuant to a Georgia Dock bracketing system, under which prices would move up or down according to whether they fell in various ranges of Georgia Dock pricing, and second, pursuant to straightforward Georgia Dock formula pricing, under which prices would be the Georgia Dock price plus a specified amount. When the Georgia Dock would increase, that would result in an increase of prices to Sanderson Farms' customers.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 737. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 737 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 737 to the extent that they relate to other Defendants and/or third parties. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 737 and therefore deny them. Sanderson Farms admits that at various points in the Relevant Period a percentage of its contracts included terms related to the "Georgia Dock;" to the extent the

allegations in Paragraph 737 characterize or describe unidentified broiler supply agreements, Sanderson Farms refers to those agreements and denies any characterization or description that is inconsistent with the referenced sources. Sanderson Farms denies any remaining allegations in Paragraph 737.

> 738. *Accordingly, as a result of Sanderson Farms' fraudulent submissions that artificially inflated the Georgia Dock price index, Sanderson Farms and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 738. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 738 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 738 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 738 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the remaining allegations in Paragraph 738.

**6. Tyson Fraudulently Made False Submissions to the Georgia Dock**

> 739. *Tyson knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. Tyson in fact produced a 2.5 to 3 pound bird. But rather than determining its actual offering price and submitting it to the PMN, Tyson made false and inflated price submissions as explained below.*

**ANSWER:** To the extent the allegations in Paragraph 739 characterize or describe submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Tyson lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 739 and therefore deny them. Tyson admits it has from time to time produced a 2.5 to 3 pound bird. Tyson denies any remaining allegations in Paragraph 739.



740. █████████████████████████████████████

**ANSWER:** ████████████████████████████████

████████████████████████████████████████████

██████████████████████████ Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 740 and therefore deny them. To the extent the allegations in Paragraph 740 characterize or describe documents or other sources, Tyson notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. ████████████████████

████████████████████████████████████████████

████████████

741. ██████████████████████████████████████

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 741 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 741 to the extent that they relate to other Defendants and/or third parties. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 741 and

therefore deny them. ████████████████████████████████████

████████████████████████████████████████████████



**ANSWER:** ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████ Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 742 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 742 to the extent that they relate to other Defendants and/or third parties. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 742 and therefore deny them. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 742 and therefore denies them.



***ANSWER:*** To the extent the allegations in Paragraph 743 characterize or describe submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 743 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in

Paragraph 743 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 743 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the remaining allegations in Paragraph 743.



*744.*

**ANSWER:** To the extent the allegations in Paragraph 744 characterize or describe a submission to the Georgia Department of Agriculture and/or Urner Barry data, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 744 and therefore deny them. Tyson denies all remaining allegations in Paragraph 744.

> *745. Tyson's submissions were false and inflated. Tyson was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Tyson's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Tyson's costs of production, rather than simply an attempt to artificially inflate the index. Yet Tyson did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.*
>
> *Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.*

**ANSWER:** To the extent the allegations in Paragraph 745 characterize or describe Tyson's submissions to the Georgia Department of Agriculture, Defendants deny any

characterization or description that is inconsistent with the referenced sources. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 745 and therefore deny them. Tyson denies all remaining allegations in Paragraph 745.

746.    *Tyson knew that its submissions were false and inflated. Tyson knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds*

█████████████████████████████████████████████████████████

*At the very least, Tyson acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:**    To the extent the allegations in Paragraph 746 characterize or describe Tyson's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 746 and therefore deny them. Tyson denies all remaining allegations in Paragraph 746.

747.    *Tyson made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Tyson's fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:**    Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 747. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 747 and therefore deny them. Tyson denies the allegations in Paragraph 747.

748.    *The intended targets of Tyson's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Tyson sold chicken to its customers based on the Georgia Dock price index. Throughout the relevant period, Tyson sold broilers and broiler products to its customers, including Plaintiffs, pursuant to pricing that used the Georgia Dock price index as a benchmark. Like Sanderson Farms, Tyson employed both bracketed and fixed pricing that used Georgia Dock as basis, dating back to at the latest 2010, when*

*its account managers internally discussed that "where certain customers are not tied to the Georgia Dock market with brackets, we must address these situations."*

**ANSWER:**  Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 748 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 748 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 748 and therefore deny them.  Tyson admits that at various points in the Relevant Period a percentage of its contracts included terms related to the "Georgia Dock," but denies any remaining allegations in Paragraph 748.

> *749.    Accordingly, as a result of Tyson's fraudulent submissions that artificially inflated the Georgia Dock price index, Tyson and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:**  Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 749.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 749 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 749 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 749 and therefore deny them.  Tyson denies the remaining allegations in Paragraph 749.

**7.    Claxton Fraudulently Made False Submissions to the Georgia Dock**

> *750.    Claxton knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week.  But rather*

*than determining its actual offering price and submitting it to the PMN, Claxton made false and inflated price submissions as explained below.*

**ANSWER:** To the extent the allegations in Paragraph 750 characterize or describe submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Claxton lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 750 and therefore deny them. Claxton denies the allegations in Paragraph 750.

751. 

**ANSWER:** Defendants other than Claxton lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 751 and therefore deny them.

752.

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 752. To the extent the allegations in Paragraph 752 characterize or describe an unidentified communication between Claxton and the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 752 that relate to other Defendants and/or third parties, and therefore each

Defendant denies the allegations in Paragraph 752 to the extent that they relate to other Defendants and/or third parties. Defendants other than Claxton lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 752 and therefore deny them.



753.

**ANSWER:**

Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 753 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 753 to the extent that they relate to other Defendants and/or third parties. Defendants other than Claxton lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 753 and therefore deny them.

754.



**_ANSWER:_**  To the extent the allegations in Paragraph 754 characterize or describe submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with such testimony or referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 754 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 754 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 754 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the remaining allegations in Paragraph 754.

*755.*

**ANSWER:**  To the extent the allegations in Paragraph 755 characterize or describe a submission to the Georgia Department of Agriculture and/or Urner Barry data, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Claxton lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 755 and therefore deny them.

███████████████████████████████████████████████

███████████████████████████████████████████████

756. *Claxton knew that its submissions to the PMN were false and inflated. At the very least, Claxton acted with reckless indifference as to whether its submissions were true or false.*

**ANSWER:** Defendants other than Claxton lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 756 and therefore deny them. Claxton denies the allegations in Paragraph 756.

757. *Claxton's submissions were false and inflated. Claxton was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Claxton's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Claxton costs of production, rather than simply an attempt to artificially inflate the index. Yet Claxton did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.* ███████████████████████████████████ ███████████████████████████████████ *Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.*

**ANSWER:** To the extent the allegations in Paragraph 757 characterize or describe Claxton's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Claxton lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 757 and therefore deny them. Claxton admits that it sold a 2.5 to 3 pound whole bird and provided certain information at the request of the Georgia Department of Agriculture, but denies any remaining allegations Paragraph 757.

758. *Claxton knew that its submissions were false and inflated. Claxton knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds* ███████████████████████████████████████ ██████████████████████████████████ *At the very least, Claxton acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:** To the extent the allegations in Paragraph 758 characterize or describe Claxton's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Claxton lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 758 and therefore deny them. Claxton admits that it sold a 2.5 to 3 pound whole bird and provided certain information at the request of the Georgia Department of Agriculture, but denies any remaining allegations in Paragraph 758 directed at Claxton.

*759. Claxton made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Claxton's fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 759. Defendants other than Claxton lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 759 and therefore deny them. Claxton denies the allegations in Paragraph 759.

*760. The intended targets of Claxton's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Claxton sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Claxton's fraudulent submissions that artificially inflated the Georgia Dock price index, Claxton and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 760. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 760 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 760 to the extent that they relate to other Defendants and/or third parties. Defendants other than Claxton lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 760 and therefore deny them. Claxton admits that at various points in the Relevant Period less than

one percent of its sales were made using the "Georgia Dock" as only one component of a pricing formula. Claxton denies the remaining allegations in Paragraph 760.

### 8. Wayne Farms Fraudulently Made False Submissions to the Georgia Dock

761. *Wayne Farms knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. But rather than determining its actual offering price and submitting it to the PMN, Wayne Farms made false and inflated price submissions as explained below.*

**ANSWER:** To the extent the allegations in Paragraph 761 characterize or describe submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 761 and therefore deny them. Wayne Farms denies the allegations in Paragraph 761.

762.



**ANSWER:** To the extent the allegations in Paragraph 762 characterize or describe submissions to the Georgia Department of Agriculture and/or prior testimony in this litigation, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 762 and therefore deny them. Wayne Farms admits that it submitted data to the Georgia Department of Agriculture. Wayne Farms lacks knowledge or information sufficient to form a belief about to the truth of the remaining allegations in Paragraph 762 and therefore denies them.

763.





**ANSWER:**

Defendants other than Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 763 and therefore deny them.

*764.*

**ANSWER:**

Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 764 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 764 to the extent that they relate to other Defendants and/or third parties. Defendants other than Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 764 and therefore deny them. Wayne Farms denies any remaining allegations in Paragraph 764.

765.    For instance, Lee Matthews made these false submissions by phone on behalf of Wayne Farms to Arty Schronce and Demetria Mabry of the PMN, at or approximately at the same date and time each week, for several years.

**ANSWER:**    To the extent the allegations in Paragraph 765 characterize or describe submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 765 and therefore deny them.  Wayne Farms admits that it submitted confidential data to the GDA, but denies the remaining allegations in Paragraph 765.

766.    Wayne Farms' submissions were false and inflated. Wayne Farms was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Wayne Farms' actual offering price (absent manipulation of the index) should reflect actual market dynamics and Wayne Farms' costs of production, rather than simply an attempt to artificially inflate the index. Yet Wayne Farms did not submit its actual or converted offering price for 2.5 to 3 pound whole birds. ███████ Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.

**ANSWER:**    To the extent the allegations in Paragraph 766 characterize or describe submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 766 and therefore deny them.  Wayne Farms denies the allegations in Paragraph 766.

767.    Wayne Farms knew that its submissions were false and inflated. Wayne Farms knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds ███████

███████ *At the very least, Wayne Farms acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:** To the extent the allegations in Paragraph 767 characterize or describe submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 767 and therefore deny them. Wayne Farms denies the allegations in Paragraph 767.

768. *Wayne Farms made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Wayne Farms' fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 768. Defendants other than Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 768 and therefore deny them. Wayne Farms denies the allegations in Paragraph 768.

769. *The intended targets of Wayne Farms' fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Wayne Farms sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Wayne's fraudulent submissions that artificially inflated the Georgia Dock price index, Wayne Farms and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 769. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 769 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 769 to the extent that they relate to other Defendants and/or third parties. Defendants other than Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 769 and therefore deny them. Wayne Farms admits that at various points in the Relevant Period a

percentage of its contracts included terms related to the "Georgia Dock," but denies any remaining allegations in Paragraph 769.

9.      **Fieldale Farms Also Made False Submissions to the Georgia Dock**

> *770.    Fieldale knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds. But rather than determining its actual offering price and submitting that price to the PMN each week, Fieldale knowingly made false and inflated price submissions as explained below.*

**ANSWER:**   To the extent the allegations in Paragraph 770 characterize or describe submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 770 and therefore deny them. Fieldale denies the allegations in Paragraph 770.

> *771.    Due to its large production capacity in Georgia, Fieldale had a "voice" of 15% (out of a total voice of all Georgia Dock Defendants of 100%) for purposes of the weighted average for the Georgia Dock price. Fieldale's voice of 15% put it among the top three weightiest voices among the Georgia Dock Defendants, and thus its submissions had a significant influence on setting the Georgia Dock price. Fieldale knew that its submissions carried significant weight compared to other Defendants' submissions.*

**ANSWER:**   Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 771 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 771 to the extent that they relate to other Defendants and/or third parties. Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 771 and therefore deny them. Fieldale denies Plaintiffs' characterizations of the Georgia Dock Price, Fieldale's "voice" and Fieldale's alleged "influence" on the Georgia Dock Price. Fieldale admits that it produces chicken in Georgia and that the relative amount of chicken produced by Fieldale compared to other companies in Georgia has varied over the period at issue. Fieldale denies the remaining allegations in Paragraph 771.

772.



**ANSWER:** To the extent the allegations in Paragraph 772 characterize or describe Fieldale's submissions to the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 772 and therefore deny them. Fieldale denies Plaintiffs' characterizations of Fieldale's submissions to the Georgia Department of Agriculture.



Fieldale denies the allegations in the last sentence of Paragraph 772.

773.

**ANSWER:** To the extent the allegations in Paragraph 773 characterize or describe Fieldale's submissions to the Georgia Department of Agriculture and the former testimony of Sammy Franklin, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 773 and therefore deny them.



Fieldale denies the remaining allegations in Paragraph 773.

*774.*

**ANSWER:** To the extent the allegations in Paragraph 774 characterize or describe the former testimony of Sammy Franklin and an unidentified phone call, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Fieldale, Claxton, and Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 774 and therefore deny them.



*775.*

**ANSWER:** To the extent the allegations in Paragraph 775 characterize or describe submissions to or actual data from the Georgia Department of Agriculture, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 775 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 775 to the extent that they relate to other Defendants and/or third parties. Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 775 and therefore deny them.



 Fieldale denies the remaining allegations in Paragraph 775.

*776.*

**ANSWER:** To the extent the allegations in Paragraph 776 characterize or describe submissions to or actual data from the Georgia Department of Agriculture or testimony offered in deposition, Defendants deny any characterization or description that is inconsistent with the

referenced sources. Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 776 and therefore deny them. Fieldale denies the remaining allegations in Paragraph 776.

*777.* 

**ANSWER:** To the extent the allegations in Paragraph 777 characterize or describe Fieldale's submissions to the Georgia Department of Agriculture or Urner Barry data, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 777 and therefore deny them. Fieldale denies the remaining allegations in Paragraph 777.

*778. Fieldale knew that its submissions to the PMN were false and inflated. At the very least, Fieldale acted with reckless indifference as to whether its submissions were true or false. Fieldale made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Fieldale's fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 778. Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 778 and therefore deny them. Fieldale denies the allegations in Paragraph 778.

*779. The intended targets of Fieldale's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Fieldale sold chicken to its customers, including Plaintiffs, based on the Georgia Dock price index. Accordingly, as a result of Fieldale's fraudulent submissions that artificially inflated the Georgia Dock price index, Fieldale and*

*the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:**    Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 779. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 779 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 779 to the extent that they relate to other Defendants and/or third parties. Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 779 and therefore deny them. Fieldale denies the allegations in Paragraph 779.

**P.**   **The Georgia Dock Defendants Fraudulently Failed to Inform the Plaintiffs with Which They Did Business of their Control Over the Georgia Dock, Their Ability to Manipulate the Georgia Dock, and Their Actual Manipulation of the Georgia Dock**

780.   *All of the Georgia Dock Defendants sold broiler chicken at prices based off of the Georgia Dock to customers during the relevant period.* ███████████████ ████████████████████████████████████████████████████████████

**ANSWER:** ████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████    Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 780 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 780 to the extent that they relate to other Defendants and/or third parties. With respect to the allegations in the first sentence of Paragraph 780, Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Mar-Jac, Wayne Farms, and Fieldale admit that, at times, they sold chicken at prices based off of the Georgia Dock to customers during the Relevant Period. Harrison Poultry denies that the prices of its Broiler sales were based on the Georgia Dock during the Relevant

Period. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 780 and therefore deny them. Defendants deny any remaining allegations in Paragraph 780.

781.



**ANSWER:** Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 781 and therefore deny them.

Tyson denies the remaining allegations in Paragraph 781.

782.



**ANSWER:** To the extent the allegations in Paragraph 782 characterize or describe unidentified documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 782 and therefore deny them.

783. 

**ANSWER:**   To the extent the allegations in Paragraph 783 characterize or describe

unidentified documents or other sources, Defendants deny any characterization or description that

is inconsistent with the referenced sources.   Defendants other than Fieldale lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 783

and therefore deny them.

Defendants

deny any remaining allegations in Paragraph 783.

783.   *Thus, not only did the Georgia Dock Defendants knowingly make false
submissions to the PMN for the purpose of inflating the Georgia Dock price index, but all
of the Georgia Dock Defendants that did business with Plaintiffs failed to disclose
significant, non-public information to Plaintiffs about the Georgia Dock price index and
the Poultry Market News.*

**ANSWER:**   Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods,

Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or

information sufficient to form a belief as to the truth of the allegations in Paragraph 784 and

therefore deny them.   Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison

Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations in Paragraph 784.

785.   *Just as Defendants' role on the PMN Advisory Committee enabled
Defendants to devise a scheme to manipulate the Georgia Dock, Defendants' role on the*

*Advisory Committee created an information asymmetry that kept chicken buyers like Plaintiffs in the dark. Unlike Defendants, which had intimate knowledge of the way in which the PMN operated and the Georgia Dock price was calculated, Plaintiffs knew only what all buyers of chicken knew and believed: that the Georgia Dock price index represented the actual offering prices of chicken producers for the next week – in other words, an actual market price for broilers based on verified, reliable, and objective information.*

**ANSWER:** Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale admit that at times during Relevant Period and at the request of the Georgia Department of Agriculture, they had an employee representative on the "Poultry Market News Advisory Committee," but deny Plaintiffs' characterization of that Committee and the remaining allegations in Paragraph 785. Harrison Poultry further states that it withdrew from any participation in the "Poultry Market News Advisory Committee" in early January 2016. Sanderson Farms denies that it was a member of any "Poultry Market News Advisory Committee;" Sanderson Farms therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations related to the "Poultry Market News Advisory Committee" and therefore denies those allegations. Sanderson Farms denies the remaining allegations in Paragraph 785. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case deny participating in the Poultry Market News Advisory Committee and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 785 and therefore deny them.

786.    *All of the Georgia Dock Defendants knew they were submitting price quotes to the PMN each week, and that those quotes were being used by the PMN to calculate the Dock price. All of the Georgia Dock Defendants knew how the Georgia Dock price index was calculated and that, unlike with the Urner Barry and the USDA Composite indices, the PMN obtained no information from buyers. All of the Georgia Dock Defendants knew that the PMN was not undertaking any effort to validate their submissions, such as by requiring Defendants to submit copies of their actual price sheets or invoices. Yet none of*

*the Georgia Dock Defendants that did business with Plaintiffs shared this significant, non-public information with Plaintiffs.*

**ANSWER:**  Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations of Paragraph 786.  Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 786 and therefore deny them.

787.  *All of the Georgia Dock Defendants knew of the existence of the PMN Advisory Committee and its control over the PMN and Georgia Dock price index. Specifically, the Georgia Dock Defendants knew that the Advisory Committee had the power to reevaluate the Georgia Dock price, to change the way in which the Dock price was calculated, and to influence who would be hired as the next Director of the PMN. The Georgia Dock Defendants also knew that the Advisory Committee consisted exclusively of representatives of chicken producers and not buyers or neutral third parties and that Defendants' then-current and former lobbyists supported the Advisory Committee and independently exercised control and influence over the PMN. Yet none of the Georgia Dock Defendants that did business with Plaintiffs shared this significant, non-public information with Plaintiffs.*

**ANSWER:**  Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations in Paragraph 787.  Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 787 and therefore deny them.

788.  *All of the Georgia Dock Defendants knew they were conspiring with each other and part of an enterprise of Defendants that were associated in fact and did in fact submit false and inflated price quotes to the PMN for the purpose of inflating the Georgia Dock price index for their benefit and Plaintiffs' detriment.  Yet none of the Georgia Dock Defendants that did business with Plaintiffs shared this significant, non-public information with Plaintiffs.*

**ANSWER:**  Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations in Paragraph 788.  Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of

Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 788 and therefore deny them.

>789.    *The Georgia Dock Defendants gave buyers of chicken, including Plaintiffs, the false impression that those Defendants were submitting their actual offering prices for 2.5 to 3 pound whole birds for the next week, instead of making submissions to the PMN to benefit their position as sellers of chicken.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 789 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 789 to the extent that they relate to other Defendants and/or third parties.  Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 789.  Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 789 and therefore deny them.



>790.

**ANSWER:**  To the extent the allegations in Paragraph 790 characterize or describe unidentified documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 790 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 790 to the extent that they relate to other Defendants and/or third parties.  Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford,

Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 790 and therefore deny them. ███████████

███████████████████████████████████████████

███████████████████████████████████ Defendants Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 790.

791. ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

**ANSWER:** To the extent the allegations in Paragraph 791 characterize or describe unidentified documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 791 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 791 to the extent that they relate to other Defendants and/or third parties. Defendants other than Sanderson Farms, Tyson, Pilgrim's, Fieldale, Claxton, Koch, and Wayne Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 791 and therefore deny them. ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



Sanderson Farms denies the remaining allegations in Paragraph 791.

792. *The Georgia Dock Defendants intentionally failed to disclose this significant, non- public information in their communications with their customers regarding their transactions for the purchase and sale of chicken, including Plaintiffs. By intentionally failing to disclose this information, the Georgia Dock Defendants were attempting to induce a false belief by buyers of chicken, including Plaintiffs, about the reliability of the Georgia Dock price index. Defendants intended to induce this false belief by customers for the benefit of the Georgia Dock Defendants.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 792 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 792 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 792 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch,

Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 792.

> 793.    The Georgia Dock Defendants that did business with Plaintiffs knew that Plaintiffs believed the Georgia Dock was a reliable price index and intentionally perpetuated that belief by failing to disclose this significant, non-public information. The Georgia Dock Defendants knew that their customers had little to no knowledge regarding how the Georgia Dock price index worked, because their customers had no ability to obtain such knowledge.

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 793 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 793 to the extent that they relate to other Defendants and/or third parties.  Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 793 and therefore deny them.  Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 793.

> 794.    The Georgia Dock Defendants that did business with Plaintiffs were successful in inducing a false belief by Plaintiffs about the reliability of the Georgia Dock price index; the Plaintiffs believed the Georgia Dock price index was reliable until information suggesting the Dock price may have been inflated was finally made public in late 2016.

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 794 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 794 to the extent that they relate to other Defendants and/or third parties.  Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 794 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 794.

795. *The Georgia Dock Defendants made these omissions when they communicated with Plaintiffs; when they bid on, offered, negotiated, and pitched Plaintiffs' business; and also when they contracted with Plaintiffs. Many of the communications in which the Georgia Dock Defendants failed to disclose significant, non-public information to customers were made via interstate wires (both email and phone).*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 795 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 795 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 795 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 795.

796. *Even if the origin and ultimate destination of any Defendants' wire communications referenced in this Complaint were within a single state, those wires were routed through other states. Thus, even such wires constitute interstate wires.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 796 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 796 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 796 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch,

Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 796.



**ANSWER:** To the extent the allegations in Paragraph 797 characterize or describe unidentified documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 797 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 797 to the extent that they relate to other Defendants and/or third parties. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 797 and therefore deny them. Sanderson Farms denies the remaining allegations in Paragraph 797.



**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. To the extent the allegations in Paragraph 798 characterize or describe unidentified documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in Paragraph 798 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 798 to the extent that they relate to other Defendants and/or third parties. Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 798 and therefore deny them. Fieldale denies the conspiracy allegations and remaining allegations in the last sentence of Paragraph 798.

> 799. *Through their fraudulent acts and omissions, the Georgia Dock Defendants were successful in inducing a false belief by buyers of chicken, including Plaintiffs, about the reliability of the Georgia Dock price index. Either through contracts directly indexed to the Georgia Dock price, or through pricing negotiations indirectly (but materially) influenced by the Georgia Dock price, all Plaintiffs paid inflated prices due to Defendants' manipulation of the George Dock index.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 799 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 799 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 799 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 799.

> 800. *The Georgia Dock Defendants' scheme deprived their victims of valuable economic information and depended for its completion on failure to disclose an essential element of the bargain.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the

437

truth of any allegations in Paragraph 800 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 800 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 800 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 800.

**Q.** **The Georgia Dock Defendants Made Fraudulent Misrepresentations to Plaintiffs by Stating that the Georgia Dock Reflected the Broiler Chicken Market**

> 801.     *In addition to their material omissions, the Georgia Dock Defendants that did business with Plaintiffs also made false statements and affirmative misrepresentations about material facts to Plaintiffs over the relevant period. The Georgia Dock Defendants knew that the Georgia Dock did not represent the broiler market because they did not submit their actual prices to the Poultry Market News. But they told Plaintiffs that the Georgia Dock represented the market price for broiler chicken regardless.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 801 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 801 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 801 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 801.

> 802.     *This practice was widespread: throughout the relevant period, the Georgia Dock Defendants stated, repeated, and maintained that the Georgia Dock represented the*

*market for broilers, and they did so in a deliberate attempt to influence the business decisions made by customers like Plaintiffs.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 802 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 802 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 802 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 802.

803.    *The Georgia Dock Defendants made these false statements and affirmative misrepresentations to Plaintiffs via telephone, in person, in writing, and over email in connection with their bids, pitches, offers, negotiations, and contracts with Plaintiffs. Thus, many of these fraudulent misrepresentations were made via interstate wires (both email and phone). As above, even if the origin and ultimate destination of any Defendants' wire communications were within a single state, those wires were routed through other states. Thus, even such wires constitute interstate wires.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 803 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 803 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 803 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 803.

*804.* 

**ANSWER:**  To the extent the allegations in Paragraph 804 characterize or describe unidentified documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 804 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 804 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 804 and therefore deny them. Tyson denies the remaining allegations in Paragraph 804.

*805.* 

**ANSWER:**  To the extent the allegations in Paragraph 805 characterize or describe unidentified documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 805 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 805 to the extent that they relate to other Defendants and/or third parties.  Defendants other than

440

Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 805 and therefore deny them. Pilgrim's denies the allegations in Paragraph 805.

> 806. Additionally, Georgia Dock Defendants often asked for cost adjustments when the Georgia Dock continued to rise, even if the parties had a pricing arrangement that was not expressly tied to the Georgia Dock.

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 806 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 806 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 806 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 806.



> 807.

**ANSWER:** To the extent the allegations in Paragraph 807 characterize or describe unidentified documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 807 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 807 to the extent that they relate to other Defendants and/or third parties. Defendants other than

Claxton lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 807 and therefore deny them. ████████████

████████████████████████████████████████

███████████



    *808.*

**ANSWER:** To the extent the allegations in Paragraph 808 characterize or describe unidentified documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 808 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 808 to the extent that they relate to other Defendants and/or third parties. Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 808 and therefore deny them. ████████████

████████████████████████████████████████

███████████████████

    *809. The Georgia Dock Defendants knew that buyers of chicken, including Plaintiffs, believed the Georgia Dock to be a reliable price index and intentionally perpetuated that belief by making fraudulent misrepresentations promoting it.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 809 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 809 to the extent that they relate

to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 809 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny any remaining allegations in Paragraph 809.

> 810.    *Plaintiffs relied on the Georgia Dock Defendants' false statements and affirmative misrepresentations about the Georgia Dock representing the broiler "market." As a result, Plaintiffs purchased broiler chicken based on Georgia Dock prices.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 810 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 810 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 810 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the remaining allegations in Paragraph 810.

## R.    Plaintiffs Were Harmed by the Georgia Dock Defendants' Fraudulent Submissions, Omissions, and Misrepresentations

> 811.    *Plaintiffs bought broiler chicken based on pricing expressly tied to the Georgia Dock from Georgia Dock Defendants.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 811 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 811 to the extent that they relate

to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 811 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Mar-Jac, Wayne Farms, and Fieldale admit that, at certain times, they sold chicken on terms related to the Georgia Dock during the Relevant Period, but deny any remaining allegations in Paragraph 811. Harrison Poultry denies that the prices of its Broiler sales were based on the Georgia Dock during the Relevant Period and any remaining allegations in Paragraph 811.

> 812.   *Plaintiffs adjusted pricing of broiler products on multiple occasions after being asked to adjust such prices due to increases in the Georgia Dock, even when the Georgia Dock did not form the basis of the pricing agreement with the supplier who asked for an increase* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**ANSWER:** The last sentence of Paragraph 812 contains no factual allegations to which a response is required. To the extent a response is required, Defendants deny the allegations in this sentence. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 812 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 812 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 812 and therefore deny them. Defendants other than Fieldale and Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 812 and therefore deny them. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

813.     Buyers of poultry, including Plaintiffs, were the targets of the Georgia Dock Defendants' fraudulent submissions to the PMN, and Plaintiffs reasonably relied on the veracity of those submissions.

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 813 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 813 to the extent that they relate to other Defendants and/or third parties.  Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 813 and therefore deny them.  Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the remaining allegations in Paragraph 813.

814.     Georgia Dock Defendants falsely submitted prices to Poultry Market News and, as detailed above, artificially inflated the Georgia Dock. The Georgia Dock price index was artificially inflated from no later than early 2011 through 2016 as a result of certain Defendants' fraudulent acts and omissions.  Plaintiffs had no reason to know that the Georgia Dock price index was inflated due to Defendants' fraudulent acts, misrepresentations, and omissions.

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 814 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 814 to the extent that they relate to other Defendants and/or third parties.  Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 814 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the remaining allegations in Paragraph 814.

> 815. Therefore, by using the Georgia Dock as the basis for the price of broiler chickens it purchased, whether pricing was expressly tied to the Georgia Dock or whether a price increase was requested based on an increase in the Georgia Dock, Plaintiffs overpaid and were harmed due to the Georgia Dock Defendants' fraud.

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 815 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 815 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 815 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the remaining allegations in Paragraph 815.

**S. Defendants Had Both the Motive and Opportunity to Perpetrate the Fraud and Specifically Intended To Do So**

> 816. The broiler chicken industry's long history of boom and bust cycles is well known to Defendants. For example, in 2008, the entire poultry industry was profoundly affected by the bankruptcy filing of Pilgrim's Pride, which was then the largest poultry company in the United States. In its filing, Pilgrim's disclosed that it had lost $998.6 million for the fiscal year, or $14.40 per share, prompting Pilgrim's shares to lose over 46 percent of their value in one day. The collateral effects of this announcement reverberated throughout the industry, with several other leading poultry companies, such as Tyson and Sanderson, also experiencing sizable losses. By the time Pilgrim's emerged from bankruptcy in December 2009, the industry was still struggling to make money, prompting a wave of consolidation and many of the collusive and fraudulent activities outlined in the Complaint.

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 816. To the extent the allegations in Paragraph 816 characterize or describe documents

related to Pilgrim's bankruptcy filing, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 816 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 816 to the extent that they relate to other Defendants and/or third parties. As the phrase "boom and bust" in the first sentence of Paragraph 816 is imprecise, Defendants are unable to form a belief as to the truth of the allegations in that sentence and on this basis deny the allegations in that sentence. With respect to the second and third sentences of Paragraph 816, Defendants other than Pilgrim's admit that they were aware that Pilgrim's had filed for bankruptcy, but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in those sentences and therefore deny them. Pilgrim's admits that in 2008-2009, Pilgrim's was on the brink of financial collapse, that it is one of several Debtors that filed for Chapter 11 bankruptcy in December 2008 and remained under the supervision of the U.S. Bankruptcy Court until approval of its Amended Plan of Reorganization and discharge from bankruptcy in December 2009. Pilgrim's denies the remaining allegations in the second and third sentences of Paragraph 816. With respect to the fourth sentence of Paragraph 816, Defendants other than Tyson and Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sentence and therefore deny them. Sanderson Farms admits that they experienced sizable losses in 2008 for reasons including the Great Recession and high input costs, but denies any remaining allegations in the fourth sentence of Paragraph 816. Tyson denies the remaining allegations in the fourth sentence of Paragraph 816. Defendants deny any remaining allegations in Paragraph 816.

817. ████████████████████████████████████████████
████████████████████████████████████████████████████



**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. To the extent the allegations in Paragraph 817 characterize or describe an unidentified document, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 817 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 817 to the extent that they relate to other Defendants and/or third parties. Defendants deny the remaining allegations in Paragraph 817.



**ANSWER:** Defendants deny the allegations in Paragraph 818.

819. *As noted above, Defendants knew that the Georgia Dock was vulnerable to manipulation and thus presented Defendants with the unique opportunity to collude and/or defraud their retail grocery customers in pursuit of higher profits, thus ensuring that Defendants had both the motive and opportunity to manipulate the index.*

**ANSWER:** Defendants deny the allegations in Paragraph 819.

820. *The manipulation of the Georgia Dock by Defendants served its intended purpose, enabling Defendants to bolster their financial results at their customers' expense. Indeed, in some instances, the manipulation of the Georgia Dock allowed Defendants to recognize a profit instead of a loss. For example, Mike Cockrell, Chief Financial Officer of Sanderson Farms, publicly stated in the New York Times that Sanderson was profitable in the fourth quarter of 2015 "only because we were making money from the chicken we were selling to the retail market." Moreover, according to other published analyses, poultry*

*companies such as Pilgrim's and Sanderson would have realized negative earnings and income in 2016 but for the profits realized from their sales based on the Georgia Dock.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. To the extent the allegations in Paragraph 820 characterize or describe a New York Times article and other unidentified published analyses, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants deny the allegations in the first and second sentences of Paragraph 820. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 820 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 820 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 820.



821.

**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 821. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 821 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 821 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's, Sanderson Farms, Wayne Farms, Koch, and Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 821 and therefore deny them.

███████████████████████████████████████████

███

822.    *Defendants acted with fraudulent intent and knew that their manipulation of the Georgia Dock was improper.*

████████████████████████████████████████

**ANSWER:**  Defendants deny the allegations of conspiracy and antitrust injury and the allegations of the first sentence of Paragraph 822.  To the extent the allegations in the second sentence of Paragraph 822 characterize or describe a 2014 email, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Koch lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 822 and therefore deny them.  ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

823.    *But Defendants did not care. Instead, they intentionally pushed the Georgia Dock on unsuspecting retail grocery customers to ensure their own continued profitability (and secure lucrative individual bonuses for themselves).*

██████████████████████████████████████████████

**ANSWER:**  Defendants deny the allegations of conspiracy and antitrust injury and the allegations of the first two sentences of Paragraph 823.  To the extent the allegations in Paragraph 823 characterize or describe unidentified documents, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 823 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in

Paragraph 823 to the extent that they relate to other Defendants and/or third parties. Defendants deny the remaining allegations in Paragraph 823.

### T. Defendants Engaged in a Pattern of Racketeering Activity as Part of the Conduct of an Enterprise's Affairs

824.    *The Georgia Dock Defendants' fraudulent acts and omissions were not committed individually, but rather as part of the affairs of an enterprise whose purpose was to obtain excessive poultry proceeds by defrauding chicken buyers, including Plaintiffs.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 824 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations in Paragraph 824.

825.    *The enterprise was the group of Georgia Dock Defendants, which were associated in fact through their price submissions to the PMN, their role on the PMN Advisory Committee, their involvement in the Georgia Poultry Federation, and their use of the Dock in selling product. This enterprise was a continuing unit that associated together and acted with a common purpose: to sustain the existence of the PMN and Georgia Dock and to artificially inflate the Dock price for the benefit of the enterprise and the individual Defendants.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 825 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the allegations in Paragraph 825. Sanderson Farms further denies that it was a member of any "Poultry Market News Advisory Committee."

826.    *There have been many relationships among those associated with the enterprise. Representatives from the Georgia Dock Defendants interacted with each other*

*frequently at industry conferences and trade shows, as discussed throughout this Complaint. All but one of the Georgia Dock Defendants participated on the PMN Advisory Committee, which acted to preserve and enhance the PMN and Georgia Dock as discussed above.*

**ANSWER:**   Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy.  Defendants admit that their employees have attended industry conferences and trade shows when it is in their unilateral business interest that they do so.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 826 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 826 to the extent that they relate to other Defendants and/or third parties. Pilgrim's, Tyson, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale admit that at various points in the Relevant Period, at the request of the Georgia Department of Agriculture, they had an employee representative on a Poultry Market News Advisory Committee. Harrison Poultry further states that it withdrew from any participation in the Poultry Market News Advisory Committee in early January 2016. Sanderson Farms admits that it was not a member of the Poultry Market News Advisory Committee.  Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 826 and therefore deny them.  Defendants deny any remaining allegations in Paragraph 826.

827.    *All of the Georgia Dock Defendants were members of the Georgia Poultry Federation, the largest lobbyist in Georgia for poultry producers. All of the Georgia Dock Defendants had positions on the Board of the Georgia Poultry Federation. Representatives from the Georgia Dock Defendants interacted often with leaders of the Georgia Poultry Federation (such as Abit Massey and Mike Giles). Those same leaders helped to preserve*

*and enhance the power of the PMN Advisory Committee and the Georgia Dock, as discussed herein.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 827 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 827 to the extent that they relate to other Defendants and/or third parties. Defendants House of Raeford, Perdue, Wayne Farms, Tyson, Sanderson Farms, Pilgrim's, Mar-Jac, Harrison Poultry, and Claxton admit that they or one or more their employees were members of certain legitimate trade associations for pro-competitive reasons, including the Georgia Poultry Federation, at certain times during the Relevant Period, but deny the remaining allegations in Paragraph 827. Defendants Agri Stats, George's, Peco, Amick, Perdue, OK Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 827 and therefore deny them. Koch denies the allegations of Paragraph 827 as to Koch, and denies any remaining allegations in Paragraph 827.

> *828. The enterprise had longevity that was sufficient to permit those associated to pursue the enterprise's purpose. There was continuity among the representatives of the Defendants who served on the Advisory Committee, interacted with representatives of the Georgia Poultry Federation, and submitted price quotes to the PMN. The scheme of the Georgia Dock Defendants to manipulate the Georgia Dock price by making false and inflated price quotes, as discussed in this Complaint, began no later than early 2011 and lasted for at least five years.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Defendants deny the first sentence of Paragraph 828. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 828 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 828 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire,

House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 828 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the remaining allegations in Paragraph 828.

829. *Not only were the Georgia Dock Defendants a part of this enterprise, but they acted in concert with each other in their fraudulent acts and omissions.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 829 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 829 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 829 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the remaining allegations in Paragraph 829.

830. *The same was true with respect to the Georgia Dock Defendants' fraudulent omissions. If any of the Georgia Dock Defendants had disclosed their knowledge about the lack of verification for their price submissions to the PMN, their ability to manipulate the Georgia Dock price index, or the fact they were manipulating the Georgia Dock price index, then all buyers would have lost confidence in the Georgia Dock earlier than the end of 2016. That was important, non- public information that only the Georgia Dock Defendants had in their possession. Because all of the Georgia Dock Defendants collectively benefited*

*from their non-disclosure, the Georgia Dock Defendants worked in concert not to disclose this information.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 830 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 830 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 830 and therefore deny them. Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale deny the remaining allegations in Paragraph 830.

**U.  The Georgia Dock Defendants Did Not Contract with Plaintiffs in Good Faith**

> 831.  *Throughout the relevant period, the Georgia Dock Defendants entered into contracts and exchanged pricing sheets and invoices with customers, including Plaintiffs, that priced broiler chicken based on the Georgia Dock. Pursuant to these agreements, the prices charged by the Georgia Dock Defendants to Plaintiffs were determined by a few methods, including bracket pricing based on the Georgia Dock and pricing that used the Georgia Dock as a percentage or fixed component of Plaintiffs' cost.*

**ANSWER:** To the extent the allegations in Paragraph 831 characterize or describe contracts and contract terms, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 831 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 831 to the extent that they relate to other Defendants and/or third parties. Defendants Agri Stats, George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford, Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 831 and therefore deny them. Defendants Pilgrim's,

Tyson, Sanderson Farms, Koch, Claxton, Wayne Farms, Mar-Jac, and Fieldale admit that, at times, they each communicated with their customers about pricing and invoices, that they each independently sold some chicken products at prices related to the Georgia Dock, and that the prices offered by each of these Defendants varied and were determined by a few methods, including bracket pricing based on the Georgia Dock and pricing that used the Georgia Dock as a percentage or fixed component of Plaintiffs' cost, but deny Plaintiffs' characterization of these communications or sales terms and any remaining allegations in Paragraph 831. Harrison Poultry specifically denies that it entered into contracts or exchanged pricing sheets or invoices related to the Georgia Dock during Relevant Period.

> 832. *Plaintiffs' broiler chicken contracts came in many forms, including oral agreements, formal written supply agreements, and other written agreements, including agreements made via email, purchase orders, and invoices.* ████████████████
> ████████████████████████████████████████████
> *An implied covenant of good faith and fair dealing was implied in all of the contracts between Plaintiffs and the Georgia Dock Defendants.*

**ANSWER:** To the extent the allegations in Paragraph 832 characterize or describe contracts and contract terms, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 832 and therefore deny them. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 832 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 832 to the extent that they relate to other Defendants and/or third parties. As the term "all of the contracts" is imprecise, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 832 and therefore deny them. Defendants other than Claxton, Fieldale, Koch, Pilgrim's, Sanderson Farms, Tyson, and Wayne Farms lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 832 and therefore deny them. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Koch denies any remaining allegations in Paragraph 832.

833. *Agreements that used Georgia Dock bracketing to determine the price of broiler chicken typically included the price at which broiler chicken would be sold to Plaintiffs depending on whether the Georgia Dock fell into one of multiple (usually three) brackets. Contracts that pertained to more than one broiler product typically listed item codes and descriptions in rows, with corresponding prices set out for each bracket. The price Plaintiffs paid for a given sale depended on what the Georgia Dock price was each week, and where it fell in the brackets listed. Throughout the relevant period, the Georgia Dock Defendants who used such bracketing systems had to add new bracket ranges on the high end to account for the "uncharted territory" into which the Georgia Dock entered.*

**ANSWER:** To the extent the allegations in Paragraph 833 characterize or describe contracts and contract terms, Defendants deny any characterization or description that is

458 of 695 PageID #:294034

inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 833 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 833 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 833 and therefore deny them.

> 834.     Other agreements specified that Plaintiffs would pay a fixed amount over the Georgia Dock pricing index's quotes for a given week. This could take several different forms, whether by adding a percentage or a certain number of cents to the Georgia Dock price. ████████████████████████████████████████████████████████████████

**ANSWER:**  As the phrase "other agreements" is imprecise, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences of Paragraph 834 and therefore deny them. ███████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 834 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 834 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 834.

> 835.     Even where a contract had a fixed price, those prices were often based off of the Georgia Dock as an indicator. ████████████████████████████████████████
> ██████████████████████

**ANSWER:**  As the term "often" is imprecise, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 835

and therefore deny them. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ Each Defendant

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

Paragraph 835 that relate to other Defendants and/or third parties, and therefore each Defendant

denies the allegations in Paragraph 835 to the extent that they relate to other Defendants and/or

third parties.  Defendants deny any remaining allegations in Paragraph 835.

> 836.  *Regardless of which Georgia Dock pricing arrangement was used, the material pricing terms of the Georgia Dock Defendants' broiler chicken contracts provided that the amount charged to Plaintiffs would be predicated on the Georgia Dock. None of these arrangements allowed the Georgia Dock Defendants to operate and control the Georgia Dock or to use their pricing submissions to PMN to falsely inflate each week's Georgia Dock price above the actual average offering price.  Such a scheme undermined all validity to the Georgia Dock pricing system as being reflective of actual average offering prices, and gave the Georgia Dock Defendants the ability to maneuver their prices skyward, so long as on a week-to-week basis they stayed within the two-cent range permitted by the PMN.  At the same time, the secrecy behind which the Georgia Dock Defendants kept the Georgia Dock shrouded deprived customers like Plaintiffs of any ability to uncover and detect that their purchases were based on an inflated pricing index.*

**ANSWER:**  Defendants Pilgrim's, Tyson, Sanderson Farms, Koch, Claxton, Mar-Jac,

Wayne Farms, and Fieldale admit that, at times, certain of their broiler chicken sales were sold on

terms related to the Georgia Dock, but deny any remaining allegations in Paragraph 836.  Harrison

Poultry specifically denies that the price of its Broiler sales during the Relevant Period were based

on the Georgia Dock and any remaining allegations in Paragraph 836.  Defendants Agri Stats,

George's, Peco, Amick Farms, Perdue, O.K. Foods, Simmons, Mountaire, House of Raeford,

Foster Farms, Keystone, and Case lack knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 836 and therefore deny them.

V.     **Defendants used the Georgia Dock Manipulation To Impact Higher Prices Charged to Contract Purchasers**

837.    *Defendants' manipulation of the Georgia Dock not only had an anticompetitive effect on the prices of broilers that were based directly on the Georgia Dock; it also contaminated and artificially raised prices for broilers that were not expressly tied to the Georgia Dock.*

**ANSWER:** Defendants deny the allegations in Paragraph 837.

838.    *Defendants also used the artificial prices reported on the Georgia Dock index to justify price increases to their contract purchasers. This was especially the case during the latter part of the conspiracy when the Georgia Dock index deviated so dramatically from the Urner Berry and USDA Composite indices. It was true, moreover, even with respect to Defendants that did not submit pricing information to Georgia Dock.*

**ANSWER:** Defendants deny the allegations in Paragraph 838.

839.    *When Defendants engaged in negotiations with restaurants and other contract purchasers of broilers, and sought to explain why they were "forced" to increase prices, one of the main explanations that they used to justify the price increases was the artificially inflated Georgia Dock index. Defendants independently could not have provided restaurants and other contract purchasers with the same false explanation for price increases without coordinating the messaging.*

**ANSWER:** Defendants deny the allegations in Paragraph 839.

W.     **Defendants' Bid-Rigging Conduct**

840.    *Beginning at least as early as 2012 and continuing at least into 2019 ("Bid-Rigging Conduct Period"), Defendants and the Co-Conspirators engaged in a conspiracy to rig bids submitted for broilers sold to restaurants and other contract purchasers, with the intent to artificially inflate the prices paid by these customers.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 840 at this time.

841.    *As part of their procurement process, many restaurants and other contract purchasers ("Bid Customers")[17] requested proposals or bids from Defendants for the volume of chicken needed. The Bid Customers received bids from Defendants throughout the Bid-Rigging Conduct Period.*

*FN 17: Pursuant to this Court's Order of September 22, 2020 (ECF No. 3835), the DAPs are permitted to use this Consolidated Pleading to amend their Complaints*

> *to include bid rigging claims. All DAPs who have or could have been affected by the bid-rigging factual allegations join in these allegations and claims.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 841 and Footnote 17 at this time.

> 842. *The Bid Customers expected Defendants to engage in a competitive bidding process, which when complete, would allow the Bid Customers to award its contracts to the most competitive bidder(s). Defendants, however, recognized that the Bid Customers offered an additional opportunity to effectuate their conspiracy.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 842 at this time.

> 843. *Defendants' and the Co-Conspirators' bid-rigging conduct took multiple forms. At its most basic level, Defendants and the Co-Conspirators exchanged confidential information with each other regarding the bids they were submitting, or intended to submit, to specific identified Bid Customers, so that all supposedly competitive bids were aligned.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 843 at this time.

> 844. *On June 3, 2020, the Department of Justice issued an Indictment against officers of certain Defendants in the District of Colorado founded on Defendants' and the Co-Conspirators' bid-rigging conduct (the "June Indictment"). The June Indictment charged Jayson Penn, President and CEO of Pilgrim's Pride, Mikell Fries, President of Claxton, Scott Brady, Vice President of Claxton, and Roger Austin Vice President of Pilgrim's Pride (the "First Indicted Defendants") with conspiring "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States" in violation of Section 1 of the Sherman Act.[18]*

*FN 18: United States of America v. Jayson Jeffrey Penn et al., Crim. Action No. 20-cr- 00152-PAB (D. Colo. June 2, 2020) [ECF No. 1].*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 844 and Footnote 18 at this time.

*845.    Specifically, the June Indictment alleged that from at least 2012 through at least 2017, the First Indicted Defendants and at least seven broiler chicken suppliers conspired:*

- *to reach agreements and understandings to submit aligned, though not necessarily identical, bids and to offer aligned, though not necessarily identical, prices, and price-related terms, including discount levels and lines of credit, for broiler chicken products sold in the United States;*

- *to participate in conversations and communications relating to nonpublic information such as bids, prices, and price-related terms, including discount levels and lines of credit, for broiler chicken products sold in the United States with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products sold in the United States; and*

- *to monitor bids submitted by, and prices and price-related terms, including discount levels and lines of credit, offered by, Suppliers and Co- Conspirators for broiler chicken products sold in the United States.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 845 at this time.

*846.    The June Indictment expressly identified as victims of the First Indicted Defendants' conspiracy "[r]estaurants, grocery retailers and others who purchased large*

*volumes of broiler chicken" who "received bids from or negotiated prices or other price-related terms, including discount levels, with Suppliers directly."*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 846 at this time.

> 847.    *The June Indictment set forth a series of communications between Defendants and the Co-Conspirators – via phone, email and text messages – sharing and coordinating confidential bidding and pricing information in connection with multiple restaurant and grocer victims' requests for bids.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 847 at this time.

> 848.    *On October 7, 2020, the Department of Justice issued a Superseding Indictment in the District of Colorado, again founded on Defendants' bid-rigging conduct (the "Superseding Indictment"). The Superseding Indictment charged six additional executives, including Tim Mulrenin (Tyson/Perdue), Bill Kantola (Koch), Jimmie Little (Pilgrim's Pride), Bill Lovette (Pilgrim's Pride), Brian Roberts (Tyson/Case Foods), and Ric Blake (George's) (together with the First Indicted Defendants, the "Criminal Defendants") with conspiring "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States" in violation of Section 1 of the Sherman Act.[19]*

> *FN 19: United States of America v. Jayson Jeffrey Penn et al., Crim. Action No. 20-cr- 00152-PAB (D. Colo. June 2, 2020) [ECF No. 101].*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 848 and Footnote 19 at this time.

849.     *The Superseding Indictment expanded the bid-rigging conduct period from at least as early as 2012 through at least early 2019, and stated that the bid-rigging conduct included but was not limited to ten different broiler chicken suppliers.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 849 at this time.

850.     *The Superseding Indictment also charged Defendant Jimmie Little with two additional counts for False Statements and Obstruction of Justice. The Superseding Indictment alleged that during an interview with special agents of the United States Department of Commerce and the Federal Bureau of Investigation, Little "knowingly and willfully made false statements to federal law enforcement agents." Specifically, "LITTLE stated words to the effect that (a) he had no contact with individuals at competing Suppliers outside of speaking to the individuals at industry trade shows; and (b) he had not called- or sent text messages to – any individuals at competing Suppliers. The Statements were false. As LITTLE then and there knew, he indeed had contact with individuals at competing Suppliers outside of trade shows, and had called and sent text messages to individuals at competing Suppliers."*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 850 at this time.

851.     *The Obstruction of Justice count alleges that "LITTLE corruptly obstructed, influenced and impeded official proceedings, and corruptly attempted to obstruct, influence, and impede official proceedings, pending and about to be instituted in the District of Colorado, to wit, the pending grand jury investigation of price fixing in the broiler chicken industry, the pending prosecution of four individuals for conspiring to fix prices in the broiler chicken industry, and the then-about-to-be-instituted prosecution of LITTLE for conspiring to fix prices in the broiler chicken industry."*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 851 at this time.

852.     *On October 13, 2020, the Department of Justice filed an Information charging Pilgrim's Pride.[20] The Information states that "[b]eginning at least as early as 2012 and continuing through at least early 2019 ... [Pilgrim's Pride] and its co-conspirators entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-*

*related terms for broiler chicken products sold in the United States. The combination and conspiracy engaged in by Defendant and its co-conspirators was a per se unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1."*

> *FN 20: United States of America v. Pilgrim's Pride Corporation., Crim. Action No. 1:20- cr-00330-RM (D. Col. October 14, 2020) [ECF No. 1].*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 852 and Footnote 20 at this time.

> *853. Plaintiffs incorporate by reference and adopt the allegations of the Superseding Indictment. As a result of the bid-rigging conduct, pricing to the Bid Customers, for broilers was elevated. The Bid Customers were injured in their business or property by paying more for broilers than they would have paid in the absence of the conspiracy.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 853 at this time.

## X. The Structure and Characteristics of the Chicken Market Make it Highly Susceptible to Collusion

> *854. **Highly-Concentrated Market with Vertically-Integrated Producers**. A concentrated market, such as the U.S. chicken market, facilitates the operation of a cartel because it is easier to coordinate behavior among possible co-conspirators and more difficult for customers to avoid the effects of collusive behavior.*

**ANSWER:** Defendants deny the allegations in Paragraph 854.

> *855. According to a November 2013 USDA report, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing. According to the National Chicken Council, 55 federally inspected Broiler companies operated in 1995, compared with 41 companies in 2010." By 2014, there were only 35 such companies.*

**ANSWER:** To the extent the allegations in Paragraph 855 characterize or describe an unidentified November 2013 USDA report, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in Paragraph 855 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 855 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 855 and therefore deny them.

856. *In fact, the trend towards consolidation among all segments of the Broiler industry goes back decades, as shown below. This consolidation has largely squeezed out the large number of smaller Broiler companies that used to represent a significant portion of Broiler industry production.*



**ANSWER:** To the extent the allegations in Paragraph 856 characterize or describe WATT Poultry USA data in the graph above, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 856 and therefore deny them.

*857. As of 2015, Defendants controlled 88.8% of Broiler production in the United States. Since the start of the relevant time period, there has been surprising stability in market share for each Defendant, as shown by the graph below.*



**ANSWER:** To the extent the allegations in Paragraph 857 characterize or describe unidentified data in the graph above, Defendants deny any characterization or description that is inconsistent with the referenced source. Harrison Poultry admits that its market share is not reflected in the graph above. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 857 and therefore deny them.

*858. Defendants now collectively control nearly 90 percent of the U.S. wholesale chicken market.*

**ANSWER:** As the term "collectively control" is imprecise, Defendants are unable to form a belief as to the truth of the allegations contained in Paragraph 858 and on this basis deny them.

*859. The U.S. chicken industry is almost entirely vertically integrated, with Defendants (known as "integrators") owning, or tightly controlling, each aspect of breeding, hatching, chick- rearing, feeding, processing, and selling.*

**ANSWER:** The Producer Defendants admit that they have ownership and control over aspects of their production, including processing and marketing. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 859 that relate to other Defendants and/or third parties, and therefore each Defendant

denies the allegations in Paragraph 859 to the extent that they relate to other Defendants and/or

third parties.  Defendants deny any remaining allegations in Paragraph 859.

> 860.  ***Inelastic Demand at Competitive Prices****. Inelastic demand means that
> increases in price result in limited declines in quantity sold in the market. In order for a
> cartel to profit from raising prices above competitive levels, demand must be inelastic at
> competitive prices, which allows cartel members to raise prices without seeing a decline
> in sales revenue.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 860 and therefore deny them.

> 861.  *Industry studies show that in the U.S. chicken market, not only is the
> demand for chicken inelastic, it has become increasingly more inelastic over the past 40
> years.*

**ANSWER:**  To the extent the allegations in Paragraph 861 characterize or describe

unidentified industry studies, Defendants deny any characterization or description that is

inconsistent with the referenced source.  Each Defendant lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in Paragraph 861 that relate to other

Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph

861 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any

remaining allegations in Paragraph 861.

> 862.  *In connection with a joint DOJ-USDA workshop on the poultry market in
> 2010, agriculture economist Michael Dicks presented research demonstrating how vertical
> integration incentivizes chicken producers to implement supply restrictions.  He stated that
> in the U.S. poultry industry "vertical coordination allows integrators to manage excess
> capacity to manage price. Integrators can minimize the effect on producers by increasing
> the time between collection and delivery of birds or reducing the number of flocks per year
> ... Because of the inelastic nature of the supply and demand a reduction in supply will
> produce an outcome more preferable to the industry than maintaining supply with a lower
> price."*

**ANSWER:**  To the extent the allegations in Paragraph 862 characterize or describe an

unidentified paper by Michael Dicks, Defendants deny any characterization or description that is

inconsistent with the referenced source.  Each Defendant lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in Paragraph 862 that relate to other

Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph

862 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any

remaining allegations in Paragraph 862.

863.    ***Existence of Numerous Trade Associations and Access to Competitors'
Data through Agri Stats***.  *The existence of industry trade associations makes a market more
susceptible to collusive behavior because such associations provide a pretext under which
co-conspirators exchange sensitive company information, such as pricing and market
allocation. Industry trade associations also provide mechanisms for sharing information,
and monitoring, deterring, detecting, and punishing cheating.*

**ANSWER:**  Defendants deny the allegations in Paragraph 863.

864.    *The following U.S. chicken industry trade associations, all of which count
all or nearly all Defendants as members, allowed Defendants to coordinate their price-
fixing and supply restriction conspiracy: National Chicken Council ("NCC"), United
States Poultry & Egg Export Council, U.S. Poultry & Egg Association, Georgia Poultry
Federation, North Carolina Poultry Federation, Poultry Federation (representing chicken
producers in Arkansas, Missouri, and Oklahoma), and the International Poultry Council.*

**ANSWER:**  Defendants deny the allegations of conspiracy and antitrust injury in

Paragraph 864.  Defendants admit that certain Defendants are members of certain legitimate trade

associations for pro-competitive reasons. Each Defendant lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in Paragraph 864 that relate to other

Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph

864 to the extent that they relate to other Defendants and/or third parties.  Defendants lack

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 864 and therefore deny them.

865.    *According to Communication in Poultry Grower Relations: A Blueprint to
Success, a book written by a management consultant affiliated with the U.S. Poultry & Egg
Association, "representatives from the various [chicken producers] readily share
information while attending the numerous seminars offered by the U.S. Poultry & Egg
Association, National Chicken Council" and other trade groups. The book notes that
"industry leaders realize the industry's tremendous potential, and their spirit of*

*cooperation is based on knowing that which is good for individual companies is good for the industry."*

**ANSWER:** To the extent the allegations in Paragraph 865 characterize or describe a book by an unidentified author, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 865 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 865 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 865.

866. *Regular and frequent attendance by Defendants' CEOs and top level executives at trade association meetings is customary. For example, NCC "represents integrated chicken producer-processors, the companies that produce, process and market chickens. [The 40] member companies of NCC account for approximately 95 percent of the chicken sold in the United States."*

**ANSWER:** To the extent the allegations in Paragraph 866 characterize or describe an unidentified source, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants admit that at times their respective executives attended trade association meetings for procompetitive reasons. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 866 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 866 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 866.

867. *The CEOs of the top integrated broiler producers are routinely on the board of directors and meet at least quarterly with one another through the NCC.*

**ANSWER:** Defendants admit that personnel of certain Defendants have served on the NCC's Board of Directors, but deny that NCC Board of Directors meetings occurred quarterly. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any

allegations in Paragraph 867 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 867 to the extent that they relate to other Defendants and/or third parties. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 867 and therefore deny them.

868. *The NCC has three annual board meetings attended by Defendants' senior executives, including most or all Defendants' CEOs and other top executives. Every Defendant and Co-Conspirator is a member of the NCC, including Mar-Jac, Claxton Poultry, Harrison Poultry, Keystone, and Allen Harim. Amick President and CEO Ben Harrison, who served on the NCC Board of Directors throughout the relevant time period, was NCC's Chairman in 2018. CEOs generally always attend the following three NCC meetings each year, in addition to special committee meetings or other special NCC events: (a) the January meeting of the NCC held along with the International Poultry Expo, (b) the mid-year Board of Directors meeting, and (c) the NCC Annual Meeting in October.*

**ANSWER:** While Defendants admit that personnel of certain Defendants have attended meetings or events held by the National Chicken Council or served on its Board of Directors, Defendants lack knowledge or information sufficient to form a belief as to whether their respective personnel attended the specific events described in Paragraph 868, and therefore deny such allegations. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 868 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 868 to the extent that they relate to other Defendants and/or third parties. Amick Farms admits that Ben Harrison served on the NCC Board of Directors during the Relevant Period. Defendants deny any remaining allegations in Paragraph 868.

869. *Generally, CEOs arrive the night before an NCC meeting and socialize with their colleagues, then have small private dinners with one or more of their competitors' CEOs or top executives. The next day, the formal NCC meetings are held and executives from Agri Stats and other allied industry organizations make presentations at the meeting. A formal lunch is held during the meeting and provides CEOs and top executives and opportunity to talk casually with their competitors. Following the meeting, Defendants' CEOs and top level executives often meet, socialize, and golf, hunt, or fish together. Defendants and Co-Conspirators also hold positions of power within the NCC. For example, Amick President and CEO Ben Harrison, served on the NCC Board of Directors*

*throughout the relevant period, and subsequently served as NCC Chairman. Thomas Shelton, Chairman and CEO of Case Foods, has continuously been a member of NCC since 1988 through the relevant period serving on the Board of Directors and as President during that time. Numerous executives of Keystone Foods, including Jeff Bailey (Director of National Account Sales), Jenelle Duncan (Domestic Sales Manager), Chuck Cooper (Senior Director Supply Chain), Charles Hill (VP Sales & Marketing), and Keith Lewis (former Senior Vice President for U.S. Poultry and Fish), were also members of the NCC during the relevant period. William Andersen of Keystone Foods was also appointed to the board of directors for a three year term during the 2010-11 NCC cycle. Andersen was heavily involved with the NCC, assisting in preparation of annual reports and management reports, and preparing and sharing market reports including graphs on chicken production, eggs set, chick placements, hatching layers, and egg production.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 869 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 869 to the extent that they relate to other Defendants and/or third parties. While Defendants admit that personnel of certain Defendants have attended meetings or events held by the National Chicken Council or served on its Board of Directors, Defendants lack knowledge or information sufficient to form a belief as to whether their respective personnel attended the specific events described in Paragraph 869, and therefore deny such allegations. Defendants deny the characterization of National Chicken Council events in Paragraph 869. Amick Farms admits that Ben Harrison served on the NCC Board of Directors during the Relevant Period. Defendants deny any remaining allegations in Paragraph 869.

*870. Similarly, Defendants and Co-Conspirators, and their senior executives, regularly attend the Georgia Poultry Federation's meetings (usually held in April, August and September). The Georgia Poultry Federation's mission is "[t]o protect and improve the competitive position of the poultry industry in Georgia, the nation's leading poultry producing state." Defendants and Co- Conspirators House of Raeford, Perdue, Fieldale Farms, Wayne Farms, Tyson, Sanderson Farms, Pilgrim's, Mar-Jac Poultry, Harrison Poultry, and Claxton Poultry, and Keystone Foods are members of the Georgia Poultry*

*Federation. Keystone Foods' Clay Banks served as Chairman of the Georgia Poultry Federation during 2014-2015.*

**ANSWER:** To the extent the allegations in Paragraph 870 characterize or describe documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 870 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 870 to the extent that they relate to other Defendants and/or third parties. Defendants other than House of Raeford, Perdue, Wayne Farms, Tyson, Sanderson Farms, Pilgrim's, Mar-Jac, Harrison Poultry, and Claxton lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 870 and therefore deny them. Defendants House of Raeford, Perdue, Wayne Farms, Tyson, Sanderson Farms, Pilgrim's, Mar-Jac, Harrison Poultry, and Claxton admit that they or one of more of their employees have been members of certain legitimate trade associations for pro-competitive reasons, including the Georgia Poultry Federation; these Defendants further admit that the Georgia Poultry Federation has meetings from time to time. Defendants deny any remaining allegations in Paragraph 870.

871.    *Defendants also accessed each other's above-described data through co-Defendant Agri Stats to monitor cheating, if any, in the conspiracy. Agri Stats acted as an active facilitator of Defendants' cartel.*

**ANSWER:** Defendants deny the allegations in Paragraph 871.

872.    ***Investor Conferences.*** *Defendants' CEOs and senior executives participate in numerous investor conferences organized by Wall Street analysts, providing further opportunities to meet and communicate with one another. Such conferences are held on an annual and/or ad hoc basis including, but not limited to, the Goldman Sachs Global Staples Forum (held every May), Bank of America Merrill Lynch Global Agriculture Conference (held every February), BMO Capital Markets Annual Ag & Protein Conference (held every May), BMO Capital Markets Conference (held every May), BMO Farm to Market Conference (held every May), Urner Barry Annual Executive Conference and Marketing*

*Seminar (held every April or May), and JP Morgan Basic Materials Conference (held every June).*

**ANSWER:** While Defendants admit that personnel of certain Defendants have attended events held by analyst firms, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations that "CEOs and senior executives" participated in the specific conferences listed in Paragraph 872, or that they occurred with the frequency described in Paragraph 872, and therefore deny them. Defendants further deny any characterization of those meetings and conferences. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 872 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 872 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 872.

873. ***Competitor Plant Tours.*** *Defendants also permitted one another to tour each other's Broiler plants, which revealed confidential business methods employed by a company. While such tours were often framed as "best practices" information exchanges, they permitted the opportunity to conspire among senior executives.*

**ANSWER:** Defendants deny the allegations of conspiracy in Paragraph 873, including that a tour of another producer's plant would necessarily reveal "confidential business methods." Defendants admit that certain personnel from other Defendants/third parties have visited certain of Producer Defendants' facilities for pro-competitive purposes; Defendants deny any characterization of those visits. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 873 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 873 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 873.

874. As additional examples of Defendants sharing competitive and sensitive information with each other,



**ANSWER:** To the extent the allegations in Paragraph 874 characterize or describe handwritten notes, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 874 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 874 to the extent that they relate to other Defendants and/or third parties. Defendants other than Peco and Mar-Jac lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 874 and therefore deny them.

███████████████████████████████████████████

███████████████████████████████████████

875.     *Defendants also permit employees to regularly move between companies without non-compete limitations or confidentiality agreements that would protect a company's (seemingly) proprietary business knowledge and customer base. For example, Dr. Don Jackson was President of Foster Farms' Poultry Division until December 2008, but then immediately took a position as CEO of Pilgrim's. Similarly, Clint Rivers, Pilgrim's former President and CEO until December 2008, left the company and became Senior VP of Operations and Supply Chain Management for Perdue in 2009. Rivers then moved to Wayne Farms in 2012, where he became Chief Operating Officer. Greg Tatum served as CFO for Claxton Poultry, before moving to Pilgrim's in 2009 to serve as Senior VP of Business Development. Numerous other high level and well as lower level executives move freely between Broiler companies with little or no provision by Defendants to protect their confidential information.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 875 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 875 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Perdue, Wayne Farms, Tyson, Pilgrim's, Foster Farms, Case, Harrison Poultry, and Claxton lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 875 and therefore deny them.  Pilgrim's admits that the majority of its employees are at-will employees with no written employment agreement; that it has termination or separation agreements with certain employees, which may contain confidentiality or non-compete provisions, upon departure from the company but not with others; and that incoming employees are asked whether they have relevant separation or termination agreements with any poultry company for whom they previously worked when they begin employment at Pilgrim's. Pilgrim's further admits that Dr. Don Jackson was CEO of Pilgrim's from January 2009 through January 2, 2011 and that he was employed by Foster Farms prior to joining Pilgrim's; that J. Clinton Rivers was CEO of Pilgrim's from March 5, 2008 to January 2009; that Greg Tatum was an employee of Pilgrim's from February 9, 2009 to

June 28, 2014, that Bill Lovette worked at Tyson and Case Foods prior to joining Pilgrim's where he was the CEO from January 2011 to March 2019, and that Jayson Penn worked at Case Foods prior to joining Pilgrim's in March 2011 as a Senior Vice President. Pilgrim's denies any remaining allegations in Paragraph 875. Tyson admits that Bill Lovette worked at Tyson, that Tyson has widely used non-compete and confidentiality agreements and has taken legal action on many occasions to enforce the restrictions in those agreements against former employees and competitors, including competitors named as Defendants in this Complaint. Tyson denies any remaining allegations in Paragraph 875. Perdue admits that Clint Rivers left Pilgrim's Pride in December 2008 and became Senior VP of Operations and Supply Chain Management for Perdue in 2009. Perdue admits that after leaving employment at Perdue Clint Rivers went to work for Wayne Farms. Perdue denies any remaining allegations in Paragraph 875. Wayne Farms admits that Clint Rivers is currently an employee of Wayne Farms and was formerly an employee of Pilgrim's and of Perdue. Wayne Farms denies any remaining allegations in Paragraph 875. Foster Farms admits that Don Jackson was President of Foster Farms' Poultry Division until December 2008. Foster Farms also avers that California law prohibits Foster Farms from imposing non-compete clauses on its executives. Foster Farms denies any remaining allegations in Paragraph 875. Case admits that Bill Lovette worked at Case from 2008 through December 2010, that Lovette left Case in 2010 and that Jayson Penn left Case in 2011, and that both subsequently worked at Pilgrims. Further answering, Case states that it has entered into restrictive covenant agreements with certain employees, including Mr. Lovette, and takes steps to enforce those agreements when necessary. Case denies any remaining allegations in Paragraph 875. Claxton admits Greg Tatum served as its CFO prior to leaving the company, but denies any remaining allegations in Paragraph 875. Harrison Poultry admits that the majority of its employees are at-

will employees with no written employment agreement, although it has termination or separation agreements with certain employees, which may contain confidentiality or non-compete provisions, but denies any remaining allegations in Paragraph 875.

> 876. ***Mergers and Acquisitions.*** *Senior executives from Defendants had numerous opportunities to directly communicate with one another regarding various mergers and acquisitions between 2008 and 2016. These merger and acquisition discussions include both completed agreements, such as those described in Section VI(E)(4) of this Complaint, as well as proposed transactions that were never completed. In connection with mergers and acquisition discussions, due diligence materials regarding confidential business information were shared between Defendants.*

**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 876. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 876 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 876 to the extent that they relate to other Defendants and/or third parties. To the extent that Paragraph 876 incorporates and re-alleges allegations contained in Section VI(E)(4), Defendants incorporate and re-allege their answers to each allegation contained in Section VI(E)(4). Defendants deny any remaining allegations in Paragraph 876.

> 877. *In addition, Defendants all rely on debt financing and merger and acquisition services from the same small group of financial institutions. In the course of providing such services, financial institutions obtain unusually detailed access to Defendants' non-public operational information, including production and pricing information, which provides another opportunity for Defendants to share confidential business information.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 877 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 877 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 877.

878.



**ANSWER:** To the extent the allegations in Paragraph 878 characterize or describe an unidentified source, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 878 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 878 to the extent that they relate to other Defendants and/or third parties. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 878 and therefore deny them. Tyson denies any remaining allegations in Paragraph 878.

879.



**ANSWER:** To the extent the allegations in Paragraph 879 characterize or describe a February 21, 2012 email, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 879 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 879 to the extent that they relate to other Defendants and/or third parties. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 879 and therefore deny them. Tyson denies any remaining allegations in Paragraph 879.

880.



████████████████████████████████████████

**ANSWER:** To the extent the allegations in Paragraph 880 characterize or describe May 16, 2013 email, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 880 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 880 to the extent that they relate to other Defendants and/or third parties. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 880 and therefore deny them. Tyson denies any remaining allegations in Paragraph 880.

881. ***Further Restricting Breeder Flock Supply and Sharing of Future Plans Through So-Called Strategic Alliances and Joint Ventures****. Defendants and their Co-Conspirators facilitated the sharing of future plans for the slaughter of so called "fowl" including spent hens through a so-called "strategic alliances" and joint ventures, which also gave the Defendants and Co-Conspirators additional opportunities to implement the supply-restriction mechanism of their conspiracy, and achieve additional profits, by sending "spent hens," which are breeder hens that can no longer lay eggs, as well as roosters (which along with spent hens, are sometimes collectively referred to as "fowl,") to so-called "hen houses" for slaughter for meat consumption.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. To the extent the allegations in Paragraph 881 characterize or describe an unidentified source, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 881 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 881 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 881.

882. *Because, unlike the broilers produced by the Defendants and Co-Conspirators, hen houses had the capacity and equipment necessary to slaughter larger*

*birds – often called "heavy fowl," which are spent hens and roosters weighing up to eight pounds – hen houses became a critical part of the Defendants' supply-restriction mechanism of their conspiracy by allowing them to send their breeder hens to slaughter at younger and younger ages, further reducing supply at the very top of the supply chain. Sending breeder hens to hen houses for slaughter while they were still capable of laying eggs – that is, before 65 weeks of age – allowed the Defendants and Co- Conspirators to use information provided by both Agri Stats (which tracked average slaughter age, as detailed above) and the hen houses (which tracked and disseminated to their members similar information) to project their own supply and also gain insight into the supply reductions of their ostensible competitors who were also members of such "strategic alliances."*

**ANSWER:**   Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy.  To the extent the allegations in Paragraph 882 characterize or describe an unidentified source, Defendants deny any characterization or description that is inconsistent with the referenced source.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 882 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 882 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any remaining allegations in Paragraph 882.

> *883.    Discovery to date has uncovered the participation of the Defendants and their Co- Conspirators in two such entities, Non-Producer Co-Conspirator Tip Top and Non-Producer Co- Conspirator Southern Hens.*

**ANSWER:**   Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 883 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 883 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Claxton admit that Tip Top and Southern Hens are spent hen processors and that certain Producer Defendants entered into agreements with Tip Top or participated in Southern Hens based on each participant's own, unilateral business judgment of what is in its independent interest; Defendants deny any

characterization of these entities. As Claxton is not an integrated poultry producer, it lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 883, and therefore denies the allegations in Paragraph 883. Defendants deny any remaining allegations in Paragraph 883.

> 884. *The Tip Top Alliance was formed in 2009 by Defendants Case Farms, House of Raeford, Keystone, Mar-Jac, Mountaire, Perdue, Harrison, and Wayne Farms, and Co- Conspirators Amick Farms and Fieldale Farms, who were later joined by Defendants Pilgrim's and Simmons* ▮▮▮▮▮
>
> ▮▮▮▮▮▮▮▮▮▮▮ *Members of the Tip Top Alliance held quarterly conference calls, and met in person at least once a year during the annual International Chickens Conference in Atlanta. Brad Respess, the president of Tip Top, regularly sent emails, as well as quarterly performance reports, to all members of the alliance, and Mr. Respess also regularly received industry information from Agri Stats' Mike Donahue.*

**ANSWER:** To the extent the allegations in Paragraph 884 characterize or describe an unidentified source, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 884 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 884 to the extent that they relate to other Defendants and/or third parties. Defendants other than Case, House of Raeford, Mar-Jac, Mountaire, Perdue, Harrison Poultry, Wayne Farms, Amick Farms, Fieldale, Pilgrims, O. K. Foods, and Simmons lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 884 and therefore deny them. Case, House of Raeford, Mar-Jac, Mountaire, Perdue, Harrison Poultry, Wayne Farms, Amick Farms, Fieldale, Pilgrims O. K. Foods, and Simmons admit that they were members of the Tip Top Alliance at certain points in time. Tyson admits that Keystone was a member of the Tip Top Alliance. ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████████

█████████████████████████████████████████████████  Case,

House of Raeford, Mar-Jac, Mountaire, Perdue, Harrison Poultry, Wayne Farms, Amick Farms,

Fieldale, Pilgrims, O. K. Foods, and Simmons deny the remaining allegations of Paragraph 884.



*885.*

*Rendering hens for non-food use has next to no value compared to slaughtering them for food, which means that the Tip Top alliance members gave up a profit from Tip Top in order to cut back on broiler production by sending breeder hens to slaughter far earlier than they would otherwise have done in a truly competitive market.*

**ANSWER:**  Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy.  To the extent the allegations in Paragraph 885 characterize or describe documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 885 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 885 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any remaining allegations in Paragraph 885.

*886.    Communications between Mr. Respess and alliance members allowed each alliance member to know that its fellow alliance members were, consistent with the supply-restriction mechanism of their conspiracy, cutting broiler production by increasing their shipments of younger and younger breeder hens to Tip Top, taking supply out of the market at the very top of the supply chain.*

**ANSWER:**  Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy.  To the extent the allegations in Paragraph 886 characterize or describe documents or

other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 886 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 886 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 886.



887.

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. To the extent the allegations in Paragraph 887 characterize or describe documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 887 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 887 to the extent that they relate to other Defendants and/or third parties. Defendants other than Perdue, Mar-Jac, Tyson, Fieldale, Harrison Poultry, Mountaire, Case, and Amick Farms lack knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 887 and therefore deny them.



Defendants deny any remaining allegations in Paragraph 887.

888.

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. To the extent the allegations in Paragraph 888 characterize or describe documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 888 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 888 to the extent that

they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 888.

889. 

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. To the extent the allegations in Paragraph 889 characterize or describe documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 889 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 889 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 889.

890. 

███████████████████████████████████████████████████

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. ████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████ Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 890 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 890 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 890.

*891.* 

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. To the extent the allegations in Paragraph 891 characterize or describe documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 891 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 891 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 891.

> *892.    In addition to providing information by which its alliance members could (and did) coordinate their collusive supply-restriction scheme, Tip Top readily gave such information to non-alliance members.*████████████████████████

**ANSWER:**  Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. To the extent the allegations in Paragraph 892 characterize or describe documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 892 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 892 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any remaining allegations in Paragraph 892.

> 893.    *Southern Hens, based in Moselle, Miss., was a joint venture formed by Defendants that facilitated the sharing of confidential information. Southern Hens is described in its corporate filings as a poultry processing business. It processes spent breeder hens for chicken producers including its joint owners. Southern Hens' Board has included representatives from Aviagen, as well as Defendants Sanderson Farms, Koch, Foster Farms, OK Industries, Pilgrim's Pride, Mar-Jac, Peco Foods, and George's.*

**ANSWER:**  To the extent the allegations in Paragraph 893 characterize or describe the contents of unidentified documents or sources, Defendants deny any characterization or description that is inconsistent with the referenced documents or sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 893 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 893 to the extent that they relate to other Defendants and/or third parties. Defendants other than Sanderson Farms, O.K. Foods, Koch, Foster Farms, Mar-Jac, Peco, George's, and Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 893 and therefore deny them.  Sanderson Farms, O.K.

Foods, Koch, Foster Farms, Mar-Jac, Peco, George's, and Pilgrim's each admit that Southern

Hens, Inc. is a spent hen processor with plants located in Moselle, Mississippi and that the Board

of Southern Hens at certain times in the Relevant Period has included a representative from each

of them and that they have processed at least some of their respective spent hens with Southern

Hens, Inc. based on their own, unilateral business judgment of what is in their respective,

independent interest, but deny any remaining allegations in Paragraph 893.

> 894.    *The Board representatives have infrequently changed over the years. For example, Bob Rosa (Sanderson Farms), served on the Board from at least 2007 through 2017. Lance Buckert and Mark Kaminsky (Koch) also served during this same time-period, as did Denny Hickman (Peco Foods) and Ben Thompson (Aviagen). Melissa Durbin (Marshall Durbin) served on the Board from at least 2008 until 2014 when Mar-Jac replaced Marshall Durbin after its acquisition. Bob Kenney (George's) served on the Board from 2010 through 2017. Other Board members have included Monty Henderson (George's); Bob Hendrix, Walt Shafer and Randy Stroud (Pilgrim's); Pete Martin (Mar-Jac); and Tim Garber and Terry Thompson (Foster Farms).*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as

to the truth of any allegations in Paragraph 894 that relate to other Defendants and/or third parties,

and therefore each Defendant denies the allegations in Paragraph 894 to the extent that they relate

to other Defendants and/or third parties.  As the term "infrequently changed" is imprecise,

Defendants are unable to form a belief as to the truth of the allegations in the first sentence of

Paragraph 894 and therefore deny them.  Defendants other than Pilgrim's, Sanderson Farms,

Koch, Mar-Jac, George's, and Foster Farms lack knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in Paragraph 894 and therefore deny them.

Pilgrim's admits that Bob Hendrix, Walt Shafer, and Randy Stroud each served on the Southern

Hens' Board at different times during the Relevant Period, but denies any remaining allegations in

Paragraph 894.  Peco admits Denny Hickman was a member of the board of directors for Southern

Hens, but denies any remaining allegations in Paragraph 894.  George's admits that Bob Kenney

and Monty Henderson each served on the Southern Hens' Board during the Relevant Period, but

denies any remaining allegations in Paragraph 894. Mar-Jac admits that in 2014 Pete Martin joined the Board of Southern Hens, but denies any remaining allegations in Paragraph 894. Foster Farms admits that Tim Garber and Terry Thompson each served on the Southern Hens' Board during the Relevant Period, but denies any remaining allegations in Paragraph 894. Sanderson Farms admits that Bob Rosa was a member of the board of directors for Southern Hens during the Relevant Period, but denies any remaining allegations in Paragraph 894. Koch admits that Mark Kaminsky and Lance Buckert served on the Southern Hens' board during some or all of the Relevant Period, but denies any remaining allegations in Paragraph 894.

895. *Southern Hens has also had the same General Manager, John Comino, since 1998. Comino regularly communicated with board members and helped to facilitate Defendants' sharing of information with each other. For example, Comino attended NCC meetings on behalf of Southern Hens, and served on the Board of Directors with representatives from several Defendants, including Pete Martin (Mar-Jac), Gary George (George's), and Trent Goins (OK Foods).*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 895 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 895 to the extent that they relate to other Defendants and/or third parties. Defendants other than Mar-Jac, George's, and O.K. Foods, and George's deny that John Comino "helped to facilitate Defendants' sharing of information with each other" and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 895 and therefore deny them. George's admits that John Comino served as the General Manager of Southern Hens during the Relevant Period. George's also admits that Gary George served on the NCC Board of Directors during the Relevant Period. George's denies that John Comino "helped to facilitate Defendants' sharing of information with each other." George's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 895 and therefore denies them. O.K. Foods admits

that John Comino served as General Manager of Souther Hens during the Relevant Period. O.K. Foods also admits that Trent Goins served on the NCC Board of Directors during the Relevant Period. O.K. Foods denies that John Comino "helped to facilitate Defendants' sharing of information with each other." O.K. Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 895 and therefore denies them Mar-Jac admits that John Comino has served as General Manager of Southern Hens at least since Mar-Jac joined the Southern Hens Board in 2014 and that Mr. Comino served on the NCC Board of Directors at the same time as Pete Martin. Defendants deny any remaining allegations in Paragraph 895.

> 896.    *Comino also shared plans for production cuts among Defendants who used*
> *Southern Hens as a means to achieve these coordinated activities.*

**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 896. To the extent the allegations in Paragraph 896 characterize or describe an April 2011 email exchange between Mark Kaminsky and John Comino, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 896 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 896 to the extent that they relate to other Defendants and/or third parties. Defendants other than Koch lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 896 and therefore deny them. Koch denies the allegations in Paragraph 896.

897. **High Barriers to Entry**. *The intended effect of a conspiracy to fix prices, either explicitly (as is the case here with the Georgia Dock benchmark price index) and through restricting supply (which Defendants also did) is to generate higher profits for the participants. The normal impact of the artificially higher profits is to draw other profit seeking companies into the market. In industries with substantial barriers to entry, such as the U.S. chicken market, however, companies – such as Defendants – are able to raise prices above competitive levels and still earn above-normal levels of profits.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Paragraph 897 contains Plaintiffs' characterization of their claims, arguments subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is required, Defendants deny them. Defendants deny any remaining allegations in Paragraph 897.

898. *The existence of high entry barriers in the U.S. chicken market is demonstrated by the trend of increasing consolidation, with larger vertically integrated companies increasing their control over the industry. Beyond the issue of vertical integration, there is a wide range of government food safety, worker safety, and environmental regulations that must be addressed by any new entrant into the chicken market. The existence of low, and highly variable, profit margins also act as significant barriers to entry. With such barriers to entry, companies that have the available resources and significant start-up capital to enter the market and benefit from economies of scale are able to reduce their average cost by producing more. Companies already in the market such as Defendants – are motivated to exclude other companies from the market to maintain their coordinated supply restriction conspiracy, and ultimately keep prices at artificially inflated levels. These high entry barriers also extend to large foreign meat conglomerates that have acquired U.S. broiler producers in the past decade, including Brazil's JBS S.A. (Pilgrim's), Mexico's Industrias Bachoco (O.K. Foods), Belgian company Continental Grain Company (Wayne Farms), Marfig Alimentos S.A. (Keystone Foods), and South Korea's Harim Group Corporation (Allen Harim). Each of these foreign meat conglomerates were already large players in the global meat industry and simply continued operating their pre-existing U.S. broiler company as a subsidiary. Ownership of U.S. broiler subsidiaries by such large, well-financed conglomerates deter entry by smaller, non-globalized companies that might want to enter the U.S. broiler production business.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 898 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 898 to the extent that they relate to

other Defendants and/or third parties. Defendants other than Pilgrim's, Wayne Farms, and O.K. Foods lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 898 and therefore deny them. Pilgrim's admits JBS S.A. acquired a majority interest in Pilgrim's in December 2009 as part of Pilgrim's restructuring in bankruptcy, but denies all remaining allegations in Paragraph 898. O.K. Foods admits that it was acquired by Industrias Bachoco which is located in Mexico, but denies all remaining allegations in Paragraph 898. Wayne Farms admits that, at times during the alleged Relevant Period, Continental Grain Company, Inc. held membership interests in Wayne Farms LLC, but denies all remaining allegations in Paragraph 898. Defendants deny any remaining allegations in Paragraph 898.

899. ***History of Government Investigation and Collusive Actions.*** *In response to a Federal Trade Commission investigation in 1919 which found oligopoly domination and anti- competitive monopolistic behavior in the meat-packing industry, Congress passed the Packers and Stockyards Act ("PSA"). See 7 U.S.C. § 193(a), § 209. Congress amended the law to include the poultry industry in 1935.*

**ANSWER:** Defendants admit that Congress passed the PSA in 1921, and amended the law to include the poultry industry in 1935. Defendants deny any characterization or description that is inconsistent with that source and legislative history. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 899 and therefore deny them.

900. *In 1922, the Supreme Court upheld the constitutionality of the PSA in Stafford v. Wallace, finding that "the object of the PSA was to secure the flow of livestock from the farms and ranges to the slaughtering center and into meat products unburdened by collusion that unduly lowered the prices to the shipper and unduly increased the price to the consumer."*

**ANSWER:** Defendants admit that the Supreme Court upheld the constitutionality of the PSA in 1922 in Stafford v. Wallace, 258 U.S. 495, but deny that the Court's opinion contains the

quote in Paragraph 900; Defendants deny any characterization or description that is inconsistent

therewith. Defendants deny any remaining allegations in Paragraph 900.

> 901. In April 1973, the United States Department of Justice filed a civil antitrust
> action against the National Broiler Marketing Association ("NBMA") alleging the NBMA
> and its members conspired to fix Broiler prices and restrict Broiler production in violation
> of Section 1 of the Sherman Act. The DOJ sought to enjoin the NBMA and its dozens
> of members from continuing a conference call program where members (and even some
> non-members) coordinated the pricing and production of Broilers. In response, numerous
> private civil antitrust actions were filed against the NBMA and 42 individual defendants in
> the In re Chicken Antitrust Litigation case. The NBMA and Broiler producers eventually
> settled the case, resulting in a settlement of roughly $30 million.

**ANSWER:** Defendants admit that the Department of Justice filed an antitrust action

against the National Broiler Marketing Association in 1973. Each Defendant lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in Paragraph 901 that relate

to other Defendants and/or third parties, and therefore each Defendant denies the allegations in

Paragraph 901 to the extent that they relate to other Defendants and/or third parties. Defendants

deny any remaining allegations in Paragraph 901.

> 902. Beginning in 2010, the USDA undertook a series of public workshops to
> explore competition issues in the upstream, contract-farmer Broiler market. A workshop
> held in Normal, Alabama, on May 21, 2010, focused on corporate concentration and lack
> of competition in the Broiler industry. The workshops led to the proposal of new rules
> aimed at encouraging competition in the meat industry, but extreme political pressure from
> Defendants and their allies eventually watered down the rule and led to the resignation of
> the official charged with imposing tougher regulations.

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as

to the truth of any allegations in Paragraph 902 that relate to other Defendants and/or third parties,

and therefore each Defendant denies the allegations in Paragraph 902 to the extent that they relate

to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph

902.

> 903. In 2011, George's Inc. acquired the Harrisonburg, Virginia processing
> plant from Tyson Foods. The DOJ brought an action to stop the acquisition (United States
> v. George's, Inc.), which alleged the purchase would impermissibly reduce the available

*options for contract farmers to sell their grower services. The DOJ eventually settled with George's in June 2011 after obtaining an agreement to require George's to make capital improvements to the facility that would increase its capacity and permit contract farmers to sell more grower services to the processing plant.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 903 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 903 to the extent that they relate to other Defendants and/or third parties. Defendants other than Tyson and George's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 903 and therefore deny them. Tyson admits that George's Inc. acquired a processing plant located in Harrisburg, Virginia from Tyson Foods in 2011 and agreed in doing so to increase capacity at that facility. Tyson denies the remaining allegations in Paragraph 903. George's admits that in 2011 George's Inc. and affiliated entities acquired, from Tyson Foods, Inc. and related entities, the assets associated with the Harrisonburg, Virginia processing plant and that an action initiated by the Department of Justice was settled pursuant to the terms of a publicly available Final Judgment that increased the capacity at the facility. To the extent Paragraph 903 characterizes or describes the papers filed in the proceeding described in Paragraph 903, George's denies that the allegations fully and accurately summarize such sources and denies any characterization or description that is inconsistent therewith.

*904. According to a June 2014 USDA Report, "the [Broiler] industry faces a range of public policy issues, [including] competition ... [c]oncerns[, including] the exercise of market power by Broiler integrators have prompted merger litigation, USDA regulatory initiatives, congressional proposals, and investigations by Federal agencies."*

**ANSWER:** To the extent the allegations in Paragraph 904 characterize or describe a June 2014 USDA report, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 904 that relate to other Defendants and/or third

parties, and therefore each Defendant denies the allegations in Paragraph 904 to the extent that

they relate to other Defendants and/or third parties. Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 904 and therefore

deny them.

## Y.    Defendants Collusively Adopted Additional Strategies to Reinforce Their Conspiracy

905.    *Defendants collectively adopted several strategies to buttress and sustain their conspiracy.*

**ANSWER:**  Defendants deny the allegations in Paragraph 905.

906.    *A Collective Shift Away From Long-Term Fixed-Price Contracts. First, particularly with respect to certain distributor and grocer customers, starting in 2008, the Defendants moved away from long-term fixed-price contracts to shorter-term contracts with variable pricing pegged to one of several publicly-available price indices (including the USDA composite Urner Barry, and the Georgia Dock). A coordinated move away from fixed price contracts to contracts permitting prices to fluctuate with an indexed public market price helped facilitate a market-wide antitrust conspiracy. See In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 659 (7th Cir. 2002). This was true even with respect to restaurants and other purchasers that continued to enter into term contracts with Defendants.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as

to the truth of any allegations in Paragraph 906 that relate to other Defendants and/or third parties,

and therefore each Defendant denies the allegations in Paragraph 906 to the extent that they relate

to other Defendants and/or third parties.   Producer Defendants admit that the pricing mechanisms

under contracts with customers are negotiated vigorously and change over time based upon the

interests of the customer and each Defendant's own judgment of its independent business interests.

Producer Defendants deny that their pricing mechanisms and any changes thereto were

"coordinated" with their competitors.  To the extent the allegations in Paragraph 906 characterize

or describe *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 659 (7th Cir. 2002),

Defendants deny any characterization or description that is inconsistent with the referenced source.

Agri Stats lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 906 and therefore denies them. Defendants deny any remaining allegations in Paragraph 906.

> 907. *Defendants' shift indicates that they anticipated higher, or artificially inflated non- competitive, prices resulting from their production cuts, and wanted the flexibility to take advantage of such prices without being locked in to longer-term, lower-pricing commitments to certain distributor and grocer customers.*

**ANSWER:** Defendants deny the allegations in Paragraph 907.

> 908. *Starting around January 2008, senior executives from Koch Foods, Pilgrim's, Perdue, Sanderson Farms, and Tyson publicly announced an effort to reduce annual fixed-price contracts.*

**ANSWER:** To the extent the allegations in Paragraph 908 characterize or describe unidentified public announcements, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 908 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 908 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 908.

> 909. *This change coincided with Defendants' efforts to reduce chicken industry supplies to drive chicken market prices higher.*

**ANSWER:** Defendants deny the allegations in Paragraph 909.

> 910. *On January 28, 2008, Tyson CEO Richard Bond announced on an earnings call that Tyson was looking at shortening its fixed price contracts, and by June 2009 Tyson reported it had "dramatically" shortened the amount of fixed-price contracts over 90 days.*

**ANSWER:** To the extent the allegations in Paragraph 910 characterize or describe a January 28, 2008 Tyson earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in Paragraph 910 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 910 to the extent that they relate to other Defendants and/or third parties. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 910 and therefore deny them. Tyson admits that it held an earnings call on January 28, 2008 for its investors, but denies any remaining allegations in Paragraph 910.

> 911.    The next day, on January 29, 2008, Pilgrim's CFO Rick Cogdill reported on an earnings call that Pilgrim's had started moving away from fixed-price contracts, noting that "in a situation like where we are now where we need to drive commodity prices up, that [i.e., having less fixed price contracts] is going to give us the opportunity for more immediate benefit to our P&L than what we would have had say, historically three year[s] ago, when a higher percentage was fixed price." Pilgrim's later reported that by March 2012, it had reduced its exposure to fixed price contracts, with most contracts now market-based or including a reset provision linked to the underlying commodity. By 2014, Pilgrim's reported that less than 5% of all its contracts were 12- month fixed price contracts.

**ANSWER:**  To the extent the allegations in Paragraph 911 characterize or describe  a January 29, 2008 Pilgrim's earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 911 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 911 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 911 and therefore deny them. Pilgrim's admits that it held an earnings call on January 29, 2008, that it independently determined in its individual self-interest that it would limit or eliminate its twelve month fixed price contracts, and by at least 2013 less than 5%

of its contracts were twelve month fixed priced contracts, but denies any remaining allegations in Paragraph 911.

> 912.    On July 28, 2008, Perdue spokesperson Julie DeYoung told an industry publication that Perdue was looking to shorten its contract terms, stating, "the company is also seeking to raise prices and shorten its contracts."

**ANSWER:**  To the extent the allegations in Paragraph 912 characterize or describe documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Perdue lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 912 and therefore deny them.  Perdue denies the remaining allegations in Paragraph 912.

> 913.    Sanderson Farms' CEO Joe Sanderson noted in a July 31, 2008, earnings call that the industry may move towards "shorter term agreements."

**ANSWER:**  To the extent the allegations in Paragraph 913 characterize or describe a Sanderson Farms earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 913 and therefore deny them.  Sanderson Farms denies that it held a July 31, 2008 earnings call.  Plaintiffs appear to quote an August 26, 2008 earnings call; Sanderson Farms denies any characterization or description that is inconsistent therewith.  Sanderson Farms denies the remaining allegations in Paragraph 913.

> 914.    On an August 6, 2012 earnings call, Tyson CEO Donnie Smith stated that "[o]ver the past couple of years we have substantially reduced a number of fixed price contracts we have with customers and currently have less than 15% of our Poultry volume [on] annual fixed price contracts.  The vast majority of our contracts are tied to specific markets or allow for conversations about adjusting prices to move – prices to offset higher input and we will continue to push for even more of these types of contracts.  I believe supply

*will begin to rationalize as well, making it easier for us to have those pricing conversations."*

**ANSWER:**  To the extent the allegations in Paragraph 914 characterize or describe an August 6, 2012 Tyson earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 914 and therefore deny them.  Tyson admits that it held an earnings call on August 6, 2012 for its investors who expect Tyson to provide information relevant to the company's financial performance including observations about the nature of Tyson's contracts with customers.  Tyson denies any remaining allegations in Paragraph 914.

> *915.  This collusive and coordinated shift toward reducing the number of longer-term fixed-price contracts had the intent and effect of creating supra-competitive market prices for broilers to all customers, including those customers who continued to enter into term contracts with Defendants.*

**ANSWER:** Defendants deny the allegations in Paragraph 915.

> *916.  **Coordinated Denial of Lines of Credit**.*



**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 916 at this time.

917. ***Inter-Defendant Sales***. *Third, the Defendants use direct purchases of chickens from one another and from smaller producers to meet each company's own sales needs.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 917 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 917 to the extent that they relate to other Defendants and/or third parties. Producer Defendants other than Harrison Poultry admit that at certain times they have purchased processed Broiler meat from each other based on their own business judgment of what was in their independent interest. Harrison Poultry denies that it purchased chicken from any other chicken producers during the Relevant Period. Defendants deny any remaining allegations in Paragraph 917.

918. *In addition to exemplifying the commodity nature of the chicken market, these inter-Defendant sales allowed Defendants to soak up excess supply that could potentially depress prices in the market and facilitated the opportunity to expressly discuss prices with competitors. Such purchases also permitted companies to maintain market share despite reducing their production. In many instances large inter-Defendant purchases were negotiated by CEOs or other senior level executives of Defendants, thereby providing additional opportunities to conspire.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 918 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 918 to the extent that they relate to other Defendants and/or third parties. Producer Defendants other than Harrison Poultry admit that at certain times they have purchased processed Broiler meat from each other based on their own business judgment of what was in their independent interest. Harrison Poultry denies that it purchased chicken from any other chicken producers during the Relevant Period. Defendants deny any remaining allegations in Paragraph 918.

919. *In 2011, for example, Tyson began using what was described as a "very unique strategy," called "Buy vs. Grow."*

**ANSWER:** Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 919 and therefore deny them. Tyson admits that it used a Buy vs. Grow program based on its own business judgment of what is in its independent interest, but denies the remaining allegations in Paragraph 919.

920. *Tyson's strategy essentially treated the industry supply as though it were for a single unified company, rather than competing businesses that would rather sell self-produced product to a customer than a competitor. Tyson's adoption of this strategy was indeed "unique," because only a few years prior to adopting the "Buy vs. Grow" strategy, it had derided a similar strategy as a "stupid" subsidization of competitors' growth, with a Tyson executive explaining on an April 29, 2008 earnings call that "I think what we said along is we're going to match our supply and demand. We're not going to cut beyond that and then go out and buy open market meat to subsidize other people's growth."*

**ANSWER:** To the extent the allegations in Paragraph 920 characterize or describe an April 29, 2008 Tyson earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 920 and therefore deny them. Tyson admits it held an earnings call on April 29, 2009 for its investors, but denies the remaining allegations in Paragraph 920.

921. *Tyson's strategic shift in 2011 to buying chicken on the open market is evidence that by that time, it was confident that its fellow conspirators would maintain their production levels as they were and not increase them.*

**ANSWER:** Defendants deny the allegations in Paragraph 921.

922.



████████████████████████████████████████████

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 922 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 922 to the extent that they relate to other Defendants and/or third parties. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ Tyson denies any remaining allegations in Paragraph 922.

*923.* ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

**ANSWER:** To the extent the allegations in Paragraph 923 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer the second sentence of Paragraph 923 at this time. To the extent the allegations in Paragraph 923 characterize or describe an email exchange, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Tyson and Pilgrim's lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

923 and therefore deny them. Tyson and Pilgrim's deny any remaining allegations in Paragraph

923.

> 924. *In a November 5, 2012, interview, Fieldale President Thomas Hensley noted his company was also pursuing a strategy to purchase excess supply from its competitors, stating that "[i]f you don't have a home for your chickens on Monday morning, you shouldn't have those chickens. Now we know where all our chickens are going. So we are buying chickens in that lower price area instead of selling them. So, no expansion for us."*

**ANSWER:** To the extent the allegations in Paragraph 924 characterize or describe a

November 5, 2012 interview of Fieldale President Thomas Hensley, Defendants deny any

characterization or description that is inconsistent with the referenced source. Defendants other

than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 924 and therefore deny them. Fieldale denies any remaining

allegations in Paragraph 924.

> 925. *In a July 9, 2012 article, Donnie Smith of Tyson was quoted as saying "the company will not over produce chicken at these expensive grain levels, preferring to buy commodity pieces in the secondary market to fill orders where necessary."*

**ANSWER:** To the extent the allegations in Paragraph 925 characterize or describe a June

9, 2012 article, Defendants deny any characterization or description that is inconsistent with the

referenced source. Defendants other than Tyson lack knowledge or information sufficient to form

a belief as to the truth of the remaining allegations in Paragraph 925 and therefore deny them.

Tyson denies any remaining allegations in Paragraph 925.

> 926. ████████████████████████████████████
> ████████████████████████████████████

**ANSWER:** To the extent the allegations in Paragraph 926 characterize or describe a 2013

Marketing Plan, Defendants deny any characterization or description that is inconsistent with the

referenced source. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 926 and therefore deny them. Tyson denies any remaining allegations in Paragraph 926.

927. *On a January 31, 2014, earnings call, Smith reported that* . (sic)

**ANSWER:** Paragraph 927 contains no factual allegations to which a response is required.

928. *through Tyson's "buy versus growth strategy we continue to keep our supply short of demand ...."*

**ANSWER:** To the extent the allegations in Paragraph 928 characterize or describe a January 31, 2014 Tyson earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 928 and therefore deny them. Tyson admits that it held an earnings call on January 31, 2014 for its investors who expect Tyson to provide information relevant to the company's financial performance including information about strategies used by Tyson to properly balance the demand for its products with available supply, but denies any remaining allegations in Paragraph 928.

929. *By the end of 2014, Tyson reported it was buying over four million pounds of chickens on the open market each week. Four million pounds of chicken per week is more than any of the 24th-30th largest chicken companies produce on a weekly basis, so the amount of Tyson's purchases was quite significant.*

**ANSWER:** To the extent the allegations in Paragraph 929 characterize or describe documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 929 and therefore deny them. To the extent the remainder of Paragraph 929 contains factual allegations, Tyson denies those allegations, except that Tyson admits that it bought Broilers on the

open market in 2014, and other years, based on its own business judgment of what is in its independent interest.

> 930.    During the first part of 2015, Tyson increased its Buy vs. Grow purchases by 50 percent, expanding its purchases from competitors to unprecedented levels. Tyson announced plans in May 2015 to increase its Buy vs. Grow strategy to 10 percent of its sales in the second half of 2015 and 2016. Ten percent of Tyson's 2014 ready-to-cook pounds was 17.6 million pounds per week, a volume that by itself would dwarf the entire average weekly production of any of the 15th-30th largest chicken producers.

**ANSWER:**   To the extent the allegations in Paragraph 930 characterize or describe unidentified Tyson announcements, Defendants deny any characterization or description that is inconsistent with the referenced sources.   Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 930 and therefore deny them.   Tyson admits that it adjusts the level of purchases under its Buy vs. Grow program every year, and throughout the year, based on its own business judgment of what is in its independent interest.   To the extent the remainder of Paragraph 930 contains factual allegations, Tyson denies those allegations.

> 931.    Notably, Tyson also announced in May 2015 that it planned to reduce its production after July 2015 and keep it flat through 2016 by increasing its Buy vs. Grow purchases.

**ANSWER:**   To the extent the allegations in Paragraph 931 characterize or describe unidentified Tyson announcements, Defendants deny any characterization or description that is inconsistent with the referenced sources.   Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 931 and therefore deny them.   Tyson admits that it adjusts the level of purchases under its Buy vs. Grow program every year, and throughout the year, based on its own business judgment of what is in its independent interest.   To the extent the remainder of Paragraph 931 contains factual allegations, Tyson denies those allegations.

932. *Atypical Increases in Exporting of Chickens*. *Fourth, during 2013 and into 2014, Defendants found new ways to actively depress the size of breeder flocks, such as using the pretext of avian flu in Mexico to justify exporting flock chickens to Mexico to repopulate flocks rather than use such chickens to increase domestic production levels.*

**ANSWER:**  Defendants deny the allegations in Paragraph 932.

933. *Indeed, Defendants continued their program of exporting chicken hens and eggs to Mexico in 2015, with Tyson explicitly noting in a May 4, 2015, earnings call that it was sending 3 percent of its eggs to Mexico to "fill incubators."*

**ANSWER:**  To the extent the allegations in Paragraph 933 characterize or describe a May 4, 2015 Tyson earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 933 and therefore deny them. Tyson admits it held an earnings call on May 4, 2015 for its investors who expect Tyson to provide information relevant to the company's financial performance including observations about the supply of, and demand for, Tyson's products, but denies any remaining allegations in Paragraph 933.

934. *Similarly, during a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted his "confidence that we're going to do the right thing with respect to maintaining [] discipline. We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million hatching eggs or so outside of the country. The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made. And so again that gives us confidence that we're going to continue to be disciplined as an industry."*

**ANSWER:**  To the extent the allegations in Paragraph 934 characterize or describe a July 2016 Pilgrim's earnings call, Defendants deny any characterization or description that is inconsistent with the referenced source.  Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 934 and therefore deny them.   Pilgrim's admits it held an earnings call on July 28, 2016, in which Mr. Lovette participated, but denies any remaining allegations in Paragraph 934.

935.    *Tyson and other Defendants exported hatching eggs to Mexico and other foreign countries from 2013-2016 with the intent to artificially reduce the supply, and artificially inflate the price, of chickens in the U.S. The revenues Tyson and others received for exporting hatchery eggs to Mexico was far less than they would have generated hatching those same eggs and selling the chicken meat in the U.S. market.*

**ANSWER:** Defendants admit that certain Producer Defendants independently exported certain products to Mexico during Relevant Period when it was in their independent business interest to do so. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 935 and therefore denies them.

936.    *Thus, but for Defendants' agreement and conspiracy as alleged in this Complaint, it would have been against Tyson's independent economic self-interest to export hatching eggs to Mexico and forego higher hatching egg prices in the U.S. But Defendants' new-found "discipline" ameliorated any remaining risk and resulted in supra-competitively higher overall U.S. chicken prices.*

**ANSWER:** Defendants deny the allegations in Paragraph 936.

**Z.    Agri Stats Actively Facilitated Defendants' Conspiratorial Communications And Provided Data Necessary To Effectuate, Monitor, And Enforce The Conspiracy**

937.    *The USDA and various other entities publicly published aggregated weekly, monthly, and annual supply and pricing information concerning the U.S. chicken industry. But only Agri Stats received from Defendants, and then provided to Defendants, detailed information to accurately determine producer-specific production, costs, and general efficiency.*

**ANSWER:** As the term "various other entities" in the first sentence of Paragraph 937 is imprecise, Defendants are unable to form a belief as to the truth of the allegations contained in that sentence and therefore deny the allegations in this sentence. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 937 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 937 to the extent that they relate to other Defendants and/or third parties. Agri Stats admits that it receives data from its subscribers regarding their broiler business and that it uses that data in the reports it produces. To the extent the allegations in Paragraph 937 relate to Agri Stats,

508

the Producer Defendants lack knowledge or information sufficient to form a belief as to the truth

of those allegations and therefore deny them. To the extent the allegations in Paragraph 937 purport

to relate to Producer Defendants, the Producer Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations and therefore deny them, except the

Producer Defendants admit that the USDA publishes pricing data for certain poultry products, that

Agri Stats collects some information from certain Producer Defendants, and that Agri Stats has

reported anonymized and historical information to certain Producer Defendants for procompetitive

benchmarking purposes. Defendants deny any remaining allegations in Paragraph 937.

938.    *Agri Stats is a company that generated confidential chicken industry data considerably more detailed than any similar types of available reports, including the following data categories:*

- *Breeder flock size and age, hatchery capacity, and the costs associated with breeder flocks, including feed and housing expense;*

- *Data about the production, delivery and formulation of feed, including corn and soybean meal costs, which are two of Defendants' most significant input costs;*

- *Grow-out information for chicken "flocks" provided to contract farmers, including the number of chickens placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (i.e., "down time"), feed conversion rate (pounds of feed per pound of chicken), average daily weight gain by chicks, live pounds produced per square foot of grower house, grower compensation, including average grower payment in cents per pound and cents per square foot, breed composition of flock (breed or cross-breed of flocks), detailed information on numerous mechanical aspects of chicken housing, and numerous other detailed cost, mortality, and operational information about disease, transportation, labor, and other grow out related information;*

- *Slaughter, processing, and further processing information, including pay for processing plant workers, total production volume, market age of chickens at slaughter, weight of chickens at slaughter, birds per man hour, processing line speeds, and labor hours per pound;*

- *Inventory levels of chickens; and*

- *Financial information, such as monthly operating profit per live pound, sales per live pound, and cost per live pound.*

**ANSWER:** To the extent the allegations in Paragraph 938 characterize or describe the contents of the Agri Stats reports, Defendants refer to the contents of the Agri Stats reports and deny any characterization or description that is inconsistent therewith. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 938 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 938 to the extent that they relate to other Defendants and/or third parties. Agri Stats admits that it receives data from its subscribers regarding their broiler business and that it uses that data in the reports it produces. Defendants deny any remaining allegations in Paragraph 938.

> 939.    *Agri Stats collected data from Defendants, audited and verified the data, and ultimately reported back to Defendants detailed statistics on nearly every operating metric within the industry, including the size and age of breeder flocks. Agri Stats' survey methodology involved – from and to Defendants – direct electronic data submissions of financial, production, breeder flock size and age, capacity, cost, and numerous other categories of information by each chicken producer on a weekly and monthly basis.*

**ANSWER:** Agri Stats admits that it receives data from its subscribers regarding their broiler business and that it uses that data in the reports it produces. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 939 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 939 to the extent that they relate to other Defendants and/or third parties. Defendants admit that Agri Stats collects some information from subscribing Producer Defendants at certain points in the Relevant Period and that Agri Stats has reported anonymized and historical information to subscribers for pro-competitive benchmarking purposes. Defendants deny any remaining allegations in Paragraph 939.

940. *At each of Defendants' chicken complexes, certain employees, typically in the accounting department, were responsible for submitting the data to Agri Stats once a week (historically, on Thursdays) using an AS400 data link system. Agri Stats used a detailed audit process to verify the accuracy of data from each complex, often directly contacting Defendants to verify data before issuing reports to Agri Stats subscribers.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 940 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 940 to the extent that they relate to other Defendants and/or third parties. Agri Stats admits that it receives data from its subscribers regarding their broiler business, that it audits the data received, and that it uses that data in the reports it produces. Producer Defendants admit that Agri Stats collects some information from certain Producer Defendants, that this information is submitted weekly by various employees, and that Agri Stats has reported anonymized and historical information to certain Producer Defendants for pro-competitive benchmarking purposes. Defendants deny any remaining allegations in Paragraph 940.

941. *Agri Stats described itself as a "benchmarking" service that "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance."*

**ANSWER:** To the extent the allegations in Paragraph 941 characterize or describe an unidentified Agri Stats publication, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 941 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 941 to the extent that they relate to other Defendants and/or third parties. Defendants other than Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 941 and therefore deny them. To the extent that Paragraph 941 contains any factual allegations requiring a response from Agri Stats, Agri Stats denies such allegations.

*942.     Sanderson Farms CEO Joe Sanderson claimed, "[w]e use Agri Stats, which some of you are probably familiar with. Agri Stats is a benchmarking service that we submit data to. Almost everyone in our industry does as well. And we get the data back. It's anonymous – the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over the industry."*

**ANSWER:**  To the extent the allegations in Paragraph 942 characterize or describe a statement by Sanderson Farms CEO Joe Sanderson, Defendants deny any characterization or description that is inconsistent with the referenced source.   Defendants other than Sanderson Farms knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 942 and therefore deny them.   Sanderson Farms admits that Sanderson Farms CEO Joe Sanderson attended a May 2008 event, and that Plaintiffs appear to be selectively quoting from Joe Sanderson's statement at that event, but denies any remaining allegations in Paragraph 942.

*943.     However, contrary to these assertions, Defendants were at all material times able to (and did) readily determine "whose numbers the numbers belong to." Indeed, each Defendant knew that when it provided its internal, confidential information to Agri Stats, the other producers would be able to access that information and identify the Defendant that submitted it.*

**ANSWER:**  Defendants deny the allegations in Paragraph 943.

*944.     There was no legitimate purpose to provide this specific, competitively-sensitive information to Agri Stats, nor was there any legitimate purpose for Agri Stats to disseminate the information in the detailed, readily-decipherable form in which it is sent to Defendants. Instead, it was provided, compiled and transmitted for anti-competitive purposes.*

**ANSWER:**  Defendants deny the allegations in Paragraph 944.

*945.     Agri Stats' critical importance for a collusive production-restriction scheme in the chicken market lies not only in the fact that it supplies data necessary to coordinate production limitations and manipulate prices, but also in its market-stabilizing power. Price-fixing or output- restricting cartels, regardless of industry, are subject to inherent instability in the absence of policing mechanisms, as each individual member has the incentive to "cheat" other members of the cartel – for example, by boosting chicken production to capture higher prices even as other cartelists heed their conspiratorial duty to limit production, which is what happened in the chicken industry for a short period in 2010, when Defendants' conspiracy temporarily faltered.*

**ANSWER:**  Defendants deny the allegations in Paragraph 945.

946. *Agri Stats' detailed statistics – coupled with its regular, in-person meetings with each Defendant and routine participation in trade association events widely attended by Defendants' senior executives – serve an indispensable monitoring function, allowing each member of Defendants' cartel to police each other's production figures (which are trustworthy because they have been audited and verified by Agri Stats' team) for any signs of "cheating."*

**ANSWER:** Defendants deny the allegations in Paragraph 946.

947. *Agri Stats claimed to maintain the confidentiality and anonymity of individual companies' data by giving each company a report identifying only that company's specific chicken complexes by name, but not identifying by name other chicken producers' complexes described in the report, but rather, listing competitors' complexes by number.*

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 947 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 947 to the extent that they relate to other Defendants and/or third parties. Producer Defendants admit that Agri Stats purports to maintain the confidentiality and anonymity of individual companies in its reports, and has reported anonymized and historical information to certain Producer Defendants for pro-competitive benchmarking purposes. Agri Stats admits that it anonymizes the reports. Defendants deny any remaining allegations in Paragraph 947.

948. *But, by design, Agri Stats reports were so detailed that any reasonably-informed producer could easily discern the identity of its competitors' individual chicken complexes. It is common knowledge among producers that others could do so, with some Defendants referring to the task of determining the identity of individual competitor's data as "reverse engineering."*

**ANSWER:** To the extent the allegations in Paragraph 948 characterize or describe Agri Stats reports or other sources, Defendants refer to those sources for their contents and deny any characterization or description that is inconsistent therewith. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 948 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in

Paragraph 948 to the extent that they relate to other Defendants and/or third parties. Agri Stats denies any allegation that it has ever willfully violated its confidentiality policies. Defendants deny any remaining allegations in Paragraph 948.

> 949. *After Tyson rejoined Agri Stats in 2008 and Perdue joined with all of its plants also in 2008, at least 95% of the Broiler Producers in the united States subscribed to Agri Stats providing most of its revenues and providing and receiving the detailed Agri Stats reports which were easily deciphered by the various producers so that they all knew the detailed information set forth hereafter about each other.*

**ANSWER:** Producer Defendants admit they subscribed to Agri Stats at certain times during the Relevant Period, and that Agri Stats has reported anonymized and historical information to certain Producer Defendants for pro-competitive benchmarking purposes. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 949 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 949 to the extent that they relate to other Defendants and/or third parties. Tyson admits that it rejoined Agri Stats in 2008. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 949 and therefore denies these allegations. Defendants deny any remaining allegations in Paragraph 949.

> 950. *Agri Stats reports identified each complex with unique numbers, including a coding system identifying the region and sub-region, for each chicken complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself.*

**ANSWER:** To the extent the allegations in Paragraph 950 characterize or describe Agri Stats reports or other sources, Defendants refer to those sources for their contents and deny any characterization or description that is inconsistent therewith. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 950 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in

Paragraph 950 to the extent that they relate to other Defendants and/or third parties. With respect to the allegations in Paragraph 950, Defendants admit that certain Agri Stats reports contain anonymized and historical data for Broilers, and that certain Agri Stats reports organize certain data geographically. The Producer Defendants deny any remaining allegations in Paragraph 950. With respect to the allegations in Paragraph 950, Agri Stats admits that it receives data from its subscribers regarding their broiler business and that it uses that data in the reports it produces. Agri Stats admits that it assigns complexes unique identifier numbers. Agri Stats denies the remaining allegations contained in Paragraph 950.

951. *Specific complexes were easily identifiable from their codes. Agri Stats' coding system made it easy for Defendants' employees – some of whom, including senior executives at both Wayne Farms and Pilgrim's, used to work at Agri Stats – to decipher production, feed, sales and other competitively-sensitive metrics for their competitors' facilities.*

**ANSWER:** To the extent the allegations in Paragraph 951 characterize or describe Agri Stats reports or other sources, Defendants refer to those sources for their contents and deny any characterization or description that is inconsistent therewith. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 951 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 951 to the extent that they relate to other Defendants and/or third parties. Defendants other than Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 951 and therefore deny them. Pilgrim's admits that it hired a former Agri Stats account manager, but denies that he was a "senior executive" at either Agri Stats or at Pilgrim's and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 951 and therefore denies them.

952. *In fact, Agri Stats' coding system, coupled with the insular nature of an industry where "everybody knows everybody," allowed for Defendants' employees to identify individual producers' data by eyeballing the rows in any Agri Stats report. The*

*coding system has never changed (e.g., the Tyson complex in Cummings, Georgia has always been identified as complex "222"), meaning that once a Defendant deciphered the numeric code for a given competitor's complex, that Defendant had the ability to know their competitor's data in perpetuity.*

**ANSWER:** To the extent the allegations in Paragraph 952 characterize or describe Agri Stats reports or other sources, Defendants refer to those sources for their contents and deny any characterization or description that is inconsistent therewith. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 952 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 952 to the extent that they relate to other Defendants and/or third parties. Defendants other than Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 952 and therefore deny them. Agri Stats denies any allegation that it has ever willfully violated its confidentiality policies and any remaining allegations in Paragraph 952.

953.    *Agri Stats played a particularly important role in Defendants' signaling practices and policing efforts. The specific type or size of breeder flock housing, breed of chick, average bird size, and production levels listed in Agri Stats data for Defendants' complexes allowed any given Defendant to "reverse-engineer" and interpret the public statements and other publicly available information about its competitors to determine which complexes were cutting back, and by how much.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. To the extent the allegations in Paragraph 953 characterize or describe Agri Stats reports or other sources, Defendants refer to those sources for their contents and deny any characterization or description that is inconsistent therewith. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 953 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 953 to the extent that they relate to other Defendants and/or third parties. Defendants other than Agri Stats lack knowledge or information sufficient to form a belief as to the truth of

516

the allegations in Paragraph 953 and therefore deny them. Agri Stats denies any allegation that it has ever willfully violated its confidentiality policies.

> 954. *For example, if in January, a Defendant publicly states its intention to reduce production – even generically, without specifying which complexes will cut back, or by how much – all of their fellow cartel members will be able to tell from the February and March Agri Stats reports whether that Defendant is following through on its conspiratorial agreement. Further, Defendants Tyson, Pilgrim's, and Sanderson are public companies that report some aggregated data publicly, which executives from other companies could use to match up against the far more detailed information in the Agri Stats' reports to identify other specific data from their competitors.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. To the extent the allegations in Paragraph 954 characterize or describe Agri Stats reports or other sources, Defendants refer to those sources for their contents and deny any characterization or description that is inconsistent therewith. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 954 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 954 to the extent that they relate to other Defendants and/or third parties. Defendants admit that Sanderson Farms, Tyson, and Pilgrim's are public companies, but deny the remaining allegations in Paragraph 954.

> 955. *Each Defendant and other Co-Conspirators received numerous types of Agri Stats reports, including separate targeted reports for each major area of operations, such as breeding, hatching, hauling, feeding, processing, selling, and administration.*

**ANSWER:** Defendants admit that Agri Stats reports anonymized and historical information to certain individual Producer Defendants for pro-competitive benchmarking purposes and refer to Agri Stats reports for their contents, but otherwise deny any characterization of Agri Stats reports in Paragraph 955. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 955 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 955 to the extent

that they relate to other Defendants and/or third parties. Defendants other than Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 955 and therefore deny them. Agri Stats admits that it produces the following reports: (1) light-blue "Live" report, (2) red "Sales" report, (3) light-green "Production" report, (4) brown "Profit" report, (5) mustard- yellow "Rendering" report, and (6) "Bottom Line" report. To the extent the allegations in Paragraph 955 purport to characterize or describe documents or other sources, Agri Stats denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies any remaining allegations in Paragraph 955.

> 956. *Defendants' complex managers typically received the targeted reports for the specific aspects of chicken operations for which they have responsibility, and the CEO, CFO, and a few other of Defendants' and co-conspirators' top executives received Agri Stats' monthly "Bottom Line Report" (which, for a portion of the relevant period, was called the "Executive Report") geared to top level executives. The Bottom Line Reports contained one row for each chicken company reporting to Agri Stats with columns for certain categories of information, such as operating profit dollars, profit percentage, corporate SG&A (aka overhead), interest expense, and other key operational information related to sales, revenues and costs.*

**ANSWER:** To the extent the allegations in Paragraph 956 characterize or describe Agri Stats reports, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 956 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 956 to the extent that they relate to other Defendants and/or third parties. Agri Stats admits that it provides Bottom Line Reports to its clients. To the extent the allegations in Paragraph 956 purport to describe documents or other sources, Agri Stats denies any characterization or description that is inconsistent therewith or taken out of context. To the extent that Paragraph 956 contains any other factual allegations requiring a response from Agri Stats, Agri Stats denies such allegations. Producer Defendants admit that Agri Stats has reported anonymized and historical information to certain individual Producer

Defendants for pro-competitive benchmarking purposes. Koch denies that it participated in or received any Bottom Line Reports. Defendants deny any remaining allegations in Paragraph 956.

> 957. Within each Agri Stats report (including the Bottom Line Report), unique information referring to supposedly "anonymous" data permitted Defendants and Producer Co- Conspirators to identify their competitors' information contained within each category of report. For example, Agri Stats data on "Actual Live Production Cost," one of many important industry metrics listed in the Bottom Line Report, included line-items for each of the "sub-regions" (described above) that shows, for each particular sub-region, the weighted average figures for "chick cost," "grower cost," "feed ingredient cost," "[feed] mill delivery cost," and "vaccination and medical cost."

**ANSWER:** To the extent the allegations in Paragraph 957 characterize or describe Agri Stats reports, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 957 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 957 to the extent that they relate to other Defendants and/or third parties. Agri Stats admits that it provides Bottom Line Reports to its clients. Agri Stats denies that its reports can be reverse engineered in the manner described in Paragraph 957. Producer Defendants admit that Agri Stats has reported anonymized and historical information to certain individual Producer Defendants for pro-competitive benchmarking purposes. Defendants deny any remaining allegations in Paragraph 957.

> 958. Information helping Defendants and Producer Co-Conspirators to assess the size and age of breeder flocks was available in the "Growth Rate Report" section of Agri Stats, which included complex-by-complex numbers showing the average age, in weeks (e.g., "63.22" or "51.76") of the hens whose eggs, when hatched, became the chickens later killed for meat consumption and supplied to Plaintiffs and other chicken buyers.

**ANSWER:** To the extent the allegations in Paragraph 958 characterize or describe Agri Stats reports, Defendants refer to the contents of the Agri Stats reports and deny any characterization or description that is inconsistent with the referenced sources. Producer Defendants other than Harrison Poultry admit that they receive various reports from Agri Stats, including the "Growth

Rate Report," that contain anonymized benchmarking information, certain of which include complex-by-complex data. Harrison Poultry denies that the reports it received from Agri Stats contained a "Growth Rate Report" containing information about breeders. Defendants admit that breeder hens generally produce eggs, certain of which hatch into chickens ultimately sold for meat consumption, and that their age impacts their fertility. Defendants deny any remaining allegations in Paragraph 958.

> 959.    *The hens comprising the breeder flocks produce fertile eggs (at a rate of roughly five per week) starting around 20 weeks of age, and are typically slaughtered at 65 weeks of age, when breeder hens lose the ability to consistently lay fertile eggs. A breeder hen killed at 60 weeks lays 25 fewer eggs than a hen killed at 65 weeks, meaning that there are 25 fewer chicks hatched and 25 fewer mature chickens available to Plaintiffs and other chicken buyers.*

**ANSWER:**    Defendants admit that breeder hens generally produce eggs, certain of which hatch into chickens ultimately sold for meat consumption, and that their age impacts their fertility. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 959 and therefore deny them.

> 960.    *The bird-age data from the "Growth Rate Report" also shows how close a given breeder flock is to the end of its egg-laying lifespan, giving Defendants insight into how much longer that flock's capacity to lay eggs will impact the supply of chickens available for slaughter further down the supply chain. In addition, because the "Growth Rate Report" was available each month, knowing the average age of a given flock from month to month can help determine when flocks were being slaughtered and removed from the supply chain (e.g., if the average hen age drops to 4.00 weeks after being at 48.00 weeks in the prior month's "Growth Rate Report," that is a clear indication a breeder flock was slaughtered at 48 weeks).*

**ANSWER:**    To the extent the allegations in Paragraph 960 characterize or describe Agri Stats reports, Defendants refer to the contents of the Agri Stats reports and deny any characterization or description that is inconsistent with the referenced sources. Producer Defendants other than Harrison Poultry admit that they receive various reports from Agri Stats, including the "Growth Rate Report," that contain anonymized benchmarking information. Harrison Poultry denies that

the reports it received from Agri Stats contained a "Growth Rate Report" containing information about breeders. Defendants deny any remaining allegations in Paragraph 960.

> 961. *The "Actual Live Production Cost" section of an Agri Stats report also included (again, by sub-region), the average number and overall weight of the chickens being processed. Other sections of Agri Stats reports included similar, sub-region data for a range of competitively sensitive metrics, such as bird age and mortality, "chick cost per settled flock," and "grower expense."*

**ANSWER:** To the extent the allegations in Paragraph 961 characterize or describe Agri Stats reports, Defendants refer to the contents of the Agri Stats reports and deny any characterization or description that is inconsistent with the referenced sources. Defendants deny any remaining allegations in Paragraph 961.

> 962. *Knowing the number of complexes each Defendant operates in each sub-region – which, as detailed above, appeared by name at the very beginning of the Agri Stats reports – any Defendant could, with relative ease, assess the performance of all competing complexes in a sub- region on a variety of important industry metrics.*

**ANSWER:** To the extent the allegations in Paragraph 962 characterize or describe Agri Stats reports, Defendants refer to the contents of the Agri Stats reports and deny any characterization or description that is inconsistent with the referenced sources. With respect to the allegations in Paragraph 962, Defendants admit that certain Agri Stats reports contain anonymized and historical data for Broilers, and that certain Agri Stats reports organize certain data geographically, but deny any remaining allegations in Paragraph 962.

> 963. *Discovery in this action has confirmed that Defendants often exchanged Agri Stats information directly with one another. For instance, on March 24, 2009, Koch CFO Joe Grendys wrote to Amick VP of Sales and Marketing Steve Kernen, inquiring whether Amick had "Any luck yet on agristats #."*

**ANSWER:** To the extent the allegations in Paragraph 963 characterize or describe discovery in *In re Broiler Chicken Antitrust Litigation* and a March 24, 2009 communication between Joe Grendys and Steve Kernen, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in Paragraph 963 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 963 to the extent that they relate to other Defendants and/or third parties. Defendants other than Amick Farms and Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 963 and therefore deny them. Amick Farms admits that Steve Kernen received an email on March 24, 2009 from Joe Grendys, but denies any characterization or description that is inconsistent with the referenced sources. Koch admits that Joe Grendys sent an email to Steve Kernen on or about March 24, 2009, and that Paragraph 963 quotes part of that email. Koch and Amick Farms deny the remaining allegations in Paragraph 963.



Defendants other than Amick Farms and Koch lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 964 and therefore deny them.

Amick Farms denies the remaining allegations in Paragraph 964. Koch denies the allegations in Paragraph 964.

██████████████████████████████████████ Defendants other

than Amick Farms and Koch lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 965 and therefore deny them. ████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ Amick Farms

denies any remaining allegations in Paragraph 965. Koch denies the allegations in Paragraph 965.

966.    *Agri Stats' role in the chicken industry extends far beyond the collection and dissemination of competitively sensitive data. It was an active and knowing participant in, and facilitator of, Defendants' scheme, along with the Producer Co-Conspirators.*

**ANSWER:**  Defendants deny the allegations in Paragraph 966.

967.    *Agri Stats' employees would confirm for Defendants and Producer Co-Conspirators the data for a particular company at quarterly meetings with each company, or at the numerous trade association meetings where Agri Stats executives presented on a regular basis.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as

to the truth of any allegations in Paragraph 967 that relate to other Defendants and/or third parties,

and therefore each Defendant denies the allegations in Paragraph 967 to the extent that they relate

to other Defendants and/or third parties.  Agri Stats admits that it offers a service to meet with its

clients to discuss client's reports.  Agri Stats denies the remaining allegations contained in

Paragraph 967.  The Producer Defendants admit that certain Producer Defendants have

periodically met individually with representatives from Agri Stats to discuss anonymized

information regarding the industry, but deny any characterization of those meetings and deny the

remaining allegations of Paragraph 967.

968.    *Nearly all of the Agri Stats Broiler division account managers responsible for Defendant and Co-Conspirator accounts during the relevant period were former employees of one or more Defendants and their Co-Conspirators and at least one senior account manager left Agri Stats to join Pilgrim's.  This revolving door among the Defendants, their Co-Conspirators and Agri Stats included current or former Agri Stats employees:* █████████████████



**ANSWER:** As the term "nearly all" in the first sentence of Paragraph 968 is imprecise, Defendants are unable to form a belief as to the truth of the allegations contained in that sentence and on this basis deny the allegations in this sentence. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 968 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 968 to the extent that they relate to other Defendants and/or third parties. Defendants other than Case, Tyson, and Pilgrim's lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 968 and therefore deny them.

███████████████████████████████████████████████

██████████████████████████

969.    During the relevant period, Agri Stats offered a service to Defendants and Producer Co-Conspirators whereby each quarter – but oftentimes far more regularly than that, in some instances two or three times per month – personnel from Agri Stats would meet with each Defendant's employees and give presentations about both company- and industry-wide data. These meetings took place at both the production-plant level, where Agri Stats personnel met with Defendants' complex managers, and at the executive level, where Agri Stats personnel met with the leadership of Defendants' hatchery, breeder, and feed departments. The executive-level meetings, referred to "quarterly reviews" or "executive reviews," often lasted several days, and were attended by one or more Agri Stats account managers, often accompanied by Agri Stats vice president Mike Donohue, along with C-suite personnel from the Defendants or Producer Co- Conspirators. These multi-day meetings would touch on a range of competitively-sensitive topics, including the Defendants' and Co-Conspirators' profits, sales, margins, operating rates and capacity, including flock or egg-placement reductions.

**ANSWER:** Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 969 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 969 to the extent that they relate to other Defendants and/or third parties. Agri Stats admits that it offers a service to meet with its clients to discuss client's reports, but denies the remaining allegations contained in Paragraph 969. The Producer Defendants admit that certain Producer Defendants have periodically met individually with representatives from Agri Stats to discuss anonymized information regarding the industry, but deny any characterization of those meetings and deny the remaining allegations of Paragraph 969.

970.    Throughout the relevant time period, Agri Stats executives and account managers fanned out across the chicken-producing regions of the country to meet with their clients and co- conspirators, ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████



**ANSWER:** To the extent the allegations in Paragraph 970 characterize unidentified documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced documents or other sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 970 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 970 to the extent that they relate to other Defendants and/or third parties.





.

*971.    Similar meetings happened day after day, week after week, month after month, year after year, and ensured the success of the production-restriction mechanism of Defendants' conspiracy. In addition, roughly every month, Agri Stats account managers would convene account manager meetings – sometimes at Agri Stats' Fort Wayne headquarters, sometimes closer to Mike Donohue's home office in Rhode Island, and sometimes over the phone – which gave Agri Stats employees the opportunity to share information about their various accounts, which could then be relayed to their clients, the Defendants and their Co-Conspirators, at one or more of their subsequent meetings.*

**ANSWER:**  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 971 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 971 to the extent that they relate

to other Defendants and/or third parties. Agri Stats admits that it offers a service to meet with its clients to discuss client's reports. Agri Stats admits that its employees held meetings with one another, but denies any characterization of those meetings. To the extent that Paragraph 971 contains any factual allegations requiring a response from Agri Stats, Agri Stats denies such allegations. The Producer Defendants admit that certain Producer Defendants have periodically met individually with representatives from Agri Stats to discuss anonymized information regarding the industry, but deny any characterization of those meetings and any remaining allegations in Paragraph 971.

> 972. *Since Agri Stats would travel and present among Defendants regularly, discussing each Defendant's non-public, proprietary data, Agri Stats was in a unique position to share information among Defendants and Producer Co-Conspirators at these regular meetings. And that is exactly what happened.*

**ANSWER:** Agri Stats admits that it offers a service to meet with its clients to discuss that client's reports, but denies the remaining allegations contained in Paragraph 972. The Producer Defendants admit that certain Producer Defendants have periodically met individually with representatives from Agri Stats to discuss anonymized information regarding the industry, but deny any characterization of those meetings and deny the remaining allegations of Paragraph 972.

> 973. *At these regular meetings with Defendants' executives, Agri Stats led detailed discussions about industry profitability and the key contributing factors, including size and average age of chicken breeder flocks, average hatchability of eggs, mortality rates, average bird rate, feed cost, and other performance factors based on data Defendants provided. Agri Stats also led discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and the top and bottom third of the industry.*

**ANSWER:** Agri Stats admits that it offers a service to meet with its clients to discuss that client's reports, but denies the remaining allegations contained in Paragraph 973. The Producer Defendants admit that certain Producer Defendants have periodically met individually with

representatives from Agri Stats to discuss anonymized information regarding the industry, but deny any characterization of those meetings and deny the remaining allegations of Paragraph 973.

> 974.   *Agri Stats also told Defendants' executives how much the industry was over- or undersupplying the market and estimated demand, and shared other information based on data Defendants provided.*

**ANSWER:**  Agri Stats denies the allegations of Paragraph 974.  The Producer Defendants admit that certain Producer Defendants have periodically met individually with representatives from Agri Stats to discuss anonymized information regarding the industry, but deny any characterization of those meetings and deny the remaining allegations of Paragraph 974.

> 975.   *Agri Stats' presentations to the Defendants were based in part on color-coded data compilations, known as "books," specifically tailored for each Defendant based on the data the Defendant has submitted to Agri Stats. Agri Stats maintained at least six "books" for each Defendant: (1) the light-blue "Live" book, with information on the Defendant's breeders, hatchery feed and grow-out; (2) the red "Sales" book, with information on the Defendant's current and year- to-date sales, which provides competitors with information on the price of their product "mix" of chickens versus the national average prices for the same "mix," ranking companies from "best" to "poorest" in terms of performance; (3) the light-green "Production" book, with information on the Defendant's yields; (4) the brown "Profit" book, with information on the Defendant's profits and losses; (5) the mustard-yellow "Rendering" book, with information on the Defendant's rendering facilities; and (6) the "Bottom Line" book, with information on the totality of the Defendant's sales, revenues, and costs.*

**ANSWER:**  To the extent the allegations in Paragraph 975 characterize or describe Agri Stats' presentations, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Defendants other than Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 975 and therefore deny them.  Agri Stats admits that it produces the following reports: (1) light-blue "Live" report, (2) red "Sales" report, (3) light-green "Production" report, (4) brown "Profit" report, (5) mustard- yellow "Rendering" report, and (6) "Bottom Line" report. To the extent the allegations in Paragraph 975 purport to characterize or describe documents or other sources, Agri Stats denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent

that Paragraph 975 contains any other factual allegations requiring a response from Agri Stats, Agri Stats denies such allegations. Defendants deny any remaining allegations in Paragraph 975.

976. *Anyone at Agri Stats had the ability to pull one or more Defendant's "books" and relay that information to other Defendants.*

**ANSWER:** Defendants other than Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 976 and therefore deny them. Agri Stats denies the allegations of Paragraph 976.

977. *Indeed, Agri Stats shipped copies of one Defendant's "books" to other Defendants on a number of occasions.*

**ANSWER:** Defendants other than Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 977 and therefore deny them. Agri Stats denies that it ever deliberately shared "books" with an incorrect subscriber. Agri Stats denies the remaining allegations contained in Paragraph 977.

978. *Despite the impropriety of this practice, when it was discovered following a routine review of shipping information, no one at Agri Stats was held accountable, nor were the "books" returned to Agri Stats.*

**ANSWER:** Defendants other than Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 978 and therefore deny them. Agri Stats denies that it ever deliberately shared "books" with an incorrect subscriber. Agri Stats denies the remaining allegations contained in Paragraph 978.

979. *In addition to its in-person meetings with Defendants, Agri Stats employees, including company Vice President Michael Donohue and Broilers account managers Paul Austin, Paul Bunting, and Dana Weatherford, regularly hosted, or presented at, chicken industry events and investor conferences, often citing Agri Stats data in discussing market, production, and demand trends in the chicken industry.*

**ANSWER:** Defendants other than Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 979 and therefore deny them. Agri Stats admits that its employees periodically host and present at chicken industry events and

conferences. To the extent that Paragraph 979 contains any other factual allegations requiring a response from Agri Stats, Agri Stats denies such allegations.

> 980. For example, Agri Stats holds events known as "poultry outlook conferences." At one such conference on April 23, 2015 in Atlanta, Mr. Donohue made a presentation that included "broiler market situation and outlook" as an agenda item.

**ANSWER:** To the extent the allegations in Paragraph 980 characterize or describe an April 23, 2015 Agri Stats conference agenda, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 980 and therefore deny them. Agri Stats admits that its employees, including Mr. Donohue, periodically host and present at chicken industry events and conferences. To the extent that Paragraph 980 contains any other factual allegations requiring a response from Agri Stats, Agri Stats denies such allegations.

> 981. Mr. Donohue also helped forecast supply and demand for the chicken industry by using Agri Stats data on breeder placements and inventory. At the U.S. Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, for example, Donohue noted that chicken breast prices were at a particularly high level and "[i]t's not just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012." He said "I hope this carries over into the latter half of 2012 based on some of the production forecasts that can be made based on breeder placements and inventories."

**ANSWER:** To the extent the allegations in Paragraph 981 characterize or describe unidentified statements by Agri Stats Vice President Donohue at US Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 981 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph

981 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 981.

982.



**ANSWER:** To the extent the allegations in Paragraph 982 characterize or describe a July 2, 2012 Agri Stats report, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Agri Stats and Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 982 and therefore deny them. Tyson and Agri Stats deny any remaining allegations in Paragraph 982.

983.



**ANSWER:** To the extent the allegations in Paragraph 983 characterize or describe unidentified publications and emails from Mr. Donohue, Defendants deny any characterization or description that is inconsistent with the referenced source. Defendants other than Agri Stats lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 983 and therefore deny them.

984.     *Among the thousands of such communications uncovered during discovery to date are the following examples, which are still being compiled in ongoing discovery:*

**ANSWER:** Paragraph 984 contains no factual allegations to which a response is required.

To the extent a response is required, Defendants deny the allegations in Paragraph 984.

985.



**ANSWER:** To the extent the allegations in Paragraph 985 characterize or describe emails

and a PowerPoint presentation from Mr. Donohue, Defendants deny any characterization or

description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in Paragraph 985 that relate

to other Defendants and/or third parties, and therefore each Defendant denies the allegations in

Paragraph 985 to the extent that they relate to other Defendants and/or third parties. Defendants

other than Agri Stats, George's, Mar-Jac, Foster Farms, Mountaire, O.K. Foods, Peco Foods,

Perdue, and Tyson lack knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 985 and therefore deny them.



986.



**ANSWER:** To the extent the allegations in Paragraph 986 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 986 at this time.

Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 986 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 986 to the extent that they relate to other Defendants and/or third parties. Defendants other than Fieldale lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 986 and therefore deny them.

*987.*

**ANSWER:**

████████████████████████████████████████ Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 987 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 987 to the extent that they relate to other Defendants and/or third parties. Defendants other than Agri Stats, Amick Farms, George's, Mar-Jac, Foster Farms, Mountaire, Peco Foods, Perdue, and Fieldale lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 987 and therefore deny them. ████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████  Defendants deny any remaining allegations in Paragraph

987.

988.   *Defendants rarely mentioned their exchange of information with one another through Agri Stats.*

**ANSWER:**  Defendants deny the allegations in Paragraph 988.

989.   *However, on certain public occasions, such as earnings or investor conference calls, executives from Defendants Sanderson and Tyson (two of the three publicly traded Defendants) noted the important role Agri Stats data plays in the industry.*

**ANSWER:**  To the extent the allegations in Paragraph 989 characterize or describe unidentified earnings or investor conference calls, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 989 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 989 to the extent that they relate to other Defendants and/or third parties.  Defendants other than Tyson and Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 989 and therefore deny them.  Tyson and Sanderson Farms admit they are publicly traded companies, but deny any remaining allegations in Paragraph 989.

990.   *For example, Defendant Sanderson's CEO, Joe Sanderson, commented on an earnings call that he "look[s] at Agri Stats and see[s] what people are doing and not doing," and similarly stated on a May 2011 earnings call that "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats." (emphasis added). Asked later on the May 2011 call by an analyst why Mr. Sanderson made this statement and another statement a few months earlier that he "feel[s] confident that we are going to see cutbacks" based on Agri Stats data, Mr. Sanderson indicated:*

> *Industry participants expected that [the market would improve in June and July] and I think they wanted to carry their production into June and July and see if the market would reward them for that it*

*appears right now .... And then once you get past July 4 ... I think then you will start seeing reduced egg sets .... Typically in my experience the first cut is not enough.*

**ANSWER:** To the extent the allegations in Paragraph 990 characterize or describe an unidentified Sanderson Farms earnings call and a May 2011 Sanderson Farms earnings call, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Sanderson Farms lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 990 and therefore deny them. Sanderson Farms admits that it held a May 2011 earnings call, but denies any remaining allegations in Paragraph 990.

991. *Defendant Tyson similarly noted in a December 2014 investor presentation that:*

> *[t]he point being is that when you talk about the chicken cycle, most people will look at the cyclicality. It's very profitable right now. And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack. We can tell that through Agri Stats. Now at the same time, when there is more poultry available and the industry may not be as profitable, we would not expect to be anywhere close to what the bottom of that cycle would be. (emphasis added)*

**ANSWER:** To the extent the allegations in Paragraph 991 characterize or describe a December 2014 Tyson investor presentation, Defendants deny any characterization or description that is inconsistent with the referenced sources. Defendants other than Tyson lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 991 and therefore deny them. Tyson denies the remaining allegations in Paragraph 991.

992. *There is no plausible, non-conspiratorial justification for Defendants to use Agri Stats to secretly share highly confidential and proprietary information about their breeder flock size and age, pricing, capacity, production, and costs at the level of detail at which they do.*

**ANSWER:** Defendants deny the allegations in Paragraph 992.

539

993.   *In a competitive market, such proprietary, competitively sensitive information should be a closely guarded secret. Economic principles establish that the routine exchange among competitors of such sensitive internal company information reduces competition.*

**ANSWER:**  Defendants deny the allegations in Paragraph 993.

994.   *One chicken industry expert testified in a case against Defendant Pilgrim's brought under the Packers and Stockyard Act, 7 U.S.C. §§ 181-229, that sharing information through Agri Stats by chicken producers regarding pay for contract farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern." The same expert also remarked that Agri Stats was unusual even among other price surveys, noting:*

> *[t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue. Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive. As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry. An intensive inquiry is needed.*

**ANSWER:**  To the extent the allegations in Paragraph 994 characterize or describe testimony by an unidentified Broiler industry expert, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 994 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 994 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 994.

995.   *When given access to Agri Stats' reports in connection with litigation where he served as an expert witness, an agricultural economist who, to that point, had only "heard rumors of a secretive poultry industry information-sharing service," said that he "was shocked at the incredible detail" of the information presented in the reports.*

**ANSWER:**  To the extent the allegations in Paragraph 995 characterize or describe testimony by an unidentified expert witness, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information

540

sufficient to form a belief as to the truth of any allegations in Paragraph 995 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 995 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 995.

> 996.    *A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively-sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:*

>> *Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue. My experience is that competitors ... are prolific at quantifying their competitor's business information on their own. For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company ... started for the poultry industry in 1985. AGRISTATS has the following mission statement: "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING ACCURATE AND TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES." Note the mission is to share comparative data while protecting individual companies. I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved. Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.*

**ANSWER:** To the extent the allegations in Paragraph 996 characterize or describe testimony by an unidentified poultry and egg industry expert, Defendants deny any characterization or description that is inconsistent with the referenced source. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 996 that relate to other Defendants and/or third parties, and therefore each Defendant

denies the allegations in Paragraph 996 to the extent that they relate to other Defendants and/or

third parties. Defendants deny any remaining allegations in Paragraph 996.

> 997.    A 2017 Bloomberg News article titled "Is the Chicken Industry Rigged? Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," highlighted the role Agri Stats plays in Defendants' efforts to monitor and police their cartel:

>> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged- out aggregated data – for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence – so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."

**ANSWER:** To the extent the allegations in Paragraph 997 characterize or describe a

2017 Bloomberg News article, Defendants deny any characterization or description that is

inconsistent with the referenced source. Each Defendant lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in Paragraph 997 that relate to other

Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph

997 to the extent that they relate to other Defendants and/or third parties. Defendants deny any

remaining allegations in Paragraph 997.

## AA.    Plaintiffs' Claims are Timely

> 998.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting its claims for relief. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least 2016 or later. Defendants engaged in a secret conspiracy that did not reveal facts that put Plaintiffs on inquiry notice that there was a conspiracy to engage in anticompetitive conduct or otherwise harm Plaintiffs.

**ANSWER:** To the extent the allegations in Paragraph 998 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid- rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer the second sentence of Paragraph 998 at this time. Defendants deny any remaining allegations in Paragraph 998.

> 999.    And it was not until June 2020 with the Department of Justice's Colorado Indictment of executives of Defendants Claxton and Pilgrim's Pride that further evidence of the conspiracy became publicly known. It was not until October 7, 2020 – when the Department of Justice issued its Superseding Indictment of six additional executives of Defendants Tyson, Koch, Pilgrim's Pride, and George's – that additional elements of Defendants' bid-rigging conduct involving broilers were revealed. The Colorado Indictments revealed that Defendants Claxton and Pilgrim's Pride aided the conspiracy by engaging in direct price fixing and specific bid rigging of broilers, which affected purchasers of large volumes of broiler chickens.

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 999 at this time.

> 1000.   With respect to the manipulation of the Georgia Dock, a January 18, 2016 Wall Street Journal article regarding Defendants' possible manipulation of the Georgia Dock benchmark price raised the possibility of collusion to artificially raise, fix, or maintain chicken prices using the Georgia Dock. Subsequently, a series of articles in various publications published between November 3 and 17, 2016, detailed for the first time that the USDA had discontinued its reliance on the Georgia Dock benchmark price because its input prices could not be verified.

**ANSWER:** To the extent the allegations in Paragraph 1000 characterize or describe Wall Street Journal articles and other unidentified publications, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 1000 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations

in Paragraph 1000 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 1000.

> 1001. *Yet even when faced with these public revelations, Defendants continued to assert the fairness and accuracy of the Georgia Dock benchmark price.*

**ANSWER:** Defendants admit that they believed any representations made regarding the fairness and accuracy of the Georgia Dock reported price throughout the Relevant Period. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 1001 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 1001 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 1001.

> 1002. *For example, in a November 8, 2016, Washington Post article, Defendant Sanderson Farms represented that the Georgia Dock benchmark price was "reliable," to induce purchasers of chickens to believe the benchmark price was not subject to illegal manipulation by the Georgia Dock Defendants.*

**ANSWER:** To the extent the allegations in Paragraph 1002 characterize or describe a November 8, 2016 Washington Post article, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 1002 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 1002 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 1002.

> 1003. *Not until November 10, 2016 was it disclosed publicly that the Georgia Dock Defendants had formed a secret Georgia Dock Advisory Committee that facilitated opportunities for executives to meet and also discuss their scheme to fix the Georgia Dock benchmark price.*

**ANSWER:** Defendants deny the allegations in Paragraph 1003.

*1004.   The existence of this committee was not known to Plaintiffs, nor would Plaintiffs have been able to learn of how Defendants' executives conducted themselves in their non-public Georgia Dock Advisory Committee meetings.*

**ANSWER:**  Defendants deny the allegations in Paragraph 1004.

*1005.   Finally, not until November 17, 2016, was it publicly disclosed that the Florida Attorney General's Office was investigating the Georgia Dock benchmark price and its calculation and manipulation by the Georgia Dock Defendants.*

**ANSWER:**   Defendants deny Plaintiffs' characterization of any investigation by the Florida Attorney General's Office and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1005 and therefore deny them.

*1006.   Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. For example, the Agri Stats coordination coupled with direct industry communications (at trade shows and via email/calls) denied Plaintiffs the opportunity to know of the conspiracy. Moreover, chickens are not exempt from antitrust regulation, and thus, before these recent events Plaintiffs reasonably considered the U.S. chicken industry to be a competitive industry. Plaintiffs also reasonably believed its contract partners to be dealing with them on fair and honest terms, and that they could justifiably rely on Defendants' representations regarding the Georgia Dock as being truthful. Accordingly, a reasonable person under the circumstances would not have been alerted to begin investigating the legitimacy of Defendants' chicken prices before these recent events.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy.  To the extent the allegation of "recent events" purports to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid- rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer the last sentence of Paragraph 1006 at this time.   Defendants deny the allegations in the first, second, and last sentences of Paragraph 1006.  The allegations in the third sentence of Paragraph 1006 contain legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations in the third sentence of Paragraph 1006.   With respect to the allegations in the fourth sentence of Paragraph 1006, Defendants admit that they believed any representations made regarding the Georgia Dock were truthful.  Harrison Poultry specifically denies making any

representations about the Georgia Dock during the Relevant Period. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 1006 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 1006 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 1006.

> 1007. *Plaintiffs exercised reasonable diligence. Plaintiffs could not have discovered Defendants' alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 1007 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 1007 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 1007.

> 1008. *Throughout the relevant period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs.*

**ANSWER:** To the extent the allegations in Paragraph 1008 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1008 at this time. Defendants deny any remaining allegations in Paragraph 1008.

> 1009. *Throughout the relevant period, Defendants repeatedly misrepresented to Plaintiffs through fraudulent statements and omissions that the inflated prices of the Georgia Dock reflected actual market conditions.*

**ANSWER:** Defendants deny the allegations in Paragraph 1009.

> 1010. *The conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, (1) secret meetings, (2) surreptitious communications between Defendants via the wires (telephones, emails, text*

*messages and other electronic communications) and in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, (3) limiting any explicit reference to competitor pricing or supply restraint communications in documents, (4) communicating competitively sensitive data to one another through Agri Stats, a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and (5) concealing the existence and nature of their competitor supply restraint and price discussions from non- conspirators (including customers).*

**ANSWER:**  Defendants deny the allegations in Paragraph 1010.

*1011.  Defendants and Co-Conspirators used code words including "discipline" and "capacity discipline" in their public statements to conceal their conspiracy and signal one other, in furtherance of their conspiracy to restrain production while shielding their conspiracy from detection or suspicion.*



*2) on a May 3, 2013, earnings call, Pilgrim's President & CEO Bill Lovette stated that "price is going to strengthen as supply continues to be disciplined and constrained" … and "we've done a good job so far of maintaining discipline;" and (3) on a July 2016 earnings call, Mr. Lovette noted that "I think what we've seen with egg sets is absolutely a testament to the discipline of our industry that we've seen the last really two to three years."*

**ANSWER:**



Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 1011 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 1011 to the extent that they relate to other Defendants and/or third parties.  Pilgrim's admits it held an earnings call on May 3, 2013, in which Mr. Lovette participated, but denies any remaining allegations in Paragraph 1011.  Koch denies the allegations in Paragraph 1011.  Defendants deny any remaining allegations in Paragraph 1011.

*1012. As alleged above, in 2008, after years of boom and bust cycles of production leading to the regular rise and fall of prices, the price of chickens began an unprecedentedly steady increase that continued at least through 2016.*

**ANSWER:** To the extent that Paragraph 1012 incorporates and re-alleges allegations above, Defendants incorporate and re-allege any response made to those allegations. As the phrases "boom and bust cycles" and "unprecedentedly steady" in Paragraph 1012 are imprecise, Defendants are unable to form a belief as to the truth of the allegations contained in Paragraph 1012 and therefore deny them. Defendants deny any remaining allegations in Paragraph 1012.

*1013. Defendants affirmatively and falsely attributed rising prices to, among other things, increases in the price of inputs. Defendants used these pretexts used to cover up the conspiracy. In fact, the chicken price increases were the result of Defendants' collusive conduct, which was undisclosed at the time.*

**ANSWER:** Defendants deny the allegations in Paragraph 1013.

*1014. During the relevant period, Defendants affirmatively made numerous misleading public statements falsely portraying the market for chickens as a competitive one.*

**ANSWER:** Defendants deny the allegations in Paragraph 1014.

*1015. For example, Defendants provided testimony at workshops held by the U.S. Department of Justice and USDA suggesting the chicken industry was competitive and not subject to anti-competitive practices and agreements, including testimony at a May 21, 2010 workshop of a National Chicken Council-commissioned study by Dr. Thomas Elam, which stated that "the chicken industry is competitive and thriving," and has "[i]ntense competition" that promotes "product innovation and lower prices for consumers."*

**ANSWER:** To the extent the allegations in Paragraph 1015 characterize or describe unidentified statements at U.S. Department of Justice, USDA and National Chicken Council workshops, Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 1015 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 1015 to the extent that

they relate to other Defendants and/or third parties.   Defendants deny any remaining allegations in Paragraph 1015.

1016. Defendants also repeatedly blamed the Renewable Fuels mandate for increased Broiler prices, both through the NCC, other trade groups, and through press releases, speeches, and other public statements by Defendants' employees, rather than disclosing the existence of an agreement to illegally restrain the supply of Broilers. Some instances of these pretextual explanations by Defendants and their agents include:

A.   On a January 29, 2008, earnings call, Pilgrim's Interim CEO Clint Rivers claimed that "the U.S. government continues its misguided policy of subsidizing ethanol production at the expense of affordable food, and a lower corn yield expectation bypro USDA will contribute to decrease corn suppliers next year."

B.   On June 23, 2008, Wayne Farms President & CEO Elton Maddox said in a statement that "the government's food fuel mandate has created the need for us to rationalize our business."

C.   On July 7, 2008, O.K. Foods announced production cuts due to "record high prices for corn and soybean meal, which it attributed to the U.S. government's mandated ethanol policies."

D.   On June 24, 2009, Harrison Poultry President & CEO Mike Welch and Claxton Poultry President Jerry Lane met in Washington D.C. and encouraged elected officials to end the "mistake" of the ethanol subsidy.

E.   In 2010, Foster Farms delayed an expansion due, allegedly, to corn prices. Ira Brill, Foster Farm's Director of Market Services, blamed the ethanol mandate for the delay, stating that it "places enormous pressure on our input costs, and for that reason we can't go forward with our expansion plans."

F.   On March 7, 2011, House of Raeford announced production cuts due to increased prices. It stated that "if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."

G.   On March 15, 2011, Simmons announced downsizing at a plant due to economics "resulting from high grain prices predominantly caused by corn being used in ethanol." Simmons cited ethanol policies again on June 27, 2011, when it laid off another 223 employees.

H.   In an April 13, 2011, hearing before a congressional subcommittee, Michael Welch (President and CEO of Harrison Poultry) stated that production of broilers was threatened by the diversion of corn to fuel production. Welch claimed that shifting corn back to feed would "allow

*consumers of poultry products to continue to enjoy an ongoing, adequate supply of animal protein at reasonable prices." Welch repeated similar claims in 2012 as well, citing increased corn costs resulting in "tens of billions of dollars in increased costs for livestock and poultry producers and food manufacturers."*

I.   *In September 2011, Phillip Green (Vice President of Commodities, Foster Farms) testified on behalf of the American Feed Industry Association at a public hearing and blamed increasing meat costs on the ethanol mandate.*

J.   *On October 10, 2014, National Chicken Council President Mike Brown wrote an op-ed citing the Renewable Energy Standard as the primary reason for the poultry industry's inability to increase production. Brown cited the Renewable Fuel Standard again in a May 15, 2015 op-ed in the Wall Street Journal.*

**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 1016. To the extent the allegations in Paragraph 1016 characterize or describe statements by Pilgrim's Interim CEO Clint Rivers from a January 29, 2008 earnings call (Subparagraph A), a June 23, 2008 statement by Wayne Farms President & CEO Elton Maddox (Subparagraph B), a July 7, 2008 statement by O.K. Foods (Subparagraph C), a June 24, 2009 joint statement by Harrison Poultry President & CEO Mike Welch and Norman W. Fries, Inc.'s President Jerry Lane (Subparagraph D), a 2010 statement by Foster Farm's Director of Market Services Ira Brill (Subparagraph E), a March 7, 2011 statement by House of Raeford (Subparagraph F), March 15, 2011 and June 27, 2011 statements by Simmons (Subparagraph G), an April 13, 2011 statement and an unidentified 2012 statement by President and CEO of Harrison Poultry Michael Welch (Subparagraph H), a September 2011 statement by Foster Farms Vice President of Commodities Phillip Green (Subparagraph I), and October 10, 2014 and May 15, 2015 articles by National Chicken Council President Mike Brown (Subparagraph J), Defendants deny any characterization or description that is inconsistent with the referenced sources. Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 1016 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph

550

1016 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 1016.

> 1017.  To explain the decreasing supply of chickens since 2012, Defendants have provided a variety of pretextual explanations, including: (1) a breeding issue with chickens during 2014, (2) a Russian ban of U.S. chicken imports starting in 2014, and (3) a 2013 shortage in supply due in part due to an avian flu outbreak in Mexico that caused a surge in demand for hens to repopulate chicken farms in Mexico. These explanations were pretextual in that Defendants sought to hide their conspiracy from discovery by blaming chicken price increases, or artificially inflated chicken prices, on these factors rather than on Defendants' own collusive conduct (including their unprecedented cuts to breeder flocks).

**ANSWER:**  Paragraph 1017 contains Plaintiffs' characterizations of their claims, arguments subject to proof by expert testimony, and/or legal conclusions, to which no response is required.  To the extent that a response is required, Defendants deny any remaining allegations in Paragraph 1017.

> 1018. Throughout the relevant period, Defendants repeatedly also cited increasing input costs as a pretext for their collusion to restrain supply and manipulate prices by anticompetitive means.

**ANSWER:**  Defendants admit that input cost increases can lead to Broiler price increases. Defendants deny the remaining allegations in Paragraph 1018.

> 1019.  For instance, Defendants repeatedly claimed that input cost increases during 2008 justified chicken price increases. However, while corn was $5/bushel in 2005-2006 and increased to $9 by May or June 2008, it quickly fell back to below $5/bushel by fall 2008.

**ANSWER:**  Defendants admit that input cost increases can lead to Broiler price increases. To the extent the allegations in Paragraph 1019 characterize or describe unidentified statements by Defendants or unidentified documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 1019 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations

in Paragraph 1019 to the extent that they relate to other Defendants and/or third parties. Defendants deny any remaining allegations in Paragraph 1019.

> 1020.   Higher chicken prices later in the relevant period also were not justified by increased costs of corn, which, after a temporary spike in the summer of 2012, were not increasing at the level that would have warranted higher chicken prices.

**ANSWER:**  Defendants deny the allegations in Paragraph 1020.

> 1021.   Defendants, through the National Chicken Council, other trade groups, and press releases, speeches, and other public statements by their employees, also repeatedly and publicly blamed the federal government's ethanol mandate for increased chicken prices, asserting that it increased their corn costs.

**ANSWER:**  To the extent the allegations in Paragraph 1021 characterize or describe unidentified statements by Defendants or unidentified documents or other sources, Defendants deny any characterization or description that is inconsistent with the referenced sources.  Each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 1021 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 1021 to the extent that they relate to other Defendants and/or third parties.  Defendants deny any remaining allegations in Paragraph 1021.

> 1022.   Defendants made all of these pretextual representations so as to conceal their conspiracy and avoid disclosing their agreement to illegally restrain the supply of chickens.

**ANSWER:**  Defendants deny the allegations in Paragraph 1022.

> 1023.   By virtue of Defendants and all of their Co-Conspirators actively and intentionally concealing their above-described wrongful conduct, the running of any applicable statute of limitations has been (and continues to be) tolled and suspended with respect to Plaintiff's claims and causes of action resulting from the Defendants' unlawful conspiracy alleged in this Complaint under the fraudulent concealment doctrine and/or doctrine of equitable estoppel.

**ANSWER:**  Defendants deny the allegations in Paragraph 1023.

> 1024.  Pursuant 15 U.S.C. § 16(i), the running of any applicable statute of limitations was also tolled when the Department of Justice instituted a criminal antitrust proceeding by convening a grand jury (which appears to have been in January 2019), and

*for which the DOJ issued a subpoena on April 2019, seeking "[a]ll discovery" in this civil case.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1024 at this time.

> *1025. Plaintiffs were members of the putative direct purchaser class action complaint asserted against Defendants, including, but not limited to Maplevale Farms, Inc. v. Koch Foods, Inc. et al., No. 1:16CV08637 (ECF No. 1) (N.D. Ill. Sept. 2, 2016).*

**ANSWER:** Paragraph 1025 consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1025 and therefore deny them.

> *1026. Plaintiffs' claims were tolled under American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974), and related case law during the pendency of that direct purchaser class action asserted against Defendants, commencing at least as early as September 2, 2016.[21]*

> *FN 21: To the extent certain Plaintiffs bring claims as indirect purchasers, they were members of an indirect purchaser class action complaint asserted against Defendants, including but not limited to Fargo Stopping Center, LLC, et al. v. Koch Foods, Inc., et al., No. 16-cv-08851 (N.D. Ill.) and their claims were tolled under American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974), and related case law during the pendency of that indirect purchaser class action asserted against Defendants, commencing at least as early as September 2, 2016.*

**ANSWER:** Paragraph 1026 consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 1026. Footnote 21 consists of Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in Footnote 21.

> *1027. The statute of limitations relevant to DAPs' claims has also been tolled because it was not until June 2020 with the Department of Justice's Indictment of executives of Defendants Claxton and Pilgrim's Pride that the nature of Defendants' conspiracy to fix prices and rig bids of broilers was revealed.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1027 at this time.

## X.  ANTITRUST IMPACT

*1028.  During the relevant period, Plaintiffs, and, where applicable, their respective assignors, purchased substantial amounts of chicken from one or more Defendants.*

**ANSWER:** Although Defendants admit that certain Plaintiffs and, where applicable, their purported respective assignors, purchased chicken from at least one Defendant during the Relevant Period, each Defendant lacks knowledge or information sufficient to form a belief as to the truth of any allegations in Paragraph 1028 that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in Paragraph 1028 to the extent that they relate to other Defendants and/or third parties.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1028 and therefore deny them.

*1029.  As a direct and proximate result of the Defendants' above-described illegal conduct, Plaintiffs, and, where applicable, their respective assignors, were compelled to pay, and did pay, artificially inflated prices for chickens during the relevant period.*

**ANSWER:** Defendants deny the allegations in Paragraph 1029.

*1030.  As a direct and proximate consequence of the Defendants' above-described wrongful conduct, Plaintiffs, and, where applicable, their respective assignors, sustained substantial losses and damage to their businesses and property in the form of overcharges for chickens. The full amount and forms and components of such damages will be calculated after discovery and presented upon proof at trial.*

**ANSWER:** Defendants deny the allegations in Paragraph 1030.

## XI.  CLAIMS FOR RELIEF AND CAUSES OF ACTION

*1031.  The pertinent and relevant factual allegations set forth herein are incorporated into and re-alleged into each of the foregoing counts as appropriate to state a claim.*

**ANSWER:** Paragraph 1031 does not contain any factual allegations to which a response is required. To the extent a response is required, Defendants deny those allegations. To the extent Paragraph 1031 incorporates allegations from unspecified Paragraphs of the Complaint, Defendants also incorporate their answers to those Paragraphs.

## COUNT I
## VIOLATION OF 15 U.S.C. § 1
## (AGAINST ALL DEFENDANTS)

*Brought by Ahold Delhaize USA, Inc.; Albertsons Companies, Inc.; ALDI, Inc.; Amigos Meat Distributors, LP; Amigos Meat Distributors East LP; Amigos Meat Distributors West, LP; Amigos Meat & Poultry, LLC; Anaheim Wings, LLC; Associated Grocers of Florida, Inc.; Associated Grocers of the South, Inc.; Associated Wholesale Grocers, Inc.; Barbecue Integrated, Inc. (d/b/a Smokey Bones, Inc.; Bi-Lo Holdings, LLC; BJ's Wholesale Club, Inc.; Bob Evans Farms, Inc.; Bojangles' Restaurants, Inc. and Bojangles Opco, LLC; Bonita Plaza Wings, LLC; Boston Market Corporation; Caesars Enterprise Services, LLC; Campbell Soup Company; Campbell Soup Supply Company, L.L.C.; Captain D's LLC; Carl Buddig & Co.; Checkers Drive-In Restaurants, Inc.; Cheney Bros., Inc.; Chick-fil-A, Inc.; Conagra Brands, Inc.; Costa Mesa Wings, LLC; Darden Restaurants, Inc.; Cracker Barrel Old Country Store, Inc. and CBOCS Distribution, Inc.; Downtown Wings, LLC; EMA Foods Co., LLC; El Pollo Loco, Inc.; FIC Restaurants, Inc. (d/b/a Friendly's); Gaslamp Wings, LLC; Gibson, Greco & Wood, LTD; Golden Corral Corporation; Hamilton Meat, LLC; Harvest Meat Company, Inc.; Hollywood Wings, LLC; Hooters Management Corporation; Hooters of America, LLC; Hy-Vee, Inc.; Independent Purchasing Cooperative, Inc.; Jetro Holdings, LLC; John Soules Acquisitions LLC; John Soules Foods, Inc.; Kinexo, Inc.; Kraft Heinz Foods Company; Krispy Krunchy Foods, LLC; L. Hart, Inc.; LTP Management Group, Inc.; Maximum Quality Foods, Inc.; McLane Company, Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.; Meijer, Inc./Meijer Distribution, Inc.; Mission Valley Wings, LLC; Nestlé Purina PetCare Company; Nestlé USA, Inc.; Oceanside Wings, LLC; Ontario Wings, LLC; OSI Restaurant Partners, LLC; Pacific Foods of Oregon; Pinnacle Foods, Inc.; PJ Food Service, Inc.; Pollo Operations, Inc.; Publix Super Markets, Inc.; Quirch Foods, LLC, f/k/a Quirch Foods Co.; R & D Marketing, LLC; Rancho Bernardo Wings, LLC; Red Bird Farms Distribution Company; Restaurants of America, Inc.; Restaurant Services, Inc.; Sam's East, Inc.; Sam's West, Inc.; Save Mart Supermarkets; Services Group of America, Inc.; Shamrock Foods Company; Sherwood Food Distributors, L.L.C.; South Gate Wings, LLC; SuperValu, Inc.; Sysco Corporation; Target Corporation; The Fresh Market, Inc.; The Johnny Rockets Group, Inc.; The Kroger Co.; Timber Lake Foods, Inc.; Unified Grocers, Inc.; United Supermarkets, LLC; United Food Service, Inc.; US Foods, Inc.; Wakefern Food Corporation; Walmart, Inc.; Wal-Mart Louisiana, LLC; Wal-Mart Stores Arkansas, LLC; Wal-Mart Stores East, LP; Wal-Mart Stores Texas, LLC; Wawa, Inc.; Western Boxed Meat Distributors, Inc.; White Castle Purchasing Co.;*

*Wings Over Long Beach, LLC; Winn-Dixie Stores, Inc.; Brookshire Brothers, Inc.; SpartanNash Company; Zaxby's Franchising LLC; WZ Franchise Corporation*

*1032. Defendants entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Denied.

*1033. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.*

**ANSWER:** Denied.

*1034. At least as early as January 1, 2008, and continuing until at least as late as 2019, the exact dates being unknown to Plaintiffs, Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for and/or restrain supply of broilers, manipulation of the Georgia Dock benchmarking price, and rig bids and allocate markets for broilers, thereby creating anticompetitive effects.*

**ANSWER:** To the extent the allegations in Paragraph 1034 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1034 at this time. Defendants deny any remaining allegations in Paragraph 1034.

*1035. Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for broilers throughout the United States.*

**ANSWER:** Denied.

*1036. The conspiratorial acts and combinations have caused unreasonable restraints in the market for broilers.*

**ANSWER:** Denied.

*1037. As a result of Defendants' unlawful conduct, Plaintiffs have been harmed by being forced to pay inflated, supra-competitive prices for broilers.*

**ANSWER:** Denied.

*1038.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.*

**ANSWER:**  Denied.

*1039.   Defendants' conspiracy had the following effects, among others:*

- *Price competition in the market for broilers has been restrained, suppressed, and/or eliminated in the United States;*

- *Prices for broilers sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and*

- *Plaintiffs, which directly purchased broilers from Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators, have been deprived of the benefits of free and open competition in the purchase of broilers.*

**ANSWER:**  Denied.

*1040.   Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of broilers paid by Plaintiffs to be higher than it would be but for Defendants' conduct.*

**ANSWER:**  Denied.

*1041.   As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs have been injured in their business or property and will continue to be injured in their business and property by paying more for broilers than they would have paid and will pay in the absence of the conspiracy.*

**ANSWER:**  Denied.

*1042.   Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.*

**ANSWER:**  Denied.

*1043.   Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.*

**ANSWER:**  Denied.

## COUNT II
## VIOLATION OF 15 U.S.C. § 1
## (AGAINST ALL DEFENDANTS FOR CONCERTED OUTPUT RESTRICTION)

*Brought by Action Meat Distributors, Inc.; Affiliated Foods, Inc.; Ahold Delhaize USA, Inc.; Albertsons Companies, Inc.; ALDI, Inc.; Alex Lee, Inc/Merchants Distributors, LLC; Amigos Meat & Poultry, LLC; Amigos Meat Distributors, LP; Amigos Meat Distributors East LP; Amigos Meat Distributors West, LP; Anaheim Wings, LLC; Associated Foods Stores, Inc.; Associated Grocers, Inc.; Associated Grocers of Florida, Inc.; Associated Grocers of New England, Inc.; Associated Grocers of the South, Inc.; Associated Wholesale Grocers, Inc.; Bashas' Inc.; Big Y Foods, Inc,; Bi-Lo Holdings, LLC; BJ's Wholesale Club, Inc.; Bob Evans Farms, Inc.; Bonita Plaza Wings, LLC; Brookshire Grocery Company; Caesars Enterprise Services, LLC; Campbell Soup Company; Campbell Soup Supply Company, L.L.C.; Carl Buddig & Co.; CBBC OPCO, LLC d/b/a Colorado Boxed Beef; Certco, Inc.; Checkers Drive-In Restaurants, Inc.; Cheney Bros., Inc.; Chick-fil-A, Inc.; Costa Mesa Wings, LLC; Darden Restaurants, Inc.; Downtown Wings, LLC; EMA Foods Co., LLC; El Pollo Loco, Inc.; Fareway Stores, Inc.; Gaslamp Wings, LLC; Giant Eagle, Inc.; Gibson, Greco & Wood, LTD; Hamilton Meat, LLC; Harvest Meat Company, Inc.; Hollywood Wings, LLC; Hooters Management Corporation; Hooters of America, LLC; Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc.; Hy-Vee, Inc.; Ira Higdon Grocery Company, Inc.; Jetro Holdings, LLC; John Soules Acquisitions LLC; John Soules Foods, Inc.; Kinexo, Inc.; King Solomon Foods, Inc.; Krispy Krunchy Foods, LLC; L. Hart, Inc.; Latina Boulevard Foods, LLC; LTP Management Group, Inc.; Maximum Quality Foods, Inc.; McLane Company, Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.; Meijer, Inc./Meijer Distribution, Inc.; Mission Valley Wings, LLC; Nicholas & Co., Inc.; Oceanside Wings, LLC; Ontario Wings, LLC; OSI Restaurant Partners, LLC; Pacific Food Distributors, Inc.; Pacific Foods of Oregon; Piggly Wiggly Alabama Distributing Co., Inc.; PJ Food Service, Inc.; Pollo Operations, Inc.; Publix Super Markets, Inc.; R & D Marketing, LLC; Rancho Bernardo Wings, LLC; Red Bird Farms Distribution Company; Restaurants of America, Inc.; Restaurant Services, Inc.; Sam's East, Inc.; Sam's West, Inc.; Save Mart Supermarkets; Schnuck Markets, Inc.; Services Group of America, Inc.; Sherwood Food Distributors, L.L.C.; South Gate Wings, LLC; SuperValu, Inc.; Sysco Corporation; Target Corporation; The Distribution Group, Inc.; The Fresh Market, Inc.; The Golub Corporation; The Kroger Co.; Timber Lake Foods, Inc.; Troyer Foods, Inc.; Unified Grocers, Inc.; United Supermarkets, LLC; URM Stores, Inc.; US Foods, Inc.; Wakefern Food Corporation; Walmart, Inc.; Wal-Mart Louisiana, LLC; Wal-Mart Stores Arkansas, LLC; Wal-Mart Stores East, LP; Wal-Mart Stores Texas, LLC; Wawa, Inc.; Weinstein Wholesale Meats, Inc.; Western Boxed Meat Distributors, Inc.; Wings Over Long Beach, LLC; Winn-Dixie Stores, Inc.; W. Lee Flowers & Company, Inc.; Woodman's Food Market, Inc.*

1044.  *In collusively restricting, limiting, and curtailing the supply of chicken in the United States, Defendants engaged in an unlawful contract, combination, or conspiracy*

558

*that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Denied.

*1045. Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, Plaintiffs for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.*

**ANSWER:** Denied.

*1046. Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiffs in the United States.*

**ANSWER:** Denied.

*1047. As a direct and proximate result of Defendants' above-described unlawful conduct, Plaintiffs paid artificially inflated prices for chicken.*

**ANSWER:** Denied.

*1048. As a direct and proximate result of Defendants' above-described anticompetitive conduct, Plaintiffs were damaged in their businesses or property by paying prices for chicken that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.*

**ANSWER:** Denied.

*1049. Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Denied.

*1050. Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.*

**ANSWER:** Denied.

## COUNT III
## VIOLATION OF 15 U.S.C. § 1
## (AGAINST THE GEORGIA DOCK DEFENDANTS FOR PRICE-FIXING)

*Brought by Action Meat Distributors, Inc.; Affiliated Foods, Inc.; Ahold Delhaize USA, Inc.; Albertsons Companies, Inc.; ALDI, Inc.; Alex Lee, Inc/Merchants Distributors, LLC; Amigos Meat Distributors, LP; Amigos Meat Distributors East LP; Amigos Meat Distributors West, LP; Amigos Meat & Poultry, LLC; Anaheim Wings, LLC; Associated Foods Stores, Inc.; Associated Grocers, Inc.; Associated Grocers of Florida, Inc.; Associated Grocers of New England, Inc.; Associated Grocers of the South, Inc.; Associated Wholesale Grocers, Inc.; Bashas' Inc.; Big Y Foods, Inc.; Bi-Lo Holdings, LLC; BJ's Wholesale Club, Inc.; Bob Evans Farms, Inc.; Bonita Plaza Wings, LLC; Brookshire Grocery Company; Caesars Enterprise Services, LLC; Campbell Soup Company; Campbell Soup Supply Company, L.L.C.; Carl Buddig & Co.; CBBC OPCO, LLC d/b/a Colorado Boxed Beef; Certco, Inc.; Checkers Drive-In Restaurants, Inc.; Cheney Bros., Inc.; Chick-fil-A, Inc.; Costa Mesa Wings, LLC; Darden Restaurants, Inc.; Downtown Wings, LLC; El Pollo Loco, Inc.; Fareway Stores, Inc.; Gaslamp Wings, LLC; Giant Eagle, Inc.; Gibson, Greco & Wood, LTD; Hamilton Meat, LLC; Harvest Meat Company, Inc.; Hollywood Wings, LLC; Hooters Management Corporation; Hooters of America, LLC; Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc.; Hy-Vee, Inc.; Ira Higdon Grocery Company, Inc.; Jetro Holdings, LLC; John Soules Acquisitions LLC; John Soules Foods, Inc.; Kinexo, Inc.; King Solomon Foods, Inc.; Krispy Krunchy Foods, LLC; Latina Boulevard Foods, LLC; LTP Management Group, Inc.; Maximum Quality Foods, Inc.; McLane Company, Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.; Meijer, Inc./Meijer Distribution, Inc.; Mission Valley Wings, LLC; Nicholas & Co., Inc.; Oceanside Wings, LLC; Ontario Wings, LLC; OSI Restaurant Partners, LLC; Pacific Food Distributors, Inc.; Pacific Foods of Oregon; Piggly Wiggly Alabama Distributing Co., Inc.; PJ Food Service, Inc.; Pollo Operations, Inc.; Publix Super Markets, Inc.; Rancho Bernardo Wings, LLC; Restaurants of America, Inc.; Restaurant Services, Inc.; Sam's East, Inc.; Sam's West, Inc.; Save Mart Supermarkets; Schnuck Markets, Inc.; Services Group of America, Inc.; Sherwood Food Distributors, L.L.C.; South Gate Wings, LLC; SuperValu, Inc.; Sysco Corporation; Target Corporation; The Distribution Group, Inc.; The Fresh Market, Inc.; The Golub Corporation; The Kroger Co.; Troyer Foods, Inc.; Unified Grocers, Inc.; United Supermarkets, LLC; URM Stores, Inc.; US Foods, Inc.; Wakefern Food Corporation; Walmart, Inc.; Wal-Mart Louisiana, LLC; Wal-Mart Stores Arkansas, LLC; Wal-Mart Stores East, LP; Wal-Mart Stores Texas, LLC; Wawa, Inc.; Weinstein Wholesale Meats, Inc.; Western Boxed Meat Distributors, Inc.; Wings Over Long Beach, LLC; Winn-Dixie Stores, Inc,; W. Lee Flowers & Company, Inc.; Woodman's Food Market, Inc.; Brookshire Brothers, Inc.; SpartanNash Company*

1051.   *In knowingly coordinating, falsifying, and manipulating prices quoted to the GDA for inclusion in the Georgia Dock benchmark price index for the intended unlawful purpose of fixing, maintaining, raising, and stabilizing the price of broilers sold in the United States, the Georgia Dock Defendants engaged in an unlawful contract,*

*combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Denied.

*1052. Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, Plaintiffs for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.*

**ANSWER:** Denied.

*1053. The Georgia Dock Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiffs in the United States.*

**ANSWER:** Denied.

*1054. As a direct and proximate result of the Georgia Dock Defendants' above-described unlawful conduct, Plaintiffs paid artificially inflated prices for chicken.*

**ANSWER:** Denied.

*1055. As a direct and proximate result of the Georgia Dock Defendants' above-described anticompetitive conduct, Plaintiffs were damaged in their businesses or property by paying prices for chicken that were higher than they would have been but for the Georgia Dock Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.*

**ANSWER:** Denied.

*1056. The Georgia Dock Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Denied.

*1057. The Georgia Dock Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.*

**ANSWER:** Denied.

**COUNT IV**
**VIOLATION OF GA. CODE ANN. §§ 16-14-4(a) AND 16-14-6 (GEORGIA RICO)**
**(AGAINST THE GEORGIA DOCK DEFENDANTS FOR ACQUIRING MONEY**
**THROUGH RACKETEERING ACTIVITY)**

*Brought by Action Meat Distributors, Inc.; Affiliated Foods, Inc.; Ahold Delhaize USA, Inc.;*
*Albertsons Companies, Inc.; ALDI, Inc.; Alex Lee, Inc/Merchants Distributors, LLC;*
*Associated Foods Stores, Inc.; Associated Grocers, Inc.; Associated Grocers of Florida, Inc.;*
*Associated Grocers of New England, Inc.; Associated Grocers of the South, Inc.; Associated*
*Wholesale Grocers, Inc.; Bashas' Inc.; Big Y Foods, Inc.; Bi-Lo Holdings, LLC; Brookshire*
*Brothers, Inc.; Brookshire Grocery Company; CBBC OPCO, LLC d/b/a Colorado Boxed*
*Beef; Certco, Inc.; Fareway Stores, Inc.; Giant Eagle, Inc.; Howard Samuels as Trustee in*
*Bankruptcy for Central Grocers, Inc.; Hy-Vee, Inc.; Ira Higdon Grocery Company, Inc.;*
*Kinexo, Inc.; King Solomon Foods, Inc.; Latina Boulevard Foods, LLC McLane Company,*
*Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.;*
*McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane*
*Minnesota, Inc.; McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.;*
*McLane/Suneast, Inc.; McLane/Western, Inc.; Meijer, Inc./Meijer Distribution, Inc.; Nicholas*
*& Co., Inc.; Pacific Food Distributors, Inc.; Piggly Wiggly Alabama Distributing Co., Inc.;*
*Publix Super Markets, Inc.; Save Mart Supermarkets; Schnuck Markets, Inc.; SpartanNash*
*Company; SuperValu, Inc.; The Distribution Group, Inc.; The Golub Corporation; The*
*Kroger Co.; Troyer Foods, Inc.; URM Stores, Inc.; Wakefern Food Corporation; Weinstein*
*Wholesale Meats, Inc.; Winn-Dixie Stores, Inc.; W. Lee Flowers & Company, Inc.;*
*Woodman's Food Market, Inc.*

1058.    The Georgia Dock Defendants violated the Georgia RICO statute, Ga. Code
Ann. § 16-14-4(a), which makes it unlawful for any person to acquire any interest in
personal property, including money, as a result of a pattern of racketeering activity.

**ANSWER:**  Denied.

1059.    The application of Georgia RICO is proper because Georgia was the locus
for the fraud. The Georgia Dock was compiled and published from the PMN's location in
Georgia. Each of the Georgia Dock Defendants had plants in Georgia. The Georgia Dock
Defendants knew that their price quotes each week to the PMN were sent into the State of
Georgia. The Georgia Dock Defendants' material omissions pertained to their conduct
and activities in Georgia.

**ANSWER:**  Denied.

1060.    Each of the Georgia Dock Defendants engaged in racketeering activity as
defined by Georgia law.  In particular, and as explained below, each of Georgia Dock
Defendants engaged in conduct that falls within the scope of three predicate acts: (1) Ga.
Code Ann. § 16-14-3(5)(C) (federal wire fraud), (2) Ga. Code Ann. § 16-14-3(5)(A)(xxii)
(false statements to government agency), and (3) Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft
by deception).

562

**ANSWER:** Denied.

*1061. Each of the Georgia Dock Defendants committed at least two incidents of such racketeering activity that had the same or similar intents, results, accomplices, victims, or methods of commission or otherwise were interrelated by distinguishing characteristics and were not isolated incidents. In particular, the Georgia Dock Defendants participated in the scheme described in this Complaint to inflate the Georgia Dock price index and thereby defraud people who purchased chicken based on that price index, including the Plaintiffs.*

**ANSWER:** Denied.

*1062. The Georgia Dock Defendants' racketeering activity falls into two categories of conduct: fraudulent submissions and fraudulent omissions.*

**ANSWER:** Denied.

*1063. **Fraudulent Submissions.** The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the Poultry Market News each week from at least 2011 to the end of 2016. As explained in detail in this Complaint, the Georgia Dock Defendants falsely reported on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2.5 to 3 pound whole birds. When the Georgia Dock Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity. These false submissions were reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of how the Georgia Dock index was used, specifically in tray pack and retail contracts where prices were often tied to the Georgia Dock.*

**ANSWER:** Denied.

*1064. **Fraudulent Omissions.** The Georgia Dock Defendants also fraudulently failed to disclose information to the Plaintiffs to whom they sell poultry. The facts that the Georgia Dock Defendants failed to disclose to the Plaintiffs were basic to their transactions with Plaintiffs. For example, the Georgia Dock Defendants failed to disclose to Plaintiffs during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia Dock. The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock price or acted with reckless disregard for their falsity, because they knew the quotes lacked integrity and were higher than the actual prices they could have charged absent the Georgia Dock manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of the Plaintiffs. Each Georgia Dock Defendant owed a duty to disclose the foregoing to the Plaintiffs to whom they sold poultry, given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock*

*Defendants benefited from Plaintiffs' trust in the Georgia Dock price index as an impartial, government-issued index. Plaintiffs could not have discovered the truth through reasonable inquiry and/or were prevented from making such an inquiry given the secret nature of the manipulation.*

**ANSWER:** Denied.

1065. *The Georgia Dock Defendants' conduct falls within the scope of Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud). The fraudulent submissions and omissions discussed above were part of the Georgia Dock Defendants' scheme to defraud their customers, including the Plaintiffs. The Georgia Dock Defendants intended to defraud those customers, who were the targets of the scheme to rig the index. Each of the Georgia Dock Defendants used multiple interstate wires in furtherance of the fraudulent scheme. The interstate wires included (i) Defendants' false submissions to the Poultry Market News and (ii) Defendants' communications with customers to whom they sold chicken based on the Georgia Dock price index and in which they failed to disclose information basic to their transactions to induce a false belief to their benefit.*

**ANSWER:** Denied.

1066. *The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency). The fraudulent submissions discussed above were made to the Poultry Market News, a division of the Georgia Department of Agriculture, on a matter within the scope of the GDA's jurisdiction. The Georgia Dock Defendants knew that the information contained in their submissions to the PMN was false.*

**ANSWER:** Denied.

1067. *The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception). With respect to the fraudulent omissions discussed above, the Georgia Dock Defendants intentionally created and/or confirmed their counterparty Plaintiffs' impressions regarding the reliability of the Georgia Dock price index that were false and which the Georgia Dock Defendants knew to be false. In addition, the Georgia Dock Defendants intentionally failed to correct their counterparty Plaintiffs' false impressions regarding the reliability of the Georgia Dock price index, when they had previously created and/or confirmed those false impressions. Finally, the Georgia Dock Defendants obtained additional property by means of this deceitful means or artful practice with the intention of depriving their counterparty Plaintiffs of that property – specifically, the Georgia Dock Defendants were able to charge their counterparty Plaintiffs higher prices than they otherwise would have charged and therefore made more money from their counterparty Plaintiffs as a result of this conduct.*

**ANSWER:** Denied.

1068. *As a result of the pattern of racketeering activity as described in this Complaint, each of the Georgia Dock Defendants acquired money that they otherwise would not have received from the sale of poultry that was tied to the Georgia Dock price index.*

**ANSWER:** Denied.

1069. *The Georgia Dock Defendants' fraudulent submissions and omissions were intended to induce the reliance of the Plaintiffs. Specifically, the Georgia Dock Defendants made these fraudulent statements and omissions with the intent and understanding that that their false statements would be used to calculate the Georgia Dock benchmark price index upon which poultry purchasers like Plaintiffs relied when purchasing poultry. The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiffs to enter into contracts at inflated prices in reliance on Defendants' material misrepresentations and omissions.*

**ANSWER:** Denied.

1070. *Plaintiffs purchased chicken based on the Georgia Dock price index. In so doing, the Plaintiffs reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiffs known that the Georgia Dock was not a legitimate price index and that the Defendants were manipulating it, Plaintiffs would not have agreed to prices tied to such a benchmark. Plaintiffs reasonably relied on these misrepresentations because the Georgia Dock benchmark price index was held out as a legitimate index and was an industry norm.*

**ANSWER:** Denied.

1071. *The Plaintiffs were injured as a result of the Georgia Dock Defendants' fraudulent submissions and omissions. In particular, the Plaintiffs paid higher prices for chicken than they would have paid if the Georgia Dock Defendants had not rigged the index and failed to disclose the basic information discussed above.*

**ANSWER:** Denied.

1072. *As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent submissions and omissions, Plaintiffs were damaged in their business by paying higher prices for chicken. The ascertainable damages will be established at trial. These damages were the foreseeable and direct result of the false submissions and omissions.*

**ANSWER:** Denied.

## COUNT V
## VIOLATION OF GA. CODE ANN. §§ 16-14-4(b) AND 16-14-6 (GEORGIA RICO) (AGAINST THE GEORGIA DOCK DEFENDANTS FOR CONDUCTING ENTERPRISE THROUGH RACKETEERING ACTIVITY)

*Brought by Action Meat Distributors, Inc.; Affiliated Foods, Inc.; Ahold Delhaize USA, Inc.; Albertsons Companies, Inc.; ALDI, Inc.; Alex Lee, Inc/Merchants Distributors, LLC; Associated Foods Stores, Inc.; Associated Grocers, Inc.; Associated Grocers of Florida, Inc.; Associated Grocers of New England, Inc.; Associated Grocers of the South, Inc.; Associated Wholesale Grocers, Inc.; Bashas' Inc.; Big Y Foods, Inc.; Bi-Lo Holdings, LLC; Brookshire Brothers, Inc.; Brookshire Grocery Company; CBBC OPCO, LLC d/b/a Colorado Boxed Beef; Certco, Inc.; Fareway Stores, Inc.; Giant Eagle, Inc.; Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc.; Hy-Vee, Inc.; Ira Higdon Grocery Company, Inc.; Kinexo, Inc.; King Solomon Foods, Inc.; Latina Boulevard Foods, LLC; McLane Company, Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.; Meijer, Inc./Meijer Distribution, Inc.; Nicholas & Co., Inc.; Pacific Food Distributors, Inc.; Piggly Wiggly Alabama Distributing Co., Inc.; Publix Super Markets, Inc.; Save Mart Supermarkets; Schnuck Markets, Inc.; SpartanNash Company; SuperValu, Inc.; The Distribution Group, Inc.; The Golub Corporation; The Kroger Co.; Troyer Foods, Inc.; URM Stores, Inc.; Wakefern Food Corporation; Weinstein Wholesale Meats, Inc.; Winn-Dixie Stores, Inc.; W. Lee Flowers & Company, Inc.; Woodman's Food Market, Inc.*

1073.   The Georgia Dock Defendants violated the Georgia RICO statute, *Ga. Code Ann. § 16-14-4(b)*, which makes it unlawful for any person associated with an enterprise to participate in the enterprise through a pattern of racketeering activity.

**ANSWER:**  Denied.

1074.   The application of Georgia RICO is proper because Georgia was the locus for the fraud. The Georgia Dock was compiled and published from the PMN's location in Georgia. Each of the Georgia Dock Defendants had plants in Georgia. The Georgia Dock Defendants knew that their price quotes each week to the PMN were sent into the State of Georgia. The Georgia Dock Defendants' material omissions pertained to their conduct and activities in Georgia.

**ANSWER:**  Denied.

1075.   The Georgia Dock Defendants were associated with an enterprise. The enterprise was the group of Georgia Dock Defendants associated in fact through their price submissions to the PMN, their role on the PMN Advisory Committee, their involvement with the Georgia Poultry Federation, and their use of the Georgia Dock price index in selling poultry.

**ANSWER:**  Denied.

566

1076.  *The enterprise was a continuing unit that associated together and acted with a common purpose: specifically, to sustain the existence of the Poultry Market News and the Georgia Dock price index and to artificially inflate the Georgia Dock price index through fraudulent acts and omissions for the benefit of the enterprise and the individual Defendants.*

**ANSWER:**  Denied.

1077.  *There were relationships among the associates in the enterprise. Representatives from the Georgia Dock Defendants interacted with each other frequently at industry conferences and trade shows, as discussed throughout this Complaint. All but one Georgia Dock Defendant participated on the PMN Advisory Committee, which acted to preserve and enhance the PMN and Georgia Dock price index as discussed above.  All of the Georgia Dock Defendants were members of the Georgia Poultry Federation, the largest lobbying group in Georgia for the poultry producers. Representatives from the Georgia Dock Defendants interacted often with leaders of the Georgia Poultry Federation, such as Abit Massey and Mike Giles, who helped to preserve and enhance the power of the PMN Advisory Committee and the Georgia Dock, as discussed in this Complaint.*

**ANSWER:**  Denied.

1078.  *The enterprise had longevity that was sufficient to permit the associates to pursue its purpose. There was continuity among the representatives of the Defendants which served on the Advisory Committee, interacted with representatives of the Georgia Poultry Federation, and submitted price quotes to the PMN. That continuity allowed the Georgia Dock Defendants to create and execute their scheme to fraudulently manipulate the Georgia Dock price index and conceal its critical flaws from customers, as described in this Complaint. The scheme by Defendants to submit false and inflated prices to the PMN lasted more than three years.*

**ANSWER:**  Denied.

1079.  *The Georgia Dock Defendants participated in the enterprise through a pattern of racketeering activity as defined by Georgia law. In particular, and as explained below, each of Georgia Dock Defendants engaged in conduct that falls within the scope of three predicate acts: Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud), Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency), and Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception).*

**ANSWER:**  Denied.

1080.  *Each of the Georgia Dock Defendants committed at least two incidents of such racketeering activity that had the same or similar intents, results, accomplices, victims, or methods of commission or otherwise were interrelated by distinguishing characteristics and were not isolated incidents. In particular, the Georgia Dock Defendants participated in the scheme described in this Complaint to inflate the Georgia Dock price index and*

*thereby defraud people who purchased chicken based on that price index, including Plaintiffs.*

**ANSWER:** Denied.

1081. *The Georgia Dock Defendants' racketeering activity falls into two categories of conduct: fraudulent submissions and fraudulent omissions.*

**ANSWER:** Denied.

1082. ***Fraudulent Submissions.*** *The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the Poultry Market News each week from at least 2011 to the end of 2016. As explained in detail in this Complaint, the Georgia Dock Defendants falsely reported on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2.5 to 3 pound whole birds. When the Georgia Dock Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity. These false submissions were reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of how the Georgia Dock index was used, specifically in tray pack and retail contracts where prices were often tied to the Georgia Dock.*

**ANSWER:** Denied.

1083. ***Fraudulent Omissions.*** *The Georgia Dock Defendants also fraudulently failed to disclose information to Plaintiffs to whom they sell poultry. The facts that the Georgia Dock Defendants failed to disclose to Plaintiffs were basic to their transactions with Plaintiffs. For example, the Georgia Dock Defendants failed to disclose to Plaintiffs during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia Dock. The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock price or acted with reckless disregard for their falsity, because they knew the quotes lacked integrity and were higher than the actual prices they could have charged absent the Georgia Dock manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of Plaintiffs. Each Georgia Dock Defendant owed a duty to disclose the foregoing to Plaintiffs to whom they sold poultry, given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock Defendants benefited from Plaintiffs' trust in the Georgia Dock price index as an impartial, government-issued index. Plaintiffs could not have discovered the truth through reasonable inquiry and/or were prevented from making such an inquiry given the secret nature of the manipulation.*

**ANSWER:** Denied.

1084. *The Georgia Dock Defendants' conduct falls within the scope of Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud). The fraudulent submissions and omissions discussed above were part of the Georgia Dock Defendants' scheme to defraud their customers, including Plaintiffs. The Georgia Dock Defendants intended to defraud those customers, who were the targets of the scheme to rig the index. Each of the Georgia Dock Defendants used multiple interstate wires in furtherance of the fraudulent scheme. The interstate wires included (i) Defendants' false submissions to the Poultry Market News, and (ii) Defendants' communications with customers to whom they sold chicken based on the Georgia Dock price index and in which they failed to disclose information basic to their transactions to induce a false belief to their benefit.*

**ANSWER:** Denied.

1085. *The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency). The fraudulent submissions discussed above were made to the Poultry Market News, a division of the Georgia Department of Agriculture, on a matter within the scope of the GDA's jurisdiction. The Georgia Dock Defendants knew that the information contained in their submissions to the PMN was false.*

**ANSWER:** Denied.

1086. *The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception). With respect to the fraudulent omissions discussed above, the Georgia Dock Defendants intentionally created and/or confirmed their counterparty Plaintiffs' impressions regarding the reliability of the Georgia Dock price index that were false and which the Georgia Dock Defendants knew to be false. In addition, the Georgia Dock Defendants intentionally failed to correct their counterparty Plaintiffs' false impressions regarding the reliability of the Georgia Dock price index, when they had previously created and/or confirmed those false impressions. Finally, the Georgia Dock Defendants obtained additional property by means of this deceitful means or artful practice with the intention of depriving their counterparty Plaintiffs of that property – specifically, the Georgia Dock Defendants were able to charge their counterparty Plaintiffs higher prices than they otherwise would have charged and therefore made more money from their counterparty Plaintiffs as a result of this conduct.*

**ANSWER:** Denied.

1087. *The Georgia Dock Defendants acted in concert with each other with respect to their fraudulent acts and omissions. Defendants' fraudulent submissions were committed for the benefit of the enterprise. The Georgia Dock Defendants were economically interdependent with respect to their fraudulent submissions and omissions; all of the Georgia Dock Defendants benefited from an inflated Georgia Dock price index through false submissions yet none could manipulate the price index alone. The Georgia Dock*

*Defendants sustained that inflated price index for years by hiding significant, non-public information from buyers.*

**ANSWER:** Denied.

*1088. The Georgia Dock Defendants' fraudulent submissions and omissions were intended to induce the reliance of Plaintiffs. Specifically, the Georgia Dock Defendants made these fraudulent statements and omissions with the intent and understanding that that their false statements would be used to calculate the Georgia Dock benchmark price index upon which poultry purchasers like Plaintiffs relied when purchasing poultry. The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiffs to enter into contracts at inflated prices in reliance on Defendants' material misrepresentations and omissions.*

**ANSWER:** Denied.

*1089. Plaintiffs purchased chicken based on the Georgia Dock price index. In so doing, Plaintiffs reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiffs known that the Georgia Dock was not a legitimate price index and that the Defendants were manipulating it, Plaintiffs would not have agreed to prices tied to such a benchmark. Plaintiffs reasonably relied on these misrepresentations because the Georgia Dock benchmark price index was held out as a legitimate index and was an industry norm.*

**ANSWER:** Denied.

*1090. Plaintiffs were injured as a result of the Georgia Dock Defendants' fraudulent submissions and omissions. In particular, Plaintiffs paid higher prices for chicken than they would have paid if the Georgia Dock Defendants had not rigged the index and failed to disclose the basic information discussed above.*

**ANSWER:** Denied.

*1091. As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent submissions and omissions, Plaintiffs were damaged in their businesses by paying higher prices for chicken. The ascertainable damages will be established at trial. These damages were the foreseeable and direct result of the false submissions and omissions.*

**ANSWER:** Denied.

## COUNT VI
## VIOLATION OF 18 U.S.C. §§ 1962(c) AND 1964(c) (FEDERAL RICO)
## (AGAINST THE GEORGIA DOCK DEFENDANTS)

*Brought by Action Meat Distributors, Inc.; Affiliated Foods, Inc.; Ahold Delhaize USA, Inc.; Albertsons Companies, Inc.; ALDI, Inc.; Alex Lee, Inc/Merchants Distributors, LLC; Associated Foods Stores, Inc.; Associated Grocers, Inc.; Associated Grocers of Florida, Inc.; Associated Grocers of New England, Inc.; Associated Grocers of the South, Inc.; Associated Wholesale Grocers, Inc.; Bashas' Inc.; Big Y Foods, Inc.; Bi-Lo Holdings, LLC; Brookshire Brothers, Inc.; Brookshire Grocery Company; CBBC OPCO, LLC d/b/a Colorado Boxed Beef; Certco, Inc.; Fareway Stores, Inc.; Giant Eagle, Inc.; Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc.; Hy-Vee, Inc.; Ira Higdon Grocery Company, Inc.; Kinexo, Inc.; King Solomon Foods, Inc.; Latina Boulevard Foods, LLC McLane Company, Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.; Meijer, Inc./Meijer Distribution, Inc.; Nicholas & Co., Inc.; Pacific Food Distributors, Inc.; Piggly Wiggly Alabama Distributing Co., Inc.; Publix Super Markets, Inc.; Save Mart Supermarkets; Schnuck Markets, Inc.; SpartanNash Company; SuperValu, Inc.; The Distribution Group, Inc.; The Golub Corporation; The Kroger Co.; Troyer Foods, Inc.; URM Stores, Inc.; Wakefern Food Corporation; Weinstein Wholesale Meats, Inc.; Winn-Dixie Stores, Inc.; W. Lee Flowers & Company, Inc.; Woodman's Food Market, Inc.*

1092.   *The Georgia Dock Defendants violated the Federal RICO statute, 18 U.S.C. § 1962(c), which makes it unlawful for any person associated with an enterprise to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity.*

**ANSWER:**  Denied.

1093.   *The Georgia Dock Defendants were associated with an enterprise. The enterprise was the group of Georgia Dock Defendants associated in fact through their price submissions to the PMN, their role on the PMN Advisory Committee, their involvement with the Georgia Poultry Federation, and their use of the Georgia Dock price index in selling poultry.*

**ANSWER:**  Denied.

1094.   *The enterprise was a continuing unit that associated together and acted with a common purpose: specifically, to sustain the existence of the Poultry Market News and the Georgia Dock price index and to artificially inflate the Georgia Dock price index through fraudulent acts and omissions for the benefit of the enterprise and the individual Defendants.*

**ANSWER:**  Denied.

571

*1095.    There were relationships among the associates in the enterprise. Representatives from the Georgia Dock Defendants interacted with each other frequently at industry conferences and trade shows, as discussed throughout this Complaint. All but one Georgia Dock Defendant participated on the PMN Advisory Committee, which acted to preserve and enhance the PMN and Georgia Dock price index as discussed above. All of the Georgia Dock Defendants were members of the Georgia Poultry Federation, the largest lobbying group in Georgia for the poultry producers. Representatives from the Georgia Dock Defendants interacted often with leaders of the Georgia Poultry Federation, such as Abit Massey and Mike Giles, who helped to preserve and enhance the power of the PMN Advisory Committee and the Georgia Dock, as discussed in this Complaint.*

**ANSWER:**  Denied.

*1096.    The enterprise had longevity that was sufficient to permit the associates to pursue its purpose. There was continuity among the representatives of the Defendants which served on the Advisory Committee, interacted with representatives of the Georgia Poultry Federation, and submitted price quotes to the PMN. That continuity allowed the Georgia Dock Defendants to create and execute their scheme to fraudulently manipulate the Georgia Dock price index and conceal its critical flaws from customers, as described in this Complaint. The scheme by Defendants to submit false and inflated prices to the PMN lasted more than three years.*

**ANSWER:**  Denied.

*1097.    The Georgia Dock Defendants conducted and participated in the conduct of the enterprise through a pattern of racketeering activity as defined by federal law. In particular, and as explained below, each of Georgia Dock Defendants conducted and participated in the conduct of the enterprise through conduct that falls within the scope of 18 U.S.C. § 1343 (federal wire fraud) (incorporated through 18 U.S.C. § 1961).*

**ANSWER:**  Denied.

*1098.    The Georgia Dock Defendants' racketeering activity falls into two categories of conduct: fraudulent submissions and fraudulent omissions.*

**ANSWER:**  Denied.

*1099.    Fraudulent submissions. The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the Poultry Market News each week from at least 2011 to the end of 2016. As explained in detail in this Complaint, the Georgia Dock Defendants falsely reported on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2.5 to 3 pound whole birds. When the Georgia Dock Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity. These false submissions were reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of how the*

*Georgia Dock index was used, specifically in tray pack and retail contracts where prices were often tied to the Georgia Dock.*

**ANSWER:** Denied.

1100.   *Fraudulent omissions. The Georgia Dock Defendants also fraudulently failed to disclose information to Plaintiffs to whom they sell poultry.  The facts that the Georgia Dock Defendants failed to disclose to Plaintiffs were basic to their transactions with Plaintiffs. For example, the Georgia Dock Defendants failed to disclose to Plaintiffs during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia Dock.  The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock price or acted with reckless disregard for their falsity, because they knew the quotes lacked integrity and were higher than the actual prices they could have charged absent the Georgia Dock manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of Plaintiffs. Each Georgia Dock Defendant owed a duty to disclose the foregoing to Plaintiffs to whom they sold poultry, given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock Defendants benefited from Plaintiff's trust in the Georgia Dock price index as an impartial, government-issued index. Plaintiffs could not have discovered the truth through reasonable inquiry and/or were prevented from making such an inquiry given the secret nature of the manipulation.*

**ANSWER:** Denied.

1101.   *The Georgia Dock Defendants' conduct falls within the scope of 18 U.S.C. § 1343 (federal wire fraud) (incorporated through 18 U.S.C. § 1961). The fraudulent submissions and omissions discussed above were part of the Georgia Dock Defendants' scheme to defraud their customers, including Plaintiffs. The Georgia Dock Defendants intended to defraud those customers, who were the targets of the scheme to rig the index. Each of the Georgia Dock Defendants used multiple interstate wires in furtherance of the fraudulent scheme. The interstate wires included: (i) Defendants' false submissions to the Poultry Market News, and (ii) Defendants' communications with customers to whom they sold chicken based on the Georgia Dock price index and in which they failed to disclose information basic to their transactions to induce a false belief to their benefit.*

**ANSWER:** Denied.

1102.   *The Georgia Dock Defendants acted in concert with each other with respect to their fraudulent acts and omissions.  Defendants' fraudulent submissions were committed for the benefit of the enterprise. The Georgia Dock Defendants were economically interdependent with respect to their fraudulent submissions and omissions; all of the Georgia Dock Defendants benefited from an inflated Georgia Dock price index through false submissions yet could not manipulate the price index alone. The Georgia Dock*

*Defendants also sustained that inflated price index for years by hiding significant, non-public information from buyers.*

**ANSWER:** Denied.

*1103. The Georgia Dock Defendants' fraudulent submissions and omissions were intended to induce the reliance of Plaintiffs. Specifically, the Georgia Dock Defendants made these fraudulent statements and omissions with the intent and understanding that that their false statements would be used to calculate the Georgia Dock benchmark price index upon which poultry purchasers like Plaintiffs relied when purchasing poultry. The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiffs to enter into contracts at inflated prices in reliance on Defendants' material misrepresentations and omissions.*

**ANSWER:** Denied.

*1104. Plaintiffs purchased chicken based on the Georgia Dock price index. In so doing, Plaintiffs reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiffs known that the Georgia Dock was not a legitimate price index and that the Defendants were manipulating it, Plaintiffs would not have agreed to prices tied to such a benchmark. Plaintiffs reasonably relied on these misrepresentations because the Georgia Dock benchmark price index was held out as a legitimate index and was an industry norm.*

**ANSWER:** Denied.

*1105. Plaintiffs were injured as a result of the Georgia Dock Defendants' fraudulent submissions and omissions. In particular, Plaintiffs paid higher prices for chicken than they would have paid if the Georgia Dock Defendants had not rigged the index and failed to disclose the basic information discussed above.*

**ANSWER:** Denied.

*1106. As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent submissions and omissions, Plaintiffs were damaged in its businesses by paying higher prices for chicken. The ascertainable damages will be established at trial. These damages were the foreseeable and direct result of the false submissions and omissions.*

**ANSWER:** Denied.

## COUNT VII
## CONSPIRACY TO DEFRAUD
## (AGAINST THE GEORGIA DOCK DEFENDANTS)

*Brought by Bi-Lo Holdings, LLC; Winn-Dixie Stores, Inc.*

*1107. Plaintiffs reasonably and justifiably relied on the material misrepresentations and omissions made by the Georgia Dock Defendants relating to the Georgia Dock pricing index, and believing the Georgia Dock pricing Index provided an honest and accurate reflection of actual pricing in the broiler chicken market, Plaintiffs were induced to and did and entered into broiler chicken supply contracts which tied the pricing of broiler chickens to the Georgia Dock as a market base during the Georgia Dock period.*

**ANSWER:** Denied.

*1108. If Plaintiffs knew of the Defendants' collusive actions to inflate the Georgia Dock price, Plaintiffs would not have entered into contracts which tied the contract price of broiler chicken to the Georgia Dock price.*

**ANSWER:** Denied.

*1109. As a result of Plaintiffs' reasonable reliance on these false representations and/or omissions, Plaintiffs entered into contracts which were tied to the Georgia Dock price index as a market base and Plaintiffs suffered damages in the form of increased broiler prices.*

**ANSWER:** Denied.

## COUNT VIII
## FRAUD (AGAINST THE GEORGIA DOCK DEFENDANTS)

*Brought by Bi-Lo Holdings, LLC; Winn-Dixie Stores, Inc.*

*1110. Plaintiffs reasonably and justifiably relied on the material misrepresentations and omissions made by the Georgia Dock Defendants relating to the Georgia Dock pricing index, and believing the Georgia Dock pricing Index provided an honest and accurate reflection of actual pricing in the broiler chicken market, Plaintiffs were induced to and did and entered into broiler chicken supply contracts which tied the pricing of broiler chickens to the Georgia Dock as a market base during the Georgia Dock period.*

**ANSWER:** Denied.

*1111. If Plaintiffs knew of the Defendants' collusive actions to inflate the Georgia Dock price, Plaintiffs would not have entered into contracts which tied the contract price of broiler chicken to the Georgia Dock price.*

**ANSWER:** Denied.

*1112. As a result of Plaintiffs' reasonable reliance on these false representations and/or omissions, Plaintiffs entered into contracts which were tied to the Georgia Dock price index as a market base and Plaintiffs suffered damages in the form of increased broiler prices.*

**ANSWER:** Denied.

## COUNT IX
## NEGLIGENT MISREPRESENTATION
## (AGAINST THE GEORGIA DOCK DEFENDANTS)

*Brought by Bi-Lo Holdings, LLC; Winn-Dixie Stores, Inc.*

*1113. Plaintiffs reasonably and justifiably relied on the material misrepresentations and omissions made by the Georgia Dock Defendants relating to the Georgia Dock pricing index, and believing the Georgia Dock pricing Index provided an honest and accurate reflection of actual pricing in the broiler chicken market, Plaintiffs were induced to and did and entered into broiler chicken supply contracts which tied the pricing of broiler chickens to the Georgia Dock as a market base during the Georgia Dock period.*

**ANSWER:** Denied.

*1114. If Plaintiffs knew of the Defendants' collusive actions to inflate the Georgia Dock price, Plaintiffs would not have entered into contracts which tied the contract price of broiler chicken to the Georgia Dock price.*

**ANSWER:** Denied.

*1115. As a result of Plaintiffs' reasonable reliance on these false representations and/or omissions, Plaintiffs entered into contracts which were tied to the Georgia Dock price index as a market base and Plaintiffs suffered damages in the form of increased broiler prices.*

**ANSWER:** Denied.

**COUNT X**
**VIOLATION OF THE FLORIDA DECEPTIVE AND**
**UNFAIR TRADE PRACTICES ACT (AGAINST SANDERSON)**

*Brought by Bi-Lo Holdings, LLC; Caesars Enterprise Services, LLC; Winn-Dixie Stores, Inc.*

*1116.  The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, et seq. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).*

**ANSWER:**  Paragraph 1116 contains legal conclusions to which no response is required. To the extent Paragraph 1116 may be deemed to require a response, Sanderson Farms refers to the Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* and denies any description or characterization that is inconsistent therewith. Sanderson Farms denies any remaining allegations in Paragraph 1116.

*1117.   Chapter 501 of the Florida Annotated Statutes generally governs consumer protection within the State of Florida (the "FDUTPA"). Fla. Stat. § 501.201, et seq.*

**ANSWER:**  Paragraph 1117 contains legal conclusions to which no response is required. To the extent Paragraph 1117 may be deemed to require a response, Sanderson Farms refers to Chapter 501 of the Florida Annotated Statutes and Fla. Stat. § 501.201, *et seq.* and denies any description or characterization that is inconsistent therewith. Sanderson Farms denies any remaining allegations in Paragraph 1117.

*1118.   The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).*

**ANSWER:**  Paragraph 1118 contains legal conclusions to which no response is required. To the extent Paragraph 1118 may be deemed to require a response, Sanderson Farms refers to

Florida Stat. § 501.202(2) and denies any description or characterization that is inconsistent therewith. Sanderson Farms denies any remaining allegations in Paragraph 1118.

> *1119. Under the FDUTPA, "trade or commerce" means "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203(8).*

**ANSWER:** Paragraph 1119 contains legal conclusions to which no response is required. To the extent Paragraph 1119 may be deemed to require a response, Sanderson Farms refers to Florida Stat. § 501.203(8) and denies any description or characterization that is inconsistent therewith. Sanderson Farms denies any remaining allegations in Paragraph 1119.

> *1120. The FDUTPA outlaws "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).*

**ANSWER:** Paragraph 1120 contains legal conclusions to which no response is required. To the extent Paragraph 1120 may be deemed to require a response, Sanderson Farms refers to Florida Stat. § 501.204(1) and denies any description or characterization that is inconsistent therewith. Sanderson Farms denies any remaining allegations in Paragraph 1120.

> *1121. Plaintiffs purchased broilers from Sanderson within the State of Florida during the Georgia Dock Conduct Period that were tied to the Georgia Dock index.*

**ANSWER:** Sanderson Farms admits that Sanderson Farms sold broiler chicken to certain of these Plaintiffs during the Relevant Period. Sanderson Farms admits that certain customers paid prices informed by the Georgia Dock Index for a certain period of time. To the extent the allegations in Paragraph 1121 characterize or describe unidentified broiler chicken supply agreements, Sanderson Farms refers to those agreements and denies any characterization or description that is inconsistent with the referenced sources. Sanderson Farms denies the remaining allegations in Paragraph 1121.

1122.   But for Defendants' deceptive and/or unfair conduct as set forth herein, the *Plaintiffs paid more per pound for broilers than they otherwise would have, in an amount to be determined at trial.*

**ANSWER:**  Paragraph 1122 contains legal conclusions to which no response is required. To the extent Paragraph 1122 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1122.

1123.   *Defendant Sanderson sold broiler chickens to Plaintiffs through contracts whereby the price of the broilers were tied to the weekly Georgia Dock price.*

**ANSWER:** Sanderson Farms admits that certain customers paid prices informed by the Georgia Dock Index for a certain period of time.  To the extent the allegations in Paragraph 1123 characterize or describe unidentified broiler contracts, Sanderson Farms refers to those agreements and denies any characterization or description that is inconsistent with the referenced sources.  Sanderson Farms denies the remaining allegations in Paragraph 1123.

1124.   *As noted above, during the Georgia Dock Conduct Period Sanderson colluded with the other Georgia Dock Defendants to raise and did raise the price of broiler chickens sold to Plaintiffs and other purchasers by agreeing to report inflated chicken prices to the GDA in order to inflate the Georgia Dock price which was often used by Defendants to adjust prices in various chicken supply contracts including supply contracts entered into between Plaintiffs and Sanderson during the Georgia Dock Conduct Period.*

**ANSWER:**  Sanderson Farms denies the allegations in Paragraph 1124.

1125.   *Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.*

**ANSWER:**  Paragraph 1125 contains legal conclusions to which no response is required. To the extent Paragraph 1125 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1125.

*1126. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property by virtue of additional overcharges for broilers during the Georgia Dock Conduct Period*

**ANSWER:** Paragraph 1126 contains legal conclusions to which no response is required. To the extent Paragraph 1126 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1126.

*1127. By reason of the foregoing, Plaintiffs are entitled to inter alia actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.*

**ANSWER:** Paragraph 1127 contains legal conclusions to which no response is required. To the extent Paragraph 1127 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1127.

## COUNT XI
## BREACH OF CONTRACT
## (AGAINST SANDERSON)

*Brought by Bi-Lo Holdings, LLC; Winn-Dixie Stores, Inc.*

*1128. Sanderson offered to supply Plaintiffs with broiler chickens pursuant to an agreement where the price of chicken was tied to the Georgia Dock as a market base. Plaintiffs Winn-Dixie and Bi-Lo Holdings accepted Fieldale's offer and entered into broiler chicken supply agreements with Fieldale farms throughout the Georgia Dock Period. The agreements between Plaintiffs and Fieldale contained bracket pricing in which the price of broiler chicken was adjusted based on the price reported by the Georgia Dock as the market base. Typically under the contract, increases of the Georgia Dock from one bracket to the next would correspondingly raise Plaintiffs' prices under the contract.*

**ANSWER:** Sanderson Farms admits that Sanderson Farms sold broiler chicken to certain of these Plaintiffs during the Relevant Period. Sanderson Farms admits that certain customers paid prices informed by the Georgia Dock Index for a certain period of time. To the extent the allegations in Paragraph 1128 relate to Fieldale, other Defendants, and/or third parties to this action, Sanderson Farms is without information sufficient to form a belief as to the truth of these allegations and therefore denies those allegations. To the extent the allegations in Paragraph 1128 characterize or describe unidentified broiler chicken supply agreements, Sanderson Farms refers

to those agreements and denies any characterization or description that is inconsistent with the referenced sources. Sanderson Farms denies the remaining allegations in Paragraph 1128.

> 1129. *The agreements were governed by Florida Law.*

**ANSWER:** Paragraph 1129 contains legal conclusions to which no response is required. To the extent Paragraph 1129 may be deemed to require a response, Sanderson Farms refers to the agreements referenced in Paragraph 1129 and denies any description or characterization that is inconsistent therewith.

> 1130. *Sanderson breached its warranty under the contract by colluding to undermine Plaintiffs' right to purchase Chicken based on Georgia Dock prices that were based on reliable and accurate reported prices.*

**ANSWER:** Paragraph 1130 contains legal conclusions to which no response is required. To the extent Paragraph 1130 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1130.

> 1131. *Sanderson's manipulation of the Georgia Dock frustrated an important purpose of the contract which was to fairly adjust the price for broilers based on legitimate market forces. However, as Fieldale manipulated the Georgia Dock price, Plaintiffs paid more than they otherwise would have for broiler chickens from Sanderson under the supply agreements with Sanderson.*

**ANSWER:** Paragraph 1131 contains legal conclusions to which no response is required. To the extent Paragraph 1131 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1131.

> 1132. *As a direct and proximate cause of these breaches of supply contracts, including by breaches of the implied covenant of good faith and fair dealing, and of Defendants' frustration of the purposes of these contracts, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial.*

**ANSWER:** Paragraph 1132 contains legal conclusions to which no response is required. To the extent Paragraph 1132 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1132.

## COUNT XII
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (AGAINST SANDERSON)

*Brought by Bi-Lo Holdings, LLC; Winn-Dixie Stores, Inc.*

*1133.  Sanderson offered to supply Plaintiffs with broiler chickens pursuant to an agreement where the price of chicken was tied to the Georgia Dock price. Plaintiffs Winn-Dixie and Bi-Lo Holdings accepted Sanderson's offer and entered broiler chicken supply agreements with Sanderson during the Georgia Dock Period. The agreements between Plaintiffs and Sanderson contained bracket pricing whereby the price of broiler chicken was adjusted based on the price reported by the Georgia Dock as the market base.  Typically under the contract, increases of the Georgia Dock from one bracket to the next would correspondingly raise Plaintiffs' prices under the contract.*

**ANSWER:**  Sanderson Farms admits that Sanderson Farms sold broiler chicken to certain of these Plaintiffs during the Relevant Period.  Sanderson Farms admits that certain customers paid prices informed by the Georgia Dock Index for a certain period of time.  To the extent the allegations in Paragraph 1133 characterize or describe unidentified broiler chicken supply agreements, Sanderson Farms refers to those agreements and denies any characterization or description that is inconsistent with the referenced sources.  Sanderson Farms denies the remaining allegations in Paragraph 1133.

*1134.   The agreements were governed by Florida Law.*

**ANSWER:**  Paragraph 1134 contains legal conclusions to which no response is required. To the extent Paragraph 1134 may be deemed to require a response, Sanderson Farms refers to the agreements referenced in Paragraph 1134 and denies any description or characterization that is inconsistent therewith.

*1135.   The agreements included an implied covenant that Sanderson will act in good faith and deal fairly with Plaintiffs, and that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.*

**ANSWER:**  Paragraph 1135 contains legal conclusions to which no response is required. To the extent Paragraph 1135 may be deemed to require a response, Sanderson Farms refers to the

agreements referenced in Paragraph 1135 and denies any description or characterization that is inconsistent therewith.

> 1136. *Sanderson breached the implied covenant of good faith and fair dealing by colluding to undermine Plaintiffs' right to purchase Chicken based on Georgia Dock prices that were based on reliable and accurate reported prices.*

**ANSWER:** Paragraph 1136 contains legal conclusions to which no response is required. To the extent Paragraph 1136 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1136.

> 1137. *Sanderson also breached the implied covenant of good faith and fair dealing by obtaining contractual benefits from its collusive and manipulative acts, in the form of receiving higher prices from Plaintiffs based on the Georgia Dock Price that Sanderson helped artificially inflate.*

**ANSWER:** Paragraph 1137 contains legal conclusions to which no response is required. To the extent Paragraph 1137 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1137.

> 1138. *Defendants' collusion to manipulate the Georgia Dock frustrated an important purpose of the contract which was to fairly adjust the price for broilers based on legitimate market forces. However, as Sanderson manipulated the Georgia Dock price, Plaintiffs paid more than they otherwise would have for broiler chickens from Sanderson under the supply agreements with Sanderson.*

**ANSWER:** Paragraph 1138 contains legal conclusions to which no response is required. To the extent Paragraph 1138 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1138.

> 1139. *Plaintiffs have fully performed all of their obligations under the supply agreements with Sanderson.*

**ANSWER:** Paragraph 1139 contains legal conclusions to which no response is required. To the extent Paragraph 1139 may be deemed to require a response, Sanderson Farms refers to the agreements referenced in Paragraph 1139 and denies any description or characterization that is inconsistent therewith.

*1140.   As a direct and proximate cause of Sanderson's breach of the implied covenant of good faith and fair dealing, Sanderson frustrated the purpose of these contracts and Plaintiffs have been damaged as alleged herein in an amount to be proven at trial.*

**ANSWER:**  Paragraph 1140 contains legal conclusions to which no response is required. To the extent Paragraph 1140 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1140.

## COUNT XIII
## UNJUST ENRICHMENT
## (AGAINST SANDERSON)

*Brought by Bi-Lo Holdings; Winn-Dixie Stores, Inc.*

*1141.   As alleged herein, Plaintiffs conferred a benefit upon Sanderson, Sanderson had knowledge of that benefit, and voluntarily accepted it from Plaintiffs.*

**ANSWER:**  Paragraph 1141 contains legal conclusions to which no response is required. To the extent Paragraph 1141 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1141.

*1142.   It would be inequitable for Sanderson to be permitted to retain the benefit which Sanderson obtained from its manipulative acts at the expense of the Plaintiffs.*

**ANSWER:**  Paragraph 1142 contains legal conclusions to which no response is required. To the extent Paragraph 1142 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1142.

*1143.   Plaintiffs are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.*

**ANSWER:**  Paragraph 1143 contains legal conclusions to which no response is required. To the extent Paragraph 1143 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1143.

*1144. Alternatively or additionally Sanderson should pay restitution or be required to disgorge to Plaintiffs its own unjust enrichment based on the reasonable value of the benefit conferred upon it.*

**ANSWER:** Paragraph 1144 contains legal conclusions to which no response is required. To the extent Paragraph 1144 may be deemed to require a response, Sanderson Farms denies the allegations in Paragraph 1144.

## COUNT XIV
## VIOLATION OF THE WISCONSIN ANTITRUST ACT

*Brought by Associated Wholesale Grocers, Inc.*

*1145. Plaintiff Associated Wholesale Grocers, Inc. purchased broilers from Defendants and other producers of broilers at and for its Kenosha, WI distribution center. Affiliated Foods Midwest Cooperative, Inc. ("AFM"), which assigned its claims to Plaintiff Associated Wholesale Grocers, Inc., also purchased broilers from Defendants from Kenosha, WI.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1145 and therefore deny them.

*1146. Defendants and all of their Co-Conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of § 133.03 of the Wisconsin Antitrust Act. Wis. Stat. § 133.03.*

**ANSWER:** Denied.

*1147. Defendants' acts in furtherance of their contract, combination, or conspiracy included, but were not limited to: (a) coordinating their output and limiting production with the intent and expected result of increasing prices of broilers in the United States, (b) manipulating price indices used to set wholesale chicken prices for buyers in Wisconsin and across the United States, and (c) rigging bids and allocating markets for broilers.*

**ANSWER:** To the extent the allegations in Paragraph 1147 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1147 at this time. Defendants deny any remaining allegations in Paragraph 1147.

1148. *Defendants' acts in furtherance of their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.*

**ANSWER:** Denied.

1149. *At least as early as January 1, 2008, and continuing until present, the exact dates being unknown to Plaintiffs, Defendants and all of their Co-Conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for broilers, thereby creating anticompetitive effects.*

**ANSWER:** Denied.

1150. *Defendants' anticompetitive acts involved commerce in Wisconsin, and had a direct, substantial, and foreseeable effect on Wisconsin's commerce by raising and fixing prices for broilers throughout the state.*

**ANSWER:** Denied.

1151. *The conspiratorial acts and combinations have caused unreasonable restraints in the market for broilers.*

**ANSWER:** Denied.

1152. *As a result of Defendants' unlawful conduct, Plaintiff Associated Wholesale Grocers, Inc. and AFM have been harmed by being forced to pay inflated, supra-competitive prices for broilers.*

**ANSWER:** Denied.

1153. *In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all of their Co-Conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:*

> A. *Price competition in the market for broilers has been restrained, suppressed, and/or eliminated in Wisconsin;*

> B. *Prices for broilers sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their Producer Co-Conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout Wisconsin; and*

> C.    *Plaintiff has been deprived of the benefits of free and open competition in the purchase of broilers.*

**ANSWER:**  Denied.

*1154.  Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of broilers on the spot market to be higher than it would be but for Defendants' conduct. Defendants also knew and intended that such an artificial inflation of spot market prices would increase other broiler market prices, including those paid by Plaintiff Associated Wholesale Grocers, Inc. and AFM.*

**ANSWER:**  Denied.

*1155.  As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff Associated Wholesale Grocers, Inc. and AFM have been injured in their business or property and will continue to be injured in their business and property by paying more for broilers than they would have paid and will pay in the absence of Defendants' contract, combination, or conspiracy.*

**ANSWER:**  Denied.

*1156.  Defendants' anticompetitive conduct described in this Complaint constitutes a per*

**ANSWER:**  Denied.

*1157.  Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.*

**ANSWER:**  Denied.

*1158.  The contracts between Plaintiff Associated Wholesale Grocers, Inc. with Defendants and between AFM with Defendants are therefore void, and payments made upon, under or pursuant to such contracts are recoverable from Defendants. Wis. Stat. § 133.14.*

**ANSWER:**  Denied.

## COUNT XV
## VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT

*Brought by Associated Wholesale Grocers, Inc.*

*1159. Plaintiff Associated Wholesale Grocers, Inc. purchased broilers from Defendants and other producers of broilers in Tennessee, including at and for a distribution center in Goodlettsville, TN.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 1159 and therefore deny them.

*1160. Defendants and all of their Co-Conspirators entered into and engaged in an arrangement, contract, agreement, trust, or combination to advance and control the price of broilers in violation of § 47-25-101 of the Tennessee Trade Practices Act. Tenn. Code § 47-25-101.*

**ANSWER:** Denied.

*1161. Defendants' acts in furtherance of their arrangement, contract, agreement, trust, or combination included, but were not limited to: (a) coordinating their output and limiting production with the intent and expected result of increasing prices of broilers in the United States, (b) manipulating price indices used to set wholesale chicken prices for buyers in Tennessee and across the United States, and (c) rigging bids and allocating markets for broilers.*

**ANSWER:** To the extent the allegations in Paragraph 1161 purport to relate to bid-rigging

claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims

and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1161 at

this time. Defendants deny any remaining allegations in Paragraph 1161.

*1162. Defendants' acts in furtherance of their arrangement, contract, agreement, trust, or combination were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.*

**ANSWER:** Denied.

*1163. At least as early as January 1, 2008, and continuing until present, the exact dates being unknown to Plaintiff Associated Wholesale Grocers, Inc., Defendants and all of their Co- Conspirators entered into a continuing agreement, understanding and*

*conspiracy in restraint of trade to advance and control prices for broilers, thereby creating anticompetitive effects.*

**ANSWER:** Denied.

*1164.   Defendants' anticompetitive acts involved commerce in Tennessee, and had a direct, substantial, and foreseeable effect on Tennessee's commerce by raising and fixing prices for broilers throughout the state.*

**ANSWER:** Denied.

*1165.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for broilers.*

**ANSWER:** Denied.

*1166.   As a result of Defendants' unlawful conduct, Plaintiff Associated Wholesale Grocers, Inc. has been harmed by being forced to pay inflated, supra-competitive prices for broilers.*

**ANSWER:** Denied.

*1167.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all of their Co-Conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:*

> *A.     Price competition in the market for broilers has been restrained, suppressed, and/or eliminated in Tennessee;*

> *B.     Prices for broilers sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their Producer Co-Conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout Tennessee; and*

> *C.     Plaintiff has been deprived of the benefits of free and open competition in the purchase of broilers.*

**ANSWER:** Denied.

*1168.   Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of broilers on the spot market to be higher than it would be but for Defendants' conduct. Defendants also knew and intended that such an artificial inflation of spot market prices*

*would increase other broiler market prices, including those paid by Plaintiff Associated Wholesale Grocers, Inc.*

**ANSWER:** Denied.

*1169.   As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff Associated Wholesale Grocers, Inc. has been injured in their business or property and will continue to be injured in their business and property by paying more for broilers than they would have paid and will pay in the absence of Defendants' arrangement, contract, agreement, trust, or combination.*

**ANSWER:** Denied.

*1170.   Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Tennessee antitrust law.*

**ANSWER:** Denied.

*1171.   Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.*

**ANSWER:** Denied.

*1172.   Contracts between Plaintiff Associated Wholesale Grocers, Inc. and Defendants are therefore void, and Plaintiff Associated Wholesale Grocers, Inc. is entitled to recover the full consideration or sum paid by Plaintiff pursuant to such contracts. Tenn. Code §§ 47-25-101, 47- 25-106.*

**ANSWER:** Denied.

## COUNT XVI
## COMMON LAW FRAUD
## (AGAINST THE GEORGIA DOCK DEFENDANTS)

*Brought by Ahold Delhaize USA, Inc.; Caesars Enterprise Services, LLC*

*1173.   Each of the Georgia Dock Defendants knowingly made false statements and/or material omissions concerning material facts, as explained below.*

**ANSWER:** Denied.

*1174.   **Fraudulent Submissions.** The Georgia Dock Defendants knowingly submitted false and inflated price quotes to the Poultry Market News each week from at least 2011 to the end of 2016 (the exact dates being unknown to Plaintiffs). As explained in detail in this Complaint, the Georgia Dock Defendants falsely reported on a weekly basis*

590

*prices that did not take into account their actual or converted quoted prices for sales of 2.5 to 3 pound whole birds. When Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity. These false submissions were also reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of the common uses of the Georgia Dock quotes, specifically their use in tray pack and retail contracts and other sales where prices were often tied to the Georgia Dock.*

**ANSWER:** Denied.

*1175. The Georgia Dock Defendants are jointly and severally liable to Plaintiffs for the damages Plaintiffs incurred because of purchases it made based on Georgia Dock pricing during the relevant period, whether or not such a purchase was made from one of the Georgia Dock Defendants or another chicken supplier.*

**ANSWER:** Denied.

*1176. **Fraudulent Misrepresentations.** The Georgia Dock Defendants also made material, fraudulent affirmative misrepresentations to their customers, including Plaintiffs, regarding the nature of and methodology for calculating the Georgia Dock. These misrepresentations were intended to induce, and did induce, the reliance of Plaintiffs on the inflated Georgia Dock prices. These misrepresentations were also reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of the common uses of the Georgia Dock quotes, specifically their use in tray pack and retail contracts and other sales where prices were often tied to the Georgia Dock.*

**ANSWER:** Denied.

*1177. **Fraudulent Omissions.** In addition, all of the Georgia Dock Defendants fraudulently failed to disclose information to the Plaintiffs to whom they sold broilers or broiler products. The facts that they failed to disclose to Plaintiffs were basic to their transactions with Plaintiffs. For example, they failed to disclose to Plaintiffs during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia Dock, a fact that was basic to their transactions with Plaintiffs. The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock price quotes from no later than early 2011 through the end of 2016 or had reckless disregard for their falsity, because the Georgia Dock Defendants each knew that the quotes lacked integrity and were higher than the actual prices they could have charged absent Georgia Dock manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of Plaintiffs.*

**ANSWER:** Denied.

1178.   *Each Georgia Dock Defendant owed a duty to disclose the foregoing to the Plaintiffs to whom they sold broilers or broiler products, given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock Defendants benefited from Plaintiffs' trust in the Georgia Dock price index as an impartial, government-issued index. Defendants used this to their advantage by pushing Plaintiffs either to incorporate the Georgia Dock into its pricing and contracts, or to justify a change to its non-Georgia-Dock-based pricing by using the Georgia Dock as a point of reference.*

**ANSWER:**  Denied.

1179.   *By failing to disclose the unreliability of the Georgia Dock, the Georgia Dock Defendants concealed a material fact, intending to induce a false belief. Plaintiffs could not have discovered the truth through reasonable inquiry and/or was prevented from making such an inquiry given the secret nature of the manipulation.*

**ANSWER:**  Denied.

1180.   *The Georgia Dock Defendants' fraudulent submissions, fraudulent misrepresentations, and fraudulent omissions were intended to induce the reliance of Plaintiffs. Specifically, the Georgia Dock Defendants made these false statements and omissions with the intent and understanding that that their false statements would be used to calculate the Georgia Dock price index upon which poultry purchasers like Plaintiffs relied when purchasing broilers and broiler products. The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiffs to enter into contracts at inflated prices in reliance on Defendants' misrepresentations and omissions of material fact.*

**ANSWER:**  Denied.

1181.   *Plaintiffs purchased chicken based on the Georgia Dock price index, and/or raised its non-Georgia Dock-based pricing by using the Georgia Dock as a point of reference, and in so doing reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiffs known that the Georgia Dock was not a legitimate price index and that the Defendants were manipulating it, Plaintiffs would not have agreed to prices tied to such a benchmark. Plaintiffs reasonably relied on these misrepresentations because the Georgia Dock price index was held out as a legitimate index of poultry producers' actual offering prices and was an industry norm.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 1181.  Defendants deny the remaining allegations in Paragraph 1181.

*1182.  Plaintiffs justifiably relied on the inflated Georgia Dock price index and was injured as a result of the Georgia Dock Defendants' fraudulent acts and omissions pertaining to the Georgia Dock price index. Plaintiffs paid higher prices than it would have had the Georgia Dock Defendants submitted accurate price quotes and not caused an artificially inflated Georgia Dock price index.*

**ANSWER:**  Denied.

*1183.  As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent acts and omissions, Plaintiffs' business was damaged by paying higher prices for chicken. The ascertainable damages will be established at trial. These damages were the foreseeable and direct result of the false submissions and omissions.*

**ANSWER:**  Denied.

## COUNT XVII
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (AGAINST ALL GEORGIA DOCK DEFENDANTS)

*Brought by Ahold Delhaize USA, Inc.*

*1184.  Throughout the relevant period, Plaintiffs contracted to purchase chicken from Defendants at prices based, in whole or in part, on the Georgia Dock.  Each of Plaintiffs' contracts with the Georgia Dock Defendants had an implied covenant that the parties would act in good faith and deal fairly with each other. Neither party was to do anything that would have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1184 and therefore deny them.  Defendants deny the remaining allegations in Paragraph 1184.

*1185.  Plaintiffs acted in good faith, dealt fairly with Defendants, and performed all of its obligations under these contracts. All conditions required for the Georgia Dock Defendants' performance of those contracts were satisfied.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1185 and therefore deny them.  Defendants deny the remaining allegations in Paragraph 1185.

*1186. The Georgia Dock Defendants unfairly interfered with Plaintiff's right to receive the benefits of the contracts by secretly manipulating the Georgia Dock to inflate prices, as alleged above in the foregoing paragraphs.*

**ANSWER:** Denied.

*1187. By intentionally and falsely inflating their price submissions that were used by the GDA to calculate the Georgia Dock, and by failing to inform Plaintiffs that they were doing so and that they controlled both the manner in which the Georgia Dock was calculated and the prices that were used to calculate it, the Georgia Dock Defendants breached their implied duty of good faith and fair dealing and prevented Plaintiffs from receiving the full benefit of their contractual agreements. Specifically, their inflation of the Georgia Dock price index resulted in Plaintiffs paying more for broiler chicken than they would have had the Georgia Dock Defendants based their GDA submissions on their actual offering prices.*

**ANSWER:** Denied.

*1188. Plaintiffs were directly and proximately harmed by Defendants' actions since Plaintiffs were impoverished by paying more for chicken than Plaintiffs would have absent Defendants' manipulation, and absent the Defendants' breach of the implied covenant of good faith and fair dealing. Defendants were enriched with increased payment for their chicken.*

**ANSWER:** Denied.

## COUNT XVIII
## NEGLIGENT MISREPRESENTATION
## (AGAINST THE GEORGIA DOCK DEFENDANTS)

*Brought by Ahold Delhaize USA, Inc.*

*1189. Each of the Georgia Dock Defendants negligently made false statements and/or material omissions concerning material facts, as explained below.*

**ANSWER:** Denied.

*1190. **False Submissions.** The Georgia Dock Defendants submitted false and inflated price quotes to the Poultry Market News each week from no later than early 2011 through the end of 2016, as explained in detail in this Complaint. When Defendants made their false submissions, they did not exercise reasonable care or competence in determining whether their submissions were true or false and/or obtaining or communicating the information. Each Georgia Dock Defendant knew and/or had reason to know that Plaintiffs were among the class of businesses that would likely receive and rely on the representations made regarding the Georgia Dock. The Georgia Dock*

594

*Defendants supplied the inaccurate and inflated price quotes in order to guide Plaintiffs'
transactions.*

**ANSWER:** Denied.

    *1191. The Georgia Dock Defendants had a special relationship with Plaintiffs;
they intended for and knew Plaintiffs relied on the representations in entering contracts or
other financial transactions tied to the Georgia Dock, or when factoring the Georgia Dock
into their decisions to increase non-Georgia Dock-based prices. They had superior
knowledge about the components of and methodology for calculating the Georgia Dock,
and their manipulation thereof was conducted in secret and concealed until the end of 2016.
The Georgia Dock Defendants owed Plaintiffs a duty to communicate accurate information
because of this special relationship. Plaintiffs justifiably relied on the information and
suffered loss as a result. It was foreseeable that Plaintiffs would be harmed by the false
submissions.*

**ANSWER:** Denied.

    *1192. **Negligent Omissions.** In addition, all of the Georgia Dock Defendants
negligently failed to disclose information to Plaintiffs. The price manipulation and other
facts that they failed to disclose to Plaintiffs were basic to their transactions with Plaintiffs.
The Georgia Dock Defendants had direct dealings with and entered into contracts with
Plaintiffs. The relationships imposed a duty on the Counterparty Georgia Dock Defendants
to make accurate and good-faith representations to Plaintiffs since the Defendants had
superior and exclusive knowledge of the integrity of the Georgia Dock price index. There
was a special duty because the Georgia Dock Defendants controlled the Georgia Dock
price index by reporting what should have been accurate price quotes but what were, in
reality, fake prices.*

**ANSWER:** Denied.

    *1193. The Defendants failed to disclose to Plaintiffs additional facts that would
make their representations regarding the Georgia Dock price index not materially
misleading. Each Georgia Dock Defendant failed to disclose that it and other poultry
producers were manipulating the Georgia Dock to their benefit and that the Georgia Dock
did not accurately reflect actual prices absent manipulation. Each Georgia Dock
Defendant used the inflated Georgia Dock to their advantage by making material
misrepresentations and omissions knowing that they were false and/or with reckless
disregard for their truth.*

**ANSWER:** Denied.

    *1194. By failing to disclose the foregoing information, the Georgia Dock
Defendants did not exercise reasonable care or competence in determining whether such
information should be shared with Plaintiffs. They knew Plaintiffs would look to the*

*Georgia Dock for guidance in contract formation and as a base for other transactions. Plaintiffs were foreseeable victims.*

**ANSWER:** Denied.

*1195. Plaintiffs reasonably relied on and were injured as a result of the Georgia Dock Defendants' negligent acts and omissions. Plaintiffs entered into contracts and other financial transactions tied to the Georgia Dock, and/or raised their non-Georgia Dock-based prices based on references to the Georgia Dock, and were therefore directly and proximately injured by the Georgia Dock Defendants. Plaintiffs paid more for chicken than they would have absent the Georgia Dock Defendants' negligent acts and omissions. Plaintiffs were injured as a result of the Georgia Dock Defendants' negligent acts and omissions pertaining to the Georgia Dock price index.*

**ANSWER:** Denied.

## COUNT XIX
## UNJUST ENRICHMENT
## (AGAINST THE GEORGIA DOCK DEFENDANTS)

*Brought by Ahold Delhaize USA, Inc.*

*1196. In the alternative to remedies at law, through manipulating the Georgia Dock by submitting false price quotes and then misrepresenting and/or omitting the material fact of this manipulation to Plaintiffs, the Georgia Dock Defendants knowingly acted in an unconscionable, unfair, and oppressive manner toward Plaintiffs, violating the fundamental principles of justice, equity, and good conscience. The Georgia Dock Defendants received higher payment then they were entitled to and acted with conscious disregard for Plaintiffs' rights.*

**ANSWER:** Denied.

*1197. It would be inequitable for the Georgia Dock Defendants to be permitted to retain the ill-gotten gains they obtained through these fraudulent and manipulative acts. The Georgia Dock Defendants' enrichment resulted directly and proximately from the alleged conduct.*

**ANSWER:** Denied.

*1198. If Plaintiffs have no adequate remedy at law, the Court can and should compel the Georgia Dock Defendants to disgorge all unlawful or inequitable proceeds. Plaintiffs are entitled to the establishment of a constructive trust impressed upon the benefits to the Georgia Dock Defendants from their inequitable actions and unjust enrichment. Alternatively, each Defendant could pay its own unjust enrichment to Plaintiffs.*

**ANSWER:** Denied.

## COUNT XX
## VIOLATION OF S.C. CODE ANN §§ 39-3-10, *ET SEQ.*
## (AGAINST ALL DEFENDANTS)

*Brought by W. Lee Flowers & Company, Inc.*

*1199. S.C. Code Ann. § 39-3-10, in pertinent part, declares unlawful all arrangements, contracts, agreements, or combinations between two or more firms made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles in South Carolina or which tend to advance or control the price to the consumer of any such product or article or which may lessen or affect in any manner the full and free competition in any prices in any branch of trade, business, or commerce.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1199 and therefore deny them.

*1200. The conduct of Defendants and their Co-Conspirators as alleged herein violates S.C. Code Ann. § 39-3-10 in that the conduct of Defendants as herein alleged tended to lessen the full and free competition and control the price of broiler chickens imported into the state of South Carolina by Defendants and purchased by Plaintiffs and other South Carolina residents.*

**ANSWER:** Denied.

*1201. S.C. Code Ann. § 39-3-30 provides, in pertinent part, that any person who may be injured or damaged by any such arrangement, contract, agreement, or combination described in § 39-3-10 may sue those firms responsible in any court of competent jurisdiction and recover the full consideration or sum paid for any goods, wares, merchandise, or articles the sale of which was controlled by such unlawful arrangement, contract, agreement, or combination.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1201 and therefore deny them.

*1202. Plaintiffs are entitled to recover the full amount of consideration they paid Defendants for the broiler chickens they purchased from Defendants during the time period in which the illegal contract, agreement, arrangement, or combination was in effect.*

**ANSWER:** Denied.

**COUNT XXI**
**VIOLATION OF S.C. CODE ANN §§ 39-35, *ET SEQ*.**
**(AGAINST ALL DEFENDANTS)**

*Brought by W. Lee Flowers & Company, Inc.*

1203.   *S.C. Code Ann. § 39-5-20(a) declares as unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 1203 and therefore deny them.

1204.   *S.C. Code Ann. § 39-5-20(b) provides that it is the intent of the South Carolina legislature that in construing paragraph (a) of that section that the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to § 5(a)(1) of the Federal Trade Commission Act, as from time to time amended.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 1204 and therefore deny them.

1205.   *Plaintiffs purchased broiler chickens from one or more Defendants from within the State of South Carolina during the relevant period.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 1205 and therefore deny them.

1206.   *Defendants engaged in an unfair or deceptive act or practice with the intent to injure competition through supra-competitive profits.*

**ANSWER:**  Denied.

1207.  *Defendants' conduct was unfair or deceptive within the conduct of commerce directed to or within the State of South Carolina.*

**ANSWER:**  Denied.

1208.   *Defendants' unlawful conduct substantially affected South Carolina's trade and commerce, in that Defendants' conduct had the following effects: (1) broiler chicken competition was restrained, suppressed, and eliminated in South Carolina; (2) broiler chicken prices were raised, fixed, maintained, and/or stabilized at artificially high levels in South Carolina; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supracompetitive, artificially inflated prices for broiler chickens.*

**ANSWER:** Denied.

    *1209.  Defendants' conduct was willful.*

**ANSWER:** Denied.

    *1210.  The conduct of Defendants herein thus violates § 5(a)(1) of the Federal Trade Commission Act and also constitutes a violation of S.C. Code Ann. § 39-5-20(a).*

**ANSWER:** Denied.

    *1211.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.*

**ANSWER:** Denied.

    *1212.  The conduct of Defendants also impacts, or has the potential to impact, the public interest in that, among other things, it is capable of repetition.*

**ANSWER:** Denied.

    *1213.  S.C. Code Ann. § 39-5-140 provides that any person who suffers any ascertainable loss of money or property as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by § 39-5-20 may bring an action individually to recover actual damages, and if the court finds that the use or employment of the unfair or deceptive method, act, or practice was a willing or knowing violation of § 39-5-20, the court shall award three times the actual damages sustained and may provide for such other relief as it deems necessary or proper. For purposes of this section, a willful violation occurs when the party committing the violation knew or should have known that its conduct was a violation of § 39-5- 20.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1213 and therefore deny them.

    *1214.  S.C. Code Ann. § 39-5-140(a) also provides that the court, upon a finding of a violation of § 39-5-20, shall award to the person bringing the action reasonable attorneys' fees and costs.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1214 and therefore deny them.

1215.   Defendants knew or should have known that their conduct alleged herein was a violation of § 39-5-20, and Plaintiffs are entitled to an award in the amount of three times their actual damages sustained plus reasonable attorneys' fees and costs.

**ANSWER:**  Denied.

## COUNT XXII
## VIOLATION OF FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201(2), *ET SEQ.*
## (AGAINST ALL DEFENDANTS)

*Brought by Checkers Drive-In Restaurants, Inc.; Hooters Management Corporation; and LTP Management Group, Inc.; Bojangles' Restaurants, Inc. and Bojangles Opco, LLC; Boston Market Corporation; The Johnny Rockets Group, Inc.*

1216.   The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, et seq. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

**ANSWER:**  Paragraph 1216 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1216.

1217.   The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

**ANSWER:**  Paragraph 1217 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1217.

1218.   Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("…anyone aggrieved by a violation of this [statute] may bring an action…").

**ANSWER:**  Denied.

1219. *Plaintiffs purchased broilers within the State of Florida during the relevant period.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1219 and therefore deny them.

1220. *But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.*

**ANSWER:** Denied.

1221. *Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of trade or commerce in the broilers market, a substantial part of which occurred within Florida.*

**ANSWER:** Denied.

1222. *Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for broilers, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2008 and continuing through the date of this filing.*

**ANSWER:** Denied.

1223. *Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.*

**ANSWER:** Denied.

1224. *Defendants' unlawful conduct substantially affected Florida's trade and commerce.*

**ANSWER:** Denied.

1225. *As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property by virtue of overcharges for broilers and are threatened with further injury.*

**ANSWER:** Denied.

1226. *By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.*

**ANSWER:** Denied.

**COUNT XXIII**
**VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT,**
**ARIZ. REV. STAT. § 44-1401, *ET SEQ*. (AGAINST ALL DEFENDANTS)**

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC; The Johnny Rockets Group, Inc.; Restaurants of America, Inc.*

*1227.  By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. § 44-1401, et seq.*

**ANSWER:**  Denied.

*1228.  Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the broilers market, a substantial portion of which occurred within Arizona.*

**ANSWER:**  Denied.

*1229.  Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial portion of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the broiler market.*

**ANSWER:**  Denied.

*1230.  Defendants' violations of Arizona law were flagrant.*

**ANSWER:**  Denied.

*1231.  Defendants' unlawful conduct substantially affected Arizona's trade and commerce.*

**ANSWER:**  Denied.

*1232.  As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury.*

**ANSWER:**  Denied.

*1233.  By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, et seq.*

**ANSWER:**  Denied.

*1234.  Pursuant to Arizona Revised Statute § 44-1415, with the filing of this Complaint, a copy is being served upon the Attorney General of Arizona.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1234 and therefore deny them.

## COUNT XXIV
## VIOLATION OF ILLINOIS ANTITRUST ACT, 740 Ill. COMP. STAT. ANN. 10/1
## (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Bojangles' Restaurants, Inc. and Bojangles Opco, LLC; Caesars Enterprise Services, LLC; Carl Buddig & Co.; Hooters Management Corporation; The Johnny Rockets Group, Inc.*

1235.  *The Illinois Antitrust Act, 740 ILCS 10/1, et seq., aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade ...." 740 ILCS 10/2.*

**ANSWER:** Paragraph 1235 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1235.

1236.  *Plaintiffs purchased broilers within the State of Illinois during the relevant period. But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 1236 and therefore deny them. Defendants deny the remaining allegations in Paragraph 1236.

1237.  *Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).*

**ANSWER:** Denied.

1238.  *Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for broilers sold, and/or for allocating customers or markets for broilers within intrastate commerce in Illinois.*

**ANSWER:** Denied.

1239. *Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for broilers in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, et seq.*

**ANSWER:** Denied.

1240. *Defendants' conduct was willful.*

**ANSWER:** Denied.

1241. *Plaintiffs were injured with respect to purchases of broilers in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.*

**ANSWER:** Denied.

## COUNT XXV
## VIOLATION OF THE MINNESOTA ANTITRUST LAW,
## MINN. STAT. §325D.49, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Restaurants of America, Inc.; The Johnny Rockets Group, Inc.*

1242. *The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.*

**ANSWER:** Paragraph 1242 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1242.

1243. *Plaintiffs purchased broilers within the State of Minnesota during the relevant period. But for Defendants' conduct set forth herein the price per pound of broilers would have been lower, in an amount to be determined at trial.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 1243 and therefore deny them. Defendants deny the remaining allegations in Paragraph 1243.

1244. *Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.*

**ANSWER:** Denied.

1245. *Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for broilers within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade of commerce in the market for broilers within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for broilers within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, et seq.*

**ANSWER:** Denied.

1246. *Plaintiffs were injured with respect to purchases of broilers in Minnesota and is entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.*

**ANSWER:** Denied.

## COUNT XXVI
## VIOLATION OF THE NEW MEXICO ANTITRUST ACT,
## N.M. STAT. ANN. §§ 57-1-15, *ET SEQ*. (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Restaurants of America, Inc.; The Johnny Rockets Group, Inc.*

1247. *The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. §§ 57-1-15.*

**ANSWER:** Paragraph 1247 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1247.

1248. *Plaintiffs purchased broilers within the State of New Mexico during the relevant period. But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 1248 and therefore deny them. Defendants deny the remaining allegations in Paragraph 1248.

1249. *Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.*

**ANSWER:** Denied.

1250. *Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for broilers within intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, et seq.*

**ANSWER:** Denied.

1251. *Plaintiffs were injured with respect to purchases of broilers in New Mexico and is entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.*

**ANSWER:** Denied.

## COUNT XXVII
## VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL BUSINESS LAW
### (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC; Hooters Management Corporation; The Johnny Rockets Group, Inc.*

1252. *Article 22 of the New York General Business Law generally prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law. § 340(1).*

**ANSWER:** Paragraph 1252 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1252.

1253. *Plaintiffs purchased broilers within New York State during the relevant period. But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 1253 and therefore deny them. Defendants deny the remaining allegations in Paragraph 1253.

1254. *Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law. § 340(6).*

**ANSWER:** Denied.

1255. *Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of broilers and restrained competition in the free exercise of the conduct of the business of broilers within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, et seq.*

**ANSWER:** Denied.

1256. *Plaintiffs were injured with respect to purchases of broilers in New York and is entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000 and reasonable attorneys' fees.*

**ANSWER:** Denied.

1257. *Pursuant to N.Y. Gen. Bus. Law Section 340(5), with the filing of this Complaint, a copy is being served upon the Attorney General of New York.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1257 and therefore deny them.

## COUNT XXVIII
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILL. COMP. STAT. ANN. 505/10a, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC; Carl Buddig & Co.; Hooters Management Corporation; The Johnny Rockets Group, Inc.; Bojangles' Restaurants, Inc. and Bojangles Opco, LLC*

1258.   By reason of the conduct alleged herein, Defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), et seq.

**ANSWER:**  Denied.

1259.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the broilers market, a substantial part of which occurred within Illinois.

**ANSWER:**  Denied.

1260.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred in Illinois, for the purpose of excluding competition or controlling, fixing, or maintained prices in the broiler market.

**ANSWER:**  Denied.

1261.   Defendants conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

**ANSWER:**  Denied.

1262.   Defendants conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs.

**ANSWER:**  Denied.

1263.   Defendants' unlawful conduct substantially affected Illinois trade and commerce.

**ANSWER:**  Denied.

1264.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and is threatened with further injury. Plaintiffs' claim falls within the scope of the Illinois statute.

**ANSWER:**  Denied.

1265.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10a, et seq.

**ANSWER:**  Denied.

## COUNT XXIX
## VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT,
## MINN. STAT. § 325F.68, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Restaurants of America, Inc.; The Johnny Rockets Group, Inc.*

1266.   By reason of the conduct alleged herein, Defendants have violated Minn. Stat. § 325F.68, et seq.

**ANSWER:**  Denied.

1267.   Defendants engaged in deceptive trade practices with intent to injure competitors and consumers through supra-competitive profits.

**ANSWER:**  Denied.

1268.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the broilers market, a substantial part of which occurred in Minnesota, for the purpose of controlling, fixing, or maintaining prices in the broilers market.

**ANSWER:**  Denied.

1269.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.

**ANSWER:**  Denied.

1270.   Defendants conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

**ANSWER:**  Denied.

1271.   Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

**ANSWER:**  Denied.

1272.   Defendants' conduct was willful.

**ANSWER:**  Denied.

1273.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury. Plaintiffs' claims fall within the scope of the Minnesota statute.

**ANSWER:**  Denied.

1274.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, et seq. and applicable case law.

**ANSWER:**  Denied.

## COUNT XXX
## VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT, N.M. STAT. ANN. §§ 57-12-3, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Restaurants of America, Inc.; The Johnny Rockets Group, Inc.*

1275.   By reason of the conduct alleged herein, Defendants have violated N.M. Stat. Ann. §§ 57-12-3, et seq.

**ANSWER:**  Denied.

1276.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade of commerce in the broilers market, a substantial part of which occurred within New Mexico.

**ANSWER:**  Denied.

1277.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the broilers market.

**ANSWER:**  Denied.

1278.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

**ANSWER:**  Denied.

1279.  Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs.

**ANSWER:**  Denied.

1280.   Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

**ANSWER:**  Denied.

1281.   Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the price paid by them for broilers as set forth in N.M. Stat. Ann. § 57-12-2E.

**ANSWER:**  Denied.

1282.   Defendants conduct was willful.

**ANSWER:**  Denied.

1283.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in its business or property and is threatened with further injury.

**ANSWER:**  Denied.

1284.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater plus reasonable attorneys' fees under N.M. Stat. Ann. § 57-12-10.

**ANSWER:**  Denied.

## COUNT XXXI
## VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,CAL. BUS & PROF. CODE §16700, ET SEQ (AGAINST ALL DEFENDANTS)

*Brought by Anaheim Wings, LLC; Bonita Plaza Wings, LLC; Boston Market Corporation; Caesars Enterprise Services, LLC; Costa Mesa Wings, LLC; Downtown Wings, LLC; Gaslamp Wings, LLC; Hollywood Wings, LLC; Mission Valley Wings, LLC; Oceanside Wings, LLC; Ontario Wings, LLC; Rancho Bernardo Wings, LLC; South Gate Wings, LLC; The Johnny Rockets Group, Inc.; Wings Over Long Beach, LLC*

1285.   The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

**ANSWER:**  Paragraph 1285 contains legal conclusions to which no response is required.

To the extent a response is required, Defendants refer to the cited statute and deny any

characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1285.

1286. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

**ANSWER:** Paragraph 1286 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1286.

1287. Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

**ANSWER:** Denied.

1288. A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust is unlawful except as provided by the Code. Id. § 16726.

**ANSWER:** Paragraph 1288 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1288.

1289. Plaintiffs purchased broilers within the State of California during the relevant period. But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 1289 and therefore deny them. Defendants deny the remaining allegations in Paragraph 1289.

1290. *Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, et seq.*

**ANSWER:** Denied.

1291. *Plaintiffs were injured in their business or property, with respect to purchases of broilers in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.*

**ANSWER:** Denied.

## COUNT XXXII
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,
## CAL. BUS & PROF. CODE § 17200, *ET SEQ*. (AGAINST ALL DEFENDANTS)

*Brought by Anaheim Wings, LLC; Bonita Plaza Wings, LLC; Caesars Enterprise Services, LLC; Costa Mesa Wings, LLC; Downtown Wings, LLC; Gaslamp Wings, LLC; Hollywood Wings, LLC; Mission Valley Wings, LLC; Oceanside Wings, LLC; Ontario Wings, LLC; Rancho Bernardo Wings, LLC; South Gate Wings, LLC; Wings Over Long Beach, LLC; The Johnny Rockets Group, Inc.; Boston Market Corporation*

1292. *The violations of federal antitrust law set forth above also constitute violations of section 17200, et seq. of the California Business and Professions Code.*

**ANSWER:** Denied.

1293. *Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.*

**ANSWER:** Denied.

1294. *This claim is instituted pursuant to sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.*

**ANSWER:** Defendants admit that Plaintiffs have purported to plead this claim pursuant to sections 17203 and 17204 of the California Business and Professions Code, but deny that Plaintiffs are entitled to restitution thereunder or otherwise and any and all allegations of wrongdoing by any of the Defendants.

1295. *The Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged*

613

*herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, et seq., of the California Business and Professions Code, set forth above.*

**ANSWER:** Denied.

*1296. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, et seq., of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.*

**ANSWER:** Denied.

*1297. Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.*

**ANSWER:** Denied.

*1298. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.*

**ANSWER:** Denied.

*1299. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs to pay supra-competitive and artificially-inflated prices for broilers sold in the State of California. Plaintiffs suffered injury in fact and lost money or property as a result of such unfair competition.*

**ANSWER:** Denied.

*1300. As alleged in this Complaint, Defendants and their Co-Conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.*

**ANSWER:** Denied.

**COUNT XXXIII**
**VIOLATION OF ALABAMA ANTITRUST LAW,**
**ALABAMA CODE §§ 6-5-60, *ET SEQ*. (AGAINST ALL DEFENDANTS)**

*Brought by The Johnny Rockets Group, Inc. and Bojangles' Restaurants, Inc. and Bojangles Opco, LLC*

*1301.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Alabama and was registered to do business in Alabama. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Alabama from its locations in Alabama. As a result of Defendants' Conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at its store locations in Alabama.*

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1301. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1301 and therefore deny them.

*1302.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through its vendors, for use in food preparation in Plaintiffs' Alabama locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Alabama.*

**ANSWER:**   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1302 and therefore deny them.

*1303.   As a result of Plaintiffs' presence in Alabama and the substantial business it conducted in Alabama – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Alabama – Plaintiffs are entitled to the protection of the laws of Alabama.*

**ANSWER:**   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1303 and therefore deny them.

*1304.   Ala. Code §§ 6-5-60 provides that "any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct, or indirect, may in each instance of such injury or damage, recover the sum of $500 and all actual damages."*

**ANSWER:**   Paragraph 1304 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any

characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph

1304.

1305. *Under Alabama law, Plaintiffs have standing to maintain an action under the antitrust provisions of the Alabama Code based on the facts alleged in this Complaint. Alabama Code §§ 6-5-60 et seq.*

**ANSWER:** Denied.

1306. *Defendants combined, contracted, understood and agreed in the market for broilers in an unlawful manner, with the effect of restraining trade, increasing the price of broilers sold to Plaintiffs in Alabama, and hindering competition in the sale of broilers, in violation of Alabama Code §§ 6-5-60 et seq. But for Defendants' conduct set forth herein, the price of broilers sold to Plaintiffs in Alabama would have been lower.*

**ANSWER:** Denied.

1307. *During the relevant period, Defendants' illegal conduct substantially affected Alabama commerce. Plaintiffs were injured and is threatened with injury with respect to purchases of broilers in Alabama in that they paid and will pay supra-competitive prices for broilers due to Defendants' unlawful conduct, and are entitled to all forms of relief available under Alabama Code §§ 6-5-60 et seq.*

**ANSWER:** Denied.

### COUNT XXXIV
### VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT, COLO. REV. STAT., §§ 6-1-101, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by The Johnny Rockets Group, Inc.*

1308. *Defendants have violated the Colorado Consumer Protection Act, Colorado Rev. Stat. §§ 6-1-101, et seq., by engaging in the acts or practices specified above.*

**ANSWER:** Denied.

1309. *Defendants engaged in unfair or deceptive trade practices as alleged above during the course of their regular business that significantly impacted Plaintiffs in Colorado.*

**ANSWER:** Denied.

1310. *Plaintiffs have suffered an injury in fact to a legally protected interest and lost money or property as a result of Defendants' concerted actions.*

**ANSWER:** Denied.

1311.  *During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Colorado and was registered to do business in Colorado. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Colorado from its locations in Colorado. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Colorado.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1311 and therefore deny them.

1312.  *During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through its vendors, for use in food preparation in Plaintiffs' Colorado locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Colorado.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1312 and therefore deny them.

1313.  *As a result of Plaintiffs' presence in Colorado and the substantial business it conducted in Colorado – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Colorado – Plaintiffs are entitled to the protection of the laws of Colorado.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1313 and therefore deny them.

1314.  *But for Defendants' conduct set forth herein, the price of broilers paid by Plaintiffs would have been lower.*

**ANSWER:**  Denied.

1315.  *Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Plaintiffs. Specifically, Defendants directly caused Plaintiffs and others to pay supra-competitive and artificially inflated prices for broilers. Defendants' conduct also substantially affected commerce in Colorado during the relevant period.*

**ANSWER:**  Denied.

1316.  *In addition, Defendants fraudulently concealed their actions from Plaintiffs. As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping communications with Co-Conspirators secret and making false statements publicly and to Plaintiffs about the reasons for artificially inflated prices of broilers.*

*Plaintiffs were likely to be deceived, and were in fact deceived by Defendants' fraudulent actions.*

**ANSWER:** Denied.

*1317. Therefore, Plaintiffs seek any and all relief, to the fullest extent allowable, under the Colorado Consumer Protection Act, Colorado Rev. Stat. §§ 6-1-101, et seq., and as equity so requires.*

**ANSWER:** Defendants admit that Plaintiffs purport to seek relief under the Colorado Consumer Protection Act, but deny that Plaintiffs are entitled to relief thereunder or otherwise and any and all allegations of wrongdoing by any of the Defendants.

## COUNT XXXV
## VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT, D.C. CODE § 28-4501, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; The Johnny Rockets Group, Inc.; Bojangles' Restaurants, Inc. and Bojangles Opco, LLC*

*1318. The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."*

**ANSWER:** Paragraph 1318 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1318.

*1319. During the relevant period, Plaintiffs conducted a substantial volume of business in the District of Columbia and was registered to do business in the District of Columbia. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in the District of Columbia from their locations in the District of Columbia. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in the District of Columbia.*

**ANSWER:** Defendants deny the existence of and participation in Plaintiffs' alleged conspiracy. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1319 and therefore deny them.

1320.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' District of Columbia locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in the District of Columbia.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1320 and therefore deny them.

1321.   But for Defendants' conduct set forth herein, the price of broilers paid by Plaintiffs would have been lower.

**ANSWER:**  Denied.

1322.   During the relevant period, Plaintiffs conducted substantial business in the District of Columbia – including submitting purchase orders for, receiving invoices for, and receiving shipments of broilers in the District of Columbia – suffered injury in the District of Columbia, and are entitled to the protection of the laws of the District of Columbia.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1322 and therefore deny them.

1323.   Under District of Columbia law, Plaintiffs have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint. See D.C. Code § 28-4509(a).

**ANSWER:**  Denied.

1324.   Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and to rig bids and allocate markets for broilers sold within the District of Columbia, in violation of D.C. Code §§ 28-4501–28-4581. Defendants' conduct substantially affected District of Columbia commerce.

**ANSWER:**  To the extent the allegations in Paragraph 1324 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1324 at this time.  Defendants deny any remaining allegations in Paragraph 1324.

1325.   Plaintiffs were injured with respect to their and/or their vendors' purchases of broilers in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

**ANSWER:**  Denied.

# COUNT XXXVI
## VIOLATION OF HAWAII ANTITRUST LAWS,
## HAWAII REV. STAT. § 480, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by The Johnny Rockets Group, Inc.*

1326.   The contract, combination, or conspiracy alleged above violates Hawaii Rev. Stat. § 480-4(a), which prohibits, inter alia, every contract, combination or conspiracy "in restraint of trade or commerce in the State;" and Hawaii Rev. Stat. § 480-4(b)(1), which, inter alia, makes it unlawful to "fix, control or maintain the price of any commodity."

**ANSWER:**  Paragraph 1326 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1326.

1327.   Broilers are "commodities" within the meaning of Hawaii Rev. Stat. § 480-1. Defendants' combinations or conspiracies restrained, suppressed and eliminated price competition for broilers in Hawaii, restrained trade and commerce in Hawaii, and caused the prices of broilers to be raised, fixed, maintained and stabilized at supracompetitive levels, in violation of Hawaii antitrust laws.

**ANSWER:**  Paragraph 1327 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1327.

1328.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Hawaii and was registered to do business in Hawaii. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Hawaii from their locations in Hawaii. As a result of

*Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Hawaii.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1328. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1328 and therefore deny them.

*1329. During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Hawaii locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Hawaii.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1329 and therefore deny them.

*1330. As a result of Plaintiffs' presence in Hawaii and the substantial business it conducted in Hawaii – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Hawaii – Plaintiffs are entitled to the protection of the laws of Hawaii.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1330 and therefore deny them.

*1331. By reason of Defendants' contract, combination or conspiracy alleged above, Plaintiffs paid more for broilers than they would have paid in the absence of such conduct. As a result, Plaintiffs have sustained injury and are entitled to all relief available under Hawaii Rev. Stat. §§ 480 et seq.*

**ANSWER:** Denied.

### COUNT XXXVII
### VIOLATION OF THE MAINE'S ANTITRUST STATUTE,
### ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ*. (AGAINST ALL DEFENDANTS)

*Brought by The Johnny Rockets Group, Inc.*

*1332. Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally*

621

*prohibiting contracts in restraint of trade and conspiracies to monopolize trade. Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.*

**ANSWER:** Paragraph 1332 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1332.

*1333.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Maine and was registered to do business in Maine. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Maine from their locations in Maine. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Maine.*

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1333. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1333 and therefore deny them.

*1334.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Maine locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Maine.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1334 and therefore deny them.

*1335.   As a result of Plaintiffs' presence in Maine and the substantial business it conducted in Maine – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Maine – Plaintiffs are entitled to the protection of the laws of Maine.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1335 and therefore deny them.

*1336.   Under Maine law, Plaintiffs have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).*

**ANSWER:**  Denied.

1337.   Defendants contracted, combined or conspired in restraint of trade or commerce of broilers within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, et seq. But for Defendants' conduct set forth herein, the price of broilers would have been lower.

**ANSWER:**  Denied.

1338.   As a result, Plaintiffs were injured with respect to broilers sold to Plaintiffs in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

**ANSWER:**  Denied.

## COUNT XXXVIII
## VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT,
## MICH. COMP. LAWS § 445.771, *ET SEQ*. (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC; The Johnny Rockets Group, Inc.*

1339.  The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce ... to prohibit monopolies and attempts to monopolize trade or commerce ... [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

**ANSWER:**  Paragraph 1339 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1339.

1340.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Michigan and was registered to do business in Michigan. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Michigan from their locations in Michigan. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Michigan.

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1340. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1340 and therefore deny them.

1341.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Michigan locations,  and not for resale in unaltered form.  Plaintiffs then sold prepared chicken meals to customers in Michigan.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1341 and therefore deny them.

1342.   As a result of Plaintiffs' presence in Michigan and the substantial business  it conducted in Michigan – including the submission of purchase orders for, receiving  invoices for, and receiving shipment of broilers in Michigan – Plaintiffs are entitled to the protection of the laws of Michigan.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1342 and therefore deny them.

1343.   Under the Michigan Antitrust Reform Act, Plaintiffs have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws § 452.778(2).

**ANSWER:**  Denied.

1344.   Defendants contracted, combined or conspired to restrain or commerce in the market for broilers, in violation of Mich. Comp. Laws § 445.772, et seq.

**ANSWER:**  Denied.

1345.   Defendants' violations of Michigan law were flagrant. But for Defendants' conduct set forth herein, the price of broiler paid by Plaintiffs would have been lower.

**ANSWER:**  Denied.

1346.   As a result, Plaintiffs were injured with respect to their and/or their vendors' purchases of broilers in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

**ANSWER:**  Denied.

## COUNT XXXIX
## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES
## ACT, MO. ANN. STAT. § 407.010, *ET SEQ.*
## (AGAINST ALL DEFENDANTS)

*Brought by Caesars Enterprise Services, LLC; The Johnny Rockets Group, Inc.*

*1347. Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.*

**ANSWER:** Paragraph 1347 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1347.

*1348. During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Missouri and was registered to do business in Missouri. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Missouri from their locations in Missouri. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Missouri.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1348. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1348 and therefore deny them.

*1349. During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Missouri locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Missouri.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1349 and therefore deny them.

*1350. As a result of Plaintiffs' presence in Missouri and the substantial business they conducted in Missouri – including the submission of purchase orders for, receiving*

*invoices for, and receiving shipment of broilers in Missouri – Plaintiffs are entitled to the protection of the laws of Missouri.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1350 and therefore deny them.

*1351. Under Missouri law, Plaintiffs have standing to maintain an action under the MMPA based on the facts alleged in this Complaint.*

**ANSWER:** Denied.

*1352. Defendants contracted, combined or conspired in restraint of trade or commerce of broilers within the intrastate commerce of Missouri, through agreements to fix prices, rig bids and allocate markets and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, et seq. But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower.*

**ANSWER:** To the extent the allegations in Paragraph 1352 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1352 at this time. Defendants deny any remaining allegations in Paragraph 1352.

*1353. As a result, Plaintiffs were injured with respect to their purchases of broilers in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.*

**ANSWER:** Denied.

## COUNT XL
## VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,
## NEV. REV. STAT. § 598A.010, *ET SEQ*. (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC; The Johnny Rockets Group, Inc.*

> *1354.   The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities ... is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).*

**ANSWER:**  Paragraph 1354 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1354.

> *1355.   The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, inter alia, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.*

**ANSWER:**  Paragraph 1355 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1355.

> *1356.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Nevada and was registered to do business in Nevada. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Nevada from their locations in Nevada. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Nevada.*

**ANSWER:**  Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1356. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1356 and therefore deny them.

1357.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Nevada locations, and not for resale in unaltered form. Plaintiff then sold prepared chicken meals to customers in Nevada.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1357 and therefore deny them.

1358.   As a result of Plaintiffs' presence in Nevada and the substantial business it conducted in Nevada – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Nevada – Plaintiffs are entitled to the protection of the laws of Nevada.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1358 and therefore deny them.

1359.   Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. § 598A.210(2).

**ANSWER:**  Denied.

1360.   Defendants fixed prices for broilers sold to Plaintiffs and/or their vendors in Nevada, rigged bids and divided Nevada markets, allocated Nevada customers, and engaged in a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, et seq.

**ANSWER:**  To the extent the allegations in Paragraph 1360 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1360 at this time.  Defendants deny any remaining allegations in Paragraph 1360.

1361.   But for Defendants' conduct set forth herein, the prices of broilers paid by Plaintiffs and/or their vendors for broilers in Nevada would have been lower. Plaintiffs were injured with respect to the broilers purchased in Nevada at supra-competitive prices caused by Defendants' conduct.

**ANSWER:**  Denied.

1362.   *Accordingly, Johnny Rockets is entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.*

**ANSWER:**  Denied.

1363.   *In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by Plaintiffs.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1363 and therefore deny them.

## COUNT XLI
## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. § 598.0903, *ET SEQ*. (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC; The Johnny Rockets Group, Inc.*

1364.   *During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Nevada and was registered to do business in Nevada. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Nevada from their locations in Nevada. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Nevada.*

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1364. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1364 and therefore deny them.

1365.   *During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Nevada locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Nevada.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1365 and therefore deny them.

1366.   *As a result of Plaintiffs' presence in Nevada and the substantial business they conducted in Nevada – including the submission of purchase orders for, receiving*

*invoices for, and receiving shipment of broilers in Nevada – Plaintiffs are entitled to the protection of the laws of Nevada.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1366 and therefore deny them.

*1367. By reason of the conduct alleged herein, Defendants have violated Nev. Rev. Stat. § 598.0903, et seq.*

**ANSWER:** Denied.

*1368. Defendants engaged in a deceptive trade practice with the intent to injure Plaintiffs and to substantially lessen competition.*

**ANSWER:** Denied.

*1369. Defendants established, maintained, or used or attempted to establish a conspiracy in restraint of trade or commerce in the broilers Market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices of broilers sold to Plaintiffs in Nevada.*

**ANSWER:** Denied.

*1370. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.*

**ANSWER:** Denied.

*1371. Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.*

**ANSWER:** Denied.

*1372. Defendants' unlawful conduct substantially affected Nevada's trade and commerce.*

**ANSWER:** Denied.

*1373. Defendants' conduct was willful. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury.*

**ANSWER:** Denied.

1374.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.

**ANSWER:**  Denied.

## COUNT XLII
## VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND BUSINESS PRACTICES ACT, N.C. GEN. STAT. § 75-1, *ET SEQ*.
## (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC; The Johnny Rockets Group, Inc.; Bojangles' Restaurants, Inc. and Bojangles Opco, LLC*

1375.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of North Carolina and was registered to do business in North Carolina. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in North Carolina from their locations in North Carolina.  As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in North Carolina.

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1375. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1375 and therefore deny them.

1376.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' North Carolina locations, and not for resale in unaltered form.  Plaintiffs then sold prepared chicken meals to customers in North Carolina.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1376 and therefore deny them.

1377.   As a result of Plaintiffs' presence in North Carolina and the substantial business they conducted in North Carolina – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in North Carolina – Plaintiffs are entitled to the protection of the laws of North Carolina.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1377 and therefore deny them.

1378.   Defendants established, maintained, or used, or attempted to establish, a conspiracy in restraint of trade or commerce in the market for broilers, for the purpose of

*affecting competition or controlling, fixing, or maintaining prices and rigging bids for broilers sold to Plaintiffs and/or their vendors in North Carolina, a substantial part of which occurred within North Carolina.*

**ANSWER:**  To the extent the allegations in Paragraph 1378 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1378 at this time.  Defendants deny any remaining allegations in Paragraph 1378.

*1379.   Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.*

**ANSWER:**  Denied.

*1380.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury.*

**ANSWER:**  Denied.

*1381.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, et seq.*

**ANSWER:**  Denied.

## COUNT XLIII
## VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,
## R.I. GEN. LAWS ANN. §6-36-1, *ET SEQ*.
## (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation; The Johnny Rockets Group, Inc.*

*1382.   The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition. R.I. Gen. Laws § 6-36- 2(a)(2).*

**ANSWER:**  Paragraph 1382 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any

characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph

1382.

> *1383.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Rhode Island and was registered to do business in Rhode Island. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Rhode Island from their locations in Rhode Island. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Rhode Island.*

**ANSWER:**   Defendants deny the allegations of conspiracy and antitrust injury in

Paragraph 1383. Defendants lack knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 1383 and therefore deny them.

> *1384.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Rhode Island locations, and not for resale in unaltered form.  Plaintiffs then sold prepared chicken meals to customers in Rhode Island.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 1384 and therefore deny them.

> *1385.   As a result of Plaintiffs' presence in Rhode Island and the substantial business it conducted in Rhode Island – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Rhode Island – Plaintiffs are entitled to the protection of the laws of Rhode Island.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 1385 and therefore deny them.

> *1386.   But for Defendants' conduct set forth herein, the price of broilers sold to Plaintiffs and/or their vendors would have been lower.*

**ANSWER:**  Denied.

> *1387.   Under the Rhode Island Antitrust Act, as of July 15, 2013, Plaintiffs have standing to maintain an action based on the facts alleged in this Complaint. See R.I. Gen. Laws § 6-36- 11(a). In Rhode Island, Plaintiffs' claims alleged herein run from July 15, 2013, through the date that the effects of Defendants' anticompetitive conduct cease.*

**ANSWER:**  Denied.

1388.   *Defendants contracted, combined and conspired in restraint of trade of broilers within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a conspiracy in restraint of trade of broilers for the purpose of excluding competition or controlling, fixing or maintaining prices and rigging bids for broilers sold to Plaintiffs and/or their vendors in Rhode Island, and allocating markets for broilers within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, et seq.*

**ANSWER:**  To the extent the allegations in Paragraph 1388 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1388 at this time.  Defendants deny any remaining allegations in Paragraph 1388.

1389.   *Plaintiffs were injured with respect to their and/or their vendors' purchases of broilers in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.*

**ANSWER:**  Denied.

1390.   *In accordance with the requirements of R.I. Gen. Laws Ann. § 6-36-21, notice of this action was mailed to the Rhode Island Attorney General by Plaintiffs and proof of service has been filed with the Court.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1390 and therefore deny them.

## COUNT XLIV
## VIOLATION OF THE UTAH ANTITRUST ACT,
## UTAH CODE ANN. § 76-10-911, *ET SEQ*. (AGAINST ALL DEFENDANTS)

*Brought by The Johnny Rockets Group, Inc.*

1391.   *The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce ...." Utah Code Ann. § 76-10-3102.*

**ANSWER:**  Paragraph 1391 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any

characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1391.

> 1392. *During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Utah and was registered to do business in Utah. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Utah from their locations in Utah. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Utah.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1392. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1392 and therefore deny them.

> 1393. *During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Utah locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Utah.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1393 and therefore deny them.

> 1394. *As a result of Plaintiffs' presence in Utah and the substantial business they conducted in Utah – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Utah – Plaintiffs are entitled to the protection of the laws of Utah.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1394 and therefore deny them.

> 1395. *But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower.*

**ANSWER:** Denied.

> 1396. *Under the Utah Antitrust Act, Plaintiffs have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).*

**ANSWER:** Denied.

1397. *Defendants contracted, combined or conspired in restraint of trade or commerce of broilers, in violation of Utah Code Ann. § 76-10-3101, et seq.*

**ANSWER:** Denied.

1398. *Plaintiffs are a Utah citizen and was injured with respect to their purchases of broilers in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.*

**ANSWER:** Denied.

## COUNT XLV
## VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT,
## VA CODE ANN. § 59.1, *ET SEQ.* (AGAINST ALL DEFENDANTS)

*Brought by The Johnny Rockets Group, Inc.; Boston Market Corporation; and Bojangles' Restaurants, Inc. and Bojangles Opco, LLC*

1399. *By reason of the conduct alleged herein, Defendants have violated Va. Code Ann. § 59.1-196, et seq.*

**ANSWER:** Denied.

1400. *During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Virginia and was registered to do business in Virginia. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers they received at store locations in Virginia from their locations in Virginia. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Virginia.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1400. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1400 and therefore deny them.

1401. *During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Virginia locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Virginia.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1401 and therefore deny them.

*1402.  As a result of Plaintiffs' presence in Virginia and the substantial business it conducted in Virginia – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Virginia – Plaintiffs are entitled to the protection of the laws of Virginia.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1402 and therefore deny them.

*1403.  Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the broilers market, a substantial part of which occurred in Virginia.*

**ANSWER:**  Denied.

*1404.  Defendants conspired for the purpose of excluding or limiting competition or controlling or maintaining prices, or rigging bids for broilers sold to Plaintiffs and/or their vendors in Virginia, and allocating markets, a substantial part of which occurred within Virginia.*

**ANSWER:**  To the extent the allegations in Paragraph 1404 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1404 at this time.  Defendants deny any remaining allegations in Paragraph 1404.

*1405.  Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Virginia.*

**ANSWER:**  Denied.

*1406.  Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.*

**ANSWER:**  Denied.

*1407.  Defendants' unlawful conduct substantially affected Virginia's trade and commerce.*

**ANSWER:**  Denied.

*1408.  Defendants' conduct was willful. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property.*

**ANSWER:**  Denied.

1409.  By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief available, including treble damages, under Va. Code Ann. § 59.1-204(A), et seq.

**ANSWER:**  Denied.

**COUNT XLVI**
**VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT,**
**KANS. STAT. ANN. § 50-101, *ET SEQ*. (AGAINST ALL DEFENDANTS)**

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC*

1410.  *The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.*

**ANSWER:**  Paragraph 1410 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1410.

1411.  *During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Kansas and was registered to do business in Kansas. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers they received at store locations in Kansas from their locations in Kansas. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Kansas.*

**ANSWER:**  Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1411. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1411 and therefore deny them.

1412.  *During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiff's Kansas locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Kansas.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1412 and therefore deny them.

1413.  *As a result of Plaintiffs' presence in Kansas and the substantial business it conducted in Kansas – including the submission of purchase orders for, receiving invoices*

638

*for, and receiving shipment of broilers in Kansas – Plaintiffs are entitled to the protection of the laws of Kansas.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1413 and therefore deny them.

*1414.  Under the Kansas Restraint of Trade Act, Plaintiffs have standing to maintain an action based on the facts alleged in this Complaint. See Kan. Stat. Ann § 50-161(b).*

**ANSWER:**  Denied.

*1415.  Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of broilers, increasing the price of broilers sold to Plaintiffs and/or their vendors in Kansas, preventing competition in the sale of broilers, rigging bids and allocating markets for the sale of broilers to Plaintiffs and/or their vendors in Kansas, in a manner that established the price of broilers and precluded free and unrestricted competition among themselves in the sale of broilers to Plaintiffs and/or their vendors in Kansas, in violation of Kan. Stat. Ann. § 50-101, et seq.*

**ANSWER:**  To the extent the allegations in Paragraph 1415 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1415 at this time.  Defendants deny any remaining allegations in Paragraph 1415.

*1416.  But for Defendants' conduct set forth herein, the price of broilers paid by Plaintiffs would have been lower. As a result, Plaintiffs were injured with respect to their and/or their vendors purchases of broilers in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.*

**ANSWER:**  Denied.

**COUNT XLVII**
**VIOLATION OF THE NEBRASKA JUNKIN ACT,**
**NEB. REV. STAT. § 59-801, *ET SEQ*. (AGAINST ALL DEFENDANTS)**

*Brought by Boston Market Corporation; Caesars Enterprise Services, LLC*

*1417.    Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices.  Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.*

**ANSWER:**  Paragraph 1417 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1417.

*1418.    During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Nebraska and were registered to do business in Nebraska. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers they received at store locations in Nebraska from their locations in Nebraska. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Nebraska.*

**ANSWER:**    Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1418. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1418 and therefore deny them.

*1419.    During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Nebraska locations,  and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Nebraska.*

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1419 and therefore deny them.

*1420.    As a result of Plaintiffs' presence in Nebraska and the substantial business they conducted in Nebraska – including the submission of purchase orders for, receiving*

640

*invoices for, and receiving shipment of broilers in Nebraska – Plaintiffs are entitled to the protection of the laws of Nebraska.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1420 and therefore deny them.

*1421. Under Nebraska law, Plaintiffs have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. See Neb. Rev. Stat. § 59-821.*

**ANSWER:** Denied.

*1422. Defendants contracted, combined or conspired in restraint of trade or commerce of broilers within the intrastate commerce of Nebraska, by agreeing to fix prices and rig bids for broilers sold to Plaintiffs and/or their vendors in Nebraska, and to allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, et seq.*

**ANSWER:** To the extent the allegations in Paragraph 1422 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1422 at this time. Defendants deny any remaining allegations in Paragraph 1422.

*1423. Plaintiffs were injured with respect to their or their vendors' purchases of broilers in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.*

**ANSWER:** Denied.

## COUNT XLVIII
## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT, NEB. REV. STAT. §59-1602, *ET SEQ*. (AGAINST ALL DEFENDANTS)

*Brought by Boston Market Corporation*

*1424. During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Nebraska and was registered to do business in Nebraska. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers they received at store locations in Nebraska from their locations in Nebraska. As a result of*

*Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Nebraska.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1424. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1424 and therefore deny them.

> 1425. *During the relevant period, Plaintiff purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Nebraska locations, and not for resale in unaltered form. Plaintiff then sold prepared chicken meals to customers in Nebraska.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1425 and therefore deny them.

> 1426. *As a result of Plaintiffs' presence in Nebraska and the substantial business it conducted in Nebraska – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Nebraska – Plaintiffs are entitled to the protection of the laws of Nebraska.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1426 and therefore deny them.

> 1427. *By reason of the conduct alleged herein, Defendants have violated Neb. Rev. Stat. § 59-1602, et seq.*

**ANSWER:** Denied.

> 1428. *Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the broilers Market, a substantial part of which occurred within Nebraska.*

**ANSWER:** Denied.

> 1429. *Defendants established, maintained, or attempted to establish, conspiracy in restraint of trade or commerce in the broilers Market, for the purpose of excluding or limiting competition or controlling or maintaining prices or rigging bids for broilers sold to Plaintiffs and/or their vendors in Nebraska, and allocating markets, a substantial part of which occurred within Nebraska.*

**ANSWER:** To the extent the allegations in Paragraph 1429 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims

and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1429 at this time. Defendants deny any remaining allegations in Paragraph 1429.

*1430. Defendants' conduct was conducted with the intent to deceive Plaintiffs regarding the nature of Defendants' actions within the stream of Nebraska commerce.*

**ANSWER:** Denied.

*1431. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.*

**ANSWER:** Denied.

*1432. Defendants' conduct misled Plaintiffs, withheld material facts, and had a direct or indirect impact upon Plaintiffs' ability to protect themselves. Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.*

**ANSWER:** Denied.

*1433. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury. Plaintiffs are within the scope of the Nebraska statute.*

**ANSWER:** Denied.

*1434. By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59-1614.*

**ANSWER:** Denied.

**COUNT XLIX**
**VIOLATION OF NEW HAMPSHIRE'S CONSUMER PROTECTION ACT, N.H. REV. STAT. ANN. TIT. XXXI, 358-A, *ET SEQ*. (AGAINST ALL DEFENDANTS)**

*Brought by Boston Market Corporation*

*1435. During the relevant period, Plaintiffs conducted a substantial volume of business in the State of New Hampshire and was registered to do business in New Hampshire. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers they received at store locations in New Hampshire from their*

*locations in New Hampshire. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in New Hampshire.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1435. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1435 and therefore deny them.

*1436. During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiff's New Hampshire locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in New Hampshire.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1436 and therefore deny them.

*1437. As a result of Plaintiffs' presence in New Hampshire and the substantial business it conducted in New Hampshire – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in New Hampshire – Plaintiffs are entitled to the protection of the laws of New Hampshire.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1437 and therefore deny them.

*1438. By reason of the conduct alleged herein, Defendants have violated N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, et seq.*

**ANSWER:** Denied.

*1439. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, trade or commerce in the relevant market, a substantial part of which occurred within New Hampshire.*

**ANSWER:** Denied.

*1440. Defendants established, maintained, or used, or attempted to establish, a conspiracy in restraint of trade or commerce in the relevant market, for the purpose of excluding or limiting competition or controlling or maintaining prices of broilers sold to Plaintiffs in New Hampshire, a substantial part of which occurred within New Hampshire.*

**ANSWER:** Denied.

*1441. Defendants' conduct was conducted with the intent to deceive Plaintiffs regarding the nature of Defendants' actions within the stream of New Hampshire commerce.*

**ANSWER:** Denied.

*1442. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.*

**ANSWER:** Denied.

*1443. Defendants' conduct was willful and knowing. Defendants' conduct misled Plaintiffs, withheld material facts, and had a direct impact upon Plaintiffs' ability to protect itself.*

**ANSWER:** Denied.

*1444. Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.*

**ANSWER:** Denied.

*1445. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury. Plaintiffs are within the scope of the New Hampshire statute.*

**ANSWER:** Denied.

*1446. By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. Tit. XXXI, §§ 358-A:10 and 358-A:10-a.*

**ANSWER:** Denied.

# COUNT L
# UNJUST ENRICHMENT
# (AGAINST ALL DEFENDANTS)

*Brought by Anaheim Wings, LLC; Bonita Plaza Wings, LLC; Costa Mesa Wings, LLC; Downtown Wings, LLC; Gaslamp Wings, LLC; Hollywood Wings, LLC; Hooters Management Corporation; LTP Management Group, Inc.; Mission Valley Wings, LLC; Oceanside Wings, LLC; Ontario Wings, LLC; Rancho Bernardo Wings, LLC; Restaurants of America, Inc.; South Gate Wings, LLC; Wings Over Long Beach, LLC*

1447.  *As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of broilers.*

**ANSWER:**  Denied.

1448.  *Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs in Arizona, California, Florida, Illinois, Minnesota, and New Mexico.*

**ANSWER:**  Denied.

# COUNT LI

# VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,
# TENN. CODE, § 47-25-101, *ET SEQ.*

*Brought by The Johnny Rockets Group, Inc. and Bojangles' Restaurants, Inc. and Bojangles Opco, LLC*

1449.  *The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, inter alia, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. Tenn. Code, § 47-25-101.*

**ANSWER:**  Paragraph 1449 contains legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the cited statute and deny any characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph 1449.

1450.  *During the Conspiracy Period, Johnny Rockets conducted a substantial volume of business in the State of Tennessee and was registered to do business in*

*Tennessee. During the Conspiracy Period, Johnny Rockets submitted purchase orders for all shipments of Broilers it received at store locations in Tennessee from its locations in Tennessee. As a result of Defendants' Conspiracy, Johnny Rockets took delivery of Broilers at artificially inflated prices at its store locations in Tennessee.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1450. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1450 and therefore deny them.

*1451. During the Conspiracy Period, Johnny Rockets purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Johnny Rockets' Tennessee locations, and not for resale in unaltered form. Johnny Rockets then sold prepared chicken meals to customers in Tennessee.*

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in Paragraph 1451. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1451 and therefore deny them.

*1452. As a result of Johnny Rockets' presence in Tennessee and the substantial business it conducted in Tennessee – including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Tennessee – Johnny Rockets is entitled to the protection of the laws of Tennessee.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1452 and therefore deny them.

*1453. Defendants competed unfairly and colluded by meeting to fix prices, rig bids, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47- 25-101, et seq.*

**ANSWER:** To the extent the allegations in Paragraph 1453 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1453 at this time. Defendants deny any remaining allegations in Paragraph 1453.

*1454. Defendants' conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free*

*competition in goods in Tennessee, and because it tended to increase the prices of goods sold to Johnny Rockets in Tennessee. Specifically, Defendants' combination or conspiracy had the following effects:(1) price competition for Broilers sold to Johnny Rockets in Tennessee was restrained, suppressed, and eliminated; (2) prices for Broilers sold to Johnny Rockets in Tennessee were raised, fixed, maintained and stabilized at artificially high levels; (3) Johnny Rockets was deprived of free and open competition; and (4) Johnny Rockets paid supra-competitive, artificially inflated prices for Broilers sold to Johnny Rockets in Tennessee.*

**ANSWER:** Denied.

*1455. But for Defendants' conduct set forth herein, the price of Broilers sold to Johnny Rockets in Tennessee would have been lower. As a direct and proximate result of Defendants' unlawful conduct, Johnny Rockets has been injured in its business and property and are threatened with further injury.*

**ANSWER:** Denied.

*1456. Under Tennessee law, Johnny Rockets has standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint.*

**ANSWER:** Denied.

*1457. Johnny Rockets was injured with respect to Broilers sold to Johnny Rockets in Tennessee and is entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.*

**ANSWER:** Denied.

## COUNT LII
## VIOLATION OF WISCONSIN ANTITRUST ACT,
## WIS. STAT. ANN. § 133.18(1)(1), *ET SEQ.*

*Brought by Boston Market; The Johnny Rockets Group, Inc.*

*1458. Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. §133.01.*

**ANSWER:** Paragraph 1458 contains legal conclusions to which no response is required.

To the extent a response is required, Defendants refer to the cited statute and deny any

characterization inconsistent therewith. Defendants deny any remaining allegations in Paragraph

1458.

> 1459. During the Conspiracy Period, Plaintiffs conducted a substantial volume of business in the State of Wisconsin and were registered to do business in Wisconsin. During the Conspiracy Period, Plaintiffs submitted purchase orders for all shipments of Broilers they received at store locations in Wisconsin from their locations in Wisconsin. As a result of Defendants' Conspiracy, Plaintiffs took delivery of Broilers at artificially inflated prices at its store locations in Wisconsin.

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in

Paragraph 1459. Defendants lack knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 1459 and therefore deny them.

> 1460. During the Conspiracy Period, Plaintiffs purchased Broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Wisconsin locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Wisconsin.

**ANSWER:** Defendants deny the allegations of conspiracy and antitrust injury in

Paragraph 1460. Defendants lack knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 1460 and therefore deny them.

> 1461. As a result of Plaintiffs' presence in Wisconsin and the substantial business they conducted in Wisconsin – including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Wisconsin – Plaintiffs are entitled to the protection of the laws of Wisconsin.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 1461 and therefore deny them.

> 1462. Under Wisconsin law, Plaintiffs have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. See Wis. Stat. § 133.18(a).

**ANSWER:** Denied.

*1463.  Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, et seq.*

**ANSWER:**  Denied.

*1464.  Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced Broilers from Defendants in Wisconsin, and (2) paying higher prices for Defendants' Broilers than they would have in the absence of Defendants' conduct. These injuries are of the type of the laws of Wisconsin were designed to prevent, and flow from that which makes Defendants' conduct unlawful.*

**ANSWER:**  Denied.

*1465.  Plaintiffs were injured with respect to Broilers sold to Plaintiffs and/or their vendors in Wisconsin. Accordingly, Plaintiffs are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief. Defendants are jointly and severally liable for all damages suffered by Plaintiffs.*

**ANSWER:**  Denied.

**COUNT LIII**
**VIOLATION OF 15 U.S.C. § 1**
**(AGAINST CASE, CLAXTON, KOCH, MAR-JAC, PERDUE, PILGRIM'S PRIDE, SIMMONS, TYSON, AND WAYNE FOR BID-RIGGING – PLED IN THE ALTERNATIVE TO COUNT I)[11]**

*Brought by Chick-fil-A, Inc.*

*1466.  CFA, Inc. incorporates by reference and adopts the allegations set forth above and the allegations in the Superseding Indictment returned by the grand jury in United States v. Jayson Jeffrey Penn, et al., 20-cv-152 (D. Colo.) [ECF No. 101], on October 6, 2020 (the "Superseding Indictment").*

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1466 at this time.

---

[11] This Count has been dismissed as against Simmons (Dkt. 4319) and no answer is required.

*1467. CFA, Inc. maintains a roster of pre-approved suppliers for its chicken products, which over time has included Defendants Claxton, Koch, Mar-Jac, Pilgrim's, Perdue, Simmons, Tyson, and Wayne Farms.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1467 at this time.

*1468. Beginning at least as early as 2012 and continuing at least into 2019 ("Bid-Rigging Conduct Period"), CFA, Inc.'s suppliers engaged in an unlawful and anticompetitive conspiracy to coordinate pricing and rig bids submitted to CFA, Inc. for broiler products, with the purpose and intent to artificially inflate the prices paid by CFA, Inc.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1468 at this time.

*1469. As part of its procurement process, CFA, Inc. expected its suppliers to engage in a competitive bidding process, which when complete, would allow CFA, Inc. to award its purchase volume to the most competitive bidders.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1469 at this time.

*1470. Rather than engage in a competitive bidding process, CFA, Inc.'s suppliers routinely exchanged confidential information with each other regarding bids they were submitting, or intended to submit, so that their supposedly competitive bids were aligned. The suppliers utilized phone calls, text messages, and email communications to carry out this exchange of confidential information. These actions were inherently anticompetitive and undermined CFA, Inc.'s purpose of securing the most favorable and competitive pricing from its suppliers.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1470 at this time.

*1471. By exchanging confidential and competitively sensitive information, CFA, Inc.'s suppliers were able to use that information as a benchmark for their own pricing, thus ensuring that their supposedly competitive bids were aligned. For instance, on or about January 21, 2013, Scott Brady, Vice President of National Accounts at Claxton, emailed Mikell Fries, President of Claxton, to pass on price "overage" information from competitors Perdue, Koch, and Pilgrim's.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1471 at this time.



*1472. Again, on or about March 4, 2013,* ▮▮▮ *that contained pricing information received from competitors* ▮▮▮ *and compared* ▮▮▮ *pricing against* ▮▮▮ *pricing.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1472 at this time.

*1473. CFA, Inc.'s suppliers' voluntary sharing of their respective confidential pricing information became even more pronounced following CFA, Inc.'s announcement in February 2014 that it planned to serve antibiotic free or No Antibiotic Ever ("NAE") broiler chicken meat at all of its restaurants within the following five years.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1473 at this time.

*1474. Indeed, the information sharing related to CFA, Inc.'s transition to NAE chicken is chronicled in the Superseding Indictment, which described conduct that specifically affected a victim identified by the pseudonym QSR-5.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1474 at this time.

1475. *CFA, Inc. is the victim identified in the Superseding Indictment by the pseudonym QSR-5.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1475 at this time.

1476. *For instance, on or about April 1, 2014, employees of suppliers Claxton, Pilgrim's, and Perdue engaged in multiple phone conversations with one another during which they discussed potential pricing for NAE broiler chicken to be sold to CFA, Inc. Following these conversations,* ▓▓▓▓▓▓ *an employee of Perdue, sent an email to another Perdue employee stating "I also found out that Pilgrim's is going to upcharge approx. $.3124/lb on the ABF product. Claxton will be around the some cost." The Perdue employee responded: "Great info."*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1476 at this time.

1477. *Approximately two weeks later, on April 18, 2014, Tim Mulrenin, an employee of supplier Tyson, called Scott Brady for approximately 12 minutes. Following that conversation, Brady sent text messages to his superior, Mikell Fries, recapping his call with Mulrenin and reciting Tyson's potential pricing for NAE broiler chicken to be sold to CFA, Inc. In that same conversation, Brady confirmed to Fries that, in addition to Tyson, he was also coordinating with Perdue and Pilgrim's regarding a potential price for NAE broiler chicken to be sold to CFA, Inc.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1477 at this time.

1478. *The conspiracy to coordinate bids to CFA, Inc. continued into the summer of 2014. From at least July to September 2014,* ▓▓▓▓▓▓▓▓▓ *texted on multiple occasions regarding* ▓▓▓▓ *conversations with competitors at* ▓▓▓▓▓▓▓ *regarding their pricing and bids to CFA, Inc.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1478 at this time.

1479.   Brady and employees of other CFA, Inc. suppliers continued to exchange
their pricing information by email throughout this period, such as on August 7, 2014, when

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1479 at this time.

1480.   Defendants' bid-rigging conspiracy not only continued after 2014, but expanded to include additional CFA, Inc. suppliers. For instance, Defendant Mar-Jac did not begin supplying broiler chicken to CFA, Inc. until 2017.

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1480 at this time.

1481.   A year later, on August 19, 2016,
                                                                          These
communications, in furtherance of the conspiracy, occurred in the midst of the bidding
period for CFA, Inc.'s 2017 broiler business.

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1481 at this time.

*1482. CFA, Inc. was directly and proximately injured by the bid-rigging conduct described above and in the Superseding Indictment.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1482 at this time.

*1483. Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, CFA, Inc. for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) CFA, Inc. was deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1483 at this time.

*1484. As a direct and proximate result of Defendants' above-described unlawful conduct, CFA, Inc. paid artificially inflated prices for chicken.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1484 at this time.

*1485. As a direct and proximate result of Defendants' above-described anticompetitive conduct, CFA, Inc. was damaged in its business or property by paying prices for chicken that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1485 at this time.

*1486. Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Alternatively, Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust*

655

*liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.*

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1486 at this time.

## COUNT LIV
## VIOLATION OF 15 U.S.C. § 1 (AGAINST CLAXTON, HARRISON, KOCH, MAR-JAC, PILGRIM'S PRIDE, AND TYSON FOR BID RIGGING – PLED IN THE ALTERNATIVE TO COUNT I)

*Brought by Pollo Operations, Inc.*

*1487.   Pollo incorporates by reference and adopts the allegations set forth above and the allegations in the Superseding Indictment returned by the grand jury in United States v. Jayson Jeffrey Penn, et al., 20-cv-152 (D. Colo.) [ECF No. 101], on October 6, 2020.*

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1487 at this time.

*1488.   Pollo was directly and proximately injured by the bid-rigging conduct described in the Superseding Indictment.*

**ANSWER:**  Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1488 at this time.

*1489.   Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, Plaintiff for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiff was deprived of the benefits of free, open, and unrestricted competition in the United States*

chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1489 at this time.

1490. Defendants named in the above Count directly and proximately caused injury to Pollo in the United States.

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1490 at this time.

1491. As a direct and proximate result of Defendants' above-described unlawful conduct, Pollo paid artificially inflated prices for chicken.

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1491 at this time.

1492. As a direct and proximate result of Defendants' above-described anticompetitive conduct, Pollo was damaged in its business or property by paying prices for chicken that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1492 at this time.

1493. Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1493 at this time.

1494. *Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1494 at this time.

## COUNT LV
## VIOLATION OF 15 U.S.C. § 1
## (AGAINST GEORGE'S, KOCH, PERDUE, PILGRIM'S PRIDE, AND TYSON FOR BID RIGGING – PLED IN THE ALTERNATIVE TO COUNT I)

*Brought by Restaurant Services, Inc.*

1495. *RSI incorporates by reference and adopts the allegations set forth above and the allegations in the Superseding Indictment returned by the grand jury in United States v. Jayson Jeffrey Penn, et al., 20-cv-152 (D. Colo.) [ECF No. 101], on October 6, 2020 ("Superseding Indictment").*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1495 at this time.

1496. *RSI was directly and proximately injured by the bid-rigging conduct described in the Superseding Indictment.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1496 at this time.

1497. *Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, RSI for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) RSI was deprived of the benefits of free, open, and unrestricted competition in the United States chicken market;*

*and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1497 at this time.

*1498. Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiff in the United States.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1498 at this time.

*1499. As a direct and proximate result of Defendants' above-described unlawful conduct, RSI paid artificially inflated prices for chicken.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1499 at this time.

*1500. As a direct and proximate result of Defendants' above-described anticompetitive conduct, RSI was damaged in its business or property by paying prices for chicken that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1500 at this time.

*1501. Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1. Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for*

*Broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.*

**ANSWER:** Pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1501 at this time.

**COUNT LVI**
**BREACH OF CONTRACT**
**(AGAINST TYSON AND TYSON SALES AND DISTRIBUTION, INC.)**

*Brought by Caesars Enterprise Services, LLC*

1502.   *Caesars incorporates and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**ANSWER:** Paragraph 1502 does not contain any factual allegations to which a response is required. To the extent Paragraph 1502 contains factual allegations, Tyson denies those allegations. Tyson incorporates by reference its answers to each preceding and succeeding paragraph, as if fully set forth herein in response to Paragraph 1502.

1503.   *Caesars entered into a series of contracts with Tyson to supply chicken at a specified price with precise estimate quantities. The contract is governed by Nevada law. Caesars purchased the broiler chickens and components of the chicken pursuant to these agreements on the agreed upon terms to specify the requirements of its restaurants.*

**ANSWER:** Tyson admits that it sold certain products to Caesars during the Relevant Period, but denies any further characterization thereof. Paragraph 1503 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations, allegations, and/or conclusions. To the extent the allegations in Paragraph 1503 characterize or describe documents or other sources, Tyson notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in Paragraph 1503.

*1504. Like all contracts, these agreements contain an implied covenant of good faith and fair dealing pursuant to which Tyson covenanted not to do anything that would frustrate the purpose of the agreement, namely to supply chickens at an agreed price based on the terms of negotiations. Tyson would regularly refer to the Georgia dock to justify its prices. By conspiring with the other defendants to fix supply and manipulate the Georgia Dock, Tyson has manipulated the market price for the chicken and has unlawfully conspired to deprive Caesar of the benefit of the contract, namely chicken at a negotiated, lawful, price driven by the market forces discussed during negotiations. By submitted fraudulent bids to the Georgia Dock and using the Dock during negotiations with Tysons, Tysons has further breached the covenant and its obligations to Caesars.*

**ANSWER:** Tyson admits that Tyson utilized the Georgia Dock in pricing its product but denies any further characterization thereof. Paragraph 1504 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations, allegations, and/or conclusions.

*1505. Caesars has substantially performed all obligations legally required of it under the agreements.*

**ANSWER:** Tyson denies the allegations in Paragraph 1505.

*1506. Caesars has been damaged by the breach of contract in an amount to be determined at trial but in no event less than: (1) the difference between the actual price and a market price without the influence of Tyson and its conspirators unlawful conduct, (2) the unjust enrichment of Tyson from the unlawful scheme from Caesars business, and (3) all other damages or losses reasonably foreseeable from the breach described here.*

**ANSWER:** Tyson denies the allegations in Paragraph 1506.

*1507. As a direct and proximate cause of these breaches of contracts, including by breaches of the implied covenant of good faith and fair dealing, and of Defendants' frustration of the purposes of these contracts, Plaintiff has been damaged as alleged herein in an amount to be proven at trial.*

**ANSWER:** Tyson denies the allegations in Paragraph 1507.

*1508. Caesars conferred a benefit upon Tyson, Tyson had knowledge of that benefit, and voluntarily accepted it from Plaintiff. It would be inequitable and unjust for Tyson to be permitted to be enriched or to retain the benefit which Tyson obtained from its manipulative acts at the expense of Caesars. Caesars is entitled to the establishment of a*

*constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.*

**ANSWER:** Tyson denies the allegations in Paragraph 1508.

## COUNT LVII
## VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT,
## S.C. CODE ANN. §§ 39-5-10, *ET SEQ.*

*Brought by Boston Market Corporation; Bojangles' Restaurants, Inc. and Bojangles Opco, LLC; and The Johnny Rockets Group, Inc.*

*1509.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**ANSWER:**  Defendants incorporate by reference their answers to each preceding Paragraph, as if fully set forth herein in response to Paragraph 1509.

*1510.  By reason of the conduct alleged herein, Defendants have violated S.C. Code Ann. §§39-5-10.*

**ANSWER:**  Denied.

*1511.  Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the Broilers Market, a substantial part of which occurred within South Carolina.*

**ANSWER:**  Denied.

*1512.  Defendants established, maintained, or used, or attempted to establish, a conspiracy in restraint of trade or commerce in the market for Broilers, for the purpose of excluding or limiting competition or controlling or maintaining prices, or rigging bids for Broilers sold to Plaintiffs and/or its vendors in South Carolina, and allocating markets, a substantial part of which occurred within South Carolina.*

**ANSWER:**  To the extent the allegations in Paragraph 1512 purport to relate to bid-rigging claims or allegations, pursuant to the Court's September 22, 2020 Order staying bid-rigging claims and allegations (Dkt. 3835), the parties agree that Defendants shall not answer Paragraph 1512 at this time.  Defendants deny any remaining allegations in Paragraph 1512.

*1513. Defendants' conduct was conducted with the intent to deceive Plaintiffs regarding the nature of Defendants' actions within the stream of South Carolina commerce.*

**ANSWER:** Denied.

*1514. Defendants' conduct misled Plaintiffs, withheld material facts, and had a direct or indirect impact upon Plaintiffs' ability to protect themselves. Plaintiffs are within the scope of the South Carolina statute.*

**ANSWER:** Denied.

## PRAYER FOR RELIEF

*WHEREFORE, Plaintiffs respectfully request that the Court:*

*A.     Enter joint and several judgments against Defendants in favor of Plaintiffs;*

*B.     Award Plaintiffs damages against Defendants in a joint and several judgment for an amount to be determined at trial to the maximum extent allowed under the claims stated above as well as treble damages, any other enhancement of damages, attorneys' fees, expenses, and costs as provided by law;*

*C.     Award Plaintiffs bringing claims under full-consideration statutes, including but not limited to under Wisconsin, Tennessee, and South Carolina state antitrust laws, the full amounts paid on the contracts with Defendants;*

*D.     Award Plaintiff damages in an amount to be determined at trial to the maximum extent allowed under Georgia RICO (Ga. Code Ann. § 16-14-1 et seq.) and Federal RICO (18 U.S.C. § 19621 et seq.), and enter a judgment in favor of Plaintiffs against the Georgia Dock Defendants, with the judgment being for joint and several liability, in an amount to be trebled to the extent such laws permit;*

*E.     Award Plaintiffs damages or other relief permitted by law or equity for Plaintiff's common law claims in an amount to be determined at trial;*

*F.     Award Plaintiffs punitive damages as appropriate under applicable law;*

*G.     Award Plaintiffs their pre- and post-judgment interest as provided by law, with such interest to be awarded at the highest legal rate;*

*H.     Award Plaintiffs their attorneys' fees, litigation expenses, and costs, as provided by law, including the federal and state antitrust laws, Georgia RICO, and Federal RICO; and*

*I.     Award Plaintiffs the costs of investigation and litigation pursuant to Ga. Code Ann. § 16-14-6(c);*

J.      Enter an order prohibiting and permanently enjoining Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and

K.      Grant Plaintiffs such other and further relief that the Court may deem just and proper.

**ANSWER:**  Defendants deny any and all allegations contained in Plaintiffs' prayer for relief, deny that Plaintiffs are entitled to any relief, and request that Plaintiffs take nothing in this suit and that this matter be dismissed with prejudice, with costs and fees awarded to Defendants.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

**ANSWER:**  Plaintiffs' Jury Demand contains no factual assertions to which a response is required. Plaintiffs' Jury Demand further states legal conclusion and Plaintiffs' characterizations of this action, with which Defendants disagree and to which no response is required. To the extent a response is required, Defendants admit that Plaintiffs purport to demand a jury trial, but deny that Plaintiffs have stated claims that are triable. Defendants deny any remaining allegations in Plaintiffs' Jury Demand.

## AFFIRMATIVE DEFENSES

Defendants state the following defenses to Plaintiffs' Complaint. Each defense is asserted as to all claims against Defendants, unless otherwise noted.  By setting forth these affirmative defenses, Defendants do not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Plaintiffs. Nothing herein is intended or shall be construed as an admission that any particular issue or subject matter is relevant to the Plaintiffs' allegations.

As separate and distinct affirmative defenses, Defendants allege as follows:

## DEFENSES TO ALL CLAIMS

## FIRST DEFENSE

1.      Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations, including, without limitation: 15 U.S.C. § 15b; *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987);  Ariz. Rev. Stat. Ann. § 44-1410; Cal. Bus. & Prof. Code § 16750.1; Cal. Bus. & Prof. Code § 17208; C.R.S. § 6-1-115; D.C. Code Ann. § 28-4511; D.C. Code Ann. § 12-301(8); O.G.A. § 16-14-8; Fla. Stat. Ann. § 501.207(5); *Sundance Apartments I, Inc. v. Gen. Elec. Capital Corp.*, 581 F. Supp. 2d 1215, 1223 (S.D. Fla. 2008); Haw. Rev. Stat. Ann. § 480-24; 815 Ill. Comp. Stat. Ann. 505/10a(e); K.S.A 60-512(2); *O'Brien v. Legion Creative Leather Prods., Inc.*, 277 P.3d 1062, 1084-86 (Kan. 2012); 11 M.R.S. § 752. Mich. Comp. Laws § 445.781(2); Minn. Stat. Ann. § 325D.64; Mo. Rev. Stat. § 416.131.2; Neb. Rev. Stat. Ann. § 25-206; Neb. Rev. Stat. Ann. § 59-1612; Nev. Rev. Stat. Ann. § 11.190(2)(d); Nev. Rev. Stat. Ann. § 598A.220(2); N.H. Rev. Stat. Ann. § 356:12; N.H. Rev. Stat. Ann. § 358-A:3(IV-a); *Monzione v. U.S. Bank, N.A.*, 2013 WL 310013, at *4 (D.N.H. Jan. 25, 2013) (applying N.H. Rev. Stat. Ann. § 508:4); *Lehane v. Wachovia Mortg., FSB*, 2013 WL 1637166, at *3 n.5 (D.N.H. Apr. 16, 2013) (same); N.M. Stat. Ann. § 57-1-12; N.M. Stat. Ann. § 37-1-4; *Porcell v. Lincoln Wood Prods.,*

*Inc.*, 2010 WL 1541264, at \*5 (D.N.M. Mar. 31, 2010); *Nance v. L.J. Dolloff Assocs., Inc.*, 126 P.3d 1215, 1220 (N.M. Ct. App. 2005); N.Y. Gen. Bus. Law § 340; N.C. Gen. Stat. § 75-16.2; N.C. Gen. Stat. § 75-16.2; R.I. Gen. Laws Ann. § 6-36-23; S.C. Code Ann. § 39-5-150; *State ex rel. Leech v. Levi Strauss & Co.*, 1980 WL 4696, at \*3 (Tenn. Ch. Sept. 25, 1980); Utah Code Ann. § 76-10-3117(2); Utah Code Ann. § 13-2-6(6)(b); Utah Code Ann. § 78B-2-305(4); Va. Code Ann. § 59.1-204.1 and Wis. Stat. Ann. § 133.18(2). Thus, their claims must be dismissed unless Plaintiffs can sufficiently allege that they could not have discovered the claimed offense within the limitations period exercising reasonable diligence.

2.      Plaintiffs cannot satisfy this burden: the challenged conduct occurred between nine and twelve years ago. *See, e.g.*, Compl. ¶ 16 (Plaintiffs allege "market-changing cuts to breeder flocks – a first round from 2008 to early 2009, and a subsequent round from 2011 to 2012"); ¶ 502.

3.      Moreover, the precise set of facts Plaintiffs cite in support of their claims were made public many years ago. For example:

- **Publicly Announced Cuts**. As Plaintiffs acknowledge, the supply decisions at issue in this case were no secret. *See, e.g.*, Compl. ¶ 376 ("On March 12, 2008, Pilgrim's CEO Clint Rivers, publicly announced the closure of seven chicken facilities . . ."). Indeed, the supply cuts cited by Plaintiffs in their Complaint were publicly announced years ago. *See, e.g.*, Compl. ¶ 379 ("On April 3, 2008 Fieldale Farms announced a 5% production cut."); ¶ 382 ("On April 9, 2008, Simmons announced in a press release a 6% reduction in production throughout its processing plants . . .").

- **Price Increases**. Plaintiffs admit that price information was reported daily by Urner Barry and the Georgia Department of Agriculture and weekly by the USDA. *See, e.g.*, Compl. ¶¶

325-328.

- **Alleged Signals**. Similarly, Plaintiffs rely on public statements made as far back as 2008 in their signaling allegations. *See, e.g.*, Compl. ¶¶ 910-11 (summarizing comments by Tyson and Pilgrim's in their respective January 28 and 29, 2008 earnings calls). If, as they claim, these statements were obvious indicators of misconduct, they triggered Plaintiffs' duty to inquire as far back as 2008.

- **Agri Stats**. Plaintiffs also rely on public statements regarding the use of Agri Stats, many from thirteen years ago. *See, e.g.*, Compl. ¶ 942 (quoting May 2008 statement in which "Sanderson Farms CEO Joe Sanderson claimed '[w]e use Agri Stats . . . Almost everyone in our industry does as well'").

- **Trade Associations**. Defendants' participation in trade conferences and meetings was public when it occurred, many years ago. *See, e.g.*, Compl. ¶ 452 ("[A]t the National Chicken Council's October 2009 Annual Conference . . . one industry analyst wrote that participants had emphasized continued 'production discipline.'").

- **Industry Structure**. The nature of the Broiler industry's structure has been known for decades. Plaintiffs cite no new information that was not otherwise available in 2008 or contemporaneously as plants were closed. *See, e.g.*, Compl. ¶ 418 ("By September 2008, chicken industry publication Watts PoultryUSA reported that '[m]ost U.S. chicken integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'").

4. Put simply, Plaintiffs' attempt to justify their delay by claiming fraudulent concealment fails—they simply recycle their underlying allegations and conclusively assert fraudulent concealment. Compl. ¶¶ 998-1023. Accordingly, Plaintiffs' Complaint is time-barred.

## SECOND DEFENSE

5. Plaintiffs' claims are barred by the equitable doctrine of laches.

6. The laches doctrine dictates that "those who sleep on their rights, lose them." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999). Specifically, laches will bar relief in the face of: "(1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom." *Id.* (citing *Cannon v. Univ. of Health Sciences/Chi. Med. Sch.*, 710 F.2d 351, 359 (7th Cir. 1983)).

7. Defendants hereby incorporate the above Paragraphs 1–4 in support of this defense.

8. Plaintiffs demonstrated an unreasonable lack of diligence in bringing their claims. As set forth in support of Defendants' statute of limitations defense, the challenged conduct that underlies Plaintiffs' claims occurred between eight and thirteen years ago. *See, e.g.*, Compl. ¶ 16. Likewise, the specific facts Plaintiffs cite in support of their claims were publicly available long ago. *See, e.g.*, Compl. ¶¶ 13, 359, 376, 379, 381-82, 384-85. Yet, Plaintiffs sat on their allegations for years, causing Defendants to continue to deal with Plaintiffs in the same manner, to their prejudice. This unreasonable lack of diligence in raising their claims bars them now.

9. Accordingly, the equitable principles embodied in the laches doctrine bar Plaintiffs from seeking relief at this delayed juncture.

## THIRD DEFENSE

10. Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

11. The precise set of facts Plaintiffs cite in support of their claims were made public long ago. Defendants hereby incorporate the above Paragraphs 1–4 in support of this defense.

668

12.     Defendants relied in good faith, and to their detriment, on Plaintiffs' actions in continuing to purchase chicken without complaint.

13.     Defendants had no knowledge of Plaintiffs' alleged Complaints or means to discover these Complaints.

14.     Plaintiffs' claims are therefore estopped.

## FOURTH DEFENSE

15.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

16.     The precise set of facts Plaintiffs cites in support of their claims were made public more than four years ago. Defendants hereby incorporate the above Paragraphs 1–4 in support of this defense.

17.     Plaintiffs' conduct in continuing to purchase chicken at what they now allege are inflated prices is evidence of an intention to waive any right to bring this suit and was inconsistent with any intention other than to waive their right to bring suit.

18.     Plaintiffs, by their actions, accepted the benefits of an ongoing relationship with Defendants and relinquished their right to bring suit.

## FIFTH DEFENSE

19.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to exercise reasonable care to mitigate any damages they may have suffered.

20.     The precise set of facts Plaintiffs cite in support of their claims were made public more than four years ago. Defendants hereby incorporate the above Paragraphs 1–4 in support of this defense.

21.     To the extent Plaintiffs believed that Defendants had unfairly increased the price of chicken by agreeing to cut chicken production, Plaintiffs had an obligation to mitigate their damages by seeking other sources of supply, including from other producers.

22.     Any effect of an alleged difference between the Georgia Dock and other price indexes were readily observable and could have been easily mitigated by Plaintiffs insisting on the use of other indices or applying a price variance from the Georgia Dock to account for the alleged differential.

23.     To the extent Plaintiffs allege that the price of chicken was unfairly manipulated through the use of indices, Plaintiffs had an obligation to renegotiate contracts to use different indices or no index at all in the pricing.

24.     Plaintiffs' failure to exercise reasonable care to mitigate damages was the complete or partial cause of any damages Plaintiffs may have suffered.

## SIXTH DEFENSE

25.     Plaintiffs' claims are barred, in whole or in part, to the extent the sales contracts pursuant to which Plaintiffs purchased Broilers contain arbitration clauses or clauses providing a different forum for the resolution of their claims. *See, e.g., Cont'l Ins. Co. v. M/V Orsula*, 354 F.3d 603 (7th Cir. 2003); *West Shore Pipe Line Co. v. Associated Electric & Gas Ins. Services, Ltd.*, 791 F. Supp. 200 (N.D. Ill. 1992).

26.     Plaintiffs' claims are barred, in whole or in part, to the extent to the sales contracts and/or agreements pursuant to which Plaintiffs purchased Broilers contain limitations and/or repose periods during which they must have brought their claims, but failed to bring their claims within those periods.

27.     Plaintiffs' claims are barred, in whole or in part, to the extent the sales contracts and/or agreements pursuant to which Plaintiffs purchased Broilers limits damages recoverable on their claims.

## SEVENTH DEFENSE

28.     Plaintiffs' claims include allegations that one or more Defendants made public statements about changes needed in alternative fuel mandates under federal law.

29.     These mandates increased usage of corn and other animal feed used to produce alternative fuels, and thereby greatly increased feed costs incurred by Producer Defendants for live Broiler operations.

30.     Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs seek to impose liability on Defendants based on the exercise of any person or entity's right to petition federal, state, and local legislative bodies, including through public statements, because such conduct was immune under the *Noerr-Pennington* doctrine and privileged under the First Amendment to the U.S. Constitution. Protected activities include, without limitation, participation in trade associations seeking legislative and administrative remedies and lobbying activities related to the establishment of rules and procedures for Georgia Dock reporting and the effect of ethanol requirements on grain prices.

## EIGHTH DEFENSE

31.     Plaintiffs' claims are barred, in whole or in part, to the extent they seek improper multiple damage awards, and damage awards duplicative of those sought in other actions, in violation of the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution.

## NINTH DEFENSE

32.     Without admitting any unlawful or unfair conduct, and specifically denying the same, Plaintiffs' claims are barred, in whole or in part, due to the ratification of, and consent to, the conduct of Defendants.

33.     Defendants hereby incorporate the above Paragraphs 1–4 in support of this defense.

34.     Plaintiffs' Complaint relies on publicly available information—much of which has been available for years—thereby demonstrating their long-standing ratification of and consent to the complained-of conduct.

35.     For example, Plaintiffs have known for more than a decade whether certain Broiler producers participate in and receive reports from Agri Stats. *See*, *e.g.*, Compl. ¶ 359 (stating that on "a January 28, 2008 earnings call … disclosed that the company had re-joined Agri Stats."). Yet, rather than complain of Broiler producers' use of Agri Stats reports, Plaintiffs did the opposite: they silently reaped the benefits of the reports' pro- competitive effects for years. Specifically, Plaintiffs reap the benefits of increased competition, lower cost products, and more efficiently produced Broilers.

36.     Plaintiffs also benefit from Defendants' visits to each other's production complexes. Like Agri Stats reports, these pro-competitive visits lead to more efficiency, lower costs, and superior products in the Broiler industry.

37.     Likewise, Plaintiffs benefit from Defendants' participation in trade association meetings and other industry events. These meetings and events promote, among other issues, lobbying efforts, regulations, industry safety, animal health, and training and education.

38.     To the extent that Plaintiffs purchased Broilers based on the Georgia Dock Index or otherwise allege any injury based on Georgia Dock-based pricing, Plaintiffs knew about and consented to industry use of the Georgia Dock Index. The Georgia Dock Index was publicly accessible online, making any deviation between the Georgia Dock and other price indices—including Urner Barry—readily available to Plaintiffs.

39.     Accordingly, because Plaintiffs have been aware for years of the very same conduct they now challenge—much of which has provided Plaintiffs a direct benefit—Plaintiffs' claims are barred by the doctrine of ratification.

**TENTH DEFENSE**

40.     Without admitting the existence of any contract, combination, or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, by non-settling Defendants' right to set off any amounts paid to Plaintiffs by any Defendants who have settled, or do settle, Plaintiffs' claims against them in this action.

**ELEVENTH DEFENSE**

41.     Without admitting the existence of any contract, combination, or conspiracy in restraint of trade, and expressly denying the same, Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs entered into cost-plus contracts with parties who purchased from Plaintiffs before Plaintiffs began paying any purported overcharge.

**TWELFTH DEFENSE**

42.     Plaintiffs' claims are barred, in whole or in part, by the Filed Rate Doctrine.

43.     Under the Filed Rate Doctrine, rates that are filed with or regulated by state or federal agencies are per se reasonable and unassailable in judicial proceedings brought by ratepayers.

44.     The Georgia Dock Index was compiled and issued by the Georgia Department of Agriculture, and the results were further published and promulgated by the United States Department of Agriculture. To the extent that Plaintiffs seek damages for purchase of Broilers based on the Georgia Dock Index or otherwise alleges any injury based on Georgia Dock-based pricing, Plaintiffs' claims are barred by the Filed Rate Doctrine.

## THIRTEENTH DEFENSE

45.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have failed to state a claim upon which relief can be granted.

## FOURTEENTH DEFENSE

46.     Plaintiffs' claims are barred, in whole or in part, by the state action doctrine.

47.     The state action doctrine exempts from antitrust claims conduct of private parties that is undertaken pursuant to a clearly articulated policy to displace competition with regulation and that is actively supervised by the state.

48.     The Georgia Dock program was undertaken and administered by the Georgia Department of Agriculture ("GDA") pursuant to its statutory authority and a cooperative agreement between the GDA and the United States Department of Agriculture ("USDA"). To the extent Plaintiffs assert or seek to imply that the Georgia Dock Defendants violated the antitrust laws by providing prices to the GDA pursuant to the Georgia Dock program, by an officer's acceptance of the Georgia Commissioner of Agriculture's appointment of him to the Poultry Market News Advisory Committee, or by his participating in activities of such advisory committee undertaken under the supervision of the GDA, such claims are precluded under the state action doctrine.

49.     States in which Producer Defendants grow and process broiler breeder and chicken flocks have statutes and rules that regulate many aspects of these operations, including, without limitation, for wastewater restriction, air permitting, monitoring, detection, medical treatment, processing for slaughter, reporting, and communication with other broiler chicken producers about the health status of broiler breeder and chicken flocks.

50.     Each state actively supervises conduct of private parties pursuant to the state's statutes, regulations, and rules that apply to operations for growing and processing broiler breeder and chicken flocks.

51.     The state action doctrine bars Plaintiffs' claims, in whole or in part, to the extent the claims are based on conduct of Defendants pursuant to these state statutes, regulations, and rules, including without limitation any alleged conduct related to wastewater restriction, air permitting, monitoring, detection, medical treatment, processing for slaughter, reporting, and communication with other broiler chicken producers about the health status of broiler breeder and chicken flocks.

## FIFTEENTH DEFENSE

52.     Plaintiffs' claims are barred, in whole or in part, because any alleged injuries and damages were not legally or proximately caused by any acts or omissions of Defendants and/or were caused, if at all, solely and proximately by the conduct of Plaintiffs or other persons including, without limitation, the prior, intervening, or superseding conduct of Plaintiffs or other persons.

## SIXTEENTH DEFENSE

53.     Plaintiffs' claims are barred, in whole or in part, to the extent any Defendants' actions, conduct, or practices including but not limited to its production, line speed, or processing that are the subject of the Complaint were regulated, compelled, and/or mandated by government authority, including, but not limited to, the USDA.

## SEVENTEENTH DEFENSE
### (Asserted by Defendant Harrison Poultry)

54.     Harrison Poultry expressly denies the existence of any alleged conspiracy relating to Georgia Dock prices, production cuts, or any other matter of competitive significance, and further denies its participation in any such conspiracy.

55.     Harrison Poultry informed the Georgia Department of Agriculture in January 2016 that it would cease participation in the Georgia Dock, and the participants of the Georgia Dock were aware of this fact.

56.     If there had been such a conspiracy related to Georgia Dock prices, Harrison Poultry's decision to stop submitting price quotes to the Georgia Department of Agriculture and the resignation of its representative on the Poultry Market News Advisory Committee in January 2016 would have constituted a withdrawal from the alleged conspiracy.

57.     As a result of such withdrawal, if any conspiracy related to the Georgia Dock had occurred, Harrison Poultry would be insulated from any liability for conduct occurring or damages incurred following the withdrawal in January 2016.

## EIGHTHTEENTH DEFENSE
### (Asserted by Defendant Pilgrim's Pride Corporation)

58.     To the extent that Plaintiff's causes of action against Pilgrim's arise from, or rely on, any fact, event, omission, liability, or damage that occurred before December 28, 2009, such causes of action are barred and enjoined by the confirmation order (ECF No. 4399) entered by the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division in the case styled *In re Pilgrim's Pride Corp. et al.*, Case No. 08-45664-MXM.

**NINETEENTH DEFENSE**

59.     Plaintiffs' claims, whether held directly or obtained through assignment, are barred, in whole or in part, to the extent those claims have been released as to Defendants.

**TWENTIETH DEFENSE**

60.     Plaintiffs' claims, whether held directly or obtained through assignment, are barred, in whole or in part, to the extent those claims are barred as to Defendants by res judicata.

**DEFENSES TO FEDERAL RICO AND STATE LAW CLAIMS**

**TWENTY-FIRST DEFENSE**

61.     Without admitting the existence of any alleged wrongful conduct, Plaintiffs' negligence or fault bars some of Plaintiffs' claims, in whole or in part, and diminishes Plaintiffs' right to recovery, if any. To the extent Plaintiffs' damages, if any, were caused in part by Plaintiffs' negligence or fault, Plaintiffs' claims are barred by the doctrine of contributory negligence or fault. Plaintiffs' recovery, if any, should be diminished by the proportion of Plaintiffs' own negligence or other fault, if any, under the doctrine of comparative negligence or fault.

**TWENTY-SECOND DEFENSE**

62.     Plaintiffs' claims are barred to the extent Plaintiffs have alleged violations of a state's laws in which the Plaintiff does not reside.

**TWENTY-THIRD DEFENSE**

63.     Some or all of Plaintiffs' state-law claims cannot be brought against Defendants for a lack of jurisdiction. For instance, the laws of certain states, including, without limitation, Alabama, Utah and West Virginia, are not intended to, and do not, apply to conduct occurring outside of those states.

64.     Many of the state laws allegedly giving rise to Plaintiffs' claims do not apply because the alleged conduct did not occur within or substantially affect the citizens or commerce of the respective states (as required in, for instance and without limitation, California, Illinois,

Maine, Minnesota, Mississippi, North Carolina, Rhode Island, South Carolina, Tennessee, Utah, and Wisconsin) or because Defendants had no specific intent to impact the commerce of those states. As a result, the application of those state laws to Defendants conduct would violate the Due Process Clauses and Commerce Clause of the U.S. Constitution, the principle of federalism, the constitutions and laws of the respective states at issue.

65.    To the extent that the Complaint seeks to assert claims or obtain relief on behalf of indirect purchasers located outside of the jurisdictions governed by those laws, those claims are barred as improper assertions of extraterritorial jurisdiction and any effort to enforce those laws as to residents of other states would violate the Due Process Clause and the Commerce Clause of the U.S. Constitution and various state laws and constitutions.

**TWENTY-FOURTH DEFENSE**
**(Asserted by the Georgia Dock Defendants)**

66.    Without admitting the existence of any alleged wrongful conduct, some of the state-law and federal RICO claims are barred, in whole or in part, because Defendants did not authorize, request, command, perform, or recklessly tolerate the commission of any alleged wrongdoing.

**TWENTY-FIFTH DEFENSE**
**(Asserted by the Georgia Dock Defendants)**

67.    Some of the state-law and federal RICO claims are barred, in whole or in part, because of the "Georgia Dock Defendants" genuine and reasonable good faith belief that they communicated true and accurate information to the Georgia Department of Agriculture or, to the extent they communicated with their customers about the Georgia Dock, their customers.

68.    At all times, Defendants acted in good faith and in compliance with all applicable laws and regulations.

## TWENTY-SIXTH DEFENSE

69.     The unjust enrichment claims certain Plaintiffs' attempt to bring in Count XIII and Count XIX are barred because Plaintiffs failed to clearly state under which laws or which states they wish to bring these claims.

70.     Such failure makes it impossible to know under which jurisdictions Plaintiffs wish to proceed and what Plaintiffs need to allege to state a claim under the state-specific unjust enrichment laws.

71.     Plaintiffs' claims are barred, in whole or in part, to the extent unjust enrichment claims are unavailable to indirect purchasers under the particular state laws on which Plaintiffs rely.  Plaintiffs' unjust enrichment claims are barred because certain states do not permit Plaintiffs to convert an antitrust claim into an unjust enrichment claim.

## TWENTY-SEVENTH DEFENSE

72.     Some of Plaintiffs' claims fail if, and to the extent, a binding and enforceable contract exists between Plaintiffs and Defendants. Furthermore, the terms of any such contract may bar some or all of Plaintiffs' claims.

## TWENTY-EIGHTH DEFENSE

73.     Plaintiffs' claims are barred, in whole or in part, by the pass-on defense because, to the extent that any alleged overcharge (the existence of which Defendants deny) was absorbed, in whole or in part, by others downstream in the chain of production, processing, distribution, and sale of broiler products, Plaintiffs suffered no injury.

74.     Furthermore, some Plaintiffs lack standing to assert indirect-purchaser claims under the state and federal laws at issue.

**TWENTY-NINTH DEFENSE**

75.     Some of Plaintiffs' state-law claims are barred, in whole or in part, to the extent Plaintiffs seek damages under state laws (including, without limitation, Illinois) that do not permit recovery of damages by private Plaintiffs.

**THIRTIETH DEFENSE**

76.     Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs failed to comply with the notice requirements under various state laws, including, without limitation, Arizona, California, and Rhode Island.

**THIRTY-FIRST DEFENSE**

77.     Plaintiffs' claim for damages and relief, including a "full consideration" remedy, would result in unjust enrichment, an uncompensated taking, and a violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and the constitutions of certain states, including, without limitation, Tennessee and Wisconsin.

**THIRTY-SECOND DEFENSE**

78.     Plaintiffs' claims under the Alabama Antitrust Law §§ 6-5-60, et. seq. (Count XXXII), are barred, because the statute only applies to intrastate conduct. Because the alleged conspiracy is nationwide, the alleged conduct is not purely intrastate.

**THIRTY-THIRD DEFENSE**

79.     Although Defendants deny any wrongdoing, Plaintiffs' claims under the Virginia Consumer Protection Act (Count XLV) are barred to the extent any alleged violation was unintentional. For example, to the extent an independent manufacturer or distributor perpetuated the alleged illegal conduct, Defendants are not liable for that conduct. *See* Va. Code. Ann. § 59.1-207.

## THIRTY-FOURTH DEFENSE

80.     Some or all of Plaintiffs' claims, including, without limitation, those state-law claims brought under the laws of California, are barred because all of Defendants' conduct challenged by Plaintiffs was lawful, fair, non-deceptive, expressly authorized by law, justified, and pro-competitive; it constituted a bona fide business practice consistent with industry practices and was carried out in furtherance of legitimate business interests; and it was an essential part of Defendants' lawful business operations.

## THIRTY-FIFTH DEFENSE

81.     Plaintiffs' claims are barred, in whole or in part, to the extent particular state laws only allow consumers to assert claims under the statutes at issue.

## THIRTY-SIXTH DEFENSE

82.     Plaintiffs' claims are barred, in whole or in part, to the extent particular state laws only allow natural persons to assert claims under the statutes at issue.

## THIRTY-SEVENTH DEFENSE

83.     Plaintiffs' claims are barred, in whole or in part, to the extent particular state laws cannot be used to enforce alleged antitrust violations.

## THIRTY-EIGHTH DEFENSE

84.     Plaintiffs' unjust enrichment claims are barred to the extent that Plaintiffs have unclean hands.

85.     The law requires that those seeking equity must do equity.

86.     Thus, a Plaintiff that seeks equitable relief must have clean hands.

87.     Plaintiffs have unclean hands to the extent that they were not honest in their dealings with any Defendant, acted in breach of any of the laws under which they bring their claims, or otherwise engaged themselves in any of the conduct that Plaintiffs allege subjects any Defendant to liability.

## THIRTY-NINTH DEFENSE
### (Asserted by Defendant Harrison Poultry and Mar-Jac)

88.    To the extent their claims sound in fraud, Plaintiffs have failed to plead their claims with particularity as required by Federal Rule of Civil Procedure 9(b).

89.    Plaintiffs do not specifically allege any false statements or misrepresentations made by Harrison Poultry or Mar-Jac, and further do not specifically allege that they purchased Broilers from Harrison Poultry or Mar-Jac during the Relevant Period.

90.    Neither Harrison Poultry nor Mar-Jac owed any duty of disclosure to Plaintiffs. Plaintiffs do not allege *any* commercial relationship between Plaintiffs and either of them, much less one that would impose a fiduciary duty on either Harrison Poultry or Mar-Jac.

91.    These general allegations are insufficient to meet the heightened pleading standard of Rule 9(b), which at minimum requires Plaintiffs to plead "the time, place, and content of the alleged false representations." *Dremco, Inc. v. Diver*, No. 12 C 8703, 2013 WL 1873917 at *3 (N.D. Ill. May 3, 2013).

## FOURTIETH DEFENSE
### (Asserted by Defendant Harrison Poultry)

92.    Plaintiffs' federal and state RICO claims are barred, in whole or in part, because Plaintiffs lack standing to bring these claims against Harrison Poultry.

93.    To establish standing with respect to these claims, Plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged." *See, e.g., Gas Tech. Inst. v. Rehmat*, No. 05 C 2712, 2006 WL 3422190 at *12 (N.D. Ill. Nov. 27, 2006) (federal RICO claims). "[M]ulti-step causal chain[s]" are often insufficient because "the relationship between injury and injurious conduct is not direct." *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 713 (11th Cir. 2014). Predicate acts directed at a third party, as opposed to the Plaintiff, are generally too indirect to meet the causation standard. *See Sidney Hillman Health Ctr. of Rochester v. Abbott*

*Labs. & Abbvie Inc.*, 192 F. Supp. 3d 963, 967–72 (N.D. Ill. 2016), *aff'd sub nom. Sidney Hillman Health Ctr. of Rochester v. Abbott Labs*, 873 F.3d 574 (7th Cir. 2017).

94.     Harrison Poultry did not sell Broilers to most Plaintiffs during the Relevant Period and did not make any fraudulent representations to Plaintiffs.  Furthermore, Harrison Poultry did not base the price of Broiler sales to its customers on the Georgia Dock price during the Relevant Period.

95.     Harrison Poultry's alleged predicate acts do not have a direct relation with Plaintiffs alleged damages.  Harrison Poultry's price information was submitted to the Georgia Department of Agriculture and not to Plaintiffs, and Harrison Poultry's submitted prices were reflected only indirectly (if at all) in the Georgia Dock prices disseminated by the Georgia Department of Agriculture.

96.     Accordingly, there is no direct relationship between Harrison Poultry's actions and Plaintiffs' damages sufficient to maintain standing for their federal or state RICO claims against Harrison Poultry, and any purported damages Plaintiffs allege they have suffered were not proximately caused by any action of Harrison Poultry.

**RESERVATION OF RIGHTS**

The defenses that must be affirmatively stated in a pleading per Federal Rule of Civil Procedure 8 are affirmative defenses referenced in Rule 8(c). ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including [identified defenses]."). To the extent Plaintiffs take a different position, Defendants state that the Complaint fails to state a claim upon which relief can be granted and fails to allege various elements of the cited claims, as discussed in part in All Defendants' Motion to Dismiss and supporting papers (Dkt. Nos. 279, 280). Plaintiffs have not provided admissible evidence establishing the accuracy of the statements

in the Complaint and in many cases, the statements are directly contradicted by evidence of market conditions and other facts, as reflected in Defendants' answers to specific allegations. Defendants reserve all rights to amend or seek to amend their affirmative defenses pursuant to Federal Rule of Civil Procedure 15. Finally, to the extent that any of the defenses above are found to be defenses but not affirmative defenses, Defendants identify them as such.

## JURY DEMAND

Pursuant to the Federal Rules of Civil Procedure 38, Defendants demand a trial by jury of all claims and defenses upon which they are entitled to a jury trial.

## PRAYER FOR RELIEF

Defendants request that Plaintiffs' Complaint be dismissed with prejudice, that the Court find that Plaintiffs are not entitled to any judgment or relief, that the Court enter judgment in favor of Defendants, and that the Court award Defendants their attorneys' fees, costs, and expenses, prejudgment interest, and such other and further relief as the Court deems just and proper.

March 8, 2021

Respectfully submitted,

| WEIL GOTSHAL & MANGES LLP | VENABLE LLP |
|---|---|
| By: */s/ Carrie C. Mahan* | By: /s/ *Douglas Baldridge* |
| Carrie C. Mahan (#459802) | J. Douglas Baldridge (#437678) |
| Christopher J. Abbott (#1014487) | Lisa Jose Fales (admitted *pro hac vice*) |
| S. Nicole Booth (admitted *pro hac vice*) | Danielle Foley (admitted *pro hac vice*) |
| Drew K. Cypher (admitted *pro hac vice*) | Andrew Hernacki (admitted *pro hac vice*) |
| 2001 M Street N.W., Ste. 600 | 600 Massachusetts Avenue, NW |
| Washington, D.C. 20036 | Washington, DC 20001 |
| Telephone: (202) 682-7000 | Telephone: (202) 344-4000 |
| Facsimile: (202) 857-0940 | Facsimile: 202-344-8300 |
| carrie.mahan@weil.com | jdbaldridge@venable.com |
| christopher.abbott@weil.com | ljfales@venable.com |
| nicole.booth@weil.com | drfoley@venable.com |
| drew.cypher@weil.com | athernacki@venable.com |
| | |
| EIMER STAHL LLP | FALKENBERG IVES LLP |
| | |
| Michael L. McCluggage (#01820966) | Kirstin B. Ives |
| 224 South Michigan Avenue, Ste. 1100 | 30 N. LaSalle St., Ste 4020 |
| Chicago, IL 60604 | Chicago, IL 60602 |
| Telephone: (312) 660-7665 | Telephone: (312) 566-4803 |
| Facsimile: (312) 692-1718 | Facsimile: (312) 566-4810 |
| mmccluggage@eimerstahl.com | kbi@ffilaw.com |
| | |
| *Attorneys for Defendant Pilgrim's Pride Corporation* | *Attorneys for Defendants Perdue Farms, Inc. and Perdue Foods LLC* |

By: /s/ *John W. Treece*

John W. Treece (#3122889)
1135 West Montana Street
Chicago, IL 60614
Telephone: (312) 961-7808
jtreece@jwtreece.com

ROSE LAW FIRM

Amanda K. Wofford (admitted *pro hac vice*)
Bourgon Reynolds (admitted *pro hac vice*)
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131
Facsimile: (501) 375-1309
awofford@roselawfirm.com
breynolds@roselawfirm.com

*Attorneys for Defendants Mountaire Farms*
*Inc., Mountaire Farms, LLC and Mountaire*
*Farms of Delaware, Inc.*

MAYER BROWN LLP

By: /s/ *Carmine R. Zarlenga*

Carmine R. Zarlenga (#90784529)
William H. Stallings (admitted *pro hac vice*)
Stephen M. Medlock (admitted *pro hac vice*)
Oral D. Pottinger (admitted *pro hac vice*)
1999 K Street N.W.
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
czarlenga@mayerbrown.com
wstallings@mayerbrown.com
smedlock@mayerbrown.com
opottinger@mayerbrown.com

*Attorneys for Defendant Foster Farms, LLC*
*and Foster Poultry Farms, a California*
*Corporation*

VEDDER PRICE P.C.

By: /s/ *Gregory G. Wrobel*
Gregory G. Wrobel (#3122900)
222 N. LaSalle Street
Chicago, IL 60601
Telephone: (312) 609-7722
Facsimile: (312) 609-5005
gwrobel@vedderprice.com

JORDAN PRICE WALL GRAY JONES & CARLTON, PLLC

Henry W. Jones, Jr. (admitted *pro hac vice*)
1951 Clark Avenue
Raleigh, NC 27605
Telephone: (919) 828-2501
Facsimile: (919) 834-8447
hjones@jordanprice.com

*Attorneys for Defendant House of Raeford Farms, Inc.*

PROSKAUER ROSE LLP

By: /s/ *Christopher E. Ondeck*
Christopher E. Ondeck (admitted *pro hac vice*)
Stephen R. Chuk (admitted *pro hac vice*)
1001 Pennsylvania Ave., NW, Ste 600 South
Washington, DC 20004
Telephone: (202) 416-6800
Facsimile: (202) 416-6899
condeck@proskauer.com
schuk@proskauer.com

*Attorneys for Wayne Farms LLC*

KIRKLAND & ELLIS LLP

By: /s/ *Daniel E. Laytin, P.C.*
Daniel E. Laytin, P.C.
Christa C. Cottrell, P.C.
Stacy Pepper
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
dlaytin@kirkland.com
ccottrell@kirkland.com
stacy.pepper@kirkland.com

*Attorneys for Defendants Sanderson Farms,*
*Inc., Sanderson Farms, Inc. (Foods Division),*
*Sanderson Farms, Inc. (Processing Division),*
*and Sanderson Farms, Inc. (Production*
*Division)*

VAUGHAN & MURPHY

By: /s/ *Charles C. Murphy, Jr.*
Charles C. Murphy, Jr. (admitted *pro hac*
*vice*)
690 S Ponce Court NE
Atlanta, GA 30307
Telephone: (404) 667-0714
Facsimile: (404) 529-4193
cmurphy@vaughanandmurphy.com

WINSTON & STRAWN LLP

James F. Herbison
Michael P. Mayer
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
jherbison@winston.com
mmayer@winston.com

*Attorneys for Defendant Norman W. Fries,*
*Inc. d/b/a Claxton Poultry Farms*

KUTAK ROCK LLP

By: /s/ *John P. Passarelli*
John P. Passarelli (admitted *pro hac vice*)
James M. Sulentic (admitted *pro hac vice*)
1650 Farnam Street
Omaha, NE 68102
Telephone: (402) 346-6000
Facsimile: (402) 346-1148
john.passarelli@kutakrock.com
james.sulentic@kutakrock.com

J.R. Carroll (admitted *pro hac vice*)
Jeffrey M. Fletcher (admitted *pro hac vice*)
234 East Millsap Road, Ste 200
Fayetteville, AR 72703-4099
Telephone: (479) 973-4200
Facsimile: (479) 973-0007
jr.caroll@kutakrock.com
Jeffrey.fletcher@kuakrock.com

Kimberly M. Hare (#6323326)
One South Wacker Drive, Ste 2050
Chicago, IL 60606-4614
Telephone: (312) 602-4100
Facsimile: (312) 602-4101
kimberly.hare@kutakrock.com

*Attorneys for Defendants O.K. Foods, Inc.,*
*O.K. Farms, Inc., and O.K. Industries, Inc.*

EDWARD C. KONIECZNY LLC

By: /s/ *Edward C. Konieczny*
Edward C. Konieczny (admitted *pro hac vice*)
1201 Peachtree Street, NE, Ste 1501
Atlanta, GA 30361
Telephone: (404) 380-1430
Facsimile: (404) 382-6011
ed@koniecznylaw.com

SMITH, GAMBRELL & RUSSELL, LLP

David C. Newman (admitted *pro hac vice*)
Wm. Parker Sanders (admitted *pro hac vice*)
1230 Peachtree Street, N.E.
Promenade, Ste 3100
Atlanta, GA 30309
Telephone: (404) 815-3500
Facsimile: (404) 815-3509
dnewman@sgrlaw.com
psanders@sgrlaw.com

LYNCH THOMPSON LLP

James L. Thompson
150 S. Wacker Drive, Suite 2600
Chicago, IL 60606
Telephone: (312) 445-4623
Facsimile: (312) 896-5883
jthompson@lynchthompson.com

*Attorneys for Defendants Mar-Jac Poultry,*
*Inc., Mar-Jac Poultry MS, LLC, Mar-Jac*
*Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-*
*Jac Poultry, LLC, Mar-Jac Holdings, Inc.*

SHOOK HARDY & BACON LLP

By: /s/ *Lynn H. Murray*
Lynn H. Murray
111 S. Wacker Dr., Ste 4700
Chicago IL 60606
Telephone: (312) 704-7700
Facsimile: (312) 558-1195
lhmurray@shb.com

Laurie A. Novion( admitted *pro hac vice*)
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
lnovion@shb.com

CONNER & WINTERS

John R. Elrod (admitted *pro hac vice*)
Vicki Bronson (admitted *pro hac vice*)
4375 N. Vantage Drive, Ste. 405
Fayetteville, AR 72703
Telephone: (479) 582-5711
jelrod@cwlaw.com
vbronson@cwlaw.com

*Attorneys for Defendant Simmons Foods, Inc.*
*and Simmons Prepared Foods Inc.*

JOSEPH D. CARNEY & ASSOCIATES LLC

By: /s/ *Joseph D. Carney*
Joseph D. Carney (admitted *pro hac vice*)
OFFICE ADDRESS:
139 Crocker Park Boulevard, Ste. 400
Westlake, OH 44145
MAILING ADDRESS:
1540 Peach Drive
Avon, OH 44011
Telephone: 440-249-0860
Facsimile: 866-270-1221
jdc@jdcarney.com
case@jdcarney.com

MILLER SHAKMAN LEVINE &
FELDMAN LLP

Thomas M. Staunton
Daniel M. Feeney
180 North LaSalle Suite 3600
Chicago, IL 60601
Telephone: 312-263-3700
tstaunton@millershakman.com
dfeeney@millershakman.com

D.KLAR LAW

Deborah A. Klar (admitted *pro hac vice*)
2934 1/2 Beverly Glen Circle, Suite 761
Bel Air, CA 90077
Telephone: 310-858-9500
dklar@dklarlaw.com

Paul L. Binder, Esq. (admitted *pro hac vice*)
Attorney at Law
20780 Brandywine
Fairview Park, OH 44126-2805
Telephone: 440-376-6850
binderpl@yahoo.com

*Attorneys for Defendants Case Foods, Inc.,*
*Case Farms, LLC, and Case Farms*
*Processing, Inc.*

690

HOGAN LOVELLS US LLP

By: /s/ *William L. Monts III*
William L. Monts III (admitted *pro hac vice*)
Justin W. Bernick (admitted *pro hac vice*)
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5910
Facsimile: (202) 637-5911
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

MILLER, CANFIELD, PADDOCK, AND
STONE P.L.C.

Jacob D. Koering
225 West Washington Street, Ste 2600
Chicago, Illinois 60606
Telephone: (312) 460-4272
Facsimile: (312) 460-4201
koering@millercanfield.com

*Attorneys for Defendant Agri Stats, Inc.*

EVERSHEDS SUTHERLAND (US) LLP

By: /s/ *Patricia A. Gorham*
James R. McGibbon (admitted *pro hac vice*)
Patricia A. Gorham (admitted *pro hac vice*)
Peter M. Szeremeta (admitted *pro hac vice*)
Kaitlin A. Carreno (admitted *pro hac vice*)
Dylan W. de Fouw (admitted *pro hac vice*)
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street, N.E., Ste 2300
Atlanta, Georgia 30309-3996
Telephone: (404) 853-8000
Facsimile:  (404) 853-8806
jimmcgibbon@eversheds-sutherland.com
patriciagorham@eversheds-sutherland.com
peterszeremeta@eversheds-sutherland.com
kaitlincarreno@eversheds-sutherland.com
dylandefouw@eversheds-sutherland.com

Ronald Balfour
SMITH AMUNDSEN LLC
150 N. Michigan Avenue, Ste 3300
Chicago, Illinois 60601
Telephone: (312) 894-3369
Facsimile: (312) 997-1816
rbalfour@salawus.com

*Attorneys for Defendant Harrison Poultry,
Inc.*

691

STINSON LLP

By: /s/ *William Greene*
William L. Greene (admitted *pro hac vice*)
Peter J. Schwingler (admitted *pro hac vice*)
Kevin P. Kitchen (admitted *pro hac vice*)
50 South Sixth Street, Ste 2600
Minneapolis, MN 55402
Telephone: (612) 335-1500
william.greene@stinson.com
peter.schwingler@stinson.com
kevin.kitchen@stinson.com

J. Nicci Warr
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105 Telephone:
(314) 259-4570
nicci.warr@stinson.com

John C. Martin
SUGAR FELSENTHAL GRAIS &
HELSINGER LLP
30 N. LaSalle Street, Suite 3000
Chicago, IL 60602
Telephone: (312) 704-2172
jmartin@sfgh.com

THE LAW GROUP OF NORTHWEST
ARKANSAS LLP

Gary V. Weeks (admitted *pro hac vice*)
K.C. Dupps Tucker (admitted *pro hac vice*)
Kristy E. Boehler (admitted *pro hac vice*)
1830 Shelby Lane
Fayetteville, AR 72704
Telephone: (479) 316-3760
gary.weeks@lawgroupnwa.com
kc.tucker@lawgroupnwa.com
kristy.boehler@lawgroupnwa.com

*Attorneys for Defendants George's, Inc. and George's Farms, Inc.*

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: /s/ *Lara Flath*
Boris Bershteyn (admitted *pro hac vice*)
Lara Flath (#6289481)
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
boris.bershteyn@skadden.com
lara.flath@skadden.com

Patrick Fitzgerald (#6307561)
Gail Lee
Peter Cheun
155 N. Wacker Drive
Chicago, IL 60606
Telephone: (312) 407-0700
Facsimile: (312) 407-0411
patrick.fitzgerald@skadden.com
gail.lee@skadden.com
peter.cheun@skadden.com

*Attorneys for Defendant Peco Foods, Inc.*

ALSTON & BIRD LLP

By: /s/ *Valarie C. Williams*
B. Parker Miller (pro hac vice)
Valarie C. Williams (pro hac vice)
Max Marks (pro hac vice)
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
parker.miller@alston.com
valarie.williams@alston.com
max.marks@alston.com

SMITH, GILLIAM, WILLIAMS & MILES
PA

Brendan J. Healey
Baron Harris Healey
225 W. Washington St., Ste. 2200
Chicago, IL 60606
312.741.1030
bhealey@BHHLawFirm.com
R. Brent Hatcher, Jr. (pro hac vice)
301 Green Street NW, Suite 200
Gainesville, GA 30501
Telephone:  (770) 536-3381
Facsimile:  (770) 535-9902
bhatcher@sgwmfirm.com

*Attorneys for Fieldale Farms Corporation*

AXINN, VELTROP & HARKRIDER LLP

By: /s/ *Rachel J. Adcox*
Rachel J. Adcox (#1001488)
Daniel K. Oakes (admitted *pro hac vice*)
Kenina J. Lee (admitted *pro hac vice*)
950 F Street NW, Ste 700
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
radcox@axinn.com
doakes@axinn.com
klee@axinn.com

John M. Tanski (admitted *pro hac vice*)
Jarod G. Taylor (admitted *pro hac vice*)
90 State House Square
Hartford, CT 06103
Telephone: (860) 275-8100
Facsimile: (860) 275-8101
jtanski@axinn.com
jtaylor@axinn.com

Nicholas E.O. Gaglio (admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Facsimile: (212) 261-5654
ngaglio@axinn.com

Jordan M. Tank
LIPE LYONS MURPHY NAHRSTADT &
PONTIKIS, LTD.
230 West Monroe, Street, Ste 2260
Chicago, IL 60606
Telephone: (312) 702-0586
Facsimile: (312) 726-2273
jmt@lipelyons.com

*Attorneys for Defendants Tyson Foods, Inc.,
Tyson Chicken, Inc., Tyson Breeders, Inc.,
Tyson Poultry, Inc., Keystone Foods LLC,
Equity Group Eufaula Division, LLC, Equity
Group Kentucky Division LLC, Equity Group
– Georgia Division LLC*

DYKEMA GOSSETT PLLC

By: /s/ *Howard B. Iwrey*
Howard B. Iwrey
39577 Woodward Ave, Ste. 300
Bloomfield Hills, MI 48304
Telephone: 248-203-0526
Facsimile: 248-203-0763
hiwrey@dykema.com

Steven H. Gistenson
10 South Wacker Drive, Ste. 2300
Chicago, IL 60606
Telephone: 312-627-2267
Facsimile: 312-876-1155
sgistenson@dykema.com

Dante A. Stella
400 Renaissance Center
Detroit, MI 48243
Telephone: 313-568-6693
Facsimile: 313-568-6893
dstella@dykema.com

Cody D. Rockey
2723 South State Street, Ste. 400
Ann Arbor, MI 48104
Telephone: 734-214-7655
Facsimile: 734-214-7696
crockey@dykema.com

*Attorneys for Defendant Amick Farms, LLC*

NOVACK AND MACEY LLP

By: /s/ Stephen Novack
Stephen Novack
Stephen J. Siegel
Christopher S. Moore
100 North Riverside Plaza
Chicago, IL 60606
Telephone: (312) 419-6900
Facsimile: (312) 419-6928
snovack@novackmacey.com
ssiegel@novackmacey.com
cmoore@novackmacey.com

*Attorneys for Defendants Koch Foods
Incorporated, JCG Foods of Alabama LLC,
JCG Foods of Georgia LLC and Koch Meat
Co., Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 8, 2021, the foregoing document was served via CM/ECF on all counsel of record.

*/s/ Carrie C. Mahan*
Carrie C. Mahan
