**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | Case No.: 1:16-cv-08637 |
| | The Honorable Thomas M. Durkin |
| This Document Relates To: | Magistrate Judge Jeffrey T. Gilbert |
| The Direct Purchaser Plaintiff Action | **<u>PUBLIC REDACTED VERSION</u>** |

**DIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR
CLASS CERTIFICATION**

951531 2

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..............................................................................................1

II.   ARGUMENT ....................................................................................................2

    A.    Defendants Concede that DPPs Meet Almost All of the Elements of Rule 23. ......2

    B.    Defendants' Opposition Ignores DPPs' Conspiracy Evidence and is Predicated on Merits-Based Attacks that Have No Bearing on Class Certification. ......................................................................................................3

    C.    Defendants' Attacks on Predominance Do Not Defeat Class Certification. ..........9

        1.    The Central Elements of DPPs' Claim—the Existence of the Conspiracy, Impact, and Damages—Will be Shown With Classwide Proof. .....................................................................................10

        2.    Dr. Carter's Damages Model is Sound, Reliable, and Consistent with Models Relied on to Certify Classes in Similar Price Fixing Class Actions. .................................................................................11

        3.    Defendants Misrepresent the Structural Break Test Utilized by Dr. Carter...............................................................................................13

            (a)    Defendants' Attempt to Use the Structural Break as a Stand-In for Dr. Carter's Damages Model is Flawed and Misleading...................................................................................14

            (b)    Defendants' Attempt to Stretch *Comcast* to Fit this Case is Without Precedent and Should be Rejected....................................18

            (c)    Defendants' Argument that the Structural Break Analysis "Dooms" Dr. Carter's Entire Analysis is Without Merit..............22

        4.    Defendants' Attacks on Dr. Carter's Damages Model are Without Merit...............................................................................................23

            (a)    Defendants' Attacks on the Variables in Dr. Carter's Damages Model Do Not Support Denial of Class Certification. .................................................................................23

            (b)    Defendants' Attempt to Undermine Dr. Carter's Damages Model with Hundreds of Sub-Regressions is Improper and Unconvincing.....................................................................31

            (c)    Defendants' Claim of "Absurd Results" is Based on Their Fundamentally Flawed Analysis.................................................34

        5.    DPPs and Dr. Carter Have Satisfied the Standard for Common Impact. ...............................................................................................35

            (a)    Defendants' Common Impact Critique Ignores Established Precedent.......................................................................................36

(b)     Dr. Carter's Statistical Tests Confirm Common Impact................37

6.     Defendants' Attack on Individual Damages has no Support in Law or Fact ..........................................................................................39

III.     CONCLUSION....................................................................................................39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06-MD-1175(JG)(VVP), 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ..........................9

*Allen v. Dairy Mktg. Servs., LLC*,
No. 09-230, 2013 WL 6909953 (D. Vt. Dec. 31, 2013) ........................................................38

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) ................................................................................16, 21, 22

*Am. Sales Co., LLC v. Pfizer, Inc.*,
No. 2:14-CV-361, 2017 WL 3669604 (E.D. Va. July 28, 2017) ...........................................39

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997) .............................................................................................................10

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
568 U.S. 455 (2013) ......................................................................................................3, 4, 6

*In re Blood Reagents Antitrust Litig.*,
MDL No. 09-2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) .................................. *passim*

*In re Capacitors Antitrust Litig.*,
No. 17-md-02801-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ............................ *passim*

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
308 F.R.D. 606 (N.D. Cal. 2015) .........................................................................................31

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
MDL No. 1917, 2013 WL 5428139 (N.D. Cal. June 20, 2013) ................................29, 32, 33

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......................................................................................... *passim*

*In re Credit Default Swaps Antitrust Litig.*,
No. 13-MD-2476 DLC, 2014 WL 4379112 (S.D.N.Y. Sep. 4, 2014) ......................................6

*D&M Farms v. Birdsong Corp.*,
No. 2:19-CV-463, 2020 WL 7074140 (E.D. Va. Dec. 2, 2020) ...................................9, 11, 36

*DeLoach v. Philip Morris Co.*,
206 F.R.D. 551 (M.D.N.C. 2002) .........................................................................................9

*In re Disposable Contact Lens Antitrust,*
    329 F.R.D. 336 (M.D. Fla. 2018)...................................................................................26, 29

*In re Domestic Drywall Antitrust Litig.,*
    MDL No. 2437, 2017 WL 3623466 (E.D. Pa. Aug. 23, 2017).................................................9

*In re Dynamic Random Access Memory Antitrust Litig.,*
    No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. Jun. 5, 2006) ........................................9

*In re Elec. Books Antitrust Litig.,*
    No. 11 MD 2293 DLC, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014).................................38

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.,*
    No. 09-CV-0852, 2016 WL 3579953 (E.D. Wis. June 24, 2016) .........................................24

*Food Lion, LLC v. Dean Foods Co.,*
    312 F.R.D. 472 (E.D. Tenn. 2016)......................................................................................38

*In re Graphics Processing Units Antitrust Litig.,*
    253 F.R.D. 478 (N.D. Cal. 2008).........................................................................................34

*High Fructose Corn Syrup Antitrust Litig.,*
    295 F.3d 651 (7th Cir. 2002) ............................................................................................4, 6

*Kleen Prod. LLC v. Georgia-Pac. LLC,*
    910 F.3d 927 (7th Cir. 2018) ...............................................................................................21

*Kleen Prods. LLC v. Int'l Paper,*
    306 F.R.D. 594 (N.D. Ill. 2015)................................................................................. *passim*

*Kleen Prods. LLC v. Int'l Paper Co.,*
    831 F.3d 919 (7th Cir. 2016) ...............................................................................3, 9, 36, 37

*Kohen v. Pac. Inv. Mgmt. Co. LLC,*
    571 F.3d 672 (7th Cir. 2009) ...............................................................................................38

*Leegin Creative Leather Prods, Inc. v. PSKS, Inc.,*
    551 U.S. 877 (2007).............................................................................................................4

*In re Lidoderm Antitrust Litig.,*
    No. 14-MD-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ..............................26

*In re Linerboard Antitrust Litig.,*
    305 F.3d 145 (3d Cir. 2002).................................................................................................9

*In re Linerboard Antitrust Litig.,*
    497 F.Supp.2d 666 (E.D. Pa. 2007) ....................................................................................21

*Loeb Indus., Inc. v. Sumitomo Corp.,*
306 F.3d 469 (7th Cir. 2002) ...................................................................31

*Manpower, Inc. v. Ins. Co. of Penn.,*
732 F.3d 796 (7th Cir. 2013) ...................................................................24

*Messner v. Northshore Univ. HealthSystem,*
669 F.3d 802 (7th Cir. 2012) ........................................................... *passim*

*In re Mushroom Direct Purchaser Antitrust Litig.,*
319 F.R.D. 158 (E.D. Pa. 2016)...................................................9, 19, 28

*In re Mushroom Direct Purchaser Antitrust Litig.,*
No. 06-0620, 2015 WL 5767415 (E.D. Pa. July 29, 2015) ...................38

*In re Namenda Direct Purchaser Antitrust Litig.,*
331 F.Supp.3d 152 (S.D.N.Y. 2018)....................................................15, 16

*In re NASDAQ Market-Makers Antitrust Litig.,*
169 F.R.D. 493 (S.D.N.Y. 1996) .............................................................29

*In re Nexium Antitrust Litig.,*
777 F.3d 9 (1st Cir. 2015).........................................................................9

*In re Optical Disk Drive Antitrust Litig.,*
No. 3:10-MD-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) .........31, 32, 33

*In re OSB Antitrust Litig.,*
No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) .........................9

*In re Packaged Seafood Prod. Antitrust Litig.,*
332 F.R.D. 308 (S.D. Cal. 2019) ....................................................... *passim*

