**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>All Commercial and Institutional Indirect Purchaser Plaintiff Actions | Case No. 1:16-cv-08637 |

**COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS'
REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

**<u>REDACTED</u>**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ....................................................................................................... 2

    A.    Notwithstanding Defendants' minor critiques, CIIPPs present overwhelming common record evidence establishing common impact and pass-through............ 4

        1.    Voluminous uncontroverted common record evidence establishes the anticompetitive conduct at issue. ................................................................ 4

        2.    Voluminous uncontroverted record evidence establishes prices inflated by anticompetitive overcharges and pass-through. ..................................... 6

        3.    Defendants distort the factual record. ........................................................ 8

            a)    Both contemporaneous record evidence and Dr. Mangum's production regression show that Defendants artificially restrained production below the competitive level. ...................... 9

            b)    Defendants' commentaries on CIIPPs' reading of documents are not evidence—and are in most cases demonstrably wrong. ... 11

            c)    Dr. Johnson mischaracterizes the Broilers market....................... 11

        4.    Defendants' other purported critiques are untethered to underlying facts or any element of the relevant legal standard................................... 12

    B.    CIIPPs' expert has specified reliable models establishing output restraints, overcharges, pass-through, and pervasive impact on the CIIPP class. ................. 13

        1.    Dr. Mangum reliably demonstrates that all or nearly all direct purchasers were impacted, and that overcharges were passed through to the CIIPPs class. ................................................................................... 14

            a)    Dr. Mangum's results confirm artificial production restraints, overcharges, and pass-through.................................................... 14

            b)    Dr. Mangum's additional analyses confirm pervasive impact on the CIIPPs class that affected all or nearly all class members. ................................................................................... 15

            c)    Dr. Mangum appropriately controlled for non-conspiratorial factors affecting price, reliably isolating the effect of Defendants' collusion. .................................................................. 17

            d)    Dr. Mangum presents a reliable methodology based on evidence common to the class for calculating damages............................. 19

i

2.    Dr. Johnson fails to identify a sound reason for disregarding Dr.
      Mangum's results. ................................................................................. 20

      a)    Dr. Johnson's analysis slicing up the conspiracy by Defendant
            and by year yields nonsensical results. ......................................... 20

      b)    Dr. Johnson's single purchaser regressions are meaningless. ....... 21

      c)    The proposed CIIPPs class does not include any members
            who "could not have been" injured. .............................................. 22

      d)    Dr. Mangum's analysis already considers and controls for
            the other industry factors Defendants identify. ............................ 22

      e)    Defendants' other legal authorities portending individualized
            issues overwhelming issues common to the class are inapposite
            or wholly irrelevant to the facts of this case. ............................... 25

C.  No other obstacle stands in the way of certifying the CIIPP class. ..................... 26

    1.    Defendants fail to identify any distinction among state laws that
          makes a difference to the determination of any common issue in this
          straightforward cartel conspiracy case. ..................................................... 26

          a)    Whatever variations in state laws are not a barrier to class
                certification of CIIPPs' state antitrust claims. ............................. 27

          b)    There are no material variations in state consumer protection
                laws here. ..................................................................................... 31

          c)    There are no material variations in CIIPPs' state unjust
                enrichment claims. ........................................................................ 33

          d)    CIIPPs Have Proposed a Manageable Trial Plan. ........................ 35

    2.    The claims of CIIPPs' proposed class representatives satisfy
          typicality. ................................................................................................... 36

    3.    CIIPPs' proposed class representatives are adequate. .............................. 36

          a)    Little Figs is an adequate and suitable class representative
                for the West Virginia CIIPPs. ...................................................... 37

          b)    Sargent's is an adequate and suitable class representative
                for the South Dakota CIIPPs. ....................................................... 39

    4.    CIIPPs satisfy the remaining Rule 23 requirements. ............................... 40

D.  An injunction should issue to protect class members' rights. ............................. 40

III.    CONCLUSION ............................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbott Labs. Norvir Anti-Trust Litig.*,
  No. 04-1511, 2007 WL 1689899 (N.D. Cal. June 11, 2007)...........................................33, 34

*In re Air Cargo*,
  No. 06-1175, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014)....................................................15

*In re Aluminum*,
  336 F.R.D. 5 (S.D.N.Y. 2020) .............................................................................................19

*Amchem v. Windsor*,
  521 U.S. 591 (1997).............................................................................................................1

*AmeriPro v. Fleming*,
  787 A.2d 988 (3d Cir. 2001) ...............................................................................................34

*Anziulewicz v. Bluefield Community Hospital*,
  531 F. Supp. 49 (S.D. W. Va. 1981) ....................................................................................38

*In re Aqua Dots*,
  270 F.R.D. 377 (N.D. Ill. 2010)...........................................................................................34

*Arthur v. Microsoft Corp.*,
  267 Neb. 586 (2004) ...........................................................................................................28

*In re Auto. Parts Antitrust Litigation*,
  2013 WL 2456612 (E.D. Mich. Jun. 6, 2013) ......................................................................31

*In re Auto. Parts Antitrust Litig.*,
  2014 WL 2993753 (E.D. Mich. July 3, 2014) ......................................................................37

*In re Average Wholesale Price Litig.*,
  252 F.R.D. 83 (D. Mass. 2008)............................................................................................32

*In re Brand Name Prescription Drugs*,
  Nos. 94 C 897, MDL 997, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994) ..................................3

*In re Bridgestone/Firestone*,
  288 F.3d 1012 (7th Cir. 2002) ........................................................................................25, 31

*In re Broiler Chicken*,
  290 F.Supp.3d 772 (N.D. Ill. 2017) ........................................................................11, 18, 28

*In re Cast Iron Soil Pipe and Fittings*,
No. 1:14–md–2508. 2015 WL 5166014 (E.D. Tenn. June 24, 2015)......................................38

*In re Catfish Antitrust Litig.*,
826 F. Supp. 1019 (N.D. Miss. 1993) ...................................................................................36

*In re Checking Account Overdraft*,
307 F.R.D. 630 (S.D. Fla. 2015) ...........................................................................................29

*In re Chocolate Confectionary*,
602 F. Supp. 2d 538 (M.D. Pa. 2009) ...................................................................................37

*Clark v. Bumbo*,
No. 15 C 2725, 2017 WL 3704825 (N.D. Ill. Aug. 28, 2017)................................................22

*Clayworth v. Pfizer*,
233 P.3d 1066 (Cal. 2010) ....................................................................................................29

*Comcast v. Behrend*,
569 U.S. 27 (2013)................................................................................................................18

*In re Community Bank of N.Va.*,
622 F.3d 275 (3d Cir. 2010)...................................................................................................30

*In re Dairy Farmers*,
No. 09-cv-3690, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) ..............................................38

*Day v. Check Brokerage*,
240 F.R.D. 414 (N.D. Ill. 2007)...............................................................................................2

*Doster Lighting v. E-Conolight*,
No. 12–C–0023, 2015 WL 3776491 (E.D. Wis. June 17, 2015) ............................................32

*In re EpiPen*,
No. 17-md-2785-DDC-TJJ, 2020 WL 1180550 (D. Kan. Mar. 10, 2020) .............................32

*Exhaust Unlimited v. Cintas*,
223 F.R.D. 506 (S.D. Ill. 2004) .............................................................................................19

*In re Fine Paper*,
82 F.R.D. 143 (E.D. Pa. 1979)...............................................................................................22

*In re Flonase*,
284 F.R.D. 207 (E.D. Pa. 2012).............................................................................................27

*In re Florida Cement*,
278 F.R.D. 674 (S.D. Fla. 2012).............................................................................................25

iv

*In re Fluidmaster,*
   No. 14-cv-5696, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ............................................21

*In re Folding Carton.*
   75 F.R.D. 727 (N.D. Ill. 1977) .................................................................................................3

*Fond Du Lac v. Jui Li,*
   No. 9-CV-852, 2017 WL 4457515 (E.D. Wis. Aug. 8, 2017) ................................................40

*GEICO Corp. v. Autoliv, Inc.,*
   345 F. Supp. 3d 799 (E.D. Mich. 2018) ...............................................................................37

*In re Grand Theft Auto Video Game ConsumerLitigation,*
   251 F.R.D. 139, 147 (S.D.N.Y. 2008) ..................................................................................31

*Grandalski v. Quest Diagnostics,*
   767 F.3d 175 (3d Cir. 2014) ............................................................................................34, 35

*In re Graphics Processing Units,*
   253 F.R.D. 478 (N.D. Cal. 2008) .........................................................................................36

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) .............................................................................................30

*Hardy v. City Optical,*
   39 F.3d 765 (7th Cir. 1994) .................................................................................................26

*In re High Fructose Corn Syrup,*
   295 F. 3d 651 (7th Cir. 2002) ........................................................................................14, 16

*In re: High-Tech Employee Antitrust Litig.,*
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) .........................................................................19, 26

*Hosp. Auth. of Metro Gov't of Nashville v. Momenta Pharm. et al.,*
   333 F.R.D. 390 (M.D. Tenn. 2019) ................................................................................27, 32

*In re IMAX*
   272 F.R.D. 138 (S.D.N.Y. 2010) ..........................................................................................39

*Kartman v. State Farm,*
   634 F.3d 883 (7th Cir. 2011) ...............................................................................................40

*Keele v. Wexler,*
   149 F.3d 589 (7th Cir. 1998) ...............................................................................................35

*In re Keurig Green Mountain Single-Serve Coffee,*
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) ..................................................................................28

*Kleen Prods. LLC v. Int'l Paper*,
   306 F.R.D. 585 (N.D. Ill. 2015) ........................................................................29

*Kleen Prods. v. Georgia-Pac.*,
   910 F.3d 927 (7th Cir. 2018) ............................................................................18

*Kleen Prods. v. International Paper*,
   831 F.3d 919 (7th Cir. 2016) ..................................................................... *passim*

*Kohen v. Pacific Investment*,
   571 F.3d 672 (7th Cir. 2009) ......................................................................22, 35

*In re Linerboard*,
   305 F.3d 145 (3d Cir. 2002) ..............................................................................29

*In re Lamictal*,
   F.3d 184 (3d Cir. 2020) .....................................................................................25

*In re LIBOR-Based Fin. Instruments*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ...............................................................39

*In re Lidoderm*,
   No. 14-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ..........27, 30, 33, 34

*Lipton v. Chattem*,
   289 F.R.D. 456 (N.D. Ill. 2013) ...................................................................38, 39

*MacNamara v. City of New York*,
   275 F.R.D. 125 (S.D.N.Y. 2011) .......................................................................40

*Malchman v. Davis*,
   761 F.2d 893 (2d Cir. 1985) ..............................................................................39

*Messner v. Northshore University HealthSystem*,
   669 F.2d 802 (7th Cir. 2012) ..................................................................... *passim*

*In re Microcrystalline*,
   218 F.R.D. 79 (E.D. Pa. 2003) ..........................................................................22

*Miller v. Gen. Motors*,
   Nos. 98 C 7386, 98 C 2851, 2003 WL 168626 (N.D. Ill. Jan. 26, 2003) ..............31

*Muehlbauer v. Gen. Motors*,
   No. 05 C 2676, 2009 WL 874511 (N.D. Ill. March 31, 2009) ..............................34

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) .............................................................................30

*Muro v. Target*,
    580 F.3d 485 (7th Cir. 2009) ...................................................................36

*In re New Motor Vehicles Canadian Export*,
    350 F.Supp.2d 160 (D. Maine 2004) ......................................................37

*In re Nexium Antitrust Litig.*,
    297 F.R.D. 168 (D. Mass. 2013)........................................................27, 32

*In re Nexium Antitrust Litig.*,
    777 F.3d 9, 2015 WL 265548 (1st Cir. 2015)........................................29

*In the Matter of Oil Spill*,
    954 F.2d 1279 (7th Cir. 1992) ................................................................14

*In re Optical Disk Drive*,
    303 F.R.D. 311 (N.D. Cal. 2014)...........................................................36

*Orlowski v. Dominick's*,
    172 F.R.D. 370 (N.D. Ill. 1997)..............................................................40

*In re Pilgrim's Pride*,
    728 F.3d 457 (5th Cir. 2013) ..................................................................17

*In re Plastic Additives*,
    No. 03–CV–2038, 2010 WL 3431837 (E.D. Pa. Aug. 31, 2010) .............5

