IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION*<br><br>This Document Relates To:<br>Certain Direct Action Plaintiffs | No. 1:16-cv-08637<br><br>District Judge Thomas M. Durkin<br><br>Magistrate Judge Jeffrey T. Gilbert |

**CERTAIN RESTAURANT DAPS' REPLY IN FURTHER SUPPORT OF THEIR
MOTION TO ESTABLISH A SEPARATE RESTAURANT DAP TRACK AND APPOINT
<u>CERTAIN RESTAURANT DAP LIAISON COUNSEL</u>**

The central theme of Defendants' Reply Brief in Support of their Motion to Amend Scheduling Order 14 and Opposition to Certain Restaurant DAPs' Motion for a Separate Restaurant DAP Track, is that the DAPs are a motley crew who "cannot agree, even among themselves, on any reasonable path forward." If by that, Defendants mean to suggest that DAPs have different positions in a complex case involving some of the largest individual chicken purchasers in the country—each claiming tens if not hundreds of millions of dollars of damages—then Certain Restaurant DAPs and Defendants have found a point of agreement.

It is not at all surprising that there is a lack of uniformity among the DAPs regarding how they believe their individual cases should proceed. The DAP group is comprised of several different categories of purchasers—from grocery stores to restaurants to distributors—and the claims of each type of purchaser varies almost as widely as their businesses. In fact, it is a testament to the DAPs' efforts that in a group as diverse as the DAPs, over 100 plaintiffs represented by over two dozen law firms were able to coalesce behind just three positions.

Indeed, for the better part of the past three months, Defendants have repeatedly emphasized in their class certification opposition briefs how unique each individual plaintiff's purchasing relationship is and why individualized proof is necessary to resolve this case. Now, however, Defendants sing the opposite tune, attempting to characterize the DAP group as a monolith with identical claims that are coextensive with the Class and for whom common discovery is more than sufficient.

Defendants cannot have it both ways. The reality is that the DAP group has many common interests, both with each other and with the Class, but that the members of the group also have unique and sometimes even divergent claims and interests that require individualized attention.

Certain Restaurant DAPs are one of the groups that have unique interests in this case. They are victims of the supply restriction and Georgia Dock conduct that has long been at issue in this case, just as the classes and their DAP brethren are. However, after the Department of Justice issued its first criminal Indictment, the case took on a very different complexion. It is now clear from the DOJ's Indictment and Superseding Indictment that Certain Restaurant DAPs are also victims of Defendants' criminal bid-rigging enterprise, which necessarily requires proof that has not been developed fully yet. Indeed, the bid-rigging conduct is paramount to and impacts all aspects of Certain Restaurant DAPs' claims.[1] It is for this reason that a separate track is necessary to address Certain Restaurant DAPs' unique position in this case.

Even with regard to the supply reduction and Georgia Dock allegations that Defendants want this Court to believe are so homogeneous, Certain Restaurant DAPs' theory is different. Like their bid-rigging claims, Certain Restaurant DAPs' supply reduction and Georgia Dock allegations incorporate Defendants' ***direct communications and dealings*** with Certain Restaurant DAPs and other contract purchasers. There is simply no way around the fact that Certain Restaurant DAPs should receive discovery of these direct communications and dealings.

While Defendants try to downplay Certain Restaurant DAPs' uniqueness, the Court need only look at the allegations of the Amended Consolidated Complaint that Defendants claimed they should not have to answer because they constituted "bid-rigging". Indeed, included among these "bid-rigging" allegations are Certain Restaurant DAPs' specific allegations—which do not mention bid-rigging—of how Defendants used a coordinated false supply reduction of small birds to justify price increases in their contract negotiations with Certain Restaurant DAPs.

---

[1] The same cannot be said of the Class. Indeed, as this Court recognized in its September 22 Order, the Class never even mentioned the word bid-rigging anywhere in its complaint.

