**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION<br><br>This Document Relates To:<br>Direct Purchaser Actions | No. 1:16-cv-08637<br><br>Hon. Thomas M. Durkin<br>Magistrate Judge Jeffrey T. Gilbert |

**MEMORANDUM IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS'
MOTION FOR INTERIM PAYMENT OF ATTORNEYS' FEES, REIMBURSEMENT
OF EXPENSES, AND CLASS REPRESENTATIVE INCENTIVE AWARDS**

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................... 1

II.     CLASS COUNSEL DEDICATED ENORMOUS RESOURCES TO THIS
        MATTER AND FACED SIGNIFICANT RISKS TO SUCCESSFULLY
        RESOLVE THIS CASE WITH THE SETTLING DEFENDANTS ................................. 3

        A.      Class Counsel Dedicated Tremendous Resources to Resolve DPPs'
                Claims. ................................................................................................ 3

        B.      Class Counsel Faced Significant Risk of Nonpayment. ........................................ 6

                1.      Antitrust Class Actions are Inherently Risky ............................................. 7

                2.      Class Counsel Faced Complex Issues. ........................................................ 8

                3.      Defendants Marshalled Tremendous Resources for Their
                        Defense. ................................................................................... 9

III.    THE REQUESTED INTERIM FEE AWARD IS APPROPRIATE
        UNDER CONTROLLING LAW ................................................................... 11

        A.      DPPs Seek a Percentage of the Settlement Fund as an Interim Award
                of Fees. ................................................................................................ 11

        B.      Plaintiffs' Requested Fee is an Appropriate Market-Based Fee. ........................... 13

                1.      Judicial Fee Awards in Other Class Actions Using a Form
                        of Market-Mimicking Approach Support a 30% to 40% Fee
                        as the Market Rate Here .......................................................... 15

                2.      Reported Statistical Data Support a Market Rate in
                        Antitrust Class Actions of 30% to 40%. ........................................ 16

        C.      A Lodestar Cross-Check Confirms that the Fee Requested is Proper. ................. 17

IV.     COUNSEL'S LITIGATION EXPENSES WERE REASONABLY
        INCURRED AND SHOULD BE APPROVED, AND AT THIS TIME
        THEY SHOULD BE REIMBURSED UP TO $4.5 MILLION ........................................ 19

V.      THE CLASS REPRESENTATIVES SHOULD RECEIVE INTERIM
        SERVICE AWARDS ................................................................................ 21

VI.     CONCLUSION ........................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allapattah Servs., Inc. v. Exxon Corp.*,
454 F. Supp. 2d 1185 (S.D. Fla. 2006) ...................................................................16

*Americana Art China Co., Inc. v. Foxfire Printing and Packaging, Inc.*,
743 F.3d 243 (7th Cir. 2014) ..................................................................................12

*Arenson, et al. v. Bd. of Trade of City of Chicago*,
372 F. Supp. 1349 (N.D. Ill. 1974) .........................................................................10

*In re Avandia Mktg., Sales Practices and Prods. Liab. Litig.*,
MDL No. 1871, 2012 WL 6923367 (E.D. Pa. Oct. 19, 2012).................................9

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982).................................................................................................14

*Blum v. Stenson*,
465 U.S. 886 (1984).................................................................................................13

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980).................................................................................................11

*Brewer v. S. Union Co.*,
607 F. Supp. 1511 (D. Colo. 1984)..........................................................................10

*Burkholder v. City of Ft. Wayne*,
750 F. Supp. 2d 990 (N.D. Ind. 2010) ....................................................................14

*In re Cabletron Sys., Inc. Secs. Litig.*,
239 F.R.D. 30 (D.N.H. 2006) ..................................................................................16

*Campbell v. Advantage Sales & Mktg. LLC*,
No. 1:09-cv-01430, 2012 WL 1424417 (S.D. Ind. Apr. 24, 2012).........................14

*In re Capital One Telephone Consumer Protection Act Litig.*,
80 F. Supp. 3d 781 (N.D. Ill. 2015) ..........................................................................7

*In re Cardizem CD Antitrust Litig.*,
218 F.R.D. 508 (E.D. Mich. 2003) ...........................................................................8

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
MDL No. 1917, 2016 WL 721680 (N.D. Cal. Jan. 28, 2016) ...................................8

*Matter of Cont'l Illinois Sec. Litig.*,
  962 F.2d 566 (7th Cir. 1992),
  *as amended on denial of reh'g* (May 22, 1992)..................................................6, 14

*Cook v. Niedert*,
  142 F.3d 1004 (7th Cir. 1998) ...........................................................17, 18, 21, 22

*In re Dairy Farmers of Am., Inc.*,
  80 F. Supp. 3d 838 (N.D. Ill. 2015) .......................................................12, 13, 17, 19

*Denius v. Dunlap*,
  330 F.3d 919 (7th Cir. 2003) ...........................................................................17

*Florin v. Nationsbank of Ga., N.A.*,
  34 F.3d 560 (7th Cir. 1994) ....................................................................6, 12, 18

*Gaskill v. Gordon*,
  160 F.3d 361 (7th Cir. 1998) ...........................................................................11

*Gaskill v. Gordon*,
  942 F. Supp. 382 (N.D. Ill. 1996) ................................................................12, 13

*Gastineau v. Wright*,
  592 F.3d 747 (7th Cir. 2010) ...........................................................................18

*George v. Kraft Foods Glob., Inc.*,
  Nos. 1:08-cv-03799; 1:07-cv-01713,
  2012 WL 13089487 (N.D. Ill. June 26, 2012) .......................................................17

*Goldsmith v. Tech. Sols. Co.*,
  No. 1:92-cv-04374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ................................14

*Hale v. State Farm Mut. Auto. Ins. Co.*,
  No. 3:12-cv-00660, 2018 WL 6606079 (S.D. Ill. Dec. 16, 2018) ................................11

*Harman v. Lyphomed, Inc.*,
  945 F.2d 969 (7th Cir. 1991) .......................................................................18, 19

*Heekin v. Anthem, Inc.*,
  No. 1:05-cv-01908, 2012 WL 5878032 (S.D. Ind. Nov. 20, 2012)............................11, 13, 17

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)......................................................................................12

*In re Hyundai and Kia Fuel Economy Litig.*,
  926 F.3d 539 (9th Cir. 2019) ...........................................................................19

*In re Ins. Brokerage Antitrust Litig.*,
  282 F.R.D. 92 (D.N.J. Mar. 30. 2012) ...................................................................10

*In re Ins. Brokerage Antitrust Litig.*,
  MDL No. 1663, 2009 WL 411856 (D.N.J. Feb. 17, 2009).....................................15

*Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs*,
  553 F.3d 487 (7th Cir. 2009) ..................................................................................17

*Kelly v. Wengler*,
  822 F.3d 1085 (9th Cir. 2016) .................................................................................19

*Kirchoff v. Flynn*,
  786 F.2d 320 (7th Cir. 1986) ..............................................................................6, 12

*Kitson v. Bank of Edwardsville*,
  No. 3:08-cv-00507, 2010 WL 331730 (S.D. Ill. Jan. 25, 2010) .............................14

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
  733 F. Supp. 2d 997 (E.D. Wis. 2010).....................................................................19

*Leung v. XPO Logistics, Inc.*,
  326 F.R.D. 185 (N.D. Ill. 2018)...............................................................................17

