## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION* | Case No.: 1:16-cv-08637 |
| | Judge Thomas M. Durkin |
| This Document Relates To: All Actions | Magistrate Judge Jeffrey T. Gilbert |
| | **Publicly-Filed Redacted Version** |

### CERTAIN DIRECT-ACTION PLAINTIFFS' RESPONSES TO THE QUESTIONS IN THE COURT'S MAY 11 ORDER

Certain direct-action plaintiffs[1] ("DAPs") respectfully submit this memorandum responding to the Court's eight questions in its Order, dated May 11, 2021 (ECF No. 4626 (the "May 11 Order)). Each question is stated below in bold followed by DAPs' response.

**(1) By what date must certain depositions now subject to the Court's Sealed Order entered on April 19, 2021 [ECF No. 4557] be completed so that testimony given at those depositions can be addressed by the parties and the Court in summary judgment practice and at trial consistent with the schedule set forth in Defendants' Proposed Scheduling Order No. 15 [ECF No. 4439-1].**

Depositions now subject to the Court's Sealed Order entered on April 19, 2021, should be completed 60 days prior to the deadline for plaintiffs' oppositions to defendants' motions for summary judgment. This will enable plaintiffs to amend or supplement their expert reports to reflect testimony or information obtained from those depositions and include any amended or supplemental reports in the summary judgment record (and at trial).

**(2) The Court would like to set a date by which a DAP case must have been consolidated with this master case to be eligible to be tried in October 2022; what date should the Court set?**

All cases filed on or before May 31, 2021.

---

[1] Those DAPs joining in this submission appear on its signature block.

1

**(3) If Direct Action Plaintiffs ("DAPs") can be assured that they will not be barred during the bid-rigging phase of this case from taking non-repetitive discovery that touches on the market manipulation claims (i.e., supply reduction and Georgia Dock), how does that impact their ability to comply with the current discovery schedule and/or try the case in October 2022?**

While all DAPs are prepared to try the case in October 2022, DAPs anticipate that the Court's bifurcation order will generate numerous discovery and evidentiary disputes throughout the remainder of the case. Defendants apparently are withholding millions of documents from plaintiffs under the guise that they are relevant *only* to bid rigging and irrelevant to the manipulation aspects of the alleged conspiracy. It is highly implausible that the limited aspects of the case DOJ seeks to have stayed really require withholding millions of documents. Certain DAPs anticipate substantial motion practice will be required to resolve these disputed document production issues. There also will be many disputes as to whether evidence that may be claimed to relate to bid rigging will be admissible in connection with summary judgment and at trial. Moreover, DAPs have no way of knowing for sure when DAPs will be able to take the stayed depositions.

The unforeseen consequences of the Court's September 22, 2020 Memorandum Opinion and Order (the "September 22 Order" (ECF No. 3835)) severing and staying so-called "bid-rigging" discovery from discovery of other aspects of the conspiracy has had and will continue to have a significant negative impact on summary judgment, the trial, and discovery scheduling concerning what the Court calls the market manipulation claims to be discussed at the Court conference on May 14 (*see* ECF Nos. 4614, 4626). Defendants have unfairly used the "bid-rigging" stay of discovery as a sword and a shield. Defendants have prevented plaintiffs from discovering any matter that in any conceivable way relates to "bid rigging," even if, for example, it relates to the conspiracy and the means by which the defendants undertook the alleged supply

reduction and Georgia Dock manipulation. Defendants have compounded the harm by indicating that they intend to affirmatively use the lack of developed evidence of bid rigging caused by the discovery prohibition to undercut proof of DAPs' non-bid-rigging aspects of the conspiracy. Defendants refused to stipulate that they would not rely on the absence of evidence about, or consideration of, the possible or actual effects of alleged or potential bid rigging.

In the context of determining trial and discovery scheduling, including a potential trial plan, for what the Court calls the market manipulation claims, the Court should modify the current bifurcation order to clarify the scope of the current stay on discovery of bid rigging. At minimum, documents that relate to *both* bid-rigging and other aspects of the case should be produced. Defendants should be permitted to withhold only documents plainly related to the depositions DOJ has sought to delay. The Court's interest in efficient prosecution of the non-bid-rigging claims does not require or even suggest withholding millions of documents tangentially related to bid-rigging but also relevant to the market manipulation claims. The Court should also prohibit defendants from relying on any absence of evidence regarding bid rigging in considering the possible or actual effects of alleged or potential bid rigging.[2]

## I.     The DOJ's bid-rigging allegations have expanded since the September 22 Order.

As a first matter, it is unclear what is encompassed by "bid rigging." Does it include any conversation between sales executives of two or more defendants who discussed customers, pricing to customers, or supplying or not supplying customers? After the Court issued its September 22 Order, on October 6, 2020, the DOJ filed a superseding indictment in *United States*

---

[2] Certain DAPs do respectfully maintain for the record that the Court should reconsider and abandon the current bifurcated approach to discovery. We are, however, cognizant of the Court's prior rulings and comments on the issue and, therefore, in the alternative, request clarification of the bifurcation order to address the concerns identified in this submission.

