**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION, | Case No.: 1:16-cv-08637 |
| | The Honorable Thomas M. Durkin |
| This Document Relates To: | |
| THE DIRECT PURCHASER PLAINTIFF ACTION | |

**DIRECT PURCHASER PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF THE SETTLEMENTS WITH DEFENDANTS PILGRIM'S PRIDE CORP., TYSON FOODS, INC., TYSON CHICKEN, INC., TYSON BREEDERS, INC., AND TYSON POULTRY, INC.**

955914.8

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...........................................................................................1

II.    LITIGATION BACKGROUND ....................................................................2

III.   SUMMARY OF THE SETTLEMENT NEGOTIATIONS AND TERMS.......................5

       A.     The Pilgrim's Settlement ...............................................................7

       B.     The Tyson Settlement ....................................................................7

IV.    THE SETTLEMENTS SATISFY THE STANDARD FOR FINAL APPROVAL ...........8

       A.     The Court-Approved Notice Program Satisfies Due Process and Has Been
              Fully Implemented .........................................................................9

       B.     The Settlements Are Fair, Reasonable, and Adequate, and Should Be
              Granted Final Approval ................................................................13

              1.     The Settlements Provide a Substantial Recovery to the
                     Settlement Class ..............................................................14

              2.     The Settlements Eliminate Significant Risk to a Class Facing
                     Complex, Lengthy and Expensive Litigation ...........................15

              3.     No Class Member Has Objected to Either of the Settlements ...............16

              4.     The Settlements Resulted from Hard-Fought Arm's Length
                     Negotiations and Experienced Counsel Recommend Approval ...............18

              5.     The Stage of the Proceedings and Amount of Discovery Supports
                     Final Approval ...............................................................19

V.     CONCLUSION..............................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re "Agent Orange" Prod. Liab. Litig.*,
  818 F.2d 145 (2d Cir. 1987)....................................................................................9

*Agretti v. ANR Freight Sys., Inc.*,
  982 F.2d 242 (7th Cir. 1992) .................................................................................15

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................................................9

*Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*,
  616 F.2d 305 (7th Cir. 1980) .............................................................................8, 13

*Bynum v. Dist. of Columbia*,
  412 F. Supp. 2d 73 (D.D.C. 2006) ........................................................................17

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  No. 14-CV-2058 JST, 2015 WL 9266493 (N.D. Cal. Dec. 17, 2015)..............17, 19

*City of Greenville v. Syngenta Crop Prot., Inc.*,
  No. 3:10-CV-188, 2012 WL 1948153 (S.D. Ill. May 30, 2012) ............................9

*Depoister v. Mary M. Holloway Found.*,
  36 F.3d 582 (7th Cir. 1994) ..................................................................................13

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
  768 F.2d 884 (7th Cir. 1985) ..................................................................................8

*Gehrich v. Chase Bank USA, N.A.*,
  316 F.R.D. 215 (N.D. Ill. 2016)............................................................................20

*Great Neck Cap. Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*,
  212 F.R.D. 400 (E.D. Wis. 2002) ....................................................................14, 18

*Isby v. Bayh*,
  75 F.3d 1191 (7th Cir. 1996) ........................................................................8, 13, 14

*Kleen Prod. LLC v. Int'l Paper Co.*,
  No. 1:10-CV-05711, 2017 WL 5247928 (N.D. Ill. Oct. 17, 2017) ........................19

*Kolinek v. Walgreen Co.*,
  311 F.R.D. 483 (N.D. Ill. 2015)............................................................................19

*Larsen v. Trader Joe's Co.*,
  No. 11-cv-05188-WHO, 2014 WL 3404531 (N.D. Cal. July 11, 2014) ................16

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
   733 F. Supp. 2d 997 (E.D. Wis. 2010) .................................................................16

*In re Linerboard Antitrust Litig.*,
   292 F. Supp. 2d 631 (E.D. Pa. 2003) ..................................................................18

*Mangone v. First USA Bank*,
   206 F.R.D. 222 (S.D. Ill. 2001) ...........................................................................9

*Pallas v. Pac. Bell*,
   No. C-89-2373 DLJ, 1999 WL 1209495 (N.D. Cal. July 13, 1999).....................17

*Petrovic v. Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999) .............................................................................9

*Redman v. RadioShack Corp.*,
   No. 11-C-6741, 2014 WL 497438 (N.D. Ill. Feb. 7, 2014) ...................................13

*Rodriguez v. West Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ...............................................................................18

*Schulte v. Fifth Third Bank*,
   805 F. Supp. 2d 560 (N.D. Ill. 2011) ..............................................................17, 20

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*,
   309 F.3d 978 (7th Cir. 2002) ...............................................................................13

*United States v. Penn, et al.*,
   20-cr-00152-PAB (D. Colo.) ................................................................................4

*United States v. Pilgrim's Pride Corp.*,
   20-cr-330-RM (D. Colo.).......................................................................................4

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005).....................................................................................15

**Other Authorities**

4 Newberg on Class Actions, §§ 13:39, *et seq.*
   Final Judicial Approval of Proposed Class Action Settlements (5th ed.) .................9

4 Newberg on Class Actions, § 13:43
   Presumptions governing approval process—Generally (5th ed.) .....................14, 18

Fed. R. Civ. P. 23(c)(2)(B) ............................................................................9, 10

Fed. R. Civ. P. 23(e) ...................................................................................8, 13

## I.     INTRODUCTION

The Direct Purchaser Plaintiffs ("DPPs") hereby seek final approval of the settlements with two additional groups of defendants: Pilgrim's Pride Corp. ("Pilgrim's"), and Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc. (collectively, "Tyson") (Pilgrim's and Tyson are collectively referred to as the "Settling Defendants"). Under the settlements (collectively, "Settlements" or "Settlement Agreements"), Pilgrim's will pay $75 million and Tyson will pay $79,340,000, collectively providing $154,340,000 to the Settlement Class[1] from Settling Defendants and bringing the total recovery to date to nearly $170 million. (*See* Declaration of Bobby Pouya in Support of Motion ("Pouya Decl.") at ¶ 8.)

