## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION*<br><br>This Document Relates To:<br>*Chick-fil-A, Inc. v. Agri Stats, Inc. et al.*, 20-cv-7205 | Case No.: 1:16-cv-08637<br><br>Judge Thomas M. Durkin<br><br>Magistrate Judge Jeffrey T. Gilbert |

## DIRECT-ACTION PLAINTIFF CHICK-FIL-A, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO PARTIALLY RECONSIDER THE SEPTEMBER 22, 2020 ORDER AND OBJECTION TO MAGISTRATE JUDGE'S MAY 7 AND MAY 13, 2021 ORDERS

On May 27, 2021, the Court requested a supplemental brief from Direct Action Plaintiff Chick-fil-A on certain aspects of its motion to reconsider the Court's bifurcation of what it characterizes as the "supply reduction and Georgia Dock claims" from the "bid-rigging claims," in light of the U.S. Supreme Court's holding in *Continental Ore Co. v. Union Carbide & Carbon Corp.* In so doing, the Court recognized the general applicability of *Continental Ore*, but requested further briefing on how that principle "applies across the distinct conspiratorial goals alleged in the complaints (i.e., conspiracy to reduce supply, conspiracy to fix Georgia Dock, conspiracy to rig contract bids), when all the alleged goals are illegal in-and-of themselves." May 27 Order, ECF No. 4722 at 2. If proof of each conspiratorial goal "could be sufficient to establish separately liability for one or more of the conspiratorial goals, and trying them together cannot establish liability without one of the conspiracies being proven," the Court stated that it was "unclear why it is legal error to discover and try them separately." *Id.* at 2-3. As a result, the Court concluded a supplemental brief containing "more granular argument addressing these concerns" would be helpful. *Id.* at 3.

1

Chick-fil-A appreciates the Court's guidance on a key legal issue governing the case and the opportunity to provide additional argument to address the Court's questions. Chick-fil-A also recognizes the unique challenges presented by this complex antitrust litigation, which has been litigated during a global pandemic and has proceeded alongside a parallel and rapidly evolving U.S. Department of Justice investigation and criminal proceeding. Chick-fil-A understands that the September 22, 2020 bifurcation order was an attempt to creatively address these challenges. Nonetheless, Chick-fil-A believes that the bifurcation order has created some unforeseen and unintended consequences. This motion for partial reconsideration attempts to highlight those issues for the Court's consideration and suggests a slightly modified path that avoids those consequences while still addressing the concerns underlying the bifurcation order.

As it understands the Court's thinking, Chick-fil-A believes it is possible that the Court may be discounting the importance of Chick-fil-A and other DAPs' allegation of a single, overarching conspiracy, which is reflected in Count One of the DAP Consolidated Amended Complaint ("CAC"). Specifically, the language in the Court's May 27 Order seems to be premised on the notion that Chick-fil-A and other DAPs are bringing three separate and distinct conspiracy "claims" when, in fact, the primary allegation in the CAC is a single overarching conspiracy to raise prices. Indeed, for some DAPs, that is the *only* antitrust conspiracy claim in the case. To be sure, many DAPs, including Chick-fil-A, have *also* pled separate conspiracies in the alternative. But the only common claim across all DAPs—and the one that will need to be adjudicated to resolve the DAP cases—is Count One of the CAC. For that reason, Chick-fil-A believes it would be helpful to provide some background on the claims before addressing the Court's questions within the established framework set forth by the Seventh Circuit for assessing bifurcation decisions under Rule 42.

## BACKGROUND

The primary allegation in all the DAP cases is that Defendants engaged in a single, overarching conspiracy to raise prices to customers.[1]  Specifically, in Count One of the CAC, the DAPs allege that, from at least as early as January 1, 2008 and continuing until at least as late as 2019, Defendants entered into a conspiracy "to fix, raise, stabilize, and maintain prices of chicken meat throughout the United States."[2]  This multi-faceted conspiracy was implemented by various means and manifested itself in many different ways.[3]  For example:

- Defendants coordinated unprecedented cuts in the supply of broiler chickens.[4]

- Defendants shared confidential and competitively sensitive information regarding production, capacity and pricing through intermediaries such as Agri-Stats, under the cover of M&A activity, and during discussions about sale/purchase transactions with each other.[5]

- Defendants further restricted broiler chicken supply through so-called strategic alliances and joint ventures, including the Tip Top Alliance and Southern Hens.[6]

- Defendants coordinated direct purchases of broiler chickens from one another and from smaller producers in order to soak up excess supply that could potentially depress market prices, including the adoption of "Buy vs. Grow" strategies.[7]

- Defendants exported hatching eggs to Mexico and other foreign countries against their own self-interest with the intent to artificially reduce the supply and increase the price of broiler chickens in the U.S.[8]

- Defendants created and controlled the Georgia-Dock pricing index for their own benefit and then collusively and fraudulently manipulated it in order to raise prices to customers.[9]

---

[1] CAC ¶¶ 1, 1032-43.

[2] CAC ¶ 1.  The pleading of a single, overarching conspiracy is not unusual.  Indeed, in its Superseding Indictment, the DOJ also pled a single-count violation of the Sherman Act involving a "conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States." Superseding Indictment at 2, *U.S. v. Jayson Penn, et al.*, 20-CR-152-PAB (D. Colo.) (Oct. 6, 2020), ECF No. 101.

[3] CAC ¶8 ("Defendants used multiple means to sustain their conspiracy/conspiracies"); CAC ¶ 335 ("Defendants used multiple means to sustain the conspiracy/conspiracies described in this Complaint.").

[4] *E.g.*, CAC ¶¶ 337-544

[5] *E.g.*, CAC ¶¶ 937-997.

[6] *E.g.*, CAC ¶¶ 881-896

[7] *E.g.*, CAC ¶¶ 917-936

[8] *E.g.*, CAC ¶¶ 932-936

[9] *E.g.*, CAC ¶¶ 587-839

- Defendants coordinated a move away from annual fixed-price contracts to contracts permitting price fluctuations with public market price indices that could be manipulated.[10]

- Defendants coordinated denials of letters of credit requested by customers.[11]

- Defendants rigged bids submitted for broilers sold to restaurants, retailers, and other contract purchasers through multiple avenues, including the exchange of confirmation information with each other regarding the bids they were submitting, or intended to submit, so that all supposedly competitive bids were aligned.[12]

- Defendants used a false supply reduction narrative with regard to small bird broilers as well as the artificially inflated Georgia Dock index to justify submitting higher bids and charging higher prices to contract-based customers.[13]

Each of these actions represented unique and inter-related acts in furtherance of the overarching conspiracy, but all shared the same overall objective of raising the prices of broiler chickens.[14] Indeed, as the Court has already recognized, Chick-fil-A and other DAPs are alleging that all of the aforementioned conduct had "the same goal of maintaining a high price for Broilers" and each of the acts described in the complaint were simply "means to the same end of manipulating Broiler prices." *See* Bifurcation Order, ECF No. 3835 at 4, 7.[15]

The Seventh Circuit has held that, in order to show an antitrust conspiracy, plaintiffs must prove that the conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 841 (7th Cir. 2020). Accordingly, because the Court has already determined that each aspect of the conspiracy alleged in Count One had the "same goal" and thus a common conspiratorial purpose, it is all part of a single, unitary conspiracy. *See, e.g.*, *U.S. v. Sababu*, 891 F.2d 1308, 1324 (7th

---

[10] *E.g.*, CAC ¶¶ 906-915

[11] *E.g.*, CAC ¶ 916

[12] *E.g.*, CAC ¶¶ 840-853

[13] *E.g.*, CAC ¶571- 573, 838-839.

