1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3    IN RE BROILER CHICKEN ANTITRUST    )    Docket No. 16 C 8637
     LITIGATION                         )
4                                       )    Chicago, Illinois
     This Document Relates To:          )    June 29, 2021
5                                       )    9:01 a.m.
     ALL END-USER CONSUMER PLAINTIFF    )
6    ACTIONS                            )

7      TRANSCRIPT OF TELEPHONIC PROCEEDINGS - Final Approval of
                         Settlements
8          BEFORE THE HONORABLE THOMAS M. DURKIN

9
     APPEARANCES:
10
     For the Plaintiffs:    MR. CLIFFORD H. PEARSON
11                          MR. BOBBY POUYA
                            Pearson, Simon & Warshaw, LLP
12                          15165 Ventura Boulevard,
                            Sherman Oaks, California  91403
13
                            MR. W. JOSEPH BRUCKNER
14                          MR. BRIAN D. CLARK
                            Lockridge Grindal Nauen P.L.L.P.
15                          100 Washington Avenue South, Suite 2200,
                            Minneapolis, Minnesota  55401-2159
16
     (Interim Co-Lead Class Counsel Direct Purchaser Plaintiffs)
17

18                          MR. STEVEN A. HART
                            Hart McLaughlin & Eldridge
19                          22 West Washington Suite 1600,
                            Chicago, Illinois  60602
20
     (Liaison Counsel Direct Purchaser Plaintiffs)
21

22                      ELIA E. CARRIÓN
                     Official Court Reporter
23               United States District Court
             219 South Dearborn Street, Room 1432,
24                 Chicago, Illinois 60604
                       (312) 408-7782
25             Elia_Carrion@ilnd.uscourts.gov

1    APPEARANCES (Continued:)

2    For Defendant
     Pilgrim's Pride:          MS. CARRIE C. MAHAN
3                              Weil, Gotshal & Manges LLP
                               2001 M Street, NW,
4                              Washington, Washington, D.C.   20036

5
     For the Tyson             MS. RACHEL J. ADCOX
6    Defendants:               Axinn, Veltrop & Harkrider LLP
                               950 F Street, NW,
7                              Washington, D.C.   20004

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings had telephonically:)

2          THE COURT:  Emily, please call the case.

3          THE CLERK:  This is Case No. 16 CV 8637, In re:

4   Broiler Chicken Antitrust Litigation.

5          Could I please have any attorneys who plan on

6   speaking during the hearing please state their names one at a

7   time.

8          MR. BRUCKNER:  Good morning, Your Honor.  This is

9   Joe Bruckner here for the direct purchaser plaintiffs.

10          MR. PEARSON:  Good morning, Your Honor.

11   Clifford Pearson for the DPPs.

12          MR. POUYA:  Good morning, Your Honor.  This is

13   Bobby Pouya for the direct purchaser plaintiffs.

14          MR. CLARK:  And, Your Honor, Brian Clark for the DPPs

15   as well.

16          MR. HART:  Good morning, Your Honor.  Steven Hart for

17   the direct purchaser plaintiffs.

18          THE COURT:  All right.  No need for everyone to put

19   their name on the record.  Obviously, I just wanted to hear

20   from the people who are going to be speaking today.  If

21   there's anyone else who wants to be acknowledged as being

22   present for the call, please email -- I think the past

23   practice has been you let Mr. Hart know and he emails my

24   court reporter so your names are reflected on the transcript.

25          Is that correct, Mr. Hart?

1    MR. HART:  That's absolutely correct, Your Honor.

2    THE COURT:  So please do that if anyone is intending

3  to -- wants to have their appearance noted on the record.

4    All right.  Emily, is there anyone in the courtroom

5  who has asked to be a participant in this proceeding?

