# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE BROILER CHICKEN ANTITRUST LITIGATION,

This Document Relates To:

THE DIRECT PURCHASER PLAINTIFF ACTION

Case No.: 1:16-cv-08637

The Honorable Thomas M. Durkin

## DIRECT PURCHASER PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENTS WITH THE MAR-JAC AND HARRISON POULTRY DEFENDANTS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................1

II.   LITIGATION BACKGROUND .................................................................3

III.  SUMMARY OF THE SETTLEMENT NEGOTIATIONS AND TERMS........................5

    A.    The Mar-Jac Settlement ..............................................................5

    B.    The Harrison Poultry Settlement .................................................6

IV.  THE SETTLEMENTS SATISFY THE STANDARD FOR PRELIMINARY APPROVAL ...............................................................................................8

    A.    The Settlements Resulted from Arm's Length Negotiations.................................11

    B.    The Settlements Provide Substantial Relief to the Settlement Class....................11

V.   THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS............13

    A.    The Requirements of Rule 23(a) Are Satisfied.......................................14

        1.    Numerosity...............................................................14

        2.    Common Questions of Law and Fact.........................................14

        3.    Typicality .................................................................15

        4.    Adequacy ..................................................................16

    B.    The Settlement Class Satisfies Rule 23(b)(3) ......................................17

VI.  THE COURT SHOULD APPROVE THE PROPOSED NOTICE PLAN ......................19

VII.  THE COURT SHOULD SCHEDULE A FINAL APPROVAL HEARING ...................22

VIII. CONCLUSION.....................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)................................................................13, 17, 18, 19

*Armstrong v. Bd. of Sch. Dirs.*,
616 F.2d 305 (7th Cir. 1980) .................................................................9

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
270 F.R.D. 330 (N.D. Ill. 2010).............................................................11

*In re Catfish Antitrust Litig.*,
826 F. Supp. 1019 (N.D. Miss. 1993)......................................................17

*City of Greenville v. Syngenta Crop Prot.*,
No. 3:10-CV-188, 2012 WL 1948153 (S.D. Ill. May 30, 2012) ......................19, 22

*In re Cmty. Bank of N. Va.*,
418 F.3d 277 (3d Cir. 2005)..................................................................13

*In re Corrugated Container Antitrust Litig.*,
643 F.2d 195 (5th Cir. 1981) ................................................................16

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
768 F.2d 884 (7th Cir. 1985) .................................................................9

*In re Foundry Resins Antitrust Litig.*,
242 F.R.D. 393 (S.D. Ohio 2007) ..........................................................17

*Gautreaux v. Pierce*,
690 F.2d 616 (7th Cir. 1982) .................................................................9

*Goldsmith v. Tech. Solutions Co.*,
No. 92-CV-4374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ...........................10

*Hughes v. Baird & Warner, Inc.*,
No. 76-CV-3929, 1980 WL 1894 (N.D. Ill. Aug. 20, 1980) .................................17

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) ..............................................................8, 10

*Kohen v. Pacific Inv. Mgmt.*,
571 F.3d 672 (7th Cir. 2009) ................................................................16

*In re Linerboard Antitrust Litig.*,
  292 F. Supp. 2d 631 (E.D. Pa. 2003) ............................................................................10, 11

*In re Mercedes-Benz Antitrust Litig.*,
  213 F.R.D. 180 (D.N.J. 2003) ..............................................................................................15

*In re Mid-Atlantic Toyota Antitrust Litig.*,
  564 F. Supp. 1379 (D. Md. 1983) ........................................................................................10

*In re NASDAQ Market-Makers Antitrust Litig.*,
  176 F.R.D. 99 (S.D.N.Y 1997) ..............................................................................................9

*Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*,
  231 F.R.D. 280 (N.D. Ill. 2005) ..........................................................................................15

*Saltzman v. Pella Corp.*,
  257 F.R.D. 471 (N.D. Ill. 2009) ....................................................................................15, 17

*Schmidt v. Smith & Wollensky LLC*,
  268 F.R.D. 323 (N.D. Ill. 2010) ..........................................................................................14

*Thillens, Inc. v. Cmty. Currency Exch. Ass'n*,
  97 F.R.D. 668 (N.D. Ill. 1983) ............................................................................................14

*Uhl v. Thoroughbred Tech. & Telecomms, Inc.*,
  309 F.3d 978 (7th Cir. 2002) ...............................................................................................10

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .............................................................................................................14

*In re Warfarin Sodium Antitrust Litig.*,
  212 F.R.D. 231 (D. Del. 2002) ..............................................................................................9

**Other Authorities**

Class Action Fairness Act, 28 U.S.C. § 1715 .............................................................................23

Fed. R. Civ. P. 23(a) ...................................................................................................14, 15, 16

Fed. R. Civ. P. 23(b)(3) .....................................................................................................17, 18

Fed. R. Civ. P. 23(c) ..................................................................................................................19

Fed. R. Civ. P. 23(c)(2)(B) ..................................................................................................19, 21

Fed. R. Civ. P. 23(e) ......................................................................................................9, 10, 19

Manual For Complex Litigation (Fourth) § 21.632 (2004) .........................................................9

2 NEWBERG ON CLASS ACTIONS, § 11.24 (3d ed. 1992)....................................................9

2 NEWBERG ON CLASS ACTIONS, § 11.40 (2d ed. 1985)...................................................10

4 NEWBERG ON CLASS ACTIONS, § 11.53 (4th ed. 2002) .............................................19

## I.    INTRODUCTION

The Direct Purchaser Plaintiffs ("DPPs") in this class action, alleging that Defendants conspired to fix, raise, maintain, and stabilize the prices of Broiler chicken sold in the United States, hereby seek preliminary approval of the settlements with defendants Mar-Jac[1] and Harrison Poultry[2] (collectively referred to as the "Settling Defendants"). Under the settlements,[3] Mar-Jac will pay $7,975,000.00 and Harrison Poultry will pay $3,300,000.00. The addition of these meaningful Settlements for the Settlement Class (as defined in Section V *infra*) brings the total recovery to date to over $180 million. (*See* Declaration of Brian D. Clark in Support of this Motion ("Clark Decl.") at ¶ 8.) In addition to this monetary relief, Mar-Jac and Harrison Poultry have agreed to provide testimony, where they reasonably can, to authenticate and provide foundation for admissibility of documents, which may assist DPPs in the prosecution of their claims against the remaining Defendants in the case.

