**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | No. 1:16-cv-08637 |
| This Document Relates To: | Honorable Thomas M. Durkin |
| *All End-User Consumer Plaintiff Actions* | |

**MEMORANDUM IN SUPPORT OF END-USER CONSUMER PLAINTIFFS'**
**MOTION FOR ATTORNEYS' FEES, EXPENSES, AND**
**<u>CLASS REPRESENTATIVE AWARDS</u>**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   THE WORK UNDERTAKEN ON BEHALF OF THE CONSUMER
      CLASS ...............................................................................................................2

      A.    Class Counsel fiercely advocated for consumers' interests before
            being appointed. ......................................................................................2

      B.    Class Counsel engaged in substantial motion practice and
            discovery efforts. .....................................................................................3

            1.    EUCPs overcame multiple rounds of motions to dismiss. ..........3

            2.    Class Counsel led depositions of more than forty defendant
                  witnesses. ..................................................................................4

            3.    Discovery required significant motion practice. .........................4

            4.    Two years into the case, the Department of Justice
                  intervened and sought a stay. .....................................................5

            5.    Class Counsel conducted discovery on pass-through issues
                  unique to their class. .................................................................7

            6.    Class Counsel worked with experts, who undertook critical
                  work. .........................................................................................7

            7.    Class Counsel reviewed class representatives' documents
                  and helped prepare for and defend their depositions. ................8

III.  LEGAL STANDARD ..........................................................................................8

IV.   ARGUMENT ......................................................................................................9

      A.    The percent of funds approach is the better approach to apply in
            this case in order to reflect the market price for legal services. .............10

            1.    In large, complex antitrust cases, sophisticated entities
                  often negotiate a flat 33% fee, according to empirical data. ......10

            2.    The complexity, length and cost of this litigation – as well
                  as the risks assumed by counsel – cut in favor of awarding
                  a flat 33% fee. ..........................................................................13

3.    The reaction of the class supports the percent-of-fund fee award. ................................................................................ 15

4.    A lodestar crosscheck confirms that the percent of funds fee award is reasonable. ............................................................... 15

B.    Class Counsel should be partially reimbursed for their out-of-pocket expenses. .................................................................... 17

C.    The named plaintiffs have expended significant time on this litigation and should be awarded $2,000. ............................... 20

V.    CONCLUSION ............................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*,
743 F.3d 243 (7th Cir. 2014) ...................................................................................8

*Arenson, et al. v. Bd. of Trade of City of Chicago*,
372 F. Supp. 1349 (N.D. Ill. 1974) .........................................................................1

*In re Auto. Parts Antitrust Litig.*,
2017 WL 3525415 (E.D. Mich. July 10, 2017) ....................................................11

*In re Auto Parts Antitrust Litig.*,
2018 WL 7108072 (E.D. Mich. Nov. 5, 2018) .....................................................17

*Beesley v. Int'l Paper Co.*,
2014 WL 375432 (S.D. Ill. Jan. 31, 2014) ...........................................................16

*In re Chicken Antitrust Litig.*,
560 F. Supp. 957 (N.D. Ga. 1980) ..........................................................................6

*City of Greenville v. Syngenta Crop Prot., Inc.*,
904 F. Supp. 2d 902 (S.D. Ill. 2012) ....................................................................11

*In re Cont'l Ill. Sec. Litig.*,
962 F.2d 566 (7th Cir. 1992) .............................................................................9, 20

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
80 F. Supp. 3d 838 (N.D. Ill. 2015) ...............................................9, 11, 13, 15

*In re Folding Carton Antitrust Litig.*,
84 F.R.D. 245 (N.D. Ill. 1979) ...............................................................................6

*Gehrich v. Chase Bank USA, N.A.*,
316 F.R.D. 215 (N.D. Ill. 2016) .......................................................................8, 12

*Hale v. State Farm Mut. Auto. Ins. Co.*,
2018 WL 6606079 (S.D. Ill. Dec. 16, 2018) ................................................. *passim*

*Heekin v. Anthem, Inc.*,
2012 WL 5878032 (S.D. Ind. Nov. 20, 2012) ......................................................11

*Kleen Prod. LLC v. Int'l Paper Co.*,
2017 WL 5247928 (N.D. Ill. Oct. 17, 2017)....................................................11, 14

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
733 F. Supp. 2d 997 (E.D. Wis. 2000)....................................................................17

*In re Loestrin 24 Fe Antitrust Litig.*,
2020 WL 4035125 (D.R.I. July 17, 2020) .............................................................14

*In re Motorsports Merchandise Antitrust Litig.*,
112 F. Supp. 2d 1329 (N.D. Ga. 2000)..................................................................13

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*,
332 F.R.D. 202 (N.D. Ill. 2019)............................................................................20

*In re Potash Antitrust Litig.*,
2013 WL 12470850 (N.D. Ill. June 12, 2013) .......................................................11

*In re Se. Milk Antitrust Litig.*,
2013 WL 2155387 (E.D. Tenn. May 17, 2013) ......................................................14

*Silverman v. Motorola, Inc.*,
2012 WL 1597388 (N.D. Ill. May 7, 2012) ...........................................................11

*Silverman v. Motorola Sols., Inc.*,
739 F.3d 956 (7th Cir. 2013)...........................................................................12, 20

*Spano v. Boeing Co.*,
2016 WL 3791123 (S.D. Ill. Mar. 31, 2016) ....................................................16, 17

*Standard Iron Works v. ArcelorMittal*,
2014 WL 7781572 (N.D. Ill. Oct. 22, 2014)......................................................11, 17

*In re Syngenta AG MIR 162 Corn Litig.*,
357 F. Supp. 3d 1094 (D. Kan. 2018) ...................................................................14

*In re Synthroid Mktg. Litig.*,
264 F.3d 712 (7th Cir. 2001) ......................................................................... *passim*

