# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | Civil Action No. 1:16-cv-08637 |
| THIS DOCUMENT RELATES TO: *CERTAIN DIRECT ACTION PLAINTIFF CASES* | Judge Thomas M. Durkin<br>Magistrate Judge Jeffrey T. Gilbert |

# MOTION TO PRECLUDE ENFORCEMENT OF
# CERTAIN DEFENDANTS' JUDGMENT SHARING AGREEMENT

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................ ii

BACKGROUND ......................................................................................................... 3

    I.   Defendants' "Judgment Sharing Agreement" ...................................................... 3

    II.  The JSA and Settlement Agreements with the Classes ........................................ 4

    III. Direct Action Plaintiffs' Request to Defendants for Production of the JSA ....................... 6

ARGUMENT .............................................................................................................. 7

    I.   The JSA's J&S Negation Provision Should Be Found Invalid and Unenforceable ........... 7

        A.   Private Antitrust Enforcement and the Role of Joint and Several Liability ............. 7

        B.   The JSA's J&S Negation Provision is Incompatible with the Federal Antitrust Regime ......................................................................................... 10

        C.   The JSA's J&S Negation Provision Violates Section 1 of Sherman Act ............... 14

        D.   The JSA's J&S Negation Provision is Void Under Illinois Law ........................... 15

    II.  The JSA's Settlement Agreement Sharing Provision Should Be Found Unenforceable ................................................................................................ 16

CONCLUSION ........................................................................................................... 17

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019)....................................................................................... 8

*Armstrong v. Bd. of Sch. Dirs.*,
616 F.2d 305 (7th Cir. 1980) ........................................................................... 17

*Beaver v. Country Mut. Ins. Co.*,
95 Ill. App. 3d 1122 (5th Dist. 1981) .............................................................. 10

*Burlington Indus. v. Milliken & Co.*,
690 F.2d 380 (4th Cir. 1982) ............................................................................. 9

*Cali Express, Inc. v. Bermingham*,
2015 WL 13631361 (S.D. Ind. July 20, 2015) ................................................ 16

*City of Atlanta v. Chattanooga Foundry & Pipeworks*,
127 F. 23 (6th Cir. 1903) ................................................................................... 8

*Dunbar v. American Tel. & Tel. Co.*,
87 N.E. 521 (Ill. 1909)..................................................................................... 15

*Elec. Contractors' Ass'n of City of Chi. v. A.S. Schulman Elec. Co.*,
63 N.E.2d 392 (Ill. 1945).................................................................................. 15

*Flintkote Co. v. Lysfjord*,
246 F.2d 368 (9th Cir. 1957) ............................................................................. 9

*Fox Midwest Theaters, Inc. v. Means*,
221 F.2d 173 (8th Cir. 1955) ........................................................................... 14

*Goesel v. Boley Int'l (H.K.) Ltd.*,
738 F.3d 831 (7th Cir. 2013) ........................................................................... 16

*Hasbrouck v. BankAmerica Housing Servs.*,
187 F.R.D. 453 (N.D.N.Y. 1999) .................................................................... 16

*Hawaii v. Standard Oil Co. of Cal.*,
405 U.S. 251 (1972) ........................................................................................... 7

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ........................................................................................... 7

ii

*In re Brand Name Prescription Drugs Antitrust Litigation,*
 1995 WL 221853 (N.D. Ill. 1995) ....................................................... 10

*In re Ins. Brokerage Antitrust Litig.,*
 282 F.R.D. 92 (D.N.J. 2012) ............................................................... 17

*In re Sch. Asbestos Litig.,*
 921 F.2d 1330 (3d Cir. 1990) ............................................................. 17

*Ironshore Speciality Ins. Co. v. Akorn, Inc.,*
 2021 WL 2399997 (N.D. Ill. June 11, 2021)...................................... 10

*Jessup v. Luther,*
 277 F.3d 926 (7th Cir. 2002) .............................................................. 16

*Jewel Tea Co. v. Local Unions,*
 274 F.2d 217 (7th Cir. 1960) .............................................................. 14

*Kelly v. Kosuga,*
 358 U.S. 516 (1959) ............................................................................ 14

*Lawlor v. Nat'l Screen Serv. Corp.,*
 349 U.S. 322 (1955) ............................................................................ 14

*Marion Healthcare, LLC v. Becton Dickinson & Co.,*
 952 F.3d 832 (2020) .............................................................................. 8

*Memorial Hosp. for McHenry Cnty. v. Shadur,*
 664 F.2d 1058 (7th Cir. 1981) ............................................................ 14

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
 473 U.S. 614 (1985) ............................................................................ 13

*Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.,*
 568 F. Supp. 1096 (N.D. Ill. 1983)..................................................... 13

*Paper Sys. Inc. v. Nippon Paper Indus. Co.,*
 281 F.3d 629 (7th Cir. 2002) .................................................... 8, 10, 12

*Paramount Famous Lasky Corp. v. United States,*
 282 U.S. 30 (1930) .............................................................................. 14

*Perez v. Z Frank Oldsmobile, Inc.,*
 223 F.3d 617 (7th Cir. 2000) .............................................................. 10

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
  392 U.S. 134 (1968) ........................................................................... 7

*Platinum Supplemental Ins., Inc. v. Guarantee Trust Life Ins. Co.*,
  989 F.3d 556 (7th Cir. 2021) ............................................................ 13

*Scentura Creations, Inc. v. Long*,
  756 N.E.2d 451 (Ill. App. Ct. 2001) ................................................. 15

*Simpson v. Union Oil Co. of Cal.*,
  377 U.S. 13 (1964) ............................................................................ 13

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981) ....................................................................... 7, 8

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ............................................................... 17

*Wells Fargo Funding v. Draper & Kramer Mortg. Corp.*,
  608 F. Supp. 2d 981 (N.D. Ill. 2009) ................................................ 13

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969) ............................................................................ 7

Statutes

15 U.S.C. § 15 .................................................................................... 12

Pub. L. No. 108–237, § 213(a), 118 Stat. 661 (2004) .......................... 9

Rules

Federal Rule of Civil Procedure Rule 23 ........................................... 15

Other Authorities

ABA Section of Antitrust Law, Antitrust Law Developments (8th ed. 2017) ....................... 9, 12

IIA Phillip E. Areeda, et al., Antitrust Law ¶ 330d (4th 2014) ........................................ 8

Christopher R. Leslie, *Judgment-Sharing Agreements*, 58 Duke L.J. 747 (2009) ................ 1, 2, 8

Manual for Complex Litigation, Fourth, § 13.23 at 178 ........................................... 1, 2

iv

Fourteen of the producer Defendants in these cases have entered into a so-called "Judgment Sharing Agreement" ("JSA") (Exhibit A). The signatories to this agreement include all of the largest producers, and all Defendants that have already acknowledged antitrust violations (Pilgrim's[1] and Tyson[2]), or been indicted for antitrust violations (Claxton and Koch[3]). "A JSA is a contract among antitrust defendants (and potential antitrust defendants) whereby the signatories agree in advance to their relative responsibility for any antitrust damages awarded at trial against any of them." Christopher R. Leslie, *Judgment-Sharing Agreements*, 58 Duke L.J. 747, 755 (2009). Although even a garden-variety JSA may undermine antitrust goals and stabilize cartels, as Professor Leslie contends,[4] with this motion, Certain Direct Action Plaintiffs ("DAPs") contest only two provisions of the Defendants' JSA, which extend well beyond "judgment sharing," and are antithetical to the federal antitrust regime carefully constructed and maintained by Congress.

