**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION, | Case No.: 1:16-cv-08637 |
| | The Honorable Thomas M. Durkin |
| This Document Relates To: | Magistrate Judge Jeffrey T. Gilbert |
| All Actions | |

**CLASS PLAINTIFFS' POSITION ON FURTHER MODIFICATIONS TO**
**SCHEDULING ORDER NO. 16**

Direct Purchaser Plaintiffs, Commercial and Institutional Indirect Purchaser Plaintiffs, and End-User Consumer Plaintiffs hereby submit their position on further modifications to Scheduling Order No. 16 (ECF No. 4748):

**INTRODUCTION**

Over a month ago, to accommodate the Court's October 15, 2021 Order (ECF No. 5128) vacating its earlier bid-rigging bifurcation Order, Track 1 Plaintiffs offered Defendants an extension of virtually all deadlines in Scheduling Order No. 16, including 45-day extensions for Defendants to depose Plaintiffs' merits experts, and for Defendants to disclose their affirmative and rebuttal merits expert reports. (ECF No. 5173-5.) During this time, Defendants have refused to discuss Track 1 Plaintiffs' reasonable proposal. Any uncertainty that might have resulted from the lag time between the Court's October 15 Order and the November 12 deadline for Plaintiffs to elect Track 1 is no more. Defendants now know the identity of every Track 1 Plaintiff. AWG is the only Track 1 DAP who did not previously disclose merits expert reports by August 31, and Defendants already received 45 extra days to account for this additional disclosure, which is taking place on December 20. (Exhibit A, Nov. 30, 2021 E-mail from D. Owen.) Given the likely

564149.4

substantial overlap with Class Plaintiffs' and the other Track 1 DAPs' merits expert reports, Defendants have adequate time with AWG's experts' reports to depose AWG's experts by the already extended January 21, 2022 deadline. In any event, AWG's election certainly is no reason to penalize the other Track 1 Plaintiffs by delaying their cases. If Defendants legitimately require additional time to depose AWG's merits experts, the parties can reasonably accommodate that in the schedule, without upending it entirely.

Defendants attempt to sow confusion where none exists, and to delay Track 1 indefinitely by refusing to discuss the Track 1 schedule without first receiving answers to so-called "threshold questions." Defendants demand that all Track 1 Plaintiffs voluntarily dismiss any bid-rigging allegations, agree to introduce no evidence of bid rigging at a Track 1 trial, and agree to amend any complaints to remove any bid-rigging allegations.[1] But Defendants' threshold demands are found nowhere in the Court's October 15 Order or any other order, and should not delay the case schedule. The Court's October 15 Order vacating its prior bifurcation order contained no such requirements as Defendants now demand. Instead, the Court again emphasized that its "prohibition on *discovery* into bid rigging during the first track should not be construed as a ruling on whether Plaintiffs may use evidence of bid rigging they already possess or that is publicly available in a trial on the supply reduction and Georgia Dock conspiracies." (ECF No. 5128 at 4 n.2.) The plain language of this Order belies Defendants' misconstruction of it. If the Court intended to require Track 1 Plaintiffs to waive allegations and claims of bid rigging, it could have done so, but did not. Instead, the Court emphasized that it is prohibiting only *discovery* into bid rigging, and

---

[1] DPPs, CIIPPs, and EUCPs claim that Defendants stabilized the supply and price of broiler chicken in violation of the antitrust laws, and that they carried out their conspiracy in various ways. It is inaccurate to refer to separate supply restriction, Georgia Dock, and bid-rigging allegations as separate claims, though the Court and the parties sometimes have used the term "claims" in describing those methods of the conspiracy.

expressly reserved ruling on whether Track 1 Plaintiffs may use evidence of bid rigging during a Track 1 trial.

