# EXHIBIT D

```
 1    Test test 8:19 a.m.
 2         THE COURT:  We are back on the record.  Mr. Byrne is
 3    not here again; is that right?  Can.
 4         MR. CANTY:  We do expect him back this week but not
 5    yet.  In his stead we have Ms. Durwin, Jennifer Durwin.
 6         THE COURT:  Great.  But I think everybody else is
 7    present.  The attorneys indicated that there was an issue to
 8    take up regarding Mr. Bryant is his immunity agreement.
 9         MR. TUBACH:  Good morning.  Late yesterday we filed a
10    short document that simply attaches the immunity document that
11    we proposed be used if necessary.  And we also attached the
12    government --
13         THE COURT:  I have had a chance to look at that,
14    right, yes.
15         MR. TUBACH:  Thank you.  It's pretty simple.
16         THE COURT:  Yeah, I agree.  Let's hear what Mr. Koenig
17    or who else from the government wants to respond on that one.
18         MR. KOENIG:  Yes, sure, Michael Koenig on behalf of
19    the United States.  We believe this is pretty straightforward.
20    We redacted out all the parts we think don't need to be
21    included and I don't see anything prejudicial about it.
22         THE COURT:  Is the government's -- what is attached as
23    Exhibit C, is that how the government assuming it would be
24    used, is that how the government would propose that it appear?
25         MR. KOENIG:  Yes.
```

1  Q.  All right.  So what was the purpose of getting the
2  competitors' pricing?
3  A.  Depended on the situation, but it was either to increase
4  prices or limit a decrease in price.
5  Q.  Okay.  For just Pilgrim's?
6  A.  No, for the other -- other competitors involved as well.
7  Q.  And did you have an understanding as to why competitors
8  gave their pricing to Pilgrim's?
9            MR. KORNFELD:  Objection.
10           MR. FELDBERG:  Objection, Your Honor.
11           THE COURT:  Grounds?
12           MR. FELDBERG:  Hearsay.
13           MR. KORNFELD:  And foundation, Your Honor.
14           THE COURT:  And response?
15           MR. KOENIG:  I just asked do you have an understanding
16 as to why competitors gave pricing to Pilgrim's.
17           THE COURT:  Okay.  That's true, it's a yes or no.  He
18 can answer yes or no.  Overruled.
19 BY MR. KOENIG:
20 Q.  You can answer the question.
21 A.  Yes.
22 Q.  And what is the basis for that understanding?
23 A.  From what I witnessed in 2014, there was some significant
24 price increases that were -- that we received in 2014 and I
25 witnessed phone calls between people at Pilgrim's and

1  Q. Okay. And why did you do that?
2  A. To increase prices or to limit a decrease depending on the
3  current market conditions.
4  Q. And when you directed the people to do the sharing of the
5  future prices, did you have an understanding as to whether
6  Pilgrim's prices were also shared?
7  A. Yes.
8  Q. What was your understanding?
9  A. My understanding was it was a two-way street. We received
10 those prices and they received ours.
11 Q. All right. So were you ever afraid that by giving
12 Pilgrim's future pricing to a competitor, that the competitor
13 would undercut Pilgrim's?
14 A. No.
15         MR. FELDBERG: Objection.
16         THE COURT: Overruled.
17 BY MR. KOENIG:
18 Q. Why not?
19 A. My past experience in 2014 where we raised prices
20 significantly and shared that information. And then when I
21 assumed the role as director, it was more of an agreement to
22 not go after volume. It was about either increasing prices or
23 limiting a decrease in price.
24 Q. Okay. So can you explain a little bit about what that
25 means not to go after volume.

1  A. So not to -- if you had 50 loads a week with a customer,
2  the agreement was to leave that 50 loads a week or grow
3  incrementally if they were growing with that customer and not
4  try to gain additional market share over their incremental
5  growth.
6  Q. What is -- so in other words, can you say it even in more
7  simple terms?
8  A. To keep the volume the same and just deal with price.
9  Q. You mentioned loads. Can you explain that to the jury,
10 what that meant?
11 A. A load is 40,000 pounds of product or a whole
12 tractor-trailer load full of product. So we typically dealt in
13 loads per week. Sometimes we would annualize that volume.
14 Q. Did you -- when these price exchanges happened with
15 competitors, you said you did it for the purpose of either
16 raising price or limiting the decrease, right?
17 A. Correct.
18 Q. Why would price-fixing -- or my apologies. Why would price
19 sharing facilitate that goal?
20 A. You would get a range that you would look at and then place
21 yourself inside that range. And then without that information,
22 you know, you may offer too much of a decrease or go too
23 aggressively and be exposed to actually losing volume.
24 Q. Now, the conduct that's the subject of the agreement we
25 mentioned before, did anyone else at Pilgrim's engage in that

1      THE COURT: All right. The witness has identified
2 Exhibit 9235 as a photograph of Mr. Austin and the objection
3 will be overruled. 9235 will be admitted.
4      MR. KOENIG: Thank you, Your Honor.
5 BY MR. KOENIG:
6 Q. Now, you said before that when I asked you who else at
7 Pilgrim's engaged in the conduct at issue here, and you said
8 Roger Austin, right?
9 A. That's correct.
10 Q. What is your basis for saying that he participated in that
11 conduct?
12 A. Specifically in 2017 I received a phone call from Roger
13 where he gave me competitor pricing.
14 Q. Okay.
15 A. We used that information to formulate our bid for 2017.
16 Q. All right. Any other examples?
17 A. You know, over the course of the years, there were many,
18 many times that Roger called and relayed information from
19 various competitors and their position on a whole host of
20 subjects, so it was common place for him to talk to people
21 outside -- or with competitors and then relay that information
22 back.
23 Q. All right. And so you said a whole host of things. Did
24 that include future pricing?
25 A. It included pricing specs. If a customer asked about --

