# EXHIBIT G

**Broiler Chicken**
**Consumer –** 54479
**115826324**

NOV 1 6 2021

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | Case No. 1:16-cv-08637 |
| | |
| This Document relates to: | Hon. Thomas M. Durkin |
| *All End-User Consumer Plaintiff Actions* | |
| | |
| JOHN ANDREN, | |
| Objector. | |

**NOTICE OF INTENT TO APPEAR IN**
***IN RE: BROILER CHICKEN ANTITRUST LITIGATION***

COMES NOW John Andren to give notice that he intends to appear at any fairness hearing in conjunction with his objection to the End-User Consumer Plaintiffs' settlement in the above-captioned matter. Andren gives notice that he intends to appear at the fairness hearing scheduled for December 20, 2021 through his counsel M. Frank Bednarz, who wishes to discuss matters raised in his objection. Andren does not currently intend to call any witnesses at the fairness hearing, but reserves the right to make use of all documents entered on the docket by any party or objector, to present documents he obtains through discovery, and the right to cross-examine any witnesses called to testify at the hearing in support of the settlement or attorneys' fee request.

Class notice requires that the notice of intent to appear include "your name, and the name of your business that purchased Broiler chicken, current mailing address, telephone number, and

signature," and also that this notice must be *postmarked* to the Clerk of Court and settling counsel. Dkt. 4341 at 10-11. In order to comply with these requirements as written, Mr. Andren advises through counsel that he purchased broiler chicken from at least Walmart, Publix, and Milam's in Florida, and from at least Walmart and Safeway in Washington, DC. His current mailing address should be his business and work address 1629 K St. NW, Suite 300, Washington, DC 20006, phone number (703) 582-2499. He has reviewed this notice and objection, which will be filed shortly by the undersigned on his behalf. Objector Andren's signature is below.


Dated: November 10, 2021        /s/ M. Frank Bednarz
                                   M. Frank Bednarz, (ARDC No. 6299073)
                                   HAMILTON LINCOLN LAW INSTITUTE
                                   CENTER FOR CLASS ACTION FAIRNESS
                                   1145 E. Hyde Park Blvd. Unit 3A
                                   Chicago, IL 60615
                                   Phone: 801-706-2690
                                   Email: frank.bednarz@hlli.org

                                   *Attorney for Objector John Andren*



John Andren

**Certificate of Service**

The undersigned certifies he electronically filed the foregoing Notice of Intent to Appear via the ECF system for the Northern District of Illinois, thus effecting service on all attorneys registered for electronic filing.

Dated: November 10, 2021

/s/ M. Frank Bednarz
M. Frank Bednarz

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | Case No. 1:16-cv-08637 |
| | |
| This Document Relates To: | Honorable Thomas M. Durkin |
| | |
| *All End-User Consumer Plaintiff Actions* | |
| | |
| JOHN ANDREN, | |
| Objector. | |

**OBJECTION TO MOTION FOR ATTORNEYS' FEES,**
**COSTS, AND SERVICE AWARD**

TABLE OF CONTENTS

**Table of Contents** ........................................................................................................ ii

**Introduction** ................................................................................................................... 1

I.     Objector John Andren is a member of the class and intends to appear through counsel at the fairness hearing. ....................................................................................................... 1

II.    The court owes a fiduciary duty to unnamed class members. .................................... 2

III.   Class counsel's fee request is excessive and contains signs of self-dealing ............... 3

    A.    Out-of-pocket costs are not a class benefit and should be excluded when calculating attorneys' fees. .................................................................................................. 5

    B.    Class counsel's past fee bids and requests show that a 33% award would pay a substantially above-market rate for the risk and opportunity cost in this case. ........... 6

    C.    Class counsel's Rule 23(h) request grossly exceeds the market rate because fees for a $181 million megafund should include diminishing marginal rates. ........................ 12

    D.    There must be consequences for class counsel seeking such an exorbitantly excessive fee. .......................................................................................................... 15

**CONCLUSION** .......................................................................................................... 15

**CERTIFICATE OF SERVICE** .................................................................................. 17

INTRODUCTION

End-user consumer plaintiff class counsel Hagens Berman Sobol Shapiro LLP ("Hagens Berman") and Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") (collectively, "class counsel") seek a Rule 23(h) award of fees and expenses that is nearly 38% of the $181 million class settlement fund—a percentage that greatly exceeds the bids they have submitted to serve as class counsel in other antitrust class actions, the sliding scale this Circuit applies to large settlements such as this, and the mean and median percentages that empirical data show are far more appropriate. To further establish the excessiveness of the fee award, objector John Andren is requesting additional data from class counsel regarding their fee bids in class actions. At a minimum, this Court should reduce class counsel's fee award and return over $30 million to the class.

## I. Objector John Andren is a member of the class and intends to appear through counsel at the fairness hearing.

As documented in the accompanying Declaration of John Andren ("Andren Decl."), Andren is a member of the class. Andren is an attorney with Hamilton Lincoln Law Institute, which represents him in this matter. During the period from January 1, 2009 to July 31, 2019, Andren purchased fresh or frozen raw chicken, whole cut-up birds within packages, or "white meat" parts including chicken breasts or wings in both the District of Columbia and Florida. Andren purchased these products for personal and household use and not for resale or distribution to retailers. Andren Decl. ¶ 3. Andren filed a claim through the settlement website and was assigned Claim Number 129172865. *Id.* ¶ 4.

HLLI, through its subunit the Center for Class Action Fairness ("CCAF"), represents class members *pro bono* in class actions where class counsel employs unfair class action procedures to benefit themselves at the expense of the class. *See, e.g., Briseño v. Henderson,* 998 F.3d 1014 (9th Cir. 2021) (sustaining CCAF's client's objection to a lopsided claims-made settlement with illusory injunctive relief); *Pearson v. NBTY, Inc.,* 772 F.3d 778, 787 (7th Cir. 2014) (same; noting that CCAF "flagged fatal weaknesses in the proposed settlement" and demonstrated "why objectors play an essential role in judicial review of proposed settlements of class actions"); *In re Dry Max Pampers Litig.,* 724 F.3d 713, 716-17 (6th Cir. 2013) (same; noting CCAF's client's "numerous, detailed, and substantive"

objections). Since it was founded in 2009, CCAF has "develop[ed] the expertise to spot problematic settlement provisions and attorneys' fees." Elizabeth Chamblee Burch, *Publicly Funded Objectors*, 19 THEORETICAL INQUIRIES IN LAW 47, 55-57 & n.37 (2018). CCAF has recouped over $200 million for class members by driving settling parties to reach an improved bargain or by reducing outsized fee awards. *See* Andrea Estes, *Critics hit law firms' bills after class-action lawsuits*, BOSTON GLOBE (Dec. 17, 2017) (more than $100 million at time). Andren brings this objection through CCAF in good faith to protect the interests of the class. Andren Decl. ¶ 6. His objection applies to the entire class; he adopts the arguments in any objections to fee requests and amicus briefs not inconsistent with this one. Andren intends to appear through his counsel at the final approval hearing.

## II.     The court owes a fiduciary duty to unnamed class members.

"Class-action settlements are different from other settlements. The parties to an ordinary settlement bargain away only their own rights—which is why ordinary settlements do not require court approval." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 715 (6th Cir. 2013). Unlike ordinary settlements, "class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations." *Id.* A district court therefore must act as a "fiduciary of the class," for the rights and interests of absent class members. *Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745, 748 (7th Cir. 2006) (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 280 (7th Cir. 2002)). The Seventh Circuit has instructed district courts as fiduciaries "to exercise the highest degree of vigilance in scrutinizing proposed settlements" and attorneys' fee awards in class actions. *Synfuel Technologies v. DHL Express (USA)*, 463 F.3d 646, 652 (7th Cir. 2006). At the fee-setting stage, the relationship between class members and counsel turns directly adversarial when awarding fees from a common fund, it is incumbent upon the Court to "carefully monitor disbursement to the attorneys by scrutinizing the fee applications." *Cook v. Niedert*, 142, F.3d 1004, 1011 (7th Cir. 1998) (internal quotation omitted). Given this natural adversity, there can be no deference to class counsel's recommendation. *In re Southwest Airlines Voucher Litig.*, 799 F.3d 701, 713 (7th Cir. 2015).

Moreover, "in most common-fund cases, defendants have little interest in challenging class counsel's timesheets." *Gutierrez v. Wells Fargo, NA*, No. 07-cv-05923 WHA, 2015 WL 2438274, at *6 (N.D. Cal. May 21, 2015). No individual class member has the financial incentive to object to an exorbitant fee request either; "[h]is gain from a reduction, even a large reduction, in the fees awarded the lawyers would be minuscule." *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir. 1992). The district court (and good-faith public-minded objectors) serve as the last line of defense against overreaching fee requests. "Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class action process." Advisory Committee Notes on 2003 Amendments to Rule 23. It is incumbent upon the Court to "carefully monitor disbursement to the attorneys by scrutinizing the fee applications." *Cook v. Niedert*, 142 F.3d 1004, 1011 (7th Cir. 1998).

III.    **Class counsel's fee request is excessive and contains signs of self-dealing.**

In recognition of the absence of an actual market and the concern plaintiffs' lawyers will be overpaid, the Seventh Circuit requires district courts to "assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys." *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011). Such concerns are heightened when, as here, "the class members are consumers, who ordinarily lack both the monetary stake and the sophistication in legal and commercial matters that would motivate and enable them to monitor the efforts of class counsel on their behalf." *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011). The *ex ante* approach recognizes that "[i]t is inherently illogical for lawyers to undertake litigation on the basis of the risks and rewards they perceive at the beginning, yet be compensated on the basis of the risks and rewards the court perceives at the end of the litigation." *In re Oracle Secs. Litig.*, 131 F.R.D. 688, 692 (N.D. Cal. 1990) (Walker, J.)).

Class counsel goes to considerable lengths to assert that a 33% flat fee—really a whopping 37.8% of the settlement fund—is a reliable and accurate *ex ante* valuation of the litigation, and that the sliding scale fee schedule that is preferable in the Seventh Circuit is not appropriate. But class counsel's request is grossly excessive in light of the diminishing marginal rates regularly applied to funds of this

---

size and the risks and opportunity cost of the litigation, as evidenced by data from similar common fund cases and class counsel's *ex ante* bids in other class-action cases. *See In re Synthroid Mkt. Litig.* (*"Synthroid I"*), 264 F.3d 712, 719 (7th Cir. 2001).

The history of this litigation is relevant to understand the minimal risk that class counsel faced and why the requested fee would overpay them. In October 2016, Hagens Berman aggressively sought to be named counsel to represent indirect purchasers. Dkt 117. A rival firm, Cotchett, also sought the role as lead counsel (Dkt. 116), and the district court approved its application to act as lead counsel in a four-firm leadership structure. Dkt. 144. In November 2017, class counsel moved to split the class and proposed to represent the end-user purchasers because of a conflict with the other indirect purchasers. Dkt. 216. The district court agreed but left open the decision on who should serve as lead counsel for the new subclass. Dkt. 243. Class counsel again sought to be named lead counsel for the new end-user subclass, and similar to its October 2016 motion, provided a detailed motion seeking appointment as lead counsel for the end-users, which the court granted. Dkt. 247 and 248. Both of its motions seeking appointment were long on resume, but conspicuously failed to mention proposed fees or fee structure or that a fee of 33% of a common fund is the *ex ante* value of the litigation and what class counsel would be seeking as a fee.

Approximately two years after initiating the lawsuit, class counsel learned that the U.S. Department of Justice had begun a criminal investigation of the defendants that led to indictments against several of the defendants and executives and a guilty plea from Pilgrim's Pride. *United States v. Pilgrim's Pride Corp.*, 20-CR-0330-RM (D. Colo.). The posture of the class case became more favorable and the litigation less onerous once DOJ picked up the laboring oar of investigation and discovery and there was the accompanying prospect of criminal liability. Although class counsel may have expended time and effort initially developing the case without piggy-backing off a government investigation, the government's eventual criminal investigation and prosecutions no doubt assisted the civil class case and eased settlement, reducing the risk to class counsel that its efforts would be fruitless.

Class counsel did not account for this reduced risk in their fee request and instead seek a fee that is excessive once it is properly calculated and analyzed in the light of (1) counsel's history of

bidding *ex ante* or requesting *ex post* lower percentage-based awards; and (2) this Circuit's sliding scale approach for megafunds. A proper fee analysis will return tens of millions of dollars to the class.

### A. Out-of-pocket costs are not a class benefit and should be excluded when calculating attorneys' fees.

As a threshold matter, class counsel includes the full settlement fund in the denominator of its fee request, but excludes costs from the numerator. The result is a percentage request that artificially appears lower than it is. The "ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman v. RadioShack*, 768 F.3d 622, 630 (7th Cir. 2014). Out-of-pocket costs, although paid through the settlement fund, are not benefits to the class and thus not part of "what the class members received." *Id.* Although some cases refer to notice and administrative costs, there is good reason to deduct all litigation costs before setting the fee award. "If an attorney risks losing some portion of his fee award for each additional dollar in expenses he incurs, the attorney is sure to minimize expenses." *In re Wells Fargo Secs. Litig.*, 157 F.R.D. 467, 471 (N.D. Cal. 1994). Accordingly, for purposes of calculating attorneys' fees, "costs are part of the settlement but not part of the value received from the settlement by the members of the class" and should be excluded. *Pearson*, 772 F.3d at 781.

The total funds available to the class are $181 million, from which class counsel is seeking $68,480,000: $59,730,000 in fees and $8,750,000 in expenses. Dkt. 5161 at 2. This is 37.8% of the settlement fund. When calculating a percentage of attorneys' fees, however, "costs are part of the settlement but not part of the value received from the settlement by the members of the class" and the calculation should exclude them. *Pearson*, 772 F.3d at 781. In the Seventh Circuit, class counsel is not entitled to a 33% commission on their out-of-pocket costs.

Performing the arithmetic *Pearson* requires, we remove the almost $9 million costs from the $181 settlement fund, leaving a $172.25 million common fund. Applying the proposed 33% flat fee to that $172.25 million would result in a fee award of about $56.8 million, or nearly $3 million less than class counsel's request. But this is still unreasonably high because it ignores the best evidence of a market rate evidenced by precedent, empirical data, and class counsel's past *ex ante* bids.

**B.    Class counsel's past fee bids and requests show that a 33% award would pay a substantially above-market rate for the risk and opportunity cost in this case.**

It is only the parties entered into this partial settlement that class counsel asserts that a flat fee of 33% is standard within the Seventh Circuit, particularly in cases with common funds in excess of $90 million. In both the Motion for Attorneys' Fees and the Response Regarding Application of Sliding Scale to Attorneys' Fees, counsel cite district court cases involving antitrust cases in which the fee award was at or near 33%, thereby concluding that there is ample support for a 33% fee award as the *ex ante* valuation of the litigation, and that the sliding scale is inapplicable because those cases, like this one, involved high-risk, high-stakes multi-million dollar complex and fact intensive litigation.

As for "data from similar common fund cases," class counsel cherry picks the most attorney-generous sample of settlements as supposed support for its position. Class counsel also argue that the lodestar cross-check is in line with the 33% flat fee request and indicative of *ex ante* expectations. This is nothing more than *ex post* reasoning dressed-up as *ex ante* evidence for the requested fee award. Both the flat fee request and the lodestar multipliers cannot be evidence of *ex ante* value for the litigation. For instance, if class counsel had achieved a greater settlement award such that the common fund was 3 or 4 times greater than the $181 million figure (perhaps because potential damages were greater), but the lodestar remained constant, then either the 33% flat fee or the range of multipliers class counsel reference as consistent with *ex ante* expectations would be dramatically inconsistent. Conversely, if the common fund reached upon settlement was significantly less than $181 million, yet the lodestar remained constant, again, either the 33% flat fee or the range or multipliers cited by class counsel could be evidence of their *ex ante* expectations of the value of the litigation, but not both.

*Ex post* awards overshoot the market partly because they are usually awarded without adversarial presentation. *See Sakiko Fujiwara v. Sushi Yasuda Ltd.*, 58 F. Supp. 3d 424, 436 (S.D.N.Y. 2014) ("By submitting proposed orders masquerading as judicial opinions, and then citing to them in fee applications, the class action bar is in fact creating its own caselaw on the fees it is entitled to... No wonder that "caselaw" is so generous to Class attorneys."). The major force that exerts downward pressure *ex ante*—the threat of losing the representation to another firm—dissipates before settlement.

In recognition of the absence of an actual market and the concern class lawyers will be overpaid, the Seventh Circuit requires district courts to "assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys." *Williams*, 658 F.3d at 635. Because no such market actually exists, the Seventh Circuit has suggested several "benchmarks" to help district courts estimate the market fee: (1) actual fee contracts between plaintiffs and their attorneys; (2) data from similar common fund cases where fees were privately negotiated; and (3) information from class-counsel auctions. *Synthroid I*, 264 F.3d at 719-20.

Class counsel nevertheless fails to mention in either their fee motion or Sliding Scale Response their fee requests or awards in the antitrust cases undertaken by the two primary class counsel firms cited in the motions to be named as lead class counsel. The firms represented that those cases involved multiple defendants, complex legal and factual issues, and featured experienced, sophisticated opposing counsel. Those cases also were similar to this one in that they involved high-risk, high-stakes, multi-million dollar complex litigation. If only we had some way to determine how class counsel valued, *ex ante*, these other similar class-action antitrust cases. Thankfully, we do. Hagens Berman, one of the two primary lead counsel firms for the end-user class, has, on multiple occasions, submitted fee structure bids as part of a motion seeking appointment as lead counsel. These bids are usually sealed, but twice, a Ninth Circuit decision required Hagens Berman to disclose the bid. *In re Lithium Ion Batteries Antitrust Litig.*, Case No. 13-MD-2420-YGR (N.D. Cal), Dkt. 2630-2 (appeal pending) (attached as Bednarz Decl. Ex. A); *In re Optical Disk Drive Prods. Antitrust Litig.*, Case No. 10-MD-2134-VRW (N.D. Cal) Dkt. 2900 (attached as Bednarz Decl. Ex. B), reported at *In re Optical Disk Drive Antitrust Litig.*, 959 F.3d 922, 934 (9th Cir. 2020).[1] In both instances, the bids were structured as a sliding-scale such that the fee award percentage declined as the size of the recovery for the class grew. Moreover, the fee structure bid that Hagens Berman submitted in the *Optical Disk Drive* litigation was inclusive of costs such that the sliding scale percentages included both attorney fees and out-of-pocket

---

[1] The district court solicited bids in the *Optical Disk Drive* litigation and Hagen Berman submitted an unsolicited bid in the *Lithium Batteries* litigation.

expenses, and the *Lithium* bid capped costs at $3.5 million. Below are the details of the *Optical Disk Drive* and the *Lithium Batteries* bids, respectively:

| | Pleading through Decision on Motion to dismiss | After Motion to Dismiss through adjudication of Class Certification | After adjudication of Summary Judgment | Through Trial Verdict and Appeal |
|---|---|---|---|---|
| First $5,000,000 | 0% | 0% | 0% | 0% |
| $5,000,001 - $25,000,000 | 5% | 14% | 14% | 14% |
| $25,000,001 - $50,000,000 | 4% | 13% | 13.25% | 14% |
| $50,000,001 - $75,000,000 | 3% | 12% | 13% | 14% |
| $75,000,001 - $100,000,000 | 2.5% | 11.5% | 12.5% | 13.5% |
| $100,000,001 - $200,000,000 | 2% | 10% | 11% | 12% |
| $200,000,001 - $400,000,000 | 1.5% | 7% | 8% | 9% |
| $400,000,001 and above | 1% | 5% | 6% | 7% |

| | Pleading through Decision on Motion to dismiss | After Motion to Dismiss through adjudication of Class Certification | After adjudication of Summary Judgment | Through Trial Verdict and Appeal |
|---|---|---|---|---|
| First $5,000,000 | 0% | 0% | 0% | 0% |
| $5,000,001 - $25,000,000 | 8% | 17% | 17% | 17% |
| 25,000,001 - $50,000,000 | 7% | 16% | 16.25% | 17% |
| $50,000,001 - $75,000,000 | 6% | 15% | 16% | 17% |
| $75,000,001 - $100,000,000 | 5.5% | 14.5% | 15.5% | 16.5% |
| $100,000,001 - $200,000,000 | 5% | 13% | 14% | 15% |
| $200,000,001 - $400,000,000 | 4.5% | 10% | 11% | 12% |
| $400,000,001 and above | 4% | 8% | 9% | 10% |

