**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) ) ) |

Case No. 1:16-cv-08637

Hon. Judge Thomas M. Durkin
Magistrate Judge Jeffrey T. Gilbert

THIS DOCUMENT RELATES TO:
*CERTAIN DIRECT ACTION PLAINTIFF CASES*

**CERTAIN DEFENDANTS' OPPOSITION TO CERTAIN DIRECT ACTION
PLAINTIFFS' MOTION TO PRECLUDE ENFORCEMENT OF CERTAIN
DEFENDANTS' JUDGMENT SHARING AGREEMENT**

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................... 1

II.    BACKGROUND ..................................................................................... 2

III.    SUMMARY OF ARGUMENT ................................................................ 6

IV.    ARGUMENT ............................................................................................ 8

        A.    The JSA Does Not Displace Joint-And-Several Liability ...................................... 8

        B.    The JSA Is Not Unlawful Under Any Antitrust Law ........................................... 11

        C.    Plaintiffs' Policy Arguments Are Unavailing ........................................................ 14

V.    CONCLUSION ........................................................................................ 18

# TABLE OF AUTHORITIES

## Cases

*A.D. Bedell Wholesale Co. v. Philip Morris Inc.*,
  263 F.3d 239 (3d Cir. 2001)............................................................................................... 13

*California v. ARC Am. Corp.*,
  490 U.S. 93 (1989)................................................................................................................ 5

*California v. Infineon Techs. AG*,
  2007 WL 6197288 (N.D. Cal. Nov. 29, 2007) ..................................................... 5, 10, 11, 15

*Campbell v. City of Chicago*,
  823 F.2d 1182 (7th Cir. 1987) ...................................................................................... 7, 12, 13

*Cimarron Pipeline Constr., Inc. v. Nat'l Council on Comp. Ins.*,
  1992 WL 350612 (W.D. Okla. 1992) ............................................................................... 5, 15

*City of Atlanta v. Chattanooga Foundry & Pipeworks*,
  127 F. 23 (6th Cir. 1903) .................................................................................................... 2

*City of Atlanta v. Chattanooga Foundry & Pipeworks*,
  203 U.S. 390 (1906)........................................................................................................... 2

*Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*,
  508 U.S. 49 (1993).................................................................................................... 12, 13

*Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*,
  944 F.2d 1525 (9th Cir. 1991) ............................................................................................ 12

*Elec. Contractors' Ass'n of City of Chicago v. A. S. Schulman Elec. Co.*,
  63 N.E.2d 392 (Ill. 1945) .................................................................................................... 18

*Fox Midwest Theaters v. Means*,
  221 F.2d 173 (8th Cir. 1955) .............................................................................................. 13

*Honeycutt v. United States*,
  137 S.Ct. 1626 (2017)......................................................................................................... 9

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  1995 WL 221853 (N.D. Ill. Apr. 11, 1995) ................................................................. *passim*

*In re Cement & Concrete Antitrust Litig.*,
  817 F.2d 1435 (9th Cir. 1987) ............................................................................................ 5

*In re Indus. Gas Antitrust Litig.*,
  100 F.R.D. 280 (N.D. Ill. 1981)........................................................................................... 5

*In re Indus. Gas Antitrust Litig.*,
  681 F.2d 514 (7th Cir. 1982) .............................................................................................. 5

*In re San Juan Dupont Plaza Hotel Fire Litigation*,
  1989 WL 996278 (D. P.R. 1989)....................................................................................... 11

*In re Terazosin Hydrochloride Antitrust Litig.*,
  2002 WL 35651678 (S.D. Fla. Aug. 28, 2002)................................................................... 5

*Kelly v. Kosuga*,
358 U.S. 516 (1959) ................................................................................................. 13

*Lundquist v. United States*,
116 F.3d 1486, 1997 WL 355933 (1997) ................................................................. 9

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) ................................................................................... 2

*McDermott, Inc. v. AmClyde*,
511 U.S. 202 (1994) ................................................................................................. 9

*Paramount Famous Lasky Corp. v. United States*,
282 U.S. 30 (1930) ................................................................................................. 12

*Primetime 24 Joint Venture v. Nat'l Broad. Co.*,
219 F.3d 92 (2d Cir. 2000) ..................................................................................... 13

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
451 U.S. 630 (1981) ............................................................................................ 2, 9

**Statute**

15 U.S.C. §15 ............................................................................................................... 2

**Regulation**

28 C.F.R. §50.23 ......................................................................................................... 6

**Other Authorities**

A. Mitchell Polinsky & Steven Shavell, *Contribution and Claim Reduction Among Antitrust Defendants: An Economic Analysis*, 33 Stan. L. Rev. 447 (1981) ......................................... 15

ABA, *Minority Report on Contribution*, 49 Antitrust L.J. 306 (1980) ......................................... 16

*Antitrust Damage Allocation: Hearings Before the Subcomm. on Monopolies and Com. Law of the House Comm. on the Judiciary*, 97th Cong. (1982) ......................................... 4, 16

*Antitrust Equal Enforcement Act of 1979: Hearings on S. 1468 Before the Subcomm. on Antitrust, Monopoly and Bus. Rights of the Senate Comm. on the Judiciary*, 96th Cong. (1979) ................................................................................................................... 3, 4

*Antitrust Remedies Reform: Hearings on S. 2022 and S. 2162 Before the Senate Comm. on the Judiciary*, 99th Cong. (1986) ......................................................................... 3

Br. of the United States as Amicus Curiae,
*Texas Indus., Inc., v. Radcliff Materials, Inc.*, No. 79-1144 (Jan. 1981) ......................... 16

Christopher R. Leslie, *Judgment-Sharing Agreements*, 58 Duke L.J. 747 (2009) ..................... 16

Edward D. Cavanagh, *The Private Antitrust Remedy: Lessons from the American Experience*, 41 Loy. U. Chi. L.J. 629 (2010) ......................................................................... 2

S. Rep. 96-428 (1979) ................................................................................................. 4

S. Rep. No. 97-359 (1982) .................................................................................. 4, 13, 17

S. Rep. No. 99-320 (1986) ......................................................................................... 17

## I.    INTRODUCTION

Judgment sharing agreements have been around for decades.  Federal courts have long enforced them, especially in the antitrust context, and the infrequent objections to them have been quickly dispatched.  Indeed, courts, legislators, law enforcement officials, practitioners, commentators, and the ABA have all applauded the role these agreements play in promoting fair settlements and even-handed enforcement of antitrust laws.  The Judgment Sharing Agreement ("JSA") at issue here is quite typical.  It incorporates standard terms like sharing and claim-reduction provisions, and it promotes settlement by ensuring that settling Defendants are not exposed to further liability and that the prospect of disproportionate liability does not create undue pressure on the remaining Defendants.

