**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ***IN RE BROILER CHICKEN ANTITRUST LITIGATION*** | Case No. 1:16-cv-08637 |
| This document relates to: | |
| *Quirch Foods LLC f/k/a Quirch Foods Co. v. Koch Foods, Inc., et al*, Case No. 1:18-cv-08511 | |
| *Independent Purchasing Cooperative, Inc. v. Koch Foods Inc., et al*, Case No. 1:20-cv-02013 | |
| *Supply Management Services, Inc. v. Koch Foods, Inc., et al*, Case No. 1:21-cv-01170 | Honorable Thomas M. Durkin |
| And | Honorable Jeffrey T. Gilbert |
| The Direct Purchaser Plaintiff Action | |

**NOTICE OF OPT-OUT AND OBJECTION TO PRELIMINARY EXCLUSION LIST
WITH RESPECT TO THE DIRECT PURCHASER PLAINTIFF SETTLEMENTS
WITH THE MAR-JAC AND HARRISON DEFENDANTS, OR, IN THE
<u>ALTERNATIVE, MOTION FOR LATE OPT-OUT FROM SETTLEMENTS</u>**

Supply Management Services, Inc. ("SMS"), Quirch Foods, LLC ("Quirch"), and

Independent Purchasing Cooperative, Inc. ("IPC")  respectfully submit this Notice of Opt-Out and

Objection to the recently-filed "Preliminary List of Exclusion Requests From The Settlements

With Mar-Jac and Harrison Poultry Defendants," D.E. 5323 (the "Preliminary Exclusion List"),

or in the alternative move to be granted a late opt out from these settlements prior to final approval,

in light of the unique circumstances set forth below.

## I.   INTRODUCTION

As set out in the attached declarations, settlement notices for the Mar-Jac and Harrison settlements with the Direct Purchase Plaintiff class ("DPPs") were never received by Direct Action Plaintiffs SMS, IPC, or Quirch. As best we can tell, based on the information we have been able to obtain from the current DPP Settlement Administrator and DPP's counsel, this was due to: (1) faulty and/or missing addresses in the data used to notify these three entities; and (2) an apparent failure of the previously-assigned Claims Administrator to provide the newly-assigned Claims Administrator with the correct contact information for these three entities – information that undersigned counsel had provided to the prior Claims Administrator on multiple prior occasions.

Because the notices were not received by these three entities, the docketing and calendaring system set up to ensure timely compliance with the exclusion deadline did not function properly. However, after the Preliminary Exclusion List was filed by DPP counsel just a few days ago, undersigned counsel immediately contacted counsel for the settling Defendants and the DPP class to explain the newly-discovered issue with the faulty notice process and to discuss how to add SMS, IPC, and Quirch to the Preliminary Exclusion List. The very next day, SMS, IPC, and Quirch promptly submitted late opt out requests to the new Claims Administrator, and are now filing this notice and motion with the Court — all well prior to final approval of the settlements and even prior to the DPPs' submission of their final approval papers.

As discussed herein, this situation therefore stands in stark contrast to late opt outs that were requested by two other direct action plaintiffs in this case (Winn-Dixie and Service Group of America) for two critical reasons: (1) those clients (unlike the three DAPs at issue here) *did* receive the notices; and (2) those motions for late opt outs came many *months after final approval* of the applicable settlements. Here, final approval has not been entered – a critical distinction, as explained herein – and DPPs have not even submitted their final approval papers. Indeed, the

Preliminary Exclusion List itself contemplates that changes may be made to it leading up to the DPPs' final approval submission. *See* D.E. 5323 ("This list may be subject to modification prior to the filing of the Motion for Final Approval on January 11, 2022 as Counsel and the Claims Administrator continue to review and finalize the motion.").

In other words, no prejudice of any kind will occur to the other parties if this request for late opt out is granted. As the case law set out herein makes clear, when no prejudice occurs in a situation such as this, a court should grant a late opt out notice, either as part of its inherent powers to provide a fair and just settlement claims process, or, in any event, under the excusable neglect standard in Rule 6(b), which standard is easily satisfied in this situation. Conversely, on these facts, it would be manifestly unjust to deny these opt outs submitted only days late and at this preliminary stage in the settlement approval process.

These unique facts are further complicated by the fact that DPPs transitioned from one claims administrator to another in the middle of a notice period, flanked by a worsening covid pandemic on one side and profound interruptions to the U.S. Postal Service delivery methods on the other. Under conditions that would have benefitted from information continuity, correct contact information about SMS, IPC, and Quirch that was previously provided to the old claims administrator in this litigation was apparently never provided or was lost in the transition to the new claims administrator.

