# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | Civil Action No. 1:16-cv-08637 |
| THIS DOCUMENT RELATES TO: *CERTAIN DIRECT ACTION PLAINTIFF CASES* | Judge Thomas M. Durkin<br>Magistrate Judge Jeffrey T. Gilbert |

**REPLY BRIEF IN SUPPORT OF MOTION TO PRECLUDE ENFORCEMENT OF CERTAIN DEFENDANTS' JUDGMENT SHARING AGREEMENT**

The JSA Defendants (hereafter Defendants) either expressly or tacitly concede several essential points:

- Federal antitrust law has "long imposed joint-and-several liability on co-conspirators" (Opp'n 2);

- Through their JSA, Defendants entered into an agreement which seeks "to ameliorate the impact of joint-and-several liability on the settlement dynamic" (Opp'n 4);

- Under a provision like the J&S Negation Provision challenged here, a settling defendant "must require" a settling plaintiff to reduce any judgment against the non-settling defendants (Opp'n 4); and

- The J&S Negation Provision makes it "less likely that a Defendant will settle on terms that maximize Plaintiffs' settlement pressure over other Defendants" (Opp'n 10).

Put differently, Defendants acknowledge the J&S Negation Provision has the purpose and effect of undermining a key part of the federal antitrust regime created and maintained by Congress.

Having ceded much ground, Defendants attempt to fend off the Motion with a series of unavailing arguments that do not withstand scrutiny.

**A.    Defendants' Collusion Is Not Excused By "Voluntary" Plaintiff Settlements**

Defendants' primary argument for preserving their ability to collude though the JSA is the claim that their scheme to "ameliorate" joint and several liability only succeeds with a "knowing and voluntary" agreement by a plaintiff to "relinquish" joint and several liability as a part of a settlement.  Opp'n 8.  Defendants—perhaps intentionally—miss the point.  Yes, some plaintiffs decide to settle, notwithstanding Defendants' collusion through the JSA and the resulting adverse consequences of the JSA for the settling plaintiff.  But such acquiescence does not excuse Defendants' conduct, or immunize it from challenge—any more than an unlawful monopolist could successfully defend overcharging consumers paying artificially inflated prices by pointing

1

out that consumers knowingly acceded to paying such prices, and could have abstained from buying from the monopolist.[1]

The relevant conduct here is not a plaintiff's assent to settlement under terms jointly arrived at by the Defendants. It is the *distortion of the settlement marketplace* created by Defendants' coordination and agreement about how they will each engage with plaintiffs concerning settlement. The antitrust laws do not guarantee the Movants any particular outcomes in settlement negotiations. But the antitrust laws are supposed to guarantee a playing field for settlement negotiation free of collusion about the terms of settlement.[2] "The Sherman Act adopted the term 'restraint of trade' along with its dynamic potential," and it "refers not to a particular list of agreements, but to a particular economic consequence, which may be produced by quite different sorts of agreements in varying times and circumstances." *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 731-32 (1988); *see also Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) ("The [Sherman] Act is comprehensive in its terms and coverage, protecting all who are made victim of the forbidden practices by whomever they may be perpetrated."). "Even an otherwise lawful device may be used as a weapon in restraint of

---

[1] *See also Perma Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 139-40 (1968) (rejecting *in pari delicto* and consent as defenses to an antitrust action, explaining: "Petitioners apparently accepted many of these restraints solely because their acquiescence was necessary to obtain an otherwise attractive business opportunity. The argument that such conduct by petitioners defeats their right to sue is completely refuted by the following statement from [*Simpson v. Union Oil Co.*, 377 U.S. 13 (1964)]: 'The fact that a retailer can refuse to deal does not give the supplier immunity if the arrangement is one of those schemes condemned by the anti-trust laws.' 377 U.S. at 16."). *Perma Mufflers* is also instructive because one reason the Supreme Court rejected such a defense was that the challenged contractual provisions were so clearly inimical to the interests of the plaintiff it demonstrated the "illegal scheme was thrust upon them." *Id.* at 141. That is precisely the case here: the challenged provisions of the JSA are directly adverse to the interest of any rational settling plaintiff.

[2] This is the point Defendants miss when declaring that "federal antitrust law simply does not speak to settlement terms." Opp'n 12.

2

trade . . . ." *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 119 (1948).[3]  Whatever the supposed virtues of judgment sharing may be, by including the challenged provisions in their JSA, Defendants "went too far."  *Sugar Inst. v. United States*, 297 U.S. 553, 601 (1936).

Even Defendants do not seem to take their own argument seriously.  They contend plaintiffs should hold out for trial if they do not like the settlement terms flowing from Defendants' JSA.  Yet in the same breath, Defendants insist they need a JSA to improve their negotiating position against "undue settlement pressures."[4]  Opp'n 5; *see also id*. at 1, 7.  If Defendants believed their own arguments, they would recognize they possess no right to jointly alter the settlement dynamics created by federal antitrust law itself.[5]  And they would recognize they can

---

[3]  Defendants cite *McDermott, Inc. v. AmClyde*, 511 US. 202 (1994), and *Lundquist v. United States*, 116 F.3d 1486 (9th Cir. 1997) (unpublished) (Opp'n 9), but those admiralty law cases did not involve a JSA or any other form of settlement coordination among defendants.

