UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION<br><br>This Document Relates To:<br>*Certain DAP Actions* | Case No. 1:16-cv-08637<br><br>The Honorable Thomas M. Durkin |

**TYSON DEFENDANTS' MOTION TO DISQUALIFY DR. ALAN S. FRANKEL
FROM SERVING AS AN EXPERT AND SUPPORTING MEMORANDUM OF LAW**

Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Poultry, Inc., and Tyson Breeders, Inc. (collectively, "Tyson" or "Tyson Defendants") hereby move for an order disqualifying Alan Frankel, Ph.D., from serving as an expert for the 37 Track One Direct Action Plaintiffs with pending claims against Tyson (collectively, "Retaining DAPs")[1] and precluding the Retaining DAPs from further consulting with Dr. Frankel regarding the issues in this case.

## INTRODUCTION

During the conspiracy period alleged in this litigation, Dr. Frankel worked with Tyson ▮

▮. His opinion in this case for Retaining DAPs ▮

▮ This motion seeks to preclude Dr. Frankel from switching sides on this fundamental issue after having been provided with Tyson's confidential information.

---

[1] The Retaining DAPs are Bi-Lo Holdings, LLC, Winn-Dixie Stores, Inc., Action Meat Distributors, Inc., Affiliated Foods, Inc., Alex Lee, Inc./Merchants Distributors, LLC, Associated Food Stores, Inc., Associated Grocers of New England, Inc., Associated Grocers, Inc., Bashas' Inc., Big Y Foods, Inc., Brookshire Brothers, Inc., Brookshire Grocery Company, Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc., Certco, Inc., Colorado Boxed Beef Co., Columbia Meats Inc., Fareway Stores, Inc., Giant Eagle, Inc., The Golub Corporation, Greenville Meats, Inc., Ira Higdon Grocery Company, Inc., King Solomon Foods, Inc., Latina Boulevard Foods, LLC, Nicholas & Co., Inc., Pacific Food Distributors, Inc., Piggly Wiggly Alabama Distributing Co., Inc., S&S Trading, LLC, Springfield Grocer Company, Schnuck Markets, Inc., SpartanNash Company, The Distribution Group, d/b/a Van Eerden Foodservice Company, Topco Associates, LLC, Troyer Foods, Inc., URM Stores, Inc., W. Lee Flowers & Company, Weinstein Wholesale Meats, Inc., and Woodman's Food Market, Inc.

Certain other DAPs that jointly engaged Dr. Frankel with the Retaining DAPs—Alberstons Companies, Inc., Hy-Vee, Inc., The Kroger Co., Save Mart Supermarkets, Associated Grocers of Florida, Inc., Associated Grocers of the South, Inc., Meijer, Inc., Meijer Distribution, Inc., OSI Restaurant Partners, LLC, Publix Super Markets, Inc., SuperValu Inc., Unified Grocers, Inc., and Wakefern Food Corporation—have dismissed their claims against Tyson. Tyson does not seek to disqualify Dr. Frankel as to the DAPs that have dismissed their claims against Tyson.

## FACTUAL BACKGROUND

A. <u>Tyson's Retention of Compass Lexecon and Dr. Frankel</u>

On November 8, 2010, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓. (Ex. A, Declaration of Michael L. Keeley ¶ 5; *id.*, Ex. 1 (▓▓▓▓▓▓

▓▓▓▓). ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[2] (Keeley Decl. ¶ 5). Tyson retained Axinn, Veltrop & Harkrider LLP

("Axinn") to represent it in connection ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and authorized

Axinn to retain experts from Compass Lexecon to provide an economic analysis ▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (*Id.* ¶¶ 6-8). Dr. Frankel, then a Senior Advisor at Compass

Lexecon, served as a consulting expert for Tyson ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; indeed, he

is identified by name in the engagement letter. (*Id.* ¶¶ 9, 13; *id.*, Ex. 2 (Engagement Letter)).[3]

The engagement letter contemplated that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (*Id.* ¶ 10). The

engagement letter further provided that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*Id.* ¶ 11).

Compass Lexecon also agreed in the engagement letter ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[2] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Ex. B, Declaration of Kail J. Jethmalani, Ex. 6 (TF-0000042907).)

