**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE BROILER CHICKEN ANTITRUST LITIGATION** | Case No: 1:16-cv-08637 |
| | Hon. Judge Thomas M. Durkin |
| THIS DOCUMENT RELATES TO: | Magistrate Judge Jeffrey T. Gilbert |
| ALL TRACK 2 DAP ACTIONS | |

**PILGRIM'S PRIDE'S MOTION TO DISMISS THE TRACK 2 DIRECT ACTION
PLAINTIFFS' SECOND AMENDED CONSOLIDATED COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

ARGUMENT ......................................................................................................2

I.  The Track 2 DAPs Have Failed to Plausibly Support Their Antitrust Claims ...................2

    A.  The Track 2 DAPs Have Not Alleged a Plausible "Overarching Conspiracy"...................................................................................3

    B.  The Track 2 DAPs Are Pursuing Bid-Rigging Claims Against Pilgrim's That Are Implausible .......................................................................7

    C.  The Plus Factors Alleged in the Complaint, Even with the Benefit of Years of Discovery, Do Not Plausibly Show a Supply-Reduction Conspiracy ...........................................................................10

II.  The Track 2 DAPs Have Failed to Plausibly Allege the Causation Element of Their RICO and Fraud-Based State Law Claims..............................................11

CONCLUSION....................................................................................................15

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alaska Dep't of Revenue, Treasury Div. v. Manku*,
2021 WL 3027170 (2d Cir. July 19, 2021) ................................................................. 3

*Amerigas Propane, L.P. v. BP America, Inc.*,
691 F. Supp. 2d 844 (N.D. Ill. 2010) ...................................................................... 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................ 2, 14

*Bank of Am., N.A. v. Knight*,
725 F.3d 815 (7th Cir. 2013) ........................................................................................ 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................... 1, 2, 5, 7, 10

*Block v. Snohomish Cty.*,
2015 WL 4164821 (W.D. Wash. July 8, 2015)
*aff'd*, 733 F. App'x 884 (9th Cir. 2018) .................................................................. 3

*Cadle Co. v. Flanagan*,
2005 WL 8167447 (D. Conn. Feb. 11, 2005) ........................................................ 13

*Cavi v. Evolving Sys. NC, Inc.*,
2018 WL 2298353 (D. Del. May 21, 2018) ............................................................ 12

*Green v. Aztar Corp.*,
2003 WL 22012205 (N.D. Ill. Aug. 22, 2003) ...................................................... 13

*Holmes v. Sec. Inv. Protection Corp.*,
503 U.S. 258 (1992) ................................................................................................. 12

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*,
60 F. Supp. 3d 914 (N.D. Ill. 2014) .......................................................................... 9

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
313 F. Supp. 3d 931 (N.D. Ill. 2018) ........................................................................ 9

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
28 F.4th 42 (9th Cir. 2022) ...................................................................................... 11

*In re GSE Bonds Antitrust Litig.*,
396 F. Supp. 3d 354 (S.D.N.Y. 2019) ........................................................................ 3

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ........................................................................................ 3

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
768 F. Supp. 2d 961 (N.D. Iowa 2011) ...................................................................... 6

*In re MasterCard Int'l Inc.*,
313 F.3d 257 (5th Cir. 2002) .................................................................................... 13

*LLM Bar Exam, LLC v. Barbri, Inc.*,
  271 F. Supp. 3d 547 (S.D.N.Y. 2017)........................................................................ 4

*Mountain Crest SRL, LLC v. Anheuser-Busch InBev SA/NV*,
  456 F. Supp. 3d 1059 (W.D. Wis. 2020) .................................................................. 5

*Neal v. Cochran, Cherry, Givens & Smith, P.C.*,
  2009 WL 10697510 (N.D. Ga. Feb. 9, 2009) ........................................................ 12

*Next Century Commc'ns Corp. v. Ellis*,
  214 F. Supp. 2d 1366 (N.D. Ga. 2002),
  *aff'd*, 318 F.3d 1023 (11th Cir. 2003).................................................................. 12

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
  629 F.3d 697 (7th Cir. 2011) ................................................................................. 10

*Pa. Emp., Benefit Tr. Fund v. Zeneca, Inc.*,
  710 F. Supp. 2d 458 (D. Del. 2010)....................................................................... 12

*Plea Agreement, United States v. Pilgrim's Pride Corp.*,
  No. 20-cr-0330 (D. Colo. Feb. 23, 2021)............................................................ 5, 6

*Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*,
  2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013) .................................................... 4, 5

*Rodriguez v. Ford Motor Co.*,
  2022 WL 972306 (N.D. Ill. Mar. 31, 2022)........................................................... 15

*Turk v. Morris, Manning & Martin, LLP*,
  2022 WL 1124974 (N.D. Ga. Mar. 24, 2022)........................................................ 12

