UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | No. 16 C 8637 |
| | Judge Thomas M. Durkin |

MEMORANDUM OPINION AND ORDER

Purchasers of chicken meat (a product known as "Broilers") allege that Broiler producers conspired to raise prices in violation of the Sherman Act. At the outset of the case, the Court appointed interim class counsel for three classes of purchasers: (1) direct purchasers (the "Directs"); (2) commercial and institutional indirect purchasers (the "Indirects"); and (3) end-user consumers (the "End Users"; and all three classes together, the "Plaintiffs"). Each class has moved for certification pursuant to Federal Rule of Civil Procedure 23. Plaintiffs rely on expert opinions to support their motions, and Defendants have moved to exclude those experts pursuant to Federal Rule of Evidence 702 and *Daubert*. Defendants also produced an expert witness, but Plaintiffs have not moved to exclude his testimony. The Court held a two-day hearing on May 10-11, 2022, and heard testimony from the parties' experts. *See* R. 5624; R. 5625.[1] This opinion addresses all three classes' motions for

---

[1] The Directs' expert is Dr. Colin A. Carter. He has degrees from the University of California at Berkeley and is a Professor of Agricultural and Resource Economics at the University of California. The Indirects' expert is Dr. Russell W. Mangum III. He earned masters and doctoral degrees from the University of Southern California and is a Senior Vice President at Nathan Associates, Inc., an economic consulting firm. The End Users' expert is Dr. David L. Sunding. He has degrees from the University of California at Berkeley and is President of The Brattle Group. Defendants' expert

certification and Defendants' corresponding *Daubert* motions. For the following reasons, Defendants' *Daubert* motions are denied, and Plaintiffs' motions for class certification are granted.

## Analysis

The Court may certify a class of plaintiffs pursuant to Federal Rule of Civil Procedure 23(a) if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Additionally, Plaintiffs in this case seek certification under Rule 23(b)(3), which requires them to demonstrate that: (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Plaintiffs bear the burden of satisfying Rule 23, which is not "a mere pleading standard." *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013). To meet this burden, Plaintiffs must "satisfy through evidentiary proof" each of Rule 23's elements. *Id.* In

---

is Dr. John H. Johnson, IV. He has a Ph.D. in economics from the Massachusetts Institute of Technology and is CEO of Edgeworth Economics, LLC. The experts prepared the following reports: Carter's report, R. 3990-122; Carter's rebuttal report, R. 4505; Mangum's report, R. 3985-8; Mangum's rebuttal report, R. 4493-3; Sunding's report, R. 3971-4; Sunding's rebuttal report, R. 4487-3; Johnson's report, R. 4209-1, R. 4234-2, R. 4213-4; Johnson's rebuttal report R. 4275-9.

deciding a class certification motion, the Court must conduct a "rigorous analysis" before it can determine whether Plaintiffs have satisfied Rule 23's requirements. *Id.* This often means that a Court must resolve issues that also bear on the merits of the claim, but only if those issues "overlap" with class certification issues. *Id.* at 33-34. Despite the need for rigorous analysis, "the court should not turn the class certification proceedings into a dress rehearsal for a trial on the merits." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Instead, the Court need only consider the evidence submitted by the parties and determine whether Plaintiffs have proven each of Rule 23's elements by a preponderance of the evidence. *Id.*

The proposed class definitions are as follows. For the Directs:

> All persons who purchased raw Broilers [directly] from any of the Defendants or their respective subsidiaries or affiliates either fresh or frozen, in the form of: whole birds (with or without giblets), whole cut-up birds, or parts (boneless or bone in) derived from the front half of the whole bird, for use or delivery in the United States from December 1, 2008 until July 31, 2019.

R. 3990 at 26. For the Indirects:

> All entities that purchased Broilers indirectly from a Defendant or named co-conspirator in an Indirect Purchaser State[2] for their own use in commercial food preparation from January 1, 2009, until July 31, 2019.

---

[2] The "Indirect Purchaser States" are: Arizona, California, the District of Columbia, Florida, Hawaii, Iowa, Illinois, Kansas, Massachusetts, Maine, Michigan, Minnesota, Missouri, Mississippi, Montana, North Carolina, North Dakota, Nebraska, New Hampshire, New Mexico, Nevada, New York, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Wisconsin, or West Virginia. The Indirects seek damages for this class under the respective state laws. The Indirects also seek certification of a class for nationwide injunctive relief under federal law.

> Excluded from the [Indirect] class are: Natural persons who purchased Broilers for their personal use and not for commercial food preparation; purchases of Broilers directly from Defendants; purchases of Broilers for resale in unaltered form; purchases or Broilers from an intermediary who has further processed the Broiler; the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant; any federal, state governmental entities, any judicial officer presiding over this action and the members of her/her immediate family and judicial staff, any juror assigned to this action; and any co-conspirator identified in this action.

R. 3968 at 2-3. And for the End Users:

> All persons and entities who indirectly purchased the following types [of] raw chicken, whether fresh or frozen: whole birds (with or without giblets), whole cut-up birds purchased within a package, breast cuts or tenderloin cuts, but excluding chicken that is marketed as halal, kosher, free range, organic, diced, minced, ground, seasoned, flavored or breaded—from defendants or co-conspirators for personal consumption in the Repealer Jurisdictions[3] from January 1, 2012 to July 31, 2019.

R. 3971 at 6.[4]

---

[3] The "Repealer Jurisdictions" are: California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, and Wisconsin. The End Users seek damages for this class under the respective state laws.

[4] The Court notes that the End Users seek certification of a class that is narrower in scope, both substantively and temporally, than the classes sought by the Directs and Indirects, and narrower than the classes the Court has approved in settlements the End Users have reached with certain defendants. The Court ordered a brief explaining this change, which the End Users provided. *See* R. 5569. Bottom line, the End Users believe their proof more closely fits a narrower class. *See id.* at 1.

## I.    Numerosity, Adequacy, Commonality & Typicality

Other than arguments about certain class representatives and the application of state laws, Defendants generally do not challenge whether the Plaintiffs have met their burden to establish the four elements of Rule 23 subsection (a). That is likely because those elements are easily met in this case.

### A.    Numerosity

Defendants have produced electronic sales data identifying thousands of direct purchases of Broilers. *See* R. 3990-122 at 106 (¶ 173) (the Directs' expert used a data set containing 5,918 customers). The Indirects' class includes nearly every entity in the United States that serves chicken to individuals, whether for profit or otherwise, including restaurants, deli-counters, schools, hospitals, airlines, casinos, etc. *See* R. 3985-8 at 127-29 (¶¶ 230-32). The End User class includes nearly every individual consumer of chicken in the United States. *See* R. 3971 at 6. Joinder of this many plaintiffs would be impractical, and so the numerosity requirement is satisfied here for all three classes. *See Anderson v. Weinert Enterprises, Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) ("Our cases have recognized that a forty-member class is often regarded as sufficient to meet the numerosity requirement."). Defendants do not dispute this.

### B.    Adequacy

Adequacy is a two-part test: (i) the class representatives must not have claims in conflict with other class members, and (ii) the class representatives and proposed

---

Defendants do not argue that this narrowing undermines any of the motions for class certification, so the Court has not focused on its significance in addressing them.

class counsel must be able to litigate the case vigorously and competently on behalf of named and absent class members alike. *See Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 679 (7th Cir. 2009).

Defendants do not challenge the adequacy of class counsel. In approving several class settlements, the Court has already found that counsel for each class has more than adequately represented the class and will continue to do so moving forward. *See*, *e.g.*, R. 1414 at 2 (Directs); R. 5536 at 3 (Indirects); R. 5304 at 3 (End Users). Defendants do not argue otherwise.

Defendants also do not dispute that the class representatives for all three classes assert claims arising from Defendants' alleged conspiracy to raise prices. The class representatives for the Directs and Indirects have submitted declarations stating that they share with their respective classes a strong interest in establishing Defendants' liability and maximizing class-wide damages. *See* R. 3962-39 ¶¶ 3-5 (Directs); R. 3968-8, -9 (Indirects). It does not appear that similar declarations were submitted by the representatives for the End User class. But there is no evidence in the record indicating that the representatives' interests are not aligned with the class as a whole for purposes of this litigation. *See* R. 3971 at 22.

### 1.    **Indirects' Class Representatives**

Defendants argue that two representatives for the Indirects' class are inadequate for reasons specific to their circumstances. First, Defendants argue that Figaretti's Restaurant cannot represent the West Virginia class because it never purchased Broilers in West Virginia, and West Virginia's antitrust law, according to

Defendants, requires intrastate commerce. *See* R. 4234 at 57-58. In support of this argument, Defendants cite a single sentence from a 40-year-old federal district court case stating that "West Virginia's antitrust law is directed towards intrastate commerce." *See Anziulewicz v. Bluefield Cmty. Hosp., Inc.*, 531 F. Supp. 49, 53 (S.D.W. Va. 1981). But the court in *Anziulewicz* was not concerned with applying the elements of the West Virginia statute to the merits of a claim. Its statement was made in the context of distinguishing West Virginia law from federal antitrust law in order to decide whether a claim under the West Virginia statute arose under federal law for purposes of removal from state court. That court's statement in dicta is of little relevance here.

