# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**IN RE BROILER CHICKEN ANTITRUST LITIGATION**

This Document Relates To:
*Commercial & Institutional Indirect Purchaser Plaintiff Actions*

No. 1:16-cv-08637

Hon. Thomas M. Durkin
Magistrate Judge Jeffrey T. Gilbert

## COMMERCIAL & INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO MOTION TO EXCLUDE THE TESTIMONY OF DR. RUSSELL MANGUM

### [REDACTED – PUBLICLY AVAILABLE VERSION]

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ........................................................................................................ 1

II.  STATEMENT OF FACTS ......................................................................................... 2

III.  LEGAL STANDARD................................................................................................. 3

IV.  ARGUMENT .............................................................................................................. 4

    A.  Dr. Mangum Has Not Changed His Position Regarding the Level of Competition in the Market .................................................................................. 4

        1.  Dr. Mangum Studied Industry Wide Production ...................................... 6

        2.  Dr. Mangum's Testimony is Consistent with CIIPPs' Case Theory and His Previous Testimony at Class Certification .................................. 7

        3.  Dr. Mangum's Model Does Control for One-Off Idiosyncratic Events........................................................................................................ 8

    B.  Defendants' Argument Regarding the Oligopolistic Nature of the Broilers Market Misunderstands Econometric and Statistical Testing............................... 8

        1.  Defendants' Argument Misunderstands Regression Models and Econometrics............................................................................................. 9

        2.  There is Substantial Case Law Holding Similar Regression Models to be Reliable in the Context of Oligopolistic Markets ............................. 9

        3.  Defendants' Arguments are Contrary to Binding Supreme Court and Circuit Court Precedent............................................................................ 11

        4.  The Output from Dr. Mangum's Regressions Further Demonstrate that His Work is Reliable.......................................................................... 11

        5.  Dr. Mangum Never Testified that a Regression Model, By Itself, Is Sufficient to Demonstrate Liability ......................................................... 12

    C.  Defendants Continue to Misconstrue and Alter Dr. Mangum's Opinions and Ignore this Court's Order on the Motion to Dismiss and at Class Certification... 13

V.  CONCLUSION.......................................................................................................... 15

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bazemore v. Friday,*
    478 U.S. 385 (1986)......................................................................................................11

*In re Broiler Chicken Antitrust Litig.,*
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ...........................................................................14

*In re Broiler Chicken Antitrust Litigation,*
    No. 16-c-8637, 2022 U.S. Dist. LEXIS 95525 (N.D. Ill. May 27, 2022)........................ *passim*

*Brown v. Burlington N. Santa Fe Ry. Co.,*
    765 F.3d 765 (7th Cir. 2014) ...........................................................................................3

*In re Chocolate Confectionary Antitrust Litig.,*
    MDL No. 1935, 2013 U.S. Dist. LEXIS 189309 (M.D. Pa. May 10, 2013) ..........................10

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993)................................................................................... *passim*

*In re Dealer Management Systems Antitrust Litig.,*
    581 F. Supp. 3d 1029 (N.D. Ill. 2022) ...........................................................................10

*In re Disposable Contact Lens Antitrust Litig.,*
    329 F.R.D. 336 (M.D. Fla. 2018)....................................................................................11

*In re Domestic Drywall Litig.,*
    322 F.R.D. 188 (E.D. Pa. 2017)......................................................................................10

*Kleen Products LLC v. International Paper,*
    306 F.R.D. 585 (N.D. Ill. 2015)..................................................................................7, 10

*In re Korean Ramen Antitrust Litig.,*
    No. 13-cv-04115, 2017 U.S. Dist. LEXIS 7756 (N.D. Cal. Jan. 19, 2017)...........................10

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999)..........................................................................................................4

*Manpower, Inc. v. Ins. Co. of Pennsylvania,*
    732 F.3d 796 (7th Cir. 2013) .........................................................................................11

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
    465 U.S. 752 (1984).......................................................................................................13

*In re Packaged Seafood Products Antitrust Litig.*,
    332 F.R.D. 308 (S.D. Cal. 2019) ...................................................................10

