**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | No. 1:16-cv-08637-TMD-JG |
| | Honorable Thomas M. Durkin |
| | Magistrate Judge Jeffrey T. Gilbert |
| This Document Relates To: | |
| *All End-User Consumer Plaintiff Actions* | |

**MEMORANDUM OF LAW IN SUPPORT OF END-USER CONSUMER**
**PLAINTIFFS' RENEWED MOTION FOR ATTORNEYS' FEES**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    PROCEDURAL BACKGROUND................................................................................5

III.   ARGUMENT .....................................................................................................8

    A.    The relevant data set for assessing what would have happened in an *ex ante* bargain includes choices to bid, choices not to bid, and actual contracts with sophisticated parties, and all support the 33 percent fee award. ................................................................................9

    B.    The bids occurred in factually dissimilar cases. ....................................14

    C.    All other evidence supports the finding that one-third is the *ex ante* rate for litigation of this size and complexity. ......................................25

         1.    Fee agreements – in this case and others across the country– show that one-third is the typical negotiated rate. .....................25

         2.    Nationally, the average award in a case of this size and complexity is 30 percent. ..........................................................26

IV.   CONCLUSION................................................................................................29

010636-11/2346918 V1

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................................16

*Bellinghausen v. Tractor Supply Co.*,
    306 F.R.D. 245 (N.D. Cal. 2015) .............................................................................29

*Blum v. Stenson*,
    465 U.S. 886 (1984) (Brennan, J., concurring) ........................................................13

*In re Broiler Chicken Antitrust Litig.*,
    2023 WL 5599636 (7th Cir. Aug. 30, 2023) ................................................... *passim*

*Matter of Cont'l Illinois Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992) ....................................................................................14

*In re Credit Default Swaps Antitrust Litig.*,
    2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) ...........................................................22

*In re Domestic Drywall Antitrust Litig.*,
    2018 WL 3439454 (E.D. Pa. July 17, 2018) .............................................................24

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018) ............................................................22

*In re Linerboard Antitrust Litig.*,
    292 F. Supp. 2d 631 (E.D. Pa. 2003) .......................................................................10

*In re Lithium Ion Batteries Antitrust Litig.*,
    2022 WL 16959377 (9th Cir. Nov. 16, 2022) ..........................................................12

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ..............................................................................10

*In re Optical Disk Drive Antitrust Litig.*,
    2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ..............................................................15

*In re Packaged Ice Antitrust Litig.*,
    723 F. Supp. 2d 987 (E.D. Mich. 2010) ...................................................................16

*In re Payment Card Interchange Fee Merch. Dis. Antitrust Litig.*,
    991 F. Supp. 2d 437 (E.D.N.Y. 2014) ................................................................21, 22

*In re Peanut Farmers Antitrust Litig.*,
    2021 WL 9494033 (E.D. Va. Aug. 10, 2021) ...........................................................16

*In re Pork Antitrust Litig.*,
   2022 WL 18959155 (D. Minn. Oct. 19, 2022) ........................................................11

*Silverman v. Motorola Sols., Inc.*,
   739 F.3d 956 (7th Cir. 2013) ..................................................................1, 9, 11, 17

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
   2005 WL 1213926 (E.D. Pa. May 19, 2005)..................................................10, 16

*In re Synthroid Mktg. Litig.*,
   264 F.3d 712 (7th Cir. 2001) ......................................................................7, 9, 25

### OTHER AUTHORITIES

Lester Brickman, *ABA Regulation of Contingency Fees: Money Talks, Ethics
   Walks*, 65 FORDHAM L. REV. 247, 248 (1996)...................................................13

Theodore Eisenberg, et. al., Attorneys' Fees in Class Actions: 2009-2013,
   92 N.Y.U. L. Rev. 937, 952 (2017) .......................................................................28

## I. INTRODUCTION

In its first opinion, the Court applied the correct methodology for determining fees.[1] It also came to the correct conclusion. Under Seventh Circuit law, an award for fees must try to approximate the market rate for legal services that willing buyers and sellers would have negotiated at the beginning of the case.[2] Here, the Court initially awarded 33.3 percent of the settlement fund, a similar amount as that awarded to the other two sets of class counsel.[3] Not only does the original award align with other awards in this specific case, it also aligns with the best available data on negotiated rates in antitrust cases. And it is only slightly over the median fee award for both all antitrust cases and End-User Consumer Plaintiffs (EUCP)'s Class Counsel's past antitrust cases with awards.

On appeal, the Seventh Circuit did *not* take issue with the size of the award. As the panel explained in the judgment, "we express no preference as to the amount or structure of the award."[4] Rather, the panel instructed this Court to give two data sets further consideration. When these data are placed in context and considered fully, they confirm that, at the outset of this case, EUCP Class Counsel would have negotiated a fee of 33 percent – equal to $56,760,000 of the net settlement.

---

[1] *In re Broiler Chicken Antitrust Litig*., No. 22-2889, 2023 WL 5599636, at *3 (7th Cir. Aug. 30, 2023) ("Because the district court followed the appropriate methodology in determining the fee award, we review its decision for an abuse of discretion.").

[2] *Id.* at *3 ("a district court must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case") (citations and quotations omitted); *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957 (7th Cir. 2013) ("attorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services.").

[3] Mem. Op. and Order ("Initial Fee Order"), ECF No. 5855 (Oct. 7, 2022) at 12.

[4] Certified Copy of USCA Judgment, ECF No. 6891 (Sept. 22, 2023).

**First**, the Seventh Circuit instructed this Court to re-examine the bids Class Counsel previously submitted in *ODD*, *Batteries*, and *Resistors*.[5] The Seventh Circuit has said that these "bids would ordinarily be good predictors of what ex ante bargain would have been negotiated."[6] But the appellate court also recognized that there may be "aspects of the cases in which the bids were made may show the bids to be poor indicators of what bargain would have been struck ex ante."[7] After considering the context in which those bids were made, they are in fact "poor indicators" of the bargain that rational economic actors would have made at the outset of this case.

Perhaps the most crucial piece of context for these bids is their rarity. Of 196 antitrust cases EUCP Class Counsel filed between 2013 and 2019, three years before and after the filing of *Broilers*, EUCP Class Counsel only submitted a bid in one case: *Resistors* in 2015.[8] As rational participants in the national market for antitrust attorney labor, EUCP Class Counsel have declined to bid in nearly *all* antitrust cases. Declining to bid is the dominant practice because the costs of running complex antitrust cases (often more than $10 million in lodestar before trial and millions

---

[5] "*ODD*" refers to *In Re Optical Disk Drive Products Antitrust Litigation*, No. 3:10-md-02143. "*Batteries*" refers to *In Re Lithium Ion Batteries Antitrust Litigation*, No. 4:13-md-02420. "*Resistors*" refers to *In Re Resistors Antitrust Litigation*, No. 3:15-cv-03820.

