**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION* | Case No. 1:16-cv-08637 |
| This Document Relates To: | Hon. Judge Thomas M. Durkin |
| DPP and Track 1 DAP Actions | Magistrate Judge Jeffrey T. Gilbert |

**SANDERSON FARMS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ...................................................................................... 1

**I.   PLAINTIFFS PRESENTED INSUFFICIENT EVIDENCE THAT SANDERSON JOINED ANY CONSPIRACY.** ........................................................................... 1

   A.   The Evidence Shows that Sanderson Cut Production to Reduce Its Losses. ...................... 2

   B.   Sanderson's Unmatched Growth During The Alleged Conspiracy Period Renders Plaintiffs' Conspiracy Claim Implausible. ................................................................. 4

   C.   Plaintiffs' Other Evidence Does Not Support An Inference of Collusion. ......................... 5

**II.   PLAINTIFFS PRESENTED INSUFFICIENT EVIDENCE  OF A LARGER SUPPLY RESTRICTION CONSPIRACY.** .............................................................. 8

   A.   Plaintiffs' Conspiracy Theory Is Indelibly Flawed. ........................................... 9

   B.   Plaintiffs Have Presented No Evidence of How the Purported Conspiracy Was Organized or Functioned. ...................................................................................... 10

   C.   Plaintiffs' Conspiracy Evidence Is Equally Consistent with Lawful Conduct. ................ 11

**III.   THE DAPS FAILED TO PROVE DAMAGES THROUGH 2019.** ........................... 14

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................................9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................3

*Dupree v. Younger*,
  598 U.S. 729 (2023) ...................................................................................................9, 11

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ......................................................................................................10

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999) ...........................................................................................8

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  764 F. Supp. 2d 991 (N.D. Ill. 2011) .............................................................................7

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
  910 F.3d 927 (7th Cir. 2018) ................................................................................. passim

*Kleen Prods. LLC v. Int'l Paper*,
  276 F. Supp. 3d 811 (N.D. Ill. 2017), *aff'd,* 910 F. 3d 927 (7th Cir. 2018) ...................4, 7, 12

*Lexington Ins. Co. v. Horace Mann Ins. Co.*,
  861 F.3d 661 (7th Cir. 2017) ..........................................................................................4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ...........................................................................................2, 9, 11, 12

*Mkt. Force, Inc. v. Wauwatosa Realty Co.*,
  706 F. Supp. 1387 (E.D. Wis. 1989), *aff'd,* 906 F.2d 1167 (7th Cir. 1990) ...........................12

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
  629 F.3d 697 (7th Cir. 2011) ..........................................................................................9

*Quality Auto Body, Inc. v. Allstate Ins. Co.*,
  660 F.2d 1195 (7th Cir. 1981) ......................................................................................13

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ........................................................................................................1

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
  873 F.3d 185 (3d Cir. 2017).................................................................................6

*Weit v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*,
  641 F.2d 457 (7th Cir. 1981) ...............................................................................13

**RULES**

Fed. R. Civ. P. 50(a)(1)...............................................................................................1

## PRELIMINARY STATEMENT

Plaintiffs' case failed to provide the jury with an evidentiary basis to conclude either that Sanderson conspired to restrict the supply of chicken, or that there was a larger conspiracy. Instead, the unrebutted testimony of Sanderson's employees established that Sanderson made production decisions based on its independent self-interest.

Plaintiffs' case overwhelmingly focused on anything and everything *except* Sanderson. As the Court noted, "if . . . this case is about Sanderson . . . that's just not the way this case has been tried." 9/26 Tr. 1225:02–04; *see also* 10/10 Tr. 2500:14-18.[1] The limited Sanderson-specific evidence proffered by Plaintiffs did not establish that Sanderson joined a multi-billion-dollar conspiracy to restrict supply. Sanderson is therefore entitled to judgment as a matter of law.

## LEGAL STANDARD

A district court may enter judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "A legally sufficient amount of evidence need not be overwhelming, but it must be more than a 'mere scintilla.'" *Filipovich v. K & R Exp. Sys., Inc.*, 391 F.3d 859, 863 (7th Cir. 2004).

## ARGUMENT

### I. PLAINTIFFS PRESENTED INSUFFICIENT EVIDENCE THAT SANDERSON JOINED ANY CONSPIRACY.

Plaintiffs chose to call Sanderson employees Joe Sanderson (CEO), Bob Rosa (Chief Financial Analyst), Lampkin Butts (President), and Mike Cockrell (CFO) to testify during their case. Each witness testified that Sanderson made production decisions in its unilateral interest—

---

[1] All references to "Tr." refer to the final trial transcripts. Testifying witness names are included in parentheticals and the date of the transcript precedes the citation.

to protect its balance sheet and reduce its losses.  The contemporaneous documentary evidence—including the Board minutes reflecting those decisions and Bob Rosa's financial models on which the Board the relied—provide strong backing for that testimony.  To get to the jury, Plaintiffs needed evidence tending to rule out the possibility that Sanderson acted independently.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 933 (7th Cir. 2018).  Plaintiffs' failure to meaningfully rebut the principled business reasons motivating any temporary production cuts means this case should not go to the jury.

