**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

IN RE BROILER CHICKEN ANTITRUST
LITIGATION

No. 1:16-cv-08637-TMD-JG

Honorable Thomas M. Durkin
Magistrate Judge Jeffrey T. Gilbert

This Document Relates To:

*All End-User Consumer Plaintiff Actions*

**REPLY IN SUPPORT OF END-USER CONSUMER PLAINTIFFS' RENEWED**
**MOTION FOR ATTORNEYS' FEES**

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 1

II.    ARGUMENT .................................................................................................................. 2

    a.    Objector Andren Ignores the Overwhelming Number of Cases in Which Class Counsel Did Not Make Bids and Sought a One-Third Award. ....................................................... 2

    b.    Class Counsel Would Have Negotiated a Higher Fee *Ex Ante* Than the Fees in *IRS*, *ODD*, *Batteries*, and *Resistors*. .......................................................................................... 6

        i.    Class Counsel Would Have Negotiated a Higher Fee Than the Fee Schedule in *IRS*..... 6

        ii.    *ODD*, *Batteries*, and *Resistors* Were Far Less Risky Than Broilers. ............................... 10

        iii.    Class Counsel's Behavior In This Case Confirms They Would Have Sought a 33 Percent Fee. ..................................................................................................................... 16

    c.    *Ex Post* Fee Awards Confirm That 33 Percent Is the Market Rate. ................................. 18

III.    CONCLUSION ............................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2015 WL 5918273 (E.D.N.Y. Oct. 9, 2015)............................................................9

*In re Auto. Parts Antitrust Litig.*,
2018 WL 11260510 (E.D. Mich. Nov. 7, 2018)....................................................19

*In re Broiler Chicken Antitrust Litig.*,
80 F.4th 797 (7th Cir. 2023) ............................................................... *passim*

*In re Continental Illinois Securities Litig.*,
962 F.2d 566, 569 (7th Cir. 1992) ................................................................11, 12

*Dial Corp. v. News Corp.*,
317 F.R.D. 426 (S.D.N.Y. 2016) ...................................................................9

*In re Domestic Drywall Antitrust Litig.*,
2018 WL 3439454 (E.D. Pa. July 17, 2018).........................................................4

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018) ........................................................9

*Fox v. Vice*,
563 U.S. 826 (2011)..........................................................................8

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
392 U.S. 481 (1968)..........................................................................9

*Kleen Prods. LLC v. Int'l Paper Co.*,
2017 WL 5247928 (N.D. Ill. Oct. 17, 2017)........................................................19

*In re Lithium Ion Batteries Antitrust Litig.*,
2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) ......................................................11

*In re Lithium Ion Batteries Antitrust Litig.*,
2022 WL 16959377 (9th Cir. Nov. 16, 2022).......................................................12

*In re Parking Heaters Antitrust Litig.*,
2019 WL 8137325 (E.D.N.Y. Aug. 15, 2019)........................................................9

*In re Payment Card Interchange Fee Merchant Discount Antitrust Litig.*,
991 F. Supp. 2d 437 (E.D.N.Y. 2014) ..............................................................6, 7

*In re Peanut Farmers Antitrust Litig.*,
2021 WL 9494033 (E.D. Va. Aug. 10, 2021)........................................................13

*Poppino v. Jones Store Co.*,
    1 F.R.D. 215 (W.D. Mo. 1940) ........................................................................................8

*In re Pork Antitrust Litig.*,
    2022 WL 18959155 (D. Minn. Oct. 19, 2022) .............................................................3

*In re Potash Antitrust Litig.*,
    2013 WL 12470850 (N.D. Ill. June 12, 2013) ...........................................................19

*Silverman v. Motorola Solutions, Inc.*,
    739 F.3d 956 (7th Cir. 2013) ....................................................................................11

*Standard Iron Works v. ArcelorMittal*,
    2014 WL 7781572 (N.D. Ill. Oct. 22, 2014)........................................................19, 20

*Stop & Shop Supermarket Co. v, SmithKline Beecham Corp.*,
    2005 WL 1213926 (E.D. Pa. May 19, 2005) ...........................................................13

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) ............................................................... *passim*

*In re Synthroid Mktg. Litig.*,
    325 F.3d 974 (7th Cir. 2003) ...............................................................3, 11, 12, 20

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)..........................................................................................3

**Other Authorities**

Fed. R. Civ. P. 23(h)(2)........................................................................................................8

## I. INTRODUCTION

In its initial opinion, this Court applied the correct methodology for determining the End-User Consumer Plaintiffs (EUCP)'s Class Counsel's fees: approximating the market rate for legal services that counsel would have negotiated at the beginning of the case.[1] That inquiry required the Court to "weigh the available market evidence, and assess the amount of work involved, the risks of non-payment, and the quality of representation."[2] The Seventh Circuit dictated only two alterations to the Court's approach on remand: (1) the Court cannot hold that "bids with declining fee structures should *categorically* be given little weight"; and (2) the Court cannot "*categorically* assign[] less weight to Ninth Circuit cases in which counsel was awarded fees under the megafund rule."[3] Objector Andren misreads this holding as a *mandate* that the fee award here cannot exceed the declining fee structures Class Counsel used in a few outlier cases.[4]

Andren's misreading is inconsistent with longstanding Seventh Circuit precedent that "[t]he market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case."[5] As this Court recognized (and as the Seventh Circuit did not dispute), Class Counsel made "a massive investment of time and money" in this case, despite the "high risk of non-payment"—a gamble that "few" other firms were interested in taking.[6] Under these circumstances, it makes sense that Class Counsel would have negotiated at the outset a fee *above* their 30 percent median fee award from 2016 through 2022.

