# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ***In re Broiler Chicken Antitrust Litigation*** | Case No. 1:16-cv-08637 |
| This Document Relates to: Track One | Honorable Thomas M. Durkin |
| | Honorable Jeffrey T. Gilbert |

**PLAINTIFFS' JOINT RULE 50(b) AND MOTION FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL**

# TABLE OF CONTENTS

**Page(s)**

I. Renewed Motion for Judgment as a Matter of Law ........................................................ 1

    A. The evidence was insufficient to allow a rational jury to find in favor of Sanderson. ............................................................................................................... 2

    B. The evidence presented at trial was not legally sufficient to support the jury's verdict that there was no conspiracy to limit the supply of chicken. ...................... 2

        1. Economic evidence ................................................................................... 3

        2. Non-Economic Evidence .......................................................................... 4

    C. Other elements of a *per se* violation were demonstrated at trial............................ 10

        1. The alleged conspirators were competitors.............................................. 10

        2. Plaintiffs are entitled to damages for conduct prior to September 2, 2012. ....................................................................................11

        3. Plaintiffs sustained antitrust injuries as a result of the supply conspiracy. ............................................................................................... 13

    D. Erroneously excluded evidence further supports Plaintiffs' motion. .................... 14

II. Sanderson's Misuse of the Summary Judgment Opinion in Violation of the Court's *In Limine* Ruling Requires a New Trial. ....................................................................... 15

    A. This Court should order a new trial to prevent injustice....................................... 16

    B. Sanderson improperly and unjustly misused the summary judgment ruling by presenting evidence and arguing that it and the remaining alleged co-conspirators were in the same position as the dismissed defendants. ........................................ 18

    C. Sanderson's misuse of this Court's summary judgment opinion was especially unfair because the economic evidence against the six dismissed defendants was "strong" and the conduct in which they participated with the alleged conspirators was sufficient to prevent the entry of summary judgment.................................... 21

        1. The trial evidence was incomplete because the trial should have included Perdue and more evidence about Perdue. ................................................. 22

        2. The trial evidence was incomplete because the trial should have included more evidence about Fieldale. ................................................................. 23

3.      The trial evidence was incomplete because the trial should have included Case Foods and more evidence about Case Foods. .................................. 25

4.      The trial evidence was incomplete because the trial should have included Claxton and more evidence about Claxton. .............................................. 26

5.      The trial evidence was incomplete because the trial should have included Wayne and more evidence about Wayne. .................................................. 26

6.      The trial evidence was incomplete because the trial should have included Foster Farms and more evidence about Foster Farms. ............................ 28

D.      The unfairness of the trial was compounded by the court's erroneous ruling to dismiss the portion of the claims based on the slaughter of broiler hens in 2015-16 and, therefore, the overarching conspiracy claims .................................................. 29

E.      The unfairness of the trial was compounded by the Court's erroneous summary judgment opinion dismissing the Georgia Dock claims. .................................... 31

III.    Conclusion    ................................................................................................ 33

**TABLE OF AUTHORITIES**

**Cases**                                                                                              **Page(s)**

*Baugh v. Cuprum S.A. De C.V.*,
   No. 08 C4204, 2015 WL 9304338 (N.D. Ill. Dec. 22, 2015)...................................................... 2

*Cobb Cty. v. Jones Grp. P.L.C.*,
   460 S.E.2d 516 (Ga. Ct. App. 1995) ................................................................................ 32

*In re Broiler Chicken Antitrust Litigation*,
   No. 16 C 8637, 2023 WL 4303476 (N.D. Ill. June 30, 2023).................................................11

*In re Copper Antitrust Litigation*,
   436 F.3d 782 (7th Cir. 2006) ..........................................................................................11

*In re Delta/Air Tran Baggage Fee Antitrust Litig.*,
   733 F. Supp. 2d 1348 (N.D. Ga. 2010) ............................................................................. 25

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) .......................................................................................... 26

*In re Sulfuric Acid Antitrust Litig.*,
   743 F. Supp. 2d 827 (N.D. Ill. 2010) ...............................................................................11

*Juneau Square Corp. v. First Wisconsin Nat'l Bank of Milwaukee*,
   624 F.2d 798 (7th Cir. 1980) .......................................................................................... 16

*Latino v. Kaizer*,
   58 F.3d 310 (7th Cir. 1995) ............................................................................................ 17

*McNabola v. Chicago Transit Authority*,
   10 F.3d 501 (7th Cir. 1993) ............................................................................................ 16

*Mejia v. Cook County, Ill.*,
   650 F.3d 631 (7th Cir. 2011) .......................................................................................... 17

*Prime Choice Servs., Inc. v. Schneider Logistics Transloading & Dist., Inc.*,
   861 F.3d 633 (7th Cir. 2017) .......................................................................................... 17

*Smith v. Holtz*,
   30 F. Supp. 2d 468 (E.D. Pa. 1998) ................................................................................. 2

*Standard Iron Works v. ArcelorMittal*,
   639 F. Supp. 3d 877 (N.D. Ill. 2009) ..........................................................................21, 29

*Stewart-Jackson Pharmacal, Inc. v. River's Edge Pharm., LLC*,
   No. 1:10-CV-2037-HLM, 2010 WL 11602697 (N.D. Ga. Sept. 24, 2010) ............................. 32

*Stragapede v. City of Evanston*,
  865 F.3d 861 (7th Cir. 2017) ................................................................. 2

*Tapia v. City of Greenwood*,
  965 F.2d 336 (7th Cir.1992) ................................................................ 16

*Thomas v. Stalter*,
  20 F.3d 298 (7th Cir. 1994) ................................................................ 17

*Tucker v. Lally*,
  No. 17 C 2331, 2020 WL 5909070 (N.D. Ill. Oct. 6, 2020) ............................ 20, 32

*U.S. Gypsum Co. v. Indiana Gas Co.*,
  350 F.3d 623 (7th Cir. 2003) ................................................................ 13

## Rules

Federal Rules of Civil Procedure
  50(a) ......................................................................................... 1, 2
  50(b) ......................................................... 1, 2, 12, 14, 15, 17, 33
  50(b)(2) ..................................................................................... 17
  59 ............................................................... 1, 16, 17, 20, 21, 29, 33

## Statutes

Sherman Act § 1, 15 U.S.C. § 1 ................................................................ 1

Georgia RICO Statute
  OCGA § 16-4-3(5)(A)(xxii) ................................................................ 32
  OCGA § 16-4-4 ............................................................................ 32

## Other Authorities

9B Wright & Miller, Federal Practice and Procedure § 2537 (1998) ............................ 2

11 Wright & Miller, Federal Practice & Procedure § 2803 (1973 & Supp (1979)) .................... 16

11 Wright Miller & Kane, Federal Practice & Procedure § 2805 (2012) (Apr. 2023 update) ...... 16

Pursuant to the Court's scheduling order for post-trial motions (ECF 7041), Plaintiffs move pursuant to Federal Rule of Civil Procedure 50(b) for judgment as a matter of law notwithstanding the jury's verdict, and, in the alternative, under Rule 59 for a new trial.

As previously stated in Plaintiffs' Rule 50(a) Motion for Judgment as a Matter of Law (ECF 6996), in light of the evidence and testimony presented at trial, under Rule 50(b), the Court should grant judgment as a matter of law in favor of the Plaintiffs on each disputed element of Sanderson's *per se* violation of Sherman Act § 1, including (i) the sole question on which the jury reached a verdict, that is, whether there was a conspiracy between or among two or more chicken producers to limit the supply of chicken; (ii) Plaintiffs' entitlement to damages prior to September 2, 2012; and (iii) their antitrust injuries resulting from the alleged violation.[1]

The Court should grant a new trial pursuant to Rule 59 because Sanderson flouted the Court's *in limine* ruling excluding references to the dismissal of any party and the Court's summary judgment ruling by repeatedly likening the conduct of the six dismissed defendants to its own conduct and that of other alleged conspirators. As explained below, Sanderson's trial strategy was unfair and resulted in a miscarriage of justice, and the unfairness was compounded by the Court's erroneous summary judgment decision.

I.      **Renewed Motion for Judgment as a Matter of Law**

Before this case was submitted to the jury, Plaintiffs moved under Rule 50(a) for judgment as a matter of law on the issues of: (1) Plaintiffs' entitlement to damages prior to September 2, 2012; (2) each disputed element of Sanderson's *per se* violation of the Sherman

---

[1] In the alternative, for the same reasons, the Court should grant a new trial on the sole question decided by the jury as against the manifest weight of the evidence and on any other disputed issues to the extent the Court does not grant judgment as a matter of law on those issues pursuant to Plaintiffs' Rule 50(b) motion.

Act, both independently and collectively;[2] and (3) Plaintiffs' antitrust injuries resulting from the alleged violation. ECF 6696. For the same reasons stated in Plaintiffs' Rule 50(a) motion, this Court should grant Plaintiffs' Rule 50(b) motion for judgment as a matter of law.

### A. The evidence was insufficient to allow a rational jury to find in favor of Sanderson.

"The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion under Rule 50(a)." *Baugh v. Cuprum S.A. De C.V.*, No. 08 C 4204, 2015 WL 9304338, at *2 n.2 (N.D. Ill. Dec. 22, 2015) (quoting 9B Wright & Miller, Federal Practice and Procedure § 2537 (1998)). The Court must determine whether the evidence presented at trial is sufficient to support the jury's verdict when viewed in the light most favorable to the non-moving party. *Stragapede v. City of Evanston*, 865 F.3d 861, 865 (7th Cir. 2017). "A district court has more discretion to scrutinize a jury's verdict when a case is factually complex and potentially outside a laymen's understanding." *Smith v. Holtz*, 30 F. Supp. 2d 468, 471 (E.D. Pa. 1998). Judgment as a matter of law should be granted only if on the basis of the admissible evidence, no rational jury could have found for the prevailing party. *Stragapede*, 865 F.3d at 865.

