**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | Case No.: 1:16-cv-08637 |
| | The Honorable Thomas M. Durkin |
| This Document Relates To: | Magistrate Judge Jeffrey T. Gilbert |
| THE DIRECT PURCHASER PLAINTIFF ACTION | |

**DIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE COURT'S ORDER
REGARDING THEIR MOTION FOR PAYMENT OF ATTORNEYS' FEES**

1013277.9

**TABLE OF CONTENTS**

<u>**Page**</u>

I. INTRODUCTION ...................................................................................................1

II. A ONE-THIRD FEE AWARD FOR DPP CLASS COUNSEL IS
APPROPRIATE WHEN EXAMINED IN LIGHT OF AUCTION BIDS AND
OUT-OF-CIRCUIT AWARDS ...............................................................................1

    A. Bids Made by Class Counsel in Auctions ..................................................2

    B. Out-of-Circuit Decisions .............................................................................3

        1. Analysis of Pearson Warshaw, LLP's Antitrust Cases Between
2010 and 2023 ..................................................................................3

        2. Analysis of Lockridge Grindal Nauen PLLP's Antitrust Cases
Between 2010 and 2023 ...................................................................7

III. THE FEE ARRANGEMENT ENTERED INTO BY EUCP COUNSEL IN *IRS*
DOES NOT SUPPORT REDUCING THE DPP ATTORNEYS' FEE REQUEST ...........9

IV. THE OTHER ISSUES RAISED IN END USERS' PETITION SUPPORT THE
DPPS' ONE-THIRD ATTORNEYS' FEE REQUEST ......................................................12

V. CONCLUSION .....................................................................................................15

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*In re Broiler Chicken Antitrust Litig.*,
 80 F.4th 797 (7th Cir. 2023) ................................................................................ *passim*

*In re Credit Default Swaps Antitrust Litig.*,
 No. 13-md-02476-DLC, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) ............................... 5, 6

*In re Dairy Farmers of Am., Inc.*,
 80 F. Supp. 3d 838 (N.D. Ill. 2015) ........................................................................... 13

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
 No. 13-cv-07789-LGS, 2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018) ................................ 10

*Interest Rate Swaps Antitrust Litig.*,
 No. 1:16-md-02704, ECF No. 74 (S.D.N.Y. July 22, 2016) ............................................ 10

*Kornell v. Haverhill Ret. Sys.*,
 790 F. App'x 296 (2d Cir. 2019) ................................................................................ 11

*In re Lithium Ion Batteries Antitrust Litig.*,
 No. 13-MD-02420-YGR, 2018 WL 3064391 (N.D. Cal. May 16, 2018) ............................. 4

*In Re: Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*,
 No. 4:14-md-2541-CW, 2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) ................................. 5

*In Re: Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*,
 No. 4:14-md-2541-CW, 2019 WL 12194763 (N.D. Cal. Dec. 6, 2019) ............................... 5

*In Re: Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*,
 No. 4:14-md-2541-CW, ECF No. 1334 (N.D. Cal. Dec. 23, 2019) .................................... 5

*Nat'l Collegiate Athletic Ass'n v. Alston*,
 594 U.S. 69 (2021) ................................................................................................... 5

*In re Optical Disk Drive Antitrust Litig.*,
 No. 3:10-MD-02143 RS, 2016 WL 11704906 (N.D. Cal. Apr. 14, 2016) ............................ 4

*In re Optical Disk Drive Antitrust Litig.*,
 No. 3:10-MD-02143 RS, ECF No. 1658 (N.D. Cal. Jul. 23, 2015) ..................................... 4

*In re Oracle Securities Litig.*,
 131 F.R.D. 688 (N.D. Cal. 1990) ................................................................................ 2

*In re Payment Card Interchange Fee Merch. Dis. Antitrust Litig.*,
    991 F. Supp. 2d 437 (E.D.N.Y. 2014) .................................................................................10

*In re Potash Antitrust Litig.*,
    No. 1:08-cv-06910, 2013 WL 12470850 (N.D. Ill. June 12, 2013)..........................................1

*In re Se. Milk Antitrust Litig.*,
    No. 2:07-cv-00208, 2012 WL 12875983 (E.D. Tenn. July 11, 2012) ....................................11

*In re Se. Milk Antitrust Litig.*,
    No. 2:07-cv-00208, 2013 WL 2155387 (E.D. Tenn. May 17, 2013) .....................................11

*Silverman v. Motorola Sols., Inc.*,
    739 F.3d 956 (7th Cir. 2013) ..........................................................................................7, 13

*Stanger v. China Elec. Motor, Inc.*,
    812 F.3d 734 (9th Cir. 2016) ..................................................................................................4

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) ..................................................................................................8

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. 3:07-MD-1827 SI, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) ....................................4

