**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE BROILER CHICKEN ANTITRUST LITIGATION** | Case No. 1:16-CV-08637<br>Judge Thomas M. Durkin<br>Magistrate Judge Jeffrey T. Gilbert |

<br><br><br>

**THE RESTAURANTS' OBJECTION
TO DPP CLASS'S PROPOSED SETTLEMENTS WITH
DEFENDANTS KOCH AND HOUSE OF RAEFORD**

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

GROUNDS FOR OBJECTION................................................................................. 10

I.  THE CLASS CANNOT SETTLE A CLAIM THAT DOES NOT EXIST..................... 10

II.  THE KOCH AND HOUSE OF RAEFORD SETTLEMENTS ARE NOT FAIR, REASONABLE, OR ADEQUATE BECAUSE THEY RELEASE THE RESTAURANTS' BID-RIGGING CLAIMS FOR NOTHING ..................................... 15

    A.  The Class's Contention that it Could Sacrifice the Restaurants' Bid-Rigging Claims to Benefit "the Class as a Whole" is an Admission of the Clear Conflict of Interest that Dooms the Settlements ......................................... 16

    B.  The Class Did Not Obtain Any "Value" for the Restaurants' Bid-Rigging Claims ....................................................................................................... 24

        1.  The Class Cannot Meet its Burden to Demonstrate the Fairness of the Koch and House of Raeford Settlements ............................................. 24

        2.  Class Counsel Never Considered the Value of the Restaurants' Bid-Rigging Claims During the Settlement Negotiations ....................... 25

        3.  The New Settlements Leave No Question that the Class Received No Value for Bid-Rigging ......................................................................... 29

        4.  The Value of the Restaurants' Bid-Rigging Claims ................................ 31

III.  THIS COURT CANNOT APPROVE A SETTLEMENT OF A BID-RIGGING CLAIM THAT WAS NOT CERTIFIED .......................................................... 46

    A.  Approval of the Koch and House of Raeford Settlements Violates the Supreme Court's Holding in Amchem and Rule 23 Itself.................................... 46

    B.  The Class's Certification Notice was Deficient.................................................... 52

IV.  THE RELEASES ARE OVERBROAD BECAUSE THEY EXTEND TO FACTUALLY DISTINCT BID-RIGGING CLAIMS ...................................... 54

CONCLUSION.................................................................................................... 60

CERTIFICATE OF SERVICE ................................................................................ 62

## TABLE OF AUTHORITIES

**Page**

CASES

*Alioto v. Town of Lisbon*,
    651 F.3d 715 (7th Cir. 2011) ............................................................................12

*Amchem Prods. Inc. v. Windsor*,
    521 U.S. 591 (1997).............................................................................. passim

*Arandell Corp. v. Xcel Energy, Inc.*,
    Nos. 07-cv-076-wmc, 09-cv-240-wmc, 2022 WL 2314717 (W.D. Wis. Dec. 27, 2022)........59

*Burgess v. Citigroup Inc.*,
    624 F. App'x 6 (2d Cir. 2015) ............................................................................59

*Dodson v. Pan Pac. Retail Props., Inc.*,
    No. S-02-258 WBS/KJM, 2003 WL 25656778 (E.D. Cal. June 13, 2003)............................12

*Donnelly v. Am. Express Bank FSB*,
    No. 18-cv-1024-GPC-WVG, 2018 WL 4759206 (S.D. Cal. Oct. 2, 2018)............................12

*Eddlemon v. Bradley Univ.*,
    65 F.4th 335 (7th Cir. 2023) ......................................................................47, 51

*Elna Sefcovic LLC v. TEP Rocky Mountain, LLC*,
    807 F. App'x 752 (10th Cir. 2020) ................................................................57, 58

*Hesse v. Sprint Corp.*,
    598 F.3d 581 (9th Cir. 2010) ..................................................................22, 49, 50

*In re Dry Max Pampers Litig.*,
    724 F.3d 713 (6th Cir. 2013) ............................................................................25

*In re Gen. Motors Corp. Engine Interchange Litig.*,
    594 F.2d 1106 (7th Cir. 1979) ........................................................................6, 25

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011)....................................................................22, 49, 57

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods.*
*Mktg. Sales Practices & Prods. Liab. Litig.*,
    91 F.4th 174 (4th Cir. 2024) ..........................................................13, 57, 59, 60

*In re W. States Wholesale Nat. Gas Antitrust Litig.*,
    725 F. App'x 560 (9th Cir. 2018) ......................................................................59

*Maclin v. SBC Ameritech*,
   520 F.3d 781 (7th Cir. 2008) ....................................................................................12

*Mirfasihi v. Fleet Mortg. Corp.*,
   450 F.3d 745 (7th Cir. 2006) ....................................................................................21

*Morris v. City of Rockford*,
   No. 3:20-cv-50384, 2021 WL 5113890 (N.D. Ill. Nov. 3, 2021) ...........................12

*Nat'l Super Spuds Inc. v. N.Y. Mercantile Exch.*,
   660 F.2d 9 (2d Cir. 1981) ..........................................................................20, 21, 22, 23

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ..................................................................................................19

*Oswald v. McGarr*,
   620 F.2d 1190 (7th Cir. 1980) ..................................................................................52

*Reynolds v. Beneficial Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002) ..............................................................................15, 19

*Santiago v. City of Chicago*,
   19 F.4th 1010 (7th Cir. 2021) .......................................................................... passim

*Simpson v. Dart*,
   23 F.4th 706 (7th Cir. 2022) ............................................................................47, 51, 52

*Soranno v. New York Life Ins. Co.*,
   No. 96 C 7882, 2001 WL 290303 (N.D. Ill. Mar. 20, 2001) ...................................22

*Synfuel Techs. v. DHL Express, Inc.*,
   463 F.3d 646 (7th Cir. 2006) ....................................................................................16

*Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*,
   453 F.3d 179 (3d Cir. 2006) ......................................................................................47

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ..................................................................................57, 58

*Williams v. Gen. Elec. Cap. Auto Lease, Inc.*,
   159 F.3d 266 (7th Cir. 1998) ....................................................................................56

*Woodson v. Folton*,
   614 F.2d 940 (4th Cir. 1980) ..............................................................................13, 59

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 ....................................................................................................... passim

## PRELIMINARY STATEMENT

The Class's settlements with Koch and House of Raeford cannot be approved.[1]

In its Order denying the Restaurants' Motion for Clarification and rejecting their Objection to the Simmons' Settlement (the "Order", D.E. 7083), the cornerstone of this Court's ruling was its determination that the Class could resurrect the bid-rigging claim it formally abandoned when it made its Track One election.[2]  The Court held that the Class's abandonment of bid-rigging did not amount to a Rule 41 dismissal and therefore that the Class's bid-rigging claim was still alive and could be settled.  The Court ruled that "[b]ecause bid-rigging claims were potentially still available to the Class, the Class could settle those claims."  Order at 2.

The Court also relied on its determination that the Class's bid-rigging claim was still viable as the basis for its reasoning that the Class's ability to assert a bid-rigging claim must have been considered when the Class and Simmons negotiated their settlement.  The Court stated that the "potential reemergence [of the bid-rigging claim] was necessarily a part of the value of the settlement."  *Id*. at 8.

As the Restaurants presented in their appeal of the Order to the Seventh Circuit (the "Appeal"), this Court's determination that the Class could resurrect its bid-rigging claim is not possible and would upend the two-track structure that the Court established on.  *See Boston Market Corp., et al. v. Mountaire Farms, Inc., et al.*, No. 24-01030, 7th Cir., D.E. 41 (Appellants' Initial Brief) at 34-42 and D.E. 75 (Appellants' Omnibus Reply Brief) at 13-19.  There is no way that the

---

[1] This Objection shall serve as notice of the Restaurants' intent to appear and offer argument at the Final Fairness Hearing scheduled for July 9, 2024 at 10:00 a.m. Central Time.

[2] The Restaurants are: Boston Market, Golden Corral, Bojangles, El Pollo Loco, Zaxby's, Domino's, Cracker Barrel, Smokey Bones, Shamrock, Sun Ice Cream Finance (f/k/a Friendly's), Johnny Rockets, Wing Zone, Captain D's, and White Castle.

Class could assert a bid-rigging claim after this Court specifically ordered that all Track One plaintiffs could not pursue discovery, engage in dispositive motion practice, or try a bid-rigging claim.

The notice of the Class settlements that this Court recently approved (the "New Notice")—which covers the Class's settlements with Koch and House of Raeford as well as the Class's settlements with defendants Sanderson, Claxton, Wayne, Perdue, Case, Foster Farms, and Agri Stats (the "New Settlements")—establishes that the Restaurants were correct. D.E. 7174-2 (New Notice); D.E. 7179 (Order Approving New Notice). The New Notice confirms that the Class had forever given up its bid-rigging claim and that bid-rigging therefore was not a Class claim that could have been the subject of the settlements with Koch and House of Raeford.

The New Notice states that "[a]s previously set forth in the class certification notice, DPP Class members are bound by all judgments and orders in the case." New Notice at ¶9. The New Notice then explains that "*[b]ecause the DPP Class claims were disposed of as to Defendants Sanderson Farms, Foster Farms, Perdue, Case Farms, Claxton, Wayne Farms, and Agri Stats by the summary judgment order and the Sanderson Farms verdict, there is no separate release of claims for the settlements with these Defendants*."[3] *Id.*

But the New Notice goes even further. It confirms that the final approval of the New Settlements "*will resolve the litigation in full* between the Plaintiffs and all Defendants." *Id*. at ¶2.

Again, as this Court knows, the only claims that were resolved or even considered by the Court's summary judgment order and the Sanderson verdict were the Class's supply reduction and Georgia Dock claims. Bid-rigging was not the subject of either.

---

[3] Unless otherwise noted, all emphasis is added and all internal citations are omitted.

This begs the question: what happened to the bid-rigging claim?  If the Class's bid-rigging claim could "potentially reemerge" as this Court stated in its Order, then the same must hold true for bid-rigging defendants Sanderson, Claxton, Case, Wayne, and Perdue.  It is the same claim.

So under this Court's reasoning in its Order that the Class could still prosecute its bid-rigging claim, the settlement of that claim against Sanderson, Claxton, Case, Wayne, and Perdue presumably would have required the same broad release that was included in the Simmons, Koch, and House of Raeford Settlements.  Indeed, because the potential resurrected bid-rigging claim would have been the only claim the Class had left against Sanderson, Claxton, Case, Wayne, and Perdue, the formal release of bid-rigging should have been even more paramount.

But as the New Notice makes clear, there was no release of bid-rigging in any of the New Settlements.  In fact, there was no release of any kind.  Again, as the New Notice states, a release was not necessary in the New Settlements because all of the Class's claims were "***disposed of***" and "***resolve[d] . . . in full***" by the summary judgment order and the Sanderson verdict.  *Id.* at ¶¶2, 9.

There is only one way that the statements in the New Notice can be true.  It is also the answer to the question of what happened to the Class's bid-rigging claim.  It was not necessary or appropriate for the Class to include a release of the bid-rigging claim as part of the New Settlements because bid-rigging was not a Class claim.  Bid-rigging already had been forever eliminated as a Class claim when the Class decided not to seek certification of bid-rigging and then formally abandoned bid-rigging when it elected Track One.

