**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | No. 16 C 8637 |
| | Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

On appeal by Objector John Andren, the Seventh Circuit vacated and remanded this Court's attorneys' fee award of one-third of certain settlement recoveries (a $57.4 million award) achieved by co-lead counsel for the End User Class ("Co-Counsel"). *See In re Broiler Chicken Antitrust Litig.*, 80 F.4th 797 (7th Cir. 2023). Specifically, the Seventh Circuit provided the following directions to this Court: (1) "bids that class counsel made in auctions around the time this litigation began in September 2016 would ordinarily be good predictors of what ex ante bargain would have been negotiated," *id.* at 802; (2) "it was an abuse of discretion to rule that bids with declining fee structures should categorically be given little weight in assessing fees" and "it was error to suggest that [the Seventh Circuit] has cast doubt on the consideration of declining fee scale bids in all cases," *id.* at 803; and (3) "the district court should not have categorically assigned less weight to Ninth Circuit cases in which counsel was awarded fees under a megafund rule. . . . [because] continued participation in litigation in the Ninth Circuit is an economic choice that informs the price of class counsel's legal services and the bargain they may have struck," *id.* at 804.

Additionally, in briefing on remand, Co-Counsel revealed that in a complex antitrust case in the Southern District of New York—*In re Interest Rate Swaps Antitrust Litigation*—they negotiated a declining fee schedule with their client, a pension fund. *See* R. 7202. This fee schedule was taken from a prior complex antitrust case in the Eastern District of New York—*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litigation*—where it was imposed by the district judge. *See* 991 F. Supp. 2d 437 (E.D.N.Y. 2014). Co-Counsel and Andren agree that application of the declining fee schedule used in *Interest Rate Swaps* and *Payment Card* would result in an award in this case of 26.6% of the settlement recovery, or approximately $47.2 million. The Court was not aware of the *Payment Card* award or the *Interest Rate Swaps* agreement when it issued the original award in this case, but it is appropriate to account for them now.

The Court originally awarded one-third of the settlement amount (minus costs) for two primary reasons: (1) nearly 47% of the awards to Co-Counsel in antitrust class actions since September 2016 were for one-third of recovery, with nearly 85% being for at least 30% of the recovery, *see* R. 5819; R. 5820; and (2) the significant number of cases in this Circuit and around the country awarding one-third of recovery, *see* R. 5050-1 at 47-50. In the context of the complexity of the case and Co-Counsel's exemplary performance (described in greater detail in the Court's prior order, *see* R. 5855), the Court found that the frequency with which courts award one-third of recovery indicates that this is the market rate for cases like this. The Court's task on

remand is to determine how the Seventh Circuit's instructions, and the *Payment Card* fee award and *Interest Rate Swaps* fee agreement, change the Court's calculus.

### A. Co-Counsel Bids

In the six years preceding the filing of this case, Co-Counsel made bids to become lead counsel in three complex antitrust cases. Two of the bids were declining fee schedules with maximum rates of 13.5% and 17% respectively. The third was a flat rate of 20%. Andren argues that these bids are highly suggestive of the market rate and that the Court should impose a 20% rate in this case. And as noted, the Seventh Circuit found that these bids, which were made more or less contemporaneously with the filing of this case, "would ordinarily be good predictors of what ex ante bargain would have been negotiated." *In re Broiler Chicken*, 80 F.4th at 802.

More relevant than the time period, however, is that fact that the three cases in which the bids were made were filed in the wake of criminal investigations by the government. *See* 6911 at 15 n.58 (Co-Counsel's brief citing complaints in the three cases referencing the investigations). Many courts, including this one, recognize that filing a complex antitrust action without the benefit of a prior government investigation increases the amount of work necessary to litigate the case and decreases the chance of success. Facing lower risk and the prospect of less work, it is not surprising that that Co-Counsel's bids to lead cases with prior government investigations were much lower than the vast majority of awards in similarly complex cases.

Andren argues that the government's criminal investigations were not always materially helpful to the civil litigation. To the extent this turned out to be true, it does not change the fact that from an *ex ante* perspective, an existing criminal investigation suggests an easier road for a related civil case. And this factor is likely to incentivize potential class counsel to make a lower bid in seeking appointment.

