UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | No. 16 C 8637<br><br>Judge Thomas M. Durkin |

MEMORANDUM OPINION AND ORDER

This case was filed in 2016 alleging a conspiracy among Broiler chicken producers to reduce supply and to manipulate the Georgia Dock price index. The Court denied Defendants' motions to dismiss in 2017, and the case proceeded to discovery.

During discovery, it came to light that the Antitrust Division of the Department of Justice was conducting a criminal investigation of the Broiler industry, specifically regarding allegations of bid-rigging. The investigation culminated in: (1) indictments in 2020 of Defendant Pilgrim's Pride and some of its officers; (2) Defendant Tyson signing a cooperation agreement; (3) Pilgrim's pleading guilty; (4) indictments in 2021 of Defendants Claxton and Koch, which were eventually dismissed; and (5) several Pilgrim's officers being acquitted in a third trial after two previous mistrials.

After the criminal indictments were filed, Plaintiffs in this case sought to amend their complaints to include bid-rigging claims. Addition of the bid-rigging claims would have significantly extended discovery in a case that was already five years old and in which discovery was nearly complete. To avoid undue delay of the

supply reduction and Georgia Dock claims that were on the cusp of summary judgment, the Court bifurcated the case into two "tracks." Plaintiffs who were willing to forgo bid-rigging claims could continue on the case's current track ("Track One") to complete discovery on the supply reduction and Georgia Dock claims and proceed to summary judgment and trial if necessary. Plaintiffs who wished to pursue bid-rigging claims (along with their supply reduction and Georgia Dock claims) would be separated into a second track ("Track Two"), which would be stayed until Track One was complete.

The class plaintiffs (including classes of: (1) direct purchasers; (2) commercial and institutional indirect purchasers; and (3) consumer end-user indirect purchasers) and more than 100 direct purchasers who had opted out of the class, decided to continue on Track One. Subsequently, the Court granted summary judgment in Track One to seven defendants (Case, Fieldale, Foster, Fries-Claxton, Perdue, Wayne, and Agri-Stats), and denied summary judgment to eleven defendants (Harrison, Keystone, Koch, Mountaire, OK Foods, Peco, Pilgrim's, Raeford, Sanderson, Simmons, and Tyson).[1] All defendants which were denied summary judgment settled before trial except for Sanderson, who ultimately prevailed at trial. Trials were scheduled for both the indirect and end-user classes, but both settled shortly before the trials were scheduled to begin.

---

[1] Defendants George's, Mar-Jac, and Amick settled either before the summary judgment motions were due or while they were being briefed and decided.

Another 130 direct purchasers who opted out of the class (known to the parties and the Court as direct-action plaintiffs, or "DAPs") decided to wait to pursue their claims in Track Two. *See* R. 5455 at 3-49. The Court ordered the DAPs in the Track Two to file a consolidated complaint. The consolidated complaint includes the following counts claiming violations of federal antitrust law:

> Count 1: brought by all Plaintiffs alleging an "overarching" conspiracy to reduce supply, manipulate the Georgia Dock, and to rig bids;
>
> Count 2: brought by all Plaintiffs against all Defendants alleging a supply reduction conspiracy;
>
> Count 3: brought by all Plaintiffs against certain Defendants for a conspiracy to manipulate the Georgia Dock;
>
> Count 4: brought by certain Plaintiffs against certain Defendants for a bid-rigging conspiracy;
>
> Count 5: brought by certain Plaintiffs against certain Defendants for a bid-rigging conspiracy; and
>
> Count 6: brought by all Plaintiffs alleging overarching conspiracy to both manipulate the Georgia Dock and to rig bids.

The consolidated complaint also contains a RICO count based on the Georgia Dock conspiracy allegations (Count 9), and counts making claims under various state laws (Counts 7-8 and 10-36) for the same conduct alleged in the federal counts.

Two different groups of Plaintiffs bring Counts 1 and 6 against two different groups of Defendants. A subset of Plaintiffs referred to as "Certain Restaurant DAPs" bring Counts 1 and 6 (the claims for overarching conspiracies) against only the "Bid-Rigging Defendants"—i.e., those Defendants alleged to have engaged in a bid-rigging

conspiracy in Counts 4 and 5.[2] The rest of the Plaintiffs—the "Non-Restaurant DAPs"—bring Counts 1 and 6 against all Defendants.

The Bid-Rigging Defendants are the only Defendants implicated in Counts 4 and 5, which are brought by all Plaintiffs. All Bid-Rigging Defendants move to dismiss Counts 4 and 5 for lack of standing or being a "proper party." Some Bid-Rigging Defendants—namely Sanderson, Raeford, Wayne, Case, and Fieldale—also argue that Plaintiffs have failed to plausibly allege a claim against them in Counts 4 and 5. A single Defendant—Pilgrim's—has moved to dismiss Count 2, which alleges a supply reduction conspiracy, and Count 3, which alleges a Georgia Dock conspiracy. Defendants also seek dismissal of the RICO and state law claims.

In sum, the Court finds the following: First, Plaintiffs have plausibly alleged a bid-rigging conspiracy among the Bid-Rigging Defendants. Plaintiffs have alleged facts showing that the Bid-Rigging Defendants increased prices in parallel. In addition, Plaintiffs have alleged facts showing communications among the Bid-Rigging Defendants exchanging price information with the intent to work together to maintain or increase the prices offered to their customers, i.e., the Plaintiffs in this case. Defendants' argument—that not every Plaintiff in particular has alleged facts showing that they were offered higher prices as a result of the conspiracy—takes too narrow a view of the reasonable inferences the Court can draw from the extensive

---

[2] The "Bid-Rigging Defendants" are: Case, Claxton, Fieldale, George's, Raeford, Koch, Mar-Jac, Marshall Durbin, Perdue, Pilgrim's, Sanderson, Simmons, Tyson, and Wayne.

4

allegations of communications among the Bid-Rigging Defendants. The only Bid-Rigging Defendant for whom the allegations are insufficient is Fieldale.

Second, no Defendant has made a sufficient argument that the Court should reconsider its findings that the supply reduction and Georgia Dock conspiracy claims are plausibly alleged. Pilgrim's is the only Defendant to make any argument on these issues, and the Court rejects Pilgrim's arguments for the reasons discussed below.

Lastly, Plaintiffs have failed to state an over-arching conspiracy claim against the seven Defendants who are alleged to have participated in only the supply reduction conspiracy, and not the bid-rigging or Georgia Dock conspiracies. There is nothing about the factual allegations supporting the supply reduction conspiracy indicating that those seven Defendants knew of or participated in any broader conspiracy.

Notably, Plaintiffs have not alleged *any* particular facts specifically indicating an overarching conspiracy with regard to *any* particular Defendant, such as an email discussing all three conspiracies. Despite this lack of evidence specifically indicating an overarching conspiracy, the fact that all of the Bid-Rigging Defendants are alleged to have participated in both the supply reduction and bid-rigging conspiracies, while some were also simultaneously allegedly participating in the Georgia Dock conspiracy, is sufficient to plausibly allege an overarching conspiracy that includes all three conspiracies. The supply reduction and bid-rigging conspiracies followed each other consecutively, suggesting that bid-rigging was a continuation of supply reduction for the Bid-Rigging Defendants. Additionally, some of the Bid-Rigging

Defendants are also alleged to have conspired to manipulate the Georgia Dock at the same time as the bid-rigging conspiracy, strongly suggesting a connection between the two. Moreover, the strength of the evidence of communications among the Bid-Rigging Defendants permits the reasonable inference that they were communicating about more than just prices. At bottom, the fact that all Bid-Rigging Defendants participated in two of the underlying conspiracies at the same time, while a third was also in process by some of the same Defendants, and that they were all communicating regularly about pricing, plausibly suggests an overarching conspiracy.