*In re Photochromic Lens Antitrust Litig.,*
No. 8:10-CV-00984, 2014 WL 1338605 (M.D. Fla. Apr. 3, 2014)..........34

*Ploss as Tr. for Harry Ploss Tr. DTD 8/16/1993 v. Kraft Foods Grp., Inc.,*
431 F.Supp.3d 1003 (N.D. Ill. 2020) .......................................................20

*In re Polyester Staple Antitrust Litig.,*
MDL 3:03CV1516, 2007 WL 2111380 (W.D.N.C. July 19, 2007) ..........9

*In re Polypropylene Carpet Antitrust Litig.,*
93 F.Supp.2d 1348 (N.D. Ga. 2000).........................................................16

*In re Polyurethane Foam Antitrust Litig.,*
No. 1:10 MD 2196, 2014 WL 6461355 (N.D. Ohio Nov. 17, 2014)........24

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
    MDL No. 2328, 2016 WL 2756437 (E.D. La. May 12, 2016)...............................................16

*In re Processed Egg Prod. Antitrust Litig.*,
    312 F.R.D. 171 (E.D. Pa. 2015)....................................................................... *passim*

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    292 F.Supp.3d 14 (D.D.C. 2017).......................................................................22, 38

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013).............................................................................38

*In re Ready-Mixed Concrete Antitrust Litig.*,
    261 F.R.D. 154 (S.D. Ind. 2009)...........................................................................26

*In re Rubber Chems. Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005)............................................................................9

*Saltzman v. Pella Corp.*,
    257 F.R.D. 471 (N.D. Ill. 2009).............................................................................4

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008) ................................................................................9

*In re Steel Antitrust Litig.*,
    No. 08 C 5214, 2015 WL 5304629 (N.D. Ill. Sept. 9, 2015)...........................................22, 34

*In re Suboxone (Buprenorphine Hydrochorine & Naloxone) Antitrust Litig.*,
    967 F.3d 264 (3d Cir. 2020)................................................................................19

*Suchanek v. Sturm Foods, Inc.*,
    311 F.R.D. 239 (S.D. Ill. 2015) ............................................................................39

*In re Sulfuric Acid Antitrust Litig.*,
    743 F.Supp.2d 827 (N.D. Ill. 2010) .........................................................................4

*In re Sulfuric Acid Antitrust Litig.*,
    No. 03 C 4576, 2007 WL 898600 (N.D. Ill. Mar. 21, 2007) .................................................26

*In re Syngenta AG MIR 162 Corn Litig.*,
    No. 14-MD-2591, 2016 WL 5371856 (D. Kan. Sept. 26, 2016) ............................................15

*In re Syngenta AG MIR 162 Corn Litig.*,
    No. 14-MD-2591, 2017 WL 1738014 (D. Kan. May 4, 2017)..............................................16

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010)...........................................................................26

*In re Titanium Dioxide Antitrust Litig.*,
284 F.R.D. 328 (D. Md. 2012) ...............................................................9

*In re Urethane Antitrust Litig.*,
768 F.3d 1245 (10th Cir. 2014) ...............................................9, 10, 15, 22

*In re Vitamin C Antitrust Litig.*,
279 F.R.D. 90 (E.D.N.Y. 2012) .............................................................9

*In re Vitamins Antitrust Litig.*,
209 F.R.D. 251 (D.D.C. 2002) ...............................................................9

*In re Zetia (Ezetimibe) Antitrust Litig.*,
No. 2:18-md-2836, 2020 WL 4917625 (E.D. Va. Aug. 21, 2020) .........................31

**Rules**

Federal Rule of Civil Procedure 23 ................................................... *passim*

**Other Authorities**

American Bar Association Section of Antitrust Law, *Proving Antitrust Damages:
Legal and Economic Issues* (3rd ed. 2017) .............................................33

Haider, Laila, John H. Johnson, and Gregory K. Leonard, "Turning Daubert on Its
Head: Efforts to Banish Hypothesis Testing in Antitrust Class Actions." 30
ABA Antitrust 53 (Spring 2016) ...........................................................32

John D. Jackson and Sarah J. Skinner, *On Valuing the Price Effect of a Conspiracy
in Price-Fixing Cases*, Journal of Forensic Economics 17, no. 2 (2004) ...............25

| INDEX OF DEFINED TERMS | |
|---|---|
| **Defined Term** | **Meaning** |
| Broilers | The term "Broiler" or "Broilers" refer to chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards. Fifth Amended and Consolidated Class Action Complaint (ECF Nos. 3919 (Redacted) and 3935 (Unredacted)) ¶ 110. |
| Carter Reply | Reply Report of Colin A. Carter, Ph.D., in support of DPPs' Motion, filed concurrently herewith. |
| Carter Report | Report of Colin A. Carter, Ph.D., in support of DPPs' Motion, ECF Nos. 3962-44 (Redacted) and 3990-122 (Unredacted). |
| Class, Class Period | DPPs' proposed Class and Class Period is defined in their opening Memorandum in support of the Motion, ECF No. 3962 (redacted) at 26, which refers in relevant part to: "All persons who purchased raw Broilers directly from any of the Defendants or their respective subsidiaries or affiliates either fresh or frozen, in the form of: wholebirds (with or without giblets), whole cut-up birds, or parts (boneless or bone in) derived from the front half of the whole bird, for use or delivery in the United Statesfrom December 1, 2008 until July 31, 2019." |
| Johnson Report | Report of John H. Johnson in support of Defendants' Opposition, ECF Nos. 4216-2 (Redacted) and 4234-2, 6 (Unredacted with Appendix). |
| Motion, Mot. | DPPs' Memorandum of Points and Authorities in support of Class Certification, ECF Nos. 3962 (Redacted) and 3990 (Unredacted). |
| Opposition, Opp. | Defendants' Opposition to DPPs' Motion, 4210 (Redacted) and 4209 (Unredacted). |
| Pouya Dec., Ex. | Declaration of Bobby Pouya in support of DPPs' Motion, 3962-1. Unless otherwise noted, all references to "Ex." in this brief refer to the Exhibits attached to the Declaration of Bobby Pouya in support of the Motion. |
| Pouya R. Dec. | Declaration of Bobby Pouya in support of this reply, filed concurrently herewith. |

## I.     INTRODUCTION

Direct Purchaser Plaintiffs ("DPPs") have shown they meet the requirements for class certification under Federal Rule of Civil Procedure 23. In their Opposition, Defendants do not dispute that DPPs have satisfied all the requirements of Rule 23(a) and that a class action is a superior method to adjudicate this lawsuit. Regarding predominance, the only battleground in this case, DPPs have shown that evidence common to the class, in the form of documents, testimony, and expert testimony, can be used to prove or disprove the three central elements of their claim— that Defendants violated the Sherman Act; that members of the DPP Class suffered impact or antitrust injury; and the amount of resulting damages. Thus, at trial, common questions of law and fact will predominate over any individual issues, and DPPs' proposed Class should be certified.

Defendants glaringly ignore the voluminous record evidence that supports not only Plaintiffs' allegations of Defendants' illegal and anticompetitive conduct, but also the intended and resulting impact of that conduct, *i.e.*, artificially inflated prices for Broilers. By so doing, Defendants concede that the first central element of DPPs' claim—whether Defendants' anticompetitive conduct violated the Sherman Act—will be shown with proof common to all Class members. Instead, their challenge to predominance is limited to attacking the opinions of DPPs' expert, Dr. Colin A. Carter, an award-winning and internationally-recognized expert in agricultural economics. Defendants' arguments rely almost entirely on the opinions of their expert, Dr. John Johnson, IV, who specializes in preparing defense reports and testimony in opposition to antitrust class actions.[1] Unlike Dr. Carter, Dr. Johnson has no expertise in agricultural economics and his opinions here solely criticize plaintiffs' experts, rather than being based on any original work. Dr.