*Ploss v. Kraft*,
    431 F. Supp.3d 1003 (N.D. Ill. 2020) ....................................................30

*In re Polyurethane Foam Antitrust Litig.*,
    314 F.R.D. 226 (N.D. Ohio 2014) .....................................................27, 31

*In re Pressure Sensitive Labelstock*,
    No. 3:03-MDL-1556, 2007 WL 4150666 (M.D. Pa. Nov. 19, 2007)......23

*In re Processed Egg*,
    312 F.R.D. 124 (E.D. Pa. 2015)..............................................................25

*In re Processed Egg*,
    851 F. Supp. 2d 867 (E.D. Pa. 2012) ......................................................31

*Randall v. Rolls-Royce*,
    637 F.3d 818 (7th Cir. 2011) ..................................................................38

*Reed v. Advocate Health Care*,
    268 F.R.D. 573 (N.D.Ill. 2009)...............................................................26

*In re Relafen.*,
    221 F.R.D. 260 (D. Mass. 2004)...................................................................................32

*In re Rhone-Poulenc Rorer*,
    51 F.3d 1293 (7th Cir. 1995) .......................................................................................31

*Riffey v. Rauner*,
    910 F.3d 314 (7th Cir. 2018) .......................................................................................25

*Riffey v. Rauner*,
    No. 10 CV 02477, 2016 WL 3165725 (N.D. Ill. June 7, 2016)...................................22

*Saltzman v. Pella*,
    257 F.R.D. 471 (N.D. Ill. 2009) ..................................................................................35

*Schleicher v. Wendt*,
    618 F.3d 679 (7th Cir. 2010) .........................................................................................8

*In re Scrap Metal*,
    527 F.3d 517 (6th Cir. 2008) .........................................................................................3

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline*,
    737 F. Supp. 2d 380 (E.D. Pa. 2010) ..........................................................................31

*Sheet Metal Workers Local 441 v. GlaxoSmithKline*,
    No. 04-5898, 2010 WL 3855552 (E.D. Pa., Sept. 30, 2010) ......................................21

*Sheet Metal Workers Nat. Health Fund v. Amgen*,
    No. 07–5295 (SRC), 2008 WL 3833577 (D.N.J. Aug. 13, 2008) ..............................38

*Siegel v. Shell Oil*,
    256 F.R.D.580 (N.D. Ill. 2008)...................................................................................32

*Singer v. AT&T Corp.*,
    185 F.R.D. 681 (S.D. Fla. 1988)..................................................................................33

*In re Skelaxin*,
    299 F.R.D. 555 (E.D. Tenn. 2014)...............................................................................34

*In re Solodyn*,
    14-md-02503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017)...............................27, 30, 32, 34

*In re Solodyn*,
    No. 14–md–02503–DJC, 2015 WL 5458570 (D. Mass. Sept. 16, 2015) ....................38

*In re Static Random Access Memory (SRAM)*,
    264 F.R.D. 603 (N.D. Cal. 2009).............................................................................27, 40

*Tait v. BSH Home Appliances*,
  289 F.R.D. 466 (C.D. Cal. 2012) ........................................29

*Texaco v. Dagher*,
  547 U.S. 1 (2006) .......................................................4

*In re TFT-LCD*,
  267 F.R.D. 583 (N.D. Cal. 2010) ...................................27, 40

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. M 07-1827 SI, 2012 WL 253298 .....................................19

*In re TFT-LCD*,
  No. M 07–1827 SI, 2011 WL 4501223 (N.D. Cal. Sept. 28, 2011) ..........34

*Thorogood v. Sears*,
  547 F.3d 742 (7th Cir. 2008) ..........................................31

*United States v. Socony-Vacuum*,
  310 U.S. 150 (1940) .....................................................4

*United Wis. Servs. v. Abbott Labs. (In re Terazosin Hydrochloride)*,
  220 F.R.D. 672 (S.D. Fla. 2004) ................................27, 33, 34

*In re Urethane*,
  768 F.3d 1245 (10th Cir. 2014) ......................................3, 24

*Vega v. T-Mobile USA*,
  564 F.3d 1256 (11th Cir. 2009) ........................................34

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
  No. 2:06-cv-1833, 2015 WL 3623005 (E.D. Pa. Jun. 10, 2015) .....30, 31, 33

*In re Vitamin C*,
  279 F.R.D. 90 (E.D.N.Y. 2012) .........................................40

*In re Vitamins*,
  209 F.R.D. 251 (D.D.C. 2002) ..........................................22

*In re Vitamins*,
  259 F. Supp.2d 1 (D.D.C. 2003) ........................................29

*Vulcan Golf v. Google*,
  254 F.R.D. 521 (N.D. Ill. 2008) .......................................34

*In re Warfarin*,
  391 F.3d 516 (3rd Cir. 2004) ..........................................27

*In re Wellbutrin XL*,
   282 F.R.D. 126 (E.D. Pa. 2011)................................................................................27

**Statutes**

W. Va. Code, § 47-18-3(a)...........................................................................................37

**Other Authorities**

Newberg on Class Actions, § 10.05 (4th Ed. 2005) .................................................19

2 Newberg on Class Actions § 4:57 (5th ed.) .........................................................29

**Rules**

Federal Rules of Civil Procedure
   Rule 23 .....................................................................................................2, 40
   Rule 23(a)......................................................................................................26
   Rule 23(a)(3)................................................................................................35
   Rule 23(b)(2)................................................................................................40
   Rule 23(b)(3)........................................................................................ *passim*

I.      **INTRODUCTION**

The Commercial & Institutional Indirect Purchaser Plaintiffs ("CIIPPs") have moved for certification of a class of purchasers that bought Defendants' price-fixed Broilers indirectly via food service distributors for their own use in commercial food preparation. Mot. for Class Certification, ECF No. 3966 (the "Motion"). CIIPPs seek certification of an injunctive relief class consisting of indirect purchasers located throughout the United States, and a damages class of indirect purchasers that paid overcharges from any of 31 jurisdictions where local law permits indirect purchaser standing. *Id.*

CIIPPs' class certification motion fits squarely within well-settled antitrust doctrine and extensive precedent holding that common issues predominate in such cases. *Amchem v. Windsor,* 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in cases alleging . . . violations of the antitrust laws."); *accord Messner v. Northshore University HealthSystem,* 669 F.2d 802, 815 (7th Cir. 2012). CIIPPs' injury is common and results from the same source—Defendants' collusion—and is amenable to determination on a classwide basis, since impact on each class member rests on an econometric analysis that applies equally and in the same way to every class member. This case therefore presents the epitome of a lawsuit suitable for class certification.

Unsurprisingly, Defendants appeal to a litany of reasons, drawn from a standard playbook, why this cartel conspiracy case is somehow different or more complex. It is not. Their brief fulfills the prediction CIIPPs made when filing the Motion: "Defendants will likely argue that the market at issue in this case is too complex; the products too varied; the pricing processes too intricate; the intervening catastrophes too great; or the experts failed to use some variable that would have made all the difference; or, likely, some combination of all of the foregoing." Mem. 42.[1] But amidst

---

[1] Memorandum of Law in Support of Commercial and Institutional Indirect Purchaser Plaintiffs' Motion for Class Certification, ECF No. 3968-1.

Defendants' churning out of objections and exceptions designed to confuse and mislead, several truths emerge. First, the vast majority of Defendants' arguments, and criticisms stated by their expert Dr. Johnson, amount to nothing beyond sheer speculation, whereas CIIPPs' expert, Dr. Mangum, substantiates his positions with conclusions derived from competent econometric analysis of the underlying data. Second, none of the purported confounding factors or omitted variables identified by Defendants or Dr. Johnson makes a difference. Dr. Mangum considers each factor presented as the potential missing piece, and shows in objectively verifiable terms why each either has no effect on the final results, or is already accounted for in his model. Third, none of the dubious facts or inapposite caselaw on which Defendants rely can displace the fact that this is exactly the type of case that courts routinely deem appropriate for resolution on a classwide basis.

This Court has held that close cases should be decided in favor of certification. *Day v. Check Brokerage,* 240 F.R.D. 414, 417 (N.D. Ill. 2007). And this is not a close case: No serious dispute remains as to whether CIIPPs can show common impact and satisfy the other elements under Rule 23(b)(3). The Court should follow longstanding precedent and certify the class.

## II.    ARGUMENT

Class certification is warranted under Rule 23(b)(3) where "questions of law and fact common to members of the class predominate over questions affecting only individual members of the class." *Messner,* 669 F. 3d at 808. "Rule 23 does not demand that *every* issue be common; classes are routinely certified under Rule 23(b)(3) where common questions exist and predominate, even though individual issues will remain after the class phase." *Kleen Prods. v. International Paper,* 831 F.3d 919, 922 (7th Cir. 2016) (*citing McMahon v. LVNV Funding,* 807 F.3d 872, 875–76 (7th Cir. 2015); *Pella Corp. v. Saltzman,* 606 F.3d 391, 393 (7th Cir. 2010)). Indeed, "Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual

2

questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Messner,* 669 F.3d at 815.

"Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'" *Id.* (*quoting Erica P. John Fund v. Halliburton,* 563 U.S. 804, 809 (2011)). As CIIPPs note, those elements comprehend core common issues, including: "(1) Defendants' participation in a conspiracy to fix the prices of Broilers; (2) common injury in the form of common impact arising from the overcharges; and (3) damages as a result of the antitrust violations, which can be calculated on an aggregate, formulaic basis," Mem. 34. Defendants, however, ignore the undeniably common nature of the key unifying question: whether defendants engaged in the alleged conspiracy.[2] They identify no individualized liability issues and ignore that absent class certification, each class member would need to present the exact same liability proof at separate trials. They engage with CIIPPs' presentation mostly on the second question, common injury, though they fail to dislodge CIIPPs' showing that common questions will predominate on that front as well. *See infra* § II.B. Finally, they devote cursory treatment to damages, and brush past the fact that CIIPPs, if successful at trial, can and will seek an aggregate damages judgment.

This case, brought on behalf of a class counting among its numbers many struggling business owners over a conspiracy to reap unearned profits by collusively restricting the supply of Broilers, a commodity food product, to inflate prices, is exactly the type of case best suited for resolution in a class action. CIIPPs respectfully request that the Court certify the CIIPPs class.

---

[2] *See In re Brand Name Prescription Drugs,* Nos. 94 C 897, MDL 997, 1994 WL 663590, (N.D. Ill. Nov. 18, 1994) ("Proof of the merits of the plaintiffs' claim will not be contingent upon an individualized analysis of each and every transaction [but rather will] hinge upon a showing of industry-wide practices, meetings, policies and agreements."); *In re Folding Carton.* 75 F.R.D. 727, 734 (N.D. Ill. 1977) ("Courts have consistently found the conspiracy issue the overriding, predominant question."); *and see In re Urethane,* 768 F.3d 1245, 1255 (10th Cir. 2014) ("In price-fixing cases, courts have regarded the existence of a conspiracy as the overriding issue"); *In re Scrap Metal,* 527 F.3d 517, 535 (6th Cir. 2008) ("proof of the conspiracy is a common question that is thought to predominate over the other issues").

A. **Notwithstanding Defendants' minor critiques, CIIPPs present overwhelming common record evidence establishing common impact and pass-through.**

As noted previously and uncontested by Defendants, a horizontal price-fixing conspiracy is a *per se* violation of the antitrust laws. *Texaco v. Dagher,* 547 U.S. 1, 5 (2006). "The antitrust laws prohibit competing economic actors from colluding to agree on prices, either directly or through such mechanisms as output restrictions." *Kleen Prods.,* 831 F.3d at 921 (*citing United States v. Socony-Vacuum,* 310 U.S. 150 (1940); *Palmer v. BRG of Georgia,* 498 U.S. 46 (1990)). CIIPPs have outlined a competent, plausible case that Defendants engaged in such conduct by presenting extensive record evidence, all of it common to the CIIPPs class.

1. **Voluminous uncontroverted common record evidence establishes the anticompetitive conduct at issue.**

In a 2016 opinion the Seventh Circuit favorably cited this Court's observation that:

> To prove each element of a conspiracy, virtually all class members would be relying on the same evidence that Plaintiffs have submitted in support of class certification—namely, the documents, emails, phone records, and other indirect evidence necessary to prove that Defendants conspired in violation of antitrust laws. . . . [I]t is much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence.