Defendants contend that Certain Restaurant DAPs' Motion is a backdoor attempt to reconsider the Court's September 22, 2020 Order, and that Certain Restaurant DAPs' Motion, like "each DAP group's proposal does nothing more than delay this case." Defendants are wrong. Certain Restaurant DAPs were explicitly clear in their Motion that they do not seek to delay or impact in any respect the Class's case schedule. Nor, do they request, again in any respect, to redo any discovery taken in this case regarding the supply reduction and Georgia Dock elements of Defendants' conspiracy.

The real question, though, is why Defendants are so opposed to the relief requested by Certain Restaurant DAPs. Since the bid-rigging aspect of the case must proceed at some point, what difference does it make to Defendants if Certain Restaurant DAPs are permitted to prosecute their supply reduction and Georgia Dock claims at the same time? And what possible justification could Defendants have for not agreeing to allow Certain Restaurant DAPs their own liaison counsel if Certain Restaurant DAPs believe it necessary to represent their interests?

Defendants' Opposition does not address either of these questions, but the answer is self-evident. Defendants are opposed to Certain Restaurant DAPs trying their claims together not because of any legitimate concern regarding case schedule, delay, or duplication. Rather, Defendants realize how interrelated Certain Restaurant DAPs' claims are and that they are much stronger prosecuted together than separately. They also hope that forcing Certain Restaurant DAPs back into the "DAP Class" will blur the differences between Certain Restaurant DAPs' and the other plaintiffs in this case and provide Defendants cover to continue avoiding any type of individualized discovery critical to Certain Restaurant DAPs' claims.

No doubt, this is why Defendants try to dismiss Certain Restaurant DAPs as a smattering of a few restaurants "largely represented by the same law firm." In fact, this smattering of

3

restaurants includes the five (and seven of eight) largest chicken restaurants in the country that have filed opt out complaints. Indeed, Certain Restaurant DAPs account for over $20 billion of purchases during the conspiracy—or *more than a quarter of the entire Direct Purchaser Class*. And, the supposed single law firm Defendants reference is actually a group of six of the most respected antitrust law firms in the country.

Defendants and the Class want this Court to still view this case as a class action, with the DAPs just along for the ride on the proverbial train that has become the analogy of choice in both the Class's and Defendants' submissions. Defendants and the Class miss the point. Certain Restaurant DAPs are not trying to hold up the Class train or change its direction. Certain Restaurant DAPs wish to take a different train to a different city.

### A. Defendants Know Certain Restaurant DAPs Are Different

In their Opposition, Defendants contend that Certain Restaurant DAPs' allegations are "at most, slight variations on the allegations that have been in this case for almost five years"—"there are supply and Georgia Dock claims at issue in all Plaintiffs' complaints." Opp. at 15, 16. Defendants then argue that the discovery already taken in this case on supply restriction and Georgia Dock should be more than sufficient for Certain Restaurant DAPs.

Defendants' attempt to characterize the supply reduction and Georgia Dock elements of this case as one-size-fits-all. They are not. Certain Restaurant DAPs included in their Complaints the allegations asserted by the Class and other DAPs that Defendants engaged in a coordinated conspiracy to reduce the supply of Broilers and to artificially inflate the Georgia Dock price index. But Certain Restaurant DAPs went further—adding allegations that were unique to Defendants' treatment of Certain Restaurant DAPs and other contract-based customers.

4

As Certain Restaurant DAPs explained in their Motion, their supply reduction and Georgia Dock claims incorporated specific allegations regarding *how Defendants used those elements in their direct communications with Certain Restaurant DAPs* to justify the higher prices they were charging. *See, e.g.,* Amended Consolidated Complaint at ¶¶ 571, 572 ("Defendants also were able to take advantage of their coordinated reduction in the supply of broilers in price negotiations with restaurants and other contract purchasers. . . . One of the primary explanations Defendants presented for these inflated prices was what they said was a reduction in the supply of broilers. Defendants were able to point to the actual supply reduction that they orchestrated for broilers in the 2011-2012 timeframe."); *id.* at ¶ 839 ("When Defendants engaged in negotiations with restaurants and other contract purchasers of broilers, and sought to explain why they were 'forced' to increase prices, one of the main explanations that they used to justify the price increases was the artificially inflated Georgia Dock index. Defendants independently could not have provided restaurants and other contract purchasers with the same false explanation for price increases without coordinating the messaging.").