*In re Linerboard Antitrust Litig.*,
  No. 2:98-cv-05055, 2004 WL 1221350 (E.D. Pa. June 2, 2004),
  *amended*, No. 2:98-cv-05055, 2004 WL 1240775 (E.D. Pa. June 4, 2004) .............8

*In re Lithotripsy Antitrust Litig.*,
  No. 1:98-cv-08394, 2000 WL 765086 (N.D. Ill. June 12, 2000)................12, 13, 14

*Martin v. Caterpillar Inc.*,
  No. 1:07-cv-01009, 2010 WL 11614985 (C.D. Ill. Sept. 10, 2010) ........................14

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970).............................................................................................11, 19

*Montgomery v. Aetna Plywood, Inc.*,
  231 F.3d 399 (7th Cir. 2000) ...................................................................................11

*In re NASDAQ Mkt-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) ...............................................................................8

*Nilsen v. York Cnty.*,
  400 F. Supp. 2d 266 (D. Me. 2005) ..........................................................................15

*In re Northfield Lab., Inc. Secs. Litig.*,
  No. 1:06-cv-01493, 2012 WL 2458445 (N.D. Ill. June 26, 2012)...........................11

*Pavlik v. FDIC*,
  No. 1:10-cv-00816, 2011 WL 5184445 (N.D. Ill. Nov. 1, 2011) ...........................................14

*Paz v. Portfolio Recovery Assocs., LLC*,
  924 F.3d 949 (7th Cir. 2019) .......................................................................................18

*In re Ready-Mixed Concrete Antitrust Litig.*,
  No. 1:05-cv-00979, 2010 WL 3282591 (S.D. Ind. Aug. 17, 2010) ..........................12, 14, 19

*In re Remeron Direct Purchaser Antitrust Litig.*,
  No. 2:03-cv-00085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) ............................................16

*Retsky Family Ltd. Partnership v. Price Waterhouse LLP*,
  No. 1:97-cv-07694, 2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) ........................................14

*In re Schering-Plough Corp. Enhance Secs. Litig.*,
  No2:08-cv-02177, 2013 WL 5505744 (D.N.J. Oct. 1, 2013) ................................................9

*Schulte v. Fifth Third Bank*,
  805 F. Supp. 2d 560 (N.D. Ill. 2011) ..............................................................................14, 19

*Sec. & Exch. Comm'n v. First Secs. Co. of Chicago*,
  528 F.2d 449 (7th Cir. 1976) .......................................................................................13

*Silverman v. Motorola Sols., Inc.*,
  739 F.3d 956 (7th Cir. 2013) .........................................................................................6

*Skelton v. Gen. Motors Corp.*,
  860 F.2d 250 (7th Cir. 1988) ....................................................................................18, 19

*Spicer v. Chicago Bd. Options Exch., Inc.*,
  844 F. Supp. 1226 (N.D. Ill. 1993) ................................................................................22

*Standard Iron Works v. ArcelorMittal*,
  No. 1:08-cv-05214, 2014 WL 7781572 (N.D. Ill. Oct. 22, 2014) .......................................19

*Matter of Superior Beverage/Glass Container Consol. Pretrial*,
  133 F.R.D. 119 (N.D. Ill. 1990) ......................................................................................8

*Sutton v. Bernard*,
  504 F.3d 688 (7th Cir. 2007) .......................................................................................12

*In re Synthroid Mktg. Litig.*,
  264 F.3d 712 (7th Cir. 2001) ...........................................................................6, 7, 15, 19

*In re Trans Union Corp. Privacy Litig.*,
  No. 1:00-cv-04729, 2009 WL 4799954 (N.D. Ill. Dec. 9, 2009),
  *order modified and remanded*, 629 F.3d 741 (7th Cir. 2011)..................................................15

*Trist v. First Fed. Savings & Loan Ass'n of Chester*,
    89 F.R.D. 8 (E.D. Pa. 1980)....................................................................................10

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ..............................................................................19

*In re Warner Comm'ns. Secs. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986)...................10

*Will v. Gen. Dynamics Corp.*,
    No. 3:06-cv-00698, 2010 WL 4818174 (S.D. Ill. Nov. 22, 2010)..........................14

*Williams v. Gen. Elec. Cap. Auto Lease*,
    No. 1:94-cv-07410, 1995 WL 765266 (N.D. Ill. Dec. 26, 1995) ...........................11

*Williams v. Rohm & Haas Pension Plan*,
    658 F.3d 629 (7th Cir. 2011) ....................................................................11, 12, 17

*Williams v. Rohm & Haas Pension Plan*,
    No. 4:04-cv-00078, 2010 WL 4723725 (S.D. Ind. Nov. 12, 2010),
    *aff'd*, 658 F.3d 629 (7th Cir. 2011).......................................................................21

*In re WorldCom, Inc. Secs. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005)....................................................................10

*Wright v. Nationstar Mortg. LLC*,
    No. 1:14-cv-10457, 2016 WL 4505169 (N.D. Ill. Aug. 29, 2016).........................17

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    395 U.S. 100 (1969)...............................................................................................14

**Other Authorities**

Alba Conte, *Attorney Fee Awards* § 2.08 (3d ed. 2004)..............................................19

Joshua P. Davis, *Toward an Empirical and Theoretical Assessment of*
    *Private Antitrust Enforcement*, 36 SEAULR 1269, 1293-95 (2013)......................16

Lester Brickman, *ABA Regulation of Contingency Fees: Money Talks,*
    *Ethics Walks*, 65 FORDHAM L. REV. 247, 248 (1996)............................................13

Nicholas M. Pace, Stephen J. Carroll, Ingo Vogelsang, & Laura Zakaras,
    *Insurance Class Actions in the United States*, 47 (tbl. 3.16) (2007)..........................7

Robert H. Lande & Joshua P. Davis, *Benefits from Private Antitrust*
    *Enforcement: An Analysis of Forty Cases*, 42 U.S.F. L. REV. 879 (July 2008) ....................16

Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses*
    *in Class Action Settlements: 1993-2008*, 7 J. Empir. L. Stud. 248 (2010) .........7, 19

**Rules**

Fed. R. Civ. P. 23(h) ...........................................................................................................19

Fed. R. Civ. P. 30(b)(1)........................................................................................................4

Fed. R. Civ. P. 30(b)(6)........................................................................................................4

## I.  INTRODUCTION

After more than four and one-half years of hard-fought litigation in this complex antitrust class action with no guarantee of compensation, Interim Co-Lead Counsel for the Direct Purchaser Plaintiffs ("Co-Lead Counsel")[1] have secured settlements with six Defendant families: Amick Farms LLC, Fieldale Farms Corporation, Peco Foods, Inc., Pilgrim's Pride Corporation, the George's Defendants,[2] and the Tyson Defendants[3] (collectively, "Settling Defendants").[4] Under the terms of these settlements, the Settling Defendants have paid into escrow a total of $170,261,600.00 ("Settlement Fund"), and Co-Lead Counsel have commenced the claims process to disburse the net proceeds of the Settlement Fund to qualified class members.