*v. Penn,* No. 20-CR-00152-PAB (D. Col.) (attached Exhibit 1). Among other things, that superseding indictment made clear that the alleged "bid rigging" was more than the traditional agreement among competitors as to who would submit a low bid to a purchaser in response to a request for proposals. *See JTC Petroleum Co. v. Plasa Motor Fuels, Inc.*, 190 F.3d 775, 777 (7th Cir. 1999) ("(t)here is a long history of bid-rigging and related practices of collusion in the road construction and road maintenance business"); *United States ex rel. McGee v. IBM Corp.*, 81 F. Supp. 3d 643, 663 (N.D. Ill. 2015) (Durkin, J.) ("To adequately plead a bid-rigging claim, a plaintiff must allege an agreement between two or more people to restrain competition for a contract that is to be awarded on the basis of competitive bidding."). The superseding indictment alleges, among other things, a "continuing combination and conspiracy to suppress and eliminate competition" (¶ 1), "a continuing agreement, understanding and concert of action" (¶ 2), and a "continuing network" (¶ 48):

(a) "to reach agreements and understandings to submit aligned—though not necessarily identical—bids *and to offer aligned—though not necessarily identical—prices, and price-related terms, including discount levels*, for broiler chicken products sold in the United States" (¶ 48 (emphasis added));

(b) "to participate in conversations and communications relating to nonpublic information such as bids, *prices, and price-related terms, including discount levels*, for broiler chicken products sold in the United States, with the shared understanding that the purpose of the conversations and communications was to rig bids, *and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels*, for broiler chicken products sold in the United States" (¶ 48 (emphasis added));  and

4

(c) "to monitor bids submitted by, *and prices and price-related terms, including discount levels,* offered by Suppliers and co-conspirators for broiler chicken products sold in the United States" (¶ 48 (emphasis added)).▮

Based on a comparison between filings in the criminal case and the documents defendants have produced in this civil litigation, there appear to be millions of documents that defendants have produced to the DOJ but not to plaintiffs. *See*, *e.g.*, Joint Motion to Declare Case Complex ¶ 10, *United States v. Penn*, No. 20-cr-152 (D. Colo. June 12, 2020) (attached Exhibit 3) (indicating that the government has received 12.5 million documents from defendants). These millions of documents produced in the criminal case but not in these civil cases surely do not all pertain solely to bid rigging. For example, an information letter that was the subject of a discovery dispute in the criminal litigation references a "chicken mafia" and an email chain referring to someone as "'the stud of all studs' in reference to competitor contacts." *See* Government's Response to Defendants.' Joint Motion for Additional Discovery, at 3, *United States v. Penn*, No. 20-cr-00152-PAB (D. Colo. Feb. 8, 2021) (attached Exhibit 4).

Indeed, even from the circumscribed discovery that plaintiffs have taken,███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████

████████████████████████ █ ████████████████████████████

████████████████████████████████████████████████████████

Not only is "discovery for all three claims [so] thoroughly intertwined in terms of the scope of relevant documents, document custodians, and deponents," as this Court found in the September 22 Order, at 4, but the "claims" themselves are inextricably intertwined. This is contrary to the Court's "belie[f] that evidence of bid-rigging is not necessary to prosecute the market manipulation claims." Order, dated May 11, 2021 (the "May 11 Order" (ECF No. 4626)), at 3. The same communications and communicators were used to discuss prices to customers, as well as traditional bid rigging, and are evidence of communications and opportunity evidence with respect to capacity limitations, buying and selling broiler chickens from each other, and the Georgia Dock manipulation. As the Court recognized in the September 22 Order, at 4, "[A]ll three claims have the same goal of maintaining high prices for Broilers, involving the same industry and defendants." However, the Court found, we believe wrongly, "that evidence of bid rigging is not necessary to prove the supply reduction or Georgia Dock claims so there is no prejudice to plaintiffs in resolving the original claims first." See also May 11 Order, at 5 ("the argument that bid-rigging discovery is necessary to try the market manipulation claims has already been rejected"). Communications among defendants' executives—whether about so-called bid rigging, supply reduction, the Georgia Dock manipulation, or other anti-competitive purposes—are all relevant to prove a

---



violation of Section 1 of the Sherman Act and are all part and parcel of that claim that should not be dismembered but should be viewed as a whole.