In granting preliminary approval of these Settlements, the Court found they fell within the range of reasonableness and ordered notice to be provided to the Class members. (*See* Preliminary Approval Order, Feb. 25, 2021, ECF No. 4341 (hereinafter referred to as "Preliminary Approval Order") at 1.) Interim Co-Lead Counsel[2] and JND Legal Administration, the Court-appointed claims administrator (*id.* at 3), have executed the Notice Plan in accordance with the Court's Preliminary Approval Order. (*Id.* at 3-4.) This process has confirmed that the settlements with Pilgrim's and Tyson are fair, reasonable, and adequate, and should be granted final approval by

---

[1] The term "Class" or "Settlement Class" is consistent with the definition of the term in the Court's Preliminary Approval Order; "All persons who purchased Broilers directly from any of the Defendants or any co-conspirator identified in this action, or their respective subsidiaries or affiliates for use or delivery in the United States from at least as early as January 1, 2008 until December 20, 2019. Specifically excluded from the Settlement Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Settlement Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action."

[2] Interim Co-Lead Counsel are Lockridge Grindal Nauen P.L.L.P. ("LGN") and Pearson, Simon & Warshaw, LLP ("PSW"). *See* Order of October 14, 2016 (ECF No. 144).

the Court. The reaction of the Class members has been uniformly positive, with no member of the Settlement Class objecting to the Settlements, and the vast majority of commerce that opted out of the Settlements is on behalf of direct action plaintiffs who had filed their own lawsuits prior to the Court's preliminary approval order. (*See* Section IV.A *infra*.) Over 2,808 potential Class members have filed claims to receive a portion of the proceeds from the Settlements. (*See* Declaration of Jennifer M. Keough in Support of Motion for Final Approval ("Keough Decl.") ¶ 27.) In the near future, DPPs will move the Court to approve a distribution of the net settlement proceeds to qualified claimants. (*See* Section IV.A *infra*; Pouya Decl. ¶ 21.)

The Settlements provide over $154 million in relief to the Class members while eliminating the risk, uncertainty, and expense of continuing litigation, and preserving DPPs' right to obtain additional settlements or judgments against the numerous remaining Defendants. DPPs therefore respectfully request that the Court grant final approval to the Settlements and enter final judgment.

## II.     LITIGATION BACKGROUND

This is an antitrust class action against certain producers of Broilers.[3] DPPs allege that Defendants combined and conspired to fix, raise, maintain, or stabilize prices of Broilers sold in the United States. DPPs allege that Defendants implemented their conspiracy in various ways, including via coordinated supply restrictions, sharing competitively sensitive price and production information, and otherwise manipulating Broiler prices.

---

[3] Consistent with the operative Fifth Consolidated Amended Complaint, the term Broilers is defined in the Settlement Agreements as "chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards." (*See* ECF No. Nos. 3919 (Redacted) and 3935 (Unredacted); Pilgrim's and Tyson Settlement Agreements § 1.d, ECF No. 4259-1 Exhibits A and B, respectively.)

DPPs commenced this litigation on September 2, 2016, when they filed a class action lawsuit on behalf of all direct purchasers of Broilers in the United States. (ECF No. 1.) Other class plaintiffs and direct action plaintiffs subsequently filed similar actions. On October 14, 2016, the Court appointed the undersigned law firms as Direct Purchaser Plaintiffs' Interim Co-Lead and Liaison Counsel. (ECF No. 144.) After extensive briefing by the parties, on November 20, 2017 the Court denied Defendants' Motions to Dismiss the DPPs' First Consolidated Amended Complaint. (ECF No. 541.) DPPs filed their operative Fifth Consolidated Amended Complaint on October 23, 2020. (ECF No. Nos. 3919 (Redacted) and 3935 (Unredacted).) DPPs' motion for class certification was filed on October 30, 2020 (ECF No. 3962).

DPPs performed a thorough investigation and engaged in extensive discovery prior to reaching the Settlements. These efforts commenced prior to the filing of DPPs' initial complaint and included pre-litigation investigation into Defendants' conduct that formed the basis of the DPPs' complaints. (*See* Pouya Decl. ¶ 4.) In denying Defendants' motions to dismiss, the Court held that these "alleged factual circumstances plausibly demonstrate that [Defendants'] parallel conduct was a product of a conspiracy." (*See* ECF No. 541 at 18.) In discovery, DPPs obtained responses to multiple sets of interrogatories, and received over 8 million documents in response to their requests for production and third party subpoenas. (*See* Pouya Decl. ¶ 5.) DPPs, along with other plaintiffs, have taken over 100 depositions of the Defendants and third parties. (*Id.* ¶ 6.) DPPs have also provided responses to written discovery, produced documents, and appeared for depositions noticed by the Defendants. (*Id.* ¶ 7.)