[14] CAC ¶8 ("While Defendants may have utilized multiple avenues, they all had the common objective of disrupting free market competition to harm Plaintiffs.").

[15] Notably, the Court's question regarding the effect on bifurcation if the goals of the three allegedly separate conspiracies were "distinct" is contradicted by its express finding in the bifurcation order itself that each aspect of alleged conspiracy had the "same goal."

Cir. 1989) ("as long as [Defendants] knowingly embraced the same criminal objective, they participated in a single conspiracy"); *U.S. v. Paiz*, 905 F.2d 1014, 1020 (7th Cir. 1990) (a single conspiracy exists if "there is one overall agreement among various parties to perform different functions in order to carry out the objectives of the conspiracy") (citations omitted).

Some DAPs have also pled different conspiracies in the alternative under Rule 8(d)(2).[16] Chick-fil-A, for example, has joined in Count II (supply restriction) and Count III (Georgia Dock) of the CAC against all Defendants and has also brought its own Count LIII (bid rigging) against certain Defendants.[17] Each one of these counts was specifically "plead in the alternative to Count I."[18] Other DAPs have also brought claims under Section 1 of the Sherman Act in the alternative that are premised on slightly different theories or include a slightly different group of Defendants.[19] All of these claims, however, are expressly labeled as being pled in the alternative and are secondary to the primary allegation brought by all DAPs in this case: Count One.

---

[16] It is well established under Federal Rule of Civil Procedure 8 that parties may plead in the alternative. Fed. R. Civ. P. 8(d)(2); *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 366 (7th Cir. 2017) (Federal Rules allow "alternative and even inconsistent pleadings"); *Mizuho Corp. Bank (USA) v. Cory & Assocs., Inc.*, 341 F.3d 644, 651 (7th Cir. 2003) ("There is generally nothing wrong with alternative pleading"). The fact that some DAPs chose to do so here, therefore, cannot be used against those DAPs. *See Alper v. Altheimer & Gray*, 257 F.3d 680, 687 (7th Cir. 2001); *Sandee's Catering v. Agri Stats, Inc.*, 2021 WL 963812, at *7 (N.D. Ill. Mar. 15, 2021). Many cases, like this one, involve offenses and lesser-included offenses pled in the alternative, but that does not mean that a court can use the presence of the lesser-included offenses to deprive the plaintiff of a right to jury trial on the overarching offence. *See Estate of McIntosh v. City of Chi.*, 2015 WL 5164080, at *9 (N.D. Ill. Sept. 2, 2015) (judicial economy concerns supporting bifurcation not sufficient "when weighed against the fact that the plaintiff is the master of her complaint").

[17] CAC at 44, 318, 321.

[18] *Id.*

[19] CAC at Count LIV & LV.

**ARGUMENT**

I.   **THE PRIMARY CAUSE OF ACTION IN THIS CASE—COUNT ONE— CANNOT BE DISMEMBERED AND SPLIT INTO THREE SEPARATE CLAIMS**

Chick-fil-A's Motion explains that the Court's bifurcation of what it characterized as the "bid rigging" claims from the "market manipulation" claims unintentionally built error into the schedule of the case by both "dismembering" and "compartmentalizing" Count One of the CAC in violation of *Continental Ore v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962). The Court's May 27 Order, however, stated that it did not see how the *Continental Ore* principle "applies across the distinct conspiratorial goals alleged in the complaints (*i.e.*, conspiracy to reduce supply, conspiracy to fix Georgia Dock; conspiracy to rig contract bids), when all the alleged goals are illegal in-and-of themselves." May 27 Order at 2. Chick-fil-A understands the Court to be suggesting that because each allegedly distinct conspiratorial goal and/or act alleged by Plaintiffs, if proved, would be illegal standing alone, then the Court has the authority and discretion to bifurcate one aspect of the conspiracy—bid rigging—as a case management matter without running afoul of *Continental Ore*. Similarly, the Court expressed the view that it was unclear why it would be legal error to split Count One into what it characterized as separate claims because "trying them together cannot establish liability without one of the conspiracies being proven." *Id.* at 3. Finally, the Court stated that it "does not see how evidence of bid rigging is relevant to or necessary to prove a supply reduction conspiracy or a Georgia Dock conspiracy." *Id.*

The touchstone for any detailed analysis of bifurcation is Rule 42. As the Court recognizes, Rule 42(b) authorizes courts to order a separate trial of one or more "separate issues [or] claims" in the interests of judicial economy and to avoid prejudice. Fed. R. Civ. Proc. 42(b). While this Rule obviously gives the Court some discretion, bifurcation remains "the exception, not the rule," and it should not be ordered "unless such a disposition is clearly necessary." *Batchelor v. City of*

*Chi.*, 2021 WL 825607, at *2 (N.D. Ill. Mar. 4, 2021) (citations omitted). Indeed, the Advisory Committee Notes to Rule 42 underscores that "separation of issues for trial is not to be routinely ordered," *Challenge Aspen v. King World Prods. Corp.*, 2001 WL 1403001, at *2 (N.D. Ill. Nov. 9, 2001), and the Wright & Miller treatise likewise emphasizes that "the piecemeal trial of separate issues in a single lawsuit is not to be the usual course." 9 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure: Civil* 2d §2388 (1995). This is because a single trial "generally tends to lessen the delay, expense, and inconvenience to all concerned." *THK Am., Inc. v. NSK Co.*, 151 F.R.D. 625, 631 (N.D. Ill. 1993). *See also Bouto v. Guevara*, 2020 WL 956294, at *1 (N.D. Ill. Feb. 27, 2020) (rejecting bifurcation because "litigating a case in a piecemeal fashion is likely to cause delay").

The party seeking bifurcation typically bears the burden of establishing that bifurcation is proper. *White v. Coventry Health Care, Inc.*, 2018 WL 1469025, at *3 (N.D. Ill. Mar. 26, 2018). In assessing whether the party has carried that burden, the Seventh Circuit has required courts to engage in a three-step analysis:

> First, the trial judge must determine whether separate trials would avoid prejudice to a party or promote judicial economy. Only one of these criteria—avoidance of prejudice or judicial economy— need be met before a court can order separation. Next, the court must be satisfied that the decision to bifurcate does not unfairly prejudice the non-moving party. Finally, separate trials must not be granted if doing so would violate the Seventh Amendment.

*Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir. 1999) (citations omitted). In weighing the competing equities under Rule 42(b), however, courts have emphasized that the plaintiff "is the master of her complaint," *Awalt v. Marketti*, 2012 WL 1161500, at *10 (N.D. Ill. Apr. 9, 2012), and recognized that courts should also "remain mindful of the traditional role of the factfinder; *i.e.* to make an ultimate determination on the basis of a case presented in its entirety." *Real v. Bunn-O-Matic Corp.*, 195 F.R.D. 618, 620 (N.D. Ill. 2000).

The *Houseman* bifurcation analysis was only partially conducted in the Bifurcation Order. The Court determined *sua sponte* that bifurcation was necessary "in order to expedite and economize the process of bringing the supply reduction and Georgia Dock claims to resolution." Bifurcation Order at 6.  In so doing, the Court conducted the first step in the *Houseman* analysis and determined on its own that judicial economy would be promoted by bifurcation.  However, the Court stopped its analysis there and never considered step two.  This is important because, "even if bifurcation might somehow promote judicial economy, courts should not order separate trials when bifurcation would result in unnecessary delay, additional expense, or some other form of prejudice." *Real*, 195 F.R.D. at 620.  Indeed, numerous courts have recognized that prejudice to the party opposing bifurcation "is the Court's most important consideration." *Id.* at 621. Consequently, in those rare cases in which motions to bifurcate have been granted, "the facts and circumstances were such that bifurcation lent itself to judicial economy while not unduly prejudicing any party." *Id.*  Similarly, the Bifurcation Order did not address step three of the *Houseman* analysis and consider the significant Seventh Amendment issues raised by the bifurcation.

Once the full *Houseman* analysis is conducted, it is clear that bifurcation is unwarranted and inappropriate.  Courts in this district typically only employ bifurcation in those situations "where experience has demonstrated its worth." *Challenge Aspen v. King World Prods. Corp.*, 2001 WLl 1403001, at *2 (N.D. Ill. Nov. 9, 2001) (citations omitted).  As the Seventh Circuit has recognized, these situations tend to be limited to scenarios in which there is "a discrete, potentially dispositive issue." *All EMS Inc. v. 7-Eleven Inc.*, 181 F.App'x 551, 559 (7th Cir. 2006). *See also Vichare v. Ambac Inc*., 106 F.3d 457, 466 (2d Cir. 1996) (rejecting bifurcation and distinguishing instances in which "the evidence offered on two different issues will be wholly distinct" or where

trying "one issue may obviate the need to try another issue"). But no court in this district has ever sanctioned the bifurcation of a single cause of action alleging an overarching antitrust conspiracy into trials of separate aspects of that conspiracy where, as here, the Court has already determined that those aspects "extensive[ly] overlap," had the "same goal," are "means to the same end," are "thoroughly intertwined," and are "closely related" without any "material differences." Bifurcation Order at 4-7. If anything, the only relevant judicial experience rejects bifurcation in this circumstance. *See, e.g.*, *Advanced Microtherm, Inc. v. Norman Wright Mech.*, 2009 WL 2136916, at *2 (N.D. Cal.) (rejecting bifurcation of antitrust claim where Plaintiffs alleged a "global conspiracy" under *Continental Ore*); *United States v. Warner*, 2006 WL 2583722, at *26 (N.D. Ill. Sept. 7, 2006), *aff'd*, 498 F.3d 666 (7th Cir. 2007) (denying bifurcation where single overarching conspiracy alleged).

## A. THE SPLITTING OF COUNT ONE INTO THREE SEPARATE CLAIMS WOULD VIOLATE *CONTINENTAL ORE*

One of the "paramount policies" embedded in the Federal Rules of Civil Procedure is that the plaintiff is "the master of the complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398-99 (1987). As such, plaintiffs "may include (or omit) claims" in the complaint, *Garbie v. Daimler Chrysler Corp.*, 211 F.3d 407, 410 (7th Cir. 2000), and what is included "control[s] the litigation." *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1486 (7th Cir. 1996). As explained above, the primary claim brought by Chick-fil-A and all DAPs is that the Defendants orchestrated a single overarching conspiracy to raise prices during the relevant time period. This multi-faceted conspiracy was carried out through various means, some of which included the conduct referenced by the Court but also included much more than just that. The Court does not directly address the existence of Count One in its May 27 Order, however, and the language used by the Court suggests that it views the case as essentially comprised of three "separate" conspiracies or claims, which

can be neatly separated into three separate boxes. While this is certainly how Defendants have attempted to brand and label DAPs' claims, it is not what DAPs pled in Count One.

Nor does it account for all the other facets of the conspiracy alleged in Count One. For example, it does not acknowledge the "competitively sensitive information exchange," "strategic alliance," "Buy vs. Grow," "foreign export" and "fixed-price contract transition" aspects of the conspiracy, or how these aspects of the conspiracy inter-related with other aspects of the conspiracy. This raises additional questions. If Count One could be split into separate conspiracies, are each of these facets also separate conspiracies and, if so, how many separate conspiracies are there and how does the Court draw the line between which conspiracies are part of the same conspiracy or not?

Any analysis of how to address the claims in this case must therefore start with Count One. *See Mizuho*, 341 F.3d at 651 ("We begin with the language of the complaint, following the rule that the plaintiff is the master of its own litigation."). As a single overarching conspiracy, albeit a "multi-faceted" one, Count One is a unitary cause of action. Consequently, Chick-fil-A continues to believe that *Continental Ore* precludes it from being sliced up into sub-conspiracies and analyzed separately as different claims. This is because, for purposes of Count One, what the Court characterizes as the supply restriction, Georgia Dock, and bid-rigging "claims" are not really claims at all. Nor are they "separate." As pled in Count One, they are simply different means— and not even the exclusive means—by which the overarching conspiracy was allegedly conducted over a lengthy period of time. *See* Bifurcation Order at 7 ("all three claims are means to the same end of manipulating Broiler prices"). As such, the factual allegations regarding such conduct— including bid-rigging—serve as ***evidence*** of that overarching conspiracy, not as separate claims in and of themselves.

This is why *Continental Ore* squarely applies. By parsing and transforming the evidence offered in support of the single overarching conspiracy alleged in Count One into "three separate claims," the Court is treating the factual allegations and evidence of conduct supporting Chick-fil-A's (and other DAPs') unitary conspiracy claim "as if they were … completely separate and unrelated lawsuits." 370 U.S. at 698. But, as the Court clarified in *Continental Ore*, "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts." *Id.* at 699. For purposes of Count One, the conspiracy is unitary and, if the Court were to break it apart for discovery, summary judgment, and trial, it would be doing exactly what *Continental Ore* forbids. There would be no way for Chick-fil-A to "be given the full benefit of its proof" on Count One at summary judgment and trial if the Court not only "tightly compartmentaliz[es] the various factual components" in its analysis, *id.*, but also goes further and builds that compartmentalization into the structure and trial of the case itself through bifurcation. Accordingly, while the Court has discretion to bifurcate issues under Rule 42, it cannot bifurcate in a way that would violate *Continental Ore.* *See, e.g.*, *Advanced Microtherm, Inc*., 2009 WL 2136916 at *3 (rejecting bifurcation of antitrust claim as inappropriate where Plaintiffs alleged a "global conspiracy" under *Continental Ore*).