6    THE CLERK:  No, there's not.

7    THE COURT:  Okay.  This is a publicly-noticed motion

8  for final approval of the settlements with defendants

9  Pilgrim's Pride Corp., Tyson Foods, Inc., Tyson Chicken, Inc.,

10  Tyson Breeders, Inc., and Tyson Poultry, Inc.

11    The courtroom has no one who has appeared, although

12  the -- we've noted that people can obviously dial in for this,

13  and I think that was the preference for going forward today,

14  but it didn't prevent anyone from appearing in court if they

15  wished to object.

16    Is there anyone on the phone who is an objector to

17  this settlement -- proposed settlement?

18    All right.  The record should reflect that no one has

19  indicated they are on the phone to attend this hearing as an

20  objector to this proposed settlement.

21    All right.  Do we have any representatives of

22  Defendants Tyson or Pilgrim's Pride on the phone?

23    (Indiscernible crosstalk.)

24    MS. MAHAN:  Good morning, Your Honor.

25    THE COURT:  Let's start --

1    MS. MAHAN:  Hi.  Good morning, Your Honor.

2  Carrie Mahan with Weil, Gotshal on behalf of Pilgrim's Pride.

3    THE COURT:  Okay.

4    MS. ADCOX:  Thank you, Your Honor.  Rachel Adcox from

5  Axinn, Veltrop & Harkrider on behalf of Tyson Foods.

6    THE COURT:  Okay.  Thank you.

7    All right.  Well, I've received the motion and also

8  the memorandum in support of the motion.  The settlements are

9  significant.  Pilgrim's is going to pay $75 million and

10  Tyson's going to pay $79,340,000.  So it's collectively a

11  settlement of $154,340,000.

12    When added to the previous settlements, which were

13  smaller, but nonetheless had been approved, that's a total

14  recovery of nearly $170 million.

15    I granted preliminary approval to these settlements

16  because I found they fell within the range of reasonableness

17  and I ordered notice to be provided to all the class members.

18    And, by the way, is the representative from the

19  company that provided notice on the phone?

20    MR. POUYA:  This is Bobby Pouya on behalf of DPPs.

21    No, we do not have a representative on the phone, but

22  we certainly are happy to answer any questions that the Court

23  has.

24    THE COURT:  That's fine.  And it was a very

25  comprehensive affidavit from, I believe it was Ms. Keough, if

1 I'm not mistaken.

2         MR. POUYA:  That's correct, Your Honor.

3         THE COURT:  Okay.  And I read that affidavit.  It was

4 very detailed, so no need for her to be on the phone, but I

5 just wanted to find out.

6         All right.  Has there been any objections to the

7 settlements that have been noted by plaintiffs' counsel

8 beyond -- the representation was there were no objections.

9 Ms. Keough said there were no objections received through her

10 company.

11         But as of today, has there been any objection to the

12 proposed settlement?

13         And I just need one person on behalf of direct

14 purchaser plaintiffs to state whether or not there's been an

15 objection.

16         MR. POUYA:  This is Bobby Pouya.  No, there have not.

17         THE COURT:  Okay.  All right.  Well, I'm going to go

18 through some findings.

19         This litigation was commenced in September 2016.

20 And, you know, the critical finding of the Court was on

21 November 20, 2017, where the Court denied defendants' motions

22 to dismiss the first -- the direct purchaser plaintiffs' first

23 consolidated amended complaint.

24         There have been four other complaints filed, so we're

25 now dealing with a fifth consolidated amended complaint.