The Settlement Agreements with the Settling Defendants constitute a fourth round of DPP settlements in this case, and also a fourth "step up" by market share point. This Court has granted final approval to DPP settlements three times in this matter; on November 16, 2018 with Fieldale Farms Corporation ("Fieldale"), which provided a total financial settlement of $2.25 million; on October 27, 2020 with Peco Foods, Inc. ("Peco"), George's, Inc., George's Farms, Inc. (collectively, "George's"), and Amick Farms, LLC ("Amick"), which provided a total financial

---

[1] Defendants Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, Mar-Jac Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-Jac Poultry, LLC and Mar-Jac Holdings, Inc. (Mar-Jac Holdings, Inc. is incorrectly named in the Complaint as Mar-Jac Holdings, LLC) are collectively referred to as "Mar-Jac."

[2] Defendant Harrison Poultry, Inc. is referred to herein as "Harrison Poultry."

[3] The Mar Jac Settlement Agreement is attached as Exhibit "A" to the Clark Declaration. The Harrison Poultry Settlement Agreement is attached as Exhibit "B" to the Clark Declaration.

settlement of $13,011,600;[4] and on June 29, 2021 with Pilgrim's Pride Corp. ("Pilgrim's") and Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc. (collectively, "Tyson"), which provided a total financial settlement of $154,340,000.[5] The Mar-Jac and Harrison Poultry Settlements bring the total amount recovered by DPPs from settling defendants to date to $180,876,600. Following the first "ice-breaker" settlement with Fieldale, the second round of settlements provided the DPP Settlement Class with substantial monetary relief reaching up to $2 million per market share point for the Peco, George's and Amick settlements. The third round of settlements with Pilgrim's and Tyson saw a significant increase per market share point to approximately $4 million. Mar-Jac's share of the Broiler market is approximately 1.5% and Harrison Poultry's share is approximately 0.5%, and therefore the Settlements represent yet another increase to approximately $5.5 million per market share point.

The ratcheted increases in the Settlement amounts—both on a gross and proportionate basis—support approval of the Settlements. DPPs are in the process of distributing the combined net settlement proceeds from the prior settlements with Fieldale, Peco, George's, Amick, Pilgrim's and Tyson to Settlement Class members, and do not intend to distribute the proceeds of the Mar-Jac and Harrison Poultry Settlements at this time.

As detailed in this Motion for Preliminary Approval of the Settlements ("Motion") and the supporting documents, these Settlements were the product of the DPPs' efforts in litigating this case and extensive arm's length negotiations among the parties. Neither Mar-Jac nor Harrison Poultry have admitted any liability and continue to deny the legal claims alleged in DPPs' Complaint, but have agreed to the Settlements to avoid the cost and burden of litigation and

---

[4] $4,964,600 from Peco, $4,097,000 from George's, and $3,950,000 from Amick.

[5] $75 million from Pilgrim's and $79,340,000 from Tyson.

eliminate the risk of adverse judgments. By contrast, the DPPs believe they would have prevailed at trial, but have agreed to the Settlements to obtain the cooperation from the Settling Defendants and avoid the risk of an adverse outcome during litigation or trial. Accordingly, these Settlements are the product of compromise and reflect the independent decisions of the DPPs, on the one hand, and the Settling Defendants, on the other hand, to resolve this matter.

Moreover, as described below, the Settlements are fair, reasonable, and adequate, and satisfy all of the factors for preliminary approval. The DPPs respectfully request that the Court grant their Motion, approve the proposed notice plan, and set a schedule for final approval of the Settlements.

## II.     LITIGATION BACKGROUND

This is an antitrust class action against certain producers of Broilers.[6] DPPs allege that Defendants combined and conspired to fix, raise, maintain, or stabilize prices of Broilers sold in the United States. DPPs allege that Defendants implemented their conspiracy in various ways, including via coordinated supply restrictions, sharing competitively sensitive price and production information, and otherwise manipulating Broiler prices.

DPPs commenced this litigation on September 2, 2016, when they filed a class action lawsuit on behalf of all direct purchasers of Broilers in the United States. (ECF No. 1.) Other class plaintiffs and direct action plaintiffs subsequently filed similar actions. On October 14, 2016, the

---

[6] Consistent with the Complaint, the term Broilers is defined in the Settlement Agreements as "chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards." (*See* Settlement Agreements § 1.d.) The Settling Defendants agree to this definition only for purposes of approving the Settlements and certifying the proposed Settlement Class and otherwise reserve all rights, arguments and defenses with respect to this definition.

Court appointed the undersigned law firms as Direct Purchaser Plaintiffs' Interim Co-Lead and Liaison Counsel. (ECF No. 144.) After extensive briefing by the parties, on November 20, 2017 the Court denied Defendants' Motions to Dismiss the DPPs' First Consolidated Amended Complaint ("FCAC"). (ECF No. 541.) Mar-Jac and Harrison Poultry were included in DPPs' Third Consolidated Amended Complaint on February 7, 2018. (ECF No. 709.) DPPs filed their operative Fifth Consolidated Amended Complaint on October 23, 2020. (ECF No. Nos. 3919 (Redacted) and 3935 (Unredacted).)