*In re Synthroid Mktg. Litig.*,
325 F.3d 974 (7th Cir. 2003) ...........................................................................8, 12

*In re Trans Union Corp. Privacy Litig.*,
629 F.3d 741 (7th Cir. 2011) ...............................................................................10

*In re: Urethane Antitrust Litig.*,
2016 WL 4060156 (D. Kan. July 29, 2016) ..........................................................14

*In re Visa Check/Mastermoney Antitrust Litig.*,
297 F. Supp. 2d 503 (E.D.N.Y. 2003) ...................................................................11

*In re Vitamins Antitrust Litig.*,
    2001 WL 34312839 (D.D.C. July 16, 2001)................................................................14

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)................................................................13

*Williams v. Rohm & Haas Pension Plan*,
    658 F.3d 629 (7th Cir. 2011) ........................................................10, 15

*Young v. Cty. of Cook*,
    2017 WL 4164238 (N.D. Ill. Sept. 20, 2017) ..................................9, 11

## FEDERAL RULES

Fed. R. Civ. P. 23(h) ................................................................8, 17

## OTHER AUTHORITIES

Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class
    Actions*, 89 Fordham L. Rev. 1151 (2021).......................................10, 13

David L. Schwartz, *The Rise of Contingent Fee Representation in Patent
    Litigation*, 64 Ala. L. Rev. 335, 356–57 (2012) ..................................10

# I.    INTRODUCTION

For five years, Hagens Berman and Cohen Milstein[1] (Class Counsel) have worked diligently to represent millions of United States consumers in this complex antitrust case – bearing the risks and costs of litigation, without any compensation to date. Now Class Counsel has secured settlements totaling $181 million. These settlements with six defendant families represent a significant substantial benefit for the class of End User Consumer Plaintiffs ("EUCPs"). The news that these settlements will compensate consumers for their damages has been shared and spread widely – even reaching national audiences via duet on *The Tonight Show*.[2]

The Court is well-aware of the hard work and dedication that has been required to see this complex litigation through; to date, there are more than 5,000 entries on the docket. Unlike many antitrust cases, this case began without having the benefit of a prior Department of Justice criminal case to use as a template. Rather, counsel for the civil plaintiffs were willing to take a risk, dig in, and follow leads to develop the evidence. Over the past five years, Class Counsel invested more than 67,522 hours representing Plaintiffs and pursuing their claims. Defendants in this litigation are large, sophisticated national and multi-national corporations and have hired some of the most well-known and aggressive attorneys in the country.[3] They are also numerous.

---

[1] "Hagens Berman" refers to the law firm Hagens Berman Sobol Shapiro LLP, whom the Court appointed as Interim Lead Counsel on December 14, 2016. *See* Order, ECF No. 248. "Cohen Milstein" refers to the law firm Cohen Milstein Sellers & Toll, PLLC. Cohen Milstein and Hagens Berman have requested appointment as Co-Lead Class Counsel for the End User Class.

[2] *See* The Tonight Show Starring Jimmy Fallon, YouTube (Sept. 15, 2021) (https://www.youtube.com/watch?v=zbcNjYT1VCs&t=3m45s) (accessed Oct. 27, 2021).

[3] *Arenson, et al. v. Bd. of Trade of City of Chicago*, 372 F. Supp. 1349, 1354 (N.D. Ill. 1974) (noting that the quality, vigor, and prior success of opposing counsel is an important factor when assessing the quality of work performed by plaintiffs' counsel).

Class Counsel conducted discovery on dozens of defendants and third parties, and to state the obvious, the amount of necessary work multiplies with their number. Overall, it is extraordinary even when compared to other complex antitrust litigations. In addition, Class Counsel has risked nearly $9 million without any guarantee of reimbursement to put forth the best and thoroughly supported case, legal and economic, for consumers of chicken.

Plaintiffs respectfully request: (1) an award of $59,730,000 in attorney's fees – equal to 33 percent of the common fund; (2) reimbursement of $8,750,000 to cover a portion of the out-of-pocket litigation expenses incurred in connection with this litigation; and (3) service awards of $2,000 for each of the class representatives.

## II.     THE WORK UNDERTAKEN ON BEHALF OF THE CONSUMER CLASS

### A.     Class Counsel fiercely advocated for consumers' interests before being appointed.

From the outset of this case, Hagens Berman and Cohen Milstein have zealously represented the consumer class's interests. In September 2016, Hagens Berman and Cohen Milstein filed one of the first complaints on behalf of the consumer class and moved to represent the consumer class as interim co-lead counsel.[4] Hagens Berman and Cohen Milstein were the first to raise the issue that having the commercial indirect class (referred to as the "CIIPPs" in this litigation) also represent consumers' interests would lead to a conflict of interest.[5] This issue was vigorously contested by the commercial class, but Class Counsel provided real examples (such as *In re Capacitors Antitrust Litigation*) where lead counsel for a dual

---

[4] *See* Application for Appointment of Steve W. Berman of Hagens Berman Sobol Shapiro, LLP and Kit A. Pierson of Cohen Milstein Sellers & Toll PLLC as Co-Lead Counsel for the Indirect Purchaser Consumer Class, ECF No. 117 (Oct. 7, 2016).