First, the JSA disables a central element of federal antitrust law: joint and several liability. With joint and several liability, each defendant "is liable for the overcharges on its co-conspirators' sales." Leslie, 58 Duke L.J. at 752. But the JSA Defendants have agreed on language to include in settlement agreements with plaintiffs which would eliminate this: "Settling Plaintiff(s) agrees to reduce the dollar amount collectable from non-Settling Parties pursuant to any Final Judgment

---

[1] *See United States v. Pilgrim's Pride Corp.*, 1:20-cr-00330-RM, No. 58 (D. Colo. Feb. 23, 2021).

[2] *See* News Release, Tyson Foods Inc., Tyson Foods' Statement on Dep't of Justice Indictment in Broiler Chicken Investigation (Jun. 10, 2020); https://www.tysonfoods.com/news/news-releases/2020/6/tyson-foods-statement-department-justice-indictment-broiler-chicken.

[3] *See United States v. Norman W. Fries, Inc. d/b/a/ Claxton Poultry Farms, Koch Foods, Inc.*, 1:21-cr-00168-RM, No. 30 (D. Colo. July 28, 2021).

[4] *See* Leslie, 58 Duke L.J. at 768-84; *see also* Manual for Complex Litigation, Fourth, § 13.23 at 178 (JSAs "create a disincentive for defendants to make available evidence indicating liability on the part of codefendants."). As Professor Leslie observes, "[t]here are sound arguments for why the presence of a JSA between price-fixing defendants could be treated as a relevant plus factor" evidencing the presence of an unlawful agreement among them. Leslie, 58 Duke L.J. at 820.

by a percentage equal to the Settling Party's Sharing Percentage as calculated pursuant to [the JSA] . . . ." JSA § 6(D)(1) (the "J&S Negation Provision"). The JSA Defendants have been able to disable joint and several liability only by unlawfully coordinating with one another—effectively engaging in a group boycott, whereby they have arranged that none of them will settle with a plaintiff unless that plaintiff "agrees" to a contractual unwinding of the normal operation of the federal antitrust law. *See* Leslie, 58 Duke L.J. at 817 (observing "[t]he refusal to settle individually smacks of price-fixing or a group boycott," and identifying a JSA requirement that plaintiffs forego joint and several liability as an "area of concern"). This coordination among Defendants harms plaintiffs, and violates both federal antitrust law and the law of Illinois which governs the JSA.

Second, the JSA provides that each JSA Defendant must provide the others with a copy of any settlement agreement to which a JSA Defendant is a party, within seven days after executing the agreement (the "Settlement Agreement Sharing Provision"). *See* JSA § 6(A). This compact among JSA Defendants to provide one another with a copy of each confidential, non-public settlement agreement with a plaintiff lacks any legitimate justification, puts the Defendants at a competitive advantage *vis-à-vis* each DAP, and discourages settlements.

Recognizing that parts of the JSA might be declared "invalid or unenforceable," the Agreement expressly provides "the remaining provisions shall continue to be fully operative if doing so can be done consistently with effectuating the judgment-sharing purpose of this Agreement . . . ." JSA § 20. For the reasons explained below, the Court should find the J&S Negation and Settlement Agreement Sharing Provisions of the JSA invalid and unenforceable. *See* Manual for Complex Litigation, Fourth, § 13.23 at 178 ("[A]lthough [JSAs] are generally appropriate, the court may refuse to approve or enforce agreements that violate public policy or unfairly prejudice other parties.").

## BACKGROUND

### I.    Defendants' "Judgment Sharing Agreement"

Certain Defendants[5] signed a document dated February 25, 2020 entitled Second Amended Judgment Sharing Agreement, relating to the class actions and direct action lawsuits that have been consolidated under the title *In re Broiler Chicken Antitrust Litigation,* Case No. 1:16-cv-08637 (N.D. Ill.).[6]   The JSA covers: (1) all claims that "allege that the Defendants violated federal and state antitrust laws, as well as other state laws, by conspiring to fix prices of broiler chickens by reducing their production"; (2) all claims that "allege that some of the Defendants conspired to manipulate . . . the Georgia Dock"; and (3) "[t]hose claims, any portions of those claims, and any amendments or additions made to those claims in the future."  JSA § 1.

The JSA provides that "[a]ny Party may settle a Plaintiff Claim, in whole or in part, at any time, whether for monetary or non-monetary consideration and/or for injunctive or other relief." *Id.* § 6(A).  However, only if a Party enters a "Qualified Settlement" shall such party "have no

---

[5]  The following Defendants, through their counsel, signed the JSA (the "JSA Defendants"):  Tyson Foods Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., Tyson Poultry, Inc. (collectively "Tyson"); Pilgrim's Pride Corporation ("Pilgrim's"); Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division), Sanderson Farms, Inc. (Processing Division) (collectively "Sanderson"); Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC, Koch Meats Co., Inc. (collectively "Koch"); Wayne Farms LLC ("Wayne"); Foster Poultry Farms, a California Corporation, Foster Farms, LLC (collectively "Foster Farms"); Perdue Farms, Inc., Perdue Foods LLC (collectively "Perdue"); Mountaire Farms, Inc., Mountaire Farms, LLC, Mountaire Farms of Delaware, Inc. (collectively "Mountaire"); Harrison Poultry, Inc. ("Harrison"); House of Raeford Farms, Inc. ("House of Raeford"); Case Foods, Inc., Case Farms, LLC, Case Farms Processing, LLC (collectively "Case"); Simmons Foods, Inc., Simmons Prepared Foods, Inc. (collectively "Simmons"); Mar-Jac Poultry, Inc., Mar-Jac Holdings, Inc., Mar-Jac Poultry MS LLC, Mar-Jac Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-Jac Poultry, LLC (collectively "Mar-Jac"); and Norman W. Fries, Inc. d/b/a/ Claxton Poultry Farms ("Claxton").