## ARGUMENT

**A.    The Court Should Adopt Plaintiffs' Proposed Schedule for Track 1 Actions**

**1.    Plaintiffs' proposed schedule ensures these cases remain on track by equitably extending all but one of the remaining deadlines by 45 days.**

Over a month ago, Track 1 Plaintiffs provided Defendants with their Proposed Scheduling Order No. 17 for Track 1 Actions. This proposed schedule would fairly extend all deadlines left untouched by the Court's November 10 Order, ECF No. 5178, providing Defendants with 45-day extensions to depose Plaintiffs' merits experts and disclose their affirmative and rebuttal merits expert reports. (ECF No. 5173-5.) The only deadline Plaintiffs did not propose to extend is the January 3, 2022 stay on depositions of DOJ-requested witnesses and topics, which is tied to the ongoing criminal trial, not to the Court's October 15 Order creating separate tracks for case management purposes. (*Id.*) This equitable solution accounts for the additional 45 days Defendants subsequently received for two of their upcoming deadlines (ECF No. 5178) while maintaining the longstanding spacing between deadlines in this case.

Extending the remaining deadlines in Scheduling Order No. 16 by 45 days is also a practical way to accommodate the Court's October 15, 2021 Order. That Order does not necessitate wiping the slate clean and constructing a new schedule for Track 1 Actions. The situation now is similar to the posture of the case after the Court entered its now vacated September 22, 2020 Order on bifurcation and when the parties agreed to Scheduling Order No. 16 in June 2021. Prior to the Court's October 15 Order, the Court stayed discovery into bid rigging until the allegations on the market manipulation method of the conspiracy were resolved. (ECF No. 3836 at 6–7.) Now, with the Court having established a Track 1 that will go to trial on the supply reduction and Georgia

Dock allegations without additional discovery into bid rigging, the situation is functionally similar. The Court's October 15 Order, like its September 22, 2020 Order, left open the possibility that "Plaintiffs may use evidence of bid rigging they already possess or that is publicly available in a trial on the supply reduction and Georgia Dock conspiracies." (*Compare* ECF No. 3835 at 7–8, *with* ECF No. 5128 at 4 n.2.) There is thus no need for an entirely new schedule, and there is similarly no reason to postpone the entry of Track 1 Plaintiffs' Proposed Scheduling Order No. 17 for Track 1 Actions when a 45-day extension to the remaining deadlines will allow these cases to move forward without further delay. (Exhibit B, Proposed Scheduling Order No. 17 for Track 1 Actions, ECF No. 5173-5.)

> **2.** **Defendants have not put forth any proposal for a Track 1 schedule and are instead seeking to manufacture an open-ended impasse.**

Defendants have refused to discuss modifications to the remaining deadlines in Scheduling Order No. 16 with Track 1 Plaintiffs. While Defendants offered to meet and confer on November 23 about the schedule, it became clear they never intended to discuss it. At the outset of the parties' conference, Defendants said they would not consider the schedule for Track 1 actions before Plaintiffs answered several so-called "threshold questions." Defendants had Track 1 Plaintiffs' proposed schedule for approximately one month by that time and at no point prior to the November 23 conference did they raise these "threshold questions" with Track 1 Plaintiffs. These "threshold questions" were also conspicuously absent from Defendants' motion for an extension of time to file the joint report on the Track 1 schedule to "accommodate the holidays," which they filed one working day earlier. Defendants also made no mention of these "threshold questions" when they asked Track 1 Plaintiffs to agree to a 10-day extension to file a joint report regarding the schedule to "accommodate the holidays." And of course these threshold questions did not prevent Defendants from previously stipulating to the operative Scheduling Order No. 16.

The "threshold questions" that Defendants sprung on Plaintiffs during the parties' November 23 conference are merely manufactured impediments to negotiating a schedule for Track 1 actions, as detailed in Section B below. More importantly, they are not genuine obstacles to setting a schedule now.