1  Q. My question was does it include future pricing?
2  A. It did.
3  Q. Did it include current pricing?
4  A. It did.
5  Q. All right. How do you know that?
6  A. That's what he communicated to me.
7  Q. Okay. Did he mention tracking current prices?
8  A. He did at one point.
9  Q. What did he say?
10 A. He told me that he had everyone's pricing dating back to
11 the nineties.
12 Q. Approximately when did he say that?
13 A. I believe it was in 2017.
14 Q. Do you have an understanding as to why Roger Austin
15 collected future pricing from competitors?
16 A. Yes.
17 Q. What is the basis for your understanding?
18 A. You know, what I witnessed over the course of the years,
19 you know, basically to keep score on where we were at and if
20 others had submitted where he thought that they were going to
21 submit on pricing.
22 Q. This is future pricing?
23 A. Correct, and past.
24 Q. And do you have an understanding -- and you may have
25 touched on this just a little bit -- but do you have an

1   A. Correct.
2   Q. And what was the -- what did you say your understanding of
3   why he did that?
4        MR. TUBACH: Asked and answered, Your Honor.
5        THE COURT: Overruled.
6   A. For bids, see where others were coming in at, make sure
7   that we were in line with them or they were in line with us,
8   and then you got the pricing after or in between contracts so
9   you know where their pricing was, in fact, going into the other
10   contract and if you needed to make adjustments.
11   BY MR. KOENIG:
12   Q. Okay. So you did the future pricing and then there is the
13   contract and then the current pricing. To what end are you
14   looking at current pricing?
15   A. See where everybody actually did end up for sure and
16   whether or not you needed to make some sort of adjustment. And
17   you could look at doing something with a case weight to offset
18   something that may have happened.
19   Q. And when you said everyone, who did you mean?
20   A. Competitors.
21   Q. All right. So it was a monitoring mechanism?
22   A. It was.
23        MR. KOENIG: Can we pull up Exhibit 9244, please?
24   BY MR. KOENIG:
25   Q. Do you recognize 9244?

1  A.  Yes.  Most of the time, yes.  There could be some instances
2  where they could have gave them the whole, you know, cents per
3  pound case and all that, but generally it was per case, 640
4  cases at this per case price and here's your freight.
5  Q.  So from a competitor's per case price were you able to
6  determine their eight-piece price, for example, per pound?
7  A.  No.  You would have to know what their billing weight was.
8  You could try to guess and go through different scenarios to
9  see if it was a price near yours, but you wouldn't know or vice
10 versa.  You could try to do -- but you needed both to know how
11 they came up with the billing -- the case weight billing.
12 Q.  Okay.  In order to purchase from a competitor, did you need
13 to know of their eight-piece per pound?
14 A.  No, you didn't have to know that.  You just needed the per
15 case price and there would be freight.
16 Q.  So you wrote all these prices down.  And what did you do
17 next?
18 A.  I called Tim and --
19 Q.  Who is that?
20 A.  I called Tim Stiller and gave him that information so we
21 could have a conversation about our bid.
22 Q.  All right.  So what did you discuss about the bid?
23 A.  I recall having a conversation with Tim and -- Tim Stiller
24 and Roger Austin.  I don't recall if that was at the same time
25 or separately.  We developed a model that put us second in

1    price. However, before we submitted that bid, and I don't
2    recall if it was Tim Stiller or Roger Austin said that they
3    didn't -- they felt like we needed to be more middle of the
4    pack, so we submitted our price third in line.
5    Q. And did you use the prices you had written down in order to
6    do that?
7    A. We did.
8    Q. All right. When you received those prices from Roger
9    Austin, those future prices, did you believe they were
10   accurate?
11   A. I trusted that they were.
12   Q. Okay. And why?
13   A. You know, I worked with Roger for many years and it seemed
14   like it transpired in 2014 and other times, and so I trusted
15   the information I was receiving from him.
16   Q. I understand that you trusted Roger Austin. Did you trust
17   the competitors' list that they had given him an accurate true
18   price?
19   A. Yes.
20   Q. Why is that?
21   A. It was my understanding that, you know, in information has
22   been falling back and forth for several years with and had been
23   successful over that period of time, so there is a history of
24   this that I was relying on.
25   Q. Can you recall a time when somebody gave you a price that

1  what is this slide?
2  A.  This is the slide that I helped prepare.
3  Q.  Okay.  And what were you trying to convey with this slide?
4  A.  Yes.  It's a little hard to read here because it actually
5  had some animation in it, but one set of those bars was the
6  five years prior of bird availability and then the other set is
7  that current availability, and I was attempting to show the
8  reduction in size ranges for the particular size that KFC
9  purchased from.
10 Q.  All right.  So are you -- which sizes are shown that KFC
11 purchases from?
12 A.  It would be from that two and a quarter to two and three
13 quarter size ranges.
14 Q.  I see at the top there is some Little white errors.
15 A.  Yes.
16 Q.  What are those supposed to represent?
17 A.  So in the two and a quarter to two and a half size there
18 was a 5 percent reduction in availability in that size and then
19 in that two and a half and two and three quarter there was a
20 7 percent reduction in available in that size.
21 Q.  All right.  And again, this meeting was part of the -- was
22 this meeting part of the customer blitz?
23 A.  It was.
24 Q.  What, if any, what effect were you trying to have on RSCS
25 by showing this?