The fee structure bids Hagens Berman has submitted in other similar antitrust cases *ex ante* its appointment as lead counsel, rather than *ex post* appointment and settlement, is the best evidence before the court of how class counsel values the litigation on an *ex ante* basis. *In re Optical Disk Drive*, 959 F.3d at 934-35 (competitive bid is starting point to determine reasonable fee); *Synthroid I*, 264 F.3d at 720 (competitive bids are key benchmark for gauging market rate because it shows what an attorney would be willing to accept as compensation). Putative lead counsel are well positioned to assess their risk and price their services accordingly based on their lodestar in similar class actions and their broader litigation experience. *See, e.g., In re Amino Acid Lysine Antitrust Litig.*, 918 F. Supp. 1190, 1196 (N.D. IL 1996) ("knowledgeable law firms are well qualified to [assess *ex ante* risks] every day in establishing fee arrangements with their own clients"). For example, if *ex ante*, an attorney believes she has a very low chance of success, then she would propose a larger percentage of the recovery or a guaranteed minimum payment, as she would in the marketplace, to compensate her for that risk. *See In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 948 n.9 ("any sensible lawyer will have pegged his or her proposal high enough to take into account the possibility of ending up with no recovery"). And there is no reason to believe that complex antitrust litigation or class-action MDL cases are significantly more costly in the Seventh Circuit than in the Ninth Circuit, but that is the essence of class counsel's claim regarding the 33% flat fee. Indeed, Ninth Circuit case law further undermines class counsel's assertions regarding the 33% flat fee. That Circuit has consistently noted that the benchmark fee award for "mega-fund" cases (settlements in excess of $100 million) is 25%. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1297 (9th Cir. 1994)

Andren recognizes that it is too late to conduct competitive bidding to assign lead counsel. Nonetheless, applying the bid Hagens Berman submitted in *Lithium Batters* (the higher of the two known bids) is consistent with Seventh Circuit's requirement that attorneys' fees be based on market rates. Moreover, it demonstrates that class counsel's 33% flat fee request is excessive. Hagens Berman submitted the bid in March 2013 along with a motion to be named sole lead counsel. The bid included a sliding scale fee percentage for different tiers of dollar recovery depending on when and how the case was resolved (e.g., motion to dismiss, summary judgment, etc.). If this Court declines to apply

the sliding scale approach formulated by the Seventh Circuit in *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 980 (7th Cir. 2003) ("*Synthroid II*"), Hagens Berman's past bids are a significantly more accurate indicator of the *ex ante* market rate for this litigation than the requested 33% flat fee. Using actual bids submitted by class counsel in other similar antitrust cases is a more reliable way to "mimic [the] bargain between the class and its attorneys." *Williams*, 658 F.3d at 635.

Applying the sliding structure from Hagens Berman's past bids yields fees about $6 million *less* than under the *Synthroid II* sliding scale (which we discuss in Section III.C below) that class counsel vigorously argues is not appropriate for this type of litigation:

| Recovery tier | % fee/tier | Fee award |
|---|---|---|
| First $5,000,000 | 0% | $0 |
| $5,000,0001 - $25,000,000 | 17% | $3,400,000 |
| $25,000,001 - $50,000,000 | 16.25% | $4,062,500 |
| $50,000,001 - $75,000,000 | 16% | $4,000,000 |
| $75,000,001 - $100,000,000 | 15.5% | $3,875,000 |
| $100,000,001 - $172,000,000 | 14% | $10,080,000 |
| Total Fee | | $25,417,500 |

Andren acknowledges that each case is unique and presents unique challenges, but the issues in this case that counsel highlights in the fee request and the Sliding Scale Response were not so extraordinary, unique or unexpected as compared to the cases in which Hagens Berman submitted fee bids as to justify a flat 33% fee. If anything, the opposite is true: the government investigation (and Pilgrim's Pride's knowledge of their eventual guilty plea) reduced risk substantially. The fee structure bids submitted by Hagens Berman in similarly complex antitrust litigation provide the district court an accurate and reliable metric with respect to an appropriate fee award. It is the best insight into the *ex ante* value placed on similar litigation by experienced and sophisticated class counsel. The district court, in its capacity as a fiduciary for the unnamed class members, must use that information in assessing the fee award request. *In re Continental Ill. Secs. Litig.*, 962 F.2d at 572 (discussing how "the

judge has so step in and play surrogate client" when selecting class counsel). In so doing, the court must reject counsel's request for a 33% flat fee and implement a sliding-scale approach that is favored in the Seventh Circuit and which Hagens Berman has demonstrated a willingness to use when seeking to win appointment as lead counsel in similarly large and complex antitrust cases.

Furthermore, details regarding class counsel's fee requests in other cases demonstrate that the requested 33% flat fee is excessive. Class counsel specifically highlighted the *In re Electronic Books Antitrust Litig.*, No. 11-MD-2293 (S.D.N.Y.) in both motions to be named lead counsel. (Dkt. 117 at 4, 8; Dkt 247 at 4). Both Hagens Berman and Cohen Milstein served as lead counsel in that antitrust class action. In that case there were two potential scenarios for recovery after settlement contingent upon the results of an appeal, the greatest being a $400 million recovery for consumers and $160 million recovery for states that had joined the class action. Under that scenario, class counsel sought a fee of 7% of the recovery to consumers (excluding costs) and a 17% fee for the recovery due to the states. Under a different scenario resulting in a smaller recovery, class counsel sought a fee of 17% of the recovery for the consumers and 26% of the recovery for the states. Including prior payments by defendants to consumers, "the total amount of fees and expenses, measured as a percentage of the total payments by all defendants, would equal 12.2 percent under the first scenario and 18.4 percent under the second scenario." *In re Electronic Books Antitrust Litig.*, 11-MD-2293 (Dkt. 666 at 14) (attached as Bednarz Ex. C). Those are percentages far below 33% and more in line with Hagen's bids.

The only case from this district cited by class counsel in either motion for appointment, *In re Stericycle, Inc., Sterisafe Contract Litig.*, 13-CV-5795, MDL 2455 (N.D. IL), also indicates that the 33% flat fee is excessive. Although not an antitrust litigation, the case involved complex issues related to pricing and pricing practices. Hagens Berman served as lead counsel and submitted a fee request that amounted to "just 8.79% of the total class recovery and 13.56% of the cash payment." *In re Stericycle, Inc., Sterisafe Contract Litig.*, 13-CV-5795, MDL 2455 (N.D. IL) (Dkt. 318 at 1, 7) (attached as Bednarz Ex. D).

Class counsel's request for a 33% flat fee is demonstrably out of line with what has been sought in similar cases. Andren expects his interrogatories seeking limited discovery of fee awards and

bids for Hagens Berman and Cohen Milstein in other complex antitrust cases will further show the excessiveness of a 33% award. Such information is far more probative of the *ex ante* market rate than "survey participants," self-interested legal arguments, or dueling empirical data. *See* Dkt. 5049 at 3-6.

With respect to the other *Synthroid I* factors, they too show that the fee request is unduly inflated. "[S]electing competent counsel using a competitive process generates a lower percentage-of-the-fund fee arrangement than Eisenberg and Miller's mean and median percentages, which mostly reflect awards granted *ex post*," and exceed the request here. *Capital One TCPA*, 80 F. Supp. 3d 781, 803 (N.D. Ill. 2015); *see also In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 947 n.7 (N.D. Ill. 2001).

### C. Class counsel's Rule 23(h) request grossly exceeds the market rate because fees for a $181 million megafund should include diminishing marginal rates.

Class counsel's request for 37.8% of the $181 million common fund grossly exceeds the market rate for funds of that size. "The market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case." *Synthroid I*, 264 F.3d at 721. Under Seventh Circuit law, diminishing marginal rates should apply to a $181 million fund to more accurately reflect the market because "negotiated fee agreements regularly provide for a recovery that increases at a decreasing rate." *See Silverman v. Motorola*, 739 F.3d 956, 959 (7th Cir. 2013); *Synthroid II*, 325 F.3d at 975 (noting that the "market rate, as a percentage of recovery, likely falls as the stakes increase"); *Synthroid I*, 264 F.3d at 721 ("Both negotiations and auctions often produce diminishing marginal fees when the recovery will not necessarily increase in proportion to the number of hours devoted to the case."). As Judge Easterbrook reasoned:

> Awarding counsel a decreasing percentage of the higher tiers of recovery enables them to recover the principal costs of litigation from the first bands of the award, while allowing the clients to reap more of the benefit at the margin (yet still preserving some incentive for lawyers to strive for these higher awards).

*Silverman*, 739 F.3d at 959 (observing that is just as expensive to litigate a $100 million case as a $200 million case because "costs of litigation do not depend on the outcome").

For example, in *Synthroid II*, the Seventh Circuit ordered fees for consumer class counsel of 30% of the first $10 million, 25% of the next $10 million, 22% of the band from $20 to $46 million, and 15% of everything else on a fund totaling $88 million. 325 F.3d at 980. *Synthroid II* was a fraud suit against a drug manufacturer which included two classes: a consumer class and a third-party payor class. *Id.* at 976. The court took into account that the consumer class counsel in that case had assumed as great a risk as counsel for the third-party payor class in those proceedings and thus, awarded fees that applied the same marginal rate awarded to the third-party payor class counsel. *Id.* at 980. The Seventh Circuit recognized that class counsel had assumed "a significant risk, for the consumer class did not have an easy road." *Id.* at 977. There is no evidence that this case involves greater risk than *Synthroid II*. And, "[a]s Eisenberg and Miler concluded in 2004 and again in 2010, 'the overwhelmingly important determinant of the fee is simply the size of the recovery obtained by the class,' not the subject matter of the litigation." *In re Capital One TCPA*, 80 F. Supp.3d at 803 (quoting Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 250 (2010)). Class counsel presents little reason to accept their view that some vaguely referenced class members might negotiate a flat 33% for a case such as this, while discarding legal precedent, sound analytical reasoning, and empirical data showing otherwise. Courts have applied sliding scales in antitrust actions, contrary to class counsel's claim that a flat 33% fee is common in large antitrust class actions, and nothing in *Synthroid* limits its application to antitrust cases. Class counsel's citation to a handful of district court case should be seen for what they are—cherry-picked outliers. *See* Dkt. 5161 at 11 (citing *Kleen Prod. LLC v. Int'l Paper Co.*, 2017 WL 5247928 (N.D. Ill. Oct. 17, 2017). And, it can hardly be said that class counsel had a difficult road here. *See* Section II.

Applying the percentages from *Synthroid II* to this case based on the $181 million common fund shows that class counsel should receive at most $31.5 million and likely much less once empirical data about class counsel's bidding history, risk, and opportunity cost are considered. The excessive fee request reflects self-dealing, and the extra $28 to $35 million should be distributed to the class members, not class counsel.

| Recovery Tier | Rate | Fee |
|---|---|---|
| $0 to $10 million | 30% | $3,000,000 |
| $10 to $20 million | 25% | $2,500,000 |
| $20 to $46 million | 22% | $5,720,000 |
| $46 to $181 million | 15% | $20,250,000 |
| **TOTAL** | | $31,470,000 |

The empirical data for megafund settlements over $100 million shows that the sliding scale appropriately compensates class counsel here and, even if the court were to apply a flat rate, the fee award should be the same. Empirical research shows that in class actions "fee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent." Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 Empirical L. Stud. 811, 838 (2010). In settlements ranging from $100 million to $250 million, the median award is 16.9% and the mean is 17.9%. *Id.* Other surveys report similar data. *See, e.g.*, Logan, Stuart, et al., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Reports (March-April 2003) (empirical survey showing average recovery of 15.1% where recovery exceeded $100 million); Eisenberg & Miller, 7 J. Empirical Legal Stud. at 265 tbl. 7 (mean percentage fee in 68 class action settlements with recovery above $175.5 million was 12% and median award was 10.2% with standard deviation of 7.9%). These authorities demonstrate that the market rate, and what would be negotiated *ex ante*, is in accord with the sliding scale which, if anything, over-compensates Hagens Berman here. Because class counsel's fee request fails to account for diminishing marginal percentages in market-based rates for megafunds, and because class counsel has not met their burden of demonstrating their proposed fee request does not overcompensate them for the relatively low risk they incurred in this case, the requested fees are unreasonable and should be reduced to the sliding scale of *Synthroid II* at most and, more reasonably, to Hagens Berman's demonstrated *ex ante* market price. Either approach would return approximately $30 million or more to the class.

### D. There must be consequences for class counsel seeking such an exorbitantly excessive fee.

The court must consider awarding a smaller fee in this case because class counsel, on previous instances involving complex antitrust class action litigation, indicated a willingness to compete to be named class counsel for an *ex ante* fee significantly less than what they now seek. If the only consequence from trying to claim a disproportionate share of a settlement is that class counsel will get what they would have been entitled to if they had agreed to a fair fee in the first place, there is no reason counsel should not to try for a "free roll" and seek a selfish initial fee. On the rare occasions counsel gets caught, they would be no worse off than if they had not tried; if no objector investigates and the district court fails to scrutinize the request, they receive a windfall. In the parlance of the gambler, this is playing with house money. If "the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place. To discourage such greed a severer reaction is needful." *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980). An "outside-chance opportunity for a megabucks prize must cost to play." *Commonwealth Electric Co. v. Woods Hole*, 754 F.2d 46, 49 (1st Cir. 1985).

## CONCLUSION

The Court should deny approval of the fee request until class counsel discloses the empirical evidence of risk and opportunity cost in this case, specifically its fee bids and awards in other antitrust cases. Even if the Court were to grant fees without that information, it should scale the Rule 23(h) award to reflect an appropriate market rate as reflected in what Hagens Berman has bid in other cases, *i.e.*, no more than $25.4 million, or suggested by the sliding scale in *Synthroid II*, *i.e.*, $31.5 million. Either result is more proportionate to the benefit realized by the class, reflects this Circuit's *ex ante* approach to fees, and returns millions of dollars to the consumer class.

Dated: November 10, 2021                    /s/ M. Frank Bednarz
                                            M. Frank Bednarz
                                            Hamilton Lincoln Law Institute
                                               Center for Class Action Fairness
                                            1629 K St. NW Suite 300
                                            Washington, DC 20006
                                            Phone: (801) 706-2690
                                            Email: frank.bednarz@hlli.org

                                            *Attorney for Objector John Andren*

I, John Andren, am the objector. I sign this written objection drafted by my attorneys as required by the Class Notice ¶ 14.

_____
John Andren

## CERTIFICATE OF SERVICE

The undersigned certifies he electronically filed the foregoing Objection via the ECF system for the Northern District of Illinois and the contemporaneously-filed declarations of John Andren, Theodore H. Frank, and M. Frank Bednarz, and exhibits thereto, thus effecting service on all attorneys registered for electronic filing.

Additionally, he caused to be served via First-Class mail a copy of this Objection and accompanying declarations and exhibits upon the following:

Broiler Chicken Consumer Litigation
ATTN: OBJECTIONS
c/o A.B. Data, Ltd.
P.O. Box 173001
Milwaukee, WI 53217

Shana E. Scarlett
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710

Brent W. Johnson
COHEN MILSTEIN SELLERS & TOLL,
PLLC
1100 New York Ave. NW
Fifth Floor
Washington, DC 20005

Dated: November 10, 2021

/s/ M. Frank Bednarz

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | Case No. 1:16-cv-08637 |
| This Document Relates To: | Honorable Thomas M. Durkin |
| *All End-User Consumer Plaintiff Actions* | |
| JOHN ANDREN,<br><br>    Objector. | |

## DECLARATION OF JOHN ANDREN

I, John Andren, declare as follows:

1.  I have personal knowledge of the facts set forth herein and, if called as witness, could and would testify competently thereto.

2.  My full legal name is John Michael Andren. My business address is Hamilton Lincoln Law Institute, 1629 K St. NW, Suite 300, Washington, DC 20006. My telephone number is (703) 582-2499. My email address is john.andren@hlli.org.

3.  During the period from January 1, 2009 to July 31, 2019, I purchased fresh or frozen raw chicken, whole cut-up birds within a package, or "white meat" parts including chicken breasts and wings in the District of Columbia and Florida on an approximately weekly basis. I purchased these chicken products for personal and household use and not for resale or distribution to retailers such as restaurants. I did not receive a refund for my purchases of these chicken products. I have not submitted an opt-out request to exclude myself from the class.

4.  After I filed a claim through the settlement website overchargedforchicken.com, I was assigned Claim Number 129172865. A true and correct copy of my claim confirmation is attached hereto as Exhibit 1.

5.  I have engaged my colleagues at Hamilton Lincoln Law Center's Center for Class Action Fairness ("CCAF") to represent me in this matter. I intend to appear through counsel at the fairness hearing currently scheduled for December 20, 2021.

6.  I bring this objection in good faith to prevent approval of an unfair settlement. Unlike many objectors who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of attorneys' fees, CCAF does not engage

in *quid pro quo* settlements and will not withdraw an objection or appeal in exchange for payment.

7.     Thus, if contrary to CCAF's practices and recommendations, I agree to withdraw my objection or any subsequent appeal for a payment by plaintiffs' attorneys or the defendant paid to me or any person or entity related to me in any way without court approval, I hereby irrevocably waive any and all defenses to a motion seeking disgorgement to the class of any and all funds paid in exchange for dismissing any objection or appeal. In addition, if this Court has any skepticism about my motives, I am happy to stipulate to an injunction forbidding me from seeking compensation for settling my objection at any stage without court approval.

8.     The specific grounds of my objection are identified in the memorandum to be filed by my attorney contemporaneously with this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 10, 2021, in Coral Gables, Florida.



_____
John Andren

# Andren Decl.
# EXHIBIT 1



overchargedforchicken.com/complete

Home   **Important Documents**   Español   FAQs   Contact

# THANK YOU FOR SUBMITTING YOUR INFORMATION

**Right click anywhere on the page and select Print**

Your Claim Number is **129172865**. The information was submitted on **Oct 1, 2021, 2:32:10 PM CST**. Relief from the Settlement will be made only if the Court approves the Settlement and only after any appeals are resolved. Please be patient.



By providing your information, either on paper, electronically, or through a website, you consent to us storing and using your information for case administration purposes only. Our site uses tracking technologies to tailor your experience and understand how you and other visitors use our site. By continuing to navigate this site you consent to use of these tracking technologies. For more information on how we use your personal data, please read our Privacy Policy.



**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | Case No. 1:16-cv-08637 |
| This Document Relates To: | Honorable Thomas M. Durkin |
| *All End-User Consumer Plaintiff Actions* | |
| JOHN ANDREN, Objector. | |

**DECLARATION OF THEODORE H. FRANK IN SUPPORT OF OBJECTION**

non-profit public-interest law firm that Melissa Holyoak and I founded in 2018. Ms. Holyoak left HLLI in 2020 to become the Solicitor General of Utah.