Although Plaintiffs try to portray their challenge as a modest one limited to distinct features of the JSA, there is nothing modest about it.  Plaintiffs are asking this Court to become the first to invalidate the central feature of all judgment sharing agreements as a violation of the antitrust laws and public policy.  Notwithstanding their feigned ignorance, *see* Dkt. 5163 at 9 n.10, every court to address similar challenges has rejected them out of hand.  Moreover, Plaintiffs' core theory—that agreements among defendants about how to defend and settle antitrust allegations against them are a form of coordinated restraints of trade that violate the antitrust laws—would endanger all manner of efforts by co-defendants to coordinate the defense or settlement of litigation.  In reality, joint efforts to resolve litigation are fully compatible with the antitrust laws and are constitutionally protected, which is why they have been endorsed by courts, Congress, and the Justice Department.  And far from hindering settlement, judgment sharing agreements promote it—as evidenced by the numerous settlements with signatories to the JSA that have been reached in this very case.  The Court should reject Plaintiffs' effort to ban these sensible and commonplace

agreements in favor of a rule designed to distort the settlement process to maximize antitrust plaintiffs' leverage.

## II.    BACKGROUND

Congress has explicitly authorized the imposition of significant monetary penalties—including, most notably, treble damages—on antitrust violators. *See* 15 U.S.C. §15. Federal courts have also long imposed joint-and-several liability on co-conspirators in the antitrust context, despite the absence of any statutory text expressly directing that liability scheme. *See, e.g.*, *City of Atlanta v. Chattanooga Foundry & Pipeworks*, 127 F. 23, 26 (6th Cir. 1903), *aff'd*, 203 U.S. 390 (1906); *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 839 (7th Cir. 2020). And the Supreme Court has held that courts lack authority "to create a right to contribution" for antitrust defendants from other defendants because Congress has not expressly provided one. *Texas Indus., Inc. v. Radcliff Materials, Inc*., 451 U.S. 630, 640-47 (1981).

As a result of those dynamics, a defendant sued for federal antitrust violations alongside alleged co-conspirators faces a very real risk of winding up on the hook for three times the amount of damages resulting from *the entire alleged conspiracy*, even if that defendant was no more than a bit player as to whom the evidence is weak. *See* Edward D. Cavanagh, *The Private Antitrust Remedy: Lessons from the American Experience*, 41 Loy. U. Chi. L.J. 629, 633-34 (2010) (describing "catastrophic consequences" that follow when a defendant is "held responsible" "under the rule of joint and several liability … for all damages caused by its co-conspirators[,] trebled"). That, in turn, creates unusual settlement pressures and the possibility of so-called "whipsaw settlements." As Judge (and then-chief of the Justice Department's Antitrust Division) Douglas Ginsburg described the dynamic to a Senate committee: "Because of joint and several liability, antitrust plaintiffs have the ability to sue and recover all of their damages from some rather than all of the persons that have participated in an antitrust conspiracy, or to collect an antitrust

judgment from less than all liable defendants, or to enter into settlement agreements with some defendants for relatively small sums and shift the balance of those defendants' damage liability to nonsettling defendants, who then face increased pressure to settle rather than litigate regardless of the merits of their defense—the 'whipsaw' settlement problem." *Antitrust Remedies Reform: Hearings on S. 2022 and S. 2162 Before the Senate Comm. on the Judiciary*, 99th Cong. 159-60 (1986) ("1986 Senate Hearings").

To ameliorate these pressures and counteract the "whipsaw" settlement problem, antitrust co-defendants have long employed judgment sharing agreements. *See generally In re Brand Name Prescription Drugs Antitrust Litig.*, 1995 WL 221853, at *1 (N.D. Ill. Apr. 11, 1995) (Kocoras, J.). These agreements are designed to "minimize the likelihood of … coercive settlements by equitably apportioning any judgment that might be entered against the defendants," *id.* at *2, and they typically have two key features. First, virtually every judgment sharing agreement creates a contractual right under which "a judgment … in favor of the plaintiff will be shared [by the signatory defendants] on some preestablished basis, often by market share." *Antitrust Equal Enforcement Act of 1979: Hearings on S. 1468 Before the Subcomm. on Antitrust, Monopoly and Bus. Rights of the Senate Comm. on the Judiciary*, 96th Cong. 71 (1979) ("1979 Senate Hearings") (statement of Robert P. Taylor). Such provisions are the basic building blocks of all judgment sharing agreements, and they "have been utilized for years as a means of spreading the risk of a massive judgment based upon everyone's sales being levied on one company." *Id.* at 121 (statement of Don T. Hibner, Jr.).

Second, because defendants entering into such agreements need to ensure that a signatory who settles cannot shift its contractually agreed-upon proportion of responsibility to the remaining defendants, agreements also typically contain a claim-reduction provision, which relieves a settling

3

defendant of its contractual sharing obligation only in specified circumstances. Claim-reduction provisions provide that "if some signatory-defendant should settle, that defendant must require the plaintiff to reduce any judgment against the other signatories by the settling defendant's stated percentage under the agreement or alternatively the settling defendant must remain liable to the other signatories for any settling difference." *Id.* at 71 (statement of Robert P. Taylor). In other words, claim-reduction provisions provide a mechanism for a defendant that wants to resolve its antitrust liability to relieve itself of its contractual sharing obligation by negotiating with the plaintiff an agreement to reduce the plaintiff's claim against the non-settling defendants by the share the settling defendant agreed to pay under the agreement in the event of an adverse verdict.