In short, as fully demonstrated herein, the DPPs' notice process did not effectively include "individual notice via mail and email to all members who can be identified through reasonable effort," D.E. 5086 at 3, as required by this Court, rendering the notice process defective as to SMS, IPC and Quirch, who should be permitted to exercise their right to opt out of the settlements and continue to pursue their own claims, as they have intended all along.

For all of these reasons and as further set forth below, SMS, IPC, and Quirch respectfully request that the Court grant their request to be included in a revised version of the Preliminary Exclusion List.

## II.    ARGUMENT

### A.    SMS, IPC, and Quirch Did Not Receive The Opt Out Notices.

Upon realizing that SMS, IPC and Quirch were not included on the DPP's Preliminary Exclusion List, undersigned counsel immediately reached out to DPP counsel and the DPP Claims Administrator to try to figure out what had caused the problem. As reflected in a communication from DPP counsel dated January 7, 2022, when DPP counsel was asked how and to where the Claims Administrator had sent notices to SMS, IPC, and Quirch, DPP counsel responded with a list of incorrect physical and e-mail addresses that were used by the claims administrator for each of these three companies. *See* Exhibits 1 & 26 to Declaration of Samuel O. Patmore ("Patmore Decl."), filed herewith. This came as a surprise to undersigned counsel, particularly given the amount of previous communication these entities and undersigned counsel have had with the prior claims administrator in this consolidated action – communications which specified the proper contact people and addresses for each of these three entities.

**SMS**: As set forth in the Patmore Declaration, SMS filed its direct action complaint in March 2021 and filed a timely exclusion from the Pilgrims' Pride and Tyson settlements with the DPP class on May 17, 2021. *Id.* ¶¶ 4-5. That exclusion request was contained in a letter signed by SMS President Kent Kronauge. *Id.* ¶ 5. Both the letterhead and body of the May 17, 2021 exclusion request include the full address, including suite number, of SMS and Mr. Kronauge. *Id.* In addition, the letter informed the then-settlement administrator that SMS had asserted claims as a direct action plaintiff in the Broiler Chicken Antitrust Litigation. *Id.* A reply email from the settlement administrator acknowledged that the SMS request had been received. *Id.*

Thus, despite being provided with full, current contact information for SMS, and having communicated repeatedly with SMS's counsel, the former settlement administrator apparently did not update its notice database to reflect known and identifiable ways to provide effective notice to SMS. As a result, based on the information that DPP's counsel provided to undersigned counsel on January 7, 2021, the new settlement administrator, A.B. Data, failed to send a notice to the correct and previously-provided SMS address in its prior exclusion request. Instead, the erroneous addresses that A.B. Data did use were *completely unaffiliated* with SMS. To the contrary, the two physical addresses and one email address utilized in connection with this Mar-Jac and Harrison settlement all correspond to individual *Popeye's* franchisees and not to *SMS*. These Popeye's franchisees are not only entirely different and independent legal entities from SMS (SMS is an independent purchasing cooperative for certain Popeye's stores.) but, more importantly, the three individual Popeye's franchisees who were sent notices *have not even assigned their claims to SMS, and Popeye's is not asserting claims on their behalf in this action*. Patmore Decl. ¶ 9.

Specifically, based on the information that DPP's counsel provided to undersigned counsel, the new claims administrator sent a settlement notice to a Sugarland, Texas, address for the Dhanani Group, which owns franchises of Burger King and Popeye's. *Id.* ¶ 8. And the Batesville, Arkansas, address that DPP counsel also identified as being a location to which A.B. Data sent a notice to SMS is likewise simply a Popeye's franchisee. *Id.* A.B. Data also sent e-mails to a Google e-mail address ([popeyes12248@gmail.com](mailto:popeyes12248@gmail.com)) that corresponds to a single Popeye's store (Store #122248) in Athens, Georgia. *Id.*

Given that lack of any common corporate ownership or corporate affiliation between these individual Popeye's franchisees and SMS, there can be no plausible suggestion that the notices sent to these independently owned Popeye's franchisees can be deemed to constitute notice to SMS, This is particularly true given that, again, none of these individual Popeye's franchisees

represented by these erroneous physical or email addresses has even assigned any claims they may have to SMS, such that they are entirely unrelated to SMS's position as a party in this litigation. *Id*. ¶ 9.  Indeed, the lack of notice to SMS is summed up by the claims administrator's records, provided to undersigned counsel by DPP counsel, which states: "Supply Management Services -- No record found." *Id*. ¶ 7, Ex. 26.   In short, the notice was not mailed or emailed to SMS.[1]

**IPC**: With respect to IPC, there is a similar trail of under-addressed mail that did not provide notice. The information provided by DPP Counsel shows that mail was repeatedly returned from one of the addresses—finally being received back at A.B. Data as undeliverable on December 17. The problems with that particular piece of mail demonstrate how the combination of faulty addresses and changes to the U.S. Postal Service practices likely resulted in no notice being delivered to IPC.[2] Regardless, IPC did not receive the notice. *See* Declaration of Dennis Clabby ("Clabby Declaration"), filed contemporaneously herewith, at ¶ 5.