[4]  It is not apparent what Defendants mean by "undue" settlement pressure.  The dynamics creating any such pressure are a product of the facts of the case and the legal framework established by Congress and the courts.  Defendants' objective of counteracting those settlement dynamics "does not justify illegal means."  *Sugar Inst.*, 297 U.S. at 559 ("The endeavor to put a stop to illicit practices must not itself become illicit.").  Defendants bemoan so-called "whipsaw" settlements (Opp'n 2, 3, 10, 15), but Movants could not find a single federal court decision discussing the supposed plague of "whipsaw" settlements, and Professor Leslie's article observes: "The premise of the unfairness argument—that many antitrust plaintiffs employ coercive whipsaw tactics—appears more theoretical than real."  Christopher R. Leslie, *Judgment-Sharing Agreements*, 58 Duke L.J. 747, 785 (2009).  Moreover, even the 1986 Senate testimony from the Department of Justice cited by Defendants as evidence of this problem (Opp'n 2-3) made clear the *opposition* of the United States to a proposal to eliminate joint and several liability in horizontal price-fixing cases.  The United States emphasized: "elimination of joint and several liability would decrease deterrence of hard-core antitrust violations to an unacceptable degree" by "dampen[ing] plaintiffs' incentives to detect and pursue violations" thereby "reduc[ing] the probability that a violation would be detected and pursued through damage actions."  *Antitrust Remedies Reform: Hearings on S. 2022 and S. 2162 Before the Senate Comm. on the Judiciary*, 99th Cong. 161-62 (1986).  Congress reached the same conclusion, leaving joint and several liability in place.  The J&S Negation provision *undermines* Congress's judgment, impairing the operation of this critical feature of the federal antitrust regime.  *See* Mot. 7-15.

[5]  Defendants press some exceedingly formalistic arguments.  For example, they insist joint and several liability is merely "a doctrine of liability for adjudicated cases," pretending it should have no role in antitrust settlements because it "comes into play if—and only if—a plaintiff goes to trial and wins."  Opp'n 9; *id*. at 8 (labeling joint and several liability a "*trial right*").  But they abandon

forego settlements and proceed to trial if they cannot reach satisfactory settlement terms without colluding "to ameliorate the impact of joint-and-several liability on the settlement dynamic." Opp'n 4.[6]

## B.    There Is No Litigation-Related Exception to the Antitrust Laws

A second principal theme in Defendants' brief is the contention that coordination or agreement among co-defendants is immune from application of the antitrust laws. But the claim that "co-defendants can jointly agree on everything" (Opp'n 7) is wrong.

Defendants cite no authority for a litigation-related exception to the antitrust laws, because there isn't one.[7] Congress knows how to exempt certain parties or activities from antitrust scrutiny,[8] but the immunity Defendants seek does not exist. Nor would one expect Congress to

---

such formalism when it suits them. For instance, they claim JSAs "ensur[e] that settling Defendants are not exposed to further *liability*." Opp'n 1 (emphasis added). But a settling defendant cannot be exposed to further "liability" by a settling plaintiff. After settling with a given plaintiff, a defendant can only be "exposed" to a voluntarily-assumed contractual obligation to make payments to co-defendants should the settling plaintiff prevail at trial.

[6] Defendants concede that not all JSAs contain a claim-reduction provision, and they do not justify the supposed "need to ensure that a signatory who settles cannot shift its contractually agreed-upon proportion of responsibility to the remaining defendants." Opp'n 3. Further, a JSA without a claim-reduction provision does not allow "a signatory who settles [to] shift its contractually agreed-upon proportion of responsibility to the remaining defendants" because the settlement resolves the settling Defendant's responsibility for damages. When there is no claim-reduction provision, the "remaining defendants" can seek payment from other non-settling Defendants in accordance with the "sharing provision" of the JSA—what Defendants describe as "the basic building block of all judgment sharing agreements." *Id.*

[7] Defendants compound their baseless claim by invoking a purported *constitutional* right to "jointly agree on everything." Opp'n 7; *see also id.* at 11, 13. The *Noerr-Pennington* doctrine, which "shields from the Sherman Act a concerted effort to influence public officials," *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965), confers no such right, and *Campbell v. City of Chicago*, 823 F.2d 1182 (7th Cir. 1987), invoked by Defendants (Opp'n 7, 12, 13), does not suggest otherwise.

[8] *See e.g.*, Medical Resident Matching Program Exemption, 15 U.S.C. § 37b (exempting graduate medical education residency-matching programs); Section 568 of the Improving America's Schools Act of 1994, 15 U.S.C. § 1 Note (exempting agreements between universities to award financial aid on a need basis and adopt common standards for evaluating student need); Natural

fashion such an odd rule, exempting from the antitrust laws a group of defendants sued because they have been accused of violating the antitrust laws.