[3] A partially executed copy of the engagement letter, signed by Dr. Dennis Carlton of Compass Lexecon (Keeley Decl. ¶ 9) is attached as Exhibit 2 to the Declaration of Michael L. Keeley. Axinn has been unable to locate the fully executed engagement letter in its archived data systems. Axinn, Tyson, and Compass Lexecon operated pursuant to the terms of the engagement letter attached to the Keeley Declaration. (*Id.* ¶ 14.)

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

██████████████████████████████. (*Id.* ¶ 12).

Compass Lexecon billed Tyson for its work on ████████████████████. (*Id.* ¶ 27-28; *id.*, Ex. 3 (Compass Lexecon Invoice)). Dr. Frankel was the highest biller in the first full month of the retention. In January 2011, Compass Lexecon recorded ████ hours of work on behalf of Tyson, totaling ████████. (*Id.* ¶ 28). Dr. Frankel's work comprised ████ hours—two-thirds of the total. (*Id.*) Dr. Frankel confirmed ██████████████████████. (Ex. B, Jethmalani Decl., Ex. 1 ("Frankel Dep. Tr.") at 350:18-351:2.)

B. **Confidential Information Shared with Dr. Frankel**

Tyson shared privileged and confidential information with Dr. Frankel,[4] and Dr. Frankel was directly involved in the development of Tyson's response to the ████████████ ████████. (Keeley Decl. ¶ 15). He participated in multiple meetings and calls with Axinn attorneys, some of which included Tyson's inside counsel, to develop the response strategy. (*Id.* ¶¶ 16, 18, 20, 22). In January 2011, for example, Dr. Frankel met with Axinn and Tyson's inside counsel in Washington, D.C. (*Id.* ¶¶ 16, 29; *id.*, Ex. 3 (Compass Lexecon Invoice)). During those meetings and calls, counsel ████████████████████████████████████

---

[4] Tyson can provide the Court, for *in camera* review, the privileged communications related to Dr. Frankel's prior engagement referenced in the Keeley Declaration. *See Slaven v. Great Am. Ins. Co.*, 83 F. Supp. 3d 789, 801 (N.D. Ill. 2015) ("Where this evidence may be presented only by revealing the very information sought to be protected by the privilege, an *in camera* inspection of the evidence is appropriate.").

3



████ (*Id.* ¶¶ 16-17, 20). Dr. Frankel also participated in interviews of Tyson employees ████████████. (*Id.* ¶ 22). The purpose of those interviews was to allow counsel and Dr. Frankel to ████████████ ██ (*Id.*)

Dr. Frankel exchanged privileged email correspondence with Axinn on matters related to ████████████. (*Id.* ¶¶ 17-20). Those communications are explicitly labeled "Privileged & Confidential" and/or "Attorney Work Product." (*Id.* ¶¶ 18-20). He developed and contributed to privileged and confidential work product at Axinn's request. (*Id.* ¶¶ 17, 20). As Dr. Frankel testified on January 25, 2022, he "████████████████████" (Frankel Dep. Tr. at 352:22-24.) He labeled some of that work product "PREPARED FOR USE OF COUNSEL" on each page, and labeled his transmittal message, "PRIVILEGED & CONFIDENTIAL" and "PREPARED FOR COUNSEL." (Keeley Decl. ¶ 20.)

In addition, Axinn shared with Dr. Frankel its privileged and confidential written work product, which Dr. Frankel reviewed, commented on, and revised. (*Id.* ¶¶ 24-25.) Subsequent versions of that written work product incorporated Dr. Frankel's contributions. (*Id.* ¶ 26.)

  C. **Agri Stats' Role in the *Broilers* Litigation**

As the Court is well aware, the alleged anticompetitive effects of Agri Stats is a significant—and hotly contested—issue in this case. The Retaining DAPs allege, among other things, that "Agri Stats acted as an active facilitator of Defendant's cartel," (DAPs' Am. Consol. Compl. ¶ 871), "played a particularly important role in Defendants' signaling practices and policing efforts," (*id.* ¶ 953), and "supplie[d] data necessary to coordinate production limitations and manipulate prices." (*Id.* ¶ 945; *see also id.* ¶ 944.)