*United States v. Pilgrim's Pride Corp.*,
  No. 20-cr-0330 (D. Colo. Feb. 23, 2021)............................................................ 5, 6

## INTRODUCTION

The Track 2 DAPs seek to impose liability on Pilgrim's based on no fewer than four separate, alleged antitrust conspiracies. They allege an "overarching" conspiracy in which Pilgrim's and twenty different suppliers purportedly raised the price of broilers, over an eleven-year period, through: (1) supply reductions during some (but not all) months of the conspiracy, by some (but not all) suppliers; (2) agreements to rig some (but not all) bids that were submitted to some (but not all) customers, by some (but not all) suppliers; and (3) efforts to manipulate the Georgia Dock index published by the Georgia Department of Agriculture, during some (but not all) months of the conspiracy, by some (but not all) suppliers. In addition to this alleged "overarching" conspiracy, the Track 2 DAPs allege Pilgrim's participated in independent, standalone conspiracies to reduce supply, rig bids, and manipulate the Georgia Dock index. Considered together, or alone, these allegations are implausible and do not withstand scrutiny under Rule 12. It defies credulity that such a conspiracy could have been conceived and adopted by twenty-one different firms, before being carried out at different times, through different actions, which were equally consistent with independent responses to common market developments.

While Pilgrim's entered a plea agreement with the U.S. Department of Justice in which it admitted it entered into a conspiracy with at least one competitor that affected bids submitted to a single customer (KFC), the Complaint reaches far beyond the conduct described in the plea agreement. The additional conduct described in the Complaint is not actionable. The Track 2 DAPs point again and again to actions taken by Pilgrim's that were at least as likely to have been undertaken as a result of the company's independent, unilateral business judgment as they were for any allegedly illicit purpose. Even at the pleading stage, the antitrust laws require a much greater showing. The Track 2 DAPs must allege "facts that tend to exclude independent self-interested conduct as an explanation for defendants' parallel behavior," *Bell Atl. Corp. v. Twombly*,

1

550 U.S. 544, 552 (2007) (cleaned up), and they have failed to meet that burden. The Complaint therefore fails to state a valid federal or state antitrust claim against Pilgrim's.

The claims based on allegations of fraud that have been asserted by a subset of the Track 2 DAPs fare no better because those claims are not supported by allegations that plausibly establish causation. The Track 2 DAPs allege they were injured because they did not pay a "market price" for chicken under contracts based on the Georgia Dock. They do not, however, allege that they reasonably could have believed the Georgia Dock in fact represented a single "market price" when they agreed to use it as a pricing benchmark. Instead, their own allegations confirm these plaintiffs had reason to know that there was no single "market price" for chicken products and that there were other, lower-priced indices they could have used as an alternative to the Georgia Dock. They nonetheless opted to make purchases based on the Georgia Dock. Thus, the injury claimed by these Track 2 DAPs—paying more than the "market price"—was caused by their own subjective beliefs and actions, not the alleged manipulation of the Georgia Dock by Defendants.

## ARGUMENT

### I. The Track 2 DAPs Have Failed to Plausibly Support Their Antitrust Claims

To pass muster under Rule 12, a complaint must contain sufficient allegations of fact, accepted as true, to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In cases brought under Section 1 of the Sherman Act, "the crucial question is whether the challenged anticompetitive conduct stems from [a lawful] independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (cleaned up). Counts 1-6 of the Track 2 DAPs' Complaint do not satisfy this standard against Pilgrim's because the allegedly conspiratorial conduct, as pleaded, either was plausibly the result of "lawful" and "independent" actions, *id.* at 566-67, or the Track 2 DAPs failed to plead facts that specifically implicate Pilgrim's in the alleged conspiracies. Plaintiffs' state law antitrust and unfair competition claims should be

dismissed for the same reasons.

### A. The Track 2 DAPs Have Not Alleged a Plausible "Overarching Conspiracy"

In Count 1 of the Complaint, the Track 2 DAPs claim Pilgrim's violated Section 1 of the Sherman Act because it entered into an eleven-year, "continuing agreement" (Compl. ¶ 1316) as part of a "multi-faceted, overarching conspiracy" (*id.* ¶ 1321) involving twenty-one different competitors (*id.* ¶¶ 158-220) to raise the prices of different chicken products Track 2 DAPs paid for every single transaction during the relevant period, thereby affecting billions of dollars in sales (*id.* ¶ 1363). Track 2 DAPs allege this conspiracy was carried out by: (1) reducing supply during some (but not all) months of the purported conspiracy (*id.* ¶¶ 333-580); (2) rigging some (but not all) bids for some (but not all) customers (*id.* ¶¶ 874-1109); (3) manipulating an index published by the Georgia Department of Agriculture during some (but not all) months during the purported conspiracy (*id.* ¶¶ 617-873); and (4) exchanging information with some (but not all) competitors (*id.* ¶¶ 322-26, 421-22, 470-71, 513, 526, 1119-53). Such a far-reaching conspiracy is implausible on its face.