Furthermore, this Court's examination of the West Virginia statute finds no requirement of "intrastate" commerce, or that the conduct alleged occur entirely within West Virginia. The statute prohibits "restraint of trade or commerce in this State," and "a monopoly of trade or commerce, any part of which is within this State." W. Va. Code Ann. §§ 47-18-3, -4. Absent more definitive authority from a higher court, this Court finds the West Virginia statute does not apply solely to conduct taking place entirely within West Virginia, but also applies to interstate commerce affecting West Virginia. Defendants do not dispute that Figaretti's was located in West Virginia when it purchased Broilers from sellers outside West Virginia and then had them delivered in West Virginia. Thus, "part" of the commerce was in West Virginia.

Defendants also argue that Sargent's is an inadequate class representative because one of Sargent's owners testified that Sargent's was represented not only by

class counsel, but also by separate individual counsel, who happened to be her son. Sargent's owner's son is not class counsel in this case. There is no evidence before the Court, including Sargent's owner's deposition testimony cited by Defendants, that her son will share in any recovery in this case. The case law Defendants cite concerns much more formal agreements between class representatives and related counsel sharing in the class recovery. The Court finds that Sargent's owner's son providing advice to his parents regarding their business does not raise an analogous appearance of impropriety necessary to find Sargent's inadequate as a class representative.

### 2. End Users' Class Representatives

Defendants raise several issues with respect to the adequacy of the End Users' class representatives. First, Defendants argue that Kansas representatives, Leslie and David Weidner, are inadequate because they are close friends with attorney Emily Levens, a partner at Cohen Milstein, co-counsel for the End Users. Levens, however, has not entered an appearance in this case, and the End Users represent that she has only worked on the case for one week and does not participate in settlement negotiations. Considering Levens's limited participation in this case, and the fact that the Weidners are two of more than 24 End Users class representatives, the Court finds that this friendship is not sufficient to raise suspicion that the Weidners will favor Cohen Milstein's compensation over the class's recovery. *See Susman v. Lincoln Am. Corp.,* 561 F.2d 86, 93-95 (7th Cir. 1977) (it is within the district court's discretion to find a class representative inadequate where there is a "possibility that one so situated will become more interested in maximizing the

8

'return' to his counsel than in aggressively presenting the proposed class action"); *see also Armes v. Shanta Enter., Inc.*, 2009 WL 2020781, at *3 (N.D. Ill. July 8, 2009).

Defendants also contend that some of the End Users' class representatives are inadequate because their purchasing habits were atypical. *See* R. 4213 at 57-59. But while these individuals may have sometimes made purchases of chicken products outside the class definition, the End Users have presented evidence that they all also made purchases that are within the class definition. *See* R. 4487 at 5-7. Thus, the Court finds them to be adequate class representatives.[5]

### C. Commonality

Commonality requires plaintiffs to show that resolution of an issue of fact or law "is central to the validity of each" class member's claim; "[e]ven a single [common] question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Here, the question of whether Defendants illegally conspired to restrict supply and increase the price of Broilers is common to each class, as are questions about the nature of the conspiracy, whether the conspiracy caused the price increase, and what is the appropriate measure of damages. *See*, *e.g.*, *In re Steel Antitrust Litig.*, 2015 WL 5304629, at *3 (N.D. Ill. Sept. 9, 2015); *In re Ready-Mixed Concrete Antitrust Litig.*,

---

[5] Defendants also argue that their expert has shown that Publix grocery did not suffer overcharges, and so any consumer who made purchases at Publix cannot be an adequate class representative. *See* R. 4213 at 57. Defendants similarly argue that the Indirects' class definition is overbroad because it "sweeps" in indirect purchasers who were not overcharged according to their expert's statistical analysis. The Court rejects these arguments for reasons discussed below regarding Defendants' arguments that Plaintiffs' experts improperly "pool" transaction data.

261 F.R.D. 154, 168 (S.D. Ind. 2009). Thus, the element of commonality is present in this case.

### D.    Typicality

Finally, the element of typicality is satisfied because Plaintiffs allege that Defendants engaged in a common scheme relative to all members of the class to restrict the supply of Broilers. *See In re Steel*, 2015 WL 5304629, at *4 ("[T]he claims of each named representative and class members are based on the same legal theory and arise from the same course of conduct (i.e. conspiring to restrict steel supply); therefore, typicality is satisfied[.]"); *In re Ready-Mixed*, 261 F.R.D. at 168 ("Typicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violation by the defendants.").

Defendants argue that the Indirects fail to demonstrate typicality because the class representatives have small market shares relative to "the massive chains and resorts included in the Proposed Class." R. 4234 at 56. Defendants contend that the differences in market share create "bargaining power and purchase volume disparities" such that the class representative's claims are not typical of the class.

But Plaintiffs in this case do not allege that Defendants agreed to set a floor for prices in bargained negotiations. Rather, Plaintiffs allege that Defendants restricted supply across the market in order to boost prices of a commodity. Bargaining power is not directly relevant to the claims.

The cases Defendants cite reveal the faults in their argument concerning bargaining power. *See In re Graphics Processing Units*, 253 F.R.D. 478, 489 (N.D. Cal.

2008); *In re Optical Disk Drive*, 303 F.R.D. 311, 317 (N.D. Cal. 2014). Both *Graphics Processing* and *Optical Disk* involve allegations that technology manufacturers agreed to fix prices of both wholesale and direct internet retail sales. The courts in those cases limited certification to classes of retail customers because those prices were set unilaterally by the manufacturers on a take-it-or-leave-it basis. By contrast, the wholesale buyers in those cases negotiated their prices, with the prices ultimately being a product of the buyers' purchasing power.

Certainly, the Broiler market is also made up of buyers with varying degrees of bargaining power. But unlike the markets for the technology products at issue in *Graphics Processing* and *Optical Disk*, the Broiler market is heavily influenced by market price indices. Bargaining power may affect the prices ultimately paid by a particular plaintiff. But all participants in a commodity market exercise their bargaining power—regardless of strength—in the context of the market price, which is viewed by the industry as an objective reflection of value. No such market prices exist for the technologies at issues in *Graphics Processing* and *Optical Disk*. In those cases and markets, after costs of production, the parties' negotiations were entirely determinative of the ultimate price, and the strength of bargaining power was a significant factor in negotiations. That is why the courts in those cases carved out classes of retail customers. They, unlike the wholesale buyers, had no opportunity to negotiate, making the price fixing agreement among the manufacturers the primary factor setting the price. By contrast, the allegation here is that Defendants fixed a market price that was the starting point for negotiations across the market,

11

regardless of a purchaser's bargaining power. Thus, differences in bargaining power do not undermine typicality in this case.

## II. Predominance

Having found that all three classes satisfy the elements of subsection (a) of Rule 23, the Court proceeds to address subsection (b). Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." "Predominance is satisfied when common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication." *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016).

In this case, the two primary common questions are: (1) whether Defendants engaged in a conspiracy to reduce supply to increase price; and (2) whether this conspiracy caused Plaintiffs to suffer injury. *See Kleen*, 831 F.3d at 925 ("[T]he court evaluated the two central elements of the Purchasers' case: the alleged violation of the antitrust laws, and the causal link between that violation and their alleged injury."); *Messner*, 669 F.3d at 815 ("[P]laintiffs [must] prove: (1) that [the defendant] violated federal antitrust law; and (2) that the antitrust violation caused them some injury."). These questions certainly represent "a significant aspect of the case," and as discussed, Defendants do not dispute that they are common to the class.

Further, with respect to the first question regarding liability, Defendants do not challenge Plaintiffs' contention that it can be "resolved for all members of [the] class in a single adjudication," and that this question predominates over any

individual issues. Nevertheless, in the interest of completing a "rigorous analysis," *see Santiago v. City of Chicago*, 19 F.4th 1010, 1020 (7th Cir. 2021), the Court reviews the evidence of liability for a conspiracy.

### A.    Evidence of Conspiracy

As can be seen in the chart below (taken from the Directs' expert's rebuttal



report, R. 4505 at 74 (Figure 12)), prior to 2008, Broiler production had increased at a relatively consistent rate for many years.[6] Then, as the two charts on the next page show in greater detail, production decreased in 2009 and 2012, and between 2008 and 2019, the rate of production increase decreased significantly, before returning to the rate that had prevailed prior to 2008. *See id.* at 74 (Figure 12), 84 (Figure 14). This unusual decrease in production indicates the presence of a conspiracy among producers for several reasons. Broilers are all generally of the same quality. This commodity-like nature, combined with consistent demand, make it difficult for an

---

[6] The vertical axis refers to "RTC Broilers," which means "ready to cook," which simply means the chicken has been slaughtered and prepared for sale as food.

individual producer to reduce supply unilaterally. *See* R. 3990-12 at 30 (¶¶ 40-41),



33-34 n.35 (¶ 49) (Directs' expert report). Furthermore, the defendant companies own

and operate virtually all of the components of production, including: the breeder



(laying) flocks; hatcheries; feed mills; live broiler inventory; live transportation;

slaughter and other processing plants; and marketing, sales and distribution

activities. This vertical integration makes collusive supply reduction easy to

effectuate. *See id.* at 75-77 (¶¶ 117-19); *Kleen*, 831 F.3d at 927. Plaintiffs have also

presented evidence of collusion in the form of the following: communication among

Defendants about production plans, both public and private, *see* R. 3990-12 at 52 nn. 98-100 (¶ 80) (citing evidence); sharing of confidential production information through industry reporter and defendant, Agri Stats, *see id.* at 53-54 (¶¶ 81-84) (citing evidence);[7] Defendants' unusual decisions to destroy breeder hens, *see id.* at 45-47 (¶¶ 69-72); and evidence that the Georgia Dock Price Index was manipulated, *see id.* at 55-58 (¶¶ 87-91).