*Schmitt v. Younique, LLC*,
    No. 17-1397-JVS, 2020 U.S. Dist. LEXIS 263313 (C.D. Cal. April 8, 2020) ........................12

*Smith v. Ford Motor Company*,
    215 F.3d 713 (7th Cir. 2000) ...................................................................4

*Stollings v. Ryobi Tech., Inc.*,
    725 F.3d 753 (7th Cir. 2013) ...................................................................4

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010)...................................................................8, 10

*In re Titanium Dioxide Antitrust Litig.*,
    No. RBD-10-0318, 2013 U.S. Dist. LEXIS 62394 (D. Md. May 1, 2013) ..............................11

*In re Urethane Antitrust Litig.*,
    No. 04-1616-JWL, 2012 U.S. Dist. LEXIS 181506 (D. Kan. Dec. 21, 2012) ........................10

*Wilbern v. Culver Franchising Sys., Inc.*,
    No. 13 C 3269, 2015 WL 5722825 (N.D. Ill. Sept. 29, 2015) (Durkin, J.) ..............................4

*Wilson v. City of Chicago*,
    6 F.3d 1233 (7th Cir. 1993) ...................................................................1, 4

**Rules**

Federal Rules of Civil Procedure
    Rule 12 ...................................................................1

Federal Rules of Evidence
    Rule 702...................................................................3, 4

iii

## I.      INTRODUCTION

As they have with each of the Plaintiff classes' (DPPs, CIIPPs, and EUCPs) and the Direct Action Plaintiffs' ("DAPs") experts, Defendants move to exclude the testimony of CIIPPs' antitrust impact and damages expert, Dr. Russell W. Mangum, Ph.D, in its entirety. According to Defendants, not a single plaintiff in this coordinated litigation has proffered an expert with admissible testimony. The contention is ludicrous. Defendants can only reach their conclusion by misrepresenting Dr. Mangum's opinions and deposition testimony, cherry-picking deposition quotes out of context and perverting them into their own self-serving narrative, or recycling critiques that this Court has already rejected at the Rule 12 and class certification phases.

Even worse, Defendants do not cite portions of Dr. Mangum's actual work that should be excluded. Instead, they cite portions of his deposition testimony—testimony where he was responding to questions asked of him by defense counsel—where he was either asked hypothetical questions about work he did not perform, or work that was not covered in his written reports. Defendants then move to exclude his opinions from his actual written work based on the notion that his deposition testimony "strayed from his damages expert role." Def. Mot. at 4. Defendants' Motion does not serve the purposes for which the *Daubert* standard was established. *Daubert* exists to shield the jury from scientific or other expert testimony that could unduly persuade it because the testimony is based on "junk science." *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993). Defendants do not attack an actual methodology employed by Dr. Mangum, the point of the *Daubert* standard, because they know that such methodologies have repeatedly been accepted by courts across the country, including this Court at class certification. Instead, Defendants' Motion is a "Hail-Mary" attempt to exclude testimony that they do not like. For the following reasons, Defendants' Motion should be denied.

## II.    STATEMENT OF FACTS

Dr. Russell W. Mangum, Ph.D. is the Commercial and Institutional Indirect Purchaser Plaintiffs' ("CIIPPs") retained expert who was tasked with assessing antitrust impact and calculating damages. Mangum Merits Report ¶ 17 ("Merits Report"), Ex. A to the Declaration of Adam Zapala, submitted herewith. In this regard, Dr. Mangum (a) reassessed the opinions he offered at class certification; (b) developed a methodology to determine the extent to which direct purchasers paid more for Broilers than they would have in the absence of Defendants' alleged conduct; (c) developed a methodology for determining whether any price impact paid by direct purchasers was passed-through to the CIIPPs; (d) estimated the total relevant purchases made by CIIPPs in the Indirect Purchaser States; and (e) calculated the total damages as a result of Defendants' alleged conduct. *Id.* Importantly, Dr. Mangum was not tasked with opining on liability. Instead, Dr. Mangum "accepted as true CIIPPs' allegations that Defendants engaged in anticompetitive conduct outlined in the complaint." *Id.* ¶ 19.