[6] *In re Broiler Chicken Antitrust Litig.*, No. 22-2889, 2023 WL 5599636, at *3 (7th Cir. Aug. 30, 2023). Only the *Resistors* bid, which was filed in 2015, was brought near the time this litigation was filed in 2016; *ODD* was filed in 2010 and *Batteries* was filed in 2012.

[7] *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5599636, at *5.

[8] Ex. 1. "Ex." refers to exhibits found in the Declaration of Steve Berman in Support of End-User Consumer Plaintiffs' Renewed Motion for Attorneys' Fees, filed concurrently herewith. EUCP Class Counsel have conducted a diligent search for all antitrust complaints and leadership applications each firm brought near the time this litigation was filed in 2016. During this search, they reviewed all leadership applications submitted between 2013 and 2019 (three years before this case was filed and three years after) to estimate the frequency of these bid submissions. During that period, both firms only offered one bid – the *Resistors* bid, which they submitted together. In addition, Cohen Milstein is aware of one other case from this period where they proposed a fee schedule – based on their negotiations with a named plaintiff. This case is discussed in section III(B). Although *ODD* and *Batteries* were brought before this period, they are also fully analyzed below. *See* section III(B).

in expert costs) and the risks of nonpayment (after sometimes up to a decade of attorney time) are too high for plaintiffs' counsel to shoulder unless they believe that they can seek a fee of up to 33.3 percent for exceptional service to their clients. Class counsel also keep in mind the opportunity cost of forgoing other cases when choosing whether to bid or not. Each choice not to bid is as relevant to what the *ex ante* agreement would have been as any choice to bid is. Each choice is as reflective of the market rate and what a firm would agree upon with a sophisticated client. This Court should therefore consider EUCP Class Counsel's hundreds of choices *not* to bid as much as their handful of bids in exceptional cases.

Even when the competitive pressures are strongest on firms – when leadership applications are necessary to compete with firms who have filed or may file related cases for their clients – Hagens Berman and Cohen Milstein almost never offered bids. A review of all 51 leadership applications submitted in antitrust cases by the two firms between 2013 and 2019 (including cases where fees have not been awarded) reveals that bids were exceedingly rare – occurring in less than 2 percent of all cases.[9] The takeaway from the two firms' practices (or lack thereof) with bids in antitrust cases is clear: they do not reflect the market rate that rational actors would generally choose in an *ex ante* bargain.

These law firms' choices at the beginning of antitrust cases to preserve their ability to seek up to one-third of any recovery accords with the choices of other sophisticated actors. For example, a 2020 study examined seventeen years of "data from sophisticated corporate clients who hire lawyers in high-stakes cases" including "antitrust cases in the pharmaceutical industry where large corporations sue each other."[10] In these cases, the fixed fee percentage of one-third "***heavily***

---

[9] *See* Ex. 2 (leadership application chart).

[10] *See* Ex. 3 at 1161 (Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151 (2020)).

dominated: the average was 32.85 percent."[11] Here, these two large, well-respected firms would have negotiated a rate that aligned with this data, given the significant risks of nonpayment and the investment of time and resources.

But even if the inquiry were limited to facts of the cases in which the firms provided bids, it would still show that the Court's original award was correct. Comparing the risks that were present at the outset of *Broilers* to the bid cases, it was apparent even at the outset that this case had significantly higher risk and required a greater time investment from senior counsel. *See* section III(B), *infra*. Given these aspects of the case, the bids are poor indicators of what rational actors would have done at the outset of this case.

**Second,** the Seventh Circuit told this Court that it should examine *ex post* fee awards from all jurisdictions, including the Ninth Circuit, rather than limit its analysis to decisions from this Circuit. But expanding the scope of the Court's analysis only confirms this Court's original findings: between 2016 (when this case was filed) and 2022, EUCP Class Counsel's median award in all jurisdictions was 30 percent.[12] *See* section III(C), *infra*. The Court did not need to exclude Ninth Circuit cases to find that "Appointed Counsel's fee request here is well within the range of awards they have received since 2016."[13]

It is no coincidence that the median *ex post* award for all antitrust cases matches the contingency fee sophisticated corporations negotiate most often in antitrust cases.[14] Both data points reflect this is the market rate. This median rate accounts for the significant risks and the

---

[11] *Id.* (emphasis in original).

[12] Ex. 9 (fee award table).

[13] Initial Fee Order, ECF No. 5855 (Oct. 7, 2022) at 10.

[14] *Compare* Ex. 4 at 31 (Josh Paul Davis and Rose Kohles, *2022 Antitrust Annual Report: Class Action Filings in Federal Court* (September 2023)) *with* Ex. 3 (Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151 (2020)).

time-investment that these cases generally take. There are opportunity costs involved in bringing any time-intensive litigation; private law firms must weigh the benefits and drawbacks of pursuing a case, given that they are forgoing the chance to pursue other, potentially more lucrative cases. In this case, it would have been economically irrational for counsel to negotiate a discount from their median rate, given that this was such high-risk, time-intensive litigation. Rather, the higher-than-average risk that counsel in this case would recover *no money*, means that counsel would have been more likely to negotiate an above-median rate. And so the Court was right to award 33 percent.

For these reasons, EUCP Class Counsel respectfully requests $56,760,000, or 33 percent of the first rounds of the net settlements reached in the EUCP case.[15] This *is* the market rate, even considering the Seventh Circuit's instructions.

## II.    PROCEDURAL BACKGROUND

After five years of hard-fought litigation, on December 20, 2021, this Court approved six settlements between the End User class and six corporate defendant families, for a total of $181 million.[16] EUCP Class Counsel moved the Court for 33 percent fee award from the settlement funds. More than a million class members submitted claims and only three objected, including objector Andren, who argued that 33 percent was "exorbitant" and "substantially above-market,"

---

[15] The Court previously said that it would award 33 percent of the net settlement, but as the Seventh Circuit noted, the amount the Court actually awarded, $57,400,000 is 33.3 percent of the net settlement, after deducting costs and service awards. *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5599636, at n.2. For consistency, Appointed Counsel's renewed requests asks for 33 percent, or $56,760,000.