### A.    The Evidence Shows that Sanderson Cut Production to Reduce Its Losses.

Bob Rosa, a forty-year employee of Sanderson, testified that he regularly made financial models to help Sanderson decide when it should open new plants or increase its production,[2] and when Sanderson should temporarily cut back production to reduce losses and protect the company's balance sheet.[3]  Numerous Sanderson fact witnesses corroborated Mr. Rosa's account, which went unrebutted.[4]

Contemporaneous Sanderson Board minutes likewise documented that the company

---

[2] **9/27 Tr. (Rosa) 1294:15-18** (testifying that in 2008 Sanderson "had a temporary cutback because it made sense for the company to cut back because we would lose less money…a cutback caused us to lose less."); **1462:05-12** (testifying his modeling in 2011 "showed that if we cut production, we'd lose less money.").

[3] *See, e.g.*, **DX1956 at -002** (6/24/08 Board Minutes demonstrating Sanderson executives relying on Rosa's sensitivity table (**DX1998-1**) modeling the effects of increased corn and soybean costs on Sanderson's expenses to decide to delay the Kinston, North Carolina expansion.); **DX2007-1** (Rosa's "break-even" model from October 2008); **DX330-1** (Rosa's July 2011 big bird deboning model showing cutting head by 8% and cutting bird weight would reduce losses).

[4] *See, e.g.*, **ECF No. 6956-1 (Sanderson Designations) 446:03-16** (testifying Sanderson Farms' decision to delay any further action on a second North Carolina processing facility "didn't have anything to do with anything other than taxing our -- and challenging our balance sheet."); **ECF No. 6956-6 (Cockrell Designations) 355:12-356:08** (testifying Sanderson's decision to delay a plant or alter its fall cuts had nothing to do with any action by its competitors, who are "going to do what they have to do because of their balance sheet and because of their facts and circumstances[.]"); **10/03 Tr. (Butts) 1935:17-19** (testifying that 2011 was the "[w]orst year in the history of the company"), **1935:20-1936:05** ("Q. And it was a tough year for the industry, as well, correct? A. Yes. Q. Would you say that Sanderson was getting desperate for some relief? A. We never operated in desperation. But we did lose $127 million in '11, so, yes…we wanted to make moves to protect the balance sheet . . . More companies had gone bankrupt by now and we wanted to stay away from that.").

leadership, after discussion, authorized the production cuts in order to reduce the company's losses. Those decisions were necessitated by external factors—the poor market conditions in 2008-09 and 2011-12, including the Great Recession and record high corn prices. That is not evidence of a conspiracy. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.4 (2007) (an "independent response[] to common stimuli" is not evidence of a conspiracy); *Kleen Prods.,* 910 F.3d at 936 (holding that the shift in manufacturers' practices "may be explained by external factors, such as the emergence from the economic downturn of 2008"). And Sanderson's decisions to temporarily reduce production at some plants or to delay capital expenditures were consistent with how the company made such decisions in the years before the alleged conspiracy.[5] *See Kleen Prods.*, 910 F.3d at 937 ("A continuation of a historic pattern . . . does not plausibly allow one to infer the existence of a cartel.").

Although Plaintiffs resorted to expert testimony to counter Sanderson's explanation for its decisions, expert testimony alone does not permit a jury to rule out the possibility that Sanderson acted independently. ECF No. 6641 ("Summary Judgment Order") at 10 ("[E]xperts' opinions are not sufficient, by themselves, to satisfy Plaintiffs' preponderance burden."). In any event, those experts failed to rebut Mr. Rosa's explanation. While Dr. Frankel thought Sanderson's decisions "left more money on the table than anyone," he did not opine that Mr. Rosa got it wrong. 9/28 Tr.1653:1-1654:10;[6] Dr. Carter did not even review *any* of Rosa's modelling or analysis. 10/11 Tr. 1816:24-12. The jury therefore lacks any basis to infer that those cuts are evidence that Sanderson joined a conspiracy.

---

[5] **10/03 Tr. (Butts) 2005:15-** (testifying that, in response to poor market conditions in 2006, Sanderson "had to do a temporary cutback" and "delayed" expansion of Waco plant "by 90 days to reserve some capital").

[6] **9/28 Tr. (Frankel) 1667:12-20** ("Q. Dr. Frankel, do you disagree with Mr. Rosa that eliminating Sanderson's worst sales could reduce losses? A. It could. You know, I've investigated that issue at some length. The numbers on Mr. Rosa's various spreadsheet models, and some of them I've only seen for the first time in the last 24 hours so I haven't had a chance to study them in detail, but those -- the effect on average price appear to be in the .7 to 1.4¢ per pound range. I need to study them more. They're not enormous changes.").

### B. Sanderson's Unmatched Growth During The Alleged Conspiracy Period Renders Plaintiffs' Conspiracy Claim Implausible.