---

[1] *In re Broiler Chicken Antitrust Litig.* ("*Broilers*"), 80 F.4th 797, 801-02 (7th Cir. 2023).
[2] *Id.* at 802 (cleaned up).
[3] *Id.* at 803-04 (emphases added).
[4] Objector John Andren's Opp'n to EUCPs' Renewed Mot. for Attorneys' Fees, ECF No. 6990 (Oct. 20, 2023) ("Opp.") at 4, 12, 25.
[5] *In re Synthroid Mktg. Litig.* ("*Synthroid I*"), 264 F.3d 712, 721 (7th Cir. 2001).
[6] *Broilers*, No. 16-cv-08637, 2022 WL 6124787, at *3-4 (N.D. Ill. Oct. 7, 2022), *vacated*, 80 F.4th 797 (7th Cir. 2023).

Andren ignores a bevy of evidence supporting this conclusion, including: (1) the vast majority of cases where Class Counsel would *not* agree to use declining fee scales; (2) the 2021 fee study by Brian Fitzpatrick that examined the rates sophisticated parties in antitrust contingency cases negotiate; and (3) the 13 years of fee award data from all jurisdictions painstakingly compiled in the *2022 Antitrust Annual Report*. In lieu of this evidence, Andren asks the Court to rely on his own opinions and speculations. But Andren (and Hamilton Law Institute) are not themselves practitioners in the field: They are not antitrust litigators nor class action counsel. And Andren has not supported his opposition to the renewed motion for fees with expert analysis, industry-wide data, or support from industry practitioners.

By contrast, Class Counsel, who are seasoned antitrust firms, have carefully explained why the risks and benefits of representing the EUCPs were materially different from the risks and benefits in *IRS*, *ODD*, *Batteries*, and *Resistors*.[7] In light of these differences, those four cases are "poor indicators of what bargain would have been struck *ex ante*" in this case.[8] Taken as a whole, the available market evidence proves Class Counsel would have negotiated a flat 33 percent at the outset of this case—in line with the median award for antitrust cases of this size.

## II.    ARGUMENT

### a.    Objector Andren Ignores the Overwhelming Number of Cases in Which Class Counsel Did Not Make Bids and Sought a One-Third Award.

The Seventh Circuit has instructed district courts to evaluate available market evidence when determining the hypothetical bargain class counsel and plaintiffs would have struck at the

---

[7] "*IRS*" refers to *In re Interest Rate Swaps Antitrust Litigation*, No. 1:16-md-02704 (S.D.N.Y.). "*ODD*" refers to *In Re Optical Disk Drive Products Antitrust Litigation*, No. 3:10-md-02143 (N.D. Cal.). "*Batteries*" refers to *In Re Lithium Ion Batteries Antitrust Litigation*, No. 4:13-md-02420 (N.D. Cal.). "*Resistors*" refers to *In Re Resistors Antitrust Litigation*, No. 3:15-cv-03820 (N.D. Cal.).

[8] *Broilers*, 80 F.4th at 803.

outset of a case.[9] Here, that market evidence includes the declining fee schedule that Cohen Milstein agreed to follow in *IRS*, and three below-market auction bids Hagens Berman made in *ODD*, *Batteries*, and *Resistors*. But it also includes the nearly 200 other cases where Class Counsel chose not to bid to preserve their ability to seek a 33 percent fee.

In nearly all cases close in time to *Broilers*, Class Counsel determined that the risks and costs of litigation were too high to warrant a bid or predetermined fee schedule, especially one with a declining fee scale. Counsel has identified only *one* bid and only *one* fee schedule in 196 antitrust cases and 51 leadership applications from cases filed between 2013 and 2019 (three years preceding and following the filing of this case).[10] That is no surprise. Antitrust cases are "complicated, lengthy and bitterly fought," "inherently expensive and complex," and present significant risks to Class Counsel who pay upfront litigation costs and the pre-litigation investigation.[11] As Andren himself states, "[p]utative lead counsel are well positioned to assess their risk and price their services accordingly based on their lodestar in similar class actions and their broader litigation experience."[12] In risky, complex cases like *Broilers*, they "would propose a larger percentage of the recovery . . . to compensate [them] for that risk."[13]

Class Counsel follow this practice even when they negotiate with "sophisticated" plaintiffs—precisely the negotiations Andren urges the Court to reference.[14] Look no further than *In re Domestic Drywall Antitrust Litigation*, which Class Counsel cited in their opening brief but

---

[9] *Id.* at 801-02.
[10] *See* Decl. of Steve W. Berman in Supp. of EUCPs' Renewed Mot. for Attorneys' Fees, ECF No. 6911-1 (Sept. 29, 2023) at Exs. 1-2 ("Ex." refers to exhibits found in the Declaration of Steve Berman in Support of End-User Consumer Plaintiffs' Renewed Motion for Attorneys' Fees, ECF No. 6911-1).
[11] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005); *In re Pork Antitrust Litig.*, No. CV 18-1776, 2022 WL 18959155, at *3 (D. Minn. Oct. 19, 2022).
[12] Opp. at 10.
[13] *Id.*
[14] *Id.* at 1-2. *See also In re Synthroid Mktg. Litig.* ("*Synthroid II*"), 325 F.3d 974, 976 (7th Cir. 2003) (referencing agreements with sophisticated clients reached "through arms'-length negotiations").