### B. The evidence presented at trial was not legally sufficient to support the jury's verdict that there was no conspiracy to limit the supply of chicken.

The jury's verdict answered only the first question: "Did Plaintiffs prove, by a preponderance of the evidence, that there was a conspiracy between or among two or more chicken producers to limit the supply of chicken?" Trial Tr. 4258:10-4260:8. The jury answered it in the negative. As explained in their Rule 50(a) motion, Plaintiffs provided overwhelming and

---

[2] Sanderson stipulated to the element of interstate commerce. *See* ECF 6948 at *13-18 (Stipulations of Fact).

unrebutted evidence of an agreement or understanding to restrict the supply of chicken by competing chicken producers. No rational jury could have found for Sanderson on this issue in light of the evidence, and therefore the evidence presented at trial was not legally sufficient to support the jury's verdict.

### 1. Economic evidence

As the Court found in its summary judgment ruling, Plaintiffs' economic evidence "strongly suggests the presence of an agreement,"[3] including:

    i.    Broilers are a commodity;[4]

    ii.    There were unprecedented changes in production in 2008-09 and 2011-12;[5]

    iii.    Production cuts by individual producers alone would not raise prices;[6]

    iv.    The individual production restrictions implemented by Sanderson and its alleged co-conspirators were against their unilateral economic self-interests in the absence of conspiracy;[7]

---

[3] ECF 6641 at 24.

[4] Trial Tr. (Prof. Einer Elhauge) 822:1-823:6.

[5] *See, e.g.*, PX2511 (chart showing two decreases in production); Trial Tr. (Prof. Einer Elhauge) at 793:3-11 (explaining that 2008 "was an unprecedented level of drop in chicken production); *see also, e.g.*, changes in production by Sanderson (PX0714.0016, PX1787.0001, PX0007.0012, PX1977.0002, PX1810, PX0730, ECF 6933-4 (Joe Sanderson) at 217:4-12); George's (PX0817, PX2461); Koch (PX1385, ECF 6935-5 (Joe Grendys) at 164:3-9); Mountaire (PX0583, PX0819); House of Raeford (PX0325, PX1272); Harrison (PX0283-A, PX0266.0003); OK Foods (PX0481, PX0489, PX0491); Peco (PX0817, PX0525); Pilgrim's (PX0649-A, PX1706.0002); Simmons (PX0817, PX0533, PX0770, PX1725.002); Tyson (ECF 6933-2 (Donnie Smith) at 131:11-15, 195:25-196:03, PX0008); Amick (PX2415, PX1334); Keystone (PX1294); and Mar-Jac (ECF 6962-5 (Phillip Turner) at 176:4-20).

[6] *See, e.g.*, PX0740; ECF 6933-4 (Joe Sanderson) at 117:12-118:13.

[7] *See, e.g.*, Trial Tr. (Dr. Alan Frankel) 1635:3-1638:4, 1639:12-17, 1641:10-1642:7).

v.     Regression analyses found that other non-conspiratorial economic factors failed to explain the price effects of the supply restrictions;[8] and

vi.     Killing off breeder flocks is a means of supply reduction that is slow to reverse and expensive.[9]

### 2.     Non-Economic Evidence

There was overwhelming, albeit circumstantial, non-economic evidence introduced at trial of a conspiracy to limit the supply of chicken.

•     Plaintiffs presented evidence that Sanderson and its alleged co-conspirators acted collectively to cut production and otherwise restrict supply in the periods January 2008 – August 2009[10] and January 2011 – August 2012.[11]

•     Plaintiffs' evidence established that the co-conspirators regularly signaled each other about supply conditions and the need for ongoing supply restrictions.

---

[8] *See, e.g.*, Trial Tr. (Dr. James McClave) 2356:11-21, 2359:12-17, 2366:22-2367:13, 2367:24-2368:3, 2372:20-2379:5, 2382:14-2383:4, 2383:10-24.

[9] *See, e.g.*, ECF 6933-4 (Joe Sanderson) at 327:10-12, 327:25-328:1 ("[I]t was really 2018 before you saw significant production come on the market … [a]nd it was all because of what happened in 2011."); Trial Tr. (Prof. Einer Elhauge) 888:21-22, 887:15-16 (breeder cuts are "going to be more irreversible [and] has a longer term effect"); ECF 6933-5 (Benny Bishop) at 231:11-17, 236:25-237:03, 238:10-15 (confirming that reducing output through breeder reductions is expensive, unusual, and has long-term consequences).

[10] Trial Tr. (Dr. Alan Frankel) 1641:10-1642:20; Sanderson (PX0714.0016, PX1787.0001, PX0007.0012, PX1977.0002); Koch (PX1385, ECF 6935-5 (Joe Grendys) at 164:15-16; Pilgrim's (PX0649-A, PX1706.0002); Simmons (PX0817); OK Foods (PX0481, PX0489); George's (PX0817, PX2461); Mountaire (PX0583); House of Raeford (PX0325); Harrison (PX0283-A); Peco (PX0817); Tyson (ECF 6933-2 (Donnie Smith) at 195:25-196:03).

[11] Trial Tr. (Dr. Alan Frankel) 1641:10-1642:20; Sanderson (PX1810, PX0730, ECF 6933-4 (Joe Sanderson designations) at 217:4-12); Simmons (PX0533, PX0770); OK Foods (PX0491); Amick (PX2415, PX1334); Mountaire (PX0819); House of Raeford (PX1272); Harrison (PX0266.0003); Peco (PX0525); Tyson (PX0008, ECF 6933-2 (Donnie Smith) at 131:11-15); Keystone (PX1294); Mar-Jac (ECF 6962-5 (Phillip Turner) at 176:4-20).

In January 2008, Pilgrim's announced that it "[could not] be the [company] . . . continually reducing production" and that "the rest of the market [was] going to have to pick up a fair share."[12] In February 2008, Joe Sanderson stated: "I just don't think the losses have been deep enough and the signals have been strong enough to cut back."[13] In May 2008, Pilgrim's further stated that "six chicken producers, including Pilgrim's Pride, have public[ly] announced production cutbacks this year. . . . We believe additional cutbacks will be required."[14] In August 2008, Joe Sanderson announced that the "industry will need to cut production" and "it will take another round of production cuts. . . . [A] lot of other people . . . are going to have to cut."[15] Also in August 2008, Harrison's CEO Mike Welch said: "Tyson is holding out and refusing to cut back as retribution to the industry for not cutting back with them the last time."[16]

Then in February 2009, Joe Sanderson announced that Sanderson was "running below capacity at all our plants."[17] Again in 2011, Joe Sanderson publicly announced that "the industry will cut back some more. They have to."[18] In February 2012, Tyson announced that "total supplies remain pulled back," and "[w]e expect to remain disciplined in our placements in production."[19]

•        In addition to public signaling, the conspirators talked secretly about supply restrictions.

---

[12] PX0005.0023, PX0005.0014.

[13] PX0595A.0006.

[14] PX0658.0004.

[15] PX0714. *See also* PX0803 (Tyson's CFO admitted that Joe Sanderson was "not really talking to investors but the rest of the industry.").

[16] PX0283.0002.

[17] PX0709.0035.

[18] PX0718.0022.

[19] PX1854.0004.

In August 2008, high-level executives from competitors Sanderson, Mountaire, OK Foods, and Pilgrim's took a fishing trip during which confidential production information was shared, including by Sanderson.[20] In October 2008, Don Tyson wrote to Jim Perdue and Joe Sanderson about joining together where interests are aligned.[21] Benny Bishop of Peco admitted he shared production plans with competitors, including Sanderson.[22] Don Taber of House of Raeford learned of an "unannounced" production cut by Sanderson from Lampkin Butts (Sanderson's President).[23] Tyson and its competitors also discussed how Tyson's "buy vs. grow" program was restraining supply and increasing market prices.[24]

Sanderson's Director of Production Randy Pettus admitted that he shared Sanderson's confidential information with Sanderson's competitors.[25] Pettus went duck hunting once or twice a year and would "talk in general terms" with competitors, including about "[w]hatever hot topic was in the grow-out at that point."[26] Sanderson's Chief Financial Analyst Robert Rosa admitted, "It was against our company policy, but . . . he did it."[27] Joe Sanderson and Donnie King (Tyson) also spoke about the delay in opening Sanderson's Palestine plant.[28] Joe Sanderson and Randall

---

[20] PX0583.

[21] PX0731; *see* ECF 6933-4 (Joe Sanderson) at 258:25-259:03.

[22] ECF 6933-5 (Benny Bishop) at 81:1-83:9, 155:25-156:20.

[23] PX0328.0001.

[24] *See, e.g.*, PX1845.0002 (Nov. 2011 email from Peco, "I know you're the reason it's tightening"); PX1874.0001 (Apr. 2012 email to Pilgrim's, Tyson was "keeping it off the street" which was "good for the market").

[25] *See, e.g.*, PX0582-A.0005; ECF 6933-6 (Randy Pettus) at 167:09-169:04; 170:23-172:21; *see also, e.g.*, ECF 6933-6 (Randy Pettus) at 39:19-40:01, 42:15-43:03, 51:20-52:17.

[26] ECF 6933-9 (Steve McLaurin) at 214:22-215:14.

[27] Trial Tr. (Robert Rosa) at 1279:13-18.

[28] PX0815; ECF 6933-4 (Joe Sanderson) at 275:05-16.