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. 3:07-MD-1827 SI, 2013 WL 149692 (N.D. Cal. Jan 14, 2013) ........................................4

**Other Authorities**

Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class
    Actions*, 89 Fordham L. Rev. 1151, 1169-70 (2021) ..............................................................14

I. **INTRODUCTION**

On May 3, 2024, the Court issued a minute order (ECF No. 7235, "Minute Order") regarding Direct Purchaser Plaintiffs' ("DPPs") motion for attorneys' fees (ECF No. 7232, "Motion"), requesting that DPPs: (1) address "the Seventh Circuit's opinion reversing the Court's approval of the End User Plaintiff Class's fee petition in this case;" (2) address "the relevance of the fee arrangement in *Interest Rate Swaps Antitrust Litig.*, No. 1:16-md-02704 (S.D.N.Y.) [("*IRS*")];" and (3) "generally address the issues that have arisen regarding the End Users' fee petition." As set forth in detail herein, the DPPs' motion for recovery of attorneys' fees in the amount of one-third of the net settlement sum is consistent with each of these factors, as well as the relevant factors articulated by Seventh Circuit precedent regarding the analysis of attorneys' fees in antitrust class actions such as this. The DPPs' attorneys' fee request is also consistent with attorneys' fees awarded by courts in similar antitrust class actions, both in the Seventh Circuit (*see, e.g.*, *In re Potash Antitrust Litig.*, No. 1:08-cv-06910, 2013 WL 12470850, at *1 (N.D. Ill. June 12, 2013)) and others. Neither the fee arrangement in *IRS*, the End Users' fee petition, nor any other factor raised by the Seventh Circuit supports a reduction in the DPPs' attorneys' fee request. As such, DPPs respectfully submit that the Court should remain consistent with its prior opinions holding that an attorneys' fee award of one-third the settlement sum is appropriate in this case.

II. **A ONE-THIRD FEE AWARD FOR DPP CLASS COUNSEL IS APPROPRIATE WHEN EXAMINED IN LIGHT OF AUCTION BIDS AND OUT-OF-CIRCUIT AWARDS**

In remanding this Court's decision on the End Users' fee petition, the Seventh Circuit concluded that while the final award to End Users' class counsel may not change on further review, this Court's evaluation should include "the consideration of bids made by class counsel in auctions, and the weight assigned to out-of-circuit decisions." *In re Broiler Chicken Antitrust Litig.*

1013277.9                                                 1

("*Broiler*"), 80 F.4th 797, 802 (7th Cir. 2023).[1] In response to the Court's request, DPP Co-Lead Class Counsel[2] thoroughly examined all antitrust class actions in which they served in a court-appointed role from 2010 through 2023. (Declaration of Michael H. Pearson of PW ("Pearson Decl."), ¶ 2; Declaration of W. Joseph Bruckner of LGN ("Bruckner Decl."), ¶ 2.) As set forth below, this analysis confirmed that: (1) DPP Co-Lead Class Counsel did not make any auction bids in these cases; and (2) the attorneys' fees awarded to DPP Co-Lead Class Counsel in other antitrust cases in which they held a court-appointed role are consistent with and support their one-third fee application in this case.

### A.     Bids Made by Class Counsel in Auctions

The Seventh Circuit held that "auction bids are properly considered when deciding what bargain the parties would have struck *ex ante*[, and] [b]ids that class counsel made in auctions around the time this litigation began in September 2016 would ordinarily be good predictors of what *ex ante* bargain would have been negotiated." *Broiler*, 80 F.4th 797, 802 (citing *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001)).

Here, neither PW nor LGN have submitted any bids in auctions[3] in antitrust cases. (*See* Pearson Decl. ¶ 3; *see* Bruckner Decl. ¶ 3.) As such, DPP Co-Lead Class Counsel respectfully submit that no further consideration by the Court on this point is required.

---

[1] In the Minute Order, the Court cited 727 F.3d 796 (7th Cir. 2023) when referencing the Seventh Circuit's opinion regarding the End Users' motion for attorneys' fees; however, DPPs believe the correct citation is 80 F.4th 797 (7th Cir. 2023).

[2] The Court appointed Lockridge Grindal Nauen PLLP ("LGN") and Pearson Warshaw, LLP (previously Pearson, Simon & Warshaw, LLP) ("PW") as Interim Co-Lead Counsel at the outset of the litigation (ECF No. 144, Oct. 14, 2016 Order), and as Co-Lead Class Counsel when it granted DPPs' motion for class certification (ECF No. 5644 at 6) (hereinafter collectively, "DPP Co-Lead Class Counsel").