The same logic must apply with full force to the Koch and House of Raeford Settlements.  The Class could not have settled and released its—and the Restaurants'—bid-rigging claims against Koch and House of Raeford because the Class did not have a bid-rigging claim to settle.

3

The Class already had given it up.  In fact, as the New Notice makes explicit, the only claim that the Class settled with Koch and House of Raeford was the claim that was going to trial—supply reduction.

The New Notice states that "HRF has agreed to pay $27,500,000 and Koch has agreed to pay $47,500,000 to end the DPP case against them.  HRF and Koch believed they could **win at trial** and that Plaintiffs might recover nothing against them.  DPPs believe they could **win at trial** and possibly obtain a greater recovery.  But **trials** involve risks to both sides, and therefore DPPs and HRF and Koch have agreed to settle the case."  *Id.* at ¶4.

As this Court is aware, at the time the Class negotiated its settlements with Koch and House of Raeford, the only claim left for the Class to try was supply reduction.  Indeed, this Court was crystal clear that the Track One trial would not cover bid-rigging and that it would be the Class's "only trial."  D.E. 5322 (December 20, 2021 Hearing Tr.) at 11.

This ruling showcases why the New Notice's confirmation that bid-rigging was not capable of being settled must be correct.  If, as the Court's Order states, the Class's bid-rigging claim was still viable and could be reasserted, then the same must hold true for all of the other Track One plaintiffs.  And that would mean that every Track One opt out plaintiff now could file a bid-rigging claim against bid-rigging defendants Claxton, Case, Perdue, Wayne, and Sanderson tomorrow.

The proposed settlements with Koch and House of Raeford also cannot be approved because they fail to meet the fairness, reasonableness, and adequacy requirements of Rule 23.  In its briefing before this Court on the Restaurants' Motion for Clarification, the Class acknowledged that it did not receive any monetary consideration from Simmons, Koch, or House of Raeford for the release of the bid-rigging claim.  Indeed, the entire basis of the Class's opposition was that the

claim did not exist because it was "waived." D.E. 6999 (Class Opp. to Motion for Clarification) at 9.

This Court recognized that the Class's "waiver" position was a non-starter. The Court understood that it could not approve a settlement that released a Class bid-rigging claim that no longer existed. Rather, the Court again grounded its Order on the notion that the "potential reemergence" of the bid-rigging claim created settlement "value" for the Class. Order at 8.

On Appeal, the Class rejected this Court's ruling outright and instead doubled down on its position that it did not receive any monetary consideration for the release of bid-rigging. It argued that Class Counsel did not have to concern themselves with whether class members received fair consideration for the release of bid-rigging because "***Appellants [cannot] establish that the bid-rigging claims have value to the DPP Class as a whole***." *Boston Market Corp., et al. v. Mountaire Farms, Inc., et al.*, No. 24-01030, 7th Cir., D.E. 60 (Class Response Brief ("Resp. Br.")) at 33. Class Counsel asserted that bid-rigging was "individual" and "targeted and specific" to the Restaurants. *Id.* at 29, 33.

But the Class's position on Appeal was more extreme. Class Counsel did not dispute that there was an inherent conflict of interest between the Restaurants and the "class as a whole." *Id.* at 46. In fact, Class Counsel readily acknowledged that they used the Restaurants' bid-rigging claim to enhance the Simmons Settlement for the class members without a bid-rigging claim. Instead, their position before the Seventh Circuit was that the conflict was permissible because their only obligation was to the Class at large. *Id.* at 45-46.

Class Counsel stated that they owed no duty to the Restaurants because the Restaurants were "not willing members of the certified Direct Purchaser Plaintiff Class." *Id*. at 1. They

contended that if the Restaurants wanted to receive fair consideration for their bid-rigging claim, they should have opted out. *Id.* at 27-29.

But, as the very case law that the Class cited in its Response Brief makes clear, the fact that the Restaurants did not opt out is exactly what activated Class Counsel's fiduciary duty to protect the Restaurants as class members in the settlements. And, Class Counsel's failure to account for what they admitted was the Restaurants' "individual" bid-rigging claim is precisely what resulted in their irreconcilable conflict of interest.

Class membership is a two way street. While Class Counsel repeatedly swings the sword of the Restaurants' failure to opt out to excuse their disregard for the Restaurants' bid-rigging claim, they conveniently forget about the shield they owe the Restaurants as class members who did not opt out. As members of the Class for the Koch and House of Raeford Settlements, Class Counsel owe the Restaurants the same fiduciary duty to protect their interests as any "willing" member of the Class. In fact, the only significance that the Restaurants' "failure to opt out" has for purposes of this Objection is that it conferred standing on the Restaurants to object to the settlements in the first place.

The Class's alternative assertion that this Court adopted in its Order—that it is not the Class's obligation to demonstrate that the "value" that the Class received for the release of the Restaurants' bid-rigging claim was fair, but rather the Restaurants' burden to show that it was unfair—is also wrong. Order at 9-10. Indeed, it violates explicit Seventh Circuit precedent and Rule 23 itself. *See In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1126 n.30 (7th Cir. 1979).

However, in the interest of satisfying this Court's request, the Restaurants have now provided the information that the Court said was necessary. In support of this Objection the

Restaurants have submitted (1) a subset of the evidence of the bid-rigging conspiracy that the Restaurants have been able to compile even before bid-rigging discovery has begun; and (2) a preliminary analysis by economist Laurel C. Van Allen of the extent of the damages that the Restaurants suffered as a result of the bid-rigging defendants' conspiracy. *See* Declaration of Lori P. Lustrin ("Lustrin Decl."); Declaration of Laurel C. Van Allen ("Van Allen Decl.").

As the evidentiary submission demonstrates, even without the benefit of any bid-rigging discovery, the direct evidence of the bid-rigging defendants' conspiratorial conduct is greater than the evidence of supply reduction that the Class submitted during the entire Sanderson supply reduction trial. And as Ms. Van Allen's analysis highlights, the Restaurants suffered more damages in just one year of the bid-rigging conspiracy than the Class recovered in their Settlements with Koch and House of Raeford for the entire class and for the entire conspiracy period. *See* Van Allen Decl. at ¶¶10, 20, Tables 3 and 5. Yet under the Koch and House of Raeford Settlements, the Restaurants will not receive a dollar more than any other class member.

The Koch and House of Raeford Settlements also cannot be approved because the Class's bid-rigging claim was never certified or even considered for certification. In fact the Class never included or even mentioned bid-rigging in its motion for certification, and thus this Court's Certification Order also did not address bid-rigging.

In its Order, this Court acknowledged these facts, but again accepted the Class's argument. The Court ruled that "'claims' are not certified under Rule 23," and there is "no authority limiting a certified class to the claims that the Court expressly analyzed in its certification opinion." Order at 5-6.

Here as well, the Class was not correct. To the contrary, the Seventh Circuit has repeatedly ruled that certification is claim specific and that a district court must subject each claim that it

seeks to certify to the rigors of a Rule 23 analysis. *See, e.g.*, *Santiago v. City of Chicago*, 19 F.4th 1010, 1018 (7th Cir. 2021) ("Only by properly circumscribing the claims and breaking them down into their constituent elements can a district court decide which issues are common, individual, and predominant.").

The Class's attempt to avoid *Santiago* and its progeny by arguing that certification requirements are completely unrelated to the standards for approval of a class action settlement, with the latter being far broader, also misstates the law. Resp. Br. at 35, 45. None of the cases that the Class relies on even addresses the issue of certification, let alone the intersection between the requirements of certification and settlement under Rule 23. There is a reason.

Beginning with *Amchem,* every case that has considered the applicability of the Rule 23 certification requirements to a class action settlement has uniformly held that Rule 23(a) and (b) establish the limits of a Rule 23(e) settlement. This was codified in the 2018 amendment to Rule 23 itself. In fact, the Advisory Committee Notes to the 2018 Amendment to Rule 23(e) confirm that "in addition to evaluating the [settlement] proposal itself, the ***court must determine whether it can certify the class under the standards of Rule 23(a) and (b)*** for purposes of judgment based on the proposal."

Class Counsel's failure to seek certification of bid-rigging and their abandonment of the claim also demonstrates the deficiency of the class certification notice (the "Certification Notice"). In its Order, this Court stated that the Restaurants "provide no authority" that the Certification Notice required mention of the Class's waiver of its bid-rigging claim. Order at 3.

But, as Class Counsel admitted in its briefing before the Seventh Circuit, "Rule 23 and due process" require that a class notice "apprises class members of the 'nature of the claims at issue.'" Resp. Br. at 49. And as this Court stated in its Order, "Class Counsel's stipulation to Track 1 is

the equivalent of an amendment to the complaint, in that it effectively dropped [the bid-rigging] claim from the case before certification." Order at 3.

Thus when the Certification Notice informed class members (in two separate paragraphs) that by staying in the Class and not opting out class members would give up their rights to sue defendants "for claims set forth in the litigation" and "that pertain[] to the claims in this case," it could not have been referring to bid-rigging. D.E. 6195, Ex. A at ¶¶8, 11. Bid-rigging was not a "claim in" or "set forth in" the Class case at the time the Certification Notice was sent.

This Court's alternative holding that the Restaurants "had sufficient notice of all actions taken by Class Counsel in this case and context in which those actions were taken" does not cure the deficiency of the Certification Notice. Order at 4. The Restaurants were certainly aware of the Class's decision not to seek certification of a bid-rigging claim and its Track One abandonment of the claim. But, it was because of this fact and the Certification Notice's express limitation to the "claims set forth in the litigation" that confirmed the Restaurants' belief that bid-rigging was not part of the Class case. D.E. 6195, Ex. A at ¶11.

The Court's statement—that "[n]otice of the stipulation to Track 1 and notice of the class certification are not relevant" because the Restaurants received "sufficient notice of the settlement agreements"—also highlights the infirmity of the Class's Certification Notice. Order at 4. Neither the notice of the Simmons Settlement nor the New Notice (which covers the Koch and House of Raeford Settlements) afforded class members an independent opportunity to opt out of the settlements. Rather, the only options that the notices provided were to accept the settlements or object to them.

The Koch and House of Raeford Settlements also cannot be approved to the extent they extend to the Restaurants' bid-rigging claim because they would violate the identical factual

predicate doctrine. The Class's continued assertion that bid-rigging and supply reduction arise from the same factual predicate simply because they were alleged in the same case is wrong and would write "factual" out of the factual predicate doctrine.

In its Order, this Court held that "evidentiary differences between two claims does not mean that those claims cannot arise out of the same transactions or occurrences such that it is appropriate for the claims to be brought in the same case." Order at 5. But as the Class's own authority that it cited to the Seventh Circuit makes clear, the standard is not whether the claims are brought in the same pleading, as the Class argued, but rather whether the *facts necessary to prove the claim* are identical.

Here, this Court already determined that bid-rigging was a completely separate conspiracy dependent on different evidentiary proof. This is why this Court denied the Class's attempts to introduce bid-rigging evidence at the supply reduction trial. As this Court stated, bid-rigging has "nothing to do with" supply reduction. D.E. 6819 at 56. "That's why we bifurcated these cases." *Id.*

For all of these reasons, the proposed Koch and House of Raeford Settlements cannot meet the requirements of Rule 23 and should not be approved.