While the bids are certainly relevant to what Co-Counsel is willing to be paid for their work, the difference in the amount of work necessary indicates that those bids can do no more than establish the floor of the market price range, as suggested by Andren. But if the appropriate market price is somewhere in a range, the floor of the range is not necessarily a good indicator of what the award should be in this case.

### B.    Ninth Circuit Awards

In deciding the fee award prior to remand, the Court ordered Co-Counsel to prepare charts of every fee award made by either of them in an antitrust case between September 2, 2016 (the date this case was filed) and August 30, 2022 (the date of the order). Of the 92 awards, 29 were awarded by courts in the Ninth Circuit, which imposes a "megafund" rule that generally caps fee awards on large recoveries at 25%. In the prior order, this Court "discounted awards from the Ninth Circuit due to its megafund rule," because the Seventh Circuit "has expressly rejected a megafund rule [as imposing] a perverse incentive." R. 5855 at 9-10 (citing *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (holding that "[m]arkets would not tolerate [the megafund] effect")). Nevertheless, on appeal the Seventh Circuit held that this Court "should not have categorically assigned less weight to Ninth Circuit cases in

which counsel was awarded fees under a megafund rule. . . . [because] continued participation in litigation in the Ninth Circuit is an economic choice that informs the price of class counsel's legal services and the bargain they may have struck." *In re Broiler Chicken*, 80 F.4th at 804.

The Seventh Circuit is, of course, correct that Co-Counsel's decision to continue practicing in the Ninth Circuit, despite the megafund rule, provides some information about the supply-side of the legal services market at issue here. But the existence of, or need for, the Ninth Circuit's megafund rule is evidence that 25% is likely *not* the market rate. Indeed, as the Seventh Circuit noted, class counsel that "seek to represent plaintiffs in the Ninth Circuit," must "assess the risk of being awarded fees *below the market rate.*" *See id.* (emphasis added). If 25% was the market rate, there would not be a need for the Ninth Circuit to artificially control the price by setting that rate by fiat.

As the Court noted in its previous order, the majority of attorneys' fee awards in antitrust class actions outside the Ninth Circuit are at least 30%. Even though attorneys are willing to continue to work in the Ninth Circuit despite the megafund rule, that willingness does not reflect supply and demand in a free market, unfettered by a megafund rule. The data available to the Court demonstrates that without a megafund rule, awards in the rest of the country tend to be at least 30% of recovery. So while the Court acknowledges that counsel is able to profitably perform the work of a case like this with an award of 25% of recovery (or a lower rate imposed according to a megafund rule), they would likely not bargain for such a rate outside the Ninth

Circuit, because they know that judges outside the Ninth Circuit are not bound by a megafund rule and it appears that the market is able to bear a higher price.

The Seventh Circuit is certainly correct that "as rational actors, class counsel assess the risk of being awarded fees below the market rate of their legal services when they seek to represent plaintiffs in the Ninth Circuit." *Id.* But the reverse must also be true. In other words, class counsel understand that outside the Ninth Circuit there is a high likelihood a judge will award them at least 30% of recovery. With that knowledge, class counsel would likely demand at least 30% from prospective clients in cases outside the Ninth Circuit.

Thus, the Court finds that while awards in the Ninth Circuit are relevant data regarding the functioning of the market for this kind of legal services, such that the Court will consider them on this renewed motion, they are not particularly good indicators of what the market would bear in this case when Co-Counsel and their clients filed the case in a jurisdiction that is not bound by the Ninth Circuit's megafund rule.

### C.     The *Interest Rate Swaps* Retainer

Andren argues that the declining fee schedule Co-Counsel agreed to in the *Interest Rate Swaps* case is highly probative of the market rate for legal services in complex antitrust class actions because it is one of few retainer agreements negotiated by a sophisticated client known to the parties on this motion. According to Andren, it is this kind of *ex ante* negotiation by a sophisticated client that the Seventh Circuit instructs district courts to mimic in deciding attorneys' fee awards.