For those reasons, which are explained in greater detail below, the motions to dismiss Count 1 and 6 are granted in part and denied in part; the motions to dismiss Counts 4 and 5 are granted in part and denied in part; Pilgrim's motion to dismiss Counts 2 and 3 is denied; and the motion to dismiss the RICO and state laws claims is denied without prejudice and deferred until summary judgment.

## I.     Counts 4 & 5: Bid-Rigging

The factual allegations supporting the three underlying conspiracies are the foundation for the overarching conspiracy claims. For that reason, analysis of the three underlying conspiracies logically should take place prior to analysis of the overarching conspiracies. Thus, the Court will begin by analyzing Counts 4 and 5 which implicate the plausibility of one of the underlying conspiracies, namely bid-rigging.

In Counts 4 and 5, Plaintiffs claim that, from 2011 to 2019, the Bid-Rigging Defendants conspired to fix the price of Broiler chicken, in some instances by rigging bids, in other instances simply by increasing or maintaining a customer's price with the knowledge that no competitor would undercut it. For years now, the Court and the parties have used the term "bid-rigging claims" as shorthand for the claims embodied in Counts 4 and 5. Clearly, however, these counts make claims regarding Defendants' conduct beyond formal bids, and include claims for more general price information exchange with the goal of fixing prices in offers to customers that were not necessarily a part of a bid process. The heart of Counts 4 and 5 are Plaintiffs' allegations that the Bid-Rigging Defendants exchanged information about their prices that enabled them to both rig bids and fix prices more generally. Nevertheless, the Court will continue to refer to Counts 4 and 5 as the "bid-rigging claims" or the "bid-rigging conspiracy" even though these counts encompass broader alleged conduct.

Moving beyond semantics, it is clear in Counts 4 and 5 that Plaintiffs allege that the Bid-Rigging Defendants accomplished price fixing by exchanging information about the prices they planned to bid or charge Plaintiffs, who were Defendants' customers. Plaintiffs allege that this information exchange resulted in parallel increases of the prices Defendants charged for Broiler chicken between 2011 and 2019.

"Parallel behavior" by putative competitors (i.e., competitors following the same course of conduct) can be circumstantial evidence of an agreement not to

compete. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007). Here, the "parallel behavior" is the parallel increase in Broiler chicken prices between 2011 and 2019. *See* R. 5455 ¶¶ 974, 1079-99.

Parallel price increases alone, however, do not plausibly suggest an illegal anticompetitive agreement. This is because such increases can be "prompted by common perceptions of the market," a circumstance which is not considered anticompetitive. *See Twombly*, 550 U.S. at 554; *see also White v. R.M. Packer Co.*, 635 F.3d 571 (1st Cir. 2011).

To plausibly allege illegal agreement, "allegations of parallel conduct . . . must be placed in a context that raises a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557. Here, Plaintiffs allege numerous exchanges of price information among the Bid-Rigging Defendants. *See* R. 5455 ¶¶ 898-1071. It is well-settled that the exchange of pricing information among competitors is indicative of anticompetitive agreement. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 457 (1978) ("[T]he exchange of price information among competitors carries with it the added potential for the development of concerted price-fixing arrangements which lie at the core of the Sherman Act's prohibitions."); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 176 F.3d 1055, 1067 (8th Cir. 1999) ("[T]he exchange of such information can be evidence of the existence of an agreement to fix or stabilize prices.").

Defendants' exchange of price information is particularly indicative of collusion in this case because, as the Court has discussed in many prior opinions, the

Broiler chicken market functions like a commodity market. In markets for commodities and other fungible products, the competition is price-based (as opposed to being based on quality or some other product characteristic), such that exchanges about prices among competitors are especially likely to cause anti-competitive effects. *See United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969); *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, 2020 WL 6134982, at *6 (N.D. Ill. Oct. 19, 2020).

Moreover, some of the documented communications appear to hint at the ultimate goal of maintaining or increasing prices to the detriment of customers.[3]

---

[3] *See, e.g.*, R. 5455 ¶ 908 ("On December 21, 2011, Penn (Pilgrim's) communicated to Jimmie Little (Pilgrim's) regarding the pricing for dark meat chicken. Penn told Little that he understood that for common restaurant customer Church's Chicken, competitor Koch was 'holding firm at dark [8-piece COB] -27.' On December 26, 2011, Scott Brady (Pilgrim's at the time), confirmed that 'I talked to Bill [Kantola (Koch)] on Friday and he got 27 back.' Little responded, 'Good for them! Now we know where we need to be.'"); *id.* ¶ 915 ("On November 7, 2012, Pilgrim's and Claxton again exchanged their pricing intentions with respect to Pollo Tropical, this time for the 2013 calendar year. McGuire (Pilgrim's) asked Larry Pate (Pilgrim's): 'How did it go with PT?' Pate responded to McGuire: 'Not sure. I Walter [Cooper (Claxton)] and saying he has to have .89. We [Pilgrim's and Claxton] are both holding firm at .90. We will see.' Following their communications, Pilgrim's and Claxton both charged Pollo Tropical the identical amount of $0.89 for splits."); *id.* ¶ 961 ("Chad Baker (Pilgrim's) thereafter reported in an internal Pilgrim's exchange that 'buyer called and he is not happy. Doesn't matter. We are holding our position . . . . I still expect the price increase to be accepted and shipping at the new price with the next set of orders placed.'"); *id.* ¶ 993 ("Jason Slider (Pilgrim's) and Scott Tucker (Pilgrim's) exchange in August 2014 referencing Bojangles further demonstrates Bid-Rigging Defendants' strategy to use KFC as leverage for exacting across-the-board increases from other Bid Customers: 'Wow. Price just went higher for 2015. Tucker responded: 'Everybody will be paying through the nose. KFC will be paying close to $0.30 between price increase and case weight increase.' Slider then responded, 'Good. Get it while we can!! What is the proposed price on Bojangles' for next year?' Tucker responded, 'We haven't started talking about it yet. Once KFC is inked, we'll be hitting these others starting next week.'").

Communications of this sort bolster the plausibility of Plaintiffs' claims that the exchanges of price information were anticompetitive, and not merely competitive gathering of information about the market.

Further, Pilgrim's pled guilty to a criminal conspiracy to rig bids and fix prices with regard to the quick service restaurant, KFC, a major direct purchaser of Broiler chicken. Pilgrim's confirms those admissions in this case. *See* R. 5587 at 7 n.1. Additionally, Tyson applied for leniency in the criminal bid-rigging case, thereby admitting to participating in a criminal conspiracy with respect to KFC. *See* R. 5455 at 51 n.11. With these admissions as a foundation, the court in the criminal case examined the evidence of price exchange communications among Pilgrim's, Tyson, and several other Bid-Rigging Defendants in this case, and found by a preponderance of the evidence that the government had demonstrated a conspiracy to rig bids and fix prices among those Broiler producers (even though many of them were not named as defendants in the criminal indictment).[4] The communications alleged in the complaint in this case are largely the same communications that were the basis for the conspiracy finding by the court in the criminal case. While the criminal court's finding is not binding on this Court, it is a highly persuasive opinion, especially considering that the preponderance standard is a higher standard than the plausibility standard Plaintiffs must satisfy here.