Johnson's attempts to undermine the plaintiffs' experts have been rejected by numerous courts. They should be similarly rejected in this case, where Dr. Carter utilized a well-established multi-variate regression model which controls for non-collusive supply and demand factors and isolates the effect of the conspiracy on Broiler prices. Dr. Carter's damages model is sound, reliable, and consistent with models accepted by many courts in certifying classes in antitrust price-fixing cases.

Recognizing that Dr. Carter's damages model is robust, Defendants and Dr. Johnson instead direct the majority of their attacks at the structural break analysis, which Dr. Carter used to help establish the Class Period in conjunction with the record evidence and DPPs' allegations. Courts have upheld the method used by Dr. Carter, and no court has held that the methodology for determining the class period is a basis to defeat class certification. Defendants' challenges to the structural break test rest entirely on a misrepresentation of the test and its purpose; and their attempt to misuse it as a stand-in for Dr. Carter's damages model is fundamentally flawed.

Moreover, Dr. Johnson's attempt to undermine Dr. Carter's damages model by using hundreds of sub-regressions, all of which use a small fraction of the data used by Dr. Carter, is a tactic described by Dr. Johnson himself as "data mining." Dr. Johnson's "sub-regression" technique generates false results *by design*, by slicing and dicing data for no purpose other than to mask common impact. In fact, Dr. Johnson's flawed methods would mask common impact even when there is known anticompetitive behavior.

## II.     ARGUMENT

### A.     Defendants Concede that DPPs Meet Almost All of the Elements of Rule 23.

Defendants' Opposition concedes that the proposed Class satisfies almost all elements of Rule 23. Namely, Defendants do not dispute that the Class is sufficiently numerous under Rule 23(a)(1); that common question of law and fact exist under Rule 23(a)(2); that the named DPPs' claims are typical of the class members under Rule 23(a)(3); that the named plaintiffs and their

counsel adequately represent the Class under Rule 23(a)(4); nor that a class action is the superior means of adjudicating this case, rather than thousands of individual lawsuits under Rule 23(b)(3). Moreover, Defendants' argument against predominance is limited to the expert report submitted by Dr. Carter. They have put all their eggs in one basket. Therefore, because Defendants' attacks on Dr. Carter are without merit, their Opposition must fail.

**B.**     **Defendants' Opposition Ignores DPPs' Conspiracy Evidence and is Predicated on Merits-Based Attacks that Have No Bearing on Class Certification.**

A pervasive theme in Defendants' Opposition and Dr. Johnson's rebuttal is their presentation of a counter-factual argument: that the conduct which Plaintiffs allege was collusive is instead explained by difficult "macroeconomic factors" (*see* Opp. at 35).[2] However, the evidence that Defendants present regarding these common pervasive "macro-economic" factors (*see* Opp. at 35), is common to the Class. Therefore, this argument is entirely consistent with the core issue at class certification; which is whether or not Defendants' alleged illegal collusion, and the resulting impact and damages can be *proven or disproven* with common classwide evidence. *See Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 470 (2013) ("'a fatal similarity— [an alleged] failure of proof as to an element of the plaintiffs' cause of action.' … is properly addressed at trial or in a ruling on a summary-judgment motion. The allegation should not be resolved in deciding whether to certify a proposed class."). Class certification is not the stage in the case where the court makes ultimate merits determinations. *See Amgen*, 568 U.S. at 470; *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) ("the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits."); *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 931 (7th Cir. 2016) ("*Kleen*") ("the fact that class

---

[2] While Defendants use the term "perfect storm" to attempt to justify all of their conduct during the Class Period, ████████████████████████████████████████████████████████

certification decisions must be supported by evidence does not mean that certification is possible only for a party who can demonstrate that it will win on the merits."); *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 475 (N.D. Ill. 2009). At class certification, Plaintiffs need only show that their claims can be resolved with evidence predominantly common to the Class. *Amgen*, 568 U.S. at 465-66; *see also Messner*, 669 F.3d at 818.

In addition to being suitable for classwide treatment, Defendants' argument also fails because conspiring in response to difficult market conditions is no defense to a *per se* price fixing claim. *See, e.g., In re Sulfuric Acid Antitrust Litig.*, 743 F.Supp.2d 827, 870-871 (N.D. Ill. 2010) ("an unforgiving market offers no excuse for violating antitrust laws."); *Leegin Creative Leather Prods, Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007) ("[a] horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price [which] is, and ought to be, *per se* unlawful."). In fact, such conspiracies are often hatched during times when the participants feeling the squeeze of market downturns. *Id.*; *see also High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 657 (7th Cir. 2002) (Declining prices or profits in a market make "price competition more than usually risky and collusion more than usually attractive."). As the Court recognized in denying Defendants' motions to dismiss, "[t]he circumstances underlying Defendants' alternative innocent explanation also serve to make a price fixing conspiracy more likely." ECF No. 541 ("MTD Order") at 48.

The classwide nature of Defendants' arguments and their legal insufficiency undermine their merits-based attacks on the DPP Motion. Although discovery is still ongoing, DPPs have supported their Motion with extensive classwide evidence that will be used to prove the conspiracy, including "deposition testimony, telephonic and electronic communications, and documents, which will prove the claims of all Class Members." *See* Mot. at 33-34. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Defendants will claim their coordinated actions were motivated by difficult market conditions (another classwide issue).

In addition to being a classwide issue, any such defense is

irrelevant anyway, because even well-intentioned conspiracies are *per se* violations of the Sherman Act. *See High Fructose Corn Syrup*, 295 F.3d at 657; *In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476 DLC, 2014 WL 4379112, at *11 (S.D.N.Y. Sep. 4, 2014) ("The financial crisis hardly explains the alleged secret meetings and coordinated actions").



Defendants do not address this evidence, nor do they dispute that all of this evidence is common to the Class. Thus, it is ironic that Defendants and Dr. Johnson accuse Dr. Carter of putting his "head in the sand" while engaging in such purposeful ignorance. *See* Opp. at 28; *see also* Johnson Dep. 263:17-264:5, 441:8-441:24 (claiming he may have heard about the criminal price fixing charges in the Broiler industry on "Law 360" rather than during his four-year engagement in this case, for a portion of which his firm has billed over $6.6 million). In any event, Defendants' improper counter-narrative is not only irrelevant at this stage, it *is common to the Class*—and therefore cannot defeat class certification. *Amgen*, 568 U.S. at 470.



However, none of these previous corn price cycles or recessions were marked with the Broiler supply reductions such as the ones that Defendants undertook market-wide during the Class Period. *See id*. These industry dynamics also establish that the proper measure of Broiler supply and demand is based on *industry-wide*

*production* which dictates the amount of chicken available in the market. Carter Reply ¶¶ 15, 18, 105-110.

Defendants' argument that their individual production data disproves the existence of a conspiracy is also without merit. This argument merely repeats their failed motion to dismiss argument, that there could not have been a conspiracy unless Defendants engaged in identical production restraints at identical times. *See* MTD Order at 24-27. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ █████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

Therein lies the weakness of Defendants' claim that class certification should denied because their conduct was "lawful." *See* Opp. at 28. This ultimate merits determination is premature at the class certification stage. Rather, the question now before the Court is whether DPPs' claims are capable of common proof. The answer to that question is yes; and Defendants

---

[8] *See* Carter Reply ¶ 58, listing the following acquisitions: Simmons (Peterson Farms, 2008), Foster Farms (Pilgrim's Farmerville Plant, 2009), Koch (Cagle's Inc., 2012), George's (Tyson Foods Plant, 2011), Peco (Townsends, 2011), and Case Farms (Park Farms, 2012).

fail to explain why this case, set in a consolidated market with commodity products, should be treated differently than the legion of horizontal price-fixing cases that have been certified.[9]

## C.   **Defendants' Attacks on Predominance Do Not Defeat Class Certification.**

Predominance is typically met where "there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis[.]" *See In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 262 (D.D.C. 2002). In antitrust class actions the predominance inquiry is focused on "two points: whether common methods of proof can be used to demonstrate the existence of the alleged collusion and its effect on prices in the [ ] market; and whether the existence and impact of any such collusion predominate over other factors that may affect an individual plaintiff's damages." *Kleen*, 831 F.3d at 926. DPPs have presented extensive common evidence of conspiracy, in the Motion and this reply. Defendants simply ignore this common evidence and instead exclusively lob unsupported attacks on the DPP expert, Dr. Carter. Defendants' attempt to undermine predominance in this case arising from prototypical *per se* price fixing conduct has no support and should be rejected in this case as it has in numerous others. *See* n.8, *supra*.