*Kleen Prods.,* 831 F.3d at 925. These materials are all common evidence of the conspiracy and weigh heavily in favor of certifying the class. CIIPPs have outlined over a decade of collusive acts by the 19 groups of supplier Defendants to restrict output and ensure illicit overcharges in exactly the manner the Supreme Court has proscribed for over 80 years. Mem. 4-18; *Socony-Vacuum.*

The conspiracy was brazen in its duration and breadth: Rumblings in the industry recognized production cuts would be necessary to elevate prices, and production cuts began in earnest after most Defendants sent their executives to meet together at the February 22-23, 2008 National Chicken Council Meeting on Maui. Mem. 4-7. Pilgrim's announced cuts and Fieldale, Amick, Simmons, Wayne Farms, Koch Foods, OK Foods, and Peco soon followed. *Id.* 7. Mid-

4

2008 featured further cuts. *Id.* 8. Two more rounds of cuts came later in the year. *Id.* 9. Tyson followed suit at the end of the year. *Id.* 10. Coordinated production restraints continued into 2009, were sustained through joint ventures into 2010, and reached a crescendo in 2011. *Id.* 10-15. The exchange of pricing and other confidential business information enabled Defendants to maintain their conspiracy and keep prices at supracompetitive levels from 2012 through 2014 and was followed by yet more coordinated production restraints in 2015 and 2016. *Id.* 15, 16.

The conspiracy was furthered by messaging conveyed by industry analysts and other go-betweens, direct exchanges of detailed supply and pricing information, and the manipulation of an oft-used pricing index. *Id.* 6-7, 17-18. Dr. Mangum examined these records and found them consistent with an industry altered by collusion. Mem. 24; Mangum I ¶¶ 89-135. And CIIPPs do not stand alone; other Plaintiff classes have outlined similar evidence.[3]

Document by document, email by email, Plaintiffs have amassed a devastating indictment of Defendants' conduct. Defendants largely ignore this evidence. They do not deny, because they cannot, the common nature of this evidence and the common core liability issue to which it is addressed. At most, they quibble with Plaintiffs' interpretation of eight documents, *see infra at* § II.A.3.b, and summon from their expert a flawed alternative analysis purporting to show production was not restrained, *see infra* § II.A.3.a. And they invoke *In re Plastic Additives,* No. 03–CV–2038, 2010 WL 3431837 (E.D. Pa. Aug. 31, 2010), a case about coordinated price increase announcements, not collusive output restrictions. While those theories can overlap, Dr. Mangum has explained that collusive output restrictions are so pernicious in part because they can impact price even when they are non-simultaneous and not perfectly uniform. Mangum II ¶¶ 23-24.[4]

---

[3] Mem. of Pts. and Authorities in Support of Direct Purchaser Plfs.' Mot. for Class Certification, ECF No. 3990, at 5-24; End-User Consumer Plfs.' Mot. for Class Certification, ECF No. 3971, at 7-19.
[4] Ex. 1, Expert Reply Report of Russell W. Mangum III, Ph.D. ("Mangum II").

Most significantly to the instant Motion, this evidence is common to all members of the CIIPPs' class.

### 2. Voluminous uncontroverted record evidence establishes prices inflated by anticompetitive overcharges and pass-through.

CIIPPs have also presented common record evidence establishing the mechanisms that created anticompetitive overcharges and ensured these overcharges were widespread and would pass through the distribution chain to the ultimate purchasers of Broilers—including CIIPPs. Mem 25-27. CIIPPs proffer *inter alia* common record evidence that Defendants such as Pilgrim's, Koch, Fieldale, Perdue, and Wayne, as well as industry analysts, understood the manufactured supply shortage supported elevated prices, *id.* 25-26; and that the direct purchasers from whom CIIPPs sourced Broilers passed any cost increases down the distribution chain to their customers, including CIIPPs, *id.* 27. Moreover, the entire logic of a food distributor business model is to buy low and sell high, sustaining the enterprise through that pricing interval. *Id.* 28. Absent pass-through, there would be little reason for these food distributor entities to exist.

Record evidence is plentiful that Defendants and industry analysts understood the Broilers market functioned like many industries according to the law of supply and demand, and that reduced supply increased prices that were passed through the distribution chain. Mem. 25-26.

- Peter Reilly of buyers' cooperative Wakefern testified ▮▮▮▮▮▮▮▮▮
  ▮▮ Ex. 1 (P. Reilly Tr., 49:11-15) ("Q. Is there a set margin over cost that corporate expects you to obtain? A. There is a set margin over cost that we are expected to maintain as a division.").

- Daniel Drake of distributor Certco confirmed ▮▮▮▮▮▮▮▮▮▮▮


Ex. 3 (Drake Tr., 65:3-13).

████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* 67:11-16.

- Jerry John McCann testified that his employer, distributor purchaser Nicholas and Company, also ██████████████████████████████████████████████████████████ Ex. 4 (J. McCann Tr.), 201:11-15.

- Scott Wagner testified that ████████████████████████████████████████ ████████████████████████████████████████████████ Ex. 5 (S. Wagner Tr.), 36:2-9.

- Donald Underwood testified that ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████ Ex. 6 (D. Underwood Tr.), 203: 9-16.

- And Thomas D. Wilson testified for distributor Troyer Foods that ████████████ ████████████████████████████████████ A. Yes." Ex. 7 (T. Wilson Tr.), 109:20-23.

Defendants are unable to disprove any of these myriad sources of common record evidence, and in response offer only attempts to confuse and obfuscate. They present two instances of distributors adopting a temporary, short-term loss leader strategy to build customer relationships. Opp 9-10. In doing so they utterly fail to explain how these isolated strategic decisions could ever reverse the overwhelming pattern of distributors selling above cost, how that notion could ever be reconciled with their stated business strategies, or why they matter at all given that under the design of CIIPPs' expert's model, occasional discounts are assumed to have happened both under the conspiracy and in the conspiracy-free "but-for" world. They make no difference, given that even a price offered under a provisional loss leader strategy would be set according to a higher baseline price in a market featuring collusion. *See infra* § II.B.1.c. Defendants offer no rationale for disbelieving that a discounted price under the conspiracy would still carry baked into it an

anticompetitive overcharge—and never cite any record evidence of their own that calls into question any of the pricing dynamics CIIPPs laid out in filing the Motion and above.

Defendants next present an array of unrelated points about the status of CIIPPs themselves. Opp. 10-13. Some had greater purchasing power than others, an aspect of the market robustly addressed in the analysis of CIIPPs' expert, Dr. Russell W. Mangum III. *See* Mangum II ¶¶ 95-96; *infra* II.B.3.d. The same is true for discounts, product differences, differences among Defendants, and variations based on season, region, and the comparative prices of other meats. *Id.* None of these distinctions can erase the immutable fact that supply restrictions raised prices, that the market structure ensured pass-through of these increases, and that proof for these points at trial will rest on uncontroverted record evidence, all of it common to all class members.

Defendants then rely on the opinions of their expert, as presented in the 1,226 pages, counting appendices, of the Expert Report of John H. Johnson, IV. ECF No. 4216-2. Defendants do not actually claim or attempt to show that pass-through did not occur; rather, they pick at a few of Dr. Mangum's tables and suggest that "pass-through, if any, did not occur uniformly." Opp. 14. But if the experts do not agree, sound practice would counsel an attempt to connect their theories to trends observed in the real economy. Dr. Mangum's work fits that description, while Dr. Johnson's stands alone in defiance of what the witnesses and documents in this case have said. CIIPPs have already shown that common record evidence would support a finding of pass-through.

### 3. Defendants distort the factual record.

The relevant inquiry is whether common questions predominate. "The chance, even the certainty, that a class will lose on the merits does not prevent its certification." *Schleicher v. Wendt*, 618 F.3d 679, 687 (7th Cir. 2010). Indeed, final weighing of the merits is inappropriate at this stage, and further "runs the risk of supplanting the jury as the finder of fact." *Messner,* 669 F.3d at 823. Defendants' attempts to muddle the record are therefore unavailing.

8

a) **Both contemporaneous record evidence and Dr. Mangum's production regression show that Defendants artificially restrained production below the competitive level.**

Defendants attempt to make much of their unfounded claim that production volume increased during the period at issue. Opp. 15-17. They title a section in their brief, "The So-Called Production Cuts Involved Defendants Selling More Chicken, Not Less." *Id.* 15. But what the text actually says is that pounds produced "increased for some Defendants during the proposed Class Period." Dr. Johnson does not even attempt an industry-wide econometric analysis. Rather, he shows only that during two year-on-year comparison periods when the record indicates Defendants cut production, some Defendants' production levels rose while that of others declined. Johnson Rep., Exs. 11 (p. 77), 12 (p. 79).[5] Importantly, Dr. Mangum explains why production levels of individual Defendants is beside the point, since in an output restriction conspiracy it is industry market supply *in toto* that matters for raising prices. Mangum II ¶ 67.[6] Defendants' executives understood this well. Mem. 25-26. Regardless, the relevant inquiry is not whether Defendants produced less chicken in absolute terms, but whether they produced less than they otherwise would have absent a conspiracy. *Id.* ¶ 25. Decisions to forgo or delay an expansion also restrain production, though they do not register as production "cuts." Measuring what production would have been absent a conspiracy requires running a regression that controls for factors affecting output—exactly what Dr. Mangum did.

---

[5] Separately, Dr. Johnson suggests that four Defendants increased pullet placements in 2008 and five did so in 2011, during the periods of heightened production cuts. *Id.* ¶ 116. Yet the record reveals that Defendants implemented their cuts in part by slaughtering breeder hens early, a point Dr. Johnson neither acknowledges nor counters, and Dr. Mangum has now shown that the overwhelming majority of Defendants did so in the relevant 2008-2009 and 2011-2012 time periods. Mangum II, Fig. 1 (p. 14).

[6] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

Defendants plow forward with a *non sequitur* about the supposed "perceived disconnect between purportedly fewer breeder hens but more pounds produced." Opp. 16. They argue that during the relevant time "the industry shifted toward producing larger birds" and that "processing yields increased steadily," citing as support paragraphs 117 and 118 of Dr. Johnson's expert report. But Dr. Mangum's production regression utilizes ready to cook pounds as the dependent variable, so it accounts for these industry changes. Dr. Mangum also tests for the proposition that supply was restrained when controlling for other factors, Mem. 21-22, Mangum I ¶¶ 138-49, and estimates that production levels were 4.8% lower from January 2009 through November 2011, and 7.4% lower between December 2011 through July 2019, than they would have been absent Defendants' supply restrictions. Mangum I ¶ 149. The results are significant at a confidence level of 99%, "meaning that there is less than a one percent probability that the results are due to chance." *Id.* Neither Defendants nor their expert Dr. Johnson quarrel with this arithmetic.

Instead, Dr. Johnson attempts to pin inaccurate assumptions on CIIPPs and Dr. Mangum. Mangum II ¶¶ 9-22. Dr. Johnson asserts that Plaintiffs assume all changes in production result from Defendants' collusion, Johnson Rep. ¶ 112, whereas all Dr. Mangum did was examine the industry context to determine if production was restrained when all other lawful factors were considered. Mangum II ¶ 11. Furthermore, Dr. Mangum notes that tracing a precise line from specific collusive agreements to specific production cut decisions is unnecessary. *Id.* ¶ 16. Recognizing that some production cuts would occur with and without the conspiracy, Dr. Mangum takes a much more pragmatic approach:



*Id.* Defendants' arguments therefore both miss the mark and demand too much when they seek refuge in the notion that they were not "monolithically engaged in lockstep 'production cuts.'" Opp. 18. Neither law nor economics requires such a showing. Earlier, this Court correctly ruled that decisions to restrain production need not have been simultaneous or uniform to have constituted collusive anticompetitive conduct. *In re Broiler Chicken,* 290 F.Supp.3d 772, 791 (N.D. Ill. 2017) (*citing inter alia Interstate Circuit v. United States,* 306 U.S. 208, 227 (1939); *Kleen Prods. v. Packaging Corp.,* 775 F. Supp. 1071, 1077 nn. 5, 9 (N.D. Ill. 2011)).

### b) Defendants' commentaries on CIIPPs' reading of documents are not evidence—and are in most cases demonstrably wrong.

Resolving disputes over the meaning of documents and determining the parties' credibility is the province of the finder of fact at trial, not a topic for debate at class certification. As the Seventh Circuit has held repeatedly, in conducting a Rule 23(b)(3) predominance and superiority analysis, "the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner,* 669 F.3d at 811 (*citing Schleicher,* 618 F.3d at 685 (7th Cir.2010).