These allegations were found nowhere in the Class complaint or in any prior DAP complaint. Indeed, Defendants themselves viewed certain of these allegations as so unique that they designated them as part of the "new" bid-rigging conduct that they did not have to answer. *See* Joint Stipulation Regarding Answer to DAPs' Am. Consolidated Compl. ¶ 3, ECF No. 4416 (Defendants "not obligated to respond" to paragraphs 571-573 of the Amended Consolidated Complaint).

Defendants clearly have no response to this point, nor can they explain how Certain Restaurant DAPs should be expected to litigate these critical aspects of their claims when Defendants refuse to even answer the allegations. Indeed, in their Opposition Defendants avoid the discussion entirely.

Instead, Defendants resort to their catch-all contention that Certain Restaurant DAPs are attempting to revisit this Court's determination to bifurcate the bid-rigging allegations from the supply reduction and Georgia Dock allegations as currently pled by the Class and other DAPs. Certain Restaurant DAPs are doing nothing of the sort. They are not seeking to lift the bid-rigging stay or accelerate the consideration of their bid-rigging claims. Certain Restaurant DAPs simply wish to prosecute their claims *in full*, and not just the portion that happen to coincide with the Class allegations.

> B. **Defendants' Refusal to Participate in Restaurant DAP Discovery Demonstrates the Need for Separate Certain Restaurant DAP Track**

In their Motion, Certain Restaurant DAPs explained that there is uncharted territory in this case concerning Defendants' communications with Certain Restaurant DAPs. The Class did not pursue discovery regarding Defendants' communications with their customers. And, when Certain Restaurant DAPs attempted to obtain this basic discovery, Defendants refused.

To justify their refusal to engage in discovery with Certain Restaurant DAPs, Defendants first claim that the documents they already produced "hit" on Certain Restaurant DAPs tens of thousands of times. According to Defendants, their hit count research demonstrates that "DAPs have plenty of individual discovery to utilize." Opp. at 9. What Defendants fail to mention, however, is that the vast majority of the "hits" Defendants' showcase are isolated references in Agri Stats and other market reports, mass emails, and other voluminous spreadsheets.

For example, Defendants say they produced documents that yielded 4,889 "hits" for Boston Market. In fact, Defendants' documents contained 8,303 hits on Boston Market. But of those 8,303 hits, 7,583 were contained in spreadsheets, reports, news alerts, and market updates that simply mentioned Boston Market in passing.

6

Similarly, with respect to El Pollo Loco, Defendants say their research yielded 14,239 hits. In actuality, Defendants documents contained 17,769 El Pollo Loco hits. But here as well, 12,857 of the hits were spreadsheets that merely mention the company name. The same holds true for Golden Corral. While nearly 15,547 documents hit on the term "Golden Corral," 10,474 were spreadsheets that simply included the words Golden Corral.

Defendants' response to Certain Restaurant DAPs' specific discovery is even more telling. When Certain Restaurant DAPs requested Defendants' communications with Certain Restaurant DAPs regarding contract negotiations, Defendants made the same assertion that they repeat in their Opposition—that Certain Restaurant DAPs' requests "are an obvious attempt to circumvent the Bid-Rigging Order." Opp. at 8. In fact, Certain Restaurant DAPs could not have been clearer that they "were not seeking documents related to their bid-rigging claims." Motion, Ex. E (3/9/21 email from L. Lustrin to J. Pennington).

Defendants' suggestion that it was Certain Restaurant DAPs who let a productive meet and confer on discovery deteriorate also is incorrect. Defendants state that "[a]s a potential compromise, Defendants agreed to consider producing any contracts that DAPs identified as likely to exist but missing from their own files." Opp. at 8-9. But, Defendants made clear they are not willing to produce *any* communications with or about Certain Restaurant DAPs, or consider adding search terms or custodians relevant to Certain Restaurant DAPs. And, even with regard to contracts, Defendants' suggestion that Certain Restaurant DAPs first must search *their* files and advise Defendants which contracts are missing is an obvious non-starter. That is not how discovery works.