These settlements reflect the skill, expertise, and hard work of Co-Lead Counsel and other Direct Purchaser Plaintiff Counsel (collectively, "Class Counsel"),[5] and the benefit to class

---

[1] The Court appointed Lockridge Grindal Nauen P.L.L.P. ("LGN") and Pearson, Simon & Warshaw, LLP ("PSW") as Interim Co-Lead Counsel, and Hart, McLaughlin & Eldridge, LLC as Interim Liaison Counsel. (ECF No. 144, Oct. 14, 2016 Order.)

[2] The George's Defendants are George's Inc. and George's Farms, Inc. (ECF No. 3919, DPPs' Fifth Amended and Consolidated Class Action Complaint, ¶¶ 61-62.)

[3] The Tyson Defendants are Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc. (*Id.*, ¶¶ 33-36.)

[4] This Court granted final approval to the DPPs' settlements with Defendant Fieldale Farms Corporation on November 16, 2018 (ECF No. 1414); Amick Farms LLC on October 26, 2020 (ECF No. 3934); and the George's Defendants and Peco Foods, Inc. on October 27, 2020 (ECF No. 3944). This Court granted preliminary approval to DPPs' settlements with Pilgrim's Pride Corporation and the Tyson Defendants on February 25, 2021 (ECF No. 4341). The Court has scheduled a fairness hearing on final approval of the Pilgrim's and Tyson settlements on June 29, 2021, at which time Co-Lead Counsel also will seek to have this motion heard.

[5] Under Co-Lead Counsel's direction, 20 other firms prosecuted this case on DPPs' behalf and, together with DPPs' Co-Lead Counsel, they are referred to collectively in this Memorandum as "Class Counsel." At all times, Co-Lead Counsel directed and organized Class Counsel's work. *See* Declaration of W. Joseph Bruckner in Support of Direct Purchaser Plaintiffs' Motion for Interim Award of Attorneys' Fees, Reimbursement Expenses, and Class Representative Incentive Awards, dated April 16, 2021 ("Bruckner Decl."). Co-Lead Counsel will have discretion to allocate an award of attorneys' fees among Direct Purchaser Plaintiff Counsel. Co-Lead Counsel's good-faith

members is substantial, real, and concrete, compared to the significant litigation risks in this case. As such, Direct Purchaser Plaintiffs ("DPPs") respectfully ask the Court to award Class Counsel 33 1/3% of the Settlement Fund or $56,753,866.00[6] as attorneys' fees, $4,500,000.00 as reimbursement for litigation expenses, and $25,000.00 in incentive awards to each of the five named class representatives.[7]

All class members will have notice and an opportunity to be heard on this motion. In the Court-approved notice to class members of the Tyson and Pilgrim's settlements, Class Counsel informed all class members that they would seek an award of attorneys' fees in an amount not to exceed 33 1/3% of the Settlement Proceeds and $4.5 million in litigation expenses.[8] As class members also were informed, this motion will be posted on the case website, https://www.broilerchickenantitrustlitigation.com, contemporaneously with the filing of this motion. Class Counsel also informed class members that the Court will determine the amount of the attorneys' fees and litigation expenses to be paid to Class Counsel in this case. Finally, class

---

determination will reflect each individual Class Counsel's contribution to the commencement, prosecution, and resolution of the litigation.

[6] There are opt-out reduction mechanisms in the Pilgrim's and Tyson settlement agreements that could result in a reduction in the total amounts of those settlements, depending on how many class members opt out of those settlements (ECF No. 4259-1, at 22-24 (Pilgrim's) and 53-55 (Tyson)). The deadline to opt out of those settlements is May 17, 2021. If those reduction mechanisms are triggered, Plaintiffs will advise the Court in advance of the hearing on June 29, 2021, provide the amounts of the reductions, and provide a new calculation of 1/3 of the Settlement Fund as a proposed award of attorneys' fees.

[7] As discussed in Section IV below, although Class Counsel's current litigation expenses exceed $4.5 million, Class Counsel informed the class that their request for reimbursement of litigation expenses from these settlements would not exceed $4.5 million.

[8] See https://www.broilerchickenantitrustlitigation.com/admin/services/connectedapps. cms.extensions/1.0.0.0/asset?id=d1618bee-26ea-4ac1-8583-56e80f11113c&languageId=1033 &inline=true (last visited April 8, 2021); *see also* ECF No. 4259-2 at 25 (proposed class notice); ECF No. 4341 (Feb. 25, 2021 Order granting DPPs' motion for preliminary approval of the Tyson and Pilgrim's settlements and accompanying class notice).

2

members were told that they may object to any aspect of the Tyson and Pilgrim's settlements and that the deadline to do so is May 17, 2021.[9]  Prior to the Court's fairness hearing on June 29, 2021, Class Counsel will report to the Court on any objections received, including to this motion for fees and expenses.

## II.  CLASS COUNSEL DEDICATED ENORMOUS RESOURCES TO THIS MATTER AND FACED SIGNIFICANT RISKS TO SUCCESSFULLY RESOLVE THIS CASE WITH THE SETTLING DEFENDANTS

From the inception of their investigation into this matter, Class Counsel dedicated their time, expertise, and capital to ensure the Class would recover for Defendants' wrongful conduct. A summary of those efforts is provided below.

### A.  Class Counsel Dedicated Tremendous Resources to Resolve DPPs' Claims.

Class Counsel have dedicated tremendous time, effort, and expense to this litigation, and they have done so entirely on a contingent basis, with no guarantee of compensation or even reimbursement of expenses. Since the inception of this case (many months before it was actually filed in September 2016), Class Counsel invested 100,608.25 hours of attorney and other legal professional time through December 31, 2020.[10] (Bruckner Decl. ¶ 24.) Co-Lead Counsel have worked diligently to ensure that throughout the case, Class Counsel's efforts have been coordinated, detailed, vigorous, and efficient. To date, the result of these efforts is a substantial recovery for the DPPs: a Settlement Fund of $170,261,600.00.

---

[9] *Id.*

[10] Class Counsel have limited the reporting of their time and lodestar through December 31, 2020 for the purpose of this motion. They will continue to dedicate significant time and resources to the litigation until it is resolved.

This Court is well acquainted with the history of this case, so it is unnecessary to describe in depth the litigation, its procedural history, expert analysis, and other work needed to build a case of this magnitude. Instead, following is an overview of Class Counsel's efforts to date:

- Co-Lead Counsel filed the first antitrust complaint on behalf of Broiler chicken purchasers in September 2016. This complaint was the product of Co-Lead Counsel's extensive preparation, independent investigation, and research into the Broiler chicken industry. Unlike other matters, there were no prior or contemporaneous government investigations or enforcement proceedings; instead, the U.S. Department of Justice's ("DOJ") related investigation and criminal proceedings followed this civil litigation. Class Counsel have prepared and filed multiple amended and consolidated complaints reflecting information Class Counsel obtained from additional investigation and discovery. (Bruckner Decl. ¶ 4.)

- Class Counsel have developed numerous case management plans and worked cooperatively with indirect purchaser class counsel, direct action plaintiffs, the DOJ, and Defendants to implement those plans. (Bruckner Decl. ¶ 5.)

- Class Counsel have prepared and filed comprehensive memoranda of law: (a) in opposition to Defendants' motions to dismiss, (b) regarding numerous discovery issues, (c) in support of class certification, including expert reports and other exhibits, and (d) seeking preliminary and final approval of settlements with the Settling Defendants. (Bruckner Decl. ¶ 6.)