## II. At trial, plaintiffs will prove a violation of the Sherman Act to keep the price of chicken broilers artificially inflated including various means.

Plaintiffs allege that defendants violated the antitrust laws to keep the price of chicken broilers artificially inflated, which was implemented by separate, but interrelated means—a supply restriction, a Georgia Dock price manipulation, and agreements on prices and customers. This Court has recognized that "it is plausible for a single conspiracy to use different means . . .." September 22 Order at 4. Proof of one illegal act is related to and reinforces proof of others. "The character and effect of a conspiracy are not to be judged by dismembering it and viewing the separate parts, but only buy looking at it as a whole*." Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

In *Continental Ore*, the Supreme Court held that it was reversible error for a lower court to approach a single, multi-faceted conspiracy "as if they were five completely separate and unrelated lawsuits." *Id.* at 698. Rather, the Court held that plaintiffs should "be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Id.* at 699. By creating two separate rounds of discovery and trial, this Court has effectively dismembered plaintiffs' single conspiracy theory and prevented DAPs from making arguments regarding the cumulative effect of various aspects of the conspiracy.

The bid-rigging aspect of the violation of the Sherman Act will be part and parcel of plaintiffs' proof on summary judgment and at trial. "[T]he party offering the evidence . . . [need] simply . . . show *any* relevant purpose other than proving conduct by means of a general propensity inference." *United States v. Robinson*, 161 F.3d 463, 466 (7th Cir. 1998) (emphasis in original). Thus, one type of evidence to which the exclusion of evidence under Rule

404(b), Fed. R. Evid., does not apply are "acts that are so intricately interwoven with the facts of the charged crime that to omit the evidence relating to it would lead to confusion or leave an unexplainable gap in the narrative of the crime." *United States v. Andreas*, 216 F.3d 645, 665 (7th Cir. 2000). Further, extrinsic acts "may be admitted to show a pattern of conduct corroborating a similar pattern carried out during the conspiracy and a method of operation." *United States v. Grabiec*, 563 F.2d 313, 318 (7th Cir. 1977). The common communications and communicators regarding the different aspects of the violation of the antitrust laws to maintain a high price for chicken broilers are part of the proof that plaintiffs will rely on and offer.

Numerous courts have found that communications at the same time among the same executives alleged to be violating the antitrust laws in one market were admissible to prove a conspiracy in a second market. *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 661, 664-665 (7th Cir. 2002)( evidence of defendants' "price-fixing of related products (lysine and citric acid) during a period overlapping the period of the alleged conspiracy to fix the prices of HFCS" admissible at summary judgment); *United States v. Giordano*, 261 F.3d 1134, 1141 (11th Cir. 2001) (evidence relating to defendants' earlier price-fixing conspiracy properly admitted under Rule 404(b) to show defendants' intent and lack of mistake in conspiracy charged in indictment).

Here, there is no second market. The communications among the executives are all in the broiler chickens market and involve the same executives with responsibility for pricing, supply, and in many cases the Georgia Dock. All those communications should be admissible as part and parcel of proof of the conspiracy. *See United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 479-480 (10th Cir. 1990) (evidence "concerning similar customer allocation agreements entered into

by the defendants before and during the time period charged in the indictment" admissible under Rule 404(b) to prove defendants' "intent to restrain competition (here, by way of the customer allocation agreement)); *In re Cathode Ray Tube (CRT) Antitrust Litigation*, 2016 WL 5871243, at *6 - *7 (N.D. Cal. Oct. 7, 2016) (in a case alleging a single conspiracy encompassing all cathode-ray tubes ("CRTs"), evidence of anticompetitive conduct involving two distinct but related kinds of CRTs was admissible under Rule 404(b) as probative of an overall conspiracy to fix the prices of CRTs in general).

### III. Defendants should be prohibited from relying on the absence of evidence concerning issues related to the bid rigging.

In March, in light of defendants' position that no discovery relating to "bid rigging" would be permitted, DAPs asked defendants to stipulate as follows:

> Defendants will not in any motion or other submission filed by any Defendant, or at trial, rely on the absence of evidence about, or consideration of, the possible or actual effects of alleged or potential bid rigging, as grounds for or in support of the motion, submission or presentation, including but not limited to any motion for summary judgment, motion *in limine*, or motion to exclude expert testimony filed by any Defendant.