On June 21, 2019, the United States Department of Justice ("DOJ") moved to intervene in the civil case and stay the depositions of Defendants, pending the DOJ's criminal investigation into the Broiler industry. (ECF No. 2268.) On June 27, 2019, the Court granted an initial stay on

the depositions of Defendants until September 27, 2019. (ECF No. 2302.) On October 16, 2019, the Court extended the stay on the depositions of Defendants (with certain exceptions) until June 27, 2020. (ECF No. 3153.) On June 2, 2020, the DOJ filed its initial indictment in the related criminal proceeding, naming four individuals (all then-current or former executives of Defendants in this civil case) as defendants. *United States v. Penn, et al.*, 20-cr-00152-PAB (D. Colo.) (ECF No. 1, June 2, 2020). On October 6, 2020, the DOJ filed a superseding indictment, naming as new defendants six additional then current or former executives of Defendants in this civil case. *Id.* (ECF No. 101, Oct. 6, 2020). Among the criminal defendants are three Pilgrim's executives, including Pilgrim's former CEOs Jayson Penn and William Lovette. Furthermore, Pilgrim's itself pled guilty to criminal price-fixing charges and agreed to pay $110.5 million in criminal penalties.[4] Meanwhile, Tyson announced that "it took appropriate actions to address the internal issues and has been fully cooperating with the DOJ as part of its application for leniency under the DOJ's Corporate Leniency Program."[5]

Prior to the Court's ruling on Defendants' motions to dismiss, Plaintiffs reached an "ice-breaker" settlement with Defendant Fieldale Farms Corporation ("Fieldale"). Fieldale, a small producer, agreed to pay $2.25 million, provide cooperation including attorney and witness proffers, and produce certain documents to DPPs. (*See* Pouya Decl. ¶ 8.) The Court granted final approval to the Fieldale settlement on November 18, 2018. (*See* ECF No. 1414.) Plaintiffs later

---

[4] Pilgrim's Announces Agreement with DOJ Antitrust Division, PILGRIM'S PRIDE CORP. (2020), https://ir.pilgrims.com/news-releases/news-release-details/pilgrims-announces-agreement-doj-antitrust-division (last visited Feb. 1, 2021). *See also United States v. Pilgrim's Pride Corp.*, 20-cr-330-RM (D. Colo.) (ECF No. 1, Oct. 13, 2020) (criminal information).

[5] Tyson Foods' Statement on Department of Justice Indictment in Broiler Chicken Investigation, TYSON FOODS, INC. (2020), https://www.tysonfoods.com/news/news-releases/2020/6/tyson-foods-statement-department-justice-indictment-broiler-chicken (last visited Feb. 1, 2021).

reached settlements with Defendants Peco Foods, Inc. ("Peco"), George's, Inc., George's Farms, Inc. (collectively, "George's"), and Amick Farms, LLC ("Amick"). Like Fieldale, these three Defendant groups are small producers. (*See* Pouya Decl. ¶ 8.) In addition to providing cooperation to DPPs, Peco paid $4,964,600, George's paid $4,097,000, and Amick paid $3,950,000. (*See Id.*) The Court granted final approval of the Amick, Peco, and George's settlements on October 27, 2020. (*See* ECF Nos. 3944 (Peco and George's), 3945 (Amick).)

Thus, the Settlement Agreements with Tyson and Pilgrim's constitute the third set of DPP settlements in this case, and a third "step up" by market share point. (*See* Pouya Decl. ¶ 8.)

## III.    SUMMARY OF THE SETTLEMENT NEGOTIATIONS AND TERMS

The Settlement Agreements with Pilgrim's and Tyson were reached separately through confidential, protracted, arm's length settlement negotiations. (*See* Pouya Decl. ¶¶ 9-18.) The Pilgrim's settlement was the product of a negotiation process that commenced in December 2020. (*Id.* ¶ 9.) The Tyson settlement was negotiated separately in a process that started in December 2019. (*Id.* ¶ 12.) The core settlement terms are substantially similar in each of the Agreements, and the settlement amounts reflect the size and other factors affecting these Settling Defendants. Each of the Settlements represents an increase—on a proportionate and gross basis—from the prior settlements. (*Id.* ¶ 8.) Collectively the Settlements provide $154,340,000 in recovery to the Settlement Class, and bring the total amount recovered by DPPs to $169,601,600. (*Id.*)

In addition to monetary relief, the Settling Defendants will: (1) cooperate with DPPs in a manner that is consistent with the provisions of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, if applicable; (2) provide an attorney proffer regarding the principal facts known to Settling Defendants relevant to the alleged conduct at issue in this Action; (3) use reasonable efforts to authenticate documents and assist DPPs to understand previously-produced

structured data, (4) producing live witnesses at trial; and (5) not oppose the DPPs' depositions of specifically-named current and former executives. (*See* Pilgrim's Settlement § 10; Tyson Settlement § 10.)