For Count One, the Supreme Court and the Seventh Circuit have both emphasized that the jury will need to consider ***all*** the evidence, including not just the three groups of factual allegations identified by the Court but all the other factual allegations as well, and then determine whether, taken together, the evidence is sufficient. In conducting this analysis, Judge Posner's often-quoted admonition about the "traps to avoid" in assessing antitrust conspiracy evidence becomes prescient:

> The second trap to be avoided in evaluating evidence of an antitrust conspiracy . . . is to suppose that if no single item of evidence

> presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment. It is true that zero plus zero equals zero. But evidence can be susceptible of different interpretations, only one of which supports the party sponsoring it, without being wholly devoid of probative value for that party. Otherwise what need would there ever be for a trial? The question for the jury in a case such as this would simply be whether, when the evidence was considered as a whole, it was more likely that the defendants had conspired to fix prices than that they had not conspired to fix prices.

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655-56 (7th Cir. 2002). In other words, for purposes of Count One, it is conceivable that the jury might not find sufficient evidence to establish standalone liability for one or more of the three conspiracies identified by the Court if they were presented alone, but that the evidence taken together will be enough for a jury to conclude that a single overarching conspiracy existed.

For example, while the Court stated that "it does not appear that *Continental Ore* or any of the other cases Chick-fil-A cites concerned a multi-faceted conspiracy like this case," the Seventh Circuit's decision in *Fontana* involved what was expressly characterized as a "multi-faceted conspiracy." May 27 Order at 3. In that context, the Seventh Circuit held that even if some of the supporting factual allegations may have been "weakened individually" by conflicting evidence presented at summary judgment, "there may be some vitality left in them when considered as parts of the whole conspiracy as alleged." *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 481 (7th Cir. 1980) (citing *Continental Ore* and reversing and remanding summary judgment decision). Indeed, numerous courts have denied summary judgment on antitrust conspiracy claims on this basis, including many that have relied on the Seventh Circuit's decision in *High Fructose Corn Syrup* to do so. *See, e.g.*, *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004) (reversing summary judgment and instructing that "a court must look to the evidence as a whole and consider any single piece of evidence in the context of other evidence."); *In re Titanium*

*Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 809 (D. Md. 2013) (denying summary judgment based on consideration of evidence as a whole and citing *In Re High Fructose*); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 178 (D. Conn. 2009) (same); *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 54 (E.D. Pa. 2007) (same); *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 14 (D.D.C. 2004) (same).

The existence of Count One is therefore critical to the answer to the Court's question whether it is possible for Chick-fil-A and other DAPs to prevail if the evidence were insufficient to demonstrate a supply reduction conspiracy, a Georgia Dock conspiracy, and a bid-rigging conspiracy. If there were no Count One, and all Chick-fil-A and other DAPs pled were separate counts based on each of the three conspiracies identified by the Court, then the answer to the Court's question would be no. But that is not how the case has been pled. *See Gibson v. City of Chi.*, 2021 WL 2127182, at *2 (N.D. Ill. Apr. 6, 2021) (rejecting bifurcation because plaintiff "is the master of his complaint and has chosen to pursue" two separate, but related claims). Indeed, because Chick-fil-A has brought a single overarching conspiracy claim, which includes the supporting evidence mentioned above ***and*** voluminous other evidence as well, the question is not whether "evidence of bid rigging is relevant to or necessary to prove a supply reduction conspiracy or a Georgia Dock conspiracy," May 27 Order at 3, but whether all of the evidence, taken together, establishes a single overarching conspiracy to raise prices. *See In re High Fructose Corp Syrup Antitrust Litig.*, 295 F.3d at 655-56.

The Court is correct, of course, that *Continental Ore* addressed an appellate court's review of a district court opinion and not review of a district court's discovery rulings or trial structure decisions. But, as this Court has previously recognized, *Continental Ore* "focuses on the use of evidence." *U.S. Futures Exchange, LLC*, 346 F. Supp. 3d at 1249. The discovery standard is,

however, tied to (and significantly broader than) the evidentiary standard. Fed. R. Civ. P. 26(b)(1). If evidence is relevant under *Continental Ore* for summary judgment purposes, then it must also be relevant for discovery purposes. For that reason, numerous courts presiding over antitrust conspiracy cases have held that the *Continental Ore* principle applies to discovery just as much as it does to summary judgment and trial. *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2014 WL 12647877, at *4 (N.D. Cal. Aug. 20, 2014) ("If 'compartmentalizing' an alleged conspiracy at trial or on summary judgment motion is not appropriate, still less is it appropriate in discovery."); *In re Vitamins Antitrust Litig.*, 2001 WL 1049433, at *11 (D.D.C. June 20, 2001) (explaining relevance of *Continental Ore* to discovery).

## B. THE DISMEMBERMENT OF COUNT ONE THROUGH BIFURCATION VIOLATES THE SEVENTH AMENDMENT

Another important limitation on the Court's discretion to bifurcate cases is the Seventh Amendment. The text of Rule 42(b) expressly addresses this limitation, and the Seventh Circuit has reinforced that bifurcation "must not be granted if doing so would violate the Seventh Amendment." *Houseman*, 171 F.3d at 1121. The bifurcation order, however, violates the Seventh Amendment in two significant ways.

First, the Seventh Amendment guarantees the right to a jury trial, but the bifurcation order deprives Chick-fil-A and other DAPs of the opportunity to *ever* have a jury trial on Count One and instead limits certain DAPs to a bifurcated trial of their alternatively pled claims. This would be the equivalent of a *de facto* grant of dismissal or summary judgment on Count One—the primary count brought by Chick-fil-A and other DAPs—without discovery or even requiring a motion from Defendants. For those DAPs who only pled Count One, such as the Conagra Plaintiffs,[20] it would

---

[20] The "Conagra Plaintiffs"—Conagra Brands, Inc., Kraft Heinz Foods Company, Nestlé USA Inc., Pinnacle Foods, Inc., and Nestlé Purina PetCare Company—filed a joinder to Chick-fil-A's motion for this very reason. *See* ECF No. 4655.

be the end of their case. This raises not only Seventh Amendment issues but due process issues under the Fourteenth Amendment as well. For that reason, numerous courts in this district have repeatedly rejected bifurcation where it would effectively result in a dismissal of the bifurcated claim. *See, e.g.*, *Maysonet v. Guavara*, 2020 WL 3100840, at *5 (N.D. Ill. June 11, 2020) (denying bifurcation where it was "essentially a means 'to achieve a *de facto* dismissal'"); *Cadiz v. Kruger*, 2007 WL 4293976, at *10 (N.D. Ill. Nov. 29, 2007) (denying bifurcation because, if accepted, bifurcation would allow Defendants "to avoid the merits" of bifurcated claim).