1   There has been extensive discovery:  Over 100 depositions
2   taken, over 8 million documents received and reviewed, many
3   sets of interrogatories, discovery that's been supervised by
4   Judge Gilbert has been extensive, there have been intervening
5   events.  Obviously, the Department of Justice moved to
6   intervene and stay this case, which I granted their motion.
7   There have since been indictments related to criminal
8   violations, some related to one of the settling parties from
9   Pilgrim's.
10          And, of course, it's been represented that Tyson is
11  cooperating with the DOJ as part of their -- under their --
12  DOJ's corporate Leniency Program.
13          So I think in light of the other settlements, those
14  involving Peco, George's, Amick, and Fieldale, all of which
15  were relatively modest, but also the market share of those
16  companies was relatively small, this is a significantly larger
17  settlement commensurate with the larger market share that
18  Pilgrim's and Tyson have.
19          It's been represented these agreements were reached
20  separately through arm's length settlement negotiations.
21  There's various opt-out provisions which were allowed
22  throughout this case and a number of -- there's been a number
23  of opt-outs in the case itself, I think resulting in a large
24  number of direct action cases of 150, which those people,
25  of course, those entities, of course, are excluded from this

1    settlement.

2         But the negotiations themselves -- one was through

3    [inaudible] involving Pilgrim's and one was Judge

4    Daniel Weinstein involving Tyson's [inaudible] --

5         COURT REPORTER:  Judge, I need everyone to mute while

6    you're speaking.

7         THE COURT:  Yeah, I'll give everybody a chance -- I

8    think you can all mute, then unmute when it's time for a

9    question to be asked.

10        I'm still hearing a lot of noise in the background so

11   please everyone mute your phones.

12        All right.  I believe the Court-approved notice plan

13   satisfies due process and has been fully implemented.  There

14   was notice sent out both with summary and long-form notices

15   sent in plain English to class members, allowed them to file

16   claims with minimal documentation.  Also -- and this was all

17   done through the JND, the legal administrator that was

18   appointed in this case.

19        There were over 26,000 print notices sent out, over

20   11- -- nearly 12,000 electronic notices sent out.  There were

21   publications and industry media and websites that were

22   maintained -- and a website that was maintained, rather,

23   relating to the case.

24        So there was, I think, sufficient notice given to

25   class members, and it was the best notice that could be given

1 under the circumstances.

2      There were a list of opt-outs which were developed by
3 Ms. Keough's company, a JND...

4      All right.  Whoever is talking, you need to mute your
5 phone or we're going to recess this and I'm going to have
6 everyone come to Chicago, which is not a good outcome here.

7      So please mute your phone.  My courtroom deputy can
8 identify you at some point, and if you don't mute your phone,
9 get off this call.  It's that simple.

10      All right.  As noted, the settlement administrator
11 received no objection to the settlements.  And there were over
12 2,800 claims by potential class members who want to receive a
13 portion of the settlement proceeds, and I believe, in sum,
14 that the notice was adequate in this case to provide class
15 members an opportunity to share in a settlement.

16      I believe the settlements are fair, reasonable, and
17 adequate, and should be granted final approval.  The standard
18 is whether -- that is, in fact, the standard:  Is it fair,
19 reasonable, and adequate?

20      And you have to evaluate the fairness of a proposed
21 class action settlement using a number of factors.  One is the
22 strength of the plaintiffs' case compared to the amount of
23 defendants' settlement offer; two is the assessment of the
24 likely complexity and length and expense of the litigation,
25 and evaluation of the amount of opposition to settlement among

1    affected parties; the reaction of class members; the opinion
2    of competent counsel; and the stage of the proceedings and the
3    amount of discovery completed at the time of the settlement.
4            Obviously, a settlement of over $154 million provides
5    considerable benefits to the class.  And also Pilgrim's and
6    Tyson have agreed to cooperate with plaintiffs' counsel in
7    further pursuit of these claims with the nonsettling
8    defendants.
9            The amount of the settlement per share point is
10   approximately $4 million, which is significantly greater than
11   what the amount of the settlement was per share point for the
12   earlier settlements with Peco, George's, Amick, and Fieldale.
13           I believe that the -- obviously, the settlements
14   eliminate significant risk to a class facing complex, lengthy,
15   and expensive litigation.  What lies ahead for the remaining
16   defendants is the question of whether a class will be
17   certified, there'll likely be summary judgment motions filed
18   by the defendants.  What lies ahead is whether or not
19   plaintiffs will survive that.
20           That is all before any trial in the case where,
21   again, liability will have to be proven, as will damages.  So
22   the risk facing the class is significant.  There's no
23   guarantee the class will be certified, there's no guarantee
24   that summary judgment won't be granted, and there's no
25   guarantee that a jury would award damages to plaintiffs.  And

1   certainly no guarantee if they did award damages that it would
2   be in the amount of the settlements.  So there's certainly a
3   risk to proceeding with this litigation.