DPPs performed a thorough investigation and engaged in extensive discovery prior to reaching the Settlement. These efforts commenced prior to the filing of DPPs' initial complaint and included pre-litigation investigation into Defendants' conduct that formed the basis of the DPPs' complaints. (*See* Clark Decl. ¶ 4.) In denying Defendants' motions to dismiss, the Court held that these "alleged factual circumstances plausibly demonstrate that [Defendants'] parallel conduct was a product of a conspiracy." (*See* ECF No. 541, p. 18.) During the litigation, DPPs obtained responses to multiple sets of interrogatories, and received over 8 million documents in response to their requests for production and third party subpoenas. (*See* Clark Decl. ¶ 5.) DPPs, along with other plaintiffs, have taken over 100 depositions of the Defendants and third parties. (*Id.* ¶ 6.) DPPs have also provided responses to written discovery, produced documents, and appeared for depositions noticed by the Defendants. (*Id.* ¶ 7.)

On June 21, 2019, the United States Department of Justice ("DOJ") moved to intervene in the civil case and stay the depositions of Defendants, pending the DOJ's criminal investigation into the Broiler industry. (ECF No. 2268.) On June 27, 2019, the Court granted an initial stay on the depositions of Defendants until September 27, 2019. (ECF No. 2302.) On October 16, 2019, the Court extended the stay on the depositions of Defendants (with certain exceptions) until June

959219.8                              4

27, 2020. (ECF No. 3153.) The Court again extended (in part) the stay on April 19, 2021. (ECF No. 4557.)

Prior to the Court's ruling on Defendants' motions to dismiss, DPPs reached an "ice-breaker" settlement with Defendant Fieldale. Fieldale, a small producer, agreed to pay $2.25 million, provide cooperation including attorney and witness proffers, and produce certain documents to DPPs. (*See* Clark Decl. ¶ 8.) The Court granted final approval to the Fieldale settlement on November 18, 2018. (*See* ECF No. 1414.) DPPs later reached settlements with Defendants Amick, Peco, and George's. Like Fieldale, these three Defendant groups are small producers. (*See* Clark Decl. ¶ 8.) In addition to providing cooperation to DPPs, Peco paid $4,964,600, George's paid $4,097,000, and Amick paid $3,950,000. (*See id.*) The Court granted final approval of the Amick, Peco, and George's settlements on October 27, 2020. (*See* ECF Nos. 3944 (Peco and George's), 3945 (Amick).) Most recently, DPPs secured significant settlements with Pilgrim's and Tyson in the amount of $75 million and $79,340,000, respectively. (*See* Clark Decl. ¶ 8.) The Court granted final approval of the Pilgrim's and Tyson settlements on June 29, 2021. (*See* ECF No. 4789.)

## III. SUMMARY OF THE SETTLEMENT NEGOTIATIONS AND TERMS

### A. The Mar-Jac Settlement

The Settlement Agreement with Mar-Jac was reached through confidential, protracted, arm's length settlement negotiations. (*See* Clark Decl. ¶¶ 9-11.) The Settlement was the product of a negotiation process that commenced in Spring 2021. (*Id.* ¶ 9.) As this litigation has been pending for over 5 years (three-and-a-half years against Mar-Jac), the parties have had ample opportunity to assess the merits of DPPs' claims and Mar-Jac's defenses, through investigation, discovery, research, settlement discussions and contested motion practice; and to balance the value

959219.8

of Settlement Class members' claims against the substantial risks and expense of continuing litigation. The parties ultimately executed the Settlement Agreement on August 18, 2021. (*See id.* ¶ 11; *see also* Mar-Jac Settlement Agreement.)

### B. The Harrison Poultry Settlement

The Settlement Agreement with Harrison Poultry was reached through confidential, arm's length settlement negotiations. (*See* Clark Decl. ¶¶ 12-14.) The Settlement was the product of a negotiation process that commenced in August 2020. (*Id.* ¶ 12.) As this litigation has been pending for over 5 years (three-and-a-half years against Harrison Poultry), the parties have had ample opportunity to assess the merits of DPPs' claims and Harrison Poultry's defenses, through investigation, discovery, research, settlement discussions and contested motion practice; and to balance the value of Settlement Class members' claims against the substantial risks and expense of continuing litigation. The parties ultimately executed the Settlement Agreement on September 11, 2021. (*See id.* ¶ 14; *see also* Harrison Poultry Settlement Agreement.)

The core settlement terms are substantially similar to each other and to the prior settlements, and the Settlement amounts reflect the size and other factors affecting these Settling Defendants. Once again, these Settlements represent an increase—on a proportionate and gross basis—from the prior settlements. These Settlements provide $11,275,000 in recovery to the Settlement Class,[7] and bring the total amount recovered by DPPs to $180,876,600. (*See* Settlement Agreements § 9; Clark Decl. ¶ 8.)

In addition to monetary relief, the Settling Defendants will make reasonable efforts to provide declarations, affidavits, or deposition testimony relating to the authentication or foundation for admissibility of documents. (*See* Settlement Agreements § 10.)

---

[7] The "Settlement Class" definition is set forth in Section V *infra* herein.