[5] *Id*.

consumer/commercial indirect class voluntarily dismissed the consumer claims and pursued litigation only on behalf of commercial entities – leaving consumers unable to recover anything.[6]

In raising this issue, Hagens Berman and Cohen Milstein conducted an independent investigation into the consumer channel, retained expert economists to evaluate and explain the different channels, and provided the Court with a legal ethicist's expert opinion – even though there was no certainty they would be appointed as lead counsel. Scarlett Decl. at ¶ 2. After careful consideration, the Court commended counsel's "aggressive and independent advocacy relating to the conflict," and appointed counsel for an independent consumer class.[7]

## B. Class Counsel engaged in substantial motion practice and discovery efforts.

### 1. EUCPs overcame multiple rounds of motions to dismiss.

EUCPs overcame multiple joint and individual motions to dismiss and one motion to reconsider the Court's denial of the motions to dismiss. Scarlett Decl. at ¶ 5. The first round of motions occurred in 2017, shortly after the complaint was filed.[8] After the Court denied these motions one defendant brought a second motion to reconsider.[9] EUCPs were the first to add Agri Stats as a defendant, and the only class to add a rule of reason claim. This initiated a second round of motions to dismiss, which was resolved in favor of EUCPs.[10] Scarlett Decl. at ¶ 5.

---

[6] *See* Reply in Support of Application for Appointment of Steve W. Berman of Hagens Berman Sobol Shapiro, LLP and Kit A. Pierson of Cohen Milstein Sellers & Toll PLLC As Co-Lead Counsel for the Indirect Purchaser Consumer Class, ECF No. 121 (Oct. 11, 2016).

[7] *See* Order, ECF No. 248 (Dec. 14, 2016).

[8] *See, e.g.*, Joint Mot. to Dismiss, ECF No. 292 (Jan. 27, 2017); *also* Mots. Mountaire (ECF No. 274); Sanderson, (ECF No. 276); Wayne (ECF No. 282); George's (ECF No. 284); Foster (ECF No. 287); Pilgrim's (ECF No. 294); Peco, (ECF No. 296) (all filed Jan. 27, 2017).

[9] *See* Mot. for Recon. Re Order on Mot. to Dismiss, ECF No. 572 (Dec. 15, 2017).

[10] *See, e.g.,* Mot. to Dismiss by Defendant Agri Stats, ECF No. 804 (Mar. 23, 2018).

### 2. Class Counsel led depositions of more than forty defendant witnesses.

From the outset of discovery, Class Counsel sought to avoid duplication by coordinating discovery assignments with the other classes. For example, the classes jointly negotiated the discovery protocols for this case and conducted a coordinated review of the millions of documents that were produced in the litigation. Scarlett Decl. at ¶ 6. During this negotiation process, Class Counsel drafted and filed many of the status reports before the Court.[11] Several of Class Counsel's staff attorneys participated in this review full time. Scarlett Decl. at ¶ 6. Counsel also worked together with the other classes to negotiate search terms, ensure the completeness of discovery, and to schedule more than 180 depositions – up to three depositions a day. Scarlett Decl. at ¶ 7.

EUCPs have taken lead in questioning more than 40 of the defendant-employees in this case, including *every* Agri Stats employee and many employees for Pilgrim's, Perdue, and Tyson. Scarlett Decl. at ¶ 9. Preparing for these depositions takes significant time and effort. To help the classes prepare for these difficult depositions, staff attorneys at Hagens Berman and Cohen Milstein devoted their full time to the joint effort among the classes to search and review Defendants' 13 million documents. *Id.* The staff attorneys, with their decades of collective experience, helped identify critical documents and prepare for depositions. Finally, Class Counsel also led questioning at several third-party depositions, including depositions of USDA witnesses. *Id.*

### 3. Discovery required significant motion practice.

Plaintiffs conducted significant written discovery, including serving document requests, interrogatories, and requests for admission. Scarlett Decl. at ¶ 10. In addition, EUCPs served

---

[11] *See, e.g.,* Joint Status Report, ECF No. 863 (Apr. 12, 2018).

subpoenas on dozens of third parties in the distribution chain to seek documents and structured

data that would be used to show to pass-through. *Id.* This document discovery was contentious at

times, requiring multiple motions to compel and responses to motions for protective orders from

defendants and third parties.[12] These motions required additional time for meet-and-confers,

briefing, and hearing preparation. *See* Scarlett Decl. at ¶ 10. The briefs argued and won by

EUCPs have impacted all three classes: for example, when Agri Stats sought a protective order

to limit its document production to a two-year period,[13] Class Counsel drafted the brief in

opposition.[14] Magistrate Judge Gilbert adopted EUCP's reasoning and denied the request for the

protective order.[15] As a result, Agri Stats produced a full set of documents and all three classes

used these Agri Stats documents in support of their motions for class certification. Scarlett Decl.

at ¶ 11.

### 4. Two years into the case, the Department of Justice intervened and sought a stay.

Often, civil plaintiffs bring antitrust claims only after the Department of Justice has

announced a criminal investigation or criminal charges. As these cases are usually brought

against national and multinational corporate leviathans who hold significant market power and

can afford the best legal services, "all would agree that antitrust litigation presents a trying task

---

[12] *See*, *e.g.*, Order, ECF No. 1254 (Sept. 26, 2018) (granting class plaintiffs' motion to serve interrogatories); Order, ECF No. 864 (Apr. 13, 2018) (denying Tyson's motion for protective order); Order, ECF No. 1090 (July 26, 2018) (denying Agri Stats's motion for protective order); Order, ECF No. 1832 (Feb. 14, 2019) (ordering third-party Porky Products to produce downstream data); Order, ECF No. 2010 (Apr. 8, 2019) (granting class plaintiffs' motion to compel documents claimed to be privileged); Order, ECF No. 3622 (May 19, 2020) (granting in part class plaintiffs' motion for production of structured data).

[13] *See* Memorandum by Agri Stats, Inc. in Support of Motion for Protective Order, ECF No. 895 (May 18, 2018).

[14] *See* Memorandum in Opposition to Motion for Protective Order, ECF No. 940 (June 1, 2018).