[6]  The JSA amended a previous Judgement Sharing Agreement, dated April 24, 2018 and a First Amended Judgement Sharing Agreement, dated September 10, 2018.  Defendants have not produced either the original or first amended agreement. Thus, Movants do not know the substantive changes made to the multiple versions of the JSA or which Defendants signed the previous agreements.

obligation to pay any portion of any other settlement or Final Judgment . . . with respect to any portion of a Claim disposed of by that Party's Qualified Settlement." *Id.* § 6(B). If a party enters a "Non-Qualified Settlement," the settling party is still considered a Sharing Party liable to other Sharing Parties for the costs of any Claim that was resolved by its Non-Qualified Settlement and "shall remain liable for the amount it would have paid in accordance with . . . this Agreement as if it had not settled." *Id.* § 6(C).

To be a Qualified Settlement, each settlement with a plaintiff must "expressly provide," *inter alia*:

- "Settling Plaintiff(s) agrees to reduce the dollar amount collectable from non-Settling Parties pursuant to any Final Judgment by a percentage equal to the Settling Party's Sharing Percentage as calculated pursuant to [the Agreement] under the assumption that the Settling Party had not settled . . . ." *Id.* § 6(D)(1).

- The JSA Defendants are "third party beneficiaries of the Settlement." *Id.* § 6(D)(3).

The JSA also requires that the signatories promptly provide each other with copies of all settlement agreements with any plaintiff. *Id.* § 6(A). ("A Settling Party shall provide to the other Parties within seven days of execution of any Settlement (i) written notice of any such Settlement, (ii) the identity of each Plaintiff that is a party to the Settlement, and (iii) a copy of the Settlement.").

## II.     The JSA and Settlement Agreements with the Classes

The first Class settlements were with Defendants which did not join the JSA: Fieldale, Amick, George's and Peco. None of the Class settlement agreements with those Defendants contain a J&S Negation Provision. *See* Dkt. Nos. 447-2, 1535, 3324, 3670, 4078-3, and 7078-4; *see also* Dkt. Nos. 4377-2, 4377-3, and 4377-4.

The existence of the JSA was first disclosed publicly on or around February 2, 2021, when the Direct Purchaser Plaintiffs ("DPPs") filed a motion for Preliminary Approval of Settlements with Pilgrim's and Tyson. At that time, the DPP Class stated:

4

> [E]ach Settlement refers to a judgment-sharing agreement among certain Defendants and, consistent with that agreement (per the Settling Defendants), each Settlement removes from the calculation of a damages award resulting from any verdict and Final Judgment DPPs may obtain against any other Defendant who is a signatory to Defendants' judgment-sharing agreement certain amounts intended to reflect the Settling Defendants' approximately proportionate sales of Broilers (Pilgrim's Settlement § 38; Tyson Settlement § 40). Thus, any other such Defendant against whom DPPs obtain a verdict and judgment would not be jointly and severally liable for Tyson or Pilgrim's share of damages removed pursuant to the judgment-sharing agreement resulting from sales to DPP Class.

Dkt No. 4259, at 6-7. Similar language has been included in subsequent memoranda in support of motions for preliminary approval of Class settlements with Harrison and Mar-Jac. Dkt. No. 4921, at 6; Dkt No. 5052, at 7. None of the settlement filings included a copy of the JSA itself.

During the hearing on DPPs' motion for preliminary approval of the Pilgrim's and Tyson settlements, the Court requested clarification regarding the JSA, stating: "There was one . . . part of your motion which I found a little confusing and it's more my fault than yours, but maybe you can explain it to me, . . . relating to any verdict in judgment would not be jointly and severally liable for Tyson and Pilgrim's damages." Hr'g on DPP Mot. for Prelim. Approval, Dkt. No. 4387, at 12:9-14. DPPs' counsel confirmed that "[s]ome of the defendants in the case entered into a joint sharing agreement. And what [DPPs] agreed to do as part of the settlement is to confirm this is a qualified settlement, which means that the … damages for Pilgrim's Pride and Tyson are taken out of any final judgment against the remaining defendants." *Id.* at 12:21-13:1.

The Court invited defense counsel to address the JSA. Citing the Agreement's confidentiality provisions, defense counsel stated the JSA was being "disclosed to the extent necessary to proceed with this settlement" and that the DPPs "acknowledge that they will be forfeiting the right to, effectively, ask for Tyson's share of the damages against other defendants." *Id*. at 14:5-10. Defense counsel then added: "But I'm not entirely comfortable discussing the arrangement here." *Id.* at 14:11-12. After the Court indicated it understood that and Pilgrim's and

Tyson "don't want to be jointly and severally liable for damages [they] already paid out through this settlement," *id.* at 14:17-18, DPP counsel explained the JSA worked "slightly different[ly]" and that "[w]hat it really means is that the percentage of the two settling defendants come out of the damages that we would ask for or be able to ask for against the remaining defendants." *Id.* at 14:21-15:2.

The Classes have now settled with four Defendants which joined the JSA: Tyson, Pilgrim's, Mar-Jac, and Harrison. Each of the Class settlements with these Defendants contain a J&S Negation Provision. *See* Dkt. No. 4259-1 at 30-31, 61-62; Dkt. No. 4377-5 at 28-29; Dkt. No. 4921-1 at 27-28, 42-43; Dkt. No. 5079-1 at 22-23, 58-60, 93-94.

## III. Direct Action Plaintiffs' Request to Defendants for Production of the JSA

After the existence of the JSA was publicly disclosed, certain DAPs served Pilgrim's and Tyson with a request for production of the JSA and it exhibits and appendices. Initially, both Pilgrim's and Tyson refused this request, which required certain DAPs to move to compel production. Dkt. No. 4768. With a motion to compel filed, Pilgrim's and Tyson elected to not contest it, and produced the JSA after "secur[ing] the consent of the other signatories to produce the JSA in order to resolve the dispute underlying the Motion to Compel." Letter from J. Tanski and C. Abbott to Mag. Judge Gilbert (July 8, 2021). Pilgrim's and Tyson originally marked the JSA "Highly Confidential," but after DAPs contested that designation, Tyson produced the JSA with a "Confidential" designation on July 20, 2021, which permits DAP counsel to show the JSA to their clients.[7]

---

[7] Because Defendants designated the JSA as Confidential, it is being filed as a sealed exhibit to this Motion.

## ARGUMENT

This motion does not contend that every judgment sharing agreement is necessarily invalid, or contest the practice of defendants agreeing among themselves how to allocate payment of a judgment (*i.e.*, creating a contractual right of contribution among co-defendants) so long as such an agreement does not alter or limit the remedies available to plaintiffs at trial. Instead, Movants challenge two specific and pernicious features of this particular JSA: the J&S Negation Provision, and the Settlement Agreement Sharing Provision.

## I. The JSA's J&S Negation Provision Should Be Found Invalid and Unenforceable

The JSA's J&S Negation Provision should be found invalid and unenforceable for at least three reasons: (1) it is incompatible with, and has the purpose and effect of undermining, a key part of the federal antitrust regime created and maintained by Congress; (2) it violates Section 1 of the Sherman Act; and (3) it is void under Illinois law as contrary to public policy.