- Defendants effectively claim they are entitled to have all Track 1 actions on precisely the same schedule. They are not. Since shortly after the first DAP case was reassigned as related, the Court has created accommodations in the schedule to allow newly reassigned DAPs to "catch up" to the classes. (ECF No. 5173 at 7.) A reasonable accommodation to account for the later disclosure of AWG's merits experts' reports, if one is even necessary, would be consistent with the Court's prior case management decisions allowing DAPs to "catch up" to Class Plaintiffs and would permit the Track 1 case to continue to move forward.

- Defendants contend they are entitled to "file an omnibus response" to the Track 1 Plaintiffs' merits experts' reports. (Exhibit C, Nov. 30, 2021 Ltr. from J. Stupar at 6.) Neither the Rules of Civil Procedure, nor the law, nor the principles of fairness entitle Defendants to delay the progress of multiple cases consolidated for pre-trial discovery until they receive every party's expert report so that their expert can file a single response. In fact, the Class Plaintiffs vociferously objected to the filing of one "omnibus" defense report opposing class certification as failing to delineate which criticism was directed at which class. Notwithstanding, with AWG disclosing its merits expert reports on December 20, they should be able to do so by the recently extended January 31, 2022 deadline. Again, if they cannot, then the parties can agree to, or the Court can order, a reasonable accommodation that enables Defendants to file a supplemental response relating only to AWG's merits experts.

- Defendants purport to "need AWG's expert report(s) (and positions) before deposing other experts in this case, as understanding the different positions and inconsistencies across Plaintiffs' experts is, of course, part of the examination." (*Id.*) This is a logical fallacy. If it were true, Defendants would need the merits expert reports of every Plaintiff on Track 1 and Track 2 before deposing a single merits expert. This is not the case. The reality is that Track 1 Plaintiffs' cases are separate cases that will have separate trials. The opinions of AWG's experts have no bearing on DPPs' case, for example, and will not be admissible at the trial of DPPs' claim.

- Defendants contend, "Before scheduling depositions of any of Plaintiffs' experts, Defendants need to know whether any Track 1 Plaintiff intends to amend its merits expert reports." Yet, as stated above, the scope of the Track 1 trial has not changed

since Track 1 Plaintiffs disclosed their merits expert reports.[2] However, Track 1 Plaintiffs do not agree that their experts cannot include in their rebuttal reports evidence from the parallel criminal trial or testimony from the depositions currently stayed at the request of the DOJ and the depositions that are the subject of currently pending motions for protective orders, to the extent that evidence rebuts arguments made by Defendants' merits expert. The parties negotiated these exceptions and included them in Scheduling Order No. 16. (*See* ECF No. 4741 at 2 n.1, 3.) In fact, Scheduling Order No. 16 explicitly states, "The Court's assumption underlying this Scheduling Order 16 is that all Plaintiffs will be able to take the stayed depositions they need to take before they respond to Defendants' motions for summary judgment and before trial." (*Id.* at 2 n.1.) Defendants were therefore on notice that Track 1 Plaintiffs' merits experts would include in their rebuttal reports additional evidence not available to them at the time of their initial reports.

Defendants previously sought to rely upon the uncertainty of the date by which AWG will disclose its merits expert reports, which is now certain, and now on late-in-the-day manufactured "threshold questions" to avoid negotiating a schedule for Track 1 actions until the Court rules on these issues, thereby buying Defendants even more time with Track 1 Plaintiffs' merits expert reports. This was one of the primary concerns Track 1 Plaintiffs raised when Defendants sought to extend only their own upcoming deadlines: that Defendants would receive an initial 45-day extension followed by a future extension as the parties conferred on a schedule for Track 1 actions. (ECF No. 5173 at 5.) Such an outcome would unfairly prejudice Track 1 Plaintiffs in two ways: first, by giving Defendants a disproportionately long time to pore over and analyze Track 1 Plaintiffs' merits experts' reports and to prepare to depose those experts; and second, by depriving Track 1 Plaintiffs of the certainty that a schedule brings to their counsel and their experts. As explained in Class Plaintiffs' Opposition to Defendants' Motion to Amend Upcoming Deadlines In Scheduling Order No. 16, Track 1 Plaintiffs' experts are leading academics in their fields with