7.      CCAF's mission is to litigate on behalf of class members against unfair class action procedures and settlements. *See, e.g., Pearson v. NBTY, Inc.,* 772 F.3d 778, 787 (7th Cir. 2014) (praising CCAF's work); *In re Dry Max Pampers Litig.,* 724 F.3d 713, 716-17 (6th Cir. 2013) (describing CCAF's client's objections as "numerous, detailed and substantive") (reversing settlement approval and certification); *Richardson v. L'Oreal USA, Inc.,* 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (describing CCAF's client's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objections in ascertaining the fairness of a settlement") (rejecting settlement approval and certification). CCAF has won over 200 million dollars for class members and received national acclaim for its work. *See, e.g., McDonough v. Toys "R" Us, Inc.,* 80 F. Supp. 3d 626 (E.D. Pa. 2015) (approving amended settlement that enhanced class recovery by about $15 million); Roger Parloff, *Should Plaintiffs Lawyers Get 94% of a Class Action Settlement?,* FORTUNE, Dec. 15, 2015 ("the nation's most relentless warrior against class-action fee abuse"); The Editorial Board, *The Anthem Class-Action Con,* WALL ST. J., Feb. 11, 2018 (opining "[t]he U.S. could use more Ted Franks" while covering CCAF's role in exposing "legal looting" in the Anthem data breach MDL). *Cf. also Eubank v. Pella Corp.,* No. 1:06-cv-04481 Dkt. 770 (N.D. Ill. Mar. 15, 2019) (calling me "a well-known and well-respected class action lawyer" in a non-CCAF/non-HLLI case). A court in a case where we did not appear gratuitously praised CCAF. *Shah v. Zimmer Biomet Holdings,* 2020 WL 5627171, 2020 U.S. Dist. LEXIS 171925 (N.D. Ind. Sept. 18, 2020).

8.      CCAF has been successful, winning reversal or remand in over twenty federal appeals decided to date in courts of appeals and the Supreme Court. *E.g., Frank v. Gaos,* 139 S. Ct. 1041 (2019); *McKinney-Drobnis v. Oreshack,* -- F.4th --, 2021 WL 4890277 (9th Cir. Oct. 20, 2021); *Briseño v. Henderson,* 998 F.3d 1014 (9th Cir. 2021); *Berni v. Barilla S.P.A,* 964 F.3d 141 (2d Cir. 2020); *Pearson v. Target Corp.,* 968 F.3d 827 (7th Cir. 2020); *In re Lithium Ion Batteries Antitrust Litig.,* 777 Fed. Appx. 221 (9th Cir. 2019) (unpublished); *In re Google Inc. Cookie Placement Consumer Privacy Litig.,* 934 F.3d 316 (3d Cir. 2019); *In re EasySaver Rewards Litig.,* 906 F.3d 747 (9th Cir. 2018); *Pearson v. Target Corp.,* 893 F.3d 980 (7th Cir.

2018); *In re Subway Footlong Mktg. Litig.*, 869 F.3d 551 (7th Cir. 2017); *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608 (8th Cir. 2017); *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718 (7th Cir. 2016); *In re EasySaver Rewards Litig.*, 599 Fed. Appx. 274 (9th Cir. 2015) (unpublished); *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060 (8th Cir. 2015); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014); *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014); *In re MagSafe Apple Power Adapter Litig.*, 571 Fed. Appx. 560 (9th Cir. 2014) (unpublished); *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013); *In re HP Inkjet Printer Litigation*, 716 F.3d 1173 (9th Cir. 2013); *In re Baby Products Antitrust Litigation*, 708 F.3d 163 (3d Cir. 2013); *Dewey v. Volkswagen*, 681 F.3d 170 (3d Cir. 2012); *Robert F. Booth Trust v. Crowley*, 687 F.3d 314 (7th Cir. 2012); *Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011). While, like most experienced litigators, we have not won every appeal we have litigated, CCAF has won the majority of them, even though appellants in private civil cases typically prevail less than 15% of the time. That CCAF and I have won the majority of our appeals against far-better-funded opposition (and usually two sets of appellees' briefs), even though most of our cases raise novel issues and seek to create new law, is, I submit, extraordinary evidence of the good faith of our project. In recent years, though there are still weeks where I argue two appeals on consecutive days, I have doled out a substantial percentage of appellate oral arguments to other CCAF attorneys, and I am proud that four other CCAF attorneys besides me have won appellate oral arguments, and that one went on to become Utah Solicitor General.

9.      HLLI and CCAF achieve success or partial success in the vast majority of their objections, and have won hundreds of millions of dollars for class members, as well as numerous landmark appeals. We regularly represent law professors in court, and have been appointed *amicus* in district court and appellate court proceedings where there was no adversary presentation. HLLI began court appearances in 2019. CCAF began existence in 2009. Frank, CCAF, and HLLI, and their attorneys have never been sanctioned in the last five years or otherwise.

10.    HLLI pays me on a salary basis that does not vary with the result in any case. HLLI and CCAF attorneys do not receive a contingent bonus based on success in any case, a structure that would be contrary to I.R.S. restrictions.

11.    CCAF has won more than $200 million for class members by driving the settling parties to reach an improved bargain or by reducing outsized fee awards. Andrea Estes, *Critics hit law firms' bills after class-action lawsuits*, Boston Globe (Dec. 17, 2016) (more than $100 million at time). *See also, e.g., McDonough v. Toys "R" Us*, 80 F. Supp. 3d 626, 661 (E.D. Pa. 2015) ("CCAF's time was judiciously spent to increase the value of the settlement to class members") (internal quotation omitted); *In re Citigroup Inc. Secs. Litig.*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013) (reducing fees, and thus increasing class recovery, by more than $26 million to account for a "significantly overstated lodestar"); *In re Apple Inc. Sec. Litig.*, No. 5:06-cv-05208-JF, 2011 U.S. Dist. LEXIS 52685 (N.D. Cal. May 17, 2011) (parties nullify objection by eliminating *cy pres* and augmenting class fund by $2.5 million).

### Pre-empting *Ad Hominem* Attacks

12.    Class counsel often try to tar CCAF as "professional objectors" or "serial objectors" and then cite court opinions using those terms of art to criticize for-profit attorneys who threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of attorneys' fees. But this is not the non-profit CCAF's *modus operandi*, so the court opinions class counsel rely upon to tar CCAF are inapposite. *See* Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. Chi. Legal F. 403, 437 n. 150 (public interest groups are not "professional objectors"); Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: Class Action Litig. Report (Aug. 12, 2011) (distinguishing CCAF from "professional objectors"). CCAF refuses to engage in *quid pro quo* settlements and has never withdrawn an objection in exchange for payment. Instead, it is funded entirely through charitable donations and court-awarded attorneys' fees. The difference between a for-profit "professional objector" and a public-interest objector is a material one. As the federal rules are currently set up, "professional objectors" have an incentive to file objections regardless of the merits of the settlement or the objection. In contrast, a

public-interest objector such as myself has to triage dozens of requests for pro bono representation and dozens of unfair class action settlements, loses money on every losing objection (and most winning objections) brought, can only raise charitable donations necessary to remain afloat by demonstrating success, and has no interest in wasting limited resources and time on a "baseless objection." CCAF represents clients as objectors in only a small fraction of the number of unfair class action settlements and fee requests it sees.

13.     While one district court called me a "professional objector" in a broader sense, that court stated that it was not meant pejoratively, and awarded CCAF fees for a successful objection and appeal that improved the settlement for the class. *Dewey v. Volkswagen*, 909 F. Supp. 2d 373, 396 n.24 (D.N.J. 2012). Similarly, the Seventh Circuit in *In re Subway Footlong Mktg. Litig.*, 869 F.3d 551 (7th Cir. 2017) referred to me non-pejoratively as a "professional objector" in an opinion agreeing with my objection and reversing a settlement approval and class certification.

14.     In *In re Equifax, Inc. Customer Data Breach Litigation*, No. 17-md-2800-TWT (N.D. Ga.), the district court's approval order stated that I am a "serial objector" who objected merely to benefit myself or my attorney. It further accused me of making "false and misleading" statements about the settlement. The order did not cite any evidence or reason to support this finding, did not identify any specific statements it deemed "false" or "misleading," and I have reason to believe the court used this language only because it adopted verbatim a proposed order that was submitted *ex parte* by plaintiffs' counsel, without exercising independent judgment to make these findings. The allegation made by the district court is false. I still believe our objection in *Equifax* was meritorious, similar to successful objections we've made elsewhere that have won millions of dollars for class members, and was supported on appeal by an amicus brief by a prominent plaintiffs' attorney that agreed with our analysis. A leading Supreme Court law firm offered to represent us in a petition for certiorari *pro bono*. *Watkins v. Spector*, No. 21-638. I did not make any false or misleading statements about the settlement, and on appeal, plaintiffs failed to identify any false or misleading statements I made and admitted that I have never engaged in extortion. The Eleventh Circuit did not resolve this question, holding that the criticism was dicta.

15.    In *Exum v. National Tire and Battery*, No. 9:19-cv-80121 (S.D. Fla.), one of HLLI's attorneys mistakenly misconstrued the release clause in the settlement agreement and filed an objection with an argument that relied on that erroneous reading. Once she became aware of the error, she withdraw that portion of the objection and has publicly expressed contrition and embarrassment that her work did not live up to the high standards she sets for herself. The district court issued an order to show cause why she should not be sanctioned, stating that the "false statements and representations" "appear[] to be reckless or negligent." The court also referred to the HLLI attorney as a "serial" or "professional" objector but made no finding that she or any other HLLI attorney has ever withdrawn an objection in exchange for payment. HLLI filed a response to the order explaining that this error was made in good faith, with no intent to delay or otherwise interfere with the court proceedings and again expressing contrition. The court subsequently issued an order discharging the order to show cause in which it stated that "it is clear to the Court that [the HLLI attorney] does hold herself to high standards" and the court was "satisfied and impressed" by HLLI's "prompt and candid response." The court found that the HLLI attorney "did not engage in bad faith conduct and did not knowingly or intentionally make a false statement or misrepresentation to the Court." The HLLI attorney, Ms. Holyoak, has since left HLLI to become Solicitor General of Utah.

16.    CCAF feels strongly enough about the problem of bad-faith objectors profiting at the expense of the class through extortionate means that it successfully initiated litigation to require such objectors to disgorge their ill-gotten gains to the class. *See Pearson v. Target Corp.*, 968 F.3d 827 (7th Cir. 2020); *see also Rougvie v. Ascena Retail Grp., Inc.*, No. 15-cv-724, 2019 U.S. Dist. LEXIS 28229 (E.D. Pa. Feb. 21, 2019); *see generally* Jacob Gershman, *Lawsuits Allege Objector Blackmail in Class Action Litigation*, Wall St. J., Dec. 7, 2016.

17.    Before I joined CEI, I had a private practice unrelated to my non-profit work. One of my former clients, Christopher Bandas, is a professional objector who has settled objections and withdrawn appeals for cash payments. I withdrew from representation of Mr. Bandas in 2015 when he undertook steps that interfered with my non-profit work. Mr. Bandas was criticized by the Southern District of New York after I ceased to represent him, and class counsel in other cases often cites that

language and attempts to attribute it to me. Class counsel in multiple cases, using boilerplate language, has tried to make it seem like my paid representation of Mr. Bandas was somehow scandalous, using language like "forced to disclose" and "secret." The sneering is false: my representation of Mr. Bandas was not secret, as I filed declarations in my name on his behalf in multiple cases, noting under oath that I was being paid to perform legal work for him; I filed notices of appearances in cases where he had previously appeared; and my declaration in the *Capital One* case ending the relationship was filed voluntarily at great personal expense to myself, as I had been offered and refused to take a substantial sum of money to accede to a Lieff Cabraser fee award of over $3400/hour. I only worked for Mr. Bandas in cases where I believed there was a meritorious objection to be made, had no role in any negotiations he made to settle appeals, and my pay was flat-rate or by the hour and not tied to his ability to extract settlements. I argued two appeals for Mr. Bandas, and won both of them. There is nothing scandalous about that, unless one believes it is scandalous for an attorney to be paid to perform successful high-quality legal services for a client. CCAF had no attorney-client relationship with Mr. Bandas, and Mr. Bandas never paid CCAF, other than for his share of printing expenses when he was an independent co-appellant representing clients unrelated to CCAF. As it turns out, the payments Mr. Bandas made to me were entirely offset by court-awarded attorneys' fees in one of the successful objections I argued on his behalf in the Seventh Circuit that resulted in a substantially improved settlement on remand. *Eubank v. Pella Corp.*, No. 1:06-cv-04481 Dkt. 770 (N.D. Ill. Mar. 15, 2019).

18.     Firms whose fees we have objected to have previously cited to *City of Livonia Employees' Ret. Sys. v. Wyeth*, No. 07 Civ 10329 (RJS), 2013 WL 4399015 (S.D.N.Y. Aug. 7, 2013), in efforts to tar CCAF. While the *Wyeth* court did incorrectly criticize our client's objection as "frivolous" (after mischaracterizing the nature of that objection and incorrectly finding that he did not have standing to challenge a settlement that froze him out of the settlement claims process because he did not make a futile claim), it ultimately agreed with our client that class counsel's fee request was too high and reduced it by several million dollars to the benefit of shareholder class members. *Compare* Dkt. 111-1 at 8 (falsely characterizing Petri as claiming that class counsel did not have any measurable risk and

that any multiplier would be inappropriate) *with* Dkt. 111-2 at 3-11 (quantifying risk in detail with empirical evidence and measuring and proposing a substantial multiplier that would compensate class counsel for that risk, while noting that the court had the discretion to not award a multiplier at all given the recovery of $0.16/share for an alleged $4.98/share of damage) *and* Daniel Fisher, *A Brief Explanation Of The Economics Of Securities Lawsuits*, Forbes (Jan. 25, 2013) (praising the economic analysis and discussion of risk in Petri's objection). *Compare also* Dkt. 111-2 at 4-5 (citing *Goldberger*) *with* Dkt. 111-1 at 6-9 (agreeing with our objection without crediting it that *Goldberger* factors did not support a 25% award). But the district court did not actually sanction us, so we could not appeal the incorrect critical language in the decision. We did not appeal the substantive result, because we had achieved the majority of what we sought to achieve in that case.

19.    Adversaries frequently cite a decade-old case, *Lonardo v. Travelers Indemnity Co.*, 706 F. Supp. 2d 766, 804 (N.D. Ohio 2010), where the district court criticized a policy-based argument by CCAF as supposedly "short on law"; however, CCAF ultimately was successful in the Seventh and Ninth Circuits on that same argument. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) (agreeing that reversionary clauses are a problematic sign of self-dealing); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) (same). Moreover, the court in *Lonardo* stated its belief that "Mr. Frank's goals are policy-oriented as opposed to economic and self-serving" and even awarded CCAF about $40,000 in attorneys' fees for increasing the class benefit by $2 million. *Lonardo*, 706 F. Supp. 2d at 813-17.

20.    CCAF has no interest in pursuing "baseless objections," because every objection we bring on behalf of a class member has the opportunity cost of not having time to pursue a meritorious objection in another case. We are confronted with many more opportunities to object (or appeal erroneous settlement approvals) than we have resources to use, and make painful decisions several times a year picking and choosing which cases to pursue, and even which issues to pursue within the case. CCAF turns down the opportunity to represent class members wishing to object to settlements or fees when CCAF believes the underlying settlement or fee request is relatively fair. This is especially true now that HLLI has expanded into successful litigation over other issues that our attorneys care

about, such as freedom of speech and regulatory abuse. *See, e.g.*, *CEI v. FCC*, 970 F.3d 372 (D.C. Cir. 2020); *Greenberg v. Haggerty*, 491 F. Supp. 3d 12 (E.D. Pa. 2020) (preliminarily enjoining rule of professional conduct that would chill free speech, which the defendant appealed but subsequently dismissed).

21.     While I am often accused of being an "ideological objector," the ideology of CCAF's objections is merely the correct application of Rule 23 to ensure the fair treatment of class members. Likewise, I have often seen class counsel assert that I oppose all class actions and am seeking to end them, not improve them. The accusation—aside from being utterly irrelevant to the legal merits of any particular objection—has no basis in reality. I have been writing and speaking about class actions publicly for nearly a decade, including in testimony before state and federal legislative subcommittees, and I have never asked for an end to the class-action device, just proposed reforms for ending the abuse of class actions and class-action settlements. That I oppose class-action abuse no more means that I oppose class actions than someone who opposes food poisoning opposes food. As a child, I admired Ralph Nader and consumer reporter Marvin Zindler (whose autographed photo was one of my prized childhood possessions), and read every issue of *Consumer Reports* from cover to cover. I have focused my practice on conflicts of interest in class actions because, among other reasons, I saw a need to protect consumers that no one else was filling, and as a way to fulfill my childhood dream of being a consumer advocate. I have frequently confirmed my support for the principles behind class actions in declarations under oath, interviews, essays, and public speeches, including a January 2014 presentation in New York that was broadcast nationally on C-SPAN and in my briefing in *Frank v. Gaos*. On multiple occasions, successful objections brought by CCAF have resulted in new class-action settlements where the defendants pay substantially more money to the plaintiff class without CCAF objecting to the revised settlement. And I was the putative class representative in a federal class action, represented by a prominent plaintiffs' firm. *Frank v. BMO Corp., Inc.*, No. 4:17-cv-870 (E.D. Mo.).

22.     On October 1, 2015, after consultation with its board of directors and its donors, CCAF merged with the much larger Competitive Enterprise Institute ("CEI"). Prior to its merger with CEI, CCAF never took or solicited money from corporate donors other than court-awarded attorneys'

9

fees. CEI, which is much larger than CCAF, does take a percentage of its donations from corporate donors. As part of the merger agreement, I negotiated a commitment that CEI would not permit donors to interfere with CCAF's case selection or case management. In the event of a breach of this commitment, I was permitted to treat the breach as a constructive discharge entitling me to substantial severance pay. CCAF attorneys made several filings in several cases opposed by CEI donors.

23.     CEI was willing to merge with CCAF because it supported CCAF's pro-consumer mission and success in challenging abusive class-action settlements and fee requests. But it is a large organization affiliated with dozens of scholars who take a variety of controversial positions. Neither I nor CCAF's clients agree with all of those positions, and they should not be ascribed to me, my clients, or this objection, any more than my support for a Pigouvian carbon tax should be ascribed to CEI scholars who have publicly opposed that position.

24.     CCAF has since left CEI, and is now part of the Hamilton Lincoln Law Institute, which receives no corporate funding. We did not consult any of our donors about our objection to this settlement. None of our donors has any say in our class-action case selection. HLLI does not receive funding from the Koch Brothers or the Chamber of Commerce. We'd be happy to accept such funding, and don't think there's anything wrong with it, but they haven't offered.

25.     Some class counsels have accused us of improper motivation because CCAF has on occasion sought attorneys' fees. While CCAF is funded entirely through charitable donations and court-awarded attorneys' fees, the possibility of a fee award never factors into the Center's decision to accept a representation or object to an unfair class-action settlement or fee request.

26.     CCAF's history in requesting attorneys' fees reflects this approach. Despite having made dozens of successful objections and having won over $200 million on behalf of class members, CCAF has not requested attorneys' fees in the majority of its cases or even in the majority of its appellate victories. CCAF regularly passes up the opportunity to seek fees to which it is legally entitled. In *Classmates*, for example, CCAF withdrew its fee request and instead asked the district court to award money to the class; the court subsequently found that an award of $100,000 "if anything" "would have undercompensated CCAF." *In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 WL 3854501,

at *11 (W.D. Wash. June 15, 2012). In other cases, CCAF has asked the court for a fraction of the fees to which it would be legally entitled based on the benefit CCAF achieved for the class and asked for any fee award over that fractional amount be returned to the class settlement fund. In *Petrobras*, despite winning tens of millions of dollars for the class, we requested less than $200,000 in fees. In *Wells Fargo*, our good-faith objection on behalf of a shareholder aided the court in increasing benefit to shareholders by $15 million, and we requested only $250,000 (and received under $100,000) in fees through a court approval process—even though a fellow objector in the same case negotiated and received a payment of $1.75 million from Wells Fargo directly for settling his objections. *In re Wells Fargo & Co. S'holder Derivative Litig.*, No. 16-cv-05541, 2021 U.S. Dist. LEXIS 48593 (N.D. Cal. Mar. 4, 2021).

27.     Moreover, under federal non-profit law, attorney fees cannot be used to support more than 50% of our program expenses. None of our attorneys' salaries are tied to fee awards in any case, and all of our attorneys have salaries that are a fraction of what they could make in private practice.