While judgment sharing agreements are not unique to antitrust cases and have been employed in other contexts to ameliorate the impact of joint-and-several liability on the settlement dynamic, the combination of treble damages and joint-and-several liability make them particularly useful and prevalent in antitrust cases. They have been used in the antitrust context for decades, and Congress has known about them since at least the 1970s. *See, e.g.*, *id.* at 121 (statement of Don T. Hibner, Jr.) (explaining how such agreements work and noting that they "have been utilized for years" in antitrust cases); *Antitrust Damage Allocation: Hearings Before the Subcomm. on Monopolies and Com. Law of the House Comm. on the Judiciary*, 97th Cong. 135 (1982) ("1982 House Hearings") (statement of Robert P. Taylor). After considering the views of executive branch officials, practitioners, the ABA, and judges, Congress applauded the role such agreements play in the "effective enforcement of the antitrust laws." S. Rep. No. 97-359, at 2-3 (1982) ("1982 Senate Report"); *see also* S. Rep. 96-428, at 25-26 (1979) (judgment sharing agreements promote "settlements that are equitable" rather than "irrational" and safeguard "the interests of fairness and deterrence"). And federal courts have uniformly enforced judgment sharing agreements, including

agreements containing sharing and claim-reduction provisions, in the antitrust context. *See, e.g.*, *In re Cement & Concrete Antitrust Litig.*, 817 F.2d 1435, 1438-39 (9th Cir. 1987), *rev'd sub nom. on other grounds*, *California v. ARC Am. Corp.*, 490 U.S. 93 (1989); *California v. Infineon Techs. AG*, 2007 WL 6197288, at *2-4 (N.D. Cal. Nov. 29, 2007); *In re Terazosin Hydrochloride Antitrust Litig.*, 2002 WL 35651678, at *2 (S.D. Fla. Aug. 28, 2002); *Brand Name Drugs*, 1995 WL 221853, at *3; *Cimarron Pipeline Constr., Inc. v. Nat'l Council on Comp. Ins.*, 1992 WL 350612 (W.D. Okla. 1992); *In re Indus. Gas Antitrust Litig.*, 100 F.R.D. 280 (N.D. Ill. 1981), *aff'd*, 681 F.2d 514 (7th Cir. 1982).

The JSA here is a typical judgment sharing agreement. Each Defendant that signed the JSA agreed to pay a proportionate share of any adverse judgment, according to agreed-upon percentages based on alleged overcharges and/or market share. *See* Second Amended Judgment Sharing Agreement (Feb. 25, 2020), Dkt. 5163-1 ("JSA"), §§4-5. To avoid double-recovery problems and undue settlement pressures, each signatory also agreed that any settling signatory will be relieved of its contractual sharing obligations only if the settling Plaintiffs agree to reduce any future judgment against the non-settling Defendants by the percentage of liability that the settling Defendant agreed to shoulder under the JSA, and to include a provision in the settlement designating the other signatories third-party beneficiaries. *See* §6(D) ("claim-reduction provision"). To effectuate the sharing and claim-reduction provisions, each signatory further agreed to "provide to the other [signatories]," "within seven days of execution of any Settlement," "a copy of the Settlement." §6(A)(iii). These provisions mirror provisions in similar judgment sharing agreements that courts have enforced.

Like other routinely enforced agreements, the JSA in no way alters the remedies available to Plaintiffs. If Plaintiffs want to try to obtain a joint-and-several judgment for trebled damages,

that is their statutory right, and the JSA does not block them from eschewing settlement and going to trial. But nothing in law or logic entitles them to that same result in a settlement, where parties are free to negotiate (subject to the Court's approval in the case of class actions) for any amount and/or for terms that ameliorate the potentially harsh effects of joint-and-several liability. Nor does the JSA prohibit individual settlements. To the contrary, it expressly provides that any signatory may settle "at any time" and on any terms, §6(A)—as four signatories have done with one or more of 103 different Plaintiffs,. While the sharing and claim-reduction provisions may incentivize signatories to try to settle on certain terms, every Plaintiff remains free to accept or reject those terms. And while the JSA requires a settling signatory to furnish a copy of its agreement to the other signatories, §6(A)(iii), that provision—without which non-settling signatories would be hard-pressed to enforce their contractual rights—is routine and consistent with public policy interests favoring transparency.[1]

## III. SUMMARY OF ARGUMENT

While Plaintiffs portray their arguments as a surgical strike, their Motion is in reality a broad-scale attack on judgment sharing agreements that, if accepted, would endanger virtually any coordination among defendants. Indeed, Plaintiffs focus their attention on a JSA provision that is materially indistinguishable from a term at the heart of every judgment sharing agreement. Courts have enforced such provisions for decades and have quickly dispatched the occasional objection. There is no reason for a different outcome here.

Plaintiffs first attack the JSA's claim-reduction provision, §6(D). But Plaintiffs concede that "the practice of defendants agreeing among themselves how to allocate payment of a

---

[1] See, e.g., 28 C.F.R. §50.23(a) ("It is the policy of the Department of Justice that, in any civil matter in which the Department is representing the interests of the United States or its agencies, it will not enter into final settlement agreements or consent decrees that are subject to confidentiality provisions, nor will it seek or concur in the sealing of such documents.").

judgment" is lawful "so long as such an agreement does not alter or limit the remedies available to plaintiffs at trial." Dkt. 5163 at 7. That concession dooms their challenge to §6(D), as it is clear beyond cavil that the JSA *does not* itself "alter or limit the remedies available to plaintiffs at trial." The JSA may incentivize signatories to negotiate with Plaintiffs to relinquish certain remedies, but Plaintiffs remain free to accept or reject such terms. Nothing in *the JSA* (as opposed to any settlement agreement) limits Plaintiffs' statutory rights or remedies in any way. Nor does the fact that co-Defendants jointly agreed to the terms of the JSA pose any problem under the antitrust laws, as co-defendants can jointly agree on everything from litigation strategy to jointly negotiated group settlements to judgment payment terms without fear of antitrust liability; indeed, such activity is constitutionally protected under the *Noerr-Pennington* doctrine. *See, e.g.*, *Campbell v. City of Chicago*, 823 F.2d 1182, 1186 (7th Cir. 1987). Provisions like §6(D) do not run afoul of amorphous public policy concerns either. To the contrary, courts, commentators, and most importantly Congress have long recognized that such provisions affirmatively promote public policy by ameliorating undue settlement pressures. As every court to consider the question has thus correctly concluded, there is simply no basis to prevent defendants from agreeing among themselves to allocate responsibility for a judgment imposing joint-and-several liability or agreeing to provisions that protect that allocation.

Plaintiffs' challenge to the requirement in §6(A)(iii) that a settling signatory supply a copy of its settlement to the other signatories is equally meritless. According to Plaintiffs, because keeping settlement agreements confidential may "encourage[] settlements" that are more favorable *to plaintiffs*, it is "inconsistent with the federal antitrust regime" for co-defendants to agree among themselves that any settling defendant will share the terms of its agreement with the group. Plaintiffs do not cite a single case embracing this theory—because there is none. The only policy

that would support refusing to enforce §6(A)(iii) is the (imagined) policy that antitrust plaintiffs have a right to settle on the most favorable terms possible, which of course is not the case.