_____

[1] It bears pointing out that email  service was provided for in this case in addition to direct mail, as part of the notice plan accepted by the Court, in part because during this pandemic, many corporate employees are not working from their physical offices, and physical mail has already been frequently disrupted; email service can therefore be more effective. But here, the Claims Administrator failed to even provide email service on SMS, much less direct mail notice, as required by the Court's approved notice plan.

[2] One possible explanation why the imperfectly addressed notices were not received by IPC and Quirch are recent changes to USPS procedures. The USPS announced that it was making significant changes to the quality of its service beginning October 1, 2021 – just days before the notice program here began. *See* https://www.washingtonpost.com/business/interactive/2021/dejoy-usps-delays-by-zip-code-map/.  Notices to both IPC and Quirch were sent to Florida, which is one of the hardest hit states for delay. *See* https://www.businessinsider.com/states-hit-hardest-mail-delays-new-usps-postal-plan-2021-6. As explained above, the prior settlement administrator had been provided with complete addresses for IPC and Quirch.  When that information reached A.B. Data, notices were not sent to those addresses but rather to visibly faulty addresses, e.g. a distribution warehouse or to the street address of a multi-tenant high rise building rather than to the specific suite number. Again, the result was that neither received the notice. *See* Clabby Decl. ¶ 5; Schneider Decl. ¶ 5. The USPS requires mailpieces to be "addressed correctly" or they are otherwise "undeliverable" as addressed. *See* https://faq.usps.com/s/article/How-is-Undeliverable-and-Misdelivered-Mail-Handled. Although some incorrectly addressed mailpieces with return addresses are returned to their sender, the USPS makes no promises and states only that it will "try

This failure to provide effective notice to a functional IPC address was in spite of the fact that IPC has had even more interactions with the former settlement administrator than SMS, which should have resulted in the notice database being updated to ensure IPC received such notice.[3]

Indeed, IPC Executive Vice President Dennis Clabby had previously been contacted ***directly*** by the prior claims administrator at his work email address in a request for more information regarding the volume of commerce that IPC sought to exclude from prior DPP class settlements. *Id*. ¶ 13. In other words, the prior settlement administrator had Mr. Clabby's full physical *and* email addresses; however, as best we can tell it apparently (and inexplicably) failed to add this information to the notice database provided to A.B. Data. As a result, the new administrator did not provide email notice to Mr. Clabby at IPC as required by the Court. As best we can tell, the administrator did attempt to physically mail a notice to Mr. Clabby, but the U.S. Postal Service returned the mail as undeliverable because the address did not include the Suite number. *Id*. ¶ 14, Exs 1 & 26. Per the log provided by DPP counsel, one of those attempts took

---

to return it to the sender." *Id*. Of course, this does not account for mailpieces that are misdelivered by reason of an incorrect address and not returned by the recipient to the USPS. In short, the risk of non-receipt of incorrectly addressed mail is real and increasing.

[3] Specifically, IPC, which filed its direct action complaint in March 2021, filed a timely exclusion from the Pilgrims' Pride and Tyson settlements with the DPP class on May 17, 2021. *See* Patmore Decl. ¶¶ 10-11. That exclusion request was contained in a letter signed by IPC Executive Vice President Dennis Clabby. Both the letterhead and body of the May 17, 2021 exclusion request include the full address, including suite number, of IPC and Mr. Clabby. *Id*. ¶ 11. In addition, the letter informed the then-settlement administrator that IPC had asserted claims as a direct action plaintiff in the Broiler Chicken Antitrust Litigation and that it had previously submitted similar exclusion requests. *Id*. A reply email from the settlement administrator acknowledged that the IPC exclusion request had been received. *Id*. IPC also sought exclusion from the Peco, George's, and Amick settlements with DPP class by timely filing an exclusion request on March 6, 2020. That exclusion request was contained in a letter signed by IPC Executive Vice President Dennis Clabby. *Id*. ¶ 12. Both the letterhead and body of the March 6, 2020 exclusion request include the full address, including suite number, of IPC and Mr. Clabby. *Id*. Moreover, the March 6, 2020 exclusion request was sent from Mr. Clabby's work email address. *Id*. A reply email from the settlement administrator acknowledged that the IPC exclusion request had been received. *Id*.