Faced with the absence of an actual rule supporting their view, Defendants falsely claim that precluding enforcement of the challenged JSA provisions "would endanger all manner of efforts by co-defendants to coordinate the defense or settlement of litigation." Opp'n 1; *see also id*. at 6 (granting motion "would endanger virtually any coordination among defendants"); *id*. at 11 ("joint efforts by antitrust co-defendants to coordinate their response to litigation"). This fearmongering is readily disproved. Defendants in these cases[9] have a joint defense agreement and, by their own account, extensively coordinate their defense. Movants do not challenge that, or foresee a circumstance in which they would. However, unlike garden-variety joint defense efforts (such as coordination about legal strategy, experts, cost-sharing, etc.), settlement agreements are commercial resolutions of legal disputes (Mot. 14)—a point Defendants have not disputed. And, as with any other commercial transaction, anticompetitive conduct by one party to the transaction can distort the negotiation process, and injure both the counterparty and the public.[10]

---

Gas Policy Act of 1978, 15 U.S.C. § 3364(e) (authorizing market allocation agreements between natural gas pipeline companies if there is a gas shortage and if such agreements meet certain requirements); The Newspaper Preservation Act of 1970, 15 U.S.C. §§ 1801-1804 (exempting joint ventures between newspapers that contain certain anticompetitive agreements provided that one of the newspapers is failing).

[9] Defendants accuse Movants of having "more than a little chutzpah" for challenging the two JSA provisions while "su[ing] a group of defendants in a single lawsuit." Opp'n 13. While this apples and oranges comparison makes little analytical sense, its factual premise is incorrect. This matter is comprised of dozens of separate lawsuits, filed by separate groups of lawyers. DAPs filed a consolidated pleading only after being directed to do so by the Court. *See* Dkt. No. 3525 (ordering DAPs and Defendants to meet and confer regarding a plan for a DAP consolidated complaint); Dkt. No. 3653 (denying DAP request for reconsideration of order requiring consolidated complaint).

[10] Of course, even garden-variety joint defense activities could be used improperly. For example, if co-defendants exchanged current or proposed future prices, or shared strategy for negotiating

## C.   Congress Has Not Endorsed Judgment Sharing Agreements in General, or the Specific JSA Provisions at Issue Here

Defendants repeatedly imply that Congress has endorsed JSAs,[11] claiming that "leav[es] no basis for this Court to invalidate the JSA or its claim-reduction provision."  Opp'n 10. Defendants' argument has fatal factual and legal defects.

First, a handful of statements about JSAs, made over the course of decades, many of which were made by witnesses, not members of Congress, does not evidence any legislative blessing.

Second, even these statements focus on judgment sharing agreements generally, not the provisions challenged by Movants.

Third, none of the legislative material cited by Defendants concerns judgment sharing agreements *among Defendants that have actually violated the antitrust laws*.  Here, at least two of

---

prices with plaintiffs, that unquestionably would trigger antitrust scrutiny, despite the litigation context.  For reasons not entirely clear, Defendants quote *Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc*., 944 F.2d 1525, 1528 (9th Cir. 1991), for the proposition that "an offer of settlement is conduct incidental to the prosecution of the suit and not a separate and distinct activity which might form the basis for antitrust liability."  Opp'n 12.  Whatever the reason for the citation, Defendants framing of *Columbia Pictures* is misleading.  That case concerned alleged sham litigation, and the court's point in the quoted language was that a settlement offer was not distinct from the prosecution of the lawsuit itself for purposes of evaluating the sham litigation doctrine— an issue that is irrelevant here.  Movants do not contend underlying litigation and settlement negotiations need to be conceived of as a whole.  Instead, the point is that defendants are not permitted to collude about the terms on which they will settle with plaintiffs.

[11]  *See*, *e.g.*, Opp'n 7 (Congress has "long recognized that such provisions affirmatively promote public policy by ameliorating undue settlement pressures."); *id.* at 10 (Congress has "full knowledge of the role such agreements play in ameliorating settlement pressures"); *id.* at 13 (Congress "has been well aware of judgment sharing agreements for decades and has taken no action to stop them or even limit their use"; claiming they have been "hailed by lawmakers"); *id.* at 14 ("The fact that [Congress] has not intervened to block or even limit judgment sharing agreements . . . is powerful evidence that the antitrust laws do not preclude their enforcement."); *id.* at 17 ("Congress has long been aware of these agreements and their effect on the settlement dynamic, and it has chosen not to prohibit them or deprive defendants of their ability to engage in self-help.").

the JSA Defendants have acknowledged antitrust violations (Pilgrim's[12] and Tyson[13]), and two more have been indicted for antitrust violations (Claxton and Koch[14]). In addition, employees from Pilgrim's, Tyson, and several other JSA Defendants have been indicted, and had their motions for acquittal denied by Chief Judge Brimmer in the District of Colorado.[15] Defendants have not identified any member of Congress who, at any time, "applauded" (Opp'n 1, 4) the use of judgment sharing agreements under such circumstances.