4

Dr. Frankel's expert report discusses ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Jethmalani Decl., Ex. 2 ("Frankel Report") ¶¶ 237-67). The time period he examines and discusses in his expert report ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Frankel Report ¶ 274).

### D. Dr. Frankel's Relationship with the Retaining DAPs

Dr. Frankel ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Frankel Dep. Tr. at 348:21-349:6). Dr. Frankel testified that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*Id.* at 351:11-352:11). ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*Id.* at 353:5-10).

### E. Tyson's Request that the Retaining DAPs Withdraw Dr. Frankel's Report as to Tyson

Dr. Frankel disclosed ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Frankel Dep. Tr. at 40:14-42:6; 351:3-352:11.)[5] Axinn immediately commenced an investigation that revealed that Dr. Frankel

---

[5] Dr. Frankel recalled only that he "did a few hours of work over a decade ago for a potential project for Tyson . . . ." (Frankel Dep. Tr. at 40:16-18, 349:11-16 ("I did some work as a subcontractor to Compass Lexicon [sic] of – in December and January of '10 and '11. I don't know – that was a prospective

was a part of the Compass Lexecon team retained by Tyson in connection with ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. Before the deposition ended, Axinn demanded, in writing, that Retaining DAPs withdraw Dr. Frankel, and offered to meet and confer. (Jethmalani Decl., Ex. 3.) Axinn then continued diligently to identify, review, and analyze materials regarding Dr. Frankel's involvement in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[6]

On February 3, 2022, Axinn met and conferred with counsel for the Retaining DAPs. During the discussion, Axinn proffered the principal facts known to it based on its ongoing investigation regarding Tyson's prior retention of Dr. Frankel. By letter dated February 8, 2022, the Retaining DAPs raised a litany of questions about, among other things, Dr. Frankel's prior work for Tyson. (Jethmalani Decl., Ex. 4.) Axinn responded on behalf of Tyson on February 11, 2022, noting that the Retaining DAPs sought to invade Tyson's privileges and setting forth principal facts known based on its ongoing investigation. (*Id.*, Ex. 5.) The Retaining DAPs responded on February 17, 2022, concerning the applicable legal standard. (*Id.*, Ex. 7.)

Later on February 17, 2022, Tyson and the Retaining DAPs agreed that Tyson would hold the instant motion in abeyance to allow additional time to meet and confer to reach a negotiated resolution of this dispute. (*Id.*, Exs. 8-9.) The Retaining DAPs also agreed that they would not argue that this motion is untimely or prejudicial based on the time elapsed since Tyson's January 25, 2022 request to the Retaining DAPs to withdraw Dr. Frankel. (*Id.*)

---

engagement by Tyson. I don't know what ever happened to that.").) Dr. Frankel's testimony about his prior work for Tyson is contradicted by the documentary evidence of the terms of his retention and the work he performed for Tyson.

[6] Axinn's investigation is ongoing, but many of the materials related to Dr. Frankel's retention by Tyson have been archived onto backup tapes and thus are not readily available.

Axinn met and conferred with counsel for the Retaining DAPs for the final time on March 13, 2022 to attempt to resolve this dispute. Tyson and the Retaining DAPs were unable to do so, necessitating this motion.

## ARGUMENT

I. **DR. FRANKEL MUST BE DISQUALIFIED BECAUSE TYSON RETAINED HIM IN CONNECTION WITH ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ AND SHARED CONFIDENTIAL, PRIVILEGED INFORMATION WITH HIM**

Courts have inherent authority to disqualify expert witnesses to protect the integrity of the judicial process and promote public confidence in the legal system. *Baxter Int'l, Inc. v. CareFusion Corp.*, No. 15-C-9986, 2019 WL 12528899, at *2 (N.D. Ill. Nov. 27, 2019). Courts in this Circuit apply a two-prong test to determine whether an expert should be disqualified: (1) "whether the party seeking disqualification acted reasonably in assuming that a confidential relationship existed[,]" and (2) "whether confidential information was exchanged requiring disqualification of the expert." *Baxter*, 2019 WL 12528899, at *2 (internal quotations omitted). Both prongs of the analysis are satisfied here.