Courts have recognized it is possible for an antitrust plaintiff to "cast a net so wide that the claimed antitrust conspiracy is implausible as alleged." *Alaska Dep't of Revenue, Treasury Div. v. Manku*, 2021 WL 3027170, at *4 (2d Cir. July 19, 2021); *Block v. Snohomish Cty.*, 2015 WL 4164821, at *1, *4-5, *11 (W.D. Wash. July 8, 2015) (dismissing as "implausible" an "unwieldy action" based on allegation of a vast retaliatory conspiracy, RICO enterprise, and antitrust scheme), *aff'd*, 733 F. App'x 884 (9th Cir. 2018). That can be the case where plausible allegations apply only to some (but not all) alleged conspirators, *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 364 (S.D.N.Y. 2019) ("[T]here must be something in the complaint that ties each defendant to the conspiracy."), or discrete evidence alleged in the complaint has no plausible relationship to other aspects of the alleged overarching conspiracy, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d

300, 348 (3d Cir. 2010) (plausible bid-rigging allegations not enough to support alleged "global conspiracy"). The Track 2 DAPs' Complaint suffers from both defects.

*First*, much of the purported direct evidence alleged against other Defendants does not apply to Pilgrim's. For example, other Defendants are alleged to have cut supply in spring 2009 (Compl. ¶¶ 439-42), fall 2010 (*id.* ¶ 450), and winter 2010-11 (*id.* ¶¶ 451-58, 473). Pilgrim's, however, is not alleged to have cut supply during any of those time periods. *See id.* ¶¶ 309-513. Allegations regarding cuts made by other suppliers during times that Pilgrim's did not reciprocate are not indicative of a conspiracy. Nor are allegations that Pilgrim's took similar actions as other Defendants but at different times—including while Pilgrim's was operating under the supervision of a bankruptcy court (*id.* 847)—sufficient to infer the existence of the alleged overarching conspiracy. *See Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, 2013 WL 6481195, at *23 (E.D.N.Y. Sept. 20, 2013) ("[T]he only factual allegations connecting these defendants to the global conspiracy are the defendants' imposition of some, but not all, of the surcharges at issue in the global conspiracy claim. . . . The lack of concerted action on their part undermines the inference that they joined a global conspiracy. . . ."), *report and recommendation adopted*, 2014 WL 298594 (E.D.N.Y. Jan. 28, 2014); *see also LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 579 (S.D.N.Y. 2017) (rejecting plaintiff's efforts to "stretch" its allegations to characterize similar actions undertaken "at different times over the span of several years" as "parallel conduct" supporting an inference of conspiracy).

Similarly, Pilgrim's is not alleged to have had any involvement in many bid-rigging episodes described in the Complaint. *See id.* ¶¶ 898-900, 904, 947-49, 957-58, 1006, 1008, 1025, 1032, 1040, 1042, 1052, 1057. Even if those allegations regarding other suppliers are taken as true, they cannot be invoked as a basis to establish that Pilgrim's participated in the alleged

overarching conspiracy that included bid-rigging. Even at the pleading stage, it is "essential to show that a particular defendant joined the conspiracy and knew of its scope." *Mountain Crest SRL, LLC v. Anheuser-Busch InBev SA/NV*, 456 F. Supp. 3d 1059, 1072 (W.D. Wis. 2020) (quoting *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013)). The allegations tying Pilgrim's to an "overarching conspiracy" through bid-rigging episodes involving other suppliers are conclusory, which is not enough to pull Pilgrim's into an alleged, "overarching" conspiracy. *Twombly*, 550 U.S. at 556 ("[A] bare assertion of conspiracy will not suffice.").

**Second**, the purported direct evidence alleged against Pilgrim's, such as its agreement to plead guilty to a conspiracy to rig bids and fix prices and other price-related terms affecting: (1) the "contract for the supply to KFC of dark meat and wings in 2013"; (2) the "contract for the supply to KFC of dark meat in 2014"; and (3) the "contract for the supply to KFC of 8-piece chicken on the bone in 2015 through 2017," Plea Agreement, *United States v. Pilgrim's Pride Corp.*, No. 20-cr-0330 (D. Colo. Feb. 23, 2021), bears no plausible relationship with or factual connection to the other allegations leveled at Pilgrim's as part of the alleged "overarching" conspiracy. *Precision Assocs., Inc.*, 2013 WL 6481195, at *4 ("The plaintiffs have not, for example, pointed to a statement in a charge or in a guilty plea suggesting that the . . . conspiracies were factually connected to the conspiracies alleged in Claim 10. The only connection is that these defendants are charged with the same type of misconduct. The fact that the defendants may be guilty of conduct that violates the antitrust laws in identical ways in similar factual circumstances does not connect that misconduct."). For example, Track 2 DAPs allege Pilgrim's reduced supply in 2008 and 2009, while it was in bankruptcy, as part of the alleged, "overarching" conspiracy. Compl. ¶¶ 435-36, 447, 451-92, 501, 847. Those alleged actions occurred years before the bids that were affected by the conduct described in Pilgrim's plea agreement. Plea Agreement at 4 (identifying

the relevant period as 2012 to early 2017). The Complaint contains no more than conclusory allegations to establish a link between Pilgrim's production decisions and the conduct at issue in its plea agreement.