Defendants do not address this evidence in their briefs opposing any of the three class motions. This is likely because this "type of alleged conspiracy is the prototypical example of an issue where common questions predominate, because it is much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence." *Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585, 594 (N.D. Ill. 2015) (citing 7AA Wright & Miller, Federal Practice & Procedure § 1781 (3d Ed. 2014) ("[W]hether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the prerequisite in Rule 23(b)(3).")); *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)

---

[7] Agri Stats reported production information for Broiler producers who subscribed to the service. This information was published with producer names redacted. But Plaintiffs allege that Agri Stats intended for the information to be easily identified. Notably, Plaintiffs have discovered a copy of an Agri Stats report from Pilgrim's for which the numerical identifiers for each producer were over-written by hand with the producers' actual names. *See* R. 3971-3 at 27 (Figure 2). This evidence indicates Pilgrim's was able to de-anonymize the otherwise proprietary and confidential information of its competitors. Moreover, it is alleged that other supposedly anonymous data was easily understood by experienced industry players as belonging to particular producers because of the nature of the data itself.

("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."). Whether this evidence is sufficient to survive summary judgment or to demonstrate liability at trial is not at issue in this motion. But the evidence is sufficient to establish the first element of predominance, because the issue of liability "can be resolved for all members of a class in a single adjudication." *Kleen*, 831 F.3d at 925.

### B. Evidence of Causation

Defendants primarily focus their opposition to class certification on the question of whether causation and injury can be demonstrated in a common fashion. *See Comcast*, 569 U.S. at 30 ("[Plaintiffs must] show (1) that the existence of individual injury resulting from the alleged antitrust violation (referred to as antitrust impact) was capable of proof at trial through evidence that [was] common to the class rather than individual to its members; and (2) that the damages resulting from that injury were measurable on a class-wide basis through use of a common methodology."). Plaintiffs rely on expert opinion evidence to satisfy their burden on this issue.

For expert opinion to be admissible and sufficient to establish elements of class certification: (1) the expert must be qualified; (2) the expert must apply a scientifically reliable methodology; and (3) the proffered testimony must "assist the trier of fact with a fact at issue." *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). Defendants do not challenge any experts' qualifications, and the helpfulness of the opinions will be

16

apparent from the following discussion. Defendants' arguments focus entirely on whether the opinions are reliable.

Each class has offered at least one expert report. The reports and the opinions they contain are of course not identical, but they employ largely similar methodology and reach many of the same conclusions. Accordingly, because the opinions are overlapping, and Defendants' criticisms of each is similar, some of the Court's analysis of one expert's opinions and Defendants' objections will suffice to address certain aspects of the other experts' opinions and how Defendants' objections apply to all three.

The theory of injury in this case for all three classes flows from the initial sales made by Defendants to the Directs, who then make sales to Indirects and/or End Users, or other entities that eventually sell to Indirects and/or End Users. In other words, the nature of the distribution chain in the Broiler market (or any market for that matter) is such that for the Indirects and End Users to have suffered injury, the Directs must have been injured first. All three classes offer expert opinion evidence in an effort to establish this primary injury.

All three experts' opinions include two primary steps: first, a method to identify the period when a conspiracy might have been in effect by identifying significant decreases in Broiler production; and second, regression analysis to determine whether factors other than a conspiracy could have caused the supply decrease by analyzing what Broiler prices would have been "but for" the conspiracy. While they take somewhat different approaches to both questions, all three experts conclude that

a conspiracy to restrict Broiler supply caused Broiler prices to increase and that this can be shown by evidence common to the class. The Court will evaluate all three experts' opinions to determine the reliability of their methods under Rule 702 and their sufficiency as evidence of causation and damages for purposes of class certification. In the end, the Court finds that the testimony of each expert is reliable, and each independently provides sufficient evidence to show that evidence of causation and injury is common to their respective classes.

### 1. Identifying the Class Period

### a. Structural Break Test – Carter

The Directs' expert, Dr. Colin A. Carter, used a "structural break test" to identify the class period.[8] According to Carter, the structural break methodology "is widely accepted in the academic literature and class certification litigation." R. 4505 at 50-51 (¶¶ 94-96). He explains that a "structural break analysis is an econometrics methodology used to simultaneously determine whether and when there exists an unusual break in a long-term statistical relationship." R. 4505 at 50 (¶ 95). Here, Carter applied this analysis to identify significant changes in Broiler supply over time. *Id.*; *see also* R. 3990-12 at 106-07 ("The structural break analysis simultaneously answers two questions: (i) was there a change in the pattern or

---

[8] Defendants do not challenge Carter's, or any of Plaintiffs' experts', credentials or qualifications.

growth in [supply] over the period of analysis, and (ii) if so, when was the most likely date on which this change occurred.").

Carter's analysis confirms what is readily apparent from the data (pictured in charts and discussed above on pages 13-14)—after steady increases since at least 1960, Broiler supply decreased in 2008 and 2012, and the rate of supply increase decreased between 2008 and 2019 relative to the historical trend from 2000 to 2020. This data is the foundation of Plaintiffs' claims, and the Court focused on this apparently anomalous occurrence in denying Defendants' motions to dismiss and finding that Plaintiffs had plausibly alleged Defendants violated the Sherman Act. *See* R. 541 at 30-33 (*In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 793-95 (N.D. Ill. 2017)). From the Court's perspective—which has not changed upon reviewing the briefing on these motions and hearing the testimony—this case is about determining whether collusive conduct by Defendants caused this historic decrease in Broiler production.

Defendants do not genuinely dispute the fact that the rate of Broiler production decreased significantly between 2008 and 2019, relative to historical trends. They also do not dispute that structural break analysis is a widely used and reliable methodology.

To be sure, Defendants assert that Carter's structural break analysis is "fundamentally unreliable." R. 4209 at 27. But they do not actually attack his method. Instead, their arguments boil down to the contention that an analysis of the total supply of Broilers in the market over time is irrelevant to the claims in this case. This

19

contention also infects Defendants' later criticism of Carter's and the other experts' regression analyses of market price during the class period, and it is one the Court rejects.

Defendants' expert, Dr. John H. Johnson, criticizes Carter's structural break test for analyzing the supply of Broilers in the market as a whole without regard to whether the overall market production statistics are reflected in production by each individual defendant. Johnson's analysis shows that not all defendants cut supply to the same extent or even at all. *See* R. 4209-1 at 4 (Exhibit 1). In his opinion, to the extent there were "structural breaks" in any individual defendant's production, they do not match the breaks identified by Carter. *See id.* at 86-88 (¶¶ 128-29) (Exhibit 16). As Defendants put it, "some Defendants cut, some grew, and some stayed the same." R. 4209 at 29.

But as the Court explained in denying the motion to dismiss, evidence that Defendants did not identically manage their Broiler production during the class period does not eliminate the plausibility of the claim that they colluded to decrease supply. *See* R. 541 at 26-28 (*In re Broiler Chicken*, 290 F. Supp. 3d at 791-92). True, it can reasonably be argued that this is evidence that at least some defendants were not part of the conspiracy, or even that there was no conspiracy at all. But that is an argument for summary judgment or trial. Such evidence does not conclusively show a lack of a conspiracy to decrease supply and increase the market price such that Carter's opinion should be rejected or class certification denied. Using overall market trends as opposed to isolated defendant conduct is a reasonable approach because

fundamental economic theory says that market supply directly affects the market price. Whether all Defendants' actions were precisely in lock step does not change the fact that supply decreased in historically unusual fashion from 2008 to 2019. Carter demonstrates that this decrease in supply is statistically significant. The fact the Johnson may be able to demonstrate that certain defendants had greater or lesser responsibility for the market movement does not change the fact that there is evidence that market supply decreased as Plaintiffs allege and Carter confirms. And thus, it is not a reason to reject Carter's opinion or deny class certification.

Defendants also argue that Carter's analysis is too "simple" and improperly "imagin[es] that the supply 'trend' from 2000 to 2008 would continue indefinitely . . . without an ounce of reality." R. 4209 at 27. But the fact that the "structural breaks" in Broiler supply are readily apparent, or "simple" as Defendants put it, does not cause the Court to question Carter's method. Quite the contrary, the Court would be more inclined to reject Carter's analysis if it showed that the decrease in supply between 2008 and 2019 was statistically *insignificant*. The "reality" is that when the period of production rate decrease ended in 2019, Broiler production returned to the rate that had prevailed prior to 2008. The fact that Carter's structural break test confirms the simple reality that is apparent to the naked eye is a reason to find his analysis credible and persuasive, not to reject it.