At class certification, Dr. Mangum also provided testimony regarding common impact, which was accepted by the Court when it certified the CIIPP classes. Specifically, in regard to the Court's Class Certification Order, the Court rejected Defendants' *Daubert* motion and found that Dr. Mangum employed the highly rigorous method of regression analysis to demonstrate antitrust impact and a common method for demonstrating damages. *In re Broiler Chicken Antitrust Litigation*, No. 16-c-8637, 2022 U.S. Dist. LEXIS 95525 (N.D. Ill. May 27, 2022) ("Order").[1]

In his Merits Report, Dr. Mangum concluded—as he did at class certification—that the structural characteristics of the industry would have facilitated the success of the alleged conspiracy. Merits Report ¶¶ 53-54. Dr. Mangum also found that common evidence demonstrated

---

[1] All further references to the Court's Class Certification Order refers to the pagination found at the Court's Order on the ECF System, *e.g.*, Order at 27, 50-51.

that industry-wide supply was constrained. *Id.* ¶ 55. At class certification, Dr. Mangum offered a production regression, which resulted in negative and statistically significant coefficients demonstrating that supply was restrained when controlling for all other relevant factors. *Id.* ¶ 56. Dr. Mangum found that his results were consistent with the results of CIIPPs' other expert, Dr. Michael Williams. *Id.*

With respect to demonstrating antitrust impact to the direct purchasers, Dr. Mangum constructed regressions for whole birds, breast products, and wings. Each regression demonstrated statistically significant price impacts across the models and across the two impact periods. *Id.* ¶ 57. The dependent variable in each overcharge regression was the price of the whole bird, breast product, or wing, respectively. The explanatory variables "were chosen to reflect the factors that affect the supply and demand of broiler products." *Id.* ¶ 73.[2] In Dr. Mangum's view, and that of the Court in its Class Certification Order, his variables appropriately account for the economic conditions facing the Poultry industry. In both his initial Merits Report and in his Merits Rebuttal Report ("Rebuttal Report"), Dr. Mangum runs a series of sensitivity tests and robustness checks to confirm that his model is appropriate and well-fitted. *See* Rebuttal Report, Zapala Decl., Ex. B.

## III.     LEGAL STANDARD

Federal Rule of Evidence 702, amended in response to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and its progeny, governs the admissibility of expert testimony to ensure that only helpful, legitimate expert testimony reaches the jury. *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 771–72 (7th Cir. 2014). The rule requires expert testimony to be (1)

---

[2] Those explanatory variables included ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.* ¶¶ 79-94.

"help[ful] [to] the trier of fact to understand the evidence or to determine a fact in issue," (2) be "based on sufficient facts or data," (3) use "reliable principles and methods," and (4) "reliably appl[y] the principles and methods to the facts of the case." *Wilbern v. Culver Franchising Sys., Inc.*, No. 13 C 3269, 2015 WL 5722825, at *7 (N.D. Ill. Sept. 29, 2015) (Durkin, J.). The inquiry into reliability is a flexible one. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). Ultimately, whether "specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id*. at 153.

Under *Daubert*, "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendments. The court's gatekeeping function is only to exclude "junk science." *Wilson*, 6 F.3d at 1238. "It is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Smith v. Ford Motor Company*, 215 F.3d 713, 719 (7th Cir. 2000); *Stollings v. Ryobi Tech., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013) ("[t]he fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible.").

## IV.    ARGUMENT

### A.    Dr. Mangum Has Not Changed His Position Regarding the Level of Competition in the Market

Defendants make the argument that Dr. Mangum "radically" changed his position regarding the level of competition in the Broiler industry during the relevant period. Motion at 1, 7-9. He did no such thing. They cite to a few misrepresented lines from his deposition testimony, and then attempt to shoehorn this testimony into wholesale exclusion of Dr. Mangum's entire opinions, contained in two reports totaling 222 pages and 422 paragraphs.