[16] Order Granting End-User Consumer Pls.' Mot. for Final Approval of the Class Action Settlements, ECF No. 5304 (Dec. 20, 2021).

and said that "there must be consequences" for such "selfish" conduct.[17] Andren is both an attorney in, and here a client of, the class action objector practice at the Hamilton Lincoln Law Institute (formerly known as the Center for Class Action Fairness).[18]

Objector Andren made two arguments that are relevant to this renewed motion. *First*, Andren said the true *ex ante* market rate that a hypothetical plaintiff would have negotiated would have been lower, because one of the two co-lead firms, Hagens Berman, had submitted sliding-scale bids in *ODD* and *Batteries* – two cases filed in the District Court for the Northern District of California in 2010 and 2012, respectively. This Court gave little weight to the bids for two reasons. *First*, the Court found persuasive that "the most recent is more than seven years old."[19] *Second*, the Court questioned "whether it is appropriate to permit declining scale bids in an auction" because "declining fee scale award structures do not reflect market realities and impose a perverse incentive" that the marginal cost for continuing litigation will exceed the benefit.[20] On appeal, the Seventh Circuit held that "[i]t was an abuse of discretion to rule that bids with declining fee structures should categorically be given little weight in assessing fees."[21] Rather, the appellate court found that "[b]ids that class counsel made in auctions around the time this litigation began in September 2016 would ordinarily be good predictors of what ex ante bargain would have been negotiated."[22] But the Seventh Circuit recognized that this inquiry is fact-specific and that "[o]ther aspects of the cases in which the bids were made may show the bids to be poor indicators of what

---

[17] Obj. to Mot. for Attorneys' Fees, Costs, and Service Award, ECF No. 5182 (Nov. 10, 2021) ("2021 Andren Objection") at. 6, 15.

[18] 2021 Andren Objection, ECF No. 5181 (Nov. 10, 2021) at 1.

[19] Initial Fee Order, ECF No. 5855 (Oct. 7, 2022) at 6.

[20] *Id.* at 6.

[21] *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5599636, at *4.

[22] *Id.* at *5.

bargain would have been struck ex ante."[23] And while the Seventh Circuit recognized this Court's finding "that in some cases, a declining fee scale structure may be appropriate, but not in this complex antitrust litigation in which settlement was not a foregone conclusion[,]" it found that this "evaluation was not linked to the decision to discount the auction bids."[24]

*Second,* Andren argued to this Court that EUCP Class Counsel's fee request "grossly exceeds the market rate" and that "a $181 million megafund should include diminishing marginal rates."[25] The Seventh Circuit has expressly disavowed the megafund rule: "we have never suggested that a 'megafund rule' trumps these market rates, or that as a matter of law no recovery can exceed 10% of a 'megafund'[.]"[26] So rather than rely on Seventh Circuit law, Andren used an outdated 2010 study of class action awards (not antitrust class actions specifically) by Professor Brian Fitzpatrick. This study found that settlements "drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent."[27] Addressing these arguments, this Court relied on Professor Fitzpatrick's declaration, which said this study was "not even trying to capture how clients pay lawyers in the market like the Seventh Circuit does."[28] The Court found that "[t]he fact that fee awards in antitrust cases in

---

[23] *Id.* at n.4.

[24] *Id.*

[25] 2021 Andren Objection, ECF No. 5182 (Nov. 10, 2021) at 12.

[26] *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001).

[27] 2021 Andren Objection, ECF No. 5182 (Nov. 10, 2021) at 14 (*quoting* Brian Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 Empirical L. Stud. 811, 838 (2010).

[28] Initial Fee Order, ECF No. 5855 (Oct. 7, 2022) at 8. The Court was able to rely on a declaration from Professor Fitzpatrick to provide context to Andren's study because the Direct Purchasers submitted the declaration with their fee motion. *See* Declaration of Brian T. Fitzpatrick Regarding Direct Purchaser Plaintiffs' Motion for Attorneys' Fees, ECF No. 5048-1 (September 15, 2021).

this circuit are almost always one-third is a strong indication that this should be considered the 'market rate.'"[29] The Court then evaluated EUCP Class Counsel's chart of historical fee awards but "discounted awards from the Ninth Circuit due to its megafund rule, and cases in which the settlement amount was less than $50 million, which are not of the scale of this case."[30] Given that all remaining awards were "either for at least 30% of the settlement fund or were greater in absolute amount than what Appointed Counsel seek here," the Court determined that EUCP Class Counsel's requested fee was not "exorbitant" or "selfish" but in line with the market rate.[31]

On appeal, Andren's argument shifted: rather than emphasize that this settlement was a megafund, Andren told the Seventh Circuit that this Court erred by excluding all Ninth Circuit fee awards from its analysis. Based on that argument, the Seventh Circuit held that this Court should not have "categorically assigned less weight to Ninth Circuit cases in which counsel was awarded fees under a mega fund rule."[32] As explained below, however, including the Ninth Circuit fee awards in the analysis does not change any result. If the Court were to give EUCP Class Counsel's fee awards from all circuits (including the Ninth Circuit) equal weight, EUCP Class Counsel's mean and median fee award was still 30 percent – close to the 33 percent requested here.

### III.    ARGUMENT

The Seventh Circuit has asked this Court to re-examine the award of attorneys' fees to EUCP Class Counsel. Crucially, the Seventh Circuit did *not* instruct this Court to reduce the fee; it only instructed the Court to consider additional information when making the fee determination.

---

[29] *Id.* at 9.

[30] *Id.* at 10.

[31] *Id.* at 10.

[32] *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5599636, at *5. The Seventh Circuit did not, however, go so far as to overrule its prior megafund holdings; rather it confirmed again that "this court has rejected the application of a megafund rule." *Id.*

*First,* the Seventh Circuit instructed this Court to conduct a fact-specific inquiry to determine whether the bids submitted in the three prior cases would be "poor indicators of what bargain would have been struck in this case *ex ante*." [33] *Second*, the Seventh Circuit instructed the Court to consider similar antitrust awards – from all circuits, including the Ninth Circuit. As discussed below, both these inquiries suggest that the Court got the result right.

**A.     The relevant data set for assessing what would have happened in an *ex ante* bargain includes choices to bid, choices not to bid, and actual contracts with sophisticated parties, and all support the 33 percent fee award.**

EUCP Class Counsel have recovered an extraordinary amount for the End-User Class – $181 million from Tyson, Pilgrim's, Mar-Jac, Peco, Fieldale, and George's. This is more than either the direct or commercial classes recovered against the same defendants. End Users have litigated this case for nearly seven years. End Users have survived many challenges – most recently summary judgment. They are knocking on trial's door. Yet despite all the effort spent vigorously litigating this case and the exceptional results achieved so far, EUCP Class Counsel's fees are still outstanding.

Under Seventh Circuit law, an award for fees must "estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case."[34] On appeal, the Seventh Circuit clarified that EUCP Class Counsel's past bids were important data points to consider in determining what would have happened in this hypothetical bargain. Crucially, however, these bids are not the *only* relevant data points for the Court to consider. To understand what rational actors would have done at the bargaining table, it is

---

[33] *Id.*

[34] *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (citations and quotations omitted); *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957 (7th Cir. 2013) ("attorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services.").

important to examine cases where: (a) EUCP Class Counsel determined that the risks and costs of litigation were sufficiently low to make a bid below one-third of the recovery; and (b) cases where EUCP Class Counsel determined that the risks and costs of litigation were too high to make such a bid. It also helps to examine what fees sophisticated antitrust plaintiffs *actually negotiated* with their counsel in other cases. Taken together, this data confirms that EUCP Class Counsel would have negotiated a 33 percent fee at the outset of this case.