Plaintiffs offered no evidence that Sanderson would have produced more chicken but for the alleged conspiracy; their experts failed to analyze that question. They offered only the conclusion that the industry as a whole—not even limited to the alleged conspirators—did not produce as much chicken as it should have.[7] Aggregate data makes it impossible to infer that Sanderson joined the alleged conspiracy, however, because it says *nothing* about Sanderson's conduct. *See Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 830 (N.D. Ill. 2017) (disregarding industry-wide data for that reason), *aff'd,* 910 F. 3d 927 (7th Cir. 2018). Absent evidence concerning *Sanderson's* production in a but-for world, the jury is left to speculate that Sanderson's production cuts demonstrated an agreement to join a conspiracy. *See Kleen Prods.*, 276 F. Supp. 3d at 844–45 (rejecting inference of conspiracy because, among other reasons, "Plaintiffs have adduced no evidence that Defendants took actions that they would have refrained from but for the fact that they were conspiring"); *cf. Lexington Ins. Co. v. Horace Mann Ins. Co.*, 861 F.3d 661, 671–72 (7th Cir. 2017) (the possibility of such speculation cannot defeat a judgment under Rule 50(a)).

Plaintiffs' failure to show what Sanderson's production "should have been" is not surprising. The evidence showed that Sanderson experienced extraordinary growth over the very period in which it is accused of conspiring to restrict supply. Plaintiffs do not dispute that Sanderson constructed five new plants between 2007 and 2019 (including one in 2011—during

---

[7] **9/19 Tr. (Elhauge) 934:17-23** ("Q. Did you conduct a regression analysis specific to Sanderson Farms? A. I did not conduct a regression analysis specific to Sanderson Farms. Q. Did Dr. Lamb conduct a regression analysis specific to Sanderson Farms? A. No.); **9/28 Tr. (Frankel) 1675:06-14** ("Q. You haven't done the math to show how much chicken in terms of extra pounds Sanderson Farms would have made but for the alleged conspiracy? A. Right. I could say there would have been additional pounds. ***I haven't done the multiplication*** because the thing that's relevant to my analysis as an economist is whether there was an anticompetitive effect in the United States, meaning a reduction -- a limitation on the supply of chicken in the aggregate, and I conclude there was.") (emphasis added).

the alleged conspiracy period),[8] and that Sanderson grew every year but 2009, including most of 2008 and all of 2011, the two years at the crux of Plaintiffs' theory. 9/19 Tr. (Elhauge) 939:12-21; 10/11 Tr. (Carter) 2788:15-2789:02, 2793:08-22. Although Sanderson's production dipped 1% in 2009, that followed a year in which Sanderson increased its production by a remarkable *21%*. 10/03 Tr. (Butts) 2009:17-19. The year 2009 was also marked by an extraordinary economic decline resulting from the Great Recession. 10/03 Tr. (Butts) 2010:03-2011:04. Before an inference of conspiracy can be drawn, Plaintiffs need to establish that "a shift in firm behavior, as opposed to external market conditions" caused a change in Sanderson's production. *See Kleen Prods.,* 910 F.3d at 936 (holding that the shift in manufacturers' practices "may be explained by external factors, such as the emergence from the economic downturn of 2008").

### C. Plaintiffs' Other Evidence Does Not Support An Inference of Collusion.

Besides production cuts, Plaintiffs' conspiracy evidence consisted principally of (i) Sanderson allegedly "signaling" its competitors during public earnings calls to cut production, and (ii) Sanderson exchanging cost information about its production with competitors. This evidence does not create an evidentiary basis for the jury to conclude Sanderson conspired.

Plaintiffs' case against Sanderson centered on statements that Joe Sanderson made during earnings calls. That evidence does not support an inference of conspiracy, for several reasons:

- Sanderson's practice of hosting such calls and making statements similar to the ones that Plaintiffs claim are conspiratorial predates the alleged conspiracy.[9] "A continuation of a historic pattern . . . does not plausibly allow one to infer the existence of a cartel." *Kleen*

---

[8] *See Kleen Prods.*, 910 F.3d at 938 (opening single new production mill during alleged price-fixing conspiracy undercut that Georgia Pacific participated in conspiracy).

[9] **10/03 Tr. (Butts) 1911:01-18** ("Q. As a publicly traded company, Sanderson Farms made public statements, right? A. Yes. Q. And you made public statements through these public conference calls. Is that right? A. Yes. Q. What is a public conference call? A. A public conference call is something that our SEC, Securities Exchange, lawyers recommended we do . . . it's fairly new. I don't know how old it is, 15 years, 20 years. But it's not something – we became public in '86 or '87. We didn't do conference calls then. But as time went on, the SEC recommended companies have these quarterly conference calls…to give information to the marketplace, but also have a platform for questions and answers from investors, from analysts, and interested parties.").

*Prods.*, 910 F.3d at 937 (manufacturers' parallel price increases before the alleged conspiracy undercut claim of collusion because the conduct pre-dated the conspiracy); *see also Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 196 (3d Cir. 2017).

- Plaintiffs' experts agree that publicly traded companies routinely hold such calls.[10] Consistent with this, the representative from Kroger—the largest publicly-traded Plaintiff—testified that Kroger regularly held earnings calls and that Kroger had a duty to be transparent about its outlook on the grocery industry in general. 10/10 Tr. 2542:19-2544:10 ("In general, we will need to be transparent about how it impacts – what's impacting our business *in the industry*.").