Andren ignores.[15] The named plaintiffs in *Drywall* were sophisticated direct purchasers. As with *Broilers*, *Drywall* involved no government investigation, significant risk of nonpayment, sophisticated defense counsel, and other firms seeking leadership.[16] It is thus a precise example of what Class Counsel likely would have negotiated with a sophisticated client here. Unsurprisingly, in *Drywall*, Cohen Milstein refused to enter a bid and negotiated a retainer that allowed it to seek a 33 percent fee. (After class counsel recovered $190 million for the class, Cohen Milstein and their co-counsel moved for and were awarded 33 percent of the recovery.)[17]

Andren ignores this market evidence. His rationale for why one fee schedule and three below-market bids should be weighed *more* than every case in which Class Counsel chose *not* to bid is that "the 'market' does not award attorneys' fees at the end of litigation."[18] But Class Counsel have identified nearly 200 cases where they chose *not* to bid at the *beginning* of litigation. As rational participants in the national market for litigation, Class Counsel understand that each time they file a case, they forgo the opportunity to take on other cases. Litigators face the highest opportunity costs on contingency cases that are especially time consuming, expensive, complex, or risky.[19] For that reason, in most instances, Class Counsel and their clients agree to retainers in which Class Counsel seek a flat percent of the fund at the end of litigation—like the *Drywall* plaintiffs who agreed to let their attorneys seek up to 33 percent.[20] Indeed, there are "actual

---

[15] Mem. of Law in Supp. of EUCPs' Renewed Mot. for Attorneys' Fees, ECF No. 6911 (Sept. 29, 2023) ("Mot.") at 24 (citing *In re Domestic Drywall Antitrust Litig.*, No. 2:13-md-2437 (E.D. Pa.)).

[16] *In re Domestic Drywall Antitrust Litig.*, No. 13-md-2437, 2018 WL 3439454, at *18-19 (E.D. Pa. July 17, 2018).

[17] *Id.* at *18-20.

[18] Opp. at 19.

[19] *Broilers*, 2022 WL 6124787, at *3-4.

[20] *See* Ex. 3, ECF No. 6911-1 at 1161-62 (explaining that "all" of the available retainer agreements in the studied antitrust cases with sophisticated clients "called for a fixed percentage of one-third").

agreements" in this case where Class Counsel indicated they would seek up to 33 percent of the fund.[21]

Instead of focusing on these many examples, Andren spends the first eight pages of his brief arguing that the *IRS* fee schedule is the "best evidence" because it involves an arm's-length negotiation with a sophisticated plaintiff.[22] But focusing on one data point alone is irreconcilable with the Seventh Circuit's instructions to "weigh[] the available market evidence."[23] Andren is silent about Professor Brian Fitzpatrick's 2021 study that surveys "antitrust cases in the pharmaceutical industry where large corporations sue each other," which finds that "the corporations in these cases appear perfectly happy with the percentage method and perfectly happy with the same fixed percentage of one-third."[24] Instead, Andren focuses on a single case, *Capital One TCPA*, to assert that "on the rare occasions non-securities attorneys negotiate price *ex ante*, they agree to fees less than 33%."[25] But *Capital One TCPA* focuses mainly on securities cases—which generally have just one defendant and are thus very different from antitrust cases. And the Court has already rejected the two non-securities cases *Capital One* cites as "outdated, none being less than 20 years old."[26] It is hard to square Andren's insistence that negotiations with sophisticated plaintiffs are the best market-rate evidence with his complete dismissal of the best antitrust data on the topic.

---

[21] EUCPs' Report in Resp. to the Court's Oct. 3, 2022 Order, ECF No. 5835 (Oct. 5, 2022) at 1-2. *See also Synthroid I*, 264 F.3d at 719.

[22] Opp. at 2.

[23] *Broilers,* 80 F.4th at 802 (quoting *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011)).

[24] Ex. 3, ECF No. 6911-1 at 1161-62 (explaining that, in study of thirty-three antitrust class action cases in the pharmaceutical industry where large corporations sue each other, a one-third fixed fee "*heavily* dominated").

[25] Opp. at 22-23 (citing *Capital One TCPA*, 80 F. Supp. 3d 781, 803 (N.D. Ill. 2015)).

[26] *Broilers*, 2022 WL 6124787, at *3 (citing *Capital One TCPA*, 80 F. Supp. 3d at 802-03).

Andren also misunderstands the incentives for sophisticated plaintiffs to accept flat 33 percent rates. He repeatedly argues that fee rates must decrease as settlements get larger and increase for each stage of the litigation because of economies of scale and increased risks that accompany each step of a case.[27] This ignores the data, however, including in Professor Fitzpatrick's 2021 study, that sophisticated antitrust plaintiffs generally negotiate *flat fees* to avoid "create[ing] declining marginal returns to legal work."[28] Andren's two arguments are also at odds with each other. While increasing fee rates as litigation progresses may encourage attorneys to litigate vigorously through trial, a declining fee scale promotes the opposite by providing lower fees for large, late-stage recoveries. Market data confirm sophisticated clients do not want to give their attorneys this financial disincentive to litigate vigorously near the finish line.

### b. Class Counsel Would Have Negotiated a Higher Fee *Ex Ante* Than the Fees in *IRS, ODD, Batteries,* and *Resistors*.

Andren advocates applying the *IRS* fee schedule, which would result in a higher award than applying any of the bids. In the alternative, Andren argues that the market rate should be determined by bids made by Hagens Berman in *ODD*, *Batteries*, and *Resistors*. But neither the fee schedule nor the bids reflect the market rate for Class Counsel's legal services; each are "poor indicators of what bargain would have been struck ex ante."[29] The market rate is the fee that Class Counsel and most sophisticated clients negotiate in complex antitrust cases: 33 percent.

### i. *Class Counsel Would Have Negotiated a Higher Fee Than the Fee Schedule in* IRS.

Andren argues that the Court should "apply a similar schedule" to the one in *IRS*, which incorporates the declining fee scale from *In re Payment Card Interchange Fee Merchant Discount*

---

[27] Opp. at 4-6.
[28] *Synthroid I*, 264 F.3d at 721.
[29] *Broilers*, 80 F.4th at 803.

*Antitrust Litigation*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014) and would amount to $44 million for the $181 million settlement here—approximately 26 percent of the net settlement.[30] Andren claims that data from prior suits with "large investors" as clients are the best available benchmark for determining *ex ante* rates, so the Court should import the fee schedule from *IRS*.[31] But the Seventh Circuit's market-based approach is not a formulaic application of one piece of information. Instead, this Court must look at the similarities and differences between *IRS* and *Broilers* to determine whether they had the same *ex ante* risks.