Goins, CEO of OK Foods, spoke shortly after Mr. Sanderson learned about a production cut by OK Foods.[29]

The alleged conspirators also communicated about specific supply cuts through Agri Stats/EMI. Although Sue Trudell publicly refused to answer questions about how much of a supply cut was needed to increase chicken prices to $1.90/lb., she told Tyson privately in April 2008 that it was exactly 6%.[30] Tyson's President Donnie King emailed, "[C]an we get [] Sue Trudell to say the things we want everyone to know?"[31] Joe Sanderson said he "s[aw] a lot of information from Agr[i] [S]tats that tells me that nobody is going to ramp up."[32] Trudell also provided models to Sanderson showing the exact percentage supply cuts the industry needed to implement in order to get to a certain price, and Sanderson used that information in deciding how much to cut and telling Sanderson's competitors how much to cut.[33]

Sanderson and its alleged co-conspirators also had private opportunities to collude, and did collude, at trade association meetings and social events[34] and during numerous telephone

---

[29] PX2317A.0003; ECF 6933-4 (Joe Sanderson) at 279:17-280:04.

[30] PX0009.0001.

[31] PX0903.

[32] PX0007.0021; compare PX1809.0009 (Trudell model: "5% cut = $1.53 annual average boneless breast price and a 7.5% cut = $1.61 annual average boneless breast price) with PX2455.0025 (Sanderson Q3 2011 earnings call: "I have a little model I had made for that question . . . and [] what it tells you is that. . . the quoted market on boneless breast has to be about $1.59") and PX2455.0034 (Sanderson Q3 2011 earnings call: "I don't know exactly what the cut has to be, but the prices I told you all . . . they have to be for a year. . . . So I'm thinking that the cutbacks may need to be more than the 6% is all I'm saying.").

[33] Trial Tr. (Robert Rosa) at 1379:16-20, 1381:6-24, 1383:5-17.

[34] *See, e.g.*, ECF 6933-4 (Joe Sanderson) at 258:06-264:10 (detailing a private meeting that Joe Sanderson had with Tyson and Perdue in October 2008); ECF 6933-6 (Randy Pettus) at 167:09-169:04, 170:23-172:21 & PX582-A (detailing an August 2008 fishing trip that included Sanderson, OK Foods, Perdue, Mountaire, and Pilgrims).

conversations, including as summarized in the Rule 1006 exhibits introduced through former FBI agent Stacy Arruda.[35]

• The alleged conspirators used spent-hen processors Southern Hens and Tip Top to coordinate and monitor supply cuts.[36] Members of these groups, which included Sanderson and other alleged co-conspirators, shared information as to how many chickens each member was sending to be slaughtered; there was no anonymization.[37] As Robert Rosa of Sanderson testified, members "could tell how many birds were being slaughtered at Southern Hens."[38] Knowing how many birds were being slaughtered allowed members to coordinate long-term supply cuts as well as to monitor compliance with the industry agreement to limit supply.[39] Tip Top and Southern Hens also allowed conspirators to communicate about efforts to reduce supply.[40] As Michael Welch (President and CEO of Harrison) wrote, slaughtering chickens early "accomplishes most of the objective . . . getting hens killed so they can't lay eggs."[41]

---

[35] *See* Trial Tr. (Stacy Arruda) at 962:20-1000:6; PX961-A; PX2307-C; PX2317-A; PX2422-A; PX2420-C; PX2350-C.

[36] *See*, *e.g.*, PX1723.011-12 (Pilgrim's 4/27/12 earnings call: "[T]he breeder flock size as, as I indicated earlier, is the lowest since 1995. . . . The industry continues to show restraint, in terms of weights and especially this summer, you know, you wouldn't expect that weights are gonna increase significantly on a per head basis. So again I, I think the die is cast for 2012 and we're comfortable that the industry's gonna remain constrained.").

[37] *See, e.g.,* PX0244.0017; ECF 6951-3 (Robert Kenney) at 250:18-251:10; PX0245.0043 (slaughter numbers by Southern Hens members from 2004 through 2014).

[38] Trial Tr. (Robert Rosa) 1412:22-23.

[39] Trial Tr. (Prof. Einer Elhauge) 901:24-902:13.

[40] PX0259.0002 (Tip Top worked "to pull their breeder kill dates up closer so that everyone can get breeders out of houses quickly"); PX0259.0001 (Harrison's CEO emailed a "plan" of Tip Top "getting hens killed so they can't lay eggs").

[41] PX0259.0001

• Sanderson joined the conspiracy to restrict the supply of chickens. Much of the evidence discussed above involved Sanderson. It conclusively shows that Sanderson knowingly became a member of a conspiracy, rather than by mistake or accident.[42]

Plaintiffs also proved that Sanderson cut or restricted production during the conspiracy. Plaintiffs' expert Dr. Alan Frankel found 17 production cuts by Sanderson from 2008 through 2012 that were more consistent with collusion than competition.[43]

Sanderson specifically cut against its unilateral interest in 2008.[44] In April 2008, Sanderson announced that it would build a processing plant in Kinston, NC.[45] Sanderson's modeling that supported its decision to build the Kinston plant factored in $7.50/lb. corn.[46] In June 2008, however, Sanderson delayed the Kinston plant when corn prices peaked, although it remained delayed when corn prices dropped.[47] Sanderson later called it "an overall positive for the industry to not have additional supply being placed into the market."[48] And although demand was strong from Sanderson's retail customers in 2008, Sanderson "ran [its] retail plants in Georgia, Mississippi, and Texas at 7 % below full capacity."[49]

In 2009, Sanderson "maintain[ed] production levels at [its] Mississippi and Louisiana big bird plants at approximately 14% below full capacity through [its] second quarter."[50] Sanderson

---

[42] *See* ECF 6948 at *34 (Sherman Act elements instruction as proposed by Sanderson).

[43] Trial Tr. (Dr. Alan Frankel) 1641:10-1642:20.

[44] *See* Trial Tr. (Robert Rosa) at 1276:19-1277:4.

[45] DX0192

[46] PX1773.0013; Trial Tr. (Robert Rosa) at 1276:9-11.

[47] PX0720.0010; Trial Tr. (Lampkin Butts) at 2051:22-2052:2, 2053:1-6, 2053:11-2054:1; DX0701.21.

[48] PX1977.0002.

[49] *See* Trial Tr. (Robert Rosa) at 1313:11-19; PX0711.0005.

[50] PX0711.0005 (discussed at Trial Tr. (Robert Rosa) at 1299:2-16 (Rosa agreeing that "corn prices [were] down drastically in 2009, but Sanderson [kept] . . . the governor on production").

cut production again in 2011-2013 for 21 months.[51] That cut was six percent, despite Mr. Rosa's internal model showing that Sanderson cutting alone would in fact cost the company money.[52]

Given this unrebutted evidence, there would be no legally sufficient evidentiary basis for the jury to find that Sanderson did not join the conspiracy.

\* \* \*

Collectively the economic and non-economic evidence established the existence of an agreement or understanding among horizontal competitors, including Sanderson, to restrict the supply of chickens. No rational jury could decide otherwise, and there was no legally sufficient evidentiary basis for the jury to find for Sanderson on this issue.

### C.    Other elements of a *per se* violation were demonstrated at trial.

#### 1.    The alleged conspirators were competitors.

Sanderson's employees confirmed this proposition. Randy Pettus testified that "everybody in the broiler business except us" is Sanderson's competitor.[53] Pic Billingsley testified that each of the alleged co-conspirators was a competitor of Sanderson.[54] Sanderson submitted no evidence to the contrary. There was therefore no legally sufficient evidentiary basis for a rational jury to find for Sanderson to the contrary on this issue.

---

[51] Trial Tr. (Robert Rosa) at 1392:1-11.

[52] *Id*. at 1391:7-10, 1324:12-14 (admitting that a cut results in increased per pound cost); PX0740.0004 (showing that a cut results in increased per pound cost).

[53] *See* ECF 6933-6 (Randy Pettus) at 26:14-22.

[54] Trial Tr. (Samuel "Pic" Billingsley) 3015:1-3016:8.

## 2. Plaintiffs are entitled to damages for conduct prior to September 2, 2012.

As reflected in the proposed jury instructions and verdict forms,[55] the parties agreed that, if Plaintiffs established that they did not know of the alleged conspiracy prior to September 2, 2012, and that they could not have discovered the alleged conspiracy before September 2, 2012, through the exercise of reasonable diligence, they are entitled to recover for injuries that occurred before September 2, 2012.

The parties' testimonial stipulations[56] combined with trial testimony provided by each live Plaintiff witness[57] established that no Plaintiff knew of the alleged conspiracy prior to September 2, 2012. Sanderson submitted no evidence indicating otherwise.

Sanderson also submitted no evidence of facts reasonably available to any Plaintiff that should have aroused suspicion of a conspiracy. Mere market facts alone, including changes in supply or prices, and parallel actions by Sanderson and its alleged co-conspirators, do not trigger a plaintiff's duty to investigate.[58] Because there was insufficient evidence to trigger any duty to

---

[55] *See* ECF 6952 at *28-29 (statute of limitations instruction proposed by Sanderson); ECF 6949-1 at *3-4, *8 (verdict form proposed by Sanderson). Plaintiffs otherwise preserve all objections to Sanderson's proposed instructions and verdict form.

[56] ECF 6877 and 6878.