[3] An "auction" is a term of art that refers to a court-directed process of selecting lead class counsel created by Judge Vaughn Walker in *In re Oracle Securities Litigation*, 131 F.R.D. 688 (N.D. Cal. 1990), where counsel submitted bids *in camera* and the court then appointed lead counsel. This process is generally limited to securities litigation, but for the purposes of this response DPP Co-Lead Class Counsel interprets the term "auction" as any bids for a court-appointed position made to a court (in a formal process or voluntarily, *in camera* or not) in an antitrust case.

B.   **Out-of-Circuit Decisions**

Regarding out-of-circuit decisions, the Seventh Circuit stated that "data about *ex post* fees awarded to class counsel in other cases should receive less weight, as those prices are set at the end of the litigation." *Broiler*, 80 F.4th at 804. "They are therefore less probative in assessing the bargain that would have been struck *ex ante*." *Id.* Nevertheless, the Seventh Circuit held that they should be considered by the Court as a factor in determining the appropriate attorney fee amount.

DPP Co-Lead Class Counsel examined their firms' respective files for antitrust cases in which they served in a court-appointed role from 2010 to 2023. (*See* Pearson Decl. ¶ 2; *see* Bruckner Decl. ¶ 2.) The results are detailed in the paragraphs below and in the supporting declarations, and support the one-third award of attorneys' fees requested here.

1.   **Analysis of Pearson Warshaw, LLP's Antitrust Cases Between 2010 and 2023**

From 2010 through 2023, PW served (or is serving) in a court-appointed role in 12 antitrust class action cases. (*See* Pearson Decl. ¶ 2, Ex. 1.) As demonstrated by the chart (*see id.*), not all these cases have resulted in the recovery of attorneys' fees, which reaffirms the contingent risks that are inherent in high stakes antitrust class actions and is a substantial factor in justifying fee awards when successful results are obtained. Of the 12 antitrust class actions that PW has served in a court-appointed role, eight cases have resulted in attorneys' fee awards either of 30% (three cases) or of 33 1/3% (five cases, including this case, *see* ECF No. 5229, December 1, 2021).[4] (*See* Pearson Decl. ¶ 2, Ex. 1.) All of PW's fee awards—except for this Court's interim award, *see* ECF No. 5229—were calculated on the *gross* settlement fund amount. (*See* Pearson Decl. ¶ 2, Ex. 1.) The average fee award for PW of these eight cases is just over 32% of the gross settlement sum, which is *greater than* the fee requested here if compared to the gross settlement amount plus

---

[4] Two cases resulted in no recovery (*see* Pearson Decl. ¶ 2, Ex. 1) and the other two are discussed below.

accrued interest.[5] Importantly, many of those cases were litigated in the Ninth Circuit where the benchmark attorneys' fee in class actions is 25%. *See Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 738-39 (9th Cir. 2016) (recognizing the Ninth Circuit's benchmark and, despite the standard, that courts often increase fee awards); *see, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-MD-1827 SI, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011), 2013 WL 149692 (N.D. Cal. Jan 14, 2013) (awarding PW and co-counsel attorneys' fees of 30% from settlements totaling over $473 million); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-02420-YGR, 2018 WL 3064391 (N.D. Cal. May 16, 2018) (awarding PW and co-counsel attorneys' fees of 30% from settlements totaling over $139 million); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-MD-02143 RS, ECF No. 1658 (N.D. Cal. Jul. 23, 2015), 2016 WL 11704906 (N.D. Cal. Apr. 14, 2016) (awarding PW and co-counsel attorneys' fees of 30% from settlements totaling nearly $75 million). In each instance, the court recognized the exemplary work of PW's attorneys and awarded fees in excess of the benchmark rate. These cases confirm that the attorneys' fees sought by DPPs here are consistent with attorneys' fees recovered by PW in comparable antitrust class actions.

In two antitrust class actions in which they served in a court-appointed position, PW *requested* and received fee awards of less than 30%. As set forth below, the circumstances surrounding these two cases are unique and distinguishable. *First*, PW was co-lead counsel in *In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation* ("*NCAA*"), No. 4:14-md-2541-CW (N.D. Cal.), an antitrust class action alleging that the NCAA and its member conferences violated the antitrust laws by restricting the value of grant-in-aid athletic scholarships and other benefits that college football and basketball players could receive. (*See* Pearson Decl. ¶ 2, Ex. 1.) The damages portion of the case settled for $208,664,445.00, while

---

[5] $37,279,851.67 (requested attorneys' fees) divided by $118,025,505.20 ($115,050,150.00 in total settlements at issue plus $2,975,355.20 in interest) equals 31.6%.

the injunctive relief phase of the case proceeded to a successful bench trial before ultimately concluding with a 9-0 victory in the Supreme Court. *See Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021). Plaintiffs requested and the court awarded $41,732,889, or 20%, in attorneys' fees. *See NCAA*, 2017 WL 6040065, at *2 (N.D. Cal. Dec. 6, 2017), *aff'd*, 768 F. App'x 651 (9th Cir. 2019). This award was on the gross amount of the settlement and represented a 3.66 lodestar multiplier. *Id*. at 12. Class counsel was paid an additional $36 million in attorneys' fees for their work on the injunctive relief portion of the case. *See NCAA*, 2019 WL 12194763 (N.D. Cal. Dec. 6, 2019); *NCAA*, ECF No. 1334 (N.D. Cal. Dec. 23, 2019). While the initial award by the court was 20%, that was due to the unique circumstances of the litigation and the ultimate award of over $77 million in total attorneys' fees does not detract from the attorneys' fees requested here.