**GROUNDS FOR OBJECTION**

**I.     THE CLASS CANNOT SETTLE A CLAIM THAT DOES NOT EXIST**

The issue that lies at the heart of the Restaurants' objection to the Koch and House of Raeford Settlements is straightforward. A class claim either exists or it does not. The bid-rigging claim cannot exist for purposes of the Class's ability to settle it, yet be "waived" for purposes of the Restaurants' ability to challenge the fairness of the settlement.

The solution this Court fashioned in its Order was that contrary to the Class's "waiver" argument, the Class's bid-rigging claim was still viable. This Court stated that while "Class Counsel's stipulation to Track 1 is the equivalent of an amendment to the complaint, in that it effectively dropped a claim from the case before certification," it could always have been "reasserted" by the Class:

> The stipulation to Track 1 constituted a waiver for the practical purposes of no longer pursing bid-rigging in discovery, on summary judgment, or at trial. But the stipulation was not a dismissal pursuant to Federal Rule of Civil Procedure 41, and it was not a judgment or release. ***The stipulation may have made re-raising bid-rigging claims more difficult in the context of this case. But it did not prevent the Class from pursing bid-rigging claims as a matter of law***.

Order at 2-3.

But, if the Class's stipulation to Track One "constituted a waiver for the practical purposes of no longer pursing bid-rigging in discovery, on summary judgment, or at trial," then *how* could the Class possibly thereafter "pursue" a bid-rigging claim? This is all the more impossible considering that the Court was unequivocal that "Track One will not get another bite at the apple after a Track One trial." D.E. 5322 at 11.

In fact, if bid-rigging remained viable, then this Court's two-track structure had no purpose whatsoever. The determination that the Class could still assert its bid-rigging claim would apply equally to all other Track One plaintiffs that abandoned bid-rigging along with appellate rights as a precondition to selecting Track One. That means that Track One opt out plaintiffs like Kroger, Publix, AWG, and Affiliated Foods could now prosecute bid-rigging claims against bid-rigging defendants Claxton, Case, Wayne, and Perdue, as well as Sanderson—the defendant in the Track One opt out trial.

This would eliminate any distinction between Track One and Track Two and undercut the very foundation of this Court's two-track structure. It also would amount to a basic denial of due

process for those plaintiffs that elected Track Two. If bid-rigging remained a viable claim on Track One that could be "reasserted," then there was no reason whatsoever for any plaintiff to have elected Track Two and accept a two and a half year stay.

This Court's determination that the Track One election did not constitute a Rule 41 dismissal "as a matter of law" was also incorrect. Order at 2. If a plaintiff forever abandons the right to take discovery, engage in dispositive motion practice, and go to trial on a claim, then there is no claim left for that plaintiff to pursue.

The law is in accord. As the Restaurants explicated in their Appeal, when a party demonstrates an intent to abandon a claim it is tantamount to a dismissal. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[A] litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss."); *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (plaintiff could not pursue appeal of abandoned claim after failing to address defendant's argument at summary judgment); *Morris v. City of Rockford*, No. 3:20-cv-50384, 2021 WL 5113890, at *2 (N.D. Ill. Nov. 3, 2021) (dismissing claim where plaintiff continued to litigate but failed to respond to motion to dismiss because plaintiff's actions "evidence[d] a conscious decision to abandon the claim."); *Donnelly v. Am. Express Bank FSB*, No. 18-cv-1024-GPC-WVG, 2018 WL 4759206, at *4 (S.D. Cal. Oct. 2, 2018) ("[R]equisite abandonment can be found in any affirmative expression to the court of an intent to abandon the claim."); *Dodson v. Pan Pac. Retail Props., Inc.*, No. S–02–258 WBS/KJM, 2003 WL 25656778, at *1 n.2 (E.D. Cal. June 13, 2003) (noting that "pre-trial statement [that] clearly state[d] that plaintiff abandoned his claim for injunctive relief" operated as an abandonment as a "practical matter.").

Notably, in its Response Brief, the Class did not address any of the cases cited by the Restaurants confirming that an abandoned claim is no different than a dismissed claim. And the Class did not cite a single case to the contrary.

Instead, the thrust of the Class's argument was that it could still settle and release the bid-rigging claim even if it was "dismissed or unavailable." Resp. Br. at 41. But here as well, the Class cited no authority to support this contention. This is not surprising because the suggestion that the Class could settle a claim it could never prosecute is indefensible and exactly what this Court bent over backwards to avoid with its ruling that the Class's bid-rigging claim was still viable.

The Fourth Circuit's decision in *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg. Sales Practices & Prods. Liab. Litig.*, 91 F.4th 174 (4th Cir. 2024) is on all fours. The plaintiff there had brought a wrongful death action against the defendant. *Id.* at 176. After removal to the district court handling a class action involving the same defendant, the district court dismissed the plaintiff's case as precluded by a settlement reached in the class action. *Id.* at 179-80.

Reversing the district court's order, the Fourth Circuit held that the class could not settle a claim it had told the court it was not pursuing. *Id.* at 185. "Important here, the settlement class representatives at least twice made clear that they were not pursing personal injury claims on a class-wide basis." *Id.*; *see also Woodson v. Folton*, 614 F.2d 940, 942 (4th Cir. 1980) (plaintiff's claims could not be settled by release when the district court "explicitly ruled that the class action would not address issues arising from allegedly discriminatory discharges.").

*Lumber Liquidators* is especially instructive because the class in that case never alleged a wrongful death claim. Here, the Class amended its complaint specifically to allege a bid-rigging claim and then ***affirmatively disavowed and abandoned it***. D.E. 3919; D.E. 5151; D.E. 5307.

13

One week after the Class amended its complaint to co-opt the Restaurants' bid-rigging allegations, it filed its motion for class certification that jettisoned bid-rigging entirely. D.E. 3990. And then, after the Class submitted its initial stipulation electing to proceed on Track One, it reaffirmed its election to give up its bid-rigging claim and all appellate rights in a second stipulation. D.E. 5151; D.E. 5307.

Significantly, the Class's second stipulation was the result of the December 20, 2021 hearing at which this Court disabused the Class and other plaintiffs of any notion that their Track One election was just a "case management decision." Resp. Br. at 40. The Court was explicit that any party that selected Track One would forever forfeit the right to pursue a bid-rigging claim. "No bid rigging claims are going to be tried in Track One either as stand-alone claims or with bid rigging as an element or component of a broader conspiracy claim premised on market manipulation claims. . . . if you're in Track One, that will be your only trial." D.E. 5322 at 11. Thus, from the moment the Class elected Track One (and certainly at the time of the Koch and House of Raeford Settlements) there was one claim that all parties knew unequivocally "was not" and "could not" ever be asserted as a Class claim—bid-rigging.

But again, if there were any question regarding whether the bid-rigging claim survived the decision of the Class not to seek to certify it and then to abandon it, the New Notice has now put the issue to bed. According to this Court's Order, because bid-rigging had never been formally "dismissed" via Rule 41, it still presented an unresolved litigation risk that required a release in the Simmons, Koch, and House of Raeford Settlements. Order at 2. But that same purported litigation risk presumably would have been present for the New Settlement defendants—even more so because bid-rigging, again, would have been the only claim that had not been extinguished by the summary judgment order and the Sanderson verdict.

However, as the New Notice makes clear, the summary judgment order and Sanderson verdict "disposed of" all of the Class's claims against the New Settlement defendants—even without any release—and thus the settlements "will resolve the litigation in full."  New Notice at ¶¶2, 9.

There is only one way that the New Notice's unequivocal statements to the class members can be correct.  As the Class has now acknowledged, it was not necessary or appropriate to include a release that extended to bid-rigging because the Class did not have a bid-rigging claim to settle and release.

The same must hold true for the Koch and House of Raeford Settlements.

In short, the Court was correct that the bid-rigging claim had to be viable in order for it to be the subject of a class settlement.

But the law and the Court's ground rules on the two-track structure dictate that the Class's bid-rigging claim was not viable.  For this reason, the Koch and House of Raeford Settlements cannot be approved if they extend to release the Restaurants' bid-rigging claims.

## II.  THE KOCH AND HOUSE OF RAEFORD SETTLEMENTS ARE NOT FAIR, REASONABLE, OR ADEQUATE BECAUSE THEY RELEASE THE RESTAURANTS' BID-RIGGING CLAIMS FOR NOTHING

Rule 23 and well-established Seventh Circuit precedent make clear that approval of a class action settlement may only be granted if a settlement is fair, reasonable, and adequate.  *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002).  This in turn means that the class representatives, class counsel, and even the district court owe all class members the fiduciary duty to ensure that a class settlement treats all class members fairly and equitably.  As Judge Posner stated in *Reynolds*, district judges are required to "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions.  We and other courts have gone so far as to term

the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Id.* at 279-80.

In their arguments before this Court and the Seventh Circuit, Class Counsel contended that the normal fiduciary duty that they otherwise owed to class members did not extend to the Restaurants because the Restaurants had the opportunity to opt of the Class but did not, and thus were "not willing" members of the Class. This Court agreed. Order at 9 ("The Court cannot ignore the fact that the only objectors here are those who failed to opt out on time.").

Class Counsel was wrong. There is nothing in the Federal Rules or case law that draws a distinction between willing and unwilling class members. Indeed, such a distinction would turn the entirety of class action jurisprudence on its head. The fact that the Restaurants did not opt out has no bearing whatsoever on Class Counsel's fiduciary obligations to ensure that the Class settlements treat the Restaurants fairly. And, because Class Counsel now admits that the Koch and House of Raeford Settlements do not account for the Restaurants' bid-rigging claims—but instead treat the Restaurants no differently than any other class member—the settlements cannot be approved.

A. **The Class's Contention that it Could Sacrifice the Restaurants' Bid-Rigging Claims to Benefit "the Class as a Whole" is an Admission of the Clear Conflict of Interest that Dooms the Settlements**

The Seventh Circuit has held that the "most important factor relevant to the fairness of a class action settlement" requires the Court to measure the strength of the merits of the claims released against the value of the settlement received. *Synfuel Techs. v. DHL Express, Inc.*, 463 F.3d 646, 653 (7th Cir. 2006).

The "value received" calculation here is straightforward. The Class did not consider the merits or potential value of the Restaurants' bid-rigging claims in connection with its negotiation

of the Koch and House of Raeford Settlements—either substantively or quantitatively—and released those claims for nothing.

There can be no dispute on this point. As far back as its briefing on the Motion for Clarification, the Class admitted that it received no consideration for bid-rigging. D.E. 6999 at 9 ("[T]hat does not obligate Class Plaintiffs in a settlement to obtain separate consideration for claims and issues that are not directly at issue a part of [sic] the Track 1 case. . . . By remaining part of the Class and Track 1, all Class members, including Restaurants, waived their right to recover for any Track 2 claims.").

Mindful that the Class's waiver argument made no sense and could not be reconciled with the "value received" analysis required by Rule 23 and the Seventh Circuit, this Court's Order walked back the Class's admission on lack of consideration for bid-rigging. The Court stated that the "Class's concession that the bid-rigging claims were not a 'focus' of settlement negotiations does not mean the value of those claims was not considered, and certainly not that they were released for 'nothing.'" Order at 7-8.