In opposition, Co-Counsel argues that the *Interest Rate Swaps* fee schedule is not indicative of the market for this case because the two cases are substantively different. Co-Counsel contends that the risk of loss in *Interest Rate Swaps* was much lower because the potential damages were much higher and the defendants were financial institutions "too big to fail," whereas the defendants here existed perpetually on the brink of bankruptcy. Co-Counsel also argues that the legal issues in this case were more complex than *Interest Rate Swaps* because Co-Counsel represent indirect purchaser consumers of a food product (broilers) that has a more unpredictable market involving live animals (chickens) and varying demand for different parts of the animal.

While this may be true, Andren contends that *Interest Rate Swaps* would be a more difficult case because of the greater assets available to financial institutions to defend themselves, and the international nature of the finance industry makes it more complex than a domestic food industry like broiler chickens. Andren also argues that the estimated potential damages in both cases were comparable and points out that settlements have been more frequent and lucrative in this case than in *Interest Rate Swaps*.

Taking all these facts into account, the Court agrees with Andren that, despite some differences, the two cases are good comparators. Both are complex antitrust actions against defendants with sufficient assets to hire the best and most expensive corporate defense firms in the country. Both cases had the potential to result in billions of dollars of damages. For these reasons, the Court finds the declining fee

schedule negotiated by the client in *Interest Rate Swaps* is relevant to the market price for legal services in antitrust class actions.

Nevertheless, *Interest Rate Swaps* is only a single case. And because it is single case, it is difficult to know for certain why the client insisted on that rate schedule and why counsel was willing to accept it, and whether that would have been true in this case. Absent other cases with similarly negotiated fee schedules or court ordered award amounts, the Court cannot identify with certainty an overarching principle according to which the *Interest Rate Swaps* fee schedule should be applied, and whether this case meets that description. In other words, why did counsel and their client agree to a declining fee schedule that would result in a fee percentage below 30% on a substantial recovery, when the majority of other awards are for at least 30%?

The simplest answer, and therefore the most likely explanation, is that while the potential damages in both *Interest Rate Swaps* and this case are comparable, the potential settlement values are not. As Co-Counsel in this case points out, two similar antitrust cases brought against financial institutions settled immediately prior to the *Interest Rate Swaps* fee agreement for $1.8 billion and $2 billion respectively. According to Co-Counsel, the largest settlement of an antitrust case against food industry defendants to that point was $303 million in the *Southeastern Milk Antitrust Litigation* in the Eastern District of Tennessee. *See* R. 6911-1 at 72. Potential damages in large Sherman Act cases can often be in the multi-billions due to the Act's provision of treble damages. But because these cases rarely go to trial where treble

damages are awarded—in no small part because the threat of treble damages incentivizes defendants to settle short of trial—a defendant's ability to pay a settlement is a much stronger indicator of the value of case than are the potential damages available from a trial verdict. And financial institutions generally have greater assets than food producers to pay larger settlements. This likely explains counsel's willingness to negotiate a declining fee schedule in *Interest Rate Swaps*. With those circumstances absent in this case, it is unlikely that Co-Counsel would have negotiated the *Interest Rate Swaps* fee schedule in this case, in the face of a market that generally pays a least 30% of the recovery in cases like this.

### D.   The Market Rate

Although the Court finds that Co-Counsel would not have agreed to the *Interest Rate Swaps* declining fee schedule in this case, it is nevertheless a relevant data point that should be incorporated into the other data that has been presented to the Court. That data consists primarily of *ex post* fee awards, both to Co-Counsel and others.

The Court compiled the following data in a single spread-sheet table, which is attached as an appendix to this opinion: (1) awards to Co-Counsel (R. 5819; R. 5820); (2) awards in other antitrust cases around the country (R. 5050-1 at 47-50); (3) the *Interest Rate Swaps* fee agreement percentage; and (4) awards in (i) *Payment Card*; (ii) *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *1 (S.D.N.Y. Apr. 26, 2016); and (iii) *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003). Some of the awards to Co-Counsel were from the same case at the same percentage. The Court combined those awards into single entries on

9

the spread sheet so as not to over-count the frequency of that particular award percentage. The Court also weighted the 26.6% effective rate that the *Interest Rate Swaps* schedule would result in for this case by including it ten times in the spread sheet. Although ten times is a somewhat arbitrary weight, the Court believes this fairly accounts for the greater weight that the Seventh Circuit instructs *ex ante* agreements should be given relative to *ex post* awards.