Faced with the strength of these allegations, a majority of the Bid-Rigging Defendants do not challenge the sufficiency of the allegations to demonstrate that

---

[4] *United States v. Penn.*, No. 20-cr-00152-PAB (D. Colo. 2021), Docket Entry No. 559.

they joined a conspiracy to rig bids and fix prices. Some do, and the Court will address those arguments below. All Defendants argue, however, that Plaintiffs "fail to properly plead Article III standing or 'proper party' status under the Sherman Act." R. 5599 at 20. This argument is based on the fact that "42 of the 64 Count 4 [Plaintiffs] allege no bids or purchases connected to them that were 'rigged' or 'fixed,'" and "rely entirely" on what Defendants characterize as "a conclusory assertion that 'Plaintiffs' negotiated pricing with unspecified 'Bid-Rigging Defendants.'" *Id.* In other words, the Bid-Rigging Defendants argue that even if the evidence shows that they conspired to rig bids and fix prices, many of the Plaintiffs have not alleged and cannot demonstrate that they were harmed by that conduct.

The initial problem with this argument is that, contrary to the Bid-Rigging Defendants' argument, the allegation that "Plaintiffs" negotiated pricing with the "Bid-Rigging Defendants," while not specific, is also not conclusory. Plaintiffs have direct knowledge of their negotiations, and so do Defendants. In other words, all of the Plaintiffs know who their suppliers were, and all of the Defendants know who their customers were. For that reason, Plaintiffs' allegation that they negotiated prices with Defendants is well pled, and the Court does not see that as a particularly controversial finding.

The real argument Bid-Rigging Defendants raise is that a particular Plaintiff cannot plausibly plead that it was harmed by higher prices without specific allegations that it negotiated with Bid-Rigging Defendants that exchanged pricing information about that particular Plaintiff. The Bid-Rigging Defendants argue that,

absent such specific allegations, those particular Plaintiffs "fail to show that the purported 'increased prices' they paid were 'fairly traceable' to the alleged bid-rigging conduct identified in the Complaint." *Id.* at 21.

Plaintiffs respond that the "general rule is that customers . . . in the affected market have antitrust standing." *See* R. 5710 at 15 (quoting *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 482 (7th Cir. 2020)). The problem with Plaintiffs' argument, however, is that it *assumes* that the alleged price-fixing conduct had a market-wide effect. True, if a plaintiff can allege market-wide affect, then the plaintiff can likely establish standing without alleging that they directly transacted business with the defendant conspirators. But if Plaintiffs' standing relies on harm to the market as a whole, then Plaintiffs must plausibly allege such harm. Presumably in an attempt to demonstrate harm to the entire market, Plaintiffs allege that some of the particular Plaintiffs experienced "virtually identical" price increases. *See* R. 5710 at 16. But while this allegation may bolster the claim that the Bid-Rigging Defendants' price-fixing activity was effective and far-reaching, it is not an allegation of a mechanism by which the market as a whole was affected by the Bid-Rigging Defendants' conduct.

The Court, however, does not perceive a market-wide effect to be necessary for Plaintiffs to allege that they were directly harmed by Bid-Rigging Defendants' alleged bid-rigging and price fixing conduct. This is because all Plaintiffs have alleged that they negotiated prices with certain Bid-Rigging Defendants, and there is evidence that the Bid-Rigging Defendants exchanged pricing information with each other in

the context of maintaining or increasing prices. In general, Bid-Rigging Defendants do not dispute that this kind of evidence—i.e., evidence of price exchange among competitors about certain customers in the context of price increases—is sufficient to plausibly allege a price-fixing conspiracy that harmed the customers whose information was exchanged.[5] But such allegations also permit the reasonable inference that Defendants were rigging bids and fixing prices for *all* of their customers, even if Plaintiffs have not specifically alleged that Bid-Rigging Defendants rigged bids or fixed prices with respect to each particular Plaintiff. Plaintiffs allege and identify communications about the pricing of many negotiations with many different Plaintiffs. Such extensive price exchanges, in the context of increased prices, plausibly suggest that the Bid-Rigging Defendants were exchanging price information and rigging bids and fixing prices not just for the Plaintiffs specifically referenced in the communications cited in the consolidated complaint, but for *all* of their customers. The price-fixing claims of all Plaintiffs—not just those for whom there is already evidence of price exchanges—are plausible for that reason.

Bid-Rigging Defendants argue that such allegations are insufficient to demonstrate Plaintiffs' standing and that there is not a sufficiently "direct" "causal connection" between the alleged bid-rigging conduct and harm to each Plaintiff. Defendants believe that Plaintiffs must identify specific negotiations that were rigged or fixed. But that is tantamount to requiring Plaintiffs to prove their case at the

---

[5] Some Defendants dispute the sufficiency of the specific allegations against them of communications of price exchange, and the Court will address those arguments below.

13

pleading stage. According to *Twombly*, the Court is required to evaluate Plaintiffs' allegations drawing all reasonable inferences in the plaintiff's favor. *See Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 523 (7th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 678 ("Facial plausibility exists 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'")); *see also Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 666 (7th Cir. 2023). It is reasonable to infer that producers who are fixing prices with respect to a large number of their customers are plausibly fixing prices for the remainder of their customers as well, absent some reason that would make that unlikely or an unreasonable inference. Perhaps Defendants will identify a contrary explanation at summary judgment, but they have not done so here.

While all of the Bid-Rigging Defendants challenge whether some Plaintiffs plausibly alleged standing or causation, many of the Defendants (i.e., Claxton, George's, Koch, Mar-Jac, Marshall Durbin, Perdue, Pilgrim's, Tyson) do not challenge the sufficiency of the allegations that they joined a bid-rigging and price-fixing conspiracy. The following Defendants, however, make that challenge: Sanderson; Simmons; Wayne; Raeford; Case; and Fieldale.

**Sanderson** points out that the "dissemination of price information is not itself a per se violation of the Sherman Act." R. 5602 at 11 (quoting *United States v. Citizens & S. Nat. Bank*, 422 U.S. 86, 113 (1975)). True, but this isn't summary judgment. And exchange of price information can plausibly indicate participation in a conspiracy

under the right circumstances, such as the parallel price increases by competitors alleged here.

Sanderson also argues that "Plaintiffs do not allege that Sanderson . . . itself shared . . . information," *see* R. 5602 at 11 n.8, implying that the other Bid-Rigging Defendants who possessed Sanderson's pricing information acquired it against Sanderson's will. But Plaintiffs allege that an internal Pilgrim's email from 2014 states that it contained "Notes Direct from Sanderson," followed by Sanderson pricing information. *See* R. 5455 at 325 (¶ 1020). Sanderson argues that the phrase "direct from Sanderson" is ambiguous. Perhaps, but ambiguity is not the standard here. At the pleading stage, the Court draws reasonable inferences in Plaintiffs' favor, and it is certainly reasonable to infer from this Pilgrim's email that Sanderson provided pricing information to its competitor. In the context of Sanderson raising prices in parallel with its competitors, the allegation that Sanderson's competitors were provided Sanderson's pricing information "directly from Sanderson" is sufficient to plausibly allege that Sanderson participated in a price exchange conspiracy to fix prices.