---

[9] *See, e.g., Kleen*; *Messner*; *In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015); *In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 148 (3d Cir. 2002); *D&M Farms v. Birdsong Corp.*, No. 2:19-CV-463, 2020 WL 7074140 (E.D. Va. Dec. 2, 2020); *In re Capacitors Antitrust Litig.*, No. 17-md-02801-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018); *In re Domestic Drywall Antitrust Litig.*, MDL No. 2437, 2017 WL 3623466 (E.D. Pa. Aug. 23, 2017); *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158 (E.D. Pa. 2016); *In re Blood Reagents Antitrust Litig.*, MDL No. 09-2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175(JG)(VVP), 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90 (E.D.N.Y. 2012); *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328 (D. Md. 2012); *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007); *In re Polyester Staple Antitrust Litig.*, MDL 3:03CV1516, 2007 WL 2111380 (W.D.N.C. July 19, 2007); *In re Dynamic Random Access Memory Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. Jun. 5, 2006); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002); *DeLoach v. Philip Morris Co.*, 206 F.R.D. 551 (M.D.N.C. 2002).

1.    **The Central Elements of DPPs' Claim—the Existence of the Conspiracy, Impact, and Damages—Will be Shown With Classwide Proof.**

As DPPs explained in the Motion, they are not solely relying on Dr. Carter to prove the conspiracy. Rather, common proof of the conspiracy includes "deposition testimony, telephonic and electronic communications, and documents, which will prove the claims of all Class Members." *See* Motion, Sections III(D)(1)(a) (entitled "Common proof will be used to show the existence of the conspiracy"), III(D)(3) (presenting the DPP trial plan which states: "DPPs intend to focus on testimony and documents proving Defendants' unlawful conduct."). None of this evidence will vary between Class members. DPPs' plan to use common evidence, including depositions and documents, to demonstrate the existence of a conspiracy has been endorsed in numerous cases. *See, e.g., Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 594 (N.D. Ill. 2015) ("*Kleen Prods.*") ("[W]hether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the prerequisite in Rule 23(b)(3).") (quoting 7AA Wright & Miller, Federal Practice & Procedure § 1781 (3d Ed. 2014)); *Messner*, 669 F.3d at 815; *Urethane*, 768 F.3d at 1254-56 ("courts have regarded the existence of a conspiracy as the overriding issue even when the market involves diversity in products, marketing, and prices.").

In addition to this common classwide conspiracy evidence, Dr. Carter has presented a well-established and widely-accepted methodology for calculating damages and proving common impact caused by Defendants' conspiracy. *See* Motion at 34. This is consistent with his role, which is to conduct economic analyses and opine on economic conditions affecting the Broiler market, damages and common impact. *See Capacitors*, 2018 WL 5980139, at *8 (stating Defendants'

expert Dr. Johnson's remarks do not account for the other sources of evidence that the Court has considered in assessing issues of classwide proof. *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 171, 194 (E.D. Pa. 2015) ("Defendants will certainly be able to argue at summary judgment or at trial that the alleged conspiracy here was not successful in restricting supply and therefore that the observed price increase in Dr. Rausser's model is not attributable to the conspiracy. But that is a common question as to the merits of Plaintiffs' claims.").

The same is true here. Defendants can argue at summary judgment or trial that their supply restrictions and manipulation of the Georgia Dock were not part of a conspiracy, or that individual Defendants did not join the conspiracy (all of which, if shown, would be common to all class members). However, if DPPs prove the conspiracy, Dr. Carter's damages model, economic analysis of the Broiler market and other statistical tests establish that common impact and damages both can be proven with classwide evidence.

2.      **Dr. Carter's Damages Model is Sound, Reliable, and Consistent with Models Relied on to Certify Classes in Similar Price Fixing Class Actions.**

Demonstrating antitrust impact for class-certification purposes does not require that Plaintiffs prove antitrust impact. Instead, Plaintiffs need "'only to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Messner*, 669 F.3d at 818 (citation omitted). Moreover, "'the issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove [classwide impact.]'" *D&M Farms*, 2020 WL 7074140, at *8 (quoting *Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 88 (D. Conn. 2009)). In other words, whether the expert has "practiced a generally accepted method for determining antitrust impact, or whether his work was 'junk science' akin to predicting criminality by feeling the bumps on a person's head." *Capacitors*, 2018 WL 5980139,

at *6; *see also In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308, 344 (S.D. Cal. 2019) ("[A]ll that is necessary is that the EPPs put forward 'a sufficient basis from which to conclude that [the EPPs] would adduce common proof concerning the effect of Defendants' alleged price-fixing conspiracy.'").



---

[10] The term "Broiler chicken" is relevant here as because the class is comprised of a particular type of chicken "Broilers" which are raised for the sole purpose of human consumption.

[REDACTED]

Defendants and Dr. Johnson do not dispute that multi-variate regression analysis is a generally accepted method for calculating damages and determining antitrust impact. Rather, their criticisms rely on misrepresentations of Dr. Carter's methodology, misapplication of the law, and data manipulations. As set forth in detail below, Defendants' attacks on Dr. Carter are without merit and should be rejected by this Court, as they have been by numerous others.

**3.      Defendants Misrepresent the Structural Break Test Utilized by Dr. Carter.**

Recognizing that Dr. Carter's damages model is well-specified, Defendants instead primarily attack the structural break test used by Dr. Carter to help establish the Class and Benchmark Periods, *in conjunction with* the record evidence and DPPs' allegations. [REDACTED]

[REDACTED]

███████████████████████████████████████████████████

████████████████████████████████████

####   (a)   <u>Defendants' Attempt to Use the Structural Break as a Stand-In for Dr. Carter's Damages Model is Flawed and Misleading.</u>

Ignoring the purpose and well-accepted design of the structural break test, Defendants and Dr. Johnson attempt to substitute the structural break test for Dr. Carter's damages model. As defense counsel admitted during Dr. Carter's deposition, they know better than this:



Defendants' attack on Dr. Carter's use of a structural break test to assist in determining the Class Period fails as a matter of law. There is "no authority for excluding an expert's damages model" based on a challenge to the methodology used by plaintiffs and their experts for determining the class period in antitrust class actions. *Blood Reagents*, 2015 WL 6123211, at *12; *Kleen Prods.*, 306 F.R.D. at 603 ("Defendants cite no authority for disregarding an expert's methodology because he relied upon the class period as alleged in an amended complaint.").

Indeed, numerous courts explicitly reject this attack on class certification motions. *See Blood Reagents*, 2015 WL 6123211, at *12 ("The Court rejects this argument. The Court concludes that this challenge implicates the weight a jury may give [the expert's] testimony"); *Kleen Prods.*, 306 F.R.D. at 603 ("To the extent Defendants' arguments [regarding the class period] are relevant, they go to the weight a jury might give Dr. Dwyer's testimony, not its reliability or admissibility."); *Urethane*, 768 F.3d at 1263 (defendant's "benchmark–shopping argument does not implicate the reliability of [expert's] methodology"); *Packaged Seafood*, 332 F.R.D. at 326 (rejecting Dr. Johnson's attacks regarding "the narrowing of the class period is based on [the expert's] analysis of the record evidence" and consultation with counsel, because "the Court sees this as bolstering the reliability of the model.").