Accordingly, CIIPPs offer a version of Defendants' Appendix A objections to evidence supplemented with brief responses, but recognize that these minor issues about the interpretation of nine documents out of the many submitted will not move the needle and are not ripe for resolution in any case. Revised App. A. Moreover, since all of them concern liability issues common to the class, if anything they weigh in favor of certifying the CIIPPs class.

### c) Dr. Johnson mischaracterizes the Broilers market.

CIIPPs have noted that the commodity nature of Broilers parts increased the likelihood of collusion in the industry. Mem. 23; Mangum I ¶¶ 62-76. As Dr. Mangum explained, ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ *Id.*

11

¶ 62. The record is replete with Defendants' admissions of Broilers' commodity nature, *id.* ¶ 64, and inter-Defendant sales and copacking agreements further underscore their products' fundamental interchangeability, *id.* ¶¶ 65-66. Moreover, ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* ¶ 68.

Notably, Defendants never expressly disagree with this point in their Opposition. Nor does Dr. Johnson. Rather than disputing that Broilers are a commodity product, he states a more equivocal view that the class plaintiffs' treatment of Broilers as a commodity "ignores important issues" relevant to the market. Johnson Rep. § IV. And he urges qualifications pertaining to product types, specific record documents cited in class plaintiffs' expert reports, bird size, and individual purchasers' demand for certain subproducts for different sales channels. *Id.* ¶¶ 71-88. As Dr. Mangum notes, none of these observations alter the fundamental commodity character of Broilers, or the fact that ████████████████████████████████████████████████

████████████████████████████████ Mangum II ¶ 83.

#### 4. Defendants' other purported critiques are untethered to underlying facts or any element of the relevant legal standard.

In their Opposition, Defendants offer an extensive purported Statement of Facts. Opp. 5-24. It is long on statements and short on facts—and such facts as they present are either refuted by the record evidence or simply beside the point. For example, Defendants say, "Price variability means that pass-through of any alleged overcharge would fluctuate wildly," Opp. 5, but no citation to record evidence or expert opinion supports that bare statement, nor is it possible to determine from the context what exactly Defendants mean by "price variability," or why the particular type of variation meant would prevent pass-through from occurring.

12

On their first page, Defendants claim Dr. Mangum "assumes uniform production levels amongst all 19 Defendant producers." Opp. 1. Dr. Mangum assumes no such thing, and Dr. Johnson does not even claim as much. Later, Defendants comment that the existence of "different pricing mechanisms" somehow "means the portion of any cost change to a supplier that would be passed-through would vary according to the timing of the purchase *and* the purchased volumes." Opp. 9-10. Defendants' purpose here is unclear. Prices are different at different times and it costs more to buy more as opposed to less of something, but Defendants fail to explain why either of those truisms means that pass-through rates would vary in any material sense. Defendants also argue that because of their bargaining power and the receipt of promotional allowances, "US Foods and Sysco would have been able to avoid any alleged overcharge and, accordingly, there would be no overcharge to pass through." Opp. 13-14. CIIPPs are left to wonder, says who? Even Dr. Johnson does not lend support to this dubious claim. These types of unsubstantiated contentions are unhelpful to the determination of the present dispute.

> **B.** **CIIPPs' expert has specified reliable models establishing output restraints, overcharges, pass-through, and pervasive impact on the CIIPP class.**

CIIPPs have previously described the robust, rigorous multiple regression analysis Dr. Mangum conducted to assess common impact and estimate overcharges arising from anticompetitive conduct. Mem. 19-21. Dr. Mangum buttressed his findings of elevated prices with a series of additional tests, studies, and analyses confirming the existence of common impact on all or nearly all members of the CIIPPs class. *Id.* 22-24. Here as well, Dr. Johnson primarily offers speculation, in addition to a few tests riddled with errors and rigged to produce findings favorable to Defendants. In the end, Defendants amass a list of ways an econometric study could run off the rails, but without ever delivering a study adjusted according to one or more of those concerns that yields reliable results, or any results.

1.    **Dr. Mangum reliably demonstrates that all or nearly all direct purchasers were impacted, and that overcharges were passed through to the CIIPPs class.**

Dr. Mangum's multiple regression model is properly specified, applies methodologies standard in his field of practice, produces reliable results, and will assuredly prove useful to the finder of fact when this case goes to trial, as explained in CIIPPs' opposition to Defendants' Daubert motion challenging Dr. Mangum. Under applicable standards, Dr. Mangum's econometric analysis constitutes important common evidence establishing impact and damages. *Kleen Prods.,* 831 F.3d at 928; *High Fructose,* 295 F.3d at 660-61; and *see* Mem. 35-36 (collecting cases).

a)    **Dr. Mangum's results confirm artificial production restraints, overcharges, and pass-through.**

Dr. Mangum designed his analysis to screen out the effect of potentially confounding factors and isolate for the effect of the artificial supply cuts, both on overall output and price. *Id.* 20; Mangum I ¶¶ 200-211. Through multiple regression analysis in his direct purchaser overcharge regressions, he determined that in the period from January 1, 2009 through November 30, 2011, Defendants were able to overcharge CIIPPs by 5.2% on WOGs, 4% on breast meat products, and 13.9% on wing products; and in a further period from December 1, 2011 through July 31, 2019, by 9.6% on WOGs, 14.6% on breast meat products, and 24.6% on wing products. Mem. 21; Mangum I ¶¶ 212-219. Each of these results as well is significant at the 99% level, meaning there is less than one percent probability these results are purely due to chance. *Id.*

Dr. Johnson notes that "[r]egression analysis is a tool" and that merely running a regression does not necessarily mean the results "yield a relevant answer to any particular question," a basic proposition that Dr. Mangum freely accepts. *Cf.* Johnson Rep. ¶ 200 *with* Mangum II ¶ 183 *et seq.; see also In the Matter of Oil Spill,* 954 F.2d 1279, 1320 (7th Cir. 1992) ("If done right, regression analysis permits an inference of causation, and of the size of the effect."). And Dr. Johnson

14

suggests several alternative ways to run the model, all of them marred by their own serious methodological flaws. Mangum II ¶¶ 183-236. But he never creates his own model, and he never says anything to challenge Dr. Mangum's results directly. In their brief, Defendants only superficially link their case citations to CIIPPs' claims here, *cf.* Opp. 30-40 *with* § II.B.2.e, and only at the end of this section do they finally invoke Dr. Johnson's lone econometric critique, one that Dr. Mangum fully addresses in his Reply report. Opp. 39, *and see infra* § II.B.2.a. Dr. Johnson levels several criticisms at Dr. Mangum's overcharge model, Johnson Rep. ¶¶ 235-248, but Defendants decline to take up any of these arguments in their Opposition. Dr. Mangum has responded to Dr. Johnson's concerns nonetheless. Mangum II ¶¶ 183-236. CIIPPs further address the three discrete expert issues in their opposition to Defendants' motion to exclude Dr. Mangum.

The standard for admitting regression models is liberal.[7] Defendants have in any case offered no good reason for rejecting the overcharge model, and it therefore remains as reliable common evidence answering the common question of the harm Defendants' conduct caused.

> **b)    Dr. Mangum's additional analyses confirm pervasive impact on the CIIPPs class that affected all or nearly all class members.**

Dr. Mangum also conducted further work to confirm that the impact of anticompetitive overcharges permeated throughout the CIIPPs class, including a structural analysis of the market, correlation analyses, and other studies. Mem. 22-24; Mangum I ¶¶ 58-135, 151-65, 170-78. He performed regressions using a massive dataset to demonstrate that overcharges passed through the direct purchasers to reach members of the CIIPPs class. Mem. 22; Mangum I ¶¶ 250-54.

Defendants attempt to attack Dr. Mangum's pass-through regressions but ultimately fail to dispute that pass-through would have occurred. As Dr. Mangum explains (Mangum II ¶ 241):

---

[7] *See e.g. In re Air Cargo,* No. 06-1175, 2014 WL 7882100, at *43 (E.D.N.Y. Oct. 15, 2014), No. 06-1775, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) at *59 (expert testimony "need not be flawless in order to be sufficiently reliable to merit the court's consideration of it as proof common to the class").



Defendants also ignore Dr. Mangum's finding that industry structure facilitated widespread impact to reach all or virtually all CIIPPs class members. They do not contest that Defendants held dominant market power, that there existed significant barriers to entry, that the industry featured inelastic demand, that Defendants had ample opportunities for forming, monitoring, and enforcing their agreement, and their extensive data sharing. Mem. 22-23. Courts regularly credit these types of structural factors as weighing in favor of common impact and class certification. *In re High Fructose Corn Syrup,* 295 F. 3d 651, 656 (7th Cir. 2002); *and see* Mem. 38 (collecting cases).

On pricing indices, Defendants suggest that because not every index covered all products and because many transactions were not done pursuant to a contract tied to an index, the indices would not facilitate impact. Opp. 40-41. Dr. Johnson does little to refute the substantial evidence showing that the indices were utilized as a starting point for negotiations, Mangum II ¶¶ 109, 113-17, and that the rise of market-based pricing and widespread use of pricing indices further tied the market together such that price increases due to artificial supply restriction would be widely felt. Mangum II ¶¶ 114-123. Moreover, Dr. Johnson's own analyses based on these indices confirm a high degree of correlation. *Id.* ¶¶ 124-25.

Lastly, Dr. Johnson in two paragraphs and Defendants in one paragraph criticize Dr. Mangum's correlation analyses. Johnson Rep. ¶¶ 322-23, Opp. 34. Dr. Mangum soundly rebuts these critiques, Mangum II ¶¶ 130-137, and shows that the hypothetical price series Dr. Johnson constructed is untethered to the allegations in this case, *id.* ¶ 133, and that he failed to demonstrate it was realistic, *id.* ¶ 135. Simply put,

███████████████████████████████████████████████████████████

████████████████████████ and moreover, ██████████████████████

███████████████████████████████████████████████████████████

████████████████████████████ *Id.* ¶ 130. Many courts have held this type

of empirical price analysis supports predominance. *See Kleen Prods.,* 831 F.3d at 928 (correlation

study supports common impact); Mem. 40 (collecting cases).

> **c)** **Dr. Mangum appropriately controlled for non-conspiratorial factors affecting price, reliably isolating the effect of Defendants' collusion.**

As is common in designing an analysis to test for antitrust impact, Dr. Mangum constructed

a benchmark model controlling for a variety of material market factors and comparing prices

during a benchmark period with prices during the alleged conspiracy. Mangum I ¶¶ 198-99

(describing benchmark period) *and generally* ¶¶ 182-211 (describing model in full). The model

detected a statistically significant effect, at a confidence interval of 99%. Mangum I ¶¶ 212-219.

Defendants suggest Dr. Mangum's models are misspecified because factors such as higher

feed costs and lower demand temporarily produced what Defendants call a "perfect storm." Opp.

17-18, 31; *and see* Johnson Rep. § V. But Defendants fail to mention that these factors are all

amenable to control via explanatory variables in a well-specified econometric analysis, and that

Dr. Mangum accounted for all of them fully in his model. Mangum II ¶¶ 54-58. For example, the

impact from the 2007-2008 financial crisis is captured by the model's real disposable income

variable, *id.* ¶ 56, and the amended renewable fuel standard placing pressure on corn prices and

2011-2012 drought are both captured in the model's dressed meat cost variable, *id.* ¶ 57.

The same logic applies to Defendants' repeated references to the Pilgrim's bankruptcy.

Defendants selectively quote a line from *In re Pilgrim's Pride,* 728 F.3d 457, 459 (5th Cir. 2013)

that says "a unilateral attempt to raise prices, without more, is not inherently illicit or anti-

competitive," presumably to create the impression that the decision had considered conspiracy evidence and found Pilgrim's blameless. In context it is abundantly clear that the chicken grower plaintiffs in that case had not alleged an inter-competitor agreement or other violation of the Sherman Act. This Court has already rejected Defendants' suggestion. *See Broiler Chicken,* 290 F. Supp. 3d at 802 ("That case, however, involved consideration of whether Pilgrim's actions had an anticompetitive effect sufficient to demonstrate violation of the Packers and Stockyards Act . . . A conspiracy claim was not at issue."). And the Seventh Circuit in a later *Kleen Products* opinion held that a defendant emerging from bankruptcy whose vice president stated post-discharge that it "had done its part" by closing plants could face antitrust liability. *Kleen Prods. v. Georgia-Pac.,* 910 F.3d 927, 940-41 (7th Cir. 2018). Here, Pilgrim's told other Defendants post-discharge that it "has done its part" by cutting production and shutting plants. Decl. of Adam J. Zapala, Ex. 68, ECF No. 3985-3. And Dr. Mangum explains that bankruptcy is a legal status, not an economic event immune from the supply and demand factors he measured. Mangum Tr. 182:25-183:19 (Defs.' Ex. A); Ex. 8 (Mangum Tr.), 190:8-191:5.