Defendants have no compunction with aggressive discovery intent on acquiring from Certain Restaurant DAPs all discovery concerning Certain Restaurant DAPs' communications

7

with Defendants and more. And Certain Restaurant DAPs have complied with this expansive discovery, running search terms, identifying custodians, producing documents responsive to Defendants requests, and sitting for corporate representative depositions—the topics of which are all encompassing. And, at no time have Certain Restaurant DAPs adopted Defendants' position that Certain Restaurant DAPs only have to produce documents "missing from [Defendants'] own files." This asymmetric discovery must stop.

To be clear, this is not a discovery dispute. That is exactly what Defendants would like this Court to think so it would fit nicely in their narrative that Certain Restaurant DAPs are only seeking to delay these proceedings. But, the dispute between Defendants and Certain Restaurant DAPs goes to the core of Certain Restaurant DAPs' cases—and how they will ultimately be tried.

Once more, as Defendants acknowledge, the interrelationship between Certain Restaurant DAPs' supply restriction, Georgia Dock, and bid-rigging theories is extensive. It is for this very reason that Certain Restaurant DAPs believe that the most efficient and effective solution is the establishment of a separate track whereby Certain Restaurant DAPs can pursue discovery applicable to all of their claims concurrently.

### C. Defendants Cannot Claim Any Prejudice from the Relief Requested in Certain Restaurant DAPs' Motion

As discussed above, what perhaps is most revealing about Defendants' Opposition is why Defendants are so opposed to the relief Certain Restaurant DAPs are requesting. Again, Certain Restaurant DAPs do not want to stand in the way of the case schedule agreed to by the Class and Defendants. Nor do Certain Restaurant DAPs seek to redo any discovery taken in this case by the Class and other DAPs either regarding supply restriction or Georgia Dock. And, since Defendants are going to have to defend the bid-rigging element of this case one way or the other,

8

they cannot claim any legitimate prejudice if Certain Restaurant DAPs are permitted to prosecute their case theories concurrently.

By contrast, Certain Restaurant DAPs should not be limited to the supply reduction and Georgia Dock allegations as pled by the Class and other DAPs. In their complaint, the Class did not rely in any fashion on Defendants' contract-based pricing to certain customers. Indeed, one of the central premises of the Class's complaint was that Defendants moved away from contract-based pricing over the course of the conspiracy. For this reason, the Class did not actively seek discovery from Defendants regarding negotiations with particular customers.

Unlike the Class's complaint, Certain Restaurant DAPs' claims include specific references to Defendants' efforts to use bid submissions and contract negotiations to effectuate across-the-board price increases to restaurants and other contract-based customers. And, to justify these price increases, Defendants engaged in a coordinated messaging campaign to restaurants that was based in major part on a false supply reduction and artificially inflated Georgia Dock prices. Yet, as demonstrated above, Defendants adamantly refused to produce negotiation documents with Certain Restaurant DAPs, claiming it is bid-rigging discovery in disguise.

In short, there is no fair mechanism for Certain Restaurant DAPs to be combined with the Class and other DAPs. By forcing Certain Restaurant DAPs to prosecute the unique aspects of their supply reduction and Georgia Dock claims now, and in conjunction with the Class and other DAPs, Certain Restaurant DAPs will be deprived of even the most basic discovery and arguments relevant specifically to their claims.

Defendants' strident opposition to separate liaison counsel for Certain Restaurant DAP is perhaps even more difficult to justify. What possible reason could Defendants have to object to

9

this reasonable request?  Certain Restaurant DAPs should be permitted a representative to speak to the Court, Defendants, and Class counsel.