- Class Counsel have conducted extensive fact and expert discovery, including preparing for and taking well over 100 Rule 30(b)(1), 30(b)(6), and expert

depositions. Class Counsel reviewed, analyzed, and coded a database containing more than 8 million documents and other records produced by Defendants and third parties in the litigation, utilized in support of depositions, class certification, and additional facets of the case. (Bruckner Decl. ¶ 7.)

- Class Counsel have consulted with experts during their pre-suit investigation and the discovery phase of this case, including their agricultural economist Dr. Colin Carter, who prepared a 119-page opening report and a 137-page reply report in support of class certification. (Bruckner Decl. ¶ 8.)

- Class Counsel engaged in extensive adversarial negotiations and mediations and ultimately negotiated six settlement agreements with the Settling Defendants. (Bruckner Decl. ¶ 9.)

- Class Counsel have taken evidence proffers and interviewed witnesses made available by Settling Defendants. (Bruckner Decl. ¶ 10.)

- Class Counsel have prepared and executed the Court-approved class notice and settlement claims administration programs. (Bruckner Decl. ¶ 11.)

In addition to the 100,608.25 hours of attorney and other legal professional time invested in this case through December 31, 2020, to date Class Counsel have incurred total litigation expenses in the amount of $5,104,566.48.[11] These expenses, discussed in detail below, were required to carefully frame the complex issues of fact and law in the pleadings, to defeat Defendants' motions to dismiss, to effectively manage the case, to undertake well-organized

---

[11] As noted above at p. 2 and in Section IV below, in this motion Class Counsel seek payment of $4.5 million in litigation costs.

attempts to discover a complex antitrust case against enormous (and enormously wealthy) business entities, and to support class certification. (Bruckner Decl. ¶¶ 28-35.)

Class Counsel will continue to vigorously litigate this case against the remaining Defendants, including discovery, motion and litigation practice, and trial. With respect to the settlements, Class Counsel will seek final approval of the settlements preliminarily approved by this Court, supervise all aspects of settlement and claims administration, and supervise the final distribution of settlement proceeds to qualified DPPs. (Bruckner Decl. ¶ 12.)

### B. Class Counsel Faced Significant Risk of Nonpayment.

A material consideration in determining an appropriate fee is the risk of nonpayment. *See Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001). "The lawyers for the class receive no fee if the suit fails." *Matter of Cont'l Illinois Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992), *as amended on denial of reh'g* (May 22, 1992). "Contingent fees compensate lawyers for the risk of nonpayment. The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Silverman*, 739 F.3d at 958 (citing *Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir. 1986)).

To determine a fee award in a class action settlement, a court must assess counsel's risk of taking a particular case and the probability of success as it existed "*at the outset* of the litigation." *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994). Therefore, a court must do its best to estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers at the outset of the case, when the risk of loss still existed, rather than at the end of a successful case:

> The best time to determine this rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness,

and sunk costs make it impossible for the lawyers to walk away if
the fee is too low). This is what happens in actual markets.

*In re Synthroid*, 264 F.3d at 718; *see also In re Capital One Telephone Consumer Protection Act Litig.*, 80 F. Supp. 3d 781, 788–89 (N.D. Ill. 2015) (the probability of success at the outset of litigation helps determine the reasonableness of the fee).

As discussed below, Class Counsel faced a significant risk of nonpayment. The scope of this case is extensive: DPPs alleged a price-fixing conspiracy by the United States' leading Broiler chicken producers and claimed that they and the Class paid significant overcharges as a result. Class Counsel believed in DPPs' case, invested extensive time, effort, and money, and prosecuted it vigorously. Class Counsel did so at the risk of no recovery and declined other opportunities because of the complexity, time, and expense this case demanded. (Bruckner Decl. ¶ 13.)

Class Counsel also conceived and brought this case without the benefit of any related government investigation or enforcement action. (Bruckner Decl. ¶ 4.) Indeed, only after DPPs had prosecuted this case for two-and-a-half years did the DOJ convene grand jury proceedings. And then, the first step the DOJ took was to *subpoena DPP Co-Lead Counsel* for the documents they already obtained in discovery from Defendants and third parties, after which the DOJ moved to intervene in this case. (Bruckner Decl. ¶ 4; ECF No. 2302.)

In the face of these risks, Class Counsel have achieved significant recoveries on behalf of the DPP Class after over four years of litigation, with 14 Defendants left in the case. (Bruckner Decl. ¶¶ 9, 12-13.) A brief overview of the relevant factors considered by courts is provided below.

1.     Antitrust Class Actions are Inherently Risky.

In a study analyzing class actions against insurers, only 12% of 564 attempted class actions led to a class settlement. Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. EMPIR. L. STUD. 248, at 24 (2010) (citing Nicholas

M. Pace, Stephen J. Carroll, Ingo Vogelsang, & Laura Zakaras, *Insurance Class Actions in the United States*, 47 tbl.3.16 (2007)). Antitrust class actions are riskier still, due in part to their unpredictable nature, as well as the tremendous time and expense required to obtain a successful resolution. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 WL 721680, at *17 (N.D. Cal. Jan. 28, 2016) (quoting *In re NASDAQ Mkt-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998)); *see In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003) (emphasizing a strong public interest in encouraging settlement of complex, class-action lawsuits because they are "notoriously difficult and unpredictable" and settlement preserves judicial resources). "The 'best' case can be lost and the 'worst' case can be won, and juries may find liability but no damages. None of these risks should be underestimated." *Matter of Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990).

Here, the stakes were extremely high. DPPs alleged a nationwide conspiracy to fix, raise, maintain, and stabilize the price of Broilers—the nation's most popular meat product. While Fieldale settled prior to November 2017 when the Court denied Defendants' motions to dismiss DPPs' complaint (ECF No. 541), the other five Settling Defendants continued to aggressively litigate the case, fighting DPPs on the merits. In the face of these risks, Class Counsel vigorously represented DPPs and obtained a substantial recovery on behalf of the Class.

2.    Class Counsel Faced Complex Issues.

Investigating and proving an unlawful conspiracy is difficult, especially when not derived from a related criminal investigation. *In re Linerboard Antitrust Litig.*, No. 2:98-cv-05055, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004), *amended*, No. 2:98-cv-05055, 2004 WL 1240775 (E.D. Pa. June 4, 2004) (observing that "an antitrust class action is arguably the most complex action to prosecute."). DPPs allege that Defendants conspired to artificially inflate prices by, among other things, suppressing production and manipulating the Georgia Dock price index.

Defendants spared no effort in challenging DPPs' complaint. They argued that DPPs' claims were conjectural and implausible under *Twombly,* that DPPs did not allege facts showing that Defendants acted in parallel to reduce output or to raise prices for Broilers, and that their parallel production and pricing decisions were the result of legitimate market forces. (ECF Nos. 274-298; 360; 363-373; 471.) After extensive briefing, the Court denied each of Defendants' motions to dismiss. (*id.*; *see also* ECF Nos. 343-345; 440; 541.)

DPPs then turned to litigating the case against 20 Defendants. Discovery has involved more than 200 document custodians, more than 8 million documents and communications, millions of telephone calls and messages, many third parties, and the depositions of more than 120 fact witnesses (with more than 200 anticipated by the time depositions end). (Bruckner Decl. ¶ 7.) Class Counsel took the lead in coordinating this discovery with Defendants, two other classes, and nearly 100 Direct Action Plaintiffs. Plaintiffs and Class Counsel also fulfilled their own discovery obligations, in response to fulsome discovery by Defendants.