Email from Scott Gant to Stephen M. Medlock, dated March 5, 2021 (attached Exhibit 5). Defendants refused to agree. Email from Stephen M. Medlock to Scott Gant, dated March 5, 2021 *(Id.).* Thus, it seems defendants intend to use the lack of developed evidence of bid-rigging caused by the discovery prohibition to undercut DAPs' claims based on the supply restriction and the Georgia Dock price manipulation. For example, defendants may argue that any damages identified by the DAPs' experts were caused by the bid-rigging conduct rather than the supply restriction and Georgia Dock price manipulation or that DAPs' experts did not sufficiently account for the damages caused by the bid-rigging conduct. That would be unfair, and defendants should be prohibited from using the lack of evidence in such a manner. *See* May 11 Order, at 3 ("the Court

will not tolerate use of discovery tactics to place plaintiffs with bid-rigging claims in a catch-22 where they are prevented from taking certain discovery during the current market manipulation phase of the case that is then also unavailable during the bid-rigging phase").

**(4) How many DAP cases now on file will be ready for trial in October 2022, subject to the Court's rulings on any motions for summary judgment, assuming the depositions referenced in paragraph 1 above have been taken and fact discovery closes on June 11, 2021?**

Subject to the assumptions listed by the Court in this Question 4, the completion of all depositions that the Court has previously allowed but which are subject to pending stay motions, and the completion of the other discovery already agreed to by plaintiffs and defendants, all DAPs expect to be ready for trial in October 2022.

**(5) Same question as (2) above directed only to the Restaurant Direct Action Plaintiffs ("Restaurant DAPs")?**

All cases filed on or before May 31, 2021.

**(6) Is it feasible for the DAPs to designate only certain bellwether DAP cases to be tried in October 2022 along with the class cases? If so, what impact will that have on all DAPs' ability to comply with the current discovery and trial schedule?**

Yes, it is feasible for the DAPs to designate certain bellwether cases, which will have no impact on DAPs' ability to comply with the discovery and trial schedule. However, there are numerous issues that should be considered, including conflicting definitions of "broiler chicken," the potential for differing damages models, and differences in Defendants sued and dismissed by settlements, among others. DAPs suggest that the parties meet and confer on the bellwether concept and fully brief the issue before the Court starting on June 15, 2021 (ECF No. 4616).

**(7) Are there any obstacles to trying bellwether DAP cases with the class cases in October 2022?**

While certain plaintiffs believe a DAP bellwether case can be tried with the class cases in October 2022, there are numerous complexities the Court and the parties need to consider as referenced in the answer to question 6.

**(8) Should all or some discovery (other than bid-rigging discovery) be stayed in any DAP cases that will not be tried in October 2022?**

No.

Dated: May 13, 2021

Respectfully submitted,

**CERA LLP**
Solomon B. Cera
595 Market Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 777-2230
E-mail: scera@cerallp.com

**CERA LLP**
C. Andrew Dirksen
800 Boylston Street, 16th Floor
Boston, MA 02199
Tel: (857) 453-6555
E-mail: cdirksen@cerallp.com

**HAYNSWORTH SINKLER BOYD P.A.**
Manton M. Grier
Elizabeth H. Black
Mary C. Eldridge
1201 Main Street, 22nd Floor
Columbia, SC 29201-3226
Tel: (803) 540-7753
E-mail: mgrier@hsblawfirm.com
E-mail: eblack@hsblawfirm.com
E-mail: meldridge@hsblawfirm.com

/s/ *Eric R. Lifvendahl*
**L&G LAW GROUP**
Eric R. Lifvendahl
175 W. Jackson Boulevard, Suite 950
Chicago, IL 60604
Tel: (312) 364-2500
E-mail: elifvendahl@lgcounsel.com

**KAPLAN FOX & KILSHEIMER, LLP**
Robert N. Kaplan
Gregory K. Arenson
Jeffrey P. Campisi
Matthew P. McCahill
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
E-mail: rkaplan@kaplanfox.com
Email: garenson@kaplanfox.com
E-mail: jcampisi@kaplanfox.com
E-mail: mmccahill@kaplanfox.com

**THE COFFMAN LAW FIRM**
Richard L. Coffman
3355 West Alabama, Suite 240
Houston, TX 77098
Tel: (713) 528-6700
E-mail: rcoffman@coffmanlawfirm.com

**MARCUS & SHAPIRA LLP**
Bernard D. Marcus
Moira Cain-Mannix

11

Erin Gibson Allen
One Oxford Center, 35th Floor
Pittsburgh, PA 15219
Tel: (412) 471-3490
E-mail: marcus@marcus-shapira.com
E-mail: cain-mannix@marcus-shapira.com
E-mail: allen@marcus-shapira.com