In exchange, the DPPs and the proposed Settlement Class will release certain Released Claims (as defined in the Settlement Agreements) against the Released Parties (as defined in the Settlement Agreements). (*See id.* §§ 14, 15.) The releases do not extend to other Defendants or to unrelated claims that are not the subject matter of the lawsuit. (*Id.*)

Each of the Settlement Agreements contain an opt-out reduction mechanism. (*See* Pilgrim's Settlement § 19; Tyson Settlement § 21.) After completion of the settlement administration process, the number of opt-outs, including opt-outs based on partial assignments, was calculated for each of the Settlements. (*See* Keough Decl. ¶¶ 34, 35.) The Pilgrim's Settlement is not subject to reduction as set forth in the Agreement. (*See* Pouya Decl. ¶ 8.) The Tyson Settlement is subject to a $660,000 reduction based on the opt-outs received during the settlement administration process and the Tyson Settlement Agreement (*see* § 21) exceeding by 1.5% the agreed upon threshold for a reduction between the parties. (*See* Pouya Decl. ¶ 8.) Thus, the total amount paid by Tyson equals $79,340,000, and the combined total of the Settlements equals $154,340,000. (*See id.* ¶ 8.)

Subject to the approval of the Court, the settlement amounts (with accrued interest) will be used to: (1) pay for notice costs and costs incurred in the administration and distribution of the Settlements; (2) pay taxes and tax-related costs associated with the escrow account for proceeds from the Settlements; (3) make a distribution to Settlement Class Members in accordance with the proposed plan of distribution; (4) pay attorneys' fees to Counsel for the Settlement Class, as well

as costs and expenses, that may be awarded by the Court (*see* ECF Nos. 4550, 4551, 4552); and (5) pay incentive awards to the named Plaintiffs (*see id.*).

### A. The Pilgrim's Settlement

DPPs' settlement negotiations with Pilgrim's commenced in December 2020. (*See* Pouya Decl. ¶ 9.) After discussions between counsel throughout December 2020, on January 5, 2021, DPPs and Pilgrim's engaged in a mediation with Professor Eric Green, a nationally renowned mediator. (*Id.* ¶ 10.) The parties were unable to reach an agreement during the face-to-face videoconference mediation session, but continued discussions and ultimately reached an agreement. (*Id.*) Thereafter, the parties continued to negotiate (with the assistance of Professor Green) regarding the settlement terms, ultimately executing the Pilgrim's Settlement Agreement on January 19, 2021. (*See* Pilgrim's Settlement; *see also* Pouya Decl. ¶ 11.)

The Pilgrim's Settlement requires Pilgrim's to pay up to $75 million. (*See* Pilgrim's Settlement § 9.)

### B. The Tyson Settlement

DPPs' settlement negotiations with Tyson commenced in December 2019. (*See* Pouya Decl. ¶ 12.) After engaging in initial discussions the parties agreed to retain Judge Daniel Weinstein (ret.), another nationally renowned mediator. The settlement negotiations with Tyson were thorough and extensive. With the assistance of Judge Weinstein, DPPs and Tyson exchanged mediation briefs, made presentations addressing the merits of the case, and exchanged settlement offers and demands throughout the course of 2020. This process included numerous conferences with Judge Weinstein and his team, a videoconference mediation, as well as other discussions. (*Id.* ¶¶ 13-15) None of these efforts resulted in a settlement, and there were times when it appeared that the parties had reached an impasse. (*Id.*) On January 6, 2021, DPPs and Tyson attended another videoconference mediation with Judge Weinstein. (*Id.* ¶ 14.) The parties were unable to reach an

agreement during the January 6, 2021 session; however, the parties continued to negotiate through the mediator. (*Id.*) On Saturday, January 9, 2021, the parties reconvened via videoconference with Judge Weinstein and, after hours of further negotiating, an agreement was reached. (*Id.* ¶ 15.) Thereafter, the parties continued to negotiate regarding the settlement terms, ultimately executing the Tyson Settlement Agreement on January 23, 2021. (*See* Tyson Settlement; *see also* Pouya Decl. ¶ 16.)

The Tyson Settlement Agreement requires Tyson to pay up to $80 million. (*See* Tyson Settlement § 9.)

## IV. THE SETTLEMENTS SATISFY THE STANDARD FOR FINAL APPROVAL

There is an overriding public interest in settling litigation, and this is particularly true in class actions. *See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 888-89 (7th Cir. 1985), *cert. denied*, 478 U.S. 1004 (1986) (noting that there is a general policy favoring voluntary settlements of class action disputes); *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement."), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Class action settlements minimize the litigation expenses of the parties and reduce the strain such litigation imposes upon already scarce judicial resources. *Armstrong*, 616 F.2d at 313 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). However, a class action may be settled only with court approval. Fed. R. Civ. P. 23(e).

Any dismissal, compromise, or settlement of a class action is subject to court approval. Rule 23 jurisprudence has led to a defined procedure and specific criteria for class action settlement approval, namely: certification of a settlement class and preliminary approval of the proposed settlement; dissemination of notice of the settlement to all affected class members, including an

opportunity to object to the proposed settlement; and a fairness hearing at which class members may be heard regarding the settlement, and counsel may present evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement. *See* 4 Newberg on Class Actions, §§ 13:39, *et seq*. Final Judicial Approval of Proposed Class Action Settlements (5th ed.). This procedure safeguards class members' due process rights and enables the Court to fulfill its role as the guardian of class interests. *See id*.