The means by which the Court accomplishes bifurcation also creates Seventh Amendment issues insofar as it usurps the fact-finding role of the jury. The Court's stated rationale for bifurcation is that there are three separate claims and each of them "are illegal in-and-of themselves." May 27 Order at 2. But the question whether there is one single overarching conspiracy or three separate conspiracies is a quintessential jury question. As the Seventh Circuit has repeatedly held in an analogous context, "whether a single conspiracy exists is a question of fact; consequently **the jury gets first crack at deciding whether there is one conspiracy or several**." *U.S. v. Magana*, 118 F.3d 1173, 1188 (7th Cir. 1997).

Second, the bifurcation order also violates the second clause of the Seventh Amendment. The so-called Re-examination Clause provides that "no fact tried by a jury, shall be otherwise re-examined." U.S. Const. Amend. VII. The Seventh Circuit has interpreted this provision to mean that "questions in a single suit can only be tried by different juries if they are 'so distinct and separable from the others that a trial of them alone may be had without injustice.'" *Houseman*, 171 F.3d 1126 (quoting *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931)). This means that a court "must not divide issues between separate trials in such a way that the same issue is reexamined by different juries." *Id*. While both juries can examine overlapping

evidence, they "may not decide factual issues that are common to both trials and essential to the outcome." *Id.*

The seminal case in the Seventh Circuit on this issue is *In re Rhone-Poulenc Rorer, Inc.,* 51 F.3d. 1293 (7th Cir. 1995). *Rhone-Poulenc* involved a certified liability-only class of hemophiliacs suing the manufacturers of a concentrate that allegedly caused them to contract the HIV virus. The district court planned to try the negligence issues first and then allow for individual class members to file lawsuits across the country to decide proximate causation and comparative negligence issues, with the initial negligence finding given collateral estoppel effect. On a writ of mandamus, however, the Seventh Circuit held that the district court had exceeded its authority and decertified the class based in part on Seventh Amendment concerns. Specifically, the Court held that the district court's trial plan was "inconsistent with the principle that the findings of one jury are not to be reexamined by a second, or third, or *n*th jury." *Id*. at 1303. Because the first jury "will not determine liability," but only negligence, it would be left to other juries to decide the overlapping and inter-related issue of comparative negligence and causation. *Id*. Because of the intertwined nature of the issues, the Seventh Circuit held that there was a serious risk of inconsistent verdicts among the different juries, which would violate the Seventh Amendment.

The Court's bifurcation order here raises similar concerns. The current trial plan contemplates the supply restriction and Georgia Dock aspects of the conspiracy going to trial sometime in 2023. The second "bid-rigging" phase of the case is currently stayed and will not even begin until the associated claims of all three classes and all 140+ DAPs "are resolved." Bifurcation Order at 7. As a practical matter, this seems to mean that it will be years between the first and second trial and that a different jury would have to be empaneled for the second trial. If so, it is impossible to avoid the *Rhone-Poulenc* problem. As the Court has already acknowledged,

there is no "material difference" in the relationship between what it characterizes as the three claims and, importantly, the Court has held that ***"factual findings"*** regarding any one of them "will undoubtedly impact the others." Bifurcation Order at 4. As such, because both juries would have to decide essentially the same factual issues, thereby creating a substantial risk of inconsistent findings, the Seventh Amendment serves as a bar to bifurcation. *See Houseman*, 171 F.3d at 1126 (second jury "may not decide factual issues that are common to both trials and essential to the outcome"); *see also Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001) ("[W]hen the evidence is intertwined . . . the district court must take care not to impinge on the right to a jury" (citing *Ross v. Bernhard*, 396 U.S. 531, 537-38 (1970)).

For example, one of the key issues at trial will be, as it was in *Phone-Poulenc*, causation. Specifically, why were broiler chicken prices rising during the relevant time period? Chick-fil-A alleges that it was due to a conspiracy amongst Defendants to raise prices. Defendants will undoubtedly argue, as they have in opposition to class certification, that it was due to external market factors, such as new renewable fuel standards, the Great Recession, and skyrocketing corn prices.[21] Importantly, however, the conspiracy conduct characterized by the Court as three separate claims largely overlapped and occurred during the same time period. As a result, if Count One is bifurcated, and some aspects of the single overarching conspiracy are tried in the first phase and then other aspects of that same conspiracy are discovered and tried as part of a second phase, there would be a significant risk that the juries could reach inconsistent findings. For example, the jury could decide in the first phase that prices rose during the relevant time period due solely to external market factors. But, in a second trial, the jury would be asked the same question: why did prices rise during the relevant time period? If a second jury were then to decide that it was actually

_____

[21] *See* Defs. Opp. to Direct Purchaser Pls.' Mot. for Class Cert., ECF No. 4210 at 1, 12-19 (Jan. 22, 2021).

not external market factors, but rather "bid rigging" conduct or some other aspect of the conspiracy, there would be two inconsistent verdicts, including one in which the second jury re-examined and corrected the first jury. As the Seventh Circuit made clear in *Rhone-Poulenc*, the Seventh Amendment does not allow that. *Rhone-Poulenc*, 51 F.3d at 1303 ("How the resulting inconsistency between juries could be prevented escapes us."); *see also In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1182 (3d Cir. 1993) (reversing and ordering new trial in bifurcated antitrust case where causation issues were put before two different juries in "clear violation of the Seventh Amendment").

Finally, even if it did not rise to the level of a Seventh Amendment violation, "piecemeal litigation is not favored and bifurcation is inappropriate in cases where the facts are so inextricably interwoven that separation is impossible or at least manifestly unfair." *Vill. of Stillwater v. Gen. Elec. Co.*, 2010 WL 4025601, at *3 (N.D.N.Y. Oct. 13, 2010) (citations omitted). Numerous courts in this district have denied bifurcation on this basis. *See, e.g.*, *Ortega v. United States*, 2017 WL 3841632, at *5 (N.D. Ill. Aug. 31, 2017); *Trading Techs. Int'l*, 431 F. Supp. 2d at 841; *Lucas v. Vee Pak, Inc.*, 2014 WL 12932245, at *2 (N.D. Ill. Nov. 13, 2014); *Cima v. WellPoint Health Networks, Inc.*, 2008 WL 746916, at *4 (S.D. Ill. March 18, 2008); *Clintec Nutrition Co. v. Aboott Labs*, 1995 WL 228988, at *5 (N.D. Ill. Apr. 14, 1995).