4        Another factor to consider is there's been no
5   objection to either of the settlements.  And that's, I find,
6   pretty significant with close to 2,800 claims being filed that
7   no one has objected.  And I find that to be a significant
8   factor in determining whether to approve this settlement.

9        The fact that the settlements were the result of arm
10  length negotiations -- arm's length negotiations supports the
11  presumption that the settlements are fair, reasonable, and
12  adequate.

13       I won't go through the detail, but the memorandum
14  sets forth, as do the supporting affidavits, the lengthy
15  negotiations that took place with mediators Professor Green
16  and Judge Weinstein, and certainly that indicates the
17  settlements were not the result of collusion.

18       And competent counsel in this case, which by my
19  appointment of them as class representatives I believe them to
20  be competent and experienced in these matters, have all
21  offered the opinion that the settlement is fair, reasonable,
22  and adequate.  So that's another factor that supports final
23  approval.

24       Another thing I have to look at is the stage of the
25  proceedings and the amount of discovery.  Again, these

1  settlements all occurred before any ruling on the class

2  certification motion, what are likely going to be summary

3  judgment motions, and any trial.  And for the reasons I stated

4  earlier, the fact that these uncertainties still face the

5  remaining defendants in this case.  And the plaintiffs

6  opposing those defendants makes the settlement at this

7  point -- I believe the settlement to be a reasonable one.

8         By the way, this is not an uninformed settlement.

9  There's been, as I said, 100 depositions -- over 100

10 depositions, millions of documents, extensive, extensive

11 discovery in this case.  So the decision by experienced

12 counsel to agree to these numbers I think is an informed

13 decision and also supports final approval of the Pilgrim's and

14 Tyson settlement agreements.

15        So for all those reasons, I do approve the Pilgrim's

16 and Tyson settlement agreements.

17        Any questions on that -- on that score?

18        I hear none, so I'll assume there are none.

19        Oh, go ahead.  Who is this?

20        MR. BRUCKNER:  Sorry, Your Honor.  Joe Bruckner.  I

21 was going to say, no questions from the DPPs.

22        THE COURT:  All right.  Thank you.

23        All right.  Well, for all those reasons, then, I am

24 approving the settlement.

25        The next question is the question of attorneys' fees

1   where there's a request for an interim payment.

2           And, Mr. Bruckner, I had a question on that.  What is

3   the authority -- I'm simply not experienced enough in these

4   matters to know to approve interim payments.  I can certainly

5   see the logic of it, but what is the authority for it?

6           MR. BRUCKNER:  Your Honor, if we do not cite them in

7   our brief, we're happy to provide them.  But it is not

8   uncommon and, in fact, frequent in a case of this size, and

9   especially a case that has gone on this long for class counsel

10  at some point, when a significant amount of recovery has been

11  made for the class, to request payment of fees.

12          I know it is the practice of the firms that are in

13  the leadership in this case not to ask for fees or

14  reimbursement of expenses or service awards for class

15  representatives until there has been, A, a significant

16  recovery on behalf of the class; and, B, a motion to

17  distribute the net settlement proceeds to qualified class

18  members.  That is, we never seek any payments for the

19  attorneys until we make sure that the class members are being

20  paid as well.

21          And as we may have informed the Court, that motion --

22  that process of claims administration is well underway.  We

23  anticipate that in the next 90 days we will move the Court to

24  approve a plan of distribution.