In exchange, the DPPs and the proposed Settlement Class will separately release certain Released Claims (as defined in the Settlement Agreements) against the Released Parties (as defined in the Settlement Agreements). (*See id.* §§ 14, 15.) The narrowly tailored releases do not extend to other Defendants or to unrelated claims that are not the subject matter of the lawsuit. (*Id.*) The Settlement Agreements contain a termination provision based on opt-outs exceeding 50% of each Settling Defendant's total Broiler sales for the Class Period (January 1, 2008 through December 20, 2019). (*See id.* §§ 21.) DPPs will report on the number of opt-outs and, if applicable, each Settling Defendant's decision regarding this provision prior to final approval. Finally, the Settlements refer to a judgment-sharing agreement among certain Defendants and, consistent with that agreement (per the Settling Defendants), each Settlement removes from the calculation of a damages award resulting from any verdict and Final Judgment DPPs may obtain against any other Defendant who is a signatory to Defendants' judgment-sharing agreement certain amounts intended to reflect the Settling Defendant's approximately proportionate sales of Broilers. (*Id.* § 40.) Thus, any other such Defendant against whom DPPs obtain a verdict and judgment would not be jointly and severally liable for either Settling Defendant's share of damages removed pursuant to the judgment-sharing agreement resulting from sales to the DPP Class.

In sum, the Settlement Agreements: (1) are the result of extensive good-faith and hard-fought negotiations between knowledgeable and skilled counsel; (2) were entered into after extensive factual investigation and legal analysis; and (3) in the opinion of experienced class counsel, are fair, reasonable, and adequate. Based on both the monetary and cooperation elements of the Settlement Agreements, Interim Co-Lead Counsel believes the Settlement Agreements are in the best interests of the Settlement Class members and should be approved by the Court. (Clark Decl. ¶ 18.)

Subject to the approval and direction of the Court, the settlement amounts (with accrued interest) will be used to: (1) pay for notice costs and costs incurred in the administration and distribution of the Settlements; (2) pay taxes and tax-related costs associated with the escrow account[8] for proceeds from the Settlements; (3) make a distribution to Settlement Class members in accordance with a plan of distribution to be filed in the future; (4) pay attorneys' fees to Counsel for the Settlement Class, as well as costs and expenses, that may be awarded by the Court (subject to a separate, not-yet-filed motion); and (5) pay incentive awards to the named Plaintiffs that may be awarded by the Court (subject to a separate, not-yet-filed motion). DPPs do not intend to seek attorneys' fees, costs (other than the costs of notice)[9] or incentive awards, from these Settlements at this time. DPPs will make a motion for distribution of settlement proceeds, and attorneys' fees and costs at an appropriate date in the future.[10]

## IV. THE SETTLEMENTS SATISFY THE STANDARD FOR PRELIMINARY APPROVAL

There is an overriding public interest in settling litigation, and this is particularly true in class actions. *See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 888-89 (7th Cir. 1985), *cert. denied*, 478 U.S. 1004 (1986) (noting that there is a general policy favoring voluntary settlements of class action disputes); *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d

---

[8] Plaintiffs respectfully request that the Court appoint US Bank as the Escrow Agent.

[9] The Settlements further provide for the use of up to $250,000 (as authorized by the Settlement Agreements, § 6.c) of Settlement proceeds for the cost of notice without seeking further approval from the Court.

[10] These Settlements with Mar-Jac and Harrison Poultry are not included in the currently-pending Motion for Interim Payment of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Incentive Awards (ECF Nos. 4550, 4551), and soon-to-be-filed Motion for Distribution of Settlement Proceeds.

305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement."), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Class action settlements minimize the litigation expenses of the parties and reduce the strain such litigation imposes upon already scarce judicial resources. *Armstrong*, 616 F.2d at 313 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). However, a class action may be settled only with court approval. Fed. R. Civ. P. 23(e).

"The first step in district court review of a class action settlement is a preliminary, pre-notification hearing to determine whether the proposed settlement is 'within the range of possible approval.'" 2 NEWBERG ON CLASS ACTIONS, § 11.24 (3d ed. 1992); *see also Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982); *Armstrong*, 616 F.2d at 314; *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254 (D. Del. 2002); *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y 1997). Generally, before directing notice to the class members, a court makes a preliminary evaluation of the proposed class action settlement pursuant to Rule 23(e). The Manual For Complex Litigation (Fourth), § 21.632 (2004), explains:

> Review of a proposed class action settlement generally involves two hearings. First counsel submit the proposed terms of settlement and the judge makes a preliminary fairness evaluation . . . The Judge must make a preliminary determination on the fairness, reasonableness and adequacy of the settlement terms and must direct the preparation of notice of the . . . proposed settlement, and the date of the [formal Rule 23(e)] fairness hearing.

A proposed settlement falls within the "range of possible approval" when it is conceivable that the proposed settlement will meet the standards applied for final approval. *See* Newberg, § 11.25, at 38-39 (quoting Manual for Complex Litigation, § 30.41 (3d ed.)). The standard for final approval of a class action settlement is whether the proposed settlement is fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e); *see also Uhl v. Thoroughbred Tech. & Telecomms, Inc.*, 309 F.3d 978, 986 (7th Cir. 2002); *Isby*, 75 F.3d at 1198-99. When granting preliminary approval, the

court does not conduct a "definitive proceeding on the fairness of the proposed settlement," and the court "must be careful to make clear that the determination permitting notice to members of the class is not a finding that the settlement is fair, reasonable and adequate." *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983) (quoting *In re Montgomery Cty. Real Estate Antitrust Litig.*, 83 F.R.D. 305, 315-16 (D. Md. 1979)). That determination must await the final hearing when the court can assess the fairness, reasonableness, and adequacy of the proposed settlement.