[15] *See* Memorandum Opinion and Order, ECF No. 1090 (July 26, 2018).

for even the most accomplished trial attorney."[16] To reduce some of the enormous risks, many civil lawyers will only bring an antitrust suit if the government has already paid for an investigation and found enough evidence to bring its own case; in such cases, courts recognize that the civil plaintiffs will be "undoubtedly helped considerably by some of the evidence developed by the government."[17]

This case was different: here, the civil plaintiffs, including Class Counsel, invested their own resources to develop the evidence and bring forth claims before the government became involved and without the benefit of their work. Scarlett Decl. at ¶ 12. Before the Department of Justice announced its investigation, the civil plaintiffs had spent over two years litigating their claims. Scarlett Decl. at ¶ 12. They negotiated and received significant document productions from Defendants and deposed more than 80 defendant witnesses. *Id.*

Seeking time to conduct its investigation, the Department of Justice sought a stay on the civil cases – just as Plaintiffs began scheduling the last round of defendant-depositions. EUCPs were the only class to oppose the stay – resulting, in part, in the Court entering a much narrower stay than originally requested.[18] The narrow stay was granted, which halted Plaintiffs' progress (and exposed Plaintiffs to significantly more risk). As part of its investigation, the government subpoenaed the class plaintiffs and requested Defendants' document productions. Scarlett Decl. at ¶ 13. Here, the government – not civil plaintiffs – were "undoubtedly helped considerably" by some of the evidence developed by Class Counsel.

---

[16] *In re Chicken Antitrust Litig.*, 560 F. Supp. 957, 960 (N.D. Ga. 1980).

[17] *In re Folding Carton Antitrust Litig.*, 84 F.R.D. 245, 251 (N.D. Ill. 1979).

[18] End-User Consumer Plaintiffs' Opposition to the United States' Motion to Stay Discovery, ECF No. 2287 (June 26, 2019).

**5.     Class Counsel conducted discovery on pass-through issues unique to their class.**

To prove that the overcharge caused by Defendants' misconduct passed through to the consumer class, Class Counsel negotiated discovery with dozens of distributors and grocery stores. Scarlett Decl. at ¶ 14. As a result of these subpoenas, Class Counsel received troves of data reflecting actual purchases and sales through the distribution chain, which EUCP's expert, Dr. Sunding, was able to use to prove systemic, class-wide pass through of the overcharge. In addition, Class Counsel participated in more than 100 depositions of opt-out distributors and retailers, using these defendant-noticed depositions as an opportunity to solidify the pass-through evidence for the consumer class. *Id.*

**6.     Class Counsel worked with experts, who undertook critical work.**

Class Counsel has also extensively worked with EUCP's two economic experts, Dr. David Sunding and Dr. Luis Cabral, to explain the economic mechanisms in this market and empirically demonstrate the overcharge. In support of the EUCP motion for class certification, Drs. Sunding and Cabral each submitted expert reports, totaling over 200 pages. Scarlett Decl. at ¶ 15. Cameron Azari submitted a report regarding the identification of class members. Defendants had an opportunity to depose each expert, and Class Counsel defended these depositions. *Id.* Plaintiffs' experts also submitted reply reports addressing the errors and criticisms made by Defendants' economic expert in his opposition to class certification. Defendants responded by noticing a second deposition of Dr. Sunding, which Class Counsel again defended. *Id.* In addition to these reports, Plaintiffs also served Defendants with their experts' merits reports, totaling 329 pages, in accordance with the Court's Scheduling Order at the end of August 2021. Scarlett Decl. at ¶ 15.

7. **Class Counsel reviewed class representatives' documents and helped prepare for and defend their depositions.**

Finally, Class Counsel helped the class representatives respond to Defendants' intense discovery requests and prepare for their depositions. To respond to Defendants' interrogatories and requests for production, some class representatives' personal email accounts were searched. Defendants used these documents to ask questions tangentially related to the claims, including questions on what cooked food products a class representative bought at his church's fundraiser. Scarlett Decl. at ¶ 16. Class representatives sat through more 97 hours of depositions, which lasted an average of four hours – with some going up to seven hours. *Id.* All of these depositions were attended by multiple defense counsel, and at some depositions, named partners – some of whom have more than 30 years of litigation experience – led the questioning. *Id.*

## III.    LEGAL STANDARD

Rule 23 permits the Court to award reasonable attorneys' fees and expenses in class actions, as authorized by law of by the parties' agreement. *See* Fed. R. Civ. P. Rule 23(h). The Seventh Circuit instructs courts to "do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."[19] Under Seventh Circuit law, the district court has discretion to award fees using either the lodestar approach or a percentage of fund approach.[20] Another approach, sometimes referred to as the marginal percentage fee structure, has also been applied to common funds,[21] though this

---

[19] *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*").

[20] *See Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014), *citing Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir.1994).

[21] *See, e.g.*, *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 978 (7th Cir. 2003) ("*Synthroid II*"); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 236 (N.D. Ill. 2016).

fee schedule appears to be less commonly applied to antitrust cases.[22] This may be because it "create[s] declining marginal returns to legal work, ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery, even though extra work could benefit the client."[23] In applying any of these approaches, the Court's goal should be to "to give the lawyer what he would have gotten in the way of a fee in an arms' length negotiation, had one been feasible."[24]

## IV. ARGUMENT

From the inception of this case through June 2021, Class Counsel has invested more than 67,522 hours litigating their claims. Counsel for the Consumer Indirect Class requests: (1) an award of attorneys' fees in the amount of 33 percent of the $181 million settlement fund; (2) reimbursement of expenses Class Counsel has advanced to date on behalf of the class; and (3) service awards of $2,000 for each named plaintiff. As demonstrated below, Class Counsel's request for $59,730,000 in fees is a reasonable rate negotiated by the market and in line with the fees awarded in similar cases. Applying a lodestar cross-check, Class Counsel's request represents a modest 1.8 multiplier, well in line with other cases. Although the Court previously indicated its inclination to apply the marginal percentage fee structure, EUCPs respectfully submit that this structure is not the best approach for this particular case.[25]

---

[22] *See, e.g., In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 80 F. Supp. 3d 838, 845 (N.D. Ill. 2015) (awarding 33% and noting that the *Synthroid* fee structure "is not a one-size-fits-all recovery scheme").