### A. Private Antitrust Enforcement and the Role of Joint and Several Liability

When fashioning federal antitrust law, "Congress had many means at its disposal to penalize violators" and specifically established a scheme "encourag[ing] . . . 'private attorneys general.'" *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972). There has been a "longstanding policy of encouraging vigorous private enforcement of the antitrust laws," *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745 (1977), and the "vindication of rights" in private antitrust suits "supplements federal enforcement and fulfills the objects of the statutory scheme." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 642 (1981). *See also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130-31 (1969) ("[T]he purpose" of creating and encouraging private antitrust lawsuit "was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws."); *Perma Life Mufflers, Inc. v. Int'l Parts*

*Corp.*, 392 U.S. 134, 136 (1968) (reversing court of appeals rulings which "seemed to threaten the effectiveness of the private action as a vital means for enforcing the antitrust policy of the United States"); *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1524 (2019) (rejecting Apple's proffered view of the Sherman Act, which would "contradict the longstanding goal of effective private enforcement and consumer protection in antitrust cases").

The imposition of joint and several liability on antitrust co-conspirators is a central element of this private enforcement regime. *See Tex. Indus.*, 451 U.S. at 646 ("defendants should be jointly and severally liable" in antitrust cases) (citing *City of Atlanta v. Chattanooga Foundry & Pipeworks*, 127 F. 23, 26 (6th Cir. 1903), *aff'd*, 203 U.S. 390 (1906)); *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 839 (2020) ("antitrust liability is joint and several").[8] Under "the rule of joint and several liability, . . . each member of a conspiracy is liable for all damages caused by the conspiracy's entire output." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002) (citing *Tex. Indus.*, 451 U.S. 630). "If [plaintiffs] can prove that there was indeed a conspiracy, they may collect damages not just firm-by-firm according to the quantity each sold, but from all conspirators for all sales." *Id.*; *see also* IIA Phillip E. Areeda, et al., Antitrust Law ¶ 330d (4th 2014) ("Federal antitrust law follows the common law tort doctrine of joint and several liability for co-conspirators or other joint violators. This means that each co-conspirator can be held liable for the entire damage award even if that particular co-conspirator was responsible for only a small portion of the injury."); Leslie, 58 Duke L.J. at 752 (with joint and several liability "each price-fixing firm is liable for the overcharges on its co-conspirators' sales").

---

[8] *Texas Industries, Inc.*, 451 U.S. at 646-47, held that under federal antitrust law defendants have no statutory or common law right to contribution from co-conspirators.

Despite its common law origins, joint and several liability has long been firmly entrenched as part of the federal antitrust regime created and maintained by Congress.  The Ninth Circuit observed more than six decades ago that joint and several liability is both "firmly rooted" and a "well settled principle."  *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 397 (9th Cir. 1957).  Four decades ago the Fourth Circuit explained that joint and several liability "has been the established doctrine of antitrust law for the better part of a century," and that "Congress has not seen fit to disapprove."  *Burlington Indus. v. Milliken & Co.*, 690 F.2d 380, 394 (4th Cir. 1982).

In the years since, Congress has *expressly* embraced the critical role of joint and several liability in the private enforcement of federal antitrust law.  When Congress enacted the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"), a statutory leniency program designed to promote cooperation and full disclosure by antitrust law offenders, it did two specific things with respect to joint and several liability.  First, it specified that one of the statutory inducements to encourage amnesty should be the elimination of joint and several liability for successful leniency applicants.  *See* ACPERA, Pub. L. No. 108–237, § 213(a), 118 Stat. 661 (2004); *see also* ABA Section of Antitrust Law, Antitrust Law Developments 977 (8th ed. 2017) ("ACPERA offers the successful amnesty applicant . . . relief from joint and several liability.").  Second, the statute provided that nothing in the Act "shall be construed to . . . affect, in any way, the joint and several liability of any party to a civil action . . . other than that of the antitrust leniency applicant and cooperating individuals . . . .".  ACPERA § 214 (3).  Thus, ACPERA adopted and reaffirmed the centrality of joint and several liability in private actions brought under federal antitrust law.  In doing so Congress recognized, like the Seventh Circuit, that in the federal antitrust

regime, "[j]oint and several liability is a vital instrument for maximizing deterrence." *Paper Sys.*,

281 F.3d at 633.[9]

### B. The JSA's J&S Negation Provision is Incompatible with the Federal Antitrust Regime

Through the JSA, the Defendants seek to displace joint and several liability as a feature of

federal antitrust law. The JSA is explicit about having joint and several liability as a primary

target, explaining in its Preamble:

> [L]iability in the Broiler Chicken Cases is "joint and several," without the right to seek "contribution" from other Defendants for their respective shares of the total judgment. That means that even if Plaintiffs go to trial against just one (or a small number) of Defendants, such Defendant(s) might have to pay three times the damages found to have been caused by the conduct of all the Defendants, even those that already settled (less any amounts they paid to settle). It also means that if a jury returns a verdict for triple damages and attorneys' fees against multiple Defendants, Plaintiffs can force a single Defendant to pay that entire amount, *i.e.*, three times the damages associated with all of the Defendants' sales, and that single Defendant would have no right to recover any of what it paid from the Defendants who paid nothing.

JSA § 1.

---

[9] Case law adjudicating the validity of judgment sharing agreements is limited, and Movants are unaware of any order addressing the arguments presented here applied to a provision like the J&S Negation Provision. For example, *In re Brand Name Prescription Drugs Antitrust Litigation*, 1995 WL 221853 (N.D. Ill. 1995), addressed a challenge by plaintiffs to the entirety of a judgment sharing agreement (not specific provisions, like here) based on arguments different than those asserted by Movants. *See id.* at *2 ("The plaintiffs contend that the Agreement encourages future intentional violations of the law, provides insurance for future intentional violations of the law, and unreasonably discourages and prevents settlements."). Moreover, *Brand Name* was decided almost a decade before ACPERA was enacted, without the benefit of Congress's reaffirmation of the importance of joint and several liability to private antitrust enforcement. With regard to the issues it did address, *Brand Name* reached some questionable conclusions, including that the agreement was not unlawfully insuring against intentional violations of the law. *Id.,* at *3. "Treble damages are a form of punitive damages," *Perez v. Z Frank Oldsmobile, Inc.*, 223 F.3d 617, 624 (7th Cir. 2000), and contracts insuring against punitive damages "contravene public policy." *Ironshore Speciality Ins. Co. v. Akorn, Inc.*, 2021 WL 2399997, at *8 (N.D. Ill. June 11, 2021) (quoting *Beaver v. Country Mut. Ins. Co.*, 95 Ill. App. 3d 1122, 1124 (5th Dist. 1981)).