---

[2] Prior to and after the order vacating bifurcation, Plaintiffs' position has remained consistent that so-called "bid-rigging" evidence was admissible at trial as direct evidence of the conspiracy, under Rule 404(b) of the Federal Rules of Evidence, or under the intricately related evidence doctrine. (*See* ECF No. 4832 at 3–5.) As discussed *supra* at pp. 11–12, significant evidence obtained from the criminal trial cannot be siloed as "bid-rigging," but is more properly described as evidence demonstrating a conspiracy to fix and stabilize prices, the same conspiracy Plaintiffs have alleged from day one.

numerous commitments who require advanced notice of court deadlines to balance their schedules and carve out enough time to analyze mountains of data, author merits reports, prepare for depositions, evaluate Defendants' merits reports, and author rebuttal merits reports. Continually moving the window for their depositions and rebuttal reports, or indefinitely postponing that window, makes it difficult for them to organize their various professional obligations. These moving dates also place additional burdens on the firms representing Track 1 Plaintiffs, who similarly benefit from the assurance that a set schedule brings in terms of the knowledge needed to allocate personnel and financial capital. By adopting Track 1 Plaintiffs' Proposed Scheduling Order No. 17 for Track 1 Actions, the Court will provide the parties, their counsel, and their experts with much-needed certainty while equitably maintaining the spacing and structure of Scheduling Order No. 16.

> **B.** **Defendants Mischaracterize the Court's Previous Orders and Seek to Inappropriately Dismember Plaintiffs' Single Antitrust Claim, Contrary to Longstanding Supreme Court Precedent**

The Court ordered the parties to negotiate an appropriate schedule modification in light of its vacation of its previous bifurcation order, which for case management reasons, staged discovery of Defendants' conduct. (ECF No. 5128.) Rather than negotiate in good faith on Scheduling Order No. 17, Defendants have preconditioned any discussions on Track 1 Plaintiffs voluntarily dismissing all bid-rigging allegations and disclaiming the ability to utilize any evidence of bid rigging at trial. In support of these preconditions—which are nowhere to be found in the Court's previous orders—Defendants invent the notion of a "three-legged stool" in an attempt to compartmentalize Plaintiffs' allegations of a single conspiracy into three separate unrelated conspiracies and to obtain a premature *in limine* ruling on evidence they are desperate to shield from the jury in these coordinated actions. (*See* Exhibit C, Nov. 30, 2021 Ltr. from J. Stupar at 1.)

The Court should decline this invitation, as it has already has done on two occasions. Defendants' effort is a distortion of antitrust and long-standing conspiracy law.

There is no "three-legged stool." All three sets of Class Plaintiffs have stated *one* claim, in each case seeking redress for Defendants' conspiracy to fix and stabilize the price of broilers in violation of Section 1 of the Sherman Act and (for CIIPPs and EUCPs) state antitrust and consumer protection laws.[3] Indeed, the very first paragraph of each of the class plaintiffs' operative complaints alleges that Defendants conspired to fix, raise, maintain, and stabilize the price of broilers. (*See, e.g.*, ECF No. 3929 ¶ 1.) In support of that single antitrust violation, Class Plaintiffs allege that Defendants utilized a variety of means—as they normally do in antitrust conspiracies— to accomplish their goal of raising and maintaining prices. Plaintiffs allege anticompetitive conduct in furtherance of the conspiracy took various forms, including coordinating output and limiting production; exchanging competitively sensitive, non-public information including pricing information through Agri-Stats and other mechanisms; manipulating a widely used price index; direct fixing of prices; and bid rigging. (*See* ECF No. 5128 at 5) (noting Class Plaintiffs' position that bid rigging and market manipulation cannot rightly be bifurcated).