28.     HLLI frequently uses its attorneys as objectors in cases. No adverse inference should be drawn from this. HLLI attorneys are paid fixed salaries, do not receive any extra income for objecting, and do not object unless they volunteer to do so; we have no way of knowing if an HLLI attorney is a class member unless he or she volunteers the information. Multiple class members contacted me offering to object (our outside clients are often very excited about participating in our work), but it was logistically easier to use an HLLI attorney as the objector. We have found that settling parties sometimes use the threat of discovery to try to intimidate our outside clients; there is no risk of an HLLI attorney being intimidated. In addition, on multiple occasions, settling parties have attempted to bribe our clients to fire us and withdraw meritorious objections or appeals. (After all, settling parties have millions of dollars at stake, and our clients only a few dollars at stake: an offered payment of tens of thousands of dollars can distort an objector's incentives and willingness to do the right thing.) We screen our clients very carefully for that possibility, and generally avoid that risk (which is much decreased with our success in *Pearson v. Target* establishing that class members may seek disgorgement of such unfair payments), but the risk becomes zero if we use an HLLI attorney as the

objector. There is also no reason not to use a single objector rather than several: it would be logistically much more time-consuming to compile objections and supporting declarations for five or six class members, as we could, but there would be no legal difference in the merits of the objection.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 9, 2021, in North Bethesda, Maryland.

Theodore H. Frank

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | Case No. 1:16-cv-08637 |
| | |
| This Document relates to: | Hon. Thomas M. Durkin |
| *All End-User Consumer Plaintiff Actions* | |
| | |
| JOHN ANDREN, | |
| Objector. | |

---

## DECLARATION OF M. FRANK BEDNARZ

---

I, Michael Frank Bednarz declares as follows:

     1.     I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

     2.     I am an attorney licensed to practice law in the Commonwealth of Massachusetts and State of Illinois, and in this case I represent objector John Andren.

     3.     I have attached several true and correct copies of public documents for reference as exhibits to the objection.

     4.     **Exhibit A**, is a true and accurate copy of *In Camera* Submission in Support of Appointment as Interim Lead Counsel for Indirect Purchasers, originally submitted by Hagens Berman Sobol Shapiro LLP on May 13, 2010, *In re Optical Disk Drive Products Antitrust Litig.*, Dkt. 10-MD-2143-RS, No. 2900 (N.D. Cal.), and includes a chart of proposed attorneys' fees (including costs).

     5.     **Exhibit B**, is a true and accurate copy of the Declaration of Steve W. Berman in Support of Application to Appoint Hagens Berman as Interim Class Counsel (without Exhibits), dated April 3, 2013, *In re Lithium Ion Batteries Antitrust Litig.*, Dkt. 13-MD-2420-YGR, No. 2630-2, and includes a chart of proposed attorneys' fees.

     6.     **Exhibit C**, is a true and accurate copy of Memorandum In Support of Class Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Expenses Related to Apple Settlement, filed October 17, 2014, *In re Electronic Books Antitrust Litig.*, Dkt. 11-MD-2293 (DLC), No. 666 (S.D.N.Y.)

     7.     **Exhibit D**, is a true and accurate copy of Plaintiffs' Memorandum In Support of Motion for Attorneys' Fees, Costs, and Incentive Awards, filed January 5, 2018, *In re Stericycle, Inc., Steri-Safe Contract Litig.*, Dkt. 13-CV-5759, MDL No. 2455, No. 318 (N.D. Ill.).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 10, 2021, in Chicago, Illinois.

# EXHIBIT A

Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Steve W. Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Lead Counsel for Indirect
Purchaser Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE OPTICAL DISK DRIVE PRODUCTS ANTITRUST LITIGATION | No. 3:10-md-2143 RS (JCS) |
| | NOTICE OF FILING OF *IN CAMERA* SUBMISSION |
| | DATE ACTION FILED: Oct. 27, 2009 |
| This Document Relates to: | |
| ALL INDIRECT PURCHASER ACTIONS | |

1    Pursuant to this Court's Order Granting Final Approval of Indirect Purchaser Plaintiffs'

2    Settlement with Defendants Samsung Electronics Co., Ltd., Toshiba Corporation and Toashiba

3    Samsung Storage Technology Corporation, Granting Motion for Attorney Fees and Expenses, and

4    Denying Objections (ECF No. 2889), indirect purchaser plaintiffs hereby submit as Attachment A

5    the excerpt from Hagen Berman's *In Camera* Submission in Support of Appointment as Interim

6    Lead Counsel for Indirect Purchasers, originally submitted May 13, 2010.

7

8    DATED: July 22, 2019                    HAGENS BERMAN SOBOL SHAPIRO LLP

9                                            By ____s/ Shana E. Scarlett_____

10                                              SHANA E. SCARLETT

11                                           Jeff D. Friedman (173886)
                                             715 Hearst Avenue, Suite 202
12                                           Berkeley, CA 94710
                                             Telephone: (510) 725-3000
13                                           Facsimile:  (510) 725-3001
                                             jefff@hbsslaw.com
14                                           shanas@hbsslaw.com

15                                           Steve W. Berman (*Pro Hac Vice*)
                                             HAGENS BERMAN SOBOL SHAPIRO LLP
16                                           1918 Eighth Avenue, Suite 3300
                                             Seattle, WA 98101
17                                           Telephone: (206) 623-7292
                                             Facsimile: (206) 623-0594
18                                           steve@hbsslaw.com

19                                           *Lead Counsel for Indirect Purchaser Class*

20

21

22

23

24

25

26

27

28

NOTICE OF FILING OF *IN CAMERA* SUBMISSION – Case No.:
3:10-md-2143 RS                                                     -1-
010177-12 1154599v1

# ATTACHMENT A

### 1. Hagens Berman's Proposal for Attorneys' Fees and Costs

In considering competitive bids from counsel, "[j]udges don't look for the lowest bid; they look for the best bid -- just as any private individual would do in selecting a law firm, an advertising firm, or a construction company." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 720 (7th Cir. 2001). But the relationship between attorneys' fees and recovery to the class is a complex one, where courts often strive to align the interests of counsel and the class. This Court has previously expressed its belief "that a 'percentage of recovery fee' calculation holds the best promise of harmonizing the interests of the class and its future counsel." *Wenderhold v. Cylink Corp.*, 188 F.R.D. 577, 587 (N.D. Cal. 1999). Based on this Court's rulings in other cases, Hagens Berman submits the following chart proposing percentage-based attorneys' fees (including costs) based on recovery from each defendant at various stages of the case and over various recoveries for the class:

| HAGENS BERMAN'S PROPOSED ATTORNEYS' FEES AND COSTS | | | |
|---|---|---|---|
| | From Pleading Through Decision on Motion to Dismiss | After Motion to Dismiss Through Adjudication of Class Certification | After Adjudication of Summary Judgment | Through Trial Verdict and Final Appellate Determination |
| First $5,000,000 | 0% | 0% | 0% | 0% |
| $5,000,001-$25,000,000 | 5% | 14% | 14% | 14% |
| $25,000,001-$50,000,000 | 4% | 13% | 13.25% | 14% |
| $50,000,001-$75,000,000 | 3% | 12% | 13% | 14% |
| $75,000,001-$100,000,000 | 2.5% | 11.5% | 12.5% | 13.5% |
| $100,000,001-$200,000,000 | 2% | 10% | 11% | 12% |
| $200,000,001-$400,000,000 | 1.5% | 7% | 8% | 9% |
| $400,000,001 and above | 1% | 5% | 6% | 7% |

# EXHIBIT B

1         I, STEVE W. BERMAN, declare as follows:

2         1.    I am the managing partner of Hagens Berman Sobol Shapiro LLP ("Hagens

3   Berman"), counsel of record for Plaintiffs in *Young, et al. v. LG Chem Ltd., et al.*, No.

4   12-CV-05129-YGR (N.D. Cal.) ("*Young*").  I have personal knowledge of the matters stated herein

5   and, if called upon, I could and would competently testify thereto.

6         **Proposal of Hagens Berman**

7         2.    I make this declaration in support of my firm's application to be appointed as

8   Interim Class Counsel for the putative class of indirect purchasers of lithium-ion rechargeable

9   batteries and related products.  In addition, Hagens Berman proposes a three-firm Plaintiffs'

10  Steering Committee ("PSC") which would include the law firms of Cohen, Milstein, Sellers &

11  Toll, PLLC, Robbins Geller Rudman & Dowd LLP, and Goldman Scarlato Karon & Penny, P.C.,

12  and which would be chaired by Hagens Berman.

13        **History of Hagens Berman's Extensive Efforts in This Litigation**

14        3.    Federal Rule of Civil Procedure Rule 23 allows this Court to consider "the work

15  counsel has done in identifying or investigating potential claims in the action."[1]  As detailed below,

16  my law firm spent significant time and resources investigating the potential claims in this action,

17  far more than any other firm.

18        4.    In the summer of 2012, months before the filing of the first complaint, Hagens

19  Berman became aware of potential anticompetitive activities in the market for lithium-ion batteries.

20        5.    We then began an extensive investigation into the lithium-ion batteries market.

21  Hagens Berman retained two experienced economists with specific expertise in high-technology

22  markets.  These experts have served as economic experts in several high-technology antitrust

23  litigations, including several that have been litigated in this District.  Hagens Berman has worked

24  extensively with these experts in other cases, and we are confident these experts possess a deep

25  knowledge of high-technology industries and the behavior of high-technology markets.

26

27

---

28  [1] Fed. R. Civ. P. 23(g)(1)(A)(i).

6.      Over the course of the next several months, Hagens Berman and its experts collected worldwide economic data on the lithium-ion batteries market, including data from the Bank of Korea and the Bank of Japan, as well as various worldwide battery-related trade associations.  Hagens Berman also collected data on lithium-ion battery raw material costs, including the pricing for such materials.  Hagens Berman and its experts collected numerous Asian language documents discussing the market for lithium-ion batteries.  These documents had to be translated and were then reviewed by Hagens Berman and its experts.

7.      As a result of Hagens Berman's extensive analysis and the work of its economists, Hagens Berman was able to determine that the pricing for lithium-ion batteries during the relevant period of time covered by this litigation behaved in a way that was not consistent with either a high-technology product market or changes in raw material costs.  For example, based on lithium-ion battery data obtained from the Bank of Korea, Hagens Berman's economists were able to create the following pricing analysis, among others:



**Bank of Korea Li-Ion Battery Price Index**

8. Following Hagens Berman's extensive investigatory efforts, on October 3, 2012, it filed a class action complaint in this district on behalf of its indirect-purchaser clients and captioned *Young, et al. v. LG Chem, Ltd., et al.*, No. 12-CV-5129-YGR (N.D. Cal.). In drafting this complaint, Hagens Berman expended significant time and resources developing the allegations of this conspiracy. While the complaint does make reference to the existence of an ongoing criminal investigation being conducted by the United States Department of Justice, such references account for only 6 paragraphs in a 189 paragraph complaint. Thus, the allegations in the *Young* complaint are not simply the result of cutting and pasting from various articles discussing a criminal investigation. Rather, the allegations in the *Young* complaint are proprietary and the result of hard work and original analysis conducted by Hagens Berman.

9. Hagens Berman's efforts in thoroughly investigating this matter, and being the firm which initiated this litigation, is typical of its approach and is a source of pride within the firm. We believe it is something that sets our firm apart from other firms. We do not believe in copying others' work product, as many counsel did here. In fact, not only do we believe this approach sets us apart from other firms, but Courts do as well. In two recent cases, *In re Electronic Books Antitrust Litigation* (S.D.N.Y.) (Judge Cote) and *Online Travel Company (OTC) Hotels Booking Antitrust Litigation* (N.D. Tex.) (Judge Boyle), Hagens Berman invested significant resources into developing and initiating these cases. In both, throngs of firms filed copy-cat complaints and sought to minimize Hagens Berman's efforts in initiating the case. Yet the Courts recognized that Hagens Berman had developed these cases, and appointed Hagens Berman as class counsel. These are but two examples.

10. Approximately a week after Hagens Berman's filing of the *Young* complaint, on October 11, 2012, Cotchett, Pitre & McCarthy ("Cotchett"), along with its co-counsel, Saveri and Saveri, filed a complaint on behalf of its client, Nicole Gray, in *Gray v. Samsung SDI, Co., Ltd.*, No. 12-CV-5274-YGR (N.D. Cal.). Unlike the plaintiffs in Hagens Berman's complaint, Ms. Gray was a ***direct***-purchaser of lithium-ion batteries.

11. On November 5, 2012, over a month following the filing of Hagens Berman's

complaint in *Young*, Lieff, Cabraser, Heimann & Bernstein, LLP ("Lieff") filed a complaint on behalf of its client in *Katz-Lacabe v. Hitachi, Ltd., et al.*, No. 12-CV-5681-YGR (N.D. Cal.). By this time, there had already been *18* additional cases filed throughout the country alleging anti-competitive practices in the lithium-ion battery industry. Following the filing of the *Katz-Lacabe* complaint, dozens of additional complaints were filed throughout the country.

12. On January 31, 2013, the Judicial Panel on Multidistrict Litigation (the "MDL Panel") heard argument on various motions to centralize these litigations in a single judicial district. On February 6, 2013, the MDL Panel issued an order transferring all related cases to this Court. On February 15, 2013, nearly five months following the filing of the *Young* action, Cotchett filed a complaint captioned *Yee v. LG Chem, LTD., et al.*, No. 13-CV-703 (N.D. Cal.). At the time, Cotchett was still counsel for direct-purchaser plaintiff Gray in *Gray v. Samsung SDI, Co., Ltd.*, No. 12-CV-5274-YGR (N.D. Cal.). On February, 22, 2013, Cotchett formally withdrew from the *Gray* matter.

### Discussions Regarding Class Counsel

13. Shortly following Lieff Cabraser's filing of the *Katz-Lacabe* complaint, Lieff partner Eric Fastiff called Hagens Berman partner Jeff Friedman and asked whether Hagens Berman would support Lieff's bid to be co-lead class counsel. Mr. Friedman explained to Mr. Fastiff that Hagens Berman had invested significant resources into the development of this case, had filed the first case, and was not prepared to agree to place Lieff into a leadership position over counsel in the 19 other cases filed before the Lieff case. Mr. Friedman asked Mr. Fastiff to support Hagens Berman given our leadership role in developing the case. Mr. Fastiff responded by saying, absent our firm agreeing to Leiff being a co-lead in the case, there would be a contested leadership fight.

14. Following the MDL Panel's transfer of this litigation, discussions among plaintiffs' counsel concerning the organization of plaintiffs' counsel ensued. At virtually every turn, the Lieff and Cotchett firms engaged in organized effort to diminish Hagens Berman's efforts in this case. For example, following the MDL Panel's transfer order, on March 6, 2013, Hagens Berman invited

1    all indirect-purchaser plaintiffs' counsel (including the Lieff and Cotchett firms) to a meeting at its

2    offices in Berkeley, California to address, among other things, the organization of counsel. Two

3    days later, the Cotchett firm then sent a letter to all indirect-purchaser plaintiffs' counsel, without

4    even mentioning Hagens Berman's March 6th invitation, inviting all counsel to a meeting at Lieff's

5    San Francisco offices for the same day and same time as the meeting that Hagens Berman

6    scheduled at its offices. This created a great deal of confusion amongst indirect-purchaser

7    plaintiffs' counsel, as there had now been two meetings scheduled to occur simultaneously.

8    Ultimately, we decided to rise above such petty actions, and counsel conducted a meeting at Lieff's

9    offices on March 18 to discuss, among other things, organizational issues.

10         15.    At no time leading up to the meeting, or during the meeting, did the Lieff and

11    Cotchett firms include Hagens Berman in a leadership position. Instead, they proposed an

12    unwieldy PSC which would include essentially any firm that wished to participate. This may be a

13    way to garner votes, but it is not in the best interests of the class to have an unwieldy, inefficient

14    structure and the bloated lodestar that usually follows.

15         16.    It was not until March 20, 2013, that the Lieff and Cotchett firms offered Hagens

16    Berman a leadership role in the organizational structure. These firms proposed that there be three

17    class counsel – Cotchett, Lieff and Hagens Berman – as well as a PSC to be determined. Hagens

18    Berman did not believe that having three co-lead counsel, as well as a PSC, was in the best

19    interests of the class. Such a structure was simply too large and would lead to inefficiency,

20    duplication, and waste. In addition, we did not feel it appropriate that two late filers who were

21    following our initiative should have an equal leadership role and be elevated above firms who filed

22    before them and who were not insisting on a lead role. Hagens Berman instead proposed that there

23    be two lead counsel firms, and a PSC, with one of the lead counsel firms being Hagens Berman.

24    We never received a response to this offer, and therefore, assumed it had been rejected.

25                **Hagens Berman's Confidential Fee Proposal**

26         17.    Pursuant to Rule 23(g)(1)(C), the Court "may order potential class counsel . . . to

27    propose terms for attorneys' fees and nontaxable costs." We propose the following percentage-

28

based attorneys' fees (including costs) based on recovery from each defendant at various stages of the case and over various recoveries for the class. We have filed the remainder of this paragraph under seal and not served it on any other party because (i) doing so is consistent with a competitive, sealed bidding process, and (ii) if made part of the public record, defendants could try and use this information to gain tactical advantage in the timing or structuring of settlement offers.

    a.    With regard to costs, Hagens Berman agrees to cap any Court-awarded expenses at $3,500,000, including class notice. Plaintiffs' counsel would be responsible for any expenses above this cap.

    b.    With regard to fees, in the event Hagens Berman is appointed sole Interim Class Counsel, we propose the attorneys' fees schedule below, to be applied on a per defendant basis:

| HBSS' PROPOSED ATTORNEYS' FEES | | | | |
|---|---|---|---|---|
| | From Pleading Through Decision on Motion to Dismiss | After Motion to Dismiss Through Adjudication of Class Certification | After Adjudication of Summary Judgment | Through Trial Verdict and Final Appellate Determination |
| First $5,000,000 | 0% | 0% | 0% | 0% |
| $5,000,001–$25,000,000 | 8% | 17% | 17% | 17% |
| $25,000,001–$50,000,000 | 7% | 16% | 16.25% | 17% |
| $50,000,001–$75,000,000 | 6% | 15% | 16% | 17% |
| $75,000,001–$100,000,000 | 5.5% | 14.5% | 15.5% | 16.5% |
| $100,000,001–$200,000,000 | 5% | 13% | 14% | 15% |
| $200,000,001–$400,000,000 | 4.5% | 10% | 11% | 12% |
| $400,000,001 and above | 4% | 8% | 9% | 10% |

18.    We believe that the foregoing fee structure provides for fair compensation while

DECL. OF STEVE W. BERMAN IN SUPPORT OF
APPL. TO APPOINT HAGENS BERMAN – No. 12-md-2420-YGR
010330-11 597061 V1

- 6 -

1    minimizing the impact on the proposed class. We also believe that the Court will find our fee

2    proposal to be very competitive, if not compelling and in the best interests of the proposed class.

3                                    **Attaching Documents**

4            19.      Attached hereto as Exhibit A is a true and correct copy of the firm resume of

5    Hagens Berman, as well as a description of each of the attorneys currently employed by the firm.

6            20.      Attached hereto as Exhibit B is a true and correct copy of a Reporter's Transcript of

7    Proceedings taken in *Nicolow, et al. v. Hewlett-Packard Co., et al.*, No. 12-CV-5980-CRB (N.D.

8    Cal. Mar. 1, 2013).

9            21.      Attached hereto as Exhibit C is a true and correct copy of the December 21, 2011

10   Case Management Order in *Electronic Books Antitrust Litig.*, No. 11-md-2293 (DLC) (S.D.N.Y.).

11           22.      Attached hereto as Exhibit D is a true and correct copy of the March 1, 2013 Order

12   Appointing Plaintiffs' Interim Lead and Liaison Counsel in *Online Travel Company (OTC) Hotel*

13   *Booking Antitrust Litig.*, No. 12-cv-03535-B (N.D. Tex.).

14           23.      Attached hereto as Exhibit E is a true and correct copy of the December 18, 2012

15   Supplemental Report And Recommendation of Special Master re Allocation of Attorneys' Fees in

16   the Indirect-Purchaser Class Action in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-

17   01827-SI (N.D. Cal.).

18

19           I declare under penalty of perjury under the laws of the United States that the foregoing is

20   true and correct.