## IV.     ARGUMENT

### A.     The JSA Does Not Displace Joint-And-Several Liability.

Plaintiffs first argue that the JSA's claim-reduction provision "undermine[s]" and is "incompatible with" the "federal antitrust regime," because it somehow "disables" the plaintiff's right to seek joint-and-several liability under the antitrust laws.[2] Dkt. 5163 at 1, 7. That complaint is meritless, as courts have repeatedly recognized. The JSA itself does nothing to disable a plaintiff from going to trial and seeking joint-and-several liability against each defendant for three times the damages caused by the entire conspiracy. The only thing that disables Plaintiffs from seeking the full remedies available under the antitrust laws is their own knowing and voluntary agreement to relinquish some of those remedies as part of a settlement—a relinquishment that Plaintiffs clearly consider when negotiating a settlement. There is nothing remotely problematic about a settlement agreement that relieves defendants of treble damages liability because the parties agree to settle for single damages (or less). Nor is there anything remotely problematic about a settlement agreement that narrows the scope of joint-and-several liability because the plaintiff has agreed to take the settling defendant's proportional liability off the table. Simply put, both treble damages and joint-and-several liability are *trial rights*, and like all trial rights they can be relinquished via settlement. Neither the settlement itself nor an agreement that incentivizes

---

[2] Plaintiffs do not argue that the JSA's sharing provision disables or negates joint-and-several liability, even though that provision could be equally described as "incompatible with" the antitrust laws' implicit preference for joint-and-several liability. That concession is telling, as it underscores that voluntary agreements that operate to alter the default consequences of an antitrust case tried to verdict do not violate the antitrust laws.

settlement on terms that differ from potential trial outcomes is "incompatible with" the antitrust laws generally or joint-and-several liability in particular.

As the Supreme Court has explained, "joint and several liability simply ensures that the plaintiffs will be able to recover the full amount of damages from some, if not all, participants." *Texas Indus.*, 451 U.S. at 646; *see also Honeycutt v. United States*, 137 S.Ct. 1626, 1631 (2017) ("If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recover only once for the full amount."). It is a doctrine of liability for adjudicated cases. Like the successful plaintiff's entitlement to treble damages, the doctrine comes into play if—and only if—a plaintiff goes to trial and wins. If a plaintiff elects to forgo trial in favor of settlement, then it likewise forgoes any entitlement to treble damages or joint-and-several liability. For that basic reason, "there is no tension between joint and several liability and a proportionate share approach to settlements." *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220 (1994).

That is not controversial. As the Ninth Circuit explained in *Lundquist v. United States*, the "argument" that a settling plaintiff "should benefit from the joint and several liability rule even though he did not go to trial" against a defendant "fails as a matter of law" because, "when a plaintiff chooses to settle with one joint tortfeasor, the plaintiff's recovery is limited only by the plaintiff's own choice to settle." 116 F.3d 1486, 1997 WL 355933, at *6 (1997). A plaintiff with a particularly compelling case may be able to reach a settlement with all defendants that ensures full payment of nearly treble damages. A plaintiff with a weaker case may settle for considerably less. But both settlements involve the plaintiff relinquishing the chance to secure a treble damages verdict enforceable jointly and severally against all defendants, and neither settlement is remotely inconsistent with the antitrust laws. In both cases, the possibility of treble damages and joint-and-

several liability after trial provides deterrence and promotes settlement. But nothing in the antitrust laws allows plaintiffs to have their cake and eat it too or precludes defendants from entering agreements among themselves that seek to ameliorate "whipsaw" settlements or other distorting pressures created by the possibility of a large joint-and-several treble damages verdict.

Consistent with those settled principles, the JSA does not deprive Plaintiffs of the ability to insist on their full range of trial remedies. Neither §6(D) nor any other provision prevents Plaintiffs from eschewing settlement, trying their claims against any or all Defendants, and obtaining a judgment for which all liable Defendants are jointly-and-severally liable. No agreement *among Defendants* could foreclose that option, because the rights to eschew settlement and seek treble damages and joint-and-several liability are rights that Plaintiffs possess and can forgo only by agreeing to settle. Nor does the JSA undermine the practical value of joint-and-several liability—namely, making it easier for a successful plaintiff to collect a judgment. And while the JSA may make it less likely that a Defendant will settle on terms that maximize Plaintiffs' settlement pressure over other Defendants, nothing in the law guarantees plaintiffs the maximum possible settlement leverage or forces defendants to unilaterally disarm. Congress presumably could pass a law precluding judgment sharing agreements in the antitrust context, or prohibiting settlements for less than double damages, or otherwise tinkering with the settlement dynamic that the availability of treble damages and joint-and-several liability creates. But Congress declined to take such steps—with full knowledge of the role such agreements play in ameliorating settlement pressures—leaving no basis for this Court to invalidate the JSA or its claim-reduction provision.

Indeed, courts have squarely rejected the rare efforts to challenge materially analogous judgment sharing agreements with substantively identical claim-reduction provisions. *See, e.g.*, *Infineon*, 2007 WL 6197288, at *2-4; *Brand Name Drugs*, 1995 WL 221853, at *1-3. Like the

provisions in those and other cases, §6(D) "does nothing to limit defendants' exposure to joint and several liability in litigation before the court, or to otherwise prevent plaintiff States from seeking a judgment against one or all signatory defendants (or non-signatory defendants, for that matter), in accordance with the principles of joint and several liability." *Infineon*, 2007 WL 6197288, at *4.[3]  It "merely affords a means of allotting responsibility for payment of any joint and several judgment among responsible parties." *Brand Name Drugs*, 1995 WL 221853, at *3.  Any effect on Plaintiffs' entitlement to their trial remedies flows from their own voluntary decision to settle. Simply put, nothing in the JSA "displace[s] joint and several liability." Dkt. 5163 at 10.

### B.      The JSA Is Not Unlawful Under Any Antitrust Law.

Plaintiffs' assertion that Defendants violated the Sherman Act (and Illinois antitrust law) simply by agreeing to a claim-reduction provision in the JSA is equally meritless—and the (il)logic of that argument would suggest that any joint efforts by antitrust co-defendants to coordinate their response to litigation, including jointly negotiated "global settlements," raise antitrust concerns. That is a rule of law only antitrust plaintiffs could favor.  In reality, such joint efforts are not only lawful, but constitutionally protected.