more than a month before it was returned. *Id*. Another more generic notice listed on the information provided by DPPs' counsel does not appear to have been returned; however, IPC did not receive it. *See* Clabby Decl. ¶ 5,

**Quirch**: Quirch also cannot confirm receipt of any notice. The new claims administrator identified the incorrect address for Quirch's corporate headquarters, even though the correct address information is easily discovered with a simple Google search and had been supplied in prior exclusion requests. Declaration of Anthony Schneider ("Schneider Decl.") ¶ 5, & **Ex. 1** thereto. This error was compounded by purported e-mails sent to a Quirch e-mail address for an employee who worked in the sales department who departed Quirch not long after notice was apparently sent, and to an e-mail address of a former employee who was deposed in this litigation by Defendants' counsel on May 19, 2021, including Harrison's counsel. *Id.* ¶¶ 6, 7. This former employee was deposed after he had already left the company, and thus it was known to all parties as of May 19, 2021 – i.e., long before the notice was emailed to his former work email address – that he was no longer employed by Quirch. *See* Patmore Decl. ¶ 15. And this occurred despite the fact that Quirch's correct contact information was disclosed to the prior administrator, including the e-mail address of its Chief Financial Officer, Carmen Sabater, and the correct physical office and post office box address for Quirch's corporate headquarters, in connection with two prior exclusion requests in 2018 and 2021. *Id.* ¶¶ 15, 16. Yet no email notice was provided to Ms. Sabater as required by the notice plan, nor was the notice mailed to the correct corporate address. Nor could receipt of any notice be confirmed at a distribution center address relied upon by A.B. Data.

With respect to each of SMS, IPC and Quirch, in connection with this litigation, processes were set up to ensure that if any settlement or other notices were served upon SMS, IPC or Quirch, those notices were to be forwarded to undersigned counsel to ensure the notices were properly sent

and received, and to further ensure timely action in response to such notices. Patmore Decl. ¶ 18. Since the notices were not received by any of these three clients, the December 21, 2021 exclusion deadline was not calendared. However, on January 6, 2022, upon receiving and reviewing the Preliminary Exclusion List that was filed on the consolidated case docket on the evening of January 4, undersigned counsel saw that these three DAPs were not included in the Preliminary Exclusion List and immediately contacted counsel for the Direct Purchaser Plaintiffs, Mar-Jac, and Harrison to find out what happened, and to express Quirch's, IPC's, and SMS's desire to be excluded from the Settlements. *See* Patmore Decl. ¶¶ 19, 20. The very next day, on January 7, 2022, SMS, IPC, and Quirch each sent opt out letters to the Claims Administrator requesting that their claims be excluded from the Settlements. *See* Exs. 23-25 to Patmore Decl. Now, just five days after the Preliminary Exclusion List was filed, these three entities file this present motion to be included on an updated exclusion list.

### B. The Claims Administrator's Distribution Of Class Notice Concerning The Settlements Was Deficient And Did Not Comport With Due Process.

Under Fed. R. Civ. P. 23(c)(2)(B), "the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The provisions of Subdivision (c)(2) are "designed to fulfill the requirements of due process to which the class action procedure is of course subject." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) (quoting Advisory Committee Notes to Fed. R. Civ. P. 23). Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 174. "The means employed [to provide notice] must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950).

Here, as explained above, the new claims administrator did not provide notice of the new settlements to SMS, IPC, and Quirch, despite easy access to the accurate information. In other words, the procedures were not tailored to readily identify potential class members "through reasonable effort," as required by Fed. R. Civ. P. 23(c)(2)(B). Although the Claims Administrator also published a notice, that notice was not sufficient to meet the requirements of Fed. R. Civ. P. 23, especially where SMS's, IPC's, and Quirch's correct addresses and contact information were reasonably and readily available to the Claims Administrator through Defendants' own transactional data and via the internet and through each of those parties' prior communications with the Claims Administrators in this case. *See Silber v. Mabon*, 18 F.3d 1449, 1445 (9th Cir. 1994) ("The only ground stated by Chief Judge Real for denying Argyris's motion to be excluded was that he should have seen the published notice in the *Wall Street Journal*. The order cannot be upheld on this reason alone because the court cannot simply rely on notice by publication.") (citing *Mullane*, 339 U.S. at 319).