Fourth, Defendants ignore clear admonitions from courts about permissible inferences from Congressional inactivity. As the Supreme Court has explained, "arguments from legislative inaction are speculative at best." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 299 (2014). Congressional inaction "lacks persuasive significance" in part "because several equally tenable inferences may be drawn from such inaction." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990)); *see also Baker v. F & F Inv.*, 420 F.2d 1191, 1196 (1970) ("Legislative inaction is, to be sure, a poor token of Congressional intent."); *Norwegian Air Shuttle ASA v. Boeing Co.*, 530 F.Supp.3d 764, 770 (N.D. Ill. 2021) ("[T]he Court sees no reason that Congress's inaction on the question should be read as an endorsement.").

---

[12] *See* Plea Agreement, *United States v. Pilgrim's Pride Corp.*, 1:20-cr-00330-RM, Dkt. No. 58 (D. Colo. Feb. 23, 2021).

[13] *See* News Release, Tyson Foods Inc., Tyson Foods' Statement on Dep't of Justice Indictment in Broiler Chicken Investigation (Jun. 10, 2020); https://www.tysonfoods.com/news/news-releases/2020/6/tyson-foods-statement-department-justice-indictment-broiler-chicken.

[14] *See* Superseding Indictment, *United States v. Norman W. Fries, Inc. d/b/a/ Claxton Poultry Farms, Koch Foods, Inc.*, 1:21-cr-00168-RM, Dkt. No. 30 (D. Colo. July 28, 2021).

[15] *See* Order, *United States v. Penn et al.*, 1:20-cr-00152-PAB, Dkt. No. 932 at 29-30 (D. Colo. Jan. 13, 2022) (denying defendants' motions for judgment of acquittal, finding "the evidence is sufficient for a reasonable jury to find that the charged conspiracy existed and that each defendant knowingly joined the conspiracy, knowing of its goal and intending to help accomplish it.").

D.     **The JSA's Settlement Agreement Sharing Provision Should Be Found Unenforceable**

Defendants contend the Settlement Agreement Sharing Provision is needed "[t]o effectuate the sharing and claim-reduction provisions." Opp'n 5. This, however, is pretextual, as is evident when considering two points. First, there is the question of *when* Defendants would legitimately need to see each other's settlement agreements "[t]o effectuate the sharing and claim-reduction provisions." *Id.* The answer is not "within seven days of execution"—or anything close to it, unless the settlement is close to or during trial. JSA § 6(A). The seven-day feature of the Settlement Agreement Sharing Provision serves no legitimate purpose, yet gives Defendants a negotiation advantage at the expense of Movants. Second, there is the *scope of disclosure*. Do JSA Defendants need to see the full settlement agreement with a plaintiff "[t]o effectuate the sharing and claim-reduction provisions"? Opp'n 5. The answer is "no." Those provisions can be effectuated by exchanging redacted versions of settlement agreements, or even by separate documents in which the JSA Defendants represent to one other only the *few* terms genuinely necessary "[t]o effectuate the sharing and claim-reduction provisions." Any ostensible "nonanticompetitive" need to exchange this information "can be adequately accomplished by other means less inimical to competition." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 n.5 (1958). The import of using "means less inimical to competition" is particularly important in light of the fact that settlements in this matter sometimes include competitively sensitive business terms, which should not be disclosed to co-defendants.

There is no legitimate need for each JSA Defendant to see the entirety of the other's settlement agreements with plaintiffs, and no need to see them months, or even years, before trial.

Moreover, while Defendants have generally (but inaccurately) claimed that JSAs are commonplace, have been used for "decades," and are widely "applauded" (Opp'n 1, 4),

Defendants have not identified a single case where a court has considered, let alone enforced, a provision like Defendants' Agreement Sharing Provision.

Defendants also make the strange claim that "public policy interests favoring transparency" justify their Agreement Sharing Provision. Opp'n 6. Defendants consider their settlements private and confidential, and typically do not make them public unless required by law (for example, in the context of a Rule 23 settlement). And they certainly do not allow a plaintiff to share its settlement agreements with other non-settling plaintiffs. Defendants interest in transparency apparently applies only to co-defendants, not to plaintiffs or to the public.

## E. The Challenged Provisions Do Not "Promote" Settlements

Defendants attempt to insulate their JSA from challenge by asserting it "promotes settlement." Opp'n 1; *see also id*. at 15. It does not.

The Motion observed (at 11):

> No rational plaintiff would agree to the J&S Negation Provision if it could settle without it. This obvious fact is confirmed by publicly available information about Class settlements in these cases. Thus far, eight defendants have settled with one or more Classes. Four of those defendants are not signatories to the JSA, and no agreement with those defendants has required plaintiff to agree to dismantle joint and several liability. Four of those defendants are signatories to the JSA. Each Class settlement with those four defendants has required the settling plaintiffs to forego joint and several liability for any judgment obtained at trial.

Defendants offer no response. Indeed, they admit their objective is to counter plaintiffs' "undue" settlement leverage, and "ameliorate the impact of joint-and-several liability on the settlement dynamic." Simply put, the J&S Negation Provision helps the Defendants and hurts plaintiffs.