### A. Tyson Had a Confidential Relationship with Dr. Frankel

As set forth above, Tyson's retention of Compass Lexecon and Dr. Frankel was accompanied by clear indicia of confidentiality. *First*, the near-final engagement letter with Compass Lexecon included multiple confidentiality provisions. (Keeley Decl. ¶¶ 9-11.) That by itself shows that Tyson and Compass Lexecon—and by extension Dr. Frankel—had a confidential relationship. *Brunstad v. Medtronic, Inc.*, No. 14-v-255-JDP, 2015 WL 1962104, at *2 (W.D. Wis. Apr. 30, 2015) (observing that "[m]any courts have held that the existence of a confidentiality agreement substantiates a reasonable expectation of a confidential relationship" (collecting cases)). Moreover, the engagement letter contemplated that the Compass Lexecon team—including Dr. Frankel—would ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

7

███████████████████████████████████████████████████

███████████████████████████████████. (Keeley Decl. ¶¶ 10-11).

*Second*, communications between Dr. Frankel and Axinn were labeled to indicate their confidentiality. *Wang Lab'ys, Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1249 (E.D. Va. 1991) (correspondence between counsel and expert that was "prominently labeled as confidential" supported expectation of confidentiality). Axinn attorneys prominently designated communications with Dr. Frankel as "privileged and confidential" and "attorney work product." (Keeley Decl. ¶¶ 18-19). Similarly, Dr. Frankel used language such as "privileged & confidential," "prepared for counsel," or "prepared for use of counsel," (*id.* ¶¶ 17, 20), on communications with Axinn to identify his work as produced at the direction of counsel and protected from disclosure. *See, e.g.*, *Basf Aktiengesellschaft v. Reilly Indus., Inc.*, 224 F.R.D. 438, 441 (S.D. Ind. 2004) (materials prepared at the direction of counsel in anticipation of litigation are protected by the attorney work product doctrine).

*Third*, courts also may consider factors such as the amount and nature of the information shared with the expert, how much time the expert provided to the party, and whether the expert was paid, in assessing whether there was a reasonable expectation of confidentiality. *See Simons v. Freeport Mem'l Hosp.*, No. 06-C-50134, 2008 WL 5111157, at *4 (N.D. Ill. Dec. 4, 2008) (identifying factors such as an expert's invoiced time and payment received for services as support for a reasonable expectation of confidentiality). Dr. Frankel's work on behalf of Tyson included, at least, receiving and contributing to attorney work product, joining confidential discussions with Tyson's inside and outside counsel, and participating in confidential interviews with Tyson employees. (Keeley Decl. ¶¶ 16-25). Compass Lexecon billed Tyson for Dr. Frankel's ███ hours of work in January 2011 alone, (*id.* ¶¶ 27-28), and Dr. Frankel confirmed

8

that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, (Frankel Dep. Tr. at 350:18-351:2). These facts likewise demonstrate the confidential relationship between Tyson and Dr. Frankel. *Simons*, 2008 WL 5111157, at *4 (finding that "it was reasonable for defendants to assume a confidential relationship with [expert]" because "[expert's] service to defendants was much more than an initial consultation" and "[expert] invested significant time reviewing . . . records and was paid by defendants accordingly").

Given the multiple indicia of confidentiality, Tyson "acted reasonably in assuming that a confidential relationship existed" with Dr. Frankel. *Baxter*, 2019 WL 12528899, at *2 (citation omitted). The first prong of the disqualification analysis is therefore satisfied.

### B. Dr. Frankel Received Confidential, Privileged Information from Tyson

When "opinion work product is shared by an attorney, confidential information has been imparted to the expert." *Simons*, 2008 WL 5111157, at *4; *see also Brunstad*, 2015 WL 1962104, at *3 (disqualifying witness that received "privileged information that will not be available through discovery"). As described above, during its retention of Compass Lexecon for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Tyson shared with Dr. Frankel privileged and confidential information and attorney work product protected from discovery, including, but not limited to, the following:

- Information obtained through interviews of Tyson employees as well as meetings with Tyson's outside and inside counsel. *See supra* at 3-4.

- Tyson's strategy and plans for responding to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See supra* at 3-4.

- Axinn's written work product reflecting Tyson's positions and potential responses ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, as well as Axinn attorneys' mental impressions, strategies, and legal theories. *See supra* at 4.