Considered collectively, these defects are fatal to the Track 2 DAPs' alleged "overarching conspiracy." Where a single, overarching conspiracy derived from discrete incidents is alleged, the evidence must establish a "larger picture from which inferences of a wider conspiracy can be drawn." *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 975 (N.D. Iowa 2011) (cleaned up). When scrutinized under the Rule 12 standard, the inferences drawn from the circumstantial allegations against Pilgrim's do not plausibly support the existence of the alleged wider, "overarching conspiracy." Instead, the allegedly conspiratorial conduct was equally likely to have resulted from the lawful, independent goals of Pilgrim's—specifically, the need to stem losses and return to profitability following a period of increased input costs, oversupply, and economic recession, which forced Pilgrim's into economic distress and, ultimately, bankruptcy. *See* Compl. ¶¶ 312-15 (glut of chicken and Pilgrim's efforts to cut production in 2007, before the alleged conspiracy); *id.* ¶ 316 ("the Great Recession hit the American economy in 2008"); *id.* (alleging that, by 2008, "the oversupply and low prices of chickens put Defendants—individually and collectively—in dire financial straits"); *id.* ¶ 1295 (then-Interim Pilgrim's CEO discussed how "the U.S. government continues its misguided policy of subsidizing ethanol production . . . , and a lower corn yield expectation [by] USDA will contribute to decrease corn suppliers next year"); *id.* ¶ 382 (May 2008 speech by Pilgrim's then-CEO referencing "recent price volatility in the grain markets"); *id.* ¶ 398 (August 2008 Pilgrim's press release announcing closures as "part of the company's ongoing effort to operate more efficiently and return to profitability amid high feed costs and an oversupply of chicken on the market"); *id.* ¶ 847 (Pilgrim's bankruptcy filing in 2008

after losing $998.6 million for one fiscal year); *id.* ¶ 431 (February 2009 Pilgrim's press release announcing closure of three "underperforming" processing plants to "improve the company's product mix by reducing commodity production and to significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession"); *id.* ¶ 479 (Pilgrim's July 2011 announcement of layoffs and closure of processing plant attributed to "the challenges facing our industry from record-high feed costs and an oversupply of chicken" and the desire to "improv[e] our capacity utilization through production consolidation and other operational changes"). Because allegedly conspiratorial conduct by Pilgrim's as pleaded is no more likely to suggest a conspiracy than it is to suggest lawful, independent decision-making, the Track 2 DAPs have not pleaded a plausible "overarching" conspiracy. *Twombly*, 550 U.S. at 553.

## B. The Track 2 DAPs Are Pursuing Bid-Rigging Claims Against Pilgrim's That Are Implausible

Pilgrim's pleaded guilty to criminal charges relating to rigging three bids submitted to a single customer (KFC). Pilgrim's does not dispute the facts admitted in its plea agreement.[1] The Track 2 DAPs, however, have not plausibly asserted bid-rigging claims relating to prices and bids

---

[1] Pilgrim's does not deny that from at least as early as 2012 and continuing through at least early 2017 (the "Relevant Period"), Pilgrim's, a corporation organized in Delaware and headquartered in Greeley, Colorado, was engaged in the production and sale of broiler chicken products. At times during the Relevant Period, through at least one of its current and/or former employees, Pilgrim's participated in a conspiracy with at least one competitor engaged in the production and sale of broiler chicken products to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for certain broiler chicken products sold in the United States. Pilgrim's participation in this conspiracy affected sales of broiler chicken products to KFC, including: (1) Pilgrim's contract for the supply to KFC of dark meat and wings in 2013; (2) Pilgrim's contract for the supply to KFC of dark meat in 2014; and (3) Pilgrim's contract for the supply to KFC of 8-piece chicken on the bone in 2015 through 2017. Pilgrim's affected sales of broiler chicken products totaled at least $361 million.

that were submitted to any customer other than KFC.