Further, the Court cannot take seriously Defendants' argument that the decrease in supply is "imagined" or contrary to "reality," because Defendants go to great lengths to identify a cause for that very decrease in supply that does not legally

implicate them. Defendants argue that the decrease in supply is a product of natural economic factors—what Johnson dubs the "perfect poultry storm." *See* R. 4209-1 at 33. Johnson believes that legislation causing an increase in feed prices, the impact of the Great Recession, and the bankruptcy of defendant Pilgrim's Pride—at the time, the industry's largest producer—are the real causes for the decrease in supply. *Id.* Citing Johnson's report, Defendants criticize Carter's structural break analysis of the class period arguing that he fails to consider these non-collusive potential causes. *See*, *e.g.*, R. 4209 at 28 ("Dr. Carter ignores factors like corn prices and the Great Recession because they would bust his model—and force him to consider, and factor out, entirely lawful reasons for supply reductions that occurred."); *id.* at 78 ("Pilgrim's bankruptcy and restructuring [was] the driver of the supposed 'structural break' in industry-wide production.").

But nowhere does Carter state that his structural break test is intended to identify a *cause* of the decrease in the rate of production. It is simply intended to confirm whether the readily apparent decrease is truly statistically significant, such that it makes sense to investigate its cause in the first place. Carter thoroughly considers alternative causes in the regression analysis that makes up the second part of his analysis. But the structural break test is not intended to identify causes, collusive or otherwise. So, the fact that Carter did not consider non-collusive causes at that point in his analysis is not a reason to find his method unreliable.

There is some visceral appeal to Defendants' contention that the Pilgrim's bankruptcy is the true cause of the significant decrease in production in 2009. The

argument implies that Pilgrim's production cuts were required by the bankruptcy and were out of its control. But according to Carter, Pilgrim's sought court permission to close certain production facilities. *See* R. 5624 at 101:3-10. And Defendants have presented no evidence that this was Pilgrim's only option to resolve its bankruptcy. Furthermore, as Carter testified, Pilgrim's announced plans to cut production before it declared bankruptcy, and then closed production facilities after its bankruptcy was largely resolved. *See* R. 5624 at 100:20-25.

Pilgrim's decision to include production cuts as part of its reorganization is not inconsistent with Plaintiffs' allegations of collusion among Defendants. Indeed, the history and structure of the Broiler production market shows that when a producer encounters economic distress, other producers are always ready to jump in and fill the production void. *See* R. 5624 at 160:12-13, 24 (Mangum, the Indirects' expert, testified that in a competitive marketplace "other competitors [should be] watching to see if [a competitor] stumbles," and be ready to "step up"). Contemporaneous statements from market analysts show that the market assumed Pilgrim's bankruptcy would not affect its production numbers. *See* R. 5635-1 at 10-11 (Mangum testimony). And Pilgrim's CEO stated that its decision to cut production was not a product of its bankruptcy but was an effort to manage supply in the market as a whole. *See id.* Even if Defendants could conclusively demonstrate that Pilgrim's bankruptcy required it to cut production (which they have not shown), Defendants' argument misses the point that other producers did not take advantage of Pilgrim's distress, as historic production statistics and consistent demand for Broilers indicate

they should have. At bottom, the question of the bankruptcy's role in Pilgrim's production decisions is really a question of intent, which is a factual dispute that is insufficient to undermine the rest of the evidence supporting certification. Whether those decisions were, at least in part, because of collusion or were a necessary by-product of the bankruptcy need not be resolved at this stage of the proceedings.

Again, Defendants' argument might have more merit if Broiler production had ever decreased during past periods of high corn prices, economic recession, or producer bankruptcy. But as is shown by the chart the Court cited on page 13 above, Broiler production has been a on steady march upward, since at least 1960, in the face of wildly fluctuating corn prices and periodic downturns in the national economy. The chart doesn't account for producer bankruptcies in particular, but it is safe to assume Pilgrim's isn't the first producer to encounter economic distress. According to Plaintiffs' experts, this ever-increasing Broiler production is a function of its commodity nature and steadily increasing nationwide demand. Even when one producer struggles with economic conditions, other producers have historically been able to jump in and satisfy any potential lag in production. Perhaps Defendants are correct that 2008 was a "perfect storm," different from previous highs in corn prices and recessions. But by labeling the conditions of the class period a "perfect storm," Defendants are implicitly conceding that it was a "structural break." Something happened starting in 2008 that caused a historic decline in the production of Broilers. Carter's analysis simply confirms that it makes sense to investigate that cause.

As an aside, Defendants insist that Carter's analysis "violates *Comcast*." In *Comcast*, 569 U.S. 27, the plaintiffs originally alleged four theories of antitrust impact, and the plaintiffs' expert analyzed the impact of all four of those theories of harm together in concluding that there was evidence of common impact.. The district court, however, rejected three of the theories.[9] For that reason, the Supreme Court held that the expert's opinion, which was based on the combination of all four theories, no longer "fit" the case and could not support class certification. *See id.* at 37 ("This methodology might have been sound, and might have produced commonality of damages, if all four of those alleged distortions remained in the case.").

Defendants argue that *Comcast* means that "an expert model must isolate the injury resulting from the alleged wrong—and disaggregate it from other factors, including lawful conduct." R. 4209 at 33-34 (quoting *Comcast*, 569 U.S. at 35 ("[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory[.]")). They then conclude that Carter's analysis "violates" *Comcast* because it—in Defendants' view—fails to account for corn

---

[9] *See Behrend v. Comcast Corp.*, 655 F.3d 182, 216–17 (3d Cir. 2011) (Jordan, J. concurring) ("[The expert's] benchmark counties fail in that regard because he formulated his model at a time when Plaintiffs had four separate theories of antitrust impact, and so he did not select his benchmark counties to isolate the impact of reduced overbuilding. He chose them, as one would expect, to reflect the impact of other conditions in addition to reduced overbuilding. Consequently . . . once the District Court rejected Plaintiffs' other theories of antitrust impact—leaving only the reduced-overbuilding theory—[the expert's] model no longer fits Plaintiffs' sole theory of antitrust impact and, instead, produces damages calculations that are not the certain result of the wrong.").

prices and the Great Recession, among other factors. But Comcast does not impose a requirement to "disaggregate lawful and unlawful conduct." Rather, it requires an expert's theory of harm to match the plaintiff's. And even if *Comcast* imposed the requirement Defendants describe, Carter's analysis does not violate it. Carter does account for market factors like corn prices and the recession, he just does so in his regression analysis of price. Carter's method identifies a significant decrease in supply and, as will be discussed below, a corresponding price increase which he demonstrates cannot be explained by market factors, like corn prices and the Great Recession. Unsurprisingly, this analysis neatly fits the Plaintiffs' claims and theory of harm. There is no *Comcast* problem here.

### b.    Regression Analysis – Mangum

Instead of Carter's structural break test, the Indirects' expert, Dr. Russell W. Mangum, used a regression analysis to identify the class period. Regression analysis is a statistical method by which data is organized as dependent and independent variables—e.g., price changes over time—and is boiled down to a straight line such that predictions can be made about scenarios outside the data—e.g., what prices will be in the future. *See ATA Airlines, Inc. v. Fed. Exp. Corp.*, 665 F.3d 882, 890 (7th Cir. 2011) ("[A] linear regression is an equation for the straight line that provides the best fit for the data being analyzed."); *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013) ("Regression analysis permits the comparison between an outcome (called the dependent variable) and one or more factors (called independent variables) that may be related to that outcome."). Regression analysis is a widely

accepted method, often used as evidence in litigation, and is commonly used in price-fixing cases. *See* Federal Judicial Center, *Reference Manual on Scientific Evidence*, at 305 (3d ed. 2011) ("[I]n an antitrust cartel damages case, the plaintiff's expert might utilize multiple regression to evaluate the extent to which the price of a product increased during the period in which the cartel was effective, after accounting for costs and other variables unrelated to the cartel."). Courts generally reject the argument that regression analysis is "unreliable" or "unscientific." *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 399 (5th ed. 2020) ("If an expert witness uses regression analysis in estimating antitrust damages, one can hardly claim that the methodology is unreliable and therefore the expert's testimony should not be excluded on *Daubert* grounds."). Indeed, even challenges to an expert's choice of variables "is normally a question that goes to the probative weight of the analysis rather than to its admissibility." *Manpower*, 732 F.3d at 808 (citing *Bazemore v. Friday,* 478 U.S. 385, 400 (1986) (reversing lower court's exclusion of regression analysis based on its view that the analysis did not include proper selection of variables)).