To understand the nature of Defendants' misrepresentation, or misunderstanding, the

context of the deposition testimony must be explained. The relevant deposition testimony appears from approximately page 62 line 15 to page 101 line 2. *See* Mangum Dep. II ("Dep. II"), Zapala Decl., Ex. D. In this colloquy, Defendants sought to understand why Dr. Mangum studied industry-wide production, rather than individual Defendant production. Notwithstanding his cogent explanation—an approach the other Plaintiffs' experts similarly took—Defendants persisted in asking Dr. Mangum if he studied whether one-off events, such as labor shortages, fires, or other firm-specific idiosyncratic events were the cause of the production shortfall. *See id.*

Dr. Mangum responded, *first*, by reiterating that studying industry wide production was the appropriate approach rather than studying individual firm but-for production. Thus, he indicated that he did not perform the type of analysis contemplated by Defendants' question. Dep. II at 62:21-63:11. ████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████ . *See* Dep. II at 64:17-66:22.[3]

Dr. Mangum then explained that, regardless, his before-during benchmark model *does* control for any of the alleged one-off idiosyncratic events affecting production because those idiosyncratic events, such as labor shortages or fires, happened during both the benchmark and conspiracy periods. *Id.* 68:5-70:24. Thus, as Dr. Mangum testified, because ████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████ .

Defendants then asked questions about a news article pertaining to a fire that occurred at a

---

[3] Based on data from Dr. Johnson, House of Raeford had approximately ███████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ (Fig 15 in the Class Certification Report) over the 8-year second class period. *See also*, Mangum Class Certification Report, Figure 10 (showing 2.7% share).

House of Raeford facility ***in 2017***, nearly 8 years after the start of the class period, and nearly 6 years after the start of the second impact period in December of 2011. *See* Dep. II at 73:15-75:15. Defendants' sought to understand whether he studied this event to determine whether *it*, rather than the alleged anticompetitive conduct, could have been the cause of the production shortfall measured in Dr. Mangum's production regression offered at class certification. *Id.* Implicit in Defendants' question is the notion that other competitors' hands were somehow tied and that they could not supply customers of House of Raeford's shuttered facility. ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████. That testimony is consistent with Plaintiffs' theory of the case: the case alleges collusion at the industry level.  It does not allege a complete *cessation of all competitive activity*. Dep. II at 76:7-77:7. Finally, Dr. Mangum also testified that this is ████████████████████████████████████████████████

████████████████████████████████████. Dep. II at 81:11-83:16.

### 1.      Dr. Mangum Studied Industry Wide Production

In this Court's Class Certification Order, it outlined Defendants' argument that "an analysis of the total supply of Broilers in the market over time is irrelevant to the claims in this case." Order at 19. But the Court already rejected that argument as grounds for excluding Plaintiffs' experts' opinions. *Id.* As the Court explained, "[u]sing overall market trends as opposed to isolated defendant conduct is a reasonable approach because fundamental economic theory says that market supply directly affects the market price. Whether all Defendants' actions were precisely in lock step does not change the fact that supply decreased in historically unusual fashion from 2008 to 2019." *Id.* at 20-21.

Defendants' argument articulated in their renewed *Daubert* Motion, therefore, is really nothing more than a redux of their argument at class certification. This case alleges, and Dr. Mangum has tested, a joint production restraint. Dr. Mangum was responding to hypothetical questions about whether, when there are one-off production reductions due to things like fires, that could have been the cause of the production restraint.[4] Dr. Mangum testified that ██████████

████████████████████████████████████████████████████████████████.

### 2. Dr. Mangum's Testimony is Consistent with CIIPPs' Case Theory and His Previous Testimony at Class Certification

Dr. Mangum has not changed his position. Dr. Mangum's testimony that, in one-off idiosyncratic situations such as the House of Raeford production facility fire, ████████████

████████████████████████████████████████████████████████████████

████████████████ First, the case alleges a production *restraint*, which means producing less than would have otherwise been produced in the but-for world. The case theory does not require a complete cessation of all competitive activity, nor does it require that firms cease marketing and advertising activities altogether. The hypothetical posed by Defense counsel is simplistic and unrealistic because it suggests that the customers receiving Broilers from the destroyed plant had nowhere else to turn. Second, the conspiracy is not an agreement amongst the competitors to be unresponsive to fires or other idiosyncratic events, but rather to maintain discipline and keep supply tight relative to demand, as much as it might be tempting to overproduce. The conspiracy is not (a) freezing the magnitude of sales to all customers and ceasing marketing and sales operations other than past client accounts, rather (b) not to expand in a way that depressed prices.