In nearly all antitrust cases, EUCP Class Counsel have determined that the risks and costs of litigation are too high to make a bid: EUCP Class Counsel offered bids *in less than one percent of all antitrust cases they filed between 2013 and 2019* – the years surrounding the filing of the Broilers case in 2016.[35] In many instances, EUCP Class Counsel would rather lose leadership than offer an under market bid; a review of all 51 leadership applications submitted in antitrust cases by the two firms between 2013 and 2019 (including cases where the firms did not win leadership) reveals that EUCP Class Counsel only offered a bid in one case – *Resistors* in 2015.[36]

As a general practice, EUCP Class Counsel do *not* submit bids in antitrust cases – even when there is contested leadership – because antitrust cases carry exceptional challenges and risk. Courts recognize that antitrust cases are "complicated, lengthy and bitterly fought"[37] and are "arguably the most complex action[s] to prosecute[.]"[38] As one district court observed, "the history of antitrust litigation is replete with cases in which plaintiffs succeeded at trial on liability, but

---

[35] *See* Ex. 1 (complaint chart).

[36] *See* Ex. 2 (leadership application chart).

[37] *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. CIV.A. 03-4578, 2005 WL 1213926, at *12 (E.D. Pa. May 19, 2005).

[38] *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 639 (E.D. Pa. 2003).

recovered no damages, or only negligible damages, at trial, or on appeal."[39] Because "antitrust litigation is inherently expensive and complex," a defense win presents a significant risk to Class Counsel, who pay the upfront costs of the litigation and the pre-litigation investigation.[40] If private parties negotiated at the outset of this litigation, their agreed-upon rate would have accounted for the risks of nonpayment and financial loss known to them. As the Seventh Circuit observed, "[t]he greater risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel."[41]

Counsel's ordinary flat-fee structure recognizes the reality that taking a case all the way to trial is particularly risky. In light of these risks, a rational plaintiff would often *want* their attorneys to charge a flat fee, rather than a declining scale, because the flat fee ensures that counsel's interests remain aligned with the plaintiff's interests until the very end of the case. For example, imagine that, at the outset of a case, a plaintiff expects to settle with some defendants, but understands that the case could go all the way to trial for other defendants. Under those circumstances, it would be rational for a plaintiff to request a fee that gives the attorneys every incentive to litigate as vigorously as possible through trial (to maximize the chance of a large recovery). A declining fee scale, however, would give counsel a perverse incentive to invest fewer resources after the initial settlements (because counsel's return on any further investment would be lower).[42]

---

[39] *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998).

[40] *In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/JD), 2022 WL 18959155, at *3 (D. Minn. Oct. 19, 2022).

[41] *Silverman*, 739 F.3d at 958 (citing *Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir.1986)).

[42] *See* Ex. 3 at 1158 (Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151 (2020) ("The danger of premature settlement can be mitigated if the fee percentage escalates as the recovery increases or the litigation matures, but it cannot be eliminated.").

And even in the exceedingly rare cases where bids were made, district courts have hesitated to accept them. For example, the district court in Batteries rejected Appointed Counsel's bid and used other factors to determining fees.[43] On an appeal, the Ninth Circuit held that Appointed Counsel's rejected bid in Batteries was not relevant for assessing the fee award and "offer[ed] little insight into market rates."[44] If these bids were not indicative of market rates for the cases in which they were offered, then *a fortiori*, the bids are poor indicators of the market rate for this case – a case that carried higher risk and offered more complexity.[45]

Another important data set to consider in determining what would happen at a hypothetical bargaining table is records of what *actually happened* in arm's-length negotiations between sophisticated antitrust plaintiffs and their counsel. A 2020 study examined whether parties in antitrust cases adopt declining fee structures when they privately negotiate contingency fees in antitrust cases. The study examined *seventeen years* of "data from sophisticated corporate clients who hire lawyers in high-stakes cases" including "antitrust cases in the pharmaceutical industry where large corporations sue each other" to determine the market rate.[46] The data reflected that a flat, negotiated rate of one-third "**heavily** dominated: the average was 32.85 percent."[47] The study noted that corporate plaintiffs in antitrust cases generally choose a flat, fixed percentage contingency fee even though antitrust cases involve large damages – contrary to the sliding fee

---

[43] *In re Lithium Ion Batteries Antitrust Litig.*, 2022 WL 16959377, at *1 (9th Cir. Nov. 16, 2022).

[44] *Id.*

[45] While the fact the bids was rejected cannot be dispositive on its own, *see In re Broiler Chicken Antitrust Litig.*, 2023 WL 5599636, at *4, the fact that the Ninth Circuit determined these bids were out-of-step with the market serves to emphasize that other aspects of these bids make them poor comparisons for this case. *See* sections III(B) and III(C), *infra*.

[46] *Id.* at 1161.

[47] *Id.*

scales many courts have adopted.[48] As the study explains, "the investment needed to win the [antitrust] cases . . . may have correlated with the stakes of the cases," such that "the optimal fixed percentage would remain constant even as the stakes increased."[49]

The Court's past fee awards in this case align with this research. Both the direct purchaser class and the commercial class have members who are large, sophisticated corporations. Even though counsel for both classes argued for a one-third fee award, none of the sophisticated participants – including the 3,500+ members of the direct purchaser class – objected to the fee motions.[50] These sophisticated market participants saw a one-third rate as reasonable, probably because it is the most commonly negotiated rate in similar cases they bring. For attorneys who practice on contingency, the results of this study are unsurprising: a one-third rate is the standard negotiated rate for most contingency fee cases.[51] As the Supreme Court observed *Blum v. Stension*, "[i]n tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery."[52]

Given that this case had exceptional risk, if the parties negotiated a rate *ex ante*, it is likely that they would have agreed to a fixed percentage of one-third, in line with what other sophisticated parties generally agree upon. Seventh Circuit law recognizes that, in such a risky case, the market rate for fees will be higher to account for the risk that "[t]he lawyers for the class receive no fee if

---

[48] *Id.* at 1153-1154.

[49] *Id.* at 1163.

[50] While many opt-outs have filed cases, it would be inaccurate to say no sophisticated plaintiffs remain in the class. Class members include huge, sophisticated corporations like Costco. None have objected to the fee request. And none of the late opt-outs raised issues with fees either.

[51] *See* Lester Brickman, *ABA Regulation of Contingency Fees: Money Talks, Ethics Walks*, 65 FORDHAM L. REV. 247, 248 (1996) (noting that "standard contingency fees" are "usually thirty-three percent to forty percent of gross recoveries").

[52] *Blum v. Stenson*, 465 U.S. 886, 903 (1984) (Brennan, J., concurring).

the suit fails."[53] Because of the particular challenges and risks that were present at the outset at the outset of this case, a declining fee structure would be less appropriate here than it was in the bid cases. *See* section III(B), *infra*. As explained further below, the Court need not use the extraordinarily rare bids – which fly in the face of the only empirical research on negotiated rates – as the starting point for determining the market rate.