- The statements that Joe Sanderson made on these calls – usually in response to an analyst's question – were neither prescriptive nor at a level of detail to be of any use to Sanderson's competitors.[11] Even when Sanderson made more specific statements about its production plans, it did not say how much or in what ways it expected its competitors to follow suit.[12] Such general statements to investors or analysts about the trajectory of Sanderson and the poultry industry do not "render the conspiracy allegation more plausible." *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1001 (N.D. Ill. 2011).

- Sanderson's statements were no different from numerous statements that Plaintiffs

---

[10] **9/19 Tr. (Elhauge) 945:08-23** ("[Q.] My question is do you think it's unusual to have earnings reports issued and conduct earnings calls to discuss how the company performed? A. No, not -- in general, no. Q. There are investment analysts on those earnings calls, correct? A. Yes. Q. And those analysts, those investment analysts, they ask questions of the company representatives, right? A. They do. Q. That's a normal thing to happen during these earnings calls, right? A. Yes. Q. And some of the questions that were asked of Sanderson related to production cuts. Do you agree? A. Yes."); **10/11 Tr. (Carter) 2730:3-18** ("Q. [A]s part of your analysis, did you find additional documents in the record which indicated that Sanderson was making cuts in '08-'09 and 2011 to 2012? A. Yes. This chart shows quotes from earnings calls. And those are -- you know, they're public calls. And any public company would have these periodically. Usually, it's every quarter of the year. And these were Sanderson earnings calls. And so they would…tell investors, you know…how are things going in the company. They'd talk about the financials. And then they would answer questions from analysts…if you were thinking of investing in a certain company, you might check…their earnings calls[.]").

[11] **PX820** ("Asked on an earnings call what type of a cut the industry overall will have to make to offset the impact, Sanderson's CEO, Joe Sanderson, Jr. said, 'I don't have a clue about what it will take, but the industry is going to feel the impact of the grain prices in September and October. The hit will occur as a demand for chicken softens post Labor Day. Look for some cuts in October and maybe some more in November and December.'"); **PX20** ("Q…Joe, do you anticipate production cuts in the industry? A. Probably, yes. I don't know. I mean, I think we are seeing -- the last information we got was from December. And during the month of December, half of the industry lost money. I think January will be -- more people will be losing money then. And based on at least the next ninety days, we can see grain prices -- I think we will see a lot of people posting red ink. And I think as a result of that, that we could see some reductions in production.").

[12] **ECF No. 6933-4 (Sanderson Designations) 103:02-20** (considering a statement Sanderson made on a May 22, 2008, earnings call: "We will make a four to five percent cut following Labor Day as we always do going into Thanksgiving, Christmas and January. We reduce our egg sets around Thanksgiving, Christmas, New Year's and Martin Luther King, and that's a period of slow demand for us and we don't announce that but we always do it. And it is just a period where we take down days, and we will do that. But if we think more is needed, we will evaluate that sometime in August. And if need be, we will do it. We don't, you know -- we cut back in 2006. We cut back in '97 or '98, whenever corn was five dollars a bushel for the first time. I don't know if we announced it or not, but we will do what we need to do. We don't feel like we need to do it right now…we haven't lost money, and we are ramping up a new plant and don't feel the need to do it at this point. But if we feel the need to, we will.").

themselves were making at the same time.[13]  *Cf. Kleen Prods.*, 276 F. Supp. 3d at 841 ("It should not be a mark of conspiracy to say what is true, already known by the audience, and articulated by countless third-party analysts, academicians, and jurists alike.").

Nor would Plaintiffs' other evidence permit the jury to conclude that Sanderson conspired. Plaintiffs relied heavily on evidence showing that an employee of Sanderson shared some of its Agri Stats metrics with other chicken producers.[14]  While some of that evidence was outside the alleged conspiracy period (undercutting any inference of conspiracy), or involved chicken companies not in the alleged conspiracy,[15] there is no genuine dispute that *none of that evidence showed current or future production output or plans of any producer*.[16]  Even if they information related in any way to overall production volume, the exchanges were also not systematic or widespread enough to facilitate monitoring a 14-company conspiracy.  More significantly, the exchanges were stopped when Plaintiffs claim the conspiracy was ramping up in July 2011 when Joe Sanderson learned of them and Lampkin Butts sent a company-wide memo reminding employees that sharing such information was not permitted under the Agri Stats contract.[17]  Plaintiffs' limited Sanderson case is largely about Joe Sanderson.  But if Joe Sanderson was a

---

[13] ***See, e.g.***, **DX641; DX645; DX648; DX656; DX658; DX659; DX1499; DX1872; DX1873; DX1874; DX1875; DX1880; DX2122; DX2123; DX2127; DX2129**.

[14] ***See, e.g.***, **PX582-A; PX746; PX2207; PX706; ECF No. 6956-3 (Maness Designations) 265:22-266:11; 9/27 Tr. (Rosa) 1279:13-19; ECF No. 6933-4 (Sanderson Designations) 60:18-23**.