Andren fundamentally oversells the importance of the *IRS* fee schedule. Andren argues that the *IRS* fee schedule is representative because "sophisticated clients" agree to "fees that marginally decline as the size of the fund increases."[32] But he ignores evidence-based research that demonstrates sophisticated clients in antitrust cases typically negotiate a flat 33 percent fee award.[33] Determining the market rate from one case—while ignoring the remainder of the data— is bad economics. Andren also claims that private parties agree to fees that "rise based on the stage of litigation."[34] But that also is not true. The best available data shows corporate antitrust plaintiffs generally choose flat contingency fees—not declining fee scales, and not fees that change based on the stage of litigation when the settlement was entered.[35]

That includes *IRS*. Andren's hypothesis that the *IRS* fee schedule might have included lower fee rates for early-stage settlements is wrong: Cohen Milstein's *IRS* fee agreement expressly follows the *Payment Card* scale and does not include lower rates for earlier-stage settlements. In other words, all the relevant information about the fee agreement in *IRS* is available in Cohen

---

[30] Opp. at 2; Mot. at 21.
[31] Opp. at 2 (quoting *Synthroid I*, 264 F.3d at 720).
[32] *Id.* at 4.
[33] Ex. 3, ECF No. 6911-1 at 1161.
[34] Opp. at 4 (quoting *Synthroid I*, 264 F.3d at 722).
[35] Ex. 3, ECF No. 6911-1 at 1153-54, 1161-63.

Milstein's publicly filed leadership application. Given this, the Court should not and need not require Cohen Milstein to produce its fee agreement (embedded in its retainer) with Chicago Teachers Pension Fund. Andren has not met his burden to show this discovery is necessary and the information is not in the possession of the named Plaintiffs (who only have access to their own legal files).[36] Further, requiring the production of unrelated fee agreements improperly threatens to turn fee disputes into "second major litigation," something heavily disfavored by the courts.[37]

Regardless, looking at the "aspects of the case[]" as the Seventh Circuit has instructed,[38] Class Counsel would not have negotiated the *IRS* fee schedule here.

**First,** the estimated size of recovery at the outset of *IRS* was significantly higher than in *Broilers*, as indicated by the trillion-dollar financial market at issue in *IRS* and the *billion*-dollar settlements in similar banking cases.[39] A declining fee scale in *IRS* was appropriate based on a particularly large, expected recovery. Andren suggests this is inaccurate because a document in *IRS* states that a "rough calculation of damages" in that case is $4.5 billion,[40] and Dr. Sunding's estimation of damages to the end-user class is $3.916 billion.[41] Dr. Sunding's pre-summary-judgment damages estimate (using Defendants' volume of commerce) was $3.4 billion—over a billion dollars less than the supposed estimated damages in *IRS*.[42] In any event, as Andren stresses, the relevant question is how Class Counsel would have estimated damages at the *outset* of *Broilers*

---

[36] *See* Fed. R. Civ. P. 23(h)(2) Advisory Committee's note to 2003 amendment ("the burden should be on the objector to justify discovery to obtain further information"); *Poppino v. Jones Store Co.*, 1 F.R.D. 215, 219 (W.D. Mo. 1940) ("The mere fact, however, that the attorney for a party has possession of a document does not make his possession of the document the possession of the party.").

[37] *Fox v. Vice*, 563 U.S. 826, 838 (2011) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).

[38] *Broilers*, 80 F.4th at 803.

[39] Mot. at 21-22.

[40] Expert Report of Mark Grinblatt at iii, 104, *In re Interest Rate Swaps Antitrust Litig.*, No. 16-md-2704 (S.D.N.Y. Mar. 7, 2019), ECF No. 725-1.

[41] Opp. at 8.

[42] Dr. Sunding Merits Rebuttal Report, ECF No. 6226-6 (Jan. 26, 2023) at Tbl. 12.

compared to the *outset* of *IRS*—not the damages numbers that are based on the discovery. Given the trillion-dollar financial market in *IRS* and the exceptionally large settlement in similar banking cases, counsel expected a much smaller recovery at the outset of *Broilers* than in *IRS*.

In fact, the declining fee scale endorsed in *In re Payment Card* and incorporated in *IRS* has mostly applied to cases with much larger expected and actual settlement funds than the one here. Andren does not point to *any* case in which the scale was applied to a fund under $244 million.[43] The one case he claims does, *In re Parking Heaters Antitrust Litigation*, does not apply the scale; it awards counsel a one-third fee and simply cites *Payment Card*.[44] The fact the *Payment Card* scale has historically applied to much larger settlements also confirms that the *ex ante* expected recovery for *IRS* was much larger than the damages here.

**Second**, unlike in *IRS*, Class Counsel here represent indirect purchasers, who face more litigation risks while typically recovering less.[45] Andren asserts that "most direct purchasers have a mirror image challenge [to indirect purchasers]: proving that all of the cartel's price increases *were not* passed through."[46] Not so: It is blackletter law that it is not a defense to a direct purchaser action under the Sherman Act that plaintiffs passed on the overcharge they incurred to their customers.[47] The *IRS* plaintiffs did not need to address pass-through as a matter of law or fact.