[57] *See* Trial Tr. (Peter Pahides (Cedar Farms)) 1061:4-8; Trial Tr. (Keith Bollman (Topco)) 2207:2-5; Trial Tr. (David Allen (Pacific Foods)) 2138:9-2139:4; Trial Tr. (Shawn Spencer (Kroger)) 2529:9-2530:10; Trial Tr. (Ryan Hutchens (Publix)) 1721:14-19; Trial Tr. (Frank Thurlow (Winn Dixie)) 1854:24-1855:14; Trial Tr. (Doug Neckers (Maplevale)) 1786:10-13; Trial Tr. (Jeff Noll (SuperValu)) 2314:14-2315:5; Trial Tr. (Stephanie Becker (AWG)) 2594:12-2595:3.

[58] *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2023 WL 4303476, at *34 (N.D. Ill. June 30, 2023) ("The impetus for such an investigation could not be the market facts alone," and "general public information that does not 'mention . . . collusive behavior' is insufficient to put Plaintiffs on notice.") (citing *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 855 (N.D. Ill. 2010)); *see In re Copper Antitrust Litig.*, 436 F.3d 782, 789-90 (7th Cir. 2006).

investigate, Plaintiffs could not have discovered the conspiracy in the exercise of reasonable diligence.[59]

The live witnesses for Cedar Farms (a direct purchaser class representative);[60] Kroger, Publix, and Winn Dixie (retailers);[61] Pacific Foods (a redistributor);[62] SuperValu (a grocery wholesaler);[63] and Topco (a grocery cooperative)[64] testified about their reasonable diligence with respect to chicken prices and chicken supply, including how Sanderson and its alleged co-conspirators provided pretextual reasons for rising chicken prices, such as the cost of feed.[65] Sanderson and its alleged co-conspirators' active concealment of collusive supply restrictions further impeded Plaintiffs' ability to discover the conspiracy.[66]

In sum, the record evidence firmly established that Plaintiffs could not (and did not) discover the alleged conspiracy through the exercise of reasonable diligence. Plaintiffs therefore satisfied their evidentiary burden, and Sanderson did not rebut that evidence. Plaintiffs are now entitled to a Rule 50(b) judgment in their favor on this issue, as the jury did not have a legally sufficient evidentiary basis to find otherwise.

---

[59] *See* ECF 6952 at *28-29 (statute of limitations instruction proposed by Sanderson).

[60] *See* Trial Tr. (Peter Pahides) 1054:3-1055:3, 1055:16-1056:11, 1061:4-8.

[61] *See* Trial Tr. (Shawn Spencer) 2520:12-2522:8, 2522:20-2523:5, 2528:19-2529:8, 2529:9-2530:10; Trial Tr. (Ryan Hutchens) 1697:7-1699:17, 1699:18-1700:12, 1721:14-19; Trial Tr. (Frank Thurlow) 1851:1-12, 1851:13-1853:4; 1854:24-1855:14.

[62] *See* Trial Tr. (David Allen) 2120:24-2121:7, 2123:13-2124:1, 2137:14-17, 2138:9-2139:4.

[63] *See* Trial Tr. (Jeff Noll) 2310:20-2312:2, 2323:3-16, 2314:14-2315:5.

[64] *See* Trial Tr. (Keith Bollman) 2199:17-19, 2207:2-5, 2207:6-25, 2210:19-25, 2213:14-17, 2214:5-7.

[65] Sanderson and its alleged co-conspirators also concealed the conspiracy from them by acting in secret. *See* Section B.2. above.

[66] See ECF 6952 at *28-29 (statute of limitations instruction proposed by Sanderson).

### 3. Plaintiffs sustained antitrust injuries as a result of the supply conspiracy.

Unrebutted trial evidence showed that the co-conspirators' supply restrictions worked to raise market prices for chicken. In May 2009, Joe Sanderson stated in a public conference call that "the improvement [in market prices for fresh chicken] has more to do with production cuts than demand improvement."[67] Lampkin Butts, President and COO of Sanderson, agreed: "[T]he improvement in boneless breast prices is a result of supply cuts and not demand improvement."[68] In December 2010, Sanderson wrote to its contract pullet producers and stated, "Industry cutbacks in 2008 and 2009 allowed chicken prices to improve, and these improved prices, combined with lower grain costs, allowed Sanderson Farms to remain profitable."[69]

Plaintiffs' causation and damages experts—Dr. James McClave, Dr. Russell Lamb, and Dr. Colin Carter—calculated the overcharge injury suffered by each Individual Plaintiff and the Class as a result of the supply restrictions implemented by Sanderson and the co-conspirators.[70] Overcharges resulting from a horizontal supply restraint conspiracy are exactly the type of injury the antitrust laws intend to prevent. *U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 626-27 (7th Cir. 2003) (antitrust injury is "injury by reason of those things that make the practice unlawful, such as reduced output and higher prices").

Sanderson did not introduce any evidence showing that the injuries Plaintiffs suffered are not the type of injuries that the antitrust laws were intended to prevent. Further, Sanderson's experts did not present any alternative damage calculation, but simply contended that there was no

---

[67] PX0711.0004.

[68] PX2417.0005.

[69] PX2144.0001.

[70] Trial Tr. (Dr. James McClave) at 2383:5-2386:11, 2406:12-2414:20; Trial Tr. (Dr. Russell Lamb) at 2609:12-18; 2626:08-2628:03; Trial Tr. (Dr. Colin Carter) at 2704:21-2705:7, 2733:3-2734:11, 2742:3-2743:13, 2747:8-2749:8, 2753:14-2755:13.

conspiracy. Accordingly, there is no legally sufficient evidentiary basis for the jury to have found for Sanderson on the issue of whether the Plaintiffs suffered antitrust injuries and the amount of damages as result of the alleged conspiracy.

### D. Erroneously excluded evidence further supports Plaintiffs' motion.

Plaintiffs respectfully submit that certain evidence was erroneously excluded during trial, and, if admitted, would further support Plaintiffs' Rule 50(b) motion.

Such erroneously excluded evidence includes several documents clearly showing how Sanderson and its alleged co-conspirators used Mike O'Shaughnessy of Urner-Berry and Sue Trudell and Mike Donohue of EMI and Agri Stats as conspiratorial tools.[71] Such evidence also includes certain documents that, while post-dating the adjudicated conspiratorial supply cuts, nonetheless are probative of the co-conspirators' understanding (or at least awareness) that their conduct violated the antitrust laws.[72]

Plaintiffs also respectfully contend that the Court erroneously admitted several exhibits where any probative value was far outweighed by the prejudicial and misleading nature of the documents.[73] These documents risked causing jurors to improperly perceive certain coarse,

---

[71] *See* PX1986 (05/15/11 Smith-King email exchange forwarding statements from O'Shaughnessy that industry reduction of egg sets would "really get things right" with the industry); PX0019 (04/18/08 Snyder-Trudell email re: "call Todd" about $1.90/lb BSB); PX1052 (2008 Scholer-Trudell email re: Tyson price forecast). Excluded evidence also shows Agri Stats/EMI's awareness that its business model exposed it and its customers to antitrust liability. *See* PX0021 (the "interim [antitrust] policy" memo).

[72] *See* PX0001 (Koch's Joe Grendys "I told you this would be coming" email); PX0295 (Chan Windham of House of Raeford email about discussing pricing with competitors being "just a little illegal").

[73] That erroneously-admitted evidence includes: DX1690 (the "[f]oot on the throat" Pilgrim's email); DX0641 (the Pacific Foods "lawsuit is BS" email, which, despite the limiting instruction, was sufficiently inflammatory to taint jurors' views of all plaintiffs; at the same time, the Court refused to allow the Pacific Foods witness to fully testify regarding the reasons he changed his mind about the lawsuit, including the Pilgrim's guilty plea and an investigation by the State of

hyperbolic internal statements about Sanderson to be evidence that there was no conspiracy, when in fact they provide no legally sufficient evidentiary basis to counterbalance Plaintiffs' voluminous evidence establishing Sanderson's collusive agreement or understanding with its alleged co-conspirators to restrict supply.

\* \* \*

For the reasons stated above, the Court should grant Plaintiffs' Rule 50(b) motion for judgment as a matter of law holding: (1) there was a conspiracy between or among two or more competing chicken producers, including Sanderson, to limit the supply of chicken; (2) Plaintiffs' are entitled to damages prior to September 2, 2012; and (3) Plaintiffs suffered antitrust injuries resulting from the alleged violation.

## II.     Sanderson's Misuse of the Summary Judgment Opinion in Violation of the Court's *In Limine* Ruling Requires a New Trial.

This Court granted summary judgment dismissing, among others, Plaintiffs' claims against Perdue, Fieldale, Case Foods, Claxton, Wayne, and Foster Farms; claims based on the slaughter of breeder hens in 2015-16; claims based on the manipulation of the Georgia Dock index; and claims as to an overarching conspiracy.[74] ECF 6641. The Court subsequently granted Plaintiffs' motion *in limine* to exclude references to the Court's summary judgment order or dismissal of any party. ECF 6705; 8/25/23 Tr. 47:10-17; ECF 6817. Nonetheless, throughout the trial, Sanderson repeatedly referenced dismissed defendants, who it claimed were in the same position as Sanderson and the other alleged conspirators, and it then argued that, as a result, there could have

---

Florida); DX1527 (the internal Koch email re: "declared war on our friends in [L]aurel"); and DX1528 (the internal Koch "I am F""CKING sick of [S]anderson" email).

[74] Plaintiffs intend to appeal each of these rulings, except with regard to Fieldale, with which each of the Plaintiffs has now settled. *See* ECF 6833. Accordingly, if there is a reversal as to the grant of summary judgment, there will need to be a new trial regarding Sanderson as well.

been no conspiracy.[75] Additionally, Plaintiffs were prevented from explaining the manipulation of the Georgia Dock index when trial testimony showed that prices had increased because the Georgia Dock index increased.[76] Accordingly, the trial was not fair and resulted in an injustice to Plaintiffs, which should be remedied by granting a new trial.