*Second*, PW attorneys served as co-lead counsel and represented the Los Angeles County Employees Retirement Association[6] ("LACERA") in a class action on behalf of all purchasers and sellers of Credit Default Swaps ("CDS") against twelve of the world's largest banks in *In re Credit Default Swaps Antitrust Litigation* ("*CDS*"), No. 1:13-md-02476-DLC (S.D.N.Y.). (*See* Pearson Decl. ¶¶ 2, 4, Ex. 1.) The lawsuit alleged that the banks, along with other defendants who controlled the market infrastructure for CDS trading, conspired for years to restrain the efficient trading of CDS, thereby inflating the cost to trade CDS. The alleged antitrust conspiracy resulted in economic harm to institutional investors such as pension funds, mutual funds, and insurance companies who used CDS to hedge credit risks on their fixed income portfolios, with amounts at issue that were higher than those in this case involving the sale of chicken. After nearly three years of litigation, PW as co-lead counsel reached settlements with the defendants totaling $1.86 *billion* plus

---

[6] "LACERA, with investment assets of over $48 billion, is one of the largest county retirement systems in the United States." *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-02476-DLC, 2016 WL 2731524, at *16 (S.D.N.Y. Apr. 26, 2016) Further, LACERA is a public entity and consistent with its policies it required counsel to submit requests for proposals from counsel. PW participated in this process and was ultimately retained. (*See* Pearson Decl. ¶ 4.)

injunctive relief. Plaintiffs requested and received attorneys' fees in the amount of $253,758,000.00, or 13.61% of the settlement fund. *CDS*, 2016 WL 2731524, at *17. This award represented a 6.36 lodestar multiplier and was based on the negotiated fee structure between PW and sophisticated class representative LACERA, which called for decreases in attorneys' fee percentages when the settlement amount reached certain recovery thresholds and increases in attorneys' fee percentages as the case passed certain litigation thresholds and proceeded closer to trial. (*Id.*; *see also id.*, at *17 n.24; Pearson Decl. ¶ 4). The settlement achieved in this "megafund" case—which is not a doctrine applicable in this Circuit—was extraordinary and one of the largest antitrust recoveries at the time. These extraordinary circumstances and the possibility of a multi-billion-dollar recovery existed at the outset of the litigation. *See id*. As more fully set forth in Section III below and the DPPs' other briefing in support of their Motion, such an arrangement was never contemplated, nor would it be appropriate or agreed to, in the instant case, especially given that the Seventh Circuit "has rejected the application of the megafund rule." *Broiler*, 80 F. 4th at 804 (citing *Synthroid*, 264 F.3d at 717-18).

More telling than the attorneys' fee awards in *NCAA* and *CDS* is the attorneys' fee arrangement that PW negotiated with a sophisticated individual client in *City of Oakland v. Oakland Raiders, et al.*, No. 3:18-cv-07444-JCS (N.D. Cal.) in an analogous case. In December 2018, PW along with its co-counsel (who are not involved in this litigation) entered into a retention agreement with public entity the City of Oakland in connection with an antitrust case against the National Football League and its 32 teams related to the Oakland Raiders' move to Las Vegas, Nevada. (*See* Pearson Decl. ¶ 5.) The retention agreement, which is a public record, was negotiated by the Oakland City Attorney's Office. (*Id.*) The terms of the pure contingency fee agreement called for counsel to advance costs and be paid attorneys' fees in the amount of 33% of any recovery, net of costs. (*Id.*) The City Council authorized the City Attorney's Office to bring the

lawsuit, which was filed in the Northern District of California. (*Id.*) Following the district court's granting of defendant's motion to dismiss as to the antitrust claim, PW and co-counsel worked for many months to appeal the case to the Ninth Circuit, as well as file a petition to the Supreme Court of the United States. Once the Supreme Court denied the petition, the other claims alleged in the complaint (breach of contract and unjust enrichment) were pursued in California state court. In the end, the defendants prevailed. While this case was not a class action, DPP Co-Lead Class Counsel believe that it is an important example of the agreements that sophisticated entities enter into with law firms such as PW and LGN for representation in antitrust lawsuits. Like the *Broiler* case, the City of Oakland case presented complex legal issues and was fraught with risk, which was borne by counsel and not the client. Indeed, this case is a prime example of the "market rate" of complex, comparable antitrust legal services, which is a relevant factor in the determination of the appropriate fee amount. *See Broiler*, 80 F. 4th at 801-802 ("a district court must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case"); *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957 (7th Cir. 2013) ("attorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services.").