Instead, this Court again relied on its determination that the Class's bid-rigging claim was viable and could still be asserted notwithstanding the Class's repeated abandonment of the claim. The Court concluded that "[a]ll parties in this case were well aware of the bid-rigging claims and their potential merits and value," and held that the "potential reemergence" of the bid-rigging claims was "necessarily a part of the value of the settlement." *Id.*

Here as well, however, the Class ran from this Court's effort to defend the settlements. In its briefing before the Seventh Circuit, the Class disregarded the Court's potential reemergence holding and confirmed once more that the Simmons Settlement did not provide the Restaurants with any monetary consideration for the release of their bid-rigging claim. Rather, the Class

17

maintained that no "separate" consideration for the bid-rigging claim was required or appropriate and that the "value" of the bid-rigging claim was irrelevant. Resp. Br. at 27-29, 33, 46.

Indeed, the entire foundation of the Class's Response Brief was an impossible syllogism—that Class Counsel did not have to consider whether class members received fair consideration for the release of bid-rigging because (i) Class Counsel had no obligation to the Restaurants but only to the Class "as a whole;" and (ii) bid-rigging had no value to the Class "as a whole" but instead was "individual" and "targeted and specific" to the Restaurants. *Id.* at 33.

The Class then doubled down on its mantra that if the Restaurants wanted to be compensated for their bid-rigging claim, they should have opted out. *Id.* at 27-29.

The Class's "opt out" argument is wrong. It would apply to every objector in every class action who contends that a settlement did not fairly compensate the objector for its claims. In fact, under the Class's logic, the fairness requirement of Rule 23 would be meaningless. There could never be an objection to a settlement because the greater the inequity and unfairness of a settlement to a class constituency, the greater the onus would be on the objectors to preserve their claim by opting out. Tellingly, the Class could not point to any authority to support its novel contention that the Restaurants forfeited their entitlement to the protections of Rule 23 as a penalty for not opting out.

Consistent with its "opt out" contention, the Class in its Response Brief did not dispute the conflict between the "class as a whole" and the Restaurants. Instead, based on their assertion that their duty was solely to the "class as a whole" and that bid-rigging was individual to the Restaurants and had no value to other class members, Class Counsel argued that the conflict is perfectly permissible. Resp. Br. 46. Class Counsel also was unapologetic about sacrificing what they said was the Restaurants' "individual" bid-rigging claims to enable them to achieve the

settlements for the class at large who did not have a bid-rigging claim. Resp. Br. at 46. In fact, they actually trumpeted it as a victory.

Class Counsel's assertion that the Restaurants "will be entitled to receive their pro rata portion of the settlement proceeds based on the value of their eligible purchases"—only underscores their failure to comply with their fiduciary duty to the Restaurants. *Id.* at 47. It was this logic that informed the Court's determination that "[i]f the DAPs believe—as they assert in their brief—that their bid rigging claims are more valuable than the other class members' supply reduction claims, the DAPs should demonstrate how that is so." Order at 9.

Whether the Restaurants' bid-rigging claim is more or less valuable than the supply reduction claims is not the issue. The conflict lies in Class Counsel's admission that they did not consider the value of the Restaurants' bid-rigging claim ***at all,*** and instead treated the Restaurants no differently in the Koch and House of Raeford Settlements than other class members without viable bid-rigging claims. Class Counsel's contention that they did not have to consider the value of the Restaurants' bid-rigging claims, let alone the impact of those claims on the Restaurants, demonstrates their failure to adhere to the adequacy of representation requirements that Rule 23 imposes on class representatives and class counsel.

As the Supreme Court held in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999), where all claimants are treated equally despite some having different claim values, Class Counsel's "very decision to treat them all the same is itself an allocation decision with results almost certainly different from the results that [the disparate claimants] would have chosen." *See also Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 626-28 (1997) (affirming rejection of settlement where "interests of those within the single class are not aligned" and finding court's assessment that named plaintiffs did not operate "under a proper understanding of their representational

19

responsibilities" was "on the mark."); *Reynolds*, 288 F.3d at 282, 284 (observing an "unremarked conflict of interest within the class" between two sets of class members, one of which with "potentially substantial claims" that "will receive no compensation for the additional damages that they incurred.").

In its argument before the Seventh Circuit, the Class relied on Judge Friendly's seminal opinion in *Nat'l Super Spuds Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9 (2d Cir. 1981) as support for its assertion that it is not unfair to limit the Restaurants' recovery to a pro rata share of the Simmons Settlement proceeds because the Restaurants did not opt out. Resp. Br. at 28. *Super Spuds* says nothing of the sort. As the Restaurants pointed out in their briefing before the Seventh Circuit, this misrepresentation of the case law has become a pattern.

The class in *Super Spuds* were holders of liquidated futures contracts on the potato market. *Id*. at 11. After the class and the defendants settled, a single class member objected. *Id*. at 14. The sole objector had filed his own action that alleged the same claim as the class based on his liquidated contracts, but also alleged a claim predicated on his unliquidated contracts. *Id*. at 13, 15.

The objector opted out, and then opted back into the class. *Id*. at 13. The class and the defendants argued that the release in the settlement foreclosed both the liquidated claims of the class and the unliquidated claims unique to the objector. *Id*. at 14. The district court agreed and approved the settlement. *Id*. at 15.

The Second Circuit reversed and found that the settlement could not be approved where the release encompassed the objector's unliquidated claims. *Id*. at 21. The Second Circuit first rejected the district court's attempt to assign any significance to the fact that the objector was the sole challenger to the settlement. *Id*. at 16.

This, of course, is the same incorrect argument that the Class presented to this Court and then continued to assert to the Seventh Circuit. D.E. 6999 at 7; Resp. Br. at 34 (arguing that the fact that the Restaurants are the only objectors "is a telling sign that the Simmons settlement had significant value to the DPP Class, and the Class members were satisfied with it.").

As the Second Circuit stated, a silent majority is not only inconsequential to the fairness analysis, but also to be expected when a clear conflict is afoot. "Lack of objection by the great majority of claimants *means little when the point of objection is limited to a few whose interests are being sacrificed for the benefit of the majority*." *Super Spuds*, 660 F.2d 9 at 16.

The Second Circuit explained further that the "benefit of the whole" concept has no application where the settlement sacrifices the claim of one class constituency:

> [T]he judge's third reason for approving the settlement, *namely that it is fair and reasonable to the class as a whole, will not pass muster. An advantage to the class, no matter how great, simply cannot be brought by the uncompensated sacrifice of claims of members, whether few or many, which were not within the description of claims assertable by the class.* Under the settlement a class member holding one liquidated and one unliquidated contract receives no more than another class member holding only one liquidated contract. *Mere statement suffices to show how far this departs from principles of equity.*

*Id.* at 19.

The Seventh Circuit reached the same conclusion in *Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745 (7th Cir. 2006). In that case, the Seventh Circuit reversed the district court's approval of a class settlement because the settlement did not provide the members of the class with information sharing claims any consideration for the release of their claims. *Id.* at 751. The Seventh Circuit held that the settlement "sold [these claimants] down the river." *Id.* at 749; *see also Super Spuds,* 660 F.2d at 17 n.6. ("Th[e] justification for permitting the representatives to sue on behalf of the class has no application to claims of class members in which the representatives

have no interest and which, as shown here, they are willing to throw to the winds in order to settle their own claims.").

Here, the sacrifice of the Restaurants' bid-rigging claim to benefit the class as a whole was even more deliberate. Class Counsel jettisoned bid-rigging when they filed their motion for certification—merely days after alleging it—precisely because they knew that they could never certify bid-rigging as an assertable Class claim. But, then they included the Restaurants' bid-rigging claims within the scope of the Koch and House of Raeford Settlement releases because, as Class Counsel now argues, it allowed them to settle the other class members' supply reduction claims.

Not only does Class Counsel's false "duty to the class as a whole" contention highlight the unfairness that informed the *Super Spuds* court's analysis, but it also is a textbook conflict of interest that renders the Class Representatives and Class Counsel inadequate.

As the Supreme Court stated in *Amchem*, "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." 521 U.S. at 625-26; *see also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 251-54 (2d Cir. 2011) (vacating district court's approval of settlement for failure to satisfy Rule 23(a)(4) where there was "'disparate interests' within the class" resulting in a "risk of fundamental conflict among subgroups" which could cause the "selling out of one category of claim for another."); *Hesse v. Sprint Corp.*, 598 F.3d 581, 589 (9th Cir. 2010) ("Conflicts of interest may arise when one group within a larger class possesses a claim that is neither typical of the rest of the class nor shared by the class representative."); *Soranno v. New York Life Ins. Co.*, No. 96 C 7882, 2001 WL 290303, at *4 (N.D. Ill. Mar. 20, 2001)

("[N]amed plaintiffs . . .'cannot represent a class of whom they are not a part,' and can only represent a class of whom they are a part 'to the extent of the interests they possess in common with members of the class.' This means that named plaintiffs have no authority to release claims beyond those that are common to the class.") (quoting *Nat'l Super Spuds*, 660 F.2d at 9, 17-19)).

The critical importance that Class Counsel adequately represent all class members and take into account the differences between what Class Counsel said were the Restaurants' "individual" claims and the claims of the class at large is reflected in the 2018 amendment to Rule 23(e). Rule 23(e)(2) now expressly requires:

> *Approval of the Proposal.*  If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> (A) ***the class representatives and class counsel have adequately represented the class***;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) ***the proposal treats class members equitably relative to each other***.

As the Advisory Committee Notes to the 2018 Amendment to Rule 23(e) make clear, "Paragraph (D) calls attention to a concern that may apply to some class action settlements—inequitable treatment of some class members vis-a-vis others.  Matters of concern could include

whether the apportionment of relief among class members **takes appropriate account of differences among their claims**, and whether the scope of the **release may affect class members in different ways** that bear on the apportionment of relief."

Notably, the Class completely ignored amended Rule 23 in its briefing before this Court and the Seventh Circuit. This was intentional. Class Counsel knows that their concession, and indeed pronouncement, that they sacrificed the Restaurants' bid-rigging claims to benefit the other class members who did not have a bid-rigging claim by itself violates the now express requirements of Rule 23(e). For this reason alone, the Class's motion to approve its settlements with Koch and House of Raeford must be denied.

### B. The Class Did Not Obtain Any "Value" for the Restaurants' Bid-Rigging Claims

#### 1. The Class Cannot Meet its Burden to Demonstrate the Fairness of the Koch and House of Raeford Settlements

In its briefing before the Seventh Circuit, the Class acknowledged that when a district court decides whether to approve a settlement under Rule 23(e), it must weigh the strength of the plaintiffs' case against the settlement value received. Resp. Br. at 22.

Yet, just like its motions to approve the Simmons Settlement, the Class's Motion for Preliminary Approve of the Koch and House of Raeford Settlements ("Preliminary Approval Motion") does not even attempt to consider the merits of the Restaurants' bid-rigging claims, let alone justify the consideration the Class obtained from Koch and House of Raeford for the release of those claims. Indeed, again just like the Simmons motions, the Class's Preliminary Approval Motion does not mention bid-rigging once, and focuses exclusively on the value of the Class's market manipulation claims. D.E. 7172.