Having created this spread-sheet, the Court sorted it according to total recovery. The Court considers awards on recoveries between $100 million and $1 billion to be most relevant here because the settlement recoveries at issue on this motion are $181 million, and total recovery by the End User Class is not likely to exceed $1 billion. (This range is in grey in the attached spread-sheet.) From the awards that fall within this range, the Court disregards three awards of 9%, 11%, and 11%, finding them to be outliers from the Ninth Circuit that, for the reasons discussed above, do not reflect the circumstances relevant to what *ex ante* agreement the parties would have reached here. Nevertheless, the Court's sample includes twelve awards from the Ninth Circuit, so the impact of awards from that Circuit is accounted for in the Court's analysis. Sorting this way identifies 49 "awards" (ten of which are the weight the Court has given to the 26.6% rate assumed from the *Interest Rate Swaps* agreement). Of these 49 awards, the average rate is 28.995% (rounded to 29%) and the median is 31%.

The Court finds that this result suggests a downward departure from the one-third fee the Court previously awarded. In the prior order, "most persuasive" to the

Court were "the large number of antitrust cases in this Circuit that have awarded one-third of the common fund as attorneys' fees." R. 5855 at 9. While this was an accurate observation, the Seventh Circuit has ordered this Court to give "appropriate weight" to awards from outside this Circuit, including the Ninth. Additionally, on remand, the Court learned of the *Interest Rate Swaps* agreement, which the Court could not have accounted for in the prior order, but which cannot now be ignored.

Taking account of this additional data, the average rate is calculated just below 30%, with the median just above 30%. This is the best evidence of the market rate that is before the Court.

### 1.     Empirical Studies

Andren argues that an award greater than 26.6% (the rate if the *Interest Rate Swaps* schedule is imposed here) is contrary to what empirical studies have found to be the average fee award rate in antitrust class actions. He cites one study finding that in settlements from the years 2006-2007 ranging from $100 million to $250 million, the median award was 16.9% and the mean is 17.9%. *See* R. 5182 at 14 (citing Brian Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 Empirical L. Stud. 811, 838 (2010)). He cites another study showing average fee awards of 15.1% where recovery exceeded $100 million. *See* R. 5182 at 14 (citing Logan, Stuart, et al., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Reports (March-April 2003)). A third found that the mean percentage fee awards in 68 class action settlements with recovery above $175.5 million was 12% and median award was 10.2%. *See* R. 5182 at 14 (citing Eisenberg & Miller, 7 J.

11

Empirical Legal Stud. at 265 tbl. 7). Lastly, he cites a treatise that cites three additional empirical studies showing that the mean percentage for antitrust fee awards from 2006 through 2013 was 22%, 25.4%, and 25.2%, respectively. *See* R. 6990 at 22 (citing 5 William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 15:83, tbl. 3 (2018)).

While this information is certainly relevant, it carries less weight with the Court because the averages produced by the studies are not apples-to-apples comparisons with the average the Court has calculated from its spread-sheet data. For instance, the first study cited above (Fitzpatrick) reviewed cases over only a two-year period, whereas as the cases in the Court's table are from a much longer time period, including more recent awards. The second study (Logan) included any recovery greater than $100 million, presumably including recoveries greater than $1 billion, which are greater in magnitude than the recovery at issue here, and which the Court has excluded from its calculation. The third study (Eisenberg) has a similar problem of over inclusiveness. Finally, in addition to the data cited by Andren, the treatise he cites shows that the fee award rate for recoveries in the Seventh Circuit from 2006-2011 was 31.6%, which is above the range of the Court's calculation, and thus is contrary to Andren's argument that the Court's calculated range is too high. Notably, a more recent study cited by Co-Counsel, which examined awards from 2009-2022 (a period longer and more recent than any cited by Andren), found the median award rate to be 30% for recoveries between $100 and $249 million, which is the range this case falls into. *See* R. 6911-1 at 77 (Center for Litigation and Court,

12

UC Law SF, "2022 Antitrust Annual Report: Class Actions in Federal Court," (Sept. 2023), at 32).