Sanderson cites cases in which defendants were dismissed because the plaintiffs failed to allege what a defendant did that was "asserted to be wrongful," *see Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013), or that a communication suggesting a price fix "actually" caused a price to be fixed, *see Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 557 (S.D.N.Y. 2017); *see also* R. 5602 at 13 (citing additional similar cases). But Plaintiffs'

15

allegations against Sanderson do not share those defects. Sanderson is alleged to have shared information with Pilgrim's and to have raised prices in parallel with its competitors. Contrary to Sanderson's arguments, these allegations provide the notice about what Sanderson allegedly did wrong and how it caused harm to Plaintiffs.

*Simmons*. Plaintiffs' claims against Simmons rely on an email in which a Simmons employee recounts a conversation he had with a Pilgrim's employee. *See* R. 5455 at 296-97 (¶ 901). According to the Simmons employee, the Pilgrim's employee expressed dissatisfaction with Defendant Koch for "goofing up" prices with Plaintiff El Pollo Loco. *See id.* The Simmons employees then contemplate that if they raised their prices to El Pollo Loco, Pilgrim's would "do the same." *See id.* The statements by the Simmons employees imply uncertainty about Pilgrim's plans, and Simmons argues that this undermines Plaintiffs' conspiracy claim. But the fact that Simmons communicated with Pilgrim's about how to prepare offers to a shared customer, and indicated that there had been a joint plan with a third Defendant, Koch, is a plausible basis to infer a conspiracy in the context of price increases. Further, the Simmons employees assumed that Pilgrim's response to Simmons increasing the price to El Pollo Loco would be to raise Pilgrim's prices. As discussed above and in other opinions the Court has issued in this case, this is at least plausibly contrary to competitive behavior because competitors in a commodity market generally attempt to undercut their competitors' prices to steal their market share.

Furthermore, the email at issue here is with Pilgrim's, which has admitted that it conspired to rig bids to major direct purchaser KFC. This heightens the

16

suspicious nature of any communications by a competitor with Pilgrim's regarding pricing. Communications about pricing with a producer who has admitted to rigging bids are sufficient to plausibly establish a conspiracy, when the communications are followed by increased prices.

*Raeford*. Plaintiffs also make plausible allegations that Raeford communicated with its competitors about pricing. In 2010, an internal Raeford email reported pricing received from competitors Sanderson and Wayne. *See* R. 5455 at 296 (¶ 900). The Raeford employee reported that he had received this information by talking with employees at those companies. *Id*.

Additionally, in 2015, an internal Raeford email reported, "we have talked to Wayne Farms, they -09." R. 5455 at 326 (¶ 1025). The email reported further that they "also talked to Amick" and Defendant Amick "confirmed [that] they didn't sell a [pound] for less than -06." *Id*. To which another Raeford employee responded, "I don't think we should mention talking to our competition about pricing. That's just a little illegal. Just sayin." *Id*.

Raeford attempts to undermine the force of these allegations by pointing out that the emails do not "identify any 'Bid Customer' who was affected," or "that any bid made or any price charged by [Raeford] or any other Defendant was affected by the information." R. 5609 at 5. But these arguments are about what can be proven, not what is plausibly alleged. The Court has already discussed that evidence of price exchange communications among competitors in the context of increased prices is generally sufficient to plausibly allege a conspiracy in violation of the Sherman Act.

17

The allegations that Raeford communicated with its competitors about price are plausible, as are the allegations of price increases. Therefore, the claim against Raeford is plausible too.[6]

*Wayne*. The communications alleged in paragraphs 900 and 1025 of the consolidated complaint just discussed with reference to Raeford also implicate Wayne. Furthermore, there are three additional internal Wayne emails alleged in the complaint in which Wayne employees admit discussing pricing information with Pilgrim's. *See* R. 5455 at 322 (¶ 1009); 327 (¶ 1029); 330 (¶ 1039); 334 (¶ 1053). Wayne characterizes these communications as "sporadic" and lacking in clarity. But again, that is beside the point on a motion to dismiss. What is relevant is what reasonable inferences can be drawn from the fact that Wayne employees were communicating about prices with competitors while prices were increasing. Such allegations are sufficient to plausibly allege that Wayne joined a conspiracy to fix prices.

*Case*. Similar to the other Defendants already discussed, Plaintiffs have discovered evidence that Case was exchanging pricing information with its competitors. Emails show that certain competitors had Case pricing information in 2013 and 2014 related to customer KFC. *See* R. 5455 ¶¶ 926, 977-78, 1027. Another email shows a Case employee providing pricing information related to KFC to a competitor. *Id.* ¶ 988. Yet another competitor possessed Case's historical pricing

---

[6] Raeford argues that other allegations of earlier communications are outside the alleged conspiracy period, *see* R. 5455 ¶¶ 898-99, or concern chicken carcasses instead of Broiler meat, *see id.* ¶ 900. But the questionable relevance of those allegations does not undermine the strength of the allegations about the 2015 communications.

information in 2016. *Id.* ¶ 1041. As with Sanderson, Raeford, and Wayne, this evidence of communications with competitors is sufficient to plausibly allege that Wayne joined a conspiracy to fix the prices of Broiler chicken.

***Fieldale***. Plaintiffs argue "the alleged facts regarding Bid-Rigging Defendants' information exchange network are overwhelming." R. 5710 at 40. True, in the preceding paragraphs the Court has reviewed plausible evidence of price exchange communications as to Defendants Sanderson, Raeford, Wayne, and Case. But the evidence against Fieldale is not of the same character. Indeed, Plaintiffs concede that "there are only two specific allegation referencing [Fieldale] by name in the bid-rigging/price-fixing section of the Complaint." *Id.* at 37. And neither of those allegations indicate that Fieldale communicated about prices with any of its competitors. Rather, the allegations are that Fieldale raised prices during the alleged conspiracy period, *see* R. 5455 ¶ 1086, and Fieldale's chairman stated at a 2014 board meeting that "the price of chicken is going down, but . . . our price is steady." *See id.* ¶ 1101. As discussed, raising prices in parallel with competitors is not sufficient by itself to plausibly establish participation in a conspiracy. Plaintiff argues that Fieldale's price increases are indicative of conspiracy because Fieldale implemented a price increase "nearly identical" to that of its competitors. *See* R. 5710 at 38. But this is just another way of alleging parallel conduct. The fact that the price increases were "nearly identical" is a difference of magnitude, not of kind. And in order for allegations of parallel conduct to contribute to a plausible claim of a conspiracy, there must be some kind of factual allegations beyond the parallel conduct alone.

Plaintiffs made such additional allegations with respect to the other Bid-Rigging Defendants by pointing to evidence of communications about prices. But Plaintiffs have made no similar allegations about Fieldale's conduct. The only other allegation about Fieldale is that its chairman noted that Fieldale was maintaining its prices in the face of declining market prices. The Court has noted in the past that it is folly to unilaterally increase prices in a commodity market. But an isolated statement from a Fieldale officer, that does not even reference any competitor, is not an indication that Fieldale was exchanging price information with its competitors. Perhaps if Plaintiffs had identified some evidence of Fieldale communicating with its competitors, the Court could reasonably infer that the chairman's statement was a form of signaling made with confidence based on those communications with competitors. But with zero factual allegations that Fieldale was communicating with its competitors, the chairman's statement does not carry sufficient weight to push the well-pled evidence of parallel conduct into the realm of plausibly demonstrating that Fieldale joined a price-fixing conspiracy.