Utilization of the structural break test, in conjunction with the record evidence and DPPs' allegations, presents a sound and reliable means to determine the Class Period. ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████

The structural break test has also been accepted as a means to determine the class period in other litigation. *See In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591, 2016 WL 5371856, at *10 (D. Kan. Sept. 26, 2016) (relying on Dr. Carter's structural break analysis to establish benchmark and class periods); *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F.Supp.3d 152 (S.D.N.Y. 2018) (rejecting the argument that plaintiffs' expert's structural break test "fails because it does not isolate the cause" of the break, because as plaintiffs' expert explained, "the test was not designed to do so."). Dr. Carter is particularly qualified to use the structural break

test because he has successfully used the test in his research, a peer reviewed award winning article regarding in a leading economics journal, and in prior litigation. *See* Carter Reply ¶¶ 94-98.

Conversely, Defendants have cited *no case* rejecting the use of a structural break test to determine the class period. The only case that Defendants cite in support of their critique did not address structural break analysis or criticize the methodology for determining the class period *at all*. *See In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 56 (S.D.N.Y. 2020). The absence of authority supporting Defendants' attack on the structural break test speaks volumes. Courts have also rejected Defendants' argument that Dr. Carter's structural break test is improper because it was performed on industry-wide production data. *See In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591, 2017 WL 1738014, at *19 (D. Kan. May 4, 2017) (ruling that defendant's arguments that Dr. Carter's analysis used improper data and "failed to consider and disaggregate other possible causes of the structural break" goes to "the weight of the opinions and may be argued to the jury."); *Namenda*, 331 F.Supp.3d at 177 (rejecting the argument that the structural break "test fails because it utilizes market-wide data rather than purchaser-specific information."); *In re Polypropylene Carpet Antitrust Litig.*, 93 F.Supp.2d 1348, 1368 (N.D. Ga. 2000) (denying motion to exclude expert testimony because econometricians need not "choose firm-specific data over industry-wide indices [even] when such data is available"); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, MDL No. 2328, 2016 WL 2756437, at *11 (E.D. La. May 12, 2016) (holding firm-specific data is not necessarily more appropriate than industry-wide data in expert analysis).

While Defendants extensively discuss their individual production data, they do not dispute that Dr. Carter correctly executed his structural break test. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████





[11]

In sum, Defendants' attacks on Dr. Carter's structural break analysis cannot undermine Dr. Carter's damages model. Defendants' claim that the structural break test cannot be used to determine the Class Period is baseless, as is their objection to the use of USDA data to run the test.

**(b)** **Defendants' Attempt to Stretch *Comcast* to Fit this Case is Without Precedent and Should be Rejected.**

Defendants also argue that class certification should be denied because Dr. Carter's structural break analysis fails under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Again, Defendants' argument is predicated on attempting to conflate the structural break analysis with Dr.

---

[11] The DPPs subpoenaed USDA to obtain the USDA production data in a disaggregated format. The USDA objected to the subpoena on the basis of statutes that protect the disclosure of such data, and further informed DPPs that the disaggregated data had been destroyed. *See* Pouya R. Dec. ¶ 3, Ex. 14.

Carter's damages model. As Defendants know, Dr. Carter's damages model includes several supply and demand factors to isolate the impact of the conspiracy.

As with their attacks on the structural break analysis, Defendants fail to cite any case in which a methodology to determine the class period gave rise to a successful *Comcast* challenge. *Comcast* provides no support for such an argument. In *Comcast*, the plaintiffs brought a class action alleging that the defendant engaged in anticompetitive efforts to gain market share and restrict competition in the Philadelphia cable market. *Comcast*, 569 U.S. at 29. In moving for class certification, the plaintiffs presented four theories of antitrust impact, and a damages model which did not isolate damages resulting from any one of the four theories. *Id.* at 31-32. The district court accepted one theory of antitrust impact as capable of classwide proof and rejected the rest. *Id.* The Supreme Court reversed class certification and held that predominance was not satisfied because "only [one] theory of antitrust impact [was] accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." *Id.* at 35. However, the Supreme Court recognized "[t]his methodology might have been sound, and might have produced commonality of damages, if all four of those alleged distortions remained in the case." *Id.* at 37.

Consistent with the Supreme Court's guidance, courts have repeatedly rejected *Comcast* challenges where, as here, the damages model is consistent with the plaintiffs' theory or theories of liability. *See, e.g., In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 270 (3d Cir. 2020) (rejecting defendant's *Comcast* attack because plaintiffs allege "the totality of [defendant's] actions, such as raising prices, withdrawing tablets from the market, providing rebates only for film, disparaging the safety of tablets, and delaying the generics' entry by filing a citizen petition and not cooperating in the REMS process, suppressed generic competition and thus violated the antitrust laws."); *Mushroom*, 319 F.R.D. at 207 ("The problem

in *Comcast* was that not all of the theories of antitrust impact underlying the plaintiffs' damages calculations survived at class certification.... I am not faced with the same problem here, as both the supply control and price fixing claims remain in this case."); *Ploss as Tr. for Harry Ploss Tr. DTD 8/16/1993 v. Kraft Foods Grp., Inc.*, 431 F.Supp.3d 1003, 1018 (N.D. Ill. 2020) ("Unlike the plaintiff in *Comcast*, however, Ploss asserts only one theory of liability that cuts across the entire class, and it is the theory of liability on which Pirrong based the event studies."); *Blood Reagents*, 2015 WL 6123211, at *33 ("Plaintiffs have set forth this single theory of liability from the outset of the litigation, and Dr. Beyer's damages methodologies, which measure the damages incurred as a result of the alleged price fixing conspiracy, match plaintiffs' theory of liability").

There is no *Comcast* issue in this case, where the Court explicitly denied Defendants' attempt to dismiss DPPs' theories of liability—that Defendants agreed to cut supply and manipulate the Georgia Dock—for the purpose and intent of raising Broiler prices in violation of the Sherman Act. Dr. Carter's damages model is consistent with DPPs' theories of liability, and includes supply and demand variables (*i.e.*, control variables) for each of the "macro economic indicators" which Defendants claim are missing. *See* Opp. at 27-28.

███████████████████████████████████████████████████████████; *Kleen*

*Prod. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 940 (7th Cir. 2018) (holding that defendant's claim

that supply reductions occurred under the oversight of bankruptcy court do not overcome the

inference of conspiracy given that [the] supply behavior could not be undone easily").[13] In sum,

Dr. Carter's "econometric damages model 'separate[s] lawful from unlawful conduct'" because it

"properly controls for exogenous factors." *In re Linerboard Antitrust Litig.*, 497 F.Supp.2d 666,

674 (E.D. Pa. 2007).

Recognizing that they cannot make a meritorious *Comcast* attack on Dr. Carter's damages

model, Defendants again misuse the structural break test as a stand-in. But there is no legal support

for a *Comcast* attack on the methodology used to determine the start of a class period. Thus, it is

not surprising that the cases relied upon by Defendants are distinguishable and do not support their

*Comcast* argument. Indeed, *Aluminum* explicitly recognized that the proof of the conspiracy was

a predominant issue that did not rely on expert evidence, stating:

> [t]he Court easily finds, by a preponderance, that proof of the alleged
> conspiracy is a common issue, susceptible to classwide proof. Such
> proof may consist of evidence of written and oral communications
> among defendants and the actions taken by and at the behest of
> defendants in alleged furtherance of the scheme.