Defendants never explain why Dr. Mangum's variables are insufficient to control for these factors. Perfect or not, the storm they identify is unremarkable in that its elements are fully addressed in the model. As a result, Defendants' reliance on cases criticizing unsound statistical work similarly fails. The model does not run afoul of *Comcast v. Behrend,* 569 U.S. 27 (2013), because it is appropriately specified to isolate the damage resulting from the alleged harm.[8] The

---

[8] The *Comcast* argument has become customary in high-stakes antitrust litigation. As the Seventh Circuit noted in *Kleen Products,* in *Comcast* "the Supreme Court found a mismatch between the plaintiffs' damages theory and the evidence they presented to show predominance. . . . [T]he plaintiffs' damages expert in *Comcast* had estimated harm based on the assumption that all four theories of liability that plaintiffs offered had been established. The class certified by the court, however, was limited to only one of those theories. This, [as] we [have] explained, is what the Supreme Court said, 'made class treatment inappropriate: without a theory of loss that matched the theory of liability, the class could not get anywhere.'" 831 F.3d at

other cases fare no better: Dr. Mangum's model isolates for the harm and is therefore able to trace "the causal link between the antitrust violation and the damages suffered." *Exhaust Unlimited v. Cintas,* 223 F.R.D. 506, 513 (S.D. Ill. 2004). Dr. Mangum did not fail to account for an important factor affecting his dependent variable, as occurred in *In re Aluminum,* 336 F.R.D. 5 (S.D.N.Y. 2020), and he explicitly and expressly did account for all the factors Defendants identified. Dr. Mangum's model is well-specified and is common evidence supplementing CIIPPs' answer to the common question of determining the damages attributable to Defendants' conduct.

### d) Dr. Mangum presents a reliable methodology based on evidence common to the class for calculating damages.

Dr. Mangum's has also presented a classwide basis for calculating damages. Mangum I ¶¶ 255-263. The calculation begins with determining the affected commerce, *id.* ¶ 255, and the overcharge and pass-through rates are then applied to the affected commerce figure, *id.* ¶ 263. As Dr. Mangum notes, Dr. Johnson is ▮▮▮▮▮ on this calculation and takes issue only with a subset of sales amounting to no more than 1% of potentially affected commerce. Mangum II ¶¶ 309-10. While neither accepting nor rejecting the criticism, Dr. Mangum offers a revised figure taking it into account, thereby demonstrating the classwide nature of the damages inquiry as well.

Defendants moreover do not address and therefore concede the authority of CIIPPs' cases standing for the notion that a computation of aggregate damages is permitted. Mem. 42, citing *Kleen Products;* Newberg on Class Actions, § 10.05 (4th Ed. 2005); *In re TFT-LCD (Flat Panel) Antitrust Litig.,* No. M 07-1827 SI, 2012 WL 253298, at *5; *In re: High-Tech Employee Antitrust Litig.,* 985 F. Supp. 2d 1167, 1223-26 (N.D. Cal. 2013).

---

925-26 (*quoting In re IKO Roofing,* 757 F.3d 599, 602 (7th Cir. 2014)). No limitation to the viable theories of injury has come to pass in this straightforward cartel conspiracy case.

### 2. Dr. Johnson fails to identify a sound reason for disregarding Dr. Mangum's results.

With respect to Dr. Mangum's overcharge model, Dr. Johnson offers a flawed, unreliable disaggregation of the overcharge model, and runs unscientific analyses on a single direct purchaser's data, a tactic all but guaranteed to yield unreliable results. Mangum II ¶¶ 222-30, 136-37. Defendants, standing on this shaky foundation, cite a range of decisions denying class certification due to methodological errors not present here.

### a) Dr. Johnson's analysis slicing up the conspiracy by Defendant and by year yields nonsensical results.

Dr. Johnson offers one attempt at a formal econometric showing. Johnson Rep. ¶¶ 282-90. In it, he carves up the data for every year and every Defendant, slicing and dicing in ways inconsistent with the alleged conspiracy and Defendants' practices. *See* Mangum II ¶ 222



As Dr. Mangum rightly notes,

including that the production cuts resulted in the price dropping by 40% for some Defendant years while doubling for others. *Id.* ¶ 224. Dr. Mangum detected a well-known problem that can infect statistical analyses, multicollinearity:

*Id.* ¶ 226. This flawed analysis is the sole basis for Defendants' and Dr. Johnson's bold assertion that CIIPPs are unable to show overcharges on a significant volume—they claim 35%—of commerce in suit. Opp. 34.

Once Dr. Mangum backs out the annual overcharge coefficients—and hence, the multicollinearity problem—and runs an alternative analysis only altering the original model to disaggregate by Defendant, the nonsensical results subside. Tellingly, the steady, consistent

positive and significant overcharges also return; ███████████████████████████

████████████████████████████████████████████████████████████████████████

██████████ Mangum II ¶¶ 230. █████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ *Id.* This is a

far cry from CIIPPs trying "to average their way to purported overcharges," Opp. 39.[9]

**b)**   **Dr. Johnson's single purchaser regressions are meaningless.**

Dr. Johnson also presents an analysis purporting to show the potential weakness of correlation analysis based on regressions he runs on single purchasers that yields a result of no overcharge on one, Colorado Boxed Beef, despite Dr. Mangum's finding that its pricing was highly correlated with that of another purchaser for which the individual regression does indicate an overcharge. Johnson Rep. ¶¶ 322-327. This study is unscientific cherry-picking, as ████████████ ████████████████████████████████████████████ Mangum II ¶ 137. And Dr. Johnson cannot have looked hard for a reason why this particular purchaser's data produced unusual results, since Dr. Mangum readily identifies one in the fact that it purchased almost exclusively (98.5%) within the conspiracy period, an attribute that complicates comparison of conspiracy and benchmark periods. *Id.*

---

[9] Defendants' case citations are unhelpful here as well. *In re Fluidmaster,* No. 14-cv-5696, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) was a products liability case in which this Court declined to certify subclasses for states whose substantive breach of warranty laws imposed requirements not met under the facts there. *Sheet Metal Workers Local 441 v. GlaxoSmithKline,* No. 04-5898, 2010 WL 3855552 (E.D. Pa., Sept. 30, 2010), a pay-for-delay case, concerned an attempt to certify a class including many end-payor plaintiffs "who, as a result of their applicable co-payment and co-insurance structures, did not suffer any out-of-pocket losses." *Id.* *26. Here, the CIIPPs all purchased at the same level of the distribution chain through the same channel of commerce, and none of their claims are subject to the insurance reimbursement provisions at issue in *Sheet Metal Workers.*

c)      **The proposed CIIPPs class does not include any members who "could not have been" injured.**

Defendants repeatedly claim the proposed CIIPPs class includes entities who "could not have been" harmed (or impacted, or overcharged) in an attempt to bring this case within the rule articulated by the Seventh Circuit in *Messner* and *Kohen v. Pacific Investment,* 571 F.3d 672 (7th Cir. 2009)*. Opp. 25, 27, 29, 39, 53, 55. and see Messner,* 669 F.3d at 824-25 (stating rule); *Kohen,* 571 F.3d at 677 (same). But Defendants only offer analysis for one of these many recitals; the others are unsupported contentions. Opp. 27, *citing* Johnson Rep. ¶¶ 282-90. The cited material is the portion of Dr. Johnson's report presenting the flawed, overfitted model producing unreliable results discussed in the previous section *supra.* Dr. Mangum's analysis demonstrates that pricing impacts from the conspiracy were widespread and common.[10] Moreover, since the viability of Dr. Mangum's model is a common question, this argument too strengthens the case for certification.

d)      **Dr. Mangum's analysis already considers and controls for the other industry factors Defendants identify.**

Confronted with CIIPPs' robust, reliable data showing, Defendants resort to identifying *potential factors* that they speculate *might* complicate analysis. Courts generally disfavor this mode of attack. *See In re Vitamins,* 209 F.R.D. 251, 263 (D.D.C. 2002) (certifying class despite argument that the market was too complicated to model); *In re Fine Paper,* 82 F.R.D. 143, 151-52 (E.D. Pa. 1979) (certifying class despite differing products and marketing practices because conspiracy was "the overriding predominant question"); *see also In re Microcrystalline*, 218 F.R.D. 79, 92–93 (E.D. Pa. 2003) ("Antitrust cases nearly always require some speculation as to what would have happened under competitive conditions . . . but this is not fatal to class certification."). One by one,

---

[10] *Riffey v. Rauner,* No. 10 CV 02477, 2016 WL 3165725 (N.D. Ill. June 7, 2016), Opp. 53, does not apply because Defendants have not shown that the class includes a "great many" members who "could not have been harmed." It is also unnecessary, per *Clark v. Bumbo,* No. 15 C 2725, 2017 WL 3704825 (N.D. Ill. Aug. 28, 2017), to determine what number of unaffected members suffices to constitute a "great many."

Dr. Mangum examines each of these potential issues and shows why each is a mere distraction and simply makes no difference in any case:

*Bird size.* Defendants allude to "critical differences based on bird size," Opp. 12, and claim it is difficult to switch a production facility from one size to another and that customers often require a certain size, *id.* 32-33, but draw no link to a reason to doubt Dr. Mangum's results. Dr. Johnson claims Dr. Mangum fails to appreciate the plant switching issue, and so Dr. Mangum responds with information that a lot of switching, in fact, occurred. Mangum II ¶ 175. Finally, ███ ████████████████████████████████████████████████████████████████████ *id.* ¶ 179. In other words, prices of all three sizes move together and respond to the same or substantially similar supply and demand factors, a strong indication that adjusting the model to account for bird size is unwarranted.

*Individual negotiations (or purchaser size or purchaser volume or buying power or discounts).* In a number of places Defendants refer to the purchasers' varying level of negotiating leverage based on their relative size, the size of the orders, and related factors. Opp. 43. But, as Dr. Mangum explains, ████████████████████████████████████████████████ ██████████████████████████████████████ Mangum II ¶ 107. There is also no indication that the conspiracy itself would have somehow enhanced some class members' comparative ability to negotiate away an overcharge, and Defendants identify no such mechanism. Stronger purchasers would have more success in negotiating lower prices and weaker customers less so, but absent a conspiracy all would have entered negotiations in a context of lower overall market prices. *See In re Pressure Sensitive Labelstock,* No. 3:03-MDL-1556, 2007 WL 4150666 at * 18 (M.D. Pa. Nov. 19, 2007) ("even customers who negotiated prices would have been harmed

because the starting point for negotiations was inflated artificially"); *Urethane*, 768 F.3d at 1254 (rejecting the contention that pricing negotiations negates common impact).

*Subproducts.* Defendants attack the model for supposedly lumping together "the many different cuts of chicken and types of processing" and "distinct product types." Opp. 33. This concern too is misplaced: As Dr. Mangum explains, ███████████████████████ ████████████████████████████████████████████ ██████████████████████ Mangum II ¶ 164. The fact that Dr. Mangum already took this concern into account perhaps explains why Defendants offer no further fix of their own.

*Other meats.* Defendants parrot Dr. Mangum's observation that the prices of beef and pork can affect the price of chicken. Opp. 13, *quoting* Mangum I ¶ 87. Yet, they fail to disclose that Dr. Mangum therefore included variables in his model to address this factor: ████████████ ████████████████████████████████████████████ ██████████████████████—though not in the wing products model because "wings are more of a specialty item" and ████████████████████████████████████ ████████████████████ *Id.* ¶ 203. Defendants concede their agreement with this specification when they acknowledge "pork and beef may be better substitutes for tray pack chicken and worse for restaurants selling chicken wings." Opp. 33.