Dated:  April 15, 2021

Respectfully submitted,

By: /s/ *Lori P. Lustrin*

Robert W. Turken (*pro hac vice*)
Lori P. Lustrin (*pro hac vice*)
Scott N. Wagner (*pro hac vice*)
**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
1450 Brickell Ave., Suite 2300
Miami, Florida 33131-3456
Telephone:  305-374-7580
Facsimile:  305-374-7593
rturken@bilzin.com
llustrin@bilzin.com
swagner@bilzin.com

Andrew P. Bleiman
**MARKS & KLEIN, LLP**
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
Telephone: 312-206-5162
Facsimile: 312-420-5568
andrew@marksklein.com

*Counsel for Boston Market Corporation, Barbeque Integrated, Inc. d/b/a Smokey Bones Bar & Fire Grill, FIC Restaurants, Inc. d/b/a Friendly's, The Johnny Rockets Group, Inc., WZ Franchise Corp., Golden Corral Corp., White Castle Purchasing Co., Cracker Barrel Old Country Store, Inc., CBOCS Distribution, Inc, Captain D's LLC, Shamrock Foods Company, United Food Service, Inc., Bojangles' Restaurants, Inc., Bojangles Opco, LLC, Zaxby's Franchising LLC, and El Pollo Loco, Inc.*

By: */s/* Ryan Phair

Ryan Phair
Hunton Andrews Kurth LLP

10

2200 Pennsylvania Avenue, NW
Washington, D.C. 20037-1701
(202) 955-1500
rphair@huntonak.com

Matthew J. Calvert
HUNTON ANDREWS KURTH LLP
Bank of America Plaza, Suite 4100
600 Peachtree Street NE
Atlanta, GA 30308
(404) 888-4000
mcalvert@huntonak.com

John S. Martin
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4704
(804) 788-8200
marinj@huntonak.com

Julie B. Porter
SALVATORE PRESCOTT PORTER
& PORTER, PLLC
1010 Davis Street
Evanston, IL 60201
(312) 283-5711
porter@spplaw.com

*Counsel for Chick-fil-A, Inc.*

By: */s/* Jay B. Shapiro

Jay B. Shapiro
Samuel O. Patmore
Carlos J. Canino
Abigail G. Corbett
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Tel: 305.789.3200
Fax: 305.789.3395
jshapiro@stearnsweaver.com

11

spatmore@stearnsweaver.com
ccanino@stearnsweaver.com
acorbett@stearnsweaver.com

Marvin Alan Miller
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
(312) 332-3400
mmiller@millerlawllc.com

*Counsel for Supply Management Systems, Inc.*

By: */s/* Philip J. Iovieno

Philip J. Iovieno
Lawrence Brandman
Nicholas A Gravante , Jr
Mark A. Singer
Cadwalader Wickersham & Taft LLP
200 Liberty Street
New York, NY 10281
212-504-6868
philip.iovieno@cwt.com
nicholas.gravante@cwt.com
lawrence.brandman@cwt.com
mark.singer@cwt.com

Terence H. Campbell
Cotsirilos, Tighe, Streicker, Poulos, & Campbell, Ltd.
33 North Dearborn Street, Suite 600
Chicago, IL 60602 (312) 263-0345
tcampbell@cotsiriloslaw.com

*Counsel for Darden Restaurants, Inc., and PJ Food Service, Inc.*

By: */s/* William J. Blechman

William J. Blechman
Douglas H. Patton
Samuel J. Randall
Michael A. Ponzoli
KENNY NACHWALTER, P.A.

12

1441 Brickell Avenue, Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
Fax: (305) 372-1861
wblechman@knpa.com
dpatton@knpa.com
srandall@knpa.com
mponzoli@knpa

*Counsel for Pollo Operations, Inc.*

By: */s/* Floyd A. Mandell

Floyd A. Mandell
Yonaton Rosenzweig
Jeffrey A. Wakolbinger
Catherine E. O'Brien
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661-3693
Tel: (312) 902-5235
Fax: (312) 902-1061
floyd.mandell@katten.com
yoni.rosenzweig@katten.com

Yonaton M. Rosenzweig (pro hac vice forthcoming)
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, California 90034
Tel: (310) 788 4460
Fax: (310) 712 8222

*Attorneys for Caesars Enterprise, LLC*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that a true and correct copy of the foregoing document was electronically served upon the parties and counsel of record on April 15, 2021.

/s/ *Lori P. Lustrin*
Lori P. Lustrin

13