3.    Defendants Marshalled Tremendous Resources for Their Defense.

Not only did Class Counsel confront the inherent uncertainties of an antitrust class action alleging a global conspiracy, but they also faced some of the world's wealthiest multinational corporations, whose skilled and experienced legal counsel mounted a strong, united defense. The fact that the nation's top legal counsel represented Defendants is an important factor in analyzing the value of Class Counsel's services. *E.g.*, *In re Schering-Plough Corp. Enhance Secs. Litig.*, No2:08-cv-02177, 2013 WL 5505744, at *25 (D.N.J. Oct. 1, 2013) (emphasizing the importance of evaluating the result in light of the fact that the case was "litigated to the hilt by highly-experience [*sic*] and first-rate defense counsel to the eve of trial"); *In re Avandia Mktg., Sales Practices and Prods. Liab. Litig.*, MDL No. 1871, 2012 WL 6923367, at *5 (E.D. Pa. Oct. 19, 2012) (collecting cases) (considering "the performance and quality of opposing counsel" as a

factor in awarding attorneys' fees); *In re Ins. Brokerage Antitrust Litig.* ("*In re Ins. Brokerage II*"), 282 F.R.D. 92, 121 (D.N.J. Mar. 30, 2012) (concluding the skill and efficiency of the attorneys involved favored approval of attorneys' fees in part because the settling defendants were represented by experienced attorneys from prominent law firms); *In re WorldCom, Inc. Secs. Litig.*, 388 F. Supp. 2d 319, 357-58 (S.D.N.Y. 2005) (finding that counsel "obtained remarkable settlements for the Class while facing formidable opposing counsel from some of the best defense firms in the country."); *In re Warner Comm'ns. Secs. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ("The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work."); *Arenson, et al. v. Bd. of Trade of City of Chicago*, 372 F. Supp. 1349, 1354 (N.D. Ill. 1974) (noting that the quality, vigor, and prior success of opposing counsel is an important factor when assessing the quality of work performed by plaintiffs' counsel).

Here, Settling Defendants were represented by Weil, Gotshal & Manges LLP; Skadden, Arps, Slate, Meagher & Flom LLP; Axinn, Veltrop & Harkrider LLP; Alston & Bird LLP; Stinson LLP; and Dykema Gossett PLLC, leading multinational and national law firms, three of which are ranked among the Vault Law 100 for most prestigious law firms. (Bruckner Decl. ¶ 9.)

The breadth and disparity of resources available to opposing parties is also significant when considering the gravity of the risk class counsel faced. *See Brewer v. S. Union Co.*, 607 F. Supp. 1511, 1531 (D. Colo. 1984); *Trist v. First Fed. Savings & Loan Ass'n of Chester*, 89 F.R.D. 8, 13 (E.D. Pa. 1980). In *Brewer*, the court remarked that inequality of resources available to the parties greatly increases the risk to class counsel. *Brewer*, 607 F. Supp. at 1531. That inequality was prominent here; available resources vastly favored Defendants, who are among the world's largest

and wealthiest businesses. The class, meanwhile, was represented by small regional distributors who purchased Broilers.

## III. THE REQUESTED INTERIM FEE AWARD IS APPROPRIATE UNDER CONTROLLING LAW

### A. DPPs Seek a Percentage of the Settlement Fund as an Interim Award of Fees.

When a party obtains compensation for the class's benefit in the form of a common fund, courts have long recognized that the costs of the litigation, including an award of attorneys' fees, should be recovered from that common fund. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392 (1970). This approach equitably apportions the costs of litigation, including attorneys' fees, among the class members who benefit from the common fund. *Boeing Co.*, 444 U.S. at 478.

The Seventh Circuit has repeatedly endorsed the percentage-of-the-fund methodology. *See Gaskill v. Gordon* ("*Gaskill II*"), 160 F.3d 361, 363 (7th Cir. 1998) (collecting cases) ("When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund, in recognition of the fact that most suits for damages in this country are handled on the plaintiffs' side on a contingent-fee basis."); *Williams v. Gen. Elec. Cap. Auto Lease*, No. 1:94-cv-07410, 1995 WL 765266, at *9 (N.D. Ill. Dec. 26, 1995) (collecting cases) ("The approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred on the class."); *see also Williams v. Rohm & Haas Pension Plan* ("*Rohm & Haas II*"), 658 F.3d 629, 635-36 (7th Cir. 2011); *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000); *Hale v. State Farm Mut. Auto. Ins. Co.*, No. 3:12-cv-00660, 2018 WL 6606079, at *7 (S.D. Ill. Dec. 16, 2018); *Heekin v. Anthem, Inc.*, No. 1:05-cv-01908, 2012 WL 5878032, at *2 (S.D. Ind. Nov. 20, 2012); *In re Northfield Lab., Inc. Secs. Litig.*, No. 1:06-cv-01493, 2012 WL 2458445, at *3 (N.D. Ill. June 26, 2012). The percentage-of-the-fund method utilizes an *ex ante*

approach, in which courts award a fee approximating a hypothetical *ex ante* bargain between the class and its attorneys. *Americana Art China Co., Inc. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 246-47 (7th Cir. 2014); *Rohm & Haas II*, 658 F.3d at 635.

A contingent fee based on a percentage of the recovery is the most common form of compensation for counsel representing classes in class action litigation. Similarly, in antitrust class action litigation, "the 'market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time' is a contingent fee in the amount of one-third (1/3) of the common fund recovered." *In re Ready-Mixed Concrete Antitrust Litig.*, No. 1:05-cv-00979, 2010 WL 3282591, at \*3 (S.D. Ind. Aug. 17, 2010) (citing *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007)); *In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 862 (N.D. Ill. 2015); *In re Lithotripsy Antitrust Litig.*, No. 1:98-cv-08394, 2000 WL 765086, at \*2 (N.D. Ill. June 12, 2000) (emphasis in original) (noting that "[m]any courts in this district have utilized" the percentage method to set fees in class actions); *Kirchoff*, 786 F.2d at 324 ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate.'").

The percentage-of-the-fund method also conserves judicial resources. Unlike a lodestar calculation, percentage fees are easy to calculate and are not subject to manipulation by counsel. Courts are not forced to review years of bills or scrutinize each decision made by counsel during the course of a complex, multi-year case. *See Florin*, 34 F.3d at 565-66 (noting "there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration."); *Gaskill v. Gordon* ("*Gaskill I*"), 942 F. Supp. 382, 386 (N.D. Ill. 1996) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (observing that "the percentage of the fund method saves the court the time it would have to spend reviewing eight years of billing

12

documents."). Instead, compensation is based on the level of class counsel's success, as it would be in a similar contingency case on behalf of a private party. The percentage-of-the-fund method also allows a court to "dispose of [the] last issue in [] prolonged proceedings as expeditiously as possible." *Gaskill I*, 942 F. Supp. at 386. (quoting *Sec. & Exch. Comm'n v. First Secs. Co. of Chicago*, 528 F.2d 449, 454 (7th Cir. 1976)).