*Counsel for the Affiliated Foods Plaintiffs*

Jay B. Shapiro
Samuel O. Patmore
Carlos J. Canino
Abigail G. Corbett
**STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.**
150 West Flagler Street, Suite 2200
Miami, FL 33130
Tel: (305) 789.3200
Fax: (305) 789.3395
Email: jshapiro@stearnsweaver.com
Email: spatmore@stearnsweaver.com
Email: ccanino@stearnsweaver.com
Email: acorbett@stearnsweaver.com

Marvin A. Miller
Andrew Szot
**MILLER LAW LLC**
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Tel: (312) 332.3400
Fax: (312) 676.2676
Email: mmiller@millerlawllc.com
Email: mvantine@millerlawllc.com
Email: aszot@millerlawllc.com

*Counsel for Quirch Foods, LLC, Independent
Purchasing Cooperative, Inc. and Supply
Management Services, Inc.*

*/s/ Gregory J. Casas*
John F. Gibbons
Illinois Bar No. 6190493
Thomas E. Dutton
Illinois Bar No. 6195923
**GREENBERG TRAURIG, L.L.P**.
77 West Wacker Dr. Suite 3100
Chicago, IL 60601
Tel: (312) 456-8400
Fax: (312) 456-8435
Email: gibbonsj@gtlaw.com
Email: duttont@gtlaw.com

Gregory J. Casas (admitted *pro hac vice*)
Texas Bar No.: 00787213
Erik Weber (admitted *pro hac vice*)
Texas Bar No.: 240898587
**GREENBERG TRAURIG, L.L.P.**
300 West Sixth Street, Suite 2050
Austin, TX 78701-4052
Tel: (512) 320-7200
Fax: (512) 320-7210
Email: casasg@gtlaw.com
Email: weberer@gtlaw.com

Dominic E. Draye (admitted *pro hac vice*)
Arizona Bar No. 033012
drayed@gtlaw.com
**GREENBERG TRAURIG, L.L.P.**
2375 East Camelback Road, Suite 700
Phoenix, AZ 85016
Tel: (602) 445-8000
Fax: (602) 445-8100

*Attorneys for Services Group of America, Inc.*

*/s/ Amy D. Fitts*
Amy D. Fitts
IL Bar No. 629248
Daniel D. Owen (*Pro Hac Vice*)
MO Bar No. 41514
Guillermo G. Zorogastua (*Pro Hac Vice*)
MO Bar No. 59643
**POLSINELLI PC**
900 W. 48th Place, Suite 900
Kansas City, MO 64112
Tel:  (816) 753-1000
Email: afitts@polsinelli.com
Email: dowen@polsinelli.com
Email: gzorogastua@polsinelli.com

Rodney L. Lewis
**POLSINELLI PC**
IL Bar No. 6288353
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
Tel: (312) 819-1900
Email: rodneylewis@polsinelli.com

*Attorneys for Plaintiff Associated Wholesale Grocers, Inc.*

*/s/ Paul J. Ripp*
Paul J. Ripp
**WILLIAMS MONTGOMERY & JOHN LTD.**
233 S. Wacker Drive, Suite 6800
Chicago, IL 60606
Tel: (312) 443-3200
Email: pjr@willmont.com

Charles E. Tompkins
(*pro hac vice* forthcoming)
**WILLIAMS MONTGOMERY & JOHN LTD.**
1607 22nd Street, NW, Suite 300
Washington D.C. 20008
Tel: (202) 791-9951
Email: cet@willmont.com

W. Lawrence Deas
(*pro hac vice* forthcoming)
**LISTON & DEAS PLLC**
605 Crescent Boulevard, Suite 200
Ridgeland, MS 39157
Tel: (601) 981-1636
Email: Lawrence@listondeas.com

Michael Gratz, Jr.
(*pro hac vice* forthcoming)
**GRATZ & GRATZ, P.A.**
312 N. Green Street
Tupelo, MS 38804
Tel: (662) 844-5531
Email: michael@gratzandgratz.com

*Counsel for Plaintiffs L. Hart, Inc., R & D Marketing, LLC, Timber Lake Foods, Inc., EMA Foods Co., LLC, and Red Bird Farms Distribution Company*

**<u>Certificate of Service</u>**

On 13 May 2021 I caused a true and correct copy of this memorandum and the accompanying exhibits referenced therein to be served on all parties of record in this case via e-mail.

*/s/ Matthew P. McCahill*
Matthew P. McCahill