A.  **The Court-Approved Notice Program Satisfies Due Process and Has Been Fully Implemented**

The Court-approved Notice Plan related to the Settlements has been successfully implemented and Class members have been notified of the Settlements. When a proposed class action settlement is presented for court approval, the Federal Rules require "the best notice that is practicable under the circumstances," and that certain specifically identified items in the notice be "clearly and concisely state in plain, easily understood language." Fed. R. Civ. P. 23(c)(2)(B). A settlement notice is a summary, not a complete source, of information. *See, e.g., Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 170 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988); *Mangone v. First USA Bank*, 206 F.R.D. 222, 233 (S.D. Ill. 2001).

The Notice Plan approved by this Court (*see* Preliminary Approval Order at 1)—which relies primarily on direct notice to Class members supplemented by publication notice—is commonly used in class actions like this one.[6] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quoting Fed. R. Civ. P. 23(c)(2)); *City of Greenville v. Syngenta Crop Prot., Inc.*, No.

---

[6] The notice plan implemented here is substantially similar to that previously disseminated in this case with prior settlements. (*See* Order Approving Fieldale Notice Plan, ECF No. 980; Peco, George's and Amick Preliminary Approval Order, ECF No. 3394 (approving the proposed notice plan); *see also* Pouya Decl. ¶ 20.)

3:10-CV-188, 2012 WL 1948153, at *4 (S.D. Ill. May 30, 2012) (same); Fed. R. Civ. P. 23(c)(2)(B). It constitutes valid, due, and sufficient notice to class members, and is the best notice practicable under the circumstances. The content of the court-approved notice complies with the requirements of Rule 23(c)(2)(b). Both the summary and long-form notice clearly and concisely explained in plain English the nature of the action and the terms of the Settlements. (*See* Keough Decl. ¶ 12.) The notices provided a clear description of who is a member of the Settlement Class and the binding effects of Class membership. *Id.* They also explained how to exclude oneself from the Settlement Class, how to object to the Settlement, and how to contact Interim Co-Lead Counsel for the Settlement Class. *Id.* The notices also explained that they provided only a summary of the Settlements, and that the Settlement Agreements, as well as other important documents related to the litigation, are available online at www.broilerchickenantitrustlitigation.com. (*See id.*) In addition, the information from that website, as well as the toll-free call-in number for the Settlements, were available in both English and Spanish. (*See id.* ¶¶ 21, 24.) The notice packages included a long-form notice and a pre-populated claim form containing the purchase information (to the extent available) for each Settlement Class member, which allowed them to file claims with minimum documentation. Settlement Class members were permitted to file an audit request form and submit proof of purchase if they chose to challenge the pre-populated purchase amounts.

The Notice Plan was implemented by the Court-appointed settlement administrator, JND Legal Administration. (*See* Preliminary Approval Order at 3.) Specifically, using customer information obtained from Defendants, JND mailed 26,811 print notices and emailed 11,996 electronic notices to potential class members. (*See* Keough Decl. ¶¶ 12, 14.) JND also published notice in the following industry print publications (or banner advertisements in digital media) on the dates indicated: the April 2021 issue of *Progressive Grocer*, the April 2021 issue of *Meat &*

*Poultry*, the March 29, 2021 issue of *Poultry Times*, the April 2021 issue of *Frozen & Refrigerated Buyer*, the April 2021 issue of *Supermarket News*, and the March/April 2021 issue of *Winsight Grocery Business*; and the following industry websites; www.progressivegrocer.com, www.supermarketnews.com, www.winsightmedia.com, and www.shelbyreport.com (March 16, 2021 through April 12, 2021), www.fastcasual.com (March 18, 2021 through April 14, 2021), and www.meatpoultry.com and www.poultrytimes.com (April 1, 2021 through April 30, 2021). (*See id.* ¶¶ 18-19.) In addition, JND continues to maintain the case website, where Class members can view and print important documents and obtain other information related to the litigation. (*See id.* ¶¶ 20-23.) The Settlement Notice documents informed Class members regarding the attorneys' fees, costs, and incentive awards that would be sought by the class representatives and Interim Co-Lead Counsel. A copy of Direct Purchaser Plaintiffs' Motion for Interim Payment of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Incentive Awards filed on April 16, 2021 (ECF No. 4551) and supporting documents were posted on the case website. JND also continues to maintain a toll-free call-in number to answer Class members' questions. (*See id.* ¶¶ 24-25.)

The Settlement Administrator reviewed and processed all requests for exclusion. (*See* Keough Decl. ¶¶ 34-35.) This process included determining the timeliness and validity of any requests for exclusion, identifying the entities that fell within the scope of valid requests for exclusion, conducting appropriate follow-ups with requested opt-outs to determine the scope and value of any assignments or partial assignments, and assisting the parties in determining the opt-out calculations. (*See id.*) As a result of this process, the Administrator has come up with a final recommended list of valid opt-outs, which is set forth at Exhibits A (Pilgrim's) and B (Tyson) of

the Keough Declaration. This recommended list of opt-outs includes certain partial assignments which are set forth at Exhibits C to the Keough Declaration.

The Settlement Administrator received no objections to the Settlements, nor to the currently pending Motion for Interim Payment of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards (ECF No. 4550). (*See* Keough Decl. ¶¶ 32-33.)