There can be no doubt that this case falls within the "extensive overlap" and "inextricably intertwined" line of cases. Indeed, in its bifurcation order, the Court already determined that there is "a substantial relationship" between all of the aforementioned aspects of the conspiracy and that they are "closely related" such that "legal rulings, factual findings or settlements regarding any of the claims will undoubtedly impact the others." Bifurcation Order at 4, 5, 7. The DOJ has likewise publicly acknowledged that there is "overlap" in the civil and criminal cases. Gov't Mot. for

Alternative Victim Notification, *U.S. v. Jayson Penn, et al.*, 20-CR-152-PAB (D. Colo.) (Oct. 6, 2020), ECF No. 73.  As a result, the Court correctly determined that there is ***"extensive overlap"*** and that discovery for all three is "***thoroughly intertwined*** in terms of the scope of relevant documents, custodians, and deponents."  Bifurcation Order at 4.  These prior findings, taken together, counsel strongly against bifurcation.  *See, e.g.*, Charles A. Wright, *et al.*, *Federal Practice & Procedure* (3d ed.) § 2388 Separate trials—Discretion of Court (noting that if the separate trial of an issue will involve "substantially the same facts or witnesses as the other issues in the case . . . it is likely that a separate trial on that issue will be denied by the district judge, as the many cases cited in the note below indicate").  *See also Marshbanks v. City of Calumet City*, 2015 WL 1234930, at *5 (N.D. Ill. Mar. 16, 2015) (denying bifurcation where it "would result in two trials that would most likely involve many of the same witnesses and evidence").

## C.  Chick-fil-A Would Be Significantly Prejudiced If The Bifurcation Order Is Not Partially Reconsidered

The final *Houseman* factor—prejudice—is the "most important consideration."  *Real*, 195 F.R.D. at 621.  The Court did not consider potential prejudice to either party in the bifurcation order, but the prejudice to Chick-fil-A and other DAPs is significant and tips the scales decisively towards partial reconsideration.  *Batchelor*, 2021 WL 825607 at *4 (granting reconsideration of prior bifurcation order where certain pleadings and issues were not considered in previous decision).

First, as noted above, Chick-fil-A and other DAPs are prejudiced by the *de facto* grant of summary judgment to Defendants on Count One.  Indeed, if Chick-fil-A and other DAPs are ***never*** allowed to present their evidence regarding Count One to a jury due to the bifurcation order, the resulting prejudice would be severe and, as noted above, raise significant constitutional questions.

Second, the combined effect of bifurcation and the corresponding stay of "bid rigging" discovery "until the supply reduction and Georgia Dock claims are resolved" means that such discovery would likely not even begin until sometime in 2023 at the earliest, which likely means that the second phase trial would not likely occur until at least 2025 (and even this timeline is optimistic). As such, the associated delay would result in unavoidable prejudice. *Real*, 195 F.R.D. at 624 ("An unreasonable delay in a case's resolution amounts to prejudice to the one opposing separation. It is clearly not in the public interest."). During that indefinite, years-long delay, it is inevitable that key witnesses relevant to the bifurcated claim will become unavailable, memories will fade, and potential evidence could be lost. *See, e.g.*, *Gibson*, 2021 WL 2127182 at *2 (N.D. Ill. Apr. 6, 2021) (denying bifurcation because "with memories fading and witnesses becoming unavailable as time passes . . . further delay would prejudice Gibson"); *Krueger Int'l, Inc. v. Fed. Ins. Co.*, 647 F. Supp. 2d 1024, 1042 (E.D. Wis. 2009) (same). This delay exacerbates the prejudice to Chick-fil-A and other DAPs and "cannot be remedied except by denying separate trials." *Real*, 195 F.R.D. at 621.

Third, numerous courts in this district have recognized that bifurcation will inevitably "add unnecessary complexity to the discovery process by instigating disputes over whether discovery requests fall within the scope" of the bifurcated claims. *Rodriguez v. City of Chi.*, 2018 WL 3474538, at *3 (N.D. Ill. July 19, 2018). *See also Rodriguez v. City of Chi.*, 429 F. Supp. 3d 537, 544 (N.D. Ill. 2019) (noting that this observation is "amply supported by case law"). Such disputes "burden the Court time-wise, and unduly increase the costs of litigation for both parties." *THK America, Inc.*, 151 F.R.D. at 633.

In the nine months since the bifurcation order was entered, this is exactly what has happened. *See* Transcript of May 24, 2021 Hearing at 45 (Magistrate Judge Gilbert acknowledging

"problems with respect to the discovery disputes that I know are brewing with respect to whether something is bid-rigging discovery or Georgia Dock discovery"). And the problem is only getting worse. Instead of the bifurcation order moving the case forward efficiently, as the Court contemplated, the parties are bogged down in an increasing number of debates regarding the amorphous definition of "bid rigging" and what is and is not meant to be included in the bifurcation order.[22] In addition, as described in more detail by Chick-fil-A in its original motion, Defendants are using the ambiguity in the bifurcation order to prejudice Chick-fil-A and other DAPs by arguing that they cannot get access to certain supply reduction and Georgia Dock discovery *because* that discovery is intertwined with the stayed bid-rigging claims. CFA Mot. to Partially Reconsider the Sept. 22, 2020 Order ("CFA Mot."), ECF No. 4651 at 11-12. This artificially created burden not only undermines any perceived efficiency gains but also significantly taxes Chick-fil-A and other DAPs' efforts to pursue their cases as pled.

Fourth, if Chick-fil-A and other DAPs are required to move forward with what the Court characterizes as "supply reduction claims" and "Georgia Dock claims" before they get access to "bid rigging" discovery, there would be significant prejudice in the presentation of DAPs' expert

---

[22] It has proven to be exceedingly difficult for the parties to agree on what is so-called "bid-rigging" evidence and what is more general "price fixing" evidence or "Georgia Dock" manipulation evidence because of the intertwined nature of the claims. This is for two reasons. First, the informal assumption is that "bid rigging" evidence is somewhat synonymous and co-extensive with the DOJ's case. But the DOJ's superseding indictment is very broad. It charges certain Defendants with a conspiracy "to rig bids *and* to fix, maintain, stabilize, and raise prices and other price-related terms for broiler chicken products sold in the United States." *See* Superseding Indictment at 2, *U.S. v. Jayson Penn, et al.*, 20-CR-152-PAB (D. Colo.) (Oct. 6, 2020). ████████ CFA Mot. at 13. The second reason is practical. Because of the intertwined nature of the claims, the same person who rigged bids to DAPs is often the same person who would have agreed to fix, maintain, stabilize, and raise prices to DAPs or manipulate DAPs into using the Georgia Dock. Similarly, there is certain generally applicable evidence collected by DOJ that would be relevant to all claims, such as emails referring to Defendants as the "chicken mafia" and one indicted Defendant employee as the "stud of all studs of competitor contacts," both of which would be relevant to any phase one trial. Thus, there is no practical way to separate out what is "bid rigging" evidence from all the other evidence in the case and, even if there were, the difficulty in doing so would quickly overwhelm any other efficiencies that the Court may believe bifurcation provides.

testimony.  As noted earlier, one of the key questions for the jury to consider will be what caused prices to rise during the relevant time period.  To properly make that determination, both parties' experts will need to conduct regression analyses that includes all known variables that could potentially affect the price of chicken.  But for one potentially significant variable—the scope and effects of any alleged "bid rigging"—they would be conducting this analysis blind and without the benefit of discovery.  As a result, Defendants will inevitably use this judicially created blind spot regarding an important variable to attack the experts' analyses.  Indeed, to partially help protect against this scenario, DAPs requested that Defendants agree to stipulate that they would not use the Bifurcation Order and the corresponding absence of big-rigging evidence against the DAPs.  Tellingly, Defendants refused.