25          Anyway, we would be happy to provide authority or

1   supplemental authority to the Court listing other cases in

2   which other interim payments have been made, but in our

3   experience, given those -- those guideposts, that is

4   significant recovery for the class, length of time that the

5   case has been pending, and a distribution to the class of the

6   net settlement proceeds, interim fee petitions are -- are

7   common.

8        THE COURT:  All right.  Well, I'm going to likely

9   issue a short order with a number of questions about the fee

10  issue, which that will include -- and if it was in your brief,

11  I apologize.  I'll look more closely.  I have to see if it's

12  there.

13       As I said, it's logical you would seek it, but I just

14  wanted to see what the authority was for it, if it's simply a

15  practice or something that's been approved by the courts, or

16  it's a practice that has never been challenged.

17       There have been no objections to the fee request

18  either.  Is that correct, Mr. Bruckner?

19       MR. BRUCKNER:  Yes, that's correct, as of today.

20       THE COURT:  Okay.  Okay.  Were there any agreements

21  you had with your clients, whether it's the remaining clients

22  or even the clients that have since opted out to become direct

23  action plaintiffs?

24       MR. BRUCKNER:  No, Your Honor.  And speaking for my

25  firm, and I'm sure it is true of the others, the agreement

1   with our client when they retained us in this litigation was

2   that we would seek the Court's approval for any recovery of

3   fees or reimbursement of expenses.  And if there was no

4   recovery for the client or for the class, that there would be

5   no attorneys' fees and no reimbursement of expenses for the

6   attorneys.

7          THE COURT:  Okay.  But no agreement as to the

8   percentage being sought?

9          MR. BRUCKNER:  There is -- in this way, Your Honor,

10  we did notify the class that we would seek up to 33 1/3

11  percent, as well as in this round of settlements,

12  reimbursement of $4.5 million in litigation expenses.

13         That was put in the notice that went out to the class

14  on March 16th of this year.  This was in the Court-approved

15  notice; and, of course, that was part of the motion for

16  attorneys' fees and reimbursement of expenses which we filed

17  with the Court on April 16.  And we also posted that motion

18  together with all of its exhibits, all of the declarations,

19  all of the other information, we posted that on the case

20  website, Broiler Chicken Antitrust Litigation, and as well as

21  been posted on the court's website.

22         So agreements, I'm not sure that whether that

23  qualifies as an agreement, but certainly the class has been

24  notified -- and the class representatives as well -- that this

25  is what we would be seeking, the motion that we're here on

1  today.  And as Your Honor noted, there have been no objections
2  and no responses to that.
3        THE COURT:  Okay.  Yeah.  No, I think that certainly
4  satisfies notice.  My question was more of upfront when this
5  litigation started or as more and more people got involved,
6  whether any separate agreements, contingency-type agreements
7  were ever entered into with any of your clients?
8        MR. BRUCKNER:  The answer is no, Your Honor.
9        THE COURT:  Okay.  Okay.  All right.
10       Well, I'm not prepared to rule on the attorney fee
11  issue today.  As I said, I have some questions that I'll
12  likely just put simply in a short order so you can file
13  supplemental brief relating to it.
14       MR. BRUCKNER:  Very good.
15       THE COURT:  Okay.  Are there any other questions
16  today by anyone?  And this can include people who have not
17  filed notice, understanding the purpose of today is to file --
18  is to -- was to seek approval of the Tyson and Pilgrim's
19  settlements?
20       But is there anyone else who wishes to be heard?
21       Okay.  The record should reflect no one has indicated
22  so, so I thank you all.
23       MR. BRUCKNER:  Very good.  Thank you, Your Honor.
24       (Time noted:  9:22 a.m.)
25

1          CERTIFICATE

2          I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.

4    /s/ Elia E. Carrión          12th day of July, 2021

5    Elia E. Carrión                      Date
     Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25