The requirement that class action settlements be fair is designed to protect against collusion among the parties. *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. at 1383. There is usually an initial presumption that a proposed settlement is fair and reasonable when it was the result of arm's length negotiations. *See* 2 NEWBERG ON CLASS ACTIONS, § 11.40 at 451 (2d ed. 1985); *Goldsmith v. Tech. Solutions Co.*, No. 92-CV-4374, 1995 WL 17009594, at *3 n.2 (N.D. Ill. Oct. 10, 1995) ("[I]t may be presumed that the agreement is fair and adequate where, as here, a proposed settlement is the product of arm's length negotiations."). Settlements that are proposed by experienced counsel and result from arm's length negotiations are entitled to deference from the court. *See, e.g., In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) ("A presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery.") (quoting *Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997)). The initial presumption in favor of such settlements reflects courts' understanding that vigorous negotiations between seasoned counsel protect against collusion and advance the fairness concerns of Rule 23(e). In making the determination as to whether a proposed settlement is fair, reasonable, and adequate, the Court necessarily will evaluate the judgment of the attorneys for the parties regarding the "strength of

plaintiffs' case compared to the terms of the proposed settlement." *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 346 (N.D. Ill. 2010).

### A.     The Settlements Resulted from Arm's Length Negotiations

In this case, the proposed Settlements satisfy the standard for preliminary approval. As detailed in this Motion and supporting declarations, the Settlements were the product of arm's length negotiations that took place separately and by experienced and knowledgeable counsel. (*See* Sections II and III *infra*; *see also* Clark Decl. ¶¶ 9-18.) The hard-fought negotiations with Mar-Jac were kept confidential, and often broke down as the parties vigorously litigated the case. (Clark Decl. ¶ 10.) The negotiations necessitated numerous conferences as well as written exchanges between counsel during which they negotiated the material terms of the Settlements, as well as the final Settlement Agreements. (*Id.*) In engaging in these settlement discussions, counsel for DPPs were focused on obtaining the best possible result for the DPP class. (*Id.*)

These protracted arm's length settlement negotiations support approval of the Settlements by demonstrating they are free from collusion. *See, e.g.*, *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 640. Moreover, the fact that the negotiations occurred over several months, and were supported by substantial discovery taken thus far in this litigation, indicate that DPPs worked to achieve the best possible result on behalf of the Settlement Class. *Id.*[11]

### B.     The Settlements Provide Substantial Relief to the Settlement Class

Even though such a finding is not required at the preliminary approval stage, the fairness, reasonableness, and adequacy of the Settlements is also supported by the relief obtained on behalf of the Settlement Class, including $11,275,000 in monetary relief. This is a significant monetary

---

[11] At the time each Settlement was reached, the parties had conducted years of discovery, excluding the hiatus in discovery upon the intervention by the Department of Justice.

recovery on behalf of the Settlement Class and brings the total amount of settlements to over $180 million, with 12 Defendants still remaining in the case. Thus, the Settlements provide a significant recovery from the Settling Defendants, while increasing the DPPs' ability to maximize their recovery from the remaining Defendants. Prior to entering into the Settlements, DPPs and Co-Lead Counsel conducted extensive discovery and analysis of the relevant facts during the five years since first filing this case. (Clark Decl. ¶¶ 4-7.) Co-Lead Counsel further considered the stage of the proceedings, the strength of DPPs' claims and the Settling Defendants' defenses, and the substantial benefits that the Settlements will provide to the Settlement Class. (*Id.*)

Further, the Settlements provide proportionally more monetary relief to Class members than the prior settlements, which have been granted final approval. The Fieldale settlement was for $2.25 million representing approximately $1 million per market share point. The Peco, George's, and Amick settlements totaled $13,011,600, representing approximately $2 million per market share point. The Pilgrim's and Tyson settlements totaled $169,610,600, representing approximately $4 million per market share point. By comparison, the proposed Settlements with Mar-Jac and Harrison Poultry provide substantially more recovery on both a gross and proportional basis. In evaluating the Settlements, the DPPs considered the recoveries from Mar-Jac and Harrison Poultry based on numerous factors, including a percentage of market share excluding current and anticipated opt-outs. (*See* Clark Decl. ¶ 8.) Based on this criteria, Mar-Jac constitutes approximately 1.5% and Harrison Poultry constitutes approximately 0.5% of commerce sold to DPPs. (*Id.*) Accordingly, the recovery for DPPs from the Settlements is approximately $5.5 million per market share point. This is a very significant amount of money recovered for the Settlement Class by two relatively small Defendants, and sets the standard for the remainder of the litigation.

The Settlements thus constitute yet another a tremendous result, falls well within the range of possible approval, and should be granted preliminary approval by the Court.

## V. THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS

At the preliminary approval stage, the Court must also determine whether the proposed Settlement Class should be certified for settlement purposes under Federal Rule of Civil Procedure ("Rule") 23. *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Certification of a settlement class must satisfy each requirement set forth in Rule 23(a), as well as at least one of the separate provisions of Rule 23(b). *Id.* at 613-14; *see also In re Cmty. Bank of N. Va.*, 418 F.3d 277, 299 (3d Cir. 2005) ("[C]ertification of classes for settlement purposes only [is] consistent with Fed. R. Civ. P. 23, provided that the district court engages in a Rule 23(a) and (b) inquiry[.]").

Here, DPPs seek certification of a Settlement Class (also referred to as "Class") of:

> All persons who purchased Broilers directly from any of the Defendants or any co-conspirator identified in this action, or their respective subsidiaries or affiliates for use or delivery in the United States from at least as early as January 1, 2008 until December 20, 2019. Specifically excluded from the Settlement Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Settlement Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

(Settlement Agreements, § 5.) This is the same class proposed in the Complaint and already approved in the prior settlements. (*See* ECF Nos. 3944 (Peco and George's), 3945 (Amick).) As detailed below, this proposed Class meets the requirements of Rule 23(a) as well as the requirements of Rule 23(b)(3).