[23] *See Synthroid I*, 264 F.3d at 721; *see also Young v. Cty. of Cook*, 2017 WL 4164238, at *9 (N.D. Ill. Sept. 20, 2017).

[24] *In re Cont'l Ill. Sec. Litig*., 962 F.2d 566, 572 (7th Cir. 1992).

[25] Class Counsel will address the marginal fee structure in these papers and has also provided a fuller explanation in response to the Court's August 4, 2021 Order. *See* End-User Consumer Plaintiffs' Response Regarding Application of Sliding Scale to Attorneys' Fees, ECF No. 5049 (Sept. 15, 2021).

**A.    The percent of funds approach is the better approach to apply in this case in order to reflect the market price for legal services.**

**1.    In large, complex antitrust cases, sophisticated entities often negotiate a flat 33% fee, according to empirical data.**

For cases with consumer plaintiffs, courts do not usually give weight to fee agreements with named plaintiffs.[26] Instead, the Seventh Circuit encourages courts to review "actual fee contracts that were privately negotiated for similar litigation[.]"[27] The most recent 2021 study examining actual fee contracts found that a flat, fixed percentage fee request of one third is *ex ante* market rate negotiated by sophisticated plaintiffs (such as Fortune 500 companies) who bring antitrust cases.[28] This study examined *seventeen years* of antitrust cases litigated on contingency where large corporations were named plaintiffs. Even though "the potential damages in many of these cases were enormous," the fixed percentage fee request "of one-third *heavily* dominated."[29] This market price dominated "even in the most enormous cases, where we would expect the lawyers to benefit from economies of scale."[30] Studies of other large, complex cases taken on contingency by sophisticated entities – such as patent cases – use similar fee structures.[31] Courts in this District have likewise recognized that "a 33% contingent fee of the

---

[26] *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011).

[27] *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011); *see also Hale v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 6606079, at *8 (S.D. Ill. Dec. 16, 2018) (noting that the empirical evidence shows "sophisticated clients and sophisticated class representatives regularly agree to pay 33.33% or more in risky, complex litigation, even when potential rewards are very large.").

[28] Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151 at 1161 (2021) (emphasis in original), available at https://ir.lawnet.fordham.edu/flr/vol89/iss4/4.

[29] *Id.* (emphasis in original).

[30] *Id.*

[31] *See* David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, 64 Ala. L. Rev. 335, 356–57 (2012) (finding that almost all sophisticated plaintiffs in patent cases

total recovery is on the low end of what is typically negotiated *ex ante* by plaintiffs' firms taking on large, complex cases[.]"[32] Because antitrust cases require the investment of significant time and resources, awards of one third the settlement fund are common.[33]

Guessing at the *ex ante* prices, it is true that district courts have sometimes reduced the percent awarded in class action cases that recover more than $100 million or some other so-called "megafund."[34] But empirical data from private market negotiations do not support these decisions. Conversely, there are many class action antitrust cases where district courts have applied the empirical private market data and awarded approximately one-third of the common fund. For example, in 2017, the district court in *Kleen Products* awarded attorneys' fees totaling 30% of the $354 million settlement, equaling about $104 million.[35]

---

negotiated a flat percentage contingency fee. The mean was 38.6 percent, even when damages were in the hundreds of millions. The second most common fee structure was one where the fees *escalate* as the litigation moves closer to trial and appeal).

[32] *Young*, 2017 WL 4164238, at *6.

[33] *See, e.g., Kleen Prod. LLC v. Int'l Paper Co*., 2017 WL 5247928 (N.D. Ill. Oct. 17, 2017) (awarding class counsel 30% of $354 million common fund); *Dairy*, 80 F. Supp. 3d at 842 (awarding class counsel 33% of $46 million common fund); *Standard Iron Works v. ArcelorMittal,* 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) (awarding class counsel 33% of $163.9 million common fund); *In re Potash Antitrust Litig*., 2013 WL 12470850, at *1 (N.D. Ill. June 12, 2013) (awarding class counsel 33% of $90 million common fund). Other complex cases in this Circuit involving large common funds have taken this approach. *See, e.g., Hale,* 2018 WL 6606079, at *12 (awarding class counsel 33% of $250 million settlement of RICO claims and declining to apply sliding scale); *City of Greenville v. Syngenta Crop Prot., Inc*., 904 F. Supp. 2d 902, 908-909 (S.D. Ill. 2012) (awarding 33% of $105 million settlement of public nuisance class claims); *Heekin v. Anthem, Inc*., 2012 WL 5878032, at *1 (S.D. Ind. Nov. 20, 2012) (awarding class counsel 33.3% of $90 million settlement of claims involving insurance demutualization and declining to apply sliding scale).

[34] *See In re Visa Check/Mastermoney Antitrust Litig*., 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003) (awarding more than $200 million in fees, which was approximately 6% of the fund); *but see In re Auto. Parts Antitrust Litig*., 2017 WL 3525415, at *2 (E.D. Mich. July 10, 2017) (noting there is no requirement to reduce the fee award simply because the common fund increases).

[35] *See Kleen*, 2017 WL 5247928, at *4 ("the requested 30 percent recovery is well-within the range of acceptable fees"); *See also Silverman v. Motorola, Inc., 2012 WL 1597388, at *3 (N.D.