To effectuate this goal of disabling joint and several liability the JSA then provides, in what this Motion refers to as the J&S Negation Provision:

> Settling Plaintiff(s) agrees to reduce the dollar amount collectable from non-Settling Parties pursuant to any Final Judgment by a percentage equal to the Settling Party's Sharing Percentage as calculated pursuant to [the Agreement] under the assumption that the Settling Party had not settled . . . *Id.* § 6(D)(1).

The Appendix to the JSA confirms the intent and effect of the J&S Negation provision:

> Because liability under the Sherman Act is joint and several, any defendant found to have violated the Act is potentially responsible for both the damages resulting from its sales <u>and also</u> the damages of its alleged co-conspirators' sales (all trebled). This scenario demonstrates how [the JSA] limits a company's exposure to such joint and several liability. *Id.* App-1 (underlining in original).

The JSA Defendants have been able to disable joint and several liability only by unlawfully coordinating with one another—effectively engaging in a group boycott, whereby they have arranged that none of them will settle with a plaintiff unless that plaintiff "agrees" to a contractual unwinding of the normal operation of the federal antitrust law.  No rational plaintiff would agree to the J&S Negation Provision if it could settle without it.  This obvious fact is confirmed by publicly available information about Class settlements in these cases.  Thus far, eight defendants have settled with one or more Classes.  Four of those defendants are not signatories to the JSA, and no agreement with those defendants has required plaintiff to agree to dismantle joint and several liability.  Four of those defendants are signatories to the JSA.  Each Class settlement with those four defendants has required the settling plaintiffs to forego joint and several liability for any judgment obtained at trial.

*      *      *

The J&S Negation Provision is antithetical to federal antitrust regime in several respects, and should be deemed invalid and unenforceable.

11

First, displacing joint and several liability is directly contrary to the statutory scheme enacted and maintained by Congress. Not only has Congress rejected numerous attempts to eliminate joint and several liability from the federal antitrust regime, but when enacting ACPERA in 2004, Congress expressly reaffirmed its importance. With ACPERA, Congress set out the one and only way to avoid joint and several liability: a successful amnesty application. The JSA runs directly counter to the overall structure for private antitrust enforcement under the federal antitrust regime—and could undermine the very goals of ACPERA by allowing wrongdoers to minimize or avoid joint and several penalties without having to cooperate and make full disclosures to the Department of Justice. *See* ABA Section of Antitrust Law, Antitrust Law Developments 757 (8th ed. 2017) ("The potential impact of joint and several liability in antitrust cases was deemed sufficiently significant by the Antitrust Division of the Department of Justice that its disallowance plays a major role in the collection of benefits to applicants to the division's leniency program.").

Second, the J&S Negation Provision interferes with the goal of deterring antitrust violations. As the Seventh Circuit has observed, "[j]oint and several liability is [a] . . . vital instrument for maximizing deterrence." *Paper Sys.*, 281 F.3d at 633. If defendants are permitted to use the pretext of "judgment sharing" to displace joint and several liability, a critical source of deterrence will be undermined.

Third, permitting enforcement of the JSA's J&S Negation Provision would result in under-enforcement of penalties with respect to the specific conduct at issue in these cases. Under established federal law, if liability is established at trial, the victims are entitled to, *inter alia*, both

joint and several liability and treble damages.  The JSA improperly seeks to strip away a vital part of the statutory remedial scheme.[10]

Fourth, the JSA's J&S Negation Provision makes settlements more difficult.  The provision leaves each plaintiff with a choice: as a practical matter, plaintiffs must forego settlement with *any* JSA Defendant or accede to the J&S Negation Provision.  Although some settlements have occurred despite the presence of the Provision, it unquestionably makes settlement more complicated.  Moreover, some DAPs which have settled with JSA Defendants and acceded to inclusion of the J&S Negation language insisted upon by the JSA Defendant have done so with the intention of seeking to preclude enforcement of the J&S Negation Provision through this Motion.

The Supreme Court has confirmed that courts can void agreements incompatible with the federal antitrust regime, explaining it would have "little hesitation in condemning [an] agreement" as "against public policy" if it prospectively waived the remedies available to a victim of an antitrust violation.  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985); *see also Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 18 (1964) (considering that government interests "frequently override arrangements that private parties make" and an otherwise lawful agreement "must give way before the federal antitrust policy"); *Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.*, 568 F. Supp. 1096, 1099 (N.D. Ill. 1983) (finding an agreement unenforceable where it "would undermine the public policy expressed in the antitrust laws by permitting enforcement of a contract detrimental to competition and therefore the public good").

---

[10] The disabling of joint and several liability not only reduces single damages to which a prevailing plaintiff is entitled under the statutory scheme, but also deprives that plaintiff of treble damages to which it is automatically entitled under federal antitrust law.  *See* 15 U.S.C. § 15.

C.     **The JSA's J&S Negation Provision Violates Section 1 of Sherman Act**

In addition to its incompatibility with the structure and goals of federal antitrust law, the J&S Negation Provision is also itself a violation of Section 1 of the Sherman Act, which prohibits all agreements unreasonably restraining trade or commerce.

Settlement agreements are commercial resolutions of legal disputes. *See Wells Fargo Funding v. Draper & Kramer Mortg. Corp.*, 608 F. Supp. 2d 981, 993 (N.D. Ill. 2009) ("Contracts, including settlement agreements, have to be read in the context of the parties' dealings and commercial reality."); *Platinum Supplemental Ins., Inc. v. Guarantee Trust Life Ins. Co.*, 989 F.3d 556, 563 (7th Cir. 2021) ("Under Illinois law, 'a settlement agreement is considered a contract, and construction and enforcement of settlement agreements are governed by principles of contract law.'"). As with any other commercial transaction, anticompetitive conduct by one party to the transaction can distort the negotiation process, and injure both the counterparty and the public. *Cf. Jewel Tea Co. v. Local Unions*, 274 F.2d 217, 223 (7th Cir. 1960) ("Private [antitrust] suits are merely a vehicle intended to further enforce t[he] antitrust laws for the benefit of the real party in interest, the public."); *Memorial Hosp. for McHenry Cnty. v. Shadur*, 664 F.2d 1058, 1063 (7th Cir. 1981) (noting the "public interest in private enforcement of federal antitrust law"); *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955) (noting "the public interest in vigilant enforcement of the antitrust laws" through private lawsuits).