It is well established, memorialized in a 1962 Supreme Court decision and unaltered in the nearly 60 years since, that antitrust plaintiffs should be given the "full benefit" of proof and are entitled to have the totality of their allegations of anticompetitive conduct considered together. *Cont'l Ore v. Union Carbide*, 370 U.S. 690, 699 (1962) ("It is apparent from the foregoing that the Court of Appeals approached Continental's claims as if they were five completely separate and unrelated lawsuits. We think this was improper. In cases such as this, plaintiffs should be given

---

[3] Although CIIPPs and EUCPs have multiple counts under various state laws, they allege one conspiracy arising from a common nucleus of operative fact.

the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."). Indeed, "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. . . ." *Id.*; *see also Bell Atlantic v. Twombly*, 550 U.S. 544, 569 n.14 (deciding Rule 12(b)(6) motion based on assessment of antitrust conduct "*in toto*").

To establish a civil conspiracy, a plaintiff must allege "a unity of purpose or a common design and understanding." *Am. Tobacco v. United States*, 328 U.S. 781, 810 (1946). "Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz Travel v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1366–67 (9th Cir. 1980). These principles are broadly consistent with, because they borrow heavily from, the equivalent standard in a criminal context as stated in cases such as *Blumenthal v. United States*, 332 U.S. 539 (1947).[4] Indeed, in the civil context, it has long been the law that conspirators need not even know about each and every aspect of the conspiracy, including all of its various methods, in order to be held jointly and severally liable for all of its effects so long as there was an overall unity of purpose. *Beltz*, 620 F.2d at 1366–67; *and see Paper Sys. v. Nippon Paper*, 281 F.3d 629, 634 (7th Cir. 2002) (applying joint and several liability in civil antitrust setting).

Defendants misinterpret the Court's most recent Order to force an artificial dismemberment of Class Plaintiffs' conspiracy allegations, in exactly the manner expressly prohibited under *Continental Ore* and its progeny. Defendants begin by arguing the Order forbids any Plaintiff

---

[4] "[C]onspiracies involving such elaborate arrangements generally are not born full-grown. Rather they mature by successive stages . . . . Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." *Id.* at 556–67.

proceeding on Track 1 from introducing any evidence of bid rigging at trial as direct evidence of a conspiracy. (*See* Exhibit C, Nov. 30, 2021 Ltr. from J. Stupar at 5.) That view is flat wrong substantively and directly contrary to this Court's Order. The Court expressly disclaimed making any ruling on Plaintiffs' use of bid-rigging evidence at a Track 1 trial: "The Court's prohibition on discovery into bid rigging during the first track should not be construed as a ruling on whether Plaintiffs may use evidence of bid rigging they already possess or that is publicly available in a trial . . . ." (ECF No. 5128 at 4 n.2.) That is exactly what Track 1 Plaintiffs intend to do, as they have informed Defendants.

Defendants then go a step further and attempt to leverage this case management exercise into a dismissal of allegations by arguing that the Order somehow requires Track 1 "plaintiffs to give up their bid-rigging claims and allegations." Yet, nowhere in the Order does any such statement appear.[5] Nothing in the Order calls for any dismissal of claims or allegations and the Order expressly contemplates that Plaintiffs may seek to use bid-rigging evidence they possess in Track 1 trials on their conspiracy allegations, which have already survived Defendants' earlier Rule 12 challenges. (ECF No. 541.)[6]

Indeed, the recent revelations of broad price fixing and bid rigging from the criminal trial can only strengthen Plaintiffs' allegations of a conspiracy, and do not give rise to any basis for

---

[5] Nor would such an outcome make sense. The situation now is similar in posture after the Court entered its September 22, 2020 bifurcation Order. At that time, the Court stayed bid-rigging discovery until after the resolution of the allegations concerning market manipulation. (ECF No. 3836 at 6–7.) The Court did not require Plaintiffs with big-rigging allegations to excise them from their complaint or waive them; nor did it require Plaintiffs to forgo any evidence of bid rigging currently in their possession. To the contrary, the Court granted Class Plaintiffs leave to amend their complaints to include bid-rigging allegations. (*Id.* at 9–10.)