21           Executed this 28th day of March 28, 2013 at Seattle, Washington.

22

23                                                      /s/ Steve W. Berman

24                                                      STEVE W. BERMAN

25

26

27

28

DECL. OF STEVE W. BERMAN IN SUPPORT OF
APPL. TO APPOINT HAGENS BERMAN – No. 12-md-
2420-YGR                                                 - 7 -
010330-11 597061 V1

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the Electronic Mail Notice List generated by the CM/ECF system, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the list generated by the CM/ECF system.

/s/ Steve W. Berman
STEVE W. BERMAN

# EXHIBIT C

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig,*
   2010 WL 3341200 (W.D. Ky. Aug. 23, 2010) .................................................13, 22

*In re Currency Conversion Fee Antitrust Litig.,*
   263 F.R.D. 110 (S.D.N.Y. 2009) ..........................................................................19

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
   586 F. Supp. 2d 732 (S.D. Tex. 2008) ..................................................................24

*In re Folding Carton Antitrust Litigation,*
   84 F.R.D. 245 (N.D. Ill. 1979)...............................................................................19

*In re Freddie Mac Sec. Litig.,*
   No. 03-CV-4261 (JES), slip. op. (S.D.N.Y. Oct. 27, 2006) ..................................22

*In re Initial Pub. Offering Sec. Litig.,*
   671 F. Supp. 2d 467 (S.D.N.Y. 2009)....................................................................22

*In re Linerboard Antitrust Litig.,*
   321 F. Supp. 2d 619 (E.D. Pa. 2004) .....................................................................19

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
   246 F.R.D. 156 (S.D.N.Y. 2007) .....................................................................12, 21

*In re The Mills Corp. Sec. Litig.,*
   265 F.R.D. 246 (E.D. Va. 2009) ............................................................................22

*In re NASDAQ Market-Makers Antitrust Litig.,*
   187 F.R.D. 465 (S.D.N.Y. 1998) .........................................................12, 19, 21, 24

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
   986 F. Supp. 2d 207 (E.D.N.Y. 2013) ...................................................................19

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
   2013 U.S. Dist. LEXIS 49885 (N.D. Cal. Apr. 1, 2013) .......................................19

*In re Towers Fin. Corp. Noteholders Litig.,*
   1996 U.S. Dist. LEXIS 2311 (S.D.N.Y. Jan. 17, 1996) ........................................24

*In re Visa Check/Mastermoney Antitrust Litig.,*
   297 F. Supp. 2d 503 (E.D.N.Y. 2003) ...................................................................15

*In re Vitamin C Antitrust Litig.,*
   2012 U.S. Dist. LEXIS 152275 (E.D.N.Y. Oct. 23, 2012).............................24, 25

*In re Warfarin Sodium Antitrust Litig.,*
   391 F.3d 516 (3d Cir. 2004)...................................................................................19

- iv -

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005)......................................................23

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02 Civ. 3288, 2004 U.S. Dist. LEXIS 22992 (S.D.N.Y. Nov. 12, 2004) ......................23

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
    485 F.3d 880 (6th Cir. 2007) ...............................................................17

*Loudermilk Servs., Inc. v. Marathon Petroleum Co. LLC*,
    623 F. Supp. 2d 713 (S.D. W. Va. 2009)...................................................22

*McDaniel v. Cnty. of Schenectady*,
    595 F.3d 411 (2d. Cir. 2010).................................................................23

*Muhammad v. Nat'l City Mortg., Inc.*,
    2008 WL 5377783 (S.D. W. Va. Dec. 19, 2008)..........................................22

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
    392 U.S. 134 (1968).............................................................................12

*Pillsbury Co. v. Conboy*,
    459 U.S. 248 (1983).............................................................................12

*Ramirez v. Lovin' Oven Catering Suffolk, Inc.*,
    2012 U.S. Dist. LEXIS 25060 (S.D.N.Y. Feb. 24, 2012)...............................24

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979).............................................................................12

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
    91 F. Supp. 2d 942 (E.D. Tex. 2000).......................................................12

*Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.*,
    490 Fed. Appx. 492 (3d Cir. 2012)..........................................................17

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)..........................................................................6

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)........................................................12, 16, 23

*Williamsburg Fair Hous. Comm. v. N.Y. City Hous. Auth.*,
    2005 U.S. Dist. LEXIS 5200 (S.D.N.Y. Apr. 4, 2005)..................................24

*Williamson Oil Co., Inc. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) ..............................................................17

## FEDERAL STATUTES

28 U.S.C. § 1407(a) ...................................................................................................9

## FEDERAL RULES

Federal Rules of Civil Procedure 23 ....................................................................7, 10

Federal Rules of Civil Procedure 30(b)(6)................................................................4

Federal Rules of Evidence 403 .................................................................................7

Federal Rules of Evidence 702 .................................................................................7

## SECONDARY AUTHORITIES

David B. Wilkins, *Rethinking the Public-Private Distinction in Legal Ethics: The Case of 'Substitute' Attorneys General*, 2010 Mich. St. L. Rev. 423, 469-70 (2010)....................................................................................................................21

## I. INTRODUCTION

Much as this Court found that Apple played a central role in facilitating and executing a conspiracy with the Publisher Defendants, so too did it play a core role in the defense of this civil action.[1] From the filing of the first motion to dismiss all the way through the settlement, Apple has required plaintiffs and the Court to expend significant resources responding to Apple's ill-disguised efforts to escape liability for classic price-fixing behavior by attempting to transform its behavior into pro-competitive conduct.   Along the way, Apple has been the leader in raising, at best, unique and novel arguments.  Apple was the sole defendant to oppose class certification or file motions to strike plaintiffs' expert, and the last defendant to settle.  And Apple filed a host of motions in an effort to seed the record for its appeal, ensuring that plaintiffs would incur expend greater resources than otherwise.

The proposed settlement represents an outstanding recovery to class members. In negotiating this settlement, the parties crafted a settlement that recognized the unique circumstances in this case:  Apple has unlimited resources to spend on the litigation, and the size of its total exposure – even after trebling – was less than one-half of one percent of Apple's cash on hand.  Thus, Apple could easily shoulder the risk of any jury verdict and, indeed, Apple could potentially benefit from years of delaying the class from receiving compensation, even if the class prevailed completely at trial and on appeal.  Apple's jury risk therefore was small, even if it lost.  And Apple has proven itself equally committed to its appeal of this Court's July 10, 2013 Opinion & Order which could potentially impact the class's claims after trial. In recognition of

---

[1] "Publisher Defendants" refers to Hachette Book Group, Inc., HarperCollins Publishers L.L.C., Holtzbrinck Publishers, LLC d/b/a Macmillan and Macmillan Publishers, Inc., Penguin Group (USA) Inc. and Simon & Shuster, Inc.

this, Class Counsel and Plaintiff States negotiated a settlement agreement with three possible outcomes.

- *Scenario #1*: If the Liability Finding[2] is upheld on appeal, consumers will recover $400 million and Apple will pay $20 million to Plaintiff States and $30 million to Class Counsel for attorneys' fees and expenses;

- *Scenario #2*: If the Liability Finding is sent back to this Court for a new trial or for reconsideration of whether Apple violated the antitrust laws, consumers will recover $50 million and Apple will pay $10 million to Plaintiff States and $10 million to Class Counsel for attorneys' fees and expenses.

- *Scenario #3*: If the Liability Finding is reversed and the case is dismissed, Apple will make no payments to consumers, Plaintiff States or Class Counsel.

Respectfully Class Counsel request that this Court award attorneys' fees and expenses as outlined in the Settlement Agreement.

## II.     THE WORK UNDERTAKEN BY CLASS COUNSEL

### A.     Apple Has Repeatedly Tried to Frame this Case as Involving Unique and Novel Issues

From the start, Apple sought to distinguish itself from the other defendants. To do so, Apple has tried to position itself as only engaging in pro-competitive behavior, instead of acting as the key organizer of the price-fixing conspiracy. Thus, Apple set itself apart from the Publisher Defendants, raising defenses unique to Apple. For example, in response to plaintiffs' complaint, Apple was the only defendant to file a separate motion to dismiss the class complaint, arguing that: (i) Class Plaintiffs had failed to plead Apple's individual participation in the conspiracy; (ii) Apple's actions were consistent with lawful independent action; and (iii) Apple's actions should be subject to rule of reason treatment, not *per se*, and plaintiffs had failed to plausibly allege agreements that violated the rule of reason. This Court denied Apple's motion to

---

[2] "Liability Finding" refers to the Opinion and Order, *United States v. Apple Inc.*, Case No. 12-cv-02826 (S.D.N.Y. July 10, 2013), ECF No. 326.

- 2 -

dismiss on May 15, 2012 in a fifty-six page order. Apple's answer to the class's complaint numbered 285 paragraphs and raised seven separate affirmative defenses.[3]

## B. Coordinated and Civil Discovery

Once the pleadings were settled, discovery began in earnest. Apple proposed to "delink" class certification discovery from the DOJ case. Plaintiffs opposed this broken schedule, and instead proposed a joint schedule with the DOJ and State Attorneys General, resulting in efficient, but expedited, discovery. Class Plaintiffs actively participated in all discovery with the governmental entities, mindful to coordinate their actions at every step. The negotiation of discovery limits, ESI protocols, custodians, and search terms required extensive discovery conferences with all parties. Although coordinated with the DOJ and the State Attorneys General, Class Counsel actively reviewed the 13 million pages of documents produced by the defendants. Class Counsel prepared memoranda, digests and summaries to identify critical documents, analyzed the emerging conspiratorial record, and shared their findings with the governmental plaintiffs. These documents eventually became deposition exhibits, trial exhibits, and exhibits to various motions filed with the Court.[4]

Class Plaintiffs also propounded and responded to significant numbers of written discovery – 55 interrogatories, 6 requests for admission and 133 requests for production of documents in total. And Class Plaintiffs led the way on behalf of all plaintiffs in the collection of the transactional data from both defendants and third parties, amassing the largest databases of e-book prices ever compiled, a database critical to the success both the expert analysis presented in the liability trial and of Dr. Noll's regression model. Class Counsel's efforts also helped secure

---

[3] Decl. of Steve W. Berman in Support of Class Counsel's Mot. for Award of Attys' Fees and Reimbursement of Expenses Related to Apple Settlement ("Berman Decl."), ¶ 2, filed concurrently herewith.

[4] *Id.* ¶ 3.

robust documentary evidence from third parties in addition to the transactional data – over 3.3 million pages of documents – describing pricing strategy, as well as market information potentially relevant to the alleged conspiracy.[5]

Class Counsel actively participated in nearly all of the depositions. In all, 47 party depositions and 9 third-party depositions took place. As this Court instructed at the outset, merits and class discovery proceeded in tandem, and Class Counsel was well aware that no fact witness would be re-deposed absent an extremely strong showing. Class Counsel attended all but eight of these depositions and questioned the witnesses at nearly half of the depositions. Class Counsel also took the lead on several critical depositions, including the depositions of Penguin and Macmillan's expert economist, Dr. Daniel Rubinfeld; David Shanks, Penguin's Chief Executive Officer (both in his personal capacity and as a Rule 30(b)(6) witness testifying about Penguin's pricing policies); John Makinson, Chairman and Chief Executive Officer of Penguin's parent company, Pearson PLC; Tim McCall, Penguin's Vice President of Online Sales; and Alex Gigante, Penguin's General Counsel. As with the other areas of discovery, Class Counsel assisted in preparing for depositions, shared work product with the other plaintiffs' groups and ensured as much as possible the efficient conduct of the depositions.[6]

## C.     The Apple Trial with the Governmental Entities

In June 2013, this Court conducted a trial on liability in which the DOJ, thirty-three states and U.S. territories, and Apple participated. This Court held that the governmental plaintiffs had shown that the Publisher Defendants conspired with each other to eliminate retail price competition to raise e-book prices, and that Apple played a central role in facilitating and executing that conspiracy. Without Apple's orchestration of the conspiracy, it would not have

---

[5] *Id.*, ¶ 4.

[6] *Id.*, ¶¶ 5-6.

succeeded as it did in the Spring of 2010. The Court indicated that a damages trial would follow.[7]

## D.  Litigation of Class Certification

After the completion of the trial, despite being found liable for violations of the antitrust laws, Apple maintained its resolve to defeat the class's claims. This Court ordered the parties to submit a report and proposed stipulation addressing issues of collateral estoppel. The Class and Apple vastly disagreed on the impact of this Court's Liability Finding on the class's claims. Unable to reach agreement, the impact of the Liability Finding became the subject of plaintiffs' summary judgment motion.[8]

On October 11, 2013, plaintiffs moved for certification of a class of e-book purchasers from 23 states. With their motion, plaintiffs submitted a detailed expert report from Dr. Roger Noll, a Professor *Emeritus* of Economics at Stanford University and a Senior Fellow in the Stanford Institute for Economic Research. Dr. Noll conducted a multivariate regression analysis on transaction records for more than 149 million sales of 1.3 million different e-book titles. Dr. Noll used prices prior to the agency period and prices during the agency period of e-books not on the agency model as benchmarks. Dr. Noll's multivariate regression model controlled for key market variables (including retailers, price, time since release, popularity, and genre). Dr. Noll found an overcharge for more than 99.6 percent of e-books sales by the Publisher Defendants. Dr. Noll estimated damages to consumers between $280 to $307 million.[9]

Apple vigorously contested the class certification, opposing the class certification motion, filing a 236-page declaration of Dr. Joseph Kalt, a 96-page declaration from Jonathan Orszag,

---

[7] *Id.,* ¶ 7.

[8] *Id.,* ¶ 8.

[9] *Id.,* ¶ 9.

and a motion to strike the declaration of Dr. Noll. Apple argued that rather than harming consumers uniformly, the introduction of the agency model had resulted in a disparate pricing impact and supposedly benefited many consumers. Apple accused plaintiffs of relying on a "trial-by-formula," suggesting that the Supreme Court had decisively rejected such methods in *Wal-Mart Stores, Inc. v. Dukes*.[10] That Apple was willing to spare no expense was evidenced by the massive class certification record, including its payments to Dr. Kalt of $1,350 per hour for his testimony.[11]

In response, Class Plaintiffs moved to exclude the opinion of Dr. Kalt, including his flawed analysis where he treated prices set by the Publisher Defendants after the onset of agency as "pre-agency" prices. Along with the reply in support of class certification, Class Plaintiffs also moved to exclude the opinion of Jonathan Orszag, arguing that his offset opinions were unreliable and not based on the facts in this case. The Class Plaintiffs also opposed Apple's motion to exclude the opinion of Dr. Noll. In response to Apple's experts' attacks on his proposed methods to measure impact and damages, Dr. Noll produced a reply report. To respond to Apple's criticisms regarding the use of averages and aggregate data, Dr. Noll used a supercomputer to run his regression models at the individual transaction level (requiring over 14 hours of computing time). The results only further confirmed plaintiffs' damages estimates.[12]

Although this Court allowed Apple to file sur-replies that were limited to "new opinions that could not have been anticipated" by Apple's experts, Apple filed a sur-reply in opposition to class certification with accompanying sur-reply declarations from Dr. Kalt and Mr. Orszag totaling 64 pages, 171 paragraphs and about 30 tables. Class Plaintiffs and Plaintiff States

---

[10] 131 S. Ct. 2541, 2561 (2011).

[11] Berman Decl., ¶ 10. In contrast, Dr. Noll was compensated at a rate of $800 per hour. *Id.*

[12] *Id.*, ¶ 11.

requested that this Court strike portions of the expert sur-reply declarations and the entirety of its sur-reply opposing class certification.[13]

E. **Class Certification Order, *Daubert* Rulings and Appellate Proceedings Relating to Class Certification**

On March 28, 2014, this court granted certification of a class of e-book consumers in twenty-three states, granted plaintiffs' motion to exclude the testimony of Apple's expert Dr. Kalt in its entirety, and excluded most of the testimony of Mr. Orszag. The Court also granted, in large part, plaintiffs' request to strike portions of Apple's sur-reply memorandum and sur-reply expert declarations.[14]

In certifying the class, this Court agreed that this was a "paradigmatic antitrust class action" where virtually all class members paid inflated prices for e-books as a result of a centralized price-fixing conspiracy. In an 86-page order, this Court outlined why the class met the elements of Rule 23 and addressed each of the litany of arguments raised by Apple against class certification. The Court commented that "[i]f certification were not appropriate here, no antitrust class action could be certified." The Court denied Apple's motion to exclude the testimony of Dr. Noll.[15]

The Court also granted plaintiffs' motion to strike most of the testimony of Apple's experts pursuant to Federal Rules of Evidence 702 and 403. This Court agreed that Dr. Kalt had committed several fundamental errors in his analysis, including by classifying prices that were set by the e-book publishers under the terms of an agency agreement, as "pre-agency," so long as one e-tailer was still selling the same books under a wholesale model. This Court also excluded Dr. Kalt's opinion that supposed "dispersion" and "churning" among e-book prices meant that

---

[13] *Id.*, ¶ 12.

[14] *Id.*, ¶ 13.

[15] *Id.* ¶ 14.

there was no "standard, stable e-book pricing structure" because it was unreliable and would tend to mislead and confuse a jury. This Court also excluded Dr. Kalt's opinion that Dr. Noll's model produced "false positives" as his analysis comparing average but-for prices to actual prices could not aid the trier of fact in determining any relevant issues. *Finally*, this Court excluded Dr. Kalt's opinion regarding offsets for certain supposed pro-competitive effects of price-fixing as based on "guesswork rather than analysis."[16]

The Court also excluded the bulk of Mr. Orszag's opinions, particularly those concerning offsets to the class's damages namely: (1) but for the conspiracy, Amazon would have lowered e-reader prices less than it did; (2) the price-fixing conspiracy increased the availability of self-published and free e-books; and (3) some e-books purchased through the iBookstore and Barnes & Noble's Nook Book Store would not have been purchased in the but-for world.[17]

**F.      Summary Judgment and Litigation over Venue**

During the flurry of class certification briefing, Class Plaintiffs moved for summary judgment on each of the three elements of their antitrust claims against Apple. *First*, plaintiffs moved for an order collaterally estopping Apple from re-litigating any legal conclusion or factual finding adjudicated at the government trial. *Second*, plaintiffs requested summary judgment on the impact on class members, arguing that the Court's factual finding on the effect of the conspiracy on industry prices in its Liability Finding and Dr. Noll's analysis showing that ninety-nine percent of Defendant Publishers' e-book sales were sold at supra-competitive levels during the class period unequivocally demonstrated that no reasonable juror could find that the Class did not suffer widespread injury. *Third*, the Class requested summary judgment on the amount of damages to consumers, given that one of Apple's experts, Dr. Burtis, testified at the liability trial

---

[16] *Id.*, ¶ 15.

[17] *Id.*, ¶ 16.

to a 17-percent overcharge caused by the conspiracy and a second expert, Mr. Orszag, Apple's expert witness for the damages trial, estimated an average agency effect of 14.9 percent. Plaintiffs argued that there could be no dispute that the amount of overcharges attributable to the conspiracy was at least that amount. Apple filed 256 pages of briefs and declarations opposing the motion.[18]

After two and a half years of litigation, and at the same time it opposed summary judgment, Apple also requested that this Court remand plaintiffs' class actions to the transferor courts (for the Class, the Northern District of California) under 28 U.S.C. § 1407(a). Class Plaintiffs opposed this motion. In its Opinion & Order dated April 24, 2014, this Court denied Apple's motion on multiple grounds, including that pretrial proceedings were still ongoing, that class actions were filed in this District and logically were able to be tried here, and that Apple had waived any right to seek remand of the actions.[19]

## G. Class Notice and Appellate Proceedings

Class Plaintiffs, working jointly with the State Attorneys General, prepared e-mail, postcard notice and detailed notice forms to be sent to class members apprising them of the certification of the class, and of their rights in the *parens patriae* actions. The Class and State Attorneys General jointly moved for approval of their proposed notices plans. The form of notice was approved on April 1 and the notice plan itself was approved on April 2, 2014.[20]

In late March, plaintiffs proposed a July 14, 2014 trial date which the Court ordered over Apple's opposition. On April 4, 2014, only 24 days before the notice administrator and retailers were to begin sending out 23 million class notices, Apple moved for a stay pending the outcome

---

[18] *Id.,* ¶ 17.