Plaintiffs contend that, by agreeing to §6(D)'s claim-reduction provision, Defendants have "effectively engag[ed] in a group boycott, whereby they have arranged that none of them will settle with a plaintiff unless that plaintiff 'agrees' to a contractual unwinding of the normal operation of the federal antitrust law." Dkt. 5163 at 2.  That is wrong as a matter of fact and law.  As a matter of fact, the JSA does not provide "that none of the[] [signatory-defendants] will settle with a

---

[3] That suffices to distinguish this case from the lone case in which a court refused to enforce a judgment sharing agreement, as that agreement (which did not arise in the antitrust context) prohibited signatories from settling on an individual basis. *See In re San Juan Dupont Plaza Hotel Fire Litigation*, 1989 WL 996278, at *2 (D. P.R. 1989).  Even assuming such an agreement raised concerns under the antitrust laws, that is miles away from this JSA, which leaves signatories free to settle with Plaintiffs on any terms they choose.

plaintiff until that plaintiff 'agrees'" to certain terms. The JSA could not be clearer: "A Party may settle a Plaintiff Claim, in whole or in part, at any time, whether for monetary or non-monetary consideration and/or for injunctive or other relief," on any terms it wishes. §6(A). To be sure, a settling signatory cannot escape its sharing obligation under the JSA unless the settlement accounts for that obligation by negotiating an agreement with the settling Plaintiffs to reduce any ultimate judgment in their favor by the amount of that obligation. Dkt. 5163 at 3-4. But that simply reflects the reality that the signatories to the JSA have undertaken a contractual sharing obligation that is not extinguished just because one of them settles; it does not preclude settlement or amount to a joint boycott. Moreover, as a matter of law, Plaintiffs are wrong to posit that the JSA runs counter to "the normal operation of the federal antitrust law." Dkt. 5163 at 11. As already noted, federal antitrust law simply does not speak to settlement terms. *See Campbell*, 823 F.2d at 1186; *accord Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*, 944 F.2d 1525, 1528 (9th Cir. 1991) ("A decision to accept or reject an offer of settlement is conduct incidental to the prosecution of the suit and not a separate and distinct activity which might form the basis for antitrust liability."), *aff'd*, 508 U.S. 49 (1993). The law provides certain trial remedies, but it leaves plaintiffs and defendants free to agree to settle on whatever terms they find mutually acceptable.

Plaintiffs identify no authority whatsoever for their assertion that claim-reduction provisions are tantamount to group boycotts. Instead, they principally rely (at 14-15) on cases invalidating agreements entered into among competitors *outside the context of litigation*. *See Paramount Famous Lasky Corp. v. United States*, 282 U.S. 30 (1930) (invalidating agreement among distributors that prohibited signatories from contracting with any exhibitor unless it agreed to accept a highly unfavorable arbitration provision); *Fox Midwest Theaters v. Means*, 221 F.2d

173, 180 (8th Cir. 1955) (similar).[4]  But the litigation context is triply critical.  First, a judgment sharing agreement (or any other joint defense agreement in litigation) at most may affect defendants' bargaining with the plaintiffs, not their dealing with any well-defined market.  Second, such agreements deal only with past conduct, providing no incentives for undertaking illegal activity in the market place like, for example, a prospective indemnification agreement might.  Third, in the litigation context, such joint coordination on everything from expert witnesses to the division of labor at trial to settlement is commonplace, constitutionally protected, and essential to the administration of complex litigation.  *See, e.g.*, *Campbell*, 823 F.2d at 1186; *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 253 (3d Cir. 2001); *Columbia Pictures*, 944 F.2d at 1528-29; *see also Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 100 (2d Cir. 2000) ("Courts have extended *Noerr-Pennington* to encompass concerted efforts incident to litigation ….").  It takes more than a little chutzpah for Plaintiffs to sue a group of defendants in a single lawsuit and then cry foul when those defendants coordinate their efforts to respond— particularly when Plaintiffs do so in a coordinated motion joined by more than 100 Plaintiff entities, many of which compete with one another.

Finally, it bears emphasis that the same Congress that has enacted the antitrust laws, and amended them from time to time, has been well aware of judgment sharing agreements for decades and has taken no action to stop them or even limit their use.  The notion that a common practice hailed by lawmakers as "consistent with public policy and the effective enforcement of the antitrust laws," 1982 Senate Report at 2-3, has actually been a violation of those very same laws all this

---

[4] Plaintiffs also cite *Kelly v. Kosuga*, 358 U.S. 516 (1959).  *See* Dkt. 5163 at 15.  But *Kelly* stands only for the unremarkable proposition that illegal contracts are not enforceable in court. 358 U.S. at 521.  *Kelly* says nothing about what would render an agreement illegal in the first place, as the Court "assume[d]" the "unlawful character" of the contract before it.  *Id.*

time strains credulity. Plaintiffs point to provisions in ACPERA, a 2004 law designed to provide incentives for antitrust violators to seek amnesty from criminal prosecution in certain circumstances, Dkt. 5163 at 9, 12, but they draw the entirely wrong lesson from its provisions. As Plaintiffs emphasize (at 9), Congress in ACPERA incentivized parties to come forward with details about an ongoing multi-party conspiracy by relieving qualifying amnesty applicants of joint-and-several liability in civil antitrust cases. At the same time, Congress sensibly made clear that conspirators who did not come forward would not have their exposure to joint-and-several liability reduced. Those provisions underscore that Congress understood that the prospect of facing joint-and-several liability for three times the damages caused by an antitrust conspiracy was a serious disincentive to parties deciding whether to seek amnesty from enforcement agencies. Congress was no less aware that it can also be an obstacle to settlement and create distorted incentives, which is precisely why parties agree to contractual sharing provisions and claim-reduction provisions. At a minimum, ACPERA underscores that Congress can intervene to alter the incentives for cooperation or settlement when it wants to. The fact that it has not intervened to block or even limit judgment sharing agreements, despite multiple hearings considering their advantages and disadvantages, is powerful evidence that the antitrust laws do not preclude their enforcement.

### C. Plaintiffs' Policy Arguments Are Unavailing.

Unable to identify any legal infirmity in the JSA, Plaintiffs fall back to arguments based on vague notions of public policy and suggest that judgment sharing agreements will "result in under-enforcement of [antitrust] penalties." Dkt. 5163 at 11. But employing the public policy label does nothing to remedy the basic flaws in Plaintiffs' argument. The only "penalties" they identify are "joint and several liability and treble damages," Dkt. 5163 at 13—and, by Plaintiffs' own admission, those trial remedies are available *only* "*if liability is established at trial.*" Dkt. 5163 at 11-12 (emphasis added); *see* pp.8-11, *supra*. And nothing in vague notions of public

14

policy suggests that there is any problem with plaintiffs settling for less than treble damages or less than joint-and-several liability.[5]