As explained by the DPPs' own prior claims administrator, "[t]he United States Supreme Court, in the seminal case of *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156 (1974), clearly stated that direct notice (when possible) is the preferred method for reaching a class." *See* Declaration of Jennifer Keough in Supp. of DPPs' Mot. for Prelim. Approval of Settlements ¶ 15 (Dkt. No. 3325) (Dec. 11, 2019). Based on the facts set forth herein, the notice procedures as to SMS, IPC, and Quirch were constitutionally deficient and do not satisfy due process.

### C. The Fact That Counsel Received ECF Notices In This Case Should Not Affect The Outcome Of This Motion.

It should also be noted that although undersigned counsel received the ECF notice of the settlements, that service, standing alone, is not mentioned nor deemed to be approved notice under the Notice Plan. Nor should it be deemed sufficient notice that is consistent with due process where

10

*actual* delivery of the Long Form Notice to the client was reasonably and readily available. To the contrary, the Notice Plan does not say anything about service being executed, through ECF, on the docket of the consolidated case. *See* D.E. 5052-2 (Declaration setting out Notice Plan); *see also* Order on Preliminary Approval (D.E. 5086). There is therefore no indication in the Notice Plan that there was an intent for service on lawyers via the ECF portal to constitute substitute service. Unlike the Winn-Dixie and Service Group of America situations, where notice ***was sent to the clients*** and *also* to the lawyers via ECF, here, SMS, IPC, and Quirch did not receive the notices, after relying on the Notice Plan's promise to send Long Form Notices to the clients which would have ensured  the calendaring of the opt out deadline. In other words, what the Notice Plan required was service on the ***clients*** – not service via ECF on counsel in a consolidated litigation. As one district court has noted:

> While plaintiff is correct in asserting that notice to an agent (the nominee) for an undisclosed principal (the class member) binds the undisclosed principal, this abstract principle of law does not absolve plaintiff from complying with the mandate of Rule 23(c)(2). The rule itself, and the Supreme Court in *Eisen* make it abundantly clear that ***Rule 23 requires a good faith attempt to give all members of the class individual notice when their names and addresses are ascertainable through "reasonable effort."***

*Popkin v. Wheelabrator-Frye, Inc.*, 1976 WL 752, at *1 (S.D.N.Y. Jan. 12, 1976) (emphasis added).

### D. The Intent Of These Three DAPs To Opt Out Of The Settlements Was Clear Due To Their Litigation Conduct.

Furthermore – although this fact alone is not dispositive – the intent of these three DAPs to opt out of the Mar-Jac and Harrison settlement has been clear, and can be of no unfair surprise, to the other parties in this litigation, in light of the parties' conduct to-date in this case. SMS's Complaint, filed March 1, 2021, IPC's Complaint, filed March 27, 2020, and Quirch's Complaint,

filed December 28, 2018, all include claims against Mar-Jac and Harrison.[4] And SMS, IPC, and Quirch have continually litigated their respective claims, and those assigned claims, against Mar-Jac and Harrison since the filing of their complaints.

For example, both IPC and SMS traded discovery requests and objections and responses with Mar-Jac and Harrison as well. *Id.* ¶ 22. On June 15, 2020 and July 10, 2020, IPC sent its objections and responses to Requests for Production sent by all defendants, including Mar-Jac and Harrison. *Id.* On August 6, 2020, IPC sent its objections and responses to Requests for Admissions sent by all Defendants, including Mar-Jac and Harrison. *Id.* On June 15, 2020 and August 24, 2020, IPC also sent objections and responses to Interrogatories sent by all Defendants, including Mar-Jac and Harrison. *Id.*

Additionally, on May 7, 2021, SMS sent a request for production to all defendants, including Mar-Jac and Harrison. *Id.* ¶ 23. SMS sent its objections and responses to Requests for Production sent by all defendants, including Mar-Jac and Harrison, on April 8, 2021. *Id.* SMS responded to Requests for Admissions sent by all Defendants, including Mar-Jac and Harrison on April 22, 2021 and August 27, 2021. On April 8, 2021, SMS also sent objections and responses to Interrogatories sent by all Defendants, including Mar-Jac and Harrison. *Id.*

And, on December 17, 2019, Quirch and other Plaintiffs sent requests for production of documents to all defendants, including Mar-Jac and Harrison. *Id.* ¶ 24. On February 6, 2020 and March 19, 2020, Quirch and other Direct Action Plaintiffs sent additional requests for production