Unable to deny the J&S Negation Provision alters, in their favor, the settlement dynamics established by federal antitrust law, Defendants proffer the facile assertion that the existence of settlements in this case evidences the JSA's settlement-promoting quality. Opp'n 1, 15. That

view would not survive a *Daubert* challenge if uttered by an expert. The existence of settlements notwithstanding the J&S Negation Provision tells us *nothing* about the "but for" world without that provision. But the procedural history here does provide some clues. For example, the first four Class settlements were with defendants which did *not* join the JSA: Fieldale, Amick, George's and Peco. *See generally* JSA at 22-36 (signature pages). None of the Class settlement agreements with those defendants contain a J&S Negation Provision. *See* Dkt. Nos. 447-2 (Fieldale settlement), 1535 at Ex. A (Fieldale settlement), 3324 at Exs. A, B, C (Peco, George's, and Amick settlements), 3670 (Amick Settlement), 4078-3 (Peco settlement), and 7078-4 (George's settlement); *see also* Dkt. Nos. 4377-2 (Fieldale settlement), 4377-3 (Peco settlement), and 4377-4 (George's settlement). The statistical probability that the JSA played no role in the fact that each of the first four settling defendants are not parties to the Agreement is *very* low. The Court can reasonably infer that the sequence of class settlements was not a coincidence, and that the JSA and its challenged provisions made (and continue to make) settlement negotiations more difficult. *See also In re Terazosin Hydrochloride Antitrust Litig.*, 2002 WL 35651678, at *2 (S.D. Fla. Aug. 28, 2002) (finding the effect of a claim-reduction provision was to "greatly diminish the possibility of settlement").

Moreover, Defendants do not dispute that some DAPs which have settled with JSA Defendants and acceded to inclusion of the J&S Negation Provision language insisted upon by the JSA Defendants have done so with the intention of seeking to preclude enforcement of the J&S Negation Provision through this Motion. *See* Mot. 13. There can be little serious doubt that the J&S Negation Provision makes many DAPs more reluctant to settle than they would be absent that provision.

10

Case: 1:16-cv-08637 Document #: 5403 Filed: 01/28/22 Page 12 of 21 PageID #:312856

**F.    This Court Has Not Endorsed the Challenged Provisions by Approving Class Settlements**

Defendants imply the Court has already endorsed their JSA by virtue of its approval of several class settlements. Opp'n 15. This claim is dubious. It is Movants' understanding that neither class counsel nor settling JSA Defendants provided the Court with a copy of the JSA in connection with motions for preliminary or final approval. This omission is conspicuous, and may have been motived by a desire to avoid potential objections.

Without any party bringing the JSA to the Court's attention, or submitting briefs or arguments about the propriety of the J&S Negation Provision, it is understandable the Court did not raise the issue *sua sponte*. But federal courts have long-recognized that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). The suggestion that the Court has already passed on the ability of Defendants to enforce the challenged JSA provisions *against Movants* is misplaced.

**G.    Existing Case Law About JSAs Does Not Resolve This Motion**

Defendants also rely heavily on their claim that "federal courts have uniformly endorsed judgment sharing agreements." Opp'n 4. But, notably, they do not claim that any Supreme Court or Seventh Circuit decision controls here. Thus, the parties seemingly agree existing case law about JSAs does not resolve this Motion.

As for the non-controlling case law cited by Defendants, there are several points worth noting.

First, while Defendants maintain that JSAs have been used (Opp'n 1, 4), and enforced by courts, "for decades" (Opp'n 6), there are only a small number of cases where a court *decided* a challenge to a JSA. And of those, only a few considered the types of provisions challenged here.

11

*See* Opp'n 10 (citing only two decisions addressing "materially analogous judgment sharing agreements with substantively identical claim-reduction provisions").

Second, most of the small number of cases cited by Defendants do not live up to their billing. For example, Defendants incorrectly list *In re Cement & Concrete Antitrust Litig*., 817 F.2d 1435 (9th Cir. 1987), as among the cases where federal courts purportedly "enforced judgment sharing agreements." Opp'n 4-5. In that decision, reviewing a district court's order allocating settlement funds among class members, the court of appeals noted the defendants had entered into a JSA, *In re Cement*, 817 F.2d at *1439, but there was no challenge to the JSA's enforceability or consistency with federal antitrust law.

While *California v. Infineon Techs. AG*, 2007 WL 6197288 (N.D. Cal. Nov. 29, 2007) did concern a challenge to a judgment sharing agreement, it nevertheless offers Defendants little help. After noting "a paucity of legal authority directly on point, controlling or otherwise," the court addressed a motion by States raising only a public policy challenge (not antitrust objections) to specific provisions of that JSA applicable to the States. *Id*. at *2. And, even limiting its consideration to public policy considerations, the court observed the JSA might have been unenforceable if there was evidence of an adverse impact on settlement negotiations. *Id*. at *3, *4.[16]

*In re Terazosin Hydrochloride Antitrust Litig.*, 2002 WL 35651678 (S.D. Fla. Aug. 28, 2002) also materially differs from this Motion. There, plaintiffs challenged a JSA solely on the theory that it "prohibits settlement," and only "as violative of public policy." *Id.* at *1. Thus, that court did not consider any antitrust objections to the JSA, or any question about its operation other