The "essential work-product nature" of this confidential information is evident because "[n]o experienced litigator would freely disclose these materials to opposing counsel." *Wang*, 762 F.

9

Supp. at 1249 (holding that it was "indisputable" that counsel disclosed confidential information to the expert when it shared a "memorandum detailing and assessing the patent file wrapper history and his . . . letter outlining potential defenses"). Moreover, Dr. Frankel not only received and reviewed all of this privileged and confidential material, but he used it in consulting with Tyson on its ▇▇▇▇▇▇ and in revising and contributing to Axinn's written work product.

The confidential information Tyson shared with Dr. Frankel, and the work product Dr. Frankel generated for Tyson, relate to core issues in this litigation. *Baxter*, 2019 WL 12528899, at *2 (disqualification requires "a substantial relationship between confidential information acquired and the matters to which the expert is expected to testify" (citation omitted)). Plaintiffs directly challenge the use of Agri Stats by certain Defendants, and have put forth the opinion of Dr. Frankel to ▇▇▇▇▇▇. (Frankel Report ¶ 84 (▇▇▇▇▇▇)); *see also id.* ¶¶ 80, 204, 238, 254, 541; *see also, e.g.,* DAP Am. Consol. Compl. ¶¶ 871, 944-45, 953). During his engagement by Tyson, however, Dr. Frankel ▇▇▇▇▇▇. (Keeley Decl. ¶¶ 7, 25).

Moreover, Dr. Frankel's prior retention by Tyson occurred during the claimed relevant period of the alleged conspiracy. Dr. Frankel asserts in his report that ▇▇▇▇▇▇ (Frankel Report ¶ 11). He also asserts that ▇▇▇▇▇▇. (*Id.* ¶ 84). Yet, in

10

late 2010 and early 2011,[7] during the claimed relevant period of the alleged conspiracy facilitated by Agri Stats, Dr. Frankel ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

After having contributed to Tyson's strategy and Axinn's work product ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and utilizing Tyson's privileged and confidential information to do so, Dr. Frankel should not be allowed to switch sides and opine directly to the contrary, and against Tyson. The Court should find that Tyson has satisfied the second prong of the disqualification analysis because Tyson shared with Dr. Frankel substantial attorney work product immunized from discovery that is directly related to the *Broilers* litigation.

## II.  DISQUALIFYING DR. FRANKEL WILL UPHOLD THE PUBLIC INTEREST AND MAINTAIN THE INTEGRITY OF THE JUDICIAL PROCESS

Even if the two-factor test were not satisfied here—and it is—Dr. Frankel's conflict is so highly prejudicial to Tyson that it warrants disqualification to maintain the integrity of the judicial process. *See, e.g., Lifewatch Servs., Inc. v. Braemer, Inc.*, No. 09-C-6001, 2010 WL 3909483, at *1 (N.D. Ill. Sept. 28, 2010) ("Where policy concerns surrounding the integrity and fairness of the adversary process are sufficient, some courts have suggested that those concerns should merit disqualification regardless of the outcome of the two factor test noted previously."); *Simons*, 2008 WL 5111157, at *5 (disqualifying expert based on policy considerations even though expert had not received confidential information); *Am. Empire Surplus Lines Ins. Co. v. Care Ctrs., Inc.*, 484 F. Supp. 2d 855, 857 (N.D. Ill. 2007) (same).

---

[7] Retaining DAPs may counter that Dr. Frankel's work for Tyson occurred over a decade ago. But courts in this Circuit have disqualified experts more than a decade after their prior conflicting engagement. *See, e.g., Baxter*, 2019 WL 12528899, at *1 (disqualifying expert more than 20 years after prior engagement); *Brunstad*, 2015 WL 1962104, at *1 (disqualifying expert approximately 14 years after prior engagement).

11

*First*, a jury may be misled into believing that Dr. Frankel's opinions are more probative than they otherwise would be precisely because ███████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████. (*See, e.g.*, Frankel Report ¶¶ 80, 84, 541).