The Track 2 DAPs allege that Pilgrim's engaged in bid-rigging that affected bids submitted to nine customers other than KFC (Pollo Tropical, Golden Corral, Boston Market, Zaxby's, Bojangles, El Pollo Loco, John Soules Foods, Sysco, and White Castle).[2]  The Complaint, however, fails to plausibly allege that Pilgrim's conspired to rig bids for any of these customers:

- **_Pollo Tropical._**  Pollo Tropical's allegations of  bid-rigging by Pilgrim's consist of quotations from internal Pilgrim's emails that do not show Pilgrim's discussed its bids/pricing to Pollo Tropical  with a competitor (*see* Compl. ¶¶ 903, 915, 997, 1000, 1004, 1031, 1078); references to phone calls between Pilgrim's and other firms that are not alleged to have any relationship to the prices or bids submitted to Pollo Tropical (*see id.* ¶¶ 998-1001); and citations to similar prices offered by Pilgrim's, Claxton, and Mar-Jac, without any reference to coordination among them (*see id.* ¶¶ 915, 999, 1007, 1083).

- **_Golden Corral._**  Golden Corral's allegations of  bid-rigging by Pilgrim's include internal Pilgrim's emails and messages, none of which state that Pilgrim's actually discussed its bids/pricing to Golden Corral with a competitor (*id.* ¶¶ 905, 940, 1011, 1013-16, 1028, 1034, 1045); allegations that Pilgrim's took a "take-it-or-leave-it" approach to negotiations, (*id.* ¶ 1003); and citations to similar prices offered by Pilgrim's, Koch, and Tyson, without any reference to coordination among them (*id.* ¶ 1082).

- **_Boston Market._**  Boston Market alleges that Carl Pepper of Tyson "receiv[ed] . . . confidential competitor information from Jimmie Little (Pilgrim's)," but references only an internal Tyson email where Pepper wrote, "I found out Pilgrims savings is .0023," with no attribution to a source.  *Id.* ¶ 910.  The other allegations concerning bid-rigging by Pilgrim's include Pilgrim's internal emails and messages, none of which state that Pilgrim's actually discussed its bids/pricing to Boston Market with a competitor (*id.* ¶¶ 1010, 1011); emails between Tyson and Pilgrim's regarding billing weight for a particular quarter (*id.* ¶ 1024); and citations to similar prices offered by Pilgrim's, Tyson, and George's, without any reference to coordination among them (*id.* ¶ 1080).

- **_Zaxby's._**  Zaxby's "bid-rigging" allegations regarding Pilgrim's are merely that Pilgrim's increased pricing to Zaxby's from 2014 to 2015.  Zaxby's alleges "[o]n December 11, 2014, in connection with negotiating 2015 pricing with Zaxby's, Justin Gay (Pilgrim's) emailed Eric Oare (Pilgrim's) and stated that with respect to chicken tenders, 'Claxton is at a 1.90-2.40 for 2015 and Marjac is 1.80 to 2.45 for this 2014, but I don't think he has completed it for next year'" (*id.* ¶ 1021), but does not specify the alleged source of that

---

[2] Several additional Track 2 DAPs have voluntarily dismissed their standalone bid-rigging claims against Pilgrim's.  *See* ECF 5282; ECF 5139; ECF 5460; ECF 5497; ECF 5201.

information.

- **Bojangles.** Bojangles' allegations concerning bid-rigging by Pilgrim's include internal Pilgrim's emails, none of which state that Pilgrim's actually discussed its bids/pricing to Bojangles with a competitor (*id.* ¶¶ 941, 993); and citations to similar price increases offered by Pilgrim's, Claxton, George's, Mar-Jac, and Koch, without any reference to coordination among them (*id.* ¶ 1084).

- **El Pollo Loco.** El Pollo Loco's allegations concerning bid-rigging by Pilgrim's include a reference to a conversation about volume (*id.*¶ 901); internal Pilgrim's emails that do not state that Pilgrim's discussed its bids/pricing to El Pollo Loco with a competitor (*id.* ¶ 1000); references to phone calls between Pilgrim's and other firms that have no relationship to El Pollo Loco (*id.* ¶ 1000); and citations to similar prices offered by Pilgrim's, Koch, and Mar-Jac, without any reference to coordination among them (*id.* ¶ 1081).

- **John Soules Foods.** John Soules Foods' allegations of bid-rigging by Pilgrim's are only that the phrase "Additional Notes Direct from Sanderson" appear in an internal Pilgrim's email below a summary of a meeting between Pilgrim's and John Soules Foods. *Id.* ¶ 1020.

- **Sysco.** Sysco's allegations concerning bid-rigging by Pilgrim's include Pilgrim's internal emails or messages, none of which state that Pilgrim's actually discussed its bids/pricing to Sysco with a competitor (*id.* ¶¶ 1037, 1100); and communications between Sysco, Pilgrim's, and Koch relating to Sysco's credit terms (*id.* ¶ 1038).