Mangum uses the following independent variables in his regression analysis: (1) the cost of dressed meat; (2) real disposable personal income; and (3) a variable to account for seasonal changes in production. *See* R. 3985-8 at 76-77 (¶¶ 148-49). His analysis showed that "the model explains 84 percent of the variation in [Broiler] production by the variables included in the model." *Id.* at 77 (¶ 148). From this he concluded that Broiler "production levels in these time periods were lower as a result

of the alleged conspiracy than they would have been in the absence of the alleged conspiracy." *Id.* at 78 (¶ 149). Specifically, he found that production levels were 4.8 percent lower in the period January 2009 through November 2011, and 7.4 lower in the period December 2011 through July 2019. *Id.*

Defendants make much of the fact that Mangum's result for real disposable personal income was "statistically insignificant." R. 5624 at 58:1-5 (Defendants' opening statement); R. 5625 at 544:25–545:1 (Defendants' closing argument); R. 4234-1 at 67 (¶ 108); R. 4268 at 7. Defendants imply this means that Mangum concluded that personal income, and hence demand, had no effect on the supply of Broilers. *See* R. 5625 at 545:1 ("He breaks the law of supply and demand."). But that is not what that number means. Of course, personal income affected the supply of Broilers. At least, Mangum assumes that it did by including it as a variable in his regression analysis. The statistical "insignificance" is only with respect to the decrease on Broiler production. In other words, Mangum's analysis shows that any change in personal income during the class period was a relatively insignificant cause of the production decrease. Other factors, i.e., production costs, seasonality, and as Mangum concludes, the alleged conspiracy, had greater significance. And in his reply report, Mangum explains that the statistical significance of income is likely masked by the "correlation between real [disposable personal income] and the time-trend variable." R. 4493-3 at 39 (¶ 58). In other words, both income and seasonality account for demand, and having two demand variables can distort their relative significance.

28

This might be relevant to the evidentiary weight of Mangum's testimony, but it is not a reason to question the reliability of his method.

### c.      Additional Evidence – Sunding

Instead of an econometric analysis like Carter's structural break test or Mangum's regression analysis, the End Users' expert, Dr. David L. Sunding, identified the class period by evaluating quantitative evidence relevant to Broiler supply. He notes that the two largest Broiler producers, Pilgrim's and Tyson, made significant production cuts starting in 2009. *See* R. 3971-4 at 48-50 (¶¶ 91-92). He also notes that Pilgrim's and Tyson slaughtered their breeder hens earlier than usual, making it more difficult to ramp up production after it had been cut. *See id.* at 50-53 (¶¶ 93-95). These production cuts resulted in a jump in profits for the industry. *See id.* at 53-57 (¶¶ 96-101); *id.* at 54 (Figure 12). Lastly, he notes that the egg industry, which is subject to many of the same market factors as Broilers, did not experience the same dramatic production decrease in the 2008-09 period as Broilers. Moreover, when the egg industry experienced a shock due to avian flu in 2015, it revived much more quickly than the Broiler industry did after 2009. *See id.* at 57-61 (¶¶ 102-08). According to Sunding, this "is a striking contrast from the ten years that it took for breeder flocks in the chicken industry to return to 2008 levels." *Id.* at 61 (¶ 108).

*      *      *      *

Carter, Mangum, and Sunding each take different approaches to identifying and analyzing the significance of the production decrease that occurred beginning in 2009. Carter and Mangum perform econometric analyses, while Sunding does not.

Mangum and Sunding conclude that the evidence demonstrates that the production decreases were the result of a conspiracy among Defendants, whereas Carter's method addresses potential causes in a later step, to be discussed below. In any event, all three expert opinions are sufficient evidence that Broiler production decreased to an extent contrary to market indicators. And that evidence is common to each class.

### 2. Price Increase

Having established that Broiler production decreased to an extent contrary to market indicators, Plaintiffs' experts next investigate the affect this decrease in supply had on price and whether there is evidence that a conspiracy among Defendants caused prices to increase. All three experts employ pooled regression analyses, meaning they analyze prices across: (i) many defendants and buyers, (ii) various Broiler products, and (iii) years of the class period. Courts have held that a pooled regression analysis can be an appropriate tool to demonstrate "class-wide impact even when the market involves diversity in products, marketing, and prices." *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 678 (9th Cir. 2022) (citing *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014)).

### a. Pooled Regression Analysis – "But For" Price

All three Plaintiffs' experts conducted regression analyses of Broiler price and relevant market factors, including: (1) costs (feed, transportation); (2) the prices of beef and/or pork, to account for relative demand; and (4) the U.S. unemployment rate and/or real disposable personal income, also to account for demand. *See* R. 3990-122

at 110-12 (¶ 183) (Carter); R 3985-8 at 116 (¶¶ 209-10) (Mangum); R. 3971-4 at 98-100 (¶¶ 206-10) (Sunding). These analyses involved developing an equation describing the relationship between price and the market factors during the benchmark period of 2000-08. *See* R. 3990-122 at 101 ("The damages model compares prices for meat derived from broilers during the alleged Class Period relative to a benchmark period (i.e., the time period before the collusive conduct was fully operational).") (Carter); R. 3985-8 at 112 (¶ 198) (Mangum); R. 3971-4 at 91-92 (¶ 193) (Sunding). This equation also includes a "dummy" variable to account for collusive conduct during the class period. *See* R. 3990-122 at 110 (¶ 181); R. 3985-8 at 138 (¶ 251); R. 3971-4 at 91-92 (¶ 193). Plugging in known prices and market factor data from the class period and running the regression equation to solve for the dummy variable allows the experts to calculate the portion of price not accounted for by the market factors. In the experts' opinions, the evidence suggests that this portion of the price is due to collusion among Defendants.

All three experts conducted their analyses with respect to the price of whole Broilers. In addition, Mangum analyzed the prices of Broiler breasts and wings, and Sunding analyzed wings. All three experts believe that the price of whole Broilers is most representative of the market because all Broiler products originate from a whole Broiler. All of their calculations, whether for whole birds, breasts, or wings, are focused on the market price and so calculate damages for the market as a whole. *See* R. 4505 at 10 (Carter) ("my model is measuring the relationship between the 'market-wide' equilibrium price of broilers and 'market-wide' supply and demand factors"); R.

4493-3 at 44 (¶ 67) (Mangum) ("[I]t is appropriate to evaluate production at the industry level rather than at the individual Defendant level. . . . In the case of a commodity product such as broiler chicken where there is very little or no product differentiation across producers, the price that a producer can charge will depend on the total demand for and supply of broilers in the market."); R. 4487-3 at 12 (¶ 24) (Sunding) ("I use my whole bird overcharge of 13% as the best measure of the market wide elevation to prices."). The experts calculated the following overcharges during the class period:

| Period | Carter Whole Birds | Mangum Whole Birds | Mangum Breasts | Mangum Wings | Sunding Whole Birds | Sunding Breasts |
|---|---|---|---|---|---|---|
| Dec. 2008 – Oct. 2011 (Carter) Jan 2009 – Nov. 2011 (Mangum) | 11.8% | 5.5% | 4.1% | 16.1% | n/a | n/a |
| Nov. 2011 – July 2019 (Carter) Dec. 2011 – July 2019 (Mangum) Jan. 2012 – July 2019 (Sunding) | 22.3% | 10.6% | 17.1% | 32.6% | 13.5% | 17.0% |

R. 5636-6 at 19 (End Users closing argument slides).

### b. Common Impact

The experts also show that this impact on the market price likely affected all direct purchasers of Broilers, each taking a different approach. Using the results of his regression analysis, Carter calculated what the market price of whole Broilers should have been "but for" the alleged conspiracy. He then compared this price to each of the 3,222,732 Broiler transactions during the class period Carter included in his model. *See* R. 3990-12 at 14 (¶ 17). He found that "93.4% of customers [had at least one transaction for which they] paid an actual price exceeding the but-for

predicted price." R. 3990-122 at 115. And this 93.4% of customers accounted for 99.95% of total purchases during the class period. *Id.*

In addition to examining the but-for price for specific transactions, Carter used the benchmark period data to predict what the market price should have been during the class period. He compared actual prices from the class period to the calculated but-for market price and found that 97.1% of customers paid an actual price that exceeded the but-for price at least once. From these results, Carter concludes that "all named Direct Purchaser Plaintiffs are determined to have been impacted by the conspiracy." R. 3990-122 at 116.

Rather than compare the "but for" price to actual prices, Mangum evaluated Broiler market characteristics to conclude that an artificially high price would have been experienced by all direct purchasers. Fundamentally, Mangum notes that "the commodity nature of broiler products" means that "market prices depend on total industry supply," which in turn means that "the prices for every customer that is based on these market price indices . . . increases." R. 3985-8 at 79-80 (¶¶ 152, 155).

Mangum then examined actual prices during the benchmark and class periods to show that prices were consistent across a variety of variables. He found that the actual prices paid mirrored the major price indices, *see id.* at 87-88 (charts), and that the prices charged by each defendant moved together over time, *see id.* at 92-94 (charts). He also found that prices were consistent across geographic regions, *see id.* at 96-98 (charts), and across the top 50 buyers, *see id.* at 99-101 (charts). Based on

33

this data, Mangum concluded that any increase in the market price would impact the prices paid by "all or nearly all" buyers. *See id.* at 78 (¶ 151).