---

[4] *See Kleen Products*, 306 F.R.D. at 598 (N.D. Ill. 2015) (rejecting that an expert "must look at all events in isolation, and then view each individual event to see if that event specifically is the one that caused antitrust impact. To the contrary, it is a well-accepted practice to look at industry events as a whole . . . ").

### 3. Dr. Mangum's Model Does Control for One-Off Idiosyncratic Events

As courts around the country have articulated, including this Court, a benchmark period "method involves identifying two similar periods in which the only significant difference in factors affecting supply and demand is the alleged collusive activity, and comparing the two periods to determine the 'but-for' price." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 602 (N.D. Cal. 2010). This Court expressed its understanding of a before-during benchmark model in its Order certifying the classes. Order at 31.

As Dr. Mangum testified, the entire line of questioning missed the mark because his production regression, offered at class certification, did in fact control for idiosyncratic one-off production events because such events occurred during both the benchmark and conspiracy periods. As Dr. Mangum explained, one-off idiosyncratic production issues ████████████ ████████████████████████████████████████████. Dep. II at 67:13-71:22. Dr. Mangum saw evidence of ████████████████████████████████ ████████████████. *Id.* And because a before-during model measures the differences between the two periods, controlling for all other factors, it is not appropriate to conclude that such one-off events during the conspiracy period were *the cause* of the observed but-for production restraint found in Dr. Mangum's model at class certification.

### B. Defendants' Argument Regarding the Oligopolistic Nature of the Broilers Market Misunderstands Econometric and Statistical Testing

In yet another perplexing argument, Defendants dispute that the Broilers market exhibits oligopolistic characteristics, while nevertheless arguing that Dr. Mangum's opinions should be wholesale excluded ██████████████████████████████████████ ████████. Def. Mot. at 9-12. In doing so, Defendants suggest that Dr. Mangum omitted an important variable from his analysis – an unknown and undefined "oligopoly variable."

8

Defendants make the further argument that Dr. Mangum "claims that his econometric models are all that is necessary to distinguish between 'lawful' and 'unlawful' pricing and production levels" *Id.* at 2; and that Dr. Mangum concludes that "because industry-wide production and pricing cannot be explained fully by his selected variables that must mean that a conspiracy was afoot." *Id.* at 9. Each of these arguments are wrong on the facts and wrong on the law.

### 1.  Defendants' Argument Misunderstands Regression Models and Econometrics

As this Court recognized, Dr. Mangum constructed a before-during benchmark linear regression, which utilizes supply and demand variables to compare the before-period to the during period, while controlling for all factors that influence price (or production, in the context of the production regression). *See* Order at 30-31. A linear regression "equation also includes a 'dummy' variable to account for collusive conduct during the class period . . . . [p]lugging in known prices and market factor data from the class period and running the regression equation to solve for the dummy variable allows the experts to calculate the portion of price not accounted for by the market factors." *Id.* at 31.

Here, Dr. Mangum clearly testified during his deposition that he saw evidence that ████

████████████████████████████████████████████████████████████████████████

████ . *See* Dep. II at 57:23-59:3; 59:20-60:8. This means that the issue of oligopoly (if it is an "issue," and it is not) is controlled for in the design of Dr. Mangum's regression. The economic effects Dr. Mangum found are, by definition, those in excess of oligopoly effects. Thus, the results Dr. Mangum found through either his production regression or his pricing regression, do not result from "oligopoly."