**B.    The bids occurred in factually dissimilar cases.**

The Seventh Circuit has cautioned against finding that "bids with declining fee structures should categorically be given little weight in assessing fees."[54] But nor should they always be given great weight. Rather, as both this Court and the Seventh Circuit have recognized, "aspects of the cases in which the bids were made may show the bids to be poor indicators of what bargain would have been struck ex ante."[55] This is a fact-specific inquiry.[56] As the Seventh Circuit put it, "the appropriateness of a declining fee scale award structure may depend on the particulars of the case."[57] There are five key factors that made that make *Broilers* unlike the three bid cases that the Seventh Circuit asked this Court to consider. These five factors make those bids poor indicators of what the parties would have agreed upon for *Broilers*.

*Aspect 1: Government Investigations.* In all three bid cases raised in the Seventh Circuit appeal, the Department of Justice had first announced an investigation into antitrust misconduct

---

[53] *Matter of Cont'l Illinois Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992), as amended on denial of reh'g (May 22, 1992).

[54] *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5599636, at *4.

[55] *Id.* at *5.

[56] Initial Fee Order, ECF No. 5855 (Oct. 7, 2022) at 6 ("declining scale fee award structure might be appropriate in cases in which settlement is a more likely outcome and in which the 'marginal costs' of increasing the settlement recovery amount are low."); *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5599636, at *4.

[57] *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5599636, at *4.

before the civil complaints were filed.[58] The initial civil complaints relied on these government investigations to bolster the plausibility of the plaintiffs' claims, which helped mitigate the risk of a defense win on the pleadings. These investigations also ameliorated the risks of a defense win later. For example, in *ODD* the district court's class certification order begins by recognizing that "[f]rom the outset of this matter, defendants have conceded, that as the guilty pleas reflect, there were at least some instances of anticompetitive conduct in connection with the sale of ODDs."[59] And in the most recent case, *Resistors,* a defendant had **admitted to criminal wrongdoing before the civil complaint was filed**.[60] Because the defendants conceded at the start they acted illegally in *Resistors*, these cases had a different settlement posture.

*Broilers* had no such investigation – and no defendants conceded to misconduct at the outset. As a result, *Broilers* was "riskier than many other antitrust class actions because there was no prior government investigation, or prior finding of civil or criminal liability based on antitrust

---

[58] *See* Ex. 5 ¶¶ 62–64 (*Disk Drive* complaint dated Apr. 6, 2010) ("Defendants SOA, TSST and HLDS confirmed that they received subpoenas from the DOJ in connection with a criminal antitrust investigation into possible price-fixing, bid-rigging, and allocation of markets regarding ODDs . . . . It is significant that Defendants' anticompetitive behavior has been the subject of a criminal grand jury investigation by the DOJ. In order for the DOJ to institute a grand jury investigation, a DOJ Antitrust Division attorney must believe that a crime has been committed"); Ex. 6, ¶ 66 (*Batteries* complaint dated Oct. 3, 2012) ("Defendants received notice they were being investigated for price-fixing Lithium Ion Batteries by the U.S. Department of Justice and European Union . . . Both Japanese and Korean producer price indexes for Lithium Ion Rechargeable Batteries fell after Defendants disclosed they were being investigated"); Ex. 7 ¶¶ 93-95 (*Resistors* complaint dated October 23, 2015) ("Competition authorities in the United States have recently launched an investigation into the major participants in the resistors industry. . . Defendant Panasonic approached U.S. and Chinese authorities to report its involvement in the conspiracy and seek amnesty.").

[59] *In re Optical Disk Drive Antitrust Litig*., No. 3:10-MD-2143 RS, 2016 WL 467444, at *1 (N.D. Cal. Feb. 8, 2016).

[60] Ex. 7 ¶ 95 (*Resistors* complaint dated Oct. 23, 2015) ("By applying for leniency through ACPERA, the cartel member believed to be Panasonic must have admitted to anticompetitive conduct in the resistors industry").

violations[.]"[61] The Supreme Court requires private plaintiffs to plead enough facts in antitrust cases to "nudge[] their claims across the line from conceivable to plausible,"[62] even though "proof is largely in the hands of the alleged conspirators[.]"[63] Conspiracies are secret; so civil plaintiffs litigate under the tension of pleading enough facts to establish a plausible conspiracy, even though most of these facts are hidden. But at the pleadings stage, "government investigations may be used to bolster the plausibility of § 1 claims."[64] For this reason, courts recognize "that there is a greater risk of nonpayment where an antitrust class action 'did not benefit from the fruits of a prior government investigation[.]'"[65]

Because *Broilers* involved greater risks at the outset, these three bid cases are "poor indicators of the ex ante market rate."[66] As the Court recognized, without a government investigation, EUCP Class Counsel in *Broilers* "invested massive resources of time and money when few other counsel expressed interest, with little assurance of success."[67] For example, EUCP Class Counsel retained an expert economist to assess market power with a focus on the retail channel – well before it was certain that *any* law firm would be appointed to represent consumers.

---

[61] *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. CIV.A. 03-4578, 2005 WL 1213926, at *12 (E.D. Pa. May 19, 2005); *see also In re Peanut Farmers Antitrust Litig.*, No. 2:19-CV-00463, 2021 WL 9494033, at *4 (E.D. Va. Aug. 10, 2021) ("The risk of nonpayment is even higher when a defendants' prima facie liability has not been established by the government in a criminal action")(quoting *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *5 (E.D. Pa. Jan. 3, 2008)).

[62] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[63] *Id*. at 586 (Stevens, J. dissenting).

[64] *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1009 (E.D. Mich. 2010).

[65] *In re Peanut Farmers Antitrust Litig.*, No. 2:19-CV-00463, 2021 WL 9494033, at *4 (E.D. Va. Aug. 10, 2021) (quoting *In re Linerboard Antitrust Litig.*, No. CIV.A. 98-5055, 2004 WL 1221350, at *11 (E.D. Pa. June 2, 2004).

[66] *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5599636, at *5.

[67] Initial Fee Order, ECF No. 5855 (Oct. 7, 2022) at 7.

And even though there was no certainty they would be appointed as lead counsel, EUCP Class Counsel also retained a conflicts expert to help the Court understand the conflict issues that arise where lead counsel represents a dual consumer/commercial indirect class.[68] The *ex ante* rate must account for the greater risk that *Broilers* posed that End Users might be "walking away empty-handed[.]"[69]

    ***Aspect 2: Number of Defendants/Market Participants.*** Antitrust lawyers understand from the outset of a case, that each additional defendant increases the work and the costs at all stages of litigation. And this case has many more defendants than those in the cases with bids.

    The initial EUCP complaint in *Broilers* named more defendants than many other antitrust class actions, including the rare bid cases. EUCP Class Counsel's initial complaint named 14 defendant families, or more than 27 individual entities.[70] Even so, given the number of entities in the broiler market, it was clear that additional defendants might be added – a prediction that came to pass, given that the operative EUCP complaint names 18 defendant families. The complexity of the market participants, and the number of defendants and relevant third parties, made clear from the outset that it would significantly increase the necessary time and resources, while not creating any more certainty for the outcome.