[15] Nearly all of this evidence concerned exchanges between Sanderson and Perdue, a non-conspirator, and could not have been in furtherance of the alleged conspiracy.  9/27 Tr. 1474:12-19 (Court's remarks regarding the six producers who received summary judgment: "Let me make it clear. My ruling was such that they were never part of the conspiracy."); cf. *Kleen Prods.*, 910 F.3d at 936 (fact that alleged conspiratorial conduct was led by non-conspirators undercut suggestion of conspiracy).

[16] **ECF No. 6933-6 (Pettus Designations) 51:20-52:04** ("Q. Do you think -- what information from Agri Stats do you think it's okay to share with anyone? A. I shared some information, some general information, like on live production costs, what it costs to -- to raise -- raise chickens."); **ECF No. 6933-4 (Sanderson Designations) 222:22-223:14** ("Q. But you know that Randy Pettus and Terry Thompson provided employees of Perdue and Amick with your Agri Stats report, correct? A. They didn't give them all of our Agri Stats. They gave -- they shared with them some live productions metrics…To my knowledge, nothing from processing or anything from sales.").

[17] *See* **PX2160 (July 21, 2011 Memo from Lampkin Butts PX2166** (July 31, 2012, Memo from Joe Sanderson, Jr. re: Agri Stats).  **ECF No. 6933-4 (Sanderson Designations) 59:21-60:03** ("Q. Was he disciplined in any way after you found out about this conduct? A. He was counseled about what had happened and told not to ever do it again. Q. Who provided that counsel to him? A. I believe Lampkin Butts did. And then a memo went out, over my signature, to everyone in the company.").

leader of the conspiracy, he would have encouraged such exchanges and praised employees for making them. Instead, he took steps to stop them.

Finally, Plaintiffs single out a handful of communications between employees of Sanderson and employees of its competitors. "But having the *opportunity* to conspire does not necessarily imply that wrongdoing *occurred*." *Kleen Prods.*, 910 F.3d at 938 (citations omitted). For example, Plaintiffs presented testimony to show that Sanderson employees had occasional phone calls with other chicken producers.[18] But these phone records showed only that a call occurred. Similarly, Plaintiffs point to a few sporadic emails that reflect Sanderson communicating with other alleged co-conspirators during the alleged conspiracy period, none of which reflect Sanderson exchanging sensitive information about Sanderson's production plans.[19] Given the infrequency of such communications and the lack of context surrounding them, no reasonable jury could infer a conspiracy based on those communications. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999) ("exchanges of information" must "impact [] pricing decisions"). Plaintiffs' evidence that Sanderson employees shared information that the company had already publicly announced does not prove their claims. *See* DX691 (announcing a 6% temporary cut, and the 4% cut announced in Q3 2011); PX328 (discussing the 6% cut); PX544 (discussing the 4% cut).

## II.    PLAINTIFFS PRESENTED INSUFFICIENT EVIDENCE OF A LARGER SUPPLY RESTRICTION CONSPIRACY.

Sanderson is also entitled to judgment as a matter of law because Plaintiffs failed to present evidence "that would allow a jury to infer that the alleged conspirators had a conscious

---

[18] *See, e.g.*, **9/19 Tr. (Arruda) 984:10-986:09** (testifying about **PX2317A** and **PX2422A**).

[19] *See, e.g.*, **PX544** (2011 email from Peco employee to Sanderson employee regarding Joe Sanderson's statements about cuts); **PX708** (10/2010 email reflecting Pilgrim's shared its Agri Stats data on hatchery costs with Sanderson). Plaintiffs also point out that Pettus shared certain Agri Stats information with a Perdue employee several times, but Perdue is a non-conspirator.

commitment to a common scheme designed to achieve an unlawful objective." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (citation and quotation marks omitted). Lacking any direct evidence of a conspiracy, Plaintiffs resort to circumstantial evidence that is ambiguous at best. However, "antitrust law limits the range of permissible inferences from ambiguous evidence." *Matsushita,* 475 U.S. at 588. Conduct that is as "consistent with other equally plausible explanations" "as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 596–97, 588 (citation omitted). Rather, Plaintiffs "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* at 588 (citation omitted); *see also Kleen Prods.*, 910 F.3d at 934. Plaintiffs' failure to proffer sufficient evidence to meet that burden entitles Sanderson to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–53 (1986).[20]

### A. Plaintiffs' Conspiracy Theory Is Indelibly Flawed.

Plaintiff's conspiracy theory suffers from several fundamental flaws that render it economically senseless:

- Plaintiffs' theory that there was an unwritten conspiracy where some chicken companies had to go bankrupt and slash their production while Sanderson got to grow its market share at their expense makes no economic sense.

- Plaintiffs' theory that a subset of chicken producers agreed to cut production fails to account for the other major chicken producers that were *not* part of the alleged conspiracy. The approximately 25% of the industry that was not in the alleged conspiracy would easily have been able to steal market share from the conspirators by increasing their production. 9/18 Tr. (Elhauge) 827:12-19, 9/19 Tr. (Elhauge) 884:9-21. Plaintiffs offered no evidence to explain that basic flaw in their theory.