Andren misunderstands why direct purchasers generally recover more than indirect purchasers.[48] Under *Illinois Brick*, indirect purchasers can only seek antitrust damages when

---

[43] *See* Opp. at 7.
[44] *In re Parking Heaters Antitrust Litig.*, No. 15-mc-0940, 2019 WL 8137325, at *7 (E.D.N.Y. Aug. 15, 2019). In fact, the other cases Andren cites as crediting the *Payment Card* scale—*Dial Corp. v. News Corp.*, 317 F.R.D. 426, 436 (S.D.N.Y. 2016), *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-md-1775, 2015 WL 5918273, at *6 (E.D.N.Y. Oct. 9, 2015), and *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at *4 (S.D.N.Y. Nov. 8, 2018)—merely cite the case and do not endorse its scale.
[45] Mot. at 22-24.
[46] Opp. at 1.
[47] *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 489 (1968).
[48] Opp. at 16.

9

permitted by state law, and only a subset of states provide this permission. So, for example, EUCP Class Counsel knew that they could only seek damages for the roughly 50 percent of chicken purchasers who live in states that allow indirect purchaser suits. Unique state-law requirements and pass-through issues in indirect purchaser cases also heighten the risk of dismissal on the pleadings and denial of class certification. It is therefore no surprise that indirect purchasers made up 46 percent of the settlements in the *2022 Annual Antitrust Report* but accounted for only 21 percent of the recoveries.[49] Andren's assertion that indirect-purchaser issues only arise in "a few states where the scope of unfair competition laws remains ambiguous" vastly underestimates the expertise and effort required to litigate an indirect purchaser case.[50]

ii.     ODD, Batteries, *and* Resistors *Were Far Less Risky Than Broilers.*

Although Andren urges the Court to follow the *IRS* fee schedule, he repeatedly references bids submitted by Hagens Berman in *ODD*, *Batteries*, and *Resistors*. These below-market bids would not have been submitted in a case as risky as *Broilers*. Indeed, the fee scale in *Batteries* (predictably) would have amounted to a *significantly negative* lodestar multiplier here.[51] And Andren's assertion that the bids reflect the only cases in which Class Counsel faced price competition is wrong: Andren simply ignores that Hagens Berman and Cohen Milstein submitted *only one* bid in 51 antitrust leadership applications in cases filed from 2013 through 2019 (the three years before and after this case was filed).[52]

Andren also contends that "if the [Seventh Circuit's] *Broiler Chicken* mandate stands for anything, courts should not discount rare examples of skilled parties assessing *ex ante* attorneys'

---

[49] Ex. 4, ECF No. 6911-1 at 17.
[50] Opp. at 15.
[51] *See Id.* at 12 (explaining *Batteries* scale would amount to $25.4 million in fees here, substantially less than Class Counsel's $32.8 million lodestar).
[52] *See* Ex. 2, ECF No. 6911-1.

fees."[53] But this mischaracterizes the Seventh Circuit's holding. The court held that "it was error to suggest that this court has cast doubt on the consideration of declining fee scale bids in *all* cases."[54] The court cautioned that whether rare auction bids are good evidence of the *ex ante* rate "depend[s] on the particulars," and "[o]ther aspects of the cases in which the bids were made may show the bids to be poor indicators of what bargain would have been struck *ex ante*."[55] That makes sense given previous Seventh Circuit cases explaining the potential pitfalls of relying on auction bids from one case to estimate the *ex ante* fee in another.[56] Far from mandating the application of the fee bid rates, the Seventh Circuit remanded for this Court to decide whether the auction bids are useful evidence here.

They are not. Andren effectively admits that *Broilers* was riskier than the bid cases *ex ante*, arguing only that the bid cases are not "*so dissimilar* as to be useless."[57] But the three bids were made under rare circumstances not present here. As Hagens Berman stated in its sworn declaration, the bids "were vastly below market."[58] Andren cannot contest this fact: had the court in *Batteries* accepted the bid, it would have resulted in a significantly negative multiplier on Hagens Berman's loadstar for the case.[59] As Judge Posner observed in *In re Continental Illinois Securities Litigation*, because contingency litigation involves serious risks of nonpayment, it would be irrational for

---

[53] Opp. at 10.

[54] *Broilers*, 80 F.4th at 803-04 (emphasis added).

[55] *Id.* at 803.

[56] *See Synthroid I*, 264 F.3d at 721 ("declining marginal percentages are [not] always best" because they "create declining marginal returns to legal work, ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery"); *Synthroid II*, 325 F.3d at 979 (explaining potential issues with auctions for legal services); *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (same).

[57] Opp. at 13-14 (emphasis added).

[58] Decl. of Steve W. Berman in Supp. of EUCPs' Mot. for Final Approval, ECF No. 5250 (Dec. 6, 2021) ¶ 19.

[59] *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420, 2020 WL 7264559, at *19 (N.D. Cal. Dec. 10, 2020), *aff'd*, No. 21-15120, 2022 WL 16959377 (9th Cir. Nov. 16, 2022).

class counsel to accept a market rate below lodestar.[60] No surprise that the Ninth Circuit found that Hagens Berman's failed *Batteries* bid "offer[ed] little insight into market rates."[61]

As Plaintiffs explained in their opening brief, these below-market bids were offered because Hagens Berman was attempting to secure leadership of litigation that was less risky than *Broilers* for five reasons. Andren does not rebut any of them. Because the bid cases "present[ed] less risk to the plaintiff class" than *Broilers* did, "it is unsound to use a contingent fee appropriate to the former as the measure in the latter."[62]

***First***, in all three bid cases raised, the Department of Justice had announced an investigation into antitrust misconduct before the complaints were filed, mitigating the risk of a defense win on the pleadings.[63] Andren does not dispute that cases following on the heels of government investigations are more likely to pass the pleading stage and thus involve less risk of nonpayment than other cases.[64] Because of that lower risk of nonpayment, counsel in those cases may have more willingness to take a lower fee. So, on this point alone, Class Counsel would have negotiated a higher rate than in the bid cases.