### A. This Court should order a new trial to prevent injustice.

A new trial is appropriate if the "verdict is against the weight of the evidence . . . or if for other reasons the trial was not fair to the moving party." *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 516 (7th Cir. 1993) (quoting *Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir.1992)). "Rule 59 gives the trial judge ample power to prevent what he considers to be a miscarriage of justice." *Juneau Square Corp. v. First Wis. Nat'l Bank of Milwaukee*, 624 F.2d 798, 806 n.11 (7th Cir. 1980) (quoting 11 Wright & Miller, Federal Practice & Procedure § 2803 (1973 & Supp. (1979)); *see* 11 Wright Miller & Kane, Federal Practice & Procedure § 2805 at 70 (2012) (Apr. 2023 update) ("The court has the power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice.").

---

[75] *See*, *e.g.*, Trial Tr. (Sanderson's opening argument) 742:25-743:7 ("We'll show you also evidence from companies the plaintiffs didn't show you[,] from companies with names that are pretty well known, like Perdue who's not being sued in this case, and how those companies, Perdue, did the same thing. Perdue is one of the biggest chicken companies in the country, and it's not alleged to be part of the conspiracy. But we'll show you it did the exact same thing."), and Sanderson's cross-examination of the class's expert, Dr. Colin Carter, at Trial Tr. 2770:3-9 (Q. So all of the chicken companies would be included in the data that's shown in this chart, right? A. Yes. Q. That would include Perdue, Wayne Farms, Foster Farms, and other major producers that are not part of this alleged conspiracy, correct? A. Correct.").

[76] *See*, *e.g.*, Trial Tr. (Robert Rosa) 1252:13-14 ("some of the formulas that we had with our retail customers used the Georgia Dock as a base") and Trial Tr. (Robert Rosa) 1299:22-25 ("the price that we sell chicken at . . . is based off of the Georgia Dock"); *see also* video testimony of Tyson Senior Vice President Raw Poultry Drew McGhee at PX1937.1.5 ("GD up this week. The year of poultry. Don't be ashamed to ask for more money." where "GD" meant the Georgia Dock price (ECF 6962-8 at 32)).

"If, after evaluating the evidence, the district court is of the opinion that the verdict is against the manifest weight of the evidence, a new trial is appropriate." *Mejia v. Cook County, Ill.*, 650 F.3d 631, 633 (7th Cir. 2011). "In deciding whether to order a new trial, [the court] was entitled to weigh the evidence for itself." *Thomas v. Stalter*, 20 F.3d 298, 304 (7th Cir. 1994). "In passing on a motion for a new trial, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia,* 650 F.3d at 633. "In cases involving simple issues but highly disputed facts . . . , greater deference should be afforded the jury's verdict than in cases involving complex issues with facts not highly disputed," *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995), as is the case here. "[A] judge is permitted to grant a new trial because the jury's verdict was against the weight of the evidence 'only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict . . . cries out to be overturned or shocks our conscience.'" *Prime Choice Servs., Inc. v. Schneider Logistics Transloading & Distrib., Inc.*, 861 F.3d 633, 635 (7th Cir. 2017) (quoting *Latino*, 58 F.3d at 315).[77]

Here, the verdict was against the manifest weight of the evidence, as discussed above, and represented a miscarriage of justice due to Sanderson's emphasis on its and other alleged conspirators' conduct being similar to that of producers who had been erroneously dismissed on summary judgment, despite this Court's ruling on Plaintiffs' motion *in limine* to exclude references to the Court's summary judgment order or dismissal of any party.

---

[77] The Court may also grant a new trial pursuant to the Rule 59 standard as an alternative basis for relief under Rule 50(b). For the reasons stated above in support of Plaintiffs' Rule 50(b) motion, the jury's verdict was against the manifest weight of the evidence presented at trial. Accordingly, the Plaintiffs request in the alternative that the Court order a new trial pursuant to Rule 50(b)(2) with respect to the question of whether there was a conspiracy to limit the supply of chicken and any other questions that the Court does not resolve as a matter of law in considering Plaintiffs' Rule 50(b) motion.

**B.** **Sanderson improperly and unjustly misused the summary judgment ruling by presenting evidence and arguing that it and the remaining alleged co-conspirators were in the same position as the dismissed defendants.**

From the outset of the trial, Sanderson sought to unfairly use the conduct of the six dismissed defendants, and especially Perdue, to convince the jury that there was no conspiracy. In his opening argument, Sanderson's counsel emphasized, "Perdue is one of the biggest chicken companies in the country, and it's not alleged to be part of the conspiracy. But we'll show you it did the exact same thing."[78] With a misleading chart (to which Sanderson's opinion witness, Dr. James Levinsohn, later testified),[79] Sanderson's counsel in his opening elaborated that, from 2008 through 2012, some producers reduced chicken production, especially Pilgrim's and including Perdue and Foster Farms, and some producers increased chicken production, especially Sanderson and including Claxton.[80] Sanderson's counsel went so far as to misleadingly suggest that Plaintiffs had chosen not to sue Perdue, stating: "[L]ike Perdue who's not being sued in this case . . . ."[81]

---

[78] Trial Tr. (Sanderson's opening argument) 743:5-7.
[79] Trial Tr. (Dr. James Levinsohn) 3226:18-3227:14, 3228:15-3229:1; DX2166.
[80] Trial Tr. (Sanderson's opening argument) 751:25-752:22; *see also* Trial Tr. (9/21/23 Sanderson interim statement.) 1132:22-23, 1133:7-13.
[81] Trial Tr. 742:25-743:7.

Sanderson expanded on this argument in cross-examining Plaintiffs' experts: Professor Einer Elhauge,[82] Dr. Lamb,[83] and Dr. Carter.[84,85] As one of Sanderson's counsel candidly admitted to the Court: "One of our key arguments will be that their expert testimony and their expert opinions are unreliable because their expert's [sic] supposedly economic methodologies can't tell the difference between the 14 producers who are in the alleged conspiracy and the six producers who are not."[86]

Thus, Sanderson introduced testimony that all 20 producers, especially the dismissed defendants, participated in Agri Stats,[87] and that some of the dismissed defendants as well as some of the alleged conspirators were sources of chicken for plaintiff Cedar Farms.[88] And Sanderson's counsel stated that the testimony about the August 2008 fishing trip, in which Sanderson's Randy

---

[82] "Q. For each . . . of . . . those six companies that I just named, Perdue, Wayne, Foster, Case, Claxton, and Fieldale, you believe that they made supply decisions that were more consistent with conspiratorial incentives than independent incentives; is that right? A. Yes." Trial Tr. (Prof. Einer Elhauge) 924:8-13.

[83] "Q. And your overcharge model does include three broiler producers that are not alleged to be co-conspirators in this case; correct? A. That's correct. Yes. Q. Those are Perdue, Foster Farms and Fieldale? A. That's correct, yes." Trial Tr. (Dr. Russell Lamb) 2647:16-21.

[84] "Q. So all of the chicken companies would be included in the data that's shown in this chart, right? A. Yes. Q That would include Perdue, Wayne Farms, Foster Farms, and other major producers that are not part of this alleged conspiracy, correct? A. Correct." Trial Tr. (Dr. Colin Carter) 2770:3-9.

[85] The Court prevented a similar cross-examination of Dr. Frankel, holding: "I don't think it's fair to attack Dr. Frankel's economic analysis with a legal ruling, especially when Frankel is prohibited from pointing out that the summary judgment ruling also found that the economic evidence is strong. . . . [T]he economic analysis isn't wrong because I made a legal ruling as to whether or not the six dismissed defendants had other conduct they engaged in that supported the economic analysis. So the bottom line is the summary judgment ruling is not a basis to question Frankel's analysis." Trial Tr. (Dr. Alan Frankel) 1622:2-15.

[86] Trial Tr. (9/26/23 Sanderson argument) 1227:23-1228:2.

[87] Trial Tr. (Robert Rosa) 1508:2-12, (Prof. Einer Elhauge) 948:12-17, (Dr. Colin Carter) 2796:16-24.

[88] Trial Tr. (Peter Pahides) 1058:16-1059:8.

Pettus participated and during which information was exchanged, was based on notes taken by Perdue, which was not alleged to be part of the conspiracy.[89]

Despite this Court's directive on Plaintiffs' motion *in limine* to exclude references to the dismissal of any party under the Court's summary judgment order, this "key argument" by Sanderson throughout the trial—that Sanderson and the other alleged conspirators were in the same situation as the six dismissed defendants—tainted the jury's verdict that there was no conspiracy to restrict the supply of chicken, resulting in a miscarriage of justice.

This tactic is analogous to the basis for a new trial in *Tucker v. Lally*, No. 17 C 2331, 2020 WL 5909070, at *1 (N.D. Ill. Oct. 6, 2020). There, the court granted defendant police detectives and the City of Chicago a new trial under Rule 59 after a verdict in plaintiff's favor on claims for malicious prosecution and unlawful pretrial detention. *Id.* The court had specifically directed the parties to refrain from mentioning plaintiff's 20-year-old conviction for aggravated battery with a firearm (similar to this Court's directive here to exclude references to the dismissal of the six producers as a result of summary judgment), while warning plaintiff's attorney that he could not argue that his client was never in possession of a gun. *Id.* at *2. Nonetheless, in closing argument, plaintiff's attorney argued falsely that the detectives had no information from anybody that the plaintiff was ever known to use a gun. *Id.* The court granted a new trial because the comments "were improper and violated the Court's ruling *in limine*." *Id.* at *3. Similarly here, Sanderson's repeated insistence that there could have been no conspiracy because the six dismissed defendants, and especially Perdue, engaged in similar conduct to the alleged conspirators violated the Court's

---

[89] Trial Tr. (9/21/23 Sanderson interim statement) 1135:8-17, 1143:21-25; Trial Tr. (10/12/23 Sanderson interim statement) 2910:7-17.

ruling *in limine* and resulted in a verdict that was unfair to Plaintiffs and against the manifest weight of the evidence. A new trial should be granted to Plaintiffs under Rule 59.