## 2. Analysis of Lockridge Grindal Nauen PLLP's Antitrust Cases Between 2010 and 2023

From 2010 through 2023, LGN served (or is serving) in a court-appointed role in eight antitrust class action cases that have resulted in the recovery of attorneys' fees.[7] (Bruckner Decl. ¶ 2, Ex. 1.) Of those eight cases, nearly all (six cases) resulted in an award of 33 1/3%. (*Id.*) In one case, *In re: Wholesale Grocery Prods. Antitrust Litigation*, No. 0:09-md-02090 (D. Minn.), LGN

---

[7] LGN did not serve in a court-appointed leadership role in *In re: Parking Heaters Antitrust Litig.*, No. 1:15-mc-00940-DLI (E.D.N.Y.); however, LGN included the case because LGN was the only firm in that litigation to represent the direct purchaser class members in settlement and settlement allocation negotiations. (Bruckner Decl. ¶ 5.)

*requested* and received an award of 30%. (Bruckner Decl. ¶ 2, Ex. 1.) All of LGN's fee awards—except for this Court's interim award, *see* ECF No. 5229—were calculated on the *gross* settlement fund amount. (*Id.*)

LGN received a fee award of less than 30% in one such case: *Precision Associates, Inc. et al., v. Panalpina World Transport (Holding) LTD., et al.* ("*Freight Forwarders*"), No. 1:08-cv-00042-BMC-PK (E.D.N.Y.). *Freight Forwarders* is readily distinguishable. There, the court relied heavily on the megafund rule for each of the three fee awards, as well as other factors which are not presented in the *Broiler* litigation. For the first interim fee award, the court awarded a 15% fee, discounting the fee percentage based on the megafund rule and because the 10 settlements were reached before the court ruled in the plaintiffs' favor on the motion to dismiss. (Bruckner Decl. ¶ 4.) The court thus reasoned that "a significant percentage" of class counsel's work "pertains to prosecuting the case against non-settling defendants, and counsel should be compensated for that work if and when they are successful in prosecuting those claims." (*Id.*) The court thereafter awarded fees for that work: a 25% fee for the second interim fee award, followed by a 25% fee for the third fee award. (*Id.*) The cumulative fee award on the $427,755,026.22 settlement fund was $88,543,872.01, reflecting an effective fee percentage of 20.70%. Notably, the *Freight Forwarders* court recognized class counsel's exceptional work, observing that the settlements "were the result of hard fought arms'-length negotiation with settling defendants' respective counsel," and remarking that class counsel "worked vigorously and ably to achieve these outcomes." (*Id.*) Because the Seventh Circuit has rejected the application of the megafund rule, *Synthroid*, 264 F.3d at 717-18, *Freight Forwarders* is not an apt indicator of the bargain that would have been struck *ex ante* here.

A better indicator of the market rate for this case comes from *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 2:16-md-02687-JLL (D.N.J.). There, LGN represented the cities of

Milwaukee, Wisconsin, the Minnesota cities of Saint Paul, Duluth, and Rochester, and other municipalities in a class action against sellers of liquid aluminum sulfate for their violations of the antitrust laws. (Bruckner Decl. ¶6.) In LGN's contracts with each of these clients, the municipalities agreed to pay a 33 1/3% fee for any recovery other than as a member of a class (under the retainer, class fees were to be decided by the court). (*Id.*) This is yet another example of sophisticated purchasers of legal services agreeing to a 33 1/3% fee for LGN's legal services in an antitrust case. (*See* Section II.B.1 above (discussing PW's agreement with the City of Oakland).) While the court did not ultimately assign LGN to a leadership role, some of LGN's clients served as class representatives, and the court awarded LGN and the other counsel in that case a 33 1/3% fee on $92,496,800 in settlements. (Bruckner Decl. ¶ 6.)

\* \* \*

The Seventh Circuit remanded EUCPs' fee award for further evaluation of EUCP class counsel's bids in auctions and out-of-circuit awards. Even though those factors receive less weight, a similar analysis here for DPP Co-Lead Class Counsel shows the appropriateness of the requested 33 1/3% fee. DPP Co-Lead Class Counsel did not bid in auctions in any antitrust cases from 2010 to 2023, so there is nothing to suggest they would place a bid in an auction for a fee of below 33 1/3%. Likewise, LGN's and PW's out-of-circuit awards, including LGN's and PW's agreements with sophisticated entities to prosecute their antitrust claims, demonstrate that the hypothetical *ex ante* bargain the sophisticated DPP class members would have struck with LGN and PW would have been at or above 33 1/3% of the net settlement sum.