In their argument before this Court with regard to the Simmons Settlement, Class Counsel asserted that they had no obligation to discuss the merits of the bid-rigging claim or justify that the

settlement of the bid-rigging claim was fair. This Court agreed and excused the Class from addressing the bid-rigging claim in any respect. Instead, the Court shifted the burden to the Restaurants to demonstrate how the Simmons Settlement's treatment of the Restaurants' bid-rigging claims was unfair. Order at 9.

The Court's acceptance of Class Counsel's conversion of the Rule 23(e) standard into a presumption of fairness in favor of the Class that the Restaurants were required to refute is improper and contrary to the law. *In re Gen. Motors Corp.*, 594 F.2d at 1126 n.30 (burden of persuasion improperly shifted to objectors where trial court "accepted the proposed settlement as Prima facie fair and shifted to the objectors . . . the burden of producing evidence disproving the fairness of the settlement."); *In re Dry Max Pampers Litig.*, 724 F.3d 713, 719 (6th Cir. 2013) ("[T]o the extent the parties here argue that the settlement was fair . . . it was the parties' burden to prove the fact, rather than [the objectors'] burden to disprove it.").

There is a reason that Class Counsel was so intent upon convincing this Court to shift the burden to the Restaurants to demonstrate that the settlements were unfair. Class Counsel knows that the Restaurants did not receive any consideration for the release of their bid-rigging claims, nor did Class Counsel care.

        2.    <u>Class Counsel Never Considered the Value of the Restaurants' Bid-Rigging Claims During the Settlement Negotiations</u>

The Court will recall that in their oppositions to the Restaurants' Motion to Confirm Opt Out Status, the Class, along with Simmons, Koch, and House of Raeford, represented to this Court that the Restaurants' purchases were critical to the settlements with these defendants. D.E. 6863; D.E. 6864. Indeed, the defendants maintained that "***Moving Plaintiffs' sales were included in [Dr. Carter's] analysis when the recent settlements in principle were reached with the DPP***

*class*," (D.E. 6863 at 4), and that the Restaurants' "unjustified delay ***inflated the DPP damage calculation***" which was "***relied on in recent settlements with that class***."  D.E. 6863 at 6.

The Court also will recall that Class Counsel told this Court that the Restaurants' failure to opt out was going to disrupt their fundamental trial preparation.  In fact, Class Counsel went so far as to represent that their expert, Dr. Carter, would have to "revise" his damages analysis on the eve of trial to remove the Restaurants' purchases should the Court grant the Restaurants' Motion to Confirm.

This Court accepted Class Counsel's statements that the Restaurants' purchases were included in Dr. Carter's prior analysis and would have to be removed for Dr. Carter's trial presentation.  In fact, based on Class Counsel's representations, the Court ordered Restaurants' Counsel to pay the costs associated with what Class Counsel stated were the "necessary revisions" to Dr. Carter's report to "remove" the Restaurants' purchases from the damages analysis he was to present at trial.  D.E. 6872.

Class Counsel's statements to this Court were not true.  Class Counsel never considered the value of the Restaurants' bid-rigging claims during their settlement negotiations.  Indeed, Class Counsel never considered any of the Restaurants' purchases for any purpose at any time.



But, there is more direct and immediate proof that Class Counsel's statements to this Court that they relied on the Restaurants' purchases when they negotiated the Class's Settlements with Koch and House of Raeford were false. In fact, Class Counsel's most recent communications with Restaurants' Counsel confirm that the Restaurants' purchases—let alone their bid-rigging purchases—were never considered for any purpose in connection with the Koch and House of Raeford Settlements.

On February 1, 2024, relying on this Court's Order on the Motion to Confirm, Class Counsel demanded payment from Restaurants' Counsel for what Class Counsel said was the "work performed by [Dr. Carter] on the Second Supplemental Merits Report" to exclude the Restaurants' purchases (D.E. 6872). *See* Lustrin Decl., Ex. 3 (2/1/24 email from B. Pouya to L. Lustrin). Pursuant to this Court's Order on the Motion to Confirm, Restaurants' Counsel paid Class Counsel.

However, Restaurants' Counsel made what they viewed was a standard request to confirm that the work done by Dr. Carter was consistent with Class Counsel's representations to this Court. Specifically, Restaurants' Counsel requested Dr. Carter's Second Supplemental Merits Report and the backup materials to show that he removed the Restaurants' purchases to calculate his revised damages figures as Class Counsel represented to this Court would be necessary. *See id.* (2/6/24 email from L. Lustrin to B. Pouya).

Class Counsel sent the Restaurants Dr. Carter's Second Supplemental Merits Report, but adamantly refused to provide any backup. *See id.* (2/8/24 email from B. Pouya to L. Lustrin). The report itself demonstrates why. In fact, it further shows that contrary to Class Counsel's representations to this Court, the Restaurants' purchases were never considered by Dr. Carter and were therefore not a subject of the revisions contained in the Second Supplemental Merits Report.





Class Counsel refused to do either.  Instead, Class Counsel ignored the obvious discrepancy in the purchase numbers, and stated that this Court's order "does not require that we produce backup material for the report, and we do not intend to do so."  *See* Lustrin Decl., Ex. 3 (2/8/24 email from B. Pouya to L. Lustrin.

Class Counsel's refusal to defend their representations to this Court was predictable.  They know that the numbers do not lie.  Contrary to what they represented to this Court, the value of the Restaurants' bid-rigging claims was never considered by the Class in connection with its settlements with Koch and House of Raeford or Simmons.

And this would directly contradict the narrative that Class Counsel advanced before this Court and again to the Seventh Circuit that "the Appellants' commerce makes up an extremely small portion of the DPP Class."  Resp. Br. at 26 n.7.

### 3. The New Settlements Leave No Question that the Class Received No Value for Bid-Rigging

The New Settlements that this Court preliminarily approved also are directly at odds with the premise of the Court's Order that the "Class's concession that the bid-rigging claims were not

a 'focus' of settlement negotiations does not mean the value of those claims was not considered, and certainly not that they were released for 'nothing.'" Order at 7-8.

In its Order this Court observed that the "potential reemergence" of [the Class's bid-rigging claim] was necessarily a part of the value of settlement[.]" *Id*. at 8. But, if that were the case for the Simmons, Koch, and House of Raeford Settlements, then it must have applied equally to the New Settlements. Again, it is the same claim.

In fact, under the Court's reasoning, the value of the Class's bid-rigging claim should have been even more paramount for the Class against bid-rigging defendants Sanderson, Claxton, Case, Wayne, and Perdue. Because of this Court's summary judgment order and the Sanderson verdict, bid-rigging would have been the only claim that the Class had left against those defendants.

Yet, under the New Settlements, the Class will receive effectively nothing from Sanderson, Claxton, Case, Wayne, and Perdue for the bid-rigging claim. Other than the New Settlement defendants' waiver of their right to seek potential litigation costs—which Class Counsel estimated was approximately one million dollars—the New Settlements are complete walk-away deals.

Once more, this is not surprising. As discussed above, the Court's approved Notice of the New Settlements made clear that there was no bid-rigging claim to settle—that the Court's summary judgment order and the Sanderson verdict "disposed of" all of the Class's claims against the New Settlement defendants. New Notice at ¶9.

But, to make sure that there was no misunderstanding that the Class would never receive anything from the New Settlement defendants for bid-rigging—either now or in the future—the New Notice went even further. It confirmed that "[i]f the Court gives final approval to these New Settlements, it will resolve the litigation *in full* between the Plaintiffs and all Defendants. . . . the New Settling Defendants have agreed to settle this action to avoid the further expense,

inconvenience, disruption, and burden of this litigation ***and any other present or future litigation arising out of the facts that gave rise to this litigation***, to avoid the risks inherent in uncertain complex litigation, trial, and appeal, and ***to thereby put to rest this controversy***." *Id.* at ¶2.

The bottom line is that if bid-rigging was in any way part of the value that the Class received in the Koch and House of Raeford Settlements, then that value also should have been reflected in the New Settlements. The fact that it was not confirms just what Class Counsel admitted to the Seventh Circuit—that bid-rigging had no value to the Class as a whole. It also proves again that the Koch and House of Raeford Settlements released the Restaurants' bid-rigging claims for nothing.

### 4. The Value of the Restaurants' Bid-Rigging Claims

As discussed above, this Court excused the Class from its obligation to demonstrate the fairness of the settlements' treatment of the Restaurants' bid-rigging claims. Instead, the Court ruled that it was the Restaurants' burden to show that the settlements were unfair and that the Restaurants failed to meet this burden because they did not support the value of their bid-rigging claim "with evidence or more sophisticated argument." Order at 9-10.

Requiring the Restaurants—who are in the midst of a years-long discovery stay on their bid-rigging claims—to assign a dollar value to their bid-rigging claims against Koch and House of Raeford holds the Restaurants to a standard that no court has ever required of any objector.

Nevertheless, in an effort to address the Court's concerns, and highlight the extent to which Class Counsel sacrificed the Restaurants' bid-rigging claims to benefit the other class members, the Restaurants are submitting in conjunction with this Objection exactly what this Court said was lacking in their Objection to the Simmons Settlement: (i) an illustrative subset of the evidence of Koch and House of Raeford and the other bid-rigging defendants' conspiratorial conduct, and (ii)

a preliminary analysis of the damages that the Restaurants suffered as a result of the bid-rigging conspiracy.

To be sure, this presentation is only the tip of the iceberg. It is submitted without the benefit of any of the bid-rigging discovery which the Court agreed with defendants was not relevant or admissible with respect to the Class's Track One market manipulation claims. D.E. 6819 at 55-56.

Yet, even without this discovery, the direct evidence of the bid-rigging defendants' bid-rigging and price-fixing conspiratorial conduct is greater than the evidence that the Class submitted during the entire Sanderson supply reduction trial. And, the single damages that the Restaurants suffered for just one year as a result of the bid-rigging conspiracy exceeds what Class Counsel declared were "substantial" settlements with Koch and House of Raeford for the entire Class during the entire supply reduction period.

First, the evidence.

On June 2, 2020, the Department of Justice issued an Indictment against officers of certain bid-rigging defendants in the District of Colorado implicating bid-rigging defendants Pilgrim's, Claxton, Tyson, Case, Koch, George's, and Mar-Jac. The June 2020 Indictment charged officers of Pilgrim's and Claxton with conspiring "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States" in violation of Section 1 of the Sherman Act. Lustrin Decl., Ex. 5 at ¶1.

Following the June 2, 2020 Indictment, Tyson issued a public statement. Tyson stated that it "uncovered information in connection with that investigation, which we immediately self-reported to the DOJ. Tyson took appropriate actions to address the internal issues and has been fully cooperating with the DOJ as part of its application for leniency under the DOJ's Corporate Leniency Program." Lustrin Decl., Ex. 6.