In sum, the empirical studies produced by Andren and Co-Counsel do not undermine the Court's calculated range of an award between 29% (the average) and 31% (the median). Furthermore, the studies indicate that 33% (or one-third) is generally the ceiling for awards, whereas a range of 29-31% is supported both by the Court's calculation and the study identified by Co-Counsel. The fact that the study cited by Co-Counsel has a longer and more recent range is most persuasive to the Court.

### 2. *Ex Post* Awards

Andren takes issue with the Court's reliance on *ex post* awards, pointing out that the Seventh Circuit has explained that ex post awards "should receive less weight." *In re Broiler Chicken*, 80 F.4th at 804. The Seventh Circuit has explained that less weight is due because it is much more difficult for courts making awards at the end of a case to "intelligently" assess "the costs and benefits of particular systems and risk multipliers." *Synthroid*, 264 F.3d at 719.

It is certainly true that a single *ex post* award should be accorded less weight than a single *ex ante* agreement like *Interest Rate Swaps*. But also undeniable is that the sheer volume of *ex post* awards, relative to the minimal number of *ex ante* agreements, has a substantial impact on the expectations of class counsel and their clients. And the expectations of counsel and clients impacts what they are willing to

13

offer and accept, which is the foundation of supply and demand, and hence the market price.

For instance, the Court presumes that a sophisticated client like the pension fund in *Interest Rate Swaps* would have been informed by its in-house counsel of what was then a recent award in *Payment Card* as well as the prevalence of awards of at least 30%. The pension fund was also likely aware of the recent settlements against financial institutions of more than $1 billion. In these circumstances, it is not surprising that Co-Counsel and the pension fund bargained for a fee agreement mimicking the fee award in *Payment Card*.

Assuming this characterization of the circumstances is relatively accurate, it demonstrates that *ex post* awards actually serve to set the market rate, and clients and counsel, to the extent they bargain *ex ante*, do so in the context of the market shaped by *ex post* awards. Of course, it is possible that at some point there will be enough *ex ante* agreements that there will be a shift in the market. But the Court has not been presented with evidence to that effect. Notably, Andren did not present the Court with his own examples of *ex post* awards to support his contention that a rate between 20% and 26.6% would be appropriate here.

## Conclusion

Therefore, having reconsidered the prior attorneys' fee award in light of the Seventh Circuit's instructions and the additional examples of awards provided by Co-Counsel, the Court grants Co-Counsel's renewed motion for attorneys' fees [6910] but decreases the award to $51,660,000.00, which is 30% of the settlement fund after deducting the expenses and incentive awards.

Andren also sought discovery from experts the Court cited in the prior order to the extent the Court continued to rely on those opinions, and in the alternative moved to strike the opinions. Because this opinion and order is not based on those expert opinions, no discovery is warranted, and the motion to strike [6931] is denied as moot.

ENTERED:

_Thomas M. Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: July 3, 2024

| Source | Case | Circuit | Fee Award Total | Fee Award % | Recovery Amount |
|--------|------|---------|-----------------|-------------|-----------------|
| Westlaw | Payment Card | Second | $554,800,000 | 9.56 | $5,803,347,280 |
| Westlaw | VISA | Second | $220,300,000 | 6.5 | $3,389,230,769 |
| R. 5050-1 | Urethane | Tenth | $835,000,000 | 33 | $2,530,303,030 |
| R. 5820 | Foreign Exchange | Second | $300,335,750 | 13 | $2,310,275,000 |
| 2016 WL 2731524 | Credit Default Swaps | Second | $253,758,000 | 13.61 | $1,864,496,694 |
| R. 5050-1 | Dahl v. Bain | First | $590,500,000 | 33 | $1,789,393,939 |
| R. 5050-1 | Vitamins | D.C. | $359,000,000 | 33 | $1,087,878,788 |
| R. 5820 | Urethane | Tenth | $324,766,666 | 33 | $984,141,412 |
| R. 5050-1 | U.S. Foodservice | Second | $297,000,000 | 33 | $900,000,000 |
| R. 5050-1 | Tricor Direct | Third | $250,000,000 | 33 | $757,575,758 |
| R. 5050-1 | Buspirone Antitrust | Second | $220,000,000 | 33 | $666,666,667 |
| R. 5050-1 | First Impressions Salon | Seventh | $220,000,000 | 33 | $666,666,667 |
| R. 5820 | Capacitors | Ninth | $187,490,000 | 31.01315 | $604,550,005 |
| R. 5050-1 | Neurontin Antitrust | Third | $190,420,000 | 33 | $577,030,303 |
| R. 5050-1 | La. Wholesale Drug | Third | $190,416,438 | 33 | $577,019,509 |
| R. 5820 | UFCW Trust v. Sutter | California State | $152,375,000 | 27 | $564,351,852 |
| R. 5050-1 | Relafen Antitrust | First | $175,000,000 | 33 | $530,303,030 |
| R. 5050-1 | Standard Iron Works | Seventh | $163,900,000 | 33 | $496,666,667 |
| R. 5050-1 | Titanium Dioxide | Fourth | $163,500,000 | 33 | $495,454,545 |
| R. 5820; R. 5050-1 | Aggrenox | Second | $162,743,064 | 33 | $493,160,800 |
| R. 5050-1 | Southeastern Milk | Sixth | $158,600,000 | 33 | $480,606,061 |
| R. 5050-1 | Flonase Antitrust | Third | $150,000,000 | 33 | $454,545,455 |
| R. 5819 | Glumetza | Ninth | $49,689,567 | 11 | $451,723,336 |
| R. 5819 | NCAA | Ninth | $78,135,810 | 20 | $390,679,050 |
| R. 5820 | Air Cargo | Second | $96,962,500 | 25 | $387,850,000 |
| R. 5819 | Automotive Parts | Sixth | $75,691,877 | 20 | $378,459,385 |
| R. 5050-1 | In re Potash | Seventh | $110,250,000 | 33 | $334,090,909 |
| R. 5820 | Automotive Parts | Sixth | $99,295,308 | 29.768127 | $333,562,498 |
| R. 5050-1 | Auto. Refinishing Paint | Third | $105,750,000 | 33 | $320,454,545 |
| R. 5050-1 | Plasma-Derivative | Seventh | $64,000,000 | 33 | $193,939,394 |
| R. 5820 | Steel | Seventh | $63,986,991 | 33 | $193,899,973 |
| R. 5820 | Domestic Drywall | Third | $63,353,019 | 33 | $191,978,845 |

| Source | Case | Circuit | Fee Award Total | Fee Award % | Recovery Amount |
|---|---|---|---|---|---|
| R. 5820 | Cathode Ray | Ninth | $38,235,000 | 20 | $191,175,000 |
| R. 5820 | LIBOR | Second | $45,346,605 | 25 | $181,386,420 |
| R. 5050-1 | Ready-Mixed Concrete | Seventh | $59,158,000 | 33 | $179,266,667 |
| R. 5819 | Lidoderm | Ninth | $45,000,070 | 27 | $166,666,926 |
| R. 5819 | Animation Workers | Ninth | $13,800,658 | 9 | $153,340,644 |
| R. 5820 | Animation Workers | Ninth | $13,800,658 | 9 | $153,340,644 |
| R. 5819 | Aggrenox | Second | $29,200,000 | 20 | $146,000,000 |
| R. 5050-1 | Dairy Farmers | Seventh | $46,000,000 | 33 | $139,393,939 |
| R. 5819 | Cameron v. Apple | Ninth | $26,000,000 | 19 | $136,842,105 |
| R. 5819 | Optical Disk | Ninth | $26,646,000 | 20 | $133,230,000 |
| R. 5820 | Liquid Aluminum | Third | $42,864,004 | 33 | $129,890,921 |
| R. 5819 | Loestrin | First | $38,678,147 | 30 | $128,927,157 |
| R. 5819; R. 5820 | Solodyn | First | $38,499,999 | 33 | $116,666,664 |
| R. 5819 | Lithium Ion | Ninth | $33,829,176 | 30 | $112,763,920 |
| R. 5820 | Lidoderm | Ninth | $34,916,000 | 33 | $105,806,061 |
| R. 5820 | Municipal Derivatives | Second | $33,000,000 | 32 | $103,125,000 |
| R. 5819; R. 5820 | Resistors | Ninth | $20,100,000 | 20 | $100,500,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 5819 | Celebrex | Fourth | $30,723,777 | 33 | $93,102,355 |
| R. 5820 | Cathode Ray | Ninth | $25,425,000 | 30 | $84,750,000 |
| R. 5820 | Municipal Derivatives | Second | $23,316,150 | 28 | $83,271,964 |
| R. 5820 | Dental Supplies | Second | $26,670,000 | 33 | $80,818,182 |
| R. 5819 | Mackmin v. Visa | D.C. | $20,022,000 | 30 | $66,740,000 |