## II. Counts 2 & 3: Supply Reduction and Georgia Dock

None of the Defendants ask the Court to reconsider its 2017 decision that Plaintiffs have plausibly alleged a conspiracy to reduce supply and a conspiracy to manipulate the Georgia Dock price index, *except* for Pilgrim's.[7] Pilgrim's argues that

---

[7] The Court's understanding is that Defendant Marshall Durbin was not a defendant in the case at the time the Court denied the motion to dismiss in Track One, so the Court would not have had the opportunity to evaluate the allegations against Marshall Durbin with respect to the supply reduction conspiracy, i.e., Count 2 in the Track Two consolidated complaint. (Marhsall Durbin is not alleged to be a Georgia

a recent Ninth Circuit case examined allegations of a supply reduction conspiracy similar to this case and affirmed a Rule 12(b)(6) dismissal. *See In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42 (9th Cir. 2022). Pilgrim's, however, merely cites the case and does not provide any analysis of the factual allegations, or why the similarity would support dismissal here. The Court is not required to address such an undeveloped argument.

In any event, the court in *DRAM* rejected the plaintiffs' allegations of "supply cuts against interest," which were an important part of the Court's analysis of the alleged supply reduction conspiracy in this case. In the opinion on the motion to dismiss in Track One, this Court noted that supply cuts in a commodity market, like that for Broilers, are indicative of prior agreement. The plaintiffs in the *DRAM* case made a similar allegation about the market at issue in that case, but the Ninth Circuit rejected it based on the particular facts of that case. This was largely because the court noted that when Samsung—the leading producer—unilaterally cut production, it nevertheless remained the market leader, "showing that restraining supply without an agreement was not as perilous as Plaintiffs claim." *Id.* at 49. That

Dock Defendant.) The Court has been unable to determine when or how Marshall Durbin became a defendant in the case. The consolidated complaint includes a "Chart of Direct Action Plaintiffs' Cases" which lists the docket entry number of the complaint for each Plaintiff. But a cursory check of some of the entries in this chart shows that Marshall Durbin is not named as a defendant in some of the complaints listed. *See*, *i.e.*, R. 2130 (complaint of Jetro Holdings, LLC). But even though it appears that the Court has never addressed the allegations about Marshall Durbin's participation in the supply reduction conspiracy, Marshall Durbin, like the other Defendants (besides Pilgrim's) has not filed a motion seeking dismissal from Count 2, so the Court does not have a reason to address in this opinion the plausibility of the supply reduction conspiracy allegations against Marshall Durbin.

circumstance is contrary to the allegations here, where Tyson attempted to unilaterally reduce supply prior to the conspiracy period and lost market share.

This is the only argument Pilgrim's makes that the Court should reconsider its earlier denial of the motions to dismiss the supply reduction conspiracy claims. It is insufficient.

Pilgrim's also concludes its brief by requesting that the Court dismiss Count 3, which is the count making a claim for a Georgia Dock conspiracy. But Pilgrim's makes no argument in support of this request, so the Court denies it.[8]

## III.   Count 1 & 6: Overarching Conspiracy

In Count 1, Plaintiffs claim that "Defendants engaged in [a] multi-faceted, overarching conspiracy . . . [to] artificially inflat[e] and maintain[] prices." Plaintiffs allege that Defendants accomplished this price-fixing by engaging in the following primary actions: (1) "coordinated unprecedented cuts in the supply of broiler chickens"; (2) "manipulated the Georgia Dock price index"; and (3) "rigged bids submitted to customers." *See* R. 544 at 407 (¶¶ 1321-22). Count 6 is a similar overarching conspiracy claim but includes only the alleged Georgia Dock conspiracy and the bid-rigging conspiracy.

To allege an unlawful conspiratorial agreement, a plaintiff must allege facts from which the Court can reasonably infer that the defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective."

---

[8] The Court, however, reminds all Plaintiffs that the Court granted summary judgment to all Defendants on the Georgia Dock conspiracy claims in Track One.

*Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 706 (7th Cir. 2011); *see also id.* ("That is, the circumstances of the case must reveal a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement."). Here, Plaintiffs have plausibly alleged that each Defendant participated in some unlawful price-fixing conduct. For instance, the Court has previously found the allegations of a supply reduction conspiracy and a conspiracy to manipulate the Georgia Dock to be plausible. As discussed, none of the Defendants ask the Court to reconsider those findings with regarding to those two conspiracies on these motions, save for Pilgrim's, which motion the Court has rejected. Additionally, the Court just explained its finding that Plaintiffs have plausibly stated a claim for a bid-rigging conspiracy in Counts 4 and 5.

Despite the plausibility of all three separate conspiracies, not all Defendants are alleged to have directly participated in all three:

| Chart of Participation | | | |
|---|---|---|---|
| Defendant Name | Supply Reduction | Georgia Dock | Bid-Rigging |
| Agri Stats | x | | |
| Amick | x | | |
| Foster | x | | |
| Mountaire | x | | |
| OK | x | | |
| Peco | x | | |
| Keystone | x | | |
| Harrison | x | x | |
| Claxton | x | x | x |
| Fieldale | x | x | x |
| Koch | x | x | x |
| Mar-Jac | x | x | x |
| Pilgrim's | x | x | x |
| Sanderson | x | x | x |
| Simmons | x | x | x |
| Tyson | x | x | x |
| Wayne | x | x | x |

| Chart of Participation | | | |
|---|---|---|---|
| Defendant Name | Supply Reduction | Georgia Dock | Bid-Rigging |
| Case | x | | x |
| George's | x | | x |
| Raeford | x | | x |
| Marshall Durbin | x | | x |
| Perdue | x | | x |

Most of the Plaintiffs argue that the fact that not all Defendants participated in all aspects of all three conspiracies is not fatal to their overarching conspiracy claims. However, as mentioned above, a group of Plaintiffs—the "Certain Restaurant DAPs"—disagree with their fellow Plaintiffs, and claim instead that *only* the Bid-Rigging Defendants are liable for the overarching conspiracies alleged in Counts 1 and 6. *See* R. 5710 at 43 ("Certain Restaurant DAPs do not seek to hold non-Bid-Rigging Defendants accountable for the bid-rigging and price-fixing conduct—either directly via Count 4 or through the overarching conspiracy back doors of Counts 1 and 6."). This is likely because, in addition to not being implicated in the bid-rigging conspiracy, almost *none* of the *non*-Bid-Rigging Defendants are alleged to have participated in the Georgia Dock conspiracy either.[9] In other words, all seven of the non-Bid-Rigging Defendants (other than Harrison) are alleged to have participated in *only* the supply reduction conspiracy—this group of seven Defendants being Agri Stats, Amick, Foster, Mountaire, OK Foods, Peco, and Keystone. The Court will continue to refer to this group of seven Defendants as "the group of seven Defendants."

---

[9] Defendant Harrison being the only non-Bid-Rigging Defendant alleged to have participated in the Georgia Dock conspiracy.