336 F.R.D. at 44. However, the court in *Aluminum* found that the *damages model* did not isolate

the impact of the conspiracy because the alleged conspiracy was "decidedly idiosyncratic" and

"the causal mechanism alleged here departs from the paradigmatic or 'traditional' price fixing

---

[13] 

conspiracy." *Id*. The other cases cited by Defendants fare no better. *In re Steel Antitrust Litig.*, No. 08 C 5214, 2015 WL 5304629, at *10 (N.D. Ill. Sept. 9, 2015) (rejecting defendants' *Comcast* argument because plaintiffs' damages model was consistent with their supply restriction theory of liability.); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F.Supp.3d 14, 127-28 (D.D.C. 2017) (upholding plaintiffs' structural break analysis, but denying certification based because a substantial portion of the class were subject to legacy contracts and were not subjected to the alleged conspiratorial fuel charges).

Defendants' claim that Dr. Carter's damages model must focus on production, rather than prices, is also flawed and must be rejected. *See Processed Egg*, 312 F.R.D. at 194 ("The Court rejects the broad notion that the failure to measure the supply effects of the conspiracy—separate and apart from the price effects of the conspiracy—alone defeats the reliability of the model. Antitrust impact and damages are ultimately concerned with whether plaintiffs paid higher prices.") (citing *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d at 594-95).

**(c)** **Defendants' Argument that the Structural Break Analysis "Dooms" Dr. Carter's Entire Analysis is Without Merit.**

As set forth above, in addition to the structural break, Dr. Carter determined the Class Period based on his review of the record evidence and DPPs' allegations. *See* Section II.B *supra*. Dr. Carter's use of the structural break analysis is supported by his review of the record and reliance on DPPs' allegations. Numerous cases support the establishment of a class period based on review of the record and Plaintiffs' allegations. *Blood Reagents*, 2015 WL 6123211, at *12; *Kleen Prods.*, 306 F.R.D. at 603; *Urethane*, 768 F.3d at 1263. Indeed, had Dr. Carter not used the structural break test, Defendants would have likely attacked him based the absence of a statistical test. Moreover, Defendants have not presented any alternative start date for the Class Period.

Therefore, Defendants' argument that their attacks on the structural break "dooms" Dr. Carter's entire analysis is inaccurate and should be rejected.[14]

### 4. Defendants' Attacks on Dr. Carter's Damages Model are Without Merit

After ignoring Dr. Carter's damages model for most of their Opposition, Defendants finally address it on page 41 of their brief. Importantly, Defendants do not level any *Comcast* arguments against Dr. Carter's damages model. Defendants further concede (as they must) that the multi-variate regression model employed by Dr. Carter is a well-established means of calculating damages in an antitrust conspiracy lawsuit. Instead, Defendants and Dr. Johnson assert two lines of attack upon the manner in which Dr. Carter has conducted and applied his multi-variate regression: (1) they claim that Dr. Carter's damages model does not include sufficient explanatory variables (it does); and (2) they attempt to "unpool" Dr. Carter's damages model to undermine the results (they do not). Neither of these attacks support denial of class certification.

### (a) Defendants' Attacks on the Variables in Dr. Carter's Damages Model Do Not Support Denial of Class Certification.

Defendants' and Dr. Johnson's claim that Dr. Carter's damages model uses "bad assumptions" is essentially an argument that Dr. Carter should have included different or additional variables. *See* Opp. at 43. In evaluating this argument, it is essential to consider: (1) the law applicable to disputes regarding the variables in an expert's model; and (2) the design of Dr. Carter's multi-variate regression model.

As numerous courts have recognized, Defendants' criticism of the selection of variables by plaintiffs' expert "is a merits question that the Court does not need to resolve in order to decide

---

14 ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

whether to certify the class." *Kleen Prods.*, 306 F.R.D. at 605; *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 808 (7th Cir. 2013) ("the Supreme Court and this Circuit have confirmed on a number of occasions that the selection of the variables to include in a regression analysis is normally a question that goes to the probative weight of the analysis rather than to its admissibility."); *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, No. 09-CV-0852, 2016 WL 3579953, at *10 (E.D. Wis. June 24, 2016) (holding criticisms "based on the way [plaintiffs' expert] conducted his multiple regression analysis not on his use of regression analysis" do not support a denial of class certification); *Capacitors*, 2018 WL 5980139, at *6 ("The appropriate concerns at this stage are not about the quality of the data Dr. McClave used or whether he included all the potential variables in his model."); *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2014 WL 6461355, at *40 (N.D. Ohio Nov. 17, 2014) ("including or omitting that variable at this stage of the litigation does not alter this Court's predominance analysis.").

As described above (Section II.C.2), Dr. Carter's multi-variate regression model includes sufficient control variables which account for changes in supply and demand affecting Broiler prices. Contrary to Defendants' claim, however, these were not the *only* factors included in Dr. Carter's damages model. *See* Opp. at 43. ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



Dr. Carter's application of a single overcharge in these circumstances is appropriate and supported by sound economic principles and has been accepted in numerous cases. *See* John D. Jackson and Sarah J. Skinner, *On Valuing the Price Effect of a Conspiracy in Price-Fixing Cases*, Journal of Forensic Economics 17, no. 2 (2004): p. 202 (confirming that a single overcharge model is "'an excellent measure of damages in price-fixing cases in both a theoretical and practical sense'"); *see also Kleen Prods.*, 306 F.R.D. at 605 ("[W]here the theory of harm is that the entire market price of a product was inflated as a result of a conspiracy, 'plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages.'") (citing *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th Cir. 2002); *Processed Egg*, 312 F.R.D. at 199 ("Plaintiffs have laid a sufficient foundation for the inferential finding that the impact reflected in the single average overcharge was shared by virtually every class member."); *Packaged Seafood*, 332 F.R.D. at 323 (certifying the class and rejecting defendants' argument that a "single average overcharge masks differences of actual impact across the Class members.").

Defendants' attempt to undermine DPPs damages model by pitting Dr. Carter against the experts for the other two classes of indirect purchasers is flawed and unpersuasive.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ This is especially true as the other

two Plaintiffs' experts represent different indirect purchaser classes. As courts have recognized,

there can be more than one way to determine damages both from a legal and economic perspective.

*See, e.g., In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2017 WL 679367, at *28 (N.D.

Cal. Feb. 21, 2017) (certifying DPP and EPP classes although their experts used different

methodologies).

Defendants' argument that class certification should be denied because Dr. Carter's

damages model includes different size birds is also unavailing. As several courts have recognized,

in certifying cases with much greater market segmentation and complex products, such attempts

at segmentation do not defeat class certification. *In re Disposable Contact Lens Antitrust,* 329

F.R.D. 336, 420 (M.D. Fla. 2018) (rejecting "Defendants' argument that the contact lens market

is highly differentiated and that a common impact from Defendants' alleged conduct cannot be

established"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 603 (N.D. Cal. 2010)

("'variations in products and complexities in a distribution chain do not preclude an estimation of

whether an overcharge impacted end purchasers.'"); *In re Sulfuric Acid Antitrust Litig.*, No. 03 C

4576, 2007 WL 898600, at *8 (N.D. Ill. Mar. 21, 2007) ("[T]hat separate markets exist for different

strengths of sulfuric acid, and that the opportunity-or lack of opportunity-for raising price varies

from market segment to market segment and from region to region" did not defeat common impact

or predominance.); *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 170 (S.D. Ind.

2009) (rejecting defendants' argument that product "differentiation makes the common proof necessary for a class action impossible to establish.").