*Season and Region.* Defendants note that "chicken product prices vary by season and region." Opp. 13. Dr. Mangum included monthly indicator variables to control for differences in prices driven by seasonality. Mangum I ¶ 202. Regional differences are addressed by inclusion of the ship-to state in the fixed effect variables. *Id.* ¶ 201. And again, Defendants themselves propose no better alternatives or explain how these considerations matter.

24

In the end, these marginal considerations never progress beyond speculation, and never form into any concrete reason to doubt common injury.

> **e)** **Defendants' other legal authorities portending individualized issues overwhelming issues common to the class are inapposite or wholly irrelevant to the facts of this case.**

In line with their overall strategy, Defendants sprinkle citations to marginally related cases with defendant-friendly language throughout their Opposition. Mainly, Defendants attempt to tie CIIPPs' certification effort to several cases where the court ruled that an expert had, in conducting a *sui generis* statistical study unlike Dr. Mangum's, performed impermissible averaging in a situation where the evidence portended significant individual issues. *In re Lamictal*, F.3d 184 (3d Cir. 2020), for example, was a pay-for-delay case where proving injury turned on the presumption that reverse payment settlement of a patent lawsuit would extend a branded drug's monopoly, but the evidence showed that the brand manufacturer had preemptively lowered its price, a factor the plaintiffs' expert had not considered. *Id.* 189, 194. Those facts are far removed from a simple output restriction. The plaintiffs in *In re Processed Egg,* 312 F.R.D. 124 (E.D. Pa. 2015) presented an analysis that did not distinguish at all among product types and combined transactions from various sales channels in the same study, unlike here where Dr. Mangum differentiated among products and CIIPPs all purchased at the same level through the same channel. That CIIPPs properly accounted for product differences also renders irrelevant Defendants' citation to *In re Bridgestone/Firestone,* 288 F.3d 1012, 1019 (7th Cir. 2002). *In re Florida Cement,* 278 F.R.D. 674 (S.D. Fla. 2012), is inapposite because there, unlike here, the plaintiffs' expert had offered "no methodology for determining whether pass-through actually occurred." *Id.* 685.

Defendants also reach for cases seeking to certify classes of employees, a task implicating considerations not applicable to collusion over commodity food products. *See Riffey v. Rauner,* 910 F.3d 314 (7th Cir. 2018) (plaintiffs sought refund of fair-share fees paid to labor union for

representation); *Reed v. Advocate Health Care,* 268 F.R.D. 573, 591-92 (N.D. Ill 2009) (nurses asserting novel employer-side monopsony claims; certification denied in part due to weak model); *see also High-Tech* (certifying employee class in groundbreaking decision issued four years later).

In short, this case presents a straightforward, cohesive class definition delineated in terms of an easily understood supply chain that in no way implicates the types of methodological difficulties that arose in the foregoing cases. Moreover, courts have long recognized that some degree of complexity is permissible and no bar to class certification. *See Hardy v. City Optical,* 39 F.3d 765, 771 (7th Cir. 1994) ( "There have been many antitrust class actions in which the relief sought was damages, and the fact that the damages would generally be different for each member of the class was not deemed an insuperable obstacle."); *Messner,* 669 F.3d at 815 ("only in rare, extreme cases would individual damages be so complex as to defeat class certification . . .").

### C.     No other obstacle stands in the way of certifying the CIIPP class.

Defendants briefly touch on concerns over distinctions among the substantive state laws applicable to indirect purchaser claims, typicality, and two proposed representatives' adequacy. The CIIPPs class readily satisfies all of these standards and the remaining elements of Rule 23(a).

### 1.     Defendants fail to identify any distinction among state laws that makes a difference to the determination of any common issue in this straightforward cartel conspiracy case.

Defendants do not dispute that proving the elements of the federal antitrust laws demonstrates a violation of the state antitrust, consumer protection, and unjust enrichment claims alleged. *See* Mem. App. A (ECF No. 3968-2), App. B (ECF No. 3968-3), App. C (ECF No. 3968-4). Instead, Defendants point to differences in *other* types of conduct that may constitute violations of these state laws to assert that variations in those laws somehow preclude CIIPPs from satisfying predominance and superiority in pursuing the antitrust claims here. Opp. 45-52; Fed. R. Civ. P. 23(b)(3). In so doing Defendants try to muddy waters that are crystal clear, ignoring that courts

26

have routinely certified similar multistate indirect purchaser classes where the core issue is whether horizontal competitors conspired, causing injury. In these circumstances, courts have found that variations in applicable state laws either do not exist or are minor and manageable.[11]

<blockquote>
a)    **Whatever variations in state laws are not a barrier to class certification of CIIPPs' state antitrust claims.**
</blockquote>

Defendants incorrectly contend that "substantive variations" among the state laws alleged defeat predominance and would render a class action unmanageable. Opp. 45-47. Just as the court noted in *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 292 (N.D. Ohio 2014), this case simply does not "pose a novel theory of antitrust harm, such that it might be questionable whether a specific state statute extends to prohibit the complained-of conduct."

As many courts have noted, apart from the indirect purchaser rule itself, most states have harmonized their antitrust jurisprudence with that of federal law—meaning that a violation of the Sherman Act also constitutes a violation of the state laws too. *See, e.g., In re TFT-LCD*, 267 F.R.D. at 608-13 (certifying indirect purchasers classes under many state laws and not identifying any predominance issue); ABA SECTION OF ANTITRUST LAW, ANTIRUST LAW DEVELOPMENTS 623 (6th ed. 2007) (noting most state statutory provisions are comparable to Sections 1 and 2 of the Sherman Act). Appendix A to CIIPPs' motion demonstrates the harmonization of federal antitrust law with

---

[11] *See e.g., In re Warfarin*, 391 F.3d 516, 528 (3rd Cir. 2004); *In re Wellbutrin XL,* 282 F.R.D. 126, 145 (E.D. Pa. 2011); *In re Solodyn*, 14-md-02503, 2017 WL 4621777, at *19-20 (D. Mass. Oct. 16, 2017); *In re Nexium*, 297 F.R.D. 168, 175-76 (D. Mass. 2013); *In re Lidoderm,* No. 14-md-02521, 2017 WL 679367, at *27 (N.D. Cal. Feb. 21, 2017); *In re Flonase*, 284 F.R.D. 207, 219 (E.D. Pa. 2012); *In re TFT-LCD*, 267 F.R.D. 583, 608 (N.D. Cal. 2010), *amended in part*, No. M 07-1827, 2011 WL 3268649 (N.D. Cal. July 28, 2011); *In re Static Random Access Memory (SRAM)*, 264 F.R.D. 603 (N.D. Cal. 2009); *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 292 (N.D. Ohio 2014); *United Wis. Servs. v. Abbott Labs. (In re Terazosin Hydrochloride*), 220 F.R.D. 672, 701 (S.D. Fla. 2004); *Hosp. Auth. of Metro Gov't of Nashville v. Momenta Pharm. et al.*, 333 F.R.D. 390 (M.D. Tenn. 2019).

the state violations alleged. The "critical differences among state antitrust laws" to which Defendants refer, Opp. 47, therefore neither are "critical" nor do they constitute "differences."

Although Defendants assert variations in state antitrust laws "can be" claim dispositive, Opp. 46, they do not show how that is the case here. For example, Defendants assert there is some irreconcilable difference between Nebraska and Mississippi laws because the former requires an effect on intrastate commerce and the latter requires both intrastate and interstate activity. *Id.*[12] But as this Court has ruled, "[i]n light of the obvious fact that Broilers are purchased in substantial numbers throughout the United States, these allegations plausibly establish 'substantial' intrastate effects [where so required]." *Broiler Chicken,* 290 F. Supp. 3d at 816. The same "obvious fact"— that Broilers are purchased in substantial numbers throughout the United States—also demonstrates interstate conduct such that no variation exists with respect to factual proof.[13] *See In re Keurig Green Mountain*, 383 F. Supp. 3d at 266-67 (allegations that defendant had distributors across the Southeast, including in Mississippi, suggested interstate activity).[14] Defendants do not say otherwise, nor do they explain how any variation negates the fact that CIIPPs will be entitled to an antitrust verdict in every state alleged if they prove Defendants violated federal antitrust law. Nor do Defendants provide any reason why putting on simple evidence of intrastate conduct in Mississippi and addressing the issue in a verdict form would create unmanageable chaos at trial.

---

[12] *Citing In re Keurig Green Mountain Single-Serve Coffee*, 383 F. Supp. 3d 187, 266-67 (S.D.N.Y. 2019) (Mississippi law) and *Arthur v. Microsoft Corp.*, 267 Neb. 586, 597 (2004), respectively.

[13] Defendants further speculate that CIIPPs who have locations in multiple states might not have records breaking down their purchases by state. Opp. 46 n.52. But the testimony they cite from the Chicken Joe's 30(b)(6) deposition in no way supports such speculation. The witness never said ████████████ ████████████████████████████████████████████████████████████████ Ex. 9 (J. Marini Tr.). 41:18-42:6.

[14] *Keurig* involved a motion to dismiss in which the court found, unlike here, that the plaintiffs failed to adequately allege *any* intrastate conduct. 383 F. Supp.3d.

28

References to cases about the pass-on defense[15] are another red herring. Opp. 47. No party is below the CIIPPs in the chain of distribution, so there is no one to whom the CIIPPs could have passed on overcharges, no risk of double recovery, and, therefore, no pass-through defense against CIIPPs. *See* ECF No. 749 at 10 ("CIIPPs downstream information cannot be relevant to show whether any overcharge was passed on . . . because CIIPPs are not upstream from either EUCPs or anyone else in the distribution chain"). Indeed, Dr. Johnson neither addresses this point nor identifies any such complicating factors. *See* Johnson Rep. ¶¶ 314-316.

Statutes of limitations also pose no insurmountable differences and it is well-settled that individual damages issues do not preclude class certification. *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 601 (N.D. Ill. 2015) (*citing In re Nexium Antitrust Litig.*, 777 F.3d 9, 2015 WL 265548, at *8 (1st Cir. 2015) ("the need for some individualized determinations at the . . . damages stage does not defeat class certification")). "Challenges based on the statute of limitations, fraudulent concealment, releases, causation, or reliance have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability." *In re Linerboard*, 305 F.3d 145, 163 (3d Cir. 2002) (quoting Newberg & Conti, NEWBERG ON CLASS ACTIONS § 4.26 (3d ed.)); 2 NEWBERG ON CLASS ACTIONS § 4:57 (5th ed.) ("Statute of limitations defenses—like damage calculations, affirmative defenses, and counterclaims—rarely defeat class certification."); *see also In re Checking Account Overdraft*, 307 F.R.D. 630, 651 (S.D. Fla. 2015); *Tait v. BSH Home Appliances*, 289 F.R.D. 466, 486 (C.D. Cal. 2012) (quoting *Linerboard*, 305 F.3d at 163); *Nexium*, 777 F.3d 9 (1st Cir. 2015) (variance in state laws and statutes of limitations do not bar certification

---

[15] *Clayworth v. Pfizer*, 233 P.3d 1066 (Cal. 2010); *In re Vitamins*, 259 F. Supp.2d 1 (D.D.C. 2003).

under Rule 23(b)(3)); *Ploss v. Kraft*, 431 F. Supp.3d 1003, 1017 (N.D. Ill. 2020) (rejecting blanket prohibition against certification based on statute of limitations differences).[16]

Defendants also fail to identify any variations that create a real manageability challenge. Minor state law differences do not render a case unmanageable because they "can be readily accommodated on a special verdict form or through other mechanisms routinely employed in complex litigations like this one." *Lidoderm*, 2017 WL 679367, at *26–27; *Solodyn*, 2017 WL 4621777, at *20.[17] CIIPPs' claims can, if necessary, be grouped into a manageable number of categories that accommodate any variations in the elements of the applicable state laws. As the Seventh Circuit held in *Mullins v. Direct Digital, LLC*, there is a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns." *Mullins*, 795 F.3d 654, 663 (7th Cir. 2015). Indeed, federal courts routinely certify indirect purchaser classes involving claims of anticompetitive conduct under the laws of multiple states.[18]

---

[16]Defendants cite *In re Community Bank of N.Va.*, 622 F.3d 275, 294 (3d Cir. 2010), to suggest individual equitable tolling issues "could" predominate. Opp. 47. Yet that case mentioned tolling only as an issue hypothetically germane to a class representative's adequacy.
,
[17] Defendants cite *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1833, 2015 WL 3623005 (E.D. Pa. Jun. 10, 2015). Opp. 48. While the court found predominance not satisfied with respect to state consumer and unjust enrichment laws, it held that "evidence of Defendants' alleged violations of the state antitrust laws would be common to the class." *Id.* *16 n.17, *citing Wellbutrin*, 282 F.RD. at 140 ("If each class member pursued its claims individually, the class member would have to prove the same antitrust and consumer protection violations using the same documents, witnesses, and other evidence"). Moreover, the *Vista* court denied certification in part because the plaintiffs had failed the Third Circuit's heightened test for ascertainability, *id.* * 13, a test that does not exist in this Circuit. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 662 (7th Cir. 2015) (declining to adopt Third Circuit's heightened ascertainability standard).