### B. Plaintiffs' Requested Fee is an Appropriate Market-Based Fee.

A fee award of 33 1/3% in this case reflects a real-world arm's length transaction between the Class and Class Counsel, and is a generally accepted percentage in the Seventh Circuit. *In re Dairy Farmers*, 80 F. Supp. 3d at 846; *In re Lithotripsy*, 2000 WL 765086, at *2. It is justified by the remarkable results obtained for the Class and the risks faced by Class Counsel. The fee award requested here is well within the acceptable range of attorneys' fee awards in protracted, complex, and expensive litigation such as this.

Thirty-three and one-third percent is a standard percentage in many fee agreements, including large, complex non-class cases. *See* Lester Brickman, *ABA Regulation of Contingency Fees: Money Talks, Ethics Walks*, 65 FORDHAM L. REV. 247, 248 (1996) (noting that "standard contingency fees" are "usually thirty-three percent to forty percent of gross recoveries"); *see also Blum v. Stenson*, 465 U.S. 886, 903 (1984) (Brennan, J., concurring) ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery.").

Courts in the Seventh Circuit routinely award contingency fees of 33 1/3% or more. *E.g.*, *In re Dairy Farmers*, 80 F. Supp. 3d at 862 (awarding one-third of the common fund); *In re Potash Antitrust Litig.*, No. 1:08-cv-06910 (ECF No. 589) (N.D. Ill. June 12, 2013) (Bruckner Decl. Ex. 32) (awarding fees of one-third of the $90 million fund, plus $791,124.63 in expenses); *Heekin*, 2012 WL 5878032, at *5 (awarding one-third fee of $90 million fund, plus $6,243,278.10 in

expenses); *Pavlik v. FDIC*, No. 1:10-cv-00816, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (one-third fee); *In re Lithotripsy*, 2000 WL 765086, at *2 ("33.3% of the fund plus expenses is well within the generally accepted range of the attorneys' fee awards"); *Goldsmith v. Tech. Sols. Co.*, No. 1:92-cv-04374, 1995 WL 17009594, at *8 (N.D. Ill. Oct. 10, 1995) (citing *Cont'l Illinois*, 962 F.2d at 572) ("Thirty three percent appears to be in line with what attorneys are able to command on the open market in arms-length negotiations with their clients."); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 597 (N.D. Ill. 2011) (one-third fee); *Retsky Family Ltd. Partnership v. Price Waterhouse LLP*, No. 1:97-cv-07694, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) ("A customary contingency fee would range from 33 1/3% to 40% of the amount recovered."); *Martin v. Caterpillar Inc.*, No. 1:07-cv-01009, 2010 WL 11614985, at *4 (C.D. Ill. Sept. 10, 2010) (one-third fee); *Kitson v. Bank of Edwardsville*, No. 3:08-cv-00507, 2010 WL 331730, at *2 (S.D. Ill. Jan. 25, 2010) (one-third fee); *Will v. Gen. Dynamics Corp.*, No. 3:06-cv-00698, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010) (one-third fee); *Burkholder v. City of Ft. Wayne*, 750 F. Supp. 2d 990, 997 (N.D. Ind. 2010) (one-third fee); *Campbell v. Advantage Sales & Mktg. LLC*, No. 1:09-cv-01430, 2012 WL 1424417, at *2 (S.D. Ind. Apr. 24, 2012) (one-third fee); *In re Ready-Mixed Concrete*, 2010 WL 3282591, at *3 (one-third fee).

Public policy also favors an attorneys' fee award at the market rate. The Supreme Court has repeatedly held that private enforcement of antitrust laws is essential to effective antitrust enforcement. *See, e.g.*, *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982); *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130–31 (1969). And a market-rate fee award incentivizes competent, experienced counsel to take on high-risk, complex class action litigation.

1. <u>Judicial Fee Awards in Other Class Actions Using a Form of Market-Mimicking Approach Support a 30% to 40% Fee as the Market Rate Here.</u>

When a court employs the market-mimicking approach, "[o]ther judicial fee awards are relevant" because they "affect the expectations of lawyers, and therefore, what they might agree to in a voluntary negotiation." *Nilsen v. York Cnty.*, 400 F. Supp. 2d 266, 282–83 (D. Me. 2005); *In re Trans Union Corp. Privacy Litig.*, No. 1:00-cv-04729, 2009 WL 4799954, at *10 (N.D. Ill. Dec. 9, 2009), *order modified and remanded*, 629 F.3d 741 (7th Cir. 2011) (explaining the Seventh Circuit has endorsed the market-mimicking approach). These results inform the market-mimicking approach, which tries to reach the market price for legal services "in light of the risk of nonpayment and the normal rate of compensation in the market." *Nilsen*, 400 F. Supp. 2d at 278 (quoting *In re Synthroid*, 264 F.3d at 718) (internal quotation marks omitted).

The market-mimicking approach led the Seventh Circuit to expressly reject a "megafund" cap on attorneys' fees:

> We have never suggested that a 'megafund rule' trumps these market rates, or that as a matter of law no recovery can exceed 10% of a 'megafund' even if counsel considering the representation in a hypothetical arms' length bargain at the outset of the case would decline the representation if offered only that prospective return . . . Why there should be such a notch is a mystery. Markets would not tolerate that effect . . . .

*In re Synthroid*, 264 F.3d at 718. Imposing such a cap could chill the willingness of counsel to take large cases and change the expectation that negotiated fee percentages in market-determined fee agreements would prevail.

Likewise, courts in other class actions using a form of market-mimicking have determined that the market rate for legal services warrants a fee award of 30% to 40%. *See In re Aftermarket Filters Antitrust Litig.*, No. 1:08-cv-04883 (ECF No. 1063) (N.D. Ill. Feb. 22, 2013) (Bruckner Decl. Ex. 31) (utilizing percentage-of-the-fund method in antitrust class action to award attorneys'

15

fees of 30% of common fund); *In re Ins. Brokerage Antitrust Litig.* ("*In re Ins. Brokerage I*"), MDL No. 1663, 2009 WL 411856, at *56–58 (D.N.J. Feb. 17, 2009) (determining market rate for privately-negotiated contingent fees was between 30% and 40% in non-class, commercial litigation); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212 (S.D. Fla. 2006) (requested 31 1/3% fee was "within the range of, if not below, the market rate" using Seventh Circuit "market approach"); *In re Remeron Direct Purchaser Antitrust Litig.*, No. 2:03-cv-00085, 2005 WL 3008808, at **14, 16 (D.N.J. Nov. 9, 2005) (employing percentage-of-the-fund method to approximate a fee negotiated in the private marketplace, emphasizing risk of nonpayment, noting "the sometimes undesirable characteristics" of contingent-fee antitrust class actions, including "the uncertain nature of the fee, the wholly contingent outlay of large out-of-pocket sums by plaintiffs, and the fact that the risk of failure and nonpayment in an antitrust case are extremely high," and determining market rate between 30% and 40%).

### 2. Reported Statistical Data Support a Market Rate in Antitrust Class Actions of 30% to 40%.

Courts often rely on academic and government reports to determine the "market price" for class action contingent fees. *See, e.g.*, *In re Cabletron Sys., Inc. Secs. Litig.*, 239 F.R.D. 30, 41-42 (D.N.H. 2006) (relying on "comprehensive studies evaluating fee awards in class action cases" and collecting those studies).