The notice to individual Class members also included a pre-populated claim form containing each class member's known purchases of affected Broiler products during the relevant Class period, and notified all Class members how to submit a claim. (*See* Preliminary Approval Order Ex. D.) The Settlement Administrator has received 2,808 claims by potential Class members who wish to receive a portion of the Settlement proceeds. (*See* Keough Decl. ¶ 27.) In addition, the Settlement Administrator has received 77 audit request forms. (*See Id.* ¶ 28.) Class members who filed valid claims will be able to receive a pro-rata portion of the net settlement sum for all six settlements to date, including Fieldale, Peco, George's, Amick, Tyson, and Pilgrim's.

As noted in DPPs' motion for preliminary approval of the Settlements, DPPs intend to distribute the net settlement proceeds to qualified members of the Settlement Classes, and the Court-approved notice so advised Class members. (*See* Preliminary Approval Order Ex. A.) In the near future, DPPs will move the Court to approve a distribution of the net settlement proceeds to qualified claimants. (*See* Pouya Decl. ¶ 21.) The Settlement Administrator will continue to confirm the validity of the claims received, follow up with potential Class members regarding any deficiencies, and assess any audit request forms in order to permit distribution of the settlement proceeds at the earliest practicable time.

**B.** **The Settlements Are Fair, Reasonable, and Adequate, and Should Be Granted Final Approval**

The standard for final approval of a class action settlement is whether the settlement is fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e); *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002); *Isby*, 75 F.3d at 1198-99. There is an overriding public interest in settling litigation, and this is particularly true in class actions. *See Isby*, 75 F.3d at 1196 ("Federal courts naturally favor the settlement of class action litigation."); *accord Redman v. RadioShack Corp.*, No. 11-C-6741, 2014 WL 497438, at *3 (N.D. Ill. Feb. 7, 2014); *Armstrong*, 616 F.2d at 312. Class action settlements minimize the litigation expenses of the parties and reduce the strain such litigation imposes upon already scarce judicial resources. *See Armstrong*, 616 F.2d at 313.

Evaluation and approval of a class action settlement are committed to the sound discretion of the Court. *See Isby*, 75 F.3d at 1197. The proper focus "is upon 'the general principles governing approval of class action settlements' and not upon the 'substantive law governing the claims asserted in the litigation.'" *Id.* (quoting *Armstrong*, 616 F.2d at 315). As part of the Court having wide latitude in making its determination, there is "no requirement that an evidentiary hearing be conducted as a precondition to approving a settlement in a class action suit." *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994).

In evaluating the fairness of a proposed class action settlement, courts typically consider the following factors: (1) the strength of plaintiffs' case compared to the amount of defendants' settlement offer; (2) an assessment of the likely complexity, length and expense of the litigation; an evaluation of the amount of opposition to settlement among affected parties; (3) the reaction of the class members; (4) the opinion of competent counsel; and, (5) the stage of the proceedings and the amount of discovery completed at the time of settlement. *See Isby*, 75 F.3d at 1198-99.

In addition, there is an initial presumption that a proposed class action settlement is fair, reasonable and adequate when the settlement was the result of arm's-length negotiations. *See* 4 Newberg on Class Actions, § 13:43 Presumptions governing approval process—Generally (5th ed.); *Great Neck Cap. Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers*, L.L.P., 212 F.R.D. 400, 410 (E.D. Wis. 2002).

The Court already found that a number of these factors were satisfied in granting preliminary approval to the Settlements (*see generally* Preliminary Approval Order), but at that time Class members themselves had yet to weigh in. Now that Class members have received notice and an opportunity to be heard, their reaction has been extremely favorable (*see* Section IV.B.3 *infra*). Thus, each of these factors support granting final approval to the Settlements, which were the product of extensive arm's-length negotiations.

### 1. The Settlements Provide a Substantial Recovery to the Settlement Class

The consideration from Pilgrim's and Tyson for the Settlements (*i.e.*, "the amount of defendants' settlement offer" (*Isby*, 75 F.3d at 1199)) is significant—totaling $154,340,000—and provides considerable benefits to the Class, including but not limited to meaningful cooperation.

Further, each of the Settlements provides proportionally more monetary relief to Class members than the prior settlements, which have been granted final approval. The Fieldale settlement was for $2.25 million representing approximately $1 million per market share point. The Peco, George's, and Amick settlements totaled $13,011,600, representing approximately $2 million per market share point. By comparison, the proposed Settlements with Pilgrim's and Tyson provide substantially more recovery on both a gross and proportional basis. In evaluating the Settlement, the DPPs considered the recovery from Tyson and Pilgrim's based on numerous factors, including a percentage of market share excluding current and anticipated opt-outs. (*See* Pouya Decl. ¶ 8.) Based on these criteria, Tyson and Pilgrim's collectively constitute 37.5% of

commerce sold to DPPs. (*Id.*) Accordingly, the recovery for DPPs from the Tyson and Pilgrim's settlements is approximately $4 million per market share point. (*Id.*) The Settlements thus constitute an excellent result for the Class, fall well within the range of possible approval, and should be granted final approval by the Court.

These factors satisfy the standard for settlements that both allow the DPPs to continue their prosecution against the remaining 14 Defendants, and will enable the DPPs to maximize their recovery from the remaining Defendants. As this Circuit has recognized, "[i]n complex litigation with a plaintiff class, 'partial settlements often play a vital role in resolving class actions.'" *Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 247 (7th Cir. 1992) (quoting 1–Part A Manual for Complex Litigation Second, Moore's Federal Practice § 30.46 (1986)).