Finally, the prejudice to Chick-fil-A and other DAPs cannot be cured by allowing evidence of bid-rigging conduct under Rule 404(b) in a first, bifurcated trial focused on supply restriction and Georgia Dock conduct.  As an initial matter, there is no recognized Rule 404(b) exception to *Continental Ore* or the Seventh Amendment that allows courts to split apart unitary conspiracy claims.  Indeed, Chick-fil-A does not seek to offer evidence of the Defendants' bid-rigging conduct as evidence of "***other*** crimes, wrongs, or acts"; for purposes of Count One, such evidence is part of the ***same*** crimes, wrongs, or acts and both *Continental Ore* and the Seventh Amendment requires the evidence to be considered together.[23]  But, even if that were not the case, the question

---

[23] The existence of one facet of a single-overarching conspiracy is highly relevant to whether another facet likewise occurred, thereby further underscoring the intertwined nature of the factual allegations and evidence, for many reasons.  For example, if the Defendants conspired with respect to one facet of the conspiracy, it suggests that they found conspiring to be profitable given market conditions, their collective market power, their incentives to cheat, and their ability to discipline cheating, and thus they are more likely to have made similar calculations on other facets of the conspiracy in the same market.  In addition, it is easier for conspirators to extend illegal relationships or other illegal activities than to create new illegal relationships and, as such, the existence of one facet of a conspiracy can often help to enforce other facets because conspirators can threaten to expose one facet unless co-conspirators cooperate with the other facets.  Similarly, some facets of conspiracies can make other facets of conspiracies easier to maintain.

whether to admit evidence under Rule 404(b) would first require the Court to allow Chick-fil-A and other DAPs to meaningfully pursue such evidence in discovery.[24] And, if the Court is going to allow such discovery, any efficiency justification for bifurcation disappears.

Similarly, the bifurcation order was premised on the legitimate concern that the "bid rigging" allegations were new and that the existing allegations were much more advanced and, as a result, the Court believed that bifurcating and staying discovery on this aspect of the conspiracy was the best option for continuing to move the case along, even if it necessarily entailed significant overlap. But it is hard to see how bifurcation will actually accomplish that. The primary cause of action asserted by all DAPs is Count One and, if the case were to continue along with the current schedule to summary judgment, the Court would not even be able to rule on Count One. Indeed, if Defendants move for summary judgment on Count One, Rule 56(d) would prevent the Court from addressing that count until bid rigging discovery is first obtained.[25] Thus, whether "bid rigging" discovery is bifurcated and stayed or not, the Court will not be able to address the primary cause of action in the case until "bid rigging" discovery is completed.

---

Consequently, one facet of a conspiracy often only makes sense when considered together with other facts, which is exactly the rationale underlying *Continental Ore.*

[24] The Court requested that, if "Chick-fil-A and other plaintiffs want to discover evidence of bid rigging in order to use it in a supply reduction or Georgia Dock trial under Federal Rule of Evidence 404(b), they should state so, and allow the Court and the parties to address that argument directly." May 27 Order at 3. As noted above, Chick-fil-A does not believe that its claims can be split consistent with *Continental Ore* and the Seventh Circuit's *Houseman* analysis. But, if the Court were to nonetheless split the claims regardless, then the answer to the Court's question would be yes. Chick-fil-A believes it would be premature to address any evidentiary rulings, however, and if the parties were to go down this path they would need to first contemplate lifting the current stay of discovery to determine what Rule 404(b) evidence may exist that they would want to submit as Rule 404(b) evidence at trial.

[25] If Defendants moved for summary judgment on Count One, Chick-fil-A and other DAPs would be forced by bifurcation to respond pursuant to Rule 56(d) because the stay of "bid-rigging" discovery would mean that they would be unable to present certain facts essential to justify their opposition to the motion directed at Count One. *See* Fed. R. Civ. Proc. 56(d). This would then likely result in the Court having to defer the motion to allow DAPs time to take the necessary discovery. *See Smith v. OSF HealthCare System*, 933 F.3d 859, 865-71 (7th Cir. 2019) (reversing denial of Rule 56(d) motion because, with "such high stakes," plaintiffs "are entitled to conduct meaningful discovery before the courts decide legal issues").

For all of these reasons, any minimal judicial economy gains from continuing bifurcation are outweighed by the significant prejudice that Chick-fil-A and other DAPs would suffer. While Chick-fil-A understands and appreciates the Court's desire to keep the case moving forward towards trial, there are better alternatives to addressing the Court's case management concerns that will not effectively eliminate Chick-fil-A's and other DAPs' primary cause of action and force Chick-fil-A and some other DAPs to try only their alternatively pled claims.

## II. THE BEST WAY TO ADDRESS THE COURT'S CONCERNS IS PARTIAL RECONSIDERATION AND A SLIGHTLY MODIFIED TRIAL PLAN

Chick-fil-A understands and shares the Court's desire for a creative solution to the case management difficulties presented by this complex and challenging case. But any solution needs to comply with both *Continental Ore* and the Seventh Amendment and avoid significant prejudice to Chick-fil-A and other DAPs. To that end, it is important to emphasize that Chick-fil-A is only requesting partial reconsideration. This is because there is a way to address the Court's desire to move the case along while avoiding the problems associated with the bifurcation order.

The Classes and a certain subset of DAPs, such as the Certain Grocer DAPs, have stated that they are prepared to move forward on the current schedule towards a bellwether trial in early 2023 that would be focused on supply restriction and Georgia Dock allegations. Both the Classes and those DAPs have been in the case for a long time and are prepared to go to trial without the "bid rigging" evidence that some other DAPs, especially restaurant DAPs named in the DOJ's Superseding Indictment such as Chick-fil-A, desire to prove their cases. If the Court were to adopt this approach, a significant piece of the consolidated cases would continue to move forward just as the Court intended with the bifurcation order. This would be Track One.

The DAPs that need to try all elements of their conspiracy together under *Continental Ore* could then proceed on a separate discovery track and schedule to be negotiated with Magistrate

Judge Gilbert. This would be Track Two. The current schedule for discovery regarding "supply reduction" and "Georgia Dock" issues would still apply to all parties and, once discovery is closed on those issues, it will be closed for all the current parties.[26] As part of Track Two, however, the non-bellwether DAPs would then begin "bid rigging" discovery following the DOJ criminal trial this fall,[27] and then proceed into expert discovery and summary judgment with that evidence, which will position the Court to be able to rule on Count One for the non-bellwether DAPs sooner than it would under the current schedule. If so, the non-bellwether DAPs should be able to complete this discovery early enough to allow for trial on all allegations in Count One following the bellwether trial in early 2023.