### A. The Requirements of Rule 23(a) Are Satisfied

#### 1. Numerosity

Rule 23(a)(1) requires that the class be so numerous as to make joinder of its members "impracticable." No magic number satisfies the numerosity requirement, however, "a class of more than 40 members is generally believed to be sufficiently numerous for Rule 23 purposes." *Schmidt v. Smith & Wollensky LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010) (citations omitted). The proposed Settlement Class consists of persons and entities that purchased Broilers from the Defendants during the period from January 1, 2008 to December 20, 2019. DPPs' investigation and discovery has confirmed that there are thousands of persons and entities that fall within the Settlement Class definition. (Clark Decl. ¶ 16.) Thus, joinder would be impracticable and Rule 23(a)(1) is satisfied.

#### 2. Common Questions of Law and Fact

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Plaintiffs must show that resolution of an issue of fact or law "is central to the validity of each" class member's claim and "[e]ven a single [common] question will" satisfy the commonality requirement. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). This litigation focuses on the Defendants' alleged conspiracy to fix, raise, maintain, or stabilize prices of Broilers sold in the United States, including via coordinated supply restrictions, sharing competitively sensitive price and production information, and otherwise manipulating Broiler prices. Proof of this conspiracy will be common to all Class members. *See, e.g.*, *Thillens, Inc. v. Cmty. Currency Exch. Ass'n*, 97 F.R.D. 668, 677 (N.D. Ill. 1983) ("The overriding common issue of law is to determine the existence of a conspiracy."). In addition to that overarching question, this case is replete with other questions of law and fact common to the Settlement Class including: (1) the role of each Defendant in the conspiracy; (2) whether Defendants' conduct violated Section 1 of the Sherman Act; (3)

whether Defendants affirmatively concealed their agreement; (4) whether Defendants' conspiratorial conduct caused the prices of Broilers to be inflated; (5) the appropriate measure of monetary relief, including the appropriate measure of damages; and (6) whether Plaintiffs and Class members are entitled to declaratory and/or injunctive relief. Accordingly, the Settlement Class satisfies Rule 23(a)(2).

### 3. Typicality

Rule 23(a)(3) requires that the class representatives' claims be "typical" of class members' claims. "[T]ypicality is closely related to commonality and should be liberally construed." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 479 (N.D. Ill. 2009) (citations omitted). Typicality is a "low hurdle," requiring "neither complete coextensivity nor even substantial identity of claims." *Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 282 (N.D. Ill. 2005). When "the representative party's claim arises from the same course of conduct that gives rise to the claims of other class members and all of the claims are based on the same legal theory," factual differences among class members do not defeat typicality. *Id.* Courts generally find typicality in cases alleging a price-fixing conspiracy. *See, e.g.*, *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 185 (D.N.J. 2003) (finding that plaintiffs met the typicality requirement based on the fact that plaintiffs' main claim – that they were harmed by an illegal price-fixing conspiracy – was the same for all class members).

DPPs here allege a conspiracy to fix, maintain, and stabilize the price of Broilers sold in the United States. The named Plaintiffs will have to prove the same elements that absent Settlement Class members would have to prove, *i.e.*, the existence and effect of such a conspiracy. As alleged in the Complaint, each named representative purchased Broilers directly from one or more Defendants, and was overcharged and suffered an antitrust injury as a result of the violations

alleged in the Complaint. (*See generally* Complaint.) Because the representative Plaintiffs' claims arise out of the same alleged illegal anticompetitive conduct and are based on the same alleged theories and will require the same types of evidence to prove those theories, the typicality requirement of Rule 23(a)(3) is satisfied.

### 4. <u>Adequacy</u>

Rule 23(a)(4) requires that, for a case to proceed as a class action, the court must find that "the representative parties will fairly and adequately protect the interests of the class." Adequacy of representation is measured by a two-part test: (1) the named plaintiffs cannot have claims in conflict with other class members, and (2) the named plaintiffs and proposed class counsel must demonstrate their ability to litigation the case vigorously and competently on behalf of named and absent class members alike. *See Kohen v. Pacific Inv. Mgmt.*, 571 F.3d 672, 679 (7th Cir. 2009).

Both requirements are satisfied here. As they demonstrated at the time they sought appointment, Co-Lead Counsel are qualified, experienced, and thoroughly familiar with antitrust class action litigation. (*See* Order Appointing Co-Lead Counsel, ECF No. 144.) Co-Lead Counsel have successfully litigated many significant antitrust actions and have prosecuted and will continue to vigorously prosecute this lawsuit. (*Id.*) Co-Lead Counsel respectfully submit that they have diligently represented the interests of the Class throughout this litigation and will continue to do so.

Moreover, the interests of the Settlement Class members are aligned with those of the representative Plaintiffs. Plaintiffs, like all Settlement Class members, share an overriding interest in obtaining the largest possible monetary recovery. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) (certifying settlement class and holding that "so long as all class members are united in asserting a common right, such as achieving the maximum possible

recovery for the class, the class interests are not antagonistic for representation purposes"). The class representatives have fulfilled their duties to the Class by actively participating throughout the litigation including sitting for depositions, responding to written discovery, and producing documents. (*See* Clark Decl. ¶¶ 5-7.) Accordingly, the requirements of Rule 23(a)(4) are satisfied.