Class Counsel opposes the use of the marginal percentage fee structure rather than a flat rate because using the flat rate keeps Class Counsel's interests and the classes' interests aligned, especially as the case moves toward trial.[36] As the Seventh Circuit recognized in *Synthroid I,* sliding scales may not always be best because they "create declining marginal returns to legal work, ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery, even though extra work could benefit the client."[37] Some courts have suggested applying the marginal percentage fee structure because "it is almost as expensive to conduct discovery in a $100 million case as in a $200 million case."[38] But this structure only accounts for discovery costs, not the time investment of pre-trial and trial. Routine discovery tasks can be completed by attorneys with relatively less experience (such as drafting discovery letters or reviewing documents). But as a case moves towards trial, senior lawyers with trial experience must invest more time to hone the facts and prepare witnesses and draft trial briefs. Thus, the time investment for senior attorneys – those who have the most experience and forgo the most lucrative opportunities when working full time on one case – increases as a case moves closer to trial. Introducing declining marginal returns as a high-risk, complex case moves closer to trial does not align with the private market. This may explain why the one-third contingency rate dominates, even when sophisticated market participants negotiate the fee structure.[39]

---

Ill. May 7, 2012), *aff'd sub nom. Silverman v. Motorola Sols., Inc.*, 739 F.3d 956 (7th Cir. 2013) (awarding 27.5% of the $200 million common fund in securities case).

[36] *See Synthroid II*, 325 F.3d at 979 (noting that one problem with the auction structure, where support for declining fees are found is that "Lawyers will earn a competitive return even at the lower level of compensation, but the class may be worse off.").

[37] *Synthroid I*, 264 F.3d at 722.

[38] *Gehrich*, 316 F.R.D. at 235.

[39] *See* Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151 at 1161 (2021).

2. **The complexity, length and cost of this litigation – as well as the risks assumed by counsel – cut in favor of awarding a flat 33% fee.**

Another factor that courts use to evaluate fee requests is the complexity, length, and cost bringing the litigation.[40] Here, antitrust cases stand out; as one court observed, "[a]n antitrust class action is arguably the most complex action to prosecute."[41] Antitrust cases are universally acknowledged for being "complicated, lengthy and bitterly fought."[42] This case is no exception; the parties are five years into litigation and trial will likely not occur until 2023.

Although all antitrust cases are complex, in many instances, civil antitrust plaintiffs have benefit of governmental investigation or prosecution.[43] "On the facts, it is important to note that unlike many cases where attorneys seek a substantial fee, Class Counsel here were not assisted by any governmental investigations or prosecution, for example, as is often the case large class actions."[44] Instead, the civil plaintiffs alone bore the risk of building the evidence.

This case has required lawyers to devote a significant amount of time and effort into building the evidence; there are many defendants and the alleged misconduct spanned more than a decade. Through June 2021, Class Counsel invested more than 67,522 hours litigating this case. Scarlett Decl. at ¶ 17. More than 13 million documents were collected and reviewed; over 180 depositions of defendants' employees and third parties have been taken. Scarlett Decl. at ¶ 6. In addition, EUCPs have attended many opt-out depositions and questioned opt-outs to develop

---

[40] *Dairy*, 80 F. Supp. 3d at 847.

[41] *In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000).

[42] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005).

[43] *See, e.g., Dairy*, 80 F. Supp. 3d at 848 ("Class Counsel benefitted from a large volume of documents and multiple deposition transcripts collected via a price-manipulation investigation by the Commodity Futures Trading Commission ("CFTC").").

[44] *Hale*, 2018 WL 6606079, at *9.

evidence of pass-through to the consumer class. Scarlett Decl. at ¶¶ 7-8. In similar cases where civil plaintiffs have borne the risk of building the case – without the benefit of a governmental investigation – courts have routinely awarded roughly one-third of the common fund as fees. This rate has been applied by courts in this district[45] as well as in other districts around the country.[46]

But this case has an additional wrinkle that amplified the complexity, length, cost, and risk: the United States intervened two years into the litigation and sought a stay.[47] At the time, Defendants argued that the stay should prevent all "depositions and non-evidentiary written discovery . . .of the defendants and their current and former employees."[48] While the stay was granted, Defendants were allowed to continue pursuing discovery on Plaintiffs, including by deposing the named plaintiffs. Scarlett Decl. at ¶ 12. Because defendants were able to continue their discovery while the civil plaintiffs were sidelined, Plaintiffs faced the risk of losing, without having power to hold Defendants' feet to the fire. Meanwhile, the United States benefited from

---

[45] *See Kleen*, 2017 WL 5247928, at *5 (N.D. Ill. Oct. 17, 2017) (awarding 30% of the $354 million common fund).

[46] *See Hale*, 2018 WL 6606079, at *16 (awarding 33% of $250 million common fund); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001) (awarding about 34% of about a $360 million dollar fund); *In re Se. Milk Antitrust Litig.*, 2013 WL 2155387, at *1 (E.D. Tenn. May 17, 2013) (noting that "the court previously awarded attorneys' fees in the amount of $48,333,333.00 (one-third of the recovery)" and awarding an additional $52,866,667 (one-third of the second recovery)); *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1103 (D. Kan. 2018) (awarding one-third of the $151 billion settlement fund as attorneys' fees); *In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *8 (D. Kan. July 29, 2016) (awarding one-third of the $835 million settlement); *In re Loestrin 24 Fe Antitrust Litig.*, 2020 WL 4035125, at *1 (D.R.I. July 17, 2020) (awarding 1/3 of $120 million).

[47] *See* Motion by Intervenor United States of America to Intervene and Stay Discovery, ECF No. 2268 (June 21, 2019).

[48] *See* Defendants' Response to the United States' Motion to Intervene and Stay Discovery, ECF No. 2285 (June 26, 2019).

work and risks borne by the civil plaintiffs, as indicated by the fact that the government intends to introduce documents at its trial that it received from the civil plaintiffs. Scarlett Decl. at ¶ 13.