That is precisely what happened here: the JSA Defendants got together and agreed among themselves to impose terms on settling plaintiffs that none of the JSA Defendants would have been able to impose on any plaintiff absent the coordination and pact among the JSA Defendants. They violated Section 1 of the Sherman Act when they agreed to include the J&S Negation Provision in the JSA, and when enforcing that provision in settlement negotiations with plaintiffs. *Cf. Paramount Famous Lasky Corp. v. United States*, 282 U.S. 30 (1930) (agreement among

14

competitors to harmonize contracts terms with third-parties violated Section 1 of Sherman Act); *Fox Midwest Theaters, Inc. v. Means*, 221 F.2d 173, 180 (8th Cir. 1955) (finding agreement void against public policy, and observing that a release provision imposed by defendants could "itself serve as a contract 'in restraint in trade'"); *see also Kelly v. Kosuga*, 358 U.S. 516, 521 (1959) (an agreement unlawful under the Sherman Act "could not be enforced by a court").[11]

### D. The JSA's J&S Negation Provision is Void Under Illinois Law

The JSA provides it "shall be construed and enforced in accordance with the laws of the State of Illinois without regard to its choice of law or conflict of laws principles." JSA § 23. In Illinois, "[a]s a general rule, courts will not enforce a private agreement that is contrary to public policy." *Scentura Creations, Inc. v. Long*, 756 N.E.2d 451, 457 (Ill. App. Ct. 2001). "In determining whether an agreement violates public policy, the courts must determine whether the agreement is capable of producing harm such that its enforcement would be contrary to the public interest." *Id.* "The power by which courts may declare a contract void as against public policy is far-reaching." *Elec. Contractors' Ass'n of City of Chi. v. A.S. Schulman Elec. Co.*, 63 N.E.2d 392, 395 (Ill. 1945).

For the same reasons the J&S Negation Provision is incompatible with federal antitrust law, it is also contrary to Illinois law, which long ago determined that "[a]ll agreements and contracts tending to . . . prevent proper competition are by the common law illegal and void." *Dunbar v. American Tel. & Tel. Co.*, 87 N.E. 521, 533 (Ill. 1909).

---

[11] The JSA Negation Provision violates Section 1 of the Sherman Act, whether evaluated under the rule of reason or as a per se violation.

## II.    The JSA's Settlement Agreement Sharing Provision Should Be Found Unenforceable

The JSA's requirement that the signatories promptly provide each other with full copies of all settlement agreements with any plaintiff should also be found invalid and unenforceable.  *See* JSA § 6(A). ("A Settling Party shall provide to the other Parties within seven days of execution of any Settlement (i) written notice of any such Settlement, (ii) the identity of each Plaintiff that is a party to the Settlement, and (iii) a copy of the Settlement.").

Settlement agreements are typically considered confidential by the parties, unless they are required to be publicly disclosed—*e.g.*, when courts must approve a settlement, as under Federal Rule of Civil Procedure Rule 23.

It is widely recognized that the confidentiality of settlement agreements encourages settlements.  *See*, *e.g.*, *Cali Express, Inc. v. Bermingham*, 2015 WL 13631361, at *3 (S.D. Ind. July 20, 2015) (noting "the strong federal policy favoring settlements and encouraging them through maintaining the confidentiality of negotiations and agreements"); *Hasbrouck v. BankAmerica Housing Servs.*, 187 F.R.D. 453, 458 (N.D.N.Y. 1999) ("[P]rotecting the confidentiality of the settlement agreement promotes the important public policy of encouraging settlements").  Accordingly, many courts refuse to require the production of settlement agreements.  *See, e.g., Jessup v. Luther*, 277 F.3d 926, 928 (7th Cir. 2002) (settlement agreements are "private documents"); *Goesel v. Boley Int'l (H.K.) Ltd.*, 738 F.3d 831, 834 (7th Cir. 2013) ("If . . . the settlement is made without any court action . . . there will rarely be a good reason to require that its terms be made public, because making them public would not reveal anything about judicial activity.").

Here, the JSA Defendants have collectively agreed they will promptly exchange settlement agreements with one another, without any valid justification.

As with the J&S Negation Provision, the JSA Defendants have imposed the Settlement Agreement Sharing Provision on DAPs by unlawfully coordinating with one another, when no rational DAP would agree to such a provision if it could settle without it. Allowing all JSA Defendants to know the confidential terms a given DAP has entered into with a given JSA Defendant puts that DAP at a disadvantage if and when the DAP subsequently negotiates with another JSA Defendant. This is both unfair, and discourages DAPs from negotiating and entering into settlements with JSA Defendants. It is also inconsistent with the federal antitrust regime, frustrates the federal policy of encouraging settlement of antitrust cases,[12] and contrary to Illinois public policy. Accordingly, the Settlement Agreement Sharing provision should be found invalid and unenforceable.

## <u>CONCLUSION</u>

Movants respectfully request that the Court issue an order finding the J&S Negation Provision is invalid and unenforceable, and finding the Settlement Agreement Sharing Provision invalid and unenforceable from the date of the Court's order forward.

---

[12] *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117-18 (2d Cir. 2005) ("[f]ederal antitrust cases are complicated, lengthy, and bitterly fought" and "[t]he compromise of complex litigation is encouraged by the courts and favored by public policy"); *see also In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 102 (D.N.J. 2012) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."); *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1333 (3d Cir. 1990) (noting the "policy of encouraging settlement of complex litigation that otherwise could linger for years"); *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement.").

Dated: October 28, 2021

Respectfully submitted,

/s/ *Scott E. Gant*

Scott E. Gant
Jonathan M. Shaw
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC  20005
Tel: (202) 237-2727
Fax: (202) 237-6131
E-mail: sgant@bsfllp.com
　　　jshaw@bsfllp.com

Colleen A. Harrison
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8204
Fax: (914) 749-8300
E-mail: charrison@bsfllp.com

Ryan T. McAllister
BOIES SCHILLER FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, NY 12207
Tel: (518) 434-0600
Fax: (518) 434-0665
E-mail: rmcallister@bsfllp.com

*Counsel for Plaintiffs Amory Investments LLC, Campbell Soup Company, Campbell Soup Supply Company, L.L.C., John Soules Foods, Inc., John Soules Acquisitions LLC, Sysco Corp., Target Corp., and US Foods, Inc.*

/s/ *Philip J. Iovieno*
Philip J. Iovieno
Nicholas A. Gravante, Jr.
Karen C. Dyer
Lawrence S. Brandman
Jack G. Stern
Gillian Groarke Burns
Mark A. Singer
Elizabeth R. Moore
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Tel: (212) 504-6000
Fax: (212) 504-6666
E-mail: philip.iovieno@cwt.com
        nicholas.gravante@cwt.com
        karen.dyer@cwt.com
        lawrence.brandman@cwt.com
        jack.stern@cwt.com
        gillian.burns@cwt.com
        mark.singer@cwt.com
        elizabeth.moore@cwt.com

*Counsel for Plaintiffs Jetro Holdings, LLC; BJ's Wholesale Club, Inc.; Maximum Quality Foods, Inc.; Sherwood Food Distributors, L.L.C.; Harvest Meat Company, Inc.; Western Boxed Meat Distributors, Inc.; Hamilton Meat, LLC; Darden Restaurants, Inc.; PJ Food Service, Inc.; Feeser's Inc.; Thurston Foods, Inc.; McDonald's Corporation; Costco Wholesale Corporation; Gordon Food Service, Inc.; Glazier Foods Company; Wood-Fruitticher Grocery Company, Inc.; Aramark Food and Support Services Group, Inc.; Poultry Products Company of New England LLC; Panda Restaurant Group, Inc.; and Quality Supply Chain Co-op, Inc., and Co-Counsel for Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC*