[6] Defendants magnify their unfairness by seeking to argue in both directions and in contradictory fashion: Defendants claim that Track 1 Plaintiffs cannot proceed with a case that includes bid-rigging evidence, while simultaneously arguing that Plaintiffs also cannot proceed on Track 2 with a bid-rigging claim because doing so would, in their view, constitute "claim splitting." (*See* Exhibit C, Nov. 30, 2021 Ltr. from J. Stupar at 5.) This is the epitome of a "heads I win, tails you lose" approach.

displacing the civil litigants' considerable progress over the past five years. This Court has already found the conspiracy allegations by each set of Class Plaintiffs to be plausible. The addition of highly specific allegations of bid rigging—including indictments and guilty pleas by many Defendants—could not conceivably render a conspiracy previously found to be plausible somehow implausible.

But what is clear from the criminal trial is that significant evidence of Defendants' misconduct does not fit neatly into the three discrete silos Defendants wrongly seek to impose upon the case. For example, the government's star witness, Robert Bryant, testified that Pilgrim's and its coconspirators engaged in rank price fixing—that is, they shared pricing information with competitors and expected information in return with the purpose of "increas[ing] prices or limit[ing] a decrease in price." (Exhibit D, *United States v. Jayson Penn, et al.*, No. 1:20-cr-00152 (D. Colo.), Nov. 1, 2021 Rough Tr. at 96:3–4.) In Mr. Bryant's words, these exchanges were conducted pursuant to an agreement not confined only to the fixing of prices; rather, "it was more of an agreement to not go after volume." (*Id.* at 100:18–101:23.) This conduct was engaged in as a matter of course, and not simply as part of discrete, episodic bid-rigging events: as Bryant testified, "[O]ver the course of the years, there were many, many times that Roger [Austin, of Pilgrim's] called and ***relayed information from various competitors and their position on a whole host of subjects***, so it was common place for him to talk to people outside -- or with competitors and then relay that information back." (*Id.* at 104:17–22) (emphasis added). Bryant testified that sharing information and prices with competitors was performed at the direction of management, who would admonish Bryant when he did not succeed in his efforts to obtain competitors' information. (*Id.* at 215:22–216:6.) As part of that conduct, Pilgrim's and its competitors shared their planned price increases, their current prices, and their justifications for raising prices. They

also had records of competitors' prices going back to the 1990s. (*Id.* at 105:10–11.) Bryant testified

that access to current pricing from their co-conspirators was useful as a "monitoring mechanism."

(*Id.* at 107:12–22.)

Class Plaintiffs do not see, and moreover under *Continental Ore* and its progeny are not

obligated to decide, where in Defendants' "three-legged stool" this conduct fits. These facts are all

appropriate for presentation to the jury not because of what category they fall into, but because

they are all evidence incontrovertibly relevant to a determination of Class Plaintiffs' allegation

that Defendants formed a price-fixing conspiracy in violation of antitrust law.

Evidence of Defendants' conduct from the trial demonstrates that the conspiracy's

mechanisms do not fall neatly within any of Defendants' concocted tripartite categories:

- In a December 2011 email, Jayson Penn of Pilgrim's informed Pilgrim's then-CEO Bill Lovette that Penn's relationships built through trade associations "allowed me to pick up the phone any time and call multiple friends to flush our current and forward pricing from friendly competitors." (Exhibit E, *Penn*, No. 1:20-cr-00152, ECF No. 621-1 at 3–4.).