[19] *Id.,* ¶ 18.

[20] *Id.,* ¶ 19.

of its two appeals (on both its appeal on this Court's Liability Finding and Apple's Rule 23(f) appeal from class certification) or, in the alternative, an administrative stay of class notice pending the Court's ruling on Apple's request. Class Plaintiffs and Plaintiff States separately opposed this last-minute request for a stay. Apple waited another week before filing its Rule 23(f) petition with the Second Circuit Court of Appeals on April 11, 2014. Apple requested an emergency ruling by this Court before April 28, 2014, the last day to stop notice from being disseminated. On April 23, 2014, this Court denied Apple's motion for a stay pending appeal and denied Apple's request for an administrative stay, followed by a detailed opinion and order on April 24, 2014.[21]

Plaintiffs proceeded to oppose Apple's Rule 23(f) petition, filing a brief on April 21, 2014 under an expedited schedule. On April 23, 2014, Apple filed an emergency stay of class notification and the damages trial before the Second Circuit Court of Appeals with an additional twenty pages of argument. Class and Plaintiff States separately opposed the emergency motion to stay before the Second Circuit just two days later. Late in the afternoon on Friday, April 25, 2014, Judge Peter W. Hall of the Second Circuit Court of Appeals granted Apple's request for an administrative stay of class notice being distributed to consumers and referred Apple's stay motion to a three-judge panel. Apple's motion for leave to appeal the class certification order and for an emergency stay were heard by a motions panel on May 29, 2014. Within hours of that hearing, both motions were denied.[22]

At the same time as the Rule 23(f) and stay briefing, Apple also moved for reconsideration of this Court's ruling on plaintiffs' *Daubert* motions, its fifth effort to delay, escape, or relitigate proceedings before this Court. On April 11, 2014, Apple requested that the

---

[21] *Id.*, ¶ 20.

[22] *Id.*, ¶ 21.

Court reconsider its denial of a *Daubert* hearing and its exclusion of Dr. Kalt's testimony and much of Mr. Orszag's testimony. The Class and Plaintiff States jointly opposed this request.[23]

On June 2, 2014, the Class and Plaintiff States proposed an August 25, 2014 trial date, and Apple did not object. The next day, this Court ordered an August 25, 2014 trial date.[24]

On June 16, 2014, the parties wrote to inform the Court that the Class Plaintiffs, Plaintiff States and Apple had executed a binding agreement in principle to resolve the Class litigation and the damages phase of the States' litigation.[25]

## H. Settlement Discussions with Apple

Plaintiffs' settlement discussions with Apple did not bear fruit until late in the litigation process. The State and Class Plaintiffs reached settlements with the five Publisher Defendants in 2013. Although this Court ordered Plaintiff States, DOJ, and Apple into mediation a month before the June 2013 trial, a mediation in which Class Plaintiffs participated, no settlement was reached.

After the Court issued its Liability Finding, the Court again directed the parties to mediate on the remaining issues, and the parties retained the widely respected and experienced mediator, Antonio Piazza. This mediation session did not result in an agreement. Indeed, until plaintiffs' motions on class certification and *Daubert* were granted, Apple adamantly rejected every effort to settle the case by any of the three plaintiff groups. The parties returned to mediation with Mr. Piazza in May 2014. While the parties did not reach agreement during the May mediation, the session provided the foundation for additional negotiations which resulted in the parties' execution of a Memorandum of Understanding on June 16, 2014. Counsel for

---

[23] *Id.*, ¶ 22.

[24] *Id.*, ¶ 23.

[25] *Id.*, ¶ 24.

- 11 -

Plaintiff States, Settlement Class, and Apple immediately began work to finalize the Apple

Settlement, using the prior settlements as a template. Counsel for the parties executed the Apple

Settlement Agreement on July 10, 2014.[26]

## III. ARGUMENT

**A. Apple Has Agreed to Pay Class Counsel Attorney's Fees and Expenses Equivalent to a Reasonable Percentage of the Benefit Conferred on Consumers**

The Supreme Court recognizes the importance of private antitrust litigation as a

necessary and desirable tool to assure the antitrust laws' effective enforcement.[27] Substantial fee

awards in successful cases, such as this one, encourage meritorious class actions, for "[i]n the

absence of adequate attorneys' fee awards, many antitrust actions would not be commenced."[28]

Although this Court may use either the percentage or the lodestar methods to assess the

reasonableness of fees in common-fund cases, the trend is towards using the percentage

method.[29] The percentage method permits the judge to focus on the quality of the lawyers'

efforts and the benefits conferred to the class rather than on how many hours the attorneys

billed.[30] The hourly-rate approach frequently bears "little or no relationship to the value of the

services performed in anything but the most routine work. A flash of brilliance by a trial lawyer

may be worth far more to his clients than hours or days of plodding effort."[31]

---

[26] *Id.*, ¶¶ 25-26.

[27] *See, e.g., Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 331 (1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972); *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968), *overruled in part, Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).

[28] *Alpine Pharm., Inc. v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir. 1973).

[29] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 171 (S.D.N.Y. 2007).

[30] *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 485 (S.D.N.Y. 1998).

[31] *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 964 (E.D. Tex. 2000).

In connection with prior settlements with the Publisher Defendants, this Court has previously awarded Class Counsel fees in the amount of $10,455,534.56 and reimbursement of expenses in the amount of $750,465.44, for a total of $11,206,000.[32] Class Counsel now move for an additional award of fees and costs, closely tied to the outcome for the class in any settlement.

There are three possible outcomes to this settlement. *First*, if the Court's Liability Finding is affirmed, Apple will pay $400 million for consumer compensation, $20 million to Plaintiff States, and $30 million to Class Counsel for fees and expenses. *Second*, if the Liability Finding is either vacated and remanded, or reversed and remanded with instructions for reconsideration or for retrial, Apple will pay $50 million for consumer compensation, $10 million to Plaintiff States and $10 million to Class Counsel for fees and expenses. (This contingency is not triggered by a remand on administrative or non-substantive grounds that could not implicate the Liability Finding.) *Third*, if the Liability Finding is reversed, Apple will make no payments for consumer compensation or to Plaintiff States or Class Counsel.

Under each scenario, attorneys' fees and costs (or the absence of) were negotiated and Apple agreed to pay such amount separately from any compensation paid to consumers.

The following chart compares the percentage of fees that Apple has agreed to pay Class Counsel as a percentage of the benefit to be conferred first to all consumers, and second to just the twenty-three states represented by Class Counsel:[33]

---

[32] *See* Order Granting Class Pls.' Mot. for Award of Attorneys' Fees and Reimbursement of Expenses, Dec. 9, 2013, ECF No. 474.

[33] The percentage fees are calculated against the total amount paid by the defendant, including both consumer recoveries and all awards to counsel. As many courts have recognized, "[u]nder the percentage-of-the-fund method, it is appropriate to base the percentage on the gross cash benefits available for class members to claim, *plus* the additional benefits conferred on the class by [defendant's] separate payment of attorney's fees and expenses, and the expenses of administration." *Hess v. Sprint Comm'cns Co. L.P.*, No. 11-cv-35, 2012 WL 5921149, at *3 (N.D. W. Va. Nov. 26, 2012) (emphasis added); *see also, e.g., In*

- 13 -

| Defendant | | Consumer Recovery | Recovery in Class States (approximately 40%) | Class Counsel's Fees and Expenses | Fees as Percentage of Benefit Conferred to Consumers* | Fees as Percentage of Benefit Conferred to Class States* |
|---|---|---|---|---|---|---|
| Macmillan | | $20,000,000 | $8,000,000 | $2,475,000 | 11% | 24% |
| Penguin | | $75,000,000 | $30,000,000 | $8,000,000 | 10% | 21% |
| HarperCollins, *et al.* (Minnesota) | | $2,119,000 | $2,119,000 | $731,000 | - | 26% |
| Apple | Scenario #1 | $400,000,000 | $160,000,000 | $30,000,000 | 7% | 17% |
| | Scenario #2 | $50,000,000 | $20,000,000 | $10,000,000 | 17% | 26% |
| | Scenario #3 | $0 | $0 | $0 | 0% | 0% |

*Excludes costs of administration of settlements.

Under any outcome of the Liability Appeal, when measured against the amount received by the class, Class Counsel would not receive an amount that exceeded 26 percent of the benefit conferred to the class states. This is the identical percentage that Class Counsel was awarded for their litigation of the Minnesota-only class against three of the Publisher Defendants. If this Court were to consider the total payments provided to consumers in the entire litigation, against the total payments to Class Counsel and Plaintiff States, the total amount of fees and expenses, measured as a percentage of the total payments by all defendants, would equal 12.2 percent under the first scenario and 18.4 percent under the second scenario.

Class Counsel's lodestar to date is $9,532,321.75 and unreimbursed expenses are $607,091.56.

---

*re Countrywide Fin. Corp. Customer Data Sec. Breach Litig*, No. 08-MD-01998, 2010 WL 3341200, at *9 (W.D. Ky. Aug. 23, 2010); *Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 591 (D.N.J. July 30, 2010), *rev'd on other grounds sub nom Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012).

**B.** **Class Counsel's Request for Fees and Expenses Is Supported by Each *Goldberger* Factor**

Whether this Court examines Class Counsel's request for fees by measuring it as a percentage-of-the fund or under the lodestar method, the fees awarded must be "reasonable" and "based on scrutiny of the unique circumstances of each case."[34] A reviewing court should consider the following six factors set forth in *Goldberger* in evaluating what constitutes a reasonable fee: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of the representation measured by the result; (5) the requested fee in relation to the settlement; and (6) public policy considerations.[35]

1. **The Time and Labor Expended by Class Counsel Support the Requested Fee**

As outlined above (*see* section II, *supra*), Class Counsel devoted significant time and labor not just to this litigation as a whole, but to the litigation against Apple *in particular*. Class Counsel's lodestar – $9,532,321.75 – reflects the extraordinary effort and attention undertaken to get the results in this case. Both co-lead counsel, Hagens Berman and Cohen Milstein, have undertaken an audit of this time spent to ensure that all time billed to this case was reasonably necessary to effectuate the strategy and work in this case.

2. **The Magnitude and Complexity of the Litigation Supports the Requested Fee**

The magnitude and complexity of this litigation is evident, particularly in the result. The "complexity of federal antitrust law is well known."[36] But here, an additional burden was present. Plaintiffs were required to show not only that the five publishers entered into a horizontal conspiracy, but that Apple, a vertical partner, knowingly participated in this

---

[34] *Goldberger*, 209 F. 3d at 47, 53.

[35] *Id.* at 50.

[36] *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 510 (E.D.N.Y. 2003), *aff'd*, *Wal-Mart Stores*, 396 F.3d at 96.

- 15 -

conspiracy. Class Plaintiffs were also required to demonstrate widespread impact and damage to a class of e-book purchasers. To demonstrate this, the class certification record alone numbered 2,018 pages. Summary judgment numbered another 751 pages.[37] Over the course of this litigation, Apple retained five different testifying experts (and an untold number of supporting economists). The volume of the pleadings filed in this case, the number of depositions, the breadth of document productions, and the complexity of the transactional database all confirm that this was extraordinarily complex litigation.[38]

### 3. The Risks Entailed in the Litigation Support the Requested Fee

Class Counsel undertook significant risk when they filed this litigation, more than an ordinary case. The six defendants are each major multinational corporations, represented by some of the most well-heeled law firms in the country. The risks Class Counsel undertook in this case are consistent with the litigation's scope and complexity, and justify a substantial award.

### a. No Governmental Actions Had Been Filed or Appeared Likely to Be Filed When Plaintiffs Filed Their Action

"[L]itigation risk must be measured as of when the case is filed."[39] The Second Circuit and district courts in this Circuit recognize the lack of previous government action as a key factor in assessing risk in this context.[40] As of August 9, 2011 when the Class Plaintiffs filed their original complaint, neither the DOJ nor the State Attorneys General had filed their actions, although the State Attorneys General had announced an investigation a year earlier. Plaintiffs' decision to commit the resources to prosecute a case of this magnitude against five of the largest

---

[37] Berman Decl., ¶ 27.

[38] *Id.*

[39] *Goldberger*, 209 F.3d at 55.

[40] *See, e.g.*, *Wal-Mart*, 396 F.3d at 122; *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2d Cir. 1974), *abrogated on other grounds by Goldberger*, 209 F.3d 43.

publishers in the world and Apple, one of the wealthiest companies in the world, carried

substantial risk and showed a willingness to commit tremendous resources.

### b. Class Counsel's Resources Committed to the Case

Class Counsel collectively committed approximately 20,254 hours of their time and

$1,357,557 in expenses ($750,465.44 of which have been reimbursed in the settlements with the

publishers) without any assurance of compensation. The historical record is full of antitrust class

actions in which a court granted summary judgment for defendants, or where defendants

prevailed at trial or on appeal.[41] The Second Circuit has long recognized that the risk associated

with a case undertaken on a contingent basis is an important factor in determining an appropriate

fee award.[42] Here, the amount of resources committed to this case certainly supports the

requested fee award.

### c. Risks Arising from Substantive Issues

The risks inherent in any antitrust class action were magnified in this litigation. From the

first motion to dismiss, Apple demonstrated its intent to vigorously defend its actions. Apple was

the only defendant to file a separate motion to dismiss the class complaint, arguing its unique

position in the conspiracy from its first filings in the case. *See* section II.A, *supra*.

After its trial against the DOJ and State Attorneys General on liability and injunctive

relief, Apple renewed its efforts to defeat the class's claims. Apple declined to stipulate on the

impact of the Liability Finding on the class's claims, leading eventually to summary judgment

---

[41] *See, e.g., Superior Offshore Int'l, Inc. v. Bristow Grp, Inc.*, 490 Fed. Appx. 492 (3d Cir. 2012) (affirming summary judgment for defendants); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880 (6th Cir. 2007) (same); *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) (same); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.*, 203 F.3d 1028 (8th Cir. 2000) (same); *In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999) (same); *In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999) (same). *See also In re Carbon Dioxide Indus. Antitrust Litig.*, 229 F.3d 1321 (11th Cir. 2000) (jury verdict against opt-out plaintiffs).

[42] *Grinnell*, 495 F.2d at 470; *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001).

motions. Plaintiffs' class certification motion included a detailed expert report from Dr. Noll which conducted a multivariate regression analysis on more than 149 million sales of 1.3 million different e-book titles. Apple contested any demonstration of widespread impact to the class, filing hundreds of pages in expert reports and moving to strike the testimony of Dr. Noll under *Daubert*. In response, Dr. Noll used a super-computer to run his regression models at the individual transaction level – an event that Class Counsel believe is unique in the history of class actions. Although this Court eventually certified a class, the risk associated with the certification of a class, was not small. *See* section II.D, *supra*.

In addition to all of these risks, Apple's onslaught of motions created their own risks – not only that some argument might have some shred of merit but that Apple's relentless motions practice would draw valuable resources away from trial preparation and essential briefing. *See* section II.F-G, *supra*.

While plaintiffs viewed this as a traditional price-fixing case, a view confirmed by this Court's opinion in the liability phase, defendants consistently sought to portray their conduct as *sui generis* and subject to novel, uncharted analyses. Although plaintiffs were (and are) confident in the outcome of the proceedings, there was risk that defendants could have prevailed on at least some of their arguments.

### 4. The Quality of Representation Measured by the Outstanding Result Supports the Requested Fee

#### a. The Results for Class Members Are Outstanding

The settlement provides for three alternate outcomes, each of which supports the requested fee award.

*First*, in the event that this Court's Liability Finding is affirmed, Apple agrees to pay $400 million in consumer compensation, $20 million to Plaintiff States and $30 million to Class

- 18 -

Counsel in attorneys' fees and expenses. Under this scenario, consumers would receive $400 million from Apple, in addition to the $166 million recovered from the publishers in earlier settlements, for a total of $566 million.[43] Dr. Noll has estimated damages of approximately $280 million. This represents a recovery of more than **200 percent** of damages, placing this case among the exceedingly rare cases that provide consumers with double their estimated damages.

*Second*, in the event this Court's Liability Finding is vacated and remanded, or reversed and remanded with instructions for reconsideration or retrial, Apple agrees to pay $50 million in consumer compensation, $10 million to Plaintiff States, and $10 million to Class Counsel in attorneys' fees and expenses. Under this scenario, class members would receive $50 million in payments from Apple, in addition to the $166 million from the publisher settlements, for a total of $216 million. This represents a ***recovery of 77 percent of damages*** by consumers, still an outstanding recovery by any measure.[44] The payment of $50 million to consumer recovery still reflects an outstanding recovery for the class who, if this Court's Liability Finding was vacated or reversed on something more than administrative or non-substantive grounds, would face a

---

[43] This amount does not include payments for attorneys' fees and costs and payments to the States, which represent an additional benefit to consumers.

[44] *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004) (approving $44.5 settlement, recovery of 33% of single damages); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 229 (E.D.N.Y. 2013) (approving $7.25 billion settlement, recovery of 2.5% of single damages); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827, 2013 U.S. Dist. LEXIS 49885 (N.D. Cal. Apr. 1, 2013) (approving $1 billion settlement, recovery of 50% of single damages) (*see also* Indirect-Purchaser Pls.' and Settling States' Joint Notice of Mot. and Mot. for Final Approval of Combined Class, *Parens Patriae*, and Governmental Entity Settlements with AUO, LG Display, and Toshiba Defendants; Mem. of Points and Authorities at 23, Case No. 3:07-MD-1827 (N.D. Cal. Nov. 15, 2012) ECF No. 7158); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 124 (S.D.N.Y. 2009) (approving $336 million settlement, recovery of 31% of single damages), *aff'd*, *Priceline.com, Inc. v. Silberman*, 405 Fed. Appx. 532 (2d Cir. 2010); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 633 (E.D. Pa. 2004) (approving $ 202.5 million in settlements, recovery of 55% of single damages); *In re NASDAQ*, 187 F.R.D. at 478 (approving settlements of $1.027 billion, recovery of 33%-41% of single damages); *In re Folding Carton Antitrust Litigation*, 84 F.R.D. 245, 254 (N.D. Ill. 1979) (approving what was, at the time, "the largest dollar settlement in the history of class action litigation at the time it was made" representing 118% of single damages to class members).

new and different battleground regarding (i) a motion to de-certify the class; (ii) motions for summary judgment; and (iii) the prospect of re-trying the entire liability case and damages under a different application of the governing legal standards.

*Third*, if this Court's Liability Finding is reversed, Apple will pay nothing pursuant to the settlement agreement, other than the costs of settlement administration. Under this scenario, class members would recover nothing from Apple, but have already recovered $166 million from the Publisher Defendants, representing recovery of 59 percent of damages. No further attorneys' fees would be paid.

Each of these scenarios represents an outstanding result for the case, given the risks that would be associated with each outcome. Plaintiffs, separately, negotiated a fee award commensurate to the recovery to consumers, ensuring that their payment is directly related to the results achieved on behalf of consumers.

### b. Quality of Class Counsel

Both Hagens Berman and Cohen Milstein have long-standing records of representing plaintiffs in complex cases with an enviable success rate. Hagens Berman is a sixty-lawyer firm, with offices in Seattle, Boston, Chicago, Colorado Springs, Los Angeles, New York, Phoenix, San Francisco and Washington, D.C. Since its founding in 1993, Hagens Berman has represented plaintiffs in a broad spectrum of complex, multi-party antitrust cases. Courts throughout the United States have recognized the firm for its ability and experience in handling major complex litigation.[45] The firm has litigated some of the most complex antitrust cases in recent decades, including as co-lead counsel in *In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-cv-05238 (E.D.N.Y.), which settled for over $3 billion in cash and over $20 billion in injunctive relief,

---

[45] Berman Decl., Ex. A (firm résumé).

making it one of the largest antitrust settlements in history.[46]

Cohen Milstein has been one of the nation's leading plaintiff's class-action firms for more than forty years, and is particularly known for its expertise in complex antitrust litigation. Cohen Milstein has been recognized by both courts and leading commentators as one of the top plaintiffs' firms in the nation.[47] The firm has obtained substantial recoveries through settlement or trial in dozens of antitrust cases, including, most recently, winning a $400 million (pretrebling) jury verdict against Dow Chemical Co. in *In re Urethane Antitrust Litig.*, No. 04-md-1616 (D. Kan.), on top of $139 million in settlements with other defendants. Additionally, Cohen Milstein has the country's leading practice representing State Attorneys General in affirmative litigation to redress injuries to the states and their citizens, experience that facilitated Class Counsel's working relationship with the State Attorneys General in this case.[48]

### c. Quality of Defendants' Counsel

The quality and zealousness of defense counsel similarly weighs in favor of the requested fee award.[49] Apple was represented by at least two of the country's largest law firms. The breadth of issues raised in this case – whether each defendant participated in the conspiracy,

---

[46] *See also* Appl. to Appoint Hagens Berman Interim Lead Counsel at 13-14, Dec. 19, 2011, ECF No. 19 (listing Hagens Berman's recent antitrust experience).