Plaintiffs complain that enforcing §6(D) will "make[] settlements more difficult." Dkt. 5163 at 13. But, at most, Plaintiffs mean that claims-reduction provisions make settlement on *the plaintiff's favored terms* more difficult. In reality, such provisions affirmatively promote fair and reasonable settlements that accurately reflect relative responsibility and ameliorate the distorting effects that enable plaintiffs to extract whipsaw settlements. The courts in *Cimarron* and *Infineon* found "no persuasive evidence" that "sharing agreement[s] had a negative impact upon settlement negotiations." *Cimarron*, 1992 WL 350612, at *3; *accord Infineon*, 2007 WL 6197288. Likewise, the court in *Brand Name Drugs* emphasized that "[s]tudies conducted by the Senate Judiciary Committee and by the Antitrust Section of the American Bar Association have concluded that sharing agreements in practice do not pose a barrier to individual settlements." 1995 WL 221853, at *3; *see also* A. Mitchell Polinsky & Steven Shavell, *Contribution and Claim Reduction Among Antitrust Defendants: An Economic Analysis*, 33 Stan. L. Rev. 447, 462 (1981). Plaintiffs, by contrast, have put forward *zero* evidence to support their claim that the JSA in general or §6(D) in particular has hampered or will hamper settlement. Any such claim would be difficult to reconcile with the reality that four signatory Defendants have settled with one or more of *103* different Plaintiffs, including in class settlements that this Court has approved after finding that they were "in all respects, fair, reasonable and adequate to the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure." Dkt. 4789 at 3.[6]

---

[5] In fact, to the extent public policy considerations are implicated at all, they affirmatively support allowing defendants to have their day in court without facing the prospect of a catastrophic loss arising out of a plaintiff's decision to settle with other defendants.

[6] Four of the signatory Defendants have settled with at least one class, and three of them—including Pilgrim's Pride and Tyson Foods—have settled with *all three* classes. *See* Dkt. 4789

Moreover, the relative pros and cons of judgment sharing agreements have been actively debated for decades, and that debate has generally favored such agreements as promoting even-handed settlements. While Plaintiffs rely heavily on a 2009 law review article that portrays such agreements as a nefarious form of self-help developed in response to "Congress declining to create a statutory right to contribution," Christopher R. Leslie, *Judgment-Sharing Agreements*, 58 Duke L.J. 747, 754 (2009), that gets matters backward. Judgment sharing agreements were prevalent in the antitrust context long before the congressional proceedings to which Plaintiffs allude. *See supra* p.4. In fact, their ubiquity was one of the core arguments advanced against creating a statutory right to contribution back in the 1970s and 1980s.[7] *See, e.g.*, 1982 House Hearings at 84-85 (Statement of Harold E. Kohn, Esq.) ("[D]efendants always have the right of self-help to dispose of the problem, by executing 'sharing agreements,' which allocate damages among them, as they see fit, tailored to the specific needs of their litigation, without interference from plaintiffs, Court or Congress."); ABA, *Minority Report on Contribution*, 49 Antitrust L.J. 306, 312 (1980) ("If plaintiffs truly are using their leverage arising from defendants' joint and several liability in

---

(Jun. 29, 2021 Order granting Direct Purchaser Plaintiffs' Motion for Final Approval of the Settlement with Defendants Pilgrim's Pride Corp., Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc.); Dkt. 5086 (Oct. 5, 2021 Order setting hearing for final approval of settlement between Direct Purchaser Plaintiffs and the Mar-Jac and Harrison Poultry Defendants); Dkt. 5127 (Oct. 15, 2021 Order granting Commercial and Institutional Indirect Purchaser Plaintiffs' Uncontested Motion for Preliminary Approval of Settlements with Defendants Tyson, Pilgrim's Pride, and Mar−Jac Defendants); Dkt. 5247 (Dec. 6, 2021 End-User Consumer Plaintiffs' Motion for Final Approval of the Class Settlements with Defendants including Tyson, Pilgrim's, and Mar-Jac). The class settlements are at various stages of court approval. Signatory Defendants' settlements with Direct Action Plaintiffs include agreements with some of the largest, most sophisticated Broiler purchasers in the country as well.

[7] The United States also pointed to judgment sharing agreements as a reason not to recognize a right to contribution in *Texas Industries*. *See* Br. of the United States as Amicus Curiae, *Texas Indus., Inc., v. Radcliff Materials, Inc*., No. 79-1144, at 25 (Jan. 1981) ("[A]ntitrust defendants are not powerless to protect themselves against large, disproportionate liabilities," because "[b]y contracts, known as 'sharing agreements,' they may allocate the risk of liability among themselves." (citing ABA Minority Report on Contribution)).

an abusive manner, defendants already have at their disposal the weapon needed to redress the imbalance. Sharing agreements, enthusiastically endorsed in the Majority Report, can provide desired protection[.]"). And lawmakers have found repeatedly that judgment sharing agreements "are consistent with public policy and the effective enforcement of the antitrust laws." 1982 Senate Report at 2-3; *see also* S. Rep. No. 99-320 at 2-3 (1986) (recounting previous reports and reiterating that "the committee regards [judgment sharing agreements] as consistent with public policy and with effective enforcement of the antitrust laws").

Plaintiffs apparently believe that they would be better off, and antitrust defendants would be worse off, in a world without judgment sharing agreements. But nothing in vague notions of public policy authorizes courts to choose sides in that debate. Congress has long been aware of these agreements and their effect on the settlement dynamic, and it has chosen not to prohibit them or deprive defendants of their ability to engage in self-help. Amorphous and self-serving concepts of public policy cannot fill that gap. To paraphrase Justice Holmes, public policy notions do not enact Professor Leslie's views on judgment sharing agreements.

Plaintiffs close by arguing that §6(A)(iii)—what they refer to as the "Settlement Agreement Sharing Provision"—also "frustrates … settlement" and is "inconsistent with" both "the federal antitrust regime" and "Illinois public policy," apparently on the theory that Plaintiffs will be "at a disadvantage" in settlement negotiations unless Defendants are in the dark about any agreements reached by their co-Defendants. Dkt. 5163 at 17. This argument has no merit. First, it wrongly assumes that Defendants would be in the dark about co-Defendant settlements absent §6(A)(iii); in reality, Plaintiffs themselves invariably begin settlement discussions by talking about what other Defendants paid, and class settlements are publicly disclosed. Second, §6(A)(iii) serves the plainly legitimate function of allowing non-settling Defendants to determine whether a settlement is a

17

"Qualified Settlement" within the meaning of §6(D) of the JSA. Third, this argument is premised on the wrongheaded notion that Plaintiffs are somehow entitled to the presumed advantage of negotiating with Defendants who are clueless about other settlements—a view that neither the law nor vague notions of public policy supports.