---

[4] In addition, Butts Foods, LP (f/k/a Butts Foods, Inc.) has assigned its claims to Quirch, and Quirch brought those claims as assignee of the claims against defendants, including against Mar-Jac and Harrison. IPC has likewise received assignments and brought those claims as assignee of the claims against defendants, including against Mar-Jac and Harrison. The Butts assignment is alleged in Paragraph 131 of the Direct Action Plaintiffs' Amended Consolidated Complaint filed on January 29, 2021 (DE 4244). The IPC assignments are alleged in Paragraph 92 of the Amended Consolidated Complaint.

of documents to all defendants, including Mar-Jac and Harrison. *Id*. In addition, on February 21, 2019 and July 10, 2020, Quirch sent its objections and responses to Requests for Production sent by all defendants, including Mar-Jac and Harrison. *Id.* On July 15, 2020, Quirch responded to Requests for Admissions sent by all Defendants, including Mar-Jac and Harrison. *Id.* On August 24, 2020, Quirch also sent objections and responses to Interrogatories sent by all Defendants, including Mar-Jac and Harrison. *Id.*

Litigation by SMS, IPC, and Quirch against Defendants, including Mar-Jac and Harrison, has also included defense of Rule 30(b)(6) depositions of IPC's and Quirch's corporate representatives, and of a Rule 30(b)(1) deposition of an IPC former employee. *Id.* ¶ 25. Notably, Harrison's counsel communicated with undersigned counsel regarding the Rule 30(b)(6) deposition of Quirch and remotely attended that deposition on May 5, 2021. *Id.* Undersigned counsel also took the Direct Action Plaintiffs' Rule 30(b)(6) of Mar-Jac on June 4, 2021, and have led numerous meet and confer discussions and email correspondence with counsel for Mar-Jac. *Id.* ¶ 26.

In short, at every stage of the litigation, SMS, IPC, and Quirch have continued to prosecute actively their pending direct action claims. Accordingly, these two Settling Defendants can claim no surprise that SMS, IPC, and Quirch did not intend to be part of the Settlements. Rather, SMS, IPC, and Quirch have given Defendants numerous clear indications of their intent to opt out of the Settlements. *See Plummer v. Chem. Bank*, 668 F.2d 654, 657 n.2 (2d Cir. 1982) ("If proposed class members are to be permitted to opt out, we find nothing in Rule 23 which requires them to file written reasons for their exercise of choice. Any reasonable indication of a desire to opt out should suffice.").

Courts exercise "considerable flexibility" "in determining what constitutes an effective request for exclusion." *In re Linerboard Antitrust Litig.*, 223 F.R.D. 357, 365 (E.D. Pa.), amended,

13

223 F.R.D. 370 (E.D. Pa. 2004). "[C]onsiderable flexibility is desirable in determining what constitutes an effective expression of a class member's desire to exclude himself and any written evidence of it should suffice." *In re Four Seasons Securities Laws Litig.*, 493 F.2d 1288, 1291 (10th Cir. 1974). This "considerably flexible" standard recognizes that potential class members can opt out even if they do not adhere to the form required by the class action notice. *Plummer*, 668 F.2d at 657 n.2 ("If proposed class members are to be permitted to opt out, we find nothing in Rule 23 which requires them to file written reasons for their exercise of choice. Any reasonable indication of a desire to opt out should suffice.").

### E. On These Facts, The Court In Its Discretion Should Permit SMS, IPC, and Quirch To Opt Out Of The Settlements.

In accordance with the aforementioned principles, "a district court may, in the exercise of its discretion, extend this period of time to opt-out." *Negrete v. Allianz Life Insurance Co.*, 2008 WL 11287092, at *2 (C.D. Cal. Mar. 20, 2008) (granting leave to opt-out); *Snyder v. Ocwen Loan Servicing, LLC*, 2019 WL 2103379, at *9-10 (N.D. Ill. May 14, 2019) (granting late opt-out; noting court's "considerable discretion" in the matter).

In addition to the Court's broad discretion in managing class settlements, the excusable neglect standard under Fed. R. Civ. P. 6(b)(2) also applies. Rule 6(b) states that "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time ... on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(2). Four factors are examined in determining whether a party's neglect is excusable: (1) the danger of prejudice to the non-movant; (2) the length of the delay and its potential effect on judicial proceedings; (3) the reason for the delay, including whether it was

14

within the reasonable control of the movant; and (4) whether the movant acted in good faith.  *See In re Processed Egg Products Antitrust Litig.*, 130 F. Supp. 3d 945, 952 (E.D. Pa. 2015).[5]

Here, each of the four factors above favors exclusion of SMS's, IPC's, and Quirch's claims from the Settlements. *First*, there is no danger of prejudice to the settling parties, as the Settlements are not yet final, and there is no indication that these opt-out requests would have any impact on the Settlements. Indeed, as noted above, the Preliminary Exclusion List notes that it is "subject to modification prior to the filing of the Motion for Final Approval." D.E. 5323. In addition, these three DAPs have been aggressively litigating their claims against Mar-Jac and Harrison, including just this year.  Patmore Decl. ¶¶ 22-26.