---

[16] *Infineon* is the only one of Defendants' judgment sharing agreement cases decided after Congress enacted ACPERA and thereby reaffirmed the importance of joint and several liability to private antitrust enforcement. *See* Mot. 9-11.

than whether it prohibited settlements. That court did, however, observe the JSA's provision that either defendant was "free to settle unilaterally at any time" was "mere window dressing for the agreement's true effect," which foreclosed settlements unless a plaintiff agreed to reduce its claim against the non-settling defendant. *Id.* The JSA at issue here contains the same "window dressing," *id.*, and Defendants do not deny that is the purpose and effect of the J&S Negation Provision. Moreover, the *Terazosin* court found the effect of the claim-reduction provision there was to "greatly diminish the possibility of settlement." *Id.* at *2. And it further noted the view of the Manual for Complex Litigation that a court can refuse to enforce or approve a JSA. *Id.* (citing Manual for Complex Litigation (Third) § 23.23 (1995)); *see also* Manual for Complex Litigation (Fourth) § 13.23 at 178 ("[A]lthough [JSAs] are generally appropriate, the court may refuse to approve or enforce agreements that violate public policy or unfairly prejudice other parties.").

Defendants also cite *Cimarron Pipeline Constr., Inc. v. Nat'l Council on Comp. Ins*., 1992 WL 350612 (W.D. Okla. 1992), but it does not appear the JSA in that case contained a claim-reduction provision, like the J&S Negation Provision. Plaintiffs there advanced an argument not made here: that any judgment sharing should be invalided because "contribution is prohibited under antitrust laws." *Id.* at *2. Thus, the court's ruling in *Cimarron* has no probative value here.

Defendants also rely on *In re Indus. Gas Antitrust Litig*., 100 F.R.D. 280 (N.D. Ill. 1983)—which they mistakenly report as decided in 1981, and mistakenly claim was affirmed by an earlier *1982* Seventh Circuit decision. Opp'n 5. That decision does not address judgment sharing agreements, and Defendants fail to explain its purported relevance.[17]

*     *     *

---

[17] Movants addressed *In re Brand Name Prescription Drugs Antitrust Litigation*, 1995 WL 221853 (N.D. Ill. 1995), in their initial brief. *See* Mot. 10 n.9.

Defendants cite no controlling authority accepting their justifications for including the challenged provisions in the JSA.

As the *Infineon* court correctly observed in 2007, there is "a paucity of legal authority directly on point." 2007 WL 6197288 at *2; *see also In re Terazosin Hydrochloride Antitrust Litig.*, 2002 WL 35651678, at *2 (noting "a dearth of case law"). That has not changed in the intervening 15 years.

Movants respectfully submit that when the Court conducts its own analysis of federal antitrust law and applicable Illinois law, it will recognize the challenged provisions in Defendants' JSA should be found invalid and unenforceable.[18]

## **CONCLUSION**

Movants request that the Court issue an order finding the J&S Negation Provision is invalid and unenforceable, and finding the Settlement Agreement Sharing Provision invalid and unenforceable from the date of the Court's order forward.

---

[18] Defendants cite a 1981 amicus brief from the United States, submitted in *Texas Indus., Inc., v. Radcliff Materials, Inc.*, No. 79-1144, at 25 (Jan. 1981), perhaps hoping the Court will infer that the executive branch has supported their arguments. Opp. 16 n.7. Of course, the quoted language does not address the J&S Negation Provision or Settlement Agreement Sharing Provision challenged here. Moreover, the United States is a party to this matter, and if the Court wants the views of the United States on this Motion, it can request them from the Department of Justice.

Dated: January 28, 2022               Respectfully submitted,

/s/ *Scott E. Gant*
Scott E. Gant
Jonathan M. Shaw
Sarah Jones
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
E-mail: sgant@bsfllp.com
       jshaw@bsfllp.com
       sjones@bsfllp.com

Colleen A. Harrison
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8204
Fax: (914) 749-8300
E-mail: charrison@bsfllp.com

Ryan T. McAllister
BOIES SCHILLER FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, NY 12207
Tel: (518) 434-0600
Fax: (518) 434-0665
E-mail: rmcallister@bsfllp.com

*Counsel for Plaintiffs Amory Investments LLC, Campbell Soup Company, Campbell Soup Supply Company, L.L.C., John Soules Foods, Inc., John Soules Acquisitions LLC, Sysco Corp., Target Corp., and US Foods, Inc.; McLane Company, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane/Eastern, Inc.; McLane/Suneast, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Western, Inc.; McLane Express, Inc.; Kinexo, Inc.; McLane Foodservice Distribution, Inc., McLane Foodservice, Inc.*

15

/s/ *Philip J. Iovieno*
Philip J. Iovieno
Nicholas A. Gravante, Jr.
Karen C. Dyer
Lawrence S. Brandman
Jack G. Stern
Gillian Groarke Burns
Mark A. Singer
Elizabeth R. Moore
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Tel: (212) 504-6000
Fax: (212) 504-6666
E-mail: philip.iovieno@cwt.com
      nicholas.gravante@cwt.com
      karen.dyer@cwt.com
      lawrence.brandman@cwt.com
      jack.stern@cwt.com
      gillian.burns@cwt.com
      mark.singer@cwt.com
      elizabeth.moore@cwt.com