*Second*, Tyson would have no recourse to protect its privileged and confidential information: "Even if [Dr. Frankel] diligently tried to respect his obligations under his confidentiality agreement, he could implicitly or unconsciously guide plaintiffs' litigation strategy on the basis of knowledge that he is contractually barred from disclosing." *Brunstad*, 2015 WL 1962104, at *4 (analyzing this factor in its policy discussion); *see also Alien Tech. Corp. v. Intermec, Inc.*, 2007 WL 4261972, at *2 (D.N.D. Nov. 30, 2007) (disqualifying expert due to the risk of inadvertent use of confidential information and its potential to affect expert's opinions). And even if Dr. Frankel ███████████████████████████████████ ███████████████████████████████████, it is "not reasonable to expect [Tyson] to bear that risk under these circumstances." *Lugo v. Hulett Env't Servs., Inc.*, 2011 WL 13298498, at *5 n.3 (M.D. Fla. Jan. 28, 2011).[8]

*Third,* allowing Dr. Frankel to switch sides will "undermine[] public confidence in the integrity and fairness of the judicial process" because it "simply appears unfair and unseemly[.]" *Am. Empire Surplus Lines*, 484 F. Supp. 2d at 857. Particularly so here because Dr. Frankel was retained by and did work for Tyson during the conspiracy the Retaining DAPs allege. *Cf.*

---

[8] The court in *Lugo* disqualified the plaintiff's expert who first consulted for defendants, but maintained that he did not remember with whom he consulted or the details of the consultation. 2011 WL 13298498, at *1. The court observed that it was "not unlikely that [the expert's] memory could be refreshed during the course of his work on the case[.]" *Id.* at *5 n.3. Similarly, in *United States v. NHC Health Care Corp.*, the court disqualified an expert that purportedly did not recall her prior conflicting work. 150 F. Supp. 2d 1013, 1015-16 (W.D. Mo. 2001).

*Lifewatch*, 2010 WL 3909483, at *3 (disqualifying expert that was the named inventor of a patent from testifying in litigation over the patent due to prior work for the movant).

III. **REQUESTED RELIEF**

Tyson requests that this Court disqualify Dr. Frankel from serving as an expert for, or consulting further with, the Retaining DAPs. Such relief is the only way to ensure that Tyson's privileged and confidential information is protected from disclosure and use against Tyson and to protect the integrity of the judicial process. *See Lifewatch*, 2010 WL 3909483, at *3 (disqualifying expert and preventing further consultations); *In re Diet Drugs Prods. Liab. Litig.*, No. 07-20144, 2009 WL 1886131 (E.D. Pa. June 26, 2009), at *4 (disqualifying expert and precluding him "from consulting any further with the plaintiff's attorneys").

## CONCLUSION

For the foregoing reasons, the Court should grant Tyson's motion and disqualify Dr. Frankel from serving as an expert for, or consulting further with, the Retaining DAPs.

Dated: March 14, 2022

Respectfully submitted,

By: */s/ Denise L. Plunkett*
Denise L. Plunkett (*pro hac vice*)
Nicholas E.O. Gaglio (*pro hac vice*)
Kail J. Jethmalani (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
T: 212-728-2200
dplunkett@axinn.com
ngaglio@axinn.com
kjethmalani@axinn.com

Rachel J. Adcox (#1001488)
Daniel K. Oakes (*pro hac vice*)
Kenina J. Lee (*pro hac vice*)
Michael J. O'Mara (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
T: 202-912-4700
radcox@axinn.com
doakes@axinn.com
klee@axinn.com
momara@axinn.com

John M. Tanski (*pro hac vice*)
Jarod G. Taylor (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
T: 860-275-8100
jtanski@axinn.com
jtaylor@axinn.com

Jordan M. Tank
LIPE LYONS MURPHY NAHRSTADT &
PONTIKIS, LTD.
230 West Monroe, Street, Ste 2260
Chicago, IL 60606
T: 312-702-0586
jmt@lipelyons.com

*Attorneys for Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Poultry, Inc., Tyson Breeders, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2022, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

>  */s/ Denise L. Plunkett*
>  Denise L. Plunkett (*pro hac vice*)
>  AXINN, VELTROP & HARKRIDER LLP
>  114 West 47th Street
>  New York, NY 10036
>  T: 212-728-2200
>  dplunkett@axinn.com