- **White Castle.** White Castle's sole allegation concerning bid-rigging by Pilgrim's is that White Castle had one primary supplier, Pilgrim's, and that Pilgrim's "implemented an unprecedented overage increase of between 19-23% for both chicken breast fillets and chicken ring products it sold to White Castle." *Id.* ¶ 1089.

None of these allegations provide direct evidence of an agreement between Pilgrim's and any other competitor to rig bids submitted to any of these customers. *Id.* ¶ 874; *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 950 (N.D. Ill. 2014) (direct evidence of an agreement "is explicit and requires no inferences to establish the proposition or conclusion being asserted"). Nor are there facts alleged that provide plausible circumstantial evidence suggesting that Pilgrim's rigged bids submitted for any of these customers. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 949 (N.D. Ill. 2018) (circumstantial evidence "is facts from which the existence of such an agreement can be inferred," but "[m]ere allegations of parallel conduct, without more, do not tend to exclude the possibility of independent action, and

are therefore insufficient") (cleaned up). At most, these allegations suggest that certain suppliers may have obtained access to pricing information (through customers or otherwise) (*e.g.*, Compl. ¶¶ 910, 915, 940-41, 1015, 1021, 1034), but "like all circumstantial evidence of conspiracy, [information exchange] is not on its own demonstrative of anticompetitive behavior, even when pricing data is what is exchanged," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 709 (7th Cir. 2011) (citations omitted). Thus, the allegations in the Track 2 DAPs' Complaint are not sufficient to allege that Pilgrim's conspired to rig bids for the purported "Bid-Rigging Victims."

### C. The Plus Factors Alleged in the Complaint, Even with the Benefit of Years of Discovery, Do Not Plausibly Show a Supply-Reduction Conspiracy

"[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. That is why plaintiffs must allege additional factual allegations that place the parallel conduct in a context suggesting a preceding agreement—something more than conduct merely consistent with agreement in order to "nudge[] their claims across the line from conceivable to plausible." *Id.* at 570. Those allegations are missing here. Even with the benefit of forty-four months of discovery concerning their supply-reduction and Georgia Dock claims, the Track 2 DAPs now allege no more than the same independent, parallel conduct to support Count 2 that was advanced in their initial complaint.

Pilgrim's recognizes the Court previously denied motions to dismiss the class allegations concerning the supply-reduction conspiracy, ECF 541, but the sufficiency of the plus factors that continue to be invoked by the plaintiffs has been called into question by a circuit court decision that was issued after the Court's last consideration of similar arguments. The Ninth Circuit recently affirmed a district court decision dismissing a putative class action against manufacturers

of dynamic random access memory (DRAM) alleging an antitrust conspiracy under Section 1 of the Sherman Act. *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42 (9th Cir. 2022). The class in that case relied on virtually identical allegations of parallel conduct to what is alleged here and identified eight plus factors that suggested a conspiracy: (1) price signaling; (2) complex, simultaneous, and historically unprecedented decreases in capital investment; (3) supply cuts against defendants' self-interest; (4) public statements encouraging supply cuts; (5) changed conduct between the start and end of the class period; (6) information exchanges between defendants regarding future supply and demand; (7) high market concentration; and (8) prior criminal convictions for price fixing. *Id.* at 47. The Ninth Circuit considered each of those factors to determine whether the plaintiffs' allegations stated a plausible Section 1 claim, ultimately concluding that they did not. *Id.* at 48-54. Here, though the Court previously held that similar factors were sufficient, ECF 541, the Ninth Circuit's *DRAM* decision supports dismissal of the Track 2 DAPs' claims based on alleged supply-reduction and Georgia Dock conspiracies. *See* ECF 280 at 29-40.

## II. The Track 2 DAPs Have Failed to Plausibly Allege the Causation Element of Their RICO and Fraud-Based State Law Claims

Two DAPs, Ahold Delhaize USA, Inc., and Aldi, Inc., assert federal RICO (Count 9, Compl. ¶¶ 1418-32) and Georgia RICO (Counts 7 and 8, *id.* ¶¶ 1384-1417) claims against Pilgrim's and the other so-called Georgia Dock Defendants, and Ahold Delhaize USA also brings claims for common law fraud (Count 19, *id.* ¶¶ 1496-1506), negligent misrepresentation (Count 21, *id.* ¶¶ 1512-18), breach of the implied covenant of good faith and fair dealing (Count 20, *id.* ¶¶ 1507-11), and unjust enrichment (Count 22, *id.* ¶¶ 1519-21). These claims are based on the same set of allegations concerning the Georgia Dock and how it was allegedly manipulated by Pilgrim's and other Defendants. The Complaint allegations fall short of what is required by Rule

11

12 because they only establish the Track 2 DAPs were injured by their own actions and misunderstanding of what the Georgia Dock represented—not the alleged fraudulent scheme.