Sunding's approach to analyzing common impact is similar to Mangum's. Like Mangum, Sunding's analysis begins with the conclusion that Broilers are a commodity product. *See* R. 3971-4 at 120 (¶ 252) ("A breast from one processor's tray pack of boneless skinless breasts would be indistinguishable from such a breast from another processor."); *see also id.* at 120-21 (¶ 253 & n.400) (all the Broiler meat sold in the United States is genetically nearly identical). "Because chicken is a commodity product, economic theory predicts that conduct that would increase the price of the chicken products by certain producers would have similar effects across all producers." *Id.* Finally, Sunding concludes that there "is no reason to believe, as a matter of economic theory, that the prices of any product directly derived from chickens and produced by the defendants would not be impacted by a reduction in supply of the only material input, chicken." *Id.* at 130 (¶ 274).

### c.    Defendants' Objections – Analysis of Prices

Defendants rely primarily on the analysis of their expert, Johnson, to criticize Plaintiffs' experts' findings that prices were higher than they should have been during the class period. Johnson's attacks on the experts' opinions boil down to challenging the idea that Broilers function as a commodity product. But Defendants and Johnson do not challenge Plaintiffs' allegation that there is no material difference between the Broiler meat sold by any defendant, or the fact that all Broiler meat sold in the United States is genetically nearly identical. Rather, Johnson insists that

34

different Broiler products (e.g., breasts, wings, frozen or not, etc.) sold by different producers to different customers cannot be compared because of the different prices of the products, the differing market share of producers, and the different bargaining power of various customers. *See*, *e.g.*, R. 4209-1 at 16-17 (¶ 27) (Carter's analysis "masks important individualized variation across the proposed DPP class. Dr. Carter appears to acknowledge the limitations of his model for showing impact to all (or nearly all) direct purchasers."). As Carter puts it in responding to Johnson's report, "Johnson is essentially claiming that every Defendant is selling a different product." R. 4505 at 57 (¶ 105).

True, Broiler meat is sold in a variety of forms with varying prices. So perhaps there is merit to Johnson's perspective. But as Carter points out, all Broiler products of course come from Broilers. It is impossible to produce wing meat without also producing breast meat, and vice versa. *See* R. 3990-122 at 96 (¶ 152) ("The economics always come back to the fact that integrators can only produce whole broilers; then they must attempt to maximize profits by selling all of the parts of the whole bird."). Because all Broiler products are produced together, any reduction in supply of Broilers will necessarily decrease the supply of all the products derived from Broilers. Further, Carter's opinion is supported by deposition testimony from the defendant producers' CEOs stating that they make production and pricing decisions based the market's "whole bird value." *See id.* at 96-99 (¶¶ 153-57). To the extent that the varying prices of different Broiler products limits the ability of the alleged conspiracy to control prices, that is a question of fact to be examined at summary judgment or

trial. It is not a reason to find any of the experts' opinions unreliable or to deny class certification.

Defendants make a related argument with regard to different "bird sizes." *See*, *e.g.*, R. 4234 at 32-33. But just as Carter shows that the pricing of Broiler parts moves in step with the pricing of whole Broilers, the pricing of different size Broilers also move together. *See* R. 4493-3 at 111-13. Defendants contend that certain customers prefer different size Broilers for various reasons. But Defendants have presented no evidence that these preferences alter the commodity nature of the Broiler market or the effect the price of whole birds has on the market as a whole. And Mangum's analysis showed that the prices for whole birds, breasts, and wings were substantially similar across bird sizes, and to the extent they differed they moved together over time. *See* R. 4493-3 at 111-13 (Figures 35-37).

Moreover, to the extent Carter's analysis of "whole bird value" is insufficiently granular, Mangum and Sunding performed regression analyses of the price of certain Broiler parts. Mangum analyzed wings and breasts in addition to whole birds, whereas Sunding analyzed breasts and whole birds. Both Mangum and Sunding also find overcharges during the class period for whole bird and breast products, and Mangum found overcharges for wing products as well. *See* R. 3990-122 at 118-23 (¶¶ 214-19); R. 3971-4 at 114-18 (¶¶ 242-47).

Johnson believes, however, that even breaking down the price analysis to the level of breasts and wings is insufficient to show whether increased prices caused common impact for each class. In his opinion, additional granularity is necessary

considering the variety of producers, products, and customers in the market, as well as the length of the class period. He argues that his more granular calculations show that prices did not increase for all categories of transactions during the class period, so Plaintiffs cannot show that all Plaintiffs suffered a price increase, and thus it is not possible to show common impact across each class.

With respect to Carter's model in particular, Johnson argues it is unreliable because it ignores the true variety in the Broiler market and instead assumes that "all 54 direct purchasers that bought this product would have paid the same price at a given point in time." R. 4209-1 at 16 (¶ 26). As Carter says in response to Johnson, "this is entirely false." R. 4505 at 103 (¶ 182). The Court agrees that it is a simplistic misrepresentation of Carter's analysis. Never does Carter assume that the same price was paid for Broiler meat across various products, producers, buyers, and time periods. Rather, Carter's "model measures the relationship between the market-wide equilibrium price of broilers and market supply and demand factors." R. 4505 at 57-58 (¶ 106). This method of analysis "is not dependent on individual Defendants selling individual parts to individual customers." *Id*. Instead it is an analysis of the market price, based on market supply and demand. As Carter puts it, "the market-wide equilibrium is the sum of all transactions taking place at the same time. What is observed in the transactions data is determined by the aggregation of individual demand and supply functions." R. 4505 at 57-58 (¶ 106). This is a common and straightforward analysis that takes into account the fact that a market consists of many individual and distinct transactions. Certainly, each transaction has its own

price. But as discussed, Defendants' executives look to the market price of whole Broilers to determine what the price for a specific deal should be. That is why a focus on the market price is a reasonable way to demonstrate common impact of an alleged conspiracy to reduce supply. Mangum and Sunding agree that this is the proper perspective from which to view the case. *See* R. 4493-3 at 73 ("Even prices that are not explicitly based on Urner Barry or Georgia Dock will still be influenced by the same market factors because the prices associated with fixed priced contracts and the margins associated with cost-plus contracts will be negotiated in reference to market prices.");[10] R. 4487-3 at 96 (¶ 152) ("[D]espite the fact that each customer paid a different price simultaneously for the identical product, each customer would have paid less for that product in the but-for world. The same dynamic is true . . . regardless [of] the 'starting [price] point' for the negotiation [because that starting point is] determined by the balance of market-wide supply and demand.").

Defendants oppose this argument by citing cases in which courts have found a lack of predominance because the plaintiffs' proof of injury was based on an expert's calculation of a "but for" "average" price. *See, e.g.*, *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 193 (3d Cir. 2020) (rejecting a statistical model that "relies on an *average* hypothetical price" thereby failing "to account for individual negotiations or the effect of [the defendant manufacturer's] Contracting Strategy on each Direct Purchaser"). The experts' opinions in this case, however, are not merely

---

[10] Urner Barry and Georgia Dock are two of the primary Broiler price indices. Part of Plaintiffs' allegations are that some Defendants conspired to manipulate the Georgia Dock index by submitting falsely inflated price reports.

based on "averages" of individually negotiated sales. Like many product markets, the Broiler market involves individual negotiations. But the evidence shows that those negotiations take place in the context of a "market price." The market price of Broilers has a significant effect on negotiations. Indeed, it is the starting point. The experts' analyses show that in the context of a commodity market in which the participants are aware of and act according to the market price, it is possible to show common injury to the class with evidence that the market price was manipulated through collusive supply reduction. This is a fundamentally different analysis than simply averaging the prices of individual negotiated sales.[11]

Even if Johnson is correct that the proper analysis is to "unpool" Plaintiffs' experts' market price analyses and drill down on more specific transactions, Johnson's analysis finds that only 16.1% of the class paid prices for Broilers lower than Carter's predicted "but for" price. *See* R. 4209-1 at 17 (¶ 29). Johnson believes

---

[11] The facts of the *Lamictal* case in particular show that it has little relevance here. That case concerned the pending expiration of a pharmaceutical patent and a settlement agreement between the manufacturer that owned the patent and a potential generic manufacturer. The agreement had the effect of decreasing the availability of generic versions of the pharmaceutical. The market was characterized by individual sales to direct purchasers, priced through individual negotiations. These isolated transactions for a sophisticated chemical product bear little resemblance to the daily commodity market for a basic food product like Broilers. The other cases Defendants cite also concern markets bearing little resemblance to the market for Broilers. *See, e.g., In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 56 (S.D.N.Y. 2020) (claim that aluminum producers restricted supply by intentionally complicating the administrative processes to dispatch aluminum from warehouses for individual shipments); *Reed v. Advoc. Health Care*, 268 F.R.D. 573, 577 (N.D. Ill. 2009) (allegation that hospitals conspired to suppress wages for nurses); *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 508 (S.D. Ill. 2004) (claim that uniform rental and laundry companies conspired to charge customers sham "environmental" fees).

this shows that the alleged conspiracy did not have common impact on the class. But the converse of this number is, of course, that 83.9% of the class *did* pay supra-competitive prices. Thus, it appears that even when Johnson "unpools" Carter's analysis it is still sufficient to establish common impact for purposes of certifying a class.