### 2.  There is Substantial Case Law Holding Similar Regression Models to be Reliable in the Context of Oligopolistic Markets

There are a plethora of cases finding regressions models, of the type that Dr. Mangum

specified in this case, reliable despite taking place in the context of an oligopolistic market. Indeed, the vast majority of antitrust price-fixing, supply fixing, or bid rigging cases take place in the context of an oligopolistic market. *See infra*. And not a single case could be found standing for the proposition that a linear regression model should be excluded on *Daubert* grounds on the basis of not including some unknown "oligopoly" variable, as Defendants advance. Notably absent from Defendants' Motion is any authority supporting their position that economists must include some kind of "oligopoly variable" in their linear regression models. *See* Def. Mot. at 9-12.

In *In re Korean Ramen Antitrust Litigation*, the district court found the experts' regression models reliable, which were similar in nature of Dr. Mangum's here. *See In re Korean Ramen Antitrust Litig.*, No. 13-cv-04115, 2017 U.S. Dist. LEXIS 7756 (N.D. Cal. Jan. 19, 2017). And there, the district court noted that the market exhibited oligopolistic characteristics. *See id.* n. 9. Absent from the district court's extended analysis of the variables utilized in plaintiffs' experts models is any discussion of a variable accounting for the oligopolistic nature of the ramen market.

Other courts have ruled the same. *See, e.g., In re Chocolate Confectionary Antitrust Litig.*, MDL No. 1935, 2013 U.S. Dist. LEXIS 189309 (M.D. Pa. May 10, 2013) (discussing the plaintiff's expert model at length with no discussion of an oligopoly variable, but noting the oligopolistic nature of the chocolate market); *In re Dealer Management Systems Antitrust Litig.*, 581 F. Supp. 3d 1029 (N.D. Ill. 2022) (noting the oligopolistic nature of the market and rejecting a *Daubert* challenge to Dr. Israel's price regressions where no "oligopoly variable" was used); *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2012 U.S. Dist. LEXIS 181506 (D. Kan. Dec. 21, 2012) (same); *In re Domestic Drywall Litig.*, 322 F.R.D. 188, 195 (E.D. Pa. 2017) (same); *Kleen Products LLC v. International Paper*, 306 F.R.D. 585 (N.D. Ill. 2015) (same); *In re Packaged Seafood Products Antitrust Litig.*, 332 F.R.D. 308 (S.D. Cal. 2019) (same); *In re TFT-LCD*

10

*Antitrust Litig.*, 267 F.R.D. 583 (N.D. Cal. 2010) (same); *In re Titanium Dioxide Antitrust Litig.*, No. RBD-10-0318, 2013 U.S. Dist. LEXIS 62394 (D. Md. May 1, 2013) (same); *In re Disposable Contact Lens Antitrust Litig.*, 329 F.R.D. 336 (M.D. Fla. 2018) (same).

CIIPPs could continue citing a slew of additional cases standing for the above proposition. But the indisputable reality is: the vast majority of Section 1 collusion cases take place in the context of oligopolistic markets. And Class Counsel is not aware that in *any* of those cases, an expert utilized a model with the oligopoly variable that Defendants claim is required in this case.

### 3. Defendants' Arguments are Contrary to Binding Supreme Court and Circuit Court Precedent

As the Seventh Circuit and this Court have held, challenges to an expert's choice of variables "is normally a question that goes to the probative weight of the analysis rather than to its admissibility." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013); *see also* Order at 27. There is good reason for this rule of law: it is based on United States Supreme Court precedent. *See Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (reversing lower court's exclusion of regression analysis based on its view that it did not include proper selection of variables). Here, Defendants' argument is that Dr. Mangum should have included a variable accounting for the oligopolistic nature of the market. They are wrong for all of the reasons outlined above, but at best, this is an area for cross examination, not exclusion.