    In contrast, the three rare bid cases were brought against fewer defendant families because those industries are much more consolidated. The most recent case, *Resistors*, had eight defendants

---

    [68] Decl. of Shana Scarlett in Supp. of Mem. in Supp. of End-User Consumer Pls.' Mot. for Attorneys' Fees, Expenses, and Class Representative Awards, ECF No. 5161-1 (Oct. 27, 2021) at ¶ 2.

    [69] *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013).

    [70] *See* Complaint, Case No. 1:16-cv-08931, ECF No. 1 (filed September 14, 2016).

– just over half number first named here.[71] *ODD* had seven.[72] *Batteries* had just five.[73] Because the electronic component part industries at issue in *ODD*, *Batteries* and *Resistors* were also more consolidated and largely involved overseas manufacturers, the parties did not expect to name additional defendant families – and in fact did not name additional defendant families – after the first complaint. Here, in contrast, plaintiffs expected (correctly) that the case could expand beyond the original 14 defendants.

But even from the outset, 14 defendants means at least 14 defense law firms. It requires evidence to be developed against ***each*** defendant regarding their participation in the conspiracy. Each defendant produces documents that have to be reviewed and each defendant's employees need to be deposed.

This increased workload was certainly apparent at the outset of this litigation, and in fact came to pass. Here, plaintiffs were permitted to take 10 depositions per defendant, or more than 180 defendant witnesses – and that was just for the defendants named in the first complaint. Compare that with *Batteries* (one of the bid cases), where the district court permitted plaintiffs to take 12 depositions from each defendant family, plaintiffs only had to depose 60 defendant witnesses – one third of the number here.[74] The higher number of defendant families signaled that

---

[71] *Resistors* was litigated against 8 defendant families (AVX, KEMET, KOA, Panasonic, Rohm, TDK, Vishay and Yageo) and the complaint named 18 entities. Ex.7 (*Resistors* complaint dated Oct. 23, 2015).

[72] *Disk Drives* was litigated against 7 defendant families (Sony, Toshiba, Samsung, Hitachi, LG Electronics, Lite-On, and Philips) and the complaint named 14 of entities. *See* Ex. 5 (*Disk Drive* complaint dated Apr. 6, 2010).

[73] *Batteries* was litigated against 5 defendant families (LG, Panasonic, Sony, Samsung and Hitachi) and the complaint named 14 entities. *See* Ex. 6, (*Batteries* complaint dated Oct. 3, 2012).

[74] *See* Ex. 8 (*Batteries* deposition protocol order) ("Plaintiffs collectively may depose up to 120 percipient witnesses as part of the joint, coordinated discovery in this case, with a maximum of 12 depositions for any single Defendant group.").

EUCP Class Counsel had to be prepared to spend more time reviewing documents and preparing deposition outlines and to respond to and argue more individual dispositive motions. Costs for hosting documents, traveling to depose witnesses, hiring court reporters, and ordering transcripts would increase. Expert analysis would require more data and would become more complex.

And the burden of the increased necessary time is highest on senior attorneys – those who have the most experience leading depositions, drafting dispositive motions, and preparing for significant arguments and trial. These same senior attorneys forgo the most lucrative work when deciding to work full-time on a case.

*Aspect 3: More complexity in passthrough.* The bid cases are also poor indicators of the market rate for this case because proving passthrough here required more data and discovery. The typical consumer may buy a new laptop or phone every few years. And there are fewer consumer electronic stores than grocery stores. In contrast, chicken eaters are buying groceries nearly every week – from several different places. The sheer volume of transactional data in *Broilers* was an order of magnitude larger than many other cases. Before a complaint was filed, EUCP Class Counsel knew this was likely; they investigated the consumer retail chain and understood this would be no easy undertaking.[75] EUCP Class Counsel also knew that they would have to invest far more in expert fees to deal with such a large data set, and if the case did not succeed, they would never get that money back. EUCP Class Counsel also prepared to send subpoenas to dozens of grocers and distributors to get adequate passthrough data, knowing that, if the grocery stores quashed the subpoenas, it would be difficult for the experts to have enough data to prove that End

---

[75] Decl. of Shana Scarlett in Supp. of Mem. in Supp. of End-User Consumer Pls.' Mot. for Attorneys' Fees, Expenses, and Class Representative Awards, ECF No. 5161-1 (Oct. 27, 2021) at ¶ 2.

Users were harmed. The added challenges here make the bid cases poor comparisons for market rates.

*Aspect 4: Added challenges for proving liability.* End Users understood at the outset of this case that Defendants had many mechanisms for controlling supply. Chickens are live animals, not widgets. Live animal production is more complex than a factory product. End Users understood that they and their experts would need to assess (and counter the defendants' arguments) about all the different mechanisms defendants had available to control supply.

That complexity creates uncertainty. For a widget like a battery, there are a few ways to cut supply and reduce output. But defendants in chicken had so many more levers at their disposal: they could kill parent and grandparent birds, decrease pullet placements, lower bird weights, under use plant capacity, break eggs, export eggs, or change the temperature or feed in their grow houses. This complexity made the case tougher from the start than the cases about component parts in electronic goods, like batteries, disk drives, or resistors. So the bids are not good indicators of what the market rate should be for this case.

*Aspect 5: Bankruptcy.* Another fact that added complexity at the outset was that Pilgrim's declared bankruptcy near the beginning of the conspiracy period. End Users expected – and the record bears this expectation out – that defendants would use this fact to argue that the reductions in supply followed independent action, not coordination. Although End Users were ready to respond to that argument, there was a risk that the Court (or even a jury) might give that fact greater weight. The bid cases did not have this added layer of complexity and risk.

Because the bid cases are poor comparisons for determining of *ex ante* market rates given the many factual differences and the small sample size of bids, the Court may look elsewhere to find better examples. The 2020 study provides the best available market rate data on negotiations

between private parties because it has more robust data.[76] But EUCP Class Counsel would also like to compare *Broilers* with a matter involving a higher potential recovery – *In re Interest Rate Swaps Antitrust Litigation*.

In November 2015, Cohen Milstein and another firm filed this antitrust case against the nation's largest investment banks. The named plaintiff representing the class was a sophisticated party: the Public School Teacher's Pension and Retirement Fund of Chicago. The named plaintiff negotiated an "arm's length [] fee provision" and adopted a graduated scale first ordered in similar banking litigation.[77] If sophisticated parties had adopted the same scale in *Broilers*, EUCP Class Counsel would be entitled to $44 million for the $181 million settlement – approximately 26 percent of the net settlement.[78] But because *Broilers* did not involve a trillion-dollar financial market, the parties in *Broilers* would have negotiated a higher rate.