- The market share of the alleged conspirators actually *grew* during the alleged conspiracy period. That is, the alleged members of a conspiracy to reduce production collectively grew their production *faster* than the rest of the market that was not in the alleged conspiracy. 9/19

---

[20] To the extent the Court rejected in the Summary Judgment Order any of the arguments that Sanderson makes in this brief, Sanderson raises them again based on the trial record to preserve them for appeal. *See Dupree v. Younger*, 598 U.S. 729, 732 (2023).

Tr. (Elhauge) 921:22-25. That undisputed fact is inconsistent with the notion that the Defendants conspired to reduce their production.

Plaintiffs' evidence thus points to an implausible and economically senseless theory of conspiracy. That precludes submission of the case to the jury and entitles Sanderson to judgment as a matter of law. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468–69 (1992) (noting that to reach the jury "the nonmoving party's inferences [must] be reasonable," and "[i]f the plaintiff's theory [of conspiracy] is economically senseless, no reasonable jury could find in its favor").

**B. Plaintiffs Have Presented No Evidence of How the Purported Conspiracy Was Organized or Functioned.**

Plaintiffs have advanced the vague contours of a conspiracy pursuant to which the alleged co-conspirators (now reduced to fourteen, from twenty) supposedly agreed for a period of years (now reduced to five, from nine) to keep supply short of demand. Plaintiffs have presented no evidence, however, that would explain who agreed with whom or about what. Their case turns on equating independent production cuts with an agreement to cut production. Obviously, those are not the same things, especially during a period of historically high grain prices and the worst economic downturn since the Great Depression.

For example, there is no evidence in the trial record that the alleged co-conspirators ever agreed on an amount or range by which each company would cut production or on an allocation of market share among the alleged conspirators. Plaintiffs promised in their opening statement that "[w]e will show that fair share means each company limits its supply by a similar percentage," 9/18 Tr. 665:11-12, but they never identified what that percentage was. Nor did Plaintiffs offer any evidence of how the alleged conspirators policed compliance with this supposed quota; or how they enforced it against those producers that were not complying, of which there were inevitably

many.[21]  Instead, the evidence showed that some alleged co-conspirators increased their production during the two production cut periods (some by quite a lot) and others decreased theirs by varying percentages, no two of them the same.  Given the absence of evidence concerning the basic contours of the alleged conspiracy, no reasonable juror could conclude that Defendants entered into an agreement to reduce production.

The disparate rates of production growth (or decline) among the alleged co-conspirators are consistent with unilateral decision-making and robust competition and inconsistent with Plaintiffs' claim that the alleged co-conspirators agreed to reduce their production by a "similar percentage."  Such evidence is insufficient to get the Plaintiffs' conspiracy claims to a jury.  *See Matsushita*, 475 U.S. at 588; *Kleen Prods.*, 910 F.3d at 934.

### C.    Plaintiffs' Conspiracy Evidence Is Equally Consistent with Lawful Conduct.

Plaintiffs' evidence of a "conspiracy" largely comprises: (i) observations and market rumors regarding certain companies' production cuts;[22] (ii) communications among employees at different companies (most often salespeople) regarding the state of the market and the need for production cuts;[23] (iii) public announcements of production cuts;[24] and (iv) public predictions, typically on earnings calls, of how the market would likely respond to various factors, or what the effect on prices might be if producers took various actions in response to market conditions.[25]

---

[21] Plaintiffs claim that Sue Trudell of EMI was pivotal to the formation and facilitation of the producers' agreement and Ms. Trudell told the producers what their "fair share" was through an email sent solely to Tyson.  **PX0009**. This is not evidence that would enable the jury to find the existence of a conspiracy. EMI is not (and has never been) an alleged conspirator. *See* ECF 6876 at 19 (Prelim. Jury Instructions). Also, the Plaintiffs' own evidence disproves the notion of an agreement between the producers to cut a uniform amount representing their supposed "fair share." The Tyson "scorecard" introduced by Plaintiffs lists production cuts that were anything but parallel. **PX817** (indicating Sanderson added production in 2008 and other producers announced production cuts ranging from 1.5% to 12%). Plaintiffs also rely on an analysis prepared by Ms. Trudell, claiming that it delineates producers' "fair share."  PX1809. But the email transmitting that analysis rebuts the inference Plaintiffs seek: "I do not think it is possible to say with certainty that X% cut in RTC production would create a Y cents/pound impact on wholesale breast meat prices." *Id.*

[22] **PX714 at –0016, –0024; PX7 at –0012, –0021; PX5 at –0014; PX650 at –0003**.

[23] **PX70**.

[24] **PX709 at –0035; 9/18 Tr. (Opening) 718:16-719:16; 9/19 Tr. (Elhauge) 892:12-23**.

[25] **PX658 at –0004; PX720 at –0012; 9/18 Tr. (Opening) 689:10-690:24, 692:6-14**.

These statements are no different from statements contemporaneously made by several Plaintiffs and the U.S. Department of Agriculture.[26] None of that evidence is sufficient to allow a reasonable juror to infer the existence of an agreement among Defendants to reduce production.