Andren argues that government investigations might not mean much, however, because the Department of Justice did not end up issuing indictments in *Resistors* and the plaintiffs in *ODD* noted that the government's related criminal proceedings took a narrower view of the conspiracy than the civil plaintiffs' case.[65] But this misses the point. At the *outset* of the three bid cases, counsel would reasonably have recognized that the government investigations lowered the risk of

---

[60] *See* 962 F.2d 566, 569 (7th Cir. 1992) (explaining that the need for a "risk multiplier" above lodestar is necessary because "[t]he lawyers for the class receive no fee if the suit fails").
[61] *In re Lithium Ion Batteries Antitrust Litig.*, No. 21-15120, 2022 WL 16959377, at *1 (9th Cir. Nov. 16, 2022).
[62] *Synthroid II*, 325 F.3d at 979.
[63] Mot. at 14-15.
[64] Opp. at 13-14.
[65] *Id.* at 13.

nonpayment by making it more likely the case would survive critical stages.[66] The district court's reference to the defendants' guilty pleas in its order granting class certification in *ODD* reflect as much.[67] That counsel in *Resistors* argued that their case, where the government closed its investigation before discovery began, was "more challenging than in other cases *where defendants have been found criminally liable*" does not refute that the lack of any governmental investigation at the outset of a case makes it much more challenging.[68] When Class Counsel filed this case, there was no government investigation. That *ex ante* perspective did not change just because the government *later* opened a criminal investigation. *Broilers* was riskier than the bid cases *ex ante*.

**Second**, *Broilers* was riskier at the outset because it involved significantly more defendants than any of the bid cases and involved a much less consolidated industry—increasing the amount of work and cost that would be necessary at every stage of the litigation and increasing the likelihood that additional defendants would be named.[69] This anticipated work bore out: Class Counsel took three times the depositions in this case compared to *Batteries*.

Andren concedes that the additional defendants in *Broilers* militate in favor of more *ex ante* risk, but argues this is a "difference of degree, not kind" because Plaintiffs could "pick off a cooperating defendant" early in the case.[70] But differences in degree (for both expenses and risk of non-payment) matter to rational parties striking fee bargains. When filing their complaints, Class Counsel recognized that the number of defendants and the complexity of the case would result in a high number of depositions, above-average time on document review and deposition

---

[66] *See, e.g.*, *Stop & Shop Supermarket Co. v, SmithKline Beecham Corp.*, No. 03-cv-4578, 2005 WL 1213926, at *12 (E.D. Pa. May 19, 2005); *In re Peanut Farmers Antitrust Litig.*, No. 2:19-CV-00463, 2021 WL 9494033, at *4 (E.D. Va. Aug. 10, 2021).
[67] Mot. at 15.
[68] Opp. at 13 (emphasis added).
[69] Mot. at 17-18.
[70] Opp. at 16.

preparation, substantial dispositive briefing, significant litigation and expert costs, and high levels of involvement from senior attorneys.[71] Class Counsel was right on every point. And putting aside that an early settlement with a smaller producer was far from certain given the lack of preceding government investigation, such a settlement also would not have offset these case-long costs.

**Third**, the bid cases are poor indicators because Class Counsel understood at the outset that proving pass-through would be much more complicated than in the bid cases. Unlike in the bid cases which involved infrequent purchases of expensive electronic items, chicken purchasers often buy chicken weekly. Class Counsel investigated the retail chain before filing their complaint, and anticipated extreme discovery and expert costs related to obtaining transactional data reflecting hundreds of thousands of millions pounds of chicken purchases and the pass-through of those purchases.[72] In response to this, Andren simply asserts that the risks for an indirect purchaser case are not "categorically" increased from direct purchasers.[73] But this overlooks the many indirect purchaser cases dismissed due to the inability to show pass-through. And it ignores that Class Counsel's predictions came to bear, as an enormous amount of work went into the EUCP expert reports that was entirely absent from those of the direct purchasers. EUCP attorneys negotiated data and document productions from dozens of third parties—and reviewed hundreds of thousands of documents—to support Dr. Sunding's pass-through analysis. EUCP attorneys attended every deposition of a DAP who participated in the retail channel and questioned on pass-through issues where witnesses had relevant information. The direct purchaser class did not have to undertake *any* of this burden. That EUCPs anticipated this work would be necessary *in addition to* demonstrating liability should not be ignored.

---

[71] Mot. at 18-19.
[72] *Id.* at 19-20.
[73] Opp. at 15.

**Fourth**, Andren contends that the complexity that results from a supply reduction conspiracy dealing with live animals is not meaningfully different than one involving widgets. Andren suggests that in *Batteries* the plaintiffs had to show pass-through based on only a component of the good, whereas a chicken is "the entire product."[74] Andren misunderstands the point. What was obvious at the outset of the case was that at the level of liability, a conspiracy to restrain the supply and increase the price of a live animal is more complicated than a cartel controlling the cost and supply of a battery. In *Broilers*, Defendants had many levers to affect the core supply restriction in the case: they could kill breeders, decrease bird weights, etc. To restrain the supply of batteries, on the other hand, the *Batteries* defendants had one option: make fewer batteries. Additional difficulties resounded on pass-through. To even get to class certification, EUCP counsel had to identify the parts of chickens most frequently sold in the U.S. (it turns out, American consumers eat white meat from the front half of the chicken). From there, each part of the chicken was examined both for the overcharge model and to look at pass-through. After obtaining extraordinary amounts of data, EUCPs excluded processed products, examined levels of seasoning or marination that might impact the pass-through of the overcharge, and excluded wings from the class given the inconsistencies in pass-through to end-users. Only after all this data retrieval, expert work, and review of market conditions did the EUCPs arrive at their proposed class. The need for all of this work was evident at the outset of the case. As experienced Class Counsel, it was evident from the start, that live animals are not the same as widgets.