**C.**   **Sanderson's misuse of this Court's summary judgment opinion was especially unfair because the economic evidence against the six dismissed defendants was "strong" and the conduct in which they participated with the alleged conspirators was sufficient to prevent the entry of summary judgment.**

In its summary judgment opinion, this Court found that "the economic evidence is relatively strong" and that all the then defendants "decreased production in parallel."[90] Nonetheless, this Court found the non-economic evidence relating to Perdue, Fieldale, Case Foods, Claxton, Wayne, and Foster Farms insufficient to go to the jury because "none of [the] documented communications include statements ***by or from*** these . . . defendants."[91] That was too narrow a lens through which to view the non-economic evidence.

> Courts have held that a conspiracy to fix prices can be inferred from an invitation followed by responsive assurances and conduct. The statements here—many of them trade meeting statements made directly to competing executives and encouraging industry production restraint—were followed closely by unprecedented industrywide production cuts, exactly as encouraged and represented by Defendant executives.

*Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 895-96 (N.D. Ill. 2009) (quotation marks and citations omitted). Because the non-economic evidence of each of the dismissed defendants' conduct should have been sufficient to go to the jury, the arguments and testimony regarding each of these producers resulted in an incomplete and misleading picture being presented to the jury, which was so unfair as to require a new trial (as well as reversal of the grant of summary judgment).

---

[90] ECF 6641 at 21-22, 24.
[91] ECF 6641 at 43 (emphasis added).

1. **The trial evidence was incomplete because the trial should have included Perdue and more evidence about Perdue.**

In its summary judgment opinion, the Court held that "information merely received *from* competitors . . . [was] insufficient to infer the act of entering into an agreement."[92] However, this conclusion does not follow if the competitors are already shown to be in a conspiracy to reduce supply, because the conspiring competitors would not have shared the information with another producer unless it was a member of the conspiracy.

For example, if Perdue were not part of the conspiracy, receiving information about competitors' production cuts would have allowed Perdue to undercut the conspiracy by expanding its own output (which it did not). Indeed, regarding Tyson, but not Perdue, the Court recognized that Don Tyson's October 2008 letter to Joe Sanderson and Jim Perdue suggesting they "join together"[93] "could contribute to a reasonable basis for the jury to find that Tyson reached an agreement with defendants *with whom Tyson later exchanged sensitive production information*."[94] In other words, once Tyson had been established as a member of the conspiracy, receipt of production information by another producer from Tyson was evidence the other producer participated in the conspiracy. Applying that logic, Perdue's receipt of production information from Sanderson and Sanderson's Agri Stats reports;[95] learning at least Sanderson's and Mountaire's production information on an August 2008 fishing trip with Pilgrim's, Sanderson's, Mountaire's, and OK Foods' executives;[96] ███████████████████████

███████████████████████████████████████

---

[92] ECF 6641 at 44 (emphasis in original).
[93] ████████████
[94] ECF 6441 at 28 & n.7, 44 (emphasis added).
[95] ECF 6441 at 31-32; ECF 6226-6 ¶ 171; ECF 6227 at 639 (102:17-22), 684 (282:12-15).
[96] ECF 6441 at 38, 45-46; ECF 6228-6 at 35; ECF 6226-19 at 426-27 (135:22-139:15); ECF 6234-11 at 15-18.

████ ████[97] strongly implies that Perdue was part of the conspiracy with the other producers for whom there was sufficient evidence to go to the jury. This conclusion is buttressed by the communications Perdue had in June 2011 as a member of the Tip Top Advisory Board (including, among others, Mountaire, Harrison, Keystone, and Mar-Jac, as well as Wayne and Case Foods) about increased breeder hen slaughter to "help the industry as a whole," ████████████ ████████████[98]

This evidence should have led to the conclusion that Perdue was involved in the conspiracy to restrict the supply of chicken and should have been sufficient to allow additional evidence at trial regarding that involvement to be presented to the jury beyond the evidence at trial showing that, in 2008, high executives of Tyson, Sanderson, and Perdue all appeared on panels at the National Chicken Council ("NCC") in April and October 2008[99] and at private meetings in October 2008 to discuss "joint business opportunities."[100]

### 2. The trial evidence was incomplete because the trial should have included more evidence about Fieldale.

The summary judgment opinion described how, in 2008, (i) Tyson initially held out from cutting supply until others did so,[101] (ii) Pilgrim's publicly stated that its competitors needed to pick up a "fair share" for production to come out of the system,[102] and (iii) Sanderson on an earnings call called on the industry to cut production.[103] Yet, Fieldale's similar statement at the January 29, 2009 meeting of the NCC that "the 'industry would be better off' if 'everybody' cut

---

[97] ECF 6228-5 at 134; ECF 6226-17 at 231 (202:20-203:20).
[98] ECF 6641 at 30-31, 45; ECF 6247-5 at 42, 45; ECF 6234-4 at 186.
[99] ECF 6934-4 at 13-14 (75:03-25), 35 (136:7-17).
[100] ECF 6933-4 at 64-65 (258:12-259:16), 67-69 (261:16-25, 262:15-264:10).
[101] ECF 6641 at 27-28.
[102] ECF 6641 at 30.
[103] ECF 6641 at 31.

production like Fieldale"[104] was found by the Court to be insufficient evidence that Fieldale had joined the conspiracy and done what Tyson and Pilgrim's had requested: cut production. Indeed, although as a private company it had no obligation to do so, ██████████████████████ ██████████ ██████ [105] ████████████████████████████████████████████████ ██████████████████████ ██████ [106] held by this Court to be sufficient to show Fieldale's involvement in the collective 2011 breeder hen cuts to "help the industry as a whole."[107]

Had this evidence been held to be sufficient, as it should have been, to demonstrate that Fieldale was part of the conspiracy, then further evidence of the supply reduction conspiracy would have been admitted at trial, such as the email exchange between Fieldale and Perdue in February 2012 showing, as this Court found, Perdue's and Fieldale's awareness of the industry's production cutbacks and the effect on their companies' profits, as well as Fieldale's hope that "companies continue the cutbacks."[108] ██████████████████████████████████

████████████████████████████████████████████████

██████████████████████ ██████ [109] Moreover, Fieldale's central role in the manipulation of the Georgia Dock index, as discussed below, should also have been presented at trial.

Thus, even though no Plaintiff remains to appeal this determination,[110] the erroneous grant of summary judgment to Fieldale affected the trial.

---

[104] ECF 6441 at 47; ECF 6247-5 at 14; ECF 6247-4 at 618 (103:4-7).
[105] ECF 6227-1 at 94.
[106] ECF 6247-5 at 42, 45.
[107] ECF 6641 at 48.
[108] ECF 6641 at 46, 48; ECF 6247-5 at 55.
[109] Frankel Reply Ex. R-4.7 at 1 (ECF 6226-9 at 1142).
[110] *See* ECF 6833.

### 3. The trial evidence was incomplete because the trial should have included Case Foods and more evidence about Case Foods.

In the summary judgment opinion,[111] this Court referenced an August 17, 2011 email from a House of Raeford employee to Case Foods' vice president for sales and marketing, Kevin Phillips, stating "one more round of cuts on placements would do the trick."[112] The Court found that Case Foods did not respond.[113] The Court held that "[a]n inference of agreement by Case through a statement made to it by an alleged co-conspirator could only be imputed to Case if there was additional evidence against it establishing its membership in the conspiracy."[114] But the Court failed to acknowledge ████████████████████████████████████████████████

████████████████████████[115] ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████[116] ███████████████████████████████████████████████████████████████████

███████[117] This additional evidence of Case Foods' involvement in the conspiracy to restrict the supply of chicken should have been sufficient to allow evidence regarding Case Foods' involvement to be presented to the jury beyond the August 17, 2011 email. *See In re Delta/Air Tran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010) ("unlawful

---

[111] ECF 6641 at 49.
[112] ECF 6227-3 at 31; ECF 6934-01 at 179:14-182:18, PX0070-B.
[113] ECF 6641 at 49.
[114] *Id.*
[115] Frankel Reply ¶ 152, Ex. R-4.8 (ECF 6226-9 at 1061-62, 1145).
[116] ECF 6276-5 at 826.
[117] Frankel Reply ¶ 153, Ex. R-4.7 at 1 (ECF 6226-9 at 1062, 1142).

conspiracies may be inferred when collusive communications among competitors precede changed/responsive business practices").

> ### 4. The trial evidence was incomplete because the trial should have included Claxton and more evidence about Claxton.

Claxton was one of the Georgia Dock Defendants that "a reasonable jury could find . . . acted in parallel to knowingly submit falsely inflated prices to the Georgia Dock with the intent of keeping it artificially high."[118] █████████████████████████████████████

████████████████████[119] As discussed below, there was sufficient evidence of the manipulation of the Georgia Dock index to go to the jury, which would have included Claxton's involvement in that manipulation.

> ### 5. The trial evidence was incomplete because the trial should have included Wayne and more evidence about Wayne.

In the summary judgment opinion, the Court acknowledged that there was evidence that Wayne acted in parallel with the other defendants to reduce supply and that nearly all defendants attended industry meetings.[120] But the Court did not find either to be sufficient evidence of Wayne's possible participation in the alleged conspiracy.[121] However, that conclusion ignored the connection between the two. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002) ("The question is simply whether this evidence, considered as a whole and in combination with the economic evidence, is sufficient to defeat summary judgment.").