**III. THE FEE ARRANGEMENT ENTERED INTO BY EUCP COUNSEL IN *IRS* DOES NOT SUPPORT REDUCING THE DPP ATTORNEYS' FEE REQUEST**

The Court asked DPP Counsel to discuss the fee arrangement in *IRS*, but that fee arrangement is not public, and DPP Co-Lead Class Counsel cannot speak to the specifics of the

fee arrangement because neither LGN nor PW had any role in *IRS*, nor has either firm ever represented the Public School Teacher's Pension and Retirement Fund of Chicago ("Chicago Teachers' Pension Fund"). In fact, *IRS* is only relevant to EUCPs because the Chicago Teachers' Pension Fund is a client of one of EUCPs' class counsel (the Cohen Milstein firm). But for that representation, a fee arrangement in a banking case pending in the Second Circuit would otherwise not be at issue. Nonetheless, *IRS* is distinguishable from the case at issue because a single example of a client reaching an attorney fee agreement with another firm in a unique case is not an apt indicator of the market rate for this case for several reasons.

Even at inception, *IRS* had all the hallmarks of a "megafund" case as recognized by the Second Circuit. At the time *IRS* was filed, some of its banking defendants had just settled two similar financial cartel cases, including *CDS* for $1.86 billion as discussed in Section II.B.1 above, and the plaintiffs' counsel in *IRS* (the Quinn Emanuel firm, not PW) was also co-lead counsel in *CDS*. *See IRS*, Application to Appoint Interim Co-Lead Counsel (July 22, 2016), ECF No. 74 at 11 ("Because the CDS case is effectively over, the same team [not including PW] that achieved this impressive result for the class of CDS investors is poised to jump into action on this case . . . ."). Based on these circumstances, which were known at the outset of the litigation, the Chicago Teachers' Pension Fund allegedly negotiated an "arm's length [] fee provision" and adopted a graduated scale first ordered in similar banking litigation.[8] Importantly, the Second Circuit—unlike the Seventh Circuit—recognizes the application of the megafund rule. *Compare, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-07789-LGS, 2018 WL

---

[8] The *IRS* fee scale was adopted from *In re Payment Card Interchange Fee Merch. Dis. Antitrust Litig.*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014).

5839691, at *5 (S.D.N.Y. Nov. 8, 2018), *aff'd sub nom. Kornell v. Haverhill Ret. Sys.*, 790 F. App'x 296 (2d Cir. 2019),[9] *with Broiler*, 80 F. 4th at 804.

In stark contrast to *IRS*, there were no similar "protein" cases when the *Broiler* litigation commenced, and the highest recovery for a food commodity antitrust case was just over $300 million (*see In re Se. Milk Antitrust Litig.*, No. 2:07-cv-00208, 2012 WL 12875983, at *1 (E.D. Tenn. July 11, 2012), 2013 WL 2155387, at *1 (E.D. Tenn. May 17, 2013) (awarding a attorneys' fees of one-third of the $303 million settlements)). This Court previously recognized the unique nature of the litigation and the risk it presented: "A substantial award is warranted here as a proper incentive for high quality counsel to take on complex cases, requiring a massive investment of time and money, **with such a high risk of non-payment**." (ECF No. 5229 at 8 (emphasis added).) In the face of this uncertainty, DPP Co-Lead Class Counsel were the only firms that decided to pursue this case. (*See* ECF No. 5229 at 6 ("no other attorneys bid to be appointed counsel for the DPPs in this case. Without competition, a bid auction was not feasible. And without competition, no attorney would offer to take a case under a declining fee scale award structure.").) Notably, in awarding DPP Co-Lead Class Counsel an interim fee award of 33 1/3%, this Court called their work "exemplary." (*Id.* at 8.)

DPP Co-Lead Class Counsel's expectation that they would be able to seek 33 1/3% was a driving reason why they took the substantial risk to bring this lawsuit and invest their time and money on a completely contingent basis with no guarantee of recovery. Of course, the risks recognized at the outset of the litigation did not abate as the litigation advanced. Instead, those risks increased and became clearer. The Court noted that its 92-page decision denying Defendants'

---

[9] "We also find that the district court did not abuse its discretion by awarding Class Counsel a percentage of the gross class action settlement fund, rather than the settlement fund net of expenses. The text of Federal Rule of Civil Procedure 23(h) does not bar one method or the other, as long as the award is reasonable, and we decline to read a proscription into Rule 23(h) where there is none." *Kornell*, 790 F. App'x at 298.