On October 6, 2020, the Department of Justice filed a Superseding Indictment in the District of Colorado, again founded on bid-rigging defendants' bid-rigging and price-fixing conduct. Lustrin Decl., Ex. 7. The Superseding Indictment charged six additional executives— including Bill Kantola, the Senior Vice President of Koch. *Id.* The Superseding Indictment expanded the criminal conspiracy period from at least as early as 2012 through at least early 2019, and expanded the bid-rigging and price-fixing conduct to implicate three additional suppliers— Perdue, Marshall Durbin, and Sanderson—for a total of 10 implicated suppliers. *Id.*

In February 2021, Pilgrim's Pride entered into a Plea Agreement with the Department of Justice and pled guilty to "participating in a conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." Lustrin Decl., Ex. 8, Plea Agreement at 3. Pursuant to its Plea Agreement, Pilgrim's admitted that "[f]rom at least as early as 2012 and continuing through at least early 2017" Pilgrim's participated in a conspiracy "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for certain broiler chicken products sold in the United States." *Id.* at 4. Pilgrim's was assessed a criminal fine of $107.9 million. *U.S. v. Pilgrim's Pride Corp.,* Crim. Action No. 1:20-cr-00330-RM (D. Colo. Oct. 14, 2020), D.E. 60 (Judgment).

During the subsequent criminal trial of Kantola and nine of his co-conspirators, former Pilgrim's employee Robbie Bryant admitted that the conspiracy occurred, and testified extensively regarding the defendants' bid-rigging conduct—including the conspiracy's purpose, how it was accomplished, and its effect on the Restaurants and other targeted victims. *See* Lustrin Decl., Ex. 9.

Mr. Bryant testified that the bid-rigging defendants used pricing to KFC as the platform for effectuating their bid-rigging and price-fixing conduct on other large QSR victims like the Restaurants:

> Q: So was there any sort of strategy in terms of which QSRs, which fast-food restaurants to increase with price first?
> A. Yes.
> Q. And what was that strategy?
> A. We wanted to get KFC done first.
> Q. Why?
> A. **They were the largest customer, anchor customer, and we had a belief that we got the price increases done at KFC, that it would make the rest of the negotiations easier.**
> Q. How so?
> A. **We got the anchor customer done and that there would be momentum out there and that word would spread about the price increase and that it would make the future negotiations easier.**
> Q. Okay. And did that strategy of going after KFC first, was it effective?
> A. **It was.**
> Q. Could you explain that?
> A. **We were able to get KFC done first. And after that intensity level went down and the rest of the negotiations went rather smoothly after that.**

*Id.* (November 2, 2021 Criminal Trial Tr.) at 193-94.

Bryant then expressly confirmed that the QSRs he was referring to included the Restaurants:

> Q: And I think that you also testified that – did the plan to raise prices apply just to KFC?
> A: No.
> Q: What else did it apply to?
> A: The rest of the QSR business and other customers that we serviced out of the small bird.
> ***
> Q: But I mean when I said such as, I meant QSRs such as what?
> A: **KFC, Popeye's, Church's and Bojangles. The goal was to get price increases from all of them.** "
> **Q: Boston Market?**
> **A: Yes.**

*Id.* at 192-93.

Bryant further testified that he witnessed his boss, Jason McGuire (Executive Vice President of Sales of Pilgrim's), ask Roger Austin (Vice President of Pilgrim's) to share information with competitors in order "to build support with competitors to raise prices in the 2014 bid season" and that he witnessed telephone calls between Austin and Scott Brady (Vice President of Claxton) and Kantola (Koch).  *Id.* (November 1, 2021 Criminal Trial Tr.) at 35, 69-70, 77.

Using this strategy, Bryant testified that Pilgrim's was able to refuse to negotiate with KFC on pricing with the confidence that other bid-rigging defendants "were raising prices similar to what [Pilgrim's was] raising prices and they were not going to concede price either.  So there wasn't a need to negotiate."  *Id.* (November 2, 2021 Criminal Trial Tr.) at 215.  Mr. Bryant confirmed that the "ultimate goal" was to raise prices in 2014 to the benefit of "the industry or the competitors…together."  *Id.* (November 1, 2021 Criminal Trial Tr.) at 163.

The documentary evidence produced during the criminal trial corroborates Mr. Bryant's account, and provides intricate details of the bid-rigging conspiracy—including the repeated exchanges of confidential information among the bid-rigging defendants with the goal of increasing prices to contract-based quick service restaurant customers like the Restaurants.  *See* Lustrin Decl., Ex. 10 and 11.

















Again, the evidence of the bid-rigging defendants' conspiratorial conduct synopsized above and presented in further detail in the Restaurants' Second Amended Consolidated Complaint was compiled without the benefit of any discovery.

Yet, based just on this information, Chief Judge Philip A. Brimmer of the United States District Court for the District of Colorado found "*by a preponderance of the evidence*" that "[t]he government has shown that a conspiracy to rig bids and fix prices for broiler chicken products in the United States did exist and that such conspiracy operated between at least August 2011 and early 2019." Lustrin Decl., Ex. 45 at ¶1. Judge Brimmer also found, again, "*by a preponderance of the evidence*" that "the conspiracy included," among others, Joe Grendys, William Kantola, and Bruce MacKenzie of Koch. *Id.* at ¶2.

After the jury was unable to reach a unanimous verdict following the first criminal trial, Judge Brimmer went even further. In his order denying the criminal defendants' motion for judgment of acquittal, Judge Brimmer held that "[t]he testimony of government witness Robbie Bryant, a Pilgrim's Pride [] employee, is sufficient to support a finding *beyond a reasonable doubt* that a conspiracy existed between Pilgrim's, *Koch Foods ("Koch")*, Claxton Poultry ("Claxton"), Tyson Foods ("Tyson"), Mar-Jac Poultry ("Mar-Jac"), and George's Inc. ("George's") [the corporations that employed the 10 criminal defendants] to rig bids and fix prices." Lustrin Decl., Ex. 46 at 6. Judge Brimmer also found that "[t]he testimony of Mr. Bryant, viewed in the light most favorable to the government, is sufficient for a reasonable jury to find *that Mr. Kantola joined the conspiracy by the time of the 2014 RSCS negotiations . . . with the intent to advance its goals*." *Id.* at 18-19.

Second, the damages.

Because bid-rigging discovery has not even commenced, it is premature for the Restaurants to present a full-scale expert report detailing the damages they suffered as a result of the bid-rigging conspiracy.  Nevertheless, to satisfy the concern that this Court articulated in its Order that "all the [Restaurants] have to offer [regarding the value of their bid-rigging claim] is conjecture," (Order at 10) the Restaurants retained Laurel Van Allen, President of Coherent Economics, to provide the Court with a preliminary indication of the extent of the damages suffered by the Restaurants as a result of the bid-rigging conspiracy.





Yet, as Class Counsel has repeatedly admitted both before this Court and the Seventh Circuit, the Restaurants will not receive one extra dollar for these claims. Once more, Class Counsel's defense of the fairness of the Settlements is that while bid-rigging might have been important to the Restaurants their only duty is to the Class as a whole, and bid-rigging had no value to the other class members.

Class Counsel's rationalization for the fairness of the Koch and House of Raeford Settlements cannot be reconciled with the law. The teachings of *Amchem* and its progeny and the subsequent amendments to Rule 23 make clear that a class settlement can only be approved if it treats all "class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). And the fact that the Restaurants will not receive a penny more for their bid-rigging claims leaves no question that the settlements do not treat the Restaurants "equitably relative" to the other members of the Class at large without a bid-rigging claim.

For this reason as well, the Koch and House of Raeford Settlements cannot be approved.

III. **THIS COURT CANNOT APPROVE A SETTLEMENT OF A BID-RIGGING CLAIM THAT WAS NOT CERTIFIED**

A. **Approval of the Koch and House of Raeford Settlements Violates the Supreme Court's Holding in Amchem and Rule 23 Itself**

In their Motion for Clarification and Objection to the Simmons Settlement, the Restaurants discussed at length that the Class was not certified for bid-rigging. D.E. 6930 at 3-4, 11; D.E. 7040 at 7-8, 10-12. The Class's certification motion was premised on market manipulation which the Class argued was an issue common to the Class that could be proven on a class-wide basis. D.E. 3990. By contrast, the Class did not even attempt to establish commonality or predominance under Rule 23 necessary to support a Class claim for bid-rigging. *Id.* Indeed, bid-rigging was not mentioned anywhere in the certification motion or Dr. Carter's report in support of certification. *Id.*; D.E. 3990-112.

Similarly, this Court's Certification Order also did not discuss whether the Class could meet the requirements of Rule 23 to certify a bid-rigging claim. D.E. 5644. The Court addressed in detail the Class's supply reduction claim and how Dr. Carter's certification report met the requirements of *Comcast*. *Id.* But, like the Class's certification motion, this Court's Certification Order did not even refer to the Class's bid-rigging claim or mention bid-rigging in any respect. *Id.*

Nevertheless, in its Order, this Court rejected the Restaurants' contention that the Class's failure to seek certification of bid-rigging precluded the Class from pursuing or settling bid-rigging as an assertable Class claim. The Court accepted the Class's argument and held that "'claims' are not certified under Rule 23" and that there is "no authority limiting a certified class to the claims that the Court expressly analyzed in its certification opinion." Order at 5-6.

On this fundamental point, the Class once more was not correct. In fact, *Amchem*, *Comcast*, and Seventh Circuit precedent teaches precisely the opposite. In *Santiago v. City of Chicago*, for example, the Seventh Circuit rejected the notion that a district court may skip a certification

analysis tailored to specific claims. 19 F.4th at 1017-18. Vacating the certification order for failure to "engage in the detailed analysis that a Rule 23 decision requires," the Seventh Circuit held that the district court "never made clear which claims the [certification] analyses refer to." *Id.* The Court explained that these "clarity issues" were a "fatal flaw" in the district court's analysis:

> *[T]he district court should have begun its analysis with the elements of these claims.* Then it could have more clearly framed within those elements what it deemed to be the common and individual issues. By juxtaposing them in that way, the district court's predominance inquiry would have better 'train[ed] on the legal or factual questions that qualify each class member's case as a genuine controversy.' *Only by properly circumscribing the claims and breaking them down into their constituent elements can a district court decide which issues are common, individual, and predominant.*

*Id.* at 1018; *see also Eddlemon v. Bradley Univ.*, 65 F.4th 335, 339-40 (7th Cir. 2023) (district court abused its discretion by conducting "scant analyses" and holding it "should have identified the elements of [plaintiff's] two claims and separately analyzed them to better understand the relationship between each claim's common and individual questions.").

As the Seventh Circuit explained in *Simpson v. Dart*, "class certification is not an all-or-nothing proposition. Certification may be appropriate as to some of the class's claims but not others. This observation flows from the text of Rule 23 itself: an order certifying a class 'must define the class *and the class claims, issues, or defenses*.'" 23 F.4th 706, 713 (7th Cir. 2022) (emphasis in original). The Seventh Circuit continued: "[i]f a class's definition was synonymous with its claims, this language would be superfluous. Instead, the 'class' takes its definition from the people in it and the period of time during which the relevant conduct occurred, and *the 'class claims' are the legal claims for which the class satisfies all of Rule 23's certification requirements*." *Id.; see also Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187-88 (3d Cir. 2006) ("[T]he requirement of Rule 23(c)(1)(B) that a certification order 'define the class and the class claims, issues, or defenses,' means that the text of the order or an

incorporated opinion must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis.").