| Source | Case | Circuit | Fee Award Total | Fee Award % | Recovery Amount |
|---|---|---|---|---|---|
| R. 5820 | Loestrin | First | $20,833,333 | 33 | $63,131,312 |
| R. 5820 | Interior Molded Doors | Fourth | $20,533,333 | 33 | $62,222,221 |
| R. 5820 | Castro v. Sanofi | Third | $20,500,000 | 33 | $62,121,212 |
| R. 5819; R. 5820 | Animation Workers | Ninth | $14,212,500 | 25 | $56,850,000 |
| R. 5820 | TransPacific Passenger | Ninth | $14,126,576 | 25 | $56,506,304 |
| R. 5819 | Edwards v. National Milk | Ninth | $13,000,000 | 25 | $52,000,000 |
| R. 5819 | Restasis | Second | $16,423,921 | 32 | $51,324,753 |
| R. 5820 | TransPacific Passenger | Ninth | $11,038,071 | 22 | $50,173,050 |
| R. 5050-1 | Propane Indirect | Seventh | $15,250,000 | 33 | $46,212,121 |
| R. 5819 | Lithium Ion | Ninth | $11,240,000 | 25 | $44,960,000 |
| R. 5820 | Blood Reagents | Third | $13,833,333 | 33 | $41,919,191 |
| R. 5820 | Municipal Derivatives | Second | $11,475,000 | 30 | $38,250,000 |
| R. 5820 | London Silver | Second | $11,400,000 | 30 | $38,000,000 |
| R. 5819; R. 5820 | Intuniv | First | $11,823,004 | 33 | $35,827,285 |
| R. 5820 | TransPacific Passenger | Ninth | $9,000,000 | 29 | $31,034,483 |
| R. 5820 | Cast Iron Soil Pipe | Sixth | $10,000,000 | 33 | $30,303,030 |
| R. 5820 | Shane Group v. Blue Cross | Sixth | $8,631,628 | 29 | $29,764,234 |
| R. 5050-1 | Pearson v. Target | Seventh | $7,500,000 | 33 | $22,727,273 |
| R. 5819 | LIBOR | Second | $6,097,000 | 28 | $21,775,000 |
| R. 5050-1 | Aftermarket Filters | Seventh | $7,162,500 | 33 | $21,704,545 |
| R. 5819 | Pork | Eighth | $6,600,000 | 33 | $20,000,000 |
| R. 5819; R. 5820 | Pre-Filled Propane | Tenth | $6,312,075 | 33 | $19,127,500 |
| R. 5819 | Asacol | First | $5,000,000 | 33 | $15,151,515 |
| R. 5050-1 | Kitson | Seventh | $3,415,000 | 33 | $10,348,485 |
| R. 5050-1 | Fond du Lac | Seventh | $3,250,000 | 33 | $9,848,485 |
| R. 5820 | Ductile Iron | Third | $2,929,166 | 33 | $8,876,261 |
| R. 5820 | Anadarko Basin | Tenth | $2,316,666 | 33 | $7,020,200 |
| R. 5050-1 | Swift v. DirectBuy | Seventh | $1,900,000 | 33 | $5,757,576 |
| R. 5050-1 | Lithotripsy | Seventh | $1,300,000 | 33 | $3,939,394 |