As discussed, Plaintiffs' overarching conspiracy claims are premised on the same factual allegations supporting the three underlying conspiracy claims. But because not all Defendants are alleged to have taken the same anticompetitive conduct, the analysis of whether Plaintiffs have stated a plausible overarching conspiracy claim against each Defendant depends on which of the three underlying conspiracies Defendants are plausibly alleged to have engaged in. For this reason, the overarching conspiracy claims against (a) the group of seven Defendants and (b) the Bid-Rigging Defendants, must be analyzed separately.

## A. The Group of Seven Defendants

Plaintiffs other than the "Certain Restaurant DAPs"—i.e., the "*non-Restaurant DAPs*"—continue to claim that the group of seven Defendants are liable for the overarching conspiracy even though they are only alleged to have participated in supply reduction. But the Court cannot see how the group of seven Defendants can be considered to have engaged in parallel conduct with the Bid-Rigging Defendants when the group of seven Defendants did not engage in the bid-rigging or Georgia Dock conspiracies. This is primarily because Plaintiffs allege that the supply reduction conspiracy was largely complete by the end of 2012, when the bid-rigging conspiracy was just beginning, and the Georgia Dock conspiracy did not begin in earnest until 2014. *See* R. 5455 ¶ 16. Plaintiffs allege that there were lingering effects of the supply reduction conspiracy beyond 2012, but concede that the only two "rounds" of significant supply reduction—implemented with "cuts to breeder flocks"—occurred from 2008-2009 and 2011-2012. *See id.* Plaintiffs allege that there were other

attempts to cut supply by other means in subsequent years, but these alleged attempts did not result in decreases in total market supply as did the breeder flock cuts in 2008-2009 and 2011-2012. For this reason, the Court considers the supply reduction conspiracy to be plausibly pled only through 2012.[10]

With the supply reduction conspiracy ending in 2012, the supply reduction conduct is not parallel to either the Georgia Dock conduct or the bid-rigging conduct. The bid-rigging conspiracy is alleged to have begun in August 2011 and lasted through 2019. And the Georgia Dock conspiracy is alleged to have occurred from 2014 until 2017. *See* R. 5455 ¶¶ 659, 706. Thus, the conspiratorial conduct of the group of seven Defendants who are alleged to have participated in *only* the supply reduction conspiracy is not materially contemporaneous with the rest of the conduct forming the overarching conspiracies, i.e., the Georgia Dock manipulation conduct and the bid-rigging conduct. And with the conduct being more consecutive than contemporaneous, the Court finds that the conduct is not "parallel" and so is *not* "circumstantial evidence of an agreement not to compete." *See Twombly*, 550 U.S. at 553.

However, even if the supply reduction conduct by the group of seven Defendants could be considered "parallel" to the ensuing Georgia Dock manipulation conduct and bid-rigging conduct, the allegations of parallel conduct are "merely consistent with," but do not "plausibly suggest" the existence of an agreement. *Id.* at

---

[10] This finding is also in accordance with the Court's findings on summary judgment in Track One.

557. As discussed, while parallel conduct makes a conspiratorial agreement "conceivable," parallel conduct, without more, does not make an agreement "plausible." Plaintiffs are still required to identify additional conduct beyond parallel conduct—often referred to as "plus factors"—to "nudge" Plaintiffs' allegation of agreement "across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570.

With respect to the group of seven Defendants, the question is whether the "plus factor" allegations that make plausible the claim that they participated in a supply reduction conspiracy also make plausible the claim for an overarching conspiracy including the bid-rigging conduct and the Georgia Dock manipulation conduct committed by the Bid-Rigging Defendants. The Non-Restaurant DAPs' argue that the plus factor allegations are sufficient to plausibly state both claims because if the group of seven Defendants was plausibly communicating with the Bid-Rigging Defendants about a supply reduction conspiracy from 2008-2012, it is just as plausible that they knew about and agreed to the later Georgia Dock and bid-rigging conspiracy. In support of this argument, the Non-Restaurant DAPs reference the Court's explanation in the order denying the 2017 motion to dismiss that not all participants in a conspiracy must be alleged to take the same actions or have the precisely same knowledge to make a conspiratorial agreement plausible. *See* R. 5769 at 23 (citing *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 803 (N.D. Ill. 2017) ("Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be

performing different tasks to bring about the desired result.")). They argue further that the suspicious communications regarding supply reduction are indicative of an overarching conspiracy to fix Broiler prices, even if the group of seven Defendants were not directly involved in the Georgia Dock and bid-rigging conduct. In other words, the Non-Restaurant DAPs argue that communications about one kind of price fixing (i.e., supply reduction) are sufficient to plausibly allege agreement about different kinds of price fixing (Georgia Dock and bid-rigging) when the communications are among the same actors.

The fundamental problem with this argument is that the Non-Restaurant DAPs identify no plus factor allegations permitting the Court to make the inferential leap from (a) the agreement of the group of seven Defendants to a supply reduction conspiracy, to (b) an agreement including Georgia Dock and bid-rigging. The plus factor allegations that the Bid-Rigging Defendants participated in the supply reduction conspiracy and then went on to participate in the bid-rigging conspiracy (with some of them also joining the Georgia Dock conspiracy), say nothing about the intent of the group of seven Defendants to join anything beyond the supply reduction conspiracy. Without plus factor allegations permitting the inference that the group of seven Defendants were aware of the Georgia Dock and bid-rigging conspiracies such that they consciously committed to those conspiracies, the overarching conspiracy claims against the group of seven Defendants must fail.

A more straightforward example of the kind of factual allegations missing with respect to the overarching conspiracy claim against the group of seven Defendants is

a bank robbery conspiracy. In a bank robbery conspiracy, the get-away driver might not be told the details of how the bank will be robbed because he doesn't need that knowledge in order to perform his role as get-away driver. But the driver's knowledge about the get-away plan *implies the existence of* a conspiracy to rob a bank. If there is a get-away plan, there must also be a plan to commit a robbery from which there is a need to flee. The ability to infer knowledge of a bank robbery from knowledge of a get-away makes the allegations against the get-away driver sufficient to plausibly allege the get-away driver's participation in the entire conspiracy.

Similarly, in the opinion on the motion to dismiss in Track One, the Court found that the supply reduction co-conspirators' lack of knowledge of how specifically each coconspirator will reduce supply did not undermine the plausibility of the conspiracy claim. But that was true because the specific method of supply reduction was inconsequential to the joint goal to reduce supply. In other words, the co-conspirators only needed to know that they were all going to reduce supply, not how they were going to go about doing it. Moreover, one co-conspirator's reduction of supply implies knowledge that the other co-conspirators would also reduce supply because in a commodity market it is economically infeasible to unilaterally reduce supply, making such an attempt implausible. Commodities are fungible, by definition. So, assuming no decrease in demand (an undisputed fact in the Broiler market), a reduction of supply by one competitor should generally immediately be filled by another competitor. For that reason, when a commodity producer reduces supply, this is at least some indication that the producer knows other producers will

also be reducing supply. These circumstances are analogous to the get-away driver whose knowledge of the get-away plan implies that existence of a bank robbery conspiracy—the get-away plan doesn't make sense without it.