Defendants' product differentiation argument is particularly unconvincing in this case, because all Class products are parts of a single commodity—Broiler chicken. Notably, the DPP Class excludes further processed products and is limited to whole birds (with or without giblets), whole cut-up birds, or parts (boneless or bone in) derived from the front half of the whole bird. █

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████

In his typical approach to undermining class certification, Dr. Johnson disputes the plain and widely accepted fact that Broiler chicken is a commodity product. But his opinion conflicts with basic economic principles and objective industry statements.[15] Dr. Johnson's biased opinion also conflicts with the sworn testimony of many industry participants who confirmed the common-sense notion that chicken is a commodity.[16] Dr. Johnson's tactic of disputing the commodity nature

---

[15] *See* Pouya R. Dec. Ex. 5, MacDonald, J., USDA Technology, Organization, and Financial Performance in U.S. Broiler Production (2014) p. 26 n.19 ("The products of any single seller are not highly differentiated from those of other sellers, and retailers and importers who buy chicken meat are sophisticated purchasers who buy in large volumes and can easily shift their purchases among sellers."); *Id.* Ex. 6, Economic Research Service Report 2019 (listing Broilers as a commodity with other staples including corn, almonds etc.); *Id.* Ex. 7, University of Georgia, Center for Agribusiness & Economic Development, AG Snapshot (listing Broilers as a top commodity product along with other stables such as cotton and corn); ██████

██████████████████████████████████████████████████████████████████████████████

of staple food products in an attempt to undermine class certification has been rejected in other cases. *See* Pouya R. Dec. Ex. 13, *In re Mushroom Antirust Litig.*, No. 06-cv-620 (E.D. Penn. May 20, 2015) Daubert Hrg. Tr. at 113:14-114:14 (Dr. Johnson disputes the fact that mushrooms are a commodity because there were hundreds of types of mushrooms on a price list); *see also Mushroom*, 319 F.R.D. at 207 (certifying the case over Dr. Johnson's opinion to the contrary). It should also be rejected in this case.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

Defendants' argument that certain "large" Class members may have been able to negotiate lower prices for Broilers than other Class members also does not defeat predominance and has been repeatedly rejected. *In re NASDAQ Market-Makers Antitrust Litig*., 169 F.R.D. 493, 523 (S.D.N.Y. 1996) ("Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that ... the price range was affected generally."); *In re Cathode Ray Tube (CRT) Antitrust Litig*., MDL No. 1917, 2013 WL 5428139, at *10 (N.D. Cal. June 20, 2013) (holding individual discounting does not preclude a finding of predominance: "[A]ll of [the] individualized discounts started from an artificially increased platform . . . . [C]ustomers who obtained [] price discounts would [thus] have paid even lower prices."); *Disposable Contact Lens*, 329 F.R.D. at 386 ("[E]ven if there is considerable individual variety in pricing because of individual price negotiations, class plaintiffs may succeed in proving classwide impact by showing that the minimum baseline for beginning negotiations, or the range of prices which resulted from negotiation, was artificially raised (or slowed in its descent) by the collusive actions of the defendants."). There is nothing unique about the market power dynamics in the Broiler industry which undermine class certification. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



Similarly, Defendants and Dr. Johnson's claim that there are different types of contracts does not support a denial of class certification.

In sum, none of Defendants' attacks on the construction of Dr. Carter's model support the denial of class certification. Each of their criticisms has been rejected in cases in which the court



certified the proposed class under similar circumstances. Defendants have failed to make any showing that Dr. Carter's damages model fails to account for an essential economic factor or that the variables Dr. Carter has included are improper.

      **(b)**      <u>**Defendants' Attempt to Undermine Dr. Carter's Damages Model with Hundreds of Sub-Regressions is Improper and Unconvincing.**</u>

Defendants also argue incorrectly that Dr. Carter's use of all available transactional data to compute overcharges precludes class certification because it is based on "averages." Opp. at 51.

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████ Regardless, "attacking averaged data is a standard defense tactic in antitrust cases, so it is unsurprising that courts have often evaluated and approved the appropriate use of averages." *In re Cathode Ray Tube (CRT) Antitrust Litig.* ("*CRT*"), 308 F.R.D. 606, 628 (N.D. Cal. 2015). Indeed, because a "'small sample size may distort the statistical analysis and may render any findings not statistically probative.' In such a case, the use of 'aggregate numbers' may 'allow for a [more] robust analysis and yield more reliable and more meaningful statistical results.'" *Id.* (citations omitted); *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-md-2836, 2020 WL 4917625, at *5-6 (E.D. Va. Aug. 21, 2020) ("It is a common practice to use averages to determine whether class members suffered a common antitrust injury," even where the evidence "does tend to show that several aspects of the pricing and purchasing process … were different for each plaintiff."). Accordingly, numerous cases have rejected defendants' disaggregation attempts, and certified antitrust class actions based on a single overcharge. *Kleen Prods.*, 306 F.R.D. at 605; *Loeb*, 306 F.3d at 493; *Processed Egg*, 312 F.R.D. at 199; *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-MD-2143 RS, 2016 WL 467444, at *7 (N.D. Cal. Feb. 8, 2016).

These cases recognize that the disaggregation or "unpooling" technique utilized by Dr.

Johnson "undermines the statistical reliability of any results, possibly masking effects that truly exist by impeding their detection at conventional levels of statistical significance." *Optical Disk Drive*, 2016 WL 467444, at *7; *CRT*, 2013 WL 5428139, at *8-9 ("disaggregating data to distinguish between every variation, no matter how small, among CRTs can result in using data sets that are too small to be meaningful."). Courts have also criticized Dr. Johnson's disaggregation techniques and rejected his unpooling practice as a basis to deny class certification. As the court stated in *Capacitors*:

> As plaintiffs rightly point out, Dr. Johnson's analysis appears to suffer from data sets that are too small…. 'Dr. Johnson chops the data into tiny datasets -- running more than one regression per class member -- thereby reaching no statistically significant results for most class members and unreliable results purportedly suggesting no injury to others.' In addition, Dr. Johnson's remarks do not account for the other sources of evidence that the Court has considered in assessing issues of classwide proof.

2018 WL 5980139, at *8, n.4; *see also Packaged Seafood*, 332 F.R.D. at 323-27 (ruling that Dr. Johnson's claim of false positives in the plaintiff expert's pooled regression model could not defeat class certification).

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████ As Dr. Johnson himself stated in a published article, it is improper to engage in such "data mining to churn through a large number of various possible subsets of the data, defined without any economic basis, and perform a statistical test for each subset, until a subset that (nominally) rejects the hypothesis of commonality." Haider, Laila, John H. Johnson, and Gregory K. Leonard, "Turning Daubert on Its Head: Efforts to Banish Hypothesis Testing in Antitrust Class Actions." 30 ABA Antitrust 53, 57 (Spring 2016). █████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████         Dr. Johnson's data mining proves the adage that if you torture the data long enough, it will confess to anything. *See* American Bar Association Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, p. 199 (3rd ed. 2017)

("virtually any regression model eventually will fail one or more tests if enough tests and specifications are run, even if nothing is wrong with the model.").

Defendants concede that a single overcharge model is often approved in antitrust class actions, but claim that it should not be in this case because of claimed complexities in the Broiler industry. Opp. at 53. However, the Broiler industry is far less complex than many others in which classes have been certified. *See, e.g.*, n.9 *supra* (listing numerous certified class actions).



These factors support Dr. Carter's damages methodology, and distinguish this case from those relied upon by Defendants involving different facts, products and theories of liability.[18]

**(c)**      **Defendants' Claim of "Absurd Results" is Based on Their Fundamentally Flawed Analysis.**

---

[18] *See, e.g., Processed Egg*, 312 F.R.D. at 200-02 (certifying a shell egg class, but not certifying a value added egg products class due to a lack of industry analysis by plaintiffs' economic expert regarding value added products); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 490-91 (N.D. Cal. 2008) (refusing to certify a class in a "highly heterogenous" market involving hundreds if not thousands of unique and customized products involving distinct applications, and plaintiffs' theory of liability (*i.e.*, fixed price lists) did not account for over 99.5% of defendants' revenue during the limitations period); *In re Photochromic Lens Antitrust Litig.*, No. 8:10-CV-00984, 2014 WL 1338605, at *23-24 (M.D. Fla. Apr. 3, 2014) (denying class certification due to plaintiffs' experts' failure to present a methodology for establishing common impact, failure to use defendants' transactional data, and "use of a 50% statistical significance measure in his regressions, rather than the more rigorous 5% measure."); *Steel*, 2015 WL 5304629, at *7, 11 (certifying a class for liability purposes, but not damages because it involved "a large variety of product types" with different chemical properties and customers with "legacy contracts").