[18] *See generally Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022-23 (9th Cir. 1998) ("differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims.").

> **b)** **There are no material variations in state consumer protection laws here.**

Defendants next point to purportedly fatal variations among CIIPPs' consumer protection law claims. Opp. 48-49.[19] Their approach closely tracks their argument on the antitrust claims; they refer generally to variations without explaining why they matter, and meanwhile they ignore the common factor that proof of antitrust liability constitutes a violation of each state's consumer protection law. *See* CIIPP App. B. The core elements of CIIPPs' state law claims are therefore the same, and common issues predominate. *See Polyurethane*, 314 F.R.D. at 292.

Defendants attempt to sow confusion from the fact that state consumer protection statutes are interpreted broadly to encompass a wide variety of unlawful conduct *beyond* or *in addition to* antitrust violations, including, *inter alia*, unfair *or* unconscionable *or* deceptive conduct, in the disjunctive. *See e.g. In re Processed Egg*, 851 F. Supp. 2d 867, 894 (E.D. Pa. 2012); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline,* 737 F. Supp. 2d 380, 406 (E.D. Pa. 2010); *In re Auto. Parts*, 2013 WL 2456612, at *23 (E.D. Mich. Jun. 6, 2013). But traditional elements of deception-based claims like fraud, *e.g.*, reliance, do not apply to alleged antitrust violations.[20] *See* App. B. Many of the cases cited by Defendants to illustrate "material differences" in state consumer protection laws are distinguishable on this basis alone.[21]

---

[19] Defendants also claim that CIIPPs "ignore" the fourteen applicable consumer protection statutes in their papers. To the contrary, Appendix B to CIIPPs' opening brief (ECF No. 3968-3) addresses those statutes in detail and demonstrates that they are substantially similar.

[20] Defendants again cite *Vista*, Opp. 48. There the plaintiffs sought to assert at least nine state consumer protection laws that are not at issue here and that require proof other than a violation of the antitrust laws.

[21] *See e.g., Bridgestone/Firestone Tires Prods. Liab. Litig.,* 288 F.3d 1012 (7th Cir. 2002) (massive class action regarding defective tires); *In re Grand Theft Auto Video Game Consumer Litigation,* 251 F.R.D. 139, 147 (S.D.N.Y. 2008) (consumer fraud case alleging defendant sold videogames under improper content rating); *Miller v. Gen. Motors*, Nos. 98 C 7386, 98 C 2851, 2003 WL 168626, at * 4 (N.D. Ill. Jan. 26, 2003) (consumer fraud by omission and common law fraud by omission, over peeling paint); *Thorogood v. Sears*, 547 F.3d 742, 746 (7th Cir. 2008) (deceptively advertised clothes dryers). *See also In re Rhone-*

Moreover, Defendants greatly exaggerate variance in the elements necessary to satisfy the intent requirement under certain consumer protection statutes. Because proof of an antitrust violation establishes a violation of each applicable consumer protection law, variations among state law treatment of *other* types of liability theories, such as fraud or off-label marketing, is simply irrelevant to predominance here.[22] *See*, *e.g.*, *Nexium,* 297 F.R.D. at 175 (D. Mass. 2013) (recognizing antitrust violations also violate all consumer protection statutes at issue); *Momenta Pharm.,* 333 F.R.D. at 404. *See also supra* n.15 (citing cases); App. B. The same is true for "what qualifies as prohibited conduct under the[] particular statutes." Opp. 49. The standards used by states to define what violates each statute do not matter when price fixing violates all of them.

Even if the Court were to identify material variations, courts often address any resulting manageability issues through grouping and subclasses. *See In re Average Wholesale Price Litig.*, 252 F.R.D. 83, 93 (D. Mass. 2008), *quoting Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004) ("if the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate."). Appendix B to CIIPPs' motion discusses the wording of each statute and provides a roadmap for grouping the statutes if deemed necessary. A

---

*Poulenc Rorer*, 51 F.3d 1293 (7th Cir. 1995) (tort liability claims against sellers of blood solids); *Doster Lighting v. E-Conolight*, No. 12–C–0023, 2015 WL 3776491, at *15 (E.D. Wis. June 17, 2015) (defective LED bulb arrays and fixtures); *Siegel v. Shell Oil*, 256 F.R.D.580, 583 (N.D. Ill. 2008) (declining to certify *nationwide* unjust enrichment class on a different theory)*; In re Relafen.,* 221 F.R.D. 260, 267-68 (D. Mass. 2004) (declining to include certain unjust enrichment claims, but allowing others, in exemplar class certified for trial).

[22] Defendants also cite *In re EpiPen,* No. 17-md-2785-DDC-TJJ, 2020 WL 1180550, at * 54 (D. Kan. Mar. 10, 2020). Opp. 48. The *EpiPen* plaintiffs, however, asserted different theories of liability including RICO violations, and did not claim that establishing the type of antitrust violation alleged here constituted a violation of the state consumer protection and unjust enrichment laws there at issue. Defendants also fail to mention that although the *EpiPen* court did not certify consumer protection and unjust enrichment classes, it did certify an end-payor class of both consumers and third-party payors under 17 state antitrust laws.

special verdict form accounting for the grouped categories can be utilized at trial. *See Solodyn*, 2017 WL 4621777, at \*20; *Lidoderm*, 2017 WL 679367, at \*27 (contemplating use of special verdict form and "other mechanisms routinely employed in complex litigations like this one").

### c) There are no material variations in CIIPPs' state unjust enrichment claims.

CIIPPs allege four state unjust enrichment claims.[23] Defendants incorrectly assert that variations among these four laws also preclude certification because they "would quickly devolve into mini-trials about which elements to apply to purchases by any particular class member." Opp. 50. But it is well settled that "state claims of unjust enrichment are universally recognized causes of action that are materially the same throughout the United States," and the elements of those claims are "virtually identical." *Terazosin*, 220 F.R.D. at 697 (internal citation and quotation marks omitted); *Singer v. AT&T Corp.*, 185 F.R.D. 681, 692 (S.D. Fla. 1988); Mem. 26. CIIPPs have demonstrated how common evidence will be used to prove all of their claims, including those for unjust enrichment. Mem. 34-42; Proposed Damages Trial Plan (ECF No. 3968-5) at 3-4; App. C.

There is no adequate remedy at law in the states for which unjust enrichment is alleged, which is why CIIPPs pursue these claims in equity. And Defendants moreover fail to identify any variation that matters. They attest that two of the four state laws require that there be no adequate remedy at law, but make no attempt to show such a remedy at law exists in either. Opp. 50. And they urge that Massachusetts requires awareness of wrongdoing on the part of the unjustly enriched wrongdoer, but decline to present an explanation for how a conspirator could fail to understand it had joined a conspiracy. *Id.* Such concerns do not defeat predominance unless they "significantly alter the central issue or the manner of proof. . . . 'idiosyncratic differences' between state unjust

---

[23] This is in stark contrast to the twenty-five state unjust enrichment laws asserted in *Vista*, the out-of-circuit trial court case on which Defendants so heavily rely. 2015 WL 3623005 at \*4.

enrichment laws 'are not sufficiently substantive to predominate over the shared claims.'" *In re Abbott Labs. Norvir Anti-Trust Litig.*, No. 04-1511, 2007 WL 1689899, at \*9 (N.D. Cal. June 11, 2007) (*quoting Hanlon*, 150 F.3d at 1022-23; *Terazosin*, 220 F.R.D. at 701.[24]

The key element of each of these unjust enrichment laws is wrongful conduct. *AmeriPro v. Fleming,* 787 A.2d 988, 991 (3d Cir. 2001); *see also In re TFT-LCD,* No. M 07–1827 SI, 2011 WL 4501223 at \*13 (N.D. Cal. Sept. 28, 2011) ("the Court views the plaintiffs' theory of unjust enrichment as relatively straightforward: defendants' wrongful conduct led them to receive a benefit at plaintiffs' expense."). Here, the common issue of the conspiracy's wrongfulness will predominate. Defendants' attempts to analogize to unsuccessful claims elsewhere therefore fail. The plaintiffs in *Vega v. T-Mobile USA,* 564 F.3d 1256, 1274 (11th Cir. 2009) sought certification of a class of employees pursuing claims over an incentive compensation program unrelated to the antitrust claims here, which the court then denied based on an analysis of Florida unjust enrichment law, a state not at issue here. Defendants cite no authority requiring a finding that "inequity would result or persist" under the unjust enrichment laws CIIPPs have asserted. The court in *In re Skelaxin*, 299 F.R.D. 555 (E.D. Tenn. 2014) declined certification where plaintiffs asserted Tennessee's statute on behalf of a nationwide class, an undertaking CIIPPs do not attempt. *Grandalski v. Quest Diagnostics*, 767 F.3d 175, 185 (3d Cir. 2014) is irrelevant because Defendants here do not claim they refunded any sums wrongfully obtained. The rest of the cases

---

[24] *See*, *e.g.*, *Solodyn*, 2017 WL 4621777, at \*20; *Lidoderm*, 2017 WL 679367, at \*27; *Norvir*, 2007 WL 1689899, at \*10 ("if necessary, sub-classes can be identified to group residents of various States with identical common law [unjust enrichment] requirements [,]" which is "manageable").

Defendants rely on concern non-antitrust causes of action, all of them unlike this case where proof will be straightforward, and common. [25]

### d) CIIPPs Have Proposed a Manageable Trial Plan.

CIIPPs have proposed a trial plan under which they will prove their claims with common evidence that will concurrently establish Defendants' violation of each state's applicable antitrust, consumer protection, or unjust enrichment law. *See* Trial Plan, ECF No. 3968-5. Because the state antitrust and consumer protection statutes are interpreted in substantial conformity with federal antitrust laws, and the four unjust enrichment claims arise from Defendants' antitrust violations, evidence of liability and impact presented to the jury will be common to all class members.

Defendants never articulate a clear critique of this uncontroversial plan. Opp. 51-52. They repeat their refrain that "variability" exists and note that courts in some states have "rejected federal precedent" and found "differences" between federal and state antitrust laws, listing several cases but offering no analysis for why it would matter here. *Id.* 51. They again refer to *Grandalski*. Opp. 45, 52. But *Grandalski* was not an antitrust case, and the plaintiffs there asserted nationwide consumer fraud and unjust enrichment claims but, unlike CIIPPs here, had not conducted "sufficient, or virtually any," analysis supporting their proposed grouping of state laws for trial. *Id.* 178, 183. Yet the *Grandalski* court explicitly recognized that multistate consumer cases could be certified in a circumstance where, like CIIPPs here, the plaintiffs provided a "series of charts setting forth comprehensive analyses of the various states' laws potentially applicable to their common law claims." *Id.* at 183*, citing In re Prudential*, 148 F.3d 283, 315 (3d Cir. 1998).

---

[25] *In re Aqua Dots,* 270 F.R.D. 377 (N.D. Ill. 2010) (product liability); *Muehlbauer v. Gen. Motors*, No. 05 C 2676, 2009 WL 874511 (N.D. Ill. March 31, 2009) (product defect); *Vulcan Golf v. Google*, 254 F.R.D. 521 (N.D. Ill. 2008) (trademark infringement).

### 2. The claims of CIIPPs' proposed class representatives satisfy typicality.

The Seventh Circuit construes Rule 23(a)(3) typicality liberally. *Saltzman v. Pella,* 257 F.R.D. 471, 479 (N.D. Ill. 2009); *and see Keele v. Wexler,* 149 F.3d 589, 595 (7th Cir. 1998) ("A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."); *Kohen,* 244 F.R.D. at 477-78 (same). Allegations of a common antitrust scheme support "a strong assumption that the claims of the representative parties will be typical of the absent class members. *In re Catfish Antitrust Litig.*, 826 F. Supp 1019, 1035 (N.D. Miss. 1993).