Relevant here is a study of 40 antitrust class actions . Robert H. Lande & Joshua P. Davis, *Benefits from Private Antitrust Enforcement: An Analysis of Forty Cases*, 42 U.S.F. L. REV. 879 (July 2008). The study shows that courts in the majority of antitrust class actions awarded a contingent fee of 30% or more where the recoveries were up to $100 million. *Id.* at 911, tlb.7A. The median fee was 33.3% and the average 28.2%. *Id*. The majority of courts in antitrust class actions where the recoveries ranged from $100 million to $500 million also awarded attorney's

fees in excess of 30% of the fund. *Id.* at 911, tbl.7B. A more recent study found the same results. Joshua P. Davis, *Toward an Empirical and Theoretical Assessment of Private Antitrust Enforcement*, 36 SEATTLE U.L. REV. 1269, 1293-95 (2013) ("[I]n the twenty newer cases counsel tended to recover approximately 30% to 33.3% in cases with recoveries below $100 million and a similar or smaller percentage in cases with recoveries between $100 and $500 million").

### C.  A Lodestar Cross-Check Confirms that the Fee Requested is Proper.

While the percentage-of-the-fund method is favored in the Seventh Circuit for calculating fees in common fund cases, *In re Dairy Farmers*, 80 F. Supp. 3d at 844, courts may use a lodestar cross-check to understand class counsel's time and effort and determine the reasonableness of a fee. *Id.* But this cross-check is not required. *Rohm & Haas II*, 658 F.3d at 636 ("[C]onsideration of a lodestar check is not an issue of required methodology"); *accord Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 204 (N.D. Ill. 2018) ("The Court is not required to check its percentage-of-fee determination against the lodestar."); *Wright v. Nationstar Mortg. LLC*, No. 1:14-cv-10457, 2016 WL 4505169, at *17 (N.D. Ill. Aug. 29, 2016) (noting that a lodestar cross-check is not required); *Heekin*, 2012 WL 5878032, at *2 (criticizing a class member for "overstat[ing] the importance of the lodestar method in this Circuit."). In fact, "[t]he use of a lodestar cross-check has fallen into disfavor." *George v. Kraft Foods Glob., Inc.*, Nos. 1:08-cv-03799; 1:07-cv-01713, 2012 WL 13089487, at *3 (N.D. Ill. June 26, 2012). And the Seventh Circuit has "never ordered [a] district judge to ensure that the lodestar result mimics that of the percentage approach." *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998).

The lodestar is derived by multiplying the hourly rate of the attorney or professional by the number of hours reasonably expended. *Wright*, 2016 WL 4505169, at *14. A reasonable hourly rate is one that is consistent with the common rate in the "community for similar services by lawyers of reasonably comparable skill, experience and reputation." *See Jeffboat, LLC v. Dir.*,

*Office of Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009); *see also Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003) (holding that the attorney's billing rate for comparable work is generally appropriate).

The base lodestar is often augmented by a multiplier that takes into account factors that affect the amount of the fees awarded. *See Cook*, 142 F.3d at 1015; *Florin*, 34 F.3d at 565; *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 255 (7th Cir. 1988). These include the complexity of the legal issues, the degree of success, and the public interest advanced by the litigation. *Paz v. Portfolio Recovery Assocs., LLC*, 924 F.3d 949, 954 (7th Cir. 2019); *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010). Also considered is the risk of non-payment. *See Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991).

A lodestar cross-check in this case supports the requested fee. The risks, complexities and challenges Class Counsel faced are discussed in detail above. During that time, Class Counsel invested 100,608.25 hours of attorney and other professional time from case inception through December 31, 2020. (*See* Bruckner Decl. ¶ 24; Bruckner Decl. Exs. 5-24, and 29.) The average hourly rate by Class Counsel and their associated professional staff is approximately $506 (with a cap of $350.00 per hour on document review (*see* Bruckner Decl. ¶ 17)), a rate comparable to those charged by other law firms with similar experience, expertise, and reputation, for similar services in the nation's leading legal markets. Class Counsel's base lodestar is $50,928,159.75.[12] Awarding a 33 1/3% fee would result in a conservative multiplier of 1.114. Such a multiplier is well within accepted ranges,[13] and is warranted here.

---

[12] Since the inception of this litigation Co-Lead Counsel have submitted Class Counsel's lodestar and expense information to the Court *in camera* on a quarterly basis and have further reviewed it in preparing this motion. (Bruckner Decl. ¶¶ 20, 22.)

[13] *E.g.*, *Cook*, 142 F.3d at 1015 (upholding the district court's decision to "enhance[] the lodestar by a multiplier of 1.5"); *Florin*, 34 F.3d at 565 ("Because class counsel have requested a

## IV. COUNSEL'S LITIGATION EXPENSES WERE REASONABLY INCURRED AND SHOULD BE APPROVED, AND AT THIS TIME THEY SHOULD BE REIMBURSED UP TO $4.5 MILLION

Under the common fund doctrine, class counsel customarily are entitled to reimbursement of reasonable expenses incurred in the litigation. Fed. R. Civ. P. 23(h); *Mills*, 396 U.S. at 392 (recognizing the right to reimbursement of expenses where a common fund has been produced or preserved for the benefit of a class); Alba Conte, *Attorney Fee Awards* § 2.08, at 50-51 (3d ed. 2004). Reimbursable expenses are those "that are consistent with market rates and practices." *In re Ready-Mixed Concrete*, 2010 WL 3282591, at *3; *see also In re Synthroid*, 264 F.3d at 722 ("Reducing litigation expenses because they are higher than the private market would permit is fine; reducing them because the district judge thinks costs too high in general is not.").

In notifying class members of the Tyson and Pilgrim's settlements, Class Counsel informed class members that they would seek repayment of such litigation expenses in an amount not to

---

multiplier of 1.53, the district court need not worry about exceeding what we have suggested is a sensible ceiling of double the lodestar."); *Harman*, 945 F.2d at 976 (internal citations omitted) (observing that "[m]ultipliers anywhere between one and four have been approved."); *Skelton*, 860 F.2d at 258 (suggesting "that a doubling of the lodestar would provide a sensible ceiling."); *In re Dairy Farmers*, 80 F. Supp. 3d at 849 (awarding a fee that equated to a multiplier of 1.34 on a lodestar cross-check); *Standard Iron Works v. ArcelorMittal*, No. 1:08-cv-05214, 2014 WL 7781572, at *2 (N.D. Ill. Oct. 22, 2014) (finding that the requested lodestar multiplier of approximately 1.97 was "well within the range of reasonable multipliers awarded in similar contingent cases."); *Schulte*, 805 F. Supp. 2d at 598 (approving an award that "represent[s] a multiplier of less than 2.5, which is not an unreasonable risk multiplier."); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1015 (E.D. Wis. 2010) (awarding a fee that represented a multiplier of 2.07 on a lodestar cross-check and recognizing that "the mean risk multiplier in cases involving class settlements comparable in size to the present settlement is 2.70.") (citing Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees & Expenses in Class Action Litigation: 1993–2008*, 7 J. OF EMPIRICAL LEGAL STUD. 248, 274 tbl.15 (2010)); *accord In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539, 572 (9th Cir. 2019) (affirming lodestar multipliers of 1.5521 and 1.22 as "modest or in-line with others"); *Kelly v. Wengler*, 822 F.3d 1085, 1093, 1105 (9th Cir. 2016) (affirming lodestar multipliers of 2.0 and 1.3); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (upholding a lodestar multiplier cross-check showing a multiplier of 3.65).