### 2.    The Settlements Eliminate Significant Risk to a Class Facing Complex, Lengthy and Expensive Litigation

While the DPPs believe their case is strong, the Settlements eliminate significant risks they would face if the action were to proceed against Pilgrim's and Tyson, including the complexity, length and expense of these types of litigations. Indeed, as reflected in the extensive docket, this case is nearly five years old and the DPPs have expended significant effort to defeat motions to dismiss, conduct extensive discovery, thoroughly brief class certification (which is ongoing), and plan and prepare for trial. The Settlements allow Class members to recover a significant sum from the two largest Defendants that will undoubtedly put pressure on, and allow the DPPs to maximize future recoveries from, the remaining 14 Defendants. Absent settlement, the DPPs would need to successfully obtain class certification, go to trial, and bear the burden of establishing liability, impact and damages before obtaining any recovery from Tyson and Pilgrim's. *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) ("'Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but

recovered no damages, or only negligible damages, at trial, or on appeal.'") (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998)). Continued litigation against the remaining Defendants, absent future settlements, will involve significant additional expenses and protracted legal battles. Therefore, the complexity, length and expense of further litigation, which the Settlement mitigates at least as to the Settling Defendants, also favor final approval. *See Larsen v. Trader Joe's Co.*, No. 11-cv-05188-WHO, 2014 WL 3404531, at *4 (N.D. Cal. July 11, 2014) ("Avoiding such unnecessary and unwarranted expenditure of resources and time would benefit all parties, as well as conserve judicial resources…. Accordingly, the high risk, expense, and complex nature of the case weigh in favor of approving the settlement.") (cited authority omitted); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1008 (E.D. Wis. 2010) ("The 'complexity, length and expense of further litigation' factor strongly favors this settlement….").

### 3.  No Class Member Has Objected to Either of the Settlements

The unanimous and positive reaction of Class members to the Settlements supports final approval. Pursuant to the Court's Preliminary Approval Order, more than 38,807 notices were sent directly to potential Class members (26,811 via mail, 11,996 via email), which was in addition to giving publication notice in industry trade press (print and online) and the settlement administrator maintaining both an informational website and toll-free call-in center. (Keough Decl. ¶¶ 12-25.) After this outreach, and with 28,882 identified potential Class members, no Class member objected to either of the Settlements.[7] (*Id.* ¶ 33.) The vast majority of Class members did not opt out of the Settlements.

---

[7] There also were no objections to the currently pending Motion for Interim Payment of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Incentive Awards. (ECF No. 4550.)

As of the filing of this Motion, there were only 155 opt-out requests, of which none were deemed invalid. (*Id.* ¶ 35.) There were 150 valid opt-out requests to the Pilgrim's Settlement, and 154 valid opt-outs to the Tyson Settlement. (*Id.* ¶ 35.) A number of the requests for exclusion were filed on behalf of multiple related entities. (*See Id.* Exs. A and B (listing the persons and entities who are subject to a valid request for exclusion to the Settlements).)

The opt-out percentage for the Settlements is consistent with what the parties anticipated when entering into the Settlements, and did not result in a reduction to the Pilgrim's Settlement, and did not result in a substantial reduction ($660,000) to the Tyson Settlement. (*See* Pouya Decl. ¶ 8; *see also* Section III).

The unanimous and positive response of the Class supports finding that the Settlements are fair, reasonable, and adequate. *See Bynum v. Dist. of Columbia*, 412 F. Supp. 2d 73, 77 (D.D.C. 2006) ("The low number of opt-outs and objectors (or purported objectors) supports the conclusion that the terms of the settlement were viewed favorably by the overwhelming majority of class members."); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) ("A very small percentage of affected parties have opposed the settlement…. only 342 [of more than 100,000] Class Members excluded themselves from the settlement and only 15 Class Members submitted documents that could be considered objections."); *Pallas v. Pac. Bell*, No. C-89-2373 DLJ, 1999 WL 1209495, at *8 (N.D. Cal. July 13, 1999) ("The small percentage—less than 1%—of persons raising objections is a factor weighing in favor of approval of the settlement."). In fact, the absence of objections to and limited opt-outs from the Settlements especially favor approval when, as here, "much of the class consists of sophisticated business entities." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 14-CV-2058 JST, 2015 WL 9266493, at *7 (N.D. Cal. Dec. 17, 2015) (citing *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 629 (E.D. Pa. 2004)).

**4.** **The Settlements Resulted from Hard-Fought Arm's Length Negotiations and Experienced Counsel Recommend Approval**

The fact that the Settlements are the product of arm's length negotiations strongly supports a presumption that the Settlements are fair, reasonable and adequate. *See* 4 Newberg on Class Actions, § 13:43 Presumptions governing approval process—Generally (5th ed.); *Great Neck*, 212 F.R.D. at, 410; *see also Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution.").