Chick-fil-A's request is therefore relatively modest. In essence, rather than forcing the non-bellwether DAPs who need to try all elements of their alleged conspiracy together into expert discovery and summary judgment with the classes and bellwether DAPs and then waiting an extended period of time for the first phase of the case to be "resolved" before they could access "bid rigging" discovery, Chick-fil-A believes that the approach outlined above would require only two modifications to the current structure of the case. First, the dates for expert discovery and summary judgment for the non-bellwether DAPs would be deferred until after they obtain "bid rigging" discovery. This avoids the prejudice to DAPs outlined above and positions the Court to

---

[26] The only potential exceptions would need to be for DAPs that enter the case in the future, who may have a need for individualized discovery. But common discovery on the "supply reduction" and "Georgia Dock" aspects of the case would be closed and Magistrate Judge Gilbert could address any individualized discovery issues with later-filing DAPs as they come up, just as he is currently doing.

[27] The Federal Judicial Center has observed that "a general stay of all activities in the civil litigation pending completion of the criminal case will rarely be appropriate," Fed. Jud. Center, *Manual for Complex Litigation* (Fourth) at 525. If a stay of all activities pending a criminal case is rarely appropriate, a broader stay until both the DOJ criminal case and a bellwether trial focused on "supply restriction" and "Georgia Dock" issues is even less so. Nonetheless, Chick-fil-A does not object to waiting until the DOJ criminal trial ends to require Defendants to produce documents and depositions relating to "bid rigging" evidence. In the interim, Chick-fil-A believes that the parties can complete discovery on the supply reduction and Georgia Dock evidence and begin to negotiate custodians, search terms and other preparatory discovery items on the "bid rigging" evidence.

be able to rule on Count One without running into Rule 56(d) issues. Second, the stay on "bid rigging" discovery would be lifted following the DOJ criminal trial, rather than waiting an indefinite period of time for the Classes and any bellwether DAPs to "resolve" their cases. This approach is consistent with the Manual for Complex Litigation and would allow for a non-bellwether DAP trial as part of Track Two following shortly after the bellwether trial. In this way, the current bifurcated approach to discovery could be maintained, but in a modified form that complies with Rule 42 as well as *Continental Ore* and *Houseman*.

This proposed dual structure would promote and enhance judicial economy. The Court would be able to sequence and focus its energies on a more manageable set of pleadings and issues in the short term—the pending motions for class certification, which has already been set for an evidentiary hearing, and summary judgment and *Daubert* motions in the class and bellwether DAP cases—as part of Track One. At the same time, Magistrate Judge Gilbert will be able to focus on separately managing Track Two discovery regarding "bid rigging" evidence in a cleaner and more streamlined manner. This also has the added benefit of building flexibility into the schedule for managing future DAPs, which are inevitable and are highly likely to also include "bid rigging" evidence. Finally, this dual structure would allow for a quicker and more efficient resolution of all DAP cases consistent with due process.

Numerous courts have utilized this multi-track system to effectively manage complex litigation across the country involving different classes of plaintiffs in varying procedural postures and it would be especially effective in dealing with the unique challenges here fairly and efficiently. *See, e.g.*, *In re Generic Pharms. Pricing Antitrust Litig.*, 315 F. Supp. 3d 848, 854-55 (E.D. P.A. 2018) (granting motion for separate track within same case for different class of plaintiff). As Magistrate Judge Gilbert recently noted, it also has the virtue of providing

Defendants with essentially the same separate discovery track and schedule that they previously requested when they sought severance, but within the same case for the reasons that the Court has already determined, thereby "simplify[ing] things" and "solving some of the problems here." *See* Transcript of May 24, 2001 Hearing at 45-46.[28]

Finally, even if the Court is not completely persuaded that *Continental Ore* and the Seventh Amendment preclude bifurcation, partial reconsideration as outlined above is still the most prudent approach. At a minimum, the current structure creates the risk the Court inadvertently builds a structural legal error into the case that, if Chick-fil-A is correct, may require the Court to go back to square one many years from now. *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1182 (3d Cir. 1993). The potential error cost associated with such a high-stakes ruling are thus very high in a case of this complexity. It is thus wiser and easier to make a slight modification to the structure and schedule of the case now than to try and fix a potential foundational error years later. The interests of judicial economy, therefore, are best served by partial reconsideration now.

---

[28] Magistrate Judge Gilbert's full observation was as follows: "When I went back and thought about, you know, how you got here to some extent in the September 2020 order, the defendants adamantly opposed adding the bid-rigging claims to the existing case, and Judge Durkin decided differently. But had defendants won that battle and the bid-rigging cases had been filed in separate cases in some other district or even here, they would be on a separate track anyway, and those two cases probably would not be tried together anyway. So defendants had opposed adding the bid-rigging claims to this case, but had you won that, you might have been in the same situation that I'm at least hypothesizing could solve some problems here. It could also solve problems with respect to the discovery disputes that I know are brewing with respect to whether something is bid-rigging discovery or Georgia Dock discovery. … it seems to me that if the first group of cases that got tried were class and certain grocer bellwethers on the Georgia Dock claim and summary judgment motions were filed on that, the supply reduction and Georgia Dock claims, and you went through, you know, experts and summary judgment on that, that's the case that has been – was filed in 2016 and, as Judge Durkin said in his September 2020 order, should be allowed to pursue. And that could provide clarity, it could simplify things. I recognize that defendants end up trying two cases, but you were going to try two cases anyway; one was bid-rigging and another was Georgia Dock, and now they're a party [sic] to the case so you can't really separate them."

## CONCLUSION

For all the foregoing reasons, Chick-fil-A respectfully requests that the September 22, 2020 Order and the Magistrate Judge's May 7 and May 13, 2021 Orders be partially reconsidered and modified as outlined above.

Dated: June 18, 2021

/s/ Ryan P. Phair

Ryan P. Phair (#479050)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, D.C. 20037-1701
(202) 955-1500
rphair@huntonak.com

Matthew J. Calvert (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Bank of America Plaza, Suite 4100
600 Peachtree Street NE
Atlanta, GA 30308
(404) 888-4000
mcalvert@huntonak.com

John S. Martin (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4704
(804) 788-8200
martinj@huntonak.com

Julie B. Porter (#6243787)
SALVATORE PRESCOTT PORTER
& PORTER, PLLC
1010 Davis Street
Evanston, IL 60201
(312) 283-5711
porter@sppplaw.com

***Attorneys for Plaintiff Chick-fil-A, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 18th day of June, 2021, I caused a true and correct copy of the

foregoing document to be served upon all counsel of record via the Court's CM/ECF system.

*/s/ Ryan P. Phair*  
Ryan P. Phair