> **B.**     **The Settlement Class Satisfies Rule 23(b)(3)**

Once Rule 23(a)'s four prerequisites are met, Plaintiffs must show the proposed Settlement Class satisfies Rule 23(b)(3) by showing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." As to predominance, "[c]onsiderable overlap exists between the court's determination of commonality and a finding of predominance. A finding of commonality will likely satisfy a finding of predominance because, like commonality, predominance is found where there exists a common nucleus of operative facts." *Saltzman*, 257 F.R.D. at 484. In antitrust conspiracy cases such as this one, courts consistently find that common issues of the existence and scope of the conspiracy predominate over individual issues. *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 408 (S.D. Ohio 2007); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1039 (N.D. Miss. 1993) ("As a rule of thumb, a price fixing antitrust conspiracy model is generally regarded as well suited for class treatment."). This follows from the central nature of a conspiracy in such cases. *Hughes v. Baird & Warner, Inc.*, No. 76-CV-3929, 1980 WL 1894, at \*3 (N.D. Ill. Aug. 20, 1980) ("Clearly, the existence of a conspiracy is the common issue in this case. That issue predominates over issues affecting only individual sellers."); *see also Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.").

In this case, issues common to the Class will predominate over any individual issues. In addition to the existence of the conspiracy itself, other predominant classwide issues include, for instance: (1) the role of each Defendant in the conspiracy; (2) whether Defendants' conduct violated Section 1 of the Sherman Act; (3) whether Defendants affirmatively concealed their agreement; (4) whether Defendants' conspiratorial conduct caused the prices of Broilers to be inflated; (5) the appropriate measure of monetary relief, including the appropriate measure of damages; and (6) whether Plaintiffs and Class members are entitled to declaratory and/or injunctive relief.

Plaintiffs must also show that a class action is superior to individual actions, which is evaluated by four considerations:

> (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of the class action.

Fed. R. Civ. P. 23(b)(3).

Here, any Class Member's interest in individually controlling the prosecution of separate claims is outweighed by the efficiency of the class mechanism. Thousands of entities purchased Broilers during the Class Period; settling these claims in the context of a class action conserves both judicial and private resources and hastens the Settlement Class members' recovery. Finally, while Plaintiffs see no management difficulties in this case, this consideration is not pertinent to approving a settlement class. *See Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.").

## VI. THE COURT SHOULD APPROVE THE PROPOSED NOTICE PLAN

Rule 23(e) requires that prior to final approval, notice of a proposed settlement be given in a reasonable manner to all class members who would be bound by such a settlement. For a class proposed under Rule 23(b)(3), whether litigated or by virtue of a settlement, Rule 23(c)(2)(B) states:

> The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

The form of notice is "adequate if it may be understood by the average class member." 4 NEWBERG ON CLASS ACTIONS, § 11.53 (4th ed. 2002).

Notice to class members must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem*, 521 U.S. at 617 (quoting Fed. R. Civ. P. 23(c)(2)); *City of Greenville v. Syngenta Crop Prot.*, No. 3:10-CV-188, 2012 WL 1948153, at *4 (S.D. Ill. May 30, 2012) (same). Individual notice should be sent to members who can be identified through reasonable effort. Such notice may be by United States mail, electronic means, or other appropriate means. Fed. R. Civ. P. 23(c)(2)(B). Other members may be notified by publication. *City of Greenville*, 2012 WL 1948153 at *4.

Plaintiffs respectfully request that the Court appoint A.B. Data Ltd., an experienced national class action notice provider and claims administrator, to administer the notice plan. (*See*

Declaration of Eric Schachter ("Schachter Decl.") ¶¶ 3-4, Ex. A.)[12] The proposed notice plan in this case satisfies the requisite criteria, and this Court approved essentially identical plans in connection with the prior settlements. (*See* Order Approving Fieldale Notice Plan, ECF No. 980; Peco, George's and Amick Preliminary Approval Order, ECF No. 3394 (approving the proposed notice plan); Pilgrim's and Tyson Preliminary Approval Order, ECF No. 4341 (approving the proposed notice plan).) As in the prior approved settlements, DPPs propose to the Court a plan of notice that comports with due process and provides reasonable notice to known and reasonably identifiable customers of Defendants pursuant to Rule 23.

The class notice documents, consisting of the long form, email, and publication notices, as well as the claim form, comply with the requirements of Rule 23(c)(2)(B). (The proposed long form, email, and publication notices are attached to the Schacter Decl. as Exhibits "B," "C," and "D," respectively.) The notice documents define the Settlement Class, describe the nature of the action, summarize the class claims, and explain the procedure for requesting exclusion from the Settlement Class and objecting to the proposed Settlements. The notice documents describe the terms of the Settlement Agreements, and inform the Settlement Class members that there is no plan of distribution at this time to qualifying Class members.[13] The notice documents will provide the date, time, and place of the final approval hearing (once that hearing is set by the Court), and inform Settlement Class members that they do not need to enter an appearance through counsel,

---

[12] In light of the forthcoming Motion for Distribution, DPPs decided that it would be in the best interests of the Class to again obtain competitive bids for the claims administration process. The result of this process was the decision to retain A.B. Data Ltd. moving forward. The claims administrator for the prior DPP settlements, JND Legal Administration, will continue to administer those settlements, including the imminent distribution to the Class (which does not include the Mar-Jac, Harrison Poultry, or any future settlements).

[13] The Settlements further provide for the use of up to $250,000 (as authorized by the Settlement Agreements, § 6.c) of Settlement proceeds for the cost of notice without seeking further approval from the Court.

but may do so if they choose. The notice documents also inform Settlement Class members how to exercise their rights to participate in, opt out of, or object to the proposed Settlements, how to make informed decisions regarding the proposed Settlements, and tell Settlement Class members that the Settlements will be binding upon them if they do not opt out.

DPPs' proposed notice plan also comports with due process and Rule 23. The plan includes: (1) direct notice by U.S. mail or email to Settlement Class members who can be identified by reasonable effort, including but not limited to Defendants' customer lists; (2) publication of the summary notice in industry-related mailed and digital media; and (3) the posting of notice on the existing case website, http://www.broilerchickenantitrustlitigation.com. Since the Settlement Class members in this case directly purchased Broilers from Defendants, DPPs have obtained mailing addresses for the vast majority of Settlement Class members from Defendants' customer lists, and will rely predominantly on direct mail and email to Settlement Class members who can be identified through reasonable effort. Fed. R. Civ. P. 23(c)(2)(B).