Other risks, both legal and factual, have abounded since the beginning of the case and continue to do so. If it were not for the presence of the remaining defendants, Class Counsel would more specifically detail them. But suffice to say, the remaining stages in this case, including class certification, summary judgment, trial and any possible appeals, are no slam dunk for the EUCPs or Plaintiffs in general.

### 3. The reaction of the class supports the percent-of-fund fee award.

Another important consideration is the reaction of the class to the proposed settlement and fee request.[49] Through published notice – on the settlement website and in the notice forms – class members have been advised that Class Counsel may seek a fee award of up to 33.3 percent, or $60,273,000 as attorneys' fees and $8.75 million in costs. Scarlett Decl. at ¶ 27. Nobody has filed notice yet that they intend to object to the settlement. However, the opt-out deadline has not passed; Class Counsel is filing this Motion ahead of the opt-out deadline and will make these briefs available on the settlement website (www.overchargedforchicken.com) so that interested class members will have an opportunity to review and comment. Scarlett Decl. at ¶ 28. Class Counsel will update the Court if this factor changes.

### 4. A lodestar crosscheck confirms that the percent of funds fee award is reasonable.

Although the district court is under no obligation to perform a cross-check on the requested fees against the lodestar,[50] courts sometimes find cross-checks as informative for

---

[49] *Dairy*, 80 F. Supp. 3d at 851.

[50] *See Williams*, 658 F.3d at 636 ("[C]onsideration of a lodestar check is not an issue of required methodology.").

appraising fee requests.[51] Class Counsel spent more than 67,522 hours litigating this case. "In risky litigation such as this, lodestar multipliers can be reasonable in a range between 2 and 5."[52] Here, Class Counsel's fee request results in a multiplier of 1.8 when compared to their lodestar.[53]

Class Counsel has kept the team litigating this case relatively lean and nimble; more than 99 percent of the hours billed in this case were incurred by Hagens Berman and Cohen Milstein. Scarlett Decl. at ¶ 17. This staffing strategy means that fewer attorneys spent a larger proportion of their time litigating this case. As a result, they have deeper institutional knowledge of the facts, law and theory, produce better work product and litigate more efficiently. They also produce less lodestar and therefore a higher multiplier when they achieve tremendous results, such as the settlements here, for the class.[54]

At times, keeping the case staffed efficiently resulted in schedules that were exceptionally grueling for the few attorneys who worked full-time on this case. During the discovery process, there were many weeks where multiple depositions were scheduled on the same day and back-to-back each week. Scarlett Decl. at ¶ 7. As a result, there were months where attorneys were required to prepare for and attend several depositions each week, every week. During this phase, several attorneys worked full-time on this case, forgoing other work, at a demanding pace. Scarlett Decl. at ¶¶ 8, 22. Due to time differences, some of these attorneys

---

[51] *But see Beesley v. Int'l Paper Co.*, 2014 WL 375432, at *3 (S.D. Ill. Jan. 31, 2014) ("The use of a lodestar cross-check has fallen into disfavor.").

[52] *Spano v. Boeing Co.*, 2016 WL 3791123, at *3 (S.D. Ill. Mar. 31, 2016).

[53] A summary of Class Counsel's time records is included in counsel's declarations that accompany this memorandum. *See Hale*, 2018 WL 6606079, at *13 ("it is well established that courts may rely on summaries and need not review actual billing records.") (citations and quotations omitted).

[54] *See Synthroid I*, 325 F.3d at 979-980 (class counsel's efficiency should not be used "to reduce class counsel's percentage of the fund that their work produced.").

regularly began their day with 6:00 A.M. depositions, and then worked through the late afternoon and evening to prepare for the next deposition. Scarlett Decl. at ¶ 8. This remained true even through the height of the pandemic.

Using counsel's current hourly rates to calculate the lodestar (as described more fully in Class Counsel's declarations, *see, e.g.,* Scarlett Decl. at ¶¶ 17-22) results in a 1.8 multiplier. The hourly rates used to calculate this lodestar are reasonable, accepted rates.[55] *See* Scarlett Decl. at ¶ 21 (providing a summary of the mean hourly rates billed by counsel). The 1.8 multiplier does not exceed the bounds of reasonableness, particularly in light of the work performed by Class Counsel prior to this settlement. Indeed, a multiplier of less than two is below the range of multipliers commonly accepted in similar litigation.[56]

## B. Class Counsel should be partially reimbursed for their out-of-pocket expenses.

Under the common fund doctrine, class counsel customarily are entitled to reimbursement of reasonable expenses incurred in the litigation.[57] Thus far, expenses in this litigation have exceeded $9 million. *See* Scarlett Decl. at ¶ 24. Here, Class Counsel seeks reimbursement for $8.75 million to partially reimburse a portion of the costs advanced to support

---

[55] *See In re Auto Parts Antitrust Litig.*, 2018 WL 7108072, at *3 (E.D. Mich. Nov. 5, 2018) ("In national markets, "partners routinely charge between $1,200 and $1,300 an hour, with top rates at several large law firms exceeding $1,400." In specialties such as "antitrust and high-stakes litigation and appeals … [f]or lawyers at the very top of those fields, hourly rates can hit $1,800 or even $1,950."); *see also Spano*, 2016 WL 3791123, at *3 (using similar rates).

[56] *See Standard Iron Works*, 2014 WL 7781572, at *2 (awarding 33 percent of a $163.9 million common fund, and noting that the lodestar multiplier was approximately 1.97, "well within the range of reasonable multipliers awarded in similar contingent cases."); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1015 (E.D. Wis. 2000) (awarding a fee that represented a multiplier of 2.07 on a lodestar cross-check and recognizing that "the mean risk multiplier in cases involving class settlements comparable in size to the present settlement is 2.70.").