Stuart H. Singer
Sabria A. McElroy
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 356-0011
E-mail: ssinger@bsfllp.com
        smcelroy@bsfllp.com

Anne M. Nardacci
BOIES SCHILLER FLEXNER LLP
30 South Pearl Street
Albany, NY 12207
Tel: (518) 434-0600
Fax: (518) 434-0665
E-mail: anardacci@bsfllp.com

*Co-Counsel for Plaintiffs Jetro Holdings, LLC; BJ's Wholesale Club, Inc.; Maximum Quality Foods, Inc.; Sherwood Food Distributors, L.L.C.; Harvest Meat Company, Inc.; Western Boxed Meat Distributors, Inc.; Hamilton Meat, LLC; Darden Restaurants, Inc.; PJ Food Service, Inc.; Costco Wholesale Corporation; Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC*

/s/ *Patrick J. Ahern*
Patrick J. Ahern
Theodore B. Bell
Ahern & Associates, P.C.
Willoughby Tower
8 South Michigan Avenue
Suite 3600
Chicago, Illinois 60603
Tel: (312) 404-3760
Email: patrick.ahern@ahernandassociatespc.com

*Counsel for Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC; and Kraft Heinz Foods as to <u>CA Number 3572</u>*

*/s/ Gregory J. Casas*
GREENBERG TRAURIG, LLP
Gregory J. Casas (admitted *pro hac vice*)
Texas Bar No. 00787213
300 W. 6th Street, Suite 2050
Austin, TX 78701
T: 512-320-7238
F: 512-320-7210
casasg@gtlaw.com

Dominic E. Draye (admitted *pro hac vice*)
Arizona Bar No. 033012
2375 East Camelback Road, Suite 700
Phoenix, AZ 85016
T: 602-445-8000
F: 602-445-8100
drayed@gtlaw.com

Thomas E. Dutton
Illinois Bar No. 6195923
John F. Gibbons
Illinois Bar No. 6190493
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
T: 312-476-5057
F: 312-456-8436
duttond@gtlaw.com
gibbonsj@gtlaw.com

Becky Leigh Caruso (admitted *pro hac vice*)
New Jersey Bar No. 015622008
500 Campus Drive, Suite 400
Florham Park, NJ 07932
T: 609-442-1196
carusob@gtlaw.com

*Attorneys for Services Group of America, Inc.*

/s/ *Kathryn A. Reilly*
Kathryn A. Reilly
Judith P. Youngman
WHEELER TRIGG O'DONNELL LLP 370
Seventeenth Street, Suite 4500
Denver, Colorado 80202
Tel: (303) 244-1800
Fax: (303) 244-1879
Email: Reilly@wtotrial.com
Youngman@wtotrial.com

*Counsel for Plaintiffs McLane Company, Inc.;*
*McLane/Mid-Atlantic, Inc.; McLane/Midwest,*
*Inc.; McLane Minnesota, Inc.; McLane New*
*Jersey, Inc.; McLane/Eastern, Inc.;*
*McLane/Suneast, Inc.; McLane Ohio, Inc.;*
*McLane/Southern, Inc.; McLane/Western,*
*Inc.; McLane Express, Inc.; Kinexo, Inc.;*
*McLane Foodservice Distribution, Inc.,*
*McLane Foodservice, Inc.*

/s/*Yonaton Rosenzweig*
KATTEN MUCHIN ROSENMAN LLP
Yonaton M. Rosenzweig
Floyd A. Mandell
Catherine E. O'Brien
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661-3693
Tel: (312) 902-5235
Fax: (312) 902-1061
floyd.mandell@katten.com
jeffrey.wakolbinger@katten.com
catherine.obrien@katten.com

Yonaton M. Rosenzweig
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, California 90034
Tel: (310) 788 4460
Fax: (310) 712 8222
yoni.rosenzweig@katten.com

*Attorneys for Plaintiffs Carl Buddig & Co. Inc.*
*and Caesars Enterprise Services LLC*

20

*/s/ David C. Eddy*
ANTITRUST LAW GROUP, LLC
David C. Eddy, Esquire
N.D. Illinois Bar No. 72258
Dennis J. Lynch, Esquire
N.D. Illinois Bar No. 07622
1601 Assembly Street
P.O. Box 8117
Columbia, South Carolina 29202
Telephone: (803) 253-8267
Email: deddy@theantitrustlawgroup.com
Email: dlynch@theantitrustlawgroup.com

*Counsel for Plaintiffs Conagra Brands, Inc.;
Pinnacle Foods, Inc.; Kraft Heinz Foods
Company; Nestlé USA, Inc.; and, Nestlé
Purina PetCare Company*

*/s/ Jay B. Shapiro*
Jay B. Shapiro
Samuel O. Patmore
Carlos J. Canino
Abigail G. Corbett
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Tel:     305.789.3200
Fax:     305.789.3395
Email:   jshapiro@stearnsweaver.com
         spatmore@stearnsweaver.com
         ccanino@stearnsweaver.com
         acorbett@stearnsweaver.com
Marvin A. Miller
Andrew Szot
Miller Law LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Tel:     312.332.3400
Fax:     312.676.2676
Email: mmiller@millerlawllc.com
aszot@millerlawllc.com

*Counsel for Quirch Foods, LLC, Independent
Purchasing Cooperative, Inc. and Supply
Management Services, Inc.*

*/s/ Paul J. Ripp*
Paul J. Ripp
Tom J. Morel
WILLIAMS & JOHN LTD.
233 S. Wacker Drive, Suite 6800
Chicago, IL 60606
Telephone: (312) 443-3200
Facsimile: (312) 630-8500
Email:    pjr@willmont.com
          tjm@willjohnlaw.com

W. Lawrence Deas
LISTON & DEAS PLLC
605 Crescent Boulevard, Suite 200
Ridgeland, MS 39157
Telephone: (601) 981-1636
Fax: (601) 982-0371
Lawrence@listondeas.com

Michael Gratz, Jr.
GRATZ & GRATZ, P.A.
312 N. Green Street
Tupelo, MS 38804
Tel.: (662) 844-5531
Fax: (662) 844-8747
Email: michael@gratzandigatz.com

*Counsel for Plaintiffs L. Hart, Inc.; R & D
Marketing, LLC; Timber Lake Foods, Inc.;
EMA Foods Co., LLC; and Red Bird Farms
Distribution Company*

/s/ Lori P. Lustrin
Robert W. Turken
Lori P. Lustrin
Scott N. Wagner
BILZIN SUMBERG BAENA
PRICE & AXELROD LLP
1450 Brickell Avenue
Suite 2300
Miami, Florida 33131-3456
Tel: (305) 374-7580
Fax: (305) 374-7593
E-mail: rturken@bilzin.com
llustrin@bilzin.com
swagner@bilzin.com