- Similarly, Buddy Ray of Pilgrim's told Penn and Larry Pate (Pilgrim's), "I received a call today from a friendly competitor telling me it's all over the market that Pilgrim's is taking contract pricing up. They thanked us for taking the lead and told me that contrary to what we might hear regarding their company, they are following as are others. Courage keep it up guys." (Exhibit F, *Penn*, No. 1:20-cr-00152, ECF No. 448-2 at 1.) Pate then confirmed the competitor was George's, and that George's disclosed to Pilgrim's it was not losing "any opportunity to move their pricing up." (*Id.*) Penn then forwarded the original Ray email with the warning "FYI. Do not fwd. not exactly a legal conversation." (*Id.*)

The trial testimony also elucidates the interrelatedness of Defendants' collusive manipulation of

supply and the bid-rigging conduct:

- Mr. Bryant testified that the decision to collude on bids resulted from the tight supply conditions and the co-conspirators desire to maximize already sky-high profits; and also that everyone in the industry knew that supply of small bird chicken was tight in 2014, a propitious state of affairs for price increase. (Exhibit G, *Penn*, No. 1:20-cr-00152, Nov. 2, 2021 Rough Tr. at 63:2–64:1). As a result, he expected prices for small birds to go up in his negotiations with larger accounts.

- Mr. Bryant also suggested that, even if supply was constrained in 2014, and even if those shortages might have resulted in higher prices, Pilgrim's wanted to maximize the supply shortage by colluding on bids—which means the shortages were themselves a catalyst for the bid rigging. (*See id.*)

- Bryant also alluded to the fact that this bid rigging was successful because of the supply shortages in the broiler market, thus emphasizing that supply and prices are two sides of the same coin: ahead of the bid rigging on KFC, for example, there was a "five percent reduction in availability" of broilers. (Exhibit D, *Penn*, No. 1:20-cr-00152, Nov. 1, 2021 Rough Tr. at 246:18–19.)

Further, the trial testimony also demonstrates the widespread impact of Defendants' price fixing—

specifically, in this context, bid-rigging conduct—on class members:

- Bryan testified that the impact from collusion on large bids generated broader effects in the market: he testified that KFC was the "anchor customer," and if they could raise prices on KFC, they would use that to raise prices on other customers. (Exhibit G, *Penn*, No. 1:20-cr-00152, Nov. 2, 2021 Rough Tr. at 6:10–8:8.) Specifically, Mr. Bryant stated, "We got the anchor customer done and that there would be momentum out there and that word would spread about the price increase and that it would make the future negotiations easier." (*Id.* at 7:16–8:3.) Mr. Bryant testified this strategy was successful and the rest of the negotiations went smoothly. (*Id.* at 8:4–10.)

These few, illustrative examples demonstrate how Plaintiffs seek to prove the conspiracy at trial:

that Defendants colluded however they could, whenever they could, to raise prices, including by

collusively restricting supply, express price-fixing, broadly exchanging competitively sensitive

information in reciprocal fashion, deanonymizing Agri Stats reports (or simply using their detailed

information), and opportunistically rigging bids—and these various methods were interrelated.

(*See* ECF No. 3835 at 4) ("There is a substantial relationship between the alleged bid-rigging claim

and the alleged supply reduction and Georgia Dock price index manipulation claims"). The above

testimony and documents do not conform to airtight distinctions between bid rigging as opposed

to, say, supply restriction; but they are unquestionably important evidence of collusion to restrain

trade in violation of antitrust law.[7] Indeed, the criminal trial has also revealed that the supply restriction was connected to the bid rigging. As this Court has recognized, "it is plausible for a single conspiracy to use different means at different times." (*Id.* at 4.)

Plaintiffs understood the now vacated bifurcation order (ECF No. 3835) as a discovery and case management tool intended to streamline proceedings in a massive litigation where the parties had already devoted significant resources to discovering certain methods of the conspiracy other than bid rigging. If it would be of assistance to the Court, Plaintiffs stand ready to brief the issue of the proper scope of a Track 1 trial on their conspiracy claim, but do not believe such briefing need delay entry of a schedule. The parties can move forward with expert discovery, rebuttal reports, and previously stayed depositions while the briefing proceeds. Alternatively, Plaintiffs believe such matters may be amenable to sound resolution via appropriate motions *in limine* close to trial. (*See* ECF No. 3835) (deferring to summary judgment or motions *in limine* as to whether bid-rigging evidence could be used in the context of Rule 404(b)). The Track 1 Plaintiffs' conspiracy allegations have already survived motions to dismiss, and Defendants have answered, and there will be plenty of opportunity to sort out the proper scope of argument and evidence suitable for presentation to the jury as trial approaches. But under the present posture, there is no reason any portion of the Track 1 Plaintiffs' cases cannot proceed in earnest and that a schedule cannot be set now.