[47] Kit A. Pierson's Decl. in Support of Class Counsel's Mot. for Award of Attys' Fees and Reimbursement of Expenses Related to Apple Settlement ("Pierson Decl."), Ex. 1 (firm résumé); *see also* Appl. of Cohen Milstein Sellers & Toll PLLC Seeking Appointment to Represent Consolidated Putative Class at 7-11, Dec. 19, 2011, ECF No. 11 (providing additional examples of Cohen Milstein's cases and acclamations, as well as the biographies of its litigation team in this case).

[48] *See* David B. Wilkins, *Rethinking the Public-Private Distinction in Legal Ethics: The Case of 'Substitute' Attorneys General*, 2010 Mich. St. L. Rev. 423, 469-70 (2010) ("The fact that firms such as Cohen Milstein are developing government-representation practices that are largely staffed by former government lawyers . . . should be taken as a hopeful sign.").

[49] *See In re Merrill Lynch*, 246 F.R.D. at 174 ("'The quality of opposing counsel is also important in evaluating the quality of Class Counsels' work.'"); *In re NASDAQ*, 187 F.R.D. at 489 (awarding counsel 14 percent of $1 billion settlement where defendants' counsel included "the nation's biggest and best defense firms operating on a seemingly unlimited budget over a period of four years").

- 21 -

whether the class was subject to an arbitration agreement, how the conspiracy affected the e-book market, whether any of the many arguments made by Apple and other defendants had merit – alone demonstrates the formidable resources facing plaintiffs.

### 5. The Requested Fee Is Consistent with the Size of the Settlement and Payments to the States

Contingency fees in cases where class members receive such a large benefit often fall between 20 to 33 percent.[50] Class Counsel's request here equates to 7 percent (scenario #1), 17 percent (scenario #2) or 0 percent (scenario #3) of the total recovery to consumers nationwide and is consistent with the settlement's size and the scope. It is also notable that the request is nearly equal to the payments sought by Plaintiff States under the settlement – in the first scenario, Plaintiff States would recover $20 million compared with Class Counsel's $30 million; and in the second scenario, Plaintiff States would recover $10 million compared with Class Counsel's $10 million.[51] Looking at the payments to Plaintiff States and the Class Counsel as a percentage of total payments by all defendants, the first scenario would result in a 12.2 percent payment to Plaintiff States and Class Counsel and 18.4 percent under the second scenario, well below the low end of typical awards. In total, the first scenario would result in a payment in total of $41.206 million to Class Counsel and $37.625 million to Plaintiff States. The second scenario

---

[50] *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) (awarding 33.3%); *In re Air Cargo Shipping Servs. Antitrust Litig.*, MDL No. 1775, 2009 WL 3077396 (E.D.N.Y Sept. 25, 2009) (awarding approximately 25%); *In re Freddie Mac Sec. Litig.*, No. 03-CV-4261 (JES), slip. op. at 1 (S.D.N.Y. Oct. 27, 2006) (awarding 20%). *See also In re Countrywide*, 2010 WL 3341200, at *9 ("[T]he ordinary range for attorney's fees [has been] between 20-30%."); *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 264 (E.D. Va. 2009) (collecting cases within Fourth Circuit and in other courts with fees of 18-33.3%); *Loudermilk Servs., Inc. v. Marathon Petroleum Co. LLC*, 623 F. Supp. 2d 713, 723-24 (S.D. W. Va. 2009) (summarizing studies finding median awards of between 20 and 30%); *Muhammad v. Nat'l City Mortg., Inc.*, No. 07-cv-0423, 2008 WL 5377783, at *9 (S.D. W. Va. Dec. 19, 2008) (collecting cases within Fourth Circuit with fees of 25-35%).

[51] Settlement Agreement by and Among Apple Inc., Pl. States and Class Pls. at 11, July 16, 2014, ECF No. 642-1.

would result in a payment of $21.206 million to Class Counsel and $27.625 million to Plaintiff States.

### 6. Public Policy Considerations Support the Requested Fee

Only a small number of firms have the expertise, resources, and inclination to lead the prosecution of cases such as this one, as the overwhelming majority of firms with the expertise and resources lack the inclination due to their defense orientation. And the number of those plaintiffs' firms who have proven their willingness and ability to carry such a case through trial is even smaller yet.[52] As this Court has recognized in other cases, undertaking representation on a fully contingent basis is a risk and effort that deserves to be compensated appropriately.[53]

### C. The Requested Fee Is Presumptively Reasonable in Light of Class Counsel's Lodestar

Class Counsel's current total lodestar in this case is $9,532,321.75. Under scenario one, the requested award would represent a 3.08 multiplier.[54] Under the second scenario, the award would represent a .99 negative multiplier. Combined with the previous fee award of $10,455,534.56, this would represent a multiplier of 4.18 and 2.08, respectively. In part, these multipliers reflect Class Counsel's efficiency in coordinating their efforts both between firms and with the various governmental participants. "The level of risk associated with litigation . . . is 'perhaps the foremost factor' to be considered in assessing the propriety of a multiplier."[55] The risk undertaken by Class Counsel in this case was at the highest level by virtue of their large

---

[52] *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("[i]n order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives").

[53] *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2004 U.S. Dist. LEXIS 22992, at *73 (S.D.N.Y. Nov. 12, 2004).

[54] These calculations of multipliers exclude payments for counsel's out-of-pocket expenses.

[55] *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 424 (2d. Cir. 2010).

- 23 -

investments of time and money as well as the case's unique and formidable issues. Class Counsel's request under either scenario falls within the acceptable range.[56]

Class Counsel's hourly rates are also reasonable. The proposed hourly rate of compensation for paralegals is $250 to $280; associates fall within a range of $245 to $505; and partners fall within a range of $500 to $900.[57] These rates are consistent with other awards in this District and with the Court's prior award of attorneys' fees to Class Counsel.[58]

### D. Class Counsel's Expenses Are Reasonable

Class Counsel requests reimbursement for $607,091.56 in additional expenses for which they have not yet been reimbursed.[59] This is in addition to the $750,465.44 previously awarded for expenses from the publisher settlements. Nearly half of these additional expenses ($298,740) represents compensation to the class's experts. Class Counsel maintained substantial incentives to control out-of-pocket expenses in this case due to the high risk they would not be reimbursed

---

[56] *Wal-Mart Stores*, 396 F.3d at 96 (finding 3.5 multiplier reasonable); *Beckman v. KeyBank, N.A.*, No. 12 Civ. 7836, 2013 U.S. Dist. LEXIS 60894, at *38 (S.D.N.Y. Apr. 29, 2013) (allowing 6.3 multiplier); *Ramirez v. Lovin' Oven Catering Suffolk, Inc.*, No. 11 Civ. 0520, 2012 U.S. Dist. LEXIS 25060, at *4 (S.D.N.Y. Feb. 24, 2012) (granting attorneys' fees equal to 6.8 times lodestar); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 803 (S.D. Tex. 2008) ("a multiplier of 5.2 is warranted, given the unmatched size of the [$7.2 billion] recovery, the obstacles and risks faced by [counsel] from the beginning, and the skill and commitment exhibited by counsel"); *In re NASDAQ*, 187 F.R.D. at 489 ("multipliers of between 3 and 4.5 have become common").

[57] Berman Decl., ¶ 32; Pierson Decl., ¶ 7.

[58] One source commonly used by Courts in this Circuit is the National Law Journal Survey to determine the fairness of fee rates. *See, e.g., Williamsburg Fair Hous. Comm. v. N.Y. City Hous. Auth.*, No. 76 Civ. 2125, 2005 U.S. Dist. LEXIS 5200, at *35 (S.D.N.Y. Apr. 4, 2005) (observing that "a recent billing survey made by the National Law Journal shows that senior partners in New York City charge as much as $ 750 per hour and junior partners charge as much as $ 490 per hour"). The most recent National Law Journal survey for 2013 shows that New York had the highest average partner and associate billing rates at $882 and $520, respectively. Berman Decl., Ex. B at 3 (2013 National Law Journal Survey). *See also Brennan v. N.Y. Law Sch.*, No. 10 Civ. 0338, 2012 U.S. Dist. LEXIS 135095, at *13 (S.D.N.Y. Aug. 15, 2012) (Courts "should generally use 'the hourly rates employed in the district in which the reviewing court sits' in calculating the presumptively reasonable fee.").

[59] Berman Decl., ¶¶ 34-36; Pierson Decl., ¶¶ 10-11.

- 24 -

and the near certainty that many years would pass before Class Counsel could recoup the expenses.

Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course – even where, as here, the action continues against other defendants.[60] All of the expenses for which Class Counsel requests reimbursement here are of the type normally incurred in a complex action (expert-witness costs, deposition reporters and transcripts, copying, travel, research, court filings) and are appropriate for reimbursement here.[61]

### IV. CONCLUSION

When Class Counsel filed this case, they were willing to undertake the entire burden of this risky litigation alone. Once joined with the DOJ and the State Attorneys General from thirty-three states, Class Counsel have worked efficiently to litigate this antitrust conspiracy claim against six sophisticated defendants. Plaintiffs jointly now request final approval of the settlement, and the approval of attorneys' fees and expenses as negotiated in the Apple Settlement.

DATED: October 17, 2014    HAGENS BERMAN SOBOL SHAPIRO LLP


By   /s/ Steve W. Berman   
  STEVE W. BERMAN (*Pro Hac Vice*)

  1918 Eighth Avenue, Suite 3300
  Seattle, WA 98101
  Telephone: (206) 623-7292
  Facsimile: (206) 623-0594
  steve@hbsslaw.com

---

[60] *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738, 2012 U.S. Dist. LEXIS 152275, at *33 (E.D.N.Y. Oct. 23, 2012). *See also In re Towers Fin. Corp. Noteholders Litig.*, No. 93 Civ. 0810, 1996 U.S. Dist. LEXIS 2311, at *6 (S.D.N.Y. Jan. 17, 1996) ("[r]egardless of what happens in the balance of the litigation, counsel's efforts have benefitted the class, and there is no reason that part of counsel's expenses should not be reimbursed now").

[61] *Vitamin C Antitrust Litig.*, 2012 U.S. Dist. LEXIS 152275, at *34-*35.

Jeff D. Friedman (*Pro Hac Vice*)
Shana Scarlett (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Kit A. Pierson (*Pro Hac Vice*)
Jeffrey Dubner (JD4545)
COHEN, MILSTEIN, SELLERS & TOLL, PLLC
1100 New York Avenue, N.W.
South Tower, Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
kpierson@cohenmilstein.com
jdubner@cohenmilstein.com

Douglas Richards (JR6038)
COHEN, MILSTEIN, SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-774
DRichards@cohenmilstein.com

*Class Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2014, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

                        /s/ Steve W. Berman
                        STEVE W. BERMAN

# EXHIBIT D

*Gehrich v. Chase Bank USA, N.A.*,
  316 F.R.D. 215 (2016) .................................................................................. 7, 13

*Harman v. Lyphomed, Inc.*,
  945 F.2d 969 (7th Cir. 1991) ...................................................................... 10

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) ...................................................................................... 10

*Kolinek v. Walgreen Co.*,
  311 F.R.D. 483 (N.D. Ill. 2015) ................................................................ 14

*Montgomery v. Aetna Plywood, Inc.*,
  231 F.3d 399 (7th Cir. 2000) ........................................................................ 4

*Redman v. RadioShack Corp.*,
  768 F.3d 622 (7th Cir. 2014) ........................................................................ 4

*Silverman v. Motorola Sols., Inc.*,
  739 F.3d 956 (7th Cir. 2013) .................................................................... 3, 6

*Sutton v. Bernard*,
  504 F.3d 688 (7th Cir. 2007) ........................................................................ 3

*In re Synthroid Mktg. Litig.*,
  264 F.3d 712 (7th Cir. 2001) ........................................................................ 5

*In re Synthroid Mktg. Litig.*,
  325 F.3d 974 (7th Cir. 2003) ................................................................ 6, 7, 9

*Taubenfeld v. Aon Corp.*,
  415 F.3d 597 (7th Cir. 2005) ........................................................................ 4

*Williams v. Rohm & Haas Pension Plan*,
  658 F.3d 629 (7th Cir. 2011) ........................................................................ 9

## OTHER AUTHORITIES

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUDIES 811 (2010) ........................................ 8

Fed. R. Civ. P. 23(h) ........................................................................................ 12

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL LEGAL STUDIES 248 (2010) ...................... 8

## I.    INTRODUCTION

Hagens Berman Sobol Shapiro LLP ("Lead Counsel") respectfully submits this memorandum in support of Plaintiffs' motion seeking an award of attorney's fees and expenses and service awards for the Class Representatives. Pursuant to the Court's October 26, 2017 Preliminary Approval Order, this motion comes in advance of the January 22, 2018 deadline for class members to opt-out or object to the Settlement. The deadline for Lead Counsel to submit its Motion for Final Approval and respond to any objections is February 12, 2018.[1] The Fairness Hearing is February 23, 2018.

Lead Counsel requests $40 million in attorney's fees and the reimbursement of $2,670,604.35 in reasonable and necessary costs.[2] The requested fees constitute just 8.79% of the total value of relief to the Class[3] and 13.56% of the cash portion of the Settlement, percentages far lower than awards commonly approved in similar class actions. Lead Counsel's costs amount to only 0.6% of the total value, or 0.9% of the cash portion of the Settlement, which also compares favorably to similar cases and speaks to Lead Counsel's efficiency and economy. Finally, Plaintiffs seek $5,000 service awards for each Class Representative—an amount routinely granted in successful class actions.

---

[1] Lead Counsel will submit a proposed order regarding this motion with its motion for final approval. Both motions are noted for consideration on February 23, 2018.

[2] The Settlement Agreement, attached to the Declaration of Steve W. Berman ("Berman Decl."), filed concurrently herewith, as Exhibit 1 ("Agreement"), permits a request of fees up to $40 million and costs up to $2.8 million. Agreement at p. 21.

[3] The Settlement requires Stericycle to discontinue its disputed API pricing practice and cap future price increases, which it has already done. Those pricing caps, when compared to the *status quo* of 18% price increases twice annually, have a real and calculable value to the Class, which Lead Counsel estimates to be $160 million.

-1-

The Settlement provides $295 million in cash, roughly 32% of total Class damages.[4] (Stericycle would present evidence that the recovery exceeds actual damages.) The cash portion of the Settlement alone, considering the risks of litigation, the effort and skill demonstrated in achieving this result, the highly contested and risky nature of the case, and the efficiency of Lead Counsel's efforts, is sufficient to justify the costs, fees, and awards requested.

But the cash component is not the only aspect of the Settlement that provides quantifiable value to the Class. The Agreement requires Stericycle to cease the disputed practice of imposing 18% price increases twice annually and caps price increases for customers subject to the old API policy at 6% annually.[5] In response to Lead Counsel's efforts in this litigation, Stericycle began transitioning customers away from its API policy in 2015 and, as required by the Agreement, ceased its API practice for existing customers following preliminary approval.[6] The realized and future savings to the Class from the termination of the API practice at issue amount to $160 million.[7] So while the cash payment to the Class is $295 million, the true value of the Settlement is at least $455 million.

The Settlement also provides benefits that are not easily quantifiable, but are still valuable. Following final approval, all new contracts for Small Quantity ("SQ") customers will have annual price increases capped at 8% and must comport with new disclosure requirements

---

[4] Agreement at p. 11. *See also* Declaration of Patrick J. Kilbourne ("Kilbourne Decl."), filed concurrently herewith, ¶ 9.

[5] The Agreement required Stericycle to cease this practice within 60 days after entry of preliminary approval, which it has done. Berman Decl. ¶ 20.

[6] Kilbourne Decl. ¶ 4. *See also* Berman Decl. ¶¶ 20-22.

[7] Kilbourne Decl. ¶¶ 5-7. *See also* Berman Decl. ¶ 22. Of the $160 million, $7 million was realized between January 2015 and December 2017, while the remaining $153 million will be realized between January 2018 and December 2020. *Id.* Although some customers may still benefit from the API cap after that time, we have conservatively assumed that most customers will have either aged out of their current contracts or entered into new contracts by that time.

-2-

that will increase transparency.[8] To ensure these benefits accrue to the Class as agreed, Retired

Federal Judge Wayne Andersen and Lead Counsel will monitor Stericycle's compliance for a

period of three years.[9] The Settlement not only procures significant cash payments for the Class,

but also ensures fair treatment going forward and implements a mechanism to guarantee that

there is substance, and not merely hopeful thinking, behind the prospective relief.

     The Settlement is an extraordinarily good result for the Class. At the outset, Plaintiffs

had two main goals: (1) obtain compensation for the alleged overcharges and (2) stop

Stericycle's disputed pricing practice. Through Lead Counsel's efforts, the Settlement met both

goals: it provides $295 million in cash, an additional $160 million in relief from price increases,

and requires Stericycle to cease the disputed practice. In light of that extraordinary result, Lead

Counsel's request for fees of 8.9% of the value to the Class is modest compared to awards in

similar cases. Likewise, the reasonable costs and service awards should be granted.

## II.    AUTHORITY AND ARGUMENT

**A.**    **The attorney's fees requested are reasonable and compare favorably with fee awards typically granted using the percentage of recovery approach.**

     In the Seventh Circuit, "in common fund cases, the decision whether to use a percentage

method or a lodestar method remains in the discretion of the district court."[10] But Lead Counsel

fee awards seek to reflect "the market price for legal services, in light of the risk of nonpayment

and the normal rate of compensation in the market at the time."[11] In this case, the percentage

---

[8] Agreement at pp. 16-17. The 8% increase cap on future contracts also has real value and represents real money savings for class members. But because these contracts will begin at an unknown future date, the savings to the Class is not included in the $160 million estimated value of stopping the API practice for existing contracts.

[9] *See* Agreement at pp. 17-20.

[10] *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994).

[11] *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007) (internal quotation marks and citation omitted). *See also Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957 (7th Cir. 2013)

method is most appropriate for analyzing the reasonableness of the fee request and most accurately approximates the fee that Lead Counsel would obtain in the open market.

Under the "common fund" doctrine, "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."[12] "The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit."[13] "When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund."[14]

Counsel is "entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client,"[15] and a 30% fee award is not unusual in common fund cases.[16] Importantly, the court must consider the overall benefit to the class, including non-monetary benefits, when evaluating a fee request.[17]

---

("[A]ttorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services.").

[12] *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

[13] *Id.* (internal citations omitted).

[14] *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) (citations omitted).

[15] *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992). *See also Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000) ("[W]hat is reasonable is what an attorney would receive from a paying client in a similar case.") (citations omitted).

[16] *See Taubenfeld v. Aon Corp.*, 415 F.3d 597, 598-600 (7th Cir. 2005) (approving a fee award of 30% of a $7.25 million settlement fund); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 572 (in class actions, "the usual range for contingent fees is between 33 and 50 percent"); *Bridgeview Health Care Ctr., Ltd. v. Jerryclark*, 2015 WL 4498741, at *2 (N.D. Ill. July 23, 2015) (awarding 1/3 of common fund in TCPA class action).

[17] *See, e.g., Redman v. RadioShack Corp.*, 768 F.3d 622, 635 (7th Cir. 2014). *See also Beesley v. Int'l Paper Co.*, 2014 WL 375432, at *1 (S.D. Ill. Jan. 31, 2014).