In sum, the law generally favors disclosure and leaves parties free to settle or not settle as they decide. There is simply no support for the notion that plaintiffs can sue multiple defendants and then turn around and block the defendants' efforts to enter into agreements to structure their defense or their settlements in an efficient manner. Plaintiffs' own self-interests provide no basis for invalidating longstanding and commonplace agreements that Congress and courts have endorsed for decades.[8]

## V.  CONCLUSION

For all the reasons explained, the JSA is consistent with the antitrust laws, and there is neither justification nor warrant for this Court to invalidate any of its provisions on policy grounds. The Court should deny Plaintiffs' motion to preclude enforcement of the JSA.

---

[8] Plaintiffs' arguments under Illinois law, *see* Dkt. 5163 at 15, are largely duplicative of their federal antitrust arguments, and so should be rejected for all the same reasons. Moreover, the sole case Plaintiffs cite in support of their effort to void any part of the JSA on Illinois "public policy" grounds makes clear that the "public policy of the State … is to be [found] in its constitution and statutes and, when they are silent, then in its judicial decisions and the constant practice of its government officials." *Elec. Contractors' Ass'n of City of Chicago v. A. S. Schulman Elec. Co.*, 63 N.E.2d 392, 394 (Ill. 1945). As discussed, courts, lawmakers, and law enforcement officers alike have opined that judgment sharing agreements further, rather than frustrate, public policy.

Dated:  December 17, 2021

Respectfully submitted,

_/s/ Daniel E. Laytin_

Daniel E. Laytin
Christa C. Cottrell
Jenna M. Stupar
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
daniel.laytin@kirkland.com

Paul D. Clement (admitted _pro hac vice_)
Erin E. Murphy (admitted _pro hac vice_)
Matthew D. Rowen (admitted _pro hac vice_)
Sara S. Tatum (admitted _pro hac vice_)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Facsimile:  (202) 389-5200
paul.clement@kirkland.com

_Attorneys for Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Processing Division), Sanderson Farms, Inc. (Production Division), & Sanderson Farms, Inc. (Foods Division)_

WEIL GOTSHAL & MANGES LLP

By: */s/ Carrie C. Mahan*
Carrie C. Mahan (#459802)
Christopher J. Abbott (#1014487)
2001 M Street N.W., Ste. 600
Washington, D.C. 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
carrie.mahan@weil.com
christopher.abbott@weil.com

EIMER STAHL LLP

Michael L. McCluggage (#01820966)
224 South Michigan Avenue, Ste. 1100
Chicago, IL 60604
Telephone: (312) 660-7665
Facsimile: (312) 692-1718
mmccluggage@eimerstahl.com

*Attorneys for Defendant Pilgrim's Pride Corporation*

VENABLE LLP

By: /s/ *J. Douglas Baldridge*
J. Douglas Baldridge (#437678)
Lisa Jose Fales (admitted *pro hac vice*)
Danielle Foley (admitted *pro hac vice*)
Andrew Hernacki (admitted *pro hac vice*)
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4000
Facsimile: 202-344-8300
jdbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
athernacki@venable.com

FALKENBERG IVES LLP

Kirstin B. Ives (#6289952)
30 N. LaSalle St., Ste 4020
Chicago, IL 60602
Telephone: (312) 566-4803
Facsimile: (312) 566-4810
kbi@ffilaw.com

*Attorneys for Defendants Perdue Farms, Inc. and Perdue Foods LLC*

MAYER BROWN LLP

By: /s/ *Camine R. Zarlenga*
Carmine R. Zarlenga (#90784529)
William H. Stallings (admitted *pro hac vice*)
Stephen M. Medlock (admitted *pro hac vice*)
Oral D. Pottinger (admitted *pro hac vice*)
1999 K Street N.W.
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
czarlenga@mayerbrown.com
wstallings@mayerbrown.com
smedlock@mayerbrown.com
opottinger@mayerbrown.com

*Attorneys for Defendants Foster Farms, LLC and Foster Poultry Farms, a California Corporation*

NOVACK AND MACEY LLP

By: /s/ *Stephen Novack*
Stephen Novack (#6284749)
Stephen J. Siegel (#6284749)
100 North Riverside Plaza
Chicago, IL 60606
Telephone: (312) 419-6900
Facsimile: (312) 419-6928
snovack@novackmacey.com
ssiegel@novackmacey.com

*Attorneys for Defendants Koch Foods
Incorporated, JCG Foods of Alabama LLC,
JCG Foods of Georgia LLC and Koch Meat
Co., Inc.*

VEDDER PRICE P.C.

By: /s/ *Gregory G. Wrobel*
Gregory G. Wrobel (#3122900)
222 N. LaSalle Street
Chicago, IL 60601
Telephone: (312) 609-7722
Facsimile: (312) 609-5005
gwrobel@vedderprice.com

JORDAN PRICE WALL GRAY JONES &
CARLTON, PLLC

Henry W. Jones, Jr. (admitted *pro hac vice*)
1951 Clark Avenue
Raleigh, NC 27605
Telephone: (919) 828-2501
Facsimile: (919) 834-8447
hjones@jordanprice.com

*Attorneys for Defendant House of Raeford
Farms, Inc.*

PROSKAUER ROSE LLP

By: /s/ *Christopher E. Ondeck*
Christopher E. Ondeck (admitted *pro hac
vice*)
Stephen R. Chuk (admitted *pro hac vice*)
1001 Pennsylvania Ave., NW, Ste 600 South
Washington, DC 20004
Telephone: (202) 416-6800
Facsimile: (202) 416-6899
condeck@proskauer.com
schuk@proskauer.com

*Attorneys for Defendant Wayne Farms LLC*

SHOOK HARDY & BACON LLP

By: /s/ *Lynn H. Murray*
Lynn H. Murray (#6191802)
111 S. Wacker Dr., Ste 4700
Chicago IL 60606
Telephone: (312) 704-7700
Facsimile: (312) 558-1195
lhmurray@shb.com

Laurie A. Novion (admitted *pro hac vice*)
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
lnovion@shb.com

CONNER & WINTERS

John R. Elrod (admitted *pro hac vice*)
Vicki Bronson (admitted *pro hac vice*)
4375 N. Vantage Drive, Ste. 405
Fayetteville, AR 72703
Telephone: (479) 582-5711
jelrod@cwlaw.com
vbronson@cwlaw.com

*Attorneys for Defendants Simmons Foods, Inc.
and Simmons Prepared Foods Inc.*

EVERSHEDS SUTHERLAND (US) LLP

By: /s/ *Patricia A. Gorham*
James R. McGibbon (admitted *pro hac vice*)
Patricia A. Gorham (admitted *pro hac vice*)
Peter M. Szeremeta (admitted *pro hac vice*)
Kaitlin A. Carreno (admitted *pro hac vice*)
Dylan de Fouw (admitted *pro hac vice*)
999 Peachtree Street, N.E., Ste 2300
Atlanta, GA 30309-3996
Telephone: (404) 853-8000
Facsimile: (404) 853-8806
jimmcgibbon@eversheds-sutherland.com
patriciagorham@eversheds-sutherland.com
peterszeremeta@eversheds-sutherland.com
katilincarreno@eversheds-sutherland.com
dylandefouw@eversheds-sutherland.com