*Second*, the request to be excluded has little to no effect on the proceedings because these requests are made **before final approval** of the Settlements – unlike the two situations this court previously ruled upon where DAPs Winn-Dixie and Service Group of America had failed to submit opt out notices until **months after** final approval.  As the Court explained in its September 9, 2019 order involving Winn-Dixie: "Winn-Dixie **did not object to its exclusion from the preliminary opt out list**, nor did it object to its exclusion from the final opt out list, *see* R. 1408, nor at the time the Court enter the final approval order." Order, D.E. 3312, at 2 (emphasis added). The Court went on to explain:

> **Winn-Dixie failed to object when it was not included on the preliminary** or final opt out lists…. Nor did it object when the Court entered the final approval order…. Moreover, Winn-Dixie never objected when Fieldale did not answer its complaint. The first time

---

[5] In addition, there are two broad principles that courts take into consideration when addressing the issue of whether the excusable neglect standard is met. First, the origin of Rule 23(c)(2), which provides for the binding effect of a judgment on members of a class who have not expressly requested exclusion, "was to eliminate the practice of waiting to see if the adjudication was favorable to the class before deciding whether to enter it."  *Four Seasons*, 493 F.2d at 1291. Second, courts have articulated a factor relating to whether the party seeking to opt out was actually intending to gain a tactical advantage. *Id.* at 1290 ("There is no indication that the tardiness was part of a strategy designed to get a tactical advantage.").

Winn-Dixie expressed its desire to continue as an individual plaintiff since sending its letter to the settlement administrator two days after the deadline, was when it filed an amended complaint on April 22, 2019—six months after the Court entered the final order approving the settlement on November 16, 2018. This is the relevant delay, and it is not insignificant.

*Id.* at 6-7 (emphasis added).

In stark contrast to Winn-Dixie's actions, SMS, IPC, and Quirch did not sit on their hands for months and wait for final approval to be entered. Rather, as soon as they realized they were not included on the preliminary exclusion list, they promptly notified Settling Defendants and DPPs' counsel and then immediately submitted their request to opt out. And, critically, their request to be opted out has been submitted *prior to final approval*, only three days after that preliminary list of exclusions was submitted, and just 17 days after the opt out deadline.

Like the Winn-Dixie situation, DAP Service Group of America ("SGA"), whose late notice was not accepted by this Court, had also waited *ten months after final approval* to raise the issue with the court. *See* D.E. 4187, SGA's Motion for Late Opt Out, filed January 19, 2021, ten months after the March 9, 2020 opt-out deadline. *See also* Order, D.E. 4547. Additionally, unlike SGA, neither SMS, IPC, and Quirch nor their affiliates (or former subsidiaries as in the SGA situation) received proper class notice from the Claims Administrator. In contrast, in the SGA situation, the Settlement Administrator confirmed that the Long Form Notices *were* sent to the correct physical addresses for two of SGA's three relevant subsidiaries. *See* D.E. 4265-1 at ¶ 28. And although the class data may have contained the incorrect address for one of their subsidiaries, the notice was sent to *ten* different email addresses for that subsidiary. *Id.* ¶ 20.

Unlike a delay of only 17 days, which occurred here, a delay of many months – like in the Winn-Dixie and SGA situations – has the potential to create prejudice to the parties. *See, e.g.*, *Klein v. O'Neal, Inc.*, 2009 WL 1174638, at *4 (N.D. Tex. Apr. 29, 2009) (characterizing a 14-month delay in requesting to opt out as "substantial"); *In re Painewebber L.P.s Litig.*, 147 F.3d

132, 136 (2d Cir. 1998) (no excusable neglect for a nine-month delay). This distinction is critical. We can certainly understand the Court's prior reluctance to grant a request for late exclusion long after final approval of a settlement has already been granted. Once final approval is granted, an extensive administrative process is undertaken to ascertain (1) the precise number of class members who are part of the settlement; (2) each class members' entitlement to settlement proceeds; (3) the precise allocation of settlement proceeds among participating class members; and (4) extensive additional information necessary to properly and fairly administer the settlement. To allow a late opt out after all of that intensive administrative and other labor has occurred could significantly alter the allocation of settlement proceeds, potentially trigger a termination or "blow" provision, prejudice class members and settling defendants, and ultimately could require substantial modification of the final approval order and approved plan of allocation.