*Counsel for Plaintiffs Jetro Holdings, LLC; BJ's Wholesale Club, Inc.; Maximum Quality Foods, Inc.; Sherwood Food Distributors, L.L.C.; Harvest Meat Company, Inc.; Western Boxed Meat Distributors, Inc.; Hamilton Meat, LLC; Darden Restaurants, Inc.; PJ Food Service, Inc.; Feeser's Inc.; Thurston Foods, Inc.; McDonald's Corporation; Costco Wholesale Corporation; Gordon Food Service, Inc.; Glazier Foods Company; Wood-Fruitticher Grocery Company, Inc.; Aramark Food and Support Services Group, Inc.; Poultry Products Company of New England LLC; Panda Restaurant Group, Inc.; and Quality Supply Chain Co-op, Inc., and Co-Counsel for Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC*

Stuart H. Singer
Sabria A. McElroy
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 356-0011
E-mail: ssinger@bsfllp.com
      smcelroy@bsfllp.com

Anne M. Nardacci
BOIES SCHILLER FLEXNER LLP
30 South Pearl Street
Albany, NY 12207
Tel: (518) 434-0600
Fax: (518) 434-0665
E-mail: anardacci@bsfllp.com

*Co-Counsel for Plaintiffs Jetro Holdings, LLC; BJ's Wholesale Club, Inc.; Maximum Quality Foods, Inc.; Sherwood Food Distributors, L.L.C.; Harvest Meat Company, Inc.; Western Boxed Meat Distributors, Inc.; Hamilton Meat, LLC; Darden Restaurants, Inc.; PJ Food Service, Inc.; Costco Wholesale Corporation; Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC*

/s/ *Patrick J. Ahern*
Patrick J. Ahern
Theodore B. Bell
Ahern & Associates, P.C.
Willoughby Tower
8 South Michigan Avenue
Suite 3600
Chicago, Illinois 60603
Tel: (312) 404-3760
Email: patrick.ahern@ahernandassociatespc.com

*Counsel for Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC; and Kraft Heinz Foods as to CA Number 3572*

*/s/ Gregory J. Casas*
GREENBERG TRAURIG, LLP
Gregory J. Casas (admitted *pro hac vice*)
Texas Bar No. 00787213
300 W. 6th Street, Suite 2050
Austin, TX 78701
T: 512-320-7238
F: 512-320-7210
casasg@gtlaw.com

Dominic E. Draye (admitted *pro hac vice*)
Arizona Bar No. 033012
2375 East Camelback Road, Suite 700
Phoenix, AZ 85016
T: 602-445-8000
F: 602-445-8100
drayed@gtlaw.com

Thomas E. Dutton
Illinois Bar No. 6195923
John F. Gibbons
Illinois Bar No. 6190493
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
T: 312-476-5057
F: 312-456-8436
duttond@gtlaw.com
gibbonsj@gtlaw.com

Becky Leigh Caruso (admitted *pro hac vice*)
New Jersey Bar No. 015622008
500 Campus Drive, Suite 400
Florham Park, NJ 07932
T: 609-442-1196
carusob@gtlaw.com

*Attorneys for Services Group of America, Inc.*

*/s/Yonaton Rosenzweig*
KATTEN MUCHIN ROSENMAN LLP
Yonaton M. Rosenzweig
Floyd A. Mandell
Catherine E. O'Brien
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661-3693
Tel: (312) 902-5235
Fax: (312) 902-1061
floyd.mandell@katten.com
jeffrey.wakolbinger@katten.com
catherine.obrien@katten.com

Yonaton M. Rosenzweig
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, California 90034
Tel: (310) 788 4460
Fax: (310) 712 8222
yoni.rosenzweig@katten.com

*Attorneys for Plaintiffs Carl Buddig & Co. Inc.
and Caesars Enterprise Services LLC*

17

/s/ David C. Eddy
ANTITRUST LAW GROUP, LLC
David C. Eddy, Esquire
N.D. Illinois Bar No. 72258
Dennis J. Lynch, Esquire
N.D. Illinois Bar No. 07622
1601 Assembly Street
P.O. Box 8117
Columbia, South Carolina 29202
Telephone: (803) 253-8267
Email: deddy@theantitrustlawgroup.com
Email: dlynch@theantitrustlawgroup.com

*Counsel for Plaintiffs Conagra Brands, Inc.;
Pinnacle Foods, Inc.; Kraft Heinz Foods
Company; Nestlé USA, Inc.; and, Nestlé
Purina PetCare Company*