All of the Track 2 DAPs' fraud-based claims require plausible allegations to establish proximate cause. *Holmes v. Sec. Inv. Protection Corp.*, 503 U.S. 258, 268 (1992) (federal RICO); *Turk v. Morris, Manning & Martin, LLP*, 2022 WL 1124974, at *21 (N.D. Ga. Mar. 24, 2022) (Georgia RICO); *Neal v. Cochran, Cherry, Givens & Smith, P.C.*, 2009 WL 10697510, at *8 (N.D. Ga. Feb. 9, 2009) (fraud); *Next Century Commc'ns Corp. v. Ellis*, 214 F. Supp. 2d 1366, 1372 (N.D. Ga. 2002) (negligent misrepresentation), *aff'd*, 318 F.3d 1023 (11th Cir. 2003); *Cavi v. Evolving Sys. NC, Inc.*, 2018 WL 2298353, at *6 (D. Del. May 21, 2018) ("resulting damage" is element of breach of implied covenant); *Pa. Emp., Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 485 (D. Del. 2010) (unjust enrichment).

The primary theory of proximate cause advanced in the Complaint is that "[b]uyers reasonably relied on the Georgia Dock benchmark price index because they believed it accurately reflected the market price for the chicken they bought," and they were injured because the Georgia Dock did not "reflect the market price of chicken." Compl. ¶ 626. In other words, these Track 2 DAPs claim they should have been paying prices based on the "market price" of chicken but they in fact paid a higher price. Importantly, they do not claim that they contracted to pay a price based on the Georgia Dock but were charged a price based on something else—they just now regret entering contracts based on the Georgia Dock in the first place.

There are no allegations in the Complaint, however, that plausibly support Track 2 DAPs' theory of injury and causation. Nothing suggests that actions by Pilgrim's caused any Track 2 DAP to believe the Georgia Dock represented "the market price of chicken" or that any Track 2 DAP could have reasonably believed the Georgia Dock represented a true "market price." In fact,

the Track 2 DAPs do not even explain what they mean by the "market price" of chicken. These deficiencies are fatal to Track 2 DAPs' theory of causation because their own allegations suggest their injuries were caused by their own subjective beliefs and voluntary decisions to rely on the Georgia Dock—not by actions taken by Pilgrim's. *See Green v. Aztar Corp.*, 2003 WL 22012205, at *3 (N.D. Ill. Aug. 22, 2003) (holding that voluntary actions by plaintiff can break the chain of RICO causation); *In re MasterCard Int'l Inc.*, 313 F.3d 257, 264 (5th Cir. 2002) (recognizing plaintiffs "cannot use RICO to avoid meeting obligations they voluntarily took on"); *Cadle Co. v. Flanagan*, 2005 WL 8167447, at *4 (D. Conn. Feb. 11, 2005) ("A plaintiff fails to establish a RICO injury where the injury flowed from the plaintiff's voluntary decisions.") (cleaned up).

According to the Track 2 DAPs, their understanding of what the Georgia Dock represented—which is the source of their putative injury—appears to have been based on a mistake or misunderstanding. They allege the Georgia Dock was "an industry-accepted benchmark" (Compl. ¶ 626), but that does not mean that it reflects "market prices" for any particular chicken product they purchased. Indeed, according to their own allegations, the Track 2 DAPs had reason to doubt whether there was a true "market price" for chicken and, even if such a price did exist, whether the Georgia Dock reflected a "market price." The Track 2 DAPs acknowledge they knew about other indices published by the USDA, Urner Barry, and EMI. *Id.* ¶¶ 299-304, 618-21. And they allege, notwithstanding the fact that "[t]he Georgia Dock, USDA Composite, and Urner Barry all measure the same (or very similar) size and grade of chicken" (*id.* ¶ 624), that the Georgia Dock was "higher than the comparable . . . Urner Barry price index" and "also higher than the USDA and EMI indices" (*id*. ¶ 629). Thus, according to their own allegations, the Track 2 DAPs had ample reason to question whether the Georgia Dock "reflected the actual market price of chicken." *Id*. ¶ 633. They nonetheless chose to purchase various chicken products based on prices tied to

the Georgia Dock—and not some other, lower-priced index—which means their putative injuries were not caused by any purported fraud by Pilgrim's or the alleged RICO scheme.[3]

While Plaintiffs allege, in passive voice, that they "were misinformed that the Georgia Dock benchmark was supposed to be based on the Georgia Dock Defendants' actual offering prices for the next week as reported to the GDA" (*id*. ¶ 634), and further allege that they "erroneously believed the Georgia Dock price to be a USDA price" (*id.* ¶ 633), they do not allege that Pilgrim's "misinformed" them. The sole allegation advanced by the Track 2 DAPs to suggest Pilgrim's told them the Georgia Dock reflected "actual market prices" is that Pilgrim's sales representative Tony Neal told Plaintiff Ahold Delhaize USA that the Georgia Dock was "fair." *Id.* ¶ 836. But a "fair price" is not an "actual market price," and neither Pilgrim's nor any other Defendant is alleged to have been involved in the USDA's decision to publish the Georgia Dock alongside the USDA composite (*id.* ¶ 633) or its reason for doing so.[4]