Similarly, Defendants attack the Indirects' motion by applying Johnson's "unpooling" analysis to Mangum's conclusions. Like Carter, Mangum conducted a regression analysis of the market price for Broilers showing that it was increased by a conspiracy among Defendants to reduce supply. Johnson argues that when Mangum's models are "unpooled" and "applied to different customers" they "show no overcharges on $37 billion in sales . . . to direct purchasers." R. 4234 at 34 ($37 billion was 35% of sales). Johnson reached this conclusion by adding coefficients (or variables) to Mangum's equations. The additional coefficients represented each defendant for each year of the alleged conspiracy period, resulting in hundreds of additional variables. *See* R. 4493-3 at 137 (¶ 222). According to Mangum, in his response to Johnson, when these additional variables are added to his regression equation, "the model cannot distinguish the effect of the overcharges with the effects of the other explanatory variables." R. 4493-3 at 139. Presumably, this is because the other independent variables, such as feed costs and transportation costs, can be unique to each defendant at any given point in time, thereby producing inconsistent results regarding whether any given defendant was charging supracompetative prices.

In any event, as Mangum explains, this is a problem known as "multicollinearity," *see* R. 4493-3 at 139, which the Seventh Circuit has noted is difficult for judges not trained as statisticians to address. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660 (7th Cir. 2002). The Seventh Circuit has also explained, however, that the presence of disputes about multicollinearity and its potential solutions indicate that "the plaintiffs have presented some admissible evidence that higher prices during the period of the alleged conspiracy cannot be fully explained by causes consistent with active competition, such as changes in the price of corn." *Id.* That finding supports Plaintiffs' motion here.

Furthermore, Johnson himself seems to question the reliability of his own method, testifying that it produces "ridiculous outcomes." Johnson Deposition, Vol. 1, Mar. 23, 2021, at 212:13. For example, the prices for Broiler breast meat charged by defendants Perdue and House of Raeford followed relatively similar trajectories over the course of the class period:



Figure 48. Comparison of Perdue and House of Raeford Breast Price Indices

R. 4493-3 at 138 (Figure 48) (Mangum rebuttal report). But according to Johnson's "unpooled" regression analysis, Perdue's prices were 42% below the market price and House of Raeford's prices were as much as 115% above market price. As Mangum explains, a model that produces such divergent conclusions regarding similar data is unreasonable and unreliable, and it should not serve as a basis to conclude that Plaintiffs' experts' opinions are insufficient evidence to demonstrate class-wide impact and support class certification. *See* R. 4493-3 at 138-39 (¶¶ 224-26).[12]

At bottom, Plaintiffs' experts argue that Johnson's calculations suffer from sample sizes that are too small. But regardless of whether the sample sizes are too small as a matter of econometric theory, at a more fundamental level Johnson's calculations do not appear to fit Plaintiffs' claims as the claims are not about such narrow swaths of transactions. Of course, the Broiler market is comprised of a large variety of transactions, at varying prices. But the existence of specific transactions does not necessarily undermine Plaintiffs' theory that those transactions took place in the context of a market price that affected the outcome of all the downstream transactions in a common manner. Plaintiffs' experts have shown that there is statistical evidence that the market price increased because of collusive conduct by Defendants, and that this statistical evidence is common to each of the classes.

---

[12] As noted earlier, Defendants also rely on this aspect of Johnson's opinion to argue that the Indirects' class definition "sweeps in a great many class members that were demonstrably unharmed" and thus is "fatally overbroad." R. 4234 at 52. They make a similar argument specifically with respect to Publix grocery and the Consumer class definition. *See* R. 4213 at 52. The Court rejects these arguments because, as discussed, the Johnson's unpooling analysis does not appear to produce an accurate picture of the market.

Defendants' arguments, based on Johnson's opinions, question whether this is the correct way to model the Broiler market. Defendants' couch this argument in terms of "reliability," but they do not actually question the reliability of Plaintiffs' experts' methods or data. Defendants merely disagree with Plaintiffs' perspective. In other words, from Plaintiffs' perspective, Johnson's calculations miss the forest for the trees, whereas Defendants argue that the forest can only be properly understood by examining the trees. Neither is necessarily incorrect in an economic sense, and the choice between them is a matter of perspective. In litigation, such a dispute is factual and is resolved at summary judgment or trial. It is not a reason to exclude either perspective or deny class certification.

### d. Defendants' Objections – Profit Margins

However, even taking Plaintiffs' experts' "but for" price calculations at face value, Johnson contends they are so low that they would have put the Broiler industry out of business, and must be rejected for that reason. With respect to Carter's model, this contention is based on Johnson subtracting Carter's "but for" price from the industry's profit margin during the class period (recorded in cents per pound), and concluding that the resulting profit margins were almost always in the negative. *See* R. 4209-1 at 14.

As Carter explains in his rebuttal report, the glaring problem with Johnson's calculation and argument is that Carter's "but for" price assumes an absence of a conspiracy to reduce supply and its corresponding price increase. In other words, Carter's predicted lower price is based on an assumed *increase in production*. With

an increase in production, the fixed costs per pound would decrease, thereby increasing the profit margin per pound. Thus, simply subtracting a predicted price from the actual profit margin, as Johnson does, is not a sound method of analysis. *See* R. 4505 at 111-15 (¶ 194-201).

Moreover, Carter responded to Johnson's criticism with analysis of his own based on Broiler operating margin data reported by the U.S. Department of Agriculture. According to Carter, his "but for" price does not cause the industry profit margin to drop below zero during the class period. *See* R. 4505 at 113-14 (¶ 200) (Figure 22). Again, this is a battle of the experts that is not a reason to reject Carter's analysis or deny certification.

Johnson also argued that Sunding's analysis resulted in a negative profit margin for much of the class period. *See* R. 4209-1 at 197-98 (¶¶ 250-51). But like Carter, Sunding points out faults in Johnson's analysis. Sunding explains that Broiler profits are derived not just from the parts of the bird he studied, but also dark meat, bones, and offal. In other words, Broilers provide sources of profit such that only the price for whole birds reflects all sources of profit in the industry.

Sunding's recalculation of "but for" profit margin still includes periods of negative profitability. *See* R. 4487-3 at 46 (Figure 5). But notably, historical data from the benchmark period shows that the industry has suffered periods of negative margins in the past. Johnson points out that Sunding's calculations reveal longer and deeper periods of industry losses and suggests that this means Sunding's calculation are unrealistic and unreliable. *See* R. 4725-9 at 58 (¶ 102). This argument, however,

is an implicit concession that periods of negative profit margins are not foreign to the industry. The mere fact that Plaintiffs' experts' "but for" prices predict negative profit margins is not a basis to reject their opinions as unreliable. Whether Plaintiffs' models anticipate profit margins that are so low and for so long as to be unlikely is a question of fact that does not need to be decided now.

### e. Defendants' Objections – The Perfect Storm

In general, Johnson argues that the more likely cause of the supply reduction during the class period is the combined effect of increased corn prices and the Great Recession, which Johnson dubs the "perfect poultry storm." Johnson's opinion, however, ignores the fact that Plaintiffs' experts take the cost of corn feed and levels of demand into account in their analyses. It also ignores historic market data which shows that Broiler production has been largely immune to both corn prices and



fluctuations in the economy (see the chart above). *See* R. 4505 at 74. True, the first part of the class period occurred during the Great Recession and during an increase in corn prices. But the previous four recessions did not cause a decrease in Broiler

production, and corn prices were just coming off an all-time low. Broiler production has steadily increased against a back-drop of up and down corn prices. This is likely because, as Carter points out, Broiler producers are experienced at hedging corn prices. *See* R. 4505 at 76 (¶¶ 133-34).

At bottom, to the extent Johnson has created alternative economic models showing that the price increase was not caused by a conspiracy, the choice to accept Plaintiffs' experts' or Johnson's models of alternatives is a question better suited to summary judgment or trial. It may not be unreasonable to conclude that Johnson's model is more reliable than Plaintiffs' experts' (Plaintiffs have not moved to exclude Johnson's opinions), but it does not show that Plaintiffs' experts' models are so unreliable that any of them should be excluded from the case. Furthermore, Johnson uses the same data to reach his conclusions as Plaintiffs' experts—Defendants' sales data and data regarding supply and demand in the Broiler market. Johnson argues that the Broiler market is too differentiated to establish that a conspiracy to reduce supply would similarly impact the class of end users. But the evidence used to show this is common to the class. Johnson's opinion might be sufficient evidence for Defendants to avoid liability. But it is not sufficient to so undermine Plaintiffs' experts' opinions that they should be excluded, or to deny class certification.

### f.  Pass-Through to the Indirects

In addition to showing that direct purchasers paid increased market prices, the Indirects must show that these increased prices were passed on to them. *See Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743-44 (7th

Cir. 2018). This burden is easily met here because representatives of the direct purchasers testified that they always pass on costs. *See* R. 3985 at 26-27 (citing deposition testimony); R. 4493-1 at 6-7 (citing deposition testimony).