### 4. The Output from Dr. Mangum's Regressions Further Demonstrate that His Work is Reliable

If Dr. Mangum had chosen supply and demand variables that are not sufficient, then his regressions would not explain a substantial portion of the variation in the dependent variable. But that is not what Dr. Mangum's regression outputs show. Indeed, the outputs from Dr. Mangum's regressions show that his model is reliable and his chosen variables are (a) explaining a substantial

portion of the variation in the dependent variable;[5] (b) demonstrating high statistical significance;[6] and (c) contain the right sign, or otherwise operate in a manner expected by economic theory.[7]

### 5. Dr. Mangum Never Testified that a Regression Model, By Itself, Is Sufficient to Demonstrate Liability

In the "Introduction" to their argument regarding Dr. Mangum's alleged failure to control for the oligopolistic nature of the Broilers market, Defendants also argue that Dr. Mangum "claims that his econometric models are all that is necessary to distinguish between 'lawful' and 'unlawful' pricing and production levels." Def. Mot. at 2. It is unclear whether Defendants intended to pursue this argument, as they do not repeat it in the section regarding their arguments on oligopoly. *See id.* § IV(B) at 9-12. The problem with Defendants' argument is that it is simply not true: Dr. Mangum repeatedly testified both that he was not offering an opinion on liability and that a regression model is not "all" that the jury needs in order to determine liability.

Dr. Mangum's Reports make clear that he is not providing a liability opinion, instead he is opining on antitrust impact, injury, and damages. Merits Report ¶ 19; Rebuttal Report ¶ 9. If that were not enough, Dr. Mangum repeated this testimony in his first deposition, when he testified "I

---

[5] Dr. Mangum's regressions all have ███████████████. Merits Report ¶¶ 104, 109, 113; *see also* Rebuttal Report ¶¶ 127-129. The "R-Squared" statistic measures the "goodness of the fit" of the model. *Schmitt v. Younique, LLC*, No. 17-1397-JVS, 2020 U.S. Dist. LEXIS 263313 (C.D. Cal. April 8, 2020) ("R Square refers to what's called the goodness of fit of the regression equation as a whole . . . ."). And the statistic generated tells the economist the percentage of the variation in the dependent variable that the chosen explanatory variables are explaining. *See* Reference Manual on Scientific Evidence at p. 355 (3d. ed. 2011). This is evidence that no significant explanatory variables were omitted.

[6] The coefficients of interest on Dr. Mangum's overcharge models are all highly statistically significant. Indeed, they are significant at the 99% confidence level—meaning there is less than a 1% chance that the results were found by chance alone. Merits Report ¶¶ 106, 110, 114. A coefficient is statistically significant if there is a sufficiently low probability that the estimated relationship between the explanatory variable and the dependent variable was only found by chance. Merits Report ¶ 65.

[7] All of the coefficients in Dr. Mangum's explanatory variables contain the right sign, which is further evidence that his model is reliable. Merits Report ¶¶ 104, 109, 113. The algebraic sign of the coefficients on the explanatory variables describes whether the estimated relationship is positive (*i.e.*, the dependent and independent variables move in the same direction) or negative (i.e., the dependent and independent variables move in opposite directions). Merits Report ¶ 65.

believe that is the case. I don't have opinions on liability, but I'm assuming liability will be found." Dep. I at 39:8-14; *see also id.* at 89:21-90:21, Zapala Decl., Ex. C ("Dep. I"). During his second deposition, Dr. Mangum not only repeated that he was providing no opinion on whether Defendants actually colluded, he also repeatedly made clear that a regression model—standing alone—does not establish liability. Dr. Mangum explained that he used the word ███████████ ██████████████████████████████████████ an expert for the Defendants. Dep. II at 29:20-30:18; *see id.* at 32:23-33:19 (testifying in substantially similar fashion). And to make matters crystal clear, Dr. Mangum flatly testified that a regression, standing alone, will not establish liability. *See* Dep. II at 38:17-40:4 ("But it isn't the case, at least my intention that only my price regressions, for example, that have found an overcharge, a statistically significant overcharge, it's not the case that that alone is deterministic of a finding of liability."). And Dr. Mangum similarly testified that the same is true with respect to his production regression. *Id.* at 40:5-20.

### C. Defendants Continue to Misconstrue and Alter Dr. Mangum's Opinions and Ignore this Court's Order on the Motion to Dismiss and at Class Certification

Finally, Defendants argue that Dr. Mangum's entire opinion must be excluded based on deposition testimony where he allegedly testified that ████████████████████████████ ██████████████████████████████████ Def. Mot. at 13-15. But Defendants are perverting Dr. Mangum's testimony and greatly overreaching.