*Factor 1: Scale of Damages*. *Broilers* and the *Interest Rate Swaps* ("*IRS*") are both cases that did not follow on the heels of a government investigation. And they both involved many defendants – though *Broilers* had more. But there is an ocean between the size of the potential recovery (and potential fee awards) in both cases. Banking cases similar to *IRS* have settled for between *$1.8 billion* and *$7 billion*. As such, the End Users' $181 million settlements, though substantial, are not in the same ballpark as the banking litigation.

---

[76] *See* Ex. 3 at 1161 (Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151, 1172-1178 (2020)).

[77] *See* Ex. 10 (Leadership Application for *In re: Interest Rate Swaps Antitrust Litigation*, Case No. 1:15-cv-09319-JPO). The leadership application notes that the parties are using the fee scale adopted by *In re Payment Card Interchange Fee Merch. Dis. Antitrust Litig.*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014).

[78] When this fee scale was first used in *In re Payment Card Interchange Fee Merch. Dis. Antitrust Litig.*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014), the district court did not deduct costs before awarding fees using this scale. The named plaintiff in *Interest Rate* also did not agree to deduct costs first.

Same goes for the *fees* involved. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 439 (E.D.N.Y. 2014) (awarding class counsel $544.8 million); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2018 WL 5839691, at *5 (S.D.N.Y. Nov. 8, 2018), *aff'd sub nom. Kornell v. Haverhill Ret. Sys.*, 790 F. App'x 296 (2d Cir. 2019) (awarding class counsel more than $300 million); *In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476 (DLC), 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (awarding class counsel more than $253 million). Class counsel in these banking cases received between $250 million and $550 million per case, an order of magnitude more than EUCPs are requesting here.

In other words, even though *Broilers* and *IRS* have some features in common, the potential recovery and fee awards was an order of magnitude higher for the banking cases. As the Seventh Circuit recognizes, EUCP Class Counsel are "rational actors."[79] Given this factor, EUCP Class Counsel would have agreed to a higher fee in this case; likely the flat 33 percent fee most sophisticated parties adopt.

***Factor 2: Indirect Purchasers***. In this case, EUCP Class Counsel represents a class of indirect purchasers, which also increases risk relative to banking cases like *IRS*. Indirect purchasers face defendant attacks that direct purchasers do not, and these attacks increase the chance of waking away with nothing. And even though they take on this additional risk, the total damages indirect purchasers can recover based on state law claims is about half of what direct purchasers can recover for their federal claims. Defendants get their first opportunity to attack indirect purchasers at the pleadings stage; indirect purchasers must bring their claims under state laws, and defendants often challenge indirect purchasers' standing under these statutes. Courts may dismiss

---

[79] *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5599636, at *5.

some of the state law claims at this stage, reducing the total damages consumers can recover. At class certification, defendants have even more opportunities to challenge indirect purchasers: they can challenge manageability of litigating the state law claims, imply there is insufficient proof of passthrough, or claim that there are too many uninjured class members in the indirect class. Sometimes, these attacks are successful; the risk of walking away with nothing is high. For this reason, many firms avoid bringing indirect purchaser cases. As the *2022 Annual Antitrust Report* shows, direct purchasers "recovered almost four times as much" as indirect purchasers:[80]

Figure 12: **Recoveries by Class Type**
2009 - 2022

| Recoveries by Class Type | # of Settlements | % of Settlements | Aggregate Amount | % of Amount |
|---|---|---|---|---|
| Direct Purchaser Classes | 665 | 53% | $24,482,999,969 | 76% |
| Indirect Purchaser / End Payor Purchaser Classes | 584 | 46% | $6,798,269,278 | 21% |
| Class of Direct & Indirect Purchasers | 9 | 1% | $923,725,769 | 3% |
| Other Classes | 6 | <1% | $109,100,000 | <1% |
| Total | 1,264 | 100% | $32,314,095.016 | 100% |

As explained above, EUCP Class Counsel knew at the outset of this case that proving passthrough would require significant investments of time and resources – the number of retailers, wholesalers and individual purchases made this a significant undertaking. In contrast, the parties in *IRS* did not need to contemplate that risk and or complete that additional discovery. This reduces the cost and time commitment. Likewise, the *IRS* plaintiffs did not need to contend with the output complications or bankruptcy issues that were present in *Broilers*.

For these two reasons, *Broilers* is high on the risk spectrum. To properly account for this risk, the parties would have negotiated a higher fee. Given that this case had exceptional risk, if

---

[80] Ex. 4 at 17. (Josh Paul Davis and Rose Kohles, *2022 Antitrust Annual Report: Class Action Filings in Federal Court* (September 2023)).

the parties negotiated a rate *ex ante*, it is likely that they would have agreed to a fixed percentage of one-third, in line with what other sophisticated parties in these cases have agreed upon.

It is also illustrative to examine cases where EUCP Class Counsel chose not to bid or negotiate any graduated scale. For example, Cohen Milstein filed the *In re Domestic Drywall Antitrust Litigation* case in 2012. It was a risky case based solely on the investigation of class counsel; no government investigation preceded it. It had a sophisticated client who directly purchased drywall from defendants and who negotiated and agreed to a retainer that allowed Cohen Milstein to seek a one-third fee. The case also presented a competitive threat as other firms filed similar complaints and sought independent leadership of the case. If they had prevailed, Cohen Milstein would not have played any further role in the case and not received any significant fee. Even so, Cohen Milstein did not offer a bid. It made a choice to risk losing leadership of the case rather than litigate it for a lesser fee given the risks of the underlying litigation and its other opportunities. Ultimately, Cohen Milstein was selected as one of the co-lead counsel, secured more than $190 million for the class, and the Court awarded a one-third fee. The Court effectively commented on the risk the case had presented at its outset in its praise for plaintiffs' counsel: "Few cases with no government action, or investigation, result in class settlements as large as this one."[81] As noted above, given that EUCP Class Counsel rarely offer bids, these circumstances and the choices not to bid are the norm and like those in *Broilers*. A similar result, one the Court already awarded, is warranted.

---

[81] *In re Domestic Drywall Antitrust Litig.*, No. 13-MD-2437, 2018 WL 3439454, at *18 (E.D. Pa. July 17, 2018).

**C.** **All other evidence supports the finding that one-third is the *ex ante* rate for litigation of this size and complexity.**

Because these bids do not adequately account for the risks and complexity of this particular case, the Court must look to other evidence to determine the appropriate market rate. This Court already assessed the decisions from this circuit – which use the *ex ante* standard – and determined that awards of one-third were typical in cases of this size and complexity.[82] The Seventh Circuit did not disagree with this assessment; it simply asked this Court to *also* assess fee awards from other circuits to determine "where class counsels' economic behavior falls on this spectrum[.]"[83] Fee awards across the country, including the Ninth Circuit, confirm that the typical fee in complex antitrust cases is one-third of the recovery.