Listening to a competitor's public quarterly earnings call or reviewing a public press release is a hallmark of competition and proves nothing. *See Kleen Prods.*, 276 F. Supp. 3d at 836 ("[T]he fact that Defendants listened to their competitors' communications cannot raise an inference of illicit collusion."). And no reasonable juror could find that mere awareness of other companies' production cuts is sufficient to rule out independent conduct. *See Kleen Prods.*, 910 F.3d at 942 (holding that conscious parallelism does not violate the antitrust laws).[27]

Plaintiffs have also failed to present evidence that the alleged conspirators' output moved in parallel. *See Mkt. Force, Inc. v. Wauwatosa Realty Co.*, 706 F. Supp. 1387, 1393 (E.D. Wis. 1989) ("[P]roof of a conspiracy requires parallel behavior plus additional facts or circumstances that raise the inference of agreement."), *aff'd*, 906 F.2d 1167 (7th Cir. 1990). The evidence presented at trial demonstrates that the alleged conspirators' output moved in different directions, by different amounts or percentages, at different times, with a number of alleged conspirators increasing their production while others decreased theirs, especially during the supposed "coordinated cut" periods of 2008–09 and 2011–12. *See, e.g.*, PX817.

In addition to Plaintiffs' failure to establish parallel conduct, none of their "plus factor" evidence tends to "exclude the possibility that [Defendants] acted independently." *See Matsushita*, 475 U.S. at 588 (citation omitted); *see also Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d

---

[26] **DX1875; DX1872; DX1873; DX1030; DX659; DX2123; DX2122; DX1870; DX1880; DX1499**.

[27] **10/05 Tr. (McClave) 2454:13-2454:22** ("Q. . . . [Y]our model cannot and is not designed to distinguish between an actual agreement to reduce supply and conscious parallelism, right? A. The model itself doesn't have variables in it that make that distinction. It's a matter of whether the context in which the model is estimated can distinguish between the two. Q. And your model cannot and is not designed to distinguish between the two, is it? A. Again, the model isn't, but the context matters.").

1195, 1201 (7th Cir. 1981) ("Parallel behavior without more (a 'plus factor') is not enough to establish a Sherman Act violation." (citation omitted)).  For instance, reliance on Agri Stats' benchmarking reports is not evidence of a conspiracy, given that it is undisputed that (*i*) Agri Stats has been providing such reports since 1985, twenty-three years before the alleged conspiracy began, and (*ii*) Agri Stats' reports cannot be used to identify historic, current, or future production output that would enable Defendants to agree on, monitor, or enforce supply levels.[28]  *See* Summary Judgment Order at 57 ("The lack of production and pricing information in the Agri Stats reports undermines their usefulness for communicating intent to reach agreement to reduce production . . . .").

Plaintiffs also rely on evidence that some alleged co-conspirators participated in industry meetings and trade association events.  At most, that evidence shows an *opportunity* to conspire, not a conspiracy.  *See Weit v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 641 F.2d 457, 462 (7th Cir. 1981).  And Plaintiffs have provided no evidence of any parallel production changes that followed any industry gatherings.[29]

Taken individually or collectively, Plaintiffs' evidence does not tend to exclude the

---

[28] *See supra* note 16; *see also* **9/27 Tr. (Rosa) 1509:04-08**; **ECF No. 6956-8 (Baker Designations) 189:20-24**.

[29] Plaintiffs also argue that the Tip Top Strategic Alliance and Southern Hens were vehicles for the conspiracy. Plaintiffs' theory that these entities served as conduits for information about producers' cuts in their breeder flocks was foreclosed when Mr. Comino from Southern Hens offered unrebutted testimony that Southern Hens' slaughter schedule would not allow anyone to identify the total domestic supply of either broilers or breeder hens. **ECF No. 6956-19 (Comino Designations) 278:11-279:07.**  Undaunted, Plaintiffs pivoted to a new theory: that it was irrational for Tip Top and Southern Hens to slaughter so many breeder hens when the prices for fowl meat were so low. Plaintiffs' theory, unhampered by any evidence, was that the conspirators knew they would be making up for those losses in the broiler market once the breeder flocks were trimmed.  Plaintiffs get points for creativity, but their theory runs afoul of the facts.  Tip Top and Southern Hens included numerous companies not alleged to be in the conspiracy, as well as companies that are not broiler producers who would not have reaped any of these alleged benefits.  *See, e.g.*, **PX1608** (listing Strategic Alliance members, which included Perdue, Wayne, Case, Fieldale, and Townsends); **PX1109** (Strategic Alliance Agreement with Case Foods); **ECF No. 6944-3 (Burruss Designations) 53:9-54:17**; **ECF No. 6951-1 (Respess Designations) 233:23-234:09** (listing "nonbroiler producers on the Alliance Advisory Board"); **PX753** (Southern Hens shareholder agreement listing Aviagen, Forest Packing Company, Marshall Durbin and Del Mesa Farms).  Plaintiffs failed to present any evidence that those other companies objected to or even questioned any of the business decisions that Plaintiffs insinuate are suspicious.

possibility of independent, lawful conduct by the Defendants. A reasonable juror therefore cannot find the existence of a conspiracy, and Sanderson is entitled to judgment as a matter of law.