**Fifth**, Andren argues that the Pilgrim's bankruptcy is "just the fact-bound version of a question that every antitrust plaintiff must prove: when did the conspiracy begin, and who committed anticompetitive acts."[75] But this is another example of Andren's gambit: Fee awards

---

[74] *Id.* at 17.
[75] *Id.*

are a fact-bound inquiry that depend on the *ex ante* peculiarities of the case, but every fact is a distinction without a difference. At the time of filing, Plaintiffs anticipated that Defendants would point to the Pilgrim's bankruptcy *in addition to* the "million other potential innocent explanations for apparent collusion" that Andren suggests.[76] The bankruptcy, *together with the other risk factors*, suggests Class Counsel would have negotiated an above-median fee here.

      **Finally**, Andren finally finds a factual difference that he deems important: that the bid cases involved foreign defendants.[77] Andren argues counsel incurred additional costs by litigating against such defendants—*e.g.*, to advances costs of translating documents—which are not costs counsel had to incur here. While counsel in the bid cases did incur costs to translate documents and compel discovery from multinational companies, these were unexpected issues. In *Batteries*, for instance, the plaintiffs had to seek discovery from a non-defendant about its parent company *after* class certification (which the plaintiffs did not anticipate *ex ante*).[78] And the issue in *ODD* where a John Doe attempted to quash an important subpoena was quite literally "not contemplated" and "unforeseen at the outset of this litigation."[79] These examples actually *illustrate* why the fee bids in those cases were below market and why Hagens Berman chose not to engage in them again.

    iii.   *Class Counsel's Behavior in This Case Confirms They Would Have Sought a 33 Percent Fee.*

      Class Counsel's behavior here confirms that one-third of the recovery is the market rate. Firms did not "clamor[]" for appointment as lead counsel for the EUCPs.[80] To the contrary, Class Counsel "invested massive resources of time and money when few other counsel expressed

---

[76] *Id.*

[77] Opp. at 18.

[78] *See Batteries*, No. 4:13-md-02420, ECF No. 2588 (N.D. Cal. Mar. 9, 2020) at 6 (explaining plaintiffs "subpoenaed packer Simplo USA to produce data from its overseas parent Simplo Taiwan" *after* class certification).

[79] *ODD*, No. 3:10-md-02143, ECF No. 2942 (N.D. Cal. Sept. 28, 2020) at 13.

[80] Opp. at 20.

interest."[81] Only one other firm besides Class Counsel submitted a leadership application for EUCPs. And Andren is incorrect that two firms vying for appointment as lead counsel somehow suggests Class Counsel would have sought a low *ex ante* rate. Class Counsel determined that there was a conflict between their clients' interests as end-users and the commercial indirect purchasers—a point on which Andren agrees[82]—and sought to remedy that irrespective of financial considerations. And on the economics, firms file cases and seek leadership positions on the presumption that they will be paid market price. Andren's argument is the equivalent of saying that if two construction firms seek a new project, the price of construction work must be low.

Andren employs the same false logic when he argues that Class Counsel would not have retained an economic expert pre-appointment nor sought discovery during motion to dismiss briefing if the case did not present a non-risky opportunity.[83] But Andren agrees that proceeding with discovery "favor[ed] plaintiffs," so Class Counsel had a fiduciary duty to pursue that action no matter how it would impact their fee.[84] In any event, the point remains the same: That Class Counsel felt compelled to take expensive, preemptive action in a risky case is evidence *for*, not against, the proposition that they would have negotiated a 33 percent rate *ex ante*.

Nor does the number of opt-out defendants suggest the market rate for legal services was below 33 percent.[85] Over 3,500 direct purchasers remain—including many sophisticated, well-capitalized corporations—and none objected to the Direct Purchasers' counsel's 33 percent fee. If the market rate for attorneys' fees is far below 33 percent, as Andren suggests, why didn't these corporations object? Moreover, because opt-outs can wait until class certification is granted or

---

[81] *Broilers*, 2022 WL 6124787, at *3-4.
[82] Opp. at 20.
[83] *Id.* at 21.
[84] *Id.*
[85] *See Id.*

denied before deciding whether to remain in the class,[86] they "identify a market mid-way through the case."[87] They do not indicate what the market-rate fee was at the outset.

In short, the precise risks that Class Counsel foresaw when they filed this case have come to pass. The motions to dismiss were a close call, meaning Class Counsel almost went home with nothing after paying pre-discovery experts.[88] Defendants were well-resourced and represented by some of the most sophisticated defense counsel in the country.[89] Several defendants were dismissed from the case on summary judgment. Another defendant just achieved a defense verdict at trial. The foreseeable risk of nonrecovery was real, as this Court knows from experience. Class Counsel would have negotiated a market rate of 33 percent at the start to mitigate it.

### c. *Ex Post* Fee Awards Confirm That 33 Percent Is the Market Rate.

Class Counsel's fee agreements in this case and fee awards granted to Class Counsel throughout the country further confirm that 33 percent is the correct market rate. This case is similar to cases in which Class Counsel did not bid and expressly reserved their right to receive one-third of the recovery—like *Domestic Drywall*. Looking at Class Counsel's fee agreements and nationwide cases in which counsel received fee awards both confirm a one-third market rate.

*First*, the Seventh Circuit took no issue with the Court crediting Class Counsel's agreements with the named Plaintiffs, which permit that Hagens Berman "will take a percentage of any recovery as determined by the Court" and Cohen Milstein's "fees will not exceed one-third of the gross monetary recovery."[90] Andren ignores this entirely.

---

[86] *See* Direct Purchaser Pls.' Resp. to Restaurant DAPS' Mot. to Confirm, ECF No. 6864 (Sept. 12, 2023) at 3; Minute Entry, ECF No. 6872 (Sept. 14, 2023).
[87] *Synthoid I*, 264 F.3d at 720.
[88] *Broilers*, 2022 WL 6124787, at *3-4.
[89] *Id.*
[90] *Broilers*, 2022 WL 6124787, at *3; ECF No. 5835 at 1-2 (cleaned up). *See also Synthroid I*, 264 F.3d at 719.