███████████████████████████████████████████████

███████████████████[122] In finding sufficient evidence to go to the jury regarding Koch, this Court

---

[118] ECF 6641 at 71, 74.
[119] ECF 6226-11 at 424.
[120] ECF 6641 at 51.
[121] *Id.*
[122] ECF 6259-6 at 113.

found that "in July 2011, Koch's CEO told industry media that Koch would be cutting production and ***called on the industry to cut production as a whole***"[123] after communicating with Wayne, among others, about Wayne's production plans.[124]



[125]

[126]

[127]

The Court in its summary judgment opinion acknowledged "an internal report in which Wayne's CFO noted . . . that 'larger players in the industry [were] communicating and acting more disciplined.'"[128] But the Court refused to draw the inference that Wayne was among the larger players so communicating,[129] even though,

[130] Also, in finding that there was sufficient evidence that Peco was involved in the alleged conspiracy to restrict supply, the Court referenced testimony from Peco's COO "that it was possible he had communicated with[ ] several of the defendants," including Wayne, about production plans.[131]

---

[123] ECF 6641 at 35; ECF 6228 at 89-90.
[124] ECF 6641 at 35; ECF 6241-4 at 656.
[125] Frankel Reply, Exhibit R-4.7 at 3, Exhibit R-4.8 (ECF 6226-9 at 1144, 1145).
[126] ECF 6259-4 at 2.
[127] Frankel Reply, Exhibit R-4.8 (ECF 6226-9 at 1145).
[128] ECF 6641 at 51; ECF 6229-8 at 87.
[129] ECF 6641 at 52.
[130] Frankel Report Exhibit 3.1 (ECF 6226-9 at 822).
[131] ECF 6641 at 39-40; *see* video testimony of Benny Bishop at ECF 6933-5 at 15-18 (81:1-83:9, 85:2-87:8).

Both of these examples indicate that Wayne was communicating its production information, not merely receiving that information from others.

Thus, summary judgment should not have been granted to Wayne. As a result, evidence at trial regarding Wayne's involvement in the conspiracy to restrict supply was more limited than it should have been.

### 6. The trial evidence was incomplete because the trial should have included Foster Farms and more evidence about Foster Farms.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████[132] The Court found that there was sufficient evidence of communications by Sanderson, Pilgrim's, OK Foods, Peco, and Koch, including communications from George's (who had settled), to go to the jury.[133] The Court further found that there was "significant evidence that early breeder hen slaughter was a primary mechanism used by Defendants to implement the supply reductions of 2008-09 and 2011-12."[134] Southern Hens' board of directors on December 11, 2013, discussed how many breeder hens had been slaughtered by each firm for the previous nine years, including 2008-2009 and 2011-12.[135] This coordination by Foster Farms with other alleged conspirators about a primary mechanism for reducing the supply of chicken should have been sufficient to present evidence to the jury regarding Foster Farms' involvement in the alleged conspiracy to restrict the supply of chicken.

* * *

---

[132] ECF 6229 at 166-74.
[133] ECF 6441 at 27, 30-33, 35, 38-40.
[134] *Id.* at 66.
[135] PX0245.0001, PX0245.0043.

It is sufficient to prove involvement in a conspiracy to restrict supply that statements were made "***to*** competing executives . . . encouraging industry production restraint" followed by adoption of the proposed behavior. *Standard Iron Works*, 639 F. Supp. 2d at 895 (emphasis added). The Court's erroneous rulings regarding each of the dismissed defendants created an opportunity for Sanderson to exploit, as it did, by emphasizing the similarity of the "strong" economic evidence and the conduct of all producers, including those that, due to this Court's decision, were not considered to be alleged conspirators, leading to the erroneous conclusion by the jury that there was no conspiracy. Sanderson's unfair tactic resulted in a miscarriage of justice that must be corrected by granting Plaintiffs a new trial under Rule 59.

**D.** **The unfairness of the trial was compounded by the court's erroneous ruling to dismiss the portion of the claims based on the slaughter of broiler hens in 2015-16 and, therefore, the overarching conspiracy claims.**

In its summary judgment opinion, the Court found that Plaintiffs had failed to make a sufficient showing of parallel conduct regarding 2015-16.[136] The Court's decision rested in part on its finding, based on a chart reproduced on page 68 of its opinion, that there was not a material decrease in breeder hen slaughter in 2015-16 for Mountaire, Wayne, Fieldale, Koch, OK Foods and Pilgrim's. But if a straight edge were placed at 2015 in each column in the chart, it is apparent that there were decreases in breeder hens for each of these producers and others during the 2015-16 period. Moreover, the overall slaughter age of breeder hens in 2015-16, according to the chart on page 66 of the opinion, clearly decreased during 2015-16, albeit more gradually and somewhat less than in 2008-09 and 2011-12. That overall production increased[137]does not mean that supply

---

[136] ECF 6641 at 67.
[137] *Id.* at 66.

was not restricted to a level below what it otherwise would have been due to "slowing the rate of increase in production as opposed to an overall production cut."[138]

There is also non-economic evidence that the members of the Tip Top Advisory Board (including Wayne, House of Raeford, Pilgrim's, Perdue, Mountaire, Mar-Jac, Harrison, Fieldale, and Case Foods) agreed in 2015 to reduce breeder hen flocks and did so. ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████[139]

Thus, there was sufficient evidence to go to the jury about the 2015-16 early breeder hen slaughter. With these cuts in the case, "a reasonable jury could conclude that these three campaigns of anticompetitive conduct [2008-09, 2011-12, and 2015-16] constitute one continuing conspiracy."[140]

The elimination of evidence of the 2015-16 slaughter of breeder hens at least affected the context for Plaintiffs' experts' testimony at trial. On cross-examination, Dr. Frankel testified that "five years of conduct, 2008 through 2012, caused seven years of lingering effects."[141] On cross-examination, Dr. McClave confirmed that it was his "understanding that the plaintiffs allege that five years of anticompetitive conduct from 2008 through 2012 . . . resulted in seven years of price effects all the way through December 2019."[142] Similarly, on cross-examination, Dr. Carter

---

[138] ECF 6641 at 16.
[139] ECF 6229-11 at 135-36 (emphasis added).
[140] ECF 6641 at 65; compare ECF 6641 at 83-84.
[141] Trial Tr. (Dr. Alan Frankel) 1669:17-21.
[142] Trial Tr. (Dr. James McClave) 2429:24-2430:5.

concurred that the price effects of the supply cuts lasted until 2019 and that the supply of chicken remained restrained below the pre-collusive trend until 2019.[143] If there were a continuing conspiracy from 2008 through 2016, those answers would have been substantially different, stating that there were nine years of conduct and three years of continuing effects.

### E.  The unfairness of the trial was compounded by the Court's erroneous summary judgment opinion dismissing the Georgia Dock claims.

The Court found that "the evidence demonstrates that a reasonable jury could find that the Georgia Dock Defendants [Claxton, Fieldale, Harrison, Koch, Mar-Jac, Pilgrim's, Sanderson, Tyson, and Wayne] acted in parallel to knowingly submit falsely inflated prices to the Georgia Dock with the intent of keeping it artificially high."[144] But the Court held that there was no evidence of agreement because a Poultry Market News ("PMN") staff person was present at the May 28, 2014 meeting that ratified Fieldale's request to re-evaluate the Georgia Dock index and there was "scant additional evidence of agreement."[145] However,



[146]

[147]

[148]

[149]                                                                                          [150] These changes in

---

[143] Trial Tr. (Dr. Colin Carter) 2789:15-20.
[144] ECF 6641 at 74.
[145] *Id.* at 75-76.
[146] ECF 6227-3 at 25-26.
[147] ECF 6226-11 at 424-25.
[148] ECF 6255 at 372-73.
[149] (ECF 6227-9 at 57).
[150] (ECF 6227 at 813-14).

behavior support an inference that there had been an earlier agreement among the Georgia Dock Defendants.[151]

Thus, an incomplete picture was presented at trial. Contrary to the Court's summary judgment finding that "the Georgia Dock Defendants acted in parallel to knowingly submit falsely inflated prices to the Georgia Dock with the intent of keeping it artificially high,"[152] Sanderson's executive Robert Rosa testified, "The Georgia Dock, as we used it, was a publication by the Georgia Department of Agriculture, and they would basically report on the market price for chickens. They didn't report supply and demand. . . . [T]hey researched the market and reported that information."[153] Mr. Rosa further testified that chicken prices had increased because the Georgia Dock index had increased.[154] Similar to *Tucker v. Lally*, *supra*, Mr. Rosa's testimony was directly contradicted by the facts found by this Court but could not be rebutted by Plaintiffs due to the erroneous summary judgment ruling. This injustice should be corrected by granting a new trial.

---

[151] In dismissing Plaintiffs' Georgia Dock claims (ECF 6641 at 86), the Court dismissed all claims under RICO, including presumably under the Georgia RICO statute, OCGA § 16-4-4, because no enterprise had been shown (ECF 6641 at 77-79). However, the Georgia RICO statute does not require proof of an enterprise but requires proof of only the commission of a predicate offense at least twice. *See Cobb Cty. v. Jones Grp. P.L.C.*, 460 S.E.2d 516, 521 (Ga. Ct. App. 1995). False statements to a government agency, such as to the PMN, are predicate acts. Ga. Code Ann. § 16-14-3(5)(A)(xxii). Thus, the submission of falsely inflated prices to the PMN, without more, was a violation of the Georgia RICO statute. *See Stewart-Jackson Pharmacal, Inc. v. River's Edge Pharm., LLC*, No. 1:10-CV-2037-HLM, 2010 WL 11602697, at *11-12 (N.D. Ga. Sept. 24, 2010) (finding that false statements to government agencies about chemicals in a drug were sufficient to state a claim under the Georgia RICO statute).
[152] ECF 6641 at 74.
[153] Trial Tr. (Robert Tosa) 1252:3-8.
[154] *See* Trial Tr. (Robert Rosa) 1252:13-14 ("some of the formulas that we had with our retail customers used the Georgia Dock as a base") and Trial Tr. (Robert Rosa) 1299:22-25 ("the price that we sell chicken at . . . is based off of the Georgia Dock").