1013277.9                                11

motions to dismiss was "a relatively close call" (ECF No. 5229 at 8), the Court dismissed six Defendants on summary judgment approximately two months before trial (ECF No. 6641), and after a six-week trial the jury returned a defense verdict for the sole remaining Defendant, Sanderson Farms (ECF No. 7015). DPPs' 33 1/3% attorneys' fee request recognizes the reality that taking a case all the way to trial is particularly risky and ensures that counsel's interests remain aligned with the Class's interests until the conclusion of the case.

Further, unlike *IRS* and *CDS* where the defendants were multi-national banking institutions with the ability to pay virtually any judgment, Defendants in this case faced significant financial pressure. Numerous Broiler producers, including Defendant Pilgrim's Pride, declared bankruptcy in the years before the lawsuit was filed, and the possibility that one or more of the other Defendants might declare bankruptcy during the litigation was a very dangerous reality. Any bankrupt Defendant might become judgment proof and the litigation against it would be stayed, preventing discovery and limiting the value of claims against *all* Defendants.

Despite these risks, DPP Co-Lead Class Counsel achieved settlements for the Class totaling $284,651,750. (*See* Motion § VI.D.) As set forth in Section II.B above, DPP Co-Lead Counsel's fee awards and fee arrangements in comparable cases (antitrust cases in which LGN and PW held a court-appointed role) demonstrate that the 33 1/3 % attorney fee request by DPPs is reflective of the appropriate "market rate" arrangement that is appropriate in this case.

### IV. THE OTHER ISSUES RAISED IN END USERS' PETITION SUPPORT THE DPPS' ONE-THIRD ATTORNEYS' FEE REQUEST

In its Minute Order, the Court stated that it "expects counsel's supplemental brief to address and focus on the substance of the cases and issues raised in the End Users' petition." (ECF No. 7235.) Regarding the hypothetical *ex ante* bargain that would have been negotiated in this case, the substance of the cases and issues addressed in the EUCP briefing center on: (1) the weight

afforded to bids that counsel made in auctions; and (2) the weight afforded to *ex post* fees awarded to counsel in out-of-circuit cases. As detailed above, a one-third fee is appropriate in this case—DPP Co-Lead Class Counsel made no bids in auctions, and the more than 20 *ex post* fees awarded to DPP Co-Lead Class Counsel in cases outside the Seventh Circuit since 2010 track the fee request in this case of 33 1/3%. Similarly, case law and real-world examples all reinforce that a one-third fee is common in antitrust litigation and proper here.

But the briefing on the EUCPs' petition also raises the issue of "the stage of litigation and the size of recovery" when determining the hypothetical *ex ante* fee agreement. (ECF No. 6990 at 6.) Specifically discussed were whether sophisticated clients favor fees that marginally decline as the size of the fund increases and the risk of recovery decreases, and whether fees in private fee agreements decrease as the case passes key mileposts and the risk to attorneys increases. (*Id.*)

First, DPPs already briefed, and the Court previously rejected, the concept of a declining sliding scale based on the amount of the recovery generally for DPPs' hypothetical *ex ante* fee agreement, and DPPs described earlier why the declining sliding scale is a poor fit for this and other antitrust cases. (ECF Nos. 5048, 5229.) Specifically, the Court recognized that, at the time of the interim fee petition, "2,808 claims have been filed by potential class member entities in the class, the majority of whom are sophisticated business entities," and "[n]one have objected to the fee award request." (ECF No. 5229 at 4-5.) There remain no objectors to DPPs' second fee request as of the filing of this Response. (*See* Pearson Decl. ¶ 6.)[10] Consistent with *Silverman*, 739 F.3d 956, 959 (7th Cir. 2013), and *In re Dairy Farmers of America, Inc.*, 80 F. Supp. 3d 838, 847 (N.D. Ill. 2015), the Court determined that the lack of objections from any of the 2,808 entities "is evidence that the award is reasonable." (ECF No. 5229 at 5.) The findings from Professor

---

[10] The deadline for Class members to object to DPPs' fee petition is June 1, 2024.

1013277.9                                    13

Fitzpatrick's study and the other study he cites similarly refute the notion that sophisticated clients prefer declining sliding scales: "the data from sophisticated clients . . . did not find any marginally decreasing rates." (ECF No. 5048-1 at 10–11); Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151, 1169-70 (2021). Professor Fitzpatrick's work instead demonstrates that a flat one-third fee remains an accurate hypothetical *ex ante* fee agreement. (ECF No. 5048-1 at 10-11.) As set forth above, Co-Lead Class Counsel's fee awards in other antitrust class actions reflect comparable attorneys' fee awards of 33 1/3% in cases that involved similar recoveries. (*See* Section II above.) Furthermore, LGN's and PW's agreements with sophisticated entities including the cities of Milwaukee, St. Paul, Rochester, Oakland, and others, reflect fee agreements of 33% or higher, without a sliding scale reduction based on the total recovery amount.