In their appellate Response Brief, the Class did not even attempt to address *Santiago*, *Eddlemon*, and *Simpson* or otherwise try to support their argument that there is "no authority limiting a certified class to the claims that the Court expressly analyzed in its certification opinion." Order at 6. Instead, Class Counsel pivoted to their companion contention—that it also presented to this Court—that the "standards for class certification" are entirely unrelated to the "permissible scope of a class action settlement and releases" under Rule 23(e), with the latter being far broader. Resp. Br. at 34, 43. Indeed, Class Counsel actually argued that the notion that "'the bid-rigging claim was required to pass Rule 23 and *Comcast* scrutiny before it could be settled'—is fundamentally flawed and has been universally rejected." *Id.* at 45.

This is a misrepresentation of the law. In *Amchem*, the Supreme Court specifically held that Rule 23(e) does not "supersede" Rule 23(a) and (b)'s requirements. To the contrary, the Court confirmed that Rule 23(a) and (b) establish the limits of a Rule 23(e) settlement. The Court explained:

> This prescription [of Rule 23(e)] was designed to function as an additional requirement, not a superseding direction, for the "class action" to which Rule 23(e) refers is one qualified for certification under Rule 23(a) and (b). . . . ***Subdivisions (a) and (b) focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives. That dominant concern persists when settlement, rather than trial, is proposed***.

521 U.S. at 621.

Class Counsel's effort to avoid the requirements of *Amchem*—by citing to a series of cases which Class Counsel said support their contention that the standards for certification have no

bearing on the approval of a class settlement and that a class can settle any claim even if it cannot be certified—continues their misstatement of the law. Resp. Br. at 45. These include the same cases that Class Counsel provided to this Court and that this Court referenced in its Order. Order at 6-7.

As the Restaurants demonstrated to the Seventh Circuit, with the exception of the Second Circuit's decision in *In re Literary Works in Elec. Databases Copyright Litig.* and the Ninth Circuit's decision in *Hesse v. Sprint Corp.*, certification was not an issue in any of the Class's cases. Indeed, again with the exception of *Literary Works* and *Hesse*, none of the Class's cases even mentions *Amchem* or class certification, let alone discusses the intersection between the certification requirements under Rule 23 and the permissible limits of class settlements. And in *Literary Works* and *Hesse*, both courts found that the releases were overbroad and could not extend to the claims at issue precisely because the settlements did not comply with the requirements of Rule 23(a) and (b).

In *Literary Works*, the objectors argued both that the settlement was overbroad because it "released claims beyond the factual predicate of the case" and that they were inadequately represented "because subgroups within the class had conflicting interests[.]" 654 F.3d at 245. The Second Circuit disagreed with the objectors' factual predicate argument but nevertheless vacated the district court's approval of the settlement. *Id.* at 248, 257-58.

Relying on *Amchem*, the *Literary Works* court held that the conflict of interest between the named plaintiffs and the objectors was "fundamental" and resulted in an inadequacy of representation under Rule 23(a)(4). *Id.* at 254-55.

The Court stated:

[T]he adequacy of representation cannot be determined solely by finding that the settlement meets the aggregate interests of the class or "fairly" compensates the

different types of claims at issue. *In the Rule 23(a)(4) context, we must ask independently whether the interests of all class members were adequately represented*.

*Id*.

In *Hesse*, the Ninth Circuit reached a similar conclusion. The court there also refused to enforce a settlement release because it found that the class plaintiffs had a fundamental conflict of interest that violated the adequacy of representation requirements of Rule 23(a)(4). 598 F.3d at 589. Again, relying on *Amchem*, the Ninth Circuit stated:

> Conflicts of interest may arise when one group within a larger class possesses a claim that is neither typical of the rest of the class nor shared by the class representative. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625–27, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) . . . In this case, the *Benney* Class Plaintiff's interest in settling his federal Regulatory Fee claims, even at the cost of a broad release of other claims he did not possess, was in conflict with the Washington Plaintiffs' unrepresented interest in prosecuting their B & O Tax Surcharge claims. The *Benney* Class Plaintiff's representation of the Washington Plaintiffs was therefore inadequate as to those claims.

*Id*.

The Class's argument that the requirements of *Amchem* somehow do not apply to the Koch and House of Raeford Settlements is further undermined by Rule 23 itself. As discussed above, the 2018 Amendment to Rule 23 codified the Supreme Court's holding in *Amchem*. Rule 23(e) now expressly requires that a district court conduct the same analysis for approving a class settlement that it must follow at the certification stage. As the Advisory Committee Notes to the 2018 Amendment explain, "in addition to evaluating the proposal itself, the *court must determine whether it can certify the class under the standards of Rule 23(a) and (b)* for purposes of judgment based on the proposal."

Here, the Class's proposed settlements with Koch and House of Raeford directly violate this requirement by including claims in the settlements that were never even considered in the

50

Certification Order.  As the Advisory Committee Notes explicate, the amendments to Rule 23(e) were specifically intended to address just this circumstance—where "the proposed settlement calls for any change in the class certified, *or of the claims, defenses, or issues regarding which certification was granted*."

As this Court observed, the Class "effectively dropped [the bid-rigging] claim from the case before certification."  Order at 3.  Tellingly, both before this Court and the Seventh Circuit, Class Counsel completely avoided this fact because it is an event they want to sweep under the rug.  Class Counsel knows that by failing to seek certification of bid-rigging the Class gave up any possibility of asserting bid-rigging as a Class claim.

But, what is just as important as the Class's failure to seek certification of a bid-rigging claim is the reason Class Counsel made that decision.  Based on the Class's briefing on Appeal, we now know why.

As Class Counsel repeatedly argued, bid-rigging had no value to the Class because it was "individual" to the Restaurants.  Resp. Br. at 29, 33, and 46.  Thus, Class Counsel knew that a claim unique to the Restaurants—and other QSRs and purchasers that negotiated contracts directly with defendants—could never be certified as an assertable Class claim.

What is particularly troubling is Class Counsel's position that it is "permissible and customary" to drop a class claim in order to hurdle Rule 23 at certification, and then fashion a broad release that expands their liability theory in order to usher through a settlement of that same claim.  *Id.* at 35.

Class Counsel's efforts to side-step *Amchem* and Rule 23 must be rejected.  Not only would it write *Amchem* and Rule 23 out of existence, it would directly overrule the Seventh Circuit's rulings in *Santiago*, *Eddlemon*, and *Simpson*.  Class Counsel's position also would reduce the

certification process to a meaningless exercise depending on how class counsel times its settlements.  Or, as the Seventh Circuit stated in *Simpson*, it would render the text of Rule 23 "superfluous."  23 F.4th at 713.

This Court should deny the Class's request to approve a settlement of an affirmatively abandoned class bid-rigging claim against Koch and House of Raeford that could never be certified.

### B.    The Class's Certification Notice was Deficient

In its Order, this Court again accepted Class Counsel's contention that there was no authority that required the Certification Notice to advise class members that the Class had given up a bid-rigging claim.  Order at 3.  This assertion also was wrong.

As Class Counsel acknowledged in its briefing before the Seventh Circuit, "the class notice satisfies Rule 23 and due process when it apprises class members of the 'nature of the claims at issue.'"  Resp. Br. at 49.  That is just the point.

In two separate paragraphs, the Certification Notice informed class members that by staying in the Class and not opting out class members would give up their rights to sue defendants "for claims set forth *in the litigation*" and "that pertain[] to the claims *in this case*."  D.E. 6195, Ex. A at ¶¶8, 11.  This was after the Class already had abandoned bid-rigging.  So, at the time the Certification Notice was sent, bid-rigging was not a "claim in" or "set forth in" the Class case.  In fact, as this Court's Order states, "Class Counsel's stipulation to Track 1 is the equivalent of an amendment to the complaint, in that it effectively dropped a claim from the case before certification."  Order at 3.

Tellingly, the Class avoided this issue altogether in its appellate submission.  It also ignored the Seventh Circuit's admonition in *Oswald v. McGarr*, 620 F.2d 1190, 1198 (7th Cir. 1980) that when a class seeks to relinquish *a known claim*, it imposes an additional notice obligation to

expressly inform the class of the abandonment of that claim. This is not surprising. Class Counsel knows that they never informed class members that they had given up bid-rigging as a class claim.

Nevertheless, this Court concluded that "there is no notice issue here because the [Restaurants] are bound by the release in the settlement agreements and the [Restaurants] do not argue that they did not receive sufficient notice of the settlement agreements. Notice of the stipulation to Track 1 and notice of the class certification are not relevant to this issue." Order at 4.

But, for purposes of this Objection, the Certification Notice is what is determinative. Like the notice of the Simmons Settlement, the New Notice of the Koch and House of Raeford Settlements does not provide an additional opportunity to opt out. And, the Class's argument in its Preliminary Approval Motion as to why a new opportunity to request exclusion under Rule 23(e)(4) was not necessary for the Koch and House of Raeford Settlements and the other New Settlements only highlights the deficiencies of the Certification Notice.

The Class maintains that the class members had received numerous notices that clearly informed them of the claims, issues, and defenses in the Class's case. Thus, according to the Class, when the class members received the Certification Notice, they knew exactly what claims they would be giving up by remaining in the Class. As the Class argued, "[o]ver the course of the case, the Class has received many notices of case developments. Up through and including the class notice of the Court's certification of the litigated class, Class members were given many opportunities to opt out." D.E. 7172 at 12.

But as discussed above, the Certification Notice limited the claims that class members would give up by remaining in the Class just to the Class's claims "***in this case***," which at the time was only supply reduction and Georgia Dock. And if anything, the New Notice only reinforced

this same communication. Again, like the Certification Notice, there is nothing in the New Notice that even suggests that the Koch and House of Raeford Settlements covered bid-rigging. In fact, again, to the contrary, the New Notice makes clear that bid-rigging was *not* part of the Class case that was settled.

The Court's statement in its Order that the Restaurants "had sufficient notice of all actions taken by Class Counsel in this case and the context in which those actions were taken" does not change the fact that the Certification Notice was deficient. Order at 4.

The Restaurants were aware of Class Counsel's decision to omit bid-rigging from the Class's certification motion. The Restaurants also were on top of the Class's two stipulations to elect Track One, even after this Court made clear that by that election the Class was giving up any ability to pursue a bid-rigging claim, including any appellate rights. In fact, it was the Restaurants' intimate knowledge of "all filings in the case" and "the actions taken by the DPP Class" with respect to the "two track structure of the case" that caused the Restaurants to determine that it was not appropriate for them to participate in the Track One opt out process.

For this reason as well, the Koch and House of Raeford Settlements cannot be approved if it extends to the Restaurants' bid-rigging claim.

## IV.    THE RELEASES ARE OVERBROAD BECAUSE THEY EXTEND TO FACTUALLY DISTINCT BID-RIGGING CLAIMS

Since this Court established its two-track case structure, this litigation has operated under the premise articulated best by this Court itself—the bid-rigging conspiracy "*has nothing to do with*" the supply reduction conspiracy. D.E. 6819 at 56; *see also* D.E. 5322 (December 20, 2021 Hearing Tr.) at 11 ("I'm not splitting claims or improperly depriving plaintiffs of evidence they believe proves up their Count I conspiracy *or a separate bid rigging conspiracy*, but that's not going to be tried in Track One. That is what I intended.").