The same cannot be said of the relationship of knowledge and action among the three different conspiracies alleged in Counts 1 and 6 with respect to the group of seven Defendants. Participating in a supply reduction conspiracy does not necessarily imply the existence of a conspiracy to manipulate the Georgia Dock or a conspiracy to rig bids, and vice versa. Without it being plausible that each of the underlying conspiracies implies the existence of the other, there is no basis for the Court to infer the existence of an overarching conspiracy based on the mere existence of the underlying conspiracies.

Not only do the three conspiracies *not* logically imply the existence of the others, Plaintiffs allege that each of the three conspiracies stands on its own. In other words, Plaintiffs allege that the conspiracy to reduce supply was successful in artificially increasing prices. They also allege that the conspiracy to manipulate the Georgia Dock was successful without the need for success in the supply reduction conspiracy. And while Plaintiffs allege that Defendants sometimes used prices from the Georgia Dock in rigging bids, there is no indication that this was *necessary* for the bid-rigging conspiracy to succeed or that mere use of the Georgia Dock prices implied knowledge that those prices were fixed. The fact that Plaintiffs allege that each conspiracy is self-sufficient undermines their argument that the mere existence

30

of all three conspiracies plausibly implies that the group of seven Defendants agreed to an overarching conspiracy beyond the supply reduction conspiracy.

Certainly, it is possible or conceivable that three self-sufficient conspiracies could be parts of an overarching conspiracy to increase prices. But there is nothing about the evidence supporting each individual conspiracy indicating that the group of seven Defendants were in agreement with all of it, tacitly or expressly. Without factual allegations that point to a commitment by the group of seven Defendants to more than just supply reduction—specifically to manipulating the Georgia Dock and bid-rigging—then Counts 1 and 6 must be dismissed with respect to the group of seven Defendants.

*     *     *     *

Before moving on to address Counts 1 and 6 with respect to the Bid-Rigging Defendants, the Court pauses to note that in order to make both (i) this finding with respect to Counts 1 and 6 and the group of seven Defendants, and (ii) the earlier finding regarding "proper plaintiffs" in Counts 4 and 5, the Court was required to determine what inferences are reasonably made from the facts alleged. And in both instances, Plaintiffs were asking the Court to make an inferential leap. First, in Counts 4 and 5, Plaintiffs asked the Court to find that the factual allegations showing Bid-Rigging Defendants exchanging price information about *some* Plaintiffs was sufficient to infer that the Bid-Rigging Defendants were exchanging price information about *all* Plaintiffs. Second, in Counts 1 and 6, Plaintiffs asked the Court to find that the factual allegations showing the group of seven Defendants engaged in a supply

reduction conspiracy with the Bid-Rigging Defendants were sufficient to infer that the group of seven Defendants were also engaged in an overarching conspiracy including bid-rigging with the Bid-Rigging Defendants.

While these are both inferences, the first is reasonable, and the second is not. The first was reasonable because it only requires imagining that the Bid-Rigging Defendants are engaging in the *same* conduct with respect to a larger group of customers. The same incentives and risks associated with exchanging pricing information about the Plaintiffs identified in the communications alleged in the complaint would also be associated with exchanging pricing information about additional Plaintiffs who weren't so identified. That is a reasonable inference, so Plaintiffs' claims in Counts 4 and 5 are plausible.

By contrast, in analyzing the overarching conspiracy pled in Counts 1 and 6, the Court is asked to make an inferential leap from one kind of conduct to a *different* kind of conduct, i.e., to infer that defendants who reduce supply must also be conspiring to rig bids. Plaintiffs make no factual allegations—no parallel conduct or plus factors—suggesting that the group of seven Defendants engaged in bid-rigging or a bid-rigging conspiracy. Without such factual allegations, the Court is left with the bare fact of the supply reduction conduct itself, and Plaintiffs' argument that engaging in supply reduction in-and-of-itself is an indication that the group of seven Defendants continued to conspire with Bid-Rigging Defendants when they moved on to the bid-rigging conspiracy after the supply reduction conspiracy ended. But as the Court discussed, there is nothing about supply reduction conduct that necessarily

32

indicates participation in the bid-rigging conspiracy. Plaintiffs have not made any argument or allegation providing the Court a basis to infer the leap from one form of conduct to another.

At bottom, it is plausible that factual allegations demonstrating that certain defendants are exchanging pricing information about certain customers are also exchanging pricing information about other customers. It is not similarly plausible that defendants who are engaged in a supply reduction conspiracy are also engaged in a bid-rigging conspiracy. And this is because Plaintiffs have not identified any factual allegations permitting that Court to make the necessary inference reasonable or the claim plausible.

*　　*　　*　　*

## B.    The Bid-Rigging Defendants

The analysis is different with respect to the Bid-Rigging Defendants. As shown in the chart above, all of the Bid-Rigging Defendants are alleged to have participated in both the supply reduction and bid-rigging conspiracies, with a sub-set of the Bid-Rigging Defendants also allegedly conspiring to fix the Georgia Dock. And notably, the Georgia Dock and Bid-Rigging conspiracies were contemporaneous.

### 1.    Supply Reduction and Bid-Rigging

It is entirely plausibly that the supply reduction conspiracy and the bid-rigging conspiracy constituted an overarching conspiracy among the Bid-Rigging Defendants. The factual allegations supporting both the supply reduction and bid-rigging conspiracies are strong. The factual allegations supporting the bid-rigging conspiracy

33

include extensive communications among many of the Bid-Rigging Defendants explicitly exchanging price information in the context of maintaining high Broiler prices to the detriment of Plaintiffs' businesses. Furthermore, all the Bid-Rigging Defendants are plausibly alleged to have participated in both conspiracies, and the bid-rigging conspiracy followed right on the heels of the supply reduction conspiracy, indicating a connection between them.

Unlike the factual allegations with respect to the group of seven Defendants, here the Bid-Rigging Defendants are alleged to have acted in parallel both in kind and in time. Moreover, there are strong allegations that the Bid-Rigging Defendants communicated directly and expressly about rigging bids and fixing prices. With the Court having found that Plaintiffs have plausibly alleged the Bid-Rigging Defendants agreed to both reduce supply and then to rig bids and fix prices, it is no great inferential leap to find that these allegations also plausibly demonstrate a larger overarching conspiracy to fix prices that included both the supply reduction and bid-rigging conduct.

The Bid-Rigging Defendants argue that Plaintiffs' overarching conspiracy claim is "no more than a bare allegation that the allegedly illicit conduct work in tandem." R. 5599 at 11. What Defendants really mean is that Plaintiffs "do not point to any meeting, communication, or event" expressly embodying the alleged overarching conspiracy. *Id.* at 2. But as the Court noted earlier, Plaintiffs do not have the burden to prove their claims at the pleading stage. Rather, plausible inferences can win the day. And here, the strength of the plus factors supporting the supply

reduction and bid-rigging conspiracies—particularly the economic evidence of supply reduction and the express communications indicating bid-rigging and price fixing—with the bid-rigging conspiracy beginning just as the supply reduction conspiracy was ending, is strong evidence that the two conspiracies are connected in the context of the factual allegations showing that the Bid-Rigging Defendants actually engaged in bid-rigging (unlike the group of seven Defendants). This evidence is sufficient to plausibly state a claim for an overarching conspiracy even though there is no direct evidence of an agreement connecting the supply reduction and bid-rigging conspiracies.