**5.** **DPPs and Dr. Carter Have Satisfied the Standard for Common Impact.**

Defendants also attempt to defeat class certification by claiming that DPPs and Dr. Carter have not demonstrated common impact. As set forth in the Motion, Dr. Carter has demonstrated the existence of common impact based on his extensive market analysis, which was confirmed by two statistical tests. Motion pp. 34-38. Defendants' common impact argument essentially repeats

the aforementioned attacks on Dr. Carter's damages model which fail for the reasons set forth in Section II.D.4 above, and as further set forth below.

### (a) Defendants' Common Impact Critique Ignores Established Precedent.

As set forth in DPPs' Motion, the Seventh Circuit (as well as other courts) recognize that common impact can be established based of the structure and characteristics of the Broiler industry. *See Kleen*, 831 F.3d at 925-27 (finding common impact is satisfied based on plaintiffs' evidence regarding the structure of the market which made it susceptible to cartelization); *Titanium Dioxide*, 284 F.R.D. at 341, 346 ("[T]his Court concludes that the evidence of the nearly simultaneous price increase announcements, in conjunction with the structural factors present in the TiO2 industry, see supra, makes the element of antitrust impact 'capable of proof at trial through evidence that is common to the class rather than individual to its members.'"); *Blood Reagents*, 2015 WL 6123211, at *31 ("Many courts have accepted market-structure analyses in finding predominance with respect to antitrust impact."); *D&M Farms*, 2020 WL 7074140, at *7 (Endorsing the market structural analysis approach because, "Importantly, if true, each factor impacts the price of runner peanuts which of course [affects] the vast majority, if not all, of the purported class.").

In *Kleen*, the Seventh Circuit affirmed the district court's finding of common impact based on plaintiffs' theory of liability, the commodity nature of the product, and communications exchanged at a high level. *See* 831 F.3d at 925-27. ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████ *see also Kleen*, 831 F.3d at 925-27. ██████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████ Thus, Dr. Carter's market analysis establishes common impact and cannot be ignored by Defendants and Dr. Johnson by labelling it "*ipse dixit.*" Opp. at 58.

      **(b)**     **Dr. Carter's Statistical Tests Confirm Common Impact.**

In addition to his market analysis, Dr. Carter performed two statistical tests, in which he studies the actual prices paid by Class members to confirm that all or nearly all Class members were impacted by the alleged conspiracy. ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Defendants and Dr. Johnson's claim that Dr. Carter's model does not show common impact because of false positives has also been rejected in several cases. *See Packaged Seafood*, 332 F.R.D. at 326 ("Defendants have not shown that the purported false positives undermine the model's finding of class-wide impact."); *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *14 (E.D. Pa. July 29, 2015) ("Dr. Johnson's false positive analysis at most goes to the weight that should be accorded to Elhauge's conclusions); *Allen v. Dairy Mktg. Servs., LLC*, No. 09-230, 2013 WL 6909953, at *17 n.9 (D. Vt. Dec. 31, 2013) (denying Daubert motion to exclude expert's regression analysis on the basis of false positives).[19] ██████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

Defendants and Dr. Johnson also attack Dr. Carter's second test to assess common impact,

---

[19] *Food Lion, LLC v. Dean Foods Co.*, 312 F.R.D. 472 (E.D. Tenn. 2016), which Defendants cite, is inapposite. In *Food Lion*, the court found that there was no common impact from the defendants' regional conspiracy to increase milk prices because "only 52.4% of the purchases showed any statistically significant increase in prices and, when weighted by volume, only 39.9% of the transactions were statistically higher than before the class period began." *Id.* at 490. *Food Lion,* also conflicts with Seventh Circuit law in holding that "plaintiffs must show that **every class member** was impacted to some degree by the antitrust violation." *Compare id.* at 487 (emphasis in original) *with Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) ("[A] class will often include persons who have not been injured by the defendant's conduct… Such a possibility or indeed inevitability does not preclude class certification."). Defendants' reliance on *Rail Freight*, is also misplaced because that case involved "legacy" contracts with locked-in prices that kept such class members from being affected by the conspiracy. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013); *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 1282293, at *22 (S.D.N.Y. Mar. 28, 2014) ("The plaintiff's expert in Rail Freight conceded that the model yielded false positives. *Id.* at 253. There is no such concession here.").

because it is not his damages model. Opp. at 57. ████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████

### 6.     Defendants' Attack on Individual Damages has no Support in Law or Fact

The last "section" of Defendants' brief is a one-sentence conclusory statement that individual issues predominate in determining damages. As the Supreme Court affirmed in *Comcast*, at the class certification stage plaintiffs do not have to calculate damages, but instead show that "damages are capable of measurement on a classwide basis." *See Comcast*, 569 U.S. at 34. Defendants' suggestion that differences in individual damage calculations defeat class certification has been repeatedly rejected. *See Kleen Prods.*, 306 F.R.D. at 605 ("[T]o the extent that there are individualized damages issues, that alone will not defeat class certification, especially where, as here, common issues predominate the liability and impact elements of Plaintiffs' claim."); *Suchanek v. Sturm Foods, Inc*., 311 F.R.D. 239, 257-58 (S.D. Ill. 2015) ("If damages are capable of measurement on a classwide basis, questions of individual damage calculations will not overwhelm questions common to the class."); *Am. Sales Co., LLC v. Pfizer, Inc.*, No. 2:14-CV-361, 2017 WL 3669604, at *17 (E.D. Va. July 28, 2017) ("Plaintiffs rely upon a widely-accepted mathematical formula for assessing damages with class wide proof. The fact that individualized inquiry may be necessary to allocate those damages will not defeat class certification.") (internal citation omitted).

## III.     CONCLUSION

In addition to meeting the other elements of Rule 23, DPPs have shown prodiminant common classwide can be used to prove or disprove the three central elements of their claim—

that Defendants violated the Sherman Act, that members of the DPP class suffered impact or antitrust injury, and the amount of resulting damages. Defendants put all their eggs in one basket by attacking Dr. Carter's report. Not only do these attacks fail, they ignore another predominant fact: that DPPs will use classwide evidence to show that by reducing market-wide production, Defendants conspired to stabilize the market for Broiler chicken against the effect of competitive forces. This prototypical price-fixing was done at a level of the market which impacted the entire market. DPPs' motion is supported by sound precedent, factual support, and expert analysis, and the Court should grant class certification.

Date: March 29, 2021

*/s/ Bobby Pouya*

W. Joseph Bruckner (*Pro Hac Vice*)
Brian D. Clark (*Pro Hac Vice*)
Simeon A. Morbey (*Pro Hac Vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com

Clifford H. Pearson (*Pro Hac Vice*)
Daniel L. Warshaw (*Pro Hac Vice*)
Thomas J. Nolan (*Pro Hac Vice*)
Bobby Pouya (*Pro Hac Vice*)
Michael H. Pearson (*Pro Hac Vice*)
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
cpearson@pswlaw.com
dwarshaw@pswlaw.com
tnolan@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

Bruce L. Simon (*Pro Hac Vice*)
PEARSON SIMON & WARSHAW, LLP
350 Sansome Street, Suite 680
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com

*Direct Purchaser Plaintiffs Interim Co-Lead Class Counsel*

Steven A. Hart (#6211008)
Brian Eldridge (#6281336)
Kyle Pozan (#6306761)
HART MCLAUGHLIN & ELDRIDGE, LLC
121 West Wacker Drive, Suite 1050
Chicago, IL 60601
Telephone: (312) 955-0545
Facsimile: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com
kpozan@hmelegal.com

*Direct Purchaser Plaintiffs Liaison Counsel*