Defendants cite a few other readily distinguishable cases. The named plaintiffs in *In re Graphics Processing Units,* 253 F.R.D. 478 (N.D. Cal. 2008) were retail consumers seeking to represent a class also including large wholesalers "who collectively comprised over 99.5% of defendants' business." *Id.* 489. The circumstances in *In re Optical Disk Drive,* 303 F.R.D. 311 (N.D. Cal. 2014) were "in a sense reversed," as the named plaintiffs were large entities, directly targeted by the defendants' bid-rigging, who sought certification of a class including "ordinary consumers." *Id.* 318. Nothing like that type of mismatch is present here. CIIPPs—including all proposed representatives—all purchased at the same level of the distribution chain from the same channels, and so "the named representatives' claims have the same essential characteristics of the claims of the class at large." *Muro v. Target,* 580 F.3d 485, 482 (7th Cir. 2009).

### 3. CIIPPs' proposed class representatives are adequate.

Defendants challenge the adequacy of only two proposed class representatives: Little Figs, Inc. dba Figaretti's Restaurant ("Little Figs") and Sargent's Restaurant and Lounge ("Sargent's"). Opp. 57-59. To launch even these two challenges, Defendants misrepresent both caselaw and facts in the record. These arguments fail. Little Figs and Sargent's are adequate representatives.

a) **Little Figs is an adequate and suitable class representative for the West Virginia CIIPPs.**

Little Figs is located and incorporated in Wheeling, West Virginia and seeks to represent the West Virginia class of purchasers. ECF No. 3968-8 at 190-93 ("Little Figs Decl."), ¶ 1; Ex. 10 ("Little Figs Tr.") at 52-54. Little Figs has purchased Broilers from various Defendants, Little Figs Decl. ¶ 5, via several national distributors, including Sysco, ECF No. 3968-8 at 194-200, US Foods, *id.* at 200-201, and Reinhart, Defs'. Ex. 78; *see also* Little Figs Tr. at 36-37. Defendants claim Little Figs purchased via the Pittsburgh branch of Reinhart, that it "never purchased broilers in West Virginia," and that it consequently cannot represent West Virginia. Opp. 57-58. But Little Figs' made non-Reinhart class period purchases, including via a US Foods facility in Hurricane, West Virginia. Ex. 11 ("Little Figs Supp. Decl."), ¶ 3. So Defendants' argument fails on the facts.

And in any case, Little Figs did purchase all of its broilers, no matter the distributor, in West Virginia: It placed the orders from West Virginia, submitted payment from within West Virginia, and had the orders delivered to West Virginia. Little Figs Tr. at 108-110, 205-207, 213-214; *see also* Defs'. Ex. 78 (showing Figaretti's Restaurant as delivery address). In every meaningful sense the injuries resulting from these transactions could not be more West Virginian in nature. This is how any product enters and impacts any particular state's commerce. *See, e.g., In re Auto. Parts Antitrust Litig.*, 2014 WL 2993753, at *17 (E.D. Mich. July 3, 2014) ("[O]nce the price-fixed products entered the state's commerce, and were purchased by EPPs, an antitrust injury occurred."); *cf. GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 839-40 (E.D. Mich. 2018) (the in-state purchase is the nexus between the defendant's conduct and the intrastate commerce required under the West Virginia Antitrust Act ("WVAA")).

Moreover, Defendants are simply wrong when they argue, citing no authority, that the WVAA applies only to wholly intrastate commerce. Opp. 58. Rather, the WVAA applies to all

anticompetitive conduct that produces "in-state effects." *In re Chocolate Confectionary*, 602 F. Supp. 2d 538, 582 (M.D. Pa. 2009).[26] Therefore, if the resulting injury—here, an overcharge—is felt in West Virginia, then the wrongful conduct has produced an in-state effect and is actionable under West Virginia law. *See In re Cast Iron Soil Pipe and Fittings*, No. 1:14–md–2508. 2015 WL 5166014, at *25 (E.D. Tenn. June 24, 2015). Intrastate impact often flows from interstate conduct. Courts recognize, in nationwide antitrust conspiracy cases, that the interstate character of collusive conduct does not require dismissal of claims and representatives just because the effect of that conduct is not felt solely within a given state. *See, e.g., In re Solodyn*, No. 14–md–02503–DJC, 2015 WL 5458570, at *16 (D. Mass. Sept. 16, 2015) (finding allegations of nationwide antitrust violation causing increased prices paid within each state sufficient to allege intrastate commerce); *Sheet Metal Workers Nat. Health Fund v. Amgen*, No. 07–5295 (SRC), 2008 WL 3833577, at *12 (D.N.J. Aug. 13, 2008) (finding the WVAA applicable "where the anticompetitive conduct may have both interstate effects and, as concerns the particular state in question, intrastate impact.").

Defendants' reliance on *Anziulewicz v. Bluefield Community Hospital*, 531 F. Supp. 49, 53 (S.D. W. Va. 1981) is also unavailing.[27] The question in that case was whether the defendants could invoke federal question jurisdiction to justify removal of a pre-CAFA suit in state court

---

[26] *Chocolate* cited West Virginia state decisional authority holding that the West Virginia antitrust statute "'prohibits a conspiracy that restrains West Virginia trade or commerce, regardless of the locus of the conspiracy.'" *Chocolate*, 602 F.Supp.2d at 582 (quoting *Buscher v. Abbott Labs.,* No. 94–C–755, at 2 (W. Va. Cir. Ct. Jan. 27, 1994)); *see also In re New Motor Vehicles Canadian Export*, 350 F.Supp.2d 160, 175 (D. Maine 2004) (West Virginia statute "not specific as to whether it is the commerce or the illegal conduct that must be inside the state"). The statute broadly makes unlawful: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce. . ." W. Va. Code, § 47-18-3(a).

[27] The same goes for *In re Dairy Farmers*, No. 09-cv-3690, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013). There the issue was whether "Indirect Purchaser Plaintiffs have Article III standing for claims brought under the laws of states" where no named plaintiff had purchased affected products. *Id.* *6. Little Figs did purchase Broilers in West Virginia, so *Dairy Farmers* is inapposite and of no moment.

asserting state antitrust law claims. *Id.* 50. The court's rote observation there that "West Virginia's antitrust law is directed towards intrastate commerce," *id.* 53, has no bearing on the only question relevant here, whether Little Figs satisfies adequacy by having made purchases in West Virginia—which it did. Little Figs clearly satisfies adequacy and typicality.[28]

> **b)** **Sargent's is an adequate and suitable class representative for the South Dakota CIIPPs.**

Defendants' argument that Sargent's is inadequate, Opp. 58-59, is similarly unpersuasive. It relies entirely on two cases where courts found inadequacy based on a representative's financial entanglements with counsel. *Id., citing In re IMAX* 272 F.R.D. 138 (S.D.N.Y. 2010); *In re LIBOR-Based Fin. Instruments*, 299 F. Supp. 3d 430 (S.D.N.Y. 2018)*.* In *IMAX,* the untimely disclosed individual counsel was a significant investment client of and paid considerable fees to the proposed representative. 272 F.R.D. at 156. In *LIBOR,* the proposed representative's son served as undisclosed individual counsel and stood to collect 15% of any class counsel fee award. 299 F. Supp. 3d at 566. Those are not the facts here. Ms. Sargent is co-owner of Sargent's and was the company's 30(b)(6) representative. Her son, Clint Sargent, has not been involved in litigating the case, and no fee arrangement exists between him and Sargent's. Ms. Sargent's testimony does not suggest anything to the contrary, nor does it suggest anything improper. *See* Defs'. Ex. 6.

Defendants cite no authority holding that having separate individual counsel, even if this is what Ms. Sargent testified to, is improper as a general matter. Rather, "the question whether named plaintiffs are adequate class representatives is one committed to the sound discretion of the

---

[28] *Randall v. Rolls-Royce*, 637 F.3d 818 (7th Cir. 2011) nor *Lipton v. Chattem*, 289 F.R.D. 456 (N.D. Ill. 2013) are both unavailing. The plaintiffs in *Randall,* an employment discrimination case, had lost on summary judgment and were subject to a conflict in that the named plaintiffs had authority over some absent class members' compensation. 637 F.3d at 824. No such conflict is present here. *Lipton,* meanwhile, turned on deposition testimony calling into question a proposed representative's reliance on defendants' statements in a consumer fraud action, a factor not relevant here. 289 F.R.D. at 459-60.

district court." *Malchman v. Davis,* 761 F.2d 893, 900 n.2 (2d Cir. 1985), *abrogated on other grounds by Amchem.* Defendants have not established that any of the concerns identified in *IMAX* or *LIBOR* are present here. Additionally, the presence of multiple class representatives—here, 31 others—reduces the likelihood that a single named plaintiff would influence the litigation in an "individually beneficial but class-detrimental way." *LIBOR,* 299 F. Supp. 3d at 565.

Little Figs and Sargent's are adequate class representatives, and adequacy poses no obstacle to certifying the West Virginia and South Dakota damages classes.[29]

### 4. CIIPPs satisfy the remaining Rule 23 requirements.

CIIPPs satisfy numerosity. Mem. 29-30. And commonality. *Id.* 30. A class action will be a superior means of resolving these matters. *Id.* 44-45; Trial Plan. Rule 23 is fully satisfied.

### D. An injunction should issue to protect class members' rights.

In a footnote, Opp. 54 n.55, Defendants aver that the Court should decline to certify a Rule 23(b)(2) injunction class, as is common where antitrust violations are proven. *See, e.g., Fond Du Lac v. Jui Li,* No. 9-CV-852, 2017 WL 4457515, at *6 (E.D. Wis. Aug. 8, 2017) (certifying a nationwide indirect purchaser injunctive relief class); *TFT-LCD,* 267 F.R.D. at 597 (same); *SRAM,* 264 F.R.D. at 611 (same); *In re Vitamin C*, 279 F.R.D. 90, 112-13 (E.D.N.Y. 2012) (same, finding elements to certify indirect purchaser injunctive relief class "easily met"). Defendants appeal to *Kartman v. State Farm,* 634 F.3d 883 (7th Cir. 2011), where plaintiffs with varying hail-damage claims sought roof reinspection relief that the court deemed "broadly impractical." *Id.* 892-93.

---

[29] The other cases Defendants cite are far afield from CIIPPs' claims here. *Orlowski v. Dominick's*, 172 F.R.D. 370 (N.D. Ill. 1997) concerned employment discrimination alleged by subclasses of female and Hispanic employees. The court found that a proposed female Hispanic representative had a conflict with the claims of "minority men." *Id.* 375. In *MacNamara v. City of New York*, 275 F.R.D. 125 (S.D.N.Y. 2011), a named plaintiff sought to represent class members arrested while observing or participating in a political protest, but had no First Amendment claim of his own since he was there to rollerblade. *Id.* 143.

Defendants have not stated a reason why the Court should apply *Kartman* and not the general run of highly practical rulings enjoining antitrust conspirators from persisting in their illicit conduct.

## III. CONCLUSION

For all of the foregoing reasons, CIIPPs respectfully request that the Court grant the motion for class certification in its entirety.

Respectfully Submitted:

Dated:  March 29, 2021

/s/ *Adam J. Zapala*
Adam J. Zapala
Tamarah Prevost
James G.B. Dallal
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: (650) 697-6000
azapala@cpmlegal.com
tprevost@cpmlegal.com
jdallal@cpmlegal.com

Alexander E. Barnett
**COTCHETT, PITRE & MCCARTHY, LLP**
40 Worth Street, 10th Floor
New York, NY 10013
Tel: (212) 201-6820
abarnett@cpmlegal.com

Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Joshua J. Rissman
Brittany Resch
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street, #2600
Minneapolis, MN 55402
Tel: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
bresch@gustafsongluek.com

41

*Interim Co-Class Counsel on Behalf of*
*Commercial and Institutional Indirect Purchasers*

Kenneth A. Wexler
Edward A. Wallace
Melinda J. Morales
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
kaw@wexlerwallace.com
eaw@wexlerwallace.com
mjm@wexlerwallace.com

*Interim Liaison Counsel on Behalf of*
*Commercial and Institutional Indirect*
*Purchasers*

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2021 the foregoing document was served via CM/ECF on all counsel of record:

_____/s/ Adam J. Zapala___
ADAM J. ZAPALA