exceed $4.5 million.[14]  Class Counsel's actual current and ongoing expenses total $5,104,566.48, and consist of the following three categories of expenses: (1) $585,059.45 in expenses incurred individually by each firm (primarily travel-related expenses), (2) $3,811,209.23 in expenses paid by the common Litigation Fund, and (3) $708,297.80 in invoiced but as-yet unpaid amounts relating to expert and consultant costs, and database and deposition expenses (which are not contingent, and will be paid regardless of the outcome of this motion or the action).[15] Expenses in each of these categories are described in detail in the Bruckner Decl. ¶¶ 28-35 and its exhibits, and were reasonably necessary to advance the interests of the Class and to obtain the favorable results achieved to date. Due to the risk that they might never be recovered, Class Counsel endeavored to keep expenses to a minimum. Accordingly, DPPs respectfully request that the Court approve these

---

[14]    *See*  https://www.broilerchickenantitrustlitigation.com/admin/services/connectedapps. cms.extensions/1.0.0.0/asset?id=d1618bee-26ea-4ac1-8583-56e80f11113c&languageId=1033& inline=true (last visited April 8, 2021); *see also* ECF No. 4259-2 at  25 (proposed class notice); ECF No. 4341 (Feb. 25, 2021 Order granting DPPs' motion for preliminary approval of the Tyson and Pilgrim's settlements and accompanying class notice).

[15] In addition to the expenses described here and for which Class Counsel now seek reimbursement, payments totaling $365,597.10 have been made from the settlement escrow accounts for settlement-related expenses; specifically, class notice as directed by the Court, related expenses regarding preliminary or final approval of the settlements, and related bank fees. These payments were made pursuant to each Settling Defendant's Settlement Agreement which reserved a specific amount of such Settling Defendant's payment to be used to pay notice and related costs, and which would be non-refundable to the Settling Defendant in the event the settlement was not finally approved. (ECF No. 447-2 at 18, ¶ II(C)(2) (Fieldale); ECF No. 3324 at 18-19, ¶ II(C)(2), 46-47, ¶ II(C)(2), and 74-75, ¶ II(C)(2) (Peco, George's, and Amick); ECF No. 4259-1 at 15, ¶ 6(c)-(d), 45, ¶ 6(c)-(d) (Tyson and Pilgrim's).) While these payments are not included in the requested reimbursement in this petition and have already been paid or may be paid from those escrow accounts, we describe those expenditures here to fully describe all litigation-related expenses incurred in this case. (Bruckner Decl. ¶ 28 n.2.)

expenses in their total amount of $5,104,566.48, and that the Court presently award litigation expenses in the amount of $4,500,000.00.[16]

## V.     THE CLASS REPRESENTATIVES SHOULD RECEIVE INTERIM SERVICE AWARDS

Courts regularly grant service awards to class representatives in recognition of the time and effort they invested in the case. Like in this case, class representatives frequently contribute to the successful resolution of a class action by assisting with the preparation of the pleadings, participating in discovery, continually providing information to class counsel, and participating in settlement negotiations. *Williams v. Rohm & Haas Pension Plan* ("*Rohm & Haas I*"), No. 4:04-cv-00078, 2010 WL 4723725, at *2 (S.D. Ind. Nov. 12, 2010), *aff'd*, 658 F.3d 629 (7th Cir. 2011) ("Because a named plaintiff plays a significant role in a class action, an incentive award is appropriate as a means of inducing that individual to participate in the expanded litigation on behalf of himself and others."). Their contributions undoubtedly benefit the class as a whole, and courts in this circuit often see fit to compensate class representatives for their service to the class. *See Cook*, 142 F.3d at 1016 (affirming $25,000.00 incentive award); *In re Potash Antitrust Litig.*, No. 1:08-cv-06910 (ECF No. 589) (N.D. Ill. June 12, 2013) (Bruckner Decl. Ex. 32) (awarding $15,000.00 apiece in incentive awards).

Courts consider various factors when determining an appropriate service award, including "the actions the [representative] has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the [representative]

---

[16] In the event of future recoveries for the DPP Class, Class Counsel will petition the Court for reimbursement of the difference, $604,566.48, together with necessary and reasonable expenses incurred in the remainder of the litigation.

expended in pursuing the litigation." *Cook*, 142 F.3d at 1016 (citing *Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1267 (N.D. Ill. 1993)).

Here, DPPs request that the Court confer an interim service award of $25,000.00 on each of the five Class Representatives: Maplevale Farms, Inc.; John Gross and Company, Inc.; Ferraro Foods, Inc. and Ferraro Foods of North Carolina, LLC; Joe Christiana Food Distributors, Inc.; and Cedar Farms Co., Inc. Throughout this litigation, the Class Representatives advised Class Counsel and approved pleadings, reviewed and responded to written discovery, searched for, gathered, preserved, and produced documents, prepared for and stood for depositions, kept up to date on the progress of the case, and performed other similar activities. (Bruckner Decl. ¶ 37; *see also* ECF Nos. 3962-39 to 3962-43 (declarations from each class representative in support of DPPs' motion for class certification).) They were never promised that they would receive any additional compensation for leading the case. (*Id.* ¶ 38.) Rather, they devoted their time and efforts solely to recovery some portion of their own overcharges and to enable other class members to recover theirs. (*Id.*) Their help has been instrumental to the success of this litigation and, DPPs respectfully submit, they are deserving of these service awards.

## VI.    CONCLUSION

For these reasons, DPPs respectfully request that this Court award interim attorneys' fees in the amount $56,753,866.00, which is equivalent to 33 1/3% of the Settlement Fund, litigation expenses in the amount of $4,500,000.00, and incentive awards to the five Class Representatives in the amount of $25,000.00 apiece.

Dated: April 16, 2021          LOCKRIDGE GRINDAL NAUEN P.L.L.P.

s/W. Joseph Bruckner
W. Joseph Bruckner
Brian D. Clark
Simeon A. Morbey
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
F: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com

Bruce L. Simon
Neil Swartzberg
PEARSON, SIMON & WARSHAW, LLP
350 Sansome Street, Suite 680
San Francisco, CA 94104
T: (415) 433-9000
F: (415) 433-9008
bsimon@pswlaw.com
nswartzberg@pswlaw.com

Clifford H. Pearson
Daniel L. Warshaw
Thomas J. Nolan
Michael H. Pearson
Bobby Pouya
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
T: (818) 788-8300
F: (818) 788-8104
cpearson@pswlaw.com
dwarshaw@pswlaw.com
tnolan@pswlaw.com
mpearson@pswlaw.com
bpouya@pswlaw.com

***Direct Purchaser Plaintiffs***
***Interim Co-Lead Class Counsel***

23

Steven A. Hart (#6211008)
Brian Eldridge (#6281336)
John Marrese (#6306516)
Kyle Pozan (#6306761)
HART MCLAUGHLIN & ELDRIDGE, LLC
22 West Washington Street, Suite 1600
Chicago, IL 60602
T:  (312) 955-0545
F:  (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com
jmarrese@hmelegal.com
kpozan@hmelegal.com

*Direct Purchaser Plaintiffs*
*Interim Liaison Class Counsel*