As detailed in this Motion and supporting declarations, each of the Settlements was the product of extensive arm's length negotiations that took place over several months. (*See* Sections II and III *supra*; *see also* Pouya Decl. ¶¶ 9-16.) The Pilgrim's settlement process included over a month of negotiations and (due to the ongoing COVID-19 pandemic) a virtual face-to-face mediation session with Professor Green. (*See id.*) The Tyson settlement negotiations extended over a year, during which discussions remained ongoing with Judge Weinstein, and included three virtual face-to-face mediation sessions. (*See id.*) These protracted arm's length settlement negotiations support approval of the Settlements by demonstrating they are free from collusion. *See, e.g.*, *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003). Moreover, the fact that the negotiations occurred over an extended time, and were supported by substantial discovery taken thus far in this litigation, indicate that all parties were well informed and that DPPs worked to achieve the best possible result on behalf of the Settlement Class. *Id.*[8]

Moreover, it is well established that the judgment and opinion of experienced and competent counsel should be taken into account when assessing whether a settlement is fair,

---

[8] At the time each Settlement was reached, the parties had conducted years of discovery, excluding the hiatus in discovery upon the intervention by the Department of Justice, and the parties were well into briefing DPPs' motion for class certification.

reasonable and adequate. "The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2015 WL 9266493, at *6 (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008)); *see also Kleen Prod. LLC v. Int'l Paper Co.*, No. 1:10-CV-05711, 2017 WL 5247928, at *3 (N.D. Ill. Oct. 17, 2017) ("The Settlement was negotiated by highly skilled and experienced antitrust and class action lawyers, who have held leadership positions in some of the largest class actions around the country."). Therefore, the endorsement of the Settlement by Interim Co-Lead Counsel for the Settlement Class (which the Court knows to have handled several major antitrust class actions), is yet another factor that supports final approval.

### 5. The Stage of the Proceedings and Amount of Discovery Supports Final Approval

While this case has been pending for some time, the stage of the case strongly supports granting final approval to the Settlements. Namely, the Settlements have been entered into prior to a ruling on DPPs' motion for class certification, Defendants' motions for summary judgment and summary adjudication, and trial on the merits. While Plaintiffs are confident in their case, each of these important hurdles present time, expense, and risk, which supports the security offered by the very significant $154,340,000 in settlement proceeds provided by the Settlements.

Interim Co-Lead Counsel also considered the strength of Plaintiffs' claims and the Settling Defendants' defenses, and the substantial benefits that the Settlements will provide to the Settlement Class. (Pouya Decl. ¶¶ 8, 22.) The Settlements take into account the fact that the agreement was entered into before the Court ruled on DPPs' pending motion for class certification, Defendants' anticipated motions for summary judgment, and trial. *See, e.g.*, *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 494 (N.D. Ill. 2015) ("Although Kolinek withstood Walgreens's motion to dismiss on both grounds, the Court observed in its written orders as to both [defense] issues that

further factual development might prove that plaintiffs did indeed consent or that the calls were made for emergency purposes."); *Schulte*, 805 F. Supp. 2d at 582 ("While Plaintiffs maintain that their claims would ultimately succeed, the above discussion establishes that Fifth Third has a number of potentially meritorious defenses. Absent settlement, Class Members would face the real risk that they would win little or no recovery."); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 229 (N.D. Ill. 2016) ("In light of Chase's potential defenses, the legal uncertainty concerning the application of the TCPA, and the time and expense inherent to litigation, proceeding to trial, and obtaining relief posed risks to Plaintiffs, and a possibility existed that they would have recovered nothing.").

Moreover, the amount of discovery and the investigation performed before the Settlements were entered ensured that DPPs and their counsel made informed decisions to approve and recommend the Settlements to the Class and the Court. As set forth herein, the Settlements were entered into after DPPs had the opportunity to take dozens of depositions, analyze millions of documents, and engage in extensive written discovery. (*See* Pouya Decl. ¶¶ 4-7). Therefore, the procedural posture and status of the case supports granting final approval to the Settlements.

## V.     CONCLUSION

For these reasons, Interim Co-Lead Counsel respectfully request that the Court grant final approval to the Pilgrim's and Tyson Settlement Agreements.[9]

/ / /

/ / /

/ / /

/ / /

---

[9] DPPs will file a [Proposed] Order granting this Motion no later than June 25, 2021.

Date:  June 15, 2021


*/s/ Bobby Pouya*

Clifford H. Pearson (*Pro Hac Vice*)
Daniel L. Warshaw (*Pro Hac Vice*)
Thomas J. Nolan (*Pro Hac Vice*)
Bobby Pouya (*Pro Hac Vice*)
Michael H. Pearson (*Pro Hac Vice*)
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
cpearson@pswlaw.com
dwarshaw@pswlaw.com
tnolan@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com


W. Joseph Bruckner (*Pro Hac Vice*)
Brian D. Clark (*Pro Hac Vice*)
Simeon A. Morbey (*Pro Hac Vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com

Bruce L. Simon (*Pro Hac Vice*)
PEARSON SIMON & WARSHAW, LLP
350 Sansome Street, Suite 680
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com

*Direct Purchaser Plaintiffs Interim Co-Lead Class Counsel*

Steven A. Hart (#6211008)
Brian Eldridge (#6281336)
Kyle Pozan (#6306761)
HART MCLAUGHLIN & ELDRIDGE, LLC
121 West Wacker Drive, Suite 1050
Chicago, IL 60601
Telephone: (312) 955-0545
Facsimile: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com
kpozan@hmelegal.com

*Direct Purchaser Plaintiffs Liaison Counsel*