A.B. Data will mail the long form notice and claim form via First-Class U.S. Mail to Settlement Class members who can be identified through Defendants' records. (Schacter Decl. ¶¶ 6-8.) A.B. Data will also send the email notice to all Settlement Class members for whom email addresses are provided in the class list data. (*Id.* ¶¶ 8-9.) Settlement Class members for whom a physical mailing address and email address is provided will be sent both the mailed and emailed notices. (*Id.*) The email notice will provide Settlement Class members with an electronic link to the settlement website, where they can obtain more information including the long form notice and the Settlement Agreement. (*Id.*) This direct mail and email notice should reach the vast majority of Settlement Class members. (*Id.* ¶ 6.)

A.B. Data further plans to supplement the direct mail and email notice via publication notice. This will include both print and digital media components. Suggested print publications include *Progressive Grocer*, *Meat & Poultry*, *Poultry Times*, *Frozen & Refrigerated Buyer*, *Supermarket News*, and *Winsight Grocery Business/Grocery Headquarters*. (*Id.* ¶ 10.) The print ads are expected to be included in a single issue of each of the publications. Suggested digital media publications include *ProgressiveGrocer.com*, *MeatPoultry.com*, *PoultryTimes.com*, *SupermarketNews.com*, *Winsightgrocerybusiness.com*, *FastCasual.com* and *ShelbyReport.com*. (*Id.*)

A.B. Data will work with Co-Lead Counsel to maintain the existing settlement website and toll-free telephone number, provide additional information and documents, and respond to any and all inquiries regarding the Settlements. (*Id.* ¶ 11.) The website and call center agents will be available in both English and Spanish.

This notice plan, which was successfully implemented for the Fieldale, Peco, George's, Amick, Pilgrim's and Tyson settlements, satisfies Rules 23(c)(2) and 23(e) and constitutes the best notice practicable under the circumstances, and thus should be approved. *See City of Greenville*, 2012 WL 1948153, at *4 (quotation omitted); (Schacter Decl. ¶ 13).

## VII. THE COURT SHOULD SCHEDULE A FINAL APPROVAL HEARING

The last step in the settlement approval process is the final approval hearing, at which the Court may hear all evidence necessary to evaluate the proposed Settlements. At that hearing, proponents of the Settlements may explain and describe their terms and conditions and offer argument in support of the Settlements' approval, and members of the Settlement Class or their counsel may be heard regarding the proposed Settlements if they choose. DPPs propose the following schedule of events necessary for a hearing on final approval of the Settlements:

| DATE | EVENT |
|---|---|
| Within 21 days after preliminary approval | Settlement Administrator to provide direct mail and email notice, and commence the publication notice plan. |
| 60 days after the mailing of Notice | Last day to request exclusion from the Settlement Class; object to the Settlements; and file notices to appear at the Fairness Hearing. |
| 14 days before Fairness Hearing | Class Counsel shall file with the Court a list of all persons and entities who have timely and adequately requested exclusion from the Settlement Class. |
| 14 days before Fairness Hearing | Class Counsel shall file a motion for final approval of the Settlements and all supporting papers, and Class Counsel and the Settling Defendants may respond to any objections to the proposed Settlements. |
| 30 days after last day to request exclusion from the Settlements[14] | Final Settlement Fairness Hearing. |

## VIII. CONCLUSION

For these reasons, Interim Co-Lead Counsel respectfully request that the Court preliminary approve the Mar-Jac and Harrison Poultry Settlement Agreements, preliminary certify the Settlement Class, appoint US Bank as the Escrow Agent, appoint and order A.B. Data Ltd. to distribute notice to the Settlement Class, and set a schedule for the final fairness hearing.

---

[14] Under the Class Action Fairness Act, 28 U.S.C. § 1715 ("CAFA"), the Court may not issue an order giving final approval of a proposed settlement earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with notice of these proposed Settlements. *Id.* at § 1715(d). Under the Settlement Agreements, within ten days of the filing of this motion, the Settling Defendants will serve upon the appropriate state officials and the appropriate federal official the CAFA notice required by Section 1715(b). This schedule will allow the Court to schedule a Fairness Hearing as DPPs propose in the schedule above, in conformance with CAFA's requirements.

Date:  September 17, 2021


/s/ Brian D. Clark

W. Joseph Bruckner (MN #147758)
Brian D. Clark (MN #0390069)
Simeon A. Morbey (MN #0391338)
Kyle Pozan (#6306761)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com
kjpozan@locklaw.com

Clifford H. Pearson (*Pro Hac Vice*)
Daniel L. Warshaw (*Pro Hac Vice*)
Thomas J. Nolan (*Pro Hac Vice*)
Bobby Pouya (*Pro Hac Vice*)
Michael H. Pearson (*Pro Hac Vice*)
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
cpearson@pswlaw.com
dwarshaw@pswlaw.com
tnolan@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

Bruce L. Simon (*Pro Hac Vice*)
PEARSON SIMON & WARSHAW, LLP
350 Sansome Street, Suite 680
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com

*Direct Purchaser Plaintiffs Interim Co-Lead Class Counsel*

Steven A. Hart (#6211008)
Brian Eldridge (#6281336)
HART MCLAUGHLIN & ELDRIDGE, LLC
22 West Washington Street, Suite 1600
Chicago, IL 60602
Telephone: (312) 955-0545
Facsimile: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com

*Direct Purchaser Plaintiffs Liaison Counsel*