[57] *See Synthroid I,* 264 F.3d at 722; Fed. R. Civ. P. 23(h).

this litigation.[58] As with the request for fess, Class Counsel informed class members that they would seek reimbursement of up to $8.75 million as reimbursement for of pocket expenses to advance this litigation. Scarlett Decl. at ¶ 24. A significant portion of Class Counsel's expenses ($7,064,226) relate to the work Plaintiffs' economic experts performed on behalf of the class. The benefits to the class from this expert work are real and substantial. Scarlett Decl. at ¶ 27.

*First*, Plaintiffs' experts conducted in-depth analyses to prove the existence of the overcharge and to show that it passed through the distribution channel. Plaintiffs have submitted the most detailed overcharge analysis among the classes. Plaintiffs' damages expert – Dr. David Sunding – was the only economist who included an annual overcharge model to confirm that class members incurred an overcharge during every year of Plaintiffs' class period.[59] Dr. Sunding also used this model to analyze chicken products by part and demonstrated that the overcharge impacted each of the product types contained in Plaintiffs' class – whole birds and breast meat. This model demonstrates an overcharge to all or nearly all class members through the entire class period.[60]

In addition to breaking out the overcharge model with this incredible level of detail, Dr. Sunding also performed a price-movement analysis and proved that the misconduct resulted in higher prices on a market-wide basis. This analysis showed that movements in the aggregate price for broilers were shared by all products, including the whole birds and breast meat.[61] In

---

[58] In the event of future recoveries, Class Counsel will petition the Court for reimbursement of additional expenses incurred, as well as the remaining $257,062.95 not sought in this motion. Scarlett Decl. at ¶ 24.

[59] *See* Decl. of Dr. David Sunding in Support of End-User Consumer Plaintiffs' Motion for Class Certification, ECF No. 3971-4 (Oct. 30, 2020) at ¶ 8(e).

[60] *Id.* at ¶ 8(e).

[61] *Id.*

addition to these detailed analyses, Dr. Sunding also measured pass-through throughout the consumer distribution chain. To evaluate pass through, EUCPs collected, and Dr. Sunding ran regression models on data reflecting $25 billion in actual purchases and sales in the distribution channel to consumers. This data covered more than 88% of club store commerce and more than half of the retail grocery stores. In every case, Dr. Sunding found positive and statistically significant pass-through rates.[62] Class Counsel believes Dr. Sunding's careful, detailed analysis gave EUCPs leverage in their negotiations with Settling Defendants.

*Second*, Plaintiffs were the only class who decided to bring a rule of reason claim based on Defendants' exchange of detailed pricing and production information through Agri Stats. There is overwhelming documentary evidence in this case that every Defendant submitted detailed pricing and production information to Agri Stats and Defendants used the information they received to raise prices. Plaintiffs believe that this claim increases the likelihood of recovery not least because of the strength of the documentary evidence in support of it. Plaintiffs are the only class who has offered an expert – Dr. Luis Cabral, an economist specializing in competition – who can explain the significance of these voluminous reports to the trier of fact.[63]

Class Counsel paid for the experts to conduct these detailed analyses in anticipation of common arguments raised by defendants in opposition to class certification and at summary judgment. Plaintiffs submitted some of the most robust reports in support of class certification. Undertaking this work added value to the class – by increasing the likelihood of success on the merits, and by creating leverage during settlement negotiations.

---

[62] *Id.* at ¶ 8(f).

[63] *See* Decl. of Dr. Luis Cabral in Support of End-User Consumer Plaintiffs' Motion for Class Certification, ECF No. 3971-3 (Oct. 30, 2020) at ¶¶ 10-11.

Class Counsel's other expenses are common expenses in litigation of this size. Before the COVID-19 pandemic Class Counsel traveled to hearings and depositions, resulting in expenses of $109,958.98. Another large expense ($952,113.64) for Class Counsel was hosting Defendants documents (a significant cost, even after being split among the classes) and hosting Plaintiffs' discovery documents. Scarlett Decl. at ¶ 27. Class Counsel's expenses are described in detail in the declarations and exhibits accompanying this motion. These expenses are in line with other cases of this size and complexity.[64]

**C. The named plaintiffs have expended significant time on this litigation and should be awarded $2,000.**

Finally, Plaintiffs request that each named plaintiff receive a $2,000. Each named plaintiff has spent significant time (40 or more hours) in connection with this case, as their prior declarations detail.[65] As described above (*see* Section II(B)(7)), being a class representative has been no walk in the park for these individuals: discovery has been borderline invasive and depositions – some of which were conducted by named partners appearing on behalf of Defendants – have been grueling. The $2,000 incentive payment compensates class representatives for their time and the intrusion on their privacy. Courts in this district routinely grant incentive payments in similar or larger amounts.[66]

---

[64] *See Silverman*, 739 F.3d at 958 (noting more than $5 million in out-of-pocket expenses were expended over four years, prior to summary judgment).

[65] *See* Exhibit E to Scarlett Declaration, ECF No. 4377-6 (Mar. 1, 2021).

[66] *See Cont'l Ill.*, 962 F.2d at 571 ("Since without a named plaintiff there can be no class action, such compensation as may be necessary[...]"); *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*, 332 F.R.D. 202, 228 (N.D. Ill. 2019) (awarding $5,000).

## V.   CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request the Court grant their request for fees, costs, and incentive awards to each named plaintiff.

DATED: October 27, 2021

By    /s/ Steve W. Berman
        Steve W. Berman

Breanna Van Engelen
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

Shana E. Scarlett
Rio R. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

Brent W. Johnson
Benjamin D. Brown
Daniel H. Silverman
Alison Deich
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone (202) 408-4600
bjohnson@cohenmilstein.com
bbrown@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com

*Interim Co- Lead Counsel for End-User Consumer Plaintiff Class*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on October 27, 2021, a true and correct copy of the foregoing was electronically filed via CM/ECF, which caused notice to be sent to all counsel of record.

By     /s/ Steve W. Berman

            Steve W. Berman