*Counsel for Plaintiffs Shamrock Foods
Company, United Food Service, Inc., Boston
Market Corporation, Bojangles' Restaurants,
Inc. and Bojangles Opco, LLC, WZ Franchise
Corporation, Zaxby's Franchising LLC,
Barbeque Integrated, Inc. d/b/a Smokey
Bones Bar & Fire Grill, FIC Restaurants, Inc.
d/b/a Friendly's, The Johnny Rockets Group,
Inc., Golden Corral Corporation, White
Castle Purchasing Co., Cracker Barrel Old
Country Store, Inc., CBOCS Distribution,
Inc., Captain D's LLC, El Pollo Loco, Inc.,
Domino's Pizza LLC, and Domino's Pizza
Distribution LLC*

/s/ David B. Esau
David B. Esau
Kristin A. Gore
Garth T. Yearick
Amanda R. Jesteadt
CARLTON FIELDS, P.A.
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida 33401
Tel: (561) 659-7070
Fax: (561) 659-7368
desau@carltonfields.com
kgore@carltonfields.com
gyearick@caarltonfields.com
ajesteadt@carltonfields.com

*Counsel for Direct Action Plaintiffs United
Supermarkets, LLC; Krispy Krunchy Foods,
LLC; Cheney Bros. Inc.; Hooters of America,
LLC; Checkers Drive-In Restaurants Inc.;
Restaurants of America, Inc.. et al.; Anaheim
Wings, LLC et al.; Bob Evans Farms, Inc.;
The Fresh Market, Inc.; Wawa, Inc.;
Restaurant Services, Inc.; Cajun Operating
Company d/b/a Church's Chicken; Sonic
Industries Services Inc.; Buffalo Wild Wings,
Inc.; CKE Restaurants Holdings, Inc.; Focus
Brands, LLC; The Cheesecake Factory
Incorporated; Whatabrands LLC; and
Whataburger Restaurants LLC.*

*/s/ Eric R. Lifvendahl*
L&G LAW GROUP
Eric R. Lifvendahl
175 W. Jackson Boulevard, Suite 950
Chicago, IL 60604
Tel: (312) 364-2500
E-mail: elifvendahl@lgcounsel.com

KAPLAN FOX & KILSHEIMER, LLP
Robert N. Kaplan
Gregory K. Arenson
Jeffrey P. Campisi
Matthew P. McCahill
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
E-mail: rkaplan@kaplanfox.com
Email: garenson@kaplanfox.com
E-mail: jcampisi@kaplanfox.com
E-mail: mmccahill@kaplanfox.com

THE COFFMAN LAW FIRM
Richard L. Coffman
3355 West Alabama, Suite 240
Houston, TX 77098
Tel: (713) 528-6700
E-mail: rcoffman@coffmanlawfirm.com

MARCUS & SHAPIRA LLP
Bernard D. Marcus
Moira Cain-Mannix
Erin Gibson Allen
One Oxford Center, 35th Floor
Pittsburgh, PA 15219
Tel: (412) 471-3490
E-mail: marcus@marcus-shapira.com
E-mail: cain-mannix@marcus-shapira.com
E-mail: allen@marcus-shapira.com

CERA LLP
Solomon B. Cera
595 Market Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 777-2230
E-mail: scera@cerallp.com

CERA LLP
C. Andrew Dirksen
800 Boylston Street, 16th Floor
Boston, MA 02199
Tel: (857) 453-6555
E-mail: cdirksen@cerallp.com

HAYNSWORTH SINKLER BOYD P.A.
Manton M. Grier
Elizabeth H. Black
Mary C. Eldridge
1201 Main Street, 22nd Floor
Columbia, SC 29201-3226
Tel: (803) 540-7753
E-mail: mgrier@hsblawfirm.com
E-mail: eblack@hsblawfirm.com
E-mail: meldridge@hsblawfirm.com

*Counsel for Action Meat Distributors, Inc.;
Affiliated Foods, Inc.; Alex Lee, Inc./Merchants
Distributors, LLC; Associated Food Stores,
Inc.; Associated Grocers of New England, Inc.;
Associated Grocers, Inc.; Bashas' Inc.; Big Y
Foods, Inc.; Brookshire Grocery Company;
CBBC Opco, LLC d/b/a Colorado Boxed Beef;
Certco, Inc.; Columbia Meats, Inc.; Fareway
Stores, Inc.; Giant Eagle, Inc.; Greenville
Meats, Inc.; Howard Samuels as Trustee in
Bankruptcy for Central Grocers, Inc.; Ira
Higdon Grocery Company, Inc.; King Solomon
Foods, Inc.; Latina Boulevard Foods, LLC;
Nicholas & Co., Inc.; Pacific Food
Distributors, Inc.; Piggly Wiggly Alabama
Distributing Co., Inc.; S&S Trading, LLC;
Schnuck Markets, Inc.; Springfield Grocer Co.
(d/b/a SGC Foodservice); The Distribution
Group, Inc. (d/b/a Van Eerden Foodservice
Company); The Golub Corporation; Topco
Associates, LLC; Troyer Foods, Inc.; URM
Stores, Inc.; W. Lee Flowers & Company, Inc.;
Weinstein Wholesale Meats, Inc.; and
Woodman's Food Market, Inc.*

/s/ *David P. Germaine*
Paul E. Slater
Joseph M. Vanek
David P. Germaine
John P. Bjork
SPERLING & SLATER, P.C.
55 West Monroe Street
Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
E-mail:PES@Sperling-law.com
JVanek@Sperling-law.com
DGermaine@Sperling-law.com
JBjork@Sperling-law.com

Phillip F. Cramer
Ryan T. Holt
SHERRARD ROE VOIGT & HARBISON, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
Tel: (615) 742-4200
E-mail:pcramer@srvhlaw.com
rholt@srvhlaw.com

*Counsel for Plaintiffs Associated Grocers of the South, Inc., Meijer, Inc., Meijer Distribution, Inc., OSI Restaurant Partners, LLC, Publix Super Markets, Inc., Supervalu Inc.; Unified Grocers, Inc.; Associated Grocers of Florida, Inc.; and Wakefern Food Corp.*

/s/ *William J. Blechman*
William J. Blechman
Kevin Murray
Douglas Patton
Samuel Randall
Michael Ponzoli
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
Fax: (305) 372-1861
E-mail:wblechman@knpa.com
kmurray@knpa.com
dpatton@knpa.com
srandall@knpa.com
mponzoli@knpa.com

*Counsel for Plaintiffs The Kroger Co., Albertsons Companies, Inc., Hy-Vee, Inc., Save Mart Supermarkets, and Pollo Operations, Inc.*

24