---

[7] Class Plaintiffs have provided other examples of evidence mischaracterized as concerning pure bid rigging that would be more accurately described as anticompetitive conduct designed to raise prices for class members. (ECF No. 4832 at 2) (detailing evidence of the "chicken mafia" and one conspirator being "the stud of all studs" when it came to competitor contacts).

## CONCLUSION

WHEREFORE, for these reasons, Direct Purchaser Plaintiffs, Commercial and Institutional Indirect Purchaser Plaintiffs, and End-User Consumer Plaintiffs respectfully request that the Court adopt their position on further modifications to Scheduling Order No. 16 (ECF No. 4748) and enter their Proposed Scheduling Order No. 17 for Track 1 Actions (ECF No. 5173-5).

Date:  December 3, 2021

*/s/ W. Joseph Bruckner*
W. Joseph Bruckner (MN #147758)
Brian D. Clark (MN #0390069)
Simeon A. Morbey (MN #0391338)
Kyle Pozan (#6306761)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
F: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com
kjpozan@locklaw.com

Clifford H. Pearson (*Pro Hac Vice*)
Daniel L. Warshaw (*Pro Hac Vice*)
Thomas J. Nolan (*Pro Hac Vice*)
Bobby Pouya (*Pro Hac Vice*)
Michael H. Pearson (*Pro Hac Vice*)
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
T: (818) 788-8300
F: (818) 788-8104
cpearson@pswlaw.com
dwarshaw@pswlaw.com
tnolan@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

Respectfully submitted,

Bruce L. Simon (*Pro Hac Vice*)
PEARSON SIMON & WARSHAW, LLP
350 Sansome Street, Suite 680
San Francisco, CA 94104
T: (415) 433-9000
F: (415) 433-9008
bsimon@pswlaw.com

*Direct Purchaser Plaintiffs' Interim Co-Lead Class Counsel*

Steven A. Hart (#6211008)
Brian Eldridge (#6281336)
HART MCLAUGHLIN & ELDRIDGE, LLC
22 West Washington Street, Suite 1600
Chicago, IL 60602
T: (312) 955-0545
F: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com

*Direct Purchaser Plaintiffs' Liaison Class Counsel*

*s/ Daniel E. Gustafson*
Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Joshua R. Rissman
Brittany N. Resch
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
T: (612)333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
bresch@gustafsongluek.com

Adam Zapala
Tamarah Prevost
James G. Dallal
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
T: (650) 697-6000
azapala@cpmlegal.com
tprevost@cpmlegal.com
jdallal@cpmlegal.com

***Commercial and Institutional Indirect Purchaser Plaintiffs' Interim Co-Lead Counsel***

Kenneth A. Wexler
Kara A. Elgersma
Melinda J. Morales
WEXLER BOLEY & ELGERSMA LLP
55W.Monroe Street, Suite 3300Chicago, IL 60603
T: (312) 346-2222
kaw@wbe-llp.com
kae@wbe-llp.com
mjm@wbe-llp.com

***Commercial and Institutional Indirect Purchaser Plaintiffs' Liaison Counsel***

16

*s/ Shana E. Scarlett*

Steve W. Berman
Breanna Van Engelen
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
1918 8th Avenue, Suite 3300
Seattle, WA 98101
T: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

Shana E. Scarlett
Rio R. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
T: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

Brent W. Johnson
Benjamin D. Brown
Daniel H. Silverman
Alison Deich
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
T: (202) 408-4600
bjohnson@cohenmilstein.com
bbrown@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com

***End-User Consumer Plaintiffs' Interim Co-Lead Counsel***