-4-

The Seventh Circuit offers three guidelines to assist courts in estimating the market rate: (1) the fee contract between plaintiffs and counsel, (2) data from similar cases, and (3) information from class-counsel auctions.[18] Courts must also consider the risk that Lead Counsel assumed by undertaking the representation because risk is necessarily a factor in determining the price counsel would have charged in arm's-length *ex ante* negotiations.[19]

Here, the first and third factors are not particularly helpful. In consumer cases, courts commonly find that named plaintiff retainer agreements are not indicative of market price because they "do not inform the court's estimation sufficiently as to what Lead Counsel would have received in an *ex ante* negotiation with the entire class, ha[d] such a negotiation occurred."[20] Information from counsel auctions also offers little guidance, given that no such auction occurred, nor is there a sufficient pool of information regarding auctions in cases like this one, involving contract and consumer protection issues as well as requiring complex and expensive data analysis. But to the extent it is relevant, this factor favors Lead Counsel's request. There is no basis to assume that in an auction at the outset of the litigation—before the extent of damages was known, and before the framework for potential liability had been established through discovery—any firm would have proposed a fee percentage below 8.79% of the total recovery, or even 13.56% of the cash recovery. Given the size, complexity, expense, and risk of the case, it is unlikely that any firm would make such an offer.

So the analysis here, as with most class actions, turns on a comparison of the fees requested in this case to the fees awarded in similar cases. That comparison shows that by any

---

[18] *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001).

[19] *Id.*

[20] *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 796 (N.D. Ill. 2015).

metric, benchmark, or methodology, Lead Counsel's fee request of 8.79% of the total recovery is far less than the percentages commonly approved in similar cases.

The modern trend in "megafund" cases has been to award fees on a tiered basis, with decreasing percentages awarded as the recovery increases. Although fee percentages tend to decline as the size of the settlement increases,[21] the Seventh Circuit has rejected an outright cap on attorney's fees in megafund cases. In *Silverman*, for example, the court held that "an award fixed at 27.5% of a $200 million fund is exceptionally high" but "[i]t does not necessarily follow that 27.5% is legally excessive."[22] Even facing such an unusually high award, the court concluded that, given the risk of the litigation and the high costs absorbed by counsel, "the district judge did not abuse her discretion in concluding that the risks of [the] suit justified a substantial award, even though compensation in most other suits has been lower."[23]

The *Silverman* court advocated the "sliding-scale approach" to determining fee awards, reasoning that "[a]warding counsel a decreasing percentage of the higher tiers of recovery enables them to recover the principal costs of litigation from the first bands of the award, while allowing the clients to reap more of the benefit at the margin."[24] This approach has yielded tiered fee awards in several other Seventh Circuit large settlement cases.[25] For example, in *Synthroid II*, counsel was awarded 30% of the first $10 million, 25% of the next $10 million, 22% of the band

---

[21] *Silverman*, 739 F.3d at 958.

[22] *Id.*

[23] *Id.*

[24] *Id.* at 959.

[25] *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 572 ("In large commercial litigation with prospects of multimillion dollar recoveries the percentage frequently is tapered—it might be 33 percent of the first million, 25 percent of the next million, and so on down," but it should not involve a recovery cap or other disincentive.).

from $20 to $46 million, and 15% of the remainder.[26] This tiered structure resulted in an overall award of 19.9% of the $88 million settlement fund ($17.52 million). *Synthroid II* effectively established 30% as the benchmark for the first band of recovery in sliding scale arrangements and 20% as the benchmark for the total fee award. Courts within the circuit have applied these benchmarks to other large settlements.[27]

The $40 million fee award sought by Lead Counsel here, constituting just 8.79% of the total class recovery and 13.56% of the cash payment, is well below the 20% informal benchmark set in *Synthroid II*. In fact, Lead Counsel's request falls below even the lowest percentage (15%) frequently awarded to the *highest* tier of recovery using the sliding scale approach. Because a sliding scale similar to that used in other cases would result in a higher recovery than is sought here, it is unnecessary.[28]

Empirical studies of fee awards in class actions also support the reasonableness of the fee sought here. There are two leading studies addressing the fees awarded in federal class action

---

[26] *In re Synthroid Mktg. Litig.*, 325 F.3d 974 (7th Cir. 2003) ("*Synthroid II*").

[27] *See Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 237 (2016) (awarding 30% of the first $10 million, 25% of the second $10 million, and 20% of the remaining amounts from $20 to $28.79 million—resulting in an overall fee award of 21.35% of the $34 million common fund); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d at 805 (applying the same 30%-25%-20% sliding scale, but adding a 6% "risk premium" to the first $10 million, resulting in an overall fee award of 20.77% of the $75 million settlement fund); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 1399367, at *5 (N.D. Ill. Mar. 23, 2015) (awarding 30% of the first $10 million, 25% of the second $10 million, and 20% of the remainder—resulting in an overall fee award of 23.75% of the $40 million common fund); *Aranda v. Caribbean Cruise Line, Inc.*, 2017 WL 1369741, at *5 (N.D. Ill. Apr. 10, 2017) ("[T]he sliding-scale approach . . . appears to have become the standard model in this circuit for cases [involving large settlements].").

[28] For illustrative purposes, the sliding scale employed in *Synthroid II* (30% of the first $10 million, 25% of the next $10 million, 22% of the band between $20 and $46 million, and 15% of the remainder) would yield a fee of $72,570,000 based on total recovery, or $48,570,000 based on the cash component only.

cases: Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL LEGAL STUDIES 248 (2010), and Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUDIES 811 (2010).[29] The Eisenberg study divided cases between 2009 and 2013 into ten tiers based on settlement value and found that the largest cases (with recoveries over $100 million) resulted in an average fee percentage of 22.3%.[30] The Fitzpatrick study, examining "every federal class action settlement from the years 2006 and 2007," found that the mean and median attorney fee percentages awarded in class action settlements between $250 and $500 million during that time were 17.8% and 19.5%, respectively, with a standard deviation of 7.9%.[31]

These figures are significant not only because they demonstrate that Lead Counsel's fee request is lower than average, but also because the averages reflect the collective wisdom of many courts over many years determining what the market rate is for contingent fee work in class cases. And the clear trend is for awards in megafund cases near the 20% mark. Lead Counsel's request for a fee award of 8.79% of the total recovery or 13.56% of the cash component is well under market price, and is the best indicator of what Lead Counsel would have received from a paying client—and one driving a hard bargain, at that.

---

[29] The court in *Capital One* cited and relied upon both of these studies. *See In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d at 797-98.

[30] Berman Decl., Ex. 4 (Eisenberg Study), at p. 9.

[31] Berman Decl., Ex. 5 (Fitzpatrick Study), at pp. 812, 839.

**B.** **Lead Counsel assumed significant risk in undertaking this litigation and expended considerable resources over an extended period pursuing the case. In doing so, it exhibited a high degree of dedication and skill, which resulted in an extraordinarily good settlement for the Class. If the Court employs the lodestar approach, it should apply an extraordinary multiplier and award the $40 million fee requested.**

If applying the percentage approach, a district court is not obligated to cross-check requested fees against the lodestar.[32] In fact, the use of a lodestar cross-check is no longer recommended in the Seventh Circuit.[33] But a district court should not place undue focus on the calculus of the fee recovery, and instead should choose the method that most equitably compensates Lead Counsel for the results achieved and the risks undertaken—be that the percentage method or the lodestar method.[34] As discussed above, Lead Counsel believes that the percentage method is the more appropriate method for calculating the fee award in this case. However, even if the lodestar method is used, the extraordinary result justifies the award sought.

Under the lodestar method, the court calculates a base lodestar by multiplying a reasonable hourly rate by the number of hours reasonably expended.[35] It may then adjust the base lodestar using the following factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation,

---

[32] *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011).

[33] *See Synthroid II*, 325 F.3d at 979-80 ("The client cares about the outcome alone" and Lead Counsel's efficiency should not be used "to reduce Lead Counsel's percentage of the fund that their work produced.").

[34] *Americana Art China Co., Inc. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243 (7th Cir. 2014).

[35] *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010).

and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[36]

District courts are required to award a multiplier when fees are contingent upon the outcome of the case.[37] To determine the appropriate multiplier, the court must attempt "a retroactive calculation of the probability of success as measured at the beginning of litigation."[38] The Seventh Circuit typically has awarded multipliers anywhere between one and four.[39]

Work performed under the direction of Lead Counsel on the litigation exceeds 19,783 hours to date, for a total lodestar value of $9,984,303.50 at current and reasonable hourly rates.[40] The resulting lodestar multiplier for the $40 million fee award sought would be 4.01, which, on the high end of what is typically allowed, is warranted in this case.

This litigation required tremendous time and energy by counsel, with nearly 20,000 hours expended over nearly five years of litigation, with multiple attorneys working nearly full time on the case for much of that time. The case involved difficult and complicated issues centered on the analysis of Stericycle's enormous customer database containing millions of entries for over 280,000 class members. The ability to certify this case as a class action—and ultimately establish

---

[36] *Id.*; *see also Hensley v. Eckerhart*, 461 U.S. 424, 444 n.3 (1983).

[37] *Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998); *see also In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 569.

[38] *Cook*, 142 F.3d at 1013 (internal quotation marks and citation omitted).

[39] *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991); *see also In re Cenco, Inc. Sec. Litig.*, 519 F. Supp. 322, 327 (N.D. Ill. 1981) (applying a lodestar multiplier of four to lead counsel's lodestar and two to other counsels' lodestar); *In re Brand Name Prescription Drugs Antitrust Litig.*, 2000 WL 204112, at *3 (N.D. Ill. Feb. 10, 2000) (awarding $91 million above lodestar and noting that "[a]n award of more than two times the lodestar calculation is believed to be fair and just in these circumstances").

[40] Berman Decl., ¶¶ 31-35 and Ex. 3. Stericycle is required to report to the Settlement Monitor and Lead Counsel for a period of three years following the Final Effective Date. In monitoring Stericycle's compliance, Lead Counsel will necessarily spend additional attorney time and accumulate additional lodestar.

-10-

Stericycle's liability—turned on Lead Counsel's ability to work effectively with its expert to locate, identify, and analyze the data in a manner allowing common proof of Stericycle's pricing practices and damages to the Class. Lead Counsel's creative approach to this problem helped gain class certification and allowed for a settlement that will allow checks in the appropriate amounts to be mailed directly to class members, with no further action needed on their part. And this Court has previously acknowledged the reputation, skill, and ability of Lead Counsel, resulting in a total recovery of over $455 million and leading to important changes in the way Stericycle does business.[41]

Because this was a contingent fee case, Lead Counsel undertook the work, expended thousands of hours, and incurred over $2.6 million in expenses with no guarantee of any compensation. The case was by no means a sure win. Stericycle fiercely disputed the allegations and presented defenses that could have (and still can, if the Agreement does not gain final approval) defeated liability or severely reduced the size of the recovery or class. And although Lead Counsel expended significant time and resources on the case, it achieved the positive result efficiently, both in terms of lodestar and costs incurred. The Court should reward, not penalize Lead Counsel for that efficiency. Finally, as discussed above, awards in similar class actions, many with arguably inferior results, typically approach 20% of the total recovery.

In light of these factors, a lodestar multiplier of 4.01, resulting in a fee of just 8.79% of the total recovery, is justified. This was not a slam-dunk case that settled quickly, with little effort. It was a hard-fought, highly contested battle requiring five years of dedicated work, the expenditure of millions of dollars, and significant skill and the ability to bring it to a successful

---

[41] Brief biographies of Lead Counsel's qualifications, and those of the attorneys who worked on this case, may be found at Berman Decl., ¶¶ 23-28 and Ex. 2. Information relating to co-counsel working under Lead Counsel's direction may be found at Berman Decl., Ex. 3 and the exhibits thereto.

-11-

resolution. Despite these challenges, Lead Counsel obtained a result that may fairly be described as a home run for the Class: a Settlement that not only provides $455 million in cash and savings to the Class, but that also incorporates the injunctive relief sought in the Complaint and ends the disputed pricing practice. If the Court employs the lodestar, it should use a lodestar multiplier of 4.01 and award the $40 million in fees requested.

**C. Plaintiffs' expenses are reasonable and were necessary to the successful prosecution of the case.**

Rule 23 allows the Court to "award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Lead Counsel (and co-counsel) expended $2,670,604.35 in litigating this case.[42] An accounting of these costs consistent with the way such costs are accounted for with paying clients is included with this motion.[43]

In light of the recovery of $455 million (or $295 million counting only the cash portion), the amount of those costs is reasonable. In *In re AT&T Mobility Wireless Data Services Sales Tax Litigation*,[44] the court observed "a 2004 empirical study, which found that costs and expenses for the sample as a whole were, on average 4 percent of the relief for the class." The costs here amount to only 0.6% of the total Settlement value, or 0.9% of the cash portion.

Individually, the costs incurred were reasonable and necessary. The vast majority of those costs were for expert services, which account for roughly 91.7% of the total. The expert work was critical to the successful outcome. This case involved enormous amounts of data that

---

[42] Stericycle is required to report to the Settlement Monitor and Lead Counsel for a period of three years following the Final Effective Date. In monitoring Stericycle's compliance, Lead Counsel will certainly continue to incur costs and expenses.

[43] *See* Berman Decl., ¶¶ 32, 36, and Ex. 3.

[44] 792 F. Supp. 2d 1028, 1041 (N.D. Ill. 2011), quoting Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27, 70 (2004) (internal quotation marks and alterations omitted).

required expert analysis. Lead Counsel invested in that analysis, which was not only critical to

class certification, but also would have been key to establishing Stericycle's liability at trial. The

expert work also benefitted the Class by allowing for a streamlined distribution process,

eliminating the need for a claims process and allowing the direct mailing of each class member's

correct share of the Settlement. The other costs were reasonable and customary, and such costs

are incurred in every case with national scale. They include filing fees, copying and research

expenses, deposition and court reporting expenses, document hosting expenses for the roughly

one million documents produced in this case, and modest travel expenses. Lead Counsel

advanced these necessary expenses, interest-free, without any assurance that they would ever be

recouped. The costs claimed are reasonable and should be allowed.

**D.      The Class Representatives expended significant time and effort on behalf of the
         Class and should be granted service awards of $5,000.**

Courts routinely grant service awards to Class Representatives to encourage plaintiffs to

serve and to reward the representatives' efforts for the benefit of the class. The modest $5,000

service award requested—an amount commonly permitted even in cases requiring less effort by

representatives than did this one[45]—is reasonable and should be granted.

"Because a named plaintiff is an essential ingredient of any class action, an incentive

award is appropriate if it is necessary to induce an individual to participate in the suit."[46] "In

deciding whether such an award is warranted, relevant factors include the actions the plaintiff

has taken to protect the interests of the class, the degree to which the class has benefitted from

---

[45] *See, e.g., Gehrich,* 316 F.R.D. at 239 ("Courts in this District have recently and routinely
granted $5,000 incentive awards to named plaintiffs in TCPA cases.").

[46] *Cook,* 142 F.3d at 1016 (approving $25,000 incentive award in employment case yielding
roughly $14.4 million for the class). *See also In re AT&T Mobility Wireless Data Servs. Sales
Tax Litig.,* 792 F. Supp. 2d at 1041 ("Incentive payments sufficient to induce a named plaintiff to
participate in the lawsuit are appropriate within the Seventh Circuit.").

-13-

those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation."[47] "It is also worth noting that courts regularly approve $5,000 incentive awards in common fund cases like this one."[48]

The Class Representatives expended significant effort on behalf of the class over nearly five years, and their efforts helped bring about the significant benefits embodied in the Settlement Agreement. Each Class Representative properly attended to its duty to remain informed about the lawsuit, worked with counsel to respond to interrogatories and produce documents, prepared for and (with one exception) attended a deposition by Stericycle's counsel, and gave due consideration to whether the Settlement was in the best interests of the Class.[49] The Class Representatives estimate that they spent between 20 and 40 hours attending to their responsibilities.[50] The total incentive awards requested for the seven Class Representatives amount to $35,000, which is just over 1/100th of a percent of the total cash recovery, far less than commonly approved. "[T]otal Named Plaintiff awards of less than one percent of the fund are well within the ranges that are typically awarded in comparable cases."[51]

---

[47] *Cook*, 142 F.3d at 1016.

[48] *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 503 (N.D. Ill. 2015) (approving $5,000 incentive award in TCPA case even though the "case did not proceed past the earliest phases of formal discovery before it was settled"). *See also In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d at 1041 (approving $5,000 incentive awards even though the representatives were never deposed or required to respond to discovery).

[49] *See* declarations of Class Representatives, filed concurrently herewith. The one exception was ResearchDx, whose deposition was scheduled but then canceled at the last moment to allow the parties to enter into settlement negotiations. Dr. Philip Cotter, ResearchDx's owner and president, had already prepared for and was ready for his deposition to proceed, but Stericycle chose not to reschedule the deposition after litigation recommenced.

[50] *Id.*

[51] *Beesley*, 2014 WL 375432, at *4 (citing examples).

The Class Representatives—like most class members—are small businesses such as veterinarians, physicians, and medical laboratories. The time spent on this litigation was time away from their core businesses, making the service awards an important incentive to encourage participation. Given the substantial benefits accruing to the Class and the need to encourage participation by small businesses in cases like this, $5,000 service awards are appropriate.

**E.      The Settlement Administrator has completed the notice program required by the Preliminary Approval Order, and opposition to the Settlement is *de minimus*.**

As required by the Preliminary Approval Order, the Settlement Administrator's declaration regarding the notice program to class members is submitted with this motion.[52] As detailed in that report, 283,043 notices have been mailed, with a successful mailing rate (including re-mailings after further research for notices returned as undeliverable) of approximately 90%.[53] The Settlement Administrator also established the Settlement website (2,868 visits to date), telephone line (499 calls to date), and has mailed 18 long-form notices upon request. Despite this successful and widespread notice campaign, and recognizing that time remains for class members to opt out or object, the Settlement Administrator has received only nine opt-out requests, and no objections to the Settlement.[54]

### III.      CONCLUSION

For all the above-stated reasons, Lead Counsel respectfully requests that the Motion be granted and the Court enter an order: (i) granting Lead Counsel $40,000,000 in attorney's fees; (ii) granting Lead Counsel $2,670,604.35 in costs; and (iii) granting each Class Representative a Service Award of $5,000.00.

---

[52] *See* Declaration of Shandarese Garr, filed concurrently herewith.

[53] Not surprisingly, given the length of time covered by the Settlement, some class member businesses have either closed their doors or otherwise have not been located.

[54] *Id.*

DATED: January 5, 2018

Respectfully submitted,

By: /s/ Steve W. Berman
    Steve W. Berman
Garth D. Wojtanowicz
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: garthw@hbsslaw.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
455 Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
Email: beth@hbsslaw.com

*Lead Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was filed electronically via the Court's ECF system on January 5, 2018. Notice of electronic filing will be sent to all parties by operation of the Court's electronic filing system.

DATED: January 5, 2018                    HAGENS BERMAN SOBOL SHAPIRO LLP

                                          By: /s/ Steve W. Berman
                                          STEVE W. BERMAN

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL



## UNITED STATES POSTAL SERVICE ®

## PRIORITY® MAIL

- Expected delivery date specified for domestic use.
- Most domestic shipments include up to $50 of insurance (restrictions apply).*
- USPS Tracking® included for domestic and many international destinations.
- Limited international insurance.**
- When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at *http://pe.usps.com*.

** See International Mail Manual at *http://pe.usps.com* for availability and limitations of coverage.

Hamilton Lincoln Law Institute
1629 K Street NW, Suite 300
Washington, DC 20006

**TO:**

## FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

Broiler Chicken Consumer Litigation
ATTN: OBJECTIONS
c/o A.B. Data, Ltd.
P.O. Box 173001
Milwaukee, WI 53217



**UNITED STATES POSTAL SERVICE** ®

USPS TRACKING #

9114 9022 0078 9303 0570 64

May 2020
2 1/2 x 9 1/2

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; May 2020; All rights reserved.