SMITH AMUNDSEN LLC

Ronald Balfour (#6307658)
150 N. Michigan Avenue, Ste 3300
Chicago, Illinois 60601
Telephone: (312) 894-3200
Facsimile: (312) 997-1828
cphillips@salawus.com

*Attorneys for Defendant Harrison Poultry, Inc.*

EDWARD C. KONIECZNY LLC

By: */s/ Edward C. Konieczny*
Edward C. Konieczny (admitted *pro hac vice*)
1105 W. Peachtree St. NE
Suite 1000
Atlanta, GA 30309
Telephone: (404) 380-1430
Facsimile: (404) 382-6011
ed@koniecznylaw.com

SMITH, GAMBRELL & RUSSELL, LLP

David C. Newman (admitted *pro hac vice*)
W. Parker Sanders (admitted *pro hac vice*)
1105 W. Peachtree St. NE
Suite 1000
Atlanta, GA 30309
Telephone: (404) 815-3500
Facsimile: (404) 815-3509
dnewman@sgrlaw.com
psanders@sgrlaw.com

LYNCH THOMPSON LLP

James L. Thompson (#6199621)
150 S. Wacker Drive, Suite 2600
Chicago, IL 60606
Telephone: (312) 445-4623
Facsimile: (312) 896-5883
jthompson@lynchthompson.com

*Attorneys for Defendants Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, Mar-Jac Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-Jac Poultry, LLC, and Mar-Jac Holdings, Inc.*

VAUGHAN & MURPHY

By: /s/ *Charles C. Murphy, Jr.*
Charles C. Murphy, Jr. (admitted *pro hac vice*)
690 S Ponce Court NE
Atlanta, GA 30307
Telephone: (404) 667-0714
Facsimile: (404) 529-4193
cmurphy@vaughanandmurphy.com


WINSTON & STRAWN LLP

James F. Herbison (#6275116)
Michael P. Mayer (#6272677)
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
jherbison@winston.com
mmayer@winston.com

*Attorneys for Defendant Norman W. Fries,*
*Inc. d/b/a Claxton Poultry Farms*

JOSEPH D. CARNEY & ASSOCIATES
LLC

By: /s/ *Joseph D. Carney*
Joseph D. Carney (admitted *pro hac vice*)
OFFICE ADDRESS:
139 Crocker Park Boulevard, Ste. 400
Westlake, OH 44145
MAILING ADDRESS:
1540 Peach Drive
Avon, OH 44011
Telephone: 440-249-0860
Facsimile: 866-270-1221
jdc@jdcarney.com
case@jdcarney.com

MILLER SHAKMAN LEVINE &
FELDMAN LLP

Thomas M. Staunton (#621764)
Daniel M. Feeney (#6224893)
180 North LaSalle Suite 3600
Chicago, IL 60601
Telephone: 312-263-3700
tstaunton@millershakman.com
dfeeney@millershakman.com

D.KLAR LAW

Deborah A. Klar (admitted *pro hac vice*)
2934 1/2 Beverly Glen Circle, Suite 761
Bel Air, CA 90077
Telephone: 310-858-9500
dklar@dklarlaw.com

Paul L. Binder, Esq. (admitted *pro hac vice*)
Attorney at Law
20780 Brandywine
Fairview Park, OH 44126-2805
Telephone: 440-376-6850
paul@pbinderlaw.com

*Attorneys for Defendants Case Foods, Inc.,*
*Case Farms, LLC, and Case Farms*
*Processing, Inc.*

ROSE LAW FIRM

By: /s/ *Amanda K. Wofford*
Amanda K. Wofford (admitted *pro hac vice*)
Bourgon Reynolds (admitted *pro hac vice*)
120 East Fourth Street
Little Rock, AR 72201
Telephone: (501) 375-9131
Facsimile: (501) 375-1309
awofford@roselawfirm.com
breynolds@roselawfirm.com


SCHIFF HARDIN LLP

Margaret A. Hickey
Lawrence Harris Heftman
Kevin James Whelan
Kylie Sue Wood
233 South Wacker Drive
Suite 7100
Chicago, IL 60606
(312) 258-5500
Email: mhickey@schiffhardin.com
Email: lheftman@schiffhardin.com
Email: kwhelan@schiffhardin.com
Email: kwood@schiffhardin.com

Robert J Wierenga
Suzanne J. Wahl
Schiff Hardin LLP
350 South Main Street
Suite 210
Ann Arbor, MI 48104
(734) 222-1507
Email: rwierenga@schiffhardin.com
Email: swahl@schiffhardin.com

John W. Treece (#3122889)
1135 West Montana Street
Chicago, IL 60614
Telephone: (312) 961-7808
jtreece@jwtreece.com

*Attorneys for Defendants Mountaire Farms Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc.*

AXINN, VELTROP & HARKRIDER LLP

By: /s/ *Rachel J. Adcox*
Rachel J. Adcox (#1001488)
Daniel K. Oakes (admitted *pro hac vice*)
Kenina J. Lee (admitted *pro hac vice*)
950 F Street NW, Ste 700
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
radcox@axinn.com
doakes@axinn.com
klee@axinn.com


John M. Tanski (admitted *pro hac vice*)
Jarod G. Taylor (admitted *pro hac vice*)
90 State House Square
Hartford, CT 06103
Telephone: (860) 275-8100
Facsimile: (860) 275-8101
jtanski@axinn.com
jtaylor@axinn.com

Nicholas E.O. Gaglio (admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Facsimile: (212) 261-5654
ngaglio@axinn.com

LIPE LYONS MURPHY NAHRSTADT & PONTIKIS, LTD.

Jordan M. Tank (#6304122)
230 West Monroe, Street, Ste 2260
Chicago, IL 60606
Telephone: (312) 702-0586
Facsimile: (312) 726-2273
jmt@lipelyons.com

*Attorneys for Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., Tyson Poultry, Inc., Keystone Foods LLC, Equity Group Eufaula Division, LLC, Equity Group Georgia Division, LLC, and Equity Group Kentucky Division, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17th, 2021, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF system, which will send notification of such filing to all counsel of record.

*<u>/s/ Daniel E. Laytin</u>*

Daniel E. Laytin