No such problems or potential prejudice of any kind is present here. Instead, this case is substantially similar to the many cases where no prejudice has been found, and a brief delinquency has been permitted. *See Silber*, 18 F.3d at 1451-52, 1455 (excusable neglect found in the instance of a seventeen-day delinquency); *Four Seasons*, 493 F.2d at 89-90 (granting untimely request to opt-out where class member waited fifteen-days); *Snyder,* 2019 WL 2103379 at *10-11 (allowing belated opt-out three weeks after the deadline); *Mars Steel Corp. v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 120 F.R.D. 51, 52-53 (N.D. Ill. 1988) (excusing 10-day delay because movant showed good faith and reasonable basis for tardiness, and finding no prejudice to other party); *Romero v. La Revise Associates, L.L.C.*, 58 F. Supp. 3d 411, 423-24 (S.D.N.Y. 2014) (two-month late opt-out request allowed); *Brown v. Am. Home Prods. Corp. (In re Diet Drugs Prods. Liab. Litig.)*, No. 99-cv-20593, 2001 U.S. Dist. LEXIS 24197, at *21-22 (E.D. Pa. Dec. 7, 2001) (allowing absent class member to opt-out nineteen months past the opt-out deadline). *See also In re Brand Name Prescription Drugs Antitrust Litig.*, 171 F.R.D. 213, 216 (N.D. Ill. 1997) (failure

to timely submit election was result of excusable neglect, warranting enlargement of time for filing election); *In re Processed Egg Products Antitrust Litig*., 130 F.Supp.3d at 957 (finding that DAPs' failure to opt out was a result of excusable neglect, and extending the period of time in which the DAPs may opt out of settlement).

*Third*, since these three plaintiffs were not properly served with the Long Form Notice, despite their efforts and their counsel's efforts to inform the prior claims administrator regarding their proper contact information, that fact further argues in favor of granting the late opt out on these unique facts. *See, e.g.*, *Mars Steel Corp.*, 120 F.R.D. at 52-53 (excusable neglect established by failure to receive notice of settlement class action at class members' current address); *Augst-Johnson v. Morgan Stanley & Co., Inc.*, 247 F.R.D. 25, 26 (D.D.C. 2008) (belated opt out allowed, even without a showing of excusable neglect, where class notice was delivered to the member late, and movant did not act in bad faith); *In re Del-Val Fin. Corp. Sec. Litig.*, 154 F.R.D. 95, 96 (S.D.N.Y. 1994) (untimely receipt of opt-out notice helps demonstrate excusable neglect, and warranted reasonable delay of two-week for opt-out request).

*Fourth*, and finally, SMS, IPC, and Quirch have acted in good faith. They are not waiting to "see if the adjudication was favorable to the class before deciding whether to enter it." *Four Seasons*, 493 F.2d at 1291. Nor are they seeking to obtain any tactical advantage. To the contrary, they are requesting exclusion from the Settlements *before* the Settlements are granted final approval – and even before the Preliminary Exclusion List is finalized – due to this unfortunate conflation of events that occurred in this unique situation.

## III.  CONCLUSION

For each of the reasons stated above, SMS, IPC, and Quirch respectfully request that their late notice of opt out be accepted, and that they be deemed to have opted out of the Settlements.[6]

Dated:  January 9, 2022

Respectfully submitted,

*/s/ Jay B. Shapiro*
Jay B. Shapiro (admitted *pro hac vice*)
Samuel O. Patmore (admitted *pro hac vice*)
Carlos J. Canino (admitted *pro hac vice*)
Abigail G. Corbett (admitted *pro hac vice*)
**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Tel:   305.789.3200
Fax:   305.789.3395
Email:  jshapiro@stearnsweaver.com
         spatmore@stearnsweaver.com
         ccanino@stearnsweaver.com
         acorbett@stearnsweaver.com

Marvin A. Miller
Andrew Szot
**Miller Law LLC**
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Tel:   312.332.3400
Fax:   312.676.2676
Email: mmiller@millerlawllc.com
         aszot@millerlawllc.com

***Counsel for Quirch Foods, LLC, Independent Purchasing Cooperative, Inc., and Supply Management Services, Inc.***

---

[6] Counsel for DPPs have indicated that they take no position on this request for exclusion from the settlements, but maintain the notice provided to SMS, IPC and Quirch was sufficient. Counsel for Mar-Jac and Harrison have indicated that they oppose the requested relief.

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2022, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jay B. Shapiro_____
Jay B. Shapiro