/s/ Jay B. Shapiro
Jay B. Shapiro
Samuel O. Patmore
Carlos J. Canino
Abigail G. Corbett
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Tel:    305.789.3200
Fax:    305.789.3395
Email:  jshapiro@stearnsweaver.com
        spatmore@stearnsweaver.com
        ccanino@stearnsweaver.com
        acorbett@stearnsweaver.com
Marvin A. Miller
Andrew Szot
Miller Law LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Tel:    312.332.3400
Fax:    312.676.2676
Email: mmiller@millerlawllc.com
aszot@millerlawllc.com

*Counsel for Quirch Foods, LLC, Independent
Purchasing Cooperative, Inc. and Supply
Management Services, Inc.*

/s/ Paul J. Ripp
Paul J. Ripp
Tom J. Morel
WILLIAMS & JOHN LTD.
233 S. Wacker Drive, Suite 6800
Chicago, IL 60606
Telephone: (312) 443-3200
Facsimile: (312) 630-8500
Email:   pjr@willmont.com
         tjm@willjohnlaw.com

W. Lawrence Deas
LISTON & DEAS PLLC
605 Crescent Boulevard, Suite 200
Ridgeland, MS 39157
Telephone: (601) 981-1636
Fax: (601) 982-0371
Lawrence@listondeas.com

Michael Gratz, Jr.
GRATZ & GRATZ, P.A.
312 N. Green Street
Tupelo, MS 38804
Tel.: (662) 844-5531
Fax: (662) 844-8747
Email: michael@gratzandigatz.com

*Counsel for Plaintiffs L. Hart, Inc.; R & D
Marketing, LLC; Timber Lake Foods, Inc.;
EMA Foods Co., LLC; and Red Bird Farms
Distribution Company*

*/s/ Lori P. Lustrin*
Robert W. Turken
Lori P. Lustrin
Scott N. Wagner
BILZIN SUMBERG BAENA
PRICE & AXELROD LLP
1450 Brickell Avenue
Suite 2300
Miami, Florida 33131-3456
Tel: (305) 374-7580
Fax: (305) 374-7593
E-mail: rturken@bilzin.com
llustrin@bilzin.com
swagner@bilzin.com

*Counsel for Plaintiffs Shamrock Foods Company, United Food Service, Inc., Boston Market Corporation, Bojangles' Restaurants, Inc. and Bojangles Opco, LLC, WZ Franchise Corporation, Zaxby's Franchising LLC, Barbeque Integrated, Inc. d/b/a Smokey Bones Bar & Fire Grill, FIC Restaurants, Inc. d/b/a Friendly's, The Johnny Rockets Group, Inc., Golden Corral Corporation, White Castle Purchasing Co., Cracker Barrel Old Country Store, Inc., CBOCS Distribution, Inc., Captain D's LLC, El Pollo Loco, Inc., Domino's Pizza LLC, and Domino's Pizza Distribution LLC*

*/s/ David B. Esau*
David B. Esau
Kristin A. Gore
Garth T. Yearick
Amanda R. Jesteadt
CARLTON FIELDS, P.A.
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida 33401
Tel: (561) 659-7070
Fax: (561) 659-7368
desau@carltonfields.com
kgore@carltonfields.com
gyearick@caarltonfields.com
ajesteadt@carltonfields.com

*Counsel for Direct Action Plaintiffs United Supermarkets, LLC; Krispy Krunchy Foods, LLC; Cheney Bros. Inc.; Hooters of America, LLC; Checkers Drive-In Restaurants Inc.; Restaurants of America, Inc.. et al.; Anaheim Wings, LLC et al.; Bob Evans Farms, Inc.; The Fresh Market, Inc.; Wawa, Inc.; Restaurant Services, Inc.; Cajun Operating Company d/b/a Church's Chicken; Sonic Industries Services Inc.; Buffalo Wild Wings, Inc.; CKE Restaurants Holdings, Inc.; Focus Brands, LLC; The Cheesecake Factory Incorporated; Whatabrands LLC; and Whataburger Restaurants LLC.*

_s/ Douglas H. Patton_
Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Kevin A. Murray, Esquire
Douglas H. Patton, Esquire
Samuel J. Randall, Esquire
Michael A. Ponzoli, Esquire
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
Fax: (305) 372-1861
E-mail: rarnold@knpa.com
       wblechman@knpa.com
       dpatton@knpa.com
       kmurray@knpa.com
       srandall@knpa.com
       mponzoli@knpa.com

_/s/ David P. Germaine_
Paul E. Slater
Joseph M. Vanek
David P. Germaine
John P. Bjork
SPERLING & SLATER, P.C.
55 West Monroe Street
Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
E-mail:PES@Sperling-law.com
JVanek@Sperling-law.com
DGermaine@Sperling-law.com
JBjork@Sperling-law.com

Phillip F. Cramer
Ryan T. Holt
SHERRARD ROE VOIGT & HARBISON, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
Tel: (615) 742-4200
E-mail:pcramer@srvhlaw.com
rholt@srvhlaw.com

_Counsel for Plaintiffs Associated Grocers of the South, Inc., Meijer, Inc., Meijer Distribution, Inc., OSI Restaurant Partners, LLC, Publix Super Markets, Inc., Supervalu Inc.; Unified Grocers, Inc.; Associated Grocers of Florida, Inc.; and Wakefern Food Corp._