To conclude the Georgia Dock represented a "market price," the Track 2 DAPs appear to have come to their own conclusions, based on their subjective "beliefs." *See* Compl. ¶ 816 ("Plaintiffs knew only what all buyers of chicken knew and believed: that the Georgia Dock price

---

[3] The Track 2 DAPs' conclusory allegation that, "[i]n some instances, Defendants insisted upon using the Georgia Dock in their pricing with Plaintiffs and/or declined to use another form of pricing with Plaintiffs" (*id.* ¶ 626), does not salvage their fraud-based claims. They have failed to allege facts that plausibly suggest, for example, which Defendants supposedly "insisted" on the Georgia Dock or when they did so. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

[4] In addition to the Track 2 DAPs failure to plausibly allege proximate cause, their common law fraud claims should be dismissed because they have failed to allege reliance, which is an element of common law fraud claims that is not required for federal RICO claims. There are no allegations that any Pilgrim's employee ever represented to any Track 2 DAP that the Georgia Dock represented an "actual market price." *See Amerigas Propane, L.P. v. BP America, Inc.*, 691 F. Supp. 2d 844, 853 (N.D. Ill. 2010) (plaintiffs could not maintain fraud claim where defendant had not made any false statements to them and they had not relied on any specific false statements).

index represented . . . an actual market price for broilers based on verified, reliable, and objective information."); *id.* ¶ 626 ("Buyers . . . believed [the Georgia Dock] accurately reflected the market price for the chicken they bought . . . ."); ¶ 633 ("Chicken buyers whose transactions with Defendants were tied to the Georgia Dock whole-bird price, reasonably but mistakenly believed it reflected the actual market price of chicken."). And based on those "beliefs," they decided to rely on the Georgia Dock, even though they knew it reflected higher prices than other indices. *Id.* ¶¶ 686-89. The independent decisions made by the Track 2 DAPs to continue relying on the Georgia Dock, even after it "diverged" from the other indices, *id.* ¶¶ 686, 689, break the chain of causation required to support their fraud-based claims.

The Track 2 DAPs also contend that their injuries were caused by a failure by Pilgrim's and other Defendants to disclose how the Georgia Dock was calculated. *Id.* ¶ 691 ("[T]he Georgia Dock Defendants fraudulently failed to inform their counterparties—that is, those Plaintiffs to whom they sold poultry on pricing tied to the Georgia Dock—of the many serious flaws with the Dock, which accrued to their benefit and to the detriment of those counterparty Plaintiffs."); *id.* ¶ 815 ("[A]ll of the Georgia Dock Defendants . . . failed to disclose significant, non-public information to Plaintiffs about the Georgia Dock price index and the Poultry Market News."). This theory of causation fails. For a plaintiff to recover damages for an injury allegedly caused by a fraudulent omission, she must establish she entered a fiduciary or other special relationship with the defendant that gives rise to a duty to speak. *Rodriguez v. Ford Motor Co.*, 2022 WL 972306, at *5 (N.D. Ill. Mar. 31, 2022). The Track 2 DAPs have failed to plead such a relationship, which means any theory of injury in this case premised on purportedly fraudulent omissions cannot stand.

**CONCLUSION**

For the reasons stated herein, Pilgrim's respectfully asks the Court to dismiss Counts 1-9 and 19-22 asserted against Pilgrim's in the Track 2 DAPs' Second Amended Complaint.

Dated: May 6, 2022                             Respectfully submitted,

**QUINN EMANUEL URQUHART &
SULLIVAN LLP**

/s/ *Michael D. Bonanno*
Michael D. Bonanno
William A. Burck
Kathleen A. Lanigan
1300 I Street, N.W., Suite 900
Washington, DC 20005
Tel: (202) 538-8000
mikebonanno@quinnemanuel.com
williamburck@quinnemanuel.com
katlanigan@quinnemanuel.com

Debra D. Bernstein
1050 Crown Pointe Parkway, Suite 500
Atlanta, Georgia 30338
Tel: (404) 482-3502
debrabernstein@quinnemanuel.com

Michelle Schmit
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: (312) 705-7400
michelleschmit@quinnemanuel.com

**WEIL GOTSHAL & MANGES LLP**

Carrie C. Mahan
2001 M Street N.W., Suite 600
Washington, DC 20036
Tel: (202) 682-7000
carrie.mahan@weil.com

*Counsel for Defendant Pilgrim's Pride Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2022, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Michael D. Bonanno*
Michael D. Bonanno