For some products, calculation of pass-through damages can be complicated because the product at issue is incorporated into a different product before being sold to indirect purchasers and consumers. But those potential complications of pass-through damages are not present here because the product at issue is unprocessed, ready-to-cook Broiler meat. The Broiler products purchased by the Indirects from the Directs are the same products the Directs purchase from Defendants. The Directs profit by adding a mark-up to the price they pay Defendants. If the Directs did not pass on any price increase imposed by Defendants, the Directs would quickly become unprofitable. Cases in which the direct purchasers process a raw material, or incorporate a component into a more complicated product, pose more difficult issues of proof. Such issues are not present here. And simple charts of certain large direct purchasers' purchase prices (Sysco, US Foods, Colorado Boxed Beef) compared to sale prices show that sale prices track the purchase price, indicating that the purchase price is passed on through the sale price:

*Figure 48. Sysco - Monthly Weighted Average Price and Cost (Top Product)*



*Figure 49. U.S. Foods – Monthly Weight Average Price and Cost (Top Product)*





*Figure 50. Colorado Boxed Beef – Monthly Weight Average Price and Cost (Top Product)*

R. 3985-8 at 134-35 (Figures 48-50).

Mangum confirmed this straightforward evidence that the Directs passed on over-charges to the Indirects with a regression analysis. That analysis showed a pass-through rate of about 96 percent. *See* R. 3985-8 at 138 (¶ 250).

Johnson criticizes Mangum for analyzing only 22 of 540 direct purchasers. But those 22 direct purchasers account for 65% of sales. *See* R. 4493-3 at 149-50. Johnson argues that Mangum's analysis does not account for the fact that the Broiler distribution chain can involve more than one distributor before ending with a member of the Indirect class. But Mangum's analysis included some entities that purchase from direct purchasers and then resell to other distributors. His findings regarding pass-through percentage apply to all stages in the distribution chain. *See* R. 4493-3 at 152.

Johnson performs a similar "unpooling" or "disaggregation" analysis to Mangum's pass-through regression analysis, and argues that it shows pass-through rates much lower than the 96% in Mangum's conclusion. The lowest pass-through rate specifically identified by Johnson is 57%. *See* R. 4234-2 at 305. To the extent Johnson's analysis is sound, a 57% pass-through rate is still sufficiently significant to demonstrate damages.

### 3. Damages

In one sentence at the end of their brief opposing the Directs' motion, Defendants argue that "individual inquiries into the damages each class member incurred would be required and predominate over issues common to the class." R. 4209 at 60. Earlier in their brief, Defendants quote the Supreme Court's decision in *Comcast* as holding "damages must be measurable on a class-wide basis." To the extent Defendants contend that by this statement the Supreme Court meant that the need to allocate total damages among class members individually prohibits certification, the Seventh Circuit has held otherwise. The Seventh Circuit has explained that "all *Comcast* said" on this issue is that "the damages theory must correspond to the theory of liability." *Kleen*, 831 F.3d at 929. But as long as "the aggregate classwide damages is something that can be handled most efficiently as a class action," then "the allocation of that total sum among the class members can be managed individually" without undermining predominance or superiority. *Id.*

In their briefs opposing the Indirects' and End Users' motions, Defendants devote more pages to their argument that Plaintiffs "have not offered a reliable

method of showing class-wide damages through common proof." R. 4234 at 42-45; *see also* R. 4213 at 38-39. This argument is based on the same observations about "variability" in the Broiler market, which Defendants argue undermines predominance; arguments the Court has rejected.

Defendants also argue that, even if Plaintiffs can demonstrate aggregate classwide damages, Plaintiffs fail to propose "an accurate 'method for calculating their individualized damages other than having hundreds, or even thousands, of individualized hearings.'" R. 4234 at 43 (quoting *Dailey v. Groupon, Inc.*, 2014 WL 4379232, at *9 (N.D. Ill. Aug. 27, 2014)); *see also* R. 4213 at 39. But Plaintiffs' experts have offered methods of calculating the "but for" price for Broilers during the class period. Those methods can be used to identify sales at supracompetative prices and the associated damages. Indeed, the Court has considered and approved methods for apportioning class settlements that should also be effective at apportioning any damages awarded by a verdict. *See* R. 5304 (final approval order of settlement between End-Users and defendants Fieldale, George's, Mar-Jac, Pilgrim's, and Tyson); R. 5248 (motion for final settlement approval describing distribution process). Perhaps more detailed calculations will be required for each individual plaintiff. But this is hardly the effort associated with "having hundreds, or even thousands, of individualized hearings." If Defendants are found liable, and the parties continue to dispute the appropriate methods for calculating damages, those disputes can be resolved by the Court, a mediator, or a special master. The resulting methods can be applied across all plaintiffs, and damages will be a function of the number of

purchases, which are already known. This is not so arduous a process as to prohibit class certification.

*     *     *     *

For these reasons, the Court finds the opinions of Carter, Mangum, and Sunding are based on reliable methods and data, and therefore should not be excluded. The Court also finds that Plaintiffs' experts have demonstrated that common impact can be shown with common evidence. Accordingly, the Court finds further that the Plaintiffs have demonstrated that common questions of law and fact predominate in this case.

## III.  Superiority

Finally, class treatment of Plaintiffs' claims is superior to joinder of individual claims. The Court does not perceive there to be another "available method" to address Plaintiffs' claims that is superior to certifying a class. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 664 (7th Cir. 2015).

### A.    Variations in State Law

Defendants question the superiority of class treatment for the Indirects and End Users because of what they characterize as "substantive variations in the many state laws governing their claims." R. 4234 at 45; R. 4213 at 41. But Defendants' discussion of any such differences is entirely general. Defendants do not identify any difference among the state laws at issue that are relevant to the price fixing claim in this case.

The three issues Defendants characterize as "variations" in state law are irrelevant here. Defendants point out that some states require intrastate activity in addition to interstate activity. *See* R. 4234 at 46; R. 4213 at 44. But as this Court has found, "[i]n light of the obvious fact that Broilers are purchases in substantial numbers throughout the United States, [the] allegations plausibly establish 'substantial' intrastate effects." R. 541 at 79 (*In re Broiler Chicken*, 290 F. Supp. 3d at 816).

Defendants also argue that some states' laws give different treatment to the pass-through defense. *See* R. 4234 at 47; R. 4213 at 44-45. But this is irrelevant to the Indirects because the Indirects class is defined to include only purchases for "use in commercial food preparation," and to exclude "purchases of Broilers for resale." To the extent any state recognizes a pass-through defense, sharing of costs by consumers within the same household is not what the defense is concerned with.

Defendants argue further about the effect of different states' varying statutes of limitations. *See* R. 4324 at 47; R. 4213 at 45. But this is only relevant to the extent of damages and can be easily addressed by excluding sales outside the relevant periods.

In addition to state antitrust laws, Defendants contend that differences in state consumer protection and unjust enrichment laws make certification of the Indirects class inappropriate. *See* R. 4234 at 48-49; R. 4213 at 45-46. But the differences in consumer protection laws concerning reliance and intent are simply not relevant to a price-fixing claim. Similarly, any state where the unjust enrichment

claim is the primary basis for recovery will be satisfied by proof of a Sherman Act violation. Defendants do not argue otherwise.

### B.     Ascertainability

In the Seventh Circuit, certification of a class requires that the class definition be sufficiently definite so "that the class can be ascertained." *See Mullins*, 795 F.3d at 659. Defendants do not argue that the class definitions in this case are vague, or subjective, or "defined in terms of success on the merits"—the three primary examples of unascertainable class definitions. *See id.* at 659-61. And the Court has already addressed and rejected Defendants' arguments that the classes include uninjured members.

But Defendants also look into the future and argue that, should they lose on the merits, the End Users class is so large and unmanageable that the Court will be unable to actually "ascertain" the injured individuals who qualify under the class definition without "multiple individualized inquiries." R. 4213 at 54. In other words, Defendants insist that Plaintiffs are required to demonstrate "that there is a reliable and administratively feasible way to identify all who fall within the class definition." *Mullins*, 795 F.3d at 657. The Seventh Circuit, however, has held that Rule 23 does not impose such a requirement. And the potential that the Court will be forced to identify class members "by affidavits from the putative class members," as the parties suggest here, is not a basis to deny certification. *See id.* at 661. It is a process the Court has contemplated and approved with respect to class settlements that have already occurred in this case.

## Conclusion

Therefore, Plaintiffs' motions to certify classes of direct purchasers [3962], indirect purchasers [3968], and end user consumers [3971] are granted, and Defendants' motions to exclude the opinions of Carter [4272], Mangum [4262], and Sunding [4281] are denied.

Lastly, the End Users supported their motions with expert opinions from Dr. Luis Cabral and Cameron R. Azari, Esq. Cabral offered opinions about whether Agri Stats served to promote anticompetitive "information exchanges." Azari offered opinions about "whether it would be possible to identify end-user consumers who purchased class products in grocery stores and other retailers." While helpful, and likely relevant to summary judgment and/or trial, the Court found their opinions unnecessary to determining whether the Consumer class should be certified. Thus, Defendants' motions to exclude their testimony [4287] [4245] are denied without prejudice.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: May 27, 2022