*First,* Dr. Mangum was not providing a liability opinion. Moreover, Defendants are intentionally conflating issues. It is certainly true that the case law holds that plaintiffs must demonstrate that Defendants had "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). That is a point that neither CIIPPs, nor Dr. Mangum dispute. Indeed, Dr. Mangum clearly testified

that Defendants' so-called "comfort theory"[8] required the Defendants to consciously commit to a common scheme. *See* Dep. II at 178:16-22 ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ ; *id.* at 176:21-25 ████████████████████████████████

████████████████████████████████████ (emphasis added). Properly understood, therefore, Dr. Mangum's testimony about what Defendants' call a "comfort theory" is nothing more than the simple observation that the participants in a conspiracy have to be convinced that enough entities will participate such that the enterprise could be successful.

Moreover, Dr. Mangum's testimony that certain Defendants ████████████████

████████████████████████████████████████████████████

████████████████████ . Dr. Mangum was merely stating the uncontroversial perspective—one that has been accepted by this Court at both the motion to dismiss and the class certification phases—that a particular Defendant need not have actually *reduced* their production in absolute terms. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 793 (N.D. Ill. 2017). Instead, the case alleges a production *restraint*, not a production cut in absolute terms. *See, e.g.,* Dep. II at 176:16-25 ████████████████████████████████████████ ; *id.* at 188:25-189:19.[9] In reiterating that he was not providing a liability opinion, Dr. Mangum made the further point, which Defendants conflate, that in a hypothetical ████████████████████

---

[8] This is Defendants' formulation. Dr. Mangum never uses the words "comfort theory" in either of his Reports, or in his Class Certification Reports.
[9] Dr. Mangum was also drawing a distinction between ████████████████████████████
████████████████████████████████████████████████████
████████████████

███████████████████████████████████████████████████

███████████████████. Dep. II at 187:6-25.

The foregoing testimony is consistent with this Court's orders on both the Motion to Dismiss and at Class Certification. For example, on the Motion to Dismiss, the Court rejected Defendants' argument that Plaintiffs need to show that each Defendant *actually reduced production in absolute terms*. *See supra* at 14. And, at Class Certification, this Court rejected Defendants' and Dr. Johnson's argument that Plaintiffs' experts were required to have modeled individual rather than industrywide production. Order at 19

*Second*, Defendants make the peculiar argument that "[d]espite being positioned as a damages expert, Dr. Mangum strayed into the merits and offered the bizarre opinion that a substantial portion of the industry could have done nothing and still been part of the alleged conspiracy." Def. Mot. at 13. But it was not Dr. Mangum that "strayed" from his Reports; it was counsel for the Defendants, who were the ones asking him questions at his deposition. Dr. Mangum was obligated to answer those questions unless the question called for privileged or otherwise immunized information. Instead, it was Dr. Mangum that repeatedly reminded the Defendants that he was not forming opinions regarding liability in the case, and that he did not engage in individual, firm-specific production regressions. Dep. II at 182:12-183:6. This argument provides no grounds to exclude Dr. Mangum's opinions.

## V.      CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Exclude the Testimony of Dr. Mangum.

Dated: January 26, 2022                                    Respectfully Submitted:

                                                                    */s/ Adam J. Zapala*
                                                                    Adam J. Zapala

James G. Dallal
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: (650) 697-6000
azapala@cpmlegal.com
jdallal@cpmlegal.com

Alexander E. Barnett
**COTCHETT, PITRE & MCCARTHY, LLP**
40 Worth Street, Suite 602
New York, NY 10013
Tel: (212) 201-6820
abarnett@cpmlegal.com

*Co-Lead Counsel for the Commercial and
Institutional Indirect Purchaser Class*

Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Joshua J. Rissman
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com

*Co-Lead Counsel for the Commercial and
Institutional Indirect Purchaser Class*

Kenneth A. Wexler
Melinda J. Morales
**WEXLER BOLEY & ELGERSMA, LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
Tel: (312) 346-2222
kaw@wbe-llp.com
mjm@ wbe-llp.com

*Liaison Counsel for the Commercial and
Institutional Indirect Purchaser Class*

16