**1.** **Fee agreements – in this case and others across the country– show that one-third is the typical negotiated rate.**

Generally, district courts first look at actual agreements between parties and their counsel to determine the market rate.[84] In its initial decision, this Court focused on Hagens Berman's fee agreement and correctly observed that these retainer agreements "simply provide that they will take a percentage of any recovery as determined by the Court."[85] But about half the class representatives retained firms other than Hagens Berman and signed different retainer agreements. While these other agreements make no promises as to the proposed rate, they all use one-third as the anchor rate. For example, Cohen Milstein's retainer agreement states that "fees will not exceed

---

[82] Initial Fee Order, ECF No. 5855 (October 7, 2022) at 9.

[83] *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5599636, at *5.

[84] *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001).

[85] Initial Fee Order, ECF No. 5855 (October 7, 2022) at 5.

one-third of the gross monetary recovery" before litigation expenses are deducted.[86] This language aligns with one-third as standard rate.[87]

### 2. Nationally, the average award in a case of this size and complexity is 30 percent.

The Seventh Circuit has said that *ex post* fees "should receive less weight, as those prices are set at the end of the litigation."[88] But because the bids are poor indicators for this case, awards from this circuit and others may be persuasive here; these awards may show where EUCP Class Counsel's "economic behavior falls on this spectrum[.]" And since EUCP Class Counsel are "rational actors," the Seventh Circuit acknowledges they must "assess the risk of being awarded fees below the market rate of their legal services[.]"[89] Here, both independent studies and EUCP Class Counsel's own past awards reflect that the requested rate here is well within the spectrum of normal – even when including Ninth Circuit cases.

***Independent Studies of Fee Awards***. The *2022 Antitrust Annual Report* shows that EUCP Class Counsel's request tracks past awards from all circuits. This report reviewed 13 years of antitrust awards from all circuits.[90] Between 2009 and 2022, the median award for fees was 30 percent – in line with EUCP Class Counsel's request here:[91]

---

[86] *See* Decl. of Brent W. Johnson in Supp. of End-User Consumer Pls.' Resp. to the Court's Oct. 3, 2022 Order, ECF No. 5835-3 (Oct. 5, 2022) at ¶ 3.

[87] *See* Ex. 3 at 116, 1172-1178 (Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151 (2020)).

[88] *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5599636, at *5.

[89] *Id.*

[90] Ex. 4 at 31. (Josh Paul Davis and Rose Kohles, *2022 Antitrust Annual Report: Class Action Filings in Federal Court* (September 2023)).

[91] *Id.* at 33.

010636-11/2346918 V1



Figure 15: **Class Recovery by Settlement Size - Median**
2009 - 2022



The study expanded on awards by settlement size – including in districts that use the megafund rule. For settlements in the same range as the settlement here, the median recovery was 30 percent between 2009 and 2022:[92]

Figure 14: **Class Recovery by Settlement Size - Median**
2009 - 2022

| Settlement Amount | Class Recovery | Attys Fees | Expenses | Total |
|---|---|---|---|---|
| >$1B | 85% | 14% | 1% | 100% |
| $500-$999M | 73% | 26% | 1% | 100% |
| $250-$499M | 74% | 25% | 1% | 100% |
| $100-$249M | 68% | 30% | 2% | 100% |
| $50-$99M | 67% | 30% | 3% | 100% |
| $10-$49M | 66% | 30% | 4% | 100% |
| <$10M | 64% | 30% | 6% | 100% |
| All Settlements | 67% | 30% | 3% | 100% |

---

[92] *Id.* at 32.

These results have been replicated by other studies, which demonstrates that the results are not cherry-picked. For example, a 2017 study found that median fee recovery was 30 percent for antitrust settlements made between 2009 and 2013.[93]

EUCP Class Counsel's request is not "exorbitant," "substantially above-market," or "selfish." It matches the median award issued for all antitrust cases over the past decade in the United States, including in jurisdictions that have megafund rules.[94] From the start, this case has been more complex and riskier than many other antitrust cases, which would have led the parties to agree, *ex ante*, to an above-median rate.

***Class Counsel's Own Awards.*** Previously, EUCP Class Counsel submitted two charts showing all the awards in antitrust cases it received (across the country) from 2016 through 2022. For the Court's ease, Class Counsel have combined these charts into one chart and calculated median and mode percent awarded.  EUCP Class Counsel were awarded fees 107 times during this period. The median percent awarded between 2016 and 2022 was 30 percent[95] – meaning that EUCP Class Counsel's awards were no different from the *2022 Antitrust Annual Report*. Nor is this median hiding any outliers – the most common award (or mode) EUCP Class Counsel received was also 30 percent.[96]

---

[93] Theodore Eisenberg, et. al., Attorneys' Fees in Class Actions: 2009-2013, 92 N.Y.U. L. Rev. 937, 952 (2017) at Table 4 (showing the median fee award for antitrust cases was 30 percent between 2009-2013).

[94] *Id.* at 967.

[95] Ex. 9 (fee award table).

[96] And these calculations may moderately undercount of the percent awarded because there is a split among circuits as to whether costs should be deducted before or after the fee award is calculated. For example, in the Ninth Circuit, fees are awarded first, then costs are deducted. The Seventh Circuit does the opposite. So in *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 261 (N.D. Cal. 2015), the district court awarded 25 percent, or $250,000 of a settlement for $1 million. The district court then deducted $54,747 costs and incentive awards. But if costs had been deducted first (as the Seventh Circuit does) class counsel's $250,000 would be an award of 26 percent.

The 54 cases that were not *ODD*, *Resistors*, and *Batteries*, powerfully indicate that the bid cases are out of step with the norm and do not reflect the market rate. As rational actors in the marketplace, EUCP Class Counsel would not negotiate a rate below the median for an exceptionally risky case.

## IV. CONCLUSION

Had the parties negotiated a rate at the outset of this case, with its many challenges and risks, they would have agreed on a rate that was slightly higher than their median award. Anything less would be irrational, given the risks of this high-stakes litigation. For that reason, the Court should award $56,760,000, or 33 percent of the net settlement.

DATED: September 29, 2023        HAGENS BERMAN SOBOL SHAPIRO LLP

By: *s/ Steve W. Berman*
    STEVE W. BERMAN

Breanna Van Engelen
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

Shana E. Scarlett
Rio R. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

DATED: September 29, 2023         COHEN MILSTEIN SELLERS & TOLL, PLLC

By: *s/ Brent W. Johnson*
    BRENT W. JOHNSON

Benjamin D. Brown
Daniel H. Silverman
Alison Deich
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Tel: (202) 408-4600
bjohnson@cohenmilstein.com
bbrown@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com

*Lead Counsel for End-User Consumer Indirect Purchaser End Users Class*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, hereby certifies that on September 29th, 2023 a true and correct copy of the foregoing was electronically filed by CM/ECF, which caused notice to be sent to all counsel of record.

*s/ Steve W. Berman*

STEVE W. BERMAN

010636-11/2346918 V1