## III.    THE DAPS FAILED TO PROVE DAMAGES THROUGH 2019.

The DAPs' damages case rests entirely on the shoulders of Dr. McClave. But Dr. McClave's testimony and his overcharge damage model (i) measured the wrong thing (ii) for the wrong period, and (iii) produced heretofore unheard-of results, as admitted on cross examination. A judgment as a matter of law should be entered that the DAPS (including AWG, whose own damages expert's opinion had similar flaws) should take nothing.

During discovery, Dr. McClave created a damages model that purported to measure the amount of overcharges assuming that (i) there were twenty broiler producers in the conspiracy and (ii) the conspiracy lasted from January 2009 to December 2019. ECF No. 5891-1 (McClave 8/31/21 Report) 4 n. 7, 8. When the Court ruled on summary judgment that Plaintiffs had adduced insufficient evidence as to six of the alleged co-conspirators and as to the existence of any conspiracy after 2012, the DAPs made the strategic choice not to modify their model in any respect, only to subtract the alleged overcharges attributable to the six dismissed defendants. The fact that their damages model showed overcharges through the end of the now-dismissed conspiracy period in 2019 was now attributed to the "price effects" of the conduct that ended in 2012.

At trial, Dr. McClave admitted:

- A seven-year "price effect" period was unprecedented. Dr. McClave could not recall ever showing an effects period longer than two years in any of the 300 cases he had worked on in his career. 10/05 Tr. (McClave) 2431:14-2432:25.

- The model might even have shown "price effects" after 2019, but he couldn't say because he didn't have the data. *Id.* at 2431:02-13.

- The damages from this alleged conspiracy that ended in 2012 were higher during 2018 than they were in 2012. *Id.* at 2435:1-10.

- The USDA data showed that boneless, skinless chicken breast prices were lower in 2019 than

at any point in the prior 20 years, yet he found price effects in 2019. *Id.* at 2437:06-2440:04.

- He had a model that used DAP-only purchases rather than the purchases by the entire market, and that model showed a lower alleged overcharge (8%) than the market-wide overcharge (9.6%).30  Dr. McClave used the 9.6% number anyway, which creates a difference of more than $700 million in the DAPs' favor. *Id.* at 2440:08-2442:21.

- He did not do an overcharge analysis limited to the fourteen alleged defendants that were in the alleged conspiracy. *Id.* at 2443:04-07.

- His model cannot distinguish conscious parallelism from a conspiracy. *Id.* at 2453:20-2454:22.

The DAPs' decision not to adjust their damages model after the Court's summary judgment ruling means that their model no longer matches their claim.  Dr. McClave's testimony is the only evidence the DAPs offered to establish their damages; accordingly, the jury has no rational basis for awarding them damages.

The remaining DAP, AWG, relies entirely on the testimony of Dr. Lamb in claiming its damages.  Like Dr. McClave, Dr. Lamb failed to calculate an overcharge model that was limited to the fourteen defendants that were in the alleged conspiracy.  **10/10 Tr. (Lamb) 2648:04-09**.  Thus Dr. Lamb's overcharge model also fails to match the claim surviving after the Court's summary judgment ruling.

 Dr. Lamb's overcharge model is also premised on an assumption that is unsupported by the record.  Dr. Lamb admitted that the model he used to calculate damages assumes that the conspiracy started in April 2008, and that he would have to rerun his analysis with different variables than those he actually used if the conspiracy started at any other time.  **10/10 Tr. (Lamb) 2638:8-2639:13.**  But there is no evidence in the record demonstrating the alleged conspiracy started that month, and thus no evidence supporting Dr. Lamb's damages model.

---

[30] This lower percentage is consistent with the fact that the DAPs are some of the largest corporations in America and would have had far more leverage in negotiating prices than the run-of-the-mill purchaser.

Dated: October 13, 2023

PROSKAUER ROSE LLP

By: /s/ *Christopher E. Ondeck*

Marc E. Rosenthal
Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3530
mrosenthal@proskauer.com

Christopher E. Ondeck (admitted *pro hac vice*)
Stephen R. Chuk (admitted *pro hac vice*)
Scott A. Eggers (admitted *pro hac vice*)
1001 Pennsylvania Ave., NW, Ste 600
Washington, DC 20004
Telephone: (202) 416-6800
condeck@proskauer.com
schuk@proskauer.com
seggers@proskauer.com

Kyle A. Casazza (admitted *pro hac vice*)
Colin G. Cabral (admitted *pro hac vice*)
Shawn S. Ledingham, Jr. (admitted *pro hac vice*)
Simona Weil (admitted *pro hac vice*)
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone: (310) 284-5677
kcasazza@proskauer.com
ccabral@proskauer.com
sledingham@proskauer.com
sweil@proskauer.com

Jared M. DuBosar (admitted *pro hac vice*)
2255 Glades Road, Suite 421
Boca Raton, FL 33431-7360
Telephone: (561) 995-4702
jdubosar@proskauer.com

*Attorneys for Defendants Sanderson Farms, LLC (f/k/a Sanderson Farms, Inc.), Sanderson Farms Foods, LLC (f/k/a Sanderson Farms, Inc. (Foods Division)), Sanderson Farms Production, LLC (f/k/a Sanderson Farms, Inc. (Production Division)), and Sanderson Farms Processing, LLC (f/k/a Sanderson Farms, Inc. (Processing Division))*