**Second**, independent studies of fee awards and Class Counsel's prior nationwide awards both support a 33 percent rate. The *2022 Antitrust Annual Report* demonstrates that the median award for fees in all Circuits nationwide from 2009 and 2022 was 30 percent, and this remained true for settlements between $100 and $249 million.[91] Class Counsel's nationwide fee awards in antitrust cases from 2016 through 2022 confirm this finding: the median fee award was also 30 percent.[92] It makes sense that a fee for a case with above-average risk would be above this median.

Andren nitpicks that Class Counsel's median past fee award should not be applied here because (1) Class Counsel's median fee award for funds between $100 and $500 million have a median of 25 percent, and (2) Class Counsel had a lower lodestar multiplier in some cases where they were awarded 30 percent or more in fees.[93] Andren again simply ignores the data he does not like. Andren has no response to the *2022 Antitrust Annual Report* showing that the median attorneys' fees in antitrust class actions across the country with settlements between $100 and $249 million is 30 percent. Nor does he dispute that courts within this district—estimating the *ex ante* rate counsel would have negotiated—regularly grant 30 to 33 percent flat fees in antitrust cases.[94]

---

[91] Ex. 4, ECF No. 6911-1 at 32-33.

[92] Mot. at 28-29 & n.96. Andren accuses Class Counsel of inflating their past fee awards by including many awards from *In re Automotive Parts Litigation*. Opp. at 23-24 n.6. Andren is mistaken. Cohen Milstein represented direct purchasers in *Automotive Parts*, and Hagens Berman represented end payors. The twenty-one "smaller funds" that Andren refers to are direct purchaser settlements, and they amount to over $100 million in fee awards. *See* Sealed Ex. 9, ECF No. 6911-1 at 3-6, 11. Separately, the end-payors received an overall fee award from the litigation of 22.06%, based on three awards that were entirely distinct from the direct purchaser awards that almost exclusively granted fees at 30 percent or higher. *See In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2018 WL 11260510, at *4 (E.D. Mich. Nov. 7, 2018) (explaining end payors had only three rounds of settlements). Exhibit 9 correctly reflects these facts. Regardless, even if Class Counsel removed all the *Automotive Parts* fee awards from Exhibit 9, their median award would still be 30 percent.

[93] Opp. at 24-25.

[94] *See, e.g., Kleen Prods. LLC v. Int'l Paper Co.*, No. 1:10-cv-05711, 2017 WL 5247928 (N.D. Ill. Oct. 17, 2017) (awarding class counsel 30% of $354 million common fund); *Standard Iron Works v. ArcelorMittal*, No. 08 C 5214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) (awarding class counsel 33% of $163.9 million common fund); *In re Potash Antitrust Litig.*, No. MDL 1996, 2013 WL 12470850, at *1 (N.D. Ill. June 12, 2013) (awarding class counsel 33% of $90 million common fund).

19

Instead, he gerrymanders Class Counsel's data by looking only at settlements for funds between $100 and $500 million. He points to the *mode* for such fee awards, but it is immaterial that in that gerrymandered set there are four 20 percent fee awards, when *eight* awards are between 30 and 33.33 percent.[95] More importantly, if Andren had limited the settlement funds to those of $100 to $249 million like the *2022 Antitrust Annual Report*, the median award would have been approximately 29 percent—essentially the same as the overall median.

Finally, the 1.8 lodestar multiplier that Class Counsel request is well within the norm for similar cases.[96] Andren argues a 1.8 multiplier is too high because certain fee awards in other cases amounted in fractional recoveries—awards that are *less* than the lodestar.[97] But this *hurts* Andren's point. That Class Counsel have received 30 percent or above fee awards that do not cover their hourly services further reveals why Class Counsel would not negotiate an even *lower* fee rate here.[98] And if Class Counsel's lodestar is less than in other cases, that is because they litigated the case efficiently; that efficiency should not be used "to reduce class counsel's percentage of the fund that their work produced."[99]

## III. CONCLUSION

For all these reasons, the Court should award $56,760,000, or 33 percent of the net settlement, reject Andren's objections, and deny Andren's request to compel discovery of the retainer agreement in *IRS*.

---

[95] *See* Sealed Ex. 9, ECF No. 6911-1.

[96] *See, e.g.*, *Standard Iron Works*, 2014 WL 7781572, at *2 (awarding 33 percent of a $163.9 million common fund and noting that the 1.97 lodestar multiplier was "well within the range of reasonable multipliers awarded in similar contingent cases").

[97] Opp. at 23 n.6.

[98] *See Synthroid II*, 325 F.3d at 979 (explaining that value of contingency cases is that where counsel is inefficient with their time, "the loss falls on counsel themselves").

[99] *See Synthroid II,* 325 F.3d at 979-980. Plaintiffs' Exhibit 9 is not "squirrely," as Andren accuses, in its estimation of lodestar, but instead reflects the lodestar data in the fee petitions cited therein. Opp. at 23 n.6.

DATED: November 3, 2023    Respectfully submitted,

*/s/ Shana E. Scarlett*
Shana E. Scarlett
Rio R. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman
Breanna Van Engelen
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7291
steve@hbsslaw.com
breannav@hbsslaw.com

Brent W. Johnson
Benjamin D. Brown
Daniel H. Silverman
Alison S. Deich
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
bjohnson@cohenmilstein.com
bbrown@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com

*Lead Counsel for End-User Consumer Indirect
Purchaser End User Class*

21

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on November 3rd, 2023 a true and correct copy of the foregoing was electronically filed by CM/ECF, which caused notice to be sent to all counsel of record.

<span style="margin-left:40%;">*s/ Shana E. Scarlett*</span>
<span style="margin-left:40%;">SHANA E. SCARLETT</span>

22