## III.   Conclusion

Plaintiffs' motion for judgment as a matter of law under Rule 50(b) should be granted as, for the reasons described above, no rational jury could have found for Sanderson on the question of whether there was a conspiracy to restrict the supply of chicken. In the alternative, this Court should grant Plaintiffs a new trial under Rule 59 as the trial was unfair because Sanderson's evidence and arguments that it and other alleged co-conspirators engaged in similar conduct to the dismissed defendants tainted the trial, and the verdict was against the manifest weight of the evidence.

Date: December 22, 2023

Respectfully submitted,

/s/ W. Joseph Bruckner
W. Joseph Bruckner
Brian D. Clark
Simeon A. Morbey
Kyle Pozan
Arielle S. Wagner
Stephen M. Owen
Develyn Mistriotti
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: 612-339-6900
Facsimile: 612-339-0981
Email: wjbruckner@locklaw.com
Email: bdclark@locklaw.com
Email: samorbey@locklaw.com
Email: kjpozan@locklaw.com
Email: aswagner@locklaw.com
Email: smowen@locklaw.com
Email: djmistriotti@locklaw.com


Clifford H. Pearson
Daniel L. Warshaw
Bobby Pouya
Michael H. Pearson
Eric J. Mont
Naveed Abaie
PEARSON WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sharman Oaks, CA 92403
Telephone: 818-788-8300
Facsimile: 818-788-8104
Email: cpearson@pwfirm.com
Email: dwarshaw@pwfirm.com
Email: bpouya@pwfirm.com
Email: mpearson@pwfirm.com
Email: emont@pwfirm.com
Email: nabaie@pwfirm.com

/s/ Robert N. Kaplan
Robert N. Kaplan
Gregory K. Arenson
Matthew P. McCahill
Jason Uris
KAPLAN FOX & KILSHEIMER, LLP
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: 212-687-1980
Email: rkaplan@kaplanfox.com
Email: garenson@kaplanfox.com
Email: mmccahill@kaplanfox.com
Email: juris@kaplanfox.com


/s/ Brian C. Hill
Bernard D. Marcus
Moira Cain-Mannix
Brian C. Hill
MARCUS & SHAPIRA LLP
301 Grant Street
One Oxford Centre, 35th Floor
Pittsburgh, PA 15219-6401
Telephone: 412-471-3490
Facsimile: 412-391-8758
Email: marcus@marcus-shapira.com
Email: cain-mannix@marcus-shapira.com
Email: hill@marcus-shapira.com

Jill M. Manning
PEARSON WARSHAW, LLP
555 Montgomery Street, Suite 1205
San Francisco, CA 94111
Telephone: 412-433-9000
Facsimile: 415-433-9008
Email: jmanning@pwfirm.com

*Co-Lead Class Counsel for Direct
Purchaser Plaintiffs*

Steven A. Hart
HART MCLAUGHLIN & ELDRIDGE,
LLC
1 South Dearborn Street, Street 1400
Chicago, IL 60603
Telephone: 312-955-0545
Email: shart@hmelegal.com

Jeffrey Corrigan
SPECTOR ROSEMAN & KODROFF, PC
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: 215-496-0300
Email: jcorrigan@srkattorneys.com

Mindee J. Reuben
LITE DEPALMA GREENBERG &
AFANADOR, LLC
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Telephone: 215-854-4060
Email: mreuben@litedepalma.com

Robert J. Wozniak
FREED KANNER LONDON & MILLEN
LLC
100 Tri-State International Drive, Suite 128
Lincolnshire, IL 60069
Telephone: 224-632-4500
Email: rwozniak@fklmlaw.com

*Counsel for Direct Purchaser Plaintiffs*

Eric R. Lifvendahl
LIFVENDAHL LAW, LLC
265 Latrobe Avenue
Northfield, IL 60093
Telephone: 847-830-7002
Email: eric@liflaw.com

Richard L. Coffman
THE COFFMAN LAW FIRM
3355 West Alabama, Suite 240
Houston, TX 77098
Telephone: 713-528-6700
Email: rcoffman@coffmanlawfirm.com

Solomon B. Cera
CERA LLP
201 California Street, Suite 1240
San Francisco, CA 94111
Telephone: 415-777-2230
Email: scera@cerallp.com

C. Andrew Dirksen
CERA LLP
800 Boylston Street, 16th Floor
Boston, MA 02199
Telephone: 857-453-6555
Email: cdirksen@cerallp.com

Elizabeth H. Black
HAYNSWORTH SINKLER BOYD P.A.
1201 Main Street, 22nd Floor
Columbia, SC 29201-3226
Telephone: 803-540-7753
Email: eblack@hsblawfirm.com

Paul E. Slater
Joseph M. Vanek
David P. Germaine
Phillip F. Cramer
John P. Bjork
Allison Margolies
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
Facsimile: 312-641-6492
Email: pes@sperling-law.com
Email: jvanek@sperling-law.com
Email: dgermaine@sperling-law.com
Email: cramer@sperling-law.com
Email: jbjork@sperling-law.com
Email: amargolies@sperling-law.com

Jay W. Matthews, III
HAYNSWORTH SINKLER BOYD P.A.
1 North Main Street, 2nd Floor
Greenville, SC 29601
Telephone: 864-240-3200
Email: jmatthews@hsblawfirm.com

*Counsel for Action Meat Distributors, Inc.; Affiliated Foods, Inc.; Alex Lee, Inc./Merchants Distributors, LLC; Associated Food Stores, Inc.; Associated Grocers of New England, Inc.; Associated Grocers, Inc.; Bashas' Inc.; Big Y Foods, Inc.; Brookshire Bros., Inc.; Brookshire Grocery Company; CBBC Opco, LLC d/b/a Colorado Boxed Beef; Certco, Inc.; Columbia Meats, Inc.; Fareway Stores, Inc.; Giant Eagle, Inc.; Greenville Meats, Inc.; Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc.; Ira Higdon Grocery Company, Inc.; King Solomon Foods, Inc.; Latina Boulevard Foods, LLC; Nicholas & Co., Inc.; Pacific Food Distributors, Inc.; Piggly Wiggly Alabama Distributing Co., Inc.; S&S Trading, LLC; Schnuck Markets, Inc.; SpartanNash Company; Springfield Grocer Co. (d/b/a SGC Foodservice); The Distribution Group, Inc. (d/b/a Van Eerden Foodservice Company); The Golub Corporation; Topco Associates, LLC; Troyer Foods, Inc.; URM Stores, Inc.; W. Lee Flowers & Company, Inc.; Weinstein Wholesale Meats, Inc.; and Woodman's Food Market, Inc.*

Ryan T. Holt
Christina Rae Burgart Lopez
SHERRARD ROE VOIGT & HARBISON,
PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
Telephone: 615-742-4200
Email: rholt@srvhlaw.com
Email: clopez@srvhlaw.com

*Counsel for Plaintiffs Associated Grocers of
the South, Inc.; Meijer, Inc.; Meijer
Distribution, Inc.; OSI Restaurant Partners,
LLC; Publix Super Markets, Inc.; Supervalu
Inc.; Unified Grocers, Inc.; Associated
Grocers of Florida, Inc.; and Wakefern
Food Corp. (the "Publix DAPs")*

*/s/ William J. Blechman*
William J. Blechman
Kevin J. Murray
Douglas H. Patton
Samuel J. Randall
Michael A. Ponzoli
KENNY NACHWALTER, P.A.
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Telephone: 305-373-1000
Facsimile: 305-372-1861
Email: wblechman@knpa.com
Email: kmurray@knpa.com
Email: dpatton@knpa.com
Email: srandall@knpa.com
Email: mponzoli@knpa.com

*Counsel for Plaintiffs The Kroger Co.;
Albertsons Companies, Inc.; Hy-Vee, Inc.;
and Save Mart Supermarkets (the "Kroger
DAPs")*

*/s/ Daniel D. Owen*
Daniel D. Owen
Guillermo G. Zorogastua
POLSINELLO PC
900 West 48th Place, Suite 900
Kansas City, MO 64112
Telephone: 816-753-1000
Facsimile: 816-753-1536
Email: dowen@polsinelli.com
Email: gzorogastua@polsinelli.com

*Counsel for Plaintiff Associated Wholesale
Grocers, Inc.*

*/s/ Patrick J. Ahern*
Patrick J. Ahern
AHERN AND ASSOCIATES, P.C.
8 South Michigan Avenue, Suite 3600
Chicago, IL 60603
Telephone: 312-404-3760
Email:
Patrick.ahern@ahernandassociatespc.com

*Counsel for Plaintiffs Winn-Dixie Stores,
Inc. and Bi-Lo Holdings, LLC (the Winn-
Dixie DAPs")*

## CERTIFICATE OF SERVICE

I hereby certify that on December 22nd, 2023, a true and correct copy of the foregoing was electronically filed and served via operation of the Court's CM/ECF system, which will automatically send e-mail notification of such filing to the attorneys of record entitled to notice who are registered users of ECF.

Date: December 22, 2023                    _/s/ Brian C. Hill_
                                           Brian C. Hill