Second, milestone-based percentages—fees that increase as the case proceeds past significant events—would likely result in an increased effective percentage fee as the case proceeds, rather than a reduction. As Professor Fitzpatrick noted, "Of the agreements [David L. Schwartz] reviewed that escalated based on procedural maturity, the average percentage upon filing was 28% and the average through appeal was 40.2%." (ECF No. 5048-1 at 11.) These opinions are consistent with the experience and practice of DPP Co-Lead Class Counsel, who have not entered into a fee agreement which called for a decreasing attorney fee recovery as the case proceeds and reaches certain litigation milestones. (*See* Pearson Decl. ¶ 7; *see* Bruckner Decl. ¶ 8.) To the contrary, the typical practice is for the attorneys' fees either to remain constant (*see, e.g., City of Oakland*; *In re Liquid Aluminum Sulfate Antitrust Litig.*) or to increase as the case surpasses litigation milestones and proceeds closer to trial (*see, e.g., CDS, Freight Forwarders*). Additionally, support for increasing fee percentages in this case is found in solicitations by DAP counsel to direct purchasers to opt out of the DPP class and, for their services, asked for "attorneys'

fee equal to one-third (33 1/3%) of the [recovery]," which "increase[d] to thirty-eight percent (38%) upon the earlier filing of a post-trial motion or notice of appeal." (ECF No. 2331-3 at 4-5.)

There is no question that DPP Co-Lead Counsel Class had to overcome a number of hurdles to achieve a successful result for the DPP Class. Five of the seven settlements underlying this Motion, including the largest of those settlements, were reached on the eve of trial, after DPPs won class certification and defeated summary judgment motions brought by those Defendants. Those five settlements total $103,775,150 of the $115,050,150 in settlements at issue in this motion. (*See* ECF No. 7233 at 15.) Given the stage of the litigation when these $103,775,150 in settlements were reached, a hypothetical fee agreement that escalates based on procedural posture would award DPPs' counsel a fee closer to 40.2%. This again reflects the reasonableness of the one-third fee award and supports DPPs' attorney fee request.

## V. CONCLUSION

For the reasons set forth in DPPs' Motion, as well as the additional points addressed herein, DPPs respectfully request that the Court grant the Motion and award attorneys' fees in the amount of 33 1/3% of the Mar Jac, Harrison Poultry, Simmons, Mountaire, O.K. Foods, HRF and Koch settlements, including interest but net of litigation expenses and Class Representative service awards, or $37,279,851.67. If the Court intends to set a hearing on the Motion, DPPs respectfully suggest that it be set for July 9, 2024 at 10:00 a.m. Central Time, concurrently with the final settlement fairness hearing for the HRF, Koch, Foster Farms, Perdue, Case, Claxton, Wayne Farms, Agri Stats, and Sanderson Farms settlements.[11]

---

[11] The previously approved notice to the Class (*see* ECF No. 7179 at 5) informed Class members that the Motion would be heard on this date and time.

Date: May 24, 2024

*/s/ Michael H. Pearson*
Clifford H. Pearson (*Pro Hac Vice*)
Daniel L. Warshaw (*Pro Hac Vice*)
Bobby Pouya (*Pro Hac Vice*)
Michael H. Pearson (*Pro Hac Vice*)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
T: (818) 788-8300
F: (818) 788-8104
cpearson@pwfirm.com
dwarshaw@pwfirm.com
bpouya@pwfirm.com
mpearson@pwfirm.com

W. Joseph Bruckner (*Pro Hac Vice*)
Brian D. Clark (*Pro Hac Vice*)
Simeon A. Morbey (*Pro Hac Vice*)
Arielle S. Wagner (*Pro Hac Vice*)
Stephen M. Owen (*Pro Hac Vice*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
F: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com
aswagner@locklaw.com
smowen@locklaw.com

Kyle Pozan (IL #6306761)
**LOCKRIDGE GRINDAL NAUEN PLLP**
1165 N. Clark Street, Suite 700
Chicago, IL 60610
T: (312) 470-4333
kjpozan@locklaw.com

Bruce L. Simon (*Pro Hac Vice*)
Jill M. Manning (*Pro Hac Vice*)
**PEARSON WARSHAW, LLP**
555 Montgomery Street, Suite 1205
San Francisco, CA 94111
T: (415) 433-9000
F: (415) 433-9008
bsimon@pwfirm.com
jmanning@pwfirm.com

*Direct Purchaser Plaintiffs' Co-Lead Class Counsel*

Steven A. Hart (IL #6211008)
Brian Eldridge (IL #6281336)
**HART MCLAUGHLIN & ELDRIDGE, LLC**
1 South Dearborn, Suite 1400
Chicago, IL 60603
T: (312) 955-0545
F: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com

*Direct Purchaser Plaintiffs' Liaison Class Counsel*