In its Order, the Court recognized that this was a "recurrent theme in this case" and that "[b]oth the Court and Plaintiffs made statements to this effect during the pretrial hearings addressing the scope of evidence at the Class's trial. The Court also made statements to this effect in explaining why it was appropriate to split the case into two tracks." Order at 4-5.

Nevertheless, the Court rejected the Restaurants' position that the Class's settlements could not extend to bid-rigging because bid-rigging did not share an identical factual predicate with supply reduction. Instead, the Court once more accepted the Class's mischaracterization of the law on the identical factual predicate doctrine and stated that "evidentiary differences between two claims does not mean that those claims cannot arise out of the same transactions or occurrences such that it is appropriate for the claims to be brought in the same case." *Id.* at 5.

This is the same argument that the Class presented in its briefing before the Seventh Circuit. The Class contended that bid-rigging and supply reduction "arise from the same injury" because they both involve "Broiler purchases tainted by antitrust violations." Resp. Br. at 26, 39. The Class then cited a series of case events that it claimed demonstrate the "relationship between the bid-rigging allegations and the rest of the case," culminating with its protest that the Restaurants themselves alleged bid-rigging and supply reduction in the same complaint. *Id.* at 39-40.

The Class's emphasis on the pleading "relationship" between bid-rigging and supply reduction in this case instead of the factual relationship (or lack thereof) of the claims is a continuation of its effort to mislead this Court.

The Class is correct that the Restaurants wanted to bring all of their claims together in one complaint. The Restaurants believed that asserting all of their claims together in one action would be the most efficient means of prosecuting their claims.

The Class also tried to combine bid-rigging with its market manipulation claims—but for a very different reason. It knew that it could never certify bid-rigging as an assertable Class claim, but it wanted to use bid-rigging evidence to bolster its supply reduction and Georgia Dock claims. Indeed, as this Court will recall, even after it dropped its bid-rigging claim, the Class fought tooth and nail to introduce bid-rigging evidence at the supply reduction trial.

But this Court shut those efforts down. At the motion in limine stage, the defendants argued that "[p]laintiffs should be barred from attempting to use a tangentially-related conspiracy involving *totally different conduct during a later time period* to prove the conspiracy at issue here." D.E. 6708 at 35.

This Court agreed. "The motion in limine to permit introduction of other bad acts, which I read the motion as talking about bid-rigging, not about anything that – well, I read it about *bid-rigging, which I think has nothing to do with this case*. That is denied. *You can't put in bid-rigging evidence in this case. That's why we bifurcated these cases*." D.E. 6819 at 55-56.

In its briefing before the Seventh Circuit, the Class completely avoided this Court's explicit determination that bid-rigging and supply reduction have nothing to do with each other and that *evidence* of bid-rigging was not admissible in a supply reduction trial. The Class knew that its contention—that as long as the claims can be alleged in the same case, they arise from the same factual predicate—is wrong and directly at odds with the law in every circuit, including this one, on the identical factual predicate doctrine.

The rule means exactly what it says. In order for a claim to fall within the identical factual predicate rule, it has to arise out of the identical core of integral *facts* at issue in the class action. *Williams v. Gen. Elec. Cap. Auto Lease, Inc.*, 159 F.3d 266, 273-74 (7th Cir. 1998) (settlement may release claim "based on the identical factual predicate as that underlying the claims in the

56

settled class action[.]"); *Elna Sefcovic LLC v. TEP Rocky Mountain, LLC*, 807 F. App'x 752, 765 (10th Cir. 2020) ("When considering the permissibility of a release, the overlap between elements of *claims* is not dispositive. Instead, we focus on the factual predicate of the settled claims.") (emphasis in original); *Lumber Liquidators*, 91 F.4th at 183 ("[I]n order to have an identical factual predicate, the claims must 'depend upon *the very same set of facts*'" and noting that "to authorize and approve a class settlement that seeks to settle materially distinct and non-litigated claims goes too far.") (emphasis in original); *Literary Works*, 654 F.3d at 248 (finding released claim must be "'based on the identical factual predicate as that underlying the claims in the settled class action'" and considering whether a "trial of this case would determine" the injuries underlying the objectors' claim); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106 (2d Cir. 2005) ("Plaintiffs' authority to release claims is limited by the 'identical factual predicate' and 'adequacy of representation' doctrines. Together these legal constructs allow plaintiffs to release claims that share the same integral facts as settled claims, provided that the released claims are adequately represented prior to settlement.").

In its arguments before this Court, the Class asserted that factual and evidentiary differences between claims do not matter for purposes of a factual predicate analysis. The Class's own case law shows just the opposite. Indeed, the cases confirm that the test for identical factual predicate is whether the core "facts" underlying the claims are the same.

The Class's reliance on *Elna* demonstrates the point. The objectors in *Elna* contended that because their claim arose from a different legal theory than the claims that were the subject of the settlement, their claims could not be covered by the identical factual predicate rule. 807 F. App'x at 765.

The Tenth Circuit disagreed. It held that it was not the legal basis of the claims that mattered, but rather the factual underpinnings of the claims. As the court stated, "[w]hen considering the permissibility of a release, the overlap between elements of *claims* is not dispositive. Instead, we focus on the factual predicate of the settled claims." *Id*. (emphasis in original). The Tenth Circuit concluded that the objectors' claim was based on the identical factual predicate as the prior settled claim because the second lawsuit was based on the same conduct alleged in the first lawsuit. *Id*. at 765-66.

*Wal-Mart*, which the Class also cites as authority, provides even stronger confirmation that it is the identity of the underlying facts that is dispositive, not the nature of the claims. In *Wal-Mart*, the objectors were class members in an antitrust tying case. 396 F.3d at 101. The objectors also filed an independent antitrust action against the defendants based on a horizontal boycott theory that arose from a government investigation. *Id*. at 104-05. The objectors argued in the class action that the settlement release was overbroad because the "difference between the elements" of the class's tying claim and their horizontal boycott claim meant "that the same factual predicate does not underlie both." *Id*. at 108.

Like the Tenth Circuit in *Elna*, the Second Circuit rejected the objectors' argument because the objectors' claim was premised on the same Visa and MasterCard exclusionary rules which "have been central to this case from its inception." *Id*. at 107-08. The Second Circuit's recognized that the ***evidence*** relevant to both claims was the same. In fact, the Second Circuit observed that the district court judge in the class action had granted the government's motion to intervene that allowed the government to use the discovery in the class action "to assist the Government in its case" which, again, was the foundation for the objectors' claims. *Id*. at 108.

Thus, contrary to the Class's argument, the factual predicate determination hinges on the very "evidentiary differences between the two claims." Indeed, it is specifically because this Court determined that bid-rigging evidence was not admissible in the supply reduction trial that bid-rigging cannot arise under the same factual predicate as supply reduction. *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 725 F. App'x 560, 563 (9th Cir. 2018) (refusing to recognize an identical factual predicate in light of "facts which [plaintiff] must prove in this action and which would have been unnecessary in the [settled action]."); *Burgess v. Citigroup Inc.*, 624 F. App'x 6, 9 (2d Cir. 2015) ("[D]istinct claims that depend 'upon proof of further facts' constitute a 'separate factual predicate.'"); *Arandell Corp. v. Xcel Energy, Inc.*, Nos. 07-cv-076-wmc, 09-cv-240-wmc, 2022 WL 2314717, at *4 (W.D. Wis. Dec. 27, 2022) (independent action not barred by prior class action where "all facts which plaintiff must prove in [the independent] action . . . would have been unnecessary to prove in the [class action].").

Here, the distinct factual predicate of the bid-rigging claim is even more paramount because the Class affirmatively abandoned bid-rigging when it made its Track One election to proceed solely under the market manipulation conspiracy. *See Lumber Liquidators*, 91 F.4th 174 at 185 (reversing district court's approval of settlement and finding "[i]mportant here, the settlement class representative at least twice made clear that they were not pursing personal injury claims on a class-wide basis."); *Woodson*, 614 F.2d at 942 (plaintiff's claims could not be settled by release when the district court "explicitly ruled that the class action would not address issues arising from allegedly discriminatory discharges" and expressly excluded claims predicated on a different factual universe).

The factual predicate doctrine is intended to protect a plaintiff's due process right to pursue its claim while guarding against piecemeal litigation that could cause a defendant to defend the

same claim twice. *Lumber Liquidators*, 91 F.4th at 183 ("[A]s the Supreme Court has recognized, an uncircumscribed ability to settle non-litigated claims would run headlong into 'our deep-rooted historic tradition that everyone should have his own day in court,' and would present serious due process concerns.").

The Class's misapplication of the law frustrates the very purpose of the identical factual predicate test. As the Class would have it, the Restaurants should be barred from pursing a bid-rigging claim that the Class formally abandoned and which this Court ruled had nothing to do with the Class's Track One case. The result would be that bid-rigging defendants Koch and House of Raeford would be beneficiaries of a windfall at the Restaurants' expense. This unjust result is exactly what the identical factual predicate test is designed to prevent.

## **CONCLUSION**

The Koch and House of Raeford Settlements cannot be reconciled with Rule 23 and black letter Supreme Court and Seventh Circuit law across multiple issues if it covers the Restaurants' bid-rigging claim. Accordingly, this Court should appropriately restrict the scope of the Koch and House of Raeford Settlements to exclude bid-rigging claims, or final approval must be denied.

Dated: May 31, 2024

Respectfully submitted,
By: /s/ *Lori P. Lustrin*
Robert W. Turken (*pro hac vice*)
Lori P. Lustrin (*pro hac vice*)
Scott N. Wagner (*pro hac vice*)
**BILZIN SUMBERG BAENA PRICE &
AXELROD LLP**
1450 Brickell Ave., Suite 2300
Miami, Florida 33131-3456
Telephone: 305-374-7580
Facsimile: 305-374-7593
rturken@bilzin.com
llustrin@bilzin.com
swagner@bilzin.com

Andrew P. Bleiman
**MARKS & KLEIN, LLP**
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
Telephone: 312-206-5162
Facsimile: 312-420-5568
andrew@marksklein.com

*Counsel for Boston Market Corporation,
Barbeque Integrated, Inc. d/b/a Smokey Bones
Bar & Fire Grill,  Sun Ice Cream Finance II,
L.P., The Johnny Rockets Group, Inc., WZ
Franchise Corp., Golden Corral Corp., White
Castle Purchasing Co., Cracker Barrel Old
Country Store, Inc., CBOCS Distribution, Inc,
Captain D's LLC, Shamrock Foods Company,
United Food Service, Inc., Bojangles'
Restaurants, Inc. and Bojangles Opco, LLC,
Zaxby's Franchising LLC, El Pollo Loco, Inc.,
and Domino's Pizza LLC and Domino's Pizza
Distribution LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of May 2024, I caused a true and correct copy of the

foregoing document to be served upon all counsel of record via the Court's CM/ECF system.

By: _____*/s/ Lori P. Lustrin*_____
            Lori P. Lustrin