Defendants also argue that the overarching conspiracy is not plausible for several additional reasons. First, they argue that the methods were "entirely different." *See* R. 559 at 11. But the fact of differing methods does not necessarily undermine the plausibility of a conspiracy allegation. The question is what can be inferred from the fact of differing methods. Here, while supply reduction and bid-rigging are undeniably different methods, it is not surprising that these would be the methods of choice for Broiler producers interested in fixing the price of Broiler chicken. They are at least plausibly complimentary methods.

Defendants also argue that the alleged participants and time periods of the underlying conspiracies are so different as to undermine any allegation of an overarching conspiracy. *See* R. 5599 at 12. The Court has already addressed the different time periods, which was in part a basis to grant the motion to dismiss the overarching conspiracy claim against the group of seven Defendants. With respect to

35

the Bid-Rigging Defendants, however, the plus factor allegations are strong enough overcome the fact that the two underlying conspiracies occurred consecutively instead of simultaneously. Furthermore, the fact that Plaintiffs allege Defendants' anticompetitive strategies evolved over time is not an implausible scenario, and the fact that the two alleged conspiracies followed each other immediately indicates some coordination among the alleged participants.

This is especially true, because contrary to Defendants' argument, it is the same Bid-Rigging Defendants alleged to have participated in both conspiracies combining into an overarching conspiracy. The Court has already accounted for the fact that the group of seven Defendants is not alleged to have participated in the bid-rigging or Georgia Dock conspiracies. That leaves the group of Bid-Rigging Defendants that allegedly participated in both, a fact which actually increases the plausibly of Plaintiffs' claims.

Defendants also argue that "Plaintiffs do not explain how (or why) all Defendants would conspire to rig bids on small-bird products they do not even sell." R. 5599 at 12. But, as Plaintiffs point out, "the Complaint makes clear, [that] Bid-Rigging Defendants' bid-rigging and price-fixing conduct was not restricted just to small birds." R. 5710 at 21 (citing the complaint, R. 544 ¶1086 ("But the price increases the Bid Customers experienced were not just limited to 8 piece and whole bird products. It extended to all chicken products.")). True, the criminal indictments were focused on rigging bids of small bird products. But even if those were the only allegations in the complaint, they would likely be sufficient to plausibly allege bid-

rigging and price-fixing beyond the small-bird market. In any event, the factual allegations in the consolidated complaint are not limited to small-bird transactions. Rather, the allegations in the complaint of bid-rigging and price-fixing plausibly implicate the Defendants who did not produce small-bird products.

Lastly, Defendants cite several cases they argue should be interpreted to support their argument that Plaintiffs' claims should be dismissed. *See* R. 5599 at 13-16. But none of those cases establish a hard and fast principle by which a court can determine whether an "overarching" conspiracy is plausible. Rather, the courts in all those cases were doing what this Court has done here—analyzing the allegations regarding underlying conspiracies to determine whether they also add up to a plausible overarching conspiracy. And unsurprisingly, those previous courts, like this Court, dismissed some claims and retained others. At bottom, those cases have little to say about the plausibility of the particular facts and claims in this case.

### 2. Georgia Dock and Bid-Rigging

Unlike the supply reduction conspiracy, not all Bid-Rigging Defendants are alleged to have participated in the Georgia Dock conspiracy. Specifically, the Georgia Dock conspiracy is predicated on the allegation that the Georgia Department of Agriculture solicited reports of Broiler prices from Broiler producers in Georgia only, most of whom eventually formed the Poultry Market News Advisory Council to advise the Georgia Department of Agriculture and the staff of the Georgia Dock price index. In other words, the non-Georgia Dock Defendants could not submit prices to the

37

Georgia Dock, so it was impossible for the non-Georgia Dock Defendants to directly participate in the Georgia Dock conspiracy.

Nevertheless, Plaintiffs have alleged that the Bid-Rigging Defendants sometimes used the allegedly inflated Georgia Dock prices as the prices in their rigged bids and fixed price offers to their customers. Moreover, the Court has already found that the allegations of communications about bid-rigging and price-fixing among the Bid-Rigging Defendants is strong. While Plaintiffs have not identified any communications expressly connecting the Georgia Dock conspiracy to the bid-rigging conspiracy, both conspiracies allegedly occurred during the same time period and are plausibly directed at the same goal. These circumstances, combined with the strength of the allegations of communications among the Bid-Rigging Defendants, are sufficient to plausibly allege that the Bid-Rigging Defendants engaged in the overarching conspiracies alleged in both Counts 1 and 6.

### C.    Defendants Harrison and Fieldale

Harrison is alleged to have participated in both the supply reduction conspiracy and the Georgia Dock conspiracy. Harrison is not alleged to have participated in the bid-rigging conspiracy. This means that there are no plus factor allegations in the complaint that Harrison participated in the price exchange communications among the Bid-Rigging Defendants. Nor have Plaintiffs made any argument why Harrison's alleged participation in the Georgia Dock conspiracy is sufficient to plausibly allege Harrison's participation in the bid-rigging conspiracy. Without such factual allegations, there is no plausible basis to infer that Harrison

participated in an overarching conspiracy. Therefore, Counts 1 and 6 against Harrison are dismissed.

Similarly, because the Court found that the allegations were insufficient to plausibly demonstrate the Fieldale participated in the bid-rigging conspiracy, the only plausible allegations against Fieldale are the supply reduction and Georgia Dock conspiracy allegations. This puts Fieldale in an analogous position to Harrison, such that Counts 1 and 6 against Fieldale are also dismissed.

## IV. RICO and State Law Claims

Lastly, the Court denies Defendants' motions to dismiss Plaintiffs' RICO and state law claims. The Court's rulings on the Sherman Act claims are sufficient to identify which parties must participate in renewed discovery regarding Counts 1, 4, 5, and 6. The scope of discovery will not be altered by deferring rulings on arguments regarding the viability of Plaintiffs' RICO and state law claims until summary judgment, so the motions to dismiss the state law claims are denied without prejudice. If any party believes that a ruling on a RICO or state claim is necessary in order to properly define the scope of discovery, they have leave to bring such a motion after meeting and conferring with the other parties.

## Conclusion

Therefore, Defendants' motions [5587] [5589] [5592] [5595] [5598] [5601] [5605] [5607] and [5610] are denied in part and granted in part as follows:

- Pilgrims' motion to dismiss Counts 2 and 3 is denied;

39

- the motions to dismiss Counts 1 and 6 are granted as to Agri Stats, Amick, Foster, Mountaire, OK Foods, Peco, Keystone, Harrison, and Fieldale;

- the motions to dismiss Counts 1 and 6 are denied as to Case, Claxton, George's, Raeford, Koch, Mar-Jac, Marshall Durbin, Perdue, Pilgrim's, Sanderson, Simmons, Tyson, and Wayne;

- the motions to dismiss Counts 4 and 5 are denied as to Case, Claxton, George's, Raeford, Koch, Mar-Jac, Marshall Durbin, Perdue, Pilgrim's, Sanderson, Simmons, Tyson, and Wayne; and

- and the motions to dismiss the RICO and state law claims in Counts 9-36 are denied without prejudice.

The parties should file a joint status report addressing discovery and other next steps due 3/5/2025. Lastly, Plaintiffs are ordered to file a status report by 2/19/2025 identifying the docket entries in which Marhsall Durbin was first added as a defendant, and identifying Marshall Durbin's counsel.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: February 11, 2025